**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| JENNIFER VANDERSTOK, *et al.*,<br><br>                     *Plaintiffs*,<br><br>    v.<br><br>MERRICK GARLAND, in his official<br>capacity as Attorney General of the United States;<br>*et al.*,<br><br>                 *Defendants*. | Civil Action No. 4:22-cv-00691-O |

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR
## MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION .............................................................................................. 1

STATEMENT OF FACTS ..................................................................................... 2

I.   THE AGENCIES ARE CONFINED TO ENFORCING THE
     NATIONAL FIREARMS ACT AND THE GUN CONTROL ACT
     WITHIN THE LIMITS ESTABLISHED BY CONGRESS ......................... 2

II.  THE AGENCIES PLAN TO IMPLEMENT SIGNIFICANT
     CHANGES TO FIREARM REGULATIONS, INCLUDING A NEW
     DEFINITION OF "FIREARM" ITSELF, ON AUGUST 24, 2022 ............. 5

     A.   The Biden Administration.................................................... 5

     B.   Frame or Receiver................................................................ 7

     C.   Weapon Parts Kits................................................................ 8

III. THE ADMINISTRATIVE PROCEDURE ACT.......................................... 10

ARGUMENT....................................................................................................... 12

I.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS ................. 13

     A.   The Final Rule Exceeds the Bounds of the Agencies'
          Congressionally Delegated Authority................................. 13

          i.    Frames or Receivers................................................. 14

          ii.   Weapon Parts Kits .................................................. 19

     B.   The Final Rule Defies Separation of Powers, Implicating the
          Major Questions Doctrine.................................................... 21

     C.   The Final Rule is Not Entitled to *Chevron* Deference......................... 24

     D.   The Final Rule is not a Logical Outgrowth of the Proposed
          Rule ...................................................................................... 28

     E.   The Final Rule Represents a Drastic Change in the Agencies'
          Position Without Adequate Explanation ............................. 29

II.   PLAINTIFFS' WILL SUFFER IRREPARABLE INJURY IF THIS
      INJUNCTION IS NOT GRANTED ............................................................... 33

      A.    The Final Rule Will Put Tactical Machining out of Business ........... 33

III.  PLAINTIFFS' INJURY OUTWEIGHS ANY HARM TO
      DEFENDANTS OR THE PUBLIC ................................................................ 37

CONCLUSION ........................................................................................................... 38

## TABLE OF AUTHORITIES

**Case**                                                                                      **Page(s)**

*Abramski v. United States*,
   573 U.S. 169, 191  2014)............................................................................. 15, 17

*Air Transp. Ass'n of Am. v. Civil Aeronautics Bd.*,
   732 F.2d 219 (D.C. Cir. 1984)..................................................................... 12

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
   141 S. Ct. 2485 (2021) ................................................................................ 38

*Allison Engine Co., Inc. v. U.S. ex rel. Saunders*,
   553 U.S. 662 (2008) .................................................................................... 17

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*,
   875 F.2d 1174 (5th Cir. 1989) ..................................................................... 36

*Barnhart v. Sigmon Coal Co.*,
   534 U.S. 438 (2002) .................................................................................... 16

*California v. ATF*,
   No. 3:20-cv-06761, 2020 WL 9849685, (N.D. Cal. Nov. 30, 2020)...................... 21, 33

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) .................................................................................... 25, 26

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979) .................................................................................... 11

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) .................................................................................... 13

*City of Dallas, Texas v. Hall*,
   2008 WL 11350041 (N.D. Tex. July 28, 2008).................................................. 40

*City of El Cenizo v. Texas*,
   890 F.3d 164 (5th Cir. 2018)....................................................................... 14

*City of Waukesha v. EPA*,
   320 F.3d 228 (D.C. Cir. 2003)..................................................................... 12

*Cobell v. Kempthorne*,
   455 F.3d 301 (D.C. Cir. 2006)..................................................................... 40

*Collins v. Yellen*,
  141 S. Ct. 1761 (2021) ................................................................ 16

*Conn. Nat'l Bank v. Germain*,
  503 U.S. 249 (1992) .................................................................. 17

*Dist. 50, United Mine Workers of Am. v. Int'l Union, Union Mine Workers of Am.*,
  412 F.3d 165 (D.C. Cir. 1969)........................................................ 40

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ............................................................... 13, 31

*Envtl. Def. Ctr., Inc. v. EPA*,
  344 F.3d 832 (9th Cir. 2003) ................................................ 11, 12, 29

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120(2000) .................................................................. 23

*Franciscan All., Inc. v. Burwell*,
  227 F. Supp. 3d 660 (N.D. Tex. 2016) ........................................... 14, 35

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) .................................................................. 24

*Gun Owners of Am. v. Garland*,
  19 F.4th 890 (6th Cir. 2021).......................................................... 3, 14

*Hanly v. Mitchell*,
  460 F.2d 640 (2d Cir. 1972) ....................................................... 13, 29

*Idaho Farm Bureau Fed'n v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995) ......................................................... 30

*Jacksonville Port Auth. v. Adams*,
  556 F.2d 52 (D.C. Cir. 1997).......................................................... 39

*Janvey v. Alguire*,
  647 F.3d 585 (5th Cir. 2011) ......................................................... 38

*Loving v. United States*,
  517 U.S. 748 (1996) .................................................................. 4, 15

*Mid Continent Nail Corp. v. United States*,
  846 F.3d 1364 (Fed. Cir. 2017) ....................................................... 31

*Milsen Co. v. Southland Corp.*,
  454 F.2d 363 (7th Cir. 1971) ......................................................... 36

iv

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*,
   463 U.S. 29 (1983) ................................................................... 35

*N. Mariana Islands v. United States*,
   686 F. Supp. 2d 7 (D.D.C. 2009)............................................. 39

*Ne. Md. Waste Disposal Auth. v. EPA*,
   358 F.3d 936 (D.C. Cir. 2004)................................................. 12

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................ 14

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 211 (2022) .............................................................. 4

*OSHA*,
   142 S. Ct. 661 (2022) .............................................................. 24

*Perez v. Mortgage Bankers Ass'n*,
   575 U.S. 92 (2015) .................................................................. 11

*Peyton v. Reynolds Assocs.*,
   955 F.2d 247 (4th Cir. 1992) .................................................. 15

*Rubin v. United States*,
   449 U.S. 424 (1981) ................................................................ 17

*Solite Corp. v. EPA*,
   952 F.2d 473 (D.C. Cir. 1991)................................................ 12

*Syracuse v. ATF*, No.
   1:20-cv-06885, 2021 WL 23326, (S.D.N.Y. Jan. 29, 2021)................................ 14, 16

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
   989 F.3d 368 (5th Cir. 2022) .................................................. 30

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) .................................................. 38

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1992) ................................................................ 38

*Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*,
   805 F.2d 351 (10th Cir. 1986) ................................................ 36

*United States v. Apel*,
   571 U.S. 359 (2014) ................................................................ 26

*United Student Aid Funds, Inc. v. King*,
   200 F. Supp. 3d 163 (D.D.C. 2016)...........................................................   35

*United Student Aid Funds, Inc. v. Devos*,
   237 F. Supp. 3d 1 (D.D.C. 2017)...........................................................   32, 33

***Wages and White Lion Invs., LLC v. FDA*,**
   **16 F.4th 1130 (5th 2021)** ...........................................................   **38**

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ...........................................................   *Passim*

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ...........................................................   23

*Wooden v. United States*,
   142 S. Ct. 1063 (2022) ...........................................................   27

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ...........................................................   4

**Constitutional Provisions**

U.S. Const. Amend. II.................................................................................   4
U.S. Const. Art. I .......................................................................................   4
U.S. Const. Art. I, § .................................................................................   13, 15, 22
U.S. Const. Art. II, § ................................................................................   3 15

**Statutes**

5 U.S.C. § 533(c) ....................................................................................   28
5 U.S.C. § 551 ..........................................................................................   9
5 U.S.C. § 551(5) .....................................................................................   9
5 U.S.C. § 553(b) .....................................................................................   11
5 U.S.C. § 553(b)(3) ................................................................................   12
5 U.S.C. § 553(b)(A) ...............................................................................   9
5 U.S.C. § 553(c) .....................................................................................   10
5 U.S.C. § 702 ..........................................................................................   9
5 U.S.C. § 705 ..........................................................................................   1
5 U.S.C. § 706 ..........................................................................................   29
5 U.S.C. § 706(2)(A) ...............................................................................   27

5 U.S.C. § 706(2)(B) ................................................................... 21

5 U.S.C. § 706(2)(C) ................................................................... 14, 21

18 U.S.C. § 921(a)(3) ................................................................... *Passim*

18 U.S.C. § 921(a)(3)(A) ............................................................. *Passim*

18 U.S.C. § 921(a)(3)(B) ............................................................. 15, 24

18 U.S.C. § 922(g)(1) ................................................................... 25

18 U.S.C. § 924(a)(1)(D) ............................................................. 25

18 U.S.C. § 926(a) ....................................................................... 3

26 U.S.C. § 7801(a)(2)(A) ........................................................... 3, 13

**Regulations**

27 C.F.R. § 478.11 ....................................................................... 3, 8

*Definition of "Frame or Receiver" and Identification of Firearms* ("Final
Rule"), 87 Fed. Reg. 24,652 (Apr. 26, 2022) ......................... 5

*Definition of "Frame or Receiver" and Identification of Firearms* ("Proposed
Rule"), 86 Fed. Reg. 27,720 (May 21, 2021) ......................... 7

*Title and Definition Changes,*
43 Fed. Reg. 13,531, 13,537 (Mar. 31, 1978) ....................... 3, 6

**Other Authorities**

1968 U.S.C.C.A.N. 2112, 2200 ................................................. 3, 15, 22, 23

S. Rep. No. 90-1097 (1968) ....................................................... 2, 8

111 Cong. Rec. 5527 (March 22, 1965) ..................................... 14

*Are there restrictions on who can purchase receiver blanks?* ................ 17

ATF COMMENTS ON PROPOSED RULE 2021R-05 ....................... 7

ATF, REGULATORY IMPACT ANALYSIS AND FINAL REGULATORY FLEXIBILITY
ANALYSIS 33 (2022) ............................................................. 5, 36

*Are "80%" or "unfinished" receivers illegal?* ......................... 16, 18, 30

*Biden announces new rules for 'ghost guns,' introduces ATF director nominee,* CBS NEWS (April 11, 2022) ...................................................... 6

*Biden Considers executive actions on guns, calls on Congress to pass weapons ban,* REUTERS (Mar. 23, 2021), ................................................. 6

*Fact Sheet: The Biden Administration Cracks Down on Ghost Guns,* THE WHITE HOUSE, (April 11, 2022) ............................................................ 37

Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms,* 54 St. Mary's L.J., at 16 (Apr. 11, 2022) ................................................. 4, 23

*National Firearms Act,* ATF ............................................................................ 2

*Special Procedures for Shipping Firearms,* UPS, ...................................... 34

*Stop Gun Violence: Ghost Guns, Hearing before the Subcomm. on the Constitution, Comm. on the Judiciary,* 117th Cong. 8 (2021) (statement of Ashley Hlebinsky, Curator Emerita & Senior Firearms Scholar, Cody Firearms Museum, President, The Gun Code, LLC), ............................... 4, 32

*The Biden Plan to End Our Gun Violence Epidemic,* BIDEN-HARRIS DEMOCRATS, https://joebiden.com/gunsafety/ (last visited Aug. 10, 2022) .......... 5, 6

*Training Aid for the Definition of Frame or Receiver & Identification of Firearms,* 35, 37

## INTRODUCTION

The Department of Justice ("DOJ") and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") (collectively, "Agencies") have far overstepped their bounds, attempting to rewrite federal law by creating a new definition of "firearm" that exceeds any mandate or delegation by Congress. In addition to acting in excess of their authority, the Agencies have promulgated their Final Rule in a manner that violates administrative law, and will immediately cause irreparable harm to producers, manufacturers, retailers, and individuals in this District and across the United States. If the Final Rule goes into effect, it will cause substantial economic loss (up to and including permanent closure) of numerous businesses, and severely undermine (if not destroy) the historical American pastime of firearm self-manufacture; not to mention the regulatory uncertainty that the entire country will suffer given the vague and unclear nature of the Final Rule. If implemented and enforced, the Agencies' Final Rule may even subject peaceable Americans and their businesses to criminal penalties for merely possessing objects that have never been regulated as if they were firearms. Therefore, pursuant to Federal Rule of Civil Procedure 65(a) and 5 U.S.C. § 705, Plaintiffs Jennifer VanDerStok; Michael G. Andren; Tactical Machining, LLC; and Firearms Policy Coalition, Inc., file this Brief in Support of Their Motion for Preliminary Injunction, asking this Court to enjoin Defendants from implementing the Final Rule, or to delay the effective date of the Final Rule, until this case can run its course.

In effect, Plaintiffs merely ask this Court to maintain the status quo that has been in place for decades while the Court reviews the propriety of the Agencies' Final Rule.

**STATEMENT OF FACTS**

I.   **THE AGENCIES ARE CONFINED TO ENFORCING THE NATIONAL FIREARMS ACT AND THE GUN CONTROL ACT WITHIN THE LIMITS ESTABLISHED BY CONGRESS**

Congress enacted the National Firearms Act ("NFA") in 1934 "[t]o provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate transportation thereof." National Firearms Act of 1934, Ch. 757, 48 Stat. 1236 (1934). The NFA "imposed a tax on the making and transfer of firearms defined by the Act, as well as a special (occupational) tax on persons and entities engaged in the business of importing, manufacturing, and dealing in NFA firearms."[1] "Firearms subject to the 1934 Act included [short barreled] shotguns and rifles . . . , certain firearms described as 'any other weapons,' machine guns, and firearm mufflers and silencers."[2]

Congress then enacted the Gun Control Act ("GCA") in 1968, which amended the NFA and established a four-part definition of what constitutes a "firearm." *See* 18 U.S.C. § 921, *et seq.* As defined in the GCA, and as it has stood since 1968, "[t]he term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921(a)(3).

The 1968 definition superseded the previous definition where "any part or parts of such a weapon [were] included. It [was] [] found that it [was] impractical to have controls over each small

---

[1]      *National Firearms Act*, ATF, https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited Aug. 17, 2022).

[2]      *Id.*

part of a firearm. Thus, the revised definition substitute[d] only the major parts of the firearm (that is, frame or receiver) for the words 'any part or parts.'" S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2200.

The term "frame or receiver" in subsection (B) is not defined by statute. The Agencies established a definition for "frame or receiver" in a 1978 regulation as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11; *see also Title and Definition Changes*, 43 Fed. Reg. 13,531, 13,537 (Mar. 31, 1978). The Agencies have not sought to change the regulatory definition of "frame or receiver" since.

Congress delegated the Attorney General authority to enforce both the NFA and GCA. *See* 26 U.S.C. § 7801(a)(2)(A) ("The administration and enforcement of the following provisions of this title shall be performed by or under the supervision of the Attorney General[.]"); *and* 18 U.S.C. § 926(a) ("The Attorney General may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter[.]"). The Attorney General then delegated this power to the ATF "to administer, enforce, and exercise the functions and powers of the Attorney General with respect to" both statutes. *Gun Owners of Am. v. Garland*, 19 F.4th 890, 897 (6th Cir. 2021).

The power to craft legislation and create law rests solely with Congress. *See* U.S. CONST. Art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States."). On the other hand, the president, and by extension the Executive Branch agencies under his purview, "shall take Care that the Laws be faithfully executed." U.S. CONST. Art. I, § 3. 147. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). This separation of powers is "a basic principle of our constitutional

scheme" under which "one branch of the Government may not intrude upon the prerogatives of another." *Loving v. United States*, 517 U.S. 748, 757 (1996). Moreover, under the delegation doctrine, agencies may only act "pursuant to a *clear delegation*" from Congress. *West Virginia v. EPA*, 142 S. Ct. 2587, 2616 (2022) (emphasis added).

Congress's legislation regulating firearms must also be viewed against the backdrop of our national tradition, and the protection of the right to keep and bear arms by the Second Amendment. U.S. CONST. Amend. II; *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2157 (2022) (Alito, J., concurring) ("*Heller* found that the [Second] Amendment codified a preexisting right and that this right was regarded at the time of the Amendment's adoption as rooted in 'the natural right of resistance and self-preservation.'") (quoting *District of Columbia v. Heller*, 554 U.S. 570, 594 (2008)). Just last term the Supreme Court reiterated the "text, as informed by history" lens with which to view the Second Amendment. *Bruen*, 142 S. Ct. at 2127. The act of self-manufacturing weapons at home is not a novel concept—in fact, this tradition pre-dates the Founding of the United States and helped secure America's freedom in the Revolutionary War.[3] "Privately made firearms have been in existence since the first ignition system was developed close to 500 years ago, in the 1400s."[4] Even in the earliest days of our country,

> Americans have been busily manufacturing and repairing arms. . . . The skill was always valued and in demand, and many Americans made their own arms rather than depend on others. . . . [T]he tradition of building arms for personal use is deeply rooted in American history, and [] there is no tradition of regulating self-built arms.[5]

---

[3] During the Revolutionary War, "[t]o sustain themselves against a large and well-supplied British military throughout the eight-year war, the Americans relied on gunsmiths, individuals with knowhow from working on their own arms, and Americans who were willing to learn the art of arms manufacturing." Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J., at 16 (Apr. 11, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3960566.

[4] *Stop Gun Violence*, at 4.

[5] *American Tradition of Self-Made Arms*, at 1.

The act of individuals self-manufacturing firearms for personal, lawful uses is a tradition steeped in our natural right to self-defense.

## II.   THE AGENCIES PLAN TO IMPLEMENT SIGNIFICANT CHANGES TO FIREARM REGULATIONS, INCLUDING A NEW DEFINTION OF "FIREARM" ITSELF, ON AUGUST 24, 2022

On April 26, 2022, the Agencies published a Final Rule, *Definition of "Frame or Receiver" and Identification of Firearms* ("Final Rule") 87 Fed. Reg. 24,652 (Apr. 26, 2022),[6] which is set to take effect on August 24, 2022. The Final Rule covers a wide expanse of topics within firearms regulation, redefines certain congressionally established terms (including the term "firearm" itself), creates new regulatory terms with far-reaching definitions, and would greatly expand the Agencies' regulatory authority over items that they never have regulated. Moreover, the Agencies acknowledge that the Final Rule is likely to affect over 130,000 entities, including manufacturers and retailers, putting hundreds of these entities out of business. ATF, REGULATORY IMPACT ANALYSIS AND FINAL REGULATORY FLEXIBILITY ANALYSIS 124 (2022).[7]

### A.   The Biden Administration

When President Biden was running for office, one of his campaign pillars was to combat "ghost guns"—a derogatory term for privately manufactured firearms that are currently legal and have been legal in the United States for the entirety of our 246 year history.[8] His plan included "stop[ping] the proliferation of these so-called 'ghost guns' by passing legislation requiring that

---

[6]     The Final Rule is available at https://www.federalregister.gov/documents/2022/04/26/2022-08026/definition-of-frame-or-receiver-and-identification-of-firearms.

[7]     The Regulatory Impact Analysis is available at https://www.atf.gov/file/165811/download.

[8]     *The Biden Plan to End Our Gun Violence Epidemic*, BIDEN-HARRIS DEMOCRATS, https://joebiden.com/gunsafety/ (last visited Aug. 17, 2022).

purchasers of gun kits or [a] 3D printing code pass a federal background check."[9] Once elected, President Biden "urged Congress to swiftly pass gun control laws[.]"[10] When Congress did not act, President Biden instead called upon his Executive Branch Agencies to dramatically expand their regulatory framework, and thus their regulatory authority, in order to accomplish the legislative agenda Congress itself declined to adopt.

On May 21, 2021, the Agencies published the Proposed Rule in line with the Biden Administration's public stance and statements. *Definition of "Frame or Receiver" and Identification of Firearms* ("Proposed Rule"), 86 Fed. Reg. 27,720 (May 21, 2021).[11] "Between May 21 and August 19, 2021, ATF received over 290,000 comments on the proposed rule."[12]

On April 11, 2022, President Biden declared that he had "instructed the Attorney General to write a regulation that would rein in the proliferation of 'ghost guns' because [he] was having trouble getting it passed in the Congress[.]"[13]

The Agencies published the Final Rule on April 26, 2022. Under the Final Rule, the Agencies seek to include "weapon parts kits" in the Agencies' regulatory definition of firearm under 18 U.S.C. § 921(a)(3)(A) and have carried over the "designed to or may be readily

---

[9]    *The Biden Plan to End Our Gun Violence Epidemic*, BIDEN-HARRIS DEMOCRATS, https://joebiden.com/gunsafety/ (last visited Aug. 17, 2022).

[10]   *Biden Considers executive actions on guns, calls on Congress to pass weapons ban*, REUTERS (Mar. 23, 2021), https://www.reuters.com/article/usa-guns-idINKBN2BG0A5.

[11]   The Proposed Rule is available at https://www.federalregister.gov/documents/2021/05/21/2021-10058/definition-of-frame-or-receiver-and-identification-of-firearms.

[12]   ATF COMMENTS ON PROPOSED RULE 2021R-05, https://www.atf.gov/rules-and-regulations/definition-frame-or-receiver/submit-comment (last visited Aug. 17, 2022).

[13]   *Biden announces new rules for 'ghost guns,' introduces ATF director nominee*, CBS NEWS, at 2:51 (Apr. 11, 2022), https://www.cbsnews.com/video/biden-ghost-guns-atf-director-nominee/#x.

converted" language[14] from subsection (A) into subsection (B) of the GCA, seeking to regulate objects that can be readily converted into frames or receivers as well as "frame or receiver kits." *See* Final Rule, at 24,735, 24,739.

### B.    Frame or Receiver

A "firearm" is "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon . . . ." 18 U.S.C. § 921(a)(3).

While the GCA does not itself independently define "frame or receiver," since the Agencies' 1978 rulemaking, the Agencies have defined the "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11; *see also Title and Definition Changes*, 43 Fed. Reg. 13,531, 13,537 (Mar. 31, 1978).

In the Final Rule, however, the ATF redefines a frame or receiver as "a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, *that is designed to or may readily be completed, assembled, restored, or otherwise converted* to function as a frame or receiver[.]" Final Rule, at 24,739 (emphasis added).

Moreover, the Final Rule also provides near complete discretion to the ATF's Director when classifying an item. The Director can consider not just the item being classified, but can also look to outside information, whether provided with the item or not, to "determine" if an item is a "frame or receiver." *Id.* at 24,739 ("When issuing a classification, the Director may consider any

---

[14]    A "firearm" constitutes "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921(a)(3).

associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.").

The Final Rule goes so far as to "[e]xpressly exclude[] from the definition of 'frame or receiver' unformed blocks of metal, liquid polymers, and other raw materials" because the ATF's new classification is so expansive and departs so markedly from its previous classifications that they are not obviously excluded without explicit mention. *Id.* at 24,700.

### C.    Weapon Parts Kits

The Final Rule also newly treats "weapons parts kits" as "firearms." In the Final Rule, the Agencies contravened their prior position and stated, "the language of section 921(a)(3)(A) should be read to include weapon parts kits and aggregations of weapon parts that . . . may or may not be designed to expel a projectile by the action of an explosive in their present form or configuration, *but may readily be converted to do so*." Final Rule, at 24,684 (emphasis added). Thus, the Final Rule included in the definition of "firearm" "a weapon parts kit that is designed to or may be readily completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *Id.* at 24,735.

Congress granted the ATF the limited authority to regulate complete weapons (including those that may be readily converted into complete weapons) and the actual complete or functional receiver of such weapons, but not items that may someday become a frame or receiver or even the individual parts of a weapon. S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2200 ("Under the present definition of 'firearm,' any part or parts of such a weapon are included. It has been found that it is impractical to have controls over each small part of a firearm. Thus, the revised definition substitutes only the major parts of the firearm; that is, frame or receiver

for the words 'any part or parts.'"). The Agencies' newly crafted definition seeks to regulate a collection of non-firearm parts (including the non-frame or non-receiver) as if they were firearms themselves, in contravention of clear statutory language and the understanding of the original public meaning of such language, and in contravention of the Agencies' congressional authority and long-standing Agency precedent. *See* Fed. Defs.' Mot. to Dismiss, at 10-11, 20, *California v. ATF*, No. 3:20-cv-06761, 2020 WL 9849685, ECF No. 29 (N.D. Cal. Nov. 30, 2020).

## III.   THE ADMINISTRATIVE PROCEDURE ACT

The Administrative Procedure Act ("APA"), among other things, sets forth specific requirements for Executive Branch agencies to follow for those agencies to establish or amend federal regulations. *See* 5 U.S.C. § 551, *et seq*. Individuals and entities are empowered by the APA to bring suit for a federal court to review an agency's rulemaking to ensure it complies with the APA. 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."). Rulemaking is an "agency process for formulating, amending, or repealing a rule[.]" 5 U.S.C. § 551(5), and there are two types of rules—non-legislative and legislative.

Non-legislative rules are exempt from notice and comment proceedings under the APA and consist of "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice[.]" 5 U.S.C. § 553(b)(A). "Rules issued through the notice-and-comment process are often referred to as 'legislative rules' because they have the 'force and effect of law.'" *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979)).

The APA "prescribes a three-step procedure for so-called 'notice-and-comment rulemaking.'" *Id.* at 96. First, the "[g]eneral notice of proposed rule making shall be published in the Federal Register[.]" 5 U.S.C. § 553(b). Second, "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c). "An agency must consider and respond to significant comments received during the period for public comment." *Perez*, 575 U.S. at 96. And third, "[a]fter consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c).

There are several ways an agency can violate the APA notice and comment rulemaking procedures. First, "an agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical outgrowth' of the former." *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005); *Huawei Techs. USA, Inc., v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) ("Notice suffices if it is a logical outgrowth of the proposed rule, meaning the notice must adequately frame the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice.") (internal quotations and citations omitted). The agency must have a foundation for its final rule that was made apparent in its proposed rule because "[s]omething is not a logical outgrowth of nothing[,] . . . nor does it apply where interested parties would have had to divine [the agency's] unspoken thoughts[.]" *Envtl. Integrity Project*, 425 F.3d at 996 (internal quotations and citations omitted). In other words, courts "have refused to allow agencies to use the rulemaking process to pull a surprise switcheroo on regulated entities." *Id.* Under the APA, a "rule is deemed a logical outgrowth if interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments

on the subject during the notice-and-comment period." *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 245 (D.C. Cir. 2003)).

Second, "[t]he APA requires that an agency set forth in its notice of proposed rulemaking 'either the terms or substance . . . or a description of the subjects and issues involved' in the proposed rule." *Air Transp. Ass'n of Am. v. Civil Aeronautics Bd.*, 732 F.2d 219, 224 (D.C. Cir. 1984) (quoting 5 U.S.C. § 553(b)(3)). This means the agency must also "make available technical studies and data that it has employed in reaching the decisions to propose particular rules. . . . An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991) (internal quotations and citations omitted). "'The most critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation.'" *Texas v. EPA*, 389 F. Supp. 3d 497, 505 (S.D. Tex. 2019) (quoting *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999)).

Third, an agency can only make changes to its existing policies "as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). An "[u]nexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice[,] . . . [and a]n arbitrary and capricious regulation of this sort is itself unlawful and receives no *Chevron* deference." *Id.* at 222 (internal quotations and citations omitted). "'When an agency changes its existing position, it . . . must at least display awareness that it is changing position and show that there are good reasons for the new policy.'" *Wages and White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1141 (5th Cir. 2021) (quoting *Navarro*, 579 U.S. at 221).

And finally, "it is 'arbitrary or capricious' for an agency not to take into account all relevant factors in making its determination." *Hanly v. Mitchell*, 460 F.2d 640, 648 (2d Cir. 1972). To determine if an agency acted arbitrarily and capriciously, the "court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

## ARGUMENT

Plaintiffs brought this action because of the threat posed to their lives, livelihoods, and personal and business practices by the Final Rule. Plaintiffs can demonstrate not just a likelihood that they will prevail on the merits, based on the Agencies' violations of the APA, but that they will be irreparably and permanently harmed should the Final Rule take effect, including but not limited to Plaintiff Tactical Machining potentially having to close its doors for good. Although a preliminary injunction is extraordinary relief, in reality, all Plaintiffs ask this Court is to preserve the status quo of current firearm regulation during the pendency of this case. The term "firearm" has remained unchanged by Congress since 1968, and the term "frame or receiver" has operated unchanged by the ATF since 1978. Compared to this backdrop, Defendants' argument that they must be allowed to completely alter the entire landscape of firearm regulation in the United States—down to redefining the word "firearm" itself—lacks weight. Not only will Defendants not be harmed, but that the public will be served by obtaining clarity on the changes contained in the Final Rule, or by its remand to the Agencies for their failure to abide by the APA.

To obtain a preliminary injunction, "the applicants must show (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the

public." *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018). The third and fourth factors—"assessing the harm to the opposing party and weighing the public interest"—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The decision to grant or deny a preliminary injunction rests with the discretion of the district court. *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 677 (N.D. Tex. 2016). To prevail on a preliminary injunction motion, the movant must "present a prima facie case" but "is not required to prove his case in full." *Id.* at 684.

## I.     PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

### A.     The Final Rule Exceeds the Bounds of the Agencies' Congressionally Delegated Authority

Congress delegated rulemaking authority under the NFA and GCA to the Attorney General, who in turn delegated that authority to the ATF. 26 U.S.C. §§ 7801(a)(2)(A), 7805(a); *see Gun Owners of Am., Inc.*, 19 F.4th, at 897 (citations omitted). This discretion, however, does not give the Agencies carte blanche to devise any rules and regulations they see fit; rather, the Agencies are limited by the congressionally established terms and bounds of the NFA and GCA.

The ability to create federal law rests solely with Congress. *See* U.S. CONST. Art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States."). The President, and by extension the Executive Branch, "shall take Care that the Law be faithfully executed." U.S. CONST. Art. II, § 3. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co.*, 343 U.S. at 587 (1952). "Even before the birth of this country, separation of powers was known to be a defense against tyranny." *Loving*, 517 U.S. at 756 (1996). "[I]t remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another." *Id.* at 757. A "fundamental precept" of a strand of

separation of powers jurisprudence, the delegation doctrine "is that the lawmaking function belongs to Congress." *Id.* at 758.

This Court is empowered to "hold unlawful and set aside agency action, findings, conclusions" that are "in excess of statutory jurisdiction, authority, or limitations . . . ." 5 U.S.C. § 706(2)(C). If an agency's regulation is not consistent with a statutory definition established by Congress, the agency has exceeded the bound of its authority. *See Peyton v. Reynolds Assocs.*, 955 F.2d 247, 251 (4th Cir. 1992) ("If a regulation reflects an administrative interpretation which is inconsistent with the plain language of the statute under which it is promulgated, we do not defer to the agency's interpretation."). Congress meant what it said—or didn't say—when it explicitly left out "readily converted" in front of the terms "frame or receiver," and Congress specifically decided regulating every part of a firearm was "impractical."[15]

### i.      Frames or Receivers

The Final Rule redefines "firearm" specifically as to frames and receivers in a way that is inconsistent with the statutory definition and violates not only basic cannons of construction, but also is in direct opposition to the position the Agencies have taken in federal court. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021) (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002)).

---

[15]      "Under the present definition of 'firearm,' any part or parts of such a weapon are included. It has been found that it is impractical to have controls over each small part of a firearm. Thus, the revised definition substitutes only the major parts of the firearm; that is, frame or receiver for the words 'any part or parts.'" Fed. Defs.' Mot. for Summ. J., *Syracuse v. ATF*, No. 1:20-cv-06885, 2021 WL 23326, ECF No. 98, at 34 (S.D.N.Y. Jan. 29, 2021) (internal quotations omitted) (quoting S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2200).

The GCA defines a "firearm" as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921(a)(3). While Congress included the phrase "is designed to or may readily be converted" in subsection (A), that language is conspicuously absent from subsection (B).

The Final Rule's regulatory redefinition of "frame or receiver," however, seeks to treat items "that [are] designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver," as frames or receivers, and thus as firearms under federal law. Final Rule, at 24,739. By so doing, the Agencies are reading the "designed to or may be readily converted" language from subsection (A) of the GCA's definition of "firearm" into subsection (B) regarding frames or receivers, in opposition to the Agencies' historical position, their legal arguments in federal court, and a plain reading of the GCA.

First and foremost, the GCA is unambiguous—neither the phrase "designed to" nor the phrase "readily converted" appears in subsection (B). [16] Obviously from their inclusion in subsection (A), Congress was well aware of how to regulate items that were not yet "frames or receivers," just as they knew how to regulate items that were not yet weapons that expel a projectile by the means of an explosive, and yet Congress chose not to. Importing language from subsection (A) to subsection (B) where Congress has not itself done so violates any number of statutory construction canons, not the least of which is the clear statement rule. *See Clear-Statement Rule*,

---

[16]     The Final Rule also includes *incomplete* frames or receivers under the regulatory definition—adding yet another word in front of Congress's definition, and backtracking on the ATF's own guidance. *See* Final Rule, at 24,686; 18 U.S.C. § 921(a)(3)(B) (defining a firearm as "the frame or receiver of any such weapon").

BLACK'S LAW DICTIONARY (11th ed. 2019) ("[A] doctrine requiring the legal drafter to use clarity of expression before some effect will follow[.]"); Fed. Defs.' Mot. for Summ. J., *Syracuse v. ATF*, No. 1:20-cv-06885, 2021 WL 23326, ECF No. 98, at 34 (S.D.N.Y. Jan. 29, 2021)[17] (quoting *Allison Engine Co., Inc. v. U.S. ex rel. Saunders*, 553 U.S. 662, 671 (2008) ("When Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in disparate inclusion or exclusion.") (internal quotation marks and alterations omitted)).

The Supreme Court has "stated time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says. . . . . When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)). If Congress wanted the Agencies to regulate items that are "designed to or may readily be converted" into frames or receivers, it would have said so—the Agencies cannot amend the GCA via rulemaking, nor can they exceed their congressionally defined limitations.

The ATF's current website demonstrates the ATF understands the unambiguous nature of the GCA. For instance, the ATF's website poses the question: "Are '80%' or 'unfinished' receivers illegal?" To which the ATF answers:

> Receiver blanks that do not meet the definition of a "firearm" are not subject to regulation under the Gun Control Act (GCA). ATF has long held that items such as receiver blanks, "castings," or "machined bodies" in which the fire-control cavity is completely solid and un-machined have not reached the "stage of manufacture" which would result in the classification of a firearm according to the GCA.[18]

---

[17]    All court filings refer to the ECF pagination.

[18]    *Are "80%" or "unfinished" receivers illegal?*, ATF, https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal  (last visited Aug. 17, 2022).

In the same vein, on the ATF's website, the ATF responds to the question "[a]re there restrictions on who can purchase receiver blanks?" with a simple "[t]he Gun Control Act does not impose restrictions on receiver blanks that do not meet the definition of a 'firearm.'"[19]

Moreover, in recent federal litigation, the same Agencies that promulgated the Final Rule provided the following examination of the GCA's statutory structure:

> [P]ursuant to the [] statutory definition, a device is a firearm if it is either: (1) a frame or receiver or (2) a device that is designed to or can readily be converted into a device that expels a projectile. *Importantly, the "designed to" and "readily be converted" language are only present in the first clause of the statutory definition.* 18 U.S.C. § 921(a)(3)(A). Therefore, an unfinished frame or receiver does not meet the statutory definition of "firearm" simply because it is "designed to" or "can readily be converted into" a frame or receiver. Instead, a device is a firearm either: (1) because it is a frame or receiver or; (2) it is a device that is designed to or can readily be converted into a device that "expel[s] a projectile by the action of an explosive." *Id.* § 921(a)(3)(A)–(B).

Fed. Defs.' Mot. for Summ. J., *Syracuse*, at 14 (emphasis added). Under the Final Rule's new interpretation, however, the ATF will treat the item photographed below, which that the ATF currently classifies as "not a firearm," as if it were now a firearm simply by improperly reading language from subsection (A) into subsection (B).[20]

---

[19]   *Are there restrictions on who can purchase receiver blanks?*, ATF, https://www.atf.gov/firearms/qa/are-there-restrictions-who-can-purchase-receiver-blanks   (last visited Aug. 17, 2022).

[20]   In fact, the ATF's new definition is so expansive that the Final Rule goes so far as to "[e]xpressly exclude[] from the definition of 'frame or receiver' unformed blocks of metal, liquid polymers, and other raw materials." Final Rule, at 24,700.



Any arguments the Agencies purport to make against this reading of the Final Rule are unsatisfactory and would demonstrate to this Court that the Final Rule should be deemed void for vagueness. To this same end, the Agencies also make some reference to "frame or receiver parts kits," which references are rare, not defined, and never explained. *See* Final Rule, at 24,739 ("The terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver[.]"). It is unclear what the ATF considers to be a "frame or receiver parts kit," or how that definition may affect Plaintiffs, or those similarly situated.

---

[21]   *Are "80%" or "unfinished" receivers illegal?*, ATF, https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal  (last visited Aug. 17, 2022).

Finally, numerous classification letters issued by the ATF over the past few decades all indicate that the Agencies did not consider so-called "80% lowers" to be a "frame or receiver." *See* Declaration of Darren Peters, Sr. ("Peters Decl."), ¶ 6–7; *see also* Fed. Defs.' Mot. for Summ. J., *Syracuse*, at 40 ("The Record contains classification letters dating back to the 1970s. These classification letters make plain that ATF has consistently adopted a standard whereby the degree of machining to the frame or receiver determined whether the device constituted a firearm.").

Overall, the Agencies' redefinition of "frame or receiver" in the Final Rule significantly broadens the items that the Agencies will regulate under the GCA—an expansion neither envisioned nor authorized by Congress. Thus, the Final Rule violates the Separation of Powers and Delegation Doctrine of the U.S. Constitution as well as exceeds the Agencies' authority under the APA.

ii.        **"Weapon Parts Kits"**

The Final Rule unlawfully treats "weapon parts kits" as "firearms"—a concept contemplated and rejected by Congress. The Final Rule includes in the regulatory definition of "firearm" "a weapon parts kit that is designed to or may be *readily completed, assembled, restored, or otherwise converted* to expel a projectile by the action of an explosive." Final Rule, at 24,735 (emphasis added).[22]

Less than two years ago, the Agencies declared in their motion to dismiss in *California v. ATF* that Congress's definition of "firearm" specifically excluded weapon parts: "As a statutory matter, Congress has legislatively defined a 'firearm' to be a weapon that may be readily converted to expel a projectile by the action of an explosive, or the frame or receiver of such weapon, *but*

---

[22]       This language is far broader and more expansive than Congress's "readily [] converted" language. *See* 18 U.S.C. § 921(a)(3)(A).

*has explicitly excluded 'firearms parts' from that definition*." Fed. Defs.' Mot. to Dismiss, at 10, *California v. ATF*, No. 3:20-cv-06761, 2020 WL 9849685, ECF No. 29 (N.D. Cal. Nov. 30, 2020) (emphasis added). The Agencies continued, "Congress has chosen to exclude firearm parts from the scope of the GCA, including parts that could be assembled with a homemade receiver and frame to make a firearm." *Id.* at 20. Nevertheless, the Final Rule seeks to include weapon parts kits in the definition of "firearm" in contravention of this clear congressional limitation.

In so far as the Agencies are seeking to include "kits" that individuals can purchase that include the parts needed to assemble a firearm along with a non-frame or non-receiver that the Agencies now seek to treat as a frame or receiver under the Final Rule, that treatment suffers from the flaws for both terms addressed above. First, the non-frame or non-receiver is just that, not a frame or receiver under the plain meaning of the GCA. *See, supra*, Argument, Section I(A)(i). Second, a collection of parts is not subject to regulation under the GCA. When a firearm is not assembled, the GCA (and thus Congress) dictates that the Agencies regulate the frame or receiver. If a "kit" does not include an item that meets the plain meaning of a "frame or receiver" under the GCA, there is no part that the Agencies have the authority to regulate. *See* 18 U.S.C. § 921(a)(3); S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2200 ("Under the present definition of 'firearm,' any part or parts of such a weapon are included. It has been found that it is impractical to have controls over each small part of a firearm. Thus, the revised definition substitutes only the major parts of the firearm; that is, frame or receiver for the words 'any part or parts.'").

In sum, the Final Rule purports to establish regulations to "guide" the ATF's administration of the NFA and GCA, but instead regulates new items Congress explicitly left out of the definition of "firearm." Thus, the Agencies' attempted regulation of these additional items not defined by

Congress as "firearms" would give the Agencies new authority in excess of that proposed, considered, debated, or enacted by Congress, in violation the APA, and the Delegation Doctrine and Separation of Powers established by the U.S. Constitution, as well as the Take Care Clause of the U.S. Constitution. *See* 5 U.S.C. § 706(2)(C); U.S. CONST. Art. I, § 1, Art. II, § 3.[23] Accordingly, Plaintiffs are likely to succeed on the merits of their claims related to the Agencies' attempted redefinition of "firearm" under the Final Rule.

> **B.    The Final Rule Defies Separation of Powers, Implicating the Major Questions Doctrine**

The Agencies' broadening of the statutorily defined term "firearm" also implicates the major questions doctrine. If Congress wanted the Agencies to regulate every item that could conceivably be converted into a firearm, it would have said as much. The major questions doctrine establishes that "administrative agencies must be able to point to clear congressional authorization when they claim the power to make decisions of vast economic and political significance." *West Virginia v. EPA*, 142 S. Ct. 2587, 2616 (2022) (Gorsuch, J., concurring) (internal citation and quotations omitted). This ensures a strict separation of powers. *Id.* at 2617. Most recently, in *West Virginia v. EPA*, the Supreme Court emphasized, "[a]gencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *Id.* at 2609 (majority opinion) (internal quotation and citation omitted). The same principles utilized in *West Virginia v. EPA* can be applied to the Final Rule.

Congress authorized DOJ, who in turn authorized the ATF, to carry out the provisions of the NFA and GCA. Neither Agency is authorized to create sweeping new interpretations of terms defined by the GCA in derogation of Congress, particularly when such interpretations have vast

---

[23]    Of note, a violation of the U.S. Constitution is always a violation of the APA. 5. U.S.C. § 706(2)(B).

economic and political impact. If Congress intended for the Agencies' regulatory reach to extend to every part of a gun prior to assembly, it wouldn't have "hid[den] elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). In fact, as discussed above, Congress explicitly sought to exclude this possibility when passing the GCA. S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2200.

The majority mentions[24] what Justice Gorsuch dives deeper into in his concurrence in *West Virginia v. EPA*. Justice Gorsuch elucidates a few ways the Supreme Court has historically flagged major questions doctrine issues. Importantly, "th[e] Court has indicated that the doctrine applies when an agency claims the power to resolve a matter of great 'political significance,' or end an 'earnest and profound debate across the country[.]'" *Id.* at 2620 (quoting *NFIB v. OSHA*, 142 S. Ct. 661, 665 (2022); *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006)). Also, if the content of bills rejected by Congress are now the content of the agency's regulation, that can be a telling sign. *Id.* at 2620–21.

To address the "history and breadth of the authority that [the agency] has asserted," *id.* at 2608, it's crucial to understand that the Agencies' purport to have the power over a centuries-old practice—a practice that existed prior to the Agencies', or even our nation's, existence. "Regulations on self-built arms are *not* longstanding. In fact, there were no restrictions on the manufacture of arms for personal use in America during the seventeenth, eighteenth, or nineteenth

---

[24]     "[O]ur precedent teaches that there are 'extraordinary cases' that call for a different approach—cases in which the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *West Virginia v. EPA*, 142 S. Ct. at 2608 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60(2000)).

centuries. All such restrictions have been enacted within the last decade."[25] The same is true of the materials that individuals used, and continue to use, to self-manufacture those arms.

The Final Rule seeks to unilaterally decide a matter of "great political significance" by regulating non-frames, non-receivers, and parts kits as firearms, despite Congress's commands. The Biden Administration is seeking to re-brand an American tradition—labeling personally manufactured firearms as "un-serialized ghost guns," and treating companies that exists to support that tradition as enabling criminals. But there is a profound national debate over the non-frames and non-receivers at issue here, as well as "weapon parts kits," that goes much deeper than derogatory labeling. Notably, some states have already seen fit to regulate the items at issue here, as well as the practice of privately manufacturing firearms, while other states have left their residents free to produce, sell, and purchase the items at issue here and to personally manufacture firearms from those items.

In checking agency authority, the Supreme Court stated, "we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *FDA v. Brown & Williamson Tobacco Corp.*, 120 S. Ct. 1291, 1301 (2000). ATF is aware of these bounds—the first page of the Proposed Rule tracks the meaning of the term "firearm" throughout history, noting:

> During debate on the [Gun Control Act] and related bills introduced to address firearms trafficking, Congress recognized that regulation of all firearm parts was impractical. Senator Dodd explained that "[t]he present definition of this term includes 'any part or parts' of a firearm. It has been impractical to treat each small part of a firearm as if it were a weapon. The revised definition substitutes the words 'frame or receiver' for the words 'any part or parts.'"

---

[25]     *The American Tradition of Self-Made Arms*, at 40 (emphasis added).

Proposed Rule, at 27,720 (quoting 111 Cong. Rec. 5527 (March 22, 1965)). The content of bills rejected by Congress are now the content of the agency's regulation. It is crucial to remember that "the Constitution does not authorize Agencies to use pen-and-phone regulations as substitutes for laws passed by the people's representative." *West Virginia v. EPA*, 142 S. Ct. at 2626 (Gorsuch, J., concurring). It is clear this issue here is a matter of "great political significance" and subject to a "profound national debate." The Agencies have violated the Separation of Powers by taking a major question under their advisement without authorization from Congress.

### C.    The Final Rule is Not Entitled to *Chevron* Deference

In instances where a court "determines Congress has not directly addressed the precise question at issue," some courts give deference to an administrative agency's interpretation or construction of a statute. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). But "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43.

Congress has delegated certain, limited rulemaking authority to the Agencies within the constructs of the NFA and GCA. The Agencies have exceeded that authority in the Final Rule. The Agencies not only acknowledged, but affirmatively argued that even a *nearly complete* frame or receiver that can be "readily converted" into a frame or receiver is not a firearm under the GCA, nor is it an accurate statutory reading of the GCA to take express language from 18 U.S.C. § 921(a)(3)(A) and add it to 18 U.S.C. § 921(a)(3)(B) when Congress had not done so. Fed. Defs.' Mot. for Summ. J., *Syracuse*, at 14. Yet, Congress says what it means. Congress could have included "readily converted" frames or receivers. Instead, Congress omitted "designed to or may be readily converted" from the subcategory of frames and receivers. It is clear, then, that Congress

did not intend to confer such authority to the Agencies. Because Congress has spoken on the issue, and Congress's intent is clear in the text of the GCA, the Agencies are not entitled to interpretive deference under *Chevron*.

Moreover, the Final Rule significantly expands the potential that peaceable Americans may be subjected to criminal penalties (accompanied with the subsequent forfeiture of their Second Amendment protected rights) for the production, sale, or purchase of currently unregulated items. *See* 18 U.S.C. § 924(a)(1)(D); *see also* 18 U.S.C. § 922(g)(1). "[C]riminal laws are for courts, not for the Government, to construe." *Abramski v. United States*, 573 U.S. 169, 191 (2014). "Whether the Government interprets a criminal statute too broadly (as it sometimes does) or too narrowly . . . a court has an obligation to correct its error." *Id.*; *see United States v. Apel*, 571 U.S. 359, 369 (2014) ("[W]e have never held that the Government's reading of a criminal statute is entitled to any deference."); *see also Rule of Lenity*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[A] court, in construing an ambiguous criminal statute that sets out multiple or inconsistent punishments, should resolve the ambiguity in favor of the more lenient punishment."); *Wooden v. United States*, 142 S. Ct. 1063, 1075 (2022) (Kavanaugh, J., concurring) ("A common formulation of the rule of lenity is as follows: If a federal criminal statute is grievously ambiguous, then the statute should be interpreted in the criminal defendant's favor.").

For example, the Agencies establish the term "complete weapon" in the Final Rule and define it as "[a] firearm other than a muffler or silencer that contains all component parts necessary to function, whether or not assembled or operable." Final Rule, at 24,747. By including unassembled weapons in the definition of "complete weapon" the ATF has created tremendous enforcement uncertainty. This definition is problematic considering the interchangeability of certain gun parts. For example, "law-abiding gun owners who legally own both AR rifles and

pistols could be charged with a felony if they store their firearms unassembled." Final Rule, at 24,700 (comment on the Proposed Rule).

This is because an AR-pattern rifle and an AR-pattern pistol are very similar, with sometimes minute differences like the use of a brace instead of a stock (Figure 1).



Figure 1: AR-pattern rifle (left) and AR-pattern pistol (right)

And yet, both AR-pattern rifles and AR-pattern pistols have a similar construction, using a split-frame that separates the firearm into an upper and a lower (Figure 2).



Figure 2: AR-pattern rifle upper and lower, separated (left), and AR-pattern pistol upper and lower, separated (right)

26

Because of this, a disassembled AR-pattern rifle and AR-pattern pistol could theoretically create a new combination—an AR rifle lower and a pistol upper (with a barrel of less than 16 inches), when combined, create a short-barrel rifle (Figure 3).



Figure 3: AR-pattern rifle lower and AR-pattern pistol upper separated (left) and NFA-regulated short-barreled rifle (right)

This matters because that individual would possess a "complete weapon" that is an NFA-regulated item and cannot be lawfully owned without a federally issued tax stamp. Mere possession of the unregulated AR-pattern pistol upper in conjunction with an AR-pattern rifle lower could now qualify as a felony under the Agencies' definition of "complete weapon."[26] Because the Final Rule has substantial impact on the interpretation of criminal statutes, in addition to the GCA's unambiguous nature, this Court should not grant any deference to the Agencies' construction.

---

[26]     Additionally, the Agencies' failure to adequately respond to commenters' concern regarding this issue is its own violation of the APA. *See* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"); *Hanly v. Mitchell*, 460 F.2d 640, 648 (2d Cir. 1972) ("[I]t is 'arbitrary or capricious' for an agency not to take into account all relevant factors in making its determination.").

### D.        The Final Rule is not a Logical Outgrowth of the Proposed Rule

The Final Rule is not a logical outgrowth of the Proposed Rule because the Final Rule introduces and defines terms that were not presented in the Proposed Rule. The Final Rule also so significantly diverges from the Proposed Rule in certain aspects that it cannot possibly be said to actually "outgrow" from the Proposed Rule. *See Envtl. Integrity Project*, 425 F.3d at 996 ("Something is not a logical outgrowth of nothing[,] . . . nor does it apply where interested parties would have had to divine [the agency's] unspoken thoughts[.]"). Under the APA, federal agencies must provide the public with a meaningful opportunity to comment on the elements of a rule and the materials that form the basis for that rule. *See, e.g.,* 5 U.S.C. § 533(c); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995) ("The purpose of the notice and comment requirement is to provide for meaningful public participation in the rule-making process."). "Final rules under APA notice-and-comment rulemaking must be the 'logical outgrowth' of the proposed rule. The objective is fair notice." *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381 (5th Cir. 2022).

For instance, the Proposed Rule defined a "frame or receiver" as "[a] part of a firearm that, when the complete weapon is assembled, is visible from the exterior and provides housing or a structure designed to hold or integrate one or more fire control components, even if pins or other attachments are required to connect those components to the housing or structure." Proposed Rule, at 27,741. The definition was followed by just over a dozen illustrations. *Id.* at 27,742–46. By contrast, the Final Rule provides *separate and distinct definitions* for "frame" and "receiver" and a third definition for the new term "variant" that were not in the Proposed Rule and were not provided for public comment. Final Rule, at 24,735—39. The Final Rule also omitted four of the illustrations included in the Proposed Rule and added five new illustrations. *Compare* Proposed

28

Rule, at 27,742–46, *with* Final Rule, at 24,735–41. Since the premise of the logical outgrowth assessment is "fair notice" it cannot be true that commenters were on notice that a single definition would be spliced into three or that the illustrative examples would change significantly. *See Tex. Ass'n of Mfrs.*, 989 F.3d, at 381.

The Final Rule also added definitions for terms like "multi-piece frame or receiver," "privately made firearms marked by nonlicensees," and "primordial" that were not present in the Proposed Rule or offered for public review or comment. Multi-piece frame or receiver is mentioned four times in the Proposed Rule, but not defined until the Final Rule. *Compare* Proposed Rule, at 27,721, *with* Final Rule, at 24,739. Privately marked firearms marked by nonlicensees is not mentioned in the Proposed Rule and is defined in the Final Rule for the first time. *See* Final Rule, at 24,743. And although mentioned in the Proposed Rule, the Final Rule, for the first time, defines the term "primordial." *Compare* Proposed Rule, at 27,729, *with* Final Rule, at 24,663 n.49.

Agencies are prohibited by the APA from adopting a final rule that contains significant changes from a proposed rule unless the agencies provide supplemental notice and opportunity to comment. *See* 5 U.S.C. § 706; *see also Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1374 (Fed. Cir. 2017) (applying "logical outgrowth" doctrine to vacate final rule that significantly deviated from proposed rule without notice). Here, the public simply could not make meaningful comments on provisions and definitions that were never proposed nor offered for comment. There was no way for the public to divine the Agencies' unspoken thoughts.

    **E.**    **The Final Rule Represents a Drastic Change in the Agencies' Position Without Adequate Explanation**

The Final Rule drastically departs from the Agencies' longstanding treatment of firearms and non-firearms.

It is "[o]ne of the basic procedural requirements of administrative rulemaking" that "an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). "It is established administrative law that if the agency fails to acknowledge a change [in its position] and adequately explain it, the changed position will be afforded no deference in litigation under either *Chevron* . . . or *Auer*[.]" *United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 6 (D.D.C. 2017) (internal quotation marks and citations omitted). Here, the Agencies have failed to adequately explain their change in position with respect to, *inter alia*, "frames or receivers," "weapon parts kits," "complete weapons," inoperable weapons, split-frame receivers, and striker-fired pistols.

For instance, as extensively discussed above, the Final Rule makes significant changes to the longstanding definition of "frame or receiver." For decades, the ATF has had the same answer to the question, "Are '80%' or 'unfinished' receivers illegal?":

> Receiver blanks that do not meet the definition of a "firearm" are not subject to regulation under the Gun Control Act (GCA). ATF has long held that items such as receiver blanks, "castings," or "machined bodies" in which the fire-control cavity is completely solid and un-machined have not reached the "stage of manufacture" which would result in the classification of a firearm according to the GCA.[27]

Similarly, the ATF answers the question of whether there are "restrictions on who can purchase receiver blanks" by stating "[t]he Gun Control Act (GCA) does not impose restrictions on receiver blanks that do not meet the definition of a 'firearm.'"[28] The ATF has nearly *fifty-year old classification letters* that demonstrate the ATF, for decades, has determined that the items at

---

[27]     *Are '80%' or 'unfinished' receivers illegal?*, ATF, https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal  (last visited Aug. 17, 2022).

[28]     *Are there restrictions on who can purchase receiver blanks?*, ATF, https://www.atf.gov/firearms/qa/are-there-restrictions-who-can-purchase-receiver-blanks     (last visited Aug. 17, 2022).

issue in the Final Rule are not firearms. *See* Fed. Defs.' Mot. for Summ. J., *Syracuse*, at 40 ("The Record contains classification letters dating back to the 1970s. These classification letters make plain that ATF has consistently adopted a standard whereby the degree of machining to the frame or receiver determined whether the device constituted a firearm.").

Even in recent litigation, the ATF has made explicit arguments that are at odds with what it now purports concerning weapon parts kits:

> As a statutory matter, Congress has legislatively defined a "firearm" to be a weapon that may be readily converted to expel a projectile by the action of an explosive, or the frame or receiver of such weapon, but has explicitly excluded "firearms parts" from that definition. Congress has determined that "firearms" are subject to regulation under the GCA, and that anything that is not a firearm is largely excluded from federal regulation. This leaves a State like California free to enact its own regulations of firearms parts (as it has done), *but does not permit the ATF to extend federal regulation beyond the limits imposed by Congress*.

Fed. Defs.' Mot. to Dismiss, at 10–11, *California v. ATF*, No. 3:20-cv-06761, 2020 WL 9849685, ECF No. 29 (N.D. Cal. Nov. 30, 2020) (emphasis added). The ATF continued, "Congress has chosen to exclude firearms parts from the scope of the GCA, including parts that could be assembled with a homemade receiver and frame to make a firearm." *Id.* at 20. Congress has also chosen to permit the home manufacture of unserialized firearms for personal use." *Id*. "There is nothing novel about the use of unregulated firearm parts to manufacture firearms for personal use; that possibility (whether lawful or by prohibited persons) has been evident since Congress's 1968 decision to exclude firearms parts from the GCA." *Id.* at 21 n.10.

Despite suggesting that the Final Rule is "not intended to alter any prior determinations by the ATF regarding which specific part is a frame or receiver," Final Rule, at 24,662, the Agencies have cast decades of classification determinations, arguments, and guidelines into the wind. For example, the Agencies include new regulation of certain firearms, such as AR-style split-frame firearms and striker-fired handguns, in the Final Rule without adequate explanation, given the

Agencies and their precursors knew of both split receivers and striker-fired handguns at the time of their prior rulemaking defining firearms, which were already popular and widely used.[29]

"[T]he concept of a 'split receiver' was nowhere near new. In fact, self-loading firearms invited, or even required, 'split' components as early as their introduction. These firearms were incredibly common, undisputedly in common lawful use, and thus very unlikely to have gone unnoticed by the ATF and its predecessor."[30] The ATF has long held that the upper receiver was the "firearm" and that the lower receiver and other parts were not themselves firearms. Yet now, the Agencies are seeking to amend regulation to declare that, for some firearms, such as AR-style rifles, the lower receiver is the "frame or receiver," without adequate explanation.

Moreover, the "ATF and its precursors were patently aware of striker-fired, selfloading firearms that were so tremendously popular they, in large part, led to the adoption of the very law the ATF purports to be interpreting. Many of the popular imported firearms targeted by the [GCA], which the ATF enforced, meet the exact factors the ATF here claims it could not have known about."[31] "In addition to this, hundreds of thousands of American made striker-fired pistols were flooding the market by 1968. To suggest that these firearms were so rare in what the ATF terms 'civilian use' compared to revolvers and break-open shotguns, despite their popularity literally preceding the very law the ATF is presently interpreting, is implausible, to say the least."[32] And

---

[29]   "[S]triker fire has been around since at least the mid-1800s and were popular and available at the time of the first iteration of the legal definition." *Stop Gun Violence: Ghost Guns*, *Hearing before the Subcomm. on the Constitution, Comm. on the Judiciary* ("Stop Gun Violence"), 117th Cong. 9 (2021) (statement of Ashley Hlebinsky, Curator Emerita & Senior Firearms Scholar, Cody Firearms Museum, President, The Gun Code, LLC), https://www.judiciary.senate.gov/imo/media/doc/Ashley%20Hlebinsky%20Written%20Testimony%20Final.pdf. "[S]plit receivers in the many forms outlined in the proposal have been around for over a century as well." *Id.* at 10.

[30]   FPC, COMMENT ON ATF'S PROPOSED RULE 12–13 (Aug. 19, 2021), https://bit.ly/3zxj9RR.

[31]   *Id.*

[32]   *Id.*

yet, the Final Rule newly seeks to regulate striker-fired pistols without adequate explanation for the change in position. "[I]f an agency does undertake an action inconsistent with past practice, it is 'obligated to supply a reasoned analysis for the change.'" *United Student Aid Funds, Inc.*, 200 F. Supp. 3d at 169 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 42).

While the Final Rule is incredibly broad and far-reaching, Plaintiffs have demonstrated numerous ways in which the Final Rule violates the APA and the U.S. Constitution. While these are certainly not exhaustive, Plaintiffs are "not required to prove [their] case in full." *Franciscan All., Inc.*, 227 F. Supp. 3d, at 677. Given these violations, it is substantially likely that Plaintiffs will succeed on the merits and that this Court will remand the Final Rule back to the Agencies.

## II.  PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF THIS INJUNCTION IS NOT GRANTED

### A.  The Final Rule Will Likely Put Tactical Machining Out of Business

Plaintiffs, who have based their personal and business practices on the Agencies' decades-long application of the GCA, will suffer irreparable harm if the Final Rule is not enjoined. Plaintiffs VanDerStok and Andren will be prohibited from continuing their existing and planned personal practices in purchasing items the Final Rule newly considers "firearms" direct from retailers and self-manufacturing them into personal use firearms. Plaintiff Tactical Machining, on the other hand, will likely be put completely out of business by the Agencies' Final Rule—a point the Agencies acknowledge.

Irreparable injury exists where "the potential economic loss is so great as to *threaten the existence of the movant's business*." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989) (emphasis added); *Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) ("A threat to trade or business viability may constitute irreparable harm."); *Milsen Co. v. Southland Corp.*, 454 F.2d

363, 367 (7th Cir. 1971) ("[Plaintiffs] have presented an appropriate case for preliminary injunction. . . [because plaintiffs] will lose their stores and may not be able to finance the trial on their legal claims if they lose their business now[.]"); *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24, 28–29 (2d Cir. 1978) ("A threat to the continued existence of a business can constitute irreparable injury.").

Plaintiff Tactical Machining, a producer and seller of the items at issue here, will likely go out of business shortly after August 24, 2022, when the Final Rule is set to go into effect. Peters Decl., ¶ 11, 14 (attached as Exhibit 1). Approximately 90% of its business is producing and selling items that individuals can use to self-manufacture frames or receivers and to build functioning firearms. Peters Decl., ¶ 2. Additionally, the freight company Tactical Machining conducted business with for eight years now refuses to ship most of its products because the company is fearful the parts may be considered firearms under the Final Rule once it takes effect, subjecting the freight company to liability.[33] Peters Decl., ¶ 12. Worse, the credit card processing company Tactical Machining uses for its transactions is threatening to drop Tactical Machining due to the effects and changes within the Final Rule. Peters Decl., ¶ 13. It should go without saying, but the vast majority of Tactical Machining's business—upwards of 95%—is conducted using credit card transactions. Peters Decl., ¶ 13. With no ability to sell its most popular products, no freight transportation, no means of processing credit cards, and 90% of its current business missing from

---

[33]    For example, UPS' website states it only "accepts packages containing firearms" between "licensed importers, licensed manufacturers, licensed dealers, [] licensed collectors, and government agencies[,]" and from a licensed importer, manufacturer, dealer, or collector to or from an individual. *Special Procedures for Shipping Firearms*, UPS, https://www.ups.com/us/en/support/shipping-support/shipping-special-care-regulated-items/prohibited-items/firearms.page (last visited Aug. 17, 2022).

its balance sheet, Tactical Machining will almost certainly have no other option but to shut its doors. Peters Decl., ¶ 2, 11, 14.

Moreover, the ATF claims the Final Rule does not "[p]rohibit an individual from making their own [personally manufactured firearm],[34] but regulating producers and retailers such as Tactical Machining out of business will do just that. Plaintiff VanDerStok owns at least one item that is now at issue under the Final Rule. Declaration of Jennifer VanDerStok ("VanDerStok Decl."), ¶ 7 (attached as Exhibit 2). Plaintiff VanDerStok has plans to self-manufacture that item into a personal use firearm to be used for lawful purposes, including self-defense. VanDerStok Decl., ¶ 7. Plaintiff Andren already has at least two firearms that he has personally manufactured from the items newly regulated under the Final Rule. Declaration of Michael G. Andren ("Andren Decl."), ¶ 6 (attached as Exhibit 3). Both want to continue their education on the function and construction of firearms. VanDerStok Decl., ¶ 8; Andren Decl., ¶ 8. This deepened understanding and ability to craft a firearm piece by piece furthers their ability to safely operate firearms. VanDerStok Decl., ¶ 8; Andren Decl., ¶ 8. Both have concrete plans to purchase those items again in the future and to engage in the centuries-old American tradition—and right—of self-manufacturing their own self-defense tools. VanDerStok Decl., ¶ 8–9; Andren Decl., ¶ 8–9. Those plans will be immediately halted by the Final Rule if it goes into effect and retailers and producers like Tactical Machining are forced out of business. VanDerStok Decl., ¶ 9; Andren Decl., ¶ 9.

Additionally, "harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). "Indeed, 'complying

---

[34]    *Training Aid for the Definition of Frame or Receiver & Identification of Firearms*, ATF (2022), https://www.atf.gov/firearms/docs/guide/new-training-aid-overview-final-rule-2021r-05f-definition-frame-or-receiver-and/download#:~:text=Under%20the%20Final%20Rule%2C%20licensed,in%20accordance%20with%20the%20regulations.

with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.'" *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1992) (Scalia, J., concurring in part)). In a case against the federal government, "federal agencies generally enjoy sovereign immunity for any monetary damages." *Wages and White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Therefore, Plaintiffs', especially Tactical Machining's, "lack of a 'guarantee of eventual recovery' is another reason that its alleged harm is irreparable." *Id.* (quoting *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021)).

Not only can Plaintiffs not seek monetary damages against the Agencies, but the Agencies acknowledge they are shutting down an entire industry. By the Agencies' own estimation, "the final rule could potentially affect 132,023 entities, including FFLs and non-FFL manufacturers and retailers of firearms parts kits with partially complete frames or receivers." ATF, REGULATORY IMPACT ANALYSIS AND FINAL REGULATORY FLEXIBILITY ANALYSIS 124 (2022). The Agencies further estimate that "the majority of affected entities are small entities that would experience a range of costs, the largest cost being the *dissolution of the entire business*." *Id.* (emphasis added). Tactical Machining's business would disintegrate, even after over a decade of strict compliance— diligently requesting classification letters for *every* unmachined frame or receiver it has *ever* sold, dating all the way back to 2009. Peters Decl., ¶ 6. Additionally, Tactical Machining does not sell "any tooling, jigs, instructions, templates, guides or any form of instruction on how to complete a firearm receiver." Peters Decl., ¶ 5, Ex. 1. Just one day after the Attorney General signed the Final

Rule[35] and President Biden declared[36] an end to so-called "ghost guns," Tactical Machining sent the ATF a determination request questioning the status of a receiver the ATF previously found to be "not a firearm." Peters Decl., ¶ 9.

The ATF has not responded.

## III. PLAINTIFFS' INJURY OUTWEIGHS ANY HARM TO DEFENDANTS OR THE PUBLIC

Finally, the injury to Plaintiffs far outweighs any potential harm to Defendants or the public interest. "[T]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009). "[T]here is an overriding public interest . . . in the general importance of an agency's faithful adherence to [their] statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58–59 (D.C. Cir. 1997). The Final Rule is a complete and utter change in the way firearms are regulated in this country—down, literally, to the redefinition of the word "firearm"—and affects every person who owns, wants to own, or wants to construct a firearm from items that have never, to this date, been regulated as firearms. The market for privately manufacturing firearms will not simply shift into compliance—the industry will more likely die. The purpose of personally manufacturing firearms is to do so lawfully without the government's approval to be self-reliant.

---

[35]     *Training Aid for the Definition of Frame or Receiver & Identification of Firearms*, ATF (2022),         https://www.atf.gov/firearms/docs/guide/new-training-aid-overview-final-rule-2021r-05f-definition-frame-or-receiver-and/download#:~:text=Under%20the%20Final%20Rule%2C%20licensed,in%20accordance%20with%20the%20regulations.
[36]     *Fact Sheet: The Biden Administration Cracks Down on Ghost Guns*, THE WHITE HOUSE, (April 11, 2022) https://www.whitehouse.gov/briefing-room/statements-releases/2022/04/11/fact-sheet-the-biden-administration-cracks-down-on-ghost-guns-ensures-that-atf-has-the-leadership-it-needs-to-enforce-our-gun-laws/.

Plaintiffs—and indeed all Americans—risk the possibility of criminal penalties for production, sale, and purchase of items that have not historically been considered firearms if the Final Rule goes into effect—Plaintiff Tactical Machining, and similar producers and retailers across the country risk the destruction of their businesses. Defendants, on the other hand, will not suffer significant harm by maintenance of the long-standing, fifty-four year status quo regarding what constitutes a "firearm" while this Court considers the merit of the Final Rule. Indeed, granting a preliminary injunction during the pendency of this litigation serves the public interest by allowing the Court to provide clarity on the validity of the Final Rule while "ensur[ing] the status quo is maintained so the legal system can resolve [an] important dispute." *City of Dallas, Texas v. Hall*, 2008 WL 11350041, at *3 (N.D. Tex. July 28, 2008); *see also Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006) (quoting *Dist. 50, United Mine Workers of Am. v. Int'l Union, Union Mine Workers of Am.,* 412 F.3d 165, 168 (D.C. Cir. 1969)) ("The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation."). The public interest undoubtedly weighs in favor of upholding the rule of law, following the APA, and enforcing the U.S. Constitution.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enjoin enforcement of the Final Rule, or postpone the effective date of the Final Rule, until a decision can be reached on the merits.

Respectfully submitted,

*/s/ R. Brent Cooper*
R. Brent Cooper (TX Bar No. 04783250)
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, TX  75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540

Cody J. Wisniewski* (CO Bar No. 50415)
FIREARMS POLICY COALITION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV  89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392
cwi@fpchq.org

Kaitlyn D. Schiraldi* (TN Bar No. 039737)
Erin M. Erhardt* (CO Bar No. 49360)
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO  80227
Telephone: (303) 292-2021
Telecopy: (877) 349-7074
kschiraldi@mslegal.org
eerhardt@mslegal.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

39