# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS

# GALVESTON DIVISION

DIVISION 80 LLC,

    *Plaintiff,*

v.

| | |
|---|---|
| MERRICK GARLAND,<br>in his official capacity as<br>Attorney General of the United States, | Case No. 3:22-CV-00148 |
| UNITED STATES DEPARTMENT OF<br>JUSTICE, | Jury Trial Demanded |
| GARY RESTAINO,<br>in his official capacity as<br>Acting Director of the Bureau of Alcohol,<br>Tobacco, Firearms, and Explosives, | |
| BUREAU OF ALCOHOL, TOBACCO,<br>FIREARMS, AND EXPLOSIVES, | |

    *Defendants.*

# PLAINTIFF'S ORIGINAL COMPLAINT
# FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.     This lawsuit challenges the Biden Administration's unlawful attempt to unilaterally rewrite federal law and destroy the ability of Americans to exercise their Second Amendment rights by privately making firearms.

2.     ATF's longstanding legal position has been that receiver blanks— unfinished firearm parts from which individuals can make their own firearms—do not fall within ATF's regulatory jurisdiction. ATF has stated this position on its website, in classification determinations issued to manufacturers after reviewing product samples, and in litigation.

3.     President Biden campaigned on a promise to take legislative action imposing new regulations on receiver blanks but has thus far been unable to persuade Congress to pass such legislation. Frustrated with the constitutional process of bicameralism and presentment, President Biden politically pressured Defendants to take unilateral executive action to accomplish his failed policy agenda.

4.     In response to the Biden Administration's political pressure, Defendants adopted a Final Rule that unlawfully rewrites federal law and repudiates ATF's longstanding legal position on receiver blanks. Exhibit A. The Final Rule expressly states that prior classification determinations "shall not continue to be valid or authoritative," 87 Fed. Reg. at 24,741, and claims that receiver blanks fall within ATF's regulatory jurisdiction.

1

5.      Plaintiff Division 80 is a business that distributes receiver blanks to lawful businesses across the country. It currently does business without a federal firearms license (FFL) in reliance on ATF's position that receiver blanks are unregulated. If the Final Rule goes into effect, Division 80 will no longer be able to continue distributing its products, putting it out of business. ATF's own Regulatory Impact Analysis and Final Regulatory Flexibility Analysis acknowledges this, stating that the Final Rule will cause businesses like Division 80 to "end up dissolving their businesses." Exhibit B at 32. Division 80 therefore seeks a temporary restraining order, preliminary injunction, and permanent injunction blocking the enforcement of the Final Rule, as well as a declaration from this Court that the Final Rule is unlawful.

## PARTIES

6.      Division 80 is a Texas limited liability company with its principal place of business in Galveston County, Texas. Its exclusive business is the distribution of receiver blanks that individuals may use to exercise their Second Amendment rights by making their own firearms. Division 80 distributes its products to businesses throughout the United States.

7.      Defendant Merrick Garland is the Attorney General of the United States and the head of the United States Department of Justice.

2

8.     Defendant United States Department of Justice is an agency of the United States that administers and enforces the principal federal gun control statutes, the National Firearms Act of 1934 and the Gun Control Act of 1968.

9.     Defendant Gary Restaino is the Chief Law Enforcement Officer and Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

10.     Defendant Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) is an agency of the United States that administers and enforces the principal federal gun control statutes, the National Firearms Act of 1934 and Gun Control Act of 1968.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 5 U.S.C. §§ 701–706 and 28 U.S.C. § 1331.

12.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(e)(1)(B) and (C). A substantial part of the events giving rise to these claims occurred in this district, a substantial part of the property that is the subject of the action is situated in this district, and Division 80 resides in this district.

13.     Division 80 has standing to assert the interests of itself and third parties, including its customers and suppliers. *See*, *e.g.*, *Craig v. Boren*, 429 U.S. 190 (1976).

3

## LEGAL BACKGROUND

14.     The Gun Control Act of 1968 established the definition of a "firearm" for purposes of federal firearms regulations.

15.     The Act states that "it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms" for appropriate purposes. Gun Control Act of 1968, Pub. L. No. 90-618, § 101, 82 Stat. 1213, 1213–14. It goes on to state that "this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this title." § 101, 82 Stat. at 1214.

16.     A "firearm" is defined as: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921.

17.     There is no statutory definition of a "frame or receiver."

18.     27 C.F.R. § 478.11 currently provides a one-sentence definition of a "firearm frame or receiver" as: "That part of a firearm which provides housing

for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."

19.    A strict licensing regime governs the importation, manufacture, and dealing of products that constitute firearms. 18 U.S.C. § 923(a) states that "[n]o person shall engage in the business of importing, manufacturing, or dealing in firearms . . . until he has filed an application with and received a license to do so from the Attorney General." 18 U.S.C. § 923(i) requires licensed importers and licensed manufacturers to "identify by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Attorney General shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer."

20.    Failure to follow these federal licensing requirements can result in criminal liability. Under 18 U.S.C. § 924(a)(1), it is a crime to violate "any other provision of this chapter," referring to Title 18, Chapter 44, of the United States Code, which contains sections 921–931. It is therefore of paramount importance for law-abiding businesses in the self-defense industry to have clarity and predictability about what products meet the definitions of a "firearm" and "frame or receiver."

21.    It is equally important for law-abiding customers and for those who may not possess firearms (prohibited possessors) to have clarity on what products constitute a "firearm" and "frame or receiver." 18 U.S.C. § 922(g)

5

makes it a crime for various categories of individuals "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

22.     An improper substantive change in what constitutes a "firearm" or "frame or receiver" would have significant criminal consequences, giving rise to the due-process interests protected by the vagueness doctrine, *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), and rule of lenity, *United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992).

## FACTUAL BACKGROUND

### I.     The United States of America Has a Long Tradition of Individuals Privately Making Their Own Firearms

23.     It is estimated that in the American colonies, around 2,500 to 3,000 people were making firearms.[1] While these people were able to make firearms from scratch, many ordered parts from England to assemble their firearms more efficiently. Until the late 1700's and the emergence of armories, gunmaking was primarily a civilian activity.

---

[1] *Stop Gun Violence: Ghost Guns: Hearing Before the Subcomm. on the Constitution, of the S. Comm. on the Judiciary*, 117th Cong. 5 (testimony of Ashley Hlebinsky), *available at* https://www.judiciary.senate.gov/imo/media/doc/Ashley%20Hlebinsky%20Written%20Testimony%20Final.pdf.

24.    Gunmaking was essential to the Continental Army, and typically, it was more practical and efficient to assemble a gun from parts rather than building one completely from scratch.

25.    Despite the emergence of armories, mass production, and the innovation of prominent manufacturers, the role of the individual in making guns never went away. Without the ingenuity of hobbyists, designers, and private individuals, much of the innovation in the firearms industry would not have been possible.

26.    Today, many law-abiding Americans make their own firearms using gun parts and receiver blanks, which are also commonly known as "incomplete receivers," "unfinished receivers," or "80% receivers."

27.    A receiver blank is a piece of raw material that has undergone some of the stages of manufacture necessary to create a firearm receiver, but which still requires additional machining to produce a functioning firearm receiver. The phrase "80% receiver" is not a legal term but refers to the colloquial understanding that receiver blanks have undergone 80% or less of the stages of manufacture necessary to produce a functioning receiver. The remaining stages of manufacture must be performed by the individual owner using appropriate machinery to produce a functioning receiver.

28.    Receiver blanks are popular among do-it-yourself hobbyists, who appreciate the challenge of using machinery to build a firearm from raw

7

materials and unfinished components.

29. Receiver blanks are purchased by law-abiding citizens who cherish the historic right of Americans to build their own firearms. Customers for receiver blanks include people of all colors, men and women, veterans, blue- and white-collar workers, parents, retirees, and government employees—a virtual melting pot of the country.

30. The receiver-blank industry has been unfairly maligned by some politicians, anti-Second Amendment groups, and the media, who point to misconduct that is already prohibited by federal law as a justification for preventing law-abiding Americans from privately making firearms. *See infra*, at ¶¶ 38–51 (compiling the Biden Administration's statements).

31. For example, it is already illegal for a prohibited possessor to own a firearm under 18 U.S.C. § 922(g), and it is already illegal to engage in the business of selling or distributing firearms without a license under 18 U.S.C. § 923(a). Even though a lawfully acquired firearm can be used in an illegal manner, that does not justify a complete destruction of businesses' ability to sell firearms and individuals' ability to purchase them. Similarly, even though lawfully, privately made firearms can be used in an illegal manner, that does not justify a complete destruction of businesses' ability to sell receiver blanks and individuals' ability to purchase them and privately make firearms in a lawful manner.

## II.   ATF Previously Classified Receiver Blanks as Unregulated Materials

32.   ATF has long held, and told the public, that receiver blanks do not meet the definitions of a "firearm" or "frame or receiver." Its website states:

**Are "80%" or "unfinished" receivers illegal?**

Receiver blanks that do not meet the definition of a "firearm" are not subject to regulation under the Gun Control Act (GCA). ATF has long held that items such as receiver blanks, "castings" or "machined bodies" in which the fire-control cavity area is completely solid and un-machined have not reached the "stage of manufacture" which would result in the classification of a firearm according to the GCA.[2]

**Are there restrictions on who can purchase receiver blanks?**

The Gun Control Act (GCA) does not impose restrictions on receiver blanks that do not meet the definition of a "firearm." . . . .[3]

**What is ATF doing in regards to people making their own firearms?**

An individual may generally make a firearm for personal use. . . . .[4]

**Does an individual need a license to make a firearm for personal use?**

No, a license is not required to make a firearm solely for personal use. . . . .[5]

---

[2] Exhibit C.

[3] Exhibit D.

[4] Exhibit E.

[5] Exhibit F.

33.    ATF's website also includes photographs of receiver blanks that

ATF has determined are not regulated firearm receivers:[6]



---

34.   For the last several decades, ATF has permitted industry to request written determinations from ATF as to the classification of sample products. ATF's Firearms and Ammunition Technology Division conducts a thorough technological analysis of the sample and provides industry with a classification determination as to whether the sample is a firearm regulated under the Gun Control Act or National Firearms Act.

35.   For example, in a recent lawsuit that dealt with whether a particular product was a "firearm," the government submitted a certified administrative record containing numerous classification determinations sent to manufacturers stating that their receiver-blank products were not firearms. *See* ATF's Certified Set of Documents Comprising the Record, at 64–70, *California Rifle & Pistol Ass'n, Inc. v. ATF*, No. 1:14-CV-1211 (E.D. Cal. Jan. 9, 2015), ECF No. 19-3 (containing the images that follow).

**Submitted forging**





Accordingly, FTB finds that the submitted item is not a "firearm" as defined in the GCA. Please note that this classification is based on the item received and examined by our Branch. Any changes to its characteristics would require re-evaluation.

11

Submitted forging, first view



Submitted forging, second view



Based on our examination, FTB finds that the submitted item is not a "firearm" as defined in the GCA. Please note that this classification is based on the item received and examined by our Branch. Any changes to its characteristics would require re-evaluation by FTB.

Accordingly, FTB finds that the submitted item is not a "firearm" as defined in the GCA. Please note that this classification is based on the item received and examined by our Branch. Any changes to its characteristics would require re-evaluation by FTB.

**Submitted forging**

12

36.     Prior to the Biden Administration, ATF defended these classification determinations in litigation brought by gun-control activists:

> Plaintiffs' challenges to ATF's classifications also seek to undercut the process under which, for decades, ATF has reviewed numerous items to determine if they should be classified as "firearms" under the GCA, bringing to bear the agency's technical, scientific, mechanical, and legal expertise. Receivers for the AR-15, the most common rifle in America, have a space within them called the fire-control cavity, which accommodates the firing components. The longstanding position of ATF is that, where a block of metal (or other material) that may someday be manufactured into a receiver bears no markings that delineate where the fire-control cavity is to be formed and has not yet been even partially formed, that item is not yet a receiver . . . .

Fed. Defs.' Mot. Dismiss at 2, *California v. ATF*, No. 3:20-CV-06761 (N.D. Cal. Nov. 30, 2020), ECF No. 29, 2020 WL 9849685.

> The Record contains classification letters dating back to the 1970s. These classification letters make plain that ATF has consistently adopted a standard whereby the degree of machining to the frame or receiver determined whether the device constituted a firearm. . . .
>
> . . . . Not one of the above-noted classification letters made reference to the amount of time that would be required to transform the given device into a fully functional frame or receiver. Further, these letters are only a few of the examples contained in the Record of ATF making determinations based on the degree of machining performed on the unfinished frame or receiver with no reference whatsoever to the time required to transform the device into a fully functional frame or receiver.

Fed. Defs.' Mot. for Summ. J. at 30–32, *City of Syracuse v. ATF*, 1:20-CV-06885 (S.D.N.Y. Jan. 29, 2021), ECF No. 98.

13

37.    Manufacturers, distributors, and retailers invested capital, created American jobs, and sold lawful products to customers based on their good-faith reliance on ATF's application of the GCA through written classification determinations.

## III.   The Biden Administration Announces That It "Will Not Wait for Congress to Act to Take Its Own Steps" on Gun Control

38.    President Biden campaigned on a promise to "[s]top 'ghost guns,'" referring to firearms "assembl[ed] . . . on [one's] own . . . by buying a kit of disassembled gun parts."[7] Specifically, he promised to "pass[] legislation" to "stop the proliferation of these so-called 'ghost guns.'"

39.    After President Biden took office, members of Congress proposed bills changing the way ATF classifies receiver blanks not currently defined as firearms. None of those bills have become law. S. 1558, 117th Cong. (2021) (Untraceable Firearms Act of 2021); H.R. 1454, 117th Cong. (2021) (Ghost Guns Are Guns Act).

40.    Because the Biden Administration could not accomplish its legislative goal through the constitutional process of bicameralism and presentment, it unlawfully sought to implement its policies through unilateral executive action.

---

[7] *The Biden Plan to End Our Gun Violence Epidemic*, BIDEN-HARRIS DEMOCRATS, https://joebiden.com/gunsafety/.

41.     On April 7, 2021, the Biden Administration announced that President Biden was "reiterating his call for Congress to pass legislation" on firearms regulations.[8] The announcement stated that "this Administration will not wait for Congress to act to take its own steps" on gun control. The announcement instructed the United States Department of Justice to "within 30 days . . . issue a proposed rule to help stop the proliferation" of so-called "ghost guns."

42.     On April 8, 2021, President Biden, Vice President Harris, and Attorney General Garland held a press conference on gun policy at the White House Rose Garden. President Biden stated that he "asked the Attorney General and his team to identify for me immediate, concrete actions I could take now without having to go through the Congress."[9]

43.     Attorney General Garland stated in his remarks that "the proliferation of the so-called ghost guns" was caused by a "regulatory loophole"

---

[8] *FACT SHEET: Biden-Harris Administration Announces Initial Actions to Address the Gun Violence Public Health Epidemic*, WHITE HOUSE (Apr. 7, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/07/fact-sheet-biden-harris-administration-announces-initial-actions-to-address-the-gun-violence-public-health-epidemic/.

[9] *Remarks by President Biden on Gun Violence Prevention*, WHITE HOUSE (Apr. 8, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/04/08/remarks-by-president-biden-on-gun-violence-prevention/.

or "gap,"[10] even though the proliferation of such products was actually the direct result of ATF's proper legal determination and carefully considered decision to issue classification determinations approving the unregulated sale of such products.

44.    On May 7, 2021, Attorney General Garland signed ATF proposed rule 2021R-05, entitled: "Definition of 'Frame or Receiver' and Identification of Firearms."

45.    On May 11, 2021, the U.S. Senate Committee on the Judiciary's Subcommittee on the Constitution held a hearing on proposed legislation addressing the regulation of receiver blanks. At the hearing, Senator Richard Blumenthal admitted that one reason he proposed the legislation was that "under federal law" receiver blanks are not classified as firearms.[11]

46.    During the ninety-day comment period for the proposed rule, the public submitted approximately 290,000 comments on the proposed rule.

---

[10] *Attorney General Garland's Full Remarks on Gun Violence Prevention at the White House Rose Garden*, U.S. DEP'T OF JUSTICE (Apr. 8, 2021), http://www.justice.gov/opa/speech/attorney-general-garland-s-full-remarks-gun-violence-prevention-white-house-rose-garden.

[11] *Stop Gun Violence: Ghost Guns: Hearing Before the Subcomm. on the Constitution, of the S. Comm. On the Judiciary*, 117th Cong. 5 (statement of Sen. Blumenthal), https://www.judiciary.senate.gov/meetings/stop-gun-violence-ghost-guns (stating at 22:19 that "they are guns, except under federal law").

47.    In February 2022, President Biden and Attorney General Garland traveled to New York City for a meeting of the Gun Violence Prevention Task Force. At that meeting, President Biden stated that "this spring, the Justice Department will issue a final rule to regulate these so-called 'ghost guns.'"[12]

48.    As the one-year anniversary of President Biden's press conference at the White House Rose Garden drew near, political pressure mounted on the Biden Administration to issue a final rule as soon as possible.

49.    In March 2022, the *New York Times* reported that then-Acting ATF Director Marvin Richardson stated at an industry gathering that ATF was expected to announce a final rule by June 2022. A Department of Justice spokesperson said he "was simply reading from a White House budget office document," but two White House officials told the *New York Times* that "Mr. Richardson had misspoken and that the rule would, in fact, be finished by early April."[13] Shortly thereafter, Mr. Richardson was removed as Acting Director and replaced with the current Acting Director Gary Restaino.

---

[12] *Remarks by President Biden at a Gun Violence Prevention Task Force Meeting*, WHITE HOUSE (Feb. 3, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/02/03/remarks-by-president-biden-at-a-gun-violence-prevention-task-force-meeting/.

[13] *See* Glenn Thrush, *Dueling Messages Muddle Biden's Agenda on Guns*, N.Y. TIMES (Mar. 4, 2022), https://www.nytimes.com/2022/03/04/us/politics/atf-biden-gun-reform.html.

50.    On April 8, 2022, exactly one year after the President's press conference at the White House Rose Garden, *Politico* reported that Senator Chris Murphy and more than 100 Democrat legislators sent a letter to President Biden on March 25, 2022, "pressing Biden to take unilateral action on guns," including "[f]inaliz[ing] a regulation to crack down on so-called ghost guns before Democrats potentially lose control of Congress."[14] The article noted that Democrats were "exasperated" at how much time it was taking for the Biden Administration to issue a final rule.

51.    On April 11, 2022, President Biden and Vice President Harris announced at the White House Rose Garden that the Final Rule had been completed. President Biden stated that a "year ago this week . . . I instructed the Attorney General to write a regulation that would rein in the proliferation of ghost guns because I was having trouble getting anything passed in the Congress."[15] President Biden explained that the purpose of the Final Rule was to make it "illegal to manufacture" weapon parts kits and "[i]llegal for a

---

[14] Laura Barron-Lopez, *Democrats Exasperated With Biden on Gun Control*, POLITICO (Apr. 8, 2022), https://www.politico.com/news/2022/04/08/democrats-biden-gun-control-00024097.

[15] *Remarks by President Biden Announcing Actions to Fight Gun Crime and His Nominee for ATF Director, Steve Dettelbach*, WHITE HOUSE (Apr. 11, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/04/11/press-briefing-by-press-secretary-jen-psaki-april-11-2022/.

licensed dealer to sell them" without complying with the same regulatory requirements governing the manufacture and sale of complete firearms.

52.    The Final Rule was published in the Federal Register on April 26, 2022. Exhibit A.

## IV.    ATF's Unlawful and Unconstitutional Final Rule

### A.    Definition of a "Frame or Receiver" as Including "Partially Complete, Disassembled, or Nonfunctional" Frames and Receivers

53.    18 U.S.C. § 921(a)(3) defines a "firearm" as including "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "the frame or receiver of any such weapon," but it does not define what constitutes a "frame or receiver."

54.    27 C.F.R. § 478.11 currently provides a one-sentence definition of a "firearm frame or receiver" as: "That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."

55.    The Final Rule deletes that definition of a "firearm frame or receiver" and replaces it with a convoluted multi-page definition of a "frame or receiver" that is unconstitutionally vague and subjective.

56.    Part of the proposed new definition states:

*Partially complete, disassembled, or nonfunctional frame or receiver.* The terms "frame" or "receiver" shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, *i.e.*, to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projective weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be. The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (*e.g.*, unformed block of metal, liquid polymer, or other raw material). When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.

87 Fed. Reg. at 24,739.

57.     If item *A* can readily be made into item *B*, it is by definition not yet item *B*. The Final Rule abuses the English language in order to expand ATF's regulatory jurisdiction to cover materials that can "readily" be made into regulated products. This attempt to drastically expand ATF's regulatory jurisdiction is in excess of ATF's statutory authority.

58.     In classification determinations issued to manufacturers, ATF has stated that receiver blanks do not meet the definition of a regulated "firearm" under federal law. ATF has defended these classification determinations in

litigation brought by gun-control activists. But the Final Rule expressly repudiates ATF's prior classification determinations:

> Prior determinations by the Director that a partially complete, disassembled, or nonfunctional frame or receiver, including a parts kit, was not, or did not include, a "firearm frame or receiver" under § 478.11, or "frame or receiver" under § 479.11, as those terms were defined prior to April 26, 2022, shall not continue to be valid or authoritative after that date. Such determinations shall include those in which the Director determined that the item or parts kit had not yet reached a stage of manufacture to be, or include, a "firearm frame or receiver" under § 478.11, or "frame or receiver" under § 479.11, as those terms were defined prior to [April 26, 2022].

87 Fed. Reg. at 24,741.

59.     ATF's complete reversal of its legal position is arbitrary, capricious, and an abuse of discretion.

60.     The phrases "partially complete," "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver," and "stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon" are so vague as to make it impossible for manufacturers, distributors, and customers to understand which product designs are regulated by the Final Rule and which are not. Among other things, this creates extreme uncertainty and will cause prolific waste in determining which facets of the firearms manufacturing supply chain require a federal firearms license. This uncertainty will force companies involved in the supply chain for manufacturing firearms to withdraw from the industry.

21

61.     These vague phrases, when combined with the Final Rule's authorization of the ATF Director to "consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials," effectively delegate to the ATF Director unbounded, unconstitutional discretion to determine by diktat which products fall within ATF's jurisdiction.

62.     There is no reason why the existence of "instructions" or "tools" would have any bearing on whether an item meets the legal definition of a firearm "frame or receiver."

63.     Because the definition of a firearm "frame or receiver" has consequences for criminal liability, vagueness in that definition violates due process of law. *See Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). Furthermore, the rule of lenity applies, and *Chevron* deference is inappropriate. *See Leocal v. Ashcroft*, 543 U.S. 1 (2004); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992).

## B.     Definition of "Readily" by Reference to Eight Unranked, Unweighted Factors

64.     The Final Rule creates a new definition of "readily" as a "process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state." 87 Fed. Reg. at 24,735; *see also id.* at 24,747.

65.     The Final Rule then provides a non-exclusive list of eight unranked, unweighted factors, none of which is dispositive.

66.     The first factor is "(a) Time, *i.e.*, how long it takes to finish the process."

67.     The second factor is "(b) Ease, *i.e.*, how difficult it is to do so."

68.     The third factor is "(c) Expertise, *i.e.*, what knowledge and skills are required."

69.     The fourth factor is "(d) Equipment, *i.e.*, what tools are required."

70.     The fifth factor is "(e) Parts availability, *i.e.*, whether additional parts are required, and how easily they can be obtained."

71.     The sixth factor is "(f) Expense, *i.e.*, how much it costs."

72.     The seventh factor is "(g) Scope, *i.e.*, the extent to which the subject of the process must be changed to finish it."

73.     The eighth factor is "(h) Feasibility, *i.e.*, whether the process would damage or destroy the subject of the process, or cause it to malfunction."

74.     By making the definition of a "frame or receiver" turn on whether the product "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver" and then defining the word "readily" in such a vague manner, the Final Rule creates an unconstitutionally vague standard and effectuates an unconstitutional delegation of legislative authority to the ATF Director.

23

## C.      Definition of a "Firearm" as Including Weapon Parts Kits

75.      18 U.S.C. § 921(a)(3) defines the term "firearm" as including four categories of items: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."

76.      27 C.F.R. § 478.11 currently defines a "firearm" as including the four categories of items contained in 18 U.S.C. § 921(a)(3), tracking the statutory text almost verbatim: "Any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device; but the term shall not include an antique firearm. In the case of a licensed collector, the term shall mean only curios and relics."

77.      The Final Rule amends 27 C.F.R. § 478.11 by adding the following fifth category to the definition of a "firearm," which has no basis in the statutory text of 18 U.S.C. § 921(a)(3):

> The term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive. The term shall not include a weapon, including a weapon parts kit, in

24

which the frame or receiver of such weapon is destroyed as
described in the definition "frame or receiver."

87 Fed. Reg. at 24,735.

78.    Under this new provision, a collection of parts, none of which
independently constitutes a firearm, could nonetheless be characterized by the
government as a firearm based on an arbitrary determination that the items,
when grouped together, can "readily" be assembled into a firearm.

79.    Buried in footnote 45 of the Notice of Proposed Rulemaking, ATF
takes the position that "persons who engage in the business of selling or
distributing such weapon parts kits cannot avoid licensing, marking,
recordkeeping, or excise taxation by selling or shipping the parts in more than
one box or shipment to the same person, or by conspiring with another person
to do so." 86 Fed. Reg. at 27,726 n.45.

80.    ATF's position in this footnote is that companies that sell or
distribute individual components which could be used to assemble a firearm
must keep records of which parts have been sold or distributed to each
individual customer. The companies would then be required to analyze the
amorphous (and ultimately impossible to answer) question of whether the
totality of the parts that have been sold or distributed to that particular
customer, in that particular timeframe, could collectively constitute a firearm.
These recordkeeping requirements are incomprehensible and impracticable.

81.    In its responses to public comments in the Final Rule, ATF stood by its position in footnote 45. 87 Fed. Reg. at 24,713.

82.    By adding weapon parts kits to the definition of a "firearm," the Final Rule takes an existing rule that closely tracks the four statutory categories of "firearms" set forth by Congress and adds a brand new fifth category that Congress did not include. This violates the plain, unambiguous text of the statute, which evinces Congress's intent to create only four categories of "firearms," not five. By adding a fifth category with no basis in the statutory text, the Final Rule goes beyond merely interpreting or clarifying the statute adopted by Congress and instead seeks to rewrite it.

83.    The legislative history cited in the Notice of Proposed Rulemaking proves that Congress did not intend to regulate mere *parts* of firearms. Prior to the enactment of the modern law regulating firearms, a firearm was defined as including "any part or parts" of a firearm. 86 Fed. Reg. at 27,720. When the modern law regulating firearms was adopted, Senator Dodd stated: "The present definition of this term includes 'any part or parts' of a firearm. It has been impractical to treat each small part of a firearm as if it were a weapon. The revised definition substitutes the words 'frame or receiver' for the words 'any part or parts.'" *Id.* As this legislative history confirms, the Final Rule unlawfully seeks to regulate firearm parts that Congress intentionally sought to exempt from regulation.

26

## D.   New Regulations on "Privately Made Firearms" That Are Sweeping in Scope

84.   The Final Rule creates a new term, "privately made firearm," which it defines as a "firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number placed by a licensed manufacturer at the time the firearm was produced." 87 Fed. Reg. at 24,735.

85.   The Final Rule states that "licensees must legibly and conspicuously identify each privately made firearm or 'PMF' received or otherwise acquired (including from a personal collection) not later than the seventh day following the date of receipt or other acquisition, or before the date of disposition (including to a personal collection), whichever is sooner." 87 Fed. Reg. at 24,742. It further states that "PMFs must be identified by placing, or causing to be placed under the licensee's direct supervision, an individual serial number on the frame or receiver, which must not duplicate any serial number placed by the licensee on any other firearm." *Id.*

86.   The Final Rule also requires licensees to "identify . . . or cause another person to so identify, each privately made firearm received or otherwise acquired (including from a personal collection) by the licensee" before the effective date of the Final Rule "within sixty (60) days from that

date, or prior to the date of final disposition (including to a personal collection), whichever is sooner." 87 Fed. Reg. at 24,743.

87.     The Supplementary Information in the Notice of Proposed Rulemaking notes that "PMFs currently in inventory that a licensee chooses not to mark may also be destroyed or voluntarily turned in to law enforcement within the 60-day period." 86 Fed. Reg. at 27,732.

88.     These "identify, destroy, or surrender" requirements are arbitrary, capricious, and beyond the scope of ATF's statutory authority. The effect of these requirements is that any time a person takes a privately made firearm to a licensed gunsmith for repair or a licensed pawnbroker for a loan, causing the licensee to accept the firearm into his dominion and control, the licensee will have to identify and physically alter the firearm by engraving a serial number on it and make an entry in the licensee's records.

89.     The Final Rule also requires licensees to retain records indefinitely until the "business or licensed activity is discontinued." 87 Fed. Reg. at 24,746. This requirement is tantamount to creating an unlawful national gun registry for privately made firearms.

90.     The Final Rule's regulations on privately made firearms are so onerous that many licensees will cease to work with privately made firearms to avoid the Final Rule's excessive regulatory burdens. The lack of availability

28

of basic services for owners of privately made firearms will deter individuals from exercising their historically recognized right to make their own firearms.

91.     The coercive effect of these regulations will be to wipe out the secondary resale market for receiver blanks and firearms produced by individuals from receiver blanks, and more broadly, to eliminate the consumer market for receiver blanks entirely.

92.     The Final Rule's excessive regulations on "privately made firearms" cumulatively violate the constitutional rights of Division 80, its suppliers, and its customers.

93.     To the extent the Final Rule's regulations on "privately made firearms" apply to purely intrastate activities, they exceed Congress's authority under the Commerce Clause.

94.     The Final Rule's excessive regulations on "privately made firearms" cumulatively effectuate unconstitutional takings in violation of the Fifth Amendment.

## V.     The Final Rule Will Destroy Division 80's Entire Business

95.     Division 80 is a Texas limited liability company with its principal place of business in Galveston County, Texas. Its exclusive business is the distribution of receiver blanks to businesses that lawfully market the products to customers who wish to exercise their Second Amendment rights by making their own firearms.

29

96.    Division 80 lawfully operates without an ATF license because ATF's longstanding position has been that receiver blanks are unregulated raw materials.

97.    Division 80 fulfills orders by shipping receiver blanks to businesses across the country that place orders for products. The bulk of its customers are out of state.

98.    By unlawfully enacting legislative changes through its redefinitions of "firearm" and "frame or receiver," the Final Rule reverses ATF's longstanding legal position and subjects currently unregulated receiver blanks to the same regulatory requirements as fully functional firearms.

99.    Under the Final Rule, Division 80 would no longer be able to continue with its business of distributing receiver blanks through mail shipment without an ATF license.

100.   By delegating to the ATF Director unbounded discretion to apply vague and capacious standards for what constitutes a "firearm" and "frame or receiver," the Final Rule makes it impossible for manufacturers to determine with any reasonable certainty which regulatory requirements apply to a product design.

101.   By imposing unlawful and excessive identification and recordkeeping requirements on licensees who take "privately made firearms"

30

into their custody, the Final Rule will eliminate consumer demand for receiver blanks.

102.   In summation, the Final Rule will wipe out Division 80's business. Treating Division 80's products as regulated firearms would render its business operations illegal. And the bureaucratic red tape imposed by the Final Rule will eliminate consumer demand for Division 80's products.

103.   The Regulatory Impact Analysis and Final Regulatory Flexibility Analysis written by ATF acknowledges that the Final Rule will destroy non-FFL businesses such as Division 80. According to ATF, it is "unlikely that a significant number of non-FFLs" will continue to do business and non-FFLs will "end up dissolving their businesses." Exhibit B at 32. "[E]mployees will lose their jobs" as a result of these businesses dissolving, causing "unemployment." Exhibit B at 42.

104.   The political rhetoric of the Biden Administration attacking so-called "ghost guns" makes it clear that Defendants' goal is to wipe out the receiver-blank industry and destroy businesses such as Division 80. The Final Rule is certain to accomplish that goal if it takes effect. Division 80 has no choice but to seek preliminary and permanent injunctive relief and a declaration that the Final Rule is unlawful.

31

## CLAIMS FOR RELIEF

### COUNT I

### The Final Rule Exceeds Defendants' Statutory Authority

105.   All preceding paragraphs of this complaint are hereby incorporated by reference.

106.   The Final Rule, including its definitions of "frame or receiver," "readily," and "firearm," and its regulations on "privately made firearms," exceed Defendants' statutory authority.

107.   The Final Rule is "not in accordance with law" and is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

### COUNT II

### The Adoption of the Final Rule Violates the Separation of Powers

108.   All preceding paragraphs of this complaint are hereby incorporated by reference.

109.   Article I, § 1 of the Constitution states: "All legislative Powers herein granted shall be vested in a Congress of the United States."

110.   Article I, § 7, Clause 2 of the Constitution requires that "Every Bill" be passed by both the House of Representatives and the Senate and presented to the President "before it [may] become a Law."

32

111.   The Final Rule is not a valid interpretation of federal law. It is an unconstitutional attempt by Defendants to exercise legislative powers that belong to Congress. And it is an unconstitutional attempt to rewrite statutes without satisfying the requirements of bicameralism and presentment.

## COUNT III

### The Final Rule is Unconstitutionally Vague

112.   All preceding paragraphs of this complaint are hereby incorporated by reference.

113.   The Supreme Court has recognized that laws defining the scope of criminal liability are unconstitutionally vague if they do not provide fair notice to the public of what conduct is proscribed. *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018).   The vagueness doctrine "guards against arbitrary or discriminatory law enforcement" and "is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not." *Id.* at 1212.

114.   Numerous aspects of the Final Rule are unconstitutionally vague, including its definitions of a "frame or receiver," "readily," and "firearm."

115.   These definitions are so vague that even an experienced lawyer specializing in firearms law cannot say for certain which products fall within those definitions. The ordinary citizen therefore could not possibly understand how to properly comply with the statutes without risking criminal sanction.

## COUNT IV

## The Final Rule is Arbitrary, Capricious, and an Abuse of Discretion

116. All preceding paragraphs of this complaint are hereby incorporated by reference.

117. ATF previously stated on its website that receiver blanks do not meet the definitions of a "firearm" or "frame or receiver."

118. ATF previously reviewed product samples from industry and issued written classification determinations stating that receiver blanks do not meet the definitions of a "firearm" or "frame or receiver."

119. Prior to the Biden Administration, ATF defended the lawfulness of those classification determinations in litigation.

120. The Final Rule reverses ATF's longstanding legal interpretation, which has generated significant reliance interests, without a reasonable explanation.

121. The Final Rule contains internally self-contradictory provisions.

122. ATF's stated explanation for the Final Rule is a pretext for its true goal of unlawfully expanding its jurisdiction.

123. ATF did not adequately consider alternative regulatory approaches that could have avoided the destruction of businesses such as Division 80.

124. The Final Rule is therefore "arbitrary," "capricious," and "an abuse of discretion." 5 U.S.C. § 706(2)(A).

34

## COUNT V

### The Final Rule Was Adopted Without
### Observance of Procedure Required by Law

125.   All preceding paragraphs of this complaint are hereby incorporated by reference.

126.   The Notice of Proposed Rulemaking did not satisfy the notice requirements of 5 U.S.C. § 553(b).

127.   The Final Rule is not the logical outgrowth of the proposed rule.

128.   The process of notice-and-comment rulemaking requires an agency to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" and to give "consideration of the relevant matter presented." 5 U.S.C. § 553(c).

129.   Approximately 290,000 members of the public submitted comments to the proposed rule.

130.   Defendants did not adequately consider all relevant arguments raised in those comments and provide appropriately reasoned responses to them.

131.   The Final Rule does not provide an accurate and adequate "concise general statement" of its basis and purpose. 5 U.S.C. § 553(c).

132.   The Final Rule was therefore adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## COUNT VI

### The Final Rule Violates the Nondelegation Doctrine

133. All preceding paragraphs of this complaint are hereby incorporated by reference.

134. If this Court concludes that the Final Rule is authorized by statute, then the statutory scheme unconstitutionally delegates legislative power with no intelligible principle, violating the nondelegation doctrine. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935).

135. Various provisions of the Final Rule effectuate a double delegation by interpreting Congress's delegation of authority to ATF as allowing for the promulgation of a rule that in turn delegates to the ATF Director unbounded discretion to create and unilaterally revise legislative standards.

## COUNT VII

### The Final Rule is Contrary to
### Constitutional Right, Power, Privilege, or Immunity

136. All preceding paragraphs of this complaint are hereby incorporated by reference.

137. Division 80 has standing to assert the interests of itself and third parties, including its customers and suppliers. *See Craig v. Boren*, 429 U.S. 190 (1976).

138.   The Supreme Court has recognized that the Constitution's guarantee of equal protection applies to the federal government.

139.   The Second Amendment protects "the right of the people to keep and bear Arms."

140.   The Ninth Amendment recognizes that the people have inalienable rights not expressly enumerated in the Constitution.

141.   The Final Rule violates the constitutional rights of Division 80, its suppliers, and its customers to, among other things, be free from discriminatory government action, be free from irrational government action, keep and bear arms, engage in lawful self-defense, privately make firearms, possess property lawfully acquired, and earn a living by manufacturing and selling lawful goods in commerce.

142.   The Final Rule is therefore "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

## COUNT VIII

### The Final Rule Exceeds the Limits of the Commerce Clause

143.   All preceding paragraphs of this complaint are hereby incorporated by reference.

144.   To the extent the Final Rule imposes regulations on intrastate activities, those requirements exceed Congress's authority under the Commerce Clause. U.S. CONST. art. I, § 8, cl. 3.

37

## COUNT IX

### The Final Rule Effectuates a Regulatory Taking of "Privately Made Firearms" Without Just Compensation

145.  All preceding paragraphs of this complaint are hereby incorporated by reference.

146.  The Supreme Court has recognized that the appropriation of personal property by the government without just compensation can violate the Fifth Amendment's Takings Clause. *See Horne v. Dep't of Agriculture*, 576 U.S. 351, 357 (2015).

147.  The Supreme Court has also recognized that onerous government regulations can effectuate a regulatory taking. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (noting that the Court looks at the "economic impact of the regulation" and "the extent to which the regulation has interfered with distinct investment-backed expectations"); *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("[I]f regulation goes too far it will be recognized as a taking.").

148.  The Final Rule seeks to require licensees with "privately made firearms" in their inventories to either mark them according to the Final Rule's specifications, destroy them, or "voluntarily" turn them over to a law enforcement agency. The Final Rule places no restrictions on what the government may choose to do with "privately made firearms" that are

38

"voluntarily" surrendered to the government.

149. The Final Rule's regulations on "privately made firearms" effectuate a regulatory taking of personal property without just compensation.

## PRAYER

WHEREFORE, Plaintiff asks this Court to enter an order and a judgment:

a.   Holding unlawful and setting aside the Final Rule;

b.   Declaring that the Final Rule is unlawful;

c.   Issuing preliminary and permanent injunctive relief enjoining Defendants from enforcing or implementing the Final Rule;

d.   Postponing the effective date of the Final Rule;

e.   Awarding Plaintiff the costs of this action and reasonable attorney's fees; and

f.   Awarding such other relief as the Court deems equitable and just.

Respectfully Submitted,

Michael J. Sullivan
Massachusetts Bar No. 487210
*Pro Hac Vice Forthcoming*
ASHCROFT LAW FIRM LLC
200 State Street, 7th Floor
Boston, MA 02109
Phone: (617) 573-9400
Fax: (703) 247-5446
Email: msullivan@ashcroftlawfirm.com

*/s/ Cory R. Liu*
Cory R. Liu
*Attorney-in-Charge*
Texas Bar No. 24098003
S.D. Texas Bar No. 3047640
ASHCROFT LAW FIRM LLC
919 Congress Ave., Ste. 1325
Austin, TX 78701
Phone: (512) 370-1800
Fax: (703) 247-5446
Email: cliu@ashcroftlawfirm.com

*Counsel for Plaintiff Division 80 LLC*