# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | |
|---|---|
| JENNIFER VANDERSTOK, *et al.*, | |
| Plaintiffs, | Case No. 4:22-cv-00691-O |
| v. | |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States, *et al.*, | |
| Defendants. | |

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' <u>MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

I.    Statutory Background ...............................................................................................2

II.   Regulatory Background ............................................................................................3

III.  The Rule ....................................................................................................................4

      A.    Definition of "Firearm" ................................................................................4

      B.    Definition of "Frame or Receiver" ..............................................................5

      C.    Definition of "Privately Made Firearm" .....................................................6

LEGAL STANDARDS ........................................................................................................6

ARGUMENT .......................................................................................................................7

I.    Plaintiffs Have Failed to Demonstrate a Likelihood of Success on the Merits ..........................7

      A.    The Amendments to Regulatory Definitions Contained in the Rule Are Well
            Within the Authority Delegated to ATF by Congress ...................................7

            1.    The Amended Definition of "Frame or Receiver" .............................8

            2.    The Amended Definition of "Firearm" ............................................11

      B.    Incremental Amendments to Long-Standing Regulatory Definitions of
            Statutory Terms Do Not Implicate the Major Questions Doctrine ...............14

      C.    There Is No Need to Determine Whether *Chevron* Deference Applies Here. .............17

      D.    The Rule Is a Logical Outgrowth of the Notice. ........................................21

      E.    The Rule Adequately Explains Changes in ATF Policy ..............................25

II.   Plaintiff Has Not Shown That It Will Incur Irreparable Harm Absent a Preliminary
      Injunction. ..............................................................................................................29

      A.    Plaintiffs' Delay in Seeking Relief Shows the Lack of Irreparable Harm .............29

      B.    Plaintiffs Fail to Substantiate Any Imminent Threat of Irreparable Injury. .................30

III.  The Balance of Equities and Public Interest Make Injunctive Relief Inappropriate. ...............34

IV.   Any Relief Ordered Should Be Appropriately Limited. ...........................................35

CONCLUSION ..................................................................................................................36

# TABLE OF AUTHORITIES

## CASES

*Alabama Ass'n of Realtors v. HHS*,
141 S. Ct. 2485 (2021) .................................................................................................... 14, 15

*Alaska Airlines, Inc. v. Brock*,
480 U.S. 678 (1987) .................................................................................................................. 36

*Am. Trucking Ass'n v. Atchison, Topeka, and Santa Fe Ry. Co.*,
387 U.S. 397 (1967) ..................................................................................................................... 8

*Andritz Sundwig GmbH v. United States*,
No. CV 4:18-2061, 2018 WL 3218006 (S.D. Tex. July 2, 2018) ................................. 32

*Anyadike v. Vernon Coll.*,
No. 7:15-cv-00157-O, 2015 WL 12964684 (N.D. Tex. Nov. 20, 2015) ....................... 29

*Ariz. Pub. Serv. Co. v. EPA*,
211 F.3d 1280 (D.C. Cir. 2000) ........................................................................................ 23, 24

*Ass'n of Priv. Sector Colls. & Univs. v. Duncan*,
110 F. Supp. 3d 176 (D.D.C. 2015), *aff'd*, 640 F. App'x 5 (D.C. Cir. 2016) ............. 20

*Associated Builders & Contractors v. NLRB*,
826 F.3d 215 (5th Cir. 2016) ................................................................................................... 7

*Baylor Cnty. Hosp. Dist. v. Price*,
850 F.3d 257 (5th Cir. 2017) ................................................................................................. 18

*Becerra v. Empire Health Found.*,
142 S. Ct. 2354 (2022) ............................................................................................................. 18

*Biden v. Missouri*,
142 S. Ct. 647 (2022) ......................................................................................................... 16, 17

*Blue-Grace Logistics LLC v. Fahey*,
340 F.R.D. 460 (M.D. Fla. 2022) ......................................................................................... 29

*Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) .................................................................................................................. 17

*Clinchfield Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*,
895 F.2d 773 (D.C. Cir. 1990) .............................................................................................. 19

*Comic Strip, Inc. v. Fox Television Stations, Inc.,*
    710 F. Supp. 976 (S.D.N.Y. 1989) ........................................................................................29

*ConocoPhillips Co. v. U.S. EPA,*
    612 F.3d 822 (5th Cir. 2010) ..............................................................................................21

*Creekstone Farms Premium Beef, LLC v. U.S. Dep't of Agric.,*
    539 F.3d 492 (D.C. Cir. 2008) ............................................................................................19

*Daves v. Dallas Cnty.,*
    22 F.4th 522 (5th Cir. 2022) ...............................................................................................36

*Def. Distributed v. U.S. Dep't of State,*
    838 F.3d 451 (5th Cir. 2016) ..............................................................................................35

*Div. 80, LLC v. Garland,*
    No. 3:22-CV-148, 2022 WL 3648454 (S.D. Tex. Aug. 23, 2022) ..............................*passim*

*Edelman v. Lynchburg Coll.,*
    535 U.S. 106 (2002) ...........................................................................................................18

*Embarcadero Techs., Inc. v. Redgate Software, Inc.,*
    No. 1:17-cv-444-RP, 2017 WL 5588190 (W.D. Tex. Nov. 20, 2017) ................................30

*Entergy Miss., Inc. v. NLRB,*
    810 F.3d 287 (5th Cir. 2015) ..............................................................................................25

*FCC v. Fox Television Stations,*
    556 U.S. 502 (2009) ...........................................................................................................25

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ...............................................................................................14, 15, 16

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) .......................................................................................................35

*Golden Cheek Ventures, L.P. v. Brazos Elec. Power Coop., Inc.,*
    No. 4:15-cv-0821-O, 2015 WL 13469994 (N.D. Tex. Nov. 10, 2015) ...............................30

*Gonzales v. Oregon,*
    546 U.S. 243 (2006) ...........................................................................................................14

*H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC,*
    No. 3:09-CV-00390-L, 2009 WL 1766095 (N.D. Tex. June 23, 2009) ..............................29

*Handley v. Chapman,*
    587 F.3d 273 (5th Cir. 2009) ..............................................................................................25

*Holland Am. Ins. Co. v. Succession of Roy*,
  777 F.2d 992 (5th Cir. 1985) ........................................................................................30

*Huawei Techs. USA, Inc. v. FCC*,
  2 F.4th 421 (5th Cir. 2021) ....................................................................................21, 25

*John Doe # 1 v. Veneman*,
  380 F.3d 807 (5th Cir. 2004) ........................................................................................36

*La Union Del Pueblo Entero v. FEMA*,
  608 F.3d 217 (5th Cir. 2010) ..........................................................................................7

*Leaf Trading Cards, LLC v. Upper Deck Co.*,
  No. 3:17-cv-3200-N, 2019 WL 7882552 (N.D. Tex. Sept. 18, 2019) ..........................29

*Long Island Care at Home, Ltd. v. Coke*,
  551 U.S. 158 (2007) ......................................................................................................23

*Louisiana v. Becerra*,
  20 F.4th 260 (5th Cir. 2021) ....................................................................................17, 36

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................................................32, 33

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ......................................................................................................35

*Maryland v. King*,
  567 U.S. 1301 (2012) ....................................................................................................34

*MD/DC/DE Broads. Ass'n v. FCC*,
  236 F.3d 13 (D.C. Cir. 2001) ........................................................................................36

*Millennium Funding, Inc. v. 1701 Mgmt. LLC*,
  No. 21-cv-20862-bloom/Otazo-Reyes, 2021 WL 3618227 (S.D. Fla. Aug. 16, 2021) ..........................29

*Morehouse Enters. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
  No. 3:22-CV-116, 2022 WL 3597299 (D.N.D. Aug. 23, 2022) ...........................*passim*

*Mueller Supply Co. v. JNL Steel Components, Inc.*,
  No. 6:21-CV-036-H, 2022 WL 1199212 (N.D. Tex. Mar. 8, 2022) ..............................30

*Munaf v. Geren*,
  553 U.S. 674 (2008) ........................................................................................................6

*Muscarello v. United States*,
  524 U.S. 125 (1998) ......................................................................................................20

iv

*Nat'l Rifle Ass'n v. Brady,*
　914 F.2d 475 (4th Cir. 1990) .................................................................................7

*Nat'l Treasury Emps. Union v. Von Raab,*
　489 U.S. 656 (1989)...........................................................................................34

*New York v. Burger,*
　482 U.S. 691 (1987)......................................................................................9, 19

*Nken v. Holder,*
　556 U.S. 418 (2009).......................................................................................7, 34

*ODonnell v. Harris Cnty.,*
　892 F.3d 147 (5th Cir. 2018), *overruled on other grounds by*
　*Daves v. Dallas Cnty.*, 22 F.4th 522, 534 (5th Cir. 2022)......................................36

*Pals Grp., Inc. v. Quiskeya Trading Corp.,*
　No. 16-23905-CIV-GOODMAN, 2017 WL 532299 (S.D. Fla. Feb. 9, 2017) ....................29

*Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.,*
　188 F. Supp. 2d 1350 (S.D. Fla. 2002) ...................................................................29

*Sig Sauer, Inc. v. Brandon,*
　826 F.3d 598 (1st Cir. 2016)...................................................................................6

*Slocum v. City of Cleveland Heights,*
　No. 1:14CV532, 2014 WL 1237534 (N.D. Ohio Mar. 25, 2014) ...............................35

*Sw. Elec. Power Co. v. U.S. EPA,*
　920 F.3d 999 (5th Cir. 2019) ..............................................................................36

*Texas v. Biden,*
　10 F.4th 538 (5th Cir. 2021) ...............................................................................31

*Texas v. U.S. EPA,*
　829 F.3d 405 (5th Cir. 2016) ..............................................................................32

*United States v. Annis,*
　446 F.3d 852 (8th Cir. 2006) ..............................................................................12

*United States v. Garcia,*
　707 F. App'x 231 (5th Cir. 2017) ........................................................................18

*United States v. Rowold,*
　429 F. Supp. 3d 469 (N.D. Ohio 2019).................................................................28

*United States v. Ryles,*
　988 F.2d 13 (5th Cir. 1993)................................................................................12

*United States v. Stewart,*
   451 F.3d 1071 (9th Cir. 2006)...................................................................................12, 13

*United States v. Suchowolski,*
   838 F.3d 530 (5th Cir. 2016).........................................................................................20

*United States v. Theodoropoulous,*
   866 F.2d 587....................................................................................................................12

*United States v. Wick,*
   697 F. App'x 507 (9th Cir. 2017)................................................................................12, 13

*Utility Air Regulatory Group v. EPA,*
   573 U.S. 302 (2014)..........................................................................................14, 15, 16

*Wages & White Lion Investors, LLC v. FDA,*
   16 F.4th 1130 (5th Cir. 2021)........................................................................................32

*West Virginia v. United States Environmental Protection Agency,*
   142 S. Ct. 2587 (2022).............................................................................................14, 15

*Wireless Agents, LLC v. T-Mobile, USA, Inc.,*
   No. 3:05-CV-0094D, 2006 WL 1540587 (N.D. Tex. June 6, 2006)...............................29

## STATUTES

18 U.S.C. § 921(a)(3) ......................................................................................................13

18 U.S.C. § 921(a)(3)(A) ..................................................................................4, 12, 13, 27

18 U.S.C. § 921(a)(3)(B) ...............................................................................8, 10, 13, 34

18 U.S.C. § 922(g) ............................................................................................................34

18 U.S.C. § 922(t) ..............................................................................................................2

18 U.S.C. § 923(a) ..............................................................................................................2

18 U.S.C. § 923(a)(1)(B) ..................................................................................................31

18 U.S.C. § 923(a)(3)(B) ..................................................................................................31

18 U.S.C. § 923(g)(1)(A) ....................................................................................................2

18 U.S.C. § 923(i) ...............................................................................................................2

18 U.S.C. § 924(d) ............................................................................................................20

18 U.S.C. § 926(a) ........................................................................................................3, 7, 17

26 U.S.C. § 5845(b) ..........................................................................................................9, 19

26 U.S.C. § 7801(a)(2) ............................................................................................................7

28 U.S.C. § 599A(c)(1) ...........................................................................................................7

42 U.S.C. § 1302(a) ...............................................................................................................17

42 U.S.C. § 1395x(e)(9) ........................................................................................................17

Omnibus Crime Control & Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197 ........................2

## REGULATIONS

27 C.F.R. § 478.11 ...........................................................................................................3, 4

27 C.F.R. § 478.12(c) ...........................................................................................................10

28 C.F.R. § 0.130 ...................................................................................................................5

28 C.F.R. § 0.130(a)(1)-(2) .....................................................................................................7

Final Rule,
    43 Fed. Reg. 13,531(Mar. 31, 1978) .................................................................................3

Final Rule, Commerce in Firearms and Ammunition,
    33 Fed. Reg. 18,555 (Dec. 14, 1968), *codified at* 27 C.F.R. § 478.11 ..................................3

Final Rule, Definition of "Frame or Receiver" and Identification of Firearms,
    87 Fed. Reg. 24,652 (Apr. 26, 2022) ..........................................................................*passim*

Medicare and Medicaid Programs, Omnibus COVID-19 Health Care Staff Vaccination,
    86 Fed. Reg. 61,555 (Nov. 5, 2021) .............................................................................16, 17

Proposed Rule, Definition of "Frame or Receiver" and Identification of Firearms,
    86 Fed. Reg. 27,720 (May 21, 2021)............................................................................*passim*

**OTHER AUTHORITIES**

ATF, *Are "80%" or "unfinished" receivers illegal?*, ATF,
  https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9C
  unfinished%E2%80%9D-receivers-illegal .............................................................................................26

ATF, *Federal Firearms Listings*,
  https://www.atf.gov/firearms/listing-federal-firearms-licensees (last accessed Aug. 26, 2022) .....31

ATF, Regulatory Impact Analysis and Final Regulatory Flexibility Analysis 27 (2022),
  https://www.atf.gov/firearms/docs/rulemaking/ria-final-rule-2021r-05f-definition-frame-or-
  receiver-and-identification (last accessed August 29, 2022) ...................................................................11

S. Rep. No. 88-1340 (1964) ...............................................................................................................................12

"Protecting Our Kids Act,"
  H.R. 7910, 117th Cong. (2022) ................................................................................................................16

## INTRODUCTION

In two carefully reasoned decisions, courts in parallel cases have denied motions for preliminary injunctions similar to Plaintiffs' motion here. *Morehouse Enters. v. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)*, No. 3:22-CV-116, 2022 WL 3597299 (D.N.D. Aug. 23, 2022), *appeal docketed*; *Div. 80, LLC v. Garland*, No. 3:22-CV-148, 2022 WL 3648454 (S.D. Tex. Aug. 23, 2022). The Court should similarly deny Plaintiffs' motion.

Congress has vested in ATF the authority to promulgate regulations necessary to enforce federal firearms laws, including advising the firearms industry and the public of the agency's understanding of those laws. To explain the application of certain statutory terms to advances in firearms technology, ATF undertook the rulemaking at issue here. As relevant here, the statutory definition of "firearm" includes the "frame or receiver" of a firearm, which is a firearm's primary structural component. Since the agency first promulgated a regulatory definition of that term in 1968, technological advances have led to an increasing variety of frames and receivers. Technological advances have also made it easier for companies to create firearm parts kits, standalone frame and receiver parts, and easy-to-complete frames or receivers, and companies under the mistaken impression that these items do not qualify as "firearms" have sold these items without conducting background checks or maintaining records of such sales. As a result, persons prohibited from possessing firearms have bought these kits and easy-to-complete frames and receivers without undergoing background checks. When such firearms are used in crime, they cannot typically be traced because they lack serial numbers.

To provide clarity to the public and the firearms industry on the proper application of federal law, ATF promulgated a rule updating its definition of "frame or receiver" and other statutory and regulatory terms. Notwithstanding the clear statutory authority underlying the agency's rule and the critical law enforcement need for updated regulations, Plaintiffs brought this pre-enforcement facial

challenge that seeks to enjoin the rule, claiming that the agency lacks the statutory authority to update its regulations. Plaintiffs are unlikely to succeed on the merits of this claim, or their claim that the rule is arbitrary and capricious. Plaintiffs also fail to show that they are likely to suffer imminent irreparable harm absent emergency injunctive relief, or that the balance of the equities supports such relief here. The Court should therefore deny Plaintiffs' motion.

## I.    Statutory Background

Congress enacted the Gun Control Act of 1968, *as amended*, 18 U.S.C. §§ 921 *et seq.* (GCA), because "existing Federal controls over [firearms moving in interstate commerce] do not adequately enable the States to control this traffic. . . ." Omnibus Crime Control & Safe Streets Act of 1968, Pub. L. No. 90-351 § 901(a)(1), 82 Stat. 197, 225.[1]  Congress determined that "only through adequate Federal control . . . over *all* persons engaging in the businesses of importing, manufacturing, or dealing in [these weapons], can this grave problem be properly dealt with." *Id.* § 901(a)(3) (emphasis added). Accordingly, Congress enacted requirements for persons engaging in the business of importing, manufacturing, or dealing in "firearms." *See generally* 18 U.S.C. §§ 922-923.

Congress defined "firearm" to include "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "the frame or receiver of any such weapon." *Id.* § 921(a)(3).  However, Congress did not define the terms "frame" or "receiver." *See id.* § 921.  Congress requires individuals and entities that import, manufacture, or deal in firearms to receive a federal firearms license, *id.* § 923(a), to maintain records of firearm acquisition and transfer as prescribed by regulation, *id.* § 923(g)(1)(A), and to conduct background checks before transferring firearms to a non-licensee, *id.* § 922(t).  Congress also requires licensed importers and manufacturers to identify each firearm they import or manufacture by means of a serial number on the receiver or frame of the weapon.  *Id.* § 923(i).  Congress has also vested in ATF the authority to prescribe

---

[1] Throughout this brief, internal alterations and citations are omitted from relevant citations.

regulations "necessary to carry out the provisions of" the GCA.  *Id.* § 926(a).

## II.   Regulatory Background

ATF has promulgated regulations implementing the GCA.  *See* 27 C.F.R. parts 478-479.  Over fifty years ago, ATF defined the statutory term "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion."  Final Rule, Commerce in Firearms and Ammunition, 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968), *codified at* 27 C.F.R. § 478.11.[2]  This definition was meant to provide direction as to which portion of a weapon is the frame or receiver for purposes of licensing, serialization, and recordkeeping, thereby ensuring that a component necessary for the weapon's functioning could be traced if the weapon was used in a crime.  Final Rule, Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652, 24,652 (Apr. 26, 2022) (Rule).

However, a restrictive application of this definition—as some courts have recently used— would not describe the frame or receiver of most current firearms.  *Id.*  Most modern weapon designs have a split or multi-piece receiver where the relevant fire control components either are housed by more than one part of the weapon or incorporate a striker rather than a hammer to fire the weapon.  *Id.*  If the restrictive definition were followed, as many as 90% of all firearms would not have *any* frame or receiver subject to regulation.  *Id.*

Furthermore, technological advances in the decades since the "frame or receiver" definition was adopted have made it easier to create firearm parts kits, standalone frame or receiver parts, and easy-to-complete frames or receivers.  *Id.*  Some individuals and companies have sold these items to unlicensed persons without being licensed themselves, maintaining any records, or conducting background checks.  *Id.*  These products allow unlicensed persons to make firearms quickly and easily.

---

[2] Plaintiffs incorrectly date this regulatory definition to 1978 instead of 1968.  The set of 1978 final rules cited by Plaintiffs made no change to ATF's regulatory definition of "firearm frame and receiver."  *Compare id.* with Final Rule, 43 Fed. Reg. 13,531, 13,537 (Mar. 31, 1978).

*Id.* Because such privately made firearms typically lack serial numbers, it is extremely difficult for law enforcement to trace them when used in a crime. *Id.* at 24,652, 24,659.

## III.   The Rule

To update its decades-old definition of "frame or receiver," ATF published a notice of proposed rulemaking. Proposed Rule, Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27,720 (May 21, 2021) (Notice). ATF promulgated the final rule on April 26, 2022. 87 Fed. Reg. 24,652. Upon consideration of over 290,000 public comments, ATF explained its responses to the comments, its reasoned basis for the Rule's provisions, and its rationale for updating its regulations. *Id.* at 24,652-734. As relevant here, the Rule contains the following key provisions:

### A.   Definition of "Firearm"

Under the GCA and implementing regulations, a "firearm" includes "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A); 27 C.F.R. § 478.11. This definition thus includes currently inoperable weapons if they are "designed to" or "may readily be converted" to expel a projectile by the action of an explosive. *See* 87 Fed. Reg. at 24,661 nn.42-43. In recent years, weapon parts kits, or aggregations of weapon parts—some of which contain all components necessary to easily complete a functional weapon—have increasingly been sold to persons without background checks or recordkeeping. *Id.* at 24,662. Some of these firearm kits include jigs, templates, and tools that allow the purchaser to easily convert the weapon to a functional state. *Id.* Such weapon parts kits or aggregations of weapon parts that are *designed to* or *may readily be converted to* expel a projectile by the action of an explosive are "firearms" under the GCA and its regulations. *Id.* at 24,662 n.44.

To reflect existing case law, the Rule amends ATF's regulatory definition of "firearm," providing that "[t]he term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an

4

explosive." *See id.* at 24,662, 24,727, 24,735.

### B.    Definition of "Frame or Receiver"

The Rule provides an updated definition of the term "frame or receiver."[3]  *See id.* at 24,652, 24,727.  The Rule further defines "frame" for handguns, and "receiver" for rifles, shotguns, and other weapons that expel a projectile.  *See id.* at 24,727, 24,735.  Unlike the 1968 definition, these updated definitions now describe only a *single* housing or structural component for a *specific* fire control component of a given weapon—including "variants thereof," a term that is also defined.  *Id.*  For handguns, the frame is the housing or structure for the component—*i.e.*, the sear or its equivalent—designed to hold back the hammer, striker, bolt, or similar primary energized component before initiating the firing sequence.  *Id.*  For long guns, the receiver is the housing or structure for the primary component designed to block or seal the breech before initiating the firing sequence.  *Id.*

The definition of "frame or receiver" includes a frame or receiver that is partially complete, disassembled, or nonfunctional—including a frame or receiver parts kit—that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver.  *Id.* at 24,739; *see also id.* at 24,663, 24,727-28.  However, the definitions of "frame" and "receiver" specifically exclude forgings, castings, printings, or similar articles that have not yet reached a stage of manufacture where they are clearly identifiable as unfinished component parts of weapons—*e.g.*, unformed blocks of metal and other raw materials.  *Id.* at 24,663, 24,728, 24,739.

To provide notice as to how ATF evaluates firearm parts kits when making firearm classifications,[4] the Rule states that in issuing classifications, ATF may consider any templates, jigs,

---

[3] Previously, ATF regulations included definitions for both "firearm frame or receiver" and "frame or receiver."  87 Fed. Reg. at 24,727.

[4] Exercising its delegated authority to administer federal firearms laws, 28 C.F.R. § 0.130, ATF has provided both formal guidance (regulations) and informal guidance (classification determinations) as to what constitute "firearms."  Although a manufacturer or dealer is not legally required to seek an agency determination whether its product constitutes a "firearm" prior to the product's manufacture

molds, equipment, tools, instructions, guides, or marketing materials that are sold or otherwise made available with the item or kit.  87 Fed. Reg. at 24,724-25, 24,739.  To provide additional clarity, the Rule includes five non-exclusive examples illustrating the application of the "frame or receiver" definition to a "partially complete, disassembled, or nonfunctional frame or receiver."  *Id.* at 24,739.

The Rule also defines "[r]eadily" to mean a process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state.  *Id.* at 24,735.  With respect to ATF's classification of firearms, relevant factors to making this determination include: (1) time (2) ease, (3) expertise, (4) equipment (5) parts availability, (6) expense, (7) scope, and (8) feasibility.  *Id.*  This definition and factors are based on case law interpreting the terms "may readily be converted to expel a projectile" in the GCA and "can be readily restored to shoot" in the National Firearms Act (NFA).  86 Fed. Reg. at 27,663 & n.58.

C.     **Definition of "Privately Made Firearm"**

To account for recent technological advances, the Rule clarifies that the GCA's definition of "firearm" includes a "privately made firearm."  87 Fed. Reg. at 24,735.  A "privately made firearm" (PMF) is a firearm (including a frame or receiver) that is assembled or otherwise produced by a person other than a licensed manufacturer, and that does not contain a serial number placed by a licensed manufacturer at the time of production.  *Id.*  The Rule does not restrict the private making of firearms by non-licensees who are not otherwise prohibited by law from possessing them, and requires only that such firearms that are taken into inventory by licensees be serialized and recorded so that they may be traced by law enforcement if they are later involved in crime.  *Id.* at 24,653, 24,742, 24,744.

## LEGAL STANDARDS

"A preliminary injunction is an 'extraordinary and drastic remedy,'" *Munaf v. Geren*, 553 U.S.

---

or sale, ATF provides such determinations to manufacturers or dealers who submit requests for classification.  *See Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 599 (1st Cir. 2016).

674, 689-90 (2008) (citation omitted), that "should only issue if the movant shows: (1) a substantial

likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is

not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the

injunction is granted; and (4) the injunction will not disserve the public interest," *La Union Del Pueblo*

*Entero v. FEMA*, 608 F.3d 217, 219 (5th Cir. 2010).  The last two factors merge when the government

is the opposing party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Because Plaintiffs "bring a facial

challenge" prior to the Rule's enforcement, Plaintiffs "must establish that no set of circumstances

exists under which the [Rule] would be valid." *Associated Builders & Contractors v. NLRB*, 826 F.3d 215,

220 (5th Cir. 2016).

## ARGUMENT

### I.     Plaintiffs Have Failed to Demonstrate a Likelihood of Success on the Merits.

#### A.     The Amendments to Regulatory Definitions Contained in the Rule Are Well Within the Authority Delegated to ATF by Congress.

Plaintiffs first assert that portions of the Rule conflict with the relevant federal firearms

statutes.  Mem. Supp. Pls.' Mot. for Prelim. Inj.  at 13-21, ECF No. 16 (Pl.'s Mem.).  However, the

Rule is a valid exercise of the authority ATF has been expressly granted by Congress.

The Attorney General (AG) is responsible for enforcing the GCA and the NFA, and Congress

and the AG have expressly delegated the responsibility for administering and enforcing the GCA and

NFA to the Director of ATF.[5]  18 U.S.C. § 926(a) expressly delegates the authority to prescribe "such

rules and regulations as are necessary to carry out the provisions" of the statute.  "Because § 926

authorizes the [AG] to promulgate those regulations which are 'necessary,' it almost inevitably confers

some measure of discretion to determine what regulations are in fact 'necessary.'" *Nat'l Rifle Ass'n v.*

*Brady*, 914 F.2d 475, 479 (4th Cir. 1990).  Pursuant to this authority, ATF has for years issued

---

[5] *See* 18 U.S.C. § 926(a); 26 U.S.C. § 7801(a)(2); 28 U.S.C. § 599A(c)(1); 28 C.F.R. § 0.130(a)(1)-(2).

regulations that define statutory terms, including "firearm" and "frame or receiver."  However, existing regulations are not permanent, inflexible rules designed to last indefinitely; instead, agencies "are neither required nor supposed to regulate the present and future within the inflexible limits of yesterday."  *Am. Trucking Ass'n v. Atchison, Topeka, and Santa Fe Ry. Co.*, 387 U.S. 397, 416 (1967).  The question before the Court, then, is whether the definitions challenged by Plaintiffs comport with the language of the statute.  They do, for the reasons set forth below.

### 1.    The Amended Definition of "Frame or Receiver"

Plaintiffs argue that the Rule's definition of "frame or receiver" was amended in excess of ATF's delegated authority because it improperly "reads into" the definition of "frame or receiver" the term and concept of "readily" which is contained only in another portion of the statutory definition of "firearm."

In so arguing, Plaintiffs essentially seek to insert a new adjective modifying "frame or receiver" into the statute – such as "actual," "complete," "functional," or "operable" – where none exists.  *See* Pls.' Mem. at 8 ("Congress granted the ATF the limited authority to regulate . . . the *actual complete or functional* receiver of such weapons.").  However, nothing in the statute expressly requires that a frame or receiver be complete, or functional, to qualify as a "firearm" under 18 U.S.C. § 921(a)(3)(B).  Because the GCA did not define "frame or receiver," Congress did not prescribe what "frame or receiver" should encompass, and it fell upon ATF to define the term, which it has done for many years.  The crucial question left unresolved by the statute is at what point a mere component or foundation of a component, such as a piece of metal or plastic—which is unregulated under federal firearms law—becomes a "frame or receiver" that is so regulated.[6]  The amended definition answers

---

[6]  Indeed, even under the previous definition, ATF has long held the position that a component need not be a complete or functional frame or receiver to constitute a "frame or receiver" within the meaning of that term in the GCA, but determined that a component identifiable as a component of a weapon became a "frame or receiver" once it reached a "critical stage of manufacture" at which it

this important question.  While Plaintiffs argue that the use of the term "readily" in the amended definition of "frame or receiver" means ATF must have improperly transported that term from the statutory definition of "firearm," ATF's use of the term "readily" incorporates a term that Congress has used repeatedly in federal firearms laws—not only the GCA, but also elsewhere, *see, e.g.*, 26 U.S.C. § 5845(b) (defining "machinegun" as "any weapon which shoots, is designed to shoot, or can *readily* be restored to shoot, automatically…").  The *Morehouse* court considered an identical argument and held that it "misses the mark" because "the Final Rule does not improperly use the statutory term 'readily.'"  *Morehouse*, 2022 WL 3597299, at *6.

This amendment to the regulatory definition of "frame or receiver" ensures that the GCA and NFA accomplish what Congress intended the statutes to do.  Any other approach would result in persons being able to easily circumvent the requirements of the GCA and NFA by producing or purchasing almost-complete frames or receivers that could easily be altered to produce a functional frame or receiver.  This would thwart Congress's purpose in enacting the GCA and NFA.  *See New York v. Burger*, 482 U.S. 691, 713 (1987) ("[T]he regulatory goals of the Gun Control Act . . . ensure[] that weapons [are] distributed through regular channels and in a traceable manner," thus making "possible the prevention of sales to undesirable customers and the detection of the origin of particular firearms.").  The clear Congressional intent, as indicated by the plain language and the statutory scheme of the GCA, was to regulate—as a "firearm"—the frame or receiver of a weapon.  By updating the definition of "frame or receiver," ATF has taken a reasonable approach that incorporates well-known and oft-interpreted concepts such as the "may readily be completed, assembled, restored, or otherwise converted" language into the definition.  As the *Morehouse* court held in rejecting an identical argument to that raised by Plaintiffs here, "adopting Plaintiffs' position would appear to contradict

---

was "brought to a stage of completeness that will allow it to accept the firearm components for which it is designed for [sic], using basic tools in a reasonable amount of time."  87 Fed. Reg. 24,684.

the plain language of the GCA, which clearly defined 'firearms' more broadly than a fully operational weapon." *Morehouse*, 2022 WL 3597299, at *6.

Plaintiffs' quotation of language from a prior government brief in the *Syracuse* case, Pls.' Mem. at 17, is inapposite to the issues before the Court. That case involved the prior definition of the term "frame or receiver." Given that the prior definition did not include the very language Plaintiffs are challenging here, it is surely unsurprising that ATF's position as to whether an unfinished frame or receiver that could readily be converted to a functional frame or receiver was a "frame or receiver" under 18 U.S.C. § 921(a)(3)(B) was different in the absence of language in the regulatory definition directly addressing the situation. Now that the current definition does specifically define "frame or receiver" as encompassing such unfinished components that may readily be converted to functional frames or receivers, of course ATF's position has evolved.[7]

It is not clear what relevance Plaintiffs' inclusion of an illustrative photo example from an ATF publication or its discussion of "frame or receiver parts kits" has to their argument that ATF exceeded its statutory authority in amending the definition of "frame or receiver." The top two pictures, *id.* at 18, show AR receiver blanks without critical interior areas having been indexed, machined, or formed. Under both the prior definition and the amended definition in the Rule, these are not considered to be a "frame or receiver" unless they are sold with jigs, templates, equipment, tools or other products or components that would make the receiver blank readily convertible to a functional frame or receiver. *See* 87 Fed. Reg. at 24,739, 27 C.F.R. § 478.12(c), Ex. 4. The final picture shows an AR receiver that has had the critical machining done so that it is a functional receiver. As to the "frame or receiver parts kits," Pls. Mem. at 18, quoting 87 Fed. Reg. at 24,739, many weapons

---

[7] Similarly, Plaintiffs' invocation of prior classification letters issued by ATF under the prior rule, Pls.' Mem. at 19, is irrelevant to whether the amended definition in the Rule is within ATF's delegated authority. Unsurprisingly, ATF classified certain products differently under the prior definition of "frame or receiver" than it presumably will under the current amended definition. If this were not the case, there would have been no point to amending the definition.

have partially complete frames or receivers that are oftentimes sold in "kits." But there is no separate regulation or definition for the term – regardless of whether it is a single component or multiple components, the inquiry under the amended definition is whether an item that is clearly identifiable as a component part of a weapon can readily be converted to a functional frame or receiver. As the Regulatory Impact Statement notes, a frame or receiver parts kit "is an aggregation of frame or receiver parts that are designed to or may readily be converted to function as a frame or receiver . . . . Simply put, . . . completing/assembling the parts in a 'frame or receiver' kit results in a *functional* frame or receiver." ATF, Regulatory Impact Analysis and Final Regulatory Flexibility Analysis 27 (2022), available at   https://www.atf.gov/firearms/docs/rulemaking/ria-final-rule-2021r-05f-definition-frame-or-receiver-and-identification (last accessed August 29, 2022).

Accordingly, including within the amended definition of "frame or receiver" a component "that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver" is within ATF's well-established delegated authority. This amended definition is consistent with the plain language of the statute and Congressional intent, and avoids an absurd result of allowing individuals to easily circumvent federal firearms regulations by purchasing a product that can easily be converted to the key component of a functional weapon without any of the licensing, background checks, recordkeeping, or tracing requirements that apply to "firearms."

### 2.     The Amended Definition of "Firearm"

Plaintiffs next argue that ATF acted in excess of its statutory authority by including "weapons parts kits" within the definition of "firearm." Pls.' Mem. at 19-21.

As an initial matter, the idea that the GCA definition of "firearm" encompasses something other than a completely assembled and functional weapon is not a novel idea set forth for the first time in the Rule, but rather a longstanding and widely-held interpretation of the statute. Courts have

long recognized that a disassembled weapon constitutes a "firearm" for purposes of the GCA.[8] Plaintiffs essentially argue that this Court should add a new term—"complete" or "fully functional"— to modify the word "weapon" in the statutory definition of "firearm." But this would directly contradict the statutory text, which states that a "firearm" is "any weapon (including a starter gun) which will *or is designed to or may readily be converted to* expel a projectile by the action of an explosive…" 18 U.S.C. § 921(a)(3)(A) (emphasis added). The reference to a starter gun[9] and to weapons that are merely "designed to" or "may readily be converted to" expel a projectile demonstrate a clear Congressional intent for the term "firearm" to encompass more than just fully functional weapons. Thus, the Rule's definition of "firearm" to include "weapon parts kits" is consistent with statutory text, Congressional intent, and courts' longstanding interpretation of the GCA.

Plaintiffs' citation to language from the Government's brief in *California v. ATF*, Pls.' Mem. at 19-20, is a red herring. The language quoted simply states that *individual* firearm parts were not considered "firearms" under the statute. Nothing in the Final Rule is to the contrary; rather, kits consisting of enough component parts such that they may be readily converted to a functional weapon are considered "firearms." The Rule is clear that in order to be "readily" convertible to expel a projectile, the conversion of a kit or aggregation of parts "must be fairly or reasonably efficient, quick, and easy . . . after examining the enumerated factors" in the definition of "readily." *Id.* That is consistent with the plain language of the statute and the interpretation of the statutory definition by numerous federal courts of appeals. It is therefore an appropriate interpretation of the regulatory

---

[8]  *See, e.g., United States v. Wick*, 697 F. App'x 507, 508 (9th Cir. 2017); *United States v. Stewart*, 451 F.3d 1071, 1073 n.2 (9th Cir. 2006): *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006); *United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993); *United States v. Theodoropoulous*, 866 F.2d 587, 595 n.3d (3d Cir. 1989).

[9]  A "starter gun" is a gun designed for use with "blank" ammunition. Congress was concerned at the ease with which such a device could be converted to expel live ammunition, and cited in the GCA's legislative history the case of an individual who made bulk purchases of starter guns out of state and "would then, at his residence, disassemble them, and . . . bore out the plugged barrel and enlarge the cylinder chambers to accommodate .22-caliber cartridges." *See* S. Rep. No. 88-1340, at 14 (1964).

definition.  Under Plaintiffs' interpretation, a partially disassembled handgun that is missing one minor part (for example, a screw or a firing pin) cannot and should not be considered a "firearm" under the GCA and therefore may freely be sold commercially with none of the licensure, background-check, marking, or record-keeping requirements that would attach to the repetitive sale of "firearms." Similarly, a disassembled rifle that could be reassembled in minutes could be freely sold by someone without a federal firearms license.  Nothing in the statute requires such an absurd result.

Plaintiffs reveal a misunderstanding of the statute by asserting that the amended definition of "firearm" to include "weapons kits" is improper because the only inquiry should be whether such "weapons kits" have a frame or receiver.  The statutory definition of firearm is framed in the disjunctive, meaning any of the four enumerated categories will constitute a firearm.  18 U.S.C. § 921(a)(3).  In other words, a "firearm" can be either "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" *or* "(B) the frame or receiver of any such weapon."  *Id.*  But there is no statutory basis for concluding that in order to be a "firearm" under § 921(a)(3)(A), a weapon parts kit must first be a "firearm" under § 921(a)(3)(B).[10]  In fact, doing so would render § 921(a)(3)(A) superfluous and irrelevant, and the Court should therefore reject this strained and illogical reading of the statute.

As the *Morehouse* court held in rejecting an identical argument to that raised by Plaintiffs here, "[t]he language from the Final Rule – 'completed, assembled, restored, or otherwise converted,' as well as the weapons kits at issue – fit squarely within the GCA's "firearm" definition because after

---

[10]  Multiple courts have rejected the distinction Plaintiffs attempt to make even prior to the Rule. Courts have held that disassembled weapons constitute "firearms" under the statute even if the frame or receiver is incomplete or nonfunctional.  In *Wick*, the receivers in question were "demilled" and therefore not functional.  697 F. App'x at 508.  In *Stewart*, the kits contained incomplete receivers that required someone to cut out a portion of the receiver for it to become functional.  451 F.3d at 1072-73.  In both cases the court held that the weapon kits could easily be converted into a functional weapon and should therefore be treated as a weapon, despite not containing a functional frame or receiver.

delivery, the kits are easily converted from mere parts into a weapon that expels a projectile." *Morehouse*, 2022 WL 3597299, at *5. Accordingly, the Rule's amendment of the term "firearm" is consistent with the statutory definition of that term and the purpose and intent of the GCA.

### B. Incremental Amendments to Long-Standing Regulatory Definitions of Statutory Terms Do Not Implicate the Major Questions Doctrine

Plaintiffs next argue that the Rule should be enjoined because it was issued in violation of the "major questions doctrine," as recently explained in the Supreme Court's decision in *West Virginia v. United States Environmental Protection Agency*, 142 S. Ct. 2587 (2022). Pls.' Mem. at 21-24. However, the amending of definitions of terms for which ATF has long provided regulatory definitions does not meet the criteria for application of the "major questions doctrine."

The "major questions doctrine" only applies "in certain extraordinary cases" that involve "decisions of vast economic and political significance," assertions of "extravagant statutory power over the national economy," or assertions of "highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 142 S. Ct. at 2605, 2609. The ATF actions challenged here fall well short of the kind of "extraordinary case[]" that the Supreme Court has previously recognized as implicating the doctrine. For example, the Clean Power Plan at issue in *West Virginia* involved a 10% energy rate hike, permanently shutting down many power plants, a $1 trillion loss to GDP, and a complete reorganization of American energy infrastructure. *Id.* at 2604. Similarly, other cases in which the Supreme Court has held that the doctrine applies involved changing the terms of 80% of American residential leases, *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021), regulating the entire tobacco industry, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), imposing new emissions regulations on hotels, restaurants, and other small businesses, *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014), and the Federal government unilaterally rescinding physicians' state-issued licenses to practice medicine, *Gonzales v. Oregon*, 546 U.S. 243 (2006). Here, the challenged action impacts a comparatively much smaller set of manufacturers and sellers, any of

14

whom could continue to sell any and all of the products at issue here freely by obtaining a federal firearms license.

In asserting that the major questions doctrine applies here, Plaintiffs neglect to mention the various factors the Supreme Court typically looks to in determining whether the doctrine is appropriate. Common factors in cases in which the Court has applied the major questions doctrine typically involve a "novel" or "unprecedented" interpretation of statutory delegation involving "ancillary" statutory provisions. *See West Virginia*, 142 S. Ct. at 2605 ("And that novel reading of the statute would…"); 2610 ("It located that newfound power in the vague language of an 'ancillary provision' of the Act…"); *Alabama Ass'n of Realtors*, 141 S. Ct. at 2489 ("This claim of expansive authority . . . is unprecedented."); *Utility Air*, 573 U.S. at 328 ("EPA asserts newfound authority…"); *FDA*, 529 U.S. at 146 ("[S]ince the agency's inception. . . . it never asserted authority to regulate tobacco products as customarily marketed."). Here, ATF has for decades used the primary delegation of authority from Congress to provide regulatory definitions for a variety of statutory terms, including "firearm" and "frame or receiver," and here has simply amended those definitions to better serve the statutory purposes. Nothing about this action entails a "novel" or "unprecedented" use of a previously unused ancillary provision to expand the agency's regulatory sphere like the cases in which the Supreme Court has applied the major questions doctrine.

The Supreme Court also typically looks to whether the challenged action is within the agency's traditional field of expertise, *see West Virginia*, 142 S. Ct. at 2612-13 ("When an agency has no comparative expertise in making certain policy judgments, we have said, Congress presumably would not task it with doing so."); whether it intrudes on matters typically governed by state law, *id.* at 2606 ("little question" that states were harmed because regulatory action required that states "more stringently regulate power plant emissions within their borders"), *Alabama Ass'n of Realtors*, 141 S. Ct. at 2489 ("The moratorium intrudes into an area that is the particular domain of state law: the landlord-

tenant relationship."), *Utility Air*, 573 U.S. at 308 ("States have primary responsibility for implementing the NAAQS…."); and whether Congress has expressly considered and rejected the measure in the past, *FDA*, 529 U.S. at 159-60 ("Congress has . . . squarely rejected proposals to give the FDA jurisdiction over tobacco").

Here, none of these indicia of a "major questions doctrine" case is present – the definition of what is and is not a "firearm" or "frame or receiver" is squarely within the expertise of ATF, regulation of firearms is traditionally primarily a matter of federal, not state, law. Nor has Congress considered and rejected this regulatory definition. While Plaintiffs assert otherwise, Pls.' Mem. at 24 ("The content of bills rejected by Congress are now the content of the agency's regulation."), they cite to no proposed legislation in support of this proposition. Nor could they. Plaintiffs are presumably referring to the "Protecting Our Kids Act," H.R. 7910, 117th Cong. (2022). Even assuming Congress does not pass the law, inferring Congressional intent from silence or inaction is a dangerous canon of statutory interpretation. More importantly, however, that proposed legislation goes *far* beyond anything in the Rule, essentially seeking to effect a complete ban on privately made firearms, which, as discussed above, the Rule here simply does not do. It is reasonable to speculate that lawmakers may feel differently about the incremental amendments to definitions contained in the Rule and a complete ban on privately made firearms, so the fact that Congress has chosen not to effect a complete ban has no bearing on whether Congress would view the Rule as being within ATF's delegated authority.

Instead, this case is much closer in all material ways to the Supreme Court's recent decision in *Biden v. Missouri*, 142 S. Ct. 647 (2022). That decision upheld an HHS rule that established a COVID-19 vaccination requirement for approximately 10.4 million healthcare workers at facilities accepting federal Medicare or Medicaid funds. *See* Medicare and Medicaid Programs, Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. 61,555 (Nov. 5, 2021). The rule was invalidated by lower

16

courts, including the Fifth Circuit, *see Louisiana v. Becerra*, 20 F.4th 260, 262 (5th Cir. 2021) (per curiam), under the major questions doctrine. However, the Supreme Court held that, even though the rule was to have total annual costs of approximately $1.38 billion, 86 Fed. Reg. at 61,602, 61,609, and went further than any condition HHS had previously placed on funding for the purpose of infection control, *Missouri*, 142 S. Ct. at 653, it was not a major questions doctrine case. The delegations of authority at issue in *Missouri* were general and made no specific mention of vaccination, stating that the Secretary could issue regulations "as may be necessary to the efficient administration of the functions with which [he] is charged," 42 U.S.C. § 1302(a), and allowing the Secretary to impose conditions on the receipt of funds that "the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services," 42 U.S.C. § 1395x(e)(9). That is similar to the general "necessary" delegation of authority to ATF contained in 18 U.S.C. § 926(a) at issue here. The Court further noted that the rule was issued to prevent infections, a subject matter area traditionally within HHS's area of expertise, *Missouri,* 142 S. Ct. at 653, and that placing conditions on the acceptance of Medicare and Medicaid funds was consistent with HHS's "longstanding practice," *id.* at 652. Similarly, here, ATF has long made determinations and issued definitions regarding what is and is not a firearm and frame or receiver, and the amended definitions contained in the Rule are consistent with ATF's expertise and longstanding practice.

Accordingly, because the actions challenged by Plaintiffs were incremental updates to definitions for which ATF has long provided definitions pursuant to its authority delegated by Congress, and this subject matter is within ATF's field of knowledge and consistent with longstanding practice, the major questions doctrine does not apply here.

### C. There Is No Need to Determine Whether *Chevron* Deference Applies Here.

Although Plaintiffs argue that the Rule is not entitled to deference under *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), *see* Pls.' Mem. at 24-27, there is no need to

reach this question because the Rule reflects the best statutory interpretation.  It is unnecessary to consider deference when an agency rule adopts "not only a reasonable [position], but the position that [the Court] would adopt even if there were no formal rule and [the Court] were interpreting the statute from scratch." *Edelman v. Lynchburg Coll.*, 535 U.S. 106, 114 (2002); *see also Becerra v. Empire Health Found.*, 142 S. Ct. 2354, 2362 (2022) (agency's "regulation correctly construes the statutory language at issue" because, *inter alia*, "[t]he provisions are technical" and "[t]he text and context support the agency's reading").  Alternatively, if a rule does not reflect this position, the Court should "consider the agency's interpretation to the extent it is persuasive." *United States v. Garcia*, 707 F. App'x 231, 234 n.5 (5th Cir. 2017) (citing *Baylor Cnty. Hosp. Dist. v. Price*, 850 F.3d 257, 261 (5th Cir. 2017)).

Under either standard, ATF acted within its statutory authority in promulgating the Rule. Plaintiffs incorrectly contend that the Rule's definition of "frame or receiver" is invalid because it improperly uses the term "readily" from the statutory definition of "firearm."  Pls.' Mem. at 24-25. However, "readily" is a widely used word and concept in federal firearms laws and regulations, and the Rule "does not improperly use the statutory term 'readily'" in the amended definition of "frame or receiver." *Morehouse*, 2022 WL 3597299, at *6.  "[T]he GCA does not define the term 'frame or receiver,' which leaves the regulation of what constitutes a frame or receiver to the discretion of the ATF." *Id.* And the crucial question is at what point a mere component or foundation of a component, such as a piece of metal or plastic—which is unregulated under federal firearms law—becomes a "frame or receiver" that is so regulated.  The clear Congressional intent, as indicated by the plain language and the statutory scheme of the GCA, was to regulate—as a "firearm"—the frame or receiver of a weapon.  By updating the definition of "frame or receiver," ATF has taken a reasonable approach that incorporates into the definition well-known and oft-interpreted concepts such as the "may readily be completed, assembled, restored, or otherwise converted" language.

Because the GCA did not define "frame or receiver," Congress did not prescribe what "frame or receiver" should encompass. ATF's use of the term "readily" incorporates a term that Congress used repeatedly in federal firearms laws—not only the GCA, but also elsewhere, *see, e.g.*, 26 U.S.C. § 5845(b) (defining "machinegun" as "any weapon that shoots, is designed to shoot, or can be *readily* restored to shoot, automatically…") (emphasis added)—so that the regulatory definition of "frame or receiver" actually accomplishes what Congress intended it to do. Any other approach would result in persons being able to easily circumvent the requirements of the GCA and NFA by producing or purchasing almost-complete frames or receivers that could easily be altered to produce a functional frame or receiver. As explained above, *see supra* I.A.1, this would be contrary to Congress's purpose in enacting the GCA and NFA. *See Burger*, 482 U.S. at 713.

Moreover, the mere fact that Congress *included* the phrase "may readily be converted" in one sub-provision of the GCA (generally defining "firearm") does not mean that it *excluded* the possibility that ATF could use the words "readily" and "converted" in interpreting another sub-provision (expressly including a firearm's "the frame or receiver" within the definition of "firearm"). *See, e.g.*, *Clinchfield Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 895 F.2d 773, 779 (D.C. Cir. 1990) (explaining that "[t]he difficulty with" the argument that "explicit direction for something in one provision, and its absence in a parallel provision, implies an intent to negate it in the second context" is that "it disregards several other plausible explanations for an omission"); *Creekstone Farms Premium Beef, LLC v. U.S. Dep't of Agric.*, 539 F.3d 492, 500 (D.C. Cir. 2008) (holding that when a statute "contains broad language authorizing the agency to promulgate regulations necessary to 'carry out' the statute," the negative-implication canon "has minimal, if any, application").

Plaintiffs also misplace their reliance on the rule of lenity, *see* Pls.' Mem. at 25, which "only applies if, after considering the text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the court must simply guess as to what Congress intended."

*United States v. Suchowolski*, 838 F.3d 530, 534 (5th Cir. 2016) (citation omitted).  That is not this case.  Plaintiffs have established no "grievous ambiguity or uncertainty" here, and the rule of lenity therefore does not apply.  *See also Muscarello v. United States*, 524 U.S. 125, 138-39 (1998) ("The simple existence of some statutory ambiguity, however, is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree.").[11]

Nor, contrary to Plaintiffs' contention, does the Rule's term "complete weapon" create enforcement uncertainty.  Pls.' Mem. at 25-27.  Initially, Plaintiffs' argument depends largely on a hypothetical scenario in which two disassembled firearms "could *theoretically* create a new combination."  *Id.* at 27 (emphasis added).  But "hypothetical examples" are "irrelevant to facial challenges," *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 110 F. Supp. 3d 176, 196 (D.D.C. 2015), *aff'd*, 640 F. App'x 5 (D.C. Cir. 2016), because it is Plaintiffs' burden to establish that no set of circumstances exists under which the Rule would be valid, *see supra* Legal Standards, and not Defendants' burden to support the Rule's application as applied to hypothetical circumstances.  In any event, the term "complete weapon" does not create enforcement uncertainty.  The Rule uses this term simply to "explain when a frame or receiver of a firearm . . . must be marked for identification" by the licensed manufacturer that produces it.  87 Fed. Reg. at 24,664.  The Rule thus defines this term to mean a "firearm" that contains all component parts necessary to function.  *Id.* at 24,734.  And because the Rule's definition of "complete weapon" expressly incorporates the term "firearm," that definition assumes that there is *already* an article defined as a "firearm" before it can be a "complete weapon."

---

[11] Moreover, ATF regulations like the Rule do not have criminal penalties attached to them (although they can be used to support seizure and forfeiture under 18 U.S.C. § 924(d)).  The Rule is primarily directed at licensing, not criminal applications.  It only implicates criminal penalties to the extent that a court in a criminal case may need to look to the Rule's definition of "frame or receiver" to understand the meaning of that term.  The Rule does not create any new criminal law, but simply clarifies that weapon parts kits and ready-to-complete frames and receivers are subject to the same rules as fully complete and assembled firearms.

In sum, the Rule's definition of "complete weapon" has no consequences for law-abiding firearm owners, but is simply intended to inform licensed manufacturers when a firearm frame or receiver should be marked for identification.[12]

### D.    The Rule Is a Logical Outgrowth of the Notice.

The Rule is a logical outgrowth of the Notice.  *Contra* Pls.' Mem. at 28-29.  A notice of proposed rulemaking is "not required to specifically identify every precise proposal which the agency might ultimately adopt" but instead "satisfie[s] the requisite standard by fairly apprising interested persons of the subjects and issues the agency was considering."  *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 448 (5th Cir. 2021); *see also ConocoPhillips Co. v. U.S. EPA*, 612 F.3d 822, 834 (5th Cir. 2010) (noting that "courts must proceed with caution before deeming a Final Rule too attenuated from the Proposed Rule").

As *Morehouse* held in rejecting a similar challenge, the Rule satisfies this standard with respect to ATF's regulatory definition of "frame or receiver."  The Notice "expressly stated [] ATF's intent to update and modernize the definition of 'frame or receiver' because 'most firearms currently in circulation in the United States do not have a specific part that expressly falls within the current frame or receiver regulatory definitions.'"  *Morehouse*, 2022 WL 3597299, at *4 (quoting 86 Fed. Reg. at 27,727).  In the Notice, "ATF started with a broad definition of 'frame or receiver,'" *id.*, to mean a firearm part "that provides housing or a structure designed to hold or integrate *any* fire control component." 86 Fed. Reg. at 27,727 (emphasis added).  In turn, "fire control component" was also defined broadly as "a component necessary for the firearm to initiate, complete, or continue the firing

---

[12] Moreover, contrary to Plaintiffs' contention, *see* Pls.' Mem. at 27 n.26, ATF specifically responded to comments arguing that "the application of the definition of 'firearm' to unassembled weapons creates enforcement uncertainty" by clarifying that the purpose of the term "complete weapon" was "to explain when the frame or receiver of a weapon in the process of being manufactured must be identified and recorded."  87 Fed. Reg. at 24,700; *see also id.* at 24,700-01 (providing additional explanation).

21

sequence, including" such different types of components as a "[h]ammer, bolt, bolt carrier, breechblock, cylinder, trigger mechanism, firing pin, striker, or slide rails." *Id.* at 27,741; *see also id.* at 27,727. "And after reviewing and considering the over 290,000 comments offered by the public, . . . ATF narrowed its definition of 'frame and receiver.'" *Morehouse*, 2022 WL 3597299, at *4. The Rule defines "frame" as the part of a handgun that provides housing for the component designed to hold back the hammer, striker, bolt, or similar primary energized component before the firing sequence is initiated. *See* 87 Fed. Reg. at 24,735. This component—also known as the "sear"—is clearly a "fire control component," as the Notice proposed to define that latter term, because the sear is necessary for the handgun to complete the firing sequence.[13] *See* 86 Fed. Reg. at 27,727. Similarly, the Rule defines "receiver" as the part of a long gun or other projectile weapon that provides housing for the primary component designed to block or seal the breech before the firing sequence is initiated. 87 Fed. Reg. at 24,735. This component—known as the bolt or breechblock—is a "fire control component" under the Notice's proposed definition because it is necessary to "complete[] or continue the firing sequence;" indeed, the Notice's nonexclusive list of "fire control components" included a "bolt" and a "breechblock." 86 Fed. Reg. at 27,741; *see also id.* at 27,727. The Notice thus made clear ATF's proposal to include in its updated definition of "frame or receiver" any firearm part that provides housing for *any* fire control component.[14] In turn, the Rule defined a "frame" or "receiver" more narrowly to mean only a subset of this broad category. The housings identified in the Rule were thus included in the Notice's proposed definition of "frame or receiver." And "variant," as defined

---

[13] When a handgun's sear is released, it causes the hammer or striker to hit the primer on the cartridge in the chamber, which completes the handgun's firing sequence. In an automatic weapon, the sear is also necessary to continue the firing sequence. Further, after a long gun's firing cycle has been initiated, a bolt or breechblock (or variant thereof) is necessary to seal gases in the chamber to prevent the gases from escaping other than through the barrel. Thus, the bolt or breechblock is necessary to complete or continue the long gun's firing sequence.

[14] Both the proposed rule and the Rule expressly stated that the proposed definition of "frame or receiver" would not have been limited to those particular fire control components. 86 Fed. Reg. 27,727 & n.46; 87 Fed. Reg. 24,662 & n.45.

by the Rule, simply means a weapon utilizing a similar frame or receiver design irrespective of such features as new or different model designations or configurations.  87 Fed. Reg. at 24,735.  "It is difficult to conclude, under these facts, that the [Rule] is not a 'logical outgrowth' of the [Notice]. Indeed, this appears to present a rather textbook example of how the administrative rulemaking process must proceed under the APA."  *Morehouse*, 2022 WL 3597299, at \*4.  Because the Notice "specifically requested comments on the feasibility of implementing the [proposed] definition of firearm 'frame or receiver,'" 86 Fed. Reg. at 27,740, the "possibility" that the agency might adopt a more limited approach than the proposed definition was "reasonably foreseeable," *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007); *see also id.* at 174-75 (final rule exempting entire category of workers from coverage under statute was logical outgrowth of proposed rule exempting only subset of that category); *Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1299-1300 (D.C. Cir. 2000).

Further, the Notice included several "nonexclusive examples that illustrate th[e] definition[]" of a frame or receiver, and a "nonexclusive list" of grandfathered frames and receivers.  86 Fed. Reg. at 27,741-46.  The Rule includes different "nonexclusive examples" to illustrate the definitions of "frame" and "receiver" and to illustrate when a partially complete frame or receiver is considered a "frame or receiver," 87 Fed. Reg. at 24,735-39, and a different "nonexclusive list" of grandfathered frames and receivers, *id.* at 24,739-41.  But these illustrative examples in the Rule are just that: illustrative examples reflecting sample applications of concepts that were either announced in the Notice or are a logical outgrowth of such concepts made in response to comments.  *See* 86 Fed. Reg. at 27,729 (announcing intent to define "frame or receiver" as including, "in the case of a frame or receiver that is partially complete, disassembled, or inoperable, a frame or receiver that has reached a stage in manufacture where it may readily be completed, assembled, converted, or restored to a functional state").  Notably, Plaintiffs fail to cite any authority suggesting that an agency violates principles of fair notice merely by using different illustrative examples than in a proposed rule.

The Rule's treatment of "multi-piece receiver[s]," "privately made firearms," and the word "primordial" are also logical outgrowths of the Notice. The Notice made clear that its regulation of frames and receivers would include multi-piece frames or receivers, *i.e.*, frames or receivers that may be disassembled into multiple standard units that can be replaced or exchanged. *Compare* 86 Fed. Reg. at 27,736 (proposed rule's regulatory "definitions account for firearms such as split frames or multi-piece firearms") *with* 87 Fed. Reg. at 24,739 (defining "multi-piece frame or receiver" as one type of frame or receiver); *see also* 86 Fed. Reg. at 27,721-22, 27,729 (repeatedly discussing concept of "split/multi-piece receiver" firearms). The Notice defined "[p]rivately made firearm," and the Rule adopted that definition with few changes. *Compare* 86 Fed. Reg. at 27,746-47 *with* 87 Fed. Reg. at 24,735. The Rule's provision entitled "privately made firearms marked by nonlicensees" defines no terms; it merely states that licensees may adopt a unique identification number previously placed on a PMF by a non-licensee. 87 Fed. Reg. at 24,743. Finally, the Notice included the concept of "primordial," stating that "articles only in a primordial state would not—without more—be considered a 'partially complete' frame or receiver," 86 Fed. Reg. at 27,729, and the Rule defined that word using a dictionary definition. *See* 87 Fed. Reg. at 24,663 n.49 (citing Oxford English Dictionary).

"In most cases, if the agency alters its course in response to the comments it receives, little purpose would be served by a second round of comment." *Ariz. Pub. Serv. Co.*, 211 F.3d at 1299. That is true here also. "Here, the Plaintiffs had an opportunity to offer comments on the proposed definitions," and "allowing Plaintiffs a new round of notice and comment would serve little purpose." *Morehouse*, 2022 WL 3597299, at *4. "Without question, the [Notice] was sufficiently descriptive that . . . ATF was going to redefine 'frame or receiver,'" as well as define PMF and regulate multi-piece receivers, "and it allowed interested parties to offer informed criticism and comment." *Id.* Notably, Plaintiffs fail to mention any comments they were allegedly prevented from submitting, much less any concrete harm traceable to any changes they cite. Because the proposed rule "fairly appris[ed]

24

interested persons of the subjects and issues the agency [was] considering," the Rule is a logical outgrowth of the Notice.  *Huawei Techs. USA*, 2 F.4th at 448.

### E.      The Rule Adequately Explains Changes in ATF Policy.

Plaintiffs' argument that "the Final Rule represents a drastic change in the agencies' position without adequate explanation" also is unlikely to succeed.  Pls.' Mem. at 29 (capitalization altered). "An agency's change in policy is not subjected to a heightened standard or more substantial review than the scrutiny applicable to policy drafted on a blank slate."  *Handley v. Chapman*, 587 F.3d 273, 282 (5th Cir. 2009) (citing *FCC v. Fox Television Stations*, 556 U.S. 502, 514-16 (2009)).  "Rather, a policy change must only meet three requirements: The new policy must be permissible under the statute; there must be good reasons for it; and the agency must believe that the new policy is better, which the conscious change of course adequately indicates."  *Id.* (citation omitted); *accord Entergy Miss., Inc. v. NLRB*, 810 F.3d 287, 293 (5th Cir. 2015).

In a series of abbreviated arguments, Plaintiffs appear to suggest that ATF did not adequately explain policy changes relating to: receiver blanks that have not yet reached the critical stage of manufacture, *see* Pls.' Mem. at 30-31; individual firearm parts, *see id.* at 31; and split-frame or striker-fired firearms, *see id.* at 31-33.  As to each product category, however, the Rule either does not change ATF's policy or adequately explains the reasons for any change.

With respect to unfinished receivers, the Rule continues ATF's existing policy that a firearm component becomes a frame or receiver when it reaches a "critical stage of manufacture."  *See supra* n.6.  Thus, ATF has always classified "some unfinished receivers [as] firearms because of the ease with which they can be made functional"—a standard which "is largely determined by which machining operations still needed to be performed."  87 Fed. Reg. at 24,668.  Indeed, Plaintiffs point to an ATF webpage illustrating that a receiver with only a "partially machined fire-control cavity" was classified as a firearm under ATF's prior regulations, although it could not function as a receiver in its existing

25

form.  *See* ATF, *Are "80%" or "unfinished" receivers illegal?*, ATF, https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal;  Pls.'
Mem. at 30.  It likewise remains true that "a partially complete frame or receiver alone is not a frame
or receiver if it still requires performance of certain machining operations." 87 Fed. Reg. at 24,668.
Accordingly, under the Rule, "[c]ompanies that sell or distribute only unfinished frame or receiver
billets or blanks, and not any associated jigs, templates, or similar tools to the same customer are not
required to be licensed or to mark those articles with identifying information." *Id.* at 24,700.[15]

The only relevant policy change concerns ATF's consideration of jigs, templates, instructions,
equipment, or tools that are sold alongside a partially-complete frame or receiver to determine whether
that clearly-identifiable component has reached the "critical stage of manufacture." 87 Fed. Reg. at
24,678.  Plaintiffs do not argue that this change was inadequately supported.  In any event, the change
meets all three requirements under *FCC v. Fox*; it is consistent with the GCA, which vests ATF with
the discretion to define the statutory term "frame or receiver," *see supra* Argument I.a.1; ATF explained
the reason for the change; and ATF acknowledged that it was changing position.  As for the reason
for the change, ATF has long maintained that that an incomplete frame or receiver is a "frame or
receiver" for purposes of the GCA when it is sold "indexed," or marked with the locations for drilling
or milling the holes or cavities in which to install the fire control components necessary to initiate,
complete, or continue the firing cycle. *See* 87 Fed. Reg. at 24,668.  Prior to the Rule, however, ATF
did not examine templates, jigs, or other items and materials sold alongside a partially complete frame
or receiver. *See id.*  Because "the aggregation of a template or jig with a partially complete frame or

---

[15] Receiver "blanks" are receivers with completely solid, un-machined, un-indexed fire-control
cavities, such as the first two examples on the ATF webpage that Plaintiffs cite.  *See* ATF, *Are "80%"
or "unfinished" receivers illegal?*, https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-
or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal.

receiver can serve the same purpose as indexing," the Rule now requires consideration of such materials. *Id.* The change thus increases the consistency and accuracy of ATF's classifications. *See id.*

The Rule also does not reflect an unexplained change in ATF's policy with respect to individual firearm parts or complete weapon parts kits, contrary to Plaintiffs' suggestion. *See* Pls.' Mem. at 31. As the ATF court filing that Plaintiffs cite reflects, ATF generally does not regulate individual firearm parts, with the exception of frames and receivers, and parts of machineguns and silencers. That remains true under the Rule. By contrast, ATF always has recognized that a complete weapon parts kit, standing alone, falls within the GCA's statutory definition of a "firearm," because it "may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A); *see* 87 Fed. Reg. at 24,662 & n.44, 24,692; 86 Fed. Reg. at 27,726 & nn.39-40 (citing case law confirming this interpretation). The Rule merely adds express language confirming and codifying this interpretation. *See* 87 Fed. Reg. at 24,662, 24,692. To the extent that ATF was required to explain this codification of existing policy, its explanation—which relied on both case law and the plain meaning of the statutory text—was adequate. *See id.* at 24,684.

Likewise, ATF did not change its position regarding firearms with split frames or receivers or striker-fired firearms, but rather codified its existing policy in the face of court decisions misinterpreting prior regulations. *Contra* Pls.' Mem. at 31-33. ATF has long regarded its prior regulatory definition of a firearm "frame or receiver" as non-exhaustive, and has maintained that split-receiver firearms "should be examined with a view toward determining if either the upper or lower half of the receiver more nearly fits the legal definition of 'receiver,' and more specifically, for machineguns, whether the upper or lower portion has the ability to accept machinegun parts." 87 Fed. Reg. at 24,655 (internal quotation marks and brackets omitted). By contrast, certain courts recently have interpreted ATF's prior regulatory definition of "frame or receiver" as exhaustive—an "erroneous" interpretation, in ATF's view. *See* 86 Fed. Reg. at 27,722, 27,727. ATF noted that such

a restrictive interpretation of its prior regulation would create the anomalous result that "as many as 90 percent of all firearms (i.e., with split frames or receivers, or striker-fired) in the United States would not have any frame or receiver subject to regulation," which would plainly contradict the statutory scheme, as determined by its plain text.  87 Fed. Reg. at 24,652; 86 Fed. Reg. at 27,722.  To address this problem, the Rule amends its regulatory definition of "frame or receiver" to expressly cover the single component best classified as the frame or receiver of particular categories of split-receiver firearms, as well as the frame or receiver of striker-fired firearms.  87 Fed. Reg. at 24,652-53, 24,695.[16]

Plaintiffs appear to suggest that this amendment is inadequately explained because, according to Plaintiffs, the technology for split-receiver and striker-fired civilian firearms was already available when ATF promulgated its prior regulatory definition of "frame or receiver."  *See* Pls.' Mem. at 32-33. But ATF never suggested otherwise; rather, it observed that split-receiver and striker-fired firearms were less commonly used by the civilian population approximately fifty years ago, when ATF promulgated its prior regulation, than they are today.  *See, e.g.*, 87 Fed. Reg. at 24,654-55, 24,683 n.88. Plaintiffs' assertions do not negate that observation.  Moreover, ATF's explanation for the change did not depend solely or even primarily on the relative prevalence of such firearms over the past fifty years, but rather on the incongruity with an interpretation of a regulatory definition under which the vast majority of weapons in circulation today have no frame or receiver whatsoever.

Finally, Plaintiffs are wrong to suggest that the Rule "ha[s] cast decades of classification determinations, arguments, and guidelines into the wind."  Pls.' Mem. at 31.  Rather, the Rule expressly grandfathers its prior classifications of the frame or receiver of existing split frame or receiver firearm designs, including AR-15 and M-16 variants.  87 Fed. Reg. at 24,653.  "The only exception to

---

[16] Notably, one of the courts that adopted this restrictive interpretation noted its view that ATF had not only the "authority," but also the "duty," to update its regulations to expressly cover split-receiver firearms, such as AR-15-style rifles. *United States v. Rowold*, 429 F. Supp. 3d 469, 476 (N.D. Ohio 2019).

'grandfathering'" is for partially complete, disassembled, or nonfunctional frames or receivers that ATF previously did not classify as firearms. *Id.* ATF explained the basis for this exception, namely that it may not have considered accompanying parts, jigs, templates, or other information that is relevant to classification under the new Rule, as noted above. *Id.* at 24,673.

## II.   Plaintiff Has Not Shown That It Will Incur Irreparable Harm Absent a Preliminary Injunction.

### A.   Plaintiffs' Delay in Seeking Relief Shows the Lack of Irreparable Harm.

Plaintiffs' delay in seeking preliminary relief weighs heavily against their assertion that they would suffer irreparable harm absent a preliminary injunction. "[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *Anyadike v. Vernon Coll.*, No. 7:15-cv-00157-O, 2015 WL 12964684, at *3 (N.D. Tex. Nov. 20, 2015) (quoting *Wireless Agents, LLC v. T-Mobile, USA, Inc.*, No. 3:05-CV-0094D, 2006 WL 1540587, at *3 (N.D. Tex. June 6, 2006)). "[C]ourts generally consider anywhere from a three-month delay to a six-month delay enough to militate against issuing injunctive relief." *Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 3:17-cv-3200-N, 2019 WL 7882552, at *2 (N.D. Tex. Sept. 18, 2019) (collecting cases).[17]

Here, ATF announced the Rule on April 11, 2022 and published it in the Federal Register on

---

[17] *See also, e.g., Anyadike*, 2016 WL 12964684, at *3 ("several-month delay in filing . . . militates against a finding of irreparable harm"); *H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC*, No. 3:09-CV-00390-L, 2009 WL 1766095, at *4 (N.D. Tex. June 23, 2009) (delay of almost five months undercut assertion of irreparable harm); *Pals Grp., Inc. v. Quiskeya Trading Corp.*, No. 16-23905-CIV-GOODMAN, 2017 WL 532299, at *6 (S.D. Fla. Feb. 9, 2017) (three-month delay "is by itself sufficient grounds to deny its request for an injunction"); *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1356 (S.D. Fla. 2002) (finding that a "three-month delay . . . undercuts any sense of urgency"); *Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F. Supp. 976, 981 (S.D.N.Y. 1989) ("three month delay"); *Millennium Funding, Inc. v. 1701 Mgmt. LLC*, No. 21-cv-20862-bloom/Otazo-Reyes, 2021 WL 3618227, at *10 (S.D. Fla. Aug. 16, 2021) ("it is not uncommon for courts to deny a preliminary injunction in the face of unexplained delays of more than two months") (collecting cases); *Blue-Grace Logistics LLC v. Fahey*, 340 F.R.D. 460, 467 (M.D. Fla. 2022) (same).

April 26, 2022, with an effective date of August 24, 2022. But Plaintiffs waited four months and did not seek a preliminary injunction until August 17, 2022, a week before the effective date. This "[u]ndue delay in seeking a preliminary injunction tends to negate the contention that the feared harm will truly be irreparable." *Embarcadero Techs., Inc. v. Redgate Software, Inc.*, No. 1:17-cv-444-RP, 2017 WL 5588190, at *3 (W.D. Tex. Nov. 20, 2017). If the Rule actually threatened irreparable harm to Plaintiffs, they would not have waited 113 out of the 120 days before the Rule took effect before seeking preliminary relief. *See Golden Cheek Ventures, L.P. v. Brazos Elec. Power Coop., Inc.*, No. 4:15-cv-0821-O, 2015 WL 13469994, at *2 (N.D. Tex. Nov. 10, 2015) ("Golden Cheek's delay in filing until just six days before construction is set to begin not only limits the Court's ability to analyze Plaintiff's claims, it militates against a finding of irreparable harm."). Nor can Plaintiffs contend it was impossible to seek relief sooner: the plaintiff in the parallel Southern District of Texas case filed suit less than two weeks after the Rule was issued and moved for preliminary injunctive relief more than two months before Plaintiffs did. *See Div. 80 LLC v. Garland*, No. 3:22-cv-00148 (S.D. Tex.), Docs. 1 (Compl., May 9, 2022), 11 (Emerg. Mot. for Prelim. Inj., June 6, 2022).

In *Morehouse*, the Court found that the plaintiffs' delay of "essentially three months" in waiting until July 25, 2022, to move for a preliminary injunction to challenge the Rule "gives the Court serious pause" and "tends to weigh against a finding of irreparable harm." *Morehouse*, 2022 WL 3597299, at *12. Here, Plaintiffs' delay until August 17, 2022, is even more egregious, and similarly weighs against a finding of irreparable harm.

### B.    Plaintiffs Fail to Substantiate Any Imminent Threat of Irreparable Injury.

"[A]ny irreparable harm must be imminent for a preliminary injunction to issue." *Mueller Supply Co. v. JNL Steel Components, Inc.*, No. 6:21-CV-036-H, 2022 WL 1199212, at *15 (N.D. Tex. Mar. 8, 2022). "Speculative injury is not sufficient" for a preliminary injunction. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

Plaintiffs have failed to demonstrate imminent irreparable harm. Plaintiffs' primary argument is that the Rule will drive Tactical Machining out of business because Tactical Machining will have to cease sales of products that the Rule classifies as firearms, which comprise more than 90% of Tactical Machining's sales. *See* Mem. 34-35; Peters Decl. ¶¶ 11, 15. The flaw in this argument is that the Rule does not prohibit Tactical Machining from selling such products; it merely requires Tactical Machining to become a federal firearms licensee and comply with regulatory requirements such as keeping transaction records and marking firearms with serial numbers. Tactical Machining does not argue that it could not obtain a license and comply with these requirements. The cost of a federal firearms license is $50 per year for manufacturers and $200 for three years ($90 for a three-year renewal) for dealers. 18 U.S.C. § 923(a)(1)(B), (a)(3)(B). There are more than 52,000 federally licensed firearms dealers and 18,000 federal licensed firearms manufacturers (excluding dealers and manufacturers of destructive devices), and nearly 5,000 dealers and more than 2,000 manufacturers in Texas alone, all of whom are able to bear such burdens.[18] The court in *Division 80* correctly rejected the plea of another seller of partially completed receivers that the Rule would force it out of business, concluding, "he does have a choice—he can get a license." *Div. 80*, 2022 WL 3648454, at *3. Any harm that results from Tactical Machining's choice not to obtain a federal firearms license is therefore "self-inflicted" and "do[es] not count" as irreparable harm. *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021); *see also Div. 80*, 2022 WL 3648454, at *5 ("[A] party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted.").[19]

---

[18] ATF, *Federal Firearms Listings*, https://www.atf.gov/firearms/listing-federal-firearms-licensees (last accessed Aug. 26, 2022).

[19] Tactical Machining states that a freight company and credit card processing company have expressed reluctance or unwillingness to do business with Tactical Machining if it violates the Rule by selling products that the Rule classifies as firearms without obtaining a license. *See* Peters Decl. ¶¶ 12-13. But Tactical Machining provides no evidence that it would have any trouble obtaining freight or processing services if it obtained a federal firearms license and complied with the Rule. In any event, any alleged harm under this rubric would be "the result of the independent action of some third party

Plaintiffs also argue that any compliance costs constitute irreparable harm because the federal government enjoys sovereign immunity from monetary damages. Pls.' Mem. at 35-36. But while extraordinary compliance costs that severely burden a business's operations may show irreparable harm, courts do not hold that modest and ordinary compliance costs constitute irreparable harm. For example, in one case cited by Plaintiffs, *Texas v. U.S. EPA*, 829 F.3d 405 (5th Cir. 2016), the Court found that the "tremendous costs" of "$2 billion" for power companies to comply with an environmental regulation sufficed for irreparable harm where the regulation required the construction of emission control systems that would "take several years to install" and would "endanger the reliability of power." *Id.* at 433-34. In *Wages & White Lion Investors, LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021), the FDA did not contest that a regulation caused irreparable harm when it was undisputed that the regulation would require the plaintiff to halt its business. Here, by contrast, the compliance costs are modest, and of the sort that tens of thousands of companies are able to bear as an ordinary cost of doing business. *Division 80* correctly rejected the argument "that *any* cost [a seller of partially complete firearms] may incur by complying with the Final Rule would amount to irreparable harm." *Div. 80*, 2022 WL 3648454, at *4. Rather, "[i]t remains that in this circuit, a 'preliminary injunction is not appropriate where the potential harm to the movant is strictly financial, unless the potential economic loss is so great as to threaten the existence of the movant's business.'" *Id.* (quoting *Andritz Sundwig GmbH v. United States*, No. CV 4:18-2061, 2018 WL 3218006, at *10 (S.D. Tex. July 2, 2018)).

Further, Plaintiffs misunderstand ATF's statements in asserting erroneously that ATF "acknowledge[s] they are shutting down an entire industry." Pls.' Mem. at 36. As explained above, the burdens of obtaining a license and complying with federal regulations are modest, so there is no

---

not before the court" rather than "fairly traceable to the challenged action of the defendant[s]." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation and internal punctuation omitted).

reason to believe that businesses who wish to sell partially completed frames and receivers to individuals legally entitled to possess firearms will be unable to do so. Rather, the reason that ATF anticipates that such businesses may choose not to become licensed is because persons prohibited from possessing firearms under federal law tend to prefer to purchase unserialized, easy-to-complete frames and receivers without a background check, which they can readily convert into useable firearms. *See* ATF Response to FBI Criminal Justice Information Services comment at 2 (App'x at 3) (explaining that firearm parts kits with partially complete frames or receivers "are currently desired because they are perceived as unregulated, and are not marked with serial numbers"). To the extent the business model of sellers of partially completed frames and receivers is premised on circumvention of the GCA's regulatory scheme, they may choose not to operate within that regulatory scheme. But the ATF's analysis "does not suggest that those without licenses could not obtain one and maintain their businesses—just that they would not wish to do so." *Div. 80*, 2022 WL 3648454, at *3.

Finally, individual Plaintiffs VanDerStok and Andren fail to show that the Rule causes them imminent irreparable harm. Both individual Plaintiffs aver that they "wish to continue to acquire [partially completed receivers] in the future" in order to manufacture their own weapons, VanDerStok Decl. ¶ 7; Andren Decl. ¶ 7, but they do not state that they plan to purchase such products imminently or at any specific time. Such indefinite future plans are insufficient to establish Article III standing, let alone imminent irreparable harm. *See Lujan*, 504 U.S. at 564 ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require"). Moreover, the Rule does not prevent Plaintiffs from purchasing partially complete frames or receivers or making their own firearms; it merely requires that Plaintiffs pass a background check and purchase the products from an FFL. If, as Plaintiffs aver, they are not legally prohibited from possessing firearms and have passed a federal background check before, VanDerStok Decl. ¶ 3; Andren Decl. ¶ 3, they could surely

33

do so again.  Although Plaintiffs state that they wish to purchase partially completed receivers "without involvement of an FFL," VanDerStok Decl. ¶ 7; Andren Decl. ¶ 7, they fail to articulate how the involvement of an FFL causes them any harm, let alone irreparable harm.

### III.   The Balance of Equities and Public Interest Make Injunctive Relief Inappropriate.

Although the balance of the equities and the public interest typically are considered as separate factors in the preliminary injunction analysis, "[t]hese factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.  Here, these combined factors strongly counsel against issuing the requested preliminary injunction.

Congress has determined that certain dangerous persons must not possess firearms; that persons or entities who regularly buy and sell firearms for profit must be licensed; that firearms must bear serial numbers to aid law enforcement in the event that a firearm is used to commit a crime; and that licensed dealers must keep records of their firearm sales for the same reason.  *See* 18 U.S.C. § 922(g); *see also supra* Statutory Background.  Congress further provided that a "firearm" includes "the frame or receiver of any such weapon" and left it to ATF to define that subsidiary term.  18 U.S.C. § 921(a)(3)(B).  ATF has exercised that authority to promulgate the Rule.  Under such circumstances, if "a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

Moreover, granting Plaintiffs' requested preliminary injunction would significantly harm the government's interests in law enforcement and public safety.  The Rule will "increase public safety by, among other things, preventing prohibited persons from acquiring firearms and allowing law enforcement to trace firearms involved in crime."  87 Fed. Reg. at 24,654.  The government has a "compelling interest[]" in protecting "public safety." *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 677 (1989).  The public consequences of permitting unlicensed merchants to sell firearms without

serial numbers, without keeping purchase records, and without confirming purchasers' eligibility to possess firearms weighs heavily against granting an injunction.

On the other side of the balance, the harms claimed by Plaintiffs are speculative or modest. *See supra* II.B. Even if Plaintiffs alleged that the Rule would impose substantial costs on them, which they do not, that would not outweigh the government's compelling interest in preventing violent crime. *See, e.g., Slocum v. City of Cleveland Heights*, No. 1:14CV532, 2014 WL 1237534, at *5 (N.D. Ohio Mar. 25, 2014) (holding that "the interest in protecting the public from . . . gun violence" outweighed allegedly "substantial damage to [the plaintiffs'] financial condition and loss of goodwill").

*Morehouse* and *Division 80* correctly concluded that the balance of the equities and the public interest both weigh against enjoining the Rule. *Morehouse*, 2022 WL 3597299, at *12 ("The rather speculative risk of harm to the Plaintiffs, on the one hand, does not outweigh the harm to the ATF's interest in law enforcement and public safety, on the other."); *Div. 80*, 2022 WL 3648454 at *6 (plaintiff could not show how government's interest in "decreas[ing] the number of untraceable firearms in circulation, thus facilitating law enforcement's efforts to keep guns out of the hands of criminals" was "outweighed by equities favoring itself and similarly situated entities"). Accordingly, Plaintiffs are not entitled to a preliminary injunction, and the Court need not reach the merits of their claims. *See Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 460 (5th Cir. 2016).

### IV.   Any Relief Ordered Should Be Appropriately Limited.

In the event the Court were to disagree with Defendants, any relief ordered should be no broader than necessary to remedy any demonstrated harms of the Plaintiffs in this case. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford,* 138 S. Ct. 1916, 1934 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). "A district court abuses its discretion if it does not 'narrowly tailor an injunction

to remedy the specific action which gives rise to the order.'" *ODonnell v. Harris Cnty.*, 892 F.3d 147, 163 (5th Cir. 2018) (quoting *John Doe # 1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)), *overruled on other grounds by Daves v. Dallas Cnty.*, 22 F.4th 522, 534 (5th Cir. 2022).   Plaintiffs fail to demonstrate that this case is an appropriate vehicle for "one district court [to] make a binding judgment for the entire country." *Becerra*, 20 F.4th at 263; *see id.* at 264 (granting stay pending appeal to all but the plaintiff-states); *see also Div. 80*, 2022 WL 3648454, at *5 (concluding that even if plaintiff had been entitled to an injunction, a nationwide injunction would have been inappropriate).   Further, the Rule contains an express severability clause.  87 Fed. Reg. at 24,730.  Typically, "[w]hether the offending portion of a regulation is severable depends upon [1] the intent of the agency *and* [2] upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001); *accord Sw. Elec. Power Co. v. U.S. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019) (vacating only "the portions of the final rule" the court decided were unlawful).  The Rule's severability clause makes clear ATF's intentions with respect to severability.  *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987).  Thus, any "objectionable provision[s]" should be "excised" from the rest of the Rule.  *Id.*

## CONCLUSION

The Court should deny Plaintiffs' motion for preliminary injunction.

DATED: August 29, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

LESLEY FARBY
Assistant Director, Federal Programs Branch

/s/ Martin M. Tomlinson
DANIEL RIESS
MARTIN M. TOMLINSON
TAISA GOODNATURE
JEREMY S.B. NEWMAN
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 353-4556
Email: martin.m.tomlinson@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

On August 29, 2022, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Martin M. Tomlinson*