# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

JENNIFER VANDERSTOK, *et al.*,

     *Plaintiffs*,

v.

MERRICK GARLAND, in his official capacity as
Attorney General of the United States, *et al.*,

     *Defendants*.

Case No. 4:22-cv-00691-O

**AMICI CURIAE BRIEF OF GUN OWNERS FOR SAFETY AND INDIVIDUAL
CO-AMICI IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

## CORPORATE DISCLOSURE STATEMENT

Gun Owners for Safety is a voluntary coalition of gun owners that does not have any corporate parent and does not issue stock, so no publicly held corporation holds 10% or more of its stock.  Gun Owners for Safety is supported by Giffords—the gun safety organization co-founded and led by former Congresswoman Gabrielle Giffords—and the employees of Giffords.  Giffords also has no corporate parent and does not issue stock, so no publicly held corporation holds 10% or more of its stock.

No counsel for a party authored any part of this brief.  No one other than amici curiae, its members, or its counsel financed the preparation or submission of this brief.

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...................................................................... i

INTEREST OF AMICI CURIAE ................................................................ 1

INTRODUCTION ....................................................................................... 6

ARGUMENT ............................................................................................... 9

I.      REGULATORY HISTORY ........................................................... 9

II.     SCRATCH BUILDS ARE NOT AFFECTED BY THE RULE ......................... 11

        A.      Background on Scratch Builds ............................................ 12

        B.      The Rule Has No Impact on Scratch Builds ............................ 15

III.    KIT BUILDS ARE ONLY MINIMALLY AFFECTED BY THE RULE .......... 17

        A.      Background on Kit Builds .................................................... 17

        B.      The Rule Has No Effect on Kit Builds With Fully Manufactured,
                Serialized Frames or Receivers and Minimally Affects 80% Kits ........... 21

                1.      The Rule does not affect kit builds with fully machined,
                        serialized frames or receivers. ....................................... 21

                2.      The Rule merely requires that kits with 80% frames or
                        receivers comply with the same federal firearms regulations
                        as kits utilizing fully machined frames or receivers. .................... 22

CONCLUSION ........................................................................................... 25

CERTIFICATE OF SERVICE .................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*California v. Blackhawk Manufacturing Group Inc.*,
  No. CGC-21-594577 (Cal. Super. Ct. Aug. 18, 2021) .................................. 19, 21, 23

*Division 80 LLC v. Garland*,
  No. 3:22-cv-00148 (S.D. Tex. July 12, 2022), ECF No. 38 ......................... 6, 9, 24, 25

*Morehouse Enters. LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  No. 3:22-cv-00116 (D. N.D. Aug. 16, 2022), ECF No. 51 ................................. passim

STATUTES

18 U.S.C. § 921(a)(3) .................................................................................... 9, 15, 22

18 U.S.C. § 923(a) ................................................................................................ 15

Gun Control Act of 1968 .................................................................................. 9, 19

OTHER AUTHORITIES

27 C.F.R. § 478.11 ............................................................................................... 10

87 Fed. Reg. at 24,652 .......................................................................... 7, 10, 11, 23

87 Fed. Reg. at 24,688 ......................................................................................... 18

87 Fed. Reg. at 24,739 .................................................................................... 16, 17

*About the Guild*, AMERICAN CUSTOM GUNMAKERS GUILD,
  https://www.acgg.org/index.php/about-acgg/the-guild.html (last visited Aug. 13, 2022) ...................................................................................... 15

ATF Firearms Tracing Guide, ATF Publication 3312.13, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,
  https://www.atf.gov/firearms/docs/guide/atf-firearms-tracing-guide-atf-p-331213 (last visited Aug. 13, 2022) ............................................................ 6

iii

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Glossary, SPORTING ARMS AND AMMUNITION MANUFACTURERS'
    INSTITUTE, INC., https://saami.org/saami-glossary (last visited Aug. 29,
    2022) .................................................................................................................. 9

Glossary, SPORTING ARMS AND AMMUNITION MANUFACTURERS'
    INSTITUTE, INC., https://saami.org/saami-glossary/?search=action (last
    visited Aug. 13, 2022)...................................................................................... 13

Glossary, SPORTING ARMS AND AMMUNITION MANUFACTURERS'
    INSTITUTE, INC., https://saami.org/saami-glossary/?search=reciever (last
    visited Aug. 13, 2022)...................................................................................... 18

*Gunsmithing a Custom Rifle Stock from Scratch: the Step by Step Guide*,
    RICHARD'S MICROFIT STOCKS (Feb. 8, 2021),
    https://richardsmicrofitgunstocks./gunsmithing-a-custom-rifle-stock-
    from-scratch-the-step-by-step-guide (last visited Aug. 13, 2022)........................ 12, 13

*Handgun Parts*, 80% LOWERS, https://www.80-lower.com/handgun-parts
    (last visited Aug. 13, 2022).......................................................................... 13, 18

How to Build an AR-15 Rifle, MIDWAYUSA,
    https://www.midwayusa.com/how-to-guides/how-to-build-ar-15-rifle
    (last visited Aug. 13, 2022) .............................................................................. 20

LOWERS, https://www.80-lower.com/products/polymer80-pf940c-80-
    compact-pistol-frame-and-jig-kit/ (last visited Aug. 29, 2022)................................... 20

*Making Guns*, SPRINGFIELD ARMORY, NATIONAL PARK SERVICE,
    https://www.nps.gov/spar/learn/historyculture/making-guns.htm (last
    visited Aug. 13, 2022)...................................................................................... 14

*80 Percent Lower Unfinished Receiver Jig*, 80% LOWERS, https://www.80-
    lower.com/80-lower-jig (last visited Aug. 13, 2022).................................................. 20

Polymer80 PF940C 80% Compact Pistol Frame and Jig Kit, 80% LOWERS,
    https://.80-./products/polymer80-pf940c-80-compact-pistol-frame-and-
    jig-kit/ (last visited Aug. 13, 2022) ...................................................................... 20

iv

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Shooting Tips and Tricks, *Assembling a 80% 1911* (Oct. 21, 2017),
   https://www.youtube.com/watch?v=h7OCCPK7qCk (last visited Aug.
   29, 2022) ................................................................................................................... 21

*Understanding Headspace in an AR-15*, AT3 TACTICAL,
   https://www.at3tactical.com///is-headspace-in-an-ar-15-and-how-can-
   you-check-it-read-on (last visited Aug. 13, 2022) ...................................................... 14

## INTEREST OF AMICI CURIAE

Amicus curiae *Gun Owners for Safety* is a united coalition of gun owners from varied backgrounds and political affiliations who believe lives can be saved through commonsense gun laws that do not infringe upon the civil rights of law-abiding gun owners.  With chapters in Texas and across the country, including Colorado, Florida, Michigan, Minnesota, Pennsylvania, and Virginia, we work to prevent gun violence while supporting and protecting Second Amendment rights.  Gun Owners for Safety has over 20,000 members, who include experienced gun owners of all trades and hobbies, including law enforcement, military, hunting, sport shooting, collecting, and building guns.  In Texas alone, Gun Owners for Safety has 1,200 gun owner members, including 60 volunteer ambassadors who have educated the public and lawmakers through such activities as hosting seminars and testifying before the State Legislature.  Affiliated with Giffords, the gun safety organization co-founded and led by Congresswoman Gabrielle Giffords, who is a gun owner herself, we fully respect the Second Amendment and are simultaneously devoted to encouraging safe and responsible gun ownership practices and promoting a shift in culture to inform Americans about ways to improve safe gun ownership, including commonsense gun laws.

In addition to the Gun Owners for Safety coalition, five individuals are also amici curiae and signatories to this brief:  Jason Perry, Ryan Busse, Jonathan Gold, Steven Kling, and Scott Spreier.  Each of these individuals is affiliated with the Gun Owners for Safety coalition, including two as leaders in its Texas chapter, and they seek to add the weight of their voices to the issues addressed in this brief.  These five individuals hail from all

different walks of life, different regions of the country, and different personal beliefs, but they are united in their dedication to promoting safe and responsible gun ownership practices consistent with their Second Amendment rights.

*Jason Perry* is the Deputy Engagement Director for Gun Owners for Safety at Giffords.  Originally from Kentucky, Mr. Perry has been a gunowner for over 20 years, previously had a license to carry concealed firearms and other deadly weapons in Kentucky, and spent several years competing in International Defensive Pistol Association ("IDPA") sporting events.  Mr. Perry served 12 years as a firefighter and paramedic in Kentucky where he treated many victims of gun violence.  After an injury cut his firefighting career short, Mr. Perry graduated from college and moved to Washington, D.C. to continue his career in public service.  Prior to moving to Washington, D.C., Mr. Perry built firearms from imported parts kits that included torched receivers, which he replaced with serialized parts that he purchased through an entity licensed in the U.S. to engage in the firearm business (referred to as a federal firearms license or "FFL").

Mr. Perry came to work for Gun Owners for Safety in May 2022.  Mr. Perry has organized a variety of events emphasizing gun safety, lobbied before Congress, and spearheaded a training program that prepares Gun Owners for Safety ambassadors to share credible and accurate information about safe and responsible gun ownership practices with their communities.

*Ryan Busse*, who resides in Montana, is a Senior Advisor to Gun Owners for Safety and to Giffords.  Mr. Busse has extensive personal experience with firearms, having received extensive firearms, armory, and gunsmith training.  In addition, Mr. Busse was

employed in the firearms industry for more than 25 years, working as a sales and marketing executive for a leading firearm manufacturer, and was nominated for industry awards multiple times.  Since leaving the industry, Mr. Busse has dedicated his time and efforts to environmental advocacy, and since June 2021 he has held the position of Senior Advisor to Gun Owners for Safety and Giffords.  In this advisory role, Mr. Busse supports Gun Owners for Safety and Giffords to promote sensible gun ownership and regulation, and he regularly engages in public outreach.

Mr. Busse is also the author of the book *Gunfight:  My Battle Against the Industry that Radicalized America*, which published in October 2021.  *Gunfight* details Mr. Busse's life as a firearms industry executive, his efforts to make inroads toward sensible gun ownership and use, and his experiences with the industry's opposition to those efforts.  Through *Gunfight* and his advocacy and advisory role, Mr. Busse seeks policy and cultural changes to reduce gun violence.

**Jonathan Gold**, who resides in Michigan, is a Senior Ambassador for Gun Owners for Safety.  Mr. Gold has owned firearms for over three decades and served as a firearms instructor for nearly as long.  He is recognized as a subject matter expert on firearms and continues to teach private firearm lessons—specifically highlighting safety, handling, and marksmanship.  Mr. Gold has been involved with working to identify perpetrators of crime, understanding the importance of serializing guns to trace firearms used in crimes to the perpetrator, and also the difficulty in solving crimes when the firearm lacks a serial number.  Mr. Gold has personally built competition rifles, all using serialized parts from an FFL.

Mr. Gold has led the Gun Owners for Safety chapter in Michigan since March 2020. This chapter, which includes many members who are regular hunters, coordinates various events and activities to promote responsible gun ownership, such as designing and teaching educational courses on gun safety, tabling at various community events, and partnering with other agencies to promote other educational programs.

**Steven Kling** is a Senior Ambassador for Gun Owners for Safety in the Texas chapter; he lives with his family in the Texas Hill Country. Mr. Kling, a former Captain in the United States Army, served two combat tours in Afghanistan and Iraq. He was awarded the Bronze Star, the Combat Action Badge, and Joint Services Commendation Medal for his service. Mr. Kling has also spent time as a Commander of a small arms training company in the United States Army Reserves. As a life-long gun owner and avid hunter, Mr. Kling has a deep respect for the heritage, training, and safety of firearms.

Mr. Kling was drawn to Gun Owners for Safety and Giffords because the organizations give a voice to gun owners like himself—those who respect firearms safety and understand the significant role that gun owners have played historically in ensuring responsible and lawful firearms ownership and use, and lament the loss of that role of gun owners in current civil discourse. Among his involvement with other events of the Texas chapter of Gun Owners for Safety, Mr. Kling's leadership has included lobbying and legislative affairs efforts in light of the Uvalde shooting.

**Scott Spreier**, who resides in Dallas, Texas, also serves as a Senior Ambassador for the Texas chapter of Gun Owners for Safety. Mr. Spreier has been a firearm owner for over 30 years and is an avid hunter and sport shooter. Mr. Spreier grew up in western

Kansas among farmers and ranchers, where guns were seen as tools.  After serving in the Air Force during the Vietnam War, Mr. Spreier became an NRA-accredited firearm instructor in order to help train his sons and their fellow Boy Scout troop members. Mr. Spreier is a published author on the subject of gun safety and commonsense gun laws.

Mr. Spreier has supported Giffords for several years and in April of 2020 joined the Gun Owners for Safety program at the inception of the Texas chapter.  The Texas chapter participates in community events, hosting informational booths and tables to provide practical, nonpartisan, educated, and commonsense information about firearms. Mr. Spreier's goal is to educate as many individuals as possible—across all races, ethnicities, and political affiliations—by providing credible information from credible sources to balance the misinformation often spread on the issue of gun ownership rights.

All five of the individual amici are passionate about the importance of serialization of firearms.  They recognize that the serial number is a key tool for law enforcement to fight crime and domestic violence.  In many circumstances, the ability to trace gun ownership through the serial number is the key step of an investigation to ultimately bring justice and closure for the families of victims of gun violence.

Amici's purpose in filing this amicus brief is to provide to this Court credible information from credible sources about the impact of the Bureau of Alcohol, Tobacco, Firearms, and Explosives Final Rule 2021R-05F, from the perspective of individuals and an organization with members who fully support the protection of Second Amendment rights but are equally concerned about enacting commonsense gun laws that promote safe and legal use of firearms, aid law enforcement in fighting crime, and reduce gun violence.

One or more amici has previously filed similar amicus briefs in two related cases, which those courts accepted. *See* Order Granting Motion for Leave to File, *Morehouse Enters. LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 3:22-cv-00116 (D. N.D. Aug. 16, 2022), ECF No. 51; Brief of Amici Curiae Gun Owners for Safety, Jonathan Gold, Jason Perry, and Scott Spreier, *Morehouse Enters. LLC* (Aug. 16, 2022), ECF No. 52; Order Granting Motion for Leave to File, *Division 80 LLC v. Garland*, No. 3:22-cv-00148 (S.D. Tex. July 12, 2022), ECF No. 38; Brief of Amicus Curiae Gun Owners for Safety, *Division 80 LLC* (July 8, 2022), ECF No. 26-1.

## INTRODUCTION

This amicus brief is intended to help the Court understand how the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Final Rule 2021R-05F, entitled Definition of "Frame or Receiver" and Identification of Firearms (the "Rule"), will impact law-abiding gun owners who build their own firearms at home.

ATF promulgated the Rule in part to address the rapidly growing threat posed by untraceable firearms, often referred to as "ghost guns." Traditionally, firearms offered for sale in the United States are marked with a serial number by a manufacturer or importer that holds a federal firearms license ("FFL"). These FFLs are also required to maintain records of transactions, which together with the serial number enable a law enforcement process called "tracing." Tracing provides a critical investigatory tool that connects crime guns back to the first retail purchaser. *See generally* ATF Firearms Tracing Guide, ATF Publication 3312.13, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,

https://www.atf.gov/firearms/docs/guide/atf-firearms-tracing-guide-atf-p-331213   (last

visited Aug. 29, 2022).

Ghost guns disrupt this traditional process:  rather than selling a completed gun,

companies sell guns as kits in partially completed form, and take the position that these

kits are not "firearms" under federal law and therefore not subject to background check,

serialization, and record-keeping requirements.   Indeed, "[a]pproximately 90% of"

Plaintiff Tactical Machining LLC's "business is producing and selling items that

individuals can use to self-manufacture frames or receivers and to build functioning

firearms."  Pls.' Br. in Supp. of Mot. for Prelim. Inj. ("Pls.' Mot.") at 34, ECF No. 16.[1]

The guns made from these kits lack serial numbers and therefore cannot be traced by law

enforcement.  Law enforcement reports indicate a stunning increase in the number of these

untraceable ghost guns used in crime since 2016.[2]  ATF records show that, from January

1, 2016, through December 31, 2021, over 45,000 privately made, un-serialized firearms

were "reported to ATF as having been recovered by law enforcement from potential crime

scenes, including 692 homicides or attempted homicides (not including suicides)," and that

this total number reflects an annual increase each year.

Faced with the Rule, which clarifies that the practices used by Tactical Machining

---

[1] All citations to ECF documents are to the internal pagination of the document, not the
ECF pagination.

[2] Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652,
24,656 (published April 26, 2022) (to be codified at 27 C.F.R. pts. 447, 478, 479) (noting
that 1,758 such firearms were recorded in 2016; 2,552 in 2017; 3,960 in 2018; 7,517 in
2019; 10,109 in 2020; and 19,344 in 2021).

LLC are not exempt from federal gun laws, Plaintiffs have filed, nearly four months after the Rule was announced, a motion for a preliminary injunction, claiming that the Rule "will severely undermine (if not destroy) the historical American pastime of firearm self-manufacture." Pls.' Mot. at 1. As an initial matter, Plaintiffs' motion is untimely. *See Morehouse* Order at 24 ("As to irreparable harm, the timeline for the filing of the motion for preliminary injunction gives the Court serious pause. . . ."). Even more important, Plaintiffs' claims in its motion are baseless, as the Rule has only a minimal impact on at-home builds. We know this because we have built our own firearms, and we understand the different processes one can use to make a gun at home. From the perspective of builders who respect and seek to comply with federal gun laws, Gun Owners for Safety and the individual amici respectfully submit that the Rule has only a minor impact on law-abiding individuals making guns at home.

Most methods of at-home builds—such as building a gun from scratch, building a historical replica, or assembling a gun with components that are already fully manufactured—are completely unaffected by the Rule. The ***sole*** at-home build that is affected by the Rule is an "80%" kit build: the process of completing a firearm from partially manufactured components, as further described in Section III.A, below. Such kit builds previously have been sold as if federal law on the sale of guns did not apply to them. The Rule aligns these kit builds with kit builds already subject to federal firearms laws.

In short, Plaintiffs' concern underlying its motion for a preliminary injunction—that individuals will be foreclosed from privately making guns and that producers, manufacturers, and retailers will suffer "substantial economic loss (up to and including

permanent closure) of numerous businesses," Pls.' Mot. at 1—is unfounded.  As the two

other courts to address similar allegations have found, the Rule should not be enjoined.  *See*

Memorandum Opinion & Order, *Division 80 LLC v. Garland*, No. 3:22-cv-00148 (S.D.

Tex.) (Aug. 23, 2022), ECF No. 74 (the "*Division 80* Order"); Order Denying Motion for

Preliminary Injunction, *Morehouse Enters. LLC v. Bureau of Alcohol, Tobacco, Firearms

& Explosives*, No. 3:22-cv-00116 (Aug. 23, 2022), ECF No. 85 (the "*Morehouse* Order").

Plaintiffs' motion here should likewise be denied.

## ARGUMENT

## I.   REGULATORY HISTORY

Under the Gun Control Act of 1968 ("the Act"), a "frame" or "receiver" is the only

component of a gun (in addition to the gun itself) that qualifies as a "firearm."[3]  This is

because the Act defines a "firearm" as "(A) any weapon (including a starter gun) which

will or is designed to or may readily be converted to expel a projectile by the action of an

explosive; (B) ***the frame or receiver of any such weapon***; (C) any firearm muffler or

firearm silencer; or (D) any destructive device."  18 U.S.C. § 921(a)(3) (emphasis added).

In 1968 ATF promulgated regulations regarding the Act.  As relevant here, ATF

adopted regulations to implement the Act.  The 1968 regulation defined a "firearm" as:

"Any weapon, including a starter gun, which will or is designed to or may readily be

---

[3] As explained more fully below in Section III.A, the frame or receiver is "[t]he basic unit
of a firearm" that houses firing control components—*i.e.*, the component that houses the
mechanisms necessary for a firearm to actually fire.  The "receiver" is the component used
in the case of long guns and the "frame" is used in the case of handguns.  *See* Glossary,
SPORTING   ARMS   AND   AMMUNITION   MANUFACTURERS'   INSTITUTE,   INC.,
https://saami.org/saami-glossary (last visited Aug. 29, 2022).

converted to expel a projectile by the action of an explosive; the frame or receiver of any

such weapon; any firearm muffler or firearm silencer; or any destructive device; but the

term shall not include an antique firearm.  In the case of a licensed collector, the term shall

mean only curios and relics." 27 C.F.R. § 478.11.  And it defined a "frame or receiver" as:

"That part of a firearm which provides housing for the hammer, bolt or breechblock, and

firing mechanism, and which is usually threaded at its forward portion to receive the

barrel." *Id.*

The Rule that is at issue was adopted on April 26, 2022, became effective on August

24, 2022, and adds the following language to the definition of a "firearm":

> The term shall include a weapon parts kit that is designed to or may readily
> be completed, assembled, restored, or otherwise converted to expel a
> projectile by the action of an explosive.  The term shall not include a
> weapon, including a weapon parts kit, in which the frame or receiver of
> such weapon is destroyed as described in the definition of "frame or
> receiver."

Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652, at

24,735 (published April 26, 2022) (to be codified at 27 C.F.R. pts. 447, 478, 479).  Further,

the definition of "frame or receiver" has been updated in the Rule.  In relevant part, the

Rule provides that "frame or receiver":

> [S]hall include a ***partially complete***, disassembled, or nonfunctional frame
> or receiver, ***including a frame or receiver parts kit, that is designed to or
> may readily be completed, assembled, restored, or otherwise converted to
> function as a frame or receiver***, *i.e.*, to house or provide a structure for the
> primary energized component of a handgun, breech blocking or sealing
> component of a projectile weapon other than a handgun, or internal sound
> reduction component of a firearm muffler or firearm silencer, as the case
> may be.  The terms shall not include a forging, casting, printing, extrusion,
> unmachined body, or similar article that has not yet reached a stage of
> manufacture where it is clearly identifiable as an unfinished component

10

> part of a weapon (*e.g.*, unformed block of metal, liquid polymer, or other raw material). When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.

*Id.* at 24,739 (emphases added). To clarify what is meant by "readily," the Rule includes eight factors that will help ATF to determine whether something is "readily" converted or assembled, including the time, ease, expertise, equipment, availability of parts, expense, scope of the project, and feasibility of the process. *Id.* at 24,663.

The Rule also adds and defines a new term: "privately made firearm" ("PMF"). A PMF is "a firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number or other identifying marking placed by a licensed manufacturer at the time the firearm was produced." *Id.* at 24,664. If a PMF maker, however, seeks to have the PMF enter the marketplace, it must meet the Act's other licensing and serial number requirements. *Id.*

## II.    SCRATCH BUILDS ARE NOT AFFECTED BY THE RULE

As law-abiding gun owners, one of our biggest concerns is that Plaintiffs conflate the tradition of building guns using raw materials with the practice of assembling guns using 80% frames or receivers, which are by definition ***partially finished*** frames or receivers for a gun. *See* Pls.' Mot. at 4-5, 35; Compl. ¶ ¶ 27-28. Plaintiffs invoke the tradition "of self-manufacturing weapons at home" that "pre-dates the Founding of the United States," Pls.' Mot. at 4, but fail to acknowledge that the Rule has no effect on this type of building guns from scratch at home. The confusion caused by Plaintiffs' allegations

11

suggests, at best, an unfamiliarity with the craft of gun building, or, of even more concern, deliberate or reckless disregard of the confusion created by conflating the issues.

We seek to clarify for the Court the rich traditions of guns built from scratch.  When evaluated with a full understanding of the different ways guns can be made and the limited impact the Rule has, Plaintiffs' concern about individuals being foreclosed from privately making guns as the Founders did at the time of the American Revolution is alleviated, as such at-home scratch builds remain unaffected by the Rule.

A.    **Background on Scratch Builds**

Crafting a gun from scratch with raw materials is called a "scratch build."  This process—often utilized by artisans—begins with "raw stock."  Raw stock consists of blocks of wood, metal, or other raw materials that have no pre-shaping, milling, or manufacturing.  The particular material is carefully selected by the gun maker depending on the type and style of gun being built.

The entirety of the scratch build process takes considerably more time and skill than starting with partially finished components (which is how we build guns with 80% kits, as discussed further in Section III.A, below).  *See, e.g.*, *Gunsmithing a Custom Rifle Stock from Scratch: the Step by Step Guide*, RICHARD'S MICROFIT STOCKS (Feb. 8, 2021), https://richardsmicrofitgunstocks.com/gunsmithing-a-custom-rifle-stock-from-scratch-the-step-by-step-guide (last visited Aug. 29, 2022) ("*Gunsmithing a Custom Rifle Stock*"). By way of example, artisans crafting a rifle from scratch begin with a "hardwood blank," which is a block of hardwood.  *Id.*  The artisan then designs their rifle stock—*i.e.*, the component to which the metal parts of a firearm are attached to enable the shooter to hold

the firearm—from scratch.  From there, the next step is to "inlet[] the action," which is when the maker ensures that the stock fits with the combination of the frame and receiver of the gun.  *Id.*; *see also* Glossary, SPORTING ARMS AND AMMUNITION MANUFACTURERS' INSTITUTE, INC., https://saami.org/saami-glossary/?search=action (last visited Aug. 29, 2022).  This step requires precision carpentry tools and woodworking skills "that might be a stretch for beginner carpenters. . . . It is [a] high labor, time, and skill-intensive task." *Gunsmithing a Custom Rifle Stock.*  Even more demanding, however, is the next step— shaping the blank to conform to the preferred rifle stock design.  *Id.*  The blank must be carved into a recognizable stock form, "fine-tuning the rifle to [one's] shooting style." *Id.* The third step, finishing the stock, "involves sanding, whiskering, and applying an oil finish." *Id.*  This step is "the most time-intensive portion of the gunsmithing process." *Id.* One way to sand the stock is to use "80-grit sandpaper, by wrapping the sandpaper around a solid wood block and rubbing back-and-forth in the same direction as the wood grain." *Id.*  "Whiskering" the stock involves wiping the stock with a wet rag, then using "a heat gun or hairdryer to rapidly dry the wood" and then "[r]epeat[ing] this process three or four times before using mineral oil to soak the wood."  *Id.*

The entirety of the scratch build process typically requires significant hours to achieve the craftsman's desired finish or level of detail.  It also involves the sourcing of different materials and parts that are not preselected or curated by a vendor, unlike gun-making that involves the use of fully or partially machined parts.  *Compare id.*, *with* discussion *infra* Section III.A, *and Handgun Parts*, 80% LOWERS, https://www.80-lower.com/handgun-parts (last visited Aug. 29, 2022).

As another example, building a musket from scratch requires highly specialized knowledge and skill. Three metal-shaping processes can be used in crafting a musket: forging, casting, and stamping. *Making Guns*, SPRINGFIELD ARMORY, NATIONAL PARK SERVICE, https://www.nps.gov/spar/learn/historyculture/making-guns.htm (last visited Aug. 29, 2022). "Forging is the process of heating metals and hammering them into a desired shape. It is the technique used by the blacksmith, and indeed the early gunmakers used many of the blacksmith's tools in their trade." *Id*. Smaller parts "that would otherwise involve many machining steps" could be "cast" by pouring molten steel into a plaster cavity. *Id*. The process of "stamping" or "bending" to shape non-critical parts such as the trigger guard was used in lieu of the more expensive option of machining. *Id*.

A scratch build of a more contemporary weapon is an even more difficult and time-consuming process. As an example, the scratch build of an AR pattern firearm will require that specific tolerances are met to ensure appropriate lockup between the round, chamber, bolt face, bolt carrier, and recoil gas tube interface occurs safely and repeatably. *See Understanding Headspace in an AR-15*, AT3 TACTICAL, https://www.at3tactical.com/blogs/news/what-is-headspace-in-an-ar-15-and-how-can-you-check-it-read-on (last visited Aug. 29, 2022). To ensure the hammer strikes the firing pin, when and only when the bolt has securely locked a live round into battery, requires expensive and specialized tools such as mills, files, headspace gauges, and micrometers not often found in the toolboxes of the average gun owner. *See id*.

As gun owners, including those of us who ourselves are scratch build artisans and craftsmen, we wish to emphasize for the Court that, from our perspective, the scratch build

14

community does not use partially manufactured frames or receivers. The scratch build community makes its frames and receivers from scratch—from raw materials such as steel billets or stock blanks. For this reason, as described below, the Rule has no impact on us.

### B.     The Rule Has No Impact on Scratch Builds

Under the previous ATF regulation before the Rule took effect on August 24, 2022, gun artisans performing a scratch build were not subject to the same regulations as a firearm purchaser or manufacturer, as they were not required to undergo a background check. Additionally, under both the previous regulation and the Rule now in effect, those who craft guns from scratch generally are not in the business of selling firearms and thus do not need to obtain an FFL. *See* 18 U.S.C. § 923(a) ("No person shall engage in the business of importing, manufacturing, or dealing in firearms, or importing or manufacturing ammunition, until he has filed an application with and received a license to do so from the Attorney General."); *see also About the Guild*, AMERICAN CUSTOM GUNMAKERS GUILD, https://www.acgg.org/index.php/about-acgg/the-guild.html (last visited Aug. 29, 2022) (explaining that the Guild serves to form a community of artisans interested in "the exchange of ideas concerning their craft").[4]   Moreover, replicas of historical weapons (manufactured before 1898), under both regulations, are considered "antique firearms" and thus do not qualify as "firearms" for the purposes of FFL licensing requirements. *See* 18 U.S.C. § 921(a)(3) (specifying that the term "firearm" does not include an "antique

---

[4] Importantly, even under the laws prior to the Rule taking effect, if an artisan or craftsman sought to "engage in the business" of "dealing in firearms," he or she would be required to apply and obtain a license to do so. *See* 18 U.S.C. § 923(a).

firearm"); *id.* § 921(a)(16) (defining "antique firearm").

In short, even before the updates to the Rule, scratch builds fell outside the ambit of regulations governing the manufacturing or purchasing of firearms. And with the Rule in effect, ***scratch builds remain outside the ambit of regulations governing firearm manufacturers or purchasers***. Contrary to Plaintiffs' assertion that the Rule "prohibit[s]" lawful gun owners "from continuing their existing and planned personal practices" of "self-manufacturing . . . personal use firearms" using partially finished components, Pls.' Mot. at 33, the Rule solely (and minimally) affects a "***partially complete, disassembled, or nonfunctional*** frame or receiver, including a frame or receiver parts kit," as discussed further in Section III.B, below. Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. at 24,739 (emphasis added). The Rule clarifies its lack of regulation over scratch builds by stating that the terms "frame or receiver" "shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (***e.g., unformed block of metal, liquid polymer, or other raw material***)." *Id.* (emphasis added); *see also id.* at 24,653 ("[T]he final rule makes clear that articles that have not yet reached a stage of manufacture where they are clearly identifiable as an unfinished component of a frame or receiver (*e.g.*, unformed blocks of metal, liquid polymers, or other raw materials) are not frames or receivers."). Thus, Plaintiffs' references to the pre-Revolution history of building guns in America overlooks the limited scope of the Rule. *See* Pls.' Mot. at 4; Compl. ¶¶ 27-28. Those performing scratch builds today—including those creating replicas of weapons once used in the American

Revolution—are subject to no more regulation under the Rule than they previously were. *Compare* Pls.' Mot. at 4, *with* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. at 24,739.

In short, a frame or receiver made with raw materials, as we do in scratch builds, through "forging, casting, printing, extrusion," is unaffected by the Rule.

## III.   KIT BUILDS ARE ONLY MINIMALLY AFFECTED BY THE RULE

Besides disregarding the Rule's lack of effect on scratch builds, Plaintiffs overstate the Rule's effect on kit builds.  Plaintiffs depict the Rule as an all-out ban on kit builds, claiming that lawful gun owners "will be prohibited from continuing their existing and planned personal practices in purchasing items the Final Rule newly considers 'firearms' direct from retailers and self-manufacturing them into personal use firearms."  Pls.' Mot. at 33.  Kits with fully machined parts, however, have long been regulated.  Yet, Plaintiffs ignore these pre-existing requirements.  Plaintiffs' claim that "[t]he market for privately manufacturing firearms . . . will more likely die" than "shift into compliance" betrays a fundamental misunderstanding of the Rule's impact on kit builds.  Pls.' Mot. at 37.  The Rule merely aligns kits with partially machined parts so that they are subject to the same requirements as kits with fully machined parts.  Thus, contrary to Plaintiffs' assertions, the Rule minimally impacts only one kind of kit build.

### A.   Background on Kit Builds

"Kit builds" refer to building guns from manufactured or partially manufactured components, as opposed to raw materials.  The components can be sold together as part of a kit, or the components can be sold individually.  For either approach, the manufactured

or partially manufactured components amount to a "kit" from which the builder can assemble a gun. "No experience is required to master one of these build projects," and "easy-to-follow instructions" are often provided. *Handgun Parts*, 80% LOWERS, https://www.80-lower.com/handgun-parts (last visited Aug. 29, 2022).

Contemporary firearms are built around a key component generally called the "receiver" in the case of long guns or the "frame" in the case of handguns. As noted above in Section I, the frame or receiver is "[t]he basic unit of a firearm" which houses firing control components. Glossary, SPORTING ARMS AND AMMUNITION MANUFACTURERS' INSTITUTE, INC., https://saami.org/saami-glossary/?search=reciever (last visited Aug. 29, 2022). In other words, the frame or receiver is the component of a firearm that houses the mechanisms necessary for a firearm to actually fire. Frames and receivers are often made of aluminum or steel, but in more recent times, these components can also be made out of a polymer, akin to a heavy-duty plastic, such as firearms produced by Glock, Bushmaster, and Smith & Wesson. *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. at 24,688.

The frames or receivers purchased for kit builds can be fully manufactured and operational, or they can be partially manufactured—what is known as a "receiver blank," "unfinished receiver," or "80%" frame or receiver—which requires additional machining, typically a minimal amount, before it can be used as a functional frame or receiver.

When a fully manufactured and functional frame or receiver is purchased, it is serialized, and it can be used to assemble a firearm without any further machining. Fully machined frames and receivers have been defined as "firearms" since the Gun Control Act

and its accompanying regulations were enacted in 1968, and accordingly all federal laws applicable to firearms have applied to fully manufactured frames and receivers as well.

An 80% frame or receiver, on the other hand, has not been fully machined; it is sold in a nearly complete form, but requires additional machining—usually a minimal amount of drilling and milling—to become a functional frame or receiver.  Historically, ATF has not considered 80% receivers and frames to be within the statutory definition of "firearm," and accordingly those making and selling 80% receivers and frames have not been subject to the federal laws applicable to the sale of firearms, such as licensing, background check, serialization, and record-keeping requirements.

80% kits include not only the 80% frame or receiver, but often the other components necessary to make a functioning firearm:  barrels, trunnions, springs, pins, slides (in pistols), uppers (in long guns), and sights.[5]  Along with these component parts, "80%" retailers also often include a "jig."  The jig is a specialized piece of steel, aluminum, or polymer that assists the builder in the machining process by clamping around the frame or receiver blank and contains holes in specific locations to guide the builder's process.  Jigs make the at-home building process more user-friendly, even foolproof.  Prior to the Rule taking effect, some retailers sold the jig with the 80% frame or receiver; others sold the jig

---

[5] For example, a kit available from MDX Arms—an online seller of rifle components and accessories—included:  frame blank, jig, trigger and trigger housing, drill bits, an unfinished slide and parts to complete it, frame rails, magazine release, take-down lever, slide stop, barrel, and recoil spring.  *See* Decl. of Inspector Eric Tejada in Supp. of Pl. People of the State of California's Mot. for a Prelim. Inj. at 5, *California v. Blackhawk Manufacturing Group Inc.*, No. CGC-21-594577 (Cal. Super. Ct. Aug. 18, 2021) ("Tejada Decl.").

separately.[6]  Jigs are often reusable.  This means that future kits purchased by an individual can be readily completed with a jig already owned by and familiar to the purchaser.  *E.g.*, *80 Percent Lower Unfinished Receiver Jig*, 80% LOWERS, https://www.80-lower.com/80-lower-jig (last visited Aug. 29, 2022).

Retailers also often provide detailed information for gun builders about what tools will be required for machining, instructions giving step-by-step guidance on how to complete an 80% frame or receiver, and tutorial videos for how to use their jigs and assemble the kits.  *See, e.g.*, How to Build an AR-15 Rifle, MIDWAYUSA, https://www.midwayusa.com/how-to-guides/how-to-build-ar-15-rifle (last visited Aug. 29, 2022); Polymer80 PF940C 80% Compact Pistol Frame and Jig Kit, 80% LOWERS, https://www.80-lower.com/products/polymer80-pf940c-80-compact-pistol-frame-and-jig-kit/ (last visited Aug. 29, 2022) (providing a link to download a tool list and instructions).

Moreover, videos are readily available online, providing step-by-step visual instructions on machining an 80% frame or receiver into a completed frame or receiver ready for use.  These online videos are user-friendly and receive substantial viewing traffic.  They show the various levels of ease and available tools for completing the frames or receivers—from hand-held routers and basic drills to more sophisticated, automated mills.

---

[6] Since the Rule took effect, retailers have reported that they are updating their sales protocols and offerings in order to comply with the Rule.  However, kit and jig sales are unlikely to disappear.  Rather, jig and kit retailers appear to have only temporarily paused sales, expressly assuring prospective customers that they "will be accepting orders again very soon."  *Polymer80 PF940C 80% Compact Pistol Frame and Jig Kit*, 80% LOWERS, https://www.80-lower.com/products/polymer80-pf940c-80-compact-pistol-frame-and-jig-kit/  (last visited Aug. 29, 2022).

*See, e.g.*, Shooting Tips and Tricks, *Assembling a 80% 1911* (Oct. 21, 2017), https://www.youtube.com/watch?v=h7OCCPK7qCk (last visited Aug. 29, 2022).  In some cases, after watching online instructions and using a drill, rotary tool, hammer, punch, file, clamp, pliers, and a utility knife, a gun maker starting with a polymer 80% frame can complete the entire process from kit to completed firearm in less than half an hour.  Tejada Decl. at 6-7.

### B.   The Rule Has No Effect on Kit Builds With Fully Manufactured, Serialized Frames or Receivers and Minimally Affects 80% Kits

As previously discussed, frames or receivers are necessary for a gun to be capable of expelling a projectile, and there are two options for purchasing frames or receivers when completing a kit build: (1) a fully manufactured, serialized, and operational frame or receiver or (2) an 80% frame or receiver.  As demonstrated below, with respect to kit builds, the Rule has minimal impact:  fully machined frames or receivers already are regulated, and thus the Rule does not impact kits that include such frames or receivers; and kits that include 80% frames or receivers are simply treated in the same manner as kits with fully machined, serialized frames or receivers.

#### 1.   *The Rule does not affect kit builds with fully machined, serialized frames or receivers.*

Even before the Rule came into effect, individuals purchasing a fully machined frame or receiver for a kit build (or even without a kit) had to comply with federal firearms law:  the frame or receiver had to be serialized by the manufacturer, purchased through an FFL, and in that sale the purchaser had to complete a Form 4473 (ATF Firearm Transaction Record) and undergo a background check—the exact same procedure legal gun owners

21

undertake to purchase a fully operational firearm.  *See* 18 U.S.C. § 921(a)(3).  We, as well as other at-home gun makers, have long utilized this process to make guns.  Through FFLs, we purchase kits that include fully machined frames or receivers, which we receive only after undergoing a background check (just like we do when we buy a fully functional firearm); and the frame or receiver is identified by a serial number on it.  Indeed, this process is required for purchase of a fully machined frame or receiver, regardless of whether it is included in a kit or sold as a standalone part.  *See id.*  These requirements— that at-home gun makers undergo a background check and receive a serialized frame or receiver—are precisely those that apply to the purchase of a completed gun, and are not burdensome.  Plaintiffs, however, fail to acknowledge the pre-existing requirements for at-home builds—requirements that we have followed for decades without impeding our ability to build guns at home.

> **2.    *The Rule merely requires that kits with 80% frames or receivers comply with the same federal firearms regulations as kits utilizing fully machined frames or receivers.***

The only change that resulted from the Rule is that guns made from kits with partially machined frames or receivers are now covered by the same federal firearm laws that already applied to kits with fully machined frames or receivers.  The adjusted definition merely brought the regulation in harmony with the present-day reality of the capabilities of the firearms industry and individual gun makers.

As ATF has explained, "technological advances have also made it easier for companies to sell firearm parts kits, standalone frame or receiver parts, and easy-to-complete frames or receivers to unlicensed persons, without maintaining any records or

conducting a background check."  Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. at 24,652.  These products "enable individuals to make firearms quickly and easily."  *Id.*

These technological advancements and marketplace developments left ATF's guidance out of date with the practices of manufacturers and gun makers, allowing for gaps that made it easier for traffickers or other prohibited individuals to obtain firearms.  The result is that the streets have been flooded with untraceable firearms, commonly referred to as "ghost guns."  *See id.* at 24,652.

By recognizing that its guidance was out of date with the practices of manufacturers and gun makers, ATF eliminated a loophole that had been exploited to the disadvantage of law-abiding gun owners, gun makers, and the public.  ATF  simply exercised its rulemaking power to address the evolving marketplace of firearms to require compliance with the minimal measures that all legal gun owners already undertake when purchasing fully manufactured firearms or fully machined frames or receivers.

As gun owners who value and support the rights protected by the Second Amendment, it is important to us that the Rule does not impact the availability of 80% kits to law-abiding Americans, ***and it does not***.  "There is a longstanding distinction between the right to keep and bears arms and commercial regulation of firearm sales."  *Morehouse* Order at 17.  In claiming that the Rule "affects every person who owns, wants to own, or wants to construct a firearm from items that have never, to this date, been regulated as firearms," Plaintiffs obfuscate the minimal effect of the Rule on law-abiding gun owners and the commercial regulation of firearms.  Pls.' Mot. at 37.  Under the Rule, the purchase

23

and utilization of 80% kits is still readily available to law-abiding citizens. The only individuals impacted are those who do not qualify to legally purchase a completed firearm, frame, or receiver, or traffickers who seek to illegally resell these weapons. In other words, any individual who can pass a background check is still permitted to utilize an 80% kit.

* * * * * * * *

We regularly purchase firearms through FFLs and pass background checks in the process. As we stated, we have previously built guns at home with the purchase of a fully machined, serialized frame or receiver, rather than an 80% kit, in compliance with federal background check, serialization, and record-keeping requirements. These requirements are not burdensome, and did not significantly impact our at-home builds. What is more, they are critical, commonsense requirements that reduce gun violence by keeping guns out of the hands of people who should not have them. *See, e.g.*, *Division 80* Order at 16-17 ("[T]he implementation of the Final Rule will decrease the number of untraceable firearms in circulation, thus facilitating law enforcement's efforts to keep guns out of the hands of criminals. Division 80 makes little attempt to dispute this point or to explain why it is outweighed by equities favoring itself.").

Plaintiffs inflate the stakes of the Rule, and the impact it has on at-home gun makers, in large part by disregarding the reality of scratch builds. *See* Pls.' Mot. at 4-5, 35; Compl. ¶¶ 27-28. But as our brief has shown, scratch and kit builds are different. The Rule recognizes these distinctions and leaves unregulated the scratch build gun-maker. Plaintiffs also overstate the impact of the Rule on kit builds, failing to fairly acknowledge the existence of requirements already in place for kits made from fully machined frames or

24

receivers, and that the Rule simply aligned the regulations with changes in the gun industry that have made it easy to build guns from partially manufactured parts.

Taking into account these different processes for building guns, the lack of any changes to the treatment of scratch builds, and preexisting requirements for kit builds made from fully machined frames and receivers, the Rule simply does not impose new restrictions or regulations not already applicable to gun makers and purchasers in similar contexts. It merely aligned gun-making from 80% frames and receivers with gun-making from fully machined frames and receivers. Like the plaintiff in the *Division 80* case, plaintiffs here "ha[ve] not shown that individual constitutional liberty interests are at stake" nor demonstrated "that the Final Rule would amount to a violation of the Second Amendment." *See Division 80* Order at 15. The Court in *Morehouse* similarly put it:

> The Final Rule does not infringe on any individuals' or business' ability to completely manufacturer a firearm for personal use, nor does it restrict the ability to obtain the weapon kits at issue. Instead, the Final Rule simply requires serialization of a firearm, when in the stream of commerce, so that it may be tracked in the event a crime is committed with the firearm.

*Morehouse* Order at 17.

Rather, the Rule sensibly prevents the dangerous proliferation of untraceable ghost guns, particularly by those who could not otherwise legally own a firearm, without unduly impeding our ability to make our own guns.

## CONCLUSION

For the foregoing reasons and the reasons stated in Defendants' Opposition, Plaintiffs' Motion for a Preliminary Injunction should be denied.

Respectfully submitted, on August 29, 2022.

/s/ *Rebecca Wernicke Anthony*

Rebecca Wernicke Anthony
Texas Bar No. 24093345
JONES DAY
2727 North Harwood Street
Dallas, Texas  75201
Telephone: 214.969.4886
Facsimile:  214.969-5100
ranthony@jonesday.com

Barbara Mack Harding
     Attorney-in-Charge
     D.C. Bar No. 419250
     (*pro hac vice* pending)
Jennifer L. Swize
     D.C. Bar No. 490988
     (*pro hac vice* pending)
Megan E. Ball
     D.C. Bar No. 1708286
     (*pro hac vice* pending)
Joseph J. Kiessling
     D.C. Bar No. 1630477
     (*pro hac vice* pending)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

Angela A. Korge
     Florida Bar No. 125419
     (*pro hac vice* pending)
JONES DAY
600 Brickell Ave, Ste 3300
Miami, FL 33131
Telephone: (305) 714-9700
Facsimile: (305) 714-9799

*Counsel for Amici Curiae*

26

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and distribution to all registered participants of the CM/ECF System.


/s/ *Rebecca Wernicke Anthony*

Rebecca Wernicke Anthony