# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

JENNIFER VANDERSTOK, *et al.*,

    Plaintiffs,

v.

MERRICK GARLAND, in his official
capacity as Attorney General of the
United States, *et al*.,

    Defendants.

Civil Action No. 4:22-cv-00691-O

---

**BRIEF OF THE DISTRICT OF COLUMBIA AND THE STATES OF NEW JERSEY, PENNSYLVANIA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, WASHINGTON, AND WISCONSIN AS AMICI CURIAE IN SUPPORT OF <u>DEFENDANTS</u>**

# TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICI STATES ...................................1

BACKGROUND ............................................................................................2

SUMMARY OF ARGUMENT .................................................................5

ARGUMENT ..................................................................................................5

    I.    The Final Rule Fits Squarely Within The GCA's Comprehensive Scheme, Which Was Designed To Fill Gaps In State-By-State Enforcement ..................................................5

    II.    The Final Rule Complements State Efforts To Regulate Unserialized Firearms ..............................................................9

        A.    At least 14 jurisdictions, including the District, have passed their own laws regulating kits and other unserialized firearms ..................................................9

        B.    Despite state efforts, the number of unserialized firearms has grown exponentially ..........................................12

        C.    The Final Rule closes the gaps inherent in state-by-state enforcement ..................................................................15

CONCLUSION ..............................................................................................18

# TABLE OF AUTHORITIES

*Cases*

*Abramski v. United States*, 573 U.S. 169 (2014) ....................................................2, 8

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ........................7

*Moore v. State*, 983 A.2d 583 (Md. Ct. Spec. App. 2009) ......................................16

*Torres v. Lynch*, 578 U.S. 452 (2016) ........................................................................9

*United Auto., Aircraft & Agric. Implement Workers of Am. v. Wis. Emp. Rels. Bd.*, 351 U.S. 266 (1956) ...............................................................................1

*United States v. Cruikshank*, 92 U.S. 542 (1875) ....................................................17

*Federal Statutes*

18 U.S.C. § 921 .................................................................................................. 2, 3, 5

18 U.S.C. § 922 ........................................................................................... 2, 7, 8, 14

18 U.S.C. § 923 .....................................................................................................2, 16

*Regulations*

Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652 (Apr. 26, 2022) ...................................... 1, 3, 4, 5, 9, 12, 16

*Legislative History*

H.R. Rep. No. 90-1577 (1968) ................................................................... 6, 7, 8, 16

114 Cong. Rec. 13647 (1968) ....................................................................................8

*State Statutes*

Ala. Code § 13A-11-64 ...................................................................................9

Cal. Penal Code § 16519 ........................................................................ 10, 16

Cal. Penal Code § 16531 ...............................................................................10

Cal. Penal Code § 29180 ...............................................................................11

Cal. Penal Code § 29182 ...............................................................................11

Cal. Penal Code § 30400 ........................................................................ 10, 11

Conn. Gen. Stat. Ann. § 29-36a ............................................................. 10, 11

Conn. Gen. Stat. Ann. § 53-206j ...................................................................10

D.C. Code § 7-2501.01 ...................................................................................9

D.C. Code § 7-2504.08 .................................................................................11

D.C. Code § 7-2505.01 .................................................................................11

D.C. Code § 7-2505.02 .................................................................................11

D.C. Code § 22-4503 ....................................................................................15

D.C. Code § 22-4514 ....................................................................................10

Del. Code Ann. tit. 11, § 1448 ......................................................................15

Del. Code Ann. tit. 11, § 1448A ...................................................................11

Del. Code Ann. tit. 11, § 1448B ...................................................................11

Del. Code Ann. tit. 11, § 1459A ............................................................ 10, 11

Haw. Rev. Stat. Ann. § 134-10.2 .......................................................... 10, 11

720 Ill. Comp. Stat. Ann. 5/24-5.1 ....................................................... 10, 11

Ind. Code § 35-47-2-18 ...................................................................................9

Md. Code Ann., Pub. Safety § 5-703 .................................................................. 10, 11

Mass. Gen. Laws ch. 269, § 11E .........................................................................11

Minn. Stat. Ann. § 609.667 ................................................................................10

Mont. Code Ann. § 45-6-326 ..............................................................................9

Neb. Rev. Stat. § 28-1207 ..................................................................................9

N.J. Stat. Ann. § 2C:39-9 .............................................................................. 10, 11

N.J. Stat. Ann. § 2C:58-2 ...................................................................................11

N.J. Stat. Ann. § 2C:58-3 ...................................................................................15

N.Y. Penal Law § 265.01 ...................................................................................10

N.Y. Penal Law § 265.07 ...................................................................................11

N.Y. Penal Law § 265.60 ...................................................................................11

N.Y. Penal Law § 265.61 ...................................................................................11

N.Y. Penal Law § 265.63 ...................................................................................11

N.Y. Penal Law § 265.64 ...................................................................................11

Nev. Rev. Stat. Ann. § 202.360 ..........................................................................15

Nev. Rev. Stat. Ann. § 202.3625 ........................................................................11

Nev. Rev. Stat. Ann. § 202.363 ..........................................................................10

Nev. Rev. Stat. Ann. § 202.3635 ........................................................................10

R.I. Gen. Laws Ann. § 11-47-2 ...........................................................................10

R.I. Gen. Laws Ann. § 11-47-8 ....................................................................... 10, 11

R.I. Gen. Laws Ann. § 11-47-40 .........................................................................11

S.D. Codified Laws § 22-14-5 ....................................................................9

Tex. Penal Code Ann. § 31.11 ....................................................................9

Wash. Rev. Code Ann. § 9.41.092............................................................11

Wash. Rev. Code Ann. § 9.41.111............................................................11

Wash. Rev. Code Ann. § 9.41.113............................................................11

2022 Wash. Sess. Laws ch. 105 (S.H.B. 1705) ................................. 10, 11

*Newspapers and Media Reports*

Andrew Blankstein & Eric Leonard, *Ex-con who killed California cop used homemade 'ghost gun,'* NBC News (Aug. 15, 2019)........................................15

Brad Brooks, *California school shooting shines light on murky 'ghost gun' world*, Reuters (Nov. 22, 2019) ..........................................15

Ryan Hill, *'Ghost guns are everywhere': San Diego's firefight continues to get ghost guns off of the street*, ABC 10 News (Feb. 19, 2022)....................12

Jeff Pegues, *Rise in crime fueled in part by 'ghost' guns, ATF says*, CBS News (Feb. 2, 2022) ...........................................12

Brian Saunders, *Philadelphia arrests gunmaker as Biden regulates ghost guns*, Phila. Tribune (Apr. 11, 2022)...........................................12

Bill Whitaker, *Ghost Guns: The build-it-yourself firearms that skirt most federal gun laws and are virtually untraceable*, CBS News (May 10, 2020) ...............14

Ovetta Wiggins, *Baltimore plans to sue 'ghost gun' part maker as state law takes effect*, Wash. Post (May 31, 2022)......................................12

*Other Authorities*

80% Arms, *Buying Guns Online Without An FFL* ....................................6

Cal. Dep't of Just., *Armed and Prohibited Persons System Report 2021* ...............14

Everytown for Gun Safety, *Untraceable: The Rising Specter of Ghost Guns* (2020) ............................................................................... 13

Int'l Ass'n of Chiefs of Police, *2018 Resolutions* (Nov. 2018) ............................... 17

JSDSupply, *FNS – Lower Parts Kit*, *Complete Kits for a Complete Build* .............. 6

JSDSupply, *Stealth Arms Parts & Kits* .................................................................. 13

Scott R. Kegler et al., Vital Signs: *Changes in Firearm Homicide and Suicide Rates – United States, 2019-2020*, Morbidity & Mortality Weekly Report (May 13, 2022) ........................................................................... 1

Polymer80, *80 Lower* ............................................................................................ 13

Travis Taniguchi et al., Nat'l Police Found., *The Proliferation of Ghost Guns: Regulation Gaps and Challenges for Law Enforcement* (2021) .. 12, 13, 14

Franklin E. Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. Legal Stud. 133 (1975) ......................................................................... 6, 7

## INTRODUCTION AND INTEREST OF AMICI STATES

The District of Columbia and the States of New Jersey and Pennsylvania, on behalf of themselves and the States of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, New York, North Carolina, Oregon, Rhode Island, Washington, and Wisconsin (collectively, the "Amici States"), file this brief as amici curiae in support of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and its authority to enact the Final Rule at issue. *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652 (Apr. 26, 2022) (to be codified at 27 C.F.R. pts. 447, 478, 479). Amici States' "dominant interest" in "preventing violence . . . cannot be questioned. It is a matter of genuine local concern." *United Auto., Aircraft & Agric. Implement Workers of Am. v. Wis. Emp. Rels. Bd.*, 351 U.S. 266, 274 (1956).

In recent years, gun violence has exploded across the country. Gun-related homicides rose nearly 35 percent between 2019 and 2020, reaching their highest level in over 25 years. Scott R. Kegler et al., Vital Signs: *Changes in Firearm Homicide and Suicide Rates – United States, 2019-2020*, Morbidity & Mortality Weekly Report (May 13, 2022), https://bit.ly/3yt5X0a. At the same time, advances in firearms technology have contributed to the rapid proliferation of "ghost guns": unserialized firearms that can be built at home from easily assembled weapon parts

kits or partially complete frames or receivers. Though individual states have worked diligently to protect their citizens from gun violence and address this emerging threat, there is a natural limit to states' abilities to combat a nationwide problem that crosses state borders. Absent federal enforcement, ghost guns have continued to proliferate, including in the very states that have been trying to keep them out. Consistent with the federal Gun Control Act of 1968 ("GCA" or "the Act"), the Final Rule fills this gap in state-by-state enforcement by expressly regulating weapon parts kits and partially complete frames or receivers as firearms. In doing so, it advances the "twin goals" of the GCA: "to keep guns out of the hands of criminals and others who should not have them, and to assist law enforcement authorities"—the bulk of whom operate at the state and local level— "in investigating serious crimes." *Abramski v. United States*, 573 U.S. 169, 180 (2014).

## BACKGROUND

To support state and local law enforcement, the GCA regulates the possession, manufacture, sale, and transfer of "firearms." *See* 18 U.S.C § 921 *et seq*. It generally prohibits certain people, such as felons, domestic abusers, and juveniles, from gun possession, *id.* § 922(g), (x)(2), and it requires federal firearms licensees to serialize each firearm, run a background check before every sale, and record each gun transaction, *id.* §§ 922(t), 923(g), (i). Because these provisions

2

apply only to "firearms," what constitutes a firearm is essential to any proper interpretation of the Act.  The Act defines a "firearm" in relevant part as "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," or "the frame or receiver of any such weapon."  *Id.* § 921(a)(3).

Recent advances in firearms technology have prompted the ATF to reexamine its rules implementing the GCA.  In the past few years, the ghost gun industry has exploded, driven in large part by the online sale of weapon parts kits.  These user-friendly kits typically contain nearly complete firearms parts and require a minor amount of assembly to become fully functional weapons.  87 Fed. Reg. at 24662.  As these firearms kits proliferated, so too have self-made, unserialized guns.  Law enforcement officers went from recovering about 1,700 self-made guns in 2016 to over 19,000 in 2021, an eleven-fold increase.  87 Fed. Reg. at 24656.  Altogether, officers recovered about 45,240 self-made guns during that five-year period—more than 40 percent of which were recovered in 2021 alone. 87 Fed. Reg. at 24656.  The rise of these kits revealed two problems.  First, a person explicitly banned from gun possession under the GCA could still buy a kit and assemble a fully functional gun within hours.  Second, because the finished product was unserialized, officers could not track the gun if it was later used in a crime.  Indeed, of the 45,240 suspected ghost guns recovered from 2016 to 2021,

only 445 could be traced—a less than one percent success rate.  87 Fed. Reg. at 24659.

The Final Rule takes important steps to remedy that problem by clarifying how the Act's key terms will be enforced.  First, the Rule explicitly includes weapon parts kits in its definition of "firearm":

> *Firearm.*  Any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon . . . .  The term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive.

87 Fed. Reg. at 24735.  Second, the Rule clarifies that a partially complete frame or receiver, or a frame or receiver kit, is a "frame" or "receiver" under the GCA if it can readily be converted to function as such.  87 Fed. Reg. at 24739.  Third, the Rule defines "privately made firearm" and "readily" for the first time and enumerates relevant factors for assessing whether something can "readily" be converted to expel a projectile.  87 Fed. Reg. at 24735.  And fourth, it provides detailed instructions on how and when licensees must mark firearms.  87 Fed. Reg. at 24741-42.  Notably, the Rule does not *ban* weapon parts kits or partially complete frames or receivers.  It merely treats them the same as conventionally manufactured guns, and it allows law-abiding citizens to privately assemble guns for personal use if they so wish.

## SUMMARY OF ARGUMENT

1. The Final Rule is consistent with the text, history, and purposes of the GCA.  As the Rule recognizes, readily assembled weapon parts kits or partially complete frames or receivers are "firearms" under the statute's plain text.  The history and context of the Act confirm this commonsense interpretation.  Congress enacted a broad scheme to regulate the interstate flow of firearms, and the Rule ensures that the Act and similar state laws are not thwarted by advances in gun technology.

2. The Final Rule is a vital backstop to states' efforts to stem the flow of ghost guns and combat the violence that has resulted.  In response to the recent influx of ghost guns, at least 14 jurisdictions have enacted their own laws regulating weapon parts kits and partially complete frames or receivers.  But absent federal enforcement, the number of unserialized guns has proliferated, leaving in its wake a spike in crime and violence.  The Final Rule serves a vital coordinating function, consistent with the GCA, that states cannot exercise on their own.

## ARGUMENT

### I.     The Final Rule Fits Squarely Within The GCA's Comprehensive Scheme, Which Was Designed To Fill Gaps In State-By-State Enforcement.

Under a plain reading of the Act, easy-to-assemble weapon parts kits and partially complete frames or receivers fall within the statutory definition of "firearm" because they are both "designed to . . . expel a projectile by the action of

5

an explosive," and "may readily be converted" to do just that.   18 U.S.C. § 921(a)(3).  As the ATF recognized, the text focuses on a weapon's *proximity* to full functionality and not on its immediate ability to fire a projectile.  87 Fed. Reg. at 24685; *see* 18 U.S.C. § 921(a)(3) (defining a "firearm" to include a "starter gun," which are filled with blanks but can readily be converted to fire an explosive).  Weapon parts kits similarly meet that proximity threshold because they are, by design, easy to convert into a fully functional firearm—and in fact, they are consistently marketed as practical substitutes to conventional weapons. *See, e.g.*, JSDSupply, *FNS – Lower Parts Kit*, *Complete Kits for a Complete Build*, https://bit.ly/3anxK8N (last visited July 8, 2022) (describing kits as essentially "fully functional firearm[s] without the hurdles of a background check or government fees"); 80% Arms, *Buying Guns Online Without An FFL*, https://bit.ly/3P9SksZ (last visited July 8, 2022) (urging visitors to "buy a 'gun' online with 80% Arms!").

This interpretation is reinforced by the Act's history and context: ending "mail order murder."  H.R. Rep. No. 90-1577, at 19 (1968).  At the time, Congress and the public were reeling from the high-profile murders of President John F. Kennedy, Martin Luther King, Jr., and Robert F. Kennedy, whose deaths focused attention on mail-order guns and helped pressure Congress to act.  Franklin E. Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. Legal

6

Stud. 133, 147-48 (1975).  Congress thus passed the GCA to curb easy access to these deadly weapons and solve the "interstate mail order gun problem."  *Id.* at 145 (citing an unpublished report from Senator Thomas Dodd).  The GCA must be read in light of that context and overall scheme.  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).  That means adopting a commonsense, functional understanding of "firearm" that considers proximity to full use and recognizes the crucial anti-circumvention role that the GCA was designed to play.

The Final Rule fits within the GCA's purpose of closing the gaps that led to widespread interstate trafficking of firearms to unknown individuals despite state laws intended to prevent those problems.  In the same way that mail-order guns previously enabled "criminals, immature juveniles, and other irresponsible persons" to obtain firearms when "they could not purchase guns under the laws in their own jurisdictions," Zimring, *supra* at 145, the unregulated supply today of unserialized gun parts lets people evade the gun laws of their states.  This modern incarnation of the mail-order gun problem also undermines the purposes of the GCA: to "control the indiscriminate flow of [guns] across State borders" and to "[e]nsure that strong local or State laws are not subverted by a deadly interstate traffic in firearms."  H.R. Rep. No. 90-1577, at 8, 19 (1968).

For example, according to a House Judiciary Committee Report, Congress banned the "interstate mail-order shipments of firearms . . . so that *State* and *local*

authorities may better exercise the controls they deem desirable over . . . such firearms." H.R. Rep. No. 90-1577, at 12 (emphasis added) (explaining 18 U.S.C. § 922(a)(2)).  Legislators also banned licensees from selling to persons barred from gun ownership in the state where the licensee does business—as well as to those who the licensee believes do not reside in that state—to close a recurring loophole in state-only enforcement: "the avoidance of *State* and *local* laws controlling firearms by the simple expediency of crossing a State line to purchase one." *Id.* at 14 (emphasis added) (explaining 18 U.S.C. § 922(b)(2)-(3)).  At bottom, the GCA was meant to protect the integrity of state gun laws against interstate circumvention—a task Congress correctly recognized was uniquely suited for the federal government:

> [C]ontrols on interstate gun traffic which only the Federal Government can apply, and without which no State gun law is worth the paper it is written on[,] [are vital]. . . . . Without such Federal assistance, any State gun law c[ould] be subverted by any child, fugitive, or felon who orders a gun by mail or buys one in a neighboring State which has lax gun laws.

114 Cong. Rec. 13647 (1968) (statement of Sen. Joseph Tydings).

If the GCA was crafted to solve a circumvention problem presented by mail-order guns, then it must also be read to solve an identical circumvention problem presented by ghost guns.  Indeed, the Supreme Court has instructed courts to interpret the GCA practically, to focus on "substance" and not "empty formalities." *Abramski*, 573 U.S. at 180.  By updating the GCA's critical definitions to cover

advances in firearms technology, the Final Rule is faithful to that guidance.  *See infra* Section II.C.

## II.   The Final Rule Complements State Efforts To Regulate Unserialized Firearms.

Absent federal regulation, unserialized firearms have flooded Amici States' communities.  Many of these weapons end up in the hands of people banned from gun ownership, directly undermining the GCA's core provisions as well as state law.  *See* 87 Fed. Reg. at 24657 n.20.  At the same time, gun violence and homicides have spiked in recent years.  In response to this influx, many states (including Amici States) have passed laws regulating weapon parts kits and partially complete frames or receivers.  The Final Rule lends critical federal support to these existing state efforts.[1]

### A.   At least 14 jurisdictions, including the District, have passed their own laws regulating kits and other unserialized firearms.

As the primary actors charged with "defining and enforcing criminal laws," states are responsible for addressing the violence associated with weapon parts kits and their resulting firearms.  *Torres v. Lynch*, 578 U.S. 452, 464 n.9 (2016)

---

[1]    A broad group of states has long recognized the problem posed by unserialized guns, and many criminalize the removal of a serial number from a firearm (or the possession of a firearm so altered).  *See, e.g.*, Ala. Code § 13A-11-64; Mont. Code Ann. § 45-6-326; Neb. Rev. Stat. §§ 28-1207, -1208; Ind. Code § 35-47-2-18; S.D. Codified Laws § 22-14-5; Tex. Penal Code Ann. § 31.11.

(internal quotation mark and citation omitted).  In light of the surge of kits and unserialized guns, states have targeted the possession, manufacture, and transfer of such firearms, and have imposed detailed marking and recordkeeping requirements on licensees.

For example, at least thirteen jurisdictions target the possession of unserialized firearms.  Three specifically define and target the possession of any "ghost gun."  *See* D.C. Code §§ 22-4514, 7-2501.01(9B); N.Y. Penal Law § 265.01(9)-(10); R.I. Gen. Laws Ann. §§ 11-47-8(e), -2(8).  Others do the same, albeit using different language.[2]  And at least one state prohibits people who are otherwise banned from gun ownership from also possessing an unserialized frame or receiver or similar component part.  *See* Conn. Gen. Stat. Ann. § 53-206j(f).

At least eight states also target the ghost gun manufacturing and assembly process.  One prescribes a detailed scheme for regulating self-manufacturing—specifically, requiring someone to apply for a unique serial number from the state, engrave that number on the gun's frame or receiver, and pass a background check. *See* Conn. Gen. Stat. Ann. §§ 29-36a, 53-206j.   Four others prohibit the

---

[2]     *See, e.g.*, Cal. Penal Code §§ 16519, 16531, 30400; Del. Code Ann. tit. 11, § 1459A(b); Haw. Rev. Stat. Ann. § 134-10.2; 720 Ill. Comp. Stat. Ann. 5/24-5.1(c), (d); Md. Code Ann., Pub. Safety § 5-703(b)(2); Minn. Stat. Ann. § 609.667(3); Nev. Rev. Stat. Ann. § 202.363; N.J. Stat. Ann. § 2C:39-9(k); 2022 Wash. Sess. Laws ch. 105 § 4 (S.H.B. 1705) (to be codified at Wash. Rev. Code Ann. § 9.41).

manufacturing of an untraceable firearm or the acquisition of certain component parts for the purpose of building a firearm. *See* Cal. Penal Code §§ 16519, 16531, 30400; Haw. Rev. Stat. Ann. § 134-10.2; N.J. Stat. Ann. § 2C:39-9(k); 2022 Wash. Sess. Laws ch. 105 § 4 (S.H.B. 1705) (to be codified at Wash. Rev. Code Ann. § 9.41). The rest have more generalized restrictions.[3]

Many states also target the sale and transport of unserialized firearms and their component parts. At least twelve jurisdictions criminalize the sale or transfer of unserialized firearms and partially complete frames or receivers, either generally or when transferred to non-licensees or prohibited persons.[4] And many states place detailed restrictions on dealers at the point of sale, using background checks, recordkeeping, and serialization requirements.[5]

---

[3]        *See, e.g.*, Mass. Gen. Laws ch. 269, § 11E; Nev. Rev. Stat. Ann. § 202.3635; R.I. Gen. Laws Ann. § 11-47-8(e).

[4]        *See* Cal. Penal Code § 30400; Conn. Gen. Stat. Ann. § 29-36a(d); Del. Code Ann. tit. 11, § 1459A; D.C. Code §§ 7-2504.08(a), 7-2505.01-.02; Haw. Rev. Stat. § 134-10.2; 720 Ill. Comp. Stat. Ann. 5/24-5.1(b); Md. Code Ann., Pub. Safety § 5-703(a)(1)-(2); Mass. Gen. Laws ch. 269, § 11E; Nev. Rev. Stat. Ann. §§ 202.3625, .364; N.J. Stat. Ann. § 2C:39-9(n); N.Y. Penal Law §§ 265.60-.64; R.I. Gen. Laws Ann. § 11-47-8(e).

[5]        *See, e.g.*, Cal. Penal Code §§ 29180, 29182; Del. Code Ann. tit. 11, §§ 1448A, 1448B, 1459A; 720 Ill. Comp. Stat. Ann. 5/24-5.1; Md. Code Ann., Pub. Safety § 5-703; Mass. Gen. Laws ch. 269, § 11E; N.J. Stat. Ann. § 2C:58-2; N.Y. Penal Law § 265.07; R.I. Gen. Laws Ann. § 11-47-40; 2022 Wash. Sess. Laws ch. 105 § 6 (S.H.B. 1705) (to be codified at Wash. Rev. Code Ann. § 9.41); Wash. Rev. Code Ann. §§ 9.41.092, .111, .113.

**B.    Despite state efforts, the number of unserialized firearms has grown exponentially.**

Absent federal enforcement, however, states and other localities (including those with laws targeting ghost guns) have continued to see self-assembled, unserialized firearms flow into their communities.  For example, in 2018, six different police agencies reported the following ghost gun recovery numbers: San Diego (53), the District of Columbia (25), Chicago (21), New York City (18), Philadelphia (17), and Prince George's County, Maryland (17).  Travis Taniguchi et al., Nat'l Police Found., *The Proliferation of Ghost Guns: Regulation Gaps and Challenges for Law Enforcement* 15 (2021) (hereinafter "NPF Report"), https://bit.ly/3yLOFLz.  Three years later, in 2021, those numbers skyrocketed— even in states regulating ghost guns—with the same agencies reporting ten- to thirty-fold increases: San Diego (545), District of Columbia (439), Chicago (455), New York City (225), Philadelphia (571), and Prince George's County (264).[6] Across the country, the story is the same: federal recovery numbers for

---

[6]    *See* Ryan Hill, *'Ghost guns are everywhere': San Diego's firefight continues to get ghost guns off of the street*, ABC 10 News (Feb. 19, 2022), https://bit.ly/3M6YcjS (San Diego); Data on file with the Metropolitan Police Department (current as of June 29, 2022) (District of Columbia); Jeff Pegues, *Rise in crime fueled in part by 'ghost' guns, ATF says*, CBS News (Feb. 2, 2022), https://cbsn.ws/3NPmkbp (Chicago and New York City); Brian Saunders, *Philadelphia arrests gunmaker as Biden regulates ghost guns*, Phila. Tribune (Apr. 11, 2022), https://bit.ly/3NCFmTh (Philadelphia); Ovetta Wiggins, *Baltimore plans to sue 'ghost gun' part maker as state law takes effect*, Wash. Post (May 31, 2022), https://wapo.st/3PXsrwU (Prince George's County).

unserialized guns have soared, jumping eleven-fold between 2016 and 2021.  87 Fed. Reg. at 24656.

The number of ghost gun sellers has also proliferated, making these weapons increasingly accessible.  According to the ATF, there are about 129 companies selling weapon parts kits or partially complete frames or receivers.  *See* 87 Fed. Reg. at 24718.  These companies operate in 27 states across the country.  NPF Report 2.  And the number of ghost gun sellers has been steadily increasing for years—a phenomenon that tracks the increasing spread of ghost guns nationwide. *See* Everytown for Gun Safety, *Untraceable: The Rising Specter of Ghost Guns* 13 (2020), https://bit.ly/3m6LRBt (finding 26 ghost gun sellers in 2014 compared to 80 sellers by 2020).  Moreover, weapon parts kits are affordable and user friendly, with some costing less than $100 and requiring only "a few tools" and "basic instructions" to "build a fully functional firearm."  JSDSupply, *Stealth Arms Parts & Kits*, https://bit.ly/3yhxQGY (last visited July 8, 2022); *see* Polymer80, *80 Lower*, https://bit.ly/3PZCS2M (last visited July 8, 2022).

This combination of widespread access and federal inaction has made it easier for individuals to circumvent state gun laws, bringing unserialized weapons into the very states that have been trying to keep them out.  For example, even though California has attempted to curb unserialized guns since at least 2016, these weapons accounted for nearly 30 percent of all guns recovered in the state by the

13

ATF.  NPF Report 5.  Meanwhile, the number of unserialized guns recovered by California law enforcement agencies increased from 167 in 2016 to nearly 12,400 in 2021, a 74-fold increase.  Cal. Dep't of Just., *Armed and Prohibited Persons System Report 2021* at 26, https://bit.ly/3uljKDs (last visited July 8, 2022).  According to local authorities, that is because guns are easily trafficked across the state's borders.  *See* Bill Whitaker, *Ghost Guns: The build-it-yourself firearms that skirt most federal gun laws and are virtually untraceable*, CBS News (May 10, 2020), https://cbsn.ws/3Li5zoM (interviewing the Los Angeles County Sheriff).  Similarly, New Jersey has regulated unserialized firearms since at least 2018.  But at the same time, the state has seen large increases in the number of ghost guns recovered at crime scenes, from 55 guns in 2019 to 101 in 2020 and 255 in 2021.[7]  More troubling, nearly all ghost guns recovered in New Jersey were assembled from kits manufactured out of state, and many were used to commit violent crimes (including murder and aggravated assault).[8]

   The Final Rule helps curb that phenomenon, advancing the GCA's core aims at a time when federal assistance is critical.  Without *banning* the sale of kits or self-manufactured guns, the Rule ensures that states can at least trace these

---

[7]    Data on file with New Jersey State Police (current as of May 5, 2022).
[8]    Data on file with New Jersey State Police (current as of May 5, 2022).

weapons and that they are not bought by criminals or children as a means of evading state law.

### C. The Final Rule closes the gaps inherent in state-by-state enforcement.

The Final Rule addresses the problems that have contributed to this alarming proliferation of untraceable guns in multiple ways. First, by updating the Act's definitions, the Rule ensures that sellers run a background check on potential purchasers before delivering a kit or nearly complete frame or receiver. This makes it harder for prohibited persons to acquire a gun and thus safeguards the numerous federal and state laws that have excluded certain people from gun ownership.[9]

Indeed, without meaningful federal oversight, unserialized guns have regularly fallen into the hands of prohibited persons, with often deadly results. In 2019, for example, a 16-year-old boy killed two classmates and himself with a gun that had been assembled from a kit. Brad Brooks, *California school shooting shines light on murky 'ghost gun' world*, Reuters (Nov. 22, 2019), https://reut.rs/3MO4fuc. That same year, a man with multiple felony convictions used a self-made semi-automatic rifle, assembled from parts, to kill one police officer and injure two others. Andrew Blankstein & Eric Leonard, *Ex-con who*

---

[9]    *See, e.g.*, 18 U.S.C. § 922(g); Del. Code Ann. tit. 11, § 1448; D.C. Code § 22-4503; Nev. Rev. Stat. Ann. § 202.360; N.J. Stat. Ann. § 2C:58-3(c).

*killed California cop used homemade 'ghost gun,'* NBC News (Aug. 15, 2019), https://nbcnews.to/3vLC09U.   The data tell a similar story.[10]   By exerting the ATF's authority over kits and readily convertible frames or receivers, the Final Rule helps keep these guns away from felons and children, consistent with Congress's intent.   *See supra* Part I.

Second, the Final Rule ensures that licensees mark kits and nearly complete frames or receivers with a unique serial number and keep records of all relevant transactions.   Tracing is a critical law enforcement tool, and over 8,600 law enforcement agencies across 46 countries rely on the ATF's web-based tracing application.   87 Fed. Reg. at 24659.   But that service has limited utility if a large number of unserialized guns are excluded and federal and state record-keeping laws are not enforced.   *See* 18 U.S.C. § 923(g); *see also supra* Part II.A.   The effective administration of justice will be thwarted if prosecutors cannot trace guns and use such evidence to enforce the Act's provisions against straw purchasers, firearms traffickers, and gun thieves.   *See* 87 Fed. Reg. at 24660.

---

[10]   In New Jersey, nearly 40 percent of all people arrested with a ghost gun from 2021 to mid-2022 had been banned from gun ownership because of their criminal records.   Data on file with New Jersey State Police (current as of May 5, 2022).   In Philadelphia, roughly half of the 478 people arrested in 2021 for the possession or use of a ghost gun had been banned because of disqualifying convictions, including violent felonies.   Data on file with the Pennsylvania Office of the Attorney General (current as of May 17, 2022).

Third, the Final Rule may also help states apply their own laws to avoid gaps that would allow ghost guns to proliferate.  State authorities often follow the ATF's lead when drafting or assessing the scope of their own gun laws.  *See, e.g.*, Cal. Penal Code § 16519 (defining a key term based on federal gun regulations); *Moore v. State*, 983 A.2d 583, 595 (Md. Ct. Spec. App. 2009) (explaining that the state legislature enacted certain gun laws expecting they would be read "consistent with federal law").  This ripple effect makes the Final Rule even more critical to state gun schemes, as it not only fills the gaps in enforcement described above, but also helps states interpret or revise their own gun laws, in keeping with Congress's intent.  H.R. Rep. No. 90-1577, at 8, 12.

The Final Rule helps stop a growing segment of the modern gun industry from exploiting new technology to widen the very gaps that the GCA sought to close.  It is therefore no surprise that law enforcement "strongly supports" efforts to treat ghost guns the same as other firearms.  Int'l Ass'n of Chiefs of Police, *2018 Resolutions* 15 (Nov. 2018), https://bit.ly/3vya4Fb.  The Final Rule makes crucial clarifications to the GCA's definitions and helps states fulfill their "very highest duty" to safeguard the lives and well-being of their citizens.  *United States v. Cruikshank*, 92 U.S. 542, 553 (1875).  It falls squarely within the GCA's framework and should be upheld.

17

## CONCLUSION

This Court should deny the plaintiffs' motion for injunctive relief.

Dated: August 30, 2022

Respectfully submitted,

MATTHEW J. PLATKIN
Acting Attorney General
for the State of New Jersey

KARL A. RACINE
Attorney General for the District of
Columbia

MELISSA MEDOWAY
Special Litigation Chief
Deputy Attorney General

CAROLINE S. VAN ZILE[*]
Solicitor General

TIM SHEEHAN
Deputy Attorney General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

The Office of the Attorney
General of New Jersey
Richard J. Hughes Justice
Complex
25 Market Street, P.O. Box 112
Trenton, NJ 08625
(609) 376-3232
melissa.medoway@njoag.gov

Office of the Solicitor General
Office of the Attorney General
for the District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

JOSH SHAPIRO
Attorney General for the
Commonwealth of Pennsylvania

*/s/ Will Thompson*
Will Thompson
TX State Bar No. 24094981
Quinn Emanuel Urquhart & Sullivan, LLP
3100 McKinnon Street, Suite 1125
Dallas, TX 75201
(469) 902-3200
(469) 902-3610 (fax)
willthompson@quinnemanuel.com
*Local Counsel*

JACOB B. BOYER
Deputy Attorney General

Office of the Attorney General
for the Commonwealth of
Pennsylvania
1600 Arch Street, Suite 300
Philadelphia, PA 19103
(267) 768-3968
jboyer@attorneygeneral.gov

*Pro hac vice application forthcoming

On behalf of:

ROB BONTA
*Attorney General*
State of California

PHILIP J. WEISER
*Attorney General*
State of Colorado

WILLIAM TONG
*Attorney General*
State of Connecticut

KATHLEEN JENNINGS
*Attorney General*
State of Delaware

HOLLY T. SHIKADA
*Attorney General*
State of Hawaii

KWAME RAOUL
*Attorney General*
State of Illinois

AARON M. FREY
*Attorney General*
State of Maine

BRIAN E. FROSH
*Attorney General*
State of Maryland

MAURA HEALEY
*Attorney General*
Commonwealth of
Massachusetts

DANA NESSEL
*Attorney General*
State of Michigan

KEITH ELLISON
*Attorney General*
State of Minnesota

LETITIA JAMES
*Attorney General*
State of New York

JOSHUA H. STEIN
*Attorney General*
State of North Carolina

ELLEN F. ROSENBLUM
*Attorney General*
State of Oregon

PETER F. NERONHA
*Attorney General*
State of Rhode Island

ROBERT W. FERGUSON
*Attorney General*
State of Washington

JOSHUA L. KAUL
*Attorney General*
State of Wisconsin

20

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2022, a true and accurate copy of the foregoing brief was filed electronically with the Court using the CM/ECF system. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.

*/s/ Will Thompson*
Will Thompson