**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| JENNIFER VANDERSTOK, *et al.*,<br><br>                                 *Plaintiffs*,<br><br>    v.<br><br>MERRICK GARLAND, in his official<br>capacity as Attorney General of the United States;<br>*et al.*,<br><br>                             *Defendants*. | Civil Action No. 4:22-cv-00691-O |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

ARGUMENT .......................................................................................................... 1

I.      PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS ................ 1

        A.      The Amended Definition of "Frame or Receiver"............................ 1

        B.      The Changed Definition of "Firearm" ................................................. 5

        C.      The Major Questions Doctrine............................................................. 6

II.     PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF
        THIS INJUNCTION IS NOT GRANTED ...................................................... 8

        A.      Plaintiffs Did Not "Delay" Seeking Relief From the Final Rule ....... 8

        B.      Substantial Threat of Irreparable Injury............................................. 9

III.    THE BALANCE OF EQUITIES WEIGHS IN FAVOR
        OF PLAINTIFFS ............................................................................................. 13

IV.     THIS COURT SHOULD ENTER A BROAD INJUNCTION ..................... 14

CONCLUSION.................................................................................................... 15

# TABLE OF AUTHORITIES

**<u>Case</u>**                                                                                                   **Pages(s)**

*Anderson v. Carter*,
    802 F.3d 4 (D.C. Cir. 2015)...................................................................    4

*Biden v. Missouri*,
    142 S. Ct. 647 (2022)...........................................................................    8

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020).........................................................................    4

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) .............................................................................    4

*Syracuse v. ATF*, No. 1:20-cv-06885,
    No. 1:20-cv-06885, 2021 WL 23326 (S.D.N.Y. 2021) .........................    2, 3

*Garden State Equal. v. Dow*,
    79 A.3d 1036, 1041 (N.J. 2013) ..........................................................    13

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013)..............................................................    13

*Grace v. District of Columbia*,
    187 F. Supp. 3d 124 (D.D.C. 2016)......................................................    13, 14

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) .............................................................................    5

*Handley v. Chapman*,
    587 F.3d 273 (5th Cir. 2009)................................................................    4

*Hornbeck Offshore Servs., L.L.C. v. Salazar*,
    696 F. Supp. 2d 627 (E.D. La. 2010)....................................................    14

*Lamie v. U.S. Trustee*,
    540 U.S. 526 (2004) .............................................................................    3

*Lujan v. Defenders of Wildlife*,
    504 U.S. 16 (1992) ...............................................................................    13

*Maryland v. King*,
    567 U.S. 1301 (2012) ...........................................................................    13

*Morehouse Enters., LLC v. ATF*, No. 3:22-cv-116,
    No. 3:22-cv-116, 2022 WL 3597299 (D.N.D. 2022) ...........................    2, 9

*Nat'l Rifle Ass'n of Am., Inc. v. BATFE,*
   700 F.3d 185 (5th Cir. 2012) ................................................................ 13

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
   142 S. Ct. 2111 (2022) ...................................................................... 8, 13

*Texas v. United States,*
   201 F. Supp. 3d 810 (N.D. Tex. 2016) .................................................. 14

*Texas v. United States,*
   No. 7:16-cv-00054, 2016 WL 7852331 (N.D. Tex. 2016) ................... 15

## **Statutes**

18 U.S.C. § 921(a)(3) ................................................................................. 6

18 U.S.C. § 921(a)(3)(A) ......................................................... 2, 3, 4, 5, 6

18 U.S.C. § 921(a)(3)(B) .................................................................... 2, 4

## **Regulations**

*Definition of "Frame or Receiver" and Identification of Firearms; Corrections,* 87 Fed. Reg.
   51,249 (Aug. 19, 2022) ........................................................................... 8

## **Other Authorities**

1968 U.S.C.C.A.N. 2112, 2208 ............................................................. 6, 7

*Ghost Guns and the Deeply American Tradition of Gun Privacy*, FEE STORIES ...... 14

S. Rep. No. 90-1097 ............................................................................... 6, 7

Defendants' arguments in favor of their new Final Rule not only fail as a matter of law, but are rife with contradiction. Defendants claim the change implemented by the Final Rule is merely a "modernization," hand-waving away the substantial, nation-wide impacts. But Defendants' Final Rule significantly redefines the term "firearm," upon which *all* "firearm" regulation is based, exceeding the mandate of the Gun Control Act ("GCA"), and causing cascading regulatory effects. And while Defendants now argue that the Final Rule is consistent with their congressionally granted power, less than two years ago they argued the opposite. Plaintiffs based their personal and business practices on the GCA and Defendants' longstanding interpretation thereof, and the Final Rule's extensive, unauthorized changes cause irreparable harm. Plaintiffs request a preliminary injunction that halts the implementation of an unlawful, sometimes unintelligible rule. To further expedite their relief, Plaintiffs waive their request for oral argument. *See* ECF No. 16.

## ARGUMENT

## I.  PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

Plaintiffs are likely to succeed on the merits. Congress has not authorized Defendants to regulate non-frames, non-receivers, "frame or receiver parts kits," or "weapons parts kits." If Congress intended for Defendants to regulate items that may be "readily converted" into "frames or receivers," it would have said so—just as Congress did in relation to several other items in the GCA. Besides being in excess of authority, Defendants' attempt to expand their regulatory power is arbitrary, capricious, impermissibly vague, and is an insufficiently explained departure from prior practice and the Proposed Rule. Defendants' arguments to the contrary ignore cannons of statutory interpretation, the history of its own application of the GCA, the history of reliance on the prior interpretations, and the actual arguments before *this* Court.

A.      The Amended Definition of "Frame or Receiver"

Defendants make a tellingly terse argument that their regulatory redefinition of "frame or receiver" is consistent with the text of the GCA, and in so doing, reach entirely the wrong conclusion. Defendants claim that the existence of language in one part of a statute, § 921(a)(3)(A), and in other statutes, validates the agency's grafting that language into a different part of the statute, § 921(a)(3)(B). ECF No. 41 at 18. But Defendants fail to explain why—since Congress has repeatedly used the term "readily [] converted" in other areas—it did not use that term in relation to a "frame or receiver." Well-established cannons of statutory construction provide an answer: Congress *intentionally* omitted the term "readily" or the concept of "readily converted" from its authorization to regulate a "frame or receiver." *See* Fed. Defs.' Mot. for Summ. J., *Syracuse v. ATF*, No. 1:20-cv-06885, 2021 WL 23326, ECF No. 98 at 34 (quoting *Allison Engine Co., Inc. v. U.S. ex rel. Saunders*, 553 U.S. 662, 671 (2008) ("When Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally….") (internal quotation marks and alteration omitted)).

In support, Defendants attempt to invoke the *Morehouse* decision, ECF No. 41 at 18, but that court confronted the argument that the Final Rule had created a "regulatory glob," not an "identical" argument to Plaintiffs' here.[1] *Morehouse Enters., LLC v. ATF*, No. 3:22-cv-116, 2022 WL 3597299, at *6 (D.N.D. Aug. 23, 2022). In addressing the definitions at issue, the *Morehouse* court did not address cannons of statutory interpretation, let alone those Plaintiffs rely upon here or that Defendants have relied upon in litigation under the old rule.

---

[1] Similarly, contrary to Defendants' representation, when the *Morehouse* court observed that "firearm" is broader than a fully operational weapon, it was addressing weapons parts kits, not "frame or receiver" and so not rejecting an "identical" argument to one made here. *See* ECF No. 41 at 18–19; *Morehouse Enters*, 2022 WL 3597299, at *5.

Ironically, Defendants dismiss Plaintiffs' analysis of the GCA, arguing that "*Plaintiffs* essentially seek to insert a new adjective modifying 'frame or receiver' into the statute." ECF No. 41, at 17. Yet Defendants' Final Rule quite literally modifies the term "frame or receiver" by inserting the "designed to or may be readily converted" language that Congress had omitted.

After giving short shrift to the text and structure of the GCA, Defendants quickly turn to the *intent* of the GCA, claiming their new Final Rule is needed "to accomplish what Congress intended the statutes to do." ECF No. 41 at 17. But arguments about congressional intent cannot alter the actual text of a statute or provide license for an agency to do what it claims Congress meant to do. *See Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("The starting point in discerning congressional intent is the existing statutory text . . . and not the predecessor statutes.").

Defendants' attempt to distinguish their admissions in *Syracuse* is equally ineffective. Defendants claim their prior statements about the inability to regulate a "frame or receiver" rested on a prior rule and should therefore be irrelevant. ECF No. 41 at 19. In *Syracuse*, however, Defendants argued that they specifically *lacked the authority* to regulate the items they seek to regulate here. Fed. Defs.' Mot. for Summ. J., *Syracuse v. ATF*, No. 1:20-cv-06885, 2021 WL 23326, ECF No. 98 at *14 (S.D.N.Y. Jan. 29, 2021) ("Importantly, the 'designed to' and 'readily be converted' language are only present in the first clause of the statutory definition 18 U.S.C. § 921(a)(3)(A)."). Congress did not expand Defendants' authority between that prior filing and this one. Defendants should be held to their prior admissions of the correct application of "frame or receiver."[2]

---

[2] Defendants claim the Final Rule "reflects the best statutory interpretation[,]" and thus *Chevron* deference is inapplicable. ECF No. 41 at 26–27. Plaintiffs agree that *Chevron* does not apply, but Defendants' reasoning is erroneous. Defendants' "best statutory interpretation" argument is refuted by their own argument from last year. Additionally, Defendants' explanation for reading

Even if Defendants had authority to effectively rewrite and expand the GCA, however, the Final Rule would still be unlawful because it is arbitrary and capricious, dismisses decades of reliance interests, and is impossibly vague. For example, Defendants relegate discussion of *four decades* of classification letters to a footnote. *See* ECF No. 41, at 19 n.7. Yet, "[w]hen an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account. . . . It would be arbitrary and capricious to ignore such matters." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (internal citations and quotations omitted); *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016).

Defendants further attempt to dodge reliance interests, arguing that "'a policy change must only meet three requirements: The new policy must be permissible under the statute; there must be good reasons for it; and the agency must believe that the new policy is better . . . .'" ECF No. 41 at 34 (quoting *Handley v. Chapman*, 587 F.3d 273, 282 (5th Cir. 2009)). The first requirement is not satisfied, extinguishing Defendants' argument. Congress did not give Defendants authority to regulate "readily convertible" frames or receivers. Nor, as further explained below, did it allow Defendants to regulate every part of a firearm.

Next, Defendants' explanation of the Final Rule illustrations highlights, among other things, the impossibly vague nature of the Final Rule. For example, Defendants insist that items illustrated in Plaintiffs' Brief, ECF No. 16 at 18, labeled "not a firearm" are "not considered to be a 'frame or receiver' unless they are sold with jigs, templates, equipment, tools or other products

---

the term "readily" from 18 U.S.C. § 921(a)(3)(A) into (B) is that "'readily' is a widely used word and concept…" ECF No. 41 at 27. If it's such a "widely used word and concept" Congress should have had no trouble including it. "Courts 'assume that Congress means what it says in a statute[.]'" *Anderson v. Carter*, 802 F.3d 4, 9 (D.C. Cir. 2015) (citation omitted).

or components that would make the receiver blank readily convertible to a functional frame or receiver." ECF No. 41 at 19. This statement makes it appear that the Final Rule does not alter the regulation of unfinished frames or receivers, but only *what they can be sold with*. This position is not readily apparent from the Final Rule. Defendants' litigation-proffered interpretation suggests that they mean to regulate jigs, templates, or other tools, which could not meet the definition of "firearm." These ambiguities are fatal to the Final Rule. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. . . . [L]aws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.").

### B.      The Changed Definition of "Firearm"

Defendants' backhanded attempt to regulate items that are less than a "frame or receiver" or other non-firearm parts when they are grouped into a "weapons part kit," likewise exceeds the GCA. Defendants spend most of their argument on the incontrovertible fact that a weapon need not be assembled to be readily converted to expel a projectile. ECF No. 41 at 20–21. Plaintiffs have not argued otherwise. The point, however, is that just as Defendants' new definition of "frame or receiver" exceeds the bounds of § 921(a)(3)(B), the new definition of "weapons part kit" exceeds § 921(a)(3)(A). Defendants now seek to also regulate a parts kit that can be "readily completed, assembled, [or] restored." Final Rule, at 24,735.

Defendants' underlying effort to expand what can be regulated is revealed in their claim that "there is no statutory basis for concluding that in order to be a 'firearm' under § 921(a)(3)(A), a weapon parts kit must be a 'firearm' under § 921(a)(3)(B)." ECF No. 41 at 22.[3] This statement

---

[3] Firearm is "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any

is an oversimplification and diversion, for two reasons. First, and most simply, without a frame or receiver within the weapon parts kit, a weapon parts kit cannot be regulated. A weapon parts kit that does not include a frame or receiver cannot be readily "converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A). The frame or receiver is the core component that allows a weapon to fire a projectile.

Second, Defendants fail to address the fact that Congress explicitly refused to regulate other weapon parts. S. Rep. No. 90-1097 (1968), as reprinted in 1968 U.S.C.C.A.N. 2112, 2200 ("Under the present definition of 'firearm,' any part or parts of such a weapon are included. It has been found that it is *impractical to have controls over each small part of a firearm*. Thus, the revised definition substitutes only the major parts of the firearm; that is, frame or receiver for the words 'any part or parts.'") (emphasis added). The plain meaning of the statute as well as clear congressional statements refute Defendants' arguments.

### C.    The Major Questions Doctrine

Defendants use the possibility of compliance in an attempt to emasculate the major questions doctrine (and proportionally increase their authority), stating, "manufacturers and sellers . . . could continue to sell any and all products…by obtaining a federal firearms license." ECF No. 41 at 23–24. Even with a mechanism for compliance, however, Defendants are seeking to regulate an industry that supports the centuries-old practice of self-manufacturing firearms.[4]

---

such weapon; (C) any firearm muffler or…silencer; or (D) any destructive device." 18 U.S.C. § 921(a)(3).

[4] "Privately made firearms have been in existence since the first ignition system . . . in the 1400s." *Stop Gun Violence: Ghost Guns*, *Hearing before the Subcomm. on the Constitution, Comm. on the Judiciary*, 117th Cong. 4 (2021) (statement of Ashley Hlebinsky, Curator Emerita & Senior Firearms Scholar, Cody Firearms Museum, President, The Gun Code, LLC), https://www.judiciary.senate.gov/imo/media/doc/Ashley%20Hlebinsky%20Written%20Testimony%20Final.pdf.

Defendants claim that the Final Rule is not as severe as "a complete reorganization of American energy infrastructure," "changing the terms of 80% of American residential leases," or "regulating the entire tobacco industry." *See* ECF No. 41 at 14. The primary objective of the Final Rule, however, literally seeks to redefine the term upon which the entire related regulatory framework is based. Changing the definition of firearm changes the entire regulatory structure.

Defendants contend that Plaintiffs failed to address whether Defendants' reading of the statute was novel, thus illuminating whether the major questions doctrine was violated. ECF No. 41 at 24. But as with other major questions problems, Defendants treat the regulatory definition of "frame or receiver" as a small crack in the door and use that crack to pry their way into expansive regulation.

Next, Defendants claim "the definition of what is and is not a 'firearm' or 'frame or receiver' is squarely within the expertise of ATF" while chastising Plaintiffs for not citing proposed legislation that supports the notion that Congress has considered and rejected certain regulatory definitions. ECF No. 41 at 25. As cited in both the Petition for Judicial Review, ECF No. 1 at 5, 24, and the Preliminary Injunction, ECF No. 16 at 3, 15, 22, 23, the 1968 definition of firearm superseded the previous definition where "any part or parts of such a weapon [were] included. It [was] [] found that it [was] impractical to have controls over each small part of a firearm.'"[5] S. Rep. No. 90-1097 (1968), as reprinted in 1968 U.S.C.C.A.N. 2112, 2200. There is no clearer congressional action than narrowing a statute and providing explicit reason for doing

---

[5] Even if the Final Rule did not raise a Major Questions Doctrine issue, it would still violation the Delegation Doctrine and the Take Care Clause. ECF No. 1, ¶¶ 131–152.

so.[6] Plaintiffs have sufficiently established a likelihood of success on the merits.

## II.   PLAINTIFFS WILL CONTINUE TO SUFFER IRREPARABLE INJURY IF A PRELIMINARY INJUNCTION IS NOT GRANTED

### A.   Plaintiffs Did Not "Delay" Seeking Relief From the Final Rule.

That Plaintiffs sought clarification from the ATF before launching a federal lawsuit is not a disqualifying delay. The ATF announced the Final Rule on April 11, 2022. The very next day, Plaintiff Tactical Machining sent a letter to the ATF requesting a classification letter clarifying Tactical Machining's product would still not be considered a "frame or receiver" under the Final Rule. *See* Declaration of Darren Peters, Sr. ("Peters Decl."), ECF No. 16-1, ¶ 9, Ex. 2. As of the filing of Plaintiffs' Motion, and indeed this Reply, the ATF had not responded to Tactical Machining. Peters Decl., ECF No. 16-1, ¶ 10; Supplemental Declaration of Darren Peters, Sr. ("Peters' Supp. Decl."), ¶ 10 (filed herewith). Had the ATF responded in a timely manner, Tactical Machining may not have been forced to initiate this lawsuit.

The Agencies published their Final Rule on April 26, 2022. The Final Rule consists of nearly 400 pages, differs significantly from the Proposed Rule, and upends decades of precedent. Then, in June, the Supreme Court issued its opinion in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), further changing the legal landscape related to firearms. And even after Plaintiffs filed their lawsuit—and just five days before the Final Rule went into effect— the Agencies published a notice of Corrections to the Final Rule. *Definition of "Frame or Receiver" and Identification of Firearms; Corrections*, 87 Fed. Reg. 51,249 (Aug. 19, 2022).[7] The

---

[6] Defendants' citation to *Biden v. Missouri*, 142 S. Ct. 647 (2022), ECF No. 41 at 25, is inapposite. *Missouri* involved hospitals that received federal funding based on conditions set by a federal agency.

[7] The corrections are available at: https://www.federalregister.gov/documents/2022/08/22/2022-17741/definition-of-frame-or-receiver-and-identification-of-firearms-corrections.

agency itself making corrections to its own Final Rule just days before it went into effect defeats any argument that action on the Rule should have been taken sooner.[8] Any burden of delay should rest solely on Defendants' failure to respond and failure to clarify the vague Final Rule.

### B.  Substantial Threat of Irreparable Injury

Defendants are severely mistaken that their Final Rule imposes only "modest and ordinary compliance costs" and thus Tactical Machining will not be irreparably harmed. ECF No. 41 at 41. Defendants claim Tactical Machining can simply become a Federal Firearms Licensee ("FFL") and avoid any real harm. ECF No. 41 at 40. But Tactical Machining is already an FFL. Peters' Supp. Decl. ¶ 3. And yet, in the week that the Final Rule has been in effect, Tactical Machining sought to comply and has already suffered irreparable injury—and will continue to do so due to regulatory uncertainty unless this Court enjoins enforcement of the Final Rule.

Production and sale of the items at issue here, marketed by Tactical Machining under the colloquial label of "80% Lowers," is 91.54% of Tactical Machining's business. Peters' Decl., ECF No. 16-1, ¶ 11. Insofar as Tactical Machining believed that business was prohibited, because of the noted lack of communication from the ATF, it amounted to a near complete loss of Tactical Machining's entire operation. Tactical Machining lost approximately $47,435.37 this past week because of the impact of the Final Rule—despite the fact that Tactical Machining continued to sell serialized receivers that must be purchased through an FFL. Peters' Supp. Decl. ¶ 4–5. In fact, to keep customers' business and preserve brand loyalty, on August 25, 2022, Tactical Machining

---

[8] The Agencies claim that *Division 80* and *Morehouse* show that Plaintiffs here could have sought relief sooner but ignore the fact that the Agencies themselves delayed both of those cases. *See* Pls.' Resp. to Mot. to Transfer, ECF No. 24 at 16. Consequently, both the *Division 80* and *Morehouse* court issued orders on the respective preliminary injunction motions on August 23, 2022, after Plaintiffs filed their Petition and Motion. *Division 80*, ECF No. 74; *Morehouse*, ECF No. 85.

discounted its complete AR-style receivers and is currently selling them at a loss, further damaging the company. Peters' Supp. Decl. ¶ 5.

As of August 30, based on email communications from the ATF and positions taken by Defendants in court, Tactical Machining resumed sales of those items colloquially marketed as "80% Lowers." Peters' Supp. Decl. ¶ 6. Tactical Machining does not sell those items with any jigs, templates, tools, or instructions, per Defendants' statements. Peters' Supp. Decl. ¶ 6. Although Tactical Machining has resumed sales, it remains irreparably injured by the Final Rule.

First, the Final Rule prevents Tactical Machining from selling any jigs with their products. Prior to the announcement of the Final Rule, Tactical Machining sold jigs. Peters' Supp. Decl. ¶ 8. When the Final Rule was announced in April, Tactical Machining ceased the sale of jigs and resubmitted an item previously classified as not a firearm for reclassification—which the ATF has failed to respond to even now. Peters' Supp. Decl. ¶ 8, 10. This alone has irreparably injured Tactical Machining. Prior to the Rule going into effect, when Tactical Machining was out of stock of jigs the sales of its "80% Lowers" would drastically drop—anywhere from 20%–50% depending on the length that jigs were not available. Peters' Supp. Decl. ¶ 9. There is no reason to assume that sales will not be impacted now when Tactical Machining is *prohibited* from selling jigs with its products. Due to the lack of clarity in the Final Rule, Tactical Machining is not sure that it can sell jigs at all, regardless of whether they are sold packed with its "80% Lowers," in the same transaction as those products, or even in separate transactions. Peters' Supp. Decl. ¶ 9.

Second, even though Defendants have indicated in emails and in court filings, including their Response Brief, that the items at issue are not considered "firearms" as long as they are not sold with "jigs, templates, equipment, tools, or other products or components that would make the receiver blank readily convertible to a functional frame or receiver," ECF No. 41 at 19 (citations

omitted), this entirely misses the lack of clarity and unconstitutional vagueness inherent in the Final Rule. In addition to resubmitting an item for reclassification in April, Tactical Machining has called the ATF three separate times since the Final Rule's effective date. Peters' Supp. Decl. ¶ 10. Each time, the individual answering the phone stated someone would call back within 24 hours—no one ever did. Peters' Supp. Decl. ¶ 10. The only point of contact who has provided Tactical Machining with any direct information is a local ATF special agent. Peters' Supp. Decl. ¶ 10. The ATF agent indicated that, based on his understanding and ATF training, Tactical Machining's products, sold without a jig, instructions, or template, are not "firearms" under the Final Rule. Peters' Supp. Decl. ¶ 10. And yet, "without any official guidance Tactical Machining does not know what to do to remain in compliance and fears the ATF may take some enforcement action against Tactical Machining for violating something that the ATF has so far refused to authoritatively define." Peters' Supp. Decl. ¶ 10.

Third, the uncertainty in the market due to the Final Rule has resulted in a chilling effect. Even with resumed sales, a significant number of Tactical Machining's customers believe that the direct sale and purchase of the items at issue, without any accompanying jigs, templates, equipment, or tools, is still prohibited. Peters' Supp. Decl. ¶ 11. This has been evidenced by the litany of calls Tactical Machining has received from customers asking whether Tactical Machining's "80% Lowers" are illegal. Peters' Supp. Decl. ¶ 11. These customers have expressed fear that they may be raided by the ATF just for buying these products. Peters' Supp. Decl. ¶ 11.

Tactical Machining does not believe it will ever bounce back to pre-Final Rule sales numbers. Peters' Supp. Decl. ¶ 12. The lack of certainty has also made it difficult for Tactical Machining to do business with other, necessary vendors. For example, Tactical Machining is under threat of being dropped by its current credit card processor because of the lack of certainty in the

Final Rule. Peters' Supp. Decl. ¶ 13. Tactical Machining attempted to switch credit card processors, for security and to decrease costs, but because of the Final Rule, that processor will not underwrite Tactical Machining. Peters' Supp. Decl. ¶ 13. Instead, Tactical Machining is in talks with yet another credit card processor, which would increase their fees by 10% and would impose more onerous compliance requirements. Peters' Supp. Decl. ¶ 13.

Lastly, without massive changes to its business structure, Tactical Machining cannot shift to solely selling complete, serialized frames and receivers to mitigate harm. Peters' Supp. Decl. ¶ 14. Among other issues, the machining required to manufacture complete frames and receivers is significantly different than that of producing the items at issue in the Final Rule. Peters' Supp. Decl. ¶ 14. Moreover, manufacturing complete frames and receivers requires additional compliance work and recording requirements that would change Tactical Machining's business practices and increase overhead. Peters' Supp. Decl. ¶ 15. In fact, when Tactical Machining attempted a temporary shift to this business practice upon the effective date of the Final Rule (by focusing on serialized receivers), not only did sales not notably increase, but the compliance work inundated staff, increasing their overall work nearly five-fold. Peters' Supp. Decl. ¶ 15. Tactical Machining estimates that if it were to continue on that course it would need at least two additional staff to deal with the paperwork requirements and increase its prices. Peters' Supp. Decl. ¶ 15. Even then, Tactical Machining may not be able to operate at a profit and there is no guarantee that Tactical Machining could keep its current customer base. Other companies have specifically focused on serialized frames and receivers (or complete weapons) and have built customer bases in those areas. There is no reason to assume that customers will shift to Tactical Machining for those products. This harm is impossible to accurately project but is no less irreparable.

Moreover, the Individual Plaintiffs' plans to purchase the items at issue here are not speculative, as Defendants assert. Both have affirmed via declaration that they have concrete plans to purchase the items newly regulated under the Final Rule. Declaration of Jennifer VanDerStok, ECF No. 16-2, ¶ 7–9; Declaration of Michael Andren, ECF No. 16-3, ¶ 7–9. And Defendants' reliance on *Lujan*'s requirement of a concrete plan is inapplicable here, where there is actual harm, given Individual Plaintiffs are entirely prohibited from engaging in an act that they have engaged in and would engage in again but for Defendants' Final Rule. *Cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992) ("Where there is no actual harm, however, its imminence (though not its precise extent) must be established."); *see also Nat'l Rifle Ass'n of Am., Inc. v. BATFE*, 700 F.3d 185, 191–92 (5th Cir. 2012) *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ("[B]y prohibiting FFLs from selling handguns to 18-to-20-year-olds, the laws caused those persons a concrete, particularized injury—i.e., the injury of not being able to purchase handguns from FFLs.").

## III.     THE BALANCE OF EQUITIES WEIGHS IN FAVOR OF PLAINTIFFS

Defendants claim that "if a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." ECF No. 41 at 43 (quoting *Maryland v. King*, 567 U.S. 1301, 1302 (2012)). But Plaintiffs are not seeking to enjoin a statute. Rather, they seek to enjoin enforcement of the extra-legal, unconstitutional Final Rule. And "if a law is unconstitutional, how is the State harmed by not being able to enforce it?" *Garden State Equal. v. Dow*, 79 A.3d 1036, 1041 (N.J. 2013). "[E]nforcement of an unconstitutional law is always contrary to the public interest." *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)).

Defendants' blanket appeal to "public safety," ECF No. 41 at 43, also fails. The

government has an interest in promoting public safety, but it does not automatically follow that a regulation enacted in the name of public safety will actually serve that interest, or that such regulation is presumptively valid. *See Hornbeck Offshore Servs., L.L.C. v. Salazar*, 696 F. Supp. 2d 627, 637–38 (E.D. La. 2010); *Grace*, 187 F. Supp. 3d at 148. Defendants contend that "[t]he Rule will 'increase public safety by, among other things, preventing prohibited persons from acquiring firearms and allowing law enforcement to trace firearms involved in crime.'" ECF No. 41, at 43 (quoting 87 Fed. Reg. at 24,654). Defendants provide no additional data in support of their contention. Other sources, however, show that the unregulated firearms targeted by the Final Rule make up a small minority of weapons recovered in conjunction with criminal activity.[9] Nevertheless, in the name of "public safety," the Final Rule will affect myriad peaceable Americans who own, produce, and sell items that are newly considered firearms.

Plaintiffs and other peaceable Americans will suffer real, irreparable harm if the Final Rule is not enjoined. Individual Americans, including Plaintiffs VanDerStok and Andren, risk the possibility of criminal penalties for purchasing items that have not historically been considered firearms. Plaintiff Tactical Machining, and other producers and retailers, risk the destruction of their businesses. These interests far outweigh any potential harm to the government.

## IV.    THIS COURT SHOULD ENTER A BROAD INJUNCTION

Defendants' request for a narrowly tailored injunction is inconsistent with the nationwide impact of the Final Rule. "[T]he scope of injunctive relief is dictated by the extent of the violation established." *Texas v. U.S.*, 201 F. Supp. 3d 810, 836 (N.D. Tex. 2016), *order clarified*, 2016 WL

---

[9]    *Ghost Guns and the Deeply American Tradition of Gun Privacy*, FEE STORIES, https://fee.org/articles/ghost-guns-and-the-deeply-american-tradition-of-gun-privacy/      ("In Philadelphia, ghost guns accounted for 2.2 percent of confiscated guns in 2019, *The Washington Times* reported. In Chicago, that percentage was 1.2 percent in 2020.").

7852331 (N.D. Tex. Oct. 18, 2016). The Final Rule affects millions of peaceable Americans and businessowners in every state, all of whom are as vulnerable to irreparable harm under the Final Rule as the Plaintiffs herein. If relief is not nationwide, "the Court risks a substantial likelihood that a geographically-limited injunction would be ineffective." *Texas v. U.S.*, No. 7:16-cv-00054, 2016 WL 7852331, at *2 (N.D. Tex. Oct. 18, 2016). Therefore, "a nationwide injunction is necessary because the alleged violation extends nationwide." *Id.* An injunction in this matter, and in all APA cases, can be entered to "preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Such a statutorily authorized injunction is not limited to the parties before the Court, but instead enjoins general enforcement and implementation of the rule.

If, however, this Court limits relief to the parties before the Court, such relief should extend to all members of Plaintiff Firearms Policy Coalition. *See* Order Denying Motion to Modify Stay Order, at 1, *Guedes v. BAFTE*, 920 F.3d 1 (D.C. Cir.), *judgment entered*, 762 F. App'x 7 (D.C. Cir. 2019) (clarifying that the entered stay "applies only to the named Appellants . . . including any current *bona fide* members of the named membership associations.").

Finally, Plaintiffs have brought claims raising questions about the Agencies' entire rulemaking process. If the process under which the Final Rule was enacted violates the APA, severing portions of the Rule is inadequate and the entire Rule must be enjoined and cannot be piecemeal redeemed by a severability clause as Defendants suggest. ECF No. 41 at 45.

## CONCLUSION

Plaintiffs respectfully request that this Court grant their Motion for Preliminary Injunction. DATED this 31st day of August, 2022.

Respectfully submitted,

R. Brent Cooper (TX Bar No. 04783250)

15

COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, TX  75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540
brent.cooper@cooperscully.com

Cody J. Wisniewski* (CO Bar No. 50415)
FIREARMS POLICY COALITION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV  89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392
cwi@fpchq.org

*/s/ Kaitlyn D. Schiraldi*
Kaitlyn D. Schiraldi* (TN Bar No. 039737)
Erin M. Erhardt* (CO Bar No. 49360)
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO  80227
Telephone: (303) 292-2021
Telecopy: (877) 349-7074
kschiraldi@mslegal.org
eerhardt@mslegal.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 31, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

/s/ *Kaitlyn D. Schiraldi*