## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| JENNIFER VANDERSTOK; MICHAEL G. ANDREN; TACTICAL MACHINING LLC, a limited liability company; FIREARMS POLICY COALITION, INC., a nonprofit corporation, | § § § § § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:22-cv-00691-O |
| | § | |
| MERRICK GARLAND, in his Official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; STEVEN DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, | § § § § § § § § § § | |
| | § | |
| Defendants. | § | |

## OPINION & ORDER ON PRELIMINARY INJUNCTION

Before the Court are Plaintiffs' Motion for Injunction (ECF Nos. 15–16), filed August 17, 2022; Defendants' Response (ECF No. 41), filed August 29, 2022; and Plaintiffs' Reply (ECF No. 55), filed August 31, 2022. Plaintiffs withdrew their request for a hearing. *See* Pls.' Resp. to Court Order 1 n.2, ECF No. 54. Having considered the briefing, arguments, and evidence, the Court **ORDERS** that the motion for Preliminary Injunction (ECF No. 15) is **GRANTED in part**.

### I.      BACKGROUND

#### A.  Statutory and Regulatory Background

The Gun Control Act of 1968 regulates firearms in interstate commerce. Among other things, the Act requires manufacturers and dealers of firearms to have a federal firearms license. 18 U.S.C. § 923(a). Dealers must also conduct background checks before transferring firearms to

someone without a license, and they must keep records of firearm transfers. *Id.* §§ 922(t), 923(g)(1)(A).

The Gun Control Act defines the term "firearm" four different ways: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." *Id.* § 921(a)(3). But "[s]uch term does not include an antique firearm." *Id.* Congress delegated authority to administer and enforce the Act to the Attorney General. *Id.* § 926(a). The Attorney General, in turn, delegated that authority to the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). 28 C.F.R. § 0.130(a).

In 1978, ATF promulgated a rule interpreting the phrase "frame or receiver." The rule defined the "frame or receiver" of a firearm as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." *Title and Definition Changes*, 43 Fed. Reg. 13,531, 13,537 (Mar. 31, 1978). That definition remained in place until this year.

In April 2022, ATF published a Final Rule changing, among other things, the 1978 definition of "frame or receiver." *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27 C.F.R. pts. 447, 478, and 479 (2022)).[1] ATF split the phrase into two parts, assigning the term "frame" to handguns and the term "receiver" to any firearm other than a handgun, such as rifles and shotguns. *See* 27 C.F.R. § 478.12(a)(1), (a)(2). ATF then defined the terms "frame" and "receiver" along the same lines as

---

[1] The final rule took effect on August 24, 2022, in the midst of the parties' briefing. *See* 27 C.F.R. pts. 447, 478, and 479 (2022).

the 1978 rule, though with updated, more precise technical terminology.[2] But ATF did not stop there.

Rather than merely updating the terminology, ATF decided to regulate *partial* frames and receivers. Under the new Final Rule, "[t]he terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." *Id.* § 478.12(c). But "[t]he terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." *Id.* When determining whether an object is a frame or receiver, the ATF Director is not limited to looking only at the object. "When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit . . . ." *Id.*

The Final Rule also amends ATF's definition of "firearm" to include weapon parts kits. The ATF's new definition of "firearm," "shall include a weapon parts kit that is designed to or

---

[2] Here are the two definitions, in full:

> (1) The term "frame" means the part of a handgun, or variants thereof, that provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence, even if pins or other attachments are required to connect such component (i.e., sear or equivalent) to the housing or structure.

> (2) The term "receiver" means the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent), even if pins or other attachments are required to connect such component to the housing or structure.

27 C.F.R. § 478.12(a).

may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *Id.* § 478.11 (definition of "firearm").

### B. The Parties

Jennifer VanDerStok and Michael Andren are Texas residents who own firearms.[3] VanDerStok is a high school teacher and former police officer.[4] Andren is a licensed firearms instructor and retired aerospace administrator.[5] Both VanDerStok and Andren own firearm components that they intend to manufacture into firearms for personal, lawful use.[6] They claim that the Final Rule prohibits them from purchasing products that they want to use to manufacture their own firearms.[7]

Tactical Machining, LLC manufactures and sells items that are subject to regulation under the Final Rule.[8] Over 90% of Tactical Machining's business consists of selling items that individuals can use to manufacture frames and receivers and to build functioning firearms.[9] The owner and CEO of Tactical Machining says the company had to cease sales of those items after the Final Rule took effect.[10] Tactical Machining estimates that cessation of over 90% of its sales will put it out of business.[11] In addition, Tactical Machining's freight company now refuses to ship most of Tactical Machining's products because the company fears the parts may be considered firearms under the Final Rule.[12] Tactical Machining's credit card processing company has likewise

---

[3] Decl. of Jennifer VanDerStok 1, ECF No. 16-2; Decl. of Michael G. Andren 1, ECF No. 16-3.
[4] Decl. of Jennifer VanDerStok 1, ECF No. 16-2.
[5] Decl. of Michael G. Andren 2, ECF No. 16-3.
[6] Decl. of Jennifer VanDerStok 2, ECF No. 16-2; Decl. of Michael G. Andren 2, ECF No. 16-3.
[7] Decl. of Jennifer VanDerStok 2, ECF No. 16-2; Decl. of Michael G. Andren 2, ECF No. 16-3.
[8] Decl. of Darren Peters, Sr. 1, ECF No. 16-1.
[9] *Id.* at 2.
[10] *Id.* at 3–4; Supp. Decl. of Darren Peters, Sr. 1–2, ECF No. 55-1.
[11] Decl. of Darren Peters, Sr. 3–4, ECF No. 16-1.
[12] *Id.* at 4.

threatened to stop providing services to Tactical Machining, which does 95% of its sales through credit card.[13]

The Firearms Policy Coalition, Inc. is a nonprofit organization dedicated to promoting the Second Amendment rights of American citizens through legislative and legal advocacy.[14]

Plaintiffs VanDerStok, Andren, Tactical Machining, and the Firearms Policy Coalition sued the Attorney General, Department of Justice, ATF, and the ATF Director over the Final Rule.[15] Plaintiffs now move for a nationwide preliminary injunction to prevent Defendants from enforcing the rule.[16] Plaintiffs argue that the Final Rule is unlawful because it (1) exceeds ATF's statutory authority under the plain language of the Gun Control Act, (2) is a "major question" that Congress did not delegate to ATF, (3) is not a logical outgrowth of the proposed rule, and (4) represents a drastic, unexplained change in ATF's position.[17] Plaintiffs say enforcement of the Final Rule will likely put Tactical Machining out of business.[18] The parties briefed the issues, and the motion is ripe for review.

## II.     LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" and will be granted only if the movants carry their burden on all four requirements. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *see also* Fed. R. Civ. P. 65. The Court should issue a preliminary injunction only if the movants establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in their favor; and (4) that the issuance of the preliminary injunction will not disserve the public interest. *Daniels Health Servs.,*

---

[13] *Id.* at 4.
[14] Compl. 8, ECF No. 1.
[15] *See generally id.*
[16] *See* Pls.' Mot. for Prelim. Inj., ECF No. 15.
[17] *See* Pls.' Br., ECF No. 16.
[18] *See id.* at 42–46.

*L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The decision to grant or deny a preliminary injunction is discretionary with the district court." *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985). The movant must make a clear showing that the injunction is warranted, and the issuance of a preliminary injunction "is to be treated as the exception rather than the rule." *Id.*

## III.       ANALYSIS

### A.  Likelihood of Success on the Merits

Plaintiffs must first show a substantial likelihood that they will succeed on the merits of their claims. *Daniels Health Servs.*, 710 F.3d at 582. "To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Id.* Plaintiffs have shown a strong likelihood that they will succeed on the merits of their claims that ATF's new definitions are inconsistent with the Gun Control Act.

### 1.  The Final Rule exceeds ATF's statutory authority under the plain language of the Gun Control Act.

The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Plaintiffs argue the Final Rule exceeds ATF's statutory authority under the Gun Control Act in two ways. First, Plaintiffs argue that the Final Rule expands ATF's authority over parts that may be "readily converted" into frames or receivers, when Congress limited ATF's authority to "frames or receivers" as such. Second, Plaintiffs argue that the Final Rule unlawfully treats weapon parts kits as firearms. Plaintiffs are likely to succeed on both claims.

### a. Parts that *may become* receivers are not receivers.

The text of the Gun Control Act resolves this motion. When "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (citation omitted). The Court "begin[s] with the assumption that the words were meant to express their ordinary meaning." *United States v. Kaluza*, 780 F.3d 647, 659 (5th Cir. 2015) (citation and internal quotation marks omitted). But when a statute "includes an explicit definition," the Court "'must follow that definition,' even if it varies from a term's ordinary meaning." *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776 (2018) (citation omitted). "Statutory language 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (citation omitted).

Congress carefully defined its terms in the Gun Control Act. The primary definition of "firearm" in the Act contains three parts: "any weapon (including a starter gun) which [1] will or [2] is designed to or [3] may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A). Under this primary definition, a firearm is first and foremost a *weapon*. Underscoring that point, Congress explicitly named starter guns in the definition because starter guns are not obviously weapons. Then, because weapon parts also are not "weapons," Congress created a secondary definition covering specific weapon parts: "the frame or receiver of any such weapon." *Id.* § 921(a)(3)(B). Congress did not cover all weapon parts—only frames and receivers. And *only* the frames and receivers "of any such weapon" that Congress described in the primary definition.

Congress did not define the phrase "frame or receiver," so the words receive their ordinary meaning. *See Kaluza*, 780 F.3d at 659. In the Final Rule, ATF interprets the phrase as two separate

7

parts. ATF says the "term 'frame' means the part of a handgun . . . that provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence." 27 C.F.R. § 478.12(a)(1). ATF defines "receiver" similarly, though it says the term refers to a "rifle, shotgun, or projectile weapon other than a handgun." *Id.* § 478.12(a)(2). Plaintiffs do not take issue with those definitions, which appear to be updated, more precise versions of ATF's 1978 interpretation.

But the Final Rule did not merely update ATF's terminology. ATF added an entirely new section expanding its jurisdiction to include "partially complete, disassembled, or nonfunctional frame[s] or receiver[s]." *Id.* § 478.12(c). ATF now claims authority to regulate parts that are "designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." *Id.* The parts must be "clearly identifiable as an unfinished component part of a weapon." *Id.* In deciding whether something is a partially complete frame or receiver, ATF may consider other materials such as molds, instructions, and marketing materials "that are sold, distributed, or possessed with the item or kit." *Id.*

The Final Rule's redefinition of "frame or receiver" conflicts with the statute's plain meaning. The definition of "firearm" in the Gun Control Act does not cover all firearm parts. It covers specifically "the frame or receiver of any such weapon" that Congress defined as a firearm. 18 U.S.C. § 921(a)(3)(B). That which *may become* a receiver is not itself a receiver. Congress could have included firearm parts that "may readily be converted" to frames or receivers, as it did with "weapons" that "may readily be converted" to fire a projectile. But it omitted that language when talking about frames and receivers. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Collins v.*

8

*Yellen*, 141 S. Ct. 1761, 1782 (2021) (citation and internal quotation marks omitted). Likewise, when Congress uses a phrase in one part of a definition and excludes that phrase from another part of the very same definition, courts should give effect to Congress's deliberate exclusion.

Congress excluded other adjectives that ATF adds to its definition. The Final Rule covers "disassembled" and "nonfunctional" frames and receivers. 27 C.F.R. § 478.12(c). Congress's definition does not. Again, compare the language in Congress's primary definition of "firearm" to its secondary definition covering frames and receivers. The primary definition of "firearm" includes any "weapon" that "is designed to" fire a projectile. 18 U.S.C. § 921(a)(3)(A). That language covers disassembled, nonfunctional, and antique firearms because they are "designed" to fire projectiles even if they are practically unable to do so. But Congress wanted to exclude antiques, so it explicitly said the "term does not include an antique firearm," once again demonstrating awareness of the scope of the language it chose. *Id.* § 921(a)(3). In contrast, Congress did not choose to cover firearm parts that are "designed" to be frames or receivers—that is, incomplete, nonfunctional frames or receivers. "That omission is telling," particularly when Congress used that more expansive terminology in the same definition. *Collins*, 141 S. Ct. at 1782.

ATF's new definition of "frame or receiver" in 27 C.F.R. § 478.12(c) is facially unlawful. By comparison, the Final Rule includes definitions of "frame" and "receiver" in § 478.12(a) that appear to be consistent with the statute. This further highlights that the Final Rule's expansion of authority in § 478.12(c) to firearm parts that are *not yet* frames or receivers goes beyond Congress's definition. In other words, § 478.12(a) describes the full scope of frames and receivers that are consistent with the statutory scheme. ATF's expansion in § 478.12(c), on the other hand, covers *additional* parts that are "designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). But Congress

intentionally omitted that language from the definition. Section 478.12(c) is thus facially unlawful because it describes only parts that Congress intentionally excluded from its definition of "firearm." It is purely an expansion of authority beyond the statutory language.

To be sure, ATF is entitled to deference on its expertise in determining whether a particular component is a frame or receiver. There are no doubt close calls, as illustrated by the samples Tactical Machining has sent to ATF over the years.[19] But this case does not require the Court to determine how much machining is necessary to transform a component into a frame or receiver— that determination lies with ATF. Rather, the issue here is whether ATF may still regulate a component as a "frame or receiver" even after ATF determines that the component in question is *not* a frame or receiver at the time of evaluation. Congress has not extended ATF's authority so far. That the firearm part is "designed" to be or may one day become a frame or receiver does not change the fact that, in that moment, it is not "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3)(B).

Defendants' counterarguments are unpersuasive. Defendants first fault Plaintiffs for adding words to the statute.[20] Defendants argue that Plaintiffs read the phrase "frame or receiver" to mean "*complete* frame or receiver," or "*functional* frame or receiver." That argument poses two problems. First, as the prior paragraph discusses, the issue here is one of kind, not of degree. An incomplete receiver may still be a receiver within the meaning of the statute, depending on the degree of completeness (hence the industry term "80% lowers"). But the Final Rule treats incomplete receivers that are *not yet receivers* as if they were receivers under the statutory definition, which is clearly a step too far.[21] Second, Defendants' argument proves too much. If

---

[19] *See* Decl. of Darren Peters, Sr. Ex. 1, ECF No. 16-1.
[20] *See* Defs.' Resp. 17–18, ECF No. 41.
[21] Recall that the definition covers "the frame or receiver *of any such weapon*." 18 U.S.C. § 921(a)(3) (emphasis added). The statutory definition covers only the frames and receivers of "such weapon[s]" that

adding language to Congress's definition is inappropriate (and it certainly is), then the Final Rule is unlawful on that ground alone. Section 478.12(c) explicitly adds the terms "partially complete, disassembled, [and] nonfunctional," even though the statute's definition omits them. 27 C.F.R. § 478.12(c).

Defendants next argue that Plaintiffs' interpretation thwarts congressional intent. According to Defendants, "[t]he clear Congressional intent, as indicated by the plain language and the statutory scheme of the GCA, was to regulate—as a 'firearm'—the frame or receiver of a weapon."[22] That much is evident. But Defendants jump from that premise to a boundless congressional intent to "define[] 'firearms' more broadly than a fully operational weapon."[23] And a broad statute justifies broad regulation, Defendants say. But "[t]hat's not the level of rigor that usually accompanies statutory interpretation . . . ." *In re Harris*, 988 F.3d 239, 241 (5th Cir. 2021) (Oldham, J., concurring). Contrary to Defendants' broad framing, "the regulatory goals of the Gun Control Act were narrower: the Act ensured that '*weapons* [were] distributed through regular channels and in a traceable manner and [made] possible the prevention of sales to undesirable customers and the detection of the origin of particular *firearms*.'" *New York v. Burger*, 482 U.S. 691, 713 (1987) (emphases added) (alterations in original) (citing *United States v. Biswell*, 406 U.S. 311, 315–16 (1972)). When Congress sought to regulate *parts* of weapons, it did so meticulously.

---

[22] Congress has said are firearms. That language implies some degree of finality or functionality because a nonfunctional receiver is arguably not a receiver of "such weapon" that Congress has said is a firearm. The determination of degree likely rests with ATF.
[22] Defs.' Resp. 18, ECF No. 41 (citing *New York v. Burger*, 482 U.S. 691, 713 (1987)).
[23] *Id.* (internal quotation marks omitted) (quoting *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 3:22-cv-116, 2022 WL 3597299, at *6 (D.N.D. Aug. 23, 2022)).

### b.  A weapon parts kit is not a firearm.

Plaintiffs are also likely to succeed on their claim that the Final Rule unlawfully treats weapon parts kits as firearms. The Final Rule contains its own definition of "firearm," notwithstanding that the Gun Control Act already defines the term. Under the Final Rule, "[t]he term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11 (definition of "firearm"). That language conflicts with the statute's definition of "firearm."

ATF has no general authority to regulate weapon parts. But the Final Rule grants ATF that general authority by copying language used throughout the statutory definition. It takes phrases like "designed to" and "may readily be converted" and "assembled" from various places in the statute, cobbling them together to form ATF's own definition of "firearm." Those terms may add a patina of credibility to the drafting, but they tarnish Congress's carefully crafted definition. More importantly, they unlawfully expand ATF's authority beyond the boundaries set by the Gun Control Act.

Under § 921(a)(3)(B), the only firearm parts that fall under ATF's purview are "the frame or receiver of any such weapon" that Congress defined as a firearm. 18 U.S.C. § 921(a)(3)(B). But the Final Rule regulates weapon parts kits (that is, "aggregations of weapon parts")[24] that are "designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11. The statute covers "any *weapon*" that is "designed to" or "may readily be converted to" fire a projectile. 18 U.S.C. § 921(a)(3)(A) (emphasis added). Congress's definition does not cover weapon *parts*, or aggregations of weapon

---

[24] Defs.' Resp. 13, ECF No. 41.

parts, regardless of whether the parts may be readily assembled into something that may fire a projectile.

The statutory context repeatedly confirms that Congress intentionally chose not to regulate "weapon" parts generally. As further evidence, look to § 921(a)(4)(C), which does allow for the regulation of "parts." But it allows for the regulation only of parts of "destructive devices"—one of the four statutory sub-definitions of "firearm." *Id.* § 921(a)(3)(D). The term "destructive device" is defined as "any explosive, incendiary, or poison gas," such as a bomb, grenade, mine, or similar device. *Id.* § 921(a)(4)(A). The definition of "destructive device" also includes "any type of weapon" that "may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter." *Id.* § 921(a)(4)(B). For example, suppose a manufacturer tried to sell a parts kit to make a homemade grenade. ATF could regulate that parts kit because it can regulate "any combination of parts either designed or intended for use in converting any device into" a grenade, from which a grenade "may be readily assembled." *Id.* § 921(a)(4)(C). Likewise for bombs, rockets, missiles, and other destructive devices. But commonly sold firearms such as 9mm pistols or .223 rifles do not fall under the specialized definition of "destructive devices," so weapon parts kits for those firearms cannot be properly regulated as components of "destructive devices." *Id.* § 921(a)(4).

In sum, the Gun Control Act's precise wording demands precise application. Congress *could have* described a firearm as "any combination of parts" that would produce a weapon that could fire a projectile. It used that language elsewhere in the definition. *Id.* § 921(a)(4)(C). Congress could have described a firearm as any part "designed" to be part of a weapon. It used that language, too. *Id.* § 921(a)(3)(A), (a)(4)(C). Congress could have described a firearm as a set of parts that "may be readily assembled" into a weapon, as it did for "destructive device." *Id.*

§ 921(a)(4)(C). Congress could have written all those things, and the very definition of "firearm" demonstrates that Congress knew the words that would accomplish those ends.[25] But Congress did not regulate firearm parts as such, let alone parts kits that are "designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11.

Defendants' counterarguments are once again unavailing. Defendants argue the Final Rule's regulation of weapon parts kits is consistent with existing judicial interpretations of the Gun Control Act.[26] To the contrary, the cases demonstrate that courts understand the constraints of the Gun Control Act's definitions. The only Fifth Circuit case Defendants cite held that a disassembled shotgun was still a "firearm" under the Gun Control Act's definition. *See United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993). The government argued the shotgun "was only 'disassembled' in that the barrel was removed from the stock and that it could have been assembled in thirty seconds or less." *Id.* The Fifth Circuit agreed after surveying other cases in which courts held that inoperable weapons were still firearms "so long as those weapons 'at the time of the offense did

---

[25] Congress's definition of "machine gun" elsewhere in the U.S. Code is a great example of a definition that would fit the kind of rule ATF has in mind:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, *any part* designed and intended solely and exclusively, or *combination of parts* designed and intended, for use in converting a weapon into a machinegun, *and any combination of parts from which a machinegun can be assembled* if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphases added); *see also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 (2006) ("Our more natural reading is confirmed by the use of the word 'contract' elsewhere in the United States Code . . . .").

[26] *See* Defs.' Resp. 20–21, ECF No. 41.

not appear clearly inoperable.'" *Id.* No weapon parts kit would pass that test, and Defendants do not claim they would.[27]

*   *   *

Plaintiffs have demonstrated a strong likelihood of success on their claims that the Final Rule—specifically, 27 C.F.R. §§ 478.11, 478.12(c)—exceeds the scope of ATF's authority under the Gun Control Act. Given Plaintiffs' strong likelihood of success on those claims, the Court need not address the merits of Plaintiffs' remaining claims. Before moving on to the remaining factors, a brief note on the *Chevron* doctrine is warranted. Plaintiffs argue that the Rule is not entitled to deference under *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).[28] Defendants respond that the Court need not reach any *Chevron* issues because the Final Rule "reflects the best statutory interpretation."[29] Defendants argue in the alternative that "the Court should 'consider the agency's interpretation to the extent it is persuasive.'"[30] Defendants do not argue that *Chevron* deference applies. Even assuming *Chevron* applies, the Court finds the statute unambiguous and ATF's interpretation unreasonable for the reasons contained in this

---

[27] The best case in support of Defendants is *United States v. Wick*, 697 F. App'x 507 (9th Cir. 2017), in which the Ninth Circuit upheld a conviction for unlicensed firearm dealing based on evidence that the defendant had sold "complete Uzi parts kits that could 'readily be converted to expel a projectile by the action of an explosive,' thus meeting the statute's definition of a firearm." *Id.* at 508 (quoting 18 U.S.C. § 921(a)(3)(A)). But *Wick* is outside this circuit, nonprecedential, and more importantly contains no analysis of the statutory text.

Defendants' remaining cases are even less applicable. *See United States v. Stewart*, 451 F.3d 1071, 1073 n.2 (9th Cir. 2006) (affirming the district court's denial of an evidentiary hearing on whether probable cause supported a search warrant based on the defendant's possession of weapon parts kits that could "readily be converted" into firearms), *overruled on other grounds by Dist. of Columbia v. Heller*, 554 U.S. 570, 594–95 (2008); *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006) (affirming a sentence enhancement for possession of a firearm because the defendant had a disassembled rifle but "could easily 'make the rifle operational in just a few seconds by putting the bolt in'"); *United States v. Theodoropoulos*, 866 F.2d 587, 595 n.3 (3d Cir. 1989) (affirming a conviction for possession of an unregistered, disassembled machine pistol), *overruled by United States v. Price*, 76 F.3d 526 (3d Cir. 1996).

[28] *See* Pls.' Br. 33–36, ECF No. 16.

[29] Defs.' Resp. 26–27, ECF No. 41 (citing *Edelman v. Lynchburg Coll.*, 535 U.S. 106, 114 (2002)).

[30] *Id.* at 27 (quoting *United States v. Garcia*, 707 F. App'x 231, 234 n.5 (5th Cir. 2017)).

Section. And to the extent the Court should consider ATF's interpretation, the Court finds it unpersuasive, again for the reasons already discussed in this Section.

### B. Irreparable Harm

Plaintiffs must also show a substantial threat of irreparable harm. *Daniels Health Servs.*, 710 F.3d at 582. "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). The harm must be more than "speculative," that is, "there must be more than an unfounded fear on the part of the applicant." *Daniels Health Scis.*, 710 F.3d at 585 (citation and internal quotation marks omitted).

Tactical Machining has shown a substantial threat of irreparable harm. Tactical Machining's owner says that he will likely be put out of business by the Final Rule.[31] That claim is not far-fetched. Over 90% of Tactical Machining's business consists of producing and selling items that customers can use to self-manufacture frames or receivers and to build firearms. *Id.* The Final Rule, as Defendants admit, "requires Tactical Machining to become a federal firearms licensee and comply with regulatory requirements such as keeping transaction records and marking firearms with serial numbers."[32] In the final regulatory analysis, ATF estimated "that the final rule could potentially affect 132,023 entities, including all FFLs[[33]] and non-FFL manufacturers and retailers of firearm parts kits with partially complete frames or receivers." ATF, *Regulatory Impact Analysis and Final Regulatory Flexibility Analysis* 124 (Apr. 2022), https://www.atf.gov/firearms/docs/rulemaking/ria-final-rule-2021r-05f-definition-frame-or-receiver-and-identification/download. Indeed, ATF estimated that "the majority of affected

---

[31] *See* Decl. of Darren Peters, Sr. 1–2, ECF No. 16-1.
[32] Defs.' Resp. 40, ECF No. 41.
[33] Federal Firearm Licensees

entities are small entities that would experience a range of costs, the largest cost being the dissolution of the entire business." *Id.* Defendants' predictions, it seems, have now materialized.

Tactical Machining's fears have also proven well-founded. On August 24, when the Final Rule took effect, Tactical Machining ceased sales of various parts.[34] Because ATF now classifies those parts as "firearms," Tactical Machining may not sell them direct to consumers out of state. *See* 18 U.S.C. § 922(a)(2). As a result, just last week Tactical Machining lost nearly $50,000 in revenue.[35] This trend risks ending Tactical Machining's business.[36]

Generally, economic loss is not an irreparable harm because it can be recovered as damages at the end of the litigation. *See Janvey*, 647 F.3d at 600. "[B]ut an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989). Tactical Machining's evidence establishes as much here, and Defendants do not contest otherwise.

Instead, Defendants argue that Tactical Machining can avoid loss of its business by simply complying with the rule.[37] They say compliance is easy and cheap: Tactical Machining need only purchase and maintain a federal firearms license.[38] That argument has two problems. First, it misunderstands Tactical Machining's business. Tactical Machining already has a federal firearms license.[39] But even as a federally licensed manufacturer, Tactical Machining is unable to continue its direct-to-consumer sales of most of its products because those products are now "firearms." *See* 18 U.S.C. § 922(a)(2) (prohibiting interstate transfers of firearms to any person who does not have a license). Second, even if it were factually sound, Defendants' argument relies on the incorrect

---

[34] Supp. Decl. of Darren Peters, Sr. 1–2, ECF No. 55-1.
[35] *Id.* at 2.
[36] *Id.* at 2–4.
[37] *See* Defs.' Resp. 40, ECF No. 41.
[38] *Id.*
[39] Pls.' Reply 13, ECF No. 55.

legal premise that compliance costs are not an irreparable harm. To the extent the Final Rule would impose additional compliance costs,[40] Defendants admit that such costs are nonrecoverable. And nonrecoverable means irreparable.

"Indeed 'complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.'" *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)). Defendants say *Texas v. EPA* dealt with "extraordinary compliance costs" that were nonrecoverable.[41] But Defendants overlook the very next sentence in the opinion: "When determining whether injury is irreparable, 'it is not so much the magnitude but the irreparability that counts . . . .'" *Id.* (alteration in original) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)). "Federal courts have long recognized that, when 'the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction.'" *Enter. Int'l*, 762 F.2d at 472 (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 575 (5th Cir. 1974)). Defendants argue the compliance costs are "modest," but not de minimis.[42]

The Fifth Circuit has settled these principles. An economic injury may be irreparable for "two independent reasons." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). "First," the circuit has "explained that 'substantial financial injury' may be 'sufficient to show irreparable injury.'" *Id.* (quoting *Texas v. EPA*, 829 F.3d at 433). Tactical Machining has shown that form of irreparable injury. "Second," compliance costs are "likely unrecoverable,"

---

[40] Because Tactical Machining already holds a federal firearms license, it is not clear that the Final Rule subjects it to compliance costs it would not otherwise incur.

[41] Defs.' Resp. 41, ECF No. 41.

[42] *Id.*

usually "because federal agencies generally enjoy sovereign immunity for any monetary damages." *Id.* Tactical Machining has also shown that form of irreparable injury.

Tactical Machining will likely suffer irreparable harm, either by shutting down its operations forever or paying the unrecoverable costs of compliance. Defendants do not contest Plaintiffs' evidence. Rather, they suggest that Tactical Machining should trade one form of irreparable harm for another.[43] That argument overlooks clear Fifth Circuit precedent. Tactical Machining faces substantial threat of irreparable harm, and it is no answer to say that it may avoid the harm by complying with an unlawful agency rule.

Finally, Defendants argue that Plaintiffs delayed in seeking relief, which shows a lack of irreparable harm. This Court has recognized that "delay in seeking relief is a consideration when analyzing the threat of imminent and irreparable harm." *Anyadike v. Vernon Coll.*, No. 7:15-cv-00157, 2015 WL 12964684, at \*3 (N.D. Tex. Nov. 20, 2015). "Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *Wireless Agents, L.L.C. v. T-Mobile, USA, Inc.*, No. 3:05-cv-0094, 2006 WL 1540587, at \*4 (N.D. Tex. June 6, 2006) (cleaned up). ATF announced the Final Rule on April 11, 2022, and published it in the Federal Register on April 26. Plaintiffs filed their complaint on August 11 and moved for a preliminary injunction six days later. The Rule became effective on August 24.

Plaintiffs offer good explanations for their delay. On April 12—the day after ATF announced the Final Rule—Tactical Machining requested a classification letter from ATF.[44] It sent ATF a sample receiver that ATF had previously said was not a firearm. Tactical Machining asked

---

[43] *See id.* (citing *Div. 80, LLC v. Garland*, No. 3:22-cv-148, 2022 WL 3648454, at \*4 (S.D. Tex. Aug. 23, 2022)).

[44] Decl. of Darren Peters, Sr. 3, ECF No. 16-1.

whether ATF would continue to classify the receiver as a non-firearm, hoping for clarification in light of the Final Rule. ATF still has not responded.[45] Regardless, any delay is insubstantial. Plaintiffs filed the lawsuit and moved for a preliminary injunction barely three months after the final rule was announced, and importantly, two weeks *before* the effective date. Considering the circumstances, Plaintiffs' delay does not undercut their showing of irreparable harm.

Though Tactical Machining has presented sufficient evidence of irreparable harm, the other Plaintiffs have not. "[A] plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury in fact.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (second alteration in original) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Plaintiffs barely substantiate the injuries of VanDerStok, Andren, and the Firearms Policy Coalition, let alone establish that they will suffer irreparable harm. Plaintiffs state that "VanDerStok and Andren will be prohibited from continuing their existing and planned personal practices in purchasing items the Final Rule newly considers 'firearms' direct from retailers."[46] But they can still purchase those items—they just need to buy them from licensed dealers after passing a background check. Plaintiffs do not explain why purchasing parts from licensed dealers constitutes an injury, particularly when both VanDerStok and Andren have done so in the past.[47] As for the Firearms Policy Coalition, the Court is left guessing at what injuries it or its members will suffer. Plaintiffs' only mention of the Coalition in their briefing is the argument that any relief "should extend to all members of Plaintiff Firearms Policy Coalition."[48] They do not explain why. In contrast to Tactical Machining's existential injury, Plaintiffs have not provided sufficient evidence that VanDerStok, Andren, or the Firearms Policy Coalition will suffer irreparable harm absent injunctive relief.

---

[45] *Id.* at 3; Supp. Decl. of Darren Peters, Sr., ECF No. 55-1.
[46] Pls.' Br. 42, ECF No. 16.
[47] Decl. of Jennifer VanDerStok 1, ECF No. 16-2; Decl. of Michael G. Andren 1, ECF No. 16-3.
[48] Pls.' Reply 19, ECF No. 55.

## C. Balance of the Equities and the Public Interest

The Court must next weigh the equities and the public interest, which "merge" when the Government is a party. *Nken*, 556 U.S. at 435. Both sides claim valid public interests.

Defendants assert a public interest in preventing dangerous individuals from possessing firearms.[49] Defendants say ATF promulgated the Final Rule to further that public interest. And to the extent ATF is prevented from enforcing the rule, Defendants say they suffer irreparable injury.[50] *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Defendants also say the Final Rule will increase public safety.[51]

Meanwhile, Plaintiffs fear substantial economic harm and loss of previously enjoyed freedoms.[52] Those interests are public, not merely personal, as ATF predicts the Final Rule could affect tens of thousands of businesses, even resulting in the dissolution of some. *See Regulatory Impact Analysis*, *supra*, at 124–25. In ATF's words, "[T]he rule will have a significant impact on small entities." *Id.* at 125. Plaintiffs also claim "an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977). "The public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

On balance, the equities and public interest weigh in favor of Plaintiffs. Defendants do not dispute that Plaintiffs are law-abiding citizens who wish to engage in lawful conduct covered by the Final Rule. But Defendants' enforcement of the rule strips Plaintiffs of freedoms they lawfully

---

[49] *See* Defs.' Resp. 43, ECF No. 41.
[50] *See id.* (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (citation and internal quotation marks omitted))).
[51] *See id.* (citing 87 Fed. Reg. at 24,654).
[52] *See* Pls.' Br. 46–47, ECF No. 16.

enjoyed until just last week. Moreover, any injury to Defendants is further outweighed by Plaintiffs' strong likelihood of success on the merits of their statutory interpretation claims. *See Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 316 (5th Cir. 2021). Finally, the Court has tailored the scope of the preliminary injunction with careful attention to avoid further upsetting the balance of these competing public interests.

*     *     *

Tactical Machining has shown it is entitled to preliminary injunctive relief. Having considered the arguments, evidence, and law, the Court determines that the relevant factors weigh in favor of a preliminary injunction. The remaining Plaintiffs have not carried that burden. Plaintiffs have also not shown that nationwide injunctive relief is appropriate at this stage. "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation and internal quotation marks omitted). Covered by the injunction, Tactical Machining can operate its business as it has, free from the threat of enforcement of the Final Rule's unlawful redefinitions. Presumably, Tactical Machining's *customers* are still subject to felony charges for buying its products. *See* 18 U.S.C. § 922(a)(3). And it may be the case that Tactical Machining's business will fail unless the injunction is subsequently amended to cover a substantial portion of Tactical Machining's customer base. But for now Plaintiffs offer neither evidence nor argument on that point.[53]

---

[53] Plaintiffs also do not explain why a class-wide injunction would be improper.

## IV.        CONCLUSION

Tactical Machining has shown it is entitled to a preliminary injunction against Defendants' enforcement of the Final Rule. Accordingly, the Court **GRANTS** the motion in part, **DENIES** the motion in part, and **ORDERS** that Defendants and their officers, agents, servants, and employees are enjoined from implementing and enforcing against Tactical Machining, LLC the provisions in 27 C.F.R. §§ 478.11 and 478.12 that this Order has determined are unlawful. The Court waives the security requirement of Federal Rule of Civil Procedure 65(c). *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). If Plaintiffs wish to submit further briefing and evidence on the scope of the injunction, they must do so no later than **September 8, 2022**. Any responses are due within seven days of Plaintiffs' filing.

**SO ORDERED** on this **2nd day** of **September, 2022.**

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**