**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

----------------------------------------------------  X
JENNIFER VANDERSTOK, *et al.*,                              :
                                                           :        Civil Action No. 4:22-cv-00691-O
              Plaintiffs,                                   :
                                                           :
              v.                                           :
                                                           :
MERRICK GARLAND, in his official                           :
capacity as Attorney General of the                        :
United States, *et al.*,                                   :
                                                           :
              Defendants.                                  :
----------------------------------------------------  X

**BRIEF OF *AMICI CURIAE* GUN VIOLENCE PREVENTION GROUPS**

**IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

DANIEL GROOMS*
   *Counsel of Record*
MATT K. NGUYEN*
COOLEY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 842-7800
dgrooms@cooley.com
mnguyen@cooley.com

ADAM M. KATZ*
RACHEL H. ALPERT*
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2300
akatz@cooley.com
ralpert@cooley.com

\* *Pro hac vice pending*

August 30, 2022

*Counsel for Amici Curiae Gun Violence Prevention Groups*

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ............................................................................ 1

STATEMENT OF INTEREST .......................................................................... 1

INTRODUCTION ............................................................................................ 2

ARGUMENT .................................................................................................... 6

    I.    *THE RULE FAITHFULLY IMPLEMENTS THE GUN CONTROL ACT AND PREVENTS ITS SUBVERSION* ..................... 6

        A.    The Rule Implements the Act's Clear Definition of "Firearm." ............................................................................. 6

        B.    The Rule Advances the Act's Purpose. ........................ 8

    II.    THE RULE APPROPRIATELY CONSIDERS THE PRACTICAL REALITY THAT GHOST GUNS CAN BE QUICKLY AND EASILY ASSEMBLED BY NONEXPERTS ........................................ 16

    III.    THE RULE COMPORTS WITH ATF'S LONGSTANDING VIEW THAT PARTIALLY COMPLETE FRAMES AND RECEIVERS CAN BE FIREARMS .......................................................... 20

CONCLUSION .............................................................................................. 24

CERTIFICATE OF SERVICE ........................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramski v. United States,*
573 U.S. 169 (2014) ................................................................. 2, 11, 13

*Barrett v. United States,*
423 U.S. 212 (1976) ............................................................................ 11

*City of N.Y. v. Arm or Ally LLC, et al.,*
22-CV-5525, ECF No. 9 (S.D.N.Y. June 29, 2022) ............................... 20

*City of Syracuse, et al. v. ATF,*
1:20-CV-6885, ECF No. 64-34 (S.D.N.Y. Dec. 9, 2020) .................................. 20, 21

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ............................................................................ 11

*District of Columbia v. Polymer80, Inc.,*
No. 2020-CA-002878-B (D.C. Sup. Ct. Aug. 10, 2022) ........................... 17

*Div. 80, LLC v. Garland*, No. 3:22-CV-148, 2022 WL 3648454, at *3–5
(S.D. Tex. Aug. 23, 2022) ...................................................... 22

*Huddleston v. United States,*
415 U.S. 814 (1974) ........................................................................ 9, 10

*Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Pelella,*
350 F.3d 73 (2d Cir. 2003) ..................................................................... 7

*Morehouse Enterprises LLC v. Merrick Garland, et al.,*
No. 3:22-CV-00116-PDW-ARS, ECF No. 85 (D.N.D. Aug. 23, 2022)............*passim*

*Nat'l Shooting Sports Found., Inc. v. Jones,*
716 F.3d 200 (D.C. Cir. 2013) .......................................................... 14, 15

*New York v. Burger*, 482 U.S. 691, 713 (1987) .......................................... 8

*N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen,*
142 S. Ct. 2111 (2022) ....................................................................... 11

*People v. Blackhawk Mfg. Grp., et al.,*
CGC-21-594577 (Cal. Super. Ct. Aug. 18, 2021) ................................ 20

*Shawano Gun & Loan, LLC v. Hughes,*
650 F.3d 1070 (7th Cir. 2011) ............................................................. 13

*United States v. Annis,*
446 F.3d 852 (8th Cir. 2006) .............................................................. 17

*United States v. Cooper,*
   714 F.3d 873 (5th Cir. 2013) ................................................................ 16

*United States v. Fuller-Ragland,*
   931 F.3d 456 (6th Cir. 2019) ................................................................ 15

*United States v. Hardin,*
   889 F.3d 945 (8th Cir. 2018) ................................................................ 16

*United States v. Harris,*
   720 F.3d 499 (4th Cir. 2013) ................................................................ 14

*United States v. Marzzarella,*
   614 F.3d 85 (3d Cir. 2010) ............................................................ 14, 15

*United States v. Mobley,*
   956 F.2d 450 (3d Cir. 1992) ................................................................ 15

*United States v. Mullins,*
   446 F.3d 750 (8th Cir. 2006) ................................................................ 17

*United States v. Rivera,*
   415 F.3d 284 (2d Cir. 2005) ................................................................ 16

*United States v. Smith,*
   477 F.2d 399 (8th Cir. 1973) ................................................................ 17

*United States v. St. Hilaire,*
   960 F.3d 61 (2d Cir. 2020) ................................................................ 15

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022) ................................................................ 22

## Statutes and Regulations

18 U.S.C.
   §§ 921–931 ................................................................................ 2
   § 921(a)(3) ........................................................................ *passim*
   § 922 ................................................................................ 10
   § 922(a)(1)(A) ................................................................................ 9
   § 922(a)(6) ........................................................................ 11, 13
   § 922(b) ................................................................................ 9
   § 922(d) ................................................................................ 9
   § 922(g)(1)(A) ................................................................................ 15
   § 922(k) ................................................................................ 14
   § 922(t) ................................................................................ 11
   § 922(t)(1) ................................................................................ 10
   § 923(i) ................................................................................ 14

§ 923(g)(1)(B) ........................................................................... 15
§ 923(g)(3) ............................................................................... 10
§ 924 ....................................................................................... 10

87 Fed. Reg.
24652
24676 ........................................................................................ 4

Clean Air Act .................................................................................... 22

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 ............................. *passim*

U.S.S.G. § 2K2.1(b)(4)(B) ................................................................. 14

## Other Authorities

27 C.F.R.
§ 478.73 ................................................................................... 10
§ 478.92 ................................................................................... 14
§ 478.99 ..................................................................................... 9
§§ 478.101 ................................................................................... 9
§ 478.102(a) .............................................................................. 10
§§ 478.121–134 .................................................................... 10, 15
§ 478.121(b) .............................................................................. 15

*80% Lower Guide,* Tactical Machining (last visited Aug. 26, 2022),
https://bit.ly/3pTHfAC ............................................................ 16, 23

*About,* R&B Tactical Tooling (last visited Aug. 28, 2022),
https://bit.ly/3oNKmZU .............................................................. 12

*Are Felons Restricted from Owning a Firearm that Was Built from an*
*80% Receiver?*, Polymer80 Blog (Oct. 21, 2020), *formerly at*
https://bit.ly/3DDzXGo ............................................................... 12

*Definition of "Frame or Receiver" and Identification of Firearms*, 87
Fed. Reg. 24652, 24656 (Apr. 26, 2022) ........................................... *passim*

*Ghost Gunner*, Ghost Guns (last visited Aug. 28, 2022),
https://bit.ly/3pUjDvj ................................................................. 12

*Ghost Guns Recoveries and Shootings*, Everytown Research (Apr. 8,
2022), https://bit.ly/3bSCcwt ......................................................... 3

Glenn Thrush, *'Ghost Guns': Firearm Kits Bought Online Fuel*
*Epidemic of Violence*, N.Y. Times (Nov. 14, 2021) ............................... 19

*GST-9: 80% Pistol Build Kit*, 80% Arms (last visited Aug. 28, 2022),
https://bit.ly/3x6n0T7 ................................................................. 19

*Gun: Enforcing Federal Laws Against Firearms Traffickers*, U.S. Dept.
of the Treasury at 10 (June 2000), https://bit.ly/3JXi6OP ................................... 13

Gun Violence Archive (July 18, 2022), https://bit.ly/3vXsrVa .................................... 3

H. Rep. No. 90-1577 (1968) ........................................................................................ 8

H. Rep. No. 116-88 (2019) ................................................................................. 15, 16

*The History of Legally Buying Firearms Without an FFL,* 80% Arms
Blog (Dec. 3, 2019), https://bit.ly/3HClkFU ........................................................... 12

*How-To Manuals* (last visited Aug. 28, 2022), https://bit.ly/3qUwobt ..................... 19

Jonathan Edwards, *A 13-Year-Old Boy Made and Trafficked 'Ghost
Guns,' Authorities Say, and Then Killed His Sister with One*, Wash.
Post. (Dec. 3, 2021) ................................................................................................ 18

*JSD, Premier Gun Parts and Accessories,* JSD Supply (last visited Aug.
28, 2022), *formerly at* https://bit.ly/3rKrgqj *and archived at*
https://bit.ly/3pPlUZ5 ............................................................................................ 12

Kallie Cox, *Once a Week, Police Find These Homemade Guns. Federal
Law Just Got Tougher*, Charlotte Observer (Aug. 25, 2022), https://
www.charlotteobserver.com/news/local/crime/article264856744.html ............... 18

Kathy Reakes, *4 Charged, 31 Ghost Guns Seized in Multi-Agency
Yonkers Bust*, Yonkers Daily Voice (Aug. 9, 2022),
https://bit.ly/3C757bc ............................................................................................ 3

*Lower Receiver,* SS-Arms (last visited Aug. 28, 2022),
https://bit.ly/3GAVvVo .......................................................................................... 12

S. Rep. No. 89-1866 (1966) ..................................................................................... 12

S. Rep. No. 90-1501 (1968) ....................................................................................... 8

T. Hart, *In the Matter of the Search of the Business and Federal
Firearms Licensee Known as Polymer80* (D. Nev. Dec, 9, 2020),
https://on.wsj.com/3pivOCi .................................................................................... 23

*Trafficking & Straw Purchasing*, Giffords Law Center (last visited
Aug. 28, 2022), https://bit.ly/3FBTtnv .................................................................. 13

*Untraceable: The Rising Specter of Ghost Guns,* Everytown Research
(May 14, 2020), https://bit.ly/3DTrIWj ................................................................. 18

*Webster's Third New International Dictionary* 1889 (1965) ...................................... 22

## DISCLOSURE STATEMENT

*Amici curiae* submit that Brady United Against Gun Violence ("Brady"), Everytown for Gun Safety Action Fund ("Everytown"), and March For Our Lives ("MFOL") (collectively, the "Gun Violence Prevention Groups") are nonprofit corporations with no parent corporations.  No publicly held company owns 10% or more of the stock of Brady, Everytown, or MFOL.

## STATEMENT OF INTEREST

The Gun Violence Prevention Groups submit this *amicus* brief in support of Defendants' opposition to Plaintiffs' motion for a preliminary injunction.

Brady is the nation's longest-standing nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and advocacy.  Brady has researched the prevalence of ghost guns, created resources to demonstrate the ease with which ghost guns can be obtained and assembled, and advocated on behalf of commonsense measures to stop the spread of ghost guns.

Everytown is the nation's largest gun-violence-prevention organization. Everytown has advocated on behalf of measures to limit the proliferation of unserialized firearms and extensively studied the detrimental effects of these firearms on safety and federal and state laws.

MFOL is a nationwide organization of young people who support sensible gun-violence-prevention policies.  MFOL has fought to curtail the rapid rise of ghost guns and has focused on the deadly effects of ghost guns on teenagers.

## INTRODUCTION

To advance public safety and aid law enforcement, the Gun Control Act of 1968 ("Act"), Pub. L. No. 90-618, 82 Stat. 1213, as amended, subjects "firearms" to key requirements: background checks to prevent sales to persons who have committed felonies, who are fugitives, and who are minors, among others; licensing for manufacturers, importers, and dealers to ensure that firearms are built and sold responsibly; and serialization to trace guns to their first retail sale. 18 U.S.C. §§ 921–931. Congress intended these requirements to "prevent guns from falling into the wrong hands" and to "assist law enforcement . . . in investigating serious crimes." *Abramski v. United States*, 573 U.S. 169, 172, 180 (2014).

The recent and rapid proliferation of "ghost guns" has undermined the Act and Congress's law-and-order objectives. A ghost gun is a fully functional, unserialized, and untraceable weapon that can be assembled in an hour or less from partially complete frames and receivers that are freely available online or at gun shows (including as part of ghost gun "kits") with no background check and no questions asked. Ghost guns thwart the Act by allowing criminals and other prohibited individuals to acquire, use, and traffic weapons, all while remaining undetectable to law enforcement.

In recent years, recoveries of ghost guns in connection with crimes have increased at an alarming rate. Law enforcement reported 19,344 recoveries of ghost guns in 2021, compared to 1,758 recoveries in 2016; 692 ghost guns were recovered

in connection with a homicide or attempted homicide.[1]  The threat posed by ghost guns shows no signs of abating on its own.  In July 2022, a 17-year-old shot herself in the face with a ghost gun built by her cousin—even though the family was prohibited from having guns due to the victim's mother's felony conviction.[2]  The month before, four individuals were charged with trafficking 31 ghost guns across state lines.[3]

ATF acted prudently and well within its authority in promulgating *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24652 (Apr. 26, 2022) (the "Rule").  *See Morehouse Enters. v. Bureau of Alcohol, Tobacco, Firearms and Explosives,* No. 3:22-CV-116, 2022 WL 3597299, at *5 (D.N.D. Aug. 23, 2022) (D.N.D. Aug. 23, 2022) (*Morehouse Enterprises*) ("[T]he [] Rule falls well-within the ATF's agency rulemaking authority as delegated by Congress.").  The Act defines "firearm" to include not only fully complete firearms, but also "frame[s]" or "receiver[s]" that are "designed to" be or that "may readily be converted" into operable weapons.  18 U.S.C. § 921(a)(3).  That unambiguously encompasses ghost gun kits and the partially complete frames and receivers they contain, which are designed to be and readily can be converted into operable and unserialized weapons in an hour or less.  Indeed, that is their *only* purpose.  With this in mind, the Rule confirms that

---

[1] *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24652, 24656 (Apr. 26, 2022).

[2] Gun Violence Archive (July 18, 2022), https://bit.ly/3vXsrVa.

[3] Kathy Reakes, *4 Charged, 31 Ghost Guns Seized in Multi-Agency Yonkers Bust*, Yonkers Daily Voice (Aug. 9, 2022), https://bit.ly/3C757bc; *see also*, *e.g.*, *Ghost Guns Recoveries and Shootings*, Everytown Research (Apr. 8, 2022), https://bit.ly/3bSCcwt.

the core building blocks of ghost guns—unserialized, partially complete frames (the core component of pistols), partially complete receivers (the core component of long guns), and the kits enabling quick and easy conversion of these frames and receivers into operable weapons—are "firearms" under the plain language of the Act. *Amici* underscore three of the many reasons why the Rule is sound and should be upheld.

**First**, the Rule faithfully implements the Act's language and prevents the subversion of its law-and-order purpose. The Act provides that "firearms" may be sold commercially only *by* licensed dealers and *to* law-abiding and responsible persons who pass a background check. Ghost gun kits and partially complete frames and receivers are "designed to" be and "may readily be converted" into operable weapons, and thus are, by definition, firearms. 18 U.S.C. § 921(a)(3). Were they not regulated as such, they could continue to be sold *by* anyone and *to* anyone—the opposite of what Congress intended. Indeed, "Plaintiffs' position would appear to contradict the plain language of the [Act], which clearly defined 'firearms' more broadly than a fully operational weapon." *Morehouse Enterprises,* at *6. The Act also requires commercial firearms to possess a serial number and criminalizes obliterating that number—all in order to help law enforcement fight crime. Ghost gun kits and partially complete frames and receivers lack serial numbers and, as such, are largely invisible to law enforcement.[4]

---

[4] References to background checks and serialization are limited to firearms that are distributed commercially, as the Rule does not require background checks on private firearm sales or restrict persons not otherwise prohibited from possessing firearms from making unserialized firearms for personal use. 87 Fed. Reg. 24652, 24676.

***Second***, beyond remaining faithful to the Act's language, the Rule recognizes practical reality in accounting for the ease and speed with which ghost gun kits and partially complete frames and receivers can and are intended to be completed into deadly weapons. As ghost gun companies' advertising and marketing materials make clear, ghost gun kits and partially complete frames and receivers are designed with the sole purpose of being converted into fully functioning weapons. True to that purpose, such kits and partially complete frames and receivers enable sophisticated and novice purchasers alike to convert these items into operable weapons swiftly and easily. Plaintiffs concede as much by acknowledging that the Rule regulates "self-manufacturing weapons at home" via ghost gun kits and partially complete frames and receivers. ECF No. 16, at 4.

***Third***, the Rule continues ATF's longstanding view that partially complete frames and receivers can be "firearms." Shortly after the Act's passage, ATF recognized that partially complete frames or receivers that could readily be converted into operable weapons were indeed "firearms," judging by the ease and speed with which they could be rendered functional. That the ghost gun industry has flouted ATF's oversight by *hiding* the ease and speed with which ghost guns can be assembled confirms that the industry knows what the Act has said all along: partially complete frames and receivers "designed" to be or that may "readily be" converted into weapons are "firearms." Plaintiffs' contention that the Rule attempts to "rewrite federal law," ECF No. 16, at 1, and would "completely alter the entire landscape of firearm

regulation in the United States," ECF No. 16, at 12, is thus ahistorical and belied by the industry's own behavior.[5]

## ARGUMENT

I.    *THE RULE FAITHFULLY IMPLEMENTS THE GUN CONTROL ACT AND PREVENTS ITS SUBVERSION*

### A.    The Rule Implements the Act's Clear Definition of "Firearm."

The Gun Control Act defines "firearm" as follows:

(A) any weapon (including a starter gun) which will or *is designed to or may readily be converted* to expel a projectile by the action of an explosive; (B) *the frame or receiver of any such weapon*; (C) any firearm muffler or firearm silencer; or (D) any destructive device.

18 U.S.C. § 921(a)(3) (emphases added).

Taken together, (A) and (B) classify as "firearms" partially complete frames and receivers and ghost gun kits that are "designed to" be or may "readily be converted" into operable weapons.  That is because "firearm" is defined as the "frame or receiver of any *such weapon*," with "*such weapon*" in (B) referring back to "weapon" in (A), which in turn encompasses "any weapon" that is "designed to or may readily be converted to expel a projectile by the action of an explosive."  In other words, when (B) refers to "the frame or receiver of any such *weapon*," it incorporates the description of "*weapon*" in (A), which covers components presently configured to fire *and* components that are "designed to [be] or may readily be converted" into operable weapons.  *See Morehouse Enterprises,* at *6 ("the plain language of the [Act], [] clearly

---

[5] *See Morehouse Enterprises*, at *11 (That the Rule "regulat[es] a non-operational kit that can be readily turned into an operational firearm is not a significant [policy] change" since "a non-operational weapon which can be made operational already qualifies as a firearm under 18 U.S.C. § 921(a)(3)(A).").

defined 'firearms' more broadly than a fully operational weapon."); *cf. Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Pelella*, 350 F.3d 73, 81 (2d Cir. 2003) ("any such action" "refers back to" the phrase providing a right to "*institute* an *action*") (citation omitted).   Because (A) includes not-yet-operable and not-yet-finished weapons, it follows that the "frame or receiver of any *such weapon*" in (B) includes partially complete frames or receivers as well (so long as they are "designed to" be or may "readily be converted" into the frame or receiver of an operable firearm).[6] Tellingly, Plaintiffs do not try to reconcile the phrase "such weapon" with their reading.   ECF No. 16, at 8.

Under a straightforward application of that definition, partially complete frames and receivers, and the ghost gun kits used to assemble such frames and receivers into operable weapons, are "firearms" whenever they are "designed to" be or may "readily be converted" into operable weapons.  *See Morehouse Enterprises*, at *5 (The Rule's "language . . . as well as the [ghost gun] kits at issue . . . fit squarely within the [Act's] "firearm" definition because after delivery, the kits are easily converted from mere parts into a weapon that expels a projectile.").

Notably, despite Plaintiffs' euphemism that ghost gun kits and partially complete frames and receivers are mere "items" untethered to operational firearms,

---

[6] Plaintiffs implicitly concede that at least some partially complete frames and receivers can qualify as firearms.  That is because Plaintiffs endorse the so-called "80% rule," ECF No. 16, at 16, 19, 30, which posits that a frame or receiver that is "80%" complete has not yet reached a stage of manufacture to be a "firearm."  This rule—although divorced from the Act's text—posits that a partially complete frame or receiver *can* at some point qualify as a firearm (*e.g.*, an "85% complete" frame).

ECF No. 16, at 16–17, 19–20, 25, 27, they remarkably fail to identify *even a single* alternative use for ghost gun kits and partially complete frames and receivers other than constructive unserialized, fully operational weapons.  And they cannot:  the exclusive purpose for which these frames, receivers, and kits are made, marketed, and sold, is conversion into operable weapons without difficulty or expertise.  Failing to regulate these items as "firearms" would ignore the Act's plain language.

### B.     The Rule Advances the Act's Purpose.

The Act's purpose demands the same interpretation.  The Act has two principal ends and two principal means, all which are directly served by the Rule's approach. Through the Act, Congress sought to:  (1) promote public safety by "keep[ing] firearms out of the hands of those not legally entitled to possess them," such as persons who have committed felonies, have been convicted of domestic abuse, or are otherwise dangerous, and (2) "assist law enforcement . . . in combating . . . crime."  S. Rep. No. 90-1501, at 22 (1968) ("Senate Report"); H. Rep. No. 90-1577, at 4412 (1968) (underscoring the "need" to combat "the growing use of firearms in violent crime").[7]

Because unregulated ghost gun kits and partially complete frames and receivers allow dangerous and prohibited individuals to obtain deadly and untraceable firearms, failing to regulate these items as "firearms" undermines the Act's ends.  Congress's chosen means were as follows:  (1) regulating who may buy or

---

[7] *See New York v. Burger*, 482 U.S. 691, 713 (1987) (The Act achieves its "regulatory goals" of "prevent[ing firearm] sales to undesirable customers and [] detect[ing] the origin of particular firearms" in support of law enforcement by "ensur[ing] that 'weapons [are] distributed through regular channels and in a traceable manner.'" (quoting *United States v. Biswell*, 406 U.S. 311, 315-16 (1972)).

sell firearms; and (2) imposing strict rules on how firearms and firearm transactions are documented and tracked. *Infra*. Because the Act's tight limits on purchase, sale, and distribution apply to frames and receivers designed to be or readily convertible into operable weapons, the Rule's coverage of ghost gun kits and partially complete frames and receivers is faithful to the means enshrined in the Act's language. Indeed, as detailed *infra*, failing to regulate these items as what they are—firearms—would undermine both the Act and other safety regulations that cross-reference or otherwise rely upon the Act's definition of "firearm."

***Federal firearms licensees.*** The Act designates federal firearms licensees ("FFLs")—those who manufacture, sell, or import firearms—the "principal agent of [law] enforcement" in "restricting . . . access to firearms." *Huddleston v. United States*, 415 U.S. 814, 824 (1974). If ghost gun kits and partially complete frames and receivers were not treated as firearms (as the Act requires), the effect would be to continue to sideline FFLs with respect to the sale and acquisition of a rapidly growing source of crime guns across the country.

Under the Act, FFLs—and only FFLs—may "engage in the business of importing, manufacturing, or dealing in firearms." 18 U.S.C. § 922(a)(1)(A); *see id*. § 923(a). In exchange for this right to engage in the firearms business, FFLs must serve as the Act's frontline mechanism for implementation:

- FFLs may not "sell or deliver" firearms to individuals who, *inter alia*, are underage, reside out-of-state (with limited exceptions), or have a criminal history. 18 U.S.C. §§ 922(b), 922(d); *see* 27 C.F.R. § 478.99.

- FFLs must keep extensive inventory and transaction records and must report suspicious purchasing patterns. 27 C.F.R. §§ 478.101 (record-

keeping), 478.121–134 (same); 18 U.S.C. § 923(g)(3) (FFLs must report when an individual buys multiple guns within a short timeframe).

- FFLs must make their records accessible to law enforcement officials, who can and often do access these records to monitor, prevent, investigate, and combat firearm-related crimes. *See infra.*

FFLs that fail to meet these or other duties may lose their license, 27 C.F.R. § 478.73, and may be held accountable through both civil and criminal liability, 18 U.S.C. §§ 922, 924.

The Act and its implementing regulations thus enshrine FFLs as scrutinizing gatekeepers at the point of sale, subject to harsh penalties for noncompliance.[8]  But FFLs' functions and enforcement mechanisms attach only to "firearms."  If ghost gun kits and partially complete frames and receivers are not treated as "firearms," FFLs would continue to be displaced as the "principal agent of [law] enforcement" for this rapidly expanding source of crime guns. *Huddleston*, 415 U.S. at 824.

***Background checks.***  The Act requires every individual who purchases a firearm from an FFL to submit to a background check.  18 U.S.C. § 922(t)(1); 27 C.F.R. § 478.102(a).  Absent recognizing ghost gun kits and unfinished frames and receivers as firearms—as the Act requires and the Rule confirms—untraceable and functional firearms could be acquired by anyone, regardless of background:  criminals, domestic abusers, minors, and persons with severe mental illness, to name a few.

---

[8] In monitoring the point of sale, the Act proactively keeps firearms out of dangerous hands, rather than forcing law enforcement to restrict possession after the firearms have entered circulation.  The Rule furthers this prophylactic premise: public safety is better served by preventing a violent criminal from purchasing a gun than it is by recovering a gun after a crime has already occurred.

Allowing unfettered access to dangerous weapons is the opposite of what Congress envisioned.  In tightly regulating who may purchase a firearm under the Act, "Congress . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976).  That approach is consistent with a "longstanding" historical tradition of "prohibitions on the possession of firearms" that further public order, such as limiting possession by "felons and the mentally ill." *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008); *see N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S. Ct. 2111, 2122, 2133–34 (2022) (the Constitution protects "the right of an ordinary, *law-abiding* citizen . . . .") (emphasis added).  The Act continues that tradition by "establish[ing] a detailed scheme to enable the dealer to verify . . . whether a potential buyer may lawfully own a gun." *Abramski*, 573 U.S. at 172.

So important is the purchaser's law-abiding status that it is a crime for an FFL to sell a firearm without running a background check on the transferee, 18 U.S.C. § 922(t); for a buyer to "make any false or fictitious oral or written statement" concerning their identity, *id.* § 922(a)(6); and for FFLs to make any "false" statement in records relating to a buyer's identity, *id.* §§ 922(m), 924(a)(3).  The Rule faithfully implements Congress's calibration of who may possess a firearm and the scheme for preventing circumvention of those rules.  Plaintiffs' position would breathe life into the exact dangers the Act was designed to address.  Congress saw "the ease with which any person can anonymously acquire firearms" as "a matter of serious national concern," and responded accordingly.  Senate Report at 22.  For instance, to curtail

anonymous purchases, Congress barred "the commercial mail-order traffic in firearms to unlicensed persons." *Id.* at 23.  In fact, Congress *rejected* earlier proposed legislation because such legislation failed to "prohibit the mail-order sale" of firearms known for "their susceptibility to crimes."  S. Rep. No. 89-1866, at 34, 100 (1966).

Absent regulation as firearms, ghost gun kits and partially complete frames and receivers are the modern incarnation of mail-order guns:  they allow anonymous buyers (including criminals) to purchase a firearm remotely and have that firearm shipped across state lines to facilitate crime.  In recent years, this has occurred regularly, nationwide.  And ghost gun kit manufacturers, for their part, have advertised anonymity and the avoidance of background checks as reasons to purchase their wares.[9]

***Straw purchases.***  Failing to classify ghost gun kits and partially complete frames and receivers as firearms would dilute the Act's ban on "straw purchases," *i.e.*, gun purchases made by someone who can pass a background check on behalf of someone else—often a prohibited buyer.  Purchasers of ghost gun kits or partially

---

[9] *See, e.g.*, *Are Felons Restricted from Owning a Firearm that Was Built from an 80% Receiver?*, Polymer80 Blog (Oct. 21, 2020), *formerly at* https://bit.ly/3DDzXGo ("Convicted felons are not restricted from purchasing and owning 80% frames . . . ."); *The History of Legally Buying Firearms Without an FFL,* 80% Arms Blog (Dec. 3, 2019), https://bit.ly/3HClkFU (no background check or serial number required); *Ghost Gunner*, Ghost Guns (last visited Aug. 28, 2022), https://bit.ly/3pUjDvj (same); *Lower Receiver,* SS-Arms (last visited Aug. 28, 2022), https://bit.ly/3GAVvVo (same); *About,* R&B Tactical Tooling (last visited Aug. 28, 2022), https://bit.ly/3oNKmZU (same); *JSD, Premier Gun Parts and Accessories,* JSD Supply (last visited Aug. 28, 2022), *formerly at* https://bit.ly/3rKrgqj *and archived at* https://bit.ly/3pPlUZ5 (same).  The JSD Supply website removed that language around the time the Rule took effect.

complete frames and receivers would not even need to cloak their identities with straw purchases if these items were not recognized as firearms.

The Act aims to prevent the diversion of firearms to the black market through several means, including by prohibiting "straw purchases." Straw purchases have long fueled illegal gun trafficking. *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers*, U.S. Dept. of the Treasury at 10 (June 2000), https://bit.ly/3JXi6OP ("Nearly 50 percent of the ATF investigations involved firearms being trafficked by straw purchasers."); *Trafficking & Straw Purchasing*, Giffords Law Center (last visited Aug. 28, 2022), https://bit.ly/3FBTtnv (noting "30,000 attempted straw purchases each year").

Through several interlocking requirements, the Act forbids straw purchases. Gun buyers must fill out "Form 4473," attesting to their identity as the "actual transferee/buyer," ATF Form 4473 (5300.9), https://bit.ly/3CAv5Rl, and it is a crime to misrepresent—on Form 4473 or elsewhere—"any fact material to the lawfulness of the sale," 18 U.S.C. § 922(a)(6); *see Abramski*, 573 U.S. at 171. Further, any FFL that does not take steps to stop straw purchases at the point of sale can lose its license and face both civil and criminal liability. *See, e.g., Shawano Gun & Loan, LLC v. Hughes,* 650 F.3d 1070, 1077–79 (7th Cir. 2011).

As the Supreme Court has recognized, protections against straw purchases are essential because, "[p]utting true numbskulls to one side, anyone purchasing a gun for criminal purposes would avoid leaving a paper trail by the simple expedient of hiring a straw." *Abramski*, 573 U.S. at 183. Yet if ghost gun kits and partially

complete frames and receivers were wrongly excluded from the definition of "firearms," then none of the tools that ATF employs to combat straw purchases would be available to this rapidly proliferating segment of the market, leaving criminal buyers with few roadblocks to obtaining firearms.

***Serialization, record-keeping, and public safety.***  Ghost guns contravene the Act's serialization and record-keeping provisions, making it more difficult for law enforcement to fight crime.  *See, e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010) ("[W]e think it plain that [serialization] serves a law enforcement interest."); *United States v. Harris*, 720 F.3d 499, 502 (4th Cir. 2013) (same).  By their very nature, ghost guns—easily assembled from partially complete frames and receivers that Plaintiffs would carve out of the Act—are fully operational, unmarked, and *untraceable* firearms, which impede law enforcement's ability to prevent and prosecute violent crime by tracing illegal weapons to their source.  *See Morehouse Enterprises*, at *12 (clarifying that the Rule advances "ATF's interest in law enforcement and public safety").

The Act mandates that every firearm possess a unique serial number and makes it a crime to tamper with a serial number or even "receive" a firearm with an already-tampered-with serial number.  27 C.F.R. § 478.92; 18 U.S.C. §§ 923(i), 922(k).  Serialization allows ATF "to link a suspect to a firearm."  *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 204 (D.C. Cir. 2013).  Possessing a firearm with an altered serial number triggers a sentencing enhancement—even if law enforcement can reconstruct the number.  U.S.S.G. § 2K2.1(b)(4)(B); *see United States*

14

*v. St. Hilaire*, 960 F.3d 61, 64 (2d Cir. 2020); *United States v. Fuller-Ragland*, 931 F.3d 456, 467 (6th Cir. 2019).

The Act also assists law enforcement by subjecting FFLs to record-keeping duties to track firearm sales and inventory. 18 U.S.C. § 922(g)(1)(A); 27 C.F.R. §§ 478.121–134. Law enforcement may "examine the inventory and records of [FFLs] . . . without . . . reasonable cause or warrant," "in the course of a reasonable inquiry during the course of a criminal investigation." 18 U.S.C. § 923(g)(1)(B); *see* 27 C.F.R. § 478.121(b). "FFL records" allow law enforcement to "trace a firearm" and identify its "path through the distribution chain." *Nat'l Shooting Sports*, 716 F.3d at 204 (cleaned up).

Without serialization and record-keeping, including for ghost gun kits and partially complete frames and receivers, these law enforcement mechanisms break down. *United States v. Mobley*, 956 F.2d 450, 454 (3d Cir. 1992) (it is "no secret that a chain of custody for a firearm greatly assists in the difficult process of solving crimes," and that, without "serial numbers," reconstructing that chain is "virtually impossible"); *Marzzarella*, 614 F.3d at 98 ("Firearms without serial numbers are of particular value to those engaged in illicit activity."). Plaintiffs regard the term "ghost guns" as "derogatory" and take offense at the suggestion that their ghost guns "enabl[e] criminals," ECF No. 16, at 23, but these protestations are belied by a House Committee report, which expressly warned that "[g]host guns" pose a "homeland security challenge" because they "hamstring[] law enforcement's ability to investigate crimes," as such crimes are "committed with untraceable weapons." H. Rep. No. 116-

88, at 2 (2019).  This conclusion tracks common sense:  would-be criminals naturally prefer untraceable ghost guns to traceable options.[10]

## II.   THE RULE APPROPRIATELY CONSIDERS THE PRACTICAL REALITY THAT GHOST GUNS CAN BE QUICKLY AND EASILY ASSEMBLED BY NONEXPERTS

The Act defines "firearm" in practical terms, covering not only fully complete weapons, but also frames and receivers that are designed to be or may readily be converted into operable weapons—thus regulating items that exist for no other purpose and almost certainly *will* become weapons.  18 U.S.C. § 921(a)(3).  The Rule is faithful to this statutory definition and Congress's pragmatic approach, recognizing that ghost guns can be assembled from ghost gun kits and partially complete frames and receivers easily and without any technical expertise, in an hour or less.

Courts have widely agreed that, under the Act, a "weapon designed to fire a projectile" that is "temporarily incapable of effecting its purpose," is not "removed from" the definition of a "firearm."  *United States v. Rivera*, 415 F.3d 284, 286 (2d Cir. 2005); *see, e.g., United States v. Cooper*, 714 F.3d 873, 881 (5th Cir. 2013) ("[W]e have consistently held that inoperable firearms can support convictions [under section 921(a)(3).]"); *United States v. Hardin*, 889 F.3d 945, 949 (8th Cir. 2018) (rejecting argument that the "disrepair" of a gun, which rendered it inoperable, changed that

---

[10] For example, the website of Plaintiff Tactical Machining, LLC ("Tactical Machining") advertises to prospective purchasers that the company's "80% lower" receivers are "*machined as far as you can*" to being operable firearms so as to avoid "requir[ing them] to be transferred to an FFL" with all its attendant regulations. *80% Lower Guide,* Tactical Machining (last visited Aug. 26, 2022), https://bit.ly/3pTHfAC (emphasis added).  In practical terms, the sale of such receivers transparently aims to skirt the Act's goal of proper FFL recordkeeping and hamper law enforcement efforts to prevent and investigate gun trafficking and violence.

the gun was "manufactured to be . . . a gun") (quotation marks omitted).  Likewise, as the Eighth Circuit has recognized, an object that must be "modified" to function as a firearm, is no less a firearm in the eyes of the Act.  *See United States v. Mullins*, 446 F.3d 750, 756 (8th Cir. 2006) (gun that could be "modified," "without any specialized knowledge, in less than an hour," is "'readily convertible'"); *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006) (finding no error in imposing the dangerous weapon sentencing enhancement even though the firearm in question "was missing both the clip and the bolt" and "partially disassembled"); *United States v. Smith*, 477 F.2d 399, 400 (8th Cir. 1973) (gun that required "8-hour working day in a properly equipped machine shop" was "readily" convertible into a gun).

Consistent with this body of precedent, last week, the District Court for the District of North Dakota denied a preliminary injunction in another challenge to the Rule, concluding that ghost gun kits and partially complete frames and receivers constitute firearms because the Act "clearly defined 'firearms' more broadly than a fully operational weapon" and so "a 'frame or receiver' may be considered a firearm much sooner in the process than a 'weapon.'"  *Morehouse Enterprises,* at *6; *see id.* (observing that "no provision of federal law foreclos[es] this possibility").  And earlier this month, the D.C. Superior Court likewise held that partially complete frames, receivers, and kits sold by a ghost gun manufacturer are "firearms" as they may be "readily converted."[11]

---

[11] *District of Columbia v. Polymer80, Inc.*, No. 2020-CA-002878-B, at 5 (D.C. Sup. Ct. Aug. 10, 2022) ("On Polymer80's website, they provide instructions to consumers on

Not only is the statutory language dispositive, but a mountain of evidence confirms that ghost gun kits and partially complete frames and receivers **are** designed to be and may readily be converted into operable weapons, and thus are "firearms" under the Act.  Manufacturers and distributors have advertised that these kits, frames, and receivers are designed for the sole purpose of being assembled into functional guns.  And—consistent with that purpose—these items can in fact be easily assembled into functional weapons by the most novice gun-builders, including children.[12]  Specifically, through a single website, one can buy a complete, all-in-one kit that "package[s] the unfinished frame or receiver with all the other parts needed to complete the firearm."  *Untraceable: The Rising Specter of Ghost Guns,* Everytown Research (May 14, 2020), https://bit.ly/3DTrIWj.  Once the kit is delivered, assembly is simple.  As the head of ATF's Los Angeles field office observed:

> If you can go to one of these big-box stores and put that type of furniture together, if you're putting together your kids Christmas toys, you can make a homemade gun.  It's that easy.

Jonathan Edwards, *A 13-Year-Old Boy Made and Trafficked 'Ghost Guns,' Authorities Say, and Then Killed His Sister with One*, Wash. Post. (Dec. 3, 2021), https://wapo.st/3Ggarb9.

---

how to build firearms with these unfinished frames, receivers, and . . . kits."), https://bit.ly/3A1f4EN.

[12] *See* Kallie Cox, *Once a Week, Police Find These Homemade Guns. Federal Law Just Got Tougher*, Charlotte Observer (Aug. 25, 2022), https://www.charlotteobserver.com/news/local/crime/article264856744.html (police "regularly seize ghost guns and often find youth have them").

As Plaintiffs readily admit, these ghost gun kits and partially complete frames and receivers readily enable "self-manufacturing weapons at home." ECF No. 16, at 4. And, notably, even though Tactical Machining attests to this Court that it does not "provide *any form of instruction* on how to self-manufacture a firearm frame or receiver" or include any "tooling" or "jigs" to build operable weapons from partially complete frames and receivers, ECF No. 16-1, ¶ 5 (Decl. of Darren Peters, Sr., Owner and CEO of Tactical Machining) (emphasis added), its website reveals the opposite. Specifically, the company sells ghost gun kits with "Install Instructions," "the cam clamp and takedown pin," and "[b]oth barrel nut and the alignment tool"—all "contained in the assembly." *80% Build Kits*, Tactical Machining (last visited Aug. 26, 2022), https://bit.ly/3wAHtjZ.

Ghost gun kits are not only designed to be converted into firearms:  they are designed to be converted ***quickly***. Kit manufacturers and distributors tout this speed in marketing materials. *See, e.g.*, *GST-9: 80% Pistol Build Kit*, 80% Arms (last visited Aug. 28, 2022), https://bit.ly/3x6n0T7 ("Our goal was for you to be able to go from opening the mail, to a competition or defense ready pistol in under 15 minutes."). Manufacturers and distributors also publish how-to guides to walk novices through the fast-and-easy assembly. *See, e.g.*, *How-To Manuals,* Polymer80 (last visited Aug. 28, 2022), https://bit.ly/3qUwobt.

Amateurs and experts alike have assembled kits in around an hour or less. *See* Glenn Thrush, *'Ghost Guns': Firearm Kits Bought Online Fuel Epidemic of Violence*, N.Y. Times (Nov. 14, 2021), https://nyti.ms/3EYiedv ("[An] amateur can . . . turn [a

kit] into a working firearm in *less than an hour*." (emphasis added)); Compl. at ¶¶ 74, 115, *People v. Blackhawk Mfg. Grp., et al.*, CGC-21-594577 (Cal. Super. Ct. Aug. 18, 2021) (officer assembled kit in "*less than 25 minutes*" with tools from a hardware store (emphasis added)); *id.* at ¶ 73 (ATF agent finished kit "in *less than nineteen minutes*" (emphasis added)); Prelim. Inj. Mem., *City of N.Y. v. Arm or Ally LLC, et al.*, 22-CV-5525, ECF No. 9, at 11 (S.D.N.Y. June 29, 2022) (ghost gun assembled "in *approximately an hour and a half*") (emphasis added).  In earlier ghost gun litigation, one individual who had "never attempted to build a firearm using an unfinished frame or receiver," watched "videos on *YouTube* for thirty minutes," then built "a complete pistol from [a] handgun kit in *86 minutes*."  Decl. of J. McFarlan, *City of Syracuse, et al. v. ATF*, 1:20-CV-6885 ("*City of Syracuse*"), ECF No. 64-34, at ¶¶ 8, 10, 11 (S.D.N.Y. Dec. 9, 2020) (emphasis added).  The Rule correctly recognizes the contemporary reality that anyone with an internet connection, an hour or less of free time, and basic household tools can convert ghost gun kits and partially complete frames and receivers into operable and untraceable weapons.

## III.   THE RULE COMPORTS WITH ATF'S LONGSTANDING VIEW THAT PARTIALLY COMPLETE FRAMES AND RECEIVERS CAN BE FIREARMS

Plaintiffs erroneously contend that the Rule upends ATF's historical practice and would "dramatically expand" existing ATF regulatory framework.  ECF No. 16, at 5–9.  To the contrary, for years after the Act's passage, ATF understood that Congress defined "firearm" to include some partially complete frames and receivers, and that the operative question is how quickly and easily—*i.e.*, how "readily"—a frame or receiver can "be converted" into an operable weapon.  18 U.S.C. § 921(a)(3);

*Morehouse Enterprises*, at *11 (regulating "a non-operational kit that can be readily turned into an operational firearm is not a significant [policy] change" because "a non-operational weapon which can be made operational already qualifies as a firearm under 18 U.S.C. § 921(a)(3)(A).").  That some purveyors of ghost gun kits and parts have tried to affirmatively *hide* from ATF the ease with which their wares can be assembled only reinforces that a partially complete frame or receiver that can quickly and easily be converted into a weapon is indeed a "firearm" under the Act.

The Act was enacted in 1968.  In 1976, ATF's Assistant Chief Counsel issued an opinion with a framework for assessing whether a partially complete frame or receiver is a "firearm."  Admin. Record, *City of Syracuse*, ECF No. 60 (S.D.N.Y. Dec. 8, 2020), at ATF0265.  The opinion explained that if "unfinished frames" or "castings" *"may readily be converted"* into weapons, "they are firearms."  *Id.* at ATF0266 (emphasis added).  The opinion concluded that unfinished frames and receivers must be reviewed "case-by-case" to gauge if they are "readily convertible" into weapons:

> [W]e view the current Bureau procedure in classifying "firearms" on a case-by-case basis as consistent with the letter and spirit of the [] Act. It is obvious that what constitutes "readily convertible" depends upon the nature of each firearm.  That there may be cases where it is difficult to determine the side on which a particular "firearm" falls is not a sufficient reason to establish a rigid criterion for … "readily convertible."

*Id.* at ATF0267.

For decades, ATF followed that approach in classification letters that turned on whether a partially complete frame or receiver could "readily be converted" into an operable weapon.  *Id.* at ATF0001, ATF0014, AATF0020, ATF0023, ATF0050, AATF0051, AATF0053, ATF0065.  Consistent with the straightforward dictionary

definition of "readily"—meaning "without much difficulty" or "with fairly quick efficiency"[13]—several of these letters referenced the ease and speed with which partially complete frames and receivers could be assembled into operable weapons. *Id.* at ATF0020 (partially complete receiver was a "firearm" because it required "75 minutes" of assembly); *id.* at ATF0024 (partially complete frame was a "firearm" because it required "20 minutes" of assembly).[14]

Plaintiffs overlook this history altogether, and instead complain that the Rule newly regulates "items that may someday become a frame or receiver or even the individual parts of a weapon" and "a collection of non-firearm parts (including the non-frame or non-receiver)." ECF 16, at 8–9. That complaint is belied by the

---

[13] *Webster's Third New International Dictionary* 1889 (1965) (defining "readily").

[14] This history illustrates one of many ways in which Plaintiffs' invocation of *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), is misplaced. ECF No. 16, at 21–22 & n.24, 24. In *West Virginia*, the Court vacated an EPA rule "claim[ing] to discover" a power in the Clean Air Act for the first and only time in four decades. 142 S. Ct. at 2610 (cleaned up). By contrast, here, the Rule follows a reading of the Act that ATF adopted in 1976. Notably, *West Virginia*'s reliance on the "major questions doctrine" also turned on the EPA rule risking "billions" in costs and "tens of thousands of jobs," under an "obscure . . . section of the law." *Id.* at 2602, 2604-05. Despite Plaintiffs' alarmist rhetoric that the Rule will cause "[t]he market for privately manufacturing firearms" to "likely die," ECF No. 16, at 37, in reality, the "Rule does not infringe on any individuals' or business' ability to completely manufacture[] a firearm for personal use, nor does it restrict the ability to obtain the weapon kits at issue. . . . [it] simply requires serialization of a firearm, when in the stream of commerce, so that it may be tracked in the event a crime is committed with the firearm." *Morehouse Enterprises*, at *8; *see Div. 80, LLC v. Garland*, No. 3:22-CV-148, 2022 WL 3648454, at *3–5 (S.D. Tex. Aug. 23, 2022) ("the only quantified compliance costs" that the Rule may impose on ghost gun companies "is a few hundred dollars in licensing fees"). Plaintiffs' contention that operating as FFLs and serializing ghost gun kits and partially complete frames and receivers in accordance with the Act "risk the destruction of their businesses" rings quite hollow. ECF No. 16, at 38.

industry's behavior, including Tactical Machining's.[15]  The ghost gun industry has seemingly tried to hide from ATF the extent to which ghost gun kits can be "readily" converted into deadly weapons—a clear sign that, even before the Rule, the industry knew that the Act reaches partially complete frames and receivers.  In an affidavit to support a warrant to search a facility operated by Polymer80 (the nation's largest public seller of ghost gun kits and parts), an ATF agent stated that, in 2017, Polymer80 sought an ATF determination that an unfinished pistol frame is not a firearm by misleadingly submitting just the partially complete frame without the rest of the kit sold with the frame, which included other parts and tools to complete the frame of a ghost gun.  Aff. of T. Hart, *In the Matter of the Search of the Business and Federal Firearms Licensee Known as Polymer80*, 3:20-mj-123, ¶¶ 42–43 (D. Nev. Dec. 9, 2020), https://on.wsj.com/3pivOCi.  ATF responded to Polymer80 in a letter noting that, "the submitted sample is simply a component of a larger product," and directing Polymer80 to "submit the complete . . . [k]it."  *Id.* at ¶¶ 43–44.  As of December 2020, Polymer80 had not "resubmitted the . . . kit."  *Id.* at ¶ 45.  ATF eventually obtained a kit through an informant who bought the "Buy Build Shoot" kit—advertised as having "all the necessary components" for a gun—with no background check, and assembled it into an operable gun in 21 minutes.  *Id.* at ¶ 69.

In short, ATF has long recognized that partially complete frames and receivers that can quickly and easily be assembled into operable weapons are "firearms."  That

---

[15] *See 80% Lower Guide* (admitting that Tactical Machining's 80% receivers are intended to bypass federal gun sale regulations by being "machined as far as you can" before being classified as operable weapons).

the ghost gun industry appears to have hidden the nature of its products from ATF only confirms that the industry knows its current practices violate federal law.

## **CONCLUSION**

This Court should deny Plaintiffs' motion for a preliminary injunction.

August 30, 2022

Respectfully Submitted,

By:   _/s/ Daniel Grooms_

ADAM M. KATZ*
RACHEL ALPERT*
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2300
akatz@cooley.com
ralpert@cooley.com

DANIEL GROOMS*
MATT K. NGUYEN*
COOLEY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 842-7800
dgrooms@cooley.com
mnguyen@cooley.com

*pro hac vice pending

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

 I hereby certify that on this 30th day of August 2022, a true and accurate copy of the foregoing brief was served via the Court's CM/ECF system to all counsel of record.


August 30, 2022        Respectfully Submitted,

                 By: */s/ Daniel Grooms*