## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

JENNIFER VANDERSTOK;
MICHAEL G. ANDREN;
TACTICAL MACHINING, LLC, a limited
liability company; and
FIREARMS POLICY COALITION, INC., a
nonprofit corporation,

*Plaintiffs*,

and

BLACKHAWK MANUFACTURING GROUP
INC. d/b/a 80 PERCENT ARMS,

*Intervenor-Plaintiff*,

v.

MERRICK GARLAND, in his official capacity as
Attorney General of the United States;
UNITED STATES DEPARTMENT OF JUSTICE;
STEVEN DETTELBACH, in his official capacity
as Director of the Bureau of Alcohol, Tobacco,
Firearms and Explosives; and
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES,

*Defendants*.

Civil Action No. 4:22-cv-691-O

### BLACKHAWK MANUFACTURING GROUP INC. d/b/a 80 PERCENT ARMS'
### [PROPOSED] MOTION FOR PRELIMINARY INJUNCTION
### (ORAL ARGUMENT REQUESTED)

Pursuant to Federal Rule of Civil Procedure 65, Northern District of Texas Local

Civil Rule 7.1, and 5 U.S.C. § 705, Intervenor-Plaintiff BlackHawk Manufacturing Group

1

Inc. d/b/a 80 Percent Arms (collectively, as used herein, "BlackHawk"), through its undersigned counsel, move this honorable Court for a nationwide preliminary injunction prohibiting Defendants and their officers, agents, servants, and employees from implementing and enforcing the provisions established and amended by the Department of Justice and Bureau of Alcohol, Tobacco, Firearms, and Explosives' Final Rule entitled Definition of "Frame or Receiver" and Identification of Firearms ("Final Rule"), 87 Fed. Reg. 24,652 (Apr. 26, 2022), and/or to postpone the effective date of the Final Rule.

Alternatively, BlackHawk requests that the Court issue a determination that BlackHawk is entitled to the same injunctive relief and protections granted to Tactical Machining in the Court's September 2, 2022 Order, ECF No. 56. Further and alternatively, BlackHawk requests that the Court enjoin Defendants' ability to rescind the lawful classification letter issued to BlackHawk by ATF on July 15, 2013, submitted with BlackHawk's accompany Brief, in order for BlackHawk to lawfully continue selling non-regulated receiver blanks with non-regulated tools, jigs, and instructions as it did prior to the Final Rule's effective date.

BlackHawk's counsel has conferred with counsel for Defendants, who oppose the relief requested herein on the basis that BlackHawk is not a party to this matter and it would be inappropriate to grant a non-party relief, particularly emergency relief. Counsel for Plaintiffs take no position as to the relief sought.

In support of this Motion, BlackHawk concurrently files a Brief in Support along with supporting documentation pursuant to Northern District of Texas Local Civil Rule 7.1(d). BlackHawk requests oral argument on this Motion, given this Motion addresses

the highly technical nature of the Final Rule and evolving factual circumstances regarding the national impact of the Final Rule which, if not enjoined, threatens to greatly and irreparably harm BlackHawk.

DATED this 22 day of September, 2022.

Respectfully submitted,

*/s/ Brian D. Poe*
BRIAN D. POE
TX Bar No. 24056908
BRIAN D. POE, ATTORNEY AT LAW PLLC
The Bryce Building
909 Throckmorton Street
Fort Worth, Texas 76102
Phone: (817) 870-2022
Fax: (817) 977-6501
bpoe@bpoelaw.com

Michael J. Sullivan
MA Bar No. 487210
*Pro Hac Vice Forthcoming*
J. Christopher Amrhein, Jr.
MA Bar No. 703170
*Pro Hac Vice Forthcoming*
Nathan P. Brennan
MN Bar No. 389954
*Pro Hac Vice Forthcoming*
ASHCROFT LAW FIRM LLC
200 State Street, 7th Floor
Boston, MA 02109
Phone: (617) 573-9400
Fax: (617) 933-7607
msullivan@ashcroftlawfirm.com
camrhein@ashcroftlawfirm.com
nbrennan@ashcroftlawfirm.com

*Counsel for Intervenor-Plaintiff BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| JENNIFER VANDERSTOK;<br>MICHAEL G. ANDREN;<br>TACTICAL MACHINING, LLC, a limited<br>liability company; and<br>FIREARMS POLICY COALITION, INC., a<br>nonprofit corporation,<br><br> *Plaintiffs*,<br>and<br><br>BLACKHAWK MANUFACTURING GROUP<br>INC. d/b/a 80 PERCENT ARMS,<br><br> *Intervenor-Plaintiff*,<br><br> v.<br><br>MERRICK GARLAND, in his official capacity as<br>Attorney General of the United States;<br>UNITED STATES DEPARTMENT OF JUSTICE;<br>STEVEN DETTELBACH, in his official capacity<br>as Director of the Bureau of Alcohol, Tobacco,<br>Firearms and Explosives; and<br>BUREAU OF ALCOHOL, TOBACCO,<br>FIREARMS AND EXPLOSIVES,<br><br> *Defendants*. | Civil Action No. 4:22-cv-691-O |

**BLACKHAWK MANUFACTURING GROUP INC. d/b/a 80 PERCENT ARMS'
BRIEF IN SUPPORT OF [PROPOSED] MOTION FOR PRELIMINARY
INJUNCTION**

## **Table of Contents**

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 3

I.       BACKGROUND ..................................................................................... 3

         A.  Statutory and Regulatory Background ............................................. 3

         B.  The Biden Administration Announces That It "Will Not Wait
             for Congress to Act to Take Its Own Steps" on Gun Control ......... 6

         C. The Final Rule Purports to Regulate *Partial* Frames and Receivers
             and Creates a New Definition of "Firearm" ................................. 10

II.      THIS COURT HAS ALREADY DETERMINED THAT THE FINAL
         RULE EXCEEDS ATF'S STATUTORY AUTHORITY UNDER THE
         PLAIN LANGAUGE OF THE GUN CONTROL ACT ....................... 11

         A. September 2 Order: "Parts that *may become* receivers are not receivers" ....... 11

         B. September 2 Order: "A weapons parts kit is not a firearm" ............. 13

ARGUMENT ..................................................................................................... 13

I.       THE COURT'S SEPTEMBER 2 ORDER ESTABLISHES THAT
         BLACKHAWK IS LIKELY TO PREVAIL ON THE MERITS ........... 14

III.     BLACKHAWK HAS SHOWN IT WILL SUFFER IRREPARABLE
         HARM IN THE ABSENCE OF INJUNCTIVE RELIEF ..................... 15

         A. The Final Rule Will Likely Put BlackHawk Out of Business ........... 15

         B. The Scope of Injunctive Relief Must Be Nationwide to Preserve
             the Status Quo and Allow BlackHawk to Continue Doing Business ............... 17

III.   BLACKHAWK'S INJURY OUTWEIGHS ANY HARM TO
       DEFENDANTS OR THE PUBLIC ....................................................................... 17

CONCLUSION ................................................................................................................. 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
  141 S. Ct. 2485 (2021)...................................................................................................16

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*,
  875 F.2d 1174 (5th Cir. 1989) .......................................................................................15

*BST Holdings, LLC v. OSHA*,
  17 F.4th 604 (5th Cir. 2021) ..........................................................................................18

*California v. ATF*,
  No. 3:20-CV-06761 (N.D. Cal. Nov. 30, 2020) ..............................................................5

*City of Dallas v. Delta Air Lines, Inc.*,
  847 F.3d 279 (5th Cir. 2017) .........................................................................................13

*City of Dallas, Texas v. Hall*,
  2008 WL 11350041 (N.D. Tex. July 28, 2008)..............................................................19

*City of Syracuse v. ATF*,
  No. 1:20-CV-06885 (S.D.N.Y. Jan. 29, 2021) ................................................................6

*Cobell v. Kempthorne*,
  455 F.3d 301 (D.C. Cir. 2006)........................................................................................19

*Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*,
  600 F.2d 1184 (5th Cir. 1979) .......................................................................................14

*Def. Distributed v. United States Dep't of State*,
  838 F.3d 451 (5th Cir. 2016) .........................................................................................14

*Dist. 50, United Mine Workers of Am. v. Int'l Union, Union Mine Workers of Am.*,
  412 F.3d 165 (D.C. Cir. 1969)........................................................................................19

*Family Rehab., Inc. v. Azar*,
  3:17-CV-3008, 2018 WL 3155911 (N.D. Tex. June 28, 2018) ......................................14

*Green Valley Special Util. Dist. v. City of Schertz*,
  969 F.3d 460 (5th Cir. 2020) .........................................................................................17

*Jacksonville Port Auth. v. Adams*,
    556 F.2d 52 (D.C. Cir. 1997) ........................................................................ 18

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ....................................................................... 16

*Jiao v. Xu*,
    28 F.4th 591 (5th Cir. 2022) ........................................................................ 15

*Milsen Co. v. Southland Corp.*,
    454 F.2d 363 (7th Cir. 1971) ....................................................................... 15

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
    760 F.2d 618 (5th Cir. 1985) ....................................................................... 14

*N. Mariana Islands v. United States*,
    686 F. Supp. 2d 7 (D.D.C. 2009) ................................................................. 18

*N.Y. Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013) ......................................................................... 18

*Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*,
    621 F.2d 683 (5th Cir. 1980) ....................................................................... 14

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ....................................................................... 16

*Texas v. Seatrain Int'l, S.A.*,
    518 F.2d 175 (5th Cir. 1975) ....................................................................... 14

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ................................................................ 17, 18

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1992) ..................................................................................... 16

*Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*,
    805 F.2d 351 (10th Cir. 1986) ..................................................................... 15

*U.S. Navy SEALs 1-26 v. Biden*,
    578 F. Supp. 3d 822 (N.D. Tex. 2022) ........................................................ 19

*Wages and White Lion Invs., LLC v. FDA*,
  16 F.4th 1130 (5th Cir. 2021) ......................................................................... 16

**Statutes**

18 U.S.C. § 921(a)(3)(B) ............................................................................... 4, 11

**Other Authorities**

Gun Control Act of 1968 ..................................................................................... 4

H.R. 1454, 117th Cong. (2021) .......................................................................... 6

S. 1558, 117th Cong. (2021) ............................................................................... 6

**Rules**

27 C.F.R. § 478.11 ............................................................................................ 11

*Definition of "Frame or Receiver" and Identification of Firearms*,
  86 Fed. Reg. 27 (May 21, 2021) ...................................................................... 7

*Definition of "Frame or Receiver" and Identification of Firearms*,
  87 Fed. Reg. 24 (Apr. 26, 2022) .................................................................... 10

*Title and Definition Changes*,
  43 Fed. Reg. 13,531, 13 (Mar. 31, 1978) ........................................................ 4

## INTRODUCTION

On September 2, 2022, this Court granted a preliminary injunction as requested by Plaintiff Tactical Machining, LLC ("Tactical Machining"). *See* Order and Opinion on Preliminary Injunction dated  September 2, 2022 ("September 2 Order"), ECF No. 56. In its September 2 Order, the Court found that ATF Final Rule 2021R-05F, which was published in the Federal Register on April 26, 2022 and went into effect on August 24, 2022 ("Final Rule") included provisions that are "facially unlawful" and that "unlawfully expand ATF's authority beyond the boundaries set by the Gun Control Act." ECF No. 56 at 9, 12.  In granting preliminary injunctive relief to Tactical Machining, this Court found that the Plaintiffs collectively "have demonstrated a strong likelihood of success on their claims that the Final Rule—specifically, 27 C.F.R. §§ 478.11, 478.12(c)—exceeds the scope of ATF's authority under the Gun Control Act." *Id*. at 15.

Like Tactical Machining, Intervenor-Plaintiff BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms (collectively, as used herein, "BlackHawk") is a federally licensed manufacturer for whom nearly 100% of its products are subject to regulation under the Final Rule. *See* Declaration of Daniel Lifschitz dated September 22, 2022, and submitted herewith as Exhibit A ("Lifschitz Decl.") ¶ 8.

Like Tactical Machining, BlackHawk faces an existential threat to its ability to continue operating because of the sharp decline in sales caused by the profound uncertainty as to potential criminal ramifications in the ATF's enforcement of the Final Rule since it took effect August 24, 2022. Lifschitz Decl. ¶¶ 12–16.  Since the Final Rule's effective

date, BlackHawk's average daily revenue has declined by more than 90% as many of its customers have expressed alarm at the prospect of possibly committing a felony by merely purchasing BlackHawk's products. *Id*. ¶ 15. Currently, BlackHawk is operating at a loss and burning through its cash reserves to stay afloat. *Id*. ¶¶ 19–20. If sales do not recover quickly, BlackHawk will be forced to shut down and cease operations well before a final judgment is rendered in this proceeding. *Id*. ¶¶ 20–21.

Like Tactical Machining, BlackHawk faces nonrecoverable compliance costs which this Court found in its September 2 Order constitute irreparable harm. ECF No. 56 at 17–19. Like Tactical Machining, BlackHawk was forced to discontinue popular product offerings from its online store after the Final Rule took effect in order to avoid the possibility of criminal or civil exposure under the Final Rule's vague provisions. Lifschitz Decl. ¶¶ 11–12; ECF No. 56 at 17.  However, unlike Tactical Machining—who for now is protected from ATF's enforcement of the unlawful Final Rule—BlackHawk remains exposed to pervasive confusion, uncertainty, loss of liberty, and plummeting revenue as it attempts to continue operating in a massively destabilized marketplace. *Compare* ECF No. 56 at 17 *with* Lifschitz Decl.

The Biden Administration's political rhetoric makes it clear that it seeks to wipe out BlackHawk and companies like it, and thereby significantly limit the ability of U.S. citizens to legally buy parts, tools, and jigs—which for decades prior to the Final Rule were legal under the Gun Control Act and earlier classification letters issued by ATF—in order to make their own firearms and enjoy the full scope of rights guaranteed by the Constitution, including their Second Amendment rights. The Final Rule is already achieving measurable

success in accomplishing the White House's misguided goals. BlackHawk therefore requests that the Court grant preliminary injunctive relief on a nationwide basis suspending enforcement of the Final Rule and re-instituting the status quo as it existed prior to August 24, 2022, which will allow BlackHawk to continue engaging in the lawful, interstate purchase and sale of frame and receiver blanks, jigs and tools, while the Court adjudicates the Final Rule's lawfulness. Alternatively, BlackHawk requests that this Court enjoins ATF's ability to rescind the lawful classification letter issued to BlackHawk by ATF on July 15, 2013 in order for BlackHawk to lawfully continue selling non-regulated receiver blanks with non-regulated tools, jigs, and instructions as it did prior to the Final Rule's effective date. *See* ATF Classification Determination dated July 15, 2013, submitted herewith as <u>Exhibit B</u>.

## STATEMENT OF FACTS

### I.   BACKGROUND

####    A.   Statutory and Regulatory Background

The United States of America has a long tradition of individuals privately making their own firearms, which dates back to the American Revolution. "[G]un-making at home was *essential* to the Continental Army, and typically, it was more practical and efficient to assemble [a firearm from parts] rather than completely start from scratch."[1] Law-abiding

---

[1] *Stop Gun Violence: Ghost Guns: Hearing Before the Subcomm. on the Constitution, of the S. Comm. on the Judiciary*, 117th Cong. 5 (testimony of Ashley Hlebinsky; emphasis in original),
https://www.judiciary.senate.gov/imo/media/doc/Ashley%20Hlebinsky%20Written%20Testimony%20Final.pdf

individuals in this country have always been allowed to make their own firearms, even after the passage of the Gun Control Act of 1968 ("GCA").

The "frame or receiver" of a firearm is the component of the firearm that is subject to federal firearms regulations. *See* 18 U.S.C. § 921(a)(3)(B) (defining a "firearm" as including "the frame or receiver of any such weapon"). Today, many Americans who choose to make their own firearms do so using frame and receiver blanks, also known as "unfinished" or "incomplete" frames and receivers, which are raw materials that have undergone some, but not all, of the stages of manufacturing necessary to produce a complete, functioning firearm frame or receiver.

As noted in the Court's September 2 Order, in 1978 the ATF promulgated a rule interpreting the phrase "frame or receiver." ECF No. 56 at 2. The rule defined the "frame or receiver" of a firearm as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." *Title and Definition Changes*, 43 Fed. Reg. 13,531, 13,537 (Mar. 31, 1978). That definition remained in place for over 40 years, during which time ATF has issued written classification determinations to businesses stating that their frame and receiver blank products are not firearms after its Firearms and Ammunition Technology Division reviewed product samples from industry. Consequently, businesses like BlackHawk and other manufacturers, distributors, and retailers invested capital, created American jobs, and sold lawful products to customers based on their good-faith reliance on ATF's written classification determinations.

As recently as November 2020 and January 2021, the Department of Justice and ATF defended these classification determinations in litigation against gun-control proponents:

> Plaintiffs' challenges to ATF's classifications also seek to undercut the process under which, for decades, ATF has reviewed numerous items to determine if they should be classified as "firearms" under the GCA, bringing to bear the agency's technical, scientific, mechanical, and legal expertise. Receivers for the AR-15, the most common rifle in America, have a space within them called the fire- control cavity, which accommodates the firing components. The longstanding position of ATF is that, where a block of metal (or other material) that may someday be manufactured into a receiver bears no markings that delineate where the fire-control cavity is to be formed and has not yet been even partially formed, that item is not yet a receiver . . . .

Fed. Defs.' Mot. Dismiss at 2, *California v. ATF*, No. 3:20-CV-06761 (N.D. Cal. Nov. 30, 2020), ECF No. 29 at 11, 2020 WL 9849685.[2]  In 2021 Defendants emphasized ATF's consistent application of classification standards spanning more than four decades:

> The Record contains classification letters dating back to the 1970s. These classification letters make plain that ATF has consistently adopted a standard whereby the degree of machining to the frame or receiver determined whether the device constituted a firearm….
>
> … Not one of the above-noted classification letters made reference to the amount of time that would be required to transform the given device into a fully functional frame or receiver. Further, these letters are only a few of the examples contained in the Record of ATF making determinations based on the degree of machining performed on the unfinished frame or receiver with no reference whatsoever to the time required to transform the device into a fully functional frame or receiver.

---

[2] The government's brief is available at
https://storage.courtlistener.com/recap/gov.uscourts.cand.366534/gov.uscourts.cand.366534.29.0.pdf

Fed. Defs.' Mot. for Summ. J. at 30–32, *City of Syracuse v. ATF*, No. 1:20-CV-06885 (S.D.N.Y. Jan. 29, 2021), ECF No. 98 at 40–42.[3]

### B.     The Biden Administration Announces That It "Will Not Wait for Congress to Act to Take Its Own Steps" on Gun Control

President Biden campaigned on a promise to "Stop 'ghost guns'" which the Biden campaign described as a weapon obtained illegally by people "assembling one on their own [] by buying a kit of disassembled gun parts."[4] Specifically, then-candidate Biden promised to "pass[] legislation" to "stop the proliferation of these so-called 'ghost guns.'"

After President Biden took office, members of Congress proposed bills changing the way ATF classifies frame and receiver blanks not currently defined as firearms. None of those bills became law. *See*, *e.g.*, S. 1558, 117th Cong. (2021) (Untraceable Firearms Act of 2021)[5]; H.R. 1454, 117th Cong. (2021) (Ghost Guns Are Guns Act).[6] Because the Biden Administration was unable to accomplish its legislative goal through the constitutional process of bicameralism and presentment, it turned to unilateral executive action and unlawful means to achieve its aims for regulating firearms.

On April 7, 2021, the White House announced that President Biden was "reiterating his call for Congress to pass legislation."[7] The announcement also stated that "this

---

[3] The government's brief is available at
https://storage.courtlistener.com/recap/gov.uscourts.nysd.542991/gov.uscourts.nysd.5429
91.98.0.pdf
[4] *The Biden Plan to End Our Gun Violence Epidemic*, BIDEN-HARRIS DEMOCRATS,
https://joebiden.com/gunsafety/ (last visited Sep. 19, 2022).
[5] https://www.congress.gov/bill/117th-congress/senate-bill/1558
[6] https://www.congress.gov/bill/117th-congress/house-bill/1454
[7] *Fact Sheet: Biden-Harris Administration Announces Initial Actions to Address the Gun Violence Public Health Epidemic*, THE WHITE HOUSE (Apr. 7, 2021),

Administration will not wait for Congress to act to take its own steps" on gun control. The announcement instructed the Department of Justice to "within 30 days … issue a proposed rule to help stop the proliferation" of so-called "ghost guns."

On April 8, 2021, President Biden, Vice President Harris, and Attorney General Garland held a press conference at the White House Rose Garden. President Biden stated that he "asked the Attorney General and his team to identify for me immediate, concrete actions I could take now without having to go through the Congress."[8] Attorney General Garland stated in his remarks that "the proliferation of the so-called ghost guns" was caused by a "regulatory loophole" or "gap,"[9] even though the proliferation of such products was actually the direct result of ATF's proper legal determinations pursuant to the GCA, and carefully considered decisions to issue classification determinations approving the lawful, unregulated sale of such products.

On May 7, 2021, Attorney General Garland announced ATF proposed rule 2021R–05, titled *Definition of "Frame or Receiver" and Identification of Firearms*, 86 Fed. Reg. 27,720 (May 21, 2021). On May 11, 2021, the U.S. Senate Committee on the Judiciary's Subcommittee on the Constitution held a hearing on proposed legislation addressing so-

---

https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/07/fact-sheet-biden-harris-administration-announces-initial-actions-to-address-the-gun-violence-public-health-epidemic/.

[8] *Remarks by President Biden on Gun Violence Prevention*, THE WHITE HOUSE (Apr. 8, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/04/08/remarks-by-president-biden-on-gun-violence-prevention/.

[9] *Attorney General Garland's Full Remarks on Gun Violence Prevention at the White House Rose Garden*, U.S. DEP'T OF JUSTICE (Apr. 8, 2021), http://www.justice.gov/opa/speech/attorney-general-garland-s-full-remarks-gun-violence-prevention-white-house-rose-garden.

called "ghost guns." At the hearing, Senator Richard Blumenthal admitted that one reason he proposed the legislation was that "under federal law" frame and receiver blanks are not classified as firearms.[10]

During the 90-day comment period for the proposed rule—from May 21 to August 19, 2021—the public submitted approximately 290,000 comments on the proposed rule.[11]

In February 2022, President Biden and Attorney General Garland traveled to New York City for a meeting of the Gun Violence Prevention Task Force. At that meeting, President Biden stated that "this spring, the Justice Department will issue a final rule to regulate these so-called 'ghost guns.'"[12]

As the one-year anniversary of the Biden Administration's press conference at the White House Rose Garden drew near, political pressure mounted on the Biden Administration to issue a final rule as soon as possible. In March 2022, the New York Times reported that then-Acting ATF Director Marvin Richardson stated at an industry gathering that ATF was expected to announce its Final Rule by June 2022. A Department of Justice spokesperson said he "was simply reading from a White House budget office document," but two White House officials told the New York Times that "Mr. Richardson

---

[10] *Stop Gun Violence: Ghost Guns: Hearing Before the Subcomm. on the Constitution, of the S. Comm. On the Judiciary*, 117th Cong. 5 (statement of Sen. Blumenthal), https://www.judiciary.senate.gov/meetings/stop-gun-violence-ghost-guns (stating at 22:19 that "they are guns, except under federal law").
[11] ATF, *Comments on Proposed Rule 2021R-05*, https://www.atf.gov/rules-and-regulations/definition-frame-or-receiver/submit-comment.
[12] *Remarks by President Biden at a Gun Violence Prevention Task Force Meeting*, THE WHITE HOUSE (Feb. 3, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/02/03/remarks-by-president-biden-at-a-gun-violence-prevention-task-force-meeting/.

had misspoken and that the rule would, in fact, be finished by early April."[13] Shortly thereafter, Mr. Richardson was removed from his position as Acting Director and replaced with the Acting Director Gary Restaino.

On April 8, 2022, exactly one year after the President's press conference at the White House Rose Garden, Politico reported that Senator Chris Murphy and more than 100 Democrat legislators sent a letter to President Biden on March 25, 2022, "pressing Biden to take unilateral action on guns," including "[f]inaliz[ing] a regulation to crack down on so-called ghost guns before Democrats potentially lose control of Congress."[14] The article noted that Democrats were "exasperated" at how much time it was taking for the Biden Administration to issue a final rule.

On April 11, 2022, President Biden announced at the White House Rose Garden that the Final Rule was complete. President Biden stated that a "year ago this week … I instructed the Attorney General to write a regulation that would rein in the proliferation of ghost guns because I was having trouble getting anything passed in the Congress."[15] He explained that the Final Rule's purpose was to make it "illegal to manufacture" weapon

---

[13] *See* Glenn Thrush, *Dueling Messages Muddle Biden's Agenda on Guns*, N.Y. TIMES (Mar. 4, 2022), https://www.nytimes.com/2022/03/04/us/politics/atf-biden-gun-reform.html.

[14] Laura Barrón-López, *Democrats Exasperated With Biden on Gun Control*, POLITICO (Apr. 8, 2022), https://www.politico.com/news/2022/04/08/democrats-biden-gun-control-00024097.

[15] *Remarks by President Biden Announcing Actions to Fight Gun Crime and His Nominee for ATF Director, Steve Dettelbach*, THE WHITE HOUSE (Apr. 11, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/04/11/press-briefing-by-press-secretary-jen-psaki-april-11-2022/.

parts kits and "[i]llegal for a licensed dealer to sell them" without complying with the same regulatory requirements governing the manufacture and sale of complete firearms.

The Final Rule was published on April 26, 2022, *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022),[16] and took effect on August 24, 2022.

### C. The Final Rule Purports to Regulate *Partial* Frames and Receivers and Creates a New Definition of "Firearm"

In its analysis of ATF's promulgation of the Final Rule, this Court observed that "[r]ather than merely updating the terminology, ATF decided to regulate *partial* frames and receivers." ECF No. 56 at 3 (emphasis in original). As described in the Court's September 2 Order:

> Under the new Final Rule, "[t]he terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." *Id*. § 478.12(c). But "[t]he terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." *Id*. When determining whether an object is a frame or receiver, the ATF Director is not limited to looking only at the object. "When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit . . . ." *Id*.

*Id*. at 3.

---

[16] The Final Rule is available at https://www.federalregister.gov/d/2022-08026.

The Final Rule also revises ATF's definition of "firearm" to include "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11 (definition of "firearm").

## II. THIS COURT HAS ALREADY DETERMINED THAT THE FINAL RULE EXCEEDS ATF'S STATUTORY AUTHORITY UNDER THE PLAIN LANGAUGE OF THE GUN CONTROL ACT

In seeking a preliminary injunction, Plaintiffs argued that the Final Rule exceeds ATF's statutory authority under the GCA in two ways: first, it "expands ATF's authority over parts that may be 'readily converted' into frames or receivers, when Congress limited ATF's authority to 'frames or receivers' as such"; and second, it "unlawfully treats weapon parts kits as firearms."  ECF No. 56 at 6.  This Court found that "Plaintiffs are likely to succeed on both claims." *Id*.

### A. September 2 Order: "Parts that *may become* receivers are not receivers"

The Court's September 2 Order found that the "text of the Gun Control Act resolves [Plaintiffs'] motion" for a preliminary injunction, ECF No. 56 at 6, and in its analysis determined:

> The Final Rule's redefinition of "frame or receiver" conflicts with the statute's plain meaning. The definition of "firearm" in the Gun Control Act does not cover all firearm parts. It covers specifically "the frame or receiver of any such weapon" that Congress defined as a firearm. 18 U.S.C. § 921(a)(3)(B). That which *may become* a receiver is not itself a receiver.

*Id*. at 8 (emphasis in original). This Court's analysis concluded that ATF's newly expanded definitions in the Final Rule were "facially unlawful":

Congress excluded other adjectives that ATF adds to its definition. The Final Rule covers "disassembled" and "nonfunctional" frames and receivers. 27 C.F.R. § 478.12(c). Congress's definition does not. …

ATF's new definition of "frame or receiver" in 27 C.F.R. § 478.12(c) is ***facially unlawful***. By comparison, the Final Rule includes definitions of "frame" and "receiver" in § 478.12(a) that appear to be consistent with the statute. This further highlights that the Final Rule's expansion of authority in § 478.12(c) to firearm parts that are not yet frames or receivers goes beyond Congress's definition. In other words, § 478.12(a) describes the full scope of frames and receivers that are consistent with the statutory scheme. ATF's expansion in § 478.12(c), on the other hand, covers additional parts that are "designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). But Congress intentionally omitted that language from the definition. Section 478.12(c) is thus ***facially unlawful*** because it describes only parts that Congress intentionally excluded from its definition of "firearm." It is purely an expansion of authority beyond the statutory language.

*Id*. at 9–10 (emphasis added).

This Court's September 2 Order went on to reject Defendants' counterarguments that ATF was entitled to deference in regulating components that ATF itself determined to *not* be a frame or receiver. *Id*. at 10. The Court likewise found Defendants' attempt to invoke "boundless congressional intent" regarding the GCA to be unpersuasive as justification for the Final Rule's overreach:

Contrary to Defendants' broad framing, 'the regulatory goals of the Gun Control Act were narrower: the Act ensured that '*weapons* [were] distributed through regular channels and in a traceable manner and [made] possible the prevention of sales to undesirable customers and the detection of the origin of particular *firearms*.'" *New York v. Burger*, 482 U.S. 691, 713 (1987) (emphases added) (alterations in original) (citing *United States v. Biswell*, 406 U.S. 311, 315–16 (1972)). When Congress sought to regulate parts of weapons, it did so meticulously.

*Id*. at 11.

**B.      September 2 Order: "A weapons parts kit is not a firearm"**

The September 2 Order also found that "Plaintiffs are also likely to succeed on their claim that the Final Rule unlawfully treats weapon parts kits as firearms." ECF No. 56 at 12.  This Court explained how the Final Rule's use of "weapons parts kits" impermissibly expanded ATF's authority beyond the scope provided by the GCA:

> The Final Rule contains its own definition of "firearm," notwithstanding that the Gun Control Act already defines the term. Under the Final Rule, "[t]he term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11 (definition of "firearm"). That language conflicts with the statute's definition of "firearm."
>
> ***ATF has no general authority to regulate weapon parts.*** But the Final Rule grants ATF that general authority by copying language used throughout the statutory definition. It takes phrases like "designed to" and "may readily be converted" and "assembled" from various places in the statute, cobbling them together to form ATF's own definition of "firearm." Those terms may add a patina of credibility to the drafting, but they tarnish Congress's carefully crafted definition. More importantly, they unlawfully expand ATF's authority beyond the boundaries set by the Gun Control Act.

*Id*. at 12 (emphasis added).

## ARGUMENT

Because the Final Rule is unlawful and would destroy BlackHawk's business, BlackHawk seeks a preliminary injunction to "preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained." *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017). Courts look to four factors in deciding whether to grant preliminary injunctive relief: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4)

granting the injunctive relief will not disserve the public interest." *Id*.  The third and fourth factors—"assessing the harm to the opposing party and weighing the public interest"— "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The decision on whether to grant preliminary relief is left to the district court's sound discretion. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). To prevail on a preliminary injunction motion, the movant must "present a prima facie case" but "is not required to prove his case in full." *Id.* at 684.

## I.   THE COURT'S SEPTEMBER 2 ORDER ESTABLISHES THAT BLACKHAWK IS LIKELY TO PREVAIL ON THE MERITS

A movant "appealing to the conscience of the chancellor to maintain the status quo … is not required to prove to a moral certainty that his is the only correct position." *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975). "As long as the court cannot say there is no likelihood of prevailing on the merits but finds the factor of substantial likelihood of success present to some degree, then the party seeking the injunction has met its burden." *Family Rehab., Inc. v. Azar*, 3:17-CV-3008, 2018 WL 3155911, at *3 (N.D. Tex. June 28, 2018) (citing *Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980)). "A preliminary injunction may issue … despite the existence of a plausible defense, as long as the movant demonstrates a substantial likelihood of success." *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979). The likelihood of success on the merits is "arguably the most important of the four factors necessary to grant a preliminary injunction[.]" *Def. Distributed v. United States Dep't of State*, 838 F.3d 451, 463 (5th Cir. 2016).

14

Here, this Court has already found that the claims BlackHawk asserts are likely to prevail on the merits. *Compare* ECF No. 56 at 6, 12, 15 and 22 (finding, *inter alia*, that provisions of the Final Rule are "facially unlawful", that the Final Rule is outside the scope of ATF's authority under the GCA, and that the Final Rule unlawfully treats weapons parts kits as firearms) *and* BlackHawk's Complaint ¶¶ 56–61, ¶¶ 80–86, ¶¶ 102–106.

## III.   BLACKHAWK HAS SHOWN IT WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF INJUNCTIVE RELIEF

### A.   The Final Rule Will Likely Put BlackHawk Out of Business

Nearly 100% of BlackHawk's business is producing and selling items that are subject to the Final Rule. Lifschitz Decl. ¶ 8. Without injunctive relief, BlackHawk will be subject to possible criminal charges if it attempts to sell parts, jigs, and/or tools that ATF determines violates the Final Rule and therefore the GCA or if it stops selling its parts, jigs, and/or tools, will likely not survive the pendency of the case and will be go out of business well before the unlawfulness of the Final Rule is determined in a final judgment. *Id*. ¶¶ 21–21.

Irreparable injury exists where "the potential economic loss is so great as to threaten the existence of the movant's business." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989); *see also Jiao v. Xu*, 28 F.4th 591, 598 (5th Cir. 2022) (quoting *Atwood Turnkey*, 875 F.2d at 1179); *Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) ("A threat to trade or business viability may constitute irreparable harm."); *Milsen Co. v. Southland Corp.*, 454 F.2d 363, 367 (7th Cir. 1971) ("[Plaintiffs] have presented an

appropriate case for preliminary injunction. . . [because plaintiffs] will lose their stores and may not be able to finance the trial on their legal claims if they lose their business now[.]").

Additionally, "harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). "Indeed, 'complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.'" *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1992) (Scalia, J., concurring in part)). In a case against the federal government, "federal agencies generally enjoy sovereign immunity for any monetary damages." *Wages and White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Therefore, BlackHawk's "lack of a 'guarantee of eventual recovery' is another reason that its alleged harm is irreparable." *Id.* (quoting *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021)).

Not only can BlackHawk not seek monetary damages against Defendants, but the ATF acknowledges the Final Rule will shut down an entire industry. By the ATF's own estimation, "the final rule could potentially affect 132,023 entities, including FFLs and non-FFL manufacturers and retailers of firearms parts kits with partially complete frames or receivers."[17] ATF further estimates that "the majority of affected entities are small entities that would experience a range of costs, the largest cost being the *dissolution of the entire business*."[18]

---

[17]ATF, REGULATORY IMPACT ANALYSIS AND FINAL REGULATORY FLEXIBILITY ANALYSIS at 124 (2022), available at https://www.atf.gov/file/165811/download.
[18] *Id*. (emphasis added).

16

**B.**      **The Scope of Injunctive Relief Must Be Nationwide to Preserve the Status Quo and Allow BlackHawk to Continue Doing Business**

An injunction on a nationwide level is necessary because BlackHawk receives its inventory from out of state and most of its customers are out of state. Lifschitz Decl. ¶ 13, ¶ 18. An injunction applying to only BlackHawk would not protect any manufacturers that supply the products that BlackHawk sells or any of BlackHawk's customers. Without a nationwide injunction to preserve the status quo, BlackHawk would have no products, no customers, and no vendors. *Id*. As a result, BlackHawk would be unable to continue its operations and would be forced out of business.  *Id*. ¶¶ 20–21; *see Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460 (5th Cir. 2020) (*en banc*) (noting that when "crafting an injunction, district courts are guided by the Supreme Court's instruction that the scope of injunctive relief is dictated by the extent of the violation established"); *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (affirming the grant of a preliminary injunction when there was "a substantial likelihood that a geographically-limited injunction would be ineffective" at remedying the plaintiff's injury).

Because BlackHawk cannot continue operations without a nationwide injunction, the issuance of nationwide relief is a necessary and essential remedy to reinstate and preserve the status quo while this Court decides this case.

**III.**     **BLACKHAWK'S INJURY OUTWEIGHS ANY HARM TO DEFENDANTS OR THE PUBLIC**

Finally, the injury to BlackHawk far outweighs any potential harm to Defendants or the public interest. Defendants face no harm from temporary relief. The relief sought is no more than what the law has dictated for over 50 years. Further, government officials have

no legitimate interest in implementing an unlawful rule. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (recognizing that government officials "do[] not have an interest in the enforcement of an unconstitutional law").

Moreover, the "public interest" is properly "served by maintaining our constitutional structure and maintaining the liberty of individuals[.]" *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021); *see N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("[T]he public interest is served when administrative agencies comply with their obligations under the APA."); *see also Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58–59 (D.C. Cir. 1997) ("[T]here is an overriding public interest … in the general importance of an agency's faithful adherence to [its] statutory mandate.").

Even if Defendants had a legitimate interest in implementing the Final Rule, they, and the public, face no substantial prejudice from suspended implementation. The government's interest "can be effectively vindicated after a trial on the merits," *Texas v. United States*, 809 F.3d at 187, whereas BlackHawk's interest cannot be, given that the Final Rule will destroy its business.

BlackHawk, its customers—and indeed all Americans—risk the possibility of criminal penalties for the production, sale, and purchase of items that have not historically been considered firearms prior to the Final Rule's taking effect on August 24. *See generally*, Lifschitz Decl. This regulatory risk extends to the sharing of technical instructions by BlackHawk, who has been compelled to self-censor and refrain from free discourse with its customers because of the profound uncertainty surrounding the Final Rule. *Id*. ¶ 11. Indeed, BlackHawk and similar producers and retailers across the country

must suffer the loss of civil liberties or risk the destruction of their businesses. Defendants, on the other hand, will not suffer significant harm by maintenance of the long-standing, 54-year status quo regarding what constitutes a "firearm" while this Court considers the merit of the Final Rule. Indeed, granting a preliminary injunction during the pendency of this litigation serves the public interest by allowing the Court to provide clarity on the validity of the Final Rule while "ensur[ing] the status quo is maintained so the legal system can resolve [an] important dispute." *City of Dallas, Texas v. Hall*, 2008 WL 11350041, at *3 (N.D. Tex. July 28, 2008); *see also Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006) (quoting *Dist. 50, United Mine Workers of Am. v. Int'l Union, Union Mine Workers of Am.,* 412 F.3d 165, 168 (D.C. Cir. 1969)) ("The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation."); *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 840 (N.D. Tex. 2022) ("An injunction does not disserve the public interest when it prevents constitutional deprivations.").

Finally, the public interest in preserving full access to and enjoyment of the guarantees of the First and Second Amendments undoubtedly weighs in favor of enjoining enforcement of ATF's unlawful Final Rule for the pendency of this litigation. *U.S. Navy SEALs 1-26*, at 840 ("An injunction does not disserve the public interest when it prevents constitutional deprivations.").

## CONCLUSION

For the foregoing reasons, BlackHawk respectfully requests that this Court enjoin enforcement of the Final Rule nationwide and re-institute the status quo as it existed prior to August 24, 2022 until a decision can be reached on the merits.  Alternatively, BlackHawk

requests that the Court issue a determination that BlackHawk is entitled to the same injunctive relief and protections granted to Tactical Machining in the Court's September 2 Order. Further and alternatively, BlackHawk requests the Court enjoin Defendants' ability to rescind the lawful classification letter issued to BlackHawk by ATF on July 15, 2013, in order for BlackHawk to lawfully continue selling non-regulated receiver blanks with non-regulated tools, jigs, and instructions as it did prior to the Final Rule's effective date.

Respectfully submitted,

*/s/ Brian D. Poe*
BRIAN D. POE
TX Bar No. 24056908
BRIAN D. POE, ATTORNEY AT LAW PLLC
The Bryce Building
909 Throckmorton Street
Fort Worth, Texas 76102
Phone: (817) 870-2022
Fax: (817) 977-6501
bpoe@bpoelaw.com

Michael J. Sullivan
MA Bar No. 487210
*Pro Hac Vice Forthcoming*
J. Christopher Amrhein, Jr.
MA Bar No. 703170
*Pro Hac Vice Forthcoming*
Nathan P. Brennan
MN Bar No. 389954
*Pro Hac Vice Forthcoming*
ASHCROFT LAW FIRM LLC
200 State Street, 7th Floor
Boston, MA 02109
Phone: (617) 573-9400
Fax: (617) 933-7607
msullivan@ashcroftlawfirm.com
camrhein@ashcroftlawfirm.com
nbrennan@ashcroftlawfirm.com

*Counsel for Intervenor-Plaintiff BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms*

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

## FORT WORTH DIVISION

JENNIFER VANDERSTOK;
MICHAEL G. ANDREN;
TACTICAL MACHINING, LLC, a limited
liability company; and
FIREARMS POLICY COALITION, INC., a
nonprofit corporation,

                  *Plaintiffs*,

and

BLACKHAWK MANUFACTURING GROUP
INC. d/b/a 80 PERCENT ARMS,

               *Intervenor-Plaintiff*,

    v.

MERRICK GARLAND, in his official capacity as
Attorney General of the United States;
UNITED STATES DEPARTMENT OF JUSTICE;
STEVEN DETTELBACH, in his official capacity
as Director of the Bureau of Alcohol, Tobacco,
Firearms and Explosives; and
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES,

               *Defendants*.

Civil Action No. 4:22-cv-691-O

## <u>DECLARATION OF DANIEL LIFSCHITZ</u>

I, Daniel Lifschitz, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746,

that the following statements are true and correct to the best of my knowledge:

1

1.      I am over 18 years of age, competent to testify, and have personal knowledge of the matters stated herein.

2.      I am the President of BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms (collectively "BlackHawk" or "we"/"our"). BlackHawk is a member in good standing of the Firearms Policy Coalition, Inc., and has been since 2020.

3.      BlackHawk has been in business as 80 Percent Arms since 2013. Its headquarters and physical office are in Fort Worth, Texas. The company was previously located in Garden Grove, California, but after the legal environment in California became inhospitable to BlackHawk's business, the company and its employees relocated to Texas.

4.      BlackHawk is a producer and e-commerce retailer of the items at issue in this case, marketed colloquially as "80 Percent Lowers," as well as tools and jigs that individuals can use to personally manufacture firearm frames and receivers. Our customers are do-it-yourself hobbyists who appreciate the challenge of manufacturing their own firearms. Under the ATF's longstanding application of the Gun Control Act of 1968 ("GCA"), evidenced and established through extensive classification determinations issued to the industry over many decades, BlackHawk's products do not meet the GCA's definition of a "frame or receiver" of a firearm. Thus, BlackHawk has been able to lawfully sell its products directly to consumers, who can lawfully purchase its products through its website and ship products to those customers through the mail. For as long as BlackHawk has been in operation this practice did not subject it or its customers to potential criminal liability or enforcement by the ATF or the United States Department of Justice.

5.     BlackHawk's position in the marketplace was solidified by its U.S. patent for one of the best-selling jigs on the market for individuals to use in personally manufacturing AR-style receivers. The product is marketed on 80 Percent Arms' website as the "Easy Jig Gen 3 Multi- Platform" and retails as a standalone product for $349.99:



6.     Since ATF Final Rule 2021-R-05F was published in April 2022 ("Final Rule"), BlackHawk devoted extensive time and resources to try to understand what the Final Rule says and how the Final Rule would affect BlackHawk. After reading the Final Rule's vague and confusing text and listening to the public statements of President Biden and Attorney General Garland, it appears that the intent of the Final Rule is to improperly reclassify all products colloquially marketed as "80 Percent Lowers" as the legal equivalent of complete, functional, regulated "frames or receivers" under federal law.

7.     BlackHawk is set up to make retailing of these products painless to customers using a direct-to-consumer model where orders are fulfilled directly. This is possible because the products that it sells do not meet the statutory definition of a "frame or

receiver." Reclassifying those products as "frames or receivers" by agency rulemaking ignores the plain text of the GCA and the federal government's historical application of the GCA. Given the uncertainty over the meaning and enforcement of the Final Rule BlackHawk must now weigh the prospect of being forced to abandon the entire business model it has built up over the past decade due to concerns that its continued operations under its existing business model could subject it and its customers to criminal charges.

8.      Earlier in this case, the government asserted that there is no irreparable harm because businesses such as BlackHawk can simply get a license and continue with business as usual. As stated above, BlackHawk does business as 80 Percent Arms which is a fully licensed FFL, but being an FFL does not permit 80 Percent Arms to operate or survive under the regulatory scheme of the Final Rule, as nearly 100% of 80 Percent Arms' business is for the products described above that the Final Rule newly seeks to regulate as firearms.

9.      In recent weeks, BlackHawk has learned that Defendants have made statements (in court filings and hearings, but not in the text of the Final Rule) suggesting that the government interprets the Final Rule to allow for the continued direct sale of those products marketed colloquially as "80 Percent Lowers," but seemingly limited to AR-style "80 Percent Lowers," as long as they were sold by themselves, without jigs, tools, or instructions. This creates confusion and great concern for BlackHawk and its 80 Percent Arms customers, as it is unclear how a physical object that is not classified as a "frame or receiver" when sold on its own could suddenly be transformed into a "frame or receiver" merely because of its combination with tools, jigs, and/or instructions, which are all

4

unregulated materials and if sold together, or simply made available, could be considered a criminal offense. Because this interpretation is not self-evident from the text of the Final Rule, BlackHawk is unsure to what extent that interpretation is legally binding on the government now and in the future. BlackHawk is also unsure whether the following combinations of items may be sold with an "80 Percent Lower" for an AR-style rifle without turning it into a regulated "frame or receiver": (1) a jig and instructions, but no tools; (2) a jig and tools, but no instructions; (3) a jig, but no tools or instructions; (4) tools and instructions, but no jig; or (5) tools, but no jig or instructions, as well as other combinations that may arise in the future.

10.     It is equally unclear what Defendants' position is on so-called "80 Percent Lowers" when it comes to handgun varieties, which ATF previously determined were not firearm "frames or receivers." BlackHawk—via 80 Percent Arms—also sells items colloquially marketed as "80 Percent Frames" that are based on designs previously determined by ATF not to be the frame of a firearm, as well as jigs for individuals to use in the self-manufacture of handgun frames. Defendants appear to be silent about the Final Rule's application to these products.

11.     Even though BlackHawk faced this regulatory uncertainty, in an effort to keep its business alive, based on what it understood to be the government's stated position and its newly expanded interpretation of the GCA, BlackHawk decided to continue selling its "80 Percent Lowers" for AR-style receivers, a small assortment of replacement parts for tools, and miscellaneous accessories after the Final Rule's effective date of August 24, 2022. Out of fear of exposing 80 Percent Arms to potential criminal liability, BlackHawk

5

discontinued all sales of jigs and jig accessories and non-AR-style "80 Percent Lowers" (which together make up approximately 65.4% of 80 Percent Arms' orders) by listing them as "out of stock" on our website. We also deleted from 80 Percent Arms' website the instructions for how to use its tools and jigs.

12.     Our customers are now fearful and confused resulting in further dramatic and unsustainable declines in sales across 80 Percent Arms' website. Not only have we significantly cut 80 Percent Arms' product offerings, but customers are no longer purchasing many other products that are still available on 80 Percent Arms' website. The graphs below show that website traffic has by and large remained the same during the past month, but the percentage of customers willing to purchase items has dropped precipitously. Typically, BlackHawk could count on 3–5% of customers who visit the 80 Percent Arms website to purchase something, a number considered healthy within the e-commerce industry.





13.    The map below summarizes the percent of online sessions by region. As a leader in the marketplace, customers come from across the U.S. to browse 80 Percent Arms' website.



| California | 15.9% | Arizona | 2.9% | Nevada | 1.2% | New Jersey | 0.6% | Wyoming | 0.3% |
| Texas | 8.1% | Ohio | 2.7% | Utah | 1.3% | Nebraska | 0.7% | Alaska | 0.3% |
| Illinois | 5.1% | Michigan | 2.7% | Alabama | 1.0% | Arkansas | 0.6% | South Dakota | 0.2% |
| Washington | 5.8% | Oregon | 2.8% | Oklahoma | 0.9% | Connecticut | 0.5% | North Dakota | 0.2% |
| New York | 4.6% | Minnesota | 2.0% | District of Columbia | 0.8% | Mississippi | 0.4% | Delaware | 0.2% |
| Florida | 4.4% | Tennessee | 1.7% | Louisiana | 0.8% | New Mexico | 0.5% | Vermont | 0.2% |
| Georgia | 3.3% | Missouri | 1.8% | Iowa | 0.8% | New Hampshire | 0.4% | Rhode Island | 0.1% |
| Pennsylvania | 3.8% | Maryland | 1.8% | South Carolina | 0.8% | West Virginia | 0.4% | Other | 0.3% |
| Virginia | 3.0% | Wisconsin | 1.7% | Kansas | 0.8% | Montana | 0.4% | | |
| North Carolina | 3.2% | Massachusetts | 1.7% | Kentucky | 0.7% | Hawaii | 0.3% | | |
| Colorado | 3.1% | Indiana | 1.6% | Idaho | 0.7% | Maine | 0.3% | | |

14.    In September the situation has only gotten worse. Customers are hesitant to purchase from us since the Final Rule has gone into effect, and are unsure if we are now operating illegally by selling our 80% receivers. Customers are unable to source jigs, specifically our patent-protected third generation jigs in order to convert their 80% receivers, so they are abandoning doing business with us entirely. After millions of dollars and years of investments in developing jig products, we can't sell the product that made us a leader in the industry.

15.    Despite BlackHawk's efforts to keep the business afloat, revenue has plummeted since the Final Rule took effect on August 24, 2022. Compared to our average daily revenue in 2022 prior to the Final Rule's effective date, our average daily revenue since the rule took effect has dropped by more than 90%.

16.    Based on our interactions with prior and potential customers, it is clear that many people believe, in the wake of the uncertainty created by the Final Rule, that all of BlackHawk's "80 Percent Lowers" sold via 80 Percent Arms direct to consumers without serial numbers are banned by the Final Rule and that purchasing these products could potentially subject 80 Percent Arms and these individuals to criminal liability. Without assurances for customers that they are not illegally purchasing a "firearm" when they buy an "80 Percent Lower" from 80 Percent Arms, with or without a jig or instructions, our sales will not recover. Below are some examples of the sorts of comments we have received from our 80 Percent Arms existing and prospective customers:

- *"I might be wrong, but I thought it was illegal to sell 80% lowers if you don't have an FFL, and they have to be serialized. ????? I hope you can clear this up." – Aug 31, 2022*

8

- *"While I appreciate your stance on this, I cannot accept shipment given the existing rule. I understand you have your own legal team. I'm barred in the state of Texas and went to the University of Virginia School of Law. I have reviewed the regulation and I am not comfortable receiving delivery without the item being shipped to an FFL." – Aug 26, 2022*

- *"O.K. how does this work since the ATF now requires that 80% lowers be serialized?" – Aug 24, 2022*

- *"Several parts if you order were 80% lower receivers, which as far as I am aware are now required to be serialized per the new ATF rule - as a result of this, I dont need any portion of the order, and was wondering when it would be canceled?" – Sep 1, 2022*

- *"are 80% lowers still becoming illegal on the 1st? thanks!" – Aug 31, 2022*

- *"Good afternoon, I was shopping and was wondering if you guys still sold the jigs for 80 percent frames? I know the recent atf law made the frames illegal but are the jigs illegal now too? And if they are still legal/for sale, can I buy one from your website?" – Aug 29, 2022*

- *"are 80% lowers still becoming illegal on the 1st? thanks!" – Aug 31, 2022*

- *"Based on the new rules, does it mean that 80% Glock style lower frames are banned from being sold to the public?" – Sep 18, 2022*

- *"HOW DO I GO ABOUT BUYING A 80 PERCENT JIG KIT. I UNDERSTAND THEY WILL NOT SHIP THE LOWER WITH THE JIG KITS ANYMORE BUT WHAT IF YOU JUST NEED THE JIG KIT. pLEASE TELL ME THEY DID NOT MAKE THE JIG KITS ILLEGAL ALSO." - Sep 18, 2022*

- *"Are 80% lowers required to be sent to an FFL now?" – Sep 19, 2022*

- *"You guys ARE aware that 80% lowers are basically just expensive paperweights without a jig to complete them, right? IOW, the lowers you proudly proclaim to be 'still shipping' are worthless to anyone who doesn't have a jig available to finish them." – Sep 20, 2022*

- *"I have purchased 3 of your 80 lowers. I got caught up in the situation where you stopped selling the Jigs and now I can't seem to be able to purchase one to complete my project. Is there anything that you can do to help me out in getting some Jigs?" – Sep 20, 2022*

9

17.     80 Percent Arms' inability to sell its unique, patented jig is also severely damaging BlackHawk's business. The 80 Percent Arms Easy Jig Gen 3 Multi-Platform is one of 80 Percent Arms' most demanded products and attracts a significant number of customers to 80 Percent Arms. The availability of that jig on 80 Percent Arms' website is essential to its ability to attract and make sales to new customers. 80 Percent Arms' jig and the "80% Lowers" that we sell are complementary goods that are used together, each creating a demand for the other. The inability to sell the jig drastically reduces sales for the "80% Lowers," as well as other ancillary products and accessories.

18.     Vendors across our supply chain have begun to refuse to work with us. This includes payment processors, metal treatment businesses, and other distributors. E-commerce companies have also begun to suggest they may no longer be able to serve our business without additional clarity that what we are doing is legal.

19.     Like any small business, BlackHawk has fixed operating costs, the most notable of which is compensation for employees and costs for its physical office in Fort Worth, Texas. In the wake of the Final Rule's catastrophic effects on 80 Percent Arms' business, we have suspended plans to hire additional employees. BlackHawk is doing its best to retain as many 80 Percent Arms employees as possible while awaiting clarity from Defendants, or the courts, on whether the Final Rule is lawful. Unfortunately, 80 Percent Arms' sales since the Final Rule took effect have declined so precipitously that we are on track to be operating at a loss and no longer profitable.

20.     BlackHawk maintains cash reserves for warranties, refunds, and replacements. If 80 Percent Arms is unable to ship products such as jigs and jig accessories that were previously ordered by customers, and continues to be unable to make a profit, we will be forced to shut down the business. Though 80 Percent Arms does have enough cash on hand to continue paying our expenses for 2 to 3 months while we operate at a loss, we will be forced to shut down our business and cease operations if this trend continues for much longer:



Unless we are given a chance to recover and stabilize our revenues, we will be forced to lay off our entire workforce, refund customers, and dissolve the business. Our bank has refused to extend credit to us due to the Final Rule and their concerns it will put us out of business, and there is no source of additional financing we could rely on to maintain the business once our cash reserves are depleted.

21.     In the absence of a nationwide preliminary injunction or other injunctive relief that provides sufficient certainty to enable us to fully transact business with our customers and vendors across the U.S., 80 Percent Arms will not be able to stay in business

11

long enough to receive a final judgment from this Court, not including any additional time needed for appellate review.

DATED this __22nd__ day of September, 2022.

_____
Daniel Lifschitz
President, BlackHawk Manufacturing
Group Inc. d/b/a 80 Percent Arms

# EXHIBIT B

**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Martinsburg, WV 25405*

www.atf.gov

903050:WJS
3311/300833

July 15, 2013

Mr. Tilden Smith
80 Percent Arms
202 East Alton Avenue
Suite A
Santa Ana, CA 92707

Dear Mr. Smith,

This is in reference to your correspondence, with enclosed samples, to the Bureau of
Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB).
In your letter, you asked for a classification of the partially completed AR-type receivers
your company is planning to manufacture (see enclosed photos). Specifically, you want
to know if the three submitted items, identified as samples 1, 2, and 3 (and reviewed
below) would be classified as "firearms" under the Gun Control Act of 1968 (GCA).

### SAMPLE #1

During the examination of this sample, FTB found that the following machining/drilling
operations had been performed:

1. Front and rear assembly/pivot pin holes drilled.
2. Front and rear assembly/pivot-detent pin holes drilled.
3. Magazine-release and catch slots cut.
4. Rear of receiver drilled and threaded to accept buffer tube.
5. Buffer-retainer hole drilled.
6. Pistol-grip mounting area faced off and threaded.
7. Magazine well completed.
8. Trigger guard machined.
9. Receiver end-plate area machined.
10. Pistol-grip mounting area threaded.
11. Selector-lever detent hole drilled.

Mr. Tilden Smith                                                           Page 2

The machining operations <u>not</u> yet performed are as follows:

1. Milling out of fire-control cavity.
2. Selector-lever hole drilled.
3. Cutting of trigger slot.
4. Drilling of trigger pin hole.
5. Drilling of hammer pin hole.

The FTB examination of your submitted casting found that **SAMPLE #1** is not sufficiently complete to be classified as the frame or receiver of a firearm and thus would <u>not</u> be a "firearm" as defined in the GCA.

**SAMPLE #2**

During the examination of Sample #2, FTB observed that the following machining/drilling operations had been performed:

1. Front and rear assembly/pivot pin holes drilled.
2. Front and rear assembly/pivot-detent pin holes drilled.
3. Magazine release and catch slots cut.
4. Rear of receiver drilled and threaded to accept buffer tube.
5. Buffer-retainer hole drilled.
6. Pistol-grip mounting area faced off and threaded.
7. Magazine well completed.
8. Trigger guard machined.
9. Receiver end-plate area machined.
10. Pistol-grip mounting area threaded.
11. Selector-lever detent hole drilled.
12. Selector-lever hole drilled.

The machining operations <u>not</u> yet performed are as follows:

1. Milling out of fire-control cavity.
2. Cutting of trigger slot.
3. Drilling of trigger pin hole.
4. Drilling of hammer pin hole.

The FTB examination of this casting found that **SAMPLE #2** is sufficiently complete to be classified as the frame or receiver of a firearm and thus <u>is</u> a "firearm" as defined in the GCA.

**SAMPLE#3**

During the examination of this sample, FTB found that the following machining/drilling operations had been performed:

1. Front and rear assembly/pivot pin holes drilled.
2. Front and rear assembly/pivot-detent pin holes drilled.

Mr. Tilden Smith                                                    Page 3

    3.  Magazine-release and catch slots cut.
    4.  Rear of receiver drilled and threaded to accept buffer tube.
    5.  Buffer-retainer hole drilled.
    6.  Pistol-grip mounting area faced off and threaded.
    7.  Magazine well completed.
    8.  Trigger guard machined.
    9.  Receiver end-plate area machined.
   10.  Pistol-grip mounting area threaded.
   11.  Selector-lever detent hole drilled.
   12.  Hole machined into fire-control cavity; measuring approximately ¼ inch in diameter and approximately 9/16 inch deep.

The machining operations not yet performed are as follows:

    1.  Complete milling out of fire-control cavity.
    2.  Cutting of trigger slot.
    3.  Drilling of trigger pin hole.
    4.  Drilling of hammer pin hole.

The FTB examination of the submitted casting found that **SAMPLE #3** is sufficiently complete to be classified as the frame or receiver of a firearm and thus **is** a "firearm" as defined in the GCA.

In conclusion, we stress that the information found in correspondence from our Branch is intended only for use by the addressed individual or company with regard to a specific scenario described within that correspondence.

To facilitate return of your samples, please provide FTB with the appropriate FedEx account information within 60 days of receipt of this letter.

We thank you for your inquiry and trust the foregoing has been responsive to your evaluation request, noting that two findings did not meet your expectations.  Please do not hesitate to contact us if additional information is needed concerning our determinations.

Sincerely yours,

Earl Griffith
Chief, Firearms Technology Branch

Enclosure

# 80 Percent Arms AR-type Forgings Submitted 4/30/2013




# Sample #1, Photographs #1 and #2

 





Sample #1, Photograph #3 and #4

# Sample #2, Photograph #1 and #2



# Sample #2, Photograph #3 and #4

 

# Sample #3, Photograph #1 and #2

 

# Sample #3, Photograph #3 and #4

 

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| JENNIFER VANDERSTOK;<br>MICHAEL G. ANDREN;<br>TACTICAL MACHINING, LLC, a limited<br>liability company; and<br>FIREARMS POLICY COALITION, INC., a<br>nonprofit corporation,<br><br>     *Plaintiffs*,<br>and<br><br>BLACKHAWK MANUFACTURING GROUP<br>INC. d/b/a 80 PERCENT ARMS,<br><br>    *Intervenor-Plaintiff*,<br><br>  v.<br><br>MERRICK GARLAND, in his official capacity as<br>Attorney General of the United States;<br>UNITED STATES DEPARTMENT OF JUSTICE;<br>STEVEN DETTELBACH, in his official capacity<br>as Director of the Bureau of Alcohol, Tobacco,<br>Firearms and Explosives; and<br>BUREAU OF ALCOHOL, TOBACCO,<br>FIREARMS AND EXPLOSIVES,<br><br>     *Defendants*. | Civil Action No. 4:22-cv-691-O |

**[PROPOSED] ORDER GRANTING INTERVENOR-PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION**

Before the Court is a Motion for Preliminary Injunction filed by Intervenor-Plaintiff

BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms ("BlackHawk"). Defendants

oppose BlackHawk's Motion, but Plaintiffs hold no position.

1

Upon consideration of BlackHawk's opposed Motion for Preliminary Injunction, it is hereby ORDERED that the Motion is GRANTED.

It is further ORDERED that Defendants and their officers, agents, servants, and employees are enjoined from implementing and enforcing against BlackHawk the provisions in 27 C.F.R. §§ 478.11 and 478.12 that the Court has determined are unlawful.

SO ORDERED on this ___ day of _____, 2022.

By: _____
HON. REED O'CONNOR
UNITED STATES DISTRICT JUDGE