## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **NAVY SEALS 1-3**, et al., <br><br> Plaintiffs, <br><br> v. <br><br> **LLOYD AUSTIN, III**, in his official capacity as Secretary of Defense, *et al.*, <br><br> Defendants. | Case No. 4:21-cv-01236-O |

## DEFENDANTS' APPENDIX IN SUPPORT OF THEIR MOTION FOR A PARTIAL STAY PENDING APPEAL

### Table of Appendix

| Bates Stamps | Description |
|---|---|
| App001–App031 | Declaration of Admiral William K. Lescher |
| App032–App039 | Supplemental Declaration of Captain Lanny F. Littlejohn |
| App040–App044 | Declaration of Lieutenant Commander Andrew J. Petralia |

Dated: January 24, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

*/s/ Andrew E. Carmichael*
ANDREW E. CARMICHAEL (VA Bar. No. 76578)
AMY E. POWELL
Senior Trial Counsel
STUART J. ROBINSON
Senior Counsel
ZACHARY A. AVALLONE
COURTNEY D. ENLOW
LIAM C. HOLLAND

Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 514-3346
Fax: (202) 616-8470
Email: Andrew.e.carmichael@usdoj.gov

*Counsel for Defendants*

# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

|  |  |
|---|---|
| **U.S. NAVY SEALs 1-26;** <br> **U.S. NAVY SPECIAL WARFARE** <br> **COMBATANT CRAFT CREWMEN 1-5;** <br> **U.S. NAVY EXPLOSIVE ORDNANCE** <br> **DISPOSAL TECHNICIAN 1; and** <br> **U.S. NAVY DIVERS 1-3,** <br>          Plaintiffs, <br><br> v. <br><br> **LLOYD J. AUSTIN, III,** <br> individually and in his official capacity as <br> United States Secretary of Defense; **UNITED** <br> **STATES DEPARTMENT OF DEFENSE;** <br> **CARLOS DEL TORO**, individually and in <br> his official capacity as United States <br> Secretary of the Navy, <br>          Defendants. | Case No. 4:21-CV-01236-O |

## DECLARATION OF WILLIAM K. LESCHER

I, William K. Lescher, hereby state and declare as follows:

1.     I am an admiral[1] in the United States Navy, currently serving as the Vice Chief of Naval Operations (VCNO), located in Arlington, Virginia at the Pentagon. The position of VCNO is appointed by the President, with the advice and consent of the Senate, and is the second highest uniformed Officer in the Navy. I have served in this position since May 29, 2020. I make this declaration in support of the Government's motion for a stay of this Court's preliminary injunction pending appeal. The statements made in this declaration are based on my

---

[1] The rank of "admiral" is the highest military rank in the Navy. The term "admirals" is also frequently referred to as "flag officers." Flag officers include the ranks of rear admiral (lower half), rear admiral (upper half), vice admiral and admiral. Flag officers comprise the most senior levels of uniformed leadership in the Navy.

1

personal knowledge, my military judgment and experience, and on information that has been provided to me in the course of my official duties.

## Preliminary Statement

2.      I have reviewed the preliminary injunction order issued by this Court on January 3, 2022. I believe the Court's injunction will cause immediate harm to the Navy, and in particular to the operations of Naval Special Warfare (NSW) and Special Operations Forces (SOF), and to the national security of the United States. Operationally, in 2021, the Navy executed more than 30,000 steaming days and one million flying hours to protect America, deter conflict and keep the sea lanes open and free. The Court's injunction directly impacts the Navy's ability to carry out its responsibilities to protect and maintain the health and safety of our Force, in particular our ability to halt the spread of COVID-19 through a mandatory vaccination requirement. Unvaccinated or partially vaccinated service members are at higher risk to contract COVID-19, and to develop severe symptoms requiring hospitalizations that remove them from their units and impact mission execution. Vaccination against COVID-19 has proven to be essential in keeping Navy units on mission by mitigating the impact of COVID-19. Fully vaccinated naval forces are required to ensure readiness to carry out Navy missions throughout the world and, if required, to engage in combat operations. Restriction of the Navy's ability to reassign unvaccinated personnel in order to mitigate COVID-19 related risks to units preparing to deploy, or that are deployed, will cause direct and immediate impact to mission execution. Further, the harm caused by this injunction is not limited to 35 unvaccinated Plaintiffs. The heath, readiness, and mission execution of broader conventional Navy units and personnel who support these personnel are threatened as well.

2

App003

## Naval Background and Experience

3.      As the Vice Chief of Naval Operations,[2] I work in coordination with the Chief of Naval Operations (CNO), the senior admiral in the U.S. Navy, [3] in the execution of his statutory duties and responsibilities as they pertain to the employment of the Navy.  Those duties include recruiting, organizing, supplying, equipping, training, servicing, mobilizing, demobilizing, administering, and maintaining the Navy, as will assist in the execution of any power, duty, or function of the Secretary of the Navy or the Chief of Naval Operations.  Additionally, the CNO delegated several specific responsibilities to me.  I oversee programs and policies that impact Sailors and their families, including health affairs, and monitor and enact polices that promote good order and discipline in the Navy.

4.      I have served in the United States Navy for nearly 42 years.  A 1980 graduate of the United States Naval Academy, my experience includes command of the Vipers of Helicopter Anti-Submarine Light (HSL) Squadron-48, the Airwolves of HSL-40 and the Maritime Strike Wing Atlantic.  As Commanding Officer, HSL-48, my responsibilities included training, preparing, and executing Seahawk helicopter detachment deployments on Navy ships deploying worldwide.  As Commanding Officer, HSL-40, I was responsible for the training, evaluation, and maintenance of the Seahawk helicopter squadron that trains all East Coast Seahawk pilots in employment of this weapon system. As Commander, Maritime Strike Wing Atlantic, I was responsible for the material readiness and training of eight Helicopter Maritime Strike (HSM)

---

[2] "The [VCNO] has such authority and duties with respect to the Department of the Navy as the Chief of Naval Operations, with the approval of the Secretary of the Navy, may delegate to or prescribe for him. Orders issued by the [VCNO] in performing such duties have the same effect as those issued by the Chief of Naval Operations." 10 U.S.C. § 8035(c).

[3] The CNO is the senior uniformed officer in the United States Navy. *See* 10 U.S.C. § 8033(b) ("The Chief of Naval Operations, while so serving, has the grade of admiral without vacating his permanent grade. In the performance of his duties within the Department of the Navy, the Chief of Naval Operations takes precedence above all other officers of the naval service.").

squadrons, the Weapons School, Fleet Replacement Squadron, and a total of 42 detachments deploying on Atlantic Fleet aircraft carriers and air capable ships, encompassing 68 aircraft and 1,900 personnel. Between command of the Vipers and Airwolves, I was the executive officer of Mine Countermeasures Command and Control Ship USS Inchon (MCS 12), a 20,000 ton vessel with a crew of 700. As the second in command, I was responsible for the supervision, training and development of the crew and the daily execution of the command mission, which included training and preparing the crew for deployment, maintaining and improving operational readiness and material condition of the ship. As a flag officer, I commanded Expeditionary Strike Group 5 (ESG-5) and Task Forces 51/59 (CTF 51/59) in Bahrain, leading multiple Amphibious Ready Groups, Marine Expeditionary Units and the afloat forward staging base USS Ponce (AFSB(I)-15) in execution of theater security events, combat operations, and emergent national taskings spanning the Middle East/Central Command region. My responsibilities as ESG-5 and CTF 51/59 included multiple events working with NSW forces embarked on my ships and interoperability exercises with partner countries. I also served as Joint Staff deputy director for resources and acquisition, deputy assistant Secretary of the Navy for budget, and Deputy Chief of Naval Operations for integration of capabilities and resources.

## **Specific Functions of the United States Navy**

5.      The United States Navy and Marine Corps comprise the Nation's principal maritime forces. Their missions are to provide globally deployable forces in order to "secure the Nation from direct attack; secure strategic access and retain global freedom of action; strengthen existing and emerging alliances and partnerships; establish favorable security conditions; deter aggression and violence by state, non-state, and individual actors and, should deterrence fail, prosecute the full range of military operations in support of U.S. national interests." *See*

4

Department of Defense Directive (DoDD) 5100.01, Change 1, 09/17/2020, Encl. 6, ¶ 5.a. –b

(attached hereto). Effective execution of all of these discrete functions is vital to the national

security of the United States, and is accomplished by providing fully trained and qualified naval

forces to joint commanders[4] to deter aggression and, if required, engage in combat operations

and win decisively.

### Naval Special Warfare (NSW) and Special Operations Forces (SOF)

6.      Naval Special Warfare (NSW) and Special Operations Forces (SOF) are

composed of Navy SEALs[5] and Special Warfare Combatant-Craft Crewmen (SWCC). The

NSW team is a multipurpose combat force organized and trained to conduct a variety of special

operations missions in all environments. Navy SEALs conduct clandestine missions infiltrating

their objective areas by fixed and rotary-wing aircraft, Navy surface ships, combatant craft,

submarines and ground mobility vehicles. Service members designated as Navy SEALs consist

of officers and enlisted members who have been designated pursuant to Navy and NSW policies.

SWCC focus on infiltration and exfiltration of SEALs and other SOF to include from other

Services, and they provide dedicated rapid mobility in maritime environments, as well as the

ability to deliver combat craft via parachute drop. SWCC operate and maintain state-of-the-art

surface craft to conduct special operations.

7.      In addition to SEALs and SWCC, combat support (CS) and combat service

support (CSS) personnel are assigned to NSW units to support the mission. CS/CSS personnel

---

[4] Joint commanders are the combatant vested with authority and responsibility for military operations within their area of responsibility. The Navy and other branches of the Armed Forces provide forces to the combatant commanders to execute those responsibilities and functions. The combatant commanders exercise authority, direction and control over the commands and forces assigned to them and employ those forces to accomplish missions assigned to the combatant commander. Department of Defense Directive (DoDD) 5100.01, Change 1, 09/17/2020, Encl. 1, ¶1.a through d.

[5] The term "SEAL" refers to "Sea, Air, Land."

5

include officers and enlisted service members identified in Plaintiffs' complaint (i.e., Explosive Ordinance Disposal (EOD) personnel and Navy Divers), in addition to other officers and enlisted service members performing a variety of military functions (e.g., chaplains, medical personnel, mobile communications teams, tactical cryptologic support, etc.). Navy EOD personnel perform missions neutralizing explosive weapons, including various weapons of mass destruction. Their duties include detonating or demolishing hazardous munitions, neutralizing various ordnance, including sea mines, torpedoes or depth charges, performing parachute or helicopter insertion operations, and clearing waterways of mines in support of our military operations. Navy Divers perform a variety of military functions, including wreckage salvage operations and underwater repairs, harbor and waterway clearance operations, assisting in construction and demolition projects, executing search and rescue missions, performing deep submergence operations, and serving as technical experts for diving operations for numerous military special operations units.

8.     Service members in the NSW force are responsible for performing special operations. Special operations require unique tactics, techniques, procedures and equipment. They are often conducted in hostile, austere or diplomatically sensitive environments, and are characterized by one or more of the following: time-sensitivity, clandestine nature, low visibility, working with or through host-nation forces, greater requirements for regional orientation and cultural expertise, and a higher degree of risk. These missions often require members of the NSW force to work in close quarters where social distancing is not possible. Small NSW teams may travel for an extended duration on boats, submersibles, helicopters, aircraft, or other vehicles that are less than six feet across, and/or which have limited ventilation. Service members may be in such close quarters while traveling that they must sit shoulder-to-shoulder.

6

Additionally, members may be required to operate in subsea environments and may have to share diving rebreather devices and inhale one another's exhalation.

### Mandatory Vaccination Requirements in Response to COVID-19 Pandemic

9.      On August 24, 2021, the Secretary of Defense directed the Secretaries of the Military Departments to immediately begin full vaccination of all members of the Armed Forces on active duty or in the Ready Reserve.  The Secretary of Defense determined that mandatory COVID-19 vaccinations are necessary to protect the health and military readiness of the force. The Secretary of the Navy directed implementation of Secretary of Defense's COVID-19 vaccination mandate[6] via a Department-wide administrative message (ALNAV) on August 30, 2021.  The ALNAV applies to both Services within the Department of the Navy (DON), the United States Navy and the United States Marine Corps.  The ALNAV required all active duty DON Service members, who were not already vaccinated, exempted, or currently seeking an exemption, to be fully vaccinated with an FDA-approved COVID-19 vaccine within 90 days of the ALNAV, and all Reserve Component personnel to be fully vaccinated within 120 days. ALNAV 062/21 ¶ 4.  Active duty Sailors and Marines were required to become fully vaccinated[7] by November 28, 2021, and Reserve Component Sailors and Marines by December 28, 2021. The requirement to obtain full vaccination constitutes a lawful order under Article 92 of the Uniform Code of Military Justice (UCMJ), and failure to comply may result in punitive or adverse administrative action, or both. ALNAV 062/21 ¶ 5.

---

[6] Secretary of Defense Memorandum, "Memorandum for Senior Pentagon Leadership, Commanders of the Combatant Commands, Defense Agency, and DoD Field Activity Directors," (August 24, 2021).
[7] Although refusal to receive the vaccine may subject a member to adverse administrative or disciplinary action, the vaccine will not be forcibly administered to any member who refuses.

10.     The United States Navy issued service-specific guidance via a separate administrative message ("NAVADMIN") on September 1, 2021. NAVADMIN 190/21 outlines Navy policy concerning the mandatory vaccination of Navy service members, vaccination administration and reporting requirements, and general guidance related to logistics and distribution of vaccines. The policy reiterates that COVID-19 vaccination "is mandatory for all DoD service members who are not medically or administratively exempt" under existing Navy policy. NAVADMIN 190/21 ¶ 2, 3.a. Refusal to become fully vaccinated against COVID-19 without an approved or pending exemption constitutes a failure to obey a lawful order and is punishable under Article 92, UCMJ.

### The COVID-19 Pandemic Threat to Naval Forces

11.     The judgment of each of the Military Services is that vaccines are the most effective tool the Armed Forces have to keep our personnel safe, fully mission capable and prepared to execute the Commander-in-Chief's orders to protect vital United States' national interests. As of January 5, 2022, 261,504 members of the Armed Forces have contracted the COVID-19 virus, resulting in 2,320 hospitalizations and 82 deaths. Eighty of 82 members who have died were unvaccinated. Of all active duty personnel who were required to be hospitalized because of COVID-19, 0.8% received a booster shot prior to hospitalization. Separately, there have only been six active duty personnel who have received a booster and had a breakthrough COVID-19 infection that required hospitalization. Among the active duty force, 12% of those required to be hospitalized have received a primary COVID-19 vaccine without the booster. Among Reserve and National Guard service members, 97% of those hospitalized with COVID were unvaccinated or partially vaccinated; 3% of hospitalized members received primary vaccination but no booster shot; 0.2% hospitalized members had received a booster shot.

8

Sending ships into combat without maximizing the crew's odds of success, such as would be the case with ship deficiencies in ordnance, radar, working weapons or the means to reliably accomplish the mission, is dereliction of duty. The same applies to ordering unvaccinated personnel into an environment in which they endanger their lives, the lives of others and compromise accomplishment of essential missions.

12.     The environment in which Navy personnel operate -- in close quarters for extended periods of time -- make them particularly susceptible to contagious respiratory diseases such as COVID-19 and renders mitigation measures such as social distancing unrealistic. In mid-March 2020, the aircraft carrier USS THEODORE ROOSEVELT (CVN 71) was deployed to the Western Pacific Ocean, a vital geo-political center of gravity encompassing several of the world's largest militaries and five nations allied with the U.S. through mutual defense treaties. The leadership of USS THEODORE ROOSEVELT began to see several COVID-19 cases among the crew. By April 1, 2020, USS THEODORE ROOSEVELT had been pulled off mission and into Guam with approximately 1,000 crew removed from the ship, with a reduced crew remaining to maintain the nuclear reactor and other essential systems. By April 20, 2020, 4,069 Sailors had been removed from the ship out of a crew of approximately 4,800. The ship was unavailable for 51 days to maintain presence in a strategically important area which includes the world's busiest sea lanes, creating a national security vulnerability in an area vital to our national interests. When USS THEODORE ROOSEVELT finally got underway on May 21, 2020, approximately 1,800 Sailors remained in Guam. Tragically, one Sailor succumbed to the COVID-19 virus and died.

13.     Even with approximately 97% of the Navy vaccinated, the COVID-19 virus can degrade units and impact mission. Last month, USS MILWAUKEE (LCS 5), with a 100%

9

vaccinated 100-person crew, remained in port one week beyond its schedule because several members tested positive for COVID-19. Because the full crew was vaccinated, infected personnel were asymptomatic or had mild symptoms and the impact to mission accomplishment was substantially mitigated compared to the USS THEODORE ROOSEVELT's experience of more than 4,000 crew removed from the ship and a 51-day loss of mission. Given the hospitalizations and death statistics cited above, the MILWAUKEE's minor deployment delay would likely have been far worse with unvaccinated personnel. The MILWAUKEE is one example of a Navy manning model where each individual crew member has a high level of responsibility with little redundancy. The medical staff of the MILWAUKEE consists of only two Navy Hospital Corpsman, comparable to an Emergency Medical Technician in the civilian setting. There is little ability on ship to care for a service member with severe COVID symptoms. If a service member were to develop severe symptoms on this type of ship, it would require a return to port or an emergency medical evacuation by helicopter. Helicopter medical evacuation is not always viable due to the location of the ship and the limited range of helicopters. At the deployable unit level, NSW, EOD, and diver personnel operate in units that can be as small as a squad of four personnel. Medical evacuations in these small units can be even less practical and significantly more damaging than the loss of an equal number of crew on a ship the size of the MILWAUKEE.

14.     The types of missions conducted by SEALs, SWCC, EOD and divers cannot be conducted remotely. A SEAL assigned to perform a counterterrorism mission in a foreign country cannot perform that task from home; a SWCC cannot drive a combatant craft and transport SEALs in a telework status; an explosive ordnance disposal technician—whose job it is to disarm and dispose of explosives—cannot perform that task remotely. Similarly, the arduous

10

training necessary to prepare NSW personnel for these missions cannot be performed remotely. It is not possible for a Navy Diver to remotely prepare compressed air and oxygen tanks for personnel to complete their training dives. A safety diver must be physically present during a high-risk training evolution that may require rescue divers or oxygen technicians. In particular, Navy Divers assigned to NSW must be able to operate a diving recompression chamber – a small confined space where the Navy Diver must be in the chamber to assist with the personnel casualty – which cannot be done remotely. SEAL trainers cannot oversee dangerous swim or survival training from a physically distanced location. NSW personnel also routinely interact with the greater Navy population, on ships and aircraft, and in dining facilities and office environments across the globe. They are required to deploy with no-notice. NSW, EOD and diver training and operations necessitate our service members interact in close-quarters, confined spaces, and under conditions where telework, social distancing, and mask-wearing are not reliable mitigation options.

<strong><u>Immediate Harm to Readiness and Mission Accomplishment</u></strong>

15.      The preliminary injunction forbids the Navy from applying MANMED § 15-105(3)(n)(9), NAVADMIN 225/21, NAVADMIN 256/21 and Trident Order #12. Order 26, ECF No. 66. MANMED § 15-105(3)(n)(9) states that personnel who choose not to receive required vaccinations will be disqualified from special operations duty. NAVADMIN 225/21 provides guidance for disposition of offenses involving Navy service members who are not fully vaccinated by the required deadlines. Navy Service members who refuse the COVID-19 vaccine, absent a pending or approved exemption, are required to be processed for administrative separation.[8] NAVADMIN 225/21 ¶ 2. A Navy Service member is considered to be "refusing the

---

[8] Although processing for separation is required, this does not automatically result in a member actually being separated. Members processed for separation may ultimately be retained in the service.

11

vaccine, if: (1) the individual has received a lawful order to be fully vaccinated, (2) is not or will not be fully vaccinated by the date required, and (3) does not have a pending or approved exemption request." *Id.* ¶ 3.c. The policy designates the Chief of Navy Personnel, a 3-star admiral, as the COVID-19 Consolidated Disposition Authority to ensure fair and consistent administrative processing across the service. *Id.* at ¶ 5.b. For disciplinary matters, authority to initiate disciplinary proceedings, either non-judicial punishment or court-martial, is withheld to the Vice Chief of Naval Operations. *Id.* NAVADMIN 256/21 provides additional guidance on administrative separation processing for those refusing the vaccine, as well as guidance on other applicable administrative actions. These other applicable administrative actions include: cancellation of government travel for training or other official purposes; temporary reassignment within the local area for unvaccinated personnel (with or without a medical exemption or religious accommodation); adverse fitness reports and evaluations; prohibition on executing permanent change of station orders; potential termination of special duty and incentive pays; potential recoupment of unearned bonuses; termination of and potential reimbursement for Navy-funded education and training; promotion and advancement delays; and removal of additional qualification designations or Navy Enlisted Classifications.[9] *See* NAVADMIN 256/21 ¶¶ 4.b.through 13. Trident Order # 12, which is directed to the NSW force, does not create any new requirements or adverse administrative actions. It consolidates and restates previously promulgated Navy implementing guidance.

16.     The preliminary injunction forbids the Navy from "[t]aking any adverse

---

[9] Navy Enlisted Classifications define the work performed by Navy enlisted members and the requirements to perform specific "ratings" (i.e., occupations). *See generally*, MANUAL OF NAVY ENLISTED MANPOWER AND PERSONNEL CLASSIFICATIONS AND OCCUPATIONAL STANDARDS, VOL II NAVY ENLISTED CLASSIFICATIONS (NAVPERS 18068F), April 21, 2021 (supplementing the enlisted rating structure in identifying personnel and billets [i.e., jobs] and skills, knowledge, aptitude, or qualifications that must be documented to identify both people and billets for management purposes).

action against Plaintiffs on the basis of Plaintiffs' requests for religious accommodation." Order 26, ECF No. 66. The order specifically references actions that Plaintiffs allege are being taken against them while they await a decision on their religious accommodation requests, actions such as restrictions on travel, access to non-work activities, unpleasant assignments, and being relieved of leadership duties. Order 26, ECF No. 66. This aspect of the order is intrusive and harmful to Navy operations, including deployment decisions. In the Navy, "adverse action" refers to an action that is punitive or the action itself has a direct adverse impact on one's career such as a court martial or discharge. The Court's order, however, indicates that routine personnel actions, such as assignment, official travel and specific duties, are adverse decisions. Contrary to the Court's apparent understanding, temporarily reassigning personnel to other units because they are unvaccinated, regardless of the reason they are unvaccinated (e.g., medical exemption, religious accommodation, or pending exemption request) is not an adverse action but a step to protect the health of the whole unit and maintain mission readiness. The Court's injunction appears to require the Navy to leave unvaccinated NSW, EOD, and diver personnel in their units, performing their same duties and deploying on missions regardless of the known risk to personnel and mission. Such an injunction will degrade NSW, EOD, and diver mission readiness, breakdown good order and discipline within the NSW force, unnecessarily limit the Navy's ability to conduct daily operations and operational missions, and could clearly result in mission failure in contingencies and crises that cause harm to national security.

17.    NSW personnel must be fully medically ready and at peak fitness given that their training and missions are physically demanding and arduous. It is vital that all members of the NSW force be medically fit to perform daily operations and to train or deploy on short notice. Regardless of their current assignment, all naval forces, NSW in particular, must be ready to

13

respond to contingencies and crises around the world. All NSW personnel are expected to meet this requirement, whether in a training status, on instructional duty, or at a headquarters, as the mission of NSW is to be ready to provide maritime SOF to conduct full spectrum operations to support national objectives. The Navy could easily require Navy Special Warfare Command to mobilize personnel outside from any unit, regardless of the planned deployment cycles of a unit or the currently assigned duties of NSW personnel to respond to the full range of contingencies and crises. Medical conditions or illness create risk, both medical and operational, not only for the service member afflicted, but for other members of the unit. As a result, unvaccinated personnel in a unit degrade the force health protection conditions in the unit, placing personnel in the unit at risk and degrading the unit's ability to safely conduct operations, regardless of the scope of the operation. The following publicly available mission event illustrates how rapidly a NSW unit can go from steady state in the United States to deploying forward on a mission of the highest difficulty, requiring peak medical, physical and mental readiness. This example illustrates the rapid manner in which a contingency or crisis could unfold, and although more than a decade old, is used due to the unclassified classification of my declaration.

18. On April 8, 2009, armed Somali pirates boarded the U.S.-flagged container ship, *Maersk Alabama* in the Indian Ocean, taking the crew, composed of U.S. citizens, hostage and making ransom demands. USS BAINBRIDGE (DDG-96) was the first ship of the international counter-piracy task force to respond. BAINBRIDGE's commanding officer realized he needed additional capabilities beyond what he had available on the ship. In response, on short notice, a SEAL team flew 8,000 miles from the United States to USS BAINBRIDGE and were recovered onboard. By the evening of April 12, 2009, the situation escalated and SEALs on BAINBRIDGE eliminated the threat to the remaining hostage, *Maersk Alabama* Captain

14

Phillips, who was subsequently rescued. This is but one example, using a well-publicized mission, that illustrates how an unvaccinated member would put himself, his teammates, the conventional forces and the mission at great risk. While NSW personnel may be assigned to various units with various mission-sets, all naval forces must be ready to respond to global contingencies and crises on short notice.

19.     If this type of crisis or contingency occurred today, with the Court's preliminary injunction in place, the Navy could be required to deploy a SEAL team with one or more unvaccinated members, risking a COVID-19 outbreak within that unit or on the host Navy destroyer. Destroyer crews, and others embarked aboard, sleep in confined shared berthing spaces, are in close proximity in passageways, and eat meals in a communal galley. An unvaccinated service member is not only more likely to contract COVID-19, but to experience significant disease symptoms, impact the mission and spread the disease to others.

20.     Navy ships have limited health care facilities. A Sailor experiencing severe COVID symptoms would require the ship to pull into port instead of executing its mission. NSW forces often deploy in countries with little or no healthcare support structure and in remote areas where healthcare is scarce. This is why there has been a long-standing requirement for all members of the NSW force to be fully medically ready to deploy. A small number of SOF medical personnel provide limited medical support and patient movement; therefore, any encumbrance placed on that limited capability unnecessarily puts the mission and the force at-risk. While some SEALs are trained to perform emergency, life-saving procedures in remote and hostile environments, those personnel are not physicians or nurses. Unlike doctors and nurses, formal civilian medical licenses are not required for them. They do not generally have the capability, capacity or training to use a ventilator. Additionally, they do not have access to this

15

equipment in the types of austere environments in which the NSW units operate. If a deployed team member contracts COVID-19, there is a strong possibility that the necessary equipment or treatment would not be readily available. Further, if medical evacuation is necessary for a member of the unit, this creates additional risk not only to the mission, but places those service members executing medical evacuation at a risk of harm to themselves such as when the member requires transport from a hostile, remote or diplomatically sensitive areas.

21.     Redirecting these assets and their crew to perform preventable evacuations results in a degradation of the Navy's ability to accomplish its primary missions and incurs collateral impacts. Medical evacuations often require one or more member from the service member's unit to accompany the evacuated service member. The loss of even one member can degrade the effectiveness of small NSW units and may compromise the mission. This is similarly the case for SWCC personnel, who routinely operate with a crew of as little as four personnel on a combatant craft. Every member of a SEAL team is vital.

22.     Unvaccinated NSW personnel put conventional Navy forces at risk as well. Navy SEALs are one of the most versatile elements of the SOF across all branches of the military services, in part, because the Navy can deliver them to their mission locations through a variety of conventional means (*e.g.*, fixed-wing aircraft, helicopters, surface ships and submarines). All of these means of delivery are confined spaces in which social distancing is impractical. Because NSW personnel rely on conventional Navy forces to support their missions, any unvaccinated NSW personnel will put the crew of those conventional forces at unnecessary risk as well. The Navy must balance the risk to unvaccinated individuals and vaccinated personnel alike. That risk calculation led to the mandatory vaccination mandate and associated personnel policies pertaining to the COVID-19 pandemic. It is imperative for the entire force, including

16

every member of NSW, to be vaccinated and ready to deploy and execute assigned missions on short notice.

23.     The capabilities NSW personnel provide include crisis response, support to forward presence operations, support to conventional Naval forces at sea and in training, support to Law Enforcement agencies and clandestine insertion operations. EOD personnel provide critical safety and response to units using live ordnance; Navy divers, EOD and SEALs support underwater surveys and route clearances. SEALs conduct insertions and extractions by sea, air or land; they capture high-value enemy personnel and terrorists around the world, carry out small-unit direct-action missions against military targets and perform underwater reconnaissance and strategic sabotage. SEALs, SWCC, EOD and divers frequently deploy to foreign countries to train partners and allies and participate in exercises. Reducing the Navy's ability to apply long-standing, proven medical readiness principles to this small, elite community will clearly negatively impact the NSW force's ability to conduct their operations and could have significant negative effects to the NSW force's ability to respond to large-scale contingencies or crises. This would damage the national security interests of the United States and our foreign allies and partners.

24.  These concerns apply if the injunction requires the Navy to maintain these 35 Plaintiffs in their current status while an appeal is pending. Of the 35 Plaintiffs, 18 are assigned to nine different parent commands and may deploy anywhere in the world in the immediate future to perform the type of missions described. 15 Plaintiffs are assigned to the NSW Center or a NSW Center subordinate command, with 14 of them assigned to NSW Advanced Training

17

Command (ATC);[10] some as instructors who necessarily have close contact with ATC students in courses to prepare them for NSW operations and some as students attending an advanced training course before returning to their current or prospective assignment. Two Plaintiffs are currently assigned to non-NSW training commands. Because the court's order prohibits them from being temporarily reassigned, the 14 unvaccinated personnel at NSW ATC have close contact with fellow instructors and students. These students then circulate among the larger NSW community as soon as their courses at ATC end. Simply put, close quarters contact during training creates the opportunity to contract COVID-19 from the unvaccinated instructors at ATC detachments. The unvaccinated instructors can spread COVID-19 to dozens of candidates in training, and qualified SEALs, SWCCs, and other personnel, including fellow instructors, at NSW ATC training courses who will promptly return to their primary units or interact with additional training classes.

25. In summary, the Navy's judgment is that COVID-19 vaccines are a critical defense against COVID-19 and mitigate risk both to our force and to our mission. This judgment takes into account the environments our service members operate in, the operations the Navy conducts, and the absence of other effective COVID-19 mitigation measures in the environments in which we operate. The COVID-19 virus has had a proven substantial impact on Navy unit readiness. The Court's order, which bars implementation of the vaccine requirement and requires the Navy to keep service members it has determined are not medically fit for deployment in a ready to deploy status, will undermine military readiness through the spread of disease and cause

---

[10] ATC's mission is to provide standardized and accredited individual training and education for qualified NSW and support personnel, U.S. SOF (i.e., from other Services), partner nation SOF and other personnel, as required for NSW Operations. There are several ATC detachments. The largest detachment in Coronado, California provides a course of instruction to candidates (i.e., those seeking to obtain their SEAL or SWCC designation). It also provides training to those already designated as SEALs, SWCC or combat support personnel. Other ATC detachments provide training in specialized areas to NSW personnel, other SOF and partner nation SOF.

significant harm to military operations by allowing unvaccinated service members to remain in an unvaccinated status.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of January, 2022.

W. K. LESCHER

ENCLOSURE 6

FUNCTIONS OF THE MILITARY DEPARTMENTS

1.  <u>COMMON MILITARY DEPARTMENT FUNCTIONS</u>.  For purposes other than the operational direction of the Combatant Commands, the chain of command runs from the President to the Secretary of Defense to the Secretaries of the Military Departments and, as prescribed by the Secretaries, to the commanders of Military Service forces.

    a.  Subject to the authority, direction, and control of the Secretary of Defense, the Secretaries of the Military Departments are responsible for, and have the authority necessary to conduct, all affairs of their respective Departments, including:

        (1)  Recruiting.

        (2)  Organizing.

        (3)  Supplying.

        (4)  Equipping (including research and development).

        (5)  Training.

        (6)  Servicing.

        (7)  Mobilizing.

        (8)  Demobilizing.

        (9)  Administering (including the morale and welfare of personnel).

        (10)  Maintaining.

        (11)  Construction, outfitting, and repairs of military equipment.

        (12)  Construction, maintenance, and repair of buildings, structures, and utilities as well as the acquisition, management, and disposal of real property and natural resources.

    b.  Subject to the authority, direction, and control of the Secretary of Defense, the Secretaries of the Military Departments are also responsible to the Secretary of Defense for ensuring that their respective Departments:

        (1)  Operate effectively, efficiently, and responsively.

(2)  Formulate policies and programs that are fully consistent with national security objectives and policies established by the President and the Secretary of Defense.

(3)  Implement, in a timely and effective manner, policy, program, and budget decisions and instructions of the President or Secretary of Defense.

(4)  Present and justify positions on the plans, programs, and policies of the Department of Defense.

(5)  Prepare, submit, and justify budgets before Congress, in coordination with other USG departments and agencies, as applicable; and administer the funds made available for maintaining, equipping, and training the forces of their respective departments, including those assigned to the Combatant Commands.  Among other things, budget submissions shall be informed by the recommendations of the Military Service Chiefs, Commanders of the Combatant Commands, and of Military Service component commanders of forces assigned to the Combatant Commands.

(6)  Establish and maintain reserves of manpower, equipment, and supplies for the effective prosecution of the range of military operations and submit, in coordination with the other Military Departments, mobilization information to the Joint Chiefs of Staff.

(7)  Develop integrated mobilization plans for the expansion of peacetime components to meet the needs of war.

(8)  Perform Military Department functions necessary to fulfill the current and future operational requirements of the Combatant Commands, including the recruitment, organization, training, and equipping of interoperable forces.

(9)  Provide forces to enhance military engagement, conduct security cooperation, build the security capacity of partner states, and deter adversaries to prevent conflict.  These actions shall be coordinated with the other Military Departments, Combatant Commands, USG departments and agencies, and international partners, as required.

(10)  Provide forces, military missions, and detachments for service in foreign countries as may be required to support the national interests of the United States, and provide, as directed, assistance in training, equipping, and advising the military forces of foreign nations.

(11)  Coordinate with the other Military Departments and all of the other DoD Components to provide for more effective, efficient, and economical administration; eliminate duplication; and assist other DoD Components in the accomplishment of their respective functions by providing personnel, intelligence, training, facilities, equipment, supplies, and services, as may be required.

(12)  Develop, garrison, supply, equip, and maintain bases and other installations, including lines of communication, and provide administrative and logistical support for all assigned forces and bases, unless otherwise directed by the Secretary of Defense.

(13)  Provide, as directed, administrative and logistical support to the headquarters of the Combatant Commands, to include direct support of the development and acquisition of the command and control systems of such headquarters.

(14)  Supervise and control Military Department intelligence activities, including the collection, production, and dissemination of military and military-related foreign intelligence and counterintelligence as required for execution of Military Department responsibilities.

(15)  Afford the Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict; the Commander, USSOCOM; the PCA; and the Commander, USCYBERCOM, an opportunity to coordinate on Military Department and Military Service personnel management policy and plans as they relate to accessions, assignments, compensation, promotions, professional development, readiness, retention, sustainment, and training of all SOF (for USSOCOM) and all cyber operations forces (for USCYBERCOM) personnel.  This coordination shall not interfere with the title 10 authorities of the Military Departments or Military Services.

(16)  Engage in such other activities as are prescribed by law, the President, or the Secretary of Defense.

2.  COMMON MILITARY SERVICE FUNCTIONS.  The Army, the Navy, the Air Force, the Marine Corps, and the Space Force, and the Coast Guard, when transferred to the Department of the Navy in accordance with sections 2, 3, and 145 of Reference (h), to include the Active and Reserve Components of each, under their respective Secretaries, shall provide conventional, strategic, and SOF to conduct the range of operations as defined by the President and the Secretary of Defense.  Further, they shall perform the following common functions:

a.  Develop concepts, doctrine, tactics, techniques, and procedures, and organize, train, equip, and provide land, naval, air, space, and cyberspace forces, in coordination with the other Military Services, Combatant Commands, USG departments and agencies, and international partners, as required, that enable joint force commanders to conduct decisive operations across the spectrum of conflict in order to achieve the desired end state.

b.  Determine Military Service force requirements and make recommendations concerning force requirements to support national security objectives and strategy and to meet the operational requirements of the Combatant Commands.

c.  Recommend to the Joint Chiefs of Staff the assignment and deployment of forces to the Combatant Commands established by the President through the Secretary of Defense.

d.  Monitor and assess Military Service operational readiness and capabilities of forces for assignment to the Combatant Commands and plan for the use of the intrinsic capabilities of the other Military Services, USSOCOM, and USCYBERCOM that may be made available.

e.  Develop doctrine, tactics, techniques, and procedures for employment by Military Service forces and:

(1)  Assist the Chairman of the Joint Chiefs of Staff in the development of joint doctrine.

(2)  Coordinate with the Chairman of the Joint Chiefs of Staff, the Combatant Commands, the other Military Services, USG departments and agencies, partner security forces, and non-governmental organizations, in the development of the doctrine, tactics, techniques, and procedures necessary for participation in and/or command of joint, interagency, and multinational operations.

(3)  Coordinate with the Commanders, USSOCOM and USCYBERCOM, in the development of the doctrine, tactics, techniques, and procedures employed by Military Service forces when related to special operations and cyber operations, respectively.

f.  Provide for training for joint operations and joint exercises in support of Combatant Command operational requirements, including the development of Military Service joint training requirements, policies, procedures, and publications.

g.  Provide logistical support for Military Service and all forces assigned to joint commands, including procurement, distribution, supply, equipment, and maintenance, unless otherwise directed by the Secretary of Defense.

h.  Organize, train, and equip forces to contribute unique service capabilities to the joint force commander to conduct the following functions across all domains, including land, maritime, air, space, and cyberspace:

(1)  Intelligence, surveillance, reconnaissance, and information operations, to include electronic warfare and MISO in order to provide situational awareness and enable decision superiority across the range of military operations.

(2)  Offensive and defensive cyberspace operations to achieve cyberspace superiority in coordination with the other Military Services, Combatant Commands, and USG departments and agencies.

(3)  Special and cyber operations in coordination with USSOCOM, USCYBERCOM, and other Combatant Commands, the Military Services, and other DoD Components.

(4)  Personnel recovery operations in coordination with USSOCOM and other Combatant Commands, the Military Services, and other DoD Components.

(5)  Counter weapons of mass destruction.

(6)  Building partnership capacity/security force assistance operations.

(7)  Forcible entry operations.

(8)  Missile Defense.

(9)  Other functions as assigned, such as Presidential support and antiterrorism.

i.  Organize, train, and equip forces to conduct support to civil authorities in the United States and abroad, to include support for disaster relief, consequence management, mass migration, disease eradication, law enforcement, counter-narcotics, critical infrastructure protection, and response to terrorist attack, in coordination with the other Military Services, Combatant Commands, National Guard, and USG departments and agencies.

j.  Operate organic land vehicles, aircraft, cyber assets, spacecraft or space systems, and ships or craft.

k.  Conduct operational testing and evaluation.

l.  Provide command and control.

m.  Provide force protection.

n.  Consult and coordinate with the other Military Services on all matters of joint concern.


3.  <u>INDIVIDUAL MILITARY DEPARTMENT FUNCTIONS</u>.  The forces developed and trained to perform the primary functions set forth in sections 4 through 6 of this enclosure shall be employed to support and supplement the other Military Service, USSOCOM, and USCYBERCOM forces in carrying out their primary functions, wherever and whenever such participation shall result in increased effectiveness and shall contribute to the accomplishment of overall military objectives.

4.  <u>FUNCTIONS OF THE DEPARTMENT OF THE ARMY</u>

a.  The Department of the Army includes land combat, and service forces, and such aviation, water transport, and space and cyberspace forces as may be organic therein, and shall be organized, trained, and equipped primarily for prompt and sustained combat incident to operations on land, and to support the other Military Services and joint forces.  The Army is responsible for the preparation of land forces necessary for the effective prosecution of war and military operations short of war, except as otherwise assigned.  The Army is the Nation's principal land force and promotes national values and interests by conducting military engagement and security cooperation; deterring aggression and violence; and should deterrence fail, compelling enemy behavioral change or compliance.  The Army shall contribute forces through a rotational, cyclical readiness model that provides a predictable and sustainable supply of modular forces to the Combatant Commands, and a surge capacity for unexpected contingencies.

b.  <u>The Functions of the Army</u>.  In addition to the common military service functions listed in paragraphs 2.a. through 2.n. of this enclosure, the Army, within the Department of the Army, shall develop concepts, doctrine, tactics, techniques, and procedures, and organize, train, equip,

and provide forces with expeditionary and campaign qualities to perform the following specific functions:

    (1)  Conduct prompt and sustained combined arms combat operations on land in all environments and types of terrain, including complex urban environments, in order to defeat enemy ground forces, and seize, occupy, and defend land areas.

    (2)  Conduct air and missile defense to support joint campaigns and assist in achieving air superiority.

    (3)  Conduct airborne and air assault, and amphibious operations.  The Army has primary responsibility for the development of airborne doctrine, tactics, techniques, and equipment.

    (4)  Conduct CAO.

    (5)  Conduct riverine operations.

    (6)  Occupy territories abroad and provide for the initial establishment of a military government pending transfer of this responsibility to other authority.

    (7)  Interdict enemy sea, space, air power, and communications through operations on or from the land.

    (8)  Provide logistics to joint operations and campaigns, including joint over-the-shore and intra-theater transport of time-sensitive, mission-critical personnel and materiel.

    (9)  Provide support for space operations to enhance joint campaigns, in coordination with the other Military Services, Combatant Commands, and USG departments and agencies.

    (l0)  Conduct authorized civil works programs, to include projects for improvement of navigation, flood control, beach erosion control, and other water resource developments in the United States, its territories, and its possessions, and conduct other civil activities prescribed by law.

    (11)  Provide intra-theater aeromedical evacuation.

    (12)  Conduct reconnaissance, surveillance, and target acquisition.

    (13)  Operate land lines of communication.

## 5. FUNCTIONS OF THE DEPARTMENT OF THE NAVY

    a.  The Department of the Navy is composed of naval, land, air, space, and cyberspace forces, both combat and support, not otherwise assigned, to include those organic forces and capabilities necessary to operate, and support the Navy and Marine Corps, the other Military Services, and joint forces.  The Navy and Marine Corps comprise the Nation's principal maritime force.  They

35

employ the global reach, persistent presence through forward-stationed and rotationally-based forces, and operational flexibility to secure the Nation from direct attack; secure strategic access and retain global freedom of action; strengthen existing and emerging alliances and partnerships; establish favorable security conditions; deter aggression and violence by state, non-state, and individual actors and, should deterrence fail, prosecute the full range of military operations in support of U.S. national interests.

   b.  The Functions of the Navy.  In addition to the common military service functions listed in paragraphs 2.a. through 2.n. of this enclosure, the Navy, within the Department of the Navy, shall develop concepts, doctrine, tactics, techniques, and procedures and organize, train, equip, and provide forces to perform the following specific functions:

      (1)  Conduct offensive and defensive operations associated with the maritime domain including achieving and maintaining sea control, to include subsurface, surface, land, air, space, and cyberspace.

      (2)  Provide power projection through sea-based global strike, to include nuclear and conventional capabilities; interdiction and interception capabilities; maritime and/or littoral fires, to include naval surface fires; and close air support for ground forces.

      (3)  Conduct ballistic missile defense.

      (4)  Conduct ocean, hydro, and river survey and reconstruction.

      (5)  Conduct riverine operations.

      (6)  Establish, maintain, and defend sea bases in support of naval, amphibious, land, air, or other joint operations as directed.

      (7)  Provide naval expeditionary logistics to enhance the deployment, sustainment, and redeployment of naval forces and other forces operating within the maritime domain, to include joint sea bases, and provide sea transport for the Armed Forces other than that which is organic to the individual Military Services, USSOCOM, and USCYBERCOM.

      (8)  Provide support for joint space operations to enhance naval operations, in coordination with the other Military Services, Combatant Commands, and USG departments and agencies.

      (9) Conduct nuclear operations in support of strategic deterrence, to include providing and maintaining nuclear surety and capabilities.

   c.  The Functions of the Marine Corps.  In addition to the common military service functions listed in paragraphs 2.a. through 2.n. of this enclosure, and pursuant to section 8063 of Reference (e), the Marine Corps, within the Department of the Navy, shall develop concepts, doctrine, tactics, techniques, and procedures and organize, train, equip, and provide forces, normally

employed as combined arms air ground task forces, to serve as an expeditionary force-in-readiness, and perform the following specific functions:

     (1)  Seize and defend advanced naval bases or lodgments to facilitate subsequent joint operations.

     (2)  Provide close air support for ground forces.

     (3)  Conduct land and air operations essential to the prosecution of a naval campaign or as directed.

     (4)  Conduct complex expeditionary operations in the urban littorals and other challenging environments.

     (5)  Conduct amphibious operations, including engagement, crisis response, and power projection operations to assure access.  The Marine Corps has primary responsibility for the development of amphibious doctrine, tactics, techniques, and equipment.

     (6)  Conduct security and stability operations and assist with the initial establishment of a military government pending transfer of this responsibility to other authority.

     (7)  Provide security detachments and units for service on armed vessels of the Navy, provide protection of naval property at naval stations and bases, provide security at designated U.S. embassies and consulates, and perform other such duties as the President or the Secretary of Defense may direct.  These additional duties may not detract from or interfere with the operations for which the Marine Corps is primarily organized.

    d.  <u>The Functions of the Coast Guard</u>.  The Coast Guard is a unique Military Service residing within the Department of Homeland Security while simultaneously providing direct support to the Department of Defense under its inherent authorities under References (e) and (h).  In addressing the Coast Guard when it is not operating in the [Department of the] Navy, this issuance is descriptive in nature and does not purport to be either directive or regulatory.  As directed by the President, and in accordance with Memorandum of Agreement between the Department of Defense and Department of Homeland Security on the use of Coast Guard Capabilities and Resources in Support of the National Military Strategy (Reference (ab)), the Department of the Navy shall coordinate with the Department of Homeland Security regarding Coast Guard military functions in time of limited war or defense contingency, without transfer of Coast Guard authority to the Secretary of the Navy.  As directed, the Department of the Navy will provide intelligence, logistical support, and specialized units to the Coast Guard, including designated ships and aircraft, for overseas deployment required by naval component commanders, maritime search and rescue, integrated port security, and coastal defense of the United States.  The Coast Guard shall maintain a state of readiness to function as a specialized Military Service in the Department of the Navy in time of war or national emergency.  If specified in a declaration of war by Congress or if directed by the President, the Coast Guard shall operate as a Military Service in the Department of the Navy, and shall continue to do so

until the President transfers the Coast Guard back to the Department of Homeland Security by Executive order pursuant to section 3 of Reference (h).

(1)  The Coast Guard shall develop concepts, doctrine, tactics, techniques, and procedures and organize, train, equip, and provide forces to perform the following specific functions when providing direct or cooperative support to the Department of Defense:

(a)  Conduct coastal sea control and maritime and air interception and interdiction operations.

(b)  Conduct maritime homeland security and counterterrorism operations.

(c)  Provide for port operations, security, and defense.

(d)  Provide maritime operational threat response.

(e)  Conduct counter-illicit trafficking operations.

(f)  Conduct military environmental response operations.

(g)  Conduct theater security cooperation operations.

(h)  Conduct search and rescue operations.

(i)  Conduct ice operations.

(j)  Provide for marine safety, including aids to navigation.

(2)  The Coast Guard will coordinate with the Department of Defense, including the Department, of the Navy to provide specialized Coast Guard units, or obtain Navy units, including designated ships and aircraft, for deployment as requested by Military Service component or joint commanders.

6.  <u>FUNCTIONS OF THE DEPARTMENT OF THE AIR FORCE</u>

a.  The Department of the Air Force is composed of air, space, and cyberspace forces, both combat and support, not otherwise assigned.  The Air Force and Space Force are the Nation's principal air and space forces, and are responsible for the preparation of forces necessary for the effective prosecution of war.  The Department of the Air Force shall organize, train, equip, and provide air, space, and cyberspace forces for the conduct of prompt and sustained combat operations, military engagement, and security cooperation in defense of the Nation, and to support the other Military Services and joint forces.  The Air Force and Space Force will provide the Nation with global vigilance, global reach, and global power in the form of in-place, forward-based, and expeditionary forces possessing the capacity to deter aggression and violence by state, non-state, and individual actors to prevent conflict, and, should deterrence fail, prosecute the full range of military operations in support of U.S. national interests.

38

*DoDD 5100.01, December 21, 2010*

b.  <u>The Functions of the Air Force</u>.  In addition to the common military service functions listed in paragraphs 2.a. through 2.n. of this enclosure, the Air Force, within the Department of the Air Force, shall develop concepts, doctrine, tactics, techniques, and procedures and organize, train, equip, and provide forces to perform the following specific functions:

(1)  Conduct nuclear operations in support of strategic deterrence, to include providing and maintaining nuclear surety and capabilities.

(2)  Conduct offensive and defensive operations, to include appropriate air and missile defense, to gain and maintain air superiority, and air supremacy as required, to enable, the conduct of operations by U.S. and allied land, sea, air, space, and special operations forces.

(3)  Conduct global precision attack, to include strategic attack, interdiction, close air support, and prompt global strike.

(4)  Provide timely, global integrated intelligence, surveillance, and reconnaissance capability and capacity from forward deployed locations and globally distributed centers to support world-wide operations.

(5)  Provide rapid global mobility to employ and sustain organic air and space forces and other Military Service and USSOCOM forces, as directed, to include airlift forces for airborne operations, air logistical support, tanker forces for in-flight refueling, and assets for aeromedical evacuation.

(6)  Provide agile combat support to enhance the air and space campaign and the deployment, employment, sustainment, and redeployment of air and space forces and other forces operating within the air and space domains, to include joint air and space bases, and for the Armed Forces other than which is organic to the individual Military Services and USSOCOM in coordination with the other Military Services, Combatant Commands, and USG departments and agencies.

(7)  Conduct global personnel recovery operations including theater-wide combat and civil search and rescue, in coordination with the other Military Services, USJFCOM, USSOCOM, and DoD Components.

(8)  Conduct global integrated command and control for air and space operations.

c.  <u>The Functions of the Space Force</u>.  In addition to the common military service functions listed in Paragraphs 2.a. through 2.n. of this enclosure, the Space Force, within the Department of the Air Force, shall develop concepts, doctrine, tactics, techniques, and procedures and organize, train, equip, and provide forces to perform the following specific functions:

(1)  Provide freedom of operation for the United States in, from, and to space.

(2)  Provide prompt and sustained space operations.

*DoDD 5100.01, December 21, 2010*

    (3)  Protect the interests of the United States in space.

    (4)  Deter aggression in, from, and to space.

    (5)  Conduct space operations.


7.  <u>DEPARTMENT OF THE ARMY AND DEPARTMENT OF THE AIR FORCE:  THE NGB</u>.
The NGB is a joint activity of the Department of Defense.  The NGB performs certain Military
Service-specific functions and unique functions on matters involving non-federalized National
Guard forces as set forth in Reference (i).

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

---

U.S. NAVY SEALs 1-26;
U.S. NAVY SPECIAL WARFARE
COMBATANT CRAFT CREWMEN 1-5;
U.S. NAVY EXPLOSIVE ORDNANCE
DISPOSAL TECHNICIAN 1; and
U.S. NAVY DIVERS 1-3,

              Plaintiffs,

v.

LLOYD J. AUSTIN, III,
individually and in his official capacity as
United States Secretary of Defense; UNITED
STATES DEPARTMENT OF DEFENSE;
CARLOS DEL TORO, individually and in
his official capacity as United States
Secretary of the Navy,

              Defendants.

---

Case No. 4:21-CV-01236-O

---

## SUPPLEMENTAL DECLARATION OF LANNY F. LITTLEJOHN

I, Lanny F. Littlejohn, hereby state and declare as follows:

      1.     I am a Captain in the United States Navy, currently serving as the Force Medical

Officer of U.S. Naval Special Warfare Command (NSWC), located in Coronado, California,

whose mission is to provide maritime special operations forces (SOF) to conduct full spectrum

operations, unilaterally or with partners, to support national objectives.  As the Force Medical

Officer, I am the senior ranking medical professional at NSWC and have ultimate responsibility

for medical readiness, combat casualty care, quality healthcare delivery, medical research

oversight, medical waivers to physical standards, and am the credentialing and privileging

authority for all providers within the NSW claimancy.  I make this declaration in my official

App033

capacity, based upon my personal knowledge and upon information that has been provided to me in the course of my official duties.

2. I have been assigned to my current position since January 10, 2020. Prior to my current assignment, I served as Command Surgeon, Naval Special Warfare Development Group; Chair of Emergency Medicine, Naval Medical Center Camp Lejeune; Diving Medical Officer, EOD Group TWO; and Flight Surgeon, VMAQ-4. I am also a board certified Emergency Physician, Assistant Professor of Military and Emergency Medicine at the Uniformed Services University, and Chair of the Technology Subcommittee for the Committee on Tactical Combat Casualty Care for the Defense Health Agency. In my current duties, I am responsible for setting policy and procedures relevant to the health, medical readiness, and medical capabilities of Naval Special Warfare operationally and in garrison.

3. I have reviewed the preliminary injunction order issued in the above captioned case on January 3, 2022. The order misinterprets Navy Instructions MANMED[1] § 15-105(3)(n)(9) and Trident Order[2] #12 and draws incorrect conclusions regarding applicable Navy policies. Citing to MANMED § 15-105(3)(n)(9) and Trident Order #12, the order determines, "[t]hose who receive religious accommodations are still 'medically disqualified.' That means Plaintiffs would be permanently barred from deployment, denied the bonuses and incentive pay

[1] Navy's Manual of the Medical Department ("MANMED"), Chapter 15, *Physical Examinations and Standards for Enlistment, Commission, and Special Duty.*

[2] Trident Order #12 was issued on September 24, 2021. The directive does not set forth new policies concerning vaccination requirements or processes by which members request medical or administrative exemptions, though it does set forth deadlines for Naval Special Warfare (NSW) personnel (like for the 33 of the 35 Plaintiffs within the NSW claimancy in the above-referenced case) to submit such requests. Service members with questions related to medical exemptions were advised to consult with their medical provider. Trident Order #12 ¶ 6.b. Service members were advised to contact their chaplain for assistance with religious accommodation requests. *Id.* ¶ 6.c.

2

that accompany deployment, and deprived of the very reason they chose to serve in the

Navy. By contrast, those receiving medical accommodations are not medically disqualified—

they receive equal status as those who are vaccinated." Op. 11-12. The order also concludes,

"even if the Navy were to grant a religious exemption, that exemption would still receive less

favorable treatment than its secular counterparts. Those who receive religious exemptions are

medically disqualified. Those who receive medical exemptions are not. But the activity itself—

forgoing the vaccine—is identical." *Id.* at 14. These findings incorrectly conflate the COVID-

19 exemption process with military medical readiness and deployability requirements.

    4.    A service member that meets all medical requirements for special operations (SO)

duty is termed "Physically Qualified" (PQ). A service member that does not meet these medical

requirements is termed "Not Physically Qualified" (NPQ). The MANMED provides that "[o]nly

the most physically and mentally qualified personnel should be selected, and those who are or

may be reasonably expected to become unfit or unreliable must be excluded." MANMED § 15-

105(1). Special operations personnel are subject to stringent medical requirements by virtue of

the nature of their military duties:

> Special operations (SO) duty takes place in every part of the world under harsh
> conditions at the extremes of human physical capabilities. Medical austerity and
> the presence of armed opposition are common. SO personnel, depending on
> service and warfare community, routinely engage in high-risk operations
> including parachuting, high angle activities, high-speed boat and unconventional
> vehicle operation, weapons operation, demolitions employment, and waterborne
> activities, to include SCUBA diving. As such, SO duty is among the most
> physically and mentally demanding assignments in the U.S. military.

*Id.*

    5.    MANMED § 15-105(4)(a) further describes the circumstances under which a

Service member might become medically disqualified from special operations duty:

> Any disease or condition causing chronic or recurrent disability or frequent health care encounters, increasing the hazards of isolation, or having the potential for significant exacerbation by extreme weather, stress, hypobaric or hyperbaric environments, or fatigue is disqualifying. Conditions and treatments causing a significant potential for disruption of operations are disqualifying.

Anyone that is NPQ must have a "Waiver to Physical Standards" recommended by the Navy Bureau of Medicine (BUMED) and approved by the Navy Bureau of Personnel (PERS). A PQ finding, or a waiver to the physical standards if NPQ, is required to be medically fit for special operations and deployable.

6.    A medical waiver to the physical standards is a separate determination that would come *after* a medical exemption *or* administrative exemption, such as religious accommodation, for the COVID-19 vaccine. Accordingly, if a service member receives an exemption/accommodation to the COVID-19 vaccine for any reason they would have to engage in this subsequent process to be cleared for full duty by the Navy. That is, a service member who receives an exemption or accommodation from the COVID-19 vaccination requirement, whether for religious or secular reasons, is not PQ unless he or she obtains separate medical clearance. Moreover, the service member may also need a separate medical waiver from the Combatant Command (CCMD) to enter that commander's geographic area of responsibility. Different CCMDs may have specific requirements for vaccination based on the endemic biomedical threats that naturally exist in their geographic area as well as any biowarfare threats from adversaries. An unvaccinated member who deployed to a geographic region where there is an endemic infectious disease would put not only his health at risk, but also the health of any other service member, any partner forces with which SOF work regularly, and other host nation personnel. Thus, a determination that a member is not deployable takes into account the risk to other personnel, the risk to mission as well as the unvaccinated member. These

4

deployability determinations do not take into account whether a member is unvaccinated for secular or religious reasons; all unvaccinated service members are treated the same for purposes of determining whether they should receive a medical waiver that would render them fit for special operations duty.

7.      Receiving a medical exemption for the COVID-19 vaccine does not automatically render a service member deployable; he or she must undergo the process described in the prior paragraph. Indeed, many of the common reasons that a service member may receive a medical exemption from an immunization requirement may also make the service-= member NPQ and nondeployable. For example, BUMEDINST 6230.15B ¶ 2.6 lists immune competence, pharmacologic or radiation therapy, pregnancy and/or previous adverse response to immunization as common reasons for a medical exemption from an immunization.[3] The first three conditions would almost certainly lead to a NPQ finding for NSW and an inability for the service member to get underway on conventional Navy units. The remaining example— previous adverse response to immunization—may provide the basis for a permanent medical exemption request, but as I explained in my prior declaration, ECF 44, Ex. 14 (Decl. of Lanny Littlejohn) ¶ 10 (App 278–79), all requests for permanent medical exemptions from COVID-19 vaccination for personnel falling under NSWC authority have been denied. Moreover, MANMED § 15-105(4)(a) specifically states that "SO personnel reporting for duty following an absence of greater than 14 days due to illness or injury, hospitalization for any reason, or reported on by a medical board must have a properly documented UMO [undersea medical

---

[3] BUMEDINST 6230.15B ¶ 2.6 also lists evidence of immunity based on serologic tests, documented infection, or similar circumstances as a possible basis for a medical exemption for an immunization. However, pursuant to DoD policy a prior COVID-19 infection, by itself, is not grounds for a medical exemption to the COVID-19 vaccination requirement.

officer] evaluation to determine fitness for continued SO duty." Again many of the reasons a service member might receive a medical exemption for an immunization would fall into this category. This is why a service member who cannot receive the COVID-19 vaccine for medical reasons (or any other reason) will still be NPQ from SO duty until a separate medical waiver is granted by BUMED and PERS. This requirement is specifically delineated in Trident Order #12[4] which states:

> For Special Operations qualification requires a separate waiver that is in addition to waiver of the COVID-19 vaccine requirement for all service members.
> *Id.* ¶ 6.d.

8.    Clinical Trials. I am not aware of any NSW personnel participating in clinical research trials concerning COVID-19 vaccines or other COVID-19 medications or treatments. Furthermore, I am not aware of DoD or the Navy conducting or sponsoring any such trials or studies. *See DoDI 3612.02 and SECNAVINST* 3900.39E CH-1 (promulgating standards for human research and clinical studies conducted or sponsored by DoD and the Navy). Choosing to participate in a clinical trial outside the DoD health care system or sponsorship is participating in an elective medical procedure. Navy personnel are required to receive counseling from a military health care provider prior to receiving or engaging in elective medical care outside the military health care system. BUMEDINST 6320.103, Encl. 2 ¶4.a. Personnel who do not receive counseling prior to receiving or engaging in elective medical care will be

---

[4] Trident Order #12 was issued on September 24, 2021. The directive does not set forth new policies concerning vaccination requirements or processes by which members request medical or administrative exemptions, though it does set forth deadlines for Naval Special Warfare (NSW) personnel (like for the 33 of the 35 Plaintiffs within the NSW claimancy in the above-referenced case) to submit such requests. Service members with questions related to medical exemptions were advised to consult with their medical provider. Trident Order #12 ¶ 6.b. Service members were advised to contact their chaplain for assistance with religious accommodation requests. *Id.* ¶ 6.c.

App038

counseled and could undergo a fitness for duty determination. *Id.* at ¶4.e. If NSW personnel were to participate in such a study or trial that required him to remain unvaccinated, he would very likely be found NPQ as discussed in the preceding paragraphs.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of January, 2022.

LANNY F. LITTLEJOHN

Captain, Medical Corps, U.S. Navy

7

# Exhibit 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

**U.S. NAVY SEALs 1-26;**
**U.S. NAVY SPECIAL WARFARE**
**COMBATANT CRAFT CREWMEN 1-5;**
**U.S. NAVY EXPLOSIVE ORDNANCE**
**DISPOSAL TECHNICIAN 1; and**
**U.S. NAVY DIVERS 1-3,**

Plaintiffs,

v.

**LLOYD J. AUSTIN, III,**
individually and in his official capacity as
United States Secretary of Defense; **UNITED**
**STATES DEPARTMENT OF DEFENSE;**
**CARLOS DEL TORO,** individually and in
his official capacity as United States
Secretary of the Navy,

Defendants.

Case No. 4:21-CV-01236-O

## DECLARATION OF ANDREW PETRALIA

I, Andrew J. Petralia, hereby state and declare as follows:

1.      I am a Lieutenant Commander in the United States Navy, currently serving as the

Executive Officer (XO) of Naval Construction Training Center (NCTC), located in Gulfport,

Mississippi. NCTC's mission is to provide preliminary construction-related apprentice and

journeyman level training to Sailors designated in one of the seven Seabee rates as well as

Soldiers and Airmen in related engineering communities. NCTC also serves as the administrative

and training support organization for students enrolled in Expeditionary Combat Skills (ECS)

course at the Center for Security Forces (CSF) learning site Gulfport, MS.  As the XO, I am the

second in command reporting directly to the Commanding Officer.  I am responsible for all

matters including personnel issues, logistics, day-to-day essential command functions and the

1

effective administration of NCTC. These duties also include the implementation of DoD and Navy policies related to the COVID-19 vaccination mandate. I make this declaration in my official capacity, based upon my personal knowledge and upon information that has been provided to me in the course of my official duties. I have also reviewed the preliminary injunction order issued in the above captioned case on January 3, 2022.

2.      I have been assigned to my current position since June 2021. Prior to my current assignment, I served as the Facilities Engineering and Acquisition Division Director at Naval Support Facility Indian Head, Public Works Officer at Marine Barracks Washington, Construction Manager at Naval Base Point Loma, Assistant Public Works Officer at the Presidential Retreat – Camp David, and Platoon Commander at Naval Mobile Construction Battalion 133.

3.      As of January 19, 2022, Navy Diver 2, a Plaintiff in this case, is assigned as a student to NCTC. Navy Diver 2 successfully graduated from a four-week expeditionary combat skills training course in Gulfport on September 24, 2021. That course is not conducted or overseen by NCTC, but NCTC provides administrative support to the organization that oversees that course. Part of that administrative support includes administratively checking personnel into their courses and then ensuring they proceed to their next training course or ultimate duty station (i.e., their final command or unit where they will perform the duties that have been trained to do). It is in this administrative support capacity that NCTC has interacted with Navy Diver 2. NCTC has no role in determining whether students, including Navy Diver 2, meet the criteria to successfully graduate from the Expeditionary Combat Skills training course.

4.      On October 6, 2021, Navy Diver 2 submitted a religious accommodation (RA) request seeking an exemption from the COVID-19 vaccination requirement. On November 29,

2

App042

2021, the Chief of Navy Personnel denied Navy Diver 2's RA request. On December 7, 2021, Navy Diver 2 appealed the denial of his request. That appeal is currently pending adjudication by the Chief of Naval Operations. Because he has a pending RA request or appeal, Navy Diver 2 is not designated as a vaccine "refuser" and, therefore, is not subject to discipline or adverse administrative actions. Navy Diver 2 is, however, unvaccinated. Navy commanders and commanding officers may take several non-adverse personnel actions to mitigate the health risks to unvaccinated members and other vaccinated members. A few weeks following the vaccination mandate, Navy training commands temporarily paused transferring graduates to their ultimate duty stations if they had a pending medical or administrative (e.g., a RA request) exemption request. Rather than send an unvaccinated member to his or her ultimate duty station and potentially to an operational unit, training commands held members pending the resolution of the exemption requests. On November 15, 2021, this policy was implemented Navy-wide. *See, e.g.*, NAVADMIN 256/21 ¶ 2.b, 4., 7.e. Accordingly, Navy Diver 2, has remained at NCTC following the completion of his training and has not transferred to his permanent duty station.

5.     I have been advised that the Navy is enjoined from applying NAVADMIN 225/21, NAVADMIN 256/21 and other policies to Navy Diver 2 and the 34 other Plaintiffs. To comply with the order, NCTC cannot apply the above provisions of NAVADMIN 256/21 and will need to send Navy Diver 2 to his ultimate duty station although he is unvaccinated with a pending RA appeal. Navy guidance also requires commands to administer weekly COVID-19 tests to unvaccinated personnel. NAVADMIN 268/21 ¶3.a. If an unvaccinated member refuses to be tested, wear masks, or comply with other mitigation measures, he or she is subject to disciplinary action or adverse administrative action. NAVADMIN 225/21 ¶5.c. Recently, Navy

Diver 2 stated that he will refuse to submit to weekly testing and further stated he intends to submit a separate RA request concerning testing for the COVID-19 virus.

6.      Navy Diver 2's ultimate duty station is SEAL Advanced Delivery Vehicle Team 1 in Pearl Harbor, Hawaii. This is an operational unit. Navy Diver 2, who is unvaccinated and currently refusing to submit to weekly COVID-19 testing, will be sent to this command to operate in confined spaces within exceptionally close proximity to other personnel and teammates. The court's order prohibits commands from applying NAVADMIN 256/21's authority to temporarily reassign[1] unvaccinated personnel, regardless of the *reason* (e.g., medical exemption or religious accommodation) they are unvaccinated. It is, therefore, my understanding that SEAL Advanced Delivery Vehicle Team 1 cannot temporarily reassign Navy Diver 2 to mitigate the substantial risks caused by him being an unvaccinated and untested member of that unit.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of January, 2022.

A. J. PETRALIA

---

[1] "Navy service members *who are not vaccinated, regardless of exemption status,* may be temporarily reassigned with concurrence of the first flag officer in the administrative chain of command based on operational readiness and mission requirements. Where applicable, the first flag officer in the operational chain of command should be notified regarding temporary reassignments.  NAVADMIN 256/21 ¶ 2.b. (emphasis added).