## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| JENNIFER VANDERSTOK, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>MERRICK GARLAND, in his official capacity as Attorney General of the United States; *et al.*,<br><br>*Defendants*. | Civil Action<br>No. 4:22-cv-00691-O |

## AMENDED PETITION FOR JUDICIAL REVIEW OF AGENCY ACTION AND REQUEST FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiffs Jennifer VanDerStok; Michael G. Andren; Tactical Machining, LLC; and Firearms Policy Coalition, Inc., file this Petition for Judicial Review of Agency Action and Request for Declaratory and Injunctive Relief against Defendants Merrick Garland, Attorney General of the United States, in his official capacity; the United States Department of Justice; Steven Dettelbach, Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, in his official capacity; and the Bureau of Alcohol, Tobacco, Firearms and Explosives and state the following:

### INTRODUCTION

1.     The Executive Branch is not Congress. Congress maintains "All legislative Powers," U.S. CONST. ART. I, § 1, and the president and his subordinate

agencies may neither enact nor legislatively "interpret" statutes to advance desired outcomes not provided for in a law as passed by Congress.

2.     Despite this fundamental tenet of separation of powers, President Biden has both expressed and advanced his intentions to expand federal firearm regulations regardless of whether Congress concurs, in contravention of the constitutional limits on Executive authority.[1]

3.     This lawsuit challenges, *inter alia*, the authority of the Department of Justice ("DOJ") and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF," collectively "Agencies") to regulate items that are not firearms as if they were, and the Agencies' failure to follow the rulemaking requirements of the Administrative Procedure Act ("APA").

4.     The Final Rule not only greatly departs from the Proposed Rule, but misconstrues the Gun Control Act ("GCA"), 18 U.S.C. § 921 *et seq.*; ignores the congressional intent conveyed by the tex of the GCA; and defies long-standing agency interpretation by redefining what constitutes a "firearm" and, in particular, what constitutes the "frame or receiver" of a "weapon."

---

[1]     THE WHITE HOUSE, https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/04/08/remarks-by-president-biden-on-gun-violence-prevention/ (last visited Aug. 10, 2022) ("I asked the Attorney General and his team to identify for me immediate, concrete actions I could [] take now without having to go through the Congress.").

5.     The GCA defines "firearm" as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921(a)(3).

6.     The central dispute in this case is whether the coverage of "any weapon" that may be "readily converted to expel a projectile by the action of an explosive" and the separate coverage of "the frame or receiver of any such weapon" allows the expansion of coverage for anything that is not already a "weapon" but could be "readily converted" into a frame or receiver of an eventual weapon to qualify as a "firearm." The Agencies claim that it is a natural extension of congressional intent to apply the readily converted language of subsection (A) to subsection (B), even though such language is notably lacking in subsection (B). *Definition of "Frame or Receiver" and Identification of Firearms* ("Final Rule"), 87 Fed. Reg. 24,652, 24,667 (Apr. 26, 2022).[2] And yet Congress is presumed to include and exclude language knowingly and intentionally, and by omitting the "readily converted" from subsection (B) regarding frames and receivers, it must be presumed that Congress did not confer such expanded authority on the Agencies.

---

[2]     The Final Rule is available at: https://www.federalregister.gov/documents/2022/04/26/2022-08026/definition-of-frame-or-receiver-and-identification-of-firearms

And, more importantly, that is how such language would have more naturally been understood by legislators and the public when it was adopted. In the context of a statute imposing criminal liability, fundamental principles of statutory interpretation and the equally fundamental due process and separation of powers concerns driving the rule of lenity forbid the Agencies' efforts to broaden the reach of the definition of "firearm."

7.      The Final Rule defies the plain language of the GCA and longstanding agency interpretation suggesting that the items at issue here, sometimes colloquially referred to as receiver blanks, unfinished frames or receivers, or 80% frames or receivers, are not firearms.[3]

8.      "Frame or receiver" is not independently defined in the GCA but refers to the "frame or receiver" of a weapon as defined in 18 U.S.C. § 921(a)(3)(A). Through this rulemaking, however, the Agencies are attempting to create a broad, sweeping definition by including items that are not yet the "frames or receivers" of such weapons and by including "frame or receiver kits."

9.      Additionally, by treating non-frames and non-receivers as if they were actual frames and receivers of a weapon, the Agencies have expanded the reach of a

---

[3] *See Are "80%" or "unfinished" receivers illegal?*, ATF, https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal (last visited Aug. 10, 2022) ("ATF has long held that items such as receiver blanks, 'castings' or 'machined bodies' in which the fire-control cavity area is completely solid and un-machined have not reached the 'stage of manufacture' which would result in the classification of a firearm according to the GCA.").

criminal statute to cover "weapon parts kits" within the definition of a "firearm" under 18 U.S.C. § 921(a)(3)(A), even though such kits do not meet the congressionally defined term and do not actually contain a frame or receiver of a weapon.

10.     Congress never understood itself to be adopting language permitting every actual or potential *part* of a firearm be regulated as a firearm itself through the GCA.[4] Congress also did not give the Agencies the authority to regulate the broad array of materials that may, at some point in the future, be manufactured into firearms by private individuals. Individuals that are not otherwise prohibited from possessing firearms in the United States are free to personally manufacture firearms—there is no federal law that allows the Executive Branch to regulate or prohibit that practice.

11.     The Agencies' Final Rule defies the APA, other federal statutes, and the United States Constitution. Accordingly, the declaratory, injunctive, and other relief Plaintiffs request is necessary to prevent the implementation and enforcement of this unconstitutional, illegal regulation that will directly impact the current and

---

[4]     "Under the present definition of 'firearm,' any part or parts of such a weapon are included. It has been found that it is impractical to have controls over each small part of a firearm. Thus, the revised definition substitutes only the major parts of the firearm; that is, frame or receiver for the words 'any part or parts.'" Fed. Defs.' Mot. for Summ. J., *Syracuse v. ATF*, No. 1:20-cv-06885, 2021 WL 23326, ECF No. 98, at 34 (S.D.N.Y. Jan. 29, 2021) (internal quotations omitted) (quoting S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2200).

longstanding personal and business practices of Plaintiffs and many other similarly situated individuals and businesses.

## **PARTIES**

12.    Plaintiff Jennifer VanDerStok is a United States citizen who lives in Mineral Wells, Texas. Ms. VanDerStok owns at least one firearm—used for lawful purposes, including but not limited to self-defense—that she purchased from Federal Firearms Licensee ("FFL") in accordance with federal law. Ms. VanDerStok does not currently own a firearm that she has manufactured herself using materials that Defendants do not currently classify as firearms, but Ms. VanDerStok wishes to manufacture a firearm using these products in the future and would do so but for the Agencies' new attempt to treat those items as firearms in and of themselves. Ms. VanDerStok is a member of Plaintiff Firearms Policy Coalition, Inc. ("FPC").

13.    Plaintiff Michael G. Andren is a United States citizen who lives in Springtown, Texas. Mr. Andren owns at least one firearm that he purchased from an FFL in accordance with federal law. Mr. Andren also owns a firearm—used for lawful purposes, including but not limited to self-defense—that he manufactured himself using materials that Defendants do not currently classify as firearms. Mr. Andren wishes to and would continue to manufacture firearms using these products but for the Agencies' new attempt to treat those items as firearms in and of themselves. Mr. Andren is a member of Plaintiff FPC.

14.     Plaintiff Tactical Machining, LLC is a producer and retailer of the items the Agencies seek to regulate under the Final Rule. Tactical Machining is a corporation in good standing registered and located in Deland, Florida. Tactical Machining has had several sales direct to customers in this district. Tactical Machining currently sells items that Defendants do not currently treat as firearms under the GCA—items that Tactical Machining submitted to the ATF for classification and that the ATF did not classify as firearms. Should Defendants succeed in amending the GCA via the Final Rule, Tactical Machining would be prohibited from continuing the direct sale of those items to consumers and would be required to serialize all newly regulated items and kits, including already existing products. These new requirements will negatively impact Tactical Machining and will likely put Tactical Machining out of business, a point that the ATF anticipates and acknowledges in the Final Rule. Final Rule, at 24,723. At minimum, these new requirements will cost Tactical Machining a significant amount of monetary expenditure, including changes in business model, changes in product offerings, and a loss of customers. The ATF specifically notes that "there are 41 FFL and 43 non-FFL manufacturers that will be affected by the rule[,]" which includes Tactical Machining.[5] Further, the "ATF estimates the majority of affected entities are small

---

[5]      ATF, REGULATORY IMPACT ANALYSIS AND FINAL REGULATORY FLEXIBILITY ANALYSIS 32 (2022), https://www.atf.gov/file/165811/download.

entities that would experience a range of costs, the largest cost being the dissolution of the entire business[,]"[6] which again includes Tactical Machining. Tactical Machining is a member of Plaintiff FPC.

15.    Plaintiff Firearms Policy Coalition, Inc. is a nonprofit organization incorporated under the laws of Delaware with its principal place of business in Las Vegas, Nevada. FPC's purposes include defending and promoting the People's rights—especially but not limited to First and Second Amendment rights—and advancing individual liberty and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC represents its members and supporters—who include gun owners, individuals who wish to acquire firearms and ammunition, individuals who wish to manufacture their own personal use firearms, licensed firearm retailers, shooting ranges, trainers and educators, and others—and brings this action on behalf of itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public. Plaintiff FPC submitted comments on the Proposed Rule.[7]

16.    Defendant Merrick Garland is the United States Attorney General. As the Attorney General, Defendant Garland leads the Department of Justice. The

---

[6]    *Id.* at 124.

[7]    FPC, COMMENT ON ATF'S PROPOSED RULE (Aug. 19, 2021), https://bit.ly/3zxj9RR.

Department of Justice oversees the Bureau of Alcohol, Tobacco, Firearms and Explosives—the agency that Congress has charged with enforcing the Gun Control Act, the National Firearms Act, and other federal laws. Attorney General Garland is sued in his official capacity.

17.    Defendant United States Department of Justice is a federal agency located at 950 Pennsylvania Avenue, NW, Washington, D.C., 20530.

18.    Defendant Steve Dettelbach is the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives. The Bureau of Alcohol, Tobacco, Firearms and Explosives is charged by Congress with enforcing the Gun Control Act, the National Firearms Act, and other federal laws. Director Dettelbach is sued in his official capacity.

19.    Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is a federal agency located at 99 New York Avenue, NE, Washington, D.C., 20226.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiffs' claims arise under federal law.

21.    This Court has jurisdiction pursuant to 5 U.S.C. § 701, *et seq.*, because Plaintiffs' claims arise under the Administrative Procedure Act.

22.    This Court has jurisdiction to grant the declaratory relief sought, pursuant to 28 U.S.C. § 2201, and additional relief pursuant to 28 U.S.C. § 2202.

23.    Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C) because Plaintiffs Andren and VanDerStok reside in this district; Plaintiff Tactical Machining has engaged in several business transactions in this district; and Plaintiff FPC has members that reside in this district, which include Plaintiffs Andren, VanDerStok, and Tactical Machining.

## STATEMENT OF FACTS

### I.    Historical Background

24.    When reviewing a regulation of "Arms," whatever the context, it is important to start by recognizing that the "People" have a right to keep and bear arms, and that any regulation burdening that right must be measured against historical practices and understandings. "[I]t has always been widely understood that the Second Amendment . . . codified a *pre-existing* right." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022) (internal quotation and citation omitted). As relevant to this case, that pre-existing right and historical practice long encompassed the practice of gunsmithing—the production of firearms by private individuals. The rulemaking challenged here would make such historical practice nearly impossible for those individuals. Congress certainly did not legislate an express ban on such a practice, and basic principles of constitutional avoidance

counsel against allowing an agency to imply such a likely unconstitutional ban from far more limited statutory language.

25.     That technology and manufacturing have evolved since the Founding does not alter the fundamental constitutional backdrop. "Just as the First Amendment protects modern forms of communications, . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008); *see Bruen*, 142 S. Ct. at 2132 ("Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.") (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (*per curiam*)).

26.     Importantly, "[t]he Second Amendment's text makes no distinction between the different methods of acquiring the firearms that Americans have a right to keep and bear. The text shows no preference for purchasing a firearm built by another individual over building one's own firearm. After all, it would not be much of a right if one unnecessarily had to pay others to exercise it[.]"[8]

---

[8]     Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J., at 9 (Apr. 11, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3960566.

27.     The concept of manufacturing a firearm at home is not novel—personal manufacturing of firearms has occurred since long before the Founding of our Nation. In fact, "[p]rivately made firearms have been in existence since the first ignition system was developed close to 500 years ago, in the 1400s."[9] During colonial times, American citizens manufactured and repaired arms—a valued skill that signified America's independence and self-reliance.[10] "Despite the emergence of armories, mass production, and the innovation of prominent manufacturers, the role of the individual never went away and still exists today."[11] Accordingly, The relevant history of arms in this country reflects a long and celebrated tradition of gunsmithing by private individuals, for their own benefit as well as for the benefit of their fellow citizens and the government.

28.     In light of the historically favorable view of gunsmithing, "[r]egulations on self-built arms are *not* longstanding. In fact, there were no restrictions on the manufacture of arms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries. All such restrictions have been enacted within the last

---

[9]      *Stop Gun Violence: Ghost Guns, Hearing before the Subcomm. on the Constitution, Comm. on the Judiciary* ("Stop Gun Violence"), 117th Cong. 4 (2021) (statement of Ashley Hlebinsky, Curator Emerita & Senior Firearms Scholar, Cody Firearms Museum, President, The Gun Code, LLC), https://www.judiciary.senate.gov/imo/media/doc/Ashley%20Hlebinsky%20Written%20Testimony%20Final.pdf.
[10]     *The American Tradition of Self-Made Arms*, at 2.
[11]     *Stop Gun Violence*, at 6.

decade."[12] Efforts to restrict that practice thus run headlong into the Second Amendment, and efforts to do so through Executive Branch expansion of a more limited congressional enactment are particularly suspect.

## II.     Legal Background

### A.      National Firearms Act and Gun Control Act

29.     In 1934, Congress enacted the National Firearms Act ("NFA"), 26 U.S.C. § 5801 *et seq.*, and "imposed a tax on the making and transfer of firearms defined by the Act, as well as a special (occupational) tax on persons and entities engaged in the business of importing, manufacturing, and dealing in NFA firearms."[13] "Firearms subject to the 1934 Act included [short barreled] shotguns and rifles . . ., certain firearms described as 'any other weapons,' machine guns, and firearm mufflers and silencers."[14]

30.     Congress then passed the GCA in 1968, which "amended the NFA definitions of 'firearm' by adding 'destructive devices' and expanding the definition of 'machine gun.'"[15]

31.     As Congress defined it in the GCA, and as it has stood since 1968, "[t]he term 'firearm' means (A) any weapon (including a starter gun) which will or

---

[12]     *The American Tradition of Self-Made Arms*, at 40 (emphasis added).
[13]     *National Firearms Act*, ATF, https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited Aug. 10, 2022).
[14]     *Id.*
[15]     *Id.*

is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921(a)(3). Congress did not independently define the terms "frame or receiver" contained in subsection (B) of that overall definition.

32.     Under federal law, it is "unlawful . . . for any person . . . except a licensed importer, licensed manufacturer, or licensed dealer to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce[.]" 18 U.S.C. § 922(a)(1)(A). "The term 'engaged in the business' means . . . as applied to a manufacturer of firearms, a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured." 18 U.S.C. § 921(a)(21). "The term 'to predominately earn a profit' means that the intent underlying the sale or disposition of firearms is predominately one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." 18 U.S.C. § 921(a)(22).

33.     Violations of the NFA and GCA can carry criminal penalties, including fines and up to five year's imprisonment. 18 U.S.C. § 924(a)(1)(D)

("[W]hoever . . . willfully violates any other provision of this chapter, shall be fined under this title, imprisoned not more than five years, or both.").

### B.   Congress's Delegation to the ATF

34.   The Attorney General has the authority to *enforce* the GCA and NFA, but lacks the authority to fill gaps or legislate. *See* 26 U.S.C. § 7801(a)(2)(A) ("The administration and enforcement of the following provisions of this title shall be performed by or under the supervision of the Attorney General[.]"); 26 U.S.C. § 7805(a) ("[T]he Secretary shall prescribe all needful rules and regulations for the enforcement of this title[.]").

35.   "Congress also authorized the Attorney General to prescribe 'rules and regulations as are necessary to carry out the provisions' of Chapter 44 of Title 18 of the Gun Control Act." *Gun Owners of Am. v. Garland*, 19 F.4th 890, 897 (6th Cir. 2021) (quoting 18 U.S.C. § 926(a)).

36.   "The Attorney General has directed the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to administer, enforce, and exercise the functions and powers of the Attorney General with respect to" both the GCA and NFA. *Id.*; *see Bump-Stock-Type Devices*, 83 Fed. Reg. 66,514, 66,527

(Dec. 26, 2018) ("The Department agrees that regulatory agencies may not promulgate rules that conflict with statutes.").[16]

37.    According to the ATF, "[a]mong ATF's responsibilities is the classification of firearms[.]" Fed. Defs.' Mot. to Dismiss, *California v. ATF*, No. 3:20-cv-06761, 2020 WL 9849685, ECF No. 29, at 12 (N.D. Cal. Nov. 30, 2020).[17]

### C.    The ATF's Prior Classifications

38.    The ATF maintains guides and images to convey and illustrate its treatment and classification of certain firearms and non-firearms.

39.    The ATF has had the same answer to this question for decades. "Are '80%' or 'unfinished' receivers illegal?":

> Receiver blanks that do not meet the definition of a "firearm" are not subject to regulation under the Gun Control Act (GCA). ATF has long held that items such as receiver blanks, "castings," or "machined bodies" in which the fire-control cavity is completely solid and un-machined have not reached the "stage of manufacture" which would result in the classification of a firearm according to the GCA.[18]

This response was available on the ATF's website at the time of filing this Petition. "Classification letters from the late 1970s through the 1990s repeatedly sought to determine whether the 'manufacturing process' was sufficiently complete in order

---

[16]    The Bump-Stock-Type Devices rule is available at: https://www.federalregister.gov/documents/2018/12/26/2018-27763/bump-stock-type-devices

[17]    All court filings refer to the ECF pagination.

[18]    *Are "80%" or "unfinished" receivers illegal?*, ATF, https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal (last visited Aug. 10, 2022).

to be deemed a firearm." Fed. Defs.' Mot. for Summ. J., *Syracuse v. ATF*, No. 1:20-cv-06885, 2021 WL 23326, ECF No. 98, at 16 (S.D.N.Y. Jan. 29, 2021). The ATF supplemented this answer with photos[19] for clarification:



40.     ATF also answered the question of whether there are "restrictions on who can purchase receiver blanks[,]" stating, "[t]he Gun Control Act (GCA) does not impose restrictions on receiver blanks that do not meet the definition of a

---

[19]     *Id.* (retrieved on Aug. 10, 2022).

'firearm.'"[20] This response was available on the ATF's website at the time of filing this Petition.

### D.     Campaign Statements, Announcement, and Rulemaking Process

41.     Before President Biden took office, one of his campaign pillars was an amorphous plan to combat "gun violence." This plan included "stop[ping] the proliferation of these so-called 'ghost guns' by passing legislation requiring that purchasers of gun kits or [a] 3D printing code pass a federal background check."[21]

42.     Once elected, President Biden "urged Congress to swiftly pass gun control laws[.]"[22] When Congress did not act to the Biden Administration's liking, President Biden instead called upon the Agencies to dramatically expand their interpretation of the congressionally defined term "firearm" in order to accomplish the legislative agenda Congress itself declined to adopt.

43.     On April 11, 2022, President Biden declared that he had "instructed the Attorney General to write a regulation that would rein in the proliferation of 'ghost guns' because [he] was having trouble getting it passed in the Congress[.]"[23]

---

[20]     *Are there restrictions on who can purchase receiver blanks?*, ATF, https://www.atf.gov/firearms/qa/are-there-restrictions-who-can-purchase-receiver-blanks    (last visited Aug. 10, 2022).
[21]     *The Biden Plan to End Our Gun Violence Epidemic*, BIDEN-HARRIS DEMOCRATS, https://joebiden.com/gunsafety/ (last visited Aug. 10, 2022).
[22]     *Biden Considers executive actions on guns, calls on Congress to pass weapons ban*, REUTERS (Mar. 23, 2021), https://www.reuters.com/article/usa-guns-idINKBN2BG0A5.
[23]     *Biden announces new rules for 'ghost guns,' introduces ATF director nominee*, CBS NEWS, at   2:51   (Apr.   11,   2022),   https://www.cbsnews.com/video/biden-ghost-guns-atf-director-nominee/#x.

44.     On May 21, 2021, the Department of Justice published a Proposed Rule directly in line with the Administration's public stance and statements. *Definition of "Frame or Receiver" and Identification of Firearms* ("Proposed Rule"), 86 Fed. Reg. 27,720 (proposed May 21, 2021).[24]

45.     The Biden Administration has sought to end run Congress and place restrictions on the ability of peaceable Americans to acquire materials to self-manufacture firearms. The Final Rule requires rigorous compliance with a labyrinth of rules should a privately manufactured firearm ever come into the hands of a licensed dealer. This will naturally cause licensed dealers to turn away privately manufactured guns for repairs to avoid tangling with the complicated regulatory scheme, thus disincentivizing Americans to take part in the pastime of self-manufacturing guns. And this Administration will put numerous companies that produce these newly-regulated items and kits out of business—despite those companies' specific reliance on the Agencies' longstanding application of federal law.

46.     The newly proposed regulation, inspired by the Biden Administration's promises, takes stances that defy statutory construction and long-standing agency interpretation.

---

[24]     The Proposed Rule is available at: https://www.federalregister.gov/documents/2021/05/21/2021-10058/definition-of-frame-or-receiver-and-identification-of-firearms

**III.    The Agencies' Unlawful Redefinition of "Firearm"**

**A.       Unlawful Definition of Frames or Receivers**

47.    Statutorily, as it has stood since Congress enacted the GCA in 1968, "[t]he term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921(a)(3).

48.    The Agencies' prior regulation defines a "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11. This definition was established by an agency rulemaking in 1978. *Title and Definition Changes*, 43 Fed. Reg. 13,531, 13,537 (Mar. 31, 1978).

49.    Just nine days after President Biden was sworn into office, the ATF recognized in a court filing that "pursuant to the . . . statutory definition, a device is a firearm if it is either: (1) a frame or receiver or (2) a device that is designed to or can readily be converted into a device that expels a projectile. Importantly, the 'designed to' and 'readily be converted' language are only present in the *first clause* of the statutory definition." Fed. Defs.' Mot. for Summ. J., *Syracuse*, at 14 (quoting 18 U.S.C. § 921(a)(3)(A)) (emphasis added).

50.    The ATF not only acknowledged, but affirmatively argued that even a *nearly complete* frame or receiver that can be "readily converted" into a frame or receiver was not a firearm under the GCA, nor was it an accurate statutory reading of the GCA to take express language from 18 U.S.C. § 921(a)(3)(A) and add it to 18 U.S.C. § 921(a)(3)(B) when Congress had not done so. *Id.*

51.    Despite the clear distinction in the statute that "readily converted" is sequestered to one section of the statutory definition, the Final Rule did precisely what the ATF claimed was inaccurate—it imported "readily converted" into 18 U.S.C. § 921(a)(3)(B). Final Rule, at 24,739 ("The terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver[.]").

52.    The Agencies newly define "readily" itself as: "A process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state." *Id.* at 24,735. Trailing behind the term "readily" in the Final Rule are eight amorphous factors that the ATF will "balance" to determine whether an object that is itself neither a weapon nor a frame or receiver of a weapon can nonetheless be "readily converted" into a firearm. *Id.* These factors include time, ease, expertise,

equipment required, parts availability, expense, scope, and feasibility. *Id.* The Final Rule does not give any indication as to the weight assigned to each factor, giving the ATF near complete discretion on all classifications moving forward.

53.    The Agencies' new interpretation of the GCA defies canons of statutory interpretation. Congress has the power to insert "readily converted" within the subsection addressing "the frame or receiver of any such weapon" in the GCA and chose not to. Importing such an extension where Congress has not itself done so violates any number of statutory construction canons, not the least of which is the clear statement rule. *See Clear-Statement Rule*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[A] doctrine requiring the legal drafter to use clarity of expression before some effect will follow[.]"); Fed. Defs.' Mot. for Summ. J., *Syracuse*, at 34 (quoting *Allison Engine Co., Inc. v. U.S. ex rel. Saunders*, 553 U.S. 662, 671 (2008) ("When Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in disparate inclusion or exclusion.") (internal quotation marks and alteration omitted)).

54.    The Agencies' newly proposed definition also defies long-standing agency precedent. In litigation documents filed just a few days after President Biden was sworn in, the ATF declared it "applies a standard under which unfinished frames or receivers that have not yet reached a critical stage of manufacturing—devices that

are not designed to expel a projectile and still require many steps, tools, and expertise to be converted into such a device—are *not firearms* within the meaning of the GCA." Fed. Defs.' Mot. for Summ. J., *Syracuse*, at 11 (emphasis added).

55.    "An unmachined frame or receiver is not 'designed' to expel a projectile, because its purpose is not to expel a projectile. Rather, its purpose is to be incorporated into something else that is designed to expel a projectile. Holding otherwise would mean that every part of a gun is designed to expel a projectile and, therefore, would be deemed a firearm under the GCA." *Id.* at 31. Notably, the ATF recognized this would contravene the purpose of the GCA. *Id.* at 34 ("Under the present definition of 'firearm,' any part or parts of such a weapon are included. It has been found that it is impractical to have controls over each small part of a firearm. Thus, the revised definition substitutes only the major parts of the firearm; that is, frame or receiver for the words 'any part or parts.'") (internal quotations omitted) (quoting S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2200).

56.    "The object that is designed to expel a projectile is a gun—not its trigger, its hammer, the grip, front sight, or the frame. It is the combination of all these things into one that results in an object that is designed to expel a projectile. [The party's] argument that unmachined frames and receivers are firearms because they are 'designed to' expel a projectile should therefore be rejected." *Id.* at 32.

57.     The ATF referenced some its own classification letters, including one letter that states: "[T]he devices at issue still required both machining to become finished frames/receivers and assembly with other parts to become operable firearms. . . . [T]his process is not one whereby an unmachined frame can 'readily' be converted into a device that expels a projectile." *Id.* at 36.

58.     "Congress knew how to regulate devices based upon what was 'intended' to be done with them. . . . The absence of analogous language in Section 921's definition of 'firearm,' forecloses any argument that unfinished frames or receivers are firearms simply because they are parts that will later be assembled into firearms, or because they are intended to be incorporated into firearms." *Id.* at 34.

59.     Under the Final Rule, the items in the photograph below[25] labeled "not a firearm" are now firearms because "the terms 'frame' and 'receiver' include a partially complete frame or receiver 'that is designed to, or may readily be completed, assembled, restored, or otherwise converted' to accept the parts it is intended to house or hold." Final Rule, at 24,685.

---

[25]     *Are "80%" or "unfinished" receivers illegal?*, ATF, https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal  (last visited Aug. 10, 2022).



60.    Additionally, the Agencies can exert broad discretion in determining what exactly constitutes a "frame or receiver." The Final Rule declares, under the definition of "frame," "receiver," and "variant," that "[t]he following are *nonexclusive* examples that illustrate the above definitions." Final Rule, at 24,735 (emphasis added); *see id.* at 24,739 ("[T]his section, the terms 'frame' and 'receiver' shall include the specific part of a complete weapon, including variants thereof, *determined (classified) by the Director* to be defined as a firearm frame or receiver prior to April 26, 2022.") (emphasis added).

61.    The Final Rule also provides near complete discretion to the ATF's Director to consider not just the item being classified, but also to consider outside information, whether provided with the item or not, to "determine" if it is a frame or receiver. *Id.* at 24,739 ("When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit."). In this way, the Final Rule also seeks to regulate a "frame or receiver parts kit" as a frame or receiver itself. In other words, under the Final Rule, a link to a YouTube video on a retailer or producer's website may have the effect of converting an unregulated item into a regulated frame or receiver.

62.    The Final Rule goes so far as to "[e]xpressly exclude[] from the definition of 'frame or receiver' unformed blocks of metal, liquid polymers, and other raw materials" because the ATF's new classification is so expansive and departs so markedly from its previous classifications that they are not obviously excluded without explicit mention. *Id.* at 24,700. But such exclusions are entirely arbitrary, cannot be supported by the definitions the ATF otherwise seeks to apply, and thus illustrate why such regulatory redefinitions are overbroad and incorrect.

63.     The Final Rule's redefinition of "firearm," specifically as to frames and receivers is not consistent with the statutory definition because the Final Rule includes items that do not meet the statutory definition of frame or receiver under the regulatory definition, thus broadening the ATF's reach without congressional mandate or approval. *See* 18 U.S.C. § 921(a)(3).

## B.     Unlawfully Designating Weapons Parts Kits as "Firearms"

64.     In addition to improperly expanding the terms "frame" and "receiver", the Final Rule unlawfully treats parts kits as "firearms." Initially, the Proposed Rule sought to add "a sentence at the end of the definition of 'firearm' in [27 C.F.R. § 478.11] providing that '[t]he *term shall include a weapon parts kit* that is designed to or may readily be assembled, completed, converted, or restored to expel a projectile by the action of an explosive.'" Proposed Rule, at 27,726 (emphasis added).

65.     In the Final Rule, the Agencies contravened their prior position and stated, "the language of section 921(a)(3)(A) should be read to include weapon parts kits and aggregations of weapon parts that . . . may or may not be designed to expel a projectile by the action of an explosive in their present form or configuration, *but may readily be converted to do so*." Final Rule, at 24,684 (emphasis added).

66.    The Final Rule included in the definition of firearm "a weapon parts kit that is designed to or may be readily completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *Id.* at 24,735.

67.    The Agencies' newly crafted regulatory definition that includes a collection of parts within the definition of a firearm defies long-standing agency precedent—explicitly argued in litigation in *California v. ATF*.

68.    In *California v. ATF*, the ATF declared in its motion to dismiss a contrary message to what it purports now, that it is required to regulate weapon parts kits:

> As a statutory matter, Congress has legislatively defined a "firearm" to be a weapon that may be readily converted to expel a projectile by the action of an explosive, or the frame or receiver of such weapon, but has explicitly excluded "firearms parts" from that definition. Congress has determined that "firearms" are subject to regulation under the GCA, and that anything that is not a firearm is largely excluded from federal regulation. This leaves a State like California free to enact its own regulations of firearm parts (as it has done), but does not permit ATF to extend federal regulation beyond the limits imposed by Congress.

Fed. Defs.' Mot. to Dismiss, *California*, at 10–11. In other words, Congress chose to regulate complete weapons, or a single component of an incomplete weapon.

69.    The ATF goes on, stating, "Congress has chosen to exclude firearm parts from the scope of the GCA, including parts that could be assembled with a homemade receiver and frame to make a firearm. Congress has also chosen to permit the home manufacture of unserialized firearms for personal use." *Id.* at 20.

70.     Congress granted the ATF the limited authority to regulate complete weapons (including those that may be readily converted into complete weapons) and the actual complete or functional receiver of a such weapon, but not items that may someday become a frame or receiver or even the individual parts of a weapon.

71.     In fact, "[t]here is nothing novel about the use of unregulated firearm parts to manufacture firearms for personal use; that possibility (whether by lawful makers or by prohibited persons) has been evident since Congress's 1968 decision to exclude firearms parts from the GCA." *Id.* at 21 n.10.

72.     The Agencies now regulate weapon parts kits in contradiction with clear statutory language and the Agencies' own long-standing precedent and understanding of the original public meaning of such language. Furthermore, Plaintiffs, and millions of other individuals, have relied on the original public meaning of such language, as confirmed by the ATF's long-standing precedent, to establish and pursue their personal and business practices. Such a shift would detrimentally impact Plaintiffs and the population writ large.

## IV.    The Agencies' Further APA Violations

73.     "Between May 21 and August 19, 2021, ATF received over 290,000 comments on the proposed rule, Definition of 'Frame or Receiver' and Identification

of Firearms."[26] DOJ published the Final Rule in the Federal Register on April 26, 2022. The Final Rule violates numerous provisions of the APA beyond just the Agencies' redefinition of congressionally established terms.

### A.    The Definition of "Complete Weapon" is in Excess of the Agencies' Authority

74.    The Agencies newly define a complete weapon as "[a] firearm other than a muffler or silencer that contains all component parts necessary to function, *whether or not assembled or operable*." Final Rule, at 24,747 (emphasis added). By including unassembled weapons in the definition of "complete weapon" the ATF has created tremendous enforcement uncertainty.

75.    This definition is problematic considering the interchangeability of certain gun parts. For example, "law-abiding gun owners who legally own both AR rifles and pistols could be charged with a felony if they store their firearms unassembled." *Id.* at 24,700. This is because an AR rifle and an AR pistol could theoretically create a new combination—an AR rifle lower and a pistol upper (with a barrel of less than 16 inches), when combined, create a short-barrel rifle. This matters because that individual would possess a "complete weapon" that is an NFA regulated item and cannot be lawfully owned without a federally issued tax stamp. Mere possession of the unregulated AR pistol upper in conjunction with an AR rifle

---

[26]    *Comments on Proposed Rule 2021R-05*, ATF, https://www.atf.gov/rules-and-regulations/definition-frame-or-receiver/submit-comment (last visited Aug. 10, 2022).

lower could now qualify as a felony under the Agencies' definition of "complete weapon."

76.     The Final Rule does not sufficiently respond to this dramatic expansion of federal regulation, intentional or not—violation of which bears potential felony charges, prison time, and the forfeiture of an individual's right to possess a firearm under federal law.

77.     The Agencies fail to adequately address this concern and merely state the definition is needed for other purposes. *See id.* at 24,700 ("Firearms manufacturing is a continuum from raw material to a functional item, and the term 'complete weapon' is needed to explain *when* the frame or receiver of a weapon in the process of being manufactured must be identified and recorded as required by the regulations."). The ATF does not explain how the current regulatory system is insufficient in this regard, nor does the ATF have the authority to regulate the various firearm parts that will be caught up in this definition.

**B.     The Final Rule is Not a Logical Outgrowth of the Proposed Rule**

78.     The Proposed Rule sought to combine frame or receiver into a less technical single definition, defined as "[a] part of a firearm that, when the complete weapon is assembled, is visible from the exterior and provides housing or a structure designed to hold or integrate one or more fire control components, even if pins or

other attachments are required to connect those components to the housing or structure." Proposed Rule, at 27,741.

79.    The Final Rule significantly departed from the Proposed Rule and defines "frame" and "receiver" as distinct terms accompanied by nearly six pages of diagrams and examples. Final Rule, at 24,735–41. The Final Rule omitted four diagrams from the Proposed Rule and added five new diagrams. *Compare* Proposed Rule, at 27,742–46 *with* Final Rule, at 24,735–41.

80.    The new, sweeping definition and diagrams associate a "frame" with handguns, a "receiver" with rifles or shotguns, and adds the term "variant," which means "a weapon utilizing a similar frame or receiver design irrespective of new or different model designations or configurations, characteristics, features, components, accessories, or attachments." Final Rule, at 24,735.[27]

---

[27]    "(1) The term 'frame' means the part of a handgun, or variants thereof, that provides housing or a structure for the primary energized component designed to hold back the hammer, striker, bolt, or similar component prior to initiation of the firing sequence (i.e., sear or equivalent), even if pins or other attachments are required to connect such component to the housing or structure. (2) The term 'receiver' means the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent), even if pins or other attachments are required to connect such component to the housing or structure. (3) The terms 'variant' and 'variants thereof' mean a weapon utilizing a similar frame or receiver design irrespective of new or different model designations or configurations, characteristics, features, components, accessories, or attachments. For example, an AK-type firearm with a short stock and a pistol grip is a pistol variant of an AK-type rifle, an AR-type firearm with a short stock and a pistol grip is a pistol variant of an AR-type rifle, and a revolving cylinder shotgun is a shotgun variant of a revolver." Final Rule, at 24,735.

81.    The definitions are followed by "nonexclusive examples that illustrate the above definitions[,]" and sub-definitions of what constitutes a "frame or receiver." *Id.* at 24,735, 24,739–41.

82.    Another significant change is that the Proposed rule sought to require a "manufacturer, importer, or maker of a firearm" identify "a complete weapon or complete muffler or silencer device no later than seven days following the date of completion of the active manufacturing process . . . or prior to disposition, whichever is sooner," Proposed Rule, at 27,752, but the Final Rule replaces seven days with "no later than close of the next business day," Final Rule, at 24,748. The Agencies did not provide any opportunity for comment on this significant change.

83.    Additional definitions were added to the Final Rule without being proposed in the Proposed Rule. For example, the definition of multi-piece frame or receiver was added to the Final Rule under sections 478.92(a)(iii) and 479.102(a)(3) without being proposed in the Proposed Rule. *See* Final Rule, at 24,741, 24,747.

84.    Additionally, under section 478.92(a)(4)(iii)(D), the requirements for privately made firearms marked by non-licensees was added without being proposed. *See id.* at 24,743.

85.    Although mentioned in the Proposed Rule, the Final Rule, for the first time, defines the term "primordial." *See* Proposed Rule, at 27,729 ("Although this addition is intended to capture when an item becomes a frame or receiver that is

regulated irrespective of the type of technology used to complete the assembly, frame or receiver molds that can accept metal or polymer, unformed blocks of metal, and other articles only in a primordial state would not—without more—be considered a 'partially complete' frame or receiver.").

86.    The Final Rule states, "[a]s used in this rule, the term 'primordial' refers to an item, such as an unmachined block of metal, liquid polymer, or other raw material that is in its original natural form or at an early stage of development without substantial processing." Final Rule, at 24,663 n.49 (citing Primordial, Oxford English                                     Dictionary, https://www.oed.com/view/Entry/151373?redirectedFrom=primordial#eid ("[T]hat [which] constitutes the origin or starting point from which something else is derived or developed.")).

87.    In addition to definitional issues, the Proposed Rule and Final Rule omit sources that the agency presumably relied on for preparing both rules. The public did not have the opportunity to review those sources or provide comment. For example, regarding personally manufactured firearms, while the ATF claims that they are involved in crimes and difficult to trace, the assertion was unsupported by any cited evidence in the Proposed Rule and the ATF declined to make available the evidence on which it purportedly relied for review, notice, and comment.

34

88.     The Final Rule included a significant amount of new and additional sources that were not provided to the public for review and comment. *See*, *e.g.*, Final Rule, at 24,657–58 (citing nearly two pages of DOJ Office of Public Affairs "OPA" sources not mentioned in the Proposed Rule; 57 new DOJ/OPA sources are cited throughout the entire Final Rule for the first time).

89.     No opportunity for additional comment was made available here on these new, critical elements of the Final Rule.

**C.     The Agencies' Failure to Adequately Explain and Failure to Consider**

90.     The Final Rule fails to adequately explain why the ATF will now treat inoperable frames or receivers or inoperable frame or receiver kits as firearms, when they were previously not treated as such. *Id.* at 24,727–28. The Final Rule (and indeed the Proposed Rule) includes "inoperable" without any explanation or justification.

91.     Despite suggesting that the ruling is "not intended to alter any prior determinations" on what is a "frame or receiver," *id.* at 24,662, the ATF appears to be changing its mind on at least one firearm right on the face of the Final Rule—the Beretta AR-70.

92.     The Final Rule makes factually incorrect claims about split frame firearms. "[T]he concept of a 'split receiver' was nowhere near new. In fact, self-loading firearms invited, or even required, 'split' components as early as their

introduction. These firearms were incredibly common, undisputedly in common lawful use, and thus very unlikely to have gone unnoticed by the ATF and its predecessor."[28]

93.     The ATF has long held that the upper receiver was the "firearm" and that the lower receiver and other parts were not themselves firearms. Yet now, the ATF is amending the regulation to declare that, for some firearms, such as AR-style rifles, the lower receiver is the "frame or receiver."

94.     The "ATF and its precursors were patently aware of striker-fired, selfloading firearms that were so tremendously popular they, in large part, led to the adoption of the very law the ATF purports to be interpreting. Many of the popular imported firearms targeted by the [GCA], which the ATF enforced, meet the exact factors the ATF here claims it could not have known about."[29]

95.     "In addition to this, hundreds of thousands of American made striker-fired pistols were flooding the market by 1968. To suggest that these firearms were so rare in what the ATF terms 'civilian use' compared to revolvers and break-open shotguns, despite their popularity literally preceding the very law the ATF is presently interpreting, is implausible, to say the least."[30]

---

[28]     FPC, COMMENT ON ATF'S PROPOSED RULE 12–13 (Aug. 19, 2021), https://bit.ly/3zxj9RR.
[29]     *Id.*
[30]     *Id.*

## V.    The Agencies' Violation of the First Amendment

96.    The Final Rule violates the First Amendment because it includes content- and speaker-based restrictions on speech by a government agency.

97.    The Final Rule, when discussing partially complete, disassembled, or nonfunctional frames or receivers, states:

> When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, *instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor* of the item or kit to the purchaser or recipient of the item or kit.

Final Rule, at 24,739 (emphasis added). The Final Rule provides the following example of the implementation of this regulation:

> Example 1 to paragraph (c)—Frame or receiver: A frame or receiver parts kit containing a partially complete or disassembled billet or blank of a frame or receiver that is sold, distributed, or possessed with a compatible jig or template is a frame or receiver, *as a person with online instructions and common hand tools* may readily complete or assemble the frame or receiver parts to function as a frame or receiver.

*Id.* (emphasis added).

98.    Under the Final Rule section discussing voluntary classification of firearms, the Final Rule states:

> Each request for classification of a partially complete, disassembled, or nonfunctional item or kit *must contain* any associated templates, jigs, molds, equipment, or tools that are made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit, *and any instructions, guides, or marketing materials if they will be made available by the seller or distributor with the item or kit*.

*Id.* at 24,749 (emphasis added).

### A.    The Final Rule Burdens and Chills Protected Speech.

99.    Instructions, guides, and marketing materials are protected speech.

100.    The Final Rule seeks to allow the ATF to assess the content of the instructions, guides, or marketing materials to determine if a product—accompanied by such protected speech—is a firearm. This equates to content-based restrictions of protected speech. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 509 (D.C. Cir. 2016) ("[T]o know whether to apply [the regulation], the FEC must 'examine the content' of the PAG's website or Facebook page and ask whether the title supports or opposes the candidate. . . . That is content-based discrimination pure and simple.") (quoting *McCullen v. Coakley*, 573 U.S. 464, 479 (2014)).

101.    "The [Supreme] Court has recognized that the 'distinction between laws burdening and laws banning speech is but a matter of degree' and [] the 'Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans.'" *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565–66 (2011) (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000)).

102.    Based on Defendants' application of the Final Rule, a product such as one of Plaintiff Tactical Machining's "80% Lower" may not be classified as a "firearm" under the GCA when sold on its own, but may be classified as a "firearm"

38

if sold with instructions on how to manufacture the item into the "frame or receiver" of a "firearm."

103.  That is a clear prohibition on the content of Tactical Machining's speech. Moreover, that same item may not be classified as a "firearm" if not sold with instructions, but if those same instructions are merely made available on Tactical Machining's website, the item may be classified as a "firearm"—another clear prohibition on the content of Tactical Machining's speech. Additionally, because the Final Rule targets both the seller and distributor, a reseller of the same products may be liable for unlawfully selling a "firearm" if the producer of the product posts instructions on the producer's website, even without the reseller's knowledge. *See* Final Rule, at 24,749.

104.  The only way the ATF can determine if an item is a "firearm" is by looking at the content of instructions, guides, or marketing materials. The ATF is not concerned if the marketing materials encourage customers to purchase more of their products; the ATF is concerned if it informs customers how to build a "firearm."

**B.  The Final Rule Targets Specific Speakers.**

105.  The ATF's Final Rule also restricts the type of speaker. *Sorrell*, 564 U.S. at 564 ("The law on its face burdens disfavored speech by disfavored speakers."); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994) ("[S]peaker-

based laws demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say).").

106.   The only time instructions, guides, and marketing materials are analyzed for the purposes of determining if a product is a "firearm" are when a *seller or distributor* sells them in conjunction with their product. Final Rule, at 24,749 ("Each request for classification . . . must contain . . . any instructions, guides, or marketing materials if they will be made available by the seller or distributor with the item or kit.").[31]

107.   Therefore, sellers and distributors are specifically being silenced, thus discouraging the longstanding practice of self-manufacturing firearms. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) ("The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good.").

---

[31] Individuals rarely seek classification letters, and if they do, it's for patent purposes.

## **CLAIMS FOR RELIEF**

### **COUNT I**
### **VIOLATION OF THE APA**
### **5 U.S.C. § 706**
### **(Exceeds the ATF's Statutory Jurisdiction and Authority)**

96.     Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

97.     Under 5 U.S.C. § 706(2)(c), "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"

98.     If the agency's regulation is not consistent with a statutory definition established by Congress, the agency has gone outside the bounds of its authority since it derives its authority from Congress. *See Peyton v. Reynolds Assocs.*, 955 F.2d 247, 251 (4th Cir. 1992) ("If a regulation reflects an administrative interpretation which is inconsistent with the plain language of the statute under which it is promulgated, we do not defer to the agency's interpretation."). And even were there some ambiguity in the legislative language, such ambiguity would be resolved in a manner that narrowed, rather than expanded, the relevant statutes, consistent with clear statement principles, the constitutional avoidance doctrine, and the rule of lenity. The agency would not have discretion to expand any such terms

to criminalize further behavior and would not receive deference of any such interpretive efforts.

99.   "Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (quotations and citation omitted).

100.   The Final Rule purports to establish a regulation to "guide" the ATF's administration of the NFA and GCA, but instead regulates new items Congress explicitly left out of the definition of "firearm," and would grant the Agencies new, additional authority in excess of that proposed, considered, debated, or passed by Congress.

101.   The Agencies are attempting to regulate weapon parts Congress explicitly left out of the statute and impose felony charges for violations thereof. *See* 18 U.S.C. § 924(a)(1)(D) ("[W]hoever . . . willfully violates any other provision of this chapter, shall be fined under this title, imprisoned not more than five years, or both.").

102.   The Final Rule exceeds the ATF's congressionally mandated jurisdiction and authority.

## COUNT II
## VIOLATION OF THE APA
## 5 U.S.C. § 706
## (Fails to Observe Procedures Required by Law)

103.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

104.   Under 5 U.S.C. § 706(2)(D), "[t]he reviewing court shall . . . hold unlawful and set aside any action, findings, and conclusions found to be . . . without observance of procedure required by law[.]"

105.   The APA's rulemaking requirements include a mandate for federal agencies to provide the public with a meaningful opportunity to comment on the elements of a rule and the materials that form the basis for the rule. *See*, *e.g.*, 5 U.S.C. § 553(c); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995) ("The purpose of the notice and comment requirement is to provide for meaningful public participation in the rule-making process.").

### *Final Rule Not a Logical Outgrowth of Proposed Rule*

106.   As part of the rulemaking process, the Agencies made significant changes to the Final Rule that do not logically grow out of the Proposed Rule.

107.   An agency is prohibited by the APA from adopting a final rule that contains significant changes unless supplemental notice and opportunity to comment is provided. *See* 5 U.S.C. § 706; *see also Mid Continent Nail Corp. v. United States*,

846 F.3d 1364, 1374 (Fed. Cir. 2017) (applying "logical outgrowth" doctrine to vacate final rule that significantly deviated from proposed rule without notice).

108.   The Final Rule provides separate and distinct definitions for "frame," "receiver," and "variant" that were not proposed in the Proposed Rule and were not provided for comment.

109.   The Proposed Rule defined a frame or receiver as "[a] part of a firearm that, when the complete weapon is assembled, is visible from the exterior and provides housing or a structure designed to hold or integrate one or more fire control components, even if pins or other attachments are required to connect those components to the housing or structure." Proposed Rule, at 27,741. Following the definition is just over a dozen illustrations. *Id.* at 27,742–46.

110.   The Final Rule omitted four diagrams from the Proposed Rule and added five new diagrams. *Compare* Proposed Rule, at 27,742–46, *with* Final Rule, at 24,735–41.

111.   The Final Rule significantly altered the time allowed for the identification of a firearm, down from 7 days to the next business day. *Compare* Proposed Rule, at 27,752, *with* Final Rule, at 24,748.

### *Lack Notice and Comment on Critical Elements of the Final Rule*

112.   As part of the rulemaking process, the agencies relied on new information and made significant changes to the Final Rule that were not available

for public comment. *See United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240, 251 (2d Cir. 1977) ("If the failure to notify interested persons of the scientific research upon which the agency was relying actually prevented the presentation of relevant comment, the agency may be held not to have considered all 'the relevant factors.'"); *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) ("It would appear to be a fairly obvious proposition that studies upon which an agency relies in promulgating a rule must be made available during the rulemaking in order to afford interested persons meaningful notice and an opportunity for comment.").

113.   For example, the Final Rule added 57 DOJ Office of Public Affairs sources, among others, that were not present in the Proposed Rule or offered for comment.

114.   The Final Rule added definitions and/or regulations for several terms, including but not limited to a multi-piece frame or receiver, privately made firearms marked by licensees, and primordial, all without being proposed in the Proposed Rule or offered for comment. These definitions also cannot be said to have logically outgrown from the Proposed Rule.

115.   The Agencies included voluminous new sources in the Final Rule that were not provided for public review nor comment in the Proposed Rule.

**COUNT III**
**VIOLATION OF THE APA**
**5 U.S.C. § 706**
**(Arbitrary, Capricious, and Not in Accordance with Law)**

116.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

117.   Under 5 U.S.C. § 706(2)(A), "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"

### *Failure to Adequately Explain Change in Position*

118.   "It is established administrative law that if the agency fails to acknowledge a change [in its position] and adequately explain it, the changed position will be afforded no deference in litigation under either *Chevron* . . . or *Auer*[.]" *United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 6 (D.D.C. 2017) (internal quotation marks and citations omitted).

119.   The Final Rule drastically departs from the Agencies' longstanding treatment of firearms and non-firearms.

120.   The Final Rule abandons the Agencies' treatment of non-firearm objects that was stated on the ATF's official website, applied in numerous classification letters, and that the ATF argued in support of in active litigation—a

position that individuals and corporations have relied on to structure their personal and business practices.

121.   The Agencies have failed to adequately reconcile their statements in *California v. ATF* and *Syracuse v. ATF* with their Final Rule, including, but not limited to, the Agencies' treatment of "readily convertible."

122.   The Agencies include new regulation of certain firearms, including but not limited to AR-style firearms and striker-fired handguns, in the Final Rule without adequate explanation, given the Agencies knew of both split receivers and striker-fired handguns at the time of their prior rulemaking defining firearms, which were already popular and widely used.

123.   The Agencies fail to adequately explain why the ATF will now treat inoperable frames or receivers or inoperable frame or receiver kits as firearms.

### *Failure to Consider Important Aspects of the Problem and Relevant Comments and/or Sources*

124.   The APA requires federal agencies, including Defendants, to (a) give general notice of proposed rulemaking in the Federal Register and thereafter (b) "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).

125.   The House and Senate reports regarding this provision state that "the agency must analyze and consider all relevant matter presented." S. Rep. No. 752,

796 Cong., 1st Sess. 15 (Nov. 19, 1945); H. Rep. No. 1980, 79th Cong., 1st Sess. 25 (May 3,1946).

126.   "[Public] participation . . . in the rule-making process is essential in order to permit administrative agencies to inform themselves[.]" Report submitted by Pat McCarran, Chairman, U.S. Senate Committee on the Judiciary, *Administrative Procedure Act, Legislative History 1944-46*, 79th Cong. (July 26, 1946).

127.   "[I]t is 'arbitrary or capricious' for an agency not to take into account all relevant factors in making its determination." *Hanly v. Mitchell*, 460 F.2d 640, 648 (2d Cir. 1972).

128.   Courts have recognized the importance of the public comment process, which is designed to prevent a person from being required to resort to, or be adversely affected by, significant rulemaking without having the opportunity to participate in that rulemaking. *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 630 (5th Cir. 2001); *Ober v. EPA*, 84 F.3d 304, 312–15 (9th Cir. 1996); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1401–06 (9th Cir. 1995).

129.   The Final Rule fails to adequately address a number of comments the Agencies received on the Proposed Rule within the Final Rule. For example, the Final Rule fails to adequately consider the implications of its "complete weapon" definition. *See* Final Rule, at 24,700 ("[T]he Department disagrees . . . that the

application of the definition of 'firearm' to unassembled weapons creates enforcement uncertainty."). Most importantly, fails to consider the fact that both split receivers and striker-fired pistols were in existence in 1968, thus Congress could not have intended for the ATF to regulate what it chose to ignore.

130.    There are a variety of other examples of such failure, including, but not limited to these instances of the Agencies' failure to consider relevant comments and sources.

## COUNT IV
## VIOLATION OF THE U.S. CONSTITUTION
## U.S. CONST. ART. I
## (Separation of Powers & The Delegation Doctrine)

131.    Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

132.    Article I, Section 1 of the U.S. Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

133.    Article I, Section 3 of the U.S. Constitution directs that the President "shall take Care that the Laws be faithfully executed[.]"

134.    A "fundamental precept" of "another strand of [] separation-of-powers jurisprudence, the delegation doctrine," "is that the lawmaking function belongs to Congress, U.S. CONST. ART. I, § 1, and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996).

135.   "Even before the birth of this country, separation of powers was known to be a defense against tyranny," and "it remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another." *Id.* at 756–57.

136.   When the ATF redefined the definition of "firearm," it did so without congressional authority, thus violating the separation of powers.

137.   "[B]oth separation of powers principles and a practical understanding of legislative intent make us reluctant to read into ambiguous statutory text the delegation claimed to be lurking there." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). "A decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to a *clear delegation* from that representative body." *Id.* at 2616 (emphasis added).

138.   Congress may not "abdicate or [] transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).

139.   Neither the president nor his subordinates, therefore, may exercise, Congress' legislative power to declare entirely "what circumstances . . . should be forbidden" by law. *Panama Refining Co. v. Ryan*, 293 U.S. 388, 418–19 (1935).

140.   A violation of the Constitution is always a violation of the APA. *See* 5 U.S.C. § 706(2)(B).

141.   The Final Rule is not merely a regulatory change that allows the Agencies to enforce the NFA and GCA. The Final Rule would give the Agencies new power over new items that are not contemplated nor regulated under federal law. This rulemaking constitutes an executive branch agency making new law, bearing potential criminal penalties, in violation of the Delegation Doctrine as established by the structure of the U.S. Constitution and elucidated by the U.S. Supreme Court.

## COUNT V
## VIOLATION OF THE U.S. CONSTITUTION
### U.S. CONST. ART. II
### (The Take Care Clause)

142.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

143.   Article I, Section 1 of the U.S. Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

144.   Article I, Section 7, Clauses 2 and 3 of the U.S. Constitution require that "Every Bill" shall be passed by both the House of Representatives and the Senate and signed by the President "before it [may] become a Law."

145.   Article II, Section 3 of the U.S. Constitution directs that the President "shall take Care that the Laws be faithfully executed[.]"

146.   A violation of the Constitution is always a violation of the APA. *See* 5 U.S.C. § 706(2)(B).

147.    "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).

148.    The Executive Branch cannot create new policies to be enforced with the force of federal law in the guise of enforcing a congressional enactment. *Id.* at 587–88 ("The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President."); s*ee Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting the notion that "the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution").

149.    "The Supreme Court has also invoked the Take Care Clause as the textual source of the President's duty to abide by and enforce the laws enacted by Congress—that is, as the instantiation of the President's duty to respect legislative supremacy and not to act c*ontra legem*." Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*, 164 U. PA. L. REV. 1835, 1848 (2016).

150.    "Separate opinions by members of the *Youngstown* majority expressed a like sentiment about the Take Care Clause—that it obliges the President to respect the means and ends of statutory policy power specified by Congress. In his famous concurrence, Justice Jackson wrote that the clause confers on the President 'a

governmental authority that reaches so far as there is law,' thereby 'signify[ing] . . . that ours is a government of laws, not of men, and that we submit ourselves to rulers only if under rules.'" *Id.* at 1849–50.

151.   "To similar effect, Justice Frankfurter quoted Justice Holmes for the proposition that '[t]he duty of the President to see that the laws be executed is a duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power.' Likewise, in Justice Douglas's words, any authority conferred by the clause 'starts and ends with the laws Congress has enacted.'" *Id.* at 1850.

152.   The Final Rule is not a faithful execution of congressionally enacted law. Instead, it is an executive created law offered under the guise of enforcing the NFA and GCA. The Final Rule violates the prohibition on the Executive of making law and violates the president's duty to ensure the laws are faithfully executed.

## COUNT VI
## VIOLATION OF THE U.S. CONSTITUTION
### U.S. CONST. AMEND. V
### (Void for Vagueness)

153.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

154.   A person of ordinary intelligence could not determine from the statute or the rule itself whether various objects were regulated. *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983) ("[T]he void-for-vagueness doctrine requires that a penal

statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.").

155.   The indeterminacy of the various tests gives the Agencies virtually unlimited and unpredictable discretion. *See, e.g.*, Final Rule at 24,735 (listing eight un-ranked factors to determine what "readily" means); *id.* at 24,735–41 (listing six pages of non-exclusive illustrations of what constitutes a "frame," "receiver," or "variants thereof"); *id.* at 24,739 (empower the Director to consider "any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit," when classifying items).

156.   Even long-standing agency classification letters are subject to change, thus adding to the obscurity. *See* Fed. Defs.' Mot. for Summ. J., *Syracuse*, at 40 ("The Record contains classification letters dating back to the 1970s. These classification letters make plain that the ATF has consistently adopted a standard whereby the degree of machining to the frame or receiver determined whether that device constituted a firearm.").

157.   The Final Rule is unduly vague and violates the void for vagueness doctrine.

## COUNT VII
## VIOLATION OF THE U.S. CONSTITUION
## U.S. Const. Amend. I
## (Free Speech)

158.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

159.   Under the First Amendment, "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. Amend. I.

160.   The Supreme Court "has held that the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011); *see Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("If the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct.") (internal quotations and citations omitted).

161.   The Final Rule specifically targets instructions, guides, and marketing materials sold by a seller or distributor of firearms parts. Instructions, guides, and marketing materials constitute commercial speech, which is protected by the First Amendment. *See Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481 (1995) ("[I]nformation on beer labels constitutes commercial speech."); *cf. Green v. Dep't of Justice*, 329 F. Supp. 3d 68, 89 (D.C. Cir. 2019) determining that plaintiffs must allege that "the rulemaking process results in censorship through 'suppressing disfavored speech or disliked speakers,'" or "that the rulemaking defendants are

'passing judgment on the content of speech'" to carry a First Amendment claim) (cleaned up) (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988) and *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 320 (2002)).

162.   Content-based restrictions on speech, found in the Final Rule, require a strict scrutiny analysis that Defendants cannot overcome. *Sorrell*, 564 U.S. at 565 "[The law] is designed to impose a specific, content-based burden on protected expression. It follows that heightened judicial scrutiny is warranted."); *id.* at 566 ("The First Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.'") (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

163.   The Final Rule also regulates speech based on speaker, not just content, which requires a strict-scrutiny analysis that Defendants likewise cannot overcome. *See Turner Broad. Sys., Inc.*, 512 U.S. at 658 ("[S]peaker-based laws demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say).").

164.   The Final Rule impermissibly places government restriction on who the speaker is and what the speaker can say, thus violating the First Amendment.

## **PRAYER FOR RELIEF**

Plaintiffs request the following relief from this Honorable Court:

1.  Holding unlawful and setting aside the Final Rule;

2.  Issuing preliminary and permanent injunctive relief enjoining Defendants from enforcing or implementing the Final Rule;

3.  Postponing the effective date of the Final Rule;

4.  Awarding Plaintiffs the costs of this action and reasonable attorney's fees; and

5.  Awarding Plaintiffs such other relief as is just and appropriate.

Respectfully submitted,

R. Brent Cooper (TX Bar No. 04783250)
Benjamin D. Passey (TX Bar No. 24125681)
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540
brent.cooper@cooperscully.com
ben.passey@cooperscully.com

Cody J. Wisniewski* (CO Bar No. 50415)
FIREARMS POLICY COALITION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV 89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392
cwi@fpchq.org

*/s/ Erin M. Erhardt*
Kaitlyn D. Schiraldi* (TN Bar No. 039737)
Erin M. Erhardt* (CO Bar No. 49360)

MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
Telephone: (303) 292-2021
Telecopy: (877) 349-7074
kschiraldi@mslegal.org
eerhardt@mslegal.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*