# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| JENNIFER VANDERSTOK;<br>MICHAEL G. ANDREN;<br>TACTICAL MACHINING, LLC, a limited<br>liability company; and<br>FIREARMS POLICY COALITION, INC., a<br>nonprofit corporation,<br><br>        *Plaintiffs*,<br><br>and<br><br>BLACKHAWK MANUFACTURING GROUP<br>INC. d/b/a 80 PERCENT ARMS,<br><br>        *Intervenor-Plaintiff*,<br><br>   v.<br><br>MERRICK GARLAND, in his official capacity<br>as Attorney General of the United States;<br>UNITED STATES DEPARTMENT OF<br>JUSTICE; STEVEN DETTELBACH, in his<br>official capacity as Director of the Bureau of<br>Alcohol, Tobacco, Firearms and Explosives; and<br>BUREAU OF ALCOHOL, TOBACCO,<br>FIREARMS AND EXPLOSIVES,<br><br>        *Defendants*. | Civil Action No. 4:22-cv-691-O |

## BLACKHAWK MANUFACTURING GROUP INC. d/b/a 80 PERCENT ARMS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### *Introduction*

1.     This lawsuit challenges the Biden Administration's unlawful attempt to unilaterally rewrite federal law, create new criminal and civil liability, and destroy the ability of Americans to exercise their Second Amendment rights by privately making firearms.

2.     Plaintiff BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms ("BlackHawk") is a business that produces and distributes receiver blanks—unfinished firearm parts from which individuals can make their own firearms—jigs, tools, and instructions, to customers across the United States.

3.     ATF's longstanding legal position has been that receiver blanks, jigs, tools, and related instructions do not fall within ATF's regulatory jurisdiction. ATF has stated this position on its website, in classification determinations issued to manufacturers after reviewing product samples, and in litigation.

4.     Receiver blanks did not fall under the purview of the Gun Control Act of 1968 ("Gun Control Act" or "Act"), an Act with definitions carefully defined by Congress. Nor did the Act apply to receiver blanks combined with tools, jigs, instructions, and/or kits.

5.     President Biden campaigned on a promise to prompt legislative action imposing new regulations on receiver blanks but was unable to persuade Congress to pass such legislation.

6.     Having failed to convince Congress, President Biden politically pressured Defendants to take unilateral executive action to accomplish his failed policy agenda.

7.     In response to the Biden Administration's political pressure, Defendants adopted a Final Rule. In doing so, Defendants (a) ignored administrative procedures; (b) flouted longstanding principles of congressional intent; and (c) illicitly redefined, *inter alia*, the Gun Control Act.

8.     First, the Final Rule unlawfully rewrites federal law by (1) expanding the definitions of "frame" and "receiver" so that ATF may regulate *partial* frames or receivers; and (2) broadening Congress' definition of "firearm" to include "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted" into a "firearm."[1] These expansions are in direct defiance of congressionally defined laws and regulations. At no point has Congress shown that it intended to regulate *partial* frames or receivers or weapon parts kits that could be readily made into a firearm, and there is no evidence to suggest otherwise.

9.     Second, the practical application of such broad sweeping definitions not only unlawfully increases Defendants' regulatory powers, but also confers to Defendants the power to hold criminally liable businesses and citizens who simply wish to exercise their Second Amendment rights.

10.     Third, the Final Rule repudiates ATF's longstanding legal position on receiver blanks, expressly stating that prior classification determinations "shall not continue to be valid or authoritative," 87 Fed. Reg. at 24,741, and claiming that receiver blanks now fall within ATF's regulatory jurisdiction.

---

[1] The Final Rule is available at https://www.federalregister.gov/d/2022-08026.

11. Fourth, beyond Defendants' facially unlawful expansion of congressionally defined terms, the Final Rule has implicated the First Amendment. For example, ATF's position that two identical pieces of metal could be treated differently depending on whether they are associated with, *inter alia*, instructions, jigs, tools, or some unknown combination, chills First Amendment speech used to guide lawful activity recognized by the Final Rule itself. Furthermore, the Final Rule's requirement that submissions to ATF for classification determination must include the submitting party's marketing materials unlawfully regulates speech protected by the First Amendment.

12. The Final Rule is an unconstitutional regulation that spells death for BlackHawk and similarly situated businesses. BlackHawk therefore asks this Court to issue a preliminary injunction preventing Defendants from enforcing the Final Rule against BlackHawk, and to declare that the Final Rule is unlawful.

## PARTIES

13. BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms (collectively, "BlackHawk") is a corporation organized under California law and located in Tarrant County in Fort Worth, Texas. BlackHawk's core business is manufacturing and distributing the very items Defendants seek to regulate under the Final Rule. BlackHawk distributes its products to businesses and consumers throughout the United States, including within this district.

14. Defendant Merrick Garland is the Attorney General of the United States and the head of the United States Department of Justice, which oversees the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

3

15.     Defendant United States Department of Justice ("DOJ") is an agency of the United States that administers and enforces the principal federal gun control statutes, including the National Firearms Act of 1934 and the Gun Control Act of 1968. DOJ is located at 950 Pennsylvania Ave., NW, Washington, D.C. 20530.

16.     Defendant Steven Dettelbach is the Chief Law Enforcement Officer and Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

17.     Defendant Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") is an agency of the United States that administers and enforces the principal federal gun control statutes, including the National Firearms Act of 1934 and Gun Control Act of 1968. ATF is located at 99 New York Ave., NE, Washington, D.C. 20226.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction pursuant to 5 U.S.C. §§ 701–706 and 28 U.S.C. § 1331.

19.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(e)(1)(B) and (C). A substantial part of the events giving rise to these claims occurred in this district; a substantial part of the property that is the subject of the action is situated in this district; and BlackHawk has engaged in business transactions in this district.

20.     BlackHawk has standing to assert the interests of both itself and its customers. *See*, *e.g.*, *Craig v. Boren*, 429 U.S. 190 (1976).

## HISTORICAL BACKGROUND

21.     The Gun Control Act established the definition of a "firearm" for purposes of federal firearms regulations.

22.     The Act states that "it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms" for appropriate purposes. Gun Control Act of 1968, Pub. L. No. 90-618, § 101, 82 Stat. 1213, 1213–14.

23.     The Act goes on to state that "this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this title." § 101, 82 Stat. at 1214.

24.     18 U.S.C. § 921 defined "firearm" as: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."

25.     There is no statutory definition of a "frame or receiver."

26.     27 C.F.R. § 478.11 provided a one-sentence definition of a "firearm frame or receiver" as: "That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."

27.     A strict licensing regime governs the importation, manufacture, and dealing of products that constitute firearms. 18 U.S.C. § 923(i) requires licensed importers and licensed manufacturers to "identify by means of a serial number engraved or cast on the

receiver or frame of the weapon, in such manner as the Attorney General shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer."

28.     Failure to follow these requirements can result in criminal liability. Under 18 U.S.C. § 924(a)(1), it is a crime to violate "any other provision of this chapter," referring to Title 18, Chapter 44, of the United States Code, which contains sections 921–931. It is therefore of paramount importance for law-abiding businesses in the firearms industry to have clarity and predictability about what products meet the definitions of a "firearm" and "frame or receiver."

29.     It is equally important for law-abiding customers and for those who may not possess firearms (prohibited possessors) to have clarity on what products constitute a "firearm" and "frame or receiver." 18 U.S.C. § 922(g) makes it a crime for various categories of individuals "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

## FACTUAL BACKGROUND

## I.     The United States of America Has a Long Tradition of Individuals Privately Making Their Own Firearms

30.     Civilian gunmaking is a practice that dates back to the American colonies.

31.     Despite the emergence of armories, mass production, and the innovation of prominent manufacturers, the role of the individual in making guns never went away.

32.     Today, many law-abiding Americans make their own firearms using gun parts and receiver blanks, which are also commonly known as "incomplete receivers," "unfinished receivers," or "80% receivers."

33.     A receiver blank is a piece of raw material that has undergone some of the stages of manufacture necessary to create a firearm receiver, but which still requires additional machining to produce a functioning firearm receiver. The phrase "80% receiver" is not a legal term but refers to the colloquial understanding that receiver blanks have undergone 80% or less of the stages of manufacture necessary to produce a functioning receiver. The remaining stages of manufacture must be performed by the individual owner using appropriate machinery to produce a functioning receiver.

34.     Receiver blanks are popular among do-it-yourself hobbyists, who appreciate the challenge of using machinery to build a firearm from raw materials and unfinished components. These law-abiding citizens cherish the right of Americans to build their own firearms.

35.     Customers for receiver blanks include women and men, veterans, blue and white collar workers, retirees, and government employees all across the country.

## II.     Politicians Malign the Receiver-Blank Industry Despite Laws That Already Prohibit the Targeted Misconduct

36.     The receiver-blank industry has been unfairly maligned by politicians and the media, who point to misconduct that is already prohibited by federal law as a justification for shutting down or criminalizing lawful businesses and preventing law-abiding Americans from privately making firearms.

7

37.     For example, it is already illegal for a prohibited possessor to own a firearm under 18 U.S.C. § 922(g), and it is already illegal to engage in the business of selling or distributing firearms without a license under 18 U.S.C. § 923(a).

38.     Even though a lawfully acquired firearm can be used in an illegal manner, that does not justify a complete destruction of businesses' ability to sell firearms and individuals' ability to purchase them.

39.     Similarly, even though lawfully, privately made firearms can be used in an illegal manner, that does not justify a complete destruction of businesses' ability to sell receiver blanks jigs, tools and instructions, and individuals' ability to purchase them and privately make firearms in a lawful manner.

## III.   ATF Previously Classified Receiver Blanks as Unregulated Materials

40.     ATF has long held, and told the public, that receiver blanks do not meet the definitions of a "firearm" or "frame or receiver." Its website states:

**Are "80%" or "unfinished" receivers illegal?**

Receiver blanks that do not meet the definition of a "firearm" are not subject to regulation under the Gun Control Act (GCA). ATF has long held that items such as receiver blanks, "castings" or "machined bodies" in which the fire-control cavity area is completely solid and un-machined have not reached the "stage of manufacture" which would result in the classification of a firearm according to the GCA.[2]

---

[2] ATF, *Are "80%" or "unfinished" receivers illegal?*,
https://www.atf.gov/firearms/qa/are-"80"-or-"unfinished"-receivers-illegal.

**Are there restrictions on who can purchase receiver blanks?**

The Gun Control Act (GCA) does not impose restrictions on receiver blanks that do not meet the definition of a "firearm." . . . .[3]

**What is ATF doing in regards to people making their own firearms?**

An individual may generally make a firearm for personal use. . . . .[4]

**Does an individual need a license to make a firearm for personal use?**

No, a license is not required to make a firearm solely for personal use. . . . .[5]

41.     ATF's website also includes photographs of receiver blanks that ATF has determined are not regulated firearm receivers:[6]

---

[3] ATF, *Are there restrictions on who can purchase receiver blanks?*, https://www.atf.gov/firearms/qa/are-there-restrictions-who-can-purchase-receiver-blanks.
[4] ATF, *What is ATF doing in regards to people making their own firearms?*, https://www.atf.gov/firearms/qa/what-atf-doing-regards-people-making-their-own-firearms.
[5] ATF, *Does an individual need a license to make a firearm for personal use?*, https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use.
[6] *See* https://www.atf.gov/firearms/qa/are-there-restrictions-who-can-purchase-receiver-blanks



42.     For the last several decades, ATF has permitted industry to request written determinations from ATF as to the classification of sample products.

43.     ATF's Firearms and Ammunition Technology Division conducts a thorough technological analysis of the sample and provides industry with a classification determination as to whether the sample is a firearm regulated under the Gun Control Act or National Firearms Act.

44.     For example, in a recent lawsuit that dealt with whether a particular product was a "firearm," the government submitted a certified administrative record containing numerous classification determinations sent to manufacturers stating that their receiver-blank products were not firearms. *See* ATF's Certified Set of Documents Comprising the Record at 64–70, *California Rifle & Pistol Ass'n, Inc. v. ATF*, No. 1:14-CV-1211 (E.D. Cal. Jan. 9, 2015), ECF No. 19-3 (containing the images that follow).

**Submitted forging**





Accordingly, FTB finds that the submitted item is not a "firearm" as defined in the GCA. Please note that this classification is based on the item received and examined by our Branch.   Any changes to its characteristics would require re-evaluation.

**Submitted forging, first view**



11

**Submitted forging, second view**

Based on our examination, FTB finds that the submitted item is <u>not</u> a "firearm" as defined in the GCA. Please note that this classification is based on the item received and examined by our Branch. Any changes to its characteristics would require re-evaluation by FTB.

Accordingly, FTB finds that the submitted item is not a "firearm" as defined in the GCA. Please note that this classification is based on the item received and examined by our Branch. Any changes to its characteristics would require re-evaluation by FTB.

**Submitted forging**



45. Prior to the Biden Administration, ATF defended these classification determinations in litigation brought by gun-control activists:

> Plaintiffs' challenges to ATF's classifications also seek to undercut the process under which, for decades, ATF has reviewed numerous items to determine if they should be classified as "firearms" under the GCA, bringing to bear the agency's technical, scientific, mechanical, and legal expertise. Receivers for the AR-15, the most common rifle in America, have a space within them called the fire-control cavity, which accommodates the firing components. The longstanding position of ATF is that, where a block of metal (or other material) that may someday be manufactured into a receiver bears no markings that delineate where the fire-control cavity is to be formed and has not yet been even partially formed, that item is not yet a receiver . . . .

12

Fed. Defs.' Mot. Dismiss at 2, *California v. ATF*, No. 3:20-CV-06761
(N.D. Cal. Nov. 30, 2020), ECF No. 29, 2020 WL 9849685.

> The Record contains classification letters dating back to the 1970s. These
> classification letters make plain that ATF has consistently adopted a standard
> whereby the degree of machining to the frame or receiver determined
> whether the device constituted a firearm. . . .
>
> . . . . Not one of the above-noted classification letters made reference
> to the amount of time that would be required to transform the given device
> into a fully functional frame or receiver. Further, these letters are only a few
> of the examples contained in the Record of ATF making determinations
> based on the degree of machining performed on the unfinished frame or
> receiver with no reference whatsoever to the time required to transform the
> device into a fully functional frame or receiver.

Fed. Defs.' Mot. for Summ. J. at 30–32, *City of Syracuse v. ATF*, 1:20-CV-06885
(S.D.N.Y. Jan. 29, 2021), ECF No. 98.

46.     Manufacturers, distributors, and retailers invested capital, created American
jobs, and sold lawful products to customers based on their good-faith reliance on ATF's
written classification determinations.

## IV. The Biden Administration Announces That It "Will Not Wait for Congress to Act to Take Its Own Steps" on Gun Control

47.     President Biden campaigned on a promise to "[s]top 'ghost guns,'" referring
to firearms "assembl[ed] . . . on [one's] own . . . by buying a kit of disassembled gun
parts."[7] Specifically, he promised to "pass[] legislation" to "stop the proliferation of these
so-called 'ghost guns.'"

---

[7] *The Biden Plan to End Our Gun Violence Epidemic*, BIDEN-HARRIS DEMOCRATS,
https://joebiden.com/gunsafety/.

48.     After President Biden took office, members of Congress proposed bills changing the way ATF classifies receiver blanks not currently defined as firearms. *See*, *e.g.*, S. 1558, 117th Cong. (2021) (Untraceable Firearms Act of 2021); H.R. 1454, 117th Cong. (2021) (Ghost Guns Are Guns Act). None of those bills have become law.

49.     Because the Biden Administration could not accomplish its legislative goal through the constitutional process of bicameralism and presentment, it unlawfully sought to implement its policies through unilateral executive action.

50.     On April 7, 2021, the Biden Administration announced that President Biden was "reiterating his call for Congress to pass legislation" on firearms regulations.[8] The announcement stated that "this Administration will not wait for Congress to act to take its own steps" on gun control. The announcement instructed the United States Department of Justice to "within 30 days . . . issue a proposed rule to help stop the proliferation" of so-called "ghost guns."

51.     On April 8, 2021, President Biden, Vice President Harris, and Defendant Garland held a press conference on gun policy at the White House Rose Garden. President Biden stated that he "asked the Attorney General and his team to identify for me immediate, concrete actions I could take now without having to go through the Congress."[9]

---

[8] *Fact Sheet: Biden-Harris Administration Announces Initial Actions to Address the Gun Violence Public Health Epidemic*, THE WHITE HOUSE (Apr. 7, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/07/fact-sheet-biden-harris-administration-announces-initial-actions-to-address-the-gun-violence-public-health-epidemic/.

[9] *Remarks by President Biden on Gun Violence Prevention*, THE WHITE HOUSE (Apr. 8, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/04/08/remarks-by-president-biden-on-gun-violence-prevention/.

52.     Defendant Garland stated in his remarks that "the proliferation of the so-called ghost guns" was caused by a "regulatory loophole" or "gap,"[10] even though the proliferation of such products was actually the direct result of ATF's carefully considered and legally correct decision to issue classification determinations approving the unregulated sale of such products.

53.     On May 7, 2021, Defendant Garland signed ATF proposed rule 2021R-05, titled: "Definition of 'Frame or Receiver' and Identification of Firearms."

54.     On April 11, 2022, President Biden and Vice President Harris announced at the White House Rose Garden that the Final Rule had been completed. President Biden stated that a "year ago this week . . . I instructed the Attorney General to write a regulation that would rein in the proliferation of ghost guns because I was having trouble getting anything passed in the Congress."[11] President Biden explained that the purpose of the Final Rule was to make it "illegal to manufacture" weapon parts kits and "[i]llegal for a licensed dealer to sell them" without complying with the same regulatory requirements governing the manufacture and sale of complete firearms.

55.     The Final Rule was published in the Federal Register on April 26, 2022.[12]

---

[10] *Defendant Garland's Full Remarks on Gun Violence Prevention at the White House Rose Garden*, U.S. DEP'T OF JUSTICE (Apr. 8, 2021), http://www.justice.gov/opa/speech/attorney-general-garland-s-full-remarks-gun-violence-prevention-white-house-rose-garden.

[11] *Remarks by President Biden Announcing Actions to Fight Gun Crime and His Nominee for ATF Director, Steve Dettelbach*, THE WHITE HOUSE (Apr. 11, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/04/11/press-briefing-by-press-secretary-jen-psaki-april-11-2022/.

[12] https://www.federalregister.gov/d/2022-08026

V.    **ATF's Unlawful and Unconstitutional Final Rule**

    A.    **Definition of a "Frame or Receiver" as Including "Partially Complete, Disassembled, or Nonfunctional" Frames and Receivers**

56.    18 U.S.C. § 921(a)(3) defined a "firearm" as including "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "the frame or receiver of any such weapon," but it does not define what constitutes a "frame or receiver."

57.    27 C.F.R. § 478.11 provided a one-sentence definition of a "firearm frame or receiver" as: "That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."

58.    The Final Rule deletes that definition of a "firearm frame or receiver" and replaces it with a convoluted multi-page definitions of "frame" and "receiver" that are unconstitutionally vague and subjective.

59.    Part of the new definitions states:

*Partially complete, disassembled, or nonfunctional frame or receiver*. The terms "frame" or "receiver" shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, *i.e.*, to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projective weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be. The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (*e.g.*, unformed block of metal, liquid polymer, or other raw material). When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools,

instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.

87 Fed. Reg. at 24,739.

60.    If item *A* can readily be made into item *B*, it is by definition not yet item *B*. The Final Rule abuses the English language in order to expand ATF's regulatory jurisdiction to cover materials that can "readily" be made into regulated products.

61.    This attempt to drastically expand ATF's regulatory jurisdiction is in excess of ATF's statutory authority.

**B.    The Final Rule Repudiates Prior Classification Determinations and, in Turn, Presents Issues Contrary to the Constitution**

62.    In classification determinations issued to manufacturers, ATF has stated that receiver blanks do not meet the definition of a regulated "firearm" under federal law.

63.    ATF has defended these classification determinations in litigation brought by gun-control activists.

64.    The Final Rule expressly repudiates ATF's prior classification determinations:

> Prior determinations by the Director that a partially complete, disassembled, or nonfunctional frame or receiver, including a parts kit, was not, or did not include, a "firearm frame or receiver" under § 478.11, or "frame or receiver" under § 479.11, as those terms were defined prior to April 26, 2022, shall not continue to be valid or authoritative after that date. Such determinations shall include those in which the Director determined that the item or parts kit had not yet reached a stage of manufacture to be, or include, a "firearm frame or receiver" under § 478.11, or "frame or receiver" under § 479.11, as those terms were defined prior to [April 26, 2022].

87 Fed. Reg. at 24,741.

65.     ATF's complete reversal of its legal position is arbitrary, capricious, and an abuse of discretion.

66.     The phrases "partially complete," "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver," and "stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon" are so vague as to make it impossible for manufacturers, distributors, and customers to understand which product designs are regulated by the Final Rule and which are not.

67.     These vague phrases, when combined with the Final Rule's authorization of the ATF Director to "consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials," effectively delegate to the ATF Director unbounded, unconstitutional discretion to determine by diktat which products fall within ATF's jurisdiction.

68.     There is no reason why the existence of "instructions" or "tools" would have any bearing on whether an item meets the legal definition of a firearm "frame or receiver."

69.     Nevertheless, ATF has recently stated that a "frame or receiver" piece may be treated differently depending on whether the piece is accompanied by tools, jigs, and instructions or some combination thereof.

70.     If a "frame or receiver" piece is combined with tools, jigs, and instructions, ATF's position is that this piece is a firearm.

71.     Because the definition of a firearm "frame or receiver" has consequences for criminal liability, vagueness in that definition violates due process of law. *See Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). Additionally, the rule of lenity applies, and *Chevron*

deference is inappropriate. *See Leocal v. Ashcroft*, 543 U.S. 1 (2004); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992).

### C.   The Final Rule Violates the First Amendment

72.   The Final Rule (unconstitutionally) expands ATF's regulatory authority so that it may now make determinations on *speech*, not just equipment submitted for classification determination.

73.   For example, the Final Rule stipulates that requests to ATF for classification determination must be submitted under penalty of perjury and include "any instructions, guides, templates, jigs, equipment, tools, or marketing materials that are made available to the purchaser or recipient of the item." 87 Fed. Reg. at 24,666, 24,739, 24,743, 24,749.

74.   The Final Rule specifically aims to police the content of the "instructions, guides, templates, . . . [and] marketing materials". *Id.*

75.   Speech restriction is content-based where such restriction requires "enforcement authorities" to "examine the content of the message that is conveyed to determine whether" the speech should be restricted. *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984); *See also, e.g., Boos v. Barry*, 485 U.S. 312, 315–18 (1988) (content-based prohibition of signage outside of foreign embassy that brings the foreign government into "public odium" or "public disrepute"); *Carey v. Brown*, 447 U.S. 455, 465 (1980) (content-based prohibition of all residential picketing except "peaceful labor picketing").

76.   BlackHawk's "instructions, guides, templates, . . . [and] marketing materials" are protected speech.

77.     ATF has suggested that a product such as a receiver blank, which BlackHawk sells, on its own—particularly without instructions—would *not* constitute a firearm.

78.     It logically flows that ATF's determination of whether a product such as a receiver blank is considered a "firearm" is predominantly dependent upon ATF's review of the content of the "instructions, guides, templates, . . . [and] marketing materials" either submitted along with the product or on a company's website.

79.     The Final Rule and ATF's admitted inconsistent determinations concerning the same metal piece (*e.g.*, receiver blank) depending on whether it is associated with instructions have forced Blackhawk to delete instructions from its company website in order to avoid potential criminal liability and to survive as a business.

80.     Thus, the possibility that two identical pieces of metal sold by Blackhawk could be treated differently depending on whether the pieces are associated with instructions chills First Amendment speech that guides lawful activity recognized by the Final Rule itself.

81.     Such regulation of speech is in direct violation of the First Amendment, and the suppression of free discourse and the self-censorship by U.S. citizens caused by the profound uncertainty regarding enforcement of the Final Rule constitutes a loss of civil liberties.

**D.     Definition of "Readily" by Reference to Eight Unranked, Unweighted Factors**

82.     The Final Rule creates a new definition of "readily": a "process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the

most efficient, speediest, or easiest process, action, or physical state." 87 Fed. Reg. at 24,735; *see also id.* at 24,747.

83.    The Final Rule then provides a *non-exclusive* list of eight unranked, unweighted factors, none of which is dispositive.

- The first factor is "(a) Time, *i.e.*, how long it takes to finish the process."

- The second factor is "(b) Ease, *i.e.*, how difficult it is to do so."

- The third factor is "(c) Expertise, *i.e.*, what knowledge and skills are required."

- The fourth factor is "(d) Equipment, *i.e.*, what tools are required."

- The fifth factor is "(e) Parts availability, *i.e.*, whether additional parts are required, and how easily they can be obtained."

- The sixth factor is "(f) Expense, *i.e.*, how much it costs."

- The seventh factor is "(g) Scope, *i.e.*, the extent to which the subject of the process must be changed to finish it."

- The eighth factor is "(h) Feasibility, *i.e.*, whether the process would damage or destroy the subject of the process, or cause it to malfunction."

84.    By making the definition of a "frame or receiver" turn on whether the product "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver" and then defining the word "readily" in such a vague manner, the Final Rule creates an unconstitutionally vague standard and effectuates an unconstitutional delegation of legislative authority to the ATF Director.

### E.    Definition of a "Firearm" as Including Weapon Parts Kits

85.    18 U.S.C. § 921(a)(3) defined the term "firearm" as including four categories of items: "(A) any weapon (including a starter gun) which will or is designed to or may

readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."

86.    27 C.F.R. § 478.11 defined a "firearm" as including the four categories of items contained in 18 U.S.C. § 921(a)(3), tracking the statutory text almost verbatim: "Any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device; but the term shall not include an antique firearm. In the case of a licensed collector, the term shall mean only curios and relics."

87.    The Final Rule amended 27 C.F.R. § 478.11 by adding the following fifth category to the definition of a "firearm," which has no basis in the statutory text of 18 U.S.C. § 921(a)(3):

> The term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive. The term shall not include a weapon, including a weapon parts kit, in which the frame or receiver of such weapon is destroyed as described in the definition "frame or receiver."

87 Fed. Reg. at 24,735.

88.    Under this new provision, a collection of parts, none of which independently has ever constituted a firearm, are now characterized by the government as a firearm based on an arbitrary determination that the items, when grouped together, can "readily" be assembled into a firearm.

89.    By adding weapon parts kits to the definition of a "firearm," the Final Rule takes an existing rule that closely tracks the four statutory categories of "firearms" set forth by Congress and adds a brand new fifth category that Congress did not include.

90.    This violates the plain, unambiguous text of the statute, which evinces Congress's intent to create only four categories of "firearms," not five.

91.    By adding a fifth category with no basis in the statutory text, the Final Rule goes beyond merely interpreting or clarifying the statute adopted by Congress and instead rewrites it.

**F.    New Regulations on "Privately Made Firearms" That Are Sweeping in Scope**

92.    The Final Rule created a new term, "privately made firearm," which it defines as a "firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number placed by a licensed manufacturer at the time the firearm was produced." 87 Fed. Reg. at 24,735.

93.    The Final Rule states that "licensees must legibly and conspicuously identify each privately made firearm or 'PMF' received or otherwise acquired (including from a personal collection) not later than the seventh day following the date of receipt or other acquisition, or before the date of disposition (including to a personal collection), whichever is sooner." 87 Fed. Reg. at 24,742. It further states that "PMFs must be identified by placing, or causing to be placed under the licensee's direct supervision, an individual serial

23

number on the frame or receiver, which must not duplicate any serial number placed by the licensee on any other firearm." *Id.*

94.     The Final Rule also requires licensees to retain records indefinitely until the "business or licensed activity is discontinued." 87 Fed. Reg. at 24,746. This requirement is tantamount to creating an unlawful national gun registry for privately made firearms.

95.     The Final Rule's regulations on privately made firearms are so onerous that many licensees will cease to work with privately made firearms to avoid the Final Rule's excessive regulatory burdens. The lack of availability of basic services for owners of privately made firearms will deter individuals from exercising their historically recognized right to make their own firearms.

96.     The coercive effect of these regulations effectively wipes out the secondary resale market for receiver blanks and firearms produced by individuals from receiver blanks, and more broadly, eliminates the consumer market for receiver blanks entirely.

97.     The Final Rule's excessive regulations on "privately made firearms" cumulatively violate the constitutional rights of BlackHawk and its customers.

98.     To the extent the Final Rule's regulations on "privately made firearms" apply to purely intrastate activities, they exceed Congress's authority under the Commerce Clause.

99.     The Final Rule's excessive regulations on "privately made firearms" cumulatively effectuate unconstitutional takings in violation of the Fifth Amendment.

## VI.    The Final Rule Will Destroy BlackHawk's Business

100.    BlackHawk's business is the distribution of receiver blanks, jigs, tools, and instructions to individual customers and businesses that lawfully market the products to customers who wish to exercise their Second Amendment rights by making their own firearms.

101.    BlackHawk fulfills orders by shipping receiver blanks, jigs, tools, and instructions to customers and businesses across the country that place orders for products. The bulk of its customers are out of state.

102.    By unlawfully enacting legislative changes through its redefinitions of "firearm" and "frame or receiver," the Final Rule reversed ATF's longstanding legal position and subjected currently unregulated receiver blanks to the same regulatory requirements as fully functional firearms.

103.    By delegating to the ATF Director unbounded discretion to apply vague and capacious standards for what constitutes a "firearm" and "frame or receiver," the Final Rule makes it impossible for manufacturers to determine with any reasonable certainty which regulatory requirements apply to a product design.

104.    By imposing unlawful and excessive requirements on licensees who take "privately made firearms" into their custody, the Final Rule will eliminate consumer demand for receiver blanks.

105.    In summation, the Final Rule will wipe out BlackHawk's business or cause BlackHawk and its owners and employees to face criminal and civil liability.

## CLAIMS FOR RELIEF

### COUNT I
### The Final Rule Exceeds Defendants' Statutory Authority

106.    All preceding paragraphs of this complaint are hereby incorporated by reference.

107.    The Final Rule, including its definitions of "frame or receiver," "readily," and "firearm," and its regulations on "privately made firearms," constitutes an unlawful expansion of Defendants' statutory authority.

108.    The Final Rule's provisions relating to and purporting to define "frame or receiver" are facially unlawful.

109.    The Final Rule presupposes a general authority to regulate weapon parts which Defendants do not possess.

110.    The Final Rule is "not in accordance with law" and is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

### COUNT II
### The Adoption of the Final Rule Violates the Separation of Powers

111.    All preceding paragraphs of this complaint are hereby incorporated by reference.

112.    Article I, § 1 of the Constitution states: "All legislative Powers herein granted shall be vested in a Congress of the United States."

113.    Article I, § 7, Clause 2 of the Constitution requires that "Every Bill" be passed by both the House of Representatives and the Senate and presented to the President "before it [may] become a Law."

26

114.    The Final Rule is not a valid interpretation of federal law. It is an unconstitutional attempt by Defendants to exercise legislative powers that belong to Congress. And it is an unconstitutional attempt to rewrite statutes without satisfying the requirements of bicameralism and presentment.

## COUNT III
## The Final Rule is Unconstitutionally Vague

115.    All preceding paragraphs of this complaint are hereby incorporated by reference.

116.    The Supreme Court has recognized that criminal laws must provide fair notice to the public of what conduct is proscribed. *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018).

117.    Numerous aspects of the Final Rule are unconstitutionally vague, including its definitions of a "frame or receiver," "readily," and "firearm."

118.    These definitions are so vague that even an experienced lawyer specializing in firearms law cannot possibly say for certain which products fall within those definitions. The ordinary business and citizen therefore could not possibly understand how to properly comply with the statutes without risking criminal sanction and loss of liberty.

## COUNT IV
## The Final Rule is Arbitrary, Capricious, and an Abuse of Discretion

119.    All preceding paragraphs of this complaint are hereby incorporated by reference.

120.    ATF previously stated on its website that receiver blanks do not meet the definitions of a "firearm" or "frame or receiver."

121.   ATF previously reviewed product samples from industry and issued written classification determinations stating that receiver blanks do not meet the definitions of a "firearm" or "frame or receiver."

122.   Prior to the Biden Administration, ATF routinely defended the lawfulness of those classification determinations in litigation.

123.   The Final Rule reverses ATF's longstanding correct legal interpretation, which has generated significant reliance interests, without a reasonable explanation.

124.   The Final Rule contains internally self-contradictory provisions.

125.   ATF's stated explanation for the Final Rule is a pretext for its true goal of unlawfully expanding its jurisdiction.

126.   ATF did not adequately consider alternative regulatory approaches that could have avoided the destruction of businesses such as BlackHawk.

127.   The Final Rule is therefore "arbitrary," "capricious," and "an abuse of discretion." 5 U.S.C. § 706(2)(A).

## COUNT V
### The Final Rule Was Adopted Without
### Observance of Procedure Required by Law

128.   All preceding paragraphs of this complaint are hereby incorporated by reference.

129.   The process of notice-and-comment rulemaking requires an agency to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" and to give "consideration of the relevant matter presented." 5 U.S.C. § 553(c).

28

130.    Approximately 290,000 members of the public submitted comments to the proposed rule. Defendants did not adequately consider all relevant arguments raised in those comments and provide appropriately reasoned responses to them.

131.    When agencies adopt rules, they must publish a "concise general statement of their basis and purpose." 5 U.S.C. § 553(c).

132.    The Final Rule does not provide an accurate and adequate "concise general statement" of its basis and purpose.

133.    The Final Rule was therefore adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## COUNT VI
## The Final Rule Violates the Nondelegation Doctrine

134.    All preceding paragraphs of this complaint are hereby incorporated by reference.

135.    If this Court concludes that the Final Rule is authorized by statute, then the statutory scheme unconstitutionally delegates legislative power with no intelligible principle, violating the nondelegation doctrine. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935).

136.    Various provisions of the Final Rule effectuate a double delegation by interpreting Congress's delegation of authority to ATF as allowing for the promulgation of a rule that in turn delegates to the ATF Director unbounded discretion to create and unilaterally revise legislative standards.

## COUNT VII
### The Final Rule is Contrary to Constitutional Right, Power, Privilege, or Immunity

137.     All preceding paragraphs of this complaint are hereby incorporated by reference.

138.     The Second Amendment protects "the right of the people to keep and bear Arms."

139.     The Ninth Amendment recognizes that the people have inalienable rights not expressly enumerated in the Constitution.

140.     The Final Rule violates the rights of BlackHawk and its customers to keep and bear arms, to engage in lawful self-defense, to make their own firearms, to possess property lawfully acquired, and to earn a living by manufacturing and selling lawful goods in commerce. *See Craig v. Boren*, 429 U.S. 190 (1976) (allowing a business to vindicate the constitutional rights of customers).

141.     The Final Rule is therefore "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

## COUNT VIII
### The Final Rule's Regulations on "Privately Made Firearms" Exceed the Limits of the Commerce Clause

142.     All preceding paragraphs of this complaint are hereby incorporated by reference.

143.     To the extent the Final Rule imposes regulations on intrastate activities with no interstate nexus, those requirements exceed Congress's authority under the Commerce Clause. U.S. CONST. art. I, § 8, cl. 3.

30

**COUNT IX**
**The Final Rule Chills First Amendment Rights**

144.   All preceding paragraphs of this complaint are hereby incorporated by reference.

145.   The First Amendment to the United States Constitution forbids any lawmaking that abridges freedom of speech. U.S. CONST. amend. I.

146.   The Final Rule mandates that requests to ATF for classification determination must be submitted under penalty of perjury and include "any instructions, guides, templates, jigs, equipment, tools, or marketing materials that are made available to the purchaser or recipient of the item." 87 Fed. Reg. at 24,666, 24,739.

147.   The purpose of this mandate is so ATF can regulate the content of the "instructions, guides, templates, . . . [and] marketing materials" that BlackHawk and other similarly situated companies provide to customers.

148.   Instructions, guides, and marketing materials are considered speech protected by the First Amendment.

149.   In accordance with the Final Rule, ATF has taken inconsistent positions which have implicated the First Amendment. In one instance, a piece of metal *would not* be considered a firearm if the piece is not accompanied by, *e.g.*, instructions. But on the flip side of the same coin, that same piece of metal *would* be classified as a firearm if accompanied by instructions.

150.   Such inconsistency has forced BlackHawk to regulate its protected speech by deleting instructions from its website in order to survive as a business.

31

151.    The Final Rule impermissibly regulates speech in direct violation of the First Amendment.

## COUNT X
**The Final Rule Effectuates a Regulatory Taking of "Privately Made Firearms" Without Just Compensation**

152.    All preceding paragraphs of this complaint are hereby incorporated by reference.

153.    The Supreme Court has recognized that the appropriation of personal property by the government without just compensation can violate the Fifth Amendment's Takings Clause. *See Horne v. Dep't of Agriculture*, 576 U.S. 351, 357 (2015).

154.    The Supreme Court has also recognized that onerous government regulations can effectuate a regulatory taking. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (noting that the Court looks at the "economic impact of the regulation" and "the extent to which the regulation has interfered with distinct investment-backed expectations"); *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("[I]f regulation goes too far it will be recognized as a taking.").

155.    The Final Rule requires licensees with "privately made firearms" in their inventories to either mark them according to the Final Rule's specifications, destroy them, or "voluntarily" turn them over to a law enforcement agency. The Final Rule places no restrictions on what the government may choose to do with "privately made firearms" that are "voluntarily" surrendered to the government.

156.    The Final Rule's regulations on "privately made firearms" effectuate a regulatory taking of personal property without just compensation.

## PRAYER

WHEREFORE, BlackHawk asks this Court to enter an order and judgment:

    a.    Declaring that the Final Rule is unlawful;

    b.    Issuing injunctive relief enjoining Defendants from enforcing the Final Rule against BlackHawk;

    c.    Awarding BlackHawk the costs of this action and reasonable attorney's fees; and

    d.    Awarding such other relief as the Court deems equitable and just.

Respectfully Submitted,

*/s/ Brian D. Poe*
BRIAN D. POE
TX Bar No. 24056908
BRIAN D. POE, ATTORNEY AT LAW PLLC
The Bryce Building
909 Throckmorton Street
Fort Worth, Texas 76102
Phone: (817) 870-2022
Fax: (817) 977-6501
bpoe@bpoelaw.com

Michael J. Sullivan
MA Bar No. 487210
*Pro Hac Vice*
J. Christopher Amrhein, Jr.
MA Bar No. 703170
*Pro Hac Vice*
Nathan P. Brennan
MN Bar No. 389954
*Pro Hac Vice*
ASHCROFT LAW FIRM LLC

33

200 State Street, 7th Floor
Boston, MA 02109
Phone: (617) 573-9400
Fax: (617) 933-7607
msullivan@ashcroftlawfirm.com
camrhein@ashcroftlawfirm.com
nbrennan@ashcroftlawfirm.com

*Counsel for Intervenor-Plaintiff BlackHawk*
*Manufacturing Group Inc. d/b/a 80 Percent*
*Arms*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 20, 2022, the foregoing document was served, via the Court's CM/ECF Document Filing System, upon the registered CM/ECF users in this action.

/s/ <i>Brian D. Poe</i>
Brian D. Poe
