**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

**FORT WORTH DIVISION**

| | |
|---|---|
| JENNIFER VANDERSTOK;<br>MICHAEL G. ANDREN;<br>TACTICAL MACHINING, LLC, a limited liability company; and<br>FIREARMS POLICY COALITION, INC., a nonprofit corporation,<br><br>    *Plaintiffs*,<br><br>and<br><br>BLACKHAWK MANUFACTURING GROUP INC.<br>d/b/a 80 PERCENT ARMS,<br><br>    *Intervenor-Plaintiff*,<br><br>  v.<br><br>MERRICK GARLAND, in his official capacity as Attorney General of the United States;<br>UNITED STATES DEPARTMENT OF JUSTICE;<br>STEVEN DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and<br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,<br><br>    *Defendants*. | Civil Action No. 4:22-cv-691-O |

**BLACKHAWK MANUFACTURING GROUP INC. d/b/a 80 PERCENT ARMS'**
**BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS .................................................................................. 4

I.   BACKGROUND ......................................................................................... 4

    A.  Statutory and Regulatory Background ........................................................ 4

    B.  The Biden Administration Announces That It "Will Not Wait for Congress to Act to Take Its Own Steps" on Gun Control ............................................ 6

    C.  The Final Rule Purports to Regulate *Partial* Frames and Receivers and Creates a New Definition of "Firearm" ...................................................... 9

II.  THIS COURT HAS ALREADY DETERMINED THAT THE FINAL RULE EXCEEDS ATF'S STATUTORY AUTHORITY UNDER THE PLAIN LANGUAGE OF THE GUN CONTROL ACT ............................................. 10

    A.  September 2 Order: "Parts that *may become* receivers are not receivers" ................. 10

    B.  September 2 Order: "A weapons parts kit is not a firearm" ........................................ 12

ARGUMENT ...................................................................................................... 12

I.   THE COURT'S SEPTEMBER 2 ORDER ESTABLISHES THAT BLACKHAWK IS LIKELY TO PREVAIL ON THE MERITS .................................... 13

II.  BLACKHAWK HAS SHOWN IT WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF INJUNCTIVE RELIEF ............................................ 14

    A.  The Final Rule Will Likely Put BlackHawk Out of Business ..................................... 14

    B.  The Scope of Injunctive Relief Must Be Nationwide to Preserve the Status Quo and Allow BlackHawk to Continue Doing Business ......................................... 16

i

III.    BLACKHAWK'S INJURY OUTWEIGHS ANY HARM TO DEFENDANTS
        OR THE PUBLIC ......................................................................................................... 17

CONCLUSION .................................................................................................................................. 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
   141 S. Ct. 2485 (2021)..................................................................................................... 16

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*,
   875 F.2d 1174 (5th Cir. 1989) ........................................................................................ 15

*BST Holdings, LLC v. OSHA*,
   17 F.4th 604 (5th Cir. 2021) ........................................................................................... 18

*California v. ATF*,
   No. 3:20-CV-06761 (N.D. Cal. Nov. 30, 2020) ........................................................... 5

*City of Dallas v. Delta Air Lines, Inc.*,
   847 F.3d 279 (5th Cir. 2017) .......................................................................................... 13

*City of Dallas, Texas v. Hall*,
   No. 3:07-CV-0060-P, 2008 WL 11350041 (N.D. Tex. July 28, 2008)................................. 19

*City of Syracuse v. ATF*,
   No. 1:20-CV-06885 (S.D.N.Y. Jan. 29, 2021) ............................................................. 6

*Cobell v. Kempthorne*,
   455 F.3d 301 (D.C. Cir. 2006)........................................................................................ 19

*Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*,
   600 F.2d 1184 (5th Cir. 1979) ........................................................................................ 14

*Def. Distributed v. United States Dep't of State*,
   838 F.3d 451 (5th Cir. 2016) .......................................................................................... 14

*Dist. 50, United Mine Workers of Am. v. Int'l Union, Union Mine Workers of Am.*,
   412 F.3d 165 (D.C. Cir. 1969)........................................................................................ 19

*Family Rehab., Inc. v. Azar*,
   3:17-CV-3008, 2018 WL 3155911 (N.D. Tex. June 28, 2018).............................................. 14

*Green Valley Special Util. Dist. v. City of Schertz*,
   969 F.3d 460 (5th Cir. 2020) .......................................................................................... 17

*Jacksonville Port Auth. v. Adams*,
   556 F.2d 52 (D.C. Cir. 1997).......................................................................................... 18

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ................................................................. 16

*Jiao v. Xu*,
    28 F.4th 591 (5th Cir. 2022) ................................................................. 15

*Milsen Co. v. Southland Corp.*,
    454 F.2d 363 (7th Cir. 1971) ................................................................. 15

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
    760 F.2d 618 (5th Cir. 1985) ................................................................. 14

*N. Mariana Islands v. United States*,
    686 F. Supp. 2d 7 (D.D.C. 2009) ........................................................... 18

*N.Y. Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013) ................................................................... 18

*Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*,
    621 F.2d 683 (5th Cir. 1980) ................................................................. 14

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ................................................................. 16

*Texas v. Seatrain Int'l, S.A.*,
    518 F.2d 175 (5th Cir. 1975) ................................................................. 14

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ........................................................... 17, 18

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1992) ............................................................................... 16

*Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*,
    805 F.2d 351 (10th Cir. 1986) ............................................................... 15

*U.S. Navy SEALs 1-26 v. Biden*,
    578 F. Supp. 3d 822 (N.D. Tex. 2022) .................................................. 19

*Wages and White Lion Invs., LLC v. FDA*,
    16 F.4th 1130 (5th Cir. 2021) ................................................................ 16

**Statutes**

18 U.S.C. § 921(a)(3)(B) ............................................................................................ 4, 11

**Other Authorities**

Gun Control Act of 1968 ................................................................................................ 4

H.R. 1454, 117th Cong. (2021) ...................................................................................... 6

S. 1558, 117th Cong. (2021) ........................................................................................... 6

**Rules**

27 C.F.R. § 478.11 ...................................................................................................... 11

*Definition of "Frame or Receiver" and Identification of Firearms*,
    86 Fed. Reg. 27 (May 21, 2021) ............................................................................... 7

*Definition of "Frame or Receiver" and Identification of Firearms*,
    87 Fed. Reg. 24 (Apr. 26, 2022) .............................................................................. 10

*Title and Definition Changes*,
    43 Fed. Reg. 13,531, 13 (Mar. 31, 1978) ................................................................. 4

## **INTRODUCTION**

On September 2, 2022, this Court granted a preliminary injunction as requested by Plaintiff Tactical Machining, LLC ("Tactical"). *See* Order and Opinion on Preliminary Injunction dated September 2, 2022 ("September 2 Order"), ECF No. 56. In its September 2 Order, the Court found that ATF Final Rule 2021R-05F, which was published in the Federal Register on April 26, 2022 and went into effect on August 24, 2022 ("Final Rule") included provisions that are "facially unlawful" and "unlawfully expand ATF's authority beyond the boundaries set by the Gun Control Act." ECF No. 56 at 9, 12. Further, the Court found that Plaintiffs collectively "have demonstrated a strong likelihood of success on their claims that the Final Rule—specifically, 27 C.F.R. §§ 478.11, 478.12(c)—exceeds the scope of ATF's authority under the Gun Control Act," *id*. at 15, but have "not shown that nationwide injunctive relief is appropriate at this stage." *Id*. at 22.

The Court's September 2 Order declared that "[c]overed by the injunction, Tactical Machining can operate its business as it has, free from the threat of enforcement of the Final Rule's unlawful definition," ECF No. 56 at 22, and ordered that "Defendants and their officers, agents, servants, and employees are enjoined from implementing and enforcing against Tactical Machining, LLC the provisions in 27 C.F.R. §§ 478.11 and 478.12 that this Order has determined are unlawful." *Id*. at 23.

On October 1 the Court issued an Order ("October 1 Order") finding that the Individual Plaintiffs were also entitled to injunctive relief and clarifying that the injunction extended to Tactical's customers. ECF No. 89 at 5–6, 17–19. The Court cited Tactical's statements regarding revenue losses that unless stemmed would likely prove fatal to the business and which were attributable to two causes:

> [Tactical's] customers' fear of felony indictment is 'eviscerating demand' for its primary product offerings, partially manufactured receivers, which are classified as firearms under

1

the Rule; and, general consumer confusion about the Rule's broad scope is stifling its customers' willingness to purchase even products not clearly subject to ATF regulation.

*Id*. at 17.  The Court further noted that "Tactical's customers are clearly afraid to buy receivers—with or without accompanying equipment—absent an assurance that they will not be prosecuted for their purchase" and made it clear that customers' reluctance to transact business with Tactical constituted irreparable harm *to Tactical* and that:

> The Court does not base its decision to expand relief on any purported irreparable harm to Tactical Machining's *customers*. Rather, by including customers in the scope of relief, the Court addresses *Tactical Machining's* particular injuries. Tactical Machining's injuries cannot be remedied if its only source of revenue—customer willingness to transact business—has been severely curtailed.

*Id*. at 18 (emphasis in original). The relief provided by the Court to Tactical naturally provided its customers, as well as its vendors and suppliers essential to its business, confidence in their ability to continue to do business with Tactical without fear of prosecution.

Like Tactical, Intervenor-Plaintiff BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms (collectively, as used herein, "BlackHawk") is a federally licensed manufacturer for whom nearly 100% of its products are subject to regulation under the Final Rule. *See* Declaration of Daniel Lifschitz dated September 22, 2022, and submitted herewith as <u>Exhibit A</u> ("Lifschitz Decl.") ¶ 8.  Like Tactical, BlackHawk faces an existential threat to its ability to continue operating because of the sharp decline in sales caused by fear regarding potential criminal ramifications in the ATF's enforcement of the Final Rule since it took effect August 24, 2022. Id. ¶¶ 12–16.  Like Tactical, BlackHawk was forced to discontinue popular product offerings from its online store after the Final Rule took effect in order to avoid the possibility of criminal or civil exposure under the Final Rule's vague provisions. *Id*. ¶¶ 11–12; ECF No. 56 at 17.  Since the Final Rule's effective date, BlackHawk's average daily revenue has declined by more than 90% as many of its customers have expressed alarm at the prospect of possibly committing a felony by merely purchasing

2

BlackHawk's products. *Id.* ¶ 15. Currently, BlackHawk is operating at a loss and burning through its cash reserves to stay afloat. *Id.* ¶¶ 19–20. If sales do not recover quickly, BlackHawk will be forced to shut down and cease operations well before a final judgment is rendered in this proceeding. *Id.* ¶¶ 20–21.  And like Tactical, BlackHawk faces nonrecoverable compliance costs which this Court found in its September 2 Order constitute irreparable harm. ECF No. 56 at 17– 19. However, unlike Tactical—who is currently protected from ATF's enforcement of the unlawful Final Rule—absent the requested relief, BlackHawk remains unable to operate in its pre-Final Rule capacity, and has suffered substantial loss in revenue as it attempts to continue operating in a profoundly vague and destabilized marketplace. *Compare* ECF No. 56 at 17 *with* Lifschitz Decl.

The Biden Administration's political rhetoric makes it clear that it seeks to wipe out BlackHawk and companies like it, and thereby significantly limit the ability of U.S. citizens to legally buy parts, tools, and jigs—which for decades prior to the Final Rule were legal under the Gun Control Act and earlier classification letters issued by ATF—in order to make their own firearms and enjoy the full scope of rights guaranteed by the Constitution, including their Second Amendment rights. The Final Rule is already achieving measurable success in accomplishing the White House's unlawful pursuit of its political goals. BlackHawk therefore requests that the Court grant BlackHawk's request for preliminary injunctive relief as already found warranted for Tactical and thus enable BlackHawk to continue engaging in the lawful, interstate purchase and sale of frame and receiver blanks, jigs and tools, while the Court adjudicates the Final Rule's lawfulness.

## STATEMENT OF FACTS

## I.      BACKGROUND

### A.      Statutory and Regulatory Background

The United States of America has a long tradition of individuals privately making their own firearms, which dates back to the American Revolution. "[G]un-making at home was *essential* to the Continental Army, and typically, it was more practical and efficient to assemble [a firearm from parts] rather than completely start from scratch."[1] Law-abiding individuals in this country have always been allowed to make their own firearms, even after the passage of the Gun Control Act of 1968 ("GCA").

The "frame or receiver" of a firearm is the component of the firearm that is subject to federal firearms regulations. *See* 18 U.S.C. § 921(a)(3)(B) (defining a "firearm" as including "the frame or receiver of any such weapon"). Today, many Americans who choose to make their own firearms do so using frame and receiver blanks, also known as "unfinished" or "incomplete" frames and receivers, which are raw materials that have undergone some, but not all, of the stages of manufacturing necessary to produce a complete, functioning firearm frame or receiver.

As noted in the Court's September 2 Order, in 1978 the ATF promulgated a rule interpreting the phrase "frame or receiver." ECF No. 56 at 2. The rule defined the "frame or receiver" of a firearm as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." *Title and Definition Changes*, 43 Fed. Reg. 13,531, 13,537 (Mar. 31, 1978). That

---

[1] *Stop Gun Violence: Ghost Guns: Hearing Before the Subcomm. on the Constitution, of the S. Comm. on the Judiciary*, 117th Cong. 5 (testimony of Ashley Hlebinsky; emphasis in original), https://www.judiciary.senate.gov/imo/media/doc/Ashley%20Hlebinsky%20Written%20Testimony%20Final.pdf

definition remained in place for over 40 years, during which time ATF has issued written classification determinations to businesses stating that their frame and receiver blank products are not firearms after its Firearms and Ammunition Technology Division reviewed product samples from industry, and the ATF has defended its determinations in multiple legal proceedings across the country. Consequently, businesses like BlackHawk and other manufacturers, distributors, and retailers invested capital, created American jobs, and sold lawful products to customers based on their good-faith reliance on ATF's written classification determinations.

As recently as November 2020 and January 2021, the Department of Justice and ATF defended these classification determinations in litigation against gun-control proponents:

> Plaintiffs' challenges to ATF's classifications also seek to undercut the process under which, for decades, ATF has reviewed numerous items to determine if they should be classified as "firearms" under the GCA, bringing to bear the agency's technical, scientific, mechanical, and legal expertise. Receivers for the AR-15, the most common rifle in America, have a space within them called the fire- control cavity, which accommodates the firing components. The longstanding position of ATF is that, where a block of metal (or other material) that may someday be manufactured into a receiver bears no markings that delineate where the fire-control cavity is to be formed and has not yet been even partially formed, that item is not yet a receiver . . . .

Fed. Defs.' Mot. Dismiss at 2, *California v. ATF*, No. 3:20-CV-06761 (N.D. Cal. Nov. 30, 2020), ECF No. 29 at 11, 2020 WL 9849685.[2]   In 2021 Defendants emphasized ATF's consistent application of classification standards spanning more than four decades:

> The Record contains classification letters dating back to the 1970s. These classification letters make plain that ATF has consistently adopted a standard whereby the degree of machining to the frame or receiver determined whether the device constituted a firearm….
>
> … Not one of the above-noted classification letters made reference to the amount of time that would be required to transform the given device into a fully functional frame or receiver. Further, these letters are only a few of the examples contained in the Record of ATF making determinations based on the degree of machining performed on the unfinished

---

[2] The government's brief is available at
https://storage.courtlistener.com/recap/gov.uscourts.cand.366534/gov.uscourts.cand.366534.29.0.pdf

frame or receiver with no reference whatsoever to the time required to transform the device into a fully functional frame or receiver.

Fed. Defs.' Mot. for Summ. J. at 30–32, *City of Syracuse v. ATF*, No. 1:20-CV-06885 (S.D.N.Y. Jan. 29, 2021), ECF No. 98 at 40–42.[3]

### B. The Biden Administration Announces That It "Will Not Wait for Congress to Act to Take Its Own Steps" on Gun Control

President Biden campaigned on a promise to "Stop 'ghost guns'" which the Biden campaign described as a weapon obtained illegally by people "assembling one on their own [] by buying a kit of disassembled gun parts."[4] Specifically, then-candidate Biden promised to "pass[] legislation" to "stop the proliferation of these so-called 'ghost guns.'"

After President Biden took office, members of Congress proposed bills changing the way ATF classifies frame and receiver blanks not currently defined as firearms. None of those bills became law. *See*, *e.g.*, S. 1558, 117th Cong. (2021) (Untraceable Firearms Act of 2021);[5] H.R. 1454, 117th Cong. (2021) (Ghost Guns Are Guns Act).[6] Because the Biden Administration was unable to accomplish its legislative goal through the constitutional process of bicameralism and presentment, it turned to unilateral executive action and unlawful means to achieve its aims for regulating firearms.

On April 7, 2021, the White House announced that President Biden was "reiterating his call for Congress to pass legislation."[7] The announcement also stated that "this Administration will

---

[3] The government's brief is available at
https://storage.courtlistener.com/recap/gov.uscourts.nysd.542991/gov.uscourts.nysd.542991.98.0
.pdf
[4] *The Biden Plan to End Our Gun Violence Epidemic*, BIDEN-HARRIS DEMOCRATS,
https://joebiden.com/gunsafety/ (last visited Sep. 19, 2022).
[5] https://www.congress.gov/bill/117th-congress/senate-bill/1558
[6] https://www.congress.gov/bill/117th-congress/house-bill/1454
[7] *Fact Sheet: Biden-Harris Administration Announces Initial Actions to Address the Gun Violence Public Health Epidemic*, THE WHITE HOUSE (Apr. 7, 2021), https://www.whitehouse.gov/briefing-

not wait for Congress to act to take its own steps" on gun control. The announcement instructed the Department of Justice to "within 30 days . . . issue a proposed rule to help stop the proliferation" of so-called "ghost guns."

On April 8, 2021, President Biden, Vice President Harris, and Attorney General Garland held a press conference at the White House Rose Garden. President Biden stated that he "asked the Attorney General and his team to identify for me immediate, concrete actions I could take now without having to go through the Congress."[8] Attorney General Garland stated in his remarks that "the proliferation of the so-called ghost guns" was caused by a "regulatory loophole" or "gap,"[9] even though the proliferation of such products was actually the direct result of ATF's proper legal determinations pursuant to the GCA, and carefully considered decisions to issue classification determinations approving the lawful, unregulated sale of such products.

On May 7, 2021, Attorney General Garland announced ATF proposed rule 2021R–05, titled *Definition of "Frame or Receiver" and Identification of Firearms*, 86 Fed. Reg. 27,720 (May 21, 2021). On May 11, 2021, the U.S. Senate Committee on the Judiciary's Subcommittee on the Constitution held a hearing on proposed legislation addressing so-called "ghost guns." At the hearing, Senator Richard Blumenthal admitted that one reason he proposed the legislation was that "under federal law" frame and receiver blanks are not classified as firearms.[10]

---

room/statements-releases/2021/04/07/fact-sheet-biden-harris-administration-announces-initial-actions-to-address-the-gun-violence-public-health-epidemic/.

[8] *Remarks by President Biden on Gun Violence Prevention*, THE WHITE HOUSE (Apr. 8, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/04/08/remarks-by-president-biden-on-gun-violence-prevention/.

[9] *Attorney General Garland's Full Remarks on Gun Violence Prevention at the White House Rose Garden*, U.S. DEP'T OF JUSTICE (Apr. 8, 2021), http://www.justice.gov/opa/speech/attorney-general-garland-s-full-remarks-gun-violence-prevention-white-house-rose-garden.

[10] *Stop Gun Violence: Ghost Guns: Hearing Before the Subcomm. on the Constitution, of the S. Comm. On the Judiciary*, 117th Cong. 5 (statement of Sen. Blumenthal),

During the 90-day comment period for the proposed rule—from May 21 to August 19, 2021—the public submitted approximately 290,000 comments on the proposed rule.[11]

In February 2022, President Biden and Attorney General Garland traveled to New York City for a meeting of the Gun Violence Prevention Task Force. At that meeting, President Biden stated that "this spring, the Justice Department will issue a final rule to regulate these so-called 'ghost guns.'"[12]

As the one-year anniversary of the Biden Administration's press conference at the White House Rose Garden drew near, political pressure mounted on the Biden Administration to issue a final rule as soon as possible. In March 2022, the New York Times reported that then-Acting ATF Director Marvin Richardson stated at an industry gathering that ATF was expected to announce its Final Rule by June 2022. A Department of Justice spokesperson said he "was simply reading from a White House budget office document," but two White House officials told the New York Times that "Mr. Richardson had misspoken and that the rule would, in fact, be finished by early April."[13] Shortly thereafter, Mr. Richardson was removed from his position as Acting Director and replaced with the Acting Director Gary Restaino.

On April 8, 2022, exactly one year after the President's press conference at the White House Rose Garden, Politico reported that Senator Chris Murphy and more than 100 Democrat

---

https://www.judiciary.senate.gov/meetings/stop-gun-violence-ghost-guns (stating at 22:19 that "they are guns, except under federal law").

[11] ATF, *Comments on Proposed Rule 2021R-05*, https://www.atf.gov/rules-and-regulations/definition-frame-or-receiver/submit-comment.

[12] *Remarks by President Biden at a Gun Violence Prevention Task Force Meeting*, THE WHITE HOUSE (Feb. 3, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/02/03/remarks-by-president-biden-at-a-gun-violence-prevention-task-force-meeting/.

[13] *See* Glenn Thrush, *Dueling Messages Muddle Biden's Agenda on Guns*, N.Y. TIMES (Mar. 4, 2022), https://www.nytimes.com/2022/03/04/us/politics/atf-biden-gun-reform.html.

legislators sent a letter to President Biden on March 25, 2022, "pressing Biden to take unilateral action on guns," including "[f]inaliz[ing] a regulation to crack down on so-called ghost guns before Democrats potentially lose control of Congress."[14] The article noted that Democrats were "exasperated" at how much time it was taking for the Biden Administration to issue a final rule.

On April 11, 2022, President Biden announced at the White House Rose Garden that the Final Rule was complete. President Biden stated that a "year ago this week … I instructed the Attorney General to write a regulation that would rein in the proliferation of ghost guns because I was having trouble getting anything passed in the Congress."[15] He explained that the Final Rule's purpose was to make it "illegal to manufacture" weapon parts kits and "[i]llegal for a licensed dealer to sell them" without complying with the same regulatory requirements governing the manufacture and sale of complete firearms.

The Final Rule was published on April 26, 2022, *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022),[16] and took effect on August 24, 2022.

### C.   The Final Rule Unlawfully Creates a New Definition of "Firearm" in Order to Regulate *Partial* Frames and Receivers

In its analysis of ATF's promulgation of the Final Rule, this Court observed that "[r]ather than merely updating the terminology, ATF decided to regulate *partial* frames and receivers." ECF No. 56 at 3 (emphasis in original). As described in the Court's September 2 Order:

---

[14] Laura Barrón-López, *Democrats Exasperated With Biden on Gun Control*, POLITICO (Apr. 8, 2022), https://www.politico.com/news/2022/04/08/democrats-biden-gun-control-00024097.

[15] *Remarks by President Biden Announcing Actions to Fight Gun Crime and His Nominee for ATF Director, Steve Dettelbach*, THE WHITE HOUSE (Apr. 11, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/04/11/press-briefing-by-press-secretary-jen-psaki-april-11-2022/.

[16] The Final Rule is available at https://www.federalregister.gov/d/2022-08026.

Under the new Final Rule, "[t]he terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." *Id*. § 478.12(c). But "[t]he terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." *Id*. When determining whether an object is a frame or receiver, the ATF Director is not limited to looking only at the object. "When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit . . . ." *Id*.

*Id*. at 3.

The Final Rule also unlawfully changes ATF's definition of "firearm" to include "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11 (definition of "firearm").

## II. THIS COURT HAS ALREADY DETERMINED THAT THE FINAL RULE EXCEEDS ATF'S STATUTORY AUTHORITY UNDER THE PLAIN LANGUAGE OF THE GUN CONTROL ACT

In seeking a preliminary injunction, Plaintiffs argued that the Final Rule exceeds ATF's statutory authority under the GCA in two ways: first, it "expands ATF's authority over parts that may be 'readily converted' into frames or receivers, when Congress limited ATF's authority to 'frames or receivers' as such"; and second, it "unlawfully treats weapon parts kits as firearms." ECF No. 56 at 6. This Court found that "Plaintiffs are likely to succeed on both claims." *Id*.

### A. The September 2 Order: "Parts that *may become* receivers are not receivers"

The Court's September 2 Order found that the "text of the Gun Control Act resolves [Plaintiffs'] motion" for a preliminary injunction, ECF No. 56 at 6, and in its analysis determined:

The Final Rule's redefinition of "frame or receiver" conflicts with the statute's plain meaning. The definition of "firearm" in the Gun Control Act does not cover all firearm parts. It covers specifically "the frame or receiver of any such weapon" that Congress

defined as a firearm. 18 U.S.C. § 921(a)(3)(B). That which *may become* a receiver is not itself a receiver.

*Id*. at 8 (emphasis in original). This Court's analysis concluded that ATF's newly expanded definitions in the Final Rule were "facially unlawful":

> Congress excluded other adjectives that ATF adds to its definition. The Final Rule covers "disassembled" and "nonfunctional" frames and receivers. 27 C.F.R. § 478.12(c). Congress's definition does not. …
>
> ATF's new definition of "frame or receiver" in 27 C.F.R. § 478.12(c) is ***facially unlawful***. By comparison, the Final Rule includes definitions of "frame" and "receiver" in § 478.12(a) that appear to be consistent with the statute. This further highlights that the Final Rule's expansion of authority in § 478.12(c) to firearm parts that are not yet frames or receivers goes beyond Congress's definition. In other words, § 478.12(a) describes the full scope of frames and receivers that are consistent with the statutory scheme. ATF's expansion in § 478.12(c), on the other hand, covers additional parts that are "designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). But Congress intentionally omitted that language from the definition. Section 478.12(c) is thus ***facially unlawful*** because it describes only parts that Congress intentionally excluded from its definition of "firearm." It is purely an expansion of authority beyond the statutory language.

*Id*. at 9–10 (emphasis added).

This Court's September 2 Order went on to reject Defendants' counterarguments that ATF was entitled to deference in regulating components that ATF itself determined to *not* be a frame or receiver. *Id*. at 10. The Court likewise found Defendants' attempt to invoke "boundless congressional intent" regarding the GCA to be unpersuasive as justification for the Final Rule's overreach:

> Contrary to Defendants' broad framing, "the regulatory goals of the Gun Control Act were narrower: the Act ensured that '*weapons* [were] distributed through regular channels and in a traceable manner and [made] possible the prevention of sales to undesirable customers and the detection of the origin of particular *firearms*.'" *New York v. Burger*, 482 U.S. 691, 713 (1987) (emphases added) (alterations in original) (citing *United States v. Biswell*, 406 U.S. 311, 315–16 (1972)). When Congress sought to regulate parts of weapons, it did so meticulously.

*Id*. at 11.

**B.     The September 2 Order: "A weapons parts kit is not a firearm"**

The September 2 Order also found that "Plaintiffs are also likely to succeed on their claim that the Final Rule unlawfully treats weapon parts kits as firearms." ECF No. 56 at 12.  This Court explained how the Final Rule's use of "weapons parts kits" impermissibly expanded ATF's authority beyond the scope provided by the GCA:

> The Final Rule contains its own definition of "firearm," notwithstanding that the Gun Control Act already defines the term. Under the Final Rule, "[t]he term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11 (definition of "firearm"). That language conflicts with the statute's definition of "firearm."
>
> ***ATF has no general authority to regulate weapon parts.*** But the Final Rule grants ATF that general authority by copying language used throughout the statutory definition. It takes phrases like "designed to" and "may readily be converted" and "assembled" from various places in the statute, cobbling them together to form ATF's own definition of "firearm." Those terms may add a patina of credibility to the drafting, but they tarnish Congress's carefully crafted definition. More importantly, they unlawfully expand ATF's authority beyond the boundaries set by the Gun Control Act.

*Id.* at 12 (emphasis added).

## ARGUMENT

Because the Final Rule—as this Court has already determined—is likely to be ultimately found unlawful and the economic harm caused by the Final Rule during the pendency of its adjudication would destroy BlackHawk's business, BlackHawk seeks a preliminary injunction to "preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained." *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017). Courts look to four factors in deciding whether to grant preliminary injunctive relief: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest." *Id.*  The third and fourth

12

factors—"assessing the harm to the opposing party and weighing the public interest"—"merge

when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Courts

in this Circuit have determined that:

> relevant to both the third and fourth factors are the facts that … Congress repeatedly failed
> to enact proposed legislation similar in effect to the Rule, and thirty-four U.S. Senators
> wrote to CMS asking that it take the action it did. These facts … raise concerns in this
> court's mind that this case involves an attempted expansion of federal agency power in
> such a manner as to raise separation of powers concerns.… [T]he potential that the Rule
> might serve to violate the basic separation of powers in the U.S. Constitution seems a quite
> relevant factor in deciding whether to allow the federal courts to resolve any concerns in
> this regard before allowing it to go into effect.

*Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921, 945 (N.D. Miss. 2016).

The decision on whether to grant preliminary relief is left to the district court's sound

discretion. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621

(5th Cir. 1985). As explained below, each of the four factors overwhelming support granting

BlackHawk the preliminary injunction it now seeks to continue to operate its business.

## I.   THE COURT'S SEPTEMBER 2 ORDER ESTABLISHES THAT BLACKHAWK IS LIKELY TO PREVAIL ON THE MERITS

A movant "appealing to the conscience of the chancellor to maintain the status quo … is

not required to prove to a moral certainty that his is the only correct position." *Texas v. Seatrain*

*Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975). "As long as the court cannot say there is no likelihood

of prevailing on the merits but finds the factor of substantial likelihood of success present to some

degree, then the party seeking the injunction has met its burden." *Family Rehab., Inc. v. Azar*,

3:17-CV-3008, 2018 WL 3155911, at *3 (N.D. Tex. June 28, 2018) (citing *Productos Carnic, S.A.*

*v. Cent. Amer. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980)). "A preliminary

injunction may issue … despite the existence of a plausible defense, as long as the movant

demonstrates a substantial likelihood of success." *Dallas Cowboys Cheerleaders, Inc. v.*

13

*Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979). The likelihood of success on the merits is "arguably the most important of the four factors necessary to grant a preliminary injunction[.]" *Def. Distributed v. United States Dep't of State*, 838 F.3d 451, 463 (5th Cir. 2016).

Here, this Court has already found that the claims BlackHawk asserts are likely to prevail on the merits. *Compare* ECF No. 56 at 6, 12, 15 and 22 (finding, *inter alia*, that provisions of the Final Rule are "facially unlawful", that the Final Rule is outside the scope of ATF's authority under the GCA, and that the Final Rule unlawfully treats weapons parts kits as firearms) *and* BlackHawk's Complaint ¶¶ 56–61, ¶¶ 85–91, ¶¶ 106–110.

## II.    BLACKHAWK HAS ESTABLISHED THAT IT WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF INJUNCTIVE RELIEF

### A.    The Final Rule Will Likely Put BlackHawk Out of Business

Nearly 100% of BlackHawk's business is producing and selling items that are subject to the Final Rule. Lifschitz Decl. ¶ 8. Without injunctive relief, BlackHawk will be subject to possible criminal charges if it attempts to provide assembly instructions and/or sells parts, jigs, and/or tools that ATF determines violate the Final Rule and therefore the GCA; or, if it stops selling its parts, jigs, and/or tools, will likely not survive the pendency of the case and will be go out of business well before the unlawfulness of the Final Rule is determined in a final judgment. *Id*. ¶¶ 21–21.

Irreparable injury exists where "the potential economic loss is so great as to threaten the existence of the movant's business." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989); *see also Jiao v. Xu*, 28 F.4th 591, 598 (5th Cir. 2022); *Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) ("A threat to trade or business viability may constitute irreparable harm."); *Milsen Co. v. Southland Corp.*, 454 F.2d 363, 367 (7th Cir. 1971) ("[Plaintiffs] have presented an

appropriate case for preliminary injunction. . . [because plaintiffs] will lose their stores and may not be able to finance the trial on their legal claims if they lose their business now[.]").

Additionally, "harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). "Indeed, 'complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.'" *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1992) (Scalia, J., concurring in part)). In a case against the federal government, "federal agencies generally enjoy sovereign immunity for any monetary damages." *Wages and White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Therefore, BlackHawk's "lack of a 'guarantee of eventual recovery' is another reason that its alleged harm is irreparable." *Id.* (quoting *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021)).

The irreparable harm standard is met here because monetary damages are unavailable to BlackHawk against Defendants. Further, ATF acknowledges the irreparable, collateral damage of the Final Rule, which will shut down an entire industry. By ATF's own estimation, "the final rule could potentially affect 132,023 entities, including FFLs and non-FFL manufacturers and retailers of firearms parts kits with partially complete frames or receivers."[17] ATF further estimates that "the majority of affected entities are small entities that would experience a range of costs, the largest cost being the *dissolution of the entire business*."[18]

---

[17]ATF, REGULATORY IMPACT ANALYSIS AND FINAL REGULATORY FLEXIBILITY ANALYSIS at 124 (2022), available at https://www.atf.gov/file/165811/download.
[18] *Id.* (emphasis added).

**B.      BlackHawk Has Established That It Is Entitled to Injunctive Relief That Matches the Relief Currently Provided to Tactical—Namely, That BlackHawk Remains Fully Protected to Continue Operating and Transacting Business to the Same Extent and Capacity As Before the Final Rule**

Similar to Tactical, BlackHawk's business depends on a customer base and network of vendors, suppliers, and industry relationships across the U.S. who have basic confidence in the prudence and legality of transacting business with BlackHawk. Before the Final Rule, BlackHawk's customers and industry partners had little cause for concern in transacting business with BlackHawk given the company's well-earned, favorable reputation in the industry and ATF's 50 years of relative consistency in construing the GCA, issuing classifications letters, and publishing guidance to industry. BlackHawk relied on stable definitions for key GCA provisions and broadly recognized and agreed-upon criteria for legality to cultivate its business and working relationships.[19] *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (analyzing Department of Labor's deficient explanation for change in position it had held for multiple decades and advising that "an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account") (internal quotes omitted); *Texas v. Biden*, No. 4:21-CV-0579-P, --- F.Supp.3d ----, 2022 WL 658579, at *17 (N.D. Tex. Mar. 4, 2022) ("When an agency changes course, it must consider whether there was legitimate reliance on the status quo prior to the change.").

With the publishing of the Final Rule, the industry has been utterly destabilized and paralyzed by the "fear of felony indictment" and "concerns about being prosecuted" that this Court cited in discussing Tactical's customers in its October 10 Order. ECF No. 89 at 17.  Consequently,

---

[19] For example, payment processors, metal treatment businesses, common carriers and E-commerce companies help make it possible for the company to manufacture, advertise, sell and ship products to its customers, most of which are out of state. Lifschitz Decl. ¶¶ 13, 18.

as a practical matter, injunctive relief would allow BlackHawk to operate and provide assurance to both its customers and its network of industry partners that they can continue doing business with BlackHawk without incurring the risk of possible felony prosecution by Defendants.

In sum, in the absence of injunctive relief, BlackHawk will continue to be irreparably harmed and will not survive the pendency of this litigation. *Id*.; *see Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460 (5th Cir. 2020) (*en banc*) (noting that when "crafting an injunction, district courts are guided by the Supreme Court's instruction that the scope of injunctive relief is dictated by the extent of the violation established"); *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (affirming the grant of a preliminary injunction when there was "a substantial likelihood that a geographically-limited injunction would be ineffective" at remedying the plaintiff's injury). Accordingly, the Court should provide the requested injunctive relief consistent with the Court's findings and purpose in granting the relief currently afforded to Tactical—namely, to preserve the ability of manufacturer Plaintiffs in this proceeding (Tactical and BlackHawk, respectively) to continue operating until the Court issues a final decision on the merits.

## III.  BLACKHAWK'S INJURY OUTWEIGHS ANY HARM TO DEFENDANTS OR THE PUBLIC

Consistent with the Court's analysis and findings regarding potential harms, ECF No. 56 at 21–22, the injury to BlackHawk far outweighs any potential harm to Defendants or the public interest. In contrast, Defendants face no harm from temporary relief, as the relief sought is no more than what the law has dictated for over 50 years. *See Nat'l Fed'n of Indep. Bus. v. Perez*, No. 5:16-CV-00066-C, 2016 WL 3766121, at *33 (N.D. Tex. June 27, 2016) ("the fact that DOL has waited over fifty years to promulgate its New Rule strongly suggests there is no compelling government interest at stake"). Further, government officials have no legitimate interest in implementing an unlawful rule. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488

(2d Cir. 2013) (recognizing that government officials "do[] not have an interest in the enforcement of an unconstitutional law").

Moreover, the "public interest" is properly "served by maintaining our constitutional structure and maintaining the liberty of individuals[.]" *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021); *see N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("[T]he public interest is served when administrative agencies comply with their obligations under the APA."); *see also Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58–59 (D.C. Cir. 1997) ("[T]here is an overriding public interest … in the general importance of an agency's faithful adherence to [its] statutory mandate.").

Even if Defendants had a legitimate interest in implementing the Final Rule, they, and the public, face no substantial prejudice from suspended implementation. The government's interest "can be effectively vindicated after a trial on the merits," *Texas v. United States*, 809 F.3d at 187, whereas BlackHawk's interest cannot be, given that the Final Rule will destroy its business.

BlackHawk, its customers, its industry co-participants—and indeed all Americans—risk the possibility of criminal penalties for the production, sale, and purchase of items that have not historically been considered firearms prior to the Final Rule's taking effect on August 24. *See generally*, Lifschitz Decl. This regulatory risk extends to the sharing of technical instructions by BlackHawk, who has been compelled to self-censor and refrain from free discourse with its customers because of the profound uncertainty surrounding the Final Rule. *Id.* ¶ 11. Indeed, BlackHawk and similar producers and retailers across the country must suffer the loss of civil liberties or risk the destruction of their businesses. Defendants, on the other hand, will not suffer significant harm by maintenance of the long-standing, 54-year status quo regarding what constitutes a "firearm" while this Court considers the merit of the Final Rule. Indeed, granting a

preliminary injunction during the pendency of this litigation serves the public interest by allowing the Court to provide clarity on the validity of the Final Rule while "ensur[ing] the status quo is maintained so the legal system can resolve [an] important dispute." *City of Dallas, Texas v. Hall*, No. 3:07-CV-0060-P, 2008 WL 11350041, at *3 (N.D. Tex. July 28, 2008); *Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921, 946 (N.D. Miss. 2016) ("[T]he Rule in this case changes a practice which CMS accepted for many years and this court does not believe that … generalized citations to agency discretion constitute sufficient reason to prevent the courts from making a careful evaluation of the Rule before it goes into effect."); *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 840 (N.D. Tex. 2022) ("An injunction does not disserve the public interest when it prevents constitutional deprivations.").

Finally, the public interest in preserving full access to and enjoyment of the guarantees of the First and Second Amendments undoubtedly weighs in favor of enjoining enforcement of ATF's unlawful Final Rule for the pendency of this litigation. *U.S. Navy SEALs 1-26*, at 840 ("An injunction does not disserve the public interest when it prevents constitutional deprivations.").

## CONCLUSION

For the foregoing reasons, BlackHawk respectfully requests that this Court enjoin the enforcement of the Final Rule as to BlackHawk and its customers and issue a determination that BlackHawk is entitled to the injunctive relief granted in the Court's September 2 and October 1 Orders and remains protected to continue transacting business with its customers to the full extent and capacity as existed prior to the publication of the Final Rule.

Respectfully submitted,

s/ *Brian D. Poe*
Brian D. Poe
TX Bar No. 24056908

BRIAN D. POE, ATTORNEY AT LAW PLLC
The Bryce Building
909 Throckmorton Street
Fort Worth, TX 76102
Phone: (817) 870-2022
Fax: (817) 977-6501
bpoe@bpoelaw.com

Michael J. Sullivan
*Pro Hac Vice*, MA Bar No. 487210
J. Christopher Amrhein, Jr.
*Pro Hac Vice*, MA Bar No. 703170
Nathan P. Brennan
*Pro Hac Vice*, MN Bar No. 389954
ASHCROFT LAW FIRM LLC
200 State Street, 7th Floor
Boston, MA 02109
Phone: (617) 573-9400
Fax: (617) 933-7607
msullivan@ashcroftlawfirm.com
camrhein@ashcroftlawfirm.com
nbrennan@ashcroftlawfirm.com

*Counsel for Intervenor-Plaintiff BlackHawk*
*Manufacturing Group Inc. d/b/a 80 Percent Arms*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 20, 2022, the foregoing document was served, via the Court's

CM/ECF Document Filing System, upon the registered CM/ECF users in this action.


/s/ <i>Brian D. Poe</i>_____<br>Brian D. Poe