**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

JENNIFER VANDERSTOK, *et al.*,

         *Plaintiffs*,

and

BLACKHAWK MANUFACTURING GROUP, INC.,

       *Intervenor-Plaintiff*,

   v.

MERRICK GARLAND, in his official capacity as Attorney General of the United States; *et al.*,

         *Defendants*.

Civil Action No. 4:22-cv-00691-O

---

## PLAINTIFFS' SUPPLEMENTAL BRIEF UNDER RULE 65(A)(2) CONSOLIDATION:

## DEFENDANTS' RULE EXCEEDS THE AGENCIES' STATUTORY AUTHORITY

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................... ii

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 2

I.  The Final Rule Exceeds The Limits Of The Original Plain Meaning
Of The Gun Control Act ............................................................................... 4

    A.  Congress Explicitly Excluded the Phrase "Readily
Converted" When Regulating "the Frame or Receiver" ................... 5

    B.  Commonly Understood Meanings of "Frame or Receiver" Do
Not Include "Partially Complete" Items ........................................... 7

    C.  "Frame or Receiver" Does Not Include "Templates, Jigs,
Molds, Equipment, Tools, Instructions, Guides, or Marketing
Materials" ....................................................................................... 10

    D.  The Gun Control Act Does Not Grant the Agencies the
Authority to Regulate a "Complete Weapon" as That Term is
Defined in the Final Rule ................................................................ 13

    E.  The Text and Structure of the Gun Control Act Does Not
Grafting "Parts Kits" Into the "Firearm" or "Frame or
Receiver" Definitions ...................................................................... 14

II.  The History And Purpose of The Gun Control Act And Its
Implementation Do Not Support The Final Rule ......................................... 17

    A.  Legislative History Proves Congress Purposefully Chose to
Not Regulate Every Part, or Even "Readily Convertible"
Parts, of a Firearm ......................................................................... 18

    B.  Contrary to the Agencies' Claim, Regulatory Expansion of the
Gun Control Act Is Not Necessary to Implement the Gun
Control Act ..................................................................................... 19

III.  The Agencies Have Previously Recognized Their Limitations Under
The Gun Control Act ................................................................................... 22

CONCLUSION ................................................................................................... 25

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Alabama v. North Carolina,*
    560 U.S. 330 (2010) ........................................................................... 7

*Allison Engine Co., Inc. v. U.S. ex rel. Sanders,*
    553 U.S. 662 (2008) ........................................................................... 5, 6, 12, 17

*Barnhart v. Sigmon Coal Co.,*
    534 U.S. 438 (2002) ........................................................................... 5

*California v. ATF,*
    No. 3:20-cv-06761, 2020 WL 9849685 (N.D. Cal. Nov. 30, 2020) ...................... 23, 24

*Chamber of Com. of the U.S. v. DOL,*
    885 F.3d 360 (5th Cir. 2018) ................................................................. 7

*Colt's Patent Firearms Mfg. Co. v. New York Sporting Goods Co.,*
    190 F. 563 (2d Cir. 1911) .................................................................... 8

*Conn. Nat'l Bank v. Germain,*
    503 U.S. 249 (1992) ........................................................................... 4, 17

*Ethyl Corp. v. EPA,*
    51 F.3d 1053 (D.C. Cir. 1995) ............................................................... 6

*Franco v. Mabe Trucking Co.,*
    3 F.4th 788 (5th Cir. 2021) .................................................................. 17

*Garland v. Remington Arms Co.,*
    137 F. Supp. 622 (S.D.N.Y. 1956) ......................................................... 8

*J&J Sports Prods., Inc. v. Mandell Family Ventures, LLC,*
    751 F.3d 346 (5th Cir. 2015) ................................................................. 3

*King v. Burwell,*
    576 U.S. 473 (2015) ........................................................................... 21

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019) ....................................................................... 3

*N.Y. State Dept. of Soc. Servs. v. Dublino,*
    413 U.S. 405 (1973) ........................................................................... 21

*Nat'l Marine Fisheries Serv.,*
    968 F.3d 460 (5th Cir. 2020) ................................................................. 6, 17

*Neese v. Becerra*,
  No. 2:21-cv-163-Z, 2022 WL 16902425 (N.D. Tex. Nov. 11, 2022) ................... 7

*Pedersen v. United States*,
  109 Ct. Cl. 226 (1947) .......................................................................................... 8

*Perrin v. United States*,
  444 U.S. 37 (1979) ................................................................................................ 7

*Peyton v. Reynolds Assocs.*,
  955 F.2d 247 (4th Cir. 1992) ................................................................................. 25

*R.R. Ricou & Sons Co. v. Fairbanks, Morse & Co.*,
  11 F.2d 103 (5th Cir. 1926) .................................................................................. 10

*Rubin v. United States*,
  449 U.S. 424 (1981) .............................................................................................. 17

*Russello v. United States*,
  464 U.S. 16 (1983) ................................................................................................ 5

*St. Paul Fire & Marine Co. v. Lubuzan*,
  579 F.3d 533 (5th Cir. 2009) ................................................................................ 17

*Syracuse v. ATF*,
  No. 1:20-cv-06885, 2021 WL 23326 (S.D.N.Y. Jan. 29, 2021) ............................. 6, 22, 23, 24

*Tex. State Bd. of Exam'rs of Marriage and Family Therapists v. Tex. Med. Ass'n*,
  511 S.W.3d 28 (Tex. 2017) .................................................................................... 8

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ................................................................................ 6

*United States v. Bittner*,
  19 F.4th 734 (5th Cir. 2021) ................................................................................. 3, 4

*United States v. Castleman*,
  134 S. Ct. 1405 (2014) .......................................................................................... 7

*United States v. Kaluza*,
  780 F.3d 647 (5th Cir. 2015) ................................................................................ 7

*United States v. Orellana*,
  405 F.3d 360 (5th Cir. 2005) ................................................................................ 22

*United States v. Thompson*,
  202 F. Supp. 503 (N.D. Cal. 1962) ....................................................................... 22

*United States v. Transocean Deepwater Drilling, Inc.*,
   767 F.3d 485 (5th Cir. 2014) ................................................................ 2

*United States v. Wong Kim Bo*,
   472 F.2d 720 (5th Cir. 1972) ................................................ 5, 6, 12, 17

*Util. Air Reg. Grp. v. EPA*,
   573 U.S. 302 (2014) ............................................................................. 6

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ........................................................................ 3

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ........................................................................... 11

**STATUTES**

5 U.S.C. § 706(2)(A) ................................................................................. 25

5 U.S.C. § 706(2)(C) .............................................................................. 3, 25

18 U.S.C. 921(a)(3) ............................................................................. 4, 5, 14

18 U.S.C. § 921(a)(3)(A) .................................................................... *Passim*

18 U.S.C. § 921(a)(3)(B) .................................................................... *Passim*

18 U.S.C. § 921(a)(4)(A) ........................................................................... 16

18 U.S.C. § 921(a)(4)(C) ...................................................................... 12, 16

18 U.S.C. § 921(a)(5) ................................................................................ 12

18 U.S.C. § 921(a)(21) ............................................................................. 10

18 U.S.C. § 922 .................................................................................... 21, 22

26 U.S.C. § 5845(b) .................................................................................. 16

26 U.S.C. § 5848 ....................................................................................... 22

Cal. Pen. Code § 16520(b) ........................................................................ 22

Nev. Rev. Stat. Ann. § 202.253(9) (West) ............................................... 21

Pub. L. 75-785 .......................................................................................... 18

Pub. L. 90-618, §101 ................................................................................ 20

Pub. L. 117-103, § 1104(b) ................................................................ 21

Pub. L. 117-159, §§ 12001(a)(1), 12004(b) ...................................... 21

H.R. Rep. 90-1577 (June 21, 1968) .................................................. 18

S. Rep. No. 90-1097 (April 29, 1968) ............................................... 18

**REGULATIONS**

26 CFR § 177.10 ............................................................................... 18

*Commerce in Firearms and Ammunition*, 33 Fed. Reg. 18,555 (Dec. 14, 1968) ...... 9

*Definition of "Frame or Receiver" and Identification of Firearms* ("Proposed Rule"),
    86 Fed. Reg. 27,720 (May 21, 2021) ...................................... 15, 23

*Definition of "Frame or Receiver" and Identification of Firearms* ("Final Rule"),
    87 Fed. Reg. 24,652 (Apr. 26, 2022) ...................................... 1

**OTHER AUTHORITIES**

111 Cong. Rec. 5527 (March 22, 1965) ............................................ 18

DAVID HARSANYI, FIRST FREEDOM (2018) ........................................ 20

Sam Bocetta, *The Complete History of the AR-15 Rifle*, SMALL WARS
JOURNAL (July 12, 2017) ................................................................. 20

IITV, *Kopel's Law & Liberty News -#002 The History of Homemade Guns*,
YouTube (Apr. 4, 2021) ................................................................... 20

JOHN OLSON, OLSON'S ENCYCLOPEDIA OF SMALL ARMS (1985) ............... 9

*Schematic View of the Springfield Model 1903*, FORGE OF INNOVATION, ................. 8

STEVEN P. FJESTAD, BLUE BOOK OF GUN VALUES (1990) ........................ 10

*Wheelgun Wednesday: A Striker Fired Revolver From The Past – Meet the
Kufahl*, THEFIREARMBLOG.COM (May 5, 2021) ................................. 20

WEBSTER'S THIRD INTERNATIONAL DICTIONARY (1971) ........................ 8–9

WILL FOWLER, THE COMPLETE WORLD ENCYCLOPEDIA OF GUNS: PISTOLS,
RIFLES, REVOLVERS, MACHINE AND SUBMACHINE GUNS THROUGH HISTORY
IN 1100 PHOTOGRAPHS (2008) ........................................................ 9

## INTRODUCTION

The Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF") and the Department of Justice's ("DOJ") (collectively, "Agencies" or "Defendants") final agency action, *Definition of "Frame or Receiver" and Identification of Firearms* ("Final Rule"), 87 Fed. Reg. 24,652 (Apr. 26, 2022),[1] exceeds their congressionally defined authority and therefore violates the Administrative Procedure Act ("APA"). While promulgated as an agency rulemaking, the Final Rule, *inter alia*, significantly expands the definition of "firearm" and "frame or receiver," beyond how those terms were established by Congress in the Gun Control Act of 1968 ("GCA"). The original plain meaning of the GCA, as evidenced by its text, structure, history, and purpose, demonstrates that the Agencies are now regulating items, pursuant to the Final Rule, that Congress never intended to be within the Agencies' purview.

First, the Final Rule's regulatory redefinition of "frame or receiver" exceeds the GCA. Congress included a "readily converted" weapon or something "designed to" be a weapon the federal definition of "firearm," and purposely left the expansions of "readily converted" and "designed to" out of the regulation of "the frame and receiver of any such weapon." The Agencies, however, rewrite and expand the statute by inserting these terms where Congress excluded them. Further, "frame" and "receiver" have had recognized meanings since at least the early 1900s when firearms were registered with the patent office and subject to litigation. These filings and contemporaneous public definitions confirm that "frame" and "receiver" did not, and still do not, encompass those items the Agencies' newly seek to regulate.

Second, the Agencies seek to expand their authority by improperly regulating "component parts" that amount to a "complete weapon," by regulating tools, equipment, and writings, and by

---

[1] The Final Rule is available at https://bit.ly/atf-final-rule.

regulating parts kits. Executive agencies do not have the inherent or even implied authority to regulate materials that may one day become part of a regulated item and there is no basis in the GCA for the Agencies to regulate tools and writings. Lastly, Congress's decision to address "parts" in some portions of the GCA but not in the definition of "firearm" or "frame or receiver" further demonstrates that the Final Rule exceeds the bounds of the GCA.

Third, the history, purpose, and prior applications of the GCA weigh against the Agencies' self-aggrandizement. Specifically, the GCA replaced the prior Federal Firearms Act and represented a conscious congressional choice as to which components may be regulated. The expansions sought by the Agencies are not "necessary," or even appropriate, to serve the purpose of the GCA. And the Agencies themselves recently acknowledged, argued even, that they could not incorporate language from one part of the GCA to expand other sections, such as the definition of "frame or receiver."

The Final Rule exceeds the Agencies' authority because it is contrary to the GCA. The Final Rule therefore violates the APA and Plaintiffs respectfully request that this Court vacate the challenged provisions of the Final Rule and enjoin the Agencies from enforcing the same.[2]

## ARGUMENT[3]

"An administrative agency's authority is necessarily derived from the statute it administers and may not be exercised in a manner that is inconsistent with the administrative structure that Congress has enacted." *United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 489

---

[2] In addition to exceeding agency authority, the Final Rule violates the APA and is unlawful for other reasons that will be more fully briefed in Plaintiffs' summary judgment motion. Ultimately, the Final Rule suffers substantive and procedural flaws justifying vacatur and enjoinment of the entire Rule.

[3] Plaintiffs submit this supplemental brief pursuant to this Court's Order consolidating the preliminary injunction proceedings and the trial on the merits for Plaintiffs' Count I. ECF No. 107. In the interest of brevity, Plaintiffs rely upon and incorporate their prior briefing, including the background explanation of the statutes and principles at issue. *See* ECF Nos. 1, 16, 55, 63.

(5th Cir. 2014); *see West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) ("Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line.").

Here, the Agencies' attempts to expand the GCA, and thus their own authority, defy the most basic canons of statutory construction. The "traditional tools of construction," include "text, structure, history, and purpose." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019); *see United States v. Bittner*, 19 F.4th 734, 749 (5th Cir. 2021) (the Fifth Circuit considers "[t]he text, structure, history, and purpose of the relevant statutory and regulatory provisions" in its layered approach to statutory interpretation); *J&J Sports Prods., Inc. v. Mandell Family Ventures, LLC*, 751 F.3d 346, 352 (5th Cir. 2015) (considering "the plain meaning of [the statute] and the statutory framework" in its statutory interpretation analysis).

The Final Rule's expansion of "frame or receiver" and "firearm" conflict with the text and structure of the GCA. Further, the new definitions are inconsistent with the history and purpose of the GCA. Finally, the ATF's own prior implementation of the GCA, as well as other precedent, confirms that the Agencies have surpassed already recognized statutory limitations on their authority. This usurpation of congressional authority violates the APA and the GCA and cannot stand. Accordingly, Plaintiffs respectfully request that this Court vacate the Final Rule in so far as it exceeds the Agencies' authority and enjoin the Agencies from enforcing the same. *See* 5 U.S.C. § 706(2)(C) ("The reviewing court shall *hold unlawful and set aside* agency action, findings, [and] conclusions" that are "in excess of statutory jurisdiction, authority, or limitations[.]") (emphasis added).

## I.   THE FINAL RULE EXCEEDS THE LIMITS OF THE ORIGINAL PLAIN MEANING OF THE GUN CONTROL ACT

The Agencies have only as much authority as Congress grants them within the confines of the statutory text. The text is the most direct path to reach the original plain meaning of the GCA, and the text is where statutory interpretation begins. *United States v. Bittner*, 19 F.4th 734, 743 (5th Cir. 2021) ("When interpreting a statute, we begin with the text."). "[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

Under the GCA, Congress defined a firearm as:

> (A) any weapon (including a starter gun) which will or is designed to or may *readily be converted* to expel a projectile by the action of an explosive; (B) *the frame or receiver* of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3) (emphases added). The Final Rule, however, wrongly inserts "may readily be converted" from 18 U.S.C. § 921(a)(3)(A) into 18 U.S.C. § 921(a)(3)(B), ignoring the structure and altering the meaning of the congressional text. The Final Rule also adds regulation of non-firearm tools and equipment into "frame or receiver," in the form of a "frame or receiver parts kit;" adds "weapons parts kit" to Congress's "firearm" definition; and further expands "firearm" by newly creating the term "complete weapon."[4] None of these changes are within the text or consistent with the structure of the GCA.

---

[4] Exhibit A demonstrates the contrast between what Congress authorized in the GCA and the Final Rule's various expansions.

### A. Congress Explicitly Excluded the Phrase "Readily Converted" When Regulating "the Frame or Receiver"

The ATF's scope of authority is in enforcing the GCA, not rewriting it. When reviewing the extent of an agency's authority, courts look to the statutes that grant the agency that authority. According to the Fifth Circuit, statutory "words are to be given their natural, plain, ordinary and commonly understood meaning unless it is clear that some other meaning was intended, . . . and where Congress has carefully employed a term in one place and excluded it in another, *it should not be implied where excluded.*" *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972) (emphasis added); *see Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, 553 U.S. 662, 671 (2008) ("'[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002)); *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting the same).

In the GCA, Congress included "or may readily be converted" in 18 U.S.C. § 921(a)(3)(A)'s regulation of a weapon and, pursuant to *Wong Kim Bo* and *Allison Engine Co.*, one must presume "intentionally and purposefully" excluded it from 18 U.S.C. § 921(a)(3)(B)'s regulation of a "frame or receiver." The Agencies have ignored Congress and instead replaced the statutory text with their policy preferences by expanding the definition of a "frame or receiver" to "include a *partially complete, disassembled, or nonfunctional frame or receiver*" that "*may readily be* completed, assembled, restored, or otherwise *converted* to function as a frame or receiver[.]" Final Rule, at 24,739 (emphases added). The Agencies admit as much:

> [C]ommenters stated that ATF does not have authority to apply the phrase "may readily be converted" to define "partially complete . . . frame or receiver" since the "may readily be converted" language was included in prong (A) of section 921(a)(3) (applying to weapons) but not prong (B), meaning that "readily" cannot be applied to "frame or receiver" to allow for the inclusion of partially complete frames or receivers in the regulatory scheme. . . . The Department disagrees with

commenters' suggestion that the Department cannot use the concepts of "readily" and "converted" in describing partially complete frames and receivers simply because those terms appear in section 921(a)(3)(A).

Final Rule, at 24,685. Thus far, the Agencies have offered no precedent to support their argument that the holdings of *Wong Kim Bo* and *Allision Engine*, or the dozens of similar holdings, should not apply. The Agencies cannot because those holdings expressly apply in this case. Indeed, the Agencies' argument that they are free to "incorporate[] a term that Congress has used repeatedly in federal firearms laws," ECF No. 41 at 18, turns the logic long employed by both the Supreme Court and the Fifth Circuit on its head and violates that existing precedent.

Further, the Agencies conveniently ignore that by incorporating expanding language into 18 U.S.C. § 921(a)(3)(B), they are expanding their congressionally-limited authority and jurisdiction. Yet, "[w]ere courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015) (quoting *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995)); *see Nat'l Marine Fisheries Serv.*, 968 F.3d at 462 ("Once again, this is the argument that presumes power given if not excluded. We have resisted that siren song before, . . . and we again decline to be seduced."). "An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 325 (2014).

Under these well-established limitations and until their recent effort to broaden the GCA, the Agencies recognized that the GCA *prevented* them from regulating the items that they now sweep within the Final Rule. *See* Fed. Defs.' Mot. for Summ. J., *Syracuse v. ATF*, No. 1:20-cv-06885, 2021 WL 23326, ECF No. 98 at 34 (S.D.N.Y. Jan. 29, 2021) (quoting the same language from *Allison Engine Co.*); *see also* ECF No. 16 at 25–29 (citing the Agencies' position in active

6

litigation that cuts against the Final Rule); *see also* Section III, *infra*, at 22 (discussing the Agencies' prior legal filings).

Because Congress "intentionally and purposefully" withheld the authority the Agencies claim to exercise, the Final Rule violates the APA.

### B.   Commonly Understood Meanings of "Frame or Receiver" Do Not Include "Partially Complete" Items

The first rule of statutory interpretation is to read the words as written when the statue was enacted. "[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). There is a "'settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law term it uses.'" *Chamber of Com. of the U.S. v. DOL*, 885 F.3d 360, 369–70 (5th Cir. 2018) (quoting *United States v. Castleman*, 134 S. Ct. 1405, 1410 (2014)) (cleaned up). The purpose of this construction is consistency—the statute's scope does not evolve with time, but only changes with congressional action.

Congress did not separately define "frame or receiver" within the GCA, so the words bear their ordinary meaning at the time the GCA was enacted. *See Alabama v. North Carolina*, 560 U.S. 330, 340 (2010) ("Since the Compact contains no definition of 'sanctions,' we give the word its ordinary meaning."); *United States v. Kaluza*, 780 F.3d 647, 659 (5th Cir. 2015) (beginning with the assumption that words express their ordinary meaning). Specifically, "[t]he Court construes statutory text to give effect to the ordinary public meaning conveyed when Congress enacted the statute." *Neese v. Becerra*, No. 2:21-cv-163-Z, 2022 WL 16902425, at *7 (N.D. Tex. Nov. 11, 2022).

That ordinary meaning can be elucidated through historical and contemporaneous usage and dictionary definitions. "To determine a statutory term's common, ordinary meaning, we

typically look first to their dictionary definitions[.]" *Tex. State Bd. of Exam'rs of Marriage and Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017). In 1903, Springfield Armory patented a rifle that included the firing pin, bolt, and striker as part of the receiver (highlighted).[5]



typically look first to their dictionary definitions[.]"

Similarly, other weapons registered with the patent office prior to 1968 identified the "frame" or "receiver." *See Colt's Patent Firearms Mfg. Co. v. N.Y. Sporting Goods Co.*, 190 F. 563, 563–64 (2d Cir. 1911) (referring to the "frame" of a pistol); *Pedersen v. United States*, 109 Ct. Cl. 226, 254–55 (1947) (referring to the "receiver" of a rifle); *Garland v. Remington Arms Co.*, 137 F. Supp. 622, 622–24 (S.D.N.Y. 1956) (same). All of these "frames" and "receivers" were a single item that either housed or served as a mounting for the key operating components of the firearm.

Moreover, the Final Rule recognizes that in 1971, Webster's Dictionary defined a "frame" as "'the basic unit of a handgun which serves as a mounting for the barrel and operating parts of the arm[,]'" and the "'receiver" as "the metal frame in which the action of a firearm is fitted and to which the breech end of the barrel is attached[.]'" Final Rule, at 24,654 (quoting WEBSTER'S

---

[5] *Schematic View of the Springfield Model 1903*, FORGE OF INNOVATION, http://bit.ly/3ua0ice (last visited Dec. 5, 2022).

THIRD INTERNATIONAL DICTIONARY 902, 1894 (1971)). In 1985, a firearms encyclopedia defined frame as "'the basic structure and principal component of a firearm[.]'" Final Rule, at 24,654 (quoting JOHN OLSON, OLSON'S ENCYCLOPEDIA OF SMALL ARMS 72 (1985)). The encyclopedia defined a receiver as "the part of a gun that takes the charge from the magazine and holds it until it is seated in the breech. Specifically, the metal part of a gun that houses the breech action and firing mechanism[.]" JOHN OLSON, OLSON'S ENCYCLOPEDIA OF SMALL ARMS 138 (1985).[6] An encyclopedia that analyzes guns throughout history defines a receiver as "[t]he heart of a firearm which houses the internal workings. The receiver is the structure to which all other parts of the firearm are joined." WILL FOWLER, THE COMPLETE WORLD ENCYCLOPEDIA OF GUNS: PISTOLS, RIFLES, REVOLVERS, MACHINE AND SUBMACHINE GUNS THROUGH HISTORY IN 1100 PHOTOGRAPHS 503 (2008).

These filings and definitions confirm the plain meaning of "frame" or "receiver" in both common and industry usage. The prior regulatory definition[7] of "frame or receiver" was consistent with the original public meaning. In contrast, the historic meaning undermines the Agencies' newly proffered definition that includes "partially complete" and "nonfunctional" items, a "parts kit," and anything that is "clearly identifiable as an unfinished component part of a weapon." Final Rule, at 24,739.

---

[6] The National Rifle Association's ("NRA") website provides a glossary of terms from the Blue Book of Gun Values. STEVEN P. FJESTAD, BLUE BOOK OF GUN VALUES 2267 (1990). A "frame" is defined as "[t]he part of a firearm to which the action (lock work), barrel, and stock/grip are connected." *Id.* at 2274. A "receiver" is defined as "[t]hat part of a rifle or shotgun (excluding hinged frame guns) that houses the bolt, firing pin, mainspring, trigger group, and magazine or ammunition feed system." *Id.* at 2279.

[7] In 1968, the ATF defined a frame or receiver as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." *Commerce in Firearms and Ammunition*, 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968).

Plaintiffs do not dispute that the Agencies can regulate "the frame or receiver" of a weapon under the GCA. Nor that the Agencies can proffer a regulatory definition of "frame or receiver"—so long as that definition is consistent with the GCA. The industry has long understood a "frame or receiver" to be the central housing structure of a firearm, and the dictionary definition of "frame or receiver" supports that common understanding. What those definitions make clear is "[t]hat which may *become* a receiver *is not itself* a receiver." Order and Opinion, ECF No. 56 at 8 (emphases added); *see R.R. Ricou & Sons Co. v. Fairbanks, Morse & Co.*, 11 F.2d 103, 104 (5th Cir. 1926) (noting that "common usage" of terms "are understood to describe structures so far completed as to be capable of being used" and that "a qualifying adjective . . . was not needed to indicate the absence of an intention to give that statute the effect of" applying before the item "becomes capable of being used").[8] Contrary to the Agencies' suggestion in their opposition to Plaintiffs' preliminary injunction, the GCA did not leave "unresolved" the "crucial question" of "at what point a mere component or foundation of a component" becomes a regulated item. *See* ECF No. 41 at 17. Common sense, court precedent, and the basic constitutional structure of our government do not permit agencies to use statutory regulation of an item as a fulcrum to regulate materials, components, ingredients, or other subunits that may eventually become a regulated item as the Agencies have attempted to do here.

### C. "Frame or Receiver" Does Not Include "Templates, Jigs, Molds, Equipment, Tools, Instructions, Guides, or Marketing Materials"

Congress granted the Agencies the authority to regulate *firearms*, not tools, equipment, or other *means* of manufacture.[9] Congress defines a firearm, in part, as "the frame or receiver of any

---

[8] This is precisely why Congress added "designed to or may readily be converted" to 18 U.S.C. § 921(a)(3)(A): to capture items not currently functioning.
[9] The ATF may also regulate those "engaged in the business" such as a manufacturer of firearms, a manufacturer of ammunition, a dealer in firearms, an importer of firearms, and an importer of ammunition. 18 U.S.C. § 921(a)(21).

such weapon[,]" 18 U.S.C. § 921(a)(3)(B). It did not define a "firearm" as a combination of tools, materials, or instructions that may assist in the manufacture of a frame or receiver. "Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

But under the Final Rule, the Agencies regulate any "jigs, molds, equipment, tools, instructions, guides, or marketing materials" that may be part of a "frame or receiver parts kit" even though these items *cannot* and *will not* ever become a frame or receiver—nor, in fact, will those items ever become *any part* of a weapon that expels a projectile by action of an explosion. Final Rule, at 24,739. While the Agencies have sought to regulate some firearm components or have indirectly regulated components under other statutory provisions, this is the first time that the Agencies have *ever* regulated an item that is not nor will ever be part of a firearm as if it is one.

In fact, the Final Rule is more of a regulation on "jigs, molds, equipment, tools, instructions, guides, or marketing materials" than anything. For example, a so-called "billet or blank" which is "sold, distributed, or possessed with a compatible jig or template *is a frame or receiver*." *Id.* (Example 1 to paragraph (c)) (emphasis added). In contrast, a "billet or blank" "not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may be readily completed *is not a receiver*." *Id.* (Examples 4 and 5 to paragraph (c)) (emphasis added). It is, therefore, not the "billet" or "blank" that is directly regulated, but rather the sale, distribution, or possession of the jig or template, an item that itself is never part of an operational or completed frame, receiver, or firearm. *See* ECF No. 41 at 10 ("[T]hese are not considered to be a 'frame or receiver' *unless they are sold with* jigs, templates, equipment, tools or other products or components that would make the receiver *blank* readily convertible to a functional frame or

receiver.") (emphases added). The Final Rule boldly establishes that the presence of tools and instructions can make a non-frame or non-receiver into a "frame or receiver" and thus a "firearm":

> However, companies that sell or distribute *firearm parts kits, jigs, templates, or tools* to the same customer with *partially complete* frames or receivers allowing them to be efficiently, quickly, and easily converted into functional weapons or functional frames or receivers must be licensed; must apply identifying markings to the *partially complete* frames or receivers; and must record them as firearms in their required records.

Final Rule, at 24,700 (emphases added).

The GCA does not grant the Agencies the authority to regulate manufacturing tools or equipment, and it certainly does not grant the Agencies the authority to regulate *speech* in the form of instructions or marketing materials. The GCA allows the Agencies to regulate items that "may readily be converted to expel a projectile," not the tools that enable the conversion.

The GCA provides its own evidence of Congress's explicit non-regulation of tools and equipment in its regulation of "frame or receiver." Elsewhere, the GCA specifically regulates "any combination of parts . . . intended for use in converting any device into a destructive device," as well as shotguns that could be "redesigned, made or remade" to function in a particular way; but the GCA does not regulate the instrumentalities that enable the conversion, redesign, making, or remaking. *See* 18 U.S.C. § 921(a)(4)(C); 18 U.S.C. § 921(a)(5). As fully established above, "where Congress has carefully employed a term in one place and excluded it in another, it should not be implied where excluded." *Wong Kim Bo*, 472 F.2d at 722; *accord Allison Engine Co.*, 553 U.S. at 671 (2008). Further, for this same reason, to the extent that the Agencies may attempt to regulate "equipment" through their new definition of "readily," Final Rule, at 24,735, or expanded interpretation of "designed to be," Final Rule, at 24,662, such regulation similarly exceeds their statutory authority.

The Final Rule exceeds the Agencies' authority under the GCA not only because it regulates "partial" objects, but also because it regulates "templates, jigs, molds, equipment, tools, instructions, guides, and marketing materials"—all of which fall outside of the Agencies' congressionally-limited authority.

### D.    The Gun Control Act Does Not Grant the Agencies the Authority to Regulate a "Complete Weapon" as That Term is Defined in the Final Rule

The Final Rule, for the first time, adds "complete weapon" to the Agencies' regulatory scheme. The Agencies define "complete weapon" as "[a] firearm other than a firearm muffler or firearm silencer that contains all component parts necessary to function, whether or not assembled or operable." Final Rule, at 24,734.

The problem, once again, is the Agencies' bald effort to expand their reach and regulate more than Congress intended. For example, under the Final Rule, a "complete weapon" is a "receiver" "that contains all component parts necessary to function." This definition elides the Agencies' later claim that a "billet" or "blank" is not a "receiver." The so-called "billet" or "blank" that the Agencies refer to, or even a "forging or casting," "contains all the component parts necessary to function" as a "receiver," and thus now qualifies as a "firearm." Indeed, the problem that makes them non-functional or not readily converted is that they contain *too much* material.

As such, the creation and regulation of a "complete weapon," like much of the Final Rule, goes too far. Under the GCA, a "frame or receiver" *is* a "firearm," and the so-called "billets" or "blanks" referred to by the Agencies *are not* "firearms." But, under the expansive "complete weapon" definition, the Agencies could seek to regulate those items as "firearms" because they contain everything they need to function once material is removed. Indeed, so does a block of aluminum. In effect, the "complete weapon" definition allows the Agencies to reach back into the manufacturing process to regulate everything from a raw material to an actual "frame or receiver."

**E.     The Text and Structure of the Gun Control Act Does Not Support Grafting "Parts Kits" Into the "Firearm" or "Frame or Receiver" Definitions**

The Agencies' additions of "weapon parts kit" to the "firearm" definition and "frame or receiver parts kit" to "frame or receiver" also exceed the bounds of the GCA.[10] Under the GCA, Congress defined a "firearm" as:

> (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3). The Agencies, however, provide their own expanded definition:

> *Firearm*. Any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device; but the term shall not include an antique firearm. In the case of a licensed collector, the term shall mean only curios and relics. *The term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive.* The term shall not include a weapon, including a weapon parts kit, in which the frame or receiver of such weapon is destroyed[.]

Final Rule, at 24,735 (emphasis added). The GCA allows the Agencies to regulate, as a "firearm," a weapon that (1) will, (2) is designed to, or (3) may readily be converted to expel a projectile by the action of an explosive, (4) the frame or receiver of such weapon, or (5) a firearm silencer/muffler—nothing more.

By including regulation of a "weapons parts kit," the Agencies expand regulatory authority over a plethora of different items and components that do not meet the GCA's definition. Further, as explained below, these parts were specifically removed from regulation when Congress passed the GCA to supplant the Federal Firearms Act of 1938. It is rather straightforward. If a "weapons

---

[10] The Agencies' previously filed brief refers to "firearm parts kits." ECF No. 41 at 10, 12, 14. This term is not used in the new Code of Federal Regulations nor defined in the Final Rule. Plaintiffs understand that this term as used by Defendants likely encompasses both "weapon parts kits" and "frame or receiver parts kit."

parts kit," contains an actual "frame or receiver" then the Agencies can regulate the "frame or receiver," subjecting it to existing federal firearms marking, background check, and purchase/shipping requirements. If a "weapons parts kit" does not contain a "frame or receiver," then that "kit" is not a "weapon" that "will" or "is designed to" or "may readily be converted" to expel a projectile by the action of an explosive because it is missing the critical component, namely "the frame or receiver," and thus falls outside of the Agencies' regulatory authority.

Indeed, this Court has already found that the "weapon parts kit" addition is at odds with the GCA's definition of firearm. ECF No. 56 at 12 ("That language conflicts with the statute's definition of 'firearm.'"). Not only is this new definition not encompassed in the plain language of the GCA, but it also defies congressional intent *not* to regulate all parts of a firearm—an intent the Agencies acknowledge. *See Definition of "Frame or Receiver" and Identification of Firearms* ("Proposed Rule"), 86 Fed. Reg. 27,720, 27,720 (May 21, 2021) ("Congress recognized that regulation of all firearm parts was impractical.").[11]

Likewise, after defining "frame" and "receiver," the Final Rule expands the Agencies' reach to a "frame or receiver parts kit." The Final Rule states, in relevant part, that "frame or receiver means":

> (c) *Partially complete, disassembled, or nonfunctional frame or receiver.* The terms "frame" and "receiver" shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to . . . be completed, assembled, restored, or otherwise converted into a frame or receiver[.]

Final Rule, at 24,739.

As with the Agencies' efforts to incorporate "may be readily converted" into frame or receiver, however, the Agencies' efforts to regulate "parts" fails because Congress knew how to

---

[11] The Proposed Rule is available at https://bit.ly/3ir66eC.

regulate "parts" and chose to do so in other sections of the GCA, but not in the definition of "firearm" or in the regulation of "the frame or receiver." Moreover, not only does the Agencies' regulation of "frame or receiver parts kits" suffer the same flaws as "weapons parts kits," it is even more egregious because, as addressed above, the Agencies are regulating items that *are not* and *will never be* firearm components. *See* Section I(C), *supra*, at 10. Defendants cannot point to a single provision of the GCA, or any other authorizing statue, that gives them the authority to regulate individuals buying or possessing drills, routers, files, or any number of tools that the Agencies now regulate as "firearms."

Had Congress wanted to regulate firearm parts it would have done so. In fact, Congress demonstrated it knew how to effectively regulate parts and kits by regulating parts later in the GCA, with regard to a "destructive device." Congress defined a "destructive device" as "any explosive, incendiary, or poison gas," such as a bomb, grenade, mine, or similar device, 18 U.S.C. § 921(a)(4)(A), or "*any combination of parts* either designed or intended for use in converting any device into any destructive device described in subparagraph (A) or (B) and from which a destructive device may be readily assembled," 18 U.S.C. § 921(a)(4)(C) (emphasis added). Similarly, Congress's definition of "machinegun" includes "*any part* designed and intended solely and exclusively, or *combination of parts* designed and intended, for use in converting a weapon into a machinegun, and *any combination of parts* from which a machinegun can be assembled." 26 U.S.C. § 5845(b) (emphases added); *see also* ECF No. 56 at 13 (discussing the same).

Congress was fully capable of adding weapon parts kits to the definition of a "firearm" or other parts kits to the definition of "frame or receiver" in a similar manner as it did with "destructive devices" and "machineguns," and very clearly decided not to do so. As noted above, "where Congress has carefully employed a term in one place and excluded it in another, it should

16

not be implied where excluded." *Wong Kim Bo*, 472 F.2d at 722; *accord*, *Allison Engine Co.*, 553 U.S. at 671.

For these same reasons, to the extent that the Agencies also seek to regulate "weapons parts kits" or "frame or receiver parts kits," through their definition of "complete weapon," because those kits contain "all component parts necessary to function," even if they are not readily converted to expel a projectile or do not contain a functional frame or receiver, the "complete weapon" definition also exceeds the Agencies' congressionally limited authority.

The Agencies cannot read words into the statute where they do not exist. The Supreme Court has "stated time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says. . . . When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Germain*, 503 U.S. at 254 (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)). Delegated power does not come to agencies by silence.

## II.   THE HISTORY AND PURPOSE OF THE GUN CONTROL ACT AND ITS IMPLEMENTATION DO NOT SUPPORT THE FINAL RULE

The unambiguous text and structure of the GCA, viewed in light of common tools of statutory construction, demonstrate that Congress permitted the federal regulation of "readily converted" items and of "parts" in some places and not in others. Where it did not so do reflects an intentional and purposeful choice that the Agencies are not free to contravene. And while "no amount of legislative history can defeat unambiguous statutory text," *Franco v. Mabe Trucking Co.*, 3 F.4th 788, 795 (5th Cir. 2021), the legislative history of the GCA confirms that the Final Rule regulates items and activities beyond the Agencies' authority. *See St. Paul Fire & Marine Co. v. Lubuzan*, 579 F.3d 533, 545 (5th Cir. 2009) (noting interpretation was supported by statute's plain language, legislative history, and purpose, as well as weight of judicial authority).

**A.      Legislative History Proves Congress Purposefully Chose to Not Regulate Every Part, or Even "Readily Convertible" Parts, of a Firearm**

When Congress enacted the GCA, it specifically chose not to regulate each and every part of a "firearm." In contrast, the statute the GCA replaced, the Federal Firearms Act of 1938 ("FFA"), did regulate all firearms parts. Pub. L. 75-785, 52 Stat. 1250 (1938); 26 CFR § 177.10 (repealed). The FFA defined a "firearm" as "any weapon, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosive and a firearm muffler or firearm silencer, *or any part or parts of such weapon*." *Id.* (emphasis added).

In 1968, Congress repealed the FFA and replaced it with the GCA. In debating the GCA, Congress considered the impracticality of regulating all component parts of a firearm. *See* 111 Cong. Rec. 5527 (March 22, 1965) ("The present definition of this term includes 'any part or parts' of a firearm. It has been impractical to treat each small part of a firearm as if it were a weapon. The revised definition substitutes the words 'frame or receiver' for the words 'any part or parts.'"); *see also* H.R. Rep. 90-1577, at 4416 (June 21, 1968) ("Under former definitions of 'firearm,' any part or parts of such a weapon were included. *It was found impractical to have controls over each small part of a firearm*. Thus, this definition includes *only the major parts of the firearm, that is, the frame or receiver*.") (emphases added); *see also* S. Rep. No. 90-1097, at 2200 (April 29, 1968) (same).

When enacting the GCA, Congress specifically and narrowly defined "firearm" to include the weapon itself and two specific parts: (1) the frame or receiver and (2) a muffler or silencer. The definition does not contemplate other weapons parts, nor does it contemplate incomplete or "readily convertible" frames or receivers.

Moreover, the Final Rule's treatment of items "that [are] designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver," as

18

firearms is not supported by Congress's stated intention in including the "readily converted" language in section 921(a)(3)(A) in the first place. Congress included the "readily converted" language specifically to deal with starter guns—complete, working handguns which are designed to discharge only blank ammunition cartridges. *See* 114 Cong. Rec. 10859 (April 29, 1968) ("Added to the term 'firearm' are weapons which 'may be readily converted to' a firearm. The purpose of this addition is to include specifically any starter gun designed for use with blank ammunition which will or which may be readily converted to expel a projectile or projectiles by the action of an explosive."). There is no indication that Congress intended the "readily converted" language to extend to frames and receivers or other incomplete weapon parts—only to functioning, convertible weapons. To the contrary, the legislative history points to Congress's intention to *not* include such a broad swath of regulation.

### B.    Contrary to the Agencies' Claim, Regulatory Expansion of the Gun Control Act Is Not Necessary to Implement the Gun Control Act

The Agencies repeatedly claim their new regulatory definitions are *necessary* to serve the purpose of the GCA, because the Agencies must address technological advancements and judicial developments since 1968 and 1971. Final Rule, at 24,693; *see also* ECF No. 41 at 18, 23, 28. The Agencies claim that under the 1968 version of "frame or receiver," "as many as 90% of all firearms would not have any frame or receiver subject to regulation." ECF No. 41 at 12. But the Agencies' claimed remedy is not limited to addressing the purported problem and falls well outside their regulatory authority.

The choice is not, as the Agencies imply, to be stuck in 1968 or to regulate items still in manufacture. Should they wish, the Agencies, consistent with the APA, may engage in a rulemaking to redefine a "frame or receiver" in such a way as to regulate a single component on a firearm consistent with the original public meaning of 18 U.S.C. § 921(a)(3)(B). They are not free,

however, to point to an amorphous problem to justify redefining "firearm" or "frame or receiver" in such a way as to expand their authority. The Agencies are charged with enforcing the GCA, not amending it.

First and foremost, the Agencies' purported problem is contrived. The items newly regulated under the Final Rule existed long before Congress enacted the GCA. Individuals have been crafting their own firearms since pre-industrialization and so-called "weapon parts kits" have existed since at least the early twentieth century.[12] Commercially successful striker-fired pistols have been in existence since the 1850s.[13] The AR-style rifle with its 'split receiver' was invented in 1955, beginning with the AR-10, and was modified into the AR-15 by 1958.[14] These are not the "new" developments in technology that the Agencies paint them to be.

Second, despite the Agencies' call to the GCA's "purpose" for support, the "purpose" of the GCA explicitly states that the statute was not meant "to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition . . . of firearms appropriate to the purpose of hunting . . . personal protection, or any other lawful activity." Pub. L. 90-618, § 101, 82 Stat. 1213. Congress went further, stating that the law was "not intended to . . . provide for the imposition by federal regulations of any procedures or requirements other than those necessary to implement and effectuate" the statute. *Id.* at 1214. As the Supreme Court has noted, a court "cannot interpret federal statutes to negate their own stated purposes." *See King*

---

[12] IITV, *Kopel's Law & Liberty News -#002 The History of Homemade Guns*, YouTube (Apr. 4, 2021), http://bit.ly/3FoYkeB.

[13] *See, e.g.*, *Wheelgun Wednesday: A Striker Fired Revolver From The Past – Meet the Kufahl*, THEFIREARMBLOG.COM (May 5, 2021), http://bit.ly/3OQdbBx ("[T]he Kufahl/Dreyse revolver was used by some police and Grenzer (border guard) units and was commercially popular. Production commenced in 1852 and continued until roughly 1800.").

[14] *See, e.g.*, DAVID HARSANYI, FIRST FREEDOM 217–22 (2018); Sam Bocetta, *The Complete History of the AR-15 Rifle*, SMALL WARS JOURNAL (July 12, 2017 10:18 AM), http://bit.ly/3ERNuvP.

*v. Burwell*, 576 U.S. 473, 493 (2015) (*quoting N.Y. State Dept. of Soc. Servs. v. Dublino*, 413 U.S. 405 419–420 (1973)).

The Final Rule is not necessary to implement the GCA—it rewrites the GCA. The Agencies could have engaged in a rulemaking to narrowly redefine "frame or receiver" to capture actual frames or receivers consistent with 18 U.S.C. § 921(a)(3)(B) that the Agencies have congressional authority to regulate. If the Agencies are concerned that 'split receivers' fall outside of their regulatory definition, then the Agencies should address that limited issue. The Agencies cannot use that as a basis to completely redefine "firearm" and "frame or receiver" to regulate non-frames, non-receivers, jigs, tools, equipment, instructions, and whatever other items or speech will fall under the Agencies' implementation of their expansive regulatory project. If there is a "problem" with implementation of the GCA, the Agencies must address that problem within the scope of their authority under the GCA.

Third, if Congress agreed with the Agencies that there was an issue with the implementation of the GCA, Congress could have acted. Section 922, which lists the unlawful acts under the GCA, has been amended *over a dozen times*, including twice in the past year.[15] 18 U.S.C. § 922. Yet at no point has Congress sought to amend the GCA to regulate "partially complete, disassembled, or nonfunctional" frames or receivers or other weapon parts.

Congress's silence is further amplified by the action of other legislative bodies. In fact, between the time the GCA was enacted and promulgation of the Final Rule, several states have enacted their own regulations regarding items that are not frames or receivers under the GCA. *See*, *e.g.*, Nev. Rev. Stat. Ann. § 202.253(9) (West) ("'Unfinished frame or receiver' means a blank, a

---

[15] *See* Pub. L. 117-103, Div. W, Title XI, § 1104(b), Mar. 15, 2022, 136 Stat. 921; Pub. L. 117-159, Div. A, Title II, §§ 12001(a)(1), 12004(b), June 25, 2022, 136 Stat. 1322, 1329.

casting or a machined body that is intended to be turned into the frame or lower receiver of a firearm with additional machining and which has been formed or machined to the point at which most of the major machining operations have been completed to turn the blank, casting or machined body into a frame or lower receiver of a firearm even if the fire-control cavity area of the blank, casting or machined body is still completely solid and unmachined."); Cal. Pen. Code § 16520(b) ("'firearm' includes the frame or receiver of a weapon, including both a completed frame or receiver, or a firearm precursor part.").

Lastly, the Agencies cannot claim that regulating subcomponents still in the manufacturing process is necessary to serve the purpose of the GCA. *See United States v. Thompson*, 202 F. Supp. 503, 506 (N.D. Cal. 1962) (finding lack of language "or any part or parts of such weapon," from 26 U.S.C. § 5848 of the National Firearms Act regulating short-barreled shotguns meaningful in light of its inclusion in the pari materia Federal Firearms Act and in light of failure to add such language to later statutory amendments). The plain text, history, and purpose of the GCA cut against the regulation of items "readily convertible" into frames or receivers or of parts kits not readily convertible to a expel a projectile by the action of an explosive. Deferring to any contrary agency interpretation is inappropriate. *See United States v. Orellana*, 405 F.3d 360, 369 (5th Cir. 2005) (holding that where the plain language and legislative history of 18 U.S.C. § 922 support one statutory interpretation, "affording conclusive weight to a questionable interpretation of an agency regulation cutting the opposite way for the purpose of imposing *criminal liability* is inappropriate").

## III.   THE AGENCIES HAVE PREVIOUSLY RECOGNIZED THEIR LIMITATIONS UNDER THE GUN CONTROL ACT

The Agencies have recognized the limitations of Congress's definition of "firearm" in two recent and ongoing lawsuits, *Syracuse v. ATF*, No. 1:20-cv-06885, 2021 WL 23326 (S.D.N.Y. Jan.

29, 2021), and *California v. ATF*, No. 3:20-cv-06761, 2020 WL 9849685 (N.D. Cal. Nov. 30, 2020). In both cases, gun control advocates sued the Agencies, seeking to broaden the federal definition of "firearm," and to force the Agencies to regulate many of the items and kits at issue in the Final Rule. In both cases, the Agencies relied on the language of the GCA, and their long-standing implementation of the GCA, to claim they could not do exactly what they have now done through the Final Rule.

With regard to frames and receivers, the Agencies recognized in *Syracuse* that "pursuant to the . . . statutory definition, a device is a firearm if it is either: (1) a frame or receiver or (2) a device that is designed to or can readily be converted into a device that expels a projectile. *Importantly, the 'designed to' and 'readily be converted' language are only present in the first clause of the statutory definition.*" Fed. Defs.' Mot. for Summ. J., *Syracuse*, ECF No. 98 at 14 (quoting 18 U.S.C. § 921(a)(3)(A)) (emphasis added). The Agencies not only acknowledged, but affirmatively argued, that even a *nearly complete* frame or receiver that can be "readily converted" into a frame or receiver was not a firearm under the GCA, nor was it an accurate statutory reading of the GCA to take express language from 18 U.S.C. § 921(a)(3)(A) and add it to 18 U.S.C. § 921(a)(3)(B) when Congress had not done so. *Id.* "An unmachined frame or receiver is not 'designed' to expel a projectile, because its purpose is not to expel a projectile. Holding otherwise would mean that every part of a gun is designed to expel a projectile and, therefore, would be deemed a firearm under the GCA." *Id.* at 31. The Agencies recognized that this would contravene the purpose of the GCA. *Id.* at 33. Nevertheless, less than four months after arguing in *Syracuse* that the GCA does not allow these items to be regulated as firearms, the Agencies promulgated the Proposed Rule (and a year later the Final Rule) doing just that. Proposed Rule, at 27,746; Final Rule, at 24,739.

Similarly, in *California*, the Agencies acknowledged that the GCA does not allow them to regulate weapon parts. "As a statutory matter, Congress has legislatively defined a 'firearm' to be a weapon that may be readily converted to expel a projectile by the action of an explosive, or the frame or receiver of such weapon, *but has explicitly excluded 'firearms parts' from that definition*." Fed. Defs.' Mot. to Dismiss, *California v. ATF*, No. 3:20-cv-06761, 2020 WL 9849685, ECF No. 29 at 10 (N.D. Cal. Nov. 30, 2020) (emphasis added). This "does not permit ATF to extend federal regulation beyond the limits imposed by Congress." *Id.* at 11. The Agencies continued, "Congress has chosen to exclude firearm parts from the scope of the GCA, including parts that could be assembled with a homemade receiver and frame to make a firearm." *Id.* at 20. Now, however, the Agencies have unilaterally—and improperly—attempted to bring weapon parts kits into the definition of "firearm." *See* Final Rule, at 24,684 ("The Department . . . believes the language of section 921(a)(3)(A) should be read to include weapon parts kits and aggregations of weapon parts that . . . may or may not be designed to expel a projectile by the action of an explosive in their present form or configuration, but may readily be converted to do so.").

The Agencies' argument that their prior positions are now irrelevant because those arguments were made before the Final Rule was in place is not persuasive. The Agencies arguments in *Syracuse* and *California* go to the question of the scope of the GCA, not the scope of the Agencies' prior regulation. The scope of the GCA has not changed since 2020, and thus, the Agencies' justification for their divergence is insufficient.

Thus, from the enactment of the GCA in 1968 until as recently as 2021, the ATF understood—and affirmatively argued in federal court—that it could not regulate non-frames and non-receivers or "parts kits" under the plain meaning and terms of the GCA. Now, despite the fact that Congress neither amended the GCA to change these limitations nor granted the Agencies

additional authority, the Agencies have done precisely what they previously admitted they were not empowered to do.

The Agencies have exceeded their authority in contravention of both clear statutory language and the Agencies' own longstanding application of such language.

## CONCLUSION

The Final Rule conflicts with the plain meaning of the GCA and purports to give the Agencies the authority to regulate items Congress intentionally left out of the definition of "firearm," thus giving the Agencies self-prescribed authority in excess of that proposed, considered, debated, or passed by Congress. *See Peyton v. Reynolds Assocs.*, 955 F.2d 247, 251 (4th Cir. 1992) ("If a regulation reflects an administrative interpretation which is inconsistent with the plain language of the statute under which it is promulgated, we do not defer to the agency's interpretation."). The Final Rule is "not in accordance with law" under the APA, 5 U.S.C. § 706(2)(A), and Plaintiffs respectfully request that this Court vacate the challenged provisions of the Final Rule and enjoin the Agencies from enforcing the same. *See* 5 U.S.C. § 706(2)(C) ("The reviewing court shall *hold unlawful and set aside* agency action, findings, [and] conclusions" that are "in excess of statutory jurisdiction, authority, or limitations[.]") (emphasis added).

DATED this 5th day of December, 2022.

Respectfully submitted,

R. Brent Cooper (TX Bar No. 04783250)
Benjamin D. Passey (TX Bar No. 24125681)
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540
brent.cooper@cooperscully.com
ben.passey@cooperscully.com

Cody J. Wisniewski* (CO Bar No. 50415)
FIREARMS POLICY COALITION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV 89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392
cwi@fpchq.org

*/s/ Erin M. Erhardt*
Kaitlyn D. Schiraldi* (TN Bar No. 039737)
Erin M. Erhardt* (CO Bar No. 49360)
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
Telephone: (303) 292-2021
Telecopy: (877) 349-7074
kschiraldi@mslegal.org
eerhardt@mslegal.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 5th day of December 2022, I electronically filed the foregoing using this Court's CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and service will be accomplished by this Court's CM/ECF system.

*/s/Erin M. Erhardt*

27