**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| JENNIFER VANDERSTOK; MICHAEL G. ANDREN; TACTICAL MACHINING, LLC, a limited liability company; FIREARMS POLICY COALITION, INC., a nonprofit corporation, <br><br> *Plaintiffs*, <br><br> and <br><br> BLACKHAWK MANUFACTURING GROUP, INC.; DEFENSE DISTRIBUTED; and SECOND AMENDMENT FOUNDATION, INC., <br><br> *Intervenor-Plaintiffs*, <br><br> v. <br><br> MERRICK GARLAND, in his official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; STEVEN DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES <br><br> *Defendants*. | Civil Action No. 4:22-cv-00691-O |

**<u>PLAINTIFFS' BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT</u>**

i

**TABLE OF CONTENTS**

<u>Page</u>

TABLE OF AUTHORITIES .................................................................................. iv

INTRODUCTION .............................................................................................. 1

LEGAL BACKGROUND .................................................................................... 2

I.      RELEVANT STATUTORY HISTORY OF FIREARM
REGULATION .................................................................................. 2

II.     THE ADMINISTRATIVE PROCEDURE ACT ......................................... 3

III.    FACTUAL BACKGROUND ...................................................................... 4

       A.     Historical Context ........................................................................ 4

       B.     The Biden Administration.............................................................. 5

       C.     The Rulemaking Process................................................................ 5

       D.     Procedural History ........................................................................ 6

STANDARDS OF REVIEW ................................................................................ 7

I.      SUMMARY JUDGMENT STANDARD .................................................... 7

II.     APA STANDARDS............................................................................... 7

III.    FIRST AMENDMENT STANDARD......................................................... 9

ARGUMENT ..................................................................................................... 9

I.      IN PROMULGATING THE FINAL RULE, THE AGENCIES
FAILED TO OBSERVE PROCEDURES REQUIRED BY LAW............... 10

       A.     The Final Rule is Not a "Logical Outgrowth" of the Proposed
Rule ........................................................................................... 10

            1.     The Definitional Structure Surrounding "Frame or
Receiver" Changed Drastically Between the Proposed
Rule and Final Rule ................................................................. 10

            2.     The Scope of the Definitions Surrounding "Frame or
Receiver" in the Final Rule did not Logically Grow
Out of the Proposed Rule........................................................ 13

| | | | | |
|---|---|---|---|---|
| | a. | "Frame," "receiver," "variant," and "variants thereof" are new | | 13 |
| | b. | "Partially complete, disassembled, or nonfunctional frame or receiver" unexpectedly mutated after the Proposed Rule | | 15 |
| | c. | "Multi-piece frame or receiver" appeared unexpectedly | | 15 |
| | 3. | Additional Provisions of the Final Rule Cannot be Said to be a Logical Outgrowth of the Proposed Rule | | 17 |
| B. | | The Final Rule Lacked Notice and Comment on Substantial Bases for the Rule | | 18 |
| II. | | THE AGENCIES ACTED ARBITRARILY AND CAPRICIOUSLY WHEN PROMULGATING THE FINAL RULE | | 21 |
| A. | | The Agencies Failed to Adequately Explain their Change in Position | | 21 |
| B. | | The Agencies Failed to Consider Important Aspects of the Problem and Relevant Comments | | 25 |
| III. | | THE FINAL RULE'S PROVISIONS VIOLATE CONSTITUTIONALLY PROTECTED RIGHTS AND EXCEED CONSTITUTIONAL LIMITATIONS | | 26 |
| A. | | The Final Rule is Unconstitutionally Vague | | 27 |
| | 1. | The text of the Final Rule does not plainly indicate when or how an unregulated item becomes a "firearm" | | 28 |
| | 2. | The eight-factor definition of "readily" is unconstitutionally vague | | 31 |
| | 3. | The definition of "complete weapon" does not establish a knowable and enforceable regulation | | 34 |
| B. | | The Final Rule Violates the First Amendment | | 36 |
| | 1. | The Final Rule chills the speech of specific, targeted speakers | | 37 |
| | 2. | The Final Rule chills the content of protected speech | | 38 |

C.      The Final Rule Violates the Constitution's Separation of Powers .......................................................................... 40

      1.      Executive Branch agencies may not legislate ........................ 41

      2.      Legislating in the Final Rule violates the Take Care Clause .................................................................................. 44

IV.    THE FINAL RULE VIOLATES THE APA AND SHOULD BE VACATED IN ITS ENTIRETY .................................................... 48

CONCLUSION ........................................................................................ 50

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Action on Smoking & Health v. C.A.B.*,
   699 F.2d 1209 (D.C. Cir. 1983)................................................................ 25

*Ala. Ass'n of Realtors v. HHS*,
   141 S. Ct. 2485 (2021)................................................................ 43

*Am. Health Care Ass'n v. Burwell*,
   217 F. Supp. 3d 921 (N.D. Miss. 2016)................................................ 42

*Amin v. Mayorkas*,
   24 F.4th 383 (5th Cir. 2022)................................................................ 7

*Ark. Writers' Project, Inc. v. Ragland*,
   481 U.S. 221 (1987)................................................................ 38

*Brackeen v. Haaland*,
   994 F.3d 249 (5th Cir. 2021)................................................................ 40

*Brown v. Gardner*,
   513 U.S. 115 (1994)................................................................ 41

*Brown v. Gardner*,
   No. 3:20-cv-06761 (N.D. Cal. Nov. 30, 2020)................................ 22

*Calix v. Lynch*,
   784 F.3d 1000 (5th Cir. 2015)................................................ 41

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979)................................................................ 3, 26

*Citizens United v. Federal Election Comm'n*,
   558 U.S. 310 (2010)................................................................ 36, 38

*Connally v. Gen. Constr. Co.*,
   269 U.S. 385 (1926)................................................................ 29

*Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*,
   447 U.S. 530 (1980)................................................................ 40

*Contender Farms, L.L.P. v U.S. Dep't of Agric.*,
   779 F.3d 258 (5th Cir. 2015)................................................ 41, 42

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor,*
    45 F.4th 846 (5th Cir. 2022) ......................................................... 47

*Davenport v. Wash. Ed. Ass'n,*
    551 U.S. 177 (1995) ....................................................................... 36

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ....................................................................... 43

*FCC v. Prometheus Radio Project,*
    141 S. Ct. 1150 (2021) .................................................................... 8

*Fla. Power Light Co. v. Lorion,*
    470 U.S. 729 (1985) ....................................................................... 47

*Forrest Gen Hosp. v. Azar,*
    926 F.3d 221 (5th Cir. 2019) ......................................................... 41

*FFC v. Fox Television Stations, Inc.,*
    567 U.S. 253 (2012) ......................................................... 26, 27, 31

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.,*
    968 F.3d 454 (5th Cir. 2020) ......................................................... 42

*Heller v. City of El Paso,*
    861 Fed. Appx. 836 (5th Cir. 2021) .............................................. 38

*Huawei Techs. USA, Inc., v. FCC,*
    2 F.4th 421 (5th Cir. 2021) ...................................................... 8, 11

*Idaho Farm Bureau Fed'n v. Babbitt,*
    58 F.3d 1392 (9th Cir. 1995) ......................................................... 18

*INS v. Chadha,*
    462 U.S. 919 (1983) ....................................................................... 41

*Jarkesy v. SEC,*
    34 F.4th 446 (5th Cir. 2022) .................................................... 41, 42

*J.W. Hampton, Jr., & Co. v. United States,*
    276 U.S. 394 (1989) ....................................................................... 42

*Kendall v. United States ex. rel Strokes,*
    37 U.S. 524 (1838) ......................................................................... 44

*Loving v. United States,*
    517 U.S. 748 (1996) ....................................................................... 40

*Medlin v. Palmer*,
    874 F.2d 1085 (5th Cir. 1989) ............................................................ 29

*Mistretta v. United States*,
    276 U.S. 394 (1989) ......................................................................... 42

*Moore v. Hannon Food Serv. Inc.*,
    317 F.3d 489 (5th Cir. 2003) ............................................................ 41

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................... 8, 21, 24

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) ..................................................................... 54

*Nat'l Inst. of Family and Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018) ..................................................................... 36

*Nat'l Pork Producers Council*,
    635 F.3d 738 (5th Cir. 2011) ............................................................ 42

*O'Reilly v. U.S. Army Corps of Eng'rs*,
    477 F.3d 225 (5th Cir. 2007) ....................................................... 47, 48

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ................................................................... 3, 25, 26

*Porter v. Califano*,
    592 F.2d 770 (5th Cir. 1979) .............................................................. 9

*Pursuing Am.'s Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) .......................................................... 40

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ......................................................................... 35

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ................................................................ 9, 36, 38

*Serv. Emps. Int'l Union, Local 5 v. City of Hous.*,
    595 F.3d 588 (5th Cir. 2010) ............................................................ 38

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018) ..................................................................... 27

*Shamloo v. Miss. State Bd. of Trustees of Insts. of Higher Learning*,
    620 F.2d 516 (5th Cir. 1980) ............................................................ 26

*Shell Offshore Inc. v. Babbitt*,
  238 F.3d 622 (5th Cir. 2001) ................................................................ 7, 10

*Sorrell v. IMS Health, Inc.*,
  564 U.S. 552 (2011) ............................................................................ 36

*Syracuse v. ATF*,
  No. 1:20-cv-06885 (S.D.N.Y. Jan. 29, 2021) ...................................... 21

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
  989 F.3d 368 (5th Cir. 2021) ........................................................ 11, 13, 17

*Tex. Entm't Ass'n, Inc. v. Hegar*,
  10 F. 4th 495 (5th Cir. 2021) .............................................................. 38

*Tex. Pipeline Ass'n v. FERC*,
  661 F.3d 258 (5th Cir. 2011) .............................................................. 41

*Texas v. EPA*,
  389 F. Supp. 3d 497 (S.D. Tex. 2019) ............................................ 8, 47, 48

*Timpinaro v. SEC*,
  2 F.3d 453, 460 (D.C. Cir. 1993) ........................................................ 32

*Turner v. Driver*,
  848 F.3d 678 (5th Cir. 2017) .............................................................. 36

*United States v. Davis*,
  139 S. Ct. 2319 (2019) ........................................................................ 27

*United States v. Playboy Entm't Grp., Inc.*,
  529 U.S. 803 (2000) .............................................................................. 9

*United States v. Rowold*,
  429 F.Supp. 3d 469 (N.D. Ohio 2019) ................................................ 24

*United Steel v. Mine Safety & Health Admin.*,
  925 F.3d 1279 (D.C. Cir. 2019) .......................................................... 47

*United Student Aid Funds, Inc. v. Devos*,
  237 F. Supp. 3d 1 (D.D.C. 2017) ........................................................ 21

*Util. Air Reg. Grp. v. EPA*,
  573 U.S. 302 (2014) ........................................................................ 41, 43

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982) ............................................................................ 27

*Wages & White Lion Invs., LLC v. FDA*,
  41 F.4th 427 (5th Cir. 2022) ................................................................ 21

*West Virginia v. EPA*,
  142 S. Ct. 2605 (2022)........................................................................ 43

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ..................................................................... 44, 47

**Constitutional Provisions**

U.S. Const. Art. I § 1 ...................................................................... 1, 40

U.S. Const. Art. II, § 3 ....................................................................... 43

**Statutes**

5 U.S.C. § 551....................................................................................... 3

5 U.S.C. § 551(5)................................................................................... 3

5 U.S.C. § 553(b).............................................................................. 3, 8

5 U.S.C. § 553(c)............................................................................. 3, 18

5 U.S.C. § 706..................................................................................... 10

5 U.S.C. § 706(2)................................................................................ 10

5 U.S.C. § 706(2)(A)........................................................................ 3, 8

5 U.S.C. § 706(2)(B)....................................................................... 8, 26

5 U.S.C. § 706(2)(C)............................................................................. 7

5 U.S.C. § 706(2)(D)...................................................................... 8, 10

5 U.S.C. §§ 706(2)(A)–(F).................................................................... 3

18 U.S.C. § 921..................................................................................... 2

18 U.S.C. § 921(a)(3)............................................................................ 2

18 U.S.C. § 921(a)(3)(A)................................................................. 4, 21

18 U.S.C. § 921(a)(3)(B) ................................................................. 4, 21

18 U.S.C. § 924(a)(1)(D) ............................................................. 3, 27, 37

18 U.S.C. § 926(a) ................................................................... 3

26 U.S.C. § 7801(a)(2)(A) ......................................................... 3

Federal Firearms Act of 1938,
    Ch. 850, Pub. L. No. 75-785, 52 Stat. 1250 (1938)................... 2

Gun Control Act of 1968,
    Ch. 44, Pub. L. 90-618, 82 Stat. 1213 (1968)........................ 27

National Firearms Act of 1934,
    Ch. 757, Pub. L. 73-474, 48 Stat. 1236 (1934)....................... 2

**Rules**

Fed. R. Civ. P. 56(a) ................................................................ 7

**Regulations**

27 C.F.R. § 478.11 ................................................................. 11, 12

27 C.F.R. § 478.12 ................................................................... 13

27 C.F.R. § 478.12(f)(1)(i) ......................................................... 14

28 C.F.R. § 0.130 ..................................................................... 3

*Commerce in Firearms and Ammunition*,
    33 Fed. Reg. 18,555 (Dec. 14, 1968) ............................... 4, 23

*Definition of "Frame or Receiver" and Identification of Firearms* ("Proposed Rule"),
    86 Fed. Reg. 27,720 (May 21, 2021)................................ *passim*

*Definition of "Frame or Receiver" and Identification of Firearms* ("Final Rule"),
    87 Fed. Reg. 24,652 (Apr. 26, 2022)................................ *passim*

*Machine Guns, Destructive Devices, and Certain Other Firearms*,
    36 Fed. Reg. 14,255 (Aug. 3, 1971) ................................... 4

**Other Authorities**

114 Cong. Rec. 10,859 (Apr. 29, 1968)................................... 33

1968 U.S.C.C.A.N. 2112 ................................................................2

ATF COMMENTS ON PROPOSED RULE ......................................... 6

*Biden announces new rules for 'ghost guns,' introduces ATF director
    nominee*, CBS NEWS (Apr. 11, 2022) ................................... 5

*Biden Considers executive actions on guns, calls on Congress to pass weapons ban*, REUTERS (Mar. 23, 2021) ................................................................. 5, 44

Brian X. McCone, *'3 Pipes Turned into a Shotgun'. Nearly 1-in-10 Seized in Philly are Homemade*, NBC10 PHILADELPHIA (Oct. 7, 2021) .......................... 20

*Calling for the submission to the House of Representatives of certain information regarding the decision of the President of the United States to institute the "Ghost Gun" Rule*,
H.R. 1478, 117th Cong. (Nov. 16, 2022) ................................................................. 47

*FACT SHEET: Biden-Harris Administration Announces Initial Actions to Address the Gun Violence Public Health Epidemic*,
THE WHITE HOUSE (April 7, 2021) ........................................................................ 45

*Ghost Guns Are Guns Act*,
H.R. 1278, 115th Cong. (Mar. 1, 2017) ................................................................. 4, 46

*Ghost Guns Are Guns Act*,
H.R. 1266, 116th Cong. (Feb. 14, 2019) ............................................................... 46

*Ghost Guns Are Guns Act*,
H.R. 1454, 117th Cong. (March 1, 2021) .............................................................. 46

GUN OWNERS OF AMERICA AND GUN OWNERS FOUNDATION, COMMENT ON ATF'S PROPOSED RULE (June 4, 2021) ...................................................................... 33

*Gun Violence Prevention and Community Safety Act of 2020*,
H.R. 5717, 116th Cong. (Jan. 30, 2020) ............................................................... 46

*Gun Violence Prevention and Community Safety Act of 2020*,
S. 3254, 116th Cong. (Feb. 5, 2020) ...................................................................... 46

*Homeland Security Assessment of Terrorist Use of Ghost Guns Act*,
H.R. 2621, 116th Cong. (May 28, 2021) ............................................................... 46

Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*,
164 U. PA. L. REV. 1835 (2016) .............................................................................. 44

John Henwood, *The Great Remington 8 and Model 81 Autoloading Rifles*,
COLLECTOR GRADE PUBLICATIONS (Jan 1, 2003) .................................................... 23

Kevin Rector, *LAPD declares 'ghost guns' an 'epidemic,' citing 400% increase in seizures*, L.A. TIMES (Oct. 15, 2021) ................................................ 20

LEONARD SPECKIN, WINCHESTER MODEL 07 SELF-LOADING .351 CALIBER: ITS PAST AND ITS FUTURE WITH MODERN BRASS, BULLETS, AND POWDERS (2013) ........................................................................................................ 23

Nicholas Bagley, *Remedial Restraint in Administrative Law*,
117 COLUM. L. REV. 253 (2017) ............................................................ 47

Paul Scarlata, *Savage Model 1907 Automatic Pistol*, SHOOTING TIMES
(January 3, 2011) ..................................................................................... 24

*Protecting Our Kids Act*,
H.R. 7910, 117th Cong. (June 8, 2022) .................................................. 47

*Remarks by President Biden on Gun Violence Prevention*,
THE WHITE HOUSE (April 8, 2021) ......................................................... 46

ROGER LARSON, COMPREHENSIVE GUIDE TO THE M1 CARBINE (2d Ed,
2010) ........................................................................................................ 23

S. Rep. No. 90-1097 (1968) ......................................................................... 2

Shanzeh Ahmad & Jeremy Gorner, '*We're seeing an explosion: 'Sheriff Tom
Dark, state Sen. Jacqueline Collins take aim at ghost guns, propose
legislation to ban the untraceable weapons*, CHI. TRIB. (Oct. 14, 2021) .............. 19–20

*Stop Home Manufacture of Ghost Guns Act of 2020*,
H.R. 7468, 116th Cong. (July 1, 2020) ................................................... 46

*Stopping the Traffic in Overseas Proliferation of Ghost Guns Act*,
S. 459, 116th Cong. (Feb. 12, 2019) ................................................... 5, 46

*The Biden Plan to End our Gun Violence Epidemic*,
BIDEN-HARRIS DEMOCRATS ............................................................... 5, 45

*To provide a private right of action against the maker of any component of
a ghost gun, and any person who facilitated a sale of the ghost gun, for
injury or death resulting from the use of the ghost gun*,
H.R. 7544, 117th Cong. (Apr. 18, 2022) ............................................ 46–47

*Untraceable Firearms Act of 2018*,
S. 3300, 115th Cong. (July 31, 2018) ................................................. 5, 46

*Untraceable Firearms Act of 2018*,
H.R. 6643, 115th Cong. (July 31, 2018) ............................................. 4, 46

*Untraceable Firearms Act of 2019*,
H.R. 3553, 116th Cong. (June 27, 2019) ................................................ 46

*Untraceable Firearms Act of 2020*,
H.R. 3743, 116th Cong. (May 14, 2020) ................................................ 46

*Untraceable Firearms Act of 2021,*
   H.R. 3088, 117th Cong. (May 11, 2021)................................................................... 46

*Untraceable Firearms Act of 2021,*
   S. 1558, 117th Cong. (May 11, 2021) ..................................................................... 46

## INTRODUCTION

Under the U.S. Constitution, Congress, not the president and his subordinate agencies, maintains "[a]ll legislative Powers" of the federal government. U.S. CONST. ART. I § 1. Here, though, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and the Department of Justice ("DOJ") ("Agencies") usurped those powers when they promulgated the Final Rule. In so doing, the Agencies admitted to seizing the power of the pen from Congress because Congress failed to enact the president's desired policy objectives or to fulfill his campaign promise to stop the proliferation of so-called "ghost guns." That constitutional coup produced the Final Rule before this Court—one that violates both the Administrative Procedure Act ("APA") and the Constitution.

When evaluated against the requirements of the APA, the Final Rule fails repeatedly. First, by going beyond the bounds of the Gun Control Act of 1968 ("GCA"), the Agencies exceeded their statutory authority. Second, the Agencies flouted the APA's prescribed process when they materially changed the Final Rule and its bases and ignored public comment. Third, the Agencies acted arbitrarily when they failed to adequately explain their reversal of their prior application and enforcement of the GCA and failed to consider important aspects of the problem.

The Final Rule also violates constitutional requirements and principles. The Final Rule is unconstitutionally vague because it fails to give understandable notice to regulated persons. Further, the Final Rule violates the First Amendment by restricting and chilling speech based on both the speaker and the content. Finally, by legislating where Congress chose not to, the Agencies violate both the Delegation Doctrine and the Take Care Clause.

The Final Rule's substantive and procedural flaws cannot be cured. Plaintiffs respectfully request that this Court vacate the Final Rule and enjoin its enforcement.

# LEGAL BACKGROUND

## I.    RELEVANT STATUTORY HISTORY OF FIREARM REGULATION

Congress enacted the National Firearms Act ("NFA") to regulate and tax short-barreled shotguns and rifles, "certain firearms described as 'any other weapons,' machine guns, and firearm mufflers and silencers." National Firearms Act of 1934, Ch. 757, Pub. L. 73-474, 48 Stat. 1236, 1236 (1934).

In 1938, Congress passed the Federal Firearms Act ("FFA") defining a "firearm" as "any weapon, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosive and a firearm muffler or firearm silencer, *or any part of such weapon*." Federal Firearms Act of 1938, Ch. 850, Pub. L. No. 75-785, 52 Stat. 1250, 1250 (1938) (repealed 1968) (emphasis added).

Congress then enacted the Gun Control Act of 1968 ("GCA"), superseding the FFA, amending the NFA, and establishing a new definition of "firearm." *See* 18 U.S.C. § 921, *et seq.* As defined in the GCA:

> The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3).

With the GCA, Congress deliberately rejected the FFA's definition under which "any part or parts of such a weapon [were] included," finding it "impractical to have controls over each small part of a firearm. Thus, the revised definition substitute[d] only the major parts of the firearm; that is, frame or receiver for the words 'any part or parts.'" S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2200.

2

Congress delegated the Attorney General authority to enforce the NFA and GCA. *See* 26 U.S.C. § 7801(a)(2)(A); *see also* 18 U.S.C. § 926(a) ("The Attorney General may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter[.]"). The Attorney General then delegated that power to the ATF. 28 C.F.R. § 0.130. Violations of the NFA and GCA carry criminal penalties, including up to five years' imprisonment. 18 U.S.C. § 924(a)(1)(D) ("[W]hoever . . . willfully violates any other provision of this chapter, shall be fined under this title, imprisoned not more than five years, or both.").

## II.   THE ADMINISTRATIVE PROCEDURE ACT

The APA sets requirements for Executive Branch agencies to follow to establish or amend federal regulations. *See* 5 U.S.C. § 551, *et seq*. Rulemaking is an "agency process for formulating, amending, or repealing a rule[.]" 5 U.S.C. § 551(5). As relevant here, the APA "prescribes a three-step procedure" for executive rule making. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). First, the "[g]eneral notice of proposed rule making shall be published in the Federal Register[.]" 5 U.S.C. § 553(b). Second, "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments[.]" 5 U.S.C. § 553(c). Third, "the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). Rules issued under this process "have the 'force and effect of law.'" *Perez*, 575 U.S. at 96 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979)).

The APA also empowers courts to review final agency actions for procedural and substantive lawfulness and dictates that courts must "hold unlawful and set aside agency action . . . found to be" arbitrary, capricious, not in accordance with law, contrary to constitutional right, power, or privilege, in excess of statutory authority, or promulgated without observance of required procedures. 5 U.S.C. § 706(2)(A)–(F).

### III.    FACTUAL BACKGROUND

#### A.    Historical Context

The term "frame or receiver" in subsection (B) of the GCA's definition is not independently defined by statute. In 1968 (and 1971), regulation defined a "frame or receiver" as: "[t]hat part of a firearm which *provides housing* for the hammer, bolt or breechblock, *and* firing mechanism, and which is usually threaded at its forward portion to receive the barrel." *Commerce in Firearms and Ammunition*, 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968) (emphases added); *Machine Guns, Destructive Devices, and Certain Other Firearms*, 36 Fed. Reg. 14,255, 14,257 (Aug. 3, 1971). Even prior to that rule, however, some weapons in common use featured a "striker" rather than a hammer, and some weapons had a central component that housed fewer than all three elements. To remedy this deficiency, the Agencies frequently ignored their own definition to regulate weapon parts they felt most resembled the concept of "frame or receiver." Courts long countenanced this "interpretation."

During this time, the Agencies recognized that although they could regulate items that "may readily be converted" into a weapon that expels a projectile by the act of an explosion, 18 U.S.C. § 921(a)(3)(A), the Agencies had—and still have—no authority to regulate items that "may readily be converted" into a "frame or receiver," 18 U.S.C. § 921(a)(3)(B).

In this context, Congress has repeatedly considered and rejected legislation regulating non-firearm objects ("NFOs").[1] *See, e.g., Ghost Guns Are Guns Act*, H.R. 1278, 115th Cong. (Mar. 1, 2017) (not enacted); *Untraceable Firearms Act of 2018*, H.R. 6643, 115th Cong. § 2(a)(36) (July

---

[1] The items discussed herein are commonly and colloquially referred to as "receiver blanks," "partially-manufactured frames," "partially-manufactured receivers," "80% frames," "80% receivers," "unfinished frames," or "unfinished receivers." These convenient monikers and marketing terms bear no legal significance. Plaintiffs refer to them as non-firearm objects ("NFOs") because that is what they are.

31, 2018) (not enacted); *Untraceable Firearms Act of 2018*, S. 3300, 115th Cong. § 2(a)(36) (July 31, 2018) (not enacted); *Stopping the Traffic in Overseas Proliferation of Ghost Guns Act*, S. 459, 116th Cong. (Feb. 12, 2019) (not enacted). Special interest groups sued the Agencies to force regulation of NFOs, but the Agencies resisted—until the law came into conflict with President Biden's political interests.

### B.     The Biden Administration

President Biden campaigned against so-called "ghost guns"[2]—a pejorative for privately manufactured firearms that are and have been legal in the United States for our 246-year history. He proposed "passing legislation requiring that purchasers of gun kits . . . pass a federal background check." *Id.* Once elected, President Biden "urged Congress to swiftly pass gun control laws[.]"[3] Congress considered but rejected such bills. *See infra* Section III(C)(2), at p. 46–47 (detailing failed legislation). When Congress refused to comply with his decrees, President Biden turned to his Executive Branch agencies. On April 11, 2022, he confessed to "instruct[ing] the Attorney General to write a regulation that would rein in the proliferation of 'ghost guns' because [he] was having trouble getting it passed in the Congress[.]"[4]

### C.     The Rulemaking Process

On May 21, 2021, the Agencies published a Proposed Rule to revise GCA implementing regulations. *See* ATF002539;[5] *Definition of "Frame or Receiver" and Identification of Firearms* ("Proposed Rule"), 86 Fed. Reg. 27,720 (May 21, 2021). The Proposed Rule reflected the

---

[2] *The Biden Plan to End Our Gun Violence Epidemic*, BIDEN-HARRIS DEMOCRATS, https://joebiden.com/gunsafety/ (last visited Dec. 23, 2022).
[3] *Biden Considers executive actions on guns, calls on Congress to pass weapons ban*, REUTERS (Mar. 23, 2021), https://www.reuters.com/article/usa-guns-idINKBN2BG0A5.
[4] *Biden announces new rules for 'ghost guns,' introduces ATF director nominee*, CBS NEWS, at 2:51 (Apr. 11, 2022), https://www.cbsnews.com/video/biden-ghost-guns-atf-director-nominee/#x.
[5] Plaintiffs refer to the Administrative Record using Bates citations.

Agencies' plan to, *inter alia*, expand the definition of "firearm," to add a definition for "complete weapon," and to define "frame or receiver" to include NFOs (at least when sold or distributed with jigs, tools, guides, or instructions). *See* Proposed Rule, at 27,746.

The Agencies "received over 290,000 comments on the proposed rule."[6] Over 170,000 commenters opposed the Rule. ATF072060; *Definition of "Frame or Receiver" and Identification of Firearms* ("Final Rule"), 87 Fed. Reg. 24,652, 24,667 (Apr. 26, 2022). The Agencies published the Final Rule on April 26, 2022—15 days after President Biden's renewed promise to regulate so-called "ghost guns." The Final Rule took effect August 24, 2022, and departs from the Proposed Rule by providing new bases for it, inventing a dizzying array of discretionary considerations as to what may be a "firearm" (including a "frame or receiver" or "complete weapon"), adding language rendering the same item a "firearm" when possessed by one person or in one set of market conditions (but not when possessed by someone else or under different conditions), and adding vague 'guidance' for when a NFO "may readily be converted" into a frame or receiver.

    **D.**    **Procedural History**

Plaintiffs filed their Petition for Review in August 2022 and amended their Petition in October 2022. ECF Nos. 1, 93. On August 17, 2022, Plaintiffs sought a preliminary injunction against enforcement of the Final Rule. ECF No. 16. After full briefing, this Court granted an injunction as to Plaintiff Tactical Machining, a producer and retailer of NFOs. ECF No. 56. After additional briefing, this Court expanded the injunction to include Tactical Machining's customers and Individual Plaintiffs VanDerStok and Andren. ECF Nos. 63, 89. The Agencies have appealed this Court's preliminary injunction orders, which appeal is being briefed. ECF Nos. 113, 114.

---

[6] ATF002688, ATF COMMENTS ON PROPOSED RULE, https://www.regulations.gov/docket/ATF-2021-0001/comments (last visited Dec. 23, 2022).

The Agencies certified and later amended the Administrative Record for this case. ECF Nos. 106, 131. During these events, additional parties have intervened as plaintiffs, and this Court enjoined enforcement of the Final Rule against BlackHawk Manufacturing Group, Inc. ECF Nos. 98, 118, 137. Finally, the Court consolidated the preliminary injunction proceeding and trial on the merits as it relates to Plaintiffs' assertion that the Agencies acted in excess of their statutory authority and the parties filed supplemental briefs. ECF Nos. 107, 132, 133.

Plaintiffs now seek summary judgment on their remaining claims that the Final Rule violates the APA and the United States Constitution.

## STANDARDS OF REVIEW

### I.   SUMMARY JUDGMENT STANDARD

Summary judgment is a common method for resolving disputes under the APA, where the district court sits as an appellate tribunal. *See Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022) ("whether an agency's decision is arbitrary [or] capricious is a legal question that the court can usually resolve on the agency record"). Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When evaluating APA challenges on summary judgment, courts apply the APA standards of review. *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001) (in reviewing grant of summary judgment, the general standard is the APA).

### II.   APA STANDARDS

A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(C).

A reviewing court shall also "hold unlawful and set aside agency action" promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). "Legislative" agency rules must be provided for notice and comment. *See* 5 U.S.C. § 553(b). A final rule, to the extent that it differs from the proposed rule, must be a "logical outgrowth" of the proposed rule, or the agency has not provided sufficient notice to allow for adequate comment. *See Huawei Techs. USA, Inc., v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) ("Notice suffices if it is a logical outgrowth of the proposed rule, meaning the notice must adequately frame the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice.") (internal quotations and citations omitted). Similarly, "[t]he most critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation." *Texas v. EPA*, 389 F. Supp. 3d 497, 505 (S.D. Tex. 2019) (internal quotation and citation omitted).

Next, a reviewing court shall set aside agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). The "arbitrary-and-capricious standard requires that agency action be [both] reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). An agency action was not reasonable if the agency "has relied on factors which Congress has not intended it to consider" or "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983).

Finally, courts must set aside agency action that is "contrary to constitutional right [or] power." 5 U.S.C. § 706(2)(B). "The intent of Congress in 5 U.S.C. § 706(2)(B) was that courts should make an independent assessment of a citizen's claim of constitutional right when reviewing

agency decision-making." *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979); *see id.* at 781 (reasoning that deferring to agency rulings when evaluating constitutional claims would be error).

## III.    FIRST AMENDMENT STANDARD

"If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest. . . . If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). "As we consider a content-based regulation, the answer should be clear: The standard is strict scrutiny." *Id.* at 814. "[S]trict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based[.]" *Reed v. Town of Gilbert*, 576 U.S. 155, 166 (2015).

## ARGUMENT

The Final Rule violates multiple APA requirements. First (and separately briefed), the Agencies acted in excess of their authority, regulating well beyond the bounds of the GCA. Plaintiffs fully addressed this issue in their prior briefing, which briefing Plaintiffs incorporate herein by reference. *See* ECF Nos. 16, 93, 133 (collectively "Excess Authority Briefs").

Second, the Final Rule is procedurally defective. It is not a logical outgrowth of the Proposed Rule. The Agencies made substantial changes between the proposed and final versions of the Rule, particularly as it relates to "frame or receiver," "partially complete" items, and multi-part frames or receivers. The Agencies also failed to identify all the sources they relied upon until publication of the Final Rule, depriving the public and regulated entities adequate notice of and opportunity to comment on the substance and bases for the Final Rule.

Third, the Final Rule is arbitrary and capricious. By purporting to regulate not just "frames or receivers," but items that, when combined with tools, marketing materials, and more, could be

"readily converted" into a frame or receiver, the Final Rule substantially departs from the Agencies' prior application and administration of the GCA. The Agencies have failed to adequately explain their reasoning for the Final Rule. Further, the Agencies failed to address substantial comments to the Proposed Rule that differed with the Agencies' desired outcome. Each of these faults renders the Final Rule arbitrary and capricious.

Finally, the Final Rule violates the Constitution in three respects: (1) the Final Rule is too vague to provide adequate notice of what the law requires, violating the Constitution's guarantee of due process; (2) the Final Rule restricts and chills speech based on its content and speaker, violating the First Amendment; and (3) by usurping Congress's legislative power, the Final Rule runs afoul of the Delegation Doctrine and the Take Care Clause.

A rule promulgated in contravention of the APA or the Constitution cannot stand. The Final Rule "shall" be set aside. *See* 5 U.S.C. § 706(2).

## I.   IN PROMULGATING THE FINAL RULE, THE AGENCIES FAILED TO OBSERVE PROCEDURES REQUIRED BY LAW

The Agencies violated the APA by promulgating a Final Rule that materially diverges from their Proposed Rule and that relies on information not available to the public for review and comment. When an Executive Branch agency fails to follow the procedures mandated by the APA, a "reviewing court shall" hold the agency action unlawful and set it aside. 5 U.S.C. § 706(2)(D).

### A.   The Final Rule is Not a "Logical Outgrowth" of the Proposed Rule

The Final Rule is not a logical outgrowth of the Proposed Rule. It substantially departs from the regulatory definitions in the Proposed Rule and introduces entirely new terms.

The APA bars agencies from taking final action significantly changing or departing from their proposed action without additional notice and an opportunity to comment. 5 U.S.C. § 706; *see Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 630 (5th Cir. 2001). To prevent agencies from

avoiding the notice and comment process, any final action must logically grow from the proposed action, so that any interested parties could reasonably anticipate (and therefore provide comment on) the changes. *See Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381–82 (5th Cir. 2021); *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021). This not only ensures that the public receives fair notice, but prevents agencies from evading the APA by introducing material amendments after initial notice and comment.

Several provisions of the Final Rule fail this standard. First, the definitional labyrinth that is the redefinition of "frame or receiver" is not a logical outgrowth from the Proposed Rule. Additionally, the Final Rule has a substantially different effect—and reach—than the Proposed Rule. Lastly, the Final Rule introduces several definitions for the first time.

### 1. The Definitional Structure Surrounding "Frame or Receiver" Changed Drastically Between the Proposed Rule and Final Rule

The Proposed and Final Rule suggest and make significant amendments to 27 C.F.R. § 478.11, and the Final Rule adds 27 C.F.R. § 478.12, which contains the regulatory definition of "frame or receiver." Both the Proposed and Final Rule present an extensive series of subsections and definitions to "update" the regulatory definition. But the Final Rule's definitional labyrinth surrounding "frame or receiver" departs significantly and unexpectedly from the Proposed Rule.

The Proposed Rule redefined "frame or receiver" along with four sub-categories, each with its own definition: (a) "Firearm muffler or silencer frame or receiver"; (b) "Split or modular frame or receiver"; (c) "Partially complete, disassembled, or inoperable frame or receiver"; and (d) "Destroyed frame or receiver." Proposed Rule, at 27,741–46. The Proposed Rule also presented four "nonexclusive examples that illustrate" the definition of "frame or receiver," Proposed Rule, at 27,741–42, and "a nonexclusive list" of nine weapons with "split or modular frame receivers"

11

where the "Director has previously determined that a specific part is the frame or receiver[.]" Proposed Rule, at 24,743–44.

By contrast, the Final Rule does not define "frame or receiver" at all, instead amending 27 C.F.R. § 478.11 to say that "[t]he term 'frame or receiver' shall have the same meaning as in § 478.12." Final Rule, at 24,735. The newly created 27 C.F.R. § 478.12 also does not provide a definition for "frame or receiver" and instead separately presents sub-categories, with independent definitions: (a)(1) "frame"; (a)(2) "receiver"; (a)(3) "variant" and "variants thereof"; (a)(4) ten "nonexclusive examples that illustrate the above definitions"; (b) "Firearm muffler or silencer frame or receiver"; (c) "Partially complete, disassembled, or nonfunctional frame or receiver," with five examples; (d) "Multi-piece frame or receiver"; (e) "Destroyed frame or receiver"; (f)(1) "Frame or receiver classifications based on which part of the weapon was classified as such before April 26, 2022," with four classification examples; and (f)(2) "Frame or receiver classifications of partially complete, disassembled or nonfunctional frames or receivers before April 26, 2022." Final Rule, at 24,735–41.

Between proposal and adoption, a single definition with four subparts became a nearly ten-part definition covering terms and concepts never mentioned in the Proposed Rule. Commenters could not have anticipated splitting "frame or receiver," which had been conjunctively defined since the Agencies' first regulation, into three parts with newly provided, illustrative examples. Commenters could not have anticipated the Agencies adopting new terms and definitions, such as "multi-piece frame or receiver," which, as discussed below, is not related to the Proposed Rule's definition of "split or modular frame or receiver." And commenters could not have anticipated the Final Rule adopting a regulatorily established before and after date for firearm classifications.

Even without examining the Final Rule's definitions in depth, it is clear that no reasonable commenter could have anticipated these dramatic changes, and thus none had an opportunity to comment on them. *See Tex. Ass'n of Mfrs.*, 989 F.3d at 381–82.

### 2. The Scope of the Definitions Surrounding "Frame or Receiver" in the Final Rule did not Logically Grow Out of the Proposed Rule

The specific differences between the Proposed and Final Rule make the lack of any "logical outgrowth" of the Final Rule's "frame or receiver" definitions even more apparent.

#### a. "Frame," "receiver," "variant," and "variants thereof" are new

The Final Rule, for the first time, separately defines "frame" and "receiver." The Proposed Rule concerned the "part of the firearm that . . . provides a housing or a structure designed to hold or integrate one or more fire control components[.]"[7] Proposed Rule, at 27,741. But the Final Rule defines "frame" as "the part of a handgun, or variants thereof, that provides housing or a structure for the primary energized component designed to hold back the hammer, striker, bolt, or similar component prior to initiation of the firing sequence," and "receiver" as "the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence[.]" Final Rule, at 24,735.

Specifically identifying frames with handguns and receivers with rifles, shotguns, and other weapons presents at least one complication that commenters did not have the opportunity to address: AR- and AK-style pistols. Legally these are "handguns." But under the Final Rule, they have a "receiver," not a "frame." Worse, the "primary component designed to block or seal the

---

[7] The Proposed Rule defines a "fire control component" as "a component necessary for the firearm to initiate, complete, or continue the firing sequence, including any of the following: Hammer, bolt, bolt carrier, breechblock, cylinder, trigger mechanism, firing pin, striker, or slide rails." Proposed Rule, at 27,741.

breech" in an AR-style pistol is the "upper receiver," which *is not* regulated as a "frame or receiver" under the Final Rule's new AR variance in 27 C.F.R. § 478.12(f)(1)(i). Final Rule, at 24,739–40 ("The receiver is the lower part of the weapon that provides the housing for the trigger mechanism and hammer (*i.e.*, lower receiver)."). Ironically, the "lower receiver" of an AR-style pistol meets the newly established definition of a handgun "frame." And that is just one example. The purpose of the "logical outgrowth" standard and the process it safeguards is to ensure that the public has the full opportunity to review an agency's proposed regulations and provide insight. The Agencies' unnoticed redefinitions of "frame" and "receiver" in the Final Rule violate the APA.

The Final Rule's redefinition of "frame" and "receiver" also regulates more specific components than the Proposed Rule's definition of "frame or receiver." The Proposed Rule sought to regulate one part of the weapon that housed *one or more fire control components*. By contrast, the Final Rule's changes specifically focus on the part that houses the sear for handguns and the bolt or breechblock for rifles, shotguns, and other weapons. This new focus on specific components is a significant departure from the Proposed Rule and thus should have been provided to commenters, especially the firearms industry, for their review and comment.

The lack of "logical outgrowth" for the term and definition of "variant" and "variants thereof" in the Final Rule is even more straightforward; those terms were not defined (and hardly appear) in the Proposed Rule. The Proposed Rule only speaks about "variants" in a single sentence, in reference to specific semiautomatic "variants" of several machineguns. Proposed Rule, at 27,729. The Final Rule's newly created category of "variant" firearms could not have been anticipated by commenters, especially when the Proposed Rule used that term only in reference to semiautomatic models of existing fully automatic machineguns. The change is material; the vague and incredibly broad definition of the new "variant" category will have a drastic impact on the

14

development and manufacture of new firearms, which may now be classified as variants if they use "a similar frame or receiver design" as an existing firearm. Final Rule, at 24,735. The Agencies may have the authority to adopt these terms and definitions, but not without notice and comment.

The Final Rule's own "examples that illustrate the above definitions" demonstrate how dramatically the proposed and adopted definitions differ. The Proposed Rule listed four examples to its proposed definition: a "hinged or single framed revolver"; a "bolt action rifle"; a "break action, lever action, or pump action rifle or shotgun"; and a "semiautomatic firearm or machinegun with a single receiver housing all firearm control components[.]" Proposed Rule, at 27,742. The Final Rule includes those same four examples but adds six "examples" that originally appeared in the Proposed Rule's abandoned definition of "[s]plit or modular frame or receiver." The Proposed Rule enumerated these six classes under "[s]plit or modular frame or receiver" based on prior specific determinations by the Director because they otherwise *did not* fall within the proposed definition of "frame or receiver." *Compare* Final Rule 24,735–41 *with* Proposed Rule 27,742–46. And yet, the Final Rule treats them as *illustrative* of its new definition of "frame or receiver." This establishes a significant *substantive* change between the proposed and adopted definitions.

> **b.     "Partially complete, disassembled, or nonfunctional frame or receiver" unexpectedly mutated after the Proposed Rule**

The Proposed and Final Rule's definition of "partially complete, disassembled, or nonfunctional frame or receiver" differ in a small, but extremely impactful way. The Proposed Rule forecasted that when determining the status of an item, "the Director may consider any available instructions, guides, templates, jigs, equipment, tools, or marketing materials." Proposed Rule, at 27,746. The Final Rule, however, added to that language, and now states that "the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, *or possessed* with the item or kit, or otherwise made

available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit." Final Rule, at 27,739 (emphasis added). Aside from the Agencies' lack of authority to regulate these items, addressed in Plaintiffs' Excess Authority Briefs, this additional reach was not—and could not have been—anticipated by commenters. Commenters could likely anticipate that this provision of the Proposed Rule, if adopted, would mean that the Director would consider items *sold or distributed* by the seller or distributor. No commenter had reason to think the Final Rule would include items *possessed and independent* of the seller or distributor. Nowhere does the Proposed Rule suggest that if an individual happens to own a book about manufacturing firearms, that the book would be subject to consideration of the Director in classifying an item that the individual purchased. The sheer breadth of "or possessed" is not a "logical outgrowth" of the Proposed Rule. Further, as explained below, these changes are impossibly vague, as they mean that an item in the "possession" of one person or under one set of market conditions is a "firearm" but in the "possession" of another or other conditions, it is not. *See infra* Section III(A), p. 26.

c.      "Multi-piece frame or receiver" appeared unexpectedly

The Final Rule's definition of "multi-piece frame or receiver" is self-evidently not a "logical outgrowth" of the Proposed Rule because the term bore a different meaning in the Proposed Rule. The four times that the Proposed Rule refers to a "multi-piece receiver," it is used in conjunction with split receivers (as "split/multi-piece receiver weapons"), in specific reference to firearms "such as the AR–15 semiautomatic rifle (upper receiver and lower receiver), Glock semiautomatic pistols (upper slide assembly and lower grip module), and Sig Sauer P320 (M17/18 as adopted by the U.S. military) (upper slide assembly, chassis, and lower grip module)[.]" Proposed Rule, at 27,721. Those firearms *all* fall under the Final Rule's redefinition of "frame or receiver," and *none* fall under the Final Rule's definition of "multi-piece frame or receiver." Final

16

Rule, at 24,671, 24,739. This redefinition of a term that referred to one category of items in the Proposed Rule to mean an entirely different category of items is not, in any sense, a "logical outgrowth" of the Proposed Rule.

>    **3.    Additional Provisions of the Final Rule Cannot be Said to be a Logical Outgrowth of the Proposed Rule**

The Final Rule's materially new provisions are not limited to terms associated with frames and receivers. The term "primordial" is used once in the Proposed Rule but was not defined until the Final Rule. *Compare* Proposed Rule, at 27,729, *with* Final Rule, at 24,663 n.49. Commenters had no opportunity to analyze and comment on this new definition, which purports to draw a line between unregulated materials and regulated frames and receivers and will certainly have downstream effects for the industry and consumers. Also, "privately made firearms marked by nonlicensees," a phrase absent from the Proposed Rule, first appears and is defined in the Final Rule. *See* Final Rule, at 24,743. Again, this establishes an entirely new subcategory of "firearms," over which the Agencies assert regulatory authority. There is no indication, based on the GCA, as to why these items should be separately defined. Along with this change, the definition of gunsmith was expanded to include the task of marking privately made firearms. *Compare* Proposed Rule, at 27,742, *with* Final Rule, at 24,734. This change is required to be provided for notice and comment to the public, including by those gunsmiths that will be engaging in that task.

The Agencies violated the APA when they failed to provide fair notice of and opportunity to comment on the Final Rule's definitions of "frame or receiver," "primordial," "privately owned firearms marked by nonlicensees," and "gunsmith." *See Tex. Ass'n of Mfrs.,* 989 F.3d at 381 ("Final rules under the APA notice-and-comment rulemaking must be the 'logical outgrowth' of the proposed rule. The objective is fair notice."). These provisions are not logical outgrowths of the Proposed Rule, rendering the Final Rule unlawful.

**B.**      **The Final Rule Lacked Notice and Comment on Substantial Bases for the Rule**

In addition to the significant changes detailed above, the Agencies relied on new information in the Final Rule that was not available during the comment period. The APA requires agencies to provide the public with a meaningful opportunity to comment on the elements of a rule, including the materials that form the basis for the rule. *See, e.g.*, 5 U.S.C. § 553(c) ("After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments[.]"); *Tex. Ass'n of Mfrs.*, 989 F.3d at 383 (holding additional notice was required after agency changed its justification for rule); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995) (reasoning that a second notice-and-comment period was appropriate because "the public needed the opportunity to comment on the new studies" that affected the agency action).

In the Preliminary Regulatory Analysis that accompanied the Proposed Rule, the Agencies requested public comment on the anticipated costs and impacts of the rule as well as the methodology used to reach those figures. Office of Regulatory Affairs, *Preliminary Regulatory Analysis and Initial Regulatory Flexibility Analysis* ("Preliminary RIA"), 23 RIN 1140-AA, at 24, 29, 32, 35–36, 40, 43, 47, 50 (Apr. 2021), ATF002472–2538. But, as at least one commenter addressed, the Agencies failed to provide any information as to *what* their methodology for estimating amounts was and *how* they arrived at their chosen methodology, aside from unsupported assumptions based on consultation with unidentified subject matter experts. *See, e.g.*, Preliminary RIA, at 39, 46; Mountain States Legal Foundation, Comments on ATF's Proposed Rule 23–24 (Aug. 19, 2021).[8] This problem persisted through the Final Rule. For example, "in the final analysis, ATF provides an estimate of . . . potential costs to individuals who

---

[8] https://www.regulations.gov/comment/ATF-2021-0001-245470

go through an FFL for services associated with marking their PMFs." Final Rule, at 24,720. Based upon a review of the Record, it appears the reason the methodology was never provided is because it was based, at least in part, on basic internet research and a single internal "subject matter expert" that had been a gunsmith for five years prior to joining the ATF. *See* E-mail from Anthony L. Ciravolo, Firearms Enf't Officer, ATF, to Jeana Davalos, Economist, ATF (Jul. 23, 2021), ATF068550–52. Neither the data nor the gunsmiths' intuitions were subject to scrutiny and correction from the public or the industry. The Agencies never provided the bases of their methodology to commenters and never provided the information that the Agencies relied on to reach that methodology for review and comment—apparently because that methodology amounted to nothing more than "ask that one ATF agent."

The Final Rule also reflects the Agencies' reliance on other sources as the basis for their decision making and that were not available for public comment/rebuttal. First, the Agencies admit that they altered the cost analysis and the methodology in adoption of the Final Rule. *See* Final Rule, at 24,716 ("ATF significantly revised its economic analysis in preparing the final rule[.]"); Final Rule, at 24,718 ("ATF revised the methodology and costs associated with this final rule[.]"). The new economic analysis and the new methodology/costs should have been noticed and provided for comment. Second, the Agencies' relied on an additional 57 DOJ Office of Public Affairs sources to justify the Final Rule. *Compare* Proposed Rule, at 27,753 n.19 (providing links for 21 public sources) *with* Final Rule, at 24,657–78 n.20 (referring back to Proposed Rule, at 27,753 n.19, and providing links for an additional 60 public sources). Finally, the Final Rule cites numerous new sources to purportedly prove the 'proliferation' of NFOs and PMFs and thus justify the need for the Final Rule, many of which postdate the Proposed Rule that was published on May 21, 2021. *See, e.g.*, Final Rule, at 24,656 n.17 (Shanzeh Ahmad & Jeremy Gorner, *'We're seeing*

19

*an explosion:' Sheriff Tom Dart, state Sen. Jacqueline Collins take aim at ghost guns, propose legislation to ban the untraceable weapons*, CHI. TRIB. (Oct. 14, 2021);[9] Brian X. McCrone, *'3 Pipes Turned into a Shotgun': Nearly 1-in-10 Guns Seized in Philly Are Homemade*, NBC10 PHILADELPHIA (Oct. 7, 2021);[10] Kevin Rector, *LAPD declares 'ghost guns' an 'epidemic,' citing 400% increase in seizures*, L.A. TIMES (Oct. 15, 2021).[11] The Agencies had a "burden to provide notice and an opportunity to comment on the clearly articulated justification for its use of such data." *Tex. Ass'n of Mfrs.,* 989 F.3d at 383; *id.* at 382–83 (finding that the Commission violated the APA when it "relied on [] new data when promulgating the Final Rule" without providing an opportunity for notice-and-comment because "[t]he agency's rationale for the rule must be made clear and subjected to public comment."). The public should have had the opportunity to review the sources and evidence the Agencies newly relied on and to provide supplemental or rebuttal evidence of their own. Reliance on new studies or imposing a new methodology to justify changes in the Final Rule requires the Agencies to notice that information for subsequent public comment.

The Final Rule is not a logical outgrowth of the Proposed Rule, rests on unvetted bases, and should be vacated.

## II. THE AGENCIES ACTED ARBITRARILY AND CAPRICIOUSLY WHEN PROMULGATING THE FINAL RULE

The Agencies acted arbitrarily and capriciously by adopting the Final Rule because they failed to adequately explain their change in policy and failed to consider important aspects of the Final Rule's effect. First, while Agencies may change their position and policy, they must

---

[9]       https://www.chicagotribune.com/news/breaking/ct-cook-county-sheriff-dart-ghost-gun-legislation-20211014-whvwjv5aangmtaje27gpllqtvu-story.html

[10]    https://www.nbcphiladelphia.com/news/local/three-metal-pipes-turned-into-a-shotgun-nearly-1-in-10-guns-seized-in-philly-are-homemade/2983066

[11]  https://www.latimes.com/california/story/2021-10-15/lapd-says-ghost-guns-an-epidemic-with-seizures-up-400-since-2017)

acknowledge when and explain why they are doing so. Here, the Agencies failed to explain their about-face reinterpretation of the GCA. The Agencies long held they *lacked* authority to apply statutory terms appearing in one subsection of the GCA (such as "readily converted") to other subsections where they do not appear. Now, without explanation, they say the opposite. Moreover, the Agencies' claims that they were forced to develop a new rule because of "technological advances" or "inflexible" judicial decisions are false.

Second, the Agencies "'entirely failed to consider an important aspect of the problem'" before them by failing to consider significant issues raised by the commentors; that failure renders their action arbitrary and capricious under the APA. *Wages & White Lion Invs., LLC v. FDA*, 41 F.4th 427, 435–36 (5th Cir. 2022) (quoting *State Farm*, 463 U.S. at 43).

## A.   The Agencies Failed to Adequately Explain their Change in Position.

A court cannot uphold an administrative agency's decision that amounts to an unexplained reversal of policy. *State Farm*, 463 U.S. at 57 ("[A]n agency changing its course must supply a reasoned analysis."). "It is established administrative law that if the agency fails to acknowledge a change [in its position] *and adequately explain it*, the changed position will be afforded no deference in litigation under either *Chevron* . . . or *Auer*[.]" *United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 6 (D.D.C. 2017)) (quotations and citations omitted) (emphasis added).

In recent years, as detailed by Plaintiffs' Excess Authority Briefs, the Agencies acknowledged, and affirmatively argued (including before another federal court), that an NFO is *not* a firearm under the GCA, even if it could be "readily converted" to a frame or receiver. *See, e.g.*, ECF No. 133 at 22–25. The Agencies have long concluded that they do not have authority to apply language from 18 U.S.C. § 921(a)(3)(A) in 18 U.S.C. § 921(a)(3)(B) when Congress had not done so. *See id.*; *see also* Fed. Defs.' Mot. for Summ. J., ECF No. 98, at 14, *Syracuse v. ATF*,

21

No. 1:20-cv-06885 (S.D.N.Y. Jan. 29, 2021). But the Agencies came to the exact opposite conclusion in their response to comments on the Proposed Rule. Citing no legal authority for the change, the Agencies simply "disagree[d] with commenters' suggestion" that the Agencies could not use the "concepts of 'readily' and 'converted'" in the definition of "frame or receiver." Final Rule, at 24,685. Beyond being in excess of the Agencies' authority, the Agencies fail to *adequately* explain their change in position. Rather than rely on legal authority, the Agencies curiously invoke tautology, claiming their new position was "appropriate" because manufacturing (their prior method of analyzing the status of NFOs) *is* converting. *Id.* How this would change the scope of congressionally enacted law, however, is unclear. The Agencies' attempts to shoo this issue away in the course of this litigation is equally unsatisfactory. The idea that the Agencies argued that they did not have the authority to superimpose "readily convertible" because they were arguing under a different (now superseded) regulatory definition, also fails to acknowledge that their *authority* cannot have changed between then and now. There has been no congressional action, and the Agencies have cited no legal authority reinterpreting the scope of the GCA. In short, the Agencies have failed to adequately explain their new theory of statutory interpretation.

Similarly, the Agencies recently argued that "[*a*]*s a statutory matter*, Congress has legislatively defined a 'firearm' to be a weapon that may be readily converted to expel a projectile by the action of an explosive, or the frame or receiver of such weapon, *but has explicitly excluded 'firearms parts' from that definition*." Fed. Defs.' Mot. to Dismiss, ECF No. 29, at 10, *California v. ATF*, No. 3:20-cv-06761 (N.D. Cal. Nov. 30, 2020) (emphases added). Just a few short months later, the Agencies announced the Proposed Rule seeking to regulate firearm parts in the form of weapons parts kits and frame or receiver parts kits. As above, the Agencies have failed to adequately explain how their authority under the GCA has changed in the last two years.

Lastly, the Agencies' *general* proffered reasons for issuing new regulations, "judicial developments as well as continued technological advancements in firearms manufacturing," Proposed Rule, at 27,725, equally fail to *adequately* explain the Agencies' reversals.

"Judicial developments" as used by the Agencies is a euphemism for courts' determination to hold agencies to the text of the regulations they publish rather than deferring to agencies' *carpe diem* interpretations of unambiguous regulations. Under the prior regulatory definition, a "frame or receiver" was "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, *and* firing mechanism[.]" *Commerce in Firearms and Ammunition*, 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968) (emphasis added). For over 50 years, however, the Agencies admittedly classified items as a "frame or receiver" even when the item does not "fall[] within the precise wording of the regulatory definition." Proposed Rule, at 27,721. The Agencies lament that courts have recently pushed back against this *laissez-faire* approach to regulatory application and "have treated the regulatory definition of 'firearm frame or receiver' as inflexible." Final Rule at 24,652. Yet, the Agencies do not explain how application of regulations as they are written can justify "updated" interpretations of statutes contrary to how they were written by Congress.

Second, the 'technological advances' the Agencies rely upon to justify their updated regulations predate both the Agencies' prior regulation and the GCA. These 'advances' cannot serve as a basis for changing the regulations decades later. Proposed Rule, at 27,725. For example, the concept of a "split receiver" is not new. Self-loading firearms invited, or even required, "split" components as early as their introduction.[12] By the Agencies' own admission, "at the time the

---

[12] *See, e.g.,* John Henwood, *The Great Remington 8 and Model 81 Autoloading Rifles*, COLLECTOR GRADE PUBLICATIONS (Jan 1, 2003); LEONARD SPECKIN, WINCHESTER MODEL 07 SELF-LOADING .351 CALIBER: ITS PAST AND ITS FUTURE WITH MODERN BRASS, BULLETS, AND POWDERS (2013); ROGER LARSON, COMPREHENSIVE GUIDE TO THE M1 CARBINE (2d Ed, 2010) (cited in FPC, COMMENTS ON ATF'S PROPOSED RULE 12–13 (Aug. 19, 2021), https://bit.ly/3zxj9RR).

current definitions were adopted there were numerous models of firearms that did not contain a part that fully met the regulatory definition of 'frame or receiver[.]'" Final Rule, at 27,721. Indeed, the ATF's agency predecessor "had been aware of the problem that two-part receivers pose for regulators for nearly as long as the GCA has been in effect." *United States v. Rowold*, 429 F. Supp. 3d 469, 476–77 (N.D. Ohio 2019) (citing to an Internal Revenue Service Memorandum dated March 1, 1971). Similarly, striker-fired pistols, another alleged technical advance,[13] were also common by 1968: approximately 300,000 were produced in Utica, New York, alone between 1907 and 1928, primarily for the civilian market.[14] Again, the presence of these arms today does not provide *adequate* justification for the Agencies' policy reversal.

Accordingly, the Agencies' attempt to distance themselves from their prior statutory interpretation of the GCA is uncompelling, and the Agencies' proffered reasons for their departure from their prior position are inadequate.

**B.     The Agencies Failed to Consider Important Aspects of the Problem and Relevant Comments**

The Agencies failed to engage in reasoned decision-making and thus act arbitrarily when they failed to consider important aspects of the problems presented and caused by the Final Rule. An agency action is not reasonable if the agency "entirely failed to consider an important aspect of the problem[.]" *See State Farm*, 463 U.S. at 43. The Agencies failed to consider how the Final Rule can be reconciled with limits on the ability to regulate speech, failed to consider a number of significant comments the Agencies received on the Proposed Rule and the sources contained therein, and failed to consider the implications of their "complete weapon" definition. "An agency

---

[13] Final Rule at 24,562 ("Most modern weapon designs . . . incorporate a striker to fire the weapon, rather than a hammer.").

[14] Paul Scarlata, *Savage Model 1907 Automatic Pistol*, SHOOTING TIMES (January 3, 2011), https://bit.ly/3zepaRo (cited in FPC, COMMENTS ON ATF'S PROPOSED RULE 12–13 (Aug. 19, 2021), https://bit.ly/3zxj9RR).

must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *see also Action on Smoking & Health v. C.A.B.*, 699 F.2d 1209, 1216 (D.C. Cir.), *supplemented*, 713 F.2d 795 (D.C. Cir. 1983) ("An agency need not respond to every comment, but it must respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments.") (internal quotations omitted).

As explained below, the Agencies purport to use a firearms statute to regulate both speech and speakers. *See infra* Section III(B), p. 35. Specifically, one item sold without instructions or marketing materials may not be a "firearm" under the Final Rule, while the exact same item, when sold with instructions or marketing materials, is a "firearm." Final Rule, at 24,739. It is thus not the item, but the explanation, the speech, that is regulated and chilled. The regulation of speech aimed at detailing how to manufacture a "firearm" or a "frame or receiver" is inexplicable since the Agencies admit that "the GCA . . . does not regulate the information used to manufacture firearms." Final Rule, at 24,670. The Agencies never come to grips with the reality that the Final Rule regulates speech, and they fail to ever consider that aspect of the Final Rule and fail to reconcile their regulation of information with their acknowledgement that they cannot regulate said information under the GCA.

Additionally, the Final Rule fails to adequately consider the uncertainty created by its "complete weapon" definition's application to otherwise lawful but unassembled weapons. *See infra* Section III(A)(3), p. 33. Comments on the Proposed Rule addressed this uncertainty, pointing out that "law-abiding gun owners who legally own both AR rifles and pistols could be charged with a felony if they store their firearms unassembled." Final Rule, at 24,700. The Agencies fail to respond, other than a bare assertion that "the Department disagrees . . . that the application of

the definition of 'firearm' to unassembled weapons creates enforcement uncertainty." *Id.* at 24,700–01. The Agencies also never indicate whether they agree regarding the application of the "complete weapon" definition. *See id.* This does nothing to either assuage the concerns of commenters or explain why the commenters' concerns are unfounded.

The Final Rule fails to consider important aspects of the problems created by its reach and fails to address significant comments on the Proposed Rule, thereby violating the APA.

### III.   THE FINAL RULE'S PROVISIONS VIOLATE CONSTITUTIONALLY PROTECTED RIGHTS AND EXCEED CONSTITUTIONAL LIMITATIONS

The Final Rule, and the federal regulations that it amends and establishes, violate the protections afforded by the U.S. Constitution, and thus also violate the APA. Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). The Final Rule violates the Constitution in at least three ways. First, the Final Rule violates due process rights, as it is unconstitutionally vague. Second, the Final Rule violates the First Amendment by regulating *who* can say *what* and chilling speech. Third, the Final Rule is an unconstitutional violation of Congress's delegated authority and a usurpation of Congress's non-delegable legislative power.

#### A.   The Final Rule is Unconstitutionally Vague

The Final Rule is unconstitutionally vague. Agency regulations bear the "'force and effect of law.'" *Perez*, 575 U.S. at 96 (quoting *Chrysler Corp.*, 441 U.S. at 302–03). Thus, agency regulations are subject to the same constitutional limits on vagueness as is legislation. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253, 254–55 (2012) (indicating that the void for vagueness doctrine applies to agency regulations).

"A law is unconstitutionally vague if people of common intelligence must guess at its meaning and differ as to its application." *Shamloo v. Miss. State Bd. of Trustees of Insts. of Higher*

26

*Learning*, 620 F.2d 516, 523 (5th Cir. 1980). The "doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019); *accord Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). A law must provide "'fair notice' of the conduct a statute proscribes," in order to "guard[] against arbitrary or discriminatory law enforcement[.]" *Sessions*, 138 S. Ct. at 1212; *see Fox Television Stations, Inc.*, 567 U.S. at 253 (judicial vagueness inquiries ensure that regulated parties know what is required of them and that enforcement of the law will not be arbitrary and discriminatory).

This clarity requirement is even more robust when a law bears criminal consequences. *See Davis*, 139 S. Ct. at 2323 ("Only the people's elected representatives in Congress have the power to write new federal criminal laws."); *cf. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982). ("The [Supreme] Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."). Courts also require greater clarity in a law that "threatens to inhibit the exercise of constitutionally protected rights." *Village of Hoffman Estates*, 455 U.S. at 499.

The GCA is a criminal statute. Congress imposed heavy consequences—up to five years in prison and/or the imposition of criminal fines—for willful violations. 18 U.S.C. § 924(a)(1)(D). The GCA also imposes regulations on constitutionally protected rights, including those protected by the Second Amendment. The GCA itself acknowledges that its statutory reach abuts the exercise of constitutionally protected rights, such that actions in excess of its bounds may inhibit protected rights. Gun Control Act, Ch. 44, Pub. L. 90-618, § 101, 82 Stat. 1213 (1968) (including in the "Purpose" of the GCA that the statute was not meant "to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition . . . of

firearms appropriate to the purpose of hunting . . . personal protection, or any other lawful activity.").

Accordingly, here, due process and vagueness concerns are at their highest. And the Final Rule is fatally vague in three respects: (1) it is not clear to a person of common intelligence when an unregulated item becomes a "firearm"; (2) the regulatory reach of "readily" and the factors used in its analysis is not comprehensible by a person of common intelligence; and (3) the expansiveness of the Final Rule's creation and definition of "complete weapon" fails to ensure that regulated parties know what may offend other provisions of federal law.

### 1.    The text of the Final Rule does not plainly indicate when or how an unregulated item becomes a "firearm"

A person of ordinary intelligence cannot look to the Final Rule alone, or the regulations it amends, and determine what is and is not regulated. The Final Rule's definition of "firearm" is so unintelligible and so broad that the Agencies had to "expressly exclude[] . . . unformed blocks of metal, liquid polymers, and other raw materials" "from the definition of 'frame or receiver[.]'" Final Rule, at 24,700. With the Final Rule repeatedly imbuing the Director with discretion and including qualifiers such as "may consider," the definition of "frame or receiver" creates extreme uncertainty and give the Agencies nearly unbridled discretion. *See, e.g.*, Final Rule, at 24,739 ("When issuing a classification, the Director *may consider* any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are *sold, distributed, or possessed* with the item or kit or otherwise made available by the seller or distributor of the item or kit[.]"); *id.* at 24,735 ("readily" is described as "[a] process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but *not necessarily the most* efficient, speediest, or easiest process, action, or physical state") (emphasis added).

28

When a law is "so indefinite that men of common intelligence must necessarily guess at its meaning and differ as to its application, the ordinance is unconstitutionally vague." *Medlin v. Palmer*, 874 F.2d 1085, 1090 (5th Cir. 1989) (citing *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).

Two points demonstrate the Final Rule's unconstitutional vagueness. First, before the Agencies began explaining the Final Rule in court and publishing subsequent guidance, members of the public (including prior NFO purchasers), along with the firearms industry, believed that the Final Rule, in effect, regulated NFOs (on their own) as "firearms". *See* Decl. of Darren Peters, Sr., ECF No. 16-1, ¶ 8; Decl. of Jennifer VanDerStok, ECF No. 16-2, ¶ 7; Decl. of Michael G. Andren, ECF No. 16-3, ¶ 7; Defs.' Brief in Opp'n to Pls.' Mot. for Prelim. Inj., ECF No. 41, at 18 ("Any other approach would result in persons being able to easily circumvent the requirements . . . by producing or purchasing almost-complete frames or receivers that could easily be altered to produce a functional frame or receiver."). In fact, Plaintiffs' preliminary injunction evidence demonstrates that some members of the public *still believe* that it is illegal to purchase an NFO without a federal background check. *See* Supp. Decl. of Darren Peters, Sr., ECF No. 55-1 at ¶ 11 ("Even with resumed sales, a significant number of Tactical Machining's customers believe that the direct sale and purchase of just Tactical Machining's '80% Lowers[]' . . . is still prohibited. Tactical Machining has received a litany of calls from customers asking whether these products are illegal."). Banks, credit card processors, and freight providers—all vastly more sophisticated and well-resourced than the ordinary person—shared this reading of the Final Rule. Decl. of Darren Peters, Sr., ECF No. 16-1 ¶ 12–13. That the Agencies reject the analysis shared by these relatively sophisticated actors demonstrates the unconstitutional ambiguity of the Final Rule.

29

Second, the Final Rule fails to inform producers what they can sell and consumers what they can purchase alongside an NFO before that item becomes a regulated "firearm." The Final Rule only indicates that an NFO sold and/or purchased with a jig *is a firearm*. *See* Final Rule, at 24,739. But it, and the Agencies, are silent as to what other "templates, [] molds, equipment, tools, instructions, guides, or marketing materials," or countless combinations thereof, may accompany an NFO before that item becomes a "firearm." Not even exceptionally sophisticated or intelligent actors can understand from the text of the Final Rule what is—and importantly what is not—a "firearm," because of the number of different items that the Director "may consider," and the lack of any indication on how those separately (or in combination) affect the status of an NFO.

The Final Rule also regulates the *possession* of items. Final Rule, at 24,739. Therefore, the Final Rule could treat an item as not a firearm when purchased and shipped, and then the item could somehow "transform" into a firearm once the purchaser receives the package, depending on what "templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials" the purchaser already owns and how the Director construes that possession. It is impossible to fully understand the impact of this provision of the Final Rule and how it may be enforced by the Agencies—with any wrong step risking felony charges and prison time. This Court has already recognized that Plaintiffs' fear of prosecution "is exacerbated because the Rule's vague language indicates they might violate the law by purchasing a receiver while 'in possession of other tools and equipment.'" ECF No. 89 at 9 (quoting Supp. Decl. of Jennifer VanDerStok 2, ECF No. 62-1, ¶ 5; Supp. Decl. of Michael G. Andren 2, ECF No. 62-2, ¶ 5).

The redefinition of "firearm" and "frame or receiver," are unconstitutionally vague as a person with ordinary intelligence cannot decipher what conduct is regulated or prohibited.

### 2.      The eight-factor definition of "readily" is unconstitutionally vague

Through the Final Rule's definition of "readily," the Agencies have created an intricate maze where all paths lead to an unascertainable risk of criminal prosecution. The Final Rule defines a firearm to "include a weapon parts kit that is designed to or *may readily be* completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." Final Rule, at 24,735 (emphasis added). But it is unclear to a person of ordinary intelligence exactly when an item or kit *becomes readily convertible* into a "firearm."

 "A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained . . . 'is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Fox Television Stations, Inc.*, 567 U.S. at 253 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). "As [] [the Supreme] Court has explained, a regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." *Id.*

The Final rule 'defines' the term "readily" using an amorphous eight-factor test. Readily is defined as "[a] process, action, or physical state that is fairly or reasonably efficient, quick, and easy, *but not necessarily* the most efficient, speediest, or easiest process, action, or physical state"—the Goldilocks rule. Final Rule, at 24,735 (emphasis added). The factors are:

(1)     Time, *i.e.*, how long it takes to finish the process;
(2)     Ease, *i.e.*, how difficult it is to do so;
(3)     Expertise, *i.e.*, what knowledge and skills are required;
(4)     Equipment, *i.e.*, what tools are required;
(5)     Parts availability, *i.e.*, whether additional parts are required and how easily they can be obtained;
(6)     Expense, *i.e.*, how much it costs;
(7)     Scope, *i.e.*, the extent to which the subject of the process must be changed to finish it; and
(8)     Feasibility, *i.e.*, whether the process would damage or destroy the subject of the process, or cause it to malfunction.

31

*Id.*

These eight factors do not provide an ascertainable standard to a person of common intelligence or even to a sophisticated, regulated manufacturer. Is ease assessed against a certain exemplar? What is easy for a mechanic may not be easy for a lawyer. Does parts availability apply to the producer, retailer, or purchaser? The former may have easy access to a part, while the latter may not even know where to start his search. Does the consideration of part availability mean that what is or is not a "firearm" changes with the reliability of the supply chain? It is unclear what facts must be demonstrated, since the Director can weigh each factor in an indeterminate way.

The D.C. Circuit, in *Timpinaro v. SEC*, found a similar seven factor test constitutionally problematic. *Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993). In *Timpinaro*, an SEC order provided that traders engaged in a "professional trading pattern" were prohibited from using certain automated trades. *Id*. at 455. In response to brokers' challenge to the order, the D.C. Circuit observed that "[f]ully five of the seven factors to which a trader must attend if he is to avoid engaging in a 'professional trading pattern' are subject to seemingly open-ended interpretation." *Id*. at 460. Two of the factors involved a "high volume of day trades in relation to" other trades or the number and value of securities and two of the factors involved "excessive frequency" of certain types of transactions. *Id.* The court noted that "[w]hat makes a frequency "excessive," for example, is a mystery" and that the uncertainties were even greater when the factors were "considered in combination, according to some undisclosed system of relative weights." *Id.* For this and other reasons, the court remanded the rule to the SEC and ordered the SEC to "consider whether the seven-part test…could be made more definite before it is subjected to scrutiny under the Due Process Clause." *Id.*

The descriptors of "readily" in the Final Rule's definition are also hopelessly vague:

> Indeed, the words "fairly" (adverb) and "reasonably" (adverb) and "efficient" (adjective) and "quick" (adjective) and "easy" (adjective) and "speedy" (adjective) are all relative terms—inherently malleable, flexible, vague, standardless, and open to infinite interpretation. Running a marathon might be "easy" for a triathlete, but not for someone who just had double bypass surgery. ATF's definition thus provides absolutely no fixed standards, and thus no one will ever have any idea what "readily" convertible means until they find themselves on the receiving end of a criminal indictment (or a no-knock raid).

GUN OWNERS OF AMERICA AND GUN OWNERS FOUNDATION, COMMENT ON ATF'S PROPOSED RULE (June 4, 2021).[15] But the Agencies know what "readily converted" means in the GCA. Congress specifically included the phrase to address starter guns—complete, working guns designed to discharge only blank ammunition. Under the GCA, a firearm that shoots blank ammunition that can be easily modified to shoot bullets constitutes a "readily converted" weapon—no eight-factor text necessary. *See* 114 Cong. Rec. 10859 (Apr. 29, 1968) ("Added to the term 'firearm' are weapons which 'may be readily converted to' a firearm. The purpose of this addition is to include specifically any starter gun designed for use with blank ammunition which will or which may be readily converted to expel a projectile or projectiles by the action of an explosive.").

### 3.   The definition of "complete weapon" does not establish a knowable and enforceable regulation

The Final Rule's new definition of "complete weapon" not only exceeds the Agencies' authority, but it fails to establish a standard clear enough to notify the ordinary person what items it includes. The Final Rule defines "complete weapon" as "[a] firearm other than a muffler or silencer that contains all component parts necessary to function, whether or not assembled or operable." Final Rule, at 24,747. By including unassembled weapons in "complete weapon" the Agencies have created tremendous enforcement uncertainty because many gun parts are interchangeable. For example, "law-abiding gun owners who legally own both AR rifles and

---

[15] https://www.regulations.gov/comment/ATF-2021-0001-44678

pistols could be charged with a felony if they store their firearms unassembled." Final Rule, at 24,700 (comment on the Proposed Rule). This is because an AR-pattern rifle and an AR-pattern pistol are very similar, with sometimes minute differences (Figure 1).



Both AR-pattern rifles and AR-pattern pistols have a similar construction, using a split-frame that separates the firearm into an upper and a lower (Figure 2).



Because of this, a disassembled AR-pattern rifle and AR-pattern pistol could theoretically create a new combination—an AR rifle lower and a pistol upper (with a barrel of less than 16 inches), that, when combined, create a short-barrel rifle (Figure 3).



Figure 3: AR-pattern rifle lower and AR-pattern pistol upper separated (left) and NFA-regulated short-barreled rifle (right)

This matters because that individual would possess a "complete weapon" that is NFA-regulated and cannot be lawfully owned without a federal tax stamp. Mere possession of the unregulated AR-pattern pistol upper in conjunction with an AR-pattern rifle lower could now qualify as a felony under the Agencies' definition of "complete weapon." And yet, the Final Rule fails to indicate whether this combination, possessed together, *does in fact* constitute a complete NFA-regulated rifle, even in response to the direct charge from commenters. *See* Final Rule, 24,700–01. Accordingly, the Final Rule's definition of "complete weapon" is unconstitutionally vague.

### B.    The Final Rule Violates the First Amendment

The Final Rule unconstitutionally chills protected speech based on both the content and on the identity of the speaker and fails to satisfy the strict scrutiny mandated by the First Amendment. According to the Agencies, an NFO accompanied by certain expressive materials (instructions and marketing materials) is subject to regulation as a "firearm" depending on the *content* of those materials and if those materials are provided by the seller. Without those expressive materials, an NFO is not a "firearm," and is thus unregulated by the Agencies.

Regulations that chill or compel speech, like prohibitions on speech, "abridge" the freedom protected by the Free Speech Clause. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("The First Amendment generally prevents government from proscribing speech . . . because of

disapproval of the ideas expressed."); *Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017) ("'[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw.'") (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978)); *In re Tam*, 808 F.3d 1321, 1339 (Fed. Cir. 2015), *as corrected* (Feb. 11, 2016), *aff'd sub nom. Matal v. Tam.*, 137 S. Ct. 1744 (2017) (applying strict scrutiny to a content-based regulation that significantly chills private speech, even though it didn't ban speech); *Reed v. Town of Gilbert*, 576 U.S. 155, 182 (2015) (Kagan, J., concurring) ("We apply strict scrutiny to facially content-based regulations of speech, in keeping with the rationales just described, when there is any 'realistic possibility that official suppression of ideas is afoot.'") (quoting *Davenport v. Wash. Ed. Ass'n*, 551 U.S. 177, 189 (1995)). Additionally, the government is prohibited from regulating speech based on the speaker and on the content. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Speech restrictions based on the identity of the speaker are all too often simply a means to control content.")

### 1.  The Final Rule chills the speech of specific, targeted speakers

Based on the Final Rule, NFO producers and retailers must cease publication of instructions or marketing materials or risk engaging in the illegal sale of firearms. "Speaker-based laws run the risk that 'the state has left unburdened those speakers whose messages are in accord with its own views.'" *Nat'l Inst. of Family and Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 580 (2011)). The Constitution does not allow for such targeted restriction. "Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United*, 558 U.S. at 340.

The Final Rule empowers the ATF "Director [to] *consider . . . instructions, guides, or marketing materials*[,]" Final Rule, at 24,739 (emphasis added), and requires that any "request for

36

classification . . . *must contain . . . any instructions, guides, or marketing materials* if they will be made available by the seller or distributor with the item or kit." Final Rule, at 24,749 (emphasis added). The Final Rule thereby specifically targets NFO producers' and retailers' speech—when they seek classification letters to ensure compliance with the GCA, the Rule mandates that they *must* send instructions, guides, or marketing materials to the ATF Director, who will consider that speech in classifying their item. Final Rule, at 24,749. Given this requirement, NFO producers will invariably choose not to speak, or will choose to alter their speech, to avoid inadvertently saying something that will "convert" the NFOs they produce into "firearms" and risk criminal liability if the Director determined that the retailers' disfavored speech made an NFO that was sold directly to the consumer a "firearm." *See* 18 U.S.C. § 924(a)(1)(D).

In effect, only NFO producers and retailers will be silenced by the Final Rule in this respect because only they bear the burden of criminal penalties if the Agencies determine they are illegally engaging in the sale of firearms. This risk will surely chill the speech of those businesses, just as it chills the speech of Plaintiff Tactical Machining. *See* Suppl. Decl. of Darren Peters, Sr., ECF No. 55-1 at ¶ 6 ("Tactical Machining does not currently sell those items with any jigs, templates, tools, or instructions, per Defendants' statements."); *id.* at ¶ 11 ("The local Agent indicated via email that, based on his understanding and ATF training, Tactical Machining's products, sold without a jig, instructions, or template, are not "firearms" under the Final Rule. But without any official guidance Tactical Machining does not know what to do to remain in compliance[.]"); *see also Abbott v. Pastides*, 900 F.3d 160, 169 (4th Cir. 2018) ("[A] chilling effect amounts to a cognizable First Amendment injury . . . if the challenged government action is likely to deter a person of ordinary firmness from the exercise of First Amendment rights") (internal quotations

37

omitted). An individual remains free to speak and convey instructions and directions as they wish, without fear of criminal prosecution for the unlawful sale of firearms.

Not only does this regulation exceed the scope of the GCA, but it impermissibly pinpoints a particular speaker and what can come out of that speaker's mouth.

### 2.      The Final Rule chills the content of protected speech

The Final Rule also has a content-based chilling effect on speech because, in regulating certain items or kits as if they were firearms, the Agencies also regulate the existence or inclusion of "instructions, guides, or marketing materials." Final Rule, at 24,739. The Agencies are not interested in assessing the instructions or marketing materials for appearance or readability, but rather to assess whether those materials assist a customer in manufacturing a firearm.

"[T]he First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United*, 558 U.S. at 340; *Heller v. City of El Paso*, 861 Fed. Appx. 836, 839 (5th Cir. 2021) (quoting *Reed v. Town of Gilbert*, 576 U.S. at 163); *Serv. Emps. Int'l Union, Local 5 v. City of Hous.*, 595 F.3d 588, 596 (5th Cir. 2010) (quoting *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 230 (1987)) ("A regulatory scheme that requires the government to 'examine the content of the message that is conveyed' is content-based regardless of its motivating purpose."). "Content based restrictions on protected First Amendment expression are presumptively unconstitutional and subject to strict scrutiny. . . . 'Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.'" *Tex. Entm't Ass'n, Inc. v. Hegar*, 10 F. 4th 495, 509 (5th Cir. 2021) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

38

The Final Rule pinpoints what content the Agencies are concerned about—instructions detailing how to assemble a firearm. The Agencies say as much:[16]

> The Department agrees with the comment that it may be burdensome for requestors to submit instructions, guides, and marketing materials with a classification request if those materials are not available at the time of submission. However, as explained in the rule, *these items and materials are important for ATF to determine whether an unfinished, disassembled, or nonfunctional item or kit is a 'firearm' subject to regulation under law.*

Final Rule, at 24,710 (emphasis added). For instance, "[a] flat blank of an AK variant receiver without laser cuts or indexing that is *not sold, distributed, or possessed with instructions*" is *not* a receiver. Final Rule, at 24,739 (emphasis added). This implies that the inverse is true and that what changes an NFO into a "firearm" is manufacturing instructions. By regulating instructions, the Final Rule directly chills speech of that type.

The Final Rule chills speech and the acquisition of speech because those instructions— *sold, distributed, or possessed*—change the legal status of unmachined non-firearm parts to federally-regulated weapons. NFO producers and retailers cannot—and will not—risk the criminal penalty of illegally engaging in the sale of firearms. Moreover, this will chill the *acquisition* of speech of consumers as well, since the Final Rule purports to regulate mere possession of an NFO in conjunction with possession of disfavored speech. *Turner*, 848 F.3d at 688 ("'[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw.'") (quoting *First Nat'l Bank of Boston*, 435 U.S. at 783). Those consumers thus are legally disincentivized from acquiring their own instructions.

---

[16] Additionally, the Agencies mention in the Final Rule: "This rule implements the GCA, which does not regulate the information use dot manufacture firearms." Final Rule, at 24,670.

To pass strict scrutiny, the government bears the burden of demonstrating that it has adopted the least restrictive means of achieving its goal. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 510 (D.C. Cir. 2016) ("If a less restrictive alternative for achieving that interest exists, the government must use that alternative.") (internal quotation and citation omitted). Here, the Agencies have met no such burden, and as addressed above, fail to address this issue entirely in the Final Rule. "The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980).

### C.     The Final Rule Violates the Constitution's Separation of Powers

With the Final Rule, the Agencies assert, for the first time, the authority to regulate a plethora of items, including tools or equipment that could be used to manufacture a "frame or receiver," as well as speech. No such authority is found in the statute passed by Congress— something the Agencies themselves have acknowledged. This executive usurpation of legislative power violates constitutional doctrines that safeguard its Separation of Powers, namely the Delegation Doctrine and the Take Care Clause.

#### 1.     Executive Branch agencies may not legislate

Article I, Section 1 of the U.S. Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States[.]" U.S. Const. Art. I, § 1. The Delegation Doctrine is borne from this constitutional promise. "'The fundamental precept of the delegation doctrine is that the lawmaking function belongs to Congress[.]'" *Brackeen v. Haaland*, 994 F.3d 249, 420 (5th Cir. 2021) (quoting *Loving v. United States*, 517 U.S. 748, 758 (1996)). As the Fifth Circuit has noted, "the Constitution's first substantive word" places *all* lawmaking power

in Congress and therefore "Congress's statutes define the scope of agencies' power." *Forrest Gen Hosp. v. Azar*, 926 F.3d 221, 228 (5th Cir. 2019).

Yet, the Final Rule exerts legislative power. Government actions, including agency rules, "are 'legislative' if they have 'the purpose and effect of altering the legal rights, duties, and relations of persons . . . outside the legislative branch.'" *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022) (quoting *INS v. Chada*, 462 U.S. 919, 952 (1983)). The Final Rule purports to limit legal rights to acquire items in commerce and to create legal duties.

The Agencies cannot flex the legislative powers demonstrated in the Final Rule. The Agencies' argument that the GCA "left unresolved" the "critical question" of when an item becomes a frame or receiver must be rejected. The Supreme Court has "reaffirm[ed] the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Agencies, therefore, "cannot manufacture statutory ambiguity with semantics to enlarge their congressionally mandated border." *Tex. Pipeline Ass'n v. FERC*, 661 F.3d 258, 264 (5th Cir. 2011); *id.* ("'Ambiguity is a creature not of definitional possibilities but of statutory context.'") (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994)). Further, an agency cannot create implicit questions "left unresolved" in a statute, "merely because a statute's 'authors did not have the forethought expressly to contradict any creative contortion that may later be constructed to expand or prune its scope.'" *Calix v. Lynch*, 784 F.3d 1000, 1005 (5th Cir. 2015) (quoting *Moore v. Hannon Food Serv. Inc.*, 317 F.3d 489, 497 (5th Cir. 2003)). Delegation must be express; courts cannot "presume that a power is delegated if Congress does not expressly withhold it, as then agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Contender Farms, L.L.P. v U.S. Dep't of Agric.*,

41

779 F.3d 258, 269 (5th Cir. 2015) (internal citation omitted); *see also Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 461 (5th Cir. 2020), *as revised* (Aug. 4, 2020).

In *Gulf Fishermens Association* and *National Pork Producers Council v. EPA*, as here, agencies tried to discover new authority hiding beneath the text of old statutes. *Gulf Fishermens Ass'n*, 968 F.3d 454, 456 (5th Cir. 2020); *Nat'l Pork Producers Council*, 635 F.3d 738, 750–51 (5th Cir. 2011). Courts properly directed them back to the text. *See Gulf Fishermens Ass'n*, 968 F.3d at 456 ("If anyone is to expand the forty-year-old . . . Act to reach aquaculture for the first time, it must be Congress."); *Nat'l Pork Producers Council*, 635 F.3d at 753 (finding EPA action outside statutory mandate). The only solution to the purported problem of an outdated statute is legislation, but not by agencies. *See Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921, 934 (N.D. Miss. 2016) ("Congress' failure to enact positive legislation should not serve as an excuse for the executive branch to assume powers which are properly reserved for the legislative branch.").

The authority newly asserted by the Agencies here would have consequences far beyond this Final Rule. Congress cannot delegate authority to an agency absent an "intelligible principle" to guide and limit the delegation. *See Jarkesy v. SEC*, 34 F.4th 446, 460–61 (5th Cir. 2022) (citing *Minstretta v. United States*, 276 U.S. 394, 409 (1989)). There is no such "intelligible principle" in the GCA that indicates "at what point a mere component, or [even] foundation of a component, such as a piece of metal or plastic—which is unregulated under federal firearms law—becomes a 'frame or receiver' that is so regulated[.]" ECF No. 41 at 17. Perhaps recognizing that there is none, the Agencies tried to establish their own "intelligible principles" that an item must be "clearly identifiable as an unfinished component of a weapon" and magnanimously acknowledged that "forging, casting, printing, extrusion, or unmachined boy" that had not passed that threshold

would not be regulated. Final Rule, at 24,739. But those principles are not found in the GCA itself. Likewise, there is no principle in GCA to determine why or which "templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials" are subject to the "frame or receiver" subsection of the GCA. Nor can the Agencies "fix" the constitutional problems created by their strained reading of a statute. *See Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("Agencies are not free to adopt…unreasonable interpretations of statutory provisions and then edit other statutory provisions to mitigate the unreasonableness.") (internal citation omitted).

Finally, the regulation of NFOs is a significant political question that Congress has tried and (so far) failed to resolve. Rewriting the GCA to regulate the citizens and entities that buy, manufacture, or ship these items, as well as the tools, equipment, and speech they may provide is not the prerogative of the executive. In looking at the Final Rule, the Court must therefore consider whether "Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). As the Agencies acknowledge, the major questions doctrine may come into play when agencies "invoke a 'novel' or 'unprecedented' interpretation of statutory delegation involving 'ancillary' statutory provision." ECF No. 41 at 24 (quoting *West Virginia v. E.P.A.*, 142 S. Ct. 2587, 2605, 2610 (2022); *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021)). That is exactly what the Agencies have done here when they claim that the term "frame or receiver" in the GCA permits them to regulate a "foundation of a component", tools and equipment that could be used to convert raw material into a finished, regulated item, or the speech that a do-it-yourself hobbyist may consult when learning how to create a regulated item.

## 2.    Legislating in the Final Rule violates the Take Care Clause

The president's duty is to "take Care that the Laws be faithfully executed[,]" U.S. CONST. ART. II, § 3, thus precluding his role as a legislator. "In the framework of our Constitution, the

President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). "[W]here Congress pass[es] a law for the guidance and government of the executive, in m[a]tters properly concerning the executive department, it belongs to the President to take care that this law be faithfully executed[.]" *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 600 (1838). "[T]he Court has treated the Take Care Clause as the direct constitutional source of the President's obligation to respect legislative supremacy." Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*, 164 U. PA. L. REV. 1835, 1837 (2016). In fact, in the early 1800s, the Supreme Court

> [T]reated the Take Care Clause as an expression of another important principle of legislative supremacy—namely that the President has no dispensation power. At common law, the Crown had long claimed the prerogative to dispense with or suspend Acts of Parliament when equity so required. By the Glorious Revolution, English law had ceased to recognize such authority. In *Kendall v. United States ex. rel Strokes*, the Court read the Take Care Clause as embodying this anti-dispensation principle in the Constitution.

*Id.* at 1850.

The Agencies masquerade their statutory change as regulatory authority, yet this authority was divined by President Biden *after* he "urged Congress to swiftly pass gun control laws[,]" and Congress failed.[17] The actions taken by President Biden are similar to those of President Truman in the pivotal "Take Care" case, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

In *Youngstown*, "a dispute arose between the steel companies and their employees[,]" who threatened to strike. *Id.* at 582. President Truman "believe[d] that the proposed work stoppage would immediately jeopardize our national defense and that government seizure of the steel mills was necessary in order to assure the continued availability of steel." *Id.* at 583. The President

---

[17] *Biden Considers executive actions on guns, calls on Congress to pass weapons ban*, REUTERS (Mar. 23, 2021), https://www.reuters.com/article/usa-guns-idINKBN2BG0A5.

issued an Executive Order, "direct[ing] the Secretary of Commerce to take possession of most of the steel mills and keep them running." *Id.* The Court found President Truman's actions unconstitutional, stating, "[t]he President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself." *Id.* at 585. In fact, Congress had rejected, a few years prior, an amendment "which would have authorized such governmental seizures in cases of emergency." *Id.* at 586. The Court held that the President can "recommend[] [] laws he thinks wise and veto[] [] laws he thinks bad." *Id.* at 587. Additionally, "[t]he Founders of this Nation entrusted the law making power to the Congress alone in both good and bad times." *Id.* at 589.

Just as President Truman used national defense as his underlying authority, President Biden played up the notion that "gun violence is a public health epidemic" to justify his actions.[18] President Biden, however, did something worse than issue an unconstitutional Executive Order— he publicly admitted his intention to usurp Congress's authority. On his campaign website he stated, "Biden will stop the proliferation of these so-called 'ghost guns' by *passing legislation* requiring that purchasers of gun kits or 3D printing code[s] pass a federal background check." *Id.* (emphasis added). But once elected, Biden announced that "this Administration *will not wait for Congress to act* to take its own steps—fully within the Administration's authority and the Second Amendment—to save lives."[19] President Biden admitted he "asked the Attorney General and his team to identify for me immediate, concrete actions [he] could take now without having to go

---

[18] *The Biden Plan to End our Gun Violence Epidemic*, BIDEN-HARRIS DEMOCRATS, https://joebiden.com/gunsafety/# (last visited Dec. 23, 2022).

[19] *FACT SHEET: Biden-Harris Administration Announces Initial Actions to Address the Gun Violence Public Health Epidemic*, THE WHITE HOUSE (April 7, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/07/fact-sheet-biden-harris-administration-announces-initial-actions-to-address-the-gun-violence-public-health-epidemic/ (emphasis added).

through the Congress."[20]

  Just as Congress had rejected Truman desired outcome, so too has Congress rejected the policy President Biden has advanced—repeatedly. Many legislative acts that have tried to regulate so-called "ghost guns" have found their final resting place in one of the chambers of Congress. *See Ghost Guns Are Guns Act*, H.R. 1278, 115th Cong. (Mar. 1, 2017) (not enacted); *Untraceable Firearms Act of 2018*, H.R. 6643, 115th Cong. § 2(a)(36) (July 31, 2018) (not enacted); *Untraceable Firearms act of 2018*, S. 3300, 115th Cong. § 2(a)(36) (July 31, 2018) (not enacted); *Stopping the Traffic in Overseas Proliferation of Ghost Guns Act*, S. 459, 116th Cong. (Feb. 12, 2019) (not enacted); *Ghost Guns Are Guns Act*, H.R. 1266, 116th Cong. (Feb. 14, 2019) (not enacted); *Untraceable Firearms Act of 2019*, H.R. 3553, 116th Cong. § 2(a)(36) (June 27, 2019) (not enacted); *Gun Violence Prevention and Community Safety Act of 2020*, H.R. 5717, 116th Cong. § 515(a)(52) (Jan. 30, 2020) (not enacted); *Gun Violence Prevention and Community Safety Act of 2020*, S. 3254, 116th Cong. § 515(a)(52) (Feb. 5, 2020) (not enacted); *Untraceable Firearms Act of 2020*, S. 3743, 116th Cong. § 3(a)(36) (May 14, 2020) (not enacted); *Stop Home Manufacture of Ghost Guns Act of 2020*, H.R. 7468, 116th Cong. (July 1, 2020) (not enacted); *Ghost Guns are Guns Act*, H.R. 1454, 117th Cong. (March 1, 2021) (introduced); *Untraceable Firearms Act of 2021*, H.R. 3088, 117th Cong. § 3(a)(36) (May 11, 2021) (introduced); *Untraceable Firearms Act of 2021*, S. 1558, 117th Cong. § 3(a)(36) (May 11, 2021) (introduced); *Homeland Security Assessment of Terrorist Use of Ghost Guns Act*, H.R. 2621, 116th Cong. § 2(b)(2) (May 28, 2021) (not enacted); *To provide a private right of action against the maker of any component of a ghost gun, and any person who facilitated a sale of the ghost gun, for injury*

---

[20] *Remarks by President Biden on Gun Violence Prevention*, THE WHITE HOUSE (April 8, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/04/08/remarks-by-president-biden-on-gun-violence-prevention/.

*or death resulting from the use of the ghost gun*, H.R. 7544, 117th Cong. (Apr. 18, 2022) (introduced); *Protecting Our Kids Act*, H.R. 7910, 117th Cong. §301(a)(38) (June 8, 2022) (passed the House); *Calling for the submission to the House of Representatives of certain information regarding the decision of the President of the United States to institute the "Ghost Gun" Rule*, H.R. 1478, 117th Cong. (Nov. 16, 2022) (resolution ordered reported).

"The Founders of this Nation entrusted the law making power to the Congress alone..." *Youngstown*, 343 U.S. at 589. Instead of ensuring that the laws are faithfully executed, the Executive Branch made laws; President Biden and his agencies cannot be Congress.

## IV.    THE FINAL RULE VIOLATES THE APA AND SHOULD BE VACATED IN ITS ENTIRETY

The Final Rule is faulty and must be vacated. The Fifth Circuit generally countenances two remedies for APA violations—remand or vacatur. The Fifth Circuit disfavors vacatur if the agency action that caused the APA violation could be remedied by an agency on remand through additional investigation or explanation. *See O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 238–39 (5th Cir. 2007) (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). For APA violations that are unlawful, however, the default—and appropriate—remedy is vacatur. *See Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859–60 (5th Cir. 2022) ("'The ordinary practice is to vacate unlawful agency action.") (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)). For example, "nearly every logical-outgrowth violation leads to vacatur." Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 COLUM. L. REV. 253, 275 (2017).

In *Texas v. EPA*, the court conducted an analysis of using vacatur as a remedy versus remand of the agency action. The court noted that where there was a "serious possibility" that the agency would be able to correct the defects, it should be given the opportunity to do so. 389 F.

47

Supp. 3d 497, 506 (S.D. Tex. 2019). Furthermore, the court noted that the agency had already begun reviewing the changes that they had made, and that they were actively working to bring predictability and clarity to the definitions (unlike the ATF here). *Id*. The court reiterated that "'[o]nly in rare circumstances is remand for agency reconsideration not the appropriate solution.'" *Id*. at 506 (quoting *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 238–39 (5th Cir. 2007)).

The Final Rule cannot be remedied on remand. The Agencies sought to broaden the definition of "frame or receiver" by obscuring it, rather than to clarify and bring predictability to the definition. Moreover, the Agencies attempted to circumvent Congress through the administrative process. In short, the Agencies' actions were worse than "arbitrary and capricious," and in such cases vacatur is the only appropriate remedy. Discarding the Final Rule is the only way to ensure that this intentional bureaucratic overreach is not tolerated. This Court has already recognized the far-reaching implications of the Final Rule, and the restraints it places on individuals and the firearms industry. Opinion & Order on Prelim. Inj., ECF No. 56. Accordingly, full vacatur of the Final Rule and a permanent injunction against its enforcement are appropriate.

Moreover, all Plaintiffs to this litigation merit injunctive relief. This Court has already determined that Plaintiffs VanDerStok, Andren, and Tactical Machining (along with its customers) satisfied the requirements for preliminary injunctive relief. *See* Opinion & Order on Scope of Prelim. Inj., ECF No. 89. For the same reasons as previously stated, those Plaintiffs' need for and entitlement to injunctive relief, now in the form of a permanent injunction, continues. Firearms Policy Coalition ("FPC"), both as an association and as to itself, also satisfies the prerequisite factors for a permanent injunction against the Final Rule's enforcement. As to its associational standing, FPC exists and, through this litigation seeks, to protect its members' rights under the U.S. Constitution—including the protections afforded by the First, Second, Fifth, and Fourteenth

Amendments. *Decl. of Brandon Combs* ("Combs. Decl."), ECF No. 62-4 at ¶ 4; *see About FPC*, FIREARMS POLICY COALITION (last visited Dec. 23, 2022).[21] These issues are directly germane to FPC's purpose to "fight for the people, liberty, and freedom . . . focused on the right to keep and bear arms and adjacent issues including freedom of speech, due process . . . separation of powers . . . and limited government." *Id.*; *see* Am. Pet., ECF No. 93, ¶ 15. FPC's legal program is designed to "bring cases that protect [FPC's members'] rights and property, restore individual liberty, and help us achieve our purpose to create a world of maximal human liberty." ABOUT FPC LAW, FIREARMS POLICY COALITION (last visited Dec. 23, 2022).[22] And as framed in Plaintiffs' Amended Petition and again in this Motion, FPC specifically seeks both declaratory and injunctive relief against the Agencies and the Final Rule regarding the rights of its members, under both the APA and the Constitution, and not individual damages. *See* Am. Pet., ECF No. 93, ¶15 (FPC "brings this action on behalf of itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public"); *id.* at 57 (Prayer for Relief, seeking declaration of unlawfulness and preliminary and permanent injunctive relief).

Plaintiff FPC has, along with its co-Plaintiffs, alleged and now demonstrated the Agencies' repeated violations of the APA and the Constitution, including violations of FPC's members' constitutionally protected rights. FPC has also demonstrated that its members, which it represents in this lawsuit, are injured by the Final Rule. Plaintiffs VanDerStok and Andren are members of FPC, *see* ECF No. 93 ¶¶ 12–13, and represent their own injuries and the injuries suffered by FPC's individual members around the nation—members that but for the Final Rule would be exercising their constitutionally protected rights by self-manufacturing firearms, engaging in commerce with

---

[21] https://www.firearmspolicy.org/about
[22] https://www.firearmspolicy.org/legal

businesses such as Tactical Machining, and engaging in and listening to protected speech. Just as much as the named member Plaintiffs, FPC's absent but represented members also have a right to enforce the APA and defend their constitutionally protected rights. Plaintiff Tactical Machining, along with Plaintiff-Intervenors BlackHawk Manufacturing and Defense Distributed, are all members of FPC, and represent the injuries suffered by FPC's corporate members. *See* ECF No. 93 ¶ 14. Each of these representative Plaintiffs, and FPC's members, have standing to bring this suit pursuant to 5 U.S.C. § 702, and each could be subject to the potential criminal liability this Court has already recognized as a risk absent the relief requested.

Moreover, FPC itself has suffered a legal wrong and is adversely affected and aggrieved by the Final Rule. FPC owns NFOs that it uses to advance its organizational purposes including education, especially in testimony during public hearings on legislation and regulations about the definition of a "firearm," to help show the absurdity and burden of laws that would treat these items as firearms. Combs Decl. ¶¶ 9–11, ECF No. 62-4. "If these items . . . are treated as firearms, it will be virtually impossible for FPC to use them to educate and inform legislators, regulators, members of the media, and the public on matters of great importance, including matters which affect their rights and duties under the laws . . .." Combs Decl. ¶ 11, ECF No. 62-4. The Rule thus directly impacts FPC's stated purpose. Accordingly, final relief should include the individual Plaintiffs, Tactical Machining and its customers, *and* FPC and its members who it represents here.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court vacate the Final Rule and enjoin its enforcement.

DATED this 23rd day of December, 2022.

Respectfully submitted,

R. Brent Cooper (TX Bar No. 04783250)
Benjamin D. Passey (TX Bar No. 24125681)
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540
brent.cooper@cooperscully.com
ben.passey@cooperscully.com

Cody J. Wisniewski* (CO Bar No. 50415)
FIREARMS POLICY COALITION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV 89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392
cwi@fpchq.org

*/s/ Erin M. Erhardt*
Kaitlyn D. Schiraldi* (TN Bar No. 039737)
Erin M. Erhardt* (CO Bar No. 49360)
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
Telephone: (303) 292-2021
Telecopy: (877) 349-7074
kschiraldi@mslegal.org
eerhardt@mslegal.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 23rd day of December 2022, I electronically filed the foregoing using this Court's CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and service will be accomplished by this Court's CM/ECF system.

<u>/s/ *Erin M. Erhardt*</u>

52