## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

### FORT WORTH DIVISION

| | |
|---|---|
| JENNIFER VANDERSTOK;<br>MICHAEL G. ANDREN;<br>TACTICAL MACHINING, LLC, a limited liability company; and<br>FIREARMS POLICY COALITION, INC., a nonprofit corporation,<br><br>    *Plaintiffs*,<br><br>and<br><br>BLACKHAWK MANUFACTURING GROUP INC. d/b/a 80 PERCENT ARMS; ; DEFENSE DISTRIBUTED; and SECOND AMENDMENT FOUNDATION, INC.,<br><br>    *Intervenor-Plaintiffs*,<br><br>  v.<br><br>MERRICK GARLAND, in his official capacity as Attorney General of the United States;<br>UNITED STATES DEPARTMENT OF JUSTICE; STEVEN DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and<br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,<br><br>    *Defendants*. | Civil Action No. 4:22-cv-691-O |

### BLACKHAWK MANUFACTURING GROUP INC. d/b/a 80 PERCENT ARMS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

*Introduction*................................................................................................................1

FACTUAL BACKGROUND ......................................................................................2

I.  THE GUN CONTROL ACT OF 1968 AND ATF IMPLEMENTING
    REGULATIONS......................................................................................................2

II. THE BIDEN ADMINISTRATION ANNOUNCES THAT IT "WILL
    NOT WAIT FOR CONGRESS TO ACT TO TAKE ITS OWN STEPS"
    ON "GHOST GUNS" ............................................................................................6

III. THE RULEMAKING PROCESS: NOTICE AND COMMENT PERIOD ................7

IV. PUBLICATION OF THE FINAL RULE..................................................................10

LEGAL STANDARD..................................................................................................15

    A. Summary Judgment ...........................................................................................15

    B. APA Standard ...................................................................................................15

        1. Notice and Comment Requirements.................................................................16

        2. "Arbitrary and Capricious" ............................................................................16

        3. "Contrary to Constitutional Right"; "Not in Accordance with Law" ..............17

ARGUMENT ..............................................................................................................17

I.  THE FINAL RULE VIOLATES THE APA AND MUST
    BE SET ASIDE......................................................................................................18

    A.  The Final Rule Was Not a Logical Outgrowth of the Notice and
    Failed to Satisfy the Public Participation Requirements of the APA..................18

    B.  The Final Rule Is Arbitrary and Capricious ........................................................21

    C.  The Final Rule Is Contrary to Constitutional Right and Not in
    Accordance with Law...........................................................................................26

II. EVEN IF GCA DEFINITIONS WERE AMBIGUOUS—AND THEY
    ARE NOT—DEFENDANTS' ARBITRARY AND CAPRICIOUS
    RULEMAKING WEIGHS AGAINST CHEVRON  DEFERENCE..................31

III.    THE FINAL RULE VIOLATES THE CONSTITUTION ...................................32

    A. The Final Rule Is Unconstitutionally Vague in Violation of
       Due Process .........................................................................................32

    B.  The Final Rule Infringes on the Exercise of Second Amendment
       Rights..................................................................................................34

    C.  The Final Rule Chills Protected Speech in Violation of the
       First Amendment ................................................................................37

    D.  The Final Rule Effectuates a Regulatory Taking of "Privately
       Made Firearms" Without Just Compensation ...................................39

IV. THE FINAL RULE IMPLICATES AND VIOLATES CORE
    CONSTITUTIONAL PRINCIPLES........................................................39

    A.  The Agencies' Rulemaking Actions and Adoption of Final
       Rule Violate the Separation of Powers..............................................40

    B. The Final Rule Violates the Nondelegation Doctrine......................40

    C. The Final Rule's Regulation on "Privately Made Firearms" Exceed
       the Limits of the Commerce Clause ..................................................41

V.   VACATUR IS THE APPROPRIATE REMEDY....................................41

*Conclusion* .................................................................................................42

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
   295 U.S. 495 (1935) .................................................................................................. 41

*Adams Fruit Co. v. Barrett*,
   494 U.S. 638 (1990) .................................................................................................. 32

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) .................................................................................................. 26

*Amin v. Mayorkas*,
   24 F.4th 383 (5th Cir. 2022) ..................................................................................... 15

*Barnhart v. Sigmon Coal Co.*,
   534 U.S. 438 (2002) .................................................................................................. 40

*Bernstein v. U.S. Dep't of State*,
   922 F. Supp. 1426 (N.D. Cal. 1996) ........................................................................ 37

*Bowen v. Georgetown Univ. Hosp.*,
   488 U.S. 204 (1988) .................................................................................................. 26

*Brown v. U.S. Dep't of Educ.*,
   No. 4:22-CV-0908-P, ─── F.Supp.3d ───, 2022 WL 16858525
   (N.D. Tex. Nov. 10, 2022) ........................................................................................ 42

*California v. ATF*,
   3:20-cv-06761 (N.D. Ca.) ......................................................................................... 24

*Chamber of Commerce v. U.S. Dep't of Labor*,
   885 F.3d 360, 384 (5th Cir. 2018) ............................................................................ 15

*Chem. Mfrs. Ass'n v. U.S. E.P.A.*,
   870 F.2d 177 (5th Cir.) ............................................................................................. 16

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ...........................................................................................*passim*

*Christensen v. Harris County*,
   529 U.S. 576 (2000) .................................................................................................. 30

*City of Arlington, Tex. v. F.C.C.*,
   569 U.S. 290 (2013) .................................................................................................. 31

*Coates v. City of Cincinnati*,
　　402 U.S. 611 (1971) ................................................................. 33

*Collins v. Mnuchin*,
　　938 F.3d 553 (5th Cir. 2019) ..................................................... 26

*Data Mktg. P'ship, LP v. United States Dep't of Lab.*,
　　45 F.4th 846 (5th Cir. 2022) ...................................................... 41

*Decker v. Nw. Envtl. Def. Ctr.*,
　　568 U.S. 597 (2013) ................................................................. 33

*Digital Realty Trust, Inc. v. Somers*,
　　138 S. Ct. 767 (2018) ............................................................... 30

*District of Columbia v. Heller*,
　　554 U.S. 570 (2008) ................................................................. 35

*Driftless Area Land Conservancy v. Valcq*,
　　16 F.4th 508 (7th Cir. 2021) ...................................................... 42

*Elgin Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Hum. Servs.*,
　　718 F.3d 488 (5th Cir. 2013) ..................................................... 33

*Encino Motorcars, LLC v. Navarro*,
　　579 U.S. 211 (2016) ........................................................... 25, 31

*Ethyl Corp. v. EPA*,
　　51 F.3d 1053 (D.C. Cir. 1995) ................................................... 27

*FCC v. League of Women Voters of Cal.*,
　　468 U.S. 364 (1984) ................................................................. 38

*FDA v. Brown & Williamson Tobacco Corp.*,
　　529 U.S. 120 (2000) ................................................................. 31

*Fed. Maritime Comm'n v. Seatrain Lines, Inc.*,
　　411 U.S. 726 (1973) ................................................................. 32

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
　　968 F.3d 454 (5th Cir. 2020) ..................................................... 23

*Horne v. Dep't of Agriculture*,
　　576 U.S. 351 (2015) ................................................................. 39

*IMS Health Inc. v. Sorrell*,
  630 F.3d 263 (2d Cir. 2010) .................................................................... 37

*Johnson v. United States*,
  576 U.S. 591 (2015) ............................................................................... 32

*Lion Health Servs., Inc. v. Sebelius*,
  635 F.3d 693 (5th Cir. 2011) .................................................................. 42

*Little v. Liquid Air Corp.*,
  37 F.3d 1069 (5th Cir. 1994) .................................................................. 15

*Loving v. United States*,
  517 U.S. 748 (1996) ............................................................................... 40

*MCI Telecomm. Corp. v. AT&T Co.*,
  512 U.S. 218 (1994) ............................................................................... 29

*Mozilla Corp. v. FCC*,
  940 F.3d 1 (D.C. Cir. 2019) .................................................................... 16

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  138 S. Ct. 2361 (2018) ........................................................................... 38

*Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*,
  921 F.3d 1102 (D.C. Cir. 2019) ........................................................ 16, 20

*Nat'l Pork Producers Council v. EPA*,
  635 F.3d 738 (5th Cir. 2011) ............................................................ 22, 26

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*,
  414 U.S. 453 (1974) ............................................................................... 29

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022) ...................................................................... 35, 36

*Panama Refining Co. v. Ryan*,
  293 U.S. 388 (1935) ............................................................................... 41

*Penn Cent. Transp. Co. v. City of New York*,
  438 U.S. 104 (1978) ............................................................................... 39

*Penn. Coal Co. v. Mahon*,
  260 U.S. 393 (1922) ............................................................................... 39

*Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC,*
    962 F.2d 27 (D.C. Cir. 1992) ........................................................................... 29

*Policy & Research, LLC v. HHS,*
    313 F. Supp. 3d 62 (D.D.C. 2018) ................................................................... 24

*Porter v. Califano,*
    592 F.2d 770 (5th Cir. 1979) ........................................................................... 17

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997) ........................................................................................ 31

*Sea-Land Serv., Inc. v. Dep't of Transp.,*
    137 F.3d 640 (D.C. Cir. 1998) ......................................................................... 17

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943) .......................................................................................... 17

*Sessions v. Dimaya,*
    138 S.Ct. 1204 (2018) ..................................................................................... 33

*Smith v. Berryhill,*
    139 S. Ct. 1765 (2019) .................................................................................... 31

*Staples v. United States,*
    511 U.S. 600 (1994) ........................................................................................ 34

*Sw. Elec. Power Co. v. EPA,*
    920 F.3d 999  (5th Cir. 2019) ................................................................... 16, 31

*Texas Off. of Pub. Util. Couns. v. F.C.C.,*
    183 F.3d 393 (5th Cir. 1999) ........................................................................... 17

*Texas v. United States,*
    497 F.3d 491 (5th Cir. 2007) ..................................................................... 27, 29

*Thomas Jefferson Univ. v. Shalala,*
    512 U.S. 504 (1994) ........................................................................................ 33

*United States v. Davis,*
    139 S. Ct. 2319 (2019) .................................................................................... 30

*United States v. USPlabs, LLC,*
    338 F. Supp. 3d 547(N.D. Tex. 2018) ....................................................... 32, 33

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013) ........................................................................... 31

*Utility Air Reg. Group v. EPA*,
  573 U.S. 302, 325–28 (2014) ..................................................... *passim*

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) ........................................................................... 37

*Vizaline, L.L.C. v. Tracy*,
  949 F.3d 927 (5th Cir. 2020) ............................................................ 38

*Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*,
  16 F.4th 1130 (5th Cir. 2021) .......................................................... 16

*Watt v. Alaska*,
  451 U.S. 259 (1981) ............................................................................. 4

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ...................................................................... 41

*Wisconsin Central Ltd. v. United States*,
  138 S. Ct. 2067 (2018) ...................................................................... 30

**Statutes**

18 U.S.C. § 921 ................................................................................ *passim*

18 U.S.C. §§ 922–923 ............................................................................. 2

18 U.S.C. § 923 ....................................................................................... 5

18 U.S.C. § 923(a) ................................................................................. 3

18 U.S.C. § 924 ....................................................................................... 5

5 U.S.C. § 553 ................................................................................. 16, 18

5 U.S.C. § 706 ................................................................................ *passim*

**Other Authorities**

Administrative Procedures Act ...................................................... *passim*

*Commerce in Firearms and Ammunition*, 33 Fed. Reg. 18,555 (Dec. 14, 1968) .......................... 4

*Definition of "Frame or Receiver" and Identification of Firearms*,
   86 Fed. Reg. 27 (May 21, 2021)................................................................*passim*

*Definition of "Frame or Receiver" and Identification of Firearms*,
   87 Fed. Reg. 24 (Apr. 26, 2022)................................................................*passim*

Federal Firearms Act of 1938 ........................................................................ 21

*Gun Control Act of 1968*............................................................................*passim*

H.R. 1454, 117th Cong. (2021) (*Ghost Guns Are Guns Act*) ....................... 6

H.R. Rep. 90-1577 (June 21, 1968) ............................................................... 21

S. 1558, 117th Cong. (2021) (*Untraceable Firearms Act of 2021*)............... 6

U.S. CONST. Art. I, § 1 ................................................................................... 40

U.S. CONST. Art. I, § 8 ................................................................................... 41

U.S. CONST. Art. II, § 3 ................................................................................. 40

**Rules**

26 C.F.R. § 178.11 .......................................................................................... 4

27 C.F.R. § 478.11 ...................................................................................*passim*

27 C.F.R. parts 478–479 ................................................................................ 3

111 Cong. Rec. 5527 (March 22, 1965).......................................................... 21

Fed. R. Civ. P. 56....................................................................................... 1, 15

Intervenor-Plaintiff BlackHawk Manufacturing Group Inc. *d/b/a* 80 Percent Arms ("BlackHawk") files this Brief in Support of its Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. BlackHawk joins the Original Plaintiffs in this action (collectively, "Plaintiffs") in seeking summary judgment against Defendants United States Attorney General Merrick Garland ("Attorney General"), United States Department of Justice ("DOJ"), Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Steven Dettelbach, and ATF (collectively, "Agencies" or "Defendants"), respectfully showing the Court as follows:

### *Introduction*

Plaintiffs in this case are challenging various regulations promulgated in a far-reaching rulemaking issued by ATF on April 26, 2022, 2021R-05F, 87 FR 24652, and which took effect on August 24, 2022, entitled *Definition of 'Frame or Receiver' and Identification of Firearms* (to be codified at 27 C.F.R. pts. 447, 478, and 479) ("Final Rule"). The Final Rule comprises hundreds of pages of preamble, explanation, new regulatory definitions, and an economic impact analysis describing harm the Final Rule inflicts upon individuals not required to be licensed by ATF who make firearms for personal use, as well as the businesses involved in providing lawful parts to these citizens.

Defendants contend that the Final Rule was a necessary response to evolving technical advances in firearms technology, and merely updates decades-old definitions within its longstanding regulations of federal firearms laws. However, the Final Rule goes much further, amending the definitions of key terms within ATF's regulations, including "frame or receiver", introducing definitions for newly regulated items, e.g., "weapons parts kits" and "privately made firearm", imposing a variety of newly revised or expanded related regulations on firearm markings

and recordkeeping and unilaterally abandoning over fifty years of ATF's determinations relied upon by both industry and citizens. *Id*.

Plaintiffs have brought this challenge because the Final Rule is an exercise of agency lawmaking that is unlawful under the Administrative Procedures Act ("APA") and impermissibly expands, confuses, and reinterprets regulations that govern activities by which American citizens exercise fundamental rights expressly guaranteed by the Constitution. The Final Rule's origin, enactment and substantive content offend the Constitution, the law, historical precedent, and common sense.  If left unaddressed, the Final Rule will enable the Agencies to arrogate to themselves a regulatory reach that puts ordinary citizens at risk and illegally invades manufacturing sectors, supply chains, and suppresses categories of protected speech for which Agencies have no Congressionally-delegated authority. These gross usurpations of the statutory limits that Congress set in the Gun Control Act regarding the making or selling of firearms, *particularly privately made firearms and the previously unregulated parts and technology to support such firearm making,* have never been asserted in ATF's regulations prior to the Final Rule.

## <u>FACTUAL BACKGROUND</u>

### I.    THE GUN CONTROL ACT OF 1968 AND ATF IMPLEMENTING REGULATIONS

Congress enacted the Gun Control Act in 1968, *as amended*, 18 U.S.C. §§ 921 *et seq*. ("GCA"), which established federal regulations for persons engaging in the business of importing, manufacturing, or dealing in "firearms." *See generally* 18 U.S.C. §§ 922–923.  Congress vested in ATF the authority to prescribe regulations "necessary to carry out the provisions of" the GCA, *id*. § 926(a), but made clear that "it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession,

or use of firearms" for appropriate purposes. Gun Control Act of 1968, Pub. L. No. 90-618, § 101, 82 Stat. 1213, 1213–14. The GCA further stated that "this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this title." § 101, 82 Stat. at 1214.

Against this backdrop, ATF has promulgated implementing regulations pursuant to the requirements of the GCA. *See* 27 C.F.R. parts 478–479.  The GCA requires entities that import, manufacture, or deal in firearms to obtain a federal firearms license, 18 U.S.C. § 923(a), to maintain records of firearm acquisition and disposition as prescribed by regulation, *id*. § 923(g)(1)(A), and to conduct background checks before transferring firearms to a non-licensee, *id*. § 922(t). The GCA also requires licensed importers and manufacturers to identify each firearm they import or manufacture by means of a serial number on the weapon's receiver or frame. *Id*. § 923(i).

The scope of the GCA—and ATF's attendant regulatory authority and obligations—is centered on and bounded by the GCA's four-part definition of "firearm" as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921. The GCA does not include a statutory definition of a "frame or receiver", but shortly after passage of the GCA in 1968, ATF promulgated regulations which provided a one-sentence definition of "frame or receiver" as: "That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually

threaded at its forward portion to receive the barrel." Final Rule, *Commerce in Firearms and Ammunition*, 33 Fed. Reg. 18,555 (Dec. 14, 1968) (then codified at 26 C.F.R. § 178.11, and today appearing at 27 C.F.R. § 478.11).

At the time ATF promulgated its 1968 Rule, it was no secret that some commonly used weapons featured a "striker" rather than a hammer and other weapons had a central component which housed fewer than all three elements. The Agencies addressed this incongruity by disregarding their own definition of "frame or receiver" and instead applied regulatory force to whatever component most closely fit the legal definition. Final Rule at 24,655. This interpretative rubric was permitted by courts, and the Agencies took and held the position that the GCA authorized ATF to regulate items that "may readily be converted" into a weapon that expels a projectile by the act of an explosion, but did not authorize the regulation of items that "may readily be converted" into a "frame or receiver." The Agencies maintained this distinction for five decades.

Since the 1968 enactment of the GCA and at all times prior to the effective date of the Final Rule, ATF's regulations defined a "firearm" as including the four categories of items contained in 18 U.S.C. § 921(a)(3), following the statutory text nearly verbatim:

> Any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device; but the term shall not include an antique firearm. In the case of a licensed collector, the term shall mean only curios and relics.

27 C.F.R. § 478.11.[1]

The above regulatory definition guides ATF's enforcement of a strict licensing regime governs the importation, manufacture, and dealing of products that constitute firearms. 18 U.S.C.

---

[1] *See Watt v. Alaska*, 451 U.S. 259, 272–73 (1981) ("The Department's contemporaneous construction carries persuasive weight. … The Department's current interpretation, being in conflict with its initial position, is entitled to considerably less deference.").

§ 923(i) requires licensed importers and licensed manufacturers to "identify by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Attorney General shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer." Failure to follow these requirements can result in criminal liability. *See* 18 U.S.C. § 924(a)(1) (making it is a crime to violate "any other provision of this chapter," referring to Title 18, Chapter 44, of the United States Code, which contains sections 921–931). It is therefore essential for law-abiding businesses in the firearms industry to have clarity and predictability about what products meet the definitions of a "firearm" and "frame or receiver."

As shown in the five decades of agency activity presented in the Administrative Record, ATF's implementing regulations maintained continuity and faithfulness with the GCA text regarding the definition of "firearm" and ATF's definition of "frame or receiver" provided basic stability while technology evolved and the American tradition of homemade gunmaking continued to gain popularity. While certainly not exempt from criticism, ATF's regulatory definitions prior to the Final Rule allowed ATF to communicate with the industry and the public at large in a relatively coherent, constructive and consistent manner so that licensees and the public alike had reasonable clarity and understanding as to the basic definition of *firearm* and the parameters of ATF's regulations regarding licensure, compliance, and criminal conduct. Indeed, the Administrative Record contains numerous classification letters and guidance that demonstrate areas of laudable consistency in ATF's generally permissible interpretation of the GCA and the application of agency rules in determinations made over the course of decades.

For five decades, ATF issued consistent guidance through scores of classification letters, ruling that certain "partially complete or unassembled frames or receivers" (even those including parts, tools, and instructions to assist in the manufacturing process) have not "reached a stage of

manufacture" to be properly classified as the "frame or receiver" of a "firearm," and thus are outside the regulatory scope of federal law.  ATF's faithful adherence to the GCA's definition of "firearm" as including the four categories of items contained in 18 U.S.C. § 921(a)(3) enabled the agency to communicate the distinctions between GCA-regulated "firearms" and unregulated non-firearm items in a reasonably straightforward, understandable manner.

## II.   THE BIDEN ADMINISTRATION ANNOUNCES THAT IT "WILL NOT WAIT FOR CONGRESS TO ACT TO TAKE ITS OWN STEPS" ON "GHOST GUNS"

President Biden campaigned on a promise to "[s]top 'ghost guns,'" referring to firearms "assembl[ed] . . . on [one's] own . . . by buying a kit of disassembled gun parts."[2] Specifically, he promised to "pass[] legislation" to "stop the proliferation of these so-called 'ghost guns.'" Prior to and after President Biden took office, legislators proposed various bills changing the way ATF classifies receiver blanks and other non-firearms. *See*, *e.g.*, S. 1558, 117th Cong. (2021) (*Untraceable Firearms Act of 2021*); H.R. 1454, 117th Cong. (2021) (*Ghost Guns Are Guns Act*). However, none of those bills gained enough Congressional support to become law.

On April 7, 2021, the Biden Administration announced the President was "reiterating his call for Congress to pass legislation" on firearms regulations but stated that "this Administration will not wait for Congress to act to take its own steps" on gun control.[3]  The announcement instructed the Department of Justice to "within 30 days . . . issue a proposed rule to help stop the proliferation" of so-called "ghost guns."  On April 8, 2021, President Biden, Vice President Harris, and Defendant Garland held a press conference on gun policy at the White House Rose Garden,

---

[2] *The Biden Plan to End Our Gun Violence Epidemic*, BIDEN-HARRIS DEMOCRATS, https://joebiden.com/gunsafety/.
[3] *Fact Sheet: Biden-Harris Administration Announces Initial Actions to Address the Gun Violence Public Health Epidemic*, THE WHITE HOUSE (Apr. 7, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/07/fact-sheet-biden-harris-administration-announces-initial-actions-to-address-the-gun-violence-public-health-epidemic/.

during which President Biden stated that he "asked the Attorney General and his team to identify for me immediate, concrete actions I could take now without having to go through the Congress."[4] (President Biden would later reiterate that the reason he "instructed the Attorney General to write a regulation … because I was having trouble getting anything passed in the Congress).[5]  The April 8, 2021 press conference also included remarks from Defendant Garland who stated that "the proliferation of the so-called ghost guns" was caused by a "regulatory loophole" or "gap,"[6] even though such parts and products are non-firearm items long used in the American homemade gunmaking tradition and as such have properly remained outside the scope of the GCA and thus unregulated as a direct result of ATF's carefully considered and legally correct decision to issue classification determinations approving the unregulated sale of such non-firearm products.

III.   THE RULEMAKING PROCESS: NOTICE AND COMMENT PERIOD

On May 21, 2021, the Agencies published in the Federal Register a Notice of Proposed Rulemaking entitled *Definition of 'Frame or Receiver' and Identification of Firearms*, requesting comments. 86 Fed. Reg. 27,720 (May 21, 2021) ("NPRM"). The NPRM provided the regulatory text of the proposed rule, *id*. at 27,741–53, which explained the ATF sought to "amend[] [its] regulations to clarify the definition of 'firearm' and to provide a more comprehensive definition of 'frame or receiver' so that those definitions more accurately reflect firearm configurations not

---

[4] *Remarks by President Biden on Gun Violence Prevention*, THE WHITE HOUSE (Apr. 8, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/04/08/remarks-by-president-biden-on-gun-violence-prevention.

[5] *Remarks by President Biden Announcing Actions to Fight Gun Crime and His Nominee for ATF Director, Steve Dettelbach*, THE WHITE HOUSE (Apr. 11, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/04/11/press-briefing-by-press-secretary-jen-psaki-april-11-2022/.

[6] *Defendant Garland's Full Remarks on Gun Violence Prevention at the White House Rose Garden*, U.S. DEP'T OF JUSTICE (Apr. 8, 2021), http://www.justice.gov/opa/speech/attorney-general-garland-s-full-remarks-gun-violence- prevention-white-house-rose-garden/.

explicitly captured under the existing definitions[.]" *Id.* at 27,725. The NPRM also "propose[d] new terms and definitions to take into account technological developments and modern terminology in the firearms industry, as well as amendments to the marking and recordkeeping requirements that would be necessary to implement these definitions." *Id.* Interested members of the public could submit comments on the Proposed Rule until August 19, 2021. *Id.* at 27,720. ATF received over 290,000 public comments in response to the Notice. Final Rule at 24,654.

In its NPRM, ATF proposed a new definition which stated:

*Partially complete, disassembled, or nonfunctional frame or receiver.* The terms "frame" or "receiver" shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, *i.e.*, to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projective weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be. The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (*e.g.*, unformed block of metal, liquid polymer, or other raw material). When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.

87 Fed. Reg. at 24,739. Numerous commentators expressed concerns that the proposed new definition was not only vague, *id.* at 24,678, but would also rewrite 18 U.S.C. § 921(a)(3) by treating receiver blanks as regulated products, contrary to ATF's longstanding legal position that such products do not fall within ATF's regulatory jurisdiction. *Id.* at 24,699.

The public submitted numerous comments in response to the NPRM explaining, among other things, the serious problems with the agency's proposed definition of "frame or receiver," which would have classified countless firearm parts as firearms, resulting in many modern firearms containing numerous different frames and receivers.  In response, ATF agreed that the NPRM's

definition of "frame or receiver" was flawed, in that firearms cannot contain "as many as ten frames and receivers." Final Rule at 24,692.

However, rather than amending the NPRM or formally proposing a new definition and providing adequate time to receive public comment thereon, ATF instead simply wrote a new definition of "frame or receiver" and promulgated it as a regulation in the Final Rule without any opportunity for notice and comment. The Final Rule admits as much: "Whereas the proposed rule would have considered any housing or structure for any fire control component a frame or receiver, the final rule ... provid[es] *new distinct definitions* ... describing a specific housing or structure for one specific type of fire control component." *Id*. at 24,693 (emphasis added).

Commentators repeatedly noted that in four decades of classification determinations issued to manufacturers, ATF has consistently stated that receiver blanks do not meet the definition of a regulated "firearm" under federal law.  Indeed, there is nothing in the GCA that states a receiver blank is a "firearm". Nevertheless, the Final Rule expressly repudiates ATF's prior classification determinations:

> Prior determinations by the Director that a partially complete, disassembled, or nonfunctional frame or receiver, including a parts kit, was not, or did not include, a "firearm frame or receiver" under § 478.11, or "frame or receiver" under § 479.11, as those terms were defined prior to April 26, 2022, shall not continue to be valid or authoritative after that date. Such determinations shall include those in which the Director determined that the item or parts kit had not yet reached a stage of manufacture to be, or include, a "firearm frame or receiver" under § 478.11, or "frame or receiver" under § 479.11, as those terms were defined prior to April 26, 2022.

87 Fed. Reg. at 24,741. Multiple commentators accurately noted ATF's complete reversal of its long-standing legal position seemed arbitrary and capricious on its face—a criticism that the Agencies were unable to rebut or adequately explain in manner consistent with logic and the text of the GCA. *See* Final Rule at 24,689.

## IV.   PUBLICATION OF THE FINAL RULE

The Final Rule was published on April 26, 2022 and scheduled to take effect on August 24, 2022.

The Final Rule amends 27 C.F.R. § 478.11 by adding the following fifth category to the definition of a "firearm," which has no basis in the statutory text of 18 U.S.C. § 921(a)(3):

> The term shall include a *weapon parts kit* that is designed to or *may readily be* completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive. The term shall not include a weapon, including a weapon parts kit, in which the frame or receiver of such weapon is destroyed as described in the definition "frame or receiver."

87 Fed. Reg. at 24,735 (emphasis added). Under this new provision, a collection of parts, none of which independently constitutes a firearm, could nonetheless be characterized by the government as a firearm based on a subjective determination that the items, when grouped together, can "readily" be assembled into a firearm.  And if not the collection of parts, but possibly several parts combined with tools and/or jigs and/or instructions might be deemed capable of being "readily" assembled into a firearm and therefore fit the definition of "weapon parts kit".

The Final Rule newly defines "readily" as a "process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state." Final Rule at 24,735; *see also id*. at 24,747.  The Final Rule then provides a non-exclusive list of eight unranked, unweighted factors relevant to the determination of *readily*-ness, none of which is dispositive:

(a)  Time, i.e., how long it takes to finish the process.
(b)  Ease, i.e., how difficult it is to do so.
(c)  Expertise, i.e., what knowledge and skills are required.
(d)  Equipment, i.e., what tools are required.
(e)  Parts availability, i.e., whether additional parts are required, and how easily they can be obtained.
(f)  Expense, i.e., how much it costs.
(g)  Scope, i.e., the extent to which the subject of the process must be changed to finish it.

(h)  Feasibility, i.e., whether the process would damage or destroy the subject of the process, or cause it to malfunction.

Final Rule at 24,735.

Prior to the Final Rule, 27 C.F.R. § 478.11 provided a one-sentence definition of a "firearm frame or receiver" as: "That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." The Final Rule replaces the above one-sentence definition with the following:

(a) Except as otherwise provided in this section, the term "frame or receiver" means the following—

(1) The term "frame" means the part of a handgun, or variants thereof, that provides housing or a structure for the primary energized component designed to hold back the hammer, striker, bolt, or similar component prior to initiation of the firing sequence (*i.e.*, sear or equivalent), even if pins or other attachments are required to connect such component to the housing or structure.

(2) The term "receiver" means the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent), even if pins or other attachments are required to connect such component to the housing or structure.

(3) The terms "variant" and "variants thereof" mean a weapon utilizing a similar frame or receiver design irrespective of new or different model designations or configurations, characteristics, features, components, accessories, or attachments. For example, an AK-type firearm with a short stock and a pistol grip is a pistol variant of an AK-type rifle, an AR-type firearm with a short stock and a pistol grip is a pistol variant of an AR-type rifle, and a revolving cylinder shotgun is a shotgun variant of a revolver.

Final Rule at 24,735. The Final Rule also provides various examples of how ATF's new definition purportedly comports with most frame/receiver classifications that already have been made by ATF. *Id*. at 24,735–38.

To summarize, pursuant to the Final Rule, the definition of a "firearm" or "frame or receiver" turns on whether the product "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver" with the definition of *readily*, in turn,

11

requiring the ATF to identify the presence (or perhaps absence) (or perhaps some quantum of applicability that will provided at a future date) of the characteristics represented in the nonexclusive eight-factor list provide above.

The Agencies assert that ATF's original definition of "frame or receiver" was meant to provide direction as to which portion of a weapon is the frame or receiver for purposes of licensing, serialization, and recordkeeping. Final Rule 24,652. The Agencies contend that the prior definition would not describe the frame or receiver of most current firearms, because in most modern weapon designs, the relevant fire control components either are housed by more than one part of the weapon or incorporate a striker rather than a hammer to fire the weapon. *Id*. However, the starting point for Defendants' argument is a critique of the statutory definition that is anything but modern and is something the Agencies have embraced from the time the GCA was first enacted in 1968.

The Final Rule admits that "[a]t the time the current definitions were adopted [1968], there were numerous models of firearms that did not contain a part that fully met the regulatory definition of 'frame or receiver,' such as the Colt 1911, FN-FAL, and the AR-15/M-16...." Final Rule at 24,655. ATF suggests that the above examples and any "split/multi-piece receiver firearms" in use as of 1968 would fall outside the statutory definition of "frame or receiver", but claims "ATF's position has long been that the weapon 'should be examined with a view toward determining if [either] the upper or lower half of the receiver *more nearly fits* the legal definition of 'receiver'…" *Id*. (emphasis added).

The Final Rule concedes that "ATF for decades has classified the lower receiver of the AR–15 rifle as a 'frame or receiver'" on the grounds that it "more nearly fits" the legal definition, an admission that the tension between agency regulations and the GCA definition is not the result of recent advancements in gunmaking technology.  Rather, it has been present since passage of the

12

GCA and throughout the five decades in which ATF used the "more nearly fits" rubric,  without seeking to formally expand the statutory definition established by Congress.  ATF's abandonment of its permissible, consistent interpretation of the GCA and the limits of the regulatory definitions has little to do with the fact that "some courts recently have treated the regulatory definition as inflexible when applied to the lower portion of the AR–15-type rifle", *id.*, a development that has nothing to do with modern technological advancements but more to do with ATF's obedience to a White House that "will not wait for Congress to act" to attain its gun control objectives.[7]

The Final Rule jettisoned decades of classification determinations, including scores of detailed technical analyses, measurements, and images cumulatively comprising a library of publicly available guidance that was <u>objective</u>, <u>quantitative</u>, <u>understandable</u> and in alignment with the limitations established by the GCA. Simultaneously, the Final Rule introduced a series of definitional phrases—e.g., "*partially* complete," "*may readily be* completed, assembled, restored, or *otherwise converted*," and "*stage of manufacture* where it is *clearly identifiable* as an *unfinished* component part of a weapon"—that are <u>subjective</u>, <u>qualitative</u>, and <u>patently susceptible to divergent interpretations</u>. These phrases, when combined with the Final Rule's authorization of the ATF Director to "consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials," effectively delegate to the ATF Director unbounded discretion to unilaterally determine the reach of ATF's jurisdiction over any raw materials, components, fabrication tools, and documentation utilized or involved in the firearm manufacturing process and supply chain. *Id.* at 24,739.

---

[7] *Fact Sheet: Biden-Harris Administration Announces Initial Actions to Address the Gun Violence Public Health Epidemic*, THE WHITE HOUSE (Apr. 7, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/07/fact-sheet-biden-harris-administration-announces-initial-actions-to-address-the-gun-violence-public-health-epidemic/.

During the notice and comment period, numerous commentators highlighted the subjective nature of the Final Rule's new definitions and expressed strong concern that the Final Rule's vagueness make it impossible for manufacturers, distributors, and customers to understand which product designs are regulated by the Final Rule and which are not. Final Rule at 24,677–79. Commentators noted the Final Rule's ambiguities will create profound uncertainty given the potential criminal penalties for violations and will create substantial waste in determining which facets of the firearms manufacturing supply chain require a federal firearms license ("FFL"). *Id*. at 24,677–79.

The Final Rule's response is at once confusing and contradictory. <u>On the one hand</u>, the Final Rule claims that "[t]o minimize disruption and cost to the licensed firearms industry as much as possible ... this rule grandfathers existing complete frame or receiver designs previously determined by the Director to be the firearm 'frame or receiver' of a given weapon." *Id*. at 24,654. The Final Rule also creates as a definition Section 478.12(f), grandfathering "[f]rame or receiver classifications based on which part of the weapon was classified as such before April 26, 2022 ... including variants thereof", *id*. at 24,739, and provides "a wide variety of examples and pictures to illustrate the frame or receiver of popular models and variants thereof … previously classified by ATF that are grandfathered...." *Id*. at 24,693. <u>But on the other hand</u>, the Final Rule says that "letter rulings are only applicable for the precise sample submitted to ATF," and cautions that its classifications can be "misapplied (as some have done) to other items that may appear similar, but have legally important differences." *Id*. at 24,691. Nowhere in the Final Rule does ATF acknowledge, much less attempt to explain or reconcile, the internal contradictions in its own guidance such that the average citizen can determine whether their "frame", "receiver" or "variant" is qualified for grandfathering under a classification letter but is not "misapplied".

In purporting to "interpret" provisions of the Gun Control Act that have existed since 1968, ATF suddenly now advances new interpretations, understandings, and applications of the statutory text that the agency apparently never new existed until now, more than a half century later, many of which implicate substantial economic concerns, potential exposure to criminal liability, and impact fundamental constitutional rights. It is little wonder that ATF anticipated that portions of the Final Rule might be struck down. *See* Final Rule at 24,730.

## LEGAL STANDARD

### A.   Summary Judgment

Summary judgment should be granted when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "APA cases are often resolved at summary judgment because whether an agency's decision is arbitrary and capricious is a legal question that the court can usually resolve on the agency record." *Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022).  Summary judgment is "an integral part of the Federal Rules as a whole, which are designed to secure the just speedy and inexpensive determination of every action." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 317).

### B.   APA Standard

The APA requires "the reviewing court" to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(B). Pursuant to the APA, federal courts therefore regularly vacate unconstitutional agency actions. *See Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 384, 388 (5th Cir. 2018).

### 1.   Notice and Comment Requirements

After publishing notice in the Federal Register of "the terms or substance of the proposed rule or a description of the subjects and issues involved," the agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b), (c). That opportunity must be "meaningful", which requires the final rule to be "a logical outgrowth" of the proposed rule "in the sense that the original notice must adequately frame the subjects for discussion." *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1115 (D.C. Cir. 2019) (internal quotations omitted). "APA notice requirement is satisfied if the notice fairly apprises interested persons of the subjects and issues the agency is considering." *Chem. Mfrs. Ass'n v. U.S. E.P.A.*, 870 F.2d 177, 203 (5th Cir.), *decision clarified on reh'g*, 885 F.2d 253 (5th Cir. 1989).

### 2.   "Arbitrary and Capricious"

The APA directs courts to set aside agency action that is "arbitrary [and] capricious." 5 U.S.C. § 706(2) (A).  A court must set aside agency action if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019).  A rule may be found arbitrary and capricious if the agency failed to "examine the relevant data and articulate a satisfactory explanation for its action", *id.* (internal quotations omitted), or failed to "respond to relevant and significant public comments in a reasoned way." *Mozilla Corp. v. FCC*, 940 F.3d 1, 69–70 (D.C. Cir. 2019) (*per curiam*) (quotation marks omitted). Further, a rule is arbitrary and capricious if it changes a prior policy which has "engendered serious reliance interests" but which the agency has failed to properly consider in its rulemaking.  *Wages*

16

*& White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1139 (5th Cir. 2021).

### 3.   "Contrary to Constitutional Right"; "Not in Accordance with Law"

The APA provides that a reviewing court must set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). "The intent of Congress in 5 U.S.C. § 706(2)(B) was that courts should make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making." *Texas Off. of Pub. Util. Couns. v. F.C.C.*, 183 F.3d 393, 410 (5th Cir. 1999) (citing *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979)).  Regardless of whether an agency action might be justified on some other basis, if it "is based upon a determination of law," then it "may not stand if the agency has misconceived the law." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943); *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 646 (D.C. Cir. 1998) ("An agency action, however permissible as an exercise of discretion, cannot be sustained where it is based not on the agency's own judgment but on an erroneous view of the law.") (cleaned up).

## ARGUMENT

The Final Rule should be held unlawful and set aside for several reasons. The most basic, as this Court found previously and as Plaintiffs' have briefed recently,[8] is that its core provisions exceed ATF's authority under the GCA and therefore are unlawful on their face and "not in accordance with law" under the APA. 5 U.S.C. § 706(2)(A).  These and other of the Final Rule's defects are incurable and render the Final Rule unworkable and subject to vacatur in its entirety.

---

[8] BlackHawk incorporates by reference its Complaint (ECF No. 99), Briefs in Support of Intervention (ECF No. 77), Preliminary Injunction (ECF No. 103), and Supplemental Brief on the Consolidated Adjudication of Count I. (ECF No. 134).

I.     THE FINAL RULE VIOLATES THE APA AND MUST BE SET ASIDE

A.     **The Final Rule Was Not a Logical Outgrowth of the Notice and Failed to Satisfy the Public Participation Requirements of the APA**

Defendants' rulemaking renders the Final Rule procedurally defective. It is not a logical outgrowth of the NPRM. The Agencies made material changes between the proposed and final versions of the Rule to critical definitions, including "frame or receiver" and "partially complete" items. The Agencies also failed to identify all of the sources they relied upon until publication of the Final Rule, depriving the public and regulated entities adequate notice of and meaningful opportunity to participate in the rulemaking process as required under the APA. 5 U.S.C. § 553(c) (rulemaking requires an agency to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" and to give "consideration of the relevant matter presented").

As discussed, *infra* at 24–25, in response to the NPRM, the public submitted comments to ATF explaining, among other things, the serious problems with the agency's proposed definition of "frame or receiver," which would have classified countless firearm parts as firearms, resulting in many modern firearms containing numerous different frames and receivers.  In response, ATF specifically addressed those comments agreeing that the NPRM's definition of "frame or receiver" was flawed, in that firearms cannot contain "as many as ten frames and receivers." Final Rule at 24,692.

However, rather than amending the NPRM or formally "proposing" a new definition and seeking public comment thereon, ATF instead simply wrote a new definition of "frame or receiver" and promulgated it as a regulation in the Final Rule without any opportunity for notice and comment. As the Final Rule explained, "[w]hereas the proposed rule would have considered any housing or structure for any fire control component a frame or receiver, the final rule ... provid[es]

18

*new distinct definitions* ... describing a specific housing or structure for one specific type of fire control component." *Id*. at 24,693 (emphasis added).

The NPRM revised the definition of "frame or receiver" into four sub-categories, each with a discrete definition: (a) "Firearm muffler or silencer frame or receiver"; (b) "Split or modular frame or receiver"; (c) "Partially complete, disassembled, or inoperable frame or receiver"; and (d) "Destroyed frame or receiver." NPRM at 27,741–46. In addition, four "nonexclusive examples that illustrate" the definition of "frame or receiver" were included in the NPRM, *id*. at 27,741–42, and "a nonexclusive list" of nine weapons with "split or modular frame receivers" where the "Director has previously determined that a specific part is the frame or receiver[.]" *Id*. at 24,743–44.

In the Final Rule, however, the Agencies did not include any definition of "frame or receiver", instead amending 27 C.F.R. § 478.11 to say that "[t]he term 'frame or receiver' shall have the same meaning as in § 478.12." Final Rule at 24,735.  But the newly minted 27 C.F.R. § 478.12 skips past providing any baseline, starting-point definition of "frame or receiver" and instead provides an expanded list of sub-categories, each with its own definitions: (a)(1) "frame"; (a)(2) "receiver"; (a)(3) "variant" and "variants thereof"; (a)(4) ten "nonexclusive examples that illustrate the above definitions"; (b) "Firearm muffler or silencer frame or receiver"; (c) "Partially complete, disassembled, or nonfunctional frame or receiver," with five examples; (d) "Multi-piece frame or receiver"; (e) "Destroyed frame or receiver"; (f)(1) "Frame or receiver classifications based on which part of the weapon was classified as such before April 26, 2022," with four classification examples; and (f)(2) "Frame or receiver classifications of partially complete, disassembled or nonfunctional frames or receivers before April 26, 2022." Final Rule, at 24,735–41.

Instead of the single definition with four subparts provided in the NPRM, the Final Rule introduced a nearly ten-part definition describing terms and concepts that never appeared in the NPRM, and for which commenters were given no meaningful opportunity to consider.  The NPRM gave no indication that "frame or receiver," which had been conjunctively defined since the Agencies' first regulation, would be split into three parts—"frame", "receiver", and "variant"— accompanied by never-before-seen example illustrations. The public could not have anticipated the adoption of the new terms like "multi-piece frame or receiver," that do not correspond to the Agencies' definition of "split or modular frame or receiver" in the NPRM.  *See Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 11116 (D.C. Cir. 2019) (final rule not a logical outgrowth where particular definition of "rural" lands was not mentioned in NPRM).

The Final Rule introduces derivatives of definitions that evolved after the NPRM. For instance, "privately owned firearms marked by nonlicensees" appears nowhere in the NPRM, but is defined in the Final Rule, *id*. at 24,743, and appears to comprise yet another subcategory of "firearms" that has no recognizable link to the GCA, but over which ATF intends to assert enforcement power by a newly-expanded definition of *gunsmith* that is responsible for marking privately owned firearms. *Compare* NPRM at 27,742 *with* Final Rule at 24,734. This change happened without proving notice to the public or opportunity for meaningful comment by the gunsmiths and citizens whose privately owned firearms are now implicated.

Because Defendants failed to provide fair notice of and opportunity to meaningfully comment on the above definitions in the Final Rule, these provisions are not the "logical outgrowth" of the NPRM, in violation of the APA. *Tex. Ass'n of Mfrs.,* 989 F.3d at 381 ("Final rules under the APA notice-and-comment rulemaking must be the 'logical outgrowth' of the proposed rule.").

20

### B.    The Final Rule Is Arbitrary and Capricious

The text and background of the GCA reflect a deliberate decision by Congress to not regulate each and every part of a "firearm."  The GCA replaced the Federal Firearms Act of 1938 ("FFA") which did regulate all firearms parts. Pub. L. 75-785, 52 Stat. 1250 (1938); 26 CFR § 177.10 (repealed). The FFA included an expansive definition of "firearm" as "any weapon, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosive and a firearm muffler or firearm silencer, *or any part or parts of such weapon*." *Id.* (emphasis added).

In repealing the FFA and replacing it with the GCA in 1968, Congress determined that regulating all component parts of a firearm was impractical and crafted a statutory definition of "firearm" that included the "frame or receiver"—but no other parts—of a firearm. *See* 111 Cong. Rec. 5527 (March 22, 1965) ("The present definition of this term includes 'any part or parts' of a firearm. It has been impractical to treat each small part of a firearm as if it were a weapon. The revised definition substitutes the words 'frame or receiver' for the words 'any part or parts.'"); *see also* H.R. Rep. 90-1577, at 4416 (June 21, 1968) ("Under former definitions of 'firearm,' any part or parts of such a weapon were included. It was found impractical to have controls over each small part of a firearm. Thus, this definition includes only the major parts of the firearm, that is, the frame or receiver.").

The Agencies began the rulemaking process with the clear recognition that the GCA reflects a congressional intent not to regulate all parts of a firearm. *See* NPRM at 27,720 ("Congress recognized that regulation of all firearm parts was impractical.").  However, the Final Rule introduces the novel term "weapon parts kit", which this Court has already found conflicts with the GCA's definition of firearm.  ECF No. 56 at 12 ("That language conflicts with the statute's

definition of 'firearm.'").  The Agencies provide no explanation for the contradiction between this term in the Final Rule which expressly regulates weapon *parts* and ATF's admission in the NPRM that the GCA does not regulate weapon parts.

Where a statute's ordinary meaning is plain, "that is the end of the matter," for the Court as well as the agency. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 and n.9 (1984). "[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014); *see also*, *e.g.*, *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 753 (5th Cir. 2011).  ATF, however, did exactly that in promulgating the Final Rule that defines firearm "parts" to make the term synonymous with GCA "firearm".[9]

The GCA does not include in its definition of "firearm" merely "items" that can be constructed into a firearm, but rather only a "weapon" or "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3). Under either category of Section 921(a)(3), in order to be a "firearm," there must be a "frame or receiver," which is every "firearm's primary structural component." By contrast, by ATF's own admission, a prohibited "weapon parts kit" does not contain a "frame or receiver," but merely an unfinished and incomplete part that could be constructed into a frame or receiver. ECF No. 41 at 27; *see* ECF No. 56 at 10 (ATF may not "regulate a component as a 'frame or receiver' even after ATF determines that the component in question is not a frame or receiver.").

---

[9] This Court's recent consideration of the term "part" may serve as useful reference point to confirm what is linguistically apparent in ordinary usage. *See United States v. Forkner*, 584 F. Supp. 3d 180, 187 (N.D. Tex. 2022) ("[C]onstruing the statute to apply to tangible objects accords with the ordinary usage of the word 'part.' One might reasonably say that computer code is part of an aircraft, but it stretches ordinary usage to say that computer code is an aircraft part.").

But the Agencies took the opposite position in their response to comments on the NPRM. The Agencies simply "disagree[d] with commenters' suggestion" that the Agencies could not use the "concepts of 'readily' and 'converted'" in the definition of "frame or receiver." Final Rule at 24,685. Citing no legal authority for the change, the Agencies simply offer the conclusory assertion that their position in the Final Rule is "appropriate" because the act of manufacturing is also the act of converting. *Id.* Defendants' self-serving, substance-free responses do not *adequately* explain or identify the authority to support their change in position—a rulemaking deficiency that renders the Final Rule arbitrary and capricious under the APA. *See Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 465 (5th Cir. 2020) (broad statutory "grant of authority over 'any fishery' and 'any stock of fish,' still depends on whether the relevant stock is a 'fishery,' which, in turn, turns on the definition of 'fishing.' … nothing in the definition plausibly suggests the agency has been given authority to regulate aquaculture."), *as revised* (Aug. 4, 2020).

Defendants likewise do not adequately explain the NPRM and Final Rule's suggestions that a firearm can have multiple frames or receivers.  Despite the absence of any ambiguity in the GCA's provision that a "firearm" can have only one "frame or receiver", the NPRM originally proposed the "possibility a firearm may have more than one frame or receiver...." NPRM at 27,734. After receiving comments to the contrary, ATF conceded that Final Rule "agrees with commentators that the definition of 'firearm' in 18 U.S.C. Section 921(a)(3)(B) is best read to mean a single part of a weapon or device as being 'the' frame or receiver," and "whereas the proposed rule would have considered any housing or structure for any fire control component a frame or receiver, the final rule focuses these definitions by describing a specific housing or structure for one specific type of fire control component." Final Rule at 24,692–93.

But while admitting the NPRM offered an incorrect understanding of the GCA, the Final Rule nevertheless fails to offer any substantive explanation and simply says that ATF "disagrees" that the statute "*must* be read to mean that a firearm may not have more than one frame or receiver," and asserts that "it is *possible* that the term 'frame,' for example, could be referring to multiple frames within a handgun, or both a frame and a receiver in a split handgun design." *Id.* at 24,683 (emphasis added).  In short, the Final Rule admits the NPRM was wrong on the central definition in the GCA, but indicates that anything is possible when it comes to interpretations in the future. The Agencies take contradictory positions in the Final Rule that cannot be reconciled with the text of the GCA or ATF's positions elsewhere in the Final Rule—demonstrating the kind of arbitrary and capricious rulemaking that is nor permitted under the APA. *See Policy & Research, LLC v. HHS*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018) ("[A]n agency acts arbitrarily and capriciously if it acts in a manner that is contrary to its own regulations or a congressional statute.").

The arbitrary and capricious nature of the Final Rule's regulation of "firearm parts" becomes even more pronounced when ATF's litigation positions are considered.  In recent court filings, ATF has admitted that "Congress has chosen to exclude firearms parts from the scope of the GCA, including parts that could be assembled with a homemade receiver and frame to make a firearm." *California v. ATF*, 3:20-cv-06761 (N.D. Ca.) (ECF No. 29, Govt. Motion to Dismiss). In the NPRM, ATF explained that "[p]rior to passage of the GCA, the Federal Firearms Act of 1938 ('FFA') regulated all firearm parts," but that "[d]uring debate on the GCA and related bills introduced to address firearms trafficking, Congress recognized that regulation of all firearm parts was impractical." NPRM at 27,720.

The Agencies repeatedly cite advancements in technology as grounds for the Final Rule, but the Agencies fail to provide a satisfactory explanation or data-supported rationale for ATF's

abandonment from its own prior *interpretation* of the GCA. Defendants' departure from prior practice in several areas serves as an additional basis for finding ATF's action to be arbitrary and capricious. As discussed above, in the Final Rule ATF dispensed with countless of its prior determinations and classifications—despite the significant reliance such guidance had cultivated among industry and the public—and adopted entirely new approaches and practices with respect to interpreting and applying the statutes it is tasked with enforcing. But throughout the Final Rule, ATF fails to even acknowledge its prior positions or concede that it is changing its position, much less address the impact of its policy reversals on those who have come to rely upon the Agencies prior positions and guidance, including the courts. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("[B]ecause of decades of industry reliance on the Department's prior policy—the explanation fell short of the agency's duty to explain why it deemed it necessary to overrule its previous position.").

Indeed, the Final Rule specifically rescinded *in its entirety* decades of prior classification determinations on partial frames or receivers, *id*. at 24,741, completely putting at risk for criminal enforcement not only those selling such non-regulated products for the homemade firearms market, but those in the regular FFL manufacturing supply chain (machine shops) who are not ATF licensed and are not required to be in order to make partial frames or receivers (deemed non-firearms by ATF's prior classification letters) for further manufacturing by their FFL manufacturing customers into regulated receivers and frames. These unlicensed vendors can no longer rely on prior ATF guidance and are now at risk of being charged with unlicensed firearms manufacturing unless new classification submissions are filed with ATF. Such new determinations can take from one to two years, potentially forcing unnecessary ATF licensing while waiting for a decision, or disrupting supply chains, including those for law enforcement and military customers.

25

Defendants' dogged refusal to fully acknowledge or adequately explain numerous specific concerns raised regarding unlawful provisions of the Final Rule provides a case study in arbitrary and capricious rulemaking for the which the APA and federal precedent provide the appropriate corrective remedy; the Final Rule must be set aside.

### C.   The Final Rule Is Contrary to Constitutional Right and Not in Accordance with Law

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). As creatures of statutory origin, agencies are "restrained by the four corners of its enabling statute and 'literally ha[ve] no power to act unless and until Congress confers power upon [them].'" *Collins v. Mnuchin*, 938 F.3d 553, 562 (5th Cir. 2019) (*en banc*) (quoting *New York v. FERC,* 535 U.S. 1, 18 (2002)), *cert. granted*, ⸺ U.S. ⸺, 141 S. Ct. 193 (2020) (mem.)

The Fifth Circuit has previously considered a federal agency's efforts to extend its regulatory reach beyond what Congress authorized in the plain text of the statute. In *Nat'l Pork Producers Council v. U.S. E.P.A*., 635 F.3d 738 (5th Cir. 2011), the Fifth Circuit recounted EPA's several attempts to impermissibly expand its regulatory reach and "impose liability that is in excess of its statutory authority." *Id*. at 753.  The court acknowledged the role of *Chevron* deference where the underlying statute is ambiguous, but emphasized that "courts are not obliged to stand aside and rubberstamp their affirmance of administrative decisions that they deem inconsistent with the statutory mandate or that frustrate the congressional policy underlying a statute." *Id*. (internal quotes omitted). "To this end, the Supreme Court has explained: 'Agencies may play the sorcerer's apprentice but not the sorcerer himself.'… In other words, an agency's authority is limited to what has been authorized by Congress." *Id*. (quoting *Alexander v. Sandoval*, 532 U.S. 275, 292 (2001)). In short, "[a]gency authority may not be lightly presumed." *Texas v. United States*, 497 F.3d 491,

502–503 (5th Cir. 2007) ("'Were courts to presume a delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well.'" (quoting *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995)). Here, Defendants sought to "play the sorcerer" in promulgating newly invented definitions by which ATF could begin regulating what Congress has repeatedly denied.

The Final Rule invents an entirely new term, "privately made firearm" ("PMF"), which has never existed prior to the Final Rule, as there is no federal prohibition on an individual manufacturing his own firearm for personal use. Final Rule at 24,735. The GCA does not regulate privately made firearms, does not require they be marked with serial numbers, and certainly does not impose risk of criminal prosecution against non-prohibited persons from making their own firearms as the Final Rule now dictates. Nevertheless, the Final Rule will require a firearms dealer to engrave a serial number on a firearm legally manufactured by an individual. *Id.* ATF's creation of a new definition of "privately made firearm" is a bald attempt to claim the authority to regulate privately made firearms where no such authority exists.

The Final Rule also appears to create new federal crimes of "criminal conspiracy" to sell and "structuring" to purchase unregulated firearm parts. *Compare* NPRM at 27,726 n.45 *with* Final Rule at 24,714. Neither of these crimes have ever been identified as part of the GCA, under which it is perfectly lawful for a citizen who is not otherwise prohibited under law from owning, possessing or receiving firearms, to make or complete a homemade firearm for personal use from an unfinished receiver or frame and to commercially sell such unregulated parts, instructions, and tooling helpful or essential to making a personal firearm without being licensed as a manufacturer

27

or dealer. The Final Rule, however, now introduces the notion that there exists some vague category of activities by which one can "structure" or "conspire" to violate the GCA.

In the NPRM, the Agencies claimed it was necessary for ATF to take action to regulate privately made firearms "because PMFs do not bear a serial number," and thus "ATF has found it extremely difficult to complete [] traces on behalf of law enforcement...." NPRM at 27,724; *see also id.* at 27,723 (claiming PMFs "hamstring[] law enforcement's ability to investigate crimes," and claiming "terrorists" use PMFs.).

The Final Rule echoes the NPRM, claiming that "technological advancements" in homemade gunmaking "make[] it extremely difficult for law enforcement to" track them. Final Rule at 24,656. However, without specifying any statutory authorization, the Final Rule simply asserts that "[t]he GCA provides that all firearms received and transferred by FFLs must be traceable"—i.e., serialized—and "[t]here is no exception for PMFs." *Id*. at 24,687; *see also id*. at 24,706 ("PMFs must be marked with a traceable serial number," and permitting otherwise "undermines the entire purpose of maintaining transactions records and other required records").

The APA does not permit an agency to grant itself regulatory power on the basis that "technological advancements" make it difficult to reach an activity that the authorizing statute does not regulate in the first place. While the regulation of privately made firearms may be part of a wish list of policy proscriptions that gun control activists have long demanded, Congress has never seriously considered and certainly not passed any law granting the regulatory power ATF seeks to wield under the Final Rule.

The Agencies contend that the expansive revision of existing definitions and the introduction of brand new terms in the Final Rule are necessary to achieve the purpose for which the GCA was enacted. *See* Final Rule at 24,686.  But court's encountering similar arguments have

rejected an agency's "whatever-it-takes" approach to regulation predicated on Congress's allegedly broad purposes for a statute. *Texas v. United States*, 497 F.3d 491, 502 (5th Cir. 2007) (citing *Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC*, 962 F.2d 27, 33 (D.C. Cir. 1992) (appeals to a statute's broad purposes do not allow the discovery of implicit delegations of authority when Congress has explicitly delineated the boundaries of delegated authority)).

"When Congress has directly addressed the extent of authority delegated to an administrative agency, neither the agency nor the courts are free to assume that Congress intended the Secretary to act in situations left unspoken." *Texas*, 497 F.3d at 502 (citing *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974) ("When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.")). "Accordingly, administrative agencies and the courts are 'bound, not only by the ultimate purposes Congress has selected *but by the means it has deemed appropriate*, and prescribed, for the pursuit of those purposes.'" *Id*. (quoting *MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 231 n.4 (1994) (emphasis added)).

The Final Rule upends existing federal gun law and creates new federal crime with respect to the newly created definition of what ATF calls a "privately made firearm" (abbreviated as "PMF")—a term that does not does not exist, and has not ever existed, within federal law. That is because there is no federal prohibition on non-prohibited individuals who privately manufacture firearms for their own personal use,  no prohibition on transferring a firearm that originally was made for personal use, and no statute that requires such firearms be marked with any serial number, recorded in the books of any dealer, or obtained only after a background check.  Accordingly, ATF's attempt to create a new definition of "privately made firearm" signifies agency's naked

intent to rewrite the statute in order to claim the authority to regulate privately made firearms, where such authority does not currently exist.

ATF defends its actions on the theory that it "must" rewrite the law in order to give purported effect to the perceived intent of Congress, but ignores the long-established principle that "Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences." *Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018). "Until [Congress] exercises that power, the people may rely on the original meaning of the written law." *Id*.

The Supreme Court has made clear that "[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms ... to suit its own sense of how the statute should operate. ... [The agency's] need to rewrite [the statute] should have alerted [it] that it had taken a wrong interpretive turn." *Utility Air Reg. Group v. EPA*, 573 U.S. 302, 325–28 (2014); *see also Christensen v. Harris County*, 529 U.S. 576, 588 (2000) (an agency may not, "under the guise of interpreting a regulation ... create de facto a new regulation."); *see also Digital Realty Trust, Inc. v. Somers*, 138 S. Ct. 767, 782 (2018) ("[t]he statute's unambiguous ... definition ... precludes the [agency] from more expansively interpreting that term."). Rather, "[o]nly the people's elected representatives in Congress have the power to write new federal criminal laws." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). Nor are "[a]gencies ... free to 'adopt . . . unreasonable interpretations of statutory provisions and then edit other statutory provisions to mitigate the unreasonableness.'" *Utility Air Reg.*, 573 U.S. at 328 (citation omitted).

As discussed above, by the Final Rule Defendants attempt to promulgate new, agency-created definitions for criminal behaviors based on new definitions purporting to reach unregulated

items, without the requisite statutory jurisdiction, authority, or statutory right to do so.  Therefore, the Final Rule must be set aside under the APA.

## II.  EVEN IF GCA DEFINITIONS WERE AMBIGUOUS—AND THEY ARE NOT—DEFENDANTS' ARBITRARY AND CAPRICIOUS RULEMAKING WEIGHS AGAINST *CHEVRON* DEFERENCE

When analyzing an agency's interpretation of a statute, federal courts apply the two-step framework announced in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *Smith v. Berryhill*, 139 S. Ct. 1765, 1778 (2019). Under that framework, the court asks whether the statute is ambiguous and, if so, whether the agency's interpretation is reasonable. *Id.* This approach "is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *Id.* (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

Even under *Chevron's* deferential framework, agencies must operate "within the bounds of reasonable interpretation." *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (quoting *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 296 (2013)). And reasonable statutory interpretation must account for both "the specific context in which ... language is used" and "the broader context of the statute as a whole." *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).  An agency interpretation that is "inconsisten[t] "with the design and structure of the statute as a whole" is not accorded deference. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013).

Further, agency rulemaking that is arbitrary and capricious or contrary to constitutional right under the APA renders the rule unqualified for *Chevron* deference. "*Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1030 (5th Cir. 2019) ("Unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious," and "[a]n arbitrary and capricious regulation of this sort is itself unlawful and receives no *Chevron* deference.") (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)).  "Although agency determinations within

the scope of delegated authority are entitled to deference, it is fundamental 'that an agency may not bootstrap itself into an area in which it has no jurisdiction.'" *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990) (quoting *Fed. Maritime Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 745 (1973)).

As shown above, the Final Rule falls far short of the APA's procedural and substantive requirements, fails to acknowledge and/or adequately explain multiple internal contradictions numerous, ignores ATF's own prior analysis of and positions on the relevant issues, and is the definition of an arbitrary and capricious rulemaking that is not entitled to *Chevron* deference and which must fall at summary judgment.

## III.   THE FINAL RULE VIOLATES THE CONSTITUTION

The procedural counts regarding the comment period and the nature of the hearing afforded by the rulemaking process would be moot if the Final Rule is rejected for other reasons or sent back as arbitrary and capricious.  The vagueness component of the Due Process counts, however, largely overlaps with the deference issue.

### A.   The Final Rule Is Unconstitutionally Vague in Violation of Due Process

As discussed, *supra* at 14–15, numerous commentators highlighted the subjective nature of the Final Rule's new definitions and expressed strong concern that the Final Rule's vagueness make it impossible for an ordinary citizen to know which or whether a given product or activity is subject to regulation and potential criminal penalties for violations. Final Rule at 24,677–79.

When a criminal statute is challenged as vague, courts consider the challenge under the rubric of the Fifth Amendment's due process clause.  *United States v. USPlabs, LLC*, 338 F. Supp. 3d 547, 570–71 (N.D. Tex. 2018) (citing *Johnson v. United States*, 576 U.S. 591, 595 (2015)). The government violates due process by taking away an individual's "life, liberty, or property under a

criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Id.* (quoting *Johnson* at 591).  As the Supreme Court has held, "the prohibition of vagueness in criminal statutes...is 'essential' of due process, required by both 'ordinary notions of fair play and the settled rules of law.'" *Sessions v. Dimaya*, 138 S.Ct. 1204, 1212 (2018).

The Final Rule admits to its vagueness, but instead of providing an amended proposed rule that satisfies constitutional due process, the Agencies instruct members of the public to ask for ATF's opinion "to the extent there is uncertainty about a particular item...." Final Rule at 24,679; *see also id.* at 24,672; 24,696 ("If persons remain unclear which specific portion of a weapon or device falls within the definitions of 'frame' or 'receiver,' then they may voluntarily submit a request to ATF...."). The Fifth Amendment, however, requires that the law be clearly written so that persons of ordinary intelligence can understand it, without being forced to seek dispensations or indulgences from bureaucrats.[10] *USPlabs, LLC*, at 570–71 (An ordinance is vague in all its applications where (1) "it subjects the exercise of [a] right ... to an unascertainable standard," or (2) persons "of common intelligence must necessarily guess at its meaning." (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (citation omitted)).

---

[10] Further, the vagueness of the Final Rule is consistent with the tactical ambiguity giving agencies increased enforcement flexibility—a particular concern that multiple Justices have raised. *See Elgin Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 718 F.3d 488, 493 n.6 (5th Cir. 2013) (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 525 (1994) (Thomas, J., dissenting, joined by Stevens, O'Connor, and Ginsburg, JJ.) and noting that "[w]here courts defer completely to agency interpretations of their own regulations, 'the incentive is to speak vaguely and broadly, so as to retain a 'flexibility' that will enable 'clarification' with retroactive effect." (quoting *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 620 (2013) (Scalia, J., concurring in part and dissenting in part) and citing *id.* at 615 (Roberts, C.J., joined by Alito, J., concurring) (expressing agreement)).

The statutory definition of "firearm" is pivotal in the criminal enforcement context and the consequences of the Final Rule's ambiguity should be carefully considered. *See*, *e.g.*, *Staples v. United States*, 511 U.S. 600, 609–10 (1994) (discussing whether *mens rea* element of criminal statute required that defendant "know of the particular characteristics that make his weapon a statutory firearm" and rejecting government's contention that guns are "highly dangerous devices" and therefore gunowners "should be alert to the probability of regulation").

The Final Rule fails to inform industry and individuals what concurrent purchases may result in a non-firearm becoming a regulated "firearm." The Final Rule says only that a non-firearm item sold and/or purchased with a jig, or a tool, or instructions or some combination of these, if by the same company or a company conspiring with another company, may be a *firearm*; however, the Agencies fail to elaborate or provide specifics as to what other "templates, [] molds, equipment, tools, instructions, guides, or marketing materials," or any of the myriad combinations thereof, may accompany the non-firearm item becomes a "firearm". No amount of expertise or sophistication is sufficient to discern whether a given combination is a "firearm" because there is no limitations to what the Director "may consider" in determining whether the combination of items results in the existence of a regulated firearm. This provision is one of multiple provisions in the Final Rule that are beyond the ken of a person of ordinary intelligence to determine what conduct is regulated or prohibited and is therefore unconstitutionally vague.

### B.   The Final Rule Infringes on the Exercise of Second Amendment Rights

The Second Amendment protects "the right of the people to keep and bear Arms" and the Ninth Amendment recognizes that the people have inalienable rights not expressly enumerated in the Constitution. The Final Rule infringes on the rights of Plaintiffs to keep and bear arms, to

engage in lawful self-defense, to make their own firearms, to possess property lawfully acquired, and to earn a living by manufacturing and selling lawful goods in commerce.

In the Final Rule, ATF reports that comments were received from "[a] majority of commenters opposed to the NPRM" to the effect that ATF's "new requirements that undermine the Second Amendment are unconstitutional," and that 'the NPRM failed to include relevant Second Amendment analysis." *See* Final Rule at 24,676; *see also id* at 24,677.  In response, the Final Rule includes a "Second Amendment analysis" that was absent from the NPRM, but confidently asserts that "this final rule is consistent with the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008)" because "[t]here are compelling governmental interests in requiring privately made firearms to be marked and recorded whenever they are accepted into the business or collection inventories of licensees." *Id*. at 24,676.  The Agencies further contended that ATF's regulatory changes do not violate Second Amendment rights on the theory that "this rule serves the *compelling governmental interest* of preventing unserialized firearms from proliferating throughout the country, as recognized by [a Fourth Circuit] decision … this rule … imposes a *minimal burden* on the possession of firearms." *Id*. at 24,677 (emphasis added); *see also id*. (relying on cases discussing whether a restriction "severely burden[s] Second Amendment-protected conduct" and is a "reasonable fit for achieving the City's objectives of "public safety and crime prevention," and upholding another restriction because "the 'burden imposed by the law does not severely limit the possession of firearms.'").

However, the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen* issued June 2022 invalidated the legal grounds on which the Final Rule's Second Amendment analysis relies. 142 S. Ct. 2111 (2022). In its *Bruen* opinion, the Court "decline[d] to adopt that two-part approach" used in the lower federal courts and relied on by ATF in the Final

Rule, "decline[d] to engage in means-end scrutiny generally," and "specifically ruled out the intermediate-scrutiny test…." *Id*. at 2117–18. In doing so, the Court made clear that the level of severity of a "burden" on Second Amendment rights is immaterial—any "burden" will do. *Id*. at 2126 (finding step-two, which looks at "the severity of the law's burden on that right," to be "one step too many"). The Court similarly rejected the ubiquitous "public-safety" talisman waved by governments to justify Second Amendment infringements, reiterating that "[t]he right to keep and bear arms ... is not the only constitutional right that has controversial public safety implications." *Id*. at 2126 n.3 (citation omitted). In light of *Bruen's* express holdings that "public safety" is an insufficient justification for an infringement, and that even a "minimal burden" on protected rights is still an unconstitutional infringement, the Agencies rulemaking is marred by a fundamental defect.

Consequently, under *Bruen*, the Final Rule cannot satisfy its Constitutional burden by referencing the alleged "problem of untraceable firearms being acquired and used by violent criminals and terrorists," and lamenting that the law as it currently exists makes it "more difficult for law enforcement to trace firearms, including PMFs." Final Rule at 24,688–89; *see also* Regulatory Impact Analysis at 27, 47 (justifying the Final Rule, even though "[w]hen PMFs are made for personal use, they are not required by the GCA to have a serial number," but "because PMFs do not bear a serial number ... ATF has found it extremely difficult to complete [] traces on behalf of law enforcement.").

Moreover, *Bruen* makes it clear ruled that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126.  There is no historical tradition or

founding era analogue for the regulation of firearm parts, or restrictions on the manufacture of homemade firearms. Rather, it is enough that Plaintiffs (members of "the people") wish to manufacture firearms (protected "arms") for lawful purposes (such as to "keep" and "bear"), their right to do so "shall not be infringed."

Consequently, the Final Rule's regulatory promulgations were justified on the basis of a legal theory that has been soundly rejected by the Supreme Court's controlling Second Amendment jurisprudence and is therefore "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

### C.    The Final Rule Chills Protected Speech in Violation of the First Amendment

By adopting the Final Rule, ATF seeks to regulate protected speech in violation of the First Amendment. In determining when a partially complete frame or receiver reaches a stage where it is classified as a firearm, the Final Rule indicates that "the Director may consider any available instructions, guides, templates, jigs, equipment, tools, or marketing materials." Final Rule at 24,678. Instructions, guides, templates, marketing materials and other similar information all constitute speech, whether printed on a piece of paper included in a product box, or contained in a digital format. *See IMS Health Inc. v. Sorrell*, 630 F.3d 263, 271–72 (2d Cir. 2010) ("The First Amendment protects [e]ven dry information, devoid of advocacy, political relevance, or artistic expression" and "speech in a form that is sold for profit is entitled to First Amendment protection.") (internal quotations omitted), *aff'd*, 564 U.S. 552, 566, 570 (2011) (noting "creation and dissemination of information are speech for First Amendment purposes"); *see also Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761–70 (1976) (drug price information in advertisements is speech); *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1435 (N.D. Cal. 1996) ("Instructions, do-it-yourself manuals, recipes … are also speech.").

37

Notably, not all information accompanying an unfinished frame or receiver transforms an unregulated item into a firearm pursuant to the Final Rule. Rather, some available speech accompanying an unfinished frame or receiver "may" be considered by the Director in determining that unfinished frame or receiver to be a firearm. Final Rule at 24,678. That ATF determines which speech affects the classification of an item constitutes a content-based restriction because it requires "enforcement authorities" to "examine the content of the message that is conveyed to determine whether" the speech should be restricted. *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984).

As a result, the Final Rule forces BlackHawk and similarly situated businesses to regulate speech by deleting instructions from their websites in order to avoid the threat of criminal liability arising from the sale of some combination of non-firearm items that together may constitute a "firearm" that is subject to all the marking, registration and recordkeeping of an FFL. The possibility that two identical pieces of metal could be treated differently depending on whether they are associated with instructions, or where the instructions might be acquired from, chills First Amendment speech that guides lawful activity recognized by the Final Rule itself. *Vizaline, L.L.C. v. Tracy*, 949 F.3d 927, 928–29 (5th Cir. 2020) ("In overturning the 'professional speech' doctrine … the Court rejected any theory of the First Amendment that 'gives the States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement.'") (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2375 (2018)).

These and other aspects of the Final Rule impermissibly regulate the speech of BlackHawk and are in direct violation of the First Amendment.

38

**D.      The Final Rule Effectuates a Regulatory Taking of "Privately Made Firearms" Without Just Compensation**

The Final Rule imposes onerous government regulations that effectuate the appropriation of personal property by the government without just compensation and therefore constitute a regulatory taking in violation of the Fifth Amendment. The Supreme Court has recognized that onerous government regulations can effectuate a regulatory taking. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (noting that the Court looks at the "economic impact of the regulation" and "the extent to which the regulation has interfered with distinct investment-backed expectations"); *see also Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("[I]f regulation goes too far it will be recognized as a taking.").

The Final Rule seeks to require licensees with "privately made firearms" in their inventories to either mark them according to the Final Rule's specifications, destroy them, or "voluntarily" turn them over to a law enforcement agency. Final Rule at 24,679–80. The Final Rule places no restrictions on what the government may choose to do with "privately made firearms" that are "voluntarily" surrendered to the government.  Consequently, the Final Rule's regulations on "privately made firearms" effectuate a regulatory taking of personal property without just compensation, rendering such provisions a violation of the Fifth Amendment's Takings Clause. *See Horne v. Dep't of Agriculture*, 576 U.S. 351, 357 (2015).

## IV.      THE FINAL RULE IMPLICATES AND VIOLATES CORE CONSTITUTIONAL PRINCIPLES

These counts need only be resolved if the court finds the statute ambiguous but nonetheless applies *Chevron* deference to uphold the Final Rule. Insofar as these same constitutional concerns inform the application of deference, the Court's reasoning as to those questions in the interpretive context likely would resolve these counts as well. If Plaintiffs prevail on interpretive or other APA grounds, the cannon of constitutional avoidance would suggest that these counts need not be

decided. If Defendants prevail on the various other APA grounds, it would be necessary to resolve the constitutional counts as they relate to separation of powers and delegated authority regarding criminal law.

### A.    The Agencies' Rulemaking Actions and Adoption of Final Rule Violate the Separation of Powers

"Under our system of government, Congress makes laws and the President, acting at times through agencies like [ATF], 'faithfully execute[s]' them." *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) (quoting U.S. CONST., Art. II, § 3).  While the power to execute laws "necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration … it does not include a power to revise clear statutory terms[,]" *Id.*; *see, e.g.*, *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002) (agency lacked authority "to develop new guidelines or to assign liability in a manner inconsistent with" an "unambiguous statute").

The Final Rule represents an attempt by an administrative agency to implement policy change and enact omnibus federal gun control legislation through bureaucratic regulation, rather than through legislation, and in so doing violates the Constitution.

### B.    The Final Rule Violates the Nondelegation Doctrine

Under Article I of the U.S. Constitution, "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. Art. I, § 1. Yet, Congress can delegate some authority to the Executive Branch (or independent agencies) to engage in rulemaking without violating principles of non-delegation, even where such rulemaking may lead to criminal consequences. *See Loving v. United States*, 517 U.S. 748, 768 (1996) (documenting the Supreme Court's history of "uphold[ing] delegations whereby the Executive or an independent agency defines by regulation what conduct will be criminal").

If this Court concludes that the Final Rule is authorized by statute, then the statutory scheme unconstitutionally delegates legislative power with no intelligible principle, violating the nondelegation doctrine. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935). Further, various provisions of the Final Rule effectuate a double delegation by interpreting Congress's delegation of authority to ATF as allowing for the promulgation of a rule that in turn delegates to the ATF Director unbounded discretion to create and unilaterally revise legislative standards.

### C. The Final Rule's Regulation on "Privately Made Firearms" Exceed the Limits of the Commerce Clause

To the extent the Final Rule seeks to impose regulations on intrastate activities with no interstate nexus, such requirements exceed Congress's authority under the Commerce Clause. U.S. CONST. Art. I, § 8, cl. 3.

## V. VACATUR IS THE APPROPRIATE REMEDY

The APA gives courts the power to "hold unlawful and set aside agency action[s]." 5 U.S.C. § 706(2). Vacatur is authorized by 5 U.S.C. § 706, which requires the Court to decide "all relevant questions of law [and] interpret constitutional and statutory provisions" and "hold unlawful and set aside" agency action "not in accordance with law," "in excess of statutory jurisdiction," or "short of statutory right." Because "under our Constitution, the people's elected representatives in Congress are the decisionmakers here—and they have not clearly granted the agency the authority it claims for itself," the Final Rule is unlawful. *West Virginia v. EPA*, 142 S. Ct. 2587, 2626 (2022) (Gorsuch, J., concurring); *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) ("the ordinary practice is to vacate unlawful agency action").

"Vacatur [of an agency action] retroactively undoes or expunges a past [agency] action....

41

Unlike an injunction, which merely blocks enforcement, vacatur unwinds the challenged agency action." *Data Mktg. P'ship*, 45 F.4th at 859 (quoting *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021)) (alterations and ellipsis in original). On occasion, a court—though authorized by the APA to vacate an agency action—may exercise its discretion to remand the action for adjustments or another agency review. *Brown v. U.S. Dep't of Educ.,* No. 4:22-CV-0908-P, —— F.Supp.3d ——, 2022 WL 16858525, at *14 (N.D. Tex. Nov. 10, 2022) (citing *Texas v. United States*, 50 F.4th at 529). In deciding whether to sidestep complete vacatur, courts consider "(1) the seriousness of the deficiencies of the action, that is, how likely the agency will be able to justify its decision on remand; and (2) the disruptive consequences of the vacatur." Id. If there is a small defect or deficiency that is quickly curable or an existing complex agency program that requires major winddown efforts, a court may remand without vacating the entire action. *Id*. (citing *Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 703 (5th Cir. 2011) (remanding to the agency to recalculate amounts owed in a manner consistent with the statute)).

Here, both factors weigh against remand. First, "the Agencies' misstep is not correctible on remand—it is a complete usurpation of congressional authorization implicating the separation of powers required by the Constitution." *Brown*, at *14. Second, the Final Rule does not require a significant administrative winddown period and will not demand significant agency resources in order to simply return to the statutory status quo as it existed prior to August 2022. Thus, vacatur of the Final Rule is the appropriate remedy.

### *Conclusion*

In multiple ways the Final Rule violates the APA's for lawful agency action, the plain text of the Gun Control Act, and the Constitution. BlackHawk and its co-Plaintiffs have met their

burden of proof and are entitled to summary judgment on the issues raised in their respective Complaints and briefs, and vacatur of the Final Rule.

Respectfully submitted,

/s/ *Brian D. Poe*
Brian D. Poe
TX Bar No. 24056908
BRIAN D. POE, ATTORNEY AT LAW PLLC
The Bryce Building
909 Throckmorton Street
Fort Worth, TX 76102
Phone: (817) 870-2022
Fax: (817) 977-6501
bpoe@bpoelaw.com

Michael J. Sullivan
*Pro Hac Vice*, MA Bar No. 487210
Nathan P. Brennan
*Pro Hac Vice*, MN Bar No. 389954
J. Christopher Amrhein, Jr.
*Pro Hac Vice*, MA Bar No. 703170
ASHCROFT LAW FIRM LLC
200 State Street, 7th Floor
Boston, MA 02109
Phone: (617) 573-9400
Fax: (617) 933-7607
msullivan@ashcroftlawfirm.com
nbrennan@ashcroftlawfirm.com
camrhein@ashcroftlawfirm.com

*Counsel for Intervenor-Plaintiff BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 23, 2022, the foregoing document was served, via the Court's

CM/ECF Document Filing System, upon the registered CM/ECF users in this action.

<div style="text-align:center; margin-left: 40%;">

/s/ *Brian D. Poe*
Brian D. Poe

</div>