# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| JENNIFER VANDERSTOK;<br>MICHAEL G. ANDREN;<br>TACTICAL MACHINING, LLC, a limited liability company; and<br>FIREARMS POLICY COALITION, INC., a nonprofit corporation,<br><br>        *Plaintiffs*,<br><br>and<br><br>Not An LLC d/b/a JSD SUPPLY,<br><br>        *Applicant in Intervention*,<br><br>    v.<br><br>MERRICK GARLAND, in his official capacity as Attorney General of the United States;<br>UNITED STATES DEPARTMENT OF JUSTICE;<br>STEVEN DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and<br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,<br><br>        *Defendants*. | Civil Action No. 4:22-cv-691-O |

## NOT AN LLC d/b/a JSD SUPPLY'S
## BRIEF IN SUPPORT OF [PROPOSED] MOTION FOR PRELIMINARY INJUNCTION

# Table of Contents

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 3

I.      BACKGROUND .................................................................................... 3

     A.  Statutory and Regulatory Background ................................................ 3

     B.  The Biden Administration Announces That It "Will Not Wait
         for Congress to Act to Take Its Own Steps" on Gun Control ........................... 5

     C. The Final Rule Purports to Regulate *Partial* Frames and Receivers
        and Creates a New Definition of "Firearm" ........................................ 9

II.     THIS COURT HAS ALREADY DETERMINED THAT THE FINAL
      RULE EXCEEDS ATF'S STATUTORY AUTHORITY UNDER THE
      PLAIN LANGAUGE OF THE GUN CONTROL ACT .......................................... 10

     A. September 2 Order: "Parts that *may become* receivers are not receivers".................. 10

     B. September 2 Order: "A weapons parts kit is not a firearm"......................... 11

     C. November 3 Order: Proper scope of relief is that which mirrors the relief currently
        afforded to Tactile Machining, LLC ........................................ 12

ARGUMENT .......................................................................................................... 13

I.      THE COURT'S SEPTEMBER 2 ORDER ESTABLISHES THAT JSD SUPPLY
      IS LIKELY TO PREVAIL ON THE MERITS ........................................ 13

II.     JSD SUPPLY HAS SHOWN IT WILL SUFFER IRREPARABLE
      HARM IN THE ABSENCE OF INJUNCTIVE RELIEF ........................................ 14

     A. The Final Rule Will Likely Put JSD Supply Out of Business ..................... 14

     B. The Scope of Injunctive Relief Must Be Nationwide to Preserve the Status Quo and
        Allow JSD Supply to Continue Doing Business........................................ 16

III.   JSD SUPPLY'S INJURY OUTWEIGHS ANY HARM TO DEFENDANTS OR THE
        PUBLIC ................................................................................................................................. 16

CONCLUSION.............................................................................................................................. 18

## TABLE OF AUTHORITIES

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
  141 S. Ct. 2485 (2021) ................................................................................................ 15

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*,
  875 F.2d 1174 (5th Cir. 1989) .................................................................................... 14

*BST Holdings, LLC v. OSHA*,
  17 F.4th 604 (5th Cir. 2021) ...................................................................................... 16

*California v. ATF*,
  No. 3:20-CV-06761 (N.D. Cal. Nov. 30, 2020) ......................................................... 5

*City of Dallas v. Delta Air Lines, Inc.*,
  847 F.3d 279 (5th Cir. 2017) ...................................................................................... 12

*City of Dallas, Texas v. Hall*,
  2008 WL 11350041 (N.D. Tex. July 28, 2008) ........................................................ 17

*City of Syracuse v. ATF*,
  No. 1:20-CV-06885 (S.D.N.Y. Jan. 29, 2021) ........................................................... 5

*Cobell v. Kempthorne*,
  455 F.3d 301 (D.C. Cir. 2006) ................................................................................... 17

*Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*,
  600 F.2d 1184 (5th Cir. 1979) .................................................................................... 13

*Def. Distributed v. United States Dep't of State*,
  838 F.3d 451 (5th Cir. 2016) ...................................................................................... 13

*Dist. 50, United Mine Workers of Am. v. Int'l Union, Union Mine Workers of Am.*,
  412 F.3d 165 (D.C. Cir. 1969) ................................................................................... 17

*Family Rehab., Inc. v. Azar*,
  3:17-CV-3008, 2018 WL 3155911 (N.D. Tex. June 28, 2018) .................................. 13

*Green Valley Special Util. Dist. v. City of Schertz*,
  969 F.3d 460 (5th Cir. 2020) ...................................................................................... 16

*Jacksonville Port Auth. v. Adams*,
  556 F.2d 52 (D.C. Cir. 1997) ..................................................................................... 17

*Janvey v. Alguire,*
    647 F.3d 585 (5th Cir. 2011) .................................................................. 15

*Jiao v. Xu,*
    28 F.4th 591 (5th Cir. 2022) .................................................................. 14

*Milsen Co. v. Southland Corp.,*
    454 F.2d 363 (7th Cir. 1971) .................................................................. 14

*Miss. Power & Light Co. v. United Gas Pipe Line Co.,*
    760 F.2d 618 (5th Cir. 1985) .................................................................. 13

*N. Mariana Islands v. United States,*
    686 F. Supp. 2d 7 (D.D.C. 2009) .......................................................... 16

*N.Y. Progress & Prot. PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013) .................................................................. 16

*Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.,*
    621 F.2d 683 (5th Cir. 1980) .................................................................. 13

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016) .................................................................. 15

*Texas v. Seatrain Int'l, S.A.,*
    518 F.2d 175 (5th Cir. 1975) .................................................................. 13

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ............................................................ 16, 17

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1992) .............................................................................. 15

*Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.,*
    805 F.2d 351 (10th Cir. 1986) ................................................................ 15

*U.S. Navy SEALs 1-26 v. Biden,*
    578 F. Supp. 3d 822 (N.D. Tex. 2022) ................................................... 18

*Wages and White Lion Invs., LLC v. FDA,*
    16 F.4th 1130 (5th Cir. 2021) ................................................................ 15

**Statutes**

18 U.S.C. § 921(a)(3)(B) .......................................................................... 3, 10

**Other Authorities**

Gun Control Act of 1968 ............................................................................................ 3

H.R. 1454, 117th Cong. (2021)................................................................................. 6

S. 1558, 117th Cong. (2021)..................................................................................... 6

**Rules**

27 C.F.R. § 478.11 ........................................................................................ 1, 10, 11

*Definition of "Frame or Receiver" and Identification of Firearms*,
   86 Fed. Reg. 27 (May 21, 2021)........................................................................... 7

*Definition of "Frame or Receiver" and Identification of Firearms*,
   87 Fed. Reg. 24 (Apr. 26, 2022)............................................................................ 9

*Title and Definition Changes*,
   43 Fed. Reg. 13,531, 13 (Mar. 31, 1978) ............................................................. 4

**INTRODUCTION**

On September 2, 2022 and on November 3, 2022, this Court granted a preliminary injunction as requested by Plaintiff Tactical Machining, LLC ("Tactical Machining") and Intervenor Blackhawk Manufacturing Group, Inc. *See* Order and Opinion on Preliminary Injunction dated September 2, 2022 ("September 2 Order"), ECF No. 56 and Order and Opinion on Blackhawk Manufacturing Group Inc. d/b/a/ 80 Percent Arms' ("BlackHawk") Preliminary Injunction dated November 3, 2022 ("November 3, 2022 Order), ECF No. 118. Reiterating its September 2, 2022 Order, in the November 3, 2022 Order, the Court found that ATF Final Rule 2021R-05F, which was published in the Federal Register on April 26, 2022 and went into effect on August 24, 2022 ("Final Rule") included provisions that are "facially unlawful" and that "unlawfully expand ATF's authority beyond the boundaries set by the Gun Control Act." ECF No. 56 at 9, 12. In granting preliminary injunctive relief to BlackHawk, this Court found that because BlackHawk's challenge to the Final Rule paralleled the Plaintiff's claims,[1] it "similarly finds that BlackHawk has shown a substantial likelihood of success on the merits of its claims." ECF No. 118 at 5-6.

Like Tactical Machining and BlackHawk, Intervenor-Plaintiff Not an LLC d/b/a JSD Supply ("JSD Supply") is manufacturer for whom nearly 60% of its products are subject to regulation under the Final Rule. *See* Declaration of Jordan Vinroe dated January 3, 2023 and submitted herewith as Exhibit A ("Vinroe Decl.") ¶ 7.

Like Tactical Machining and BlackHawk, JSD Supply faces an existential threat to its ability to continue operating because of the sharp decline in sales caused by the profound

---

[1] Plaintiffs collectively "have demonstrated a strong likelihood of success on their claims that the Final Rule—specifically, 27 C.F.R. §§ 478.11, 478.12(c)—exceeds the scope of ATF's authority under the Gun Control Act." *Id*. at 15.

1

uncertainty as to potential criminal ramifications in the ATF's enforcement of the Final Rule since it took effect August 24, 2022. Vinroe Decl. ¶¶ 10–16.  Since the Final Rule's effective date, JSD Supply's average daily revenue has declined by more than 60% as many of its customers have expressed alarm at the prospect of possibly committing a felony by merely purchasing JSD Supply's products. *Id*. ¶ 14. Currently, JSD Supply is operating under financial hardship and burning through its cash reserves. *Id*. ¶¶ 17-19. If sales do not recover quickly, JSD Supply risks being forced to shut down and cease operations well before a final judgment is rendered in this proceeding. *Id*. ¶¶ 19.

Like Tactical Machining and BlackHawk, JSD Supply faces nonrecoverable compliance costs which this Court found in its September 2 Order constitute irreparable harm. ECF No. 56 at 17–19. Like Tactical Machining and BlackHawk, JSD Supply was forced to discontinue popular product offerings from its online store after the Final Rule took effect in order to avoid the possibility of criminal or civil exposure under the Final Rule's vague provisions. Vinroe Decl. ¶¶ 10-11; ECF No. 56 at 17.  However, unlike Tactical Machining—who for now is protected from ATF's enforcement of the unlawful Final Rule—JSD Supply remains exposed to pervasive confusion, uncertainty, loss of liberty, and plummeting revenue as it attempts to continue operating in a massively destabilized marketplace. *Compare* ECF No. 56 at 17 *with* Vinroe Decl.

The Biden Administration's political rhetoric makes it clear that it seeks to wipe out JSD Supply and companies like it, and thereby significantly limit the ability of U.S. citizens to legally buy parts, tools, and jigs—which for decades prior to the Final Rule were legal under the Gun Control Act and earlier classification letters issued by ATF—in order to make their own firearms and enjoy the full scope of rights guaranteed by the Constitution, including their Second Amendment rights. The Final Rule is already achieving measurable success in accomplishing the

White House's misguided goals. JSD Supply therefore requests that the Court grant preliminary injunctive relief on a nationwide basis suspending enforcement of the Final Rule and re-instituting the status quo as it existed prior to August 24, 2022, which will allow JSD Supply to continue engaging in the lawful, interstate purchase and sale of frame and receiver blanks, jigs and tools, while the Court adjudicates the Final Rule's lawfulness. Alternatively, JSD Supply requests that this Court enjoins ATF's ability to rescind the lawful classification letter issued to JSD Supply by ATF on November 21, 2017 in order for JSD Supply to lawfully continue selling non-regulated receiver blanks with non-regulated tools, jigs, and instructions as it did prior to the Final Rule's effective date. *See* ATF Classification Determination dated November 21, 2017, submitted herewith as Exhibit B.

## STATEMENT OF FACTS

### I.      BACKGROUND

#### A.      Statutory and Regulatory Background

The United States of America has a long tradition of individuals privately making their own firearms, which dates back to the American Revolution. "[G]un-making at home was *essential* to the Continental Army, and typically, it was more practical and efficient to assemble [a firearm from parts] rather than completely start from scratch."[2] Law-abiding individuals in this country have always been allowed to make their own firearms, even after the passage of the Gun Control Act of 1968 ("GCA").

---

[2] *Stop Gun Violence: Ghost Guns: Hearing Before the Subcomm. on the Constitution, of the S. Comm. on the Judiciary*, 117th Cong. 5 (testimony of Ashley Hlebinsky; emphasis in original), https://www.judiciary.senate.gov/imo/media/doc/Ashley%20Hlebinsky%20Written%20Testimony%20Final.pdf

The "frame or receiver" of a firearm is the component of the firearm that is subject to federal firearms regulations. *See* 18 U.S.C. § 921(a)(3)(B) (defining a "firearm" as including "the frame or receiver of any such weapon"). Today, many Americans who choose to make their own firearms do so using frame and receiver blanks, also known as "unfinished" or "incomplete" frames and receivers, which are raw materials that have undergone some, but not all, of the stages of manufacturing necessary to produce a complete, functioning firearm frame or receiver.

As noted in the Court's September 2 Order and November 3 Order, in 1978 the ATF promulgated a rule interpreting the phrase "frame or receiver." ECF No. 56 at 2; ECF No.118 at 2, 5. The rule defined the "frame or receiver" of a firearm as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." *Title and Definition Changes*, 43 Fed. Reg. 13,531, 13,537 (Mar. 31, 1978). That definition remained in place for over 40 years, during which time ATF has issued written classification determinations to businesses stating that their frame and receiver blank products are not firearms after its Firearms and Ammunition Technology Division reviewed product samples from industry. Consequently, businesses like JSD Supply and other manufacturers, distributors, and retailers invested capital, created American jobs, and sold lawful products to customers based on their good-faith reliance on ATF's written classification determinations.

As recently as November 2020 and January 2021, the Department of Justice and ATF defended these classification determinations in litigation against gun-control proponents:

> Plaintiffs' challenges to ATF's classifications also seek to undercut the process under which, for decades, ATF has reviewed numerous items to determine if they should be classified as "firearms" under the GCA, bringing to bear the agency's technical, scientific, mechanical, and legal expertise. Receivers for the AR-15, the most common rifle in America, have a space within them called the fire- control cavity, which accommodates the firing components. The longstanding position of ATF is that, where a block of metal (or

4

other material) that may someday be manufactured into a receiver bears no markings that delineate where the fire-control cavity is to be formed and has not yet been even partially formed, that item is not yet a receiver . . ..

Fed. Defs.' Mot. Dismiss at 2, *California v. ATF*, No. 3:20-CV-06761 (N.D. Cal. Nov. 30, 2020), ECF No. 29 at 11, 2020 WL 9849685.[3]   In 2021 Defendants emphasized ATF's consistent application of classification standards spanning more than four decades:

> The Record contains classification letters dating back to the 1970s. These classification letters make plain that ATF has consistently adopted a standard whereby the degree of machining to the frame or receiver determined whether the device constituted a firearm….
>
> … Not one of the above-noted classification letters made reference to the amount of time that would be required to transform the given device into a fully functional frame or receiver. Further, these letters are only a few of the examples contained in the Record of ATF making determinations based on the degree of machining performed on the unfinished frame or receiver with no reference whatsoever to the time required to transform the device into a fully functional frame or receiver.

Fed. Defs.' Mot. for Summ. J. at 30–32, *City of Syracuse v. ATF*, No. 1:20-CV-06885 (S.D.N.Y. Jan. 29, 2021), ECF No. 98 at 40–42.[4]

### B.     The Biden Administration Announces That It "Will Not Wait for Congress to Act to Take Its Own Steps" on Gun Control

President Biden campaigned on a promise to "Stop 'ghost guns'" which the Biden campaign described as a weapon obtained illegally by people "assembling one on their own [] by buying a kit of disassembled gun parts."[5] Specifically, then-candidate Biden promised to "pass[] legislation" to "stop the proliferation of these so-called 'ghost guns.'"

---

[3] The government's brief is available at https://storage.courtlistener.com/recap/gov.uscourts.cand.366534/gov.uscourts.cand.366534.29.0.pdf

[4] The government's brief is available at https://storage.courtlistener.com/recap/gov.uscourts.nysd.542991/gov.uscourts.nysd.542991.98.0.pdf

[5] *The Biden Plan to End Our Gun Violence Epidemic*, BIDEN-HARRIS DEMOCRATS, https://joebiden.com/gunsafety/ (last visited Sep. 19, 2022).

After President Biden took office, members of Congress proposed bills changing the way ATF classifies frame and receiver blanks not currently defined as firearms. None of those bills became law. *See*, *e.g.*, S. 1558, 117th Cong. (2021) (Untraceable Firearms Act of 2021)[6]; H.R. 1454, 117th Cong. (2021) (Ghost Guns Are Guns Act).[7] Because the Biden Administration was unable to accomplish its legislative goal through the constitutional process of bicameralism and presentment, it turned to unilateral executive action and unlawful means to achieve its aims for regulating firearms.

On April 7, 2021, the White House announced that President Biden was "reiterating his call for Congress to pass legislation."[8] The announcement also stated that "this Administration will not wait for Congress to act to take its own steps" on gun control. The announcement instructed the Department of Justice to "within 30 days … issue a proposed rule to help stop the proliferation" of so-called "ghost guns."

On April 8, 2021, President Biden, Vice President Harris, and Attorney General Garland held a press conference at the White House Rose Garden. President Biden stated that he "asked the Attorney General and his team to identify for me immediate, concrete actions I could take now without having to go through the Congress."[9] Attorney General Garland stated in his remarks that

---

[6] https://www.congress.gov/bill/117th-congress/senate-bill/1558

[7] https://www.congress.gov/bill/117th-congress/house-bill/1454

[8] *Fact Sheet: Biden-Harris Administration Announces Initial Actions to Address the Gun Violence Public Health Epidemic*, THE WHITE HOUSE (Apr. 7, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/07/fact-sheet-biden-harris-administration-announces-initial-actions-to-address-the-gun-violence-public-health-epidemic/.

[9] *Remarks by President Biden on Gun Violence Prevention*, THE WHITE HOUSE (Apr. 8, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/04/08/remarks-by-president-biden-on-gun-violence-prevention/.

"the proliferation of the so-called ghost guns" was caused by a "regulatory loophole" or "gap,"[10] even though the proliferation of such products was actually the direct result of ATF's proper legal determinations pursuant to the GCA, and carefully considered decisions to issue classification determinations approving the lawful, unregulated sale of such products.

On May 7, 2021, Attorney General Garland announced ATF proposed rule 2021R–05, titled *Definition of "Frame or Receiver" and Identification of Firearms*, 86 Fed. Reg. 27,720 (May 21, 2021). On May 11, 2021, the U.S. Senate Committee on the Judiciary's Subcommittee on the Constitution held a hearing on proposed legislation addressing so-called "ghost guns." At the hearing, Senator Richard Blumenthal admitted that one reason he proposed the legislation was that "under federal law" frame and receiver blanks are not classified as firearms.[11]

During the 90-day comment period for the proposed rule—from May 21 to August 19, 2021—the public submitted approximately 290,000 comments on the proposed rule.[12]

In February 2022, President Biden and Attorney General Garland traveled to New York City for a meeting of the Gun Violence Prevention Task Force. At that meeting, President Biden

---

[10] *Attorney General Garland's Full Remarks on Gun Violence Prevention at the White House Rose Garden*, U.S. DEP'T OF JUSTICE (Apr. 8, 2021), http://www.justice.gov/opa/speech/attorney-general-garland-s-full-remarks-gun-violence-prevention-white-house-rose-garden.

[11] *Stop Gun Violence: Ghost Guns: Hearing Before the Subcomm. on the Constitution, of the S. Comm. On the Judiciary*, 117th Cong. 5 (statement of Sen. Blumenthal), https://www.judiciary.senate.gov/meetings/stop-gun-violence-ghost-guns (stating at 22:19 that "they are guns, except under federal law").

[12] ATF, *Comments on Proposed Rule 2021R-05*, https://www.atf.gov/rules-and-regulations/definition-frame-or-receiver/submit-comment.

stated that "this spring, the Justice Department will issue a final rule to regulate these so-called 'ghost guns.'"[13]

As the one-year anniversary of the Biden Administration's press conference at the White House Rose Garden drew near, political pressure mounted on the Biden Administration to issue a final rule as soon as possible. In March 2022, the New York Times reported that then-Acting ATF Director Marvin Richardson stated at an industry gathering that ATF was expected to announce its Final Rule by June 2022. A Department of Justice spokesperson said he "was simply reading from a White House budget office document," but two White House officials told the New York Times that "Mr. Richardson had misspoken and that the rule would, in fact, be finished by early April."[14] Shortly thereafter, Mr. Richardson was removed from his position as Acting Director and replaced with the Acting Director Gary Restaino.

On April 8, 2022, exactly one year after the President's press conference at the White House Rose Garden, Politico reported that Senator Chris Murphy and more than 100 Democrat legislators sent a letter to President Biden on March 25, 2022, "pressing Biden to take unilateral action on guns," including "[f]inaliz[ing] a regulation to crack down on so-called ghost guns before

---

[13] *Remarks by President Biden at a Gun Violence Prevention Task Force Meeting*, THE WHITE HOUSE (Feb. 3, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/02/03/remarks-by-president-biden-at-a-gun-violence-prevention-task-force-meeting/.

[14] *See* Glenn Thrush, *Dueling Messages Muddle Biden's Agenda on Guns*, N.Y. TIMES (Mar. 4, 2022), https://www.nytimes.com/2022/03/04/us/politics/atf-biden-gun-reform.html.

Democrats potentially lose control of Congress."[15] The article noted that Democrats were "exasperated" at how much time it was taking for the Biden Administration to issue a final rule.

On April 11, 2022, President Biden announced at the White House Rose Garden that the Final Rule was complete. President Biden stated that a "year ago this week … I instructed the Attorney General to write a regulation that would rein in the proliferation of ghost guns because I was having trouble getting anything passed in the Congress."[16] He explained that the Final Rule's purpose was to make it "illegal to manufacture" weapon parts kits and "[i]llegal for a licensed dealer to sell them" without complying with the same regulatory requirements governing the manufacture and sale of complete firearms.

The Final Rule was published on April 26, 2022, *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022),[17] and took effect on August 24, 2022.

### C. The Final Rule Purports to Regulate *Partial* Frames and Receivers and Creates a New Definition of "Firearm"

In its analysis of ATF's promulgation of the Final Rule, this Court observed that "[r]ather than merely updating the terminology, ATF decided to regulate *partial* frames and receivers." ECF No. 56 at 3 (emphasis in original). As described in the Court's September 2 Order:

> Under the new Final Rule, "[t]he terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver

---

[15] Laura Barrón-López, *Democrats Exasperated With Biden on Gun Control*, POLITICO (Apr. 8, 2022), https://www.politico.com/news/2022/04/08/democrats-biden-gun-control-00024097.

[16] *Remarks by President Biden Announcing Actions to Fight Gun Crime and His Nominee for ATF Director, Steve Dettelbach*, THE WHITE HOUSE (Apr. 11, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/04/11/press-briefing-by-press-secretary-jen-psaki-april-11-2022/.

[17] The Final Rule is available at https://www.federalregister.gov/d/2022-08026.

> parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." *Id*. § 478.12(c). But "[t]he terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." *Id*. When determining whether an object is a frame or receiver, the ATF Director is not limited to looking only at the object. "When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit . . . ." *Id*.

*Id*. at 3.

The Final Rule also changes and broadens ATF's definition of "firearm" to include "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11 (definition of "firearm").

## II.     THIS COURT HAS ALREADY DETERMINED THAT THE FINAL RULE EXCEEDS ATF'S STATUTORY AUTHORITY UNDER THE PLAIN LANGAUGE OF THE GUN CONTROL ACT

In seeking a preliminary injunction, Plaintiffs argued that the Final Rule exceeds ATF's statutory authority under the GCA in two ways: first, it "expands ATF's authority over parts that may be 'readily converted' into frames or receivers, when Congress limited ATF's authority to 'frames or receivers' as such"; and second, it "unlawfully treats weapon parts kits as firearms." ECF No. 56 at 6. This Court found that "Plaintiffs are likely to succeed on both claims." *Id*.

### A.     September 2 Order: "Parts that *may become* receivers are not receivers"

The Court's September 2 Order found that the "text of the Gun Control Act resolves [Plaintiffs'] motion" for a preliminary injunction, ECF No. 56 at 6, and in its analysis determined:

> The Final Rule's redefinition of "frame or receiver" conflicts with the statute's plain meaning. The definition of "firearm" in the Gun Control Act does not cover all firearm parts. It covers specifically "the frame or receiver of any such weapon" that Congress defined as a firearm. 18 U.S.C. § 921(a)(3)(B). That which *may become* a receiver is not itself a receiver.

*Id*. at 8 (emphasis in original). This Court's analysis concluded that ATF's newly expanded definitions in the Final Rule were "facially unlawful":

> Congress excluded other adjectives that ATF adds to its definition. The Final Rule covers "disassembled" and "nonfunctional" frames and receivers. 27 C.F.R. § 478.12(c). Congress's definition does not. …
>
> ATF's new definition of "frame or receiver" in 27 C.F.R. § 478.12(c) is ***facially unlawful***. By comparison, the Final Rule includes definitions of "frame" and "receiver" in § 478.12(a) that appear to be consistent with the statute. This further highlights that the Final Rule's expansion of authority in § 478.12(c) to firearm parts that are not yet frames or receivers goes beyond Congress's definition. In other words, § 478.12(a) describes the full scope of frames and receivers that are consistent with the statutory scheme. ATF's expansion in § 478.12(c), on the other hand, covers additional parts that are "designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). But Congress intentionally omitted that language from the definition. Section 478.12(c) is thus ***facially unlawful*** because it describes only parts that Congress intentionally excluded from its definition of "firearm." It is purely an expansion of authority beyond the statutory language.

*Id*. at 9–10 (emphasis added).

This Court's September 2 Order went on to reject Defendants' counterarguments that ATF was entitled to deference in regulating components that ATF itself determined to *not* be a frame or receiver. *Id*. at 10. The Court likewise found Defendants' attempt to invoke "boundless congressional intent" regarding the GCA to be unpersuasive as justification for the Final Rule's overreach:

> Contrary to Defendants' broad framing, 'the regulatory goals of the Gun Control Act were narrower: the Act ensured that '*weapons* [were] distributed through regular channels and in a traceable manner and [made] possible the prevention of sales to undesirable customers and the detection of the origin of particular *firearms*.'" *New York v. Burger*, 482 U.S. 691, 713 (1987) (emphases added) (alterations in original) (citing *United States v. Biswell*, 406 U.S. 311, 315–16 (1972)). When Congress sought to regulate parts of weapons, it did so meticulously.

*Id*. at 11.

## B.    September 2 Order: "A weapons parts kit is not a firearm"

The September 2 Order also found that "Plaintiffs are also likely to succeed on their claim that the Final Rule unlawfully treats weapon parts kits as firearms." ECF No. 56 at 12.  This Court explained how the Final Rule's use of "weapons parts kits" impermissibly expanded ATF's authority beyond the scope provided by the GCA:

> The Final Rule contains its own definition of "firearm," notwithstanding that the Gun Control Act already defines the term. Under the Final Rule, "[t]he term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11 (definition of "firearm"). That language conflicts with the statute's definition of "firearm."
>
> ***ATF has no general authority to regulate weapon parts.*** But the Final Rule grants ATF that general authority by copying language used throughout the statutory definition. It takes phrases like "designed to" and "may readily be converted" and "assembled" from various places in the statute, cobbling them together to form ATF's own definition of "firearm." Those terms may add a patina of credibility to the drafting, but they tarnish Congress's carefully crafted definition. More importantly, they unlawfully expand ATF's authority beyond the boundaries set by the Gun Control Act.

*Id*. at 12 (emphasis added).

### C. November 3 Order:  proper scope of relief is that which mirrors the relief currently afforded to Tactical Machining, LLC.

This Court's November 3, 2022 Order found that the relevant facts and law weigh in favor of granting intervenor BlackHawk's request for a preliminary injunction:

> As BlackHawk requests and the Government concedes, 41 the proper scope of relief is that which mirrors the relief currently afforded to Tactical Machining, LLC.42 Thus, any protective relief provided to BlackHawk must be sufficient to redress its injuries, without being overly inclusive. As this Court has previously found, BlackHawk's injuries cannot be remedied if its only source of revenue—customer willingness to transact business—has been severely curtailed. Thus, the Court finds that the proper remedy is an injunction that applies to the company itself and to its customers.

This Court also noted that the Government's purported regulation of firearm parts was "contrary to the plain language of the GCA."  ECF 118 at 5.  It then stated "the Government's

12

likely ultra vires enforcement efforts upset more than fifty years of ATF regulatory precedent against a public that has relied on that historic posture." ECF 118 at 10.

## ARGUMENT

Because the Final Rule is unlawful and could ultimately destroy JSD Supply's business, JSD Supply seeks a preliminary injunction to "preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained." *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017). Courts look to four factors in deciding whether to grant preliminary injunctive relief: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest." *Id*. The third and fourth factors—"assessing the harm to the opposing party and weighing the public interest"—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The decision on whether to grant preliminary relief is left to the district court's sound discretion. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). To prevail on a preliminary injunction motion, the movant must "present a prima facie case" but "is not required to prove his case in full." *Id.* at 684.

## I.   THE COURT'S SEPTEMBER 2 AND NOVEMBER 3 ORDERS ESTABLISHES THAT JSD SUPPLY IS LIKELY TO PREVAIL ON THE MERITS

A movant "appealing to the conscience of the chancellor to maintain the status quo … is not required to prove to a moral certainty that his is the only correct position." *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975). "As long as the court cannot say there is no likelihood of prevailing on the merits but finds the factor of substantial likelihood of success present to some degree, then the party seeking the injunction has met its burden." *Family Rehab., Inc. v. Azar*, 3:17-CV-3008, 2018 WL 3155911, at *3 (N.D. Tex. June 28, 2018) (citing *Productos Carnic, S.A.*

*v. Cent. Amer. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980)). "A preliminary injunction may issue … despite the existence of a plausible defense, as long as the movant demonstrates a substantial likelihood of success." *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979). The likelihood of success on the merits is "arguably the most important of the four factors necessary to grant a preliminary injunction[.]" *Def. Distributed v. United States Dep't of State*, 838 F.3d 451, 463 (5th Cir. 2016).

Here, this Court has already found that the claims JSD Supply asserts are likely to prevail on the merits. *Compare* ECF No. 56 at 6, 12, 15 and 22 (finding, *inter alia*, that provisions of the Final Rule are "facially unlawful", that the Final Rule is outside the scope of ATF's authority under the GCA, and that the Final Rule unlawfully treats weapons parts kits as firearms) *and* JSD Supply's Complaint ¶¶ 56–61, ¶¶ 80–86, ¶¶ 102–106.

## II.   JSD SUPPLY HAS SHOWN IT WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF INJUNCTIVE RELIEF

### A.   The Final Rule Will Likely Put JSD Supply Out of Business

Nearly 60% of JSD Supply's business is producing and selling items that are subject to the Final Rule. Vinroe Decl. ¶ 7. Without injunctive relief, JSD Supply will be subject to possible criminal charges if it attempts to sell the parts, jigs, and/or tools that ATF determines violates the Final Rule and, under ATF's incorrect interpretation embodied in the Final Rule, therefore the GCA or, alternatively, if it continues its present prohibition on selling its parts, jigs, and/or tools arguably covered by the Final Rule, JSD Supply may not survive the pendency of the case and could go out of business well before the unlawfulness of the Final Rule is determined in a final judgment. *Id.* ¶¶ 21–21.

Irreparable injury exists where "the potential economic loss is so great as to threaten the existence of the movant's business." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*,

875 F.2d 1174, 1179 (5th Cir. 1989); *see also Jiao v. Xu*, 28 F.4th 591, 598 (5th Cir. 2022) (quoting *Atwood Turnkey*, 875 F.2d at 1179); *Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) ("A threat to trade or business viability may constitute irreparable harm."); *Milsen Co. v. Southland Corp.*, 454 F.2d 363, 367 (7th Cir. 1971) ("[Plaintiffs] have presented an appropriate case for preliminary injunction. . . [because plaintiffs] will lose their stores and may not be able to finance the trial on their legal claims if they lose their business now[.]").

Additionally, "harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). "Indeed, 'complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.'" *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1992) (Scalia, J., concurring in part)). In a case against the federal government, "federal agencies generally enjoy sovereign immunity for any monetary damages." *Wages and White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Therefore, JSD Supply's "lack of a 'guarantee of eventual recovery' is another reason that its alleged harm is irreparable." *Id.* (quoting *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021)).

Not only can JSD Supply not seek monetary damages against Defendants, but the ATF acknowledges the Final Rule will shut down an entire industry. By the ATF's own estimation, "the final rule could potentially affect 132,023 entities, including FFLs and non-FFL manufacturers and retailers of firearms parts kits with partially complete frames or receivers."[18] ATF further

---

[18]ATF, REGULATORY IMPACT ANALYSIS AND FINAL REGULATORY FLEXIBILITY ANALYSIS at 124 (2022), available at https://www.atf.gov/file/165811/download.

estimates that "the majority of affected entities are small entities that would experience a range of costs, the largest cost being the *dissolution of the entire business*."[19]

**B.      The Scope of Injunctive Relief Must Be Nationwide to Preserve the Status Quo and Allow JSD Supply to Continue Doing Business**

An injunction on a nationwide level is necessary because JSD Supply receives some of its inventory from out of state and most of its customers are out of state. Vinroe Decl. ¶ 12, ¶ 19. An injunction applying to only JSD Supply would not protect any manufacturers that supply the products that JSD Supply sells or any of JSD Supply's customers. Without a nationwide injunction to preserve the status quo, JSD Supply would essentially have no products, no customers, and no vendors. *Id*. As a result, JSD Supply would be unable to continue its operations as run before the Final Rule and would likely be forced out of business.  *Id*. ¶¶18-19; *see Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460 (5th Cir. 2020) (*en banc*) (noting that when "crafting an injunction, district courts are guided by the Supreme Court's instruction that the scope of injunctive relief is dictated by the extent of the violation established"); *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (affirming the grant of a preliminary injunction when there was "a substantial likelihood that a geographically-limited injunction would be ineffective" at remedying the plaintiff's injury).

Because JSD Supply cannot continue its pre-Final Rule operations without a nationwide injunction, the issuance of nationwide relief is a necessary and essential remedy to reinstate and preserve the status quo while this Court decides this case.

**III.    JSD SUPPLY'S INJURY OUTWEIGHS ANY HARM TO DEFENDANTS OR THE PUBLIC**

---

[19] *Id*. (emphasis added).

Finally, the injury to JSD Supply far outweighs any potential harm to Defendants or the public interest. Defendants face no harm from temporary relief. The relief sought is no more than what the law has dictated for over 50 years. Further, government officials have no legitimate interest in implementing an unlawful rule. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (recognizing that government officials "do[] not have an interest in the enforcement of an unconstitutional law").

Moreover, the "public interest" is properly "served by maintaining our constitutional structure and maintaining the liberty of individuals[.]" *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021); *see N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("[T]he public interest is served when administrative agencies comply with their obligations under the APA."); *see also Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58–59 (D.C. Cir. 1997) ("[T]here is an overriding public interest … in the general importance of an agency's faithful adherence to [its] statutory mandate.").

Even if Defendants had a legitimate interest in implementing the Final Rule, they, and the public, face no substantial prejudice from suspended implementation. The government's interest "can be effectively vindicated after a trial on the merits," *Texas v. United States*, 809 F.3d at 187, whereas JSD Supply's interest cannot be, given that the Final Rule will destroy its business.

JSD Supply, its customers—and indeed all Americans—risk the possibility of criminal penalties for the production, sale, and purchase of items that have not historically been considered firearms prior to the Final Rule's taking effect on August 24. *See generally*, Vinroe Decl. This regulatory risk extends to the sharing of technical instructions by JSD Supply, who has been compelled to self-censor and refrain from free discourse with its customers because of the profound uncertainty surrounding the Final Rule. *Id*. ¶ 8. Indeed, JSD Supply and similar producers and

17

retailers across the country must suffer the loss of civil liberties or risk the potential destruction of their businesses. Defendants, on the other hand, will not suffer significant harm by maintenance of the long-standing, 54-year status quo regarding what constitutes a "firearm" while this Court considers the merit of the Final Rule. Indeed, granting a preliminary injunction during the pendency of this litigation serves the public interest by allowing the Court to provide clarity on the validity of the Final Rule while "ensur[ing] the status quo is maintained so the legal system can resolve [an] important dispute." *City of Dallas, Texas v. Hall*, 2008 WL 11350041, at *3 (N.D. Tex. July 28, 2008); *see also Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006) (quoting *Dist. 50, United Mine Workers of Am. v. Int'l Union, Union Mine Workers of Am.*, 412 F.3d 165, 168 (D.C. Cir. 1969)) ("The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation."); *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 840 (N.D. Tex. 2022) ("An injunction does not disserve the public interest when it prevents constitutional deprivations.").

Finally, the public interest in preserving full access to and enjoyment of the guarantees of the First and Second Amendments undoubtedly weighs in favor of enjoining enforcement of ATF's unlawful Final Rule for the pendency of this litigation. *U.S. Navy SEALs 1-26*, at 840 ("An injunction does not disserve the public interest when it prevents constitutional deprivations.").

## CONCLUSION

For the foregoing reasons, JSD Supply respectfully requests that this Court enjoin enforcement of the Final Rule nationwide and re-institute the status quo as it existed prior to August 24, 2022 until a decision can be reached on the merits. Alternatively, JSD Supply requests that the Court issue a determination that JSD Supply is entitled to the same injunctive relief and protections granted to Tactical Machining in the Court's September 2 Order. Further and

alternatively, JSD Supply requests the Court enjoin Defendants' ability to rescind the lawful classification letter issued to JSD Supply by ATF on November 21, 2017, in order for JSD Supply to lawfully continue selling non-regulated receiver blanks with non-regulated tools, jigs, and instructions as it did prior to the Final Rule's effective date.

Respectfully submitted,

*/s/ Matthew J. Smid*
MATTHEW J. SMID
TX Bar No. 24063541
ATTORNEY AT LAW
301 Commerce Street, Suite 2001
Fort Worth, Texas 76102
Phone: (817) 332-3822 Phone
Fax: (817) 332-2763 Fax
matt@mattsmidlaw.com


J. Mark Brewer
TX Bar No. 02965010
BREWER & PRITCHARD, P.C.
800 Bering Dr., Suite 201
Houston, TX 77057
(713) 209-2910
brewer@bplaw.com

*Counsel for proposed Intervenor-Plaintiff Not an LLC dba JSD Supply*

19