**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| JENNIFER VANDERSTOK; MICHAEL G. ANDREN; TACTICAL MACHINING, LLC, a limited liability company; and FIREARMS POLICY COALITION, INC., a nonprofit corporation, | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| BLACKHAWK MANUFACTURING GROUP INC. d/b/a 80 PERCENT ARMS, | ) ) ) | |
| **Intervenor Plaintiff,** | ) ) ) | Civil Action No. 4:22-cv-00691-O |
| DEFENSE DISTRIBUTED, and SECOND AMENDMENT FOUNDATION, INC., | ) ) ) | |
| **Intervenor Plaintiffs,** | ) ) ) | |
| and | ) ) | |
| POLYMER80, INC., | ) ) | |
| **Applicant in Intervention,** | ) ) | |
| v. | ) ) | |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; STEVEN DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, | ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

<u>**APPENDIX IN SUPPORT OF POLYMER80, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO INTERVENE**</u>

| Exhibit No. | Description | APP No. |
|:---:|:---|:---:|
| A | Declaration of Loran L. Kelley Jr. | 002 |
| B | Open Letter dated December 27, 2022 | 008 |
| C | ATF Letter dated January 18, 2017 | 019 |
| D | ATF Letter dated November 2, 2015 | 027 |
| E | Polymer80, Inc. Letter dated December 27, 2022 | 047 |
| F | Polymer80, Inc.'s Proposed Complaint for Declaratory and Injunctive Relief | 058 |

Respectfully submitted,

**BRADLEY ARANT BOULT CUMMINGS LLP**

By:  */s/ Dennis L. Daniels Jr.*
DENNIS L. DANIELS JR.
Texas Bar No. 24107402
dldaniels@bradley.com
3600 Fountain Place
1445 Ross Avenue
Dallas, Texas 75202
Telephone (214) 257-9800
Facsimile (214) 939-8787

JAMES W. PORTER, III (*pro hac vice* forthcoming)
jporter@bradley.com
MARC A. NARDONE (*pro hac vice* forthcoming)
mnardone@bradley.com
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street NW
Suite 1350
Washington, D.C. 20036
Telephone (202) 393-7150
Facsimile (202) 347-1684

**ATTORNEYS FOR POLYMER80, INC.**

2

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 9, 2023, the foregoing document was served, via the Court's CM/ECF Document Filing System, upon the registered CM/ECF users in this action.

<u>*/s/ Dennis L. Daniels*</u>
Dennis L. Daniels

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| JENNIFER VANDERSTOK; MICHAEL G. ANDREN; TACTICAL MACHINING, LLC, a limited liability company; and FIREARMS POLICY COALITION, INC., a nonprofit corporation, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| BLACKHAWK MANUFACTURING GROUP INC. d/b/a 80 PERCENT ARMS, | ) ) ) | |
| Intervenor Plaintiff, | ) ) | Civil Action No. 4:22-cv-00691-O |
| DEFENSE DISTRIBUTED, and SECOND AMENDMENT FOUNDATION, INC., | ) ) ) | |
| Intervenor Plaintiffs, | ) ) | |
| and | ) ) | |
| POLYMER80, INC., | ) ) | |
| Applicant in Intervention, | ) ) | |
| v. | ) ) | |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; STEVEN DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF LORAN L. KELLEY JR.

I, Loran L. Kelley Jr., declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that

the following statements are true and correct to the best of my knowledge:

1

1.     I am over eighteen (18) years of age, am fully competent to testify, and have personal knowledge of the matters set forth herein.

2.     I am a citizen of the United States of America and reside in the State of Nevada.

3.     I am one of the founders of Polymer80, Inc. ("Polymer80") and am its President and Chief Executive Officer. As its senior officer, I am deeply familiar with all of Polymer80's business and commercial activities.

4.     Polymer80 is incorporated under the laws of the State of Nevada and has its principal place of business in Dayton, Nevada.

5.     Plaintiff Polymer80 designs, manufactures, markets, and distributes firearms, non-firearm products such as receiver blanks (partially complete, disassembled, or nonfunctional frames), and other innovative products, components, and accessories. At the heart of Polymer80's business is the aim to allow customers to participate in the build process of creating a constitutionally protected instrument. Polymer80 is and has been the industry leader in the design, manufacture, and distribution of receiver blanks, jigs, and associated kits. Others in this industry include Blackhawk Manufacturing Group Inc., Tactical Machining LLC, and Defense Distributed. Polymer80's core business is manufacturing and distributing the very items Defendants regulate under ATF final rule 2021R-05F ("Final Rule"), the December 27, 2022 Open Letter, and the December 27, 2022 Polymer80 Letter.

6.     Polymer80's customers are do-it-yourself hobbyists who appreciate the challenge of manufacturing their own firearms. Our products, including our receiver blanks, uniquely provide responsible, law-abiding citizens the means of creating a constitutionally-protected instrument. Polymer80 distributes receiver blanks throughout the United States, including within this district. Receiver blanks are popular among Polymer80's customers, many of whom reside in

this district. Polymer80 has sold a substantial number of its products in this district, and attends—and sells its products at—the biannual Nation's Best Sports trade show, which occurs in Fort Worth. Polymer80 intends to continue and grow its sales of receiver blanks into the Dallas Forth-Worth area and into Texas generally.

7.     Under the ATF's longstanding application of the Gun Control Act of 1968, evidenced and established through extensive classification determinations issued to the industry (including directly to Polymer80) over many decades, Polymer80's receiver blanks are not a "frame or receiver" or "firearm" as that term is defined in the Gun Control Act.

8.     Polymer80 was therefore able to lawfully sell its receiver blanks directly to consumers, who could lawfully purchase these products through our website and ship products to those customers through the mail throughout the country and to this district. For as long as Polymer80 has been in operation, this practice did not subject it or its customers to potential criminal liability or enforcement by the ATF or the United States Department of Justice.

9.     I am familiar with the "Classification Letters" issued to Polymer80 by the United States Bureau of Alcohol, Tobacco, Firearms and Explosive ("ATF"), determining that Polymer80 pistol frame or receiver blanks are *not* "firearm[s]" under the meaning of the Gun Control Act. *See* Classification Letter, ATF (Jan. 18, 2017) (determining that Polymer80's PF940C pistol blank frame is not a firearm) (attached to the complaint as Exhibit B); Classification Letter, ATF (Nov. 2, 2015) (determining that Polymer80's Glock-type GC9 pistol frame blank and Polymer80's Warrhogg receiver blank are not firearms) (attached to the complaint as Exhibit C). Those Classification Letters are extremely important to Polymer80 and key components and foundations of its business today. Polymer80 conducted its business model in accordance with these Classification Letters.

3

10.     Since the Final Rule was published in April 2022, Polymer80 has devoted extensive time and resources to try to understand what the Final Rule says and how the Final Rule would affect Polymer80, for the purpose of continued compliance with all ATF rules and regulations. After reading the Final Rule's vague and confusing text and listening to the public statements of President Biden and Attorney General Garland, it appears that the intent of the Final Rule is to improperly reclassify receiver blanks as the legal equivalent of complete, functional, regulated "frames or receivers" under federal law.

11.     Since ATF published its Open Letter—which adjudicated the "Impact of Final Rule 2021-05F on Partially Complete Polymer80, Lone Wolf, and Similar Semiautomatic Pistol Frames"—and the since the ATF sent the Polymer80 Letter to Polymer80 specifically—which reinforced the Open Letter but tailored its "evaluation" to only Polymer80's products and was sent only to Polymer80—Polymer80 has devoted extensive time and resources to try to understand what the Open Letter and Polymer80 Letter says and how they will affect Polymer80. Neither the Open Letter nor the Polymer80 Letter were in any way prompted by Polymer80.

12.     The Final Rule and Open Letter make it impossible for manufacturers, including Polymer80, to determine with any reasonable certainty which regulatory requirements apply to a product design. Polymer80 attempted in good faith to comply with the Final Rule by, for instance, selling receiver blanks without jigs, but the Open Letter and Polymer80 Letter prohibit Polymer80 from engaging in even that practice.

13.     Polymer80 is adversely affected by the Final Rule, Open Letter, and Polymer80 Letter because they forced Polymer80 to discontinue sales of unfinished-frame kits and unfinished frames as they are currently designed. Polymer80 has also regulated its protected speech by deleting instruction materials regarding its receiver blanks from its website.

14.     Polymer80's business model and continued existence are reliant on its sales of receiver blanks that have long been held and understood not to be "firearms" under federal law but are under unlawful and unconstitutional attack from the Biden Administration. The Final Rule, in conjunction with the Open Letter and the Polymer80 Letter, have caused profound economic harm to Polymer80 and threaten its very existence as a going concern. Dated, this the 9th day of January, 2023

Loran L. Kelley Jr.

5

# EXHIBIT B



**U.S. Department of Justice**
Bureau of Alcohol, Tobacco,
Firearms and Explosives
*Office of Enforcement Programs and Services*
Washington, DC 20226
*www.atf.gov*

December 27, 2022

## OPEN LETTER TO ALL FEDERAL FIREARMS LICENSEES

### Impact of Final Rule 2021-05F on Partially Complete Polymer80, Lone Wolf, and Similar Semiautomatic Pistol Frames

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is issuing this open letter to assist the firearms industry and the public in understanding whether a "partially complete, disassembled, or nonfunctional" frame of a Polymer80, Lone Wolf, or similar semiautomatic, striker-fired pistol (sometimes generally referred to as "Glock-type" pistols) has reached a stage of manufacture such that it "may readily be completed, assembled, restored, or otherwise converted" to a functional frame, and is therefore classified as a "frame" or "firearm" in accordance with the final rule titled *Definition of 'Frame or Receiver' and Identification of Firearms* (Final Rule 2021R-05F), which became effective August 24, 2022.  In particular, the following addresses partially complete, disassembled, or nonfunctional semiautomatic striker-fired pistol frames or parts kits manufactured, sold, or distributed by Polymer80 (known as 'Poly80' or 'P80' frames or blanks), Lone Wolf (known as 'Freedom Wolf 80%' frames), and others, with the characteristics described below.

## Summary

Applying the regulatory text of Final Rule 2021-05F, partially complete Polymer80, Lone Wolf, and similar striker-fired semiautomatic pistol frames, including, but not limited to, those sold within parts kits, have reached a stage of manufacture where they *"may readily be completed, assembled, restored, or otherwise converted"* to a functional frame.  This definition of "readily" applies to each and every classification of a partially complete frame or receiver under this Rule, whether sold alone or as part of a kit.  Therefore, *even without* any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials, these partially complete pistol frames are "**frames**" and also "**firearms**" as defined in the GCA and its implementing regulations, 18 U.S.C. § 921(a)(3)(B) and 27 CFR 478.12(a)(1), (c).

## Background

The Gun Control Act (GCA) defines the term "**firearm**" as: *"...(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive;* **(B) the frame or receiver of any such weapon**; *(C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique*

-2-

*firearm.*" (Emphasis added.)  18 U.S.C. § 921(a)(3).  The GCA implementing regulations define the terms "frame" and "receiver" by describing a single housing or structural component for one specific fire control component of a given weapon—for example, a single housing is specified for particular weapons such as a "handgun" and a "rifle."  27 CFR 478.12(a).

The regulation defines the term "**frame**" in 27 CFR 478.12(a)(1), as *"the part of a handgun, or variants thereof, that provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence, even if pins or other attachments are required to connect such component (i.e., sear or equivalent) to the housing or structure.*"

Further, 27 CFR 478.12(c) explains when a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, is regulated as a "**frame**" or "**receiver**":

> *The terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, i.e., to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projectile weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be.  The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material).  When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.*

Section 478.11 defines "**readily**" as:

> *A process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state.  With respect to the classification of firearms, factors relevant in making this determination include the following:*
>
> *(a) Time, i.e., how long it takes to finish the process;*
> *(b) Ease, i.e., how difficult it is to do so;*
> *(c) Expertise, i.e., what knowledge and skills are required;*
> *(d) Equipment, i.e., what tools are required;*
> *(e) Parts availability, i.e., whether additional parts are required, and how easily they can be obtained;*
> *(f) Expense, i.e., how much it costs;*
> *(g) Scope, i.e., the extent to which the subject of the process must be changed to finish it; and*

-3-

*(h) Feasibility, i.e., whether the process would damage or destroy the subject of the process or cause it to malfunction.*

The above list of factors is a non-exhaustive list but represents factors that have been identified by federal courts as being relevant to a "**readily**" analysis with respect to firearms. For each and every assessment of whether any partially complete frame (in the case of a handgun) or receiver (in the case of a long gun) – whether assessed individually, or in conjunction with other items – is a "firearm" under the GCA, parties must consider the above definition, including all factors that are relevant to that assessment. This is true for all frames and receivers.

**Analysis**

There are many partially complete, disassembled, or nonfunctional semiautomatic pistol "frames" being marketed as so-called "partially complete" or "80%" frames. The Federal firearms statutes and regulations, however, do not employ terms such as "80%," "80% finished," or "80% complete." These are merely terms used by some to market these items; they are not based upon application of the term "**readily**" in the GCA or Final Rule 2021-05F. As used in the GCA and the Final Rule, the term "readily" does not involve evaluation of a percentage of completion for an item that, when completed, will function as a frame or receiver. Rather, the analysis examines how efficiently, quickly, and easily a clearly identifiable component part of a weapon can be completed, assembled, restored, or otherwise converted to house or provide a structure for the applicable fire control component. Such analysis may include consideration of any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are, directly or indirectly, sold, distributed, possessed, or marketed with the component part or kit. As outlined in the above definition, the analysis must consider all factors that are relevant to the assessment.

On the above mentioned "partially complete" pistol frames and products manufactured by Polymer80, Lone Wolf, and similar "partially complete" frames used to assemble semiautomatic, striker-fired pistols, the critical areas of the "**frame**" are the front and rear fire control cavities. The front and rear cavities are critical because these areas provide housing for the sear. *See* 27 CFR 478.12(a)(1), (a)(4)(iii). As further explained and illustrated below, removing or indexing any material in these critical areas, or completing or indexing any of the pin holes necessary to install the sear, are therefore crucial steps in producing a functional frame.

-4-



*Figure 1*

**In a pistol based on a Glock design, the trigger is housed in the front fire control cavity, and the sear, which is connected by the trigger bar, is located in the rear cavity.**



*Figure 2*

**For reference, in a pistol based on a Glock design, the trigger bar assembly contains the sear.  The trigger bar assembly operates as a single unit.**

-5-



*Figure 3*

**The trigger bar assembly (side view and top view) is a single unit. The frame cannot house or provide a structure for the sear without both the front and rear cavities.**

In addition, many front and rear cavities of pistol frames using this internal design incorporate slide rails that have pin holes designed to secure the trigger mechanism and sear in precise locations. Specifically, in the Polymer80 design, the front cavity also provides housing for a front slide rail module (known as the "Locking Block Rail System" or "LBRS"), and the rear cavity provides housing for a rear slide rail module (known as the "Rear Rail Module" or "RRM"). Under the Final Rule, these slide rail components are "attachments … required to connect" the sear to the frame. *See* 27 CFR 478.12(a)(1).



*Figure 4*

-6-

**The above picture, taken from Polymer80 instructional materials, shows that the trigger bar assembly is attached to the "Rear Rail Module," which is attached to the frame.**



*Figure 5*

**Top view of "Locking Block Rail System" and "Rear Rail Module" with trigger and trigger mechanism installed.**

The above mentioned "partially complete" pistol frame products marketed by Polymer80, Lone Wolf, and substantially similar "partially complete" frames used to assemble semiautomatic striker-fired pistols, are also manufactured from a polymer material and incorporate temporary rails or blocking tabs that are easily removable by a person with novice skill, using common tools, such as a Dremel-type rotary tool, within minutes—an amount of time and a set of circumstances that are far less than required to fall within the meaning of the term "readily" in the Final Rule. Once this material is removed, the partially complete frames are immediately capable of accepting both the slide rail attachments and fire control components, including the sear.

-7-



*Figure 6*

**<u>FIREARM</u> - Poly80 with Temporary Rails**



*Figure 7*

**<u>FIREARM</u> - Poly80 with Temporary Rails and Barrel Blocking Tab**



*Figure 8*

**<u>FIREARM</u> - Poly80 with Temporary Rails and Barrel Blocking Tab**

In addition, similar partially complete frame designs, such as those marketed by Lone Wolf, do not require removal of temporary rails but make it easy to attach the slide rails with connection points for the trigger mechanism and sear by incorporating fully formed front and rear fire control cavities into which the slide rails may be inserted. These slide rail attachments are

-8-

commercially available online and may be glued-on within minutes—an amount of time and a set of circumstances that are far less than required to fall within the meaning of the term "readily" in the Final Rule—with no fitting and no specialized knowledge or expertise.  The ease of obtaining and attaching such items is also pertinent as part of the analysis.



*Figure 9*

**<u>FIREARM</u> - Lone Wolf "Freedom Wolf 80%" with Cavities for Slide Rail Attachments.**



*Figure 10*



*Figure 11*

-9-

**<u>FIREARM</u> - Fully Formed Front and Rear Cavities to Attach Slide Rail Inserts**



*Figure 12*

**Locking Block Cavity**



**Trigger Mechanism Cavity**

<u>Based on the above, partially complete Polymer80, Lone Wolf, and similar pistol frames with any kind of indexing or material removed from the front or rear fire control cavities for installation of the trigger mechanism and sear, or slide rail attachments to connect the trigger mechanism and sear to the frame, have reached a stage of manufacture where they *"may readily be completed, assembled, restored, or otherwise converted"* to a functional frame.  As examined, they are classified as a "**frame**" and also a "**firearm**," as defined in the GCA, 18 U.S.C. § 921(a)(3)(B), and implementing regulations, 27 CFR 478.12(a)(1), (c).  They are classified as firearms even if they are not sold, distributed, marketed, or possessed with any associated templates, jigs, molds, equipment, tools, instructions, or guides.  While the analysis allows for the consideration of how a partially complete frame is, directly or indirectly, sold, distributed, marketed, or possessed with any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials, for these partially complete frames such analysis was not necessary because they are, by themselves, "frames" and "firearms" as defined in the GCA.</u>

This information is provided to assist the firearms industry and general public in understanding whether the above mentioned "partially complete" pistol frame products manufactured by Polymer80, Lone Wolf, and substantially similar "partially complete" frames

-10-

used to assemble semiautomatic striker-fired pistols have reached the stage of manufacture where they are classified as a "**frame**" or "**firearm**."  If persons remain unclear with respect to a specific model or configuration, they can voluntarily submit a request, under penalty of perjury, with a sample to ATF in accordance with 27 CFR 478.92(c) (GCA) or 479.102(c) (NFA).  ATF cannot render a formal determination without a formal request and physically examining a submitted sample.

If you have any questions, please contact the Firearms & Ammunition Technology Division at fire_tech@atf.gov or (304) 616-4300.

MATTHEW VARISCO
Digitally signed by MATTHEW VARISCO
Date: 2022.12.27 10:45:27 -05'00'

KRISTEN DETINEO
Digitally signed by KRISTEN DETINEO
Date: 2022.12.27 11:53:54 -06'00'

Assistant Director
Enforcement Programs and Services

Assistant Director
Field Operations

# EXHIBIT C



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

---

*Martinsburg, WV 25405*

www.atf.gov

JAN 1 8 2017

907010:WJS
3311/305402

Mr. Jason Davis
The Law Offices of Davis & Associates
27201 Puerta Real, Suite 300
Temecula, California 92691

Mr. Davis:

This is in reference to your correspondence, with enclosed samples, to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Industry Services Branch (FTISB). In your letter, you asked for a classification of two Glock-type "PF940C Blank" on behalf of your client, Polymer 80 Incorporated (see enclosed photos). Specifically, you wish to know if each of these items would be classified as a "firearm" under the Gun Control Act of 1968 (GCA).

You state the submitted **PF940C** has critical machining operations <u>not</u> yet "implanted" as follows:

- *Drilling of the locking left and right block pin holes.*
- *Drilling of the left and right trigger pin holes.*
- *Drilling of the left and right trigger housing pin holes.*
- *Cutting of the left and right rail slots to allow for slide installation.*
- *Machining of the side walls that block slide installation.*
- *Machining of the cross walls that block barrel and recoil spring installation.*

As a part of your correspondence, you describe design features and the manufacturing process of the submitted "**PF940C**" to include the following statement:

• *The submitted PF940C blank is a solid core unibody design made out of a single casting without any core strengthening inserts. Moreover, it is void of any indicators that designate or provide guidance in the completion of the firearm.*

Mr. Jason Davis                                                    Page 2

For your reference in this matter, the amended Gun Control Act of 1968 (GCA), 18 U.S.C. § 921(a)(3), defines the term **"firearm"** *to include any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive…[and] …the frame or receiver of any such weapon…*

Also, 27 CFR Section 478.11 defines **"firearm frame or receiver"**. *That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel.*

Also, the AECA, 27 CFR Section 447.11, defines **"defense articles"** as—

*…Any item designated in § 447.21 or § 447.22.  This includes models, mockups, and other such items which reveal technical data directly relating to § 447.21 or § 447.22.*

The USMIL, Section 447.22, **FORGINGS, CASTINGS, and MACHINED BODIES** states:

*Articles on the U.S. Munitions Import List include articles in a partially completed state (such as forgings, castings, extrusions, and machined bodies) which have reached a stage in manufacture where they are clearly identifiable as defense articles. If the end-item is an article on the U.S. Munitions Import List, (including components, accessories, attachments and parts) then the particular forging, casting, extrusion, machined body, etc., is considered a defense article subject to the controls of this part, except for such items as are in normal commercial use.*

During the examination of your sample **"PF940C"**, FTISB personnel found that the following machining operations or design features present or completed:

1. Trigger slot.
2. Capable of accepting Glock 17 trigger mechanism housing.
3. Capable of accepting Glock 17 trigger bar.
4. Magazine well.
5. Magazine catch.
6. Accessory rail.
7. Slide-stop lever recess.
8. Magazine catch spring recess.

Machining operations or design features <u>not</u> yet present or completed:

1. Trigger-pin hole machined or indexed.
2. Trigger mechanism housing pin machined or indexed.
3. Locking block-pin hole machined or indexed.
4. Devoid of front or rear frame rails.
5. Barrel seat machined or formed.
6. Incapable of accepting Glock locking-block.

Mr. Jason Davis                                                    Page 3

**Note:** *The dust cover, top of the barrel seat area and locking-block recess area became damaged during this evaluation.*

As a result of this FTISB evaluation, the submitted "**PF940C**" is not sufficiently complete to be classified as the frame or receiver of a firearm and thus is not a "firearm" as defined in the GCA. Consequently, the aforementioned items are therefore not subject to GCA provisions and implementing regulations.

To reiterate the conclusion of FTISB's evaluation, our Branch has determined that the submitted Polymer 80, Incorporated Glock-type receiver blanks incorporating the aforementioned design features are not classified as the frame or receiver of a weapon designed to expel a projectile by the action of an explosive, thus each of these items are not a "firearm" as defined in GCA, 18 U.S.C. § 921(a)(3)(B).

Please be aware, while not classified as a "firearm"; the submitted items are each classified as a "defense article" as defined in 27 CFR Section 447.11. The U.S. Department of State (USDS) regulates all exports from, and particular imports into, the United States. Firearms, parts, and accessories for firearms are all grouped as "defense articles" by the USDS and overseen by their Directorate of Defense Trade Controls. Information regarding import/export of defense articles can be found on their web site at www.pmddtc.state.gov.

Correspondence from our Branch is dependent upon the particular facts, designs, characteristics or scenarios presented. Please be aware that although other cases (submissions to our Branch) may appear to present identical issues, this correspondence pertains to a particular issue or item. We caution applying this guidance in this correspondence to other cases, because complex legal or technical issues may exist that differentiate this scenario or finding from others that only appear to be the same.

Please be aware, this determination is relevant to the item as submitted. If the design, dimensions, configuration, method of operation, processes or utilized materials, this classification would be subject to review and would require a submission to FTISB of a complete functioning exemplar.

We thank you for your inquiry and trust the foregoing has been responsive to your evaluation request.

                              Sincerely yours,


                              Michael R. Curtis
        Chief, Firearms Technology Industry Services Branch


Enclosure



PF940C Blank, Submitted 10/6/16

Devoid of Trigger Pin Hole

Devoid of Trigger Mechanism Pin Hole



PF940C Blank, Dust Cover Area Damaged

Un-Formed Barrel Seat

Devoid of Slide Rails



PF940C Blank, With Trigger Mechanism Housing and Slide Stop Lever

Damage to Locking Block Recess Area



PF940C Blank, Incapable of Accepting Glock Locking Block

# EXHIBIT D



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_Martinsburg, WV  25405_

www.atf.gov

NOV 0 2 2015

907010:WJS
3311/303738

Mr. Jason Davis
The Law Offices of Davis & Associates
41593 Winchester Road, Suite 200
Temecula, California 92590

Mr. Davis:

This is in reference to your correspondence, with enclosed samples, to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Industry Services Branch (FTISB).  In your letter, you asked for a classification of an AR10-type item identified by you as a "WARRHOGG BLANK" as well as a Glock-type "GC9 Blank" on behalf of your client, Polymer 80, Incorporated (see enclosed photos).  Specifically, you wish to know if these items would be classified as a "firearm" under the Gun Control Act of 1968 (GCA).

You state the submitted **WARRHOGG BLANK** incorporates the following design features:

- _Magazine well._
- _Magazine catch._
- _Receiver extension/buffer tube._
- _Pistol grip area._
- _Pistol-grip screw hole._
- _Pistol grip upper receiver tension hole._
- _Pistol grip tension screw hole._
- _Bolt catch._
- _Front pivot-pin takedown hole._
- _Rear pivot-pin takedown hole._

As a part of your correspondence, you describe design features and the manufacturing process of the submitted "WARRHOGG Blank" to include the following statements:

APP 027

- 2 -

Mr. Jason Davis

- *The submitted WarrHogg .308 blank lower receiver blank is a solid core unibody design made out of a single casting without any core strengthening inserts. Moreover, it is void of any indicators that designate or provide guidance in the completion of the firearm. This submitted item incorporates a solid fire control cavity area, and was cast in a homogenous manner using a "single shot of molten material."*

For your reference in this matter, the amended Gun Control Act of 1968 (GCA), 18 U.S.C. § 921(a)(3), defines the term **"firearm"** *to include any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive…[and] …the frame or receiver of any such weapon…*

Also, 27 CFR § 478.11 defines **"firearm frame or receiver."** *That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel.*

Also, the AECA, 27 CFR § 447.11, defines **"defense articles"** as—

*…Any item designated in § 447.21 or § 447.22.  This includes models, mockups, and other such items which reveal technical data directly relating to § 447.21 or § 447.22.*

The USMIL § 447.22, **FORGINGS, CASTINGS, and MACHINED BODIES** states:

*Articles on the U.S. Munitions Import List include articles in a partially completed state (such as forgings, castings, extrusions, and machined bodies) which have reached a stage in manufacture where they are clearly identifiable as defense articles. If the end-item is an article on the U.S. Munitions Import List, (including components, accessories, attachments and parts) then the particular forging, casting, extrusion, machined body, etc., is considered a defense article subject to the controls of this part, except for such items as are in normal commercial use.*

During the examination of your sample, FTISB personnel found that the following machining operations or design features present or completed:

1. Front and rear pivot/take down pin holes.
2. Front and rear pivot/ take down detent retainer holes.
3. Front and rear pivot/take down lug clearance areas.
4. Selector-retainer hole.
5. Magazine-release and catch slots.
6. Trigger-guard formed.
7. Rear of receiver present and threaded to accept buffer tube.
8. Buffer-retainer hole.
9. Pistol-grip mounting area faced off and drilled, but not threaded.
10. Magazine well.
11. Receiver end-plate recess.

- 3 -

Mr. Jason Davis

Machining operations or design features <u>not</u> yet present or completed:

1. Complete removal of material from the fire-control cavity area.
2. Machining or indexing of selector-lever hole.
3. Machining or indexing of trigger slot.
4. Machining or indexing of trigger-pin hole.
5. Machining or indexing of hammer-pin hole.

As a part of this evaluation, FTISB personnel noted the following markings:

<u>Left Side</u>

- **308**
- **POLYMER80**

FTISB has determined that an AR-10 type receiver blank could have all other machining operations performed, including front receiver pivot-pin and rear take down pin hole and clearance for the front receiver lug and rear take down pin lug clearance area (not to exceed 1.60 inches), but must be completely solid and un-machined in the fire-control recess area. The rear take down pin lug clearance area must be no longer than 1.60 inches, measured from immediately forward of the front of the buffer-retainer hole.

The FTISB examination of your submitted item, found that the most forward portion of the rear take down pin lug clearance area measures approximately 1.32 inches in length, less the maximum allowable 1.60 inch threshold. As a result, the submitted item is not sufficiently complete to be classified as the frame or receiver of a firearm; and thus, is <u>not</u> a "firearm" as defined in the GCA. Consequently, the aforementioned item is therefore not subject to GCA provisions and implementing regulations.

To reiterate the conclusion of FTISB's evaluation, our Branch has determined that the submitted Polymer 80, Incorporated AR10-type receiver blank incorporating the aforementioned design features is not classified as the frame or receiver of a weapon designed to expel a projectile by the action of an explosive; and thus, it is not a "firearm" as defined in (GCA), 18 U.S.C. § 921(a)(3)(B).

As a part of your correspondence, you describe design features and the manufacturing process of the submitted "**CG** or **CG9**" to include the following statement:

- *The submitted GC9 blank is a solid core unibody design made out of a single casting without any core strengthening inserts. Moreover, it is void of any indicators that designate or provide guidance in the completion of the firearm.*

- 4 -

Mr. Jason Davis

Please note, while not indicated in the accompanying correspondence, the submitted CG or CG9 appears to have been made utilizing additive manufacturing or 3-D printing technology and not "made out of a single casting."

During the examination of your sample **"CG or CG9,"** FTISB personnel found that the following machining operations or design features present or completed:

1. Slide lock lever location indexed.
2. Upper portion of slide lock spring recess.
3. Trigger slot.
4. Capable of accepting Glock 17 trigger mechanism housing.
5. Capable of accepting Glock 17 trigger bar.
6. Capable of accepting Glock 17 locking block.
7. Magazine well.
8. Magazine catch.
9. Accessory rail.
10. Slide-stop lever recess.
11. Magazine catch spring recess.

Machining operations or design features <u>not</u> yet present or completed:

1. Trigger-pin hole machined or indexed.
2. Locking block-pin hole machined or indexed.
3. Devoid of front or rear frame rails.
4. Barrel seat machined or formed.

As a result, the submitted "CG or CG9" is not sufficiently complete to be classified as the frame or receiver of a firearm; and thus, is not a "firearm" as defined in the GCA. Consequently, the aforementioned item is therefore not subject to GCA provisions and implementing regulations.

To reiterate the conclusion of FTISB's evaluation, our Branch has determined that the submitted Polymer 80, Incorporated Glock-type receiver blank incorporating the aforementioned design features is <u>not</u> classified as the frame or receiver of a weapon designed to expel a projectile by the action of an explosive, thus it is <u>not</u> a "firearm" as defined in (GCA), 18 U.S.C. § 921(a)(3)(B).

Please be aware, while not classified as a "firearm"; the submitted items are each classified as a "defense article" as defined in 27 CFR § 447.11. The U.S. Department of State (USDS) regulates all exports from, and particular imports into, the United States. Firearms, parts, and accessories for firearms are all grouped as "defense articles" by the USDS and overseen by their Directorate of Defense Trade Controls. Information regarding import/export of defense articles can be found on their web site at www.pmddtc.state.gov.

In conclusion, correspondence from our Branch is dependent upon the particular facts, designs, characteristics or scenarios presented. Please be aware that although other cases (submissions to our Branch) may appear to present identical issues, this correspondence pertains to a particular

- 5 -

Mr. Jason Davis

issue or item.  We caution applying this guidance in this correspondence to other cases, because complex legal or technical issues may exist that differentiate this scenario or finding from others that only appear to be the same.

Also, this determination is relevant to the items as submitted.  If the design, dimensions, configuration, method of operation, or utilized materials or processes such as changing from additive manufacturing to injection molding, this classification would be subject to review and require a submission to FTISB of an exemplar utilizing the new manufacturing process.

We thank you for your inquiry and trust the foregoing has been responsive to your evaluation request.  Please do not hesitate to contact us if additional information is needed.

Sincerely yours,

Michael R. Curtis
Chief, Firearms Technology Industry Services Branch

Enclosures

# Polymer 80, Inc. WARRHOGG Receiver Blank











# Polymer 80, Inc; GC or CG9 Receiver Blank









Capable of Accepting Glock 17 Trigger Mechanism and Trigger Bar Assemblies



# Capable of Accepting Glock 17 Locking Block, Trigger Assembly and Slide Stop Lever



# Internal Frame Comparison to NFC Glock 17



Slide Rails on NFC Glock 17

Devoid of Frame Rails

# Frame Comparison to NFC Glock 17



Trigger Mechanism Housing Pin Hole

Devoid of Trigger Mechanism Pin Hole

# Frame Comparison to NFC Glock 17



Trigger-Pin Hole

Locking Block Pin Hole

Devoid of Locking Block and Trigger Pin Holes

# EXHIBIT E



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Firearms Technology Industry Services Branch*

*244 Needy Road, Suite 1600*
*Martinsburg, WV 25405*
www.atf.gov

907010:DLH
3311/322714

**December 27, 2022**

Mr. Loran Kelley
Polymer80 Inc.
134 Lakes Blvd
Dayton, NV 89403
FFL# 9-88-019-07-2J-04702

Dear Mr. Kelley:

This correspondence serves to inform you that the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Industry Services Branch (FTISB), has evaluated multiple semiautomatic, striker-fired pistols (sometimes generally referred to as "Glock-type" pistols) manufactured by Polymer80 Inc. Applying the regulatory text of the final rule titled *Definition of 'Frame or Receiver' and Identification of Firearms* (Final Rule 2021-05F), partially complete Polymer80 striker-fired semiautomatic pistol frames, including, but not limited to those sold within parts kits, have reached a stage of manufacture where they *"may readily be completed, assembled, restored, or otherwise converted"* to a functional frame. Therefore, *even without* any associated templates, jigs, molds, equipment, tools, instructions, or guides, these partially complete pistol frames are "**frames**" and also "**firearms**" as defined in the Gun Control Act (GCA) and its implementing regulations, 18 U.S.C. § 921(a)(3)(B) and 27 CFR 478.12(a)(1), (c).



**Polymer80, model PF940V2 partially complete frame - FIREARM**

- 2 -

Mr. Loran Kelley                                                                          322714



**Polymer80, model PF940C (V1) partially complete frame - FIREARM**

**Background**:

The GCA defines the term "**firearm**" as: *"…(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; **(B) the frame or receiver of any such weapon**; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."* 18 U.S.C. § 921 (a)(3) (emphasis added). The GCA implementing regulations define the terms "**frame**" and "**receiver**" by describing a single housing or structural component for one specific fire control component of a given weapon—for example, a single housing is specified for particular weapons such as a "handgun" and a "rifle." 27 CFR 478.12(a).

The GCA implementing regulations define the term "**frame**" as: *"the part of a handgun, or variants thereof, that provides housing or a structure for the primary energized component designed to hold back the hammer, striker, bolt, or similar component prior to initiation of the firing sequence (i.e., sear or equivalent), even if pins or other attachments are required to connect such component to the housing or structure."* 27 CFR § 478.12(a)(1).

Further, 27 CFR § 478.12(c) explains when a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, is regulated as a "**frame**" or "**receiver**:"

*The terms "**frame**" and "**receiver**" shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, i.e., to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projectile weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be. The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material). When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit."*

- 3 -

Mr. Loran Kelley                                                                                    322714

Lastly, 27 CFR § 478.11 defines the term "**readily**" as: *"A process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state.  With respect to the classification of firearms, factors relevant in making this determination include the following:*

> *(a) Time, i.e., how long it takes to finish the process;*
> *(b) Ease, i.e., how difficult it is to do so;*
> *(c) Expertise, i.e., what knowledge and skills are required;*
> *(d) Equipment, i.e., what tools are required;*
> *(e) Parts availability, i.e., whether additional parts are required, and how easily they can be obtained;*
> *(f) Expense, i.e., how much it costs;*
> *(g) Scope, i.e., the extent to which the subject of the process must be changed to finish it; and*
> *(h) Feasibility, i.e., whether the process would damage or destroy the subject of the process, or cause it to malfunction."*

**Evaluation**:

Polymer80 Inc., manufacturers multiple partially complete frames modeled after, and compatible with, components for Glock pistols.  The PF940V2 is the Polymer80 version of the Glock 17 and Glock 22 full size semiautomatic pistol, while the PF940C is a compact semiautomatic pistol compatible with the Glock 19 and Glock 23.  Other models such as the PF940SC (subcompact), PF45 (.45ACP/10mm) and PF9SS (single stack) emulate other models of Glock pistols.  Polymer80 partially complete frames utilize Glock or Glock-type components to complete the assembly of the weapon.  These designs utilize slide rail components, including the Locking Block Rail System (LBRS) and Rear Rail Module (RRM), as described below.

FTISB evaluation identified that the above-listed Polymer80 partially complete frames have the following features:

- External and internal contours appear to be complete
- Steel serial number plate insert imbedded into frame in a manner to be marked as required under 27 CFR § 478.92
- Magazine well appears to be finished
- Finished clearances to house magazine catch
- Finished channel and contours for magazine catch spring
- Trigger guard completed
- Trigger clearance into trigger guard area
- Cavities fully formed for slide lock springs
- Housing and clearance for the slide lock lever complete
- Contours and clearances for the slide stop lever complete
- Interior channel of dust cover partially formed
- Clearances for the trigger bar complete
- Front pin holes for LBRS completed

- 4 -

Mr. Loran Kelley                                                                                          322714

- Locking Block pin holes not completed
- Trigger pin holes not completed
- Trigger Mechanism Housing pin holes not complete
- Trigger cavity formed
- Recess fully formed for the LBRS
- Recess fully formed for trigger mechanism housing and RRM
- "Temporary Rails" preventing installation of RRM
- "Temporary Rails" preventing installation of the LBRS
- "Barrel Block" in dust cover channel preventing slide installation

In the semiautomatic, striker-fired pistol described above, the critical areas of the "**frame**" are the front and rear fire control cavities.  The front and rear cavities are critical because these areas provide housing for the sear.  *See* 27 CFR 478.12(a)(1), (a)(4)(iii).  As further explained and illustrated below, removing or indexing any material in these critical areas, or completing or indexing any of the pin holes necessary to install the sear, are therefore crucial steps in producing a functional frame.



**In a pistol based on a Glock design, the trigger is housed in the front fire control cavity, and the sear, which is connected by the trigger bar, is located in the rear cavity**

- 5 -

Mr. Loran Kelley                                                             322714



**For reference, in a pistol based on a Glock design, the trigger bar assembly contains the sear.  The trigger bar assembly operates as a single unit**



**Polymer80 frame with Glock-type Fire Control Components including trigger bar assembly containing the sear**

In addition, the front and rear cavities of pistol frames using this internal design incorporate slide rails that have pin holes designed to secure the trigger mechanism and sear in precise locations. Specifically, in the Polymer80 design, the front cavity also provides housing for the LBRS, and the rear cavity provides housing for the RRM.  Under the Final Rule, these slide rail components are "attachments … required to connect" the sear to the frame.  *See* 27 CFR 478.12(a)(1).

- 6 -

Mr. Loran Kelley                                                                                     322714



**The above picture, taken from Polymer80 instructional materials, shows that the trigger bar assembly is attached to the RRM, which is attached to the frame**



**Top view of the LBRS and RRM with trigger and trigger mechanism installed**

The above-mentioned "partially complete" pistol frame products marketed by Polymer80 are manufactured from a polymer material and incorporate temporary rails or blocking tabs that are easily removable by a person with novice skill, using common tools, such as a Dremel-type rotary tool, within minutes—an amount of time and a set of circumstances that are far less than required to fall within the meaning of the term "readily" in the Final Rule. Once this material is removed, the partially complete frames are immediately capable of accepting the LBRS, RRM, and fire control components, including the sear.

- 7 -

Mr. Loran Kelley                                                                                    322714



**FIREARM - Poly80 with Temporary Rails**



**FIREARM - Poly80 with Temporary Rails and Barrel Blocking Tab**



**FIREARM - Poly80 with Temporary Rails and Barrel Blocking Tab**

The Polymer80 partially complete frame contains a fully formed cavity for the LBRS, RRM Trigger, Trigger Bar, and Trigger Mechanism Housing.  These components are critical features to these semiautomatic pistols, as discussed above. Any partially formed or indexed hole or recess is relevant, even if unfinished, because such forming or indexing facilitates the completion of this feature and reduces the time, expertise, equipment, and expense needed to make the unfinished item functional.

Mr. Loran Kelley                                                                         322714



**"Temporary Rails" and "Barrel Block" blocking features removed within minutes**



**Polymer80 partially complete frame with Locking Block Rail System and
Rear Rail Module – "Temporary Rails" present**



**Polymer80 partially complete frame with Locking Block Rail System and
Rear Rail Module – "Temporary Rails" removed**

- 9 -

Mr. Loran Kelley                                                                                            322714



**Polymer80 partially complete frame with Locking Block Rail System and Rear Rail Module installed**

As the front and rear cavities were already fully formed, FTISB completed numerous Polymer80 partially complete frames by removing the "temporary rails," "blocking tab," and drilling of the six pin holes, with common tools, to assemble a weapon capable of expeling a projectile by action of an explosive, with completion times of 10 to 30 minutes using Glock-type parts, an amount of time and a set of circumstances that are far less than required to fall within the meaning of the term "readily" in the Final Rule. These parts are not regulated and are readily available. The time to assemble a weapon capable of expeling a projectile by action of an explosive when it was assembled was generally reduced to less than 15 minutes when completed by individuals having previous experience completing Polymer80 frames.



**Polymer80 PF940C assembled with Glock 19 components into fully functional firearm**

**Conclusion**:

Based on the above, the partially complete Polymer80, with any kind of indexing or material removed from the front or rear fire control cavities for installation of the trigger mechanism and sear, or slide rail attachments to connect the trigger mechanism and sear to the frame, has reached a stage of manufacture where it *"may readily be completed, assembled, restored, or otherwise converted"* to a functional frame. As examined, it is classified as a "**frame**" and also a "**firearm**," as defined in the GCA, 18 U.S.C. § 921(a)(3)(B), and implementing regulations, 27 CFR 478.12(a)(1), (c). It is classified as a firearm even if it is not sold, distributed, marketed, or possessed with any associated templates, jigs, molds, equipment, tools, instructions, or guides.

- 10 -

Mr. Loran Kelley                                                                                              322714

While the analysis allows for the consideration of how a partially complete frame is, directly or indirectly, sold, distributed, marketed, or possessed, with any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials, for these partially complete frames such analysis was not necessary because they are, by themselves, "frames" and "firearms" as defined in the GCA.

It is important that persons engaged in the business of manufacturing, importing, or dealing in this item do not take any steps to avoid licensing (18 U.S.C. §§ 922(a)(1), 923(a)), serialization (§ 923(i); 27 CFR 478.92(a)(2)), recordkeeping (§ 923(g)(1)(A); 27 CFR 478/125(i)), or other requirements and prohibitions of the law by selling or shipping the parts or parts kits in more than one box or shipment to the same person, or by conspiring with others to do so (18 U.S.C. §§ 2; 371).  Anyone engaging in the business of manufacturing, importing, or dealing in firearms, such as those classified above, must obtain a Federal firearms license from ATF and abide by all applicable laws and regulations, including those related to marketing, recordkeeping, serialization, and background checks. Nor may any person or entity intentionally assist another to avoid such legal requirements.

Further, this item is also considered a "**defense article**" on the U.S. Munitions Import List and, therefore, requires an approved Application and Permit for Importation of Firearms, Ammunition and Implements of War (ATF Form 6) for importation into the United States under 27 CFR 447.41; 447.22, and is also subject to export controls.[1]

Please note this classification applies to the samples evaluated above: the PF940V2, PF940C, PF940SC, PF45, and PF9SS. ATF has classified these items under its own regulatory authority. Please note that you must comply with the Final Rule whether or not you have submitted or received a specific classification with respect to any item. You are free to submit any additional item to ATF for voluntary classification pursuant to 27 CFR 478.92(c).

If we can be of any further assistance, please contact us.

Sincerely yours,

Digitally signed by
Daniel Hoffman
Date: 2022.12.27
12:54:05 -05'00'

Daniel Hoffman
Chief, Firearms Technology Industry Services Branch

Cc:     Patrick Gorman, Special Agent in Charge, San Francisco Field Division
        Roger Root, Director, Industry Operations, San Francisco Field Division

---

[1] Exporters should consult with the U.S. Departments of Commerce and State to determine applicable requirements.

# EXHIBIT F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

|  |  |
|---|---|
| JENNIFER VANDERSTOK;<br>MICHAEL G. ANDREN;<br>TACTICAL MACHINING, LLC, a limited<br>liability company; and<br>FIREARMS POLICY COALITION, INC., a<br>nonprofit corporation;<br><br>       *Plaintiffs*,<br><br>and<br><br>BLACKHAWK MANUFACTURING GROUP<br>INC. d/b/a 80 PERCENT ARMS; DEFENSE<br>DISTRIBUTED; SECOND AMENDMENT<br>FOUNDATION, INC.,<br><br>       *Intervenor-Plaintiffs*,<br><br>and<br><br>POLYMER80, INC.,<br><br>       *Applicant in Intervention*,<br><br>       v.<br><br>MERRICK GARLAND, in his official capacity<br>as Attorney General of the United States;<br>UNITED STATES DEPARTMENT OF<br>JUSTICE; STEVEN DETTELBACH, in his<br>official capacity as Director of the Bureau of<br>Alcohol, Tobacco, Firearms and Explosives;<br>and BUREAU OF ALCOHOL, TOBACCO,<br>FIREARMS AND EXPLOSIVES,<br><br>       *Defendants*. | Civil Action No. 4:22-cv-691-O |

## POLYMER 80, INC.'S [PROPOSED] COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.      This lawsuit challenges the Biden Administration's unlawful attempt to unilaterally rewrite federal law, create new criminal and civil liability, destroy the ability of Americans to exercise their Second Amendment rights by privately making firearms, and infringe the First Amendment rights of Plaintiff Polymer80, Inc. ("Polymer80") to market and sell the lawful products targeted by the Biden Administration.

2.      Plaintiff Polymer80 designs, manufactures, markets, and distributes firearms, non-firearm products such as receiver blanks (partially complete, disassembled, or nonfunctional frames), and other innovative products, components, and accessories. At the heart of Polymer80's business is the aim to allow customers to "participate in the build process" of creating a constitutionally protected instrument.[1] Polymer80 is the industry leader in the design, manufacture, and distribution of receiver blanks, jigs, and associated kits.[2] Polymer80's business model and continued existence are reliant on its sales of these products that have long been held and understood not to be "firearms" under federal law but are under unlawful and unconstitutional attack from the Biden Administration. Recently, the Bureau of Alcohol, Tobacco, Firearms and Explosives' (the "ATF") has taken administrative action that specifically targets Polymer80.

3.      The ATF's longstanding legal position has been that receiver blanks, jigs, tools, and related instructions do not fall within the ATF's regulatory jurisdiction because they are not "firearms" as that term is defined and understood under federal law. The ATF has consistently stated this position on its website, in classification determinations issued to manufacturers, including Polymer80, after reviewing product samples, and in litigation.

---

[1] *About Polymer80*, https://www.polymer80.com/about-us (last visited Jan. 3, 2022).
[2] Although Polymer80 was the industry leader in the design, manufacture, and distribution of these kits, Polymer80 no longer sells these kits.

4.      Receiver blanks did not fall under the purview of the Gun Control Act of 1968 ("Gun Control Act" or "Act"), an Act with definitions carefully defined by Congress. Nor did the Act apply to receiver blanks combined with tools, jigs, instructions, and/or kits.

5.      President Biden campaigned on a promise to prompt Congressional action to impose new laws on receiver blanks.

6.      President Biden failed to convince Congress to impose new laws on receiver blanks.

7.      Subsequently, President Biden pressured Defendants to take unilateral executive action to impose new regulations having the force of law on receiver blanks.

8.      In response to the Biden Administration's pressure, Defendants adopted a Final Rule. In doing so, Defendants: (a) ignored administrative procedures; (b) flouted longstanding principles of congressional intent; and (c) illicitly redefined, *inter alia*, the Gun Control Act.

9.      The Final Rule unlawfully rewrites federal law by: (1) expanding the definitions of "frame" and "receiver" so that the ATF may regulate *partial* frames or receivers; and (2) expanding Congress' definition of "firearm" to include "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted" into a "firearm."[3] These expansions contradict congressionally defined laws and regulations. Congress has never demonstrated an intent to regulate *partial* frames or receivers or weapon parts kits that could be readily made into a firearm.

10.     The Final Rule not only unlawfully increases Defendants' regulatory powers but also confers to Defendants the power to hold criminally liable businesses and citizens who wish to exercise their Second Amendment rights.

---

[3] The Final Rule is available at https://www.federalregister.gov/d/2022-08026.

2

11.     The Final Rule repudiates the ATF's longstanding legal position on receiver blanks, expressly stating that prior classification determinations "shall not continue to be valid or authoritative," 87 Fed. Reg. at 24,741, and claiming that receiver blanks now fall within the ATF's regulatory jurisdiction.

12.     The Final Rule also violates the First Amendment. The Final Rule's requirement that submissions to the ATF for classification determination must include the submitting party's marketing materials unlawfully regulates speech protected by the First Amendment. The Final Rule will have the unconstitutional result that two identical pieces of metal could be treated differently depending on whether they are associated with, *inter alia*, instructions, jigs, tools, or some unknown combination, chilling First Amendment speech used to guide lawful activity recognized by the Final Rule itself.

13.     Subsequent to adopting the Final Rule, the ATF issued an Open Letter that specifically targets Polymer80. The Open Letter states that certain Polymer80's partially complete, disassembled, or nonfunctional pistol frames are "firearm[s]" under the Gun Control Act and the Final Rule even when not sold as part of a parts kit. *Open Letter to All Firearms Licensees*, Bureau of Alcohol, Tobacco, Firearms, and Explosives (Dec. 27, 2022) (the "Open Letter") (attached hereto as Exhibit A).

14.     The Open Letter further rewrites federal law by expanding the definitions of "frame" and "receiver" so that the ATF may regulate *partial* frames or receivers even when not sold as part of a parts kit. The Open Letter effectively amended the Final Rule by using a definition of "readily" that is facially contradictory to the Final Rule, making it a legislative rule with the force of law. It was subject to but did not undergo the required notice-and-comment procedures.

3

15.     The Open Letter represents a stark, unsupportable reversal of the ATF's previous determinations that Polymer80 pistol frame or receiver blanks are *not* "firearm[s]" under the meaning of the Gun Control Act. *See* Classification Letter, ATF (Jan. 18, 2017) (determining that Polymer80's PF940C pistol blank frame is not a firearm) (attached hereto as <u>Exhibit B</u>); Classification Letter, ATF (Nov. 2, 2015) (determining that Polymer80's Glock-type GC9 pistol frame blank and Polymer80's Warrhogg receiver blank are not firearms) (attached hereto as <u>Exhibit C</u>). The Open Letter singles out Polymer80 and creates rules of play for Polymer80 that are materially different from other marketplace participants.

16.     Also on December 27, 2022, the ATF sent, unprompted by Polymer80, a letter directly to Polymer80. *See* December 27, 2020 Letter to Mr. Loran Kelley (hereinafter the "Polymer80 Letter") (attached hereto as Exhibit D). The Polymer80 Letter reinforced the Open Letter but tailored its "evaluation" to only Polymer80's products and was sent only to Polymer80. The Polymer80 Letter classified several of Polymer80's receiver blanks as a "'frame' and also a 'firearm', as defined in the GCA, 18 U.S.C. § 921(a)(3)(B), and implementing regulations, 27 CFR 478.12(a)(1), (c)."

17.     The Final Rule, Open Letter, and Polymer80 Letter are unconstitutional regulations intended to terminate Polymer80's business. Polymer80 therefore asks this Court to issue a preliminary and permanent injunction preventing Defendants from enforcing the Final Rule and the Open Letter against Polymer80, and to declare that the Final Rule and Open Letter are unlawful.

## PARTIES

18.     Polymer80 is a corporation organized under Nevada law and located in Dayton, Nevada. Polymer80's core business is manufacturing and distributing the very items Defendants regulate under the Final Rule and Open Letter. Polymer80 distributes its products throughout the

APP 062

United States, including within this district. *See* Declaration of Loran L. Kelley, Jr. ("Kelley Decl."), at ¶ 4 (attached hereto as Exhibit E).

19.     Defendant Merrick Garland is the Attorney General of the United States and the head of the United States Department of Justice, which oversees the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

20.     Defendant United States Department of Justice ("DOJ") is an agency of the United States that administers and enforces the principal federal gun control statutes, including the National Firearms Act of 1934 and the Gun Control Act of 1968. DOJ is located at 950 Pennsylvania Ave., NW, Washington, D.C. 20530.

21.     Defendant Steven Dettelbach is the Chief Law Enforcement Officer and Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

22.     Defendant Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") is an agency of the United States that administers and enforces the principal federal gun control statutes, including the National Firearms Act of 1934 and Gun Control Act of 1968. ATF is located at 99 New York Ave., NE, Washington, D.C. 20226.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction pursuant to 5 U.S.C. §§ 701–706 and 28 U.S.C. § 1331.

24.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(e)(1)(B) and (C). A substantial part of the events giving rise to these claims occurred in this district; a substantial part of the property that is the subject of the action is situated in this district; and Polymer80 has engaged in business transactions in this district. *See* Kelley Decl., at ¶ 6.

25.     Polymer80 has standing to assert the interests of both itself and its customers. *See*, *e.g.*, *Craig v. Boren*, 429 U.S. 190 (1976).

5

### HISTORICAL BACKGROUND

26.     The Gun Control Act established the definition of a "firearm" for purposes of federal firearms regulations.

27.     The Act states that "it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms" for appropriate purposes. Gun Control Act of 1968, Pub. L. No. 90-618, § 101, 82 Stat. 1213, 1213–14.

28.     The Act goes on to state that "this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this title." § 101, 82 Stat. at 1214.

29.     The Act defines "firearm" as: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921

30.     There is no statutory definition of a "frame or receiver."

31.     The GCA "exclude[s] firearm parts from the scope of the GCA, including parts that could be assembled with a homemade receiver and frame to make a firearm. Congress has also chosen to permit the home manufacture of unserialized firearms for personal use." Fed. Defs.' Mot. to Dismiss, *California v. ATF*, No. 3:20-cv-06761, 2020 WL 9849685, ECF No. 29, at 12 (N.D. Cal. Nov. 30, 2020).

6

32.     27 C.F.R. § 478.11 provided a one-sentence definition of a "firearm frame or receiver": "That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."

33.     A strict licensing regime governs the importation, manufacture, and dealing of products that constitute firearms. Licensed importers and licensed manufacturers must "identify by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Attorney General shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer." 18 U.S.C. § 923(i).

34.     Failure to follow these requirements can result in criminal liability. Under 18 U.S.C. § 924(a)(1), it is a crime to violate "any other provision of this chapter," referring to Title 18, Chapter 44, of the United States Code, which contains sections 921–931. It is therefore of paramount importance for law-abiding businesses in the firearms industry to have clarity and predictability about what products meet the definitions of a "firearm" and "frame or receiver."

35.     It is equally important for law-abiding customers and for those who may not possess firearms (prohibited possessors) to have clarity on what products constitute a "firearm" and "frame or receiver." Federal law makes it a crime for various categories of individuals "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g).

## FACTUAL BACKGROUND

## I.     America Has a Long Tradition of Individuals Privately Making Their Own Firearms.

36.     Civilian gunmaking is a practice that dates back to the American colonies.

37.     There remains a strong tradition of civilian gunmaking today, despite the emergence of armories, mass production, and the innovation of prominent manufacturers.

7

38.     Many law-abiding, responsible Americans make their own firearms using gun parts such as partially complete, disassembled or nonfunctional pistol frames. Polymer80 is the industry leader—accounting for the vast majority of the market share—in designing, manufacturing, marketing, and distributing these items. *See* Kelley Decl., at ¶¶ 5–6.

39.     A frame or receiver blank is a raw piece of material that has undergone some, but not all, of the stages of manufacture necessary for a firearm frame or receiver to someday be created. Additional substantial machining is still required to produce a functioning firearm frame or receiver.

40.     Receiver blanks are popular among Polymer80's customers, many of whom reside in this district, *see* Kelley Decl., at ¶ 6, who appreciate the challenge of using machinery to build a firearm from raw materials and unfinished components. These law-abiding, responsible citizens cherish the right of Americans to use machinery to build their own constitutionally-protected firearms.

41.     Polymer80's customers for receiver blanks include "the people" protected by the First and Second Amendments, including law-abiding and responsible women and men, veterans, blue and white collar workers, retirees, and government employees all across the country.

## II.     Congress Does Not Regulate Materials Like Receiver Blanks That Are Not Firearms But Eventually Could Be.

42.     In 1934, Congress enacted the National Firearms Act ("NFA"), 26 U.S.C. § 5801 *et seq.*, and "imposed a tax on the making and transfer of firearms defined by the Act, as well as a special (occupational) tax on persons and entities engaged in the business of importing, manufacturing, and dealing in NFA firearms."[4] "Firearms subject to the 1934 Act included [short

---

[4] *National Firearms Act*, ATF, https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited Aug. 10, 2022).

APP 066

barreled] shotguns and rifles . . ., certain firearms described as 'any other weapons,' machine guns, and firearm mufflers and silencers."[5]

43.     Congress then passed the Gun Control Act in 1968, which "amended the NFA definitions of 'firearm' by adding 'destructive devices' and expanding the definition of 'machine gun.'"[6]

44.     As Congress defined it in the Gun Control Act, and as it has stood since 1968, "[t]he term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921(a)(3). Congress did not independently define the terms "frame or receiver" contained in subsection (B) of that overall definition.

45.     Under federal law, it is "unlawful . . . for any person . . . except a licensed importer, licensed manufacturer, or licensed dealer to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce[.]" 18 U.S.C. § 922(a)(1)(A). "The term 'engaged in the business' means . . . as applied to a manufacturer of firearms, a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured." 18 U.S.C. § 921(a)(21). "The term 'to predominately earn a profit' means that the intent underlying the sale or disposition of firearms is predominately one of obtaining pecuniary gain, as opposed to

---

[5] *Id.*

[6] *Id.*

other intents, such as improving or liquidating a personal firearms collection." 18 U.S.C. § 921(a)(22).

46.     Violations of the NFA and Gun Control Act carry criminal penalties, including fines and imprisonment up to five years. 18 U.S.C. § 924(a)(1)(D) ("[W]hoever . . . willfully violates any other provision of this chapter, shall be fined under this title, imprisoned not more than five years, or both.").

## III.   The ATF Previously Classified Receiver Blanks as Unregulated Materials

47.     The ATF has long held that receiver blanks do not meet the definitions of a "firearm" or "frame or receiver." Its website states:

**Are "80%" or "unfinished" receivers illegal?**

Receiver blanks that do not meet the definition of a "firearm" are not subject to regulation under the Gun Control Act (GCA). ATF has long held that items such as receiver blanks, "castings" or "machined bodies" in which the fire-control cavity area is completely solid and un-machined have not reached the "stage of manufacture" which would result in the classification of a firearm according to the GCA.[7]

**Are there restrictions on who can purchase receiver blanks?**

The Gun Control Act (GCA) does not impose restrictions on receiver blanks that do not meet the definition of a "firearm." . . . .[8]

**What is ATF doing in regards to people making their own firearms?**

An individual may generally make a firearm for personal use . . . .[9]

**Does an individual need a license to make a firearm for personal use?**

---

[7] ATF, *Are "80%" or "unfinished" receivers illegal?*, https://www.atf.gov/firearms/qa/are-"80"-or-"unfinished"-receivers-illegal.

[8] ATF, *Are there restrictions on who can purchase receiver blanks?*, https://www.atf.gov/firearms/qa/are-there-restrictions-who-can-purchase-receiver-blanks.

[9] ATF, *What is ATF doing in regards to people making their own firearms?*, https://www.atf.gov/firearms/qa/what-atf-doing-regards-people-making-their-own-firearms.

APP 068

No, a license is not required to make a firearm solely for personal use . . . .[10]

48.    The ATF's website also includes photographs of receiver blanks that ATF has determined are not regulated firearm receivers:[11]



49.    In a recent lawsuit that dealt with whether a particular product was a "firearm," the government submitted a certified administrative record containing numerous classification

---

[10] ATF, *Does an individual need a license to make a firearm for personal use?*, https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use.

[11] *See* https://www.atf.gov/firearms/qa/are-there-restrictions-who-can-purchase-receiver-blanks.

determinations sent to manufacturers stating that their receiver-blank products were not firearms. *See* ATF's Certified Set of Documents Comprising the Record at 64–70, *California Rifle & Pistol Ass'n, Inc. v. ATF*, No. 1:14-CV-1211 (E.D. Cal. Jan. 9, 2015), ECF No. 19-3 (containing the images that follow).

**Submitted forging**





Accordingly, FTB finds that the submitted item is not a "firearm" as defined in the GCA. Please note that this classification is based on the item received and examined by our Branch.   Any changes to its characteristics would require re-evaluation.

Submitted forging, first view



12

**Submitted forging, second view**



Based on our examination, FTB finds that the submitted item is <u>not</u> a "firearm" as defined in the GCA. Please note that this classification is based on the item received and examined by our Branch. Any changes to its characteristics would require re-evaluation by FTB.

Accordingly, FTB finds that the submitted item is not a "firearm" as defined in the GCA. Please note that this classification is based on the item received and examined by our Branch. Any changes to its characteristics would require re-evaluation by FTB.

**Submitted forging**



50.     Prior to the Biden Administration, the ATF defended these classification determinations in litigation brought by gun-control activists:

> Plaintiffs' challenges to ATF's classifications also seek to undercut the process under which, for decades, ATF has reviewed numerous items to determine if they should be classified as "firearms" under the GCA, bringing to bear the agency's technical, scientific, mechanical, and legal expertise. Receivers for the AR-15, the most common rifle in America, have a space within them called the fire-control cavity, which accommodates the firing components. The longstanding position of ATF is that, where a block of metal (or other material) that may someday be manufactured into a receiver bears no markings that delineate where the fire-control cavity is to be formed and has not yet been even partially formed, that item is not yet a receiver . . . .

13

Fed. Defs.' Mot. Dismiss at 2, *California v. ATF*, No. 3:20-CV-06761 (N.D. Cal. Nov. 30, 2020),

ECF No. 29, 2020 WL 9849685.

> The Record contains classification letters dating back to the 1970s. These classification letters make plain that ATF has consistently adopted a standard whereby the degree of machining to the frame or receiver determined whether the device constituted a firearm. . . .
>
> . . . . Not one of the above-noted classification letters made reference to the amount of time that would be required to transform the given device into a fully functional frame or receiver. Further, these letters are only a few of the examples contained in the Record of ATF making determinations based on the degree of machining performed on the unfinished frame or receiver with no reference whatsoever to the time required to transform the device into a fully functional frame or receiver.

Fed. Defs.' Mot. for Summ. J. at 30–32, *City of Syracuse v. ATF*, 1:20-CV-06885 (S.D.N.Y. Jan.

29, 2021), ECF No. 98.

51.     For the last several decades, the ATF has permitted industry participants to request

written determinations from the ATF as to the classification of sample products. Polymer80 has

requested written determinations from the ATF that its pistol frame or receiver blanks are not

"firearms" under the meaning of the Gun Control Act. The ATF has confirmed to Polymer80 that

both its pistol frame and receiver blanks are not "firearm[s]." *See* Exs. B & C. Polymer80

conducted its business model in accordance with these written determinations. *See* Kelley Decl.,

at ¶¶ 8–9.

**IV.     The Biden Administration Announces That It "Will Not Wait for Congress to Act to Take Its Own Steps" on Gun Control.**

52.     President Biden campaigned on a promise to "[s]top 'ghost guns,'" referring to

firearms "assembl[ed] . . . on [one's] own . . . by buying a kit of disassembled gun parts."[12]

---

[12] *The Biden Plan to End Our Gun Violence Epidemic*, BIDEN-HARRIS DEMOCRATS, https://joebiden.com/gunsafety/.

14

Specifically, he promised to "pass[] legislation" to "stop the proliferation of these so-called 'ghost guns.'"

53.     After President Biden took office, members of Congress proposed bills changing the way the ATF classifies receiver blanks not currently defined as firearms. *See, e.g.*, S. 1558, 117th Cong. (2021) (Untraceable Firearms Act of 2021); H.R. 1454, 117th Cong. (2021) (Ghost Guns Are Guns Act). None of those bills have become law.

54.     Because the Biden Administration could not accomplish its legislative goal through the constitutional process of bicameralism and presentment, it resorted to the unlawful implementation of its policies through unilateral executive action.

55.     On April 7, 2021, the Biden Administration announced that President Biden was "reiterating his call for Congress to pass legislation" on firearms regulations.[13] The announcement stated that "this Administration will not wait for Congress to act to take its own steps" on gun control. The announcement instructed the United States Department of Justice to "within 30 days . . . issue a proposed rule to help stop the proliferation" of so-called "ghost guns."

56.     Defendant Garland has stated that "the proliferation of the so-called ghost guns" was caused by a "regulatory loophole" or "gap,"[14] even though the proliferation of such products was actually the direct result of the ATF's carefully considered and longstanding, correct decision to issue classification determinations approving the sale of such products.

---

[13] *Fact Sheet: Biden-Harris Administration Announces Initial Actions to Address the Gun Violence Public Health Epidemic*, THE WHITE HOUSE (Apr. 7, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/07/fact-sheet-biden-harris-administration-announces-initial-actions-to-address-the-gun-violence-public-health-epidemic/.

[14] *Defendant Garland's Full Remarks on Gun Violence Prevention at the White House Rose Garden*, U.S. DEP'T OF JUSTICE (Apr. 8, 2021), http://www.justice.gov/opa/speech/attorney-general-garland-s-full-remarks-gun-violence-prevention-white-house-rose-garden.

57.     On May 7, 2021, Defendant Garland signed ATF proposed rule 2021R-05, titled: "Definition of 'Frame or Receiver' and Identification of Firearms" ("Proposed Rule").[15]

58.     On April 11, 2022, President Biden and Vice President Harris announced at the White House Rose Garden that the Final Rule had been completed. President Biden stated that a "year ago this week . . . I instructed the Attorney General to write a regulation that would rein in the proliferation of ghost guns because I was having trouble getting anything passed in the Congress."[16] President Biden explained that the purpose of the Final Rule was to make it "illegal to manufacture" weapon parts kits and "[i]llegal for a licensed dealer to sell them" without complying with the same regulatory requirements governing the manufacture and sale of complete firearms.

59.     The Final Rule was published in the Federal Register on April 26, 2022.[17]

**V.     The ATF Promulgates its Unlawful and Unconstitutional Final Rule.**

    **A.     The Final Rule Rewrites the Definition of a "Frame or Receiver" to Include "Partially Complete, Disassembled, or Nonfunctional" Frames and Receivers.**

60.     18 U.S.C. § 921(a)(3) defined a "firearm" as including "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "the frame or receiver of any such weapon," but it does not define what constitutes a "frame or receiver."

---

[15] *Definition of "Frame or Receiver" and Identification of Firearms*, 86 Fed. Reg. 27,720 (proposed May 21, 2021), https://www.federalregister.gov/documents/2021/05/21/2021-10058/definition-of-frame-or-receiver-and-identification-of-firearms.
[16] *Remarks by President Biden Announcing Actions to Fight Gun Crime and His Nominee for ATF Director, Steve Dettelbach*, THE WHITE HOUSE (Apr. 11, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/04/11/press-briefing-by-press-secretary-jen-psaki-april-11-2022/.
[17] https://www.federalregister.gov/d/2022-08026.

APP 074

61.     27 C.F.R. § 478.11 provided a one-sentence definition of a "firearm frame or receiver" as: "That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."

62.     The Final Rule deletes that definition of a "firearm frame or receiver" and replaces it with convoluted multi-page definitions of "frame" and "receiver" that are unconstitutionally vague and subjective.

63.     Part of the new definitions section states:

*Partially complete, disassembled, or nonfunctional frame or receiver*. The terms "frame" or "receiver" shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, *i.e.*, to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projective weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be. The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (*e.g.*, unformed block of metal, liquid polymer, or other raw material). When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.

87 Fed. Reg. at 24,739.

64.     The Final Rule abuses the English language and canons of statutory interpretation to expand the ATF's regulatory jurisdiction to cover materials, like receiver blanks, that can "readily" be made into regulated products.

65.     This attempt to drastically expand the ATF's regulatory jurisdiction is in excess of ATF's statutory authority.

17

**B.    The Final Rule Repudiates Prior Classification Determinations and, in Turn, Raises Serious Constitutional Issues, Including Violations of the First Amendment.**

66.    In classification determinations issued to manufacturers, the ATF has stated that receiver blanks do not meet the definition of a regulated "firearm" under federal law. *See* Exs. B & C.

67.    The ATF has defended these classification determinations in litigation brought by gun-control activists.

68.    The Final Rule expressly repudiates the ATF's prior classification determinations:

Prior determinations by the Director that a partially complete, disassembled, or nonfunctional frame or receiver, including a parts kit, was not, or did not include, a "firearm frame or receiver" under § 478.11, or "frame or receiver" under § 479.11, as those terms were defined prior to April 26, 2022, shall not continue to be valid or authoritative after that date. Such determinations shall include those in which the Director determined that the item or parts kit had not yet reached a stage of manufacture to be, or include, a "firearm frame or receiver" under § 478.11, or "frame or receiver" under § 479.11, as those terms were defined prior to [April 26, 2022].

87 Fed. Reg. at 24,741.

69.    The ATF's complete reversal of its legal position is arbitrary, capricious, and an abuse of discretion.

70.    The phrases "partially complete," "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver," and "stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon" are so vague as to make it impossible for manufacturers, distributors, and customers to understand which product designs are regulated by the Final Rule and which are not.

71.    These vague phrases, when combined with the Final Rule's authorization of the ATF Director to "consider any associated templates, jigs, molds, equipment, tools, instructions,

18

guides, or marketing materials," effectively delegate to the ATF Director unbounded, unconstitutional discretion to determine by diktat which products fall within ATF's jurisdiction.

72.    There is no reason why the existence of "instructions" or "tools" would have any bearing on whether an item meets the legal definition of a firearm "frame or receiver."

73.    Nevertheless, the ATF has recently stated that a "frame or receiver" piece may be treated differently depending on whether the piece is accompanied by tools, jigs, and instructions or some combination thereof.

74.    If a "frame or receiver" piece is combined with tools, jigs, and instructions, the ATF's position is that this piece is a firearm.

75.    Because the definition of a firearm "frame or receiver" has consequences for criminal liability, vagueness in that definition violates due process of law. Additionally, the rule of lenity applies, and *Chevron* deference is inappropriate.

76.    The Final Rule also unconstitutionally expands the ATF's regulatory authority so that it may make determinations on speech, not just equipment submitted for classification determination. For example, the Final Rule stipulates that requests to the ATF for classification determination must be submitted under penalty of perjury and include "any instructions, guides, templates, jigs, equipment, tools, or marketing materials that are made available to the purchaser or recipient of the item." 87 Fed. Reg. at 24,666, 24,739, 24,743, 24,749.

77.    The Final Rule specifically aims to police the content of the "instructions, guides, templates, . . . [and] marketing materials". *Id.*

78.    Polymer80's "instructions, guides, templates, . . . [and] marketing materials" are protected speech.

19

79.     The ATF had previously suggested that a product such as a receiver blank, which Polymer80 sells, on its own—particularly without instructions—would *not* constitute a firearm.

80.     It logically flows that the ATF's determination of whether a product such as a receiver blank is considered a "firearm" is predominantly dependent upon the ATF's review of the content of the "instructions, guides, templates, . . . [and] marketing materials" either submitted along with the product or on a company's website.

81.     The Final Rule and the ATF's admitted inconsistent determinations concerning the same metal piece (*e.g.*, receiver blank) depending on whether it is associated with instructions have forced Polymer80 to delete instructions from its company website in order to avoid potential criminal liability and to survive as a business.

82.     Thus, the possibility that two identical pieces of metal sold by Polymer80 could be treated differently depending on whether the pieces are associated with instructions chills First Amendment speech that guides lawful activity recognized by the Final Rule itself.

**C.     Definition of "Readily" by Reference to Eight Unranked, Unweighted Factors.**

83.     The Final Rule creates a new definition of "readily:" a "process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state." 87 Fed. Reg. at 24,735; *see also id.* at 24,747.

84.     The Final Rule then provides a *non-exclusive* list of eight unranked, unweighted factors, none of which is dispositive.

- The first factor is "(a) Time, *i.e.*, how long it takes to finish the process."

- The second factor is "(b) Ease, *i.e.*, how difficult it is to do so."

- The third factor is "(c) Expertise, *i.e.*, what knowledge and skills are required."

- The fourth factor is "(d) Equipment, *i.e.*, what tools are required."

20

- The fifth factor is "(e) Parts availability, *i.e.*, whether additional parts are required, and how easily they can be obtained."

- The sixth factor is "(f) Expense, *i.e.*, how much it costs."

- The seventh factor is "(g) Scope, *i.e.*, the extent to which the subject of the process must be changed to finish it."

- The eighth factor is "(h) Feasibility, *i.e.*, whether the process would damage or destroy the subject of the process, or cause it to malfunction."

85.     By making the definition of a "frame or receiver" turn on whether the product "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver" and then defining the word "readily" in such a vague manner, the Final Rule creates an unconstitutionally vague standard and effectuates an unconstitutional delegation of legislative authority to the ATF Director.

### D.      Definition of a "Firearm" as Including Weapon Parts Kits.

86.     18 U.S.C. § 921(a)(3) defined the term "firearm" as including four categories of items: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."

87.     27 C.F.R. § 478.11 defined a "firearm" as including the four categories of items contained in 18 U.S.C. § 921(a)(3), tracking the statutory text almost verbatim: "Any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device; but the term shall not include an antique firearm. In the case of a licensed collector, the term shall mean only curios and relics."

21

88.     The Final Rule amended 27 C.F.R. § 478.11 by adding the following fifth category to the definition of a "firearm," which has no basis in the statutory text of 18 U.S.C. § 921(a)(3):

> The term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive. The term shall not include a weapon, including a weapon parts kit, in which the frame or receiver of such weapon is destroyed as described in the definition "frame or receiver."

87 Fed. Reg. at 24,735.

89.     Under this new provision, a collection of parts, none of which independently is or has ever constituted a firearm, are now characterized by the government as a firearm based on an arbitrary determination that the items, when grouped together, can "readily" be assembled into a firearm.

90.     By adding weapon parts kits to the definition of a "firearm," the Final Rule takes an existing rule that closely tracks the four statutory categories of "firearms" set forth by Congress and adds a brand new fifth category that Congress did not include.

91.     This violates the plain, unambiguous text of the statute, which evinces Congress's intent to create only four categories of "firearms," not five.

92.     By adding a fifth category with no basis in the statutory text, the Final Rule goes beyond merely interpreting or clarifying the statute adopted by Congress and instead rewrites it.

**E.     New Regulations on "Privately Made Firearms" That Are Sweeping in Scope.**

93.     The Final Rule created a new term, "privately made firearm," which it defines as a "firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number placed by a licensed manufacturer at the time the firearm was produced." 87 Fed. Reg. at 24,735.

94.     The Final Rule states that "licensees must legibly and conspicuously identify each privately made firearm or 'PMF' received or otherwise acquired (including from a personal

22

collection) not later than the seventh day following the date of receipt or other acquisition, or before the date of disposition (including to a personal collection), whichever is sooner." 87 Fed. Reg. at 24,742. It further states that "PMFs must be identified by placing, or causing to be placed under the licensee's direct supervision, an individual serial number on the frame or receiver, which must not duplicate any serial number placed by the licensee on any other firearm." *Id.*

95.     The Final Rule also requires licensees to retain records indefinitely until the "business or licensed activity is discontinued." 87 Fed. Reg. at 24,746. This requirement is tantamount to creating an unlawful national gun registry for privately made firearms, as is expressly prohibited by law.

96.     The Final Rule's regulations on privately made firearms are so onerous that many licensees will cease to work with privately made firearms to avoid the Final Rule's excessive regulatory burdens. The lack of availability of basic services for owners of privately made firearms will deter individuals from exercising their historically recognized right to make their own firearms.

97.     The coercive effect of these regulations effectively wipes out the secondary resale market for receiver blanks and firearms produced by individuals from receiver blanks, and more broadly, eliminates the consumer market for receiver blanks entirely.

98.     The Final Rule's excessive regulations on "privately made firearms" cumulatively violate the constitutional rights of Polymer80 and its customers.

99.     To the extent the Final Rule's regulations on "privately made firearms" apply to purely intrastate activities, they exceed Congress's authority under the Commerce Clause.

100.     The Final Rule's excessive regulations on "privately made firearms" cumulatively effectuate unconstitutional takings in violation of the Fifth Amendment.

APP 081

**VI.    ATF Targets Polymer80 in its Unlawful and Unconstitutional Open Letter and Polymer80 Letter.**

101.    On December 27, 2022, ATF issued an "open letter to assist the firearms industry and the public in understanding whether a 'partially complete, disassembled, or nonfunctional' frame of a Polymer80, Lone Wolf, or similar semiautomatic, striker-fired pistol (sometimes generally referred to as 'Glock-type' pistols) has reached a stage of manufacture such that it 'may readily be completed, assembled, restored, or otherwise converted' to a functional frame, and is therefore classified as a 'frame' or 'firearm' in accordance with the final rule titled Definition of 'Frame or Receiver' and Identification of Firearms (Final Rule 2021R-05F), which became effective August 24, 2022." *See* Open Letter. "In particular, the following addresses partially complete, disassembled, or nonfunctional semiautomatic striker-fired pistol frames or parts kits manufactured, sold, or distributed by Polymer80 (known as 'Poly80' or 'P80' frames or blanks) . . ." *Id.* The Open Letter was not in response to any communication from Polymer80.

102.    Also on December 27, 2022, the ATF sent, unprompted by Polymer80, the Polymer80 Letter. The Polymer80 Letter reinforced the Open Letter but tailored its "evaluation" to only Polymer80's products and was sent only to Polymer80. The Polymer80 Letter classified several of Polymer80's receiver blanks as a "'frame' and also a 'firearm', as defined in the GCA, 18 U.S.C. § 921(a)(3)(B), and implementing regulations, 27 CFR 478.12(a)(1), (c)."

103.    The Open Letter and Polymer80 Letter purport to apply the Final Rule to Polymer80's receiver blanks to determine that Polymer80's "partially complete pistol frames are 'frames' and also 'firearms' as defined in the GCA and its implementing regulations, 18 U.S.C. § 921(a)(3)(B) and 27 CFR 478.12(a)(1), (c)." *Id.* The Open Letter singles out as firearms two Polymer80 products that the ATF had previously classified as not being firearms. *Compare* Open Letter, at 4–10 *with* Exs. B & C. The Polymer80 Letter classified Polymer80's PF940C as a

24

firearm, contradicting the ATF's previous classification letter that had classified it as not being a firearm. *See* Ex. B.

104.    The Open Letter and Polymer80 Letter have the force and effect of law. It is a statement of general or particular applicability and future effect that is designed to implement, interpret, or prescribe law or policy.

105.    The Open Letter amends the Final Rule in two ways.

106.    The Polymer80 Letter contradicts the Final Rule in two ways.

107.    The Open Letter contradicts and thus amends the Final Rule's definition of the term "readily." The Polymer80 Letter contradicts the Final Rule's definition of the term "readily."

108.    The Final Rule defines to term readily as a "process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state." 87 Fed. Reg. at 24,735; *see also id.* at 24,747. The Final Rule then provides a list of eight factors: "(a) Time, i.e., how long it takes to finish the process; (b) Ease, i.e., how difficult it is to do so; (c) Expertise, i.e., what knowledge and skills are required; (d) Equipment, i.e., what tools are required; (e) Parts availability, i.e., whether additional parts are required, and how easily they can be obtained; (f) Expense, i.e., how much it costs; (g) Scope, i.e., the extent to which the subject of the process must be changed to finish it; and (h) Feasibility, i.e., whether the process would damage or destroy the subject of the process or cause it to malfunction."

109.    The Open Letter, by contrast, defines "readily" to "not involve evaluation of a percentage of completion for an item that, when completed, will function as a frame or receiver. Rather, the analysis examines how efficiently, quickly, and easily a clearly identifiable component part of a weapon can be completed, assembled, restored, or otherwise converted to house or

provide a structure for the applicable fire control component." *Id.* The Open Letter and Polymer80 Letter do *not* analyze the eight factors listed in the Final Rule.

110.    The Open Letter's definition of "readily" contradicts, and thus amends, 27 CFR 478.12(g), which requires ATF to examine "the extent to which the subject of the process must be changed to finish it." The Polymer80 Letter contradicts 27 CFR 478.12(g), which requires ATF to examine "the extent to which the subject of the process must be changed to finish it."

111.    Polymer80's partially complete pistol frames are incomplete and unusable, and would require substantial time and effort to complete to a stage where they could be readily convertible to be fitted with the remaining firearms parts that would enable the completed firearm to expel a projectile. But, pursuant to the Open Letter and Polymer80 Letter, and contrary to the Final Rule, the extent to which the subject of the process must be changed to finish it shall be excluded from the analysis for determining whether Polymer80's partially complete pistol frames, "or similar semiautomatic, striker-fired pistol," may readily be completed, assembled, restored, or otherwise converted to a functional frame.

112.    The Open Letter also contradicts and thus amends the Final Rule's definition of the process by which the Director may classify an item as a "frame" or "receiver." The Polymer80 Letter contradicts the Final Rule's definition of the process by which the Director may classify an item as a "frame" or "receiver."

113.    Pursuant to the Final Rule, "[w]hen issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit."

114.    The Open Letter, by contrast, does not allow for the consideration of this information when determining whether Polymer80's partially complete pistol frames, "or similar semiautomatic, striker-fired pistol," are a "frame" or "receiver": "They are classified as firearms even if they are not sold, distributed, marketed, or possessed with any associated templates, jigs, molds, equipment, tools, instructions, or guides." The Open Letter and Polymer80 Letter do not consider this information when determining whether Polymer80's receiver blanks are a "frame" or "receiver." Moreover, Defendants have contradicted the Open Letter both in court filings to this Court and at oral argument before the Southern District of Texas, stating that "under both the prior definition and the amended definition in the Rule, [blank receivers] are not considered to be a 'frame or receiver' unless they are sold with jigs, templates, equipment, tools or other products or components that would make the receiver blank readily convertible to a functional frame or receiver." *See* Doc. 41, at 10; *see also* Langford, Cameron, *Texas company asks judge to block Biden ghost gun regulations*, Courthouse News Service (August 9, 2023), available at https://www.courthousenews.com/texas-company-asks-judge-to-block-biden-ghost-gun-regulations ("To qualify as a regulated receiver, [Defendants' attorney] explained, the part must come with a 'jig' or template – typically a piece of plastic that snaps into place to guide the purchaser on where and how deep to drill holes – drill bits and instructions, making the receiver 'readily convertible' within minutes to a fully functional firearm.").

115.    In these ways, the Open Letter and Polymer80 Letter are inconsistent with the Final Rule and is therefore arbitrary and capricious in violation the Administrative Procedure Act ("APA").

27

116.     Although the Open Letter amends the Final Rule in two ways, both of which have the force and effect of law, the ATF did not follow the notice-and-comment rulemaking procedures required by the APA when issuing the Open Letter.

**VII.    The Final Rule, Open Letter, and Polymer80 Letter Will Destroy Polymer80's Business**

117.     Polymer80's business is the distribution of receiver blanks, jigs, tools, and instructions to customers and businesses that lawfully market the products to customers who wish to exercise their Second Amendment rights by making their own firearms.

118.     Polymer80 fulfills orders by shipping receiver blanks, jigs, tools, and instructions to customers and businesses across the country that place orders for products. The bulk of its customers are out of state.

119.     By unlawfully enacting legislative changes through its redefinitions of "firearm" and "frame or receiver," the Final Rule and Open Letter reversed the ATF's longstanding legal position and subjected currently unregulated receiver blanks to the same regulatory requirements as fully functional firearms.

120.     By delegating to the ATF Director unbounded discretion to apply vague and capacious standards for what constitutes a "firearm" and "frame or receiver," the Final Rule and Open Letter make it impossible for manufacturers to determine with any reasonable certainty which regulatory requirements apply to a product design.

121.     Polymer80 attempted in good faith to comply with the Final Rule by, for instance, selling receiver blanks without jigs, but the Open Letter and Polymer80 Letter prohibit Polymer80 from engaging in even that practice.

122.    By imposing unlawful and excessive requirements on licensees who take "privately made firearms" into their custody, the Final Rule will eliminate consumer demand for receiver blanks.

123.    By *sua sponte* determining that Polymer80's partially complete pistol frames, or similar semiautomatic, striker-fired pistol, may readily be completed, assembled, restored, or otherwise converted to a functional frame, the Open Letter and Polymer80 Letter will eliminate manufacturer supply of receiver blanks.

124.    In summation, the Final Rule, Open Letter, and Polymer80 Letter will wipe out Polymer80's business or cause Polymer80 and its owners and employees to face criminal and civil liability.

## CLAIMS FOR RELIEF

### COUNT I.
### The Adoption of the Final Rule Violates the Separation of Powers

125.    All paragraphs of this complaint are hereby incorporated by reference.

126.    Article I, Section 1 of the U.S. Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

127.    Article I, Section 3 of the U.S. Constitution directs that the President "shall take Care that the Laws be faithfully executed[.]"

128.    Lawmaking functions belong to Congress and may not be conveyed to another branch or entity. Congress may not abdicate or transfer to others the essential legislative functions with which it is thus vested.

129.    Neither the President nor his subordinates may exercise Congress' legislative power to declare entirely what circumstances should be forbidden by law.

130.    The Final Rule was not enacted by Congress.

131.    The ATF redefined the definition of "firearm" without congressional authority.

132.    The Final Rule gives the ATF new power over new items that are not contemplated or regulated under federal law.

133.    The Final Rule is a new law, bearing potential criminal penalties.

### COUNT II.
### The Adoption of the Open Letter Violates the Separation of Powers

134.    All paragraphs of this complaint are hereby incorporated by reference.

135.    Article I, Section 1 of the U.S. Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

136.    Article I, Section 3 of the U.S. Constitution directs that the President "shall take Care that the Laws be faithfully executed[.]"

137.    Lawmaking functions belong to Congress and may not be conveyed to another branch or entity. Congress may not abdicate or transfer to others the essential legislative functions with which it is thus vested.

138.    Neither the President nor his subordinates may exercise Congress' legislative power to declare entirely what circumstances should be forbidden by law.

139.    The Open Letter was not enacted by Congress.

140.    The Open Letter contradicts and thus amends the Final Rule's definition of the term "readily" without congressional authority.

141.    The Open Letter also contradicts and thus amends the Final Rule's definition of the process by which the Director may classify an item as a "frame" or "receiver."

### COUNT III.
### The Final Rule Exceeds Defendants' Statutory Authority

142.    All paragraphs of this complaint are hereby incorporated by reference.

30

143.    Under 5 U.S.C. § 706(2)(c), "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"

144.    The ATF has only those powers given to it by Congress.

145.    The ATF exceeds its authority when its regulation is not consistent with a statutory definition established by Congress.

146.    The Final Rule regulates weapon parts Congress explicitly left out of federal statutes and imposes felony charges for violations thereof.

147.    The Final Rule exceeds the ATF's congressionally mandated jurisdiction and authority because it regulates new items Congress explicitly left out of the definition of "firearm," and grants the ATF new, additional authority in excess of that proposed, considered, debated, or passed by Congress.

## COUNT IV.
### The Open Letter Exceeds Defendants' Statutory Authority

148.    All paragraphs of this complaint are hereby incorporated by reference.

149.    Under 5 U.S.C. § 706(2)(c), "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"

150.    The ATF has only those powers given to it by Congress.

151.    The ATF exceeds its authority when its regulation is not consistent with a statutory definition established by Congress.

152.    The Open Letter regulates weapon parts Congress explicitly left out of federal statutes and imposes felony charges for violations thereof.

31

153.     The Open Letter exceeds the ATF's congressionally mandated jurisdiction and authority because it regulates new items Congress explicitly left out of the definition of "firearm," and grants the ATF new, additional authority in excess of that proposed, considered, debated, or passed by Congress.

## COUNT V.
## The Final Rule Violates the Nondelegation Doctrine

154.     All paragraphs of this complaint are hereby incorporated by reference.

155.     If this Court concludes that the Final Rule is authorized by statute, then the statutory scheme unconstitutionally delegates legislative power with no intelligible principle, violating the nondelegation doctrine.

156.     Various provisions of the Final Rule effectuate a double delegation by interpreting Congress's delegation of authority to the ATF as allowing for the promulgation of a rule that in turn delegates to the ATF Director unbounded discretion to create and unilaterally revise legislative standards.

## COUNT VI.
## The Open Letter Violates the Nondelegation Doctrine

157.     All paragraphs of this complaint are hereby incorporated by reference.

158.     If this Court concludes that the Open Letter is authorized by statute, then the statutory scheme unconstitutionally delegates legislative power with no intelligible principle, violating the nondelegation doctrine.

159.     Various provisions of the Open Letter effectuate a double delegation by interpreting Congress's delegation of authority to the ATF as allowing for the promulgation of a rule that in turn delegates to the ATF Director unbounded discretion to create and unilaterally revise legislative standards.

32

## COUNT VII.
### The Final Rule Was Adopted Without
### Observance of Procedure Required by Law

160.    All paragraphs of this complaint are hereby incorporated by reference.

161.    The process of notice-and-comment rulemaking requires an agency to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" and to give "consideration of the relevant matter presented." 5 U.S.C. § 553(c).

162.    Approximately 290,000 members of the public submitted comments to the proposed rule. Defendants did not adequately consider all relevant arguments raised in those comments and provide appropriately reasoned responses to them.

163.    When agencies adopt rules, they must publish a "concise general statement of their basis and purpose." 5 U.S.C. § 553(c).

164.    The Final Rule does not provide an accurate and adequate "concise general statement" of its basis and purpose.

165.    The Final Rule was therefore adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## COUNT VIII.
### The Open Letter Was Adopted Without
### Observance of Procedure Required by Law

166.    All paragraphs of this complaint are hereby incorporated by reference.

167.    The process of notice-and-comment rulemaking requires an agency to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" and to give "consideration of the relevant matter presented." 5 U.S.C. § 553(c).

33

168.     Defendants failed to give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments and failed to give consideration of the relevant matter presented.

169.     When agencies adopt rules, they must publish a "concise general statement of their basis and purpose." 5 U.S.C. § 553(c).

170.     The Open Letter does not provide an accurate and adequate "concise general statement" of its basis and purpose.

171.     The Open Letter was therefore adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## COUNT IX.
### The Final Rule is Arbitrary, Capricious, and an Abuse of Discretion

172.     All paragraphs of this complaint are hereby incorporated by reference.

173.     The Final Rule drastically departs from the ATF's longstanding treatment of firearms and non-firearms.

174.     The Final Rule abandons the ATF's treatment of non-firearm objects that was stated on the ATF's official website, applied in numerous classification letters, and that the ATF submitted as evidence in federal courts across the country—a position that individuals and corporations have relied on to structure their personal and business practices.

175.     The ATF has failed to adequately reconcile their statements in *California v. ATF* and *Syracuse v. ATF* with their Final Rule, including, but not limited to, the ATF's treatment of "readily convertible."

176.     The ATF fails to adequately explain why the ATF will now treat inoperable frames or receivers or inoperable frame or receiver kits as firearms.

34

177.    The APA requires federal agencies to (a) give general notice of proposed rulemaking in the Federal Register and thereafter (b) "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).

178.    It is arbitrary or capricious for an agency not to take into account all relevant factors in making its determination.

179.    The Final Rule fails to adequately address a number of comments the ATF received on the Proposed Rule within the Final Rule. For example, the Final Rule fails to adequately consider the implications of its "complete weapon" definition. *See* Final Rule, at 24,700 ("[T]he Department disagrees . . . that the application of the definition of 'firearm' to unassembled weapons creates enforcement uncertainty."). The Final Rule also fails to consider the fact that both split receivers and striker-fired pistols were in existence in 1968, thus Congress could not have intended for the ATF to regulate what it chose to ignore.

180.    The ATF promulgated the Final Rule without considering the Second Amendment factors and data made relevant by *New York State Rifle & Pistol Ass'n, v. Bruen*, 142 S. Ct. 2111 (2022).

181.    Under *Bruen*, the ATF had to strictly (without means-ends scrutiny) consider whether "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2126-32.

182.    The ATF failed to consider whether the regulation is consistent with this Nation's historical tradition of firearm regulation. The ATF did not consider whether the new Final Rule "addresses a general societal problem that has persisted since the 18th century," and if so only whether there is a "lack of a distinctly similar historical regulation addressing that problem." *Id*.

35

Nor did it consider whether "earlier generations addressed the societal problem," and if so only whether they "did so through materially different means." *Id.*

183.    The ATF instead infected its Second Amendment analysis with the presumptions of legality and means-ends scrutiny that *Bruen* prohibits. *Compare* 87 Fed. Reg. 24,676-24,677 (relying on "compelling governmental interests" and "presumptively lawful regulatory measures"), *with Bruen*, 142 S. Ct. at 2126 ("*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.").

## COUNT X.
### The Open Letter is Arbitrary, Capricious, and an Abuse of Discretion

184.    All paragraphs of this complaint are hereby incorporated by reference.

185.    The Open Letter drastically departs from the ATF's longstanding treatment of firearms and non-firearms.

186.    The Open Rule abandons the ATF's treatment of non-firearm objects that was stated on the ATF's official website, applied in numerous classification letters, and that the ATF submitted as evidence in federal courts across the country—a position that individuals and corporations have relied on to structure their personal and business practices.

187.    The Open Letter is inconsistent with the Final Rule and is therefore arbitrary and capricious.

188.    The ATF promulgated the Open Letter without considering the Second Amendment factors and data made relevant by *New York State Rifle & Pistol Ass'n, v. Bruen*, 142 S. Ct. 2111 (2022).

36

189.    Under *Bruen*, the ATF had to strictly (without means-ends scrutiny) consider whether "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2126-32.

190.    The ATF failed to consider whether "the regulation is consistent with this Nation's historical tradition of firearm regulation." The ATF did not consider whether the new Open Letter "addresses a general societal problem that has persisted since the 18th century," and if so only whether there is a "lack of a distinctly similar historical regulation addressing that problem." *Id*. Nor did it consider whether "earlier generations addressed the societal problem," and if so only whether they "did so through materially different means." *Id*.

191.    The ATF instead infected its Second Amendment analysis with the presumptions of legality and means-ends scrutiny that *Bruen* prohibits. *Compare* 87 Fed. Reg. 24,676-24,677 (relying on "compelling governmental interests" and "presumptively lawful regulatory measures"), *with Bruen*, 142 S. Ct. at 2126 ("*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.").

### COUNT XI.
### The Polymer80 Letter is Arbitrary, Capricious, and an Abuse of Discretion

192.    All paragraphs of this complaint are hereby incorporated by reference.

193.    The Polymer80 Letter drastically departs from the ATF's longstanding treatment of firearms and non-firearms.

194.    The Polymer80 Letter abandons the ATF's treatment of non-firearm objects that was stated on the ATF's official website, applied in numerous classification letters, and that the

37

ATF submitted as evidence in federal courts across the country—a position that individuals and corporations have relied on to structure their personal and business practices.

195.    The Polymer80 Letter is inconsistent with the Final Rule and is therefore arbitrary and capricious.

196.    The ATF promulgated the Polymer80 Letter without considering the Second Amendment factors and data made relevant by *New York State Rifle & Pistol Ass'n, v. Bruen*, 142 S. Ct. 2111 (2022).

197.    Under *Bruen*, the ATF had to strictly (without means-ends scrutiny) consider whether "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2126-32.

198.    The ATF failed to consider whether "the regulation is consistent with this Nation's historical tradition of firearm regulation." The ATF did not consider whether the Polymer80 Letter "addresses a general societal problem that has persisted since the 18th century," and if so only whether there is a "lack of a distinctly similar historical regulation addressing that problem." *Id*. Nor did it consider whether "earlier generations addressed the societal problem," and if so only whether they "did so through materially different means." *Id*.

199.    The ATF instead infected its Second Amendment analysis with the presumptions of legality and means-ends scrutiny that *Bruen* prohibits. *Compare* 87 Fed. Reg. 24,676-24,677 (relying on "compelling governmental interests" and "presumptively lawful regulatory measures"), *with Bruen*, 142 S. Ct. at 2126 ("*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.").

38

## COUNT XII.
## The Final Rule is Not a Logical Outgrowth of the Proposed Rule

200.    All paragraphs of this complaint are hereby incorporated by reference.

201.    As part of the rulemaking process, the ATF made significant changes to the Final Rule that do not logically grow out of the Proposed Rule.

202.    An agency is prohibited by the APA from adopting a final rule that contains significant changes unless supplemental notice and opportunity to comment is provided. *See* 5 U.S.C. § 706.

203.    The Final Rule provides separate and distinct definitions for "frame," "receiver," and "variant" that were not proposed in the Proposed Rule and were not provided for comment.

204.    The Proposed Rule defined a frame or receiver as "[a] part of a firearm that, when the complete weapon is assembled, is visible from the exterior and provides housing or a structure designed to hold or integrate one or more fire control components, even if pins or other attachments are required to connect those components to the housing or structure." Proposed Rule, at 27,741. Following the definition is just over a dozen illustrations. *Id.* at 27,742-46.

205.    The Final Rule omitted four diagrams from the Proposed Rule and added five new diagrams. *Compare* Proposed Rule, at 27,742-46, *with* Final Rule, at 24,735-41.

206.    The Final Rule significantly altered the time allowed for the identification of a firearm, down from 7 days to the next business day. *Compare* Proposed Rule, at 27,752, *with* Final Rule, at 24,748.

207.    As part of the rulemaking process, the agencies relied on new information and made significant changes to the Final Rule that were not available for public comment.

208.    For example, the Final rule added 57 DOJ Office of Public Affairs sources, among others, that were not present in the Proposed Rule or offered for comment.

39

209.    The Final Rule also added definitions and regulations for several terms, including but not limited to a multi-piece frame or receiver, privately made firearms marked by licensees, and primordial, all without being proposed in the Proposed Rule or being offered for comment. These definitions also cannot be said to have been a logical outgrowth of the Proposed Rule.

210.    Finally, the Final Rule included voluminous new sources that were not provided for public review or comment in the Proposed Rule.

## COUNT XIII.
### The Final Rule, Open Letter, and Polymer80 Letter Violate the Fifth Amendment as Unconstitutionally Vague

211.    All paragraphs of this complaint are hereby incorporated by reference.

212.    The Final Rule is unduly vague and violates the void for vagueness doctrine because a person of ordinary intelligence could not determine from the Final Rule whether various objects were regulated.

213.    Numerous aspects of the Final Rule are unconstitutionally vague, including but not limited to its definitions of a "frame or receiver," "readily," and "firearm." Furthermore, the indeterminacy of the various tests gives the ATF virtually unlimited and unpredictable discretion. *See, e.g.*, Final Rule at 24,735 (listing eight un-ranked factors to determine what "readily" means); *id.* at 24,735–41 (listing six pages of non-exclusive illustrations of what constitutes a "frame," "receiver," or "variants thereof"); *id.* at 24,739 (empower the Director to consider "any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit," when classifying items).

40

214.    The Open Letter and Polymer80 Letter suffer from this same constitutional infirmity. Nothing in their purported guidance informs Polymer80 or its customers as to what these critical terms mean, and whether (or at what point) they may have run afoul of the ATF's novel interpretation of the Gun Control Act.

## COUNT XIV.
## The Final Rule, Open Letter, and Polymer80 Letter Violate the Second Amendment

215.    All paragraphs of this complaint are hereby incorporated by reference.

216.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

217.    The Second Amendment protects "the right of the people to keep and bear Arms."

218.    The Final Rule, Open Letter, and Polymer80 Letter infringe the individual right to make and acquire arms, which is part and parcel of the right to keep and bear arms, in a way that is inconsistent with this Nation's historical tradition of firearm regulation. The Final Rule, Open Letter, and Polymer80 Letter therefore violate the rights of Polymer80 and its customers to keep and bear arms, to engage in lawful self-defense, to make their own firearms, to possess property lawfully acquired, and to earn a living by manufacturing and selling lawful goods in commerce.

## COUNT XV.
## The Final Rule Violates the First Amendment

219.    All paragraphs of this complaint are hereby incorporated by reference.

220.    The First Amendment forbids any lawmaking that abridges freedom of speech.

221.    The Final Rule specifically targets instructions, guides, and marketing materials sold by a seller or distributor of firearms parts. Instructions, guides, and marketing materials constitute commercial speech.

41

222.   The Final Rule mandates that requests to the ATF for classification determination must be submitted under penalty of perjury and include "any instructions, guides, templates, jigs, equipment, tools, or marketing materials that are made available to the purchaser or recipient of the item." 87 Fed. Reg. at 24,666, 24,739. In accordance with the Final Rule, the ATF has taken inconsistent positions which have implicated the First Amendment. In one instance, a piece of metal *would not* be considered a firearm if the piece is not accompanied by, *e.g.*, instructions. But that same piece of metal *would* be classified as a firearm if accompanied by instructions.

223.   The purpose of this mandate is so the ATF can regulate the content of the "instructions, guides, templates, . . . [and] marketing materials" that Polymer80 and other companies provide to customers.

224.   Instructions, guides, and marketing materials are considered speech protected by the First Amendment.

225.   Such inconsistency has forced Polymer80 to regulate its protected speech by deleting instructions from its website in order to survive as a business. *See* Kelley Decl., at ¶ 13.

226.   Content-based restrictions on speech, found in the Final Rule, require a strict scrutiny analysis that Defendants cannot overcome.

227.   The Final Rule also regulates speech based on speaker, not just content, which requires a strict-scrutiny analysis that Defendants likewise cannot overcome.

### COUNT XVI.
### The Final Rule's, Open Letter's, and Polymer80 Letter's Regulations on "Privately Made Firearms" Exceed the Limits of the Commerce Clause

228.   All paragraphs of this complaint are hereby incorporated by reference.

229.   To the extent the Final Rule and Open Letter impose regulations on intrastate activities with no interstate nexus, those requirements exceed Congress's authority under the Commerce Clause. U.S. CONST. art. I, § 8, cl. 3.

42

## COUNT XVII.
### The Final Rule, Open Letter, and Polymer 80 Letter Effectuate a Regulatory Taking of "Privately Made Firearms" Without Just Compensation

230.     All paragraphs of this complaint are hereby incorporated by reference.

231.     The appropriation of personal property by the government without just compensation can violate the Fifth Amendment's Takings Clause.

232.     Onerous government regulations can effectuate a regulatory taking.

233.     The Final Rule requires licensees with "privately made firearms" in their inventories to either mark them according to the Final Rule's specifications, destroy them, or "voluntarily" turn them over to a law enforcement agency. The Final Rule places no restrictions on what the government may choose to do with "privately made firearms" that are "voluntarily" surrendered to the government.

234.     The Final Rule's regulations on "privately made firearms" effectuate a regulatory taking of personal property without just compensation.

235.     The Open Letter and Polymer80 Letter focus this unconstitutional taking on Polymer80, by far the largest manufacturer in this marketplace, explicitly, exacerbating the negative impact of the Final Rule on Polymer80 and its customers.

### PRAYER

WHEREFORE, Polymer80 asks this Court to enter an order and judgment:

a.     Declaring that the Final Rule is unlawful;

b.     Declaring that the Open Letter is unlawful;

c.     Declaring that the Polymer80 Letter is unlawful;

d.     Issuing preliminary and permanent injunctive relief enjoining Defendants from enforcing the Final Rule against Polymer80;

e.     Issuing preliminary and permanent injunctive relief enjoining Defendants from enforcing the Open Letter against Polymer80;

43

f.      Awarding Polymer80 the costs of this action and its reasonable attorney's fees; and

g.      Awarding such other relief as the Court deems equitable and just.

Respectfully submitted,

**BRADLEY ARANT BOULT CUMMINGS LLP**

By:   */s/ Dennis L. Daniels Jr.*
        DENNIS L. DANIELS JR.
        Texas Bar No. 24107402
        dldaniels@bradley.com
3600 Fountain Place
1445 Ross Avenue
Dallas, Texas 75202
Telephone (214) 257-9800
Facsimile (214) 939-8787

JAMES W. PORTER, III (*pro hac vice* forthcoming)
jporter@bradley.com
MARC A. NARDONE (*pro hac vice* forthcoming)
mnardone@bradley.com
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street NW
Suite 1350
Washington, D.C. 20036
Telephone (202) 393-7150
Facsimile (202) 347-1684

**ATTORNEYS FOR POLYMER80, INC.**

44