UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| JENNIFER VANDERSTOK *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 4:22-cv-00691-O |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States *et al.*, | |
| Defendants. | |

**APPENDIX IN SUPPORT OF DEFENDANTS' COMBINED BRIEF
IN OPPOSITION TO PLAINTIFFS' AND INTERVENOR-PLAINTIFF
BLACKHAWK MANUFACTURING GROUP'S MOTIONS FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

| Document | Date | Bates Numbers | Document Numbers |
|---|---|---|---|
| Comment by Sig Sauer, Inc. in Response to Notice | Sept. 22, 2021 | N/A | Defs.' MSJ App. 001-019 |
| Comment by Nathan Quarantillo in Response to Notice | June 2, 2021 | N/A | Defs.' MSJ App. 020-043 |
| Comment by Beretta U.S.A. Corp., Benelli U.S.A. Corp. and Stoeger Industries, Inc. in Response to Notice | June 24, 2021 | N/A | Defs.' MSJ App. 043-050 |
| Comment by Scott Lipiec in Response to Notice | June 15, 2021 | N/A | Defs.' MSJ App. 051-063 |
| Comment by Walter Stokes in Response to Notice | May 22, 2021 | N/A | Defs.' MSJ App. 064-065 |
| Comment by Anonymous Commenter in Response to Notice | July 23, 2021 | N/A | Defs.' MSJ App. 066-067 |
| ATF Letter to Private Counsel #303304 | March 20, 2015 | ATF 71845-71849 | Defs.' MSJ App. 068-072 |
| ATF Classification Letter to Chris Coad, Ultra-Tech, Inc. | May 20, 2009 | ATF 000140-000141 | Defs.' MSJ App. 073-074 |
| ATF Classification Letter to Jason Davis, Davis & Associates | Undated | ATF000248-000253 | Defs.' MSJ App. 075-080 |
| Regulatory Impact Analysis | April 2022 | ATF071142-071282 | Defs.' MSJ App. 081-221 |
| S. Rep. No. 89-1866 | Oct. 19, 1966 | N/A | Defs.' MSJ App. 222-322 |
| 111 Cong. Rec. 5527 | March 22, 1965 | N/A | Defs.' MSJ App. 323 |

| Document | Date | Bates Numbers | Document Numbers |
|---|---|---|---|
| S. Rep. No. 79-752 | Nov. 19, 1945 | N/A | Defs.' MSJ App. 324-376 |
| H.R. Rep. No. 79-1980 | May 3, 1946 | N/A | Defs.' MSJ App. 377-433 |

DATED: February 13, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

LESLEY FARBY
Assistant Director, Federal Programs Branch

/s/ Daniel Riess
DANIEL RIESS
MARTIN M. TOMLINSON
TAISA M. GOODNATURE
JEREMY S.B. NEWMAN
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 353-3098
Email: Daniel.Riess@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

On February 13, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Daniel Riess

*Comments submitted in response to*

Department of Justice

Bureau of Alcohol, Tobacco, Firearms and Explosives

Notice of Proposed Rule Making (NPRM)

Docket No. ATF 2021R-05

Definition of Frame or Receiver and Identification of Firearms

Comments submitted by

Sig Sauer, Inc.

72 Pease Boulevard

Newington, NH 03801

August 11, 2021

Defs.' MSJ App. 001

INTRODUCTION

SIG SAUER, Inc. is an internationally recognized and respected manufacturer of firearms which are trusted by not only the average citizen for recreational or self-defense purposes, but also countless law enforcement and military organizations that rely on SIG SAUER firearms on a daily basis. SIG SAUER is greatly concerned by the scope and contents of the above-captioned NPRM, the confusing and arbitrary effects it will have on the firearms industry and general public, and the costs it will undoubtedly impose on SIG SAUER and all other firearms manufacturers. SIG SAUER respectfully submits the comments to the NPRM made herein, and requests careful consideration by ATF of the many concerns these comments represent and accordingly modify or limit the proposed rulemaking.

THE GRANDFATHERING OF THE CURRENT MARKING REQUIREMENT SCHEME FOR EXTANT FIREARMS IS BOTH INCOMPLETE AND UNNECESSARILY CONFUSING

Although the NPRM attempts to ease the burden of this rulemaking on manufacturers relative to the changes to the serialization and other marking requirements by grandfathering in current firearm serialization and marking regulations as applied to firearm models extant as of the date of the final rule, this attempt only creates additional confusion on the matter.

First, the grandfathering clause as currently drafted is incomplete and creates a legal inconsistency, in so far as it does not preserve the current definition of firearm frame or receiver as applied to covered firearms. This failure results in manufacturers being faced with confusion over what components of an extant firearm model must be marked if such model now has more than one component defined as a frame or receiver as a result of the proposed change to *that* definition. Although the grandfathering is effective in relieving manufacturer's from the need to locate name, location, model, and caliber markings on the frame(s) or receiver(s), the failure to incorporate the current definition of frame or receiver into the grandfathering clause results in a situation where manufacturers will still be required to place a serial number on any additional component(s) of these extant models which could now be defined as a frame or receiver (absent any prior determination by ATF on what component is the single frame or receiver of that weapon). Although this is clearly not ATF's intent with this grandfathering clause,

Defs.' MSJ App. 002

the poor drafting of this language leads to a legal reality where such confusion exists.

Secondly, the way in which this grandfathering clause is drafted creates inevitable confusion about which firearms it applies to. Specifically, the grandfathering clause applies to firearms of the same "design and configuration" of models extant as of the date of the final rule. The use of the term "and" in this context indicates that ATF believes these are two separate criteria which must both be met for the grandfathering clause to apply (i.e., a change in a model's configuration but not design would render the grandfathering inapplicable, and vice versa). However neither of these terms is defined within the rule or any other regulation, and therefore the proposed rule leave manufacturers at a loss to know when changes to a particular firearm model render it outside of the grandfathering protection. Does a change in grip panels matter? Barrel length? Threaded vs. unthreaded barrels? Fixed sights vs. adjustable or red-dot capable? Which of these changes relate to a change in design, and which to a change in configuration? These are questions that currently have no answer in the proposed rule.

Although it is our position, as stated elsewhere herein, that no changes in the current marking requirements for firearms are required (a position that the inclusion of this grandfathering clause is just more evidence of), if ATF is to implement such a change, and for this grandfathering provision to be effective, ATF must revise the proposed rule to give clarity to the terms "design" and "configuration" so that manufacturers can effectively operate within its bounds, and must ensure that the current definition of firearm frame or receiver is preserved for such purpose, to avoid creating a third category of firearms which do not fit neatly within the old marking requirement scheme and the new.


NEW DEFINITION OF FRAME/RECEIVER DOES NOT MEET STATED GOAL OF STREAMLINING THE DEFINITION OR ANTICIPATING FUTURE TECHNOLOGY

ATF makes multiple statements in the NPRM regarding the reason for the changes to the definition of "firearm frame or receiver". Chief among these are (1) concerns that recent court decisions have interpreted the current definition in a manner that might render a large proportion of the current firearm market essentially "frame-less", and (2) a desire to modernize the definition to anticipate and be compatible with future developments in firearms technology. ATF's

Defs.' MSJ App. 003

Comments to NPRM ATF 2021R-05

rework of this definition however, goes beyond what is necessary to address both of these concerns, and instead creates more confusion, inconsistency, and cost for the firearms industry and individual firearm owners.

ATF's concerns regarding the judicial interpretations of the current definition of firearm frame or receiver stem from the definition's use of an "and" operator in listing the distinctive attributes of a firearm frame. Per the current definition, a firearm frame or receiver must provide a housing for the "hammer, bolt or breechblock, *and* firing mechanism" (emphasis added). Therefore, all three of these elements must be included in a single component for that component to meet the definition of a firearm frame or receiver. By way of example, AR-pattern firearms have two components together which share these elements, and therefore neither component in and of itself meets the definition of a firearm frame or receiver.

ATF further states that its long-standing practice and interpretation of the definition of a firearm frame or receiver has been to evaluate firearm designs in such a way as to determine a *singular* component that qualifies as the frame or receiver of the weapon, and not to identify a group of components which house all of the required components (". . .ATF has long applied these factors in determining *which component* of these weapons qualifies as the frame or receiver." (emphasis added)). The Gun Control Act also indicates an intent of Congress that firearms have only one frame, as evidenced by a move away from statutes which regulate all firearm parts (pre-GCA), as well as the use of the article "the" in the subdefinition of firearm defining a firearm frame or receiver as a "firearm" (". . . the frame or receiver of any such weapon" 18 USC 921(a)(7)). ATF has further enshrined this intent of a frame being defined as a singular component in the current regulatory definition of firearm frame or receiver: " . . . *that part* of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." (27 CFR 478.11)

Despite this long-standing practice and clear statutory language that the intent of the GCA was to define a firearm frame or receiver as a single component of a given firearm, ATF has now decided that such interpretations should be thrown out, in favor of a definition which starts from an assumption that a firearm can have *multiple* frames or receivers, and in fact does have such, unless otherwise determined by ATF.

Defs.' MSJ App. 004

Comments to NPRM ATF 2021R-05

In part, the notice of proposed rule-making (NPRM) proposes a specific new definition of a 'split or modular frame or receiver' as a 'firearm with more than one part that provides housing or a structure designed to hold or integrate one or more fire control or essential components' as a firearm.[1]  This is directly at odds with the incorporated definition language of the GCA for a frame or receiver which is a *singular* definition with particular emphasis on the word 'that' in the phrase 'That part of a firearm…'.

Such a change represents a reversal in ATF's as well as industry's and the public's interpretation of the definition of firearm frame or receiver.  However, ATF fails to provide any reasonable explanation as to why such a change in interpretation of this term is warranted, as opposed to a redefinition of the term that continues to presume the existence of a *single* frame or receiver in any firearm, and better captures the intent of the current definition to define this component as the component which houses those features critical to the firing sequence.  As such, this definitional change is clearly arbitrary, capricious, and made without any clear reasoning for such change.

The current definition of a frame or receiver is singular and well-defined whilst the application and interpretation of the current definition by the ATF is flexible enough to accommodate firearms of different designs, to include 'split or modular frames/receivers.'  What the NPRM proposes is first and foremost inconsistent with the current definition of a frame and receiver.  The federal definition ensconced in the current law trumps any NPRM per the Administrative Procedures Act of 1946 (APA).  By definition then, a change in the definition that is inconsistent *requires* a similar act of congress to redefine 'what' a frame or receiver is.

In addition to this failing of proper support for such a change to the definition of firearm frame or receiver, such change creates a legal reality which necessitates the creation of a byzantine structure whereby ATF is required to specifically identify in regulation which component is the frame or receiver of certain firearm models (which ATF does across multiple pages of the NPRM), or necessitates firearm designers and manufacturers to submit new firearm designs to ATF for official determination as to which component qualifies as the frame or receiver.  Otherwise, manufacturers will be forced to identify and treat any part of the

---

[1] NPRM 86 FR 27720 at pg 27728.

Defs.' MSJ App. 005

firearm which might meet the new definition of frame or receiver as such, a reality which comes with many other issues discussed elsewhere herein.

Such a system would have a chilling effect on innovation and advancement in the firearms industry and firearms design, by significantly and unnecessarily increasing the administrative and regulatory burden on designers and manufacturers. If a manufacturer desires to not mark multiple components with serial numbers and other identifying information (a requirement which serves no real law enforcement purpose and creates its own issues for industry, discussed elsewhere herein), it must submit a sample of each new firearm design to ATF for a determination as to whether a single component thereof can be defined as the frame or receiver of the firearm. This process is not subject to any guaranteed response time on the part of ATF, and past experiences clearly indicate that manufacturers can expect to wait many months for a response from the Tech Branch, with current wait times on similar requests for determination approaching a year. Furthermore, there is not any requirement for ATF to even make a determination on such a submission, nor is there any guarantee that ATF will determine that a submitted firearm has a single frame or receiver, leaving manufacturers in a state of limbo for an extended period of time. Such costs and unknowns render this an overly complex, burdensome, and costly process for industry to rely on while raising constitutional questions of executive branch infringement of citizens second amendment rights.

Ironically, ATF's redefinition of frame or receiver creates another problem that is analogous to the exact problem which courts have identified with the current definition of firearm frame or receiver, namely, that no reasonable person will be able to determine what component or components of a given firearm constitute a frame or receiver, much like the court in *US v. Joseph Roh* found that "no reasonable person would understand that a part constitutes a receiver where it lacks the components specified in regulation". The proposed definition creates a reality where a reasonable person would be forced to assume that every component of the firearm which meets the proposed definition of firearm frame or receiver is such, *unless* they are aware of a determination to the contrary by ATF. Therefore, consumers must constantly be in doubt as to whether a firearm in their possession has been properly marked in accordance with law, or if they are in possession of an illegal item.

Defs.' MSJ App. 006

Comments to NPRM ATF 2021R-05

## THE DEFINITION OF FIREARM FRAME OR RECEIVER IS POORLY WRITTEN IN THAT IT INCLUDES UNNECESSARY ELEMENTS

The basis of ATF's desire to rework the definition of firearm frame or receiver really stems from poor initial drafting which required that a frame or receiver contain ALL of the elements listed in the definition. Ironically, ATF has drafted the proposed definition to include a similar element that would result in many components that really should be defined as a firearm frame, being excused from such definition merely because they are not visible from the exterior of the firearm.

Specifically, the proposed definition includes the following language, "A part of a firearm that, when the complete weapon is assembled, *is visible from the exterior . . .*" (emphasis added). Inclusion of this language means that a component of a firearm *cannot* be defined as a frame or receiver if it is not visible from the exterior of the firearm. By way of example, if one were to apply this language to the SIG SAUER P320, merely removing the serial number window from the grip module of that firearm would render the frame *not* visible from the exterior of the fully assembled firearm, and therefore render definition of that component as the frame of the weapon improper, even though common sense and all other elements of the definition would clearly indicate that component is the frame or receiver.

It would appear that ATF included this language because it realizes that the remainder of the proposed definition of firearm frame or receiver would be impossible to implement without this qualifier on what components qualify as a frame or receiver. Namely, the proposed definition states that any component which provides a housing for a fire control component qualifies as a frame or receiver, however such a definition comes with all the attendant requirements for serializations and other markings, which *must be conspicuous*. It is easy to imagine that this new definition could result in internal components of future firearms which could be determined to be frames or receivers, and could also be of a nature that does not permit them to be visible from the outside, and therefore not markable in accordance with regulation. Thus, the proposed definition could not include a requirement that frames or receivers *must* be visible from the exterior of an assembled firearm, and ATF was forced to instead adopt the reverse proposition and make visibility from the exterior a definitional feature of a frame or receiver. But, as has been already illustrated, the inclusion of this feature as a definitional feature of a frame or receiver will necessarily lead to ridiculous outcomes where a designer can merely enclose with a cosmetic wrapper a component that by any

Defs.' MSJ App. 007

other measure would (and should) certainly be defined as a frame or receiver, and avoid having to define such component as a frame.  Not only does this possibility lead to intellectual inconsistencies, but it adds yet more confusion into the marketplace, where items that would never otherwise be defined as a frame or receiver become defined as such, and items which are clearly frames or receivers are not.

ATF's INCLUSION OF FRAME DETERMINATIONS FOR CERTAIN FIREARM MODELS IS AMBIGUOUS AS TO WHAT IS INCLUDED.

Ostensibly to lessen the burden on manufacturers and others, and to smooth the transition from the current definition of firearm frame or receiver to the new, ATF is proposing to include by regulation determinations as to what component of certain firearm designs is properly defined as a frame or receiver.  However, like many other inclusions in this rulemaking, ATF's efforts fall short and rather than relieving the burden caused by this new regulation, instead creates more confusion in the marketplace as to what a firearm frame or receiver actually is.

Beyond the inherent confusion and byzantine structure this rulemaking has created with the complex and convoluted definition of firearm frame or receiver that ATF has proposed, running over several pages of the NPRM, and creating a definition where a frame has one definition, unless ATF says otherwise – ATF's inclusion of these firearm-specific definitions of frame or receiver are often ambiguous about the scope of their application.

This ambiguity arises in two ways.  First, in some of these firearm-specific definitions, ATF lists various specific manufacturers of the defined firearm type. The inclusion of these manufacturers creates a confusion as to whether the definition only applies to firearms produced by those manufacturers, or if it applies to all firearms which follow the same basic design.  This confusion is evident in the first of these definitions provided by ATF for "Colt 1911-type, Beretta/Browning/FN Herstal/Heckler & Koch/Ruger/Sig Sauer/Smith & Wesson/Taurus hammer fired semiautomatic pistols".  Does this definition only apply to hammer-fired semiautomatic pistols manufactured by these discrete manufacturers? Or does it apply to all firearms that integrate an operating system that matches ATF's provided definition for these firearms? The answer is unclear in the regulation as currently proposed, and leaves manufacturers and others to guess as to ATF's intent.

Defs.' MSJ App. 008

Comments to NPRM ATF 2021R-05

The other confusing element included in some of these definitions is the use of "-type" language to identify a firearm type. By way of example, this point of confusion is evident in ATF's inclusion of a definition of the frame or receiver for "Sig Sauer P320-type semiautomatic pistols". Is the identification of these firearms as "P320-type" firearms meant only to include P320s or exact replicas thereof? Or is "-type" meat to convey a broader meaning of any firearm that has the same basic design basis, even if it uses different materials, or has different gross dimensions (such as the SIG P365)? Again, the proposed regulation is insufficiently precise to provide a clear answer, and leaves industry and the public to take a guess as to what ATF's true intent was.

The need for these specific firearm-type definitions of firearm frame or receiver are evidence in and of themselves of the tortured nature of ATF's proposed definition, and would not be necessary if ATF made the effort at promulgating a more clear, concise, efficient, and jurisprudentially consistent definition of firearm frame or receiver, rather than the lazy approach evidenced in the NPRM, leaving industry and the greater public with this byzantine, confused, and ambiguous reality. At a minimum, clarification must be made to these firearm-specific definitions of firearm frame or receiver, so that industry and the public can discern ATF's intended scope thereof.


RECOMMENDED REVISIONS TO THE DEFINITION OF FIREARM FRAME OR RECEIVER THAT ADDRESS THE ISSUES RAISED BY THE ATF PROPOSAL WHILE REMAINING CONSISTENT WITH THE STATUTE

One of ATF's stated goals for this redefinition is to provide a definition that better captures current firearms technology and is flexible enough to accommodate future advancements in technology which might not be compatible with the inclusion of more definitive features. ATF attempts to reach this goal by not identifying any specific defining feature that a frame possesses (to avoid the risk of future designs not incorporating such components), but a more ambiguous statement that a frame is any component which provides "housing or a structure . . .to hold. . . one or more *fire control components*. . ." (emphasis added). "Fire control component" is then defined broadly as any component "necessary for the firearm to initiate, complete, or continue the firing sequence", with a non-exhaustive list of examples of such components provided.

Defs.' MSJ App. 009

Although this definition could be effective in effectuating this goal, it is by no means the most efficient way to do so, nor the most consistent with past interpretations of the term firearm frame or receiver, namely in regards to the presumption that a firearm only has a single frame or receiver.

To resolve these, as well as the other issues with the proposed definition outlined above, ATF could choose to adopt a more concise and elegant definition of firearm frame or receiver, which would (1) make it clear that a firearm can only have one frame or receiver, (2) not create any need for byzantine regulatory definitions or determination systems, (3) eliminate any issues around what a reasonable person's understanding of a frame or receiver might be, and (4) still be flexible enough to anticipate and be effective in defining and describing the frame component of firearms incorporating future developments or changes in technology.

Multiple different reworks of the definition of firearm frame or receiver could meet these objectives, a couple suggestions of which follow:

- Firearm frame or receiver means the component of the firearm which provides a housing for the component responsible for constraining the energized component of the firearm (i.e., the sear or equivalent thereof);
- Firearm frame or receiver means the component of the firearm which provides a housing for the component which the operator interacts with to initiate the firing sequence of the firearm. (i.e., the triggering mechanism, or the equivalent thereof);
- Firearm frame or receiver means the component of the firearm which incorporates or provides a housing for the component which interacts with the barrel to form the chamber of the firearm.

Each of these definitions, or countless variations thereof which could be drafted, would be more effective at meeting ATF's stated goals for the change in the definition of firearm frame or receiver, while also being consistent with ATF's and the wider public's long standing interpretation of the term to mean a single component of a given firearm, and while also being clear and concise, without the need for a convoluted, multi-page definition as proposed in the NPRM, or the attendant byzantine determination structure that such definition necessitates.

## COSTS OF IMPLEMENTING MULTIPLE SERIAL NUMBERS ON A FIREARM

Defs.' MSJ App. 010

ATF's analysis of the proposed rule has come to the conclusion that most, if not all, manufacturers would not incur any cost in complying with the changes proposed to the definition of a firearm frame or receiver. In the worst case, ATF estimates that a manufacturer would only incur costs of $12,828 in order to revise its processes and toolings to appropriately mark firearms in accordance with the redefinition of firearm frame or receiver. It is entirely unclear how ATF has reached this figure, however the actual figure is orders of magnitude higher, and ambiguity in the proposed rule presents great risk to manufacturers of incurring this cost, including costs of additional equipment, setup, nonrecurring and recurring labor, modifications to IT systems which track millions of serial numbers, and associated potential for interruptions of production.

Sig Sauer has conducted an internal analysis on costs and impact incurred to maintain compliance with the NPRM if it were required to mark a second component of a firearm with a serial number or a serial number and other required information. Specifically, SIG looked at the following scenarios:

- Scenario A: SIG is required to mark a second component of an extant firearm model with a serial number, because the firearm is determined to have two frames; and
- Scenario B: SIG is required to mark a second component of a future firearm design with all markings required by the NPRM (serial number, name, location, model, and caliber), because the firearm is determined to have two frames.

SIG is currently running at the production capacity of its engraving machines, and therefore any additional engravings that might be required by the changes imposed by the NPRM would necessitate the acquisition of additional machines.

In Scenario A, where the marking of only an additional serial number is required, an additional engraving machine would be able to produce approximately 421,000 parts per year running at full capacity. To put this into the context, one of SIG's most popular products is currently produced at a rate of approximately 840,000 units per year. Therefore, if this product required a second serial number marking, this would necessitate the purchase of at least two additional engraving machines. SIG estimates that the capital and set-up costs of such acquisition would be approximately $312,000 ($156,000 per machine). SIG additionally estimates that

Defs.' MSJ App. 011

operational costs to actually conduct the additional engraving operations in this scenario would run to approximately $1.64 million per year.

Alternatively, in Scenario B, where SIG may potentially be required to mark a second component of a firearm with all markings required by the NPRM, an additional engraving machine would only be able to produce approximately 105,000 parts per year running at full capacity (due to increased cycle times per unit). To put this into context, SIG has a future product planned for release, which it is projecting to manufacture at an initial rate of 240,000 units per year. Therefore, SIG would potentially be required to purchase three additional engraving machines to meet capacity requirements of this product. Capital and set-up costs to acquire these machines would be approximately $468,000, while additional yearly operational costs would run to $1.692 million. These cost projections are conservative in nature, and only represent the additional cost presented by one single product. Yearly operational costs would increase on a linear basis for every 105,000 additional parts that need to be marked in this scenario, and each increase would come with a one-time machine acquisition cost of $156,000. Sig typically introduces 2-3 new models each year, and 8 to 15 changes in configuration to established models. Depending upon the ATF's clarification of these terms, with this level of activity Sig could expect 2-18 requirements per year to add an additional serial number (or two). Again, depending upon the definitions, this historical activity level could put operational costs of adding a single serial number to these products to over $20,000,000.

The costs presented in the scenario above do not take into account additional costs that would be incurred due to fallout of components in the manufacturing process. Due to the requirement that ATF has placed in the NPRM of newly manufactured firearms with multiple frames having matching serial numbers, any fallout in one frame would necessarily result in the scrapping of any corresponding serialized components marked with the same serial number, as remarking of a replacement to the fallout part would result in a duplicated serial number. This reality could effectively double, triple, or quadruple manufacturing scrap costs, depending on how many serialized components a firearm has.

Beyond these initial capital and continuing operational costs, SIG's current electronic business suite (EBS) software, which is responsible for tracking all parts and product inventory, and also for generating and maintaining required acquisition and disposition records, is inherently incompatible with the notion of

Defs.' MSJ App. 012

multiple serial numbers per firearm (whether matching or non-matching). At this time, SIG is not aware of a viable solution available to adapt this system in a way that would allow for the tracking of multiple serial number per serialized item, and therefore an exact cost of such an adaptation is not known.

However, if such an adaptation were possible, the cost might be estimated by looking at experiences with prior changes to this software platform. Recently, SIG went through a running update to its EBS platform to upgrade the platform to its most recent release. This project entailed more than a year of work of testing, development, and implementation by both dedicated personnel in SIG's IT department, as well as input from personnel across the company affected by this upgrade. In all, this upgrade cost SIG over $1 million to implement. It should also be noted that this was the cost incurred from an upgrade that did not require any stoppage of manufacturing production – if an upgrade were available to meet the requirements of multiple serial number markings, SIG would be forced to halt all affected manufacturing until such an upgrade could be fully developed, tested, and implemented, resulting in untold lost profits and opportunity costs that cannot be estimated. A recent ATF action that required Sig to shut down its manufacturing lines for an extended period had an estimated revenue loss impact of over $1,000,000 per day. Similar financial impact could be expected if production is interrupted because of the need to modify a production line to incorporate additional serial numbers onto component parts.

Furthermore, as great as the potential costs of an as yet unknown software adaptation noted above are, those would be dwarfed by the costs that SIG would incur if it is forced to find a completely new software platform that could support multiple serializations. Such a project would entail a ground up rework of SIG's entire IT infrastructure, would require significant work to ensure that all other IT systems SIG currently uses would be compatible, and would also necessitate a shut-down of manufacturing operations to allow for its implementation. SIG estimates that the cost for a solution in this vein would run ten times greater than the cost of implementing a potential software adaptation.

Such incompatibility is not limited to SIG's internal inventory software. Even if SIG were able to find some solution for its software applications that would allow the effective tracking of multiple serial numbers per firearm, firearms distributors, dealers, and other manufacturers, all use similar systems, be they internal inventory applications, or Point-of-Sale software solutions, that may or may not have the

Defs.' MSJ App. 013

capability to be so modified. As of now SIG is not aware of any such system that would allow for the use of multiple serial numbers associated with a single product, and therefore all FFLs with electronic recordkeeping systems are likely to be faced with the same difficulties.

Even if SIG were able to find a workable solution allowing its software to accommodate multiple serial numbers, such solution would undoubtedly be in the form of a custom modification to the underlying EBS software. By their nature, such modifications increase the user's exposure to and risk of cyber attack, as customized platforms are generally not able to be patched or updated in accordance with manufacturer's recommendations on a timely basis. The risk of cyber attack has been rapidly growing in the institutional sector in recent years, most recently exemplified by the attack on the oil pipeline system of the southeast US, which caused regional gas shortages for an extended period of time. An attack on SIG's cyber infrastructure in a similar manner would effectively halt all operations and manufacturing activities for an unknown period of time, costing SIG not only in the amount needed to fix the issue, but also untold amounts in lost productivity. As a defense contractor to the US government with numerous critical contracts for the supply of weapons, ammunition, and other accessories, such a stoppage would be crippling not only to SIG, but would present an unacceptable stoppage in its ability to fulfill the nation's critical defense needs. The risk of such an event that is posed by changes to SIG's (and other manufacturers and dealers) current software that increases its vulnerability for cyber attack, while not quantifiable, must be taken into account in this analysis.

As can be seen from the figures noted above, ATF's analysis of the costs that FFL's might face to bring themselves into compliance with the redefinition of firearm frame or receiver are likely much greater than the $12,828 quoted in the RIA, outstripping that figure by more than ten times in initial capital cost of a single machine alone, and underestimates the total company costs of the addition of a single serial number by orders of magnitude. Realistic figures must be taken into account by ATF before moving forward on the proposed rule, and a re-analysis of the expected costs should be undertaken to take a more holistic view of the costs that manufacturers are likely to face, and what those costs are likely to be, rather than the myopic view of woefully deficient engineering costs that ATF has so far contemplated.

Defs.' MSJ App. 014

Comments to NPRM ATF 2021R-05

## SIGNIFICANT DELAYS ASSOCIATED WITH ISSUANCE OF ATF DETERMINATIONS WILL ADD SIGNIFICANTLY TO INDUSTRY COSTS

The proposed rule will require industry and individuals to seek ATF determinations regarding which component(s) of a firearm meet the definition of firearm frame or receiver. Shortly before suspending determination requests altogether, ATF recently advised that the response time associated with issuing a determination was approaching 12 months. The requirement imposed by the proposed rule will drive an increase in the amount determination requests submitted - a potentially significantly greater increase now that they are mandatory - which are already at an unacceptable level of backlog as proven by the year long wait times currently being experienced. Promises of additional funding for these bureaucratic tasks has never materialized, and demands from the criminal division are prioritized over the requests of industry. Based upon this history it is completely unreasonable to predict that ATF will have the ability to reduce this backlog and shorten the year-long queue in even the next several years. Moreover, as the ATF has no 'power of the purse string', it cannot compel appropriations to support new NPRM requirements such as these now required determinations. The funding problem that ATF has faced for decades that causes these interminable delays cannot be resolved by the proposed rule, which only adds significantly to the delays for determinations.

The result is that the substantial investment industry makes in new product development – millions of dollars per new product in R&D and capital expense - will be expended by industry and then sequestered. The product will sit unable to be marketed and unable to yield a return for the business for the period of time it takes for the determination to issue. Assuming sales of a single new model are forestalled for a year, a modest 50,000 units first year of sales figure multiplied by a modest $300 sales price that yields a modest 30% margin, the impact is roughly $4,500,000 in deferred margin for each product developed and under ATF determination review.

## THE STATED GOAL OF THE NPRM HAS ALREADY BEEN ACCOMPLISHED.

Defs.' MSJ App. 015

Comments to NPRM ATF 2021R-05

The ATF on its 'Rules and Regulations' page states that 'the goal of the proposed rule is to ensure the proper marking, recordkeeping, and traceability of all firearms manufactured, imported, acquired and disposed by federal firearms licensees.[2]

Each of these functions is already more than adequately accomplished under the current definition of a firearm frame/receiver; and the redefinition proposed under the NPRM does not substantively improve the current practice – and conversely makes identification and tracing of a firearm more difficult for law enforcement.

Under the NPRM, the recordkeeping, traceability, acquisition, and disposition of firearms would be made exponentially more difficult as firearms could have multiple serial numbers, some matching, some not. A useful characteristic required under the GCA will become an administrative burden for all entities involved: citizen, FFL, and the ATF in tracking multiple legal 'receivers/frame' for one firearm.

The goal of proper marking under the NPRM presents significant and difficult challenges. Under current law firearms marking requirements (and exceptions) are well defined. The GCA requires all firearm frame/receivers to have the serial number engraved, cast, or stamped on the receiver or frame of the weapon in such manner as the Secretary of the Treasury[3] prescribes by regulation.[4] Further rulemaking clarified these markings to be no smaller than 1/16th of an inch in height and at least .003 inches in depth. It is simple, it is effective, and for decades putting one serial number on what has been determined to be the frame/receiver of a firearm has not been controversial and is quite clear, even with modern firearm designs like the SIG P320.

While the authors of the NPRM repeatedly cite court cases like *Rowald, Jimenez,* and *Roh* as cautionary allegories of judicial activism that could redefine what a firearm/frame/receiver is under law, they are the exception, not the rule. As a result of aberrant case law ATF seeks to recast a system that has worked for decades and upend industry practice while imposing significant confusion and cost.

---

[2] https://www.atf.gov/rules-and-regulations/definition-frame-or-receiver; accessed July 7, 2021.

[3] Now the US Attorney General

[4] GCA, 18 U.S.C. Chapter 44 §923(i).

Defs.' MSJ App. 016

Comments to NPRM ATF 2021R-05

There is simply an inadequate basis for imposing such a sweeping change to a system that has met all stated objectives for decades.

As each of these NPRM goals has not been improved (and in many cases, worsened) by the proposed rule, the NPRM fails meet is objective. Note, this published goal on the ATF website does not even address the 'Ghost Guns' and/or Privately Made Firearms (PFMs) concern which publicly, was the genesis of these proposed changes with the definition changes of a frame/receiver being the backstop rule for new proposed rules behind ghost guns, 80% receivers, kits, and PFMs. In the end, the NPRM is not needed and does nothing to augment public safety while adding confusion to industry and law enforcement an unnecessarily complicating and adding cost to processes.

## THE PROPOSED RULE CREATES AN INABILITY TO FIT ALL REQUIRED MARKINGS ON ALL REQUIRED PARTS OF EACH FIREARM.

Under the proposed rule, a large number of other markings must also be applied to any of the multiple parts of a firearm that under the new rule now require serial numbers.

The current ATF marking requirement specifies that the serial number, the name of the manufacturer, and the country of origin must be conspicuously engraved, cast or stamped (impressed) on the firearm frame or receiver and that the serial number cannot duplicate the serial number the manufacturer has used on another firearm. For firearms manufactured after January 30, 2002, the engraving, casting or stamping (impressing) of the serial number must be to a minimum depth of .003 inch and in a print size no smaller than 1/16 inch. The new proposed definition of a firearm frame or receiver is any externally visible housing or holding structure for one or more fire control components. A "fire control component" is one necessary for the firearm to initiate, complete, or continue the firing sequence, including, but not limited to, any of the following: hammer, bolt, bolt carrier, breechblock, cylinder, trigger mechanism, firing pin, striker, or slide rails. Rather than having one part of the firearm be marked, the new language will require multiple parts be marked. The modification in language does nothing to provide increased clarity and rather creates ambiguity and uncertainty. In addition, the proposed regulations would require that manufacturers apply the following information on every component of a firearm that meets the definition of a frame or receiver: the model of the firearm (if such designation has been made); the caliber or gauge of the firearm; the name of the foreign manufacturer and country of manufacture (if

Defs.' MSJ App. 017

Comments to NPRM ATF 2021R-05

applicable); a serial number in a format that is either a unique serial number, accompanied by the name and location information of the manufacturer or a unique serial number, which has a prefix consisting of the manufacturer's abbreviated license number (first three and last five digits) appended as a prefix thereto accompanied by the manufacturer's name. The new requirement significantly increases the scope of the markings and expands the number of potential components that may have to be marked leading to marking requirements on certain parts that will not be large enough in size to accommodate the proposed marking requirements.

## MULTIPLE SNs LEADS TO CONFUSION.  INCLUSION OF ADDITIONAL MARKING IS UNNECESSARY

The process of requiring a manufacturer to utilize a unique serial number on each firearm they manufacturer is to aid in the tracing of firearms that have been used or suspected to have been used in a crime. Firearm tracing provides critical information to assist domestic and international law enforcement agencies investigate and solve firearms crimes; detect firearms trafficking; and track the intrastate, interstate and international movement of crime guns. Tracing is a systematic process of tracking the movement of a firearm from its manufacture or from its introduction into U.S. commerce by the importer through the distribution chain (wholesalers and retailers), to identify an unlicensed purchaser. That information can help to link a suspect to a firearm in a criminal investigation and identify potential traffickers. Firearms tracing can detect in-state, interstate and international patterns in the sources and types of crime guns. ATF processes crime gun trace requests for thousands of domestic and international law enforcement agencies each year. It also traces U.S.-sourced firearms recovered in foreign countries for law enforcement agencies in those countries. These tracing processes are also used with lost or stolen firearms. Under the proposed rule each firearm that was to be traced could potentially include two or more serial numbers, which would provide confusion and increased time and money spent on tracing. Including multiple serial numbers on a single firearm or creating the situation where multiple serialized parts can be combined into one firearm is inconsistent with the purpose and intent of serial numbers and markings. There does not appear to be any rational connection between requiring markings on multiple firearm components and improving the tracing process of firearms.

Defs.' MSJ App. 018

Comments to NPRM ATF 2021R-05

## SUMMARY

In conclusion the ATF has attempted to develop rule that addresses two specific issues: a court ruling which applied a close reading of the existing definition of a firearm and found it inconsistent with an ATF determination, and the sale of parts kits which under ATF rulings had not previously qualified as firearms and were therefore subject to transfer with background review.

In fashioning this rule ATF has created a byzantine and confusing requirement to mark multiple parts of a firearm rather than one part, and mark those multiple parts with not just a serial number but an extensive variety of other markings. ATF then fails to provide guidance as to which parts are required to be marked, and in turn requires that the parts be submitted for a determination by ATF. The inability to define a requirement that is subject to criminal penalty so that it can only be determined in post review by the governing authority fails to provide the required constitutional notice of a criminal act – it is whatever ATF says it is can be defined as - one of the definitions of the word capricious, which is prohibited by the rule making process. It also subjects the design features of a firearm – a constitutionally protected product – to an unlimited and potentially never-ending review of the product by the executive branch, and prohibits its manufacture until authorization is granted. If the ATF refuses to authorize, or requires design modification that renders the firearms ineffective, the ability of citizens to keep and bear arms is significantly infringed.

Industry has proposed far simpler solutions that carry none of this difficulty – simply redefine the term firearm to include one specific characteristic. As with the current marking regulation this requires that all current designs be grandfathered, and would permit the ATF's objectives to be met while serializing a single part, avoiding the extensive costs and delays associated with multiple markings on multiple components. Simple Is Good.

Respectfully submitted,

Steven Shawver
Executive Vice President and Chief Legal Officer
Sig Sauer, Inc.

Defs.' MSJ App. 019

Docket no. 2021R-05 comment

This comment is written in response to the Bureau of Alcohol, Tobacco, Firearms, and Explosives, hereafter referred to as "ATF," proposing a new regulation regarding the definition of "firearm" or "receiver," specifically docket number 2021R-05 ("the proposed rule"). I am a student attending West Virginia University College of Law, entering my second year of legal study. I have years of significant experience with firearms; I have participated in many shooting competitions, work in the firearms industry, and greatly enjoy shooting and collecting guns.

The ATF should retract the proposed regulation, docket number 2021R-05. The proposed rule, if adopted and given the force of law, would add significant confusion and a substantial burden to private citizens, Federal Firearm Licensees ("FFL"), and manufacturers. The proposed regulation is overly broad, vague, and could be read to include such a wide assortment of parts that any new firearm design or configuration would likely include many potential receivers.[1] The potential liability for improperly handling, marking, or recording an item the ATF might determine to be a receiver would stifle the development and trade of firearms.  The proposed rule also exceeds the scope of the Gun Control Act ("GCA") and National Firearm Act ("NFA") by stating that firearms can have multiple controlled receivers, and imposes gunsmithing duties onto FFLs that are without precedent or Congressional authorization.[2] In addition, 2021R-05 relies upon an interpretation of the GCA and NFA that is without support in statute or common law to rule that unfinished receivers become a GCA "frame or receiver," at some vague point before completion.[3] Because the ATF finds that the current definition of "frame or receiver" fails to meet current firearms technology, a different rule should be proposed that identifies one part of the firearm that is the frame or receiver, in accordance with the GCA.[4]

Defs.' MSJ App. 020

Docket no. 2021R-05 comment

### I.     The proposed rule 2021R-05 is outside the scope of the authority Congress has delegated to the ATF to enforce the GCA and NFA.

The judicial and executive branches must interpret and enforce, respectively, the unambiguous intent of Congress. In *Chevron, U.S.A., Inc. v. Nat. Resources Def. Council, Inc.*, the Supreme Court held that "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[5] If an agency's interpretation of the statutes enacted by Congress are not a reasonable interpretation of the law, it will not be upheld by the Court.[6] "The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress."[7] An agency only has rulemaking power to enforce the plain meaning of or interpret ambiguity *within* the parameters of the statutes which Congress have enacted and delegated rulemaking authority to that agency.[8] If an agency's actions, conclusions, or interpretations of the law are not in accordance with the statute, the Court will strike such agency actions down.[9]

Indeed, the Courts are compelled to do so not only by common law, but by statute as well. The United States Code compels the courts to "hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;"[10] Here, the proposed rule is not in accordance with the law in several key areas, such as the provision establishing that a firearm might have multiple receivers, the requirement that FFLs mark and serialize receivers of PMFs, and the idea that "readily converted" can apply to bare pieces of metal, unfinished receivers.

Defs.' MSJ App. 021

## A.  2021R-05 establishes that firearms can have multiple receivers, and this interpretation of the GCA and NFA is not supported by the statutory language.

It is settled law that statutes must be enforced "according to its terms."[11] While statutes are interpreted within the overall context of the code or act, plain meaning is normally controlling.[12] The plain meaning of statutory language is the everyday, ordinary interpretation of the words.[13] Even when words have expansive, broad meanings, the interpretation of statute must not stray from the clear, plain meaning of words.[14] The Supreme Court has held that "a legislative body generally uses a particular word with a consistent meaning in a given context."[15]

Here, the proposed rule correctly notes that the GCA authorizes the marking of the receiver or frame of a firearm and controlling the frame or receiver as if it were the whole, completed firearm.[16] The proposed rule even acknowledges that the GCA specifically replaced the language of the Federal Firearms Act ("FFA") "part or parts" with "frame or receiver."[17] However, the proposed rule strays from accordance with the law when it states that a firearm can have multiple receivers that can all be controlled, recorded, and marked as if they were completed firearms. Within the relevant sections of the U.S. Code, there is mention of only "frame or receiver," there is no mention of the plural version of either noun, showing that Congress's intent was for a single part of the firearm to be considered the "frame of receiver," not multiple parts.[18] Nowhere in the relevant statutes is it even contemplated that a firearm might have multiple "frames or receivers."[19]

In addition to the complete absence of any mention of a plural form of "frame or receiver," the grammar and words used throughout the statutes support the fact that a firearm can only have one receiver. 18 U.S.C.A. § 921(a)(3) specifically states "the frame or receiver," signifying that the firearm only has one.[20] 18 U.S.C.A. § 922(p)(2) subsections (A) and (B) also both specifically state "the frame or receiver," demonstrating that there is only one such part of a firearm.[21] 26 U.S.C.A. § 5845(b) also similarly states "the frame or receiver," signifying the fact that it is one

Defs.' MSJ App. 022

single part of the firearm.[22] All of these statutes address and govern firearms, so the consistent usage of the singular form of "frame or receiver" demonstrates a consistent meaning that a firearm have only one such part. Indeed, as noted in the proposed rule, Congress specifically replaced the language from the FFA that permitted a firearm to have multiple receivers with the language of the GCA, which specifically uses the singular form "frame or receiver."[23] This purposeful change shows that Congress had considered, even used for a time, a definition that permitted a regulatory scheme which regulated multiple parts of a firearm as the receiver, then rejected that definition in favor of one that makes clear that "the frame or receiver" is a single part of a firearm. Because the plain meaning of the phrase "the frame or receiver" and the replacement of the FFA's multiple receiver definition, the proposed rule's split receiver definition is not in accordance with the law.

### B. 2021R-05 imposes a gunsmithing duty upon FFLs to serialize receivers of privately made firearms (PMFs), and this duty is not imposed by the GCA nor NFA.

The proposed rule states that "gunsmiths" are those who mark firearm receivers that require serialization, something that typically done by the firearm's manufacturer.[24] 2021R-05 also "require FFLs to mark, or supervise the marking of, the same serial number on each frame or receiver (as defined in this rule) of a weapon that begins with the FFL's abbreviated license number (first three and last five digits) as a prefix followed by a hyphen on any ''privately made firearm'' (as defined) that the licensee acquired."[25] This requirement, that FFLs take on gunsmithing duties and mark PMFs, or have them marked, is created from thin air, with no basis in the law. There is nowhere in the U.S. Code regulating NFA weapons that establishes such a duty,[26] nor is there such a duty imposed by the provisions of the U.S. Code governing firearms.[27] The PMF marking requirement imposed by the proposed regulation is wholly unsupported by the law, plainly in excess of the ATF's statutory rulemaking authority.

Defs.' MSJ App. 023

### C.  2021R-05 stretches the word "readily" to rule that partially completed receivers are completed frames or receivers.

The proposed rule seeks to enlarge the definition of "frame of receiver" to encompass a partially made frame or receiver, causing such an unfinished item to require marking, recording, and all other legal requirements, of a completed "frame or receiver," a firearm.[28] The proposed rule goes about this by leaning on the words "readily converted" in the GCA,[29] stating ''in the case of a frame or receiver that is partially complete, disassembled, or inoperable, a frame or receiver that has reached a stage in manufacture where it may readily be completed, assembled, converted, or restored to a functional state.''[30] However, this interpretation, that "readily converted" permits unfinished frames or receivers to be defined and controlled the same as "frame or receiver" firearms, is beyond the scope of the CGA, and is not supported by common law.

### 1.  The plain language of the law does not support the interpretation that "readily converted" can be read to apply to incomplete receivers.

The GCA defines a firearm as "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive;" or "the frame or receiver of any such weapon."[31] Currently, the ATF regulates "frames or receivers" as firearms pursuant to the CGA once that piece of raw material "has reached a critical stage of manufacture," and this is supported by the terms of the GCA, as presumably, once a piece of material has become machined or formed near to completion, it may be permissibly regulated as a "frame or receiver." The proposed rule seeks to amend this standard, instead stating that a partially complete receiver is a "frame or receiver" when it "has reached a stage in manufacture where it can readily be made into a functional frame or receiver, that article would be a 'frame or receiver' under the GCA."[32]

However, the ATF's proposed rule essentially misstates the GCA, the proposed rule would essentially read "convert" from the GCA to be analogous to "made." The plain meaning of

Defs.' MSJ App. 024

"convert" implies a shift or transformation from one thing to another, while "made" is the past tense of "make," which means to create something new, these are different meanings entirely. In addition, the text of the GCA which contains the language "readily be converted" actually reads "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive."[33] It is a settled law that statutory language cannot be considered alone, but instead must be properly considered within its statutory context.[34]

The GCA's language states that a "firearm" is a "weapon" that "may readily be converted," not an unfinished frame or receiver.[35] In addition, the text states that the subject "weapon" which "may readily be converted" is being "converted to expel a projectile by the action of an explosive," not a piece of raw material which is being "converted" into a firearm part which may later be assembled into a "weapon" which can "expel a projectile by the action of an explosive."[36] This interpretation is supported by the fact that the language "the frame or receiver of any such weapon" is made into a different term in the list of objects defined as "firearms" in the GCA absent any verbiage about being "readily converted" into a frame.[37] Because the GCA only applies the language "readily be converted" to "weapons" that can expel projectiles with explosives and not "frames or receivers," the proposed rule's broadening of the definition of "frame or receiver" based on the "readily converted" language is an interpretation beyond the scope of the law.

## 2. The proposed rule 2021R-05 misapplies common law concerning when a firearm is returned to firing condition to items that never were firearms.

The ATF puts forth the position that the proposed rule's expansive inclusion of parts kits and unfinished receivers as "firearms" under the GCA is based on common law,[38] but analysis of these cases reveal that these rulings do not support this interpretation.

Defs.' MSJ App. 025

The unpublished case *United States v. Dodson* has nothing to do with at what stage a parts kit or unfinished frame or receiver becomes a GCA "frame or receiver," but instead what constitutes proper deactivation of an unregistered NFA machine gun,[39] an entirely different type of firearm more tightly regulated by a different law.[40] In addition, *Dodson* is further distinguished from the issue at hand because *Dodson* deals with the issue of when an item that was once a machine gun is no longer considered a machine gun, not when an item that has never been a firearm is considered a "frame or receiver."

Another case the ATF presents as common law justification, *U.S. v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*, also deals with the legal issue of whether a rifle made from two halves of machine guns was considered a machine gun, and how much labor was needed to "readily restore" its automatic firing capabilities.[41] *U.S. v. One TRW, Model M14, 7.62 Caliber Rifle* also addresses these same issues.[42] *U.S. v. Smith* also addresses whether a machine gun which had its barrel and receiver welded was not able to be "readily restored" to a functioning machine gun.[43] These cases address when "machine guns" are so disabled that they are no longer controlled NFA firearms,[44] an entirely separate legal issue from the point at which a piece of raw material which was never any sort of firearm becomes a "frame or receiver" under the GCA.

*United States v. Mullins* is also easily distinguishable from the legal issue at hand, as *Mullins* was a convicted felon arguing that his starter pistol was not a "firearm" under the GCA, and the court ruled that it was readily convertible to fire live ammunition.[45] The case *U.S. v. 16,179 Molso Italian .22 Caliber Winler Derringer Convertible Starter Guns*, also similarly features a defendant arguing that their starter pistols were not "firearms" as defined by the GCA.[46] A starter pistol, like in *Mullins*, is literally enumerated as a weapon that might "readily be converted" in the GCA,[47]

Defs.' MSJ App. 026

entirely separate from a "frame or receiver" which has no such language about being readily converted.[48]

In *U.S. v. Woods*, another case the ATF cites to support their position that parts kits and unfinished receivers can be "readily converted' into firearms pursuant to the GCA, the defendant argued that their unregistered short-barrel shotgun was not a firearm because it was disassembled into two pieces.[49] *Woods* addresses NFA firearms, not "frames or receivers" as controlled by the GCA[50], and even if the same "readily" standard somehow applied, it is an utter disregard of reality to imagine that merely assembling a broken down shotgun is analogous to the transformative work of manufacturing a firearm "frame or receiver." In *U.S. v. Morales*, another case the ATF cites, the defendant unsuccessfully argued that the mere disassembling of their pistol removed it from the GCA definition of "firearm," easily distinguished from a legal issue involving the creation of frames or receivers, as the disassembled pistol was clearly a "weapon" subject to analysis of whether or not it could "readily be converted."[51] The court in *Morales* even notes that there was a completed receiver present,[52] so the ruling of *Morales* has little bearing on at the point an unfinished receiver is a GCA "firearm." Similarly, in *U.S. v. Catanzaro*, another case the ATF cites as support for their new interpretation of "frame or receiver," the defendant unsuccessfully argued that their sawed-off shotgun was no longer a weapon subject to the NFA because they lacked the appropriate parts to make it fire.[53]

The only case the ATF cites to establish an outer limit for the amount of anticipated work an unfinished receiver would need to not be a GCA firearm under the proposed rule is *U.S. v. Seven Misc. Firearms*, in which the court found that museum displays of experimental deactivated machine guns could not be "readily restored" to fully automatic capacity, and thus were not subject to the NFA.[54] In *Seven Misc. Firearms*, the court noted that restoration would require an expert

possibly thirty hours of work and cost around 65,000 dollars.[55] The ATF here puts forward an incredibly expansive outer limit for the amount of effort required to cause a parts kit or unfinished receiver to be considered a GCA "frame or receiver." However, the ruling of *Seven Misc. Firearms* addresses when an item that was once an NFA machine gun has been so thoroughly disabled that it cannot be "readily restored" to automatic function,[56] not at what point a piece of aluminum or plastic becomes a GCA "frame or receiver."

The ATF's proposed rule ignores the precedent set by *U.S. v. Prince*, which upheld the district court's ruling that partially finished receivers are not firearms.[57] In *Prince*, the district court had ruled that an AK-pattern rifle "flat," which is an unbent receiver for an AK-pattern rifle with all the holes and cuts otherwise completed, was not a "firearm" upon which to base a search warrant.[58] While the Tenth Circuit Court of Appeals overruled the district court's suppression of the warrant's evidence, it upheld the lower court's ruling that the defendant's partially completed receivers were not firearms.[59] Unlike all the cases the ATF cites in its proposed rule, *Prince* actually addresses the issue at hand, when a partially completed frame or receiver can be considered a "firearm" pursuant to the GCA's "frame or receiver" definition. The *Prince* court stated that the unfinished receiver was "akin to a piece of paper with lines drawn on it as a guide to make a paper airplane. Although making the paper airplane might be the intended use, it is not an airplane until it is properly folded."[60] Clearly, the common law that actually addresses when an unfinished receiver becomes a GCA "firearm" contradicts 2021R-05's overly broad interpretation that parts kits and unfinished receivers are GCA "firearms."

## II.   The proposed rule 2021R-05 is impermissibly vague and overly broad, adding ambiguity to the law instead of removing it.

Congress delegates authority to agencies to remove ambiguity from the law, and to clarify the law so that citizens can have clear rules to abide by.[61] Agencies exist to interpret the law in

Defs.' MSJ App. 028

concrete terms, clarifying the law so that the due process rights of citizens are preserved, that citizens might not live in a state of ambiguous potential criminal liability.[62] However, the proposed rule runs contrary to this most basic *raison d'etre* of an agency, promulgating vague multifactored tests for what constitutes a "frame or receiver"[63] and the meaning of "readily," which the ATF seeks to apply to partially completed frames and receivers, in order to define them as GCA "firearms."[64] A core principle of due process is that laws must clearly define the conduct they prohibit, one of reasonable intelligence must be able to understand prohibited conduct, so that they might act accordingly.[65] The Supreme Court has established that "laws must provide explicit standards for those who apply them."[66]

### A. 2021R-05 uses a vague multifactored test to determine what is and what is not a receiver or frame.

The proposed rule states a broader definition for "frame or receiver" as any part visible to the outside of a firearm "that provides housing or a structure designed to hold or integrate any fire control component."[67] The ATF's proposed rule defines "fire control components as "any housing or holding structure for a hammer, bolt, bolt carrier, breechblock, cylinder, trigger mechanism, firing pin, striker, or slide rails. However, the definition is not limited to those particular fire control components."[68] As this broad definition likely encompasses many parts of a firearm, the ATF's proposed rule claims that a firearm can have multiple "frames or receivers."[69] The ATF puts forth numerous factors that define whether a firearm part is a "frame or receiver" including what part the manufacturer intended to be the "frame or receiver," what part the gun industry perceives to be the "frame or receiver," how the part fits into the "overall design of the firearm when assembled," "the design and function of the fire control components," how suitable the part is for marking for identification purposes, whether defining the part as a "frame or receiver" would be "consistent with the legislative intent" of the GCA, or the ATF director's prior classifications.[70]

Defs.' MSJ App. 029

The proposed rule then establishes that no single factor is controlling, and that GCA "frames or receivers" retain their status as "frames or receivers" when assembled into a new firearm.[71] The proposed rule also establishes that anyone who acquires or possesses a part "that is marked with a serial number" which might be encompassed by the new "frame or receiver" definition must, "absent an official determination by ATF or other reliable evidence to the contrary," presume that the part is a GCA "frame or receiver."[72]

The proposed rule makes it near impossible to define what is the "frame or receiver" of a firearm, absent a blanket declaration that almost any part visible to the outside is a GCA "frame receiver." As firearms technology has evolved, more efficient designs have few parts that do not have some sort of function interacting with or containing a "fire control component," the AR-15 bolt carrier group, pistol grip, buttstock, and dust cover could all be considered "frames or receivers."[73] The AK-47, which has millions of lawfully owned semi-automatic copies in America, could similarly have many different parts which are visible to the exterior and house a "fire control component," such as the dust cover, the barrel, the front and rear trunnions, the bolt carrier, and the trigger guard.[74]

Even ignoring the worrying implications of almost all semi-automatic rifles potentially having five or six GCA "frames or receivers," many of the factors the ATF identifies are too vague to useful to the public in identifying whether a firearm part is a receiver. The intent of the manufacturer and the perception of the gun industry are subjective standards impossible to discern unless one reached out to each firearm's manufacturer or took a survey of the gun industry's opinion. Similarly, how the part fits into the assembled design and the design and function of the "fire control components" need further definition as to specifically *how* they would influence the classification of any given part, it is not enough to merely state that some types of parts assembly

Defs.' MSJ App. 030

or design would place a thumb on the ATF's scales without explaining how. The other factors fail to inform the public about what is or is not a "frame or receiver," as the suitability for accepting markings is really little more than an implication that metal parts are more likely to be ruled to be a "frame or receiver." The final factors, consistency with legislative intent and the ATF director's rulings, are also unhelpful. The legislative intent underlying the GCA, while presumably helpful and informative for the ATF's statutory interpretation, is simply too far separated from the technical question of whether a certain firearm part is a "frame or receiver." Proposing that consistency with prior ATF rulings is a factor in deciding if a part is a "frame or receiver" is little more than a promise by the ATF to play by their own rules, and is unhelpful to identifying "frames or receivers" in cases of first impression.

### B. The proposed rule 2021R-05 establishes an unduly vague test to determine when an unfinished receiver is "readily" considered a firearm.

The proposed rule also creatively expands the definition of a GCA "frame or receiver" to encompass unfinished receivers, stating that any partially complete receiver that "has reached a stage in manufacture where it may readily be completed, assembled, converted, or restored to a functional state'' is a "frame or receiver" pursuant to the GCA.[75] The proposed rule defines an incomplete receiver as one that "has reached a stage in manufacture where it is clearly identifiable as an unfinished component part of a weapon.''[76] The proposed rule applies the word "readily" to "frame or receiver" in a novel way, and defines the completion needed for a "readily" incomplete receiver as ''a process that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speedy, or easy process.''[77] The ATF attempts to clarify this "readily" definition by providing some factors that the ATF will consider in their determination of whether an incomplete receiver is a GCA "frame or receiver."[78] Those factors are the time, ease, tools, and expertise required to complete the manufacture of the incomplete receiver.[79] In addition, the ATF

Defs.' MSJ App. 031

will factor in whether additional parts are needed to complete the "frame or receiver," and if so, the ease of acquiring these parts.[80] The ATF also factors in the expense of the completion process, the "scope," that is "the extent to which the subject of the process must be changed to finish it," and the "feasibility," whether the completion would likely damage, cause to malfunction, or destroy the subject of the process.[81] These factors the ATF puts forward are almost directly lifted from the factors in the court's decision in the case *Seven Misc. Firearms*, but that case dealt with whether deactivated machine guns on display in a museum could be "readily restored" to automatic function, nothing to do with incomplete frames.[82]

Even assuming for the sake of discussion, that the factors from *Seven Misc. Firearms* are applicable to adjudicating the completeness of an incomplete receiver, they put forward an unworkable and vague set of standards. Without more definition, it is difficult to understand the degree of time, ease, expertise, tooling, and expense required for an incomplete receiver to *not* be considered a GCA "frame or receiver." In addition, the "feasibility" standard is fundamentally incompatible with the concept of an incomplete frame or receiver. Presumably, incomplete frames or receivers are intended to be completed at some point, and a requirement that the process of completion be likely to damage or destroy the incomplete receiver is illogical, simply incompatible with competent manufacturing processes. Indeed, as applied, several factors seem to enlarge the definition of "frame or receiver" the more efficient one's manufacturing process is. Based on the factors presented, it would seem that a manufacturer who uses a quick, easy, and cheap process that requires little tooling or skilled labor would be forced to regard their incomplete receivers as GCA "frames or receivers" at an earlier time than a manufacturer using an expensive, long, arduous process requiring skilled labor and advanced tools. The capricious nature of this multi-factor test becomes apparent if one compares even two different AR-15 pattern rifles at different

Defs.' MSJ App. 032

price points. The Lewis, Machine and Tool ("LMT") Mars-L 5.56 rifle has a manufacturer's suggested retail price ("MSRP") of $ 2,329.00,[83] while the Smith and Wesson ("S&W") M&P 15 Sport II has an MSRP of $772.00.[84] While the two products are both AR-15 design weapons, the LMT weapon costs much more, takes longer to create, requires more skilled engineers and gunsmiths, and more tools and complex machining, and proprietary parts and manufacturing processes.[85] As evaluated by the ATF factors for an incomplete receiver, the LMT weapon's complex and expensive manufacturing process seems to suggest that the LMT receivers less "readily" become a GCA "frame or receiver' than a simpler, cheaper S&W receiver, despite the two weapons being fundamentally the same design, AR-15 pattern rifles.

The proposed rule states that the factors used to adjudicate the status of incomplete frames or receivers is "based on case law,"[86] but as addressed above in this comment, the cases the ATF cites as common law support for these factors grapple with the legal question of when a weapon that was once a functioning machine gun, tightly regulated by the NFA, become sufficiently disabled as to not be able to be "readily restored."[87] Accordingly, the courts have imposed strict standards for sufficient disabling to render the ex-machine gun not "readily restorable," finding that even a gun requiring eight hours of work in a well-equipped machine shop to restore automatic capability to still be "readily restorable."[88]

Applying these standards to manufacturing of new receivers would be unworkable and makes little sense, it does not logically follow that the same strict standards required to exempt an ex-machine gun from the NFA should apply to parks kits and incomplete receivers, items fully intended to become less strictly controlled GCA "firearms" at a later date. It is simply common sense that it should be more difficult to cause a machine gun to lose that status, and the legal implications of that status, than it should be for raw materials which never were firearms to gain

Defs.' MSJ App. 033

GCA "firearm" status without some transformative process that gives the newly made part the ability to function as a "frame or receiver." Indeed, the proposed rule would create a substantial burden for manufacturers, private or commercial, who can completely create a GCA "frame or receiver" from a raw forging or even a simple block of material well within the "readily" standard proposed by the proposed regulation, as they are completed in less than 30 hours, do not require expert gunsmiths, only a CNC machine, little expense, and the process is highly "feasible."[89] These factors would suggest that even raw receiver forgings would be considered GCA "frames or receivers" under the proposed rule, an expansion of the GCA that would see the term "frame or receiver" swallow up almost every stage of firearms manufacturing.

III.    **Proposed rule 2021R-05 if codified, would impose substantial burdens upon the firearms industry and the gun-owning public.**

As discussed above in this comment, the proposed rule dramatically expands the definition of a GCA "frame or receiver," claiming that a firearm might have multiple receivers and that any part which houses a "fire control component" and is visible to the outside when the firearm is assembled, can be a "frame or receiver."[90] The ATF also adopts an expansive view of what constitutes a "fire control component."[91] The proposed rule also creates a presumption that without ATF adjudication, any part that might be a "frame or receiver" is a GCA "frame or receiver."[92] While the ATF puts forth some factors that are supposed to aid the public identify what is a frame or receiver, the factors themselves are vague, as the proposed rule fails to give the public concrete guidance on how those factors will affect the ATF's adjudication of what parts are a "frame or receiver," and thus "firearms" pursuant to the GCA. This expansive definition would overcomplicate and burden firearm manufacturers, FFLs, and the public.

Defs.' MSJ App. 034

**A. The firearms industry would face great liability if 2021R-05 becomes law, as any new firearm design could have a multitude of receivers that require marking, recording, and control as firearms.**

While the proposed rule states that prior classifications will be left intact,[93] any new firearm design faces a serious issue, what parts are "frames and receivers?" If the manufacturer reads the proposed rule as broadly as the ATF writes, a new firearm design might have five or six potential frames or receivers, or that number might change if a different configuration of firearm is produced that the ATF finds to contain a different amount of frames or receivers. Indeed, the ATF has been known to "change their mind" on classifications of receivers in the past, such as when it reclassified TommyBuilt Tactical LLC's T36 receiver as a "machine gun" after years of T36 sales as a GCA "firearm."[94] Manufacturers face the worrying prospect that the ATF could reclassify an additional part of a firearm as a "receiver" and determine that the company has been selling unmarked and unrecorded "receivers," or if the part was sold individually, selling "firearms" without a background check, a serious degree of criminal liability. This potential liability would stifle the firearms industry, and the public's ability to buy and sell firearm parts.

**B. The proposed rule 2021R-05 fails to establish at what point a design becomes new, as the firearms industry often produces small, iterative changes in older designs.**

The proposed rule claims that prior ATF decisions on what part of a firearm is the "frame or receiver" will not be altered, and even enumerates some common designs that it claims will not need re-adjudication, even if a manufacturer makes a new firearm with that design.[95] However, modern firearms design is based on iterative changes, and many new firearms share parts compatibility with enumerated designs. For example, the BRN-180, produced by Brownell's, is a piston-driven firearm that uses the AR-15 lower receiver, thus sharing the entire lower half of the AR-15 design.[96] The Sig Sauer MCX, while coming from the factory on a proprietary lower receiver, will accept an AR-15 lower receiver.[97] If the proposed rule was in effect during the design

Defs.' MSJ App. 035

of those firearms, how would their "frames or receivers" be classified? While the proposed factors would suggest a split-design receiver, and thus at least two "frames or receivers," would their placement upon an AR-15 lower change the classification of the BRN-180 and MCX uppers, in order to preserve the prior classification of the AR-15, or would the classification of the AR-15 be displaced by placing a different upper on the AR-15 lower?

How would the proposed rule govern iterative changes in the enumerated designs? The AR-15's design has changed throughout the years, and this will continue into the future, so what degree of changes are permitted to enumerated designs without needing re-evaluation under the proposed rule? The LMT Mars-L 5.56 has many distinct design changes from a standard AR-15, such as the proprietary monolithic upper and rail, gas system, quick change barrel, and ambidextrous lower receiver.[98] The LMT Mars-L 5.56 Piston rifle features all those differences and a piston gas system.[99] Land Warfare Resources Corporation International ("LWRCI") produces similarly high-end rifles with proprietary parts, such as custom forged upper and lower receivers, unique fluted barrels, and some variants have a piston operating system.[100] The Knight's Armament Company ("KAC") SR-15 rifles have similar custom ambidextrous lower receivers, a proprietary gas system, and bolt design.[101] Despite all these changes to the original AR-15 design, the gun community regards all of those rifles as AR-15s.

The firearm industry is not sure how strictly the ATF will apply the proposed rule, and this will stifle innovation as companies will be unsure at what point in a firearm design's evolution or modification the ATF will require them to subject their products to the vague, multifactor "frame or receiver" evaluation process in the proposed rule.

Defs.' MSJ App. 036

**C. 2021R-05 would force FFLs to mark all PMFs that come into their possession, and this would impose a serious burden onto FFLs, forcing dealers to either pay for or perform an invasive alteration to most PMFs.**

As discussed above in this comment, the proposed rule would force FFLs to act as gunsmiths, marking any PMFs that they might acquire with unique serial numbers in accordance with current marking requirements of firearms, to be made on a metal surface with a proscribed typeface and depth.[102] In addition, FFLs would also have to have all the "frames or receivers" of PMF's similarly marked.[103] Ignoring the fact that nowhere in the NFA or GCA are such duties imposed on FFLs, this requirement forces FFLs to act as gunsmiths, which is something that most FFLs are not equipped or skilled enough to do.

The process of adding these markings is typically done through some sort of engraving, laser etching, or stamping into a metal surface.[104] Polymer or plastic "frames or receivers" are required to have their serial numbers marked on a steel plate embedded within the frame itself.[105] Many firearms are composed of polymer today, PMFs included. Under the proposed rule, FFLs would have to insert a serialized steel plate inside already completed PMF frames, an invasive and laborious process that almost all FFLs, and gunsmiths for that matter, are incapable of. Even the easier task of marking the "frame or receiver" of a metal PMF is likely beyond the capabilities of the vast majority of FFLs. FFLs are licensed gun dealers, not machinists.

In addition, FFLs who undertake the task of marking a PMF must also successfully identify and mark all the "frames and receivers" of the PMF. As discussed above, this task alone is a confusing, multifactored mess, leaving FFLs exposed to potential liability for unknowingly violating the GCA if the ATF later determines that the FFL did not successfully identify and mark all the "frames and receivers" of the PMF. The proposed rule is also unclear about how an FFL who makes their own PMF for their personal use must mark his PMF, if at all. Additionally, the

Defs.' MSJ App. 037

proposed rule mandates that FFLs must keep their records in perpetuity, which will become a serious burden as the background check records accumulate over the years. FFLs will practically have to use an electronic recording system, an additional burden as many FFLs lack the resources to convert to an electronic system, or to purchase the hardware and software to manage a business.

### D. Modern firearms feature modular parts that many enjoy swapping, and the proposed rule's frame requirements would generate many inconsistently-marked firearms.

Modern weapons designs are modular, any AR-15 upper and lower set can be swapped,[106] and Glock pistols enjoy such aftermarket support that any component can be replaced easily.[107] In the future, this trend is only likely to continue. If 2021R-05 takes effect, future designs will likely become an unworkable mess of serialized frames and receivers, as shooters enjoy swapping parts on their firearms. This will present recording and identification problems as shooters use, sell, buy, and gift firearms that are built from the "frames and receivers" of multiple firearms, resulting in a market of firearms with multiple sets of markings, identification, and serial numbers.

### IV. The ATF could better meet the objectives of 2021R-05 through a rule that establishes a single component of a firearm as the receiver.

The ATF claims that the proposed rule is needed in order to address the advanced firearms technology of the modern era, arguing that "split-receiver" and striker fired designs were the predominant firearms when the current regulations were written.[108] The ATF also cites court cases in which some modern receiver designs were found to not be encompassed in the ATF's broad definition as reason for the extremely broad interpretations put forth in 2021R-05.[109]

However, these claims display a troubling ignorance of firearms history, as all of the design features they cite as being too rare to encompass in the regulations of the time "around 50 years ago"[110] should have been well-known to the agency responsible for regulating the firearms industry. Striker-fired pistols with separate frames and slides were popular in the early 20th

Defs.' MSJ App. 038

century. The M1911 design, with a separate slide and frame, was popular in America since the pistol's adoption as the U.S. military's sidearm, and the FN Model 1910, infamously used in the assassinations of Huey Long and Archduke Franz Ferdinand, used an internal striker, just as pistols do today.[111] "Split-receiver" technology has been well-known since before the 1950's, the Thompson submachine gun famously used by 1930's gangsters and the U.S. Army in WWII, comes apart into a "frame group" and a "bolt and recoil spring" group analogous to modern upper and lower receivers.[112] In addition, the FAL was prolific in the 1960's and has an upper and lower receiver arrangement that is the direct ancestor to the AR-15.[113] Even the AR-15 itself has been sold to civilians since the early 1960's.[114] The ATF, as the agency tasked with efficiently regulating the firearms industry, should stay abreast with the cutting edge trends of the shooting industry, or at the very least regulate with some consideration of what the future might bring. Here the ATF claims to have been blindsided by the broad trends of the firearms industry that predated the current regulation by decades, and now has no choice but to implement dramatic expansions of their current regulatory scheme in order to play catch-up with firearms technology.

Even assuming that the ATF indeed had regulated ignorantly in the past and is not simply stretching the law to regulate conduct that is outside the scope of its Congressionally-delegated authority, its goals would be better served by a simpler rule. Currently the ATF's definition of "frame or receiver" is "that part of a firearm that provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."[115] The ATF's goal of updating the definition of "frame or receiver" to encompass "split-receiver" firearms would be met by simply re-writing it to read "the part of a firearm that provides housing for the hammer, bolt or breechblock, firing mechanism, or at its forward portion receives the barrel." By changing the list from requiring all the features to only one, this proposed

Defs.' MSJ App. 039

definition encompasses modern "split-receiver" designs, and by specifying that only one part is the "frame or receiver" does not exceed the authority granted to the ATF by the GCA and NFA.

## V. Conclusion

The ATF should rescind the proposed rule, because as proposed, it exceeds the scope of the ATF's authority as Congress delegated to it through the GCA and NFA. The law does not support the position that a "firearm" can have multiple "frames or receivers" as regulated by the GCA, nor does the law contemplate imposing gunsmithing duties onto FFLs. The proposed rule attempts to stitch the word "readily" to "frame or receiver" in a novel fashion, even though in the statutes "readily" is used in reference to GCA "weapons" which can "be converted" to fire a projectile,[116] and NFA "machine guns," which can be "readily restored" to shoot automatically.[117] Nowhere in the law is the language "readily" applied to raw materials or an unfinished receiver.

Instead of trying to stretch the law to meet their ends, the ATF should withdraw 2021R-05 and instead consider proposing a more concise interpretation of "frame or receiver" that more clearly encompasses modern firearm receivers, while still interpreting within the scope of the law.

Thank you for reading.

Signed, Nathan Quarantillo
844 Stewart Street
Morgantown, West Virginia, 26505

**Defs.' MSJ App. 040**

Docket no. 2021R-05 comment

---

[1] Definition of ''Frame or Receiver'' and Identification of Firearms, 86 Fed. Reg. 27727–29 (May 21, 2021) (to be codified at 27 C.F.R. pt. 478).

[2] *Id*. at 27731–32.

[3] *Id*. at 27729–30.

[4] 18 U.S.C.A. § 921(a)(3) (West)

[5] Chevron, U.S.A., Inc. v. Nat. Resources Def. Council, Inc., 467 U.S. 837, 842–43 (1984).

[6] *Id*. at 844.

[7] Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974).

[8] Chevron, 467 U.S. at 843–844; U.S. v Mead Corp., 533 U.S. 218, 229–31 (2001).

[9] Mead, 533 U.S. at 229.

[10] 5 U.S.C.A. § 706 (2) (West).

[11] King v. Burwell, 576 U.S. 473, 486 (2015).

[12] *Id*.

[13] Smith v. U.S., 508 U.S. 223, 228 (1993).

[14] *Id*. at 229; Watson v. U.S., 552 U.S. 74, 74 (2007).

[15] Erlenbaugh v. U. S., 409 U.S. 239, 243 (1972).

[16] *Supra* note 1, at 27721–22.

[17] *Id*.

[18] 18 U.S.C.A. § 921(a)(3)(16)(C) (West); 18 U.S.C.A. § 922(p)(2)(A)(B) (West); 26 U.S.C.A. § 5845(b) (West).

[19] *Id*.

[20] 18 U.S.C.A. § 921(a)(3) (West).

[21] 18 U.S.C.A. § 922(p)(2)(A)(B) (West).

[22] 26 U.S.C.A. § 5845(b) (West).

[23] *Supra* note 17.

[24] *Supra* note 1, at 27731.

[25] *Id*. at 27732.

[26] 26 U.S.C.A. §§ 5801, 5802, 5811, 5812, 5821, 5822, 5841, 5842, 5843, 5844, 5845, 5846, 5847,5848, 5849, 5851, 5852, 5853, 5854, 5861, 5871, 5872, (West).

[27] 18 U.S.C.A. §§ 921, 922, 923, 924, 925, 925A, 926, 926A, 926B, 926C, 927, 928, 929, 930, 931 (West).

[28] *Supra* note 1, at 27729.

[29] 18 U.S.C.A. § 921(a)(3) (West).

[30] *Supra* note 1, at 27729.

[31] 18 U.S.C.A. § 921(a)(3) (West).

[32] *Supra* note 1, at 27729.

[33] 18 U.S.C.A. § 921(a)(3) (West).

[34] Kasten v. St.-Gobain Performance Plastics Corp., 563 U.S. 1, 7 (2011).

[35] 18 U.S.C.A. § 921(a)(3) (West).

[36] *Id*.

[37] *Id*.

[38] *Supra* note 1, at 27730.

[39] U.S. v. Dodson, 519 Fed. Appx. 344, 352–53 (6th Cir. 2013)(unpublished).

[40] 26 U.S.C.A. § 5845(b) (West).

[41] U.S. v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006, 447 F.3d 686, 691–93 (9th Cir. 2006).

[42] U.S. v. One TRW, Model M14, 7.62 Caliber Rifle, 441 F.3d 416, 422–23 (6th Cir. 2006).

[43] U.S. v. Smith, 477 F.2d 399, 400 (8th Cir. 1973).

[44] 26 U.S.C.A. § 5845(b) (West).

[45] U.S. v. Mullins, 446 F.3d 750, 756 (8th Cir. 2006).

[46] U.S. v. 16,179 Molso Italian .22 Caliber Winler Derringer Convertible Starter Guns, 443 F.2d 463, 464–65 (2d Cir. 1971).

[47] 18 U.S.C.A. § 921(a)(3) (West).

[48] *Id*.

[49] U.S. v. Woods, 560 F.2d 660, 664–65 (5th Cir. 1977).

[50] *Id*.

[51] *Id*.

[52] *Id*.

Defs.' MSJ App. 041

53 U.S. v. Catanzaro, 368 F. Supp. 450, 452–453 (D. Conn. 1973).

54 U.S. v. Seven Misc. Firearms, 503 F. Supp. 565, 574–76 (D.D.C. 1980).

55 *Id.*

56 *Id.*

57 U.S. v. Prince, 593 F.3d 1178, 1184 (10th Cir. 2010).

58 *Id.* at 1181–83.

59 *Id.* at 1184.

60 *Id.* at 1183.

61 Reilly v. Super. Ct., 304 P.3d 1071, 1076 (Cal. 2013).

62 *Id.*

63 *Supra* note 1, at 27728.

64 *Id.* at 27730.

65 Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).

66 *Id.*

67 *Supra* note 1, at 27727.

68 *Id.*

69 *Id.* at 27728.

70 *Id.*

71 *Id.*

72 *Id.* at 27727.

73 Chris Bartocci, Armor's Manual AR15/M16/M4 Family of Weapons, 107, 115, 125, 129 (2017).

74 AK-47 Exploded View, https://www.apexgunparts.com/rifles/ak-47/ak-47-exploded-view.html (last visited June 1, 2021).

75 *Supra* note 1, at 27729.

76 *Id.*

77 *Id.* at 27730.

78 *Id.*

79 *Id.*

80 *Id.*

81 *Id.*

82 Seven Misc. Firearms, 503 F. Supp. at 574–75.

83 Mars-L 5.56, https://lmtdefense.com/product/mlc/ (last visited June 2, 2021).

84 M&P 15 Sport II, https://www.smith-wesson.com/product/mp-15-sport-ii (last visited June 2, 2021).

85 *Supra* note 83.

86 *Supra* note 1, at 27730.

87 26 U.S.C.A. § 5845(b) (West).

88 Smith, 477 F.2d at 400.

89 Jim McPherson, CNC Milling an AR-15 From Scratch: It works!, https://www.youtube.com/watch?v=-JrHFKqLCd4 (last visited June 2, 2021); Machining an AR15 Lower Forging - August 26th, 2016, http://jefenry.com/main/AR15Lower.php (last visited June 2, 2021); Ray Brandes, *Machining the AR15 Lower Receiver Forging*, https://arlower.ray-vin.com/ar15/ray%20brandens%20complete%20ar%2015%20build.pdf.

90 *Supra* note 1, at 27727–28.

91 *Id.* at 27727.

92 *Id.*

93 *Id.* at 27728–29.

94 Letter of Explanation, https://www.tommybuilttactical.com/t36-upgrade/letter-of-explanation/ (last visited June 2, 2021).

95 *Id.* at 27728–29.

96 BRN-180 Gen 2, https://www.brownells.com/.aspx/bapid=700/ClientPage/brownells-brn-180 (last visited June 2, 2021).

97 Sig MCX Virtus Patrol, https://www.sigsauer.com/sig-mcx-virtus-patrol.html, (last visited June 2, 2021).

98 *Supra* note 83.

99 Mars-L 5.56 Piston, https://lmtdefense.com/product/mars-l-5-56-piston/ (last visited June 2, 2021).

100 IC-SPR Rifle, https://www.lwrci.com/IC-SPR-Rifle_p_255.html (last visited June 2, 2021); IC DI M-LOK 5.56, https://www.lwrci.com/IC-DI-M-LOK-556_p_250.html (last visited June 2, 2021).

Defs.' MSJ App. 042

Docket no. 2021R-05 comment

---

[101] SR-15 Mod 2 M-Lok, https://www.knightarmco.com/12010/shop/commercial-firearms/sr-15/non-nfa/sr-15-e3-mod-2-m-lok (last visited June 2, 2021).

[102] *Supra* note 1, at 27731–32.

[103] *Id.*

[104] 27 C.F.R. § 478.92(a).

[105] Identification Markings Placed on Firearms, 66 Fed. Reg. 40599 (Aug. 3, 2001) (to be codified at 27 C.F.R. pts. 178, 179).

[106] Can Any AR-15 Upper Match With Any AR-15 Lower? https://www.wingtactical.com/can-any-ar-15-upper-match-with-any-ar-15-lower/#:~:text=No%2C%20combining%20upper%20and%20lower,your%20upper%20receiver%20certainly%20will. (last visited June 2, 2021).

[107] 5 of the Best Aftermarket Glock Part Companies, https://www.pewpewtactical.com/best-aftermarket-glock-part-companies/ (last visited June 2, 2021).

[108] *Supra* note 1, at 27721.

[109] *Id.* at 27721–22.

[110] *Id.* at 27721.

[111] A SHORT HISTORY OF THE BELOVED COLT 1911 PISTOL, https://smallwarsjournal.com/blog/short-history-beloved-colt-1911-pistol (last visited June 2, 2021); The FN Model 1910, https://www.shootingillustrated.com/articles/2020/2/13/the-fn-model-1910 (last visited June 2, 2021).

[112] THOMPSON SUBMACHINE GUN, CAL. .45, M1 Section V. DISASSEMBLY AND ASSEMBLY, http://www.nfatoys.com/tsmg/web/m1assy.htm (last visited June 2, 2021).

[113] FN FAL: THE WORLD'S MOST SUCCESSFUL BATTLE RIFLE, https://sofrep.com/specialoperations/fn-fal-worlds-successful-battle-rifle/ (last visited June 2, 2021).

[114] Once Banned, Now Loved and Loathed: How the AR-15 Became 'America's Rifle', https://www.nytimes.com/2018/03/03/us/politics/ar-15-americas-rifle.html#:~:text=the%20United%20States.-,'America's%20Rifle',of%20the%20military's%20M16%20rifle. (last visited June 2, 2021).

[115] 27 CFR 478.11.

[116] 18 U.S.C.A. § 921(a)(3) (West).

[117] 26 U.S.C.A. § 5845(b) (West).

Defs.' MSJ App. 043

Beretta U.S.A. Corp., Benelli U.S.A. Corp. and Stoeger Industries, Inc. comments regarding ATF Docket Number ATF 2021R-05 ("Definition of 'Frame or Receiver' and Identification of Firearms")

These comments are arranged so that more general comments are made at the beginning and more specific (though equally important) comments are made toward the end.  For ease of reference, instead of repeating the term "Bureau of Alcohol, Tobacco, Firearms and Explosives" throughout these comments, the shortened term "ATF" is used.

1)   Our understanding is that the Gun Control Act of 1968 (GCA) requires the serial number be placed on "the frame or receiver", meaning there is or can only be one such part on a firearm, not multiple parts.  Given that, since the GCA language was enacted by Congress, would it require an act of Congress to modify it (rather than try to change the requirement to possibly include multiple frames or receivers through administrative regulatory amendment)?

2)   From our point of view, the current regulations have been in effect for over 50 years and have been capable of application with respect to 2-part receiver designs and other iterations of frame or receiver that your agency now claims needs further definition.  We can see nothing to suggest that ATF could not use its existing process of working with the manufacturer to identify what part is the frame or receiver as it has in the past, especially since the introduction to the proposed regulations states that all previously defined frames or receivers will continue to be treated as such going forward, including the versions ATF now claims to be problematic.  In other words, either those designs are or were problematic or they are or were not.  If they are or were not, as shown by the fact that ATF will continue to treat them as previously defined, why is the new regulation needed?  [Please also note our comment below regarding court cases that appear to have prompted ATF to issue these proposed rules.]

3)   For example, at the bottom of page 5 of the proposed rulemaking, ATF talks about some firearms having split or multi-piece receivers and attributes those characteristics to Glock pistols and Sig Sauer's P320.  By doing this, ATF makes the "problem" of the original definition of receiver (i.e. "*that part of a firearm that provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel*") a bigger one than it is by stating that a modern semi-automatic pistol contains these components in the frame and the slide assembly, hence making it a multi-piece receiver, however, this aspect of design housing has existed for over 100 years (see, for example, the Colt Model 1911 pistol) and this has never been an issue until now.

4)   The issue might be resolvable by using a different definition of frame or receiver.  The SAAMI definition of "receiver" is "the basic unit [note the singular] of a firearm which houses the firing and breech mechanism and to which the barrel and stock are assembled.  In revolvers, pistols and break-open gun, it is called the Frame." (See, www.saami.org.)  Using that definition would avoid the additional list of components contained (or perhaps not) in the receiver that appear to be part of the problem ATF is trying to address in its proposed rulemaking without having to change the language of the GCA.

Defs.' MSJ App. 044

5) If more than one part of a firearm is now defined as a frame or receiver requiring serialization, if each serialized part was to be sold as a separate item would each part thus require all of the markings required by law to be found on a firearm?  Presumably all of the restrictions against altering a serial number or repeating a serial number found on another frame or receiver would apply to each such serialized part?

6) The key question in all of this is when a component is at a point where it can "readily be converted to expel a projectile by the action of an explosive." (starting at the bottom of page 35 of the proposed rulemaking.)  So-called 80% receivers have existed for years without ATF objection and if there are iterations that ATF believes can be readily converted, it can address those directly with whomever is making that version.  ATF should not change the definition for everyone because of one or more companies/persons who are in what it considers to be violation.

7) The draft regulations allow or require a Federal Firearm License holder (FFL) to add a serial number and other identifying marks to an unmarked firearm it receives but can an FFL receive a firearm at all under existing law if the firearm is unmarked?

8) For firearms designs that involve what ATF now calls a split receiver, the gun cannot fire or be readily converted to fire if it only has one of those 2 components.   Controlling/serializing one thus controls/serializes the finished product.  No secondary serialization is needed to advance the purposes of the GCA.

9) If these proposed regulations are prompted by the court decisions described on page 9 of the proposed rulemaking, why hasn't ATF simply appealed those decisions?  Is it afraid an appellate court would uphold the lower court rulings?  If an appellate court did overrule the lower court decisions, the draft regulations would not be needed.  If it did not, ATF's interpretation of "frame or receiver" as found in the GCA was wrong all along.  Either way, simply issuing further regulations will not change how a court interprets ATF's definition vis. the GCA.  In other words, ATF cannot "fix" a misinterpretation simply by issuing new regulations that say its interpretation is now correct.

10) The new proposed definition of frame or receiver at the bottom of page 26 is very problematic.  Using this definition (and setting aside for now the 'exemption of existing designs'), many current pistol designs could be construed to have three receivers: The chassis, the slide and the 'grip', requiring manufacturers to serialize and manage all three.  The proposed rulemaking appears to try to temper this impact somewhat by stating that existing designs, such as the SIG P320, are 'grandfathered' to existing standards and that its chassis is the receiver but what will constitute a "new" design?  If a manufacturer later introduces a new model pistol with a chassis insert, will the previously-approved definition of chassis being the receiver for other models apply?  If an existing model now has a change in the design (different grips, different sights, different colors, external shape, etc.) is it still grandfathered or would a new evaluation of what is the frame (or frames) have to be applied?  If the latter is the case there would be considerable difficulty controlling serialization for one version of the similar model and a potentially different part to be serialized for its cousin.  [See also comment number 13 below.]

11) Some countries (for example, European Union countries) require serialization of the barrel in addition to the frame or even serialization of three components: frame, barrel and slide.  Will the new regulation, stating that "*Any such part identified with a serial number shall be presumed, absent an official determination by the Director or other reliable evidence to the contrary, to be a frame or receiver*" now create confusion to FFL's who receive and then have to decide which serial numbers to add to their acquisition and distribution records, to law enforcement officials who need now to figure out not only what serial number to trace but to describe the component part that is marked so that the number for that component can be searched, etc.?

12) In the middle of page 29 of the proposed rulemaking, ATF further defines a sound suppressor.  Does this mean that internal and other smaller components for suppressors that no longer need be serialized can now be imported into the U.S.?

13) The last sentence before the start of the first full paragraph on page 31 ("It would further make clear. . .etc.") is extremely confusing.  Can ATF please explain further what is intended? Is what is intended an effort to avoid a mix and match of different gun parts that result in an un-serialized firearm.  As an example, if one company made a gun with a serialized upper, and another company made a gun with a serialized lower, and by some chance the two designs are compatible, one cannot mate the un-serialized upper and lower.  One of the two would have to be serialized.

14) On proposed rulemaking page 33, it reads that "[h]owever, if there is a present or future split or modular design for a firearm that is not comparable to an existing classification, then the definition would advise that more than one part is the frame or receiver subject to marking and other requirements unless a specific classification or marking variance is obtained from ATF, as described above."  Does this mean that if a new firearm is comparable to one of the nine classifications listed on pages 32-33 it would only require markings applicable to that classification as grandfathered in?

15) The discussion on page 34 (ending with the sentence that includes reference to footnote 53) is very problematic.  If the concept now is that the items can be completed or converted into a functional state and if that effort can involve 90 minutes of work with commonly available tools or 6 hours of such work or even 8 days of such work (see footnote 58 at the bottom of page 36), that could mean that even certain toy guns, for example, can be considered a firearm since they could be converted after a few days or multiple hours of work to fire a live projectile through the force of an explosion.

16) Similarly, if "partially complete" now includes a forging that "is clearly identifiable as an unfinished component part of a weapon" (p. 35), that means a frame forging in the shape of a receiver would require serialization even though the object itself cannot be completed into a dischargeable state without substantial work involving non-standard equipment.  ATF appears to try to correct this issue on page 35 by stating that unformed blocks of metal or other articles

in a primordial state would not be considered partially complete, but a frame forging in the shape of a frame is not "unformed" and whether ATF would consider it "primordial" is undefined.

17) By way of example, attached is a photograph of a frame forging in its unmachined state.  Since it is in the shape of a firearm frame, would this example be considered a frame or receiver subject to marking at this step of production, even though all exterior surfaces will be ground off during the machining process?



18) Similarly, if not at its inception as a forging, at what step of progressive machining would this sample become a frame or receiver?

Step 2

Step 3



Step 4



Step 5



Step 6



Step 7



19) Under this definition, would a blue training aid gun or movie prop be considered to have a frame or receiver?

20) Pages 41-42 of the proposed rulemaking establish new definitions of all that must be marked on a frame or receiver but if, for example, the firearm design involves a chassis insert inside a grip housing or if the frame itself is very small, there is likely not enough space on the chassis or small frame to add all of the markings stipulated on pages 41-42 (adding, for example, nine characters to what are often already long and complicated serial numbers) such that all could be seen at the size specified by regulation through the grip housing aperture found on many

polymer gripped pistols and maybe not even on many small frame pistols.  In addition, if more than one part is now defined as a frame/receiver, that amount of marking covering multiple components would make the pistol start to look ridiculous.

21) Regarding the procedure found on pages 49-50 for requesting classification of firearms from ATF, does this mean, for example, that if a brace is approved for use on one manufacturer's model of firearm, the customer/consumer cannot assume that the same stock is legal to use on a different model of firearm?  This could create a "if not specifically approved, assume it's not legal" environment, with consumers being unable to know or readily find out whether their combination has been approved or not.

22) It would be extremely challenging to serialize both a frame and slide/upper receiver in the manufacturing process and match those components by number in the assembly process, especially if the 7-day window to serialize those parts is to be met (since the two or three components would be going through different manufacturing cycles and would thus be available for marking at potentially significantly different times.

23) We are prohibited by current regulations from using the same serial number for two or more different firearms in our A&D tracing records. Our IT system is thus programmed to reject duplication of serial numbers and our prior investigation of whether our IT system can be modified to accept multiples of the same serial number in a single receiving transaction (for example, at the time of import or after manufacturing of the frame/receiver is completed as opposed to a serialized firearm that in shipped to an FFL as one transaction, then returned by that FFL as a second transaction, etc.) is that entering the same serial number for multiple parts at the same time is not feasible.  That would require that different serial numbers would be required for each component part, which then creates the issue that law enforcement officials who seek to trace a component must not only provide the serial number but would need to know how to describe the part to which that number applies.

24) The extra serialization(s) will add cost per firearm.  Because serialization requires a progressive roll-marking or stamping or other means of marking (meaning, the same fixed mark is not applied to each item but instead a new and distinct—in this case, number or number/letter combination—must be created and added to each frame or receiver), an existing marking system cannot simply be modified so that there is no incremental cost increase to each frame or receiver marked.  Total cost for the additional marking will vary based on marking method used but at a minimum would be likely to add close to $.25 per firearm.  Multiplied by the number of additionally designated frames and receivers made in the U.S. or imported into the U.S. per year would add up to a substantial annual cost to consumers, law enforcement customers and potentially the U.S. military.

ATF Proposed Rule ATF 2021R-05

From: Scott Lipiec
248-819-2337
1966 Wickham Street, Royal Oak, MI 48073-1123

(There is a text only summary in the "comment" section and there is a PDF in the "attachment" section with the rest of the text some graphics along with the text.  Also, I hope you are having a nice day.)

Hello, I am engineer with experience in CNC (Computer Numeric Control) machining, plastics, and additive manufacturing (3D printing).  I have never made a Receiver from an 80% lower. I have never made a Frame or Receiver from a block of metal.  But, I could.  I have designed and made more complex parts with tighter tolerances.

I have some issues with the proposed rule making.  But to sum it up the bigger points. The current rule applies to the configurations of objects. The proposed rule applies to people and their skills.  So some people can be punished for attributes or skills that others don't have.
This sounds like a *Bill of Attainder*. Which I believe, is not allowed in the United States of America.

**Issues List:**
1. **Reasoning for rule change is not proven/shown.  Rule doesn't show data on how often the tracking of the serial numbers were in the critical path of solving a crime.  And rule doesn't show how effective this change will be in those instances, or even if those instances actually occur.**
2. **Rule is supposed to clarify the definition of Frame or Receiver.  The rule does the opposite and creates a Bill of Attainder.**
3. **Rule has a false premise about Aluminum or Steel "80 percent" Frame or Receivers.**
4. **Rule makes almost everything a receiver, and everyone a criminal.  It's a Chuck Norris joke but trying to be codified into law. Also, Machine Guns were everywhere we just didn't know it.**
5. **Rule is discriminatory against lower income citizens.**
6. **Rule is racist** (according to the current President of the United States)**.**
7. **Rule has no provisions for cost overruns.**
8. **Rule falsely implies that modern-day firearms weren't in civilian use when GCA was written and rules were made.**
9. **Rule has no provisions for if it fails to achieve desired result.**
10. **Airsoft/Paintball guns (or parts of them) can be considered Frames or Receivers.**

Do not want to give criticism without solutions so I have some alternate solutions to issues that this is attempting to solve.  Here is a quick reference list:

**11. Alternative definition of Frame or Receiver.**
**12. Be Trustworthy**

_____

# Part 1. Reasoning for rule change is not proven/shown.  Rule doesn't show data on how often the tracking of the serial numbers were in the critical path of solving a crime.  And rule doesn't show how effective this change will be in those instances, or even if those instances actually occur.

The proposed rule says that this will make it easier to solve crimes because it will allow guns to be traced.   But it never says how many shootings are solved solely because the gun is traced.

### *PART 1: IMPORTANT QUESTIONS THAT NEED TO ANSWERED*

Since the premise for this rule isn't proven/shown, would that invalidate the proposed rule?

Does the ATF/DOJ have to prove there is a valid reason for the rule change?

## Part 2: Rule is supposed to clarify the definition of Frame or Receiver.  The rule does the opposite and creates a Bill of Attainder.

The proposed rule has the result of making a paradox.  The proposed rule will define a receiver with the criteria "how long it takes to finish the process", "ease", "expertise", "equipment","expense", etc.  These are criteria that belong to people not things.

**Repeat: These are criteria that apply to people not things.  An "80% Receiver" will not jump up and mill away the Fire Control Cavity itself.**

Therefore, there are some situations where the same item can be a Frame or Receiver or Not a Frame or Receiver depending on the "expertise", "equipment", etc. available to the person possessing it.

Let's take the example of a block of Aluminum being transformed into an Ar-15 Lower Receiver.

On the left (see graphic) is a block of Aluminum, in the hands of some CNC operators it can be turned into a fully complete Ar-15 lower in less than an hour.   This would fit the new rule's definition of "readily".   If it were in the hands of a person with no experience



A Receiver for some people.

A Receiver for more than some people.

Yes, it is a Receiver. Unless a baby is holding it, or someone with no tooling experience then it is **not** a receiver.

Finished Receiver.

Block

Outer Shaped Receiver "OSR"

80% Lower Receiver

Finished Receiver

in milling and no equipment it could take weeks of continuous independent learning and acquiring equipment to make a Finished Receiver, that is not the definition of "readily".

Here's where the problem is. With that same inexperienced person, the Outer Shaped Receiver "OSR" will also take weeks of continuous independent learning and acquiring equipment to make a Finished Receiver.  That is not the definition of "readily".

And now, here's an even bigger problem. That same inexperienced person could take a few days of continuous independent learning and acquiring equipment to make a Finished Receiver from an 80% Lower.  That is not the definition of "readily".

So with the proposed rule there will be situations where the same item will be a Receiver and Not a Receiver, depending on who is possessing it.   This seems weird, because if a CNC operator and my mom (who had trouble operating a cordless screwdriver) were juggling a Block, an OSR, and something between a Block and OSR, by this new rule an ATF agent would see 6 things in the air. Even though a normal person would see only 3.

A point type system will needed to be implemented to determine if someone is holding a Receiver or Not-a-Receiver.  I did my best to interpret the rule.  (see charts)

Example:

Part 1: Attributes of Individuals/Groups

| Attribute | Point |
|---|---:|
| CNC Operator | 5 |
| Engineer/Mechanic | 4 |
| Carpenter | 4 |
| Access to CNC machines | 3 |
| Income Level: High | 5 |
| Income Level: Low | -1 |
| Average Boomer mom with no mechanical experience | 0.5 |
| Small Child with Physical Disability | 0 |
| Someone with the Internet, a ruler, a drill, and 4 hours of free time | 3 |

Part 2: Stage of Machining

| Block | 1 |
|---|---:|
| In between Block and OSR | 2 |
| In between Block and OSR but closer to OSR | 3 |
| AirSoft or Magazine Fed Paintball gun | 4 |
| OSR | 4 |
| Between OSR and current "80% lower" | 5 |
| "80% lower" | 6 |

So I think the above table shows how unworkable the proposed rule is.   Because a product of more than 6 points is a receiver, but the criteria in Part 1 could be an endless debate.

***PART 2: IMPORTANT QUESTIONS THAT NEED TO ANSWERED***

1.  How will the average person know when he/she is in possession of a Receiver?

2.  Will there be a point system to add up "ease", "expertise", "equipment","expense", etc. that are available to an individual so they will know if they are holding a Receiver?

3. If a case were taken to court, could the Defendant just give the "Receivers" to a small child and then they wouldn't be "Receivers" anymore and … case dismissed?

4. The current rule is quite simple (Ar-15 example) and can be shown in just 3 photos with a quick explanation. The proposed rule is a confusing mess. Was this rule drafted just to give the ATF an almost unlimited power to go after people it disagrees with (politically or otherwise)?
https://www.atf.gov/firearms/qa/are-"80"-or-"unfinished"-receivers-illegal

5. Personal attributes will be used in determining if an object is a Receiver. So if there is a crime involving the possession of a Receiver, personal attributes could be used be convict someone. How is the not a *Bill of Attainder*? Because some people could be convicted and some not convicted, while possessing the exact same item. And that item, according to the proposed rule could a block of wood (with maybe a little form to it).

## Part 3: Rule has a false premise about Aluminum Receivers or Steel Receivers or "80 percent" Frame or Receivers.

Once again using the Ar-15 Lower Receiver as an example. The rule is making the assumption that manufacturing a completed lower has become easier due to advances in technology. While this is true for additive manufacturing (3D printing) this is not true for standard production (milling) of metal receivers.

CNC equipment has been around since the late 1940's, and CNC equipment with what operators would consider modern controls have been around since the 1960's, well before the GCA was written. Granted the computer displays have become more colorful, but the amount time it takes to machine lower from a block of Aluminum hasn't decreased by an order of magnitude. The speed that metals can be machined have the same limits as they did in 1968.



And as for converting 80% lower receivers to finished receivers. That takes a drill and some patience. And according the Sears Catalogue, drills were available for purchase back in 1960 (see catalogue page). And according to

anyone who was alive back then, people had more patience.  So, by drill alone, there is now a lower percentage of people who could "readily" complete a Receiver.

**PART 3: IMPORTANT QUESTIONS THAT NEED TO ANSWERED**

Since the in-tool manufacturing time (time of forming a part) of CNC or drilling hasn't changed very much since 1968 (the year of the GCA) wouldn't this new rule about 80% lowers only apply to additive manufacturing?

Also, if this rule applies to additive manufacturing wouldn't a spool of plastic be a "readily" completed receiver?  That part seems glossed over in the proposed rule.

Can I (an Engineer who knows CAD/CAM) purchase a spool of plastic (for 3D printing) in California without being arrested?

Since the rule has a false premise in it, is it invalid?

# Part 4. Rule makes almost everything a receiver, and everyone a criminal.  It's a Chuck Norris joke but trying to be codified into law. Also, Machine Guns were everywhere we just didn't know it.

In the hands of a CNC operator (or anyone with milling experience) any block of wood or steel or aluminum or plastic or any material with a certain hardness can be "readily" manufactured into a receiver.

So the proposed rule will cause some issues.  A CNC operator any block can be readily manufactured into a receiver.   Once again, the difference in time from transforming a plain block of wood relative to that of an Outer Shaped Receiver (or even an 80% Lower) is negligible when using a CNC machine.

So anyone who is felon and a CNC operator will not be allowed to posses any hard block of metal or wood or plastic of sufficient size to make a firearm.  In the case of the Ar-15 that is about 220mm x 50mm x 80 mm.

Also, if someone (Person B) is building a deck with this felon/CNC operator.  According to the rule, the co-ownership of the wood (that can be readily converted to a receiver) is a felony for Person B.

In summary, there was an old joke that Chuck Norris (or maybe it was Bruce Lee) had to register his fists and feet at lethal weapons.  If this rule gets approved, anytime someone like myself or a CNC operator gets near metal that piece of metal will be a

Frame or Receiver.   Now, for most states this will not be an issue.  However for states like California where it is illegal for someone to make a firearm it leaves some issues for anyone who can operate machinery.  They could be arrested for buying a 4x4 of wood at the Home Depot or Lowes.

Now about the Machine Guns, since a block of metal can be a Receiver it could have always been a Receiver.   So if a Block of metal existed before May 19, 1986 it could be registered as a Machine Gun.  The Hughes Amendment that banned new manufacturing of Machine Guns took effect that day.   So if someone were to find a block of metal that were made before May 19, 1986, that Block could be registered as a Machine Gun, the same as if someone found a Thompson Sub-Machine gun (manufactured in 1928) in their attic.

## PART 4: IMPORTANT QUESTIONS THAT NEED TO ANSWERED

Are a materials of hardness greater than sponges to be kept away from Felon CNC operators?

What is the average citizen's new responsibilities when handling blocks of wood/metal/plastic?

Will any engineer or CNC operator living in California or Washington DC be required to perform a background check to buy lumber? Or will they even be allowed to buy lumber?

Will engineers and CNC operators be required to register their hands and minds as "lethal weapons"?   (Note: I put this question in as a joke.  But, the more I think about it, it is not really a joke. Some people will have skills to "readily" turn a block of metal into a Frame or Receiver.)

So, what is my guidance if I go to California or Washington DC?  I am someone who could "readily" turn a block of metal or wood into a Frame or Receiver.  I am going to be allowed in a hardware or lumber store, without being arrested?

If the proposed rule change goes through a Block of metal will be considered a receiver (in certain people's hands) and if a Block of metal was made before May 19, 1986 does the Block of metal need to be completed into a Machine Gun Receiver before registering it or can the Block itself be registered as a Machine Gun?

## Part 5. Rule is discriminatory against lower income citizens.

Since "expense" will now be considered in when a Block of material to an "80% lower" is a considered a receiver, this is discrimination against poor people.   While is true that the more money you have the easier most things are to do, this new rule seems to be specifically targeting poor people.

Once again since "expense" is being considered as a factor that is an attribute that cannot be assigned to an object, that attribute is assigned to a person.

### PART 5: IMPORTANT QUESTIONS THAT NEED TO ANSWERED

Did the ATF seek to discriminate against poor people with this proposed rule, by using "expense" as a determining factor?  Does discrimination against income level invalidate the rule?

## Part 6. Rule is racist.

This next part is a touchy subject, and it only brought up because of the words of our President and some members of Congress.   Recently with voter ID laws being debated, our president said that these proposed and current laws were racist.  Our President said that are a lot of people in the Hispanic and African American community don't know how use the Internet or get online.   Granted this was in reference to getting an ID or registering to vote.   But, if they don't know to use the Internet for that, then they don't know how to use the Internet to gain other "expertise".

With the new rule "expertise" will be used to determine how "readily" complete a receiver is.

Also the Internet can help with all other factors of how "readily" complete a receiver is, such as:  "ease", "availability", "expense", "scope", and "feasibility".

Note, the writer doesn't feel that way the President does.  The writer believes race doesn't determine how well someone can use the Internet.  But, the head of the Executive Branch of the United States does.  And the ATF and DOJ fall under the Executive Branch.

There has also been much talk about Critical Race Theory being taught in government agencies.  Some of what Critical Race Theory states that Systemic Racism has kept minorities poor, especially in Progressive/Neo-Liberal Democrat controlled urban areas. If this is true then using "expense" and even "equipment" as criteria for if a Frame or Receiver is racist.

Also, if the President is correct, this rule violates 18 U.S. Code § 242 - Deprivation of rights under color of law.

### PART 6: IMPORTANT QUESTIONS THAT NEED TO ANSWERED

Is the President correct when he said that race is determining factor for the ability to use the Internet to gain "expertise"?

If the president is correct on his opinion that some races (ethnic groups) have difficulty using the Internet, then this rule is racist and shouldn't be adopted.  Unless the President wrong in his opinion.  Is he wrong in his opinion?

If the President is correct this rule is a violation 18 U.S. Code § 242- Deprivation of rights under color of law.  So who goes to jail for it, if it is implemented?

## Part 7. Rule has no provisions for cost overruns.

Rule has estimated costs for implementing this rule. But what happens in costs go over estimates.

### PART 7: IMPORTANT QUESTIONS THAT NEED TO ANSWERED

Will businesses be compensated for extra and overruns of the cost of this rule?

If unforeseen expenses are caused by this new rule is the rule invalidated?

## Part 8. Rule falsely implies that modern-day firearms weren't in civilian use when GCA was written and rules were made.

The rule implies that types of firearms such as striker fired firearms, split receiver firearms, etc. were almost exclusively for military purposes when then GCA was written.  This isn't true.  There were plenty of non-revolver or non-banded rifles in civilian hands.

The writer believes this new rule is to keep the definition of a frame or receiver as vague as possible to give the ATF monarch type powers on determinations.   And with these monarch type powers change the definition when it suits the ATF's purposes.

### PART 8: IMPORTANT QUESTIONS THAT NEED TO ANSWERED

Will the new definitions of frame or receiver be so vague that an average person will be able to understand the definition?  Is there anyone who could clearly explain the proposed rule to someone who knows little about firearms?

How did the ATF not know that striker fired and split-receiver firearms were totally available to the public in 1968?

## Part 9. Rule has no provisions for if it fails to achieve desired result.

To not put a too fine a point on it, many laws and regulations don't achieve the desired result.  Many times the law or regulation causes the opposite of the desired result.  Take the GCA.  Its goal was reduce violence, but in the following years violence across America increased, so that was a failure.   But the "Assault Weapons" ban in 1994 smartly had a sunset provision.  The ban, by its own measure failed to reduce crime, and is no more.

This proposed rule has some goals, but they are not really quantified.  "How many murders will be solved as a result of this rule alone", would be a quantified result.   But, this rule doesn't have that.

As a citizen and engineer I have been subjected to the seemingly endless regulation.  And this just seems to be regulation to keep government employees busy or give them excessive power.

### *PART 9: IMPORTANT QUESTIONS THAT NEED TO ANSWERED*

What are the quantifiable goals of this new rule?

Will the new rule be scrapped if those quantifiable goals aren't reached?

## Part 10: Airsoft/Paintball guns (or parts of them) can be considered Frames or Receivers.

By reading the proposed rule most Airsoft and some Paintball guns can be considered "readily" completed Frames or Receivers.  They resemble firearm receivers, and some are 1:1 scale.  (Example: First Strike T-15, Tippmann TMC)

Granted they might require an extra step of reinforcing the plastic (or sometimes metal) with an epoxy (or other filler material) then some machining.   But they could be "readily" converted by some people.

Now, let's take rubber training guns. They resemble firearm receivers. According to this new rule they could now all be firearm receivers. And much like the Airsoft and some Paintball guns are readily converted to a functional firearm.

The writer believes Airsoft and Magfed Paintball is lame, but it is an industry that will be affected by this new rule and the implications to that industry have not been considered. And the implications and cost will be huge relative to the industry.

***PART 10: IMPORTANT QUESTIONS THAT NEED TO ANSWERED***

How will Airsoft, Paintball, toy, and rubber guns be registered as firearms under the new rule?

(note: some Ar-15 Airsofts have the Auto Sear hole outlined)
So, will those with the Auto Sear hole outlined be considered machine guns and be destroyed?

Will minors that own Airsoft and Paintball guns be required to turn them in or destroy them, because they can't own firearms?

How will these minors be compensated for their property being confiscated or destroyed? (I'm sure they have 5th Amendment rights.)

What is the average citizen's new responsibilities when handling Airsoft or Paintball guns?

Will the economic impact on the Paintball and Airsoft industries be considered in this rule (or remade rule)?


# Part 11: Alternative definition of Frame or Receiver.

As stated before I am not just about criticism. I am about solutions. The current definition of a frame or receiver is confusing. The new rule will make it even more confusing. My suggestion is to move to a points system. Similar to the handgun import point system.

Example:

The fire control group would be 3 points. The hammer would be 1 point. The striker also 1 point. Then whichever external part has the most points would be the frame or receiver. This would give manufacturers a clear definition going forward, also could be structured to keep current definitions the same.

But, the Frame or Receiver would have to one part in a completed firearm.  Otherwise, it would be a confusing mess.

# Part 12. Be Trustworthy

Let's be honest here.  The ATF doesn't have a good reputation and the management particularly doesn't have a good reputation.  Recently the ATF headed up an event that sent thousands of guns to Mexican drug cartels.  The ATF stated this was to track where the guns went, but almost none were practically tracked.  Most people believe it was to cause violence to sway public opinion on guns.

Either way, thousands of guns went where they weren't supposed to.  The exact opposite stated mission the ATF was performed.  Granted, I am assuming that the stated mission the ATF is to keep guns out of the hands of criminals.  There were also some other questionable operations in the recent past.  This errors in judgment from events that were weren't spontaneous, they were thought out and approved by management.   These errors had seemingly no penalty to persons at the ATF.

Also, the ATF has an infinite legal budget compared to a regular person.  The ATF has gone after people for something as benign as painting a receiver.  The serial number was slightly covered (but still readable) and the ATF threatened years in jail for that.

It is stories like that that cause rational people to not trust the ATF.  So, with no penance for huge errors and oversteps of authority that the ATF has committed, the ATF is saying "trust us".   But, if the ATF can do all those bad things without penalty, the ATF can certainly make a bad judgment call against an average citizen without penalty.

### *PART 12: IMPORTANT QUESTIONS THAT NEED TO ANSWERED*

This proposed rule will allow ATF agents to arrest some people for driving blocks of wood, for commerce, across state lines. Also, since that is a felony, can I make a citizen's arrest if I see certain people with blocks of wood being driven across state lines?

Because according to your current application of the rules, I can currently citizen's arrest anyone with a painted gun.  Even an ATF agent, right?   (this is slightly sarcastic)

I hope you see the foolishness of the enforcement of the current rules, so I hope that you agree that adding vagueness on top of current foolishness is bad idea?

Defs.' MSJ App. 062

From: Scott Lipiec
248-819-2337
1966 Wickham Street, Royal Oak, MI 48073-1123

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2021-10058

Posted by the **Alcohol, Tobacco, Firearms, and Explosives Bureau** on May 28, 2021

View More Comments    249.29K   (/document/ATF-2021-0001-0001/comment)

View Related Comments    249.29K   (/docket/ATF-2021-0001/comments)     Share ▾

---

Comment

I have been making firearms for personal use for several years and I have several serious concerns about the proposed rule. I believe that the ATF is overstepping its authority by making law with respect to the definition of "receiver" and doing so with a rule that has serious deficits. Specifically, the definition of "receiver" is vague and overly broad; the definition of "readily" proposed in the rule change is incredibly broad and would make raw material fall under the definition of "receiver" even if it were defined more precisely and narrowly; and the wording of the rule change is at odds with the stated intent of the rule.

First, I believe that the proposed regulations seeks to interpret a criminal statute outside of the written legislation and the 6th Circuit just ruled (against the ATF) " that Chevron deference categorically does not apply to the judicial interpretation of statutes that criminalize conduct". Since the GCA of 1986 refers to a "receiver" as a single object, not a collection of objects, the re-defining of the term "receiver" to apply to a group of objects (receiver plus instructions, guides, tools, etc.) and not when bought individually is outside of the "permissible ambiguity" of the law.

The rule does not provide an objective definition of what a receiver is so the proposed definition of "receiver" would create an undue burden on law abiding citizens because it is vague and overly broad. The most popular firearm in America, the AR-15, has no fewer than 5 parts that would qualify as a receiver, and many older or foreign firearms may have even more that have not been classified by the ATF. This creates a quagmire for law abiding citizens, but not for those willing to break the law.

The rule does not propose an objective standard for what is "readily" converted and the implied definition of "readily" is so broad that it would defacto classify all aluminum stock and steel sheet metal in the US. In footnote 58 they point to a case that found that material that "would take around an eight-hour working day in a properly equipped machine shop was readily restored to shoot". Since an AR-15 receiver can be milled from a billet of aluminum in under 8 hour in a properly equipped machine shop, then all aluminum would be classified as a "receiver", and since an AK-47 receiver can be manufactured under those circumstances from a sheet of steel, all sheet steel would need to be serialized and registered with the ATF.

Defs.' MSJ App. 064

Finally, the wording of the rule under "Partially Complete, Disassembled, or Inoperable Firearm Kits" would classify "partial receivers" as firearms based on what tools and information exist, not what is sold with the "partial receiver". However, under "Statutory Review" section A.2 "Partially Complete, Disassembled, or Inoperable Firearm Kits" it is stated that non-licensees could sell "partial frames" or "unregulated items or parts kits that do not contain a frame or receiver (i.e., unregulated raw materials or molds, fire control components, barrels, accessories, tools, jigs, or instructions), but not both". However the wording of the regulation states that the "Director may consider *any* available instructions, guides, templates, jigs, equipment, tools, or marketing materials" (emphasis mine) which is inclusive of parts kits sold without a frame. This is not only flagrantly at odds with the stated intent of the rule; but it would make a "partial receiver" legally purchased into a firearm without any action on the part of the owner if instructions, guides, templates, or jigs were produced after the fact. Reforming the sentence to say "The director may consider included instructions", etc. would alleviate this problem, but I doubt either phrase would survive judicial review without Chevron deference.

Because of these deficiencies, which will affect me directly, I am against ATF Proposed rule 2021R-05 (Federal Register 2021-10058).

**Comment ID**

ATF-2021-0001-9032

 **Tracking Number**

kp0-8330-agb2

| Comment Details | Submitter Info |
|---|---|

**Submitter Name**

Walter Stokes

An official website of the United States Government.

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2021-10058

Posted by the **Alcohol, Tobacco, Firearms, and Explosives Bureau** on Jul 25, 2021

| View More Comments | 249.29K | (/document/ATF-2021-0001-0001/comment) |

| View Related Comments | 249.29K | (/docket/ATF-2021-0001/comments) |

Share ▾

---

Comment

The proposed regulation ATF 2021R-05, in attempting to redefine the definition of a firearm for political reasons has, instead, created a definition that is so vague as to provide no guidance.

The regulation says: "it is not intended to alter any prior determinations by ATF of what it considers the frame or receiver of a particular split/modular weapon". The regulation then proceeds to do just that. It states: "an internal frame or chassis at least partially exposed to the exterior to allow identification may be determined by ATF to be the frame or receiver of a split or modular frame or receiver." That is substantially different from the current definition and is obviously designed to redefine the what constitutes the receiver(s) in an AR15-style weapon.

This definition is so nebulous that it is difficult, if not impossible to be sure what is a receiver. For example, using the parts named in the regulation, I believe that the bolt carrier of an AR15 could be a receiver. The bolt carrier holds the bolt and the bolt holds the firing pin which is a named part. When the dust cover is open this assembly is visible, so, by your definition, it is a receiver and would require a serial number. This is nonsensical.

Additionally, further clarification would be required for AR15-type rifles. Current models in private hands have serialized lower receivers because the is what the ATF required and defined as the firearm. The upper receivers are typically not marked because that was not required and an upper can't fire without its attachment to a lower receiver which is already serialized. What is the status of current uppers if this change goes into effect? Do they need to be serialized? Do I now own 2 guns where I used to have just one? What if I have an extra upper in a different caliber? What if the manufacturer of the upper went out of business and there is no address to engrave?

Lastly, on this topic, is the wording of the regulation. It has the statement "may be determined by ATF". The words "is", "are", and "shall be" are appropriate for a regulation. The words "may be" means you're making up definitions by whim.

Now to the issue of partially finished parts that, someday, with work, might become firearms if the owner has enough skills.

There is a longstanding tradition that non-criminal persons may manufacture arms for their own use. It is

only when they sell them to someone else that it becomes illegal. Possibly, instead of hassling law abiding citizens, the FBI could hunt down some of these gangbangers building guns in their basements. Assuming, that is not going to happen, let's move on to the regulation.

The problem, of course, is in actually defining when a part nears completion. The regulation contains the phrase "may readily be converted". This is obviously no help. We then have:

"… the Director may consider any available instructions, guides, templates, jigs, equipment, tools, or marketing materials." For clarification, "partially complete" for purposes of this definition "means a forging, casting, printing, extrusion, machined body, or similar article that has reached a stage in manufacture where it is clearly identifiable as an unfinished component part of a weapon."

This implies that, if a person posted a youtube video giving instructions on converting a raw block of aluminum of a certain size to a receiver, the Director could consider all blocks of aluminum that size to be receivers. Note again, the use of the word "may".

The crux of determining when a block of aluminum becomes a valid part of a firearm is referenced at least twice:

"For clarification, "partially complete" for purposes of this definition "means a forging, casting, printing, extrusion, machined body, or similar article that has reached a stage in manufacture where it is clearly identifiable as an unfinished component part of a weapon."

And…

"ATF has long held that a piece of metal, plastic, or other material becomes a frame or receiver when it has reached a critical stage of manufacture."

The ATF has provided a gold standard of advice that has been used for decades, the 80% rule. People can buy parts that come with a written certification from the ATF that says the parts are not guns. People have relied on that advice for years. Now, the ATF wishes to say "We changed our minds," and impose procedures on owners of these parts that are costly, time consuming , and, at this time, unavailable. This effectively acts like a law change, a privilege given to the Legislative branch and not to an Executive agency.

This regulation should be scrapped.

---

**Comment ID**

ATF-2021-0001-91905

---

 **Tracking Number**

krg-ymqw-c1oi

---

**Comment Details**                                    Submitter Info

**Document Subtype**

Comment(s)

**Received Date**

Jul 23, 2021



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

---

*Martinsburg, WV  25405*

www.atf.gov

**MAR 2 0 2015**

907010: WS
3311/ 303304

Mr. Mark Barnes
Mark Barnes & Associates
1350 I Street, N.W.
Suite 260
Washington D.C. 20005

Dear Mr. Barnes,

This letter is in response to your follow-up telephonic and electronic inquiries regarding correspondence and submitted sample to Firearms Technology Industry Services Branch (FTISB), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) by Alliant Techsytems Alliance (ATK). You are asking for additional clarification on behalf of ATK, as to when the frame or receiver of the submitted and evaluated **7.62 mm Automatic Chain Gun;** becomes a "machinegun". You have included a portion of our previous correspondence to ATK regarding the aforementioned evaluation with this request.

Basically, you wish to know, specifically; at what point the subject 7.62mm Automatic Chain Gun receiver; becomes a machinegun receiver. Prior to any dissemination of a formal response to your inquiry, a review of pertinent definitions is required.

The Gun Control Act of 1968 (GCA), as amended, defines **"firearm"** to include—

*"...any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive……[and] ... **the frame or receiver of any such weapon…."** (See 18 U.S.C. § 921(a)(3).)*

As specified in the GCA, 18 U.S.C. § 921(a)(23), *the term "**machinegun**" has "the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)). " (See below, page 2.)*

ATF071845

**Defs.' MSJ App. 068**

Mr. Mark Barnes                                                    Page 2

The National Firearms Act of 1934 (NFA), 26 U.S.C. § 5845(a), defines **"firearm"** as:

*"... (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection **(6) a machinegun;** (7) any silencer (as defined in 18 U.S.C. § 921); and (8) a destructive device. The term 'firearm' shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the ...[Attorney General] ... finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon."*

As you know, the NFA defines the term **"machinegun"** to mean—

*"...any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. **The term shall also include the frame or receiver of any such weapon,** any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."* (See 26 U.S.C. § 5845(b).)

As background to our findings, every licensed manufacturer has to meet all of the following Federal marking requirements that are specified in 27 CFR 478. 92:

*...each licensed manufacturer or licensed importer of any firearm manufactured or imported shall legibly identify each such firearm by engraving, casting, stamping (impressing), or otherwise conspicuously placing or causing to be engraved, cast, stamped (impressed) or placed on the frame or receiver thereof in a manner not susceptible of being readily obliterated, altered, or removed, an individual serial number not duplicating any serial number placed by the manufacturer or importer on any other firearm, and by engraving, casting, stamping (impressing), or otherwise conspicuously placing or causing to be engraved, cast, stamped (impressed), or placed on the frame or receiver, or barrel thereof in a manner of not susceptible of being readily obliterated, altered or removed, the model, if such designation has been made; the caliber or gauge; the name (or recognized abbreviation of same) of the manufacturer and also, when applicable, of the importer; in the case of a domestically made firearm, the city and State (or recognized abbreviation thereof) wherein the licensed manufacturer maintains its place of business; and in the case of an imported firearm, the name of the country in which manufactured and the city and State (or recognized abbreviation thereof) of the importer.*

Mr. Mark Barnes                                                      Page 3

Furthermore, for firearms manufactured or imported on and after January 30, 2002, the engraving, casting, or stamping (impressing) of the serial number must be to a minimum depth of .003 inch and a minimum height of 1/16 inch. All other markings must be of a minimum depth of .003 inch.

As you are aware, a firearm frame or receiver is a "part" of a weapon. Pursuant to Federal law, it is a specific item that is itself a "firearm" under the GCA and a "machinegun" under the NFA. The GCA implementing regulations, 27 CFR 478.11, define frame or receiver as "that part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." Whereas before the GCA Federal law regulated "any part or parts of a firearm," Congress determined that this was impracticable and, in passing the GCA, determined that only the receiver would be regulated. This definition was necessary in order to identify that part of the firearm so that the public would be able to identify the regulated item.

The regulatory definition does not therefore require that a "precursor receiver" be capable of accepting installation of the fire-control components before it may be regulated. Because the regulatory definition speaks of the part (portion) that "provides housing," it is a standard used to determine which portion of the completed weapon is considered the "firearm frame or receiver." The regulatory definition is not a standard used to determine whether a particular item has reached a stage such that it is properly classified as a "frame or receiver." In this way, the regulatory definition answers the question "what" and not "when."

The critical inquiry, then, is the point at which an unregulated piece of metal or plastic becomes a regulated item under Federal law. ATF has long held that a piece of metal or plastic becomes a "part" when it reaches a critical "stage of manufacture." This is a point at which a substantial step has been taken, or a critical line crossed, so that the item in question may be so classified under the law. To fall under the purview of the GCA, NFA or AECA, an item needn't be capable of functioning to have reached a critical stage of manufacture. Indeed, Congress concluded that to make a specific item regulated by the GCA or NFA, an items need only be designed, re-designed, intended, readily convertible, readily restored, or combined with other parts.

ATF's position is best understood by considering alternatives. For example, in AR-type firearm receivers, ATF could have determined that the critical "stage of manufacture" was the creation of the magazine well. After all, an AR-type firearm cannot function as designed unless it can accommodate a magazine. However, this position would have permitted possessors to create a fire-control cavity, install the fire-control components, attach an upper assembly and fire a projectile without ever creating a "firearm receiver." This is clearly contrary to the statute.

Further, ATF might have determined that a piece of metal or plastic is not a "firearm receiver" until the cavity is capable of housing all of the fire-control components. However, this would have permitted the unregulated manufacture of receiver "blanks" in

Mr. Mark Barnes                                                    Page 4

which all but one of the major processes are completed.  For example, a manufacturer could avoid licensing and prohibited persons could lawfully possess "receiver blanks" with all but one fire-control component pin hole drilled.  Further, this position would permit the manufacturer to index the remaining pinhole as long as the indexing would not create a hole so that the final component may be installed.

The point at which a firearm frame or receiver can be recognized as such is necessarily different from firearm to firearm due to the multitude of different model designs, methods of operation, features, material, and manufacturing methods. ATF has noted that such determination depends upon whether the item "can be brought to a stage of completeness that will allow it to accept the firearm components to which it is designed for [sic], using basic tools in a reasonable amount of time."

The statutory definition of "firearm" and common-sense law enforcement and public safety considerations support ATF's position.  The GCA defines firearm, in relevant part, as a "weapon capable of expelling a projectile by the action of an explosive" and as a "frame or receiver of such weapon."  In passing the GCA, Congress explicitly intended that the critical factor in determining whether an item is a "firearm" is that item's ability to expel a projectile by the action of an explosive.  Therefore, ATF has long held that because the fire-control cavity is the area that is vital to the item's ability to expel a projectile, it is appropriate to focus on this area in making classifications.

Further, to require that an item be fully functional as a firearm receiver before it may be classified as such would allow manufacturers to substantially complete a receiver, leaving a purchaser to complete minor operations to make it fully functional.  Such classification would allow manufacturers to avoid licensing, regulation, and serialization requirements, while permitting individuals to receive nearly functional weapons with no background checks.  Such a classification would wholly undermine the Gun Control Act of 1968.

Finally, this analysis applies to frames and receivers of machineguns as well.  There is no requirement that a machinegun receiver expel a projectile.  That is, the receiver is only a "part" of the complete weapon and therefore, as only a receiver, it need not expel a projectile to be designated as such.  ATF classifies machinegun receivers based upon the design feature that results in automatic fire.

For example, to be made in to a machinegun, an AR-type firearm requires a sear pin hole in the receiver and, often, a widening of the fire-control cavity in order to accommodate a sear.  For this reason, ATF classifies any AR-type receiver with the sear pin hole as a machinegun.  In comparison, the 7.62mm chain gun receiver incorporates design features found only on electro-driven machineguns.

ATF071848

Defs.' MSJ App. 071

Mr. Mark Barnes                                              Page 5

The subject firearm incorporates a "highly machined" firearm receiver, complex in design, which incorporates machinegun features and is further capable of accepting machinegun components such as a chain drive assembly, chain gun bolt assembly, motor and gear box assembly, which is initiated by an electrical discharge of energy as a part of the firing sequence.

A firearm receiver of this type is the frame or receiver of a weapon, which at no point in the manufacturing process is designed to be a semiautomatic weapon. Further, a chain gun "receiver housing", by design; is a machinegun receiver. Therefore, the subject receiver housing, at any stage in the depicted assembly process is identifiable as a "firearm" as defined in 18 U.S.C. § 921(a)(3) and moreover the frame or receiver of a weapon designed to shoot automatically more than one shot, without manual reloading, by a single function of the trigger; a "machinegun" as defined in 26 U.S.C. § 5845(b).

In conclusion, to reiterate; the "receiver housing" previously reviewed in *Detailed 7.62mm Receiver Determination Overview* submitted by ATK; illustrates a 7.62 mm Automatic Chain Gun receiver housing that is a "firearm" and a "machinegun" as defined in 18 U.S.C. § 921(a)(3) and 26 U.S.C. § 5845(b) respectively.

We thank you and trust that the foregoing has been responsive to your request for further clarification regarding this matter.  If we can be of any further assistance, please contact us.

Sincerely yours,

George Rogers
Acting Chief, Firearms Technology Industry Services Branch



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

|  |  |
|---|---|
| Martinsburg, West Virginia 25405 | 903050:MMK |
| www.atf.gov | 3311/2009-565 |

MAY 2 0 2009

Mr. Chris Coad
Ultra-Tech, Inc.
3003 Power Drive
Kansas City, Kansas 66106

Dear Mr. Coad:

This refers to your letter to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB), with an accompanying sample of a partially machined AR-15 type receiver-casting. You have requested a classification of the sample.

The FTB evaluation of this casting found that the following machining operations had been completed:

- Casting to shape, from aluminum alloy, of an AR-15 type receiver.
- Milling of recesses for the bolt stop and magazine release.
- Milling of the forward and rear take-down pins.
- Milling of the magazine well.
- Threading for the attachment of the buffer tube assembly.
- Drill and tap for the pistol-grip screw.
- Hole for the take-down retaining pin and spring.

The following operations were not completed:

- Drilling of the fire-control (trigger-group) component pivot-pin holes.
- Milling of the cavity for the fire-control (trigger-group) components.

Additionally, we noted that there were no external markings on the receiver.

Our Branch has previously determined that if an AR-type receiver-blank possessed either pivot pin holes or indexing marks for the fire-control components (trigger group); or if any of the cavity for the trigger group had been milled, then the receiver-blank would have been finished to the point at which it could be recognized as a firearm frame or receiver. Your submitted sample does not contain any of these critical features.

ATF000140

Defs.' MSJ App. 073

Mr. Chris Coad

Based on our examination, FTB finds that this sample AR-15 type receiver-casting is not yet finished to the point at which it would be classified as a firearm. As such, it is not regulated by the Gun Control Act or National Firearms Act.

To facilitate the return of the submitted sample, please provide FTB with the appropriate FedEx or other common carrier account information within 60 days of receipt of this letter. If you intend to use UPS, you must make arrangements with them to pick up the item at our location. Alternatively, if you wish to abandon the sample to ATF, you may notify us in writing.

We trust the foregoing has been responsive to your request. If we can be of any further assistance, please contact us.

Sincerely yours,

John R. Spencer
Chief, Firearms Technology Branch



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

---

*Martinsburg, WV 25405*

www.atf.gov

903050:MRC
3311/301179

Mr. Jason Davis
Davis & Associates
27201 Puerta Real
Suite 300
Mission Viejo, CA 92691

Dear Mr. Davis,

This is in reference to your letter dated March 4, 2014, requesting reconsideration of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) determination that the EP80 prototype submitted by EP Arms, LLC. (EP Arms) is classified as a "firearm receiver" under the Gun Control Act of 1968 (GCA). The basis for your request is your belief that ATF's assumptions concerning the manufacturing process for the EP80 were integral to our determination that the prototype constitutes a firearm for purposes of the GCA. That is not correct. To the extent ATF made assumptions about the manufacturing process, it was because details about that process were not provided with the July 30, 2013, request for classification. In any event, for the reasons articulated below, the details provided in your March 4, 2014, letter do not change our ultimate conclusion that the EP80 is a firearm receiver under the GCA.

As you are aware, the GCA, 18 U.S.C. § 921(a)(3), defines the term **"firearm"** as follows: ...*(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.* Further, GCA implementing regulations, 27 CFR § 478.11, define "firearm frame or receiver" as "that part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."

Our examination of this EP80 prototype submitted by EP Arms confirmed that it had the following features and characteristics:

1. Magazine well.
2. Magazine catch.
3. Bolt catch.
4. Pistol grip.
5. Forming and tapping for receiver-extension/buffer tube.
6. Front pivot-pin hole.
7. Rear take-down hole.
8. Holes drilled for the detent take-down and pivot pin, retainer buffer, detent fire-control selector and pistol-grip screw.

Further examination by the Firearms Technology Branch (FTB) revealed that excess material extended past the exterior walls of the casting, indicating the approximate locations of the holes to be drilled for the selector, hammer, and trigger pins.

In our initial classification this office included analysis of two separate and distinct issues. First, we advised that the EP Arms submission was a firearm receiver because the fire control cavity was created during the manufacturing process and was later filled with polymer—the item referred to in your appeal as the "biscuit." *In addition,* we noted that filling the fire control cavity with plastic was not sufficient to destroy the firearm.

You have not appealed this determination as being incorrect, but are appealing the determination that the EP80 receiver is a firearm because the manufacturing process differs from what is described in our determination letter. In your request for reconsideration, you describe that during the manufacturing process, the area comprising the fire control cavity is formed around a nylon core that you refer to as a "biscuit" and that at no stage in the manufacturing is the EP80 "back filled."

We previously advised that "the filling of the cavity at a later point does not change our classification....ATF has long held that this is not sufficient to destroy the receiver and remove the item from classification as a 'frame or receiver.'" We included this analysis to address any contention that inserting the biscuit would remove the item from classification as a firearm receiver.

However, based upon your newly supplied description of the EP Arms manufacturing process, we agree that this aspect of our analysis is not applicable to the EP80, as the biscuit is not meant to destroy the firearm. In fact, we understand that your contention is that this process prevents the item from reaching a stage of manufacture in which it may be classified as a "firearm receiver" claiming that "[a]t no time is a fire-control cavity formed during the manufacturing process....In fact; at no time does a fire-control cavity exist in the manufacturing process." We disagree.

The EP Arms manufacturing process represents a change from the processes by which AR-type firearms have historically been produced. ATF has long held that items such as receiver blanks–"castings" or "machined bodies" in which the fire-control cavity area is

Defs.' MSJ App. 076

completely solid and un-machined – have not yet reached a "stage of manufacture" to be classified as a "firearm receiver." These items are a *single piece of metal* that require a substantial amount of machining to the vital areas of the firearm. In your request for reconsideration, you noted several letters in which FTB determined that certain submissions were not firearm receivers. However, in each of those examples the fire-control cavity was the same material as the receiver itself and the material filling the fire-control cavity is integral to the item; therefore the fire-control "cavity" had not been created.

To illustrate, photo 1 is a receiver "blank." This is not classified as a "firearm receiver" because the fire-control cavity has not been machined in any way. It is a single piece of metal from which a firearm receiver may be produced through further machining.

Location of the Fire Control Cavity



**Photo 1**

To further illustrate this difference between the EP Arms manufacturing process and traditional metal "castings" or "machined bodies," consider the following. Photo 2 is an AR-type receiver with a fully machined fire-control cavity. The red box outlines the cavity. This is classified as a firearm receiver pursuant to the GCA.



**Photo 2**

ATF000250

**Defs.' MSJ App. 077**

Photo 3 is an example of the EP Arms submission. The "biscuit" is the white portion—the exact size and dimensions of the functional fire-control cavity. Notice that the biscuit outlines the fire-control cavity as shown in photo 2.



**Photo 3**

Photo 4 is a side-view of the EP Arms design. The top sample is made of clear plastic and shows that the biscuit creates the internal dimensions of the fire-control cavity.



**Photo 4**

The photos illustrate that the EP Arms manufacturing process creates a fire-control cavity through the use of a "biscuit."

Accordingly, based upon your description of the EP Arms manufacturing process, the EP Arms submission is distinguishable from other "castings" or "blanks" that are not

ATF000251

Defs.' MSJ App. 078

classified as firearms. Unlike "castings" or "blanks" which are formed as a single piece so that a fire-control cavity has not been made, EP Arms uses the biscuit specifically to create that fire-control cavity during the injection molding process. As described in your letter, it appears that the sole purpose of the "biscuit" is to differentiate the fire-control area from the rest of the receiver and thus facilitate the process of making the receiver into a functional firearm. ATF has long held that "indexing" of the fire-control area is sufficient to require classification as a firearm receiver. Based upon the EP Arms manufacturing process, it is clear that the "biscuit" serves to index the entire fire-control cavity. In fact, the biscuit is meant to differentiate the fire-control cavity from the rest of the firearm so that it may be easily identified and removed to create a functional firearm. See photo 5.



**Photo 5**

Therefore, the submitted sample is properly classified as a "firearm" as defined in 18 U.S.C. 921(a)(3) because the fire-control area is created during the manufacturing process through the use of the biscuit.

In addition to the formation of the fire-control cavity in the manufacturing process, your manufacturing process results in "excess material extending past the exterior walls of the casting, indicating the approximate locations of the holes to be drilled for the selector, hammer, and trigger pins." Based upon our previous understanding of the EP Arms manufacturing process, we did not analyze whether this excess material, on its own, would be sufficient to warrant classifying the EP80 as a firearm receiver. However, to remove any doubt about the correctness of our classification decision, we are including that analysis here.

The AR-15 platform is a two-part system generally comprised of a lower and an upper assembly. The lower assembly is classified as the receiver and a "firearm" because it provides the housing for the hammer and the firing mechanism, and contains mounting points for the upper assembly which accepts the barrel and houses the bolt or

breechblock. As stated above, an AR-15 receiver blank is not classified by ATF as a firearm. The point in the manufacturing process at which an AR-15 blank is classified as a firearm is when it has been indexed for or machined in the fire-control recess area. Such a receiver may also have had other machining performed, such as drilled pivot-pin and takedown-pin hole(s). However, based upon your explanation of the manufacturing process, this excess material indexing the location for the holes to be drilled is, by itself, sufficient to classify the sample as a firearm receiver. See photo 6, below.



Indexing for the selector, hammer, and trigger pins

**Photo 6**

If you require further information concerning our findings, we can be contacted at any time.

Sincerely yours,

Earl Griffith
Chief, Firearms Technology Branch

Defs.' MSJ App. 080



# Definition of "Frame or Receiver" and Identification of Firearms

**27 CFR Parts 447, 478, and 479**

**Docket No. 2021R-05; AG Order No.**
**RIN 1140-AA54**
**Final Rule**

***Regulatory Impact Analysis and Final Regulatory FlexibilityAnalysis***

**April 2022**

Prepared by:
Office of Regulatory Affairs
Bureau of Alcohol, Tobacco, Firearms, and Explosives
Washington, D.C.

ATF071142

**Defs.' MSJ App. 081**

# Table of Contents

Executive Summary                                    8
1.      Introduction                                 10
   1.1. Statutory Authority ...............................................................................................11
   1.2. Need for Federal Regulatory Action .........................................................................11
   1.3. Regulatory Changes from the NPRM to the Final Rule ................................................14
2.      Definition of Frame or Receiver      17
   2.1. Need for a Definition of Frame or Receiver ...............................................................17
   2.2. Population for Definition of Frame or Receiver ..........................................................18
   2.3. Costs for Definition of Frame or Receiver .................................................................19
   2.4. Definition of Frame or Receiver Benefits ..................................................................21
3.      Silencers   22
   3.1. Need for Change in Markings on Silencers ................................................................22
   3.2. Comments Received on Silencers .............................................................................23
   3.3. Population of Silencers ...........................................................................................24
      3.3.1. Population of FFL Manufacturers of Silencers    24
      3.3.2. Population of Individual Owners of Silencers     24
   3.4. Costs Related to Silencers .......................................................................................25
      3.4.1.     Costs for Silencer Manufacturers        25
      3.4.2.     Costs for Individual Silencer Owners   25
   3.5. Benefits Related to Silencers ...................................................................................26
4.      FFL and Non-FFL Manufacturers of Firearm Kits .............................................................27
   4.1. Need to Include Firearms Kits in the Definition of Firearm ............................................27
   4.2. Comments Received on Manufacturers .......................................................................28
   4.3. Population for Firearm Parts Kits .............................................................................29
      4.3.1.     Population of Manufacturers of Firearm Parts Kits     29
      4.3.2.     Population of Dealers and Individuals with Firearm Parts Kits        30
   4.4. Costs to Manufacturers of Firearm Parts Kits ...........................................................30
      4.4.1.     Scenario 1: 1 Non-FFL Manufacturer Becomes Licensed as an FFL  33
      4.4.2.     Scenario 2: FFL Manufacturers to Serialize Firearm Parts Kits        41
      4.4.3.     Scenario 3: Non-FFL Manufacturers That Cease Business       42
      4.4.4.     Summary of Costs for Manufacturers of Firearm Parts Kits    43
   4.5. Benefits of Regulating Firearm Parts Kits ..................................................................45
5.      Privately Made Firearms and FFL and non-FFL Dealers of Firearm Kits .......................50
   5.1. Need for Markings on PMFs .....................................................................................50
   5.2. Comments Received on FFL and non-FFL Dealers .......................................................51
   5.3. Population of Markings on Firearms Kits and PMFs.......................................................57
      5.3.1.     Population of FFL and Non-FFL Manufacturers of Firearm Parts Kits with a
      Partially Complete "Frame or Receiver"57
      5.3.2.     Population of FFL and non-FFL Dealers          57
      5.3.3.     Population of Type 03 FFL Collectors 59
      5.3.4.     Population of Individuals          60

ATF071143

Defs.' MSJ App. 082

5.4.  Cost of Markings on Weapon Parts Kits and PMFs for FFL and non-FFL Dealers ..........61
    5.4.1.    Costs for Non-FFL Manufacturers    62
    5.4.2.    Costs for FFL and non-FFL Dealers    62
    5.4.3.    Costs for Individuals to Mark PMFs    75
5.5.  Benefits of Marking PMFs ..................................................................................78
6.      Gunsmithing            79
6.1.  Need for Change in Definition of Gunsmithing .......................................................80
6.2.  Comments Received on Gunsmithing ...................................................................80
6.3.  Gunsmithing Population ....................................................................................81
6.4.  Gunsmithing Costs ..........................................................................................82
6.5.  Benefits for Changing the Definition of Gunsmithing .............................................88
7.      Record Retention          89
7.1.  Comments Received on Indefinite Records Retention..............................................89
7.2.  Need for Record Retention ...............................................................................93
7.3.  Population for Record Retention.........................................................................94
7.4.  Costs for Record Retention ...............................................................................96
7.5.  Benefits of Record Retention ...........................................................................106
7.6.  Record Retention Collection of Information .........................................................110
8.      Government Costs          111
9.      Summary of the Overall Cost of the Rule..................................................................112
9.1.  Industry Costs................................................................................................112
9.2.  Total Cost of the Rule .....................................................................................114
10.     Analysis of Alternatives Considered ......................................................................115
10.1.  The Final Rule—Definition of Receiver and New Recordkeeping Requirements .........117
10.2.  Alternative 1—No Change ..............................................................................117
10.3.  Alternative 2— Everytown Petition...................................................................118
10.4.  Alternative 3—Grandfather All Existing Firearms and Receivers ............................118
10.5.  Alternative 4—Require Serialization of All Partially Complete Firearms or Split Receivers and Frames and Modular Silencers ...............................................................119
10.6.  Alternative 5—Implement Corrective Taxes .........................................................120
10.7.  Alternative 6—Record Retention Longer than 20 Years, but Less than Indefinite ......120
10.8.  Alternative 7—Requiring Unlicensed Individuals to Mark their Firearms..................121
10.9.  Alternative 8—Allowing the Manufacturer to Designate a Component as the "Receiver" of the Firearm ....................................................................................................121
10.10.  Alternative 9—Non-Regulatory Alternatives .....................................................122
10.11.  Alternative 10—Have Multiple Serial Numbers on a Firearm ...................................122
11.     Final Regulatory Flexibility Analysis .....................................................................124
11.1.  Summary of Findings .....................................................................................124
11.2.  Final Regulatory Flexibility Analysis .................................................................125
11.3.  A Statement of the Need for, and Objectives of, the Rule...........................................126
11.4.  A Statement of the Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, a Statement of the Assessment of the Agency of Such Issues, and a Statement of Any Changes Made in the Proposed Rule as a Result of Such

ATF071144

Defs.' MSJ App. 083

Comments.................................................................................................................127

11.5.  The Response of the Agency to Any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Proposed Rule, and a Detailed Statement of Any Changes Made to the Proposed Rule in the Final Rule as a Result of the Comments. ............................................................................................................127

11.6.  A Description of and an Estimate of the Number of Small Entities to Which the Rule Will Apply or an Explanation of Why No Such Estimate is Available. ...................................128

11.7.   A Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities Which Will be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record. ......................................................................................................129

11.8.  A Description of the Steps the Agency has Taken to Minimize the Significant Economic Impact on Small Entities Consistent with the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered by the Agency Which Affect the Impact on Small Entities was Rejected............129

12.      Collection of Information          131

13.      Appendix: Retail Prices of Firearm Parts Kits with Partially Complete "Frames or Receivers"          136

ATF071145

Defs.' MSJ App. 084

# Tables and Graphs

Table ES.1.  Summary of Affected Population, Costs, and Benefits 8

Table 4.1.  Cost for a Form 7 Application to Become a Type 07 FFL        35

Table 4.2.  Cost to Purchase a Laser Engraver        36

Table 4.3.  Cost to Purchase an Air Handler  36

Table 4.4.  Wage Categories for Metal and Plastic Workers  39

Table 4.5.  Hourly and Wage Burden to Update and Maintain Production and Disposition Records        40

Table 4.6.  Per FFL and Total First-Year Cost to Become a Type 07 Manufacturer FFL    40

Table 4.7.  Cost Per Manufacturer of Firearm Parts Kits        43

Table 4.8.  Industry Cost for Manufacturers of Firearm Parts Kits   44

Table 4.9.  10-Year Cost for FFL and Non-FFL Manufacturers of Firearm Parts Kits        44

Table 4.10.  Number of Traces of Suspected PMFs from 2016 Through 2021        47

Graph 4.1.  Total Suspected PMFs by Year   48

Table 5.1.  Number of PMFs in Circulation  61

Table 5.2.  Range of Individuals Who Currently Own PMFs        61

Table 5.3.  Wage Categories Used for Gunsmithing Activities        64

Table 5.4.  Per FFL Dealer Cost to Engrave Existing Inventory of Firearm Parts Kits with a Partially Complete "Frame or Receiver"        65

Table 5.5.  Annually Recurring Cost to Engrave PMFs Held Overnight in Inventory        66

Table 5.6.  Summary of Costs for FFL Dealers with Gunsmithing Capabilities        67

Table 5.7.  Wage Rate for a Non-Specialized Employee        69

Table 5.8.  Hourly Burden and Cost to Dispose of Existing Inventory of Firearm Parts Kits with a Partially Complete "Frame or Receiver"        70

Table 5.9.  Retail Price of Firearm Parts Kits with a Partially Complete "Frame or Receiver"        70

Table 5.10.  Application Cost to be a Type 01 or 02 FFL        73

Table 5.12.  One-time Cost for Non-FFL Dealers to Engrave Existing Inventory of Firearm Parts Kits with a Partially Complete "Frame or Receiver" 74

ATF071146

Defs.' MSJ App. 085

Table 5.13.  Summary of Costs for a Non-FFL Dealer to Become Licensed as an FFL Dealer
        75

Table 5.14.  Cost for Milage to an FFL          76

Table 5.15.  Leisure Wage Rate for Individuals          77

Table 5.16.  Individual Cost to Go to an FFL (Roundtrip)          77

Table 6.1.  Wage Categories Used for Gunsmithing Activities          83

Table 6.2.  Hourly Burden Due to Additional A&D Entries  84

Table 6.3.  Cost to Mark Firearms          85

Table 6.4.  Annually Recurring Cost to Engrave PMFs Held in Inventory   87

Table 7.1.  Summary Comparing Total Type 01 and 02 FFLs to Affected Type 01 and 02 FFLs
        95

Table 7.2.  Number of FFLs, Boxes, and Number of Records over 20 Years Sent to ATF   96

Table 7.3.  Application and Renewal Cost for a Form 7 Application for Type 01 and Type 02
FFLs   97

Table 7.4.  10-year Cost of FFLs Applying for a New License          99

Table 7.5.  Average Monthly Price of Electronic Storage          100

Table 7.6.  Historical and Projected NICS and NFA Transactions          102

Graph 7.1.  Historical and Projected Growth of NICS and NFA Transactions          103

Table 7.7.  Projected Number of Pages for NICS and NFA Transactions, Paper Cost, Per-FFL
Savings from Reduced Paper Printing, and Per-FFL Net Cost          105

Table 7.8.  Industry Cost for Records Retention          106

Table 7.9.  Numbers and Percentages of Traces of Firearms Over 20 Years Old and Successful
Prosecution Rates.          109

Table 9.1.  Industry Cost by Action          112

Table 9.2.  Total 10-year Cost of the Rule          114

Table 10.1.  Summary of Cost and Benefits of the Alternatives          115

ATF071147

Defs.' MSJ App. 086

Abbreviations

| | |
|---|---|
| ATF | Bureau of Alcohol, Tobacco, Firearms, and Explosives |
| BLS | Bureau of Labor Statistics |
| CFR | Code of Federal Regulations |
| FATD | Firearms Ammunitions Technology Division |
| FFL | Federal Firearms Licensee |
| IRFA | Initial Regulatory Flexibility Analysis |
| NAICS | North American Industry Classification System |
| NPRM | Notice of Proposed Rulemaking |
| OMB | Office of Management and Budget |
| PMF | Privately Made Firearm |
| RFA | Regulatory Flexibility Act |
| § | Section symbol |
| SBA | Small Business Administration |
| SME | Subject Matter Experts |
| U.S. | United States |
| U.S.C. | United States Code |

ATF071148

**Defs.' MSJ App. 087**

# Executive Summary

Executive Order 12866 (Regulatory Planning and Review) directs agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic benefits, environmental benefits, public health and safety effects, distributive impacts, and equity). Executive Order 13563 (Improving Regulation and Regulatory Review) emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility.

The Attorney General has determined that while the final rule is not economically significant, it is a "significant regulatory action" under section 3(f)(4) of Executive Order 12866 because the final rule raises novel legal or policy issues arising out of legal mandates. Accordingly, the final rule has been reviewed by the Office of Management and Budget ("OMB").

This Regulatory Impact Analysis ("RIA") provides supporting documentation for the regulatory evaluation in the preamble of the final rule for the Definition of Frame or Receiver and Identification of Firearms [2021R-05F].

Table ES.1.  Summary of Affected Population, Costs, and Benefits

| Category | Final Rule |
|---|---|
| Applicability | • Definition of Frame or Receiver<br>• Updates Marking Requirements<br>• Gunsmithing Definition<br>• Updates Record Retention |
| Affected Population | • 113,204 FFLs |

ATF071149

| | |
|---|---|
| | • 19,449 FFL Type 07 Manufacturers<br>• 43 Non-FFL Manufacturers<br>• 114,001 FFL Dealers, Pawnbrokers, and Collectors<br>• 24 Non-FFL Dealers<br>• Approximately 1 Million Individual Owners |
| Total Costs to Industry, Public, and Government (7 percent Discount Rate) | $14.3 Million Annualized |
| Benefits (7 percent Discount Rate) | Not Estimated |
| Benefits (Qualitative) | • Provides clarity to courts on what constitutes a firearm frame or receiver<br>• Adapts to new technology/terminology<br>• Makes consistent markingrequirements<br>• Eases certain marking requirements<br>• Increase tracing of crime scenefirearms to prosecute criminals<br>• Restricts felons and other prohibited persons from acquiring PMFs |

-9-

ATF071150

Defs.' MSJ App. 089

# 1. Introduction

This analysis provides an assessment of the impacts to industry, the public, and government from the changes that are detailed in the final rule titled Definition of "Frame or Receiver" and Identification of Firearms. This RIA does not attempt to precisely replicate the regulatory language of the final rule; the regulatory text of the published rule, not the text of this analysis, is legally binding. Furthermore, in the calculations presented throughout the RIA, the various totals do not add up precisely due to rounding in the calculation process. Additionally, the prices for items that are cited and relied on throughout the RIA are the prices that were found at the time ATF conducted the analysis and therefore may differ from the prices listed at or after the time of publication. ATF cannot account for inevitable fluctuations in market prices over time.

The final rule does the following:

- Provides definitions of "frame or receiver" and "privately made firearms" ("PMFs") that would encompass and adapt to technological advances in the industry, as well as changes in firearms terminology;

- Requires consistent marking requirements for firearms, including mufflers and silencers;

- Adds weapon parts kits and frame or receiver parts kits containing partially complete frames or receivers that may readily be converted to function to the definitions of "firearm" and "frame or receiver";

- Extends recordkeeping retention requirements from 20 years to indefinitely;

- Allows for greater electronic storage of transaction records in lieu of paper records; and

-10-

**Defs.' MSJ App. 090**

- Clarifies the definition of gunsmithing to include marking by licensed dealer-gunsmiths.

1.1.  Statutory Authority

The Attorney General is responsible for enforcing the Gun Control Act of 1968 ("GCA"), as amended, and the National Firearms Act of 1934 ("NFA"), as amended.  This responsibility includes the authority to promulgate regulations necessary to enforce the provisions of the GCA and NFA.  *See* 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(A), 7805(a).  Congress and the Attorney General have delegated the responsibility for administering and enforcing the GCA and NFA to the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") of the Department of Justice ("Department"), subject to the direction of the Attorney General and the Deputy Attorney General.  *See* 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(b)(1), (c)(1); 28 CFR 0.130(a)(1)–(2); T.D. Order No. 221(2)(a), (d), 37 FR 11696–97 (June 10, 1972).  Accordingly, the Department and ATF have promulgated regulations implementing both the GCA and the NFA.  *See* 27 CFR parts 478, 479.

The final rule provides regulatory definitions to replace "firearm frame or receiver" and "frame or receiver" because they are outdated.  The final rule also amends ATF's definitions of "firearm" and "gunsmith" to clarify the meaning of those terms and to add regulatory terms such as "complete weapon," "complete muffler or silencer device," "multi-piece frame or receiver," "privately made firearm," and "readily" to improve clarity and to account for advancements in firearms technology.  Further, the final rule amends ATF's regulations on marking and recordkeeping to implement these definitions.

1.2.  Need for Federal Regulatory Action

In the notice of proposed rulemaking ("NPRM"), *see* Definition of "Frame or Receiver"

-11-

and Identification of Firearms, 86 FR 27720 (May 21, 2021), ATF stated that the rule would address externalities.  Commenters stated that externalities involve inefficiencies resulting from market transactions.  ATF concurs that the rule would not address externalities due to market inefficiencies; therefore, ATF has removed language that suggested the rule would address a market inefficiency.  Regardless, the publication of the final rule remains necessary to enforce the GCA and NFA.

Agencies take regulatory action for various reasons.  One of the reasons is to carry out Congress's policy decisions, as expressed in statutes.  Here, this rulemaking aims to apply Congress's policy decision to require licensing, marking, recordkeeping, and background checks so that firearms can be traced if used in crimes and to prevent felons and other prohibited persons from acquiring them.

The final rule is necessary to address recent court cases that have narrowly construed ATF's current regulatory definition of "frame or receiver."  Such a narrow construction of the regulatory term creates the possibility that future courts may hold that the overwhelming majority of regulated firearm frames or receivers do not meet the existing definition. Furthermore, administrative inspections, criminal investigations, and prosecutions are hindered when PMFs are accepted into and disposed of from a licensee's inventory, and when firearms records are destroyed after 20 years despite the need of these records to combat criminal activities.

The final rule removes and replaces the existing definitions of "frame or receiver" to account for technological advances in the industry and to ensure that these firearms continue to remain under the regulatory regime as intended by the enactment of the GCA.  Among other

-12-

things, these changes address the manufacturing of firearms using multiple manufacturers and the making of PMFs.  The narrow interpretation of what constitutes a "frame or receiver" by some courts may potentially allow persons to avoid: (a) having to obtain a license to engage in the business of manufacturing or importing frames or receivers; (b) identifying frames or receivers with a serial number and other traceable markings; (c) maintaining records of produced or imported frames or receivers that are necessary for tracing the frames or receivers; and (d) running National Instant Criminal Background Check System ("NICS") checks on potential transferees to determine if they are legally prohibited from receiving or possessing firearms when they acquire frames or receivers.  These consequences could, in turn, allow otherwise prohibited persons to acquire frames or receivers that can quickly be assembled into semiautomatic weapons easily and without a background check.[1]

If no portion of split or multi-piece frames or receivers were subject to any existing regulations—such as marking, recordkeeping, or background checks—law enforcement's ability to trace firearms used in the commission of a crime would be severely impeded.  The final rule makes marking requirements consistent to facilitate tracing in the event a firearm is used in the commission of a crime.  In order to accommodate additional marking requirements, the final rule expands the definition of "gunsmithing" to expressly allow licensed dealer-gunsmiths to mark firearms without a manufacturer's license.  In addition, the final rule requires Federal firearms licensees ("FFLs") to retain all firearms records, either in hard copy or electronically, until the

---

[1] *See* Ake Bleiberg & Stefanie Dazio, *Design of AR-15 could derail charges tied to popular rifle*, Associated Press (Jan. 13, 2020), *available at* https://apnews.com/article/396bbedbf4963a28bda99e7793ee6366 (last visited Mar. 24, 2022).

-13-

Federally licensed firearms business or licensed activity is discontinued. For more specific details regarding the need for regulation, please refer to the specific chapters pertaining to each provision of the final rule.

1.3. Regulatory Changes from the NPRM to the Final Rule

Section V of the final rule's preamble describes the regulatory text of the final rule and changes from the proposed rule. The following is a list of substantive changes from the NPRM to the final rule:

(1) Definition of frame or receiver

- The final rule describes one part of a projectile weapon that will be either the "frame" or "receiver" with examples and pictures.

- The final rule defines "variant" and more clearly grandfathers existing classifications (*e.g.*, AR-15/M-16 variants).

- The final rule clarifies the one part of a firearm muffler or silencer device that is the frame or receiver and addresses how modular silencers are marked.

- The final rule defines "multi-piece frame or receiver" and specifically addresses how such items should be marked.

- The final rule clarifies the supplement titled "partially complete, disassembled, or nonfunctional frame or receiver" and provides examples.

- The final rule clarifies the items and materials that need to be submitted when voluntarily seeking a firearm or armor piercing ammunition classification from ATF.

(2) PMFs

- The final rule requires FFLs to mark and record PMFs only when they are received or

-14-

Defs.' MSJ App. 094

otherwise acquired into inventory, but allows PMFs to be adjusted or repaired and returned by licensed dealer-gunsmiths on the same day without marking.

- The final rule allows FFLs to directly supervise a nonlicensee that may mark the PMF for the licensee in accordance with the regulations.
- The final rule clarifies who is required to be licensed as a gunsmith eligible to mark PMFs without a manufacturer's license.

(3) Marking

- The final rule defines "new design" to inform manufacturers as to when they are required to mark firearms they manufacture in accordance with the new marking requirements (*i.e.*, either FFL name, city, and State, or FFL name and abbreviated FFL number placed on the frame or receiver).
- The final rule expands the adoption of marking allowances and addresses three additional circumstances where markings can be adopted. This expansion includes newly manufactured firearms, manufacturers performing gunsmithing services, and PMFs marked by nonlicensees.
- The final rule provides that an acceptable way for PMFs to be marked is by placing the serial number on a metal plate that is permanently embedded into a polymer frame or receiver, or other method approved by the Director of ATF ("Director").

(4) Recordkeeping

- The final rule clarifies that manufacturers have seven days to enter non-NFA firearms into their records, and by close of the next business day for manufactured NFA firearms.

-15-

- The final rule clarifies that licensed dealers (including gunsmiths), manufacturers, and importers may conduct adjustments or repairs of all firearms without recording them as acquisitions or dispositions provided they are returned to the person from whom they were received on the same day.

- The final rule clarifies that PMFs must be recorded as an acquisition when a licensee places marks of identification and as a disposition upon return (unless the licensee is marking under the direct supervision of another licensee that recorded the acquisition).

(5) Record retention

- The final rule clarifies that FFLs are required to maintain their records until the business or licensed activity is discontinued.

-16-

ATF071157

**Defs.' MSJ App. 096**

# 2.  Definition of Frame or Receiver

The final rule provides definitions to replace "firearm frame or receiver."  It updates how frames or receivers are defined, incorporating various configurations, such as split or multi-piece receivers, as well as firearm parts kits with partially complete "frames or receivers."[2]  The final definition of this term will maintain current classifications and current marking requirements of frames or receivers, except that the name, city, and State (or, alternatively, the name and abbreviated license number) of the manufacturer or importer must be marked on the frame or receiver along with the serial number.  In contravention of ATF's interpretation of its own regulation, some courts have narrowly construed the regulatory definition of frame or receiver. This narrow construction of ATF's regulatory definition of "frame or receiver" as not applying to split receivers like the AR-15 would mean that a large percentage of all firearms now in existence do not have an identifiable frame or receiver.

All new or unclassified frames or receivers will be required to be marked according to the final rule.  Markings must be placed within seven days of completion of a GCA weapon (or "frame or receiver," if not being sold as a complete weapon), or by close of the next business day for NFA firearms.

## 2.1.  Need for a Definition of Frame or Receiver

---

[2] As explained in chapter 4 of this RIA, the final rule clarifies that weapon parts kits that are "designed to or may readily be assembled, completed, converted, or restored to expel a projectile by the action of an explosive" are included under the definition of "firearm."  Furthermore, the final rule clarifies that "frame or receiver parts kits" are included in the definition titled, "partially complete, disassembled, or nonfunctional frame or receiver" that supplements the definition of "frame or receiver."  Because both "weapon parts kits" and "frame or receiver parts kits" are "firearms" under the definition, this analysis uses the term "firearm parts kits" to refer to both.

ATF071158

Defs.' MSJ App. 097

Currently, the definition of "firearm frame or receiver" is outdated and does not account for advances in technology or terminology.  As it exists, the current definition of "firearm frame or receiver" does not capture the vast majority of firearms that are commercially available. Although numerous firearms manufacturers have asked for and received a classification from ATF as to which component or part of a new firearm design constitutes the frame or receiver, some courts have determined the current regulatory definition of "firearm frame or receiver" does not capture the portion of the firearm that ATF had determined to be a "frame or receiver."

ATF's regulatory definition of "frame or receiver" has not been updated since it was first published, and thus it does not reflect innovations made by the industry.  Although the majority of FFLs that manufacture or import firearms (Type 07 and Type 08 FFLs) request determinations from ATF's Firearms Ammunitions Technology Division ("FATD") as to which part of their firearm is the frame or receiver, these determinations have largely relied on ATF policy that interprets the existing regulatory definitions.

2.2.  Population for Definition of Frame or Receiver

The definition of "frame or receiver" affects Type 07 FFLs that manufacture or sell firearms with split or multi-piece receivers.  Based on ATF's licensing database, there are 19,449 Type 07 FFLs that could potentially be affected by the final rule.  The rule will also affect non-FFLs that may request a determination (or "classification") letter for multi-piece frame or receiver designs for the purpose of establishing that they are not producing a frame or receiver that falls under the regulatory definition.  This definition will not affect FFLs that import firearms (Type 08) because they already need a determination in order to be able to import firearms.

ATF071159

This chapter does not address manufacturers or retailers of firearm parts kits with partially complete "frames or receivers."  For information regarding manufacturers of firearm kits with a partially a complete frame or receiver, please refer to chapter 4 of this analysis.  For retailers of firearm parts kits with partially complete "frames or receivers," please refer to chapter 5 of this analysis.

## 2.3.  Costs for Definition of Frame or Receiver

Under the proposed rule, licensed manufacturers of firearms would have been required to serialize multiple parts of a "frame" or "receiver" if the firearm was a new split frame or receiver design unless they had asked for and received a determination letter from ATF.  Existing designs would have been grandfathered in, and would have been serialized in accordance with the existing marking requirements.  Public comments stated that serializing multiple parts of a firearm would be cost prohibitive.  Manufacturers opined that they would need to submit a request to ATF for a determination or classification letter for every modification or design change to existing firearms, significantly increasing the time to receive a determination or classification letter from FATD, which they stated currently takes about one year.  Based on the comments received, ATF concurs that serializing multiple parts of a firearm would be cost prohibitive and therefore has changed the definition of "frame or receiver" in the final rule to identify only one part of a firearm as the "frame or receiver."  Furthermore, all existing classifications and their variants will be grandfathered in and may continue to be identified under the existing marking requirements.

There may be some minor costs to manufacturers under the new marking requirements when they produce a completely new firearm design.  However, because ATF is revising the

-19-

**Defs.' MSJ App. 099**

definition of "frame or receiver" so that it can be applied to identify only one part of the firearm that needs to be marked even when there are new technological designs, ATF anticipates an unknown amount of savings for new designs.  These savings arise from reduced application and wait times for manufacturers because they will not need to make a request for a classification letter from ATF to determine which part of the firearm is the frame or receiver.  ATF is also revising the definition to account for multi-piece frame or receiver designs.  Because these definitions would better clarify which part is the frame or receiver on a split or multi-piece design, Type 07 FFLs will know where to mark the firearm without submitting new requests for determination or classification letters.

However, there is an unknown cost for non-FFL manufacturers that intended to manufacture multi-piece frames or receivers that do not meet the definition of "frame or receiver" in the final rule.  These costs could not be accurately measured because currently there are no known non-FFLs that manufacture multi-piece firearms or receivers that would fall outside the final rule's definition of frame or receiver.  When the final rule is in effect, any such non-FFL manufacturers that do exist will cease submitting applications for a determination or classification letter as a means to ensure that their new designs will fall outside the regulatory regime.  This is because such non-FFL manufacturers will either dissolve their business or become FFLs selling products that fall within the scope of the regulatory regime.

This chapter does not account for partially complete frames or receivers or firearm kits with a partially complete frame or receiver.  Costs incurred by the manufacturers of partially complete frames or receivers or firearm kits with a partially complete frame or receiver are described under chapter 4 of this RIA.

ATF071161

2.4.  Definition of Frame or Receiver Benefits

The definition of "frame or receiver" in this rule would account for many of the innovations made by the industry.  Furthermore, it would clarify to the industry what part of a firearm constitutes a frame or receiver.  Currently, the definition of "firearm frame or receiver" is outdated.  The final rule defines "frame" and "receiver" in a way that consistently identifies one part of the projectile weapon or muffler or silencer device that would need to be marked.  In addition, it would provide clarity to the courts on how the definition of frame or receiver is to be applied to all firearm configurations and variants.

One benefit of the new marking provisions is that they relax the marking burden in other ways.  Currently, FFL manufacturers and importers that mark their frames or receivers need to mark the name of their company (or an accepted abbreviation of their name) in addition to identifying information such as the city and State in which they operate.  The current requirement may be onerous due to the amount of space available for marking.  The rule would allow FFLs to continue to mark their existing frames or receivers that have already been the subject of an ATF determination or classification letter in the same way they do now.  These FFLs may also switch to the new marking requirements that would apply when they produce a new design.  The new marking requirements require the frame or receiver to be marked with either the FFL's name, city and State, and serial number, or the FFL's name and the serial number beginning with the abbreviated licensee number as a prefix to a unique identification number in the size and depth prescribed by existing marking requirements.

ATF071162

Defs.' MSJ App. 101

# 3. Silencers

The final rule clarifies and makes consistent the marking requirements for silencers (sometimes referred to as "sound suppressors").[3]  Under the final rule, a supplement is provided for "firearm muffler or silencer frame or receiver."  The definition clarifies that manufacturers and makers of complete muffler or silencer devices need only mark the one part of the device defined as the frame or receiver under the rule.  The final rule also describes the part of the silencer device that would need to be marked in the case of a modular design.  By focusing on a single principal part attached to the weapon to be marked, this change decreases the number of parts that might need to be marked for modular silencers while eliminating the need to mark each small internal nonstructural part of a complete muffler or silencer device.  However, individual muffler or silencer parts will need to be individually marked if they are disposed of separately from a complete device unless transferred by qualified manufacturers to other qualified licensees for the manufacture or repair of complete devices.  Thus, in response to comments received, the final rule will require silencers to be marked on the part that provides housing or a structure for the primary internal component designed to reduce the sound of a projectile or, in the case of a modular silencer with more than one such part, the principal housing attached to the weapon that expels a projectile.

## 3.1.  Need for Change in Markings on Silencers

Currently, manufacturers can mark the housing unit or the end caps of a silencer.

---

[3] For purposes of this RIA, the term "silencer" will be used to refer to both firearm mufflers and firearm silencers as defined in 18 U.S.C. 921(a)(24).

ATF071163

However, end caps of silencers wear out more readily than the housing unit, leaving the muffler or silencer without any traceable markings of identification.  The final rule makes clear that the frame or receiver of a silencer does not include the removable end cap of an outer tube.   Further, the final rule clarifies for the industry the one part of a silencer that may be identified as the frame or receiver of the device and the marking requirements applicable to silencers.

3.2.  Comments Received on Silencers

One commenter asserted that ATF underestimated the cost to serialize all parts of a silencer, and another commenter argued that the benefits of requiring additional silencer parts to be serialized does not outweigh the costs.  Also, a commenter asked if ATF would pay for replacement of serialized parts if that part of the silencer is damaged during a repair.

The rule as proposed and finalized requires only the "frame" or "receiver" of a firearm muffler or silencer device to be marked, and the final rule also makes clear which part is the frame or receiver of a modular silencer device.  Based on comments received in response to the NPRM and in response to an earlier advance notice of proposed rulemaking ("ANPRM"), *see* Identification Markings Placed on Firearm Silencers and Firearm Mufflers, 81 FR 26764 (May 4, 2016), the final rule will not significantly change the way the industry currently marks silencers. In most cases, the "frame" or "receiver" would be the outer tube.

Under Federal law, 26 U.S.C. 5842(a), and 27 CFR 479.102, each person manufacturing or making each "firearm"—including a "muffler or silencer," *see* 26 U.S.C 5845(a)—is required to mark the firearm in accordance with the regulations and register it in the National Firearms Registration and Transaction Record ("NFRTR").  The rule as proposed and finalized eliminates the substantial cost of marking each and every individual internal part defined as a muffler or

ATF071164

silencer, including a removable end cap of an outer tube. Additionally, under the rule, individual internal muffler or silencer parts may be transferred by qualified manufacturers to other qualified licensees for further manufacture or repair of complete devices without paying transfer tax or registration, and complete registered devices may be temporarily conveyed for replacement of these internal parts. However, the term "repair" does not include replacement of the outer tube. The outer tube is the largest single part of the silencer, the main structural component of the silencer, and the part to which all other component parts are attached. The replacement of the outer tube is so significant an event that it amounts to the "making" of a new silencer. Hence, new silencer outer tubes must be marked, registered, recorded, and transferred after payment of transfer tax in accordance with the NFA and GCA. By law, this transfer tax is owed by the transferor, not the government. *See* 26 U.S.C. 5811(b).

## 3.3. Population of Silencers

The population of people and entities affected by the portion of the final rule addressing silencers includes manufacturers of silencers (a subset of Type 07 FFLs with a Special Occupational Tax ("SOT")) and individuals who purchase NFA weapons.

### 3.3.1. Population of FFL Manufacturers of Silencers

There are 7,012 Type 07 FFLs with an SOT that manufacture silencers. Of these manufacturers, approximately one percent, or five companies, might be marking on the endcap rather than on the housing (*e.g.*, outer tube). The final rule will not affect manufacturers that already mark the outer tube because that tube would be the "frame" or "receiver" in most cases.

### 3.3.2. Population of Individual Owners of Silencers

Based on the NFRTR, ATF estimates that there are 101,873 individuals who have

ATF071165

**Defs.' MSJ App. 104**

purchased silencers.  Because of changes made to the proposed rule after the receipt of comments, these individuals will not be affected by the final rule.

### 3.4.  Costs Related to Silencers

There are a few silencer manufacturers that mark their silencers solely on the end cap, rather than the outer tube; these manufacturers would be affected only if they mark only the end cap where ammunition exits the silencer.  Because of expected minimal costs for manufacturers to change the location of marking in order to comply with the final rule, ATF does not anticipate the cost of silencers to increase and be passed onto individuals purchasing silencers.  Please refer to the section below for manufacturing costs.

#### 3.4.1.   Costs for Silencer Manufacturers

Markings on silencers under the final rule will be required on those parts that provide housing or a structure for the primary internal component designed to reduce the sound of a projectile or, in the case of a modular silencer with more than one such part, the principal housing attached to the weapon that expels a projectile.  Based on comments received in response to the ANPRM, most manufacturers mark either the outer tube or the end cap attached to the firearm.  There may be some manufacturers that mark on the end cap where ammunition exits the silencer; however, these manufacturers typically also mark the outer tube.  Furthermore, based on comments received in response to the ANPRM, moving marking locations has minimal costs associated with it so long as the new location can meet the identification, size, and depth requirements under the marking regulations.  Therefore, ATF anticipates only minimal costs associated with moving the serial number or other identifying information to the outer tube.

#### 3.4.2.  Costs for Individual Silencer Owners

-25-

ATF does not anticipate that individuals will be affected by the rule's definition of "frame or receiver," as applied to silencers.  In the NPRM, ATF estimated that this provision of the rule would not have affected individual owners of silencers because the cost to modify the markings on silencers would be minimal and not passed on to individuals.

### 3.5.  Benefits Related to Silencers

The final rule clarifies the definition of frame or receiver as applied to silencers and makes consistent the marking requirements for silencers.  Currently, manufacturers can mark the serial number anywhere on the silencer, including the end cap of a silencer device.  However, end caps of silencers wear out more readily than the housing unit, leaving the muffler or silencer without any traceable markings of identification.  The final rule makes clear that the frame or receiver of a silencer does not include a removable end cap of an outer tube.  The rule provides a definition of frame or receiver as applied to silencers that standardizes marking requirements, allows for increased traceability, and eliminates the cost and confusion of marking each and every individual internal part defined as a muffler or silencer.

ATF071167

**Defs.' MSJ App. 106**

# 4.  FFL and Non-FFL Manufacturers of Firearm Kits

This section addresses FFL and non-FFL manufacturers that produce partially complete, disassembled, or nonfunctional frames or receivers that are often sold within firearm parts kits. The final rule's definitions of "firearm" and "partially complete, disassembled, or nonfunctional frame or receiver" under the definition of "frame or receiver" capture both firearm parts kits that are designed to, or may readily be converted to, expel a projectile (*i.e.*, a weapon parts kit) and firearm parts kits with partially complete frames or receivers (*i.e.*, a frame or receiver parts kit). This analysis therefore uses the term "firearm parts kit" to refer to both weapon parts kit and frame or receiver parts kits because both the weapons and frames or receivers produced from the parts within these kits are subject to regulation as "firearms" under the rule and must be marked with a serial number.

## 4.1.  Need to Include Firearms Kits in the Definition of Firearm

Currently, ATF's definitions of "firearm frame or receiver" and "frame or receiver" are outdated and do not account for advances in firearms technology or terminology.  The reason for ensuring that firearm parts kits are included in the definition of "firearm" and "frame or receiver" is that is that these parts kits, or aggregations of weapon parts, some of which contain all of the components necessary to complete a functional weapon or frame or receiver within a short period of time, have been increasingly sold to individuals either directly from manufacturers of the kits or retailers, without background checks or recordkeeping.  When PMFs are made for personal use, they are not required by the GCA to have a serial number placed on the frame or receiver.  However, when PMFs are relinquished by their makers and enter commerce, the

ATF071168

**Defs.' MSJ App. 107**

absence of markings on PMFs makes it extremely difficult for law enforcement to determine where, by whom, or when they were manufactured and to whom they were sold or otherwise transferred if they are recovered and submitted for tracing.

### 4.2.  Comments Received on Manufacturers

ATF received various comments regarding the methodology used to determine affected populations and costs for non-FFL manufacturers of partially complete frames or receivers and firearms kits.  Several commenters treated manufacturers and retailers of these kits as one group and stated that the population estimated by ATF was too low.  ATF partially concurs that the population was underestimated.  After conducting further internet searches, ATF found more manufacturers and retailers of firearm kits with partially complete frames or receivers, but because the requirements for manufacturers and retailers are different, ATF accounts for them separately in different chapters of the RIA, which makes the numbers per chapter lower than the estimates submitted by some of the commenters.

Many commenters stated that ATF did not know how much of an effect on commerce the rule will have on manufacturers.  Some commenters stated that ATF did not account for the cost of non-FFL manufacturers to become licensed.  Some commenters stated that non-FFLs would be unable to become licensed either due to the costs associated with becoming licensed or because of zoning restrictions, and that ATF did not account for companies going out of business.  One commenter reiterated the opinion that non-FFL manufacturers are not likely to become licensed and that, because most of these companies are small, the final rule will force these companies to go out of business.  Commenters also asserted that ATF did not estimate the impact on revenue the rule will have on the public and that ATF's assumptions were

-28-

unsupported.  One commenter worried that the rule will have a significantly bigger impact than the cost stated in the NPRM.  Several commenters claimed that the rule will cause unemployment.

ATF concurs that the costs were underestimated in the analysis accompanying the proposed rule.  This RIA has revised the methodology and costs associated with the final rule to incorporate the costs and cost scenarios that the commenters suggested might arise.  In response to commenters who stated ATF's assumptions were lacking or unsupported, ATF reiterates that the agency does not maintain consolidated or aggregated records on companies' inventory regardless of whether the items in the inventory are regulated, nor can ATF interview all firearm part manufacturers to determine their intended future actions upon publication of the final rule. ATF can make estimates based on the best available information it can acquire through comments received, willing participants on informational surveys, and ATF subject matter experts, but it cannot determine with complete specificity the actual outcomes of the final rule.

4.3.  Population for Firearm Parts Kits

This chapter describes how the rule's definition of "frame or receiver" affects FFL and non-FFL manufacturers of firearm parts kits.

4.3.1.  Population of Manufacturers of Firearm Parts Kits

The final rule would affect certain FFL and non-FFL manufacturers that manufacture firearm parts kits with partially complete frames or receivers.  As stated previously, ATF does not maintain consolidated or aggregated records of companies' inventory regardless of whether the items the companies produce are regulated.  Therefore, ATF performed a search on the internet to estimate the number of manufacturers that would be affected by inclusion of firearm

-29-

parts kit in the definitions of "firearm" and "frame or receiver."  In the NPRM, ATF estimated that the rule may affect up to 35 non-FFL manufacturers.  86 FR at 27735.  Commenters asserted that the population of non-FFL manufacturers was too low.  ATF performed another search on the internet to determine the number of affected companies and found 84 companies that manufacture firearm parts kits with partially complete frames or receivers.  The search also identified 45 retailers that sell such kits, but retailers are discussed in chapter 5 of this RIA, below.

ATF reviewed FFL licensing information to determine if the 84 manufacturers were FFLs or non-FFLs.  Of the 84 manufacturers identified, ATF verified that 41 of them were FFLs and 43 were not FFLs.  One of these FFLs was found to have become an FFL after the publication of the NPRM, while the other FFLs were licensed prior to the publication of the NPRM.  For purposes of this analysis, ATF estimates that 43 non-FFL and 41 FFL manufacturers will be affected by the final rule.

4.3.2.  Population of Dealers and Individuals with Firearm Parts Kits

For populations and costs pertaining to firearm parts kits in the inventory of Type 01 and 02 FFLs, non-FFL retailers, and individuals, please refer to chapter 5.

4.4.  Costs to Manufacturers of Firearm Parts Kits

Currently, manufacturers of firearm parts kits produce and sell kits that require additional drilling of the frame or receiver in order to make them into a functional weapon or frame or

ATF071171

Defs.' MSJ App. 110

receiver.  A lower receiver parts kit can range in cost from $59.99 to $474.99.[4,5,6,7]  A handgun kit could range from $360 to $800.[8,9,10]  A rifle kit could range from $670 to $750.[11,12,13]  How the final rule will affect manufacturers of such kits depends on whether they are FFLs and on how they respond to these requirements.  Some non-FFL manufacturers may choose to apply to become an FFL.  Commenters suggested that some may opt to become FFLs despite a market strategy that attempts to avoid regulation by ATF.  One commenter provided some information on the price to serialize the "frame or receiver" within a firearm parts kit.  This commenter

---

[4] $350: *See* 80% Lowers, *LR-308 Lower Assembly | Lower Parts Kit | Butt Stock | Buffer Tube | FIRE/SAFE Billet 80% Lower*, *available at* https://www.80-lower.com/products/lr-308-lower-assembly-lower-parts-kit-fire-safe-billet-80-lower/ (visited Apr. 28, 2021).  The prices for items cited and listed throughout the RIA are the prices that were found at the time ATF conducted its analysis and therefore may differ from the prices listed at or after the time of publication.  ATF cannot account for inevitable fluctuations in market prices over time.

[5] $475: *See* 80% Lowers, *9mm AR-9 Lower Assembly | Lower Parts Kit | Tactical Brace | Buffer Tube | FIRE/SAFE Billet 80% Lower*, *available at* https://www.80-lower.com/products/ar-9-lower-assembly-lower-parts-kit-fire-safe-billet-80-lower/ (visited Apr. 28, 2021).

[6] $560–$70: JSDSupply, *80% Glock Compatible Lower Parts Kit – LPK*, *available at* https://jsdsupply.com/shop/80-glock-compatible-lower-parts-kit-lpk/ (visited Apr. 28, 2021).

[7] $470: *See* 80% Arms, *Easy-Jig® Gen 3 Starter Kit - AR15*, *available at* https://www.80-lower.com/products/easy-jig-gen-3-starter-kit-ar15/ (visited Apr. 28, 2021).

[8] $800: *See* 80% Arms, *GST-9: 80% Pistol Build Kit*, *available at* https://www.80percentarms.com/products/gst-9-80-pistol-build-kit/ (visited Apr. 28, 2021).

[9] $636: *See* 80% Arms, *Complete 10.5″ 5.56/300BLK AR-15 Pistol 80% Build Kit*, *available at* https://www.80percentarms.com/products/complete-10-5-5-56-300blk-ar-15-pistol-80-build-kit/ (visited Apr. 28, 2021).

[10] $360: *See* MDX Arms, *MDX Arms G23 LF23 .40SW with RMR Cut Build Kit - No Frame*, *available at* https://mdxarms.com/mdx-arms-g23-lf23-40sw-with-rmr-cut-build-kit-no-frame/ (visited Apr. 28, 2021).

[11] $670: *See* 80% Lowers, *.223 Wylde AR 15 Rifle Kit - 16″ Parkerized Barrel, 1:7 Twist Rate with 12″ M-Lok Handguard*, *available at* https://www.80-lower.com/products/223-wylde-ar-15-rifle-kit-16-parkerized-barrel-12-m-lok-handguard-w-80-lower-1-7-twist/ (visited Apr. 28, 2021).

[12] $750: *See* 80% Lowers, *.223 Wylde AR 15 Rifle Kit - 16″ Parkerized Barrel, 1:8 Twist Rate with 15″ M-Lok Handguard*, *available at* https://www.80-lower.com/products/new-223-wylde-ar-15-rifle-kit-16-parkerized-barrel-15-m-lok-handguard-w-80-lower-1-8-twist/ (visited Apr. 28, 2021).

[13] $996: *See* 80% Arms, *Complete 18″ AR .308 80% Build Kit*, *available at* https://www.80percentarms.com/products/complete-18-ar-308-80-build-kit/ (visited Apr. 28, 2021).

ATF071172

Defs.' MSJ App. 111

suggested that it would cost an estimated $10,000 to buy an appropriate laser engraver and associated equipment, plus labor costs to train an employee to use the laser engraver.

As previously stated, there are 41 FFL and 43 non-FFL manufacturers that will be affected by the rule.  Because ATF does not know what future actions they may take, ATF envisions two scenarios in how the non-FFLs may respond to the final rule:  become an FFL or end their business.  Based on the comments received and the fact that only one manufacturer became an FFL after publication of the NPRM, ATF estimates it will be unlikely that a significant number of non-FFLs will opt to become FFLs.  Hence, ATF estimates that 1 non-FFL will become a licensee, continue to sell firearm parts kits, and serialize the "frame or receiver," while the remaining 42 non-FFLs will end up dissolving their businesses.  Based on the known revenue of non-FFL manufacturers of firearm parts kits, these non-FFL manufacturers are small businesses, and the loss in business transactions will be $583,500 for each non-FFL manufacturer that ends up dissolving its business.  ATF notes that, because these firearm parts kits will now need to be serialized, this will reduce the overall supply and demand for such items.

In summary, ATF estimates three possible approaches which FFL and non-FFL manufacturers could take in order to comply with the final rule:

- Scenario 1: 1 Non-FFL manufacturer becomes an FFL and serializes the frames or receivers within the firearm parts kits it manufactures;

- Scenario 2: The 41 existing FFL manufacturers serialize their firearm parts kits; and

- Scenario 3: 42 Non-FFL manufacturers dissolve their business.

-32-

### 4.4.1.  Scenario 1: 1 Non-FFL Manufacturer Becomes Licensed as an FFL

Based on comments received, some commenters contend that there may be non-FFLs that opt to become licensed, and that ATF should cost it out.  Other comments suggested that it would be difficult or unlikely for non-FFLs to become licensed.  Although it might be unlikely that non-FFLs will opt to become licensed, for the purposes of this analysis, ATF assumes that 1 non-FFL manufacturer would become licensed, and the other remaining 42 non-FFL manufacturers will dissolve their businesses.

In order to become licensed, non-FFL manufacturers must complete an Application for Federal firearms license, ATF Form 7/7CR ("Form 7"), and include fingerprints, a passport photo, and postage to mail the package.  The application fee for a Type 07 FFL manufacturer is $150; the cost to get fingerprinted is $19; the cost to obtain a passport photo is approximately $16; and the cost for postage is approximately $1 for a large envelope.[14,15,16,17]

Because it takes time to complete the actions needed to complete a Form 7, ATF accounts for the hourly burden to perform activities such as filling out the form and obtaining fingerprints and passport photos.  ATF used the hourly burden as reported on Form 7 as the time needed to

---

[14] ATF, *Form 7/ 7 CR - Application for Federal Firearms License (ATF Form 5310.12/5310.16)*, *available at* , https://www.atf.gov/firearms/docs/form/form-7-7-cr-application-federal-firearms-license-atf-form-531012531016 ("Form 7").

[15] Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or legal Entity with Respect to Making or Transferring a Firearm, 81 FR 2658, 2715 (Jan 15, 2016) (stating the average cost to get fingerprints is $18.66).

[16] $16 = ($17 + 15) / 2.  Passport photo prices from CVS, *Passport Photos*, *available at* https://www.cvs.com/photo/passport-photos (last visited Mar. 24, 2022).

[17] *See* USPS, *Mailing & Shipping Prices*, *available at* https://www.usps.com/business/prices.htm (last visited Mar. 24, 2022).

ATF071174

**Defs.' MSJ App. 113**

complete a Form 7.[18]  The hourly burdens to obtain fingerprints and passport photos were

obtained from comments received on a rule previously published by ATF.[19]

      Because ATF does not know the salary or hourly wage rate of the person applying for the

Form 7, ATF uses the wage rate for General and Operations Managers from the Bureau of Labor

Statistics ("BLS") at the average hourly wage rate of approximately \$60.[20]  In the NPRM, ATF

used the 2019 wage rates as reported by BLS.  At the time of the publication of the NPRM, 2019

wage rates were the latest reported wages.  However, one commenter suggested that 2019 wage

rates as reported in BLS are not recent enough to compensate for changes in wages in 2021.

This commenter suggested using BLS's Employee Cost Index to account for wage increases.

ATF concurs and updates the RIA to reflect the most recent BLS wage rate data (for 2020) and

uses Employee Cost Index of 1.035 to account for wage increases in 2021.[21]  Finally, ATF adds

a load rate[22] to the hourly wage to account for fringe benefits like health insurance to derive a

loaded wage rate of \$89.[23]

      To simplify the total application cost discussed above, ATF presents Table 4.1, which

---

[18] Form 7 at 4.

[19] *See* Implementation of the Safe Explosives Act, Title XI, Subtitle C of Public Law 107-296, 68 FR 13768, 13777 (Mar. 20, 2003).

[20] BLS, *Occupational Employment and Wage* (May 2020), *available at* https://www.bls.gov/oes/2020/may/oes111021.htm (last visited Mar. 24, 2022).

[21] BLS, *Employment Cost Index—June 2021* (July 30, 2021), *available at* https://www.bls.gov/news.release/archives/eci_07302021.pdf (last visited Mar. 24, 2022).

[22] The load rate is based on the average total compensation \$36.29 (CMU2010000000000D) for years 2020 and 2021 divided by the average wages and salaries \$25.54 (CMU2020000000000D) for years 2020 and 2021.  *See* BLS, *Employer Cost for Employee Compensation*, *available at* https://data.bls.gov/cgi-bin/surveymost?cm (last visited Mar. 24, 2022).

[23] A loaded wage rate is the wage rate adjusted to include fringe benefits such as insurance.  Hourly wage rate of \$60.45 * 1.035 Employee Cost Index * load rate of 1.4209 = \$89.

-34-

outlines the hourly burden, wage rate, and cost items required for a Form 7 application.

Table 4.1.  Cost for a Form 7 Application to Become a Type 07 FFL

| Cost Item | Hourly Burden | Hourly Wage Rate | Hourly Wage Adjusted with Employee Cost Index | Loaded Wage Rate | Wage Burden | Cost Item | |
|---|---|---|---|---|---|---|---|
| Form 7 | 1 | $60 | $63 | $89 | $89 | $150 | |
| Fingerprints | 1 | $60 | $63 | $89 | $89 | $19 | |
| Passport Photo | 0.5 | $60 | $63 | $89 | $44 | $16 | |
| Postage | | | | | | $1 | |
| Application Cost | | | | | $222 | $186 | **$408** |
| Form 8 Renewal Cost | 0.5 | $60 | $63 | $89 | $44 | $150 | **$194** |

Overall, the per company cost to apply to become a Type 07 FFL is $408 with a renewal fee of

$194 every 3 years.

4.4.1.1.  Non-FFL Manufacturers to Serialize Firearm Parts Kits

In addition to licensing, Federal law, 18 U.S.C. 923(i), requires licensed manufacturers to

mark firearms with an identifying serial number.  One commenter estimated that it would cost

-35-

ATF071176

Defs.' MSJ App. 115

$10,000 for a laser engraver, air handler, and safety equipment.  ATF used this comment to base prices on the necessary equipment to serialize firearm parts kits with partially complete "frames or receivers."  Table 4.2 provides a range of costs to purchase a laser engraver.

Table 4.2.  Cost to Purchase a Laser Engraver

|  | Laser Engraving Cost | Vendor | |
|---|---|---|---|
|  |  |  | Website |
|  | $16,997 | Boss Laser | https://www.bosslaser.com/laser-machines/hp-2440 |
|  | $18,997 | Boss Laser | https://www.bosslaser.com/laser-machines/boss-hp-3655 |
|  | $18,497 | Boss Laser | https://www.bosslaser.com/laser-machines/boss-hp-5598 |
|  | $4,098 | Toolots | https://www.toolots.com/30w-handheld-fiber-laser-marking-machine.html |
|  | $3,050 | Toolots | https://www.toolots.com/flmm-b01-30.html |
| Average Cost | **$12,328** |  | |

Overall, ATF estimates that the average cost for a laser engraver is $12,328.  Based on the comment received about the cost of engraving, ATF also estimated the cost to purchase an air handler.  Table 4.3 shows the range of costs of air handlers.

Table 4.3.  Cost to Purchase an Air Handler

| Air Handler Cost | Vendor | Website |
|---|---|---|
| $1,193 | Grainger | https://www.grainger.com/product/44ZA50?ef_id=EAIaIQobChMIuceD4rqq9QIVu-y1Ch3q6gpzEAQYBiABEgIGlPD_BwE:G:s&s_kwcid=AL!2966!3!496359975784!!!g!437513351199!&gucid=N:N:PS:Paid:GGL:CSM-2295:4P7A1P:20501231&gclid=EAIaIQobChMIuceD4rqq9QIVu-y1Ch3q6gpzEAQYBiABEgIGlPD_BwE&gclsrc=aw.ds |
| $3,719 | AC | https://www.acwholesalers.com/Daikin-Light-Commercial- |

-36-

| | Wholesalers | DAT12043/p83645.html?gclid=EAIaIQobChMIuceD4rqq9QIVu-y1Ch3q6gpzEAQYBCABEgLNK_D_BwE |
|---|---|---|
| $1,696 | Comfort.com | https://www.ecomfort.com/LG-LVN241HV4/p102697.html?gclid=EAIaIQobChMIuceD4rqq9QIVu-y1Ch3q6gpzEAQYEiABEgL-KfD_BwE |
| **$2,203** | Average Cost | |

Overall, ATF estimates that the average cost for an air handler is $2,203.  The commenter suggested an FFL would need to also train an employee to do engraving of serial numbers.  ATF estimates that an FFL manufacturer may need a full-time engraver.  ATF uses the annual wage rate for 51-9194 Etchers and Engravers ($35,230) as reported by BLS.[24]  In addition to the base, annual wage rate, ATF used the Employee Cost Index of 1.035 and the load rate of 1.4209 as described in the paragraphs above to determine a loaded annual wage of $51,810.[25]  Although the commenter suggested including the cost of safety equipment, ATF believes that safety equipment is likely to be already included in normal manufacturing operations of non-FFL manufacturers.  Therefore, ATF did not individually assess the cost of safety items for this analysis.

4.4.1.2.  Non-FFL Manufacturers to Maintain Production and Disposition Records

In addition to acquiring marking equipment, non-FFL manufacturers that become licensees would need to maintain manufacturers' records in accordance with the regulations. These records show the manufacture or production of firearms and their disposition (in this case, firearm parts kits with partially complete frames or receivers).  Based on the Paperwork

---

[24] BLS, *Occupational Employment and Wages: 51-9194 Etchers and Engravers* (May 2020), *available at* https://www.bls.gov/oes/2020/may/oes519194.htm (last visited Mar. 24, 2022).

[25] $35,230 * 1.035 Employee Cost Index * 1.4209 load rate = $51,810.

-37-

ATF071178

Defs.' MSJ App. 117

Reduction Act ("PRA") collection of information 1140-0067, it takes approximately one minute (0.01667 hours) to record this required information.[26]  In order to estimate the annual number of transactions, ATF reviewed publicly available information for revenue and compared it to the average retail price of a firearm parts kit with a partially complete frame or receiver.

Based on publicly available information from *Dun & Bradstreet*, ATF was able to obtain revenue data for certain relevant companies.[27]  Based on a review of affected non-FFL manufacturers, ATF was able to obtain the revenue of 24 out of 43 non-FFL manufacturers.  Of these non-FFL manufacturers, one was deemed not small under the Small Business Administration's ("SBA") size standards.[28]  ATF was unable to determine the size standards or revenue for 19 non-FFL manufacturers, as such information was not publicly available.  Of the 24 non-FFL manufacturers for which information was available, the average revenue was $2.6 million.  This $2.6 million average, however, was skewed by the revenue of one non-FFL manufacturer.  To account for this outlier and more accurately represent the revenue of the population of non-FFL manufacturers, ATF instead used the median revenue of $280,000.

ATF then reviewed retail costs of firearm parts kits with partially complete frames or receivers as a means of estimating the number of items produced annually.  For a list of prices used, please refer to the Appendix at the end of this analysis.  Using the average price of $116 for firearm kits with partially complete frames or receivers and the median revenue of $280,000,

---

[26] ATF, *Licensed Firearms Manufacturers Records of Production, Disposition, and Supporting Data*, *available at* https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202109-1140-005 (last visited Mar. 24, 2022).

[27] Dun & Bradstreet, *Data Cloud*, *available at* https://www.dnb.com/ (last visited Mar. 24, 2022).

[28] SBA, *Table of Size Standards* (Aug. 2019), *available at* https://www.sba.gov/document/support--table-size-standards (last visited Mar. 24, 2022).

-38-

ATF estimates that the average number of those parts kits produced annually by non-FFL manufacturers is 2,408.[29]  Assuming that these firearm parts kits are manufactured and sold within the same year, ATF assumes two record entries (one for production and one for disposition) per kit, for an annual number of 4,816 record entries per non-FFL manufacturer.[30]

As stated above, ATF estimates that the time burden per record entry is one minute (0.01667 hours).[31]  In order to determine the cost associated with the time burden for the number of record entries calculated above, ATF estimates that recording the entries will be performed by an employee with a background in metal and plastic works.  For the purposes of this analysis, ATF uses three different wage categories from BLS.  ATF incorporated the Employee Cost Index to account for inflation and used a load rate to account additional costs such as benefits and insurance.[32]  Table 4.4 provides the hourly wage rates for the wage categories used for this scenario.

Table 4.4.  Wage Categories for Metal and Plastic Workers

| Hourly Wage | Hourly Wage Adjusted with Employee Cost Index | Loaded Wage Rate | BLS Occupation | Website |
|---|---|---|---|---|
| | | | | |

---

[29] $280,000 annual revenue / $116 average retail price of a partially complete firearm kit = 2,408 items.

[30] 4,816 entries = 2,408 annual production * 2 entries.

[31] *See* footnote 26, *supra*.

[32] *See* BLS, *Series Report*, *available at* https://data.bls.gov/cgi-bin/srgate (last visited Mar. 24, 2022).  ATF used series CMU1010000000000D and series CMU1020000000000D.  Average total compensation: $36.29.  Average cost per hour worked: $25.54.  Loaded wage rate: 1.4209 = $36.29 / $25.54.

-39-

ATF071180

Defs.' MSJ App. 119

| | | | | |
|---|---|---|---|---|
| $21 | $22 | $31 | 51-4022 Forging Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls.gov/oes/2020/may/oes514022.htm |
| $19 | $20 | $28 | 51-4199 Metal Workers and Plastic Workers, All Other | https://www.bls.gov/oes/2020/may/oes514199.htm |
| $19 | $19 | $27 | 51-4031 Cutting, Punching, and Press Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls.gov/oes/2020/may/oes514031.htm |
| Average Wage | | **$29** | | |

Based on these calculations, ATF used a loaded hourly wage rate of $29 for recording entries in production and disposition records. In order to demonstrate the calculation of the hourly burden for PRA collection of information 1140-0067, ATF presents the per manufacturer hourly and wage burden in Table 4.5.

Table 4.5. Hourly and Wage Burden to Update and Maintain Production and Disposition Records

| Population Type | Hourly Burden | Loaded Wage Rate | Estimated Entries Annually | Per Manufacturer Cost |
|---|---|---|---|---|
| Non-FFL Manufacturer | 0.01667 | $29 | 4,816 | **$2,300** |

4.4.1.3. Summary Cost for Scenario 1: Non-FFL Manufacturer Becoming FFL

To simplify the presentation of the cost to become an FFL, Table 4.6 illustrates the first-year cost for a non-FFL manufacturer to become a Type 07 Manufacturer FFL.

Table 4.6. Per FFL and Total First-Year Cost to Become a Type 07 Manufacturer FFL

| Population Description | Population | One-time Cost | Annual Recurring Cost | Cost for Renewal | Per Company First Year Cost | Total First |
|---|---|---|---|---|---|---|

-40-

ATF071181

**Defs.' MSJ App. 120**

| | | | | Every Three Years | | Year Cost |
|---|---|---|---|---|---|---|
| Population to Become FFL | 1 | $14,939 | $54,111 | $194 | $69,049 | **$69,049** |

Although there may be other expenses beyond the cost described above, ATF is not required to consider these costs because they are too speculative to include in the cost estimates.

4.4.2.   Scenario 2: FFL Manufacturers to Serialize Firearm Parts Kits

Because the manufacturers considered in this section are currently licensed, they will not need to incur the same expenses as non-FFL manufacturers becoming FFLs.  Also, because they are already licensed, they will have an engraving machine and trained staff.  Based on public comments, however, manufacturers tend to have different machines to engrave serial numbers for different product lines, and their existing equipment accordingly may not be sufficient to engrave a serial number on firearm parts kits with partially complete frames or receivers.  Thus, FFLs may still need to acquire an appropriate laser engraving machine to comply with this rule and serialize firearm parts kits.  For the purposes of this analysis, ATF uses the average cost of a laser engraver and an air handler as stated in section 4.4.1 above as the one-time additional cost for FFL manufacturers to serialize firearm parts kits.  As stated above, the average price for a laser engraver is $12,328 and the average price of an air handler is $2,203, making the one-time cost per FFL manufacturer $14,530.

As stated above, FFL manufacturers will incur an additional record burden in updating and maintaining their records to reflect the production and disposition of firearm parts kits.  As discussed in section 4.4.1 above, the hourly burden is 1 minute (0.01667 hours) for each record

-41-

entry.  The estimated loaded wage rate is $29.  The estimated annual number of entries is

4,816.[33]  The annual per FFL cost is $2,300.  Because there are an estimated 41 FFL

manufacturers of firearm parts kits, the total first year cost for scenario 2 is $690,068.[34]

### 4.4.3.   Scenario 3: Non-FFL Manufacturers That Cease Business

For some non-FFLs, continuing operations may be cost prohibitive to comply with the

new rule or due to different regulatory requirements, such as local zoning laws.  Other non-FFLs

may choose to stay unregulated and therefore cease operations.

As stated above, ATF reviewed revenue data of all known non-FFL manufacturers of

firearm parts kits using publicly available information from *Dun & Bradstreet*.  Based on the

known revenue, the median revenue was $280,000.  As stated in section 4.4.1 above, the average

revenue ($2.6 million) was not used because one non-FFL manufacturer was an outlier.  For

purposes of this analysis, and as stated in above, ATF estimates that all non-FFL manufacturers

except 1 (*i.e.*, 42 non-FFL manufacturers) will dissolve their businesses.  Based on the median

revenue of non-FFL manufacturers, ATF estimates that the cost of the decision to cease

operations will be $11.7 million annually.[35]

Commenters also stated that companies going out of business will cause unemployment.

ATF partially concurs.  Although employees will lose their jobs, it is not clear whether they will

---

[33] 4,816 total entries = 2,408 firearm parts kits with a partially complete "frame or receiver" produced annually * 2 entries per item.

[34] $690,068 industry cost = 41 companies * ($14,530 one-time cost + $2,300 recurring cost).  Both here and elsewhere, ATF used unrounded results from previous calculations when carrying out new calculations.  As a consequence, the results obtained from the new calculations do not always precisely match the results that would be obtained had the rounded figures been used.  Here, for example, ATF used the unrounded figures for the one-time and recurring costs to calculate the total industry cost.

[35] 42 non-FFL manufacturers * $280,000 median revenue = $11,760,000.

ATF071183

**Defs.' MSJ App. 122**

be unable to find other employment.  However, because ATF expects that not all employees will in fact be able to find alternative employees, ATF also estimates the number of job losses due to non-FFL manufacturers going out of business.  Based on publicly available information on *Dun & Bradstreet*, ATF was able to determine the employee sizes of 24 non-FFL manufacturers. Based on these companies, the average number of employees was 20.  However, as stated in the paragraphs above, one non-FFL manufacturer was not small and is considered an outlier. Therefore, ATF used the median number of employees to calculate total job loss.  The median number of employees at these non-FFL manufacturers was six, and therefore, ATF estimates that the final rule will negatively affect an estimated total of 252 jobs.[36]  Because ATF accounts for overall revenue lost, ATF does not account for loss of wages from these jobs due to double counting of costs from revenue.

4.4.4.   Summary of Costs for Manufacturers of Firearm Parts Kits

To summarize the cost results discussed above, ATF presents Table 4.7, which shows the cost per manufacturer for the first year.

Table 4.7.  Cost Per Manufacturer of Firearm Parts Kits

| Type of Cost Result | One-time Cost | Application Renewal Cost | Annual Recurring Cost | First Year Cost per Company |
|---|---|---|---|---|
| Scenario 1: Non-FFL Becomes FFL and Serializes | $14,939 | $194 | $54,111 | $69,049 |
| Scenario 3: Non-FFLs Dissolve Businesses | $0 | $0 | $280,000 | $280,000 |
| Scenario 2: FFLs Serialize | $14,530 | $0 | $2,300 | $16,830 |

*Note: Calculation of these numbers may not be exact due to rounding.

---

[36] 252 jobs = 6 jobs * 42 companies.

-43-

For the purposes of this analysis, ATF estimates that one non-FFL manufacturer will become licensed as an FFL and serialize firearm parts kits, 41 FFL manufacturers will serialize firearm parts kits, and 42 non-FFL manufacturers will dissolve their businesses.  Table 4.8 illustrates the industry cost for manufacturers of firearm parts kits.

Table 4.8.  Industry Cost for Manufacturers of Firearm Parts Kits

| Total Manufacturing Cost | Population | One-time Cost | Application Renewal Cost | Annual Recurring Cost | Total First Year Cost |
|---|---|---|---|---|---|
| Scenario 1: Non-FFL Becomes an FFL and Serializes | 1 | $14,939 | $194 | $54,111 | $69,049 |
| Scenario 3: Non-FFLs Dissolve Businesses | 42 | $0 | $0 | $11,760,000 | $11,760,000 |
| Scenario 2: FFLs Serialize | 41 | $595,750 | $0 | $94,318 | $690,068 |
| Sum of Total First Year Cost | | | | | $12,519,118 |

*Note: The sum of these numbers may not be exact due to rounding.

To further understand the costs that FFL and non-FFL manufacturers could incur to comply with the final rule, Table 4.9 provides the 10-year undiscounted and discounted costs for this scenario.

Table 4.9.  10-Year Cost for FFL and Non-FFL Manufacturers of Firearm Parts Kits

| Year | Undiscounted | Discount Rate | |
|---|---|---|---|
| | | 3% | 7% |
| 2022 | $12,519,118 | $12,154,483 | $11,700,110 |
| 2023 | $11,908,429 | $11,224,836 | $10,401,283 |
| 2024 | $11,908,429 | $10,897,899 | $9,720,825 |

ATF071185

| 2025 | $11,908,623 | $10,580,658 | $9,085,032 |
|---|---|---|---|
| 2026 | $11,908,429 | $10,272,315 | $8,490,545 |
| 2027 | $11,908,429 | $9,973,122 | $7,935,089 |
| 2028 | $11,908,623 | $9,682,800 | $7,416,092 |
| 2029 | $11,908,429 | $9,400,624 | $6,930,814 |
| 2030 | $11,908,429 | $9,126,819 | $6,477,396 |
| 2031 | $11,908,623 | $8,861,134 | $6,053,740 |
| Total | $119,695,560 | $102,174,690 | $84,210,926 |
| Annualized | | $11,977,991 | $11,989,741 |

*Note: Calculations using these estimates may not be exact due to rounding.

As shown in Table 4.9, the total 10-year cost is $119.7 million undiscounted, or $12.0 million annualized at 3 percent and $12.0 million annualized at 7 percent.

4.5.  Benefits of Regulating Firearm Parts Kits

Unlike firearms manufactured by FFLs, which must meet certain marking requirements, firearm parts kits with partially complete frames or receivers are not currently being serialized by their manufacturers, nor are the manufacturers requiring purchasers to undergo a NICS background check prior to purchase.  This is because these manufacturers do not consider such kits as falling within the current regulatory definition of "firearm," or otherwise subject to the current regulatory regime.  Because these manufacturers are not serializing the frames or receivers in these kits, and are not requiring background checks when selling them, the kits can be obtained with relative ease on the internet by persons who are prohibited from possessing firearms.  In other words, prohibited persons do not have to go in person to a local FFL to purchase this product.  Furthermore, certain manufacturers also offer the option to remove purchaser information in their sales records to prevent the government from tracing the purchasers of the sale.  This is another aspect of the current regulatory regime and existing industry practice that likely makes these firearm parts kits an attractive option to persons

-45-

prohibited from possessing firearms.

In addition, a survey performed by *Small Arms Survey* suggested that purchases of firearms for illegal purposes are often made outside the traditional regulatory regime. Specifically, on firearms trafficking, the *Small Arms Survey* states that "[m]any of the traffickers studied did not apply for arms export licenses or attempt to exploit licensing exemptions; they simply bypassed the licensing system entirely."[37] Of the 159 cases that *Small Arms Survey* reviewed, over half of the cases involved selling firearm parts and accessories; an unknown number of these firearm kits were purchased, assembled into functional weapons, and then shipped illegally.[38]

Purchasing these firearm parts kits is easier than purchasing complete weapons not only because an individual can purchase them on the internet without undergoing a background check, but also because their sales do not trigger multiple sales reports that are reviewed by law enforcement for criminal activity. Because such transactions are not currently viewed as regulated, and because it is easy to assemble a complete weapon from these kits, they are an attractive option for those with intent to illegally use firearms.

As discussed in the NPRM, tracing is an integral tool for Federal, State, local, and international law enforcement agencies to utilize in their criminal investigations, and the proliferation of untraceable firearms severely undermines this process. 86 FR at 27723–24. ATF traces firearms found by law enforcement at a crime scene by first contacting the licensed

---

[37] Matt Schroeder, *The Mechanics of Small Arms Trafficking from the United States*, Small Arms Survey 1 (Mar. 2016), available at https://www.files.ethz.ch/isn/196408/SAS-IB17-Mechanics-of-trafficking.pdf (last visited Mar. 24, 2022).

[38] *Id.* at 4.

ATF071187

Defs.' MSJ App. 126

manufacturer or importer marked on the frame or receiver.  That manufacturer or importer must maintain permanent records of their manufacture or importation.  Using the information obtained from those required records, ATF then contacts each licensed dealer and any other licensees that recorded their receipt and disposition to locate the first unlicensed purchaser and thus help find the perpetrator or otherwise solve the crime.[39]  However, because PMFs do not bear a serial number or other markings of a licensed manufacturer or importer, ATF has found it extremely difficult to complete such traces on behalf of law enforcement.  To demonstrate their increasing popularity in criminal activities, ATF filtered trace requests for suspected PMFs, which are typically assembled from firearm kits with partially complete frames or receivers.  Table 4.10 shows the approximate number of attempted traces of suspected PMFs from 2016 through 2021.

Table 4.10.  Number of Traces of Suspected PMFs from 2016 Through 2021

| Year | Published NPRM | Final Rule Update (as of 01/21/2022) | Difference Between NPRM and Final Rule[40] |
|---|---|---|---|
| 2016 | 1,750 | 1,758 | 8 |
| 2017 | 2,507 | 2,552 | 45 |
| 2018 | 3,776 | 3,960 | 184 |
| 2019 | 7,161 | 7,517 | 356 |
| 2020 | 8,712 | 10,109 | 1,397 |
| 2021 | 0 | 19,344 | 19,344 |
| **Total** | **23,906** | **45,240** | **21,334** |

---

[39] Licensees must respond to ATF trace requests within 24 hours.  18 U.S.C. 923(g)(7); *see also J&G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1045–46 (9th Cir. 2007) (describing the tracing process).

[40] The total number of suspected PMFs is greater than the 23,906 originally reported as of March 4, 2021, in the NPRM, 86 FR at 27772–23 because of (1) the addition of 2021 data; (2) updates to traces to add more specificity regarding the firearm; and (3) inclusion of all suspected PMFs recovered within this time frame regardless of when the trace was entered.

ATF071188

Defs.' MSJ App. 127

| Homicides 2016 Through 2021 | 325 | 692 | 367 |
|---|---|---|---|

Based on suspected PMF traces from 2016 through 2021, there were approximately 692 homicides or attempted homicides carried out with a PMF.  There were also approximately 4,288 felons in possession of a suspected PMF.  To demonstrate the increasing popularity of these PMFs in criminal activities, Graph 4.1 illustrates this growth trend.

Graph 4.1.  Total Suspected PMFs by Year



Furthermore, if firearm parts kits or resulting PMFs are stolen, owners can report the theft to police and insurance companies and provide them with a full description of the firearm.  Because these kits (which are likely to become complete and assembled PMFs) will be serialized

-48-

ATF071189

Defs.' MSJ App. 128

under the final rule, the firearm kits or PMFs would now be traceable in the event they were stolen, lost by licensees or individuals, or used in criminal activities. Law enforcement would then be able to return any recovered stolen or lost firearm kits or PMFs to their rightful owners and use the trace to prosecute criminals who may have used those weapons.

ATF071190

**Defs.' MSJ App. 129**

# 5.  Privately Made Firearms and FFL and non-FFL Dealers of Firearm Kits

A firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number placed by a licensed manufacturer at the time the firearm was produced is defined as a PMF in the final rule.  This definition does not include a firearm identified and registered in the NFRTR pursuant to chapter 53, title 26, United States Code, or any firearm manufactured or made before October 22, 1968 (unless remanufactured after that date).

Under the final rule, each FFL must mark PMFs within seven days of the firearm being received into inventory by the FFL or before disposition, whichever first occurs.  Licensees have from the date of the final rule's publication until 60 days after the date the final rule becomes effective to mark PMFs already in inventory.  FFLs that are manufacturers, importers, or dealers may mark PMFs for nonlicensees, and FFLs may directly supervise marking by another licensee or a nonlicensee that may mark a PMF in accordance with the regulations.

## 5.1.  Need for Markings on PMFs

Requiring the marking of PMFs that are taken into inventory allows FFLs to track and reconcile their inventories, respond to trace requests, process warranty claims, and report lost or stolen PMFs to police and insurance companies.  Furthermore, requiring markings on firearm kits with a partially complete frame or receiver is also necessary because these kits are likely to become PMFs.  Because these firearms will now be serialized, these PMFs will be traceable in the event that they are stolen from any licensee or are used in criminal activities.  Law

ATF071191

Defs.' MSJ App. 130

enforcement will be able to return any recovered stolen or lost PMFs to their rightful owners, and they will be able to use the trace information to combat firearms trafficking and other criminal activity.

5.2.   Comments Received on FFL and non-FFL Dealers

Several commenters stated that the proposed rule would affect companies that retail only in firearm parts due to their concern that the proposed rule would have required multiple parts to become serialized.  In response to these concerns, ATF has changed the definition of "frame or receiver" to require only one part of a firearm to be serialized.  Because of this change, retailers of firearm parts other than the frame or receiver will be unaffected and can continue to sell unmarked, unregulated parts of a firearm.

One commenter asserted that the population of affected dealers of firearm kits with partially complete frames or receivers was underestimated in the NPRM, specifically stating that there were more than 75 dealers.  ATF partially concurs.  During the analysis described in the NPRM, ATF found 71 companies selling these firearm kits.  Although all 71 companies sell firearm kits with a partially complete frame or receiver, ATF separated the number of companies between manufacturers and dealers of kits.  However, ATF performed a second internet search of companies and found an additional 58 companies.  ATF then separated the total number of companies into four groups: (1) FFL manufacturers; (2) non-FFL manufacturers: (3) FFL dealers; and (4) non-FFL dealers.  By categorizing the companies this way, the population numbers appear to be lower than suggested by the commenter in each chapter of the RIA, but the overall number of companies affected is similar to the estimated total number suggested by the commenter.

ATF071192

Defs.' MSJ App. 131

Many commenters estimated a total number of PMFs already in circulation and estimated that the cost of marking those PMFs currently in circulation would be in the millions of dollars. Some commenters stated that the NPRM should have included an estimate of the number of PMFs and unfinished receivers that would be reclassified as firearms. ATF disagrees that it did not properly estimate the number of firearms affected. Neither the proposed nor final rule requires the serialization of all PMFs in circulation. The rule affects only firearm parts kits with a partially complete "frame or receiver" held by FFLs and PMFs that are transferred through an FFL; therefore, only the ones held by FFLs or that may go through FFLs, as the case may be, were accounted for. However, in this analysis, ATF provides an estimate of the total number of PMFs in circulation, along with potential costs to individuals who go through an FFL for services associated with their PMFs.

A couple of commenters stated that ATF did not provide evidence for its assumption that 10 percent of Type 01 and Type 02 FFLs currently deal in firearm parts kits with a partially complete frame or receiver, and that all dealers would have only two such items in inventory. The commenters noted that ATF cited only unknown subject matter experts ("SMEs"). In the NPRM, ATF relied on SMEs from its Firearms Industry Programs Branch ("FIPB") to provide an estimated population and number of firearm parts kits with a partially complete frame or receiver in inventory. However, many such kits are not currently viewed by their manufacturers as regulated, and because ATF does not have the inventory data that FFLs maintain, ATF is unable to obtain estimates at the level of accuracy requested by the commenters. To improve these estimates for the final rule, ATF relied on general observations from its field divisions to estimate population and inventory. This information was deemed to be the best available

-52-

information for the analysis.

One commenter stated that ATF did not account for the lost revenue and increased expenses for gunsmiths, companies selling firearm parts kits, and individuals. ATF concurs that lost revenue was not accounted for in the proposed rule, and this RIA now incorporates the loss in revenue for companies and additional expenses for individuals.

Several commenters suggested that the populations, cost assumptions, and descriptions for in-house engraving were inaccurate. One commenter stated that engraving equipment is not common at FFLs. One commenter suggested that the only viable means of acquiring equipment for engraving is a laser engraver, associated equipment and safety supplies, and a specialized worker. Several suggested the labor and equipment needed to engrave existing inventory is significantly higher than the stamping method discussed in the NPRM. One commenter stated that ATF did not account for expenses associated with serializing PMFs made from polymer materials. The same commenter pointed out that the cost for non-FFL dealers were omitted from the analysis. One commenter stated that the assumption that individuals will not be charged for serialization is inaccurate.

Comments and anecdotal commentary from various offices and divisions throughout ATF suggest that most FFLs do not have gunsmiths on staff; therefore, it is unlikely that they will purchase engraving equipment if the staff and equipment are not already part of their normal operations. FFLs that deal in PMFs can either contract the serialization to another FFL or may be able to perform the serialization as part of their current gunsmithing services. Another possibility that ATF is including for this analysis is that FFLs can dispose of their PMF inventory.

-53-

Many commenters stated that the cost of serializing a PMF can range between $35 and $405 based on whether the serialization includes only serializing or also includes related services such as cleaning, oiling, bluing, and polishing. ATF infers from these comments that the high-end cost should be included because ATF should include the cost to return the PMF to its original state in the event the PMF is serialized due the PMF being taken into inventory by an FFL for repair or customization services that are performed on the PMF after implementation of the final rule.

ATF concurs that the description of in-house engraving methods outlined in the NPRM was inaccurate and therefore is no longer considering only FFLs that currently have gunsmiths on staff. As for purchasing a laser engraver, associated equipment and safety supplies, and labor, ATF used this information to illustrate engraving expenses for manufacturers. ATF disagrees that a dealer will need to purchase such labor and equipment because future firearm parts kits with a partially complete frame or receiver will be serialized by the manufacturer and not the dealer. Dealers will not be required to provide additional serialization. ATF concurs that it did not account for costs of serializing firearm parts kits with a partially complete frame or receiver made from polymer materials. In order to account for those costs, ATF has now included the costs for disposing of such items if they cannot be serialized. ATF also concurs that the cost for non-FFL dealers was omitted from the analysis, and ATF now incorporates such costs into this analysis.

Furthermore, ATF reiterates that PMFs for personal use are not required by this rule to be serialized (unless required by State or local law) and marking is limited to those that are taken into inventory, though the final rule exempts same day adjustment or repair and return to the

-54-

person from whom it was received.  Because repairs are performed by gunsmiths, ATF assumes that only FFLs who are gunsmiths or hire gunsmiths will be performing repairs or customizations of PMFs, so ATF incorporated the annual costs for these FFLs in this analysis.  In the NPRM, ATF assumed that individuals with PMFs would choose not to undertake repairs or customization of their PMFs so as to avoid marking requirements; therefore, ATF did not anticipate costs to individuals.  This final analysis illustrates situations in which an individual might experience costs related to the final rule because of repairs and customization.  ATF estimated the cost of serialization to individuals in these situations only as potential costs to illustrate and respond to comments.  Based on gunsmithing experience from an SME from ATF's FATD, most individuals seeking repairs or customization typically do not seek bluing or other services at the same time they are seeking services such as engraving designs on firearms. ATF concurs that the analysis in the NPRM regarding engraving was inaccurate.  ATF agrees that a more likely scenario is that there may be some FFLs that sell firearm parts kit with a partially complete frame or receiver that also offer gunsmithing services.  These FFLs will not need to purchase engraving equipment; rather, they can use their existing staff and equipment to serialize their existing inventory of firearm parts kits.  For FFLs that do not employ gunsmiths or do not have existing gunsmithing equipment, ATF estimates that these FFLs will contract out engraving services to another FFL or dispose of their inventory.

One commenter asserted that ATF's estimate of a one-time cost for contracting out gunsmithing services in order to mark inventory that would need to be serialized lacked any supporting evidence or data as to why this cost would not be on-going.  In the final analysis, ATF estimated a one-time contracting cost for gunsmithing services to account for FFLs that

-55-

have the affected firearm parts kits currently in inventory, but do not have gunsmithing capabilities. ATF made the assumption that most FFLs do not have gunsmiths on staff based on anecdotal commentary from various SMEs at ATF. This assumption was further substantiated by the comments received on the NPRM. Because it is unlikely that only FFLs with gunsmithing capabilities will carry firearm parts kits with a partially complete frame or receiver, ATF assumed that this portion of the population, *i.e.*, FFLs without gunsmithing capabilities, will therefore need to hire gunsmiths.

Because this subset of FFLs would not have gunsmithing capabilities, they logically would not provide repairs to PMFs currently in circulation. Furthermore, future firearm parts kits with a partially complete frame or receiver will already be serialized by the manufacturer. Given these circumstances, this subset of FFLs would not have ongoing serialization costs, nor would they incur expenses to buy serializing equipment; rather, they would incur a one-time expense in order to comply with the final rule.

One commenter stated that ATF did not account for the costs associated with entering PMFs into firearm acquisition and disposition records ("A&D records"). ATF concurs that A&D records were not accounted for in the PMF analysis. Currently, FFLs are required by regulation to enter all firearms, including PMFs, that they receive into their A&D records. Because this requirement already exists, ATF did not attribute additional costs for A&D recordkeeping. Again, ATF is not requiring all PMFs in circulation to be serialized; therefore, the only entries in A&D records are those already required by current regulations.

Some commenters suggested that, because of the proposed rule's definitions, it would cost more to purchase individual firearm parts because individuals would now have to go

-56-

through FFLs to purchase their firearms kits and pay a transfer fee for each frame or receiver they purchase.  This concern is substantially mitigated because, based on the comments, the final rule changes the proposed definition of "frame or receiver" to identify only one part of a firearm that will need a serial number.

5.3.  Population of Markings on Firearms Kits and PMFs

FFLs that deal in PMFs are affected by the final rule in that they now have to mark their existing inventory of firearm parts kits with a partially complete frame or receiver as well as PMFs.  The affected FFLs are primarily anticipated to be Type 01 dealers, Type 02 dealers, and non-FFL sellers who will either need to become licensed or dissolve their businesses. Individuals may also be affected and incur the additional cost of serializing their PMFs if they bring their PMF to an FFL for sale or repair and the FFL needs to take the PMF into inventory (or overnight in the case of a repaired firearm).

5.3.1.  Population of FFL and Non-FFL Manufacturers of Firearm Parts Kits with a Partially Complete "Frame or Receiver"

The final rule will affect certain FFL and non-FFL manufacturers that produce firearm parts kits with a partially complete frame or receiver.  However, the discussion regarding this population was addressed in chapter 4 above.

5.3.2.  Population of FFL and non-FFL Dealers

Due to the replacement definition of "frame or receiver," ATF anticipates that there will be a one-time cost associated with serializing PMFs or firearm parts kits with a partially complete frame or receiver that are currently in the inventory of dealers, as well as an annual cost to serialize individually owned PMFs that are taken into inventory.  The potentially affected FFL

-57-

ATF071198

Defs.' MSJ App. 137

dealers are Type 01 and Type 02 FFLs that may sell online or locally at a storefront, along with sellers that are nonlicensees (or non-FFL dealers).  Based on ATF's Federal Firearms Licensing Center databases, there are 53,816 Type 01 FFLs and 6,974 Type 02 FFLs.

However, the majority of these FFL dealers do not sell firearm kits with partially complete frames or receivers, and therefore the majority of FFL dealers will not be affected by this provision of the final rule.  In the NPRM, ATF relied on SMEs in FIPB to estimate the affected population and existing inventory.  This was the best available information.  Because ATF does not maintain consolidated or aggregated records on companies' inventory regardless of whether the items in the inventory are regulated, ATF does not have specific or direct information on how many FFL and non-FFL dealers will be affected or what aspect of their inventory might be affected.  ATF informally requested information from 10 FFL dealers, located throughout the country, in an effort to obtain relevant information.[41]  Of those 10 FFL dealers, 1 did not provide any information and 1 did not deal in firearm parts kits with a partially complete frame or receiver.  The remaining eight FFLs did not respond to the informal information request.  Given the lack of information from the industry, ATF sent out an internal survey to its field divisions asking for their best estimates of the percentage or number of FFL dealers that deal in firearm parts kits with a partially complete frame or receiver and their best estimates of the parts kits that dealers may have in their inventory.  Although Industry Operations Investigators ("IOIs") do not report such items as part of their inspections, ATF determined that their collective recollection represented the best available information regarding

---

[41] For the purposes of complying with the Paperwork Reduction Act, only 2 of the 10 FFL dealers were provided the actual list of questions.

ATF071199

Defs.' MSJ App. 138

the population and inventory because IOIs inspect a sample of FFLs every year.  Based on informal observations from ATF IOIs and field divisions, ATF estimated that the final rule will affect 124 Type 01 FFLs and 66 Type 02 FFLs, for a combined total of 190 FFL dealers.

Based on comments received regarding the affected population of non-FFL dealers, ATF performed a second internet search of all sellers of firearm parts kits with a partially complete frame or receiver.  As ATF discussed in chapter 4 of this analysis, there are 84 manufacturers (both FFL and non-FFL) of these types of firearm kits.  For information and costs regarding these 84 manufacturers of firearm parts kits with a partially complete frame or receiver, please refer to chapter 4.  Of the remaining websites found regarding the retail sales of these firearm parts kits, ATF found 21 FFL dealers with an online presence and 24 non-FFL dealers.  In total, ATF found 214 FFL and non-FFL companies that sell firearm parts kits with a partially complete frame or receiver.

### 5.3.3.  Population of Type 03 FFL Collectors

The final rule will affect Type 03 FFL collectors who wish to add PMFs defined as curios or relics into their collections of firearms.  This subset of PMFs will have to be serialized under the final rule.  However, there is no requirement that Type 03 FFL collectors add their entire collection of personal firearms into their required records.  They can keep and maintain a personal collection similar to that of an unlicensed individual.  Because the final rule does impose a requirement on Type 03 collectors to mark PMFs that are not curios or relics, PMFs are unlikely to be curios or relics (*i.e.*, more than 50 years of age), and the rule does not require retroactive serialization of all PMFs in their personal collections, Type 03 FFL collectors are not likely to be affected by the rule as a licensee for many years.  For this reason, the relevant

ATF071200

**Defs.' MSJ App. 139**

population, costs, and requirements for Type 03 FFLs are included in the same group as unlicensed individuals listed below.

### 5.3.4.  Population of Individuals

Individuals who own PMFs may be affected by this provision, but only when the PMF is transferred to an FFL and the FFL voluntarily accepts the PMF into its inventory.  In the case of PMFs being adjusted or repaired by a dealer-gunsmith, the PMFs would need to be accepted overnight to be affected by this provision.  Assuming that individuals would choose not to go through an FFL so as to avoid serializing their PMFs, no individuals will be affected by the rule. However, ATF attempts to estimate the total number of individuals that may own PMFs.  As stated in chapter 4, ATF estimates there are 84 manufacturers of firearm parts kits with a partially complete frame or receiver.  The median revenue of all manufacturers (both FFL and non-FFL) of firearm parts kits with a partially complete frame or receiver is $478,000.  Because ATF does not know when these FFL and non-FFL manufacturers started manufacturing firearm parts kits with a partially complete frame or receiver, ATF used the years 2016 to 2020 as reported in PMF traces as a reference point.  At an average retail price of $116 for firearm parts kits with a partially complete frame or receiver, ATF estimates the annual production of PMFs by all 84 manufacturers to be 345,258.  Using a high estimate that all 84 manufacturers have been in the business from 2016 through 2021 (*i.e.*, for six years), ATF estimates that the total number of PMFs currently in circulation is less than 2.1 million.  *See* Table 5.1 below.  ATF reiterates that the final rule does not require the retroactive serialization of all PMFs in circulation, just those that are in an FFL's inventory.

Table 5.1 provides the outlines estimated number of PMFs currently in circulation.

ATF071201

**Defs.' MSJ App. 140**

Table 5.1.  Number of PMFs in Circulation

| All Kit Manufacturers | 84 |
|---|---|
| Years in Production | 6 |
| Median Revenue of All Manufacturers | $478,000 |
| Average Retail Price of Kits/Receivers | $116.30 |
| Annual Production | 345,245 |
| Total in Circulation | 2,071,470 |

Based on bump stock turn-ins after the final rule on "Bump-Stock-Type Devices" went into effect,[42] individuals turned in an average of two bump stocks.  One commenter suggested that individuals may own several PMF handguns and one PMF rifle.  For purposes of this analysis, ATF assumes three handguns and one rifle as the number of PMFs owned by individuals.  Using these data points, ATF estimates a range of individuals in Table 5.2.

Table 5.2.  Range of Individuals Who Currently Own PMFs

| Low | Midrange | High |
|---|---|---|
| 517,868 | 1,035,735 | 2,071,470 |

5.4.  Cost of Markings on Weapon Parts Kits and PMFs for FFL and non-FFL Dealers

As stated above, this chapter primarily deals with Type 01 and Type 02 FFLs dealers and non-dealers that will now need to mark their existing inventories of PMFs and firearm parts kits with a partially complete frame or receiver.  ATF assumes the cost associated with this marking

---

[42] Bump-Stock-Type Devices, 83 FR 66514 (Dec. 26, 2018).

-61-

ATF071202

Defs.' MSJ App. 141

is primarily a one-time cost because manufacturers will be marking future firearm parts kits with a partially complete frame or receiver.  There may be annual costs for FFL dealers if they take PMFs into their inventory due to repairs or customization.

### 5.4.1.  Costs for Non-FFL Manufacturers

For non-FFL manufacturers that will be affected by this provision and their associated costs, please refer to chapter 4 above.

### 5.4.2.  Costs for FFL and non-FFL Dealers

Based on comments received regarding the NPRM, ATF revised some of the cost estimates of this chapter.  Depending on their staff, equipment, and FFL status, FFL dealers and non-FFL dealers have several ways to respond to the final rule.  ATF envisions five different scenarios resulting from the final rule that could cause costs for FFL and non-FFL dealers:

- Scenario 1: 42 FFL dealers with gunsmithing capabilities will engrave their own inventory;

- Scenario 2: 74 FFL dealers without gunsmithing capabilities will hire or outsource the engraving of their inventory to another FFL;

- Scenario 3: 74 FFL dealers and 12 non-FFL dealers will dispose of their inventory;

- Scenario 4: 12 non-FFL dealers will dissolve their businesses; and

- Scenario 5: 0 non-FFL dealers will become licensed as an FFL dealer.

For information regarding the numbers of affected populations, please read the different scenarios below.

5.4.2.1.  Scenario 1: In-house Engraving

Based on informal observations from its field divisions, ATF estimates that FFL dealers maintain, on average, 10 firearm parts kits with a partially complete frame or receiver in inventory.  As discussed above, ATF also contacted 10 FFL dealers to inquire whether they would be interested in participating in an information request.  Of those 10, only 2 responded. Of the two that responded, one did not provide any information and the other did not deal in firearm parts kits with a partially complete frame or receiver.  Because there is no way to obtain accurate numbers or information on these types of firearm kits, observations from field division inspections were deemed to be the best available source of information.

As discussed above in section 5.3.2, ATF estimates that there are 124 Type 01 and 66 Type 02 FFL dealers that deal in firearm parts kits with a partially complete frame or receiver. Using the same methodology of averaging the estimated percentages from the different field divisions, ATF estimates that 28.7 percent of Type 01 FFLs and 9.66 percent of Type 02 FFLs have gunsmithing capabilities.  Using this information, ATF estimates that 36 Type 01 FFLs and 6 Type 02 FFLs (or 42 Type 01 and 02 FFLs combined) will use existing staff and equipment to perform in-house engraving.[43,44]

Because these FFL dealers already have gunsmithing capabilities, ATF assumes for purposes of this analysis that these FFL dealers will have in-house capabilities for engraving their existing inventory.  ATF used information reported by BLS to obtain an average wage rate

---

[43] 124 Affected Type 1 FFLs * 28.7 percent = 36 Type 1 FFLs with gunsmithing services.

[44] 66 affected Type 2 FFLs * 9.66 percent = 6 Type 2 FFLs with gunsmithing services.

ATF071204

Defs.' MSJ App. 143

for gunsmiths.  In the NPRM, ATF used the most recent wage rates by the publication of the

NPRM, which was 2019 data.  Comments suggested that wage rates changed drastically between

2019 and 2021, and that an inflation adjustment should be included.  Therefore, ATF updated the

wage rates to 2020, which is the latest information available at the time of analysis, and

multiplied the 2020 base wage rate by the Employee Cost Index of 1.035 to account for the

inflation of wages to 2021.[45]  In addition to the Employee Cost Index, ATF also used a load rate

of 1.4209 to account for additional costs like fringe benefits.[46]  Table 5.3 illustrates the wage

categories used for gunsmiths.

Table 5.3.  Wage Categories Used for Gunsmithing Activities

| Hourly Wage | Hourly Wage Adjusted with Employee Cost Index | Loaded Wage Rate | BLS Occupation | Website |
|---|---|---|---|---|
| $21 | $22 | $31 | 51-4022 Forging Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls.gov/oes/2020/may/oes514022.htm |
| $19 | $10 | $28 | 51-4199 Metal Workers and Plastic Workers, All Other | https://www.bls.gov/oes/2020/may/oes514199.htm |

[45] BLS, *Employment Cost Index—June 2021* (July 30, 2021), *available at* https://www.bls.gov/news.release/archives/eci_07302021.pdf (last visited Mar. 24, 2022).

[46] A loaded wage rate is hourly wage rate adjusted to include costs of fringe benefits such as insurance.  The load rate is based on theaverage total compensation of $36.29 (CMU2010000000000D) for the years 2020 and 2021 divided by the average wages and salaries of $25.54 (CMU2020000000000D) for the years 2020 and 2021.  BLS, *Employer Cost for Employee Compensation*, *available at* https://data.bls.gov/cgi-bin/surveymost?cm (last visited Mar. 24, 2022).

ATF071205

Defs.' MSJ App. 144

| | | | 51-4031 Cutting, Punching, and Press Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls.gov/oes/2020/may/oes514031.htm |
|---|---|---|---|---|
| $19 | $19 | $27 | | |
| Average Loaded Wage | | **$29** | | |

ATF used the average loaded wage ($29) of the three job categories referenced in Table 5.3 for the loaded wage of a gunsmith.  Engraving firearm parts kits with a partially complete frame or receiver requires two collections of information ("COIs").  ATF utilized the hourly burden for making firearms from prior relevant PRA COI determinations.[47]  Based on the hourly burdens as reported in these COIs, the hourly burden to mark a firearm is 0.01667 hours and the hourly burden for entries into A&D records is 0.05 hours.  Table 5.4 outlines the per FFL dealer cost to engrave existing inventory of firearm parts kits with a partially complete frame or receiver.

Table 5.4.  Per FFL Dealer Cost to Engrave Existing Inventory of Firearm Parts Kits with a Partially Complete "Frame or Receiver"

| Activity Type | COI Number | Hourly Burden | Loaded Wage Rate | Existing Inventory | Entries per Kit | One-time Cost per FFL |
|---|---|---|---|---|---|---|
| Entries into A&D Records | COI: 1140-0032 | 0.05 | $29 | 10 | 2 | $29 |
| Mark Firearms | COI: 1140-0050 | 0.01667 | $29 | 10 | 1 | $5 |
| Total | | | | | | **$33** |

---

[47] ATF, *Identification Markings Placed on Firearms*, available at https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201807-1140-003 (last visited Mar. 24, 2022); and ATF, *Records of Acquisition and Disposition, Collection of Firearms*, available at https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202005-1140-002 (last visited Mar. 24, 2022).

ATF071206

**Defs.' MSJ App. 145**

Because these FFL dealers retail in firearm parts kits with a partially complete frame or receiver, and because they have gunsmithing capabilities, for the purposes of this analysis, ATF assumes that there may be recurring costs to engrave individually owned PMFs currently in circulation when these PMFs enter an FFL's inventory.  An SME in FATD with prior gunsmithing experience estimated that a gunsmith would work on several hundred PMFs a year. For the purposes of this analysis, ATF used an overestimate of 500 repairs per year.  Due to the inherently busy nature of gunsmithing, the SME also specified that on-the-spot repairs are unlikely, and that most PMFs are held overnight and thus already included in A&D records as a PMF (though generally recorded without a serial number).  Therefore, ATF has attempted to estimate an annual recurring cost for PMFs that enter inventory due to repairs or customization that result in the PMF being held overnight.  However, based on the number of comments received regarding the serialization of PMFs, ATF estimates that seeking the services of FFLs for repairs or customization is less likely to occur, so the costs are overestimated.

Because PMFs are already entered into A&D records, ATF did not estimate an additional cost for A&D records; instead, ATF estimated only the cost for serializing PMFs.  The additional cost to individuals for serializing their PMF are accounted for under the costs to individuals below.  The hourly wage burden to mark a firearm is estimated to cost $0.48.[48]  Table 5.5 shows annually recurring costs per FFL dealer to serialize PMFs held overnight in inventory.

Table 5.5.  Annually Recurring Cost to Engrave PMFs Held Overnight in Inventory

---

[48] $0.48 cost to mark a PMF = $28.66 hourly wage * 0.01667 hours.

-66-

ATF071207

Defs.' MSJ App. 146

| | |
|---|---|
| Number of Repairs per Year | 500 |
| Cost to Mark per PMF | $0.48 |
| Annual Cost per FFL | $240 |

Table 5.6 provides a summary of the per FFL and industry costs outlined above.

Table 5.6.  Summary of Costs for FFL Dealers with Gunsmithing Capabilities

| Affected Population | Existing Inventory Cost | Annual Repair Costs | Per FFL First Year Cost | First Year Cost |
|---|---|---|---|---|
| 42 | $33 | $240 | $273 | $11,484 |

5.4.2.2.  Scenario 2: Contract out Gunsmithing Services

Of the remaining Type 01 and 02 FFL dealers, ATF assumes that a portion may contract out engraving services to a separate FFL or a licensed gunsmith.  Those FFL dealers that do not do so may instead opt to dispose of their inventory of firearm parts kits with a partially complete frame or receiver.  Because there is no way to determine which FFL dealers will chose to contract out engraving services or dispose of their inventory, ATF assumes 50 percent of the dealers will choose each option.  The 50 percent of dealers that choose to dispose of their inventory are discussed further in section 5.4.2.3, below.

ATF estimates that there are 44 Type 01 and 30 Type 02 FFL dealers that deal in firearm parts kits with a partially complete frame or receiver yet do not have gunsmithing capabilities and that would opt to obtain the services of a separate FFL to engrave these firearm parts kits in their inventory.  ATF estimates that the average price for serialization paid by these 74 dealers

-67-

Defs.' MSJ App. 147

would be $42.[49]

Although comments suggested a range of costs from $35 for serialization to $405 to include cleaning, oiling, bluing, and polishing services, ATF believes that $42 is an appropriate cost to use.  Based on information from an SME in FATD with gunsmithing experience, most individuals who engrave firearms do not request additional services such as cleaning or oiling when seeking engraving services.  Therefore, ATF did not account for the costs of these extra services.

ATF estimates the existing inventory of each FFL to be 10 firearm parts kit with a partially complete frame or receiver.  Based on the information above, ATF estimates that the per FFL cost for engraving inventory is $420, making the total cost for all FFLs for engraving inventory to be $31,080.[50]

5.4.2.3.  Scenario 3: Disposal Costs

As stated in the previous section, ATF assumed an even distribution between FFLs that would hire another party to engrave their inventory and FFLs that would dispose of their inventory.  Thus, much as ATF assumed 74 FFLs would choose to have their inventory engraved, ATF assumes that 74 FFLs would choose to dispose of their inventory.

In this portion of the analysis, ATF also considered the disposal costs for non-FFL

---

[49] For representative indications of the price of engraving services, see, e.g., Tar Heel State Firearms, *SBR / SBS Laser Engraving*, *available at*
https://tarheelstatefirearms.com/store/index.php?route=product/product&product_id=232 (last visited Mar. 25, 2022); Atomic Engraving, *Serial Number Engraving*, *available at* https://www.atomicengraving.com/product-category/firearms-engraving/serial-number-engraving-ca-compliant/ (last visited Mar. 25, 2022).  As noted above, ATF cannot account for fluctuations in market prices over time, and the estimated price of engraving services used in this analysis—$42—may not precisely match the prices quoted by the cited websites or other providers of such services.

[50] $31,080 = 74 FFLs * (10 firearm parts kit with a partially complete frame or receiver * $42 to serialize each kit).

ATF071209

**Defs.' MSJ App. 148**

dealers.  Some of these dealers may dissolve their business as a result of the rule, whereas some non-FFL dealers may choose only to dispose of their inventories of affected items.  Because ATF cannot determine which non-FFL dealers will choose which option, ATF assumed that 50 percent of non-FFL dealers would dissolve their business and 50 percent would choose only to dispose of their inventory.  Thus, ATF assumed that 12 non-FFL dealers would dispose of their inventory.  ATF assumed that the remaining 12 non-FFL dealers would dissolve their business, and these dealers are discussed more fully in section 5.4.2.4, below.

Both FFL and non-FFL dealers are also retail stores.  Hence, ATF assumes that a non-specialized retail employee will perform the work of disposing firearm parts kits with a partially complete frame or receiver.  For purposes of this analysis, ATF used the wage category of cashier to dispose of the existing inventory.  Table 5.7 provides the wage rate for a cashier.

Table 5.7.  Wage Rate for a Non-Specialized Employee

| Wage Rate | Wage Rate Adjusted with Employee Cost Index | Loaded Wage Rate After Adjustment for Cost Index | Title | Website |
|---|---|---|---|---|
| $12 | $13 | $18 | 41-2011 Cashier | https://www.bls.gov/oes/2020/may/oes412011.htm |

ATF anticipates that the same or similar methods that are used to destroy bump stock-type devices will be used to destroy a firearm parts kit with a partially complete frame or receiver.  Based on disposal information from ATF's rule regarding bump-stock type devices, ATF used the hourly burden as reported for small businesses as determined by the SBA.  Table 5.8 provides the cost and hourly burden to dispose of existing inventory.

-69-

Table 5.8.  Hourly Burden and Cost to Dispose of Existing Inventory of Firearm Parts Kits with a Partially Complete "Frame or Receiver"

| Hourly Burden | Loaded Wage Rate After Adjustment with Employee Cost Index | Per Dealer Cost | Source |
|---|---|---|---|
| 0.25 | $18 | $5 | Bump-Stock-Type Devices, 83 FR 66514, 66550 (Dec. 26, 2018). |

Because ATF does not know the inventory of non-FFL dealers, for the purposes of this analysis, ATF uses the same estimate of 10 firearm parts kits with a partially complete frame or receiver as was used above for FFL dealers.  ATF notes that this is likely to be an underestimate for non-FFL dealers because most firearm parts kits with a partially complete frame or receiver are available for purchase online.  However, for the purposes of this analysis, ATF assumes that non-FFL dealers that incur the costs described here sell other items and not only firearm parts kits with a partially complete frame or receiver; therefore, the loss of such parts kits due to disposal would only be a part of their total revenue.

In addition to the hourly burden of disposing existing inventory of firearm parts kits with a partially complete frame or receiver, these FFL and non-FFL dealers will incur a loss in inventory.  Table 5.9 lists the retail prices of firearm parts kits with a partially complete "frame or receiver" used for this analysis.  As noted earlier, the prices quoted by vendors such as the ones referenced here may fluctuate over time, but ATF believes the average price reported in Table 5.9 is a reasonable price to use for this RIA.

Table 5.9.  Retail Price of Firearm Parts Kits with a Partially Complete "Frame or Receiver"

| Cost | Vendor | Website |
|---|---|---|

ATF071211

Defs.' MSJ App. 150

| | | |
|---|---|---|
| $150 | Polymer 80 | https://www.polymer80.com/pistols/80percentpistolkits |
| $170 | Polymer 80 | https://www.polymer80.com/pistols/80percentpistolkits |
| $255 | 5D Tactical | https://www.5dtactical.com/80-build-kits-s/160.htm |
| $912 | 5D Tactical | https://www.5dtactical.com/80-build-kits-s/160.htm |
| $616 | 5D Tactical | https://www.5dtactical.com/80-build-kits-s/160.htm |
| $53 | Tennessee Arms | https://www.tnarmsco.com/categories/bundle-packs/80-bundles.html |
| $191 | Tennessee Arms | https://www.tnarmsco.com/categories/bundle-packs/80-bundles.html |
| $466 | Tennessee Arms | https://www.tnarmsco.com/categories/bundle-packs/80-bundles.html |
| $317 | Tennessee Arms | https://www.tnarmsco.com/categories/bundle-packs/80-bundles.html |
| $224 | Tennessee Arms | https://www.tnarmsco.com/categories/bundle-packs/80-bundles.html |
| $335 | | Average Price |

*Note: Calculations using these estimates may not be exact due to rounding.

At an average price of $335 per kit, the total loss in inventory per dealer is $3,354. Including the $5 hourly burden cost for disposal, the per FFL and non-FFL dealer cost to dispose of existing inventory of firearm parts kits with a partially complete frame or receiver is $3,359, making the industry cost for this scenario $288,835.[51]

### 5.4.2.4.  Scenario 4: Non-FFL Dealer Dissolves Business

Some non-FFL dealers only or primarily sell firearm parts kits with a partially complete frame or receiver.  Upon publication of the final rule, it is unlikely that these non-FFL dealers will be able to continue their business.  As described above, however, ATF assumed for the purposes of this analysis that half of the non-FFL dealers will simply dispose of their inventory

---

[51] $288,835 = 86 FFL and non-FFL dealers * ((10 firearm parts kits with a partially complete frame or receiver * $335) + $5 hourly disposal cost).

-71-

of affected items and remain in business; and only the remaining half of non-FFL dealers will dissolve their business.

Based on the information gathered on non-FFL dealers, the average revenue of a non-FFL dealer is $405,667.  The median revenue is $117,000.  Given the large discrepancy among the known revenues of non-FFL dealers, ATF used the median revenue rather than the average revenue.  Assuming 12 non-FFL dealers, with median revenues of $117,000, dissolve their business, ATF estimates this scenario will have an annual cost of $1.4 million.[52]

5.4.2.5.  Scenario 5: Non-FFL Dealer Becomes an FFL

Anecdotal evidence from the ATF field divisions indicates that most firearm parts kits with a partially complete frame or receiver are sold online and not through a local storefront.  It is unclear whether a non-FFL dealer that primarily sells on the internet will be able to completely change its operations to comply with the regulations that licensed dealers must abide by, including having a physical place of business where they maintain their inventory and records that are subject to ATF inspection.  However, to illustrate the potential cost for a non-FFL dealer to become licensed as a Type 01 or Type 02 FFL, ATF estimates the per company cost for a non-FFL dealer to become an FFL dealer.

In order to become licensed as a Type 01 or Type 02 FFL dealer, the non-FFL dealer will need to submit a Form 7 application.  Table 5.10 outlines the hourly burden and costs for the first-year application to become licensed as a Type 01 or Type 02 FFL.  In calculating these costs, ATF used the same sources as described earlier when discussing the costs associated with

---

[52] 12 non-FFL dealers * $117,000 median revenue = $1,404,000.

ATF071213

Defs.' MSJ App. 152

Form 7.

Table 5.10.  Application Cost to be a Type 01 or 02 FFL

| Cost Item | Hourly Burden | Hourly Wage Rate | Hourly Wage Adjusted with Employee Cost Index | Loaded Hourly Wage Rate After Adjustment with Cost Index | Wage Burden | Cost Item | |
|---|---|---|---|---|---|---|---|
| Form 7 | 1 | $60 | $63 | $89 | $89 | $200 | |
| Fingerprints | 1 | $60 | $63 | $89 | $89 | $19 | |
| Passport Photo | 0.5 | $6 | $63 | $89 | $44 | $16 | |
| Postage | | | | | | $1 | |
| Application Cost | | | | | $222 | $236 | **$458** |
| Renewal Cost | 0.50 | $60 | $63 | $889 | $44 | $90 | **$134** |

In addition to the application for an FFL license, non-FFL dealers will also need to begin

maintaining A&D records.  In order to determine the number of firearm parts kits with a partially

complete frame or receiver that will now need to be entered in A&D records, ATF used the

median revenue for non-FFL retailers divided by the average retail price for a firearm parts kit to

derive an estimated number of 349 firearm parts kits with a partially complete frame or receiver

-73-

per year.[53]  Multiplied by 2 entries for acquisitions and dispositions, the total number of entries is

estimated to be 698.  Because retailers do not need specialized employees to record serial

numbers, ATF used the same BLS category of cashier to enter A&D records at the loaded wage

rate of $18.  For more information regarding this wage category, please refer to scenario 4 above.

Table 5.11.  Cost to Maintain A&D Records

| Population Type | Hourly Burden | Loaded Wage Rage | Estimated Entries Annually | Per Dealer Cost |
|---|---|---|---|---|
| Non-FFL Dealers | 0.0167 | $18 | 698 | $211 |

In addition to incurring costs associated with A&D records non-FFL dealers seeking to

become FFL dealers will need to procure engraving services for their inventory from an FFL that

provides engraving services.  Table 5.12 provides a summary of the one-time cost to engrave

existing inventory.

Table 5.12.  One-time Cost for Non-FFL Dealers to Engrave Existing Inventory of Firearm Parts
Kits with a Partially Complete "Frame or Receiver"

| | |
|---|---|
| Average Cost to Contract out Existing Inventory for Engraving | $42 |
| Number of Kits | 349 |
| Application Cost | $458 |
| Total First Time Cost | $15,116 |

---

[53] 349 firearm parts kit with a partially complete "frame or receiver" = $117,000 median revenue / $335 retail price of a parts kit.

-74-

Table 5.13 provides a summary of the cost for a non-FFL dealer to become a licensed Type 01 or 02 FFL.

Table 5.13.  Summary of Costs for a Non-FFL Dealer to Become Licensed as an FFL Dealer

| Population Description | One-time Cost | Annual Recurring Cost | Every 3 Year FFL Renewal Cost | Per Company First Year Cost |
|---|---|---|---|---|
| Cost | $15,116 | $211 | $134 | $15,328 |

Based on a median annual revenue of $117,000, this scenario is likely to cost 13 percent of the revenue of a non-FFL dealer.

### 5.4.3.  Costs for Individuals to Mark PMFs

As stated previously in various sections, the final rule does not require serialization of all PMFs currently in circulation.  Although there may be State or local requirements for individuals to serialize their PMFs, the Federal requirements do not require serialization for PMFs owned by individuals unless they transfer their PMFs to an FFL.  In the NPRM, ATF did not estimate costs for an individual to do so because ATF assumed that individuals with PMFs would choose to avoid taking their PMF to an FFL to avoid the serialization requirement and hence would not incur any associated costs.  This assumption was reinforced by the many comments that ATF received regarding PMFs.

However, some commenters asserted that the rule disproportionately affects low-income households because it is more arduous and expensive for an individual to go through an FFL to purchase firearms than it is for an individual to purchase an unregulated firearm parts kit online and build a PMF.  ATF disagrees that the final rule disproportionately affects low-income households.  Regardless of the rule, ordering a firearm parts kit online and building a PMF may

-75-

take more time and money overall than going to an FFL to purchase a complete firearm.

Scenario 1 illustrates the cost for an individual to go to an FFL to purchase a complete firearm

compared to the cost of building a PMF.   Additionally, because there is at least some possibility

that individuals may choose to take an existing PMF to an FFL for repairs or customization, ATF

estimates the cost for individuals to bring their PMFs to an FFL to be serialized.

5.4.3.1.  Result 1: Individuals Go to an FFL to Purchase a Firearm

Table 5.14 illustrates the cost to travel to an FFL to purchase a firearm.

Table 5.14.  Cost for Milage to an FFL

| | | |
|---|---|---|
| Miles Traveled | 35.48 | ATF estimated during a previous rulemaking that this is the average distance traveled by an individual to turn in bump stock-type devices to ATF. |
| Per Diem for Miles Traveled | $.59 | General Services Administration, *Privately Owned Vehicle (POV) Mileage Reimbursement Rates* (Jan. 1, 2022), *available at* https://www.gsa.gov/travel/plan-book/transportation-airfare-pov-etc/privately-owned-vehicle-pov-mileage-reimbursement-rates last visited (Mar. 26, 2022). |
| Cost for Miles Traveled | $21 | |

*Note: Calculations using these estimates may not be exact due to rounding.

Based on the Department of Transportation's guidance on the costs for leisure time,

ATF attempted to update the leisure wage based on the methodology outlined in the guidance.[54]

The Department of Transportation uses the median household income as the base for income

---

[54] Dep't of Transportation, *Revised Departmental Guidance on Valuation of Travel Time in Economic Analysis* (Sept. 27, 2016), *available at* https://www.transportation.gov/office-policy/transportation-policy/revised-departmental-guidance-valuation-travel-time-economic last visited (Mar. 26, 2022).

ATF071217

Defs.' MSJ App. 156

from the Census.  ATF used the latest median income of a household from the Current

Population Survey Annual Social and Economic Supplements, as published by the Census

Bureau in September 2021.[55]  Table 5.15 provides the leisure wage.

Table 5.15.  Leisure Wage Rate for Individuals

| Median Household Income (2021) | $67,521 |
| --- | --- |
| DOT Travel Time | 2080 |
| Value of Travel Time Savings | 50% |
| Leisure Wage | $16 |

ATF notes that the value calculated for the time and miles traveled are likely to be

overestimates because the data is based on the time and miles traveled for an individual to go to

an ATF field office rather than an FFL.  There are more FFL locations than there are ATF

locations; therefore, FFL locations may be closer to the individual.  Based on these

assumptions, Table 5.16 outlines the cost for an individual to go to an FFL (roundtrip) to

purchase an affected firearm kit.

Table 5.16.  Individual Cost to Go to an FFL (Roundtrip)

| Total Cost for Driving Time | $25 |
| --- | --- |
| Cost for Miles Traveled | $21 |
| FFL Transfer Fee | $35 |
| Cost per Trip (per Individual) | $81 |

---

[55] Census Bureau, *Income and Poverty in the United States: 2020* (Sept. 14, 2021), *available at* https://www.census.gov/library/publications/2021/demo/p60-273.html (last visited Mar. 26, 2022).

The per individual cost to go to an FFL to purchase a firearm is $81.  In contrast, Table 5.17 illustrates an estimated time to build a PMF.

Table 5.17.  Estimated Time (in Hours) to Build a PMF

| | |
|---|---|
| Time to Build a PMF (low) | 4 |
| Time to Build a PMF (high) | 8 |
| Average Time | 6 |
| Leisure Wage | $16 |
| Cost to Build a PMF | $97 |

*Note: Calculations using these estimates may not be exact due to rounding some of the values used as inputs for subsequent calculations.

As illustrated, Table 5.17 shows that the cost to build a PMF is $97, which is more than the cost to go to an FFL to purchase firearm, as reported in Table 16 ($81).  Furthermore, various YouTube videos show that personally building a firearm is more expensive than buying a similar type of firearm through an FFL.[56, 57]

5.4.3.2.  Scenario 2: Serialization Cost

Based on the average cost of serialization as described above, ATF estimates that it will cost an additional $42 to serialize a PMF.

5.5.  Benefits of Marking PMFs

ATF anticipates a one-time surge in the markings of firearm parts kits with partially

---

[56] YouTube, *Polymer 80 What Does It Cost To Build* (June 16, 2021), *available at* https://www.youtube.com/watch?v=l4N1k6Hjqqk (last visited Mar. 26, 2022) (explaining at 2:24 that "[b]uilding the polymer 80 was about $50 or so more than buying a Glock 19," with a total price to build of $630.47).

[57] YouTube, *POLYMER 80 BUILD COST BREAKDOWN* (July 8, 2021), *available at* https://www.youtube.com/watch?v=a_prtH4NQ5g (last visited Mar. 26, 2022) (acknowledging at 4:00 that the price to personally build a Glock can be "pretty close to what a Glock costs" at retail, but also noting that costs for personally building a Glock can run higher than retail prices if a person is not knowledgeable about how to construct the weapon, with a cost of up to $1,000).

ATF071219

**Defs.' MSJ App. 158**

complete frames or receivers and PMFs, primarily from Type 01 and Type 02 FFL dealers.

Regulating these items will help prevent felons and other prohibited persons from easily

obtaining unmarked firearms without a background check and illegally making PMFs.  Bringing

these kits and PMFs within the regulated market thereby helps prevent violent crime, allows

ATF to locate and prosecute offenders and their straw purchasers, and makes it easier to trace

firearms to criminals who commit crimes with the weapons they build from those kits.  As

reported by commenters, the objective of ATF in issuing the rule is to increase public safety.

For more discussion on the benefits of serializing firearm kits and PMFs, please refer to

chapter 4 on manufacturers of firearm parts kits with a partially complete frame or receiver.

# 6.  Gunsmithing

The final rule amends the definition of "gunsmith" under the term "engaged in the

business" to make clear that businesses may be licensed as dealer-gunsmiths rather than as

manufacturers if they, among other things, routinely repair or customize existing firearms not for

sale or distribution, or mark PMFs, which by definition includes unmarked firearm parts kits

with partially complete frames or receivers.  The final rule also makes clear that gunsmiths are

not required to be licensed as manufacturers if they perform gunsmithing services only on

existing firearms for their customers, or for another licensee's customers, because the work is not

being performed to create firearms for sale or distribution.  The change to the definition also

allows greater access to professional marking services so that individuals or gunsmiths can be

licensed as dealer-gunsmiths solely to provide professional PMF marking services.  This

provision includes all FFLs that perform gunsmithing activities; in particular, it may encompass

ATF071220

Defs.' MSJ App. 159

gunsmiths that perform custom work on firearms.

## 6.1.  Need for Change in Definition of Gunsmithing

The final rule allows persons to become licensed as Type 01 and Type 02 FFLs (dealers or pawnbrokers) to accommodate the increase in the number of firearm parts kits with a partially complete frame or receiver and PMFs that must be serialized.

## 6.2.  Comments Received on Gunsmithing

One commenter stated that the proposed rule would increase the cost to gunsmith PMFs, particularly for small changes such as on-the-spot repairs and firearm competitions.  ATF concurs and, under the final rule, licensees will need to mark and record only PMFs that are acquired into inventory.  The final rule specifically excludes from this requirement adjustments or repairs of PMFs where the firearm is returned to the person from whom it was received on the same day.

One commenter opposed the definition of gunsmith proposed in the NPRM, stating that one should not need to be licensed in order to gunsmith.  ATF disagrees because the requirement for gunsmiths to be licensed if they are engaged in the business of providing gunsmithing services is an existing statutory requirement.  The final rule clarifies that Type 01 and 02 FFLs can perform gunsmithing and customization services, which include marking services on firearms, rather than requiring them to apply for a Type 07 manufacturer's license.

One commenter suggested that there was a discrepancy in the regulatory analysis regarding contract gunsmithing.  ATF concurred with this and other commenters, as discussed in chapter 5 for dealers of firearm parts kit with a partially complete frame or receiver.  ATF has significantly revised and clarified those costs in both the rule and chapter 5 of this RIA.

ATF071221

Defs.' MSJ App. 160

One commenter asserted that ATF significantly underestimated the activities for gunsmithing; the commenter did not understand why the number of items needing to be serialized was so low.  ATF reiterates that PMFs for personal use are not required to be serialized (unless required by State or local law); instead, only those PMFs that are taken into inventory by FFLs must be serialized.  Further, as noted above, the final rule exempts same-day adjustments and repairs from this requirement.  Because adjustments and repairs are done by gunsmiths, ATF assumes that FFLs with gunsmithing capabilities will be performing repairs or customizations of PMFs, so ATF incorporated the annual costs for these FFLs.  Also, the additional costs are primarily a one-time cost to FFL dealers that outsource or hire gunsmiths to serialize their existing inventory of firearm parts kit with a partially complete frame or receiver, as discussed in chapter 5.

## 6.3.  Gunsmithing Population

Although gunsmithing activities can be performed by all licensed manufacturers, the final rule allows persons who are engaged in the business of marking firearms to be licensed as Type 01 and Type 02 dealers specifically to mark firearms.  For the purposes of this RIA, ATF has broken this provision up by population because some of the marking requirements are for Type 01 and Type 02 FFLs whose main operations are not gunsmithing activities, but rather retail sales or pawn brokering.  For purposes of this analysis, ATF is using the term "gunsmith" to indicate that these may be FFLs that perform more custom work or repairs on firearms.

Based on informal observations from ATF field divisions located throughout the country, ATF estimates that 28.7 percent of Type 01 FFLs and 9.66 percent of Type 02 FFLs already have gunsmithing capabilities.  For more information on this subset of FFLs that would do in-

ATF071222

**Defs.' MSJ App. 161**

house engraving, please refer to chapter 5, section 5.4.2.1.  Additionally, for purposes of this analysis, ATF estimates that 74 FFLs would need to hire or contract with another licensed dealer-gunsmith in order to serialize the PMFs in their inventory that would need to be marked as a result of the final rule.  For more information regarding these 74 FFLs, please refer to chapter 5, section 5.4.2.  This chapter relates to the FFLs that receive serialization orders from the 74 FFLs that outsource their engraving to a separate FFL.  ATF assumes that there will be 74 FFLs that incur one-time serialization costs from fulfilling orders from the 74 FFLs that outsource the serialization of their existing inventory of firearm parts kit with a partially complete frame or receiver.

### 6.4.  Gunsmithing Costs

ATF anticipates that there would be a one-time increase in requests from other FFLs to provide custom markings of serial numbers on PMFs and firearm parts kits with a partially complete frame or receiver.  Although FFLs can mark the firearms in their inventory themselves, there may be a portion who opt to outsource the marking to another FFL that specializes in engraving services.  The costs for serializing these kits from the outsourcing by Type 01 and 02 FFLs to gunsmiths are outlined in chapter 5, above.  This chapter outlines the costs for FFLs to receive and fulfill outsourced requests from FFLs that currently have firearm parts kit with a partially complete frame or receiver.

For the FFL dealers that receive these requests to serialize another FFL's existing inventory of firearm parts kit with a partially complete frame or receiver, ATF assumes that these FFLs will have additional costs due to (1) completing A&D records from the one-time increase in serialization, and (2) the time spent making these firearm parts kits.  ATF used approximate

ATF071223

job categories from BLS to obtain an average wage rate for gunsmiths.  In the NPRM, ATF used the most recent wage rates at time of the NPRM's publication, which was 2019 data. Commenters suggested that wage rates changed drastically between 2019 and 2021 and that an inflation adjustment should be included.  One commenter specifically referenced the Employee Cost Index as an appropriate inflation rate.  ATF concurs and has updated the wage rates to use data from 2020, which is the latest reported data at the time of this analysis.  ATF has also multiplied the 2020 base wage rate by the Employee Cost Index of 1.035 to account for the inflation of wages to 2021.[58]  In addition to the Employee Cost Index, ATF also used a load rate of 1.4209 to account for additional costs like fringe benefits.[59]  Table 6.1 illustrates the wage categories used for gunsmiths.

Table 6.1.  Wage Categories Used for Gunsmithing Activities

| Hourly Wage | Hourly Wage Adjusted by Employee Cost Index | Loaded Wage Rate | BLS Occupation | Website |
|---|---|---|---|---|
| $21 | $22 | $31 | 51-4022 Forging Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls.gov/oes/2020/may/oes514022.htm |

---

[58] BLS, *Employment Cost Index—June 2021* (July 30, 2021), *available at* https://www.bls.gov/news.release/archives/eci_07302021.pdf (last visited Mar. 24, 2022).

[59] A loaded wage rate is the wage rate adjusted to include fringe benefits such as insurance.  The load rate is based on the average total compensation $36.29 (CMU2010000000000D) for years 2020 and 2021 divided by the average wages and salaries $25.54 (CMU2020000000000D) for years 2020 and 2021.  *See* BLS, *Employer Cost for Employee Compensation*, *available at* https://data.bls.gov/cgi-bin/surveymost?cm (last visited Mar. 24, 2022).

ATF071224

Defs.' MSJ App. 163

| | | | | https://www.bls. gov/oes/2020/ma y/oes514199.ht m |
|---|---|---|---|---|
| $19 | $20 | $28 | 51-4199 Metal Workers and Plastic Workers, All Other | |
| $19 | $19 | $27 | 51-4031 Cutting, Punching, and Press Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls. gov/oes/2020/ma y/oes514031.ht m |
| Average Loaded Wage | | **$29** | | |

ATF used the average loaded wage ($29) of the three job categories referenced in Table 6.1 for the loaded wage of a gunsmith. Engraving firearm parts kits with a partially complete frame or receiver requires two COIs, one COI for marking firearms, and one COI for maintaining A&D records. ATF utilized the hourly burden for making firearms from prior relevant PRA COI determinations and then assumed that these firearm parts kits with a partially complete frame or receiver will have two entries, one for acquisition and one for disposition. Based on the hourly burdens as reported in these COIs, the hourly burden to mark a firearm is 0.01667 hours and the hourly burden for entries into A&D records is 0.05. Table 6.2 outlines the total hourly burden for gunsmiths to complete the records required when they take in firearm parts kits with a partially complete frame or receiver.

Table 6.2. Hourly Burden Due to Additional A&D Entries

| OMB 1140-0032 A&D Records | |
|---|---|
| FFLs that Receive Outsourcing Requests | 74 |
| | |
| Number of Kits in Inventory | 10 |
| Total Items | 740 |
| | |

ATF071225

**Defs.' MSJ App. 164**

| | |
|---|---|
| Number of Entries per Submission | 2 |
| Total Number of Entries | 1480 |
| | |
| Hourly Burden per Entry | 0.05 |
| Hourly Burden due to Rule | 74 |

Table 6.3 outlines the total hourly burden for gunsmiths to mark the firearm parts kits with a partially complete frame or receiver after receiving them by FFLs dealers that have chosen to outsource the work required to comply with the marking requirements.

Table 6.3.  Cost to Mark Firearms

| | |
|---|---|
| OMB 1140-0050 Marking a Firearm | |
| FFLs Outsourcing | 74 |
| | |
| Number of Kits in Inventory | 10 |
| Total Items | 740 |
| | |
| Number of Markings on a Firearm | 1 |
| Total Number of Markings | 740 |
| | |
| Hourly Burden per Marking | 0.01667 |
| Hourly Burden due to Rule | 12 |

The total hourly burden for completing the records and performing the marking is 86 hours.  ATF multiples this hourly burden by the average loaded wage rate of $29 to determine the one-time cost to engrave kits sent out from FFL dealers that deal in firearm parts kits with a partially complete frame or receiver, but do not have gunsmithing capabilities, of $2,474.  For purposes of this analysis, only the one-time cost to serialize an existing inventory of firearm parts

ATF071226

Defs.' MSJ App. 165

kits with a partially complete "frame or receiver" is considered part of the total cost of the rule. However, as similarly suggested in chapter 5, FFLs with gunsmithing capabilities may currently be repairing or customizing PMFs currently in circulation.  FFLs may continue to adjust or repair unserialized PMFs regardless of the rule; however, they will be required to serialize the PMF if the FFL takes an unserialized PMF into inventory for a purpose other than same-day adjustment or repair.  Because going to an FFL is an optional decision for owners of unserialized PMFs, as reflected in the comments, ATF anticipates that owners of PMFs will be less likely to do so after issuance of the final rule.  Furthermore, ATF does not have access to information that would allow it to calculate a reasonable estimate of the number of non-same-day adjustment or repairs of PMFs that gunsmiths might perform in a given year.  Therefore, the costs discussed below are not included in calculating the overall cost of the final rule; instead, they are discussed only for illustration of costs that might arise.

Based on anecdotal evidence from a SME in FATD with prior gunsmithing experience, a gunsmith would work on several hundred PMFs a year.  Due to the inherently busy nature of gunsmithing, the SME also stated that on-the-spot repairs are unlikely, and that most PMFs are held overnight and already included in A&D records as a PMF (though generally without recording a serial number).  Therefore, ATF estimates an annual recurring cost for repairs, or customizations, of PMFs whether or not they are held overnight.  As mentioned above, ATF estimates that all costs for serializing individually-owned PMFs are an overestimate because it is less likely that individuals with PMFs will undertake repairs or customizations through an FFL after publication of the final rule in order to avoid serializing their PMFs.

Because this analysis assumes FFLs may currently be repairing or customizing PMFs and

ATF071227

Defs.' MSJ App. 166

that PMFs are already entered into A&D records, ATF did not estimate an additional cost for

A&D records; instead, it estimated only the incremental cost for serializing PMFs.  The

additional cost to the individuals for serializing their PMFs in addition to repair or customization

are accounted for under the costs to individuals, below.  Table 6.4 shows annually recurring costs

per FFL dealer to serialize PMFs held in inventory.

Table 6.4.  Annually Recurring Cost to Engrave PMFs Held in Inventory

| Number of Repairs per Year | 500 |
|---|---|
| Cost to Mark per PMF | $0.48 |
| Annual Cost per FFL | $239 |

Despite calculating the annual recurring cost for engraving PMFs taken into inventory,

ATF did not use these costs in calculating the total cost of the rule.  This is because the best

available data from SMEs at ATF regarding the number of repairs performed by gunsmiths

resulted in an estimated number of repairs that far exceeds the total number of PMFs currently in

circulation, as estimated in chapter 5's analysis (Table 5.1) of FFL dealer costs.  In the absence

of more accurate data, ATF was unable to estimate the costs of serialization associated with

individuals taking their PMFs to FFLs for repairs or other work that cannot be completed on the

same day.  Thus, for purposes of calculating the costs associated with the final rule, ATF

considered only the one-time cost to engrave kits sent out from FFL dealers that deal in firearm

parts kits with a partially complete frame or receiver, but do not have gunsmithing capabilities

(*i.e.*, $2,474).

-87-

ATF071228

Defs.' MSJ App. 167

6.5.  Benefits for Changing the Definition of Gunsmithing

The benefit to amending the term "gunsmith" in the final rule is that it allows persons to be licensed as dealer-gunsmiths if they are engaged in the business of only placing markings on PMFs, thus expanding the availability of professional marking services for both: (1) licensees that need their inventory of firearm kits or PMFs serialized, and (2) nonlicensees if they should want their PMFs serialized.  Providing these types of services will no longer be limited to Type 07 manufacturers.  The amended definition also clarifies who is required to be licensed as a gunsmith versus a manufacturer.

ATF071229

**Defs.' MSJ App. 168**

# 7.  Record Retention

Currently, Type 01 FFLs (dealers), Type 02 FFLs (pawnbrokers), and Type 03 FFLs (collectors) do not have to store their required records beyond 20 years.  As stated above, the final rule requires all licensees to store their Forms 4473 and A&D records until the business or licensed activity is discontinued, at which point they will need to send their out-of-business records to ATF, as currently prescribed.

Based on tracing data and out-of-business records from the last 10 years, ATF estimates that the majority of FFLs currently retain their records indefinitely or send their out-of-business records to ATF.  For these FFLs, this provision of the final rule would not impose any additional costs.  The final rule will affect only businesses that currently destroy their records or send records older than 20 years to ATF, as these businesses will be required to retain these records either indefinitely or until they discontinue their business or licensed activity.

Finally, the rule allows an FFL to store its records electronically (under an ATF approved method) and its paper records older than 20 years in a separate warehouse.  FFLs that do not currently store transaction records longer than 20 years thus have various means of storing their records indefinitely.  They can: (1) buy additional electronic storage files; (2) purchase or rent additional physical storage space; (3) transfer their forms onto an electronic platform; or (4) voluntarily discontinue their current business or licensed activity, send their send their paper out-of-business records to ATF, and start a new business or activity under a new license with a new electronic recordkeeping system.

## 7.1.  Comments Received on Indefinite Records Retention

ATF071230

Defs.' MSJ App. 169

ATF received various comments regarding the population affected and the cost of record retention.  Some commenters stated that the costs of shipping all firearms records were not accounted for, and that, even if they had been, ATF's estimated shipping cost was too low to account for all shipments from all FFLs and that the estimated shipping cost amounted to less than $1 per FFL.  Furthermore, one commenter suggested that, regardless of whether an FFL ships records voluntarily, all FFLs should be accounted for, not only the ones that currently destroy their records that are older than 20 years.

The Department disagrees with commenters who said the agency underestimated the cost per FFL or that it should have taken into account the costs borne by all FFLs.  Federal law, *see* 18 U.S.C. 923(g)(4); 27 CFR 478.127, already requires FFLs to send all of their out-of-business records to ATF.  ATF does not attribute these costs to the final rule because the duty to send out-of-business records to ATF is an existing statutory and regulatory requirement.  In the NPRM, ATF estimated that most FFLs currently store their records for longer than 20 years and will not be affected by the indefinite records retention requirement.  The final rule's requirement will impose costs only on a subset of the total number of FFLs.  Furthermore, the Office of Management and Budget ("OMB") has explained that the baseline for an RIA should be "what the world will be like if the proposed rule is not adopted."[60]  Prior to the publication of the NPRM, the majority of FFLs maintained records until discontinuance of business or licensed activity regardless of whether they remained in the business for 20 years.  Because any alternative, including the requirement in the final rule, would be a comparison against this

---

[60] OMB, *Circular A-4* at 2 (Sept. 17, 2003), *available at* https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf (last visited Mar. 26, 2022).

ATF071231

**Defs.' MSJ App. 170**

baseline, only the incremental cost above this baseline is attributed to the rule.[61]

Some commenters suggested that ATF did not account for the influx of transactions recorded for multiple "frames" or "receivers" or the influx of transaction records from purchases of firearm parts kit with a partially complete frame or receiver that would be disposed of as a "firearm" under the rule. One commenter suggested that ATF use NICS checks and population growth to account for the increased number of transactions and number of records in the future. Several commenters suggested that ATF's assertedly low records retention cost was due to an over-reliance of savings from converting paper records to electronic storage. One commenter suggested that the cost for electronic storage should include a team of employees to create and maintain electronic storage for the FFL.

ATF partially concurs. ATF did not account for the potential increase in the number of records stored due to an increase in transactions recorded for multiple "frames" or "receivers;" however, this cost no longer needs to be accounted for as a result of changes to the definition of "frame or receiver." Nonetheless, ATF concurs that there will be an increase in firearms records because there could be more firearms transactions, which can increase the overall retention cost. However, most FFLs have and will continue to retain records, and the rule will not affect these FFLs. As stated above, this activity for the majority of FFLs is an existing activity prior to the publication of the final rule and is not attributed to the rule. However, for the relatively small subset of FFLs that currently destroy records older than 20 years, the new retention requirement could impose a significant cost. For purposes of this analysis, ATF estimates that, in an effort to

---

[61] *Id.* at 11.

-91-

ATF071232

Defs.' MSJ App. 171

reduce their costs, FFLs may utilize electronic storage.  Furthermore, most FFLs that use electronic formats for A&D records or Forms 4473 already outsource these software applications to third parties rather than hiring employees and building the program in-house; therefore, ATF is not incorporating the cost for an FFL to create and maintain electronic storage of their records.

One commenter suggested that ATF consider an alternative to this requirement with a timeframe between 20 years and indefinite.  Though the alternatives of requiring record retention for 25 or 30 years was considered, ATF determined they were not the best course of action.  Because firearms are durable items that can be in circulation for many decades or even beyond 100 years, a specific retention requirement of 25 years, 30 years, or some other fixed duration will fail to track the shelf life of firearms that last longer than the specific duration.  ATF would thus continue to have unsuccessful traces of these firearms when used in the commission of a crime.

One commenter suggested that ATF relied too heavily on SMEs and did not explain its methodologies.  Furthermore, this commenter questioned the assumption that all FFLs would choose to send their records older than 20 years to ATF.

ATF partially concurs.  Based on SMEs' analyses, most FFLs already retain records indefinitely beyond the existing 20-year requirement until discontinuance of business or licensed activity.  For most FFLs this is already an industry standard.  Furthermore, upon publication of the final rule, FFLs that currently ship records older than 20 years to ATF will no longer be able ship their records to ATF because, under the final rule, FFLs are required to retain them indefinitely until they discontinue business or licensed activity.  However, ATF was able to use tracing data and out-of-business records as a proxy to estimate the number of FFLs that do not

ATF071233

**Defs.' MSJ App. 172**

retain records older 20 years and therefore could be affected by the rule.  For the final rule, ATF deemed this to be the best available information.  Also, in this analysis, ATF estimates that, after the final rule becomes effective, FFLs that currently and voluntarily ship records older than 20 years may decide to voluntarily discontinue their license and apply for a new license so they can ship their paper out-of-business records to ATF and start a new business or activity under a new license with a new electronic recordkeeping system.

Some commenters stated that ATF did not quantify or monetize benefits for the record retention requirement.  One commenter suggested that the benefits do not outweigh the costs.  One commenter asserted that ATF did not demonstrate how many crimes would be solved through tracing firearms over 20 years old.  ATF concurs that additional quantification is appropriate, and therefore, has modified the benefits section to illustrate an estimated number of successful prosecutions that increased and successful tracing may achieve.  This analysis does not monetize the reduction in criminal activity.

## 7.2.  Need for Record Retention

Currently, FFLs are not required to maintain transaction records for longer than 20 years.  Although the 20-year requirement would account for the lifespan of most firearms, it does not account for crimes being committed using firearms that outlast this timeframe.  Not only have there been technological advances in the firearms industry, but there have also been technological advances in storage capabilities.  Currently, FFLs are required to maintain Forms 4473 in paper form, except as authorized by ATF Ruling 2016-2.  The majority of FFLs use electronic versions of Form 4473 but are still required to print these same records for storage because they are required to be available for inspection purposes.  The final rule would allow

ATF071234

Defs.' MSJ App. 173

FFLs to store records electronically without also printing them using an ATF approved method that will be issued separately from the rule.

7.3.  Population for Record Retention

The rule would affect Type 01, Type 02, and Type 03 FFLs because all of them are now required to maintain transaction records until their business or licensed activity is discontinued.[62] Because Type 03 FFLs acquire curio or relic firearms for personal use, ATF anticipates that Type 03 FFLs already store their curio or relic firearm transaction records indefinitely.  Even if not, they would not have a sufficient number of records to need to rent additional storage space for these records.  There are 60,790 Type 01 and Type 02 FFLs that may be affected by this record retention requirement.  Because ATF is only aware of those FFLs that voluntarily reported destroyed records during crime gun traces, ATF does not know how many FFLs overall have destroyed their records that are over 20 years old.  Therefore, to determine an estimated number of FFLs that do not retain records older than 20 years, ATF compared the total number of FFLs (184,460) involved in all traces from January 2012 to December 2021 (10 years) against the number of FFLs (1,260) that were traced but that did not retain records older than 20 years from January 2012 to January 2021 (9 years).  Because the overall total number of FFLs is relatively stable (even as FFLs go in and out of business), ATF used the average among the years to estimate that, on average, there were 140 FFLs every year to which firearms were traced but that did not retain records older than 20 years.  This amounts to 0.76 percent of the

---

[62] Retaining records for more than 20 years will affect a subset of all FFLs—in particular, Type 1 and 2 FFLs, because licensed manufacturers (Types 6, 7, and 10) and importers (Types 8 and 11) generally maintain permanent consolidated production, acquisition, and disposition records in accordance with 27 CFR 478.129(d), and ATF Rulings 2011-1 and 2016-3.

ATF071235

Defs.' MSJ App. 174

average 18,446 FFLs every year.[63]  Table 7.1 provides a summary of the population analysis.

Table 7.1.  Summary Comparing Total Type 01 and 02 FFLs to Affected Type 01 and 02 FFLs

| | |
|---|---|
| Total FFL Type 01 and 02 Population | 60,790 |
| Population of Type 01 and 02 FFLs Involved in All Traces Over 10 Years | 184,460* |
| Average Number of FFLs with Trace Data | 18,446 |
| Population of Type 01 and 02 FFLs that Destroy Records 20+ Years Old | 1,260** |
| Average Number of FFLs with Trace Data and Destroyed Records Per Year | 140 |
| Proportion of FFLs Destroying Records 20+ Years Old Per Year | 0.76% |
| Population of FFLs Not Storing 20+ Years Old Based on Unsuccessful Traces | 461 |

*Over a 10-year period of analysis
**Over a 9-year period of analysis
*Note: Calculations using these estimates may not be exact due to rounding.

For purposes of this analysis, ATF estimates that less than 0.76 percent of all Type 01 and Type 02 FFLs (or 461 FFLs) do not store their records longer than 20 years and would convert to electronic storage.[64]

Based on National Tracing Center ("NTC") records, from 2016 to 2021, a total of 284 FFLs voluntarily sent their records older than 20 years to ATF as an alternative to destruction. For purposes of this analysis, ATF assumes that all FFLs that have shipped records that are older

---

[63] 0.76 percent= (1,260 FFLs involved in a trace but did not retain records / 9 years) / (184,460 FFLs involved in a trace / 10 years) *100.

[64] 60,790 Type 1 and 2 FFLs * 0.76 percent = 461 FFLs that do not retain records over 20 years old.  As noted elsewhere, ATF used unrounded numbers (rather than the approximate numbers reported in the tables) when performing subsequent calculations.  This may result in apparent discrepancies in some of the calculations.

-95-

than 20 years over the last 5 years to ATF are likely to want to continue to operate a firearms business or licensed activity for longer than 20 years.  In total, this provision is estimated to affect a total of 745 FFLs.

7.4.  Costs for Record Retention

ATF estimates that there may be 461 FFLs that currently destroy their records after 20 years.  For purposes of this analysis, ATF assumes that they will convert their records from paper to electronic storage.  For these FFLs, the cost will be the cost to outsource their electronic storage to a third party.  No cost was attributed to convert existing paper into electronic format; any estimate of this cost would be inherently speculative because ATF does not have sufficient information that might allow it to calculate such a cost..

In a September 2013 newsletter, ATF strongly encouraged FFLs to voluntarily send records older than 20 years to ATF rather than destroy them.[65]  Based on information from the NTC, some FFLs currently send their records that are older than 20 years to ATF as an alternative to destroying them.  Table 7.2 shows the number of FFLs that have shipped records older than 20 years, the number of boxes shipped, and the number of records contained in all boxes.

Table 7.2.  Number of FFLs, Boxes, and Number of Records over 20 Years Sent to ATF

| Year | Number of Active FFLs Shipping Records 20+ Years | Number of Boxes | Number of Records | Average Number of Boxes |
|---|---|---|---|---|
| | | | | |

---

[65] ATF, *Federal Firearms Licensees Newsletter* (Sept. 2013), *available at* https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensees-newsletter-september-2013-volume-1 (last visited Mar. 26, 2022).

ATF071237

Defs.' MSJ App. 176

| 2016 | 159 | 563 | 1,221,710 | 4 |
|------|-----|-----|-----------|---|
| 2017 | 32 | 295 | 640,150 | 9 |
| 2018 | 20 | 267 | 579,390 | 13 |
| 2019 | 29 | 166 | 360,220 | 6 |
| 2020 | 20 | 107 | 232,190 | 5 |
| 2021 | 24 | 242 | 525,140 | 10 |
| Total FFLs | **284** | | Average | **8** |

However, after the publication of the final rule, these FFLs will no longer be able to voluntarily ship their records that are older than 20 years to ATF because the FFLs are required to retain them until they discontinue business or licensed activity.  Once the final rule is effective, FFLs do have the option of voluntarily discontinuing the business or licensed activity for which those records were maintained, sending their paper out-of-business records to ATF, and then applying for a new license with new a recordkeeping system.  Because these companies already ship their records to ATF, no additional shipping cost was attributed to the final rule.

Because FFL licenses have to be renewed every three years, ATF did not account for the full cost of an application; instead, it accounted only for the net cost between a new application and the cost for a renewal.  To estimate the difference in cost between a renewal and a new application, ATF used the data for new applications that was discussed above.  Table 7.3 illustrates the cost of an application and a renewal.

Table 7.3.  Application and Renewal Cost for a Form 7 Application for Type 01 and Type 02 FFLs

| Cost Item | Hourly Burden | Hourly Wage Rate | Employee Cost Index | Loaded Wage Rate | Wage Burden | Cost Item | |
|-----------|---------------|------------------|---------------------|------------------|-------------|-----------|---|
| Form 7 | 1 | $60 | $63 | $89 | $89 | $200 | |

ATF071238

Defs.' MSJ App. 177

| | | | | | | |
|---|---|---|---|---|---|---|
| Fingerprints | 1 | $60 | $63 | $89 | $89 | $19 | |
| Passport Photo | 0.5 | $60 | $63 | $89 | $44 | $16 | |
| Postage | | | | | | $1 | |
| Application Cost | | | | | $222 | $236 | **$458** |
| Renewal Cost | 0.5 | $60 | $63 | $89 | $44 | $90 | **$134** |

* Note: Calculation of these numbers may not be exact due to rounding.

Because the cost for a new application is $458 and the renewal cost $134, ATF estimates that the difference in cost is $324.  Based on information from NTC, one chain of FFLs with multiple licenses ships its overflow records every five years.  For purposes of this analysis, ATF estimates that it will now ship records every three years.[66]  Because ATF does not know the shipping frequency for the other FFLs, ATF assumed an annual average of 25 FFLs will cancel their license; ship their out-of-business records to ATF; and apply for a new license.

Table 7.4 shows the 10-year undiscounted net cost for an FFL to apply for a new license rather than renew an existing license.  The numbers in the column of active shippers are based on

---

[66] This estimate is based on ATF's assumption that, rather than retain its records indefinitely under the final rule, the chain of FFLs will instead choose to cease its licensed activity at the end of the three-year duration of its license; ship its out-of-business records to ATF; apply for a new license; and repeat the process every three years.

ATF071239

Defs.' MSJ App. 178

historical shipping patterns (*see* Table 7.2) and ATF's assumption that one large chain of FFLs will cease operations and ship its out-of-business records to ATF every three years.

Table 7.4.  10-year Cost of FFLs Applying for a New License

| Year | Number of Active FFLs Shipping Records 20+ Years | Industry Cost of FFLs Applying for a New License Instead of Renewing Existing License |
|---|---|---|
| 2016 | 159 | N/A |
| 2017 | 32 | N/A |
| 2018 | 20 | N/A |
| 2019 | 29 | N/A |
| 2020 | 20 | N/A |
| 2021 | 24 | N/A |
| 2022 | 159 | $51,462 |
| 2023 | 25 | $8,092 |
| 2024 | 25 | $8,092 |
| 2025 | 159 | $51,462 |
| 2026 | 25 | $8,092 |
| 2027 | 25 | $8,092 |
| 2028 | 159 | $51,462 |
| 2029 | 25 | $8,092 |
| 2030 | 25 | $8,092 |
| 2031 | 159 | $51,462 |

Note: Calculation of these numbers may not be exact due to rounding

To alleviate costs for storage requirements, the rule would also allow electronic storage of Forms 4473 without also maintaining paper records.  Because this is a new allowance, ATF does not know how much it will cost to convert records electronically.  Currently, ATF allows FFLs to store A&D records electronically and allows Forms 4473 to be completed electronically, so long as the electronically completed Forms 4473 are printed, signed by hand, and also

-99-

retained in paper format.  Because fully electronic storage will be a new allowance, ATF does not have the information needed to estimate the cost for electronic storage.  However, because there are existing companies that electronically store A&D transaction records and Forms 4473, ATF uses this information as the closest proxy in terms of cost.  Table 7.5 provides a list of companies that provide electronic storage of A&D records as well as electronic Forms 4473s.

Table 7.5.  Average Monthly Price of Electronic Storage

| E-Storage Company | Cost | Frequency | Website |
|---|---|---|---|
| Gun Store Master | $50 | Month | https://www.gunstoremaster.com/?gclid=EAIaIQobChMIubyG8ZHS9QIVgo3ICh0ZBwqkEAAYASAAEgLA3vD_BwE |
| Fast Bound | $34 | Month | https://www.fastbound.com/try/#plans |
| Easy Bound Book | $59 | Month | https://easyboundbook.com/pricing/ |
| Orchid eBound | $37.50 | Month | https://orchidadvisors.com/orchid-ebound-and-e4473-software/ |
| ExpressLogBook.com | $29.99 | Month | http://www.expresslogbook.com/ |
| EZ Arms Keeper | $19 | Month | https://www.ezarmskeeper.com/ |
| Logbooks For Guns | $60 | Month | https://www.logbooksforguns.com/purchase |
| Average | $41 | Month | |
| Annual Cost | $496 | 12 Months in a Year | |

*Note: Calculations using these estimates may not be exact due to rounding some of the values used as inputs for subsequent calculations.

For purposes of this analysis, ATF assumes that companies that currently destroy their records after 20 years may opt to use fully electronic storage rather than retain their paperwork in paper format, making the total cost attributable to the final rule $228,780 a year.[67]  Assuming

---

[67] $228,780 = 461 FFLs that currently destroy records over 20 years * $496 annual cost.

ATF071241

that FFLs convert to electronic storage of Forms 4473, there may be a cost in the first few years, but a savings in later years.  In order to account for these savings, ATF used NICS and NFA Form 4 applications as the closest proxy for the amount of pages printed and retained.

The Department concurs with one commenter who suggested that there will be an increase in NICS transactions year to year, *i.e.*, there is an upward trend which must be considered as part of this analysis.  This increase in NICS transactions, in turn, increases the number of Forms 4473 (and thus the number of pages) that must be retained.  However, ATF disagrees with the methodology suggested by the commenter in using population growth of persons in estimating additional NICS transactions.  Although ATF agrees that there will be a population growth of potential firearm purchasers, and a general increase in NICS transactions over time, these are not one-to-one comparisons.  In other words, ATF disagrees that all individuals purchase firearms; therefore, ATF determined that population data is not appropriate for determining the growth rate of NICS transactions.  Instead, ATF projects the increase in transactions based on the historical trend.  Because the historical trend already includes population growth, accounting for population growth in addition to the growth of NICS transactions would double count the number of transactions.

In addition to NICS transactions, FFLs will also need to retain records of NFA transactions.  ATF forecasted the growth of paperwork based on historical data for the number of NICS and NFA transactions as reported by the Federal Bureau of Investigation ("FBI") and NFA Form 4 Applications as maintained by ATF (background checks are conducted when ATF

-101-

ATF071242

**Defs.' MSJ App. 181**

receives NFA Form 4 Applications).[68]  Because there is not a one-to-one correlation with the number of transactions, as suggested by the commenter, ATF multiplied the number of reported NICS checks by 6 pages (Form 4473) and NFA applications by 13 pages (NFA Form 4 Application).  ATF notes that the number of NICS checks and NFA applications underrepresents the total number of Form 4473 transactions involving a NICS transaction.  Under varying circumstances, States may perform a State background check for a person purchasing a firearm; these checks are included in the data on NICS transactions run by the FBI.  Currently, there are 37 States that are non-point-of-contact States and thus contact NICS for all firearms background checks, and 13 States that are full point-of-contact States where the state conducts all firearms background checks.  Additionally, there are 25 States that have qualifying State permits in which an individual holding a permit does not need to undergo any background checks in order to purchase a firearm.  However, ATF notes that, although an individual carrying a permit may be exempt from undergoing background checks, he or she will still need to complete a Form 4473. Table 7.6 shows the historical and projected number of NICS checks and Form 4 applications between 2012 and 2031, and the projected number of pages to be retained.

Table 7.6.  Historical and Projected NICS and NFA Transactions

| Year | NICS Checks | NFA Applications | Projected Paperwork Due to NICS and NFA Transactions* |
|---|---|---|---|
| 2012 | 19,592,303 | 65,084 | 118,399,910 |
| 2013 | 21,093,273 | 91,010 | 127,742,768 |
| 2014 | 20,968,547 | 97,925 | 127,084,307 |

---

[68] As maintained by ATF (background checks are conducted when ATF receives NFA Form 4 Applications).  *See* FBI, *NICS Firearm Checks: Month/Year*, *available at* https://www.fbi.gov/file-repository/nics_firearm_checks_-_month_year.pdf/view (last visited Mar. 26, 2022).

ATF071243

**Defs.' MSJ App. 182**

| 2015 | 23,141,970 | 137,222 | 140,635,706 |
|---|---|---|---|
| 2016 | 27,538,673 | 237,567 | 168,320,409 |
| 2017 | 25,235,215 | 112,018 | 152,867,524 |
| 2018 | 26,181,936 | 164,402 | 159,228,842 |
| 2019 | 28,369,750 | 179,973 | 172,558,149 |
| 2020 | 39,695,315 | 251,937 | 241,447,071 |
| 2021 | 38,876,673 | 323,536 | 237,466,006 |
| 2022 | N/A | N/A | 239,026,122 |
| 2023 | N/A | N/A | 251,933,237 |
| 2024 | N/A | N/A | 264,840,352 |
| 2025 | N/A | N/A | 277,747,467 |
| 2026 | N/A | N/A | 290,654,582 |
| 2027 | N/A | N/A | 303,561,697 |
| 2028 | N/A | N/A | 316,468,812 |
| 2029 | N/A | N/A | 329,375,927 |
| 2030 | N/A | N/A | 342,283,042 |
| 2031 | N/A | N/A | 355,190,157 |

\* Note that this column counts the total number of pages per transactions (6 pages for NICS and 13 pages for NFA)

ATF also graphed the projection for clarification.  Graph 7.1 shows the historical and projected outcomes of NICS and NFA transactions.

Graph 7.1.  Historical and Projected Growth of NICS and NFA Transactions

ATF071244

Defs.' MSJ App. 183



Although the graph projects an upper bound and a lower bound, ATF did not separately present costs for each bound because the numbers were similar.  Thus, for this RIA, ATF used the main, middle estimate.

As pointed out by one commenter, completion of a Form 4473 could take up to 6 pages per transaction, and, based on the copy requirements for an NFA Form 4 application, FFLs need to retain 13 pages for these types of NFA transactions.  ATF used these page estimates to estimate the projected paperwork that FFLs would need to retain for Form 4473 transactions and NFA transactions.

For purposes of this analysis, ATF uses $0.10 as the cost per page.  ATF divided the total paper cost by the existing population of 60,790 Type 01 and 02 FFLs to obtain the per FFL cost that would normally be incurred from printing paper.  Should these FFLs convert to electronic storage, they would no longer incur the cost of printing paper, which results in an overall savings.  Finally, because electronic storage costs an average $496 per year, ATF used the $496

-104-

cost and subtracted the per FFL savings from reduced paper printing, which results in the per

FFL net cost.  Because the number of NICS and NFA transactions (and hence the corresponding

number of pages to store) is expected to increase over time, the total cost to print paper each year

would also increase.  However, with electronic storage, FFLs enjoy a net savings over time

because they no longer need to print and maintain paper records.  Table 7.7 shows the projected

number of pages by year, the cost to print pages, the savings from reduced paper printing per

FFL by year, and the net cost per FFL.

Table 7.7.  Projected Number of Pages for NICS and NFA Transactions, Paper Cost, Per-FFL

Savings from Reduced Paper Printing, and Per-FFL Net Cost

| Year | Projected Number of Pages for NICS and NFA Transactions | Paper Cost | Per FFL Savings from Reduced Paper Printing | Per FFL Net Cost |
|---|---|---|---|---|
| 2022 | 239,026,122 | $23,902,612 | $393 | $103 |
| 2023 | 251,933,237 | $25,193,324 | $414 | $82 |
| 2024 | 264,840,352 | $26,484,035 | $436 | $61 |
| 2025 | 277,747,467 | $27,774,747 | $457 | $39 |
| 2026 | 290,654,582 | $29,065,458 | $478 | $18 |
| 2027 | 303,561,697 | $30,356,170 | $499 | ($3) |
| 2028 | 316,468,812 | $31,646,881 | $521 | ($24) |
| 2029 | 329,375,927 | $32,937,593 | $542 | ($46) |
| 2030 | 342,283,042 | $34,228,304 | $563 | ($67) |
| 2031 | 355,190,157 | $35,519,016 | $584 | ($88) |

Based on discussions with FIPB, electronic storage is a popular concept.  However,

because ATF does not know the number of FFLs that will choose the option for electronic

-105-

storage, ATF uses the estimated population of FFLs that currently destroy records over 20 years (461 FFLs) as a low estimate of savings.  In other words, ATF used the per FFL net cost from Table 7.7 and multiplied that cost from each year by 461 FFLs in order to obtain the overall net industry cost for electronic storage.  ATF also references the second set of FFLs that have been voluntarily shipping their records to ATF and will now be applying for a new license from Table 7.4.  Combining these 2 sets of industry costs results in the total industry cost for this provision of the final rule.  Table 7.8 shows the industry cost for FFLs to apply for a new license, plus the industry cost of electronic storage, and the overall cost from both sets of FFLs combined.

Table 7.8.  Industry Cost for Records Retention

| Industry Cost for Records Retention | Industry Cost for New Form 7 Application | Industry Cost for Electronic Storage | Net Total Cost for Records Retention |
|---|---|---|---|
| 2022 | $32,543 | $47,515 | $80,057 |
| 2023 | $5,117 | $37,728 | $42,844 |
| 2024 | $5,117 | $27,941 | $33,057 |
| 2025 | $32,543 | $18,149 | $50,691 |
| 2026 | $5,117 | $8,362 | $13,479 |
| 2027 | $5,117 | ($1,425) | $3,692 |
| 2028 | $32,543 | ($11,212) | $21,330 |
| 2029 | $5,117 | ($21,004) | ($15,887) |
| 2030 | $5,117 | ($30,791) | ($25,674) |
| 2031 | $32,543 | ($40,578) | ($8,035) |

*Note: Calculations using these estimates may not be exact due to rounding.

7.5.  Benefits of Record Retention

As acknowledged by commenters, the objective of ATF in issuing the rule is to increase public safety.  Expanding the record retention requirement would have benefits in investigating criminal activities.  Currently, there are a significant number of traces that are unsuccessful due

ATF071247

Defs.' MSJ App. 186

to the age of the firearm and the fact that records over 20 years of age have been reported to ATF as destroyed.  Furthermore, allowing for electronic storage accommodates advancements in technology and eases the burden of maintaining physical copies of transaction records.  The subsections below describe in further detail these benefits.

7.5.1.   Law Enforcement Tracing

This proposed rule would support tracing requests for crimes committed in the U.S. and abroad.  Currently, Type 01, Type 02, and Type 03 FFLs are required to retain transaction records for only 20 years.  Depending on the usage and care of firearms, firearms could be maintained and used (including use in criminal activity) for much longer than 20 years.

Currently, records older than 20 years can be disposed of by burning or shredding.  The rule would eliminate the need to incur costs to burn or shred old records.  Furthermore, 1,400 to 1,600 traces a year are unsuccessful due to the age of the firearm and the lack of a requirement to retain firearm records longer than 20 years.  Without any transaction records, law enforcement officers are unable to determine who purchased the firearms used in criminal activity.  Because the rule requires indefinite recordkeeping, ATF will be able to increase the number of successful traces of firearms found at crime scenes.

Commenters stated that ATF did not show the number of homicides and violent crimes associated with traces nor, did ATF show the success rates that tracing has on criminal activities. The Department agrees and is providing additional support.  Of these total unsuccessful traces over 12 years (16,324), approximately 182 of the traces were designated as "Urgent," 1,013 were related to a homicide, and 4,237 were related to "Violent Crime."  The Department has also added successful traces of records older than 20 years as a proxy to estimate the success rate of

-107-

traces for records that would have otherwise been destroyed.  Between the years 2010 to 2021,

ATF successfully traced an average of around 40,000 firearms per year to records older than 20

years.  ATF has been able to successfully prosecute an average of 8,310 cases per year from

2016 to 2020 where the crime involved a firearm over 20 years.  Note that prosecutions might

not be resolved within the year they were opened.  These reported cases are only those that were

opened and closed between the years 2016 and 2020.  Thus, the success rates reported in this

analysis are under-representative of the overall successful prosecution cases overall.  Using this

information, ATF is projecting the number of successful prosecutions that could have occurred

had records over 20 years old not been destroyed and had the traces associated with those records

been successful.  Table 7.9 shows the number of traces involving records over 20 years; the

number of unsuccessful traces due to the lack of transaction records beyond 20 years; the number

of successful traces to records over 20 years linked an individual; and the projected number of

successful prosecutions that could have occurred had the unsuccessful traces been successfully

completed.

-108-

ATF071249

**Defs.' MSJ App. 188**

Table 7.9.  Numbers and Percentages of Traces of Firearms Over 20 Years Old and Successful Prosecution Rates.

| Year | Number of Traces involving 20+ year Records | Traces Not Completed Due to Records 20+ Years and Destroyed | Number of Successful Traces Linked to First Retail Purchaser 20+ Year Record | Percentage of Successful Traces from All Traces 20+ Years | Estimated Number of Additional Successful Traces if 20+ year Records Had Not Been Destroyed | Estimated Number of Successful Prosecution Cases Had Traces of 20+ Years Records Been Successful* |
|---|---|---|---|---|---|---|
| 2010 | 114,042 | 1663 | 33,236 | 29.14% | 485 | 35 |
| 2011 | 121,281 | 1070 | 35,531 | 29.30% | 313 | 21 |
| 2012 | 120,714 | 931 | 35,973 | 29.80% | 277 | 19 |
| 2013 | 139,767 | 1151 | 42,264 | 30.24% | 348 | 21 |
| 2014 | 147,794 | 1176 | 43,826 | 29.65% | 349 | 20 |
| 2015 | 145,940 | 1414 | 42,927 | 29.41% | 416 | 24 |
| 2016 | 140,400 | 1477 | 42,137 | 30.01% | 443 | 26 |
| 2017 | 143,960 | 1608 | 43,452 | 30.18% | 485 | 28 |
| 2018 | 145,522 | 1610 | 45,569 | 31.31% | 504 | 29 |
| 2019 | 131,263 | 1438 | 42,835 | 32.63% | 469 | 30 |
| 2020 | 121,731 | 1461 | 40,267 | 33.08% | 483 | 33 |
| 2021 | 112,642 | 1325 | 38,784 | 34.43% | 456 | 34 |
| Average | **132,088** | **1360** | **40,567** | **30.77%** | **419** | **27** |

*Note: 8,310 average prosecution cases / (number of traces involving 20+ year old records * estimated number of successful traces if 20+ year old records had not been destroyed).

Although the rule does not attempt to monetize the costs of criminal activity, ATF estimates that, on a low range, the Department would be able to successfully prosecute 27 additional cases per year if all FFLs retained records indefinitely.

7.5.2.  Electronic Storage

The rule would allow for electronic storage of Forms 4473 in a manner approved by

ATF071250

ATF.  Currently, FFLs are required to retain Forms 4473 in paper format (even if also stored electronically) and would thus need infrastructure to store that paperwork.  Allowing for full electronic storage reduces the need for infrastructure and provides flexibility in terms of storage. It also modernizes the storage requirements to allow for use of the latest technology.  Finally, electronic storage of records could expedite searches for firearms transactions in trace requests, thereby decreasing the time needed for FFLs to search their records and for law enforcement to investigate criminal activity.

   7.6.  Record Retention Collection of Information

       This provision would not affect any COIs because the number of requestsand the information requested has not changed; instead, only the retention period has been extended.

ATF071251

# 8.  Government Costs

The final rule changes the FFLs' requirement to retain firearms records from 20 years to until the business or licensed activity is discontinued.  For the purposes of this analysis, ATF assumes that the only FFLs that will dissolve their business or licensed activity and apply for a new license with a new recordkeeping system are those that currently voluntarily ship their over 20-year-old records to ATF.  Because this is an existing supply of records, and because it is assumed that fewer paper records will be maintained by FFLs over time, thus reducing the need to send paper records to ATF, ATF did not account for any additional government costs for the final rule.  No other enforcement actions or government activities are anticipated upon the publication of the final rule.

ATF071252

**Defs.' MSJ App. 191**

# 9. Summary of the Overall Cost of the Rule

This chapter summarizes the various costs as estimated by the other chapters in this RIA. In summary, there are six chapters that outline how the final rule will affect various populations and describe the various options that each population has in order to comply with the final rule. The chapters regarding the individual costs and benefits are as follows:

- Chapter 2: Costs for Type 07 manufacturers

- Chapter 3: Costs for silencers

- Chapter 4: Costs for manufacturers of firearm parts kit with a partially complete frame or receiver

- Chapter 5: Costs for dealers of firearm parts kit with a partially complete frame or receiver

- Chapter 6: Cost for gunsmithing activities

- Chapter 7: Cost for records retention

## 9.1. Industry Costs

Table 9.1 outlines the costs by chapter and action.

Table 9.1. Industry Cost by Action

| Cost Type | Frequency | First Year Cost | Annually Recurring Cost | Other Cost |
|---|---|---|---|---|
| **Chapter 2: Markings on Existing Firearms** | | | | |
| Marking of Firearms | Annual | $0 | $0 | $0 |
| **Chapter 3: Markings on Silencers** | | | | |

ATF071253

Defs.' MSJ App. 192

| | | | | |
|---|---|---|---|---|
| Markings on Silencers | Annual | $0 | $0 | $0 |
| **Chapter 4: Cost to Manufacturers of Partially Complete Firearm Kits** | | | | |
| Scenario 1: Non-FFL Manufacturers Becoming Licensed | Variable | $69,049 | $54,111 | $0 |
| Scenario 3: Non-FFL Manufacturers Dissolve Business | Annual | $11,760,000 | $11,760,000 | $0 |
| Scenario 2: FFL Manufacturers Adding Serialization | One-time | $690,068 | $2,300 | $0 |
| **Chapter 5: Retail Sales of Partially Complete Firearm Kits** | | | | |
| Scenario 1: Engraving Costs | One-time | $11,484 | $10,080 | $0 |
| Scenario 2: Outsourcing Costs | One-time | $31,080 | $0 | $0 |
| Scenario 3: Disposal to ATF | One-time | $288,835 | $0 | $0 |
| Scenario 4: Non-FFL Dealers Dissolve Business | Annual | $1,404,000 | $1,404,000 | $0 |
| **Chapter 6: Gunsmithing** | | | | |
| Additional A&D Records for Gunsmiths due to Outsourcing | One-time | $2,474 | $0 | $0 |
| **Chapter 7 Records Retention** | | | | |
| Records Retention | Annual | Variable | Variable | |
| Total | | $14,256,992 | $13,230,491 | |

ATF071254

Defs.' MSJ App. 193

Most costs are attributed to non-FFL manufacturers and dealers dissolving their businesses because of the final rule.

9.2.  Total Cost of the Rule

This RIA describes various costs for manufacturers and dealers of firearm parts kits with a partially complete frame or receiver could encounter as a result of the final rule.  There are no government costs associated with the final rule.  The total cost thus includes only the industry costs.  Table 9.2 provides the 10-year cost for the final rule.

Table 9.2.  Total 10-year Cost of the Rule

| Year | Undiscounted | Discounted | |
|---|---|---|---|
| | | 3% | 7% |
| 2022 | $14,355,968 | $13,937,833 | $13,416,793 |
| 2023 | $14,302,811 | $13,481,771 | $12,492,629 |
| 2024 | $14,293,024 | $13,080,141 | $11,667,365 |
| 2025 | $14,326,602 | $12,729,001 | $10,929,696 |
| 2026 | $14,273,445 | $12,312,399 | $10,176,769 |
| 2027 | $14,263,658 | $11,945,589 | $9,504,478 |
| 2028 | $14,297,241 | $11,624,966 | $8,903,603 |
| 2029 | $14,244,079 | $11,244,408 | $8,290,184 |
| 2030 | $14,234,292 | $10,909,400 | $7,742,512 |
| 2031 | $14,267,876 | $10,616,639 | $7,253,064 |
| Total | $142,858,996 | $121,882,147 | $100,377,093 |
| Annualized | | $14,288,306 | $14,291,440 |

*Note: Calculations using these estimates may not be exact due to rounding.

-114-

ATF071255

Defs.' MSJ App. 194

# 10.  Analysis of Alternatives Considered

This chapter outlines the alternatives considered in the development of the final rule. Table 10.1 provides a summary of the alternatives, along with the benefits and costs of each alternative.

Table 10.1.  Summary of Cost and Benefits of the Alternatives

| Summary | 7% Annualized Costs | Benefits | Comments |
|---|---|---|---|
| Preferred Alternative | $14.3 million | - Updates definition to account for technological advances<br>- Ensures traceability regardless of age of firearm<br>- Makes consistent marking requirements | Grandfather technology that has been compliant with previous regulations |
| Alternative 1: No Change | $0 | $0 | Does not account for the majority of existing firearms. The majority of firearms would not fall under the current definition of frame or receiver, decreasing the overall benefits |
| Alternative 2: Everytown Petition | Less than Final Rule | Less than Final Rule | Does not account for the majority of existing firearms. The majority of firearms would not fall under this proposed definition of frame or receiver, |

ATF071256

Defs.' MSJ App. 195

|  |  |  | decreasing the overall benefits |
|---|---|---|---|
| Alternative 3: Grandfathering | Less than Final Rule | Less than Final Rule | Enforcement becomes a problem |
| Alternative 4: Serialization of All Items | More than the Final Rule | More than the Final Rule | ATF regulates only Federal firearms licensees |
| Alternative 5: Implement Corrective Taxes | N/A | Would not achieve safety-related benefits of the final rule; any increase in government revenue would amount to a transfer rather than a net benefit | Does not meet the objective to prevent access to firearms by felons |
| Alternative 6: Record Retention for Longer than 20 Years, but Not Until Discontinuation of the Business | Less than the Final Rule | Less than Final Rule | Due to the longevity of firearms, would fails to fully achieve the objective of enhanced traceability for law enforcement purposes |
| Alternative 7: Require All Individuals To Mark Their Firearms. | More than the Final Rule | N/A | ATF is not requiring individuals to mark their firearms.  Also, without a serial number marked and recorded by an FFL that includes the FFL's associated information, law enforcement still would not be able to determine how to trace a PMF with an unlicensed person's newly created |

-116-

ATF071257

Defs.' MSJ App. 196

| | | | identification number. |
|---|---|---|---|
| Alternative 8: Allowing Manufacturer to Designate a Component as the "Receiver" for the Firearm | Less than the Final Rule | N/A | May be more confusing for law enforcement to determine what part has the serial number |
| Alternative 9: Non-Regulatory Alternatives. | N/A | N/A | Out of scope of the rulemaking |
| Alternative 10: Have Multiple Serial Numbers on a Firearm | More Expensive than the Final Rule | Same as the Final Rule | Was deemed too costly to implement. |

A discussion of the costs follows in the sections below.

10.1.   The Final Rule—Definition of Receiver and New Recordkeeping Requirements

This final rule replaces the definition of "frame or receiver," creates a definition for "privately made firearm," updates existing serialization requirements, makes marking requirements consistent, clarifies gunsmithing eligibilities for all Type 01 and Type 02 FFLs, and requires record retention (in electronic storage or otherwise) until business or licensed activity is discontinued.  The rule is estimated to cost $14.3 million annualized at 7 percent, but, where feasible, grandfathering was allowed to minimize costs to industry.  The final rule—rather than an alternative such as those described in Table 10.1—was chosen because the final rule maximizes benefits.

10.2.   Alternative 1—No Change

ATF071258

Defs.' MSJ App. 197

Some individuals requested that no change be made.  This alternative has no costs or benefits because it maintains the status quo.  This alternative was considered but not implemented, because the GCA requires that firearms be regulated.  Currently, the majority of firearms fall outside the scope of the existing statutory definition of receiver.  Due to recent court rulings on what constitutes a firearm, it would be difficult to prosecute criminal activity because the vast majority of legal firearms would no longer fit the definition of a firearm.

10.3.  Alternative 2— Everytown Petition.

A petition for rulemaking from *Everytown for Gun Safety* was received proposing to define "firearm frame or receiver" in 27 CFR 478.11 to read as follows: "That part of a firearm which provides housing for the trigger group, including such part (1) that is designed, intended, or marketed to be used in an assembled, operable firearm, or (2) that, without expenditure of substantial time and effort, can be converted for use in an assembled, operable firearm."  This proposed definition focuses on the housing for the "trigger group"; however, it does not define "trigger group," and even if it did, it would not address firearms that do not house trigger components within a single housing or which have a remote trigger outside the weapon.  In other words, this alternative would fall short of addressing all technologies or designs of firearms that are currently available or may become available in the future.  It also does not address potential changes in firearms terminology.  Thus, although the alternative requested by this petition would reduce the cost by reducing the number of entities affected, it does not fully address the objectives of the final rule.

10.4.  Alternative 3—Grandfather All Existing Firearms and Receivers

This alternative would grandfather all existing firearms that would not meet the

-118-

ATF071259

**Defs.' MSJ App. 198**

serialization standard for partially complete firearms and split receiver frames on firearms and silencers. This alternative also has no costs and low benefits. This alternative was considered and incorporated into the proposed alternative where feasible, but a complete grandfathering of all firearms, firearm parts kits with a partially complete "frame or receiver," and PMFs was not adopted. In order to enforce the rule, a complete grandfathering of existing firearms and silencers is problematic in that manufacturers could continue to produce non-compliant frames or receivers and market them as grandfathered frames or receivers.

ATF received comments that the NPRM would not grandfather PMFs. This is not accurate with respect to PMFs already purchased and possessed by nonprohibited, unlicensed individuals. Firearm parts kits with partially complete frames or receivers and PMFs made from those kits that are owned by non-prohibited individuals for lawful purposes are not subject to regulation under either the proposed or final rule. Retroactively serializing all firearm parts kits with a partially complete "frame or receiver" and PMFs owned by individuals was considered and rejected under Alternative 4. However, firearm parts kits with a partially complete frame or receiver and PMFs owned or serviced by FFLs (except for same-day adjustments and repairs) will not be grandfathered. Those PMFs are subject to regulation under the rule and must be marked and recorded by licensees.

10.5.  Alternative 4—Require Serialization of All Partially Complete Firearms or Split
       Receivers and Frames and Modular Silencers

This alternative would have required all unmarked firearms currently in circulation, including those purchased by individuals, to be retroactively serialized. This would benefit individuals whose firearms are stolen. It would make it easier for owners to either retrieve stolen

ATF071260

firearms or have them considered lost property for insurance purposes. However, the GCA regulates only the production, acquisition, and disposition of firearms by FFLs, not the making of firearms for personal use by private unlicensed individuals. Therefore, this alternative was not chosen.

10.6.  Alternative 5—Implement Corrective Taxes

This alternative was suggested by a commenter, presumably to reduce market demand of certain firearms. ATF interprets this alternative as placing a higher tax on firearms that are currently being regulated, thereby making the cost of regulated firearms more expensive to the public. The objective of the final rule, however, is not to suppress purchasing of firearms or otherwise make it more difficult for the public to obtain firearms; instead, it is to regulate firearms, whether made by licensed manufacturers or private individuals, that enter the market, as defined by the GCA, in a consistent manner. The rule intends only to prevent access to firearms by felons and other prohibited persons, and to help law enforcement solve crime. It was not clear how implementing corrective taxes would further these public safety goals, and therefore, this alternative was rejected.

10.7.  Alternative 6—Record Retention Longer than 20 Years, but Less than Indefinite

A commenter suggested that ATF require retention of records for longer than 20 years but not indefinitely. Theoretically, this alternative could cost less for FFLs retaining records until the discontinuation of their business or licensed activity. Though this alternative was considered, ATF determined this was not the best course of action. Considering that firearms can be in circulation for as long as, or beyond, 100 years, a specific year record retention term fails to track the shelf life of firearms that may last a significant number of years. When records

ATF071261

Defs.' MSJ App. 200

are destroyed, ATF cannot successfully trace these firearms that may have used in the commission of a crime.  This alternative was, therefore, not accepted.

10.8.   Alternative 7—Requiring Unlicensed Individuals to Mark their Firearms.

This alternative would require all persons to mark serial numbers on any firearm.  ATF partially accepts this alternative by allowing FFLs to adopt such a unique identification number placed on a PMF so long as the firearm is marked according to the regulations, and they add their abbreviated FFL number as a serial number prefix.  Individuals always have and will continue to be able to serialize their own personal firearms for their lawful personal use under the GCA and NFA.  States that have laws pertaining to the serialization of PMFs will not be affected by the rule.  The rule will not change an individual's right to mark or not to mark the individual's firearms the way the individual sees fit, consistent with State and local laws.  Further, the rule does not require individuals to serialize their non-NFA firearms.

10.9.   Alternative 8—Allowing the Manufacturer to Designate a Component as the "Receiver" of the Firearm

This alternative proposes that regulatory compliance be accomplished by allowing the manufacturer to designate a component identified as the "firearm" for each model.  One commenter suggested that "[t]hese specific components, regardless of the level of completion, should be the components prohibited from direct-to consumer sales and required to go through an FFL."  ATF partially disagrees.  Although allowing the manufacturer to designate certain components would reduce the need for an ATF determination or classification letter, it would cause more confusion for law enforcement in determining which part is the "frame or receiver."  To provide clarity and standardization, however, ATF is publishing a more comprehensive

-121-

ATF071262

Defs.' MSJ App. 201

definition of "frame or receiver" to account for varying modularity of frames and receivers. By defining various configurations, it is anticipated that fewer manufacturers will need to request classification letters from ATF to determine what component of the firearm is in fact the "frame" or "receiver." Additionally, a uniform rule applicable to all firearms is a better alternative because it prevents a manufacturer from designating a minor, non-essential, easily removable component as a frame or receiver, which would undermine congressional intent to ensure that firearms are traceable.

### 10.10.  Alternative 9—Non-Regulatory Alternatives

One commenter suggested that ATF consider the following non-regulatory alternatives: subsidies, enlistment of aid from non-governmental organizations, tort law, public service advocacy, and private contracting.

It is not clear how the commenter envisioned using these non-regulatory alternatives as a means of achieving the objective of ensuring that firearms fall under regulation. However, these alternatives are beyond the scope of the rule and regulatory controls of the GCA; therefore, these alternatives were rejected.

### 10.11.  Alternative 10—Have Multiple Serial Numbers on a Firearm

This alternative was partially proposed in the NPRM. All firearms and firearm kits defined under the NPRM as firearms would have been required to be serialized on each housing or holding structure for any fire control component, unless a determination was made by ATF designating the particular part to be marked. This alternative was rejected in the final rule because, based on comments received, it would have been too costly for the industry to implement, and could have resulted in multiple markings that would have been confusing for law

-122-

ATF071263

Defs.' MSJ App. 202

enforcement when tracing firearms.

ATF071264

**Defs.' MSJ App. 203**

# 11.  Final Regulatory Flexibility Analysis

In accordance with the Regulatory Flexibility Act ("RFA"), ATF prepared a Final Regulatory Flexibility Analysis ("FRFA") that examines the impacts the final rule will have on small entities (*see* 5 U.S.C. 601 *et seq.*).  The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of fewer than 50,000 people.

Because the final rule affects different populations in different ways, the analysis for the FRFA has been broken up by provision.  Certain provisions may have a significant impact on certain small entities, such as non-FFL manufacturers of firearm parts kits with partially complete frames or receivers.

## 11.1.  Summary of Findings

ATF performed an FRFA of the impacts on small businesses and other entities from the Definition of Frame or Receiver and Identification of Firearms final rule [2021R-05F].  This assessment was performed using the cost information discussed in chapters 2 through 7.

Based on the information from this analysis:

- ATF estimates that the final rule could potentially affect 132,023 entities, including all FFLs and non-FFL manufacturers and retailers of firearm parts kits with partially complete frames or receivers, but anticipates that the majority of entities listed in this analysis will not be directly affected.  Only a small subset will be significantly affected.

- ATF estimates the majority of affected entities are small entities that would experience a range of costs, the largest cost being the dissolution of the entire business.  Therefore,

ATF071265

Defs.' MSJ App. 204

the rule will have a significant impact on small entities.

11.2.  Final Regulatory Flexibility Analysis

The RFA establishes "as a principle of regulatory issuance that agencies shall endeavor, consistent with the objectives of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to regulation.  To achieve this principle, agencies are required to solicit and consider flexible regulatory proposals and to explain the rationale for their actions to assure that such proposals are given serious consideration."  5 U.S.C. 601 note.

Under the RFA, the agency is required to consider what, if any, impact the rule would have on small entities.  Agencies must perform a review to determine whether the rule will have an impact on a substantial number of small entities.  Because ATF has determined that the final rule will, ATF has prepared an FRFA as described in the RFA.

Under section 604(b) of the RFA, the FRFA must contain:

- a statement of the need for, and objectives of, the rule;

- a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made to the proposed rule as a result of such comments;

- the response of the agency to any comments filed by the Chief Counsel for Advocacy of the SBA in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;

-125-

- a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

- a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and

- a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected;

11.3.   A Statement of the Need for, and Objectives of, the Rule

The Attorney General is responsible for enforcing the GCA, as amended, and the NFA, as amended.  This responsibility includes the authority to promulgate regulations necessary to enforce the provisions of the GCA and NFA.  *See* 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(A), 7805(a).  Congress and the Attorney General have delegated the responsibility for administering and enforcing the GCA and NFA to the Director of ATF, subject to the direction of the Attorney General and the Deputy Attorney General.  *See* 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(b)(1), (c)(1); 28 CFR 0.130(a)(1)–(2); T.D. Order No. 221(2)(a), (d), 37 FR 11696–97 (June 10, 1972). Accordingly, the Department and ATF have promulgated regulations implementing both the GCA and the NFA.  *See* 27 CFR parts 478, 479.

-126-

The final rule removes and replaces the current regulatory definitions of "firearm frame or receiver" and "frame or receiver" because they are outdated.  The final rule would also amend ATF's definitions of "firearm" and "gunsmith" to clarify the meaning of those terms and to add regulatory terms such as "complete weapon," "complete muffler or silencer device," "multi-piece frame or receiver," "privately made firearm," and "readily" for purposes of clarity in light of advancements in firearms technology.  Further, the proposed rule would amend ATF's regulations on marking and recordkeeping that are necessary to implement these definitions.

11.4.  A Statement of the Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, a Statement of the Assessment of the Agency of Such Issues, and a Statement of Any Changes Made in the Proposed Rule as a Result of Such Comments

Commenters stated that having multiple serial numbers on firearms will significantly affect the entire firearms industry, most of whom are small businesses.  ATF considered these comments and changed the definition of "frame or receiver" to identify one part of the weapon that will need to be marked.  Commenters also suggested that including firearm kits with partially complete frames or receivers will have a significant impact on non-regulated entities. ATF concurred and revised the analysis to include small entities dissolving their business as a worst-case scenario.

11.5.  The Response of the Agency to Any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Proposed Rule, and a Detailed Statement of Any Changes Made to the Proposed Rule in the Final Rule as a Result of the Comments.

-127-

ATF071268

There were no comments filed by the Chief Counsel for Advocacy of the SBA in response to the proposed rule.  Therefore, no changes were made to the proposed rule in the final rule as a result of comments.

11.6.  A Description of and an Estimate of the Number of Small Entities to Which the Rule Will Apply or an Explanation of Why No Such Estimate is Available.

ATF estimates that the rule could potentially affect a maximum number of the following entity types:

- 53,816 Type 01 FFL dealers;

- 6,974 Type 02 FFL pawnbrokers;

- 53,211 Type 03 FFL collectors;

- 17,642 Type 07 FFL manufacturers;

- 1,807 Type 08 FFL importers;

- 43 non-FFL manufacturers;

- 24 non-FFL dealers.

This list of entities is an overestimate of the actual number of entities affected because most FFLs will not be affected by the final rule.  Only a small subset of FFLs and non-FFLs that deal in firearm parts kits with a partially complete frame or receiver will be directly affected by the rule.

The final rule will primarily affect the population of non-FFLs, more specifically the 43 manufacturers and 24 dealers.  The actual costs incurred will depend on the business choices they make.  Some entities may choose to dissolve their businesses, which will result in a complete loss in total revenue and a loss of jobs associated with these businesses.

ATF071269

11.7.   A Description of the Projected Reporting, Recordkeeping, and Other Compliance

Requirements of the Rule, Including an Estimate of the Classes of Small Entities Which

Will be Subject to the Requirement and the Type of Professional Skills Necessary for

Preparation of the Report or Record.

The final rule will affect four existing COIs: an application to become a licensed FFL,

production and disposition records for 41 FFL manufacturers, A&D records for 190 FFL dealers,

and identification markings on firearms for FFL manufacturers and FFL dealers.  Although

applying for a license and updating and maintaining records do not require specialized skills,

marking firearms may require an employee trained in engraving services at a mean, loaded

yearly salary of $51,810.

11.8.  A Description of the Steps the Agency has Taken to Minimize the Significant Economic

Impact on Small Entities Consistent with the Stated Objectives of Applicable Statutes, Including

a Statement of the Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in

the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered

by the Agency Which Affect the Impact on Small Entities was Rejected.

In the proposed rule, ATF considered a definition of "frame or receiver" that could have

resulted in multiple serial numbers on firearms as well as serializing firearm parts kits with a

partially complete "frame or receiver."  Commenters suggested that requiring multiple serial

numbers on firearms will have a significant impact on the entire firearm industry.  Most entities

in the firearm industry are small.  ATF considered these comments and changed the definition of

"frame or receiver" to identify one part of a complete weapon or complete muffler or silencer

device that will need to be marked.  ATF was unable to find lower cost alternatives to serializing

-129-

firearm kits with partially complete frames or receivers that would have resulted in the same benefits as the final rule.  The GCA requires serialization of firearms and these firearm parts kits with partially complete frames or receivers are firearms.  ATF considered excluding firearm parts kits with a partially complete frame or receiver from falling under regulation, but decided it was in the interest of public safety to regulate them and therefore include them in the definition of "firearm."

-130-

# 12.  Collection of Information

This rule calls for COIs under the Paperwork Reduction Act of 1995, 44 U.S.C. 3501 *et seq.*  As defined in 5 CFR 1320.3(c)(1), a "collection of information" includes reporting, recordkeeping, monitoring, posting, labeling, and other similar actions.  The title and description of the information collection, a description of those who must collect the information, and an estimate of the total annual burden follow.  The estimate covers the time for reviewing instructions, searching existing sources of data, gathering and maintaining the data needed, and completing and reviewing the collection.

Under the provisions of the final rule, there is a one-time increase in paperwork burdens of identification markings placed on firearms as well as additional transaction records.  This requirement would be added to an existing approved collection covered by OMB control numbers 1140-0018, 1140-0032, 1140-0050, and 1140-0067.

TITLE: Application for a Federal Firearms License

OMB Control Number: OMB 1140-0018

PROPOSED USE OF INFORMATION:  This collection of information is necessary to ensure that anyone who wishes to be licensed as required by 18 U.S.C. 923 meets the requirements to obtain the desired license.

DESCRIPTION AND NUMBER OF RESPONDENTS:  Currently there are 13,000 applications for a license.  As explained above, ATF anticipates that one non-FFL will choose to become an FFL as a result of the rule, causing a one-time increase of one respondent.

FREQUENCY OF RESPONSE:  There will be a recurring response for all currently existing

-131-

FFLs.  This rule will result in a one-time increase of one response (13,001 respondents * 1 response).

BURDEN OF RESPONSE: The response includes recurring time burden of one hour.  ATF anticipates a one-time hourly burden of one hour per respondent.

ESTIMATE OF TOTAL ANNUAL BURDEN: The current burden listed in this collection of information is 13,000 hours.  The new burden, as a result of this rule, is a one- time hourly burden of 13,001 hours (13,001 respondents * 1 response * 1 hour per respondent).


TITLE:  Records of Acquisition and Disposition, Type 01/02 Dealer of Firearms

OMB Control Number:  OMB 1140-0032

PROPOSED USE OF INFORMATION:  The recordkeeping requirements as contemplated by 18 U.S.C. 923, as amended, are for the primary purpose of facilitating ATF's authority to inquire into the disposition of any firearm in the course of a criminal investigation and to conduct compliance inspections.  Because the regulations require uniform formats for recordkeeping, the records serve a major secondary purpose:  granting ATF officials the ability to examine records for firearms traces or compliance inspections, per 18 U.S.C. 923(g)(1)(B), (C).

DESCRIPTION AND NUMBER OF RESPONDENTS: Currently there are 60,790 respondents. The final rule will not increase the number of respondents, though we anticipate that 116 current respondents will have firearm parts kits and will therefore have an additional burden under the final rule.

FREQUENCY OF RESPONSE:  There will be a recurring response for all currently existing Type 01 and 02 FFLs.  The frequency of response will be dependent on the inventory and sales

-132-

of FFLs.

BURDEN OF RESPONSE:  The per response burden is estimated to be 0.5 hours for

inspections.  No burden was attributed to entries in records.

ESTIMATE OF TOTAL ANNUAL BURDEN:  The current burden listed in this collection of

information is 60,790 hours.  The new, additional burden, as a result of the final rule, is a burden

of 116 hours (116 respondents * 10 items * 2 responses * 0.05 hourly burden per entry).


TITLE:  Identification Markings Placed on Firearms

OMB Control Number:  OMB 1140-0050

PROPOSED USE OF INFORMATION:  ATF would use this information in fighting crime by

facilitating the tracing of firearms used in criminal activities.  The systematic tracking of

firearms from the manufacturer or U.S. importer to the retail purchaser also enables law

enforcement agencies to identify suspects involved in criminal violations, determine if a firearm

is stolen, and provide other information relevant to a criminal investigation.

DESCRIPTION AND NUMBER OF RESPONDENTS:  Currently there are 12,252 licensed

manufacturers of firearms and 1,343 licensed importers.  Of the potential number of licensed

dealers and licensed pawnbrokers, ATF estimates that those directly affected would be a one-

time increase of 42 licensed dealers and 74 licensed pawnbrokers.  The final rule would thus

cause a one-time increase of 116 respondents.

FREQUENCY OF RESPONSE:  There will be a recurring response for all currently existing

13,595 licensed manufacturers and licensed importers.  The final rule would cause a one-time

number of 1,160 responses (116 one-time respondents * 10 responses).  There will be an annual

ATF071274

Defs.' MSJ App. 213

increase in 101,136 responses (42 existing respondents * 2,408 responses).

BURDEN OF RESPONSE:  This includes recurring time burden of one minute.

ESTIMATE OF TOTAL ANNUAL BURDEN:  The current burden listed in this collection of information is 85,630 hours.  The new, additional burden, as a result of the final rule, is a one-time hourly burden of 19 hours (116 one-time respondents * 10 responses * 0.016667 hourly burden per respondent).  The new recurring burden as a result of the final rule is 1,686 hours (42 existing respondents * 2,408 responses * 0.016667 hourly burden per respondent).


TITLE:  Licensed Firearms Manufacturers Records of Production, Disposition, and Supporting Data

OMB Control Number:  OMB 1140-0067

PROPOSED USE OF INFORMATION:  ATF would use this information for criminal investigations and assessments of compliance with the Gun Control Act of 1968 and its implementing regulations.  The Attorney General may inspect or examine the inventory and records of a licensed importer, licensed manufacturer, or licensed dealer, without reasonable cause or warrant, and during the course of a criminal investigation of a person or persons other than the licensee, in order to ensure compliance with the record keeping requirements of 18 U.S.C. 923(g)(1)(A).  The Attorney General may also inspect or examine any records relating to firearms involved in a criminal investigation that are traced to the licensee, or firearms that may have been disposed of during the course of a bona fide criminal investigation.  18 U.S.C. 923(g)(1)(B), (C).

DESCRIPTION AND NUMBER OF RESPONDENTS:  The current number of respondents is

ATF071275

9,056 firearm manufacturers.  The final rule will affect a subset of existing respondents (42 respondents)

FREQUENCY OF RESPONSE:  There will be a recurring response for all 9,056 licensed manufacturers.  The final rule will result in an increase in records of 202,272 responses.

BURDEN OF RESPONSE:  This includes a recurring time burden of 1 minute.  The burden resulting from the final rule is 3,371 hours annually.

ESTIMATE OF TOTAL ANNUAL BURDEN:  The current burden listed in this collection of information is 201,205 hours.  The new, additional burden, as a result of the final rule, is 3,371 hours (42 respondents * 0.016667 hours * 4,816 responses).

ATF071276

# 13.  Appendix: Retail Prices of Firearm Parts Kits with Partially Complete "Frames or Receivers"

The websites and prices for items listed below are the prices that were found at the time ATF conducted the analysis in January and February of 2022 and therefore may differ from the prices listed at or after the time of publication.  It is also possible that some of the websites no longer exist.  ATF cannot account for inevitable fluctuations in market prices over time.

| Cost per Item | Cost per Single Frame/Receiver | Description | Website |
|---|---|---|---|
| $140 | $140 | 1911 Frame | https://www.1776supplyco.com |
| $150 | $150 | | |
| $375 | $375 | Glock | |
| $100 | $100 | AR15 | |
| $210 | $210 | 1911 government frame | www.1911builders.com |
| $200 | $200 | | |
| $50 | $50 | AR15 | https://www.5dtactical.com/ |
| $120 | $120 | | |
| $60 | $60 | | |
| $80 | $80 | | |
| $210 | $70 | AR15 3 pack | |
| $180 | $60 | | |
| $225 | $45 | AR15 5 pack | |
| $175 | $35 | | |
| $330 | $33 | AR15 10 pack | |
| $430 | $43 | | |
| $110 | $110 | 80% lowers - single | https://www.80lowerjig.com/80-glock-frame |
| $130 | $130 | | |

-136-

ATF071277

**Defs.' MSJ App. 216**

| | | | |
|---|---|---|---|
| $140 | $140 | | |
| $110 | $110 | | |
| $330 | $110 | 80% lowers - 3 -pack | |
| $420 | $140 | | |
| $550 | $110 | 80% lowers - 5 -pack | |
| $650 | $130 | | |
| $700 | $140 | | |
| $1,100 | $110 | 80% lowers - 10 -pack | |
| $1,300 | $130 | | |
| $49 | $49 | AR15 single | http://www.80pctlower.com/ |
| $59 | $59 | | |
| $125 | $125 | AR15 3 pack | |
| $140 | $140 | 1911 Frame | |
| $100 | $100 | 80% lowers | https://www.80percentarms.com/ |
| $150 | $150 | | |
| $130 | $130 | | |
| $129 | $129 | | |
| $99 | $99 | | |
| $160 | $160 | | |
| $180 | $180 | | |
| $110 | $110 | | |
| $80 | $80 | | |
| $100 | $100 | 80% lowers - single | https://www.80-lower.com/collections/80-percent-lower/ |
| $110 | $110 | | |
| $120 | $120 | | |
| $130 | $130 | | |
| $140 | $140 | | |
| $150 | $150 | | |
| $160 | $160 | | |
| $170 | $170 | | |
| $360 | $120 | 80% lowers | |

-137-

ATF071278

**Defs.' MSJ App. 217**

| | | - 3 pack | |
|---|---|---|---|
| $390 | $130 | | |
| $420 | $140 | | |
| $450 | $150 | | |
| $510 | $170 | | |
| $600 | $120 | 80% lowers - 5 pack | |
| $700 | $140 | | |
| $750 | $150 | | |
| $650 | $130 | | |
| $850 | $170 | | |
| $1,200 | $120 | 80% lowers -10 pack | |
| $1,300 | $130 | | |
| $1,500 | $150 | | |
| $55 | $55 | poly80 pistol frame | |
| $45 | $45 | AR15 AR10 AR9 lowers | https://aaomfg.com/ |
| $90 | $90 | | |
| $80 | $80 | | |
| $110 | $110 | | |
| $120 | $120 | | |
| $65 | $65 | AK blanks | https://ak-builder.com/index.php |
| $35 | $35 | | |
| $75 | $75 | | |
| $80 | $80 | | |
| $70 | $70 | | |
| $40 | $40 | | |
| $70 | $70 | 80% lower - single | https://americanmadetactical.com/product-category/80lowers/80-ar-15-lower-receivers/ |
| $80 | $80 | | |
| $85 | $85 | | |
| $68 | $68 | | |
| $75 | $75 | | |
| $55 | $55 | | |

-138-

| $210 | $70 | 80% lowers - 3 pack | |
| $240 | $80 | | |
| $255 | $85 | | |
| $204 | $68 | | |
| $350 | $70 | 80% lowers - 5 pack | |
| $400 | $80 | | |
| $425 | $85 | | |
| $340 | $68 | | |
| $89 | $89 | ar15 lower | https://www.brokenarmory.com/ |
| $99 | $99 | | |
| $114 | $114 | | |
| $100 | $100 | lower receivers | https://www.durkintactical.com |
| $90 | $90 | | |
| $90 | $90 | AR15 Lower | https://getlowers.com |
| $76 | $76 | | |
| $176 | $88 | AR15 Lower–2 Pack | |
| $261 | $87 | AR15 Lower–3 Pack | |
| $427 | $86 | AR15 Lower–5 Pack | |
| $55 | $55 | AR15 Lower | https://ggd-store.com |
| $140 | $140 | poly80 pistol frame | https://ghostgunner.net/ |
| $90 | $90 | AK lower | |
| $75 | $75 | AR15 | |
| $85 | $85 | AR-308 | |
| $150 | $150 | $1,911.00 | |
| $95 | $95 | .308 lower | http://jamesmadisontactical.com/ |

-139-

ATF071280

Defs.' MSJ App. 219

| | | | |
|---|---|---|---|
| $120 | $120 | AR lowers | https://www.modulusarms.com/ |
| $75 | $75 | | |
| $119 | $119 | | |
| $55 | $55 | | |
| $160 | $160 | | |
| $150 | $150 | | |
| $140 | $140 | | |
| $106 | $106 | | |
| $190 | $190 | Poly80 Glock pistol frame | https://www.omegamanufacturinginc.com/ |
| $150 | $150 | | |
| $120 | $120 | AR lower single | https://ormondarms.com/ |
| $95 | $95 | | |
| $90 | $90 | | |
| $85 | $85 | | |
| $425 | $85 | AR lower 5 pack | |
| $390 | $390 | | |
| $135 | $135 | AR15 lower receivers | https://www.righttobear.com/Contact-Us-a/259.htm |
| $190 | $190 | | |
| $155 | $155 | | |
| $200 | $200 | | |
| $200 | $200 | | |
| $165 | $165 | | |
| $195 | $195 | | |
| $175 | $175 | | |
| $93 | $93 | 9mm Colt lower | https://www.smftactical.com |
| $29 | $29 | receiver flats | www.theflatspot.net |
| $32 | $32 | | |
| $35 | $35 | | |
| $250 | $250 | Remsport | http://www.tr-enabling.com/default.asp |

-140-

| | | 1911 frames | |
|---|---|---|---|
| $240 | $240 | | |
| $230 | $230 | | |
| $225 | $225 | | |
| $220 | $220 | | |
| $90 | $90 | AR15 lowers | |
| $105 | $105 | | |
| $125 | $125 | | |
| $66 | $66 | AR15 Billet lower | https://venom-defense.com/ |
| $120 | $120 | AR10 lower | http://web.archive.org/web/20210303233834/https://www.warrdogz.com/category-s/201.htm |
| $90 | $90 | AR15 lower | |
| $110 | $110 | | |
| $119 | $119 | | |
| $135 | $135 | | |
| $150 | $150 | | |
| Average Retail Price Per Item: $225 | Average Cost Per Single Frame or Receiver: $116 | | |

-141-

ATF071282

Defs.' MSJ App. 221