# Calendar No. 1835

| 89TH CONGRESS *2d Session* | SENATE | REPORT No. 1866 |
|---|---|---|

## FEDERAL FIREARMS AMENDMENTS OF 1966

OCTOBER 19, 1966.—Ordered to be printed

Mr. HRUSKA, from the Committee on the Judiciary, submitted the following

# REPORT

together with

## INDIVIDUAL VIEWS

[To accompany S. 3767]

The Committee on the Judiciary, to which was referred the bill (S. 3767) to amend the Federal Firearms Act, having considered the same, reports favorably thereon, without amendment, and recommends that the bill do pass.

### PURPOSE

The purpose of the proposed legislation is to amend existing Federal firearms control law to—

(1) regulate more effectively interstate commerce in firearms so as to reduce the likelihood that they fall into the hands of the lawless or those who might misuse them;

(2) assist the States and their political subdivisions to enforce their firearms control laws and ordinances;

(3) help combat the skyrocketing increase in the incidence of serious crime in the United States.

It is not the purpose of this bill to interfere with the legitimate uses of firearms by the millions of law-abiding citizens who acquire, transport and possess them for hunting and other recreational pursuits, self-protection, and other lawful purposes.

### MAJOR PROVISIONS OF S. 3767

1. No carrier in interstate or foreign commerce may deliver any handgun to any person under 21 years of age.

2. No manufacturer or dealer may ship any handgun in interstate or foreign commerce to any person, except a licensed manufacturer or dealer, unless that person submits to the shipper a sworn statement that he

69-593 O—66——1

Defs.' MSJ App. 222

(*a*) is at least 21 years of age;

(*b*) is not prohibited by Federal or State law or local ordinance from receiving or possessing the handgun;

(*c*) discloses the title, true name and address of the principal law enforcement officer of the locality to which the handgun will be shipped.

In addition, no manufacturer or dealer may sell a handgun over-the-counter to out-of-state residents unless a sworn statement is submitted by the prospective recipient containing the same information required of the mail-order purchaser.

3. Prior to the shipment of a handgun under provisions of the act, the manufacturer or dealer must forward a copy of the customer's sworn statement by registered or certified mail (return receipt requested) to the law enforcement officer named in the statement containing a full description (excluding serial number) of the handgun to be shipped, and must receive a return receipt evidencing delivery of the letter, or notice that the law enforcement officer has refused to accept the letter. A dealer then must delay delivery to the purchaser for 7 days after he has received the return receipt or notice of refusal.

The Governor of any State may designate any official in his State to receive notification of handgun purchases for his State or any part thereof in lieu of notification to local law enforcement officers.

4. The act of a manufacturer or dealer shipping any firearm (including rifles and shotguns) in interstate commerce to any person in any State where the receipt of the firearm by such person would violate any statute of that State is prohibited.

5. The act of knowingly making a false statement, furnishing false or deceiving identification to any licensed dealer or manufacturer for the purpose of obtaining a firearm is prohibited.

6. The act of transporting into or receiving a firearm by a resident of any State from outside the State if it were unlawful for him to purchase or possess a firearm in his own State is prohibited.

7. No manufacturer or dealer may deliver any package containing a firearm to any carrier for shipment in interstate commerce without prior written notice to the carrier.

8. A person must be at least 21 years of age to obtain a Federal firearms license as dealer, manufacturer, or pawnbroker. The applicant must not be prohibited from receiving a firearm by the provisions of the act. The applicant must not have failed to disclose any material fact or made false statements in connection with the application.

9. The fee for a manufacturer's or pawnbroker's license shall be $50 a year; for a dealer's license $25 for the first year and $10 for each renewal year.

10. Ammunition, ammunition components, and minor parts of a firearm (such as springs, sights, and accessories) are removed from the application of the Federal Firearms Act.

11. Firearms manufactured prior to 1899 are considered as antique firearms and, as such, are exempted from the provisions of the act.

12. The existing penalty provisions of the Federal Firearms Act (a maximum fine of $5,000 and a maximum term of imprisonment of 2 years) are increased to maximums of $10,000 and 10 years, but all sentenced offenders are made eligible for parole as the U.S. Board of Parole may determine.

On September 22 of this year, the committee by a vote of 10 to 5, reported this bill to the Senate favorably.

## STATEMENT

Over the past 4 years the Committee on the Judiciary has become increasingly concerned over the rise in lawlessness and violent crime in the United States and the relationship between the apparent easy availability of firearms and criminal behavior.   Initial investigative hearings were conducted by a subcommittee in 1963 and 1964 into the adequacy of existing Federal firearms control laws.   Further hearings followed in 1965.

The public hearings demonstrated that the interstate mail-order sale of firearms to criminal elements posed a significant problem to law enforcement officials throughout the United States and necessitated legislation to strengthen existing Federal control statutes.

The earlier hearings produced evidence that criminals and other undesirable elements have seized upon the inadequacies of existing Federal law by availing themselves of mail-order firearms.   The availability through this source thus circumvents State and local laws, giving rise to serious law enforcement problems at the State and local level.

The 1965 hearings brought out further deficiencies in the present firearms statutes.

Not only is mail order a means of circumventing State and local law, but the over-the-counter sale of firearms, primarily handguns, to persons who are not residents of the locale in which the dealer conducts his business, affords similar circumvention.   This problem is most prevalent in, but not limited to, those States where stringent firearms regulations are in effect and the purchaser is not able to purchase a firearm in accord with the laws of his State.   As a result, a would-be purchaser travels to a neighboring State with less stringent controls and purchases the firearm which is then misused in his residence State.   This problem was outlined by law-enforcement officers throughout the country.

Firearms purchased in the above manner have been utilized in the commission of crime in substantial numbers.   For example, the Massachusetts State Police have traced 87 percent of the concealable firearms used in crimes in Massachusetts to out-of-State purchases.

The lack of adequate Federal controls over this aspect of the commerce in firearms affords circumvention and violation of the laws of several of the States similar to the mail-order methods of purchase.

It is difficult for the States to cope with this aspect of the problem without additional help by the Federal Government.

## THE NEED FOR LEGISLATION

There has been a great nationwide concern over the steadily increasing rate of crime in this country.   Much attention, perhaps too much attention, has been directed at the role of firearms in crime, with too little attention given to the many sociological aspects which are the basic causes of our crime problem.   It would appear, however, from testimony presented to this committee, that there are some respects in which the existing Federal Firearms Act should be strengthened.

After reviewing all of the evidence adduced during the hearings, it is the opinion of the committee that the enactment of legislation that would indiscriminately place further restrictions on the acquisition of all types of firearms would be unwarranted. Rather, in seeking to reduce the criminal use of firearms, the legislation should especially concern itself with the particular type of weapon that is predominantly used by the criminal.

Despite the fact that the vast majority of all handguns are used for legitimate sporting purposes, the committee concluded that this firearm was the most troublesome and difficult factor in the unlawful use of firearms. Its size, weight, and compactness make it easy to carry, to conceal, to dispose of, or to transport. All these factors make it the weapon most susceptible to criminal use.

In particular, it was learned upon investigation that the most serious firearms problem facing most enforcement agencies has been the widespread availability of handguns through mail-order channels. The record shows that the sale of mail-order handguns in the large urban complexes may have stimulated crime and juvenile delinquency and that State, county, and municipal laws and ordinances have been unable to cope with the problem because of their jurisdictional limits. The extension of the Federal law proposed in S. 3767 is in keeping with the long-accepted role of the Federal Government in restricting interstate commerce in weapons, drugs, and other commodities dangerous to life.

### THE PROBLEM: HANDGUNS

The handgun as the most formidable and most frequently used tool of the criminal is well recognized and established by first, the existence in many States of laws controlling it; and, second, by statistics showing its dominance as the weapon used in unlawful activities.

*State control of handguns*

While there is 1 State that requires an identification card for the purchase of a rifle or shotgun and 22 States that prohibit the carrying of a loaded rifle or shotgun in a moving vehicle, compare the much greater extent of control over handguns by the States. These controls are of two classes—the positive and the negative. In those States with positive handgun controls:

Twenty-three States require a license to sell at retail.

Twenty-nine States require a license to carry a handgun on or about the person.

Eight States require a permit or its equivalent to purchase a handgun.

Ten States prescribe a waiting period between purchase and delivery of a handgun.

Eighteen States require a license to carry a handgun in a vehicle.

As to States with negative controls:

Twenty-one States prohibit the carrying of a handgun concealed on the person.

Four States require registration of handguns.

Twenty-two States prohibit carrying a loaded handgun—and in some instances other firearms—in a vehicle.

In addition, many municipalities have similar ordinances.

The committee is of the opinion that the lawmakers of each State are best able to determine the conditions and needs within their own borders and to pass appropriate legislation in regard to the use of handguns. Thus, the committee endeavored to draft legislation which would give State and local officials notice of the flow of handguns into their jurisdiction so as to enable them to regulate their use as dictated by applicable local laws.

### Statistics on firearms used in crimes

Federal Bureau of Investigation statistics delineate the handgun as the firearms problem.

The 1965 FBI Uniform Crime Reports state that 57 percent of the willful killings during that year were committed with firearms. Thus, out of a total of 9,850 such killings, firearms were used in 5,634 cases. Writing to Senator Roman L. Hruska on July 27, 1966, FBI Director J. Edgar Hoover supplemented the Reports. Indicating that handguns were used in 70 percent of the murders committed with firearms, the Director stated:

> "Based on the submission of police reports under the uniform crime reporting program, 70 percent of the murder by gun in this country is committed with a handgun, 20 percent by the use of a shotgun, and 10 percent with a rifle or other firearm. This will supplement the data available to you in Uniform Crime Reports—1965."

In regard to aggravated assaults, approximately 17 percent of the total (206,600) were committed with firearms. However, Mr. Hoover advised that,

> "There is no available breakdown of the type of firearms used in these attacks."

In 1965, there were 118,900 robberies. Of this figure, 38 percent, or about 45,000, were armed robberies committed with firearms. In regard to this category, Mr. Hoover stated in the above-mentioned letter:

> Although we do not make a regular collection of the type of weapon used in armed robbery, from special surveys in the past we have determined about two-thirds are firearms and most of these the handgun.

From these statistics, as well as the treatment accorded handguns by State and city statutes and ordinances, it is quite clear that the principal offender in the unlawful use of firearms is the handgun.

### Inadequacy of existing Federal law

It was the intent of the Congress in enacting the Federal Firearms Act of 1938 (as amended) to control the movement of all firearms in interstate commerce. This law;

(a) Requires the licensing of manufacturers and importers of, and dealers in, firearms, ammunition and components thereof;

(b) Provides restrictions on the movement of all firearms and pistol ammunition in interstate or foreign commerce;

(c) Prohibits convicted felons, persons under indictment and fugitives from justice from shipping, transporting or receiving firearms or ammunition in interstate or foreign commerce;

Defs.' MSJ App. 226

Case 4:22-cv-00691-O   Document 182-1   Filed 02/13/23   Page 6 of 212   PageID 3523

(*d*) Prohibits the shipment, transportation, or receipt of stolen firearms or ammunition, or firearms from which the serial number has been removed, obliterated, or altered;

(*e*) Requires all licensed manufacturers, importers, and dealers to maintain complete records of the production, receipt, and disposition of all firearms.

A provision of this Federal firearms law makes it mandatory for any federally licensed firearms manufacturer or dealer to observe the purchase-permit requirement of any State which has such a requirement for the purchase of a firearm. Here, however, it is important to note that only 8 of the 50 States enacted a purchase-permit requirement, and in all cases with respect to the purchase of a pistol or revolver. At the same time, virtually all States do have statutes regulating the acquisition of firearms by minor children. It is these State and local statutes which are being circumvented by mail order and are creating the pressing problem before us.

The committee has drafted legislation to effectively plug this loophole by providing that a federally licensed manufacturer or dealer, in shipping a pistol or revolver by common carrier, must notify the carrier that the package being transported contains a pistol or revolver. The law then places the responsibility on the common carrier to knowingly make no delivery of such a package to a person who is a minor or otherwise prohibited from receiving or possessing a handgun.

It is believed that this, in addition to the sworn affidavit requirement provided in S. 3767 and the notification to local law enforcement authorities, will provide the necessary and timely information to State and local enforcement officials to enable them to enforce the applicable laws in their respective jurisdictions.

These provisions will serve to give greatest assurance that State and local laws can be effectively enforced, without the necessity of encroaching unduly upon the longstanding rights and privileges of the millions of firearms owners, collectors, and users who put them to legal, wholesome, and beneficial use.

*What S. 3767 does not do*

The subject bill does not have special provisions which apply to imported firearms, destructive devices, or rifles and shotguns.

Imported firearms have been singled out by proponents of highly restrictive firearms control legislation for embargoes in some cases and unusual requirements such as meeting recognized safety standards in others. However, the testimony before the committee indicated clearly that imported firearms are not inherently evil because of their origin. They are brought into this country in as wide a range of price and variety as are their domestically manufactured counterparts. To be sure, they should be subject to the same controls and restrictions which apply to all firearms, but no reason could be ascertained to apply embargoes and unusual restrictions against them. In any event, any such restrictions fall beyond the jurisdiction or competency of this committee since questions of foreign trade and relations policy are involved. Properly these matters should be considered by the Senate Committees on Finance and Foreign Relations. Detailed comments on imported firearms follow later in this report.

The subject bill does not deal with the so-called destructive devices such as bazookas, rockets, mines, heavy field artillery and the like.

Defs.' MSJ App. 227

S. 3767 is intended to amend the Federal Firearms Act of 1938, which primarily governs interstate and foreign commerce in firearms used for sporting purposes. The National Firearms Act of 1934, the so-called Machinegun Act, has effectively controlled interstate commerce in machineguns, other automatic weapons, and sawed-off rifles and shotguns by imposing heavy ($200) transfer taxes on each sale and a national registration system of all such weapons.

While the destructive devices are not a substantial factor in the commission of serious crimes (only a handful of cases were made known to the committee in which these weapons were actually used in the commission of the 86,000 firearms crimes committed in 1965), neither are there any significant sporting purposes for which they are suited.

Both Senators Dodd and Hruska have introduced bills to bring destructive devices within the scope of the National Firearms Act. These bills are pending in the Senate Committee on Finance. These bills should be given early consideration.

The subject bill does not impose special procedures or restrictions on the long gun, although many of the bill's provisions apply to all firearms. The evidence before the committee has overwhelmingly demonstrated that the handgun is the type of firearm that is principally used in the commission of serious crime. Thus, it is the subject of special provisions which require the submission of a sworn statement by the purchaser and waiting periods before delivery can be effected by the dealer or manufacturer. Also, persons under the age of 21 cannot obtain handguns by interstate mail-order shipment. Rifles and shotguns are exempted from these additional requirements, since they are used substantially less frequently by the lawless and because of their preponderant use in a lawful and beneficial manner.

### ENFORCEMENT OF EXISTING FEDERAL LAW

Experience and testimony before this committee indicate that the operation of the Federal Firearms Act over the years has demonstrated certain weaknesses which call for correction. The object of S. 3767 is to remove these weaknesses in the interest of more effective and efficient law enforcement.

Many of the problems which some persons ascribe to the present Federal firearms statutes are, in reality, not the fault of the law itself but a result of the yet unsolved problem of uniform and effective administration of the criminal law. This problem has several factors, not the least of which are overworked and understaffed enforcement agencies and similarly overworked but frequently too lenient prosecutors and courts. The record shows that indictments and convictions under the existing Federal firearms statutes have been relatively few, and the comparative rarity of successful action in the courts by the Federal Government have contributed to a compounding of the problems of reasonable and effective firearms regulation.

Apparently, in a number of instances, the public authorities are not fully utilizing the tools available to them at present under Federal law. Testimony has been presented to this committee that a State conservation agency, in the course of apprehending individuals in violation of game laws or in routine checking, has had occasion to turn over to Federal enforcement personnel weapons in violation of the

Defs.' MSJ App. 228

National Firearms Act. To its knowledge, this conservation agency has never heard of a Federal prosecution resulting from those seizures. Further, testimony before this committee has brought out that in a number of instances Federal agents have apprehended individuals in serious violation of the Federal firearms laws but that no action has resulted from the arrest of these individuals. This is a matter of concern to this committee and ought to be considered in evaluating the desirability and necessity for additional firearms controls.

A police official of a large American city testified before this committee that in the first 6 months of 1965, police officers "stopped and searched and found 256 persons carrying, in most instances, handguns. The arrested persons were charged with carrying a concealed weapon and warrants were applied for in all these cases. However, due to frailties in the law, only 81 warrants were issued."

Another police official testified that even though his State has a law requiring permits for the purchase of handguns, serious difficulty was encountered with persons obtaining handguns by mail order from out-of-State dealers. These sales apparently are in violation of section 2(c) of the Federal Firearms Act (15 U.S.C. 902(c)). Yet, no evidence was presented to the committee that these violations were prosecuted.

This committee is fully aware that the foregoing examples could be amplified many times. If this be the case, and the evidence points in that direction, then this committee believes that the solution to the problem of firearms in crime lies not in highly restrictive legislative controls but in the understanding and proper handling of all operative factors in the field of crime and criminal administration.

## Lawful Use of Firearms

As detailed earlier in this report, specific needs for amendment of the Federal Firearms Act have been demonstrated in the hearings before the committee. The subject bill, S. 3767, has effectively addressed itself to these problems which must be resolved. Yet, in the drafting of the reported bill, the committee has been scrupulously careful to avoid any undue restrictions upon the legitimate, proper, and beneficial use of firearms, for when taken in the entire context and on balance, the place and role of privately owned and used firearms are necessary and wholesome as they have always been in the history of this Nation. Their legitimate role should be maintained.

Any legislation intended to deal with those who unlawfully use firearms must be made to concentrate on them as effectively as possible without encroaching upon the vast preponderance of the public who use firearms in a lawful and beneficial manner.

In seeking to protect the constitutionally guaranteed right of our citizenry to keep and bear arms for lawful purposes, the committee was considering a factor in our society of no mean proportion. Best estimates indicate that there are, within the United States, over 100 million privately owned firearms in the possession of over 20 million citizens.

The committee considered the hundreds of thousands of shooters who enter into formal rifle, pistol, and shotgun competitive shooting, and the millions who use these same types of firearms for informal skeet, trap, and target shooting. Not only does this use of firearms provide a healthy recreational activity, but it provides, as a valuable

Defs.' MSJ App. 229

national asset, a great number of young men who are, prior to their entering our Armed Forces, familiar with firearms and skilled in their use. In Vietnam, as in every armed conflict, it is evident that, in spite of spectacular advances in weaponry systems, we are still faced with a need for skilled riflemen. The plain fact that preinduction firearms training produces more capable and effective soldiers was recently made clear by a Department of Defense study.

The study, which was conducted for the Department of the Army by the Arthur D. Little, Inc., a private industrial and management research firm, undertook to review completely the Army's civilian marksmanship program conducted by the National Board for the Promotion of Rifle Practice.

A brief summary of the findings of that evaluation follows:

> The results of our study indicate that the civilian marksmanship program * * * contributes significantly to the development of rifle marksmanship proficiency and confidence in the ability to use a rifle effectively in combat on the part of those who participate in the program or benefit indirectly from it.
>
> We believe that those aspects of the DCM program which relate to the broader interest and participation in rifle shooting among the youth of our country (primarily club activities) should be emphasized more and pursued even more effectively to reach a greater percentage of those young men likely to enter military service.

This study indicates clearly that a continuation and implementation of the program is necessary for the defense of our country.

The committee was cognizant of the many collectors of legitimate firearms of all types; the students of firearms history and development who are just as serious about their respectable hobby as those who collect stamps, automobiles, or works of art.

While in no way advocating that individuals take the law into their own hands, the committee is aware that there are millions of homes where firearms have a proper place for self-protection.

Finally, the committee endeavored to draft legislation which would not unnecessarily restrict the activities of the more than 15 million hunters in this country. Hunting provides a healthy outdoor recreation which can be enjoyed throughout the lifetime of an active adult. This activity is an effective instrument of wildlife management utilized by Federal and State wildlife managers. In addition, these sportsmen fund, in large part, Government programs of wildlife management through the purchase of hunting licenses, and through the allocated Federal excise taxes paid upon the sales of sporting arms and ammunition.

Furthermore, the recent report by the U.S. Department of the Interior, Bureau of Sport Fisheries and Wildlife, is noteworthy. Its 1965 National Survey of Fishing and Hunting revealed that during this period, 13,583,000 hunters spent a total of $1,121,135,000 in pursuit of their sports. They took 169,377,000 trips in spending 185,819,000 recreation days afield. They traveled 8,659,034,000 passenger miles, principally by auto, to reach and return from hunting areas. Collectively and individually, hunting supports a significant portion of the economy.

The lawful and legitimate use of firearms by our citizenry is a widespread and worthwhile activity which must not be unnecessarily impaired. The committee believes that this bill preserves the freedom of activity for these more than 20 million lawful firearms users while effectively confronting the infinitesimal fraction of this number which represents those who use firearms in an antisocial manner.

### DESTRUCTIVE DEVICES

During last year's firearms hearings, much attention was devoted to the so-called destructive devices—rockets, mortars, bazookas, grenades, mines, bombs, missiles, field artillery, and the like. Imports of such military hardware were featured at the hearings as a major reason for authorizing an embargo on military surplus of all kinds and other categories of firearms.

While these devices do not appear to be used significantly in the commission of serious crime, it was not contended by any of the sportsmen's groups whose representatives testified in opposition to S. 1592 that there were legitimate sporting uses for them. One of the larger importers of firearms recommended that import licenses be denied such military ordnance under section 414 of the Mutual Security Act, as amended. The Munitions Control Office of the State Department advises that it no longer permits imports of this type.

Serious objections were raised to the inclusion in the Federal Firearms Act of prohibitions designed to take this or any other category of firearms out of commerce. This law was enacted primarily for the regulation of commerce in firearms generally used for sporting purposes—rifles, shotguns, and handguns. The National Firearms Act of 1934 (ch. 53 of the Internal Revenue Code of 1954) has long been the vehicle for removing from commerce weapons which are peculiarly susceptible to criminal use and not generally used for recreation. This act provides for the registration and prohibitory taxes on the transfer of automatic weapons such as machineguns and sawed-off rifles and shotguns. Also included are firearms mufflers and silencers. The National Firearms Act appears to have regulated effectively so-called gangster-type weapons in the years since its enactment. Persuasive testimony at the hearings brought out the advantages of preserving the essential difference between the two acts. Obviously, it would be more effective to restrict commerce in all destructive devices, not merely imports, and to subject all prohibited weapons to the same enforcement and regulatory machinery.

*Imports*

The committee gave a good deal of consideration to the question of whether the Federal Firearms Act should be amended to authorize the Secretary of the Treasury to place embargoes on certain categories of imported firearms and special restrictions on others. The conclusion reached by a majority of the committee was that the purposes of the bill could be adequately accomplished through regulation of domestic commerce in firearms and that no clear basis had been established at the hearings to define types of firearms which particularly aggravated the crime problem and which were not also readily available from domestic sources. The committee felt strongly that discriminatory treatment of commerce and interference with consumer preference without a clear showing of overriding necessity should be

avoided.  Proposals to cut off certain imports and to ban mail-order sales of rifles made to military specifications were among the provisions which the committee rejected as unnecessary and discriminatory. This prevailing view is well expressed in a letter dated April 20, 1966, circulated to the full committee from one of its members who thus gave notice of his reservations while nonetheless voting to submit the subcommittee bill to the full committee.

As pointed out in the above section on so-called destructive devices, considerable attention was attracted at the hearings to the rather shocking idea that anyone can buy a bazooka, antitank gun, or other high-caliber military ordnance.  Taking destructive devices out of commerce is no justification whatsoever for an embargo on imports because (a) imports of these devices have already been cut off by the State Department under existing law, and (b) the need is for restrictions which reach destructive devices already in the United States. Pending bills to amend the National Firearms Act to include destructive devices will far more effectively accomplish the desired objective.

The proposed import restrictions would have given the Secretary of the Treasury unusually broad discretion to decide whether a particular type of firearm is generally recognized as particularly suitable for, or readily adaptable to, sporting purposes.  If this authority means anything, it permits Federal officials to differ with the judgment of sportsmen expressed in the more familiar manner through consumer preference in the marketplace.  It is plain that the proponents of an embargo anticipated cutting off large quantities of imported firearms.  Quite obviously such large-scale imports would not exist in the absence of important consumer preference.  This committee is not prepared to make the unlikely assumption without evidence that substantial markets for imported products are composed of irresponsible or criminal citizens.  No justifiable criteria have been proposed for the Secretary of the Treasury to discriminate between various categories of imported firearms; on the contrary, the statements of the proponents of embargoes would encourage the Secretary to use this broad discretion to curtail the availability of firearms in general within the practical limitations of domestic politics. The fact that Treasury witnesses expressed no sensitivity to this problem further suggests the need for caution.

The hearings failed to establish inherent differences, which might bear on criminal use, between military and sporting small arms or between firearms manufactured abroad or in the United States. Despite a general tendency toward lower prices for imports and military surplus, the hearings revealed a considerable overlap with the retail prices of equally lethal domestic sporting firearms.  Furthermore, the hearings brought out the important role over the last 10 years of imported military surplus, largely bolt action rifles, in making inexpensive hunting and shooting equipment more widely available as a stimulant to outdoor sports and also to thousands of small businesses (gunsmiths, manufacturers of accessories and parts, sporterizers of surplus rifles, makers of ammunition and ammunition loading equipment and retailers).

The conclusion is inescapable that the purpose of proposing any embargo would be twofold: (a) remove lower cost firearms from the market, and (b) discriminate against imports because they are politically vulnerable and might enlist the support of competing domestic manufacturers.  The majority of the committee rejects on principle

the discriminatory implications of both justifications in a bill designed to meet the problem of crime in the United States. It is both impractical and unfair to legislate against low prices. Where should the line be drawn? Why should low-income sportsmen, frequently farmers and other country people to whom hunting is most important, bear the burden of Federal intervention in the marketplace?

The committee considered a proposal which originated quite recently on a subject not covered at the hearings. It would give the Secretary of the Treasury broad discretion to embargo imports on the grounds that they might be unsafe to the user. The injection of this issue may reflect the difficulty in finding plausible grounds for curbing imports. To establish Federal safety regulations in firearms is a complex step which should be carefully studied. It could require elaborate regulatory machinery. Why should safety standards be applied to imported firearms and not to the much larger commerce in new and used domestic firearms?

The device of an embargo on international trade raises complex questions with regard to U.S. treaty obligations. It could prejudice the future bargaining positions of our country if we oppose the misuse by other countries of public safety justifications for otherwise unacceptable protectionist moves. Import restrictions considered by the committee would require the Treasury Department to overlap a State Department import licensing system authorized by section 414 of the Mutual Security Act, as amended, which is working well and makes full use of the overseas investigatory facilities of the State Department. Such duplication would waste Government man-hours and unduly burden those affected by the overlapping regulation; no necessity for this inherently undesirable approach has been demonstrated.

For these reasons, it seemed plain to the majority of the committee that the foreign source of a firearm is no basis to outlaw it because, like a similar domestic firearm, it might be used in a crime. If nondiscriminatory restrictions on mail-order distribution and firearms dealers are adequate methods of firearms control for domestic products, they are adequate for imports. To declare imports somehow more evil than its comparable domestic product is not only illogical; it would be misunderstood by many as inspired by the collateral purpose of protecting American industry from foreign competition. Any such misunderstanding would jeopardize passage of the bill and the credibility and standing of any law which might finally be enacted.

## Existing Federal Laws Relating to Firearms

### A. National Firearms Act of 1934, as Amended

(a) Imposes a tax and registration on the making or transfer, among other weapons, of all fully automatic firearms and all short-barrel rifles and shotguns.

(b) Provides that all manufacturers and importers of, and dealers and pawnbrokers in, the foregoing kinds of firearms must pay an annual occupational tax.

### B. FEDERAL FIREARMS ACT OF 1938, AS AMENDED

(*a*) Requires the licensing of manufacturers and importers of, and dealers in, firearms, ammunition and components thereof;

(*b*) Provides certain restrictions on the movement of firearms and ammunition in interstate or foreign commerce;

(*c*) Prohibits convicted felons, persons under indictment, and fugitives from justice from shipping, transporting, or receiving firearms or ammunition in interstate or foreign commerce;

(*d*) Prohibits the shipment, transportation, or receipt of stolen firearms or ammunition, or firearms from which the serial number has been removed, obliterated or altered.

### C. MAILING OF CONCEALABLE FIREARMS (18 U.S.C. 1715)

(*a*) Prohibits the mailing of concealable firearms (i.e., handguns) except to officers of the Active or Reserve Forces; to law-enforcement officers whose duty is to serve warrants of arrest or commitment, to employees of the postal service; and to watchmen engaged in guarding any Government property;

(*b*) Permits the mailing of concealable firearms to or between firearms manufacturers and dealers.

### D. WEAPONS ABOARD AIRCRAFT (49 U.S.C. 1472(1))

(*a*) Prohibits the carrying on or about the person while aboard an aircraft engaged in air transportation of a concealed deadly or dangerous weapon;

(*b*) Permits the carrying of such weapon aboard such aircraft by any law-enforcement officer authorized to carry arms, or by any person authorized by regulations issued by the Administrator of the Federal Aviation Agency.

### E. MUTUAL SECURITY ACT OF 1954 (22 U.S.C. 1934)

(*a*) Gives authority to the President to control the export and import of arms, ammunition, implements of war, and technical data related thereto.

(*b*) Requires all persons engaging in these transactions to register with the U.S. Government, pay registration fees, and secure import licenses for all such materials imported into this country.

### SECTIONAL ANALYSIS OF THE PROVISIONS OF S. 3767

#### SECTION 1

Section 1 of S. 3767 amends section 1 of the Federal Firearms Act (52 Stat. 1250) by restating and clarifying existing definitions contained in the act and adding several new definitions.

The definition of "person" is unchanged. The terms "interstate or foreign commerce," "firearm," "manufacturer," "dealer," and "fugitive from justice," have been restated and clarified. The term "ammunition" has been deleted. The terms "State," "pawnbroker," "Secretary," "crime of violence," and "indictment" are new.

*Paragraph (1)*

The definition of the term "person" in paragraph (1) of the bill is unchanged from the existing law (15 U.S.C. 901(1)).

*Paragraph (2)*

Paragraph (2) of section 1 of the bill adds a new definition "State" to simplify and clarify later provisions of the bill and the existing law. The Canal Zone is included in the definition. Previously it was excluded. Also included are the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa, the principal Commonwealth and possessions of the United States.

*Paragraph (3)*

Paragraph (3) restates the existing definition of "interstate or foreign commerce" (15 U.S.C. 901(2)). However, language has been removed that has been defined in paragraph (2) above.

*Paragraph (4)*

Paragraph (4) restates the definition of "firearm" and revises it to exclude from the act antique firearms made in 1898 or earlier. Also mufflers and silencers for firearms are removed from the definition.

The year 1898 was selected as the "cutoff" date on the basis of testimony presented to Congress by several gun collectors organizations and to be consistent with the regulations on importation of firearms issued by the Department of State pursuant to section 414 of the Mutual Security Act of 1954.

Mufflers and silencers for firearms are excluded from coverage since these items are included presently in the National Firearms Act (Ch. 53 of the Internal Revenue Code of 1954). This act provides for heavy transfer taxes and registration of all such items.

Also excluded from the present definition of the term "firearm" is "any part or parts" of a firearm. Experience in the administration of the Federal Firearms Act has indicated that it is impractical to treat each small part as if it were a firearm. The revised definition substitutes the words "frame or receiver" for the words "any part or parts."

Added to the term "firearm" are weapons which "may be readily converted to" a firearm. The purpose of this addition is to include specifically any starter gun designed for use with blank ammunition which will or which may be readily converted to expel a projectile or projectiles by the action of an explosive. Such so-called starter pistols have been found to be a matter of serious concern to law enforcement officers.

*Paragraph (5)*

The definition of the term "handgun" in paragraph (5) is a new provision. This definition is necessary because of later provisions of the bill which have application solely to these firearms. There is no intention that handguns be exempted from any of the other provision of the bill since a handgun is a firearm within the meaning of paragraph (4) above.

The term includes "pistols," "revolvers" and "any other weapons originally designed to be fired by the use of a single hand" which are made to be fired by the use of a single hand and which are designed to fire or are capable of firing fixed cartridge ammunition.

*Paragraph (6)*

The definition of the term "manufacturer" is a restatement of existing law (15 U.S.C. 901(4)) except that references to ammunition, cartridge cases, primers, bullets, or propellant powder" have been striken.

This deletion was made because experience in the administration of the Federal Firearms Act has showed that it is extremely difficult to control interstate and foreign commerce in ammunition.

The requirement that the manufacturer be "in the business of" manufacturing or importing firearms has been added to the definition to conform with a similar provision in the definition of "dealer."

*Paragraph (7)*

The definition of the term "dealer" is a restatement of existing law (15 U.S.C. 901(5)) except that references to "ammunition, cartridge cases, primers, bullets, or propellant powder" have been stricken as in the definition of "manufacturer" above.

The word "special" has been stricken from the definition since a gunsmith or other person in the business of repairing firearms should be required to comply with the provisions of the Federal Firearms Act if he fits only barrels which do not fall into "special" category.

The words "or breech mechanism" have been stricken because they are unnecessary to a complete description of the functions performed by a person in the business of repairing firearms.

Other minor rephrasing of the language in the definition has been made to clarify the existing language.

*Paragraph (8)*

The definition of the term "pawnbroker" is a new provision. Pawnbroker dealers are covered under the provisions of the existing law in the same manner as other dealers. The purpose of this definition is to provide a basis for a separate classification of pawnbroker dealers.

Under this bill pawnbrokers would be subject to a higher license fee than other dealers.

*Paragraph (9)*

The definition of the term "Secretary" contained in paragraph (14) is a new provision. The purpose of this definition is to eliminate the necessity of repeating "Secretary of the Treasury or his delegate" in several sections of the act.

*Paragraph (10)*

The definition of the term "crime of violence" is new. The term includes "voluntary manslaughter, murder, rape, mayhem, kidnaping, robbery, burglary, housebreaking, extortion accompanied by threats of violence, assault with a dangerous weapon, assault with intent to commit any offense punishable by imprisonment for more than 1 year, arson punishable as a felony, or an attempt to commit any of the foregoing offenses."

Prior to an amendment of October 3, 1961 (75 Stat. 757), the term "crime of violence" was included in the act. However, the 1961 amendment substituted the term "crime punishable by imprisonment for a term exceeding 1 year" for the term formerly used.

On September 15, 1965, another amendment (79 Stat. 788) was enacted which gave persons convicted of "a crime punishable by imprisonment for a term exceeding 1 year (other than a crime involving

the use of a firearm or other weapon or a violation of the act or the National Firearms Act)" the privilege of applying to the Secretary of the Treasury for "relief from the disabilities under this act incurred by reason of such conviction" and the Secretary was authorized to grant relief.   However, this privilege was not extended to persons who were indicted for felony crimes.

The effect of the 1965 amendment was to place certain convicted persons in a position to obtain relief from the prohibitions of the act, whereas certain persons under indictment could not.

Under these circumstances it was determined that a return to the previous concept of a crime of violence should be effected to remove the obvious disparity of treatment.

*Paragraph (11)*

The definition of the term "indictment" is a new provision.  Inasmuch as a person under indictment for certain crimes is proscribed from shipping or receiving firearms in interstate or foreign commerce, and a license under the act will not be issued to such a person, the definition will serve a useful purpose in making it clear that an "information" charging a crime is the same as an indictment charging a crime.   This definition is in accord with the opinion of the court in *Quinones* v. *United States*, 161 F. 2d 79.

*Paragraph (12)*

The definition of the term "fugitive from justice" is a restatement of existing law (15 U.S.C. 901(6)) with reference to "Territory, the District of Columbia, or possession of the United States" omitted in accordance with the definition of "State" in paragraph (2) above.

*"Ammunition"*

The definition of the term "ammunition" has been stricken from the existing law (15 U.S.C. 901(7)), to exclude all ammunition from the coverage of the Federal Firearms Act.

Under existing law, the term included pistol and revolver ammunition.   However, an evaluation of the evidence developed in the hearings before the committee showed that it is difficult to control effectively interstate and foreign commerce in conventional firearms ammunition used for sporting, recreational, and other lawful purposes and that the act was not enforced in this regard.

### SECTION 2

Section 2 of the Federal Firearms Act (15 U.S.C. 902) would be restated, revised and six new subsections added.   References to ammunition have been eliminated in subsections (a), (b), (d), (e), and (g).   Subsection (c) has been substantially revised and broadened. Subsections (f) and (i) have been restated and language stricken which has been declared unconstitutional.   Subsections (j) through (o) are new.

*Subsection (a)*

Subsection (a) of section 2 of existing law (15 U.S.C. 902(a)) has been restated except that the words "or ammunition" have been stricken.

*Subsection (b)*

Subsection (b) of section 2 of existing law (15 U.S.C. 902(b)) has been restated except that the words "or ammunition" have been stricken and minor changes have been made for clarity.

*Subsection (c)*

Subsection (c) of section 2 of existing law (15 U.S.C. 902(c)) has been revised and its scope broadened so that it is an unlawful act within the meaning of the act for any Federal licensee to knowingly ship or transport directly or indirectly in interstate or foreign commerce any firearm (including rifles and shotguns as well as handguns) to any person in any State in violation of any State law which has application to the shipment.

The existing provision has application only to State firearms control laws which require purchase permits. Fewer than 10 States have such laws, whereas most States have firearms laws which impose controls and restrictions on the receipt, transportation or possession of firearms in a variety of ways.

This provision has been broadened to assist the States in the control of firearms commerce within their respective borders by insuring that channels of interstate and foreign commerce will not be used to circumvent applicable State laws.

It is not the intention of the subsection to impose absolute criminal liability on Federal licensees. It is contemplated that an affirmative defense would be allowed so that any person charged with a violation of this section may establish that he took reasonable efforts to ascertain that the shipment would not be in violation of the applicable State laws.

*Subsection (d)*

Subsection (d) of section 2 of the existing law (15 U.S.C. 902(d)) has been restated and modified. The words "or ammunition" have been stricken.

The term "crime of violence" has been inserted in lieu of a "crime punishable by imprisonment exceeding 1 year." This change substitutes language similar to that in section 2(d) of the Federal Firearms Act which was eliminated by the amendment of October 3, 1961 (75 Stat. 757). The 1961 amendment substituted the words "crime punishable by imprisonment for a term exceeding 1 year." The reason for the return to the previous language was stated in discussion of the definition of "crime of violence" in section 1(10).

The words "territories, possessions, or the District of Columbia" have been stricken as they fall within the meaning of the term "State" as defined in section 1(2) of the bill.

*Subsection (e)*

Subsection (e) of section 2 of the existing law (15 U.S.C. 902(e)) has been restated and modified by substituting crime "of violence" for the words "punishable by imprisonment for a term exceeding one year" and by striking the words "or ammunition."

*Subsection (f)*

Subsection (f) as changed by section 2 of the bill is a restatement of existing law (15 U.S.C. 902(f)). The restatement eliminates the words "and the possession of a firearm or ammunition by any such person

Defs.' MSJ App. 238

shall be presumptive evidence that such firearm or ammunition was shipped or transported or received, as the case may be, by such person in violation of this act," since the presumption is meaningless in view of the decision of the Supreme Court in *Tot* v. *United States*, 319 U.S. 463.

### Subsection (g)

Subsection (g) as changed by section 2 of the bill is a restatement of existing law (15 U.S.C. 902(g)) and has been revised by striking the words "or ammunition" and making minor changes for clarity.

### Subsection (h)

Subsection (h) as changed by section 2 of the bill is a restatement of existing law (15 U.S.C. 902(h)) and the words "or ammunition" stricken wherever they appear. Also, minor changes have been made for clarity.

### Subsection (i)

Subsection (i) as changed by section 2 of the bill is a restatement of existing law (15 U.S.C. 902(i)). The restatement also deletes the words "and the possession of any such firearm shall be presumptive evidence that such firearm was being transported, shipped, or received, as the case may be, by the possessor in violation of this act" since the presumption is meaningless in view of the decision of the Supreme Court in *Tot* v. *United States*, 319 U.S. 463.

### Subsection (j)

Subsection (j) as changed by section 2 of the bill is a new provision which would make it unlawful for any licensee under the act knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, any package containing a firearm, without written notice to the carrier that a firearm is being transported or shipped. This provision is correlated to the provisions of section 2(c). Testimony before the committee disclosed the existence of a practice of surreptitiously shipping firearms, without notice or disclosure, to circumvent requirements of Federal or State law.

### Subsection (k)

Subsection (k) prohibits a common or contract carrier from delivering in interstate or foreign commerce any firearm to any person knowing or having reasonable cause to believe that such person is under 21 years of age.

### Subsection (l)

Subsection (l) as added by section 2 of the bill is a new provision that would establish a procedure whereby the channels of interstate and foreign commerce could not be used to circumvent applicable State laws and local ordinances. It would make it a violation of the Federal Firearms Act for any licensee to ship any handgun in interstate or foreign commerce to any person other than another licensed manufacturer or dealer unless the prospective recipient has submitted a sworn statement to the manufacturer or dealer containing material information pertaining to the sale. The dealer must then forward a copy of the statement to the appropriate local law enforcement officer or designated State official by registered or certified mail, receive a return receipt evidencing delivery of the letter or notice of refusal to accept the

letter, and wait at least 7 days after return of the receipt or refusal before making delivery of the handgun to the recipient.

*Paragraph (1)*

Paragraph (1) of such subsection (l) provides that the sworn statement to be submitted to the dealer or manufacturer by the prospective recipient shall be in such form as prescribed by the Secretary of the Treasury and shall contain the following information: (1) That the recipient is at least 21 years or more of age; (2) that he is not prohibited by the Federal Firearms Act from receiving a handgun in interstate or foreign commerce; (3) that there are no provisions of applicable State law or local ordinance which would be violated by the purchaser's receipt or possession of the handgun; and (4) the title, name, and official address of the principal law enforcement officer where the handgun is to be shipped.

*Paragraph (2)*

Paragraph (2) of such subsection (l) provides that prior to shipment of the handgun to the purchaser, the dealer, or manufacturer shall forward to the appropriate local law enforcement or State official a description of the handgun (not including serial number) and a copy of the sworn statement by registered or certified mail. Also, the dealer must receive a return receipt evidencing delivery of the letter containing the description of the handgun and the copy of the sworn statement or a notice of refusal to accept the letter in accordance with the applicable regulations of the Post Office Department.

*Paragraph (3)*

Paragraph (3) of such subsection (l) would impose a 7-day waiting period following receipt of the notification of the local law enforcement officer's acceptance or refusal before the manufacturer or dealer could make delivery to the consignee.

In addition, subsection (l) provides (1) that the Governor of any State may designate any official in his State to receive the notification to local law enforcement officials required by this subsection and that the Secretary shall publish such designation in the Federal Register; and (2) that the Governor of any State may request that the Secretary discontinue the required notification to local law enforcement officials in his State or any part thereof and upon publication in the Federal Register, the request shall be in effect for 5 years, unless withdrawn by the Governor and so published in the Federal Register.

*Subsection (m)*

Subsection (m) as added by section 2 of the bill is a new provision prohibiting licensees under the act from selling a handgun to an unlicensed individual who is a resident of a State, other than that in which the manufacturer's or dealer's place of business is located without compliance with the provisions of subsection (l) above. The subsection is intended to deal with the serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities. The hearings before the committee have demonstrated the ease with which residents of a particular State, which has laws regulating the purchase of firearms, can circumvent such laws by procuring a firearm in a neighboring jurisdiction which has no such controls on the purchase of firearms. The hearings have also shown

that this is a means by which criminal and lawless elements obtain firearms.

This provision allows such handgun purchases to be made, but only after compliance with the detailed procedures set forth in subsection (1) above.

### Subsection (n)

Subsection (n) of section 2 of the bill is a new provision that would make it unlawful for any person, in purchasing or otherwise obtaining or attempting to purchase or otherwise obtain a firearm from a licensed manufacturer or licensed dealer under this act, knowingly to make any written or oral false statement or to knowingly supply any false or spurious information or identification intended or calculated to deceive such licensee with respect to such person's identity, age, address, or criminal record (if any), or with respect to any other material fact pertinent to the lawfulness of a sale or other disposition of a firearm by a licensed manufacturer or licensed dealer.

### Subsection (o)

Subsection (o) of section 2 as contained in the bill is a new provision that would make it unlawful for any person to bring into or receive in the State where he resides a firearm purchased or otherwise obtained outside that State if it is unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.

The intent of this provision is to assist the States and their political subdivisions in the enforcement of applicable firearms control laws and ordinances by imposing Federal felony sanctions upon those who utilize channels of interstate or foreign commerce to circumvent or evade these laws and ordinances.

### SECTION 3

Section 3 of the bill would restate and revise section 3 of the Federal Firearms Act (15 U.S.C. 903). All references to ammunition would be stricken along with references to territories and possessions.

Subsection (a) of the existing law would be revised and the fee schedules for manufacturers, dealers, and pawnbrokers set forth in separate paragraphs. The fees for manufacturers and dealers would be increased. The fee for pawnbroker dealers is new. Subsection (b) of the existing law would be revised and three new requirements for obtaining a Federal license established. The applicant must be at least 21 years of age, must not be prohibited from transporting firearms under the provisions of the act, and must not have made false statements or misrepresented material facts in connection with his application. Subsection (c) of the bill is a new provision intended to substitute for section 3(c) of the existing law. Subsection (d) is a restatement of the recordkeeping requirement of existing law with minor changes.

### Subsection (a)

Subsection (a) of the bill is intended to make it clear that no person shall engage in business as a manufacturer of firearms, or as a dealer in firearms until he has filed an application with, and received a license to do so from the Secretary. In order to regulate effectively interstate and foreign commerce in firearms it is necessary that all persons en-

gaging in these businesses be licensed. Similar provisions were upheld in *Hanf* v. *United States* (235 F. 2d 710, cert. den. 352 U.S. 880), as reasonably necessary to effective control of interstate and foreign commerce under comparable conditions.

Subsection (a) also provides that the application for a license shall be in such form and contain such information as the Secretary of the Treasury shall by regulation prescribe. It is the intent of this provision to authorize the Secretary to require the submission of information reasonably relevant to the determination as to whether the applicant is entitled to a license under the standards prescribed in subsection (b). Since the Secretary has the responsibility for determining whether the license should be issued, he must necessarily have the authority to require the submission by the applicant of information relevant to his determination as to the applicant's eligibility. Authority to prescribe the form of the license application has been exercised by the Secretary since the Federal Firearms Act was enacted in 1938.

Subsection (a) also increases license fees presently contained in section 3(a) of the Federal Firearms Act and adds a new fee for pawnbrokers. The annual fee for manufacturers (including importers) would be doubled from $25 to $50. Fees for dealers (including gunsmiths) would be increased from $1 to $10, except that a one-time fee of $25 would be levied for the first renewal date following the effective date of the bill or for the first year the dealer is engaged in business. This additional charge would help to defray the costs of the investigation necessary to determine if the applicant has met the licensing requirements contained in section 3(b) of the bill.

A separate license with a higher license fee is also provided for pawnbroker dealers. A "pawnbroker" is defined in paragraph (8) of section 1 of the bill. It is noted that under the National Firearms Act (26 U.S.C. ch. 53) pawnbroker dealers are charged a higher rate of occupational tax than other dealers.

Since all references to ammunition would be removed from the act by the bill, the substantial number of persons who deal only in ammunition will not be required to obtain a license under the act. Thus, ammunition reloaders and ammunition dealers will not be affected by the bill.

*Subsection (b)*

Subsection (b) establishes three conditions under which no licenses shall be issued by the Secretary of the Treasury or his disignee. An application for a license shall be denied if the applicant is "under 21 years of age," if he is "prohibited by the provisions of the act from transporting, shipping, selling, or receiving firearms in interstate or foreign commerce," and if the applicant has "willfully failed to disclose any material information required, or made any false statement as to any material fact, in connection with his application."

*Subsection (c)*

Subsection (c) as contained in the bill replaces the provisions of existing law contained in section 3(c) of the act (15 U.S.C. 903(c)) and reflects the construction of existing law as contained in current regulations (26 CFR, pt. 177).

The requirement of existing law, concerning the posting of a bond by a licensee convicted of a violation of the act in order to continue operations pending final disposition of the case on appeal, serves no

useful purpose, and has been omitted. Further, the provisions of this subsection have been revised to simplify administration. Since the licensee is required to reapply each year for a license, the information on the application relating to his indictment and/or conviction will be adequate. Also, the license itself can, as at present, contain a warning that the licensee cannot continue operations once his conviction has become final (other than as provided in section 10 of the existing law).

As under existing law and regulations, a new license will not be issued to a person under indictment for, or who has been convicted of, an offense punishable by imprisonment for a term exceeding 1 year. However, a licensed manufacturer or licensed dealer may continue operations pursuant to his existing license (provided that prior to the expiration of the term of the existing license timely application is made for a new license), during the term of such indictment and until any conviction pursuant to the indictment becomes final, whereupon he shall be subject to all provisions of this act, and operations pursuant to such license shall be discontinued. If a bona fide application for relief is filed under section 10 of the act, operations may continue until such application is acted upon.

*Subsection (d)*

Subsection (d) would restate and revise section 3(d) of the Federal Firearms Act (15 U.S.C. 903(d)). References to ammunition would be removed from the existing law. The word "permanent" would be stricken from the recordkeeping requirement of the subsection, since the Secretary of Treasury is given specific authority to prescribe regulations for the implementation of this requirement. The length of time for which the records should be kept and maintained by licensees under the provisions of the act and other administrative details would be left to the discretion of the Secretary. Thus, the word "permanent" becomes meaningless. It is anticipated that any regulations issued under that authority granted by this subsection of the bill would be reasonable and in accordance with good commercial practice and custom.

### SECTION 4

Section 4 of the bill would restate section 4 of the Federal Firearms Act (15 U.S.C. 904), strike the references to ammunition and to territories, possessions and the District of Columbia, and renumber and revise several provisions of the section for clarity.

*Subsection (a)*

Subsection 4(a) of the bill would restate portions of section 4 of the Federal Firearms Act (15 U.S.C. 904) and make several modifications thereof. Ammunition would be removed as elsewhere in the bill. The words "territory, or possession, or the District of Columbia," would be stricken consistent with their deletion in other sections of the bill. Other revisions would be made by renumbering and rephrasing provisions of the section for clarity without changing the meaning of existing law.

*Subsection (b)*

Subsection 4(b) of the bill would restate the remainder of section 4 of the Federal Firearms Act (15 U.S.C. 904) and would make certain

modifications.  All references to ammunition would be deleted.  The Secretary of "Defense or his designee" would be substituted for the Secretary of "War".  The words "receipt or" would be added to the last sentence of the section to clarify the provision contained therein and other technical revisions made for the same purpose without altering the meaning of existing law.

### SECTION 5

Section 5 of the bill would restate section 5 of the Federal Firearms Act, add an element of reasonable cause to the provision which makes it unlawful for an applicant for a license or exemption to make a false statement in connection with the application, increase the maximum penalties provided for in the act from $2,000 to $10,000 and from 2 years to 10 years, provide for parole of sentenced offenders as the board of parole shall determine, remove the reference to ammunition contained in subsection (b), and update the reference to the Internal Revenue Code.

*Subsection (a)*

Subsection (a) of section 5 of the bill would restate the existing law (15 U.S.C. 905(a)) and make several changes.  The words "or having reasonable cause to know" would be added to the provision which sets forth the unlawful act of making a false statement in connection with an application for a license or an exemption under the provisions of the Federal Firearms Act.

The maximum penalty provisions for violation of the Federal Firearms Act would be increased from $5,000 to $10,000 and 2 years to 10 years to serve as a further deterrence to potential violators of the act.  It is anticipated that this change will have the effect of increasing compliance with the act's provisions.

All sentenced violators are made eligible for parole "as the board of parole shall determine."  Thus, the opportunity will be available to keep hardened criminals away from the law-abiding community for a substantial period of time, but at the same time provide flexibility to correctional officials so that they may work with those who show significant potential for rehabilitation.

*Subsection (b)*

Subsection (b) of section 5 of the bill would restate subsection (b) of section 5 of the existing law (15 U.S.C. 905(b)) and make minor changes.  The reference to ammunition would be deleted.  The reference to the Internal Revenue Code would be changed to reflect the recodification of the code which was accomplished in 1954.

### SECTION 6

Section 6 of the bill would amend the Federal Firearms Act by adding a new section 11 which would provide that nothing contained in the act shall be construed as "modifying or affecting the requirements" of the provisions of the Mutual Security Act of 1954 which deal with "the manufacture, exportation, and importation of arms, ammunit'on, and implements of war."

Section 414 of that act gives authority to the President to control the export and import of arms, ammunition, mplements of war, and technical data related thereto.  It also requires all persons engaging

Defs.' MSJ App. 244

in these transactions to register with the U.S. Government, pay registration fees, and secure import licenses for all such materials imported into this country.

### SECTION 7

Section 7 of the bill would establish the date at which time the amendments and changes made by the bill become effective. The effective date would be "the first day of the sixth month beginning after the date of enactment" of the amendments. It is felt that this period of time will be sufficient for the promulgation and dissemination of any regulations necessary to implement the amendments to the act made by the bill and would afford ample opportunity for comment of persons who would be affected by the regulations.

### SECTION 8

Section 8 of the bill would set forth a short title for the bill, "Federal Firearms Amendments of 1966."

### CHANGES IN EXISTING LAW

In compliance with subsection 4 of rule XXIX of the Standing Rules of the Senate, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

### THE FEDERAL FIREARMS ACT

That as used in this Act—

(1) The term "person" includes an individual, partnership, association, or corporation.

(2) *The term "State" includes each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, the Canal Zone, and American Samoa.*

[(2)] (*3*) The term "interstate or foreign commerce" means commerce between any State [, Territory, or possession (not including the Canal Zone), or the District of Columbia,] and any place outside thereof; or between points within the same State, [, Territory, or possession (not including the Canal Zone), or the District of Columbia,] but through any place outside thereof; or within any [Territory or] possession or the District of Columbia.

[(3)] (*4*) The term "firearm", *except when the context otherwise requires,* means any weapon, *manufactured after the year 1898,* by [whatever] *whatsoever* name known, which *will,* or is designed to, *or which may be readily converted to,* expel a projectile or projectiles by the action of an explosive [and a firearm muffler or firearm silencer, or any part or parts of such weapon] *or the frame or receiver of any such weapon.*

(*5*) *The term "handgun" means any pistol or revolver originally designed to be fired by the use of a single hand and which is designed to fire or capable of firing fixed cartridge ammunition, or any other firearm originally designed to be fired by the use of a single hand.*

[(4)] (*6*) The term "manufacturer" means any person engaged in the [manufacture or importation of firearms, or ammunition

Defs.' MSJ App. 245

or cartridge cases, primers, bullets, or propellent powder] *business of manufacturing or importing firearms* for purposes of sale or distribution [; and the]. *The* term "licensed manufacturer" means any such person licensed under the provisions of this Act.

[(5)] *(7)* The term "dealer" means any person engaged in the business of selling firearms [or ammunition or cartridge cases, primers, bullets or propellent powder,] at wholesale or retail, or any person engaged in the business of repairing such firearms or of manufacturing or fitting [special] barrels, stocks, or trigger mechanisms [, or breech mechanisms] to firearms, *or any person who is a pawnbroker. The* [and the] term "licensed dealer" means any [such person] *dealer who is* licensed under the provisions of this Act.

*(8) The term "pawnbroker" means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm as security for the repayment of money loaned thereon.*

*(9) The term "Secretary" means the Secretary of the Treasury or his designee.*

*(10) The term "crime of violence" includes voluntary manslaughter, murder, rape, mayhem, kidnaping, robbery, burglary, housebreaking, extortion accompanied by threats of violence, assault with a dangerous weapon, assault with intent to commit any offense punishable by imprisonment for more than one year, arson punishable as a felony, or an attempt to commit any of the foregoing offenses.*

*(11) The term "indictment" includes an indictment or any information in any court of the United States or in any court of any State under which a crime of violence may be prosecuted.*

[(6)] *(12)* The term "fugitive from justice" means any person who has fled from any State [, Territory, the District of Columbia, or possession of the United States] to avoid prosecution for a crime [punishable by imprisonment for a term exceeding one year] *of violence* or to avoid giving testimony in any criminal proceeding.

[(7) The term "ammunition" shall include only pistol or revolver ammunition. It shall not include shotgun shells, metallic ammunition suitable for use only in rifles, or any .22 caliber rimfire ammunition.]

SEC. 2. (a) It shall be unlawful for any manufacturer or dealer, except a manufacturer or dealer having a license issued under the provisions of this Act, to transport, ship, or receive any firearm [or ammunition] in interstate or foreign commerce.

(b) It shall be unlawful for any person to receive any firearm [or ammunition] transported or shipped in interstate or foreign commerce in violation of [subdivision] *subsection* (a) of this section, knowing or having reasonable cause to believe such [firearms] *firearm* [or ammunition] to have been transported or shipped in violation of [subdivision (a) of this section] *said subsection.*

(c) It shall be unlawful for any licensed manufacturer or *licensed* dealer to [transport or ship] *ship or transport, or cause to be shipped or transported,* any firearm in interstate or foreign commerce [to any person other than a licensed manufacturer or dealer in any State the laws of which require that a license be obtained for the purchase of such firearm, unless such license is exhibited to such manufacturer or dealer

by the prospective purchaser**]**, *to any person in any State where the receipt by such person of such firearm would be in violation of any statute of such State unless the licensed manufacturer or licensed dealer establishes that he was unable to ascertain with reasonable effort that the shipment would be in violation of such State law.*

(d) It shall be unlawful for any person to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm **[**or ammunition**]** to any person knowing or having reasonable cause to believe that such person is under indictment or has been convicted in any court of the United States **[**, Territories, possessions, or the District of Columbia of a crime punishable by imprisonment for a term exceeding one year**]** *or in any court of any State of a crime of violence* or is a fugitive from justice.

(e) It shall be unlawful for any person who is under indictment or who has been convicted of a crime **[**punishable by imprisonment for a term exceeding one year**]** *of violence,* or who is a fugitive from justice to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm **[**or ammunition**]**.

(f) It shall be unlawful for any person who *is under indictment or who* has been convicted of a crime **[**punishable by imprisonment for a term exceeding one year**]** *of violence, or who* is a fugitive from justice, to receive any firearm **[**or ammunition**]** which has been shipped or transported in interstate or foreign commerce **[**, and the possession of a firearm or ammunition by any such person shall be presumptive evidence that such firearm or ammunition was shipped or transported or recieved, as the case may be, by such person in violation of this Act.**]**.

(g) It shall be unlawful for any person to transport or ship or cause to be transported or shipped in interstate or foreign commerce any stolen firearm **[**or ammunition**]**, knowing, or having reasonable cause to believe, **[**same**]** *such firearm* to have been stolen.

(h) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any firearm **[**or ammunition**]** or to pledge or accept as security for a loan any firearm **[**or ammunition**]** moving in or which is a part of interstate or foreign commerce, and which while so moving or constituting such part has been stolen, knowing, or having reasonable cause to believe, **[**the same**]** *such firearm* to have been stolen.

(i) It shall be unlawful for any person to transport, ship, or knowingly receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered **[**, and the possession of any such firearm shall be presumptive evidence that such firearm was transported, shipped, or received, as the case may be, by the possessor in violation of this Act.**]**.

*(j) It shall be unlawful for any manufacturer or dealer knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, to persons other than licensed manufacturers or licensed dealers, any package or other container in which there is any handgun without written notice to the carrier that such handgun is being transported or shipped.*

*(k) It shall be unlawful for any common or contract carrier to deliver, or cause to be delivered, in interstate or foreign commerce any handgun to any person with knowledge or with reasonable cause to believe that such person is under twenty-one years of age.*

**Defs.' MSJ App. 247**

(l)  It shall be unlawful for any licensed manufacturer or licensed dealer to ship any handgun in interstate or foreign commerce to any person other than another licensed manufacturer or licensed dealer unless:

(1)  such person has submitted to such manufacturer or dealer a sworn statement in such form and manner as the Secretary shall by regulation prescribe, containing the following information: (A) that such person is twenty-one years or more of age; (B) that he is not a person prohibited by this Act from receiving a handgun in interstate or foreign commerce; (C) that there are no provisions of law, regulations, or ordinances applicable to the locality to which the handgun will be shipped, which would be violated by such person's receipt or possession of the handgun; and (D) the title, name, and official address of the principal law enforcement officer of the locality to which the handgun will be shipped;

(2)  such manufacturer or dealer has, prior to the shipment of such handgun, forwarded by registered or certified mail (return receipt requested) to (A) the local law enforcement officer named in the sworn statement, or (B) the official designated by the Governor of the State concerned under this subsection, a description of the handgun to be shipped (including the manufacturer, the caliber, the model and type of such handgun, but not including serial number identification), and one copy of the sworn statement, and has received a return receipt evidencing delivery of such letter, or such letter has been returned to such manufacturer or dealer due to the refusal of the named law enforcement officer or designated official to accept such letter in accordance with United States Post Office Department regulations; and

(3)  such manufacturer or dealer has delayed shipment for a period of at least seven days following receipt of the notification of the local law enforcement officer's or designated official's acceptance or refusal of such letter.

A copy of the sworn statement and a copy of the notification to the local law enforcement officer or designated official along with evidence of receipt or rejection of that notification shall be retained by the licensee as a part of the records required to be kept under section 3(d).  For purposes of paragraph (2)(B), the Governor of any State may designate any official in his State to receive such notification for such State or any part thereof in lieu of the notification required by paragraph 2(A) and shall notify the Secretary of the name, title, and business address of such official and the Secretary shall publish in the Federal Register the name, title, and address of such official.  Upon such publication, notification to the local law enforcement officers required under paragraph (2)(A) of this subsection will not be required for a period of five years from the date of such publication unless the request is withdrawn by the Governor of such State and such withdrawal is published in the Federal Register.

(m)  It shall be unlawful for any licensed manufacturer or licensed dealer to sell or deliver for sale any handgun to any person other than another licensed manufacturer or licensed dealer who is not a resident of the State in which such manufacturer's or dealer's place of business is located and in which the sale or delivery for sale is made, unless such manufacturer or dealer has, prior to sale, or delivery for sale of the handgun, complied with the provisions of subsection (1)(b) of this section.

(n)  It shall be unlawful for any person in connection with the acquisition or attempted acquisition of a firearm from a licensed manufacturer or licensed dealer to—

Defs.' MSJ App. 248

*(1) knowingly make any false or fictitious statement, written or oral; or*

*(2) knowingly furnish or exhibit any false, fictitious, or misrepresented identification with the intention to deceive such manufacturer or dealer with respect to any fact material to the lawfulness of the sale or other disposition of a firearm by a licensed manufacturer or licensed dealer under the provisions of this section.*

*(o) It shall be unlawful for any person to transport or receive in the State where he resides a firearm purchased or otherwise obtained by him outside the State where he resides if it would be unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.*

SEC. 3. (a) Any manufacturer or dealer desiring a license to transport, ship, or receive firearms [or ammunition] in interstate or foreign commerce shall [make] *file an* application [to] *for such license with* the Secretary [of the Treasury, who shall prescribe by rules and regulations the information to be contained in such application. The applicant shall, if a manufacturer, pay a fee of $25 per annum and, if a dealer, shall pay a fee of $1 per annum], *in such form and containing such information as the Secretary shall by regulation prescribe. Each such applicant shall be required to pay a fee for obtaining such license as follows:*

*(1) If a manufacturer of firearms, a fee of $50 per annum;*

*(2) If a dealer (other than a pawnbroker) in firearms, a fee of $10 per annum, except that for the first renewal following the effective date of the Federal Firearms Amendments of 1966 or for the first year he is engaged in business as a dealer such dealer will pay a fee of $25;*

*(3) If a pawnbroker, a fee of $50 per annum.*

(b) Upon *filing by a qualified applicant of a proper application and the* payment of the prescribed fee, the Secretary [of the Treasury] shall issue to such applicant [a license] *the license applied for,* which shall, *subject to the provisions of this Act,* entitle the licensee to transport, ship, *sell* and receive firearms [and ammunition] in interstate [and] *or* foreign commerce [unless and until the license is suspended or revoked in accordance with the provisions of this Act: *Provided,* That no license shall be issued to any applicant within two years after the revocation of a previous license] *during the period stated in the license.* No license shall be issued pursuant to this Act——

*(1) to any applicant who is under twenty-one years of age;*

*(2) to any applicant, if the applicant (including, in the case of a corporation, partnership, or association, any individual who, directly or indirectly, has the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is prohibited by the provisions of this Act from transporting, shipping, selling or receiving firearms in interstate or foreign commerce; or*

*(3) to any applicant who has willfully failed to disclose any material information required, or made any false statement as to any material fact, in connection with his application.*

[(c) Whenever any licensee is convicted of a violation of any of the provisions of this Act, it shall be the duty of the clerk of the court to notify the Secretary of the Treasury within forty-eight hours after such conviction and said Secretary shall revoke such license: *Provided,* That in the case of appeal from such conviction the licensee may

furnish a bond in the amount of $1,000, and upon receipt of such bond acceptable to the Secretary of the Treasury he may permit the licensee to continue business during the period of the appeal, or should the licensee refuse or neglect to furnish such bond, the Secretary of the Treasury shall suspend such license until he is notified by the clerk of the court of last appeal as to the final disposition of the case.]

(c) *The provisions of section 2 (d), (e), and (f) of this Act shall not apply in the case of a licensed manufacturer or licensed dealer who is under indictment for a crime of violence: Provided, That such manufacturer or dealer gives notice to the Secretary by registered or certified mail of his indictment within thirty days of the date of the indictment. A licensed manufacturer or licensed dealer who has given notice of his indictment to the Secretary, as provided in this subsection, may continue operation pursuant to his existing license during the term of such indictment, and until any conviction pursuant to the indictment becomes final, whereupon he shall be fully subject to all provisions of this Act, and operations pursuant to such license shall be discontinued.*

(d) [Licensed dealers] *Each licensed manufacturer and licensed dealer* shall maintain such [permanent] records of *production*, importation, *notification*, shipment, *sale* and other disposal of firearms [and ammunition] as the Secretary [of the Treasury shall] *may by regulation* prescribe.

SEC. 4. (a) The provisions of this Act shall not apply with [respect] *respect*—

(1), to the transportation, shipment, receipt, or importation of any [firearm or ammunition,] *firearms* sold or shipped to, or issued for the use [of, (1)] *of (A)* the United States or any department, independent establishment, or agency thereof; [(2)] (*B*) any State [Territory, or possession, or the District of Columbia,] or any department, independent establishment, agency, or any political subdivision thereof; [(3)] (*C*) any duly commissioned officer or agent of the United States, a State, [Territory, or possession, or the District of Columbia,] or any political subdivision thereof; [(4) or to] (*D*) any bank, [public carrier, express] *common or contract carrier, express company*, or armored-truck company organized and operating in good faith for the transportation of money and valuables, *which is granted an exemption by the Secretary*; or [(5)] (*E*) [to] any research laboratory designated [by the Secretary of the Treasury: *Provided*, That such bank, public carriers, express, and armored-truck companies are granted exemption by the Secretary of the Treasury; nor] *as such by the Secretary; or*

(2) to the transportation, shipment, or receipt of [any] antique or unserviceable firearms [, or ammunition,] possessed and held as [curios or museum pieces: *Provided*, That nothing herein] *a curio or museum piece.*

(b) *Nothing* contained in this [section] *Act* shall be construed to prevent shipments of firearms [and ammunition] to institutions, organizations, or persons to whom [such] firearms [and ammunition] may be lawfully delivered by the Secretary of [War,] *Defense or his designee*, nor to prevent the *receipt or* transportation of such firearms [and ammunition so delivered] by their lawful possessors while they are engaged in military training or in competitions.

SEC. 5. (a) Any person violating any of the provisions of this Act or any rules and regulations promulgated hereunder, or who makes

any statement in applying for the license or exemption provided for in this Act, knowing *or having reasonable cause to know* such statement to be false, shall, upon conviction thereof, be fined not more than [$2,000] *$10,000*, or imprisoned for not more than [five] *ten* years, or both, *and shall become eligible for parole as the Board of Parole shall determine.*

(b) Any firearm [or ammunition] involved in any violation of the provisions of this Act or any rules or regulations promulgated thereunder shall be subject to seizure and forfeiture, and all provisions of [Title 26] *the Internal Revenue Code of 1954* relating to the seizure, forfeiture, and disposition of firearms, as defined in section [2733 of Title 26] *5848(1) of said Code* shall, so far as applicable, extend to seizures and forfeitures incurred under the provisions of this Act.

\*      \*      \*      \*      \*      \*      \*

SEC. 10. A person who has been convicted of a crime punishable by imprisonment for a term exceeding one year (other than a crime involving the use of a firearm or other weapon or a violation of this Act or of the National Firearms Act) may make application to the Secretary of the Treasury for relief from the disabilities under this Act incurred by reason of such conviction, and the Secretary of the Treasury may grant such relief if it is established to his satisfaction that the circumstances regarding the conviction, and the applicant's record and reputation, are such that the applicant will not be likely to conduct his operations in an unlawful manner, and that the granting of the relief would not be contrary to the public interest. A licensee conducting operations under this Act, who makes application for relief from the disabilities incurred under this Act by reason of such a conviction, shall not be barred by such conviction from further operations under his license pending final action on an application for relief filed pursuant to this section. Whenever the Secretary of the Treasury grants relief to any person pursuant to this section, he shall promptly publish in the Federal Register notice of such action, together with the reasons therefor.

*SEC. 11. Nothing in this Act shall be construed as modifying or affecting the requirements of section 414 of the Mutual Security Act of 1954, as amended, with respect to the manufacture, exportation, and importation of arms, ammunition, and implements of war.*

# INDIVIDUAL VIEWS OF MESSRS. DODD, BAYH, KENNEDY OF MASSACHUSETTS, TYDINGS, FONG, JAVITS, SMATHERS, AND LONG OF MISSOURI

It became obvious late in the session that the controversial aspects of the firearms legislation proposed by the Juvenile Delinquency Subcommittee gave the administration bill little chance of being reported out of the full committee in this Congress. In view of that fact, even though a majority of the committee voted for S. 1592 initially, the committee finally voted to report S. 3767 favorably, and we did this with the intention of substituting S. 1592 for S. 3767 once the bill came to a vote on the Senate floor.

Eight of the sixteen members of the Judiciary Committee have signed these individual views, more than signed any other views contained in this report.

In our view, the report on S. 3767 raises serious questions.

The most important point is that this report has not been signed by a majority of the members of the Judiciary Committee.

It has not even been signed by all of the opponents of the administration's firearms control bill, S. 1592.

It should be noted that the report on S. 3767 was submitted to the members for approval shortly before it was to be printed. Thus, time did not permit much more than a brief analysis of the findings set out and the basis of those findings.

It is significant that the opponents' report does not even mention the major change contained in S. 3767, one which would weaken the present Federal Firearms Act (i.e., the return to the "crime of violence" standard as a substitute for the existing "felony" standard). Further, the record reflects no need for this change. This aspect of the bill is discussed subsequently.

There are several specific areas in the report on S. 3767 which are in direct contradiction to the facts and to the testimony presented before the Subcommittee To Investigate Juvenile Delinquency.

## COMMITTEE ACTION

The facts are as follows: In voting on the major provisions of S. 1592, i.e. the inclusion of handguns, the inclusion of rifles and shotguns, the inclusion of import controls and the inclusion of destructive device controls, the committee vote was nine to five in favor of their inclusion.

It was the extended opposition of several members of the committee which led the supporters of S. 1592 to propose reporting S. 3767 from the committee as a means of getting some kind of gun bill to the Senate floor. They did this with the full intention of offering S. 1592 as a substitute for S. 3767.

31

*Rifles and shotguns*

The opponents' report claims that upon review of the testimony before the Juvenile Delinquency Subcommittee there is no justification for restrictions on rifles and shotguns. It ignores the testimony of Commander Leary of the Philadelphia Police Department, Deputy Comdr. Leonard Reisman of the New York City Police Department, and Attorney General Sills of New Jersey. (Their testimony is referred to in the individual views of Senator Dodd.)

It ignores the fact that 1,690 persons were murdered and many thousands wounded with rifles and shotguns last year and that this figure represents a steady increase over the last 3 years.

*Imported firearms*

Under the title "What S. 3767 Would Not Do," the opponents' report completely ignores the testimony of law enforcement witnesses who enthusiastically supported S. 1592's ban on imported military surplus handguns and other foreign-made firearms, not suitable for lawful use. Completely overlooked is the evidence presented by Chief Herbert Jenkins, of Atlanta, Ga., Chief Curtis Brostron, of St. Louis, Mo., Attorney General Thomas Lynch, of California, Attorney General McLeod, of South Carolina, that great numbers of firearms used in crimes in their jurisdiction were in this category. (The individual views go into detail on this point.)

The report indicates that the same restrictions should be applied to imported firearms as are applied to domestic firearms and using this "equality" argument it denounces any embargo on imported firearms. This argument completely overlooks the existing Federal law, implemented by regulations, which prohibits the sale of domestic military surplus firearms to the public. (They *may* be obtained under limited and special circumstances under the civilian marksmanship program of the Department of Defense.) The report denounces embargoes on the one hand, yet later, as a partial rationale for excluding destructive devices from his bill, it indicates that the State Department, under the authority granted by the Mutual Security Act of 1954, as amended, can in fact embargo the importation of destructive devices.

The opponents' report further alleges that the Federal Firearms Act primarily governs interstate and foreign commerce in firearms used for sporting purposes. This is an unusual interpretation. The Federal Firearms Act covers all firearms, by definition, and to say otherwise represents a consummate failure to appreciate the legislative history of this law. The report states further that the National Firearms Act has effectively controlled firearms covered by that act. This area is covered later in the individual views and, summarily the national act does not proscribe shipment and receipt by and to felons or fugitives. It merely imposes a transfer tax on transactions, and compliance with those provisions results in a lawful transfer. A felon could lawfully acquire a national act weapon under the language of that specific act. A prime example of the application of the national act concerns the recent case in Washington State, where a mental incompetent acquired, lawfully, a fully operable German machinegun, by paying the $200 transfer tax.

*Civilian marksmanship program*

The opponents' report cites a report of the Arthur D. Little Co. on the Office of the Director of Civilian Marksmanship (DCM) program which operates under the auspices of the National Board for the Promotion of Rifle Practice.

Based on this study, the opponents' report concludes:

> The plain fact that preinduction firearms training produces more capable and effective soldiers was recently made clear by a Department of Defense study.

Again this statement is not in keeping with the facts. First, the study did not show that such preinduction training produced more capable or effective soldiers. In fact, it stated that only 3 percent (385 men) of the 12,800 basic trainees surveyed at 4 basic training centers had previous DCM-affiliated club firearms training.

This is a rather insignificant number of the total number of trainees surveyed to make such a sweeping statement. More important, one of the crucial questions left unanswered by this study is the performance of both groups under combat conditions.

We *can* say that the study strongly suggests that the program is not doing what it is supposed to do, i.e., train significant numbers of young men in rifle proficiency before entering military service, so that they will be better marksmen in combat.

This statement is in direct contradiction to the testimony of the Department of Defense on S. 1592. In addition, we must point out that DCM-trained men are apparently not entering military service (3 percent of the trainees in a sampling of 12,800). One of the reasons for this is that a significant 42 percent of the members of the DCM clubs are over 25, an age after which the likelihood of being drafted drastically diminishes.

## COMPARISON OF S. 1592 AND S. 3767

S. 1592, the administration firearms control bill, was carefully studied by the Juvenile Delinquency Subcommittee during 11 days of hearings during May, June, and July of 1965 and then reported, as amended, to the full committee on May 19 of 1966.

It has been endorsed by the administration, by the American Bar Association, and by the International Association of Chiefs of Police. The bill has been supported editorially by virtually every leading newspaper in the country. Fully 70 percent of the people, according to a recent Gallup poll, favor enactment of legislation that would be much more restrictive than S. 1592 in controlling firearms in this country.

We believe that the need for the amendments to the Federal Firearms Act embodied in S. 1592, as amended by the subcommittee, has more than adequately been documented through testimony and other factual information coming to the attention of the subcommittee.

We do not consider that S. 3767 is a substitute for S. 1592. Its scope is much too narrow and limited. Its claimed effectiveness is very questionable. S. 3767 does not provide the controls that our hearings have demonstrated are necessary, if we are to effectively regulate the acquisition of firearms as a means of arresting the rising

Defs.' MSJ App. 254

crime rate. S. 3767 falls far short of the positive controls that the enactment of S. 1592 would bring about.

For example, S. 3767 does not propose any control at all over the indiscriminate sale of rifles and shotguns yet there were 1,690 murders committed in 1965 with these firearms. The hearing record on S. 1592 indicates that rifles and shotguns are misused, especially in those areas where there are stringent controls on the acquisition and the use of pistols and revolvers.

*Mail-order controls*

S. 3767 does not prohibit the mail-order sale of handguns to individuals as does S. 1592. The method of regulation envisioned in S. 3767 is a requirement that an affadavit be filed. This approach was rejected by the subcommittee because the provisions of S. 1592 would be much more effective. By cutting out these mail-order sales, we would assist the States materially in controlling handgun sales within their own borders.

S. 3767 retains the controls now in the Federal Firearms Act over the interstate movement of shotguns and rifles, but they are only a record-keeping requirement and a proscription on shipment and receipt by and to felons. In addition, the bill would eliminate many of the present controls over the interstate movement of mufflers and silencers. And S. 3767 does not include destructive devices, which has long been considered a serious omission in the act. S. 1592 would correct this omission.

The hearings clearly establish the need for additional controls over mail-order sales of all firearms and certain other devices. There is nothing in the hearing record to justify the elimination of mufflers and silencers, articles which have no legitimate use, and there is a need to control destructive devices as is proposed in S. 1592.

S. 1952 would authorize the mail-order shipment of rifles and shotguns subject to affidavit controls.

It would retain mufflers and silencers within the control of the Federal Firearms Act and it would extend these controls to destructive devices.

More significantly, the interstate movement of handguns, destructive devices, and ammunition for such devices, would be limited to licensees by S. 1592. Nonlicensed persons would be prohibited from making mail-order purchases of such weapons.

*Importations*

S. 3767 would not affect imported weapons, in spite of a wealth of testimony reflecting the need for the controls provided for in S. 1592. The record compiled on S. 1592 contains more than adequate documentation of the problems and dangers inherent in the unlimited importation of firearms.

S. 1592 is concerned with the importation of destructive devices, ammunition for such devices and surplus military weapons. It would prohibit the importation of destructive devices and ammunition therefor, and would place only reasonable restrictions on the importation of surplus military weapons.

*Licensing*

S. 3767 provides for the licensing of manufacturers and dealers receiving or shipping firearms in interstate or foreign commerce, as does the present statute. The criteria used for the issuance of a

license under the bill are that the applicant (1) must be at least 21 years of age, (2) is not prohibited by the act from shipping or receiving firearms in interstate or foreign commerce, and (3) has not willfully failed to disclose a material fact or made a false statement in his application. An example readily illustrates the weakness in these proposed licensing features of the bill. Assuming that requirement Nos. (1) and (3) are met, S. 3767 would not prevent the issuance of a license to one convicted of a violation of this very act, the National Firearms Act, the Narcotics Act, or many other felonies. Moreover, the privilege granted by a license could be suspended only in the event the licensee were finally convicted of a crime of violence. Thus the Government might be placed in the embarrassing position of having to authorize firearms operations by a person convicted of prior violations of the Federal firearms laws.

The licensing problem is treated in detail in S. 1592. That bill would require anyone engaged in the business of manufacturing, importing or dealing in firearms to obtain a license. That requirement is substantially broader than merely requiring a dealer or manufacturer shipping or receiving firearms in interstate or foreign commerce to obtain a license as does S. 3767. The criteria for issuing a license under S. 1592 are keyed to the age of the applicant, whether the applicant will actually engage in the firearms business, whether he may lawfully ship or receive firearms in interstate or foreign commerce under the act, and whether, in view of the past record and reputation of the applicant, he is likely to conduct his business lawfully.

In short, S. 1592, contemplates that the privilege of engaging in the firearms business should be extended only to those legitimately entitled to the confidence of society. Moreover, the licensing provisions of S. 1592 recognize the right of one who has been denied a license to obtain a hearing as well as judicial review of the administrative decision depriving him of a license. It should also be noted that under S. 1592, certain business-type felony convictions will not result in the "felony" sanctions. Finally, if a person convicted of certain other felonies is, in fact, entitled to the confidence of society, under section 10 of the act, he could be granted relief at the discretion of the Secretary of the Treasury.

*Substituting "crime of violence" criteria for so-called "felony" criteria used in the present act and in S. 1592*

As just outlined, S. 3767 does not contain the licensing standards set forth in S. 1592. Thus, under that bill it would be possible for a convicted gambler or racketeer to become licensed under the Federal Firearms Act. There is another major flaw in S. 3767 which would allow an evasion of the major intent of the act. In reverting to the pre-1961 preclusionary term "crime of violence" rather than retaining the term "crime punishable by imprisonment for a term exceeding 1 year", S. 3767 would not preclude a person who had violated a provision of the National or Federal Firearms Act from being licensed under the Federal act as a dealer, manufacturer or importer of firearms. This clearly is outside of the intent of the present act.

Under S. 3767, the Treasury Department would have to issue a license to a person who had violated the National Firearms Act or the Federal Firearms Act. It is this type of violator that the present act has tried to get at and since passage of the 1961 amendment (changing crime of violence to crime punishable by a term of imprisonment

exceeding 1 year), there have been many denials of licenses to persons who have, in the past, violated one or both acts.

In view of the importance of this proposed change, we feel it is necessary to review the history of this part of the Federal Firearms Act. The "crime of violence" criteria appeared in the original Federal Firearms Act. However, the criteria of "crime punishable by imprisonment for a term exceeding 1 year"—the felony criteria—was substituted by Public Law 87–342. Both Senate Report 364 (87th Cong., 1st sess.) and House Report 1202 (87th Cong., 1st sess.) on S. 1750, which became Public Law 87–342, stated:

> Over the past few years the infiltration of racketeering into our society and the exploding crime rate have increasingly become a cause for national concern. New laws are needed to give the Federal Bureau of Investigation additional jurisdiction to assist local authorities in the common assault against crime. S. 1750, introduced at the request of the Attorney General as an integral part of an anticrime legislative program, would be such a law.
>
> Additionally, it would make it more difficult for the criminal elements of our society to obtain firearms.
>
> The Attorney General's letter proposing the enactment of this legislation, a letter from the Comptroller General, as well as a letter from the executive vice president of the National Rifle Association of America urging such an enactment, are printed below.

In considering H.R. 9570 (89th Cong., 1st sess.), which later became Public Law 89–184, the Congress again looked at the crime of violence criteria in relation to the felony criteria. That public law added section 10 (15 U.S.C. 910) to the Federal Firearms Act and through the provisions of that section, the Secretary is authorized to grant relief to felons (other than those who used a firearm or other weapon to commit a felony or were convicted of violating the Federal or National Firearms Act) under certain circumstances. Both Senate Report 666 (89th Cong., 1st sess.) and House Report 708 (89th Cong., 1st sess.) stated:

> Prior to 1961 the Federal Firearms Act prohibited such interstate traffic in firearms and ammunition only in the case of a person indicted for, or convicted of, a "crime of violence." The 1961 legislation changed this to the language indicated above; that is, substantially to any crime meeting the definition of a felony under Federal law (18 U.S.C. 1(1)).
>
> * * * However, your committee has concluded from an examination of this case that, under certain circumstances, it would be desirable to authorize the Secretary of the Treasury to grant relief from the disabilities imposed under the Federal Firearms Act in the case of felony convictions. Relief from the disabilities is provided, however, only where it is established to the Secretary's satisfaction that the circumstances regarding the conviction and the applicant's record and reputation are such that he will not be likely to conduct his operations in an unlawful manner and that the granting of the relief will not be contrary to the public interest. Among the factors which would be given primary

consideration in the case of a corporation is the absence of culpability of any person, at the time the application is filed, having the power to direct or control the management of the corporation.

The Secretary of the Treasury is not given permission to grant such relief if the crime involves the use of a firearm or other weapon or a violation of the Federal Firearms Act or the National Firearms Act.

The record of hearings on S. 1592 shows no need to return to the crime of violence criteria. Yet, S. 3767 proposes such action. Moreover, the manner in which this criteria would be incorporated in the act by S. 3767 would create inconsistencies. Under the licensing provisions, as amended, a person convicted of a violation of the act, the National Firearms Act, a narcotics violation, or many other felonies would be entitled not only to continue a firearms business under an outstanding license but also to obtain a new license under the act in that the act would not prohibit foreign or interstate shipments or receipts by such persons. In addition, the provisions of section 10 of the act (15 U.S.C. 910) would, for all practical purposes, become meaningless.

S. 1592 retains the "felony" criteria. It is used in relation to unlawful acts. The licensing provisions incorporate this criteria and expand on it. Moreover, it should be noted that in those instances where this criteria may prove to be unjust the person affected may obtain relief pursuant to section 10 of the act under stated circumstances.

*Implementation of State firearms laws*

Section 902(c) of S. 3767 is written so as to be largely ineffective as a means of regulating the interstate movement of firearms.

It reads:

> It shall be unlawful for any licensed manufacturer or licensed dealer to ship or transport, or cause to be shipped or transported, any firearm in interstate or foreign commerce, to any person in any State where the receipt by such person of such firearm would be in violation of any statute of such State unless the licensed manufacturer or licensed dealer establishes that he was unable to ascertain with reasonable effort that the shipment would be in violation of such State law.

This provision would be of doubtful value in assisting the States to enforce their own gun laws for the following reasons: (1) It applies only to interstate shipment and would not prevent a felon or fugitive from buying a gun from a dealer, over the counter, in his own State; (2) it would punish shipment by licensees to purchasers in States where it would be unlawful for the buyer to receive a firearm; whereas most prohibitive State gun laws proscribe purchase, ownership, possession, transportation, and so forth, by criminals or other specified classes. They do not prohibit receipt. Most States would have to enact special legislation penalizing receipt of firearms in order to benefit from the proposed control; and (3) the "unless" clause would make it very difficult to establish an offense under this provision. This is the very problem now faced by the Treasury Department under the present act.

The language of the "unless" clause is faulty in that it relieves the dealer of criminal liability because the substantive offense is based on receipt in violation of State law rather than possession.

In the opinion of the Treasury Department this subsection would be as ineffective as is the present subsection 902(c) of the Federal Firearms Act, under which not a single conviction has been obtained since enactment of the act in 1938.

A further consideration is the fact that many political subdivisions of a State have enacted local laws or ordinances controlling the sale, transfer, or possession of firearms in their respective jurisdictional areas. This subsection would not assist authorities in such local areas in the enforcement of control provisions.

On the other hand, S. 1592 offers assistance to State and local authorities in controlling the movement of firearms into a State or political subdivision of a State. This, in fact, is one of the acute problems which the bill is designed to correct. In the case of handguns, and certain other types of weapons, this would be effected by limiting interstate shipments to those between licensees and prohibiting such weapons from being shipped interstate to nonlicensed persons. Moreover, S. 1592 would prohibit over-the-counter sales of handguns and certain other types of weapons to out-of-State residents. It specifically proscribes the sale of any firearm where the receipt or possession of the weapon would be in violation of any State or local law, regulation, or ordinance, and further, prohibits any one from bringing a firearm into his State of residence from another State if it would be unlawful for him to purchase or possess the firearm in the State of his residence or political subdivision thereof where he resides. It includes no proviso similar to that in S. 3767 which would render these prohibitions unenforceable.

*Destructive devices*

S. 3767 does not define nor provide special regulations over the acquisition of "destructive devices," weapons which are basically armaments of war. Thus, under S. 3767 any teenager could acquire through the mail order route an antitank gun in the same manner that he would acquire a .22 caliber rifle. We believe that destructive devices should be regulated in accordance with the provisions of S. 1592, which provides for strict controls over their acquisition.

The apparent rationale for failure to include "destructive devices" in S. 3767 is that such weapons should be covered only by the National Firearms Act rather than by the Federal Firearms Act, which S. 3767 would amend.

We do not concur with that rationale.

The National Firearms Act (1934) is intended to regulate and control the possession of automatic weapons under the taxing power. It is similar to the intent of the Marihuana Tax Act, that is to control, through taxing measures, certain commodities. The commodities controlled under the National Firearms Act are the gangster's weapons of the thirties, machineguns, sawed-off shotguns, etc.

The act requires the payment of a transfer tax of $200 on automatic weapons and of $5 on the other weapons covered in the act, which tax is paid by the transferor. If the taxing provisions of the act are complied with then the covered weapons may be lawfully obtained. Thus, a felon who complied with the transfer tax provision could lawfully purchase a machinegun, under the act.

The act does not proscribe sale to a felon or acquisition by a felon through movement in interstate commerce. However, the Federal Firearms Act (1938), which covers all firearms, does proscribe the interstate shipment and receipt of all firearms, including the National Act weapons, by and to felons and fugitives. Thus there is no rationale for including "destructive devices" in the National Act only. It is obvious that such weapons should be included in the Federal Firearms Act, if we are to control their interstate movement and acquisition adequately and effectively.

In summary, S. 3767 is quite limited and would not be as positive a crime deterrent as S. 1592. Further, in urging enactment of his bill, Senator Hruska has never made clear the inconveniences or extreme burdens of law-abiding sportsmen that S. 1592 would effect. All of our 50 States now have a substantial number of federally licensed dealers, thus any responsible person could purchase the firearm of his choice through such dealers with minor inconvenience of identifying himself, filling out a form and complying with the laws of his State.

If we hope to enact effective firearms legislation, then we cannot accept Senator Hruska's ineffective compromise. This is borne out through a perusal of the legislative history of the National and Federal Firearms Acts, both of which were watered down versions of the original proposals, and which have led to the tragic situation in this country today where any juvenile, criminal, or demented person can buy a gun with unbelievable ease.

A comparative analysis of S. 1592 and S. 3767 follows:

| S. 1592 | S. 3767 |
|---|---|
| Definition section: | |
| Defines firearms to include destructive devices, mufflers, and silencers. | No similar provision. |
| Defines specifically destructive devices (to provide for special regulation). | No similar provision. |
| Defines short barreled shotgun (to provide for special regulation). | No similar provision. |
| Defines short barreled rifle (to provide for special regulation). | No similar provision. |
| Defines importer specifically. | No similar provision. |
| Defines crime punishable by imprisonment for a term exceeding 1 year to exclude antitrust and similar violations. (The Federal Firearms Act was amended in 1961 to provide the felony criteria rather than more limited "crime of violence" which was in the original act, passed in 1938.) | Defines "crime of violence" in lieu of definition cited in column 1. (This is a reversion to the pre-1961 definition and is inconsistent with the Attorney General's amendment of that year defining "crime punishable by imprisonment for a term exceeding one year." Thus under Senator Hruska's bill a convicted racketeer or gambler could be licensed to ship or receive firearms in interstate commerce.) |

| S. 1592 | S. 3767 |
|---|---|
| Unlawful acts (Federal licensees, importers, manufacturers, and dealers): | |
| Prohibits the interstate mail-order sale of handguns. | Regulates mail-order sale of handguns through affidavit provisions. (Not as effective as provision in S. 1592.) |
| | No similar provision. |
| Regulates through affidavit provision interstate mail-order sale of rifles and shotguns. | |
| Prohibits the sale of handguns to nonresidents of the licensee's place of business (State). | Regulates through affidavit provision this type of sale. (Not as effective as S. 1592.) |
| Prohibits the sale of handguns to persons under 21 and of rifles and shotguns to persons under 18 in over-the-counter transactions. | No similar provision. |
| Prohibits the over-the-counter sale of firearms by licensees without identifying purchasers. | No similar provision. |
| Prohibits the sale of firearms over the counter in violation of State and local law. | No similar provision. |
| Prohibits delivery of handguns to persons under 21 and rifles and shotguns to persons under 18 by common or contract carriers and Post Office Department. (This does not apply to licensees only.) | No similar provision with regard to rifles and shotguns on the carriers or Post Office Department. |
| Licensing: | |
| Licenses all manufacturers, importers, and dealers in firearms engaged in business. (Power to license is consistent with the commerce clause of Constitution.) | No similar provision. Retains present Federal Firearms Act terminology for licensing, transportation, or receipt in interstate or foreign commerce. |
| Sets forth licensing standards to insure bona fide status of licensees and compliance with the act. | No similar provision. |
| Importation of firearms: | |
| Prohibits importation of military surplus and other foreign-made nonsporting handguns as well as destructive devices and National Firearms Act weapons. (Allows importation of new foreign-made quality firearms suitable for sporting purposes and military surplus rifles and shotguns in the same category.) | No similar provision. |
| Regulation of destructive devices and National Firearms Act | |

Defs.' MSJ App. 261

| S. 1592 | S. 3767 |
|---|---|
| weapons, short barreled rifles and shotguns, machineguns, etc.: | |
| Provides for stringent controls over sale of these firearms. | No similar provision. |
| Recordkeeping provisions: | |
| Provides for adequate recordkeeping and periodic examination of these records to insure compliance with the act. Provides for making available to State and local officials pertinent record information for use in law enforcement. | Retains wording of present Federal Firearms Act. |

In urging enactment of the stronger and more effective S. 1592, we recognize the fact that stringent firearms laws are a deterrent to firearms misuse. All one need do is examine the figures compiled by the Federal Bureau of Investigation relative to gun murders in the several States to conclude that strong gun laws do work.

First, in those geographic areas of the country with strong gun laws, the percentages of gun murders are low when compared with areas with either minimal or no gun controls. In the Northeast with generally strong gun controls, 38 percent of the murders were committed with guns in 1965. Nationally the average was 57 percent. In the Western, North Central and Southern States where gun controls are minimal the percentages of gun murders were 60, 61, and 66 percent respectively.

Second, in specific States with effective firearms regulation the disparity is even more pronounced when comparing strong gun control States with the minimal gun control States.

Below are percentages of gun murders in individual States for the 4-year period 1962–65.

| States with stringent gun laws: | States with weak gun laws: |
|---|---|
| New York, 32 percent. | Colorado, 59 percent. |
| Massachusetts, 35 percent. | Louisiana, 62 percent. |
| New Jersey, 39 percent. | New Mexico, 64 percent. |
| Pennsylvania, 43 percent. | Arizona, 66 percent. |
| | Montana, 68 percent. |
| | Texas, 69 percent. |
| | Nebraska, 70 percent. |

We acknowledge the fact that there are many and varied contributing causes to crime, all of which must be considered in any evaluation of the problem. Thus, the above figures are made more meaningful when it is realized that the densely populated States have low percentages when compared with the less densly populated States, because a major factor affecting the incidence of crime is population density.

While S. 1592 would be a much more effective means of regulation, as compared with S. 3767, it would not interfere with the purchase of firearms by law-abiding, responsible adult Americans. When one weighs the ultimate saving of human life, which we believe is the hallmark of S. 1592, with the slight inconvenience that the bill would

Defs.' MSJ App. 262

impose upon sportsmen and other responsible Americans in purchasing firearms, then we believe that the enactment of S. 1592 is the only responsible course to follow.

There follows the text of the amended S. 1592 along with a statement of purpose, the extent of the program with which the bill deals, its scope of coverage with rationale based on testimony before the subcommittee and a section-by-section analysis of S. 1592.

## S. 1592

### A BILL To amend the Federal Firearms Act

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That this Act may be cited as the "State Firearms Control Assistance Amendments of 1966".*

### FINDINGS AND DECLARATION

SEC. 2. (a)  The Congress hereby finds and declares—

(1) that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control the firearms traffic within their own borders through the exercise of their police power;

(2) that the ease with which any person can acquire firearms (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States;

(3) that only through adequate Federal control over interstate and foreign commerce in firearms, and over all persons engaging in the businesses of importing, manufacturing, or dealing in firearms, can this grave problem be properly dealt with, and effective State and local regulation of the firearms traffic be made possible;

(4) that the acquisition on a mail-order basis of firearms by nonlicensed individuals, from a place other than their State of residence, has materially tended to thwart the effectiveness of State laws and regulations, and local ordinances;

(5) that the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensee's place of business is located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms;

(6) that there is a causal relationship between the easy availability of firearms and juvenile and youthful criminal behavior, and that firearms have been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior;

(7) that the United States has become the dumping ground of the castoff surplus military weapons of other nations, and that such weapons, and the large volume of relatively inexpensive pistols and revolvers (largely worthless for sporting purposes), imported into the

*United States in recent years, has contributed greatly to lawlessness and to the Nation's law enforcement problems;*

*(8) that the lack of adequate Federal control over interstate and foreign commerce in highly destructive weapons (such as bazookas, mortars, antitank guns, etc., and destructive devices such as explosive or incendiary grenades, bombs, missiles, etc.) has allowed such weapons and devices to fall into the hands of lawless persons, including armed groups who would supplant lawful authority, thus creating a problem of national concern;*

*(9) that the existing licensing system under the Federal Firearms Act does not provide adequate license fees or proper standards for the granting or denial of licenses, and that this has led to licenses being issued to persons not reasonably entitled thereto, thus distorting the purposes of the licensing system.*

*(b) The Congress further hereby declares that the purpose of this Act is to cope with the conditions referred to in the foregoing subsection, and that it is not the purpose of this Act to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap shooting, target shooting, personal protection, or any other lawful activity, and that this Act is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this Act.*

Sec. 3. *The first section of the Federal Firearms Act (52 Stat. 1250) is amended to read as follows:*

"Section 1. Definitions.—*(a) As used in this Act—*

"*(1) The term 'person' includes an individual, partnership, association, or corporation.*

"*(2) The term 'interstate or foreign commerce' means commerce between any State or possession (not including the Canal Zone) and any place outside thereof; or between points within the same State or possession (not including the Canal Zone), but through any place outside thereof; or within any possession or the District of Columbia. The term 'State' shall include the Commonwealth of Puerto Rico, the Virgin Islands, and the District of Columbia.*

"*(3) The term 'firearm', except where the context otherwise requires, means any weapon (including a starter gun), by whatsoever name known, which will, or is designed to, or which may be readily converted to, expel a projectile or projectiles by the action of an explosive; the frame or receiver of any such weapon; or any firearm muffler or firearm silencer; or any destructive device.*

"*(4) The term 'destructive device' means any explosive or incendiary (A) bomb or (B) grenade or (C) mine or (D) rocket or (E) missile or (F) similar device; and the term shall also include any type of weapon by whatsoever name known which will, or is designed to, or which may be readily converted to expel a projectile or projectiles by the action of an explosive, the barrel or barrels of which have a bore of one-half inch or more in diameter.*

"*(5) The term 'short-barreled shotgun' means a shotgun having a barrel or barrels of less than eighteen inches in length and any weapon made from a shotgun (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six inches.*

**Defs.' MSJ App. 264**

"(6) The term 'short-barreled rifle' means a rifle having a barrel or barrels of less than sixteen inches in length, and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six inches.

"(7) The term 'importer' means any person engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution; and the term 'licensed importer' means any such person licensed under the provisions of this Act.

"(8) The term 'manufacturer' means any person engaged in the manufacture of firearms or ammunition for purposes of sale or distribution; and the term 'licensed manufacturer' means any such person licensed under the provisions of this Act.

"(9) The term 'dealer' means (A) any person engaged in the business of selling firearms or ammunition at wholesale or retail, (B) any person engaged in the business of repairing such firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker. The term 'licensed dealer' means any dealer who is licensed under the provisions of this Act.

"(10) The term 'pawnbroker' means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm or ammunition as security for the payment or repayment of money.

"(11) The term 'indictment' includes an indictment or an information in any court of the United States or of any State or possession under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted.

"(12) The term 'fugitive from justice' means any person who has fled from any State or possession (A) to avoid prosecution for a crime punishable by imprisonment for a term exceeding one year, or (B) to avoid giving testimony in any criminal proceeding.

"(13) The term 'antique firearm' means any firearm of a design used before the year 1870 (including any matchlock, flintlock, percussion cap, or similar early type of ignition system) or replica thereof, whether actually manufactured before or after the year 1870; but not including any weapon designed for use with smokeless powder or using rim-fire or conventional center-fire ignition with fixed ammunition.

"(14) The term 'Secretary' or 'Secretary of the Treasury' means the Secretary of the Treasury or his delegate.

"(15) The term 'ammunition' means ammunition for a destructive device; it shall not include shotgun shells or any other ammunition designed for use in a firearm other than a destructive device.

"(b) As used in this Act—

"(1) The term 'firearm' shall not include an antique firearm.

"(2) The term 'destructive device' shall not include—

"(A) a device which is not designed or redesigned or used or intended for use as a weapon; or

"(B) any device, although originally designed as a weapon, which is redesigned for use as a signaling, line throwing, safety or similar device; or

"(C) any shotgun (other than a short-barreled shotgun); or

"(D) any nonautomatic rifle (other than a short-barreled rifle)

*generally recognized as particularly suitable for use for the hunting of big game; or*

"(E) *surplus obsolete ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of 10 U.S.C. 4684(2), 4685, or 4686; or*

"(F) *any other device which the Secretary finds is not likely to be used as a weapon.*

"(3) *The term 'crime punishable by imprisonment for a term exceeding one year' shall not include any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices as the Secretary may by regulation designate.*"

SEC. 4. *Section 2 of the Federal Firearms Act is amended to read as follows:*

"SEC. 2. UNLAWFUL ACTS.—(a) *It shall be unlawful—*

"(1) *for any importer, manufacturer, or dealer, except an importer, manufacturer, or dealer having a license issued under the provisions of this Act, to engage in the business of importing, manufacturing, or dealing in firearms or ammunition, or to transport, ship, or receive any firearm or ammunition, in interstate or foreign commerce; or*

"(2) *for any importer, manufacturer, or dealer licensed under the provisions of this Act to ship, transport, or cause to be shipped or transported, in interstate or foreign commerce, any firearm to any person other than a licensed importer, licensed manufacturer, or licensed dealer, except that—*

"(A) *this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from returning a firearm to the sender (including a replacement firearm of the same kind, make, and type);*

"(B) *this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from shipping, or causing to be shipped, for conveyance in the mails, a firearm to any officer, employee, agent, or watchman eligible under the provisions of section 1715 of title 18 of the United States Code to receive through the mails, for use in connection with their official duty, pistols, revolvers, and other firearms capable of being concealed on the person;*

"(C) *this paragraph shall not apply in the case of a shotgun or rifle (other than a short-barreled shotgun or a short-barreled rifle) of a type and quality generally recognized as particularly suitable for lawful sporting purposes, and not a surplus military firearm, which is shipped, transported, or caused to be shipped or transported, in interstate or foreign commerce by an importer, manufacturer, or dealer licensed under the provisions of this Act to any person who has submitted to such importer, manufacturer, or dealer a sworn statement, in duplicate, in such form and manner as the Secretary shall by regulations prescribe, attested to by a notary public, to the effect that (1) such person is eighteen years or more of age, (2) he is not a person prohibited by this Act from receiving a shotgun or rifle in interstate or foreign commerce, (3) there are no provisions of law, regulations, or ordinances applicable to the locality to which the shotgun or rifle will be shipped which would be violated by such person's receipt or possession of a*

*shotgun or rifle, and (4) that (Title _____, Name _____, and Official Address _____) (blanks to be filled in with the title, true name, and address) are the true name and address of the principal law enforcement officer of the locality to which the shotgun or rifle will be shipped. It shall be unlawful for an importer, manufacturer, or dealer, licensed under the provisions of this Act, to ship, transport, or cause to be shipped or transported, in interstate or foreign commerce any such shotgun or rifle unless such importer, manufacturer, or dealer has, prior to the shipment of such shotgun or rifle forwarded by United States registered mail (return receipt requested) to the local law enforcement officer named in the sworn statement, the description (including (1) manufacturer thereof, (2) the caliber or gage, (3) the model and type of shotgun or rifle but not including serial number identification) of the shotgun or rifle to be shipped, and one copy of the sworn statement, and has received a return receipt evidencing deliver of the registered letter or such registered letter has been returned to the importer, manufacturer, or dealer due to the refusal of the named law enforcement officer to accept such letter as evidenced in accordance with United States Post Office Department regulations, and has delayed shipment for a period of at least seven days following receipt of the notification of the local law enforcement officer's acceptance or refusal of the registered letter. A copy of the sworn statement and a copy of the notification to the local law enforcement officer along with evidence of receipt or rejection of that notification, all as prescribed by this subparagraph, shall be retained by the licensee as a part of the records required to be kept under section 3(g): Provided, That (i) the Governor of any State may designate any official in his State to receive the notification to local law enforcement officers required in this subparagraph.   The Secretary shall be notified of the name and title of the official so designated and his business address and shall publish the title, name, and address of that official in the Federal Register.   Upon such publication, notification of local law enforcement officers required in this subparagraph shall be made to the official designated; and (ii) the Governor of any State may request the Secretary to discontinue in his State or any part thereof the notification to local law enforcement officers required in this subparagraph.   Upon publication of the request in the Federal Register, the notification to the law enforcement officers in the area described in the request will not be required for a period of five years unless the request is withdrawn by the Governor and the withdrawal is published in the Federal Register; and*

*"(D) nothing in this paragraph shall be construed as applying in any manner in the District of Columbia, the Commonwealth of Puerto Rico, or any possession of the United States differently than it would apply if the District of Columbia, the Commonwealth of Puerto Rico, or the possession were a State of the United States; or*

*"(3) for any person in connection with the acquisition or attempted acquisition of a firearm from a licensed importer, licensed manufacturer, or licensed dealer to—*

"(A) knowingly make any false or fictitious statement, written or oral, or

"(B) knowingly furnish or exhibit any false, fictitious, or misrepresented identification;

intended or calculated to deceive such importer, manufacturer, or dealer with respect to any fact material to the lawfulness of the sale or other disposition of a firearm by a licensed importer, licensed manufacturer or licensed dealer under the provisions of subsections (b) and (c), or

"(4) for any person to transport into or receive in the State where he resides a firearm purchased or otherwise obtained by him outside the State where he resides if it would be unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.

"(b) It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or otherwise dispose of any firearm to any person—

"(1) without ascertaining through reliable means of identification customarily used in good commercial practice (which shall be noted in the licensee's records) the identity, date of birth (in the case of an individual), and place of residence (or place of business in the case of a corporation or other business entity) of such person; or

"(2) who (in the case of an individual) he knows or has reasonable cause to believe is under twenty-one years of age (except for a shotgun or rifle), and under eighteen years of age in the case of a shotgun or rifle; or

"(3) who he knows or has reasonable cause to believe does not reside in (or in the case of a corporation or other business entity, who does not have a place of business in) the State in which the importer's, manufacturer's, or dealer's place of business is located; except that this paragraph shall not apply in the case of a shotgun or rifle (other than a short-barreled shotgun or short-barreled rifle); or

"(4) who by reason of any State or local law, regulation, or ordinance applicable at the place of sale or other disposition may not lawfully receive or possess such firearm.

This subsection shall not apply in the case of transactions between licensed importers, licensed manufacturers, and licensed dealers, nor in the case of transactions involving rifles or shotguns which are subject to the provisions of subparagraph (C) of section 2(a)(2).

"(c) It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or otherwise dispose of any firearm or ammunition to any person (other than a licensee) knowing or having reasonable cause to believe that such person is under indictment or has been convicted in any court of the United States or of any State or possession of a crime punishable by imprisonment for a term exceeding one year or is a fugitive from justice.

"(d) It shall be unlawful for any person who is under indictment or who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, or who is a fugitive from justice, to ship, transport, or cause to be shipped or transported, any firearm or ammunition in interstate or foreign commerce.

"(e) It shall be unlawful for any person who is under indictment or who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, or is a fugitive from justice, to receive

Defs.' MSJ App. 268

any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

"(f) It shall be unlawful for any person knowingly to deposit, or cause to be deposited for mailing or delivery by mail, or knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, any package or other container in which there is any firearm, without written notice that a firearm is being transported or shipped.

"(g) It shall be unlawful for any common or contract carrier to deliver, or cause to be delivered, in interstate or foreign commerce, any firearm to any person who does not exhibit or produce evidence of a license obtained under section 3 of this Act—

"(1) knowing or having reasonable cause to believe that such person is under twenty-one years of age (except for a rifle or shotgun) and under eighteen years of age in the case of a rifle or shotgun; or

"(2) with knowedge or with reasonable cause to believe that the receipt or possession of the firearm by the person to whom it is delivered would be in violation of the laws or ordinances of the State (or political subdivision thereof) in which the delivery is made; and

No firearm will be delivered in the United States mails under such circumstances as would be unlawful if done by a common or contract carrier.

"(h) It shall be unlawful for any person to transport or ship, or cause to be transported or shipped, in interstate or foreign commerce, any stolen firearm, or stolen ammunition knowing, or having reasonable cause to believe, same to have been stolen.

"(i) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition or pledge or accept as security for a loan any stolen firearm or stolen ammunition, moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing, or having reasonable cause to believe, the same to have been stolen.

"(j) It shall be unlawful for any person to transport, ship, or knowingly receive, in interstate or foreign commerce, any firearm from which the importer's or manufacturer's serial number, as the case may be, has been removed, obliterated, or altered.

"(k) It shall be unlawful for any person to import or bring into the United States or any possession thereof any firearm in violation of the provisions of this Act, or to import or bring into the United States or any possession thereof any ammunition.

"(l) It shall be unlawful for any person to knowingly receive any firearm or ammunition which has been imported or brought into the United States or any possession thereof in violation of the provisions of this Act."

Sec. 5. Section 3 of the Federal Firearms Act is amended to read as follows:

"Sec. 3. (a) No person shall engage in business as a firearms or ammunition importer, manufacturer, or dealer until he has filed an application with, and received a license to do so from, the Secretary. The application shall be in such form and contain such information as the Secretary shall by regulations prescribe. Each applicant shall be required to pay a fee for obtaining such license (for each place of business) as follows:

"(1) If a manufacturer—

"(A) of destructive devices, a fee of $1,000 per annum;

"(B) *of firearms (other than destructive devices), a fee of $500 per annum.*

"(2) *If an importer—*

   "(A) *of destructive devices, a fee of $1,000 per annum;*

   "(B) *of firearms (other than destructive devices), a fee of $500 per annum.*

"(3) *If a dealer—*

   "(A) *in destructive devices, a fee of $1,000 per annum;*

   "(B) *who is a pawnbroker (dealing in firearms other than destructive devices), a fee of $250 per annum;*

   "(C) *who is not a dealer in destructive devices or a pawnbroker, a fee of $10 per annum; except that for the first renewal following the effective date of the State Firearms Control Assistance Amendments of 1966 or for the first year he is engaged in business as a dealer such dealer will pay a fee of $25.*

*The fee for an importer or manufacturer of, or a dealer in, ammunition for a destructive device shall be the same as for an importer or manufacturer of, or a dealer in, destructive devices. However, a person who has obtained a license covering destructive devices shall not be required to obtain an additional license with respect to ammunition for destructive devices.*

"(b) *Upon filing by an applicant of the prescribed application and payment of the prescribed fee, the Secretary shall (except as provided in subsection (c)), issue to such applicant the license applied for, which shall, subject to the provisions of this Act and other applicable provisions of law, entitle the licensee to transport, ship, and receive firearms and ammunition covered by such license in interstate or foreign commerce during the period stated in the license.*

"(c) *Any application submitted under subsections (a) and (b) of this section shall be disapproved and the license denied if the Secretary, after notice and opportunity for hearing, finds that—*

"(1) *the applicant is under twenty-one years of age; or*

"(2) *the applicant (including in the case of a corporation, partnership, or association, any individual possessing directly or indirectly, the power to direct or cause the direction of the mangement and policies of the corporation, partnership, or association) is prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under the provisions of subsection (d) or (e) of section 2 of this Act; or is, by reason of his business experience, financial standing, or trade connections, not likely to commence business operations during the term of the annual license applied for or to maintain operations in compliance with this Act; or*

"(3) *the applicant has willfully violated any of the provisions of this Act or the regulations issued thereunder; or*

"(4) *the applicant has willfully failed to disclose any material information required, or made any false statement as to any material fact, in connection with his application; or*

"(5) *the applicant does not have, or does not intend to have or to maintain, in a State or possession, business premises for the conduct of the business.*

"(d) *The provisions of sections 2 (d) and (e) of this Act shall not apply in the case of a licensed importer, licensed manufacturer, or licensed dealer who is indicted for a crime punishable by imprisonment for a term exceeding one year. A licensed importer, licensed manufacturer, or*

Defs.' MSJ App. 270

licensed dealer may continue operations, pursuant to his existing license (provided that prior to the expiration of the term of the existing license timely application is made for a new license), during the term of such indictment and until any conviction pursuant to the indictment becomes final, whereupon he shall be fully subject to all provisions of this Act and operations pursuant to such license shall be discontinued (unless an application for relief has been filed under section 11).

"(e) No person shall import or bring any firearm into the United States or any possession thereof, except that the Secretary may authorize a firearm to be imported or brought in if the person importing or bringing in the firearm establishes to the satisfaction of the Secretary that the firearm—

"(1) is being imported or brought in for scientific or research purposes, or is for use in connection with competition or training pursuant to chapter 401 of title 10 of the United States Code; or

"(2) is an unserviceable firearm (not readily restorable to firing condition), imported or brought in as a curio or museum piece; or

"(3) is—

"(A) of a type and quality that meets recognized safety standards,

"(B) generally recognized as particularly suitable for, or readily adaptable to, sporting purposes,

"(C) in the case of surplus military firearms, a rifle or shotgun, and

"(D) of a type that does not fall within the definition of a firearm as defined in section 5848(1) of the Internal Revenue Code of 1954; or

"(4) was previously taken out of the United States or a possession by the person who is bringing in the firearm.

Provided, That the Secretary may permit the conditional importation or bringing in of a firearm for examination and testing in connection with the making of a determination as to whether the importation or bringing in of such firearm will be allowed under this subsection.

"(f) No licensed importer, licensed manufacturer, or licensed dealer shall sell or otherwise dispose of a destructive device, a machine gun (as defined in section 5848 of the Internal Revenue Code of 1954), a short-barreled shotgun, or a short-barreled rifle, to a nonlicensee unless he has in his possession a sworn statement executed by the principal law enforcement officer of the locality wherein the purchaser or person to whom it is otherwise disposed of resides, attesting that there is no provision of law, regulation, or ordinance which would be violated by such person's receipt or possession thereof and that he is satisfied that it is intended by such person for lawful purposes. Such sworn statement shall be retained by the licensee as a part of the records required to be kept under subsection (g).

"(g) Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, and sale or other disposition, of firearms and ammunition at such place, for such period and in such form as the Secretary may by regulations prescribe. Such importers, manufacturers, and dealers shall make such records available for inspection at all reasonable times, and shall submit to the Secretary such reports and information with respect to such records and the contents thereof as he shall by regulations prescribe. The Secretary or his delegate may enter during business hours the premises

(including places of storage) of any firearms or ammunition importer, manufacturer, or dealer for the purpose of inspecting or examining any records or documents required to be kept by such importer or manufacturer or dealer under the provisions of this Act or regulations issued pursuant thereto, and any firearms or ammunition kept or stored by such importer, manufacturer, or dealer at such premises. Upon the request of any State or possession or political subdivision thereof, the Secretary of the Treasury may make available to such State, or possession, or any political subdivision thereof, any information which he may possess or which he may obtain by reason of the provisions of this Act with respect to the identification of persons within such State, or possession, or political subdivision thereof, who have purchased or received firearms or ammunition, together with a description of the firearms or ammunition so purchased or received.

"(h) Licenses issued under the provisions of subsection (c) of this section shall be kept posted and kept available for inspection on the business premises covered by the license.

"(i) Licensed importers and licensed manufacturers shall identify (or cause to be identified), in such manner as the Secretary shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer."

SEC. 6. Section 4 of the Federal Firearms Act is amended to read as follows:

"SEC. 4. EXCEPTIONS TO APPLICABILITY OF THE ACT.—The provisions of this Act shall not apply with respect to the transportation, shipment, receipt, or importation of any firearms or ammunition imported for, or sold or shipped to, or issued for the use of (1) the United States or any department, independent establishment, or agency thereof; or (2) any State, or possession, or any department, independent establishment, agency, or any political subdivision thereof."

SEC. 7. Section 5 of the Federal Firearms Act is amended by striking out subsection (b) and inserting in lieu thereof new subsections (b) and (c) reading as follows:

"(b) Any person who—

"(1) with intent to commit therewith an offense punishable by imprisonment for a term exceeding one year; or

"(2) with knowledge or with reasonable cause to believe that an offense punishable by imprisonment for a term exceeding one year is intended to be committed therewith;

ships, transports, or receives a firearm in interstate or foreign commerce shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for each such offense.

"(c) Any firearm or ammunition involved in, or used or intended to be used in, any violation of the provisions of this Act, or any rules or regulations promulgated thereunder, or any violation of the provisions of title 18, United States Code, chapter 84, or sections 111, 112, 372, 871, or 1114, shall be subject to seizure and forfeiture and all provisions of the Internal Revenue Code of 1954 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5848(1) of said Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of this Act."

SEC. 8. The Federal Firearms Act is amended by renumbering sections 6, 7, 8, 9, and 10 as sections 7, 8, 9, 10, and 11, respectively, and inserting after section 5 the following new section:

Defs.' MSJ App. 272

"SEC. 6. *APPLICABILITY OF OTHER LAWS.*—

"(a) *Nothing in this Act shall be construed as modifying or affecting any provision of*—

"(1) *the National Firearms Act (chapter 53 of Internal Revenue Code of 1954); or*

"(2) *section 414 of the Mutual Security Act of 1954, as amended (section 1934 of title 22 of the United States Code (relating to munitions control)); or*

"(3) *Section 1715 of title 18 of the United States Code (relating to nonmailable firearms).*

"(b) *Nothing in this Act shall confer any right or privilege to conduct any business contrary to the law of any State, or be construed as relieving any person from compliance with the law of any State.*"

"SEC. 9. *Section 8 of the Federal Firearms Act (relating to rules and regulations) is amended to read as follows:*

"SEC. 8. *RULES AND REGULATIONS.—The Secretary may prescribe such rules and regulations as he deems reasonably necessary to carry out the provisions of this Act. The Secretary shall give reasonable public notice, and afford to interested parties opportunity for hearing, prior to prescribing such regulations.*"

SEC. 10. *The amendments made by this Act shall become effective on the first day of the third month beginning not less than ten days after the date of enactment of this Act; except that the amendments made by section 5 of this Act to section 3(a) of the Federal Firearms Act shall not apply to any importer, manufacturer, or dealer licensed under the Federal Firearms Act on the effective date of this Act until the expiration of the license held by such importer, manufacturer, or dealer on such date.*

The principal purposes of this proposed bill, S. 1592, are to aid in making it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency, and to assist law enforcement authorities in combating the increasing prevalence of crime in the United States.

The ease with which any person can anonymously acquire firearms (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotic addicts, mental defectives, armed groups who would supplant duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest) is a matter of serious national concern.

We believe that the existing Federal controls over interstate and foreign commerce in firearms are not sufficient to enable the States to effectively cope with the firearms traffic within their own borders through the exercise of their police power. Only through adequate Federal control over interstate and foreign commerce in firearms, and over all persons engaging in the business of importing, manufacturing, or dealing in firearms, can this problem be dealt with, and effective State and local regulation of the firearms traffic be made possible. S. 1592 would provide this needed control.

It would provide Federal controls over—

(1) The interstate traffic in mail-order firearms;

(2) Out-of-State purchases of concealable firearms;

(3) Acquisition of firearms by juveniles and minors;

(4) Rifles and shotguns;

(5) Importation of nonsporting and military surplus firearms;

(6) Highly destructive weapons (e.g., bazookas, mortars, antitank guns, explosives, or incendiary grenades, bombs, etc.);

Defs.' MSJ App. 273

   (7) Licensing of importers, manufacturers, and dealers;
   (8) Recordkeeping provisions;
   (9) Making interstate transportation, shipment, or receipt of a firearm with intent to commit a felony therewith, a Federal offense.

It is not the purpose of S. 1592 to place any undue or unnecessary restrictions or burdens on responsible law-abiding citizens with respect to the acquisition, possession, transportation, or use of firearms appropriate to the purposes of hunting, trapshooting, target shooting, personal protection, or any other lawful activity. It is not intended to discourage or eliminate the private ownership of such firearms by law-abiding citizens for lawful purposes, or to provide for the imposition, by regulations, of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of the bill.

We believe that there is a serious problem of firearms misuse in the United States based on our extensive inquiries into the problem.

For 4 years prior to the introduction of S. 1592, on March 22, 1965, the Subcommittee to Investigate Juvenile Delinquency had been conducting an investigation into the interstate traffic in mail-order firearms, especially to juveniles, youthful offenders, and adult criminals.

In January, March, and May of 1963, and in March and April of 1964, public hearings were held by the subcommittee and the testimony proved conclusively that the interstate traffic in mail-order firearms to the above persons was a serious problem to law enforcement throughout the United States. The consensus of those who testified at the hearings was that this problem could only be effectively attacked through the enactment of Federal legislation.

During the 1963 and 1964 hearings, testimony revealed the existance of the following conditions because of the mail-order gun business:

   Juveniles, minors, convicted felons, and undesirable adults have increasingly availed themselves of the mail-order source of firearms.

   These firearms have been used extensively in the commission of serious crimes.

The indiscriminate sale of these firearms has resulted in accidental tragedies including loss of life and serious injury.

Because of the anonymity afforded the purchaser in a mail-order transaction, these firearms appeal to juveniles, youthful offenders, and adult criminals.

The sale of mail-order firearms is accomplished with little or no concern as to the age, background and competence of a purchaser, especially by a certain group of dealers who entered the mail-order business in recent years.

Firearms sold through the mails are primarily foreign made or imported military surplus firearms, relatively inexpensive and often inferior in design and quality.

The yearly volume of importation of these firearms is approximately 1 million a year.

The $1 fee and lack of minimum standards for obtaining Federal firearms dealers' licenses has resulted in flagrant abuse of the intent of the Federal Firearms Act.

The failure of certain dealers to keep adequate records as required by the regulations (26 C.F.R. Part 177) and to cooperate with State

and local law-enforcement officials is a detriment to effective law enforcement.

> The interstate traffic in mail-order firearms often circumvents State and local law, and it is virtually impossible for the States to control this traffic in the maintenance of domestic law and order.

Furthermore, during the period between the 1964 hearings and the introduction of S. 1592 on March 22, 1965, substantial evidence on the problem of increasing firearms misuse was developed by the subcommittee concerning (1) the interstate traffic in all firearms, including rifles and shotguns and certain destructive devices, (2) the importation of firearms, (3) the effectiveness of laws in certain States and locales as a deterrent to firearms misuse and their lethal capabilities.

In addition to reaffirming the existence of the problem areas referred to in the foregoing paragraphs, many witnesses testified in the 1965 hearings regarding another aspect of the interstate firearms traffic.

Not only is mail order a means of circumventing State and local law, but the over-the-counter sale of firearms, primarily handguns, to persons who are not residents of the locale in which the dealer conducts his business, affords similar circumvention. This problem is most prevalent in, but not limited to, those States where stringent firearms regulations are in effect and the purchaser is not able to purchase a firearm under the laws of his State. As a result, a would-be purchaser travels to a neighboring State with less stringent controls and purchases the firearm which, many times it was demonstrated, was misused in his State or residence. This problem was outlined by law enforcement officers throughout the country.

Firearms purchased in the above manner have been used in the commission of a substantial number of crimes. For example, the Massachusetts State Police have traced 87 percent of the concealable firearms used in crimes in Massachusetts to out-of-State purchases.

The lack of adequate Federal controls over this aspect of the interstate traffic in firearms leaves open to people a method of violating the laws of their own States similar to the mail-order sales route.

Again, as with mail order, the records show that juveniles, youthful offenders, and adult criminals have purchased firearms in this manner and subsequently used them in crimes.

It is virtually impossible for the States to cope with this aspect of the problem without additional controls by the Federal Government.

While we conceded that the more serious problem in firearms misuse concerns the pistol and revolver, the fact remains that of the total number of firearms murders each year, some 30 percent are perpetrated by persons armed with rifles and shotguns.

Furthermore, law enforcement officials have testified to the need for and supported the concept of additional regulations over the acquisition of such weapons.

The capabilities and lethal nature of the firearm are readily apparent, when one examines the figures compiled by the Federal Bureau of Investigation and included in their uniform crime reports. During 1963, 56 percent of the 8,500 murders were perpetrated by persons armed with firearms. In 1964, 55 percent of the 9,250 murders were traced to firearms misuse. In 1965, 57 percent of the 9,850 murders were committed by persons armed with guns. Furthermore, a firearm is seven times more lethal than all other weapons combined.

In gun murders involving emotional provocation, the evidence indicates that if the gun were not available at the spur of the moment, many such murders could well have resulted only in a minor assault. However, because guns are readily available and are lethal by nature, our homicide statistics have soared.

The testimony before our subcommittee has also pointed to the fact that the majority of bank robberies involved the use of a firearm and were it not for the easy availability of guns, the chances for a successful perpetration of this particular crime would be substantially reduced.

In his statement opening the 1965 hearings, the subcommittee chairman cited the volume of firearms which had been imported during the 2-year period 1963-64.   In that 2-year period, 2,167,754 firearms were imported, with pistols and revolvers numbering 859,758 of the total.

Law enforcement officials testified that foreign imports account for a significant percentage of the total number of firearms seized pursuant to their use in the commission of crimes.   The percentage ranged from a low of 18 percent in Washington, D.C., to a high of 80 percent in Atlanta, Ga.   The .22-caliber revolver has been singled out by law enforcement generally as being a particular problem in that it is inexpensive and easily obtainable.

The extent of the problem is clear, we believe, and the need for enactment of S. 1592 is apparent.

In documenting the thoroughness of our inquiry, we feel that it is important to cite those Federal, State, and local officials who appeared before the subcommittee calling upon the Federal Government to enact remedial legislation, and specifically S. 1592.

They are—

Nicholas deB. Katzenbach, Attorney General of the United States.

Henry H. Fowler, Secretary of the Treasury.

Sheldon M. Cohen, Commissioner of Internal Revenue.

Stephen Ailes, Secretary of the Army.

James V. Bennett, consultant, Federal Bureau of Prisons, Department of Justice.

Thomas C. Lynch, attorney general, State of California.

Arthur J. Sills, attorney general, State of New Jersey.

Daniel R. McLeod, attorney general, State of South Carolina.

Richard R. Caples, commissioner of public safety, State of Massachusetts, accompanied by Lt. John Collins and Sgt. Edward Higgins, Massachusetts State Police.

John B. Layton, Chief of Police, Washington, D.C.

Herbert T. Jenkins, chief of police, Atlanta, Ga.

Curtis Brostron, chief of police, St. Louis, Mo., accompanied by Maj. Adolph Jamobsmeyer.

Howard R. Leary, commissioner of police, Philadelphia, Pa., accompanied by Chief Inspector Harry Fox.

Leonard Reisman, deputy commissioner, New York City Police Department.

Carl K. Miller, commander, Chicago Police Department.

Merton Howe, captain, Los Angeles Police Department.

Jesse Gonzales, sergeant, Los Angeles Police Department.

### PRESIDENT'S STATEMENT ON FIREARMS CONTROL

President Johnson in his message to the Congress March 8, 1965, described crime as a "malignant enemy in America's midst of such extent and seriousness that the problem is now one of great national concern." He identified as a significant factor in the rise of violent crime the ease with which any person can acquire a firearm. He also stressed the need for increased Federal control over interstate shipment of firearms and the importance of curbing the importation of surplus military weapons as well as other used firearms.

The President recommended the enactment of legislation amending the Federal Firearms Act to "make it more feasible for the States to impose more effective controls over firearms within their own boundaries," and more specifically, to correct abuses in mail order sales, to provide suitable licensing standards for persons engaged in activities licensed under the act, and to restrict the sale of firearms by licensees to persons of mature age. As a complement to Federal firearms control legislation, he urged public officials to review State and local laws "in this critical field with a view to keeping lethal weapons out of the wrong hands."

S. 1592, as originally introduced, was designed to accomplish the Federal objectives outlined by the President.

The scope of S. 1592 is broad. However, we believe that the need for each of the provisions of the bill has been thoroughly documented by the testimony given before the subcommittee. There follows the scope of coverage of the bill with rationale.

#### The interstate traffic in mail order firearms

S. 1592 would have the effect of channeling interstate and foreign commerce in firearms, except for sporting-type rifles and shotguns (not to include military surplus), through federally licensed importers, manufacturers, and dealers, thereby prohibiting the commercial mail order traffic in firearms (other than rifles and shotguns) to unlicensed persons; and with respect to interstate mail order transactions in sporting-type rifles and shotguns would require a purchase affidavit, and notice to a law enforcement officer at the place where the rifle or shotgun is to be shipped. This will enable the States to more effectively control the firearms traffic within their own jurisdictions under the police power granted to them by the Constitution.

The testimony and the record reflect the concern of law enforcement officials throughout the country over the vast proliferation of mail order firearms in interstate commerce.

This traffic is a means which affords circumvention and contravention of State and local laws governing the acquisition of firearms. It is characterized by ready availability, minimal cost, and anonymity of purchase. The result has been an ever-increasing abuse of this source of firearms by juveniles, minors, and adult criminals.

In the District of Columbia, the subcommittee, with the cooperation of the Metropolitan Police Department, determined that 25 percent of the recipients of mail-order firearms had criminal records ranging in seriousness from habitual drunkenness to murder.

In testifying before the subcommittee on June 2, 1965, Commander Carl K. Miller, Chicago Police Department, referred to the results of an investigation of 4,069 consignees of mail-order firearms in Chicago, who had purchased and received their firearms from just 3 California-

based mail-order firearms dealers.   He indicated that 948 consignees had arrest records.   Of the 948 arrestees, 13 were arrested for murder, 58 for robbery, 42 for burglary, 111 for various types of assaults, 83 for carrying concealed weapons, and 426 for disorderly conduct.

In addition, 229 were arrested for various other crimes including larceny, larceny from auto, gambling, resisting arrest, causing a disturbance with a gun, narcotics investigation, and sex offenses.

In testifying on June 3, 1965, Attorney General Arthur J. Sills, of New Jersey, cited the results of a State police survey conducted to determine if purchase permits had been obtained by residents in New Jersey who had received mail-order firearms from two California mail-order firearms dealers.   In summary, Attorney General Sills testified that, of the 154 guns sold and mailed by the 2 dealers, 61 were sold and mailed without permits being issued.   Further, it was determined that 26 persons with criminal records were among those who had purchased the 61 firearms from the 2 mail-order outlets.   This subcommittee cooperated with the New Jersey authorities by furnishing the names of consignees of mail-order handguns to the New Jersey State Police.   The laws of New Jersey require a permit to purchase a handgun.

Deputy Commissioner Leonard E. Reisman, New York City Police Department, testified on July 1, 1965, that since 1950, the police department, in accord with the provisions of the Sullivan law of New York, has checked out 2,676 deliveries of concealable firearms by common carrier into New York.   While some 1,200 were proper shipments, the police department disapproved 1,439 deliveries because they were consigned to persons who would not have been authorized to receive them under the laws of the State of New York.   Thus, even where there are the most stringent State laws, attempts are being made to circumvent the law through the delivery of mail-order firearms to unauthorized persons.

Police Commissioner Howard Leary, of Philadelphia, testified on June 8, 1965, and referred to a survey of mail-order gun consignees in Philadelphia.   Again, this survey was conducted in cooperation with the subcommittee.   Commissioner Leary stated that of the 300 guns received by Philadelphians via mail order, 54 of them had police records.   Furthermore, 15 of them had been arrested previously for crimes involving the use of firearms.   He went on to indicate that, thus far, in 1965, 160 handguns were mail-ordered to Philadelphians, and 16 of them had previous arrest records.

In endorsing S. 1592, Attorney General Thomas C. Lynch, of the State of California, cited the mail-order source of firearms as a contributing and compounding factor to crime and the problem of law enforcement throughout his State.

Chief of Police Herbert T. Jenkins, Atlanta, Ga., in referring to the increasing number of firearms which come into the custody of the Atlanta Police Department each year, indicated that the traffic in illegal firearms has doubled in the last 5 years.   He blamed mail-order sources as a major contributing factor in this increase.

In addition, examples of mail-order firearms purchased and received in circumvention of the law and subsequently used in the commission of crime, were cited by the following law enforcement officials who appeared in support of S. 1592 before the subcommittee during the 1965 public hearings:

John B. Layton, chief of police, Washington, D.C.

Howard R. Leary, commissioner, police department, Philadelphia, Pa.

Curtis Brostron, chief of police, St. Louis, Mo.

Carl K. Miller, commander, Chicago Police Department.

Merton W. Howe, captain, commander of robbery division, Los Angeles Police Department.

In summary, the record is replete with testimony documenting the existence of a serious mail-order gun problem. This traffic affords easy circumvention and contravention of State and local law and leads to the frustration of law enforcement in its efforts to combat crime.

### Acquisition of firearms by juveniles and minors

S. 1592 would bar federally licensed importers, federally licensed manufacturers, and federally licensed dealers from selling or otherwise disposing of any firearms to any person who (in the case of an individual) he knows, or has reasonable cause to believe, is under 21 years of age (except for a shotgun or rifle) and under 18 years of age in the case of a shotgun or rifle. The bill would place similar restrictions on interstate carriers regarding delivery of firearms to such persons. Thus, the bill would provide a uniform and effective means throughout the United States for preventing the acquiring of the specified firearms by persons under such ages. However, under the bill, a minor or juvenile would not be restricted from owning, or learning the proper use of the firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian.

The clandestine acquisition of firearms by juveniles and minors is a most serious problem facing law enforcement and the citizens of this country.

Deputy Commissioner Leonard Reisman, of the New York City Police Department, testified that in 1964, there were 2,615 arrests in that city for the illegal possession of dangerous weapons; 1,136 of the arrestees were under 21 years of age, or 43 percent of the total. The commissioner stated that by far the most popular instruments of violence among these young people are firearms of all types.

Capt. Merton W. Howe, Los Angeles Police Department, testified that in the crimes of armed robbery and aggravated assault, the increase of gun misuse by juveniles is graphically illustrated by a comparison of 1956 and 1964 figures. In 1956, there were only 26 incidents of juvenile armed robbery by gun. However, in 1964, the figure jumped to 58 incidents. In 1956, there were 31 incidents of juvenile aggravated assaults by gun, whereas in 1964, the figure jumped to 157.

Chief Curtis Brostron, St. Louis Police Department, testified that in 1964, 21 youths, ages 14 to 26 years, committed murders with firearms, and that one of these was the double shotgun slaying of his parents by a 15-year-old boy.

Comdr. Carl K. Miller, Chicago Police Department, testified that in 1964 there were 191 firearms murders in Chicago. Of this total, the perpetrator in 3 cases was a 13-year-old juvenile; in 2 cases a 14-year-old; and 7 cases a 15-year-old, and in 11 cases a 16-year-old. Thus, 23 of the 191 gun murders were committed by juveniles under 17 years of age.

Commander Miller further indicated that minors were involved as principals in 18 of the murders. Six were 17 years of age, six were 18 years of age, five were 19, and one was age 20.

Thus, of 191 gun murders in the city of Chicago, minors under 21 years of age accounted for 41, or approximately 20 percent of the total.

Police Commissioner Howard R. Leary, Philadelphia, Pa., cited the incidence of juvenile misuse of firearms in that city during 1964. He testified that guns played an important role in Philadelphia's juvenile crime picture. A total of 199 juveniles under 18 years of age were arrested in 1964 charged with crimes involving firearms, including homicides, robberies, assaults, carrying concealed weapons, and violation of Pennsylvania's Uniform Firearms Act. He indicated further that 203 firearms were confiscated from teenagers by the juvenile aid division in 1964. The results of this traffic were exemplified by the fact that four teenage gang clashes resulted in two 17-year-olds, one 18-year-old, and one 20-year-old being killed by firearms on Philadelphia's highways.

Chief Herbert T. Jenkins, Atlanta Police Department, in referring to the misuse of firearms in the crime of aggravated assault, testified that of the 404 such assaults in the last 17 months, 93 of the perpetrators were under 21 years of age. He concluded:

> Most of these cases would have ended as a simple altercation, except for the ready availability of the gun.

Attorney General Daniel R. McLeod, South Carolina, included in his testimony the comments of law enforcement officials in South Carolina, who responded to his request for information in preparation for his appearance before the subcommittee. The reply of the chief of police of Greenville, S.C., is relevant:

> For your information and file, during the year 1964, 42 teenage males and 3 teenage females were arrested and charged with carrying, shooting, pointing, or having in possession, firearms in the city of Greenville.
>
> During the first 6 months of 1965, we have already arrested for the same offenses as mentioned above 26 male teenagers and 2 female teenagers.

The statistics documenting the misuse of firearms by juveniles and minors in this section of the report take on added significance when one considers the fact that in each of the jurisdictions referred to the lawful acquisition of concealable firearms by these persons was prohibited by statute.

The testimony conclusively refutes the myth that criminals steal firearms rather than purchase them in illicit channels. While it is conceded that some criminal firearms are stolen, the fact is that the record reflects illicit purchases are made either through mail order or by over-the-counter purchase in nonresident jurisdictions.

Specific cases exemplifying illicit purchases by juveniles and minors in the above manner were included in the record by several witnesses who appeared before the subcommittee.

Commissioner Richard R. Caples, of the Massachusetts Department of Public Safety, cites the out-of-State purchase of firearms by Massachusetts residents as the prime source of the criminal gun in his State. His statement was documented by records covering the past

10 years.   He also included in the record specific cases of juveniles and minors who journeyed to neighboring States, purchased concealable firearms, and subsequently used them in crimes in Massachusetts.

A case in point concerned a 16-year-old juvenile who traveled to Maine on numerous occasions, purchased 16 firearms, including 3 handguns, and subsequently sold them to Cambridge, Mass., youths who used them in crimes.

Chief John B. Layton, Metropolitan Police Department, District of Columbia, cited the recent case of a shooting in the city's sixth precinct.   Juvenile investigators determined that the gun involved, a .22-caliber pistol, had been purchased by an 18-year-old on the same day in nearby Silver Spring, Md.   Further investigation determined that the same dealer in Silver Spring, in a 3- or 4-month period, had sold 11 pistols and two .22-caliber blank pistols to persons under 21 years of age.   All of those involved resided in the 6th and 12th precincts which border the Silver Spring area.

Minors under 21 years of age are prohibited by the laws of the District of Columbia from purchasing pistols and revolvers.

Capt. Merton W. Howe, Los Angeles Police Department, Robbery Division, cited two cases which involved juveniles and mail-order guns:

> Two of the most tragic cases that come to mind from mail-order guns involve juveniles.

One case involved the shooting by a 16-year-old boy of his best friend.   He claimed that he did not know that the gun was loaded.   The second concerned a 16-year-old boy, who shot himself with a mail-order gun after having been reprimanded by his father.

Deputy Commissioner Leonard Reisman, New York City Police Department, testified about the case of a do-it-yourself gunsmith who made out-of-State purchases of starter pistols and converted them to lethal firearms.   These death weapons were being sold to youth gang members on street corners for $20.

The cases cited clearly show the two major sources of firearms for juveniles: Mail-order houses and over-the-counter purchases in States with weak gun laws.

We believe that these two prime sources of firearms to juveniles and minors involving interstate commerce, mail-order, and out-of-State, over-the-counter purchases should be regulated in accord with the provisions of S. 1592.

By prohibiting the mail-order traffic in concealable firearms entirely and restricting the over-the-counter purchase of concealable firearms by nonresidents, and by regulating the mail-order traffic in shotguns and rifles, the problem will be substantially alleviated.   In addition, the establishing of minimum ages for (1) purchase of rifles and shotguns at 18 years, and (2) pistols and revolvers and all other firearms at 21 years, provides the machinery for the States to implement and enforce their own statutes governing the sale and acquisition of firearms.

### Out-of-State purchase of concealable firearms

S. 1592 would prohibit a federally licensed importer, federally licensed manufacturer, or federally licensed dealer from selling or otherwise disposing of a firearm (other than a shotgun or rifle) to any person whom he knows, or has reasonable cause to believe, does not reside in (or in the case of a corporation or other business entity, who

does not have a place of business in) the State in which the importer's, manufacturer's, or dealer's place of business is located.

It would also make it unlawful for any person to bring into or receive in the State where he resides a firearm purchased outside that State in those cases where it would be unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.

The provisions of S. 1592, which prohibit a licensee from disposing of pistols and revolvers to persons who are not residents of the State in which he conducts his business is justified by the record of the subcommittee's 1965 hearings.

The record is replete with testimony documenting the fact that the purchase of firearms by persons in other than their resident State is a serious contributing factor to crime.   Testimony further indicates that large numbers of criminals and juveniles have availed themselves of this source of firearms in order to circumvent the laws of their respective jurisdictions.

The subcommittee, in conjunction with the Treasury Department, surveyed the records of selected firearms dealers in the Maryland suburban area of Washington, D.C.   The results are most certainly alarming.   It was determined that two dealers whose records were examined sold to a significant number of District residents.   Those two dealers are located in a Maryland county where regulations controlling over-the-counter sales are minimal.   (A county ordinance was subsequently enacted.)

The records of Apple Hardware, Inc., in Chillum, Md., show that 58 percent of their handgun sales during 1964 and early 1965 were to residents of the District of Columbia.   Subsequent criminal records checks on these purchasers reveal that 40 percent of them have criminal records in this city.

The records of the Suitland Trading Post in Suitland, Md., show that 40 percent of their firearms sales during 1964 and early 1965 were to residents of the District of Columbia.   Subsequent criminal records checks have revealed that 23 percent of the purchasers have records in the District of Columbia.

The results referred to need no elaboration.   Circumvention of the laws of the District of Columbia was easily effected by these purchases.

This situation is not peculiar or confined to the Washington, D.C., area.

The most complete documentation of the State level of this aspect of the problem was included in the testimony of Commissioner Richard R. Caples, of Massachusetts.   He testified that over a 10-year period, the Massachusetts State Police had traced 87 percent of the guns used in crime in that State to purchases in neighboring States. He further stated that of some 4,506 firearms which were traced, only 6 were determined to have been stolen.

He included for the record some 60 cases which concerned the purchase of firearms in neighboring States which were subsequently used in crimes in Massachusetts.

One case concerned an unknown person who purchased nine snub-nosed revolvers from several dealers in New Hampshire, using fictitious names and addresses.   Subsequently, two of the revolvers were found in the possession of a Boston resident (George McLaughlin), who, at

the time of the sales, was being sought for murder and was considered by the FBI to be 1 of the 10 most wanted criminals in this country.

The remaining cases presented by Commissioner Caples are equally serious in nature.

Attorney General Sills, of New Jersey, also testified about the purchase of firearms in other States and their subsequent illegal entry into New Jersey.

He stated that of 1,815 arrests for the illegal carrying of concealed weapons (handguns) only 15 of the guns involved had been purchased legally, that is with the permit to purchase which is required in New Jersey. Only six had been registered voluntarily, after purchase outside of that State.

Attorney General Sills referred to a cooperative effort on the part of New Jersey and Maryland authorities who surveyed the purchase of handguns by 27 New Jersey residents in Maryland. The 27 persons purchased 65 handguns from 3 retail stores in Aberdeen, Md. Eight of the purchasers used fictitious names and/or addresses, and five of these used the same fictitious address. One of the five who used that fictitious address, Hector Gomez, was later found to have a lengthy police record for such offenses as extortion, robbery, assault, and attempted rape. He purchased 12 handguns in one store and 3 from another store in a period of 12 days.

Mr. Sills endorsed the provisions of S. 1592, which would prohibit the sale of handguns to nonresidents.

In addition, the following officials cited specific cases which involved out-of-State and nonresident purchases of concealable firearms contrary to the local law and which were subsequently used in the commission of crimes of violence. None of the examples referred to in this section concerned mail-order sources. These examples are separate and distinct from those cited in the section on the interstate traffic in mail-order firearms.

Chief John B. Layton, District of Columbia.

Captain Merton Howe and Sgt. Jess Gonzales, Los Angeles Police Department.

Commissioner Howard Leary, Philadelphia.

Further, Chief Curtis Brostron, of St. Louis, and Chief Herbert Jenkins, of Atlanta, Ga., referred to the easy availability of firearms from out of State as a contributing factor to firearms used in crime.

We believe that the problem outlined above is sufficient to warrant the enactment of the provisions of S. 1592 which would prohibit the sale of handguns to nonresidents of a given State.

*Rifles and shotguns*

The control would be exercised through the filing of an affadavit by the purchaser of a mail-order gun. The dealer would be required to forward a copy of this affadavit to the law enforcement officials in the purchaser's area of residence. This would give police officials a chance to check and see if the purchaser is legally entitled to have a rifle or shotgun, under that jurisdiction's statutes.

But in general, rifles and shotguns are distinguished from pistols and revolvers in S. 1592, and are given favored treatment.

Testimony reflects that the inclusion of rifles and shotguns in S. 1592 is one of the most controversial aspects of the bill, and we believe it necessary therefore, to devote a section of these views to clarifying the need for including them. While the major problem

facing law enforcement is the control of concealable firearms, the fact remains that the record also shows a substantial misuse of rifles and shotguns.

It would be unwise to exclude these firearms from coverage entirely. Such an exclusion simply cannot be justified on the basis of available information. The position which we have taken with regard to rifles and shotguns is to provide moderate but effective regulation over their acquisition.

Federal Bureau of Investigation crime statistics for 1963, show that 30 percent of the firearms murders in the United States were carried out by persons armed with rifles and shotguns. This represented a loss of lives numbering some 1,400. The 1964 figures reflect that 30 percent of the 5,090 gun murders, or 1,527 deaths, were committed with rifles and shotguns. And in 1965, 1,690 persons were murdered with rifles and shotguns.

The 30 percent figure does not always hold true in large metropolitan cities on the basis of statistics on rifle and shotgun murders given to us by representatives from a number of urban areas. The percentage of rifle and shotgun murders is much higher in rural areas than in the cities, a fact which those who oppose their inclusion in S. 1592 have consistently failed to acknowledge. FBI statistics show that 52.8 percent of the rural gun murders are by rifle and shotgun.

Thus, the problem of firearms misuse is not confined to the cities. Rather it is national in scope.

Further evidence of the need for the inclusion of the long arms is a subcommittee inquiry into the mail order sales of rifles and shotguns by Klein's Sporting Goods, Chicago, Ill., a reputable and respected firm in the business of selling mail-order firearms.

From the subpenaed files of Klein's Sporting Goods, the subcommittee in cooperation with local police in several jurisdictions has determined that mail-order rifles and shotguns have been sent to persons with criminal arrest records in Chicago, Ill.; in Dallas, Tex.; in Philadelphia, Pa.; in Los Angeles, Calif.; in the State of New Jersey; and in the State of New York.

The crimes of these mail-order purchasers of rifles and shotguns range in seriousness from misdemeanors to felonies and include assault, assault and battery, assault with a deadly weapon, assault and battery on a police officer, larceny, sex offenses, and narcotics and dangerous drug offenses.

The incidence of sale of mail-order rifles and shotguns to persons with criminal records is not as frequent as is the case with regard to pistols and revolvers. However, we do find that such firearms sales to persons with criminal records range between 10 and 15 percent of total sales in the jurisdictions mentioned above.

In addition, the record shows the concern of law enforcement with regard to rifles and shotguns and the need for regulation.

In referring to efforts at the State level to regulate the acquisition of long arms, Deputy Commissioner Leonard Reisman, of New York, cited statistics which show that there were 490 crimes in 1963, where the weapon used was a rifle or shotgun. This figure included 37 homicides.

In supporting the inclusion of rifles and shotguns in S. 1592, Attorney General Arthur J. Sills, of New Jersey, referred to his efforts at the State level to enact controls over these firearms. In citing the

need for S. 1592, and complementary State regulation, he referred to specific instances of rifle and shotgun murders, wherein the weapons had been purchased and subsequently misused by persons who could not have done so had the proper regulation been in effect.

Further specific references to rifle and shotgun murders were cited by Commissioner Richard R. Caples, of Massachusetts; Chief Herbert T. Jenkins, of Atlanta, Ga.; and Chief Curtis Brostron, of St. Louis, Mo.

And finally, Commissioner Howard R. Leary, of Philadelphia, testified:

> We have noticed a greater tendency, as police pressure on methods of securing of handguns is stepped up, for felons to use shotguns and rifles to hold up and threaten the public. In fact, we had a wave of holdups of public transportation vehicles by a team, who used rifles to hold at bay a busload of citizens while the robbery of the driver was being completed.

The record is, we believe, quite clear. Rifles and shotguns are misused in the commission of crimes of violence in great enough frequency to warrant regulation over their acquisition.

Importation of nonsporting and military surplus firearms:

S. 1592 would curb the flow of surplus military weapons and other foreign made firearms into the United States which are not particularly suitable for target shooting, hunting, or for any other lawful purpose.

The provisions concerning the importation of firearms would not interfere with the importation of currently produced firearms, such as rifles, shotguns, pistols, or revolvers of recognized quality which are used for hunting, recreational purposes, or personal protection.

The importation of certain foreign-made and military surplus nonsporting firearms has an important bearing on the problem which S. 1592 is designed to alleviate.

During 1963 and 1964, 2,167,754 firearms were imported into the United States. This includes 859,758 pistols and revolvers, the majority of which were either inexpensive, small caliber firearms or military surplus. Of the 1,307,996 rifles and shotguns imported, the majority were military surplus.

The problem which this flow of firearms creates has become great, not because of the high import figures alone, but because of the fact that many of these weapons have gotten into the hands of juveniles and felons.

The subcommittee's inquiry has shown that at least 75 percent of the mail order guns sold in the United States are imported in one manner or another.

Law enforcement officials testified that foreign imports account for a significant percentage of the total number of firearms coming into their possession as the result of having been used in the commission of crime. The figure ranged from a low of 18 percent of the total in Washington, D.C., to a high of 80 percent in Atlanta, Ga.

Attorney General Thomas C. Lynch, of California, testified:

> Imported surplus weapons have proved especially troublesome in connection with juveniles. Thousands of firearms not suitable for lawful sporting purposes have been dumped onto the market here at prices which attract juveniles.

Attorney General Lynch then went on to cite the problem of juvenile misuse of imported .22 caliber starter pistols which are converted to fire .22 caliber ammunition. He indicated that over the past 8 years, hundreds of felonies had been committed by youngsters armed with these weapons.

Deputy Commissioner Leonard Reisman, New York City Police Department, also testified about the experiences of New York City with regard to the imported starter pistol. He cited the case of one type of pistol which was imported into New York with a plugged barrel. Separate shipments of rifled barrels followed which were used to replace the plugged barrels. Converting the blank starter pistols to lethal firearms took a matter of minutes.

This problem, however, is not limited to the convertible starter pistols.

Chief Herbert T. Jenkins, Atlanta Police Department, testified that 80 percent of the confiscated firearms now in the possession of his department are foreign-made imports, with an average value of about $10. He indicated further that the misuse of the small-caliber firearms (usually .22 caliber) pose one of the greatest problems to law enforcement in Atlanta.

Chief Curtis Brostron, St. Louis Police Department, testified that his department's crime laboratory processes each day at least one German-made .22 caliber revolver which sells for $10 to $15.

Captain Merton W. Howe, Los Angeles Police Department, testified that in 1963, 46.7 percent of the firearms which were destroyed by the department under authority conferred by the California Penal Code, were foreign made.

In 1964, the figure based on a sampling of about 25 percent of the total was 47 percent.

Attorney General McLeod, of South Carolina, testified that the inexpensive, imported .22 caliber revolver, designed as a starter pistol but readily converted to a lethal firearm, has been a problem of serious proportions to law enforcement officials in South Carolina. He indicated that he has reliable information that one dealer alone converted 20,000 Rohm starter pistols to lethal .22 caliber firearms.

With regard to these weapons, the Attorney General stated:

> This gun, and others of its characteristics, should not be permitted to be imported or manufactured in this country, and so far as S. 1592 meets this problem, we are in accord with it.

The incidence of foreign-made firearms coming into the possession of police departments is truly significant.

Furthermore, the following excerpt from Senate Report 1340, 88th Congress, 2d session, is particularly noteworthy.

With reference to the interstate mail-order traffic in imported firearms, the report states on page 4:

> It is of relevance that the mail-order-type firearms are .22 caliber revolvers, .25 caliber pistols, .38 caliber, and .45 caliber revolvers. The .22 caliber and the .25 caliber are usually new weapons, while the .38 and .45 caliber are usually surplus military firearms which have been discarded by foreign governments.

Defs.' MSJ App. 286

### Highly destructive weapons

S. 1592 would extend the coverage of the Federal Firearms Act to include highly destructive devices, such as explosive or incendiary bombs, grenades, and mines. And it would establish stricter controls than those presently in the act over interstate and foreign commerce in such devices as large-caliber, military-type weapons (bazookas, mortars, and antitank guns). They are now treated the same way as rifles and shotguns, i.e., records of sales must be kept.

The stark realities of the ease with which these weapons can be and are purchased were described in a statement opening hearings on June 2, 1965, when the chairman of the Subcommittee To Investigate Juvenile Delinquency read into the Record circumstances surrounding the purchase of several mortars and bazookas by a subcommittee consultant, who at the time was a provisional member of the paramilitary organization, the Minutemen.

The concern of law enforcement officials throughout the country over this traffic in heavy armament was made clear by Attorney General Thomas C. Lynch, of California; Attorney General Arthur J. Sills, of New Jersey; Deputy Commissioner Leonard Reisman, of New York, and Capt. Merton W. Howe and Sgt. Jesse Gonzales, of the Los Angeles Police Department.

Several representatives of the sporting fraternity indicated in testimony that the definition of "destructive devices," in S. 1592 was too inclusive and would include certain antique firearms and certain large-bore sporting firearms. Based on these objections, the subcommittee amended this definition to exclude these firearms from coverage.

### Licensing of importers, manufacturers, and dealers

S. 1592 would prescribe meaningful licensing standards and denial hearing procedures designed to assure that licenses would be issued only to responsible, law-abiding persons actually engaged in or intending to engage in business as importers, manufacturers, or dealers in firearms. License fees, to be increased by the bill, would provide sufficient funds to partially defray the cost of investigation of applicants and would tend to discourage license applications by persons who do not intend to engage in the business for which the license is sought.

The absence of specific standards from the present Federal Firearms Act and the minimal fees in the act have resulted in an abuse of the intent of the act.

Secretary of the Treasury Henry H. Fowler told the subcommittee:

> Since a bureau of my Department is responsible for the administration of the Federal Firearms Act, I am particularly anxious that the changes proposed in the bill with respect to the issuance of licenses to manufacture, import, and deal in firearms be adopted.

Under the existing law, anyone other than a felon can, upon the mere allegation that he is a dealer and payment of a nominal fee of $1, demand and obtain a license.

This situation invites irresponsible individuals to obtain licenses, thus facilitating the acquisition of these weapons by criminals and other undesirables.

Secretary Fowler, in answering a question posed by Senator Hiram Fong, testified that of the 99,544 outstanding licenses in 1964:

> It is our estimate that less than half of the licensed dealers are actually engaged in the business as dealers and that more than half are persons who are using the simple device of becoming a licensee for their own personal nonbusiness purpose.

Further strong support for the need for increased license fees for dealers, manufacturers, and importers and the inclusion of specific standards to obtain licenses was given by Attorney General Nicholas deB. Katzenbach; Commissioner Sheldon S. Cohen, of the Internal Revenue Service; Commissioner Richard R. Caples, of Massachusetts; Deputy Commissioner Leonard Reisman of New York City, and by Capt. Merton W. Howe, of the Los Angeles Police Department.

*Recordkeeping provisions*

S. 1592 would place more emphasis on the recordkeeping responsibilities of licensees by requiring that reliable means be used by the licensee to verify information submitted to him by the purchaser, and by specifically providing for the inspection of records required to be maintained by licensees.

It would also authorize the release of pertinent information obtained from the licensee's records, to State and local authorities, to assist them in law enforcement activities.  In addition, the bill would make it possible to require, by regulations, the submission of reports concerning the operations of lisensees.

Because of the controversy which arose during the hearings concerning section 3(g) under S. 1592, relating to the recordkeeping of acquisition and disposition of firearms and destructive device ammunition by licensees, it is necessary to devote a section of this report to these provisions of the bill.

Section 3(g) requires no more recordkeeping by licensees than is presently required by section 903(d) of the Federal Firearms Act, as implemented by regulations (26 CFR pt. 177), with the exception of including destructive device ammunition.

Section 3(g) does require that such records be made available for inspection or examination by the Secretary or his delegate during normal business hours.  It is further required that licensees shall submit such reports and information with respect to the records and the contents thereof as the Secretary shall by regulation prescribe.

This is a reasonable means of determining periodically the licensees' compliance with the recordkeeping provisions of the bill.  It is not designed as, nor intended to be, a means of national registration of firearms.

It is further provided for in this section that the Secretary may make available to a State, possession, or political subdivision thereof, any information that he is authorized to obtain concerning the identity of purchasers of firearms and the types of firearms purchased. This provision is included as an aid to effective law enforcement.

The record on S. 1592 is quite clear that the maintenance of complete records of acquisition and disposition of firearms by licensees is an essential element contributing to effective and sound law enforcement at the Federal, State, and local levels of government.

Making interstate transportation, shipment, or receipt of a firearm, with intent to commit a felony therewith, a Federal offense.

The evidence presented at the hearings showed a need for a change in the Federal Firearms Act to provide a penalty for shipping, transporting, or receiving a firearm in interstate or foreign commerce with intent to commit a felony therewith or with knowledge or with reasonable cause to believe that a felony offense is intended to be committed therewith.

The subcommittee agreed to provide that this be a Federal offense and that it be punishable by a fine of not more than $10,000, or imprisonment of not more than 10 years, or both.

In view of the constitutional question that has been raised with regard to S. 1592, we include the following brief analysis of the intent and interpretation of the second amendment.

A number of witnesses at the hearings argued that S. 1592 is unconstitutional because it would interfere with individual rights guaranteed by the second amendment to the Constitution. The amendment provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

It is noteworthy that enactment of the National Firearms Act of 1934, as well as the Federal Firearms Act, was opposed on the same grounds and that these statutes were attacked in the courts as being violative of the second amendment. The courts have uniformly ruled to the contrary, and their decisions make it plain that the amendment presents no obstacle to the enactment and enforcement of S. 1592.

The decisions hold that the second amendment, unlike the first, was not adopted with the individual rights in mind, but is a prohibition upon Federal action which would interfere with the organization of militia by the States of the Union.

Obviously, Federal firearms legislation does not hamper the present-day militia; that is, the National Guard, and the courts have held accordingly (see *United States* v. *Miller*, 307 U.S. 174 (1939); *Cases* v. *United States*, 131 F. 2d 916 (1st Cir. 1942), cert. denied, sub nom *Velasquez* v. *United States*, 319 U.S. 770 (1943); *United States* v. *Tot*, 131 F. 2d 261 (3d Cir. 1942, reviewed on other grounds, 319 U.S. 463 (1943); *United States* v. *Adams*, 11 F. Supp. 216 (S.D. Fla. 1935)).

It is sometimes contended that, aside from the second amendment, there is a natural right to bear arms, or a right stemming from a State constitution. However, it is well settled that there is nothing inherent in any such right that renders it absolute. The overwhelming majority of State cases hold that the legislature may prescribe regulations and limitations with regard to the carrying of weapons. It is clear, for example, that a State law prohibiting the carrying of revolvers without a license, or forbidding possession of concealed weapons, does not violate either the Federal or State constitution. And it is clear also that no body of citizens other than the organized State militia, or other military organization provided for by law, may be said to have a constitutional right to bear arms.

In summary, the decided cases, both at the Federal and State levels, reveal no constitutional barrier to the passage of S. 1592. To the contrary, they afford ample precedent for its validity.

It is of some importance here to point out that the American Bar Association was not impressed by the allegation that this legislation would violate the constitutional rights of citizens. Although this argument was made in the course of the proceedings, the house of delegates of the association at its 1965 annual meeting in Miami Beach, Fla., overwhelmingly (i.e., by a vote of 184 to 26) endorsed the enactment of this bill. The association reaffirmed its position on August 8, 1966, at its convention in Montreal when it adopted a resolution urging the Congress to adopt S. 1592.

THOMAS J. DODD.
BIRCH BAYH.
EDWARD M. KENNEDY.
JOSEPH D. TYDINGS.
HIRAM L. FONG.
JACOB K. JAVITS.
GEORGE A. SMATHERS.
EDWARD V. LONG.

SECTION-BY-SECTION ANALYSIS OF S. 1592, AS AMENDED

*Section 1*

This section, which was added to the bill by the subcommittee, would include an informative short title and provide that this act (which amends the Federal Firearms Act) may be cited as the State Firearms Control Assistance Amendments of 1966.

*Section 2*

This section, which was added to the bill by the subcommittee, would incorporate into the bill a statement of "findings and declaration."

In view of the misconceptions which have arisen concerning the nature and purpose of the bill, it is deemed desirable to include in the bill a definitive declaration of the bill's purpose and of the findings which justify its enactment.

*Subsection (a)*

Subsection (a) of section 2 contains findings and declarations as to the existence of the conditions with which the bill is designed to deal and of the action necessary to cope with those conditions. Each of these findings is fully supported by the evidence of record before the subcommittee.

Paragraph (1) is the basic finding and declaration that the existing Federal controls over the traffic in firearms moving in (or otherwise affecting) interstate or foreign commerce do not adequately enable the States to control the firearms traffic within their own borders through the exercise of their police power.

Paragraph (2) is the basic finding and declaration that the ease with which any person can acquire firearms (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States.

The subcommittee through its own investigations and by the evidence presented to the subcommittee by the Nation's leading law-enforcement officers, has established this fact beyond reasonable doubt.

Paragraph (3) is the basic finding and declaration that only through adequate Federal control over interstate and foreign commerce in firearms, and over all persons engaging in the businesses of importing, manufacturing, or dealing in firearms, can the grave problem of firearms getting into the wrong hands be properly dealt with, and effective State and local regulation of the firearms traffic be made possible.

Paragraph (4) is a specific finding that the acquisition on a mail-order basis of firearms by nonlicensed individuals, from a place other than their State of residence, has materially tended to thwart the effectiveness of State laws and regulations, and local ordinances.

70

Defs.' MSJ App. 291

This specific finding is documented by the evidence summarized in the August 7, 1964, Interim Report on Interstate Traffic in Mail Order Firearms (S. Rept. 1340, 88th Cong., 2d sess.) and by the further evidence submitted with regard to S. 1592 in the 89th Congress and summarized in the general statement regarding the bill under the discussion of the scope of coverage of the bill. (See p. 8.) The documentation of the existence of the problem of the interstate traffic in mail-order firearms is so complete that the Attorney General of the United States has described it to the committee as resulting in "unarguable evils."

Paragraph (5) is a specific finding and declaration that the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensee's place of business is located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms.

The evidence of record before the committee fully supports this finding and declaration. (See summary in the general discussion of the scope of coverage of the bill under the subheading "Out of State Purchase of Concealable Firearms," p. 12.) The existence of this problem has been so well established that even the principal opponents of S. 1592 who appeared before the subcommittee conceded the existence of this problem in the course of their subsequent appearances before the House Committee on Ways and Means.

Paragraph (6) is a specific finding and declaration that there is a causal relationship between the easy availability of firearms and juvenile and youthful criminal behavior, and that firearms have been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent, juveniles and minors prone to criminal behavior.

The subcommittee in the course of its investigation and hearing has fully established the basis for this finding and declaration. The subcommittee expressed its concern with regard to the causal relationship between the availability of firearms and juvenile and youthful criminal behavior in the interim report on August 7, 1964 (S. Rep. 1340, 88th Cong., 2d sess.), relating to the "Interstate Traffic in Mail Order Firearms."

This finding and declaration has been further supported by the evidence presented before the subcommittee in the 89th Congress during hearings on S. 1592. (See the summarization under the bill subheading on "Acquisition by Juveniles and Minors" in the general discussion of the scope of coverage of the bill.)

Paragraph (7) is a specific finding and declaration that the United States has become the dumping ground of the castoff surplus military weapons of other nations, and that such weapons, and the large volume of relatively inexpensive pistols and revolvers (largely worthless for sporting purposes), imported into the United States in recent years have contributed greatly to lawlessness and to the Nation's law enforcement problems.

This finding and declaration is fully supported by the evidence developed by the investigation of the subcommittee and by testimony before the subcommittee by the Attorney General of the United States, the attorneys general of California, New Jersey, and South Carolina, and by the police officials of Atlanta, Chicago, Los Angeles, New

Defs.' MSJ App. 292

York City, Philadelphia, St. Louis, and the District of Columbia. (See summary under subheading "Importation of Nonsporting and Military Surplus Firearms," in general discussion of the bill relating to scope of coverage.)

Paragraph (8) is a specific declaration and finding that the lack of adequate Federal control over interstate and foreign commerce in highly destructive weapons (such as bazookas, mortars, antitank guns, etc., and destructive devices such as explosive or incendiary grenades, bombs, missiles, etc.) has allowed such weapons and devices to fall into the hands of lawless persons, including armed groups who would supplant lawful authority, thus creating a problem of national concern.

This finding and declaration is fully supported by the investigations of the subcommittee and by the evidence presented at the hearings before the subcommittee.

The concern of Federal, State, and city law enforcement officers over this problem was made clear at the hearings before the subcommittee.   (See summary under subheading "Highly Destructive Weapons" in general discussion of the scope of coverage of the bill.)

Paragraph (9) is a specific finding and declaration that the existing licensing system under the Federal Firearms Act does not provide adequate license fees or proper standards for the denial of licenses, and that this has led to licenses being issued to persons not reasonably entitled thereto, thus distorting the purposes of the licensing system.

This finding and declaration is fully supported by investigations of the subcommittee and by the evidence presented by Federal, State, and city law enforcement officials at the hearings before the subcommittee.   (See summary under subheading "Licensing of Importers, Manufacturers, and Dealers" in general discussion of the scope of coverage of the bill.)

*Subsection (b)*

Subsection (b) of section 2 is designed and intended to remove certain public misconceptions as to the nature of the bill and is a general declaration that the purpose of the bill is to cope with the conditions referred to in the findings in subsection (a), and that it is not the purpose of the bill to place any undue or unnecessary restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap shooting, target shooting, personal protection, or any other lawful activity, and that the bill is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by regulations of any procedures or requirements other than those reasonably necessary to implement, and effectuate the provisions of the Federal Firearms Act (as it would be amended by S. 1592).

*Section 3*

This section (which was sec. 1 of the bill as introduced) would restate and amend section 1 of the Federal Firearms Act (52 Stat. 1250) which contains the definition of the meaning of certain terms used in the act.   This section, as amended by the subcommittee, would be divided into subsection (a) (containing definitions of terms) and subsection (b) (containing exclusions as to the application of certain terms as used in the act).

*Subsection (a)*

The definition of the term "person" in paragraph (1) is existing law (15 U.S.C. 901(1)).

The definition of the term "interstate or foreign commerce" is a re-statement of existing law (15 U.S.C. 901(2)). "Territory" is omitted since there is no territory at the present time. The last sentence of this definition is inserted to clarify the status of the act in Puerto Rico, the Virgin Islands, and the District of Columbia.

The definition of the term "firearm" in paragraph (3) is a restate-ment and revision of the provisions of existing law (15 U.S.C. 901(3)). The revised definition has been extended to include any weapon (in-cluding a starter gun) by whatsoever name known "which will," or "which may be readily converted to," expel a projectile or projectiles by the action of an explosive. This represents a much-needed clari-fication and strengthening of existing law designed to prevent circum-vention of the purposes of the act. As under existing law, the defini-tion also includes weapons "designed to" expel a projectile or projec-tiles by the action of an explosive, and firearm mufflers and firearm silencers.

The present definition of the term "firearm" includes "any part or parts" of a firearm. It has been impractical to treat each small part of a firearm as if it were a weapon. The revised definition substitutes the words "frame or receiver" for the words "any part or parts."

In addition, the definition of the term "firearm" is extended to in-clude any "destructive device" as defined in the proposed new defini-tion of this term contained in paragraph (4) of section 1(a). The effect of this inclusion is to make the provisions of the act applicable to all such destructive devices.

The subcommittee amended the definition of a "firearm" to specifi-cally include any starter gun designed for use with blank ammunition which will or which may be readily converted to expel a projectile or projectiles by the action of an explosive, in order to make it unequivo-cally clear that such starter pistols are firearms within the meaning of the Federal Firearms Act. Such so-called starter pistols which may be converted to fire a projectile by boring a hole through an obstruc-tion in the barrel, substitution of a barrel which will permit the firing of a projectile, or otherwise converted to fire a projectile have been a matter of serious concern to law-enforcement officers.

The definition of the term "destructive device" contained in para-graph (4) is a new provision.

The subcommittee has restated this definition for the purpose of clarifying its application.

As amended, the term "destructive device" means any explosive or incendiary (a) bomb or (b) grenade or (c) mine or (d) rocket or (e) missile or (f) similar device; and the term also includes any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile or projectiles by the action of an explosive, the barrel or barrels of which have a bore of one-half inch or more in diameter.

The restated exceptions to the application of the term "destructive device" are contained in paragraph (2) of subsection (b).

The first part of the definition of destructive device would bring under the coverage of the Federal Firearms Act certain highly de-structive weapons not now covered by the act. The part of the defini-

Defs.' MSJ App. 294

tion including firearms which have a bore of one-half inch or more in diameter would not extend the coverage of the present act (since existing law now applies to all firearms as defined in the act), but would rather subject such military-type weapons which have no recognized use for lawful sporting purposes to the restrictive controls provided under the bill for traffic in destructive devices.

The definition of the term "short-barreled shotgun" contained in paragraph (5) is a new provision. The definition describes a shotgun of the type which is subject to the provisions of the National Firearms Act (ch. 53 of the Internal Revenue Code of 1954). The purpose of the definition is to provide a convenient means of reference to weapons of this type.

The definition of the term "short-barreled rifle" contained in paragraph (6) is a new provision. The definition describes a rifle of the type which is subject to the provisions of the National Firearms Act (ch. 53 of the Internal Revenue Code of 1954). The purpose of the definition is to provide a convenient reference to weapons of this type.

The definition of the term "importer" is a new provision. Under existing law (15 U.S.C. 901(4)), the term "manufacturer" includes a person engaged in importation of firearms or ammunition for purposes of sale or distribution. It appears obvious that separate classifications should be provided for importers and manufacturers in order to more appropriately effectucate the purposes of the act.

The definition of the term "manufacturer" is a restatement of existing law (15 U.S.C. 904(4)) except that the references to importation have been deleted.

The definition of the term "dealer" is a restatement of existing law (15 U.S.C. 901(5)) with certain revisions. The definition also makes it clear that "pawnbrokers" are a type of dealer. This reflects proposed changes in other provisions of the act which would place pawnbrokers handling firearms in a special category and provide for higher license fees for procurement of licenses by pawnbroker dealers.

The definition of the term "pawnbroker" is a new provision. Pawnbroker dealers are covered under the provisions of the existing act in the same manner as other dealers. The purpose of this definition is to provide a basis for a separate classification of pawnbroker dealers. Under the provisions of the National Firearms Act (26 U.S.C. ch. 53), pawnbrokers are separately classified and charged a higher rate of special (occupational) tax than other dealers.

The definition of the term "indictment" is a new provision. Inasmuch as a person under indictment for certain crimes is proscribed from shipping or receiving firearms in interstate or foreign commerce, and a license under the act will not be issued to such a person, the definition will serve a useful purpose in making it clear that an "information" charging a crime is the same as an indictment charging a crime. This definition is in accord with the opinion of the court in *Quinones* v. *United States*, 161 F. 2d 79.

The definition of the term "fugitive from justice" is a restatement of existing law (15 U.S.C. 901(6)) with reference to "Territory" omitted since there is at the present time no such "Territory."

The definition of the term "antique firearm" contained in paragraph (13) is a new definition added by the subcommittee to the bill. The purpose is to provide by this definition (and par. (1) of subsec. (b)) for the exclusion of bona fide antique firearms (and replicas thereof) from the coverage of the Federal Firearms Act. As included in the

bill, the term "antique firearm" means any firearm of a design used before the year 1870 (including any matchlock, flintlock, percussion cap, or similar early type of ignition system) or replica thereof, whether actually manufactured before or after the year 1870 (but not including weapons designed for use with smokeless powder or using rimfire or conventional center-fire ignition with fixed ammunition).

Certain suggestions were made to the subcommittee to the effect that ready availability of ammunition on a commercial basis should be one of the principal criteria considered in determining whether a firearm was an antique. Under this concept, firearms using fixed ammunition and of a design developed after the year 1870, would be classed as antiques based on availability of ammunition. The subcommittee after careful study rejected this approach for two principal reasons: First, there are devices commercially available by which firearms can be adapted to fire ammunition other than that which the firearm was designed to fire. Second, there would be an inherent and undesirable uncertainty in this type of classification, dependent upon whether or not ammunition was (or was not) at any given time, readily available on a commercial basis.

The definition of the term "Secretary" or "Secretary of the Treasury" contained in paragraph (14) is a new provision. The purpose of this definition is to eliminate the necessity of repeating "Secretary of the Treasury or his delegate" in several sections of the act.

The definition of the term "ammunition" contained in paragraph (15) was amended by the subcommittee to exclude from the coverage of the Federal Firearms Act all ammunition, other than ammunition for a destructive device.

As revised, the term "ammunition" means ammunition for a destructive device. The term does not include shotgun shells or any other ammunition designed for use in a firearm other than a destructive device.

Under existing law (15 U.S.C. 901(7)), the term included pistol and revolver ammunition. However, an evaluation of the evidence developed in the hearings before the subcommittee showed that it is difficult to effectively control interstate and foreign commerce in conventional firearms ammunition used for sporting, recreational, and other lawful purposes. Therefore, the subcommittee decided to limit the coverage of the act, insofar as ammunition is concerned, to ammunition for highly destructive weapons. Strict controls can be effectively exercised in this area since there is no significant normal legitimate commerce in such ammunition (other than for military purposes which are exempt from coverage under sec. 4 of the Federal Firearms Act).

*Subsection (b)*

Subsection (b) is new. It contains exceptions to the applicability of certain terms as used in the Federal Firearms Act (as it would be amended by the bill).

Paragraph (1) provides that as used in the Federal Firearms Act, the term "firearm" shall not include an antique firearm. The term "antique firearm" is defined in paragraph (13) of subsection (a). The effect of this provision has is to make the Federal Firearms Act inapplicable to antique firearms.

An exception was provided in existing law for firearms held and possessed as an antique or curio but the Act contained no definition

Defs.' MSJ App. 296

of an "antique firearm." S. 1592, as introduced, proposed to delete this exception. The evidence presented at the hearings demonstrated the need for a properly defined and delineated exception for antique firearms. It was pointed out that in other countries which exercise strict controls over the traffic in firearms exemption from such controls is made for firearms which can properly be classified as antiques.

Paragraph (2) of subsection (b) is a new provision which contains exceptions to the applicability of the term "destructive device." The subcommittee has restated these exceptions and has specifically enumerated items not intended to be covered.

All antique firearms would be excluded by paragraph (1) since antique firearms are excluded from the application of the definition of "firearms."

As restated, this paragraph would provide that as used in the Federal Firearms Act the term "destructive device" would not include—

(A) a device which is not designed or redesigned or used or intended for use as a weapon; or

(B) any device, although originally designed as a weapon which is redesigned for use as a signaling, line throwing, safety or similar device; or

(C) any shotgun (other than a short-barreled shotgun); or

(D) any nonautomatic rifle (other than a short-barreled rifle) generally recognized or particularly suitable for use for the hunting of big game; or

(E) surplus obsolete ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of 10 U.S.C. 4684(2), 4685, or 4686; or

(F) any other device which the Secretary finds is not likely to be used as a weapon.

The exceptions contained in paragraph (2) are drafted in the same manner as the exceptions contained in 26 U.S.C. 5179(a) (relating to registration of stills) and section 5205(a)(2) (relating to stamps on containers of distilled spirits). Therefore, the decisions of the courts (*Queen* v. *United States*, 77 F. 2d 780; certiorari denied, 295 U.S. 755; and *Scherr* v. *United States*, 305 U.S. 251) to the effect that the Government is not required to allege or prove matter contained in an exception would be applicable. Establishment by a person that he came within the exception would be a matter of affirmative defense. Thus, an explosive device shown to be designed and intended for lawful use in construction or for other industrial purposes would be excepted. However, if the device were designed or used or intended for use, as a weapon, it would be subject to the provisions of the act.

A provision has been made in this paragraph that the Secretary may exclude from the application of the definition of "destructive device" any device which he finds is not likely to be used as a weapon. This provision makes it possible to deal with situations which may arise where there is no reasonable likelihood that the device will be used as a weapon.

Paragraph (3), which relates to the application of the term "crime punishable by imprisonment for a term exceeding one year" as used in the Federal Firearms Act, is a new provision. This provision was placed in subsection (b), rather than in subsection (a), since it merely excludes certain offenses from the application of this language as used in the Federal Firearms Act.

Prior to October 4, 1961, the Federal Firearms Act included provisions which made it unlawful for a person convicted of a crime of violence (as defined) in any court of the United States, a State or possession, to transport, ship, or receive any firearm in interstate or foreign commerce. S. 1750 (87th Cong., 1st sess.) amended the act by striking the definition of "crime of violence" and by striking that term wherever it appeared in the act and inserting in lieu thereof the term "crime punishable by imprisonment for a term exceeding one year." S. 1750 was introduced at the request of the Attorney General as an integral part of an anticrime legislative program. See House Report 1202 (87th Cong., 1st sess.). The felony criteria for prohibiting the transporting, shipping, or receiving of firearms incorporated in the act by S. 1740 has been retained to date.

However, the definition of "crime punishable by imprisonment for a term exceeding one year" proposed in the bill would modify the felony criteria by excluding antitrust-type violations. It may be noted that antitrust-type violations are not felonies under Federal law. However, a limited number of States have statutes making such offenses felonies. The definition would provide uniform treatment of such offenses, both State and Federal.

*Section 4*

Section 4 of the bill (sec. 2 of the bill as introduced) would amend section 2 of the Federal Firearms Act (15 U.S.C. 902), which relates to prohibited acts, to read as contained in the bill.

*Subsection (a)*

The subcommittee has rearranged and restated the provisions of subsection (a) of section 2 of the act as contained in the bill. This subsection is, in general, intended to aid in coping with the problems referred to in paragraphs (1) through (4) of the "Findings and Declaration" contained in subsection (a) of section 2 of the bill, including the problem of the interstate traffic in mail-order firearms.

The subsection, as amended by the subcommittee, would apply only with respect to the activities of persons engaging in the firearms business. Thus, there would be no possibility that a hunter, a person engaging in shooting competitions, a person moving his household belongings from one State to another, a person sending his firearm to another State for service, would be burdened or restricted in such activity by the provisions of this subsection.

As a related change, the subcommittee has amended section 5 of the Federal Firearms Act to provide a specific penalty for the shipment, transportation, or receipt of a firearm in interstate or foreign commerce with intent to commit therewith an offense punishable by imprisonment for a term exceeding 1 year (see sec. 7 of the bill for the detailed discussion of this new penalty provision).

Subsection (a) is derived in part from the provisions of existing law contained in subsection (a) and (b) of section 2 of the Federal Firearms Act (15 U.S.C. 902 (a) and (b)). Such provisions of existing law make it unlawful for any importer, manufacturer, or dealer, except an importer, manufacturer, or dealer licensed under the act, to transport, ship, or receive any firearm in interstate or foreign commerce, or for any person to receive any firearm transported or shipped in interstate or foreign commerce, by an unlicensed importer, manutransport, ship, or receive any firearm in interstate or foreign comfacturer, or dealer.

Defs.' MSJ App. 298

Subsection (a), as amended by the subcommittee, is aimed primarily at the activities of persons engaging in the business of importing, manufacturing, or dealing in firearms (or ammunition for destructive devices).

The effect of subsection (a), as amended, with respect to commercial transactions, is substantially the same as the effect of the subsection as contained in the bill as introduced.   It would have the effect of channeling interstate and foreign commerce in firearms to licensed importers, licensed manufacturers, and licensed dealers, thereby prohibiting the commercial mail-order traffic in firearms (other than rifles and shotguns subject to the provisions of paragraph (2)(C)) to unlicensed persons.   This will help the States to effectively control the firearms traffic within their own jurisdiction under the exercise of their police power granted to them under the Constitution.

Paragraph (1) of subsection (a) provides that it shall be unlawful for any importer, manufacturer, or dealer, except an importer, manufacturer, or dealer having a license issued under the provisions of the Federal Firearms Act to engage in the business of importing, manufacturing, or dealing in firearms (or ammunition for destructive devices) or to transport, ship, or receive any firearm (or ammunition for destructive devices) in interstate or foreign commerce.

This paragraph is essentially existing law, except for the specific prohibition against engaging in business without having first obtained a license under the provisions of the Federal Firearms Act.   This new language is keyed to the provisions of the first sentence of subsection (a) of section 3 of the Federal Firearms Act as contained in the bill, and the purpose of the basic requirement is discussed in the analysis of that provision.

Paragraph (2) of subsection (a) provides, in general, that it shall be unlawful for any importer, manufacturer, or dealer licensed under the provisions of the Federal Firearms Act to ship, transport, or cause to be shipped or transported, in interstate or foreign commerce, any firearm to any person other than a licensed importer, licensed manufacturer, or licensed dealer.

The effect of paragraph (2) is to channel the commercial traffic in firearms in interstate and foreign commerce through licensees in the various States so that the State into which a firearm is shipped will have authority to effectively control the transactions between the Federal licensees and the ultimate purchasers under the police power granted to the States by the Constitution.

The provisions of this paragraph would not, of course, be applicable in respect to transactions with the persons excepted under the provisions of section 4 of the act (15 U.S.C. 904), such as Federal or State agencies.   No specific exception is made in this section for the transactions with such persons, since such transactions are covered by section 4 of the Federal Firearms Act (as contained in sec. 6 of the bill).

However, four specific exceptions have been provided in the bill to the provisions of paragraph (2).

The first exception in subparagraph (A) provides that paragraph (1) of subsection (a) shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from returning a firearm to the sender (including a replacement firearm of the same kind, make, and type).   This provision is intended to accommodate interstate shipments of firearms for service or repair and to allow a dissatisfied

customer to have a substitute firearm of the same kind, make, and type shipped to such customer by a licensee.

The second exception in subparagraph (B) of paragraph (2) of subsection (a) provides that paragraph (1) of subsection (a) shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from shipping, or causing to be shipped, for conveyance in the mails, a firearm to any officer, employee, agent, or watchman eligible under the provisions of section 1715 of title 18 of the United States Code to receive through the mails, for use in connection with their official duty, pistols, revolvers, and other firearms capable of being concealed on the person. This will allow interstate shipments by mail of firearms by licensees to persons who are, under existing law, authorized to receive through the mails firearms capable of being concealed on the person for use in connection with their official duties.

The third exception in subparagraph (C) of paragraph (2) of section 2(a) of the act as contained in the bill exempts from the prohibition against shipment or transportation in interstate or foreign commerce of firearms by licensees to nonlicensed persons rifles and shotguns which are suitable for sporting purposes but which are not military surplus. The exemption is conditioned on the obtaining of an affidavit from the prospective consignee attesting to the legality of the shipment and receipt of the firearm. The provision also makes it unlawful for a licensee to ship or transport in interstate or foreign commerce to a nonlicensed person such rifle or shotgun without first notifying the principal law enforcement officer of the locality to which the rifle or shotgun is to be shipped. These controls are designed to assure against commercial interstate mail-order shipment to persons ineligible under Federal or applicable State law to receive a rifle or shotgun, and to advise interested local law enforcement officers of the transaction in order that they may have an opportunity to establish the prospective recipient's qualifications under State law for receipt or possession of a rifle or shotgun and to take any action deemed appropriate.

In addition, subparagraph (C) provides (1) that the Governor of any State may designate any official in his State to receive the notification to local law enforcement officials required by this subparagraph and that the Secretary shall publish such designation in the Federal Register; and (2) that the Governor of any State may request that the Secretary discontinue the required notification to local law enforcement officials in his State or any part thereof and upon publication in the Federal Register, the request shall be in effect for 5 years, unless withdrawn by the Governor and so published in the Federal Register.

The fourth exception in subparagraph (D) of paragraph (2) of subsection (a) of section 2 of the act as contained in the bill is the exception for the District of Columbia, the Commonwealth of Puerto Rico, and the possessions of the United States. This provides that nothing in paragraph (2) shall be construed as applying in any manner in the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, or a possession, differently than it would apply if such place were a State of the United States. This provision is intended to make it clear that the prohibitions of this paragraph are not intended, by reason of the definition of the term "interstate or foreign commerce," to apply to over-the-counter sales, or transportation within such places.

The decisions of the courts (*Queen* v. *United States*, 77 F. 2d 780, cert. den. 295 U.S. 755; and *Scherr* v. *United States*, 305 U.S. 251) to the effect that the Government is not required to allege or prove matter contained in an exception would be applicable to the exceptions contained in paragraph (2) of this subsection. Establishment by a person that he came within the exception would be a matter of affirmative defense.

Paragraph (3) of subsection (a) of section 2 of the act as contained in the bill would make it unlawful for any person, in purchasing or otherwise obtaining or attempting to purchase or otherwise obtain a firearm from a licensee licensed under this act, knowingly to supply any false or spurious information or identification intended or calculated to deceive such licensee with respect to such person's identity, age, address or criminal record (if any), or with respect to any other material fact pertinent to the lawfulness of a sale or other disposition of a firearm by a licensed importer, licensed manufacturer, or licensed dealer under the provisions of subsections (b) and (c) of section 2 of the act.

Paragraph (4) of section 2(a) of the act as contained in the bill is a new provision which would make it unlawful for any person to bring into or receive in the State where he resides a firearm purchased outside that State if it is unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.

*Subsection (b)*

Subsection (b) of section 2 of the act, as contained in the bill, is a new provision which is intended to regulate the over the counter disposition of firearms by federally licensed importers, manufacturers, and dealers, to persons other than licensees under the act.

The subcommittee has made certain amendments to this subsection to set forth more specifically the procedures intended to be followed and the exact nature of the acts which are prohibited.

In order for the records of disposition required to be kept by licensees to have significant value or validity, it is essential that the licensees be required to ascertain by reliable means of identification the age and identity of the purchaser and the address of the place where he resides.

Paragraph (1) of subsection (b), as amended by the subcommittee, would make it unlawful for any licensee under the Federal Firearms Act to sell or otherwise dispose of any firearm to any person without ascertaining through some reliable means of identification, such as a motor vehicle driver's license, or other comparable document (which is required to be noted in the licensee's records), the identity, date of birth (in the case of an individual) and place of residence (or place of business in the case of a corporation or other business entity) of such person.

It is intended that the place of residence to be established under this provision be the place where the person is actually residing, other than on a transient basis.

Under paragraph (2) of subsection (b), as amended by the subcommittee, it would be unlawful for a federally licensed importer, federally licensed manufacturer, or federally licensed dealer, to sell or otherwise dispose of any firearm to any person who (in the case of an individual) he knows or has reasonable cause to believe is under 21

years of age (except for a shotgun or rifle) and under 18 years of age in the case of a shotgun or rifle.

The subcommittee amendment to paragraph (2) inserted the words "knows or has reasonable cause to believe." This change does not relieve the licensee from the requirement of ascertaining the age of the purchaser as provided in paragraph (1) of subsection (b).

The provisions of paragraph (2) of subsection (b) of section 2 of the act, as contained in the bill, provide uniform and effective means throughout the United States for preventing the purchasing of the specified firearms by persons under such ages. The procuring of firearms by juveniles (often without the knowledge or consent of their parents or guardians) has become a matter of national concern. The tragic consequences of this situation have been fully brought out in the proceedings of the subcommittee.

Under this provision a minor or juvenile would not be restricted from owning or learning the proper usage of a firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian.

The subcommittee amended paragraph (3) of subsection (b) of section 2 of the act, as contained in the bill, by substituting the words "does not reside in" for the words "is not a resident of" to make it clear that this provision is to be construed as referring to actual place of residence rather than the legal or voting residence. However, it is not intended that premises occupied only on a transient basis be considered the place of residence for the purpose of this subsection.

As amended by the subcommittee, the provisions of paragraph (3) prohibiting licensees under the act from selling a firearm (other than a shotgun or rifle) to an unlicensed individual who is a resident of a State, other than that in which the importer's, manufacturer's, or dealer's place of business is located, is intended to deal with the very serious problem of individuals going across State lines to procure firearms which they could not lawfully procure or possess in their own State and without the knowledge of their local authorities. The hearings before the subcommittee have fully demonstrated the ease with which residents of a particular State, which has laws regulating the purchase of firearms, can circumvent such laws by procuring a firearm in a neighboring jurisdiction which has no such controls on the purchase of firearms. The hearings have also shown that this is a common means by which criminal and lawless elements obtain firearms.

Paragraph (4) of the subsection would make it unlawful for any federally licensed importer, manufacturer, or dealer to sell or otherwise dispose of any firearm to any person who, by reason of State or local law, regulation, or ordinance, applicable to the place of sale or other disposition, may not lawfully receive or possess such firearm.

The conditions imposed by this subsection on the operations of persons licensed under the act are deemed to be reasonable conditions on the privilege granted to them, and necessary to effective control of interstate and foreign commerce in firearms, and to protect the public welfare.

*Subsection (c)*

Subsection (c) of section 2 of the act, as contained in the bill, is a new provision which, like subsection (b), deals with the activities of

Defs.' MSJ App. 302

licensed importers, licensed manufacturers, and licensed dealers. This subsection would make it unlawful for any such importer, manufacturer, or dealer to sell or otherwise dispose of any firearm or ammunition to any person (other than a licensee) knowing, or having reasonable cause to believe, that such person is under indictment or has been convicted in any court of the United States, or of a State (as defined in par. (2) of sec. 1(a) of the act, as contained in the bill) or possession, of a crime punishable by imprisonment for a term exceeding 1 year, or who is a fugitive from justice. In other words, licensees would be prohibited from knowingly disposing of firearms or ammunition to felons, fugitives from justice, or persons under indictment for a felony. The subcommittee deleted from subsection (c) of section 2 of the act, as contained in the bill originally introduced, the final clause thereof which would have made it unlawful for a licensed importer, licensed manufacturer, or licensed dealer to ship or transport any firearm in interstate or foreign commerce to any person who could not have lawfully received such firearm under the provisions of subsection (a) of section 2 of the act, as contained in the bill originally introduced. A provision to achieve a comparable purpose is now found in subsection (a)(2) of section 2 of the act, as contained in the amended bill.

*Subsection (d)*

Subsection (d) of section 2 of the act, as contained in the bill, is existing law (15 U.S.C. 902(e)) except that the words "in any court" have been inserted to conform the language of subsection (e).

*Subsection (e)*

Subsection (e) of section 2 of the act, as contained in the bill, is a restatement of existing law (15 U.S.C. 902(f)) revised to include persons under indictment. The omission of these persons from existing law appears to have been an inadvertent omission since such persons are, under existing law (15 U.S.C. 902(e)), prohibited from shipping or transporting firearms in interstate or foreign commerce. Also, the presumption contained in existing law has been eliminated, since it was declared unconstitutional by the Supreme Court in *Tot* v. *United States*, 319 U.S. 463.

*Subsection (f)*

Subsection (f) of section 2 of the act as contained in the bill is a new provision which would make it unlawful for any person (including a licensee under the act) knowingly to deposit, or cause to be deposited for mailing, or delivery by mail, or knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, any package or other container in which there is any firearm, without written notice to the Postmaster General or his delegate or to the carrier (as the case may be) that a firearm is being transported or shipped. This provision is correlated to the provisions of section 2(g) of the act as contained in the bill. Further, the testimony before the subcommittee disclosed the existence of a practice of surreptitiously shipping firearms, without notice or disclosure, to circumvent requirements of Federal or State law.

Defs.' MSJ App. 303

*Subsection (g)*

The subcommittee has amended subsection (g) of section 2 of the act as contained in the bill since the amendments made to subsection (a) require a restatement of the provisions applicable to carriers.

As amended, subsection (g) of section 2 of the act as contained in the bill contains two paragraphs.

Paragraph (1) prohibits a common or contract carrier from delivering in interstate or foreign commerce any firearm to any person knowing or having reasonable cause to believe that such person is under 21 years of age (or under 18 years of age in the case of a rifle or shotgun).

Paragraph (2) prohibits a common or contract carrier from delivering a firearm in interstate or foreign commerce to any person with knowledge or with reasonable cause to believe that the receipt or possession of the firearm by the person to whom it is delivered would be in violation of the laws or ordinances of the State (or political subdivisions thereof) in which the delivery is made.

A similar requirement is also provided with respect to delivery of firearms in the U.S. mails.

The provisions of this subsection are in furtherance of the purposes of the bill to restrict acquisition of firearms by juveniles and minors and to aid the States and their political subdivisions in achieving effective firearms controls.

*Subsection (h)*

Subsection (h) of section 2 of the act as contained in the bill is existing law (15 U.S.C. 902(g)) and relates to the transportation or shipment of stolen firearms.

*Subsection (i)*

Subsection (i) of section 2 of the act as contained in the bill is a restatement of existing law (15 U.S.C. 902(h)). The language has been revised to correspond with other comparable provisions of Federal law pertaining to the receipt or sale of stolen property "moving as, or which is a part of, or which constitutes interstate or foreign commerce," (see 18 U.S.C. 2313 relating to sale or receipt of stolen vehicles). This change will make it clear that the provisions apply to stolen firearms or ammunition transported in interstate or foreign commerce, after having been stolen, as well as to firearms and ammunition stolen in the course of movement in interstate or foreign commerce.

*Subsection (j)*

Subsection (j) of section 2 of the act as contained in the bill is a restatement of existing law (15 U.S.C. 902(i)) relating to firearms from which the manufacturer's serial number has been removed, obliterated, or altered. The restatement makes applicable the provisions of the subsection to an importer's serial number, as well as the manufacturer's, since importers and manufacturers are separately classified under the provisions of the bill. The restatement also deletes the words "and the possession of any such firearm shall be presumptive evidence that such firearm was being transported, shipped, or received as the case may be, by the possessor in violation of this act" since the presumption is meaningless in view of the decision of the Supreme Court in *Tot* v. *United States*, 319 U.S. 463.

### Subsection (k)

Subsection (k) of section 2 of the act as contained in the bill is a new provision which would make it unlawful for any person to import or bring into the United States, or any possession thereof, any firearm in violation of the provisions of this act or to import or bring into the United States or any possession thereof any ammunition for a destructive device.   This provision is correlated to the provisions relating to importation of firearms contained in section 3(e) of the act as contained in the bill.

### Subsection (l)

Subsection (l) of section 2 of the act as contained in the bill is a new provision which would make it unlawful for any person to knowingly receive any firearm or ammunition which has been imported or brought into the United States, or any possession thereof, in violation of the provisions of this act.   This subsection also is correlated to the provisions of section 3(e) of the act as contained in the bill relating to importation.

### Section 5

Section 5 of the bill (which was sec. 3 of the bill as introduced) would amend section 3 of the Federal Firearms Act (15 U.S.C. 903) which relates to licensing of importers, manufacturers, and dealers, and to recordkeeping by licensees.

### Subsection (a)

Subsection (a) of section 3 of the act, as contained in the bill, is a restatement and revision of existing law (15 U.S.C. 903(a)).

The first sentence of subsection (a) is intended to make it clear that no person shall engage in business as an importer of firearms, or as a manufacturer of firearms, or as a dealer in firearms (or ammunition for destructive devices) until he has filed an application with, and received a license to do so from the Secretary.   In order to effectively regulate interstate and foreign commerce in firearms (and ammunition for destructive devices) it is necessary that all persons engaging in these businesses be licensed.   Similar provisions were upheld in *Hanf* v. *United States*, 235 F. 2d 710, cert. den. 352 U.S. 880, as reasonably necessary to effective control of interstate and foreign commerce under comparable conditions.

The legislative record before the subcommittee concerning the traffic in firearms amply demonstrates that the licensing of all persons engaged in the business of importing, manufacturing, or dealing in firearms is an appropriate and necessary means to the attainment of the legitimate end of effective control over the interstate traffic in firearms. A full discussion of the constitutional basis for this provision (and other provisions) is contained in the memorandum submitted by the Attorney General of the United States, Nicholas deB. Katzenbach, when he testified before the subcommittee on May 19, 1965.   This memorandum is included in the record of the hearings following the testimony of the Attorney General.

The second sentence of subsection (a) provides that the application for a license shall be in such form and contain such information as the Secretary of the Treasury shall by regulations prescribe.   It is the intent of this provision to authorize the Secretary to require the submission of information reasonably relevant to the determination as to whether the applicant is entitled to a license under the standards

prescribed in subsection (c).  Since the Secretary has the responsibility for determining whether the license should be issued, he must necessarily have the authority to require the submission by the applicant of information relevant to his determination as to the applicant's eligibility.  Authority to prescribe the form of the license application has been exercised by the Secretary since the Federal Firearms Act was enacted in 1938, and the evidence presented to the subcommittee demonstrated that only information relevant to the issuance of a license has been required on the prescribed application form.

The provision that applicants shall be required to pay a fee for obtaining their license "for each place of business" is merely a clarification of existing law, since existing law is now so construed (see 26 CFR 177.33).  It is intended that the license cover only the specific place of business for which it is issued.

Under existing law, an importer is required to obtain a license as a manufacturer.  The bill provides a separate classification for importers, and under subsection (a) an importer would be required to obtain a license as such.

Under existing law, the applicant, if a manufacturer or importer, paid a fee of $25 per annum, and, if a dealer, a fee of $1 per annum. These fees are completely unrealistic and, in the case of dealers represent only a fraction of the cost of processing an application and issuing a license.  Further, the information presented at the public hearings held by the subcommittee established the fact that many persons holding licenses as dealers under the Federal Firearms Act are not bona fidely engaged in business as such, but nevertheless have due to the nominal license fees and the absence of statutory standards for the issuance of licenses, obtained licenses.  This information is summarized in the general discussion of the provisions of the bill regarding the scope of coverage under the subheading "Licensing of Importers, Manufacturers, and Dealers."  In order for the licensing system under the act to serve its intended purpose, it is essential that this situation be corrected.

Under the provisions of subsection (a) of section 3 of the act as contained in the bill the license fees would be increased to a figure which would make it unlikely that any person not bona fidely engaged in business as an importer, manufacturer, or dealer would attempt to obtain a Federal Firearms Act license.  The increased license fees would be such as to not only cover the cost of processing an application and issuing the license, but would partially defray the cost of conducting the investigation contemplated by the provisions of section 3(c) of the act as contained in the bill to determine the qualifications of the applicant and whether or not he would be likely to conduct his operations in compliance with the act.

A separate classification and higher fees are provided in the case of a manufacturer or importer of, or a dealer in, "destructive devices" as defined in paragraph (4) of subsection (a) of section 1 of the act, as contained in the bill.  Since "destructive devices" are not ordinary articles of commerce, it is anticipated that very few such licenses will be issued.  The purpose of this separate classification and higher fee with respect to such devices is to make more effective the stringent controls imposed under the bill with regard thereto.

A separate license with a higher license fee is also provided for pawnbroker dealers.  A "pawnbroker" is defined in section 1(a) of the bill. It may be noted that under the National Firearms Act (26 U.S.C. ch.

Defs.' MSJ App. 306

53) pawnbroker dealers are charged a higher rate of occupational tax than other dealers.

The bill provided a fee of $100 per annum for dealers (other than dealers in destructive devices and pawnbrokers). The evidence presented at the hearings before the subcommittee showed that the $100 dealer fee would work a hardship on small dealers, particularly dealers in sporting ammunition and dealers in sporting rifles and shotguns.

The amendment to the bill eliminating ammunition (other than ammunition for destructive devices) means that the substantial number of persons who deal only in ammunition will not be required to obtain a license under the act. Thus, ammunition reloaders and ammunition dealers will not be affected by the bill.

The subcommittee further amended the bill to provide a basic license fee of $10 per annum for dealers (other than pawnbrokers and dealers in destructive devices). This will materially reduce the burden on small dealers while retaining a fee sufficiently high to discourage filing of applications by persons not genuinely engaged in business as dealers in firearms.

It is contemplated that investigations will be conducted to determine suitability of licensees and prospective licensees under the new licensing standards discussed below in subsection (c). Because the annual license fee for dealers (other than pawnbrokers or dealers in destructive devices) is being reduced to $10 and in order to partially defray the expense of a one-time investigation of such dealers the subcommittee has provided that for the first renewal following the effective date of the amendments to the Federal Firearms Act made by this bill or for the first year he engages in business such a dealer will pay a license fee of $25.

It is deemed that the fees provided in the bill as amended by the subcommittee will be adequate for the purposes intended and will partially defray the costs of investigation of applications and of administration of the Federal Firearms Act, as amended by the bill.

*Subsection (b)*

Subsection (b) of section 3 of the act as contained in the bill is a restatement and revision of the provisions of existing law (15 U.S.C. 903(b)). Existing law provides that upon payment of the prescribed fee the Secretary of the Treasury shall issue to such applicant a license which shall entitle the licensee to transport, ship, or receive firearms and ammunition in interstate or foreign commerce unless and until the license is suspended or revoked in accordance with the provisions of the act. It will be noted that in existing law there are no specific conditions on the issuance of a license other than the payment of the prescribed fee. However, in view of the existing proscriptions in section 2 of the act against the shipment, transportation, or receipt in interstate or foreign commerce in firearms or ammunition by a person who is a fugitive from justice, or who has been convicted of, or who is under indictment for, any offense punishable by imprisonment for a term exceeding 1 year, the act has consistently been construed as precluding the issuance of licenses to such persons since it would be illegal for them to engage in the transactions covered by the license. (See 26 CFR, pt. 177.)

The revision of section 3(b) makes it clear that the privileges granted to the licensee are not unlimited or unconditional but are subject to the provisions of this act and other applicable provisions

of law, and also that an application for a license (including a renewal application as well as an original application) may be denied under the conditions set forth in section 3(c) of the act as contained in the bill.

*Subsection (c)*

Subsection (c) of section 3 of the act as contained in the bill is basically a new provision, except to the extent that it incorporates the construction of existing law to the effect that a license will not be issued to a person who is prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under the provisions of section 2 of the act (i.e., a person who has been convicted of, or who is under indictment for, a felony, or who is a fugitive from justice).

The existing provisions of the Federal Firearms Act, regarding the issuance of licenses, represent an anomaly to the general practice with regard to the issuance of licenses or permits in that the act contains no standards for the issuance or denial of a license, such as are contained in other comparable acts. (See 26 U.S.C. 5271(c) and 5712, and 27 U.S.C. 204(a)(2).)

Further, the existing weak provisions of the act do not grant any discretion with regard to the issuance of licenses to importers, manufacturers, and dealers, but rather provide that upon payment of the prescribed nominal fee that the Secretary of the Treasury "shall" issue the license applied for.

Since under existing law it would be unlawful for an importer, manufacturer, or dealer to ship or receive firearms in interstate or foreign commerce without a license, it is necessary to issue licenses upon the allegation of applicants that they "intend" to engage in such business. However, under existing law there is no specific statutory basis for denying an application submitted by a person who is not yet engaged in the firearms business and who does not intend to engage in the business with respect to which he is submitting an application for a license. While there may be implied authority in existing law to deny applications under such conditions, there are significant legal and administrative problems involved in taking such action under existing law.

In view of the magnitude of this problem (e.g., Secretary Fowler estimated that possibly 50,000 licenses had been issued to persons who may not be engaged in the business covered by the license) as developed at the hearings, it is essential that there be no doubt as to the authority of the Secretary of the Treasury or his delegate to deny license applications in cases where the applicant is not engaged in the applicable business, and does not intend to engage in such business. Therefore, the subcommittee has restated the provisions of paragraph (2) of subsection (c) to make it completely clear that the Secretary of the Treasury or his delegate may deny an application for a license where the applicant is not engaged in the business and there is good cause to believe that he will not engage in the business during the term of the license applied for.

The hearing record shows that the nominal license fees and other inadequacies of existing law have resulted in an untenable situation which urgently needs correction and it is noted that Secretary of the Treasury Henry H. Fowler in his appearance before the subcommittee on May 19, 1965, stated, that as the head of the Department responsible for the administration of the Federal Firearms Act that he was

"particularly anxious that the changes proposed in the bill with respect to the issuance of licenses to manufacture, import, and deal in firearms be adopted."   The Attorney General of the United States, Nicholas deB. Katzenbach, who testified before the subcommittee on the same date, stated that the changes in the licensing provisions provided in the bill were intended to "give reasonable discretion to the Secretary of the Treasury as to who should be licensed to manufacture, import, or deal in the deadly weapons with which the Federal Firearms Act is concerned," and "to bring about a higher level of responsibility in the firearms trade."

Subsection (c) of section 3 of the act as contained in the bill eliminates the anomalous situation with respect to the licensing system contained in existing law and sets forth specific standards under which an application shall be disapproved and the license denied, after notice and opportunity for hearing.

The standards provided in subsection (c) are very similar to the standards provided in 26 U.S.C. 5271(c) (relating to permits to procure, deal in, or use specially denatured distilled spirits); 26 U.S.C. 5712 (relating to permits for manufacturers of tobacco products); and to 27 U.S.C. 204 (relating to wholesale dealers in liquors, importers of liquors, etc.) under which the Treasury Department has issued over 25,000 permits.   The principal standard in all three of the statutes cited is the implied standard recognized by the Supreme Court in the *Ma-King* case (*Ma-King* v. *Blair,* 271 U.S. 479).

The record and reputation of the applicant as well as relevant and significant association with persons with a criminal record or reputation would be the principal basis for finding that the applicant is not likely to maintain operations in compliance with the Federal Firearms Act.   (See *Seaway Beverages, Inc.* v. *Dillon, et al.,* 319 F. 2d 722, cert. den. 375 U.S. 923; and *Pincourt* v. *Palmer,* 190 F. 2d 390, which construe the language of the standards set forth in par. (2).)

The hearing and appeal procedures provided by the Administrative Procedure Act (act of June 11, 1946, 5 U.S.C. 1001 et seq.) would, as in the case of the permits provided for in title 26, United States Code, sections 5271 and 5712, be applicable with respect to license proceedings under the Federal Firearms Act.

The provisions of paragraph (2) relating to individuals possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association, are necessary to preclude felons or other individuals who could not obtain a license as an individual from using a corporation or other business organization to conduct their operations.   In the past, individuals convicted of a felony have formed corporations for the purpose of continuing their firearms operations.

The provisions of paragraph (5) would preclude the issuance of licenses to applicants who do not have, or do not intend to have or maintain, bona fide business premises for the conduct of the business. This provision will be a definite aid in limiting licensees under the Federal Firearms Act to persons bona fidely engaged in business, and assuring that there will be an appropriate place that is subject to proper inspection where the required records will be maintained.

The information developed at the public hearings held by the subcommittee disclosed a definite need for such a provision.   It was shown that in some cases importers or dealers maintained no regular place of business which could be found, and conducted their operations

through post office boxes, mail drops, answering services, etc., or from a vehicle, vessel, or aircraft which moved from place to place.

It is not intended that a building also used as a dwelling be precluded from being the place of business. However, in such cases the part of the building intended as the business premises should be designated as such and the records maintained in the designated area available for inspection as provided in subsection (g).

*Subsection (d)*

Subsection (d) of section 3 of the act as contained in the bill replaces the provisions of existing law contained in section 3(c) of the act (15 U.S.C. 903(c)) and reflects the construction of existing law as contained in current regulations (26 CFR part 177).

The requirement of existing law, concerning the posting of a bond by a licensee convicted of a violation of the act in order to continue operations pending final disposition of the case on appeal, serves no useful purpose, and has been omitted. Further, the provisions of this subsection have been revised to simplify administration. Since the licensee is required to reapply each year for a license, the information on the application relating to his indictment and/or conviction will be adequate. Also, the license itself can, as at present, contain a warning that the licensee cannot continue operations once his conviction has become final (other than as provided in sec. 11).

As under existing law and regulations, a new license will not be issued to a person under indictment for, or who has been convicted of, an offense punishable by imprisonment for a term exceeding 1 year. However, a licensed importer, licensed manufacturer, or licensed dealer may continue operations pursuant to his existing license (provided that prior to the expiration of the term of the existing license timely application is made for a new license), during the term of such indictment and until any conviction pursuant to the indictment becomes final, whereupon he shall be subject to all provisions of this act, and operations pursuant to such license shall be discontinued. If a bona fide application for relief is filed under section 11, operations may continue until such application is acted upon.

*Subsection (e)*

Subsection (e) of section 3 of the act as contained in the bill is a new provision designed to bring under control the flow of surplus military weapons and other firearms being imported or brought into the United States which are not particularly suitable for target shooting, hunting, or any other lawful purpose.

The operations of certain importers of and dealers in such firearms has reflected a flagrant disregard of the public interest.

The interim report made by the subcommittee with respect to the "Interstate Traffic in Mail-Order Firearms" (S. Rept. 1340, 88th Cong., 2d sess.) pointed out that such firearms are a principal source of supply to juvenile delinquents and other lawless elements. This report also indicated that many of these firearms were in such poor condition, or of such poor workmanship, that their use would be hazardous.

The further evidence now of record before the committee fully supports and justifies the halting of this senseless flow of imported surplus military and non-sporting-type firearms which have found their way into the hands of criminal and lawless elements across the United States. Many of the Nation's leading law enforcement officials have

Defs.' MSJ App. 310

testified regarding the wide usage of such firearms in the commission of crimes and of their serious and destructive effect on law enforcement. They have also testified as to the unsafe character to the user of many such firearms, particularly the converted starter pistols, the rebored weapons, and the firearms with insufficient safety features. The testimony concerning the problems created by the importation of such firearms is more fully set forth in the general discussion of the provisions of the bill relating to scope of coverage under the subheading dealing with the "Importation of Nonsporting and Military Surplus Firearms."

One particularly disturbing facet of the traffic in military surplus firearms involves the importation of antitank guns, bazookas, mortars, and similar larger caliber weapons. One importer told the subcommittee that he alone had imported over 4,000 such weapons. These firearms have not been imported for national defense purposes, but for indiscriminate sale to anyone with the purchase price, including lawless elements.

Under the provisions of subsection (e), no person could import or bring firearms into the United States or a possession thereof, except upon authorization by the Secretary. Such authorization would not be issued under the provisions of this subsection unless it was established to the satisfaction of the Secretary that certain conditions designed to protect the public interest had been met.

These provisions would not prohibit the importation of currently produced firearms which are in safe firing condition and which are particularly suitable for sporting purposes; nor would they prohibit the importation of military surplus rifles or shotguns as long as they meet adequate safety standards, are suitable for, or readily adaptable to, sporting purposes and are not "firearms" as defined in the National Firearms Act. Therefore, there would be no interference with the bringing in of rifles or shotguns, or of pistols or revolvers (not military surplus), of recognized quality which are used for hunting and other recreational purposes or for personal protection.

Also firearms could be brought in for scientific or research purposes, or for use in connection with competition or training pursuant to chapter 401 of title 10 of the United States Code; or if they were unserviceable (not readily restorable to firing condition) and were intended as curios or museum pieces. Also any antique firearm (as defined) could be brought in since such firearms are excluded from the coverage of the Federal Firearms Act. A firearm which had previously been taken out of the United States (or a possession) could be brought back in by the person who took it out. This is to accommodate travelers, hunters, and American personnel stationed in foreign countries.

*Subsection (f)*

Subsection (f) of section 3 of the act as contained in the bill is a new provision relating to the sale or other disposition of destructive devices, machineguns, short-barreled shotguns, and short-barreled rifles by licensee to nonlicensees. This provision is imposed as a condition on the privilege granted the licensee to engage in interstate or foreign commerce with respect to such firearms. Since these are not ordinary articles of commerce, it is not expected that there will be any significant volume of transactions falling within the application of the subsection. However, it is deemed to be in the public interest to place

Defs.' MSJ App. 311

adequate controls over the disposition of these highly destructive weapons by licensees to nonlicensed persons.

*Subsection (g)*

Subsection (g) of section 3 of the act as contained in the bill is a restatement and revision of the recordkeeping requirements of existing law (15 U.S.C. 903(d)). Under existing law and regulations (26 CFR 177.51), licensees are required to maintain complete and adequate records reflecting the importation, production, and disposition at wholesale and retail of firearms, and the records are required to be kept available for inspection by internal revenue officers during regular business hours (26 CFR 177.54).

The restatement of the recordkeeping requirements contained in this subsection would make clear in the statute the requirement that the records be made available for inspection at all reasonable times, and the authority of the Secretary or his delegate to enter during business hours the premises of the licensee for inspection purposes.

The subsection also makes clear the authority of the Secretary, by regulations, to require the submission of reports concerning the operations of licensees.

Particularly as to manufacturing and importing operations the submission of information as to the number and types of firearms manufactured and imported might prove to be desirable and in the public interest. The hearings held regarding the bill have demonstrated the difficulty of readily obtaining reliable information in this regard. Also there may be other situations in which the submission of information could be of significant value, as for example retail sales of firearms in unusual quantities which might be destined for armed groups who would supplant lawful authority or for illicit exportation for purposes for which an export license could not be obtained.

There is no provision of S. 1592 which requires, provides for, or authorizes the Secretary or his delegate to institute a national firearms registration procedure under the Federal Firearms Act, and it is not intended that S. 1592 be used as the statutory basis for the national registration of firearms.

If it should be deemed necessary or desirable to provide for the national registration of firearms (other than as provided in the National Firearms Act; 26 U.S.C. ch. 53), it is intended that such registration be by specific congressional authorization and not pursuant to any regulatory discretion granted under the terms of this bill.

It has been existing practice to make available to State and local law enforcement officers information obtained from the required records of licensees for law enforcement purposes (e.g., tracing the ownership of a firearm found at the scene of the crime). The subsection would provide specific statutory authority for this practice.

It may be noted that the entry and inspection provisions contained in this subsection are similar to those provided in 26 U.S.C. 5146 with regard to the premises of liquor dealers. If there is to be proper enforcement of the Federal Firearms Act, it is essential that there be clear statutory authority to enter the premises where the business is carried on in order to inspect the records which are required to be maintained pursuant to the act.

*Subsection (h)*

Subsection (h) of section 3 of the act as contained in the bill is a new provision which would require licenses issued to importers, manufacturers, and dealers under the provisions of this section to be kept posted and available for inspection on the business premises covered by the license.

*Subsection (i)*

Subsection (i) of section 3 of the act as contained in the bill is a new provision. Existing law (15 U.S.C. 902(i)) makes it unlawful for any person to transport, ship, or knowingly receive in interstate or foreign commerce, any firearm from which the manufacturer's serial number has been removed, obliterated, or altered. Under the statutory authority to prescribe regulations to carry out the provisions of the act (15 U.S.C. 907), the Secretary has prescribed regulations requiring the identification of firearms (26 CFR 177.50). Subsection (i) would include in the act specific statutory authority for the Secretary to require licensed importers and licensed manufacturers to identify firearms in the manner prescribed by regulations.

*Section 6*

Section 6 of the bill (which was sec. 4 of the bill as introduced) amends section 4 of the Federal Firearms Act. Section 4 of the act as contained in the bill is a restatement of existing law (15 U.S.C. 904). However, the section as contained in the bill eliminates certain of the exceptions in existing law.

Section 4 of the act as contained in the bill contains the exception in existing law (15 U.S.C. 904) applicable in respect to transportation, shipment, receipt, or importation of firearms or ammunition imported for or sold or shipped to, or issued for the use of (1) the United States or any department, independent establishment, or agency thereof, or (2) any State or possession, or the District of Columbia, or any department, independent establishment, agency, or any political subdivision thereof. Such transactions are completely exempt from all provisions of the act.

The exemptions in existing law for certain nongovernmental activities have been omitted. Such omission does not mean that firearms or ammunition (for destructive devices) cannot be shipped to, or procured by, the omitted persons. Rather, it means that the omitted persons will be required to conduct their transactions and operations in conformity with the terms of the Federal Firearms Act. There appears to be no substantial reason why this cannot be done.

The Department of Defense has advised the subcommittee that the Department "strongly recommends the enactment of S. 1592" and that "no function of the Department of Defense will be in any way impaired by this legislation" (this includes the civilian marksmanship program conducted under the auspices of the Secretary of the Army).

*Section 7*

Section 7 of the bill (which was sec. 5 of the bill as introduced) amends section 5 of the Federal Firearms Act (15 U.S.C. 905(b)).

No change has been made in subsection (a), the existing penalty provision of the Federal Firearms Act.

The subcommittee has amended section 7 of the bill by redesignating subsection (b), which relates to forfeiture, as subsection (c) and inserting a new subsection (b) which would provide that any person who

(1) with intent to commit therewith an offense punishable by imprisonment for a term exceeding 1 year; or (2) with knowledge or with reasonable cause to believe that an offense punishable by imprisonment for a term exceeding 1 year is intended to be committed therewith; ships, transports or receives a firearm in interstate or foreign commerce shall be fined not more than $10,000 or imprisoned not more than 10 years, or both, for each such offense.

The provisions of the new subsection (b) would provide a severe penalty for shipping, transporting, or receiving a firearm in interstate or foreign commerce with intent, or with knowledge or reasonable cause to believe, that a felony offense is intended to be committed therewith.

This is basically an extension of the penalty imposed under the present act regarding the shipment, transportation or receipt in interstate or foreign commerce of firearms by persons convicted of an offense punishable by imprisonment for a term exceeding 1 year.

The 10-year maximum penalty appears clearly warranted in the cases to which subsection (b) would be applicable and it is important that persons be deterred from shipping, transporting, or receiving firearms in interstate or foreign commerce under the conditions which would be covered by this subsection. However, this provision would not have the effect of unduly burdening the agencies involved in criminal justice activities at the Federal level, as would certain other proposals relating to subsequent criminal misuse of a firearm which at any previous time had moved in interstate or foreign commerce. The effect of the "subsequent misuse" approach would be to give apparent Federal jurisdiction in the case of an inordinately large number of criminal cases involving crimes of an essentially local nature.

*Subsection (c)*

Subsection (c) of section 5 of the act as contained in the bill is a restatement and revision of existing law (15 U.S.C. 905(b)). This subsection would extend the existing forfeiture provisions of the Federal Firearms Act, which provide for the forfeiture of firearms and ammunition involved in violations of the act to cover firearms and ammunition "involved in, or used or intended to be used in," violation of the act or of certain provisions of title 18 of the United States Code pertaining to threats to, or assaults on, law-enforcement officers, members of the judiciary, etc.

Under existing law, firearms involved in violations of the Federal Firearms Act (15 U.S.C. 901 et seq.) or the National Firearms Act (26 U.S.C., ch. 53) are subject to forfeiture. However, these provisions are inadequate to cover many cases involving firearms used in offenses against the laws of the United States pertaining to assaults on, or threats against, law enforcement officers and public officials.

The subcommittee made one change in the redesignated subsection (c) dealing with forfeiture of firearms. This amendment added to the enumerated provisions of title 18, United States Code, the violation of which makes a firearm subject to seizure and forfeiture, chapter 84 of title 18. Chapter 84 of title 18 contains the recently enacted provisions concerning, in general, assassination or attempted assassination of the President of the United States and certain other persons. The subcommittee deems the inclusion of chapter 84 necessary to avoid the possibility of future situations involving attempted

Defs.' MSJ App. 314

commercial exploitation of the fact that a firearm was used in an assassination or an attempted assassination. It has come to the subcommittee's attention that a deplorable and regrettable situation in this respect has already developed with regard to the rifle reported by the Warren Commission to have been used in the assassination to which that report was directed.

The procedures applicable to seizure, forfeiture, and disposition would be the same as for firearms seized for violation of the Federal Firearms Act (i.e., the provisions of the Internal Revenue Code of 1954, applicable in respect of National Firearms Act firearms, would apply).

The enactment of the provisions contained in this section of the bill is deemed to be clearly a matter in the national interest.

*Section 8*

Section 8 of the bill (sec. 6 of the bill as introduced) would renumber sections 6, 7, 8, 9, and 10 of the Federal Firearms Act as sections 7, 8, 9, 10, and 11, respectively, and insert after section 5 a new section.

The new section 6 of the act as contained in the bill relates to the applicability of other laws. This section is merely for the purpose of making it completely clear that nothing in the Federal Firearms Act shall be construed as modifying or affecting any provision of the National Firearms Act, section 414 of the Mutual Security Act of 1954, or section 1715 of title 18 of the United States Code. Also subsection (b) of section 6 makes it clear that nothing in the Federal Firearms Act is intended to confer any right or privilege to conduct any business contrary to the law of any State, or to be construed as relieving any person from compliance with the law of any State.

*Section 9*

The first sentence of section 9 of the bill is a restatement of existing law (15 U.S.C. 907) concerning the authority of the Secretary of the Treasury to prescribe such rules and regulations as he deems reasonably necessary to carry out the provisions of the Federal Firearms Act.

The subcommittee has amended this section of the existing Federal Firearms Act (relating to the issuance of regulations) by adding at the end thereof a new sentence which would specifically provide that the Secretary shall give reasonable public notice, and afford interested parties opportunity for hearing, prior to prescribing regulations to carry out the provisions of the Federal Firearms Act. This would mean that any new regulations issued to effectuate the provisions of the bill would only be issued after such public notice and opportunity for hearing. Thus, all interested parties will have full opportunity to be heard before any regulations implementing the provisions of the Federal Firearms Act, as amended by the bill, are issued.

The subcommittee deems this specific statutory requirement for a hearing desirable in view of the wide public interest in the procedural details to be prescribed by regulations to implement the provisions of the statute.

It is expected that the Treasury Department will give full consideration to the views of interested parties and to the legitimate interests of those who may be affected by the procedures to be prescribed.

The language of the notice and hearing provision included in the subcommittee amendment is identical to the language contained in

section 5 of the Federal Alcohol Administration Act (27 U.S.C. 205) under which the Treasury Department issues regulations relating to the labeling and advertising of alcoholic beverages.

*Section 10*

Section 10 of the bill contains the effective date provisions and corresponds to section 8 of the bill as introduced.

In view of the notice and hearing requirements regarding the issuance of regulations which the subcommittee has provided for in section 9 of the bill, the subcommittee has deemed it advisable to amend the effective date provisions to provide time for the issuance of implementing regulations as provided for in the bill. Under this section of the bill, as amended by the subcommittee, the amendments to the Federal Firearms Act contained in the bill would, in general, be effective as of the first day of the third month which begins not less than 10 days after the date of enactment. However, the amendments made by the bill to section 3(a) of the Federal Firearms Act (relating to the obtaining of licenses by importers, manufacturers, and dealers) would not apply to any importer, manufacturer, or dealer licensed under the Federal Firearms Act as of the effective date until the expiration of the license held by such importer, manufacturer or dealer on such date.

In effect this means that a licensee will not have to obtain a new license, by reason of the amendments to the Federal Firearms Act made by this bill, until the licensee's existing annual license expires. This will permit an orderly processing of license applications over the course of the year following the effective date of amendments to the Federal Firearms Act made by this bill.

THOMAS J. DODD.
GEORGE A. SMATHERS.
EDWARD V. LONG.
BIRCH E. BAYH.
EDWARD M. KENNEDY.
JOSEPH D. TYDINGS.
HIRAM L. FONG.
JACOB K. JAVITS.

Defs.' MSJ App. 316

## Additional Views of Mr. Kennedy of Massachusetts

Although I am pleased that some legislation regulating the sale of firearms has finally been reported from the Judiciary Committee, I intend to support a motion on the Senate floor to substitute Senator Dodd's bill S. 1592, for the bill reported, S. 3767. S. 3767 is a compromise measure supported by some members as the only way to get any kind of gun control legislation out of the committee. But it is not an adequate substitute for S. 1592, and in my judgment there is no justification for passing legislation weaker in impact or narrower in scope than S. 1592.

Indeed it is amazing to me that we continue to tolerate a system of laws which makes it ridiculously easy for any criminal, madman, drug addict, or child to obtain lethal firearms which can be used to rain violence and death on innocent people. I recognize that S. 1592 is not a panacea; that effective gun regulation will require State action and that gun controls will not by themselves eliminate violence. But I think we have a responsibility to do what we can to minimize the bloodshed and death resulting from firearms abuse. And S. 1592 represents a responsible first step. S. 1592 establishes a Federal framework within which State regulation of firearms can be made effective. It does this by, inter alia, banning interstate mail order traffic in handguns, restricting the over-the-counter purchase of handguns by nonresidents, regulating mail-order traffic in shotguns and rifles by an affidavit procedure, establishing minimum ages of 18 for the purchase of rifles and 21 for the purchase of pistols, and seeking to curb the flow of nonsporting and military surplus firearms which have poured into this country from abroad in recent years and been dumped on the market at low prices attractive to juveniles. It is a serious attempt to deal with the problems revealed by the testimony taken at the many hearings the Juvenile Delinquency Subcommittee held on this question.

S. 3767 on the other hand leaves out regulation of rifles altogther, and permits anyone, no matter how young, to buy a rifle by mail order or a pistol over the counter. S. 3767 would also permit the sale of handguns, by interstate mail order and to nonresidents over the counter, provided an affidavit is filled out. This is not adequate. There is no justification for replacing a ban on mail-order handgun sales by an affidavit procedure. An affidavit procedure is simply not as effective as an outright ban. Affidavits may be ignored by local law enforcement officers or the information on them may go unchecked for accuracy. Consequently, employing the affidavit procedure will not insure that handguns will not be sold to those who have no right to them.

Similarly, in the face of the evidence of substantial misuse of rifles and shotguns, particularly in areas where handguns are regulated, I can see no justification for leaving mail-order rifle and shotgun sales totally unregulated.

Defs.' MSJ App. 317

Furthermore, S. 3767 would do nothing to stop the torrent of cheap imports flooding our country with unsafe and military surplus weapons. In contrast, under S. 1592, imported military surplus handguns are banned, and imported military surplus rifles are permitted only if they meet recognized safety standards and are suitable for lawful sporting purposes. The purpose of this restriction is to stop the United States from being the dumping ground for weapons of death from abroad. Since the flow of cheap and unsafe guns from abroad increases the danger of gun violence to the American people, I think it altogether appropriate to legislate to slow that flow.

Opponents of S. 1592 base their opposition on what they claim to be the unnecessary burdens caused the average gun buyer by this legislation. But this legislation will not in any substantial way burden any person who has a legitimate purpose in obtaining a firearm. And I do not believe that the minor burdens this bill may impose can possibly justify any further watering down of its gun controls.

Why would it be so burdensome to have to order guns by mail within your State? Or to actually visit a weapons shop or department store to purchase firearms? Or to be restricted in buying a pistol to buying it in the State of your residence? Or to be 21 to buy a pistol from a federally licensed dealer over the counter? Why should any-one under 18 be permitted to buy a rifle by mail order or over the counter? What is so burdensome about requiring the buyer of a rifle by mail order from out of State to fill out a simple affidavit? After all, S. 3767 would impose that burden for handguns. Is it really so great a burden to put upon a rifle buyer? If imposing this slight inconvenience would result in even only a few less than the present 1,700 rifle murders a year, I think it would be worth it.

I believe we owe it to the people of this country to try and make a decent start in reducing the dangers of gun violence, and passage of S. 1592 would mark such a beginning.

EDWARD M. KENNEDY.

### ADDITIONAL VIEWS OF MR. TYDINGS

I opposed S. 3767 and I voted against it in the Judiciary Committee, because I believe it is totally inadequate to protect the American public from the nearly unlimited traffic in lethal weapons which threatens us today.

I realize that other Senators who share my opinion of this bill nonetheless voted for it in order to get some firearms bill to the floor, where it can be strengthened by amendment. I have joined those Senators in the views they express against S. 3667 in this report and I join them in rejecting the views expressed in this report in favor of S. 3767. I will vigorously support the amendments which will be offered on the Senate floor to strengthen this bill.

How much longer will the people of the United States be subjected to indiscriminate slaughter at the hands of criminals and lunatics who have nearly unlimited access to weapons of death? That is the question squarely facing the Congress.

JOSEPH D. TYDINGS.

98

Defs.' MSJ App. 319

### INDIVIDUAL VIEWS OF MR. HART

With others of the committee, I voted to report S. 3767 in the belief that the Senate should be put into position to act in this area of great concern. The country does face a serious problem in the sale and distribution of firearms, and our colleague from Connecticut, Senator Dodd, long has urged the Congress to recognize the problem and act.

I believe we should prohibit the interstate sale of handguns and large, operable, military weapons. However, I do not agree that mail-order restrictions should apply to sporting shoulder arms weapons difficult to conceal. The criminal who felt the need for a shoulder arm would not be seriously inconvenienced by mail-order restrictions. Even in many States that have strict regulations on handgun purchases, over-the-counter sales of shoulder arms are unrestricted.

PHILIP A. HART.

99

### Individual Views of Mr. Scott

We need realistic, enforcible Federal regulation of the interstate sale of firearms. Two areas are most urgently in need of prompt action: (1) sales of handguns, which are most liable to use and abuse by criminals, and (2) mail-order purchases of all weapons because of their susceptibility to crimes, most horribly illustrated by the assassination of President Kennedy.

I cannot, however, without some reservations, support either S. 1592 or S. 3767.

S. 1592 has several desirable provisions. But I would be more favorably disposed to that bill if it were stripped of section 2, its statement of findings—which by inference lumps millions of law-abiding citizens together with criminals and the worst kind of extremists—and if its regulation of "destructive devices" would be treated separately in the National Firearms Act of 1934.

S. 3767 does not go far enough, chiefly because I believe that the interstate mail-order sale of rifles and shotguns, as well as handguns, should be regulated.

I offered, during the Judiciary Committee's executive session consideration of various firearms control bills, a measure patterned after S. 14, a bill which Senator Dodd introduced on January 6, 1965. I believe it meets the areas of major concern.

My bill would (by amendment of the Federal Firearms Act):

1. Require the manufacturer or dealer, before making shipment of a firearm, to obtain from the purchaser a sworn statement in duplicate that—

   (*a*) Such a person is at least 18 years of age.

   (*b*) Such person is not under indictment, has not been convicted of a crime punishable by a term exceeding 1 year, and is not a fugitive from justice.

   (*c*) There are no provisions of local law which would be violated by his possession of the firearm.

   (*d*) Provides the true name and address of the principal law enforcement officer of the locality to which the firearm will be shipped.

2. Require the manufacturer, prior to shipment of a firearm, to send to the local law enforcement officer by registered mail a description of the firearm (but not its serial number identification), one copy of the purchaser's statement, and obtain return receipt from such officer for the registered letter. The dealer must wait for 7 days after receiving receipt, before making delivery of the firearm.

3. Require the shipper of a firearm to deliver a written notice of the content of the shipment, to the common or contract carrier.

4. Make it unlawful for the carrier to deliver any firearm to a person with knowledge or reasonable cause to believe that such person is under 18 years of age.

5. Exempt antique firearms.

100

6. Provide that it is not the intent of Congress to—

    (*a*) Regulate shipments of firearms to the exclusion of State laws.

    (*b*) Supersede State laws, unless inconsistent with the bill.

    (*c*) Make lawful any act if such act is unlawful under State law.

My bill also incorporates certain technical and clarifying amendments to the act, for example (1) license fees in the case of dealers are increased from $1 to $25 for the first year and $10 for subsequent years, and in the case of manufacturers and pawnbrokers from $25 to $50; (2) deletes obsolete references to "territories"; (3) eliminates ammunition and small firearms parts from coverage of the act since Treasury has found provisions relating thereto impractical to administer; (4) makes clear that the act would not be construed so as to affect section 414 of the Mutual Security Act of 1954.

The imminent adjournment of the 89th Congress precludes further action on firearms control legislation. When Congress reconvenes in January, I shall continue my efforts to help enact effective legislation, geared to meet a serious problem.

HUGH SCOTT.

O

Defs.' MSJ App. 322

and federally licensed dealers of shotguns and rifles to persons under 18 years of age, and of all other types of firearms to persons under 21 years of age, would be prohibited.

The bill is also designed to eliminate the serious abuses of the Federal Firearms Act license fee system inherent in the nominal license fee and weak qualifying requirement provisions of existing law, and to assure that persons licensed under the act are bona fide engaged in the business and are of good repute.

The bill would curb the flow of imports of surplus military weapons, and certain other firearms which are not particularly suitable for lawful sporting purposes.

Further, the bill would bring under strict Federal control interstate and foreign commerce in large caliber weapons such as bazookas, mortars, antitank guns, etc., and destructive devices such as explosive or incendiary (a) grenades or (b) bombs or (c) missiles or (d) rockets or (e) similar weapons.

SECTION-BY-SECTION ANALYSIS

Section 1: This section would restate and amend section 1 of the Federal Firearms Act (52 Stat. 1250) which contains the definition of the meaning of certain terms used in the act.

The definition of the term "person" in paragraph (1) is existing law (15 U.S.C. 901 (1)).

The definition of the term "interstate or foreign commerce" is a restatement of existing law (15 U.S.C. 901(a)). "Territory" is omitted since there is no "territory" at the present time. The last sentence of this definition is inserted to clarify the status of the Act in Puerto Rico, the Virgin Islands, and the District of Columbia.

The definition of the term "firearm" in paragraph (3) is a restatement and revision of the provisions of existing law (15 U.S.C. 901(3)). The revised definition has been extended to include any weapon by whatsoever name known "which will," or "which may be readily converted to," expel a projectile or projectiles by the action of an explosive. This represents a much needed clarification and strengthening of existing law designed to prevent circumvention of the purposes of the act. As under existing law, the definition also includes weapons "designed to" expel a projectile or projectiles by the action of an explosive, and firearm mufflers and firearm silencers.

The present definition of this term includes "any part or parts" of a firearm. It has been impractical to treat each small part of a firearm as if it were a weapon. The revised definition substitutes the words "frame or receiver" for the words "any part or parts."

In addition, the definition of the term "firearm" is extended to include any "destructive device" as defined in the proposed new definition of this term contained in paragraph (4) of section 1. The effect of this inclusion is to make the provisions of the act applicable to such destructive devices.

The definition of the term "destructive device" contained in paragraph (4) is a new provision. The purpose of this definition is twofold. First, it would bring under the terms of the act any explosive or incendiary (a) grenade or (b) bomb or (c) rocket or (d) missile or (e) similar weapon, or launching device therefor (except devices which are not designed or redesigned or used or intended for use as a weapon). Second, the definition would include large caliber weapons such as bazookas, mortars, antitank guns, etc., in order that the more stringent controls applicable with respect to the traffic in destructive devices would be applicable with respect to such weapons.

The parenthetical exception contained in this definition is drafted in the same manner as the exceptions contained in 26 U.S.C. section 5179(a) (relating to registration of stills) and section 5205(a)(2) (relating to stamps on containers of distilled spirits). Therefore, the decisions of the courts in (*Queen v. United States*, 77 F. 2d 780; cert. den. 295 U.S. 755; and *Scherr v. United States*, 305 U.S. 251) to the effect that the Government is not required to allege or prove matter contained in an exception would be applicable. Establishment by a person that he came within the exception would be a matter of affirmative defense. Thus, an explosive device shown to be designed and intended for lawful use in construction or for other industrial purposes would be excepted. However, if the device were designed or used or intended for use, as a weapon, it would be subject to the provisions of the act.

A provision has been made in this definition that the Secretary may exclude from the definition any device which he finds is not likely to be used as a weapon. Examples of devices which may be excluded from this definition are devices such as Very pistols and other signaling devices and line-throwing appliances (required for commercial vessels by U.S. Coast Guard regulations) which may have been made from converted firearms. This provision also makes it possible to deal with any other comparable situation which may arise, such as old cannon or fieldpieces which are primarily of historical significance and with respect to which there is no reasonable likelihood that they will be used as a weapon.

The definition of the term "short-barreled shotgun" contained in paragraph (5) is a new provision. The definition describes a shotgun of the type which is subject to the provisions of the National Firearms Act (ch. 53 of the Internal Revenue Code of 1954). The purpose of the definition is to provide a convenient means of reference to weapons of this type.

The definition of the term "short-barreled rifle" contained in paragraph (6) is a new provision. The definition describes a rifle of the type which is subject to the provisions of the National Firearms Act (ch. 53 of the Internal Revenue Code of 1954). The purpose of the definition is to provide a convenient reference to weapons of this type.

The definition of the term "importer" is a new provision. Under existing law (15 U.S.C. 901(4)), the term "manufacturer" includes a person engaged in importation of firearms or ammunition for purposes of sale or distribution. It appears obvious that separate classifications should be provided for importers and manufacturers in order to more appropriately effectuate the purposes of the act.

The definition of the term "manufacturer" is a restatement of existing law (15 U.S.C. 904(4)) except that the references to importation have been deleted.

The definition of the term "dealer" is a restatement of existing law (15 U.S.C. 901(5)) with certain revisions. The definition also makes it clear that "pawnbrokers" are a type of dealer. This reflects proposed changes in other provisions of the act which would place pawnbrokers handling firearms in a special category and provide for higher license fees for procurement of licenses by pawnbroker dealers.

The definition of the term "pawnbroker" is a new provision. Pawnbroker dealers are covered under the provisions of the existing act in the same manner as other dealers. The purpose of this definition is to provide a basis for a separate classification of pawnbroker dealers. Under the provisions of the National Firearms Act (26 U.S.C., ch. 53), pawnbrokers are separately classified and charged a higher rate of special (occupational) tax than other dealers.

The definition of the term "indictment" is a new provision. Inasmuch as a person under indictment for certain crimes is proscribed from shipping or receiving firearms in interstate or foreign commerce, and a license under the act will not be issued to such a person, the definition will serve a useful purpose in making it clear that an "information" charging a crime is the same as an indictment charging a crime. This definition is in accord with the opinion of the court in *Quinones* v. *United States*, 161 F. 2d 79.

The definition of the term "fugitive from justice" is a restatement of existing law (15 U.S.C. 901(6)) with reference to "territory" omitted since there is at the present time no such territory.

The definition of the term "crime punishable by imprisonment for a term exceeding 1 year" is a new provision.

Prior to October 4, 1961, the Federal Firearms Act included provisions which made it unlawful for a person convicted of a crime of violence (as defined) in any court of the United States, a State, or possession, to transport, ship, or receive any firearm in interstate or foreign commerce. S. 1750 (87th Cong., 1st sess.) amended the act by striking the definition of "crime of violence" and by striking that term wherever it appeared in the act and inserting in lieu thereof the term "crime punishable by imprisonment for a term exceeding 1 year." S. 1750 was introduced at the request of the Attorney General as an integral part of an anticrime legislative program. See House Report No. 1002 (87th Cong., 1st sess.). The felony criteria for prohibiting the transporting, shipping, or receiving of firearms incorporated in the act by S. 1750 has been retained to date.

However, the definition of "crime punishable by imprisonment for a term exceeding 1 year" proposed in the bill would modify the felony criteria by excluding antitrust-type violations. It may be noted that antitrust-type violations are not felonies under Federal law. However, a limited number of States have statutes making such offenses felonies. The definition would provide uniform treatment of such offenses, both State and Federal.

The definition of the term "Secretary" or "Secretary of the Treasury" contained in paragraph (12) is a new provision. The purpose of this definition is to eliminate the necessity of repeating "Secretary of the Treasury or his delegate" in several sections of the act.

The definition of the term "ammunition" contained in existing law (15 U.S.C. 901(7)) has been revised to include ammunition for a destructive device and ammunition for a machinegun or rifle in addition to pistol and revolver ammunition.

Section 2: Section 2 of the bill would amend section 2 of the Federal Firearms Act (15 U.S.C. 902), which relates to prohibited acts.

Subsection (a): Subsection (a) is derived in part from the provisions of existing law contained in subsections (a) and (b) of section 2 of the Federal Firearms Act (15 U.S.C. 902 (a) and (b)). Such provisions of existing law make it unlawful for any importer, manufacturer, or dealer, except an importer, manufacturer, or dealer licensed under the act, to transport, ship, or receive any firearm in interstate or foreign commerce, or for any person to receive any firearm transported or shipped in interstate or foreign commerce, by an unlicensed importer, manufacturer, or dealer.

The provisions of section 2(a) of the bill establish a general rule making it unlawful for any person, except an importer, manufacturer, or dealer licensed under the provisions of this act, to transport, ship, or receive firearms in interstate or foreign commerce. This would have the effect of channeling interstate and foreign commerce in firearms through licensed importers, licensed manufacturers, and licensed dealers, thereby prohibiting the so-called mail-order traffic

Calendar No. 758

| 79TH CONGRESS<br>1st Session | SENATE | REPORT<br>No. 752 |
|---|---|---|

# ADMINISTRATIVE PROCEDURE ACT

## REPORT

OF THE

## COMMITTEE ON THE JUDICIARY

ON

# S. 7

### A BILL TO IMPROVE THE ADMINISTRATION OF JUSTICE BY PRESCRIBING FAIR ADMINISTRATIVE PROCEDURE



NOVEMBER 19 (legislative day, OCTOBER 29), 1945.—Ordered to be printed

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1945

## COMMITTEE ON THE JUDICIARY

### PAT McCARRAN, Nevada, *Chairman*

CARL A. HATCH, New Mexico
JOSEPH C. O'MAHONEY, Wyoming
HARLEY M. KILGORE, West Virginia
ABE MURDOCK, Utah
ERNEST W. McFARLAND, Arizona
BURTON K. WHEELER, Montana
CHARLES O. ANDREWS, Florida
JAMES O. EASTLAND, Mississippi
JAMES W. HUFFMAN, Ohio
—— —— (vacancy)

ALEXANDER WILEY, Wisconsin
WILLIAM LANGER, North Dakota
HOMER FERGUSON, Michigan
CHAPMAN REVERCOMB, West Virginia
KENNETH S. WHERRY, Nebraska
E. H. MOORE, Oklahoma
H. ALEXANDER SMITH, New Jersey

CALVIN M. CORY, *Clerk*
J. G. SOURWINE, *Counsel*

II

Defs.' MSJ App. 325

# CONTENTS

| | Page |
|---|---|
| I. Legislative history | 1 |
| II. Approach of the committee | 5 |
| III. Structure of the bill | 7 |
| IV. Analysis of provisions | 9 |
| V. General comments | 30 |
| Appendixes: | |
| A. Text of bill | 32 |
| B. Report of Attorney General on bill | 37 |
| Diagrams: | |
| 1. Chronological list of bills | 2 |
| 2. Chart of present bill | 4 |

III

Defs.' MSJ App. 326

# Calendar No. 758

| 79TH CONGRESS<br>1st Session | SENATE | REPORT<br>No. 752 |
|---|---|---|

## ADMINISTRATIVE PROCEDURE ACT

November 19 (legislative day, October 29), 1945.—Ordered to be printed

Mr. McCarran, from the Committee on the Judiciary,
submitted the following

# REPORT

[To accompany S. 7]

The Committee on the Judiciary, to whom was referred the bill
(S. 7), to improve the administration of justice by prescribing fair
administrative procedure, having considered the same, reports favor-
ably thereon, with an amendment, and recommend that the bill do
pass, as amended.

There is a widespread demand for legislation to settle and regulate
the field of Federal administrative law and procedure. The subject is
not expressly mentioned in the Constitution, and there is no recogniz-
able body of such law, as there is for the courts in the Judicial Code.
There are no clearly recognized legal guides for either the public or
the administrators. Even the ordinary operations of administrative
agencies are often difficult to know. The Committee on the Judiciary
is convinced that, at least in essentials, there should be some simple
and standard plan of administrative procedure.

## I. LEGISLATIVE HISTORY

For more than 10 years Congress has considered proposals for
general statutes respecting administrative law and procedure. Figure
1 on page 2 presents a convenient chronological chart of the main
bills introduced. Each of them has received widespread notice and
intense consideration.

The growth of the Government, particularly of the executive
branch, has added to the problem. The situation had become such
by the middle of the 1930's that the President appointed a committee

**1**

Defs.' MSJ App. 328

**2**                ADMINISTRATIVE PROCEDURE ACT

FIGURE 1



ADMINISTRATIVE PROCEDURE ACT                    3

to make a comprehensive survey of and suggestions concerning administrative methods, overlapping functions, and diverse organization. While that committee was not primarily concerned with the more detailed questions of administrative law and procedure as the term is now understood, it was inevitably brought face to face with the fundamental problem of the inconsistent union of prosecuting and deciding functions exercised by many executive agencies.

REPORT OF PRESIDENT'S COMMITTEE.—In 1937 the President's Committee on Administrative Management issued its report, in which it said (pp. 32–33, 39–40):

The executive branch of the Government of the United States has * * * grown up without plan or design * * *. To look at it now, no one would ever recognize the structure which the founding fathers erected a century and a half ago. * * * Commissions have been the result of legislative groping rather than the pursuit of a consistent policy. * * * They are in reality miniature independent governments set up to deal with the railroad problem, the banking problem, or the radio problem. They constitute a headless "fourth branch" of the Government, a haphazard deposit of irresponsible agencies and uncoordinated powers. * * * There is a conflict of principle involved in their make-up and functions. * * * They are vested with duties of administration * * * and at the same time they are given important judicial work. * * * The evils resulting from this confusion of principles are insidious and far reaching. * * * Pressures and influences properly enough directed toward officers responsible for formulating and administering policy constitute an unwholesome atmosphere in which to adjudicate private rights. But the mixed duties of the commissions render escape from these subversive influences impossible. Furthermore, the same men are obliged to serve both as prosecutors and as judges. This not only undermines judicial fairness; it weakens public confidence in that fairness. Commission decisions affecting private rights and conduct lie under the suspicion of being rationalizations of the preliminary findings which the Commission, in the role of prosecutor, presented to itself.

To which, in transmitting it to Congress, the President added (pp. iii–v):

I have examined this report carefully and thoughtfully, and am convinced that it is a great document of permanent importance. * * * The practice of creating independent regulatory commissions, who perform administrative work in addition to judicial work, threatens to develop a "fourth branch" of the Government for which there is no sanction in the Constitution.

See also pages 41–42, 207–210, 215–219, 222–223, 230–239 for additional comments and the very drastic remedy proposed in that report. That Committee recommended the complete separation of investigative-prosecuting functions and personnel from deciding functions and personnel.

EARLIER HEARINGS AND BILLS.—In 1938 the Senate Committee on the Judiciary held hearings on a proposal for the creation of an administrative court and, in that connection, issued a committee print elaborately analyzing administrative powers conferred by statute (S. 3676, 75th Cong., 3d sess.). In 1939 the Walter-Logan administrative procedure bill was favorably reported to the Senate (S. Rept. 442, 76th Cong., 1st sess., on S. 915). In the third session of the same Congress the Walter-Logan bill (S. 915 and H. R. 6324) was reported to the House of Representatives with amendments (see H. Rept. 1149, 76th Cong., 1st sess.; for an annotated draft, see S. Doc. 145, 76th Cong., 3d sess.). The Walter-Logan bill was passed by the Congress but vetoed by the President in 1940 in part on the ground

**4**                    ADMINISTRATIVE PROCEDURE ACT

that action should await the then imminent final report by a committee appointed in the executive branch to study the entire situation (H. Doc. 986, 76th Cong., 3d sess.).

ATTORNEY GENERAL'S COMMITTEE.—In December 1938 the Attorney General, renewing the suggestion which he had previously made respecting the need for procedural reform in the wide and growing field of administrative law, recommended the appointment of a commission to make a thorough survey of existing practices and procedure and point the way to improvements (S. Doc. 8, 77th Cong., 1st sess., p. 251). The President concurred and authorized the Attorney General to appoint a committee for that purpose (id., p. 252). This Committee was composed of Government officials, teachers, judges, and private practitioners. It made an interim report in January 1940 (id., 254–258). Its staff prepared, and in 1940–41 issued, a series of studies of the procedures of the principal administrative agencies and bureaus in the Federal Government (S. Doc. 186, 76th Cong., 3d sess., pts. 1–13; and S. Doc. 10, 77th Cong., 1st sess., pts. 1–14). The Committee held executive sessions over a long period, at which the representatives of Federal agencies were heard. It also held public hearings. It then prepared and issued a voluminous final report. See *Administrative Procedure in Government Agencies—Report of the Committee on Administrative Procedure, Appointed by the Attorney General, at the Request of the President, to Investigate the Need for Procedural Reform in Various Administrative Tribunals and to Suggest Improvements Therein* (S. Doc. 8, 77th Cong., 1st sess.). That Committee is popularly known as the Attorney General's Committee on Administrative Procedure and will be so designated in this report. In the framing of the bill herewith reported, (S. 7), your committee has had the benefit of the factual studies and analyses prepared by the Attorney General's Committee.

SUBSEQUENT BILLS AND HEARINGS.—Growing out of the work of the Attorney General's Committee on Administrative Procedure, several bills were introduced in 1941 (S. 674, 675, and 918, 77th Cong., 1st sess.). Hearings were held on these bills during April, May, June, and July of that year. (See *Administrative Procedure*, hearings, 77th Cong., 1st sess., pts. 1–3, plus appendix.) However, the then emergent international situation prompted a postponement of further consideration of the matter. But all interested administrative agencies were heard at length at that time and the proposals then pending involved the same basic issues as the present bill.

PRESENT BILL.—Based upon the studies and hearings in connection with prior bills on the subject, and after several years of consultation with interested parties in and out of official positions, S. 2030 (78th Cong., 2d sess.) was introduced on June 21, 1944, the companion bill in the House of Representatives being H. R. 5081. The introduction of these bills brought forth a volume of further suggestions from every quarter. As a result, with the opening of the present Congress, a revised and simplified bill was introduced (S. 7, January 6, 1945; H. R. 1203, January 8, 1945).

CONSIDERATION AND REVISION.—Much informal discussion followed the introduction of S. 7 and H. R. 1203. The House of Representatives' Committee on the Judiciary held hearings in the latter part of June 1945.

Previously, that committee and the Senate Committee on the Judiciary had requested administrative agencies to submit their views in writing. These were carefully analyzed and, with the aid of representatives of the Attorney General and interested private organizations, in May 1945 there was issued a Senate committee print setting forth in parallel columns the bill as introduced and a tentatively revised text.

Again interested parties in and out of Government submitted comments orally or in writing on the revised text. These were analyzed by the committee's staff and a further committee print was issued in June 1945. In four parallel columns it set forth (1) the text of the bill as introduced, (2) the text of the tentatively revised bill previously published, (3) a general explanation of provisions with references to the report of the Attorney General's Committee on Administrative Procedure and other authorities, and (4) a summary of views and suggestions received.

Thereafter the Attorney General again designated representatives to hold further discussions with interested agencies and to screen and correlate further agency views, some of which were submitted in writing and some orally. Private parties and representatives of private organizations also participated.

Following these discussions the committee drafted the bill as reported, which is set forth in full in appendix A. The Attorney General's favorable report on the bill, as revised, is set forth in appendix B.

## II. APPROACH OF THE COMMITTEE

In undertaking the foregoing very lengthy process of consideration, the committee has attempted to make sure that no operation of the Government is unduly restricted. The committee has also taken the position that the bill must reasonably protect private parties even at the risk of some incidental or possible inconvenience to or change in present administrative operations. The committee is convinced, however, that no administrative function is improperly affected by the present bill.

THE PRINCIPAL PROBLEMS.—The principal problems of the committee have been: *First*, to distinguish between different types of administrative operations. *Second*, to frame general requirements applicable to each such type of operation. *Third*, to set forth those requirements in clear and simple terms. *Fourth*, to make sure that the bill is complete enough to cover the whole field.

The committee feels that it has avoided the mistake of attempting to oversimplify the measure. It has therefore not hesitated to state functional classifications and exceptions where those could be rested upon firm grounds. In so doing, it has been the undeviating policy to deal with types of functions as such and in no case with administrative agencies by name. Thus certain war and defense functions are exempted, but not the War or Navy Departments in the performance of their other functions. Manifestly, it would be folly to assume to distinguish between "good" agencies and others, and no such distinction is made in the bill. The legitimate needs of the Interstate Commerce Commission, for example, have been fully considered but it has not been placed in a favored position by exemption from the bill.

The committee feels that administrative operations should be treated as a whole lest the neglect of some link defeat the purposes of the bill. The chart set forth as figure 2 on page 9 emphasizes this approach of the committee.

COMPARISON WITH WALTER-LOGAN BILL.—The Walter-Logan bill, which was vetoed by the President, differed materially from S. 7 as reported. While it distinguished between regulations and adjudications, the Walter-Logan bill simply required administrative hearings for each and provided special methods of judicial review.

More particularly, in the matter of general regulations, the Walter-Logan bill failed to distinguish between the different classes of rules. It stated that rules should be issued within 1 year after the enactment of the statutory authority. It required a mandatory administrative review upon notice and hearing within a year (sec. 2), and set up a system of judicial review through declaratory judgments by the Court of Appeals for the District of Columbia within a limited time after the adoption of any rule (H. R. 6324, 76th Cong., 3d sess., sec. 3).

In the adjudication of particular cases, the Walter-Logan bill also provided for administrative hearings of any "controversy" before a board of any three employees of any agency. Decisions of such boards were to be made within 30 days and were subject to the apparently summary approval or modification of the head of the agency or his deputy. But independent commissions (not less than three members sitting) were required to hold a further hearing after any hearing by an examiner (sec. 4). A special form of judicial review was provided for any administrative adjudication (sec. 5). A long list of exemptions of agencies by name concluded that bill (sec. 7).

The present bill must be distinguished from the Walter-Logan bill in several essential respects. It differentiates the several types of rules. It requires no agency hearings in connection with either regulations or adjudications unless statutes already do so in particular cases, thereby preserving rights of judicial trials de novo. Where statutory hearings are otherwise provided, it fills in some of the essential requirements; and it provides for a special class of semi-independent subordinate hearing officers. It includes several types of incidental procedures. It confers numerous procedural rights. It limits administrative penalties. It contains more comprehensive provisions for judicial review for the redress of any legal wrong. And, since it is drawn entirely upon a functional basis, it contains no exemptions of agencies as such.

COMPARISON WITH ATTORNEY GENERAL'S COMMITTEE REPORT.— The present bill is more complete than the solution favored by the majority of the Attorney General's Committee, but less prolix and more definite than the minority proposed. While it follows generally the views of good administrative practice as expressed by the whole of that Committee, it differs in several important respects. It provides that agencies may choose whether their examiners shall make the initial decision or merely recommend a decision, whereas the Attorney General's Committee made a decision by examiners mandatory. It provides some general limitations upon administrative powers and sanctions, particularly in the rigorous field of licensing, while the Attorney General's Committee did not touch upon the sub-

ject. It relies upon independence, salary security, and tenure during good behavior of examiners within the framework of the civil service, whereas the Attorney General's Committee favored short-term appointments approved by a special "Office of Administrative Procedure."

A more detailed comparison of the present bill, with full references to the report of the Attorney General's Committee, is to be found in the third parallel column of the print issued by this committee in June 1945.

## III. STRUCTURE OF THE BILL

The bill, as reported, is not a specification of the details of administrative procedure, nor is it a codification of administrative law. Instead, out of long consideration and in the light of the studies heretofore mentioned, there has been framed an outline of minimum basic essentials. Figure 2 on page 9 diagrams the bill.

The bill is designed to afford parties affected by administrative powers a means of knowing what their rights are and how they may be protected. By the same token, administrators are provided with a simple course to follow in making administrative determinations. The jurisdiction of the courts is clearly stated. The bill thus provides for public information, administrative operation, and judicial review.

SUBSTANCE OF THE BILL.—What the bill does in substance may be summarized under four headings:

1. It provides that agencies must issue as rules certain specified information as to their organization and procedure, and also make available other materials of administrative law (sec. 3).
2. It states the essentials of the several forms of administrative proceedings (secs. 4, 5, and 6) and the limitations on administrative powers (sec. 9).
3. It provides in more detail the requirements for administrative hearings and decisions in cases in which statutes require such hearings (secs. 7 and 8).
4. It sets forth a simplified statement of judicial review designed to afford a remedy for every legal wrong (sec. 10).

The first of these is basic, because it requires agencies to take the initiative in informing the public. In stating the essentials of the different forms of administrative proceedings, it carefully distinguishes between the so-called legislative functions of administrative agencies (where they issue general regulations) and their judicial functions (in which they determine rights or liabilities in particular cases).

The bill provides quite different procedures for the "legislative" and "judicial" functions of administrative agencies. In the "rule making" (that is, "legislative") function it provides that, with certain exceptions, agencies must publish notice and at least permit interested parties to submit their views in writing for agency consideration before issuing general regulations (sec. 4). No hearings are required by the bill unless statutes already do so in a particular case. Similarly, in "adjudications" (that is, the "judicial" function) no agency hearings are required unless statutes already do so, but in the latter case

**8**            ADMINISTRATIVE PROCEDURE ACT

the mode of hearing and decision is prescribed (sec. 5). Where existing statutes require that either general regulations (called "rules" in the bill) or particularized adjudications (called "orders" in the bill) be made after agency hearing or opportunity for such hearing, then section 7 spells out the minimum requirements for such hearings, section 8 states how decisions shall be made thereafter, and section 11 provides for examiners to preside at hearings and make or participate in decisions.

While the administrative power and procedure provisions of sections 4 through 9 are law apart from court review, the provisions for judicial review provide parties with a method of enforcing their rights in a proper case (sec. 10). However, it is expressly provided that the judicial review provisions are not operative where statutes otherwise preclude judicial review or where agency action is by law committed to agency discretion.

KINDS OF PROVISIONS.—The bill may be said to be composed of five types of provisions:

1. Those which are largely formal such as the sections setting forth the title (sec. 1), definitions (sec. 2), and rules of construction (sec. 12).

2. Those which require agencies to publish or make available information on administrative law and procedure (sec. 3).

3. Those which provide for different kinds of procedures such as rule making (sec. 4), adjudications (sec. 5), and miscellaneous matters (sec. 6) as well as for limitations upon sanctions and powers (sec. 9).

4. Those which provide more of the detail for hearings (sec. 7) and decision (sec. 8) as well as for examiners (sec. 11).

5. Those which provide for judicial review (sec. 10).

The bill is so drafted that its several sections and subordinate provisions are closely knit. The substantive provisions of the bill should be read apart from the purely formal provisions and minor functional distinctions. The definitions in section 2 are important, but they do not indicate the scope of the bill since the subsequent provisions make many functional distinctions and exceptions. The public information provisions of section 3 are of the broadest application because, while some functions and some operations may not lend themselves to formal procedure, all administrative operations should as a matter of policy be disclosed to the public except as secrecy may obviously be required or only internal agency "housekeeping" arrangements may be involved. Sections 4 and 5 prescribe the basic requirements for the making of rules and the adjudication of particular cases. In each case, where other statutes require opportunity for an agency hearing, sections 7 and 8 set forth the minimum requirements for such hearings and the agency decisions thereafter while section 11 provides for the appointment and tenure of examiners who may participate. Section 6 prescribes the rights of private parties in a number of miscellaneous respects which may be incidental to rule making, adjudication, or the exercise of any other agency authority. Section 9 limits sanctions, and section 10 provides for judicial review.

ADMINISTRATIVE PROCEDURE ACT     **9**

FIGURE 2.—*Diagram of principal sections of bill*



Section 1 prescribes the title, section 2 the definitions, and section 3 the effective dates and rules of construction. In the above diagram, the first row of sections sets forth the several kinds of requirements, procedures, and limitations; and the second row includes hearing and decision requirements where other statutes require a hearing. Section 10 on judicial review relates not only to decisions made after agency hearing but, in appropriate cases, to the exercise of any other administrative power or authority.

## IV. ANALYSIS OF PROVISIONS

The following statements respecting each provision of the bill are designed to answer specific questions relating to language and objectives. Under each section or subsection heading there appears an italicized synopsis of the provision, followed by one or more paragraphs of analysis or special comment. A reading of all the italicized paragraphs will, therefore, afford a synopsis of the whole bill, which is reproduced at length in appendix A at page 32.

SEC. 1. TITLE.—*It is provided that the measure may be cited as the Administrative Procedure Act.*

While a short title has been deemed preferable, it may be noted that the bill actually provides for both administrative procedure *and* judicial review.

SEC. 2. DEFINITIONS.—*The definitions apply to the remainder of the bill.*

Defs.' MSJ App. 336

**10**                ADMINISTRATIVE PROCEDURE ACT

For the purpose of both simplifying the language of later provisions and achieving greater precision, general terms of administrative law and procedure are defined.

(*a*) AGENCY.—*The word "agency" is defined by excluding legislative, judicial, and territorial authorities and by including any other "authority" whether or not within or subject to review by another agency. The bill is not to be construed to repeal delegations of authority provided by law. Expressly exempted from the term "agency", except for the public information requirements of section 3, are (1) agencies composed of representatives of parties or of organizations of parties and (2) defined war authorities including civilian authorities functioning under temporary or named statutes operative during "present hostilities."*

The word "authority" is advisedly used as meaning whatever persons are vested with powers to act (rather than the mere form of agency organization such as department, commission, board, or bureau) because the real authorities may be some subordinate or semidependent person or persons within such form of organization. In conferring administrative powers, statutes customarily do not refer to formal agencies (such as the Department of Agriculture) but to specified persons (such as the Secretary of Agriculture). Boards or commissions usually possess authority which does not extend to individual members or to their subordinates.

The bill does not repeal delegations of authority which are duly authorized by existing law. This does not mean, however, that delegations are effective where other provisions of the bill require otherwise. For example, the requirement that examiners in certain instances hear cases would supersede any existing delegations to prosecuting officers to hear such cases.

Agencies composed of representatives of the parties or of organizations of the parties to the disputes determined by them are exempted because such agencies as presently operated do not lend themselves to the adjudicative procedures set out in the remaining sections of the bill. They tend to be arbitral or mediating agencies rather than tribunals.

The exclusion of war functions and agencies, whether exercised by civil or military personnel, affords all necessary freedom of action for the exercise of such functions in the period of reconversion. It has been deemed wise to exempt such functions in view of the fact that they are rarely required to be exercised upon statutory hearing, with which much of the bill is concerned, and the fact that they are rapidly liquidating. It should be noted, however, that even war functions are not exempted from the public information requirement of section 3. "Present hostilities" means those connected with the war brought on at Pearl Harbor in December 1941.

(*b*) PERSON AND PARTY.—*"Person" is defined to include specified forms of organizations other than agencies. "Party" is defined to include anyone named, or admitted or seeking and entitled to be admitted, as a party in any agency proceeding except that nothing in the subsection is to be construed to prevent an agency from admitting anyone as a party for limited purposes.*

The definition of person includes both individuals and any form of organization but advisedly excludes Federal agencies. The practice of agencies to admit persons as parties in proceedings "for limited purposes" is expressly preserved, but that exception does not authorize

ADMINISTRATIVE PROCEDURE ACT **11**

any agency to ignore or prejudice the rights of the true or full parties in any proceeding.

(c) RULE AND RULE MAKING.—*"Rule" is defined as any agency statement of general applicability designed to implement, interpret, or prescribe law, policy, organization, procedure, or practice requirements. "Rule making" means agency process for the formulation, amendment, or repeal of a rule and includes any prescription for the future of rates, wages, financial structures, etc., etc.*

The definition of "rule" is important because it prescribes the kind of operation that is subject to section 4 rather than section 5. The specification of the activities that are involved in rule making is included in order to comprehend them beyond any possible question. They are defined as rules to the extent that, whether of general or particular applicability, they formally prescribe a course of conduct for the future rather than merely pronounce existing rights or liabilities. It should be noted that rule making is exempted from some of the general requirements of sections 7 and 8 relating to the details of hearings and decisions.

(d) ORDER AND ADJUDICATION.—*"Order" means the final disposition of any matter, other than rule making but including licensing, whether or not affirmative, negative, or declaratory in form. "Adjudication" means the agency process for the formulation of an order.*

The term "order" is defined to exclude rules. "Licensing" is specifically included to remove any possible question at the outset. Licenses involve a pronouncement of present rights of named parties although they may also prescribe terms and conditions for future observance. It should be noted, however, that licensing is exempted from some of the provisions of sections 5, 7, and 8 relating to hearings and decisions.

(e) LICENSE AND LICENSING.—*"License" is defined to include any form of required official permission such as certificate, charter, etc. "Licensing" is defined to include agency process respecting the grant, renewal, modification, denial, revocation, etc., of a license.*

This definition supplements subsection (d). Later provisions of the bill distinguish between initial licenses and renewals or other licensing proceedings. A further distinction might have been drawn between licenses for a term, such as radio licenses, and those of indefinite duration, such as certificates of convenience and necessity.

(f) SANCTION AND RELIEF.—*"Sanction" is defined to include any agency prohibition, withholding of relief, penalty, seizure, assessment, requirement, restriction, etc. "Relief" is defined to include any agency grant, recognition, or other beneficial action.*

These definitions are mainly relevant to section 9 on sanctions and powers and to section 10 on judicial review. The purpose of the subsection is to define exhaustively every possible form of legitimate administrative power or authority.

(g) AGENCY PROCEEDING AND ACTION.—*"Agency proceeding" is defined to mean any agency process defined in the foregoing subsections (c), (d), or (e). For the purpose of section 10 on judicial review, "agency action" is defined to include an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, and failure to act.*

The term "agency proceeding" is specially defined in order to simplify the language of subsequent provisions and to assure that all forms of administrative procedure or authority are included. The

term "agency action" brings together previously defined terms in order to simplify the language of the judicial review provisions of section 10 and to assure the complete coverage of every form of agency power, proceeding, action, or inaction.

SEC. 3. PUBLIC INFORMATION.—*From the public information provisions of section 3 there are exempted matters (1) requiring secrecy in the public interest or (2) relating solely to the internal management of an agency.*

The public information requirements of section 3 are in many ways among the most important, far-reaching, and useful provisions of the bill. For the information and protection of the public wherever located, these provisions require agencies to take the mystery out of administrative procedure by stating it. The section has been drawn upon the theory that administrative operations and procedures are public property which the general public, rather than a few specialists or lobbyists, is entitled to know or to have the ready means of knowing with definiteness and assurance.

The introductory clause states the only general exceptions. The first, which excepts matters requiring secrecy in the public interest, is necessary but is not to be construed to defeat the purpose of the remaining provisions. It would include confidential operations in any agency, such as some of the aspects of the investigating or prosecuting functions of the Secret Service or Federal Bureau of Investigation, but no other functions or operations in those or other agencies. Closely related is the second exception, of matters relating solely to internal agency management, which may not be construed to defeat other provisions of the bill or to permit withholding of information as to operations which remaining provisions of the section or of the whole bill require to be public or publicly available.

*(a) RULES.— Every agency is required to publish in the Federal Register its (1) organization, (2) places of doing business with the public, (3) methods of rule making and adjudication including the rules of practice relating thereto, and (4) such substantive rules as it may frame for the guidance of the public. No person is in any manner to be required to resort to organization or procedure not so published.*

Since the bill leaves wide latitude for each agency to frame its own procedures, this subsection requiring agencies to state their organization and procedures in the form of rules is essential for the information of the public. The publication must be kept up to date. The enumerated classes of informational rules must also be separately stated so that, for example, rules of procedure will be separate from rules of substance, interpretation, or policy. The effect of any one of the first three classifications of required rule making is that agencies must also publish their internal delegations of authority. The subsection forbids secrecy of rules binding or applicable to the public, or of delegations of authority. The requirement that no one shall "in any manner" be required to resort to unpublished organization or procedure protects the public from being required to pursue remedies that are not generally known.

*(b) OPINIONS AND ORDERS.—Agencies are required to publish or, pursuant to rule, make available to public inspection all final opinions or orders in the adjudication of cases except those held confidential for good cause and not cited as precedents.*

ADMINISTRATIVE PROCEDURE ACT                           **13**

Rule making results in published material in the Federal Register as set forth in subsection (a), but in the case of adjudication there is no standard, general, and official medium of publication. Some agencies publish sets of some of their decisions, but otherwise the public is not informed as to how and where they may see decisions or consult precedents. Requiring each agency to formulate and publish a rule respecting access to their final opinions and orders will give the general public notice 'as to how such information may be secured. While the subsection does not mention "rulings"—which are neither rules nor orders but are general interpretations, such as the opinions of agency counsel—if authoritative, they would be covered by the fourth category in subsection (a) of this section.

(c) PUBLIC RECORDS.—*Except as statutes may require otherwise or information may be held confidential for good cause, matters of official record are to be made available to persons properly and directly concerned in accordance with rules to be issued by the agency.*

This provision supplements subsections (a) and (b). The requirement of an agency rule on the availability of official records is inserted for the same purpose as in subsection (b). In many cases, the interest of the person seeking access to the record will be determinative. Agencies should classify data in order to specify what may be disclosed and what may not; and they must in any case provide how and where applications for information may be made, how they will be determined, and who will do so. Refusals of information would be subject to the requirements of section 6 (d).

SEC. 4. RULE MAKING.—*The introductory clause exempts from all of the requirements of section 4 any rule making so far as there are involved (1) military, naval, or foreign affairs functions or (2) matters relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.*

These exceptions would not, of course, relieve any agency from requirements imposed by other statutes. The phrase "foreign affairs functions," used here and in some other provisions of the bill, is not to be loosely interpreted to mean any function extending beyond the borders of the United States but only those "affairs" which so affect relations with other governments that, for example, public rule making provisions would clearly provoke definitely undesirable international consequences. The exception of matters of management or personnel would operate only so far as not inconsistent with other provisions of the bill relating to internal management and personnel. The exception of proprietary matters is included because the principal considerations in most such cases relate to mechanics and interpretations or policy, and it is deemed wise to encourage and facilitate the issuance of rules by dispensing with all mandatory procedural requirements. None of these exceptions, however, is to be taken as encouraging agencies not to adopt voluntary public rule making procedures where useful to the agency or beneficial to the public. The exceptions merely confer a complete discretion upon agencies to decide what, if any, public rule making procedures they will adopt in a given situation within their terms. It should be noted, moreover, that the exceptions apply only "to the extent" that the excepted subjects are directly involved.

(a) NOTICE.—*General notice of proposed rule making must be published in the Federal Register and must include (1) time, place, and*

**14**          ADMINISTRATIVE PROCEDURE ACT

*nature of proceedings, (2) reference to authority under which held, and (3) terms, substance, or issues involved. However, except where notice and hearing is required by some other statute, the subsection does not apply to rules other than those of substance or where the agency for good cause finds (and incorporates the finding and reasons therefor in the published rule) that notice and public procedure are impracticable, unnecessary, or contrary to the public interest.*

Agency notice must be sufficient to fairly apprise interested parties of the issues involved, so that they may present responsive data or argument relating thereto. The subsection governs the application of the public procedures required by the next subsection, since those procedures only apply where notice is required by this subsection. Agencies are given discretion to dispense with notice (and consequently with public proceedings) in the case of interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice. This does not mean, however, that agencies should not—where useful to them or helpful to the public—undertake public procedures in connection with such rule making. The exemption of situations of emergency or necessity is not an "escape clause" in the sense that any agency has discretion to disregard its terms or the facts. A true and supported or supportable finding of necessity or emergency must be made and published. "Impracticable" means a situation in which the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings. "Unnecessary" means unnecessary so far as the public is concerned, as would be the case if a minor or merely technical amendment in which the public is not particularly interested were involved. "Public interest" supplements the terms "impracticable" or "unnecessary"; it requires that public rule-making procedures shall not prevent an agency from operating and that, on the other hand, lack of public interest in rule making warrants an agency to dispense with public procedure. It should be noted that where authority beneficial to the public does not become operative until a rule is issued, the agency may promulgate the necessary rule immediately and rely upon supplemental procedures in the nature of a public reconsideration of the issued rule to satisfy the requirements of this section. Where public rule-making procedures are dispensed with, the provisions of subsections (c) and (d) of this section would nevertheless apply.

(b) PROCEDURES.—*After such notice, the agency must afford interested persons an opportunity to participate in the rule making at least to the extent of submitting written data, views, or argument; and, after consideration of such presentations, the agency must incorporate in any rules adopted a concise general statement of their basis and purpose. However, where other statutes require rules to be made after hearing, the requirements of sections 7 and 8 (relating to public hearings and decisions thereon) apply in place of the provisions of this subsection.*

This subsection states, in its first sentence, the minimum requirements of public rule making procedure short of statutory hearing. Under it agencies might in addition confer with industry advisory committees, consult organizations, hold informal "hearings," and the like. Considerations of practicality, necessity, and public interest as discussed in connection with subsection (a) will naturally govern the agency's determination of the extent to which public proceedings

should go. Matters of great import, or those where the public submission of facts will be either useful to the agency or a protection to the public, should naturally be accorded more elaborate public procedures. The agency must analyze and consider all relevant matter presented. The required statement of the basis and purpose of rules issued should not only relate to the data so presented but with reasonable fullness explain the actual basis and objectives of the rule.

(c) EFFECTIVE DATES.—*The required publication or service of any substantive rule must be made not less than 30 days prior to its effective date except (1) as otherwise provided by the agency for good cause found and published or (2) in the case of rules recognizing exemption or relieving restriction, interpretative rules, and statements of policy.*

This subsection does not provide procedures alternative to notice and other public proceedings required by the prior subsections of this section. Nor does it supersede the provisions of subsection (d) of this section. Where public procedures are omitted as authorized in certain cases, subsection (c) does not thereby become inoperative. It will afford persons affected a reasonable time to prepare for the effective date of a rule or rules or to take any other action which the issuance of rules may prompt. While certain named kinds of rules are not necessarily subject to the deferred effective date provided, it does not thereby follow that agencies are required to make such excepted types of rules operative with less notice or no notice but, instead, agencies are given discretion in those cases to fix such future effective date as they may find advisable. The other exception, upon good cause found and published, is not an "escape clause" which may be arbitrarily exercised but requires legitimate grounds supported in law and fact by the required finding. Moreover, the specification of a 30-day deferred effective date is not to be taken as a maximum, since there may be cases in which good administration or the convenience and necessity of the persons subject to the rule reasonably requires a longer period.

(d) PETITIONS.—*Every agency is required to accord any interested person the right to petition for the issuance, amendment, or repeal of a rule.*

This subsection applies not merely to effective rules existing at any time but to proposed or tentative rules. Where the latter are published, agencies should receive petitions for modification because that is one of the purposes of publishing proposed or tentative rules. Where such petitions are made, the agency must fully and promptly consider them, take such action as may be required, and pursuant to section 6 (d) notify the petitioner in case the request is denied. The agency may either grant the petition, undertake public rule making proceedings as provided by subsections (a) and (b) of this section, or deny the petition. The taking or denial of action would have the same effect and consequences as the taking or denial of action where, under presently existing legislation, the equivalent of a right of petition is recognized in interested persons. The mere filing of a petition does not require an agency to grant it, or to hold a hearing, or engage in any other public rule making proceedings. The refusal of an agency to grant the petition or to hold rule making proceedings, therefore, would not per se be subject to judicial reversal. However, the facts or considerations brought to the attention of an agency by such a petition might be such as to require the agency to act to prevent the rule from continuing or becoming vulnerable upon

**16**               ADMINISTRATIVE PROCEDURE ACT

judicial review, through declaratory judgment or other procedures pursuant to section 10.

SEC. 5. ADJUDICATIONS.—*The various subsequent provisions of section 5 relating to adjudications apply only where the case is otherwise required by statute to be determined upon an agency hearing except that, even in that case, the following classes of operations are expressly not affected: (1) Cases subject to trial de novo in court, (2) selection or tenure of public officers other than examiners, (3) decisions resting on inspections, tests, or elections, (4) military, naval, and foreign affairs functions (5) cases in which an agency is acting for a court, and (6) the certification of employee representatives.*

The general limitation of this section to cases in which other statutes require the agency to act upon or after a hearing is important. All cases are nevertheless subject to sections 2, 3, 6, 9, 10, and 12 so far as those are otherwise relevant.

The numbered exceptions remove from the operation of the section even adjudications otherwise required by statute to be made after hearing. The first, where the adjudication is subject to a judicial trial de novo, is included because whatever judgment the agency makes is effective only in a prima facie sense at most and the party aggrieved is entitled to complete judicial retrial and decision. The second, respecting the selection and tenure of officers other than examiners, is included because the selection and control of public personnel has been traditionally regarded as a discretionary function which, if to be overturned, should be done by separate legislation. The third exempts proceedings resting on inspections, tests, or elections because those methods of determination do not lend themselves to the hearing process. The fourth exempts military, naval, and foreign affairs functions for the same reasons that they are exempted from section 4; and, in any event, rarely if ever do statutes require such functions to be exercised upon hearing. The fifth, exempting cases in which an agency is acting as the agent for a court, is included because the administrative operation is subject to judicial revision in toto. The sixth, exempting the certification of employee representatives such as the Labor Board operations under section 9 (c) of the National Labor Relations Act, is included because these determinations rest so largely upon an election or the availability of an election. It should be noted that these exceptions apply only "to the extent" that the excepted subject is involved and, it may be added, only to the extent that such subjects are directly involved.

(a) NOTICE.—*Persons entitled to notice of an agency hearing are to be duly and timely informed of (1) the time, place, and nature of the hearing, (2) the legal authority and jurisdiction under which it is to be held, and (3) the matters of fact and law asserted. Where private persons are the moving parties, respondents must give prompt notice of issues controverted in law or fact; and in other cases the agency may require responsive pleading. In fixing the times and places for hearings the agency must give due regard to the convenience and necessity of the parties.*

The specification of the content of notice, so far as legal authority and the issues are concerned, does not mean that prior to the commencement of the proceedings an agency must anticipate all developments and all possible issues. But it does mean that, either by the formal notice or otherwise in the record, it must appear that the party

ADMINISTRATIVE PROCEDURE ACT                    **17**

affected has had ample notice of the legal and factual issues with due time to examine, consider, and prepare for them. The second sentence of the subsection applies in those cases where the agency does not control the matter of notice because private persons are the moving parties; and in such cases the respondent parties must give notice of the issues of law or fact which they controvert so that the moving party will be apprised of the issues he must sustain. The purpose of the provision is to simplify the issues for the benefit of both the parties and the deciding authority. The last sentence, requiring the convenience and necessity of the parties to be consulted in fixing the times and places for hearings, includes an agency party as well as a private party; but the agency's convenience is not to outweigh that of the private parties and, while the due and required execution of agency functions may be said to be paramount, that consideration would be controlling only where a lack of time has been unavoidable or a particular place of hearing is indispensable and does not deprive the private parties of their full opportunity for a hearing.

(b) PROCEDURE.—*The agency is required first to afford parties an opportunity for the settlement or adjustment of issues (where time, the nature of the proceeding, and the public interest permit) followed, to the extent that issues are not so settled, by hearing and decision under sections 7 and 8.*

The preliminary settlement-by-consent provision of this subsection is of the greatest importance. Such adjustments may go to the whole or any part of any case. The limitation of the requirement to cases in which "time, the nature of the proceeding, and the public interest permit" does not mean that formal proceedings, to the exclusion of prior opportunity for informal settlement, lie in the discretion of any agency irrespective of the facts, legal situation presented, or practical aspects of the case. It does not mean that agencies have an arbitrary choice, or that they may consult their mere preference or convenience. It is intended to exempt only situations in which, for example, (1) time is unavoidably lacking, (2) the nature of the proceeding is such that for example (as in some forms of rule making) the great number of parties or possible parties makes it unlikely that any adjustment could be reached, and (3) the administrative function requires immediate execution in order to protect the tangible and demonstrable requirements of public interest.

(c) SEPARATION OF FUNCTIONS.—*Officers who preside at the taking of evidence must make the decision or recommended decision in the case. They may not consult with any person or party except openly and upon notice, save in the disposition of customary ex parte matters, and they may not be made subject to the supervision of prosecuting officers. The latter may not participate in the decisions except as witness or counsel in public proceedings. However, the subsection is not to apply in determining applications for initial licenses or the past reasonableness of rates; nor does it apply to the top agency or members thereof.*

The gist of the subsection is that no investigating or prosecuting officer shall directly or indirectly in any manner influence or control the operations of hearing and deciding officers, except as a participant in public proceedings, and even then in no different fashion than the private parties or their representatives. "Ex parte matters authorized by law" means passing on requests for adjournments, continuances, filing of papers, and so forth. The exemption of applications

18                     ADMINISTRATIVE PROCEDURE ACT

for initial licenses frees from the requirements of the subsection such
matters as the granting of certificates of convenience and necessity
which are of indefinite duration, upon the theory that in most
licensing cases the original application may be much like rule making.
The latter, of course, is not subject to any provision of section 5.   The
exemption of cases involving "the past reasonableness of rates" (if
triable *de novo* on judicial review they would be exempted in any
event) is made for the same reason.   There are, however, some
instances of either kind of case which tend to be accusatory in form
and involve sharply controverted factual issues.   Agencies should
not apply the exceptions to such cases, because they are not to be
interpreted as precluding fair procedure where it is required.

A further word may be said as to the last exemption—of the agency
itself or the members of the board who comprise it.   Such a provision
is required by the very nature of administrative agencies, where the
same authority is responsible for both the investigation-prosecution
and the hearing and decision of cases.   There, too, the exemption is
not to be taken as meaning that the top authority must reserve to
itself both prosecuting and deciding functions.   To be sure it is
ultimately responsible for all functions committed to it, but it may
and should confine itself to determining policy and should delegate
the actual supervision of investigations and initiation of cases to
responsible subordinate officers.

(*d*) DECLARATORY ORDERS.—*Every agency is authorized in its sound
discretion to issue declaratory orders with the same effect as other orders.*

This subsection does not mean that any agency empowered to issue
orders may issue declaratory orders, because it is limited by the intro-
ductory clauses of section 5.   Thus, such orders may be issued only
where the agency is empowered by statute to hold hearings and the
subject is not expressly exempted by the introductory clauses of this
section.

Agencies are not required to issue declaratory orders merely because
request is made therefor.   Such applications have no greater effect
than they now have under existing comparable legislation.   "Sound
discretion," moreover, would preclude the issuance of improvident
orders.   The administrative issuance of declaratory orders would be
governed by the same basic principles that govern declaratory judg-
ments in the courts.

SEC. 6. ANCILLARY MATTERS.—*The provisions of section 6 relating to
incidental or miscellaneous rights, powers, and procedures do not override
contrary provisions in other parts of the bill.*

The purpose of this introductory exception, which reads "except as
otherwise provided in this act," is to limit, for example, the right of
appearance provided in subsection (a) so as not to authorize improper
ex parte conferences during formal hearings and pending formal deci-
sions under sections 7 and 8.

(*a*) APPEARANCE.—*Any person compelled to appear in person before
any agency or its representative is entitled to counsel.   In other cases,
every party may appear in person or by counsel.   So far as the responsible
conduct of public business permits, any interested person may appear
before any agency or its responsible officers at any time for the presentation
or adjustment of any matter.   Agencies are to proceed with reasonable
dispatch to conclude any matter so presented, with due regard for the
convenience and necessity of the parties.   Nothing in the subsection is to*

ADMINISTRATIVE PROCEDURE ACT **19**

*be taken as recognizing or denying the propriety of nonlawyers representing parties.*

This subsection is designed to confirm and make effective the right of interested persons to appear themselves or through or with counsel before any agency. The word "party" in the second sentence is to be understood as meaning any person showing the requisite interest in the matter, since the subsection applies in connection with the exercise of any agency authority whether or not formal proceedings are available. The phrase "responsible officers", as used here and in some other provisions, both includes all officers or employees who really determine matters or exercise substantial advisory functions and excludes those whose duties are merely formal or mechanical. The third sentence does not require agencies to give notice to all who may be affected, but merely to receive the presentations of those who seek to make them. The qualifying words in the third sentence—which read "so far as the responsible conduct of public business permits"—preclude the undue harassment of agencies by numerous petty appearances by or for the same party in the same case; but they do not confer upon agencies a discretion to emasculate the subsection or preclude interested persons from presenting fully and before any responsible officer or employee their cases or proposals in full. The reference to "stop-order or other summary actions" emphasizes the necessity for an opportunity for full informal appearance where normal and formal hearing and decision requirements are not applicable or are inadequate. The requirement that agencies proceed "with reasonable dispatch to conclude any matter presented" is a statement of legal requirement that no agency shall in effect deny relief or fail to conclude a case by mere inaction.

The final sentence provides that the subsection shall not be taken to recognize or deny the right of nonlawyers to be admitted to practice before any agency, such as the practitioners before the Interstate Commerce Commission. The use of the word "counsel" means lawyers. While the subsection does not deal with the matter expressly, the committee does not believe that agencies are justified in laying burdensome admission requirements upon members of the bar in good standing before the courts. The right of agencies to pass upon the qualifications of nonlawyers, however, is expressly recognized and preserved in the subsection.

(b) INVESTIGATIONS.—*Investigative process is not to be issued or enforced except as authorized by law. Persons compelled to submit data or evidence are entitled to retain or, on payment of costs, to procure copies except that in nonpublic proceedings a witness may for good cause be limited to inspection of the official transcript.*

This section is designed to preclude "fishing expeditions" and investigations beyond the jurisdiction or authority of an agency. It applies to any demand, whether or not a formal subpena is actually issued. "Nonpublic investigatory proceeding" means those of the grand jury kind in which evidence is taken behind closed doors. The limitation, for good cause, to inspection of the official transcript is deemed necessary where evidence is taken in a case in which prosecutions may be brought later and it is obviously detrimental to the due execution of the laws to permit copies to be circulated. In those cases the witness or his counsel may be limited to inspection of the relevant portions of the transcript. Parties should in any case have

**20**                    ADMINISTRATIVE PROCEDURE ACT

copies or an opportunity for inspection in order to assure that their evidence is correctly set forth, to refresh their memories in the case of stale proceedings, and to enable them to be advised by counsel. They should also have such copies whenever needed in legal or administrative proceedings.

(c) SUBPENAS.—*Where agencies are by law authorized to issue subpenas, parties may secure them upon request and upon a statement or showing of general relevance and reasonable scope if the agency rules so require. Where a party contests a subpena, the court is to inquire into the situation and, so far as the subpena is found in accordance with law, issue an order requiring the production of the evidence under penalty of contempt for failure then to do so.*

This provision will assure private parties the same access to subpenas as that available to the representatives of agencies. It will also prevent the issuance of improvident subpenas or action by an agency requiring a detailed, unnecessary, and burdensome showing of evidence which might fall into the hands of the party's adversaries or investigators and prosecutors (who in any event should not have access to such papers directly or indirectly). The subsection constitutes a statutory limitation upon the issuance or enforcement of subpenas in excess of agency authority or jurisdiction. This does not mean, however, that courts should enter into a detailed examination of facts and issues which are committed to agency authority in the first instance, but should, instead, inquire generally into the legal and factual situation and be satisfied that the agency could possibly find that it has jurisdiction. The subsection expressly recognizes the right of parties subject to administrative subpenas to contest their validity in the courts prior to subjection to any form of penalty for noncompliance.

(d) DENIALS.—*Prompt notice is to be given of denials of requests in any agency proceeding, accompanied by a simple statement of grounds.*

This subsection affords the parties in any agency proceeding, whether or not formal or upon hearing, the right to prompt action upon their requests, immediate notice of such action, and a statement of the actual grounds therefor. The latter should in any case be sufficient to apprise the party of the basis of the denial and any other or further administrative remedies or recourse he may have. A statement of the actual grounds need not be made "in affirming a prior denial or where the denial is self-explanatory." However, prior denial would satisfy the subsection requirement only where the grounds previously stated remain the actual grounds and sufficiently notify the party as set forth above. A self-explanatory denial must meet the same test; that is, the request must be in such form that its mere denial fully informs the party of all he would otherwise be entitled to have stated.

SEC. 7. HEARINGS.—*Section 7 relating to agency hearings applies only where hearings are required by sections 4 or 5.*

As heretofore stated in connection with sections 4 and 5, the bill requires no hearings unless other statutes contain such a requirement in particular cases of either rule making or adjudication. This section 7, therefore, is merely supplementary to sections 4 or 5 in the relevant cases.

(a) PRESIDING OFFICERS.—*The hearing must be held either by the agency, a member or members of the board which comprises it, one or*

ADMINISTRATIVE PROCEDURE ACT                    **21**

*more examiners, or other officers specially provided for in or designated by other statutes. All presiding and deciding officers are to operate impartially. They may at any time withdraw if they deem themselves disqualified and, upon the filing of a proper affidavit of personal bias or disqualification against them, the agency is required to determine the matter as a part of the record and decision in the case.*

This subsection provides two mutually exclusive methods of hearing—by the agency itself (or one or more of its members) or by subordinate officers. A third kind of hearing officer recognized in this subsection is one specially provided for or named in other statutes. Whoever presides is subject to the remaining provisions of the bill. They must conduct the hearing in a strictly impartial manner, rather than as the representative of an investigative or prosecuting authority—but this does not mean that they do not have the authority and duty—as a court does—to make sure that all necessary evidence is adduced and to keep the hearing orderly and efficient. The provision for affidavits of bias or personal disqualification requires a decision thereon by the agency in, and as a part of, the case; it thereby becomes subject to administrative and judicial review. That decision might be made upon the affidavit alone, as for example, the protest might be dismissed as insufficient on its face. The agency itself may hear any relevant argument or facts, or it may designate an examiner to do so. The effect which bias or disqualification shown upon the record might have would be determined by the ordinary rules of law and the other provisions of this bill. If it appeared or were discovered late, it would have the effect—where issues of fact or discretion were important and the conduct and demeanor of witnesses relevant in determining them—of rendering the recommended decisions or initial decisions of such officers invalid. This consequence will require agencies and examiners themselves to take care that they do not sit where subject to disqualification or conduct themselves in a manner which will invalidate the proceedings.

(b) HEARING POWERS.—*Presiding officers, subject to the rules of procedure adopted by the agency and within its powers, have authority to (1) administer oaths, (2) issue such subpenas as are authorized by law, (3) receive evidence and rule upon offers of proof, (4) take depositions or cause depositions to be taken, (5) regulate the hearing, (6) hold conferences for the settlement or simplification of the issues, (7) dispose of procedural requests, (8) make decisions or recommended decisions under section 8 of the bill, and (9) exercise other authority as provided by agency rule consistent with the remainder of the bill.*

This subsection does not expand the powers of agencies. It is designed to assure that the presiding officer will perform a real function rather than serve merely as a notary or policeman. He would have and should independently exercise all the powers numbered in the subsection. The agency itself—which must ultimately either decide the case, or consider reviewing it, or hear appeals from the examiner's decision—should not in effect conduct hearings from behind the scenes where it cannot know the detailed happenings in the hearing room and does not hear or see the private parties.

(c) EVIDENCE.—*Except as statutes otherwise provide, the proponent of a rule or order has the burden of proof. While any evidence may be received, as a matter of policy agencies are required to provide for the exclusion of irrelevant and unduly repetitious evidence and no sanction*

*may be imposed or rule or order be issued except as supported by relevant, reliable, and probative evidence. Any party may present his case or defense by oral or documentary evidence, submit rebuttal evidence, and conduct reasonable cross-examination. However, in the case of rule making or determining applications for initial licenses, the agency may adopt procedures for the submission of evidence in written form so far as the interest of any party will not be prejudiced thereby.*

That the proponent of a rule or order has the burden of proof means not only that the party initiating the proceeding has the general burden of coming forward with a prima facie case but that other parties, who are proponents of some different result, also for that purpose have a burden to maintain. Similarly the requirement that no sanction be imposed or rule or order be issued except upon evidence of the kind specified means that the proponents of a denial of relief must sustain such denial by that kind of evidence. For example, credible and credited evidence submitted by the applicant for a license may not be ignored except upon the requisite kind and quality of contrary evidence. No agency is authorized to stand mute and arbitrarily disbelieve credible evidence. Except as applicants for a license or other privilege may be required to come forward with a prima facie showing, no agency is entitled to presume that the conduct of any person or status of any enterprise is unlawful or improper.

The second and primary sentence of the subsection is framed on the theory that an administrative hearing is to be compared with an equity proceeding in the courts. The mere admission of evidence is not to be taken as prejudicial error (there being no lay jury to be protected from improper influence) although irrelevant and unduly repetitious evidence is to be excluded as a matter of efficiency and good practice; and no finding or conclusion may be entered except upon evidence which is plainly of the requisite materiality and competence; that is, "relevant, reliable, and probative evidence." Thus while the exclusionary "rules of evidence" do not apply except as the agency may as a matter of good practice simplify the hearing and record by excluding obviously improper or unnecessary evidence, the standards and principles of probity and reliability of evidence must be the same as those prevailing in courts of law or equity in nonadministrative cases. There are no real rules of probity and reliability even in courts of law, but there are certain standards and principles—usually applied tacitly and resting mainly upon common sense—which people engaged in the conduct of responsible affairs instinctively understand and act upon. They may vary with the circumstances and kind of case, but they exist and must be rationally applied. These principles, under this subsection, are to govern in administrative proceedings.

The right of cross-examination extends, in a proper case, to written evidence submitted pursuant to the last sentence of the subsection as well as to cases in which oral or documentary evidence is received in open hearing. Even in the latter case, subject to the appropriate safeguards, technical data may as a matter of convenience be reduced to writing and introduced as in courts. The written evidence provision of the last sentence of the subsection is designed to cover situations in which, as a matter of general rule or practice, the submission of the whole or substantial portions of the evidence in a case is done in written form. In those situations, however, the provision limits

the practice to specified classes of cases and, even then, only where and to the extent that "the interest of any party will not be prejudiced thereby." To the extent that cross-examination is necessary to bring out the truth, the party should have it. Also, an adequate opportunity must be provided for a party to prepare and submit appropriate rebuttal evidence.

(d) RECORD.—*The record of evidence taken and papers filed is exclusive for decision and, upon payment of costs, is available to the parties. Where decision rests on official notice of a material fact not appearing in the evidence of record, any party may on timely request show the contrary.*

The "official notice" mentioned relates to the administrative practice of taking facts as shown and true though not in the record. This is done by analogy to judicial notice familiar in court procedure. Where agencies take such notice they must so state on the record or in their decisions and then afford the parties an opportunity to show the contrary.

SEC. 8. DECISIONS.—*Section 8 applies to cases in which a hearing is required to be conducted pursuant to section 7.*

Like section 7, upon which section 8 depends, this section is supplementary to sections 4 and 5 in cases in which agency action is required to be taken after hearing provided by statute and not otherwise excepted from the operation of sections 4 or 5.

(a) ACTION BY SUBORDINATES.—*Where the agency has not presided at the reception of the evidence, the presiding officer (or any other officer qualified to preside, in cases exempted from subsec. (c) of sec. 5) must make the initial decision unless the agency—by general rule or in a particular case—undertakes to make the initial decision. If the presiding officer makes the initial decision, it becomes the decision of the agency in the absence of an appeal to the agency or review by the agency on its own motion. On such appeal or review, the agency has all the powers it would have had in making the initial decision. If the agency makes the initial decision without having presided at the taking of the evidence, whatever officer took the evidence must first make a recommended decision except that, in rule making or determining applications for initial licenses, (1) the agency may instead issue a tentative decision or any of its responsible officers may recommend a decision or (2) such intermediate procedure may be wholly omitted in any case in which the agency finds on the record that the execution of its functions imperatively and unavoidably so requires.*

This subsection requires in effect that the officer who presided shall make the initial decision in the case, or the agency may do so, but in the latter event the officer who presided must make a recommended decision. However, the recommended decision may be supplied by a tentative agency decision or a proposed decision by its responsible officers in certain cases or, where the due and timely execution of agency functions will not permit such intermediate action, it may be omitted entirely. The parties might agree to waive such intermediate procedure in any case. The reference to an appeal or review by the agency does not cut off any further appeals to or review by any existing superior agency authorized to hear appeals or review decisions of the first agency. The agency for which the examiner or other presiding officer functions may not dispense with the recommended decision except as provided by the subsection.

The provision that on agency review of initial examiners' decisions the agency shall have all the powers it would have had in making the initial decision does not mean that the initial examiners' decisions (or their recommended decisions) are without effect. They become a part of the record in the case. They would be of consequence, for example, to the extent that material facts in any case depend on the determination of credibility of witnesses as shown by their demeanor or conduct at the hearing. Since the examiner system is made necessary because agencies themselves cannot hear cases, some device must be used to bridge the gap between the officials who hear and those who decide cases.

The alternative intermediate procedure which an agency may adopt in rule making or determining applications for initial licenses lies in the discretion of the agency. In order to simplify the bill, the exception which confers this discretion is broadly drawn. However, it may be noted that even in those cases, if issues of fact are sharply controverted or the case or class of cases tends to become accusatory in nature, sound practice would require the agency to adopt the intermediate recommended decision procedure

(b) SUBMITTALS AND DECISIONS.—*Prior to each recommended or other decision or review the parties must be given an opportunity to submit for the full consideration of deciding officers (1) proposed findings and conclusions or (2) exceptions to recommended decisions or other decisions being appealed or reviewed, and (3) supporting reasons for such findings, conclusions, or exceptions. All recommended or other decisions become a part of the record and must include (1) findings and conclusions, as well as the basis therefor, upon all the material issues of fact, law, or discretion presented by the record and (2) the appropriate agency action or denial.*

Ordinarily proposed findings and conclusions are submitted only to the officers making the initial decision, and the parties present exceptions thereafter if they contest the result. However, such exceptions may in form or effect include proposed findings or conclusions for the reviewing authority to consider as a part of the exceptions. "Supporting reasons" means that briefs on the law and facts must be received and fully considered by every recommending, deciding, or reviewing officer. They must also hear such oral argument as may be required by law. Where the issues of fact are serious and the case becomes one adversary in character, the agency should provide for oral argument before all recommending, deciding, or reviewing officers at least as a matter of good practice.

The requirement that the agency must state the basis for its findings and conclusions means that such findings and conclusions must be sufficiently related to the record as to advise the parties of their record basis. Most agencies will do so by opinions which reason and relate the issues of fact, law, and discretion. Statements of reasons, however, may be long or short as the nature of the case and the novelty or complexity of the issues may require.

Findings and conclusions must include all the relevant issues presented by the record in the light of the law involved. They may be few or many. A particular conclusion of law may render certain issues and findings immaterial, or vice versa. Where oral testimony is conflicting or subject to doubt of its credibility, the credibility of witnesses would be a necessary finding if the facts are material. It should also be noted that the relevant issues extend to matters of

administrative discretion as well as of law and fact. This is important because agencies often determine whether they have power to act rather than whether their discretion should be exercised or how it should be exercised. Furthermore, without a disclosure of the basis for the exercise of, or failure to exercise, discretion, the parties are unable to determine what other or additional facts they might offer by way of rehearing or reconsideration of decisions.

SEC. 9. SANCTIONS AND POWERS.—*Section 9 relating to powers and sanctions refers to the exercise of any power or authority by an agency.*

Unlike sections 7 and 8, this section applies in all relevant cases, whether or not the agency is required by statute to proceed upon hearing or in any special manner. It also applies to any power or authority that an agency may assume to exercise.

(*a*) IN GENERAL.—*No sanction may be imposed or substantive rule or order be issued except within the jurisdiction delegated to the agency and as authorized by law.*

This subsection embraces both substantive and procedural requirements of law. It means that agencies may not undertake anything which statutes or other appropriate sources of authority (such as treaties) do not authorize them to do. Where these sources are specific in the authority granted, no additional authority may be assumed. Where these sources are general, no authority beyond the generality granted may be exercised. In particular, agencies may not impose sanctions which have not been specifically or generally provided for them to impose. Thus, an agency which is authorized only to issue cease-and-desist orders may not set up a licensing system; and conversely a licensing authority may not assume to issue desist orders. A rule-making authority may not undertake to adjudicate cases, and vice versa. Of course some statutes confer upon the same agency authority to exercise more than one of these forms of regulation. An agency authorized to regulate trade practices may not regulate banking, and so on. Similarly, no agency may undertake directly or indirectly to exercise the functions of some other agency. The subsection confines each agency to the jurisdiction delegated to it by law.

(*b*) LICENSES.—*Agencies are required, with due regard for the rights or privileges of all the interested parties or persons adversely affected, to proceed with reasonable dispatch to conclude and decide proceedings on applications for licenses. They are not to withdraw a license without first giving the licensee notice in writing and an opportunity to demonstrate or achieve compliance with all lawful requirements, except in cases of wilfulness or those in which public health, interest, or safety requires otherwise. In businesses of a continuing nature, no license expires until timely applications for new licenses or renewals are determined by the agency.*

This section operates in all cases whether or not hearing is required. The requirement of dispatch means that agencies must proceed as rapidly as is feasible and practicable, rather than at their own convenience. Undue delays are subject to correction by mandatory injunction pursuant to section 10. The exceptions to the second sentence, regarding revocations, apply only where the demonstrable facts fully and fairly warrant the application of the exceptions. Willfulness must be manifest. The same is true of "public health, interest, or safety." The standard of "public * * * interest"

Defs.' MSJ App. 352

means a situation requiring immediate action irrespective of the equities or injuries to the licensee, but the term does not confer upon agencies an arbitrary discretion to ignore the requirement of notice and an opportunity to demonstrate compliance. However, this limitation does not apply to temporary permits or temporary licenses.

SEC. 10. JUDICIAL REVIEW.—*Section 10 on judicial review does not apply in any situation so far as there are involved matters with respect to which statutes preclude judicial review or agency action is by law committed to agency discretion.*

Very rarely do statutes withhold judicial review. It has never been the policy of Congress to prevent the administration of its own statutes from being judicially confined to the scope of authority granted or to the objectives specified. Its policy could not be otherwise, for in such a case statutes would in effect be blank checks drawn to the credit of some administrative officer or board.

The basic exception of matters committed to agency discretion would apply even if not stated at the outset. If, for example, statutes are drawn in such broad terms that in a given case there is no law to apply, courts of course have no statutory question to review. That situation cannot be remedied by an administrative procedure act but must be treated by the revision of statutes conferring administrative powers. However, where statutory standards, definitions, or other grants of power deny or require action in given situations or confine an agency within limits as required by the Constitution, then the determination of the facts does not lie in agency discretion but must be supported by either the administrative or judicial record.

(a) RIGHT OF REVIEW.—*Any person suffering legal wrong because of any agency action, or adversely affected within the meaning of any statute, is entitled to judicial review.*

This subsection confers a right of review upon any person adversely affected in fact by agency action or aggrieved within the meaning of any statute. The phrase "legal wrong" means such a wrong as is specified in subsection (e) of this section. It means that something more than mere adverse personal effect must be shown—that is, that the adverse effect must be an illegal effect. The law so made relevant is not just constitutional law but any and all applicable law.

(b) FORM AND VENUE OF ACTION.—*The technical form of proceeding for judicial review is any special proceeding provided by statute or, in the absence or inadequacy thereof, any relevant form of legal action (such as those for declaratory judgments or injunctions) in any court of competent jurisdiction. Moreover, agency action is also made subject to judicial review in any civil or criminal proceeding for enforcement except to the extent that prior, adequate, and exclusive opportunity for such review is provided by law.*

The first sentence of this subsection is an express statutory recognition of the so-called common-law actions as being appropriate and authorized means of judicial review, operative whenever special forms of judicial review are lacking or insufficient. The declaratory judgment procedure, for example, may be operative before statutory forms of review are available; and in a proper case it may be utilized to determine the validity or application of agency action. The expression "special statutory review" means not only special review proceedings wholly created by statute, but so-called common-law forms referred to and adopted by statute as the appropriate mode of

ADMINISTRATIVE PROCEDURE ACT            27

review. The exception from "prior, adequate, and exclusive  *  *  *
review" in the second sentence is operative only where statutes,
either expressly or as they are interpreted, require parties to resort to
some special statutory form of judicial review which is prior in time
and adequate to the case.

(c) REVIEWABLE ACTS.—*Agency action made reviewable specially
by statute or final agency action for which there is no other adequate
judicial remedy is subject to judicial review. In addition, preliminary
or procedural matters not directly subject to review are reviewable upon
the review of final actions. Except as statutes may expressly require
otherwise, agency action is final whether or not there has been presented
or determined any application for a declaratory order, for any form of
reconsideration, or (unless the agency otherwise requires by rule) for an
appeal to superior agency authority.*

"Final" action includes any effective agency action for which
there is no other adequate remedy in any court.  "Reconsideration"
includes reopening, rehearing, etc.

The last clause, permitting agencies to require by rule that an
appeal be taken to superior agency authority before judicial review
may be sought, is designed to implement the provisions of section
8 (a).  Pursuant to that subsection an agency may permit an exam-
iner to make the initial decision in a case, which becomes the agency's
decision in the absence of an appeal to or review by the agency.  If
there is such review or appeal, the examiner's initial decision becomes
inoperative until the agency determines the matter.  For that reason
this subsection permits an agency also to require by rule that, if any
party is not satisfied with the initial decision of a subordinate hearing
officer, the party must first appeal to the agency (the decision mean-
while being inoperative) before resorting to the courts.  In no case
may appeal to "superior agency authority" be required by rule unless
the administrative decision meanwhile is inoperative, because other-
wise the effect of such a requirement would be to subject the party to
the agency action and to repetitious administrative process without
recourse.  There is a fundamental inconsistency in requiring a person
to continue "exhausting" administrative processes after administra-
tive action has become, and while it remains, effective.

(d) INTERIM RELIEF.—*Pending judicial review any agency may post-
pone the effective date of its action.  Upon conditions and as may be
necessary to prevent irreparable injury, any reviewing court may post-
pone the effective date of any agency action or preserve the status quo
pending conclusion of review proceedings.*

This section permits either agencies or courts, if the proper showing
be made, to maintain the status quo.  While it would not permit a
court to grant an initial license, it provides intermediate judicial
relief for every other situation in order to make judicial review effec-
tive.  The authority granted is equitable and should be used by both
agencies and courts to prevent irreparable injury or afford parties an
adequate judicial remedy.

(e) SCOPE OF REVIEW.—*Reviewing courts are required to decide all
relevant questions of law, interpret constitutional and statutory provisions,
and determine the meaning or applicability of any agency action.  They
must (A) compel action unlawfully withheld or unreasonably delayed and
(B) hold unlawful any action, findings, or conclusions found to be (1)
arbitrary, (2) contrary to the Constitution, (3) contrary to statutes or short
of statutory right, (4) without observance of procedure required by law, (5)*

*unsupported by substantial evidence upon the administrative record where the agency is authorized by statute to hold hearings subject to sections 7 and 8, or (6) unwarranted by the facts so far as the latter are subject to trial de novo. In making these determinations the court is to consider the whole record or such parts as the parties may cite, and due account must be taken of the rule of prejudicial error.*

This subsection provides that questions of law are for courts rather than agencies to decide in the last analysis and it also lists the several categories of questions of law. It expressly recognizes the right of properly interested parties to compel agencies to act where they improvidently refuse to act. "Finding" and "conclusion" also mean failure to find or conclude as the law and the record may require. "Short of statutory right" means that agencies are not authorized to give partial relief where a party demonstrates his right to the whole. "Without observance of procedure required by law" means not only the procedures required by this bill but any other procedures the law may require. "Substantial evidence" means evidence which on the whole record is clearly substantial, sufficient to support a finding or conclusion under section 7 (c), and material to the issues.

The sixth category, respecting the establishment of facts upon trial de novo, would require the reviewing court to determine the facts in any case of adjudication not subject to sections 7 and 8. It would also require the judicial determination of facts in connection with rule making or any other conceivable form of agency action to the extent that the facts were relevant to any pertinent issues of law presented. For example, statutes providing for "reparation orders", in which agencies determine damages and award money judgments, usually state that the money orders issued are merely prima facie evidence in the courts and the parties subject to them are permitted to introduce evidence in the court in which the enforcement action is pending. In other cases, the test is whether there has been a statutory administrative hearing of the facts which is adequate and exclusive for purposes of review. Thus, where adjudications such as tax assessments are not made upon an administrative hearing and record, contests may involve a trial of the facts in the Tax Court or the United States district courts. Where administrative agencies deny parties money to which they are entitled by statute or rule, the claimants may sue as for any other claim and in so doing try out the facts in the Court of Claims or United States district courts as the case may be. Where a court enforces or applies an administrative rule, the party to whom it is applied may offer evidence and show the facts upon which he bases a contention that he is not subject to the terms of the rule. Where for example an affected party claims in a judicial proceeding that a rule issued without an administrative hearing (and not required to be issued after such hearing) is invalid, he may show the facts upon which he predicates such invalidity.

The requirement of review upon "the whole record" means that courts may not look only to the case presented by one party, since other evidence may weaken or even indisputably destroy that case. The requirement that account shall be taken "of the rule of prejudicial error" means that a procedural omission which has been cured by affording the party the procedure to which he was originally entitled is not a reversible error.

SEC. 11. EXAMINERS.—*Subject to the civil-service and other laws not inconsistent with this bill, agencies are required to appoint such examiners*

ADMINISTRATIVE PROCEDURE ACT                          **29**

*as may be necessary for proceedings under sections 7 and 8, who are to be assigned to cases in rotation so far as practicable and to perform no inconsistent duties. They are removable only for good cause determined by the Civil Service Commission after opportunity for hearing and upon the record thereof. They are to receive compensation prescribed by the Commission independently of agency recommendations or ratings. One agency may, with the consent of another and upon selection by the Commission, borrow examiners from another. The Commission is given the necessary powers to operate under this section.*

That examiners be "qualified and competent" requires the Civil Service Commission to fix appropriate qualifications and the agencies to seek fit persons. In view of the tenure and compensation requirements of the section, designed to make examiners largely independent, self-interest and due concern for the proper performance of public functions will inevitably move agencies to secure the highest type of examiners.

The purpose of this section is to render examiners independent and secure in their tenure and compensation. The section thus takes a different ground than the present situation, in which examiners are mere employees of an agency, and other proposals for a completely separate "examiners' pool" from which agencies might draw for hearing officers. Recognizing that the entire tradition of the Civil Service Commission is directed toward security of tenure, it seems wise to put that tradition to use in the present case. However, additional powers are conferred upon the Commission. It must afford any examiner an opportunity for a hearing before acceding to an agency request for removal, and even then its action would be subject to judicial review. The hearing and decision would be made under sections 7 and 8 of this bill. The requirement of assignment of examiners "in rotation" prevents an agency from disfavoring an examiner by rendering him inactive.

In the matter of examiners' compensation the section adds greatly to the Commission's powers and function. It must prescribe and adjust examiners' salaries, independently of agency ratings and recommendations. The stated inapplicability of specified sections of the Classification Act carries into effect that authority. The Commission would exercise its powers by classifying examiners' positions and, upon customary examination through its agents, shift examiners to superior classifications or higher grades as their experience and duties may require. The Commission might consult the agency, as it now does in setting up positions or reclassifying positions, but it would act upon its own responsibility and with the objects of the bill in mind.

SEC. 12. CONSTRUCTION AND EFFECT.—*Nothing in the bill is to diminish constitutional rights or limit or repeal additional requirements of law. Requirements of evidence and procedure are to apply equally to agencies and private persons except as otherwise provided by law. The unconstitutionality of any portion or application of the bill is not to affect other portions or applications. Agencies are granted all authority necessary to comply with the bill. Subsequent legislation is not to modify the bill except as it may do so expressly. The bill would become law three months after its approval except that sections 7 and 8 take effect six months after approval, the requirements of section 11 become effective a year after approval, and no requirement is mandatory as to any agency proceeding initiated prior to the effective date of such requirement.*

The word "initiated" in the final clause of the section means a proceeding formally begun as by the issuance of a complaint by the agency (irrespective of prior charges or investigations) or of notice of a rule-making hearing. As to new cases, the effective dates provided in section 12 are deferred longer so far as sections 7 and 8 are concerned in order to afford agencies ample time to prepare and make any adjustments required in their procedures. The selection of examiners under section 11 is deferred for a year in order to permit present military service personnel an opportunity to qualify for these positions.

## V. GENERAL COMMENTS

The bill is designed to operate as a whole and, as previously stated, its provisions are interrelated. At the same time, however, there are certain provisions which touch on subjects long regarded as of the highest importance. On those subjects, such as the separation of examiners from the agencies they serve, there has been a wide divergence of views. The committee has in such cases taken the course which it believes will suffice without being excessive. Moreover, amendatory or supplementary legislation can supply any deficiency which experience discloses in those cases. The committee believes that special note should be made of the following situations:

The exemption of rule making and determining initial applications for licenses from provisions of sections 5 (c), 7 (c), and 8 (a) may require change if, in practice, it develops that they are too broad. Earlier in this report, in commenting upon some of those provisions, the committee has expressed its reasons for the language used and has stated that, where cases present sharply contested issues of fact, agencies should not as a matter of good practice take advantage of the exemptions.

Should the preservation in section 7 (a) of the "conduct of specified classes of proceedings in whole or part by or before boards or other officers specially provided for by or designated pursuant to statute" prove to be a loophole for avoidance of the examiner system in any real sense, corrective legislation would be necessary. That provision is not intended to permit agencies to avoid the use of examiners but to preserve special statutory types of hearing officers who contribute something more than examiners could contribute and at the same time assure the parties fair and impartial procedure.

The basic provision respecting evidence in section 7 (c)—requiring that any agency action must be supported by plainly "relevant, reliable, and probative evidence"—will require full compliance by agencies and diligent enforcement by reviewing courts. Should that language prove insufficient to fix and maintain the standards of proof, supplemental legislation will become necessary.

The "substantial evidence" rule set forth in section 10 (e) is exceedingly important. As a matter of language, substantial evidence would seem to be an adequate expression of law. The difficulty comes about in the practice of agencies to rely upon (and of courts to tacitly approve) something less—to rely upon suspicion, surmise, implications, or plainly incredible evidence. It will be the duty of the courts to determine in the final analysis and in the exercise of their independent judgment, whether on the whole record the evidence in a given instance is sufficiently substantial to support a finding, conclusion, or other agency action as a matter of law. In

the first instance, however, it will be the function of the agency to determine the sufficiency of the evidence upon which it acts—and the proper performance of its public duties will require it to undertake this inquiry in a careful and dispassionate manner. Should these objectives of the bill as worded fail, supplemental legislation will be required.

The foregoing are by no means all the provisions which will require vigilant attention to assure their proper operation. Almost any provision of the bill, if wrongly interpreted or minimized, may present occasion for supplemental legislation. On the other hand, should it appear at any time that the requirements result in some undue impairment of a particular administrative function, appropriate amendments or exceptions may be in order.

INTERPRETATION AND ENFORCEMENT.—Except in a few respects, this is not a measure conferring administrative powers but is one laying down definitions and stating limitations. These definitions and limitations must, to be sure, be interpreted and applied by agencies affected by them in the first instance. But the enforcement of the bill, by the independent judicial interpretation and application of its terms, is a function which is clearly conferred upon the courts in the final analysis.

It will thus be the duty of reviewing courts to prevent avoidance of the requirements of the bill by any manner or form of indirection, and to determine the meaning of the words and phrases used. For example, in several provisions the expression "good cause" is used. The cause so specified must be interpreted by the context of the provision in which it is found and the purpose of the entire section and bill. Cause found must be real and demonstrable. If the agency is proceeding upon a statutory hearing and record, the cause will appear there; otherwise it must be such that the agency may show the facts and considerations warranting the finding in any proceeding in which the finding is challenged. The same would be true in the case of findings other than of good cause, required in the bill. As has been said, these findings must in the first instance be made by the agency concerned but, in the final analysis, their propriety in law and on the facts must be sustainable upon inquiry by a reviewing court.

Nevertheless, in the nature of things, for most practical purposes it is to the agencies that the Congress and the people must look for fair administration of the laws and compliance with this bill. Judicial review is of utmost importance, but it can be operative in relatively few cases because of the cost and general hazards of litigation. It is indispensable since its mere existence generally precludes the arbitrary exercise of powers or assumption of powers not granted. Yet, in the vast majority of cases the agency concerned usually speaks the first and last word. For that reason the agencies must make the first, primary, and most far-reaching effort to comply with the terms and the spirit of this bill.

It is the view of the committee that this bill is not an indictment of administrative agencies or administrative processes. The committee takes no position one way or the other on these questions. By enacting this bill, the Congress—expressing the will of the people—will be laying down for the guidance of all branches of the Government and all private interests in the country a policy respecting the minimum requirements of fair administrative procedure.

The committee recommends that the bill as reported be enacted.

# APPENDIXES

---

## Appendix A

*That this Act may be cited as the "Administrative Procedure Act".*

### DEFINITIONS

SEC. 2. As used in this Act—

(a) AGENCY.—"Agency" means each authority (whether or not within or subject to review by another agency) of the Government of the United States other than Congress, the courts, or the governments of the possessions, Territories, or the District of Columbia. Nothing in this Act shall be construed to repeal delegations of authority as provided by law. Except as to the requirements of section 3, there shall be excluded from the operation of this Act (1) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them, (2) courts martial and military commissions, (3) military or naval authority exercised in the field in time of war or in occupied territory, or (4) functions which by law expire on the termination of present hostilities, within any fixed period thereafter, or before July 1, 1947, and the functions conferred by the following statutes: Selective Training and Service Act of 1940; Contract Settlement Act of 1944; Surplus Property Act of 1944.

(b) PERSON AND PARTY.—"Person" includes individuals, partnerships, corporations, associations, or public or private organizations of any character other than agencies. "Party" includes any person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party, in any agency proceeding; but nothing herein shall be construed to prevent an agency from admitting any person or agency as a party for limited purposes.

(c) RULE AND RULE MAKING.—"Rule" means the whole or any part of any agency statement of general applicability designed to implement, interpret, or prescribe law or policy or to describe the organization, procedure, or practice requirements of any agency. "Rule making" means agency process for the formulation, amendment, or repeal of a rule and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services, or allowances, therefor, or of valuations, costs, or accounting, or practices bearing upon any of the foregoing.

(d) ORDER AND ADJUDICATION.—"Order" means the whole or any part of the final disposition (whether affirmative, negative, or declaratory in form) of any agency in any matter other than rule making but including licensing. "Adjudication" means agency process for the formulation of an order.

(e) LICENSE AND LICENSING.—"License" includes the whole or part of any agency permit, certificate, approval, registration, charter, membership, statutory exemption, or other form of permission. "Licensing" includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license.

(f) SANCTION AND RELIEF.—"Sanction" includes the whole or part of any agency (1) prohibition, requirement, limitation, or other condition affecting the freedom of any person; (2) withholding of relief; (3) imposition of any form of penalty or fine; (4) destruction, taking, seizure, or withholding of property; (5) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees; (6) requirement, revocation, or suspension of a license; or (7) taking of other compulsory or restrictive action. "Relief" includes the whole or part of any agency (1) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy; (2) recognition of any claim, right, immunity, privilege, exemption, or exception; or (3) taking of any other action beneficial to any person.

(g) AGENCY PROCEEDING AND ACTION.—"Agency proceeding" means any agency process as defined in subsections (c), (d), and (e) of this section. For the purposes of section 10, "agency action" includes the whole or part of every agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.

82

ADMINISTRATIVE PROCEDURE ACT                    33

## PUBLIC INFORMATION

SEC. 3. Except to the extent that there is involved (1) any function of the United States requiring secrecy in the public interest or (2) any matter relating solely to the internal management of an agency—

(a) RULES.—Every agency shall separately state and currently publish in the Federal Register (1) descriptions of its central and field organization; (2) the established places and methods whereby the public may secure information or make submittals or requests; (3) statements of the general course and method by which its rule making and adjudicating functions are channeled and determined, including the nature and requirements of all formal or informal procedures available as well as forms and instructions as to the scope and contents of all papers, reports, or examinations; and (4) substantive rules adopted as authorized by law and statements of general policy or interpretations formulated and adopted by the agency for the guidance of the public. No person shall in any manner be required to resort to organization or procedure not so published.

(b) OPINIONS AND ORDERS.—Every agency shall publish or, in accordance with published rule, make available to public inspection all final opinions or orders in the adjudication of cases except those required for good cause to be held confidential and not cited as precedents.

(c) PUBLIC RECORDS.—Save as otherwise required by statute, matters of official record shall in accordance with published rule be made available to persons properly and directly concerned except information held confidential for good cause found.

## RULE MAKING

SEC. 4. Except to the extent that there is involved (1) any military, naval, or foreign affairs function of the United States or (2) any matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts—

(a) NOTICE.—General notice of proposed rule making shall be published in the Federal Register and shall include (1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved. Except where notice or hearing is required by statute, this subsection shall not apply to interpretative rules, general statements of policy, rules of agency organization, procedure, or practice, or in any situation in which the agency for good cause finds (and incorporates the finding and a brief statement of the reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(b) PROCEDURES.—After notice required by this section, the agency shall afford interested persons an opportunity to participate in the rule making through submission of written data, views, or argument with or without opportunity to present the same orally in any manner; and, after consideration of all relevant matter presented, the agency shall incorporate in any rules adopted a concise general statement of their basis and purpose. Where rules are required by law to be made upon the record after opportunity for or upon an agency hearing, the requirements of sections 7 and 8 shall apply in place of the provisions of this subsection.

(c) EFFECTIVE DATES.—The required publication or service of any substantive rule (other than one granting or recognizing exemption or relieving restriction or interpretative rules and statements of policy) shall be made not less than thirty days prior to the effective date thereof except as otherwise provided by the agency upon good cause found and published with the rule.

(d) PETITIONS.—Every agency shall accord any interested person the right to petition for the issuance, amendment, or repeal of a rule.

## ADJUDICATION

SEC. 5. In every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing, except to the extent that there is involved (1) any matter subject to a subsequent trial of the law and the facts de novo in any court; (2) the selection or tenure of an officer or employee of the United States other than examiners appointed pursuant to section 11; (3) proceedings in which decisions rest solely on inspections, tests, or elections; (4) the conduct of military, naval, or foreign affairs functions; (5) cases in which an agency is acting as an agent for a court; and (6) the certification of employee representatives—

(a) NOTICE.—Persons entitled to notice of an agency hearing shall be timely informed of (1) the time, place, and nature thereof; (2) the legal authority and jurisdiction under which the hearing is to be held; and (3) the matters of fact and law asserted.

**34**                ADMINISTRATIVE PROCEDURE ACT

*In instances in which private persons are the moving parties, other parties to the proceeding shall give prompt notice of issues controverted in fact or law; and in other instances agencies may by rule require responsive pleading. In fixing the times and places for hearings, due regard shall be had for the convenience and necessity of the parties or their representatives.*

*(b) PROCEDURE.—The agency shall afford all interested parties opportunity for (1) the submission and consideration of facts, argument, offers of settlement, or proposals of adjustment where time, the nature of the proceeding, and the public interest permit, and (2) to the extent that the parties are unable so to determine any controversy by consent, hearing and decision upon notice and in conformity with sections 7 and 8.*

*(c) SEPARATION OF FUNCTIONS.—The same officers who preside at the reception of evidence pursuant to section 7 shall make the recommended decision or initial decision required by section 8 except where such officers become unavailable to the agency. Save to the extent required for the disposition of ex parte matters as authorized by law, no such officer shall consult any person or party on any fact in issue unless upon notice and opportunity for all parties to participate; nor shall such officer be responsible to or subject to the supervision or direction of any officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency. No officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency in any case shall, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 8 except as witness or counsel in public proceedings. This subsection shall not apply in determining applications for initial licenses or the past reasonableness of rates; nor shall it be applicable in any manner to the agency or any member or members of the body comprising the agency.*

*(d) DECLARATORY ORDERS.—The agency is authorized in its sound discretion, with like effect as in the case of other orders, to issue a declaratory order to terminate a controversy or remove uncertainty.*

### ANCILLARY MATTERS

*SEC. 6. Except as otherwise provided in this Act—*

*(a) APPEARANCE.—Any person compelled to appear in person before any agency or representative thereof shall be accorded the right to be accompanied, represented, and advised by counsel, or if permitted by the agency, by other qualified representative. Every party shall be accorded the right to appear in person or by or with counsel or other duly qualified representative in any agency proceeding. So far as the responsible conduct of public business permits, any interested person may appear before any agency or its responsible officers or employees for the presentation, adjustment, or determination of any issue, request, or controversy in any proceeding or in connection with any agency function, including stop-order or other summary actions. Every agency shall proceed with reasonable dispatch to conclude any matter presented to it except that due regard shall be had for the convenience and necessity of the parties or their representatives. Nothing herein shall be construed either to grant or to deny to any person who is not a lawyer the right to appear for or represent others before any agency or in any agency proceeding.*

*(b) INVESTIGATIONS.—No process, requirement of a report, inspection, or other investigative act or demand shall be issued, made, or enforced in any manner or for any purpose except as authorized by law. Every person compelled to submit data or evidence shall be entitled to retain or, on payment of lawfully prescribed costs, procure a copy or transcript thereof, except that in a nonpublic investigatory proceeding the witness may for good cause be limited to inspection of the official transcript of his testimony.*

*(c) SUBPENAS.—Agency subpenas authorized by law shall be issued to any party upon request and, as may be required by rules of procedure, upon a statement or showing of general relevance and reasonable scope of the evidence sought. Upon contest the court shall sustain any such subpena or similar process or demand to the extent that it is found to be in accordance with law and, in any proceeding for enforcement, shall issue an order requiring the appearance of the witness or the production of the evidence or data under penalty of punishment for contempt in case of contumacious failure to do so.*

*(d) DENIALS.—Prompt notice shall be given of the denial in whole or in part of any written application, petition, or other request of any interested person made in connection with any agency proceeding. Except in affirming a prior denial or where the denial is self-explanatory, such notice shall be accompanied by a simple statement of grounds.*

## ADMINISTRATIVE PROCEDURE ACT    85

### HEARINGS

*Sec. 7. In hearings which section 4 or 5 requires to be conducted pursuant to this section—*

*(a) PRESIDING OFFICERS.—There shall preside at the taking of evidence (1) the agency, (2) one or more members of the body which comprises the agency, or (3) one or more examiners appointed as provided in this Act; but nothing in this Act shall be deemed to supersede the conduct of specified classes of proceedings in whole or part by or before boards or other officers specially provided for by or designated pursuant to statute. The functions of all presiding officers and of officers participating in decisions in conformity with section 8 shall be conducted in an impartial manner. Any such officer may at any time withdraw if he deems himself disqualified; and, upon the filing in good faith of a timely and sufficient affidavit of personal bias or disqualification of any such officer, the agency shall determine the matter as a part of the record and decision in the case.*

*(b) HEARING POWERS.—Officers presiding at hearings shall have authority, subject to the published rules of the agency and within its powers, to (1) administer oaths and affirmations, (2) issue subpenas authorized by law, (3) rule upon offers of proof and receive relevant evidence, (4) take or cause depositions to be taken whenever the ends of justice would be served thereby, (5) regulate the course of the hearing, (6) hold conferences for the settlement or simplification of the issues by consent of the parties, (7) dispose of procedural requests or similar matters, (8) make decisions or recommend decisions in conformity with section 8, and (9) take any other action authorized by agency rule consistent with this Act.*

*(c) EVIDENCE.—Except as statutes otherwise provide, the proponent of a rule or order shall have the burden of proof. Any evidence, oral or documentary, may be received, but every agency shall as a matter of policy provide for the exclusion of immaterial and unduly repetitious evidence and no sanction shall be imposed or rule or order be issued except as supported by relevant, reliable, and probative evidence. Every party shall have the right to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts. In rule making or determining claims for money or benefits or applications for initial licenses any agency may, where the interest of any party will not be prejudiced thereby, adopt procedures for the submission of all or part of the evidence in written form.*

*(d) RECORD.—The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, shall constitute the exclusive record for decision in accordance with section 8 and. upon payment of lawfully prescribed costs, shall be made available to the parties. Where any agency decision rests on official notice of a material fact not appearing in the evidence in the record, any party shall on timely request be afforded an opportunity to show the contrary.*

### DECISIONS

*Sec. 8. In cases in which a hearing is required to be conducted in conformity with section 7—*

*(a) ACTION BY SUBORDINATES.—In cases in which the agency has not presided at the reception of the evidence, the officer who presided (or, in cases not subject to subsection (c) of section 5, any other officer or officers qualified to preside at hearings pursuant to section 7) shall initially decide the case or the agency shall require (in specific cases or by general rule) the entire record to be certified to it for initial decision. Whenever such officers make the initial decision and in the absence of either an appeal to the agency or review upon motion of the agency within time provided by rule, such decision shall without further proceedings then become the decision of the agency. On appeal from or review of the initial decisions of such officers the agency shall, except as it may limit the issues upon notice or by rule, have all the powers which it would have in making the initial decision. Whenever the agency makes the initial decision without having presided at the reception of the evidence, such officers shall first recommend a decision except that in rule making or determining applications for initial licenses (1) in lieu thereof the agency may issue a tentative decision or any of its responsible officers may recommend a decision or (2) any such procedure may be omitted in any case in which the agency finds upon the record that due and timely execution of its function imperatively and unavoidably so requires.*

*(b) SUBMITTALS AND DECISIONS.—Prior to each recommended, initial, or tentative decision, or decision upon agency review of the decision of subordinate officers the parties shall be afforded a reasonable opportunity to submit for the consideration of the officers participating in such decisions (1) proposed findings and conclusions, or*

*(2) exceptions to the decisions or recommended decisions of subordinate officers or to tentative agency decisions, and (3) supporting reasons for such exceptions or proposed findings or conclusions.   All decisions (including initial, recommended, or tentative decisions) shall become a part of the record and include a statement of (1) findings and conclusions, as well as the basis therefor, upon all the material issues of fact, law, or discretion presented; and (2) the appropriate rule, order, sanction, relief, or denial thereof.*

### SANCTIONS AND POWERS

*SEC. 9. In the exercise of any power or authority—*

*(a) IN GENERAL.—No sanction shall be imposed or substantive rule or order be issued except within jurisdiction delegated to the agency and as authorized by law.*

*(b) LICENSES.—In any case in which application is made for a license required by law to the agency, with due regard to the rights or privileges of all the interested parties or adversely affected persons and with reasonable dispatch, shall set and complete any proceedings required to be conducted pursuant to sections 7 and 8 of this Act or other proceedings required by law and shall make its decision.   Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, no withdrawal, suspension, revocation, or annulment of any license shall be lawful unless, prior to the institution of agency proceedings therefor, facts or conduct which may warrant such action shall have been called to the attention of the licensee by the agency in writing and the licensee shall have been accorded opportunity to demonstrate or achieve compliance with all lawful requirements.   In any case in which the licensee has, in accordance with agency rules, made timely and sufficient application for a renewal or a new license, no license with reference to any activity of a continuing nature shall expire until such application shall have been finally determined by the agency.*

### JUDICIAL REVIEW

*SEC. 10. Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion—*

*(a) RIGHT OF REVIEW.—Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof.*

*(b) FORM AND VENUE OF ACTION.—The form of proceeding for judicial review shall be any special statutory review proceeding relevant to the subject matter in any court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action (including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus) in any court of competent jurisdiction.   Agency action shall be subject to judicial review in civil or criminal proceedings for judicial enforcement except to the extent that prior, adequate, and exclusive opportunity for such review is provided by law.*

*(c) REVIEWABLE ACTS.—Every agency action made reviewable by statute and every final agency action for which there is no other adequate remedy in any court shall be subject to judicial review.   Any preliminary, procedural, or intermediate agency action or ruling not directly reviewable shall be subject to review upon the review of the final agency action.   Except as otherwise expressly required by statute, agency action shall be final whether or not there has been presented or determined any application for a declaratory order, for any form of reconsideration, or (unless the agency otherwise requires by rule) for an appeal to superior agency authority.*

*(d) INTERIM RELIEF.—Pending judicial review any agency is authorized, where it finds that justice so requires, to postpone the effective date of any action taken by it.   Upon such conditions as may be required and to the extent necessary to prevent irreparable injury, every reviewing court (including every court to which a case may be taken on appeal from or upon application for certiorari or other writ to a reviewing court) is authorized to issue all necessary and appropriate process to postpone the effective date of any agency action or to preserve status or rights pending conclusion of the review proceedings.*

*(e) SCOPE OF REVIEW.—So far as necessary to decision and where presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of any agency action.   It shall (A) compel agency action unlawfully withheld or unreasonably delayed; and (B) hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; (5) unsupported by substantial*

## ADMINISTRATIVE PROCEDURE ACT 87

*evidence in any case subject to the requirements of sections 7 and 8 or otherwise reviewed on the record of an agency hearing provided by statute; or (6) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by the parties, and due account shall be taken of the rule of prejudicial error.*

### EXAMINERS

*SEC. 11. Subject to the civil-service and other laws to the extent not inconsistent with this Act, there shall be appointed by and for each agency as many qualified and competent examiners as may be necessary for proceedings pursuant to sections 7 and 8, who shall be assigned to cases in rotation so far as practicable and shall perform no duties inconsistent with their duties and responsibilities as examiners. Examiners shall be removable by the agency in which they are employed only for good cause established and determined by the Civil Service Commission (hereinafter called the Commission) after opportunity for hearing and upon the record thereof. Examiners shall receive compensation prescribed by the Commission independently of agency recommendations or ratings and in accordance with the Classification Act of 1923, as amended, except that the provisions of paragraphs (2) and (3) of subsection (b) of section 7 of said Act, as amended, and the provisions of section 9 of said Act, as amended, shall not be applicable. Agencies occasionally or temporarily insufficiently staffed may utilize examiners selected by the Commission from and with the consent of other agencies. For the purposes of this section, the Commission is authorized to make investigations, require reports by agencies, issue reports, including an annual report to the Congress, promulgate rules, appoint such advisory committees as may be deemed necessary, recommend legislation, subpena witnesses or records, and pay witness fees as established for the United States courts.*

### CONSTRUCTION AND EFFECT

*SEC. 12. Nothing in this Act shall be held to diminish the constitutional rights of any person or to limit or repeal additional requirements imposed by statute or otherwise recognized by law. Except as otherwise required by law, all requirements or privileges relating to evidence or procedure shall apply equally to agencies and persons. If any provision of this Act or the application thereof is held invalid, the remainder of this Act or other applications of such provision shall not be affected. Every agency is granted all authority necessary to comply with the requirements of this Act through the issuance of rules or otherwise. No subsequent legislation shall be held to supersede or modify the provisions of this Act except to the extent that such legislation shall do so expressly. This Act shall take effect three months after its approval except that sections 7 and 8 shall take effect six months after such approval, the requirement of the selection of examiners pursuant to section 11 shall not become effective until one year after such approval, and no procedural requirement shall be mandatory as to any agency proceeding initiated prior to the effective date of such requirement.*

## APPENDIX B

OCTOBER 19, 1945.

HON. PAT McCARRAN,
   *Chairman, Senate Judiciary Committee,*
      *United States Senate, Washington, D. C.*

MY DEAR SENATOR: You have asked me to comment on S. 7, a bill to improve the administration of justice by prescribing fair administrative procedure, in the form in which it appears in the revised committee print issued October 5, 1945. I appreciate the opportunity to comment on this proposed legislation.

For more than a decade there has been pending in the Congress legislation in one form or another designed to deal horizontally with the subject of administrative procedure, so as to overcome the confusion which inevitably has resulted from leaving to basic agency statutes the prescription of the procedures to be followed or, in many instances, the delegation of authority to agencies to prescribe their own procedures. Previous attempts to enact general procedural legislation have been unsuccessful generally because they failed to recognize the significant and inherent differences between the tasks of courts and those of administrative agencies or because, in their zeal for simplicity and uniformity, they proposed too narrow and rigid a mold.

Nevertheless, the goal toward which these efforts have been directed is, in my opinion, worth while. Despite difficulties of draftsmanship, I believe that overall procedural legislation is possible and desirable. The administrative process is

**38**                      ADMINISTRATIVE PROCEDURE ACT

now well developed.   It has been subject in recent years to the most intensive and informed study—by various congressional committees, by the Attorney General's Committee on Administrative Procedure, by organizations such as the American Bar Association, and by many individual practitioners and legal scholars.   We have in general—as we did not have until fairly recently—the materials and facts at hand.   I think the time is ripe for some measure of control and prescription by legislation.   I cannot agree that there is anything inherent in the subject of administrative procedure, however complex it may be, which defies workable codification.

Since the original introduction of S. 7, I understand that opportunity has been afforded to public and private interests to study its provisions and to suggest amendments.   The agencies of the Government primarily concerned have been consulted and their views considered.   In particular, I am happy to note that your committee and the House Committee on the Judiciary, in an effort to reconcile the views of the interested parties, have consulted officers of this Department and experts in administrative law made available by this Department.

The revised committee print issued October 5, 1945, seems to me to achieve a considerable degree of reconciliation between the views expressed by the various Government agencies and the views of the proponents of the legislation.   The bill in its present form requires administrative agencies to publish or make available to the public an increased measure of information concerning their organization, functions, and procedures.   It gives to that portion of the public which is to be affected by administrative regulations an opportunity to express its views before the regulations become effective.   It prescribes, in instances in which existing statutes afford opportunity for hearing in connection with the formulation and issuance of administrative rules and orders, the procedures which shall govern such hearings.   It provides for the selection of hearing officers on a basis designed to obtain highly qualified and impartial personnel and to insure their security of tenure.   It also restates the law governing judicial review of administrative action.

The bill appears to offer a hopeful prospect of achieving reasonable uniformity and fairness in administrative procedures without at the same time interfering unduly with the efficient and economical operation of the Government.   Insofar as possible, the bill recognizes the needs of individual agencies by appropriate exemption of certain of their functions.

After reviewing the committee print, therefore, I have concluded that this Department should recommend its enactment.

My conclusion as to the workability of the proposed legislation rests on my belief that the provisions of the bill can and should be construed reasonably and in a sense which will fairly balance the requirements and interests of private persons and governmental agencies.   I think it may be advisable for me to attach to this report an appendix discussing the principal provisions of the bill.   This may serve to clarify some of the essential issues and may assist the committee in evaluating the impact of the bill on public and private interests.

I am advised by the Acting Director of the Bureau of the Budget that while there would be no objection to the submission of this report, he questions the appropriateness of the inclusion of the words "independently of agency recommendations or ratings," appearing after the words "Examiners shall receive compensation prescribed by the [Civil Service] Commission," in section 11 of the bill, inasmuch as he deems it highly desirable that agency recommendations and ratings be fully considered by the Commission.

With kind personal regards,

  Sincerely yours,

         Tom C. Clark, *Attorney General.*

APPENDIX TO ATTORNEY GENERAL'S STATEMENT REGARDING REVISED COMMITTEE
PRINT OF OCTOBER 5, 1945

Section 2: The definitions given in section 2 are of very broad character.   It is believed, however, that this scope of definition will not be found to have any unexpected or unfortunate consequences in particular cases, inasmuch as the operative sections of the act are themselves carefully limited.

"Courts" includes The Tax Court, Court of Customs and Patent Appeals, the Court of Claims, and similar courts.   This act does not apply to their procedure nor affect the requirement of resort thereto.

In section 2 (a) the words "agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by

## ADMINISTRATIVE PROCEDURE ACT 39

them" are intended to refer to the following, among others: National War Labor Board and the National Railroad Adjustment Board.

In section 2 (c) the phrase "the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances," etc., is not, of course, intended to be an exhaustive enumeration of the types of subject matter of rule making. Specification of these particular subjects is deemed desirable, however, because there is no unanimity of recognition that they are, in fact, rule making. The phrase "for the future" is designed to differentiate, for example, between the process of prescribing rates for the future and the process of determining the lawfulness of rates charged in the past. The latter, of course, is "adjudication" and not "rule making." (*Arizona Grocery Co.* v. *Atchison, Topeka and Santa Fe Railway Co.*, 284 U. S. 370.)

The definitions of "rule making" and "adjudication," set forth in subsections (c) and (d) of section 2, are especially significant. The basic scheme underlying this legislation is to classify all administrative proceedings into these two categories. The pattern is familiar to those who have examined the various proposals for administrative procedure legislation which have been introduced during the past few years; it appears also in the recommendations of the Attorney General's Committee on Administrative Procedure. Proceedings are classed as rule making under this act not merely because, like the legislative process, they result in regulations of general applicability but also because they involve subject matter demanding judgments based on technical knowledge and experience. As defined in subsection (c), for example, rule making includes not only the formulation of rules of general applicability but also the formulation of agency action whether of general or particular applicability, relating to the types of subject matter enumerated in subsection (c). In many instances of adjudication, on the other hand, the accusatory element is strong, and individual compliance or behavior is challenged; in such cases, special procedural safeguards should be provided to insure fair judgments on the facts as they may properly appear of record. The statute carefully differentiates between these two basically different classes of proceedings so as to avoid, on the one hand, too cumbersonme a procedure and to require, on the other hand, an adequate procedure.

Section 3: This section applies to all agencies covered by the act, including war agencies and war functions. The exception of any function of the United States requiring secrecy in the public interest is intended to cover (in addition to military, naval, and foreign affairs functions) the confidential operations of the Secret Service, the Federal Bureau of Investigation, United States attorneys, and other prosecuting agencies, as well as the confidential functions of any other agency.

Section 3 (a), by requiring publication of certain classes of information in the Federal Register, is not intended to repeal the Federal Register Act (44 U. S. C. 301 et seq.) but simply to require the publication of certain additional material.

Section 3 (a) (4) is intended to include (in addition to substantive rules) only such statements of general policy or interpretations as the agency believes may be formulated with a sufficient degree of definiteness and completeness to warrant their publication for the guidance of the public.

Section 3 (b) is designed to make available all final opinions or orders in the adjudication of cases. Even here material may be held confidential if the agency finds good cause. This confidential material, however, should not be cited as a precedent. If it is desired to rely upon the citation of confidential material, the agency should first make available some abstract of the confidential material in such form as will show the principles relied upon without revealing the confidential facts.

Section 3 (c) is not intended to open up Government files for general inspection. What is intended is that the agencies, to the degree of specificity practicable, shall classify its material in terms of whether or not it is confidential in character and shall set forth in published rules the information or type of material which is confidential and that which is not.

Section 4. The term "naval" in the first exception clause is intended to include the defense functions of the Coast Guard and the Bureau of Marine Inspection and Navigation.

Section 4 (b), in requiring the publication of a concise general statement of the basis and purpose of rules made without formal hearing, is not intended to require an elaborate analysis of rules or of the detailed considerations upon which they are based but is designed to enable the public to obtain a general idea of the purpose of, and a statement of the basic justification for, the rules. The requirement would also serve much the same function as the whereas clauses which are now customarily found in the preambles of Executive orders.

Section 4 (c): This subsection is not intended to hamper the agencies in cases in which there is good cause for putting a rule into effect immediately, or at some time earlier than 30 days. The section requires, however, that where an earlier effective date is desired the agency should make a finding of good cause therefor and publish its finding along with the rule.

Section 4 (d) simply permits any interested person to petition an agency for the issuance, amendment, or repeal of a rule. It requires the reception and consideration of petitions but does not compel an agency to undertake any rule-making procedure merely because a petition is filed.

Section 5: Subject to the six exceptions set forth at the commencement of the section, section 5 applies to administrative adjudications "required by statute to be determined on the record after opportunity for an agency hearing." It is thus limited to cases in which the Congress has specifically required a certain type of hearing. The section has no application to rule making, as defined in section 2 (c). The section does apply, however, to licensing, with the exception that section 5 (c), relating to the separation of functions, does not apply in determining applications for initial licenses, i. e., original licenses as contradistinguished from renewals or amendments of existing licenses.

If a case falls within one of the six exceptions listed at the opening of section 5, no provision of section 5 has any application to that case; such a case would be governed by the requirements of other existing statutes.

The first exception is intended to exempt, among other matters, certain types of reparation orders assessing damages, such as are issued by the Interstate Commerce Commission and the Secretary of Agriculture, since such orders are admissible only as prima facie evidence in court upon attempted enforcement proceedings or (at least in the case of reparation orders issued by the Secretary of Agriculture under the Perishable Agricultural Commodities Act) on the appeal of the losing party. Reparation orders involving in part an administrative determination of the reasonableness of rates in the past so far as they are not subject to trial de novo would be subject to the provisions of section 5 generally, but they have been specifically exempted from the segregation provisions of section 5 (c). In the fourth exception, the term "naval" is intended to include adjudicative defense functions of the Coast Guard and the Bureau of Marine Inspection and Navigation, where such functions pertain to national defense.

Section 5 (a) is intended to state minimum requirements for the giving of notice to persons who under existing law are entitled to notice of an agency hearing in a statutory adjudication. While in most types of proceedings all of the information required to be given in clauses (1), (2), and (3) may be included in the "notice of hearing" or other moving paper, in many instances the agency or other moving party may not be in position to set forth all of such information in the moving paper, or perhaps not even in advance of the hearing, especially the "matters of fact and law asserted." The first sentence of this subsection merely requires that the information specified should be given as soon as it can be set forth and, in any event, in a sufficiently timely manner as to afford those entitled to the information an adequate opportunity to meet it. The second sentence complements the first and requires agencies and other parties promptly to reply to moving papers of private persons or permits agencies to require responsive pleading in any proceedings.

Section 5 (c) applies only to the class of adjudicatory proceedings included within the scope of section 5, i. e., cases of adjudication required by statute to be determined after opportunity for an agency hearing, and then not falling within one of the six excepted situations listed at the opening of section 5. As explained in the comments with respect to section 5 generally, this subsection does not apply either in proceedings to determine applications for initial licenses or in those to determine the reasonableness of rates in the past.

In the cases to which this subsection is applicable, if the informal procedures described in section 5 (b) (1) are not appropriate or have failed, a hearing is to be held as provided in sections 7 and 8. At such hearing the same officers who preside at the reception of evidence pursuant to section 7 shall make the recommended decision or initial decision "required by section 8" except where such officers become unavailable to the agency. The reference to section 8 is significant. Section 8 (a) provides that, in cases in which the agency has not presided at the reception of the evidence, the officer who presided (or, in cases not subject to subsection (c) of section 5, an officer or officers qualified to preside at hearings pursuant to section 7) shall make the initial or recommended decision, as the case may be. It is plain, therefore, that in cases subject to section 5 (c), only the officer who presided at the hearing (unless he is unavailable for reasons beyond

**ADMINISTRATIVE PROCEDURE ACT**                    **41**

the agency's control) is eligible to make the initial or recommended decision, as the case may be.

This subsection further provides that in the adjudicatory hearings covered by it no presiding officer shall consult any person or party on any fact in issue unless upon notice and opportunity for all parties to participate (except to the extent required for the disposition of ex parte matters as authorized by law). The term "fact in issue" is used in its technical, litigious sense.

In most of the agencies which conduct adjudicative proceedings of the types subject to this subsection, the examiners are placed in organizational units apart from those to which the investigative or prosecuting personnel are assigned. Under this subsection such an arrangement will become operative in all such agencies. Further, in the adjudicatory cases covered by section 5 (c), no officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency in any case shall, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 8 except as witness or counsel in public proceedings. However, section 5 (c) does not apply to the agency itself or, in the case of a multi-headed agency, any member thereof. It would not preclude, for example, a member of the Interstate Commerce Commission personally conducting or supervising an investigation and subsequently participating in the determination of the agency action arising out of such investigation.

Section 5 (c), applying as it does only to cases of adjudication (except determining applications for initial licenses or determining reasonableness of rates in the past) within the scope of section 5 generally, has no application whatever to rule making, as defined in section 2 (c). As explained in the comment on section 2 (c), rule making includes a wide variety of subject matters, and within the scope of those matters it is not limited to the formulation of rules of general applicability but includes also the formulation of agency action whether of general or particular application, for example, the reorganization of a particular company.

Section 5 (d): Within the scope of section 5 (i. e., in cases of adjudication required by statute to be determined on the record after opportunity for an agency hearing, subject to certain exceptions) the agency is authorized to issue a declaratory order to terminate a controversy or remove uncertainty. Where declaratory orders are found inappropriate to the subject matter, no agency is required to issue them.

Section 6: Subsection (a), in stating a right of appearance for the purpose of settling or informally determining the matter in controversy, would not obtain if the agency properly determines that the responsible conduct of public business does not permit. It may be necessary, for example, to set the matter down for public hearing without preliminary discussion because a statute or the subject matter or the special circumstances so require.

It is not intended by this provision to require the agency to give notice to all interested persons, unless such notice is otherwise required by law.

This subsection does not deal with, or in any way qualify, the present power of an agency to regulate practice at its bar. It expressly provides moreover, that nothing in the act shall be construed either to grant or to deny the right of non-lawyers to appear before agencies in a representative capacity. Control over this matter remains in the respective agencies.

Section 6 (b): The first sentence states existing law. The second sentence is new.

Section 6 (c): The first sentence entitles a party to a subpena upon a statement or showing of general relevance and reasonable scope of the evidence sought. The second sentence is intended to state the existing law with respect to the judicial enforcement of subpenas.

Section 6 (d): The statement of grounds required herein will be very simple, as contrasted with the more elaborate findings which are customarily issued to support an order.

Section 7: This section applies in those cases of statutory hearing which are required by sections 4 and 5 to be conducted pursuant to section 7. Subject to the numerous exceptions contained in sections 4 and 5, they are cases in which an order or rule is to be made upon the basis of the record in a statutory hearing.

Section 7 (a): The subsection is not intended to disturb presently existing statutory provisions which explicitly provide for certain types of hearing officers. Among such are (1) joint hearings before officers of the Federal agencies and persons designated by one or more States, (2) where officers of more than one agency sit, (3) quota allotment cases under the Agricultural Adjustment Act of 1938, (4) marine casualty investigation boards, (5) registers of the General Land Office,

Defs.' MSJ App. 368

(6) special boards set up to review the rights of disconnected servicemen (**38 U. S. C. 693h**) and the rights of veterans to special unemployment **compensation** (38 U. S. C. 696h), and (7) boards of employees authorized under the **Interstate** Commerce Act (49 **U. S. C. 17 (2)**).

Subject to this qualification, section 7 (a) requires that there shall preside at the taking of evidence one or more examiners appointed as provided in this act, unless the agency itself or one or more of its members presides. This provision is one of the most important provisions in the act. In many agencies of the Government this provision may mean the appointment of a substantial number of hearing officers having no other duties. The resulting expense to the Government may be increased, particularly in agencies where hearings are now conducted by employees of a subordinate status or by employees having duties in addition to presiding at hearings. On the other hand, it is contemplated that the Civil Service Commission, which is empowered under the provisions of section 11 to prescribe salaries for hearing officers, will establish various salary grades in accordance with the nature and importance of the duties performed and will assign those in the lower grades to duties now performed by employees in the lower brackets. It may also be possible for the agencies to reorganize their staffs so as to permit the appointment of full-time hearing officers by reducing the number of employees engaged on other duties.

This subsection further provides for withdrawal or removal of examiners disqualified in a particular proceeding. Some of the agencies have voiced concern that this provision would permit undue delay in the conduct of their proceedings because of unnecessary hearings or other procedure to determine whether affidavits of bias are well founded. The provision does not require hearings in every instance but simply requires such procedure, formal or otherwise, as would be necessary to establish the merits of the allegations of bias. If it is manifest that the charge is groundless, there may be prompt disposition of the matter. On the other hand, if the affidavit appears to have substance, it should be inquired into. In any event, whatever procedure the agency deems appropriate must be made a part of the record in the proceeding in which the affidavit is filed.

Section 7 (b): The agency may delegate to a hearing officer any of the enumerated powers with which it is vested. The enumeration of the powers of hearing officers is not intended to be exclusive.

Section 7 (c): The first sentence states the customary rule that the proponent of a rule or order shall have the burden of proof. Statutory exceptions to the rule are preserved. Parties shall have the right to conduct such cross-examination as may be required for a full and true disclosure of the facts. This is not intended to disturb the existing practice of submitting technical written reports, summaries, and analyses of material gathered in field surveys, and other devices appropriately adapted to the particular issues involved in specialized proceedings. Whether the agency must in such cases produce the maker of the report depends, as it does under the present law, on what is reasonable in all the circumstances.

It may be noted that agencies are empowered, in this subsection, to dispense with oral evidence only in the types of proceedings enumerated; i. e., in instances in which normally it is not necessary to see and hear the witnesses in order properly to appraise the evidence. While there may be types of proceedings other than those enumerated in which the oral testimony of the witnesses is not essential, in such instances the parties generally consent to submission of the evidence in written form so that the inability of the agency to compel submission of written evidence would not be burdensome.

The provision regarding "evidence in written form" does not limit the generality of the prevailing principle that "any evidence may be received"; i. e., that the rules of evidence as such are not applicable in administrative proceedings and that all types of pertinent evidentiary material may be considered. It is assumed, of course, that agencies will, in the words of the Attorney General's Committee on Administrative Procedure, rely only on such evidence (whether written or oral) as is "relevant, reliable, and probative." This is meant as a guide, but the courts in reviewing an order are governed by the provisions of section 10 (e), which states the "substantial evidence" rule.

Section 7 (d): The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, shall constitute the exclusive record for decision, in the cases covered by section 7. This follows from the proposition that sections 7 and 8 deal only with cases where by statute the decision is to be based on the record of hearing. Further, section 7 is limited by the exceptions contained in the opening sentences of sections 4 and 5; accordingly, certain special classes of cases, such as those where decisions rest solely on inspections, tests, or

elections, are not covered. The second sentence of the subsection enables the agency to take official notice of material facts which do not appear in the record, provided the taking of such notice is stated in the record or decision, but in such cases any party affected shall on timely request be afforded an opportunity to show the contrary.

Section 8: This section applies to all hearings held under section 7.

Section 8 (a): Under this subsection either the agency or a subordinate hearing officer may make the initial decision. As previously observed with respect to subsection (c) of section 5, in cases to which that subsection is applicable the same officer who personally presided over the hearing shall make such decision if it is to be made by a subordinate hearing officer. The agency may provide that in all cases the agency itself is to make the initial decision, or after the hearing it may remove a particular case from a subordinate hearing officer and thereupon make the initial decision. The initial decision of the hearing officer, in the absence of appeal to or review by the agency, is (or becomes) the decision of the agency. Upon review the agency may restrict its decision to questions of law, or to the question of whether the findings are supported by substantial evidence or the weight of evidence, as the nature of the case may be. On the other hand, it may make entirely new findings either upon the record or upon new evidence which it takes. It may remand the matter to the hearing officer for any appropriate further proceedings

The intention underlying the last sentence of this subsection is to require the adoption of a procedure which will give the parties an opportunity to make their contentions to the agency before the issuance of a final agency decision. This sentence states as a general requirement that whenever the agency makes the initial decision without having presided at the reception of the evidence, a recommended decision shall be filed by the officer who presided at the hearing (or, in cases not subject to section 5 (c), by any other officer qualified to preside at section 7 hearings). However, this procedure need not be followed in rule making or in determining applications for initial licenses if, in lieu of a recommended decision by such hearing officer, the agency issues a tentative decision; (2) if, in lieu of a recommended decision by such hearing officer, a recommended decision is submitted by any of the agency's responsible officers; or (3) if, in any event, the agency makes a record finding that "due and timely execution of its function imperatively and unavoidably so requires."

Subsection (c) of section 5, as explained in the comments on that subsection, does not apply to rule making. The broad scope of rule making is explained in the notes to subsection (c) of section 2.

The second exception permits, in proceedings to make rules and to determine applications for initial licenses, the continuation of the widespread agency practice of serving upon the parties, as a substitute for either an examiner's report or a tentative agency report, a report prepared by the staff of specialists and technicians normally engaged in that portion of the agency's operations to which the proceeding in question relates. The third exception permits, in lieu of any sort of preliminary report, the agency to issue forthwith its final rule or its order granting or denying an initial license in the emergent instances indicated. The subsection, however, requires that an examiner issue either an initial or a recommended decision, as the case may be, in all cases subject to section 7 except rule making and determining applications for initial licenses. The act permits no deviation from this requirement, unless, of course, the parties waive such procedure.

Section 8 (b): Prior to each recommended, initial, or tentative decision, parties shall have a timely opportunity to submit proposed findings and conclusions, and, prior to each decision upon agency review of either the decision of subordinate officers or of the agency's tentative decision, to submit exceptions to the initial, recommended, or tentative decision, as the case may be. Subject to the agency's rules, either the proposed findings or the exceptions may be oral in form where such mode of presentation is adequate.

Section 9: Subsection (a) is intended to declare the existing law. Subsection (b) is intended to codify the best existing law and practice. The second sentence of subsection (b) is not intended to apply to temporary licenses which may be issued pending the determination of applications for licenses.

Section 10: This section, in general, declares the existing law concerning judicial review. It provides for judicial review except insofar as statutes preclude it, or insofar as agency action is by law committed to agency discretion. A statute

**44**                    ADMINISTRATIVE PROCEDURE ACT

may in terms preclude judicial review or be interpreted as manifesting a congressional intention to preclude judicial review. Examples of such interpretation are: *Switchmen's Union of North America* v. *National Mediation Board* (320 U. S. 297); *American Federation of Labor* v. *National Labor Relations Board* (308 U S. 401); *Butte, Anaconda and Pacific Railway Co.* v. *United States* (290 U. S. 127). Many matters are committed partly or wholly to agency discretion. Thus, the courts have held that the refusal by the National Labor Relations Board to issue a complaint is an exercise of discretion unreviewable by the courts (*Jacobsen* v. *National Labor Relations Board*, 120 F. (2d) 96 (C. C. A. 3d); *Marine Engineers' Beneficial Assn.* v. *National Labor Relations Board*, decided April 8, 1943 (C. C. A. 2d), certiorari denied, 320 U. S. 777). In this act, for example, the failure to grant a petition filed under section 4 (d) would be similarly unreviewable.

Section 10 (a): Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review of such action. This reflects existing law. In *Alabama Power Co.* v. *Ickes* (302 U. S. 464), the Supreme Court stated the rule concerning persons entitled to judicial review. Other cases having an important bearing on this subject are: *Massachusetts* v. *Mellon* (262 U. S. 447), *The Chicago Junction Case* (264 U. S. 258), *Sprunt & Son* v. *United States* (281 U. S. 249), and *Perkins* v. *Lukens Steel Co.* (310 U. S. 113). An important decision interpreting the meaning of the terms "aggrieved" and "adversely affected" is *Federal Communications Commission* v. *Sanders Bros. Radio Station* (309 U. S. 470).

Section 10 (b): This subsection requires that where a specific statutory method is provided for reviewing a given type of case in the courts, that procedure shall be used. If there is no such procedure, or if the procedure is inadequate (i. e., where under existing law a court would regard the special statutory procedure as inadequate and would grant another form of relief), then any applicable procedure, such as prohibitory or mandatory injunction, declaratory judgment, or habeas corpus, is available. The final sentence of the subsection indicates that the question of the validity of an agency action may arise in a court proceeding to enforce the agency action. The statutes presently provide various procedures for judicial enforcement of agency action, and nothing in this act is intended to disturb those procedures. In such a proceeding the defendant may contest the validity of the agency action unless a prior, adequate, and exclusive opportunity to contest or review validity has been provided by law.

Section 10 (c): This subsection states (subject to the provisions of section 10 (a)) the acts which are reviewable under section 10. It is intended to state existing law. The last sentence makes it clear that the doctrine of exhaustion of administrative remedies with respect to finality of agency action is intended to be applicable only (1) where expressly required by statute (as, for example, is provided in 49 U. S. C. 17 (9)), or (2) where the agency's rules require that decisons by subordinate officers must be appealed to superior agency authority before the decision may be regarded as final for purposes of judicial review.

Section 10 (d): The first sentence states existing law. The second sentence may be said to change existing law only to the extent that the language of the opinion in *Scripps-Howard Radio, Inc.* v. *Federal Communications Commission* (316 U. S. 4, 14) may be interpreted to deny to reviewing courts the power to permit an applicant for a renewal of a license to continue to operate as if the original license had not expired, pending conclusion of the judicial review proceedings. In any event, the court must find, of course, that granting of interim relief is necessary to prevent irreparable injury.

Section 10 (e): This declares the existing law concerning the scope of judicial review. The power of the court to direct or compel agency action unlawfully withheld or unreasonably delayed is not intended to confer any nonjudicial functions or to narrow the principle of continuous administrative control enunciated by the Supreme Court in *Federal Communications Commission* v. *Pottsville Broadcasting Co.* (309 U. S. 134). Clause (5) is intended to embody the law as declared, for example, in *Consolidated Edison Co.* v. *National Labor Relations Board* (305 U. S. 197). There the Chief Justice said: "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion (p. 229) * * * assurance of a desirable flexibility in administrative procedure does not go so far as to justify orders without a basis in evidence having rational probative force" (p. 230).

The last sentence of this section makes it clear that not every failure to observe the requirements of this statute or of the law is ipso facto fatal to the validity of

ADMINISTRATIVE PROCEDURE ACT                    **45**

an order. The statute adopts the rule now well established as a matter of common law in all jurisdictions that error is not fatal unless prejudicial.

Section 11: This section provides for the appointment, compensation, and tenure of examiners who will preside over hearings and render decisions pursuant to sections 7 and 8. The section provides that appointments shall be made "subject to the civil service and other laws to the extent not inconsistent with this act." Appointments are to be made by the respective employing agencies of personnel determined by the Civil Service Commission to be qualified and competent examiners. The examiners appointed are to serve only as examiners, except that, in particular instances (especially where the volume of hearings under a given statute or in a given agency is not very great), examiners may be assigned additional duties which are not inconsistent with or which do not interfere with their duties as examiners. To insure equality of participation among examiners in the hearing and decision of cases, the agencies are required to use them in rotation so far as may be practicable.

Examiners are subject to removal only for good cause "established and determined" by the Commission. The Commission must afford the examiner a hearing, if requested, and must rest its decision solely upon the basis of the record of such hearing. It should be noted that the hearing and the decision are to be conducted and made pursuant to the provisions of sections 7 and 8.

Section 11 provides further that the Commission shall prescribe the compensation of examiners, in accordance with the compensation schedules provided in the Classification Act, except that the efficiency rating system set forth in that act shall not be applicable to examiners.

Section 12: The first sentence of section 12 is intended simply to indicate that the act will be interpreted as supplementing constitutional and legal requirements imposed by existing law.

The section further provides that "no subsequent legislation shall be held to supersede or modify the provisions of this act except to the extent that such legislation shall do so expressly." It is recognized that no congressional legislation can bind subsequent sessions of the Congress. The present act can be repealed in whole or in part at any time after its passage. However, the act is intended to express general standards of wide applicability. It is believed that the courts should as a rule of construction interpret the act as applicable on a broad basis, unless some subsequent act clearly provides to the contrary.

O

79th Congress, 2d Session   -   -   -   -   -   -   House Report No. 1980

# ADMINISTRATIVE PROCEDURE ACT

### REPORT

OF THE

## COMMITTEE ON THE JUDICIARY
## HOUSE OF REPRESENTATIVES

ON

# S. 7

### A BILL TO IMPROVE THE ADMINISTRATION
### OF JUSTICE BY PRESCRIBING FAIR
### ADMINISTRATIVE PROCEDURE



MAY 3, 1946.—Committed to the Committee of the Whole House
on the State of the Union and ordered to be printed

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1946

Defs.' MSJ App. 373

## COMMITTEE ON THE JUDICIARY

### HATTON W. SUMNERS, Texas, *Chairman*

EMANUEL CELLER, New York
ZEBULON WEAVER, North Carolina
FRANCIS E. WALTER, Pennsylvania
SAM HOBBS, Alabama
JOHN H. TOLAN, California
WILLIAM T. BYRNE, New York
ESTES KEFAUVER, Tennessee
JOSEPH R. BRYSON, South Carolina
FADJO CRAVENS, Arkansas
SAM M. RUSSELL, Texas
THOMAS J. LANE, Massachusetts
MARTIN GORSKI, Illinois
MICHAEL A. FEIGHAN, Ohio
FRANK L. CHELF, Kentucky

CLARENCE E. HANCOCK, New York
EARL C. MICHENER, Michigan
JOHN M. ROBSION, Kentucky
CHAUNCEY W. REED, Illinois
JOHN W. GWYNNE, Iowa
LOUIS E. GRAHAM, Pennsylvania
RAYMOND S. SPRINGER, Indiana
JOSEPH E. TALBOT, Connecticut
FRANK FELLOWS, Maine
EARL R. LEWIS, Ohio
JOHN JENNINGS, JR., Tennessee
ANGIER L. GOODWIN, Massachusetts

VELMA SMEDLEY, *Clerk*
BONNIE ROBERTS, *Assistant Clerk*
CHARLES E. LONG, JR., *Counsel*

---

### SUBCOMMITTEE NO. 3

#### MR. WALTER, *Chairman*

MR. KEFAUVER
MR. BRYSON
MR. LANE

MR. GWYNNE
MR. TALBOT
MR. LEWIS

II

# TABLE OF CONTENTS

|  | Page |
|---|---|
| I. Text of bill as reported | 1 |
| II. Legislative history | 7 |
| 1937. Report of President's Committee on Administrative Management | 7 |
| 1938. Senate hearings | 8 |
| 1939–40. Walter-Logan bill | 9 |
| 1941. Final report of Attorney General's Committee on Administrative Procedure | 11 |
| Senate hearings | 12 |
| 1942–44 | 14 |
| 1945. The present bill | 14 |
| Favorable recommendation of the Attorney General | 15 |
| Favorable report of the Senate Judiciary Committee | 15 |
| 1946 Senate debate and passage | 16 |
| Changes proposed by House Judiciary Committee | 16 |
| III. The substance of the bill | 16 |
| Diagram synopsis | 28–29 |
| IV. Explanation of provisions | 18 |
| Section 1. Title | 18 |
| Section 2. Definitions | 18 |
| Section 2 (a). "Agency" | 18 |
| Section 2 (b). "Person" and "party" | 19 |
| Section 2 (c). "Rule" and "rule making" | 19 |
| Section 2 (d). "Order" and "adjudication" | 20 |
| Section 2 (e). "License" and "licensing" | 20 |
| Section 2 (f). "Sanction" and "relief" | 20 |
| Section 2 (g). "Agency proceeding" and "agency action" | 21 |
| Section 3. Public information | 21 |
| Section 3 (a). Rules to be published | 21 |
| Section 3 (b). Opinions, orders, and rules to be available to public inspection | 22 |
| Section 3 (c). Accessibility of public records | 23 |
| Section 4. Rule making | 23 |
| Section 4 (a). Notice of rule making | 24 |
| Section 4 (b). Public procedures in rule making | 25 |
| Section 4 (c). Future effective date of rules | 25 |
| Section 4 (d). Petitions respecting rules | 26 |
| ection 5. Adjudications | 26 |
| Section 5 (a). Notices of making adjudications | 27 |
| Section 5 (b). Adjudication procedure | 27 |
| Section 5 (c). Separation of prosecuting functions | 30 |
| Section 5 (d). Declaratory adjudications | 31 |
| Section 6. Ancillary matters | 31 |
| Section 6 (a). Appearance or representation of parties | 31 |
| Section 6 (b). Administrative investigations | 32 |
| Section 6 (c). Administrative subpenas | 33 |
| Section 6 (d). Agency denials of requests | 33 |
| Section 7. Hearings | 34 |
| Section 7 (a). Presiding officers at hearings | 34 |
| Section 7 (b). Hearing powers of presiding officers | 35 |
| Section 7 (c). Evidence requirements | 35 |
| Section 7 (d). Record of hearings | 37 |

Defs.' MSJ App. 375

IV. Explanation of provisions—Continued                                    Page
            Section 8. Agency decisions after hearing_____   38
                  Section 8 (a).  Decisions by subordinates_____   38
                  Section 8 (b).  Requirements for all submittals and decisions_   39
            Section 9. Agency sanctions and powers_____   40
                  Section 9 (a).  General limitation on sanctions and powers__   40
                  Section 9 (b).  Licenses_____   40
            Section 10.  Judicial review_____   41
                  Section 10 (a).  Right of court review_____   42
                  Section 10 (b).  Forms of action_____   42
                  Section 10 (c).  Reviewable agency acts_____   42
                  Section 10 (d).  Temporary relief pending full review_____   43
                  Section 10 (e).  Scope of court review_____   44
            Section 11.  Examiners_____   46
            Section 12.  Construction and effect_____   47
Appendix A.  Committee amendment_____   49
Appendix B.  Letter of Attorney General_____   57

| | | |
|---|---|---|
| 79th Congress<br>*2d Session* | HOUSE OF REPRESENTATIVES | Report<br>No. 1980 |

# ADMINISTRATIVE PROCEDURE ACT

---

May 3, 1946.—Committed to the Committee of the Whole House on the State
of the Union and Ordered to be printed

---

Mr. Walter, from the Committee on the Judiciary, submitted the
following

# REPORT

[To accompany S. 7]

The Committee on the Judiciary, to whom was referred the bill
(S. 7) to improve the administration of justice by prescribing fair
administrative procedure, having considered the same, report the bill
favorably to the House, with an amendment, with the recommenda-
tion that, as amended, the bill do pass.

The committee amendment is as follows:

Strike out all of the bill after the enacting clause and insert in lieu
thereof the following:

## TITLE

Section 1. This Act may be cited as the "Administrative Procedure Act".

### Definitions

Sec. 2. As used in this Act—

(a) Agency.—"Agency" means each authority (whether or not within or
subject to review by another agency) of the Government of the United States
other than Congress, the courts, or the governments of the possessions, Terri-
tories, or the District of Columbia. Nothing in this Act shall be construed to
repeal delegations of authority as provided by law. Except as to the require-
ments of section 3, there shall be excluded from the operation of this Act (1)
agencies composed of representatives of the parties or of representatives of
organizations of the parties to the disputes determined by them, (2) courts martial
and military commissions, (3) military or naval authority exercised in the field
in time of war or in occupied territory, or (4) functions which by law expire on
the termination of present hostilities, within any fixed period thereafter, or before
July 1, 1947, and the functions conferred by the following statutes: Selective
Training and Service Act of 1940; Contract Settlement Act of 1944; Surplus
Property Act of 1944.

(b) Person and party.—"Person" includes individuals, partnerships, corpo-
rations, associations, or public or private organizations of any character other
than agencies. "Party" includes any person or agency named or admitted as a
party, or properly seeking and entitled as of right to be admitted as a party, in
any agency proceeding; but nothing herein shall be construed to prevent an
agency from admitting any person or agency as a party for limited purposes.

H. Repts., 79-2, vol. 6——19

(c) RULE AND RULE MAKING.—"Rule" means the whole or any part of any agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or to describe the organization, procedure, or practice requirements of any agency and includes the approval or prescription for the future of rates, wages, corporate or finanical structures or reorganizations thereof, prices, facilities, appliances, services, or allowances therefor, or of valuations, costs, or accounting, or practices bearing upon any of the foregoing. "Rule making" means agency process for the formulation, amendment, or repeal of a rule.

(d) ORDER AND ADJUDICATION.—"Order" means the whole or any part of the final disposition (whether affirmative, negative, injunctive, or declaratory in form) of any agency in any matter other than rule making but including licensing. "Adjudication" means agency process for the formulation of an order.

(e) LICENSE AND LICENSING.—"License" includes the whole or part of any agency permit, certificate, approval, registration, charter, membership, statutory exemption, or other form of permission. "Licensing" includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license.

(f) SANCTION AND RELIEF.—"Sanction" includes the whole or part of any agency (1) prohibition, requirement, limitation, or other condition affecting the freedom of any person; (2) withholding of relief; (3) imposition of any form of penalty or fine; (4) destruction, taking, seizure, or withholding of property; (5) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees; (6) requirement, revocation, or suspension of a license; or (7) taking of other compulsory or restrictive action. "Relief" includes the whole or part of any agency (1) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy; (2) recognition of any claim, right, immunity, privilege, exemption, or exception; or (3) taking of any other action upon the application or petition of, and beneficial to, any person.

(g) AGENCY PROCEEDING AND ACTION.—"Agency proceeding" means any agency process as defined in subsections (c), (d), and (e) of this section. "Agency action" includes the whole or part of every agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.

## PUBLIC INFORMATION

SEC. 3. Except to the extent that there is involved (1) any function of the United States requiring secrecy in the public interest or (2) any matter relating solely to the internal management of an agency—

(a) RULES.—Every agency shall separately state and currently publish in the Federal Register (1) descriptions of its central and field organization including delegations by the agency of final authority and the established places at which, and methods whereby, the public may secure information or make submittals or requests; (2) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal or informal procedures available as well as forms and instructions as to the scope and contents of all papers, reports, or examinations; and (3) substantive rules adopted as authorized by law and statements of general policy or interpretations formulated and adopted by the agency for the guidance of the public, but not rules addressed to and served upon named persons in accordance with law. No person shall in any manner be required to resort to organization or procedure not so published.

(b) OPINIONS AND ORDERS.—Every agency shall publish or, in accordance with published rule, make available to public inspection all final opinions or orders in the adjudication of cases (except those required for good cause to be held confidential and not cited as precedents) and all rules.

(c) PUBLIC RECORDS.—Save as otherwise required by statute, matters of official record shall in accordance with published rule be made available to persons properly and directly concerned except information held confidential for good cause found.

## RULE MAKING

SEC. 4. Except to the extent that there is involved (1) any military, naval, or foreign affairs function of the United States or (2) any matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts—

(a) NOTICE.—General notice of proposed rule making shall be published in the Federal Register (unless all persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law)

ADMINISTRATIVE PROCEDURE ACT     **3**

and shall include (1) a statement of the time, place, and nature of public rule-making proceedings; (2) reference to the authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.   Except where notice or hearing is required by statute, this subsection shall not apply to interpretative rules, general statements of policy, rules of agency organization, procedure, or practice, or in any situation in which the agency for good cause finds (and incorporates the finding and a brief statement of the reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(b) PROCEDURES.—After notice required by this section, the agency shall afford interested persons an opportunity to participate in the rule making through submission of written data, views, or argument with or without opportunity to present the same orally in any manner; and, after consideration of all relevant matter presented, the agency shall incorporate in any rules adopted a concise general statement of their basis and purpose.   Where rules are required by statute to be made on the record after opportunity for an agency hearing, the requirements of sections 7 and 8 shall apply in place of the provisions of this subsection.

(c) EFFECTIVE DATES.—The required publication or service of any substantive rule (other than one granting or recognizing exemption or relieving restriction or interpretative rules and statements of policy) shall be made not less than thirty days prior to the effective date thereof except as otherwise provided by the agency upon good cause found and published with the rule.

(d) PETITIONS.—Every agency shall accord any interested person the right to petition for the issuance, amendment, or repeal of a rule.

### ADJUDICATION

SEC. 5. In every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing, except to the extent that there is involved (1) any matter subject to a subsequent trial of the law and the facts de novo in any court; (2) the selection or tenure of an officer or employee of the United States other than examiners appointed pursuant to section 11; (3) proceedings in which decisions rest solely on inspections, tests, or elections; (4) the conduct of military, naval, or foreign-affairs functions; (5) cases in which an agency is acting as an agent for a court; and (6) the certification of employee representatives—

(a) NOTICE.—Persons entitled to notice of an agency hearing shall be timely informed of (1) the time, place, and nature thereof; (2) the legal authority and jurisdiction under which the hearing is to be held; and (3) the matters of fact and law asserted.   In instances in which private persons are the moving parties, other parties to the proceeding shall give prompt notice of issues controverted in fact or law; and in other instances agencies may by rule require responsive pleading. In fixing the times and places for hearings, due regard shall be had for the convenience and necessity of the parties or their representatives.

(b) PROCEDURE.—The agency shall afford all interested parties opportunity for (1) the submission and consideration of facts, argument, offers of settlement, or proposals of adjustment where time, the nature of the proceeding, and the public interest permit and (2) to the extent that the parties are unable so to determine any controversy by consent, hearing, and decision upon notice and in conformity with sections 7 and 8.

(c) SEPARATION OF FUNCTIONS.—The same officers who preside at the reception of evidence pursuant to section 7 shall make the recommended decision or initial decision required by section 8 except where such officers become unavailable to the agency.   Save to the extent required for the disposition of ex parte matters as authorized by law, no such officer shall consult any person or party on any fact in issue unless upon notice and opportunity for all parties to participate; nor shall such officer be responsible to or subject to the supervision or direction of any officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency.   No officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency in any case shall, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 8 except as witness or counsel in public proceedings.   This subsection shall not apply in determining applications for initial licenses or to proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers; nor shall it be applicable in any manner to the agency or any member or members of the body comprising the agency.

**4**                    ADMINISTRATIVE PROCEDURE ACT

(d) DECLARATORY ORDERS.—The agency is authorized in its sound discretion, with like effect as in the case of other orders, to issue a declaratory order to terminate a controversy or remove uncertainty.

### ANCILLARY MATTERS

SEC. 6. Except as otherwise provided in this Act—

(a) APPEARANCE.—Any person compelled to appear in person before any agency or representative thereof shall be accorded the right to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative. Every party shall be accorded the right to appear in person or by or with counsel or other duly qualified representative in any agency proceeding. So far as the orderly conduct of public business permits, any interested person may appear before any agency or its responsible officers or employees for the presentation, adjustment, or determination of any issue, request, or controversy in any proceeding (interlocutory, summary, or otherwise) or in connection with any agency function. Every agency shall proceed with reasonable dispatch to conclude any matter presented to it except that due regard shall be had for the convenience and necessity of the parties or their representatives. Nothing herein shall be construed either to grant or to deny to any person who is not a lawyer the right to appear for or represent others before any agency or in any agency proceeding.

(b) INVESTIGATIONS.—No process, requirement of a report, inspection, or other investigative act or demand shall be issued, made, or enforced in any manner or for any purpose except as authorized by law. Every person compelled to submit data or evidence shall be entitled to retain or, on payment of lawfully prescribed costs, procure a copy or transcript thereof, except that in a nonpublic investigatory proceeding the witness may for good cause be limited to inspection of the official transcript of his testimony.

(c) SUBPENAS.—Agency subpenas authorized by law shall be issued to any party upon request and, as may be required by rules of procedure, upon a statement or showing of general relevance and reasonable scope of the evidence sought. Upon contest the court shall sustain any such subpena or similar process or demand to the extent that it is found to be in accordance with law and, in any proceeding for enforcement, shall issue an order requiring the appearance of the witness or the production of the evidence or data within a reasonable time under penalty of punishment for contempt in case of contumacious failure to comply.

(d) DENIALS.—Prompt notice shall be given of the denial in whole or in part of any written application, petition, or other request of any interested person made in connection with any agency proceeding. Except in affirming a prior denial or where the denial is self-explanatory, such notice shall be accompanied by a simple statement of procedural or other grounds.

### HEARINGS

SEC. 7. In hearings which section 4 or 5 requires to be conducted pursuant to this section—

(a) PRESIDING OFFICERS.—There shall preside at the taking of evidence (1) the agency, (2) one or more members of the body which comprises the agency, or (3) one or more examiners appointed as provided in this Act; but nothing in this Act shall be deemed to supersede the conduct of specified classes of proceedings in whole or part by or before boards or other officers specially provided for by or designated pursuant to statute. The functions of all presiding officers and of officers participating in decisions in conformity with section 8 shall be conducted in an impartial manner. Any such officer may at any time withdraw if he deems himself disqualified; and, upon the filing in good faith of a timely and sufficient affidavit of personal bias or disqualification of any such officer, the agency shall determine the matter as a part of the record and decision in the case.

(b) HEARING POWERS.—Officers presiding at hearings shall have authority, subject to the published rules of the agency and within its powers, to (1) administer oaths and affirmations, (2) issue subpenas authorized by law, (3) rule upon offers of proof and receive relevant evidence, (4) take or cause depositions to be taken whenever the ends of justice would be served thereby, (5) regulate the course of the hearing, (6) hold conferences for the settlement or simplification of the issues by consent of the parties, (7) dispose of procedural requests or similar matters, (8) make decisions or recommend decisions in conformity with

ADMINISTRATIVE PROCEDURE ACT 5

section 8, and (9) to take any other action authorized by agency rule consistent with this Act.

(c) EVIDENCE.—Except as statutes otherwise provide, the proponent of a rule or order shall have the burden of proof. Any oral or documentary evidence may be received, but every agency shall as a matter of policy provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence and no sanction shall be imposed or rule or order be issued except upon consideration of the whole record or such portions thereof as may be cited by any party and as supported by and in accordance with the reliable, probative, and substantial evidence. Every party shall have the right to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts. In rule making or determining claims for money or benefits or applications for initial licenses any agency may, where the interest of any party will not be prejudiced thereby, adopt procedures for the submission of all or part of the evidence in written form.

(d) RECORD.—The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, shall constitute the exclusive record for decision in accordance with section 8 and, upon payment of lawfully prescribed costs, shall be made available to the parties. Where any agency decision rests on official notice of a material fact not appearing in the evidence in the record, any party shall on timely request be afforded an opportunity to show the contrary.

## DECISIONS

SEC. 8. In cases in which a hearing is required to be conducted in conformity with section 7—

(a) ACTION BY SUBORDINATES.—In cases in which the agency has not presided at the reception of the evidence, the officer who presided (or, in cases not subject to subsection (c) of section 5, any other officer or officers qualified to preside at hearings pursuant to section 7) shall initially decide the case or the agency shall require (in specific cases or by general rule) the entire record to be certified to it for initial decision. Whenever such officers make the initial decision and in the absence of either an appeal to the agency or review upon motion of the agency within time provided by rule, such decision shall without further proceedings then become the decision of the agency. On appeal from or review of the initial decisions of such officers the agency shall, except as it may limit the issues upon notice or by rule, have all the powers which it would have in making the initial decision. Whenever the agency makes the initial decision without having presided at the reception of the evidence, such officers shall first recommend a decision except that in rule making or determining applications for initial licenses (1) in lieu thereof the agency may issue a tentative decision or any of its responsible officers may recommend a decision or (2) any such procedure may be omitted in any case in which the agency finds upon the record that due and timely execution of its function imperatively and unavoidably so requires.

(b) SUBMITTALS AND DECISIONS.—Prior to each recommended, initial, or tentative decision, or decision upon agency review of the decision of subordinate officers the parties shall be afforded a reasonable opportunity to submit for the consideration of the officers participating in such decisions (1) proposed findings and conclusions, or (2) exceptions to the decisions or recommended decisions of subordinate officers or to tentative agency decisions, and (3) supporting reasons for such exceptions or proposed findings or conclusions. The record shall show the ruling upon each such finding, conclusion, or exception presented. All decisions (including initial, recommended, or tentative decisions) shall become a part of the record and include a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record; and (2) the appropriate rule, order, sanction, relief, or denial thereof.

## SANCTIONS AND POWERS

SEC. 9. In the exercise of any power or authority—

(a) IN GENERAL.—No sanction shall be imposed or substantive rule or order be issued except within jurisdiction delegated to the agency and as authorized by law.

(b) LICENSES.—In any case in which application is made for a license required by law the agency, with due regard to the rights or privileges of all the interested parties or adversely affected persons and with reasonable dispatch, shall set and complete any proceedings required to be conducted pursuant to sections 7 and 8

**6**                     ADMINISTRATIVE PROCEDURE ACT

of this Act or other proceedings required by law and shall make its decision. Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, no withdrawal, suspension, revocation, or annulment of any license shall be lawful unless, prior to the institution of agency proceedings therefor, facts or conduct which may warrant such action shall have been called to the attention of the licensee by the agency in writing and the licensee shall have been accorded opportunity to demonstrate or achieve compliance with all lawful requirements. In any case in which the licensee has, in accordance with agency rules, made timely and sufficient application for a renewal or a new license, no license with reference to any activity of a continuing nature shall expire until such application shall have been finally determined by the agency.

### JUDICIAL REVIEW

SEC. 10. Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion—

(a) RIGHT OF REVIEW.—Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof.

(b) FORM AND VENUE OF ACTION.—The form of proceeding for judicial review shall be any special statutory review proceeding relevant to the subject matter in any court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action (including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus) in any court of competent jurisdiction. Agency action shall be subject to judicial review in civil or criminal proceedings for judicial enforcement except to the extent that prior, adequate, and exclusive opportunity for such review is provided by law.

(c) REVIEWABLE ACTS.—Every agency action made reviewable by statute and every final agency action for which there is no other adequate remedy in any court shall be subject to judicial review. Any preliminary, procedural, or intermediate agency action or ruling not directly reviewable shall be subject to review upon the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final shall be final for the purposes of this subsection whether or not there has been presented or determined any application for a declaratory order, for any form of reconsideration, or (unless the agency otherwise requires by rule and provides that the action meanwhile shall be inoperative) for an appeal to superior agency authority.

(d) INTERIM RELIEF.—Pending judicial review any agency is authorized, where it finds that justice so requires, to postpone the effective date of any action taken by it. Upon such conditions as may be required and to the extent necessary to prevent irreparable injury, every reviewing court (including every court to which a case may be taken on appeal from or upon application for certiorari or other writ to a reviewing court) is authorized to issue all necessary and appropriate process to postpone the effective date of any agency action or to preserve status or rights pending conclusion of the review proceedings.

(e) SCOPE OF REVIEW.—So far as necessary to decision and where presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of any agency action. It shall (A) compel agency action unlawfully withheld or unreasonably delayed; and (B) hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; (5) unsupported by substantial evidence in any case subject to the requirements of sections 7 and 8 or otherwise reviewed on the record of an agency hearing provided by statute; or (6) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error.

### EXAMINERS

SEC. 11. Subject to the civil-service and other laws to the extent not inconsistent with this Act, there shall be appointed by and for each agency as many qualified and competent examiners as may be necessary for proceedings pursuant to sections 7 and 8, who shall be assigned to cases in rotation so far as practicable

and shall perform no duties inconsistent with their duties and responsibilities as examiners. Examiners shall be removable by the agency in which they are employed only for good cause established and determined by the Civil Service Commission (hereinafter called the Commission) after opportunity for hearing and upon the record thereof. Examiners shall receive compensation prescribed by the Commission independently of agency recommendations or ratings and in accordance with the Classification Act of 1923, as amended, except that the provisions of paragraphs (2) and (3) of subsection (b) of section 7 of said Act, as amended, and the provisions of section 9 of said Act, as amended, shall not be applicable. Agencies occasionally or temporarily insufficiently staffed may utilize examiners selected by the Commission from and with the consent of other agencies. For the purposes of this section, the Commission is authorized to make investigations, require reports by agencies, issue reports, including an annual report to the Congress, promulgate rules, appoint such advisory committees as may be deemed necessary, recommend legislation, subpena witnesses or records, and pay witness fees as established for the United States courts.

### CONSTRUCTION AND EFFECT

SEC. 12. Nothing in this Act shall be held to diminish the constitutional rights of any person or to limit or repeal additional requirements imposed by statute or otherwise recognized by law. Except as otherwise required by law, all requirements or privileges relating to evidence or procedure shall apply equally to agencies and persons. If any provision of this Act or the application thereof is held invalid, the remainder of this Act or other applications of such provision shall not be affected. Every agency is granted all authority necessary to comply with the requirements of this Act through the issuance of rules or otherwise. No subsequent legislation shall be held to supersede or modify the provisions of this Act except to the extent that such legislation shall do so expressly. This Act shall take effect three months after its approval except that sections 7 and 8 shall take effect six months after such approval, the requirement of the selection of examiners pursuant to section 11 shall not become effective until one year after such approval, and no procedural requirement shall be mandatory as to any agency proceeding initiated prior to the effective date of such requirement.

## II. LEGISLATIVE HISTORY

For more than 10 years this legislation has been under consideration. Certainly no measure of like character has had the painstaking and detailed study and drafting. Both the legislative and executive branches have participated, and private interests of every kind have had an opportunity to present their views. In the legislative branch there have been four major proposals for the creation of an administrative court, and at least eight for the regulation of administrative procedure. Two important studies were conducted in the executive branch under the late President Franklin D. Roosevelt—each resulting in reports to Congress with legislative recommendations. Private individuals and organizations have made innumerable studies and recommendations. While various proposals have been made over the years, the continuous line of development leading to the present bill is clear and illuminating.

**1937 Report of President's Committee on Administrative Management.**--The growth and intensification of administrative regulation of private enterprise and other phases of American life had moved President Roosevelt early in his administration to appoint a committee to study administrative methods, functioning, and organization. Although that committee approached the problem from the standpoint of executive branch management, it was soon deeply involved in the essential public processes of administrative regulation. It issued numerous studies and an extensive report (*Report With Special Studies*, 1937), which President Roosevelt transmitted to Congress with his

Defs.' MSJ App. 383

**8**       ADMINISTRATIVE PROCEDURE ACT

endorsement and the statement that it was "a great document of permanent importance" (p. iii).   At that time he also took occasion to remark that the practice of creating administrative agencies—

who perform administrative work in addition to judicial work, threatens to develop a "fourth branch" of the Government for which there is no sanction in the Constitution.

To which the committee added (p. 40):

There is a conflict of principle involved in their make-up and functions. * * * They are vested with duties of administration * * * and at the same time they are given important judicial work. * * * The evils resulting from this confusion of principles are insidious and far reaching. * * * Pressures and influences properly enough directed toward officers responsible for formulating and administering policy constitute an unwholesome atmosphere in which to adjudicate private rights.   But the mixed duties of the commissions render escape from these subversive influences impossible.   Furthermore, the same men are obliged to serve both as prosecutors and as judges.   This not only undermines judicial fairness; it weakens public confidence in that fairness.   Commission decisions affecting private rights and conduct lie under the suspicion of being rationalizations of the preliminary findings which the Commission, in the role of prosecutor, presented to itself.

The foregoing statement reflects a widespread feeling, which has been greatly extended by the expansion of administrative controls during the subsequent war years.

The problem has been how to deal with the situation, in our complex governmental set-up, without unduly interfering with necessary governmental operations.   President Roosevelt's committee recommended a drastic reform by which every agency exercising mixed functions would be divided into an administrative and judicial section. The latter, although it might be "in" a department, was to be wholly independent of the former and of executive control.   While subsequent proposals (except for the minority of the later Attorney General's Committee on Administrative Procedure, discussed hereinafter) have not suggested such a complete separation of functions and the present bill does not go so far, the recommendations of the President's Committee on Administrative Management are—as President Roosevelt said in his message to the Congress—of permanent importance.

**1938 Senate hearings.**—The Senate Judiciary Committee in 1938 held hearings on the proposal for the creation of an administrative court; and it issued as a committee print an elaborate study of administrative powers conferred by statute up to that time (S. 3676, 75th Cong.).   However, such a proposition presents serious problems and some deficiencies.   It means the creation of a special court or courts, in derogation of the regular courts with which people are familiar and which the Constitution directs the Congress to provide for the redress of all grievances and settlement of disputes.   There may also be some limitations upon the functions which could be conferred upon a court.   It could not, for example, exercise the rule-making power without undertaking to supplant the administrative arm entirely.   Moreover, that proposal fails to reach and control the administrative process at its source.   There is need for a simple and standard plan of administrative procedure, together with the statement of legal and enforceable guides for administrative officers and agents in their daily operations.   In short, an important object of any legislation in this field is not only to provide judicial redress but to assure administrative fairness in the beginning so that litigation may become unnecessary.

ADMINISTRATIVE PROCEDURE ACT                    9

**1939–40 Walter-Logan bill.**—S. 915, the Walter-Logan administrative procedure bill, was favorably reported to the Senate in 1939 (S. Rept. No. 442, 76th Cong., 1st sess.). Although a different bill is now reported to the House of Representatives, the following passages of that report are well worth quoting (pp. 9–10):

Unfortunately the statutes providing for hearings before the so-called independent agencies of the Federal Government as well as those providing for the conduct of the affairs of the single-headed agencies, do not provide for uniform procedure for  *  *  *  hearings or for a uniform method and scope of judicial review. All argument that such uniformity is neither possible or desirable is answered by the fact that uniformity has been found possible and desirable for all classes of both equity and law actions in the courts exercising the whole of the judicial power of the Federal Government. It would seem to require no argument to demonstrate that the administrative agencies, exercising but a fraction of the judicial power may likewise operate under uniform rules of practice and procedure and that they may be required to remain within the terms of the law as to the exercise of both quasi-legislative and quasi-judicial power.

The results of the lack of uniform procedure for the exercise of quasi-judicial power by the administrative agencies have been at least threefold: (1) The respective administrative agencies give little heed to, and are little assisted by, the decisions of other administrative agencies or by the decisions of the courts applicable to such agencies; (2) the courts are placed at considerable disadvantage because they must verify the basic statutes of all decisions relating to other administrative agencies which are cited to them, thus slowing up the writing of opinions in particular cases; and (3) individuals and their attorneys are at a disadvantage in the presentation of their administrative appeals, with the result that there is a tendency to emphasize the importance of the judiciary in the administrative process.

In fact, the present situation of indescribable confusion is due to the fact that the Congress has ignored the development of the administrative process prior to 1861; that since such time the Congress has created administrative agencies without regard to any uniformity of the judicial review provisions and without regard to the procedure developed and proven prior to that time; and that the law schools have placed undue emphasis on the pathological aspects of administrative procedure rather than upon the statutes and the administrative processes. Added to all this has been the constantly growing complexity of the Federal Government and the resulting lack of training of most lawyers and businessmen therein.

Furthermore the statutes, commencing with the Interstate Commerce Act, have made no provision whatever for improvement of the administrative process and rarely have these statutes attempted to prescribe, even in a general way, the scope of judicial review. The result has been that the administrative agencies and the courts have been required to work out the procedure from case to case with unnecessary fumbling in the administrative process and with unnecessary criticisms of the courts when they have attempted—not altogether with success—in their decisions to lay down general rules of trial and appellate procedure.

The Judiciary Committee of the House of Representatives reported the similar bill (H. R. 6324) with some amendments during the same year (H. Rept. No. 1149, 76th Cong., 1st sess.).

Referring to President Roosevelt's program of governmental reorganization which followed the report of his Committee on Administrative Management, described above, the Committee on the Judiciary of the House of Representatives said in reporting the bill (p. 2):

Procedures vary as among the several agencies and to some extent even among the principal officers or employees of the same agencies. It is practically impossible for a Member of the Congress, much less an individual citizen, to find his way among these many agencies or to locate the particular officer or employee in any of the agencies with whom any particular problem should be discussed with a view to settlement.

This condition of affairs has been in the making for many years and is not something which has come upon us within the past few years, though it might be candidly admitted that the condition has grown worse within the past few years in the attempts that have been made to meet serious economic and social problems.

Very obviously these administrative agencies cannot be abolished, though without doubt there are many of us who yearn for the comparatively simple life

of yesteryear when these agencies of Government were not needed and did not exist. Practically all of these agencies, in their administration of the various and sundry statutes, must issue rules, make investigations, conduct hearings, and decide controversies, and there is no practicable and feasible method which could be adopted by which there could be segregated these quasi-legislative and quasi-judicial functions from the purely administrative functions without destroying the usefulness of such agencies.

At the same time, the law must provide that the governors shall be governed and the regulators shall be regulated, if our present form of government is to endure.

Early in 1940 there was issued an elaborately annotated copy of the bill, explaining its purposes and the derivation of its provisions (S. Doc. No. 145, 76th Cong., 3d sess.).

Meanwhile the President had directed the appointment of a committee to make further studies and recommendations, as described under the next heading of this report. Congress nevertheless passed the Walter-Logan bill. In vetoing it President Roosevelt said (H. Doc. No. 986, 76th Cong., 3d sess, pp. 1, 3–4):

The objective of the bill is professedly the assurance of fairness in administrative proceedings. With that objective there will be universal agreement. The promotion of expeditious, orderly, and sensible procedure in the conduct of public affairs is a purpose which commends itself not only to the Congress and the courts, but to the executive departments and administrative agencies themselves.

    *        *        *        *        *        *        *

I am, of course, not unaware that improvement in the administrative process is as much the duty of those concerned with it as the improvement of court procedure ought to be a duty of the legal profession.

Recognizing this, more than a year ago I directed the Attorney General to select a committee of eminent lawyers, jurists, scholars, and administrators to review the entire administrative process in the various departments of the executive Government and to recommend improvements, including the suggestion of any needed legislation. For over a year such a committee has been taking up in detail each of the several typical administrative agencies and has been holding prolonged sessions, hearings, inquiries, and discussions. Its task has proved unexpectedly complex. The objective of this committee, however, is not to hamper administrative tribunals but to suggest improvements to make the process more workable and more just and to avoid confusions and uncertainties and litigations. I should desire to await their report and recommendations before approving any measure in this complicated field. In this thought I believe most Americans will agree. The report and recommendations will be transmitted to the Congress in a few weeks.

The committee to which the President referred had been at work for more than a year, had made an interim report, and had issued studies of the work of particular agencies.

The present bill must be distinguished from the Walter-Logan bill in several essential respects. Unlike that bill it differentiates the several types of rules. It requires no agency hearings in connection with either regulations or adjudications unless statutes already do so in particular cases. Where statutory hearings are otherwise provided, it fills in some of the essential requirements; and it provides for a special class of semi-independent subordinate hearing officers. It includes several types of incidental procedures. It confers numerous procedural rights. It limits administrative penalties. It contains comprehensive provisions for judicial review for the redress of any legal wrong. And, since it is drawn entirely upon a functional basis, it contains no exemptions of agencies as such. One of the main recommendations of the later Attorney General's Committee on Administrative Procedure—which is hereinafter discussed—was that "an important and far-reaching defect in the field of administrative law has

ADMINISTRATIVE PROCEDURE ACT **11**

been a simple lack of adequate public information concerning its substance and procedure" (S. Doc. No. 8, 77th Cong., p. 25). The Walter-Logan bill made no provision in that respect, whereas the first operative section of the present bill spells out the requirements of public information in considerable detail (sec. 3). This is an important provision of the present bill. The Walter-Logan bill changed the present examiner system by providing for employee boards to hear cases in departments and that examiners could hear cases in independent agencies, but that in independent agencies either boards or three members should rehear cases on the petition of the party involved before a decision could be entered (sec. 4 (a), (b), (d)). The present bill, on the other hand, does not change the operation of the examiner system nor does it provide that examiners should supersede the functions of other types of hearing officers provided by statute (sec. 7 (a)).

**1941 Final Report of Attorney General's Committee on Administrative Procedure.**—In December 1938 the Attorney General in a letter to President Roosevelt had reviewed the progress made in securing simplified and uniform rules of procedure for Federal court procedure, stated that "there is need for procedural reform in the wide and growing field of administrative law," and recommended the creation of an appropriate body to make the necessary studies and recommendations for congressional consideration (S. Doc. No. 8, 77th Cong., 1st sess., p. 251). The President had agreed by letter of February 16, 1939 (p. 252). The committee had made an interim report in January 1940, setting forth mainly the comprehensive scope of its program of studies (p. 254).

The agencies studied were the following (pp. 3–4):

The Department of Agriculture (Agricultural Marketing Service; Commodity Exchange Administration; Bureau of Animal Industry; Bureau of Entomology and Plant Quarantine; Surplus Marketing Administration; and Sugar Division).

The Department of Commerce (Civil Aeronautics Administration; Bureau of Marine Inspection and Navigation; and Patent Office).

The Department of the Interior (Bituminous Coal Division; General Land Office; Grazing Service; Office of Indian Affairs; Bureau of Fisheries; and Bureau of Biological Survey).

The Department of Justice (Immigration and Naturalization Service).

The Department of Labor (Division of Public Contracts; Wage and Hour Division; and Children's Bureau).

The Post Office Department (fraud orders and second-class mailing privileges).

The Department of State (Passport Division, Visa Division, and the Division of Controls, having to do with the international traffic in arms and with the supervision and administration of neutrality laws).

The Department of the Treasury (Bureau of Internal Revenue [into which had been absorbed the Federal Alcohol Administration]; Processing Tax Board of Review; Bureau of the Comptroller of the Currency; and the Bureau of Customs).

The War Department (Office of the Chief of Engineers; the Selective Service Act was enacted after the completion of these studies).

The Commodity Exchange Commission.

The Federal Communications Commission.

The Federal Deposit Insurance Corporation.

The Federal Home Loan Bank Board.

The Federal Power Commission.

The Federal Reserve System.

The Federal Security Agency (Social Security Board, Public Health Service, and the Food and Drug Administration).

The Federal Trade Commission.

The Interstate Commerce Commission.

The National Labor Relations Board.

The National Mediation Board.

The National Railroad Adjustment Board.
The Railroad Retirement Board.
The Securities and Exchange Commission.
The United States Board of Tax Appeals.
The United States Employees' Compensation Commission (including the deputy
    commissioners).
The United States Maritime Commission.
The United States Tariff Commission.
The Veterans' Administration.

The committee's investigators examined agency records and pro-
cedures, it held executive hearings, and then written studies were
issued. These usually embraced a first mimeographed study, a re-
vision thereof, and finally the issuance of 27 printed monographs each
embodying the results for one or more agencies, which became Senate
documents (S. Doc. No. 186, 76th Cong., 3d sess., pts. 1–13; and S.
Doc. No. 10, 77th Cong., 1st sess., pts. 1–14). They were widely
distributed. The committee also held public hearings. Defects of
the procedures of particular agencies are also summarized at length
in chapter IX of the committee's final report.

There are 474 pages in the committee's final report, of which only
the first 127 are the report proper. The remainder is made up of
minority views (pp. 203–250) and appendixes. See *Administrative
Procedure in Government Agencies—Report of the Committee on Admin-
istrative Procedure, Appointed by the Attorney General at the Request of
the President, to Investigate the Need for Procedural Reform in Various
Administrative Tribunals and To Suggest Improvements Therein* (S.
Doc. No. 8, 77th Cong., 1st sess., dated January 22, 1941).

The published documents relating to the present bill, notably the
Senate Judiciary Committee print of June 1945 on S. 7 which collates
in parallel columns the provisions of the present bill with the pertinent
portions of the final report of the Attorney General's Committee on
Administrative Procedure, indicate the care with which the recom-
mendations of that committee have been studied in framing the
present bill. While it follows generally the views of good administra-
tive practice as expressed by the whole of that committee, it differs in
several important respects. It provides that agencies may choose
whether their examiners shall make the initial decision or merely
recommend a decision, whereas the Attorney General's committee
made a decision by examiners mandatory. It provides some general
limitations upon administrative powers and sanctions, particularly
in the rigorous field of licensing, while the Attorney General's com-
mittee did not touch upon the subject. It relies upon independence,
salary security, and tenure during good behavior of examiners within
the framework of the civil service, whereas the Attorney General's
committee favored short-term appointments approved by a special
"Office of Administrative Procedure."

As a matter of drafting, the actual language of the present bill has
had vastly more consideration and participation by all parties con-
cerned than the bills presented in 1941 by the majority and minority
of the Attorney General's Committee on Administrative Procedure.
An entire year has been spent alone in redrafting the original S. 7
(H. R. 1203) of the present Congress, as hereinafter more fully ex-
plained. Its predecessor, S. 2030 (H. R. 5081), of the previous Con-
gress, had passed through a similar process.

**Senate hearings.**—The majority and minority bills growing im-
mediately out of the work of the Attorney General's committee were

introduced in Congress along with revised versions of other bills. A distinguished subcommittee of the Senate Committee on the Judiciary (composed of Senator Hatch as chairman and Senators O'Mahoney, Chandler, Austin, and Danaher) then held hearings in April, May, June, and July of 1941, which were published in three parts and an appendix. (See hearings on S. 674, 675, and 918.) By far the greater part of the hearings were devoted to the oral or written statements, or both, of representatives of governmental agencies, among them the following:

> Agriculture Department
> Attorney General
> Bituminous Coal Division
> Bonneville Power Administration
> Bureau of Marine Inspection and Navigation
> Bureau of Reclamation
> Civil Aeronautics Administration
> Civil Aeronautics Board
> Civil Service Commission
> Export Control Administrator
> Federal Communications Commission
> Federal Deposit Insurance Corporation
> Federal Power Commission
> Federal Reserve System
> Federal Security Agency
> Federal Trade Commission
> Fish and Wildlife Service
> Grazing Service
> General Land Office
> Immigration and Naturalization Service
> Interior Department
> Interstate Commerce Commission
> Justice Department
> Labor Department
> National Labor Relations Board
> National Railroad Retirement Board
> Office of Indian Affairs
> Patent Office
> Post Office Department
> Securities and Exchange Commission
> Tariff Commission
> Tennessee Valley Authority
> Treasury Department
> Veterans' Administration
> War Department

In addition, the subcommittee heard or received the written statements of representatives of business, professional, labor, and agricultural organizations as well as members of the Attorney General's Committee on Administrative Procedure. The written statement submitted by the minority members of that committee summarizes most of the testimony and statements (pp. 1374–1401) and also presents a revision of their legislative recommendations (pp. 1402–1418).

It can be said fairly that no point raised by any agency in those very lengthy and detailed hearings has not been given full consideration in the drafting of the present bill, and indeed in almost every instance the present bill avoids the difficulties which Government agencies then feared. For example, in those hearings agencies protested mainly against limitations upon delegations of authority (p. 1378), but the present bill expressly states that "nothing in this Act shall be construed to repeal delegations of authority as provided by

**14**                  ADMINISTRATIVE PROCEDURE ACT

law" (sec. 2 (a)).   They feared any provision which might be construed to require them to issue rules or regulations in advance to meet every case (p. 1381), but apart from rules of organization and procedure the present bill requires the publication only of "substantive rules adopted as authorized by law and statements of general policy or interpretations formulated and adopted by the agency for the guidance of the public" (sec. 3 (a)).   Some agencies did not want hearings provided (pp. 1389–1398, 1394), and the present bill provides the details for hearings only where other statutes require a hearing. (See sec. 4 (b) and the introductory clause to sec. 5.)   They wished power to make declaratory rulings to be so limited that parties would not have an absolute right to such a ruling in every case (p. 1392), and the present bill expressly confers the authority upon certain agencies to be exercised only in their "sound discretion" (sec. 5 (d)). Various agencies objected to any provision for the separation of functions in rule making (p. 1396), a suggestion which the present bill expressly carries even further because section 5 which contains the segregation provision does not apply to rule making and in subsection (c) makes additional exemptions.

**1942–44.**—In August 1941 the increasingly threatening international situation moved the Senate Judiciary Committee to postpone further consideration of the legislative proposals.   The attack at Pearl Harbor occurred before the year was out.   During the war years 1942–43 the subject was necessarily in abeyance; but war legislation, administration, and congressional investigations brought administrative processes more and more into prominence.   In June 1944 new bills were introduced by the chairmen of the Senate and House Judiciary Committees (S. 2030 and H. R. 5081, 78th Cong., 2d sess.), and thereafter there was a good deal of discussion and activity in and out of the Government with respect to the form such legislation should take.   The Attorney General, utilizing some of the staff of his former Committee on Administrative Procedure, had a voluminous analysis made of the new bill.

**1945. The present bill.**—With the opening of the present Seventy-ninth Congress, revised and simplified bills were introduced in January 1945 by the chairmen of the two Judiciary Committees as S. 7 and H. R. 1203.   Both chairmen called upon administrative agencies to submit their further views and suggestions in writing.   Written submittals were also received from private organizations and parties. These were analyzed and, with the aid of representatives of the Attorney General and interested private organizations, in May 1945 there was issued a Senate committee print setting forth in parallel columns the bill as introduced and a tentatively revised text.   This was distributed to administrative agencies, and they again submitted comments and suggestions in writing.

Thereupon the Senate Judiciary Committee had its staff make a further analysis and issued in June 1945 a large committee print setting forth in four parallel columns the text of the bill as originally introduced, the tentatively revised text as previously published, a general explanation of provisions with references to the final report of the Attorney General's Committee on Administrative Procedure and other authorities, and a summary of agency and private views received in response to the first committee print.

At this point the full Committee on the Judiciary of the House of Representatives held hearings late in June. The House Committee on the Judiciary had kept in close touch with, and had participated fully in, the development of the bill; and it had also designated a subcommittee on the subject. Attorney General Biddle had previously indicated orally that he was prepared to recommend the enactment of an administrative procedure statute, and now indicated similarly that he was prepared to accept the draft proposed. He was, however, succeeded in office by Attorney General Tom C. Clark, who made some additions to the conference group representing the Attorney General. They entered upon 3 more months of discussions with interested Government agencies and undertook to screen and correlate views and suggestions received orally or in writing. Private parties and organizations also participated. By this time the issues had been narrowed to matters of language and expression. A final form of bill (see the revised Senate committee print dated October 5, 1945) was then submitted to and endorsed by the Attorney General by letters addressed to the committee chairmen of both Houses. (For the full text see S. Rept. No. 752, 79th Cong., 1st sess., pp. 37–38.)

**Favorable recommendation of the Attorney General.**—In his letter approving and recommending S. 7 as revised the Attorney General stated:

The goal toward which these efforts have been directed is, in my opinion, worth while. Despite difficulties of draftsmanship, I believe that over-all procedural legislation is possible and desirable. The administrative process is now well developed. It has been subject in recent years to the most intensive and informed study—by various congressional committees, by the Attorney General's Committee on Administrative Procedure, by organizations such as the American Bar Association, and by many individual practitioners and legal scholars. We have in general—as we did not have until fairly recently—the materials and facts at hand. I think the time is ripe for some measure of control and prescription by legislation. I cannot agree that there is anything inherent in the subject of administrative procedure, however complex it may be, which defies workable codification.

Since the original introduction of S. 7, I understand that opportunity has been afforded to public and private interests to study its provisions and to suggest amendments. The agencies of the Government primarily concerned have been consulted and their views considered. * * *

The plan appears to offer a hopeful prospect of achieving reasonable uniformity and fairness in administrative procedures without at the same time interfering unduly with the efficient and economical operation of the Government. Insofar as possible, the bill recognizes the needs of individual agencies by appropriate exemption of certain of their functions.

After reviewing the committee print, therefore, I have concluded that this Department should recommend its enactment.

A similar statement was delivered to the chairman of the Committee on the Judiciary of the House of Representatives at the same time.

**Favorable report of the Senate Judiciary Committee.**—On November 19, 1945, the Committee on the Judiciary of the Senate unanimously reported the bill as revised (S. Rept. No. 752, 79th Cong., 1st sess.). Its report states that (p. 1)—

There is a widespread demand for legislation to settle and regulate the field of Federal administrative law and procedure. The subject is not expressly mentioned in the Constitution, and there is no recognizable body of such law, as there is for the courts in the Judicial Code. There are no clearly recognized legal guides for either the public or the administrators. Even the ordinary operations of administrative agencies are often difficult to know. The Committee on the Judiciary is convinced that, at least in essentials, there should be some simple and standard plan of administrative procedure.

That report contains a somewhat more brief résumé of the legislative history (pp. 1–5) than is here set forth, a general statement as to the approach of the Senate committee (pp. 5–6), a comparison of the bill with the earlier Walter-Logan bill (p. 6), a comparison with the 1941 final report of the Attorney General's Committee on Administrative Procedure (pp. 6–7), a general statement as to the structure of the bill with a diagram (pp. 7–9), a detailed analysis of provisions (pp. 9–30), and some concluding general comments (pp. 30–31).   Appendix A thereto is the Senate bill as reported.   Appendix B is the letter of the Attorney General in full, together with the more detailed statement which accompanied it.

**1946 Senate debate and passage.**—On March 12, 1946, the bill came on the Senate floor for action.   It was explained in detail.   It passed on the same day without change and without an adverse vote.

**Changes proposed by House Judiciary Committee.**—The original S. 7, as heretofore stated, was also introduced in the House of Representatives as H. R. 1203 by Chairman Hatton W. Sumners of the Judiciary Committee.   A half dozen other bills on the same subject had also been introduced in the House of Representatives.   The revised S. 7 as reported by the Senate Judiciary Committee (and subsequently passed by the Senate) was introduced in the House of Representatives in December 1945 as H. R. 4941 by Chairman Sumners. The designated subcommittee of the House Judiciary Committee had followed all the proceedings and language of the bill.   It considered many suggested changes and alternative proposals.   As a result of its deliberations, certain corrections and clarifications were written into the text of the bill and introduced as H. R. 5988 by Chairman Francis E. Walter of the subcommittee.   These changes are shown in appendix A of this report.   They have been submitted for comment to the Attorney General, who has approved them as shown by his letter set forth as appendix B of this report.   They are obviously desirable from the standpoint of all parties concerned.   Accordingly, the text of H. R. 5988 has been substituted, as a committee amendment, for S. 7 as passed by the Senate.

## III. THE SUBSTANCE OF THE BILL

Manifestly the bill does not unduly encroach upon the needs of any legitimate government operation, although it is of course operative according to its terms even if it should cause some administrative inconvenience or changes in procedure.   It is brief, but necessarily not oversimplified.   Functional classifications and exemptions have been made, but in no part of the bill is any agency exempted by name. The bill is meant to be operative "across the board" in accordance with its terms, or not at all.   Where one agency has been able to demonstrate that it should be exempted, all like agencies have been exempted in general terms.   (See sec. 2 (a)).   Where one agency has shown that some particular operation should be exempted from any particular requirement, the same function in all agencies has been exempted.   No agency has been favored by special treatment.

The bill is an outline of minimum essential rights and procedures. Agencies may fill in details, so long as they publish them.   It affords private parties a means of knowing what their rights are and how they may protect them, while administrators are given a simple

framework upon which to base such operations as are subject to the provisions of the bill.

What the bill does in substance may be summarized under four headings: **1.** It provides that agencies must issue as rules certain specified information as to their organization and procedure, and also make available other materials of administrative law (sec. 3). **2.** It states the essentials of the several forms of administrative proceedings (secs. 4, 5, and 6) and the general limitations on administrative powers (sec. 9). **3.** It provides in more detail the requirements for administrative hearings and decisions in cases in which statutes require such hearings (secs. 7 and 8). **4.** It sets forth a simplified statement of judicial review designed to afford a remedy for every legal wrong (sec. 10).

The public information section is basic, because it requires agencies to take the initiative in informing the public. In stating the essentials of the different forms of administrative proceedings, the bill carefully distinguishes between the so-called legislative functions of administrative agencies (where they issue general regulations) and their judicial functions (in which they determine rights or liabilities in particular cases). It provides quite different procedures for the "legislative" and "judicial" functions of administrative agencies. In the "rule making" (that is, "legislative") function it provides that with certain exceptions agencies must publish notice and at least permit interested parties to submit their views in writing for agency consideration before the issuance of general regulations (sec. 4). No hearings are required by the bill unless statutes already do so in a particular case. Similarly, in "adjudications" (that is, the "judicial" function) no agency hearings are required unless statutes already do so, but in the latter case the mode of hearing and decision is prescribed (sec. 5). Where existing statutes require that either general regulations (called "rules" in the bill) or particularized adjudications (called "orders" in the bill) be made after agency hearing or opportunity for such hearing, then section 7 spells out the minimum requirements for such hearings, section 8 states how decisions shall be made thereafter, and section 11 provides for examiners to preside at hearings and make or participate in decisions.

While the administrative power and procedure provisions of sections 4 through 9 are law apart from court review, the provisions for judicial review afford parties a method of enforcing their rights in proper cases (sec. 10). However, it is expressly provided that the judicial-review provisions are not operative where statutes otherwise preclude judicial review or where agency action is by law committed to agency discretion.

The bill is so drafted that its several sections and subordinate provisions are closely knit. The operative provisions of the bill should be read apart from the purely formal provisions and minor functional distinctions. The definitions in section 2 are important, but they do not indicate the scope of the bill since the subsequent provisions make many functional distinctions and exceptions. The public-information provisions of section 3 are of the broadest application because, while some functions and some operations may not lend themselves to formal procedure, all administrative operations should as a matter of policy be disclosed to the public except as secrecy may

H. Repts., 79-2, vol. 6——20

**18** ADMINISTRATIVE PROCEDURE ACT

obviously be required or only internal agency "housekeeping" arrangements may be involved. Sections 4 and 5 prescribe the basic requirements for the making of rules and the adjudication of particular cases. In each case, where other statutes require opportunity for an agency hearing, sections 7 and 8 set forth the minimum requirements for such hearings and the agency decisions thereafter while section 11 provides for the appointment and tenure of examiners who may participate. Section 6 prescribes the rights of private parties in a number of miscellaneous respects which may be incidental to rule making, adjudication, or the exercise of any other agency authority. Section 9 limits sanctions, and section 10 provides for judicial review.

A diagram of the bill is to be found at pages 28–29 of this report.

## IV. EXPLANATION OF PROVISIONS

In the following explanation, under each section heading there appears an italicized synopsis of the provision and a paragraph or more of analysis or comment. The chart on pages 28 and 29 provides a diagrammed synopsis of the bill. The full bill is reproduced as appendix A hereto, which also shows the clarifications it makes in the similar Senate bill.

### SECTION 1. TITLE

*It is provided that the measure may be cited as the "Administrative Procedure Act."*

As a reading of the bill will demonstrate, it is designed to provide for publicity of information, fairness in administrative operation, and adequacy of judicial review. The purpose of the bill is to assure that the administration of government through administrative officers and agencies shall be conducted according to established and published procedures which adequately protect the private interests involved, the making of only reasonable and authorized regulations, the settlement of disputes in accordance with the law and the evidence, the impartial conferring of authorized benefits or privileges, and the effectuation of the declared policies of Congress in full.

### SECTION 2. DEFINITIONS

*The definitions apply to the remainder of the bill.*

The definitions simplify the language of the remaining sections. They are necessarily broad. Save as exceptions are made from the term "agency" in section 2 (a), this section on definitions is not intended to make all the necessary exceptions; those are to be found in the remaining sections of the bill as appropriate.

#### SECTION 2 (A). "AGENCY"

*The word "agency" is defined by excluding legislative, judicial, and territorial authorities and by including any other "authority" whether or not within or subject to review by another agency. The bill is not to be construed to repeal delegations of authority provided by law. Expressly exempted from the term "agency," except for the public-information requirements of section 3, are (1) agencies composed of representatives of*

*parties or of organizations of parties and (2) defined war authorities including civilian authorities functioning under temporary or named statutes.*

Whoever has the authority is an agency, whether within another agency or in combination with other persons. In other words agencies, necessarily, cannot be defined by mere form such as departments, boards, etc. If agencies were defined by form rather than by the criterion of authority, it might result in the unintended inclusion of mere "housekeeping" functions or the exclusion of those who have the real power to act.

Although delegations of authority otherwise lawful are expressly not affected as shown by the second sentence of the section, that does not mean that the examiner system or other requirements provided by the bill may be avoided.

Agencies composed in whole or in part of representatives of all the parties or organizations of parties are exempted because they do not lend themselves to the adjudicative procedures set out in the remaining sections of the bill. This excludes from all but the public-information provisions of section 3 such agencies as the National Railroad Adjustment Board and the Railroad Retirement Board. Other boards so composed under the Railway Labor Act or like statutes would also be exempt. In such cases the exclusion from the bill is total, save for section 3.

The exclusion of war functions is self-explanatory. They are rarely required to be exercised upon statutory hearing, with which much of the remainder of the bill is concerned, and they are rapidly liquidating. But they are subject to the public information requirements of section 3. "Present hostilities" means those connected with the war brought on at Pearl Harbor in December 1941.

### SECTION 2 (B). "PERSON" AND "PARTY"

*"Person" is defined to include specified forms of organizations other than agencies. "Party" is defined to include anyone named, or admitted or seeking and entitled to be admitted, as a party in any agency proceeding except that nothing in the subsection is to be construed to prevent an agency from admitting anyone as a party for limited purposes.*

The definition of person includes both individuals and any form of public or private organization other than Federal agencies, because the latter are separately defined in section 2 (a) and so identified throughout the remainder of the bill. The practice of agencies to admit persons as parties in proceedings "for limited purposes" does not of course authorize an agency to ignore or prejudice the rights of the true or full parties to a proceeding.

### SECTION 2 (C). "RULE" AND "RULE MAKING"

*"Rule" is defined as any agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law, policy, organization, procedure, or practice requirements and includes any prescription for the future of rates, wages, financial structures, etc. "Rule making" means agency process for the formulation, amendment, or repeal of a rule.*

"Rules" are often called "regulations" or "general regulations." The definition is important because it determines whether section 4 rather than section 5 applies to a regulatory operation.   The specification of some of the activities that are rule making is included to illustrate and to embrace them in the definition beyond question. "Rules" formally prescribe a course of conduct for the future rather than pronounce past or existing rights or liabilities.   Rule making is exempted from some of the general requirements of sections 7 and 8 relating to hearings and decisions.

### SECTION 2 (D). "ORDER" AND "ADJUDICATION"

*"Order" means the final disposition of any matter, other than rule making but including licensing and whether or not affirmative, negative, injunctive, or declaratory in form. "Adjudication" means agency process for the formulation of an order.*

The term "order" is essentially and necessarily defined to exclude rules.   "Licensing" is specifically included to remove any question, since licenses involve a pronouncement of present rights of named parties although they may also prescribe terms and conditions for future observance.   Licensing as such is later exempted from some of the provisions of sections 5, 7, and 8 relating to hearings and decisions.   "Injunctive" action is a common determination of past or existing lawfulness, although the remedy or sanction is in form cast as a command or restriction for the future rather than as a fine, assessment of damages, or other present penalty.

### SECTION 2 (E). "LICENSE" AND "LICENSING"

*"License" is defined to include any form of required official permission such as certificate, charter, etc.   "Licensing" is defined to include agency process respecting the grant, renewal, modification, denial, revocation, etc., of a license.*

The definition of licensing supplements section 2 (d).   It is included because licenses take many forms and the term is important in some of the remaining sections.   Later provisions of the bill distinguish between initial licensing and renewals or other licensing proceedings.

### SECTION 2 (F). "SANCTION" AND "RELIEF"

*"Sanction" is defined to include any agency prohibition, withholding of relief, penalty, seizure, assessment, requirement, restriction, etc.   "Relief" is defined to include any agency grant, recognition, or other beneficial action taken on the application or petition of any person.*

These definitions are mainly relevant to section 9 on sanctions and powers and to section 10 on judicial review.   They embrace all forms of legitimate administrative authority.   They define but do not confer powers.   They are necessary in order to identify "sanction" for the protection in later sections of those against whom agencies are authorized to proceed, and "relief" for the benefit of those seeking authorized redress.

## SECTION 2 (G). "AGENCY PROCEEDING" AND "AGENCY ACTION"

*"Agency proceeding" means any agency process defined in the foregoing subsections (c), (d), or (e). "Agency action" is defined to include an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, and failure to act.*

"Agency proceeding" is a term devised to simplify the language of later sections and assure that all forms of administrative procedure or authority are included. The term "agency action" brings together previously defined terms in order to simplify the language of the judicial-review provisions of section 10 and to assure the complete coverage of every form of agency power, proceeding, action, or inaction. In that respect the term includes the supporting procedures, findings, conclusions, or statements of reasons or basis for the action or inaction.

## SECTION 3. PUBLIC INFORMATION

*From the public-information provisions of section 3 there are exempted matters (1) requiring secrecy in the public interest or (2) relating solely to the internal management of an agency.*

The public-information requirements of section 3 are among the most useful provisions of the bill. The general public is entitled to know agency procedures and methods or to have the ready means of knowing with certainty. The section requires agencies to disclose their set-ups and procedures, to publish rules and interpretations intended as guides for the solution of cases, and to proceed in consistent accordance therewith until publicly changed.

The introductory clause of the section states the only general exceptions. The first, which excepts matters requiring secrecy in the public interest, is necessary but may not be construed to defeat the remaining provisions. It would include confidential operations in any agency, such as some of the aspects of the investigating or prosecuting functions of the Secret Service or Federal Bureau of Investigation, but no other functions or operations in those or other agencies. "Public interest" means manifest need in order to achieve the due execution of authorized functions. Closely related is the second exception, of matters relating solely to internal agency management, which may not be construed to defeat the other provisions or to permit withholding of information as to operations which remaining provisions of the section or of the whole bill require to be public or publicly available. Neither exception is operative unless the excepted subject matter is clearly and directly involved. Neither exception supersedes other legal requirements of publicity or free public accessibility.

## SECTION 3 (A). RULES TO BE PUBLISHED

*Every agency is required to publish in the Federal Register its (1) organization and delegations of final authority as well as places and ways of doing business with the public, (2) methods of rule making and adjudication, including the rules of practice relating thereto, and (3) such substantive rules, policies, or interpretations as it may frame for the guidance of the public but not rules addressed to and served upon named parties as provided by law. No person is in any manner to be required to resort to organization or procedure not so published.*

**22**                    ADMINISTRATIVE PROCEDURE ACT

Since the bill leaves wide latitude for each agency to frame its own procedures, this subsection requiring agencies to state their organization and procedures in the form of rules is essential for the information of the public. The publication must be kept up to date. The enumerated classes of informational rules must also be separately stated so that, for example, rules of procedure will be separate from rules of substance, interpretation, or policy. Under (1) only final delegations of authority to dispose of cases or matters must be published; the delegation of other functions would be shown in (2) in stating the general course and method by which each of an agency's functions are channeled and determined. Also, under (2), an agency is required to state all the stages, steps, courses, and alternatives for each of the types of functions it is authorized to perform. The section forbids secrecy of rules binding upon or applicable to the public, or of delegations of authority. Mimeographed releases of many kinds now common should no longer be necessary since, if they contain really informative matter, they must be published as rules, policies, or interpretations. Substantive rules include the statement of standards. As a matter of good practice rules of any kind should not unnecessarily repeat statutes, but may quote and should identify the statutory authority which they invoke or provisions they properly amplify. Where it is not desirable to publish complicated forms at length and in full-spread fashion in the Federal Register, under this provision an agency may publish in the Federal Register a simple statement of the contents of the form and, if blanks are available, state where they may be obtained. The requirement that no one shall "in any manner" be required to resort to unpublished organization or procedure protects the public from being required to pursue remedies that are not published as required by the section.

SECTION 3 (B). OPINIONS, ORDERS, AND RULES TO BE AVAILABLE TO
PUBLIC INSPECTION

*Agencies are required to publish or, pursuant to rule, make available to public inspection all final opinions or orders in the adjudication of cases (except those held confidential for good cause and not cited as precedents) and all rules.*

General rule making results in published material in the Federal Register as set forth in section 3 (a), but in the case of adjudication and some rules of particular applicability there is no standard medium of publication. Some agencies publish sets of some of their decisions, particularized rules, or orders; but otherwise the public is not informed as to how and where they may consult them. Requiring each agency to formulate and publish a rule respecting access to these materials of administrative law will afford the general public notice as to how such information may be consulted or secured. While the subsection does not mention "rulings"—which are neither rules nor orders but are general interpretations, such as the opinions of agency counsel— if authoritative they would be covered by the third category in section 3 (a). All rules must be subject at least to freely accorded public inspection under this section. The parenthetical exception respecting confidential opinions and orders would not supersede or repeal future or existing legal requirements of publication or public accessibility.

ADMINISTRATIVE PROCEDURE ACT 23

### SECTION 3 (C). ACCESSIBILITY OF PUBLIC RECORDS

*Except as statutes may require otherwise or information may be held confidential for good cause, matters of official record are to be made available to persons properly and directly concerned in accordance with rules to be issued by the agency.*

The purpose of this section is to make access to public records generally applicable, uniform, and more readily determinable. The requirement of an agency rule on the availability of official records is inserted for the same purpose as in section 3 (b). The interest of the person seeking access to records may in some cases be determinative. Agencies must classify data, specify generally what may be disclosed and what may not, and provide where applications for information may be made, how they will be determined, and what public agents will do so. In short, a routine and a procedure must be provided as well as a classification. Refusals of information would be subject to the requirements of section 6 (d). The concluding exception would not repeal or supersede present or future legal requirements of publicity or public accessibility existing apart from the bill.

## SECTION 4. RULE MAKING

*The introductory clause exempts from all of the requirements of section 4 any rule making so far as there are involved (1) military, naval, or foreign-affairs functions or (2) matters relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.*

The principal purpose of this section is, where other statutes do not require a hearing, to provide that the legislative functions of administrative agencies shall so far as possible be exercised only upon public participation on notice as provided in sections 4 (a) and (b).

The introductory exceptions to the section do not relieve an agency from any requirements imposed by law apart from this bill. They apply only "to the extent" that the excepted subject matter is clearly and directly involved. The phrase "foreign affairs functions," used here and in some other provisions of the bill, is not to be loosely interpreted to mean any agency operation merely because it is exercised in whole or part beyond the borders of the United States but only those "affairs" which so affect the relations of the United States with other governments that, for example, public rule-making provisions would provoke definitely undesirable international consequences. The exception of matters of management or personnel would operate only so far as not inconsistent with other provisions of the bill relating to those matters. The term "public property" would include property held by the United States in trust or as guardian, as Indian property is often held. The exception of proprietary matters is included because a main consideration in such cases relates to mechanics, interpretations, or policy and it is wise to encourage and facilitate the issuance of rules by dispensing with all mandatory procedural requirements. Changes can then be sought through the petition procedures of section 4 (d), by which such rule making may also be initially invoked. But these exceptions are not to be taken as encouraging agencies not to adopt voluntary public rule-making procedures where useful to the agency or beneficial to the public. They merely confer a discretion upon agencies to decide what, if any, public rule-making procedures shall be utilized in a given situation within their terms.

**24**                    ADMINISTRATIVE PROCEDURE ACT

### SECTION 4 (A). NOTICE OF RULE MAKING

*General notice of proposed rule making must be published in the Federal Register—unless all persons subject to the rules are named and are personally served or otherwise have actual notice as provided by law—and must include (1) the time, place, and nature of proceedings, (2) reference to the authority under which held, and (3) the terms, substance, or issues involved. However, except where notice and hearing is required by some other statute, the section does not apply to rules other than those of substance or where the agency for good cause finds (and incorporates the finding and reasons therefor in the published rule) that notice and public procedure are impracticable, unnecessary, or contrary to the public interest.*

The provisions respecting the fullness of notice apply whether or not, under the terms of the section, it must be published in the Federal Register. Notice must fairly apprise interested persons of the issues involved, so that they may present relevant data or argument. The required specification of legal authority must be done with particularity. Statements of issues in the general statutory language of legislative delegations of authority to the agency would not be a compliance with the section. Prior to public procedures agencies must conduct such nonpublic studies or investigations as will enable them to formulate issues, or where possible to issue proposed or tentative rules for the purpose of public proceedings. Summaries and reports may also be issued as aids in securing public comment or suggestions.

The section governs the application of the public procedures required by section 4 (b) since those procedures only apply where notice is required by this section. Agencies are given discretion to dispense with notice (and consequently with public proceedings) in the case of interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; but this does not mean that they should not undertake public procedures in connection with such rule making where useful to them or helpful to the public. The exemption of situations of emergency or necessity is not an "escape clause" in the sense that any agency has discretion to disregard its terms or the facts. A true and supported or supportable finding of necessity or emergency must be made and published. "Impracticable" means a situation in which the due, timely, and required execution of agency functions would be unavoidably prevented by its undertaking public rule-making proceedings. "Unnecessary" means so far as the public is concerned, as would be the case if a minor or merely technical amendment in which the public is not particularly interested were involved. "Public interest" supplements the terms "impracticable" or "unnecessary"; it requires that public rule-making procedures shall not unreasonably prevent an agency from fulfilling its duty and that, on the other hand, lack of public concern in rule making warrants an agency to dispense with public procedure. Where authority beneficial to the public does not become operative until a rule is issued, the agency may promulgate the necessary rule immediately and rely upon supplemental procedures in the nature of a public reconsideration of the issued rule to satisfy the requirements of this section. Where public rule-making procedures

ADMINISTRATIVE PROCEDURE ACT **25**

are dispensed with, the provisions of subsections (c) and (d) of this section would nevertheless apply. Notice otherwise required by law apart from this bill is not repealed or diminished by this section.

### SECTION 4 (B). PUBLIC PROCEDURES IN RULE MAKING

*After such notice, the agency must afford interested persons an opportunity to participate in the rule making at least to the extent of submitting written data, views, or argument; and, after consideration of such presentations, the agency must incorporate in any rules adopted a concise general statement of their basis and purpose. However, where other statutes require rules to be made after opportunity for hearing, the requirements of sections 7 and 8 (relating to public hearings and decisions thereon) apply in place of the provisions of this subsection.*

The first sentence states the minimum requirements of public rule-making procedure short of statutory hearing. Under it agencies might in addition confer with industry advisory committees, consult organizations, hold informal "hearings," and the like. Open proceedings may be aided by the submission of reports or summaries of data by agency representatives. Where open proceedings are held, interested persons unable to be present would be entitled to make written submittals. Considerations of practicality, necessity, and public interest as discussed in connection with section 4 (a) will naturally govern the agency's determination of the extent to which public proceedings may be carried. Matters of great import, or those where the public submission of facts will be either useful to the agency or a protection to the public, should naturally be accorded more elaborate public procedures. The agency must keep a record and analyze and consider all relevant matter presented prior to the issuance of rules. The required statement of the basis and purpose of rules issued should not only relate to the data so presented but with reasonable fullness explain the actual basis and objectives of the rule.

These rule-making procedures must be incorporated in the rules published pursuant to section 3 (a), although their applicability may be left to the notice of rule making in a given case and modifications or extensions of procedure may be made in the notice.

### SECTION 4 (C). FUTURE EFFECTIVE DATE OF RULES

*The required publication or service of any substantive rule must be made not less than 30 days prior to its effective date except (1) as otherwise provided by the agency for good cause found and published or (2) in the case of rules recognizing exemption or relieving restriction, interpretative rules, and statements of policy.*

This section does not repeal or diminish other time requirements provided by law apart from this bill. It does not provide procedures alternative to notice and other public proceedings required by the prior sections. Nor does it supersede the provisions of section 4 (d). Where public procedures are omitted as authorized in certain cases, section 4 (c) does not thereby become inoperative. It will afford persons affected a reasonable time to prepare for the effective date of a rule or rules or to take any other action which the issuance of rules may prompt. The specification of a 30-day deferred effective date

is not to be taken as a maximum, since there may be cases in which good administration or the convenience and necessity of the persons subject to the rule reasonably require a longer period. While certain named kinds of rules are not necessarily subject to the deferred effective date provided, it does not thereby follow that agencies are required to make such excepted types of rules operative with less notice or no notice but, instead, agencies may fix such future effective date as is advisable. The other exception—upon good cause found and published—is not an "escape clause" which may be exercised at will but requires legitimate grounds supported in law and fact by the required finding. Many rules, such as some agricultural marketing "orders," may be made operative in less than 30 days because of inescapable or unavoidable limitations of time, because of the demonstrable urgency of the conditions they are designed to correct, and because the parties subject to them may during the usually protracted hearing and decision procedures anticipate the regulation. In any event, however, no rule requiring action may be made effective until a legally reasonable time after its issuance as judged in the light of all the circumstances.

### SECTION 4 (D). PETITIONS RESPECTING RULES

*Every agency is required to accord any interested person the right to petition for the issuance, amendment, or repeal of a rule.*

This section applies not merely to effective rules existing at any time but to proposed or tentative rules. Where such petitions are made, the agency must fully and promptly consider them, take such action as may be required, and pursuant to section 6 (d) notify the petitioner in case the request is denied. The agency may either grant the petition, undertake public rule-making proceedings as provided by sections 4 (a) and 4 (b), or deny the petition. ·The mere filing of a petition does not require an agency to grant it, or to hold a hearing, or to engage in other public rule-making proceedings. But the agency must act on the petition in accordance with procedures set up and published in compliance with section 3 (a).

### SECTION 5. ADJUDICATIONS

*The provisions of section 5 relating to adjudications apply only where the case is required by some other statute to be determined upon an agency hearing except that, even in that case, the following classes of operations are expressly not affected: (1) Cases subject to trial de novo in court, (2) selection or tenure of public officers other than examiners, (3) decisions resting on inspections, tests, or elections, (4) military, naval, and foreign-affairs functions, (5) cases in which an agency is acting for a court, and (6) the certification of employee representatives.*

This section is limited to cases in which other statutes require an agency to act upon or after a hearing, but even then the numbered exceptions remove from the operation of the section adjudications otherwise required by statute to be made after hearing or opportunity therefor. The first, where the adjudication is subject to a judicial trial de novo, is included because whatever judgment the agency makes is effective only in a prima facie sense at most and the party aggrieved is entitled to complete judicial retrial and decision. The second, respect-

ing the selection and tenure of officers other than examiners, is included because the selection and control of public personnel has been traditionally regarded as a largely discretionary function. The third exempts proceedings resting entirely on inspections, tests, or elections because those methods of determination do not lend themselves to the hearing process. The fourth exempts military, naval, and foreign affairs functions for the same reasons that they are exempted from section 4; in any event, rarely do statutes require such functions to be exercised upon hearing; and the term "foreign affairs" is used in the same sense as in section 4. The fifth, exempting cases in which an agency is acting as the agent for a court, is included because the administrative operation is subject to judicial revision in toto. The sixth, exempting the certification of employee representatives such as the Labor Board operations under section 9 (c) of the National Labor Relations Act, is included because those determinations rest so largely upon an election or the availability of an election. Any of these exceptions apply only "to the extent" that the excepted subject is clearly and directly involved.

### SECTION 5 (A). NOTICES OF MAKING ADJUDICATIONS

*Persons entitled to notice of an agency hearing are to be duly and timely informed of the (1) time, place, and nature of the hearing, (2) the legal authority and jurisdiction under which it is to be held, and (3) the matters of fact and law asserted. Where private persons are the moving parties, respondents must give prompt notice of issues controverted in law or fact; and in other cases the agency may require responsive pleading. In fixing the times and places for hearings the agency must give due regard to the convenience and necessity of the parties.*

A party must be given ample notice of the legal and factual issues with due time to examine, consider, and prepare for them. To make that possible the issues must be specified with reasonable particularity, for which purpose the statement of issues in general statutory language of delegations of authority to the agency would not be sufficient. The second sentence of the subsection applies in those cases where the agency does not control the matter of notice because private persons are the moving parties; and in such cases the respondent parties must give notice of the issues of law or fact which they controvert so that the moving party will be apprised of the issues he must sustain. The purpose of the provision is to simplify the issues for the benefit of both the parties and the deciding authority.

### SECTION 5 (B). ADJUDICATION PROCEDURE

*The agency is required first to afford parties an opportunity for the settlement or adjustment of issues (where time, the nature of the proceeding, and the public interest permit) followed, to the extent that issues are not so settled, by hearing and decision under sections 7 and 8.*

The preliminary settlement-by-consent provision of this section is important. Such adjustments may comprehend the whole or any part of any case. Pursuant to section 3 (a) agencies would be required to state settlement procedures in their rules. The limitation to cases in which "time, the nature of the proceeding, and the public

# DIAGRAM SYNOPSIS OF BILL OMITTING

## GENERAL PROVISIONS

SEC. 1. **Title.**—"Administrative Procedure Act."

SEC. 2. **Definitions.**—Defines (a) agency, excepting representative and war agencies, (b) person and party, (c) rule and rule making, (d) order and adjudication, (e) license and licensing, (f) sanction and relief, (g) agency proceeding and action.

SEC. 3. **Public Information.**—Except secret functions and internal management: (a) agencies are required to publish organization, procedure, and other general rules, (b) opinions and orders are to be published or open to inspection, and (c) official records are to be made available to properly interested persons.

SEC. 6. **Ancillary Matters.**—(a) Parties are entitled to counsel. (b) Investigations are to be confined to authority granted agencies and witnesses are entitled to copies of testimony. (c) Subpenas are to be issued to parties on request and reasonable showing, and are to be judicially enforced if in accordance with law. (d) Written notice and statement of grounds is to be given by agency in denying any request.

SEC. 9. **Sanctions and Powers.**—In exercise of any power or authority: (a) no sanction is to be imposed or rule or order issued save within jurisdiction delegated and authority granted by law, (b) license applications are to be acted upon promptly, revocation is not to be attempted except upon notice and opportunity for the licensee to comply with lawful requirements, and renewals are not to be deemed denied until finally acted upon.

SEC. 11. **Examiners.**—Examiners are to be appointed pursuant to Civil Service for proceedings under sections 7 and 8 and may perform no inconsistent duties. They are removable only for good cause determined by Civil Service Commission after hearing, which is subject to judicial review. They are to receive compensation prescribed and adjusted by Civil Service Commission independently of agency recommendations or ratings.

SEC. 12. **Construction and Effect.**—The Act is not to impair other or additional legal rights. Procedure is to apply equally. The usual saving clause is included. Authority is granted to agencies to comply with the Act. Subsequent repeals are to be express. Effective dates are to be deferred and the Act is not to apply to proceedings previously begun.

28

*NOTE:* Sections 7, 8, and 11 apply only where other statutes require an agency hearing; and section 10 applies in a proper case whether or not an agency hearing is required. Sections 4, 5, 6 (b) and (c), and 9 (b) apply only where agencies by other statutes are given authority to make regulations, adjudicate cases, investigate, issue subpenas, or grant licenses as the case may be. The definitions in section 2 are not operative apart from the rest of the bill.

# IN DETAIL AND SECONDARY EXCEPTIONS

## QUASI-LEGISLATIVE FUNCTIONS

SEC. 4. **Rule Making.**—Except war, foreign affairs, management, and proprietary functions: (a) notice of rule making is to be published in certain instances, (b) thereafter interested persons are to be permitted to make at least written submittals for agency consideration, except that if other statutes require an agency hearing then sections 7 and 8 apply, (c) effective date of rules is to be 30 days following publication, and (d) any interested person may petition for issuance, amendment, or repeal of a rule.

## QUASI-JUDICIAL FUNCTIONS

SEC. 5. **Adjudication.**—Where statutes require a hearing: (a) contents of notice are specified, (b) hearings are to be held under sections 7 and 8 to the extent issues cannot first be settled informally, (c) hearing officers are required to operate entirely separate from prosecuting officers and to make or recommend the decision in the case, and (d) agencies are authorized to issue declaratory orders.



SEC. 7. **Hearings.**—In hearings which sections 4 or 5 require to be conducted under this section: (a) presiding officers are to be the agency or its members, examiners, or others specially provided for in other statutes, all to act impartially and be subject to disqualification, (b) presiding officers are to have authority necessary to conduct the hearing and dispose of motions, (c) irrelevant and repetitious evidence is to be excluded as a matter of policy and no sanction is to be imposed or rule or order issued except upon the whole record and as supported by and in accordance with reliable, probative, and substantial evidence, and (d) record of the hearing is to be exclusive for purposes of decision.



SEC. 8. **Decisions.**—Where hearing is required under section 7: (a) examiners are to make either initial decision or recommended decision, as the agency may determine, and (b) prior to any recommended or other decision the parties are entitled to submit suggested findings, exceptions, and supporting reasons and all decisions are to include findings on material issues and a statement of the appropriate action.

SEC. 10. **Judicial Review.**—Except so far as statutes preclude judicial review or agency action is by law committed to agency discretion: (a) any person suffering legal wrong is entitled to judicial review, (b) the form of action is to be that specially provided by any statute or, in the absence or inadequacy thereof, any appropriate common-law action, (c) every action for which there is no other adequate remedy is made subject to such review, (d) agencies or courts may stay agency action or preserve status or rights pending review, and (e) reviewing courts, upon the whole record and with due regard for the rule of prejudicial error, are to determine all questions of law, compel agency action unlawfully withheld, and hold unlawful action found (1) arbitrary, (2) not in accord with the Constitution, (3) in violation of any statute, (4) without observance of procedure required by law, (5) unsupported by substantial evidence on the record in cases subject to sections 7 and 8, or (6) unwarranted by the facts to extent that facts are subject to trial *de novo* by the reviewing court.

29

interest permit" does not mean that formal proceedings, to the exclusion of prior opportunity for informal settlement, may be required at will by an agency.   It is intended to exempt only situations in which (1) time is unavoidably lacking, (2) the nature of the proceeding is such that the number of parties makes it unlikely that any adjustment could be reached, and (3) the administrative function requires immediate execution in order to protect the demonstrable requirements of public interest in the due and timely execution of the laws.   Where settlements do not dispose of the whole case, sections 7 and 8 as well as section 5 (c) apply.

### SECTION 5(C).  SEPARATION OF PROSECUTING FUNCTIONS

*Officers who preside at the taking of evidence must make the decision or recommended decision in the case.   They may not consult with any person or party except openly and upon notice save in the disposition of customary ex parte matters, and they may not be made subject to the supervision of prosecuting officers.   The latter may not participate in the decisions except as witness or counsel in public proceedings.   However, the subsection is not to apply in determining applications for initial licenses or the validity or application of rates, facilities, or practices of public utilities or carriers; nor does it apply to the top agency or members thereof.*

The purpose of the section is to assure that no investigating or prosecuting officer shall directly or indirectly in any manner influence or control the operations of hearing and deciding officers, except as a participant in public proceedings, and even then in no different fashion than the private parties or their representatives.   The separation of functions here required must be reflected in the rules of organization and procedure issued pursuant to section 3 (a).   "Ex parte matters authorized by law" means passing on requests for adjournments, continuances, filing of papers, and so forth.   The exemption of applications for initial licenses frees from the requirements of the section such matters as the granting of certificates of convenience and necessity, upon the theory that in most licensing cases the original application may be much like rule making.   The latter, of course, is not subject to any provision of section 5.   The exemption of cases involving the validity or application of utility or carriers' rates, facilities, or practices is included for a similar reason—since they may often be consolidated with rule making.   There are, however, some instances of either kind of case which tend to be accusatory in form and involve sharply controverted factual issues, to which agencies should not apply the exceptions because they are not to be interpreted as precluding fair procedure where it is required.

The last exemption—of the agency itself or the members of the board who comprise it—is required by the very nature of administrative agencies, where the same authority is responsible for both the investigation-prosecution and the hearing and decision of cases.   There, too, the exemption is not to be taken as meaning that the top authority must reserve to itself both prosecuting and deciding functions.   It is ultimately responsible for all functions committed to it, but it may and should confine itself to determining policy and delegate the actual supervision of investigations and initiation of cases to responsible

subordinate officers.   Agencies, such as heads of bureaus or departments, performing mainly executive functions should delegate to examiners or boards of examiners at least the initial decision of cases and should confine their own review to important issues of law or policy.

### SECTION 5 (D). DECLARATORY ADJUDICATIONS

*Every agency is authorized in its sound discretion to issue declaratory orders with the same effect as other orders.*

This section does not mean that any agency empowered to issue orders may issue declaratory orders, because it is limited by the introductory clauses of section 5 so that such orders may be issued only where the agency is empowered by statute to hold hearings and the subject is not otherwise expressly exempted there.   Where authorized to do so by this section, agencies are not required to issue declaratory orders merely because request is made therefor.   Such applications have no greater effect than they now have under existing comparable legislation.   "Sound discretion," moreover, would preclude the issuance of improvident orders.   The administrative issuance of declaratory orders would be governed by the same basic principles that govern declaratory judgments in the courts.   Such orders, if issued, would not bind those not parties to them or determine subject matter not presented.   They would be subject to judicial review as in the case of other orders.

### SECTION 6. ANCILLARY MATTERS

*The provisions of section 6 relating to incidental or miscellaneous rights, powers, and procedures do not override contrary provisions in other parts of the bill.*

The purpose of this introductory exception, which reads "except as otherwise provided in this act," is to limit, for example, the right of appearance provided in section 6 (a) so as not to authorize improper ex parte conferences during formal hearings and pending formal decisions under sections 7 and 8.   This section 6 contains provisions respecting various procedural rights which may be incidental to either rule making or adjudication or independent of either.

### SECTION 6 (A). APPEARANCE OR REPRESENTATION OF PARTIES

*Any person compelled to appear in person before any agency or its representative is entitled to counsel.   In other cases, every party may appear in person or by counsel.   So far as the orderly conduct of public business permits, any interested person may appear before any agency or its responsible officers at any time for the presentation or adjustment of any matter.   Agencies are to proceed with reasonable dispatch to conclude any matter so presented, with due regard for the convenience and necessity of the parties.   Nothing in the subsection is to be taken as recognizing or denying the propriety of nonlawyers representing parties.*

The section is a statement of statutory and mandatory right of interested persons to appear themselves or through or with counsel before any agency in connection with any function, matter, or process whether formal, informal, public, or private.   The word "party" in the second sentence is to be understood as meaning any person show-

ing the requisite interest in the matter, since the section applies in connection with the exercise of any agency authority whether or not formal proceedings are available. The phrase "responsible officers," as used here and in some other provisions, includes all officers or employees who actually determine matters or exercise substantial advisory functions. The qualifying words in the third sentence— which read "so far as the orderly conduct of public business permits"—preclude numerous petty appearances by or for the same party in the same case; but they do not confer upon agencies a right to preclude interested persons from presenting fully and before any responsible officer or employee their cases or proposals in full. The reference to interlocutory and summary proceedings emphasizes the necessity for an opportunity for full informal appearance where normal and formal hearing and decision requirements are not applicable prior to agency action.

The requirement that agencies proceed "with reasonable dispatch to conclude any matter presented" means that no agency shall in effect deny relief or fail to conclude a case by mere inaction, or proceed in dilatory fashion to the injury of the persons concerned. No agency should permit any person to suffer injurious consequences of unwarranted official delay.

The final sentence provides that the subsection shall not be taken to recognize or deny the rights of nonlawyers to be admitted to practice before any agency. The use of the word "counsel" means lawyers. The right of agencies to pass upon the qualifications of nonlawyers is expressly recognized and preserved in the subsection, but this provision does not authorize an agency to permit nonlawyers to "practice law" where that would be contrary to law apart from this bill. As to lawyers, agencies are ordinarily not warranted in laying burdensome requirements upon those in good standing in the courts and should normally require no more at most than an attorney's own representation that he is such in good standing before the highest court of any State, Territory, or the United States.

### SECTION 6(B). ADMINISTRATIVE INVESTIGATIONS

*Investigative process is not to be issued or enforced except as authorized by law. Persons compelled to submit data or evidence are entitled to retain or, on payment of costs, to procure copies except that in nonpublic proceedings a witness may for good cause be limited to inspection of the official transcript.*

This section is designed to preclude "fishing expeditions" and investigations beyond jurisdiction or authority. It applies to any demand, whether or not a formal subpena is actually issued. It includes demands or requests to inspect or for the submission of reports. An investigation must be substantially and demonstrably necessary to agency operations, conducted through authorized and official representatives, and confined to the legal and factual sphere of the agency as provided by law. Investigations may not disturb or disrupt personal privacy, or unreasonably interfere with private occupation or enterprise. They should be conducted so as to interfere in the least degree compatible with adequate law enforcement.

Defs.' MSJ App. 408

ADMINISTRATIVE PROCEDURE ACT     **33**

"Nonpublic investigatory proceeding" means those of the grand jury kind in which evidence is taken behind closed doors. The limitation, for good cause, to inspection of the official transcript may be properly invoked by an agency where evidence is taken in a case in which prosecutions may be brought later and it would nullify the execution of the laws to permit copies to be circulated. In those cases the "good cause" should be clear and convincing; then the witness or his counsel may be limited to inspection of the relevant portions of the transcript. Parties should in any case have copies or an opportunity for inspection in order to assure that their evidence is correctly set forth, to refresh their memories in the case of stale proceedings, and to enable them to be advised by counsel. They should also have such copies whenever needed in other judicial or administrative proceedings.

### SECTION 6 (C). ADMINISTRATIVE SUBPENAS

*Where agencies are by law authorized to issue subpenas, parties may secure them upon request and upon a statement or showing of general relevance and reasonable scope if the agency rules so require. Where a party contests a subpena, the court is to inquire into the situation and, so far as the subpena is found in accordance with law, issue an order requiring the production of the evidence within a reasonable time under penalty of contempt for failure then to comply.*

This provision will assure private parties the same access to subpenas, pursuant to the same just and reasonable routine, as that available to the representatives of agencies. It will also prevent the issuance of improvident subpenas or action by an agency requiring a detailed, unnecessary, and burdensome showing of what evidence is sought. The section constitutes a statutory limitation upon the issuance or enforcement of subpenas in excess of agency authority or jurisdiction, in connection with any agency function or authority. It does not mean that upon contest courts should enter into a detailed examination of facts and issues which are committed to agency authority in the first instance; they should instead inquire generally into the legal and factual situation and be satisfied that the agency could lawfully have jurisdiction. The section expressly recognizes the right of parties subject to administrative subpenas to contest their validity in the courts prior to subjection to any form of penalty for noncompliance. In such contests, the court is required to determine all relevant questions of law.

### SECTION 6 (D). AGENCY DENIALS OF REQUESTS

*Prompt notice is to be given of denials of requests in any agency proceeding, accompanied by a simple statement of procedural or other grounds.*

The section affords the parties in any agency proceeding, whether or not formal or upon hearing, the right to prompt action upon their requests, immediate notice of such action, and a statement of the actual grounds therefor. The latter should in any case be sufficient to apprise the party of the basis of the denial and any other or further administrative remedies or recourse he may have. A statement of

Defs.' MSJ App. 409

the actual grounds need not be made "in affirming a prior denial or where the denial is self-explanatory." However, prior denial would satisfy this requirement only where the grounds previously stated remain the actual grounds and sufficiently notify the party. A self-explanatory denial must meet the same test; that is, the request must be in such form that its mere denial fully informs the party of all he would otherwise be entitled to have stated.

## SECTION 7. HEARINGS

*Section 7 relating to agency hearings applies only where hearings are otherwise required by statute and by section 4 or 5.*

As heretofore stated in connection with sections 4 and 5, the bill requires no hearings unless other statutes contain such a requirement in particular cases of either rule making or adjudication and even then section 5 contains numerous functional exceptions. This section 7, therefore, is merely supplementary to section 4 or 5 in the relevant cases. These formal hearing provisions are not in derogation of the settlement provisions of sections 5 and 6 (a), which require that parties be given every opportunity to simplify or settle cases. Hearings are not to be used as indirect burdens or penalties.

### SECTION 7 (A). PRESIDING OFFICERS AT HEARINGS

*The hearing must be held either by the agency, a member or members of the board which comprises it, one or more examiners, or other officers specially provided for in or designated pursuant to other statutes. All presiding and deciding officers are to operate impartially. They may at any time withdraw if they deem themselves disqualified and, upon the filing of a proper affidavit of personal bias or disqualification against them, the agency is required to determine the matter as a part of the record and decision in the case.*

The section provides two mutually exclusive methods of hearing— by the agency itself (or one or more of its members) or by subordinate officers. Also recognized as hearing officers are those, including State representatives, specially provided for or named in other statutes. But the reference to other statutory officers would not prevent an agency, such as the head of a department or a board, from utilizing examiners as provided by the bill. On the other hand, statutory provisions authorizing the use of employees or attorneys generally to be presiding officers are superseded. The preservation of the "conduct of specified classes of proceedings by or before boards or other officers specially provided by or designated pursuant to statute" is not a loophole for the avoidance of the examiner system; it is intended to preserve only special types of statutory hearing officers who contribute some special qualifications, as distinguished from examiners otherwise provided in the bill, and at the same time assure the parties fair and impartial procedure.

Those who so preside are subject to the remaining provisions of the bill. They must conduct the hearing in a strictly impartial and considerate manner, rather than as representatives of an investigative or prosecuting authority. They may make sure that all necessary evidence is adduced and keep the hearing orderly and efficient. No

examiner may proceed in willful disregard of law. Presiding officers must conduct themselves in accord with the requirements of this bill and with due regard for the rights of all parties as well as the facts, the law, and the need for prompt and orderly dispatch of public business.

The provision for affidavits of bias or personal disqualification requires a decision thereon by the agency in, and as a part of, the case; it thereby becomes subject to administrative and judicial review. That decision might be made upon the affidavit alone, as for example, the protest might be dismissed as insufficient on its face. The agency itself may hear any relevant argument or facts, or it may designate an examiner to do so. The effect which bias or disqualification shown upon the record might have would be determined by the ordinary rules of law and the other provisions of this bill. If it appeared or were discovered late, it would have the effect—where issues of fact or discretion were important and the conduct and demeanor of witnesses relevant in determining them—of rendering the recommended decisions or initial decisions of such officers invalid. This consequence will require agencies and examiners themselves to take care that they do not sit where subject to disqualification.

The term "presiding officers" means those who officially sit and conduct the proceedings for reception of evidence. If more than one so "presides," there may of course be a chairman who also presides in a slightly different but familiar sense as chairman of the presiding body.

### SECTION 7 (B). HEARING POWERS OF PRESIDING OFFICERS

*Presiding officers, subject to the rules of procedure adopted by the agency and within its powers, have authority to (1) administer oaths, (2) issue such subpenas as are authorized by law, (3) receive evidence and rule upon offers of proof, (4) take depositions or cause them to be taken, (5) regulate the hearing, (6) hold conferences for the settlement or simplification of issues, (7) dispose of procedural requests, (8) make decisions or recommended decisions under section 8 of the bill, and (9) exercise other authority as provided by agency rule consistent with the remainder of the bill.*

The section does not expand the powers of agencies. It assures that the presiding officer or officers will perform a real function rather than serve merely as notaries or policemen. They would have and independently exercise all the powers listed in the section. The agency itself—which must ultimately either decide the case, consider reviewing it, or hear appeals from the examiner's decision—should not in effect conduct hearings from behind the scenes where it cannot know the detailed happenings in the hearing room and does not hear or see the witnesses or private parties.

### SECTION 7 (C). EVIDENCE REQUIREMENTS

*Except as statutes otherwise provide, the proponent of a rule or order has the burden of proof. While any evidence may be received, as a matter of policy agencies are required to provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence and no sanction may be imposed or rule or order be issued except upon consideration of the whole record or such portions as any party may cite and as supported by and*

*in accordance with reliable, probative, and substantial evidence. Any party may present his case or defense by oral or documentary evidence, submit rebuttal evidence, and conduct reasonable cross-examination. However, in the case of rule making or determining applications for initial licenses, the agency may adopt procedures for the submission of evidence in written form so far as the interest of any party will not be prejudiced thereby.*

That the proponent of a rule or order has the burden of proof means not only that the party initiating the proceeding has the general burden of coming forward with a prima facie case but that other parties, who are proponents of some different result, also for that purpose have a burden to maintain. Similarly the requirement that no sanction be imposed or rule or order be issued except upon evidence of the kind specified means that the proponents of a denial of relief must sustain such denial by that kind of evidence. For example, credible and credited evidence submitted by the applicant for a license may not be ignored except upon the requisite kind and quality of contrary evidence. No agency is authorized to stand mute and arbitrarily disbelieve credible evidence. Except as applicants for a license or other privilege may be required to come forward with a prima facie showing, no agency is entitled to presume that the conduct of any person or status of any enterprise is unlawful or improper. In other words, this section means that every proponent of a rule or order or the denial thereof has the burden of coming forward with sufficient evidence therefor; and in determining applications for licenses or other relief any fact, conduct, or status so shown by credible and credited evidence must be accepted as true except as the contrary has been shown or such evidence has been rebutted or impeached by duly credited evidence or by facts officially noticed and stated.

The second and primary sentence of the section is framed on the premise that, as to the admissibility of evidence, an administrative hearing is to be compared with an equity proceeding in the courts. Thus, the mere admission of evidence is not to be taken as prejudicial error (there being no lay jury to be protected from improper influence) although irrelevant, immaterial, and unduly repetitious evidence is useless and is to be excluded as a matter of efficiency and good practice; and no finding or conclusion may be entered except upon consideration by the agency of the whole record or so much thereof as a party may cite and as supported by and in accordance with evidence which is plainly of the requisite relevance and materiality—that is, "reliable, probative, and substantial evidence." Thus while the exclusionary "rules of evidence" do not apply except as the agency may as a matter of sound practice simplify the hearing and record by excluding improper or unnecessary matter, the accepted standards and principles of probity, reliability, and substantiality of evidence must be applied. These are standards or principles usually applied tacitly and resting mainly upon common sense which people engaged in the conduct of responsible affairs instinctively understand. But they exist and must be rationally applied. They are to govern in administrative proceedings. These requirements do not preclude the admission of or reliance upon technical reports, surveys, analyses, and summaries where appropriate to the subject matter.

ADMINISTRATIVE PROCEDURE ACT                    **37**

The first and second sentences of the section therefore mean that, where a party having the burden of proceeding has come forward with a prima facie and substantial case, he will prevail unless his evidence is discredited or rebutted. In any case the agency must decide "in accordance with the evidence." Where there is evidence pro and con, the agency must weigh it and decide in accordance with the preponderance. In short, these provisions require a conscientious and rational judgment on the whole record in accordance with the proofs adduced. The proof must be substantial, as provided in this section and also in section 10 (e) where the term "substantial evidence" is discussed later in this report.

The provision on its face does not confer a right of so-called "unlimited" cross-examination. Presiding officers will have to make the necessary initial determination whether the cross-examination is pressed to unreasonable lengths by a party or whether it is required for the "full and true disclosure of the facts" stated in the provision. Nor is it the intention to eliminate the authority of agencies to confer sound discretion upon presiding officers in the matter of its extent. The test is—as the section states—whether it is required "for a full and true disclosure of the facts." In many rule-making proceedings where the subject matter and evidence are broadly economic or statistical in character and the parties or witnesses numerous, the direct or rebuttal evidence may be of such a nature that cross-examination adds nothing substantial to the record and unnecessarily prolongs the hearings. The right of cross-examination extends, in a proper case, to written evidence submitted pursuant to the last sentence of the section as well as to cases in which oral or documentary evidence is received in open hearing. Even in the latter case, subject to the appropriate safeguards, technical data may as a matter of convenience be reduced to writing and introduced as in courts. Among these are technical statements, reports of surveys, analyses, and summaries. The written evidence provision of the last sentence of the section is designed to cover situations in which, as a matter of general rule or practice, the submission of the whole or substantial portions of the evidence in a case is done in written form. In those situations, however, the provision limits the practice to specified classes of cases and, even then, only where and to the extent that "the interest of any party will not be prejudiced thereby." To the extent that cross-examination is necessary to bring out the truth, the party must have it. An adequate opportunity must also be provided for a party to prepare and submit appropriate rebuttal evidence.

Agencies must comply fully and the courts, pursuant to section 10 of the bill, must enforce all of these requirements diligently.

### SECTION 7 (D). RECORD OF HEARINGS

*The record of evidence taken and papers filed is exclusive for decision and, upon payment of costs, is available to the parties. Where decision rests on official notice of a material fact not appearing in the evidence of record, any party may on timely request show the contrary.*

The "official notice" mentioned relates to the administrative practice of taking facts as shown and true though not in the record. This is done by analogy to "judicial notice" familiar in court procedure. Where agencies take such notice they must so state on the

record or in their decisions and then afford the parties an opportunity to show the contrary. But such notice may initially be taken only of generally recognized and ordinarily indisputable facts—usually those of a scientific or public nature.

## Section 8. Agency Decisions After Hearing

*Section 8 applies to cases in which a hearing is required to be conducted pursuant to section 7.*

Like section 7, upon which section 8 depends, this section is supplementary to sections 4 and 5 in cases in which agency action is required to be taken after hearing provided by statute and not otherwise expressly excepted. The decision in formal proceedings is exceedingly important, because most criticisms of the administrative process relate in one way or another to the methods whereby agencies decide cases. There are suspicions and good ground for assuming that those who purport to decide cases actually do not, that the submittals of private parties are not fully considered, that the views of agency personnel are emphasized without opportunity for private parties to meet them, and that matters outside the record are often the real grounds of decision.

### Section 8 (a). Decisions by Subordinates

*Where the agency has not presided at the reception of the evidence, the presiding officer (or any other officer qualified to preside, in cases exempted from section 5 (c)) must make the initial decision unless the agency—by general rule or in a particular case—undertakes to make the initial decision. If the presiding officer makes the initial decision, it becomes the decision of the agency in the absence of an appeal to the agency or review by the agency on its own motion. On such appeal or review, the agency has all the powers it would have had in making the initial decision. If the agency makes the initial decision without having presided at the taking of the evidence, whatever officer took the evidence must first make a recommended decision except that, in rule making or determining applications for initial licenses, (1) the agency may instead issue a tentative decision or any of its responsible officers may recommend a decision or (2) such intermediate procedure may be wholly omitted in any case in which the agency finds on the record that the execution of its functions imperatively and unavoidably so requires.*

These provisions are mandatory but permit agencies to either have their examiners make decisions or, as is now usually the case, recommend decisions. In either case the examiner system is necessary because agencies cannot themselves hear all cases. Where they do not do so some device must be used to bridge the gap between the officials who hear and those who decide cases. The provision that on agency review of initial examiners' decisions it has all the powers it would have had in making the initial decision itself does not mean that initial examiners' decisions or recommended decisions are without effect. They become a part of the record and are of consequence, for example, to the extent that material facts in any case depend on the determination of credibility of witnesses as shown by their demeanor or conduct at the hearing. In a broad sense the agencies' reviewing powers are to be compared with that of courts under section 10 (e)

of the bill. The agency may adopt in whole or part the findings, conclusions, and basis stated by examiners or other presiding officers. Agency rules must prescribe a reasonable time for appeals from initial examiners' decisions. Where the agency determines to review such a case, it should, so far as possible, specify the issues of law, fact, or discretion for review with particularity.

The alternative intermediate procedure which an agency may adopt in rule-making or determining applications for initial licenses is broadly drawn. But even in those cases, if issues of fact are sharply controverted or the case or class of cases tends to become accusatory in nature, sound practice would require the agency to adopt the intermediate recommended decision procedure.

### SECTION 8 (B). REQUIREMENTS FOR ALL SUBMITTALS AND DECISIONS

*Prior to each recommended or other decision or review the parties must be given an opportunity to submit for the full consideration of deciding officers (1) proposed findings and conclusions or (2) exceptions to recommended decisions or other decisions being appealed or reviewed, and (3) supporting reasons for such findings, conclusions, or exceptions. The record must show the official rulings upon each such finding, conclusion, or exception presented. All recommended or other decisions become a part of the record and must include (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented by the record and (2) the appropriate agency action or denial.*

"Supporting reasons" means that briefs on the law and facts must be received and fully considered by every recommending, deciding, or reviewing officer. They must also hear such oral argument as may be required by law, and the bill does not diminish rights to oral argument. Where the issues are serious or the case becomes one adversary in character, the agency should provide for oral argument before all recommending, deciding, or reviewing officers.

The requirement that the agency must state the reasons or basis for its findings and conclusions means that such findings and conclusions must be sufficiently related to the record and the law as to advise the parties and any reviewing court of their record and legal basis. Most agencies will do so by opinions which reason and relate the issues of fact, law, and discretion. Statements of reasons, however, may be long or short as the nature of the case and the novelty or complexity of the issues may require.

Findings and conclusions must include all the relevant issues of law and fact presented by the record. They may be few or many, simple or complex, as the case may be. Where oral testimony is conflicting or subject to doubt of its credibility, the credibility of witnesses would be a necessary finding if the facts are material. It should also be noted that the relevant issues extend to matters of administrative discretion as well as of law and fact. This is important because agencies often appear to determine only whether they have power to act rather than whether their discretion should be exercised or how it should be exercised. Furthermore, without a disclosure of the basis for the exercise of, or failure to exercise, discretion, the parties are unable to determine what other or additional facts they might offer by way of rehearing or reconsideration of decisions.

**40**                    ADMINISTRATIVE PROCEDURE ACT

When made, decisions as defined by this section must be served on parties named, and also furnished to those participating as well as to interested persons who request them or have attempted to participate or intervene.   Any person who requests in writing to be notified or given copies should have his request honored.

### SECTION 9. AGENCY SANCTIONS AND POWERS

*Section 9 relating to powers and sanctions refers to the exercise of any power or authority by an agency.*

Unlike sections 7 and 8, this section applies in all relevant cases, whether or not the agency is required by statute to proceed upon hearing or in any special manner.   It also applies to any power or authority that an agency may assume to exercise.

### SECTION 9 (A). GENERAL LIMITATION ON SANCTIONS AND POWERS

*No sanction may be imposed or substantive rule or order be issued except within the jurisdiction delegated to the agency and as authorized by law.*

This section embraces both substantive and procedural requirements of law.   It means that agencies may not undertake anything which statutes or other adequate sources of authority (such as treaties) do not authorize them to do.   Where these sources are specific in the authority granted, no additional authority may be assumed.   Where these sources are general, no authority beyond the generality granted may be exercised.   In short, agencies may not impose sanctions which have not been specifically or generally provided for them to impose. Thus, an agency which is authorized only to issue cease-and-desist orders may not set up a licensing system.   An agency authorized to regulate only trade practices may not regulate banking, and so on. Similarly, no agency may undertake directly or indirectly to exercise the functions of some other agency.   The section confines each agency to the jurisdiction delegated to it by law.   Sanctions in the way of penalties or relief must be identified and authorized by law, and where authorized they must in any case properly apply in the factual situation presented.

One troublesome subject in this field is that of publicity, which may in no case be utilized directly or indirectly as a penalty or punishment save as so authorized.   Legitimate publicity extends to the issuance of authorized documents, such as notices or decisions; but, apart from actual and final adjudication after all proceedings have been had, no publicity should reflect adversely upon any person, organization, product, or commodity of any kind in any manner otherwise than as required to carry on authorized agency functions and necessary in the administration thereof.   It will be the duty of agencies not to permit informational releases to be utilized as penalties or to the injury of parties.

### SECTION 9 (B). LICENSES

*Agencies are required, with due regard for the rights or privileges of all the interested parties or persons adversely affected, to proceed with reasonable dispatch to conclude and decide proceedings on applications for licenses.   They are not to withdraw a license without first giving the licensee notice in writing and an opportunity to demonstrate or achieve compliance with all lawful requirements except in cases of willfulness or*

Defs.' MSJ App. 416

*those in which public health, interest, or safety requires otherwise. In businesses of a continuing nature, no license expires until timely applications for new licenses or renewals are determined by the agency.*

This section operates in all cases whether or not hearing is required, but it does not provide for a hearing where other statutes do not do so. Nor does it diminish statutory rights to a hearing. It does not confer licensing powers. The requirement of dispatch means that agencies must proceed as rapidly as is feasible and practicable, rather than at their own convenience. Undue delays are subject to correction by mandatory injunction pursuant to section 10. The exceptions to the second sentence, regarding revocations, apply only where the demonstrable facts fully and fairly warrant their application. Willfulness must be manifest. The same is true of "public health, interest, or safety." The standard of "public \* \* \* interest" means a situation where clear and immediate necessity for the due execution of the laws overrides the equities or the injury to the licensee; the term does not confer upon agencies authority at will to ignore the requirement of notice and an opportunity to demonstrate compliance. However, this limitation does not apply to temporary permits or temporary licenses.

## Section 10. Judicial Review

*Section 10 on judicial review does not apply in any situation so far as there are involved matters with respect to which statutes preclude judicial review or agency action is by law committed to agency discretion.*

This section requires adequate, fair, effective, complete, and just determination of the rights of any person in properly invoked proceedings.

Very rarely do statutes withhold judicial review. It has never been the policy of Congress to prevent the administration of its own statutes from being judicially confined to the scope of authority granted or to the objectives specified. Its policy could not be otherwise, for in such a case statutes would in effect be blank checks drawn to the credit of some administrative officer or board. The statutes of Congress are not merely advisory when they relate to administrative agencies, any more than in other cases. To preclude judicial review under this bill a statute, if not specific in withholding such review, must upon its face give clear and convincing evidence of an intent to withhold it. The mere failure to provide specially by statute for judicial review is certainly no evidence of intent to withhold review.

Matters of discretion are necessarily exempted from the section, since otherwise courts would in effect supersede agency functioning. But that does not mean that questions of law properly presented are withdrawn from reviewing courts. Where laws are so broadly drawn that agencies have large discretion, the situation cannot be remedied by an administrative procedure act but must be treated by the revision of statutes conferring administrative powers. However, where statutory standards, definitions, or other grants of power deny or require action in given situations or confine an agency within limits as required by the Constitution, then the determination of the facts does not lie in agency discretion but must be supported by either the administrative or judicial record. In any case the existence of discretion does not prevent a person from bringing a review action but merely prevents him *pro tanto* from prevailing therein.

**42**                    ADMINISTRATIVE PROCEDURE ACT

### SECTION 10 (A). RIGHT OF COURT REVIEW

*Any person suffering legal wrong because of any agency action, or adversely affected within the meaning of any statute, is entitled to judicial review.*

This section confers a right of review upon any person adversely affected in fact by agency action or aggrieved within the meaning of any statute. The phrase "legal wrong" means such a wrong as is specified in section 10 (e). It means that something more than mere adverse personal effect must be shown in order to prevail—that is, that the adverse effect must be an illegal effect. Almost any governmental action may adversely affect somebody—as where rates or prices are fixed—but a complainant, in order to prevail, must show that the action is contrary to law in either substance or procedure. The law so made relevant is not only constitutional law but any and all applicable law.

### SECTION 10 (B). FORMS OF ACTION

*The technical form of proceeding for judicial review is any special proceeding provided by statute or, in the absence or inadequacy thereof, any relevant form of legal action (such as those for declaratory judgments or injunctions) in any court of competent jurisdiction. Moreover, agency action is also made subject to judicial review in any civil or criminal proceeding for enforcement except to the extent that prior, adequate, and exclusive opportunity for such review is provided by law.*

The first sentence of this section is an express statutory recognition and adoption of the so-called common-law actions as being appropriate and authorized means of judicial review, operative whenever special statutory forms of judicial review are either lacking or insufficient. Declaratory judgment procedure, for example, may be operative before statutory forms of review are available and may be utilized to determine the validity or application of any agency action. By such an action the court must determine the validity or application of a rule or order, render a judicial declaration of rights, and so bind an agency upon the case stated and in the absence of a reversal. The expression "special statutory review" means not only special review proceedings wholly created by statute, but so-called common-law forms referred to and adopted by other statutes as the appropriate mode of review in given cases. The provision respecting "prior, adequate, and exclusive * * * review" in the second sentence is operative only where statutes, either expressly or as they are interpreted, require parties to resort to some special statutory form of judicial review which is prior in time and adequate to the case.

The section does not alter venue provisions under existing law, whether in connection with specially provided statutory review or the so-called nonstatutory or common-law-action variety. Under this and the other provisions of section 10 a proper reviewing court has full authority to render decision and grant relief.

### SECTION 10 (C). REVIEWABLE AGENCY ACTS

*Agency action made reviewable specially by statute or final agency action for which there is no other adequate judicial remedy is subject to judicial review. In addition, preliminary or procedural matters not*

*directly subject to review are reviewable upon the review of final actions. Except as statutes may expressly require otherwise, agency action is final for the purposes of the section whether or not there has been presented or determined any application for a declaratory order, for any form of reconsideration, or (unless the agency otherwise requires by rule and provides that the action shall meanwhile be inoperative) for an appeal to superior agency authority.*

"Final" action includes any effective or operative agency action for which there is no other adequate remedy in any court. Action which is automatically stayable on further proceedings invoked by a party is not final "Reconsideration" includes reopening, rehearing, etc. The last clause, permitting agencies to require by rule that an appeal be taken to superior agency authority before judicial review may be sought, is designed primarily to implement the provisions of section 8 (a) pursuant to which an agency may permit an examiner to make the initial decision in a case which becomes the agency's decision in the absence of an appeal to or review by the agency. If there is such review or appeal, the examiner's initial decision becomes inoperative until the agency determines the matter. This section permits an agency also to require by rule that, if any party is not satisfied with the initial decision of a subordinate hearing officer, the party must first appeal to the agency (the decision meanwhile being inoperative) before resorting to the courts. In no case may appeal to "superior agency authority" be required by rule unless the administrative decision meanwhile is inoperative, because otherwise the effect of such a requirement would be to subject the party to the agency action and to repetitious administrative process without recourse. There is a fundamental inconsistency in requiring a person to continue "exhausting" administrative processes after administrative action has become, and while it remains, effective.

### SECTION 10 (D). TEMPORARY RELIEF PENDING FULL REVIEW

*Pending judicial review any agency may postpone the effective date of its action. Upon conditions and as may be necessary to prevent irreparable injury, any reviewing court may postpone the effective date of any agency action or preserve the status quo pending conclusion of review proceedings.*

This section permits either agencies or courts, if the proper showing be made, to maintain the status quo. The section is in effect a statutory extension of rights pending judicial review, although the reviewing court must order the extension; or, to put the situation another way, statutes authorizing agency action are to be construed to extend rights pending judicial review and the exclusiveness of the administrative remedy is diminished so far as this section operates. While the section would not permit a court to grant an initial license, it provides intermediate judicial relief for every other situation in order to make judicial review effective. The authority granted is equitable and should be used by both agencies and courts to prevent irreparable injury or afford parties an adequate judicial remedy. Such relief would normally, if not always, be limited to the parties complainant and may be withheld in the absence of a substantial question for review. In determining whether agency action should be postponed, the court should take into account that persons other

**44**          ADMINISTRATIVE PROCEDURE ACT

than parties may be adversely affected by such postponement and in such cases the party seeking postponement may be required to furnish security to protect such other persons from loss resulting from postponement.

### SECTION 10 (E). SCOPE OF COURT REVIEW

*Reviewing courts are required to decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of any agency action. They must (A) compel action unlawfully withheld or unreasonably delayed and (B) hold unlawful any action, findings, or conclusions found to be (1) arbitrary or an abuse of discretion, (2) contrary to the Constitution, (3) contrary to statutes or statutory right, (4) without observance of procedure required by law, (5) unsupported by substantial evidence in any case reviewed upon the record of an agency hearing provided by statute, or (6) unwarranted by the facts so far as the latter are subject to trial de novo. In making these determinations the court is to consider the whole record or such parts as any party may cite, and due account must be taken of the rule of prejudicial error.*

This section provides that questions of law are for courts rather than agencies to decide in the last analysis and it also lists the several categories of questions of law. Under it courts are required to determine the application or threatened application or questions respecting the validity or terms of any agency action notwithstanding the form of the proceeding or whether brought by private parties for review or by public officers or others for enforcement. It expressly recognizes the right of properly interested parties to compel agencies to act where they improvidently refuse to act. "Finding" and "conclusion" also mean failure to find or conclude as the law and the record may require. "Accordance with law" requires, among other things, a judicial determination of the authority or propriety of interpretative rules and statements of policy. "Short of statutory right" means that agencies are not authorized to give partial relief where a party demonstrates his right to the whole. Authorized relief must be granted by an agency to the full extent that entitlement is shown.

"Without observance of procedure required by law" means not only the procedures required and procedural rights conferred by this bill but any other procedures or procedural rights the law may require. Except in a few respects, this is not a measure conferring administrative powers but is one laying down definitions and stating limitations. These definitions and limitations must, to be sure, be interpreted and applied by agencies affected by them in the first instance. But the enforcement of the bill, by the independent judicial interpretation and application of its terms, is a function which is clearly conferred upon the courts in the final analysis. It will thus be the duty of reviewing courts to prevent avoidance of the requirements of the bill by any manner or form of indirection, and to determine the meaning of the words and phrases used. For example, in several provisions the expression "good cause" is used. The cause so specified must be interpreted by the context of the provision in which it is found and the purpose of the entire section and bill. Cause found must be real and demonstrable. If the agency is proceeding upon a statutory hearing and record, the cause will appear there; otherwise it must be

ADMINISTRATIVE PROCEDURE ACT       **45**

such that the agency may show the facts and considerations warranting the finding in any proceeding in which the finding is challenged. The same would be true in the case of findings other than of good cause, required in the bill. As has been said, these findings must in the first instance be made by the agency concerned but, in the final analysis, their propriety in law and on the facts must be sustainable upon inquiry by a reviewing court.

"Substantial evidence" means evidence which on the whole record is clearly substantial, plainly sufficient to support a finding or conclusion under the requirements of section 7 (c), and material to the issues. It is exceedingly important. Difficulty has come about by the practice of agencies and courts to rely upon something less—suspicion, surmise, implications, or plainly incredible evidence. Although the agency must do so in the first instance, under this bill it will be the duty of the courts to determine in the final analysis and in the exercise of their independent judgment whether on the whole of the proofs brought to their attention the evidence in a given instance is sufficiently substantial to support a finding, conclusion, or other agency action or inaction. In reviewing a case under this fifth category the court must base its judgment upon its own review of the entire record or so much thereof as may be cited by any party.

The sixth category, respecting the establishment of facts upon trial de novo, would require the reviewing court to determine the facts in any case of adjudication not subject to sections 7 and 8 or otherwise required to be reviewed exclusively on the record of a statutory agency hearing. It would also require the judicial determination of facts in connection with rule making or any other conceivable form of agency action to the extent that the facts were relevant to any pertinent issues of law presented. For example, statutes providing for "reparation orders," in which agencies determine damages and award money judgments, usually state that the money orders issued are merely prima facie evidence in the courts and the parties subject to them are permitted to introduce evidence in the court in which the enforcement action is pending. In other cases, the test is whether there has been a statutory administrative hearing of the facts which is adequate and exclusive for purposes of review. Thus, adjudications such as tax assessments not made upon a statutory administrative hearing and record may involve a trial of the facts in The Tax Court or the United States district courts. Where administrative agencies deny parties money to which they are entitled by statute or rule, the claimants may sue as for any other claim and in so doing try out the facts in the Court of Claims or United States district courts as the case may be. Where a court enforces or applies an administrative rule, the party to whom it is applied may for example offer evidence and show the facts upon which he bases a contention that he is not subject to the terms of the rule. Where for example an affected party claims in a judicial proceeding that a rule issued without an administrative hearing (and not required to be issued after such hearing) is invalid for some relevant reason of law, he may show the facts upon which he predicates such invalidity. In short, where a rule or order is not required by statute to be made after opportunity for agency hearing and to be reviewed solely upon the record thereof, the facts pertinent to any relevant question of law must be tried and determined de novo

**46**                ADMINISTRATIVE PROCEDURE ACT

by the reviewing court respecting either the validity or application of
such rule or order—because facts necessary to the determination of
any relevant question of law must be determined of record somewhere
and, if Congress has not provided that an agency shall do so, then the
record must be made in court.

The requirement of review upon "the whole record" means that
courts may not look only to the case presented by one party, since
other evidence may weaken or even indisputably destroy that case.
The requirement that account shall be taken "of the rule of prejudi-
cial error" means that a procedural omission which has been cured
prior to the finality of the action involved by affording the party the
procedure to which he was originally entitled is not a reversible error.

### SECTION 11. EXAMINERS

*Subject to the civil-service and other laws not inconsistent with this bill,
agencies are required to appoint such examiners as may be necessary for
proceedings under sections 7 and 8, who are to be assigned to cases in
rotation so far as practicable and to perform no inconsistent duties. They
are removable only for good cause determined by the Civil Service Com-
mission after opportunity for hearing and upon the record thereof. They
are to receive compensation prescribed by the Commission independently
of agency recommendations or ratings. One agency may, with the consent
of another and upon selection by the Commission, borrow examiners from
another. The Commission is given the necessary powers to operate under
this section.*

That examiners be "qualified and competent" requires the Civil
Service Commission to fix appropriate qualifications and the agencies
to seek fit persons. In view of the tenure and compensation require-
ments of the section, designed to make examiners largely independent
in matters of tenure and compensation, self-interest and due concern
for the proper performance of public functions will inevitably move
agencies to secure the highest type of examiners. The section thus
changes the present situation, in which examiners are mere employees
of an agency. The entire tradition of the Civil Service Commission is
directed toward security of tenure, and that system is put to appro-
priate use in the present case.

Additional powers are conferred upon the Commission. It must
afford any examiner an opportunity for a hearing before acceding to
an agency request for removal, and even then its action would be sub-
ject to judicial review. The hearing and decision would be made
under sections 7 and 8 of this bill.

The requirement of assignment of examiners "in rotation" prevents
an agency from disfavoring an examiner by rendering him inactive,
although examiners may be permitted to specialize and be assigned
mainly to cases for which they have so qualified.

In the matter of examiners' compensation the section adds greatly
to the Commission's powers and function. It must prescribe and
adjust examiners' salaries, independently of agency ratings and
recommendations. The stated inapplicability of specified sections of
the Classification Act carries into effect that authority. The Com-
mission would exercise its powers by classifying examiners' positions
and, upon customary examination through its agents, shift examiners
to superior classifications or higher grades as their experience and

duties may require.   Agencies may make, and the Commission may consider, recommendations; and the Commission might consult the agency, as it now does in setting up positions or reclassifying positions, but it would act upon its own responsibility and with the objects of the bill in mind.   Examiners' salaries should be high enough to attract superior personnel.

The provision permitting agencies to borrow examiners is intended to permit those who do not need full-time examiners to borrow them as needed as well as to aid those agencies which may become temporarily or occasionally insufficiently staffed.

## SECTION 12. CONSTRUCTION AND EFFECT

*Nothing in the bill is to diminish constitutional rights or limit or repeal additional requirements of law.   Requirements of evidence and procedure are to apply equally to agencies and private persons except as otherwise provided by law.   The unconstitutionality of any portion or application of the bill is not to affect other portions or applications.   Agencies are granted all authority necessary to comply with the bill.   Subsequent legislation is not to modify the bill except as it may do so expressly.   The bill would become law three months after its approval except that sections 7 and 8 take effect six months after approval, the requirements of section 11 become effective a year after approval, and no requirement is mandatory as to any agency proceeding initiated prior to the effective date of such requirement.*

The word "initiated" in the final clause of the section means a proceeding formally begun as by the issuance of a complaint by the agency (irrespective of prior charges or investigations) or of notice of a rule-making hearing.   As to new cases, the effective dates provided in section 12 are deferred longer so far as sections 7 and 8 are concerned in order to afford agencies ample time to prepare and make any adjustments required in their procedures.   The selection of examiners under section 11 is deferred for a year in order to permit present military service personnel an opportunity to qualify for these positions.

This section, however, merely provides formal matters of construction and effect.   Except as it expands or defers the prior sections of the bill, it supplies mainly the time of taking effect of the several provisions of the bill.   Otherwise the earlier provisions are operative according to their terms.   Any inconsistent agency action or statute is in effect repealed.   No agency action taken or refused would be lawful except as done in full compliance with all applicable provisions of the bill and subject to the judicial review provided.   No agreed waiver of its provisions would suffice unless entirely voluntary and without any manner or form of coercion.

Like some other statutes, judicial enforcement in case by case fashion is not the only method of enforcing the bill.   For willful failure to comply, funds may be withheld or officers or employees may be subject to disciplinary action or dismissal.   However, for most practical purposes it is to the agencies that the Congress and the people must look for fair administration of the laws and compliance with this bill.   Judicial review is of utmost importance, but it can be operative in relatively few cases because of the cost and general hazards of litigation.   It is indispensable since its mere existence generally precludes the arbitrary exercise of powers or assumption of powers

Defs.' MSJ App. 423

**48**              ADMINISTRATIVE PROCEDURE ACT

not granted.   Yet, in the vast majority of cases the agency concerned usually speaks the first and last word.   For that reason the agencies must make the first, primary, and most far-reaching effort to comply with the terms and the spirit of this bill.

This bill is not, of course, the final word.   It is a beginning.   If it becomes law, changes may be made in the light of further experience; and additions should be made.

# APPENDIX A

## COMMITTEE AMENDMENT

It is proposed by the Committee amendment to make the following changes in S. 7: Portions of the bill to which no change is proposed are printed in roman, with matter proposed to be omitted shown in black brackets, and new matter is printed in italic:

A BILL To improve the administration of justice by prescribing fair administrative procedure

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* [That]

### TITLE

SECTION 1. This Act may be cited as the "Administrative Procedure Act".

### DEFINITIONS

SEC. 2. As used in this Act—

(a) AGENCY.— "Agency" means each authority (whether or not within or subject to review by another agency) of the Government of the United States other than Congress, the courts, or the governments of the possessions, Territories, or the District of Columbia. Nothing in this Act shall be construed to repeal delegations of authority as provided by law. Except as to the requirements of section 3, there shall be excluded from the operation of this Act (1) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them, (2) courts martial and military commissions, (3) military or naval authority exercised in the field in time of war or in occupied territory, or (4) functions which by law expire on the termination of present hostilities, within any fixed period thereafter, or before July 1, 1947, and the functions conferred by the following statutes: Selective Training and Service Act of 1940; Contract Settlement Act of 1944; Surplus Property Act of 1944.

(b) PERSON AND PARTY.— "Person" includes individuals, partnerships, corporations, associations, or public or private organizations of any character other than agencies. "Party" includes any person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party, in any agency proceeding; but nothing herein shall be construed to prevent an agency from admitting any person or agency as a party for limited purposes.

(c) RULE AND RULE MAKING.— "Rule" means the whole or any part of any agency statement of general *or particular* applicability *and future effect* [1] designed to implement, interpret, or prescribe law or policy or to describe the organization, procedure, or practice requirements of any agency [.] *and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services, or allowances therefor, or of valuations, costs, or accounting, or practices bearing upon any of the foregoing.* "Rule making" means agency process for the formulation, amendment, or repeal of a rule [and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services, or allowances therefor, or of valuations, costs, or accounting, or practices bearing upon any of the foregoing]:

[1] The change of the language to embrace specifically rules of "particular" as well as "general" applicability is necessary in order to avoid controversy and assure coverage of rule making addressed to named persons. The Senate committee report so interprets the provision, and the other changes are likewise in conformity with the Senate committee report (p. 11). The phrase "future effect" does not preclude agencies from considering and, so far as legally authorized, dealing with past transactions in prescribing rules for the future.

**49**

Defs.' MSJ App. 425

**50**                    ADMINISTRATIVE PROCEDURE ACT

(d) ORDER AND ADJUDICATION.—"Order" means the whole or any part of the final disposition (whether affirmative, negative, *injunctive*,[2] or declaratory in form) of any agency in any matter other than rule making but including licensing. "Adjudication" means agency process for the formulation of an order.

(e) LICENSE AND LICENSING.—"License" includes the whole or part of any agency permit, certificate, approval, registration, charter, membership, statutory exemption, or other form of permission. "Licensing" includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license.

(f) SANCTION AND RELIEF.—"Sanction" includes the whole or part of any agency (1) prohibition, requirement, limitation, or other condition affecting the freedom of any person; (2) withholding of relief; (3) imposition of any form of penalty or fine; (4) destruction, taking, seizure, or withholding of property; (5) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees; (6) requirement, revocation, or suspension of a license; or (7) taking of other compulsory or restrictive action. "Relief" includes the whole or part of any agency (1) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy; (2) recognition of any claim, right, immunity, privilege, exemption, or exception; or (3) taking of any other action *upon the application or petition of, and* [3] beneficial to, any person.

(g) AGENCY PROCEEDING AND ACTION.—"Agency proceeding" means any agency process as defined in subsections (c), (d), and (e) of this section. ⟦For the purposes of section 10,[4]⟧ "Agency action" includes the whole or part of every agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.

## PUBLIC INFORMATION

SEC. 3. Except to the extent that there is involved (1) any function of the United States requiring secrecy in the public interest or (2) any matter relating solely to the internal management of an agency—

(a) RULES.—Every agency shall separately state and currently publish in the Federal Register (1) descriptions of its central and field organization, *including delegations by the agency of final authority and* the established places *at which*, and methods whereby, the public may secure information or make submittals or requests; ⟦(3)⟧ (2) statements of the general course and method by which its ⟦rule making and adjudicating [5]⟧ functions are channeled and determined, including the nature and requirements of all formal or informal procedures available as well as forms and instructions as to the scope and contents of all papers, reports, or examinations; and ⟦(4)⟧ (3) substantive rules adopted as authorized by law and statements of general policy or interpretations formulated and adopted by the agency for the guidance of the public, *but not rules addressed to and served upon named persons in accordance with law*.[6] No person shall in any manner be required to resort to organization or procedure not so published.

(b) OPINIONS AND ORDERS.—Every agency shall publish or, in accordance with published rule, make available for public inspection all final opinions or orders in the adjudication of cases (except those required for good cause to be held confidential and not cited as precedents) *and all rules*.[7]

---

[1] This addition is prompted by the fact that some people interpret "future effect" as used in defining rule making, to include injunctive action, whereas the latter is traditionally and clearly adjudication. It is made even more necessary that this matter be clarified because of the amendment of section 2 (c) to embrace clearly particularized rule making as set forth in note 1.

[2] The change is necessary to make it clear that "relief" means only action taken upon the application or petition of a party. Agencies frequently, of course, may take action, beneficial or otherwise, on their own motion.

[3] As the bill now stands the term "agency action" is not used in other sections, but the term ought not be limited to section 10 since it may be found useful in later years in connection with additions and amendments.

[4] The first insert is necessary to show in which separate set of rules delegations of authority should appear. The Senate committee report states that the effect of any one of the first three classifications requires the publication of subdelegations of authority to subordinate officers (p. 12), and, of course, to other agencies, but certainly such publication should not be required in all three sets of rules. It should be noted that there will be no requirement to list in the rules the names of specific individuals to whom power is delegated unless such a designation is now required by law. The listing of subdelegations of final authority requires only the naming of the specific office or agency to which a delegation of final authority has been made. The phrase "rule making and adjudicating" is eliminated because the introductory clauses of the section make the necessary exemptions.

[5] The added language is necessary in order not to fill the Federal Register with a great mass of particularized rule making which has always been satisfactorily handled without general publication.

[6] This change supplements the change explained in note 6. If some rules are not published in the Federal Register, then clearly they should be made available in the same manner as orders.

ADMINISTRATIVE PROCEDURE ACT 51

(c) Public records.—Save as otherwise required by statute, matters of official record shall in accordance with published rule be made available to persons properly and directly concerned except information held confidential for good cause found.

## RULE MAKING

Sec. 4. Except to the extent that there is involved (1) any military, naval, or foreign affairs function of the United States or (2) any matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts—

(a) Notice.—General notice of proposed rule making shall be published in the Federal Register (*unless all persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law*)[8] and shall include (1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved. Except where notice or hearing is required by statute, this subsection shall not apply to interpretative rules, general statements of policy, rules of agency organization, procedure, or practice, or in any situation in which the agency for good cause finds (and incorporates the finding and a brief statement of the reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(b) Procedures.—After notice required by this section, the agency shall afford interested persons an opportunity to participate in the rule making through submission of written data, views, or argument with or without opportunity to present the same orally in any manner; and, after consideration of all relevant matter presented, the agency shall incorporate in any rules adopted a concise general statement of their basis and purpose. Where rules are required by [law] *statute* to be made [upon] *on* the record after opportunity for [or upon][9] an agency hearing, the requirements of sections 7 and 8 shall apply in place of the provisions of this subsection.

(c) Effective dates.—The required publication or service of any substantive rule (other than one granting or recognizing exemption or relieving restriction or interpretative rules and statements of policy) shall be made not less than thirty days prior to the effective date thereof except as otherwise provided by the agency upon good cause found and published with the rule.

(d) Petitions.—Every agency shall accord any interested person the right to petition for the issuance, amendment, or repeal of a rule.

## ADJUDICATION

Sec. 5. In every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing, except to the extent that there is involved (1) any matter subject to a subsequent trial of the law and the facts de novo in any court; (2) the selection or tenure of an officer or employee of the United States other than examiners appointed pursuant to section 11; (3) proceedings in which decisions rest solely on inspections, tests, or elections; (4) the conduct of military, naval, or foreign affairs functions; (5) cases in which an agency is acting as an agent for a court; and (6) the certification of employee representatives—

(a) Notice.—Persons entitled to notice of an agency hearing shall be timely informed of (1) the time, place, and nature thereof; (2) the legal authority and jurisdiction under which the hearing is to be held; and (3) the matters of fact and law asserted. In instances in which private persons are the moving parties, other parties to the proceeding shall give prompt notice of issues controverted in fact or law; and in other instances agencies may by rule require responsive pleading. In fixing the times and places for hearings, due regard shall be had for the convenience and necessity of the parties or their representatives.

(b) Procedure.—The agency shall afford all interested parties opportunity for (1) the submission and consideration of facts, argument, offers of settlement, or

<hr/>

[8] The added language supplements the changes explained in notes 6 and 7. There is no reason to burden the Federal Register with notices addressed to particular parties who have been personally served or otherwise have notice.

[9] The change is made to conform to the language used in the introductory clause of section 5 respecting adjudications. A statute may, in terms, require a rule or order to be made upon the record of a hearing, or in the usual case be interpreted as manifesting a Congressional intention so to require, and in either situation sections 7 and 8 would apply save as other exceptions are operative.

proposals of adjustment where time, the nature of the proceeding, and the public interest permit and (2), to the extent that the parties are unable so to determine any controversy by consent, hearing and decision upon notice and in conformity with sections 7 and 8.

(c) SEPARATION OF FUNCTIONS.—The same officers who preside at the reception of evidence pursuant to section 7 shall make the recommended decision or initial decision required by section 8 except where such officers become unavailable to the agency. Save to the extent required for the disposition of ex parte matters as authorized by law, no such officer shall consult any person or party on any fact in issue unless upon notice and opportunity for all parties to participate; nor shall such officer be responsible to or subject to the supervision or direction of any officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency. No officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency in any case shall, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 8 except as witness or counsel in public proceedings. This subsection shall not apply in determining applications for initial licenses or [the past reasonableness of rates:] *to proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers;*[10] nor shall it be applicable in any manner to the agency or any member or members of the body comprising the agency.

(d) DECLARATORY ORDERS.—The agency is authorized in its sound discretion, with like effect as in the case of other orders, to issue a declaratory order to terminate a controversy or remove uncertainty.

ANCILLARY MATTERS

SEC. 6. Except as otherwise provided in this Act—

(a) APPEARANCE.—Any person compelled to appear in person before any agency or representative thereof shall be accorded the right to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative. Every party shall be accorded the right to appear in person or by or with counsel or other duly qualified representative in any agency proceeding. So far as the [responsible] *orderly*[11] conduct of public business permits, any interested person may appear before any agency or its responsible officers or employees for the presentation, adjustment, or determination of any issue, request, or controversy in any proceeding (*interlocutory, summary, or otherwise*)[12] or in connection with any agency function [including stop order or other summary actions]. Every agency shall proceed with reasonable dispatch to conclude any matter presented to it except that due regard shall be had for the convenience and necessity of the parties or their representatives. Nothing herein shall be construed either to grant or to deny to any person who is not a lawyer the right to appear for or represent others before any agency or in any agency proceeding.

(b) INVESTIGATIONS.—No process, requirement of a report, inspection, or other investigative act or demand shall be issued, made, or enforced in any manner or for any purpose except as authorized by law. Every person compelled to submit data or evidence shall be entitled to retain or, on payment of lawfully prescribed costs, procure a copy or transcript thereof, except that in a nonpublic investigatory proceeding the witness may for good cause be limited to inspection of the official transcript of his testimony.

(c) SUBPENAS.—Agency subpenas authorized by law shall be issued to any party upon request and, as may be required by rules of procedure, upon a statement or showing of general relevance and reasonable scope of the evidence sought. Upon contest the court shall sustain any such subpena or similar process or demand to the extent that it is found to be in accordance with law and, in any proceeding for enforcement, shall issue an order requiring the appearance of the witness or the production of the evidence or data *within a reasonable time* under penalty of punishment for contempt in case of contumacious failure [to do so] *to comply.*[13]

---

[10] The exemption is broadened to include facilities and practices, which are quite as important as rates and often involved in the determination of rate questions. It also seems a wise clarification to use the broader term "validity or application" instead of merely "past reasonableness." It is understood that the reason for this exemption is that these proceedings are often consolidated with rule making so that, unless the exemption is properly made, either rule making will be restricted or the consolidation of proceedings may be impossible.

[11] The word "orderly" is substituted because "responsible" is used later in the same sentence in a somewhat different sense.

[12] It seems desirable to specify that interlocutory proceedings are included. The change does not restrict the section. Stop-order proceedings are one form of interlocutory action.

[13] The additions are made to clarify the intended meaning of the provisions.

## ADMINISTRATIVE PROCEDURE ACT
<span style="float:right">**53**</span>

(d) DENIALS.—Prompt notice shall be given of the denial in whole or in part of any written application, petition, or other request of any interested person made in connection with any agency proceeding.   Except in affirming a prior denial or where the denial is self-explanatory, such notice shall be accompanied by a simple statement of *procedural or other* grounds.[14]

### HEARINGS

SEC. 7. In hearings which section 4 or 5 requires to be conducted pursuant to this section—

(a) PRESIDING OFFICERS.—There shall preside at the taking of evidence (1) the agency, (2) one or more members of the body which comprises the agency, or (3) one or more examiners appointed as provided in this Act; but nothing in this Act shall be deemed to supersede the conduct of specified classes of proceedings in whole or part by or before boards or other officers specially provided for by or designated pursuant to statute.   The functions of all presiding officers and of officers participating in decisions in conformity with section 8 shall be conducted in an impartial manner.   Any such officer may at any time withdraw if he deems himself disqualified; and, upon the filing in good faith of a timely and sufficient affidavit of personal bias or disqualification of any such officer, the agency shall determine the matter as a part of the record and decision in the case.

(b) HEARING POWERS.—Officers presiding at hearings shall have authority, subject to the published rules of the agency and within its powers, to (1) administer oaths and affirmations, (2) issue subpenas authorized by law, (3) rule upon offers of proof and receive relevant evidence, (4) take or cause depositions to be taken whenever the ends of justice would be served thereby, (5) regulate the course of the hearing, (6) hold conferences for the settlement or simplification of the issues by consent of the parties, (7) dispose of procedural requests or similar matters, (8) make decisions or recommend decisions in conformity with section 8, and (9) take any other action authorized by agency rule consistent with this Act.

(c) EVIDENCE.—Except as statutes otherwise provide, the proponent of a rule or order shall have the burden of proof.   Any [evidence] oral or documentary *evidence* [15] may be received, but every agency shall as a matter of policy provide for the exclusion of *irrelevant*,[16] immaterial, [and] or unduly repetitious evidence and no sanction shall be imposed or rule or order be issued except *upon consideration of the whole record or such portions thereof as may be cited by any party and* [17] as supported by *and in accordance with the* [relevant] reliable, [and] probative, *and substantial* evidence.[18]   Every party shall have the right to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts.   In rule making or determining claims for money or benefits or applications for initial licenses any agency may, where the interest of any party will not be prejudiced thereby, adopt procedures for the submission of all or part of the evidence in written form.

(d) RECORD.—The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, shall constitute the exclusive record for decision in accordance with section 8 and, upon payment of lawfully prescribed costs, shall be made available to the parties.   Where any agency decision rests on official notice of a material fact not appearing in the evidence in the record, any party shall on timely request be afforded an opportunity to show the contrary.

### DECISIONS

SEC. 8. In cases in which a hearing is required to be conducted in conformity with section 7.—

(a) ACTION BY SUBORDINATES.—In cases in which the agency has not presided at the reception of the evidence, the officer who presided (or, in cases not subject to subsection (c) of section 5, any other officer or officers qualified to preside at

---

[14] The added language is designed to clarify the provision by making it clear that, if the ground for denial is procedural, the agency must say so.

[15] The prior form involved an unnecessary circumlocution of language.

[16] The word "relevant" has been stricken from the latter part of this sentence and the word "irrelevant" has been inserted at this point where it more appropriately belongs, to achieve the same purpose.

[17] That the whole of the relevant record must be considered is the rule laid down in section 10 (e) on judicial review, but some hypercritical mind might contend that the omission to specify such consideration at the agency stage of proceedings was intentional and meant that the agency is not required to consider the whole record.

[18] The insertion of the word "substantial" is made for the same reason as the insertion explained in note 17.   Obviously the agency will proceed in accordance with the evidence which it finds reliable, probative, and substantial—there is no reason why the bill should not say so.

**54**                    ADMINISTRATIVE PROCEDURE ACT

hearings pursuant to section 7) shall initially decide the case or the agency shall require (in specific cases or by general rule) the entire record to be certified to it for initial decision. Whenever such officers make the initial decision and in the absence of either an appeal to the agency or review upon motion of the agency within time provided by rule, such decision shall without further proceedings then become the decision of the agency. On appeal from or review of the intital decisions of such officers the agency shall, except as it may limit the issues upon notice or by rule, have all the powers which it would have in making the initial decision. Whenever the agency makes the initial decision without having presided at the reception of the evidence, such officers shall first recommend a decision except that in rule making or determining applications for initial licenses (1) in lieu thereof the agency may issue a tentative decision or any of its responsible officers may recommend a decision or (2) any such procedure may be omitted in any case in which the agency finds upon the record that due and timely execution of its function imperatively and unavoidably so requires

(b) SUBMITTALS AND DECISIONS.—Prior to each recommended, initial, or tentative decision, or decision upon agency review of the decision of subordinate officers the parties shall be afforded a reasonable opportunity to submit for the consideration of the officers participating in such decisions (1) proposed findings and conclusions, or (2) exceptions to the decisions or recommended decisions of subordinate officers or to tentative agency decisions, and (3) supporting reasons for such exceptions or proposed findings or conclusions. *The record shall show the ruling upon each such finding, conclusion, or exception presented.*[19] All decisions (including initial, recommended, or tentative decisions) shall become a part of the record and include a statement of (1) findings and conclusions, as well as the *reasons or basis* therefor, upon all the material issues of fact, law, or discretion presented *on the record;*[20] and (2) the appropriate rule, order, sanction, relief, or denials thereof.

SANCTIONS AND POWERS

SEC. 9. In the exercise of any power or authority—

(a) IN GENERAL.—No sanction shall be imposed or substantive rule or order be issued except within jurisdiction delegated to the agency and as authorized by law.

(b) LICENSES.—In any case in which application is made for a license required by law the agency, with due regard to the rights or privileges of all the interested parties or adversely affected persons and with reasonable dispatch, shall set and complete any proceedings required to be conducted pursuant to sections 7 and 8 of this Act or other proceedings required by law and shall make its decision. Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, no withdrawal, suspension, revocation, or annulment of any license shall be lawful unless, prior to the institution of agency proceedings therefor, facts or conduct which may warrant such action shall have been called to the attention of the licensee by the agency in writing and the licensee shall have been accorded opportunity to demonstrate or achieve compliance with all lawful requirements. In any case in which the licensee has, in accordance with agency rules, made timely and sufficient application for a renewal or a new license, no license with reference to any activity of a continuing nature shall expire until such application shall have been finally determined by the agency.

JUDICIAL REVIEW

SEC. 10. Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion—

(a) RIGHT OF REVIEW.—Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof.

(b) FORM AND VENUE OF ACTION.—The form of proceeding for judicial review shall be any special statutory review proceeding relevant to the subject matter in any court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action (including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus) in any court of competent jurisdiction. Agency action shall be subject to judicial review in civil or criminal

---

[19] The sentence is added for the purpose of requiring agencies to note their rulings somewhere on the record in order to preclude later controversy as to what the agency had done.

[20] "Reasons or" and "on the record" are inserted for purposes of clarification. "Basis" ought to include "reasons," but use of both words will preclude controversy. "Presented" should mean "on the record," or the protection of both agencies and parties, and the matter should be made specific.

proceedings for judicial enforcement except to the extent that prior, adequate, and exclusive opportunity for such review is provided by law.

(c) REVIEWABLE ACTS.—Every agency action made reviewable by statute and every final agency action for which there is no other adequate remedy in any court shall be subject to judicial review. Any preliminary, procedure, or intermediate agency action or ruling not directly reviewable shall be subject to review upon the review of the final agency action. Except as otherwise expressly required by statute, agency action *otherwise final* shall be final *for the purposes of this subsection* whether or not there has been presented or determined any application for a declaratory order, for any form of reconsideration, or (unless the agency otherwise requires by rule *and provides that the action meanwhile shall be inoperative*) for an appeal to superior agency authority.[21]

(d) INTERIM RELIEF.—Pending judicial review any agency is authorized, where it finds that justice so requires, to postpone the effective date of any action taken by it. Upon such conditions as may be required and to the extent necessary to prevent irreparable injury, every reviewing court (including every court to which a case may be taken on appeal from or upon application for certiorari or other writ to a reviewing court) is authorized to issue all necessary and appropriate process to postpone the effective date of any agency action or to preserve status or rights pending conclusion of the review proceedings.

(e) SCOPE OF REVIEW.—So far as necessary to decision and where presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of any agency action. It shall (A) compel agency action unlawfully withheld or unreasonably delayed; and (B) hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, *an abuse of discretion*,[22] or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; (5) unsupported by substantial evidence in any case subject to the requirements of sections 7 and 8 or otherwise reviewed on the record of an agency hearing provided by statute; or (6) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by [the parties] *any party*,[23] and due account shall be taken of the rule of prejudicial error.

EXAMINERS

SEC. 11. Subject to the civil-service and other laws to the extent not inconsistent with this Act, there shall be appointed by and for each agency as many qualified and competent examiners as may be necessary for proceedings pursuant to sections 7 and 8, who shall be assigned to cases in rotation so far as practicable and shall perform no duties inconsistent with their duties and responsibilities as examiners. Examiners shall be removable by the agency in which they are employed only for good cause established and determined by the Civil Service Commission (hereinafter called the Commission) after opportunity for hearing and upon the record thereof. Examiners shall receive compensation prescribed by the Commission independently of agency recommendations or ratings and in accordance with the Classification Act of 1923, as amended, except that the provisions of paragraphs (2) and (3) of subsection (b) of section 7 of said Act, as amended, and the provisions of section 9 of said Act, as amended, shall not be applicable. Agencies occasionally or temporarily insufficiently staffed may utilize examiners selected by the Commission from and with the consent of other

---

[21] The change is made to clarify the provision by making specifically the language of the bill the explanation given in the Senate Committee report (p. 27). It should be noted that section 8 (a) permits agencies to provide by rule for appeals to them from initial decisions of examiners. That provision, as well as this provision of section 10 (c), would authorize an agency to adopt rules requiring a party to take a timely appeal to the agency before resorting to the courts. A party cannot wilfully fail to exhaust his administrative remedies and then, after the agency action has become operative, either secure a suspension of the agency action by a belated appeal to the agency, or resort to court without having given the agency an opportunity to determine the questions raised. If he so fails he is precluded from judicial review by the application of the time-honored doctrine of exhaustion of administrative remedies. This is not to say that after the right to an administrative appeal has lapsed an agency may not, on proper application, either reconsider an adjudication or receive proposals for the modification of a rule, with or without suspending the operation of the agency action involved.

[22] The change is designed to make it clear that S. 7 preserves judicial review of abuses of discretion.

[23] This change is to conform the language with the similar provision in sec. 7 (c).

agencies.   For the purposes of this section, the Commission is authorized to make investigations, require reports by agencies, issue reports, including an annual report to the Congress, promulgate rules, appoint such advisory committees as may be deemed necessary, recommend legislation, subpena witnesses or records, and pay witness fees as established for the United States courts.

### Construction and Effect

Sec. 12. Nothing in this Act shall be held to diminish the constitutional rights of any person or to limit or repeal additional requirements imposed by statute or otherwise recognized by law.   Except as otherwise required by law, all requirements or privileges relating to evidence or procedure shall apply equally to agencies and persons.   If any provision of this Act or the application thereof is held invalid, the remainder of this Act or other applications of such provision shall not be affected.   Every agency is granted all authority necessary to comply with the requirements of this Act through the issuance of rules or otherwise.   No subsequent legislation shall be held to supersede or modify the provisions of this Act except to the extent that such legislation shall do so expressly.   This Act shall take effect three months after its approval except that sections 7 and 8 shall take effect six months after such approval, the requirement of the selection of examiners pursuant to section 11 shall not become effective until one year after such approval, and no procedural requirement shall be mandatory as to any agency proceeding initiated prior to the effective date of such requirement.

# APPENDIX B

## LETTER OF ATTORNEY GENERAL

APRIL 3, 1946

Hon. FRANCIS E. WALTER,
*Chairman, Subcommittee on Administrative Law,*
*Committee on the Judiciary,*
*House of Representatives, Washington, D. C.*

MY DEAR CONGRESSMAN WALTER: I have carefully reviewed the revised version of H. R. 4941, a bill to improve the administration of justice by prescribing fair administrative procedure, as contained in the attached document entitled "Final Draft, April 2, 1946."

The changes indicated in the enclosed draft, as explained by the notes appended thereto, are not objectionable to the Department of Justice. They may, in general, be described as clarifications of the language and intention of H. R. 4941, as introduced by Congressman Sumners on December 10, 1945. As you know, I recommended the enactment of H. R. 4941 in my letter to Congressman Sumners dated October 19, 1945.

With kind personal regards.
Sincerely yours,

TOM C. CLARK, *Attorney General.*

57

O