## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

JENNIFER VANDERSTOK, *et al.*,

      Plaintiffs,

    v.

MERRICK GARLAND, in his official
capacity as Attorney General of the United
States, *et al.*,

      Defendants.

Case No. 4:22-cv-00691-O

## DEFENDANTS' COMBINED BRIEF IN OPPOSITION TO ORIGINAL PLAINTIFFS' AND INTERVENOR-PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

    I.    Statutory Background.........................................................................3

    II.    Regulatory Background......................................................................4

    III.    The Rule ............................................................................................5

        A.    Definition of "Firearm" .........................................................5

        B.    Definition of "Frame or Receiver" .......................................6

        C.    Definition of "Privately Made Firearm"................................8

        D.    The Present Case.....................................................................8

LEGAL STANDARDS.............................................................................................9

ARGUMENT...........................................................................................................10

    I.    Defendants Are Entitled to Summary Judgment to the Extent That Plaintiffs Lack Article III Standing to Bring Their Claims.........................................................10

        A.    Defense Distributed ..............................................................11

        B.    Individual Plaintiffs...............................................................12

        C.    FPC & SAF..........................................................................12

    II.    The Rule Is a Logical Outgrowth of the Notice................................14

    III.    The Rule Is Not Arbitrary and Capricious. ......................................26

        A.    The Rule Adequately Explains Changes in ATF Policy.................................27

        B.    ATF Considered All Relevant Aspects of the Regulatory Problem, and Addressed Significant Comments........................................35

        C.    Plaintiffs' Remaining Arbitrary and Capricious Arguments Lack Merit.........37

    IV.    The Rule Reflects the Best Interpretation of the Relevant Statutory Terms..............40

    V.    The Rule Is Consistent With the Second Amendment.....................45

    VI.    The Rule Is Consistent With the First Amendment........................46

    VII.    The Definitions Contained in the Rule Are Not Otherwise Unconstitutional. ..........50

i

A.     The Rule Is Not Void for Vagueness ................................................50

B.     The Rule Is Consistent With All Other Constitutional Provisions Raised by Plaintiffs and BlackHawk. ................................................60

VIII.   Any Relief Should Be Narrowly Tailored. ................................................67

A.     Section 706(2) Does Not Authorize the Universal Vacatur Urged by Plaintiffs................................................67

B.     In Any Event, Remand Without Vacatur Is the Appropriate Remedy for Any Procedural Violation. ................................................69

C.     In the Alternative, Any Vacatur of the Rule Should Be Narrowly Tailored................................................71

CONCLUSION ................................................72

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*10 Ring Precision, Inc. v. Jones*,
   722 F.3d 711 (5th Cir. 2013) ................................................................................ 9, 26

*A.L.A. Schechter Poultry Corp. v. United States*,
   295 U.S. 495 (1935) ................................................................................................61

*Abramski v. United States*,
   573 U.S. 169 (2014) ...............................................................................................42

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ..............................................................................70

*Am. Acad. of Implant Dentistry v. Parker*,
   860 F.3d 300 (5th Cir. 2017) .................................................................................48

*American Coke & Coal Chems. Inst. v. EPA*,
   452 F.3d 930 (D.C. Cir. 2006) ..............................................................................26

*Amin v. Mayorkas*,
   24 F.4th 383 (5th Cir. 2022) .................................................................................26

*Anderson v. Williams*,
   No. 2:10-CV-01916-KJD, 2011 WL 2580665 (D. Nev. June 27, 2011) ...............54

*Arbaugh v. Y&H Corp.*,
   546 U.S. 500 (2006) ...............................................................................................10

*Arcaca v. Cloud Books, Inc.*,
   478 U.S. 697 (1986) ...............................................................................................49

*Ariz. Pub. Serv. Co. v. EPA*,
   211 F.3d 1280 (D.C. Cir. 2000) ....................................................................... 17, 25

*Arizona v. Biden*,
   31 F.4th 469 (6th Cir. 2022) .................................................................................69

*Ass'n of Cmty. Organizations for Reform Now v. Fowler*,
   178 F.3d 350 (5th Cir. 1999) .................................................................................11

*Ass'n of Private Sector Colleges & Universities v. Duncan*,
   110 F. Supp. 3d 176 (D.D.C. 2015), *aff'd*, 640 F. App'x 5 (D.C. Cir. 2016) ........36

*Attala Cnty., Mississippi Branch of NAACP v. Evans*,
   37 F.4th 1038 (5th Cir. 2022) ...............................................................................10

*Avoyelles Sportsmen's League, Inc. v. Marsh,*
  715 F.2d 897 (5th Cir. 1983) ................................................................................69

*Ayotte v. Planned Parenthood of N. New Eng.,*
  546 U.S. 320 (2006) ............................................................................................71

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) ............................................................................................47

*Bacon v. NCO Fin. Sys., Inc.,*
  No. 3:12-CV-646-D(BK), 2012 WL 1899978 (N.D. Tex. Apr. 23, 2012)...........64

*Baker v. Carr,*
  369 U.S. 186 (1962) ............................................................................................62

*Baylor Cnty. Hosp. Dist. v. Price,*
  850 F.3d 257 (5th Cir. 2017) ..............................................................................45

*Becerra v. Empire Health Found.,*
  142 S. Ct. 2354 (2022) ........................................................................................44

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................................................65

*Boyce Motor Lines v. United States,*
  342 U.S. 337 (1952) ............................................................................................53

*Brockett v. Spokane Arcades, Inc.,*
  472 U.S. 491 (1985) ............................................................................................71

*Bruesewitz v. Wyeth LLC,*
  562 U.S. 223 (2011) ............................................................................................63

*California v. Texas,*
  141 S. Ct. 2104 (2021) ........................................................................................69

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023) ..............................................................................44

*Central and South West Servs., Inc. v. EPA,*
  220 F.3d 683 (5th Cir. 2000) ..............................................................................69

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,*
  447 U.S. 557 (1980) ......................................................................................48, 49

*Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield,*
  853 F. Supp. 2d 214 (D. Conn. 2012)................................................................55

*Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n,*
  768 F.3d 183 (2d Cir. 2014) ................................................................................................56

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council,*
  467 U.S. 837 (1984) ............................................................................................................44

*Citizens United v. Fed. Election Comm'n,*
  558 U.S. 310 (2010) ............................................................................................................47

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
  142 S. Ct. 1464 (2022) ........................................................................................................48

*City of Stoughton v. EPA,*
  858 F.2d 747 (D.C. Cir. 1988) ............................................................................................23

*City of Waukesha v. EPA,*
  320 F.3d 228 (D.C. Cir. 2003) ............................................................................................26

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ............................................................................................................10

*Cmty. Nutrition Inst. v. Block,*
  749 F.2d 50 (D.C. Cir. 1984) ..............................................................................................25

*ConocoPhillips Co. v. EPA,*
  612 F.3d 822 (5th Cir. 2010) ..............................................................................................14

*Cox v. Louisiana,*
  379 U.S. 559 (1965) ............................................................................................................58

*Davis v. Fed. Election Comm'n,*
  554 U.S. 724 (2008) ............................................................................................................65

*Delta Found. Inc. v. United States,*
  303 F.3d 551 (5th Cir. 2002) ................................................................................................9

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ......................................................................................................45, 63

*Div. 80, LLC v. Garland,*
  No. 3:22-CV-148, 2022 WL 3648454 (S.D. Tex. Aug. 23, 2022) ......................................72

*Edelman v. Lynchburg Coll.,*
  535 U.S. 106 (2002) ............................................................................................................44

*Entergy Miss., Inc. v. NLRB,*
  810 F.3d 287 (5th Cir. 2015) ..............................................................................................27

*Erie R. Co. v. Tompkins,*
  304 U.S. 64 (1938) ...................................................................................................68

*FCC v. Fox Television Stations,*
  556 U.S. 502 (2009) .................................................................................................27

*FCC v. Prometheus Radio Project,*
  141 S. Ct. 1150 (2021) .............................................................................................35

*Federal Power Commission v. Hope Natural Gas Co.,*
  320 U.S. 591 (1944) .................................................................................................62

*Florida v. Bostick,*
  501 U.S. 429 (1991) .................................................................................................51

*Fontenot v. McCraw,*
  777 F.3d 741 (5th Cir. 2015) ...................................................................................10

*Franciscan All., Inc. v. Azar,*
  414 F. Supp. 3d 928 (N.D. Tex. 2019) ....................................................................72

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010) .................................................................................................71

*Friends of the Earth, Inc. v. Chevron Chem. Co.,*
  129 F.3d 826 (5th Cir. 1997) ...................................................................................13

*Girouard v. United States,*
  328 U.S. 61 (1946) ...................................................................................................64

*Gonzales v. Raich,*
  545 U.S. 1 (2005) .....................................................................................................65

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) .................................................................................................57

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.,*
  968 F.3d 454 (5th Cir. 2020) ...................................................................................32

*Gulf Restoration Network. v. U.S. Dep't of Trans.,*
  452 F.3d 362 (5th Cir. 2006) ...................................................................................41

*Gundy v. United States,*
  139 S. Ct. 2116 (2019) .............................................................................................61

*Handley v. Chapman,*
  587 F.3d 273 (5th Cir. 2009) .............................................................................27, 28

*Hecht Co. v. Bowles,*
  321 U.S. 321 (1944) ................................................................................68

*Helvering v. Hallock,*
  309 U.S. 106 (1940) ................................................................................64

*Hill v. Colorado,*
  530 U.S. 703 (2000) ................................................................................58

*Hollingsworth v. Perry,*
  570 U.S. 693 (2013) ................................................................................10

*Hollis v. Lynch,*
  121 F. Supp. 3d 617 (N.D. Tex. 2015) ..................................................65

*Home Bldg. & Loan Ass'n v. Blaisdell,*
  290 U.S. 398 (1934) ................................................................................68

*Horne v. Department of Agriculture,*
  576 U.S. 350 (2015) ................................................................................66

*HSBC Bank USA, N.A. as Tr. for Merrill Lynch Mortg. Loan v. Crum,*
  907 F.3d 199 (5th Cir. 2018) ..................................................................10

*Huawei Techs. USA v. FCC,*
  2 F.4th 421 (5th Cir. 2021) ........................................................14, 23, 26

*Huddleston v. United States,*
  415 U.S. 814 (1974) ................................................................................42

*Hunt v. Washington State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) ................................................................................12

*Idaho Farm Bureau Federation v. Babbitt,*
  58 F.3d 1392 (9th Cir. 1995) ..................................................................25

*In re Franchise Servs. of N. Am., Inc.,*
  891 F.3d 198 (5th Cir. 2018) ..................................................................38

*Innovator Enters., Inc. v. Jones,*
  28 F. Supp. 3d 14 (D.D.C. 2014)............................................................42

*Johnson v. United States,*
  576 U.S. 591 (2015) ................................................................................58

*Kam-Almaz v. United States,*
  682 F.3d 1364 (Fed. Cir. 2012) ..............................................................67

*Lewis v. Casey,*
   518 U.S. 343.............................................................................................................10

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
   140 S. Ct. 2367 (2020) ...................................................................................25, 72

*Long Island Care at Home v. Coke,*
   551 U.S. 158 (2007) .......................................................................................18, 24

*Lucas v. S.C. Coastal Council,*
   505 U.S. 1003 (1992) ...........................................................................................66

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) .................................................................................10, 11, 12

*Magee v. City of S. Padre Island,*
   463 F. App'x 377 (5th Cir. 2012).........................................................................51

*Mallinckrodt Chem. Works v. Missouri ex rel. Jones,*
   238 U.S. 41 (1915) ...............................................................................................68

*Mass. v. Mellon,*
   262 U.S. 447 (1923) .............................................................................................67

*Maynard v. Cartwright,*
   486 U.S. 356 (1988) .............................................................................................52

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) .............................................................................................45

*Michigan v. Chesternut,*
   486 U.S. 567 (1988) .............................................................................................52

*Mississippi v. Johnson,*
   71 U.S. (4 Wall.) 475 (1867) ...............................................................................62

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) ........................................................................................10, 72

*Morehouse Enterprises LLC v. ATF,*
   No. 22-116, 2022 WL 3597299 (D.N.D. Aug. 23, 2022)...........................*passim*

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ....................................................................................9, 26, 34

*Munn v. City of Ocean Springs,*
   763 F.3d 437 (5th Cir. 2014) ...............................................................................51

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  138 S. Ct. 1461 (2018) ..................................................................................69

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
  804 F.3d 242 (2d Cir. 2015) .........................................................................54

*National Broadcasting Co. v. United States*,
  319 U.S. 190 (1943) ......................................................................................62

*Nat'l Lifeline Ass'n v. FCC*,
  921 F.3d 1102 (D.C. Cir. 2019) ...................................................................24

*Nat'l Rest. Ass'n v. Solis*,
  870 F. Supp. 2d 42 (D.D.C. 2012) ..........................................................23, 25

*Nat'l Shooting Sports Found., Inc. v. Jones*,
  716 F.3d 200 (D.C. Cir. 2013) .....................................................................41

*Nat'l Treasury Emps. Union v. Von Raab*,
  489 U.S. 656 (1989) ......................................................................................70

*New York v. Burger*,
  482 U.S. 691 (1987) ......................................................................................43

*New York Central Securities Corp. v. United States*,
  287 U.S. 12 (1932) ........................................................................................62

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022) .......................................................................37, 45, 46

*O'Reilly v. U.S. Army Corps of Eng'rs*,
  477 F.3d 225 (5th Cir. 2007) .......................................................................69

*Panama Refining Co. v. Ryan*,
  293 U.S. 388 (1935) ......................................................................................62

*Penn Cent. Transp. Co. v. City of New York*,
  438 U.S. 104 (1978) ......................................................................................67

*Pennsylvania v. President of the United States*,
  930 F.3d 543 (3d Cir. 2019) .........................................................................72

*Pension Benefit Guaranty Corp. v. LTV Corp.*,
  496 U.S. 633 (1990) ......................................................................................64

*Peoples Rts. Org., Inc. v. City of Columbus*,
  152 F.3d 522 (6th Cir. 1998) .......................................................................54

*Phelps v. Budge,*
   188 F. App'x 616 (9th Cir. 2006) ................................................................................ 54

*Prime Healthcare Servs., Inc. v. Harris,*
   216 F. Supp. 3d 1096 (S.D. Cal. 2016) ....................................................................... 55

*Pub. Citizen v. FAA,*
   988 F.2d 186 (D.C. Cir. 1993) .................................................................................... 35

*Reagan Nat'l Advertising v. City of Austin,*
   972 F.3d 695 (5th Cir. 2020) ...................................................................................... 49

*Roark & Hardee LP v. City of Austin,*
   522 F.3d 533 (5th Cir. 2008) ...................................................................................... 53

*Roberts v. United States,*
   No. 2:04-cr-295-PMD, 2007 WL 9754483 (D.S.C. Oct. 30, 2007) ............................ 54

*Sabine River Auth. v. U.S. Dep't of Interior,*
   951 F.2d 669 (5th Cir. 1992) ........................................................................................ 9

*Sessions v. Dimaya,*
   138 S. Ct. 1204 (2018) ........................................................................................ 57, 58

*Shell Offshore, Inc. v. Babbitt,*
   238 F.3d 622 (5th Cir. 2001) ................................................................................ 23, 38

*Shinseki v. Sanders,*
   556 U.S. 396 (2009) ................................................................................................... 37

*Sierra Club v. U.S. Dep't of Interior,*
   990 F.3d 909 (5th Cir. 2021) ...................................................................................... 26

*Sig Sauer, Inc. v. Brandon,*
   826 F.3d 598 (1st Cir. 2016) ......................................................................................... 7

*Sig Sauer, Inc. v. Jones,*
   133 F. Supp. 3d 364 (D.N.H. 2015) ........................................................................... 42

*SIH Partners LLLP v. Comm'r of Internal Revenue,*
   923 F.3d 296 (3d Cir. 2019) ....................................................................................... 38

*Students for Fair Admissions, Inc. v. Univ. of Texas at Austin,*
   37 F.4th 1078 (5th Cir. 2022) ..................................................................................... 13

*Sw. Elec. Power Co. v. EPA,*
   920 F.3d 999 (5th Cir. 2019) ...................................................................................... 71

*Tex. State LULAC v. Elfant,*
52 F.4th 248 (5th Cir. 2022) ............................................................................................11

*Texas Ass'n of Manufacturers v. U.S Consumer Prod. Safety Comm'n,*
989 F.3d 368 (5th Cir. 2021) ............................................................................23, 69, 70

*Texas Clinical Labs. v. Sebelius,*
612 F.3d 771 (5th Cir. 2010) ...........................................................................................27

*Texas v. Becerra,*
577 F. Supp. 3d 527 (N.D. Tex. 2021) ..............................................................................41

*Texas v. Biden,*
20 F.4th 928 (5th Cir. 2021), *cert. granted*, 142 S. Ct. 1098 (2022), *and rev'd and remanded on
other grounds*, 142 S. Ct. 2528 (2022) ...........................................................................70

*Texas v. United States,*
50 F.4th 498 (5th Cir. 2022) ............................................................................................11

*Timpinaro v. SEC,*
2 F.3d 453 (D.C. Cir. 1993) .......................................................................................56, 57

*Town of Chester v. Laroe Est., Inc.,*
581 U.S. 433 (2017) ........................................................................................................66

*Transp. Div. v. Fed. R.R. Admin.,*
40 F.4th 646 (D.C. Cir. 2022) ..........................................................................................35

*Trump v. Hawaii,*
138 S. Ct. 2392 (2018) .....................................................................................................71

*United States v. 16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns,*
443 F.2d 463 (2d Cir. 1971) .............................................................................................54

*United States v. Abbate,*
970 F.3d 601 (5th Cir. 2020) ...........................................................................................53

*United States v. Batson,*
706 F.2d 657 (5th Cir. 1983) ...........................................................................................52

*United States v. Campbell,*
427 F.2d 892 (5th Cir. 1970) ...........................................................................................55

*United States v. Catanzaro,*
368 F. Supp. 450 (D. Conn. 1973) ...................................................................................54

*United States v. Clark,*
   582 F.3d 607 (5th Cir. 2009) ..................................................................................51, 52, 58

*United States v. Clinical Leasing Serv., Inc.,*
   925 F.2d 120 (5th Cir. 1991) ...........................................................................................59

*United States v. Drasen,*
   845 F.2d 731 (7th Cir. 1988) ...........................................................................................54

*United States v. Felsen,*
   648 F.2d 681 (10th Cir. 1981) .........................................................................................54

*United States v. Garcia,*
   707 F. App'x 231 (5th Cir. 2017) ....................................................................................45

*United States v. Kelly,*
   276 F. App'x 261 (4th Cir. 2007) ....................................................................................54

*United States v. Kent,*
   175 F.3d 870 (11th Cir. 1999) .........................................................................................54

*United States v. Kirk,*
   105 F.3d 997 (5th Cir. 1997) ...........................................................................................65

*United States v. Mask,*
   330 F.3d 330 (5th Cir. 2003) ...........................................................................................52

*United States v. M-K Specialties Model M-14 Machinegun,*
   424 F. Supp. 2d 862 (N.D. W. Va. 2006) .......................................................................54

*United States v. Nat'l Dairy Prod. Corp.,*
   372 U.S. 29 (1963) ..........................................................................................................58

*United States v. O'Brien,*
   391 U.S. 367 (1968) ........................................................................................................36

*United States v. Paul,*
   274 F.3d 155 (5th Cir. 2001) ...........................................................................................53

*United States v. Quiroz,*
   449 F.2d 583 (9th Cir. 1971) ...........................................................................................54

*United States v. Raines,*
   362 U.S. 17 (1960) ..........................................................................................................58

*United States v. Rowold,*
   429 F. Supp. 3d 469 (N.D. Ohio 2019) ...........................................................................34

*United States v. Whalen,*
    337 F. Supp. 1012 (S.D.N.Y. 1972).........................................................................54

*United States v. Wick,*
    No. CR 15-30-M-DLC, 2016 WL 10612608 (D. Mont. Mar. 11, 2016)............................54

*United States v. Williams,*
    553 U.S. 285 (2008) ........................................................................................51

*United States v. Wojcikievicz,*
    403 F. App'x 483 (11th Cir. 2010)........................................................................54

*Util. Air Reg. Grp. v. EPA,*
    573 U.S. 302 (2014) ........................................................................................61

*VanDerStok v. Garland,*
    No. 4:22-CV-00691-O, 2022 WL 4809376 (N.D. Tex. Oct. 1, 2022) ..............................71

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
    455 U.S. 489 (1982) ........................................................................51, 55, 59

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ........................................................................................57

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008) ........................................................................................51

*Whitman v. American Trucking Ass'ns,*
    531 U.S. 457 (2001) ........................................................................................62

*Worldcall Interconnect, Inc. v. FCC,*
    907 F.3d 810 (5th Cir. 2018) ............................................................................37

*Yakus v. United States,*
    321 U.S. 414 (1944) ........................................................................................62

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ........................................................................................63

## Constitutional Provisions

U.S. Const. Art. II, § 3 ........................................................................................60, 62

U.S. Const. Art. III ........................................................................................10

## Statutes

5 U.S.C. § 603 ........................................................................................24

5 U.S.C. § 703 ................................................................................................................68

5 U.S.C. § 706 ............................................................................................................*passim*

18 U.S.C. §§ 921 *et seq.* ....................................................................................................3

18 U.S.C. § 921 ...........................................................................................................*passim*

18 U.S.C. § 922 ...................................................................................................3, 31, 40

18 U.S.C. § 923 ...................................................................................................3, 40, 62

18 U.S.C. § 926 ...................................................................................................3, 62, 63

26 U.S.C. § 5842 .............................................................................................................62

26 U.S.C. § 5845 .......................................................................................................30, 54

26 U.S.C. § 5861 .............................................................................................................54

26 U.S.C. § 7801 .......................................................................................................62, 63

26 U.S.C. § 7805 .............................................................................................................63

28 U.S.C. § 599A ............................................................................................................62

Gun Control Act of 1968, Pub. L. No. 90-351, 82 Stat. 197 (1968) ........................3

## Rules

Fed. R. Civ. P. 56(a) .......................................................................................................9

## Regulations

27 C.F.R. part 478 ...........................................................................................................4

27 C.F.R. part 479 ...........................................................................................................4

27 C.F.R. § 478.11 .....................................................................................................*passim*

27 C.F.R. § 478.12 .....................................................................................................*passim*

27 C.F.R. § 478.42 ...........................................................................................................40

27 C.F.R. § 478.124 .........................................................................................................40

27 C.F.R. § 478.125 .........................................................................................................40

27 C.F.R. § 478.92 ............................................................................................................... 42, 59

27 C.F.R. § 479.11 ....................................................................................................................54

27 C.F.R. § 479.102 ..................................................................................................................42

28 C.F.R. § 0.130 .................................................................................................................. 7, 62

33 Fed. Reg. 18,555 (Dec. 14, 1968) ........................................................................................4

86 Fed. Reg. 27,720 (May 21, 2021) ...............................................................................*passim*

87 Fed. Reg. 24,652 (Apr. 26, 2022) ...............................................................................*passim*

## **Other Authorities**

111 Cong. Rec. 5527 (1965) ....................................................................................................43

*Are "80%" or "unfinished" receivers illegal?*, ATF,
    https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-
    %E2%80%9Cunfinished%E2%80%9D-receivers-illegal ................................................28

ATF, Nat'l Firearms Act Handbook § 7.2.4 (2009) ...................................................................7

H.R. Rep. No. 79-1980 (1946) ................................................................................................69

*Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers* (Sept. 27, 2022),
    www.atf.gov/firearms/docs/open-letter/all-ffls-september-2022-impact-final-rule-2021-05f-
    partially-complete-ar/download ............................................................................................60

*Impact of Final Rule 2021-05F on Partially Complete Polymer80, Lone Wolf, and Similar Semiautomatic Pistol
    Frames* (Dec. 27, 2022), https://www.atf.gov/rules-and-regulations/docs/open-letter/all-ffls-
    dec2022-open-letter-impact-final-rule-2021-05f/download. .................................................60

IRS Form 990, Return of Organization Exempt From Income Tax, Second Amendment
    Foundation (2021),https://www.saf.org/wp-content/uploads/2022/08/SAF-2021-990.pdf .......14

Order Partially Approving Proposed Rule Change Relating to the Small Order Execution System on
    Pilot Basis, Exchange Act Release No. 33,377, 55 SEC Docket 2005 (Dec. 23, 1993) ...................56

*Protecting Our Kids Act*, H.R. Rep. 117-346(I), 117th Cong., 2022 WL 2035934 (June 6, 2022)............64

S. Rep. No. 89-1866 (1966) .....................................................................................................42

S. Rep. No. 90-1501 (1968) .....................................................................................................42

S. Rep. No. 79-752 (1945) ....................................................................................................60

SECOND AMENDMENT FOUNDATION, *Join SAF or Renew Your Membership*, https://www.saf.org/join-saf/.............................................................................................................................13

*Set aside, Webster's New International Dictionary of the English Language* 2291 (2d ed. 1958) .......................67

## INTRODUCTION

In their respective motions for summary judgment, the original Plaintiffs ("Plaintiffs") and Intervenor-Plaintiff BlackHawk Manufacturing Group, Inc. d/b/a 80 Percent Arms ("BlackHawk") raise a plethora of legal claims relating to the Final Rule "Definition of 'Frame or Receiver' and Identification of Firearms" issued by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") on April 26, 2022 (the "Rule"). However, while Plaintiffs and BlackHawk clearly disagree with certain definitions of terms contained in the Rule, this disagreement does not make the Rule, or any specific portion thereof, unlawful. Each of the legal arguments raised by Plaintiffs and BlackHawk is without merit and should be rejected.

Plaintiffs and BlackHawk both assert that this Court should invalidate the Rule because the definitions contained in the Rule differ in some respects from the definitions originally proposed in the Notice of Proposed Rulemaking issued on May 21, 2021 (the "Notice"). However, all of the changes to the definitions in the Rule arose out of the definitions contained in the Notice, and the Administrative Record demonstrates that the changes were the result of ATF's careful consideration of the more than 290,000 comments ATF received. ATF's consideration of these comments and the resulting changes to the Rule are precisely the type of changes courts have consistently recognized as permissible under the Administrative Procedure Act ("APA"), and indeed, the very purpose of notice and comment rulemaking.

Plaintiffs' and BlackHawk's argument that ATF's issuance of the Rule was arbitrary and capricious in violation of the APA fares no better. Their primary argument is that the Rule constituted a change in position by ATF on several issues. However, it is perfectly permissible for ATF, like any Federal agency, to change its position on an issue provided that its new position is lawful and it adequately explains the basis for its change. Here, ATF addressed and explained its reasoning for each of the challenged changes. Plaintiffs and BlackHawk further argue that ATF issued the Rule in

1

violation of the APA because it failed to consider a number of significant issues and comments. However, as made clear in ATF's responses to issues raised by some of the over 290,000 comments, the agency duly considered all significant comments to the Rule and the issues they raised, and addressed them in the Rule.

Plaintiffs and BlackHawk also raise a number of constitutional issues, none of which have merit. Their Second Amendment claims fail because the Rule does not prevent any person from keeping or bearing arms. Plaintiffs and BlackHawk both also claim that the Rule violates the First Amendment because the amended definition of "frame or receiver" provides that ATF "may consider" instructions, guides, or marketing materials, along with other factors, in determining whether a product will be classified as a "frame or receiver." However, this portion of the amended definition does not regulate, burden, or restrict speech at all, and therefore cannot be a violation of the First Amendment. The multiple other constitutional claims fare no better. The Rule is not unconstitutionally vague because it is based upon well-established statutory language and concepts and contains detailed definitions and examples sufficient to provide notice of how it will operate. Nor does the Rule violate the separation of powers, the non-delegation doctrine, or the Take Care Clause because the Rule was issued pursuant to multiple valid delegations of authority to ATF contained in the Gun Control Act of 1968 ("GCA") and the National Firearms Act of 1934 ("NFA"). The Rule is also not a regulatory taking because personal property such as a weapon cannot even be the subject of a regulatory takings claim, and even if it could, nothing in the Rule deprives any law-abiding weapon owner of the use or possession of any personal property. Finally, the Rule presents no Commerce Clause issues because even if some of the products governed by the Rule are entirely manufactured, purchased, and owned in a single state, there is an aggregate effect on interstate commerce.

Accordingly, because none of the arguments raised by either Plaintiffs or BlackHawk have any legal merit, this Court should reject them all and grant summary judgment in favor of Defendants.

## I.      Statutory Background

Congress enacted the Gun Control Act of 1968, as amended, 18 U.S.C. §§ 921 *et seq*., after finding that "existing Federal controls over [widespread traffic in firearms moving in interstate commerce] do not adequately enable the States to control this traffic within their own borders."  Pub. L. No. 90-351, Title IV, § 901(a)(1), 82 Stat. 197, 225 (1968).  Congress specifically determined that "only through adequate Federal control . . . over *all* persons engaging in the businesses of importing, manufacturing, or dealing in [these weapons], can this grave problem be properly dealt with."  *Id.* § 901(a)(3), 82 Stat. at 225 (emphasis added).  Accordingly, Congress enacted requirements for persons who engage in the business of importing, manufacturing, or dealing in "firearms."  *See generally* 18 U.S.C. §§ 922-923.

Congress defined "firearm" to include "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "the frame or receiver of any such weapon."  *Id.* § 921(a)(3).  As Plaintiffs concede, Pls' Br. in Supp. of Mot. for Summ. J. ("MSJ") at 4 (ECF No. 141); BlackHawk Mfg. Grp. Inc.'s Br. in Supp. of Mot. for Summ. J. ("BlackHawk MSJ") at 3 (ECF No. 145), Congress did not define the terms "frame" or "receiver."  *See* 18 U.S.C. § 921.  Congress requires individuals and entities that import, manufacture, or deal in firearms to obtain a federal firearms license, *id.* § 923(a), to maintain records of firearm acquisition and disposition as prescribed by regulation, *id.* § 923(g)(1)(A), and to conduct background checks before transferring any firearms to a non-licensee, *id.* § 922(t).  Congress also requires licensed importers and manufacturers to identify each firearm they import or manufacture by means of a serial number on the receiver or frame of the weapon.  *Id.* § 923(i).  Congress has also vested in ATF the authority to prescribe regulations "necessary to carry out the provisions of" the GCA.  *Id.* § 926(a).

II.     **Regulatory Background**

ATF has promulgated regulations implementing the GCA and NFA.  *See* 27 C.F.R. parts 478-479.  Over fifty years ago, ATF defined the statutory term "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion."  Final Rule, Commerce in Firearms and Ammunition, 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968) (formerly codified at 27 C.F.R. § 478.11).  This definition was meant to provide direction as to which portion of a weapon is the frame or receiver for purposes of licensing, serialization, and recordkeeping, thereby ensuring that a component necessary for the weapon's functioning could be traced if the weapon was used in a crime.  Final Rule, Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022).

However, a restrictive application of this definition—as some courts have recently used— would not describe the frame or receiver of most current firearms, and would allow for circumvention of federal firearms laws.  *Id.*  Most modern weapon designs have a split or multi-piece receiver where the relevant fire control components either are housed by more than one part of the weapon (*e.g.*, the upper and lower receiver of an AR-15 rifle) or incorporate a striker rather than a hammer to fire the weapon.  *Id.*  Under a restrictive application of the regulatory definition, as many as 90% of all firearms would not have any frame or receiver subject to regulation.  *Id.*

Furthermore, technological advances in the decades since the "frame or receiver" definition was adopted have made it easier for companies to create firearm parts kits, standalone frame or receiver parts, and easy-to-complete frames or receivers, and some have sold these items to unlicensed persons without being licensed themselves, and without maintaining any records or conducting background checks.  *Id.*  These parts kits, standalone frame and receiver parts, and partially complete frames and receivers allow unlicensed persons—including persons prohibited from possessing firearms—to assemble operational firearms quickly and easily.  *Id.*  Because such privately made

4

firearms typically lack serial numbers, it is extremely difficult for law enforcement to trace them when used in a crime. *Id.* at 24,652, 24,659.

## III.     The Rule

To update its decades-old definition of "frame or receiver," ATF published a notice of proposed rulemaking in 2021.  Proposed Rule, Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27,720 (May 21, 2021).  ATF promulgated the final rule on April 26, 2022, and issued minor technical corrections on August 22, 2022.  87 Fed. Reg. 24,652, 51,249.  Upon consideration of over 290,000 public comments, ATF explained its responses to the comments, its reasoned basis for the provisions of the Rule, and its rationale for updating its regulations.  *Id.* at 24,652-734.  As relevant here, the Rule contains the following key provisions:

### A.      Definition of "Firearm"

Under the GCA and implementing regulations, a "firearm" includes "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A); 27 C.F.R. § 478.11.  This definition thus includes inoperable weapons, even though they will not expel a projectile by the action of an explosive at the time of sale or transfer, if they are "designed to" or may "readily be converted" to do so. *See* 87 Fed. Reg. at 24,661 nn.42-43 (citing case law).  In recent years, weapon parts kits, or aggregations of weapon parts—some of which contain all components necessary to complete a functional weapon within a short time period—have increasingly been sold to individuals either directly from kit manufacturers or from retailers, without serialization, background checks, or recordkeeping. *Id.* at 24,662.  Some of these firearm kits include jigs, templates, and tools that allow the purchaser to complete the weapon fairly or reasonably efficiently, quickly, and easily to a functional state. *Id.*  As courts have already recognized, such weapon parts kits or aggregations of weapon parts that are *designed to* or *may readily be*

5

*converted* to expel a projectile by the action of an explosive are "firearms" under the GCA and its regulations. *Id.* at 24,662 n.44 (citing case law).

Consistent with this case law, and to further public safety, the Rule adds a sentence to ATF's regulatory definition of "firearm" providing that "[t]he term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *See id.* at 24,735.

### B.      Definition of "Frame or Receiver"

The Rule accepts the recommendations of numerous commenters and provides an updated definition of the term "frame or receiver."[1] *See id.* at 24,652, 24,727. The Rule further defines "frame" for handguns and "receiver" for rifles, shotguns, and other weapons that expel a projectile. *See id.* at 24,727, 24,735. Unlike the 1968 definition, these updated definitions now describe only a single housing or structural component for a specific fire control component of a given weapon—including "variants thereof," a term that is also defined. *Id.* For handguns (or variants thereof), the frame is the housing or structure for the primary energized component designed to hold back the hammer, striker, bolt, or similar component before initiating the firing sequence (*i.e.*, the sear or equivalent). *Id.* For long guns and other projectile weapons (or variants thereof), the receiver is the housing or structure for the primary component designed to block or seal the breech before initiating the firing sequence (*i.e.*, the bolt, breechblock, or equivalent). *Id.*

The definition of "frame or receiver" includes a frame or receiver that is partially complete, disassembled, or nonfunctional—including a frame or receiver parts kit—that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver. *Id.* at 24,739; *see also id.* at 24,663, 24,727-28. However, the definitions of "frame" and "receiver"

---

[1] Previously, ATF regulations included definitions for both "firearm frame or receiver" and "frame or receiver." 87 Fed. Reg. at 24,727.

specifically exclude forgings, castings, printings, unmachined bodies, or similar articles that have not yet reached a stage of manufacture where they are clearly identifiable as unfinished component parts of weapons—*e.g.*, unformed blocks of metal, liquid polymers, and other raw materials. *Id.* at 24,663, 24,728, 24,739.

To provide notice to the firearms industry and the public as to how ATF evaluates partially complete, disassembled, or nonfunctional frames or receivers (including firearm parts kits) when making firearm classifications,[2] the Rule states that when issuing classifications, ATF may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor with the item or kit to the purchaser or recipient of the item or kit. 87 Fed. Reg. at 24,724-25, 24,739. To provide additional clarity, the Rule includes five non-exclusive examples illustrating the application of the "frame or receiver" definition to a "partially complete, disassembled, or nonfunctional frame or receiver." *Id.* at 24,739. The Rule also defines "[r]eadily" to mean a process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state. *Id.* at 24,735. Relevant factors in determining whether a process meets that standard include: (1) time (how long it takes to finish the process), (2) ease (how difficult it is to do so), (3) expertise (what knowledge and skills are required), (4) equipment (what tools are required), (5) parts availability (whether additional parts are required and how easily they can be obtained), (6) expense (how much it costs), (7) scope (the extent to which the subject of the process must be changed to finish it), and (8) feasibility (whether the process would

---

[2] Exercising its delegated authority to administer federal firearms laws, 28 C.F.R. § 0.130(a)(1)-(2), ATF has provided both formal guidance (regulations) and informal guidance (classification determinations) as to what constitute "firearms." Although a manufacturer or dealer is not legally required to seek an agency determination whether its product constitutes a "firearm" prior to the product's manufacture or sale, ATF provides such determinations to manufacturers or dealers who submit requests for classification. *See* 87 Fed. Reg. at 24,666; *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 599 (1st Cir. 2016) (citing ATF, Nat'l Firearms Act Handbook § 7.2.4 (2009)).

damage or destroy the subject of the process, or cause it to malfunction). *Id.* This definition, including relevant factors, is based on case law interpreting the terms "may readily be converted to expel a projectile" in the GCA and "can be readily restored to shoot" in the NFA. 86 Fed. Reg. at 27,730 & n.58 (citations omitted).

### C.    Definition of "Privately Made Firearm"

To account for recent technological advances, the Rule clarifies that the GCA's definition of "firearm" includes a "privately made firearm." 87 Fed. Reg. at 24,735. A "privately made firearm" is a firearm (including a frame or receiver) that is assembled or otherwise produced by a person other than a licensed manufacturer, and that does not contain a serial number placed by a licensed manufacturer at the time of production. *Id.* The Rule does not restrict in any way the private making of firearms by non-licensees for personal use who are not prohibited by law from possessing them, and requires only that such firearms that are taken into inventory by licensees be serialized and recorded so that they may be traced by law enforcement if they are later involved in crime. *Id.* at 24,653, 24,742, 24,744.

### D.    The Present Case

On August 11, 2022, Plaintiffs—two individuals (Jennifer VanDerStok and Michael Andren), a firearms manufacturer (Tactical Machining, LLC), and an advocacy organization (Firearms Policy Coalition ("FPC"))—filed the present action, seeking preliminary and permanent injunctive relief enjoining ATF from enforcing the Rule. Compl. (ECF No. 1). On September 2, 2022, the Court preliminarily enjoined enforcement of the Rule as applied to the individual plaintiffs and the firearms manufacturer, but declined to issue injunctive relief with respect to the organizational plaintiff. Op. & Order on Prelim. Inj. (ECF No. 56). A second firearms manufacturer (BlackHawk Manufacturing Group), a corporation (Defense Distributed), and a second advocacy organization (Second Amendment Foundation ("SAF")) later intervened as plaintiffs. Orders (ECF Nos. 98, 137). The

8

Court has enlarged the scope of its preliminary injunction to include the second firearms manufacturer. Op. & Order (ECF No. 118). Pursuant to the Court's instruction, *see* Order (ECF No. 107), the parties have previously briefed the issue of whether the Rule is consistent with ATF's statutory authority. *See* ECF Nos. 132-34. The present brief therefore addresses only Plaintiffs' other claims.[3]

## LEGAL STANDARDS

Summary judgment is proper only when (1) "the movant shows that there is no genuine dispute as to any material fact" and (2) "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, a party seeks judicial review of a federal agency action under the APA, the action will not be set aside unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Fifth Circuit has stressed: "Under this highly deferential standard of review, a reviewing court has the 'least latitude in finding grounds for reversal.'" *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 678 (5th Cir. 1992) (citation omitted).

It is well settled that an agency action must be upheld if the action "is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency." *State Farm*, 463 U.S. at 42. In other words, "if the agency considers the factors and articulates a rational relationship between the facts found and the choice made, its decision is not arbitrary and capricious." *Delta Found. Inc. v. United States*, 303 F.3d 551, 563 (5th Cir. 2002) (citation omitted). Reviewing courts "uphold an agency's action if 'its reasons and policy choices satisfy minimum standards of rationality.'" *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013) (citation omitted).

---

[3] The summary judgment arguments raised by intervenor-plaintiffs Defense Distributed and Second Amendment Foundation, Inc., are coextensive with the arguments raised by Plaintiffs and BlackHawk. *See* Br. in Supp. of Defense Distributed's Mot. for Summ. J. (ECF No. 166).

## ARGUMENT

**I.      Defendants Are Entitled to Summary Judgment to the Extent That Plaintiffs Lack Article III Standing to Bring Their Claims.**

Article III of the Constitution limits the jurisdiction of federal courts to deciding actual "Cases" and "Controversies," U.S. Const. Art. III, § 2, which requires, among other things, that a plaintiff establish standing to sue, *see, e.g.*, *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). "To establish standing, each plaintiff must demonstrate an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Attala Cnty., Mississippi Branch of NAACP v. Evans*, 37 F.4th 1038, 1042 (5th Cir. 2022) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). "In analyzing whether a plaintiff has met these requirements, federal courts are skeptical of '"standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."' *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013)). Because "[s]tanding is a component of subject matter jurisdiction," *HSBC Bank USA, N.A. as Tr. for Merrill Lynch Mortg. Loan v. Crum*, 907 F.3d 199, 202 (5th Cir. 2018), objections to a party's standing "may be raised by a party, or by a court on its own initiative, at any stage in the litigation." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006). And because "standing is not dispensed in gross," a court must "evaluate each plaintiff's Article III standing for each claim." *Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)). Because Defense Distributed, the Individual Plaintiffs, FPC, and SAF have not established Article III standing, the Court should dismiss their claims for lack of subject-matter jurisdiction.[4]

---

[4] To the extent that the Court has previously rejected arguments that Plaintiffs lack standing, Defendants reassert them here both for preservation purposes and in recognition of the higher standard of proof that Plaintiffs bear to establish standing at summary judgment. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

### A.      Defense Distributed

Plaintiff Defense Distributed lacks standing, because it has offered no evidence that it ever sold any product that the Rule classifies as a firearm.  Although the Court previously accepted Defense Distributed's bare allegation that it previously sold "items . . . that are defined for the first time ever as 'firearms' by the new Final Rule" as sufficient to establish standing for purposes of intervention, *see* ECF No. 137, at 4 (emphasis omitted) (citing ECF No. 117, at 4), the elements of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation," *Lujan*, 504 U.S. at 561.  Thus, "[w]hile 'general factual allegations of injury resulting from the defendant's conduct may suffice' at the pleadings stage," at summary judgment, a plaintiff must demonstrate that it was "directly affected" by the challenged action.  *Texas State LULAC v. Elfant*, 52 F.4th 248, 255 n.4 (5th Cir. 2022) (quoting *Ass'n of Cmty. Organizations for Reform Now v. Fowler*, 178 F.3d 350, 354 (5th Cir. 1999)); *see also Texas v. United States*, 50 F.4th 498, 513-14 (5th Cir. 2022) ("At summary judgment, [a plaintiff] can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts." (internal quotation marks and ellipses omitted) (quoting *Clapper*, 568 U.S. at 412)).  Defense Distributed has adduced no specific facts demonstrating that it is harmed by the Rule, or, indeed, that it ever sold products that the Rule classifies as firearms.  As Defendants have previously noted, this may be because Defense Distributed's founder has publicly stated that the Rule *benefits* Defense Distributed.  *See* ECF No. 126, at 9 n.4; ECF No. 176, at 10-11.  In any event, Defense Distributed has not satisfied its burden to establish standing with the evidence required at the summary judgment stage.

### B.      Individual Plaintiffs

Individual Plaintiffs Jennifer VanDerStok and Michael Andren contend that they are injured by the Rule because they intend to purchase products that the Rule classifies as firearms, and thus

must use an in-state federal firearms licensee ("FFL") to facilitate such a sale, including by running a background check to confirm that Ms. VanDerStok and Mr. Andren are lawfully entitled to possess firearms.  ECF No. 62-1, ¶¶ 2, 6; ECF Nos. 62-2, ¶¶ 2, 6.  Ms. VanDerStok and Mr. Andren aver that the FFLs that they intend to use for this purpose would charge a transfer fee of $30.  ECF No. 62-1, ¶ 3; ECF Nos. 62-2, ¶ 3.  They acknowledge that they have no basis to fear criminal prosecution, provided they follow these procedures.  ECF No. 62-1, ¶ 3; ECF Nos. 62-2, ¶ 3.

Federal law, however, does not require FFLs to charge any transfer fee for facilitating the shipment of a firearm purchased online, nor do Plaintiffs offer any basis to conclude that the transfer fees that these particular FFLs choose to charge bear any relationship to the challenged Rule.  Thus, any alleged cost that Ms. VanDerStok or Mr. Andren might incur in purchasing products that the Rule classifies as firearms would be "the result of the independent action of some third party not before the court"—namely, the facilitating FFLs—and not "fairly traceable" to any challenged action of Defendants.  *Lujan*, 504 U.S. at 560 (internal punctuation omitted).  Accordingly, Ms. VanDerStok and Mr. Andren have not established Article III standing to challenge the Rule.

### C.    FPC & SAF

Plaintiffs FPC and SAF assert alleged injuries on behalf of their members, but they have not satisfied the requirements to establish associational standing.  An organization may have standing to bring suit in a representative capacity on behalf of its members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Additionally, as a threshold requirement, the organization must show that it is either: (1) a traditional membership organization, or (2) the equivalent thereof with the requisite "indicia of membership," *id.* at 344, such as by demonstrating the organization's "clearly articulated

12

and understandable membership structure" and establishing that its members alone "elect[] the governing body of the organization and . . . finance[] its activities," *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997).

FPC and SAF have failed to demonstrate that they satisfy these requirements, as the Court has previously held with respect to FPC.  *See* ECF No. 137, at 2 ("FPC . . . [has] twice failed to adequately plead standing in its own right or associational standing on behalf of its members . . . ." (citing ECF No. 89, at 12-15)).  With respect to SAF, Defendants recognize that the Court previously held that at least one of its members had standing, that the interests it sought to protect were germane to its purpose, and that individual members' participation was not required.  *Id.* at 5.  But the Court has not yet addressed whether SAF is either a traditional membership organization or the functional equivalent thereof, and SAF has demonstrated neither.

For example, the Fifth Circuit has held that an organization was a traditional membership organization based on evidence that its "[i]ts amended bylaws provide[d] for a single class of 'General Members," who pa[id] membership dues and elect[ed] one of [the organization's] five directors." *Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 37 F.4th 1078, 1084-85 (5th Cir. 2022).  It likewise has held that an organization was the functional equivalent of a traditional membership organization where its members "elected the governing body of the organization," "financed its activities," "ha[d] voluntarily associated themselves" with the organization, and had "testified in court that they were members" of the organization.  *Friends of the Earth, Inc.*, 129 F.3d at 829.

By contrast, it appears that anyone may call himself or herself a "member" of SAF simply by making a donation of $15 on SAF's website, which is refundable "for any reason" within thirty days. *See Join SAF or Renew Your Membership*, Second Amendment Foundation, https://www.saf.org/join-saf/ (last visited Feb. 13, 2023).  Moreover, according to SAF's IRS Form 990 for tax year 2021, SAF's members do *not* elect the nine "voting members of [its] governing body,"

and none of SAF's governance decisions are reserved to or subject to approval by members other than the governing body.  IRS Form 990, Return of Organization Exempt From Income Tax (2021), at 6, SECOND AMENDMENT FOUNDATION, https://www.saf.org/wp-content/uploads/2022/08/SAF-2021-990.pdf (last visited Feb. 13, 2023).  Plaintiffs have cited no authority for the proposition that a purported membership organization whose members neither elect its governing body nor participate directly in any of its governance decisions—effectively, mere donors—may sue on behalf of those so-called members.  Because SAF has not satisfied this threshold requirement, the Court lacks jurisdiction over its claims.

## II.     The Rule Is a Logical Outgrowth of the Notice.

The Rule is a logical outgrowth of the Notice.  *Contra* MSJ at 10-18; BlackHawk MSJ at 18-21.  A notice of proposed rulemaking is "not required to specifically identify every precise proposal which the agency might ultimately adopt" but instead "satisfie[s] the requisite standard by fairly apprising interested persons of the subjects and issues the agency was considering."  *Huawei Techs. USA v. FCC*, 2 F.4th 421, 448 (5th Cir. 2021) (citation and alterations omitted); *see also ConocoPhillips Co. v. EPA*, 612 F.3d 822, 834 (5th Cir. 2010) ("[C]ourts must proceed with caution before deeming a Final Rule too attenuated from the Proposed Rule, lest we supplant the agency's role in the nation's regulatory scheme.").  The Notice satisfies this standard with respect to ATF's regulatory definition of "frame or receiver."  *See Morehouse Enterprises LLC v. ATF*, No. 22-116, 2022 WL 3597299, at *4 (D.N.D. Aug. 23, 2022) ("Without question, the [Notice] was sufficiently descriptive that the ATF was going to redefine 'frame or receiver,' and it allowed interested parties to offer informed criticism and comment.").

Plaintiffs fail to demonstrate that the Rule is not a logical outgrowth of the Notice.  MSJ at 13-17, 19-20.  Initially, the mere fact that the Rule chose to define "frame" and "receiver" separately, instead of the using the combined term "frame or receiver," as in the Notice, represents a trivial

distinction.[5]  And it was readily apparent to commenters that the final rule might adopt a different definition of "frame or receiver," as ATF "specifically request[ed] comments on the feasibility of implementing" the Notice's definition, 86 Fed. Reg. at 27,740, and many commenters submitted proposed alternative definitions.[6]

Moreover, as *Morehouse* held in rejecting a similar challenge, the Rule satisfies the logical outgrowth standard with respect to ATF's narrowed regulatory definition of "frame or receiver."  The Notice "expressly stated [] ATF's intent to update and modernize the definition of 'frame or receiver'

---

[5] Plaintiffs also miss the mark in contending that the Rule is irrational because under the Rule, an AR- or AK-style pistol has a "receiver" rather than a "frame," and its "lower receiver" is the "receiver." MSJ at 13-14.  The Rule specifically explained why this is the case.  87 Fed. Reg. at 24,735 (27 C.F.R. § 478.12(a)(3)).  Its definition of "receiver" includes "variants thereof," which are defined in turn as weapons utilizing a similar frame or receiver design irrespective of such differences as new or different model designations or attachments.  *Id.*  Thus, "an AK-type firearm with a short stock and a pistol grip is a pistol variant of an AK-type pistol [and] an AR-type firearm with a short stock and a pistol grip is a pistol variant of an AR-type rifle."  *Id.*  AR- and AK-type pistols are therefore rifle variants that incorporate a rifle "receiver" rather than a handgun "frame."  Moreover, as the Rule explained, to minimize disruption to the firearm industry, the Rule grandfathered most prior ATF "frame or receiver" classifications "such as AR-15/M-16 variant firearms."  *Id.* at 24,672; *see also id.* at 24,683, and both the Notice and the Rule expressly designated the lower portion of an AR-15-type weapon as its "frame or receiver," based on past classifications.  86 Fed. Reg. at 27,745; 87 Fed. Reg. 24,739-40 (27 C.F.R. § 478.12(f)(1)(i)).  And the Rule did not need to grandfather any AK variant firearms because the part of that weapon classified as the "frame or receiver" under the proposed definition was unchanged by the pistol "frame" versus rifle "receiver" distinction in the Rule.  *Compare* 86 Fed. Reg. at 27,742 (proposed 27 C.F.R. § 478.11, Example 4) (the "frame or receiver" of an "AK-type firearm" houses the hammer, bolt, trigger mechanism, and firing pin) *with* 87 Fed. Reg. at 24,737 (final 27 C.F.R. § 478.12(a)(4)(vii)) (the "receiver" of an "AK variant firearm" houses the bolt).

[6] *See* 87 Fed. Reg. at 24,693.  For example, Sig Sauer, Inc, suggested that the term "firearm frame or receiver" be defined as either: (1) "the component of the firearm which provides a housing for the component responsible for constraining the energized component of the firearm (i.e., the sear or equivalent thereof)"; (2) "the component of the firearm which provides a housing for the component which the operator interacts with to initiate the firing sequence of the firearm (i.e., the triggering mechanism, or the equivalent thereof)"; or (3) "the component of the firearm which incorporates or provides a housing for the component which interacts with the barrel to form the chamber of the firearm."  Appendix ("App.") 010.  Others suggested: "the part of a firearm that provides housing for the hammer, bolt or breechblock, firing mechanism, or at its forward portion receives the barrel," App. 039; "[t]he basic unit of a firearm which houses the firing and breech mechanism and to which the barrel and stock are assembled," App. 044; and a point system in which the part that had the most points would be the "frame or receiver" (*e.g.*, the fire control group would be three points, the hammer would be one point, and the striker would be one point), App. 061-062.

because 'most firearms currently in circulation in the United States do not have a specific part that expressly falls within the current 'frame or receiver' regulatory definitions.'" *Morehouse*, 2022 WL 3597299, at *4 (quoting 86 Fed. Reg. at 27,727). Unlike the prior definition that was "rigidly tied to three specific fire control components," the proposed definition was "intended to be general enough to encompass changes in technology and parts terminology." 86 Fed. Reg. at 27,727. Thus, in the Notice, ATF defined "frame or receiver" to mean a firearm part "that provides housing or a structure designed to hold or integrate *any* fire control component." *Id.* (emphasis added). In turn, the Notice defined "fire control component" as "a component necessary for the firearm to initiate, complete, or continue the firing sequence, including," but not limited to, such different types of components as a "[h]ammer, bolt, bolt carrier, breechblock, cylinder, trigger mechanism, firing pin, striker, or slide rails." *Id.* at 27,741; *see also id.* at 27,727.

"And after reviewing and considering the over 290,000 comments offered by the public, . . . ATF *narrowed* its definition of 'frame and receiver.'" *Morehouse*, 2022 WL 3597299, at *4. Specifically, some commenters explained that the proposed definition was too broad and would lead to confusion because it potentially included more than one housing for any given weapon; thus, a weapon could have multiple "frames" or "receivers" all of which would be subject to regulation. *See, e.g.,* 87 Fed. Reg. at 24,692. Thus, "[a]fter carefully considering the numerous comments submitted on this issue," ATF agreed that defining "frame or receiver" "to encompass only one single part of a given weapon would greatly reduce the possibility that a modified weapon might have more than one serial number," a possibility that "would make it more difficult and costly for licensees to mark firearms and maintain associated records, and for law enforcement to trace firearms used in crime." *Id.* at 24,683.

The Rule thus reflects that there is only a single "frame or receiver"—*i.e.*, a single housing for a single fire control component—of a given weapon. Agreeing with the comment of at least one major firearms manufacturer, *see id.* at 24,693, the Rule defines "frame" as the part of a handgun that

16

provides housing for the component designed to hold back the hammer, striker, bolt, or similar primary energized component before the firing sequence is initiated.  *See id.* at 24,735.  This component—also known as the "sear"—is clearly a "fire control component," as the Notice proposed to define that latter term, because the sear is necessary for the handgun to complete the firing sequence.[7]  *See* 86 Fed. Reg. at 27,727.  Similarly, the Rule defines "receiver" as the part of a long gun or other projectile weapon that provides housing for the primary component designed to block or seal the breech before the firing sequence is initiated.  87 Fed. Reg. at 24,735.  This component—known as the bolt or breechblock—is a "fire control component" under the Notice's proposed definition because it is necessary to "complete[] or continue the firing sequence;" indeed, the Notice's nonexclusive list of "fire control components" included a "bolt" and a "breechblock."  86 Fed. Reg. at 27,741; *see also id.* at 27,727.  The Notice thus made clear ATF's proposal to include in its updated definition of "frame or receiver" any firearm part that provides housing for *any* fire control component of any projectile weapon.[8]  In turn, the Rule defined a "frame" or "receiver" more narrowly to mean only a subset of this category—*viz.*, the part of a handgun that provides housing for the sear (the "frame"), and the part of a long gun or other projectile weapon that provides housing for the bolt or breechblock (the "receiver").  The housings identified in the Rule were thus included in the Notice's proposed definition of "frame or receiver," and the Rule is a logical outgrowth of the Notice.  *See Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1299-1300 (D.C. Cir. 2000) (notice sufficient where agency

---

[7] When a handgun's sear is released, it causes the hammer or striker to hit the primer on the cartridge in the chamber, which completes the handgun's firing sequence.  In an automatic weapon, the sear is also necessary to continue the firing sequence.  Further, after a long gun's firing cycle has been initiated, a bolt or breechblock (or variant thereof) is necessary to seal gases in the chamber to prevent the gases from escaping other than through the barrel.  Thus, the bolt or breechblock is necessary to complete or continue the long gun's firing sequence.

[8] Both the Notice and the Rule also expressly stated that the proposed definition of "frame or receiver" would not have been limited to those particular fire control components.  86 Fed. Reg. 27,727 & n.46; 87 Fed. Reg. 24,662 & n.45.

first proposed that Indian tribes be required to meet the same requirements as States with respect to judicial review of certain actions, but the final rule exempted tribes from some of those requirements); *cf. Long Island Care at Home v. Coke*, 551 U.S. 158, 174-75 (2007) (final rule exempting an entire category of workers from coverage under an employment statute was a logical outgrowth of a proposed rule exempting only a subset of that category).

The Rule's use of the term "variant" is also a logical outgrowth of the Notice. The term "variant," as applied to a frame or receiver, simply refers to a weapon that utilizes a similar frame or receiver design irrespective of such differences as new or different model designations or configurations. 27 C.F.R. § 478.12(a)(3); 87 Fed. Reg. at 24,735.[9] It is not surprising that the Rule would clarify how the definitions of "frame" and "receiver" would apply to weapons utilizing similar designs, particularly given that the Notice observed that "[s]ince it began issuing firearm classifications," factors that ATF has considered when examining firearms include "which component the firearms industry commonly considers to be the frame or receiver with respect to the same *or similar firearms*." 86 Fed. Reg. at 27,721 (emphasis added).[10]

---

[9] Moreover, the Notice explained that ATF had previously determined that a specific part is the frame or receiver with respect to certain weapons with split or modular frames or receivers, and specifically discussed different variants of those weapons, referring either to the same "type" of weapon produced by a given manufacturer (*e.g.*, "Colt-type," "Glock-type," "AR-15-type,") or to "variants" of such weapons (*e.g.*, "Thompson M1A1-type machineguns and semiautomatic variants," "Vicker's/Maxim, Browning 1919, and M2-type machineguns, and box type variants"). 86 Fed. Reg. at 27,743-45. And there was no need for the Notice to address variants of single unified (*i.e.*, not split or modular) frame or receiver firearms because the frame or receiver houses or provides a structure for *all* fire control components regardless of new or different model designations or configurations (*e.g.*, rifle stock versus pistol grip).

[10] Plaintiffs also fail to substantiate their contention that the Rule's definition of "variant" "will have a drastic impact on the development and manufacture of new firearms." MSJ at 14-15. To the contrary, the Rule's definition of "variant" provides clarity to firearm manufacturers that if they create a firearm frame or receiver with a similar design to an existing frame or receiver, they need not change their manufacturing processes to accommodate the Rule's marking requirements.

18

Plaintiffs also fail to cite any authority suggesting that an agency violates principles of fair notice merely by using different illustrative examples than in a proposed rule. The Notice included several "nonexclusive examples that illustrate th[e] definition[]" of a frame or receiver, and a "nonexclusive list" of grandfathered frames and receivers. 86 Fed. Reg. at 27,741-46. The Rule includes different "nonexclusive examples" to illustrate the definitions of "frame" and "receiver" and to illustrate when a partially complete frame or receiver is considered a "frame or receiver," 87 Fed. Reg. at 24,735-39, and a different "nonexclusive list" of grandfathered frames and receivers, *id.* at 24,739-41. But these illustrative examples in the Rule are just that: illustrative examples reflecting sample applications of concepts that were either announced in the Notice or are a logical outgrowth of such concepts made in response to comments. *See* 86 Fed. Reg. at 27,729 (announcing intent to define "frame or receiver" as including, "in the case of a frame or receiver that is partially complete, disassembled, or inoperable, a frame or receiver that has reached a stage in manufacture where it may readily be completed, assembled, converted, or restored to a functional state").[11]

The Rule's definition of a "partially complete, disassembled, or nonfunctional frame or receiver" is also a logical outgrowth of the Notice's definition. The Notice stated that in determining whether such an item "may readily be assembled, completed, converted, or restored to a functional state, [ATF] may consider *any available* instructions, guides, templates, jigs, equipment, tools, or marketing materials." 86 Fed. Reg. 27,746 (emphasis added). Contrary to Plaintiffs' representation, MSJ at 15-16, the Notice did not limit ATF's consideration of such materials to only such materials sold or distributed by the item's seller or distributor. Instead, the Notice stated that ATF may consider "any available" materials. Therefore, Plaintiffs err in contending that the Rule expanded the scope of the Notice's definition by stating that ATF may consider "any associated templates, jigs, molds,

---

[11] It is also of little note that the Rule includes several illustrative examples of a "frame or receiver" that the Notice included under the rubric of "split or modular frame or receiver" because the Notice proposed that "split or modular frames or receivers" would be a subset of "frames or receivers."

equipment, tools, instructions, guides, or marketing materials that are sold, distributed or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit." 27 C.F.R. § 478.12(c); 87 Fed. Reg. at 24,739. In any event, considering any such materials that are "sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit" represents a logical outgrowth of proposing that ATF consider "any available" materials.[12]

The Rule's use of the term "multi-piece frame or receiver" is also a logical outgrowth of the Notice. The Notice made clear that its regulation of frames and receivers would include multi-piece frames or receivers, *i.e.*, frames or receivers that may be disassembled into multiple standard units that can be replaced or exchanged. *Compare* 86 Fed. Reg. at 27,736 (proposed rule's regulatory "definitions account for firearms such as split frames or multi-piece firearms") *with* 87 Fed. Reg. at 24,739 (defining "multi-piece frame or receiver" as one type of frame or receiver); *see also* 86 Fed. Reg. at 27,721-22, 27,729 (repeatedly discussing concept of "split/multi-piece receiver" firearms).[13] Moreover, a multi-

---

[12] Additionally, contrary to Plaintiffs' contention that no commenter on the Notice could have anticipated that the Rule would allow for consideration of "items possessed and independent of the seller or distributor," MSJ at 16, a number of comments did in fact anticipate that the Rule might consider such items. *See, e.g.*, App. 065 (observing that the Notice would consider a "partially complete, disassembled, or nonfunctional frame or receiver" to be a "firearm" "without any action on the part of the owner if instructions, guides, templates, or jigs were produced after the fact"); App. 067 (observing that under the Notice's definition of "partially complete, disassembled, or nonfunctional frame or receiver," "if a person posted a youtube video giving instructions on converting a raw block of aluminum of a certain size to a receiver, the [ATF] Director could consider all blocks of aluminum that size to be receivers").

[13] Moreover, Plaintiffs incorrectly represent that specific weapons listed in the Notice as "split/multi-piece receiver weapons"—the AR-15 semiautomatic rifle (upper and lower receiver), Glock semiautomatic pistols (upper slide assembly and lower grip module), and Sig Sauer P320 (M17/18 as adopted by the U.S. military) (upper slide assembly, chassis, and lower grip module)—could not have a "multi-piece frame or receiver" under the Rule. MSJ at 16-17. In fact, those weapons could have a multi-piece frame or receiver if their frames or receivers were split into multiple modular subparts. *See* 87 Fed. Reg. at 24,671 (explaining that "multi-piece frame or receiver" means a frame or receiver that may be disassembled into multiple modular subparts).

piece frame or receiver is a subset of modular frames or receivers, and the Notice expressly proposed regulating modular frames and receivers. *See* 86 Fed. Reg. at 27,728-29, 27,743. And in promulgating the Rule, ATF explained the need to explain the Rule's application to "multi-piece" frames or receivers when, in response to comments, it removed a proposed section addressing "split or modular frames or receivers." *See* 87 Fed. Reg. at 24,671. ATF "agree[d] with numerous commenters" that the removed section would have been "difficult for persons to apply" under the original proposed definition of "frame or receiver," which would have included more than one housing for any fire control component. *Id.* The Rule removed this section as unnecessary because it modified the definition of "frame or receiver" to focus on a single firearm component (based on commenters' recommendations). *See id.* However, although this modified definition of "frame or receiver" provided clarity as to which part of a "split" frame or receiver is regulated, it did not provide such clarity with respect to frames or receivers that may be disassembled into multiple standard units that can be replaced or exchanged. *Id.* The term "multi-piece frame or receiver" was thus added to the Rule to make clear how it applied to such items. *Id.*

The Rule's treatment of "privately made firearms" and "gunsmiths," and its use of the word "primordial" are also logical outgrowths of the Notice. *Contra* MSJ at 17; BlackHawk MSJ at 20. The Notice defined "[p]rivately made firearm," and the Rule adopted that definition with few changes. *Compare* 86 Fed. Reg. at 27,746-47 *with* 87 Fed. Reg. at 24,735. The Rule's provision entitled "privately made firearms marked by nonlicenseees" defines no terms; it merely states that licensees may adopt a unique identification number previously placed on a privately made firearm by a non-licensee. 87 Fed. Reg. at 24,743. The Notice defined "gunsmith" as, in relevant part, a person who "as a service performed on existing firearms not for sale or distribution by a licensee, devotes time, attention, and labor to . . . identifying firearms in accordance with this chapter," 86 Fed. Reg. at 27,741, and the Rule narrowed this definition to a person who "as a service performed on existing firearms not for sale or

distribution, devotes time, attention, and labor to. . . placing marks of identification on privately made firearms in accordance with this part. 87 Fed. Reg. at 24,734 (27 C.F.R. §478.11(d)). Finally, the Notice included the concept of "primordial," stating that "articles only in a primordial state would not—without more—be considered a 'partially complete' frame or receiver," 86 Fed. Reg. at 27,729, and the Rule defined that word using a dictionary definition. *See* 87 Fed. Reg. at 24,663 n.49 (citing Oxford English Dictionary).

The Rule's decision to grandfather certain existing frame or receiver classifications is also a logical outgrowth of the Notice. Contrary to Plaintiffs' assertion, MSJ at 12, the Notice showed that ATF generally intended to grandfather existing frame or receiver classifications. *See* 86 Fed. Reg. at 27,728-29 ("One important goal of this rule is to ensure that it does not affect existing ATF classifications of firearms that specify a single component as the frame or receiver. Application of the rule, as proposed, would not alter these prior ATF classifications."). The Notice also expressly distinguished between firearms designed and configured before and after the Rule's effective date. *See id.* at 27,748, 27,752.

Plaintiffs also provide no authority to support their contention that a final rule is inconsistent with the logical outgrowth standard if its "definitional structure" has changed from that of the proposed rule. MSJ at 11; *see id.* at 11-13; BlackHawk MSJ at 18-20. As explained above, the Rule's definition of "frame or receiver" is a logical outgrowth of the Notice's definition. As in the Notice, the Rule defines the terms "firearm muffler or silencer frame or receiver," "partially complete, disassembled, or nonfunctional frame or receiver,"[14] and "destroyed frame or receiver," *compare* 86 Fed. Reg. at 27,743, 27,746 (proposed 27 C.F.R. § 478.12(a), (c), (e)) *with* 87 Fed. Reg. at 24,739 (27

---

[14] In response to comments, the Rule changed "inoperable frame or receiver" changed to "non-functional frame or receiver." *See* 87 Fed. Reg. at 24,670.

C.F.R. § 478.12(b), (c), (e)), and as explained above, any changes in the terms included in the definition of "frame or receiver" represent logical outgrowths of the Notice's definition.

Inherent in Plaintiffs' challenge to the Rule's "definitional structure" is their apparent belief that any differences between a proposed rule and a final rule are impermissible. But that is not the law. "The whole rationale of notice and comment rests on the expectation that the final rules will be somewhat different—and improved—from the rules originally proposed by the agency." *City of Stoughton v. EPA*, 858 F.2d 747, 753 (D.C. Cir. 1988) (citation omitted). It is not "uncommon for a final rule to contain new provisions that are 'substantially different' from those in the proposed rule." *Nat'l Rest. Ass'n v. Solis*, 870 F. Supp. 2d 42, 50 (D.D.C. 2012) (citation omitted). "A standard that required otherwise would obligate an agency to engage in successive rounds of notice and comment any time a final rule differs from what it proposed, greatly impeding and delaying an agency's ability to address a problem." *Id.* (citation omitted).[15] Especially in light of the fact that the Notice

---

[15] Nor does case law cited by Plaintiffs suggest otherwise. Unlike Plaintiffs, the petitioners in *Texas Ass'n of Manufacturers v. U.S Consumer Prod. Safety Comm'n*, 989 F.3d 368 (5th Cir. 2021), did "not object to a substantive change in the text of the Proposed Rule and the Final Rule, but to the change in the justification for the Proposed Rule and the justification for the Final Rule." *Id.* at 382. No such change in justification occurred here. Similarly, *Shell Offshore, Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001), did not involve any textual changes between a proposed and final rule, but instead whether a specific policy change by the Interior Department—requiring certain oil and gas lessees to petition the Federal Energy Regulatory Commission for approval of requested tariff rates—represented a new "rule" triggering APA's notice and comment provisions. *Id.* at 624-26. And *Huawei Technologies USA* affirms that "all the APA demands" is that a proposed rule seek "comment on the ultimate subject" of the regulation "and apprise[] interested parties of the related issues under consideration by offering designation proposals and inviting alternatives." 2 F.4th at 448; *see also id.* at 449 ("[T]he rulemaking fairly acquainted Huawei with the subject and issues delineated in [the final rule], which is all [5 U.S.C.] § 553 demands."). Finally, the proposed rule in *National Lifeline Ass'n v. FCC*, 921 F.3d 1102 (D.C. Cir. 2019), limited the availability of an established low-income subsidy based on an Agriculture Department rule excluding towns with populations greater than 10,000, but the final rule instead limited availability based on the provisions of a different agency's program that would exclude "some small towns of significantly less than 25,000 or even 10,000 people (despite contrary terms in the proposed rule)." *Id.* at 1105-06, 1116. The D.C. Circuit held that the proposed rule's failure to provide searchable maps that "were necessary to appreciate that even some towns with under 10,000 people (contrary to the Commission's original proposal of excluding towns above 10,000 people) would be

"specifically requested comments on the feasibility of implementing the [proposed] definition of firearm 'frame or receiver,'" 86 Fed. Reg. at 27,740, the "possibility" that the agency might modify this definition in the Rule was "reasonably foreseeable." *Long Island Care at Home*, 551 U.S. at 175.

Further, Plaintiffs miss the mark in contending that if a final rule includes additional supporting citations to press releases or news articles in a footnote, an agency must reopen its notice and comment period. MSJ at 19-20. The Notice explained that "numerous Federal criminal cases have been brought by the Department [of Justice] to counter illegal trafficking in unserialized home-completed and assembled weapons, and possession of such weapons by prohibited persons," and cited numerous Justice Department press releases. 86 Fed. Reg. at 27,723 & n.19. The Rule cited additional press releases in supporting the same statement. 87 Fed. Reg. at 24,657-58 n.20. Similarly, the Rule explained that "[i]n recent years, the number of [privately made firearms] recovered from crime scenes throughout the country has increased," and cited supporting news articles. 86 Fed. Reg. at 27,722 & n.17. The Rule cited additional articles to support the same statement. 87 Fed. Reg. at 24,656 & n.17. An agency's final rule may include additional citations to supporting press releases and news articles, and Plaintiffs cite no authority to the contrary.

Finally, Plaintiffs include under the rubric of their logical outgrowth arguments a challenge under the Regulatory Flexibility Act ("RFA"), but that challenge is meritless. MSJ at 18-19. The RFA requires proposed rules to include an "initial regulatory flexibility analysis" containing certain specified items. 5 U.S.C. §§ 603(a)-(c). The Notice's initial regulatory flexibility analysis complied with this requirement. 86 Fed. Reg. at 27,738-39. Plaintiffs incorrectly contend that in addition to the RFA's express requirements, ATF's initial regulatory flexibility analysis was required to explain the agency's methodology underlying its initial cost estimates. Such a requirement is not imposed by RFA or the

---

excluded" from the subsidy rendered the final rule "inadequate to enable sufficient comment on the proposed rule." *Id.* at 1116. *National Lifeline Ass'n* is thus far afield from this case.

APA, and courts may not impose additional procedural rulemaking requirements beyond those the APA and other statutes expressly require. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2385 (2020) ("We have repeatedly stated that the text of the APA provides the maximum procedural requirements that an agency must follow in order to promulgate a rule.") (citations and internal punctuation omitted).[16]   Further, the Notice specifically requested public comment on "the costs or benefits of the proposed rule and on the appropriate methodology and data for calculating those costs and benefits," 86 Fed. Reg. at 27,740, and in response to comments received, ATF revised its initial cost-benefit analysis, *see, e.g.*, 87 Fed. Reg. at 24,716, 24,718.  An agency complies with the APA when it revises a cost-benefit analysis in response to public comments, and Plaintiffs' contrary suggestion that an agency must reopen the comment period whenever it does so "would obligate an agency to engage in successive rounds of notice and comment any time a final rule differs from what it proposed." *Nat'l Rest. Ass'n*, 870 F. Supp. 2d at 50.

"It is difficult to conclude, under these facts, that the [Rule] is not a 'logical outgrowth' of the [Notice].  Indeed, this appears to present a rather textbook example of how the administrative rulemaking process must proceed under the APA." *Morehouse*, 2022 WL 3597299, at *4.  "Without question, the [Notice] was sufficiently descriptive that . . . ATF was going to redefine 'frame or receiver,' and it allowed interested parties to offer informed criticism and comment." *Id.*  Moreover, "[i]n most cases, if the agency alters its course in response to the comments it receives, little purpose would be served by a second round of comment." *Ariz. Pub. Serv. Co.*, 211 F.3d at 1299 (citation

---

[16] *Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995), cited by Plaintiffs, does not suggest otherwise.  That case involved an Interior Department final rule listing a particular type of snail as an endangered species, and before the comment period expired, the Department had not made publicly available a U.S. Geological Survey report that was "central to the Secretary's decision to list the [snail] as an endangered species." *Id.* at 1402-04.  This case, by contrast, does not involve any contention that ATF relied on an "unavailable" study "provid[ing] new information that was 'critical' to the agency's determination." *Id.* at 1403 (quoting *Cmty. Nutrition Inst. v. Block*, 749 F.2d 50, 57-58 (D.C. Cir. 1984)).

omitted).  That is true here also.  "Here, the Plaintiffs had an opportunity to offer comments on the proposed definitions," and "allowing Plaintiffs a new round of notice and comment would serve little purpose."  *Morehouse*, 2022 WL 3597299, at *4.

In any event, even if the Rule's definitions of "frame" and "receiver" were not a logical outgrowth of the Notice, any error would be harmless.  Under the APA, plaintiffs "must demonstrate that the agency's violation" has "resulted in 'prejudice.'"  *American Coke & Coal Chems. Inst. v. EPA*, 452 F.3d 930, 939 (D.C. Cir. 2006) (quoting 5 U.S.C. § 706(2)).  Where, as here, the agency has conducted notice and comment, plaintiffs claiming that notice was inadequate must show that "had proper notice been provided, they would have submitted additional, different comments that could have invalidated the [agency's] rationale."  *City of Waukesha v. EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003).  But Plaintiffs fail to identify any specific comment they were allegedly prevented from submitting, much less any concrete harm traceable to any changes they cite.  Because the proposed rule "fairly appris[ed] interested persons of the subjects and issues the agency [was] considering," the Rule is a logical outgrowth of the Notice.  *Huawei Techs. USA*, 2 F.4th at 448 (citation omitted).

## III.    The Rule Is Not Arbitrary and Capricious.

Plaintiffs' arbitrary-and-capricious claims fare no better.  The arbitrary and capricious standard is "narrow and highly deferential."  *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021) (citation omitted).  The court's "task is merely to ask whether the agency considered the relevant facts and articulated a satisfactory explanation for its decision."  *Amin v. Mayorkas*, 24 F.4th 383, 393 (5th Cir. 2022).  "[A] court is not to substitute its judgment for that of the agency," *State Farm*, 463 U.S. at 43 (citation omitted), and must "uphold an agency's actions if its reasons and policy choices satisfy minimum standards of rationality," *10 Ring Precision*, 722 F.3d at 723 (citation and internal punctuation omitted).  A reviewing court starts from "a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption by showing that the decision was erroneous."

26

*Texas Clinical Labs. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010).  Plaintiffs have failed to overcome this presumption of validity because the Rule is rational.

> ### A.    The Rule Adequately Explains Changes in ATF Policy.

"An agency's change in policy is not subjected to a heightened standard or more substantial review than the scrutiny applicable to policy drafted on a blank slate."  *Handley v. Chapman*, 587 F.3d 273, 282 (5th Cir. 2009) (citing *FCC v. Fox Television Stations*, 556 U.S. 502, 514-16 (2009)).  "Rather, a policy change must only meet three requirements: The new policy must be permissible under the statute; there must be good reasons for it; and the agency must believe that the new policy is better, which the conscious change of course adequately indicates."  *Id.* (citation omitted); *accord Entergy Miss., Inc. v. NLRB*, 810 F.3d 287, 293 (5th Cir. 2015).

Plaintiffs appear to suggest that ATF did not adequately explain policy changes relating to: partially complete frames and receivers, *see* MSJ at 21-22, BlackHawk MSJ at 22-23; individual firearm parts, MSJ at 22, BlackHawk MSJ at 21-22, 24; weapon parts kits and frame or receiver parts kits, MSJ at 22; BlackHawk MSJ at 22-23; and split-frame or striker-fired firearms, MSJ at 23-24.  As to each product category, however, the Rule either does not change ATF's policy or adequately explains the reasons for any change.

With respect to partially complete frames and receivers, the Rule is consistent with ATF's longstanding fact-specific approach.  There are no statutory definitions for the term "frame or receiver" in the GCA.  Therefore, the crucial question is at what point a mere component or foundation of a component, such as a piece of metal or plastic, becomes a "frame or receiver" that is regulated as a firearm.  For many years, ATF has determined that a component becomes a "frame or receiver" when it reaches a "critical stage of manufacture," which is the point at which it is "brought to a stage of completeness that will allow it to accept the firearm components [that] it is designed for,

using basic tools in a reasonable amount of time." *See, e.g.*, ATF Letter to Private Counsel #303304, at 3-4 (Mar. 20, 2015), App. 070-071.

Thus, ATF has always classified "some unfinished receivers [as] firearms because of the ease with which they can be made functional"—a standard which "is largely determined by which machining operations still needed to be performed." 87 Fed. Reg. at 24,668.[17] It likewise remains true that "a partially complete frame or receiver alone is not a frame or receiver if it still requires performance of certain machining operations." *Id.* at 24,668. Under the Rule, the issue is whether a partially complete frame or receiver may "readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver[.]" *Id.* at 24,739. Accordingly, under the Rule, "[c]ompanies that sell or distribute only unfinished frame or receiver billets or blanks, and not any associated jigs, templates, or similar tools to the same customer are not required to be licensed or to mark those articles with identifying information." *Id.* at 24,700. The Rule clarifies that ATF will consider "any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available" with an unfinished frame or receiver to determine whether the component has reached the "critical stage of manufacture." *Id.* at 24,678. Plaintiffs do not argue that this change was inadequately supported.[18]

---

[17] Indeed, in a prior filing, Plaintiffs cited an ATF webpage illustrating that a receiver with only a "partially machined fire-control cavity" was classified as a firearm under ATF's prior regulations, although it could not function as a receiver in its existing form. *See Are "80%" or "unfinished" receivers illegal?*, ATF, *available at* https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal; Pls.' Br. in Supp. of Mot. for Prelim. Inj. at 30, ECF No. 16.

[18] Moreover, the change satisfies all three requirements for a regulatory change: it is consistent with the GCA, which vests ATF with the discretion to define the statutory term "frame or receiver," *see supra* Background; ATF acknowledged that it was changing position; and ATF explained the reason for the change. *See Handley*, 587 F.3d at 282. As for the reason for the change, ATF has long maintained that a partially complete frame or receiver is a "frame or receiver" for purposes of the

Further, Plaintiffs' contention that the Rule is inconsistent with statements made in a prior litigation brief rests on a misunderstanding of that brief. The brief reiterated that "an unfinished frame or receiver is not a firearm until it has been sufficiently machined such that it has reached a critical stage of manufacture, and that line-drawing exercise is necessarily carried out on a device-by-device basis"; that "[o]nce a device crosses that threshold, it becomes a regulated firearm"; and that "ATF has applied this standard for decades when determining whether a device qualifies as a firearm under the GCA." Mem. Supp. Defs.' Mot. for Summ. J. at 9, *City of Syracuse v. ATF*, No. 20-6885 (S.D.N.Y. Jan. 29, 2021). As explained above, the Rule maintains this "critical stage of manufacture" standard, under which the crucial question is whether the device has been brought to a state of completeness that will allow it to accept the fire control components for which it has been designed, using basic tools, in a reasonable amount of time. 87 Fed. Reg. at 24,685. In accordance with this standard, the Rule explains that the terms "frame" and "receiver" include a partially complete frame or receiver "that is designed to, or may readily be completed, assembled, restored, or otherwise converted" to accept the parts it is intended to house or hold. *Id.*; *see also id.* at 24,739 (27 C.F.R. § 478.12(c)). The plaintiffs in the cited case, however, incorrectly argued that the GCA expressly *mandated* a particular statutory definition of "frame or receiver" based on a mistaken interpretation of its provisions. Under the GCA, a "firearm" includes: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; [or] (B) the frame or receiver of any such weapon[.]" 18 U.S.C. § 921(a)(3). The plaintiffs incorrectly contended that the statutory phrase "which . . . is designed to . . . expel a projectile" in the first clause expressly applied

GCA when it is sold "indexed," or marked with the locations for drilling or milling the holes or cavities necessary to initiate, complete, or continue the firing cycle. *See* 87 Fed. Reg. at 24,668; App. 073, 079. Prior to the Rule, however, ATF did not examine templates, jigs, or other items and materials made available with a partially complete frame or receiver. *See* 87 Fed. Reg. at 24,668. Because "the aggregation of a template or jig with a partially complete frame or receiver can serve the same purpose as indexing," the Rule now requires consideration of such materials. *Id.* The change thus increases the consistency and accuracy of ATF's classifications. *See id.*

to the second clause, such that the statute *required* ATF to regulate any item which "*is designed to*" become a "frame or receiver." The government's briefs explained that this contention represented a misunderstanding of the GCA, which does not require ATF to regulate so broadly.

And the Rule does not regulate so broadly. As explained above, the GCA did not define "frame or receiver," so Congress did not specifically prescribe what the statutory term "frame or receiver" should encompass. However, ATF must draw the line somewhere, and the Rule thus defines "frame or receiver" to include a frame or receiver that is partially complete, disassembled, or nonfunctional—including a frame or receiver parts kit—that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a completed frame or receiver. 87 Fed. Reg. at 24,739 (27 C.F.R. § 478.12(c)); *see also id.* at 24,663, 24,727-28. ATF's definition utilizes the term "readily" not because it is required by statute to do so, but because it is a term and concept that Congress used, not only in 18 U.S.C. § 921(a)(3)(A), but elsewhere in federal firearm laws.[19] ATF also utilizes this term because it "has been repeatedly—and consistently—defined by case law." 87 Fed. Reg. at 24,678; *see also id.* at 24,678-79 & n.79 (citing authority). ATF's use of the term "readily" thus reflects the determinations that Congress has made throughout the federal firearm laws to define regulated weapons as including items that may be readily converted to regulated weapons, and ensures that the Rule coheres with this consistent legislative intent. In short, the Rule retains some aspects of ATF's existing policy with respect to partially complete frames and receivers, while making changes that the Rule acknowledges and explains.

---

[19] *See, e.g.,* 26 U.S.C. § 5845(b) (defining "machinegun" as "any weapon that shoots, is designed to shoot, or can readily be restored to shoot, automatically…"); *id.* § 5845(c) (defining "rifle" as including any weapon within the prescribed definition "which may be readily restored to fire a fixed cartridge"); *id.* § 5845(d) (defining "shotgun" to include any weapon within the prescribed definition "which may be readily restored to fire a fixed shotgun shell"); *id.* § 5845(f) (defining "destructive device" to include "any combination of parts either designed or intended for use in converting any device into a destructive device . . . and from which a destructive device may be readily assembled"); *id.* § 5845(h) (defining "unserviceable firearm" to mean "a firearm which is incapable of discharging a shot by means of an explosive and incapable of being readily restored to a firing condition").

The Rule also does not reflect an unexplained change in ATF's regulation of individual firearm parts, weapon parts kits, or frame or receiver parts kits.  As the ATF court filing that Plaintiffs cite reflects, *see* MSJ at 22, ATF generally does not regulate individual firearm parts, with the exception of frames and receivers, and parts of machineguns and silencers.  That remains true under the Rule.  By contrast, ATF always has recognized that a weapon parts kit, standing alone, may fall within the GCA's statutory definition of a "firearm," where it "is designed to or may readily be converted to expel a projectile by the action of an explosive."  18 U.S.C. § 921(a)(3)(A); *see* 87 Fed. Reg. at 24,662 & n.44, 24,692; 86 Fed. Reg. at 27,726 & nn.39-40 (citing case law confirming this interpretation).  The Rule merely adds express language confirming and codifying this interpretation.  *See* 87 Fed. Reg. at 24,662, 24,692.  To the extent that ATF was required to explain this codification of existing policy, its explanation—which relied on both case law and the plain meaning of the statutory text—was more than adequate.  *See id.* at 24,684.  Similarly, the Rule regulates frame or receiver kits that may readily be converted to function as a frame or receiver because such kits simply constitute a frame or receiver in a disassembled form or configuration, and the GCA expressly provides ATF with the authority to regulate frames and receivers of any such weapons.  In short, the Rule regulates items that are "firearms" within the GCA's definition.[20]

---

[20] Nor, contrary to BlackHawk's contention, are the Notice and the Rule contradictory with respect to weapon parts kits.  Rather, the Notice acknowledged that firearm parts kits that allow a buyer to complete a functional weapon within a short time period or with minimal effort, expertise, or equipment are "firearms" under the GCA "because they are *designed to or may readily be converted* to expel a projectile by the action of an explosive."  86 Fed. Reg. at 27,726.  Such aggregations of weapon parts are not regulated because they are firearm parts, but because they are a "firearm" when aggregated— a single weapon in a disassembled form or configuration.  Indeed, a number of provisions of the GCA show that the term "firearm" in 18 U.S.C. 921(a)(3)(A) includes an aggregation of weapon parts.  *See, e.g.*, 18 U.S.C. § 921(a)(30) (defining "handgun" to include "any combination of parts from which" a firearm with a short stock that is designed to be held and fired with one hand "can be assembled"); *id.* § 921(a)(23) (defining the term "machinegun" to include "any combination of parts from which a machinegun can be assembled" in a person's possession or control); *id.* § 922(p) (prohibiting possession of any assembled firearm with an undetectable major component, *i.e.*, barrel, slide, cylinder, frame, or receiver"); *id.* § 922(r) (prohibiting assembly of a nonsporting "rifle" or "shotgun" from

Further, BlackHawk makes several mistaken contentions regarding the Rule's regulation of weapon parts kits. BlackHawk MSJ at 21-22.[21] The Rule does not "prohibit[]" weapon parts kits; instead, it includes certain regulatory requirements governing such kits if they may be readily converted to expel live ammunition. Nor does the Rule state that a weapon parts kit does not contain a frame or receiver; instead, it provides that such a kit "that is designed to or may be readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive" is a "firearm." 87 Fed. Reg. at 24,735 (27 C.F.R. § 478.11). Some such kits may contain a complete frame or receiver, while others may contain a partially complete or a multi-piece frame or receiver. However, the GCA's definition of "firearm" does not mandate the presence of a clearly-identifiable frame or receiver in order for an aggregation of parts to be a "firearm," *see* 18 U.S.C. § 921(a)(3)(A) ("firearm" includes "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive"), and the Rule explains that a weapon parts kit "need not have a partially complete frame or receiver . . . to satisfy the definition of 'firearm' under section 921(a)(3)(A)," 87 Fed. Reg. at 24,670; *see also id.* ("For example, a weapon parts kit that contains pieces of a multi-piece frame or receiver . . . may still meet the definition of 'firearm' under section

---

"imported parts"). In short, the Rule provides how ATF will apply "readily" to stand alone partially complete frames or receivers, as well as kits.

[21] *Gulf Fishermens Ass'n v. National Marine Fisheries Serv.*, 968 F.3d 454 (5th Cir. 2020), cited by BlackHawk, does not advance its arguments. The relevant issue in that case was whether Congress had granted the agency the authority to regulate aquaculture. The agency "claim[ed], not that [the relevant statute] affirmatively empowers it to regulate aquaculture, but that [it] fails to "express[] Congress's unambiguous intent to *foreclose* the regulation of aquaculture." *Id.* at 461. ATF makes no such claim here. Congress has affirmatively empowered ATF to regulate the "frame or receiver" of firearms, and has also expressly authorized the agency to regulate "firearms," which Congress defined to include "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," 18 U.S.C. § 921(a)(3)(A), regardless of whether that weapon is in a disassembled form.

921(a)(3)(A) if the kit "is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive'").

Additionally, ATF did not change its position regarding firearms with split frames or receivers or striker-fired firearms, but rather codified its existing policy in the face of court decisions misinterpreting prior regulations.  As explained above, *see supra* Background, the GCA regulates a firearm "frame or receiver," 18 U.S.C. § 921(a)(3)(B), which is a firearm's primary structural component to which fire control components are attached.  87 Fed. Reg. at 24,654.  ATF's now-superseded regulations defined "frame or receiver" as that part of a firearm that provides housing for the hammer, bolt or breechblock, and firearm mechanism, and which is usually threaded at its forward portion to receive the barrel.  *Id.*  However, ATF has long recognized that many firearms might have a primary structural component to which fire control components are attached that would nonetheless fall outside a restrictive application of its prior regulatory definition of "frame or receiver."  *Id.*; *see also* 86 Fed. Reg. at 27,721.  In particular, such an application might not capture those types of firearms— split frames or receivers—that now constitute the majority of firearms in the United States.  87 Fed. Reg. at 24,655.  Unsurprisingly, then, existing law and Congressional intent both reflect that the prior regulatory definition of "frame or receiver" need not be so restrictively applied.  86 Fed. Reg. at 27,721-22.  ATF has thus long regarded that prior regulatory definition of a firearm "frame or receiver" as non-exhaustive, and has maintained that split-receiver firearms "should be examined with a view toward determining if either the upper or lower half of the receiver more nearly fits the legal definition of 'receiver,' and more specifically, for machineguns, whether the upper or lower portion has the ability to accept machinegun parts."  87 Fed. Reg. at 24,655 (internal quotation marks and brackets omitted); *see also id.* (the prior regulatory definitions "were never intended, or understood, to be exhaustive").  By contrast, certain courts recently have interpreted ATF's prior regulatory definition of "frame or receiver" as exhaustive—an "erroneous" interpretation, in ATF's view.  *See* 86 Fed. Reg.

33

at 27,722, 27,727; *contra* MSJ at 23.  ATF has explained that a restrictive interpretation of its prior regulation would create the anomalous result that "as many as 90 percent of all firearms (i.e., with split frames or receivers, or striker-fired) in the United States would not have any frame or receiver subject to regulation," which would clearly contradict the statutory scheme, as determined by its plain text. 87 Fed. Reg. at 24,652; 86 Fed. Reg. at 27,722.  To address this problem, the Rule amended the regulatory definition of "frame or receiver" to expressly cover the single component best classified as the frame or receiver of particular categories of split-receiver firearms, as well as the frame or receiver of striker-fired firearms.  87 Fed. Reg. at 24,652-53, 24,695.[22]  The Rule thus does not represent a change in ATF's policy regarding firearms with split frames or receivers or striker-fired firearms.

Plaintiffs also incorrectly suggest that the Rule's coverage of split-receiver and striker-fired civilian firearms is inadequately explained because, according to Plaintiffs, the technology for such firearms was already available when ATF promulgated its prior regulatory definition of "frame or receiver."  MSJ at 23-24.  But ATF did not suggest otherwise.  Rather, the agency observed that split-receiver and striker-fired firearms were less commonly used by the civilian population approximately fifty years ago, when ATF promulgated its prior regulation, than they are today.  *See, e.g.*, 87 Fed. Reg. at 24,654-55, 24,683 n.88.  Plaintiffs' assertions do not negate that observation.

### B.   ATF Considered All Relevant Aspects of the Regulatory Problem, and Addressed Significant Comments.

Plaintiffs incorrectly contend that as to two issues—potential First Amendment considerations, and the application of the Rule's "complete weapon" definition to firearms owners' possession of unassembled weapons—that ATF either "entirely failed to consider a significant aspect of the problem" it addressed through regulation, *State Farm*, 463 U.S. at 43, or did not respond to

---

[22] Notably, one court that had adopted this restrictive interpretation noted its view that ATF had not only the "authority," but also the "duty," to update its regulations to expressly cover split-receiver firearms, such as AR-15-style rifles.  *United States v. Rowold*, 429 F. Supp. 3d 469, 476 (N.D. Ohio 2019).

significant comments.  MSJ at 24-26.  Regardless of the standard under which this argument is analyzed, it has no merit.  "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained," and a reviewing court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  And the requirement to "respond to 'relevant' and 'significant' public comments" is not "particularly demanding."  *Pub. Citizen v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993).  "[T]he agency's response to public comments need only enable courts to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did."  *Id.* (citation omitted).  An agency "need only respond to comments that can be thought to challenge a fundamental premise underlying the proposed decision."  *Transp. Div. v. Fed. R.R. Admin.*, 40 F.4th 646, 663 n.4 (D.C. Cir. 2022).

Plaintiffs' claim that the Rule did not adequately consider potential First Amendment considerations is simply a repackaging of their constitutional claim as an APA claim.  As explained below, *see infra* Section VI, Plaintiffs' First Amendment claim is meritless.  And contrary to Plaintiffs' assertion, the Rule squarely addressed contentions made by commenters that the Rule might implicate First Amendment concerns because the agency allegedly "would be able to determine when a component has become a firearm based on a company's instructions and how a company markets that product."  87 Fed. Reg. at 24,675.  The Rule explained that such contentions were groundless because the First Amendment is not implicated by the enforcement of a regulation of general applicability that is not targeted at expressive activity.  *Id.*  As explained in more detail below, the Rule's definitions do not target expressive conduct of any kind but are instead part of a regulation of general applicability that clarifies the definition of a firearm frame or receiver for purposes of licensing, serialization, and recordkeeping.  *See id.*  And in an abundance of caution, the Rule explains that even if its provisions could somehow be construed as incidentally limiting expressive conduct—which they

do not—they would nevertheless satisfy the Supreme Court's standard for regulating "speech" and "nonspeech" elements that are combined in the same course of conduct.  *See id.* at 24,675-76 (citing *United States v. O'Brien*, 391 U.S. 367 (1968)).

Likewise, Plaintiffs' argument that the Rule did not adequately consider how its definition of "complete weapon" would apply to law-abiding firearm owners' possession of unassembled weapons merely restates their constitutional vagueness claim as an APA claim.  That constitutional claim has no merit, *see infra* Section VII.A, and it is no more persuasive rephrased as an APA argument.  As an initial matter, Plaintiffs' argument concerns a hypothetical application of the Rule's "complete weapon" definition to a hypothetical scenario not alleged by any plaintiff: namely, the simultaneous possession of AR rifles and pistols that are stored unassembled.  MSJ at 25-26.  But "hypothetical examples" are "irrelevant to facial challenges," *Ass'n of Private Sector Colleges & Universities v. Duncan*, 110 F. Supp. 3d 176, 196 (D.D.C. 2015), *aff'd*, 640 F. App'x 5 (D.C. Cir. 2016), because it is Plaintiffs' burden to establish that no set of circumstances exists under which the Rule would be valid, *see supra* Legal Standards, and not Defendants' burden to support the Rule's application as applied to hypothetical circumstances.  In any event, the Rule adequately considered the extent to which the term "complete weapon" might apply to firearm owners' possession of unassembled weapons, and rejected any contention that such an application would create law enforcement uncertainty.  87 Fed. Reg. at 24,700.  The Rule uses this term simply to "explain when a frame or receiver of a firearm . . . must be marked for identification" by the licensed manufacturer that produces it.  *Id.* at 24,664.  The Rule thus defines this term to mean a "firearm" that contains all component parts necessary to function.  *Id.* at 24,734.  And because the Rule's definition of "complete weapon" expressly incorporates the term "firearm," that definition assumes that there is already an article defined as a "firearm" before it can be a "complete weapon."  In sum, the Rule's definition of "complete weapon" has no consequences

for law-abiding firearm owners, but is simply intended to inform licensed *manufacturers* when a firearm

frame or receiver should be marked for identification during the manufacturing process.

### C.    Plaintiffs' Remaining Arbitrary and Capricious Arguments Lack Merit.

None of Plaintiffs' remaining arbitrary and capricious arguments have any merit.   Initially,

Plaintiffs Defense Distributed and SAF err in contending that the Rule is arbitrary and capricious

because, in their view, it did not follow the analysis required by *New York State Rifle & Pistol Ass'n, Inc.*

*v. Bruen*, 142 S. Ct. 2111 (2022).   *See* Br. in Supp. of Defense Distributed Mot. for Summ. J. at 2-4,

ECF No.  166.  That argument is unavailing.  As explained below, *see infra* Section V, ATF correctly

concluded that the Rule is consistent with the Second Amendment.   Moreover, the APA requires

courts to take account of the "rule of prejudicial error."  5 U.S.C. § 706.  Under that rule, "the burden

of  showing  that  an  error  is  harmful  normally  falls  upon  the  party  attacking  the  agency's

determination."  *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009); *see also Worldcall Interconnect, Inc. v. FCC*,

907  F.3d  810,  818-19  (5th  Cir.  2018)  (rejecting  challenge  to  administrative  action  because  the

challenger had failed to show that it was prejudiced by the claimed error).   Thus, to the extent that

Defense Distributed urges that the Rule is invalid because it cites and applies case law from federal

courts employing a means-end scrutiny analysis that *Bruen* rejected, that argument has no merit.

Because ATF correctly explained that the Rule does not infringe Second Amendment rights, the

inclusion of additional analysis reaching the same result under a different test cannot be prejudicial.

And given that the Second Amendment question is a legal one, its resolution does not implicate the

sort of policy considerations and agency discretion that the agency must resolve in the first instance.

In any event, *Bruen* was issued after the Rule's promulgation, and under APA review, "it is well

established that reviewing courts generally should, in evaluating agency action, avoid considering

evidence that was not before the agency when it issued its final decision.   Agency actions should

generally be reviewed in light of the evidence before the agency at the time, and not with the benefit

of hindsight." *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 630 n.8 (5th Cir. 2001) (internal citations omitted); *see also SIH Partners LLLP v. Comm'r of Internal Revenue*, 923 F.3d 296, 301 (3d Cir. 2019) (arbitrary and capricious review does not permit courts to apply "hindsight derived from matters occurring after the[] adoption" of the challenged agency action).   The Rule thus adequately demonstrates why it does not implicate the Second Amendment.

Somewhat bizarrely, Plaintiffs also challenge the Rule as arbitrary and capricious for having rejected a proposal that Plaintiffs disagree with.   BlackHawk MSJ at 23-24.   Specifically, the Notice suggested the possibility that for purposes of licensing, serialization, and recordkeeping, a firearm could be deemed to have more than one frame or receiver, but the Rule rejected this possibility and instead reflects that there is only a single "frame or receiver"—*i.e.*, a single housing for a single fire control component—of a given weapon.   *Compare* 86 Fed. Reg. at 27,734 *with* 87 Fed. Reg. at 24,727, 24,735.   Plaintiffs agree with the Rule's conclusion that a given weapon has only a single "frame or receiver," but nevertheless challenge the proposal made in the Notice—which was rejected—as arbitrary and capricious.   However, Plaintiffs cite no authority suggesting that an arbitrary-and-capricious claim may be maintained with respect to a rejected proposal.   And to the extent that Plaintiffs suggest that the agency could hypothetically re-examine this rejected proposal, they ask this Court for an impermissible advisory opinion.   *See In re Franchise Servs. of N. Am., Inc.*, 891 F.3d 198, 205 (5th Cir. 2018) ("The prohibition of advisory opinions is a constitutional limit on the power of the courts.").

Nor are Plaintiffs correct in contending that the Rule has "rescinded in its entirety decades of prior classification determinations."   BlackHawk MSJ at 25.   In fact, the Rule expressly grandfathers its prior classifications of the frame or receiver of existing split frame or receiver firearm designs, including AR-15 and M-16 variants.   87 Fed. Reg. at 24,653; *see also id.* at 24,683, 24,693.   "The only exception to 'grandfathering' will be for partially complete, disassembled, or nonfunctional frames or

receivers . . . that ATF previously did not classify as firearm 'frames or receivers[.]'" *Id.* at 24,653, 24,672. And ATF explained the basis for this exception. In the past, incomplete frames or receivers had been sent to ATF for classification without any of the other parts, jigs, templates, or materials that are sold or distributed with the item or kit. *Id.* at 24,673. Thus, the entire kit may not have been presented to the agency when it made its classification, *id.* at 24,709, despite the fact that these items and materials are relevant to making a proper firearm classification. *Id.* at 24,725. ATF explained that in addition to not grandfathering these particular classifications, individuals seeking classifications prospectively must submit any associated templates, jigs, molds, equipment, or tools that are made available by the seller or distributor of the item or kit, to the purchaser or recipient of the item or kit, together with any instructions, guides, or marketing materials if they will be made available by the seller or distributor with the item or kit, to ensure that a proper classification decision can be made that considers the entire kit. *Id.* at 24,673. ATF acted reasonably in making this distinction with respect to grandfathered classification decisions.

Plaintiffs also err in contending that ATF failed to account for any reliance interests of persons or entities already engaged in the production or sales of partially complete frames and receivers. To the contrary, in its regulatory impact analysis, the agency directly accounted for the costs that such persons or entities might incur under the Rule. *See* Regulatory Impact Analysis at 27-78, App. 107-158. The agency reasonably concluded, however, that the benefits far outweighed the costs of maintaining a policy regarding partially complete frames and receivers that allowed for easy circumvention of the GCA's licensing and serialization requirements, which in turn has promoted illegal weapons trafficking. Moreover, Plaintiffs exaggerate the cost and burden that the Rule imposes: ATF found only 214 companies nationwide that sell firearm parts kits with a partially complete frame or receiver. *Id.* at 59, App. 139. And the costs to such companies are limited to applying for a federal

39

firearms license, conducting background checks, and maintaining certain records.[23]  Further, ATF mitigated any burden where feasible by allowing persons to be licensed as dealer-gunsmiths, which will make professional marking services more available to other licensees and to unlicensed individuals, and will allow other licensed dealers to receive and transfer partially complete frames and receivers into inventory.  87 Fed. Reg. at 24,664, 24,689, 24,702-04.  ATF acted reasonably in making a distinction with respect to the classification decisions it chose to grandfather.

*          *          *

Ultimately, Plaintiffs disagree with the policy judgments made by ATF in promulgating the Rule.  But such disagreement is not a basis for finding the Rule arbitrary and capricious.  Plaintiffs' claims thus do not succeed under the "highly deferential" arbitrary and capricious standard.

## IV.   The Rule Reflects the Best Interpretation of the Relevant Statutory Terms.

The Rule reflects the best interpretation of the statutory term "frame or receiver."  As explained previously, the Rule is consistent with the GCA's text, context, and purpose, both with respect to the regulation of firearm frames and receivers and weapon parts kits.  *See* Defs.' Supp. Br. at 6-15, ECF No. 132.  Moreover, the Rule's interpretation is persuasive.  ATF issued a thorough analysis that sets forth its reasoning.  It explained that, although the GCA and its implementing regulations define a "firearm" to include its "frame or receiver," neither delineates when a frame or receiver is created.  86 Fed. Reg. at 27,729.  Nor do common dictionary definitions of "frame" or "receiver" answer this question.  *See id.* at 27,720 n.4 (quoting dictionary definitions of these terms).  ATF must use its technical expertise to draw the line somewhere, and "courts are generally unwilling to review line-drawing performed by the agency unless a petitioner can demonstrate that lines drawn

---

[23] The cost of a three-year license to be a dealer in firearms other than destructive devices is $200.  18 U.S.C. § 923(a)(3)(B); 27 C.F.R. § 478.42(c)(2).  The cost of renewal is $90 for three years.  *Id.*  Licensed dealers must conduct background checks before transferring firearms to non-licensees, 18 U.S.C. § 922(t), and maintain records of firearms acquisition and disposition, 27 C.F.R. §§ 478.124, 478.125(e).

40

are patently unreasonable, having no relationship to the underlying regulatory problem." *Texas v. Becerra*, 577 F. Supp. 3d 527, 551 (N.D. Tex. 2021) (cleaned up); *accord Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214-15 (D.C. Cir. 2013); *see also Gulf Restoration Network. v. U.S. Dep't of Trans.*, 452 F.3d 362, 370 n.15 (5th Cir. 2006) ("[W]e find the Secretary has wide discretion in determining where to draw the line, that the line must be drawn somewhere, and that he acted within his discretion when he [drew the line as he did.]").

ATF made a reasonable line-drawing determination here. The crucial inquiry is at what point an unregulated piece of metal, plastic, or other material becomes a "frame or receiver" that is a regulated item under federal law. 87 Fed. Reg. at 24,685. To make this determination, ATF's position even before the Rule had been that a piece of metal, plastic, or other material becomes a frame or receiver when it reaches a "critical stage of manufacture:" in other words, when the article is brought to a stage of completeness that will allow it to accept the firearm components it is designed for, using basic tools in a reasonable amount of time. *Id.* (citing ATF Letter to Private Counsel #303304 (Mar. 20, 2015)). At this "critical stage of manufacture," an item becomes sufficiently complete to function as a frame or receiver, or may be readily completed or converted to accept the parts it is intended to house or hold. 86 Fed. Reg. at 27,729. By contrast, unformed blocks of metal, liquid polymers, and other raw materials have not reached this critical stage of manufacture and are not frames or receivers. 87 Fed. Reg. at 24,686. However, once a forging, casting, or additive printing for a frame or receiver that is clearly identifiable as a component part of a weapon—*i.e.*, a partially complete frame or receiver—has reached a stage of manufacture where it can readily be completed or converted into a *functional* frame or receiver, it is a "frame or receiver" under the GCA. *Id.*[24]

---

[24] These items, well known to the firearms industry, have been regulated for importation and exportation as "defense articles" since at least 1939. *Id.* at 24,678 & n.78, 24,697.

This line-drawing determination is consistent with the legislative history of federal firearms laws.  *See* S. Rep. No. 90-1501, at 46 (1968), 1968 WL 99114, at *31 ("Any machinegun frame or receiver *which is readily restorable* would be treated as serviceable.") (emphasis added); S. Rep. No. 89-1866, at 73 (1966) (clarifying that "firearm" includes "starter pistols which may be converted to fire a projectile by boring a hole through an obstruction in the barrel, substitution of a barrel which will permit the firing of a projectile, or otherwise converted to fire a projectile"), App. 294.  It is also consistent with the manner in which Congress has treated similar issues in analogous statutes, *see supra* page 30, and is informed by ATF's expertise in firearms.  *See Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 22 (D.D.C. 2014) ("The Firearms Technology Branch of ATF has expertise in classifying firearms and firearm silencers—much more so than the Court."); *Sig Sauer, Inc. v. Jones*, 133 F. Supp. 3d 364, 371 (D.N.H. 2015) (explaining that examination of firearms parts and comparison with other items on the market "require[s] expertise that is well within ATF's grasp . . . [and] entitled to substantial deference").  And the same is true with respect to ATF's line-drawing determination as to whether a disassembled "firearm" in the form of a weapon parts kit "is designed to or may readily be converted to expel a projectile by the action of an explosive[.]"  18 U.S.C. § 921(a)(3)(A).

The logic of ATF's determination is also underscored by its consistency with the principal purpose underlying the GCA, namely, "to curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them.'"  *Abramski v. United States*, 573 U.S. 169, 181 (2014) (quoting *Huddleston v. United States*, 415 U.S. 814, 824 (1974)).  Clarifying that partially complete frames or receivers can be "firearms" within the meaning of federal law is necessary in light of the widespread availability of unlicensed and unregulated partially complete frames or receivers that are often sold as part of easy-to-complete kits.  *See* 27 C.F.R. §§ 478.92(c), 479.102(c); 87 Fed. Reg. at 24,686.  Otherwise, prohibited persons could easily circumvent the requirements of federal law—including background checks and firearms serialization—simply by buying almost-complete frames or receivers.

*Id.* Indeed, many prohibited persons have easily obtained such items and assembled their own firearms at home. *Id.* at 24,655-56. Adopting Plaintiffs' contrary interpretation of the statute would mean that prohibited persons could easily make or acquire virtually untraceable firearms directly from unlicensed parts manufacturers, which would unreasonably thwart Congress's evident purpose in enacting the GCA. *Id.* at 24,686; *see New York v. Burger*, 482 U.S. 691, 713 (1987) ("[T]he regulatory goals of the [GCA] . . . ensure[] that weapons [are] distributed through regular channels and in a traceable manner and [make] possible the prevention of sales to undesirable customers and the detection of the origin of particular firearms.") (citation omitted). It would also mean that prohibited persons could purchase weapon parts kits that constitute "firearms" in a disassembled form, and that are designed to or may readily be converted to expel a projectile by the action of an explosive. But Congress defined "firearm" broadly to avoid such circumvention. *See* 111 Cong. Rec. 5527 (1965), App. 323 (explaining that "extend[ing]" the definition of firearm "to include any weapon by whatsoever name known which will, or which may be readily converted to, expel a projectile or projectiles by the action of an explosive" "represents a much needed clarification and strengthening of existing law *designed to prevent circumvention* of the purposes of the" GCA) (emphasis added).

Finally, the agency's decision reflects a consistently applied policy. As explained above, *see supra* Section IV, even before the Rule, ATF has maintained that a piece of metal, plastic, or other material becomes a frame or receiver when it reaches a "critical stage of manufacture." The Rule preserves this policy, while applying it to an updated definition of "frame or receiver" that takes stock of decades of technological advances in firearms manufacturing. And to maintain consistency, ATF has grandfathered existing complete frame or receiver designs previously determined by the agency to be the firearm "frame or receiver" of a given weapon. *See infra* III.C. Moreover, ATF set out its reasoning for deciding not to grandfather partially complete, disassembled, or nonfunctional frames or receivers (including weapon or frame or receiver parts kits) that it had previously classified as not

being "frames or receivers." *See id.* Previously, incomplete frames or receivers had been sent to ATF

for classification without the other parts, jigs, templates, or materials that are sold or distributed with

the item or kit. *See id.* The agency acknowledged this decision, and explained its reasoning, which is

all that APA review requires. *See infra* III.C. Furthermore, complete weapon parts kits have long been

understood to fall within the statutory definition of "firearm," because such kits—standing alone—

"are designed to or may readily be converted to expel a projectile by the action of an explosive[.]" 18

U.S.C. § 921(a)(3)(A); *see* 87 Fed. Reg. at 24,692; 86 Fed. Reg. at 27,726 & nn.39-40 (citing case law).

Thus, with respect to weapon parts kits, the Rule merely codifies ATF's existing legal interpretation

that complete weapon parts kits are "firearms" within the meaning of the GCA.

In short, ATF's determination reflects the best interpretation of the GCA. Plaintiffs

nevertheless contend that, based on several considerations, deference under *Chevron, U.S.A., Inc. v.*

*Natural Resources Defense Council*, 467 U.S. 837 (1984), does not apply here. BlackHawk MSJ at 31-32;

Pls.' Mot. for Leave to Provide Supp. Authority at 1-4, ECF No. 171. However, there is no need to

decide whether the Rule is entitled to *Chevron* deference because it reflects the best interpretation of

the GCA.[25] The Supreme Court has explained that it is unnecessary to consider deference when an

agency rule adopts "not only a reasonable [position], but the position that [the Court] would adopt

even if there were no formal rule and [the Court] were interpreting the statute from scratch." *Edelman*

*v. Lynchburg Coll.*, 535 U.S. 106, 114 (2002); *see also Becerra v. Empire Health Found.*, 142 S. Ct. 2354, 2362

(2022) (agency's "regulation correctly construes the statutory language at issue" because, *inter alia*,

"[t]he provisions are technical[]" and "[t]he text and context support the agency's reading").

---

[25] In any event, Plaintiffs' contentions have no merit. As explained above, Plaintiffs have failed to
demonstrate that the Rule is contrary to law, arbitrary and capricious, or that any changes in agency
policy have not been adequately explained. Nor, contrary to BlackHawk's contention, does the Rule
"fail[] to acknowledge and/or adequately explain multiple internal contradictions numerous [sic]."
BlackHawk MSJ at 32. Moreover, *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023), is irrelevant here
because that case involved issues related to *Chevron* deference and, as explained in the text, there is no
need here for the Court to determine whether the Rule is entitled to such deference.

Alternatively, if a rule does not reflect this position, the Court should "consider the agency's interpretation to the extent it is persuasive." *United States v. Garcia*, 707 F. App'x 231, 234 n.5 (5th Cir. 2017) (citing *Baylor Cnty. Hosp. Dist. v. Price*, 850 F.3d 257, 261 (5th Cir. 2017)).  Relevant factors under this alternative standard include "how persuasively [ATF] interpreted the statute," which in turn "depends on the thoroughness evident in the agency's consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade[.]" *Baylor Cnty. Hosp. Dist.*, 850 F.3d at 261-62 (citation and internal punctuation omitted). As explained above, the Rule reflects the best interpretation of the statutory language, and has the power to persuade because it is well-reasoned, substantiated, and logical.  There is thus no need to determine whether *Chevron* deference applies here.

## V.      The Rule Is Consistent With the Second Amendment.

BlackHawk also contends that the Rule infringes the exercise of Second Amendment rights. *See* BlackHawk MSJ at 34-37.  It does not.  To the extent that BlackHawk suggests that the Rule's explanation why it does not offend the Second Amendment is inadequate, rendering the Rule arbitrary and capricious, its arguments fail for the reasons set forth above.  *See supra* Section III.C.  BlackHawk is equally mistaken to the extent that it suggests the Rule violates the Second Amendment on its face. The Supreme Court has confirmed that nothing in its decisions interpreting the Second Amendment "cast[s] doubt" on "laws imposing conditions and qualifications on the commercial sale of arms." *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008); *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (same); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion) (same).  As ATF explained, the statutory licensing, recordkeeping, and background check requirements implicated by the Rule are such commercial restrictions; they "do not prohibit individuals from assembling or otherwise making their own firearms."  87 Fed. Reg. at 24,676.  Nor do those requirements "burden the ability of non-prohibited people to buy, sell, or possess firearms."

*Id.* Thus, as the Rule properly explains, nothing in the Rule or the underlying statute "prevents law-abiding citizens" from exercising the Second Amendment "right to bear arms in public for self-defense." *Bruen*, 142 S. Ct. at 2156. The Rule therefore does not infringe the protected right, and there is no need for further analysis. *See id.* at 2126 (holding that the threshold inquiry is whether "the Second Amendment's plain text covers an individual's conduct").

As the text of the Second Amendment makes plain, only a restriction that "infringe[s]" the right implicates the Amendment. U.S. Const. amend. II; *see also Bruen*, 142 S. Ct. at 2126. As the Supreme Court has repeatedly made clear, the "right" protected in the Second Amendment's text is the right of law-abiding, responsible citizens "to keep and bear arms for self-defense." *Bruen*, 142 S. Ct. at 2125. Because, like many other commercial regulations, the Rule does not prevent any qualified individual from making, buying, or possessing firearms, it does not infringe that right and it need not be justified by historical analogy. And the Rule's requirements related to privately made firearms are, like the other requirements, commercial restrictions: they attach only to federal firearms licensees (who are necessarily engaged in commerce), not to private persons, and they attach only when the licensee takes the firearm into its inventory.

## VI.   The Rule Is Consistent With the First Amendment.

Plaintiffs and BlackHawk both assert that the Rule impermissibly burdens protected commercial speech in violation of the First Amendment. *See* MSJ at 35-40; BlackHawk MSJ at 37-38. However, nothing in the Rule either prohibits or compels any speech whatsoever. Furthermore, nothing in the Rule regulates the content of any instructions or marketing materials that sellers of components choose to sell or include with any products, or imposes any punishment or prejudice based upon any speech, and therefore there is no burden on protected speech. Rather, the Rule simply provides that ATF will consider, as one of multiple factors, instructions, guides, or marketing materials

distributed, possessed, or made available with components as part of the determination of whether the component is readily convertible to a functional frame or receiver.

> The Rule provides that:
>
> When issuing a classification, the Director *may consider* any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient or item or kit.

87 Fed. Reg. at 24,739 (emphasis added).

First and foremost, Plaintiffs' and BlackHawk's First Amendment claims fail at the threshold because the Rule does not restrict or burden speech at all. To even have standing to bring a First Amendment claim, a plaintiff must establish that it has engaged in or will engage in speech that is "arguably . . . proscribed" by a government regulation. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Here, the Rule does not "proscribe[]" *any* speech. Nothing in the Rule prohibits or restricts sellers from including certain content in their instructions or marketing materials. Nor does the Rule compel sellers to include any specific content in such materials. The Rule does not impose any punishment on any seller based on the content in such materials. At most, the Rule provides that the content of such materials "may [be] consider[ed]," along with a number of other factors, by ATF in deciding how to classify a component. 87 Fed. Reg. at 24,739. Even in the event that ATF classifies a particular product as a "frame or receiver," and therefore a "firearm" under the GCA, a seller may continue to sell, distribute, or otherwise make available the instructions or marketing materials in question, and it can also continue to sell the component or components subject to the classification decision, consistent with the obligations and requirements of the GCA. Therefore, because the Rule does not regulate or burden speech, Plaintiffs and BlackHawk have failed to even establish standing to bring a First Amendment challenge to the Rule.

Furthermore, instructions or marketing materials sold, distributed, or made available with weapon components are unquestionably commercial speech. And although "commercial speech is

protected by the First Amendment, courts give it 'lesser protection . . . than to other constitutionally guaranteed expression.'"  *Am. Acad. of Implant Dentistry v. Parker*, 860 F.3d 300, 306 (5th Cir. 2017) (quoting *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561-62 (1980)). Moreover, nothing in the Rule targets any speech on the basis of the identity of the speaker or the content of the speech.  While Plaintiffs imply that the Rule contains some sort of restriction "based on the speaker," MSJ at 36, they tellingly cannot identify any part of the Rule that does so.  The case they cite in support of this assertion, *Citizens United*, dealt with political speech, rather than commercial speech, and identified as constitutionally invalid government "restrictions . . . allowing speech by some but not others."  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010).  But the Rule makes no distinctions among different types of speakers; rather, it states that ATF "may consider" instructions, guides, or marketing materials sold, distributed, or made available with *any* components as part of the classification determination for potential frames or receivers, regardless of the identity of the seller.  Similarly, nothing in the Rule discriminates on the basis of the content of the speech. The Supreme Court has emphasized its "rejection of the view that *any* examination of speech or expression inherently triggers heightened First Amendment concern."  *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1474 (2022).  Here, nothing in the Rule requires or restricts any specific content of a seller's instructions, manuals, or marketing materials; it only provides that ATF may examine and consider such materials, along with a number of other factors, in determining whether a product should be classified as a "frame or receiver."

Furthermore, even to the extent the Rule might be considered to have some minor incidental impact on speech, the Rule is clear that it is not motivated by, or targeting, any marketing materials or instructions sold or provided by sellers; rather, the Rule's purpose is expressly to update certain regulatory definitions to "capture the full meaning" of terms used in the GCA and to better effectuate the purposes of that statute.  *See* 87 Fed. Reg. at 24,652.  The Supreme Court has held that a generally

applicable government regulation that is not targeted at expressive activity does not implicate the First Amendment. *See, e.g.*, *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986) (rejecting First Amendment challenge to forced closure of a business that engaged in illegal activities and also sold books and other First Amendment protected speech). As the Court has explained, First Amendment scrutiny "has no relevance to a [governmental action] directed at . . . non-expressive activity[,]" and such a scrutiny test is only applicable if "it was conduct with a significant expressive element that drew the legal remedy in the first place[.]" *Id.* at 706-07. Here, the Rule's amended definition of "frame or receiver" does not target any expressive conduct, but is instead a regulation of general application clarifying the definition of frame or receiver.

Even in the event this Court does determine that the Rule restricts or burdens speech in some way, because the speech at issue is commercial speech and any restriction or regulation is content-neutral, the appropriate standard would be intermediate scrutiny, not strict scrutiny. *Reagan Nat'l Advertising*, 972 F.3d 695, 702 (5th Cir. 2020) (citing *Central Hudson*, 447 U.S. at 561). This intermediate scrutiny is satisfied if the regulation "directly advance[s] the state interest involved" and could not be "served as well by a more limited restriction on commercial speech." *Central Hudson*, 447 U.S. at 564. Here, the portions of the Rule challenged in Plaintiffs' and BlackHawk's First Amendment claims unquestionably serve an important governmental interest—assisting law enforcement in the increasingly difficult tasks of preventing and solving crimes committed with firearms. *See* 87 Fed. Reg. at 24,652. And, as set forth earlier in this Section, the Rule does not restrict speech at all, and to the extent there is any burden on speech, it would be very minimal given that any seller or manufacturer can continue to sell or distribute marketing materials, guides, or manuals containing whatever otherwise lawful content the seller or manufacturer wishes to include, with no punishment or penalty as a result of the Rule.

49

Finally, contrary to Plaintiffs' repeated assertions to the contrary, *see, e.g.*, MSJ at 35 ("Without those expressive materials, an NFO is not a 'firearm,' and is thus unregulated by the Agencies"), the Rule does *not* at any point provide that a seller providing instructions, or the content of those instructions, will necessarily be determinative of the classification, which expressly considers multiple factors other than the "instructions, guides, or marketing materials."  In arguing to the contrary, Plaintiffs resort to omitting language from a quotation from one of the "nonexclusive examples" provided by the Rule for illustrative purposes.  Example 5 provides that "[a] flat blank of an AK variant receiver without laser cuts or indexing that is not sold, distributed, or possessed with instructions, *jigs, templates, equipment, or tools* is not a receiver…[.]"  87 Fed. Reg. at 24,739 (emphasis added).  In quoting this language, MSJ at 37, Plaintiffs tellingly omit the portion of the quoted language specifying "jigs, templates, equipment, or tools," apparently to suggest that the inclusion of instructions is an outcome-determinative factor in the illustrative example.  But as the full text of the example and the Rule overall make clear, it is just not so.  *See* 87 Fed. Reg. 24,739; *see also id.* at 24,747 (defining "readily" as considering a number of factors which would not be impacted by instructions, guidance, or manuals, including "equipment," "parts availability," "expense," "scope," and "feasibility").  It is simply not the case that any component or components sold with instructions or marketing materials will be necessarily classified as a "frame or receiver" under the Rule; rather, such materials are one factor in the agency's application of the "readily" standard.

Accordingly, because nothing in the Rule restricts, regulates, or punishes the commercial speech of Plaintiffs, BlackHawk, or any other person or entity, Plaintiffs' and BlackHawk's First Amendment claims should be rejected.

**VII.    The Definitions Contained in the Rule Are Not Otherwise Unconstitutional.**

    **A.    The Rule Is Not Void for Vagueness.**

Plaintiffs' claims that the Rule is unconstitutionally vague also fail as a matter of law.  Under the Fifth Amendment's Due Process Clause, a criminal or quasi-criminal law is unconstitutionally vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *accord Munn v. City of Ocean Springs*, 763 F.3d 437, 439 (5th Cir. 2014).[26]  "[F]acial vagueness challenges, in particular"—which Plaintiffs bring here—"are generally 'disfavored for several reasons,' including but not limited to, the fact that facial invalidity claims often 'rest on speculation.'"  *Magee v. City of S. Padre Island*, 463 F. App'x 377, 380 (5th Cir. 2012) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)).  "Accordingly, '[i]n determining whether a law is facially invalid, [courts] must be careful not to go beyond the statute's facial requirements and speculate about "hypothetical" or "imaginary" cases.'"  *Id.* (quoting *Wash. State Grange*, 552 U.S. at 449-50).  Instead, to establish that a law is unconstitutionally vague on its face, "the complainant must demonstrate that the law is impermissibly vague in all of its applications," *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982), "including its application to the party bringing the vagueness challenge," *United States v. Clark*, 582 F.3d 607, 612-13 (5th Cir. 2009).  Plaintiffs here fail to make that showing.

Plaintiffs contend that the Rule is unconstitutionally vague for four reasons, none of which is persuasive.  First, Plaintiffs cite the purported confusion of certain customers as to the Rule's scope and the decisions of certain banks, credit card customers, and freight providers not to provide service to Plaintiffs after the Rule took effect.  *See.* MSJ at 29 (citing ECF No. 55-1, ¶ 11; ECF No. 16-1,

---

[26] The challenged portions of the Rule are subject to this standard because certain "Federal felony violations . . . can apply to circumstances involving the final rule's requirements."  87 Fed. Reg. at 24,713.

¶¶ 12-13).  But the standard for determining whether a regulation is unconstitutionally vague is objective.  *See, e.g.*, *United States v. Batson*, 706 F.2d 657, 682 (5th Cir. 1983) (assessing a void-for-vagueness claim in light of what "a reasonable person would be able to understand"); *accord Clark*, 582 F.3d at 613 (quoting *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988)).  Thus, subjective confusion alleged by any particular individual or entity is no more probative of vagueness than, for example, a particular "citizen's subjective perception" of whether the citizen was free to leave a police encounter is probative of whether a seizure has occurred.  *United States v. Mask*, 330 F.3d 330, 336 (5th Cir. 2003) (citing *Michigan v. Chesternut*, 486 U.S. 567, 575 n.7 (1988); *Florida v. Bostick*, 501 U.S. 429, 438 (1991)).  Moreover, although Plaintiffs do not explain the basis for their customers' purported confusion, to the extent that the products marketed as "80% Lowers"[27] that are the source of that purported confusion are "billet[s] or blank[s] of . . . AR-15 variant receiver[s] without critical interior areas having been indexed, machined, or formed that [are] not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that [they] may readily be completed," then the Rule explicitly provides that these products are not receivers.  87 Fed. Reg. at 24,739 (codified as amended at 27 C.F.R. § 478.12(c), example 4).  Thus, any such confusion would be objectively unreasonable.  And, as discussed further below, *see infra* pages 59-60, Plaintiff Tactical Machining should not be heard to complain of purported ambiguity in the Rule, as applied to its products, when it has declined to have at least one such product classified by ATF, which would have resolved any potential confusion.

Second, Plaintiffs contend that the Rule is unconstitutionally vague because ATF has not "provide[d] specifics as to what . . . 'templates, [] molds, equipment, tools, instructions, guides, or marketing materials,' or any of the myriad combinations thereof, may accompany the non-firearm item [sic] becomes a 'firearm.'"  MSJ at 30 (second alteration in original); *see also* BlackHawk MSJ at 34

---

[27] Additionally, ATF is not responsible for any confusion as to the meaning of the term "80% Lowers," because ATF has never recognized 80%—or indeed any percentage—as determinative of a frame or receiver's completeness.  *See* 87 Fed. Reg. at 24,663 n.47.

(stating that "there is [sic] no limitations to what the Director 'may consider' in determining whether the combination of items results in the existence of a regulated firearm"). Plaintiffs are silent as to the "specifics" that they contend the Due Process Clause requires, but to the extent that they suggest that the Rule is unconstitutionally vague for failing to classify every possible combination of such materials that might be sold with a partially complete frame or receiver, they are mistaken. The Fifth Circuit has explained that "for [a provision] to pass constitutional muster" under the void-for-vagueness doctrine, it need not "delineate the exact actions a [regulated party] would have to take to avoid liability," *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008), or, conversely, "describe every possible permutation" of conduct that would constitute a violation, *United States v. Abbate*, 970 F.3d 601, 604 (5th Cir. 2020) (quoting *United States v. Paul*, 274 F.3d 155, 167 (5th Cir. 2001)). Indeed, "most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions." *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952). Moreover, it is not "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Id.* This is especially true here, where Plaintiffs operate in a highly regulated industry and the Rule does not proscribe any conduct altogether, but rather imposes reasonable regulations that are not especially costly or onerous. Under these standards, the Rule is sufficiently clear in setting forth the materials that may be considered in determining whether a partially complete frame or receiver is a firearm.

Third, with respect to the standard that governs that determination, Plaintiffs contend that the Rule is unconstitutionally vague in providing that a partially complete, disassembled, or nonfunctional frame or receiver is a firearm within the meaning of the GCA if it "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver," and in setting forth a non-exhaustive set of eight factors relevant to that determination. 87 Fed. Reg. at 24,739 (codified as

amended at 27 C.F.R. § 478.12(c)); 87 Fed. Reg. at 24,747 (codified as amended at 27 C.F.R. § 479.11);

*see* MSJ at 31-33.  As noted, *see supra* pages 30-31 & n.19, the phrase "may readily be . . . converted"

derives from federal statutes.  *See* 18 U.S.C. § 921(a)(3) (GCA); 26 U.S.C. § 5845 (employing similar

language in various definitions in the NFA).  The vast majority of courts to consider the question have

rejected the argument that provisions of the GCA and the NFA addressing products that may be

"readily converted" or "readily restored" to function in a particular manner (or materially identical

language in state laws) are unconstitutionally vague.[28]   Courts likewise have rejected vagueness

challenges to the term "readily" in the context of criminal statutes other than the GCA and NFA.  *See,*

*e.g.*, *Phelps v. Budge*, 188 F. App'x 616, 619 (9th Cir. 2006) (rejecting a vagueness challenge to the term

"readily capable of causing substantial bodily harm or death," as used in a criminal statute); *United*

*States v. Felsen*, 648 F.2d 681, 686-87 (10th Cir. 1981) (same, as to "readily attachable equipment items");

---

[28] *See, e.g., N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 266 (2d Cir. 2015) (rejecting a void-for-vagueness challenge to the term "can be readily restored or converted" in New York and Connecticut statutes); *United States v. Kelly*, 276 F. App'x 261, 267 (4th Cir. 2007) (same, as to 26 U.S.C. § 5845(b), which includes the term "can be readily restored"); *United States v. Kent*, 175 F.3d 870, 874 (11th Cir. 1999) (same, as to 26 U.S.C. § 5861(d), as applied to an individual who possessed a short-barrel rifle that was disassembled at the time of his arrest but could be "readily restored to fire," *id.* § 5845(c)-(d)); *United States v. Drasen*, 845 F.2d 731, 737-38 (7th Cir. 1988) (same, as to the GCA's "statutory framework . . . as applied to parts kits"; *United States v. 16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns*, 443 F.2d 463, 464 (2d Cir. 1971) (same, as to the term "may readily be converted" in the GCA); *United States v. Quiroz*, 449 F.2d 583, 585 (9th Cir. 1971) (same); *United States v. Wick*, No. CR 15-30-M-DLC, 2016 WL 10612608, at *3-4 (D. Mont. Mar. 11, 2016) (same, as to the term "can be readily restored" in the NFA); *United States v. M-K Specialties Model M-14 Machinegun*, 424 F. Supp. 2d 862, 872 (N.D. W. Va. 2006) (same), *United States v. Catanzaro*, 368 F. Supp. 450, 454 (D. Conn. 1973) (same, as to the term "may be readily restored" in the NFA); *United States v. Whalen*, 337 F. Supp. 1012, 1018-19 (S.D.N.Y. 1972) (same, as to the NFA as a whole); *cf. United States v. Wojcikiewicz*, 403 F. App'x 483, 486 (11th Cir. 2010) (holding that plaintiff could not "establish that the district court plainly erred in failing to determine that the term 'readily restored' was unconstitutionally vague as applied" to his case); *Roberts v. United States*, No. 2:04-cr-295-PMD, 2007 WL 9754483, at *7 (D.S.C. Oct. 30, 2007) (on an ineffective assistance of counsel claim, holding that the plaintiff had "made no showing whatsoever that 26 U.S.C. § 5845"—which includes the term "may be readily restored"—"is unconstitutionally vague").  *But see Peoples Rts. Org., Inc. v. City of Columbus*, 152 F.3d 522, 538 (6th Cir. 1998) (holding that term "may be readily assembled," as used in a local firearms ordinance, did "not provide sufficient information to enable a person of average intelligence to determine whether a particular combination of parts [was] within the ordinance's coverage").

*Anderson v. Williams*, No. 2:10-CV-01916-KJD, 2011 WL 2580665, at *4 (D. Nev. June 27, 2011) (same, as to "readily identifiable vehicle").

Moreover, although the Fifth Circuit has not considered this precise question, it has rejected a void-for-vagueness challenge to the closely related statutory term "any combination of parts designed and intended for use in converting a weapon into a machine gun." *United States v. Campbell*, 427 F.2d 892, 893 (5th Cir. 1970) (per curiam). In determining whether a combination of parts was designed and intended for use in converting a weapon into a machine gun, a court would likely need to consider similar factors as the Rule prescribes for determining whether a non-functioning frame or receiver may be readily converted to function, such as the "time," "ease," "expertise," "equipment," "parts availability," "expense," "scope," and "feasibility" of the conversion. 87 Fed. Reg. at 24,735 (capitalization altered); *cf. Vill of Hoffman Ests.*, 455 U.S. at 500-01 (holding that the statutory term "designed . . . for use" calls for an inquiry into the product's "objective features").

Perhaps in recognition of these precedents, Plaintiffs appear to concede that the term "readily converted" is not unconstitutionally vague on its face, but suggest that the Rule's identification of eight non-exhaustive factors relevant to the application of that standard somehow creates a vagueness problem. *See* MSJ at 33 ("Under the GCA, a firearm that shoots blank ammunition that can be easily modified to shoot bullets constitutes a 'readily converted' weapon—no eight-factor text [sic] necessary."). But the opposite is true. As common sense dictates and courts have confirmed, specifying factors relevant to application of a statutory or regulatory standard mitigates, rather than exacerbates, any vagueness concerns. *See, e.g., Prime Healthcare Servs., Inc. v. Harris*, 216 F. Supp. 3d 1096, 1125 (S.D. Cal. 2016) (holding that a statute did not confer "boundless discretion" because it specified nine non-exhaustive factors to guide the ultimate "public interest" inquiry); *Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield*, 853 F. Supp. 2d 214, 235 (D. Conn. 2012) (holding that an ordinance was not void for vagueness in part because it set forth factors to consider in conducting the

ultimate "appropriateness" inquiry, which, although "subjective in nature," were "sufficiently tied to objective . . . standards . . . to provide the required guidance . . . in enforcing the law"), *aff'd in relevant part, vacated in part, remanded sub nom. Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183 (2d Cir. 2014).

*Timpinaro v. SEC*, 2 F.3d 453 (D.C. Cir. 1993), *as amended on denial of reh'g* (Nov. 9, 1993), on which Plaintiffs rely, *see* MSJ at 32, is not to the contrary. In *Timpinaro*, the D.C. Circuit remanded without vacatur a Securities and Exchange Commission (SEC) rule that, in relevant part, barred "professional traders" from a particular trading network, concluding that the agency had not adequately supported the cost-benefit analysis underlying the rule. 2 F.3d at 455, 457-59. In considering the petitioners' void-for-vagueness challenge to the seven-factor standard governing identification of a "professional trading pattern" for purposes of the rule, the court noted that the agency had not addressed the petitioners' vagueness concerns either in the order adopting the rule, or in its brief before the D.C. Circuit. *See id.* at 460. The court also raised the question whether "the agency could provide traders with greater guidance" as to the application of the seven factors, such as "by specifying some numerical thresholds, below which a trader would find a harbor safe from regulatory squalls or above which he should surely expect to encounter rough sailing," while acknowledging the possibility that the agency had already "used the most precise terms possible, consistent with its regulatory goals." *Id.* The court therefore directed the agency to address vagueness on remand. *Id.*[29]

---

[29] Following the D.C. Circuit's remand, the agency elected to withdraw the relevant rule, "in significant measure because [it] did not prove effective" as a policy matter. Self-Regulatory Organizations; National Association of Securities Dealers, Inc.; Order Partially Approving Proposed Rule Change Relating to the Small Order Execution System on Pilot Basis, Exchange Act Release No. 33,377, 55 SEC Docket 2005 (Dec. 23, 1993). Thus, it does not appear that any court ever reached the question whether the seven-factor standard at issue in *Timpinaro* was unconstitutionally vague.

The Rule at issue here is distinguishable from the SEC rule addressed in *Timpinaro* in every relevant respect.  Whereas the SEC had ignored the petitioner's vagueness concerns both in rulemaking and in litigation, ATF thoroughly engaged with commenters' concerns in the preamble to the Rule and explained why the Rule is not unconstitutionally vague.  *See* 87 Fed. Reg. at 24,677-79. Among other things, ATF referred commenters to the Rule's "illustrative examples of ATF's prior classifications that are grandfathered, and examples of when a partially complete, disassembled, or nonfunctional frame or receiver is considered readily completed, assembled, restored, or otherwise converted to a functional state."  *Id.* at 24,679; *see, e.g.*, 87 Fed. Reg. at 24,739 (codified as amended at 27 C.F.R. § 478.12(c), examples 1-5).  Although ATF was not required to and did not purport to "spell out every possible factual scenario with celestial precision," *id.* at 24,679 (internal quotation marks and citation omitted), the examples that it provided offer just the sort of guidance as to conduct that is clearly permitted, on one hand, and clearly proscribed, on the other, that the D.C. Circuit noted was absent from the SEC rule in *Timpinaro*.  ATF also discussed the nearly half-century of precedent "repeatedly—and consistently—defin[ing]" the term "readily" in the context of firearms regulation and rejecting vagueness challenges to that term.  *See id.* at 24,678-79.  In sum, the D.C. Circuit's concern in *Timpinaro* that the mode of applying of the relevant factors was "a mystery so far as the current record [was] concerned," 2 F.3d at 460, is irrelevant here, because ATF both offered illustrative examples of the application of the term "readily" within the meaning of the Rule and discussed case law dating back to 1973 interpreting that term in analogous contexts and holding that it is not unconstitutionally vague.

At bottom, Plaintiffs complain that the regulatory definition of "readily" is "amorphous," MSJ at 31, but, as noted, the Due Process Clause does not require "perfect clarity and precise guidance," *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989); *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1214 (2018) (reaffirming that "[m]any perfectly constitutional statutes use imprecise terms").  Rather,

"[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).  Accordingly, the Supreme Court and the Fifth Circuit have rejected vagueness challenges to criminal laws imposing standards as open-ended as: "near" a courthouse, *Cox v. Louisiana*, 379 U.S. 559, 568 (1965); "immoral purposes," *Clark*, 582 F.3d at 612; "unreasonably low prices," *United States v. Nat'l Dairy Prod. Corp.*, 372 U.S. 29, 31-33 (1963); and "unreasonable noise," including noise "which, under the circumstances of time, place, and manner in which it is produced . . . annoys . . . a reasonable person of normal sensitivities," *Munn*, 763 F.3d at 438-39 (emphasis omitted).  The Rule's "readily" standard is at least as precise with respect to the conduct that it proscribes as the standards upheld in *Cox*, *Clark*, *National Dairy Products Corp.*, and *Munn*.

Fourth, Plaintiffs argue that the Rule's definition of a "complete weapon" is unconstitutionally vague, citing the possibility that "a disassembled AR-pattern rifle and AR-pattern pistol could theoretically create a new combination—an AR rifle lower and a pistol upper (with a barrel of less than 16 inches), that, when combined, create a short-barrel rifle," possession of which would require a federal tax stamp under the NFA.  *See* MSJ at 33-35.  But they offer no evidence that any Plaintiff possesses both a disassembled AR-pattern rifle and AR-pattern pistol.  It is well established that "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (quoting *United States v. Raines*, 362 U.S. 17, 23 (1960)); *see also Dimaya*, 138 S. Ct. at 1250 (Thomas, J., dissenting) (explaining that *Johnson v. United States*, 576 U.S. 591 (2015), could not have abrogated the requirement that, "outside the First Amendment context, a challenger must prove that the statute is vague as applied to him," given that the Court held in *Johnson* that the relevant provision was vague as applied to the challenger).  Thus, Plaintiffs' suggestion that

the Rule may be vague as applied to a hypothetical "individual," MSJ at 35, does not support their vagueness claims.

Moreover, it is clear on the face of the Rule there is no basis for Plaintiffs' hypothetical concern. Indeed, ATF responded to the very concern that Plaintiffs raise here, and explained that the term "complete weapon," as used in the Rule, addresses when frames or receivers "that are in the process of being manufactured as part of complete weapons" must be marked. 87 Fed. Reg. at 24,700-01. Specifically, the marking requirement takes effect only after "the entire manufacturing process has ended" for both NFA and non-NFA firearms. *Id.* at 24,742 (codified as amended at 27 C.F.R. § 478.92(a)(1)(vi)). Thus, provided that an individual does not actually make a disassembled AR-pattern rifle and AR-pattern pistol into a short-barrel rifle, requiring marking and NFA registration, the Rule imposes no new requirements on the owner of such a rifle and pistol.

For the reasons described above, the Rule is sufficiently clear on its face to satisfy the Constitution's due process requirements. Moreover, Plaintiffs' contentions that the Rule is unconstitutionally vague lack merit for an additional reason: the Rule provides for an administrative process through which regulated entities may obtain classifications as to whether their particular products fall within the Rule's scope.[30] The Supreme Court and Fifth Circuit have held that "licensing . . . requirements," such as the Rule, "are afforded considerable deference in the vagueness analysis," in part "because the regulated party may 'have the ability to clarify the meaning of the regulation[s] . . . by resort to an administrative process.'" *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122 (5th Cir. 1991) (quoting *Vill. of Hoffman Ests.*, 455 U.S. at 498). The Rule provides precisely such an opportunity, by inviting requests for voluntary classifications as to whether a

---

[30] Contrary to BlackHawk's contention, ATF did not "admit[] to [the Rule's] vagueness" but suggest that the classification process would cure any vagueness. BlackHawk MSJ at 33. Rather, ATF thoroughly explained why the Rule is not unconstitutionally vague on its face, even apart from the classification process. *See* 87 Fed. Reg. at 24,677-79.

particular item, such as a partially complete frame or receiver, is a "firearm" within the meaning of the GCA and its regulations. *See* 87 Fed. Reg. at 24,743. Indeed, ATF has already issued more than 40 individual classifications and provided two Open Letters to the public to explain the application of the Rule's definitions of "frame" and "receiver" to various products. *See Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers* (Sept. 27, 2022), www.atf.gov/firearms/docs/open-letter/all-ffls-september-2022-impact-final-rule-2021-05f-partially-complete-ar/download; *Impact of Final Rule 2021-05F on Partially Complete Polymer80, Lone Wolf, and Similar Semiautomatic Pistol Frames* (Dec. 27, 2022), https://www.atf.gov/rules-and-regulations/docs/open-letter/all-ffls-dec2022-open-letter-impact-final-rule-2021-05f/download. Moreover, Plaintiff Tactical Machining, in particular, took the position in this Court that ATF should not be permitted to complete its classification of the product that Tactical Machining had submitted. *See* ECF No. 75. Tactical Machining should not be heard to complain of customer confusion resulting from purported vagueness when it has declined the opportunity to resolve any uncertainty regarding the status of its products. For all of these reasons, Plaintiffs' void-for-vagueness claims fail as a matter of law.

### B. The Rule Is Consistent With All Other Constitutional Provisions Raised by Plaintiffs and BlackHawk.

Both the original Plaintiffs and BlackHawk also assert a variety of other constitutional claims, all of which lack merit and should be rejected.

Plaintiffs and BlackHawk both assert that the Rule constitutes overreach by the Executive Branch in violation of the separation of powers. MSJ at 40-44; BlackHawk MSJ at 40. BlackHawk also makes a cursory argument that the Rule violates the non-delegation doctrine. BlackHawk MSJ at 40-41. Plaintiffs further argue that the Rule violates Article II's "Take Care Clause," MSJ at 43-47, which states that the duty of the President is to "take Care that the Laws be faithfully executed[,]" U.S. Const. art. II, § 3. However, all of these arguments are simply attempts to dress up statutory claims

under the guise of constitutional claims, as the gravamen of all of these arguments is the assertion that ATF acted in excess of the authority delated to it by Congress.[31]

Plaintiffs argue that the Rule somehow constitutes "legislat[ing]," MSJ at 40, because it "rewrite[s] clear statutory terms," MSJ at 41 (quoting *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014)), and therefore impermissibly impedes upon the authority of the Legislative Branch. However, the Rule implements, rather than usurps, the GCA and NFA. The definitions contained in the Rule challenged by Plaintiffs and BlackHawk were all promulgated pursuant to ATF's statutory authority under the GCA and NFA. Furthermore, Plaintiffs' attempt to characterize the Rule's definition of "frame and receiver" as a sudden change in which ATF for the first time asserts authority to determine at what point in time a component becomes a "frame or receiver" is simply inaccurate. Even under the previous definition, ATF's position was that a component need not be a complete or functional frame or receiver to constitute a "frame or receiver" within the meaning of that term in the GCA; ATF would determine that a component identifiable as a component of a weapon became a "frame or receiver" once it reached a "critical stage of manufacture" at which it was "brought to a stage of completeness that will allow it to accept the firearm components for which it is designed for [sic], using basic tools in a reasonable amount of time." 87 Fed. Reg. at 24,685.

BlackHawk's non-delegation doctrine claim fares no better. The Supreme Court recently reaffirmed—as it has, "time and again"—"that a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle'" to direct the exercise of its delegated authority. *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion) (citation omitted). Indeed, "[o]nly twice in this country's history[,]" both times in 1935, has the Court "found a delegation excessive," and then only "because 'Congress had failed to articulate *any* policy or standard' to confine

---

[31] The issue of whether ATF acted in excess of the authority delegated to it by Congress has been briefed at length elsewhere in this litigation. *See, e.g.*, ECF No. 16 at 13-21, ECF No. 41 at 7-17, ECF No. 55 at 1-8.

discretion." *Id.* at 2129 (citation omitted); *see A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935). Meanwhile, the Court has rejected challenges to delegations as broad as the authority to set "fair and equitable" prices, *Yakus v. United States,* 321 U.S. 414, 427 (1944); to determine "just and reasonable" rates, *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 600 (1944); to regulate broadcast licensing as "public interest, convenience, or necessity" require, *National Broadcasting Co. v. United States,* 319 U.S. 190, 225-26 (1943); to allow railroad acquisitions in the "public interest," *New York Central Securities Corp. v. United States*, 287 U.S. 12, 24 (1932); and to issue any air quality standards "requisite to protect the public health[,]" *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (citation omitted). Here, Congress expressly delegated to the Department of Justice and ATF the authority to prescribe "rules and regulations as are necessary to carry out the provisions of" the GCA (which also amended the NFA). 18 U.S.C. § 926; *see* 26 U.S.C. § 7801(a)(2); 28 U.S.C. § 599A(b)(1), (c)(1); 28 C.F.R. § 0.130(a)(1)-(2). This delegation includes the authority to promulgate regulations and rules implementing and interpreting the GCA, 18 U.S.C. § 926(a), to specify the information and period by which firearms are required to be marked pursuant to the GCA and NFA, 18 U.S.C. § 923(i), 26 U.S.C. § 5842(a)-(b) (to include the frames or receivers of automatic weapons), and to specify the precise period and form in which Federal firearm licensee records required by the GCA are maintained, 18 U.S.C. § 923(g)(1)-(2). These delegations are more specific than many upheld by the Supreme Court.

Plaintiffs' Take Care Clause claim largely mirrors its separation of powers claim. The Take Care Clause states that the duty of the President is to "take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 3. As an initial matter, the Take Care Clause does not provide any basis for the relief Plaintiffs seek here. Relying on the Take Care Clause to invalidate agency action would express a "lack of the respect due" to the political branches, *Baker v. Carr*, 369 U.S. 186, 217 (1962), by assuming judicial superintendence over the exercise of Executive power that the Take Care Clause

commits to the President and the delicate relationship between the Executive and Legislative coordinate branches. *Cf. Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867).

Furthermore, Plaintiffs' claim fails because the Rule was expressly promulgated pursuant to federal statutes. The primary case upon which Plaintiffs rely for this argument, *Youngstown Sheet & Tube Co. v. Sawyer,* mentions the Take Care Clause exactly once. 343 U.S. 579, 587 (1952). In that case, the Government could not, and did not, cite any statutory authority for the seizures at issue. *See id.* at 585 ("Nor is there any act of Congress to which our attention has been directed from which such a power can fairly be implied. Indeed, we do not understand the Government to rely on statutory authorization for this seizure."). Here, by contrast, the Rule makes clear that ATF is not claiming any inherent power to issue this Rule. Rather, the GCA and NFA confer on the agency the authority to amend the regulatory definitions of statutory terms. *See, e.g.*, 87 Fed. Reg. at 24,654 ("The Attorney General is responsible for enforcing the Gun Control Act of 1968, as amended, and the National Firearms Act of 1934, as amended. This responsibility includes the authority to promulgate regulations necessary to enforce the provisions of the GCA and NFA.") (citing 18 U.S.C. § 926(a), 26 U.S.C. §§ 7801(a)(2)(A), 7805(a)).

Plaintiffs also cite various efforts made by members of Congress to enact legislation dealing with "so-called 'ghost guns,'" to argue that the Rule is an impermissible end-around the legislative branch because Congress has conclusively spoken on this issue. MSJ at 46. First and foremost, subsequent Congressional inaction is categorically irrelevant to the scope of the GCA, which was enacted in 1968. *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation" because it "by definition 'could have had no effect on the congressional vote.'") (Scalia, J.) (quoting *Heller*, 554 U.S. at 605). However, even if Congress's contemporary views were relevant to a statute enacted in 1968,

63

Plaintiffs make no attempt to describe the contents of any of these proposed bills, or to identify how the proposed bills are identical to, or at least very similar to, any provisions of the Rule.

For example, the bill cited by Plaintiffs that appears to have advanced furthest in the process, the "Protecting Our Kids Act," which passed the House but was not passed by the Senate, bears little resemblance to the Rule. *See Protecting Our Kids Act*, H.R. Rep. 117-346(I), 117th Cong., 2022 WL 2035934 (June 6, 2022). That bill proposed to, *inter alia*, create a new federal criminal offense, regulate the storage of firearms in the home, regulate bump stocks, and prohibit the sale of certain large ammunition devices. *See id.* §§ 201-03, 401-03, 501, 602-03. It also contained a provision that would have prohibited the manufacture, sale, or possession of any firearm without a serial number, which the Rule explicitly does not do. *See* 87 Fed. Reg. at 24,676 ("Neither the GCA nor this rule prohibits law-abiding citizens from completing, assembling, or transferring firearms without a license as long as those persons are not engaged in the business of…"). In other words, it would have gone well beyond the steps taken by ATF in the Rule. Therefore, there is no basis to conclude that Congress's failure to enact that particular piece of legislation reflects any specific judgment on the steps taken by ATF in the Rule, or whether the Executive Branch should take any steps at all to regulate such weapons and components. *See Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change."); *see also Girouard v. United States*, 328 U.S. 61, 69 (1946) ("It is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law."); *Helvering v. Hallock*, 309 U.S. 106, 121 (1940) ("[W]e walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle.").

This Court should also reject BlackHawk's single-sentence assertion that the Rule violates the Commerce Clause. BlackHawk MSJ at 41. As an initial matter, such a vague, conclusory allegation

falls well short of Rule 8's requirement that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" *See Bacon v. NCO Fin. Sys., Inc.*, No. 3:12-CV-646-D(BK), 2012 WL 1899978 at \*1-2 (N.D. Tex. Apr. 23, 2012) (dismissing a claim that merely asserted a legal violation as "woefully insufficient" because it was "wholly devoid of any factual allegations"); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (noting that Rule 8(a)(2) requires that the factual allegations in a complaint "possess enough heft" to show entitlement to relief).

Regardless, however, the Rule's definition of privately made firearm (PMF) does not exceed the limits placed on the federal government by the Commerce Clause. Courts have consistently recognized that Congress has authority to regulate firearms even if the firearms are manufactured and used within a single state. *See, e.g., United States v. Kirk*, 105 F.3d 997, 1004 (5th Cir. 1997) (per curiam) (holding federal regulation of machine guns does not violate Commerce Clause because "it is hardly irrational to conclude that meaningful regulation of their use in lines of interstate commerce requires regulation of this intrastate possession."); *see also Hollis v. Lynch*, 121 F. Supp. 3d 617, 639-40 (N.D. Tex. 2015) (noting the "well-established precedent" that Congressional regulation of firearms does not violate the Commerce Clause because "even a purely local activity can be regulated if it is part of a greater 'economic class of activities' having a substantial effect on interstate commerce") (citing *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005)). Similarly, here, even if the component parts of a PMF originate from within the single state in which the PMF is assembled and operated, the PMF has an aggregate effect on the well-established interstate market of firearms and firearm components, such that federal regulation of PMFs is constitutionally valid under the Commerce Clause.

BlackHawk also claims that the Rule's definition of "privately made firearm" "effectuate[s] the appropriation of personal property by the government without just compensation and therefore constitute[s] a regulatory taking in violation of the Fifth Amendment." BlackHawk MSJ at 39. However, as the Supreme Court has repeatedly emphasized, "[o]ur standing decisions make clear that

'standing is not dispensed in gross.'  To the contrary, 'a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.'"  *Town of Chester v. Laroe Est., Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)).  Here, BlackHawk has made no allegation that it is either the owner of a PMF, or is an FFL that would take any PMF into its inventory.  *See* BlackHawk Compl., ECF No. 99, ¶ 2.  Therefore, BlackHawk would not be subject to any regulation pursuant to the Rule's definition of "privately made firearm," and it lacks standing to bring this claim.

In any event, PMFs are unquestionably personal property, not real property.  And while the Supreme Court has recognized that the Takings Clause can apply to "physical appropriation" of personal property just as it does to physical appropriation of real property, *Horne v. Department of Agriculture*, 576 U.S. 350, 359 (2015), it has also held that there is a "different treatment of real and personal property in a regulatory case[,]" *id.* at 361.  In the case of a regulation potentially altering the acceptable use or value of personal property,[32] the Supreme Court has held that there is an "implied limitation" on the applicability of the Takings Clause because an owner of such personal property "ought to be aware of the possibility that that new regulation might even render his property economically worthless[.]"  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027-28 (1992).  Therefore, even if BlackHawk had alleged a sufficient Article III injury to give it standing to bring this regulatory taking claim, and even if the Rule's definition of "privately made firearm" somehow impacted the use or value of PMFs, personal property cannot be the subject of a valid regulatory takings claim.

Moreover, and in any event, the Rule's definition of "privately made firearm" does *not* prohibit an individual from manufacturing a firearm for personal use and imposes *no* regulations upon owners

---

[32] While the Rule contemplates that in some circumstances an FFL may forfeit a PMF to the Government, the Rule also makes clear that such a forfeiture will only occur as a result of the FFL's choice.  87 Fed. Reg. at 24,680.  This cannot reasonably be said to be the kind of forceful mandatory seizure or appropriation that courts have recognized as a physical taking of property.

of PMFs, who may continue to possess and use their PMFs just as they could prior to the Rule. Instead, the Rule's definition requires FFLs to "legibly and conspicuously identify each" PMF that the FFL is taking into inventory within seven days of receipt or acquisition. 87 Fed. Reg. at 24,742. Courts considering takings claims generally consider the three factors articulated by the Supreme Court in *Penn Central*: (1) the economic impact of the regulation on the plaintiff; (2) the interference of the regulation on the plaintiff's investment-backed expectations; and (3) the character of the governmental action. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). Here, any economic impact or interference with investment-backed expectations on FFLs would be minimal to nonexistent, as FFLs can choose not to take PMFs into inventory or, if they do, to apply a serial number to the PMF. As to the character of the governmental action, courts have consistently rejected takings claims involving government regulations of highly regulated goods pursuant to the police power. *See, e.g.*, *Kam-Almaz v. United States*, 682 F.3d 1364, 1372 (Fed. Cir. 2012).

Accordingly, because nothing in the Rule violates any of the constitutional provisions cited in Plaintiffs' and BlackHawk's various constitutional claims, these claims should be rejected and summary judgment should be granted for Defendants on these causes of action.

## VIII. Any Relief Should Be Narrowly Tailored.

### A. Section 706(2) Does Not Authorize the Universal Vacatur Urged by Plaintiffs.

For the reasons set forth above, Plaintiffs are not entitled to relief. In any event, the Court cannot universally vacate the Rule, as Plaintiffs urge, *see* MSJ at 47-50, BlackHawk MSJ at 41-43, because Section 706(2) of the APA does not provide for such relief. As an initial matter, the ordinary meaning of "set aside," 5 U.S.C. § 706(2), is to disregard, not to nullify. *See, e.g.*, *Webster's New International Dictionary of the English Language* 2291 (2d ed. 1958) (defining "set aside" as: (a) "[t]o put to one side; discard; dismiss," and (b) "[t]o reject from consideration; overrule" (emphasis omitted)). This understanding is consistent with limits on judicial review of acts of the other branches of

government.  For example, in the context of reviewing statutes for constitutionality, courts "have no power *per se* to review and annul acts of Congress on the ground that they are unconstitutional." *Mass. v. Mellon*, 262 U.S. 447, 488 (1923).  Instead, judicial review "amounts to little more than the negative power to disregard an unconstitutional enactment." *Id.*  Thus, when the APA was enacted, it was well understood that courts' "setting aside" unconstitutional statutes referred to disregarding such statutes in deciding the cases before them, not vacating the statutes.  *See, e.g.*, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 87 (1938); Act of Aug. 24, 1937, ch. 754, § 3, 50 Stat. 752-753; *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 432 (1934); *Mallinckrodt Chem. Works v. Missouri ex rel. Jones*, 238 U.S. 41, 54 (1915).

The structure of the APA confirms in at least three respects that Section 706(2)'s instruction to "set aside" deficient agency action does not provide for universal vacatur as a remedy.  First, whereas Section 706(2) supplies a rule of decision directing courts to disregard unlawful "agency actions, findings, and conclusions," 5 U.S.C. § 706(2), Section 703 pertains to remedies.  And absent a "special statutory review proceeding" authorizing a court to act directly upon an agency order, Section 703 remits plaintiffs to traditional remedies such as "declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." *Id.* § 703.  It does not speak of vacatur.

Second, Section 706(2) requires a court to "hold unlawful and set aside" not only "agency action," but also "findings[] and conclusions." *Id.* § 706(2).  It would make little sense for a court to vacate an agency's "findings" and "conclusions."  But it is entirely sensible for a court to disregard unfounded agency findings and conclusions in resolving the case before it.

Third, because Section 706 provides the substantive standard for holding agency action "unlawful," *id.*, it must be applicable in all forms of action where Section 706 applies, including "actions for declaratory judgments or [on] writs of prohibitory or mandatory injunction or habeas corpus," as well as "in civil or criminal proceedings for judicial enforcement," *id.* § 703.  No one would suggest that a court hearing a habeas petition or an enforcement action could vacate a regulation.  But

68

Section 706(2) fits naturally in those contexts if it is understood as an instruction to disregard unlawful agency actions, conclusions, and findings.

Moreover, Congress enacted the APA against a background understanding that statutory remedies should be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Traditionally, remedies "operate with respect to specific parties," not "on legal rules in the abstract." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1486 (2018)). By contrast, universal vacatur violates "the bedrock practice of case-by-case judgments with respect to the parties in each case." *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, C.J., concurring). There is no basis to conclude that Congress contemplated creating such extraordinary remedial power when it enacted the APA. Indeed, both committee reports characterize Section 706(2) as authorizing a court to hold agency action unlawful, without mentioning the phrase "set aside." *See* S. Rep. No. 79-752, at 27 (1945), App. 354; H.R. Rep. No. 79-1980, at 44 (1946), App. 420. This silence further confirms that Congress did not intend for that phrase to establish the novel and far-reaching remedy of universal vacatur.

### B.   In Any Event, Remand Without Vacatur Is the Appropriate Remedy for Any Procedural Violation.

In any event, even if vacatur were an available remedy, it would not be the appropriate form of relief in the event that Plaintiffs were to succeed on any of their procedural claims. As the Fifth Circuit has held repeatedly, "when 'an agency decision is not sustainable on the basis of the administrative record, then "the matter should be remanded to the agency for further consideration."'" *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 238 (5th Cir. 2007) (brackets omitted) (quoting *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 905 (5th Cir. 1983)). That is because, "when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so," "[r]emand, not vacatur, is generally appropriate." *Texas Ass'n of Manufacturers*, 989 F.3d at 389 (citing *Central and South West Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000)).

With respect to many of Plaintiffs' claims, even if the Court were to hold that ATF had not adequately supported the Rule on the current record, there would be at least a serious possibility that the agency could do so on remand.  The defects that Plaintiffs purport to find in the Rule—including their policy shift, Second Amendment-related, and logical outgrowth claims—are precisely those amenable to correction on remand, through additional articulation of the agency's reasons for acting and/or an additional round of notice and comment.  *Cf. Texas Ass'n of Mfrs.*, 989 F.3d at 389-90 (remanding without vacatur where the agency had not properly employed notice-and-comment procedures and had failed to consider relevant factors).

In addition to the likelihood of correction on remand, courts in the Fifth Circuit may also consider the disruptive consequences of vacatur in determining the appropriate remedy for an APA violation.  *See, e.g.*, *Texas v. Biden*, 20 F.4th 928, 1000 (5th Cir. 2021), *as revised* (Dec. 21, 2021), *cert. granted*, 142 S. Ct. 1098 (2022), *and rev'd and remanded on other grounds*, 142 S. Ct. 2528 (2022); *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000); *cf. Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993).  Here, the disruptive consequences of vacatur would be immense.  As ATF explained in the Rule, the recent "proliferation of untraceable firearms severely undermines" law enforcement's ability to engage in the "integral" process of "determin[ing] where, by whom, or when" a firearm used in a crime was manufactured, and "to whom [it was] sold or otherwise disposed."  87 Fed. Reg. at 24,656, 24,659.  By updating ATF's regulations to reflect current technology, the Rule "increase[s] public safety by, among other things, preventing prohibited persons from acquiring firearms and allowing law enforcement to trace firearms involved in crime."  *Id.* at 24,654; *see, e.g.*, *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 677 (1989) (noting that the government has a "compelling interest[]" in protecting "public safety").  Vacating the Rule thus would facilitate the further proliferation of untraceable weapons, which could not be reversed in the event that ATF cured any defects in the Rule on remand.

### C.   In the Alternative, Any Vacatur of the Rule Should Be Narrowly Tailored.

Alternatively, any vacatur should be limited to the relevant provision or provisions of the Rule and to the parties to this action that have demonstrated standing with respect to any successful claim. With respect to severability, the Rule provides:

> in the event any provision of this rule, an amendment or revision made by this rule, or the application of such provision or amendment or revision to any person or circumstance is held to be invalid or unenforceable by its terms, the remainder of this rule, the amendments or revisions made by this rule, and the application of the provisions of such rule to any person or circumstance shall not be affected and shall be construed so as to give them the maximum effect permitted by law.

87 Fed. Reg. at 24,730.  The Court should give effect to this clause and, to the extent it decides that vacatur of any provision of the Rule is warranted, tailor such relief narrowly such that the remainder of the Rule remains in effect.  *See, e.g.*, *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019) (vacating only "unlawful . . . portions of [an agency] rule"); *cf. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) (noting that, "'when confronting a constitutional flaw in a statute,' . . . the 'normal rule' is 'that partial, rather than facial, invalidation is the required course'" (first quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328-329 (2006); and then quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985))).

With respect to the scope of any vacatur, this Court has recognized that "longstanding principles of equity" confine courts to "redress[ing] particular injuries in particular cases or controversies." *VanDerStok v. Garland*, No. 4:22-CV-00691-O, 2022 WL 4809376, at *2 (N.D. Tex. Oct. 1, 2022) (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2426 (2018) (Thomas, J., concurring)). Moreover, universal relief "take[s] a toll on the federal court system" by "preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Id.* (quoting *Hawaii*, 138 S. Ct. at 2426 (Thomas, J., concurring)).  These considerations are no less compelling in the context of vacatur on summary judgment than preliminary injunctive relief.  Moreover, in addition to this action,

71

challenges to the Rule are also pending in four other districts in four different Circuits, underscoring the impropriety of an order vacating the Rule for all parties nationwide.  *See Div. 80, LLC v. Garland*, No. 3:22-CV-148, 2022 WL 3648454 (S.D. Tex. Aug. 23, 2022) (preliminary injunction denied); *Morehouse*, 2022 WL 3597299, at *3 (preliminary injunction denied), *appeal docketed*, No. 22-2812 (8th Cir. Aug. 31, 2022) (appeal fully briefed and scheduled for argument); *California v. ATF*, No. 20-CV-06761-EMC (N.D. Cal.) (motion to dismiss granted in part and denied in part); *Miller v. Garland*, 22-CV-02579-CKK (D.D.C.) (motion to dismiss pending).

Finally, in the event the Court were to grant summary judgment in favor of Plaintiffs on any of their claims, it should decline Plaintiffs' request for injunctive relief.  *See* MSJ at 48-49.  As this Court has held, permanent injunctive relief is not appropriate under the APA where an injunction would have no "meaningful practical effect independent of its vacatur."  *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 946 (N.D. Tex. 2019) (quoting *Monsanto*, 561 U.S. at 165); *see also id.* (noting that courts addressing unlawful administrative rules "ultimately 'invalidate—without qualification—[such] rules as a matter of course, leaving their predecessors in place until the agencies can take further action'" (quoting *Pennsylvania v. President of the United States*, 930 F.3d 543, 575 (3d Cir. 2019), *as amended* (July 18, 2019), *rev'd and remanded on other grounds sub nom. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020))).  Plaintiffs here do not argue that injunctive relief would have any effect independent of vacatur.  Thus, any relief that the Court may grant should be limited, at most, to remand on any procedural violation or vacatur of any particular provision of the Rule that the Court holds unlawful with respect to the parties here.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that the Court enter summary judgment in their favor, and deny Plaintiffs' and Intervenor Plaintiffs' motions for summary judgment.

DATED: February 13, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

LESLEY FARBY
Assistant Director, Federal Programs Branch

*/s/ Daniel Riess*
DANIEL RIESS
MARTIN M. TOMLINSON
TAISA M. GOODNATURE
JEREMY S.B. NEWMAN
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 353-3098
Email: daniel.riess@usdoj.gov

*Attorneys for Defendants*

73

**<u>CERTIFICATE OF SERVICE</u>**

On February 13, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/  Daniel Riess*