# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

JENNIFER VANDERSTOK, *et al.*,

     *Plaintiffs,*

v.

BLACKHAWK MANUFACTURING GROUP INC., *et al.*,

     *Intervenor-Plaintiffs,*

v.

MERRICK GARLAND, in his official capacity as Attorney General of the United States, *et al.*,

     *Defendants.*

Case No. 4:22-cv-00691-O

**AMICI CURIAE BRIEF OF GUN OWNERS FOR SAFETY AND INDIVIDUAL CO-AMICI IN SUPPORT OF DEFENDANTS' OPPOSITION TO ORIGINAL PLAINTIFFS' AND INTERVENOR-PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## CORPORATE DISCLOSURE STATEMENT

Gun Owners for Safety is a voluntary coalition of gun owners that does not have any corporate parent and does not issue stock, so no publicly held corporation holds 10% or more of its stock.  Gun Owners for Safety is supported by Giffords—the gun safety organization co-founded and led by former Congresswoman Gabrielle Giffords—and the employees of Giffords.  Giffords also has no corporate parent and does not issue stock, so no publicly held corporation holds 10% or more of its stock.

No counsel for a party authored any part of this brief.  No one other than amici curiae, its members, or its counsel financed the preparation or submission of this brief.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .................................................................. I

TABLE OF AUTHORITIES .......................................................................................... iii

INTEREST OF AMICI CURIAE ................................................................................... 1

INTRODUCTION ........................................................................................................... 6

ARGUMENT .................................................................................................................. 8

I.   THE RULE DOES NOT AFFECT SCRATCH BUILDS AND ONLY
     MINIMALLY AFFECTS KIT BUILDS ................................................................ 8

     A.   Scratch Builds Are Not Affected by the Rule .............................................. 8

     B.   Kit Builds Are Only Minimally Affected by the Rule .............................. 11

II.  THE RULE IS A NARROWLY TAILORED COMMERCIAL
     REGULATION DESIGNED TO PREVENT CRIMINAL ACTIVITY ............. 13

     A.   The Rule is Narrowly Tailored to Prevent Criminal Activity ................... 14

     B.   The Rule Prohibits Ghost Guns Without Exceeding ATF's Statutory
          Authority or the Second Amendment ........................................................ 22

CONCLUSION ............................................................................................................ 25

CERTIFICATE OF SERVICE ..................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abramski v. United States,*
  573 U.S. 169 (2014) ................................................................................ 14, 22, 23

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ................................................................................. 23

*Huddleston v. United States,*
  415 U.S. 814 (1974) ................................................................................. 22

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ................................................................................. 23

*Morehouse Enters. LLC v. Bureau of Alcohol, Tobacco, Firearms &*
  *Explosives,*
  2022 WL 3597299 (D.N.D. Aug. 16, 2022) ............................................. 24

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  142 S. Ct. 2111 (2022) ............................................................................. 23

*New York v. Burger,*
  482 U.S. 691 (1987) ................................................................................. 23

*United States v. Hosford,*
  843 F.3d 161 (4th Cir. 2016) ................................................................... 24

*United States v. Tilotta,*
  No. 3:19-CR-04768, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) .......................... 24

**STATUTES & REGULATIONS**

27 C.F.R. § 478.11 .......................................................................................... 14, 15

18 U.S.C. § 921 .............................................................................................. 12, 14, 16

18 U.S.C. § 923 .............................................................................................. 16

**TABLE OF AUTHORITIES**
(continued)

Page(s)

18 U.S.C § 926 ............................................................................... 22

Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed.
Reg. 24,652 (published April 26, 2022) (codified at 27 C.F.R. pts. 447,
478, 479) ............................................................................ passim

Gun Control Act of 1968, Pub. L. No. 90-618, § 101, 82 Stat. 1213 ............................... 22

**OTHER AUTHORITIES**

*A Better-Than-Basic Glock 17 Compatible Build List for Under $500*, 3CR
TACTICAL, https://3crtactical.com/a-betterthan-basicglock-17-clone-
build-list-for-under-500/ (last visited February 14, 2023) ........................................... 19

ATF Firearms Tracing Guide, ATF Publication 3312.13, BUREAU OF
ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,
https://www.atf.gov/firearms/docs/guide/atf-firearms-tracing-guide-atf-
p-331213 (last visited Feb. 17, 2023) ............................................................ 16

Carter Evans, *Santa Monica Shooter Built His Own Weapon*, CBS NEWS
(June 14, 2023), https://www.cbsnews.com/news/santa-monica-shooter-
built-his-own-weapon/ ................................................................... 20

*Cody Rutledge Wilson*, SOUTHERN POVERTY LAW CENTER,
https://www.splcenter.org/fighting-hate/extremist-files/individual/cody-
rutledge-wilson (last visited Feb. 17, 2023) ............................................... 21

Dakin Andone, *The Gunman In The Saugus High School Shooting Used A
'Ghost Gun,' Sheriff Says*, CNN (Nov. 21, 2019),
https://www.cnn.com/2019/11/21/us/saugus-shooting-ghost-
gun/index.html ........................................................................ 21

David Pucino, *Ghost Guns: How Untraceable Firearms Threaten Public
Safety*, GIFFORDS LAW CENTER (May 2020),
https://files.giffords.org/wp-content/uploads/2020/08/Giffords-Law-
Center-Ghost-Guns-Report.pdf%20 ........................................... 17, 19, 20

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Glossary, SPORTING ARMS AND AMMUNITION MANUFACTURERS'
INSTITUTE, INC., https://saami.org/saami-glossary/?search=reciever (last
visited Feb. 17, 2023)..................................................................................... 12

*Gunsmithing a Custom Rifle Stock* and Glossary, SPORTING ARMS AND
AMMUNITION MANUFACTURERS' INSTITUTE, INC.,
https://saami.org/saami-glossary/?search=action (last visited Feb 15,
2023 ............................................................................................................... 10

*Gunsmithing a Custom Rifle Stock from Scratch: the Step by Step Guide*,
RICHARD'S MICROFIT STOCKS (Feb. 8, 2021),
https://richardsmicrofitgunstocks.com/thing-a-custom-rifle-stock-from-
scratch-the-step-by-step-guide (last visited Feb. 17, 2023)
("*Gunsmithing a Custom Rifle Stock*"........................................................... 10

*Handgun Parts*, 80% LOWERS, https://www.80-lower.com/handgun-parts
(last visited Feb. 15, 2023)...................................................................... 11, 19

*Understanding Headspace in an AR-15*, AT3 TACTICAL,
https://www.at3tactical.com///is-headspace-in-an-ar-15-and-how-can-
you-check-it-read-on (last visited Feb. 15, 2023)......................................... 11

*Untraceable: The Rising Spector of Ghost Guns*, EVERYTOWN FOR GUN
SAFETY (May 14, 2020), https://everytownresearch.org/report/the-
rising-specter-of-ghost-guns/ ........................................................... 17, 18, 20

*What Are Ghost Guns*, BRADY UNITED, https://www.bradyunited.org/fact-
sheets/what-are-ghost-guns (last visited February 14, 2023) ...................... 20

*Why Outlawing Ghost Guns Didn't Stop America's Largest Maker of Ghost
Gun Parts*, PROPUBLICA (August 24, 2022),
https://www.propublica.org/article/nevada-ghost-guns-polymer80-
firearms-laws............................................................................................... 21

## INTEREST OF AMICI CURIAE

Amicus curiae Gun Owners for Safety is a united coalition of gun owners from varied backgrounds and political affiliations who believe lives can be saved through commonsense gun laws that do not infringe upon the civil rights of law-abiding gun owners.  With chapters in Texas and across the country, including Colorado, Florida, Michigan, Minnesota, Montana, Pennsylvania, and Virginia, Gun Owners for Safety works to prevent gun violence while supporting and protecting Second Amendment rights.  Gun Owners for Safety is comprised of over 20,000 experienced gun owners of all trades and hobbies, including law enforcement, military, hunting, sport shooting, collecting, and building guns.  In Texas alone, Gun Owners for Safety has 1,200 gun owner members, including 60 volunteer ambassadors who have educated the public and lawmakers through such activities as hosting seminars and testifying before the State Legislature.  Affiliated with Giffords, the gun safety organization co-founded and led by Congresswoman Gabrielle Giffords, a gun owner herself, we fully respect the Second Amendment and simultaneously are devoted to encouraging safe and responsible gun ownership practices. Guns Owners for Safety promotes a shift in culture to inform Americans about ways to improve safe gun ownership, including commonsense gun laws.

In addition to the Gun Owners for Safety coalition, five individuals are also amici curiae and signatories to this brief:  Jason Perry, Ryan Busse, Jonathan Gold, Steven Kling, and Scott Spreier.  Each of these individuals is affiliated with the Gun Owners for Safety coalition, including two as leaders in its Texas chapter, and they seek to add the weight of their voices to the issues addressed in this brief.  These five individuals hail from all

1

different walks of life, different regions of the country, and different personal beliefs, but they are united in their dedication to promoting safe and responsible gun ownership practices consistent with their Second Amendment rights.

Jason Perry is the Deputy Engagement Director for Gun Owners for Safety at Giffords.  Originally from Kentucky, Mr. Perry has been a gunowner for over 20 years, previously had a license to carry concealed firearms and other deadly weapons in Kentucky, and spent several years competing in International Defensive Pistol Association ("IDPA") sporting events.  Mr. Perry served 12 years as a firefighter and paramedic in Kentucky where he treated many victims of gun violence.  After an injury cut his firefighting career short, Mr. Perry graduated from college and moved to Washington, D.C. to continue his career in public service.  Prior to moving to Washington, D.C., Mr. Perry built firearms from imported parts kits that included torched receivers, which he replaced with serialized parts that he purchased through an entity licensed in the U.S. to engage in the firearm business (referred to as a federal firearms license or "FFL").

Mr. Perry came to work for Gun Owners for Safety in May 2022.  Mr. Perry has organized a variety of events emphasizing gun safety, lobbied before Congress, and spearheaded a training program that prepares Gun Owners for Safety ambassadors to share credible and accurate information about safe and responsible gun ownership practices with their communities.

Ryan Busse, who resides in Montana, is a Senior Advisor to Gun Owners for Safety and to Giffords.  Mr. Busse has extensive personal experience with firearms, having received intensive firearms, armory, and gunsmith training.  In addition, Mr. Busse was

employed in the firearms industry for more than 25 years, working as a sales and marketing executive for a leading firearm manufacturer, and was nominated for industry awards multiple times.  Since leaving the industry, Mr. Busse dedicates his time and efforts to environmental advocacy, and since June 2021 he has held the position of Senior Advisor to Gun Owners for Safety and Giffords.  In this advisory role, Mr. Busse supports Gun Owners for Safety and Giffords to promote sensible gun ownership and regulation, and he regularly engages in public outreach.

Mr. Busse is also the author of the book *Gunfight: My Battle Against the Industry that Radicalized America*, which he published in October 2021.  *Gunfight* details Mr. Busse's life as a firearms industry executive, his efforts to make inroads toward sensible gun ownership and use, and his experiences with the industry's opposition to those efforts.  Through *Gunfight* and his advocacy and advisory role, Mr. Busse seeks policy and cultural changes to reduce gun violence.

Jonathan Gold, who resides in Michigan, is a Senior Ambassador for Gun Owners for Safety.  Mr. Gold has owned firearms for over three decades and served as a firearms instructor for nearly as long.  He is recognized as a subject matter expert on firearms and continues to teach private firearm lessons—specifically highlighting safety, handling, and marksmanship.  Mr. Gold has been involved with working to identify perpetrators of crime, understanding the importance of serializing guns to trace firearms used in crimes to the perpetrator, and also the difficulty in solving crimes when the firearm lacks a serial number.  Mr. Gold has personally built competition rifles, all using serialized parts from an FFL.

Mr. Gold has led the Gun Owners for Safety chapter in Michigan since March 2020. This chapter, which includes many members who are regular hunters, coordinates various events and activities to promote responsible gun ownership, such as designing and teaching educational courses on gun safety, tabling at various community events, and partnering with other agencies to promote other educational programs.

Steven Kling is a Senior Ambassador for Gun Owners for Safety in the Texas chapter; he lives with his family in the Texas Hill Country. Mr. Kling, a former Captain in the United States Army, served two combat tours in Afghanistan and Iraq. He was awarded the Bronze Star, the Combat Action Badge, and Joint Services Commendation Medal for his service. Mr. Kling has also spent time as a Commander of a small arms training company in the United States Army Reserves. As a life-long gun owner and avid hunter, Mr. Kling has a deep respect for the heritage, training, and safety of firearms.

Mr. Kling was drawn to Gun Owners for Safety and Giffords because the organizations give a voice to gun owners like himself—those who respect firearms safety and understand the significant role that gun owners have played historically in ensuring responsible and lawful firearms ownership and use, and lament the loss of that role of gun owners in current civil discourse. Among his involvement with other events of the Texas chapter of Gun Owners for Safety, Mr. Kling's leadership has included lobbying and legislative affairs efforts in light of the Uvalde shooting.

Scott Spreier, who resides in Dallas, Texas, also serves as a Senior Ambassador for the Texas chapter of Gun Owners for Safety. Mr. Spreier has been a firearm owner for over 30 years and is an avid hunter and sport shooter. Mr. Spreier grew up in western

Kansas among farmers and ranchers, where guns were seen as tools. After serving in the Air Force during the Vietnam War, Mr. Spreier became an NRA-accredited firearm instructor in order to help train his sons and their fellow Boy Scout troop members. Mr. Spreier is a published author on the subject of gun safety and commonsense gun laws.

Mr. Spreier has supported Giffords for several years and in April of 2020 joined the Gun Owners for Safety program at the inception of the Texas chapter. The Texas chapter participates in community events, hosting informational booths and tables to provide practical, nonpartisan, educated, and commonsense information about firearms. Mr. Spreier's goal is to educate as many individuals as possible—across all races, ethnicities, and political affiliations—by providing credible information from credible sources to balance the misinformation often spread on the issue of gun ownership rights.

All five of the individual Amici are passionate about the importance of serialization of firearms. They recognize that the serial number is a key tool for law enforcement to fight crime and domestic violence. In many circumstances, the ability to trace gun ownership through the serial number is the key step of an investigation to ultimately bring justice and closure for the families of victims of gun violence.

Amici's purpose in filing this amicus brief is to provide to this Court credible information from credible sources about the impact of the Bureau of Alcohol, Tobacco, Firearms, and Explosives Final Rule 2021R-05F. Amici provide this information from the perspective of individuals and an organization with members who fully support the protection of Second Amendment rights. These individuals and the organization are equally concerned with enacting commonsense gun laws that promote safe and legal use

5

of firearms, aid law enforcement in fighting crime, and reduce gun violence.  Amici have previously filed a brief in this case at the preliminary injunction stage, which the Court accepted.  *See* ECF Nos. 57-58.

## INTRODUCTION

Amici previously filed an amicus brief at the preliminary injunction stage of these proceedings, with the purpose of providing real-world context regarding the effect of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Final Rule 2021R-05F, Definition of "Frame or Receiver" and Identification of Firearms (the "Rule"), on law-abiding gun owners who build their own firearms at home.  *See* Amici Curiae Br. of Gun Owners for Safety and Individual Co-Amici in Support of Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, ECF No. 58 ("PI Amici Curiae Br.").

Now at summary judgment, Amici likewise seek to address the issues before the Court with their unique perspective on the real-world impacts of the Rule and the challenges to the Rule brought by Plaintiffs and Intervenor-Plaintiffs (collectively, "Plaintiffs").  To that end, Amici wish to provide their insight as gun owners who respect the Second Amendment, favor commonsense firearm regulations, and oppose the proliferation of unserialized firearms.  It is therefore important for Amici to explain why the Rule strikes a constitutional and permissible balance in discouraging criminal actors from obtaining dangerous, unserialized "ghost guns" while maintaining our rights to craft guns in our own homes within the bounds of preexisting law.

In particular, Amici intend to offer this Court a different perspective on the Rule than what has been offered by the parties to date.  Amidst the various constitutional and

statutory challenges raised by Plaintiffs and addressed across two-hundred-plus pages of summary judgment briefing, this Court should not lose sight of the fundamentals of this case:  What does the Rule prohibit?  What does the Rule allow?  What are unserialized firearms?  How does the Rule compare to previous exercises of ATF's authority under the Gun Control Act?   Amici believe that when the Court views these questions and the underlying legal issues through a grounded, practical lens, the answer is clear:  even under a broad view of the Second Amendment, and a limited view of agency rulemaking, the Rule is a constitutional and reasonable commercial firearm regulation that should be duly upheld against Plaintiffs' challenges.

In answering the questions above, Amici also aim to correct Plaintiffs' erroneous assertions and assumptions about the scope of the Rule.  At various points in their briefing, Plaintiffs exaggerate the import of the Rule, claiming that ATF has seized unprecedented power or somehow starkly departed from its previous regulatory practices.  The truth is much less dramatic.  The Rule merely extends the same serialization and other *de minimis* commercial restrictions that already apply in similar home build contexts to partially finished frames and receivers.   These requirements are not burdensome and do not significantly impact our at-home builds.  What is more, they are critical, commonsense requirements that reduce gun violence by keeping guns out of the hands of people who legally should not have them.

The Court should reject the Plaintiffs' challenges to the Rule and grant the Government's cross-motion for summary judgment on the merits.

**ARGUMENT**

## I.   THE RULE DOES NOT AFFECT SCRATCH BUILDS AND ONLY MINI-MALLY AFFECTS KIT BUILDS

At the outset, Amici reiterate that the Rule does not impose any new or burdensome regulations on traditional at-home gun making.  The Rule is narrowly tailored to *avoid* infringing on the rights of law-abiding citizens to build their own firearms from scratch or from kits.  These nuances are lost in Plaintiffs' summary judgment briefing.  Indeed, Plaintiffs rely heavily on the premise that the Rule will sweep away entirely the rights of law-abiding gun owners to complete at-home builds of firearms.  *See* VanDerStok, Andren, Tactical Machining, LLC, and Firearms Policy Coalition, Inc. Br. in Supp. of Mot. for Summ. J., ECF No. 140 ("VanDerStok Br."), at 5.[1]  This premise is patently false.  An accurate assessment of the different processes for building guns and the applicable regulatory requirements makes clear that the Rule simply extends existing federal restrictions to cover partially finished and easy-to-manufacture guns.  *See* PI Amici Curiae Br. at 24-25.

### A.   Scratch Builds Are Not Affected by the Rule

Far from Plaintiffs' sweeping gestures at a "bald attempt to claim the authority to regulate privately made firearms," the plain text of the Rule exempts from regulation an entire category of privately made firearms—those built from scratch.  BlackHawk Mfg. Grp. Inc. Br. in Supp. of Mot. for Summ. J., ECF No. 145 ("BlackHawk Br."), at 27.  As

---

[1] All citations to ECF documents are to the internal pagination of the document, not the ECF pagination.

in their preliminary injunction briefing, Plaintiffs continue to conflate the assembly of guns made from *partially finished* components (*i.e.*, ghost guns) with guns made from *scratch*, potentially due to a lack of familiarity with the differences between the two processes, or perhaps a desire to overstate the effect of the Rule. *See, e.g.*, VanDerStok Br. at 5 (broadly describing "ghost guns" as "a pejorative for privately manufactured firearms"); *see also* PI Amici Curiae Br. at 8-9, 11 16-17, 23-24 (correcting similar misstatements). But appreciating the differences between scratch builds and kit builds is critical to understanding the true impact of the Rule. *Scratch builds for personal use are outside the ambit of the Rule and will continue to be exempt from regulations governing FFLs.* The Rule solely (and minimally) affects a "*partially complete, disassembled, or nonfunctional* frame or receiver, including a frame or receiver parts kit." Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652, at 24,739 (published April 26, 2022) (codified at 27 C.F.R. pts. 447, 478, 479) (emphasis added).

The Rule's revised definition of "frame or receiver" plainly excludes scratch build firearms by stating that these terms "shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (*e.g.*, *unformed block of metal, liquid polymer, or other raw material*)." *Id.* (emphasis added); *see also id.* at 24,653 ("[T]he final rule makes clear that articles that have not yet reached a stage of manufacture where they are clearly identifiable as an unfinished component of a frame or receiver (*e.g.*, unformed blocks of metal, liquid polymers, or other raw materials) are not frames or receivers.").

As noted in our prior brief, there should be no mistaking a scratch build for a kit build that utilizes partially finished components.  *See* PI Amici Curiae Br. at 12.  The scratch build community does not use partially manufactured frames or receivers.  Crafting a gun from scratch begins with raw materials that have no pre-shaping, milling, or manufacturing.  *Id.*  Scratch builds "require[] precision carpentry tools and woodworking skills 'that might be a stretch for beginner carpenters . . . . It is [a] high labor, time, and skill-intensive task.'"  *Id.* at 13 (quoting *Gunsmithing a Custom Rifle Stock from Scratch: the Step by Step Guide*, RICHARD'S MICROFIT STOCKS (Feb. 8, 2021), https://richardsmicrofitgunstocks.com/gunsmithing-a-custom-rifle-stock-from-scratch-the-step-by-step-guide (last visited Feb. 17, 2023)).  The steps for building a rifle from scratch include selecting raw materials; designing the rifle stock; in letting the action to ensure that the stock fits with the frame and receiver; shaping the hardwood material to conform to the preferred rifle stock design; and sanding, whiskering, and applying an oil finish to the rifle stock.  *See id.* (citing *Gunsmithing a Custom Rifle Stock* and Glossary, SPORTING ARMS AND AMMUNITION MANUFACTURERS' INSTITUTE, INC., https://saami.org/saami-glossary/?search=action (last visited Feb 15, 2023)).  Crafting a musket from scratch similarly requires "highly specialized knowledge and skill." *Id.* at 14 (describing the processes of forging, casting, and stamping metal parts for a musket).

A scratch build of a more contemporary weapon, such as an AR pattern firearm, demands even more technical skill from the artisan. *See id.* at 14.  Specific tolerances must be met to ensure appropriate lockup between the round, chamber, bolt face, bolt carrier, and recoil gas tube interface occurs safely and repeatably. *See Understanding Headspace*

10

*in an AR-15*, AT3 TACTICAL, https://www.at3tactical.com/blogs/news/what-is-headspace-in-an-ar-15-and-how-can-you-check-it-read-on (last visited Feb. 15, 2023).  To ensure the hammer strikes the firing pin, when and only when the bolt has securely locked a live round into battery, requires expensive and specialized tools such as mills, files, headspace gauges, and micrometers not often found in the toolboxes of the average gun owner.  *See id.*

In sum, a scratch build is fundamentally different from a gun constructed from partially finished components as part of an easy-to-complete kit (commonly called "ghost guns").  By affirmatively taking these differences into account, the Rule protects, rather than compromises, the rights of law-abiding gun owners to privately manufacture firearms from scratch.

## B.      Kit Builds Are Only Minimally Affected by the Rule

In addition, Plaintiffs continue to overstate the limited impact the rule has on kit builds.  *See, e.g.*, BlackHawk Br. at 2 (arguing that the Rule "puts ordinary citizens at risk and illegally invades manufacturing sectors [and] supply chains").

As a brief overview, "kit builds" refer to the process of "building guns from manufactured or partially manufactured components, as opposed to raw materials.  The components can be sold together as part of a kit, or the components can be sold individually."  PI Amici Curiae Br. at 17-18.  In direct contrast to scratch builds, "[n]o experience is required" to perform a kit build, and "easy-to-follow instructions" are often provided.  *Handgun Parts*, 80% LOWERS, https://www.80-lower.com/handgun-parts (last visited Feb. 15, 2023).  The "basic unit" of a contemporary firearm is generally called the "frame" in handguns, or the "receiver" in long guns."  PI Amici Curiae Br. at 18 (citing

Glossary, SPORTING ARMS AND AMMUNITION MANUFACTURERS' INSTITUTE, INC., https://saami.org/saami-glossary/?search=reciever (last visited Feb. 17, 2023)).  Frames or receivers can be fully manufactured and operational, or they can be partially manufactured. A partially manufactured frame or receiver, known as "receiver blank," "unfinished receiver," or "80%" frame or receiver, typically requires a minimal amount of additional machining in order to be a fully functional frame or receiver.  *Id.* at 18-19.

As explained in Amici's prior brief, regulation is nothing new for certain types of kit builds.  Indeed, the building of guns using *fully* machined parts has long been regulated. *Id.* at 17.  To that end, the Rule imposes *no new regulations* on kit builds with fully machined parts.  Even before the Rule came into effect, the purchase of a fully machined frame or receiver (with or without a kit) was subject to the same requirements as the purchase of a fully operational firearm:  the frame or receiver had to be serialized by the manufacturer and purchased through an FFL.  *See* 18 U.S.C. § 921(a)(3)).  Furthermore, the purchaser had to complete a Form 4473 (ATF Firearm Transaction Record) and undergo a background check.  *See id.*  Plaintiffs' assertion that the rule "illegally invades manufacturing sectors . . . [and] supply chains" thus disregards the preexisting regulations in this space.

The Rule merely puts kits with *partially* machined frames or receivers on the same footing, likewise requiring these products to comply with the same federal firearms regulations as kits utilizing fully machined parts, given their plain purpose of being turned into a firearm.  PI Amici Curiae Br. at 21-24.  In other words, the *only* change that resulted from the Rule is that *unfinished* frames or receivers, along with kits containing such parts,

are now treated in the same manner as kits with *fully machined*, *serialized* frames or receivers.  *See id*.  To be clear, the Rule *does not* impact the availability of 80% kits to law-abiding Americans:  any individual who can pass a background check is still permitted to purchase or utilize an 80% kit.  *Id*.  ATF's lawful exercise of its rulemaking authority makes explicit that it does "not burden law-abiding, good faith actors"—it merely closes a loophole that made it easier for "traffickers and prohibited persons" to obtain firearms.  87 Fed. Reg. at 24,669-70.

*     *     *

In both neglecting to distinguish scratch builds from kit builds and overstating the Rule's impact on kit builds, Plaintiffs continue to overstate the effect of the Rule.  Given that scratch builds are unaffected by the Rule, and that kit builds are only minimally impacted, Plaintiffs' continued re-casting of the facts in their summary judgment briefs remains misleading.

## II.   THE RULE IS A NARROWLY TAILORED COMMERCIAL REGULA-TION DESIGNED TO PREVENT CRIMINAL ACTIVITY

As discussed above, the Rule *does not* cover traditional home gun making protected by the Second Amendment.  What the Rule *does* cover is criminal activity clearly designed to subvert federal firearms law.  This purpose is fully consistent with the Gun Control Act and the Constitution, and belies Plaintiffs' many constitutional and statutory claims alleging otherwise.

### A.     The Rule is Narrowly Tailored to Prevent Criminal Activity

As the Government aptly explained, the Rule is narrowly tailored to carry forward the Gun Control Act's plainly constitutional goal of "curb[ing] crime by keeping firearms out of the hands of those not legally entitled to possess them."  Defs.' Combined Br. in Opp. to Pls.' Mot. for Summ. J. ("Gov't Br.") at 42, ECF No. 181 (quoting *Abramski v. United States*, 573 U.S. 169, 181 (2014) (internal quotations omitted)).  In doing so, the Rule does not expand ATF's reach beyond either the Gun Control Act's traditional bounds or what courts have long considered compliant with the Second Amendment.

At the outset, it bears repeating what the Rule does and does not prohibit.  Under the Gun Control Act of 1968 ("the Act"), a "frame" or "receiver" is the only component of a gun (in addition to the gun itself) that qualifies as a "firearm."  This is because the Act defines a "firearm" as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) *the frame or receiver of any such weapon*; (C) any firearm muffler or firearm silencer; or (D) any destructive device."  18 U.S.C. § 921(a)(3) (emphasis added).

In 1968 ATF promulgated regulations regarding the Act.  As relevant here, ATF adopted regulations to implement the Act.  The 1968 regulation defined a "firearm" as: "Any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device; but the term shall not include an antique firearm.  In the case of a licensed collector, the term shall mean only curios and relics."  27 C.F.R. § 478.11.  And it defined a "frame or receiver" as:

14

"That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." *Id.*

The Rule that is at issue was adopted on April 26, 2022, became effective on August 24, 2022, and adds the following language to the definition of a "firearm":

> The term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive.  The term shall not include a weapon, including a weapon parts kit, in which the frame or receiver of such weapon is destroyed as described in the definition of "frame or receiver."

87 Fed. Reg. at 24,735.  Further, the definition of "frame or receiver" has been updated in the Rule.  In relevant part, the Rule provides that "frame or receiver":

> [S]hall include *a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver*, i.e., to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projectile weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be.  The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material).  When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.

*Id.* at 24,739 (emphases added).  To clarify what is meant by "readily," the Rule includes eight factors that will help ATF to determine whether something is "readily" converted or

15

assembled, including the time, ease, expertise, equipment, availability of parts, expense, scope of the project, and feasibility of the process. *Id.* at 24,663.

The Rule also adds and defines a new term: "privately made firearm" ("PMF"). A PMF is "a firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number or other identifying marking placed by a licensed manufacturer at the time the firearm was produced." *Id.* at 24,664. If a PMF maker, however, seeks to have the PMF enter the marketplace, it must meet the Act's other licensing and serial number requirements. *Id.*

These provisions reflect one primary, fundamental concern: the criminal misuse of firearms, and in particular the frequent use of kit-made unserialized firearms in violent crime. *See, e.g.*, 87 Fed. Reg. at 24,686 & n.107. These firearms can be easily acquired by persons otherwise prohibited from possessing them, *see id.* at 24,676, and make violent crimes more difficult to trace and solve, *id.* at 24,659. The Rule recognizes these substantial risks, and that these firearms offer no advantage to law-abiding gun owners.

Traditionally, a firearm made by a federally licensed manufacturer or importer must be engraved with identifying information: a unique serial number, as well as the make and model. 18 U.S.C. 921(a)(3)(C), 923(i). Using this information, ATF and its law enforcement partners can easily track firearms from the manufacturer or importer through the distribution chain to the first retail purchaser. *See generally* ATF Firearms Tracing Guide, ATF Publication 3312.13, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, https://www.atf.gov/firearms/docs/guide/atf-firearms-tracing-guide-atf-p-331213 (last visited Feb. 17, 2023). Tracing, as the Rule recognizes, is an "integral tool"

for criminal investigators and has allowed law enforcement to ultimately bring justice and closure for countless families affected by gun violence.  87 Fed. Reg. at 24,659.

Rather than comply with the regulations that facilitate this critical law enforcement tool, the ghost gun industry claims that gaps in those regulations allow it to make an end-run around the Gun Control Act.  David Pucino, *Ghost Guns: How Untraceable Firearms Threaten Public Safety*, GIFFORDS LAW CENTER (May 2020), https://files.giffords.org/wp-content/uploads/2020/08/Giffords-Law-Center-Ghost-Guns-Report.pdf%20.  The practical effect of selling the frame or receiver in a partially finished form is to circumvent federal and state gun regulations that apply to the industry that manufactures and sells these products and the buyers who purchase them.  *Id.*  Plaintiffs do not seriously deny this reality, nor do they offer any compelling alternative interest in selling or purchasing these kits.  Nor could they.  Just like *finished* frames and receivers, the sole function of *unfinished* frames and receivers is to assemble a weapon designed and capable of expelling a projectile.  *Id.*  When constructed, these ghost guns are functionally indistinguishable from traditional firearms that would ordinarily be subject to the full panoply of federal firearms regulations like background checks, serialization, and transfer restrictions.  *Id.*

A visual example makes this similarity plain.  The diagram below shows the parts of a traditional, ready-to-use Glock 17 handgun, with emphasis on the highlighted component of the "frame."  *Untraceable: The Rising Spector of Ghost Guns*, EVERYTOWN FOR GUN SAFETY (May 14, 2020), https://everytownresearch.org/report/the-rising-specter-of-ghost-guns/.



Compare this traditional firearm to the diagram below, which shows the fully functional frame of the Glock 17 (on the left), next to the "unfinished" frame sold in the typical 80% ghost gun kit (on the right).  *Id.*



As is evident, the difference between the two frames is minimal.  The functional frame contains three drilled holes (the locking block pin hole, the trigger pin hole, and the trigger housing pin hole), and the rails filed off.  By adding these simple features to the unfinished frame with common household tools, any individual can make the unfinished frame functional in hours or less.  *See* PI Amici Curiae Br. at 20-21.

18

Worse still, ghost gun manufacturers make the assembly process even easier—often providing a kit with the tools and step-by-step instructions included to make the frame fully functional with an insignificant amount of time and effort. *Ghost Guns*, GIFFORDS, *supra*. Over the past decade, the market for such ghost gun kits has exploded, allowing untrained amateurs to assemble their own firearms quickly and easily from unregulated parts. Often referred to as "80% kits" because the frame or receiver is approximately 80% complete, these kits require limited additional machining—usually a minimal amount of drilling and milling that can be completed with everyday home tools—to create a functional frame or receiver. *Id.*

Manufacturers of 80% kits make clear that their target consumer is *not* the artisan gunsmith, but rather *anyone* who wishes to buy and build a gun. Indeed, these entities advertise that "[n]o experience is required to master one of these build projects," and "easy-to-follow instructions" are often provided. *Handgun Parts*, 80% LOWERS, *supra*. It is thus unsurprising that the ghost gun Glock 17 is considered a "clone" of the traditional Glock 17 and is advertised as such on gun kit websites. *See, e.g.*, *A Better-Than-Basic Glock 17 Compatible Build List for Under $500*, 3CR TACTICAL, https://3crtactical.com/a-better-than-basic-glock-17-clone-build-list-for-under-500/ (last visited February 14, 2023). In short, ghost gun kits allow any individual, regardless of their ability to pass a background check, to build an unserialized and untraceable firearm with widely available tools and a few hours of work.

This ability to evade federal firearms regulation is the defining feature, not a bug, of ghost guns. The resultant completed frame will offer the user the same functionality as

19

a traditional firearm.  There is only one main difference between the ghost gun Glock 17 and the Glock 17 handgun manufactured by a licensed manufacturer or importer:  the lack of a serial number on the ghost gun.  *Ghost Guns*, GIFFORDS, *supra.*  For law-abiding gun owners, there is no discernable advantage.  But this difference, along with the lack of a background check requirement, makes ghost guns the weapon of choice for gun traffickers and legally prohibited persons, including those bent on violence.  *Id.*; *see also* 87 Fed. Reg. at 24,659.

Perhaps unsurprisingly, ghost guns have been used frequently in violent crimes. One review of a limited sample of federal prosecutions from 2010 to April 2020 revealed that over 2,500 ghost guns were connected to criminal activity.  *Untraceable*, EVERYTOWN, *supra*.  In nearly half of these prosecutions, the defendants had been prohibited from possessing a firearm and would not have passed background check.  *Id.*  And other studies have confirmed that the increasing popularity of ghost gun kits have led to a corresponding increase in the use of ghost guns in crimes.  *What Are Ghost Guns*, BRADY UNITED, https://www.bradyunited.org/fact-sheets/what-are-ghost-guns (last visited February 14, 2023) (recording testimony from one ATF agent that "almost half our cases we're coming across are these ghost guns") .

Tragically, ghost guns have also been used in multiple mass shootings.  In one case, a shooter had already failed a background check but was nonetheless able to build an assault rifle from a ghost gun kit to kill five people on a college campus in Southern California.  *Id.*; *see also* Carter Evans, *Santa Monica Shooter Built His Own Weapon*, CBS NEWS (June 14, 2023), https://www.cbsnews.com/news/santa-monica-shooter-built-his-own-

weapon/.  In another, a sixteen-year-old California high school student killed two students and injured three others with a unserialized gun assembled from a kit.  Dakin Andone, *The Gunman In The Saugus High School Shooting Used A 'Ghost Gun,' Sheriff Says*, CNN (Nov. 21, 2019), https://www.cnn.com/2019/11/21/us/saugus-shooting-ghost-gun/in-dex.html.  The Rule itself notes that it was intended to counteract these terrible conse-quences.  *See* 87 Fed. Reg. at 24,656 (noting that ATF had recovered privately-made fire-arms from 692 homicides or attempted homicides from 2016 to 2021).

Despite the well-documented criminal consequences of ghost guns, many ghost gun manufacturers make no secret of their contempt for firearm regulations or the fact that their product is designed for those whose intended purpose is to subvert those regulations.  For example, Cody Wilson, the CEO of Intervenor-Plaintiff Defense Distributed, was unapol-ogetic when pressed with allegations that he "wants children to have guns," responding only that his ghost gun technology intends to be "disruptive."  *Cody Rutledge Wilson*, SOUTHERN POVERTY LAW CENTER, https://www.splcenter.org/fighting-hate/extremist-files/individual/cody-rutledge-wilson (last visited Feb. 17, 2023).  The owner of Poly-mer80, one of the nation's largest ghost gun manufacturers, has thumbed his nose at a Nevada bill banning ghost guns, telling legislators:  "[W]e, as Americans, just will not comply with [the bill] no matter what you do."  *Why Outlawing Ghost Guns Didn't Stop America's Largest Maker of Ghost Gun Parts*, PROPUBLICA (August 24, 2022), https://www.propublica.org/article/nevada-ghost-guns-polymer80-firearms-laws.   This neglectful and reckless behavior only exacerbates the ongoing crisis.

As its meticulous responses to the over 290,000 public comments reflect, ATF exercised its careful judgment in promulgating this Rule to close a significant regulatory loophole in existing firearms regulations.  87 Fed. Reg. at 24,652-734.  In doing so, as described below, ATF plainly acted within the statutory authority delegated to it by the Gun Control Act to carry out its provisions and principal purpose of counteracting criminal activity.  18 U.S.C. § 926.

### B.   The Rule Prohibits Ghost Guns Without Exceeding ATF's Statutory Authority or the Second Amendment

Notwithstanding Plaintiffs' histrionic assertions about a "constitutional coup," VanDerStok Br. at 1, the Rule's regulatory definitions fit comfortably within the scope of historical regulation under the Gun Control Act and the bounds of the Second Amendment.

As the Supreme Court has recognized, the Gun Control Act's principal purpose is to "curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them.'"  *Abramski*, 573 U.S. at 181 (quoting *Huddleston v. United States*, 415 U.S. 814, 824 (1974)).  At the same time, the text of the Gun Control Act makes clear that "it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms" for appropriate purposes.  Gun Control Act of 1968, Pub. L. No. 90-618, § 101, 82 Stat. 1213, 1213–14.  As the Government aptly explained, meeting these twin goals has often required that ATF engage in line-drawing exercises to adapt the Gun Control Act to meet its regulatory goals, as it has done here.  Gov't Br. at 42.

The Gun Control Act's carefully calibrated balance is well mirrored in the Rule. The Gun Control Act does not define the terms "frame" and "receiver," leaving the question of when "an unregulated piece of metal, plastic, or other material becomes a 'frame or receiver' that is a regulated item under federal law" to the executive branch. *Id.* at 41. By promulgating the Rule, ATF has merely updated applicable regulations to reflect advances in technology, an approach fully consistent with the Gun Control Act. *Id.* Indeed, under these circumstances, *not* regulating partially completed firearms would be directly contrary to the crime-fighting purpose of the Gun Control Act. *See Abramski*, 573 U.S. at 181.

What is more, the Rule's chosen means of addressing the undeniable ghost gun problem—extending its existing serialization regime—respects Second Amendment limitations. The Supreme Court has never seriously questioned—not in *Heller*, not in *McDonald*, and certainly not in *Bruen*—the right of the federal government to craft reasonable regulations on the commercial sale and production of firearms. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111, 2162 (2022) (Kavanaugh, J., joined by Roberts, C.J., concurring); *see District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion). To the contrary, *Heller* itself noted that certain classes of firearm regulations would be "presumptively lawful" such as "prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27 & n.26.

As described above, the Rule's definitions merely expand the existing serialization regime to a previously unserialized class of firearms—ghost guns. In this way, the Rule

constitutes a recognized and permissible qualification on commercial firearm sales.  *See, e.g.*, *New York v. Burger*, 482 U.S. 691, 713 (1987) ("[T]he regulatory goals of the [Gun Control Act] . . . ensure[] that weapons [are] distributed through regular channels and in a traceable manner and [make] possible the prevention of sales to undesirable customers and the detection of the origin of particular firearms."); *United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016) ("[T]he prohibition against unlicensed firearm dealing is a longstanding condition or qualification on the commercial sale of arms and is thus facially constitutional.").  Because the Constitution empowers the federal government to impose serialization requirements and other sale controls on traditional firearms, it surely allows ATF to impose those same controls on products designed to produce functionally indistinguishable firearms.

Plaintiffs thus err in suggesting that *Bruen* and other Supreme Court precedent renders the Rule unconstitutional.  *See, e.g.*, BlackHawk Br. at 35-36; Br. in Supp. of Defense Distributed's Mot. for Summ. J., ("Defense Distributed Br."), ECF No. 166.  Plaintiffs wholly fail to appreciate that "[t]here is a longstanding distinction between the right to keep and bears arms and commercial regulation of firearm sales."  *Morehouse Enters. LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 2022 WL 3597299, at *8 (D.N.D. Aug. 16, 2022) (citations omitted); *see also, e.g.*, *United States v. Tilotta*, No. 3:19-cr-04768, 2022 WL 3924282, at *6 (S.D. Cal. Aug. 30, 2022) ("[T]he natural reading of 'keep and bear arms' does not include the ability to sell or transfer firearms unrestricted.").  And Plaintiffs have provided zero explanation as to how serialization impacts their specific right to "keep and bear" arms.  *See* BlackHawk Br. at 35-36; Defense Distributed Br. at 2-5.  The

Court should therefore reject Plaintiffs' underdeveloped and erroneous constitutional arguments.

## CONCLUSION

ATF has been careful to craft a rule that avoids infringing on the rights of law-abiding home gunsmiths.  Accordingly, upholding the Rule respects our goals as law-abiding gun owners who support the Second Amendment and reasonable regulations.  This Court should recognize as much by rejecting Plaintiffs' motions for summary judgment. For the foregoing reasons and the reasons stated in Defendants' Opposition, the Plaintiffs' and Intervenor-Plaintiffs' Motions for Summary Judgment should be denied.

Respectfully submitted, on February 22, 2023.

/s/ *Rebecca Wernicke Anthony*

Rebecca Wernicke Anthony
Texas Bar No. 24093345
JONES DAY
2727 North Harwood Street
Dallas, Texas  75201
Telephone: 214.969.4886
Facsimile:  214.969-5100
ranthony@jonesday.com

Barbara Mack Harding
      Attorney-in-Charge
      D.C. Bar No. 419250
      (admitted *pro hac vice*)
Jennifer L. Swize
      D.C. Bar No. 490988
      (admitted *pro hac vice*)
Joseph J. Kiessling

D.C. Bar No. 1630477
(admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700


*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and distribution to all registered participants of the CM/ECF System.

_/s/ Rebecca Wernicke Anthony_

Rebecca Wernicke Anthony