**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| JENNIFER VANDERSTOK; MICHAEL G. ANDREN; TACTICAL MACHINING, LLC, a limited liability company; FIREARMS POLICY COALITION, INC., a nonprofit corporation, <br><br> *Plaintiffs*, <br><br> and <br><br> BLACKHAWK MANUFACTURING GROUP, INC.; DEFENSE DISTRIBUTED; and SECOND AMENDMENT FOUNDATION, INC., <br><br> *Intervenor-Plaintiffs*, <br><br> v. <br><br> MERRICK GARLAND, in his official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; STEVEN DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES <br><br> *Defendants*. | Civil Action No. 4:22-cv-00691-O |

**PLAINTIFFS' COMBINED REPLY BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................... iii

INTRODUCTION ......................................................................................... 1

STANDARD OF REVIEW ............................................................................ 2

ARGUMENT ................................................................................................. 3

I.   INDIVIDUAL PLAINTIFFS AND FIREARMS POLICY
     COALITION, INCLUDING ITS MEMBERS, ARE HARMED BY
     THE FINAL RULE AND HAVE STANDING TO CHALLENGE IT
     ...................................................................................................... 3

     A.   Individual Plaintiffs Have Standing .................................................. 3

     B.   Firearms Policy Coalition Has Standing ........................................... 5

II.  THE FINAL RULE IS INCONSISTENT WITH THE GCA AND
     THE AGENCIES ARE NOT ENTITLED TO DEFERENCE ..................... 8

     A.   The Final Rule is Inconsistent with the GCA ................................... 8

     B.   The Agencies are Not Otherwise Entitled to Deference ................... 10

          1.   The Agencies cannot bootstrap a "gap" into the GCA .......... 10

          2.   The Agencies cannot use *Skidmore* to incorporate
               arbitrary and capricious standards into issues of
               statutory interpretation ........................................................... 11

III. THE FINAL RULE IS PROCEDURALLY DEFECTIVE ........................... 14

     A.   The Final Rule's Deviation from the Proposed Rule Exceeds
          Logical Outgrowth .......................................................................... 14

     B.   Position Changes in the Final Rule are Arbitrary and
          Capricious ....................................................................................... 21

IV.  ELEMENTS OF THE RULE ARE UNCONSTITUTIONALLY
     VAGUE ...................................................................................................... 24

     A.   The Definition of "Readily" is Unconstitutionally Vague ................. 25

     B.   The Final Rule's Definitions of "Firearm" and "Complete
          Weapon" Subject People of Ordinary Intelligence to Criminal
          Penalties .......................................................................................... 31

V.  THE RULE'S REGULATION OF SPEECH VIOLATES THE
    FIRST AMENDMENT................................................................... 36

    A.  Tactical Machining's Self-Censorship is an "Injury" for
        Standing Purposes.............................................................. 36

    B.  Other Plaintiffs' Right to Information Satisfies their Standing
        Requirements ..................................................................... 38

    C.  The Final Rule Implements Speaker-Based Restrictions on
        Non-Commercial, Protected Speech...................................... 39

    D.  The Final Rule Impermissibly Restricts Specific Content................. 41

VI. THE TAKE CARE CLAUSE AND MAJOR QUESTIONS
    DOCTRINE ENSURE THE SEPARATION OF POWERS IS NOT
    JUST AN ABSTRACT PRINCIPLE ............................................. 43

VII. VACATUR IS THE APPROPRIATE REMEDY ......................................... 44

CONCLUSION........................................................................................ 50

## Table of Authorities

**Page**

__Cases__

*Adkins v. Vilsack*,
  252 F. Supp. 3d 588 (N.D. Tex. 2017) .................................................................   2

*Air Evac EMS, Inc. v. Texas Dept. of Ins., Div. of Workers' Comp.*,
  851 F.3d 507 (5th Cir. 2017) ...............................................................................   5

*Allison Engine Co., Inc. v. U.S. ex rel. Saunders*,
  553 U.S. 662 (2008) ............................................................................................   9

*Arbuckle Mountain Ranch of Tex., Inc. v. Chesapeake Energy Corp.*,
  810 F.3d 335 (5th Cir. 2016) ...............................................................................   16

*Arcaca v. Cloud Books, Inc.*,
  478 U.S. 697 (1986) ............................................................................................   42

*Arizona v. Biden*,
  31 F.4th 469 (6th Cir. 2022) ................................................................................   47, 48

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*,
  627 F.3d 547 (5th Cir. 2010) ...............................................................................   6, 7

*Ass'n of Priv. Sector Colls. & Univs. v. Duncan*,
  681 F.3d 427 (D.C. Cir. 2012)..............................................................................   20

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001) ............................................................................................   37

*Basiardanes v. City of Galveston*,
  682 F.2d 1203 (5th Cir. 1982) .............................................................................   38

*Baylor County Hosp. Dist. v. Price*,
  850 F.3d 257 (5th Cir. 2017) ...............................................................................   11, 12

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982) ............................................................................................   38

*Bd. of Governors of Fed. Rsrv. Sys. v. Dimension Fin. Corp.*,
  474 U.S. 361 (1986) ............................................................................................   46

*Bd. of Trustees of State Univ. of N.Y. v. Fox*,
  492 U.S. 469 (1989) ............................................................................................   40

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................................   5

*Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*,
    448 F.3d 138 (2d Cir. 2006) ................................................................. 7

*Bolger v. Youngs Drug Prods. Corp.*,
    463 U.S. 60 (1983) ............................................................................ 40

*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973) .......................................................................... 37

*Brown v. Gardner*,
    513 U.S. 115 (1994) ..................................................................... 10, 11

*Cargill v. Garland*,
    57 F.4th 447 (5th Cir. 2023) ...................................................... 2, 10, 49

*Carlson v. Postal Reg. Comm'n*,
    938 F.3d 337 (D.C. Cir. 2019) ........................................................... 10

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980) .......................................................................... 40

*Chabad Lubavitch of Litchfield Cty., Inc. v. Borough of Litchfield*
    853 F. Supp. 2d 214 (D. Conn. 2012) .................................................. 29

*Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*,
    768 F.3d 183 (2d Cir. 2014) ............................................................... 29

*Chocolate Mfrs. Ass'n of U.S. v. Block*,
    755 F.2d 1098 (4th Cir. 1985) ............................................................ 17

*Citizens to Preserve Overton Park v. Volpe*,
    401 U.S. 402 (1971) ............................................................................ 3

*Collins v. Yellen*,
    141 S. Ct. 1761 (2021) ......................................................................... 9

*Competitive Enter. Inst. v. U.S. Dep't of Transp.*,
    856 F.2d 1563 (D.C. Cir. 1988) .......................................................... 38

*Connally v. General Constr. Co.*,
    269 U.S. 385 (1926) .......................................................................... 34

*CSX Transp., Inc. v. Surface Transp. Bd.*,
    584 F.3d 1076 (D.C. Cir. 2009) ..................................................... 20, 21

*Dakota Access, LLC v. Standing Rock Sioux Tribe*,
    142 S. Ct. 1187 (2022) ....................................................................... 48

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
  45 F.4th 846 (5th Cir. 2022) ................................................................. 45, 47

*Dep't of Com. v. New York*,
  139 S. Ct. 2551 (2019)......................................................................... 5

*Driftless Area Land Conservancy v. Valcq*,
  16 F.4th 508 (7th Cir. 2021) ................................................................ 49

*ESI/Emp. Sols., L.P. v. City of Dallas*,
  531 F. Supp. 3d 1181 (E.D. Tex. 2021)................................................ 4

*Fairchild v. Liberty Indep. Sch. Dist.*,
  597 F.3d 747 (5th Cir. 2010) ................................................................ 25

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ............................................................................. 46

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021).......................................................................... 21

*Firearms Policy Coal., Inc. v. McCraw*,
  No. 4:21-cv-1245-P, 2022 WL 3656996 (N.D. Tex. Aug. 25, 2022) .... 6, 8

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) ............................................................................. 44

*Friends of the Earth, Inc. v. Chevron Chemical Co.*,
  129 F.3d 826 (5th Cir. 1997) ................................................................ 8

*GBX Assocs., LLC v. United States*,
  No. 1:22-cv-401, 2022 WL 16923886 (N.D. Ohio Nov. 14, 2022) ...... 46, 47

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
  805 F.2d 1050 (D.C. Cir. 1986)............................................................ 3

*Glass v. Paxton*,
  900 F.3d 233 (5th Cir. 2018) ................................................................ 36

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ............................................................................. 24, 26

*Griffin v. Oceanic Contractors, Inc.*,
  458 U.S. 564 (1982) ............................................................................. 13

*Gulf Restoration Network v. U.S. Dep't of Trans.*,
  452 F.3d 362 (5th Cir. 2006) ................................................................ 12

*Handley v. Chapman*,
   587 F.3d 273 (5th Cir. 2009) ............................................................. 21

*Harmon v. Thornburgh*,
   878 F.2d 484 (D.C. Cir. 1989) ........................................................... 47

*Hays Cty. Guardian v. Supple*,
   969 F.2d 111 (5th Cir. 1992) ............................................................. 41

*Hill v. Colorado*,
   530 U.S. 703 (2000) .......................................................................... 25

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) ........................................................... 15, 16

*Hunt v. Wash. St. Apple Adver. Comm'n*,
   432 U.S. 333 (1977) ......................................................................... 6, 7

*Innovator Enterprises, Inc. v. Jones*,
   28 F. Supp. 3d 14 (D.D.C. 2014) ....................................................... 13

*Johnson v. United States*,
   576 U.S. 591 (2015) .......................................................................... 34

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) ........................................................................ 9

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) .......................................................................... 38

*Kolender v. Lawson*,
   461 U.S. 352 (1983) .......................................................................... 26

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   140 S. Ct. 2367 (2020) ...................................................................... 46

*Long Island Care at Home, Ltd. v. Coke*,
   551 U.S. 158 (2007) .......................................................................... 16

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................ 4

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ................................................................ 46, 47, 49

*Magee v. City of S. Padre Island*,
   463 F. App'x 377 (5th Cir. 2012) ...................................................... 24

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ........................................................................... 29

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................. 21

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
  804 F.3d 242 (2d Cir. 2015) ............................................................. 27

*Nat'l Inst. of Family and Live Advocs. v. Becerra*,
  138 S. Ct. 2361 (2018)....................................................................... 41

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998).......................................................... 47

*Nat'l Rifle Ass'n of Am., Inc. v. BATFE*,
  700 F.3d 185 (5th Cir. 2012) ............................................................... 6

*Nat'l Shooting Sports Found., Inc. v. Jones*,
  716 F.3d 200 (D.C. Cir. 2013)............................................................ 12

*Ne. Md. Waste Disposal Auth. v. EPA*,
  358 F.3d 936 (D.C. Cir. 2004)............................................................ 15

*O'Reilly v. U.S. Army Corps of Eng'rs*,
  477 F.3d 225 (5th Cir. 2007) ............................................................. 45

*Pa. Family Inst., Inc. v. Black*,
  489 F.3d 156 (3d Cir. 2007) ............................................................... 38

*Papachristou v. City of Jacksonville*,
  405 U.S. 156 (1972) ........................................................................... 35

*Phillips Petroleum Co. v. Johnson*,
  22 F.3d 616 (5th Cir. 1994) ............................................................... 16

*Prime Healthcare Serv.'s, Inc. v. Harris*
  216 F. Supp. 3d 1096 (S.D. Cal. 2016) .............................................. 29

*R.R. Ricou & Sons Co. v. Fairbanks, Morse & Co.*,
  11 F.2d 103 (5th Cir. 1926) ............................................................... 11

*Reed v. Town of Gilbert*,
  135 S. Ct. 2218 (2015)........................................................................ 42

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980) ........................................................................... 38

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988) ............................................................................... 41

*Roark & Hardee LP v. City of Austin*,
522 F.3d 533 (5th Cir. 2008) ............................................................ 34, 35

*Roberts v. United States*,
No. 2:04-cr-295-PMD, 2007 WL 9754483 (D.S.C. Oct. 30, 2007) ...................... 27

*Sarre v. City of New Orleans*,
420 Fed. Appx. 371 (5th Cir. 2011) ........................................................ 38

*Sector Colls. & Univs. v. Duncan*,
681 F.3d 427 (D.C. Cir. 2012) ............................................................... 20

*Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*,
467 U.S. 947 (1984) ............................................................................... 37

*Sierra Club v. Peterson*,
185 F.3d 349 (5th Cir. 1999) ................................................................... 3

*Sig Sauer, Inc. v. Jones*,
133 F. Supp. 3d 364 (D.N.H. 2015) ......................................................... 13

*Siwe v. Holder*,
742 F.3d 603 (5th Cir. 2014) ................................................................... 2

*Small Refiner Lead Phase-Down Task Force v. EPA*,
705 F.2d 506 (D.C. Cir. 1983) ........................................................ 15, 16, 20

*Smith v. Goguen*,
415 U.S. 566 (1974) ............................................................................... 26

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ....................................................................... 37, 41, 42

*Tribe v. Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021) .............................................................. 48

*Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*,
37 F.4th 1078 (5th Cir. 2022) .................................................................. 8

*Summit Petroleum Corp. v. EPA*,
690 F.3d 733 (6th Cir. 2012) .................................................................. 10

*Syracuse v. ATF*,
No. 1:20-cv-06885, 2021 WL 23326 (S.D.N.Y. Jan. 29, 2021) ...................... 10, 22

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n,*
  989 F.3d 368 (5th Cir. 2021) ................................................................... 15

*Tex. Pipeline Ass'n v. F.E.R.C.,*
  661 F.3d 258 (5th Cir. 2011) ................................................................... 11

*Texas v. Becerra,*
  577 F. Supp. 3d 527 (N.D. Tex. 2021) .................................................... 12

*Texas v. Biden,*
  20 F.4th 928 (5th Cir. 2021) ............................................................. 45, 48

*Texas v. EPA,*
  389 F. Supp. 3d 497 (S.D. Tex. 2019) .................................................... 15

*Texas v. United States,*
  40 F.4th 205 (5th Cir. 2022) .............................................................. 3, 48

*Thompson v. W. States Med. Ctr.,*
  535 U.S. 357 (2002) ................................................................................. 42

*Timpinaro v. S.E.C.,*
  2 F.3d 453 (D.C. Cir. 1993)............................................................... 29, 30

*UAW v. Brock,*
  477 U.S. 274 (1986) ................................................................................... 7

*United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.,*
  517 U.S. 544 (1996) ................................................................................... 7

*United States v. 16,179 Molso Italian .22 Caliber Winlee*
  *Derringer Convertible Starter Guns,*
  443 F.2d 463 (2d Cir. 1971) .............................................................. 27, 28

*United States v. Campbell,*
  427 F.2d 892 (5th Cir. 1970) ................................................................... 27

*United States v. Catanzaro,*
  368 F. Supp. 450 (D. Conn. 1973)........................................................... 27

*United States v. Clinical Leasing Serv., Inc.,*
  925 F.2d 120 (5th Cir. 1991) ................................................................... 35

*United States v. Drasen,*
  845 F.2d 731 (7th Cir. 1988) ............................................................. 27, 28

*United States v. Kelly,*
  276 F. App'x 261 (4th Cir. 2007) ............................................................ 27

*United States v. M-K Specialties Model M-14 Machinegun*,
424 F. Supp. 2d 862 (N.D. W. Va. 2006)........................................................ 27

*United States v. Quiroz*,
449 F.2d 583 (9th Cir. 1971) ......................................................................... 28

*United States v. Texas*,
40 F.4th 205 (5th Cir. 2022), *cert granted*, __ U.S. __ (2022)
(No. 22-58 linked with 22A17) ...................................................................... 46

*United States v. Ross*,
948 F.3d 243 (5th Cir. 2020) ......................................................................... 31

*United States v. TRW Rifle 7.62x55mm, One Model 14 Serial 593006*,
447 F.3d 686 (9th Cir. 2009) ......................................................................... 28

*United States v. Whalen*,
337 F. Supp. 1012 (S.D.N.Y. 1972) .............................................................. 27

*United States v. Wick*,
No. CR 15-30-M-DLC, 2016 WL 10612608 (D. Mont. Mar. 11, 2016) .............. 27

*United States v. Wojcikiewicz*,
403 F. App'x 483 (11th Cir. 2010)................................................................. 27

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019)..................................................................... 45

*Util. Air Reg. Grp. v. EPA*,
573 U.S. 302 (2014) ...................................................................................... 13

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) ............................................................................... *passim*

*Virgin Islands Tel. Corp. v. FCC*,
444 F.3d 666 (D.C. Cir. 2006)....................................................................... 45

*Virginia v. Am. Booksellers Ass'n*,
484 U.S. 383 (1988) ...................................................................................... 36

*Warth v. Seldin*,
422 U.S. 490 (1975) ................................................................................... 6, 7

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022)................................................................................... 44

*Winters v. New York*,
333 U.S. 507 (1948) ................................................................................. 25, 35

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ................................................................................ 43

## STATUTES

5 U.S.C. § 703 .......................................................................................... 45

5 U.S.C. § 706(2)(A) .......................................................................... 2, 21

5 U.S.C. § 706(2)(B)–(C) .......................................................................... 2

18 U.S.C. § 921 ........................................................................................ 22

18 U.S.C. § 921(a)(3)(A) .......................................................................... 22

18 U.S.C. § 921(a)(3)(B) .......................................................................... 23

18 U.S.C. § 924(a)(1)(D) .......................................................................... 31

## OTHER AUTHORITIES

BLACK'S LAW DICTIONARY (11th ed. 2019) ............................................. 45

H.G. Emery and K.G. Brewster, THE NEW CENTURY DICTIONARY OF
   THE ENGLISH LANGUAGE, Vol. 2 (1927) ................................................. 45

*How to Mill & Finish an 80% Lower*,
   80 PERCENT ARMS (Nov. 3, 2022) ......................................................... 40

*How to Request Variances, Exemptions, and Determinations*, ATF ....................... 40

Johnathan F. Mitchell, *The Writ-of-Erasure Fallacy*,
   104 VA. L. REV. 933 (2018) .................................................................... 45

Memorandum from the Office of the Att'y Gen. to the Heads of Civil
   Litigating Components U.S. Attorneys, Litigation Guidelines for Cases
   Presenting the Possibility of Nationwide Injunctions 7 (Sept. 13, 2018) ............... 47

Mila Sohoni, *The Power to Vacate a Rule*,
   88 GEO. WASH. L. REV. 1121 (2020) ................................................ 46, 47

Nicholas Bagley, *Remedial Restraint in Administrative Law*,
   117 COLUM. L. REV. 253 (2017) .............................................................. 15

Open Letter to All Federal Firearms Licensees, U.S. Dep't of Justice &
   Bureau of Alcohol, Tobacco, Firearms and Explosives (Sept. 27, 2022) .............. 33

Open Letter to All Federal Firearms Licensees, U.S. Dep't of Justice &
   Bureau of Alcohol, Tobacco, Firearms and Explosives (Dec. 27, 2022) ............... 33

## INTRODUCTION

The Department of Justice ("DOJ") and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") (collectively, "Agencies") continue to provide unsubstantiated and inadequate rationalizations as to why the Final Rule should not fail judicial review. The Agencies' repeated claim that the sky is falling, however, does not alter the facts and statutes. To begin, deference has no place in the case before this Court. The Agencies' squinting at the statute to create ambiguity and manufacture authority to regulate non-firearm objects—against the explicit directive of Congress—violates basic principles of statutory interpretation. The deference afforded to agencies under the "arbitrary and capricious" standard is a lower threshold—presumably why the Agencies beg for its application—and does not apply to misinterpretations of statutes and the Constitution.

Additionally, the Agencies assemble a patchwork of language and claim that because Congress said it somewhere, sometime, 'readily converted' can apply wherever they would like. This disingenuous "interpretation" is not the sole infirmity of the Final Rule. The Final Rule was not a foreseeable or logical outgrowth of the Proposed Rule. The Proposed Rule's definition of "frame or receiver" was mutilated, depriving commenters of the opportunity to provide feedback and the Agencies the benefit of receiving that feedback. The product of the Agencies' definitional labyrinth is a vagueness that clouds the Final Rule. Worse, the Final Rule subjects violators to criminal penalties despite its lack of clarity. The Final Rule also forces sellers and distributors to self-censor for fear of criminal prosecution now that the Agencies have seen fit to regulate First Amendment protected materials.

For these reasons, in addition to the Agencies' lack of authority to promulgate this regulation, the Final Rule should be vacated, and its enforcement enjoined; the Final Rule's unlawfulness cannot be untangled and remedied on remand.

## STANDARD OF REVIEW

The Agencies' standard of review recitation is woefully inadequate. The Agencies act as though Plaintiffs only challenge the Final Rule as being arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A). Defs' Br. in Opp to Pls.' Mot. For Summ. J. & Cross-Mot. ("Feds' Br." or "Agencies' Brief") at 9. By focusing on only this basis for review, the Agencies assert that the Court's review of the Final Rule must be narrow and highly deferential, a court cannot second-guess an agency's judgment, there is "less latitude in finding grounds for reversal," and agency action must be upheld if the agency articulates a minimally rational relationship between the facts it found and the choice it made. *Id.* That simply is not the case.

As an initial matter, Plaintiffs challenge the Final Rule on multiple bases, including as being in excess of the Agencies' statutory authority and contrary to constitutional right, power, and privilege under 5 U.S.C. § 706(2)(B) and (C). *See* ECF Nos. 16, 133 (Preliminary Injunction brief and Rule 65 Supplement); Pls.' MSJ at 39–63. Courts generally review questions of statutory and constitutional interpretation *de novo*, not under a "highly deferential standard." *See Siwe v. Holder*, 742 F.3d 603, 607 (5th Cir. 2014) (agency's legal conclusion reviewed *de novo* unless agency is construing an ambiguous statute that it has the responsibility to administer); *Adkins v. Vilsack*, 252 F. Supp. 3d 588, 596–97 (N.D. Tex. 2017) (courts review legal questions *de novo*, but with an "appropriate level of deference" for interpretations of a statute or regulation). Because the GCA is not ambiguous as relevant here, the Court owes no deference to the Agencies. *See Cargill v. Garland*, 57 F.4th 447, 464–65 (5th Cir. 2023) (*en banc*) (*Chevron* not applicable where government had not invoked it and the statute imposed criminal penalties).

Even where agency action is reviewed under an arbitrary and capricious standard, the review is not pro forma. The Fifth Circuit has recently stated that a court need not rely on an

agency's assertion that it considered important aspects of the problem but rather "must make a searching and careful inquiry to determine if [the agency] actually *did* consider" them. *Texas v. United States*, 40 F.4th 205, 228 (5th Cir. 2022) (determining agency had not shown adequate consideration of costs of new rule and reliance on old policy) (quoting *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986)); *Sierra Club v. Peterson*, 185 F.3d 349, 368 (5th Cir. 1999) ("*Overton Park* added teeth to arbitrary and capricious review") (citing *Citizens to Preserve Overton Park v. Volp*e, 401 U.S. 402, 415–16 (1971)).

## ARGUMENT

I. **INDIVIDUAL PLAINTIFFS AND FIREARMS POLICY COALITION, INCLUDING ITS MEMBERS, ARE HARMED BY THE FINAL RULE AND HAVE STANDING TO CHALLENGE IT**

### A. **The Individual Plaintiffs Have Standing**

The Agencies' argument that Individual Plaintiffs lack standing is inconsistent with this Court's prior findings and misapplies the traceability element of standing.

First, this Court has already found that Individual Plaintiffs established irreparable harm. This Court noted Plaintiffs' affidavit testimony that, but for the risk of criminal penalties, they would directly purchase items they perceive as being subject to the Final Rule. *See* ECF No. 89 at 9 (citing Supp. Decl. of J. VanDerStok 1, ECF No. 62-1, ¶¶ 2–6; Supp. Decl. of M. Andren 1, ECF No. 62-2, ¶¶ 2–6). Because "the credible threat of a potential felony indictment" has effectively chilled Individual Plaintiffs' behavior, they have "sufficiently demonstrated irreparable harm." *Id.* at 11. The Agencies provide no argument as to why this prior finding was erroneous or how Individual Plaintiffs could suffer irreparable harm and yet not have standing. *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."). Nor can the Agencies claim they are not responsible for the expansion of criminal penalties to

3

previously lawful conduct—a practice that Individual Plaintiffs engaged in prior to the Final Rule is now unlawful under the Final Rule. Plaintiffs' irreparable harm demonstrates their standing.

Additionally, this Court previously found that to purchase items newly regulated due to the Final Rule, Individual Plaintiffs would be required to route their transaction through a Federal Firearms Licensee ("FFL") and incur a $30 transfer free, plus additional time and expense. ECF No. 89 at 7–8. While this Court found these costs insufficient to establish *irreparable* harm, they demonstrate *harm* nonetheless and provide standing. *See ESI/Emp. Sols., L.P. v. City of Dallas*, 531 F. Supp. 3d 1181, 1188 (E.D. Tex. 2021) (overruling objections to declarations providing cost estimates where relief sought was nonmonetary and increased costs established *de minimis* harm for standing purposes). There is no dispute that these expenditures would be unrecoverable against the Agencies should Plaintiffs prevail. Again, the Agencies do not argue or provide authority to the contrary.

The Agencies' main argument seems to be that because the FFL transfer fees are not federally mandated, they are not traceable to the Agencies. The Agencies assert that the fees are "the independent action of some third party." Feds' Br. at 28–29. This argument stems from a sound bite in *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), and does not withstand analysis. For example, in *Department of Commerce v. New York*, the Supreme Court held that third party action will not defeat standing when the "theory of standing . . . does not rest on mere speculation about the decision of third parties; [but] relies instead on the *predictable effect* of Government action on the decisions of third parties." 139 S. Ct. 2551, 2565–66 (2019) (emphasis added). Indeed, even in *Lujan*, the Court held that a plaintiff would need only "adduce facts showing" the third-party choices that "will be made." 504 U.S. at 562. Here, Individual Plaintiffs did not

4

speculate, but contacted an FFL. *See* Supp. Decl. of J. VanDerStok, ECF No. 62-1, ¶¶ 2–6; Supp. Decl. of M. Andren, ECF No. 62-2, ¶¶ 2–6.

Further, actions by third parties do not prevent traceability, as "Article III 'requires no more that *de facto* causality.'" *Dep't of Com.*, 139 S. Ct. at 2566. Tracing an injury to the conduct of a defendant for purposes of Article III does not require meeting a legal standard of proximate cause. *See Air Evac EMS, Inc. v. Tex. Dept. of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 514 (5th Cir. 2017). Thus, harm by a defendant need not be "the very last step in the chain of causation" to be traceable to the defendant. *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997). Here, the harms that Individual Plaintiffs would suffer are directly traceable to the Agencies.

## B.     Firearms Policy Coalition Has Standing

As to Firearms Policy Coalition ("FPC"), the Agencies do not challenge that FPC has standing in its own right. As already addressed in Plaintiffs' Motion, FPC itself has suffered a legal wrong and is adversely affected by the Final Rule because it owns NFOs[1] that it uses to advance its organizational purposes including education, especially in testimony during public hearings on legislation and regulations about the definition of a "firearm." *See* Pls.' MSJ at 50; Combs Decl. ¶¶ 9–11, ECF No. 62-4. Among other issues, because NFOs are now treated as firearms, FPC cannot directly purchase these items, would be required to pay a similar transfer fee as Individual Plaintiffs, would be subject to heightened corporate compliance requirements for storage and transportation, and is prevented bringing NFOs into many places, even though they do not meet the statutory definition of "firearm." This injury satisfies Article III.

---

[1] The items discussed herein are colloquially referred to as "blanks," or "partially-manufactured," "80%" or "unfinished" frames or receivers. These monikers bear no legal significance. Plaintiffs refer to them as non-firearm objects ("NFOs").

In addition, FPC has associational standing to bring this suit. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975) ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members."). Associational standing allows membership organizations to challenge a law's constitutionality if:

> [1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citing *Hunt v. Wash. St Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)); *see Nat'l Rifle Ass'n of Am., Inc. v. BATFE*, 700 F.3d 185, 191–92 (5th Cir. 2012) (finding NRA had associational standing on behalf its members). This District has already determined that FPC has met this test in a similar context. *See Firearms Policy Coal., Inc. v. McCraw*, No. 4:21-cv-1245-P, 2022 WL 3656996, at *2 (N.D. Tex. Aug. 25, 2022) ("FPC has standing to challenge the laws that prohibit its members from carrying a handgun for self-defense outside the home.").

Here, FPC's individual members, including VanDerStok and Andren, have standing to sue in their own right. Moreover, FPC's corporate members, including Tactical Machining and Intervenor-Plaintiff Blackhawk Manufacturing, have standing to sue in their own right. Accordingly, the first associational standing prong it met.

As to the second, this lawsuit is directly germane to FPC's purpose, which is to "advocate for individual liberties, restore freedom, and defend important rights—especially, but not limited to, those protected under the First, Second, Fifth, and Fourteenth Amendments to the United States Constitution." Combs Decl. ¶ 4, ECF No. 62-4. In fact, several of the claims here are directly relevant to FPC's purpose to "fight for the people, liberty, and freedom . . . focused on the right to keep and bear arms and adjacent issues including freedom of speech, due process . . . separation

of powers . . . and limited government." Pls'. MSJ. at 49 (citations omitted). Moreover, the "germaneness requirement is 'undemanding' and requires 'mere pertinence' between the litigation at issue and the organization's purpose." *Ass'n of Am. Physicians & Surgeons, Inc.*, 627 F.3d at 550 n.2 (citing *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 148 (2d Cir. 2006)). Here, that modest requirement is met.

Lastly, the relief Plaintiffs request does not require individual participation by FPC's members. At its base, the third prong is "prudential" and "focuses importantly 'on matters of administrative convenience and efficiency.'" *Id.* at 551 (quoting *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996)). In *Association of American Physicians & Surgeons*, the Fifth Circuit reasoned that, like here, while an association's action for damages running solely to its members would be barred, equitable claims of relief were not, and "both the claims and relief appear to support judicially efficient management if associational standing is granted." *Id.* at 553.

This follows the Supreme Court's reasoning in *Warth*, where it stated: "[S]o long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members entitled to invoke the court's jurisdiction." 422 U.S. at 511; *see Hunt*, 432 U.S. at 342 (citing the same); *UAW v. Brock*, 477 U.S. 274, 282 (1986) (citing the same). As framed in Plaintiffs' Amended Petition and Plaintiffs' Motion, FPC seeks declaratory and injunctive relief against the Agencies and the Final Rule regarding the rights of its members, under the APA and the Constitution, and not individual damages. Given Plaintiffs' requested equitable relief, FPC meets this prudential standing requirement.

The Agencies' arguments regarding the indicia of members tests in *Friends of the Earth, Inc. v. Chevron Chemical Co.* and *Students for Fair Admissions, Inc. v. University of Texas at Austin* are not relevant here. Those cases addressed whether the organizations *actually had members*—something that has never been a question here. *See Friends of the Earth*, 129 F.3d 826, 827, 829 (5th Cir. 1997); *Students for Fair Admissions*, 37 F.4th 1078, 1084–85 (5th Cir. 2022). FPC is a traditional membership organization and has detailed how individuals become members. *See* Combs Decl. ¶ 8, ECF No. 62-4. The Agencies do not contest this point as to FPC in the Agencies' Brief. Accordingly, FPC meets the prongs of the associational standing test and has standing to sue on behalf of its members, as it did in *McCraw*.

## II.   THE FINAL RULE IS INCONSISTENT WITH THE GCA AND THE AGENCIES ARE NOT ENTITLED TO DEFERENCE

The Agencies' interpretation of the GCA is neither correct nor persuasive. While invoking arguments for deference due to the "line-drawing" allegedly required by and the "technical nature" of the GCA, the Agencies simultaneously argue that no deference is needed because the Final Rule offers the "best interpretation of the statutory term 'frame or receiver'" and of the GCA more broadly. Feds' Br. at 57–63. Yet, as this Court already held, as demonstrated in Plaintiffs' prior briefing, as this Court already held, and as further elaborated in Plaintiffs' Rule 65 Supplemental Brief, the Final Rule's inclusion of "partially complete, disassembled or nonfunctional" frames or receivers and its "weapons parts kit" insertion, at a minimum, are inconsistent with the GCA. *See* ECF Nos. 16, 56, 89, 133, 141. Moreover, the Agencies are not entitled deference.

### A.   The Final Rule is Inconsistent with the GCA

This Court has already held that the "Final Rule's redefinition of 'frame or receiver' conflicts with the [GCA's] plain meaning." ECF No. 56 at 8; *see* ECF No. 133-1 (comparison of statutory language and regulation). Specifically, the Rule's addition of "partially complete,

disassembled, or nonfunctional" frames or receivers goes beyond the GCA by regulating things that *may become* receivers as receivers. *Id.* In doing so, the Agencies inappropriately commandeered language Congress had used elsewhere but chose not to use when regarding firearm frames or receivers. *Id.; see Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021); *Allison Engine Co., Inc. v. U.S. ex rel. Saunders*, 553 U.S. 662, 671 (2008).

Similarly, this Court found that the Final Rule expanded the definition of "firearm" beyond that permitted in the GCA by adding a sentence addressing "weapon parts kit[s]." ECF No. 56 at 12. This Court held that the Agencies had inappropriately purported to grant themselves authority, by copying phrases "from various places in the statute, [and] cobbling them together to form the ATF's own definition of 'firearm,'" which exceeded the boundaries of the GCA. *Id.* This Court observed that, in enacting the GCA, Congress chose to regulate only certain parts—the frame or receiver—and that the definition of firearm "does not cover weapon *parts*, or aggregations of weapon parts, regardless of whether the parts may be readily assembled into something that may fire a projectile." *Id.* at 12–13. This Court concluded that "precise wording demands precise application." *Id*. at 13.

These regulations, including the regulation of jigs, tools, and other items that will never be part of a firearm, incorporate terms where Congress excluded them, ignore the plain and understood meaning of "frame" and "receiver," regulate where the Agencies previously recognized they were precluded from regulating, and disregard the legislative history of the GCA. *See* ECF No. 16 at 23–30; ECF No. 56 at 6–10; ECF No. 133 at 8–25, 28–31. In short, using standard principles of statutory construction focused on text, structure, and history, not only is the Final Rule not the best interpretation of the GCA, but it is also inconsistent with the plain meaning of the GCA. *See Collins*, 141 S. Ct. at 1782; *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019); Fed.

Defs.' Mot. for Summ. J., *Syracuse v. ATF*, No. 1:20-cv-06885, 2021 WL 23326, ECF No. 98 at 34 (S.D.N.Y. Jan. 29, 2021).

### B.    The Agencies are not Otherwise Entitled to Deference

#### 1.    The Agencies cannot bootstrap a "gap" into the GCA

While purporting not to invoke *Chevron* and not directly arguing that the GCA is ambiguous, the Agencies argue that Congress left a "gap" for them to fill. Feds' Br. at 57–60.

 As demonstrated above, no such "gap" exists; nor would *Chevron* deference be applicable in any event. *See Cargill*, 57 F.4th at 465 (declining to apply *Chevron* where statute was not ambiguous, agencies did not invoke *Chevron*, statute at issue imposed criminal penalties, and agency's interpretive position was inconsistent with prior interpretation). The Agencies' argument that the GCA is incomplete and should be left to their "technical expertise" relies not on the text of the GCA, but rather on the Agencies' prior position that a frame or receiver is determined by its stage of manufacture. *Id.* at 58. The Agencies cannot bootstrap their prior interpretation of the statute to create ambiguity where none existed in the first place. Moreover, the longevity of an agency's interpretation "is no antidote to clear inconsistency with a statute[.]'" *Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 349 (D.C. Cir. 2019) (quoting *Brown v. Gardner*, 513 U.S. 115, 122 (1994)). "[A]n agency may not insulate itself from correction merely because it has not been corrected soon enough, for a longstanding error *is still an error*." *Summit Petroleum Corp. v. EPA*, 690 F.3d 733, 746 (6th Cir. 2012) (emphasis added).

The Agencies claim that the GCA does not "delineate[] when a frame or receiver is created," that "common" dictionary definitions do not answer this question, and therefore the "ATF must use its technical expertise to draw the line somewhere." Feds' Br. at 57. Essentially, the Agencies' argument is that whenever Congress regulates an item, Congress also implicitly

leaves it to agencies to determine whether and to what degree potential precursors to or elements of the item may be regulated. The Agencies, however, supply no caselaw or other reasoning as to why this is an appropriate approach to statutes. Nor do they provide any limitation that would preclude this argument from being made as to every item regulated under the United States Code.

Thankfully, common statutory principles rebut the Agencies' arguments. *See Tex. Pipeline Ass'n v. FERC*, 661 F.3d 258, 264 (5th Cir. 2011) ("[A]gencies cannot manufacture statutory ambiguity with semantics to enlarge their congressionally mandated border. 'Ambiguity is a creature not of definitional possibilities but of statutory context.'") (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994); *see R.R. Ricou & Sons Co. v. Fairbanks, Morse & Co.*, 11 F.2d 103, 104 (5th Cir. 1926) ("common usage" of terms "describe structures so far completed as to be capable of being used," "a qualifying adjective . . . was not needed to indicate the absence of an intention to give that statute the effect of" applying before then).

### 2. The Agencies cannot use *Skidmore* to incorporate arbitrary and capricious standards into issues of statutory interpretation

Seemingly unhappy with the outcome of any prospective *Chevron* analysis, the Agencies implicitly argue for the application of arbitrary and capricious standards to the entirety of this case, including their statutory interpretation, and ask for deference on other bases, none of which are warranted.

First, "arbitrary and capricious" type deference cannot be applied to statutory interpretation. The Agencies place their "best interpretation" argument *after* their arbitrary and capricious argument, interweaving suggestions of arbitrary and capricious analysis into their statutory interpretation. Feds' Br. at 57–60. This line of argument seems to be inspired by *Baylor County Hospital District*. Feds' Br. at 62 (citing *Baylor Cty. Hosp. Dist. v. Price*, 850 F.3d 257, 262 (5th Cir. 2017)). There, the Fifth Circuit referred to the "'distinct but potentially overlapping'

11

relationship between the arbitrary and capricious standard of review and *Skidmore* deference." *Baylor Cty. Hosp*. 850 F.3d at 262 (internal citation omitted). The *Baylor County Hospital* Court assumed that the arbitrary and capricious standard applied as the more stringent standard before that court, rather than a specific Medicare standard not applicable here. *Id.* at 261 (requiring the agency's finding, "if supported by substantial evidence," to be conclusive). The GCA, however, places no thumb on the Agencies' side of the scale.

The Agencies claim that defining frame or receiver requires "technical expertise to draw the line somewhere," and then cite cases to the effect that "courts are generally unwilling to review line-drawing by the agency" unless the lines "are patently unreasonable." Feds' Br. at 57–58. Each of the cases cited by the Agencies proceeded under an arbitrary and capricious analysis. *See Texas v. Becerra*, 577 F. Supp. 3d 527, 551 (N.D. Tex. 2021) (enjoining HHS COVID vaccine and mask mandates, making line-drawing statement in context of arbitrary and capricious analysis); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214–15 (D.C. Cir. 2013) (making line-drawing statement in context of evaluating whether agencies' selection of entities to receive demand letter was arbitrary); *Gulf Restoration Network v. U.S. Dep't of Trans*., 452 F.3d 362, 370 n.15 (5th Cir. 2006) (applying line drawing statement in the context of an arbitrary and capricious review of consideration of cumulative effects and what is "foreseeable"). These cases do not establish that the Agencies may, as they seek to do here, reduce a court's diligence or duty when interpreting a statute merely by claiming that statutory interpretation is an instance of drawing lines as to the limit of the Agencies' authority.

Second, the Agencies cite cases mentioning their "expertise in classifying firearms," suggesting the Court should defer to such expertise. Feds' Br. at 59. In the first case, the court found that only *Skidmore* deference could apply to a classification letter and then rejected the

12

classification of the item at issue as a silencer, proving that whatever "expertise" the Agencies may have, it is neither absolute nor determinative. *See Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 24 (D.D.C. 2014) (holding ATF's classification of item was arbitrary and capricious and "deeply flawed" for failure to provide adequate reasoning and failure to consider relevant data). The second case likewise mentioned deference only in the context of an arbitrary and capricious review, deferring to ATF's distinction between a muzzle brake and a silencer. *Sig Sauer, Inc. v. Jones*, 133 F. Supp. 3d 364, 370–72 (D.N.H. 2015). These cases are consistent with this Court's statement that ATF may be entitled to some deference when making a specific classification. *See* ECF No. 56 at 10. *This* case, however, is not about applying existing regulations to a single item, but about changing federal regulations entirely to sweep new categories of items into the Agencies' purview. An arbitrary and capricious standard is not appropriate in this context.

Third, the Agencies resort to their concern that, without the Final Rule, it will be too easy to circumvent the purposes of the GCA. Feds' Br. at 59. The Agencies' repeated attempts to sensationalize this matter and claim chaos in the streets does not expand the statutory limits on their authority. The Agencies have no more expertise than courts in divining legislative purpose and offer no authority for their supposition that courts should defer to new statutory interpretations that an Agency discovers half a century after the statute was enacted. Indeed, this Court has already rejected the Agencies' articulation of the intent of the GCA as overly broad. ECF No. 56 at 11. In any event, perceived legislative purpose cannot overcome unambiguous statutory text. *See Griffin v. Oceanic Contractors, Inc*., 458 U.S. 564, 571 (1982) ("There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes."); *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 325 (2014) ("An agency has

13

no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms.").

The Agencies' interpretation of the GCA is due no deference.

## III.   THE FINAL RULE IS PROCEDURALLY DEFECTIVE

In addition to being inconsistent with the GCA and entitled no deference, the Final Rule is procedurally defective. First, the Proposed Rule did not provide adequate notice and opportunity to comment on what became the Final Rule; the extent and direction of change from what was noticed was not foreseeable. Second, the Agencies failed to adequately explain their reversal of position and failed to consider important aspects of the Final Rule, rendering their action arbitrary and capricious.

### A.   The Final Rule's Deviation from the Proposed Rule Exceeds Logical Outgrowth

Contrary to the Agencies' assertion, the Final Rule is not a logical outgrowth of the Proposed Rule. *See* Pls.' MSJ at 23–30; *contra* Feds' Br. at 31–43. The Agencies try to obscure this fact by pointing to specific, minute similarities between the two and by attempting to minimize their burden under the APA. Importantly, in the context of this claim, Plaintiffs do not assert that the Agencies *cannot* make these changes—that would be a distinct argument—but rather that, in making specific changes between the Proposed Rule and the Final Rule, the Agencies materially diverged from the former in a way that was unknowable to the reasonable commenter; thus the Agencies were required to notice those substantive alterations and allow for comment. The Agencies' claim that enforcing the logical outgrowth requirement would in some way broadly and negatively impact their ability to issue federal regulations is nonsense. Congress established the Agencies' ability to issue regulations and conditioned that ability on notice and comment. Application of the law is not a negative feedback loop; it is the will of Congress. The Agencies'

14

failure here constitutes a violation of the APA that warrants vacatur of the Final Rule. *See* Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 COLUM. L. REV. 253, 275 (2017) ("[N]early every logical-outgrowth violation leads to vacatur."). The ultimate question on this issue is whether the Agencies provided adequate notice to the public to respond to the scope and issues in the Final Rule, and the answer simply, "No."

The Agencies do not dispute that a final agency action must logically grow from the proposed action, so that any interested parties could reasonably anticipate (and therefore provide comment on) the changes. Feds' Br. at 14; *see Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381–82 (5th Cir. 2021); *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) ("notice [of proposed rulemaking] must adequately frame the subjects for discussion such that [an] affected party should have anticipated the agency's final course"); *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004). Instead, the Agencies claim they meet the duty imposed by the APA standard and lean heavily on a previously rejected and non-binding order denying a preliminary injunction in *Morehouse Enterprises LLC*. Feds' Br. at 31–33. The Agencies do not meet the APA's requirements here.

The Final Rule does not have to identically follow the Proposed Rule, but the APA's mandate is a question of fair notice. "[I]f if the final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal." *Texas v. EPA*, 389 F. Supp. 3d 497, 504 (S.D. Tex. 2019) (quoting *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983)). This requirement seeks both to include the public in the rulemaking that will bind it *and* to provide the agency the benefits of obtaining informed input from as many sources as possible. *Id.* at 503–04 ("[T]he notice-and-comment requirements assist in the substantive formation of a rule by ensuring 'that the broadest base of

15

information [is] provided to the agency by those most interested and perhaps best informed on the subject of the rulemaking at hand.'") (quoting *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616, 620 (5th Cir. 1994)). The test that the Agencies repeatedly bury is: "Whether a final rule is a 'logical outgrowth' of a proposed rule will turn on whether the interested parties 'should have anticipated' the final rule from the proposed rule." *Id.* (quoting *Small Refiner Lead*, 705 F.2d at 549). "The object, in short, is one of fair notice." *Id.* (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007)). The Agencies cannot satisfy this test here.

First, the Agencies' attempt to support their argument through extensive usage of footnotes constitutes a waiver of those specific arguments. As the Agencies have previously recognized, "[a]rguments subordinated in a footnote are insufficiently addressed in the body of the brief, and thus are waived." *See Arbuckle Mountain Ranch of Tex., Inc. v. Chesapeake Energy Corp.*, 810 F.3d 335, 339 n.4 (5th Cir. 2016) (internal quotation marks omitted); *see* Defs' Resp. to Ps' Req. to Expand Scope of Preliminary Inj., ECF No. 72 at 18 (quoting the same).

Second, the Agencies' argument that the "mere fact that the Rule chose to define 'frame' and 'receiver' separately, instead of using the combined term 'frame or receiver,' as in the Notice, represents a trivial distinction," Feds' Br. at 31–32, is misdirection. The ultimate question when determining if something is a logical outgrowth is whether the notice "adequately frame[s] the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice." *See Huawei Techs.*, 2 F.4th at 447. Here, the Agencies fail to address how an ordinary commenter would have been aware that the Final Rule would come to separately define "frame" and "receiver" based on different and specific components that were not addressed in the Proposed Rule. This applies to the Agencies' alteration and surprise inclusion of several definitions in the Final Rule, as addressed in Plaintiffs' Motion.

The Proposed Rule focused on the "part of the firearm that . . . provides a housing or a structure designed to hold or integrate one or more fire control components[.]"[2] Proposed Rule at 27,741. But the Final Rule defines "frame" as "the part of a handgun, or variants thereof, that provides housing or a structure for the primary energized component designed to hold back the hammer, striker, bolt, or similar component prior to initiation of the firing sequence," and "receiver" as "the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence[.]" Final Rule, at 24,735. The Agencies fail to address how a reasonable commenter would have been able to anticipate this change as to appropriately comment on it for the Agencies to reap the benefits of those comments.

The Agencies credit comments as the basis for the Agencies' change, arguing that proves notice was adequate. *See* Feds' Br. at 32 n.6. But the Agencies cannot satisfy the APA's notice burden by pointing to a selection of commenters as justification for the change between proposed and final agency action. *See Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098, 1104 (4th Cir. 1985) ("An agency . . . does not have carte blanche to establish a rule contrary to its original proposal simply because it receives suggestions to alter it during the comment period."). The Agencies have an independent duty to ensure that a reasonable commenter could foresee the change, not that a commenter prompted the change; commenters are not required to review other comments.

---

[2] The Proposed Rule defines a "fire control component" as "a component necessary for the firearm to initiate, complete, or continue the firing sequence, including any of the following: Hammer, bolt, bolt carrier, breechblock, cylinder, trigger mechanism, firing pin, striker, or slide rails." Proposed Rule at 27,741.

But more telling is that even the examples the Agencies provide to support their argument that "it was readily apparent to commenters that the final rule might adopt a [new] definition of 'frame or receiver,'" are substantially similar to the definition in the Proposed Rule, not the Final Rule. *See* Feds' Br. at 32, 32 n.6. Moreover, not a single one cited by the Agencies sought to split the definition of "frame or receiver," into separate definitions for "frame," "receiver," "variant," and examples thereof. The question is not whether a commenter could have anticipated *some* change to "frame or receiver," but whether the Proposed Rule provided sufficient notice that a reasonable commenter could have anticipated the change and so have an opportunity to comment on that change. And, as fully addressed in Plaintiffs' Motion, there could be untold downstream effects of separately defining "frame," "receiver," and "variant" that the Agencies are not aware of because of their failure—this thwarts the key purpose behind the APA's requirements. *See* Pls.' MSJ at 30.

Third, the Agencies skirt the issues with "variant" raised by Plaintiffs. Even though the Agencies never defined and barely used the term "variant" in the Proposed Rule, the Agencies claim "[i]t is not surprising that the Rule would clarify how the definitions of 'frame' and 'receiver' would apply to weapons utilizing similar designs[.]" Feds' Br. at 35. Yet not only are there *not* independent definitions of "frame" and "receiver" in the Proposed Rule, but the Proposed Rule only speaks about "variants" in reference to specific semiautomatic "variants" of machineguns— not in reference to similarly designed semiautomatic firearms. Again, commenters were not given an opportunity to comment on the breadth or impact of "variant." Proposed Rule at 27,729.

Ironically, the Agencies note that, due to the change in definition between the Proposed Rule and Final Rule, the Agencies had to address variants in a completely new way, because "there was no need for the [Proposed Rule] to address variants of single unified (*i.e.*, not split or

modular)" frame or receiver firearms. Feds' Br. at 35 n.9. In other words, because of the material changes between the Proposed Rule and the Final Rule, the Agencies needed to establish and define a new term to address the different impact of the new Final Rule's definitions. Even the Agencies did not anticipate that they would need to separately define this category of firearms.

Fourth, the Agencies miss the point in attempting to counter Plaintiffs' arguments regarding the illustrative examples provided for the Final Rule's definition. The point is not that the Agencies cannot use examples, nor that the Agencies cannot provide new examples in the Final Rule. Rather, the examples, and their shift in usage from the Proposed Rule to the Final Rule, demonstrate the drastic impact of the change in definitions. The breadth of the Final Rule's "frame" and "receiver" definition expanded so much that the new definition captured six additional "examples" that were previously separately defined and regulated. *See* Pls.' MSJ at 28. The Proposed Rule enumerated these six classes under "[s]plit or modular frame or receiver" based on prior specific determinations by the Director because they otherwise did not fall within the proposed definition of "frame or receiver," but under the Final Rule they do. *Compare* Final Rule, at 24,735–41 *with* Proposed Rule at 27,742–46. The examples themselves are not at issue, but they demonstrate the change in impact between the Proposed and Final Rule.

Fifth, in terms of a "partially complete, disassembled, or nonfunctional frame or receiver," the fact that the Proposed Rule used the language "*any available* instructions, guides, templates, jigs, equipment, tools, or marketing materials," Proposed Rule at 27,746 (emphasis added), does not mean that a reasonable commenter would have anticipated an item's classification could change based on *anything* that is "sold, distributed, *or possessed* with the item or kit," Final Rule, at 24,739 (emphasis added). *See* Feds' Br. at 36. The Proposed Rule does not use the term "possessed" nor does it give any indication that the term "available" would extend beyond those

listed items being made available by the seller or distributor. In fact, the natural reading of the Proposed Rule's reach appears later in the Final Rule's expanded: ". . . or otherwise *made available by the seller or distributor* of the item or kit to the purchaser or recipient of the item or kit." Final Rule, at 24,739. It is telling that the Agencies continued to include that language in the definition, while also expanding the definition to cover things simply possessed alongside an NFO. No reasonable commenter could have anticipated such an expansion. Moreover, to the extent the Agencies argue that the logical outgrowth doctrine is more appropriately limited to instances where an agency alters the scope of its authority between a proposed and final rule, this is a prime example of such an issue and is fully briefed in the context of Plaintiffs' challenge as to the Agencies' lack of statutory authority to promulgate the Final Rule. *See* Feds' Br. at 40; *see also* Pls' Supp. Br. Under Rule 65(A)(2) Consolidation, ECF No. 133, at 10–13.

Lastly, the Agencies fail to adequately address the most obvious evidence presented by Plaintiffs. From the Proposed Rule to the Final Rule, a single definition with four subparts became a nearly ten-part definition covering terms and concepts never mentioned. Commenters could not have anticipated splitting "frame or receiver," which had been conjunctively defined since 1968, into three parts with newly included examples. *Compare* Proposed Rule at 27,741–46 *with* Final Rule, at 24,735–41. There is also no way that commenters could have anticipated the Agencies would adopt entirely new terms and definitions.

"Agency notice must describe the range of alternatives being considered with reasonable specificity." *Small Refiner Lead*, 705 F.2d at 549. Even if the Final Rule had "not amount[ed] to a complete turnaround" from the Proposed Rule, it was still inadequate because it did not "indicate[] that [the Agencies were] contemplating [the] particular change[.]" *See CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081–82 (D.C. Cir. 2009); *see also Ass'n of Priv. Sector Colls. &*

20

*Univs. v. Duncan*, 681 F.3d 427, 462 (D.C. Cir. 2012). Realistically, there was "no way that commenters here could have anticipated which particular aspects of [the Agencies'] proposal were open for consideration." *See CSX Transp.*, 584 F.3d at 1082 (cleaned up).

### B.     Position Changes in the Final Rule are Arbitrary and Capricious

The Agencies' failure to explain their reversal and expansion of positions or to consider specific constitutional implications of the Final Rule render the Agencies' decisions arbitrary and capricious. A reviewing court shall set aside agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). The "arbitrary-and-capricious standard requires that agency action be [both] reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). An agency action is not reasonable if the agency "has relied on factors which Congress has not intended it to consider" or "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*. ("*State Farm*"), 463 U.S. 29, 43 (1983).

"An agency action representing a policy change requires 'a reasoned analysis of the change beyond that which may be required when an agency does not act in the first instance.'" *Handley v. Chapman*, 587 F.3d 273, 281 (5th Cir. 2009) (quoting *State Farm*, 463 U.S. at 42). Once again, however, the Agencies fail to adequately explain their change in policy from "we do not have legal authority to regulate non-firearms or parts under the GCA" to "we have legal authority to regulate non-firearms and parts under the GCA." Instead, the Agencies point to statutes covering machineguns (which are irrelevant to this question) and ignore the underlying legal issue that they lack the authority to promulgate the Final Rule. Moreover, the Agencies expressly leave out important parts of the statue and definitions to make it seem like they might have the regulatory authority they expressly disavowed previously.

The Agencies have failed to explain their change in position and policy as to the scope of their authority; that failure renders the change arbitrary. *See* Pls.' MSJ at 34–36. In particular, the Agencies' prior position was that they did not have the power to take language from one part of the GCA ("readily be converted") and apply it to another part of the GCA, and that the GCA excludes treating NFOs as firearms. *See* Fed. Defs.' Mot. for Summ. J., ECF No. 98 at 14, *Syracuse v. ATF*, No. 1:20-cv-06885 (S.D.N.Y. Jan. 29, 2021) ("Importantly, the 'designed to' and 'readily be converted' language are only present in the first clause of the statutory definition. 18 U.S.C. § 921(a)(3)(A). Therefore, an unfinished frame or receiver does not meet the statutory definition of 'firearm' simply because it is 'designed to' or 'can readily be converted into' a frame or receiver."); *id.* at 29 ("The GCA Excludes Unmachined Frames or Receivers From the Statutory Definition of a Firearm"); *id.* at 33 ("That the statute contains a separate clause defining firearms to include weapons that 'may readily be converted to' expel a projectile makes clear that the phrase 'designed to' in the statute does not encompass items that are intended to become part of a gun only after being converted into something else."); *id.* at 34 ("The absence of analogous language in Section 921's definition of 'firearm,' forecloses any argument that unfinished frames or receivers are firearms simply because they are parts that will later be assembled into firearms, or because they are intended to be incorporated into firearms."). Similarly, the Agencies recently argued that "[a]s a statutory matter, Congress has legislatively defined a 'firearm' to be a weapon that may be readily converted to expel a projectile by the action of an explosive, or the frame or receiver of such weapon, but has explicitly excluded 'firearms parts' from that definition." Fed. Defs.' Mot. to Dismiss, ECF No. 29, at 10, *California v. ATF*, No. 3:20-cv-06761 (N.D. Cal. Nov. 30, 2020) (emphases added).

Now the Agencies take a diametrically opposed position, arguing essentially that the existence of the language in surrounding statutory provisions *supports* rather than forbids the incorporation of language where Congress did not use it. Feds' Br. at 47. Not only do the Agencies continue to fail to explain their change, but they deny that they made any change at all, instead claiming they are adhering to a "longstanding fact-specific approach." Feds' Br. at 44. The Agencies try to frame their policy at a high level, arguing that the question has always been whether an item has reached a "critical stage of manufacture." Feds' Br. at 44, 46. But the Agencies are unquestionably regulating items under the Final Rule that they expressly argued they lacked authority to regulate just two years ago. Indeed, the Agencies are now regulating jigs, tools, and other items that will never be part of a firearm and that they had never before claimed the ability to regulate. The APA requires an explanation—an explanation the Agencies have failed to provide.

The Agencies also fail to explain how a weapons parts kit (without a frame or receiver) could be a firearm when the Agencies had previously considered that a kit could be a firearm only when: (1) the kit contained what was legally a frame or receiver (under 18 U.S.C. § 921(a)(3)(B)); or (2) was otherwise a machinegun. Final Rule, at 24,662 n. 44. The Agencies fail to explain a plethora of changes, resulting in arbitrary and capricious decision-making.

As to the Agencies' failure to consider important aspects of the problem, the question here, for example, is whether the Agencies even considered that their conduct might be a speaker- or content-based regulation of speech or whether the Final Rule informs people of ordinary intelligence what is proscribed; having failed to consider these issues violates the APA separate and apart from the underlying constitutional violations. The substance of the constitutional claims is addressed in the relevant sections below.

The Agencies' dismissive treatment of speech chilled by the Final Rule shows just how inadequately they considered, and still consider, important aspects of their actions. For example, the Agencies assert that they considered the First Amendment by responding to a comment about the impact of the Rule on works of expressive art that include random components, some of which may be components of a firearm. Feds' Br. at 52 (citing Final Rule, at 24,675). That comment and response, however, bear no relation to Plaintiffs' assertion that the Final Rule is a speaker-based, content-based regulation of the transmission of information. *See infra* Section V. The Agencies failed to consider this aspect of the problem of regulating instructions and marketing materials.

Nor do the Agencies' explanations yet consider the impermissibly vague import of the "complete weapon" definition. The Agencies' responded to comments addressing the potential vagueness of other terms, but not this one. Final Rule, at 24,678–79. Neither the Agencies' definition of "complete weapon" nor their claim that it will only affect manufacturers is statutorily supported. Law enforcement officers, prosecutors, and courts across the country will be applying these regulations in settings well outside the regulation of marking weapons. And yet, the Agencies have entirely failed to consider that aspect of the problem.

## IV.     ELEMENTS OF THE RULE ARE UNCONSTITUTIONALLY VAGUE

The Final Rule does not inform people of ordinary intelligence what is proscribed. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Magee v. City of South Padre Island*, 463 F. App'x 377, 379 (5th Cir. 2012) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). It would seem, however, that the Agencies do not mean—nor intend—for their regulations to be clear, but only to "provide direction" which should not be subject to "inflexible" or "restrictive application" by courts. Feds.' Br. at 21; Final Rule, at 24,652.

"A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 761 (5th Cir. 2010) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). In a facial challenge, particularly a pre-enforcement facial challenge, "the principal inquiry is whether the law affords fair warning of what is proscribed." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 503 (1982). The Final Rule is ripe for arbitrary, subjective enforcement; therefore, it is unconstitutionally vague.

### A.  The Definition of "Readily" is Unconstitutionally Vague

"Men of common intelligence cannot be required to guess at the meaning of [an] enactment." *Winters v. New York*, 333 U.S. 507, 515 (1948). Yet guessing is exactly what is required under the Final Rule. The Final Rule departs from the statutory definition of firearm by adding a new subcategory: "The term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." Final Rule, at 24,735. But it is unclear to a person of common intelligence when an item or kit is "readily . . . converted" into a "firearm", whether or how "completed" is meant to differ from "assembled," or if "otherwise converted" is meant to encompass more than the "converted" in the GCA.

The Final Rule purports to "define" the term "readily," as it applies both to a "weapons part kit" and as it is used in the GCA's definition of "firearm," but the "definition" does not provide an objective, ascertainable standard that informs people of common intelligence of what is prohibited. Rather, the Final Rule defines "readily" as "[a] process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or

easiest process, action, or physical state." Final Rule, at 24,735. The "definition" then lists eight subjective "factors relevant in making this determination [of the classification of firearm]." *Id*. Presumably, if a kit is faster or easier to convert, or if the converter has more expertise or parts available, the more likely the kit is to be classified as a firearm—but the Rule does not specify. The Rule provides no examples of how each factor might be applied, nor any benchmarks for when a factor might tip the scales to "firearm" classification. Indeed, the list of factors is not necessarily even exhaustive of what the Agencies might consider in their classification determination—the definition of "readily" merely states that relevant factors "include" the foregoing—not that the Agencies are limited to considering only those factors. *Id*.

The nebulous and amorphous definition of "readily" lends itself to precisely the type of ad hoc and subjective interpretations the vagueness doctrine guards against. *See Vill. of Hoffman Ests.*, 455 U.S. at 498 (quoting *Grayned*, 508 U.S. at 108–09) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications."). How much time or expense must be anticipated before it affects an item's classification? Does the classification change if the item is in the hands of an expert welder with a machine shop in his garage, versus if it is in the hands of an attorney with no handyman skills living in an apartment? The Supreme Court has recognized "that the more important aspect of the vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). The Final Rule provides no such guidelines for applying the definition of "readily."

The Agencies overstate, overgeneralize, and obfuscate important distinctions when they claim that most courts "to consider the question" have found that "readily converted" or "readily restored" are not unconstitutionally vague. Feds' Br. at 71–72. As an initial matter, various of the cases the Agencies cited addressed the question of whether an item that was once a functional machinegun (pursuant to the National Firearms Act ("NFA")) could be "readily restored" to function as a machinegun, and often relied upon the previously functional nature of the item or other language in the "machinegun" definition not applicable here.[3] Other cases made a similar inquiry under the NFA about whether a short barreled rifle or shotgun could be readily restored to its prior functional state or, under state law, whether a magazine could be readily restored, likely to its original and common capacity.[4] In one similar case the Agencies cite, addressing disassembled short-barreled rifle kits, the court lamented the ambiguous nature of "readily restored" but found that *other terms* provided adequate notice. *See United States v. Drasen*, 845

---

[3] *See United States v. Kelly*, 276 F. App'x 261, 267 (4th Cir. 2007) (addressing previously functional military M-14s; addressing vagueness and two other claims in one sentence); *United States v. M-K Specialties Model M-14 Machinegun*, 424 F. Supp. 2d 862, 872 (N.D. W. Va. 2006) (addressing previously functional military M-14s), *United States v. Wick*, No. CR 15-30-M-DLC, 2016 WL 10612608, at *3–4 (D. Mont. Mar. 11, 2016) (addressing Uzi parts kits, finding challenge to "readily restored" precluded by Ninth Circuit precedent); *United States v. Whalen*, 337 F. Supp. 1012, 1018–19 (S.D.N.Y. 1972) (addressing war trophy machineguns); *United States v. Campbell*, 427 F.2d 892, 893 (5th Cir. 1970) (addressing M-2 conversion kits as "combination of parts" that allowed weapon to operate as a machinegun and finding machinegun statute gave adequate notice).
[4] *See N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 266 (2d Cir. 2015) (addressing readily restored in the context of magazine capacity and relying on *United States v. 16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns*, 443 F.2d 463, 464 (2d Cir. 1971) discussed below); *United States v. Kent*, 175 F.3d 870, 874 (11th Cir. 1999) (addressing readily restored in context of short-barrel rifle disassembled into two parts and considering use of "made" in definition); *United States v. Catanzaro*, 368 F. Supp. 450, 454 (D. Conn. 1973) (addressing readily restored in context of non-functioning sawed-off shotgun); *United States v. Wojcikiewicz*, 403 F. App'x 483, 486 (11th Cir. 2010) (finding argument about short-barrel rifle waived in light of guilty plea); *Roberts v. United States*, No. 2:04-cr-295-PMD, 2007 WL 9754483, at *7 (D.S.C. Oct. 30, 2007) (addressing argument regarding AK 47 with pistol grip and bayonet mount under NFA "any other weapon" after entry of guilty plea and sentencing).

F.2d 731 733–35 (7th Cir. 1988) (the court noted "[t]he statutory language 'readily restored' is somewhat ambiguous[,]" but relied on "make," "rifle" and the previous version of the statute to hold that it provided adequate notice). Furthermore, many of these cases were in settings where the burden was on the claimant/defendant or provided no analysis of the vagueness question. Finally, the cases that did involve "readily converted" under the GCA dealt with starter guns, the very items called out in the text of the GCA, causing the courts to find that the statute provided adequate notice.[5]

Obviously, none of the cases cited by the Agencies reviewed their newly created phrase "readily completed, assembled, restored, or otherwise converted" or their newly created category of a "weapon parts kit." Final Rule, at 24,735. Nor did any of the cases address the situation now swept within "weapon parts kit," and "partially" complete frame or receiver, where a purchaser would have to engage in machining or other operations to complete the manufacture an item before then assembling parts. Moreover, precedent underlying one of the cases cited by the Agencies turned to dictionary definitions of "readily." *See United States v. TRW Rifle 7.62x55mm, One Model 14 Serial 593006*, 447 F.3d 686, 689–90 (9th Cir. 2009) (applying dictionary definitions in context of readily restored machinegun). But "readily" under the Final Rule has a definition appended with a list of relative and subjective factors. Final Rule, at 24,735. Thus "readily completed, assembled, restored, or otherwise converted" is not the same as "readily converted" starter guns or "readily restored" functional items dealt with in the cases the Agencies rely upon.

The Agencies also claim that similar tests featuring non-exhaustive lists of factors have passed constitutional muster. But their cases in support are both out of circuit and readily

---

[5] *See 16,179 Molso Italian Starter Guns*, 443 F.2d at 464 (addressing starter guns in forfeiture context); *United States v. Quiroz*, 449 F.2d 583, 585 (9th Cir. 1971) (addressing starter gun).

distinguishable. In *Prime Healthcare Services, Inc. v. Harris*, for example, the "enabling regulations supply definitions and guidelines for what the Attorney General shall and may consider in her review"—not bare factors with no indication of how they should be applied. 216 F. Supp. 3d 1096, 1125 (S.D. Cal. 2016). Moreover, *Prime Healthcare* dealt with hospital acquisitions and specifically noted that "[t]he vagueness inquiry is less strict in the civil context." *Id.* at 1124. *Chabad Lubavitch of Litchfield Cty., Inc. v. Borough of Litchfield* similarly dealt with a civil statute, this one related to the criteria for judging applications for construction in a historic district. 853 F. Supp. 2d 214, 219 (D. Conn. 2012), *aff'd in relevant part, vacated in part, remanded sub nom. Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183 (2d Cir. 2014). While there was some room for discretion in enforcement, the underlying statute included guidance for contextualizing the discretionary factors, such that "those factors are sufficiently tied to objective aesthetic standards." *Id.* at 235. By contrast, the Final Rule does not provide any objective standard for application of any of the listed factors, nor does it provide any guidance as to how the factors interact. *See Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993), *as amended on denial of reh'g* (Nov. 9, 1993) (how each factor is applied "is a mystery so far as the current record is concerned. The uncertainty . . . is all the greater when these mysteries are considered in combination, according to some undisclosed system of relative weights."). Providing numerous relative, subjective factors of unknown weight does not provide clarity. *See McDonald v. City of Chicago*, 561 U.S. 742, 975 (2010) (Scalia, J., concurring) ("The ability of omnidirectional guideposts to constrain is inversely proportional to their number.").

Ironically, the Agencies cite to *Village of Hoffman Estates* for the proposition that "the statutory term 'designed . . . for use' calls for an inquiry into the product's 'objective features,'" suggesting that a similar inquiry is appropriate for the term "readily." Feds' Br. at 72 (citing 455

U.S. at 500–01). The court in *Village of Hoffman Estates* noted that "objective features" refers to "features designed by the manufacturer." 455 U.S. at 501 ("A business person of ordinary intelligence would understand that this term refers to the design of the manufacturer, not the intent of the retailer or customer."). The eight factors the Final Rule lists as relevant, however, are neither tied to objective standards nor are they attached to objective features of the products themselves. Instead, most of the factors—time, ease, expertise, parts availability, etc.—are dependent on subjective facts, such as the skills and resources of the person completing the item, not on objective criteria regarding the manufacturer or the item itself.

The Agencies' attempt to distinguish *Timpinaro* is equally unpersuasive. The Agencies claim that, unlike the SEC in *Timpinaro*, they engaged with commenters' vagueness concerns and provided "illustrative examples" of how certain items would be classified. Feds' Br. at 74. The examples, however, do not provide guidance on how the eight relevant factors would be applied. Final Rule, at 24,739. A few of the examples mention instructions, jigs, or tools, but they say nothing whatsoever about the time, ease, expertise, or expense involved. *Id*. They also say nothing about how the factors are weighed. *Id*. At best, the eight factor "readily" test in the Final Rule suffers from the same infirmities as the seven-part test at issue in *Timpinaro*, which the court instructed the SEC to "consider whether [the test] could be made more definite before it is subjected to scrutiny under the Due Process Clause." 2 F.3d at 460.

The definition of "readily" in the Final Rule is hopelessly vague. It lists eight relevant, non-exhaustive factors to consider in identifying "firearms." It provides no standards for applying those factors or how they interact, leaving people of common intelligence to wonder at what those factors mean and leaving law enforcement free to subjectively apply and weigh the factors at their discretion. Thus, the definition is unconstitutionally vague.

**B.    The Final Rule's Definitions of "Firearm" and "Complete Weapon" Subject People of Ordinary Intelligence to Criminal Penalties**

The Final Rule's definitions of "firearm" and "complete weapon" do not give fair notice of what conduct might subject an individual to criminal penalties. "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enactment—depends in part on the nature of the enactment." *Vill. of Hoffman Ests.*, 455 U.S. at 498. "The Court has [] expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are less severe." *Id.* Conversely, statutes and regulations that threaten criminal penalties are held to a stricter standard. "The prohibition of vagueness in criminal statutes . . . is an essential of Fifth Amendment due process. . . . [T]he vagueness doctrine requires statutes define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited . . . and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Ross*, 948 F.3d 243, 246–47 (5th Cir. 2020) (internal quotation, citation, and brackets omitted).

Violations of the NFA and GCA carry criminal penalties, including fines and prison time. 18 U.S.C. § 924(a)(1)(D) ("[W]however . . . willfully violates any other provision of this chapter, shall be fined under this title, imprisoned not more than five years, or both."); 26 U.S.C. § 5871 ("Any person who violates or fails to comply with any provision of this chapter shall, upon conviction, be fined not more than $10,000, or be imprisoned not more than ten years, or both."). Plaintiffs have demonstrated that people—from lay members of the public to banks and credit card processors to sophisticated members of the firearms industry—do not understand what is covered by the Final Rule. Pls.' MSJ at 42. The Final Rule has created a labyrinth of land mines that could result in criminal prosecution for those who cannot navigate its vagaries.

31

First, the Final Rule defines "complete weapon" as "[a] firearm other than a muffler or silencer that contains all component parts necessary to function, whether or not assembled or operable." Final Rule, at 24,747. The inclusion of unassembled weapons is troubling, because many gun parts are interchangeable. Indeed, the Agencies noted that commenters "asserted that law-abiding gun owners who legally own both AR rifles and pistols could be charged with a felony if they store their firearms unassembled." Final Rule, at 24,700. Yet the Agencies failed to address this assertion; the Final Rule does not indicate whether such a combination, possessed together, constitutes a complete NFA-regulated rifle. *See id*. at 24,700–01. Thus, people of ordinary intelligence are left to guess—with the risk of felony charges if they guess wrong.

The Agencies claim that Plaintiffs' concerns are unfounded because "complete weapon" is meant to address when in the manufacturing process items must be marked. Feds' Br. at 76; *see also* Final Rule, at 74,000–01. But the Agencies' explanation only makes "complete weapon" *more* vague. The definition of "complete weapon" is a "firearm . . . that contains all component parts necessary to function, whether or not assembled or operable." Final Rule, at 24,747. It says nothing about the manufacturing process, nor whether one needs to be a manufacturer or merely a possessor of the requisite component parts. Moreover, contrary to the Agencies' assertion that an individual only need worry if he or she actually assembles an NFA-regulated item, the plain language of the definition clearly contemplates possession of "all component parts" even if they are "not assembled." *Id*. Thus, the Agencies' assertion only adds to the vagueness of "complete weapon"; it does nothing to dispel the haze of vagueness.

Second, the definition of "firearm" is so expansive that the Agencies had to "expressly exclude[] from the definition of 'frame or receiver' forgings, castings, printings, extrusions, unmachined bodies, or similar articles that have not yet reached a stage of manufacture (e.g.,

unformed blocks of metal, liquid polymers, or other raw materials) where they are clearly identifiable as an unfinished component part of a weapon." Final Rule, at 24,698. Nowhere do the Agencies provide any guidance on when an item is "clearly identifiable" as something that may become part of a weapon, suggesting that is left to the discretion of enforcement agents.

Other portions of the definition leave additional room for arbitrary enforcement. *See*, *e.g.*, Final Rule, at 24,739 ("[T]he Director *may consider* any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that *are sold, distributed, or possessed* with the item or kit ….") (emphases added); *id.* at 24,735 ("Readily" is "[a] process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state.").

The Agencies claim that Plaintiffs' examples of "subjective confusion" hold little to no probative value. Feds' Br. at 69. This claim is undermined by the fact that, in just over four months since the Final Rule went into effect, the Agencies have issued one set of corrections and two open letters[6] "to assist the firearms industry and the public in understanding" whether certain "partially complete, disassembled, or nonfunctional" frames and receivers have "reached a stage of manufacture such that [they] 'may readily be completed, assembled, restored, or otherwise converted' to a functional [frame or receiver], and [are] therefore classified as a 'frame or receiver' or 'firearm' in accordance with the final rule."[7,8] If the Final Rule was not vague, these open letters

---

[6] The letters themselves, which were not before the Agencies when they issued the Final Rule, are not properly part of the administrative record for this case. The letters do, however, illustrate the Agencies' own recognition of the vague nature of the Final Rule.

[7] Open Letter to All Federal Firearms Licensees, U.S. Dep't of Justice & Bureau of Alcohol, Tobacco, Firearms and Explosives (Sept. 27, 2022), https://www.atf.gov/firearms/docs/open-letter/all-ffls-september-2022-impact-final-rule-2021-05f-partially-complete-ar/download

[8] Open Letter to All Federal Firearms Licensees, U.S. Dep't of Justice & Bureau of Alcohol, Tobacco, Firearms and Explosives (Dec. 27, 2022), https://www.atf.gov/rules-and-regulations/docs/open-letter/all-ffls-dec2022-open-letter-impact-final-rule-2021-05f/download

would not be necessary. Yet the Agencies found they were necessary because neither people of ordinary intelligence nor sophisticated industry players (like the federal firearms licensees to whom the open letters are addressed) can understand the Final Rule on its face.

Moreover, the Final Rule regulates the mere possession of items in conjunction with NFOs. For instance, one of the Agencies' examples of something that is "[n]ot a receiver" is "[a] billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is not . . . *possessed* with instructions, jigs, templates, equipment, *or* tools such that it may readily be completed." Final Rule, at 24,739 (emphases added). Thus, an individual who purchases something that is "[n]ot a receiver" may inadvertently and unknowingly subject himself to criminal penalties if he also happens to own a well-equipped tool bench.

The Agencies claim that they do not need to "delineate the exact actions" that would allow an individual to "avoid liability" under the Final Rule. Feds' Br. at 70 (quoting *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008)). But giving fair notice of what is proscribed and outlining standards to guard against arbitrary enforcement are "essential of due process." *Johnson v. United States*, 576 U.S. 591, 595 (2015) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). The Final Rule's definition of "firearm" does not meet these requirements. Instead, the definition contains lists of what enforcement agents "may consider"—leaving plenty of room for arbitrary decisions based on unenumerated and discretionary criteria. *See, e.g.*, Final Rule, at 24,739 (listing what the Director "may consider" when issuing a classification of a "partially complete, disassembled, or nonfunctional frame or receiver); *id.* at 24,747 ("factors relevant" to a determination of 'readily' "include" eight non-exhaustive factors).

The Agencies' reliance on voluntary classifications and the administrative process are similarly unavailing. Feds' Br. at 76. The Agencies seek "deference in the vagueness analysis"

because those seeking clarity under the Final Rule can "resort to an administrative process," in this case by seeking voluntary classification letters regarding whether a particular item is a "firearm." *Id.* (quoting *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122 (5th Cir. 1991)). Such deference is not appropriate here. It is true that "economic regulation is subject to a less strict vagueness." *Vill. of Hoffman Ests.*, 455 U.S. at 498. But the Final Rule is not merely an economic regulation—rather, it is a sweeping and novel application of the GCA that comes with the risk of *criminal penalties*. The vagueness analysis is stricter where criminal penalties are involved. *Winters*, 333 U.S. at 515 ("The standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement. . . . There must be ascertainable standards of guilt."); *see also Roark*, 522 F.3d at 552 (applying "the 'relatively strict test' required for criminal laws" even though "[t]he evidence reveals that the owners and operators regulated by the ordinance may clarify the meaning of its provisions by their own inquiry.").

Additionally, deference for economic regulation stems from the premise that such regulations primarily affect businesses, "which face economic demands to plan behavior carefully" and "can be expected to consult relevant legislation in advance of action." *Vill. of Hoffman Ests.*, 455 U.S. at 498. The impact of the Final Rule, however, affects industry members and less sophisticated laypeople alike. *Compare Clinical Leasing Serv.*, 925 F.2d at 123 (holding that "a physician of ordinary means and intelligence would understand" federal registration provisions regarding the distribution of controlled substances) *with Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) ("The poor among us, the minorities, the average householder are not in business and not alerted to the regulatory schemes of vagrancy laws; and we assume they would have no understanding of their meaning and impact if they had read them.").

35

It is easy to see how an otherwise law-abiding citizen of common intelligence could inadvertently run afoul of the Final Rule, perhaps by interpreting the Rule differently than the Agencies, or merely because he possesses items that transforms a NFO into a firearm. Consequently, the Agencies' redefinition of "firearm" is unconstitutionally vague.

## V.     THE RULE'S REGULATION OF SPEECH VIOLATES THE FIRST AMENDMENT

Plaintiffs have standing to bring a First Amendment claim because Tactical Machining's self-censorship constitutes injury-in-fact, and Individual Plaintiffs have a constitutionally protected right to acquire information through speech. Additionally, Supreme Court and Fifth Circuit precedent established the broad pool of qualified parties who can sue when First Amendment protected rights are on the chopping block.

### A.     Tactical Machining's Self-Censorship is an "Injury" for Standing Purposes

For standing purposes, fear of prosecution that results in self-censorship constitutes an injury. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ("[T]he alleged danger of this statute is, in large measure one of self-censorship; a harm that can be realized without an actual prosecution."); *Glass v. Paxton*, 900 F.3d 233, 238 (5th Cir. 2018) ("[G]overnment action that chills protected speech without prohibiting it can give rise to a constitutionally cognizable injury.") (internal quotations and citations omitted).

First, the Agencies' claim that the Final Rule in no way "imposes any punishment or prejudice based upon any speech" is false. Feds' Br. at 63. The Final Rule states:

> When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, *instructions*, guides, or *marketing materials* that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit….

Final Rule, at 24,739 (emphases added). In other words, when determining whether an item is a firearm, the Agencies consider speech. If such speech contributes to an item being a "firearm"

36

there are a host of business cost and operation consequences as well as potential criminal consequences for failure to comply with "firearm" regulations.

Second, Plaintiff Tactical Machining has self-censored for fear of instructions tipping its NFOs over the edge into the "firearm" category, thus subjecting the NFO manufacturer to criminal penalties. *See* Suppl. Decl. of Darren Peters, Sr., ECF No. 55-1 at ¶ 6 ("[B]ased on email communications from a local ATF special agent and positions taken by the [Agencies] in court, Tactical Machining resumed sales of" NFOs. "Tactical Machining does not currently sell those items with any jigs, templates, tools, or instructions, per Defendants' statements."). Nor is it a hypothetical situation that the Agencies will evaluate First Amendment protected materials and enforce consequences. Instructions *must*—not "may"—be submitted to the Agencies. *See* Final Rule, at 24,743 ("Each request … *must contain . . . any instructions*, guides, *or marketing materials* if they will be made available by the seller or distributor….") (emphases added).

Third, even without their own self-censorship Tactical Machining meets the standing requirements. The Supreme Court recognizes that "[l]itigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech[9] or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). Specifically, the Supreme Court deemed a company had standing even though it did "not claim that its own First Amendment rights have been or will be infringed by the challenged statute[.]" *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 955–56 (1984).

---

[9] Instructions are protected speech. "[T]he creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct.") (internal quotation marks omitted).

("[W]hen there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged."). Whether due to its own self-censorship or on behalf of its clients, Tactical Machining has standing.

### B.   Other Plaintiffs' Right to Information Satisfies their Standing Requirements

Limiting access to knowledge also constitutes a legally cognizable harm. "Free speech carries with it freedom to listen. 'In a variety of contexts [the Supreme] Court has referred to a First Amendment right to receive information and ideas.'" *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980) (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972)). "This right is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution" and protects both the "*sender's* First Amendment right to send them[,]" and "the right to receive ideas," which "is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982).

For Plaintiffs to successfully establish standing, they must "clearly establish the existence of a 'willing speaker.' In the absence of a willing speaker, 'an Article III court must dismiss the action for lack of standing.'" *Pa. Family Inst., Inc. v. Black*, 489 F.3d 156, 166 (3d Cir. 2007) (quoting *Competitive Enter. Inst. v. U.S. Dep't of Transp.*, 856 F.2d 1563, 1566 (D.C. Cir. 1988)); *Basiardanes v. City of Galveston*, 682 F.2d 1203, 1211 (5th Cir. 1982) ("Recipients of protected communication have standing only if there is a speaker who wishes to express himself or herself.") (abrogation on other grounds recognized by *Sarre v. City of New Orleans*, 420 Fed. Appx. 371 (5th Cir. 2011)). Such "willing speaker" is co-Plaintiff Tactical Machining, as well as the

intervening manufacturers and FPC's other corporate members. By depriving the other Plaintiffs of information, the Agencies provide them standing.

C.     **The Final Rule Implements Speaker-Based Restrictions on Non-Commercial, Protected Speech**

The Final Rule blatantly spells out the speakers it is targeting, and the Agencies cannot hide under the cloak of "commercial speech." First, the Agencies misconstrue what is a speaker-based restriction when they assert that "the Rule makes no distinctions among different types of speakers," considering the speech "regardless of the identity of the seller." Feds' Br. at 65. Second, the government erroneously argues that the speech at issue here is commercial speech and is afforded less protection. Feds' Br. at 64–65.

The Final Rule is speaker based; it requires the "seller or distributor" of a NFO to submit First Amendment protected materials when those entities seek classification letters and it alters the legal status of an item based on the speech of a "seller or distributor," thus chilling certain speakers' rights based on their status. Final Rule, at 24,749. Not only does the Final Rule explicitly target the speech of those parties, but any argument of broad applicability is unavailing. The Agencies supplied around 600 pages of classification letters in the administrative record dating from 2001–2017, and only 8 individuals, potentially inventors working on innovations for manufacture, asked for a firearm classification over the course of that 16-year timespan. *See* ATF000046–000645. Even then, it's unlikely individuals, if not inventors, will produce their own instructions which the Director could assess, but rather would supply instructions created by a seller or distributor.

Additionally, ATF markets its classification and determination letters[10] to sellers and distributors, affirming Plaintiffs' argument. *See How to Request Variances, Exemptions, and Determinations*, ATF, https://www.atf.gov/explosives/how-request-variances-exemptions-and-determinations (last visited Mar. 6, 2023) (information concerning determination letters is nestled under "current licensees"). The Agencies are targeting certain speakers.

Nor is the targeted speech merely commercial. Instructions on how to assemble a firearm or machine a component are not commercial speech. The Agencies claim[11] the material at issue is "commercial speech[,]" Feds' Br. at 64, yet offer no explanation as to why. The distinction is critical because "the degree of protection afforded by the First Amendment depends on whether the activity sought to be regulated constitutes commercial or non-commercial speech." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983).

Commercial speech is defined as "expression solely related to the economic interests of the speaker and its audience[,]" *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980), or "speech that *proposes* a commercial transaction[.]" *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989). Here, even if instructions contain an advertisement for a company's products, the speech retains its non-commercial status.[12] *See Hays*

---

[10] "Classification" and "determination" are used interchangeably. *How to Request Variances, Exemptions, and Determinations*, ATF, https://www.atf.gov/explosives/how-request-variances-exemptions-and-determinations (last visited Mar. 6, 2023).

[11] The Agencies' attempt to apply *Central Hudson*'s four-part commercial speech test is unavailing since the regulated speech is not commercial speech. Feds' Br. at 66; *see Central Hudson*, 447 U.S. at 573 ("I do not agree, however, that the Court's four-part test is the proper one to be applied when a State seeks to suppress information about a product in order to manipulate a private economic decision that the State cannot or has not regulated or outlawed directly.") (Blackmun, J., concurring).

[12] Although BlackHawk's instructions, for example, link to their newest product, the instructions are still protected First Amendment material. *How to Mill & Finish an 80% Lower*, 80 PERCENT ARMS (Nov. 3, 2022), https://www.80percentarms.com/blog/how-to-finish-an-80-lower/.

*Cty. Guardian v. Supple*, 969 F.2d 111, 120 (5th Cir. 1992) (advertisements were "inextricably linked to the newspaper's non-commercial speech, making the whole paper non-commercial."); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) (holding speech does not retain "commercial character when it is inextricably intertwined with" other speech).

In any event, even commercial speech cannot be unduly restricted. "Permissible restraints on commercial speech have been limited to measures designed to protect consumers from *fraudulent, misleading, or coercive sales techniques*." *Id.* at 574 (Blackmun, J., concurring) (emphasis added). Such conduct is not at issue here. And even limits on commercial speech will be evaluated for impermissible speaker-based restrictions. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563–64 (2011) (finding a statute governing commercial goods to impermissibly restrict content and speakers); *id.* at 564 ("The statute thus disfavors marketing, that is, speech with a particular content. More than that, the statute disfavors specific speakers, namely pharmaceutical manufacturers."); *see also Nat'l Inst. of Family and Live Advocs. v. Becerra*, 138 S. Ct. 2361, 2368, 2378 (2018) (finding a speaker-based restriction likely to violate the First Amendment that required pregnancy clinics inform patients about abortion options). Instructions and marketing materials, even for products disfavored by the Agencies, enjoy First Amendment protections.

**D.      The Final Rule Impermissibly Restricts Specific Content**

The Agencies review First Amendment protected material to determine how "readily" a firearm can be assembled, thus also imposing a content-based restriction on speech. The Agencies admit they judge the content of a manufacturer's instructions, stating, "[i]t is simply not the case that any component or components sold with instructions or marketing materials will be necessarily classified as a 'frame or receiver' . . .; rather, such materials are one factor in the

agency's application of the 'readily' standard." Feds' Br. at 67. The Agencies evaluate whether the speech will make it "easier" to assemble, complete, or convert an item into a firearm.

The Agencies claim that even if this Court does find "that the Rule restricts or burdens speech in some way," the Rule is content-neutral and serves the interest of assisting law enforcement. Feds' Br. at 66. The Agencies attempt to bolster this argument by citing *Arcaca v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986), for the notion that the Court "reject[ed] [a] First Amendment challenge to forced closure of a business that engaged in illegal activities and also sold books and other First Amendment protected speech[.]" Feds' Br. at 66.

The Agencies, however, are not looking at Tactical Machining's protected First Amendment materials to judge the sufficiency of its memes or the cleverness of its marketing— the Agencies aim to assess how "readily" a firearm can be assembled. This is a clear description of a content-based regulation. "Content-based regulations 'target speech based on its communicative content.'" *Nat'l Inst. of Fam. and Life Advocs.*, 138 S. Ct. 2361, 2371 (2018) (quoting *Reed v. Town of Gilbert,* 135 S. Ct. 2218, 2226 (2015)) (internal quotation and citation omitted). Additionally, "the 'fear that people would make bad decisions if given truthful information' cannot justify content-based burdens on speech." *Sorrell*, 564 U.S. at 577 (quoting *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002)).

Moreover, *Cloud Books* is distinguishable. The establishment in *Cloud Books* was illegally engaging in prostitution *and* selling First Amendment protected materials. *Id.* at 698. In the case before this Court, the alleged illegality of NFO manufacturers selling firearms turns, in part, on the dissemination of instructions. The prostitution charge in *Cloud Books* did not hinge on the content of the establishment's books. 478 U.S. at 707. The bookstore was "free to sell the same materials at another location." *Id.* at 706. Citing *Cloud Books* to hint that shutting down "illegal

activity" trumps the First Amendment is futile, and a close reading of the case reveals the opposite conclusion. The Agencies' choice to make such an analogy reveals their judgment of NFO sellers.

## VI.   THE TAKE CARE CLAUSE AND MAJOR QUESTIONS DOCTRINE ENSURE THE SEPARATION OF POWERS IS NOT JUST AN ABSTRACT PRINCIPLE

The Take Care Clause guards against Executive Branch legislating, which is exactly the relief Plaintiffs seek, *contra* Feds' Br. at 79, and failed bills are a graveyard of the authority the Agencies hoped for.

The Agencies argue that "the Take Care Clause does not provide any basis for the relief Plaintiffs seek here[,]" because it would be disrespectful "by assuming judicial superintendence of the exercise of the Executive power that the Take Care Clause commits to the President and the delicate relationship between the Executive and Legislative coordinate branches." Feds.' Br. at 79–80. But the cases the Agencies cite in support are limited to those involving political questions and are therefore inapposite here. *Baker v. Carr*, 396 U.S. 186, 217 (1962) ("Prominent on the surface of any case held to involve a *political question*. . . .) (emphasis added); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867) ("An attempt on the part of the judicial department of the government to enforce the performance of [purely executive *and political*] duties by the President might be justly characterized . . . as 'an absurd and excessive extravagance.'") (emphasis added). The scope of the Agencies' authority is squarely within the province of the Court, not a political question.

Additionally, the Agencies claim the seminal Take Care Clause case cited by Plaintiffs, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952), barely mentions the Take Care Clause and state that "[i]n that case, the Government could not, and did not, cite any statutory authority for the seizures at issue." Feds' Br. at 80. This case, however, is not so distinguishable from *Youngstown*. Though the Agencies point to the GCA, this statute does not grant *carte blanche*

43

authority to regulate non-firearm items, just as war powers did not grant President Truman unfettered authority.

Nor may the Agencies so cavalierly dismiss the recent years of failed litigation, which they characterize as "[p]ost-enactment legislative history[.]" Feds' Br. at 80. Plaintiffs do not use failed bills as a statutory interpretation analysis, but to affirm the underlying principle of the major questions doctrine—great power does not lie in the shadows of statutes. The Supreme Court "has found it telling when Congress has considered and rejected bills authorizing something akin to the agency's proposed course of action. . . . That [] may be a sign that an agency is attempting to work [a]round [circumvent, if that is not too ironic] the legislative process to resolve for itself a question of great political significance." *West Virginia v. EPA*, 142 S. Ct. 2587, 2620–21 (2022) (Gorsuch, J., concurring) (internal quotations and citations omitted); *id.* at 2626 ("[T]he Constitution does not authorize agencies to use pen-and-phone regulations as substitutes for laws passed by the people's representatives.") (Gorsuch, J., concurring).

The bills Plaintiffs identified all sought to address the regulation of NFOs, labeled "ghost guns," originally by those who seek to manipulate public opinion. *See* Exhibit A (identifying every bill Plaintiffs cited and the language pertinent to the attempted regulation of "ghost guns"). Contrary to the Agencies' position, subsequent failed legislation is *directly* relevant to the scope of a fifty-five-year-old statute—Congress knows *exactly* how to delegate power over the private manufacture of firearms.

## VII.   VACATUR IS THE APPROPRIATE REMEDY

The Final Rule is unlawful and must be vacated. There are two typical remedies available for violations of the APA: remand and vacatur. Remand is only appropriate when an agency can fix the APA violations underlying its action through additional investigation or explanation. *See O'Reilly v. U.S. Army of Eng'rs*, 477 F.3d 225, 238–39 (5th Cir. 2007) (citing *Fla. Power & Light*

*Co. v. Lorion*, 470 U.S. 729, 744 (1985)). On the other hand, when an agency action is unlawful, the "ordinary practice" is to vacate the action. *See Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859–60 (5th Cir. 2022) (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)). Indeed, "by default, remand *with* vacatur is the appropriate remedy." *Texas v. Biden*, 20 F.4th 928, 1000 (5th Cir. 2021), *as revised* (Dec. 21, 2021), *cert. granted*, 142 S. Ct. 093 (2022), and *rev'd and remanded*, 142 S. Ct. 2528 (2022). Here, the Agencies' Final Rule is fatally flawed under the APA and the U.S. Constitution; therefore, it must be vacated.

The Agencies' argument that universal vacatur is not appropriate is unavailing. They attempt to create space between the definitions of "set aside" (the language used in the APA) and vacate (as used by courts as the remedy for APA violations that cannot be cured by remand). They claim that the "ordinary meaning" of "set aside" "is to disregard, not to nullify." Feds' Br. at 84. But other common language dictionaries define "set aside" as to "annul or quash (as to *set aside* a verdict)"). *See* H.G. Emery and K.G. Brewster, THE NEW CENTURY DICTIONARY OF THE ENGLISH LANGUAGE, Vol. 2, 1673 (1927); s*ee also Virgin Islands Tel. Corp. v. FCC*, 444 F.3d 666, 671 (D.C. Cir. 2006) ("'Set aside' usually means 'vacate.'").[13] Moreover, the Agencies' position is at odds with Fifth Circuit precedent, which recognizes that the APA, specifically section 706, "empowers courts to 'set aside'—*i.e., formally nullify* and revoke—an unlawful agency action." *Data Mktg.*, 45 F.4th at 859 (quoting Johnathan Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 950 (2018)) (emphasis added).

---

[13] The Agencies further claim that vacatur is inappropriate because section 703 of the APA "does not speak of vacatur." Feds' Br. at 85. But section 703 allows for "*any* applicable form of legal action . . . in a court of competent jurisdiction." 5 U.S.C. § 703 (emphasis added). Section 706(2) specifically provides that a "reviewing court shall . . . set aside agency" that violates the APA. And the preeminent legal dictionary informs that "set aside" means "vacate." *Set Aside*, BLACK'S LAW DICTIONARY (11th ed. 2019).

If a regulation is a final agency action, "it can of course be challenged under the APA by a person adversely affected—and the entire [program,] insofar as the content of that particular action is concerned, would thereby be affected." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990). Additionally, "it bears noting that, for over twenty years, numerous courts (including several Circuit Courts of Appeals) have vacated unlawful agency action in whole (and as against non-parties) under APA § 706(2)." *GBX Assocs., LLC v. United States*, No. 1:22-cv-401, 2022 WL 16923886, at *7 (N.D. Ohio Nov. 14, 2022) (citing cases from the D.C. Circuit, the Ninth Circuit, and other jurisdictions).

While the Supreme Court has not yet confirmed whether the "set aside" language in section 706(2) *require*s universal vacatur of regulations that violate the APA,[14] it has endorsed, through affirmation of lower court decisions, the idea that universal vacatur is *permissible* under the APA. *See*, *e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 161 (2000) (affirming Fourth Circuit's vacatur of tobacco regulations); *Bd. of Governors of Fed. Res. Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 365 (1986) (affirming Tenth Circuit's set aside of certain Federal Reserve Bank Regulations); *see also Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2412 n.28 (2020) (Ginsburg, J., dissenting) ("The Administrative Procedure Act contemplates nationwide relief from invalid agency action.").

Despite this precedent, the Department of Justice has for several years been leading the charge to reframe the debate surrounding vacatur. *See* Mila Sohoni, *The Power to Vacate A Rule*, 88 GEO. WASH. L. REV. 1121, 1178 (2020) ("[T]his article evaluates a legal argument that has been largely, though not entirely, advanced by DOJ. . . . [I]t is pressing its view of the APA before

---

[14] The Supreme Court is set to decide that question this term. *United States v. Texas*, 40 F.4th 205 (5th Cir. 2022), *cert granted*, __ U.S. __ (2022) (No. 22-58 linked with 22A17).

federal courts around the country."); *id.* at 1129 n.35 (collecting cases where DOJ has argued against universal vacatur). As stated, courts have long held that universal vacatur is permissible under the APA. *Lujan*, 497 U.S. at 890 n.2; *GBX Assocs.*, 2022 WL 16923886, at *7; *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.").[15]

Nevertheless, in 2018, the Department of Justice issued guidance instructing its attorneys to argue that "Universal Vacatur Is Not Contemplated by the APA." Memorandum from the Office of the Att'y Gen. to the Heads of Civil Litigating Components U.S. Attorneys on Litigation Guidelines for Cases Presenting the Possibility of Nationwide Injunctions 7 (Sept. 13, 2018).[16] The guidance stated, "Department litigators should, as appropriate, and where not inconsistent with circuit precedent, additionally argue that the APA's text should not be read to displace the traditional equitable limitation of relief to the parties before the court." *Id.*

In this case the Agencies have advanced the recommended argument against universal vacatur to the letter, ECF 181, at 84–86—even though their argument is contradicted by Fifth Circuit precedent. *See Data Mktg.*, 45 F.4th at 859. Notably, the Agencies do not cite to *any* Fifth Circuit precedent to support their argument. In fact, the only APA case cited in support, *Arizona v. Biden*, is an out of circuit concurrence, which is explicitly distinguished by a subsequent Fifth

---

[15] *See also* Mila Sohoni, *The Power to Vacate a Rule*, 88 GEO. WASH. L. REV. 1121, 1178 (2020) ("The assumption that universal vacatur is, at a minimum, *authorized* by the APA is a basic proposition shared by *both* sides of the debate . . . the disagreement between the two sides has been entirely over the question whether universal vacatur is *required* by the APA. Yet it is to that logically antecedent question—is universal vacatur even authorized?—that the debate has now, oddly, regressed.").

[16] https://www.justice.gov/opa/press-release/file/1093881/download

Circuit decision. *Compare Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, C.J., concurring) (granting stay of nationwide injunction pending appeal and asserting that universal vacatur "upset[s] the bedrock practice of case-by-case judgments with respect to the parties in each case") *with Texas v. United States*, 40 F.4th 205, 229–30 (5th Cir. 2022) (explicitly "depart[ing] from the Sixth Circuit's recent opinion in *Arizona v. Biden*[,]" and denying stay of universal vacatur of agency action pending appeal). The Fifth Circuit held it would adhere to its precedent, "[u]ntil there is a contrary ruling from the Supreme Court." *Texas v. United States*, 40 F.4th at 230.

The Agencies' contention that vacatur of the Final Rule would have immense disruptive consequences is similarly unpersuasive. Feds' Br. at 87; *see also Texas v. Biden*, 20 F.4th at 1000 (when determining "whether vacatur is appropriate" courts may consider "the disruptive consequences of vacatur"). First and foremost, the "effects" the Agencies warn of assumes the merit of their arguments. If this Court is considering the appropriate scope of relief, then the Court has already determined that the Agencies have failed to meet their burden, at least in part, and that some or all of the Final Rule is unlawful, unconstitutional, or both. The idea that there can be a negative impact from enjoining an illegal and/or unconstitutional agency action is nonsensical.

In any event, the Agencies claim that vacatur "would facilitate the further proliferation of untraceable weapons" which decreases public safety. Feds' Br. at 87. But the Final Rule has been in effect for just six months and has been partially enjoined nearly that entire time. Further, courts act within their discretion even when vacatur causes severe disruption so long as they consider all relevant factors. See *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1053 (D.C. Cir. 2021*), cert. denied sub nom. Dakota Access, LLC v. Standing Rock Sioux Tribe*, 142 S. Ct. 1187 (2022) (court acted within its discretion even though vacatur "would cause" "severe economic disruption"). Moreover, "it is not [the Court's] job to determine our nation's

public policy" but to "apply the law as Congress has written it." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023).

The Final Rule is procedurally deficient and must be vacated in its entirety. To the extent, however, that this Court finds that the Final Rule is not procedurally deficient and vacates only specific portions of the Final Rule, the government's argument that vacatur will have immense disruptive consequences is further weakened.

Finally, the Agencies ask that, to the extent this Court vacates some or all of the Final Rule, it do so only with regard to the parties before the Court. Feds' Br. at 89. But the Agencies do not point to any authority even suggesting that a statute or regulation may be vacated only as to a subset of the population—and for good reason. "Vacatur . . . retroactively undoes or expunges a past state action." *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021), *reh'g denied* (Nov. 16, 2021). It "unwinds the challenged agency action" as if it no longer exists. *Id*; *see also Lujan*, 497 U.S. at 912 (Blackmun, J., dissenting) ("In some cases the 'agency action' will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, *not simply that the court forbids its application to a particular individual*.") (emphasis added). This is in contrast to an injunction, "which merely blocks enforcement" of a law or regulation but does not remove it from the books. *Id.* If, however, the Court were to entertain a "limited" vacatur (perhaps more properly considered an injunction), such relief, however denominated, should include all of the Plaintiffs, including FPC, FPC's members, and Tactical Machining's customers, all of which are properly represented before this Court.

When a regulation is unlawful, however, the proper remedy is to vacate the regulation (or the offending portions), not to merely enjoin enforcement against certain parties. The Final Rule

49

is procedurally and constitutionally defective in ways that cannot be remedied on remand. Therefore, this Court should vacate the Final Rule and enjoin its enforcement.

## CONCLUSION

For the foregoing reasons and those stated in Plaintiffs' Motion for Summary Judgment and Supplemental Brief under Rule 65(A)(2) Consolidation, ECF Nos. 141, 133, Plaintiffs respectfully request that this Court vacate the Final Rule and/or enjoin its enforcement.

DATED this 6th day of March 2023.

Respectfully submitted,

R. Brent Cooper (TX Bar No. 04783250)
Benjamin D. Passey (TX Bar No. 24125681)
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540
brent.cooper@cooperscully.com
ben.passey@cooperscully.com

Cody J. Wisniewski* (CO Bar No. 50415)
FIREARMS POLICY COALITION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV 89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392
cwi@fpchq.org

*/s/ Erin M. Erhardt*
Erin M. Erhardt* (CO Bar No. 49360)
Kaitlyn D. Schiraldi* (TN Bar No. 039737)
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
Telephone: (303) 292-2021
Telecopy: (877) 349-7074
eerhardt@mslegal.org
kschiraldi@mslegal.org
*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of March 2023, I electronically filed the foregoing using this Court's CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and service will be accomplished by this Court's CM/ECF system.

/s/ *Erin M. Erhardt*
Erin M. Erhardt