**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| JENNIFER VANDERSTOK;<br>MICHAEL G. ANDREN;<br>TACTICAL MACHINING, LLC, a limited liability<br>company; and<br>FIREARMS POLICY COALITION, INC., a nonprofit<br>corporation,<br><br>        *Plaintiffs*,<br><br>and<br><br>BLACKHAWK MANUFACTURING GROUP INC.<br>d/b/a 80 PERCENT ARMS; DEFENSE<br>DISTRIBUTED; and SECOND AMENDMENT<br>FOUNDATION, INC.,<br><br>        *Intervenor-Plaintiffs*,<br><br>   v.<br><br>MERRICK GARLAND, in his official capacity as<br>Attorney General of the United States;<br>UNITED STATES DEPARTMENT OF JUSTICE;<br>STEVEN DETTELBACH, in his official capacity as<br>Director of the Bureau of Alcohol, Tobacco, Firearms<br>and Explosives; and<br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS<br>AND EXPLOSIVES,<br><br>        *Defendants*. | Civil Action No. 4:22-cv-691-O |

**BLACKHAWK MANUFACTURING GROUP INC. d/b/a 80 PERCENT ARMS'**
**REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN**
**OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

*Introduction*...................................................................................................1

ARGUMENT ...................................................................................................2

   I.    BLACKHAWK'S STANDING IS UNCHALLENGED ...................................2

   II.    THE RULE VIOLATES THE APA AND MUST BE SET ASIDE ..................2

        A.  The Rule Is Arbitrary and Capricious ...........................................2

             1.   The Rule Fails to Acknowledge or Explain the Change
                  Made in ATF's New Definition of "Partially Complete
                  Frames or Receivers" .................................................................2

             2.   The Rule Constitutes a Material Change in ATF's Position
                  Without Adequate Explanation .................................................4

             3.   The Agencies' Arguments and Cited Cases Fail to Explain
                  the Change in Position Justifying Regulation of
                  "Weapons Parts Kits" ................................................................8

        B.  The Rule Was Not a Logical Outgrowth of the Notice ................12

             1.   The Single Instance of Narrowing the Definition of
                  "Frame or Receiver" Demonstrates the Disconnect
                  Between the Notice and Rule .....................................................12

              2.   The Definition of "Partially Complete, Disassembled, or
                  Nonfunctional Frame or Receiver" Was Not Properly
                  Provided in the Notice ..............................................................13

              3.   The Notice Did Not Describe the Term "Variant" Found
                  in the Rule ...............................................................................15

   III.    THE RULE VIOLATES THE CONSTITUTION ...............................................16

        A.  The Rule Is Unconstitutionally Vague Because It Fails to Give
           Fair Notice ...................................................................................16

              1.   The Administrative Classification Determination Is Not
                  a Sufficient Remedy for the Rule's Vagueness .......................17

2.   *United States v. Campbell* Demonstrates the Rule's
Vagueness Problem.................................................................21

B.  The Rule Infringes Upon Conduct Covered by the Second
Amendment.......................................................................................22

C.  The Rule Chills Protected Speech in Violation of the First
Amendment.......................................................................................24

IV.   VACATUR IS THE APPROPRIATE REMEDY PRESCRIBED
UNDER THE APA .......................................................................................25

*Conclusion* .........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Arcaca v. Cloud Books, Inc.*,
    478 U.S. 697 (1986) ..................................................................................................... 24

*City of Syracuse, NY v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
2021 WL 1051625 (S.D.N.Y. Mar. 19, 2021) ...................................................... 3, 4

*Data Mktg. P'ship, LP v. United States Dep't of Lab.*,
    45 F.4th 846 (5th Cir. 2022) ..................................................................................... 8, 25

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ........................................................................................ 22, 23, 24

*Emp'r Sols. Staffing Grp. II, L.L.C v. Office of Chief Admin. Hearing Officer*,
    833 F.3d 480 (5th Cir. 2016) .......................................................................................... 16

*Enamorado v. United States*,
    No. C16–3029–MWB, 2017 WL 2588428 (N.D. Iowa June 14, 2017)................................ 11

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ........................................................................................................ 8

*Exxon Mobil Corp. v. Mnuchin*,
    430 F. Supp. 3d 220 (N.D. Tex. 2019) ...................................................................... 16, 18, 19

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ........................................................................................................ 16

*FCC v. League of Women Voters of Cal.*,
    468 U.S. 364 (1984) ........................................................................................................ 25

*FCC v. Prometheus Radio Project*,
    141 S. Ct. 1150 (2021)..................................................................................................... 4

*Franciscan Alliance, Inc. v. Becerra*,
    47 F.4th 368 (5th Cir. 2022) ........................................................................................ 25

*Gen. Elec. Co. v. EPA*,
    53 F.3d 1324 (D.C. Cir. 1995).......................................................................................... 20

*Howmet Corporation v. EPA*,
    656 F. Supp. 2d 167 (D.D.C. 2009), *aff'd*, 614 F.3d 544 (D.C. Cir. 2010)...................... 18, 19

*Magee v. City of S. Padre Island,*
  463 F. App'x 377 (5th Cir. 2012) ............................................................... 17

*Medlin v. Palmer,*
  874 F.2d 1085 (5th Cir. 1989) .................................................................... 17

*Millennium Restaurants Grp., Inc. v. City of Dallas, Texas,*
  181 F. Supp. 2d 659 (N.D. Tex. 2001) ....................................................... 24

*Minneapolis Star & Trib. Co. v. Minnesota Com'r of Revenue,*
  460 U.S. 575 (1983) .................................................................................... 24

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
  142 S. Ct. 2111 (2022) .......................................................................... 22, 23

*States v. Jimenez,*
  191 F. Supp. 3d 1038 (N.D. Cal. 2016) ..................................................... 6, 7

*Tex. Ass'n of Mfrs. v. United States Consumer Product Safety Commission,*
  989 F.3d 368 (5th Cir. 2021) ...................................................................... 15

*United States v. Campbell,*
  427 F.2d 892 (5th Cir. 1970) ................................................................. 21, 22

*United States v. Clinical Leasing Serv., Inc.,*
  925 F.2d 120 (5th Cir. 1991) ...................................................................... 18

*United States v. Hicks,*
  No. W:21-CR-00060-ADA, ---F. Supp. 3d ---, 2023 WL 164170 (W.D. Tex. Jan. 9, 2023) .. 22

*United States v. Joseph Roh,*
  SACR 14–167–JV, Minute Order at 6 (C.D. Cal. July 27, 2020) ............. 6, 7

*United States v. Marzzarella,*
  614 F.3d 85 (3d Cir. 2010) ......................................................................... 22

*United States v. McGee,*
  992 F.3d 1035 (10th Cir. 2021) .................................................................. 12

*United States v. Morales,*
  280 F. Supp. 2d 262 (S.D.N.Y. 2003) ........................................................ 10

*United States v. Price,*
  76 F.3d 526 (3d Cir. 1996) ......................................................................... 10

iv

*United States v. Randolph*,
  No. 02 CR. 850-01(RWS), 2003 WL 1461610 (S.D.N.Y. Mar. 20, 2003) ...................... 10, 11

*United States v. Rowold*,
  429 F. Supp. 3d 469 (N.D. Ohio 2019) ................................................................. 5, 6

*United States v. Ryles*,
  988 F.2d 13 (5th Cir. 1993) ........................................................................... 11

*United States v. Stewart*,
  No. CR-00-0698 PHX ROS, 2001 WL 194917 (D. Ariz. Feb. 26, 2001),
  *aff'd*, 451 F.3d 1071 (9th Cir. 2006) ................................................................ 9

*United States v. Theodoropoulos*,
  866 F.2d 587 (3d Cir. 1989) ........................................................................... 9

*United States v. Wick*,
  No. CR 15-30-M-DLC, 2016 WL 10637098 (D. Mont. July 1, 2016),
  *aff'd*, 697 F. App'x 507 (9th Cir. 2017) ........................................................... 9

*USA v. Alejandro Jimenez*,
  No. 16-10342 (9th Cir. 2016) ECF No. 2 (Oct. 3, 2016) ....................................... 7

*VanDerStok v. Garland*,
  No. 4:22-CV-00691-O, 2022 WL 4009048 (N.D. Tex. Sept. 2, 2022).................... 9

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982) ................................................................................. 18, 20

**Rules**

27 C.F.R. § 478.12(a)(3) ...................................................................... 15

27 C.F.R. § 479.11 .............................................................................. 6

**Statutes**

5 U.S.C. § 706(2) .............................................................................. 25

18 U.S.C. § 921(a)(3) .................................................................... *passim*

18 U.S.C. § 922(a)(1)(A) .................................................................... 9

**Other Authorities**

Administrative Procedure Act ......................................................... *passim*

Definition of "Frame or Receiver" and Identification of Firearms,
87 Fed. Reg. 24 (Apr. 26, 2022) ................................................................................*passim*

Gun Control Act of 1968 ................................................................................ *passim*

H.R. Rep. No. 90–1577, U.S. Code Cong. & Admin. News at 4410 (1968)............................... 10

Oxford English Dictionary Online (3d ed. 2015) ........................................................ 12

Intervenor-Plaintiff BlackHawk Manufacturing Group Inc. *d/b/a* 80 Percent Arms ("BlackHawk") files this Reply Brief in Support of its Motion for Summary Judgment, ECF No. 144, and in Opposition to Defendants' Cross-Motion for Summary Judgment, ECF No. 180, respectfully showing the Court as follows:

### *Introduction*

In their 72-page Combined Brief, ECF Nos. 181 and 183, Defendants the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and the Department of Justice ("DOJ") (collectively, "Agencies" or "Defendants") continue to defend a regulatory promulgation that started from a legally defective premise—that ATF could achieve expanded regulatory power without congressional authorization—and evolved into an agency whose rules are plagued by unexplained contradictions and pervasive ambiguity that produced a new regulation falling far short of the requirements of the Administrative Procedure Act ("APA") and the Constitution.

Like the Notice of Proposed Rulemaking ("Notice"), Defendants' Combined Brief seeks to justify the Final Rule ("Rule") by blaming past courts for using "restrictive applications" of ATF regulations—*while ignoring that such courts' interpretations reflected the position held by the agency itself for 50 years*.  To this selective reading of history, Defendants add speculation that future courts might refuse to adopt ATF's re-imagined interpretation of the Gun Control Act ("GCA") and thus diminish the newly discovered and unbounded regulatory discretion the agency claims to possess under the GCA.  It is telling that nowhere in the Notice, the Rule or the Agencies' briefing in this case does ATF present a factually and legally sound explanation for why ATF choose to promulgate the extreme regulation challenged here.

1

The Agencies' arguments in their Combined Brief share many of the same strained interpretations and erroneous legal conclusions that appear in Defendants' briefing on BlackHawk's and Plaintiffs' statutory claims and are no more availing in defending the Rule's validity under the APA or Constitution.  The Rule is unlawful and should be vacated.

## ARGUMENT

## I.    BLACKHAWK'S STANDING IS UNCHALLENGED

Defendants challenge the standing of several of the Plaintiffs and seek summary judgment on standing grounds with respect to those Plaintiffs. Defs' Br. at 10–14.  This Court's previous orders establish—and Defendants do not contest—that BlackHawk has standing to pursue its claims challenging the Rule. *See* ECF No. 98 (Order granting BlackHawk's Motion to Intervene); ECF No. 118 (Order granting BlackHawk's Motion for Preliminary Injunction).

## II.    THE RULE VIOLATES THE APA AND MUST BE SET ASIDE

### A.    The Rule Is Arbitrary and Capricious

The arbitrary and capricious nature of the Rule is largely the product of ATF's attempt to expand and exert regulatory authority where the plain language of the GCA and 50 years of ATF interpretation provide that no such authority exists. Defendants attempt to draw attention away from ATF's rulemaking deficiencies by employing the language of deference in their response to BlackHawk's APA challenge, asserting "best interpretation" arguments. *See* Defs' Br. at 40–45. This Court should disregard Defendants' implicit reliance on deference, which the Agencies have failed to invoke and have waived in this proceeding.

### 1.    <u>The Rule Fails to Acknowledge or Explain the Change Made in ATF's New Definition of "Partially Complete Frames or Receivers"</u>

The arbitrary and capricious nature of the Rule is aptly illustrated by Defendants' argument with respect to ATF's newly created definition "partially complete frames and receivers":

> With respect to partially complete frames and receivers, the Rule is consistent with ATF's longstanding fact-specific approach. There are no statutory definitions for the term "frame or receiver" in the GCA. Therefore, the crucial question is at what point a mere component or foundation of a component, such as a piece of metal or plastic, becomes a "frame or receiver" that is regulated as a firearm.

Defs' Br. at 27.  Defendants concede that ATF's "longstanding fact-specific approach" has aimed to answer "*the crucial question* is at what point a mere component . . . becomes a 'frame or receiver' that is regulated as a firearm." *Id*. (emphasis added).  However, the Rule radically diverges from the agency's "longstanding fact-specific approach" and changes the nature of the "the crucial question."  Prior to the Rule, ATF considered fact-specific questions about whether the tangible *physical features* of an unfinished component render it capable of being or becoming a frame or receiver of a regulated firearm. The Rule, in contrast, indicates ATF will now apply a much different, largely subjective "fact-specific" inquiry about the *circumstances* surrounding the component. The Rule is predicated on an expanded regulatory premise that drives a qualitatively different inquiry than "ATF's longstanding fact-specific approach."

Like the Rule, Defendants' Combined Brief refuses to even acknowledge that the Rule constitutes any change to its "longstanding fact-specific approach" and utterly fails to address the contradiction between the Rule and ATF's own recent litigation positions.  Defendants argue that "Plaintiffs' contention that the Rule is inconsistent with statements made in a prior litigation brief rests on a misunderstanding of that brief." Defs' Br. at 29 (citing ATF's 2021 brief in *City of Syracuse, NY v. ATF,* 2021 WL 1051625 (S.D.N.Y. Mar. 19, 2021)). But the Agencies fail to identify anything in the allegedly "misunderstood" brief that explains or even addresses the distinction made in the preceding paragraph: prior to the Rule, ATF answered the "crucial" fact-specific question by examining the measurable physical properties of an object; now, however, the agency will engage in a subjective, qualitative inquiry that encompasses a variety of circumstances

3

surrounding the item in question.  Contrary to Defendant' quoting of ATF's 2021 brief in *City of Syracuse v. ATF*, it is simply not true that "ATF has applied this standard for decades when determining whether a device qualifies as a firearm under the GCA." Defs' Br. at 29. Instead of explaining or reasoning, Defendants contrive a "misunderstanding" by a tortured reading of their own *City of Syracuse* brief.

As has repeatedly been the case in this litigation, Defendants ignore the historical reality of ATF's own statements and simply disregard any facts that cannot be reconciled with their current positions.  Implicit in Defendants' arguments is the notion that every point made in opposition by BlackHawk or public commenters is merely the product of flawed observations which do not require any meaningful consideration by Defendants. Defendants' failure to respond directly and substantively to BlackHawk's arguments illustrates the chronic absence of reasonable explanations for multiple challenged provisions in ATF's rulemaking—a failure not permitted by the APA. *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) ("The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained.").

### 2.  The Rule Constitutes a Material Change in ATF's Position Without Adequate Explanation

A federal agency may change its position and policy, but in doing so must acknowledge when a change occurs and explain why it is doing so.  Here, Defendants failed to explain their volte-face reinterpretation of the GCA and long-held position that ATF lacked authority to apply statutory terms appearing in one subsection of the GCA (such as "readily converted") to other subsections where they do not appear. Now, without explanation, ATF says the opposite, and ironically, blames the courts for having *faithfully* applied the language in the agency's definition of "frame or receiver," claiming that judges have "misinterpreted" the regulation, on the theory that "the current definitions were never intended to be, or understood to be, exhaustive."  Notice

at 27,721–22; *see also* Rule at 24,655, 24,661 (claiming the Rule is needed "so that the courts . . . no longer misinterpret the term to mean that most firearms in circulation have no parts identifiable as a frame or receiver"). However, the Agencies' justification that the Rule was necessitated by mistaken court decisions fails to hold up under scrutiny.

In the Notice, ATF claimed that the then-current definition did not precisely encompass "all of the firearms with a split or multi-piece frame or receiver, or those that are striker fired" and offered its speculative concern that "[t]he problem remains that a court could decide that the current definition of 'frame or receiver' does not apply to those firearms." Notice at 24,694. However, the Notice failed to identify any cases in which a court actually made such a determination. In their Combined Brief, Defendants make the unsupported argument that "ATF did not change its position regarding firearms with split frames or receivers or striker-fired firearms, but rather codified its existing policy in the face of court decisions misinterpreting prior regulations", Defs' Br. at 33, but again, as in the Notice and Rule, fail to identify any cases in which a court misinterpreted ATF's prior regulations in a manner demonstrating the purported problem the Rule claims to solve.

The Notice, Rule and Defendants' Combined Brief all cite *United States v. Rowold*, 429 F. Supp. 3d 469, 476 (N.D. Ohio 2019), as an allegedly concerning instance in which the court adopted a restrictive interpretation of ATF's regulations and expressed its view that the agency had a "duty" to update its regulations to expressly cover split-receiver firearms. *See* Notice at 27,722, Rule at 24,655; Defs' Br. at 34 n.22. However, the *Rowold* court's observations were not predicated on a "restrictive interpretation" of a regulation, but rather on the ATF-created *contradiction* between its regulatory definition in § 478.11 and the agency's interpretation of its regulation for criminal *enforcement* purposes. *Rowold*, 429 F. Supp. 3d at 475–76. The *Rowold*

court found that ATF retained the authority and had the duty "to fix the regulatory scheme and to regulate AR-15 lower receivers as firearms within the GCA." *Id*.  The court made clear that the result it reached "only prevents the agency from using an unreasonable and legally unacceptable application of its current regulation to accomplish that worthwhile objective [of regulating AR-15 lower receivers]." *Id*.  That the court in *Rowold* admonished ATF to address a contradiction in the application of its own regulations is hardly probative of the alleged problem necessitating the Rule and does not remotely constitute an adequate explanation for the material change in ATF's position on multiple, critical aspects of the GCA regulatory scheme.

Defendants' Combined Brief does not mention the other cases relied upon in the Notice and Rule, namely, *United States v. Jimenez*, 191 F. Supp. 3d 1038, 1041 (N.D. Cal. 2016), and *United States v. Joseph Roh*, SACR 14–167–JV, Minute Order at 6 (C.D. Cal. July 27, 2020). These cases, like *Rowold*, merely show that courts have (correctly) limited ATF's efforts to pursue enforcement on grounds that were inconsistent with *its own regulations*. And contrary to the Notice and Rule, the decisions made in these cases do not any way diminish or threaten to impede ATF's authority to regulate statutorily-defined *firearms*.

In *Jimen*ez the court dismissed the government's charge of criminal possession of a firearm because the lower receiver in the defendant's possession did not meet the three elements of ATF's definition of "receiver" in § 479.11 of the CFR. 191 F. Supp. 3d at 1041. Notably, the government agreed that the lower receiver housed only two of the three required features and "does not perfectly fit the CFR section definition." *Id*.  The court found it telling that the government "makes no effort to parse the statutes or the CFR for proof of notice or clear standards [and] concedes that the plain language of the law does not answer the vagueness challenge." *Id*. ("The Government's effort to find clear notice and standards outside the statutes and CFR is unpersuasive."). The court

concluded that the government was unable to show that the defendant "had fair notice that his particular conduct was proscribed and that ATF's action against him was not arbitrary." *Id*.  The lesson of *Jimenez* is that ATF's regulatory definitions must provide specific standards in plain language that can be understood by ordinary citizens, particularly where criminal penalties are implicated.  Rather that serving to explain and support the Rule, *Jimenez* provides a cautionary illustration advising against the type of imprecise and subjective rulemaking challenged here.

The Notice's and Rule's citation of *Roh* is similarly lacking in explanatory value. *See* Notice at 27,722; Rule at 24,655.  In *Roh* the court disagreed with the agency's position on the basis of a simple finding: "ATF's classification here cannot be accepted as a mere interpretation where that interpretation is wholly contradictory to its existing regulations." Brief Min. Order at 6. The court rejected the ATF's position "with respect to receiver as a mere and permissible interpretation" and found that "[t]here is not simply tension between the Government's position and Section 478.11; there is a disconnect." *Id*. at 5.  Again, to the extent ATF considered *Roh* to be illustrative of any "problem," the solution required by the APA and the Constitution is the promulgation of clear rules unlike the pliable definitions found in the Rule.  Moreover, nothing in *Roh* adequately explains the dramatic change in position taken by ATF in promulgating the Rule.

Simply put, the cases cited in the Rule show an agency seeking to justify its rulemaking by asserting the existence of a problem for which it had no compelling evidence.[1] ATF relies on a dubious and inaccurate portrayal of court decisions to rationalize a Rule that adopts a materially different definition of "frame or receiver", jettisons scores of classification determinations issued over the course of four decades, and conflicts with its own legal filings in recent litigation.  The

---

[1] In none of these cases did ATF pursue an appeal of the district courts' decision rejecting ATF's classification of the AR-15. *Jimenez* was appealed, then voluntarily dismissed by the government. *See USA v. Alejandro Jimenez*, No. 16-10342 (9th Cir. 2016) ECF No. 2 (Oct. 3, 2016).

Rule "thus has 'an unexplained inconsistency'—the hallmark of 'an arbitrary and capricious change from agency practice.'" *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 857 (5th Cir. 2022) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (internal quotation omitted).  Under the APA, the Rule was required to have acknowledged the conflict with ATF's previous position and practice and was required to explain the departure.  This failure renders the Rule arbitrary and capricious.

### 3. The Agencies' Arguments and Cited Cases Fail to Explain the Change in Position Justifying Regulation of "Weapons Parts Kits"

Rather than acknowledge and explain the change in position made by the Rule's regulation of "weapons parts kits", Defendants assert the Rule "does not reflect an unexplained change in ATF's regulation of individual firearm parts, weapon parts kits, or frame or receiver parts kits" and claim that "ATF always has recognized that a weapon parts kit, standing alone, may fall within the GCA's statutory definition of a "firearm," where it "is designed to or may readily be converted to expel a projectile by the action of an explosive." Defs' Br. at 31. In support of this claim, Defendants cite the statute, 18 U.S.C. § 921(a)(3)(A), and footnotes in the Notice and Rule "citing case law confirming this interpretation." *Id*. (citing Rule at 24,662 & n.44, 24,692; Notice at 27,726 & nn.39–40). On the basis of these citations, Defendants contend that "[t]o the extent ATF was required to explain this codification of existing policy, its explanation—which relied on both case law and the plain meaning of the statutory text—was more than adequate." *Id*.

However, a review of the "case law confirming [ATF's] interpretation" show the stark absence of any substantive analysis that can reasonably be viewed as "confirming" or "adequate", and instead underscore Defendants' ongoing inability to provide a coherent, adequate explanation for ATF's change in positions made in promulgating the Rule.

8

First, the Notice and Rule cite *United States v. Wick*, a case involving a defendant who strategically cut the receivers of *fully manufactured* UZI machineguns and then sold them as kits that could be returned to full functionality by an average welder. No. CR 15-30-M-DLC, 2016 WL 10637098, at *1 (D. Mont. July 1, 2016), *aff'd*, 697 F. App'x 507 (9th Cir. 2017). In contrast to the nonfunctional "weapons parts kit" concept in the Rule, ATF's arguments in *Wick* started with the (long-standing) premise that an operable UZI that had already reached manufacturing completion was a "firearm"; therefore, its receiver, even if cut, could still come within the statutory definition. *See VanDerStok v. Garland*, No. 4:22-CV-00691-O, 2022 WL 4009048, at *7 n.27 (N.D. Tex. Sept. 2, 2022) (noting that "*Wick* is outside this circuit, nonprecedential, and more importantly contains no analysis of the statutory text"), *opinion clarified*, No. 4:22-CV-00691-O, 2022 WL 6081194 (N.D. Tex. Sept. 26, 2022). As such, the facts and findings of *Wick* undercut, rather than "confirm," Defendants' explanation for ATF's newly claimed authority to regulate "weapons parts kits."

Also cited in the Rule but similarly unsupportive is *United States v. Stewart*, a case in which a felon prohibited from possessing firearms admitted to an undercover agent to selling FFL parts kits that included serialized receivers and which ATF, unsurprisingly, determined to be "readily . . . converted" into an unlawful firearm, in violation of 18 U.S.C. § 922(a)(1)(A) and 921(a)(3)—a position consistent with the five decades of ATF statutory interpretation and enforcement actions prior to the Rule. No. CR-00-0698 PHX ROS, 2001 WL 194917, at *9 (D. Ariz. Feb. 26, 2001), *aff'd*, 451 F.3d 1071, 1072–73 (9th Cir. 2006).

Another non-supportive case cited in the Rule, *United States v. Theodoropoulos*, involved a disassembled automatic machine pistol which could easily be made operable was found to be a firearm under § 921(a)(3)(A)—an unremarkable conclusion that provides no relevant analysis

given that no party disputed the fully manufactured, complete status of the machine pistol prior to disassembly. 866 F.2d 587, 595 n.3 (3d Cir. 1989), *overruled in part on other grounds by United States v. Pric*e, 76 F.3d 526, 528 (3d Cir. 1996).

Yet another of the Rule's inapposite citations is to *United States v. Morales*, a case involving facts and findings that directly undercut Defendants' claims—and buttress Plaintiffs' arguments—in several ways. First, the *Morales* court discussed multiple cases involving inoperable weapons, which together stood for the proposition that "inoperable *firearms* fall within the ambit of the statute," a point consistent with the GCA and ATF's former, long-held position and which does not explain the agency's reversal in the Rule. 280 F. Supp. 2d 262, 272 (S.D.N.Y. 2003) (emphasis added).  Second, *Morales* reviewed the legislative history of § 921(a)(3)(A) which specifically confirmed the intentional exclusion of non-frame and non-receiver "parts" from the GCA's definition of "firearm": "Under former definitions of 'firearm,' any part or parts of such a weapon were included. It was found impractical to have controls over each small part of a firearm. Thus, this definition includes only the major parts of the firearm, that is, the frame or receiver." *Morales*, 280 F. Supp. 2d at 273 (quoting H.R. Rep. No. 90–1577, U.S. Code Cong. & Admin. News at 4410, 4416 (1968)).  Finally, the *Morales* court found that "even if the definition of 'firearm' under § 921(a)(3)(A) did not include so-called 'inoperable firearms,' . . . the different parts represented in [court exhibits] include both the 'frame' and the 'receiver' of a Tec–9 pistol, and are therefore explicitly covered under the language of 18 U.S.C. § 921(a)(3)(B)." *Id*.  In sum, the facts and analysis in *Morales* run contrary to the arguments and justifications asserted in the Rule and Defendants' Combined Brief.

Other cases cited in the Rule also provide no explanatory value with respect to ATF's change in position. *See United States v. Randolph*, No. 02 CR. 850-01(RWS), 2003 WL 1461610,

at *2 (S.D.N.Y. Mar. 20, 2003) (no assertion that disassembled gun lacked a frame or receiver or had other characteristics that would exclude it from the GCA definition of "firearm"); *United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993) (where government asserted shotgun [read: *firearm*] with its barrel removed from the stock could have been assembled in thirty seconds or less, court found shotgun could have been readily converted to an operable firearm); *Enamorado v. United States*, No. C16–3029–MWB, 2017 WL 2588428, at *6 (N.D. Iowa June 14, 2017) (.45 caliber handgun [read: *firearm*] that was dissembled for cleaning and could easily be reassembled and made operable was a firearm for sentencing enhancement purposes). Rather than confirming ATF's argument or adequately explaining the agency's change in position, the Rule's citations to these cases simply highlight the unresolved incongruities that pervade this rulemaking.

Defendants contend that "BlackHawk makes several mistaken contentions regarding the Rule's regulation of weapon parts kits" and offer the apparent correction that "[n]or does the Rule state that a weapon parts kit does not contain a frame or receiver; instead, it provides that such a kit 'that is designed to or may be readily be [sic] completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive' is a 'firearm.'" Defs' Br. at 32. However, Defendants' criticism is disingenuous, as it recites the Rule's language and selectively quotes the statutory language of § 921(a)(3)(A), but omits and continues to ignore the significance of the first words of the provision, "*any weapon . . . that is designed . . .*" (emphasis added).

Defendants' splicing of statutory language into partially quoted definitions in the Rule conflicts with the plain language of the statute and contravenes well-established principles of statutory interpretation.[2] Elsewhere and in similar fashion Defendants argue that "aggregations of

---

[2] ATF's use of cherry-picked statutory content to achieve "a patina of credibility" has previously been noted by this Court. *See* ECF No. 56 (noting the Rule purports to grant ATF authority "by copying language used throughout the statutory definition" and "tak[ing] phrases like 'designed

weapon parts are not regulated because they are firearm parts, but because they are a "firearm" when aggregated—a single weapon in a disassembled form or configuration. Defs' Br. at 31 n.20. However, this reasoning is simply a form of begging the question, offering this Court and the observing public no reasoning beyond ATF's conclusion that mere "aggregation" is the key determinant, irrespective of the specific physical form or characteristics of any given "part"—a position reflecting a statutory interpretation previously disclaimed by the agency but which the Rule seeks to codify without providing an explanation for the change.

**B.     The Rule Was Not a Logical Outgrowth of the Notice**

The consequential new definitions and provisions that appeared in the Rule fail to satisfy the APA's "logical outgrowth" standard in multiple ways, due in large part to the challenged definitions not actually functioning as *definitions*[3] but as *permissions* to codify a new, utterly elastic interpretive framework by which ATF can exert significantly expanded regulatory power well beyond what was described in the Notice.

**1.     The Single Instance of Narrowing the Definition of "Frame or Receiver" Demonstrates the Disconnect Between the Notice and Rule**

Defendants applaud their responsiveness to public comments by touting that the Rule narrowed its definition of "frame and receiver" in response to input from commenters. Defs' Br. at 16. However, this "narrowing" only addressed one particularly glaring defect in the proposed definition—namely, the potential inclusion of more than one housing for any given weapon and, thus, the possibility that a weapon could have multiple "frames" or "receivers" all of which would

---

to' and 'may readily be converted' and 'assembled' from various places in the statute, cobbling them together to form ATF's own definition of 'firearm'").

[3] *See United States v. McGee*, 992 F.3d 1035, 1044 (10th Cir. 2021) ("The word 'define' is commonly understood to mean '[t]o set bounds to, to limit, restrict, confine.'") (citing Oxford English Dictionary Online (3d ed. 2015)).

be subject to regulation. *See* Rule at 24,683; 24,692–93. Forced to acknowledge the peculiar practical consequences of its proposal, ATF conceded that defining "frame or receiver" "to encompass only one single part of a given weapon would greatly reduce the possibility that a modified weapon might have more than one serial number." *Id*. at 24,683.

That Defendants hold up this "narrowing" as an achievement in APA-compliant rulemaking is telling. ATF did nothing more than revise the Rule to address one conspicuous defect in a proposed rule riddled with legal and logical incongruencies identified by commenters. The Agencies' correction of one egregious flaw in the Notice does nothing to confer the status of logical outgrowth to the legally dubious, never-before-seen definitions that appeared in the Rule.

### 2.   The Definition of "Partially Complete, Disassembled, or Nonfunctional Frame or Receiver" Was Not Properly Provided in the Notice

The Rule's definition of "partially complete, disassembled, or nonfunctional frame or receiver" diverged from the Notice in another material way. The Notice announced that when determining the status of an item, "the Director may consider any available instructions, guides, templates, jigs, equipment, tools, or marketing materials." Notice at 27,746. The Rule, however, expanded that language to state that "the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials *that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit*." Rule at 27,739 (emphasis added).

Aside from the Agencies' lack of authority to regulate such non-firearm items, even if commenters anticipated that this provision of the Notice, if adopted, would mean that the ATF Director would consider items *sold or distributed* by the seller or distributor, no commenter had reason to believe the Rule would include items merely *possessed* independent of the seller or distributor. Nowhere does the Notice suggest that if an individual happens to own a book about

13

homemade gunmaking, that the book would fall within the purview of the Director's decision to classify an item that the individual purchased. The unbounded latitude of "or possessed" cannot be a "logical outgrowth" of the Notice, which says nothing about mere possession of gunmaking literature or tools that are commonly found in Americans' garages.

Defendants argue that the Notice's use of the phrase "any available" served to sufficiently notify the public: "The Notice stated that in determining whether such an item 'may readily be assembled, completed, converted, or restored to a functional state, [ATF] may consider *any available* instructions, guides, templates, jigs, equipment, tools, or marketing materials.'" Defs' Br. at 19 (citing Notice at 27,746 (emphasis added by Defs)). Defendants' reliance on the phrase "any available" means that commentors should have read the Notice to say that there is absolutely no limit to the ATF Director's power to consider privately owned materials in classifying the purchaser's item. However, acceptance of such an argument—that the use of "any available" served to give the public meaningful notice—would make a mockery of the APA's "logical outgrowth" standard.

Defendants chide Plaintiffs for "their apparent belief that any differences between a proposed rule and a final rule are impermissible," Defs' Br. at 23, but in the process demonstrate Defendants' utter inability to defend their rulemaking without resorting to exaggeration and straw man devices. As made clear in their opening briefs, neither BlackHawk nor the Plaintiffs are contending that "any differences" between the proposed and final rules are impermissible; rather, they are arguing that the materiality and expansiveness of the differences in the Rule constitute changes not made in compliance with the APA's rulemaking requirements. Defendants fail to acknowledge this distinction and likewise fail to rebut or distinguish the caselaw cited by

BlackHawk and Plaintiffs, which Defendants discuss in only cursory fashion in a footnote. *See* Defs' Br. at 23 n.15.

Instead of acknowledging and addressing commenter's concerns arising from the Notice, the Rule simply promulgated a new a regulatory definition of "frame or receiver," created new derivative terms like "privately owned firearms marked by nonlicensees" (which appears nowhere in the Notice, but is defined in the Rule at 24,743), and "primordial" (used once in the Notice at 27,729 but not defined until the Rule at 24,663 n.49). These terms too were not described in the Notice. *See Tex. Ass'n of Mfrs. v. United States Consumer Product Safety Commission*, 989 F.3d 368, 381 (5th Cir. 2021) ("Final rules under the APA notice-and-comment rulemaking must be the 'logical outgrowth' of the proposed rule. The objective is fair notice.").

### 3.     The Notice Did Not Describe the Term "Variant" Found in the Rule

The Rule's use of the term "variant" and "variants" is likewise not a logical outgrowth of the Notice, as those terms were not defined (and are mentioned in passing) in the Notice. *See* Notice at 27,729 (referencing specific semiautomatic "variants" of several existing machineguns). The Rule, however, introduced the vague and expansive definition of a new "variant" category to be applied to components of firearms which may now be classified as variants if they use "a similar frame or receiver design" as an existing firearm. Rule at 24,735.

Defendants argue that the term "variant," as applied to a frame or receiver, "simply refers to a weapon that utilizes a similar frame or receiver design irrespective of such differences as new or different model designations or configurations." Defs' Br. at 18 (citing 27 C.F.R. § 478.12(a)(3); Rule at 24,735). Defendants assert that "[i]t is not surprising that the Rule would clarify how the definitions of 'frame' and 'receiver' would apply to weapons utilizing similar designs, particularly given that the Notice observed that '[s]ince it began issuing firearm classifications,' factors that ATF

has considered when examining firearms include 'which component the firearms industry commonly considers to be the frame or receiver with respect to the same *or similar firearms*.'" Defs' Br. at 18 (citing Rule at 27,721 (emphasis added in Defs' Brief)).  However, ATF's nonchalance and dismissiveness is no substitute for a substantive explanation as to ATF's authority to adopt the materially significant new term "variant" in the Rule without notice and comment. These provisions too were not a logical outgrowth of the Notice, rendering the Rule unlawful.

## III.   THE RULE VIOLATES THE CONSTITUTION

### A.   The Rule Is Unconstitutionally Vague Because It Fails to Give Fair Notice

The Supreme Court has made it clear that "laws that regulate individuals or entities 'must give fair notice of [the] conduct that is forbidden or required" under the Due Process Clause of the Fifth Amendment. *Exxon Mobil Corp. v. Mnuchin*, 430 F. Supp. 3d 220, 229 (N.D. Tex. 2019) (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253, (2012)). Fair notice is considered to have been given when the agency has "'state[d] with ascertainable certainty what is meant by the standards [it] has promulgated.'" *Emp'r Sols. Staffing Grp. II, L.L.C v. Office of Chief Admin. Hearing Officer*, 833 F.3d 480, 488 (5th Cir. 2016).  Contrary to satisfying due process fair notice requirements, the Rule promulgates definitions that are designed to prevent any "ascertainable certainty" and give ATF unbounded flexibility to decide what its regulations mean on a case-by-case basis in an accountability-free, non-public manner.

The Rule's definition of "readily" is convoluted, subjective, and ambiguous, as it provides no fixed standards and makes future arbitrary and capricious enforcement a certainty. Like its definition of "readily," the Rule is riddled with language that is qualitative, indefinite, and prone to ambiguity—e.g., "clearly identifiable," "critical stage," "critical line," "substantial step," "sufficiently complete," "primordial state," "without more," etc., creating an incomprehensible

and utterly unpredictable regulatory scheme that does not provide the average American with fair notice of what is prohibited and is therefore unconstitutionally vague on its face. *Medlin v. Palmer*, 874 F.2d 1085, 1090 (5th Cir. 1989) (when a law is "so indefinite that men of common intelligence must necessarily guess at its meaning and differ as to its application, the ordinance is unconstitutionally vague") (citation omitted).

Defendants cite *Magee v. City of S. Padre Island*, 463 F. App'x 377 (5th Cir. 2012), in arguing that facial vagueness challenges "are generally 'disfavored for several reasons,' including but not limited to, the fact that facial invalidity claims often 'rest on speculation.'" Defs' Br. at 51 (citing *Magee*, 463 F. App'x at 380 (internal quotes omitted)). However, *Magee* readily distinguishes itself from the instance case.  In *Magee*, the plaintiff brought a void-for-vagueness challenge to an ordinance on the contention that "arguably poor use of syntax and semantics" and the term "solicit" together enabled the ordinance "to potentially be construed to prohibit a street vendor from selling his wares, a political organization from advancing its opinions, or a religious group from proselytizing." *Magee*, 463 F. App'x at 378–79. The Fifth Circuit found plaintiff's arguments to be speculative and insufficient to establish the ordinance as void for vagueness. *Id*.

Here, in contrast, there is nothing speculative about the consequences of allowing ATF to promulgate a regulation with criminal implications that explicitly and emphatically disavows any definite, objective standards as to the conduct now prohibited under the agency's new interpretations of the GCA.

### 1.   The Administrative Classification Determination Is Not a Sufficient Remedy for the Rule's Vagueness

Defendants argue that the Rule is not impermissibly vague on the grounds that it "provides for an administrative process through which regulated entities may obtain classifications as to whether their particular products fall within the Rule's scope." Defs' Br. at 59.  Defendants cite

17

*United States v. Clinical Leasing Serv., Inc.* for the proposition that "licensing . . . requirements," such as the Rule, "are afforded considerable deference in the vagueness analysis," in part "because the regulated party may 'have the ability to clarify the meaning of the regulation[s] . . . by resort to an administrative process.'" 925 F.2d 120, 122 (5th Cir. 1991) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982)).

However, *Clinical Leasing* is inapposite for several reasons.  First, unlike the multi-faceted vagaries of the Rule, the vagueness challenge in *Clinical Leasing* centered on a single word, "principal", as used in the phrase "each principal place of business" in a Drug Enforcement Agency licensing regulation. *Clinical Leasing* at 123. The Fifth Circuit found that, while the term "may engender some limited amount of confusion," the dictionary meaning of "principal" as "important [or] consequential" was sufficiently clear that a "physician of ordinary means and intelligence would understand that the federal registration provisions apply to each important or consequential place of business where the physician distributes controlled substances." *Id*.  Second, DEA investigators had previously explicitly warned the defendants "that the statutory provisions precisely governed their actions", undermining defendants' complaints that the provisions were impermissibly vague. *Id*.  Here, in contrast, ATF promulgated a maze of new definitions, concepts, and nonexclusive examples that provide, at best, an array of malleable guideposts and no discernable fixed standards, no matter how many dictionaries are consulted.

Not mentioned in the Agencies' Combined Brief is this Court's recent discussion of *Clinical Leasing* while considering an argument, similar to that made here by Defendants, regarding a regulated party's ability seek clarity regarding vague regulations by inquiring about the agency's position. *Exxon Mobil Corp. v. Mnuchin*, 430 F. Supp. 3d 220, 236 (N.D. Tex. 2019). In *Exxon Mobil*, this Court discussed *Howmet Corporation v. EPA* in which a District of Columbia

district court analyzed a regulated party's failure to seek guidance from the regulatory agency. *Id.* at 236–37 (discussing 656 F. Supp. 2d 167, 173–74 (D.D.C. 2009), *aff'd*, 614 F.3d 544 (D.C. Cir. 2010)). This Court recounted the *Howmet* court's determination that relevant to the fair notice analysis was the plaintiff's failure to inquire about the regulating agency's position which "was [also] reiterated in publicly available advisory letters" and discernable from the agency's guidance manual. *Id.* Based on these circumstances, the *Howmet* court found that the regulated party had fair notice of the agency's interpretation. *Exxon Mobil* at 237 (citing *Howmet* at 174). In contrast to *Howmet*, here ATF has essentially repudiated 50 years' worth of classification letters and other guidance, and in the Rule disavows, without explanation, any previous agency interpretation or action that could in any way limit ATF's flexibility to take new positions in the future.

Further, in *Exxon Mobil*, this Court noted that "the burden of providing fair notice remains with the agency—not the regulated party," and "the regulated party's failure to seek guidance weighs in favor of a finding fair notice, [but] this fact is not dispositive." *Exxon Mobil*, 430 F. Supp. 3d at 237. Notably, this Court found that OFAC failed to provide fair notice of the Government's interpretation of the regulations at issue because, "[w]hile OFAC may reserve the opportunity to interpret sanctions programs differently, it may not then claim that a regulated party should know that OFAC interprets the programs identically without OFAC's explicit clarification." *Id.* at 238. This Court concluded that OFAC issued the regulations "with broad language that fails to delineate their boundaries" and only after penalizing Exxon did OFAC provide guidance clarifying what particular conduct was prohibited. *Id.* at 243 (noting that "a regulation cannot be construed to mean what an agency intended but did not adequately express") (quotes omitted). This Court's conclusion in *Exxon Mobile* is instructive and applicable to BlackHawk's vagueness challenge to the Rule, because "a regulated party acting in good faith"

19

would not "be able to identify, with 'ascertainable certainty,' the standards with which [ATF] expects parties to conform". Like OFAC, ATF's contemplated enforcement of the Rule would "violate[] the Due Process Clause of the Fifth Amendment by depriving [BlackHawk] of fair notice." *Id*. (quoting *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995)).

Defendants also rely on *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982), but that case supports precisely the opposite conclusion. In *Hoffman* the Court explained that the permissible "degree of vagueness . . . depends in part on the nature of the enactment," and there is a "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id*. at 498–99. This case involves what items constitute regulated firearms under federal law, the Rule's precision must be exacting, as serious criminal penalties attach for violations thereof.  Moreover, the Court in *Hoffman* explained that "perhaps the most important factor affecting the clarity . . . is whether it threatens to inhibit the exercise of constitutionally protected rights," *id*. at 499—such as the Second Amendment right implicated in this case.  In other words, *Hoffman* condemns—rather than saves—the Rule's ambiguous definition of "readily", "partially complete", "variant", and the like.

Further, the Rule itself disclaims any assurances regarding the ATF classification process. The Rule does not make ATF classification letters public, does not establish standard operating procedures for ATF testing, and does not even guarantee ATF will ever respond to a request for classification. In fact, the Rule explicitly rejected such a suggestion. *See* Rule at 24,709–10 (rejecting comments advocating "some ... reasonable time frame" because "there is no statutory requirement . . . for ATF to act upon any such requests"). In other words, the Rule codifies the agency's ability to play favorites, pick technologies, issue conflicting decisions, simply refuse to

issue guidance when requested, and otherwise engage in arbitrary and capricious regulatory enforcement free from scrutiny and accountability.

 2.   ***United States v. Campbell* Demonstrates the Rule's Vagueness Problem**

Defendants assert that, "although the Fifth Circuit has not considered this precise question, it has rejected a void-for-vagueness challenge to the closely related statutory term 'any combination of parts designed and intended for use in converting a weapon into a machine gun.'" Defs' Br. at 55 (citing *United States v. Campbell*, 427 F.2d 892, 893 (5th Cir. 1970) (*per curiam*)). Based on the foregoing citation to *Campbell*, Defendants then hypothesize that "[i]n determining whether a combination of parts was designed and intended for use in converting a weapon into a machine gun, a court would likely need to consider similar factors as the Rule prescribes for determining whether a non-functioning frame or receiver may be readily converted to function, such as the 'time,' 'ease,' 'expertise,' 'equipment,' 'parts availability,' 'expense,' 'scope,' and 'feasibility' of the conversion. *Id*. (citing Rule at 24,735). However, *Campbell* demonstrates that a proper interpretation of key statutory definitions—in *Campbell*, the terms "weapon" and "machine gun"—must ensure that the statute or regulation is sufficiently understandable to an ordinary citizen without the need to undertake a complicated, subjective analysis of eight qualitative, non-weighted factors as required by the Rule. Further, the *Campbell* court was at all relevant times dealing with statutorily defined *firearms*, and thus could point to the evidence which "clearly showed that the kits were designed and intended for use in converting a standard M-1 carbine"—undisputedly a "firearm" under the GCA—"into a 'machine gun' as defined in the statute." *Campbell*, 427 F.2d at 893. Contrary to Defendants' contention, *Campbell* demonstrates that ATF regulations *having a clear basis in and coherence with the statutory text* are likely to

21

withstand vagueness challenges and be found enforceable by courts. Nothing in *Campbell* or other caselaw suggests the inherent vagueness of the Rule will be found acceptable in the Fifth Circuit.

### B.    The Rule Infringes Upon Conduct Covered by the Second Amendment

The Agencies admit that the Rule is "a regulation that imposes a minimal *burden on the possession of firearms*." Rule at 24,677 (emphasis added).   Under *Bruen*, the "possession of firearms" is clearly conduct covered and protected by the plain language of the Second Amendment. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2135 (2022).   And where the plain text covers an individual's conduct, the government must demonstrate that its regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen* at 2126.

There is no record or legal authority cited in this case supporting the constitutionality of the Rule under *Bruen*.   Indeed, the Rule does not even begin to conduct the historical analysis that *Bruen* requires, much less does ATF provide even a single historical analogue showing a tradition of regulating homemade firearms, requiring serial numbers, demanding records be kept in perpetuity—or any of the other requirements in the Rule.

Instead, the Rule applies an interest balancing test that was foreclosed by the Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and again rejected by the Court in *Bruen*. *See* Rule at 24,677 and 24,690. The Rule also cites the, now obsolete, two-step test applied in *United States v. Marzzarella*, 614 F.3d 85, 101 (3d Cir. 2010), which likewise does not suffice to justify a regulation that admits to imposing a burden on conduct covered by the Second Amendment, namely, the possession of firearms. *See also United States v. Hicks*, No. W:21-CR-00060-ADA, — F. Supp. 3d —, 2023 WL 164170, at *2–3 (W.D. Tex. Jan. 9, 2023) ("the right of the people to keep and bear Arms" includes *possessing*, *having*, *receiving*, *carrying*).

Defendants argue unpersuasively that, because "the Rule *does not prevent* any qualified individual from making, buying, or possessing firearms, *it does not infringe* [Second Amendment rights] and it need not be justified by historical analogy." Defs' Br. at 46 (emphasis added). However, Defendants fail to provide a single authority for this claim that *Bruen* does even not apply until a right has been not merely infringed but entirely extinguished. By Defendants' logic, any regulation that has the practical impact of preventing or delaying the purchase or possession of a firearm, would not be subject to the *Bruen* analysis, because such restrictions "do[] not prevent" a person from bearing arms. Defendants' extreme claim that *Bruen*'s analysis does not even apply to the Rule should be rejected.

Defendants also attempt to justify the Rule's conflict with *Bruen* by claiming the promulgated regulations are merely "laws imposing conditions and qualifications on the commercial sale of arms," and thus per se permissible under *Heller*—meaning that *Bruen* does not even apply. *See* Defs' Br. at 45–46 ("[T]here is no need for further analysis."). However, the Rule cannot be characterized as mere commercial regulation. Defendants have explained that the Rule creates requirements for "privately made firearms" when such firearms come into contact with any licensee and result in that the firearm is taken into its inventory, even if only for cleaning, repair or other services not involving transfer or disposition. Defs' Br. at 46. However, these activities have nothing to do with the "commercial sale of arms." Moreover, the "commercial sale" language from *Heller* is not a magic talisman to be waved to avoid *Bruen* scrutiny, as *Heller* itself deemed commercial regulations only "presumptively lawful." *Heller*, 554 U.S. at 627 n.26. Nowhere in the rulemaking process or this litigation do the Agencies conduct the analysis required by *Bruen* to justify the government's infringement of activities implicated in the Rule which are covered by the Second Amendment.

23

### C.     The Rule Chills Protected Speech in Violation of the First Amendment

Defendants concede that the Rule "might be considered to have some minor incidental impact on speech" but nevertheless argue that "it is not motivated by, or targeting, any marketing materials or instructions sold or provided by sellers; rather, the Rule's purpose is expressly to update certain regulatory definitions to 'capture the full meaning' of terms used in the GCA and to better effectuate the purposes of that statute." Defs' Br. at 48 (citing Rule at 24,652). However, the purported purpose of the regulatory definitions does not mitigate the functional reality of the regulation on protected speech.

Defendants' citation of *Arcaca v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986), does not help the Agencies' position.   In *Arcaca*, the conduct prompting the enforcement action had "nothing to do with any expressive conduct at all," since the expressive conduct at issue was the selling of adult books. *Id*. at 705 n.2. Accordingly, the Court found no First Amendment issue of prior restraint. *Id*.   The Court did, however, affirm the application of First Amendment scrutiny "where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity[.]" 478 U.S. at 706–07 (citing *Minneapolis Star & Trib. Co. v. Minn. Com'r of Revenue*, 460 U.S. 575, 592–93 (1983)). While the circumstances in *Arcaca* were found to not implicate the First Amendment, the situation before this Court falls within the principle expressed in *Minneapolis Star* because the Rule "has the inevitable effect of singling out those engaged in expressive activity"—namely, an individual or entity who engages in speech that takes the form of "any available instructions, guides, templates, jigs, equipment, tools, or marketing materials." Rule at 24,678; *see Millennium Restaurants Grp., Inc. v. City of Dallas, Texas*, 181 F.Supp.2d 659, 665–66 (N.D. Tex. 2001) (finding First Amendment implicated and

that *Arcara*'s holding did not apply in case involving city's license revocation procedure on basis of "violations [that] undoubtedly arise from conduct that at least has an expressive element").

The Rule provides that the ATF Director "may consider" such speech in making classification determinations that implicate significant rights and potential criminal ramifications. This constitutes a content-based restriction because it requires "enforcement authorities" to "examine the content of the message that is conveyed to determine whether" the speech should be restricted. *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984).

**IV.     VACATUR IS THE APPROPRIATE REMEDY PRESCRIBED UNDER THE APA**

The APA directs courts to "hold unlawful and set aside agency action[s]." 5 U.S.C. § 706(2). Indeed, "[t]he default rule is that vacatur is the appropriate remedy." *Data Mktg. P'ship*, 45 F.4th at 859.  Upon finding the Rule was promulgated in violation of the APA, this Court should apply vacatur, "the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022).

*Conclusion*

The Rule is an exercise in agency lawmaking that is unlawful under the APA and impermissibly expands, confuses, and reinterprets regulations that govern activities by which American citizens exercise fundamental rights expressly guaranteed by the Constitution. The Rule is an attempt by the Agencies and the Executive Branch to arrogate to themselves a regulatory reach for which they have no congressionally-delegated authority. BlackHawk and Plaintiffs have met their burden of proof and are entitled to summary judgment on the issues raised in their respective Complaints and briefs, including vacatur of the Rule as provided by the APA.

Respectfully submitted,


/s/ *Brian D. Poe*
Brian D. Poe
TX Bar No. 24056908
BRIAN D. POE, ATTORNEY AT LAW PLLC
The Bryce Building
909 Throckmorton Street
Fort Worth, TX 76102
Phone: (817) 870-2022
Fax: (817) 977-6501
bpoe@bpoelaw.com

Michael J. Sullivan
*Pro Hac Vice*, MA Bar No. 487210
Nathan P. Brennan
*Pro Hac Vice*, MN Bar No. 389954
J. Christopher Amrhein, Jr.
*Pro Hac Vice*, MA Bar No. 703170
ASHCROFT LAW FIRM LLC
200 State Street, 7th Floor
Boston, MA 02109
Phone: (617) 573-9400
Fax: (617) 933-7607
msullivan@ashcroftlawfirm.com
nbrennan@ashcroftlawfirm.com
camrhein@ashcroftlawfirm.com

*Counsel for Intervenor-Plaintiff BlackHawk*
*Manufacturing Group Inc. d/b/a 80 Percent Arms*

26

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 6, 2023, the foregoing document was served, via the Court's CM/ECF Document Filing System, upon the registered CM/ECF users in this action.

/s/ *Brian D. Poe*
Brian D. Poe
