UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| JENNIFER VANDERSTOK, et al., § <br> § <br> Plaintiffs, § <br> § <br> BLACKHAWK MANUFACTURING § <br> GROUP INC. d/b/a 80 Percent Arms, § <br> § <br> Intervenor-Plaintiff, § <br> § <br> DEFENSE DISTRIBUTED, and § <br> THE SECOND AMENDMENT § <br> FOUNDATION, INC. § <br> § <br> Intervenors-Plaintiffs, § <br> § <br> v. § <br> § <br> MERRICK GARLAND, in his Official § <br> Capacity as Attorney General of the § <br> United States, et al., § <br> § <br> Defendants. § | Civil Action No. 4:22-cv-00691-O |

DEFENSE DISTRIBUTED AND
THE SECOND AMENDMENT FOUNDATION, INC.'S
SUMMARY JUDGMENT RESPONSE/REPLY BRIEF

Defense Distributed and the Second Amendment Foundation, Inc., file this combined reply in support of their motion for summary judgment, Doc. 165 (motion); Doc. 166 (brief), and response in opposition to the Agencies' cross-motion for summary judgment, Doc. 181.

**Argument**

The Agencies deny Defense Distributed's standing by arguing that it "offered no evidence that it ever sold any product that the Rule classifies as a firearm." Doc. 181 at 11. The Court should reject the Agencies' standing denial because Defense Distributed established that both with the proof it originally submitted and the additional declaration attached as Exhibit A.

**I.  Defense Distributed has standing.**

Defense Distributed's latest evidence, the 2023 Declaration of Cody Wilson, Ex. A, establishes beyond doubt that the Final Rule caused Defense Distributed to cease selling Polymer 80 pistol frames—an item that ATF's own December 2022 Open Letter deems covered by the Final Rule. *Id.* at 3, 5. It also specifies six other "80% Lowers & Frames" that Defense Distributed used to sell, showing the exact website sales page that no longer exists because of the Final Rule:



*Id.*

1

The Court should also reject the Agencies' standing denial for the reasons that the Court approved of Defense Distributed's standing to obtain a preliminary injunction. Doc. 188. The original proof regarding Defense Distributed's activities, Doc. 164-01, was enough, and the additional clarifying proof leaves no room for debate. Defense Distributed has standing.

## II.  SAF has standing.

The Agencies deny SAF's standing by arguing that SAF needs to but cannot show that "SAF is either a traditional membership organization or the functional equivalent thereof." Doc. 181 at 12-14. The Court should reject this because SAF established that it is a "traditional voluntary membership organization" within the meaning of *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 342 (1977). The proof shows this by explaining that "SAF is a non-profit ***membership*** organization ***incorporated*** under the laws of the State of Washington," Doc. 166-2 at 1, ¶3 (emphasis added), and specifying that SAF has actual "members nationwide and in this district." *Id.* Those plain facts alone—that SAF is an actually "incorporated" association with actual "members"—make it a "traditional voluntary membership organization."

Precedent on both sides of the line upholds this conclusion. SAF is like the entity deemed a "traditional membership organization" by *Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1084-86 (5th Cir. 2022), because both are a "validly incorporated 501(c)(3) nonprofit with [thousands of] members who joined voluntarily to support its mission." *Id.* In contrast, *Hunt*'s government commission was "not a traditional voluntary membership organization such as a trade association, *for it ha[d] no members at all.*" *Hunt*, 432 U.S. at 342 (emphasis added). Under *Hunt* and its progeny, SAF's constitution of actual members makes all the difference. No more was required.

The Agencies err (at 12-13) by double counting and adding an extra element to the definition of "traditional voluntary membership organization." They demand "traditional

2

voluntary membership organization" status to be shown not just by proof of actual members, but also by proof of particular governance methods. But under *Hunt*, proof of governance methods is *not* a part of the threshold "traditional voluntary membership organization" test. It is instead part of the functional inquiry that occurs *later*, if and only if an entity did not establish "traditional voluntary membership organization" status in the first place by showing actual members.

*Students for Fair Admissions, Inc. v.*, 37 F.4th 1078, 1085 (5th Cir. 2022), is not to the contrary. It mentioned governance methods only in passing, not as an element of the holding about "traditional voluntary membership organization" status. *Id.* A leading case that *Students for Fair Admissions, Inc.* expressly approved of shows this—that the threshold definition of "traditional voluntary membership organization" looks only at whether the entity has actual "members":

> Although [the defendant] argues that *Hunt* and its progeny support the application of an indicia-of-membership test to all organizations asserting associational standing, regardless of whether they formally have members, the Court is not aware of any case that explicitly stands for this proposition. . . .
> . . .
> The Court reads *Hunt* as standing for the following propositions: (1) a membership organization has standing to sue on behalf of its members if it satisfies the three *Hunt* prerequisites (in short, that at least one member has a personal injury-in-fact, germaneness, and no need for individual member participation); and (2) a non-membership organization might still have associational standing provided it has sufficient indicia of membership as more fully set forth in *Hunt* and its progeny. In introducing the indicia-of-membership test, *Hunt* expanded the category of organizations that could have associational standing, rather than limiting it.

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 261 F. Supp. 3d 99, 108 (D. Mass. 2017) (approved of by *Students for Fair Admissions, Inc. v.*, 37 F.4th at 1085 n.8), *aff'd sub nom. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 980 F.3d 157 (1st Cir. 2020).

SAF's status as a "traditional voluntary membership organization" is "consistent with the rationale underlying associational standing," the key being "adequacy of representation." *Id.* Just

3

as with Students for Fair Admissions, the "circumstances here do not call for a functional analysis of [SAF's] membership" because (1) SAF has "clearly stated its mission,"[1] (2) SAF has used litigation to pursue its purposes "consistently, and recently, in highly public ways,"[2] and (3) SAF's "members voluntarily associate themselves with the organization."[3] *Id.* Therefore it "can be presumed for the purposes of standing that [SAF] adequately represents the interests of its current members without needing to test this further based on the indicia-of-membership factors." *Id.*

### III. Count Two is Meritorious.

Defense Distributed and SAF seek summary judgment against the Agencies on Count Two of their complaint, *see* Doc. 143 at 22-23, ¶¶ 67-69, which no other party asserts. Doc. 165 at 2 (motion); Doc. 166 (brief). Count Two is the "unique process-based claim about the Agencies having violated the Administrative Procedure Act by promulgating the Final Rule with insufficient considerations." Doc. 166 at 2. It shows that the "Agencies doubly violated the APA by both (1) failing to consider the factors and data that *Bruen* deems constitutionally mandatory and (2) relying instead on factors and data that *Bruen* deems constitutionally improper." *Id.* at 3. It is meritorious.

---

[1] *See* Doc. 166-2 at 1, ¶3 ("SAF promotes the right to keep and bear arms by supporting education, research, publications, and legal efforts about the Constitution's right to privately own and possess firearms and the consequences of gun control."); Second Amendment Foundation, Inc., *Mission Statement*, www.saf.org/mission/# (last visited Feb. 27, 2023) ("The Second Amendment Foundation (SAF) is dedicated to promoting a better understanding about our Constitutional heritage to privately own and possess firearms. To that end, we carry on many educational and legal action programs designed to better inform the public about the gun control debate.").

[2] *See, e.g.*, *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 874 (2010) (SAF was a plaintiff and petitioner in the Supreme Court); *see generally* Second Amendment Foundation, Inc., *News*, www.saf.org/category/news/ (last visited Feb. 27, 2023).

[3] *See* Doc. 181 at 13-24 (the Agencies concede that SAF memberships are fully voluntary).

### A. Procedure-based APA claims turn on a rule's procedure, not its end result.

The Agencies' first answer tries to beat a process-based APA claim by ignoring process. In response to Count Two, the Agencies say this: "As explained below, *see infra* Section V, ATF correctly concluded that the Rule is consistent with the Second Amendment." Doc. 181 at 37. Section V says "The Rule Is Consistent With the Second Amendment." *Id.* at 45. These arguments do not address the Final Rule's *process*. They address the Final Rule's *outcome*. They fail as to Count Two because an *outcome*-based assertion is no answer to Count Two's *process*-based claim.

Count Two targets the Agencies' use of an APA-violating promulgation *process*, which the APA makes actionable regardless of whether or not the resulting rule is also unconstitutional. That is the whole point of process-based requirements like the need to examine all "relevant factors" and "relevant data." Doc. 166 at 3 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*, 463 U.S. 29, 43 (1983)). If such failures were actionable only in the event of an independent APA-violating outcome, the process requirements would never matter. But the Agencies' compliance with rulemaking processes *does* matter, which is precisely why the Supreme Court has repeatedly deemed *process*-based APA claims to be fully actionable standing alone.

### B. The Agencies considered the wrong Second Amendment factors and data.

To establish the procedural violation, Count Two posits that the Agencies' rulemaking process failed to examine the Second Amendment's "relevant factors" and "relevant data" in two separate ways. *See* Doc. 166 at 3-4. The Agencies (1) failed to consider factors and data *Bruen* deems constitutionally *mandatory* because they failed to consider whether the new Final Rule "addresses a general societal problem that has persisted since the 18th century," and if so whether there was "a distinctly similar historical regulation addressing that problem." *Bruen*, 142 S.Ct. 2111. The Agencies also (2) relied instead on factors and data that *Bruen* deems constitutionally

5

improper by infecting their rulemaking process with the very presumptions of legality and means-ends scrutiny that *Bruen* deems illegal. Both are established.

### 1. The Agencies considered factors and data that *Bruen* deems improper.

The Agencies do not deny error aspect (2). That is, the Agencies do not deny that their rulemaking expressly relied upon factors and data *Bruen* deems constitutionally improper. They say that this error was harmless, and that separate issue is addressed below. But on the issue of whether error aspect (2) occurred because of improper considerations, there is no real opposition.

### 2. The Agencies failed to consider historical analogs.

The Agencies also do not deny error aspect (1), at least not seriously. The brief is best read as conceding that the rulemaking process failed to actually consider whether the new Final Rule addresses a general societal problem that has persisted since the 18th century and if so whether there was a distinctly similar historical regulation addressing that problem. While the brief says that "ATF correctly explained that the Rule does not infringe Second Amendment rights," Doc. 181 at 37, that can mean only that the Agencies think no *Bruen*-style analysis was needed—not that a *Bruen*-style analysis of historically analogous problems and regulations actually occurred.

### 3. The Agencies were required to consider historical analogs.

Instead of saying that a *Bruen*-style analysis *did in fact* occur, their keystone argument is that it *did not need to* occur: "Because, like many other commercial regulations, the Rule does not prevent any qualified individual from making, buying, or possessing firearms, it does not infringe that right and it need not be justified by historical analogy." Doc. 181 at 46. The Court should reject this and hold that, under *Bruen*, a proper Second Amendment analysis of the Final Rule requires a historical analysis. The reasons to do so here are the same as the reasons to do so for

the Second Amendment claim that is briefed fully already. *See* Doc. 165 at 3 (adopting Doc. 144 at 1-3 (motion); Doc. 145 at 34-37, 41-42 (brief)); Doc. 192 at 22-23.

*Shell Offshore Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001) (cited by the Agencies at 37-38), is about the rule that "reviewing courts generally should, in evaluating agency action, avoid considering evidence that was not before the agency when it issued its final decision." *Id.* at 630 n.8. That does not weaken Count II because Count II uses the record's emptiness *against* the Agencies. The Final Rule violated the APA *because* no *Bruen*-compliant historical inquiry occurred during its promulgation, and this is what is plainly apparent on the face of the existing administrative record. If anything, *Shell Offshore* just goes to show that the Agencies cannot now save the Final Rule by imagining what a *Bruen*-compliant rulemaking would have looked like.

### C. The harmless error argument fails.

The Agencies next oppose Count Two by claiming harmless error. Doc. 181 at 37-38. Assuming that their failure to conduct a *Bruen*-compliant Second Amendment inquiry violated the APA, the Agencies say that this APA violation warrants no relief because Defense Distributed and SAF cannot show that it caused harm. Doc. 181 at 37-38. The Court should reject this because (1) the Agencies did not carry *their burden* of negating harm, and (2) harm is evident.

#### 1. The Agencies did not carry their harm burden.

First, the Court should reject the harmless error argument because the Agencies bear the burden of showing harmlessness. The Agencies certainly did *not* carry a burden of affirmatively demonstrating harmless. All they did is deny harm, which is not the same as showing the opposite. There is, for example, no assertion by the Agencies (and certainly no proof) that the Final Rule would have come out same if a *Bruen*-compliant historical analysis had occurred. So if the Agencies had the burden of showing harmlessness, their harmless-error argument fails.

7

The Agencies bear the burden of establishing harmlessness under two legal rules. Each is independently sufficient to prove the point. The first applicable burden-allocating rule comes from federal law's overall harmless error doctrine, which applies to APA matters, *see Shinseki v. Sanders*, 556 U.S. 396, 406 (2009). The rule is that the government bears the burden of showing harmlessness where the government commits an error regarding the Constitution or in depriving citizens of liberty. *See United States v. Walters*, 418 F.3d 461, 464 (5th Cir. 2005). The second applicable burden-allocating rule comes from APA-specific precedent. The rule is that, when courts cannot tell whether or not harm stemmed from an APA violation about what material agency considered, harm is presumed. *PDK Labs. Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("What weight [the agency] gave to those circumstances (or any others) is impossible to discern. The decision upholding the suspension orders must therefore be set aside and the case remanded.").

These burden-allocating rules apply. The first applies because the Agencies committed an error regarding the Constitution (what the Second Amendment requires) in depriving citizens of liberty; so the government therefore bears the burden of showing harmlessness. *See Walters*, 418 F.3d at 464. The second applies because the Agencies' error controlled what material the agency considered; so even if the record about harm is silent (it is not for reasons explained next), harm is presumed. *See PDK Labs*, 362 F.3d at 799. One way or the other, the Agencies bore the burden; and since they did not do the work of showing a lack of harm, Count Two survives on this basis.

    **2.**    **Harm is evident.**

Regardless of where the burdens lie, the Court should reject the harmless-error argument by holding that harm is evident. "In conducting the harmless error inquiry, we inform our analysis with a number of potentially relevant factors, including (1) 'an estimation of the likelihood that the result would have been different'; (2) 'an awareness of what body (jury, lower court,

8

administrative agency) has the authority to reach that result'; (3) 'a consideration of the error's likely effects on the perceived fairness, integrity, or public reputation of judicial proceedings'; and (4) 'a hesitancy to generalize too broadly about particular kinds of errors when the specific factual circumstances in which the error arises may well make all the difference.'" *City of Arlington, Tex. v. F.C.C.*, 668 F.3d 229, 244 (5th Cir. 2012), *aff'd*, 569 U.S. 290 (2013). Under this framework, Defense Distributed and SAF need not necessarily show an actual Second Amendment violation. That is one way of proving harm. But it is not the only way. Relief is warranted if the Count Two APA violation caused *any harm* deemed meaningful, and several such harms are evident here.

Specifically, the Count Two APA violation caused sufficient harm by impacting the rulemaking procedure used and the substance of the decision reached. Harm warranting relief occurs when an APA error has a "bearing on" either "the procedure used" or "the substance of the decision reached." *United States v. Johnson*, 632 F.3d 912, 930 (5th Cir. 2011) ("In this circuit, an administrative body's APA deficiency is not prejudicial "only 'when [it] is one that clearly had no bearing on the procedure used or the substance of decision reached.'"); *U.S. Steel Corp. v. U.S. E.P.A.*, 595 F.2d 207, 215 (5th Cir. 1979) ("Here the Agency's error plainly affected the procedure used, and we cannot assume that there was no prejudice to petitioners."). The requisite "bearing" exists when the erroneous aspect of the process "directly informed" and "guided" the agency's conclusion. *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 444 (5th Cir. 2001).

Here, the Count Two APA violation had a "bearing" on the "procedure used" and a "bearing" the "substance of the decision reached," as it (wrongly) defined the universe of historical materials the Agencies had to accounted for and (wrongly) told them to employ means-ends scrutiny. *See* Doc. 164 at 5 (showing the Agencies' heavy reliance on "compelling governmental interests" and "presumptively lawful regulatory measures"). Depriving this rulemaking process

9

of its constitutionally-required methods and ingredients necessarily infected the end result. Such process harms are especially evident where, as here, the rule concerns a "complex regulatory decision" and not a mere "yes or no" decision. *Johnson*, 632 F.3d at 932.

*Worldcall Interconnect, Inc. v. FCC*, 907 F.3d 810 (5th Cir. 2018) (cited by the Agencies), is the flip side of the coin. That case's APA violations caused no harm because they "clearly had no bearing on the procedure used or the substance of the decision reached." *Id.* at 819; *see also* ("the references appear unimportant"). Here by contrast, the APA violation (failure to conduct a *Bruen*-compliant historical analysis) had both relevant bearings. The Court should therefore follow *U.S. Steel*'s holding: "Here the Agency's error plainly affected the procedure used, and we cannot assume that there was no prejudice to petitioners." *U.S. Steel Corp.*, 595 F.2d at 215.

## IV.   The other counts are meritorious.

Defense Distributed and SAF continue to move for summary judgment against the Agencies on Counts One, Three, Four, Five, and Six, of Defense Distributed and SAF's complaint by adopting the corresponding parts of the motions filed by Plaintiffs Jennifer VanDerStok, Michael G. Andren, Tactical Machining, LLC, and Firearms Policy Coalition, Inc. (hereinafter "Plaintiffs"), and Intervenor-Plaintiff BlackHawk Manufacturing Group Inc. d/b/a 80 Percent Arms (hereinafter "Blackhawk"), *see* Doc. 165, as well as their response/replies, Doc. 191, 192.

## Conclusion

Defense Distributed and SAF's motion for summary judgment should be granted. The Agencies' motion for summary judgment should be denied.

Date: March 6, 2023                                  Respectfully submitted,

                                                               /s/ Chad Flores  
Chad Flores  
Texas Bar No. 24059759  
cflores@beckredden.com  
Beck Redden LLP  
1221 McKinney St., Suite 4500  
Houston, TX 77010  
(713) 951-3700  
(713) 951-3720   Fax  
*Counsel for Defense Distributed and the Second Amendment Foundation, Inc.*

11