**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| JENNIFER VANDERSTOK *et al.*, | |
| Plaintiffs, | Case No. 4:22-cv-00691-O |
| v. | |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States *et al.*, | |
| Defendants. | |

**APPENDIX IN SUPPORT OF DEFENDANTS' REPLY BRIEF IN**
**SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

| Document | Date | Bates Numbers | Document Numbers |
|---|---|---|---|
| ATF Memorandum #22334 | Jan. 24, 1977 | ATF000005-000009 | Defs.' Reply App. 001-005 |
| Internal Revenue Service Memoranda #21208 | March 1, 1971 | ATF000001-000004 | Defs.' Reply App. 006-009 |
| Transcript of Motion Hearing, *United States v. Rowold*, No. 3:18-cr-387 (N.D. Ohio) | Sept. 26, 2019 | ATF071283-071445 | Defs.' Reply App. 010-172 |
| *United States v. Roh*, No. 8:14-cr-167 (C.D. Cal.), ECF No. 164 | July 27, 2020 | N/A | Defs.' Reply App. 173-180 |

DATED: April 6, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

LESLEY FARBY
Assistant Director, Federal Programs Branch

*/s/ Daniel Riess*
DANIEL RIESS
TAISA M. GOODNATURE
JEREMY S.B. NEWMAN
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 353-3098
Email: Daniel.Riess@usdoj.gov
*Attorneys for Defendants*

1

## **CERTIFICATE OF SERVICE**

On April 6, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Daniel Riess*

Case 4:22-cv-00691-O   Document 199  Filed 04/06/23   Page 4 of 183   PageID 4157

Criminal Ref. —  FIREARMS

FN FAL Machinegun Receivers (T-II)

The Central Region has raised a question concerning the FN FAL machinegun split receiver which you believe should be reconciled since their position with respect thereto appears to conflict with an opinion of the Office of Technical and Scientific Services.

Basically, the FN FAL rifle was designed to fire automatically and was the standard weapon of the NATO ground forces.  Several thousand of these weapons were lawfully imported into the United States after a slight modification had been made of the upper portion of the receiver which would prevent automatic fire.  With regard to these weapons, the upper receiver which had been designed for automatic fire had been modified.  It is a simple process to adapt these weapons so they can fire automatically.

Many more FN FAL rifles have been imported which utilize an upper receiver which was designed and manufactured to fire semi-automatically.  Such weapons are true sporting rifles and were never manufactured from a machinegun.  The upper half of the receiver of the "sporting" rifle cannot be easily converted to fire automatically.

Since the design of the upper half of the receiver is the only distinguishing characteristic between those semi-automatic FN FAL rifles made from a machinegun and the true "sporting" version, it appears to us that this is the portion of the receiver that should bear the serial number.

See: Digest #21208, 3/1/71.

ATF000005 (1)

Defs.' Reply App. 001

```
Subject:  0000824
  Ruling:  22334.0
    Date:  19770124
    Auth:  CRN
```

KeyWords:
FN FAL Machinegun Receivers (T-II)


Law-Regs:
Machineguns, Receivers, Rifles


Related Opinions:


Summary:
21208
                          The Central Region has raised a
question concerning the FN FAL machinegun split receiver which
  Criminal Enforcement believes should be reconciled since their
position with respect thereto appears to conflict with an opinion
of Office of Technical and Scientific Services.
     Basically, the FN FAL rifle was designed to fire
automatically and was standard weapon of NATO ground forces.
Several thousand of these weapons were lawfully imported into the
United States after a slight modification had been made of upper
portion of receiver which would prevent automatic fire. With
regard to these weapons, the upper receiver which has been
designed for automatic fire had been modified.  It is simple
process to adapt these      weapons so they can fire
automatically.           Many more FN FAL rifles have been
imported which  utilize an upper receiver which was designed &
manufactured to fire  semiautomatically. Such weapons are true
sporting rifles and were never manufactured from a machinegun.
The upper half of receiver  of "sporting" rifle cannot be easily
converted to fire automatically.
Since design of upper half of receiver is only distinguishing
characteristic between those semiautomatic FN FAL rifles made
from a machinegun and the true "sporting" version, it appears to
us that this is portion of receiver that should bear the
serial number.



mmp

*Lee # 21208 (3-1-71)*

22334

CLOSED.

JAN 24 1977

CC-23,932 L:CRN

MEMORANDUM TO: Acting Assistant Director (CE)

FROM: Assistant Chief Counsel (Litigation)

SUBJECT: FN FAL Machinegun Receivers (T-II)

This refers to your above-captioned memorandum which was received in this office on November 2, 1976. Attached to your memorandum was a memorandum, with attachments, from the Central Region pertaining to the same subject. The Central Region has raised a question concerning the FN FAL machinegun split receiver which you believe should be reconciled since their position with regard thereto appears to conflict with an opinion of the Office of Technical and Scientific Services.

The particular weapon in question has a split receiver namely an upper and lower half. The Central Region believes that the lower half is the controlling part and should thus be the portion which has the serial number impressed thereon. The Office of Technical and Scientific Services expresses the view that the upper half is the controlling portion because it more nearly meets the definition of "receiver" as that term is defined in the statute and thus the upper half should bear the serial number of the weapon. Our views with respect to this problem have been requested.

Apparently the Central Region's view is based, at least in part, upon two factors, which are:

1. In 1971 the M-16 rifle was examined by this Bureau and, since it also was a split receiver rifle the determination was made that the serial number should be imprinted upon the lower half. Even though the M-16 was the weapon under consideration, the

ATF000007

Defs.' Reply App. 003

**22334**

- 2 -

Acting Assistant Director (CE)

> memorandum reflecting the Bureau's finding
> stated: "We have determined that the lower
> receiver is in fact the receiver of a
> machinegun as that term is used in
> section 5845(b) of the National Firearms
> Act.  Therefore, it must be identified
> by the name and address of the
> manufacturer and it would also bear
> the serial number of the firearm."  This
> quotation was taken completely out of
> context by some of the readers of the
> memorandum and it was erroneously assumed
> that all split receivers were to be
> treated the same as the M-16.  (Such an
> assumption is totally incorrect.)
>
> 2. It was published in Bureau Publication
> 603 and its successors under "questions
> and answers" that with regard to weapons
> having both an upper and lower receiver
> the serial number must be impressed into
> the lower receiver.  This question and
> answer will no longer be published.

Basically, the FN FAL rifle was designed to fire
automatically and was the standard weapon of the NATO
ground forces.  Several thousand of these weapons were
lawfully imported into the United States after a
slight modification had been made of the upper portion
of the receiver which would prevent automatic fire.
With regard to these weapons, the upper receiver which
had been designed for automatic fire had been modified.
It is a simple process to adapt these weapons so they
can fire automatically.

Many more FN FAL rifles have been imported which utilize
an upper receiver which was designed and manufactured
to fire semi-automatically.  Such weapons are true
sporting rifles-and were never manufactured from a
machinegun.  The only difference between the rifles
referred to in this paragraph and those in the previous

- 3 -

Acting Assistant Director (CE)

paragraph is in design of the upper half of the receiver. The upper half of the receiver of the "sporting" rifle cannot be easily converted to fire automatically.

Since the design of the upper half of the receiver is the only distinguishing characteristic between those semi-automatic FN FAL rifles made from a machinegun and the true "sporting" version, it appears to us that this is the portion of the receiver that should bear the serial number.

It should be kept in mind that this memorandum is addressed only to the FN FAL rifle and any other split receiver weapon should be examined with a view toward determining if the upper or lower half of the receiver more nearly fits the legal definition of "receiver."

We have examined the criminal case report forwarded to this office with your memorandum in which at least one of the defendants was convicted, upon his guilty plea, of possessing a machinegun because he possessed the lower portion of an FN FAL weapon which was unserialized. Once a decision has been made as to whether the upper or lower half of the FN FAL Weapon is the "receiver," we believe that the Department of Justice should be advised with respect to this criminal conviction so a decision can be made as to the proper course of action to be pursued.

The case report forwarded by you is returned herewith.

(Signed) James R. Wachter

James R. Wachter

Attachment

CRNolte:etc
1/29/77

JRW    21208

J. F. McCarren                                    "Initialed"

"Frame or Receiver"

Re: M-16 Receivers which is fabricated in two parts.

This matter was discussed in a conference, which included an examination of the weapon. We were assured at that time that the lower portion of comes closest to meeting the definition of frame or receiver in 26 CFR 178.11 although both parts were necessary to function as a "frame or receiver" in a machine gun.

I can see some difficulty in trying to make cases against persons possessing only the lower part of a receiver, but insofar as the licensing, serial numbering, and special occupational tax requirements are concerned, I feel that this is the only practical solution.

I recommend your approval.

ce: <u>26 U.S.C. 5845(b)</u>
ce: <u>Firearms(Chap 53, Title 26 U.S.C.)</u>                                    (3)
  Also See Initialed letter dated March 2, 1971 to Asst. Regional Commissioner,
  Mid-Atlantic Region (Proposed).

ATF000001

Defs.' Reply App. 006

```
Subject:   0001561
  Ruling:   21208.0
    Date:   19710301
    Auth:   JRW
KeyWords:
Possession of lower part of a receiver

Law-Regs:
Machineguns, frame, receiver

Related Opinions:
26 CFR 178.11, 26 USC 5845(b)

Summary:
Re: M-16 Receiver  which is fabricated in two parts.
                              This matter was discussed in a
conference which included an examination of the weapon.  We were
assured at that time that the lower portion comes closet to
meeting the definition of frame or receiver in 26 CFR 178.11
although both parts were necessary to function as a "frame or
receiver" in a machinegun.
                              I can see
some difficulty in trying to make cases against persons
possessing only the lower part of the receiver, but insofar as
the licensing, serialnumbering, and special occupational tax
requirements are concerned, I feel that this is the only
practical solution.
                              I recommend your approval.
```

emr

ATF000002

Defs.' Reply App. 007

21208

CC:ATF-12,736
T:JRW

## memorandum

March 1, 1971

to: J. F. McCarren

from: J. R. Wachter

subject: M-16 Receivers

Apparently the M-16 receiver is fabricated in two parts, and the Enforcement Division has determined that the lower portion should be considered the receiver, and, thus, a machine gun under 26 U.S.C. 5845(b). This matter was discussed in a conference attended by Mr. Powell and myself with Messrs. Darr, Westenberger, Scroggie, and, I believe, Mr. Wolfe, which included an examination of the weapon.

We were assured at that time that the lower portion comes closest to meeting the definition of frame or receiver in 26 CFR 178.11 although both parts were necessary to function as a "frame or receiver" in a machine gun.

I can see some difficulty in trying to make cases against persons possessing only the lower part of a receiver, but insofar as the licensing, serial numbering, and special occupational tax requirements are concerned, I feel that this is the only practical solution.

I recommend your approval.

J. R. Wachter

I Concur: _W. T. Hare_          Date: 3/2/71
                W. T. Hare

Approved: _JFM_                 Date: 3/2/71
              J. F. McCarren

Internal Revenue Service

ATF000003

Defs.' Reply App. 008

1971

21208

Assistant Regional Commissioner (ATF)
Mid-Atlantic Region

Acting Director, Alcohol, Tobacco and Firearms Division
National Office                                    CP:AD:RD:JRB

M-16 Receivers Forged by Kaiser Aluminum and Chemical Company, Erie,
Pa., and Subsequently Machined by Firearms Manufacturers Such as Colt,
H & R Arms Company and General Motors Corporation

This is in response to a memorandum dated December 8, 1970, from
Stanley S. Sass, Area Supervisor, Pittsburgh ATF office, to Chief
Special Investigator, ATF Northern Section; reference: SL-PIM-71-M-
F-(T-LM) Collateral. The receivers and slides referred to in Mr. Sass'
memorandum have been received in this office.

The aluminum castings produced by the Kaiser Aluminum Company
are not frames or receivers for firearms. It is not necessary, there-
fore, that any action be taken in regard to these forged aluminum
blocks.

Firearms manufacturers who subsequently machine these aluminum
blocks into upper and lower receivers for M-16 rifles, however, have
produced firearms receivers which are subject to the controls of the
National Firearms Act. We have determined that the lower receiver
is in fact the receiver of a machine gun as that term is used in
Section 5845(b) of the National Firearms Act. Therefore, it must
be identified by the name and address of the manufacturer and it
would also bear the serial number of the firearm.

In regard to any of these M-16 bottom receivers which are
defective, it will be necessary for the manufacturers to destroy
them prior to their return to the Kaiser Aluminum and Chemical
Company. Such returned receivers must be destroyed in a manner
which will insure that they are no longer machine gun receivers.

If these receivers are not so removed from control under the
Act, all parties possessing them will have to be properly qualified
under Title I and Title II of the Gun Control Act of 1968. We have
retained custody of the forged aluminum blocks and the machined
upper and lower receiver for reference purposes.

Rex D. Davis

RECEIVED
NOV 23 1971

ATF000004

Defs.' Reply App. 009

1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                          WESTERN DIVISION

3    UNITED STATES OF AMERICA,        Docket No. 3:18CR387

4              Plaintiffs,            Toledo, Ohio

5              v.                     September 26, 2019

6    RICHARD L. ROWOLD and

7    STEVEN J. ROBISON,

8              Defendants.

9    ------------------------------

10                   TRANSCRIPT OF MOTION HEARING
                  BEFORE THE HONORABLE JAMES G. CARR
11                   UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14   For the Plaintiffs:  Thomas P. Weldon
                          Office of the U.S. Attorney
15                        Four SeaGate, Suite 308
                          Toledo, Ohio 43604
16                        (419) 242-5675

17                               - - -

18                        James Patrick Vann
                          Special Assistant U.S. Attorney
19                        99 New York Avenue, N.E.
                          Washington, DC 20226
20                        (202) 648-8119

21                               - - -

22                        Jonathan Sydney Jacobs
                          Special Assistant U.S. Attorney
23                        244 Needy Road
                          Martinsburg, WV 25405
24                        (304) 433-2765

25

```
 1    For the Defendant, Richard L. Rowold:
                            Thomas P. Kurt
 2                          610 Adams Street 43604
                            Toledo, Ohio 43604
 3                          (419) 241-5506

 4    For the Defendant, Steven J. Robison:
                  Jacqueline A. Johnson and Claire R. Cahoon
 5                Office of the Federal Public Defender
                  1660 West Second Street
 6                 Cleveland, Ohio 44113
                  (216) 522-4856

 7

 8

 9    Court Reporter:       Angela D. Nixon, RMR, CRR
                            1716 Spielbusch Avenue
10                          Toledo, Ohio 43624
                            (419) 260-5259

11

12    Proceedings recorded by mechanical stenography, transcript

13    produced by notereading.

14

15

16

17

18

19

20

21

22

23

24

25
```

ATF071284

Defs.' Reply App. 011

1          COURTROOM DEPUTY:  Case 3:18CR387, United States

2    of America versus Richard L. Rowold, et al. matter called

3    for motion to dismiss hearing.

4          THE COURT:  Okay.  And counsel, first for the

5    government, Mr. Weldon?

6          MR. WELDON:  Good morning, Your Honor.  This is

7    Tom Weldon representing the United States in this case.

8    Today with me, Judge, I'd like to introduce two Special

9    Assistant United States Attorneys.  To my immediate left is

10   James Vann, and next to him is John Jacob somebody.

11         THE COURT:  V-A-N-N?

12         MR. VANN:  V-A-N-N, correct, Your Honor.  Thank

13   you.

14         MR. WELDON:  Judge, these two gentlemen actually

15   work for the Bureau of Alcohol Tobacco and Firearms, and

16   their chief counsel office is in West Virginia and

17   Washington D.C., but Justin Herdman recently swore them

18   both in to assist us in this matter today.

19         THE COURT:  Absolutely.  Welcome, counsel.  And

20   if the clerk -- if you'll just provide the contact

21   information, I'll have them noted as co-counsel --

22         MR. WELDON:  Thank you, Your Honor.

23         THE COURT:  -- pro hac vice if that's necessary.

24   For the defendants?

25         MS. JOHNSON:  Good morning, Your Honor,

ATF071285

Defs.' Reply App. 012

1    Jacqueline Johnson and Clair Cahoon --

2              THE COURT:  It's Clair Keegan (sic) and --

3              MS. JOHNSON:  -- present with our client, Steve

4    Robison, Your Honor.

5              THE COURT:  Okay.

6              MR. KURT:  Your Honor, Tom Kurt representing

7    Mr. Rowold.

8              THE COURT:  Just for the record, the matter comes

9    on to be heard on the defendant's motion to dismiss.  I

10   guess generally the contention is that the indictment fails

11   to give adequate notice because the portion which

12   colloquially is referred to as the lower receiver, which is

13   at issue here contains, as I understand it, the hammer and

14   the firing mechanism necessary to make -- turn the weapon

15   into a firearm, make it operate, eject a projectile with an

16   explosive, but it does not contain either the bolted or the

17   breechblock.  The statute under the Gun Control Act

18   simply -- in its definition as to what constitutes a

19   firearm simply includes the single term along with some

20   other categories, receiver, closed quote.  Regulations

21   adopted by the agency define the receiver as that part of

22   the firearm that contains the hammer, comma, the bolt or

23   breechblock, comma, and the firing mechanism.

24             If I understand correctly, and if I don't,

25   counsel, please correct me, the contention is because what

1  is designated and serial numbered as -- it's not

2  designated, but, once again, colloquially called at least,

3  the lower receiver contains only the hammer and the firing

4  mechanism, as I indicated what is colloquially called the

5  upper receiver contains what, a bolt or a breechblock,

6  anybody know?  Can somebody tell me?  And perhaps counsel

7  with ATF --

8            MR. VANN:  The upper receiver is colloquially,

9  what is referred to often as the upper receiver contains

10  the bolt, Your Honor.

11            THE COURT:  Okay.  I know it's not part of the

12  record, but I -- and I -- perhaps I could look up and

13  Google, I don't know, but shouldn't go shopping for

14  information that way.  Can you describe it to me

15  physically?  I know nothing about firearms, okay.

16            MS. CAHOON:  Your Honor, I apologize for

17  interrupting, but I believe we have firearms experts both

18  for the defense and the government.

19            THE COURT:  Do you have --

20            MS. CAHOON:  There we go --

21            THE COURT:  My apologies.

22            MS. CAHOON:  Yes.  Pardon my interruption, I just

23  wanted to let The Court know that the defense and the

24  government both do have firearms experts who will be

25  testifying, and they'll be breaking down all of these

ATF071287

**Defs.' Reply App. 014**

1    different terms.

2              THE COURT:  Today or later?

3              MS. CAHOON:  Yes, right now, Your Honor.

4              MR. WELDON:  Your Honor --

5              MS. CAHOON:  That may help resolve any confusion.

6              THE COURT:  Time out.  One at a time.  Go ahead,

7    Mr. Weldon.  Everybody's going to get a chance to talk.  As

8    Mr. Weldon and Ms. Johnson and Mr. Kurt all know, I do have

9    one rule about talking, and that is when my mouth is open,

10   everybody else's is shut.  As I may have already indicated,

11   I may be off target, the metaphor fits, and if so, please

12   don't interrupt.  I don't think any of you have witnessed,

13   I hope, what happens when somebody interrupts me and I get

14   annoyed.  I think I'm a pretty even tempered guy on the

15   whole, some might dispute that, but the one thing that's

16   guaranteed, for whatever reason, truly light my wick and

17   send me off is getting interrupted.  Don't ask me why.  All

18   people, Judges have idiosyncrasies, and that's the one that

19   can get me very angry.  So -- okay.  So -- and the same

20   with each other, okay.  Everyone's going to get a chance to

21   talk, I've got plenty of time this morning.  Mr. Weldon, go

22   ahead.

23             MR. WELDON:  I think it would be helpful to

24   mention to The Court that the government and the defense

25   have arranged for, today, for The Court to have, as an

ATF071288

**Defs.' Reply App. 015**

1    exhibit, a lower receiver, actually one of the lower

2    receivers that were -- was allegedly purchased in this

3    particular case.  And at the request of defense, an actual

4    upper or complete AR-15 style weapon is here in the

5    courtroom today.  Before this happened, Judge, I just want

6    you to know I cleared it all with Alex Rutter.  He has a

7    deputy here with a key with a trigger lock on the

8    particular AR-15.  It's unloaded, and of course would be

9    rendered safe immediately after testimony, but that was

10   done in agreement with defense.  They had an opportunity

11   yesterday to come up to ATF to view these exhibits, and

12   they are marked for The Court's benefit.

13            THE COURT:  All right.  And as I was saying, the

14   last time I had a firearm in my hands was Boy Scout camp

15   70 -- not quite -- 65 or more years ago, so I know nothing

16   about firearms.  That's good, I'm glad to hear that.

17            So anyway, just to sort of set what's before me

18   in terms of legal issues for you, ATF adopted a -- you

19   know, a regulation, as it's authorized to do, and the one

20   at issue here says where used in this part, and I've

21   already referred to that, that creates the problem, at

22   least in the defendants' eyes with the indictment and the

23   charge, and the problem they contend they have with notice.

24   I do want to note that -- let me complete the -- what I was

25   about to say.  The regulation contains -- the following ATF

1    regulation contains the following were used in this part,

2    and then forms prescribed under this part, comma, where not

3    otherwise distinctly expressed or manifestly inconsistent

4    with this part with -- excuse me, with the -- I'm sorry, I

5    have trouble reading, with the intent thereof, terms shall

6    have the meanings ascribed in this -- in this section,

7    okay.  Sorry to be so clumsy, but -- so I think under the

8    regulation itself raises the question of whether or not the

9    statute itself simply expressly describes what a receiver

10   is, quite simply using the term receiver.  In other words,

11   is the more elaborate definition or, quote, more precise

12   definition or clarification necessary in view of the

13   statutory term, and the, what I would suggest is the -- an

14   understanding of what a receiver is relative to a firearm

15   generally.

16          And secondly, I think another issue is whether or

17   not the duel definition or the -- excuse me, the unitary

18   definition as expressed here, whether or not is manifestly

19   inconsistent with the intent thereof.  And so far as I can

20   tell, the term there of seems to refer to the phrase this

21   part, I'm not sure where else it would go, but if that

22   relates to something else, let me know.

23          So I guess a couple of issues here is whether,

24   without the definition, the term receiver, as used in the

25   statute itself, is sufficiently specific and clear to put

ATF071290

Defs.' Reply App. 017

1    the defendants on notice of the requirements of the law,

2    really regardless of whatever the statute says by way of

3    punitive or alleged clarification or elaboration.

4            Secondly, there's, of course, the Chevron case,

5    and I believe that the pertinent segment of that decision

6    reads as follows, (Reading:) When a Court reviews an

7    agency's instruction of the statute which ad -- administers

8    it, excuse me, it is -- it is confronted with a question

9    first always is the -- first always is a question whether

10   Congress has directly spoken to the precise question at

11   issue, and didn't Congress do so when it simply used the

12   term receiver in light of the legislative -- statutory

13   purpose, its manifest purpose in enacting the Gun Control

14   Act and also replacing the former National Firearms with

15   the current version, namely the Gun Control Act.

16           If the intent -- and second, if the intent of

17   Congress is clear, then it is the end of the -- of the

18   matter.  Only question for defendants isn't the intent of

19   Congress clear in enacting the statute?  It's not -- using

20   particular term, maybe it is, but certainly seems to me

21   indisputably the intent of the statute is to undertake to

22   control undesirable access to proliferation of and use of

23   firearms.  I would think that's indisputable, but if it is

24   disputable let me know.  And if so, to put the question

25   quite bluntly to the defendants, well, does this -- isn't

ATF071291

Defs.' Reply App. 018

1     this regulation interpreted in this case with regard to

2     this overall weapon contrary to Congressional intent?  It

3     would undo, wouldn't it, congressional intent with a

4     weapon?  I think it's fair to say, I suspect the record, in

5     due course, will show and be relatively easily altered by

6     somebody with a modest bit of knowledge and no longer serve

7     as a semi-automatic weapon but a, you know, automatic

8     firearm.  And doesn't it cut the heart out of the

9     congressional purpose and ignore absolutely the intent of

10    Congress to say, well, we've got the definition here,

11    Judge, and, therefore, dismiss us and go home?  I'm putting

12    the question to defense counsel quite clearly just so that

13    you know what's on my mind at this point, and I think -- I

14    hope all the lawyers in the room, except the guests, are

15    aware that I can change my mind and sometimes prone to do

16    so even after I've heard all argument or whatever.  But

17    just -- I'm trying to put it directly to you that, first,

18    with regard to the regulation itself what's to clarify

19    about the term receiver?  We're not talking about a

20    telephone, we're not talking about a, you know, radio.

21    We're not talking about somebody who gets e-mail.  We're

22    not talking about somebody I appoint to marshal the assets

23    of a potentially bankrupt company, and we're certainly not

24    talking football.  We're talking a gun, firearm.  As I

25    understand it, and I only -- my understanding comes solely

ATF071292

Defs.' Reply App. 019

1    from the term firing mechanism, you take the firing

2    mechanism and the hammer out, and the AM-15, whether as a

3    semi-automatic or automatic firearm, is more -- is not even

4    as harmful as a Nerf gun or a water pistol.  It's -- it's

5    the guts of what makes the gun shoot.

6            And another question that may bear some further

7    research is, well, who uses -- I know that the manufacturer

8    uses those terms, and others, military and so forth, but

9    isn't it simply, you know, the fact that we refer to a

10   certain portion, the bolt or whatever, as the upper

11   receiver and the rest is the lower receiver, the thing

12   that -- the mechanism that actually makes the thing shoot

13   whatever's been put in the chamber or the -- you know,

14   bolted in or however it works.  I mean, from a -- from a --

15   any standpoint, does it make sense to let those terms

16   unique to this weapon for whatever purpose they may be so

17   used and the fact that only one part is serialized, maybe

18   that simply suggests that as the agency has interpreted and

19   applied the overall statute, it didn't have to serialize

20   the bolt because, after all, they are -- and I'll find out

21   soon, to the extent to which -- they're physically

22   connected I assume, that somehow there's -- to that extent

23   they're a single unit, you know, quote, the lower receiver

24   can't function without the upper.  The upper receiver can't

25   function without the lower, and therefore, in light of the

ATF071293

Defs.' Reply App. 020

1    statute referring to the receiver, although that term --

2    those terms may be applied to this construct, this --

3    this -- how this particular part is fabricated, simple

4    truth is together jointly and joined together some way, I

5    assume, whether in the same housing or not, I'll find out,

6    I gather not, otherwise we probably wouldn't be here.  So

7    what.  And we're not talking, say, well football or

8    telephones, we're talking about firearms.  And -- and

9    nobody could argue for a moment somebody reading the

10   statute would think they're talking about somebody that's

11   about to get a package or catch a football or receive a

12   telephone call.  It's a firearm.  So I put it quite

13   squarely and bluntly to you, and I thought we'd cut to the

14   chase.  And if you want a few moments to talk amongst

15   yourself and prepare your thoughts -- so, one, just to try

16   to summarize, one is, isn't the statute enough, clear

17   enough, sure, we've got the regulation.  It's my

18   understanding regulations are supposed to clarify, make

19   something to fill a legislative gap, to make something

20   that, read on its own, would really leave somebody baffled,

21   whether it's A or B or C or D.  And then isn't it -- is the

22   term inconsistent with this part refers -- part refers, as

23   I assume it does, just to the regulations, nonetheless with

24   the intent thereof, nonetheless the regulations, the

25   purpose, the intent of ATF in adopting the regulations

ATF071294

Defs.' Reply App. 021

1    cannot be to weaken the force and effect of the statute,

2    and -- and nullify its enforcement, especially when you're

3    talking about a weapon of this sort and this kind.

4    Manufacturing or other convenience they call three parts

5    because somehow they're separated and not housed together,

6    or whatever it is, upper and lower receiver.

7              So secondly, with regard to the Chevron Doctrine,

8    and of course, as I understand it, at least Justice

9    Kavanaugh has taken the view, that Law Review Article that

10   I came across that says judges should interpret statutes,

11   not agencies.  And I haven't delved into what's happened in

12   Chevron, I don't think I have to except apparently its --

13   its command, as I understand it dimly, that sort of a

14   heightened sense of deference to the agents -- agency,

15   they're the experts, they know what they're talking about,

16   leave it to them.  It's my understanding that he's not

17   alone in saying, hey, among other things that raises

18   serious questions about the separation of powers and

19   exemplified in its line I just referenced from that

20   article.

21             So that being said, I say you're welcome to take

22   a few moments, or you're welcome to go.  Do you want to

23   show me them first, or would you like to call a witness?

24             MS. CAHOON:  I think, Your Honor, respectfully,

25   we would like to take a moment.

ATF071295

Defs.' Reply App. 022

 1             THE COURT:  I'm having trouble --

 2             MS. CAHOON:  If Your Honor's willing, we would

 3    like to take a moment to just refer at counsel table.

 4             THE COURT:  If you want to go back there, that's

 5    a more private --

 6             MS. CAHOON:  I think we probably only need a

 7    moment at counsel table and then we'll be ready to call our

 8    first witness.

 9             THE COURT:  Does somebody want to show this thing

10    to me?

11             MS. CAHOON:  Yes, Your Honor, our witness will do

12    that.  We'll be just a moment.

13             THE COURT:  Take whatever time you want.  The

14    proponent always has a rock to roll up a hill.  I

15    understand I've made the rock a lot heavier and the hill a

16    lot steeper.  I know Jackie and Mr. Weldon know it's just

17    my practice to say this is what I'm thinking rather than

18    put all this stuff in an opinion and then you say, well,

19    gee --

20             MS. JOHNSON:  Thank you, Your Honor, we do

21    appreciate it.

22             THE COURT:  And the real no no is come back with

23    a motion to reconsider.

24             Go ahead, take whatever time you need.

25             MS. JOHNSON:  Thank you.

1          THE COURT:  Actually, sorry to interrupt, if I

2     am.  It might be useful for all of us at least to find out

3     from the government if I have overstated or misstated those

4     views in terms of somewhat distorted either what its

5     argument is or what the issue is.  If the government says,

6     Judge, actually you have it wrong in this respect, that

7     might make it easier for everybody, any problem -- I don't

8     want to -- I'm not trying to open the gate to the argument,

9     I just want to say, Judge, you said this, that or the other

10    thing, and we even disagree with that.

11         MS. CAHOON:  Certainly.  I appreciate the

12    courtesy in asking us.  If The Court is willing, our

13    preference would be to present our witness and then for

14    both sides to have an opportunity to argue what they think

15    the relative issues are in light of those --

16         THE COURT:  Of course.  Absolutely.

17         MS. CAHOON:  Thank you so much for giving us that

18    time, Your Honor, we appreciate that.  We would ask -- or

19    we would call Daniel O'Kelly as the witness for the

20    defense.

21         MR. WELDON:  The government has a witness present

22    here today as well, it's Mr. Dan Hoffman.  He's seated in

23    the back of the courtroom today.  I wasn't going to make a

24    motion for separation of witnesses unless the defense

25    thought that would be helpful.  I just want to make The

ATF071297

Defs.' Reply App. 024

1    Court aware we do have a --

2              THE COURT:  I think it's custom in civil cases

3    if -- correct me if I'm wrong, but it's my understanding

4    that when it comes to expert testimony, there's generally

5    no separation.  I don't really care, okay.

6              MS. JOHNSON:  Your Honor --

7              THE COURT:  Doesn't matter to me.

8              MS. JOHNSON:  We did not ask for a separation of

9    witnesses because we anticipate that we want our witness,

10   after he testifies to --

11             THE COURT:  I'm sorry, I'm having a little

12   trouble hearing you.

13             MS. JOHNSON:  We did not ask for a separation of

14   witnesses because we anticipate that after our witness

15   testifies we'd like him to remain in the courtroom.

16             THE COURT:  Sure.

17             MS. JOHNSON:  So thank you.

18             THE COURT:  Rebuttal or whatever, sure that's

19   fine.

20                  DANIEL O'KELLY,

21   was herein, called as if upon examination, was first duly

22   sworn, as hereinafter certified, and said as follows:

23             THE COURT:  Good morning.

24   A.       Good morning, sir.

25             THE COURT:  You've got to sit about this

ATF071298

Defs.' Reply App. 025

1    distance -- just about this distance of your four fingers.

2    A.         Yes, sir.

3               THE COURT:  So tell me your name, please.

4    A.         Daniel O'Kelly.

5               THE COURT:  What's your present community of

6    residence?

7    A.         I live in Denton, Texas, sir.

8               THE COURT:  Okay.  Home of Texas Women's College.

9    A.         Yes, it's very close to my home.

10              THE COURT:  Our daughter received a Ph.D. there a

11   year ago December, very enjoyable visit.  Very happy for us

12   and our entire family so we enjoyed it.

13              So do you have a present occupation or way to

14   earn a living right now?

15   A.         Yes, sir.

16              THE COURT:  And what is that?

17   A.         I'm the Director of the International Firearms

18   Specialist Academy.

19              THE COURT:  What is that?

20   A.         Excuse me, it's a guild of firearm experts that

21   serve to assist and train law enforcement, the firearm

22   industry and the legal profession.

23              THE COURT:  And assist in what way, and train in

24   what way?

25   A.         We teach 14 separate topics in a course called

ATF071299

Defs.' Reply App. 026

1    Certified Firearms Specialist to raise the bar of firearm

2    training within those three industries to bring people up

3    to a fully competent level.  And we assist, in addition to

4    training, by serving as expert witnesses in civil and

5    criminal trials.

6              THE COURT:  You say you're a guild, it's

7    international, did you have a membership roster, or if so

8    how many members?  It's not that relevant, I'm just

9    curious.

10   A.        There are about a dozen consultants on staff,

11   including two doctors, two attorneys, the rest are retired

12   law enforcement people, including one who is the chief of

13   the firearms unit of the South African Police Service.

14             THE COURT:  Okay.  And what's your position with

15   that organization again?

16   A.        I'm the director.

17             THE COURT:  Okay.  And how long have you been

18   with it?

19   A.        Since 2011.

20             THE COURT:  Okay.  And before that what did you

21   do?

22   A.        I was two years a corporate senior manager for

23   the Cabelas Corporation Outdoors companies.  It was the

24   biggest firearm dealer in the world.

25             THE COURT:  Okay.  And before that what did you

ATF071300

Defs.' Reply App. 027

1    do?

2    A.          I was with ATF for 23 years.

3              THE COURT:  Okay.  And what were your duties,

4    generally?  What sort of areas did your -- into what sort

5    of areas did you -- what kinds of activities and so forth

6    did your duties take you, your assignments?

7    A.          As an ATF I was a criminal investigator special

8    agent.  I specialized in firearm knowledge, everything from

9    range training to interstate Nexus.  I did a lot of

10   teaching in the U.S. and internationally in that capacity.

11   I've toured quite a number of firearm and ammunition

12   factories in the U.S. and abroad.  I've been through a

13   number of armored schools, just any firearm training of any

14   kind that was available, applied myself to it having been a

15   life-long student of firearm history, design and anything

16   related to it.

17             THE COURT:  And before becoming an ATF agent,

18   what did you do?

19   A.          I was a police officer for 11 years in Northwest

20   Indiana.

21             THE COURT:  Whereabouts?

22   A.          Portage, sir, near Gary, Indiana.  It's Portage,

23   Indiana on Lake Michigan.

24             THE COURT:  Okay.  And then before that?

25   A.          I was a general manager for a small oil company,

ATF071301

Defs.' Reply App. 028

1    which was basically just a series of gasoline stations, but

2    they called themselves Parker Oil Company.  I was their

3    general manager and worked my way up to that position

4    having just been a gas station attendant prior to that as a

5    kid in high school.

6            THE COURT:  Okay.  And how long were you with

7    them?

8    A.       I was with them for four years as I recall.

9            THE COURT:  Okay.  And you are a native of that

10   area, Indiana area, Northern Indiana?

11   A.       Yes, sir.

12           THE COURT:  Okay.  Okay.

13           MS. CAHOON:  Thank you so much, Your Honor.

14           THE COURT:  I assume there's no objection to him

15   being permitted to testify and give his opinion on whatever

16   relevant matters he may be testifying to?

17           MR. VANN:  No, Your Honor.

18           THE COURT:  Okay.

19                      DIRECT EXAMINATION

20   BY MS. CAHOON:

21   Q.       Good morning, Mr. O'Kelly.

22           THE COURT:  I apologize, Ms. Keegan (sic), just

23   FYI, counsel, looking down the road in the event of a

24   trial, I would prefer that you avoid the use of the term

25   expert.  It's a little phobia of mine.  I think it tends to

ATF071302

**Defs.' Reply App. 029**

1    give a witness greater weight, perhaps, than other

2    witnesses in the case, and I think that's particularly

3    something to be avoided in a criminal case, because, as you

4    know, when we instruct -- the jury can take into account

5    his testimony and evaluate credibility and reliability,

6    same standards and so forth, so anyway just FYI, that's why

7    I refer to he's qualified to give his opinion on whatever

8    subject is relevant.  So go ahead.

9         MS. CAHOON:  Thank for your clarification, Your

10   Honor.

11   BY MS. CAHOON:

12   Q.       Mr. O'Kelly, good morning.

13   A.       Good morning.

14   Q.       I just have a few additional questions about your

15   background to supplement what Judge Carr already asked you

16   about.  Could you tell us a little more specifically what

17   your role as director, your current role involves?

18   A.       I do most of the training; however we do have two

19   other active current instructors which teach our seminars,

20   so I coordinate their activities and direct them.  I serve

21   as an expert witness -- or a witness, I'm sorry, I serve as

22   a witness in criminal and civil litigations, and I direct

23   the other consultants on our staff which do the same thing,

24   I develop the training.

25   Q.       And does your company work in all parts of the

1    country?

2    A.          Yes, we do.

3    Q.          Could you tell us a little bit about your

4    educational background, please?

5    A.          I have a Bachelor's Degree from Indiana

6    University.

7    Q.          And what sorts of firearm trainings have you

8    received?

9    A.          I've successfully completed, in no particular

10   order, 13 armorer schools, interstate Nexus, basic and

11   advanced courses, all the ones that ATF offers.  I was a

12   range instructor from 1980 as certified by the Indiana Law

13   Enforcement Academy, and then the Federal Law Enforcement

14   Training Center, and some smaller certifications like

15   firearm training simulator.  I forget some of the other

16   ones, but there were more.

17   Q.          Do you have any specific certifications?

18   A.          I've been certified as an instructor for a lot of

19   police and firearm-related topics, yes.

20   Q.          Thank you.  Have you ever testified as a witness

21   regarding specialized knowledge in firearms before?

22   A.          Many times.

23   Q.          About how many times, just ballpark?

24   A.          Ballpark probably 100.

25   Q.          And have you testified in state or federal court?

ATF071304

Defs.' Reply App. 031

1   A.        Both.

2   Q.        Have you testified for the defense or for the

3   prosecution?

4   A.        Both.

5   Q.        And have you testified in civil or criminal

6   cases?

7   A.        Both.

8   Q.        Was some portion of that testimony during your

9   role as an ATF agent?

10  A.        Yes, it was.

11  Q.        And was there testimony you provided in your

12  current role?

13  A.        Yes.

14  Q.        Were you asked to review police reports and

15  receipts relating to this case for defendant Steven Robison

16  and his co-defendant?

17  A.        Yes, I was.

18  Q.        You'll see there's a black binder there in front

19  of you that has some of defense exhibits for your

20  reference.

21            Let's just start by talking a little bit about

22  sort of the basic terms we're going to be using.  If you

23  take a look at Defense Exhibit A.

24  A.        Yes.

25  Q.        Mr. O'Kelly, could you please tell me, what is

ATF071305

**Defs.' Reply App. 032**

 1    that a picture of?

 2    A.        That's the item which ATF refers to as an AR-15

 3    type lower receiver.

 4    Q.        And if you take a look at Defense Exhibit D, E

 5    and F --

 6              THE COURT:  Counsel, anybody mind if I look at

 7    the various exhibits before they're proffered?

 8              MR. VANN:  No, Your Honor, no objection.

 9    BY MS. CAHOON:

10    Q.        Are you familiar with these documents?

11    A.        Yes.

12    Q.        What sort of documents are they?

13    A.        These are ATF Reports of Investigation.

14    Q.        And do they describe a particular gun component?

15    A.        Yes.

16    Q.        What gun component do they describe?

17    A.        Anderson -- Anderson manufactured receivers.

18    Q.        Are these the same kind of lower receivers as the

19    one we're looking at in Defense Exhibit A?

20    A.        Yes.

21    Q.        In these documents they sometimes describe them

22    as stripped lower receivers, could you tell us what that

23    means?

24    A.        That refers to a receiver, as they call it, the

25    lower in a lower AR-15 type, lower which has no parts

ATF071306

Defs.' Reply App. 033

1    attached to it, whether it ever did, or whether it's right

2    from the factory and has never had anything installed in

3    it.  Some people say bare receiver versus stripped, whereas

4    stripped indicates that maybe it had parts in it prior and

5    they've been removed.  Some people just refer to it as a

6    bare receiver.

7                THE COURT:  In other words, is this what I call

8    the housing, in other words, parts go inside there

9    somewhere?

10   A.       Yes, sir, some of the parts in the definition go

11   inside.

12               THE COURT:  This is a container for the parts?

13   A.       For some of them, yes, sir.

14               THE COURT:  Whatever parts go in there they're

15   not in there right now?

16   A.       Correct, yes, sir.

17   Q.       And to clarify, Mr. O'Kelly, there are times when

18   they write AM-15 and times when they write AR-15, are those

19   terms different?

20   A.       The original design of this firearm, the

21   blueprint that the AM-15 is made from, was named an AR-15

22   by the designer, and there are hundreds of companies which

23   manufacture and/or market copies of it, clones which are

24   made from the exact same blueprints.  The parts

25   interchange, but since the patent ran out long ago some

1    companies decide rather than calling it an AR-15 they call

2    theirs an AM-15 or a CR-15, or they sometimes use the

3    number 16 instead of a 15.  They can call it anything they

4    want, just happens to be that Anderson refers to theirs as

5    an AM-15 I believe.

6    Q.      Just so I understand, an AM-15 and AR-15 are

7    essentially the same thing, do I have that right?

8    A.      Yes.

9    Q.      I'm going to have you take a look at one of these

10    lower receivers.

11            THE COURT:  If I can ask?

12            MS. CAHOON:  Sure.

13            THE COURT:  You say the unit -- the item, as

14    depicted here, is, quote, the lower receiver?

15    A.      Yes, sir.  Item A is what ATF refers to as the

16    lower receiver.

17            THE COURT:  And when whatever parts are put into

18    it, what is it called then?

19    A.      They still only refer to it as a lower receiver.

20            THE COURT:  In other words, this shell or

21    whatever, whatever term to use, it's a stripped or bare

22    receiver or lower receiver, correct?

23    A.      Yes, sir, with no parts they refer to it as a

24    stripped or bare receiver.

25            THE COURT:  Okay.  And that's how, generally or

ATF071308

Defs.' Reply App. 035

1    colloquially, it would be called; is that correct?

2    A.        I'm sorry, sir?

3              THE COURT:  That's how it generally or

4    colloquially would be called when somebody's referring to

5    what's depicted in Exhibit A with or without the parts?

6    A.        Yes, sir, bare or stripped being synonomous, you

7    could use either term, and the fact that it's referred to

8    as a receiver is because ATF tells everybody that's

9    licensed that's a receiver.  So the industry adheres to

10   that for fear of being prosecuted or sanctioned civilly.

11   Q.        And I think, to that point, Mr. O'Kelly, if you

12   take a look at Defense Exhibit G, are you familiar with

13   that document?

14   A.        Yes.

15   Q.        What is that document?

16             THE COURT:  Hold on one second, please.

17             MS. CAHOON:  Sure.

18             THE COURT:  Where's the sticker on that document?

19             MS. CAHOON:  Upper right-hand corner, Your Honor,

20   right after F3, I believe it also has the Government's

21   Bates stamp number 93 if that's helpful.

22             THE COURT:  One minute, please.

23             MS. CAHOON:  Thank you, Your Honor.

24   BY MS. CAHOON:

25   Q.        Mr. O'Kelly, I believe I was asking you to tell

1  us what this document is.

2  A.        This is a copy of an invoice from Jaqua,

3  J-A-Q-U-A, I don't know how you pronounce the name, a gun

4  company.  It's an invoice for a number of Anderson stripped

5  lowers, stripped lower receivers which ironically they

6  refer to as AR-15s, even though that's not what the items

7  are marked on them.

8  Q.        But this receipt does identify to them as

9  stripped lower receivers, right?

10  A.        Yes.

11            MS. CAHOON:  Your Honor, may I approach?

12            THE COURT:  Of course.  And, again, you have

13  standing permission, okay?

14            MS. CAHOON:  Thank you, Your Honor, I appreciate

15  that.

16            THE COURT:  I appreciate the courtesy but --

17  BY MS. CAHOON:

18  Q.        Mr. O'Kelly, I'm going to show you Government's

19  Exhibit 2.

20            THE COURT:  Is that in the book?

21            MS. CAHOON:  It's a physical exhibit from the

22  government, Your Honor.  This is --

23            THE COURT:  Of course it wouldn't be in the book.

24  BY MS. CAHOON:

25  Q.        Mr. O'Kelly, could you tell us what that item is

ATF071310

Defs.' Reply App. 037

1    I just handed to you, please?

2    A.          Anderson Manufacturing AR-15 lower.

3              THE COURT:  May I see it, please?  This is --

4    this is what's in Exhibit A?

5    A.          Yes, sir.

6              MR. VANN:  Your Honor, for classification, the

7    government has no objection, and that's been marked as

8    Government's Exhibit 2.

9              THE COURT:  Okay, that's fine.  Here you go.

10   BY MS. CAHOON:

11   Q.          So Mr. O'Kelly, as Judge Carr just astutely

12   noted, is that item you're holding, Government's Exhibit 2,

13   is that the same lower receiver that we talked about in

14   Defense Exhibit A in that photographs?

15   A.          Yes, it is.

16             THE COURT:  Does that have a serial number on it?

17   A.          Yes, sir, it has an eight digit serial number

18   right here, it's stamped (indicating).

19             THE COURT:  Couldn't actually see it for lack of

20   contrast, but I could feel the -- okay, and that's --

21   that -- that stamping to that particular item itself, and

22   only that item, is unique, right, there's no -- that serial

23   number is only on that item, or is it on other parts --

24   would there be other parts of the weapon into which that

25   item would be put?  You see what I'm saying?  I'm just

1    curious as to how the serialization works.

2    A.        Yes, sir.  According to 18 U.S. Code 923(i), if a

3    licensed manufacturer manufactures a, quote, receiver, they

4    are compelled to put a serial number on it because ATF

5    regulates licensees.  They tell licensees if you make one

6    of this item, we call it a receiver so you had better put a

7    serial number on it.  So they do it to avoid criminal and

8    civil sanctions.  So for that reason, this piece does have

9    a serial number, no other part of the firearm is required

10   to have a serial number.

11             And to your other question, yes, this is for the

12   purpose of containing some of the parts of the firearm.

13             THE COURT:  Okay.

14   BY MS. CAHOON:

15   Q.        Now, you know I'm not a gun expert so this might

16   be a silly question, but if I just have a stripped lower

17   receiver, can I use that to fire a bullet at someone?

18   A.        No.

19   Q.        Can I injure someone with that lower receiver?

20   A.        Only if you hit them with it over the head or

21   throw it at them.

22   Q.        I'd like to have you hang on to Government's

23   Exhibit 2 for a minute, but I'd also like to have you look

24   at what's been marked as Government's Exhibits 3 and 4,

25   which are the completed AR-15.

ATF071312

Defs.' Reply App. 039

```
 1              So, now, Mr. O'Kelly, the Marshal Service has put
 2    a trigger lock on that firearm, so if you need it to be
 3    removed, you'll simply let me know.
 4    A.        Okay.
 5    Q.        Can you describe the item I've just handed to
 6    you, please?
 7    A.        Yes, it's an Anderson Manufacturing AM-15 rifle,
 8    bearing serial number 14118616.
 9    Q.        Is that a completed version of an AR-15 firearm
10    of which a lower receiver would be a part?
11    A.        Yes.
12    Q.        Could you explain for all of us where the lower
13    receiver is in that completed firearm?
14    A.        It's this part that my left hand is holding on
15    to, and you'll see that this part is there, it's
16    (indicating) --
17              THE COURT:  First of all, if you can relate for
18    the transcript what he's showing and have him -- I just
19    asked Ms. Keegan (sic) if she can translate into words so
20    the record shows when he uses the word "there" and "this
21    part" and so forth -- why don't you do that because you're
22    the person who knows?
23    A.        I apologize, Your Honor.
24              THE COURT:  Let's start all over.  Put it back
25    together and --
```

ATF071313

Defs.' Reply App. 040

1  A.          The part of this rifle which ATF considers the

2  lower receiver is the part to which the pistol grip is

3  attached, and the part to which this selector switch, which

4  is visible on the left side, is installed.  It's the part

5  which you see at the center and the lower-most portion of

6  the rifle.  You can recognize this stripped receiver type

7  item as being where I just described it.

8  Q.          And could you describe for us just for context

9  where the upper receiver on the AR-15 would be?

10  A.          Yes.  The AR-15 type firearm is one which has an

11  upper and lower type receiver, and they hinge open.  So

12  having hinged this open by pulling out this captive pin,

13  the part just above the lower that I'm holding onto with my

14  right hand is the upper receiver to which the barrel is

15  installed (indicating).

16          THE COURT:  And I can't see that, so can you

17  maybe even --

18  A.          Yes, Your Honor.  The firearm hinges open when

19  you pull this pin out, and this is what the government

20  calls an upper (indicating).  It's not controlled by

21  federal law in any way.  It's nothing, legally it's no more

22  controlled than a lamp shade, for example.  Whereas this is

23  the part that we were looking at over here (indicating),

24  and into which the hammer and firing components are

25  installed, along with the shoulder stock, the pistol grip.

ATF071314

Defs.' Reply App. 041

1    However, the bolt is installed in the upper as is the

2    barrel.

3              THE COURT:  And what does -- leave it like that

4    for a moment, please, open.  What does the bolt do?  What's

5    its function in a weapon?

6    A.        Its function support the rear of a cartridge

7    during firing to contain the tens of thousands of pounds of

8    gas pressure which occur to protect the shooter and

9    bystanders from injury and force the gas to --

10             THE COURT:  That's what actually propels it along

11   the barrel and out.  And when closed, they're basically

12   proximate to each other, they fit into each other, the

13   upper and lower receiver?

14   A.        No, sir.  There's no -- there's no insertion

15   between the two.  They just merely mate, connect to each

16   other.

17             THE COURT:  That's what I meant, they mate, they

18   join.

19   A.        They join to each other, but one is not housed

20   within the other.

21             THE COURT:  I understand.  But if you take one

22   away from the other --

23   A.        Then you have no -- no ability to fire a

24   cartridge.

25             THE COURT:  Both parts are as harmless as a lamp

ATF071315

Defs.' Reply App. 042

1    shade?

2    A.        Yes, sir, you can see how quickly (indicating) --

3              THE COURT:  Even detach.

4    A.        -- push out pin and the upper removes.

5              THE COURT:  Okay.  And then you refer to the

6    selector switch, what does it do?

7    A.        The selector switch has three positions, it's on,

8    safe, semi auto.  And on a machine gun it has a third, full

9    auto, but of course this version only has safe and semi

10   automatic.

11             THE COURT:  I see.

12   A.        It's the safety switch in other words.

13             THE COURT:  I see, okay, sure, all right.  Thank

14   you.

15   BY MS. CAHOON:

16   Q.        Mr. O'Kelly, I'd like to walk back just a minute,

17   just for clarity sake.  Let's just take a look at that

18   lower receiver that I've given you, Government's Exhibit 2.

19   Just looking at that stripped receiver, can you tell us

20   what component pieces, if any, does that lower receiver

21   house?

22   A.        It houses the magazine release, it houses the

23   selector switch, the safe -- semi automatic safety switch,

24   it houses the trigger, the disconnector, the hammer, the

25   shoulder stock, the pistol grip, the magazine.

ATF071316

Defs.' Reply App. 043

1              THE COURT:  What -- what is the, quote, firing

2      mechanism?

3      A.         The firing mechanism is composed of the trigger,

4      the sear, which connects the trigger to the hammer, and

5      then the disconnecter which prevents full auto fire, and

6      the selector, the safety fire selector switch.

7              THE COURT:  Okay.  And said trigger hammer and

8      then?

9      A.         And sear and disconnecter.

10             THE COURT:  And I've heard the term sear before.

11     A.         Yes, sir.

12             THE COURT:  And it's my understanding that it is

13     relatively easy to remove the sear; is that correct?

14     A.         It depends on the model of the firearm.

15             THE COURT:  Okay.

16     A.         In this case you would have to use a punch and

17     push out certain pins, but once you remove that, the

18     firearm doesn't work anymore.

19             THE COURT:  Okay.  But I realize this has nothing

20     to do with this case, I'm just curious for general

21     understanding.  Again, I've had other cases where weapons

22     have been converted, or people have made, taken AR-15 parts

23     and created an automatic mode capability.

24     A.         Yes.

25             THE COURT:  I've had testimony that was something

ATF071317

Defs.' Reply App. 044

1    about removing or altering the sear or something, at least

2    my impression, again, it was in relative terms.  Somebody

3    who's familiar with how to do it and has whatever equipment

4    is needed can do that, and therefore, take a weapon like

5    that constructed to be semi automatic, and that means you

6    have to pull the trigger each time to fire a bullet, or no?

7    What does -- what's the difference between semi automatic

8    and automatic?  And then tell me about the sear, and the

9    extent to which the conversion process may or may not be

10   something that's readily accomplished, and if so how is it

11   done?

12   A.      Okay.  I have to somewhat back pedal and clarify.

13   This gun does not actually have a piece called a sear.

14           THE COURT:  Okay.

15   A.      A sear is the part in the average firearm that

16   connects between the trigger and the hammer.  When you pull

17   the trigger that pivots the sear, which then disengages

18   from the hammer.  The hammer is normally under spring

19   pressure, and therefore, it moves forward and strikes the

20   firing pin, initiates firing.  This gun rather than having

21   a part called a sear has the disconnecter.  At any rate --

22           THE COURT:  Let's forget about that, okay.  Let's

23   move on down the road.

24   A.      Semi automatic, sir, means one shot per trigger

25   pull or trigger function.

ATF071318

Defs.' Reply App. 045

1              THE COURT:  I understand.

2    A.          Full automatic means more than one shot per

3    trigger function, so if you pull the trigger, just per pull

4    or per release you get more than one shot, that's

5    considered a machine gun under federal law.  And then as

6    far as converting this to full auto, there are probably

7    four or five different ways.  The factory way would require

8    drilling a hole, an extra hole through the receiver, and

9    then installing a military part which this gun doesn't

10   have.  There are some clandestine ways to do it, one would

11   be to possess a clandestinely-made gadget, some of which

12   are legally registered, called a drop-in auto sear that

13   replaces the part I just mentioned.  And those are

14   regulated as a machine gun by themselves under federal law.

15   There are a couple of other items, like, called a

16   lightening link or a swift link, those are also regulated

17   as machine guns by themselves, even though all they are is

18   a little piece of metal.  You would have to install one of

19   those, then you would get full automatic fire.  But to

20   possess one without having it registered through ATF is a

21   federal felony.  And then there's always somebody coming up

22   with some new gadget.  There are others that I won't bore

23   you with, but any of those gadgets solely intended to

24   convert this to fire full automatic are deemed to be

25   machine guns by themselves and are felonies to make or

ATF071319

Defs.' Reply App. 046

1    possess without prior ATF approval.

2              THE COURT:  Unless you're in uniform?

3    A.        Yes, sir.

4              THE COURT:  Okay.  Counsel, I'm going to admit

5    that under Rule 404(b) just for contextual background --

6    just so I understand --

7              MS. CAHOON:  Certainly, Your Honor.

8              THE COURT:  -- more about all of this, but

9    that's -- that obviously has nothing to do with this case.

10             MS. CAHOON:  Thank you, Your Honor.

11             THE COURT:  In terms of what's at issue or that

12   with which the defendants stand charged, it's simply

13   contextual so I can get some understanding of, you know,

14   what a receiver and upper and lower receivers are.

15             MS. CAHOON:  Thank you for that clarification,

16   your Honor.

17             THE COURT:  No problem.  I just wanted to let you

18   know.

19   BY MS. CAHOON:

20   Q.        Mr. O'Kelly, if we could take another look at the

21   lower receiver we've been chatting about, again, just to

22   clarify.  So it was your testimony that it's just the

23   hammer and the firing mechanism that are a part of the

24   lower receiver, am I understanding that correctly?

25   A.        Among the elements in the definition in the CFR,

ATF071320

Defs.' Reply App. 047

1   yes.

2   Q.        And you're familiar with the CFR?

3   A.        Yes.

4   Q.        Why are you familiar with the C --

5   A.        I teach it.

6   Q.        And I assume -- well, I'll just ask you, is the

7   part of the CFR, the part that you teach, the part that

8   regulates firearms?

9   A.        Yes.

10  Q.        And so since you mentioned that definition, if we

11  look at 478.11, what relevance does that definition have to

12  your teaching about firearms?

13  A.        Well, under the Gun Control Act there are four

14  definitions of a firearm.  When you look it up, it looks

15  like one definition, it's one paragraph, but in that

16  paragraph there are four clauses.  Each one describes a

17  different category of firearms.  The first of which is any

18  weapon which excels a projectile by the action of an

19  explosive such as this rifle; the second of which is the

20  frame or receiver of any of the above firearms; the third

21  being any silencer; the fourth being any destructive

22  device.

23          So then that begs the question, okay, any frame

24  or receiver of a firearm is a firearm.  What's the

25  definition of a frame or receiver, how do I know if this

ATF071321

Defs.' Reply App. 048

 1   item counts or that item counts?  So to find that

 2   definition you go to Chapter 27 of the CFR 478.11, and it

 3   says that part, singular, which houses the hammer, comma,

 4   bolt or breechblock, comma -- and if I can pause right

 5   there -- it says bolt or breechblock because every firearm,

 6   depending on how it was designed, has either a bolt or a

 7   breechblock, they both perform the same function.  Some

 8   guns have a bolt, some have a breechblock.  After that

 9   comma, firing mechanism, comma, I'm sorry, and firing

10   mechanism.  It says the word and, and then it says and

11   which is usually threaded at its forward portion to receive

12   the barrel period.

13           THE COURT:  Counsel, I'm willing to accept the

14   proposition, subject to hearing from the government, that

15   if that definition is, in fact, what is controlling, then

16   obviously all three of those components, at least viewed as

17   he's viewing them, are not present.

18           MS. CAHOON:  Thank you, Your Honor.  And to

19   clarify -- I'm sorry.

20           THE COURT:  Okay.  Go ahead.

21           MS. CAHOON:  I was just going to clarify that

22   there are actually four component pieces, which I'm just

23   going to walk through for clarify.

24           THE COURT:  I understand this weapon has a bolt,

25   above -- firing mechanism and hammer.

ATF071322

Defs.' Reply App. 049

1    BY MS. CAHOON:

2    Q.        And Mr. O'Kelly, perhaps you can tell us what

3    that fourth component of the definition is from your

4    teaching experience?

5    A.        That fourth component is the phrase which says,

6    and which is usually threaded at its forward portion to

7    receive the barrel.  And when I teach it, I criticize it to

8    some degree by saying that, in my opinion, it's poorly

9    worded.  It's clear that what they're referring to is that

10   which is a receiver is also the part which receives a

11   barrel, comma, usually it's threaded in order to do that

12   because the part of a firearm which receives the barrel,

13   sometimes a barrel is threaded in, depending on the model,

14   it screws in, in other words.  Some of them are press fit

15   in using a machine that just forces the two together using

16   friction.  And some use a pin, insert one in the other,

17   drive a cross pin in to hold it in place.  They're not

18   always threaded.  That's why this definition, in my

19   opinion, says usually threaded, but rather than saying

20   first that it receives the barrel and then the fact that

21   it's usually threaded, why that matters, is ironic, but the

22   fourth element, in short, is that it's the part which

23   receives the barrel.

24   Q.        And which of those four components are present in

25   an Anderson lower receiver?

1    A.        Only two.

2    Q.        Which two again, for clarity?

3    A.        It houses the hammer, and it houses the firing

4    mechanism.

5    Q.        And is the firing mechanism the part of a gun

6    that actually makes a bullet be projected out?

7    A.        That, along with the hammer.  It requires the

8    hammer, and the hammer requires the firing mechanism.  They

9    have to work in unison, so yes.

10   Q.        What part of an AR-15 would house the bolt and

11   breechblock and would include the area where the barrel is

12   threaded or inserted?

13   A.        That's the part that is called the upper by ATF

14   and the gun industry which is unregulated.

15   Q.        If I could have you take what's been marked as

16   Government's Exhibit 4, which is the completed AR-15 I've

17   given you previously, it's just the upper portion of that.

18   Could you show all of us where the bolts or breechblock

19   would be housed in this firearm?

20   A.        Once you hinge the firearm open, pull out the

21   other pin, lay the lower unit aside, what I'm holding is

22   the barrel, and the rear portion of this barrel upper is --

23   this rear 6 or 7 inches of this (indicating) is what's

24   called the upper.  And pulling slightly rear on the

25   charging handle I'm removing what's called the bolt carrier

ATF071324

Defs.' Reply App. 051

1    group.  The forward two-and-a-half inches or so of this

2    which moves in and out of the bolt carrier, is the bolt

3    itself, the part that my left hand is grasping.  The

4    biggest rear part, this is the bolt carrier, but this is

5    the bolt (indicating).

6            THE COURT:  I can't see it.  I'm sorry, I can't

7    see it.

8    A.        This is the bolt, this short piece which moves

9    back and forth, this is the bolt (indicating), and this

10   part called the bolt carrier, which carries it back and

11   forth inside this upper -- inside here, it moves back and

12   forth.

13   Q.        And Mr. O'Kelly, so that we understand, what is

14   the job of a breechblock inside of an AR-15, what does it

15   do?

16   A.        The bolt's job is to feed and chamber a

17   cartridge.  Every time you pull the trigger, of course, the

18   explosion causes the bolt carrier to go to the rear,

19   extract and eject the empty case or shell, whatever you

20   want to call it.  And then a spring drives this bolt

21   carrier back forward, which feeds another cartridge from

22   the magazine, pushes it into the chamber of the rifle, and

23   then these little pins on the front of the bolt enter

24   matching grooves, turn to some radius and lock it in place,

25   so that when you fire the next shot, that roughly

ATF071325

Defs.' Reply App. 052

1    50,000 pounds of pressure per square inch, is safely

2    contained and force all the pressure down the barrel and

3    away from the shooter.

4    Q.        I believe you said the barrel is also threaded

5    through the upper receiver; is that correct?

6    A.        On an AR-15 the barrel is threaded in, yes.

7    Q.        Can you please show us where that barrel is

8    threaded?

9    A.        You would need a wrench to take it apart, but

10   it's where they meet right here at the front end of the

11   upper, at the rear end of the barrel.  It's the --

12   depending on the design, it's threaded in or using various

13   methods of connection.  They're not always threaded.

14   Q.        If I have just a lower receiver that you've been

15   describing here and then I'm able to acquire the other

16   component pieces, could I put together a firearm in a

17   minute or two?

18   A.        No, not in a minute or two, but probably in 30

19   minutes, 15 minutes, depending on your skill level.

20   Q.        Would I need tools, or could I simply do it with

21   my hands snapping it together?

22   A.        You would need at least the tool required to

23   attach the barrel to the upper.  You would need, depending

24   on which tool you have, you may be able to use that same

25   tool to attach the stock to the lower, and you would need

ATF071326

Defs.' Reply App. 053

1   some sort of a wrench or screwdriver to attach the pistol

2   grip to the lower, but they make a combination tool which

3   does all of those things.  So with that one tool, you could

4   assemble the rifle in a few minutes.

5   Q.        So it sounds like we would need some specialized

6   training and some sort of a special tool, do I have that

7   correct, or at least a tool --

8   A.        Yes.

9   Q.        -- beyond my own hand?

10  A.        Yes.

11           THE COURT:  If I may, again, it's just sort of

12  general understanding, I'm just curious, it's my

13  understanding, at least in military use, in order for a

14  weapon to be -- maintain sufficiency, the M-16, it has to

15  be disassembled and cleaned from time to time; is that

16  right?

17  A.        Yes, Your Honor.

18           THE COURT:  Otherwise you can have problems with

19  jamming or malfunctioning?

20  A.        Yes, sir, as dirt accumulates in the rifle, and

21  as the lubricant dissipates, you get a lot more friction, a

22  lot less clearance, and you're going to have stoppage

23  unless you clean it and lubricate it.

24           THE COURT:  And I realize once -- again, it's not

25  at issue in this case at all, but if someone just walked

ATF071327

Defs.' Reply App. 054

1    into a gun store and bought one of those things without

2    military or other sort of training, might or might not be

3    able to do all of that, who would know, right?

4    A.        Right.  If you -- if you have no prior training

5    or knowledge of these, it doesn't have any instructions

6    printed on, it you're going to need some sort of guidance.

7              THE COURT:  It's not a moment or two to take it

8    apart, but someone who's had the training and experience

9    can do so, and has to basically to maintain the thing --

10   A.        Yes, sir.

11             THE COURT:  -- okay, if he wants to use it, or

12   she wants to use it.  Go ahead, Ms. Keegan (sic).

13             MS. CAHOON:  Ms. Cahoon.  Thank you, Your Honor.

14   BY MS. CAHOON:

15   Q.        Mr. O'Kelly, you were explaining a little bit

16   about the lower receiver for the Anderson.  If you know,

17   are there any guns that have receivers that would satisfy

18   this four-part definition, or do they all suffer from the

19   same problem that this lower receiver suffers from?

20   A.        There are an unbelievable number of guns on the

21   market --

22             THE COURT:  I couldn't hear your answer.

23   A.        There are an unbelievable number of guns on the

24   market which have this same situation.

25   Q.        But are there any receivers that satisfy this

ATF071328

Defs.' Reply App. 055

1  definition?

2  A.        There are some.

3  Q.        Mr. O'Kelly, you -- you already identified that

4  you had looked through the materials, the receipts?

5         THE COURT:  Ms. Keegan (sic), if I may,

6  because -- if -- if any of you do want to object, please

7  object to my questions in this regard.  If I heard you

8  correctly, and tell me if I didn't, because her question to

9  you was is there any component of a firearm -- I'm

10  rephrasing, why don't you read her question back?

11  Q.        I think my --

12         THE COURT:  I want Angela to read the question

13  back, please.

14              (Whereupon the court reporter read back the

15              previous question.)

16         THE COURT:  And your answer was?

17  A.        Yes, there are some firearms on the market which

18  have a part which does satisfy all four elements of the

19  CFR's definition of a receiver.  Those would be most

20  pump-action firearms, most lever-action firearms, most

21  revolvers, balling (phonetic) block type firearms, rolling

22  block type firearms, some bolt action firearms.

23         THE COURT:  But pistols that aren't revolvers,

24  many, if not most, models of a rifle or whatever would have

25  a duel assembly of this sort in them rather than a -- a

ATF071329

Defs.' Reply App. 056

1    single and/or singly housed component that contains all

2    four parts, is that -- is my paraphrase correct?

3    A.        There are several firearms in the market which

4    have an upper, what's called an upper and a lower, such as

5    the H&K series, the Tommy gun type firearms, Oozies, and of

6    those, just those examples, the upper performs one or two

7    of these four functions; the lower performs the other two

8    or three; and, therefore, they don't have a part which

9    satisfies the definition of a receiver within the CFR.  For

10   instance, semi-automatic pistols, the kind the police

11   officers carry, Glocks, Berettas, Colts, Smith & Wessons,

12   you name it, 90 some percent of those do not have a part

13   which has more than one of these four elements in it and,

14   therefore, don't qualify, according to the definition in

15   the CFR, yet for decades ATF has insisted, well, yes, they

16   do.  All you have to do is look at the definition and look

17   at the part and you see, well, I'm not sure what you're

18   looking at, but, no, they don't.

19             THE COURT:  Okay.  Thank you.

20   BY MS. CAHOON:

21   Q.        Mr. O'Kelly, since you bring it up, are there

22   other inconsistencies you've noticed in your professional

23   experience the way ATF has internally thought about

24   firearms and their component pieces based on how the Code

25   of Federal Regulations defines those items?

1  A.        They don't all fall within the Code of Federal

2  Regulations issues.  Sometimes they contradict themselves

3  as to how they rule concerning the installation of certain

4  features on firearms.  Sometimes they are in contradiction

5  of U.S. Code.

6  Q.        So as an example, could you describe for us how

7  the ATF internally conceives the receivers in an AR-15

8  versus an AFL (sic) type rifle?

9            THE COURT:  What's an AFL?

10            MS. CAHOON:  Or excuse me, FAL.

11            THE COURT:  What's an FAL?

12  A.        The FAL is a classical design rifle, it was the

13  military rifle for dozens of countries in the '50s, '60s

14  and '70s around the world.  And it's somewhat similar to an

15  AR-15.  It has a pistol grip, you know, there are

16  semi-automatic versions of it, full-automatic versions of

17  it, and it has an upper and a lower, just like the AR-15

18  does, Your Honor.  And the lower of an FAL, just like an

19  AR-15, houses the hammer and the firing mechanism, whereas

20  the upper houses the bolt and receives the barrel.

21            The irony is, though, that ATF considers the

22  upper of that firearm to be the receiver and the lower to

23  be nothing, in direct opposite of what they consider with

24  an AR-15, the lower is the firearm and the upper's nothing.

25            THE COURT:  In other words, what -- in terms of

ATF071331

Defs.' Reply App. 058

1    functionality, in terms of how it helps the firearm

2    function as such, the gun fire as such, the weapon function

3    as such, to get that bullet out there, with regard to which

4    the FAL, if I understood correctly, rifle, what ATF

5    designates the receiver is  the upper portion, which is not

6    designated as such in the AM–15?

7    A.        Correct.

8              THE COURT:  Okay, and vice versa?

9    A.        Yes, sir.

10             MS. CAHOON:  Your Honor, if I could just a

11   moment, I'd like to confer with my colleagues before I

12   conclude?

13             THE COURT:  Sure.

14             MS. CAHOON:  Thank you.  Mr. Weldon, will you

15   want that weapon up there?  If so, fine.

16             MR. WELDON:  We may as well leave it up there,

17   it's still locked.

18             THE COURT:  Even if it weren't, I wouldn't know

19   how to use it.

20             MR. WELDON:  Fair enough.

21             THE COURT:  And I couldn't see where I was

22   pointing it either, as you know.

23   BY MS. CAHOON:

24   Q.        Mr. O'Kelly, before I conclude, do you think

25   there would be any value in having the Marshal Service come

ATF071332

Defs.' Reply App. 059

1    and take that lock off so you could show The Judge in

2    detail how those pieces work together?

3              THE COURT:  I assume what happens is you -- if

4    the lock were off, you pull the trigger, and if there were

5    a projectile in there it would head on out, right?

6    A.        I can probably quickly do it without the lock

7    being removed.  This -- this being the hammer (indicating),

8    Your Honor, you can see it's in the under tension, it's

9    cocked to the rear.  If you were to pull the trigger, it

10   would move forward about -- and be pointing vertically.

11   And when it was in that vertical position, it would strike

12   right here, which is the rear of the firing pin

13   (indicating).

14             THE COURT:  The rear of the cartridge --

15   A.        The rear of the firing pin right here, and then

16   the tip of the firing pin would hit the cartridge

17   (indicating).

18             THE COURT:  The cartridge?

19   A.        Yes, sir.

20             THE COURT:  And cause explosion and whatever you

21   call it and cause the bullet to go out -- head on out.

22   Okay.

23   A.        Yes, sir.

24             THE COURT:  I don't think it's necessary to do

25   that, Ms. Keegan (sic), that's fine.

ATF071333

Defs.' Reply App. 060

1          MS. CAHOON:  Thank you, Your Honor.

2   BY MS. CAHOON:

3   Q.        Just to close here, Mr. O'Kelly, the stripped

4   lower receiver, which was Government's Exhibit 2, we can

5   agree that that includes only two of the four component

6   pieces from the CFR definition, correct?

7   A.        That's correct.

8          THE COURT:  And I would agree with that.

9   BY MS. CAHOON:

10  Q.        It's also my understanding, just so it's clear,

11  the lower receiver, in and of itself, isn't capable of

12  firing a bullet or hurting anyone unless it's a --

13  A.        That's correct.

14  Q.        And I'm sorry, just for the sake of the record,

15  if you'll look at Defense Exhibit B, which is in that

16  exhibit book there in front of you --

17         THE COURT:  What --

18   BY MS. CAHOON:

19  Q.        I'm sorry, Defense Exhibit B, as in boy.

20  A.        Yes.

21  Q.        Are you familiar with that image?

22  A.        Yes.

23  Q.        And could you please tell us what it is?

24  A.        It's an AR-15 type rifle which is hinged open, I

25  can't see from the photograph any markings to determine who

ATF071334

Defs.' Reply App. 061

1    made it.

2    Q.        Is this AR-15 substantially similar to the AR-15

3    you've been holding as Government's Exhibits 3 and 4?

4    A.        The only obvious difference is the one in the

5    photograph has an optical sight and an iron front sight on

6    it, whereas this one has no sights, otherwise they're

7    essentially the same.

8    Q.        Same essential component pieces?

9    A.        Yes.

10   Q.        Thank you so much.

11            THE COURT:  I do have one question.  Again, it

12   is, I think, pertinent, and, therefore, if you object say

13   so.

14            With regard to the units which bring the

15   defendants here, and the government, the 50 units which the

16   government claims are receivers and, therefore, firearms

17   and so forth, if I understand correctly, are those units,

18   those precise units, are they the same as -- in other

19   words, if I bought -- if I had an M-16 or if I had an

20   AR-15, okay, another manufacturer --

21   A.        Yes, sir.

22            THE COURT:  -- can I -- could I take what is at

23   issue here and put it into one of those weapons, some, all,

24   a few or none?

25   A.        All.  They're all clones, whether -- whether the

ATF071335

Defs.' Reply App. 062

1   parts you have are made by Colt, Bushmaster, Anderson or

2   300 others I could that name, they all fit because they're

3   made from the same blueprints, they're clones from each

4   other, other than minor cosmetic differences and/or the

5   type of shoulder stock or sites.

6          THE COURT:  So I wouldn't need all the other

7   components of the Anderson that go into the Anderson

8   firearm from Anderson, wouldn't have to go to Anderson and

9   say give me everything else so I can make one of your

10  weapons or whatever use --

11  A.        No, sir, you could build it from Colt parts or

12  Bushmaster parts.

13  Q.        I think you were explaining to even if you did

14  have all those component parts, you would need some skill

15  and tools to put them into one operable firearm; is that

16  correct?

17  A.        That's correct.

18  Q.        Thank you so much.

19         THE COURT:  Okay.  Is it Mr. Vann, did I get that

20  correctly?

21         MR. VANN:  Yes, Your Honor, it's Mr. Vann.

22         THE COURT:  You're welcome to sit, stand,

23  whatever's comfortable.  It's your stage, go ahead and use

24  it, counsel.

25         MR. VANN:  I'll stand here, a couple of times I

ATF071336

Defs.' Reply App. 063

1   will have to approach.

2           THE COURT:  Of course.  It's not necessary to

3   ask.  Has any judge told you no, you may not?

4           MR. VANN:  I used to have to request to wander

5   the courtroom because I tended to pace a lot.

6           THE COURT:  Have you ever asked a judge to

7   approach and he say no, stay where you are?  That's why I

8   dispense with that nice little courtesy, and it's

9   traditional I know, but go ahead.

10          MR. VANN:  Thank you, Your Honor.

11                   CROSS-EXAMINATION

12  BY MR. VANN:

13  Q.      Good morning, Mr. O'Kelly.  I want to talk about

14  your experience and some of your background first.

15          THE COURT:  I have a question.

16          MR. VANN:  Yes, Your Honor.

17          THE COURT:  Tell me a little more about the guild

18  and when was it -- and once again, I'm not sure this is

19  relevant, but if you have any objection to it, say so.  I'm

20  just curious, when was it created?

21  A.      2011, sir.

22          THE COURT:  And you have 12 staff members, but do

23  you have members?  In other words, if I were to call up and

24  say I'd like to become a member of the guild, or is it sort

25  of a closed -- is it like the old medieval guild where you

ATF071337

Defs.' Reply App. 064

1   have to show a certain degree of -- you have to be

2   qualified?

3   A.       Yes, sir.  You have to be highly qualified in

4   some firearm-related area in order for us to consider

5   putting you as one of our consultants.  We have two medical

6   doctors who are forensic pathologists, we have two firearm

7   related attorneys.  And as I said, former law enforcement

8   people, all of whom have some facet of firearm expertise.

9           THE COURT:  So it's not like an association or

10  whatever I can just get a member slip and contribute my

11  money --

12  A.       No, sir.

13          THE COURT:  -- help support it?

14  A.       No, sir.

15          THE COURT:  I gather that basically you keep the

16  doors open, people employed, ultimately, but by doing what

17  you're doing here today in a variety of other capacities

18  and other venues and circumstances, is that right?

19  A.       Yes, sir.  We saw a need in law enforcement, the

20  gun industry and the legal profession for years during my

21  career.  There just isn't a well-rounded knowledge of

22  firearms out there.  Law enforcement academies, they only

23  teach their people how to shoot when they can shoot, but

24  they don't teach them anything about firearms.

25          THE COURT:  Where to put, how to pull?

ATF071338

Defs.' Reply App. 065

1    A.        Yes, sir, so we wanted to raise that bar.

2              THE COURT:  And also obviously legal profession,

3    here I am being called upon to make a pretty important

4    decision, and obviously I didn't have a clue and you've

5    given me plenty, so I'm just saying that's your job in that

6    regard, and medical profession same sort of thing about

7    what injuries that weapons can cause and so forth --

8    A.        Yes, sir.

9              THE COURT:  -- how to treat them?

10   A.        If we get brought into a shooting or a homicide,

11   sometimes the defense attorneys or prosecutors want an

12   independent medical opinion on the --

13             THE COURT:  Sort of the forensics of it, terminal

14   ballistics?

15   A.        Yes, sir.

16             THE COURT:  I interrupted, the forensics of it,

17   how the -- how the bullet may have traveled or entered the

18   body or perhaps even the velocity of which -- all of that

19   sort of stuff?

20   A.        Yes, sir.

21             THE COURT:  Okay.  Now I understand.  Not so much

22   treating but examining --

23   A.        Yes.

24             THE COURT:  -- and working backwards from what

25   you see to other data that is pertinent, whatever the

1  situation is you've been called to testify about?

2  A.        Yes, sir.

3            THE COURT:  Okay.  How did it come to be formed?

4  I'm just curious.  How did --

5  A.        During 34 years in law enforcement I constantly

6  was approached by other law enforcement people and lawyers

7  and firearm industry people asking questions that you would

8  think they would have already been taught or would have

9  learned on their own.  And I just saw there was an extreme

10  need for the bar to be raised concerning firearm knowledge

11  in those three industries.

12            THE COURT:  You're the founder?

13  A.        Yes, sir.

14            THE COURT:  Good enough.  Go ahead, Mr. Vann.

15  Thank you.

16  BY MR. VANN:

17  Q.        Let's talk about some of the teaching you do or

18  have done in the past.  You were an instructor at FLETC; is

19  that correct?

20  A.        Yes, sir.

21            THE COURT:  An instructor where?

22            MR. VANN:  At FLETC.  I'm going to have him

23  describe that.

24  BY MR. VANN:

25  Q.        I'm referring to it as FLETC, what is that, can

ATF071340

Defs.' Reply App. 067

1    you say what the acronym stands for?

2    A.          Stands for Federal Law Enforcement Training

3    Center, which is where ATF National Academy is housed,

4    along with many other federal law enforcement academies.

5    Q.          Department of Homeland Security's down there; is

6    that correct.

7    A.          I can't swear to that, but I think they are.  I

8    think pretty much everybody except FBI and DEA are there.

9                THE COURT:  Is that Glynco?  I've heard marshals

10   talk rather disparaging about some aspects of that, but go

11   ahead.

12   BY MR. VANN:

13   Q.          Where is that located?

14   A.          It's in Brunswick, Georgia, which is referred to

15   as Glynco because it's in Glynn County, Georgia.

16   Q.          And what kind of things did you teach while at

17   FLETC?

18   A.          I'm sorry?

19   Q.          What kind of things did you teach, what subjects?

20   A.          I, at various times, was a range instructor, and

21   many of these duties overlapped.  I was a range instructor,

22   I was physical control techniques instructor, an

23   interviewing instructor, I ran the ATF's undercover school

24   for two years.  And during nearly the entire

25   five-and-a-half years I was the chief firearm tech

ATF071341

Defs.' Reply App. 068

1    instructor.

2    Q.        What would that involve?

3    A.        Teaching the basic and advanced classes on

4    firearm classification, ID, technology.

5    Q.        Did you teach the AR-15?

6    A.        I don't recall whether ATF had adopted using the

7    AR-15 as a tactical weapon yet when I was there.

8    Q.        But if you're teaching -- I'm sorry?

9    A.        But I taught various issues concerning the AR-15,

10   yes.

11   Q.        So you taught the agents that the AR-15 had no

12   receiver?

13   A.        No, I did not.  That would have been seriously

14   frowned upon by the agency.

15   Q.        But you're stating that it's clear the AR-15 has

16   no receiver, correct?

17   A.        That's correct.  There are a number of firearms

18   on the market that have no receiver according to the CFR.

19   Q.        Was it clear to you then when you were teaching

20   at Glynco?

21   A.        Yes.

22   Q.        And yet you didn't do it, again, if it's clear

23   under the statute and under the regulations, why wouldn't

24   you have stated this firearm has no receiver?

25   A.        It wasn't allowed.

ATF071342

Defs.' Reply App. 069

1          THE COURT:  Had you raised the issue within --

2     A.        No.

3          THE COURT:  -- in the institute or elsewhere in

4     the ATF?  Did you say, hey, time out guys, you're out there

5     charging people, potentially charging people, at least have

6     charged -- some day you may charge someone with the lower

7     receiver as possessing a receiver, and then because the

8     information that you are causing me to give the agents and

9     other law enforcement officers is a misdefinition of that

10    term?

11    A.        No, sir, I wasn't allowed to.  I co-wrote the

12    lesson plans that are still taught there today, myself and

13    about five other people co-wrote those in 1998, and at that

14    time I voiced my concerns to headquarters to a man named

15    Richard Turner who is still in charge of the interstate

16    Nexus program.  And his response to me was, Dan, there are

17    things that are need to know and there are things that are

18    nice to know.  That's all nice to know, and we're not going

19    to teach that, and it wasn't taught.  I could only teach

20    what was approved by headquarters.

21    Q.        When did that conversation occur?

22    A.        1998.

23    Q.        You recall a conversation with Richard Turner in

24    1998 were he talked about need to know versus nice to know?

25    A.        I recall conversations way prior to that, yes,

ATF071343

**Defs.' Reply App. 070**

1    sir.

2    Q.        And have you brought this up at any time in the

3    past?  You've testified on this issue before, correct?

4    A.        Yes.

5    Q.        Have you brought this up at any time in the past?

6    A.        Yes, if you'll Google a declaration I wrote for a

7    federal civil suit in San Diego in about 2015, you'll see

8    where I quoted it then.

9    Q.        Okay.  And you wrote a manual then --

10            THE COURT:  If I may interrupt, I'm sorry.  And

11   to your knowledge -- the reason I ask, counsel, I don't

12   think any of you cited a case directly on point, and

13   Melissa and I have not, primarily she, has not yet to

14   undertake the research, which I suspect may also turn the

15   fact that there's no case directly on point.  You say civil

16   suit, was it federal civil suit?

17   A.        Yes, sir.

18            THE COURT:  And do you know -- do you -- do you

19   recall the name of it?

20   A.        Yes, sir.  It was Lycurgan, L-Y-C-U-R-G-A-N.  It

21   was against the then acting or director of ATF  B. Todd

22   Jones, and --

23            THE COURT:  How do you spell the first name?

24   A.        Well, his name was B, the initial B, period, Todd

25   Jones is the name he went by.  He was either acting or

ATF071344

Defs.' Reply App. 071

1    full-fledged director at the time, I don't recall.  But a

2    company in San Diego had been served a search warrant --

3              THE COURT:  I'm not -- I was more interested so

4    it might be possible to look up to see if that Court

5    reached any conclusion or decision on that issue.  Probably

6    not, but you've given us enough information that somebody

7    who knows the mechanics, as I and other people do, of how

8    to get that information out of these machines as well as

9    you know, or maybe not as well, but certainly as you know

10   the mechanics and how those things function, we'll find

11   out.

12   A.       Yes, sir.  If you just Google O'Kelly declaration

13   armorer you'll see it come right up.

14             THE COURT:  I'm interested in whether or not

15   anything another Court anywhere any time had to pronounce

16   the issue that is directly in front of me.

17   A.       Yes, sir.

18             THE COURT:  Go ahead, Mr. Vann.  Thank you.

19             MR. VANN:  Thank you, Your Honor.

20   BY MR. VANN:

21   Q.       We're going to come back to that in a second.

22   Talk about your nexus training.  Explain to me what you

23   mean by nexus.  First of all, can you spell it for the

24   court reporter, and tell me what it is?

25   A.       Nexus, N-E-X-U-S.  The word nexus just means a

ATF071345

Defs.' Reply App. 072

1    connection.  There is an element which must be proven in

2    many federal gun prosecutions and ammunition prosecutions.

3    And that element is that the gun or ammunition affected

4    interstate or foreign commerce.  In order for the

5    government to prove that element, you have to establish who

6    made the firearm or ammunition, and, therefore, where they

7    made it.  And if it was made outside the state or country,

8    where it's being prosecuted, then there's been judicial

9    notice given that that item has affected interstate or

10   foreign commerce, and you have established an interstate

11   nexus because, of course I don't have to tell this Court,

12   but a Court has -- apparently these gun prosecutions have

13   to affect two or more states, otherwise it's a state

14   jurisdictional issue.

15   Q.       Actually that's under the portion of traveled in.

16   Isn't it not necessarily in or affecting, it's the traveled

17   in portion, you show that it actually crossed state lines?

18   A.       The nexus is the fact that it traveled in, and

19   having done so it has affected --

20   Q.       But those are two separate things in the statute,

21   you're aware of that, correct?

22            THE COURT:  Counsel, it would be my understanding

23   that a firearm manufactured in Ohio will be used in the way

24   things are going these days, in a convenience store robbery

25   here which everything -- the firearm was fabricated in

ATF071346

Defs.' Reply App. 073

1    Ohio, nonetheless I would have jurisdiction over that

2    robbery, I've been learning that lately. I get your point.

3           MR. VANN: Thank you, Your Honor.

4    BY MR. VANN:

5    Q.        And how do you go about doing that, proving the

6    traveling of the firearm?

7    A.        You look at the markings on the firearm and

8    determine who is credited with having made it. You then

9    either refer to a vetted -- at the time when I was an agent

10   I would refer to a database which ATF maintains which has

11   vetted records since they issue the licensure to all

12   manufacturers, importers, and dealers as to where that

13   company actually made that item, did they actually make it

14   in-house, or did they outsource it to a vendor. Having

15   established where it was actually made, then you can

16   testify to whether or not it affected interstate commerce.

17   Q.        Okay. And are you looking at the general

18   firearm, or the specific firearm that you've been given?

19   A.        You would look at the specific firearm being

20   prosecuted in that case.

21   Q.        And how do you know -- what marking is on that

22   firearm that identifies it different than one that looks

23   like it?

24   A.        The company -- well, under the Gun Control Act,

25   under 921 Title 18, any firearm manufactured by a licensed

1   manufacturer, has to bear five markings, that being the

2   manufacturer's company name, the city and state where they

3   maintain their business records, the make, the model, and

4   the serial -- oh, I'm sorry, the caliber, model and serial

5   number.

6   Q.        And where is the serial number placed on the

7   firearm?

8   A.        It's required to be on the part that ATF

9   considers to be a receiver.

10  Q.        Okay.  Let me ask you specifically what the

11  statute says.  Does the statute say that it's on the part

12  that ATF considers to be the receiver, or does it say the

13  manufacturer must put the serial number on the receiver?

14          MS. CAHOON:  Your Honor, objection.  He's asking

15  for a legal conclusion.

16          THE COURT:  Well, the statute is the statute.  If

17  you want to recite and quote it -- I think you're actually

18  asking for him to testify under a matter of law, and the

19  law is what it is.  I get your point, counsel, and I'm sure

20  I'll hear from you further on it.

21          MR. VANN:  Thank you, Your Honor.

22  BY MR. VANN:

23  Q.        So you take the serial number that's on the

24  receiver, correct?

25  A.        You take the serial number off the firearm that

ATF071348

Defs.' Reply App. 075

1    was placed there by the manufacturer, where ATF told them

2    they had to put it.

3    Q.        Okay.  Does -- are you familiar with the Gun

4    Control Act?

5    A.        Quite a bit.

6    Q.        You've taught it, correct?

7    A.        I don't teach the entire Gun Control Act, no.

8    Q.        You've taught portions of it?

9    A.        Portions.

10   Q.        Have you taught nexus training?

11   A.        I have.

12   Q.        On the nexus training do you teach agents to look

13   on the receiver for the serial number?

14   A.        I teach agents that you can find the serial

15   number on the part which ATF calls a receiver.  This gun

16   doesn't have a receiver, but ATF insists that one part of

17   it is a receiver because they can't accept the fact that

18   their definition is flawed.  And on firearms like this, no

19   part is a receiver, according to their own definition.

20   Therefore, they summarily choose a part, tell licensed

21   manufacturers to put a number there, or importers, because

22   if they don't then they're going to be prosecuted or

23   civilly sanctioned.  And, therefore, when you encounter

24   that firearm, that's where you're going to find the serial

25   number, not because it satisfies the definition, but that's

ATF071349

Defs.' Reply App. 076

1  because that's where ATF told them put it.

2  Q.        Is there a requirement --

3            THE COURT:  Give me one moment, counsel.  Go

4  ahead, counsel.  I apologize for interrupting.

5            MR. VANN:  No problem, Your Honor.  Thank you.

6  BY MR. VANN:

7  Q.        If you're teaching a new agent how to do nexus

8  training, where would you tell him to look on an AR-15 in

9  order to find a serial number?

10  A.        I would tell them to look on the lower because

11  that's where ATF makes manufacturers put it.

12  Q.        Tell me -- or are you aware of any provision that

13  requires a manufacturer to submit a firearm to ATF before

14  it can be produced?

15  A.        Yes.

16  Q.        Where is that provision?

17  A.        There isn't a provision.  It's a common sense

18  practice by a manufacturer to make sure that the part that

19  he's putting the serial number on is in agreement with

20  their opinions.

21  Q.        Mr. O'Kelly, I'm being very specific with my

22  questions, I think it's going to be easier.

23            Is there a provision that requires a manufacturer

24  to submit a firearm, a new firearm, to the ATF before it

25  can be manufactured?

1    A.        I'm not familiar with one.

2    Q.        There isn't one, is there?

3    A.        I don't believe so.

4    Q.        In fact --

5              THE COURT:  Well, he said he doesn't believe so.

6    You know one way or the other?

7    A.        I cannot cite one, Your Honor.  I don't know of

8    one that's coming to mind.

9              THE COURT:  Once again, counsel, if it's a

10   vacuum, you'll let me know, if you or somebody else let me

11   know.  I think getting to the point, again, where you're

12   asking him to testify on a matter of law, and it is what it

13   is.

14             MR. VANN:  I understand, Your Honor.

15             THE COURT:  This witness has said he can't cite

16   one, which means that as he sits here now he doesn't know.

17   Go ahead.

18   BY MR. VANN:

19   Q.        So where does Anderson Manufacturing place their

20   serial number?

21   A.        On the part referred to as the lower.

22   Q.        Okay.  And do you -- are you aware of Anderson

23   Manufacturing ever reaching out to ATF and asking where

24   they should place that serial number?

25   A.        I'm not aware, no.

1    Q.        Are you aware of, let's say, FNH ever reaching

2    out to ATF asking them where to place a serial number on an

3    AR?

4    A.        No.

5    Q.        Sig Sauer?

6    A.        No.

7    Q.        Smith and Wesson?

8    A.        What I'm aware of is a letter from ATF stating

9    that the lower is going to be considered the receiver, even

10   though it doesn't have all the elements in it --

11   Q.        Okay.  And when was that letter?

12   A.        -- and that's what everybody goes by.

13   Q.        And when was that letter?

14   A.        Where or when?

15   Q.        When?

16   A.        In the 19 -- late '60s or early '70s.  I've

17   produced a copy of it for other attorneys in other similar

18   cases, but I can't give you the exact date off the top of

19   my head.

20   Q.        And when was ATF formed?

21   A.        ATF became its own bureau in 1972.  Prior to that

22   it was part of the IRS.

23             THE COURT:  Counsel, excuse me.  Ms. Keegan (sic)

24   and Ms. Johnson, if you wish to have this witness provide

25   you with a copy of that letter, and if you want to offer it

1    as an exhibit, subject to objection, once that happens I'll

2    keep the record open for that.

3              MS. JOHNSON:  Thank you, Your Honor.

4              MR. VANN:  Thank you, Your Honor.

5    BY MR. VANN:

6    Q.        Now, you frequently have said throughout your

7    testimony that what ATF refers to as -- what does Anderson

8    Manufacturing refer to as their receiver -- as their

9    receiver?

10   A.        What ATF tells them to.

11   Q.        Okay.  Again, ask you the same question, do you

12   know if they've ever asked ATF for an opinion?

13             MS. CAHOON:  Your Honor, objection.  This is

14   asked and answered at this point.

15             THE COURT:  Overruled.

16             MR. VANN:  Thank you.

17   BY MS. CAHOON:

18   Q.        Do you know if Anderson Manufacturing has ever

19   asked ATF which one is the receiver?

20   A.        No.

21   Q.        Okay.  So again, what is Anderson Manufacturing,

22   to your knowledge --

23             THE COURT:  Counsel, I understand your point.  I

24   will -- I understand you're challenging the statement what

25   ATF has told him, okay, which is, I think, what you're

ATF071353

**Defs.' Reply App. 080**

1    talking about.

2    BY MR. VANN:

3    Q.        What does every other manufacturer call the

4    receiver for the AR that they produce?

5    A.        The lower because ATF tells them to.

6              MR. VANN:  Your Honor, at this point I ask that

7    he respond to the question.  We've already addressed that.

8              THE COURT:  I'm going to strike that reference

9    to, quote, what the ATF tells them.  If there is such a

10   document, regulation, guidance, whatever, to which someone,

11   A, can refer, and which ATF has otherwise made commonly

12   available, that's one thing.

13             MR. VANN:  Thank you.

14             THE COURT:  Okay.  And I understand that Mr. --

15   Mr. O'Kelly, that's what you -- I gather you -- that's not

16   what you taught agents because obviously you were required

17   to say, point to the lower receiver, but I think the

18   question is -- I just don't think there's a foundation for

19   what ATF told, much less what, quote, was on Anderson's

20   mind when it -- its designers said we better put the

21   receiver there, the serial number there, so we don't, you

22   know, get shut down for selling un-serialized weapons.  I

23   understand.

24   BY MR. VANN:

25   Q.        And when you trace a firearm that's manufactured

ATF071354

Defs.' Reply App. 081

1    by any licensed manufacturer, is there required to be their

2    manufacturing information along with the serial number?

3    A.        When you trace a firearm, is there required to

4    be --

5    Q.        Absolutely, it is a very disjointed question, I

6    apologize for that.

7              If you pick up a firearm that you're going to

8    trace and it comes from a licensed manufacturer, would you

9    expect to find, in attempting to trace this firearm, the

10   manufacturing information along with a unique serial

11   number?

12   A.        Yes.

13             THE COURT:  Where -- I'm sorry, I'm curious --

14   where would you find -- are you talking about -- I'm a

15   little lost.  What do you mean by manufacturing information

16   and so forth?  You lost me a little bit.

17   BY MR. VANN:

18   Q.        Would you find the name of the manufacturer, the

19   city and state where it was produced along with a unique

20   serial number?

21   A.        Would I, or where would I?

22   Q.        Would you?

23   A.        You would, yes.

24   Q.        Okay.  And where would it typically be located?

25   A.        ATF has ruled that the serial number has to be on

1   the receiver.

2   Q.        Let me ask you a question about ATF has ruled.

3   Is that in the regulation, or is that in the statute, or do

4   you know?

5   A.        18 U.S.C. 9323(i) says, as I recall, if a

6   licensed manufacturer makes a receiver, then the number has

7   to be on the receiver.

8   Q.        So that's --

9   A.        But it's not in reverse.  Just because you put a

10  serial number on something doesn't make it a receiver.

11  Q.        But that's in the statute, correct?

12  A.        18 U.S.C. 923(i) is.

13  Q.        And if you were to pick up a firearm that had no

14  markings, would you be able to trace that firearm?

15  A.        No.

16  Q.        Why not?

17  A.        Because it takes a serial number to be able to

18  identify that gun as being different from one exactly like

19  it.

20  Q.        Okay.  Let me draw your attention to the AR

21  sitting in front of you, the complete one, Government's

22  Exhibit 3 and 4, I believe.  Do you mind pulling the pins

23  on that and separating the two units?

24          THE COURT:  Give me a moment, please, Mr. Vann.

25          MR. VANN:  Yes, Your Honor.

ATF071356

Defs.' Reply App. 083

1            THE COURT:  What was that citation again, 924(i)?

2     A.      923(i), Your Honor.  I'm going by memory,

3     hopefully I'm right.

4            THE COURT:  I understand.  No problem.  Go ahead.

5            MR. VANN:  Thank you, Your Honor.

6     BY MR. VANN:

7     Q.      I'll ask you to take Government's Exhibit 4 in

8     your hand.  And can you show this to The Court?  Your

9     Honor, Government Exhibit 4?

10    A.      One moment, please.

11    Q.      You're holding up both of them, just 4?

12    A.      I'm sorry?

13    Q.      Just 4, not 3 and 4, just 4.

14    A.      Which is the --

15    Q.      The upper.

16            THE COURT:  Half a second.  I'm sorry.  Okay.

17    BY MR. VANN:

18    Q.      And does that have the manufacturing information

19    contained anywhere on the sample you're holding in your

20    hand?

21            THE COURT:  I'll take judicial notice that it

22    would not; is that correct?

23    A.      Yes, sir, that's correct.

24            THE COURT:  Wouldn't be a -- would there be any

25    firearm anywhere, that component would have a serial

ATF071357

Defs.' Reply App. 084

1    number, the barrel -- I'll even call it the barrel where

2    the upper is.

3    A.        There's no law against putting a serial number on

4    every part of the firearm if a manufacturer so desires, but

5    they're only required to put it on what ATF says is the

6    receiver.

7    Q.        And since the serial number requirement -- are

8    there any reports that are required to be kept as to upper

9    receiver or barrels?

10   A.        ATF doesn't require any.

11   Q.        So if you found one that did have a serial

12   number, would you know how to trace that if it just had a

13   number?

14   A.        ATF's tracing center doesn't trace non-firearms.

15   Q.        It would be untraceable, wouldn't it?

16   A.        Then upper would be untraceable, yes.  I mean,

17   they could trace that serial number in conjunction with the

18   manufacturer if that serial number -- let's say on a Glock,

19   for instance, a Glock has the same serial number on the

20   frame, what ATF calls the frame, and on the barrel, and on

21   the slide, because in all other gun manufacturing countries

22   in the world, none of them consider a frame to be a

23   firearm.  They consider a barrel to be a firearm, or a

24   breechblock, or both, to be a firearm.  Therefore, Glocks,

25   being made in Austria, the barrels and the breechblock or

ATF071358

Defs.' Reply App. 085

1    slide is serialized.  And then if it's coming to the U.S.,

2    they're, like, oh, yeah, that's going to America, put a

3    number on that piece of plastic for those Americans too, so

4    it has three numbers.

5           So if, to answer your question, you were going to

6    try to trace the slide from a Glock that you found and you

7    can determine, yes, it was made by Glock and here's the

8    serial number, ABC123, you could trace that serial number,

9    and what it would give you is the pedigree on the frame

10   that that goes to since that's the part that ATF decides

11   they want to control.

12   Q.      But it wouldn't necessarily be related because

13   you could take that slide off and put it on another

14   firearm?

15   A.      Correct.

16   Q.      Okay.  So as it stands now, though, there's no

17   records, that's untraceable, we know the one in front of

18   you now has no manufacturer's mark and no serial number,

19   correct?

20   A.      The upper does not, correct.

21   Q.      So can I buy that as a complete unit?

22   A.      Yes.

23   Q.      In fact, lots of people buy that as a complete

24   unit now, correct?

25   A.      Yes.

ATF071359

Defs.' Reply App. 086

1   Q.        So I can -- do I go to a firearms dealer and buy

2   that?

3   A.        You can go to anyone who has possession of one

4   and buy it.

5   Q.        Can I go on the internet, order it, and have it

6   sent to my house?

7   A.        Yes.

8   Q.        So that can show up, complete with the bolt, bolt

9   carrier group, barrel, everything attached to it ready to

10  go?

11  A.        Yes.

12  Q.        Okay.  Now, tell me about the lower.  Does that,

13  as it stands right there, have a manufacturer's mark on it?

14  A.        Yes.

15  Q.        Does it have a serial number on it?

16  A.        Yes.

17  Q.        Can I trace that firearm with the information

18  that's present on the lower receiver of that firearm?

19  A.        Yes.

20  Q.        Okay.  Your contention is that that is not a

21  firearm receiver?

22  A.        Correct.

23  Q.        And therefore, that is not a firearm, correct?

24  A.        Correct.

25  Q.        Okay.  So earlier you talked with counsel that

ATF071360

Defs.' Reply App. 087

1    you have to have some specialized training in order to

2    assemble an AR, correct?

3    A.       Yes.

4    Q.       It's not just as simple as snapping it together

5    like Legos?

6    A.       Correct.

7    Q.       In fact, you have to -- there are some special

8    tools you might need.  Could you get that training off,

9    say, the internet?

10   A.       Probably.

11   Q.       Do a lot of people do that, put them together

12   that way?

13           MS. CAHOON:  Objection.

14           THE COURT:  He said probably, so --

15           MR. VANN:  I'm fine with that, Your Honor.

16   BY MR. VANN:

17   Q.       But under your theory, that part's not

18   controlled, correct, should not be controlled?

19   A.       The lower should not be controlled, according to

20   ATF's own definition in the CFR, no.

21   Q.       At all?

22   A.       No.

23   Q.       So in fact, I wouldn't need a license to

24   manufacture any of those pieces, correct?

25   A.       According to the sloppy way that they wrote the

ATF071361

Defs.' Reply App. 088

1   definition in the CFR, no.

2   Q.      So according to your theory, I can produce that,

3   and then I can sell that on the internet, correct?

4   A.      It's not my theory.  All I did was read the CFR,

5   just like you can read it, and that doesn't match it, so

6   the answer is yes.

7   Q.      According to your opinion, I then no longer need

8   to control that piece at all?

9           MS. CAHOON:  Objection.  Your Honor, this is

10  outside --

11          THE COURT:  A little argumentative.  Rephrase.

12  BY MR. VANN:

13  Q.      Do me a favor, can you put that together for me?

14  A.      Put what together, the rifle?

15  Q.      The lower and the upper.

16  A.      Sure.

17          MR. VANN:  And, Your Honor, I think this is part

18  of --

19          THE COURT:  One moment, please, I'm making a

20  note.

21  BY MR. VANN:

22  Q.      Hold on, please.  Mr. O'Kelly, not yet, please.

23  Could you put it together now?

24  A.      Yes.

25  Q.      Is that's what's required to assemble the lower

ATF071362

Defs.' Reply App. 089

1    that is uncontrolled and the upper that is uncontrolled?

2    A.       Snap upper to lower, yes.

3    Q.       So under your theory, I can order the top and

4    have it sent to my house because we both agree that doesn't

5    expel a projectile by means of explosive?

6    A.       Right, the upper can.

7    Q.       Would you say the upper's a firearm in and of

8    itself?

9             MS. CAHOON:  Objection.

10            THE COURT:  Overruled.  I did not hear the

11   answer.

12   A.       The answer is it's not up for me to say, ATF

13   decides what they think is a firearm or not.

14   Q.       You've given an opinion on what you consider the

15   receiver, and you talked to The Court about your experience

16   with firearms.  Would you classify, and you've also talked

17   in your CV about classification of firearms, would you

18   classify the upper as a firearm in and of itself?

19   A.       No.

20   Q.       Okay.  And the lower you say is not a firearm in

21   and of itself?

22   A.       Correct.

23   Q.       So under your opinion, you could order the top,

24   have it sent to your home, because it's not controlled,

25   have the bottom sent to your house because it's not

ATF071363

Defs.' Reply App. 090

1    controlled, and --

2    A.        It is controlled, I didn't say it wasn't

3    controlled.

4    Q.        Under your theory it would not be controlled?

5             MS. CAHOON:  Objection, Your Honor.

6             THE COURT:  Let him --

7    A.        My theory is not -- I don't have some theory that

8    it's not controlled.

9    Q.        Under your opinion --

10   A.        I'm giving you my opinion that it doesn't match

11   the four elements in the CFR, so, therefore, it shouldn't

12   be controlled, because the CFR says only items which do

13   match that definition should be controlled.

14   Q.        Mr. O'Kelly --

15   A.        This doesn't, just like my glasses don't match

16   the CFR --

17   Q.        Mr. O'Kelly, we understand that.

18   A.        Well, that's not the way you worded it.

19   Q.        Under your opinion, the lower portion complete

20   should not be controlled, so the extent of the assembly

21   required would be that you push two pins and you have an

22   operable AR-15?

23   A.        No, putting the upper and lower does not give you

24   an operable AR-15, you have to install all the parts in the

25   lower.

ATF071364

Defs.' Reply App. 091

1   Q.          If you have a complete lower, under your theory,

2   excuse me, under your opinion, you have a complete lower,

3   it's not controlled, cannot expel a projectile by means of

4   explosive, and in your opinion it is also not the receiver

5   of a firearm, it could then be shipped absolutely complete

6   with the trigger, with the hammer, with the disconnecter,

7   with the pistol grip and with the stock buffer tube, buffer

8   spring, every piece attached to it, under your opinion it

9   would not be controlled, correct?

10  A.          You're going to have to repeat, you have a lot

11  going on in that question.

12          THE COURT:  Counsel, I believe your question is,

13  and -- is that it would be lawful, in light of the

14  regulation and its interpretation of the Gun Control Act,

15  meaning both of those provisions, as you read them, for a

16  purchaser to order, and for a manufacturer to ship in

17  interstate commerce, unit, a connected unit, an assembled

18  unit that included the upper and lower receiver because the

19  regulation refers to the receiver, and there is no receiver

20  per the regulation in such a unit or shipment?  If my

21  question didn't make sense, say so.

22  A.          I'm sorry, I do not understand the question.

23          MR. VANN:  I think I'll ask this and make it very

24  simple.

25          THE COURT:  It's your witness, you ask the

1    question.

2                MR. VANN:  Thank you, Your Honor.  I'm going to

3    approach.

4    BY MR. VANN:

5    Q.        Could you disassemble this for me?  Mr. O'Kelly,

6    I'm holding up Government's Exhibit 4, it is a complete

7    upper receiver, would you agree with that?

8    A.        Yes.

9    Q.        It is not controlled currently, we would agree

10   with that?

11   A.        Yes.

12   Q.        It can be shipped, and you testified people do

13   order this and have it shipped to their homes?

14   A.        Yes.

15   Q.        Okay.  So it's lawful for me to order this off

16   the internet and have it shipped --

17   A.        Yes.

18   Q.        -- to my house, okay.  Your opinion is that this

19   is also, and I'm holding up Government's Exhibit 3, this is

20   also not a firearm because it does not expel a projectile

21   by means of explosive, correct?

22   A.        Correct.

23   Q.        It's not a silencer?

24   A.        Correct.

25   Q.        Not a destructive device?

ATF071366

Defs.' Reply App. 093

1    A.        Correct.

2    Q.        And it, under your opinion, does not contain the

3    receiver of a firearm?

4    A.        Correct.

5    Q.        Correct.  Okay.  So then under your opinion I

6    could order this complete lower receiver and have it

7    shipped to my house without any markings from a person who

8    is not regulated?

9    A.        If ATF went according to the regulations, yes.

10   Q.        Okay.  So I would have this -- I could then,

11   under your opinion, have this shipped to my house, and then

12   have this shipped to my house, both of those actions would

13   be lawful, correct, interstate --

14   A.        No, because then ATF would finally take out a pin

15   and change the word and to or in the definition and it

16   wouldn't be lawful.

17   Q.        Mr. O'Kelly, I'm not asking for your opinion

18   about what ATF might do in response to that.  I'm saying

19   under your opinion these things could be shipped to your

20   house independently, correct?

21   A.        If ATF went by the definition, yes.

22   Q.        Okay.  Now, what I'd like you to do is

23   demonstrate for The Judge what would be required to make

24   these two pieces into a configuration that would expel a

25   projectile by means of an explosive.  Can you put these two

ATF071367

Defs.' Reply App. 094

1  pieces together?

2  A.        Again, sure.

3             THE COURT:  One moment, please, I'm making a

4  note.  I'm not watching, but go ahead.  Wait a minute.  Go

5  ahead, counsel, I apologize for interrupting.

6  BY MR. VANN:

7  Q.        Can you assemble those two pieces?

8  A.        And so as a result we should pretend that things

9  fall within the definition that don't satisfy --

10  Q.       Mr. O'Kelly --

11            THE COURT:  There's no question.

12  BY MR. VANN:

13  Q.       I'm not asking for commentary.

14  A.        Yes, sir.

15  Q.       Thank you.  Is that now -- you have expertise as

16  a firearm's specialist in your CV, right, would that be a

17  complete AR that could expel a projectile by means of an

18  explosive?

19  A.        Yes.

20  Q.       So it wouldn't take, as you said with counsel, 30

21  minutes and some specialized training and tools to assemble

22  that, you would nearly need your thumbs to push two pins,

23  correct?

24  A.        Yes.

25  Q.       Okay.  Let's talk about the receiver itself, and

ATF071368

Defs.' Reply App. 095

1    I believe that's been marked as Government's Exhibit 2, the

2    receiver.  And you kept saying it has two of the four

3    requirements under the CFR?

4    A.      Yes.

5    Q.      What are the four requirements under the CFR?

6    A.      House the hammer, house the bolt, house the

7    firing mechanism, receive the barrel.

8    Q.      And is receiving the barrel a requirement of the

9    CFR?

10   A.      Yes.

11   Q.      Okay.  And it says -- what does it say

12   specifically?

13   A.      And is usually threaded at its forward portion to

14   receive the barrel.

15   Q.      Does that mean must or that means usually?

16          MS. CAHOON:  Objection, Your Honor.

17   A.      It is usually threaded.

18          THE COURT:  It reads as it says.  It says what it

19   says.

20          MR. VANN:  Well, Your Honor, I want to know --

21   he's now claiming it's a requirement, and I'm asking what

22   his interpretation of the word is for purposes of his

23   definition that he's applied.

24          MS. CAHOON:  Your Honor, if I may, I think that's

25   the very reason --

ATF071369

1                THE COURT:  Counsel, I get your point --

2                MR. VANN:  Thank you, Your Honor.

3                THE COURT:  -- which is the regulation standing

4    on its own suggests to the reader, and we have to assume an

5    uninformed reader who's relying only on that set of terms,

6    the term usually does not mean always.  Now, to somebody

7    who is familiar with a firearm, as I am not, that might

8    somehow seem inconsistent or senseless because the three

9    components within the regulation can only have a

10   utilitarian function, which is to enable the weapon to

11   expel a projectile by means of an explosive, if there is a

12   barrel so that the projectile when it goes out, it simply,

13   at some point, drops immediately to the ground because it

14   hasn't otherwise been directed.  I get your point.

15               MR. VANN:  Thank you, Your Honor.

16   BY MR. VANN:

17   Q.        Would we agree that there are three things that

18   are required for a receiver under the CFR, the attachment

19   of the hammer, the trigger group or firing mechanism and

20   then either houses the bolt or breech face, we would agree

21   with that, wouldn't we?

22   A.        I agree that there are at least three.

23   Q.        Possibly fourth?

24   A.        Well, I say four.

25   Q.        Okay.  Now --

ATF071370

Defs.' Reply App. 097

1          THE COURT:  My question is, sir, I believe the

2    question is what and only what are the terms of the

3    regulation.

4    A.       The --

5          THE COURT:  Does refer to those three, and the

6    middle one is in the distinctive.

7    A.       Your Honor, the fourth one, the word usually

8    refers to the word threaded, is usually threaded.  It's not

9    usually receives the barrel.  That's --

10          THE COURT:  I understand it's your contention

11    that, to the extent -- at the very least to be more clear,

12    and to conform with the way things are in the real world, a

13    weapon, the breechblock, need not be threaded, it simply

14    needs somehow to keep the barrel in place so that the

15    projectile, when ejected, goes in the direction in which

16    the person pulling the trigger wants it to go, simply

17    doesn't literally fly off anywhere, and who knows were.

18    A.       Yes, sir, I agree.

19          THE COURT:  In other words, it's your contention

20    that the draftsman could have and should have been more

21    careful because, as it is, there is a degree of ambiguity,

22    at least as one reads the words themselves?

23    A.       Yes, sir.

24          THE COURT:  To bring comprehension to those

25    words, given that ambiguity, one must have some additional

ATF071371

Defs.' Reply App. 098

1    information about how a weapon is constructed, a weapon

2    capable of ejecting a projectile by means of an explosive.

3    A.        That's true, Your Honor.

4             THE COURT:  Thank you.  You may continue,

5    counsel.

6    BY MR. VANN:

7    Q.        Now, on the lower receiver that you have there,

8    we would agree that you pin the trigger group to it,

9    correct?

10   A.        The trigger does install into this piece using a

11   pin, yes.

12   Q.        And the hammer does as well?

13   A.        Yes.

14   Q.        And on the complete one you have in front of you,

15   how does it hold the upper receiver in place?

16   A.        By pins.

17   Q.        Capture pins, in fact, right?

18   A.        Yes.

19   Q.        And by capture pins, I mean, and tell me if I'm

20   wrong, you don't push them and they fall out, they actually

21   are retained in the lower receiver, correct?

22   A.        Correct.

23   Q.        And that grabs hold of ears on the upper receiver

24   and holds that receiver tight that incorporates the bolt;

25   is that right?

ATF071372

Defs.' Reply App. 099

1    A.        Yes.

2    Q.        And so the pins attach to the lower receiver,

3    hold the upper receiver in place, that then holds the third

4    component, which is the bolt and also the openings -- well,

5    we won't go into that, also is threaded for the barrel as

6    well, correct?

7    A.        Yes.

8    Q.        Okay.  So the piece that we're talking about that

9    is designated and it's marked by Anderson Manufacturing as

10   their receiver contains two of the components, and then

11   pins are captured in it to hold in place another portion of

12   the firearm that retains the other two?

13   A.        That doesn't house them.

14   Q.        Okay.  All right.  But it provides an attachment

15   point for the housing, correct?

16   A.        Yes.

17   Q.        Okay.

18             THE COURT:  The only, quote, housing is in -- is

19   shown in Government's Exhibit A; is that correct?

20   A.        Yes, Your Honor.

21             THE COURT:  I call that envelope or a container,

22   I believe you testified -- I believe you testified that

23   there is nothing similar, and it doesn't appear to be from

24   what you've shown here?

25   A.        Well, when I use the word housing, Your Honor,

ATF071373

Defs.' Reply App. 100

1  I'm referring to the verbiage in the CFR that says that

2  part to which houses, and then lists the parts.

3          THE COURT:  Houses, contains, holds?

4  A.      Yes, sir.

5          THE COURT:  And closes?

6  A.      Yes, sir.

7          MR. VANN:  And for purposes of the record, I also

8  want to -- as part of Government's Exhibit 2 is the chain

9  of custody bag with the markings on it, that will be part

10  of that exhibit.

11          THE COURT:  No objection, right?

12          MS. CAHOON:  No, Your Honor.  Thank you.

13          THE COURT:  Excuse me, Ms. Keegan (phonetic), as

14  Mr. Weldon knows, tell me, don't bother with the chain of

15  custody, my question simply, is there any dispute about it

16  being what the proponent claims it is?  All the stuff you

17  learned in law school, only fuss with what's in front of me

18  and they'll only do it once, but go ahead.

19          MR. VANN:  Thank you, Your Honor.

20  BY MR. VANN:

21  Q.      Let's talk about how these are sold, both the

22  complete AR's and the lower receivers.  Are lower receivers

23  manufactured by licensed manufacturers throughout the U.S.?

24  A.      Because ATF insists they must be, yes.

25  Q.      Mr. O'Kelly --

1          THE COURT:  The answer's yes.

2    A.        I answered the question, sir, I answered yes.

3    Q.        Thank you.  Are they sold by multiple

4    manufacturers throughout the U.S.?

5    A.        Yes.

6    Q.        And can I purchase an AR lower from this

7    manufacturer and get pieces from all different ones and

8    assemble my own firearm?

9    A.        Yes.

10   Q.        Okay.  And if I wanted to buy that, me, the

11   individual, wants to buy that firearm, how would I go about

12   buying that lower receiver so that I could assemble, in my

13   house a firearm?

14   A.        According to ATF you would have to complete a

15   form called a 4473 giving your name, address, date of

16   birth, place of birth, et cetera, sex, height, weight,

17   you'd have to answer a series of questions yes or no as to

18   whether you're prohibited from possessing a firearm,

19   whether you're the actual owner -- I'm sorry, purchaser of

20   the fire arm, because ATF insists that that is a firearm,

21   and then you would sign and date it.  You would withstand a

22   background check, which the dealer would call in to either

23   the FBI or the state police, depending on the state in

24   which you're purchasing it, after which if the dealer gets

25   to proceed you would be able to take it home.

1   Q.        And if were to walk into a dealer who's selling

2   these and request to purchase one without filling out that

3   form, would, by law, I be able to just take it and leave?

4   A.        No, because if you did, ATF would come after them

5   and take their license because they insist that's a

6   firearm, even though it doesn't match the definition.

7           THE COURT:  And that is in fulfillment of its

8   understanding of its obligations under the Gun Control Act?

9   A.        Yes, sir.

10  Q.        If I were to buy the complete AR, would I have to

11  do the same thing?

12  A.        Yes.

13  Q.        That's the firearm, you even concede that's a

14  firearm, correct?

15  A.        That is definition one of weapon which expels by

16  action of an explosive.

17  Q.        Okay.  So if I go in, I have to fill out the

18  form, background check is run, and that's the control

19  that's in place to ensure that someone who's prohibited

20  doesn't have access to a firearm, correct?

21  A.        Yes.

22  Q.        Lastly I want to talk about the FAL, I think you

23  spent some time on that, to show the inconsistency in

24  determinations.  If I were to manufacture a machine gun

25  from an AR, what's the difference in the lower receiver

ATF071376

Defs.' Reply App. 103

1    that you see in front of you, and a lower receiver for a

2    machine gun for an AR?

3    A.          The only difference, according to ATF, is a very

4    small hole just slightly above this hole for the selector,

5    which I'm indicating with my little finger (indicating).

6    Probably an 1/8 of an inch from this top surface there

7    would be a hole the size of -- to use layman's terms, about

8    the size of a pencil lead, going clearly through the hole

9    receiver.  ATF says that changes this from a Gun Control

10   Act receiver to a NFA receiver.

11   Q.          And what is the purpose of that hole?

12   A.          To accommodate the axle pin for a part called the

13   auto sear.

14   Q.          So it has a function, it holds the machine gun

15   part in place, correct?

16   A.          Yes.

17   Q.          So there is a difference between an AR that is a

18   semi- automatic receiver and an AR that has been

19   manufactured for machine gun?

20   A.          Correct.

21   Q.          Okay.  And that distinction is the hold, that's

22   the change you would have to make in the lower receiver,

23   correct?

24   A.          That's ATF's ruling, yes.

25   Q.          Okay.  Under the FAL, what modification would you

ATF071377

Defs.' Reply App. 104

1    make to an upper of an FAL -- I'm sorry, to a lower of an

2    FAL, for a semi- automatic and the lower of an FAL for a

3    fully automatic?

4    A.        Well, you wouldn't modify the lower, you would

5    just go get a three-position lower.  You would otherwise

6    try -- you would be trying to reinvent the wheel to modify

7    a semi-automatic FAL lower.

8    Q.        Isn't it true that the modification in order to

9    take an FAL from a semi-automatic to an automatic is made

10   in the upper receiver and not the lower receiver?

11   A.        Correct.

12   Q.        Okay.  So there's a difference between the FAL

13   and the AR in that what makes one a machine gun and the

14   other a machine gun, you have to make modifications to

15   different receivers, correct?

16   A.        That's the only comparison, yes.  In contrast to

17   the differences between them --

18   Q.        The only --

19             THE COURT:  Excuse me, I believe you answered the

20   question, okay.  Or if you did not, counsel let him

21   continue, but I --

22             MR. VANN:  Your Honor, I think he did, and I

23   didn't mean to cut you off.

24             THE COURT:  No problem.

25   BY MR. VANN:

ATF071378

Defs.' Reply App. 105

1  Q.        So you -- the difference is that you would have

2  to modify different portions of the firearm in order to

3  make it into a machine gun?

4  A.        Correct.

5  Q.        Okay.

6            MR. VANN:  No further questions, Your Honor.

7            THE COURT:  Tell me, I'm sorry, I've already

8  forgot what's FAL stand for?

9            MR. VANN:  FAL is a type of firearm that --

10           THE COURT:  Type of semi-automatic rifle that

11  can, as you indicated, be converted to an automatic?

12  BY MR. VANN:

13  Q.        And Mr. O'Kelly, just to reiterate, the FAL's

14  also a two-part receiver system, upper and lower, correct?

15  A.        Yes.

16           THE COURT:  Okay.  Ms. Keegan (sic), I think,

17  folks, after this we'll take a short break, just FYI.  We

18  won't take a lunch break -- we'll find out how much longer

19  we're going to go.  Go ahead, Ms. Keegan.

20           MS. CAHOON:  Thank you, Your Honor, I'll be

21  brief.  And it is Cahoon, not Keegan.

22           THE COURT:  Oh, I'm sorry.

23           MS. CAHOON:  That's quite all right.  It's an

24  unusual last name.

25           THE COURT:  Cahoon, Calley, Cavanaugh, Carr --

ATF071379

Defs.' Reply App. 106

```
 1              MS. CAHOON:  Too many C names in your life.

 2              THE COURT:  Too many Irish genes floating around

 3     the room.

 4              MS. CAHOON:  Exactly right.

 5                        REDIRECT EXAMINATION

 6     BY MS. CAHOON:

 7     Q.        Mr. O'Kelly, just a few brief questions for you.

 8     If you could turn to Defense Exhibit G -- or, excuse me, H,

 9     which is in that black binder, it's a three-page document.

10     A.        Okay.

11     Q.        And are you familiar with that document,

12     Mr. O'Kelly?

13     A.        Yes.

14     Q.        And what is that document?

15     A.        It's an affidavit which I wrote.

16     Q.        Was that an affidavit you wrote for this case,

17     right?

18     A.        Yes.

19              THE COURT:  I'm sorry, I apologize.

20     BY MS. CAHOON:

21     Q.        And I believe Judge Carr asked a question during

22     cross-examination as to whether or not there had been a

23     case involving a similar issue, and in your affidavit you

24     talk about the Jimenez case did that case also involve the

25     CFR definition of a firearm?
```

ATF071380

Defs.' Reply App. 107

1   A.        Yes.

2   Q.        And if you know, do you know what the resolution

3   of that case was?

4   A.        I do not recall.  If I did know -- I have had

5   quite a number of cases.

6   Q.        Not a problem.

7             THE COURT:  I'm not sure Jimenez is directly on

8   point.  Obviously both parties cite it.

9             MS. CAHOON:  Certainly, Your Honor.  We're happy

10  to provide argument at a later time.

11            THE COURT:  Of course, I'm just saying --

12  BY MS. CAHOON:

13  Q.        Just a few more points of clarification,

14  Mr. O'Kelly.  You received some questions --

15            THE COURT:  We can talk about this later.  It is

16  my impression, my recollection from my reading of the

17  briefs, actually occurred sometime last week because I had

18  lots of other things in between, but that to the extent

19  that Jimenez is on point, and I understand the

20  contentions -- contention that it is, I'm really not sure

21  that's, quote, directly on point.  I don't think there's --

22  I don't think it raises precisely the issue in front of me.

23  And that's all I'm saying.

24            MS. CAHOON:  Thank you, Your Honor.  I appreciate

25  that.

ATF071381

Defs.' Reply App. 108

1          THE COURT:  It may still have pertinence, may

2    still be controlling, but I just don't -- I don't think

3    there's a case, at least none has been cited, that is four

4    square, contains all the components, or lack thereof, of

5    this case, okay?

6          MS. CAHOON:  And thank you, that's fine, Your

7    Honor.  And if you're willing, we certainly have argument

8    about that at the close of the hearing.

9          THE COURT:  Don't worry.  I expect that.  I

10   invite that.  I require that.

11         MS. CAHOON:  Thank you, Your Honor.

12   BY MS. CAHOON:

13   Q.        Mr. O'Kelly, we've been talking a lot about this

14   lower receiver, upper receiver, if you could just grab

15   Government's Exhibit 2, which I think you told us is just

16   the lower receiver, correct?

17   A.        According to ATF, yes.

18   Q.        Right.

19         THE COURT:  Let me ask you a question.  I'm

20   sorry.  Hold that back up, would you please?  There is, at

21   the very top fixed to that a round and open portion.  What,

22   if anything, goes through there?

23   A.        Your Honor, that's where the shoulder stock

24   screws into it.  You can see --

25         THE COURT:  That's not where the barrel goes

1   through?

2   A.          No, no, sir.  The barrel would be toward the

3   front.

4               THE COURT:  I understand.

5   BY MS. CAHOON:

6   Q.          So you've already explained to us that the lower

7   receiver, as defined, that you're holding in your hand

8   there, doesn't have all of the four CFR components pieces.

9   If we were to take the lower receiver and the upper

10  receiver as defined, would they have all of those four

11  components pieces together?

12  A.          Yes.

13  Q.          You received some questions from the government

14  today in which you were asked should not be controlled.

15  Could you clarify, it's not your opinion today about

16  whether or not certain components of firearms should be

17  controlled as a matter of policy, correct?

18  A.          I'm not so sure I understand.

19  Q.          I'm sorry, that's a poor question, let me ask it

20  better.

21              You're not -- are you here today to provide an

22  opinion about what would be good firearm policy in terms of

23  whether or not that's -- that's an even worse question.

24              Let me just ask you this.  The pieces that you

25  snapped together for us earlier, for the government's

1    counsel, the -- did that include a stripped lower receiver

2    or a completed lower receiver that you snapped together?

3    A.        That was a completed lower.

4    Q.        Thank you.  And if we had only a stripped lower

5    receiver, as we do in this case, would you be able to

6    easily snap it together to make a complete firearm?

7    A.        Easy being a relative term, it depends on who's

8    doing it.

9    Q.        So if we had only the stripped lower receiver,

10   would we need someone with some skill in firearms and

11   possibly also tools to make it into an operable firearm?

12   A.        Yes.

13            MS. CAHOON:  Your Honor, if I can just have a

14   moment, I just want to confer?

15            THE COURT:  Absolutely.

16   BY MS. CAHOON:

17   Q.        Just briefly, Mr. O'Kelly.  Did the, what's being

18   defined as the lower receiver in this case, did the one at

19   issue in this case that you reviewed, was that stripped or

20   complete?

21   A.        It stripped, it's bare.

22   Q.        And would a stripped lower receiver require more

23   skill and time to make into a complete firearm?

24   A.        Yes, of course.  That is quite a number of parts

25   that has to be installed.

ATF071384

Defs.' Reply App. 111

1    Q.        So it wouldn't be as simple as what you did for

2    The Court a moment ago where you snapped the two completed

3    pieces together, correct?

4    A.        No.  Not only do you have to add quite a number

5    of parts, they have to be done in certain order, because in

6    some situations one retains the other, so you can't even do

7    them in the wrong order.

8    Q.        Thank you.

9              MS. CAHOON:  We have nothing further.  Thank you,

10   Your Honor.

11             MR. VANN:  Your Honor, if I may?

12             THE COURT:  Absolutely.  Sure.

13             MR. VANN:  Thank you.

14                     RECROSS EXAMINATION

15   BY MR. VANN:

16   Q.        Mr. O'Kelly, snapping in those parts to the lower

17   receiver wouldn't change your opinion or your analysis of

18   whether or not it classified as a receiver, would it?

19   A.        No, sir.

20   Q.        So it wouldn't matter if it came completely

21   stripped or fully completed, under your opinion even fully

22   completed, it is not a receiver?

23   A.        Fully completed it still only has two of the

24   elements in the CFR, so in my opinion, no, it's not there.

25   Q.        Thank you.

ATF071385

Defs.' Reply App. 112

1          THE COURT:  Ms. Cahoon, anything further?

2          MS. CAHOON:  Nothing additional for this witness.

3    Thank you.

4          THE COURT:  Mr. O'Kelly, you may step down.

5    You're welcome to stay, or you're free to go.  It's

6    entirely up to you.

7          What's next?  How much time -- I don't expect to

8    take closing argument and then go from there.  I think it's

9    important, fairly substantial amount of information has

10   been generated so far in this hearing, I suspect we'll get

11   more from the government's witness, and I think it's

12   appropriate to give you time, if you wish, to order a

13   transcript and set a briefing schedule.  Are both the

14   defendants out of custody?

15         MR. KURT:  No.

16         MS. CAHOON:  Mr. Robison is out of custody.

17   Mr. Robison is out of custody, I believe his

18   co-defendant --

19         THE COURT:  Given the delay, I think we may have

20   discussed this before, but in terms of -- that's a separate

21   issue, but perhaps we can talk about that a little bit

22   further this afternoon just to see, obviously more sense --

23   Speedy Trial Act.  And also Mr. Robison wants to know, just

24   as Mr. Rowold, what's going to happen at the end of the

25   day.  I understand that, but it's going to take a little

ATF071386

Defs.' Reply App. 113

 1    bit of time to get these issues briefed up further, and

 2    it's going to take me some time to reach and write up an

 3    opinion.  So anyway, that's neither here nor there, all I'm

 4    saying I don't expect -- maybe if you want to try and

 5    submit it to me today, fine, I'll leave that up to you.

 6              So what's next on your side?

 7              MS. CAHOON:  Your Honor, and I do, just to answer

 8    the question you just asked, I think our preference would

 9    be to have post -- would be to have post-hearing briefing

10    if this Court --

11              THE COURT:  That's my custom.

12              MS. CAHOON:  We are not calling anyone

13    additional, so we'd be happy to move for admission of our

14    exhibits.

15              THE COURT:  Any objection to the items contained

16    in their binder?

17              MR. VANN:  No, Your Honor.

18              MS. CAHOON:  Thank you, Your Honor.  Then we have

19    nothing further.

20              THE COURT:  Including Exhibit Number 2, the

21    article itself?

22              MS. CAHOON:  The lower receiver itself, as well

23    as the firearms are government's exhibits for Your Honor.

24    If for some reason the government doesn't move to admit

25    them, then we would ask that they be admitted.

1          THE COURT:  Obviously I'm not going to take the

2    weapon.  Just -- government, what's your -- my question,

3    really, is how much of a break should we take, ten minutes

4    or so just to --

5          MR. WELDON:  A short break would be fine, Your

6    Honor, and then maybe expect half hour or 40 minutes

7    additional testimony from our witness.

8          THE COURT:  What if I charge you a dollar a

9    minute for every minute after that?

10         MR. WELDON:  Maybe five minutes after that,

11   Judge.

12         THE COURT:  That's okay.  If we take the time

13   we've taken so far, that's fine.  My reputation for brevity

14   in allowing its opposite is not that great anyway.  So

15   seriously let's take about a ten minute break rather than a

16   lunch break.

17              (A brief recess was taken.)

18         THE COURT:  The government may proceed.

19         MR. WELDON:  Your Honor, the government calls

20   special -- I'm sorry, Firearm's Enforcement Officer Daniel

21   Hoffman to the stand.

22         THE COURT:  Is there any objection to his

23   qualifications for the matter at hand, for purposes of this

24   hearing anyway?

25         MS. JOHNSON:  No, for purposes of this hearing,

 1    no, Your Honor.

 2                    DANIEL HOFFMAN,

 3    was herein, called as if upon examination, was first duly

 4    sworn, as hereinafter certified, and said as follows:

 5                    THE COURT:  Good morning.  Good noon, I guess.

 6    Once again, about that distance.  Mr. O'Kelly did a fine

 7    job actually.

 8                    Tell me your name, please.

 9    A.        Daniel Hoffman, H-O-F-F-M-A-N.

10                    THE COURT:  Okay.  And are you presently

11    employed?

12    A.        Yes, sir.  Currently I'm employed with the

13    Firearm's and Ammunition Technology Division of the ATF.

14                    THE COURT:  How long have you been employed with

15    that division or unit?

16    A.        I began there in January of 2016.

17                    THE COURT:  And how long have you been employed

18    by ATF?

19    A.        That's when I joined ATF, Your Honor.

20                    THE COURT:  And before that what occupation did

21    you have?

22    A.        Before that I performed security at government

23    facilities.

24                    THE COURT:  And for whom?  Was there a particular

25    agency or set of agencies, or was it sort of a rotating

ATF071389

Defs.' Reply App. 116

1   assignment?

2   A.        It was a contractor that worked for Federal

3   Protective Services.

4            THE COURT:  How long did you work for them?

5   A.        About three-and-a-half years I believe.

6            THE COURT:  Okay.  And before that?

7   A.        Before that I went back to school to get my

8   education after my military time.

9            THE COURT:  Okay.  Where was that, what was the

10  education?

11  A.        I attended, or I went online to Ashford

12  University where I received a Bachelors in Business

13  Economics and a Masters Degree in Business Administration.

14           THE COURT:  Okay.  And before that?

15  A.        Before that I kind of have duel employment.  I

16  worked retail and management, along with served in the

17  National Guard.

18           THE COURT:  Okay.  How long were you in the

19  National Guard?

20  A.        Approximately 13-and-a-half years.

21           THE COURT:  And are you still -- are you in the

22  reserve or --

23  A.        No, sir, I left after my deployments.

24           THE COURT:  What rank did you attain?

25  A.        Sergeant E-5.

ATF071390

Defs.' Reply App. 117

1                THE COURT:  Okay.  And what was your specialty or

2       whatever in the National Guard, what were you trained to

3       do?

4       A.       I began as a -- the first four-and-a-half years

5       as a small arm's repairman, basically trained on all the

6       weapon systems.  After that I moved over to infantry where

7       I did a few deployments in Iraq and was basically the

8       unit's weapons Sergeant.

9                THE COURT:  What does that mean?

10      A.       I trained my soldiers on -- especially when we

11      went to Iraq, we were a light infantry group, and we were

12      given vehicles so we didn't have a lot of experience on the

13      larger machine guns, the Ma Deuce 50 caliber machine guns

14      and Mark 19 grenade launcher, I got everybody up to speed

15      on them and maintain those weapon systems.

16               THE COURT:  How did you learn the information and

17      gain the experience necessary to tell other folks how those

18      things worked?

19      A.       Essentially through my time as small arms

20      repairman, little more than just armorer, you're completely

21      trained on the operating systems, not just how to break

22      them down and reassemble them, but the principles of how

23      they operate.

24               THE COURT:  And what kind of firearms or other

25      weapons are, quote, small arms?

ATF071391

Defs.' Reply App. 118

1   A.          We started with the M-9 Beretta pistol, and we

2   went all the way up to 155-millimeter Howitzer Cannon which

3   can expel a projectile 30 miles, so it's quite a big thing.

4             THE COURT:  So a sidearm is a sidearm, but not

5   all small arms can be carried in one hand or slung across

6   your back?

7   A.          Correct, Your Honor.

8             THE COURT:  And is there any other training or

9   experience that you've had that, in your view, qualifies

10   for the question, as you understand you may be asked, and

11   the testimony you expect to offer?

12   A.          Primarily my training as my time in the ATF, we

13   do a very thorough two year on-the-job training program

14   when we become an FEO.

15             THE COURT:  When did you join the ATF?

16   A.          January of 2016.

17             THE COURT:  '15, '16?

18   A.          '16, Your Honor.

19             THE COURT:  '16.  So been about a year and eight

20   or nine months since you completed that portion of your

21   activity, your training; is that correct?

22   A.          Yes, Your Honor.

23             THE COURT:  And once again, what do you do day in

24   and day out, what are your -- what's the scope and span of

25   your assignment with ATF?

1   A.          Essentially the Firearms and Ammunition

2   Technology Division provides the technical guidance and

3   classification on how items fall under the federal law.

4            THE COURT:  Okay.  What does that -- how do you

5   go about determining that?

6   A.          So my day-to-day operations we would receive an

7   item either for a criminal investigation or for an industry

8   evaluation, and determine either, yes, this falls under the

9   GCA or the NFA and make a classification based on that.

10           THE COURT:  Gun Control Act or National Firearms

11  Act, and you say an item can fall under either of those?

12  I'm sorry, it was my impression that the Gun Control Act

13  had replaced the National Firearms Act.

14  A.          No, Your Honor.  The Gun Control Act replaced

15  Federal Firearms Act, the National Firearms Act is still in

16  effect.

17           THE COURT:  My mistake then, thanks for that

18  correction.  And then so you receive an item, what do you

19  do then?

20  A.          We examine it.  If it's a full firearm like the

21  assembled AR type firearm, we'll do a safety check and make

22  sure it's safe, we'll determine how it functions, its

23  physical characteristics.  We'll photograph it, and we'll

24  evaluate on how it falls under our definitions, both

25  statutory and regulatory.

1          THE COURT:  For example, if you were to receive

2     an AM-15, would your evaluation ascertain whether it had

3     been altered to fire in automatic mode?

4     A.          An AM-15 like stripped receiver, Your Honor, or

5     complete firearm?

6          THE COURT:  I'm sorry, the whole thing, the

7     government -- whatever the government's exhibit is.

8     A.          Absolutely.  We would do a function test to

9     determine how that weapon is firing and whether it's

10    capable of fully automatic firing.

11         THE COURT:  Okay.  And what other sorts of tests

12    or determinations would you do?

13    A.          In addition to the function test, we'd actually,

14    if safe, go back and do a live test fire.  We have a range

15    in our office, Your Honor.

16         THE COURT:  Okay.  Did you do -- did you do

17    anything within the line of your ordinary duties, not as an

18    expert, in line of your ordinary duties, with regard to the

19    items at issue in this case, the specific items?

20    A.          Yes, Your Honor.  I wrote the criminal technical

21    report on this case.

22         THE COURT:  Okay.  Now we get to why you're here.

23    I understand now, okay, among other reasons.

24         And counsel, it's not -- you are, once again?

25         MR. JACOBS:  Jonathan Jacobs, sir.

ATF071394

**Defs.' Reply App. 121**

1          THE COURT:  Mr. Jacobs, of course go ahead.

2                    DIRECT EXAMINATION

3    BY MR. JACOBS:

4    Q.        Yes, Your Honor, thank you.  Mr. Hoffman, just a

5    few more questions about AR-15 and AM-15 specific training

6    in your background.  In your military, did you deal with

7    those types of weapon systems?

8    A.        Yes, the AR or M-16 as it's known in the

9    military, it's the primary weapon of all military members.

10   Q.        What's the difference between the M-16 and the AR

11   type weapon system?

12   A.        The M-16 is capable of fully automatic fire,

13   three round burst fire, it would be considered a

14   machinegun.

15   Q.        It operates the same way, though, right?

16   A.        The design and operation is identical.

17   Q.        Okay.  And in -- as an FEO -- in your training as

18   an FEO did you do specific training on AR-15 style rifle or

19   have references when making those types of classifications?

20   A.        Yes, the AR being probably the most type of

21   firearm in America, we definitely focused on that.  You

22   mentioned references.  We have the national firearms

23   collection which houses approximately 15,000 firearms.

24   This would include probably 100 AR different types of

25   firearms and another 100 or so AR/M-16 type receivers.

ATF071395

Defs.' Reply App. 122

1   Q.        And do you have any expert materials that you

2   reference as well?

3   A.        We also maintain a library of periodicals and

4   books, that library consists of approximately 2,000 books

5   on firearm and firearm-related topics.

6   Q.        I imagine, Mr. Hoffman, your experience involves

7   many manufacturers of AR-15s?

8   A.        Yes, I've toured many manufacturers of firearms

9   and ammunition, several of which manufacture AR-type

10  firearms.

11  Q.        Can you give us some examples or --

12  A.        Yes, I've been to LWRC in Cambridge, Maryland and

13  up north to Smith & Wesson, Remington and Colt as well.

14  Q.        And they all make an AR-15 style not -- not -- an

15  AR-15 style weapon?

16  A.        That's correct.

17            THE COURT:  Duplicate -- whatever the name,

18  whoever the manufacturer, it's, in all significant

19  respects, a clone, a duplicate, the same thing; is that

20  correct, or not?

21  A.        Yes, Your Honor.

22            THE COURT:  Go ahead, Mr. Jacobs.

23            MR. JACOBS:  Thank you, Your Honor.

24  BY MR. JACOBS:

25  Q.        As far as your -- you briefly talked about your

1   experience with Federal Regulation and the Gun Control Act

2   and National Firearms Act, what's your experience with

3   training in those different provisions?

4   A.       During the two year on-boarding process that we

5   talked about, we do a lot of seminars taught by lawyers,

6   actually, on not just the regulations under the Gun Control

7   Act, but also the Congressional hearings behind them, how

8   we got to where we are today.

9   Q.       And can you give The Court an idea of who -- when

10  you receive a firearm, as you did in this case, who do you

11  usually receive it from?

12  A.       We have an evidence room where all of our -- when

13  a special agent or even another agency needs a

14  classification, sends it in, we have a firearms evidence

15  specialist who processes it, and then when a report gets

16  assigned, like this one got assigned to me, we go and we

17  check it out.  We sign a log book basically saying we're

18  taking possession of that evidence, and then we return it

19  to our workstation.

20  Q.       But who are your customers; where do they usually

21  originate from, just ATF or --

22  A.       Generally we have an ATF work flow number, a U.I.

23  number it's called, but we also do Homeland Security, FBI,

24  DEA cases.

25  Q.       Okay.  And in this case specifically, you stated

ATF071397

**Defs.' Reply App. 124**

1    that you reviewed the AM-15 in this case, and what was your

2    conclusion in this case?

3    A.        It's the receiver of an AR type firearm.

4    Q.        Okay.  I want to walk The Court down why ATF

5    has -- has said that this is the receiver of an AR type

6    firearm, and first I think it's important to start with the

7    AR-15 history.  Can you give us an idea of that history?

8    A.        The AR-15, which the assembled weapon was today,

9    the AR-15 type derived from an AR-10 type, which was the

10   inventor's original firearm, the military was looking for a

11   more scaled down weapon, so he reduced the size, him and

12   two or individuals.  He worked for a company called

13   Armalite, that's where the AR came from, and AR-15.

14   Armalite got in some financial trouble, sold the rights to

15   Colt, and Colt kind of made it what it is we know today.

16   It originally was adopted by the military in 1963 and went

17   into production in '64.  At the same time Colt made a

18   sporterized version for the --

19             THE COURT:  A what -- what version?  What was

20   the --

21   A.        Sporterized.

22             THE COURT:  Sporterized?

23   A.        That did not have the machinegun function for the

24   civilian market.

25   Q.        By sporterized, what do you mean by that?

1   A.          Essentially took away the third position for

2   automatic fire, removed parts such as the automatic sear.

3   Q.          And Mr. Hoffman, at that time when did that come

4   commercially, you mentioned it came commercially on the

5   scene --

6   A.          1964.

7   Q.          1964.  And at that time did Colt happen to

8   identify a piece or part as their frame or receiver?

9   A.          They marked their markings with serialized lower.

10  Q.          And that was in 1964?

11  A.          Yes.

12  Q.          Okay.  And Mr. Hoffman, how many -- let's go to

13  today, how many AR-15s are out there today?

14  A.          The National Sports Shooting Foundation, NSFS,

15  estimated a few years ago anywhere between 5 and

16  10 million.

17  Q.          Okay.  You said 5 and 10 million, okay?

18  A.          Yes, sir.

19  Q.          And how are those -- today how are AR-15 style

20  firearms identified, marking wise?

21  A.          How or where?

22  Q.          Where are the marks -- I'm sorry, I'll rephrase.

23              Where are the markings contained on the AR-15

24  style weapons today?

25              THE COURT:  By markings, do you mean the serial

1    number?

2    BY MR. JACOBS:

3    Q.        The serial numbers, the manufacturer's markings?

4    A.        They're found on the receiver, the lower

5    assembly.

6    Q.        Okay.  I'd like to talk to you a little bit about

7    your knowledge of the history of the Gun Control Act

8    because I think it's directly relevant here to -- to your

9    classification, and ATF's continued classification of

10   the -- of the lower receiver of an AR as the firearm frame

11   or receiver.  So what was the Gun Control Act predecessor?

12   A.        The Federal Firearms Act, which was enacted in

13   1938.

14   Q.        And in -- in that, that predecessor, what -- what

15   was defined as a firearm, or what was included?

16   A.        I don't know the definition verbatim, but it was

17   not only a weapon that expelled a projectile but any part

18   or parts of a firearm.

19   Q.        So any part --

20            THE COURT:  If I may, for example, if -- and I --

21   my familiarity with what I'm about to say is, you know,

22   when I was eight years old with a cap gun, okay, but

23   there's a little plastic part on the handle of the toy

24   revolver, and that was screwed in, if memory serves, if

25   that were a real weapon, okay, would that little screw

1    that, you know, held the little plastic part of the grip

2    on, that would constitute a firearm, the screw itself, the

3    little teeny thing?

4    A.        If it was a live firearm, yes, Your Honor.  Yes,

5    that would have been a firearm under the Federal Firearms

6    Act.

7            THE COURT:  When they said any part, even

8    something as -- I thought so, but I -- that came to mind,

9    just curious.  Go ahead.

10           MR. JACOBS:  Thank you, Your Honor.

11   BY MR. WELDON:

12   Q.        How many parts are on an AR-15 roughly?  I know

13   you --

14   A.        It would depend on the sighting system, the

15   barrels.  In the lower with the collapsed stock, the last

16   one I built had 36 components in the lower, I would say

17   another 20, 25 in the upper, so 50 to 60 perhaps.

18   Q.        What's the smallest part, along the same question

19   as Your Honor's question here?

20   A.        There are very tiny springs, I'm holding up my

21   fingers about a quarter inch roll pins, about a quarter to

22   3/8 of an inch long.

23   Q.        Let's fast forward to the Gun Control Act.  What

24   did the Gun Control Act of 1968 do then as it pertains to

25   firearms' parts?

ATF071401

Defs.' Reply App. 128

1    A.        As it pertains to firearms' parts, Congress

2    intentionally replaced parts or parts of a firearm with

3    frame or receiver.

4    Q.        Do you happen to know, maybe you don't, do you

5    happen to know why they did that?

6    A.        They felt it was unruly to regulate all those

7    little individual pieces that could be used in things

8    outside of firearms as well.

9    Q.        Okay.  And so now the current Gun Control Act

10   definition, as we've heard from the defense, can you,

11   again, tell us that that includes the current firearm

12   definition under the Gun Control Act?

13   A.        Under the Gun Control Act, firearm is defined as

14   any weapon, including a starter gun, which will or is

15   designed to or may readily be converted to expel a

16   projectile by the action of an explosive.

17             The second part is the frame or receiver of any

18   such weapon.

19   Q.        Okay.  That's where we're concerned.  So you --

20   478.11, I'm sorry, where is -- where is the firearm frame

21   or receiver defined?

22   A.        It's defined in two Code of Federal Regulations,

23   478.11 and 479.11.  478.11 which supports the Gun Control

24   Act --

25             THE COURT:  Hold on just a moment, please.  What

1    was that first number?

2    A.        478.11, 27 CFR.

3              THE COURT:  Pardon me?

4    A.        27 CFR, Section 478.11.

5              THE COURT:  Hold on a second, I'm sorry.  Okay.

6    What does this say?

7    A.        As in how does it define frame or receiver?

8              THE COURT:  Yeah.

9    A.        That part which houses the hammer, the bolt, or

10   breechblock, and the firing mechanism, and which is usually

11   threaded at its forward portion to receive the barrel.

12             THE COURT:  Okay.  Go ahead.

13             MR. WELDON:

14             MR. JACOBS:  Thank you, Your Honor.

15   BY MR. JACOBS:

16   Q.        You mentioned 479.11.  What regulation is that?

17   A.        That's the regulation for the National Firearms

18   Act.

19   Q.        Can you give us an idea of what firearms are

20   covered under the National Firearms Act?

21   A.        That's the Gun Control Act, essentially covers

22   conventional-type weapons.  The National Firearms Act

23   contains eight specific categories of firearms which

24   Congress felt were dangerous and unusual.  These types of

25   firearms include machine guns, silencers, destructive

ATF071403

Defs.' Reply App. 130

1  devices, short barrel weapons.

2  Q.        Is the 478.11 definition the same, definition of

3  frame or receiver the same?

4  A.        Yes, sir, it is.

5  Q.        Okay.  And so the Federal Firearms -- I'm sorry,

6  the Federal Regulation, or 478.11, you mentioned that

7  definition, and you -- classify the M-15.  What parts does

8  four -- what parts of the M-15 are also in 478.11, what

9  elements does that meet?

10  A.        It meets two of the elements under the definition

11  of receiver.  It houses the hammer and firing mechanism.

12  Q.        How many firearms on the market also house all of

13  those parts, or may not house all of those parts?

14        THE COURT:  That's two different questions.

15  BY MR. JACOBS:

16  Q.        Sorry.  How many firearms on the market house all

17  of those parts?

18  A.        It's a, at this point, minority of firearms

19  currently manufacture that contain all three elements of

20  the frame or receiver definition.

21        THE COURT:  Let me ask you this, do you -- do you

22  have an opinion, to a reasonable degree of within your

23  particular field of expertise, as to the approximate

24  percentage of all firearms in the United States, whether on

25  the market or otherwise, contain -- or have a receiver that

1    has a housing that has all four of those components?

2    A.        Currently manufactured, my opinion would be

3    approximately 10 percent.  In previous years going all the

4    way back to '68, that may rise to 20 to 25 percent net.

5              THE COURT:  Okay.  Do you know how many firearms

6    in toto are manufactured within the United States in a

7    given year, roughly?  And if you don't, that's fine.

8    A.        I should know that, Your Honor, but I can't put

9    my --

10             THE COURT:  Do you know approximately how many

11   firearms, if I were to take a census of firearms next year

12   along with everything else?

13   A.        We're well above 150,000,000.

14             THE COURT:  Okay.  You may continue, counsel.

15             MR. JACOBS:  And Your Honor --

16             THE COURT:  If we apply your 10 -- so of the

17   150,000,000, once again, realizing that, you know --

18   A.        I would conservatively say --

19             THE COURT:  It's not statistically accurate, but

20   based upon your background, training and education, to a

21   reasonable degree of certainty?

22   A.        I would say --

23             THE COURT:  Conclusive, but not speculation.

24   A.        I would say 100 million of those do not meet the

25   complete definition of frame or receiver.

ATF071405

Defs.' Reply App. 132

1    Q.       Can you give us --

2             THE COURT:  Counsel, both sides, if there's

3    further data of that sort, I -- quite candidly I think it's

4    highly relevant, and the record will be open for you to

5    refine that -- those figures.

6             MR. JACOBS:  Sure, Your Honor.

7             THE COURT:  Or in terms of annual production and,

8    you know, as I say the census, as it were, realizing that

9    the second one will necessarily have an element of

10   speculation, but nonetheless if you each come up with some

11   sort of data on that information I think it's pertinent.

12   Thank you.

13            MS. JOHNSON:  Your Honor, I'm sorry, can you

14   clarify what you said you wanted additional information on,

15   did you say annual production?

16            THE COURT:  He -- he basically gave two bits of

17   testimony, one was whatever the annual production is, it

18   would be his testimony about 10 percent of those weapons

19   contain a receiver that contains, would meet the literal --

20   literal terms of the -- of the regulation at issue here.

21   He also testified, quote, well above 150,000,000, so let's

22   deal with 150,000,000 firearms out there, literally able to

23   somehow go out and take a census, as I understand his

24   testimony, the head count or the gun count would be

25   something above 150.

1          Second part of my question then in that regard

2    was, again, to a reasonable degree of certainty, within his

3    field of expertise, what percentage -- percentage of those,

4    or how many of those, and he said about 100,000.  So in

5    other words -- about 100,000 would meet the term, another

6    50,000 or greater number because of prior modes of

7    production and so forth.  That's all.  And that may be it.

8    I'm just saying to both parties if there is somewhat more

9    precise, somehow derived, and that's fine, you may offer

10   that as exhibits in your -- in your briefing.  That's all.

11          MS. JOHNSON:  Thank you, Your Honor.

12          THE COURT:  Did that answer your question?

13          MS. JOHNSON:  Yes, Your Honor.  Thank you.

14          MR. JACOBS:  Thank you, Your Honor.

15          THE COURT:  Go ahead.

16   BY MR. JACOBS:

17   Q.      As far as some examples, specific examples of

18   firearms that do not contain all three parts, can you

19   provide some of those weapons systems outside of the AR-15?

20   A.      When I look at semi-automatic self loading

21   pistols, basically handguns that are not revolvers, I can't

22   think of any that would meet all three elements,

23   specifically the most important -- lost my words, excuse

24   me.  The Glock is the primary weapon of law enforcement

25   officers of the country.  The Glock does not use a hammer,

1    it's a striker fire system, essentially the fire pin is

2    under spring tension, gets cocked, sear releases it and it

3    strikes the cartridge.  Having no hammer, that would put

4    all Glock pistols outside of a firearm that met the

5    definition, and many, many firearms are now cloning or

6    copying the Glock type of firearm.

7         THE COURT:  And the Glock is, at least from your

8    testimony, fairly popular?

9    A.        Popular is the word I was looking for.

10        THE COURT:  Pardon me?

11   A.        Popular is the word I was looking for I couldn't

12   find.

13        THE COURT:  Is it popular in private market?

14   A.        Very, very, Your Honor.

15        THE COURT:  Well, again, if you can testify to a

16   reasonable degree of certainty, based upon your background,

17   training, experience and your overall familiarity with the

18   subject, I'm good to ask, of the handguns, of -- of the

19   pistols, take out revolvers, okay, but of the pistols, what

20   percentage are Glocks being most recent production, or your

21   best estimate to a reasonable degree?

22   A.        I couldn't really ballpark that, Your Honor.  At

23   one point, law enforcement they were almost all --

24        THE COURT:  That's fine, okay.  Your answer is

25   you can't give an answer, and that's fine.  Thank you, sir.

ATF071408

Defs.' Reply App. 135

1    BY MR. JACOBS:

2    Q.          And so the Glock doesn't contain a hammer at all,

3    so it's missing one of the elements?

4    A.          Yes, sir, that's correct.

5    Q.          Okay.  And so you get a Glock in or you get an

6    AM-15 receiver in, and you're asked to classify the

7    receiver, do you look at the regulatory definition at all

8    in that case?

9    A.          At that point a precedence has been set like the

10   frame of a Glock pistol, the frame is interchangeable with

11   the receiver, receiver usually for pistols, has been well

12   established way before I joined ATF.

13   Q.          Okay.  So let's move to the AR-15.  You do rely

14   on precedence.  When was the first classification of the

15   AR-15, AM-15 style firearm by ATF?

16   A.          The oldest letter that I'm aware of that

17   determined the lower as the receiver of an AR was dated

18   1972, I believe January 19th.

19   Q.          Okay.  And -- and that's been consistent for the

20   last 50 years?

21   A.          Yes, the lower has always been the receiver of an

22   AR.

23   Q.          You've never classified the upper as the receiver

24   at ATF for the AR-15?

25   A.          Not for AR type firearms.

1    Q.         Okay.  And when you -- when you receive a new

2    receiver, a brand-new receiver, you've never seen that

3    firearm before or a new firearm model that comes in, do you

4    even use the firearm frame or receiver definition at this

5    point?

6    A.         Yes, we refer to it to determine which part best

7    meets the definition.

8    Q.         Okay.  And best meets the definition, can you

9    give us an example of that?

10             THE COURT:  Can you put a hold -- I apologize for

11   interrupting because I know you're heading on down the

12   line.  Was it your testimony that the letter of -- 1972

13   letter classified the lower receiver as a firearm -- I

14   mean, tell me again what the 1972 letter said.

15   A.         In 1972 someone wrote into the Alcohol, Tobacco

16   and Firearms unit, which was still part of the IRS, and

17   said, hey, we have something called an upper receiver and

18   something called a lower receiver.  What is the receiver?

19   By that point the Gun Control Act was in effect and one

20   part had to be classified as the receiver.  We responded

21   that the lower was the receiver of the AR type firearm.

22             MR. JACOBS:  Your Honor, I'm sorry, that's

23   Government's Exhibit 3 in our motion to dismiss brief, our

24   opposition to the motion to dismiss.

25             THE COURT:  Okay.  Thank you.  Why do you say

 1   only one part can be classified as firearm?

 2   A.        Under the statutory regulations, 923(i), it

 3   requires a license manufacturer or license importer to mark

 4   the receiver of the weapon.

 5            THE COURT:  Okay.  Go ahead.

 6   BY MR. WELDON:

 7   Q.        And Mr. Hoffman, along those lines it requires --

 8   do you necessarily see every manufacturer's weapon that

 9   they make?

10   A.        No.

11   Q.        Okay.  So someone can make a weapon and not send

12   it in to you for a determination, correct?

13   A.        Can you clarify, are we talking about licensees

14   or --

15   Q.        Non-licensees.

16   A.        -- non-licensees?

17   Q.        Yes.

18   A.        Yes, there's no requirement for you them to

19   submit a sample.

20   Q.        What about licensees, is there a requirement for

21   them to submit a sample?

22   A.        No, sir.

23   Q.        Okay.

24            THE COURT:  Counsel, I apologize for

25   interrupting, but do you know -- or perhaps it may or may

ATF071411

**Defs.' Reply App. 138**

1  not have any relevance at all -- whether that regulation,

2  973 -- or the 9731 was adopted before or after the

3  regulation at issue here, or they've been -- they were

4  concurrent or --

5  　　　　　　MR. JACOBS:  I'm sorry, 923(i)?

6  A.　　　923(i).

7  　　　　　　MR. JACOBS:  923(i), Your Honor.

8  　　　　　　THE COURT:  Is that statutory?

9  　　　　　　MR. JACOBS:  Yes, that's --

10  　　　　　　THE COURT:  I misunderstood.

11  　　　　　　MR. JACOBS:  18 U.S.C. 923(i).

12  　　　　　　THE COURT:  Once again, it's a statute, okay.

13  923(i)?

14  　　　　　　MR. JACOBS:  Yes, sir.

15  　　　　　　THE COURT:  What does it say, best of your

16  recollection?  I think it was testified to by Mr. O'Kelly,

17  but go ahead and tell --

18  A.　　　License importers or license manufacturers are

19  required to conspicuously mark on the frame or receiver of

20  a firearm a unique serial number.

21  　　　　　　THE COURT:  That's right, okay.  Okay, go ahead.

22  BY MR. WELDON:

23  Q.　　　And Mr. Hoffman, there are other markings on the

24  firearm other than the serial number, correct?

25  A.　　　Correct, a licensee is required to mark

ATF071412

Defs.' Reply App. 139

1    manufacturer's name, a model if designated, caliber and

2    city and state along with the serial number.

3    Q.        And where's that requirement?

4    A.        That's in the Code of Federal Regulations for

5    478.92.

6    Q.        Okay.  And in this case, how long has Colt been

7    marking -- or I'm sorry, not Colt, how long has the AR-15

8    been marked on the lower receiver?

9    A.        Even the original prototypes of the ARs were

10   marked on the lower.

11   Q.        Okay.  I want to go back to the question about if

12   you receive a firearm and it doesn't house all the parts,

13   you still reference the firearm frame or receiver

14   definition, correct?

15   A.        Correct.  We still utilize it to find the part

16   that best meets it.

17   Q.        Can you give us an example how you specifically

18   would utilize that?

19   A.        We look for which part houses the hammer, the

20   firing mechanism and the bolt, see if there's one part that

21   has two.  It's -- basically we are looking for a critical

22   part that we can, you know, direct them that this is the

23   frame or receiver of the weapon, and that's where the

24   serial number needs to be marked.

25   Q.        But Mr. -- how can you do that?  How do you --

ATF071413

Defs.' Reply App. 140

1    how do you depart from that definition when the three

2    elements are not met?

3    A.        As part of the preamble to 478.11, it says that

4    these are the definitions of the terms unless manifestly --

5    manifestly incompatible.  And it would be incompatible,

6    specifically like with the AR, the upper house is one, the

7    lower house is two, but Congress continued for a single

8    part to be the frame or receiver.

9    Q.        Under the Gun Control --

10            THE COURT:  How do you know that?

11   A.        Because they -- Your Honor, they took out any

12   part or parts in order to control a frame or receiver.

13            THE COURT:  Is that 923 little I, is that where

14   that's manifested or --

15   A.        I believe that would be in the frame or receiver,

16   and I'm a little unsure, Your Honor.

17            THE COURT:  Okay.  Well, I'll leave it then to

18   counsel to address that issue.

19            MR. JACOBS:  Your Honor, we cited legislative

20   history in our brief that indicates that they intended to

21   mark one part, or intended to regulate one part.

22            THE COURT:  I'm sorry.  As I say, I read it a

23   week or so ago and I've forgot.  That's fine.

24            MR. JACOBS:  No problem.

25   BY MR. WELDON:

ATF071414

Defs.' Reply App. 141

1    Q.        So Mr. Hoffman, in this case you received AR-15

2    type lower receiver.  In 1971 ATF classified it.  Why did

3    they classify the lower and not the upper?

4    A.        Essentially they were adopting the -- where Colt

5    had already marked it, there was nothing about the lower

6    being a receiver that prevented the administration of the

7    Gun Control Act.  It fell within part of the frame or

8    receiver definition, and we just essentially adopted it.

9              MR. JACOBS:  Okay.  Your Honor, one moment to

10   consult?

11             THE COURT:  Okay.

12             MR. JACOBS:  Your Honor, in response to your

13   previous question about how many exactly firearms are

14   manufactured in the United States, we would probably have

15   to do further research on that.

16             THE COURT:  And that's fine, that's what I'm

17   saying.  The record will remain open for refinement of

18   that, that statistical data.

19             MR. JACOBS:  Thank you, Your Honor.

20             THE COURT:  And if there's other statistical data

21   that seems pertinent, quite candid, it seems to me if you

22   have 100,000 weapons that are not regulated, at least under

23   Chevron, it seems to me to be -- to be serious, there are

24   serious problems because you get 2/3 of all firearms that

25   are not covered by the Gun Control Act or National Firearms

1    Act.

2              MR. JACOBS:  Thank you, Your Honor.

3              THE COURT:  Might be news to Congress.  Go ahead.

4    I'm being very candid with you only.

5              MR. JACOBS:  Thank you, Your Honor.

6              THE COURT:  If only 10 percent of the weapons

7    streaming off the world's production lines coming into this

8    country being manufactured here, whatever, 10 percent of

9    weapons manufactured here are regulated, okay, so I do

10   think that further refinement, to the extent that there is

11   data out there would be meaningful, at least as I read the

12   Chevron, and as I say, the problem with looking just at the

13   regular -- the preamble, there is, I -- I think that the

14   word thereof refers back to this part.  And as I

15   understand, maybe erroneously, this part means the

16   regulations themselves.  On the other hand, you have cited,

17   and there may be other aspects of the legislative history

18   that, you know, make -- or do not make clear, or make

19   unclear, whether the regulation, the inconsistency, if

20   there is one, between the defendant's interpretation of the

21   regulation, and they're entitled to a motion to dismiss

22   because the lack of regulation of the part that's at issue

23   here --

24             MR. JACOBS:  Your Honor --

25             THE COURT:  -- is unregulated -- you see where

 1   I'm going?

 2              MR. JACOBS:  Yeah.  So, Your Honor, maybe perhaps

 3   to clarify, is --

 4   BY MR. JACOBS:

 5   Q.        Mr. Hoffman, where's the definition of frame or

 6   receiver found, what part of the CFR is that found in?

 7   A.        It's in 478.11, meaning and terms, and 479.11,

 8   meaning and terms.

 9   Q.        So 478 specifically, right?

10   A.        As it applies to this case, yes, sir.

11   Q.        Okay.  And -- and to mark a firearm, where is

12   that found, what part of the CFR is that found in?

13   A.        Section 478.92.

14   Q.        And do you know where to transfer a firearm,

15   where that is found in?

16   A.        I'm not sure which section it's found.

17   Q.        That's fine.  Mr. Hoffman, I want to ask you one

18   more question.

19              THE COURT:  In other words, is it the

20   government's contention that if it has a serial number it

21   is a firearm?

22              MR. JACOBS:  Not necessarily, Your Honor.

23              THE COURT:  I just -- I'm not -- I don't have the

24   terms, the latter statute in front of me, so --

25              MR. JACOBS:  Okay.

ATF071417

Defs.' Reply App. 144

1          THE COURT:  It says what it says about where you

2     mark the firearm.  Go ahead.

3     BY MR. WELDON:

4     Q.       Mr. Hoffman, what did you do with the specific

5     firearm when it was received in your examination?

6          THE COURT:  I am very sorry, but, again, reask

7     the question.  Is your answer not necessarily to my

8     question about the regulation informing the manufacturing

9     where to mark the firearm, not necessarily because it may

10    be marked, as we had testimony from Mr. O'Kelly, in a

11    number of places may bear the same marking, is that --

12         MR. JACOBS:  I'm sorry, Your Honor, can you

13    repeat that?  I'm not sure I understood.

14         THE COURT:  My question was -- my first question

15    was, oh, if it bears the marking, is it -- if a particular

16    component bears the marking, i.e. the serial number, is

17    that ipso facto a firearm?  And you said not necessarily.

18    So then I'm simply trying to understand your not

19    necessarily response.  Simply is it not necessarily a

20    firearm, a component bearing a marking because some

21    manufacturers may repeat the serial number elsewhere on the

22    weapon?

23         MR. JACOBS:  Precisely, Your Honor.  Some

24    manufacturers may put -- sometimes this is actually for

25    tracing processes.  For example, Glock will place it on the

1    frame or receiver, and also place it on other places on the

2    firearm for when it's obliterated, but our -- that the --

3    that the manufacturer themselves, as in this scenario with

4    the AR-15, identified that frame or receiver part as the

5    frame or receiver.  ATF accepted it in 1971.  They put the

6    serial number, the manufacturer's markings on them, and

7    they've been sold for 50 years like that.  And it's not

8    necessary -- ATF is not in the business of if a

9    manufacturer submits a firearm to ATF to look at it and say

10   that -- that can't be the firearm frame or receiver, we

11   will examine it, determine whether it meets the definition

12   and it's compatible with the Gun Control Act.

13   BY MR. JACOBS:

14   Q.       Mr. Hoffman, just to conclude what you did with

15   this firearm specifically, when you received this AM-15

16   receiver, what did you do with it?

17   A.       As part of my examination, I took the first

18   receiver I had, and I actually assembled it into a complete

19   firearm to demonstrate it was the receiver of that firearm.

20   I utilized a completed upper to save time, and assembled

21   the firearm.

22   Q.       And it worked, you assembled it completely?

23   A.       Yeah, it was a fully functional AR type firearm.

24   Q.       At that point it meets the definition under

25   subpart A?

1    A.        Correct, yes, sir.

2              MR. JACOBS:  No further questions, Your Honor.

3              THE COURT:  You want a moment?

4              MS. JOHNSON:  No, Your Honor.  Thank you.  I

5    appreciate it.

6                        CROSS-EXAMINATION

7    BY MS. JOHNSON:

8    Q.        Good afternoon.

9    A.        Good afternoon, ma'am.

10   Q.        I'd like to first thank you for your service to

11   our country.  Your vita, which you have an exhibit book in

12   front of you, I think that we have it labeled as

13   Defendant's Exhibit C, 1 through 4.  Can you identify that

14   document?

15   A.        Yes, ma'am.  That's my curriculum vitae or CV.

16   Q.        And it reflects that military service from 1995

17   to 2008; is that correct?

18   A.        Yes, ma'am, that was my years in the military.

19   Q.        And did you receive much of your training,

20   whether it was on-the-job training regarding weapons while

21   you were in the military?

22   A.        Yes, ma'am.

23   Q.        Because I notice that in your vitae you don't

24   have the dates or the years that you receive the training.

25   I think on Page C-2, you specify the training you received

1    from ATF; is that correct?

2    A.        Yes, ma'am.  The military experience, which is 2,

3    goes into 3, I discussed my job as a small arms repairman,

4    there's no date on that, yes, ma'am.

5    Q.        So you've actually only been an ATF agent for the

6    last three years since 2016?

7    A.        It will be -- yes, ma'am, it will be four in

8    January.

9    Q.        And I believe that you said that while an ATF

10   agent, that you provided technical guidance.  Do you

11   actually go out into the field?

12   A.        Yes, ma'am.

13   Q.        And you also evaluate, for classification,

14   weapons, correct?

15   A.        Yes, ma'am.

16   Q.        Now, included in your training, you indicated

17   that you attended the new professional ATF National Academy

18   in Glynco, what year was that?

19   A.        Where is that listed, ma'am?

20   Q.        Well, let's see, I have it in my notes, so I --

21            THE COURT:  Ms. Johnson, if it is your point

22   you're about -- you are reaching is that Mr. -- Mr. O'Kelly

23   would appear to have an education, training, experience

24   that extends over a longer period, more substantive than

25   its scope and breadth, that's fine.  I think I can read

1    both CVs and take that into account.

2            MS. JOHNSON:  Thank you, Your Honor.

3    BY MS. JOHNSON:

4    Q.       Do you recall whether our expert, Daniel O'Kelly,

5    may have been one of your instructors?

6    A.       Ma'am, I didn't -- I didn't attend Glynco, that's

7    not in my CV.

8    Q.       Oh, I'm sorry, the entry operations investigative

9    basic course, is that one of the courses --

10   A.       That's part of Mr. O'Kelly's CV.

11   Q.       Okay.  I'm sorry.  You also included the fact

12   that you received manufacturing and historical instruction

13   at the following firearms factories.  During what time

14   frame would you have gone to actually visit some of the

15   factories that you set forth?

16   A.       All of the factories listed there were during my

17   time with ATF, ma'am.

18   Q.       Was that sponsored by the manufacturer or by ATF?

19   A.       It was part of our advanced interstate Nexus

20   tour, it was sponsored by ATF.

21   Q.       And were the lecturers employees of ATF, or were

22   they from the manufacturer?

23   A.       No, the manufacturer actually gave us essentially

24   a guided tour of their manufacturer process.

25   Q.       And so the historical instruction that you

1   received, that would have come from the ATF?

2   A.        Not there, ma'am.  That actually, like, for

3   instance, when we went to Smith & Wesson we were taught the

4   entire history of the company by someone from Smith &

5   Wesson.

6   Q.        So it's actually the firearms industry that

7   provides some of your background and training?

8   A.        Absolutely, part of our training, ma'am.

9   Q.        And that's sanctioned by the ATF?

10  A.        Yes, ma'am.

11  Q.        Now, during the investigation of my client,

12  Mr. Robison, did you confirm that the co-defendant, Richard

13  Rowold actually purchased the packet of 50 stripped

14  receivers?

15  A.        That's completely out of my realm, ma'am.

16            MR. JACOBS:  Objection, Your Honor.

17  BY MS. JOHNSON:

18  Q.        That was not a part of your investigation?

19  A.        No, ma'am.

20            MR. JACOBS:  That's not relevant to his --

21            THE COURT:  I would agree.  I would agree.  And

22  that -- that certainly is the government allegation, but I

23  think he would have to form that based upon, you know,

24  information obtained otherwise, which, of course, acquired

25  by law enforcement so it can be taken into account and

1    testified to, but go ahead.

2            MS. JOHNSON:  Thank you, Your Honor.

3            THE COURT:  Is it your understanding that the

4    government has alleged that the co-defendant was the actual

5    purchaser of the lower receiver?

6    A.       Your Honor, I read the ROI, that's the case

7    agent.  My job completely is classification.

8            THE COURT:  And, Ms. Johnson, you said purchased

9    the receiver, I assume you meant to include the adjective

10   lower receiver, correct?

11           MS. JOHNSON:  Yes, Your Honor.

12           THE COURT:  Okay.

13   BY MS. JOHNSON:

14   Q.       Well, following up with that, you testified that

15   you, to save time, tested one receiver, there were 50, is

16   that correct, were you aware of that?

17   A.       There were 15 that were submitted for

18   classification.

19   Q.       So only 15 were submitted, did you test each one

20   of those?

21   A.       I examined each one of those, I assembled one.

22   Q.       And according to your report, having assembled

23   it, you said that -- and we can turn to Government's

24   Exhibit 1, it's not in that book.

25           THE COURT:  Do I have a copy of those up here?

1          MS. JOHNSON:  Thank you.

2   BY MS. JOHNSON:

3   Q.          I'm going to hand you Government's Exhibit 1 if

4   you can identify it.

5   A.          Government Exhibit 1 is the technical report I

6   wrote on the 15 exhibits I examined.

7   Q.          And so on Page 2 of that report, you identified

8   that you test fired and assembled the firearm using --

9   utilizing Exhibit 21; is that correct?

10  A.          Yes, ma'am.

11  Q.          And then you listed Exhibits 25 through 38 each

12  consist of one AR type receiver manufactured by Anderson

13  Manufacturing?

14  A.          Yes, ma'am.

15  Q.          And the last sentence of that paragraph says

16  because they are identical I did not assemble and test fire

17  them; is that correct?

18  A.          Yes, ma'am.

19  Q.          So you simply -- I believe that there are

20  photographs, you simply examined each of the receivers, or

21  what's described as the lower receiver, and what is it that

22  you were looking for on each one?

23  A.          Just to make sure it was the same as Exhibit 21

24  that I did assemble.  The only difference being the serial

25  number in each exhibit.

1    Q.        You say the only difference is a serial number,

2    but you don't know if each one of them would actually

3    testify fire; is that correct?

4    A.        It's my professional opinion they would.

5    Q.        Based on the fact that you said that they were

6    all identical?

7    A.        Yes, ma'am.

8    Q.        Is it your testimony that none of these could

9    fail?

10   A.        A lower really never does fail, the stress point

11   would be in the upper, in the barrel extension.

12   Q.        Is it your testimony that they never fail?

13   A.        It's a possibility, a receiver extension could

14   crack.

15   Q.        Thank you.  Now, turning to the letter which is

16   attached, which you don't have a copy of, a copy that was

17   attached to the government's response in opposition to the

18   defendant's motion to dismiss, you referred to the letter

19   from, I think you said it was 1972 when lower receivers

20   were first identified as firearms.

21   A.        That's the earliest letter I'm aware of, yes,

22   ma'am.

23   Q.        And in that letter specifically, the letter comes

24   from manufacturer, and it's sent to the ATF, correct?

25   A.        Correct, a manufacturer is able to write in to us

1  to ask for guidance.

2  Q.          And yet in the response from the government, this

3  particular letter says this office has determined that for

4  the purposes of marking and control, the lower receiver is

5  the receiver of the firearm.  It doesn't say specifically

6  that a receiver is a firearm --

7  A.          No, ma'am.

8  Q.          -- in this particular letter?  And the definition

9  of a receiver, according to ATF, doesn't match the CFR,

10 does it, in terms of the components?

11 A.          The definition is in the CFR, are you asking if

12 it matches the AR?

13 Q.          Yes.

14 A.          No, ma'am, it does not.

15 Q.          Thank you.  Actually, in your testimony you were

16 talking about ATF, ATF can't determine specifically what

17 the classifications are, can it?

18 A.          Yes, ma'am, we can.

19 Q.          Well, when they do that, they have to follow the

20 law, don't they?

21 A.          Yes, ma'am.

22 Q.          Isn't as if they can simply change the law?

23 A.          No, we have no authority to change law, that's

24 legislative branch.

25 Q.          That's right.  So when The Court was asking the

ATF071427

Defs.' Reply App. 154

1    question about the serial number, the fact that the serial

2    number is placed on the lower receiver doesn't make it a

3    firearm, would you agree?

4    A.       Placing any marking on a part doesn't necessarily

5    make it something else.

6    Q.       Thank you.

7             MS. JOHNSON:  May I have just a moment, Your

8    Honor?

9             THE COURT:  Absolutely.  Yep.

10            MS. JOHNSON:  I have no further questions at this

11   time, Your Honor.  Thank you.

12            THE COURT:  Mr. Kurt?  Sure, of course.

13                  FURTHER CROSS-EXAMINATION

14   BY MR. KURT:

15   Q.       Sir, in your work with the ATF, have you, at any

16   time, been involved in the drafting of regulations?

17   A.       Regulation --

18   Q.       CFR regulations?

19   A.       Can you clarify, sir, what you're asking?

20   Q.       Have you had any involvement in the drafting of

21   what we call the CFR, the regulations?

22   A.       Oh, no, sir, I have not.

23   Q.       And what is the purpose of the requirements of

24   serialization of parts?

25   A.       It's for tracing purposes, sir.

1  Q.          Okay.  It's not there to identify a particular

2  part as a weapon or is not a weapon?

3  A.          No, sir, it's for tracing purposes.

4  Q.          Thank you.  If we were to talk about the upper

5  receiver of an AR-15 and the lower receiver of an AR-15, is

6  either one more lethal than the other?

7  A.          Not particularly, sir.

8  Q.          There's no lethality until all the parts are

9  together, isn't that correct?

10 A.          Right.  I think Mr. O'Kelly may have pointed out,

11 it is possible by taking a rod and a hammer to strike the

12 firing pin on an upper, but you would have a dangerous

13 situation because there's nothing really to contain the

14 explosion, but --

15 Q.          That's certainly not the case with the lower?

16 A.          Correct, sir.

17 Q.          All right.  And there was some discussion of, I

18 think it's Government's Exhibit -- the letter from the

19 manufacturer asking for clarification?

20 A.          Yes, sir.

21 Q.          Okay.  Are you aware of any other documents post

22 that which talk about this -- this problem of conflict

23 between CFR definition and what the ATF wants to call a

24 firearm?

25 A.          I'm sorry, sir, were you referring to the '72

ATF071429

Defs.' Reply App. 156

1    letter that I mentioned, or the '71 letter that Mr. O'Kelly

2    mentioned?

3    Q.      I think I'm referring to the '72 letter first

4    that you mentioned, which was the request for guidance,

5    correct?

6    A.      Correct, sir.  There was no -- it just asked is

7    the lower receiver or upper receiver, it didn't talk about

8    the definition of frame or receiver.  I believe the '71

9    letter was the one that may have mentioned that, I've never

10   seen that letter.

11   Q.      Okay.  But you're aware of it?

12   A.      Only from hearing it in court.  I've never, like

13   I said, examined that.

14   Q.      Okay.  Thank you.

15   A.      Yes, sir.

16           THE COURT:  Okay.  Mr. Jacobs, any --

17           MR. JACOBS:  One question, Your Honor.

18           THE COURT:  If I were to charge you a dollar for

19   every question it would be beyond the --

20                    REDIRECT EXAMINATION

21   BY MR. JACOBS:

22   Q.      Quickly, Mr. Hoffman, did you examine every one

23   of these AM-15 receivers?

24   A.      Yes, sir, I did.

25   Q.      And in your expert opinion, is every AM-15

ATF071430

Defs.' Reply App. 157

1    receiver the frame or receiver of a firearm?

2    A.        Yes, sir, it was.

3    Q.        Thank you.

4              THE COURT:  Okay.  Further -- Mr. Kurt, further

5    re-cross?

6              MR. KURT:  No, Your Honor.

7              THE COURT:  Okay.  Mr. Hoffman, you're free to go

8    or welcome to stay.  It's entirely up to you.

9    A.        Thank you, Your Honor.

10             THE COURT:  Okay.  Further witnesses -- or I

11   assume the government offers exhibits?

12             MR. VANN:  Yes, Your Honor, at this time --

13             THE COURT:  Except for the actual, you know,

14   weapon itself.

15             MR. VANN:  We would offer the introduction of 2,

16   3 and 4.  Of course we will maintain custody of those based

17   on the nature that they're firearms.

18             THE COURT:  And then whatever's in the binder,

19   you offer those too?

20             MR. VANN:  I don't think -- we don't have a

21   binder, Your Honor.  That was -- the binder, I believe,

22   was --

23             THE COURT:  That's right.  And this was the only

24   one here.

25             MR. VANN:  And Government's Exhibit 1 we didn't

ATF071431

Defs.' Reply App. 158

1    intend to offer into evidence, I don't know if defense

2    counsel wanted that.

3              THE COURT:  Do you care one way or the other?

4              MS. CAHOON:  Yes, Your Honor, we would like to

5    admit Government's Exhibit 1.

6              THE COURT:  I think it should be part of the

7    record.  It was testified to, and in case Melissa or I want

8    to refer to it while we work on the opinion, it's there.

9              MR. VANN:  Yes, Your Honor.

10             THE COURT:  No further evidence.  We'll confine

11   our examination into whatever he covered in his testimony,

12   though.  Okay.

13             MR. VANN:  Thank you, Your Honor.  No further

14   witnesses.

15             THE COURT:  Okay.  Anything further by way of

16   witnesses for this morning or this afternoon?

17             MS. JOHNSON:  No, Your Honor, but we want the

18   record to be complete.  We did have -- Defendant's Exhibit

19   C was just identified by Agent Hoffman, and that was his

20   CV.

21             THE COURT:  Okay.

22             MS. JOHNSON:  That was the only one we had not

23   requested submission.

24             THE COURT:  I thought I meant to simply admit

25   everything that was in the book.  Do you want to recall

ATF071432

Defs.' Reply App. 159

1  Mr. O'Kelly for any purpose?

2          MS. CAHOON:  Not at this time, Your Honor.  Thank

3  you.

4          THE COURT:  This is the time, okay.  Unless maybe

5  at trial, I understand.  Okay.  Mr. Vann, what -- let me

6  ask you this, let's start with Angela.

7                (A brief discussion was had off the record.)

8          THE COURT:  Why don't I give you -- is two weeks

9  enough, or do you want more time?  I mean, basically what I

10  would suggest is simply starting from scratch in light of

11  the testimony.  I mean, obviously you can cut and paste.  I

12  don't want simply supplemental briefing in light of

13  hearing, I would much rather have one document.

14          MR. VANN:  Just to clarify, Your Honor, two weeks

15  after we receive the transcript?

16          THE COURT:  Absolutely.

17          MR. VANN:  That's plenty of time, yes.

18          MS. CAHOON:  Yes.  Is it this court's intention

19  to have simultaneous briefing, Your Honor, because our

20  preference would be to --

21          THE COURT:  No, if you would prefer then to -- to

22  do it the way I customarily do it, that's fine with me.  In

23  fact, that's probably preferable.  So why don't I say that

24  the movants, the defendants, shall file their -- let's call

25  it a substitute brief, okay?

ATF071433

**Defs.' Reply App. 160**

```
1              MS. CAHOON:  Certainly.

2              THE COURT:  A lot I've already read, doesn't

3    matter, I don't want to be shifting back and forth, it's

4    quite inconvenient.  And then two weeks after that for

5    the --

6              MR. VANN:  Yes, Your Honor.

7              THE COURT:  -- reply?

8              MR. VANN:  That's fine.

9              THE COURT:  And then ten days after that for

10   the --

11             MS. CAHOON:  Depending on the dates, Your Honor.

12             THE COURT:  Let's make it two weeks because ten

13   days equals two weeks.

14             MS. CAHOON:  Two weeks from the generation of the

15   transcript, Your Honor?

16             THE COURT:  No, no.  Two weeks after you get the

17   transcript, file your brief, they'll file their reply two

18   weeks after that, and if you want up to two weeks after

19   that to file your reply, that's fine.

20             MS. CAHOON:  I'm sure we can make that work.

21   Thank you, Your Honor.

22             THE COURT:  Pardon?

23             MS. CAHOON:  That's fine.  Thank you so much.

24             THE COURT:  So anything further?

25             MR. VANN:  Not from the government, Your Honor.
```

1          THE COURT:  Okay.  For the defendants?

2          MR. KURT:  Your Honor, you had mentioned earlier

3     concern with Mr. Rowold's custody status?

4          THE COURT:  Pardon.

5          MR. KURT:  You mentioned some concern with

6     Mr. Rowold's status in custody while all this is going on?

7          THE COURT:  Why don't we approach on that, that

8     way everyone else can leave.  Thank you, folks, very

9     interesting case, and we will see what we decide.  Candidly

10    this, undoubtedly, is a case in which I'm going to be

11    writing a third brief for the Court of Appeals, I

12    understand that, regardless of the outcome.  That's fine.

13    Happens from time to time.  Very well.  Thank you.  Very

14    well argued and extremely interesting case.  Thank you.

15    Tom and Tom, come on up.

16               (A side bar conference was had on the

17                record.)

18         THE COURT:  We probably talked about this before,

19    but, you know, did I ask you about how come he's in?

20    What's the issue?

21         MR. WELDON:  You held a hearing actually on that

22    after Judge Knepp detained him.

23         MR. KURT:  I tried twice.

24         MR. WELDON:  Well, there's a couple issues.

25    Number one, didn't have any suitable custodians.  Second

ATF071435

Defs.' Reply App. 162

1    one was he was on supervision to you and violated, that was

2    the big one.

3           MR. KURT:  We would -- I'll be honest -- this is

4    a little off the wall, maybe it would be work, he wonders

5    if he could be --

6           THE COURT:  Let me say as I tell other people, if

7    you look at the position in the portraits up there, judge

8    in the middle -- Judge Potter little to the right, Judge

9    Katz to the left, Judge Walinski further to the right, I'm

10   the far left, and I'm actually more or less positioned --

11   actually, my first office where Vern Armstrong had her

12   office, north that corner of the building that is where in

13   the old Toledo Municipal park of what I have a park left

14   field is located, so I'm right at home, Tom, go ahead.

15          MR. KURT:  Anyway, his idea is to be --

16          THE COURT:  As a side, I've got that tie, and

17   that tie.

18          MR. WELDON:  Good taste, Judge.

19          MR. KURT:  He be admitted to a nursing home, he'd

20   be a good candidate.

21          THE COURT:  The trouble is -- well, okay, yeah,

22   go ahead.  What are those problems, what would be the --

23          MR. KURT:  He's diabetic, he's got some kind of

24   heart condition, he's got high --

25          THE COURT:  How old of a man?

ATF071436

Defs.' Reply App. 163

```
 1              MR. KURT:  I think he's 72.

 2              THE COURT:  How much?

 3              MR. KURT:  72, Judge.

 4              THE COURT:  Tom, work it up, work it out, okay.

 5   And, you know, I'm obviously a bit worried about risk of

 6   flight, but I'd like to know about his resources,

 7   background.  If he's got a trust fund that he's living off

 8   of, that's one thing.

 9              MR. KURT:  Social Security and pension.

10              THE COURT:  The simple truth, I'll be very honest

11   with you, risk of flight is -- it's not based on failures

12   to appear, okay, that doesn't matter.  Abscond -- so many

13   of our defendants they haven't got the money to go up to

14   Detroit.  So seriously, Tom, I may have not been quite that

15   blunt before, the violence or other kinds of misbehaving,

16   and if he's in a nursing home and --

17              MR. KURT:  At least we know where he is.

18              THE COURT:  And you put it together, present it

19   to Tom, present it to Jordan or Cheryce, and I'll take it

20   into consideration.

21              MR. KURT:  All right.

22              THE COURT:  Is he at CCNO?

23              MR. KURT:  CCNO.

24              THE COURT:  I assume, doesn't really matter in

25   terms of accommodations, but I would hope little better up
```

ATF071437

Defs.' Reply App. 164

1    there.

2              MR. KURT:  I would think so, that would be my

3    preference.

4              THE COURT:  That will also give you a little

5    closer access.  I wish I hadn't let people go, are they all

6    here?

7              MR. WELDON:  Everyone's still here.

8              THE COURT:  Counsel, actually there are a couple

9    things I'd like to say.  Have a seat for a moment.  I'm

10   sorry.

11             (Side bar concluded.)

12             THE COURT:  I think I've made these -- this,

13   again, those of you in front of me know this is sort of

14   customary, and I don't know why I didn't think of it.  Just

15   to give you my -- my thoughts to which you make -- wish to

16   address, and I think they're pretty much contained, at

17   least in the essence of what I said at the outset.

18   Although I got the impression from the testimony that

19   within the regulations there may be some inconsistency,

20   that may be mistaken.  But if there is an inconsistency

21   between one regulation that's at issue and another one,

22   then it seems to me that it would be, quote, inconsistent

23   with this part if that's what the thereof in the preamble

24   says.  In other words, if -- and I think will take and then

25   back to the -- to the statute.

ATF071438

Defs.' Reply App. 165

1          In any event, I do think that I would suggest

2     that you focus perhaps more -- or maybe you're content

3     with, but I do think that the Chevron standard may be

4     certainly as important, and I'm getting a bit confused.  Is

5     it in the regular -- does the regulation -- the preamble to

6     the regulation say incompatible with this part?  One says

7     incompatible, other one says inconsistent.

8          MR. VANN:  Your Honor, it says where not

9     otherwise distinctly expressed or manifestly incompatible

10    with the intent thereof, intent in the statute.

11         THE COURT:  Intent -- of the part -- I think

12    there's some suggestion or some thought maybe where thereof

13    refers to the statute, but as a matter of grammar, if you

14    look for the related antecedent, the only thing within that

15    sentence is part, so -- so, once again, recite that for me.

16         MR. VANN:  Where not otherwise distinctly

17    expressed or manifestly incompatible with the intent

18    thereof, and it -- the --

19         THE COURT:  Okay.

20         MR. VANN:  The beginning of this says when used

21    in this part and in forms prescribed under this part, where

22    not otherwise distinctly expressed or manifestly

23    incompatible with the intent thereof.

24         THE COURT:  And, again, this is a grammatical

25    issue, but I think manifest -- or in -- again, I'm sorry,

ATF071439

Defs.' Reply App. 166

1    inconsistent with the intent or contrary to the intent?

2            MR. VANN:  Manifestly incompatible with the

3    intent.

4            THE COURT:  Or --

5            MR. VANN:  -- with the intent thereof.

6            THE COURT:  I'm very sorry.

7            MR. VANN:  That's all right, Your Honor.

8            THE COURT:  Read it slowly for me.

9            MR. VANN:  It says when used in this part and in

10   forms prescribed under this part, where not otherwise

11   distinctly expressed or manifestly incompatible with the

12   intent thereof.

13           THE COURT:  See, now, again, I think the thereof

14   refers with the intent thereof, the intent of this part.

15   However, where distinctly expressed, I think you might want

16   to address whether that relates back to, or refers to the

17   statute itself; therefore, whether or not simply leaving

18   the statute alone is sufficiently distinct expression given

19   the meaning otherwise applied to the term receiver that

20   would inform someone attempting to determine whether this

21   item was a receiver or not, but that individual could look

22   to determine that yes or no.  But as I said on the Chevron,

23   actually have it in here, have to give me a minute, please.

24   Do any of you have that at hand?  It's in my notes, but --

25   wait a minute, hold on a second.  The Court said when a

ATF071440

Defs.' Reply App. 167

1   Court reviews an agency's construction of the statute

2   which --

3           MR. WELDON:  Your Honor, may I -- this is

4   Mr. Weldon, Your Honor.  This contained -- you're citing to

5   Chevron, and the government makes reference to this

6   particular case on Page 12 of its response, which is what's

7   filed on March 26th, it's document 41.  And the quote, if

8   you're looking for it, is if Congress has explicitly left a

9   gap for the agency to fill, there is an express delegation

10  of authority to the agency to elucidate a specific

11  provision of the statute by regulation.  Such legislative

12  regulations are given controlling weight unless they are

13  arbitrary, capricious, or manifestly contrary to statute.

14  And that's at Pages 843 to 844.

15          THE COURT:  It also says -- Melissa, can you read

16  that?

17          MS. DYBALA:  Chevron says when a Court reviews an

18  agency construction of the statute which it administers, it

19  is confronted with two questions:  First always is the

20  question whether Congress has directly spoken to the

21  precise question at issue.  If the intent of Congress is

22  clear, then it ends -- then it's the end of the matter

23  before The Court as well as the agency.

24          THE COURT:  And then the second paragraph?

25          MS. DYBALA:  And then must give affect to the

1    unambiguously express intent of Congress.

2          THE COURT:  That aspect, both parts of that test,

3    you know, whether it was the intent of Congress -- and,

4    quite candidly, the intent of Congress, seems to me, was to

5    regulate the availability and use of firearms or weapons

6    within the firearm category.  And my question is, and I'm

7    sure we'll all be digging further in legislative history

8    and so forth, but I think that intent is indisputable.  And

9    under that test, under Chevron, and I may misread it,

10   misunderstand it entirely, that's fine.  I want to

11   emphasize, as I sit here today, the important of the

12   Chevron holding and doctrine, and also the extent to which

13   some, or at least I will have to acknowledge of the way the

14   acceptable trend about that doctrine and its influence upon

15   how we, as Courts, interpret agency regulations.  I'll be

16   very candid with you, it seems to me that if that -- that

17   if the regulation, which is not the law, the law is the

18   statute.  Legislation is intended to, quote, fill a gap,

19   something that's missing, something without which statute

20   makes no sense at all and cannot be understood as that term

21   is meant under the due process clause.  And a regulation

22   that leaves, you know, 10 percent of the weapons streaming

23   off of American gun manufacturer line, assembly lines,

24   however many that number is, I don't see how that can be

25   upheld to be quite candid.  In light of what, again, I

ATF071442

Defs.' Reply App. 169

1    understand to be uninformed understanding, not having done

2    really anything except having Melissa do a little bit

3    beyond what was contained in the briefs about the interplay

4    between congressional intent and using the terms that it

5    does and legislative, you know, commentary enhancement

6    clarification of thereof.  And likewise, if we have, you

7    know, and I realize that is borderline speculative, but

8    it's fair to say that there's lots of firearms out there

9    that have been manufactured over the years and lots of

10   assault rifles since the assault rifle ban, and if none of

11   that is subject to the Gun Control Act, how can that

12   possibly square with legislative history and purpose of

13   this statute?  That would be ridiculous.  I'm sorry to be

14   so emphatic, but that's the argument you have to -- that's

15   the position you have to address.  And if it's a misreading

16   of Chevron, by all means lay that out.  And the same with

17   regard to the statute, any inconsistency within the

18   regulation, any internal inconsistency between one

19   regulation and another, that may not have been the gist of

20   the import of the testimony or the testimony itself, and

21   also, you know, what does it mean to be manifestly

22   incompatible with thereof.  And once again, it would be

23   more clear, so much else would be if the manifest

24   incompatibility were the statute or the Congressional

25   purpose in enacting the statute, but I don't think that's

```
 1    what that means.  The government may well want to argue

 2    that no, no, Judge, that's the way to read the preamble,

 3    okay.  And those are the comments I wanted to make.

 4            And again, let me say this also, if you find

 5    yourself constrained by the time limits, I know you're all

 6    very busy, all of us are confronted with a truly

 7    overwhelming increase in the criminal dockets in -- in this

 8    court in particular.  I understand you've just hired two

 9    more AUSAs, and at least seems to me that criminal case

10    load, I know seems that way to my staff and fellow judges,

11    is truly burgeoning, or at least it's expanding

12    significantly, all of which to say here you have all got a

13    lot to do coming in the door tomorrow, next week and so

14    forth.  If you find yourself needing some more time, simply

15    reach out to each other and send a brief request to that --

16    in that regard to Deanna.  She'll let me know, and I will

17    gladly give it to you, because, you know, perhaps I'm

18    exaggerating, but somehow these two weeks I've got cases, a

19    couple Lake Erie cases and now this case both being heard

20    by me this week that I perceive as being the kind of case

21    that require truly extensive effort regardless of lengthy

22    opinion.  But my best efforts to try to get it right, and

23    the likelihood in both of these cases, I will be, as I say,

24    the third brief in the Court of Appeals, and like anybody

25    else who goes down to the Court of Appeals, I like to win.
```

ATF071444

1    So give it your best, I'm sure you will, and I look forward

2    to the briefing and then to the challenge of resolving this

3    dispute and moving on from there.  Thank you all very much.

4    Greatly appreciate it.

5

6                              - - -

7

8                    C E R T I F I C A T E

9

10           I certify that the foregoing is a correct transcript

11    from the record of proceedings in the above-entitled matter.

12

13    s:/Angela D. Nixon              October 17, 2019

14    --------------------------              -----------

15    Angela D. Nixon, RMR, CRR        Date

16

17

18

19

20

21

22

23

24

25

ATF071445

Defs.' Reply App. 172

***AMENDED 7/30/20***

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

| Case No. | SACR 14-167-JVS | | Date | July 27, 2020 |
|---|---|---|---|---|

Present: The Honorable **James V. Selna, US District Court Judge**

Interpreter      Not Needed

| Lisa Bredahl | Sharon Seffens | Shawn Nelson, Benjamin Lichtman |
|---|---|---|
| *Deputy Clerk* | *Court Reporter.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present Cust. Bond | Attorneys for Defendants: | Present App. Ret. |
|---|---|---|---|
| **Joseph Roh** | X | **Gregory Nicolaysen** | X   X |

**Proceedings:** Defendant's Motion to Vacate Guilty Plea [157]
Government's Motion to Dismiss Indictment With Prejudice [159]

Cause is called for hearing with the defendant, his counsel, and counsel for the Government present. Court and counsel confer. The Court GRANTS the Government's Motion to Dismiss and GRANTS Defendant's Motion to Vacate Guilty Plea. Counsel shall submit the proposed orders on the motions to the Court.

The tentative ruling on the Motion for Acquittal is attached to this minute order.

|  | 0 | : | 10 |
|---|---|---|---|
| Initials of Deputy Clerk | lmb | | |

Defs.' Reply App. 173

***AMENDED 7/30/20***

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

Now before the Court are Roh's post trial motions.  He moves for acquittal under Rule 29 of the Federal Rules of Criminal Procedure and for dismissal on grounds on unconstitutional vagueness.  (Docket Nos. 124, 139.)  The Government has filed an opposition (Docket No. 132), and Roh has replied (Docket No 137).

For the reasons set forth below, the Court grants in part and denies in part the Motion.

I.      The Indictment.

The single-count Indictment charges that Roh "not being licensed as an importer, manufacturer, or dealer in firearms, willfully engaged in the business or manufacturing and dealing firearms, to wit, hundreds of AR-15-type lower receivers, completed pistols, and completed rifles" in violation of 18 U.S.C. § 922(a)(1)(A).  (Docket No. 1.)  The Indictment tracks the language of the statute:

> It shall be unlawful--
> (1) for any person--
> > (A) except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate. or foreign commerce;

 (18 U.S.C. § 922(a)(1)(A).)

The term "firearm" is defined by statute and further defined by regulations issued by the Bureau of Alcohol, Tobacco, and Firearms.  The statute provides:

> The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

(18 U.S.C. § 921(a)(3); emphasis supplied.)  The regulations define a receiver:

> Firearm frame or receiver. That part of a firearm which provides housing for the

Defs.' Reply App. 174

\*\*\*AMENDED 7/30/20\*\*\*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel.

(27 C.F.R. § 478.11.)

The core dispute here is whether an unfinished AR-15 receiver constitutes a firearm under the statute and regulations.

II.    <u>Legal</u> <u>Standards.</u>

Rule 29 of the Federal Rules of Criminal Procedure provides in part: "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  (Fed. R. Crim. P. 29(a).)  On a Rule 29 motion, "The court, after viewing the evidence in the light most favorably to the government, must determine whether the jury could reasonably find the defendant guilty beyond a reasonable doubt."  <u>United States</u> <u>v.</u> <u>Bernhardt</u>, 840 F.2d 1441, 1448 (9th Cir. 1988).

Criminal statutes must give fair notice of their scope:

It is a basic principle of due process that <u>an</u> <u>enactment</u> <u>is</u> <u>void</u> <u>for</u> <u>vagueness</u> <u>if</u> <u>its</u> <u>prohibitions</u> <u>are</u> <u>not</u> <u>clearly</u> <u>defined</u>. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, <u>we</u> <u>insist</u> <u>that</u> <u>laws</u> <u>give</u> <u>the</u> <u>person</u> <u>of</u> <u>ordinary</u> <u>intelligence</u> <u>a</u> <u>reasonable</u> <u>opportunity</u> <u>to</u> <u>know</u> <u>what</u> <u>is</u> <u>prohibited,</u> <u>so</u> <u>that</u> <u>he</u> <u>may</u> <u>act</u> <u>accordingly</u>. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.

<u>Grayned</u> <u>v.</u> <u>City</u> <u>of</u> <u>Rockford</u>, 408 U.S. 104, 108 (1972) (emphasis supplied).  More stringent standards are applied where the vagueness challenge involves a criminal statute or the exercise of constitutional rights.  <u>Village</u> <u>of</u> <u>Hoffman</u> <u>Estates</u> <u>v.</u> <u>Flipside</u> <u>Hoffman</u> <u>Estates,</u> <u>Inc.</u>, 455 U.S. 489, 498-99 (1982); <u>McCormack</u> <u>v.</u> <u>Herzon</u>, 788 F.3d 1017, 1031(9th Cir. 2015).

III.    <u>Discussion.</u>

Roh operated Rogh Industries, a machine shop which catered to gun enthusiasts. Part of his operation consisted in manufacturing AR-15 semi-automatic assault rifles.  One of

Defs.' Reply App. 175

Case 8:14-cr-00167-JVS   Document 164   Filed 07/27/20   Page 4 of 8   Page ID #:2719
Case 4:22-cv-00691-O   Document 199   Filed 04/06/23   Page 179 of 183   PageID 4332
***AMENDED 7/30/20***

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

the steps is the manufacture of a receiver.  Rather than initiating the process of machining a receiver, Roh had his customers push a button on the milling machine which initiated the process.  But for that one step, Roh performed all of the steps in manufacturing completed AR-15s.

      The correspondence and testimony establish that Roh was informed of ATF's position that his operations, including the manufacture of finished receivers, constituted unlicensed manufacture of firearms.  In response to correspondence from Roh, the AFT examined samples of machined AR-15 parts and advised that they were not "classified as a 'firearm."  (Ex. 132.)  A year later, the ATF wrote with regard to receivers that they would be "classified by our Branch as a 'firearm.'"  (Ex. 134, p. 4.)[1]  On December 23, 2013, the ATF sent Roh a cease and desist letter informing him that his operations constituted the illegal unlicensed manufacture of firearms.  (Ex. 126.)  Roh signed a written acknowledgment of the notice.  (Id., p. 2.)

      There is no dispute that Roh does not have a license for firearms manufacturing.

      The Government has two theories: Roh's manufacturing of receivers violated the statute, and separately Roh sold firearms.  The Court deal with each theory.

      A.    Receivers.

      The definition of receiver under the ATF regulations requires four component: a "housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."  (27 C.F.R. § 478.11; emphasis supplied.) The evidence at trial was uncontroverted that a finished AR-15 receiver does not contain a bolt or breechblock and is not threaded to receive the barrel.  (E.g., Tr. Feb. 21, 2018, pp. 111-13 (Jackson); Tr. Feb. 24, 2018, pp. 65-67 (Hoffman).)  Indeed, the Government concedes the point in its opposition.  (Opposition, p. 23.)  The plain conclusion is that the finished receiver is not a firearm.

      The Government's theory of conviction rests on proposition that the AFT had "classified" finished receivers as firearms, notwithstanding the conflict with the definition published by the ATF in its regulations.  Examination of Government expert Daniel Hoffman revealed that there is no "objective classification scheme or system in place."  (Tr. Feb. 24,

---

[1]There is a dispute as to whether this letter was ever sent and received.  (See Tr. ) For present purposes, the Court finds that Roh was on notice that the ATF "classified" finished receivers as "firearms."

Defs.' Reply App. 176

***AMENDED 7/30/20***

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

2018, p. 44.)  ATF personnel simply make a determination in response to individual inquiries.  (Id.)  Usually, there is no consultation with ATF counsel.  (Id., p. 50.)  More significant for present purposes is that there is no way for the public to learn the particulars of the classification system.  (Id., pp.  44-45, 55.)  The only way a person can learn of an AFT classification is to make direct contact with the AFT.  (Id., pp. 48-49, 55-56.)

It is clear that the ATF's classification of articles as firearm does not comply with the rule making process which brought into effect the public definition for firearm found in Section 478.11.  The rule making process under Administrative Procedures Act, 5 U.S.C. § 551, requires promulgation of a rule and eventual publication of the rule in the Federal Register.  5 U.S.C. § 552(a).

United States v. Picciotto, 875 F.2d 345 (D.C. Cir. 1989), illustrates the flaw in seeking criminal prosecution on the basis of an unpublished classification.  There the Park Service had adopted regulations, but informally added "additional conditions."  The defendant was prosecuted for violating one of those conditions.  The Court rejected the prosecution:

> A rule which is subject to the APA's procedural requirements, but was adopted without them, is invalid. Certainly, a criminal prosecution founded on an agency rule should be held to the strict letter of the APA.

(Id. at 346; internal citation deleted.)  Other circuits have similarly recognized that criminal liability cannot be imposed where the agency has failed to comply with APA's procedures, and therefore had not given fair notice.  United States v. Cain, 583 F.3d 408, 420, 422-23 (6th Cir. 2009) (sex offender regulations); United States v. Reynolds, 710 F.3d 498 (3d Cir 2013) (same); United States v. Valverde, 628 F.3d 1159, 1168-69 (9th Cir. 2010).

The Government would distinguish Picciotto on the ground that the Park Service had in fact made a substantive change.  (Opposition, pp. 23-35.)  But that is the point: By deleting certain requirements for a receiver, the AFT made a substantive change in the regulation.

The Government contends that Roh knew that AR-15 lower receivers constituted "receivers."  (Id., pp. 36-38.)  He certainly knew through correspondence with the AFT and visits that it was the ATF's position that the lower receiver were "receivers."  But his knowledge of the AFT's position does not give ATF's unsupported position the force of law. Significantly, in its discussion of Roh's knowledge it cites neither case law nor statutory authority.

Defs.' Reply App. 177

***AMENDED 7/30/20***

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

The Court rejects the Government's position here with respect to receiver as a mere and permissible interpretation. (Opposition, p. 31.) There is not simply tension between the Government's position and Section 478.11; there is a disconnect. (See id., p. 32.) The Government counters with Cabais v. Egger, 690 F.2d 234, 238 (D.C. Cir. 1982), for the proposition that a position may nevertheless be a valid interpretation even if it contradicts the statute. But there is a qualifier: The interpretation must reasonable. (Id. at 238 n.10, 239.) In fact, the D.C. Circuit rejected the the Labor Department's interpretation of the statute in Cabais where it its interpretation imposed on the states a formula for determining individual pension contribution not found in the statute. Here, the converse is true: ATF is reading out of the regulation express requirements for a receiver. That is not reasonable.[2]

In United States v. Evans, 712 F. Supp. 1435, (D. Mont. 1989), aff'd 928 F.2d 858 (9th Cir. 1991) the court held that a formal regulation was not necessary to give content to the term "any combination of parts from which a machine gun can be assembled." The term "combination" was enacted by amendment, and evidenced a Congressional intent to cover whatever parts were used in the final make up of the machine gun. (Id. at 1438-39.) Unlike the statute in Evans, no broad interpretation can support an interpretation which fails to take into account the express components of a receiver. (Id. at 1443-44.) The ATF's classification here cannot be accepted as a mere interpretation where that interpretation is wholly contradictory to its existing regulations.

ATF's notices to Roh were notices of its classification of receivers.

The Court finds that Roh's activities with respect to the production of finished receivers were not within the scope of the statute or the ATF regulatory definition. Therefore, Roh did not violate the law by manufacturing receivers. The Court further finds that with respect to manufacturing receivers, the statue and regulation are unconstitutionally vague as applied here. No reasonable person would understand that a part constitutes a receiver where it lacks the components specified in the regulation.

In addition, the Court finds that when applied to include finished lower receivers, Section 478.11 is unconstitutionally vague. Grayned, 408 U.S. at 108. This conclusion is unchanged and even reinforced when one considers the Government's argument that the preamble to the section supports its position.

The definitions in the section are applicable "[w]hen used in this part and in forms prescribed

---

[2]The Government's recitation of "strawman" cases is inapposite. (Opposition, pp. 32-33, citing e.g. United States v. Nelson, 221 F.3d 1206, 1210 (11th Cir. 2000).

Defs.' Reply App. 178

***AMENDED 7/30/20***

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

under this part, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof." (27 C.F.R. § 478.11, Preamble.)   At least for criminal purposes, putting a defendant to discern whether a definition is "manifestly incompatible with the intent" of the regulation is a far cry from giving fair notice of the scope of the regulation.[3]

In United States v. Jiminez, 191 F. Supp. 3d 1038, 1045 (N.D. Cal. 2016), the court found that the definition of receiver in a parallel provision of the regulations, 27 C.F.R. §479.11, was unconstitutionally vague.  Just as here, the court focused on the language of the regulation:

> Tellingly, the Government makes no effort to parse the statutes or the CFR for proof of notice or clear standards. In effect, it concedes that the plain language of the law does not answer the vagueness challenge. This is tantamount to acknowledging that even if Jiminez had read the rules and regulations, he could not have known that the lower receiver of the AR-15 would be covered by them. That alone is a strong blow against the Government's position.

(Id. at 1041; emphasis supplied.)  So too here.  Moreover, the Jiminez  court specifically rejected the argument that the need to strengthen law enforcement overrode the vagueness defect.[4] (Id. at 1044.)

Roh is entitled to acquittal of the charges here to the extent they are based on a definition of receiver supported only by the ATF's so-called classification.  As applied here, Section 479.11 is void for vagueness.

B. Assembly of Firearms.

The Court focuses more broadly on Roh's activities.  There is no question that he manufactured completed AR-15s.  Dr. Frank Juste's purchase was typical.  He paid for the purchase and assembly of his AR-15.  (Tr. Feb. 21, 2018, pp. 118-20.)  The parties stipulated that approximately 25 percent of Roh's customers received a completed AR-15 or a completed

---

[3]In view of the Court's analysis, the Court finds that it is unnecessary to reopen the record to take the testimony of ATF counsel, and rejects Roh's request.  (See Rebuttal, pp. 17-18.)

[4]The Government suggests that Jiminez left room for the possibility that a different record in a different case might show "adequate notice to the defendant or vitiate a vagueness challenge on other grounds."  (Opposition, pp. 27-28 n.9, citing Jiminez, 191 F.3d Supp. at 1044.)  The Court has already found that notice of an unsupported classification can not rise to such notice.

Defs.' Reply App. 179

***AMENDED 7/30/20***

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

pistol.  (Docket No. 101, p. 5.)[5]

   Roh's contention that the communications between ATF and Roh focused "exclusively" on lower receiver is mistaken, and incorrectly assumes that ATF was required to inform him of the law.  (See Reply, pp. 24-25.)  The December 2013 cease-and-desist letter was directed to all of Roh's operations.  (Ex. 126.)  It focused specifically on how the rifles were manufactured, including customer performance of some steps.  (Id., p. 1, third paragraph.)  Other than arguing a lack of notice, Roh does not contest the showing her that he in fact manufactured and sold completed firearms.

   Apart from the AR-15 sales, Rho sold Agent Jackson a pistol in violation of California law.

   This conduct, apart from the debate over receivers, is sufficient to support a finding beyond a reasonable doubt that Roh wilfully engaged in the unlicensed manufacture and sale of firearms in violation of 18 U.S.C. 922(a)(1)(A).

III. <u>Conclusion.</u>

   The Court grants the Motion for Acquittal with respect to the manufacture of AR-15 receivers, but otherwise denies the Motion.

_____

[5]<u>See also</u> Customer Appointment Records, Exs. 415, 470B, 470D.

**Defs.' Reply App. 180**