**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

JENNIFER VANDERSTOK, *et al.*,

     Plaintiffs,

  v.

MERRICK GARLAND, in his official
capacity as Attorney General of the United
States, *et al.*,

     Defendants.

Case No. 4:22-cv-00691-O

**REPLY BRIEF IN SUPPORT OF DEFENDANTS'**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

ARGUMENT ..............................................................................................................................2

I.    Defendants Are Entitled to Summary Judgment to the Extent That Plaintiffs Lack Article III Standing to Bring Their Claims. ..............................................................2

    A.    Individual Plaintiffs ........................................................................................2

    B.    FPC & SAF ....................................................................................................3

II.    The Rule Represents a Logical Outgrowth of the Notice. ............................................4

III.    The Rule Is Not Arbitrary and Capricious. ...............................................................12

    A.    The Rule Explains Its Treatment of Partially Complete Frames and Receivers. ......................................................................................................12

    B.    The Rule Explains Why Weapon Parts Kits That Can Readily Be Converted to Expel a Projectile by Means of an Explosive Are "Firearms." .................15

    C.    The Rule Does Not Alter ATF's Position Regarding Firearms with Split Frames or Receivers or Striker-Fired Firearms. .........................................20

    D.    Plaintiffs' Remaining Arbitrary and Capricious Claims Are Without Merit. ..............24

IV.    The Rule Reflects the Best Interpretation of the Relevant Statutory Terms. ............................28

V.    The Rule Is Consistent with the Second Amendment. ..............................................32

VI.    The Rule Is Consistent with the First Amendment. .................................................33

VII.    The Definitions Contained in the Rule Are Not Otherwise Unconstitutional. .......................39

    A.    The Rule Is Not Void for Vagueness. ..........................................................39

    B.    The Rule Is Consistent with the Take Care Clause and the Major Questions Doctrine. ....................................................................................................49

VIII.    Any Relief Should Be Narrowly Tailored. ...............................................................51

CONCLUSION .........................................................................................................................55

# TABLE OF AUTHORITIES

## CASES

*Am. Airlines, Inc. v. Dep't of Transp.,*
  202 F.3d 788 (5th Cir. 2000) ................................................................................. 28

*Am. Coke & Coal Chems. Inst. v. EPA,*
  452 F.3d 930 (D.C. Cir. 2006) ................................................................................. 6

*Am. Commc'ns Ass'n, C.I.O. v. Douds,*
  339 U.S. 382 (1950) ................................................................................................ 44

*Arcaca v. Cloud Books, Inc.,*
  478 U.S. 697 (1986) ................................................................................................ 36

*Ariz. Christian Sch. Tuition Org. v. Winn,*
  563 U.S. 125 (2011) ................................................................................................ 52

*Ariz. Pub. Serv. Co. v. EPA,*
  211 F.3d 1280 (D.C. Cir. 2000) .............................................................................. 10

*Ass'n of Private Sector Colls. & Univs. v. Duncan,*
  110 F. Supp. 3d 176 (D.D.C. 2015)) ...................................................................... 25

*Associated Builders & Contractors v. NLRB,*
  826 F.3d 215 (5th Cir. 2016) ............................................................................. 25, 38

*Basiardanes v. City of Galveston,*
  682 F.2d 1203 (5th Cir. 1982) ................................................................................ 35

*Bd. of Educ. v. Pico,*
  457 U.S. 853 (1982) ................................................................................................ 35

*Bolger v. Youngs Drugs Prod. Corp.,*
  463 U.S. 60 (1983) .................................................................................................. 37

*Cal. Trucking Ass'n v. Becerra,*
  433 F.Supp.3d 1154 (S.D. Cal. 2020) ...................................................................... 2

*Cent. & S.W. Servs., Inc. v. EPA,*
  220 F.3d 683 (5th Cir. 2000) .................................................................................. 53

*Chabad Lubavitch of Litchfield County, Inc. v. Borough of Litchfield,*
  853 F. Supp. 2d 214 (D. Conn. 2012) ..................................................................... 41

*Chem. Mfrs. Ass'n v. EPA,*
  870 F.2d 177 (5th Cir. 1989) ............................................................................. 6, 12

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council*,
 467 U.S. 837 (1984) ...................................................................................................................28

*Chocolate Manufacturers Association v. Block*,
 755 F.2d 1098 (4th Cir. 1985) .....................................................................................................6

*City of Waukesha v. EPA*,
 320 F.3d 228 (D.C. Cir. 2003)......................................................................................................8

*Cnty. of Maui v. Hawaii Wildlife Fund*,
 140 S. Ct. 1462 (2020) ...............................................................................................................31

*CSX Transportation, Inc. v. Surface Transportation Board*,
 584 F.3d 1076 (D.C. Cir. 2009)..................................................................................................11

*Data Marketing Partnership v. U.S. Dep't of Labor*,
 45 F.4th 846 (5th Cir. 2022) ...............................................................................................23, 52

*Department of Commerce v. New York*,
 139 S. Ct. 2551 (2019) .................................................................................................................2

*Dist. of Columbia v. Heller*,
 554 U.S. 570 (2008) ...................................................................................................................32

*Dupart v. Roussell*,
 497 F. Supp. 3d 102 (E.D. La. 2020) ..........................................................................................37

*E.T. v. Paxton*,
 19 F.4th 760 (5th Cir. 2021) .......................................................................................................55

*Enamorado v. United States*,
 No. 16-3029, 2017 WL 2588428 (N.D. Iowa June 14, 2017)....................................................19

*Escamilla v. United States*,
 62 F.4th 367 (7th Cir. 2023) .......................................................................................................31

*Exxon Mobil Corp. v. Mnuchin*,
 430 F. Supp. 3d 220 (N.D. Tex. 2019) ........................................................................................47

*Fertilizer Inst. v. EPA*,
 935 F.2d 1303 (D.C. Cir. 1991)..................................................................................................54

*FN Herstal, S.A. v. Clyde Armory, Inc.*,
 123 F. Supp. 3d 1356 (M.D. Ga. 2015) ........................................................................................7

*Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*,
 59 F.4th 180 (5th Cir. 2023) .......................................................................................................12

*Friends of the Earth, Inc. v. Chevron Chem. Co.*,
  129 F.3d 826 (5th Cir. 1997) ..................................................................................4

*GBX Assocs., LLC v. United States*,
  No. 1:22-CV-401, 2022 WL 16923886 (N.D. Ohio Nov. 14, 2022)........................54

*Glass v. Paxton*,
  900 F.3d 233 (5th Cir. 2018) ................................................................................34

*Gonzalez de Lara v. United States*,
  439 F.2d 1316 (5th Cir. 1971) ..............................................................................51

*Gun Owners of Am., Inc. v. Garland*,
  19 F.4th 890 (6th Cir. 2021) .................................................................................31

*Handley v. Chapman*,
  587 F.3d 273 (5th Cir. 2009) ................................................................................13

*Hernandez v. Scott*,
  No. SA-10-CV-1051-OG-NN, 2011 WL 2619342 (W.D. Tex. July 1, 2011)..................55

*Howmet Corp. v. EPA*,
  656 F. Supp. 2d 167 (D.D.C. 2009) .......................................................................47

*Huawei Techs. USA, Inc. v. FCC*,
  2 F.4th 421 (5th Cir. 2021) .........................................................................5, 6, 12

*Hull v. Kapstone Container Corp.*,
  No. 3:17-CV-0641-K, 2018 WL 4409798 (N.D. Tex. Sept. 17, 2018)..................5

*In re Clean Water Act Rulemaking*,
  60 F.4th 583 (9th Cir. 2023) .................................................................................53

*Innovator Enterprises, Inc. v. Jones*,
  28 F. Supp. 3d 14 (D.D.C. 2014) ..........................................................................31

*Jordan v. Jewel Food Stores, Inc.*,
  743 F.3d 509 (7th Cir. 2014) ................................................................................37

*Lefebure v. D'Aquilla*,
  15 F.4th 650 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 2732 (2022) ......................52

*Lexmark Int'l v. Static Control Components*,
  572 U.S. 118 (2014) .............................................................................................37

*Long Island Care at Home v. Coke*,
  551 U.S. 158 (2007) ...............................................................................................6

*Magee v. City of S. Padre Island*,
    463 F. App'x 377 (5th Cir. 2012) ................................................................46

*Mass. Museum of Contemp. Art Found., Inc. v. Buchel*,
    593 F.3d 38 (1st Cir. 2010) ......................................................................30

*Mayor & City Council of Balt. v. Azar*,
    No. CV RDB-19-1103, 2020 WL 1873947 (D. Md. Apr. 15, 2020) ......................55

*McDonald v. Chicago*,
    561 U.S. 742, (2010) ............................................................................32

*Mink v. Genmar Indus., Inc.*,
    29 F.3d 1543 (11th Cir. 1994) ..................................................................30

*Minneapolis Star & Trib. Co. v. Minn. Com'r of Revenue*,
    460 U.S. 575 (1983) .............................................................................36

*MWK Recruiting Inc. v. Jowers*,
    833 F. App'x 560 (5th Cir. 2020) ...............................................................55

*National Institute of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) ..........................................................................38

*Nat'l Solid Wastes Mgmt. Ass'n v. City of Dallas*,
    903 F. Supp. 2d 446 (N.D. Tex. 2012) .........................................................44

*New York State Rifle & Pistol Association. v. Bruen*,
    142 S. Ct. 2111 (2022) .................................................................26, 32, 33

*Ochoa-Salgado v. Garland*,
    5 F.4th 615 (5th Cir. 2021) ....................................................................52

*Pa. Fam. Inst., Inc. v. Black*,
    489 F.3d 156 (3d Cir. 2007) ....................................................................35

*PDK Laboratories v. DEA*,
    362 F.3d 786 (D.C. Cir. 2004) ..................................................................27

*Police Dept. of Chicago v. Mosley*,
    408 U.S. 92 (1972) ..............................................................................37

*Prime Healthcare Services, Inc. v. Harris*,
    216 F. Supp. 3d 1096 (S.D. Cal. 2016) .........................................................41

*Procter & Gamble Co. v. Amway Corp.*,
    242 F.3d 539 (5th Cir. 2001) ...................................................................37

*R.R. Ricou & Sons Company v. Fairbanks, Morse & Company,*
  11 F.2d 103 (5th Cir. 1926) ................................................................................30

*Reed v. Town of Gilbert, Ariz.,*
  576 U.S. 155 (2015) .........................................................................................36

*Regan v. Taxation with Representation of Wash.,*
  461 U.S. 540 (1983) .........................................................................................35

*Richmond Newspapers, Inc. v. Virginia,*
  448 U.S. 555 (1980) .........................................................................................35

*Roark & Hardee LP v. City of Austin,*
  522 F.3d 533 (5th Cir. 2008) ................................................................40, 45, 46

*Shinseki v. Sanders,*
  556 U.S. 396 (2009) ....................................................................................27, 28

*Sierra Club v. U.S. Fish & Wildlife Service,*
  245 F.3d 434 (5th Cir. 2001) ............................................................................27

*Sig Sauer, Inc. v. Jones,*
  133 F. Supp. 3d 364 (D.N.H. 2015) .................................................................31

*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1944) .........................................................................................31

*Skyworks, Ltd. v. CDC,*
  542 F. Supp. 3d 719 (N.D. Ohio 2021) ...........................................................54

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011) .........................................................................................38

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
  985 F.3d 1032 (D.C. Cir. 2021) .......................................................................54

*Students for Fair Admissions, Inc. v. University of Texas at Austin,*
  37 F.4th 1078 (5th Cir. 2022) .............................................................................4

*Texas v. EPA,*
  389 F. Supp. 3d 497 (S.D. Tex. 2019) .............................................................11

*Texas v. United States,*
  40 F.4th 205 (5th Cir. 2022) ............................................................................52

*Texas Pipeline Association v. FERC,*
  661 F.3d 258 (5th Cir. 2011) ...........................................................................30

*Timpinaro v. SEC*,
   2 F.3d 453 (D.C. Cir. 1993) ............................................................................43

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ..................................................................................34

*Turner Broadcasting Sys., Inc. v. FCC*,
   512 U.S. 622 (1994) ......................................................................................35

*U.S. Steel Corporation v. EPA*,
   595 F.2d 207 (5th Cir. 1979) ........................................................................27

*United States v. 16,179 Molso Italian .22 Caliber Winler Derringer Convertible Starter Guns*,
   443 F.2d 463 (2d Cir. 1971) ..........................................................................39

*United States v. Arcadipane*,
   41 F.3d 1 (1st Cir. 1994) ...............................................................................40

*United States v. Campbell*,
   427 F.2d 892 (5th Cir. 1970) ........................................................................48

*United States v. Clinical Leasing Serv., Inc.*,
   925 F.2d 120 (5th Cir. 1991) ........................................................................47

*United States v. Drasen*,
   845 F.2d 731 (7th Cir. 1988) ........................................................................40

*United States v. Jiminez*,
   191 F. Supp. 3d 1038 (N.D. Cal. 2016) ........................................................22

*United States v. Johnson*,
   632 F.3d 912 (5th Cir. 2011) ..................................................................26, 27

*United States v. L. A. Tucker Truck Lines, Inc.*,
   344 U.S. 33 (1952) ........................................................................................53

*United States v. Morales*,
   280 F. Supp. 2d 262 (S.D.N.Y. 2003) ......................................................17, 18

*United States v. O'Brien*,
   391 U.S. 367 (1968) ................................................................................24, 39

*United States v. One TRW, Model M14, 7.62 Caliber Rifle*,
   441 F.3d 416 (6th Cir. 2006) ........................................................................41

*United States v. Randolph*,
   No. 02-850, 2003 WL 1461610 (S.D.N.Y. Mar. 20, 2003) .............................18

*United States v. Rowold,*
   429 F. Supp. 3d 469 (N.D. Ohio 2019) ................................................................ 21, 22

*United States v. Ryles,*
   988 F.2d 13 (5th Cir. 1993) .................................................................................. 18

*United States v. Stewart,*
   451 F.3d 1071 (9th Cir. 2006) ............................................................................. 16

*United States v. Stewart,*
   No. 00-698, 2001 WL 194917 (D. Ariz. Feb. 26, 2001) ..................................... 16

*United States v. Theodoropoulos,*
   866 F.2d 587 (3d Cir. 1989) ................................................................................ 17

*United States v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006,*
   447 F.3d 686 (9th Cir. 2006) ............................................................................... 41

*United States v. Walters,*
   418 F.3d 461 (5th Cir. 2005) ............................................................................... 27

*United States v. Wick,*
   697 F. App'x 507 (9th Cir. 2017) ........................................................................ 16

*United States v. Wick,*
   No. 15-30, 2016 WL 10637098 (D. Mont. July 1, 2016)................................... 16

*United States v. Wick,*
   No. CR 15-30-M-DLC, 2016 WL 10612608 (D. Mont. Mar. 11, 2016)............ 41

*VanDerStok v. Garland,*
   __F. Supp. 3d __, 2022 WL 4809376 (N.D. Tex. Oct. 1, 2022).......................... 2

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
   455 U.S. 489 (1982) .............................................................................. 42, 47, 48

*Virginia v. Am. Booksellers Ass'n, Inc.,*
   484 U.S. 383 (1988) ............................................................................................ 34

*Virginia Soc'y for Hum. Life, Inc. v. FEC,*
   263 F.3d 379 (4th Cir. 2001) ............................................................................... 55

*Wash. State Grange v. Wash. State Republican Party,*
   552 U.S. 442 (2008) ............................................................................................ 46

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022) ........................................................................................ 50

*Worldcall Interconnect, Inc. v. FCC,*
  907 F.3d 810 (5th Cir. 2018) .......................................................................................26

*Yogi Metals Grp., Inc. v. Garland,*
  38 F.4th 455 (5th Cir. 2022) .......................................................................................12

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ....................................................................................................49

**STATUTES**

5 U.S.C. § 706 ............................................................................................................*passim*

18 U.S.C. § 921 ..........................................................................................................*passim*

18 U.S.C. § 922 ..................................................................................................10, 16, 18, 22

18 U.S.C. § 924 ................................................................................................................17

26 U.S.C. § 5845 ........................................................................................................*passim*

26 U.S.C. § 5861 ..........................................................................................................17, 22

**REGULATIONS**

27 C.F.R. § 478.11 ....................................................................................................*passim*

27 C.F.R. § 478.12 ....................................................................................................*passim*

27 C.F.R. § 478.92 ..................................................................................................13, 43, 44

Internal Revenue Service, Department of the Treasury,
  33 Fed. Reg. 18,555 (Dec. 14, 1968) .........................................................................20

Definition of "Frame or Receiver" and Identification of Firearms,
  86 Fed. Reg. 27,720 (May 21, 2021) .....................................................................*passim*

Definition of "Frame or Receiver" and Identification of Firearms,
  87 Fed. Reg. 24,652 (Apr. 26, 2022) ....................................................................*passim*

Definition of "Frame or Receiver" and Identification of Firearms; Corrections,
  87 Fed. Reg. 51,249 (Aug. 22, 2022) .........................................................................44

**OTHER AUTHORITIES**

Antonin Scalia & Bryan A. Garner, READING LAW (2012) ....................................................32

Firearm News Digital Editors, *Kel-Tec Introduces New Firearm Variants,*
  Firearm News (Feb. 9, 2018),
  https://www.firearmsnews.com/editorial/kel-tec-introduces-new-firearm-variants/77710 ...........7

*Fund the Fight for Your Rights!*, Firearms Pol'y Coal.,
    https://www.firearmspolicy.org/support#:~:text=FPC%3A%20Donations%20to%20
    and%20support,communications%2C%20and%20public%20education%20programs ................... 3

H.G. Emery & K.G. Brewster, THE NEW CENTURY DICTIONARY OF THE
    ENGLISH LANGUAGE, Vol. 2 (1927) ...................................................................................... 51

How to Mill & Finish an 80% Lower, 80 Percent Arms (Nov. 3, 2022),
    https://www.80percentarms.com/blog/how-to-finish-an-80-lower/ ................................. 38

IRS Form 990, Return of Organizations Exempt from Income Tax (2018), Firearms Pol'y Coal.,
    https://apps.irs.gov/pub/epostcard/cor/ 472460415_201812_990OA_
    2022081720282612.pdf ........................................................................................................ 3

*Join the FPC Grassroots Army*, Firearms Pol'y Coal.,
    https://secure.anedot.com/firearmspolicycoalition/join_the_fpc_grassroots_army
    ?sc=joinfpc .............................................................................................................................. 3

*Public Safety Advisory to All Federal Firearms Licensees, and Firearm Parts, Components, and Accessories
    Manufacturers and Distributors*, ATF (Mar. 21, 2023),
    https://www.atf.gov/firearms/docs/guide/public-safety-advisory-all-federal-firearms-
    licensees-and-firearm-parts/download ............................................................................... 45

*Set Aside*, BLACK'S LAW DICTIONARY (3d ed. 1933) ...................................................................... 51

*Set Aside*, BLACK'S LAW DICTIONARY (11th ed. 2019) .................................................................. 51

Tim Pack, *20 AK-47 Variants You Want to Own*, Guns & Ammo (Nov. 18, 2013),
    https://www.gunsandammo.com/editorial/20-ak-47-variants-around-the-world/249760 ............. 7

U.S. Sentencing Guidelines § 1B1.1 ................................................................................................ 19

WEBSTER'S THIRD INTERNATIONAL DICTIONARY (2002) ................................................................ 20

**INTRODUCTION**

Plaintiffs' and Intervenor-Plaintiffs' opposition briefs fail to rescue their claims from the deficiencies set forth in Defendants' opening brief.[1]  As a threshold matter, the Individual Plaintiffs cannot establish standing based on the action of a third party that bears no causal relationship to the Rule.   And FPC and SAC still do not establish that they are either traditional membership organizations, as any court has defined that structure, or the functional equivalent thereof.  Turning to the merits of Plaintiffs' claims, Plaintiffs fail to identify any change between the Notice and the Rule that was not reasonably foreseeable, and, in any event, they fail to establish any harm from the changes ATF made.  Accordingly, their logical outgrowth claims fail as a matter of law.  Because the Rule is both reasonable and reasonably explained in every respect raised by Plaintiffs, their arbitrary and capricious claims also should be dismissed.

Plaintiffs' constitutional claims fare no better. The Rule does not infringe any law-abiding citizen's right to bear arms.  As to the First Amendment, the Rule neither prohibits nor compels any speech.  Moreover, any speech that the Rule affects incidentally is commercial speech, and the Rule readily satisfies intermediate scrutiny.  Plaintiffs' void-for-vagueness claims also fail as a matter of law. Case law interpreting the term "readily" in closely analogous contexts overwhelmingly supports the conclusion that the Rule is not unconstitutionally vague, and the availability of an administrative process to resolve any confusion further mitigates any due process concerns.  Plaintiffs also fail to establish that the Rule violates the Take Care Clause.  In the event the Court were to hold that Plaintiffs succeeded on the merits of any of their claims, however, any relief should be narrowly tailored, and, in particular, should not include universal vacatur.

---

[1] Defendants adopt throughout this brief the same naming conventions used in Defendants' opening summary judgment brief.  *See* Defs.' Combined Br. in Opp'n to Original Pls.' & Intervenor-Pls.' Mots. for Summ. J. & in Supp. of Defs.' Cross-Mot. for Summ. J., ECF No. 181 (Defs.' MSJ).

**ARGUMENT**

I.   **Defendants Are Entitled to Summary Judgment to the Extent That Plaintiffs Lack Article III Standing to Bring Their Claims.**[2]

A.   **Individual Plaintiffs**

As explained in Defendants' opening brief, the Individual Plaintiffs lack standing because the only purported injury they plausibly invoke—a $30 transfer fee that certain FFLs purportedly would charge them to facilitate a firearm purchase—is not fairly traceable to the Rule. *See* Defs.' MSJ at 11-12.[3]  Plaintiffs respond by citing *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), in which the Supreme Court held that traceability may be established where the plaintiff's injury is the result of "the predictable effect of Government action on the decisions of third parties." *Id.* at 2566.  Plaintiffs contend that it is not speculative that the FFLs they contacted would charge them $30 to transfer ownership of a firearm purchased from out of state. *See* Pls.' Combined Reply Br. in Supp. of Their Mot. for Summ. J. & Resp. to Defs.' Cross-Mot. for Summ. J., at 4-5, ECF No. 191 (Pls.' Opp.).  But this contention misses the point.  While it may be "predictable" that the FFLs will charge such a fee, it is not the "effect of Government action."  That is, as Defendants previously explained, any transfer fees that an FFL may choose to charge bear no causal relationship to the Rule, *see* Defs.' MSJ at 12—

---

[2] In light of the evidence that Defense Distributed submitted for the first time alongside its opposition and reply brief, *see* ECF No. 193-1, Defendants no longer challenge the standing of Defense Distributed for purposes of this motion.

[3] As noted in Defendants' opening brief, Plaintiffs acknowledge that, as long as they follow this procedure, the purported threat of criminal prosecution on which the Court relied in granting their motion for preliminary injunctive relief will be eliminated. *See* Defs.' MSJ at 12 (citing ECF No. 62-1, ¶ 3; ECF No. 62-2, ¶ 3); *VanDerStok v. Garland*, __ F. Supp. 3d __, 2022 WL 4809376, at *4-6 (N.D. Tex. Oct. 1, 2022), *appeal filed*, No. 22-11071 (5th Cir. Nov. 3, 2022).  Accordingly, any such threat of prosecution is not credible; Plaintiffs do not face a "Hobson's choice" whether to comply with a regulation or risk criminal prosecution when the costs of compliance are merely *de minimis*. *VanDerStok*, 2022 WL 4809376, at *5 (quoting *Cal. Trucking Ass'n v. Becerra*, 433 F.Supp.3d 1154, 1169-70 (S.D. Cal. 2020), *rev'd on other grounds sub nom. Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644 (9th Cir. 2021)).  Plaintiffs are thus mistaken that Defendants did not "provide . . . argument as to why this prior finding was erroneous." Pls.' Opp. at 3.

whether "*de facto*," "proximate," or otherwise, Pls.' Opp. at 5.  Plaintiffs offer no argument to the contrary, and thus fail to establish traceability for purposes of Article III standing.[4]

### B.  FPC & SAF

FPC and SAF both fail to establish associational standing to challenge the Rule because they do not establish that they are either traditional membership organizations or the functional equivalents thereof.  *See* Defs.' MSJ at 12-14.[5]  Both organizations seemingly contend that all that is required to constitute a traditional membership organization is to permit any member of the public to make a donation and call himself or herself a "member."  *See* Pls.' Opp. at 8 (citing Combs Decl. ¶ 8, ECF No. 62-4); Defense Distributed and Second Amendment Foundation's Summ. J. Resp./Reply Br. at 2, ECF No. 193 (DD-SAF Opp.) (citing Gottlieb Decl. ¶ 2, ECF No. 166-2).  To the contrary, the Fifth Circuit has held that an organization that "simply follow[s] a practice of considering all those who gave a donation, as well as those who had a donation made in their name, to be members" "ha[s] no members" for purposes of associational standing and thus must satisfy the indicia-of-membership

---

[4] To the extent that FPC contends it is injured in its own right by analogous fees, its argument suffers from the same defect.  *See* Pls.' Opp. at 5.

[5] FPC argued for the first time in its opposition and reply brief that it satisfies the traditional membership organization standard, so it is unsurprising that Defendants have not previously "contest[ed]" it.  Pls.' Opp. at 5.  In any event, like SAF, it appears that anyone may become a "member" of FPC simply by making a one-time donation of $30 on its website.  *See Join the FPC Grassroots Army*, FIREARMS POL'Y COAL., https://secure.anedot.com/firearmspolicycoalition/join_the_fpc_grassroots_army?sc=joinfpc (last visited Apr. 6, 2023).  Moreover, FPC's most recent IRS Form 990 available on the IRS website states that FPC does not have any members whatsoever, much less members with authority to elect voting members of its governing body or to approve any of its governance decisions.  *See* IRS Form 990, Return of Organizations Exempt from Income Tax (2018), FIREARMS POL'Y COAL., https://apps.irs.gov/pub/epostcard/cor/472460415_201812_990OA_2022081720282612.pdf (last visited Apr. 6, 2023), at 6.  Additionally, donations to FPC are not tax-deductible, because FPC is organized as a 501(c)(4) social welfare organization.  *See Fund the Fight for Your Rights!*, FIREARMS POL'Y COAL., https://www.firearmspolicy.org/support#:~:text=FPC%3A%20Donations%20to%20and%20support,communications%2C%20and%20public%20education%20programs (last visited Apr. 6, 2023).  FPC is accordingly not a traditional membership organization for the same reasons that SAF is not.

3

test.  *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 827 (5th Cir. 1997).  In *Students for Fair Admissions, Inc. v. University of Texas at Austin*, 37 F.4th 1078 (5th Cir. 2022), meanwhile, the Fifth Circuit held that the plaintiff organization was a traditional membership organization "[i]n light of [its] structure," which "provide[d] for a single class of 'General Members,' who pa[id] membership dues *and* elect[ed] one of [the organization's] five directors"—in contrast to its "affiliate members," who lacked these rights and responsibilities.  *Id.* at 1082, 1084-85 (emphasis added).  SAF's argument that the Fifth Circuit "mentioned governance methods only in passing" in *Students for Fair Admissions*, DD-SAF Opp. at 3, is belied by the court's use of the conjunctive; it is not clear why the court would have emphasized both the dues-paying and the voting provisions of the plaintiff organization's bylaws if only the former were required.  In sum, FPC and SAF fail to establish that they are traditional membership organizations under governing precedent, and they do not attempt to establish that they satisfy the alternative, indicia-of-membership threshold requirement.

## II.     The Rule Represents a Logical Outgrowth of the Notice.

Defendants' opening brief showed that the Rule is a logical outgrowth of the Notice.  It was readily apparent to commenters that the final rule might adopt a definition of "frame or receiver" different from that proposed in the Notice, as ATF specifically requested comments on the feasibility of implementing the Notice's proposed definition, and commenters submitted proposed alternative definitions.  The Rule satisfies the logical outgrowth standard with respect to ATF's narrowed regulatory definition of "frame or receiver."  The Rule's definitions of "variant," "partially complete, disassembled, or nonfunctional frame or receiver," "multi-piece receiver," and other terms are all logical outgrowths of the Notice, as is the Rule's grandfathering of certain existing frame or receiver

classifications.  In any event, Plaintiffs fail to identify any specific comment they were prevented from submitting or any tangible harm traceable to any changes they mention.  Defs.' MSJ at 14-26.[6]

Plaintiffs' attempts to challenge these conclusions are not persuasive.  Pls.' Opp. at 14-21; BlackHawk Mfg. Grp., Inc.'s Reply Br. in Supp. of Mot. for Summ. J. & in Opp'n to Defs.' Cross-Mot. for Summ. J. at 12-16, ECF No. 12 (BlackHawk Opp.).  First, Plaintiffs err in contending that the Rule's definition of "frame or receiver" is not a logical outgrowth of the Notice because that definition differs from the Notice's proposed definition of "frame" and "receiver."  Pls.' Opp. at 16-18; BlackHawk Opp. at 12-13.  That contention runs headlong into the Fifth Circuit's precedent governing such challenges.  As the Fifth Circuit has explained, a notice of proposed rulemaking is "not required to specifically identify every precise proposal which the agency might ultimately adopt" but instead "satisfie[s] the requisite standard by fairly apprising interested persons of the subjects and issues the agency was considering."  *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 448 (5th Cir. 2021) (citation and alterations omitted).

And the Rule satisfies this standard because its definitions of "frame" and "receiver" hew closely to the definition of "frame or receiver" proposed in the Notice.  *See* Defs.' MSJ at 14-18.  Both sets of definitions focus on the housing or structure for fire control components, with the primary difference being only that the Rule—directly heeding comments raising concerns about the expansiveness of the Notice's definition—identifies the housing for a *specific* fire control component as the "frame" or "receiver" instead of identifying the housing for *any* such component as a frame or

---

[6] As an initial matter, "[w]hen a party fails to respond to an argument in the opposing party's motion for summary judgment, the party concedes that argument."  *Hull v. Kapstone Container Corp.*, No. 3:17-CV-0641-K, 2018 WL 4409798, at *2 (N.D. Tex. Sept. 17, 2018).  To the extent that Plaintiffs fail to respond to arguments presented by Defendants in footnotes rather than in the text of their brief, those arguments are conceded.  Moreover, Plaintiffs fail to identify any specific argument presented by Defendants to which they were prevented from responding by the fact that the argument appeared in a footnote of Defendants' brief.  Plaintiffs are thus incorrect in their contention that Defendants have waived any argument presented "through extensive usage of footnotes."  Pls.' Opp. at 16.

receiver.  The housings identified in the Rule were thus included in the Notice's proposed definition of "frame or receiver."  In short, the Notice "sought comment on the ultimate subject of" the Rule "and apprised interested parties of the related issues under consideration by offering . . . proposals and inviting alternatives," which is "'all the APA demands.'"  *Huawei Techs. USA*, 2 F.4th at 448 (quoting *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989)).  "Consequently, the [Notice] should have enabled—and in fact, did enable—[Plaintiffs] to anticipate those aspects of the final rule [they] claim[] were not properly noticed."  *Id.*[7]

Moreover, Plaintiffs' argument that ATF improperly bootstrapped notice from comments is not persuasive.  Although ATF relied in part on submitted comments in formulating the Rule's definition of "frame" and "receiver," the Notice itself "fairly appris[ed] interested persons of the subjects and issues the agency was considering."  *Huawei Techs. USA*, 2 F.4th at 448.  Especially in light of the fact that the Notice "specifically requested comments on the feasibility of implementing the [proposed] definition of firearm 'frame or receiver,'" 86 Fed. Reg. at 27,740, the "possibility" that the agency might modify this definition in the Rule was "reasonably foreseeable," *Long Island Care at Home v. Coke*, 551 U.S. 158, 175 (2007).  And the agency "permissibly implemented changes in the final rule instigated by comments" during the rulemaking, as shown in Defendants' opening brief. *Huawei Techs. USA*, 2 F.4th at 448 (citing *Chem. Mfrs. Ass'n*, 870 F.2d at 203) (internal punctuation omitted)).  In any event, Plaintiffs fail to "demonstrate" any way in which an alleged lack of notice "resulted in 'prejudice'" to them.  *Am. Coke & Coal Chems. Inst. v. EPA*, 452 F.3d 930, 939 (D.C. Cir.

---

[7] *Chocolate Manufacturers Association v. Block*, 755 F.2d 1098 (4th Cir. 1985), cited by Plaintiffs, does not suggest to the contrary.  In that case, the agency's proposed rule specified the content of a federal food program, proposing the elimination of certain foods with high sugar content but specifically authorizing flavored milk; however, the final rule reversed course and eliminated flavored milk from the program.  *Id.* at 1103.  The case thus presented "not the simple question of whether the notice of a proposed rule adequately informs the public of its intent," but instead "how to judge the adequacy of the notice when the proposal it describes is replaced by a final rule which reaches a conclusion exactly opposite to that proposed" based on comments.  *Id.*  That is not the situation presented here.

2006) (quoting 5 U.S.C. § 706(2)).  Vague, unsubstantiated allegations that "there *could* be untold downstream effects of separately defining 'frame,' 'receiver,' and 'variant'" in the Rule do not equate to a demonstration of prejudice.  Pls.' Opp. at 18 (emphasis added).

Second, the Rule's use of the term "variant" is also a logical outgrowth of the Rule.  Defs.' MSJ at 18; *contra* Pls.' Opp. at 18-19; BlackHawk Opp. at 15-16.  The term "variant," as applied to a frame or receiver, merely refers to a weapon that utilizes a similar frame or receiver design irrespective of such differences as new or different model designations or configurations.  87 Fed. Reg. at 24,735 (codified as amended at 27 C.F.R. § 478.12(a)(3)).  This term is well known in the firearms industry as describing different variations of a particular weapon platform based on the same frame or receiver design.[8]  Indeed, the Notice observed that "[s]ince [ATF] began issuing firearm classifications," among the factors that the agency has considered when examining firearms are "which component the firearms industry commonly considers to be the frame or receiver with respect to the same *or similar firearms*."  86 Fed. Reg. at 27,721, 27,728, 27,743 (emphasis added).  It thus came as no surprise that the Rule chose to clarify how the definitions of "frame" and "receiver" apply to weapons utilizing similar designs (*i.e.*, variants).  Furthermore, the Notice explained that ATF had previously determined a specific part to be the frame or receiver with respect to certain weapons with split or modular frames or receivers—including both semiautomatic weapons and machineguns—and the Notice specifically discussed different variants of such weapons by referring either to the same "type" of weapon produced by a given manufacturer or to "variants" of such weapons.  86 Fed. Reg. at 27,743-46.  Thus,

---

[8] *See, e.g.*, *FN Herstal, S.A. v. Clyde Armory, Inc.*, 123 F. Supp. 3d 1356, 1361 (M.D. Ga. 2015) (citing various firearms-related publications crediting a firearms manufacturer with developing a particular firearm, and also discussing "different forms and variants of the firearm"); Firearm News Digital Editors, *Kel-Tec Introduces New Firearm Variants*, FIREARM NEWS (Feb. 9, 2018), https://www.firearmsnews.com/editorial/kel-tec-introduces-new-firearm-variants/77710;  Tim Pack, *20 AK-47 Variants You Want to Own*, GUNS & AMMO (Nov. 18, 2013), https://www.gunsandammo.com/editorial/20-ak-47-variants-around-the-world/249760.

Plaintiffs' assertion that the Notice's use of word "type" rather than "variant" to describe certain semiautomatic weapons somehow deprived them of fair notice, Pls.' Opp. at 18, strains credulity.

There was also no need for the Notice to address variants of firearms without a split or modular frame or receiver because for such firearms, the frame or receiver houses or provides a structure for *all* fire control components regardless of new or different model designations or configurations. *See* Defs.' MSJ at 18 n.9. Plaintiffs are mistaken in their assertion that this explanation somehow implies that the Rule fails to satisfy the logical outgrowth standard. And in any event, a plaintiff claiming inadequate notice must show that, "had proper notice been provided, [it] would have submitted additional, different comments that could have invalidated the [agency's] rationale." *City of Waukesha v. EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003). But Plaintiffs fail to identify any specific comment they were prevented from submitting, much less substantiate any tangible harm resulting from the Rule's use of the term "variant."

Third, Plaintiffs do not advance their claims by observing that the Rule uses different illustrative examples in its definitions section than the Notice. Pls.' Opp. at 19. The Notice listed twelve nonexclusive examples of single and split frame or receiver weapons specifying the part ATF previously determined was the frame or receiver. *See* 86 Fed. Reg. at 27,742-46 (proposed 27 C.F.R. § 478.11, Examples 1-4 and (b)(3)(i)-(iii), (v), (ix)). Therefore, under the Notice's proposal, the designated parts of these weapons would have been treated as the firearm's "frame or receiver." The Rule listed these same examples as nonexclusive examples that illustrated the Rule's definition of "frame" or "receiver." *See* 87 Fed. Reg. at 24,735-41 (codified as amended at 27 C.F.R. § 478.12(a)(4)(i)-(x), (f)(1)(i), (iv)).[9] The ultimate result is thus the same, because both the Notice and

---

[9] In response to comments, the Rule merely added two new examples—the Ruger Mark IV pistol and Benelli 121 M1 Shotgun—and specified the frame of "certain locking block rail system semiautomatic pistols" as the lower grip of "Glock variant striker-fired semiautomatic pistols." *See* 87 Fed. Reg. 24,740 (codified as amended at 27 C.F.R. § 478.12(f)(1)(ii), (iii)), and *compare* 86 Fed. Reg. 27,744

the Rule treated these specific parts of these specific weapons as the frame or receiver of those weapons.  Plaintiffs thus misplace their reliance on these examples and, again, they fail to identify any prejudice or concrete harm resulting from the fact that these purely illustrative examples do not appear in precisely the same way in the Notice and the Rule.

Fourth, the Rule's definition of a "partially complete, disassembled, or nonfunctional frame or receiver" is a logical outgrowth of the Notice's definition.  Defs.' MSJ at 19-20.  *Contra* Pls.' Opp. at 19-20; BlackHawk Opp. at 13-14.  The Notice proposed that in determining whether such an item "may readily be assembled, completed, converted, or restored to a functional state, [ATF] may consider *any available* instructions, guides, templates, jigs, equipment, tools, or marketing materials." 86 Fed. Reg. at 27,746 (emphasis added).  The Notice did not qualify or limit the scope of this determination to examining only materials sold or distributed by the items' seller or distributor. Rather, its text clearly and unambiguously proposed that ATF may consider "any available" materials. Plaintiffs thus miss the mark in arguing that the Rule expanded the scope of the Notice's definition by providing that ATF may consider "any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit."  87 Fed. Reg. at 24,739 (codified as amended at 27 C.F.R. § 478.12(c)). Their contention that "no commenter had reason to believe the Rule would include items merely possessed independent of the seller or distributor," BlackHawk Opp. at 13, is belied by the fact that a number of commenters did, in fact, so interpret the Notice.  *See* Defs.' MSJ at 20 n.12 (citing comments).

_____

(proposed 27 C.F.R. § 478.11(b)(3)(iv)) *with* 87 Fed. Reg. 24,736 (codified as amended at 27 C.F.R. § 478.12(a)(4)(iii)).

9

Plaintiffs expend considerable space attempting to show that the phrase "any available" materials does not actually mean what it says, but instead means "only those materials sold or distributed by the item's seller or distributor." But Plaintiffs' wish cannot transmute this plain text into something it is not. Nor would it have made sense for an agency classification determination to focus only on firearm sellers and distributors because ATF classifies firearms for persons who are not sellers or distributors. Moreover, as the Notice stated, ATF not only classifies firearms in response to voluntary requests, but also in criminal cases against persons who *possess* firearms unlawfully. *See* 86 Fed. Reg. at 27,723 (noting that "numerous Federal criminal cases have been brought . . . to counter illegal trafficking in unserialized home-completed and assembled weapons, and *possession* of such weapons by prohibited persons") (emphasis added).

Thus, contrary to Plaintiffs' assertions, the Rule actually limited the scope of the Notice's definition by providing that ATF may consider "any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit" instead of "any available instructions, guides, templates, jigs, equipment, tools, or marketing materials." *Compare* 87 Fed. Reg. at 24,739 *with* 86 Fed. Reg. at 27,746. And because the GCA prohibits the possession of firearm frames and receivers by prohibited persons, it would make little sense for ATF to treat a partially complete frame or receiver sold or distributed with a template or jig differently from a situation in which the end user possesses such items. It would be inconsistent with the GCA, which focuses not only on the sale or distribution of firearms, *see* 18 U.S.C. §§ 922(a)-(f), but also on their possession by prohibited persons, *id.* §§ 922(g), (h). The Rule's limitation of the Notice's scope represents a logical outgrowth of the Notice. *See Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1299-1300 (D.C. Cir. 2000) (notice sufficient where agency first proposed that

10

Indian tribes be required to meet the same requirements as States with respect to judicial review of certain actions, but the final rule exempted tribes from some of those requirements).

Finally, Plaintiffs cite no authority to support their assertion that a final rule is inconsistent with the logical outgrowth standard if its definitional structure has changed from the proposed rule, *see* Defs.' MSJ at 22-23, and Plaintiffs' closing briefs fail to remedy this deficiency.[10]   Moreover, Defendants' opening brief demonstrated that the Rule's definitions of "frame" and "receiver" constitute a logical outgrowth of the Notice's definition of "frame or receiver."  Defs.' MSJ at 14-23. Plaintiffs' mere observation that the Notice and the Rule contain a different number of definitional provisions does not satisfy their burden under the APA.

In any event, Plaintiffs must show that any alleged change in definitional structure resulted in prejudice to them.  *See* Defs.' MSJ at 26 (citing authority).  They have made no such demonstration. Plaintiffs have neither identified any specific comment they were supposedly prevented from submitting, nor shown that any change they cite between the Notice and the Rule caused them actual

---

[10] Plaintiffs also misplace their reliance on the authority that they do cite.  The proposed rule at issue in *CSX Transportation, Inc. v. Surface Transportation Board*, 584 F.3d 1076 (D.C. Cir. 2009), suggested a method for resolving rail rate disputes that depended in relevant part on comparing the rail movement at issue with a comparison group of rail movements selected from the most recent year of sample data; however, the final rule expanded the data set to the most recent four years.  *Id.* at 1078.  Because nothing in the proposed rule indicated that the agency might consider expanding the scope of the comparison group data from one to four years, the D.C. Circuit found that the final rule was not a logical outgrowth.  *Id.* at 1082.  The Rule here, by contrast, narrowed rather than expanded the scope of the Notice.  Moreover, the D.C. Circuit stated that "a final rule represents a logical outgrowth where the NPRM expressly asked for comments on a particular issue," *id.* at 1081, and here, the Notice "specifically requested comments on the feasibility of implementing the [proposed] definition of firearm 'frame or receiver.'"  86 Fed. Reg. at 27,740.  The final rule in *Texas v. EPA*, 389 F. Supp. 3d 497 (S.D. Tex. 2019), relied on a fundamentally different set of criteria to define a term in the Clean Water Act—namely, "precise numerical distance-based criteria" "rather than the ecologic and hydrologic criteria in the [p]roposed [r]ule," without advance notice.  *Id.* at 502.  This change was "significant" because "it alter[ed] the jurisdictional scope of the" Clean Water Act.  *Id.* at 504.  By contrast, as explained in the text, the Rule simply identifies the housing for a *specific* fire control component as the "frame" or "receiver" instead of identifying the housing for *any* such component as a frame or receiver, as in the Notice.  The Rule neither relies on a fundamentally different set of criteria to define "frame" and "receiver" nor expands the GCA's scope.

harm.  As such, "the [N]otice satisfied the requisite standard by 'fairly appris[ing] interested persons of the subjects and issues the agency [was] considering,'" and the Rule is a logical outgrowth of the Notice.  *Huawei Techs. USA*, 2 F.4th at 448 (quoting *Chem. Mfrs. Ass'n*, 870 F.2d at 203).

## III.   The Rule Is Not Arbitrary and Capricious.

Review of final agency action to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "is neither sweeping nor intrusive," *Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*, 59 F.4th 180, 194 (5th Cir. 2023).  Instead, the Court "ask[s] whether the agency considered the relevant facts and articulated a satisfactory explanation for its decision; [it] cannot substitute [its] judgment for the agency's."  *Id.* (citation omitted).  "A decision is arbitrary or capricious only when it is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Yogi Metals Grp., Inc. v. Garland*, 38 F.4th 455, 458 (5th Cir. 2022) (citation omitted).  Here, ATF provided a reasoned explanation for promulgating the Rule after considering relevant factors.  The APA requires no more.

### A.   The Rule Explains Its Treatment of Partially Complete Frames and Receivers.

First, the Rule's treatment of partially complete frames and receivers reflects a consistently applied policy.  *See* Defs.' MSJ at 27-28.  Even before the Rule, ATF has maintained that a piece of metal, plastic, or other material becomes a "frame or receiver" when it reaches a "critical stage of manufacture," *see id.*, in other words, when the article is "brought to a stage of completeness that will allow it to accept the firearm components [that] it is designed for, using basic tools in a reasonable amount of time."  ATF Letter to Private Counsel #303304, at 3-4, ECF No. 182 at 070-071.  The Rule preserves this general approach, while applying it to an updated definition of "frame or receiver" that takes stock of decades of technological advances in firearms manufacture.

BlackHawk thus errs in contending that prior to the Rule, ATF addressed the critical stage of manufacture question "by examining measurable physical properties" but that the Rule now utilizes a

"subjective, qualitative inquiry." BlackHawk Opp. at 3. While ATF had previously classified partially complete frames and receivers based on the extent to which converting the item to be functional would require certain machining operations, its analysis largely parallels the "readily" convertible test adopted in the Rule. *See* 87 Fed. Reg. at 24,668 ("Rather than a new or different test, how quickly and easily [*i.e.*, readily] an item could be made functional is largely determined by which machining operations still needed to be performed."). ATF has reasonably explained that adopting the term "readily" allows ATF to incorporate definitions and factors based on preexisting case law interpreting that term in other firearms statutes and thereby to "provide[] manufacturers with fair warning on how the factors in that definition are evaluated." 87 Fed. Reg. at 24,663, 24,668; *see also* Defs.' MSJ at 30.[11] The agency thus acknowledged the extent to which it was updating a preexisting understanding and explained the reason for the update; moreover, the update is consistent with the GCA, which does not define the statutory term "frame or receiver," leaving it to ATF to do so. Nothing more is required under the APA. *See Handley v. Chapman*, 587 F.3d 273, 282 (5th Cir. 2009); Defs.' MSJ at 28 n.18.

Further, "[t]o minimize disruption and cost to the licensed firearms industry as much as possible, and in keeping with the public safety goals of the rule," ATF grandfathered existing complete frame or receiver designs that it previously determined to be the firearm "frame or receiver" of a given weapon. 87 Fed. Reg. at 24,654; *see also id.* at 24,683, 24,693. And ATF set out its reasoning for deciding not to grandfather partially complete, disassembled, or nonfunctional frames or receivers (including weapon or frame or receiver parts kits) that it had previously classified as not being "frames or receivers." *Id.* at 24,672. Previously, incomplete frames or receivers had been sent to ATF for

---

[11] Contrary to Plaintiffs' assertion, Pls.' Opp. at 21, statutes concerning machineguns are relevant to the question of ATF's authority to regulate firearms under the GCA. As with other types of firearms, machineguns are regulated by the GCA, which amended the NFA to specifically include "the frame or receiver of any such weapon." *See* 18 U.S.C. § 921(a)(24); 26 U.S.C. § 5845(b). And similar to its treatment of other firearms, the Rule requires a machinegun to be marked on its frame or receiver. 87 Fed. Reg. at 24,741-42 (codified as amended at 27 C.F.R. § 478.92(a)(1)(i), (a)(1)(vi)(A)-(B)).

classification without the other parts, jigs, templates, or materials that are sold or distributed with the item or kit.  *See id.*  Thus, the entire kit may not have been presented to ATF when it made its classification, *id.* at 24,709, despite the fact that these items and materials are necessary to make a proper classification, *id.* at 24,725.[12]  Contrary to Plaintiffs' contention, *see* Pls.' Opp. at 23, the agency acknowledged this decision, and explained its reasoning, which is well within APA requirements.

Moreover, Plaintiffs' argument that the Rule is inconsistent with statements made in a prior litigation brief is based on a mistaken understanding of that brief.  *See* Defs.' MSJ at 29.  In response, Plaintiffs simply repeat their mistaken interpretation of that prior litigation brief without acknowledging Defendants' explanation as to why they are mistaken.  Pls.' Opp. at 22-23; BlackHawk Opp. at 2-4.  Their argument is no more persuasive when repeated a second time.  Plaintiffs also mistake their reliance on a prior litigation brief in another case, in which ATF accurately represented that Congress "has explicitly excluded 'firearm parts' from [the] definition" of "firearm" in the GCA. Pls.' Opp. at 22 (quoting Mem. Supp. Fed. Defs.' Mot. to Dismiss at 1, *Calif. v. ATF*, No. 20-6761 (N.D. Cal. Nov. 30, 2020)).  It is correct that ATF generally does not regulate individual firearm parts, with the exception of frames and receivers, and parts of machineguns and silencers, as required by the GCA.  That remains true under the Rule.  The Rule explains *when* in the manufacturing process an unregulated item or part has become a regulated "frame" or "receiver" under 18 U.S.C. § 921(a)(3)(B).

---

[12] Plaintiffs incorrectly represent that the Rule "regulat[es] jigs, tools, and other items."  Pls.' Opp. at 23.  The Rule provides only that "[w]hen issuing a classification," ATF "may *consider* any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit."  87 Fed. Reg. at 24,739 (codified as amended at 27 C.F.R. § 478.12(c)) (emphasis added).  Such items are considered only to determine whether a partially complete frame or receiver has reached a stage of manufacture sufficient to be considered a "frame" or "receiver."  ATF does not regulate the manufacture, sale, or possession of such items.

**B.    The Rule Explains Why Weapon Parts Kits That Can Readily Be Converted to Expel a Projectile by Means of an Explosive Are "Firearms."**

The Rule does not reflect an unexplained change in ATF's treatment of weapon parts kits.  In recent years, weapon parts kits, or aggregations of weapon parts—some of which contain all components necessary to complete a functional weapon within a short time period—have increasingly been sold to individuals either directly from kit manufacturers or from retailers, without background checks or recordkeeping.  87 Fed. Reg. at 24,662.  Even before the Rule, ATF recognized that a weapon parts kit, standing alone, that is "designed to or may readily be converted to expel a projectile by the action of an explosive" is a "firearm" under the GCA and its regulations.  18 U.S.C. § 921(a)(3)(A); *see* 87 Fed. Reg. at 24,662 & n.44, 24,692; 86 Fed. Reg. at 27,726 & nn.39-40 (citing case law confirming this interpretation).  To reflect existing case law, the Rule adds a sentence to ATF's regulatory definition of "firearm" providing that "[t]he term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive."  87 Fed. Reg. at 24,735 (codified as amended at 27 C.F.R. § 478.11) (definition of "firearm").  And to the extent that ATF was required to explain this codification of existing policy, its explanation—relying on both case law and the GCA's plain meaning—was more than sufficient.  *See* Defs.' MSJ at 31-33.

In response, Plaintiffs ignore the GCA's text and instead attempt to distinguish the case law cited in the Rule.  BlackHawk Opp. at 8-12.[13]  Initially, because the plain statutory text suffices to

_____

[13] Plaintiffs also contend, without substantiation, that ATF previously considered a weapon parts kit a "firearm" only if the kit contained a firearm frame or receiver or the kit constituted a "machinegun." Their sole support for this contention is the portion of the Rule citing case law that—as explained below—confirms that a weapon parts kit that is designed to or may readily be converted to expel a projectile by the action of an explosive is a "firearm" under 18 U.S.C. § 921(a)(3)(A).  *See* Pls.' Opp. at 23 (citing 87 Fed. Reg. at 24,662 n.44).  And as a matter of statutory interpretation, the existence of a frame or receiver is not a precondition to classifying a weapon as a "firearm" under section 921(a)(3)(A) because section 921(a)(3) defines a "firearm" in the disjunctive, meaning that at least one of those alternatives (considered separately or together) is a "firearm."  87 Fed. Reg. 24,670 & n.65.

support the Rule's codification of ATF's existing policy regarding weapon parts kits, Plaintiffs' exclusive focus on the case law cited in the Rule is largely beside the point. In any event, Plaintiffs fail in their attempts to distinguish this body of case law.

The criminal defendant in *United States v. Wick*, 697 F. App'x 507 (9th Cir. 2017), unsuccessfully appealed his conviction of manufacturing and dealing firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A). *See id.* at 508. He contended that the evidence presented in support of his conviction—"Uzi parts kits undisputedly *not* assembled into operable weapons at the time [he] sold them"—were not "firearms" under 18 U.S.C. § 921(a)(3). *United States v. Wick*, No. 15-30, 2016 WL 10637098, at *1 (D. Mont. July 1, 2016). The court of appeals rejected this contention. It held that the evidence demonstrated that "in addition to demilled receivers" (*i.e.*, "receivers cut into pieces"), the defendant "was selling complete Uzi parts kits that could 'readily be converted to expel a projectile by the action of an explosive,' thus meeting the statute's definition of a firearm," and that "[t]wo witnesses [had] testified that these kits contained all the necessary components to assemble a fully functioning firearm with relative ease." 697 F. App'x at 508 (quoting 18 U.S.C. § 921(a)(3)(A)). Accordingly, it was unnecessary to reach the defendant's "argument as to whether a demilled receiver may, by itself, support a firearm conviction under 18 U.S.C. § 922(a)(1)(A)." *Id.* BlackHawk's description of *Wick* focuses solely on evidence relating to demilled receivers that the court expressly held was not necessary to its holding. BlackHawk Opp. at 9. *Wick* thus demonstrates that a weapon parts kit "contain[ing] all the necessary components to assemble a fully functioning firearm with relative ease" is a "firearm" under the GCA. 697 F. App'x at 508.

The criminal defendant in *United States v. Stewart*, 451 F.3d 1071 (9th Cir. 2006), sold weapon parts kits for the manufacture and assembly of .50 caliber rifles that "include[d] all parts necessary to complete the rifle, including the trigger assembly, bolt assembly, receiver, and barrel." *United States v. Stewart*, No. 00-698, 2001 WL 194917, at *1 (D. Ariz. Feb. 26, 2001). ATF determined that a weapon

16

parts kit purchased from the defendant "'was designed to and may readily be converted to expel a projectile by the action of an explosive, thereby making it a firearm' pursuant to 18 U.S.C. § 921(a)(3)." *Id.* at *2. The district court denied the defendant's request for an evidentiary hearing on his motion to suppress, *id.* at *7-10, and the court of appeals affirmed, 451 F.3d at 1073 & n.2. BlackHawk's brief correctly states that ATF's determination that the weapon parts kit purchased from the defendant could be readily converted into an operable "firearm" is "a position consistent with the five decades of ATF statutory interpretation and enforcement actions prior to the Rule." BlackHawk Opp. at 9. BlackHawk's assessment of *Stewart* shows that the Rule's treatment of weapon parts kits reflects established agency policy as well as existing case law.

*United States v. Theodoropoulos*, 866 F.2d 587 (3d Cir. 1989), affirmed a defendant's conviction for using a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c) and possessing an unregistered firearm in violation of 26 U.S.C. § 5861, despite the fact that the firearm in question— an automatic machine pistol—was disassembled when found during a search of the defendant's residence. *Id.* at 595 & n.3. The court explained that because 18 U.S.C. § 921(a)(3) defines "firearm" to include "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," and the disassembled machine pistol "could have easily been made operable," it was a "firearm" for purposes of 18 U.S.C. § 924(c) and 26 U.S.C. § 5861. *Id.* These statutory provisions are located in the GCA and NFA, respectively. Because there is no material difference between a disassembled firearm and a weapon parts kit that can be readily converted to expel a projectile by means of an explosive, *Theodoropoulos*'s conclusion supports the Rule's treatment of weapon parts kits as "firearms."

Similarly, the court in *United States v. Morales*, 280 F. Supp. 2d 262 (S.D.N.Y. 2003), denied a motion to dismiss an indictment charging the defendant under 18 U.S.C. § 924(c). *Id.* at 272-73. The court rejected the defendant's argument that he had not used a "firearm" because when the semi-

automatic pistol in question was recovered from the defendant's residence, it was "partially-disassembled" and "inoperable." *Id.* at 272. The court expressly noted that the GCA "includes in the definition of a firearm not only those weapons that 'will' expel a projectile, but also those 'designed to' or that 'may readily be converted to' a weapon that will expel a projectile." *Id.* (quoting 18 U.S.C. § 921(a)(3)(A)). Thus, because "[w]hether in pieces or whole," the defendant's partially-disassembled pistol "was clearly 'designed to,' and could 'readily be converted to' expel a projectile," it was a "firearm." *Id. Morales* supports the Rule's treatment of weapon parts kits because, as noted above, there is no relevant difference between a disassembled firearm and a weapon parts kit that can be readily converted to expel a projectile by means of an explosive. And it is irrelevant that *Morales* noted that the GCA's legislative history included a recognition that the statute would not regulate individual firearm parts. *See* BlackHawk Opp. at 10. Weapon parts kits that allow a buyer to complete a functional weapon within a short time period, or with minimal effort, expertise, or equipment are not regulated because they are firearm parts, but because they are a "firearm" when aggregated—a single weapon in a disassembled form or configuration.

The remaining cases discussed in the Rule also support its treatment of weapon parts kits that are readily convertible to expel a projectile by means of an explosive as "firearms." The court in *United States v. Randolph*, No. 02-850, 2003 WL 1461610 (S.D.N.Y. Mar. 20, 2003), sentenced the defendant for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The court explained that although the firearm at issue "consist[ed] of disassembled parts with no ammunition, no magazine, and a broken firing pin, making it incapable of being fired without replacement or repair," it nonetheless satisfied "the federal definition of a firearm" because it could "'be readily converted to expel a projectile.'" *Id.* at *2 (quoting 18 U.S.C. § 921(a)(3)). So too, the Fifth Circuit in *United States v. Ryles*, 988 F.2d 13 (5th Cir. 1993), rejected a defendant's contention that his sentence for drug possession should not have been enhanced for possession of a firearm in connection with the offense

18

because the firearm—a shotgun—was disassembled when recovered from the defendant's vehicle.  *Id.* at 16.  Citing the Sentencing Guidelines' definition of a "firearm" as "any weapon . . . which will or is designed to *or may readily be converted to expel a projectile by the action of the explosive*"—a definition that tracks the GCA's definition of "firearm"—the Fifth Circuit affirmed the sentencing increase "[b]ecause [the defendant's] disassembled shotgun could have been 'readily converted' to an operable firearm."  *Id.* (quoting U.S. Sentencing Guidelines § 1B1.1); *see also Enamorado v. United States*, No. 16-3029, 2017 WL 2588428, at *6 (N.D. Iowa June 14, 2017) (similarly rejecting ineffective assistance of counsel claim when affirming plaintiff's sentence enhancement based on plaintiff's argument that his pistol "was dis[a]ssembled and not readily usable" because plaintiff "could easily reassemble it," and it thus constituted a "firearm").  Each of these cases supports the Rule's inclusion of weapon parts kits that can be readily converted to expel a projectile within its definition of "firearm" because such kits—like other disassembled weapons—are "firearms" under the GCA.

Finally, as explained previously, the Rule does not state—as BlackHawk contends—that a weapon parts kit does not contain a frame or receiver; instead, it provides that such a kit "that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive" is a "firearm."  87 Fed. Reg. at 24,735 (codified as amended at 27 C.F.R. § 478.11).  BlackHawk incorrectly criticizes this explanation as "disingenuous" because the GCA's definition of "firearm"—which the Rule's definition tracks—includes "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive."  18 U.S.C. § 921(a)(3)(A).  BlackHawk's charge is unwarranted.  The GCA does not define the term "weapon," and both the Notice and the Rule explained that a weapon parts kit that may readily be converted to expel a projectile by the action of an explosive is a "weapon."[14]

---

[14] *See* 86 Fed. Reg. at 27,726 n.41 ("Even though they generally cannot function to expel a projectile when sold, weapon parts kits are still 'weapons'—real combat instruments, such as pistols, revolvers, rifles, or shotguns—in an unassembled, unfinished, and/or incomplete state or configuration."); 87

**C.     The Rule Does Not Alter ATF's Position Regarding Firearms with Split Frames or Receivers or Striker-Fired Firearms.**

ATF also did not change its position regarding firearms with split frames or receivers or striker-fired firearms.  The Rule instead codifies the agency's existing position in the face of court decisions misinterpreting ATF's now-superseded regulations.  Those prior regulations defined "frame or receiver" as that part of a firearm that provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel.  33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968) (formerly codified at 27 C.F.R. § 478.11).  But ATF has long recognized that many firearms might have a primary structural component to which fire control components are attached that would nevertheless fall outside a restrictive application of this prior definition.  87 Fed. Reg. at 24,654; *see also* 86 Fed. Reg. at 27,721.  And a restrictive interpretation of this former definition would create the anomalous result that "as many as 90 percent of all firearms (i.e., with split frames or receivers, or striker-fired) in the United States would not have any frame or receiver subject to regulation."  87 Fed. Reg. at 24,652; *see also* 86 Fed. Reg. at 27,722.

Unsurprisingly, then, ATF has long regarded its now-superseded regulatory definition of "frame or receiver" as non-exhaustive.  87 Fed. Reg. at 24,655.  The agency's position has long been that firearms with split frames or receivers "should be examined with a view toward determining if [either] the upper or lower half of the receiver more nearly fits the legal definition of 'receiver.'"  ATF Memorandum #22334 at 3 (Jan. 24, 1977), App. 003.[15]  By contrast, certain courts recently have

---

Fed. Reg. at 24,684 ("A 'weapon' is defined by common dictionaries as '[a]n instrument of offensive or defensive combat,' but there is no requirement in either the dictionary definition or [18 U.S.C.] § 923(a)(3)(A) that the instrument have a minimum level of utility or lethality to be considered a 'weapon.'  While the aggregation of parts in a kit may not yet function as a weapon, these parts, simply in broken down form, can only be completed and assembled as instruments that expel live ammunition.") (quoting WEBSTER'S THIRD INTERNATIONAL DICTIONARY 2589 (2002)).

[15] More specifically, for split receiver machineguns, ATF has long maintained the position that determining which part is the weapon's "frame or receiver" should be determined with respect to whether the upper or lower portion of the receiver has the ability to accept machinegun parts.  *See id.,*

interpreted this now-superseded regulatory definition as exhaustive—an "erroneous" interpretation, in ATF's view. *See* 86 Fed. Reg. at 27,722, 27,727. To address this problem, the Rule amended ATF's regulatory definition of "frame or receiver" to expressly cover the single component best classified as the frame or receiver of striker-fired firearms. *See* Defs.' MSJ at 33-34. The Rule thus does not reflect a change in ATF's policy regarding split frames or receivers or striker-fired firearms.

In response, BlackHawk incorrectly states that no recent cases cited in the Rule treated the now-superseded definition of "frame or receiver" as exhaustive. BlackHawk Opp. at 4-8. Initially, this issue is largely irrelevant. The premise of BlackHawk's argument is that the Rule effected a change in existing policy with respect to split frames or receivers or striker-fired firearms without adequate explanation. But as shown above, ATF's position that its prior regulation was not exhaustive regarding the identification of the "frame or receiver" of such weapons dates back more than fifty years, and the Rule codified this existing policy. In any event, however, recent cases cited by ATF do reveal that some courts treated the agency's now-superseded definition of "frame or receiver" as exhaustive, contrary to BlackHawk's representation.

For example, *United States v. Rowold*, 429 F. Supp. 3d 469 (N.D. Ohio 2019), deemed ATF's former regulation exhaustive as applied to a firearm with a split receiver, the AR-15. Although the AR-15 firearm platform "is a two-part system comprised of an 'upper receiver' and a 'lower receiver,'" "[n]either the upper nor the lower receiver can, standing alone, cause the weapon to fire." *Id.* at 471. The United States had indicted a defendant for being a felon in possession of fifteen AR-15 lower receivers, *id.* at 470, and "[t]he only dispute" in the case was "whether, as a matter of law, the [AR-15's] lower receiver is a 'firearm' under the GCA," *id.* at 472.

_____

App. 003 (upper half of a FN FAL rifle is the "frame or receiver" because it was designed to accept the components that allow fully automatic fire); ATF Internal Revenue Serv. Memoranda #21208 at 3 (Mar. 1, 1971), App. 008 (lower portion of an M-16 rifle is the "frame or receiver" because it "comes closest to meeting the definition of frame or receiver" in ATF's now-superseded regulations).

Expert testimony showed that only approximately 10% of currently manufactured firearms in the United States had a receiver falling within the definition of ATF's superseded regulation. Transcript of Motion Hearing at PageID #557-58, *United States v. Rowold*, No. 3:18-cr-387 (N.D. Ohio Sept. 26, 2019), App. 132-33. Nevertheless, the court treated this superseded regulation as exhaustive, and concluded that that regulation "len[t] itself to only one interpretation: namely, that under the GCA, the receiver of a firearm must be a single unit that holds three, not two, components," and because an AR-15 lower receiver held only two fire control components, it was not a "firearm." 429 F. Supp. 3d at 475-76. In response to the government's undisputed statement that "dismissal on the basis the defendants urge would leave the AR-15 lower receiver unregulated under the GCA," the court declared that "ATF retains the authority—and has the duty—to *fix the regulatory scheme* and to regulate AR-15 lower receivers as firearms within the GCA." *Id.* at 476 (emphasis added).

Similarly, *United States v. Jimenez*, 191 F. Supp. 3d 1038 (N.D. Cal. 2016), also deemed ATF's prior regulation exhaustive as to the identification of an AR-15's "receiver." The defendant had purchased an AR-15 lower receiver, and was charged with unlawful possession of a machinegun, in violation of 18 U.S.C. § 922(o), and receiving and possessing an unregistered NFA firearm, in violation of 26 U.S.C. § 5861(d). *Id.* at 1039. As in *Rowold*, "[t]he gist of [the defendant's] challenge [wa]s that the AR-15 lower receiver does not fit the CFR definition of a 'receiver' that is illegal under the gun laws." *Id.* at 1041. Despite the United States' insistence that "the 'receiver' of an AR-15/M-16-style firearm is and always has been the lower portion' like the one [the defendant had] acquired," the court treated ATF's former regulation as exhaustive on this issue, and held that because "the lower receiver for which [the defendant] was arrested and indicted houses only two of the required features [under the regulation]—the hammer and the firing mechanism," *id.*, it was not a "receiver," *id.* at 1041-45.

Finally, *United States v. Roh*, No. 8:14-cr-167 (C.D. Cal. July 27, 2020), acquitted the defendant of manufacturing firearms without a license to the extent that the charge was premised on the

defendant's manufacture of AR-15 lower receivers. Again, the court determined that ATF's former regulatory definition of "firearm frame or receiver" was exhaustive, and held that an AR-15 lower receiver was not a "receiver" because it "does not contain a bolt or breechblock and is not threaded to receive the barrel." *Id.* at 4, App. 176.

These cases held that ATF's prior regulation was exhaustive regarding the identification of the "receiver" of the AR-15 rifle. Had such holdings been widely adopted, then many millions of such weapons would not have had a "receiver" regulated under the GCA. ATF accordingly fixed the regulatory scheme by promulgating the Rule. BlackHawk thus errs in characterizing *Rowold* as "hardly probative of the alleged problem necessitating the Rule," in contending that *Jiminez* does not "serv[e] to explain and support the Rule," or in concluding that "the decisions made in these cases do not any way [sic] diminish or threaten to impede ATF's authority to regulate statutorily-defined firearms." BlackHawk Opp. at 6, 7 (emphasis omitted).[16] The result of these decisions was that, as applied to the criminal defendants in these cases, ATF's regulatory definition of "firearm frame or receiver" did not apply *at all* to the AR-15 rifle, not (as BlackHawk claims) simply that a problem existed regarding ATF's enforcement of that definition. Had this application been widely adopted, then "as many as 90 percent of all firearms (i.e., with split frames or receivers, or striker-fired) in the United States would not have any frame or receiver subject to regulation," which would clearly contradict the statutory scheme, as determined by its plain text. 87 Fed. Reg. at 24,652; *see also* 86 Fed. Reg. at 27,722. To

---

[16] *Data Marketing Partnership v. U.S. Dep't of Labor*, 45 F.4th 846 (5th Cir. 2022), cited by BlackHawk, is inapposite. The Fifth Circuit determined that the agency in that case had issued an advisory opinion interpreting a term in ERISA that ignored both the agency's prior advisory opinions discussing that term and its own regulation adopting a definition of the term in a related context. *Id.* at 856. By contrast, the Rule's treatment of split frames and receivers and striker-fired firearms is consistent with established agency policy over half a century. And ATF has explained its reason for codifying this practice: to avoid the absurd result that as many as 90% of firearms in circulation in the United States would not have a "frame" or "receiver" subject to regulation under the GCA.

avoid this anomalous result, ATF included in the Rule a codification of its preexisting policy regarding split frames and receivers and striker-fired weapons.

### D.   Plaintiffs' Remaining Arbitrary and Capricious Claims Are Without Merit.

Plaintiffs incorrectly contend that in promulgating the Rule, ATF did not adequately consider potential First and Fifth Amendment considerations.  Pls.' Opp. at 23-24.  To the contrary, the Rule specifically addressed such concerns.  *See* 87 Fed. Reg. at 24,675-76 (addressing, and rejecting, commenters' First Amendment objections); *id.* at 24,677-79 (discussing, and rejecting, commenters' objections regarding constitutional vagueness).  Plaintiffs are free to disagree with the conclusions reached by ATF after considering these topics, but such disagreement does not equate to a refusal by the agency to consider those topics.

Nor are Plaintiffs correct in asserting that the Rule did not address the issue of whether it is "a speaker-based, content-based regulation of the transmission of information."  Pls.' Opp. at 24. Citing relevant case law, the Rule explained that because "the First Amendment is not implicated by the enforcement of a regulation of general application not targeted at expressive activity," and that "the definitions at issue" in the Rule "are not targeting expressive conduct of any kind but are part of a 'regulation of general application' clarifying the definition of frame and receiver and the marking requirements thereof," "the First Amendment is not implicated by th[e] [R]ule."  87 Fed. Reg. at 24,675.  Nevertheless, in an abundance of caution, ATF assumed that the Rule might "somehow affect" expressive conduct, and analyzed the Rule under the First Amendment analysis in *United States v. O'Brien*, 391 U.S. 367 (1968), pertaining to the regulation of conduct involving both speech and non-speech elements.  87 Fed. Reg. at 24,675-76.  ATF concluded that even if the Rule did affect expressive conduct, the Rule was justified under *O'Brien* because (1) the government may constitutionally regulate the sale and possession of firearms, (2) courts have repeatedly held that public safety and crime prevention are compelling governmental interests, (3) the government's efforts to reduce gun violence

are not directed at any expressive conduct and are not related to the suppression of free expression, and (4) any incidental restriction on free expression is minimal. *Id.* (citing authority). Plaintiffs fail to articulate any specific way in which the analysis conducted by ATF inadequately addressed whether the Rule implicates First Amendment issues. Nor, in any event, have Plaintiffs identified any prejudice resulting from any alleged shortcomings in the agency's analysis.

Likewise, Plaintiffs err in claiming that ATF did not adequately consider how the Rule's definition of "complete weapon" would apply to law-abiding firearm owners' possession of unassembled weapons. Pls.' Opp. at 24. The Rule adequately considered the extent to which the term "complete weapon" might apply to firearm owners' possession of unassembled weapons, and rejected any contention that such an application might create law enforcement uncertainty. *See* Defs.' MSJ at 36-37 (citing 87 Fed. Reg. at 24,664, 24,700, 24,734). As the Rule made clear, its definition of "complete weapon" has no consequences for law-abiding firearm owners, but instead is simply intended to inform licensed *manufacturers* when a firearm frame or receiver must be marked for identification during the manufacturing process. 87 Fed. Reg. at 24,664, 24,700. In response, Plaintiffs speculate that this definition will be applied "outside the regulation of marking weapons," but fail to specify how and in what particular context that could possibly occur. Pls.' Opp. at 24. And in any event, a hypothetical future application of the Rule's "complete weapon" definition to a hypothetical scenario not alleged by any plaintiff is "irrelevant to [the] facial challenge[]" raised by Plaintiffs. *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 110 F. Supp. 3d 176, 196 (D.D.C. 2015), *aff'd*, 640 F. App'x 5 (D.C. Cir. 2016). That is because it is Plaintiffs' burden to "establish that no set of circumstances exists under which the [Rule] would be valid," *Associated Builders & Contractors v. NLRB*, 826 F.3d 215, 220 (5th Cir. 2016) (citation omitted), and not Defendants' burden to justify the Rule's application as applied to hypothetical circumstances.

Finally, Defense Distributed (DD) and Second Amendment Foundation miss the mark in arguing that the Rule is arbitrary and capricious because, in their view, it did not follow the analysis required by *New York State Rifle & Pistol Association. v. Bruen*, 142 S. Ct. 2111 (2022). DD-SAF Opp. at 4-10. As explained below, *see infra* part V, ATF correctly determined that the Rule is consistent with the Second Amendment; any error was therefore harmless. And because ATF correctly explained that the Rule does not infringe Second Amendment rights, DD and SAF have not met their burden of demonstrating prejudice to them based simply on the inclusion of additional analysis reaching the same result under a different test. Defs.' MSJ at 37-38.

DD and SAF "neither propose[] comments [they] would have made during [the] comment period nor did [they] choose to involve [themselves] in the . . . comment period" at all. *United States v. Johnson*, 632 F.3d 912, 933 (5th Cir. 2011). Their complete "lack of involvement in all stages of administrative decision-making points to the conclusion that [they were] not practically harmed by" any alleged deficiencies in the Rule's Second Amendment analysis. *Id.* Nor does either entity demonstrate any other harm to them. Instead, they rely on case law supporting the proposition that courts "will not reverse an agency action due to a mistake where that mistake clearly had no bearing on the procedure used or the substance of [the] decision reached." *Worldcall Interconnect, Inc. v. FCC*, 907 F.3d 810, 818 (5th Cir. 2018) (citation omitted). That is precisely the circumstance presented here. DD and SAF fail to show that any alleged deficiency in the Rule's Second Amendment analysis had any bearing on the procedure the agency used: namely, notice-and-comment rulemaking. Nor do DD and SAF show that any purported deficiency affected the substance of the agency's decision. Because ATF correctly concluded that the Rule is consistent with the Second Amendment, "it would have

26

made no difference" if the agency had included additional analysis reaching the same conclusion, and "any alleged error . . . was harmless and therefore does not warrant vacatur." *Id.* at 819.[17]

Furthermore, DD and SAF err in attempting to shift the burden of demonstrating harmless error to Defendants. That burden lies squarely on their shoulders. *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009). No case law that they cite suggests otherwise. The burden rested with the government in *United States v. Walters*, 418 F.3d 461 (5th Cir. 2005), to show that any error in the sentencing of a criminal defendant was harmless because *Walters* was a *criminal* case, in which the prosecution generally bears the burden. Contrary to Plaintiffs' representation, *Walters* neither adopted nor acknowledged any "rule" that in a civil case, the burden shifts to a government defendant to show error was harmless "where the government commits an error regarding the Constitution or in depriving citizens of liberty." DD-SAF Opp. at 8. Instead, *Walters* stands only for the limited proposition that the prosecution has the "burden to show harmless error beyond a reasonable doubt in the imposition of [a criminal] sentence." *Walters*, 418 F.3d at 464. Likewise, and contrary to DD and SAF's representation, *PDK Laboratories v. DEA*, 362 F.3d 786 (D.C. Cir. 2004), did not adopt any "rule" that "harm is presumed" if the Court cannot determine whether harm resulted from an alleged failure to comply with the APA. DD-SAF Opp. at 8.

And even if these cases could possibly have been interpreted as shifting the burden in civil cases to the government to show any error was harmless, the Supreme Court's subsequent decision in

---

[17] The case law relied on by DD and SAF does not suggest to the contrary. The Fifth Circuit in *Johnson* held that the challenger had "ma[de] no showing that the outcome of the [agency's decisionmaking] process would have differed . . . had notice been at its meticulous best," and any purported APA violations were harmless error. 632 F.3d at 933. The same is true here, and the same result follows. The Fifth Circuit in *U.S. Steel Corporation v. EPA*, 595 F.2d 207 (5th Cir. 1979), held that the agency's failure to provide a notice and comment period before engaging in rulemaking had "plainly affected the procedure used" in rendering its decision. *Id.* at 215. No such procedural error is shown here. In *Sierra Club v. U.S. Fish & Wildlife Service*, 245 F.3d 434 (5th Cir. 2001), the agency's reliance on an invalidated regulation had extensively "permeate[d]" its decision not to designate "critical habitat" for a particular endangered species. *See id.* at 444. By contrast, as explained in the text, any deficiency alleged by DD and SAF did not affect the substance of ATF's decision to promulgate the Rule.

*Sanders* would have overridden any such interpretation. There, the Supreme Court plainly stated: "Lower court cases make clear that courts have correlated review of ordinary administrative proceedings to appellate review of civil cases in this respect. Consequently, *the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.*" 556 U.S. at 409 (emphasis added) (citing, *inter alia, Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 797 (5th Cir. 2000)). The Supreme Court rejected the suggestion that in civil cases, the "agency" should bear "the burden of proving that a notice error did *not* cause harm," and explained that prior case law had "placed such a burden on the [government] only when the matter underlying review was criminal." *Id.* at 410. Such a distinction made sense because "[i]n criminal cases the Government seeks to deprive an individual of his liberty" and "the fact that the Government must prove its case beyond a reasonable doubt justifies a rule that makes it more difficult for the reviewing court to find that an error did not affect the outcome of a case. But in the ordinary civil case that is not so." *Id.* at 410-11 (citations omitted).

DD and SAF thus bear the burden of demonstrating that any alleged deficiency caused them harm. Having not even bothered to submit comments on the Rule, they cannot satisfy this burden.

## IV.    The Rule Reflects the Best Interpretation of the Relevant Statutory Terms.

As Defendants' opening merits brief explained, there is no need for the Court to decide whether deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), applies here because the Rule reflects the best interpretation of the GCA. Alternatively, the Rule has the power to persuade because it is well-reasoned, substantiated, and logical. Defs.' MSJ at 40-45.

In response, Plaintiffs note that the Court has preliminarily determined that the Rule is not consistent with the GCA. Pls.' Opp. at 8-10. Defendants respectfully acknowledge that the Court has made a preliminary determination regarding this issue. Now that the administrative record has been filed, and the parties have submitted supplemental briefing on the subject of the Rule's consistency with the GCA, *see* ECF Nos. 132-134, Defendants respectfully request that the Court

reconsider its preliminary decision regarding this issue.  To avoid unnecessary repetition, Defendants

refer the Court to the arguments presented in their supplemental brief on this topic.  ECF No. 132.

Moreover, Plaintiffs are mistaken in their interpretation of the GCA with respect to the

definition of "frame or receiver."  Pls.' Opp. at 10-11.  As Plaintiffs themselves concede, Pls.' MSJ at

4, Congress did not define "frame or receiver of any such weapon" in the GCA.  *See* 18 U.S.C.

§ 921(a)(3)(B).  Nor do these terms have any accepted common-law definition.  In any event, firearm

frames and receivers are manufactured items, but the GCA does not address the relevant question: at

what point in the manufacturing process does a mere component or foundation of a component—

such as a piece of metal or plastic—become the "frame or receiver" of a weapon that is regulated

under the GCA as a "firearm"?  Plaintiffs did not propose an alternative definition of those terms in

response to the Notice, and they nowhere come to terms with this Court's recognition that "[a]n

incomplete receiver may still be a receiver within the meaning of the statute, depending on the degree

of completeness."  Op. & Order on Prelim. Inj. at 10 ("PI Op."), ECF No. 56.  Congress knows how

to prescribe the boundaries of agencies' regulatory authority, and when Congress expressly defines an

item that is subject to regulation or the item has an established common-law definition, such

definitions control.  But in enacting the GCA, Congress declined to define what it means to be the

"frame or receiver" of any weapon that of any weapon that "will[18] or is designed to or may readily be

converted to expel a projectile," 18 U.S.C. § 921(a)(3)(A), despite Congress's obvious knowledge that

these are objects of manufacture, and that "the very definition of 'manufacturing' is the process of

---

[18] Although Congress did not define the term "frame or receiver," it is clear that a frame or receiver
of any weapon that "will . . . expel a projectile" must have reached a stage of manufacture where it can
accept the fire control components it is designed to house, *i.e.*, one that is fully functional.  Otherwise,
the weapon for which it is designed could not fire and expel a projectile by the action of an explosive.
However, because the GCA does not identify the stage of manufacture at which a frame or receiver
of any weapon "is designed to or may readily be converted to expel a projectile," that issue is addressed
by the Rule's definition of "frame or receiver."  *See* 87 Fed. Reg. 24,739 (codified as amended at 27
C.F.R. § 478.12(c) (partially complete, disassembled, or nonfunctional frame or receiver)).

'converting' raw materials into finished goods suitable for use," 87 Fed. Reg. at 24,685 (citing authority). Congress did not specify the stage of completeness in the manufacturing process at which an unregulated piece of metal, plastic, or other material has been converted into a regulated "frame or receiver." And for good reason: had Congress only wished to regulate fully complete, functional frames and receivers, anyone wishing to circumvent the GCA could easily do so simply by producing almost-complete frames and receivers. *See id.* at 24,686. Had Congress wished to exclude almost functional frames and receivers from the scope of its regulation, it would have specified that it was excluding such nonfunctional items. But it did not. As such, the "determination" as to "how much machining is necessary to transform a component into a frame or receiver" "lies with ATF." PI Op. at 10; *see also, e.g.*, *Mink v. Genmar Indus., Inc.*, 29 F.3d 1543, 1545 n.3 (11th Cir. 1994) (where Congress defined "vessel" to include every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water, court would "decline to engraft upon the general language of the statute a 'completed vessel' requirement"); *Mass. Museum of Contemp. Art Found., Inc. v. Buchel*, 593 F.3d 38, 51 (1st Cir. 2010) (agreeing with other courts that because statutory text "does not state when an artistic project becomes a work of visual art subject to its [copyright] protections," those protections "extend to unfinished works").[19]

---

[19] No case law cited by Plaintiffs suggests otherwise. The statute at issue in *Texas Pipeline Association v. FERC*, 661 F.3d 258 (5th Cir. 2011), specifically designated subjects that the agency could and could not regulate. *See id.* at 259 (Natural Gas Act "applies 'to the transportation of natural gas in interstate commerce [and] to the sale in interstate commerce of natural gas for resale . . . *but shall not apply to* any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution'") (citation omitted). By contrast, in the GCA, Congress declined to specify any stage of manufacture to which its regulation of "frame[s] or receiver[s]" did not apply. And *R.R. Ricou & Sons Company v. Fairbanks, Morse & Company*, 11 F.2d 103 (5th Cir. 1926), relied on the facts that "[i]n common usage the words 'boat' and 'vessel' are understood to describe structures so far completed as to be capable of being used as a means of transportation on water" and that "[i]t is not customary for a structure to be called a 'boat' or 'vessel' and to have a name before she is launched" to conclude that the vessel at issue lay within its admiralty jurisdiction. *Id.* at 104. This case neither involves admiralty jurisdiction nor interpretation of maritime law.

Additionally, none of the three arguments Plaintiffs advance under this rubric is persuasive. First, Plaintiffs are mistaken in characterizing Defendants' briefs as arguing for the application of "arbitrary and capricious" standards to questions of statutory interpretation. Pls.' Opp. at 11-13. The Rule, issued through notice-and-comment rulemaking, reflects the "body of experience and informed judgment" that the expert agency possesses and "to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). As the Supreme Court has explained, "we often pay particular attention to an agency's views in light of the agency's expertise in a given area, its knowledge gained through practical experience, and its familiarity with the interpretive demands of administrative need." *Cnty. of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1474 (2020); *see also Escamilla v. United States*, 62 F.4th 367, 373 (7th Cir. 2023); *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 907-08 (6th Cir. 2021) (en banc), *cert. denied*, 143 S. Ct. 83 (2022).

Second, Defendants' opening brief cites case law supporting the conclusion that ATF possesses expertise in firearms. *See* Defs.' MSJ at 42 (citing *Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14 (D.D.C. 2014); *Sig Sauer, Inc. v. Jones*, 133 F. Supp. 3d 364, 366 (D.N.H. 2015)). Plaintiffs respond by attempting to distinguish the specific factual circumstances and case holdings in *Innovator Enterprises* and *Sig Sauer* from the present case. Defendants did not cite those cases for their facts or specific holdings, but instead for the conclusion that ATF possesses firearms expertise, which Plaintiffs fail to refute. Indeed, this Court has acknowledged that "ATF is entitled to deference on its expertise in determining whether a particular component is a frame or receiver." PI Op. at 10. In rendering its merits decision, the Court may consider the acknowledged fact that ATF has developed a body of expertise in enforcing the GCA, which is a statutory scheme that requires technical knowledge of firearms to ensure its proper administration.

Third, Plaintiffs incorrectly state that the Court must ignore Congress's concern—as reflected throughout the GCA's text and expressed clearly in its legislative history—that the GCA's language

should not be read to allow for easy circumvention of its requirements. Plaintiffs fail to contend with Congress's clear purpose, evidenced throughout the statute, to regulate incomplete weapons (and their frames or receivers) and thus ensure that individuals cannot circumvent Congress's public-safety regime by dealing in nearly-complete firearms, destructive devices, machineguns, or other weapons. By clarifying that the statutory definition of "firearm" includes certain partially complete frames and receivers, the Rule implements this clear Congressional intent and properly adheres to the well-established principle that statutes should be interpreted "to work rather than fail." Antonin Scalia & Bryan A. Garner, READING LAW 63 (2012) (explaining the presumption against ineffectiveness). And Plaintiffs' observation that "legislative purpose cannot overcome unambiguous statutory text," Pls.' Opp. at 13, begs the question by assuming as correct what Plaintiffs have failed to demonstrate: that the GCA contains an unambiguous definition of "frame or receiver," when in fact the GCA contains no such definition at all. As explained above, Congress chose not to define "frame or receiver," but instead left that task to the agency. Because "the resolution of an ambiguity or vagueness that achieves a statute's purpose should be favored over the resolution that frustrates its purpose," Scalia & Garner, READING LAW 56, ATF's anti-circumvention interpretation should be favored over an interpretation such as Plaintiffs' that would allow for easy circumvention of the statute's requirements.

## V.      The Rule Is Consistent with the Second Amendment.

In its opposition brief, BlackHawk relies entirely on *Bruen*, 142 S. Ct. 2111, to support its contention that the Rule violates the Second Amendment. *See* BlackHawk Opp. at 22-23. But *Bruen* cannot bear that weight. In *Bruen*, the Court "decide[d] nothing" about "the requirements that must be met to buy a gun," and similarly did not "disturb[] anything that [the Court] said in [*Dist. of Columbia v. Heller*, 554 U.S. 570 (2008),] or *McDonald v. Chicago* 561 U.S. 742, (2010), about restrictions that may be imposed on the possession or carrying of guns." *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring); *see also Heller*, 554 U.S. at 626-27 ("[N]othing in our opinion should be taken to cast doubt on . . . laws

imposing conditions and qualifications on the commercial sale of arms."); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (confirming—without resort to historical analogy—that States may "require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements," before being permitted to publicly carry a firearm).  Stated differently, *Bruen* broke no new ground with respect to the regulations that the Government may impose to ensure that firearms are possessed only by those permitted to possess them.  As previously explained, no provision of the Rule—including the provision regarding serialization of privately made firearms that are taken into commercial inventory—prevents any law-abiding citizen from possessing or using a firearm.  *See* 87 Fed. Reg. at 24,676.  Thus, the Rule does not implicate the plain text of the Second Amendment, and ATF need not justify the Rule by reference to historical tradition.  *See Bruen*, 142 S. Ct. at 2129-30.[20]

## VI.   The Rule Is Consistent with the First Amendment.

Plaintiffs and BlackHawk both argue that the Rule's provision that in issuing a classification decision, ATF "*may consider*" any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by" the seller or distributor of the product, 87 Fed. Reg. at 24,739 (emphasis added), violates their First Amendment rights.  *See* Pls.' Opp. at 36-41; BlackHawk Opp. at 24-25.  However, these First Amendment claims are without merit and should be rejected.

Plaintiffs' and BlackHawk's First Amendment claims fail at the outset because the Rule's "may consider" provision is not a restriction on speech at all.  Nothing in the Rule prohibits any particular speech or type of speech.  Nor does anything in the Rule compel any particular speech or type of speech.  And nothing in the Rule punishes or regulates the content of any instructions or marketing

---

[20] In any event, to the extent that historical analysis were relevant, Defendants are prepared to submit supplemental briefing demonstrating that the Rule is analogous to various Founding-era firearm regulations.

materials that sellers of components choose to sell or make available with products they sell. Sellers of firearm components remain free to include whatever content they want in their instructions, guides, or marketing materials. The Rule provides only that ATF may consider the content of those materials, as one of multiple factors, in making a classification decision as to whether a product is a frame or receiver and thus subject to the commercial sale restrictions of the GCA.

Nothing in the Rule or any federal firearms statute prevents a federal firearms licensee from selling a frame or receiver; rather, the law only provides certain requirements for such sales. Having to comply with the law cannot be viewed as a restriction on speech or a punishment, and it cannot form the basis for an Article III injury in fact. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2206 (2021) (an "uninjured plaintiff" who "has not suffered any physical, monetary, or cognizable intangible harm" "is merely seeking to ensure a defendant's 'compliance with regulatory law,'" which is "not grounds for Article III standing") (citation and footnote omitted). Plaintiffs contend that their "self-censorship" constitutes an injury, asserting that "fear of prosecution that results in self-censorship constitutes an injury." Pls.' Opp. at 36. But here, there can be no "fear of prosecution" because there is no potential prosecution based on speech. Tellingly, the first case cited by Plaintiffs in support of this assertion involved actual criminal penalties for speech. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 386 (1988) (detailing state statute providing that "[i]t shall be unlawful for any person . . . to knowingly display for commercial purposes" certain materials). The second cited case, *Glass v. Paxton*, actually undermines Plaintiffs' claim. Pls.' Opp. at 36 (citing *Glass v. Paxton*, 900 F.3d 233 (5th Cir. 2018)). *Glass* held that a professor lacked standing to bring a First Amendment claim based on a purported "chilling" of her First Amendment rights because, "[r]egardless of the likelihood of her being disciplined" for the proposed speech, the professor was "ultimately deciding to self-censor her speech" based on theoretical future actions by others, which cannot be the basis for an injury-in-fact supporting a First Amendment claim. *Glass*, 900 F.3d at 239-40. If anything, the professor in *Glass*

34

had a much stronger claim to standing, because the potential consequence she claimed to be self-censoring to avoid was a university disciplinary action, whereas here, Plaintiffs can only assert that they are choosing to self-censor in hopes of affecting a classification decision that would determine which regulations govern how products may be sold.

Plaintiffs' invocation of the "right to information" as the basis for an injury in fact allowing them to bring their First Amendment claim, Pls.' Opp. at 38-39, fares no better.  It is irrelevant that Tactical Machining is a "willing speaker" of certain theoretical content that it desires to communicate to its customers or the public at large here, because nothing in the Rule prevents it from including whatever it wants to communicate to its customers in any of its instructions, guides, or marketing materials.  Therefore, nothing in the Rule restricts the ability of Tactical Machining or any other seller to communicate whatever information it wishes to communicate to its customers, or restricts the ability of such customers, or the public at large, to access or receive such information.[21]

Contrary to Plaintiffs' contention, Pls.' Opp. at 39, the Rule's "may consider" provision is not unconstitutionally "speaker based."  The Supreme Court has rejected the "assertion that all speaker-partial laws are presumed invalid," clarifying that "speaker-based laws demand strict scrutiny when they reflect the Government's *preference for the substance of what the favored speakers have to say* (or aversion to what the disfavored speakers have to say)."  *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994) (citing *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 548 (1983)) (emphasis added).  The Rule is not an unconstitutional speaker-based restriction, because (a) as explained above, it is not

---

[21] Plaintiffs thus misplace their reliance on cases involving governmental actions that (unlike here) actually restricted the flow of information from speaker to audience.  *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576-80 (1980) (holding that a state may not exclude the public from attending criminal trials); *Bd. of Educ. v. Pico*, 457 U.S. 853, 863-72 (1982) (holding that local school boards have only limited discretion to remove books from school libraries); *Pa. Fam. Inst., Inc. v. Black*, 489 F.3d 156, 161-69 (3d Cir. 2007) (per curiam) (holding that an organization lacked standing to challenge judicial canons prohibiting judges from making certain statements and promises while in office); *Basiardanes v. City of Galveston*, 682 F.2d 1203, 1207-12 (5th Cir. 1982) (holding that a property owner lacked standing to challenge zoning ordinance prohibiting showing of adult-oriented motion pictures).

a "restriction" on speech at all; and (b) the "may consider" provision applies to the ATF's classification decision by any entity selling weapon components. The Rule does not state, for example, that the "may consider" provision operates differently depending on whether the selling entity is an individual or a corporate entity, or a federal firearms licensee or an entity without such a license. Instead, it includes a speaker-neutral provision that applies equally to all classification decisions, and that expresses no preference for the message of any particular "speaker" that publishes or distributes instructions, guides, or marketing materials over any other category of speaker.

BlackHawk's invocation of *Minneapolis Star* is inapposite to the matter before the Court. *See* BlackHawk Opp. at 24 (citing *Minneapolis Star & Trib. Co. v. Minn. Com'r of Revenue*, 460 U.S. 575, 592-93 (1983)). The "expressive activity" the Supreme Court held worthy of protection in *Minneapolis Star* was the ability of a free press in the form of newspapers to operate, and the Court provided a lengthy recitation of the uniquely important role of newspapers in the nation's founding. *Minneapolis Star*, 460 U.S. at 583-85. And the Court seemed specifically to limit its holding to that industry, holding that "[a] tax that singles out *the press*, or that targets individual publications *within the press*, places a heavy burden on the State to justify its action." *Id.* at 592-93 (emphasis added). BlackHawk offers no support for its bare assertion that the content of instructions, guides, templates, jigs, equipment, tools, or marketing materials sold or made available with products sold to customers is entitled to the same level of "expressive activity" protection as newspapers, and Defendants are aware of no such authority. Instead, the Rule's amended definition of "frame or receiver" is plainly a generally applicable government regulation that is not targeted at expressive activity and therefore does not implicate the First Amendment. *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986).

Plaintiffs' assertion that the Rule constitutes an unconstitutional content-based restriction, Pls.' Opp. at 41-43, likewise fails. First and foremost, the inquiry into whether a law or regulation is "content based" applies only to regulations and restrictions on speech. *See Reed v. Town of Gilbert, Ariz.*,

36

576 U.S. 155, 163 (2015) ("Government *regulation* of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.") (emphasis added); *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) (holding that a government "has no power to *restrict* expression because of its message, its ideas, its subject matter, or its content") (emphasis added). Here, as explained earlier in this section, nothing in this Rule prevents, proscribes, or otherwise regulates the content of any speech a seller chooses to include in any instructions, guides, or marketing materials. Nor does the Rule provide any punishment for the content of such materials; rather, it only provides that ATF may consider such materials' content as one of multiple factors involved in a classification decision. And nothing in the Rule addresses any specific content or type of content that would trigger any particular action or inaction on the part of ATF. Instead, the Rule provides that ATF may examine and consider such materials, along with a number of other factors, in considering all relevant factors in determining whether a product should be classified as a "frame or receiver."

And contrary to Plaintiffs' assertion, Pls.' Opp. at 40-41, such materials incidentally considered by the Rule fit comfortably within the commercial speech doctrine. Although the "core" of commercial speech is that "which does no more than propose a commercial transaction," *Bolger v. Youngs Drugs Prod. Corp.*, 463 U.S. 60, 66 (1983) (citation omitted), courts consider this definition "just a starting point," *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516 (7th Cir. 2014)). Courts in this Circuit apply "three factors that help determine whether speech is commercial: (i) whether the communication is an advertisement, (ii) whether the communication refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech." *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 552 (5th Cir. 2001) (citing *Bolger*, 463 U.S. at 67).[22] "If all three

---

[22] Although the part of *Proctor & Gamble* concerning the test governing suits for false advertising under the Lanham Act was later abrogated, *see Lexmark Int'l v. Static Control Components*, 572 U.S. 118, 134-37 (2014), the Fifth Circuit's conclusions regarding the nature of commercial speech under the First Amendment remain good law. *See, e.g., Dupart v. Roussell*, 497 F. Supp. 3d 102, 117-18 (E.D. La. 2020).

factors are present, there is 'strong support' for the conclusion that the speech is commercial." *Id.*

Because Plaintiffs facially challenge the Rule, it is Plaintiffs' burden to "establish that no set of circumstances exists under which the [Rule] would be valid," *Associated Builders & Contractors*, 826 F.3d at 220 (citation omitted), including under the First Amendment. And here, as applied to at least one set of circumstances, materials incidentally considered by the Rule satisfy all three *Bolger* factors. Plaintiffs concede that a set of instructions posted by BlackHawk on its website contains "link[s] to [BlackHawk's] latest product."[23] Those instructions are an advertisement that refer to a specific product: BlackHawk's Easy Jig Gen 3. And BlackHawk has an economic motive for providing these instructions: namely, to facilitate sales by convincing customers of the ease with which its jig can be used to readily complete a partially complete receiver to function as a receiver. These instructions are thus commercial speech. And as explained in Defendants' opening brief, any incidental effect of the Rule on commercial speech satisfies intermediate scrutiny. Plaintiffs do not dispute that the Rule would survive intermediate scrutiny.[24]

---

[23] *See* How to Mill & Finish an 80% Lower, 80 Percent Arms (Nov. 3, 2022), https://www.80percentarms.com/blog/how-to-finish-an-80-lower/) (cited in Pls.' Opp. at 40 n.12). Under the subheading "COMPLETE YOUR NEXT 80 LOWER BUILD WITH 80% ARMS," these instructions proclaim (and include several supporting hyperlinks):

> Do these instructions look confusing, or you just aren't sure what they mean? No problem. We've made things easier than ever with the release of our Easy Jig® Gen 3! Check out the product page for videos of how simple it really is, or our instruction manual page to see how simple we have made all of our products. Also, don't forget, we offer the Foolproof Guarantee! If you happen to mess up one of our lowers with one of our jigs, we'll replace it at a 50% discount.

*Id.* The instructions also include hyperlinks to other products sold by BlackHawk, including the FST-1 Freedom Jig Router, Easy Jig Gen 3 Tool Kit, and the Large Router Base - Gen 3 Jig. *See id.*

[24] Moreover, because nothing in the Rule targets any speech on the basis of the speaker's identity or the speech's conduct, Plaintiffs misplace their reliance on cases such as *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), and *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018), that involved speaker- or content-based restrictions. In any event, unlike here, the laws challenged in those cases either restricted speech or compelled it. *See Sorrell*, 564 U.S. at 557-61 (analyzing state law restricting the sale, disclosure, and use of certain pharmacy records); *Nat'l Inst.*, 138 S. Ct. at 2368-70

**VII.    The Definitions Contained in the Rule Are Not Otherwise Unconstitutional.**

    **A.    The Rule Is Not Void for Vagueness.**

As explained in Defendants' opening brief, courts have overwhelmingly rejected vagueness challenges to statutory standards nearly identical to the Rule's definition of "frame" and "receiver." *See* Defs.' MSJ at 54-55 & n.28.  Plaintiffs' various efforts to distinguish these precedents fail.  Plaintiffs first observe that the firearms at issue in the cited cases had certain features that differ from the products that Plaintiffs sell or wish to purchase; for example, Plaintiffs note that "the previously functional nature" of an item that was once a machinegun, Pls.' Opp. at 27 & n.3, is sometimes relevant to determining whether it could "be readily restored to shoot" multiple shots automatically, for purposes of 26 U.S.C. § 5845(b).  But Plaintiffs do not develop any argument that this or any other feature of the weapons at issue in the relevant cases renders the "readily" standard less vague as applied to those weapons than the Rule's "readily" standard, as applied to Plaintiffs' products.  Whether or not an item was previously functional, the relevant inquiry under both the Rule and Section 5845(b) is how readily the item can be made functional in the future.  Plaintiffs likewise fail to explain why, in their view, the "readily" standard is less vague as applied to starter guns in the context of 18 U.S.C. § 921(a)(3) than as applied to their products.  *See* Pls.' Opp. at 28 & n.5.  That provision, too, calls for the same essential inquiry as the Rule's "readily" standard, and courts' decisions that Section 921(a)(3) is not unconstitutionally vague thus squarely apply here.  *See, e.g., United States v. 16,179 Molso Italian .22 Caliber Winler Derringer Convertible Starter Guns*, 443 F.2d 463, 466 (2d Cir. 1971) (holding that "whatever else th[e] term ['readily convertible'] may mean," "[r]easonable men would surely agree that

---

(analyzing state law requiring clinics primarily serving pregnant women to provide certain notices). And it is well settled that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms," *O'Brien*, 391 U.S. at 376, regardless of whether the speech at issue is fraudulent or misleading, *see, e.g., id.* at 377-82 (applying standard to burning of draft cards).

guns which can be . . . transformed into dangerous weapons" within "twelve minutes or less" meet the standard, which accordingly is not void for vagueness).

Plaintiffs also fail to distinguish the Seventh Circuit's decision in *United States v. Drasen*, 845 F.2d 731, 733 (7th Cir. 1988).  *See* Pls.' Opp. at 27-28.  Although it is true that the Seventh Circuit found it "somewhat ambiguous" whether the statutory term "readily restored," as used in 26 U.S.C. § 5845(b), applied to an unassembled weapon parts kit that had never previously been assembled, the court ultimately concluded that the statute did so apply.  *Drasen*, 845 F.2d at 733.  It went on to reject the argument that the statute was unconstitutionally vague as applied to such a kit, reasoning in part that "the defendants . . . could easily have ascertained the illegality of their conduct, if not already known to them, by making an inquiry into the applicable firearms regulations."  *Id.* at 738 & n.9.  The same analysis applies here; Plaintiffs could have ascertained the legality or illegality of their conduct through the classification process, but they instead either neglected to submit a classification request or opposed ATF's completion of their classification request.  *See* Defs.' MSJ at 59-60; *see also, e.g.*, *United States v. Arcadipane*, 41 F.3d 1, 5 (1st Cir. 1994) (explaining that the fair notice requirement of the Due Process Clause does not "excuse[]" or "encourage[] deliberate blindness").

Nor do Plaintiffs succeed in distinguishing the cited precedents on the ground that "many of these cases were in settings where the burden was on the claimant/defendant."  Pls.' Opp. at 28.  Likewise, in this pre-enforcement facial challenge, the burden rests with Plaintiffs to establish that the Rule is unconstitutionally vague on its face.  *See, e.g.*, *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 548 (5th Cir. 2008).

Having failed to distinguish the many cases in which courts have rejected vagueness challenges to statutory standards materially identical to the Rule's "readily" standard, Plaintiffs return to arguing that the Rule is unconstitutionally vague because it specifies certain factors relevant to the application of that standard.  *See* Pls.' Opp. at 26, 28-29.  But their efforts are unpersuasive for many of the same

reasons set forth in Defendants' opening brief. *See* Defs.' MSJ at 55-56. For example, Plaintiffs note that in *United States v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 689-90 (9th Cir. 2006), the Ninth Circuit relied in part on dictionary definitions of the term "readily" to determine whether a particular rifle could be "readily restored"—a phrase undefined in the NFA—to function as a machinegun within the meaning of 26 U.S.C. § 5845(b). *See* Pls.' Opp. at 28.[25] But Plaintiffs fail to mention that the Ninth Circuit held, after consulting a dictionary, that "[r]eadily" refers, in this context, to the "speed" and/or "ease" of restoration, *TRW Rifle*, 447 F.3d at 690—two of the same factors underlying the Rule's definition of "readily," *see* 87 Fed. Reg. at 24,735 (codified as amended at 27 C.F.R. § 478.11) (enumerating "[t]ime" and "[e]ase" as relevant factors).[26] Accordingly, the definition of "readily" that the Ninth Circuit adopted in *TRW Rifle*—on which the district court relied in *Wick* to reject a vagueness challenge to 26 U.S.C. § 5845(b)—does not support Plaintiffs' argument that the factors set forth in the Rule render its definition of "readily" unconstitutionally vague, because the Ninth Circuit relied on two of the very same factors.

Plaintiffs next attempt to identify certain differences between the Rule and the standards at issue in *Prime Healthcare Services, Inc. v. Harris*, 216 F. Supp. 3d 1096, 1125 (S.D. Cal. 2016), and in *Chabad Lubavitch of Litchfield County, Inc. v. Borough of Litchfield*, 853 F. Supp. 2d 214, 235 (D. Conn. 2012),

---

[25] Although the Ninth Circuit did not confront a vagueness challenge in *TRW Rifle*—a case that was not cited in Defendants' opening brief—a district court relied on *TRW Rifle* in rejecting a vagueness challenge to the same statutory provision in *Wick*, 2016 WL 10612608, at *3-4. Defendants thus presume that Plaintiffs' unspecified reference to "one of the cases cited by the Agencies," Pls.' Opp. at 28, pertains to *Wick*.

[26] Moreover, the Ninth Circuit also cited with approval the Sixth Circuit's understanding that "'[r]eadily' is a relative term, one that describes a process that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speedy, or easy process." 447 F.3d at 690 (emphasis omitted) (quoting *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 422 (6th Cir. 2006)). That is almost verbatim the definition of "readily" used in the Rule. *See* 87 Fed. Reg. at 24,735 (codified as amended at 27 C.F.R. § 478.11) (defining "[r]eadily" to include "[a] process . . . that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process").

*aff'd in relevant part, vacated in part on other grounds, remanded sub nom. Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183 (2d Cir. 2014). *See* Pls.' Opp. at 28-29. But any such distinctions do nothing to refute the relevant proposition—namely, that specifying factors relevant to application of a standard makes that standard less vague, not more. *See* Defs.' MSJ at 55-56. Moreover, and in any event, Plaintiffs are wrong insofar as they suggest the statutes at issue in either *Prime Healthcare Services* or *Chabad Lubavitch* provided more specific "standard[s] for application of any of the listed factors" or "guidance as to how the factors interact" than the Rule. Pls.' MSJ at 29. To the contrary, both statutes set forth non-exhaustive and open-ended lists of factors without any guidance as to how to apply or weigh them.[27]

Plaintiffs also dispute that the Rule's "readily" standard calls for an "objective" inquiry into "the design of the manufacturer," as opposed to the "intent of the retailer or customer." Pls.' Opp. at 29-30 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 501 (1982)). But nothing in the Rule calls for an inquiry into subjective intent. There also is no basis in the Rule for Plaintiffs' suggestion that classification of a product may vary depending on "the skills and resources of the person completing the item." *Id.* at 30; *see also id.* at 34 (positing that the classification of an item could vary depending whether its purchaser "happen[ed] to own a well-equipped tool bench"). If that were true, then ATF would not be able to issue a classification determination based solely on

---

[27] *See Prime Healthcare Servs.*, 216 F. Supp. 3d at 1101-02 (addressing a statute that directs the Attorney General to consider "any factors that the Attorney General deems relevant," "including, but not limited to a list of nine factors specified by the Statute," including, in turn, "whether the transaction may create a significant effect on the availability or accessibility of health care services to the affected community" and "whether the transaction is in the public interest," while ultimately vesting "complete discretion" in the Attorney General (internal quotation marks and citations omitted)); *Chabad Lubavitch*, 853 F. Supp. 2d at 233-34 (addressing a statute that directs a commission to consider, "in addition to other pertinent factors, the type and style of exterior windows, doors, light fixtures, signs, above-ground utility structures, mechanical appurtenances and the type and texture of building materials, as well as the historical and architectural value and significance, architectural style, scale, general design, arrangement, texture and material of the architectural features involved and the relationship thereof to the exterior architectural style and pertinent features of other buildings and structures in the immediate neighborhood" (internal quotation marks and citations omitted)).

the "item or kit" itself; its manufacturer or importer; and "any associated templates, jigs, molds, equipment, or tools that are made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit, and any instructions, guides, or marketing materials if they will be made available by the seller or distributor with the item or kit." 87 Fed. Reg. at 24,743 (codified as amended at 27 C.F.R. § 478.92(c)).

Turning next to *Timpinaro v. SEC*, 2 F.3d 453 (D.C. Cir. 1993), Plaintiffs do not dispute that the Rule provides illustrative examples of the Rule's application or that ATF thoroughly addressed commenters' vagueness concerns—both features that the D.C. Circuit noted were lacking from the regulation challenged in *Timpinaro*. *See* Defs.' MSJ at 56-57. But they complain that the Rule's examples do not expressly address all eight of the enumerated (but non-exhaustive) factors or explain "how the factors are weighted" in each application. Pls.' MSJ at 30. *Timpinaro* did not suggest, however, that such comprehensive guidance was required, and indeed the court expressly allowed for the possibility that the agency had already "used the most precise terms possible, consistent with its regulatory goals." 2 F.3d at 460. Analogously, as explained in the preamble to the Rule, ATF could not, as a practical matter, "[e]numerat[e] . . . how each of the [Rule's] factors would apply to the manifold designs and configurations of firearms and aggregations of firearm parts now in existence, or to those that may be produced in the future." 87 Fed. Reg. at 24,700. The regulation at issue in *Timpinaro* is thus far afield of the Rule.

Ultimately, Plaintiffs fail to distinguish any of the multitude of precedents demonstrating that the Rule's "readily" standard is not unconstitutionally vague. And they fail to establish that the *only* precedent they cite to support their vagueness claim—*Timpinaro*, in which the D.C. Circuit stopped short even of holding that the challenged regulation was void for vagueness—is materially relevant.

Plaintiffs' remaining vagueness arguments are equally unpersuasive. For example, Plaintiffs do not establish that the Rule's definition of a "complete weapon" is unconstitutionally vague, for the

reasons explained in Defendants' opening brief.  *See* Defs.' MSJ at 58-59.  Most significantly, Plaintiffs'
hypothetical concerns regarding criminal liability of hypothetical individual firearm owners who
possess both disassembled AR-pattern rifles and disassembled AR-pattern pistols do nothing to
advance their facial vagueness claim.  As Defendants previously explained, controlling precedent
requires Plaintiffs to establish that the Rule is unconstitutional as applied to *them*.  *See id.*; *see also, e.g.*,
*Nat'l Solid Wastes Mgmt. Ass'n v. City of Dallas*, 903 F. Supp. 2d 446, 466-67 (N.D. Tex. 2012) (rejecting
a facial void-for-vagueness claim predicated on "hypothetical cases in which the meaning of [the
ordinance's] terms w[ould] be in nice question" (quoting *Am. Commc'ns Ass'n, C.I.O. v. Douds*, 339 U.S.
382, 412 (1950))).[28]  And Plaintiffs' response regarding "complete weapons" relies on the mistaken
contention that the Rule "says nothing about the manufacturing process" in the context of a
"complete weapon."  Pls.' Opp. at 32.  To the contrary, the Rule expressly imposes requirements on
complete NFA weapons only *after* "the date the entire manufacturing process has ended for the
weapon or device, or prior to disposition, whichever is sooner."  87 Fed. Reg. at 24,742 (codified as
amended at 27 C.F.R. § 478.92(a)(1)(vi)(B)).  It does not impose any requirements on individuals who
merely possess a collection of parts that together could conceivably be assembled into a complete
NFA weapon, and Plaintiffs' hypothetical concerns are therefore unfounded.

There also is no merit to Plaintiffs' suggestion that guidance that ATF has issued regarding
the application of the Rule supports Plaintiffs' vagueness claim.  *See* Pls.' Opp. at 33-34; Pls.' Mot. for
Leave to Provide Suppl. Auth., ECF No. 197 (Suppl. Auth. Notice).[29]  Agencies routinely issue

---

[28] For the same reason, Plaintiffs cannot rely on the Rule's treatment of "forgings, castings, printings,
extrusions, unmachined bodies, or similar articles," such as "unformed blocks of metal, liquid
polymers, or other raw materials," to support their vagueness claim, because they do not suggest,
much less offer evidence, that they manufacture or sell such products.  Pls.' Opp. at 32-22 (internal
quotation marks and citation omitted).

[29] The corrections to which Plaintiffs refer, *see* Pls.' Opp. at 33, were merely technical in nature.  And
they bear no relationship to the features of the Rule that Plaintiffs contend are unconstitutionally

guidance advising the public how a standard applies in particular contexts.  As the Fifth Circuit has recognized, such guidance tends to *mitigate* any vagueness concerns by "help[ing] to standardize enforcement."  *Roark & Hardee LP*, 522 F.3d at 540; *see id.* at 554 (reversing decision of district court that "the issuance of . . . two additional sets of guidelines weighed in favor of finding the ordinance vague" (citation omitted)).  Moreover, Plaintiffs' contention that ATF's recent Public Safety Advisory renders the Rule vague relies on a misreading of the Advisory.  That is, Plaintiffs contend that they lack fair notice of their obligations under the Rule because the Advisory "seemingly requires producers and retailers to survey not just the firearms industry, but any retailer of tooling and equipment or anyone producing content that may contribute to manufacturing."  Suppl. Auth. Notice ¶ 18.  But the Public Safety Advisory does no such thing.  Rather, it makes clear that retailers may violate the GCA if they "*purposely* set[] up ostensibly separate transactions or methods of operating with the *willful intent* to violate the GCA's requirements" or "set[] up multiple" entities "to sell, distribute, or otherwise make available to the same customers" products regulated under the Rule, "with the *willful intent* to violate the GCA's requirements."  *Public Safety Advisory to All Federal Firearms Licensees, and Firearm Parts, Components, and Accessory Manufacturers and Distributors*, ATF, https://www.atf.gov/firearms/docs/guide/public-safety-advisory-all-federal-firearms-licensees-and-firearm-parts/download (Mar. 21, 2023), at 5-6 (emphasis added); *accord* 87 Fed Reg. at 24,713 & n.138.  Plaintiffs do not allege, much less attempt to prove, that they purposely structure transactions or business entities with the willful intent to violate the GCA.  And, as noted, it is well established that a plaintiff must show that an action is unconstitutionally vague as applied to the plaintiff to prevail on a facial, pre-enforcement challenge.  *See* Defs.' MSJ at 58.

_____

vague.  *See Definition of "Frame or Receiver" and Identification of Firearms; Correction*, 87 Fed. Reg. 51,249 (Aug. 22, 2022).

Finally, to the extent that Plaintiffs suggest that an administrative process such as ATF's voluntary classification process does not mitigate any vagueness concerns where criminal penalties are possible—*see* Pls.' Opp. at 34-35 (contrasting a "mere economic regulation" with an "application of the GCA that comes with the risk of criminal penalties" (emphasis omitted))—there is no support for that contention. As Plaintiffs themselves acknowledge, *see id.* at 35, the Fifth Circuit has relied in part on the ability of regulated entities to "clarify the meaning of [the challenged] provisions by their own inquiry" in rejecting a vagueness challenge even under the "relatively strict test required for criminal laws," *Roark & Hardee LP*, 522 F.3d at 552 (internal quotation marks and citation omitted).

For its part, BlackHawk also fails to rebut Defendants' showing that the Rule is not unconstitutionally vague as a matter of law. *See* BlackHawk Opp. at 17-22. At the outset, BlackHawk does not and cannot meaningfully dispute that "facial vagueness challenges, in particular, are generally 'disfavored for several reasons,' including but not limited to, the fact that facial invalidity claims often 'rest on speculation.'" *Magee v. City of S. Padre Island*, 463 F. App'x 377, 380 (5th Cir. 2012) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)); *see* Defs.' MSJ at 51. Instead, BlackHawk irrelevantly contends that the facts of *Magee* are distinguishable from those of this case. *See* BlackHawk Opp. at 17. Any such factual distinctions are beside the point, because Defendants rely on *Magee* for the general legal proposition cited above, and not for the court's specific holding in that case. *See* Defs.' MSJ at 51. In any event, BlackHawk's attempt to distinguish the Rule from the ordinance at issue in *Magee*—which the Fifth Circuit acknowledged had certain "failings" with respect to "clarity," 463 F. App'x at 379—rests on the misunderstanding that the Rule lacks "definite, objective standards," BlackHawk Opp. at 17. That contention is incorrect for the reasons set forth above. *See supra* page 42-43.

Similarly, BlackHawk does not and cannot refute that "licensing . . . requirements," such as the Rule, "are afforded considerable deference in the vagueness analysis," in part "because the

regulated party may 'have the ability to clarify the meaning of the regulation[s] . . . by resort to an administrative process.'" *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122 (5th Cir. 1991) (quoting *Vill. of Hoffman Ests.*, 455 U.S. at 498). Instead, BlackHawk attempts to distinguish *Clinical Leasing Service* on its facts—which, again, are irrelevant to the legal proposition for which Defendants rely on that case. *See* Defs.' MSJ at 59. In any event, it is equally "hypocr[itical]" for BlackHawk to complain that the Rule is unconstitutionally vague when BlackHawk has not availed itself of the readily available classification process as it was for the regulated entity in *Clinical Leasing Service* to complain of vagueness after receiving a warning from the agency. *Clinical Leasing Serv.*, 925 F.2d at 123.

The decision of another court in this District in *Exxon Mobil Corp. v. Mnuchin*, 430 F. Supp. 3d 220 (N.D. Tex. 2019), also does nothing to advance BlackHawk's vagueness claim. *Contra* BlackHawk Opp. at 20. In *Exxon Mobil*, the court concluded that the text of the challenged regulations did not provide fair notice on their face. 430 F. Supp. 3d at 230-34. Here, by contrast, the Rule is not unconstitutionally vague even without consideration of the classification process. *See* Defs.' MSJ at 51-59. In any event, the court in *Exxon Mobil* recognized that the failure of the regulated entity to "seek clarification" from the agency weighed against the entity's fair-notice claim, although that factor was not dispositive. 430 F. Supp. 3d at 235-37. Likewise, here, BlackHawk's failure to seek any desired clarification through the classification process weighs against its void-for-vagueness claim. And because *Exxon Mobil* addressed a fair-notice defense in an enforcement proceeding, the court's discussion of the agency's burden is inapplicable. *Contra* BlackHawk Opp. at 19. As noted above, Plaintiffs bear the burden in this facial, pre-enforcement challenge. *See supra* page 40.

With respect to *Howmet Corp. v. EPA*, 656 F. Supp. 2d 167 (D.D.C. 2009), *aff'd*, 614 F.3d 544 (D.C. Cir. 2010), *see* BlackHawk Opp. at 19, the relevant factor in the court's analysis was the clarity of the preambles to the proposed and final rules and the agency's guidance documents, not their age, *see Howmet*, 656 F. Supp. 2d at 173. Moreover, BlackHawk is mistaken that ATF "has essentially

repudiated 50 years' worth of classification letters and other guidance" and "disavow[ed], without explanation, any previous agency interpretation or action that could in any way limit ATF's flexibility to take new positions in the future." BlackHawk Opp. at 19. To the contrary, "most prior ATF classifications and variants thereof" are "grandfathered" under the new Rule. 87 Fed. Reg. at 24,672.

BlackHawk's efforts to rely on *Village of Hoffman Estates* are also unavailing. BlackHawk first notes that "there is a 'greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.'" BlackHawk Opp. at 20 (quoting *Vill. of Hoffman Ests.*, 455 U.S. at 498-99). While that is true, the Court in *Village of Hoffman Estates* held that the challenged ordinance was not unconstitutionally vague under the *more* demanding "test appropriate to either a quasi-criminal or a criminal law"—the same test applicable here. 455 U.S. at 500. BlackHawk also correctly observes that "a more stringent test" applies where the law "threatens to inhibit the exercise of constitutionally protected rights." *Id.* at 499; *see* BlackHawk Opp. at 20. But that proposition does nothing to advance BlackHawk's vagueness claim; the Rule does not prevent any law-abiding citizen from exercising his or her right to keep and bear arms. *See supra* pages 32-33.

To the extent that BlackHawk raises speculative concern that the classification process may be executed in an arbitrary and capricious manner, *see* BlackHawk Opp. at 20-21, it offers no evidence to support its argument. In any event, the appropriate vehicle for any such claim would be an APA challenge to a classification decision.

Similarly, BlackHawk unsuccessfully attempts to distinguish the Fifth Circuit's decision in *United States v. Campbell*, 427 F.2d 892 (5th Cir. 1970) (per curiam), that 26 U.S.C. § 5845(b) is not unconstitutionally vague, on the ground that "ATF regulations having a clear basis in and coherence with the statutory text are likely to withstand vagueness challenges." BlackHawk Opp. at 21-22. The vagueness inquiry is wholly distinct from the inquiry whether a regulation is consistent with statutory authority, and *Campbell* does not suggest otherwise. BlackHawk thus errs in conflating the two

48

analyses.  Moreover, and in any event, the Rule is entirely consistent with the GCA for the reasons Defendants have explained.  *See* ECF No. 132.  In sum, BlackHawk's vagueness arguments are no more persuasive than Plaintiffs', and both parties' void-for-vagueness claims should be dismissed.

**B.**     **The Rule Is Consistent with the Take Care Clause and the Major Questions Doctrine.**

Plaintiffs briefly respond to Defendants' argument regarding why the Take Care Clause provides no basis for relief here.  Pls.' Opp. at 43-44.[30]  Plaintiffs still do not provide any support for their contention that the Take Care Clause provides an independent basis for a court to wade into the delicate relationship between the Executive and Legislative branches and invalidate the actions of one or the other.  Instead, Plaintiffs again turn to what they characterize as the "seminal Take Care Clause case," Pls.' Opp. at 43, *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579 (1952).  However, as Defendants noted in their cross-motion, *Youngstown* is not a "Take Care Clause case" at all, and it mentions that constitutional provision only once.  343 U.S. at 587.  That case involved a question of whether the Constitution itself authorized a certain exercise of executive power.  Here, however, ATF has made no claims that the Rule was issued pursuant only to any Article II provision; rather, the Rule repeatedly and explicitly notes that it is issued pursuant to authority delegated to ATF by Congressional statute.  *See, e.g.,* 87 Fed. Reg. at 24,654.  *Youngstown* therefore has no relevance to the issue of whether ATF acted in excess of its statutory authority, and provides no support for Plaintiffs' Take Care Clause claim.

Finally, Plaintiffs return to their claim that unpassed bills that touched on privately made firearms in various ways are "*directly* relevant to the scope of a fifty-five-year-old statute."  Pls.' Opp.

---

[30] Tellingly, neither Plaintiffs nor BlackHawk address in their respective closing briefs any of the myriad other constitutional claims they asserted in their complaints and raised in summary judgment motions.  Defendants thus do not specifically address any of those claims here, but they are without merit for the reasons addressed in Defendants' opening brief.  *See* Defs.' MSJ at 60-67.

at 44 (emphasis in original).  Plaintiffs still make no attempt to actually explain or provide any detail as to the contents of those bills, and whether the way those bills proposed to regulate privately made firearms is in any way similar to the challenged provisions in the Rule.  Instead, Plaintiffs appear to make the fairly astounding assertion that the fact that Congress has not passed a number of specific bills having to do with privately made firearms[31] means that Congress has conclusively decided that the Executive Branch may not take *any* action with regard to privately made firearms.  Unsurprisingly, Plaintiffs can provide no support of this assertion.

Plaintiffs appear to pivot and argue that Congressional inaction actually supports an argument that the Rule falls under the "major questions doctrine."  Pls.' Opp. at 44.  However, as Defendants have previously explained, *see* ECF No. 41 at 14-17, the amending of definitions of terms for which ATF has long provided regulatory definitions does not meet the criteria for application of the "major questions doctrine."  That doctrine only applies "in certain extraordinary cases" that involve "decisions of vast economic and political significance," assertions of "extravagant statutory power over the national economy," or assertions of "highly consequential power beyond what Congress could reasonably be understood to have granted."  *West Virginia v. EPA*, 142 S. Ct. 2587, 2605, 2609 (2022).  The ATF actions challenged here fall well short of the kind of "extraordinary case[]" that the Supreme Court has previously recognized as implicating the doctrine.  Here, ATF has for decades used the primary delegation of authority from Congress to provide regulatory definitions for a variety of statutory terms, including "firearm" and "frame or receiver," and in the Rule has simply amended those definitions to better serve the statutory purposes.  Nothing about this action entails a "novel"

---

[31] As Defendants have explained, *see* Defs.' MSJ at 64, the bill cited by Plaintiffs that advanced the furthest, the "Protecting Our Kids Act," did much more than regulate privately made firearms, and the proposed regulation of privately made firearms went much further than what is contained in the Rule.  Thus, even if Congress's failure to pass that bill were treated as some sort of definitive Congressional judgment on the bill's contents, the bill bears little relationship to the Rule and it could not reasonably be understood to reflect Congressional opinion on the Rule's contents.

or "unprecedented" use of a previously unused ancillary provision to expand the agency's regulatory

sphere like the cases in which the Supreme Court has applied the major questions doctrine.

Accordingly, because Plaintiffs' Take Care Clause claim provides no basis for relief and is

without merit, the Court should grant judgment in favor of Defendants on this claim.

## VIII.   Any Relief Should Be Narrowly Tailored.

As explained in Defendants' opening brief, the APA does not provide for universal vacatur

of agency action, consistent with the ordinary meaning of "set aside," 5 U.S.C. § 706(2), and

longstanding limits on judicial power to review actions of the political branches.  *See* Defs.' MSJ at 67-

69.  Plaintiffs respond by citing a dictionary that defines "set aside" as "annul or quash," as in, "to *set*

*aside* a verdict."  Pls.' Opp. at 45 (quoting H.G. Emery & K.G. Brewster, THE NEW CENTURY

DICTIONARY OF THE ENGLISH LANGUAGE, Vol. 2, 1673 (1927)).[32]  But Plaintiffs' cited example of

"set[ting] aside a verdict" does not support their argument that to "set aside" means to "vacate."  That

is because, in at least one statutory context, the Fifth Circuit has rejected the argument that "the effect

of a motion to set aside [a] verdict, when granted, is to erase the conviction completely."  *Gonzalez de*

*Lara v. United States*, 439 F.2d 1316, 1318 (5th Cir. 1971).  More specifically, in *Gonzalez de Lara*, the

Fifth Circuit held that a state court's order "set[ting] aside" a state court conviction pursuant to section

7 of the Texas Adult Probation and Parole Law did *not* serve to "expunge or erase the conviction."

*Id.*  Rather, while such an order "releas[ed]" the defendant "from certain penalties and disabilities

otherwise imposed upon convicted persons by Texas law," it did not preclude federal courts from

continuing to rely on the state court conviction for purposes of federal immigration law.  *Id.*

Analogously, while the APA permits a court to "set aside" (*i.e.*, disregard) an unlawful agency action,

---

[32] Similarly, when the APA was enacted, Black's Law Dictionary defined "set aside" as follows: "To set aside a judgment, decree, award, or any proceedings is to cancel, annul, or revoke them at the instance of a party unjustly or irregularly affected by them."  *Set Aside*, BLACK'S LAW DICTIONARY (3d ed. 1933).  Notably, it did not include "vacate" in the definition, as it does today.  *See* Pls.' Opp. at 45 n.13 (citing *Set Aside*, BLACK'S LAW DICTIONARY (11th ed. 2019)).

it does not permit a court to nullify the action universally, including in other jurisdictions. Thus, even Plaintiffs' preferred dictionary definition is at least consistent with the proper understanding that to "set aside," as used in the APA, means to disregard, not to nullify. *See* Defs.' MSJ at 67-68. And Plaintiffs have no response to Defendants' explanation that universal vacatur is out of step with traditional limits on judicial power to review the acts of the political branches. *See id.* at 67-69.

Plaintiffs' contention that Defendants' position is "contradicted by Fifth Circuit precedent" fails to advance their case. Pls.' Opp. at 47 (citing *Data Mktg. P'ship, LP*, 45 F.4th at 859-60). In the case on which Plaintiffs rely, no party argued that the APA does not authorize universal vacatur. *See Data Mktg. P'ship*, 45 F.4th at 859 (noting that the defendant agency "ma[de] no developed argument" that vacatur was not the proper remedy).[33] It is well established that "a panel's assumption"—here, that the APA permits universal vacatur—"'is not binding if the adverse party did not challenge and [the panel] did not consider' that issue." *Ochoa-Salgado v. Garland*, 5 F.4th 615, 619 (5th Cir. 2021) (collecting cases). This remains true even when the assumption was necessary to the decision, as in the context of subject matter jurisdiction. *See, e.g.*, *Lefebure v. D'Aquilla*, 15 F.4th 650, 657 (5th Cir. 2021) ("The Supreme Court has repeatedly instructed lower courts that, '[w]hen a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed.' (quoting *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011))), *cert. denied*, 142 S. Ct. 2732 (2022).

Likewise, in each of the Supreme Court decisions on which Plaintiffs attempt to rely, *see* Pls.' Opp. at 46, the Court affirmed vacatur of an agency action, but it was not presented with and did not address the question whether that remedy was authorized under the APA. The Supreme Court, like

---

[33] To the extent that Plaintiffs suggest that *Texas v. United States*, 40 F.4th 205 (5th Cir. 2022) (per curiam), supports their interpretation of the APA's "set aside" provision, *see* Pls.' Opp. at 47, that case also did not address the question whether the APA authorizes universal vacatur.

the Fifth Circuit, has held that a decision of the Court "is not a binding precedent" on any issue that was not "raised in briefs or argument nor discussed in the opinion of the Court." *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952). Indeed, the question whether the APA authorizes universal vacatur is currently pending before the Court. *See* Br. for Pet'rs at 40-44, *United States v. Texas*, No. 22-58 (Sept. 12, 2022).[34] In sum, Plaintiffs cite no binding authority, and Defendants are aware of none, that stands for the proposition that the APA authorizes universal vacatur. The statute does not, for the reasons Defendants have explained. *See* Defs.' MSJ at 67-69.

In the alternative, Defendants have argued that even if vacatur is authorized under the APA, it is not warranted here in the event that Plaintiffs succeed on the merits of any procedural claim, because the agency can likely correct any such error on remand, and the disruptive consequences of vacatur to public safety would be immense. *See id.* at 69-70. As to the first prong of that standard, Plaintiffs do not dispute that ATF could likely remedy any procedural deficiency in the Rule on remand. As to the disruptive consequences of vacatur, Plaintiffs principally contend that it is "nonsensical" that "there can be a negative impact from enjoining an illegal and/or unconstitutional agency action." Pls.' Opp. at 48. But their argument proves too much. That is, in every case in which a court has considered the disruptive consequences of vacatur in determining the appropriate remedy, the court already had determined, in Plaintiffs' words, that the defendant agency had "failed to meet [its] burden, at least in part." *Id.*; *see, e.g.*, *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (holding that remand without vacatur was the appropriate remedy, in part because vacatur "would be disruptive," only after holding that the challenged agency action was unlawful); *cf. In re Clean Water Act Rulemaking*, 60 F.4th 583, 594 (9th Cir. 2023) ("[W]e are unaware of any precedent or

---

[34] Plaintiffs are mistaken in suggesting that any party has argued in *United States v. Texas* that the APA "requires" universal vacatur. Pls.' Opp. at 46 & n.14 (emphasis omitted); *see* Br. for Resp'ts at 40-42, *United States v. Texas*, No. 22-58 (Oct. 18, 2022) (arguing that Section 706(2) of the APA "authorizes"— not requires—vacatur).

historical examples supporting the power of courts to vacate executive action not first held unlawful . . . .").  Plaintiffs' argument that disruptive consequences are irrelevant where the agency action is unlawful thus cannot be squared with the two-part test set forth by the Fifth Circuit.

Plaintiffs are also mistaken to the extent they suggest that the serious disruptive consequences that would result from vacating the Rule are analogous to those addressed in *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032 (D.C. Cir. 2021), *cert. denied sub nom. Dakota Access, LLC v. Standing Rock Sioux Tribe*, 142 S. Ct. 1187 (2022) (mem.).  *See* Pls. Opp. at 48.  *Standing Rock* addressed mere economic disruption, which, "though . . . properly considered, . . .  is not commonly a basis, standing alone, for declining to vacate agency action."  985 F.3d at 1051.  Here, by contrast, vacatur would not result in mere economic disruption, but rather harm to public safety from the further proliferation of untraceable weapons.  *See* Defs.' MSJ at 70; *see also, e.g.*, *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) (remanding without vacatur to avoid adversely "affect[ing] the EPA's ability to respond adequately to serious safety hazards").

In the further alternative, Defendants have explained that any vacatur of the Rule should be limited in scope to any parties to this action who have standing to pursue any claim that the Court deems meritorious.  *See* Defs.' MSJ at 71-72.  Plaintiffs' response principally rehashes their argument that to "set aside" agency action within the meaning of the APA means to nullify it.  *See* Pls. Opp. at 49.  That argument is unpersuasive for the reasons set forth above and in Defendants' opening brief.  *See supra* pages 51-52; Defs.' MSJ at 67-69.  And to the extent Plaintiffs suggest that there is no precedent for setting aside agency action only as to the parties pursuant to Section 706(2) of the APA, they are mistaken.  *See, e.g.*, *GBX Assocs., LLC v. United States*, No. 1:22-CV-401, 2022 WL 16923886, at *18 (N.D. Ohio Nov. 14, 2022) (setting aside agency action only as to the plaintiff); *Skyworks, Ltd. v. CDC*, 542 F. Supp. 3d 719, 735-36 (N.D. Ohio 2021) (noting that "the lack of a firm foundation for nationwide vacatur in the language, structure, and history of the [APA] is striking" and, accordingly,

setting aside agency action only with respect to "the parties and their members"), *appeal dismissed*, No. 21-3563, 2021 WL 4305879 (6th Cir. Sept. 21, 2021); *cf. Virginia Soc'y for Hum. Life, Inc. v. FEC*, 263 F.3d 379, 394 (4th Cir. 2001) (holding that "[n]othing in the language of the APA" requires universal vacatur and directing the district court on remand to limit the scope of its permanent injunction to the plaintiff), *overruled on other grounds by Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012); *Mayor & City Council of Balt. v. Azar*, No. CV RDB-19-1103, 2020 WL 1873947, at *4 (D. Md. Apr. 15, 2020) (holding that "the APA does not require a reviewing court vacating a rule to do so on a nationwide basis" and declining to extend scope of vacatur beyond the State of Maryland).

Finally, Plaintiffs do not dispute in their opposition brief that injunctive relief would not have any practical effect independent of vacatur, and thus is unwarranted in the event the Court vacates any portion of the Rule. *See* Defs.' MSJ at 72. The Court should thus deem their request for injunctive relief abandoned. *See, e.g., Hernandez v. Scott*, No. SA-10-CV-1051-OG-NN, 2011 WL 2619342, at *1 (W.D. Tex. July 1, 2011) (assuming that a party abandoned its request for relief where its "reply did not address th[e] [relevant] issue"). In any event, Plaintiffs have not satisfied the equitable factors required for permanent injunctive relief. *See, e.g., MWK Recruiting Inc. v. Jowers*, 833 F. App'x 560, 562 (5th Cir. 2020). In the alternative, any injunctive relief the Court might grant must be narrowly tailored to the parties. *See, e.g., E.T. v. Paxton*, 19 F.4th 760, 769 (5th Cir. 2021) (holding that a permanent injunction that applied to all Texas school districts was "overbroad," in part because it "could have been tailored to address only the seven plaintiffs in [the] action, as well as their school districts").

## CONCLUSION

For the reasons stated above and in Defendants' opening brief, Defendants respectfully request that the Court enter summary judgment in their favor, and deny Plaintiffs' motions for summary judgment.

DATED: April 19, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

LESLEY FARBY
Assistant Director, Federal Programs Branch

*/s/ Daniel Riess*
DANIEL RIESS
TAISA M. GOODNATURE
JEREMY S.B. NEWMAN
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 353-3098
Email:  daniel.riess@usdoj.gov
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

On April 19, 2023, I electronically submitted the foregoing document with the clerk of court

for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the

court.  I hereby certify that I have served all parties electronically or by another manner authorized by

Federal Rule of Civil Procedure 5(b)(2).

*/s/ Daniel Riess*

56