UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| JENNIFER VANDERSTOK, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>MERRICK GARLAND, in his official capacity as Attorney General of the United States, *et al.*,<br><br>    Defendants. | Case No. 4:22-cv-00691-O |

**DECLARATION OF MATTHEW P. VARISCO**

I, Matthew P. Varisco, hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

**Introduction**

1. I am the Assistant Director for the Office of Enforcement Programs and Services (Regulatory Operations) within the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), United States Department of Justice (DOJ). I have been in this position for 9 months, and have also served as an ATF Special Agent for over 22 years, including as the Special Agent in Charge of the Philadelphia Field Division, which encompasses the Commonwealth of Pennsylvania. Before that, I was an ATF Industry Operations Investigator for over 2 years. I hold a Master of Science degree in Criminal Justice from Iona University, New Rochelle, New York, and a Master of Science degree in Strategic Studies from the U.S. Army War College, Carlisle,

2. In my current senior executive position, I direct policy, conduct planning, and oversee rulemakings for Bureau-wide programmatic offices, including ATF's National Tracing Center Division, Firearms Ammunition Technology Division, Regulatory Affairs Division, and National Firearms Act Division. These divisions support every aspect of ATF's mission to protect the public and reduce violent crime throughout the United States. I supervise around 833 personnel and currently manage an approximately $57 million budget.

3. I am authorized to provide this Declaration on ATF's behalf and am providing it in support of the Defendants' Emergency Motion for Stay Pending Appeal in this civil case. This declaration is based on my personal knowledge and belief, my training and experience, as well as information conveyed to me by ATF personnel in the course of my official duties. This declaration does not set forth all of the knowledge and information I have on the topics discussed herein and it does not state all of the harms to ATF and the public from the judgment in this case.

4. I am familiar with the definition of "firearm" and the enforcement provisions in the Gun Control Act of 1968, as amended ("GCA"), and the National Firearms Act of 1934, as amended ("NFA"). I am also familiar with ATF's Final Rule, *"Definition of 'Frame or Receiver' and Identification of Firearms"* ("Rule"), 87 FR 24652 (Apr. 26, 2022), which implemented several of these GCA and NFA provisions.

5. Congress and the Attorney General delegated the responsibility for administering and enforcing the GCA and NFA to the Director of ATF, subject to the direction of the

Pennsylvania. I have testified in numerous grand jury proceedings as well as criminal trials and hearings in U.S. District Court.

        Attorney General and the Deputy Attorney General. *See* 28 U.S.C. 599A(b)(1)-(2); 28 C.F.R. 0.130(a)(1)–(2).

6. ATF's top priority is public safety. ATF recognizes the role that firearms play in violent crimes and, as part of its efforts to administer and enforce the GCA and NFA, ATF pursues an integrated regulatory and enforcement strategy. ATF uses the GCA and NFA to target, investigate, and recommend prosecution of offenders to reduce the level of violent crime and to enhance public safety. ATF also takes steps to increase State and local awareness of available federal prosecution under these statutes through, among other things, devoting its limited resources to developing and presenting relevant training and conducting outreach.

7. ATF uses its regulatory authority to similarly fulfill its public safety mission. In order to curb the illegal use of firearms and enforce the federal firearms laws, ATF issues licenses to firearms manufacturers, importers, dealers, and curio or relic collectors, and conducts federal firearms licensee ("licensee") qualification and compliance inspections. In addition to aiding the enforcement of federal requirements for firearm purchases, compliance inspections of existing licensees focus on assisting law enforcement to identify and apprehend criminals who illegally purchase and possess firearms. As part of this effort, ATF also takes steps to increase awareness of the legal obligations among the firearms industry and the public. To accomplish this, ATF devotes its limited resources to educational campaigns and helping to ensure that those engaged in the business of manufacturing, importing, or dealing in firearms follow the law and have the essential education, training, and support to comply with federal law.

8. ATF issues rulemakings, rulings, forms, open letters, public safety advisories, Q&As, marking and recordkeeping variances (alternate methods to comply with the

regulations), and a variety of publications to implement, administer, and enforce the GCA and NFA.

9. Among the critical public safety issues ATF has identified and attempted to address is the impact of the proliferation of unserialized and unregulated firearms on efforts to reduce violent crime, including: (1) the proliferation of "privately made firearms" ("PMFs"), sometimes referred to as "ghost guns;" and (2) limitations of certain regulatory definitions that, as described below, could result in the vast majority of firearms in circulation in the United States having no frame or receiver.

## The Rule

10. This rule updated the regulatory definitions of "frame or receiver," "firearm," and associated marking and recordkeeping regulations. This update helped prevent firearms, particularly, easy-to-complete firearm parts kits, from falling into the hands of felons and other prohibited persons[1] who, without the Rule, were able to purchase them without a background check or transaction records. The Rule also curbs the proliferation of unserialized privately made firearms, typically assembled from those kits, by ensuring that those weapons, or the frames or receivers of those weapons, are subject to the same requirements as commercially produced firearms whenever they are accepted into inventory by licensees. This, in turn, helps law enforcement solve crime by providing law enforcement officers with the ability to trace those weapons to a potential suspect if they are later found at a crime scene.

---

[1] Among other GCA prohibitions, 18 U.S.C. § 922(g) makes it unlawful for persons who fall into one or more of the following categories of "prohibited persons" to ship, transport, receive, or possess firearms: felons, fugitives from justice, drug abusers, persons adjudicated as a mental defective or committed to a mental institution, illegal aliens, certain nonimmigrant aliens, persons dishonorably discharged from the military, persons who have renounced their U.S. citizenship, persons subject to a qualifying domestic violence restraining order, and persons who have been convicted of a misdemeanor crime of domestic violence. Additionally, under 18 U.S.C. § 922(b)(1), juveniles under the age of 21 are prohibited from purchasing firearms other than a rifle or shotgun from a licensee, and if under 18, any firearms.

11. ATF issued the Rule to increase public safety with the goal of ensuring proper marking, recordkeeping, and traceability of all firearms manufactured, imported, or otherwise acquired, and sold or otherwise disposed of by licensees.

12. I am aware that in an Opinion and Order dated June 30, 2023, and a Final Judgment dated July 5, 2023, the district court in *VanDerStok v. Garland*, 4:22-cv-00691-O (N.D. Tex.), determined that two provisions of the Rule, *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652f (Apr. 26, 2022), exceeded ATF's regulatory authority, and vacated the Rule.

13. The Court's prior preliminary injunction decisions and June 30 Opinion and Order were limited to determining that these two specific provisions in the Rule—namely, 27 CFR 478.12(c) ("frame or receiver"), regulating certain partially complete frames and receivers (*i.e.*, those are designed to or may readily be designed to or may readily be completed, assembled, restored, or otherwise converted to a functional state) as falling within the definition of "frame or receiver," and the portion of 27 CFR 478.11 ("firearm") that addresses certain weapon parts kits (*i.e.*, those that are designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive) as falling within the definition of "firearm."

14. The Rule, which was published with 90 days of public notice and comment, and which evaluated over 290,000 public comments, did considerably more than amend the regulatory definition of "frame or receiver" to include certain partially complete frames or receivers, 27 CFR 478.12(c), and amend the regulatory definition of "firearm" to include certain weapon part kits, 27 CFR 478.11.

15. In addition to these amendments, the Rule also: (a) defines the terms "frame" for handguns, and "receiver" for long guns and other projectiles weapons, to identify the

specific part that provides the housing for one primary fire control component with respect to those weapons, and grandfathers pre-existing designs; (b) addresses how and by when unserialized firearms that are privately made and are voluntarily accepted into the inventory of a licensee must be marked and recorded; (c) provides silencer manufacturers with important clarifications as to which portion of a complete muffler or silencer device must be marked with a serial number and other required identification, and when (often tiny) individual silencer parts must be marked; (d) explains how "multi-piece" frames or receivers that are modular—those that may be disassembled into standardized multiple subparts—are required to be marked; (e) updates the marking requirements for manufacturers to allow them to mark their abbreviated license number as an alternative to "city" and "state," by clarifying what it means to mark "conspicuously," and permits adoption of markings when firearms are being transferred prior to first sale or distribution into commerce and when gunsmithing operations are performed; (f) requires all licensees to consolidate records of manufacture, importation, acquisition, and disposition of firearms; and (g) updates existing regulations to require that all records retained by firearms licensees be maintained until they discontinue business or licensed operations rather than requiring them to be maintained for only 20 years.

## Overview of Harms

16. Eliminating the entire Rule—including provisions other than those evaluated by the Court in its opinions and orders—would irreparably harm the public, the regulated community, and ATF.  Such elimination would damage public safety by allowing felons and other prohibited purchasers (including underage persons) and possessors to easily buy and assemble both serialized and unserialized firearms, by permitting the

widespread proliferation of unserialized firearms, and by impairing law enforcement's ability to trace firearms recovered at crime scenes. In addition, the Rule provides clarity to, and eases certain regulatory burdens on, the regulated community, such that its elimination would cause confusion among, and costs to, that community. ATF has already spent substantial resources to implement the Rule. Thus, eliminating the Rule would—especially if any elimination were later narrowed or reversed—require ATF to spend additional substantial resources and would create confusion both inside and outside the agency.

## Harm to Public Safety

17. A number of the Rule's provisions are aimed at ensuring that all firearms have a single frame or receiver subject to the statutory serialization, licensing, background check, recordkeeping, and other requirements. The effective implementation of those requirements is critically important to public safety, primarily for two separate reasons.

18. First, these requirements prevent felons and other prohibited persons throughout the country from acquiring firearms by ensuring that licensees sell firearms only after the purchaser undergoes a background check (or falls within an exception) and completes an ATF Form 4473, Firearms Transaction Record.

19. Second, as detailed extensively in the Rule and the administrative record, unserialized firearms, which have been increasingly recovered at crime scenes, are nearly impossible to trace and therefore pose a significant challenge to law enforcement. (87 FR 24655 – 24660; AR 818-819; 825-827; 855-859; 871-901;71,465-71,657). The number of suspected unserialized firearms recovered by law enforcement agencies and submitted to ATF for tracing increased by 1,083% from 2017 (1,629) to 2021 (19,273). (National Firearms Commerce and Trafficking Assessment Vol. II: Part III, Page 5). With the

      Rule in its infancy, the threat of unserialized firearms continues. Between August 24, 2022, and July 6, 2023, a total of approximately 23,452 suspected privately made firearms were recovered at crime scenes and submitted for tracing. (ATF PMF Trace Data, queried July 14, 2023). These numbers are likely far lower than the actual number of privately made firearms recovered from crime scenes because some law enforcement departments incorrectly trace some privately made firearms as commercially manufactured firearms, or may not see a need to use their resources to attempt to trace firearms with no serial numbers or other markings. (87 FR 24656 n.18).

20. Eliminating all of the Rule's provisions would thus irreparably harm public safety by allowing the continued proliferation of unserialized firearms—generally acquired by individuals who have not undergone a background check and sold with no record of their sale—on a number of different dimensions.

21. At the outset, the two provisions that the Court determined exceeded ATF's regulatory authority in its opinion vacating the Rule are critical to public safety because they prevent easy circumvention of the GCA's entire regulatory scheme. 27 CFR 478.12(c) ("frame or receiver"), which explains when a partially complete, disassembled, or nonfunctional frame or receiver has reached the stage of manufacture to be considered a "frame" or "receiver," ensures that companies that produce and sell frame or receiver parts kits, or standalone partially complete frames or receivers, that allow ready completion and assembly to be *functional* frames or receivers: (a) are properly licensed; (b) place traceable marks of identification on them; (c) conduct background checks when they are sold to prevent felons and other prohibited persons from acquiring them; and (d) maintain records through which the weapons that incorporate

them can traced if later used in crime. Under the Court's decision, unlike every other firearms manufacturer, a manufacturer of frames or receivers can easily avoid the regulatory requirements of the GCA simply by producing and selling frames or receivers that are missing, for example, a single hole necessary to install the applicable fire control component, or that has a small piece of plastic that can easily be removed to allow installation of that component (*i.e.*, a frame or receiver that is "partially complete").

22. The same is true of weapon parts kits. 27 CFR 478.11 ("firearm") ensures that companies that produce and sell weapon parts kits, or aggregations of parts that allow a weapon to readily be completed and assembled to expel a lethal projectile, are subject to the same requirements as all other firearms manufacturers. Again, these requirements help prevent violent crime by requiring manufacturers to conduct background checks to prevent prohibited persons from receiving them, and requiring licensees to mark and keep records that allow those weapons to be traced to a potential suspect if they are later used in a crime.

23. In recognition of these risks to public safety, the Court had previously limited its preliminary injunctions so that it did not apply to plaintiffs' customers who were prohibited from possessing firearms pursuant to 18 U.S.C. § 922(g). In vacating the Rule, that important limitation to the Court's prior rulings no longer exists, which will only encourage felons and other prohibited purchasers (including underage persons) and possessors to buy firearms in the configuration of weapon parts kits or partially complete frames or receivers that enable those individuals to easily acquire the parts and readily complete and assemble a functional unserialized firearm for use in violent crime. (87 FR 24686 & n.107).

24. For example, in New Orleans, Louisiana, from August 19, 2021, to February 1, 2022, a 20-year-old named Tyrese Harris committed a series of carjackings using a privately made 9mm caliber semiautomatic pistol that had been completed and assembled from a Lone Wolf parts kit that could not be traced. During one attempted carjacking, Harris fired the weapon at the driver, and in another, the victim was dragged by the car resulting in serious bodily injury. He was sentenced to 45 years in prison. *See also, Teens buying ghost guns online, with deadly consequences*, Washington Post (July 12, 2023), available at https://www.washingtonpost.com/dc-md-va/2023/07/12/teens-ghost-guns-deadly-shootings/.

25. In addition, numerous other provisions of the Rule, which were not addressed by the Court, seek to combat the proliferation of unserialized, or otherwise untraceable, firearms in different ways. Eliminating those provisions would thus further undermine public safety.

26. First, one provision of the Rule updates the regulatory definitions of "frame" and "receiver" to reflect advances in weapons technology. As noted in the Rule (87 FR 24691, 24655) and administrative record (AR 628-687; 701-709; 719-722; 71,330), the 1968 regulatory definition of "frame or receiver" meant "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism." But today, 90% of firearms currently available do not have a single part that houses a hammer, bolt or breechblock, and firing mechanism; instead, most firearms have split frames or receivers (*i.e.*, they house those three components in two or more separate parts), or they house a striker rather than a hammer. As a result, under a strict reading of the previous regulatory definition—which had been adopted by at least three federal

district courts (87 FR 24691, 24655)[2]—the vast majority of available firearms would have no frame or receiver.

27. The practical result of that strict reading is that every individual part of almost all firearms in circulation in the United States may be sold separately without compliance with the statutory background check, licensing, serialization, and recordkeeping requirements. As illustrated below, a felon or other prohibited person could easily purchase online Part A and Part B (*i.e.*, the upper and lower receiver) as "non-firearms" and assemble a fully functional AR-variant firearm within a minute. And that firearm may not have a serial number, and even if it did, there would be no recordkeeping required that would allow ATF to trace it if it were later recovered at a crime scene.



**Part A**

**Part B**

**Complete Weapon**

---

[2] *See United States v. Jimenez,* 191 F. Supp. 3d 1038 (N.D. Cal 2016); *United States v. Roh*, 8:14-cr-00167-JVS, May 16, 2019; *United States v. Rowold*, 429 F. Supp. 3d 469 (N.D. Ohio 2019).

28. Notably, a court in the Northern District of Ohio encouraged ATF to alter the 1968 regulatory definition of "frame or receiver," stating that "[A]TF retains the authority – and has the duty – to fix the regulatory scheme and to regulate AR-15 lower receivers as firearms within the GCA. The result I reach only prevents the agency from using an unreasonable and legally unacceptable application of its current regulation to accomplish that worthwhile objective." *Rowold*, 429 F. Supp. 3d at 476.

29. Second, the Rule requires that firearms licensees mark unserialized firearms whenever they are voluntarily accepted into the licensee's inventory. The GCA requires that licensees record the acquisition and disposition of each firearm, but without unique identifying information to record, those records are ineffective as a means of tracing or locating unserialized firearms. Thus, eliminating that provision of the Rule would undermine the GCA's requirements that ensure every licensee has recorded each firearm's acquisition and disposition for purposes of tracing.

30. As explained above, the lack of proper records makes it nearly impossible to trace firearms that are recovered at crime scenes. But it also harms public safety in other, related ways. For example, it is difficult, if not impossible, for licensees and ATF (during inspections) to match accurately and reliably the unserialized firearms in a licensee's inventory with those in required records, or to determine whether a particular unserialized firearm recorded as disposed on a Form 4473 (which details information of a purchaser) are those recorded as disposed in the records. Such difficulty not only makes it hard for ATF to ensure that licensees are keeping accurate records during inspections, but also means that licensees and ATF will have difficulty accurately determining which unserialized firearms were stolen or lost from inventory if such an incident occurs, or were the same crime guns listed on an ATF Form 4473.

       In addition, the lack of such a serialization requirement makes it much more difficult for police to locate stolen unserialized firearms in the business inventories of pawnbrokers, for example, or to return any recovered stolen or lost unserialized firearms to their rightful owners. (87 FR 24659-60)

31. Third, the Rule imposes a number of requirements related to silencers and mufflers that are important for public safety. The Rule explains how, by when, and where on the device, including one that is modular, the silencer or muffler must be marked so that law enforcement officers can trace them if later found at a crime scene. The Rule also prohibits manufacturers from marking a removable end cap on the device, which can be damaged during use, thus destroying the information necessary to trace the firearm. (87 FR 24660, 24727, 24739)

32. Fourth, the Rule updates existing regulations to require that all records retained by firearms licensees be maintained (including allowing storage of old paper records at a separate warehouse) until they discontinue business or licensed operations, rather than destroying them after a twenty-year period. As the Rule and administrative record make clear, numerous older firearms could not be traced after having been used in crime because the records were destroyed after 20 years. (87 FR 24667, 24712; AR 68,595-597; 68,605-606; 68,626-628; 68,640-644; 68,655; 68,659-661). There are currently 81,808 total active federal firearms licensees. Of those, 14,048 have been in business 20 years or more, and an additional 751 have been in business for 19 years. With the Rule vacated, these thousands of licensees are able to destroy their dated records now and every day the Rule remains vacated without recourse. Once these firearms transactions records are destroyed, there is no way to recover the information

   they contained, which will make any additional traces of the firearms involved unsuccessful.

33. As explained in the Rule, the National Tracing Center conducted an analysis of all trace requests submitted between January 1, 2010, and December 31, 2021, that were closed under a particular code in the tracing system indicating the licensee specifically informed ATF that it did not have records for that firearm because the records were more than 20 years old and had been destroyed. A total of approximately 16,324 traces, or 1,360 on average per year, could not be completed during this time period because ATF was informed the records had been destroyed. Of these total unsuccessful traces, approximately 182 of the traces were designated as "Urgent," 1,013 were related to a homicide or attempted homicide (not including suicide), and 4,237 were related to "Violent Crime." (87 FR 24712)

**Harm to the Regulated Community**

34. In addition to harming public safety, eliminating the entire Rule would substantially injure the regulated community, in primarily two different ways. First, it would create substantial confusion among the regulated community regarding their legal obligations. Second, it would increase regulatory burdens on the regulated community.

35. First, eliminating the Rule will create, and indeed has already created, significant confusion among the regulated community—impacting approximately 80,000 licensees. Vacating the entire Rule also has a significant impact on formal ATF Rulings that were superseded by the Rule because the firearms industry is unclear how to proceed with their current business practices. ATF has already received inquiries from members of the firearms industry, a trade association that represents many of those members, and a software company, seeking clarification whether they must now

reverse their newly implemented business practices (*e.g.*, whether these licensees must now separate their recently consolidated records) and methods of operation. This confusion will only increase if the Court's ruling, or the scope of relief, is reversed on appeal, which may require licensees to overhaul certain business practices twice in a short period of time.

36. Second, a number of provisions of the Rule were aimed at easing burdens on the regulated community, and their elimination harms that community by reimposing those requirements. For example, the Rule authorizes manufacturers to mark the "frame" or "receiver" with their abbreviated license number instead of "city" and "state" of manufacture, and enumerates specific exceptions as to when and how a licensee may adopt existing markings. Without the Rule, these codified allowances and blanket "marking variances" would not exist, increasing burdens on the firearms industry. These burdens may be particularly onerous because manufacturers must set up their manufacturing processes to comply with marking requirements, a process that costs substantial time and money to accomplish.

37. In addition, the Rule provides silencer manufacturers with important clarification as to which portion of a complete muffler or silencer device must be marked with a serial number and other required identification. Under the GCA, the term "silencer" is defined to include each small individual part designed and intended only to be used to fabricate a silencer. It is extremely difficult and expensive for silencer manufacturers to mark each tiny individual silencer part. For this reason, the Rule only requires them to mark what is defined as the "frame or receiver" of the silencer. (AR 917; 937-938).

38. Similarly, the Rule also provides an exception for qualified manufacturers to delay or avoid registration of silencer parts if they become part of a complete device, or

gunsmithing operations are being performed on an existing marked and registered silencer device.  Without the Rule, there is no exception for manufacturers from the requirement that they mark and register each and every silencer part, and no grace period in which to mark them after completion of manufacture.

39. The Rule replaced many prior ATF Rulings with updated information that explained how to conduct business under law.  (87 FR 24664 n.53, 24665-66, 24688, 24702-03, 24729-30).  For example, the Rule superseded ATF Rulings 2009-5 (Firearms Manufacturing Activities, Identification Markings of Firearms) and 2013-3 (Adopting Identification of Firearms).  Under the applicable provisions of the Rule, manufacturers may adopt existing markings on a firearm and a "non-marking variance request" or notice is no longer required under the new regulations under certain circumstances.  Without the Rule, manufacturers will either have to mark firearms they remanufacture, or apply for a variance not to mark firearms they remanufacture even though they have already been marked by another manufacturer.  These additional markings are expensive for licensees to place, and confusing to law enforcement when conducting a trace of a crime gun.

40. In addition, the Rule superseded ATF Ruling 2011–1 (Importers Consolidated Records) and ATF Ruling 2016–3 (Consolidation of Records Required for Manufacturers), which allowed licensed manufacturers and importers to consolidate their records of both production/importation, and disposition, but only under certain conditions.  The Rule made this consolidation a requirement.  If the Rule is removed, manufacturers and importers would need to undo this consolidation and keep their production/importation records separately from their records of sale or distribution unless they obtain a variance.

**Harm to ATF**

41. In addition, elimination of the Rule will substantially harm ATF, which has devoted significant resources to training and implementing the Rule, and which will need to devote substantial additional resources to comply.

42. For example, after the issuance of the Rule, ATF amended its Form 4473, Firearms Transaction Record, to comport with the updates made by the Rule. This form must be completed every time a licensee transfers a firearm to a non-licensee. ATF will incur substantial monetary costs to publish a revised version of Form 4473. This would include the cost of creating, printing, and shipping approximately 25 million replacement forms to licensees throughout the United States. This cost could double if the Court's decision is overturned or rendered inconsistent with rulings by other courts. In addition to ATF's costs to change the Form 4473, there are also costs to the industry to develop the electronic Form 4473 for their electronic systems; in addition to the costs, these changes can take roughly several months to complete.

43. After publication of the Rule, ATF and the Department of Justice conducted extensive training and outreach to federal, state, and local law enforcement partners, and United States Attorney's Offices nationwide regarding the impact of the Rule. ATF extensively trained its personnel on the scope of the Rule and identified one Industry Operations Investigator and one Special Agent in each ATF field division as the local subject matter expert on the Rule. ATF conducted approximately 18 internal trainings which around 1,978 ATF employees attended. Additionally, ATF presented at least four virtual trainings for over 5,200 regulated industry members and in person trainings to regulated industry members at the Orchid Advisors Conference, SAAMI Conference, National Shooting Sports Foundation conference, and Firearms and

        Ammunition Import Roundtable Conference. ATF's Office of Field Operations also conducted over 150 licensee seminars from June 22, 2022, to the present which included explaining the Rule.

44. Each training covered the Rule's definition of "frame or receiver"; its definition of "privately made firearm"; marking and recordkeeping for licensees; general changes to the marking, recordkeeping, and record retention requirements for licensees; and affected ATF Rulings/Procedures. In each training, experts from ATF's Firearms and Ammunition Technology Division, Firearms and Explosives Services Division, National Firearms Act Division, Field Operations, and Firearms and Explosives Law Division answered numerous questions.

45. In addition to training, ATF established a robust public facing webpage, (https://www.atf.gov/rules-and-regulations/definition-frame-or-receiver) dedicated to the Rule. The website includes a summary of the Rule, resource guides explaining the impact of the Rule, and it provides access to the regulation's website with the Rule's text, the detailed PowerPoint training, frequently asked questions, and a recorded training video on the Rule.

46. Removal of the Rule will result in widespread confusion among law enforcement officers and prosecutors, firearms industry members, and the general public. ATF has already begun to receive these inquiries, and will need to devote the agency's limited time and resources to retraining internal personnel and educating the regulated industry, law enforcement, and the public on implementation of this decision. The potential of an appeal or contrary decision by the court of appeals or another district court further increases the risk that ATF will need to expend further resources to undertake continual efforts to update the public on the status of the Rule.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of July, 2023.

_____
Matthew P. Varisco
Assistant Director, Enforcement Programs and Services (Regulatory Operations)
Bureau of Alcohol, Tobacco, Firearms and Explosives
United States Department of Justice