# EXHIBIT A

No. 23A\_\_\_\_

_____

_____

IN THE SUPREME COURT OF THE UNITED STATES

————————————

MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL., APPLICANTS

v.

JENNIFER VANDERSTOK

————————————

APPLICATION FOR A STAY OF THE JUDGMENT
ENTERED BY THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

————————————

ELIZABETH B. PRELOGAR
  Solicitor General
    Counsel of Record
  Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217

_____

_____

**PARTIES TO THE PROCEEDING**

Applicants (defendants-appellants below) are the U.S. Department of Justice; the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); Merrick B. Garland, in his official capacity as Attorney General of the United States; and Steven Dettelbach, in his official capacity as Director of ATF.

Respondents (plaintiffs-appellees below) are Jennifer VanDerStok; Michael G. Andren; Tactical Machining, L.L.C.; and Firearms Policy Coalition, Inc. Additional respondents (intervenor plaintiffs-appellees below) are Blackhawk Manufacturing Group, Inc. (doing business as 80 Percent Arms); Defense Distributed; Second Amendment Foundation, Inc.; Not An L.L.C. (doing business as JSD Supply); and Polymer80, Inc.

**RELATED PROCEEDINGS**

United States District Court (S.D. Tex.):

   VanDerStok v. Garland, No. 22-cv-691 (July 5, 2023)

United States Court of Appeals (5th Cir.):

   VanDerStok v. Garland, No. 22-11071 (notice of appeal filed
      Nov. 1, 2022)

   VanDerStok v. Garland, No. 22-11086 (notice of appeal filed
      Nov. 4, 2022)

   VanDerStok v. Garland, No. 23-10463 (notice of appeal filed
      May 1, 2023)

   VanDerStok v. Garland, No. 23-10718 (July 24, 2023) (denying
      stay pending appeal)

IN THE SUPREME COURT OF THE UNITED STATES

_____

No. 23A____

MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL., APPLICANTS

v.

JENNIFER VANDERSTOK

_____

APPLICATION FOR A STAY OF THE JUDGMENT
ENTERED BY THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

_____

Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Solicitor General, on behalf of applicants Merrick B. Garland, et al., respectfully applies for a stay of the judgment entered on July 5, 2023, by the United States District Court for the Northern District of Texas (App., infra, 6a-45a), pending the consideration and disposition of the government's appeal to the United States Court of Appeals for the Fifth Circuit and, if the court of appeals affirms, pending the timely filing and disposition of a petition for a writ of certiorari and any further proceedings in this Court.

This case concerns a district court's nationwide vacatur of a regulation issued by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) to respond to the urgent public safety and

law enforcement crisis posed by the exponential rise of untraceable firearms commonly called "ghost guns."  Ghost guns can be made from kits and parts that are available online to anyone with a credit card and that allow anyone with basic tools and rudimentary skills (or access to Internet video tutorials) to assemble a fully functional firearm in as little as twenty minutes.  Some manufacturers of those kits and parts assert that they are not "firearms" regulated by federal law, and thus can be sold without serial numbers, transfer records, or background checks.  Those features of ghost guns make them uniquely attractive to criminals and others who are legally prohibited from buying firearms.

Over the last several years, police departments around the Nation have confronted an explosion of crimes involving ghost guns. In 2017, law enforcement agencies submitted roughly 1600 ghost guns to the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) for tracing.  App., _infra_, 52a.  By 2021, that number was more than 19,000 -- an increase of more than 1000% in just four years.  _Ibid._  And those submissions to ATF have been largely futile because the lack of serial numbers makes ghost guns "nearly impossible to trace."  _Ibid._

In 2022, ATF responded to that crisis by issuing a regulation updating its interpretation of the statutory definition of a regulated "firearm."  See Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (Rule). In defining that term, Congress recognized that limiting the fed-

eral firearms laws to functional firearms would invite evasion, and it thus broadly defined "firearm" to include "any weapon" that "will or is designed to or may readily be converted to expel a projectile by the action of an explosive."  18 U.S.C. 921(a)(3)(A). Congress also included "the frame or receiver of any such weapon," 18 U.S.C. 921(a)(3)(B), ensuring that the key structural component of a firearm is subject to serial-number, background-check, and recordkeeping requirements, even if it is sold alone.

The Rule addresses both of those prongs of that definition. It makes clear that a parts kit that allows a purchaser to readily assemble an operational weapon is a "firearm."  27 C.F.R. 478.11; see 87 Fed. Reg. at 24,735.  And it clarifies that a "frame or receiver" includes "a partially complete, disassembled, or non-functional frame or receiver" that may be readily converted into a functional one -- by, for example, simply drilling holes or removing plastic rails to allow the frame or receiver to accept other parts.  27 C.F.R. 478.12(c); see 87 Fed. Reg. at 24,739.

The Rule does not prohibit the purchase, sale, or possession of any firearm, nor does it prohibit any individual lawfully en-titled to possess a firearm from making one at home.  Instead, it simply requires compliance with the uncontroversial federal laws "imposing conditions and qualifications on the commercial sale of arms," District of Columbia v. Heller, 554 U.S. 570, 626-627 (2008).  Under the statute as interpreted in the Rule, commercial manufacturers and sellers of certain weapon parts kits and par-

tially completed frames or receivers must obtain licenses, mark products with serial numbers, conduct background checks, and keep records to allow law enforcement to trace firearms used in crimes.

Manufacturers and sellers of ghost-gun kits, along with other plaintiffs, have filed at least a half dozen suits challenging the Rule. Two district courts have rejected those challenges or denied preliminary relief, and other suits remain pending. In this case, however, the district court pretermitted that litigation by vacating the Rule nationwide. The court's decision rested on a cramped interpretation that contradicts both the text of the statute and common sense. And the court compounded its error by granting universal relief.

First, contrary to the district court's conclusion, a weapon parts kit falls squarely within the plain meaning of the statutory definition, which expressly includes items that can "readily be converted" into functional firearms. 18 U.S.C. 921(a)(3)(A). Every speaker of English would recognize that a tax on sales of "bookshelves" applies to IKEA when it sells boxes of parts and the tools and instructions for assembling them into bookshelves. The court's insistence on treating guns differently contradicts ordinary usage and makes a mockery of Congress's careful regulatory scheme.

Second, the term "frame or receiver" is naturally read to include a partially completed frame or receiver that can readily be made functional. Again, that accords with ordinary usage. Just

as a bicycle is still a bicycle even if it is sold without pedals, a frame or receiver is still a frame or receiver even if the buyer must drill a few holes or remove some plastic tabs before attaching other parts of the firearm.  And again, the district court's contrary interpretation transforms Congress's broad definition of "firearm" into a self-defeating invitation to evasion of serialization, recordkeeping, and background-check requirements.

Third, the district court erred in granting nationwide vacatur.  Such universal remedies contradict Article III and traditional equitable principles, which limit courts to "case-by-case judgments with respect to the parties in each case."  <u>Arizona</u> v. <u>Biden</u>, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring).  And as three Justices recently emphasized, even if district courts were empowered to issue such universal remedies, at the very least they must "'think twice -- and perhaps twice again -- before granting' such sweeping relief."  <u>United States</u> v. <u>Texas</u>, 143 S. Ct. 1964, 1985 (2023) (Gorsuch, J., concurring in the judgment) (citation omitted).  The court failed to do that here.

The Fifth Circuit stayed the district court's vacatur to the extent it applied to portions of the Rule that respondents had not challenged and that the district court had not even purported to find unlawful.  But the Fifth Circuit declined to stay the vacatur of the two challenged provisions.  In so doing, it offered no analysis of the merits, no defense of the district court's universal remedy, and no meaningful discussion of the equities.

The district court's universal vacatur is irreparably harming the public and the government by reopening the floodgates to the tide of untraceable ghost guns flowing into our Nation's communities. Once those guns are sold, the damage is done: Some will already be in the hands of criminals and other prohibited persons -- and when they are inevitably used in crimes, they are untraceable. Those profound harms to public safety and law enforcement dwarf any harm a stay would impose on respondents. Under a stay, respondents would remain free to make, sell, and buy weapon parts kits and partial frames and receivers; they would need to comply only with the same straightforward and inexpensive administrative requirements that apply to commercial sales of all other firearms.

This Court should stay the district court's vacatur in full. A stay would prevent further irreparable harm to the public while allowing the litigation in this case and other challenges to the Rule to proceed in the ordinary course. But given the gravity and urgency of the public safety issues at stake, if the Court is not prepared to grant a stay it may wish to construe this application as a petition for a writ of certiorari before judgment, grant the petition, and set this case for argument this fall. Cf. United States v. Texas, 143 S. Ct. 51 (2022) (No. 22A17).

**STATEMENT**

**A.   Background**

1.   In the Gun Control Act of 1968, Congress imposed requirements on persons who import, manufacture, or deal in "fire-

arms." 18 U.S.C. 922, 923. Such persons must obtain a federal license, maintain records of the acquisition and transfer of firearms, and conduct background checks before transferring firearms to non-licensees. 18 U.S.C. 922(t), 923(a) and (g)(1)(A). Importers and manufacturers are also required to identify firearms with a serial number on the receiver or frame. 18 U.S.C. 923(i).

As this Court has recognized, that "comprehensive scheme" has "twin goals": "keep[ing] guns out of the hands of criminals and others who should not have them[] and * * * assist[ing] law enforcement authorities in investigating serious crimes." Abramski v. United States, 573 U.S. 169, 180 (2014). The Act's background-check requirements "prevent felons and other prohibited persons from acquiring" firearms in the first place. App., infra, 52a. And the Act's record-keeping and serialization requirements are essential to the investigation and prosecution of crimes because they allow "law enforcement to determine where, by whom, or when" a firearm was manufactured and "to whom [it was] sold or otherwise transferred." 87 Fed. Reg. at 24,652.

Congress broadly defined "firearm" as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." 18 U.S.C. 921(a)(3). Congress did not define the terms "frame" or "receiver," which generally refer to the primary structural com-

ponents of firearms to which fire-control components are attached.

Congress authorized the Attorney General to prescribe "such rules and regulations as are necessary to carry out" the Act. 18 U.S.C. 926(a). The Attorney General has delegated that authority to ATF. 28 C.F.R. 0.130(a). In 1968, ATF promulgated a regulation defining "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968). That regulation "provide[d] direction as to which portion of a weapon is the frame or receiver for purposes of licensing, seri-alization, and recordkeeping, thereby ensuring that a component necessary for the functioning of the weapon could be traced if later involved in a crime." 87 Fed. Reg. at 24,652.

2.   The Rule at issue here took effect on August 24, 2022. 87 Fed. Reg. at 24,652. It updates ATF's regulations concerning the definition of a firearm and related requirements, and specifi-ically addresses the rapid proliferation of ghost guns. This case concerns two provisions of the Rule.

First, the Rule clarifies that the statutory definition of "firearm" includes certain parts kits. As the Rule explains, "technological advances have  * * *  made it easier for companies to sell firearm parts kits" -- "some of which contain all of the components necessary" for a buyer "to complete a functional weapon within a short period of time." 87 Fed. Reg. at 24,652, 24,662.

For example, one kit permits a purchaser to assemble a fully func-
tional Glock-style semiautomatic pistol in as little as 21 minutes.
App., infra, 70a-71a, 81a-88a; see id. at 82a-83a (photographs of
weapon parts kits).  Because some manufactures failed or refused
to treat such kits as firearms, they did not mark them with serial
numbers, and sellers did not maintain records of their transfer or
conduct background checks on purchasers.  See 87 Fed. Reg. at
24,655, 24,662.  For those reasons, it has proved almost impossible
for law enforcement to trace such firearms when they are used in
crimes:  out of 45,240 unserialized firearms recovered from crime
scenes from 2016 through 2021 that were submitted for federal
tracing, ATF was able to successfully complete only 445 traces to
individual unlicensed purchasers.  Id. at 24,656, 24,659.

To make clear there is no ghost-gun regulatory loophole, the
Rule defines "firearm" to "include a weapon parts kit that is
designed to or may readily be completed, assembled, restored, or
otherwise converted to expel a projectile by the action of an
explosive." 87 Fed. Reg. at 24,735.  And the Rule defines "read-
ily" as "[a] process, action, or physical state that is fairly or
reasonably efficient, quick, and easy," noting that the "factors
relevant in making this determination include" the "[t]ime," "dif-
ficult[y]," "knowledge," "skills," and "[e]quipment" associated
with "finish[ing] the process."  Ibid.  ATF explained that regu-
lating such kits is consistent with Section 921(a)'s definition of
"firearm," which includes "any weapon" that "is designed to or may

readily be converted to expel a projectile by the action of an explosive," 18 U.S.C. 921(a)(3)(A). See 87 Fed. Reg. at 24,662.

Second, the Rule clarifies the Act's definition of "frames or receivers." The Rule explains that, as with weapon parts kits, "partially complete or unassembled frames or receivers * * * are often sold in kits where the frame or receiver can readily be completed or assembled to a functional state." 87 Fed. Reg. at 24,663. Some frame or receiver kits can be completed in under 30 minutes. Id. at 24,686. And a manufacturer can "produc[e] and sell[] frames or receivers that are missing * * * a single hole necessary to install the applicable fire control component, or that has a small piece of plastic that can easily be removed to allow installation of that component." App., infra, 54a.[1] Before ATF's adoption of the Rule, it was sometimes unclear whether the prior regulation's definition of "frame or receiver" covered such products. See 87 Fed. Reg. at 24,663.

The Rule therefore provides that "[t]he terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, as-sembled, restored, or otherwise converted to function as a frame or receiver." 87 Fed. Reg. at 24,739. The Rule lists examples of

---

[1]     For pictures, see p. 23, infra. For a video of the assembly of a frame parts kit that was cited in the Rule's pream-ble, see https://web.archive.org/web/20200331211935/https://www.youtube.com/watch?v=ThzFOIYZgIg (cited at 87 Fed. Reg. at 47,686).

products that fall within that definition.  A kit containing the necessary parts and "a compatible jig or template" so that "a person with online instructions and common hand tools may readily complete or assemble" the parts "to function as a frame or receiver" is included under the Rule.  Ibid.  The Rule likewise covers a "partially complete billet or blank of a frame or receiver" -- that is, a machined, molded, or manufactured frame or receiver structure -- "with one or more template holes drilled or indexed in the correct location" so that "a person with common hand tools may readily complete the billet or blank to function as a frame or receiver."  Ibid.

**B.  Proceedings Below**

1.  Respondents -- two individual firearm owners, two advocacy organizations, and five entities that manufacture or distribute products regulated by the Rule -- filed or intervened in this suit.  As relevant here, they challenged the portions of the Rule that define "firearm" to include certain weapon parts kits and define "frame or receiver" to include some partially complete, disassembled, or nonfunctional frames and receivers, alleging that those provisions of the Rule are inconsistent with the Act.

Between September 2022 and March 2023, the district court entered a series of preliminary injunctions based on its determination that the two challenged provisions of the Rule were likely contrary to the Act.  See, e.g., D. Ct. Doc. 118, at 3, 5-6 (Nov. 3, 2022).  The preliminary injunctions only prohibited the gov-

ernment from enforcing the two challenged provisions against certain respondents and the customers of some of the manufacturing respondents.  See, _e.g._, _id._ at 11-12.  In so doing, the court "decline[d] [respondents'] invitation to issue a nationwide injunction."  D. Ct. Doc. 89, at 19 (Oct. 1, 2022).  In the court's view, "a broad injunction would [have] far exceed[ed] the 'particular' tailoring necessary to redress [respondents'] injuries."  _Ibid._  The government appealed those party-specific preliminary injunctions but did not seek stays pending appeal.

2.  On June 30, 2023, the district court granted respondents' motions for summary judgment, finding that ATF "acted in excess of its statutory jurisdiction" in adopting the two challenged portions of the Rule.  App., _infra_, 40a; see _id._ at 6a-43a.

As to weapon parts kits, the district court held that "Congress's definition does not cover weapon _parts_, or aggregations of weapon parts, regardless of whether the parts may be readily assembled into something that may fire a projectile."  App., _infra_, 37a.  The court believed ATF's contrary interpretation "render[s] [Section] 921(a)(3)(B)'s carveout for 'frame[s] or receiver[s]' superfluous."  _Ibid._  The court also noted that the Act's destructive-device provision includes language referring to "any combination of parts" or parts that "may be readily assembled."  _Id._ at 38a (quoting 18 U.S.C. 921(a)(4)(C)).  In the court's view, Congress's use of such language elsewhere in the Act indicates that the phrase "may readily be converted to" a working

firearm, 18 U.S.C. 921(a)(3), does not include "a weapon parts kit that  * * *  may readily be  * * *  assembled" into a working firearm, 87 Fed. Reg. at 24,735.  See App., infra, 38a.

The district court also found invalid the Rule's provision defining "frame or receiver" to include a partially complete, dis-assembled, or nonfunctional frame or receiver.  App., infra, 30a-35a.  The court "acknowledge[d]" that the statute gives ATF some "discretion to decide 'whether a particular component is a frame or receiver' based upon that component's degree of completeness." Id. at 33a (citation omitted).  But the court viewed the Rule as treating an item as a frame or receiver "even after ATF determines that the component in question is not a frame or receiver."  Id. at 33a-34a.  And the court emphasized that "Congress could have" -- but did not -- "include[] firearm parts that 'may readily be converted' to frames or receivers, as it did with 'weapons' that 'may readily be converted' to fire a projectile."  Id. at 32a (quoting 18 U.S.C. 921(a)(3)(A)).  The court therefore held that "[a] part that has yet to be completed or converted to function as a frame or receiver is not a frame or receiver."  Id. at 34a.

The district court vacated the Rule nationwide, relying on Fifth Circuit precedent holding that vacatur is the "default rule" whenever a district court finds that an agency action is unlawful. App., infra, 41a (citation omitted).  The court rejected the gov-ernment's request to limit relief "to the parties."  Id. at 42a. And although respondents had challenged only two discrete provi-

sions of the Rule, the court extended the vacatur to the entire Rule without explanation or analysis.  Ibid.

3.   On July 5, the district court entered a final judgment memorializing its vacatur of the Rule. App., infra, 44a-45a.  On July 18, the court declined to stay the vacatur pending appeal but granted a seven-day administrative stay.  Id. at 5a.

4.   On July 24, the Fifth Circuit granted in part and denied in part a stay pending appeal.  App., infra, 1a-4a.  The court concluded that the government was likely to succeed on its argument that "the vacatur was overbroad" because the district court had "analyzed the legality of only two of the numerous provisions of the rule, which contains an explicit severability clause."  Id. at 3a (citing 87 Fed. Reg. at 24,730).  But the Fifth Circuit declined to stay the vacatur of the two challenged provisions of the Rule, stating without elaboration that "ATF has not demonstrated a strong likelihood of success on the merits, nor irreparable harm in the absence of a stay."  Ibid.  The court expedited the appeal, ibid., and will hold oral argument on September 7, 2023, see C.A. Doc. 63 (July 25, 2023).[2]

---

[2]    The Fifth Circuit's stay order specified that, "[t]o allow time for additional proceedings as appropriate, this order is administratively STAYED for 10 days."  App., infra, 4a.  That appears to have been a response to the government's request that, if the Fifth Circuit declined to stay the district court's vacatur pending appeal, it "enter an administrative stay of at least ten days to permit the Supreme Court to consider an application for a stay."  C.A. Doc. 9, at 1 (July 18, 2023).  But the Fifth Circuit stayed its own order rather than the district court's vacatur, which means that the vacatur of the entire Rule took effect when the district court's seven-day administrative stay expired at

**ARGUMENT**

An applicant for a stay pending appeal and certiorari must establish (1) "a reasonable probability that this Court would eventually grant review," (2) "a fair prospect that the Court would reverse," and (3) "that the applicant would likely suffer irreparable harm absent the stay" and "the equities" otherwise support relief.  Merrill v. Milligan, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring).  Those requirements are satisfied here.

**I.   THIS COURT WOULD LIKELY GRANT REVIEW IF THE COURT OF APPEALS AFFIRMED THE DISTRICT COURT'S NATIONWIDE VACATUR**

The district court's nationwide vacatur nullifies the central provisions of a regulation adopted to respond to the recent explosion of ghost guns and close a perceived loophole that was resulting in widespread evasion of the federal laws regulating commercial firearm sales.  If the Fifth Circuit affirmed the vacatur of those provisions, this Court's review would plainly be warranted:  Even in the absence of a circuit conflict, this Court frequently grants stays or plenary review in response to district court decisions granting universal relief against important federal regulations or policies.  See, e.g., Biden v. Nebraska, 143 S. Ct. 477 (2022) (No. 22A444); Wolf v. Innovation Law Lab, 140

_____

11:59 p.m. on July 25 -- and that the Fifth Circuit's partial stay of that order will not take effect until August 3.  The government called the Fifth Circuit's attention to this apparent oversight, see C.A. Doc. 59 (July 25, 2023), but the court has not yet clarified or corrected its order.

S. Ct. 1564 (2020) (No. 19A960); <u>Barr</u> v. <u>East Bay Sanctuary Cove-</u>
<u>nant</u>, 140 S. Ct. 3 (2019) (No. 19A230).

## II.   THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS

There is more than "a fair prospect that the Court would
reverse" if it granted review.  <u>Merrill</u>, 142 S. Ct. at 880 (Ka-
vanaugh, J., concurring).  A weapon parts kit falls within the
plain meaning of the Act's definition of "firearm."  The term
"frame or receiver" is naturally interpreted to include partially
complete receivers that can easily be made functional.  And at a
minimum, the district court erred in granting universal vacatur,
wiping the Rule off the books nationwide and pretermitting liti-
gation pending in other courts.

### A.   A Weapon Parts Kit Falls Within The Plain Meaning Of The Act's Definition Of "Firearm"

1.   The Act's text and context make clear that the weapon
parts kits covered by the Rule are "firearms" under the Act.  The
Act defines "firearm" to encompass "any weapon  * * *  which will
or is designed to or may readily be converted to expel a projectile
by the action of an explosive." 18 U.S.C. 921(a)(3)(A).  The plain
meaning of "convert" is "[t]o change or turn from one state to
another:  alter in form, substance, or quality:  transform, trans-
mute." <u>Webster's Third New International Dictionary of the English</u>
<u>Language</u> 499 (1968) (<u>Webster's</u>) (capitalization omitted).  The Act
thus includes items that may readily be "transform[ed]" into a
working firearm -- or, put differently, items that may readily be

"change[d]" into a functional firearm from a different "state" or "form."  Ibid.

The Rule's inclusion of parts kits is entirely consistent with that plain-text interpretation.  The Rule defines "firearm" to "include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive."  87 Fed. Reg. at 24,735.  The terms "complete[]," "assemble[]," and "restore[]" fit comfortably within the plain meaning of "convert":  all are a type of transformation or change from one state or form to another. When a person "completes" a parts kit, he transforms it from an unfinished state or form into a "finished" state.  Webster's 465. When he "assembles" a parts kit, he "fit[s] together various parts" of the weapon to make it into "an operative whole."  Id. at 131. And when he "restores" a parts kit, he "brings [it] back" to its "former or original state" as a usable weapon.  Id. at 1936.  A "weapon parts kit that is designed to or may readily be completed, assembled, [or] restored" into an operational firearm, 87 Fed. Reg. at 24,735, is thus a "weapon  * * *  which will or is designed to or may readily be converted" into an operational firearm, 18 U.S.C. 921(a)(3)(A).

Even setting aside the Act's express inclusion of items that can "readily be converted" into usable firearms, a covered firearm parts kit qualifies as a firearm as a matter of ordinary usage. If a state placed a tax on the sale of tables, chairs, couches,

and bookshelves, IKEA surely could not avoid that tax by claiming
that it does not sell any of those items and instead sells "fur-
niture parts kits" that must be assembled by the purchasers.  So
too with guns:  An ordinary speaker of English would recognize
that a company in the business of selling kits that can be assem-
bled into firearms in minutes -- and that are designed, marketed,
and used for that express purpose -- is in the business of selling
firearms.  A contrary conclusion blinks reality.

2.   The district court nonetheless held that the Act's def-
inition of "firearm" does not include "aggregations of weapon
parts, regardless of whether the parts may be readily assembled
into something that may fire a projectile."  App., _infra_, 37a.
The court did not attempt to reconcile that conclusion with ordi-
nary usage or with the plain meaning of "convert" -- indeed, the
court all but read the "may readily be converted" language out of
the statute.  Instead, the court believed that other statutory
provisions compelled the conclusion that collections of weapon
parts can never be treated as firearms.  But the court misunder-
stood the provisions on which it relied.

First, the district court thought that including parts kits
within Section 921(a)(3)(A) would make Section 921(a)(3)(B)'s spe-
cific inclusion of "frame[s] or receiver[s]" superfluous because
it would "read the statute as authorizing regulation of (A) weapon
parts generally and (B) two specific weapon parts."  App., _infra_,
37a.  But the Rule does not interpret Section 921(a)(3)(A) to

include "weapon parts generally."  It does not extend to weapon parts writ large, such as standalone triggers, barrels, clips, frames, or receivers, because those parts cannot "readily be completed, assembled, restored, or otherwise converted" into an operational weapon.  87 Fed. Reg. at 24,735.  Instead, the relevant part of the Rule reaches only weapon parts kits that "readily" -- that is, with "fair[] or reasonabl[e] efficien[cy], quick[ness], and eas[e]" -- "may be completed, assembled, restored, or otherwise converted to" a functional weapon.  Id. at 24,735.  Those kits are covered by Section 921(a)(3)(A) because they can "readily be converted" into operational firearms.  Ibid.  Section 921(a)(3)(B), in contrast, covers standalone frames or receivers even if they are not part of a kit and cannot otherwise be readily converted into a functional weapon.  There is no superfluity.

The district court also noted that the Act defines "destructive device" to include "any combination of parts either designed or intended for use in converting any device into any destructive device  * * *  and from which a destructive device may be readily assembled," 18 U.S.C. 921(a)(4)(C).  App., infra, 37a-38a.  In the court's view, because that provision refers to combining parts and assembly but Section 921(a)(3)(A) does not, the latter provision cannot be read to include weapon parts kits.  That is doubly wrong. First, Section 921(a)(4)(C) -- which was added to federal law after the text at issue here, compare Pub. L. No. 90-351, § 902, 82 Stat. 197, 227, with Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1214-1215

-- serves a different function by expanding the definition of destructive device to include parts "designed or intended for use in <u>converting</u> any device into any destructive device," not just combinations of parts that themselves constitute a destructive device.  18 U.S.C. 921(a)(4)(C) (emphasis added).  Second, and in any event, Section 921(a)(3)(A)'s plain text encompasses weapon parts kits because completing or assembling a kit is a type of "conver[sion]" under the Act.  18 U.S.C. 921(a)(3)(A).  It was thus unnecessary (and would have been superfluous) for Congress to include additional language in Section 921(a)(3)(A).  "Congress's use of more detailed language in another provision" that was en-acted separately provides no reason to depart from the statute's "most natural reading." <u>Caraco Pharm. Labs., Ltd.</u> v. <u>Novo Nordisk A/S</u>, 566 U.S. 399, 416 (2012).

3.  Finally, the district court's reading of Section 921(a)(3)(A) leads to bizarre and illogical results that would thwart the Act's careful design.  The court appeared to accept that "disassembled" weapons are subject to the Act's requirements, App., <u>infra</u>, 39a, but exempted parts kits that can be assembled into a fully functional weapon in a matter of minutes, see <u>id.</u> at 70a-71a, 81a-88a.  There is no logical basis for drawing that line, which would allow fully functional firearms quickly assembled from parts kits to entirely circumvent the Act's serialization, record-keeping, and background-check requirements -- preventing law en-forcement from tracing those firearms and prosecuting dangerous

criminals.  This Court should reject an interpretation that would so gravely "undermine -- indeed, for all practical purposes, would virtually repeal -- the gun law's core provisions." Abramski, 573 U.S. at 179.  Courts "should not lightly conclude that Congress enacted a self-defeating statute." Pugin v. Garland, 143 S. Ct. 1833, 1841 (2023) (citation omitted).

**B.    A Partially Completed Or Nonfunctional Frame Or Receiver That Can Readily Be Completed Qualifies As A "Frame Or Receiver"**

The Rule also correctly interprets the terms "frame" and "receiver" to include "a partially complete, disassembled, or non-functional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 87 Fed. Reg. at 24,739.  In reaching a contrary conclusion, the district court again misread the Act's text, ignored ordinary usage, and adopted a wooden construction that would thwart the Act's design.

1.    A "frame" or "receiver" need not be fully complete or functional to fall within the plain meaning of those terms.  A "frame" is "a basic structural unit onto or into which other constituents of a whole are fitted, to which they attach, or with which they are integrated"; in this context, the term refers to "the basic unit of a handgun which serves as a mounting for the barrel and operating parts of the arm." Webster's 902.  And a "receiver" is "something that acts as a receptacle or container";

here, "the metal frame in which the action of a firearm is fitted and to which the breech end of the barrel is attached" or "the main body of the lock in a breech mechanism." Id. at 1894.  Neither of those definitions suggests that a product that is missing "a single hole necessary to install the applicable fire control component, or that has a small piece of plastic that can easily be removed to allow installation of that component," App., infra, 54a, ceases to be the "basic unit of a handgun" or its "receptacle or container," Webster's 902, 1894.  The Act likewise lacks any language specifying that a "frame" or "receiver" must be "complete," "operable," or "functional."

Nor does ordinary usage support the district court's decision to read those missing adjectives into the Act.  A bicycle is still a bicycle even if lacks pedals, a chain, or some other component needed to render it complete or allow it to function.  So too if the bicycle is shipped with plastic guards attached to the gears or brakes that must be removed before operation, or with a seat tube that the user must cut to length before installing.  No one could deny that a company selling and shipping products in any of those conditions was engaged in selling "bicycles."

Again, there is no reason in language or logic to treat firearm frames and receivers any differently.  Consider two images from a recent ATF document implementing the Rule:



The picture on the left depicts the frame of a Glock-style handgun; no one disputes that it is a "frame" covered by the statute.  ATF, <u>Open Letter on Impact of Final Rule 2021-05F on Partially Complete Polymer80, Lone Wolf, and Similar Semiautomatic Pistol Frames</u>, at 4 (Dec. 27, 2022), https://perma.cc/VP62-S26P (<u>Open Letter</u>).  The picture on the right depicts a partially complete frame sold by respondent Polymer80.  <u>Id.</u> at 7.  The difference between the two is the presence of the "temporary rails or blocking tabs" that are circled in red.  <u>Id.</u> at 6.  Those tabs "are easily removable by a person with novice skill, using common tools, such as a Dremel-type rotary tool, within minutes."  <u>Ibid.</u>  Once the tabs are removed, the Polymer80 product is a fully functional frame that is "immediately capable of accepting" the remaining parts of a fire-arm.  <u>Ibid.</u>  It is entirely natural to refer to that product as a "frame."  In fact, it is hard to know what else to call it.

The Rule thus accords with the natural reading of the statute and ordinary usage.  As the Rule notes, "the crucial inquiry is at what point an unregulated piece of metal, plastic, or other mate-

rial becomes a 'frame or receiver' that is a regulated item under Federal law."  87 Fed. Reg. at 24,685.  That is inevitably a question of degree that cannot be reduced to bright line rules. But the Rule's focus on whether a frame or receiver can "readily" be converted to functional status incorporates a concept that is familiar in the law and that accords with ordinary usage.

Some examples illustrate the point.  On the one hand, the Rule includes frames and receivers missing a single hole or including an unnecessary piece of plastic that can easily be removed. App., infra, 54a.  The Rule also covers kits containing all necessary parts to rapidly assemble a frame or receiver using tools that are part of the kit and common hand tools.  87 Fed. Reg. at 24,739.  That includes "'partially complete' pistol frame products" like the Polymer80 product pictured above that "incorporate temporary rails or blocking tabs that are easily removable by a person with novice skill, using common tools,  * * *  within minutes."  Open Letter 6.  On the other hand, the Rule does not cover products that, even though they may be a precursor to a frame or receiver, lack markings, tabs, or tools that would allow an individual to easily make the product functional (and are not otherwise readily convertible to a functional frame or receiver). See ATF, Open Letter on Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers (Sept. 27, 2022), https://perma.cc/4AKT-NWS5.  For example, the Rule does not treat as a "frame or receiver" a standalone "partially complete AR-type

receiver with no indexing or machining of any kind performed in the area of the fire control cavity." Id. at 3 (emphasis omitted); see id. at 3-4 (photographs of products that are not frames or receivers under the Rule); see also 87 Fed. Reg. at 24,739 (identifying additional examples of the Rule's treatment of products).

The Rule's understanding of "frame or receiver" is also consistent with ATF's longstanding interpretation and implementation of the Act. As the Rule explains, "ATF has long held that a piece of metal, plastic, or other material becomes a frame or receiver when it has reached a 'critical stage of manufacture'" -- that is, when a product "is 'brought to a stage of completeness that will allow it to accept the firearm components [for] which it is designed   *  *  *   , using basic tools in a reasonable amount of time.'"  87 Fed. Reg. at 24,685 (quoting ATF Letter to Private Counsel #303304, at 3-4 (Mar. 20, 2015)).  Indeed, since shortly after Congress adopted the Act, ATF has consistently determined that various products should be treated as "frames or receivers" based on the manufacturing stage that those products have reached.[3]

---

[3]   For example, in a 1978 classification letter ATF found that a partially machined frame "ha[d] reached a stage of manufacture such that it may be readily converted to functional condition" and "[t]herefore[] [was] a firearm." App., infra, 65a; see id. at 67a.  Additional examples abound.  See, e.g., id. at 68a (1980 letter explaining that "if an unfinished receiver could be converted to functional condition within a few hours['] time using common hand tools, or simple grinding, cutting, drilling, or welding operations, it would likely qualify as a firearm"); id. at 69a (1983 letter finding that a "basically complete" receiver where "[a]pproximately 75 minutes  *  *  *  was required to make the receiver functional" was a firearm); see also Administrative Record 1-645 (collecting additional ATF classification letters).

2.    The district court "acknowledge[d]" that the statute affords ATF some "discretion to decide 'whether a particular component is a frame or receiver' based upon that component's 'degree of completeness.'" App., _infra_, 33a (citation omitted).  But the court viewed the Rule as creating a "logical contradiction" by treating parts as "both not yet a receiver and [a] receiver at the same time." _Id._ at 34a.  The Rule does no such thing.  Instead, it defines the point in the manufacturing process at which an item has sufficient qualities to fit within the term "frame or receiver" -- at which point it ceases to be a not-yet frame or receiver.

The district court also emphasized that Congress defined "firearm" to include weapons that are "designed to or may readily be converted to" function as firearms but did not include a similar phrase for frames and receivers.  App., _infra_, 32a.  In the court's view, that omission indicates that "frame or receiver" cannot include readily completable frames and receivers.  _Ibid._  But that inference does not follow.  Section 921(a)(3)(A) is part of the express definition of the term "firearm."  If Congress had limited that definition to weapons that "_will_  * * *  expel a projectile by the action of an explosive," 18 U.S.C. 921(a)(3)(A) (emphasis added), it would have departed from ordinary meaning by including only _functional_ firearms.  In contrast, Congress did not define "frame or receiver."  Accordingly, those terms should be interpreted consistent with their ordinary meaning, which is not limited to complete or functional frames or receivers.  And if anything,

the fact that Congress has repeatedly defined "firearm" and other weapons-related terms to include non-operational weapons that can easily be converted or restored to an operational state further underscores that ATF properly took the same approach in interpreting the undefined terms "frame" and "receiver."  See, _e.g._, 26 U.S.C. 5845(b), (c), and (d).

Finally, the district court's reading of "frame or receiver" thwarts the Act's manifest design and invites circumvention through trivialities.  It entirely excuses from the Act's coverage products that, but for a single hole or piece of plastic, are fully functional frames and receivers.  That would frustrate one of the Act's principal goals:  ensuring that firearms transfers are adequately vetted and recorded so that weapons do not fall into the hands of prohibited persons (and, when they do, that such persons can be prosecuted).  The Act should not be read to create such "a large and obvious loophole" in its core provisions.  Maui v. Hawaii Wildlife Fund, 140 S. Ct. 1462, 1473 (2020).

### C. The District Court Erred In Granting Universal Relief

The district court compounded its errors on the merits by reflexively granting the sweeping remedy of universal vacatur.  As Members of this Court have recognized, such universal remedies are "inconsistent with longstanding limits on equitable relief and the power of Article III courts" and impose a severe "toll" on courts. Trump v. Hawaii, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring).  And even if universal vacatur were not categorically

foreclosed, such "an extraordinary remedy" would "demand truly extraordinary circumstances to justify it." <u>United States</u> v. <u>Texas</u>, 143 S. Ct. 1964, 1985 (2023) (Gorsuch, J., concurring in the judgment). No such circumstances exist here.

1. Under Article III, "a plaintiff's remedy must be 'limited to the inadequacy that produced his injury.'" <u>Gill</u> v. <u>Whitford</u>, 138 S. Ct. 1916, 1930 (2018) (brackets and citation omitted). Principles of equity reinforce that constitutional limitation. A federal court's authority is generally confined to the relief "traditionally accorded by courts of equity" in 1789. <u>Grupo Mexicano de Desarrollo, S. A.</u> v. <u>Alliance Bond Fund, Inc.</u>, 527 U.S. 308, 319 (1999); see <u>id.</u> at 318-319. Such relief must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." <u>Califano</u> v. <u>Yamasaki</u>, 442 U.S. 682, 702 (1979). Thus, English and early American "courts of equity" typically "did not provide relief beyond the parties to the case." <u>Hawaii</u>, 138 S. Ct. at 2427 (Thomas, J., concurring).

Universal relief is irreconcilable with those constitutional and equitable limitations. By definition, it extends to parties who were not "plaintiff[s] in th[e] lawsuit, and hence were not the proper object of th[e court's] remediation." <u>Lewis</u> v. <u>Casey</u>, 518 U.S. 343, 358 (1996). And when a court awards relief to nonparties, it exceeds the relief "traditionally accorded by courts of equity" in 1789. <u>Grupo Mexicano</u>, 527 U.S. at 319; see

Samuel L. Bray, <u>Multiple Chancellors: Reforming the National Injunction</u>, 131 Harv. L. Rev. 417, 424-445 (2017) (Bray).

Universal relief also creates other constitutional, legal, and practical problems. It "strains our separation of powers" by "allowing individual judges to act more like a legislature by decreeing the rights and duties of people nationwide." <u>Texas</u>, 143 S. Ct. at 1985 (Gorsuch, J., concurring in the judgment). It circumvents the procedural rules governing joinder and class actions. See <u>id.</u> at 1981. It encourages forum shopping by empowering a single district judge to nullify the decisions of other courts upholding the challenged agency action. See <u>id.</u> at 1986. And it operates asymmetrically: The government must prevail in every suit to keep its policy in force, but plaintiffs can derail a federal regulation or policy nationwide with a single district court victory. See <u>DHS</u> v. <u>New York</u>, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring in the grant of stay).

The prospect that a single district court decision can halt a government policy nationwide for years while the ordinary appellate process unfolds often leaves the Executive Branch with little choice but to seek emergency appellate relief. See <u>New York</u>, 140 S. Ct. at 600-601 (Gorsuch, J., concurring in the grant of stay). Emergency litigation in turn deprives the judicial system, including this Court, of the benefits that accrue when different courts grapple with complex legal questions in a con-

sidered, orderly dialogue. See Texas, 143 S. Ct. at 1985 (Gorsuch,
J., concurring in the judgment).

This case vividly illustrates those problems.  The district
court's vacatur effectively countermands other district court de-
cisions that have denied at least preliminary relief to other
plaintiffs challenging the Rule.  See Morehouse Enterprises, LLC,
v. ATF, No. 22-cv-116 (D.N.D. Sept. 27, 2022), appeal pending,
Nos. 22-2812, 22-2854 (8th Cir.) (Morehouse); Division 80, LLC, v.
Garland, No. 22-cv-148 (S.D. Tex. June 12, 2023).  It also pre-
termits pending challenges to the Rule in two other district
courts, see Miller v. Garland, No. 22-cv-2579 (D.D.C.); California
v. ATF, No. 20-cv-6761 (N.D. Cal.), and a pending Eighth Circuit
appeal, see Morehouse, supra (argued Mar. 14, 2023).  In effect,
the district court below claimed a veto power over all other fed-
eral judges in the country.  And the court's nationwide vacatur
has compelled the government to seek emergency relief from this
Court, short-circuiting the ordinary process of percolation.

2.  The district court viewed universal vacatur as "a less
drastic remedy" than an injunction because "vacatur does nothing
but re-establish the status quo absent the unlawful agency action."
App., infra, 42a (citation omitted).  But that sidesteps the Ar-
ticle III and equitable bases for limiting relief to the plaintiffs
before the court -- and ignores the various ways in which nation-
wide vacaturs disrupt the standard process of litigation.  In any
event, vacatur is practically equivalent to an injunction compel-

ling the agency to rescind the challenged action.  Indeed, the court denied respondents' remaining claims -- including claims for permanent injunctive relief -- as "moot" "because vacatur provides [respondents] full relief."  Id. at 42a, 45a; see D. Ct. Doc. 93, at 57 (Oct. 5, 2022).

The district court also invoked 5 U.S.C. 706(2), which provides that a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions" found to be unlawful. App., infra, 41a.  But Section 706(2) does not provide a basis for nationwide vacatur.  At the outset, Section 706(2) "does not say anything about 'vacating' agency action ('wholesale' or otherwise)," Texas, 143 S. Ct. at 1982 (Gorsuch, J., concurring in the judgment); indeed, it does not pertain to remedies at all.  Instead, it directs a court to disregard unlawful "agency action, findings, and conclusions" in resolving the case before it.  5 U.S.C. 706(2); see John Harrison, Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies, 37 Yale J. on Reg. Bull. 37, 42 (2019-2020).

That understanding is consistent with the standard account of judicial review of statutes, which holds that judicial review is merely "the negative power to disregard an unconstitutional enactment" in deciding a case.  Massachusetts v. Mellon, 262 U.S. 447, 488 (1923).  Of course, when a court declines to give effect to an agency action in the case before it on the ground that the action is unlawful, it may issue appropriate relief.  But 5 U.S.C.

703 points <u>outside</u> the Administrative Procedure Act (APA) for the available remedies, specifying that "[t]he form of proceeding" is a traditional "form of legal action," such as "actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." There is no reason to think that, after "nodd[ing] to traditional standing rules and remedial principles" in Section 703, "Congress proceeded just a few paragraphs later to plow right through those rules and empower a single judge to award a novel form of relief affecting parties and nonparties alike." <u>Texas</u>, 143 S. Ct. at 1983 (Gorsuch, J., concurring in the judgment). To the contrary, the contemporaneous understanding of the term "set aside" further confirms that it "does not depart from, but rather incorporates, background rules of equity and judgments." Aditya Bamzai, <u>The Path of Administrative Law Remedies</u>, 98 Notre Dame L. Rev. 2037, 2041 (2023) (Bamzai).

Even if Section 706 did speak to remedies, it would not suggest that courts should "set aside," 5 U.S.C. 706(2), a rule on a universal basis. Congress enacted the APA against a background rule that statutory remedies should be construed in accordance with "traditions of equity practice." <u>Hecht Co.</u> v. <u>Bowles</u>, 321 U.S. 321, 329 (1944); see Bray 438 n.121. There is nothing to suggest that the APA "upset the bedrock practice of case-by-case judgments with respect to the parties in each case" by allowing every district judge to nullify agency action nationwide. <u>Arizona</u>, 40 F.4th at 396 (Sutton, C.J., concurring).

3.    Even if this Court were to conclude that that the APA does authorize universal vacatur -- or if the Court were not prepared to definitively resolve the question now -- it should make clear that district courts should stop reflexively imposing that profoundly disruptive result as the "default rule" in every case challenging agency action.    App., infra, 41a (citation omitted). Instead, "a district court should 'think twice -- and perhaps twice again -- before granting' such sweeping relief."    Texas, 143 S. Ct. at 1985 (Gorsuch, J., concurring in the judgment) (citation omitted).    At a minimum, a court should "carefully consider" the grave systemic and separation-of-powers issues raised by universal vacatur.    Id. at 1986.    And if "party-specific relief can adequately protect the plaintiff's interests," then reviewing courts "should not hesitate to hold that broader relief is an abuse of discretion."    Ibid.

Here, the district court did not find -- and could not plausibly have found -- that universal vacatur was necessary to provide relief to respondents.    Indeed, it had previously found just the opposite, concluding that universal preliminary relief would have "far exceed[ed] the 'particular' tailoring necessary to redress [respondents'] injuries and afford them complete relief."    D. Ct. Doc. 89, at 19.    Nor could the court have justified the vacatur's disruptive effects on nonparties and litigation pending before coordinate courts.

At a minimum, therefore, this Court should stay the district court's vacatur as applied to individuals and entities that are not parties to this case.  And granting such a stay would be the most natural way for the Court to begin to curb the lower courts' routine issuance of universal relief.  Once this Court grants plenary review, questions about the scope of relief ordinarily become less important:  Because of "vertical stare decisis," this Court's <u>holding</u> determines the validity of the challenged agency action nationwide even if the <u>judgment</u> is party-specific.  Bamzai at 2068.  The scope of relief matters -- and the serious systemic costs of universal remedies are felt -- where, as here, challenges to an agency's action remain pending in the lower courts and have not yet reached this Court in the ordinary course.

**III. THE EQUITIES OVERWHELMINGLY FAVOR A STAY**

The district court's vacatur of the challenged provisions of the Rule imposes grave and irreparable harm to the government and the public by enabling the irreversible flow of large numbers of untraceable ghost guns into our Nation's communities.  On the other side of the ledger, a stay would impose only a minimal burden on respondents' lawful activities:  They would be entirely free to continue making, selling, and buying the exact same products so long as they complied with the routine regulatory requirements that tens of thousands of licensees abide by on daily basis.

A.   The recent explosion in the availability and use of ghost guns is a grave threat to public safety.  Ghost gun kits are

available online to anyone with a credit card -- or, for that
matter, an anonymous pre-paid "debit card" bought at "7-Eleven."
Tom Jackman & Emily Davies, Teens Buying "Ghost Guns" Online, With
Deadly Consequences, Wash. Post (July 12, 2023) (Teens Buying Ghost
Guns), https://perma.cc/TJE5-3WF2.  Minors in particular "have
discovered the ease with which they can acquire the parts for a
ghost gun" and "have been buying, building, and shooting the home-
made guns with alarming frequency."  Ibid.

Ghost guns thus provide a ready means for felons, minors, and
others who are prohibited from buying firearms to circumvent the
law -- thwarting Congress's "comprehensive scheme" intended to
"verify a would-be gun purchaser's identity," "check on his back-
ground," and thereby "keep guns out of the hands of criminals and
others who should not have them."  Abramski, 573 U.S. at 180.  And
on the back end, the lack of records and serial numbers means that
ghost guns have "severely undermine[d]" law enforcement's ability
to "determine where, by whom, or when" a firearm used in a crime
was manufactured and "to whom [it was] sold or otherwise trans-
ferred."  87 Fed. Reg. at 24,652, 24,659; see id. at 24,655-24,660.
That, in turn, has impaired law enforcement's ability to apprehend
violent criminals who may pose an ongoing threat to public safety.
By ensuring that ghost guns are regulated as what they actually
are -- firearms -- the two challenged provisions of the Rule "pre-
vent easy circumvention of the [Act's] entire regulatory scheme"
and are thus "critical to public safety."  App., infra, at 53a.

The district court's vacatur prevents ATF from relying on the Rule and effectively gives respondents -- and other ghost-gun man-ufacturers and sellers -- the green light to resume distribution of ghost guns without background checks, records, or serial num-bers.  That poses an acute threat to public safety.  Tens of thousands of ghost guns are recovered by law enforcement each year -- more than 19,000 in 2021, a 1000% increase from 2017.  App., <u>infra</u>, 52a.  The numbers continue to grow:  Over the last eleven months, more than 23,000 suspected ghost guns "were recovered at crime scenes and submitted for tracing."  <u>Id.</u> at 53a.  Police departments are also confronting "the soaring use of ghost guns in violent crimes."  <u>Teens Buying Ghost Guns</u>.

Vacatur of the challenged provisions has also already created -- and will continue to engender -- widespread confusion among law enforcement, regulated parties, and the general public.  See App., <u>infra</u>, 62a-63a.  Such confusion harms ATF and the public.  ATF has devoted substantial resources to implementing and training its own officers and the public about the Rule.  <u>Ibid.</u>  And, except as to some respondents and their customers (who obtained preliminary injunctions), the entirety of the Rule was effective and enforce-able for over ten months -- from its effective date until its recent nationwide vacatur.  Permitting vacatur to continue during this litigation would require ATF to expend substantial additional resources to re-educate its officers and the public.  <u>Id.</u> at 63a.

B.   On the other side of the ledger, respondents will incur minimal, if any, injuries from a stay of the vacatur of the challenged provisions.   Those provisions do not forbid the sale or purchase of any firearm, weapon parts kit, or other item.   Rather, they clarify that certain items are "firearms" and therefore must be sold in accordance with the Act's licensing, recordkeeping, and background-check requirements.   Those requirements are not particularly onerous.   An entity that already possesses a federal firearms manufacturer's license is permitted to sell the firearms that it manufactures at retail, see 27 C.F.R. 478.41(b), subject to certain restrictions on direct sales to out-of-state customers, 18 U.S.C. 922(b)(3).   Even for such customers, sales are permitted so long as the firearm is shipped to a licensee in the customer's state of residence, which can then transfer the firearm to the customer after fulfilling background-check and recordkeeping requirements.   Respondents who wish to manufacture, sell, or purchase regulated products therefore may do so as long as they comply with the Act.

Tens of millions of firearms owners regularly bear the minor costs associated with statutory compliance when they purchase firearms.   And there are around 80,000 licensed firearms manufacturers and dealers around the country -- which comply with the Act's requirements in manufacturing and selling millions of firearms each year.   See App., infra, 59a.   Critically, three of the manufacturing respondents already have federal licenses, which

means that they presumably have in place processes necessary to comply with the Act's serialization and record-keeping requirements.  See ATF, Complete Federal Firearms Listings (Jan. 2023), https://perma.cc/G3KD-NHWF (entries for Tactical Machining, L.L.C.; Blackhawk Manufacturing Group, Inc.; and Polymer80, Inc.).  It would be a minimal burden for those respondents to abide by those processes for products covered by the challenged portions of the Rule during the pendency of the appeal.

In addition, all respondents have been required to comply with the Rule's requirements for at least some period of time.  The Rule went into effect on August 24, 2022, but the earliest that a respondent obtained a preliminary injunction was on September 2, 2022 -- and one of the manufacturing respondents did not obtain relief until the district court's vacatur on June 30, 2023.  See App., infra, 13a-14a, 21a; D. Ct. Doc. 56 (Sept. 2, 2022).  In short, requiring respondents to continue to comply with the Act's licensing, recordkeeping, and background-check requirements will only require them to incur incidental costs of compliance with the Act, which are dwarfed by the substantial harms to the government and the public from nationwide vacatur of the Rule.

C.  The Fifth Circuit did not acknowledge the profound harms inflicted by the vacatur, conclude that a stay would irreparably harm respondents, or otherwise engage in meaningful analysis of the equities.  Instead, it stated only that the vacatur "effectively maintains, pending appeal, the status quo that existed for

54 years." App., <u>infra</u>, 3a. That reflects a serious misunder-standing. To begin with, the Rule has been the "status quo" since August 2022 for everyone except some respondents and their cus-tomers who secured preliminary relief. More fundamentally, there was no such thing as a ghost gun in 1968. As recently as 2017, they were a novelty being sold in relatively small numbers. It is only over the last five years that the manufacturing respondents and others have dramatically changed the status quo by selling tens if not hundreds of thousands of firearms outside the Act's regulations. Even if respondents might ultimately persuade this Court that the Act compels ATF to tolerate such evasion, the ap-proach that would appropriately balance the equities and preserve the status quo while the litigation proceeds is a stay -- not a vacatur that allows the continued, irreversible flow of ghost guns.

## IV.  IN THE ALTERNATIVE, THE COURT MAY WISH TO TREAT THIS APPLI-CATION AS A PETITION FOR A WRIT OF CERTIORARI BEFORE JUDGMENT

For the foregoing reasons, this Court should stay the district court's vacatur. If, however, the Court denies that relief or grants it only in part, the Court may wish to construe this ap-plication as a petition for a writ of certiorari before judgment, grant the petition, and set the case for expedited briefing and argument on the question whether the Rule's challenged provisions are consistent with the statutory definition of "firearm." The government would be prepared to brief this case on a schedule that would allow it to be argued during the November 2023 sitting.

A writ of certiorari before judgment under 28 U.S.C. 2101(e) is an extraordinary remedy, but as in past cases involving universal relief against important government policies, the issues presented by the district court's vacatur are "of such imperative public importance as to justify deviation from normal appellate practice and to require immediate determination in this Court." Sup. Ct. R. 11; cf. <u>Biden</u> v. <u>Nebraska</u>, 143 S. Ct. 477 (2022) (No. 22A444); <u>United States</u> v. <u>Texas</u>, 143 S. Ct. 51 (2022) (No. 22A17). As explained, every day that the vacatur is in place is another day that untraceable ghost guns are entering circulation, often through sales to prohibited persons.  And although the Fifth Circuit has scheduled oral argument for September 2023, it is impossible to know when that court will issue a decision.  If, as seems likely, that does not occur until late 2023 or early 2024, this Court could not hear the case in the ordinary course until October Term 2024 -- which means that the Court may not issue a decision on the merits until June 2025, nearly two years from now.  Particularly on an urgent public safety issue of national importance, a single district judge should not be allowed to dictate universal policy for such an extended period absent this Court's review.

## CONCLUSION

The application for a stay of the district court's judgment vacating the Rule should be granted.  At a minimum, the Court should stay the district court's judgment to the extent it applies to nonparties.  And if the Court does not stay the vacatur in full,

it may wish to construe this application as a petition for a writ of certiorari before judgment, grant the petition, and set the case for expedited briefing and argument.

Respectfully submitted.

ELIZABETH B. PRELOGAR
Solicitor General

JULY 2023