No. 23A82

_____

_____


IN THE SUPREME COURT OF THE UNITED STATES

_____


MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL., APPLICANTS

v.

JENNIFER VANDERSTOK

_____


REPLY IN SUPPORT OF APPLICATION FOR A STAY

_____


ELIZABETH B. PRELOGAR
 Solicitor General
  Counsel of Record
 Department of Justice
 Washington, D.C. 20530-0001
 SupremeCtBriefs@usdoj.gov
 (202) 514-2217

_____

_____

IN THE SUPREME COURT OF THE UNITED STATES

_____

No. 23A82

MERRICK B. GARLAND, ATTORNEY GENERAL, ET AL., APPLICANTS

v.

JENNIFER VANDERSTOK

_____

REPLY IN SUPPORT OF APPLICATION FOR A STAY

_____

Respondents do not and could not deny the stark practical stakes of this case:  The district court's universal vacatur would allow anyone with access to the Internet to anonymously buy a parts kit or partially completed frame or receiver and easily assemble a working firearm in as little as twenty minutes.  That result "would virtually repeal" the "core provisions" of the federal firearms laws.  Abramski v. United States, 573 U.S. 169, 179-180 (2014).  And by making untraceable guns freely available to felons, minors, and other prohibited persons, it would endanger the public and thwart efforts to prevent and solve serious crimes.

Respondents offer no good reason to tolerate those grave harms during what could be a years-long appellate process.  On the merits, they do not seriously dispute that the weapon parts kits covered by the Rule fall squarely within the plain text of the

statute, or that an ordinary speaker of English would recognize that a company selling nearly complete frames and receivers is selling "frames" and "receivers." Nor do respondents deny that their interpretation would frustrate the Gun Control Act by transforming its central definition into an invitation to evasion. Instead, respondents assert that the structure and context of the Act mandate that self-defeating result. But those interpretive tools actually point in precisely the opposite direction.

Respondents also fail to justify the district court's reflexive grant of universal relief. They do not dispute that such relief is a dramatic departure from traditional equitable principles. They assert that the Administrative Procedure Act (APA) compelled that departure by directing courts to "set aside" agency action found to be unlawful. 5 U.S.C. 706(2). But the APA was widely understood to codify, not revolutionize, traditional pre-APA remedies. The lower-court practice of universal vacatur on which respondents rely emerged only decades later. And even if that sweeping remedy were authorized in some cases, respondents fail to show why a disruptive departure from party-specific relief was justified here -- indeed, they scarcely even try to do so.

Finally, respondents' filings further confirm that the balance of the equities overwhelmingly favors a stay. Allowing the vacatur to take effect would let tens of thousands of untraceable ghost guns flow into our Nation's communities -- with many going to felons, minors, or those intending to use them in crimes. A

stay, in contrast, would simply require respondents to comply with the same straightforward, inexpensive requirements for commercial firearms sales that tens of thousands of dealers already comply with in millions of transactions each year.

## I.  THIS COURT WOULD LIKELY GRANT CERTIORARI AND REVERSE IF THE FIFTH CIRCUIT AFFIRMED THE DISTRICT COURT'S UNIVERSAL VACATUR

Respondents do not seriously dispute that this Court would likely grant review if the Fifth Circuit affirmed the district court's nationwide vacatur. And on the merits, respondents fail to rehabilitate either the district court's analysis of the challenged provisions of the Rule or its grant of universal relief.

### A.  A Weapon Parts Kit Falls Within The Plain Meaning Of The Act's Definition Of "Firearm"

Respondents insist that a weapon parts kit that can readily be converted into a working firearm -- and that is designed, marketed, and used for that specific purpose -- is not a "firearm" under the Act. But respondents do not acknowledge, much less refute, our plain-text analysis of 18 U.S.C. 921(a)(3), which explicitly includes "any weapon" that "is designed to or may readily be converted to expel a projectile by the action of an explosive." That is fatal to their argument: The parts kits covered by the Rule fall squarely within the statutory definition. Appl. 16-17.

The plain text of the statute also answers respondents' objection (VanDerStok Opp. 17-18) that the Rule impermissibly covers parts kits that require what they call "additional manufacturing" of the frame or receiver. A kit that includes a partially complete

frame or receiver and the other parts necessary to "readily  *  *  * complete[], assemble[], restore[], or otherwise convert[]" the kit into a functional firearm, 27 C.F.R. 478.11, fits within the statutory definition because it can "readily be converted" into a functional firearm, 18 U.S.C. 921(a)(3)(A).  That the frame or receiver may only be partially complete does not change the analysis.  And because the Rule, like the statute, reaches only kits that can "readily" be converted, what respondents call "additional manufacturing" (VanDerStok Opp. 18) typically involves drilling a few holes and removing some plastic rails -- a process that can be completed in a matter of minutes.  Cf. Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652, 24,669 (Apr. 26, 2022); see Appl. App. 70a-71a, 81a-88a.

Respondents' interpretation also violates the "cardinal principle of statutory construction" that requires courts to "'give effect, if possible, to every clause and word of a statute.'" Williams v. Taylor, 529 U.S. 362, 404 (2000) (citation omitted). Respondents appear to maintain (VanDerStok Opp. 18) that the phrase "may readily be converted" reaches only a "disassembled firearm" that was "at one time" a "functioning firearm."  But because such a firearm would by definition "includ[e] a finished frame or receiver," id. at 19, it would also be covered by Section 921(a)(3)(B) -- rendering the phrase "may readily be converted" in Section 921(a)(3)(A) superfluous.

Respondents invoke (VanDerStok Opp. 6-7; BlackHawk Opp. 4) a Senate Report stating that the statutory scheme that predated the Act had imposed "impractical * * * controls over each small part of a firearm," and that the Act therefore regulates only frames and receivers, not "any part or parts." S. Rep. No. 1097, 90th Cong., 2d Sess. 111 (1968) (citation omitted). But the Rule does not permit ATF to treat as firearms "any part or parts," <u>ibid.</u> (citation omitted), because individual parts cannot "readily be completed, assembled, restored, or otherwise converted" into an operational weapon, 27 C.F.R. 478.11. Only parts kits that meet the Rule's readily completed requirement are covered.

Finally, respondents err in asserting (BlackHawk Opp. 15) that the government has not previously treated weapon parts kits as firearms. The emergence of those kits is a recent phenomenon, but the government's view that they can qualify as firearms spans multiple Administrations. In a December 2020 classification letter, for example, ATF determined that respondent Polymer80's "Buy Build Shoot" kit is a firearm. Appl. App. 70a-76a. ATF explained that the kit had allowed a user to "mill and assemble the kit's components into a complete pistol within 21 minutes," and that the kit therefore qualified as a "firearm" because it was "designed to, or may readily be converted to expel a projectile by the action of an explosive." <u>Id.</u> at 71a, 76a. The Rule's provision addressing parts kits adheres to the same straightforward understanding of the statutory text.

**B.   A Partially Completed Or Nonfunctional Frame Or Receiver
That Can Readily Be Completed Is A "Frame Or Receiver"**

Respondents also offer no persuasive defense of the district court's invalidation of the provision of the Rule addressing partially complete frames or receivers.

1.   The Act does not define the terms "frame" and "receiver," which should thus be given their "ordinary, contemporary, common meaning." Delaware v. Pennsylvania, 143 S. Ct. 696, 705 (2023) (citation omitted).  Neither dictionary definitions nor ordinary usage requires that a frame or receiver be "complete," "operable," or "functional" in order to be described as such.  Appl. 21-23.  Respondents thus do not and could not deny that, as a matter of ordinary usage, it would be perfectly natural to describe a pistol frame as a "frame" even if it is missing "a single hole necessary to install the applicable fire control component" or "has a small piece of plastic that can easily be removed to allow installation of that component."  Appl. App. 54a.  Indeed, respondents themselves use the terms in precisely that way when marketing their products to the public, describing them as "80% frames" and "80% receivers" -- or often simply as "frames" and "receivers."[1]

2.   Respondents acknowledge that they seek a departure from ordinary meaning, asserting (VanDerStok Opp. 13) that "ordinary understanding" is "unhelpful" because, "when used to mean 'frame

---

[1]      Polymer80, for example, sells the relevant products on a section of its website entitled "Pistol Frame[s] and Jigs." https://perma.cc/DLG5-GRGX.   Similarly, BlackHawk markets "the GST-9" "[f]rame."  https://perma.cc/4N5Y-YQHM.

or receiver,' 'firearm' is a term of art."  No one disputes that the Act defines "firearm" more broadly than its ordinary meaning by including "frame[s] or receiver[s]."  18 U.S.C. 921(a)(3)(B).  But the relevant terms for present purposes are the underlined terms "frame" and "receiver."  And as to those terms, ordinary under-standing is not merely relevant, but dispositive.  See Delaware, 143 S. Ct. at 705.

Respondents' variation on our bicycle analogy illustrates the point.  They assert (VanDerStok Opp. 14) that if Congress defined a bicycle to include a bicycle "frame," that definition would not include a frame that "require[d] additional manufacturing" before other parts could be attached.  But that would not be true of a readily completable bicycle frame -- for example, one that requires the buyer to drill two holes before attaching the seat, or that comes packaged with plastic guards that must be removed before connecting the crank and pedals.  So too here:  A frame or receiver that includes "temporary rails or blocking tabs that are easily removable by a person with novice skill  * * *  within minutes" and thereby becomes "immediately capable of accepting" the remain-ing parts of an operational firearm is a "frame or receiver."  ATF, Open Letter on Impact of Final Rule 2021-05F on Partially Complete Polymer80, Lone Wolf, and Similar Semiautomatic Pistol Frames, at 6 (Dec. 27, 2022), https://perma.cc/VP62-S26P.

Like the district court, respondents emphasize (VanDerStok Opp. 12, 14; BlackHawk Opp. 13-14) that Congress used the phrase

"designed to or may readily be converted to" in Section 921(a)(3)(A) but did not include a similar phrase in Section 921(a)(3)(B).  But as we have already explained (Appl. 26-27), there is an obvious explanation for that difference:  If Congress had limited the express definition of "firearm" in Section 921(a)(3)(A) to weapons that "<u>will</u> * * * expel a projectile by the action of an explosive," 18 U.S.C. 921(a)(3)(A) (emphasis added), it would have departed from ordinary meaning by including only <u>functional</u> firearms.  But Congress did not define "frame or receiver," which means that those terms should be interpreted consistent with their ordinary meaning -- not artificially limited to "complete" or "functional" frames or receivers.  Respondents have no answer to that straightforward textual point.

3.  Finally, respondents' assertion (VanDerStok Opp. 15-16) that the Rule is inconsistent with ATF's prior understanding of "frame or receiver" is belied by the record.  ATF has long treated as a frame or receiver a product that has reached "a stage of completeness that will allow it to accept the firearm components [for] which it is designed * * *  , using basic tools in a reasonable amount of time."  87 Fed. Reg. at 24,685 (citation omitted).  Contrary to respondents' assertion (VanDerStok Opp. 15-16), that closely parallels the Rule, which defines frame or receiver to include products that "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver."  27 C.F.R. 478.12(c).  That similarity is backed up by

decades of classification letters issued by numerous Administrations in which ATF recognized that products that need minimal additional work to convert them into complete frames or receivers are frames and receivers.  See Appl. 25 n.3; Appl. App. 65a-69a; Administrative Record 1-645.  Indeed, some of those letters analyze whether frames or receivers can be "readily converted" into functional ones.  E.g., Appl. App. 65a.

### C.  Neither The Rule Of Lenity Nor The Canon Of Constitutional Avoidance Supports Respondents' Position

Respondents invoke (VanDerStok Opp. 19-22) the rule of lenity and the constitutional-doubt canon.  The district court did not rely on those arguments, and they lack merit.

The rule of lenity has a role to play only if, "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute." United States v. Castleman, 572 U.S. 157, 172-173 (2014) (citation omitted).  And the constitutional-doubt canon applies only when there are "competing plausible interpretations of a statutory text." Clark v. Martinez, 543 U.S. 371, 381 (2005).  Neither interpretive tool is relevant here because the Rule reflects the best reading of the statute and respondents' contrary interpretation is not plausible.

In any event, the Rule does not "raise[] serious constitutional doubts." Clark, 543 U.S. at 381.  This Court's Second Amendment decisions have emphasized that "laws imposing conditions and qualifications on the commercial sale of arms" are "presump-

tively lawful." District of Columbia v. Heller, 554 U.S. 570, 626-627 & n.26 (2008); see New York State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111, 2162 (2022) (Kavanaugh, J., concurring). The Rule does not prohibit anyone from possessing a firearm or making one at home; instead, it merely confirms that those engaged in "commercial sale[s]" of weapon parts kits and covered frames and receivers must abide by the Act's longstanding and uncontroversial serialization, background-check, and recordkeeping requirements. Heller, 554 U.S. at 627; see Abramski, 573 U.S. at 180. And respondents' brief invocation of vagueness (VanDerStok Opp. 20-21) is equally unavailing. Like countless other laws, the Rule's provision covering frames or receivers that can readily be made functional "call[s] for the application of a qualitative standard" to "real-world" facts. Johnson v. United States, 576 U.S. 591, 604 (2015). Indeed, that standard closely parallels the express "may readily be converted" language in Section 921(a)(3)(A), which respondents do not suggest raises any constitutional concern.

**D.   The District Court Erred In Granting Universal Relief**

Respondents fail to justify the district court's disruptive vacatur remedy, either as a general matter or under the particular circumstances of this case.

1.   Respondents appear to acknowledge that traditional equitable principles require courts to tailor relief to the parties before them and would not countenance the sort of universal relief

granted here.  Appl. 28-29.  Respondents maintain (VanDerStok Opp. 22-26) that the APA radically departed from that tradition in directing reviewing courts to "set aside" unlawful agency actions. But respondents cannot show that "Congress meant to upset the bedrock practice of case-by-case judgments with respect to the parties in each case or create a new and far-reaching power through this unremarkable language." Arizona v. Biden, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring).

Respondents do not dispute that, as a textual matter, the APA's "set aside" language could equally be interpreted to be consistent with traditional equitable principles by directing courts to deny effect to unlawful agency action in resolving the cases before them.  Appl. 31.  Instead, respondents rely primarily on what they portray (VanDerStok Opp. 3, 23-26) as a longstanding interpretation of the APA among lower courts.  But they acknowledge (id. at 25) that this Court has never endorsed that understanding.

In addition, respondents' interpretation has no grounding in the contemporaneous interpretation of the APA.  The statute was universally understood to codify, not upend, traditional remedies. See U.S. Dep't of Justice, Attorney General's Manual on the Administrative Procedure Act 93 (1947).  Consistent with that understanding, "vacatur of rules as today understood" was "unknown when the APA was adopted and for at least two decades afterward." John Harrison, Vacatur of Rules Under the Administrative Procedure Act, 40 Yale J. on Reg. 119, 120 (2023).  Indeed, respondents cite

only one decision that could be construed as vacating agency regulation in the period shortly after the APA's enactment.   See VanDerStok Opp. 3, 23 (citing Cream Wipt Food Prods. Co. v. Federal Security Adm'r, 187 F.2d 789, 790 (3d Cir. 1951)).   And that case involved a "special statutory review proceeding," 5 U.S.C. 703, permitting a court of appeals to review an agency order and act directly on the order itself by "affirm[ing] the order" or "set[ting] it aside in whole or in part, temporarily or permanently."   Cream Wipt, 187 F.2d at 790 (quoting 21 U.S.C. 371(f)(3)).   The government acknowledges that such special review provisions can authorize courts to vacate a rule.   But the fact that Congress has enacted statutes authorizing courts of appeals to enter such relief in specific contexts further undermines respondents' assertion that Section 706(2) implicitly authorizes every district court in the country to grant universal vacatur with respect to every agency action.

Respondents' other decisions (VanDerStok Opp. 22-23) are from the 1980s, 1990s, and 2000s.   Decisions postdating the APA by many decades are not probative of the statute's original meaning.   And many of the decisions on which respondents rely share the same feature as Cream Wipt:   They involved "special statutory review proceeding[s]," 5 U.S.C. 703, authorizing the D.C. Circuit or another court of appeals to review and act directly upon agency

actions.  See, e.g., 28 U.S.C. 2342.  Those special review provisions present distinct remedial questions.[2]

Where no such special statute applies, however, Section 703 provides that "[t]he form of proceeding" under the APA is not direct appellate-type review of the agency's action, but instead a traditional "form of legal action," such as "actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus."  5 U.S.C. 703.  Those forms of action do not authorize universal vacatur.  And district courts' routine assertion of authority to grant that relief is a development that has emerged only in "recent years" -- not a settled feature of APA litigation.  United States v. Texas, 143 S. Ct. 1964, 1980 (2023) (Gorsuch, J., concurring in the judgment).  Neither the APA's text nor any precedent compels this Court to accept the resulting systemic harms, which have become increasingly apparent as the practice has spread.  See ibid.

2.  Of course, this Court need not definitively resolve the dispute about nationwide vacatur in connection with this emergency application.  But as three Justices recently emphasized, the ar-

_____

    [2]   The D.C. Circuit's vacatur practices also reflect its unique jurisdiction.  That court's leading decision on vacatur reasons that because any party challenging federal agency action can ordinarily "seek review in the district court for the District of Columbia," the precedential effect of a D.C. Circuit decision holding an agency action unlawful is effectively nationwide even if the judgment is limited to the parties.  National Mining Ass'n v. U.S. Army Corps of Eng'rs, 145 F.3d 1399, 1409 (1998).  Whatever the merits of that logic as applied to the D.C. Circuit, it does not justify extending the same sweeping remedial authority to every district court judge in the Nation.

guments against that form of relief are at minimum "serious." Texas, 143 S. Ct. at 1980 (Gorsuch, J., concurring in the judgment). And those arguments are relevant to the stay because they bear directly on the government's likelihood of success in overturning, or at least narrowing, the district court's universal vacatur.

At a minimum, the Court should not hesitate to narrow grants of universal relief where, as here, party-specific relief would fully redress respondents' asserted injuries and the same issue is being actively litigated in other courts. Appl. 33-34. Even if the APA authorizes universal vacatur, it also preserves district courts' authority to "deny relief on any other appropriate legal or equitable ground." 5 U.S.C. 702. And respondents make little effort to show why a grant of universal relief was consistent with equity here. To the extent they address the question at all (e.g., VanDerStok Opp. 27-28), they presume that the district court's judgment definitively establishes that the Rule is unlawful and thus justifies an order precluding its enforcement against anyone. But this case illustrates the fallacy of that presumption: Other courts have reached the opposite conclusion, and the district court's vacatur denies effect to their decisions and pretermits the ordinary process of percolation. Appl. 30.

## II.  THE EQUITIES OVERWHELMINGLY FAVOR A STAY

A.   The district court's judgment imposes ongoing and ir-reparable harm on the government and the public.  The recent ex-plosion in the availability and use of ghost guns is a grave threat to public safety:  Ghost guns provide an attractive and all-too-easy way for felons, minors, and others who are prohibited from purchasing firearms to evade the background-check requirement that would otherwise prevent them from easily obtaining firearms.  The challenged provisions of the Rule ensure that ghost guns are properly regulated as firearms by requiring manufactures and sellers like respondents to place serial numbers on covered prod-ucts, conduct background checks, and maintain records of their sales.[3]

Respondents quibble (VanDerStok Opp. 30-33) with the precise number of ghost guns that the Rule will prevent from reaching the hands of minors, felons, and other prohibited persons.  But they cannot deny the basic point:  Large and rapidly increasing numbers of ghost gun kits are being sold online; many of those guns inev-itably wind up in the hands of prohibited persons; and tens of thousands of them have been recovered at crime scenes.

Tellingly, respondents ignore the Act's background-check requirement -- which would prevent respondents and other ghost-

---

[3]      Respondents object (VanDerStok Opp. 30-31) to the widely used term ghost gun, but respondents themselves have embraced it in their sales and marketing.  Indeed, one of respondent Defense Distributed's websites is ghostgunner.net.

gun manufacturers and sellers from selling parts kits and covered frames and receivers to prohibited persons. That alone would do much to slow the flow of ghost guns to criminals. And while respondents suggest that tracing may be ineffective in some instances, this Court has recognized that "[i]nformation about a gun buyer's identity" plus "trac[ing]" broadly "help[] * * * fight serious crime." Abramski, 573 U.S. at 182.

Respondents fault (VanDerStok Opp. 35-36) the government for declining to seek stays of the district court's preliminary injunctions (although the government appealed from those injunctions). The government and the public did suffer irreparable harm from the entry of those injunctions because they permitted manufacturing respondents to sell ghost guns. But the government should not be faulted for being judicious about seeking emergency relief. And its decision to forgo seeking such relief from the court's prior party-specific injunctions provides no reason to deny relief as to the court's subsequent and extraordinary remedy of universal vacatur -- which is substantially more destructive to public safety. Even if the equities are balanced only with respect to respondents, they still tip in the government's favor: Excusing respondents from complying with the Rule during the pendency of the appeal will create significant loopholes in the Rule, while respondents will at most incur minor compliance costs.

B.    Respondents will sustain minimal, if any, injuries from a stay pending appeal. Respondents do not contest that they are

capable of bringing their manufacturing and selling practices into compliance with the Rule.  Respondents also do not deny that the manufacturing respondents who are not already federal licensees can easily obtain licenses.  Respondents assert only that, if they comply with the Rule, they will have to pay the "costs of compliance."  VanDerStok Opp. 38 (citation omitted).

Those cost are minimal.  The cost of a federal firearms license is $50 per year for manufacturers and $200 for three years for dealers.  18 U.S.C. 923(a)(1)(B) and (3)(B).  Respondents do not discuss other possible compliance costs in this Court, but they are also likely to be minimal, as tens of thousands of other licensees comply with the Act on a regular basis.  Compliance will be particularly straightforward for the manufacturing respondents who already have federal licenses -- and therefore presumably have processes in place for manufacturing and selling products in accordance with the Act.  And individual respondents and the organizational respondents' members will likewise incur insignificant costs:  They need only purchase covered products "through a local [firearms licensee] and incur a $30 transfer charge plus additional time and expense associated with having to make an in-person purchase."  D. Ct. Doc. 89, at 7 (Oct. 1, 2022).  Those costs are easily outweighed by the significant public safety interests supporting a stay.

Respondents also suggest (VanDerStok Opp. 38) that they will be at risk of criminal prosecution if the Rule is stayed and they

choose to produce, sell, or purchase parts kits or covered frames or receivers. But respondents need only comply with the Act to avoid any such risk -- and, as discussed, such compliance is a de minimis burden. That is particularly so in light of the fact that all respondents have been required to comply with the Rule at numerous points since it took effect. Appl. 38.

Respondents finally echo (VanDerStok Opp. 33-34; BlackHawk Opp. 1) the Fifth Circuit's conclusion that vacatur "effectively maintains, pending appeal, the <u>status quo</u> that existed for 54 years." Appl. App. 3a. That is wrong three times over. First, the Rule has been the "status quo" for nearly a year for everyone except some respondents who secured preliminary relief (and their customers). Second, there was no such thing as a ghost gun in 1968: Only over the last five years have manufacturing respondents and others dramatically changed the status quo by selling massive quantities of firearms outside the Act's regulations. And third, as explained above, even before adopting the Rule ATF treated both weapon parts kits and readily completable frames and receivers as firearms under the Act. Maintaining the Rule would therefore only maintain the status quo. And, in any event, the balance of the equities here is straightforward: The public-safety interests in reversing the flow of ghost guns to dangerous and otherwise pro-hibited persons easily outweighs the minor costs that respondents will incur from complying with the Rule.

## III.  IN THE ALTERNATIVE, THE COURT MAY WISH TO TREAT THIS APPLI-CATION AS A PETITION FOR A WRIT OF CERTIORARI BEFORE JUDGMENT

A stay is clearly merited.  But if the Court denies a stay or grants it only in part, it may wish to grant a writ of certiorari before judgment on the question whether the Rule's challenged pro-visions are consistent with the statutory definition of "firearm." Absent a stay, that issue would merit immediate resolution by this Court because of the massive public safety harms that result from even a brief continuation of the Rule's vacatur.  Appl. 40-41.

Respondent BlackHawk asserts (Opp. 26) that the Fifth Cir-cuit's expedition of briefing and oral argument counsels against immediate review.  But BlackHawk does not dispute that (1) it is impossible to know when that court will issue a decision and (2) if, as seems likely, the court does not do so until late 2023 or early 2024, this Court could not hear the case in the ordinary course until October Term 2024.  That means the Court may not issue a decision on the merits until June 2025, nearly two years from now.  In light of the urgent public safety issues and the nation-wide scope of the vacatur, this Court should not permit the dis-trict court's judgment to stand for that lengthy period of time.

### CONCLUSION

The application for a stay of the district court's judgment vacating the Rule should be granted.  At a minimum, the Court should stay the district court's judgment to the extent it applies to nonparties.  And if the Court does not stay the vacatur in full,

it may wish to construe this application as a petition for a writ
of certiorari before judgment, grant the petition, and set the
case for expedited briefing and argument.[4]

    Respectfully submitted.

              ELIZABETH B. PRELOGAR
              <u>Solicitor General</u>

AUGUST 2023

---

[4]    The government sought a stay of the district court's
July 5 final judgment, Appl. App. 44a-45a, on the understanding
that the court's June 30 vacatur order, <u>id.</u> at 6a-43a, merged into
the final judgment and therefore ceased to have independent effect.
See <u>Dupree</u> v. <u>Younger</u>, 143 S. Ct. 1382, 1389 (2023) (noting the
"general rule" that a court's earlier rulings "merge into the final
judgment") (citation omitted).  But to the extent the Court con-
cludes that the June 30 order might continue to have independent
effect, the government respectfully requests that it adhere to the
approach taken in the administrative stay granted on July 28 and
stay both the June 30 order and the July 5 final judgment.