## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **DEFENSE DISTRIBUTED,** | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 4:22-cv-00691-O** |
| **PAMELA BONDI in her Official** | § | |
| **Capacity as Attorney General of the** | § | |
| **United States,** *et al.*, | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

### Defense Distributed's Brief in Support of
### Defense Distributed's Motion for a Preliminary Injunction

**Table of Contents**

Table of Authorities.................................................................................................. 3

Summary of the Argument ........................................................................................ 6

Argument.................................................................................................................. 9

I.      Defense Distributed will prevail on the merits of its unresolved claims............................. 9

        A.      *Bondi v. VanDerStok*, 145 S. Ct. 857 (2025), does not control............................... 9

        B.      The Rule violates the Due Process Clause............................................................10

        C.      The Rule violates the Second Amendment...........................................................14

II.     Irreparable harm. ............................................................................................18

III.    Equity balancing. ...........................................................................................20

Conclusion...............................................................................................................21

# Table of Authorities

## Cases

*Andrews v. State,*
    50 Tenn. 165 (1871)..................................................................................15

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.,*
    875 F.2d 1174 (5th Cir. 1989) ...............................................................19

*Bondi v. VanDerStok,*
    145 S.Ct. 857 (2025) ..............................................................6, 10, 13, 14 20

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin.,*
    *United States Dep't of Labor,*
    17 F.4th 604 (5th Cir. 2021) ..................................................................19

*District of Columbia v. Heller,*
    554 U.S. 570, 582 (2008) .......................................................................15

*Elrod v. Burns,*
    427 U.S. 347 (1976)................................................................................19

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011)..................................................................15

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) .............................................................. 22

*Ill. Ass'n of Firearms Retailers v. City of Chicago,*
    961 F.Supp.2d 928 (N.D. Ill. 2014)......................................................16

*Johnson v. United States,*
    576 U.S. 591 (2015) ..........................................................................11, 13

*League of Women Voters of United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016)................................................................... 22

*Luis v. United States,*
    578 U.S. 5 (2016) ...................................................................................15

*Mock v. Garland,*
    75 F.4th 563 (5th Cir. 2023)..................................................................15

*N.Y. State Rifle & Pistol Ass'n, v. Bruen*,
    142 S.Ct. 2111 (2022) ................................................................................... 6, 15, 16, 19

*O'Donnell v. Goodhart*,
    900 F.3d 220 (5th Cir. 2018) ........................................................................... 22

*Sessions v. Dimaya*,
    138 S.Ct. 1204 (2018) ...................................................................................... 13

*Tripoli Rocketry v. ATF*,
    437 F.3d 75 (D.C. Cir.2006.) ........................................................................... 12

*United States v. Evans*,
    333 U.S. 483 (1948) .......................................................................................... 13

*United States v. Lim*,
    444 F.3d 910 (7th Cir. 2006) ........................................................................... 12

*VanDerStok v. Garland*,
    86 F.4th 179 (5th Cir. 2023) ......................................................................... 6, 13

*Wages & White Lion Investments, L.L.C. v. United States Food & Drug Admin.*,
    16 F.4th 1130 (5th Cir. 2021) ...................................................................... 19, 21

**Statutes and Rules**

5 U.S.C. § 706(2)(B) ............................................................................................. 11, 14

Fed. R. Civ. P. 5(b)(2) ............................................................................................. 23

**Regulations**

27 C.F.R. § 478.11.............................................................................................. 6, 11, 22

27 C.F.R. § 478.12 .............................................................................................. 11, 22

87 Fed. Reg. 24,652-01 (Apr. 26, 2022)............................................................... 6, 22

**Other Authorities**

Brown, Firearms in Colonial America:
    The Impact on History and Technology 1492-1792 127 (1980) ........................... 17

Charles Winthrop Sawyer,
  Firearms in American History 145 (1910) ................................................................17

Francis Newton Thorpe,
  The Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the
  States, Territories, and Colonies Now or Heretofore Forming the United States of
  America 3787–88 (Francis Newton Thorpe ed., 1909) ........................................16

James B. Whisker,
  The Gunsmith's Trade 5 (1992) ............................................................................17

John G.W. Dillin,
  The Kentucky Rifle 96 (1975) ...............................................................................18

Joseph G.S. Greenlee,
  The American Tradition of Self Made Arms, 54 St. Mary's L.J. 35, 66 (2023) ..................16

Letter from Secretary of State Thomas Jefferson to British Ambassador to the United States
  George Hammond, May 15, 1793, in 7 The Writings of Thomas Jefferson 325–2
  (Paul Ford ed., 1904) ...........................................................................................17

## Summary of the Argument

Defense Distributed sues to halt ATF's enforcement of the 2022 ATF Rule redefining "firearm" in 27 C.F.R. §§ 478.11 and 27 C.F.R. §§ 478.12. *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022). *Bondi v. VanDerStok*, 145 S. Ct. 857 (2025), decided only a *statutory* challenge—whether the Gun Control Act permits ATF's new "firearm" definition. Still unresolved are *constitutional* challenges showing that, even if a statute permits this Rule, the Constitution's Due Process Clause and Second Amendment do not.

Defense Distributed's two leading constitutional challenges are each fully meritorious. The Fifth Amendment Due Process Clause challenge was already rightly accepted by Judge Oldham: "With its nonexclusive list of eight factors and lack of concrete examples, the Final Rule produces 'more unpredictability and arbitrariness than the Due Process Clause tolerates.'" *VanDerStok v. Garland*, 86 F.4th 179, 209 (5th Cir. 2023) (Oldham, J., concurring), *rev'd and remanded sub nom. Bondi v. VanDerStok*, 145 S. Ct. 857 (2025). And because there is no historical tradition of criminalizing firearm parts or the self-manufacture of firearms, a Second Amendment violation is manifest as well. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). Either alone would supply a sufficient likelihood of success. Together they are overwhelming.

Every other factor supports Defense Distributed now for the same reasons that it supported Defense Distributed before—both when this Court granted Defense Distributed preliminary injunctive relief, *see* Doc. 188; Doc. 261, and when the Fifth Circuit agreed, *see* Doc. 264. If anything, developments like the Attorney General's ongoing review, *see* Doc. 290, further weaken the "public interest" in continued Rule enforcement. The only significant change in analysis is to the scope of relief. In this respect, Defense Distributed has diligently negotiated with ATF to determine the precise scope of Rule enforcement that must now be preliminarily enjoined.

First, Defense Distributed moves for an order preliminarily enjoining the Defendants from enforcing the challenged Rule provisions against Defense Distributed vis-à-vis the following items, each as sold by Defense Distributed on ghostgunner.com before the Rule took effect :

1. The Polymer80 80% Frame
2. The M1911 80% Frame:45ACP
3. The M1911 80% Frame:9mm/10mm/.38 Super/.40 S&W

Defense Distributed sought relief as to these three items before, presenting them in Document 184 as items that Defense Distributed "used to sell but no longer does because of the Final Rule":



Doc. 184 at 7. To confer for the instant motion, Defense Distributed inquired about ATF's enforcement of the challenged provisions of the Rule against the Polymer80 and 1911 frames shown at Document 184. Ex. B at 1-2. "Will the government agree to not enforce the rule against Defense Distributed and its customers vis-a-vis these items during the action's pendency?" *Id.* "No." *Id.* An injunction halting this aspect of ATF's ongoing Rule enforcement is therefore needed, so that Defense Distributed can resume marketing these established Polymer80 and 1911 frame products free from the Rule's unconstitutional proscriptions.

Second, Defense Distributed moves for an order preliminarily enjoining the Defendants from enforcing the challenged Rule provisions against Defense Distributed vis-à-vis these items:

1. The G80 Build Kit as sold by Defense Distributed on G80.com.
2. The G80 Unfinished Receiver as sold by Defense Distributed on G80.com.
3. The G80 Grip Module as sold by Defense Distributed on G80.com.

Since Defense Distributed first brought these products to market earlier this year, conferral efforts made sure to fairly inform ATF of exactly what was at issue. Ex. B at 1-2. For the G80 items now at issue, G80.com gives comprehensive narrative descriptions alongside accurate images like this:



*Id.*; *G80 Build Kit*, https://g80.com/product/g80-build-kit/ (June 4, 2025) (called a "Bundle" previously). G80.com also gives digital reference models in an open source 3D file format (.step), showing all engineering traits with complete transparency, whether for compliance, engineering, or legal purposes. Ex. B at 3; *Downloads*, https://g80.com/downloads/ (June 4, 2025).

Conferral efforts were clear again: "Will the government agree to not enforce the rule against Defense Distributed and its customers vis-a-vis these items during the action's pendency?" Ex. B at 1-2. "No." *Id.* "The government′s position might or might not change if these items underwent an examination process for further coverage determination." *Id.* "But because that has not happened and unless and until that happens, the answer is no." *Id.* An injunction halting this aspect of ATF's ongoing Rule enforcement is therefore needed, so that Defense Distributed can market its important new G80 products free from the Rule's unconstitutional proscriptions.

## Argument

Defense Distributed moves for an order preliminarily enjoining the Defendants from enforcing the challenged Rule provisions against Defense Distributed vis-à-vis the six items designated above. The Court should apply to Defense Distributed's current motion the same preliminary injunction standards that it applied in the Document 188 order granting Defense Distributed's initial motion. The circumstances justifying the Document 188 preliminary injunction are all present again, with the only difference being that the likelihood of success on the merits now arises not from a mere statutory issue, but from multiple Constitutional violations.

## I.    Defense Distributed will prevail on the merits of its unresolved claims.

Defense Distributed's complaint seeks to have the Rule held unlawful and set aside with six counts of claims asserting distinct legal theories. Doc. 143 at 20-27. The instant motion's likelihood of success factor is sufficiently demonstrated by the Count Six Due Process Clause claims and the Count Five Second Amendment claims. The other unresolved Counts, *see* Doc. 231 at 2 n.1 (reserving judgment Counts II-VI of the Document 143 complaint), can be addressed later in due course, such as by summary judgment proceedings, after the instant motion is resolved.

### A.    *Bondi v. VanDerStok*, 145 S. Ct. 857 (2025), does not control.

The Supreme Court's decision in *Bondi v. VanDerStok*, 145 S. Ct. 857 (2025), does not govern the preliminary injunction inquiry for any of the items this motion puts at issue. It held only that "some" items covered by the Rule fall within the GCA, expressly refused "to untangle exactly how far [the Rule] reaches," and candidly revealed that "[f]uture cases may present other and more difficult questions about ATF's regulations." *Id.* at 869, 872. The exact distinctions that matter here differ slightly from item to item, showing precisely how the Rule's multiple defects cause such severe harm.

*Polymer80*: *VanDerStok* upholds the Rule's coverage of Polymer80's products in particular, using them to exemplify what the GCA let ATF defines as a "firearm." *VanDerStok,* 145 S. Ct. at 868 ("Congress used that term, as an ordinary speaker might, to embrace some unfinished instruments of combat like Polymer80′s product."). Be that as it may, the conclusion shows only what the GCA lets the Rule cover. The Due Process Clause and Second Amendment still do not let ATF use the Rule to criminalize the sale of Polymer80 items, even if backed by statute.

*1911 & G80*: *VanDerStok* does not address the Rule's coverage of the 1911 and G80 items at issue here, reserving judgment on these "more difficult questions about ATF's regulations." *VanDerStok,* 145 S. Ct. at 869-70. That ATF persists in deeming them covered "firearms" is a severe failure,[1] but again only a *statutory* as-applied failure under Count I's statutory claims. Assuming for this motion's purposes that the GCA lets ATF enforce the Rule against the 1911 and G80 items, the Second Amendment and Due Process Clause still do not let ATF use the Rule to criminalize the sale of either the 1911 or G80 items at issue here.

## B.    The Rule violates the Due Process Clause.

Defense Distributed will succeed on the merits of its Count Six which asserts that ATF's 2022 rule redefining "firearm" is "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), because it violates the vagueness doctrine of the Fifth Amendment of the Constitution of the United States. Doc. 143 at 25-26, ¶¶ 81-86. This claim has not yet been adjudicated, *see* Doc. 231 at 2 n.1, and should now be upheld as fully meritorious.

---

[1] The correct view is that the GCA does not let the Rule cover either the 1911 and G80 items at issue because they do *not* exhibit the characteristics *VanDerStok* deemed definitive—namely that an "ordinary person, using ordinary tools, can finish the frame in minutes." *Id.* at 874. Their finishing process requires more on all fronts—differences of kind, just just degree. *Id.* Indeed, Defense Distributed designed the G80 platform *after VanDerStok* to guarantee legal compliance.

The Fifth Amendment's Due Process Clause forbids deprivations of life, liberty, or property without due process of law.  U.S. Const. amend. V.  Its vagueness doctrine is violated by criminal laws that either deny defendants fair notice of what is punishable or invite arbitrary enforcement by lack of standards.  *E.g., Johnson v. United States*, 576 U.S. 591 (2015).  Taking for granted that the Rule's new "firearm" definition properly construes the GCA, ATF's resulting enforcement scheme violates the Fifth Amendment's vagueness doctrine in three key respects.

First, the Rule violates the Due Process Clause's vagueness prohibition by defining "frame" and "receiver" to include a "partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c).  Those inherently amorphous terms—especially "readily," even as defined by 27 C.F.R. § 478.11—present an unconstitutional level of vagueness that denies citizens fair notice of what is punishable.  The rule does not say, and no reasonable person can reliably infer, what point of evolution a piece of metal or plastic crosses the "readily" barrier to become a "frame or receiver." Vacuous metrics like this are invalid.  *See Tripoli Rocketry v. ATF*, 437 F.3d 75, 81 (D.C. Cir. 2006.).  Objectified, specific measurements would be needed to cure this fault, *see United States v. Lim*, 444 F.3d 910, 916 (7th Cir. 2006), and the Rule has none.

Second, the Rule also violates the Due Process Clause's vagueness prohibition by defining "frame" and "receiver" to sometimes include "a forging, casting, printing, extrusion, unmachined body, or similar article," depending on whether or not it has "reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." 27 C.F.R. § 478.12(c).  Here

again, inherently amorphous terms—especially "clearly identifiable"—present an unconstitutional level of vagueness that denies citizens fair notice of what is punishable. Much like the vagueness problem regarding "readily," the Rule does not say, and no reasonable person can reliably infer, what point of evolution defines the "clearly identifiable" threshold.

Third, the Rule also violates the Due Process Clause's vagueness prohibition by providing that, "[w]hen issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit." 27 C.F.R. § 478.12(c). Those terms violate the vagueness doctrine by inviting arbitrary enforcement. The Rule does not say, and no reasonable person can reliably infer, exactly what set of materials ATF thinks are relevant to this inquiry—let alone how the bureaucrats will construe them to make the critical determination.

Crimes cannot be defined by government imagination. So held *Johnson v. United States*, 576 U.S. 591 (2015), which deemed the law at issue unconstitutionally vague because it "ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real world facts or statutory elements." *Id.* The Rule here is just as bad, in that it ties the definition of all "firearm" based crimes to an administratively imagined notion of what a complete and operable "firearm" really is, based on little more than a bureaucrat's ipse dixit. "It is one thing to apply an imprecise . . . standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction." *Id.* The Rule's ATF imagined abstraction of when a gun becomes a true gun is no better.

"Each of the uncertainties in the [Rule] may be tolerable in isolation, but 'their sum makes a task for us which at best could be only guesswork.'" *Id.* (quoting United States v. Evans, 333 U.S.

483, 495 (1948)). "Invoking so shapeless a provision to condemn someone to prison . . . does not comport with the Constitution's guarantee of due process." *Id.*

It is no answer for the government to say that some cases might make for easy application of the Rule. The controlling holdings—both *Johnson* and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018)—"squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson*, 576 U.S. at 602. Just as in *Johnson* and *Sessions*, the Rule produces "more unpredictability and arbitrariness than the Due Process Clause tolerates." *Sessions*, 138 S. Ct. at 1215.

Judge Oldham's concurring opinion from 2023 treats the Due Process Clause challenge to this Rule correctly and should be followed here. *VanDerStok v. Garland*, 86 F.4th 179, 209 (5th Cir. 2023) (Oldham, J., concurring), *rev'd and remanded sub nom. Bondi v. VanDerStok*, 145 S. Ct. 857 (2025). "As important as the Fifth Amendment's guarantee of fair notice to individuals is the Amendment's prohibition against "arbitrary enforcement" by government officials." *Id.* "It is thus of no use for ATF to say that it will tell ordinary people what they can do." *Id.* "The law exists to tell both the people and government officials what they can do." *Id.* "The nonexclusive eight-factor balancing test provides no guidance to anyone and hence is void for vagueness." *Id.*

Indeed, ATF's continued inability to cogently classify Defense Distributed's items proves the point. Why does ATF now posit that the Rule covers 80% pistol frames *but not 80% rifle lowers*? No one knows, and this incoherence demonstrates the Rule's lack of clear standards, forcing Defense Distributed to guess at compliance while facing criminal liability. Such arbitrary and unpredictable standards epitomizes the vagueness that the Fifth Amendment forbids.

### C.    The Rule violates the Second Amendment.

Defense Distributed will also succeed on the merits of Count Five, which asserts that the rule is "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), because it subjects Defense Distributed to an unconstitutional abridgement of Second Amendment rights.  Doc. 143 at 25, ¶¶ 77-80.  This claim has not yet been adjudicated, *see* Doc. 231 at 2 n.1 (reserving judgment in the first round), and should now be upheld as fully meritorious.

At issue is the individual right to acquire and make Arms, which is part and parcel of the Second Amendment's right to keep and bear Arms.  America's historical tradition of personal gunmaking is well-established and wholly free from any major federal regulation at all.  Because ATF's new "firearm" definition makes the GCA trample that right, its enforcement is unconstitutional.

Where "the Second Amendment's plain text covers an individual's conduct," the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  New York State Rifle & Pistol Association, v. Bruen, 142 S.Ct. 2111 (2022).  That test applies to the Rule's "firearm" definition and cannot be met.

As to the initial issue of constitutional text, the Second Amendment's operative words cover what the Rule proscribes.  The Second Amendment's term "Arms" covers "all instruments that constitute bearable arms," including "those that were not in existence at the time of the founding."  *Heller*, 554 U.S. at 582.  The Rule plainly regulates such "Arms" by changing the scope of the GCA's keystone "firearm" definition.

The activities proscribed by the Rule's new "firearm" definition are also covered by the Second Amendment phrase "keep and bear," which necessarily entails an individual right to make

14

or acquire Arms. *See Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring in the judgment) ("Constitutional rights thus implicitly protect those closely related acts necessary to their exercise."). *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."); *Andrews v. State*, 50 Tenn. 165, 178 (1871) (the "right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair"); *see also Mock v. Garland*, 75 F.4th 563, 588 (5th Cir. 2023) (Willett, J., concurring) ("protected Second Amendment 'conduct' likely includes making common, safety-improving modifications to otherwise lawfully bearable arms); *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) ( "the right to keep and bear arms . . . must also include the right to *acquire* a firearm . . ." (emphasis in original)). Just as a law criminalizing printing presses would implicate the First Amendment, so too a law criminalizing personal gunsmithing parts and kits implicates the Second.

Because the Rule's "firearm" definition implicates the Second Amendment's protections, Defendants have the burden of demonstrating the requisite historical tradition; it is not the Defendants' burden to disprove that historical tradition. *See Bruen*, 142 S.Ct. 2111. Even so, authorities already make it clear that there is no historical tradition of regulating the self-manufacture of firearms that supports the Rule's expansion of the GCA.

Self-manufactured firearms in America have a long and, until just recently, unregulated history. *See* Joseph G.S. Greenlee, The American Tradition of Self Made Arms, 54 St. Mary's L.J. 35, 66 (2023). The unregulated self-manufacture of firearms was common in the American

colonies, beginning with gunsmiths who made and repaired militia and hunting weapons and were "extremely important and highly valued in their communities." *Id.* at 9.

Colonists possessed both the express right to import whole firearms and the parts necessary to make their own firearms. *Id.* at 9-10 (citing Francis Newton Thorpe, The Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America 3787–88 (Francis Newton Thorpe ed., 1909)). While "[i]n the large gunsmith shops of the cities it is probable that many minds were given to the making of a gun . . . in the smaller shops which formed the great majority—mere cabins on the outskirts of the wilderness—one man with or without an apprentice did every part of the work." Charles Winthrop Sawyer, Firearms in American History 145 (1910); *see also* James B. Whisker, The Gunsmith's Trade 5 (1992).

During the Revolutionary War, when the British attempted to prevent Americans from acquiring firearms and ammunition, Americans were forced to manufacture their own firearms and gunpowder to survive. *See* Greenlee, *supra*, at 12–15 (citing M.L. Brown, Firearms in Colonial America: The Impact on History and Technology 1492-1792 127 (1980)). Due to the circumstances of the war, "[n]early every able-bodied male between 16 and 60 . . . [had] to provide his own arms" and some men "built their arms themselves." *Id.* at 25. "When the colonies faced major arms shortages throughout the war, domestic arms manufacturing filled the void." *Id.* at 16. Indeed, the colonies themselves solicited firearm manufacturers, including those engaged in private manufacture and others outside of the firearms industry, to increase domestic production. *Id.* at 18–23.

Thomas Jefferson understood the right very well. Describing the landscape of firearms in early America in 1793, he wrote that "[o]ur citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." Letter from Secretary of State Thomas Jefferson to British Ambassador to the United States George Hammond, May 15, 1793, in 7 The Writings of Thomas Jefferson 325–26 (Paul Ford ed., 1904).

After the Revolutionary War, "gunsmithing was a universal need in early America" and "many early Americans who were professionals in other occupations engaged in gunsmithing as an additional occupation or hobby." Greenlee, *supra*, at 29. This tradition extended to pioneers, mountain men, and explorers whose need to make and repair firearms was a survival necessity. *Id.* at 32.

ATF's supposedly modern notion of firearm "precursor parts" is not modern at all. Although some early riflemakers forged their firearm parts from scratch, "there were gunsmiths who did not forge out their barrel blanks, but purchased them in bulk from some factory like that of Eliphalet Remington." John G.W. Dillin, The Kentucky Rifle 96 (1975). These riflemakers then fitted their barrels "to hand-made stocks with American factory or English locks." *Id.*

This tradition of personal gunmaking—free from any major federal regulation whatsoever—continued into the nineteenth and twentieth centuries, when "[m]any of the most important innovations in firearms technology began not in a federal armory or major firearms manufactory, but in private homes and workshops." Greenlee, *supra*, at 35. Such innovations include "[t]he most popular rifle in America today . . . the AR-15, owned in the tens of millions . . . [whose] roots are in homebuilding." *Id.* at 39.

During all of these foundational time periods, anyone with the requisite skill had an essentially unfettered right to build their own firearms; "[o]ne need not have had a wealthy patron or sponsor, or work for king and nobility, to make guns." Greenlee, *supra*, at 41 (internal citation omitted); Whisker, *supra*, at 6 ("Even those apprentices who had never completed an apprenticeship might enter the trade. No guild, union or government agency attempted to regulate the gun making business….He need not take any examination. He need not present one of his guns to any examining board."); *id.* at 90 ("Gunsmiths considered it to be their right to make guns without regulation or interference.").

Deviations from this historical tradition are decidedly few and modern. No restrictions were placed on the self-manufacture of firearms for personal use (or their parts) in America during the seventeenth, eighteenth, or nineteenth centuries. *See* Greenlee, *supra*, at 40. Rather, "[a]ll such restrictions have been enacted within the last decade." *Id.* At the state level, it was not until 2016 that a small minority of states began to regulate the manufacture of arms for personal use. *Id.* at 42.

Hence, there is no American historical tradition of regulating firearm parts or the self-manufacture of firearms—let alone criminalizing them. Yet that is precisely what the Rule's "firearm" definition makes the GCA do. Because that violates the Second Amendment, *see N.Y. State Rifle & Pistol Ass'n, v. Bruen*, 142 S. Ct. 2111 (2022), it cannot be enforced.

## II.    Irreparable harm.

Two distinct categories of irreparable harm warrant relief here.

First, the test is met by the irreparable *constitutional* harms that ATF's continued enforcement of the Rule inflicts upon Defense Distributed. The "loss of constitutional freedoms 'for even minimal periods of time … unquestionably constitutes irreparable injury.'" *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Labor*, 17 F.4th 604,

618 (5th Cir. 2021) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). So long as ATF continues to enforce the Rule against Defense Distributed, its right to be free from laws infringing both its Due Process Clause and Second Amendment freedoms are irreparably lost. *See id.*

Second, the test is met by the category of harm that warranted the Document 188 order granting Defense Distributed's initial motion: economic losses that are either nonrecoverable, *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021), and/or "so great as to threaten the existence of the movant's business," *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989). *See* Doc. 188 at 5-6.

Three of the exact items at issue now were at issue in the last motion—the Polymer80 80% Frame and the two M1911 80% Frames in Document 184. So the very same analysis, Doc. 188 at 5-7, continues to apply. *See* Ex. A at 2-6. The test is also met as to the items that were not at issue before—the three "G80" products that Defense Distributed brought to market more recently, after *Bondi v. VanDerStok*, 145 S. Ct. 857 (2025)—for essentially the same reasons. *See* Ex. B at 3.

Now just as before, Defense Distributed will never be able to recover the substantial business income that this Rule interrupts. *See* Ex. A at 2-6; Ex. B at 3. Without a preliminary injunction, Defense Distributed is barred from freely selling the six products at issue—the three previously litigated 80% frames and the three new G80 products. These sales, if permitted without the Rule's cloud of criminality, would generate substantial revenue and healthy profit margins critical to the company's survival. *Id.* The inability to market these products deprives Defense Distributed of a core revenue stream, undermining its financial stability and threatening its continued existence as a going concern. *Id.* On top of that, Defense Distributed can never recover the high compliance costs of figuring out what the Rule means. *Id.* For these reasons, Defense

Distributed is again "likely to suffer irreparable harm—through unrecoverable lost revenues and, potentially, eventual total dissolution of its business—if the Court does not provide injunctive relief while litigation is ongoing." Doc. 188 at 5.

## III.    Equity balancing.

The balance of equities and public interest strongly favor a preliminary injunction enjoining the ATF from enforcing the Rule against all products now at issue. The Court previously found these factors satisfied as to the first three, *see* Doc. 188 at 9-10, and the same reasoning applies with even greater force to the new G80 items.

Once again, the balance of harms tips decisively in Defense Distributed's favor. Defense Distributed faces irreparable harm—unrecoverable financial losses, loss of market share, and potential business dissolution—if the Rule's enforcement continues. *See* Doc. 188 at 5-7; Ex. A at 2-6; Ex. B at 3. The inability to sell the six products, which constitute a core revenue stream, threatens the company's survival. *Id.* Conversely, the government faces minimal harm from a narrowly tailored injunction. Pausing enforcement against Defense Distributed's specific products during litigation imposes no significant administrative burden on the ATF, particularly as the Attorney General's ongoing review of the Rule suggests enforcement priorities may shift already. See Doc. 290. The equities thus favor preserving Defense Distributed's operations over the government's speculative interest in immediate enforcement.

Maintaining the status quo is still a prime directive for harm balancing and the public interest. *See Wages & White Lion Investments, L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1143 (5th Cir. 2021). And once again, a preliminary injunction maintains the status quo by returning the law's "firearm" definition to what it had been for decades.

The public interest also still favors a preliminary injunction because the "public interest is in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* "And 'there is generally no public interest in the perpetuation of unlawful agency action.'" *Id.* (cleaned up).

Again as well, Plaintiffs' "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest*." League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

Last but not least, with respect to the constitutional claims at issue, preserving constitutional rights always serves the public interest, *see, e.g.*, *O'Donnell v. Goodhart*, 900 F.3d 220, 232 (5th Cir. 2018), whereas "enforcement of an unconstitutional law is always contrary to the public interest," *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

### Conclusion

The Court should grant the motion and issue an order preliminarily enjoining the Defendants from enforcing the challenged redefinition of "firearm" in 27 C.F.R. §§ 478.11 and 27 C.F.R. §§ 478.12, *see* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022), against Defense Distributed vis-à-vis the specified items.

Respectfully submitted,

By /s/ *Chad Flores*
Chad Flores
  cf@chadfloreslaw.com
   Texas Bar No. 24059759
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
P: (713) 893-9440
F: (832) 645-2496

Counsel for Defense Distributed

## Certificate of Service

A true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record on the day of its filing.

/s/ Chad Flores
Chad Flores