**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| JENNIFER VANDERSTOK *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> PAMELA BONDI, in her official capacity as Attorney General of the United States *et al.*, <br><br> Defendants. | Case No. 4:22-cv-00691-O |

**DEFENDANTS' BRIEF IN OPPOSITION TO DEFENSE**
**DISTRIBUTED'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................1

ARGUMENT ........................................................................................................................3

I.     Defense Distributed Is Not Likely to Succeed on the Merits. .......................................3

     A.     Defense Distributed Is Not Likely to Succeed on Its Fifth Amendment Claim. .........3

     B.     Defense Distributed Is Not Likely to Succeed on Its Second Amendment Claim. ...10

     C.     Although the Supreme Court's *VanDerStok* Decision Did Not Adjudicate Constitutional Issues, the Decision Remains Instructive in Adjudicating Defense Distributed's Motion. ........................................................................................16

II.     Defense Distributed Fails to Substantiate an Imminent Threat of Irreparable Injury. ...........17

III.     The Balance of the Equities Weighs in Favor of the Rule's Interim Enforcement. .................22

IV.     If the Court Were to Issue a Preliminary Injunction, It Should Require a Bond. ...................25

CONCLUSION ..................................................................................................................25

i

# TABLE OF AUTHORITIES

## Cases

*22 Caliber Winlee Derringer Convertible Starter Guns,*
   443 F.2d 463 (2d Cir. 1971) .................................................................................... 5

*Anderson v. Williams,*
   No. 2:10-CV-01916-KJD, 2011 WL 2580665 (D. Nev. June 27, 2011) ........................... 6

*Ass'n of Professional Ball Players of Am. v. Madison,*
   No. 4:23-cv-01037-O, 2024 WL 102946 (N.D. Tex. Jan. 9, 2024) ............................... 25

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.,*
   875 F.2d 1174 (5th Cir. 1989) ................................................................................ 20

*Bondi v. VanDerStok,*
   145 S. Ct. 857 (2025) ................................................................................... *passim*

*Boyce Motor Lines v. United States,*
   342 U.S. 337 (1952) ............................................................................................. 7

*BST Holdings, L.L.C. v. OSHA,*
   17 F.4th 604 (5th Cir. 2021) ................................................................................. 20

*Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield,*
   853 F. Supp. 2d 214 (D. Conn. 2012) ....................................................................... 7

*Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n,*
   768 F.3d 183 (2d Cir. 2014) .................................................................................... 7

*Cox v. Louisiana,*
   379 U.S. 559 (1965) ............................................................................................. 8

*Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.,*
   108 F.4th 194 (3d Cir. 2024) ................................................................................. 20

*Dist. of Columbia v. Heller,*
   554 U.S. 570 (2008) ..................................................................................... 10, 11

*Garland v. Blackhawk Mfg. Grp., Inc.,*
   144 S. Ct. 338 (2023) ....................................................................................... 2, 21

*Garland v. VanDerStok,*
   144 S. Ct. 44 (2023) ........................................................................................ 2, 21

*Hohe v. Casey,*
   868 F.2d 69 (3d Cir. 1989) ................................................................................... 20

*Holland Am. Ins. Co. v. Succession of Roy,*
   777 F.2d 992 (5th Cir. 1985) ............................................................................ 17, 18

*Humana Ins. Co. v. Tenet Health Sys.,*
    No. 3:16-CV-2919-B, 2016 WL 6893629 (N.D. Tex. Nov. 21, 2016) ............................................. 17

*Janvey v. Alguire,*
    647 F.3d 585 (5th Cir. 2011) ................................................................................................ 17

*Johnson v. United States,*
    576 U.S. 591 (2015) ............................................................................................................. 5, 9

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) ................................................................................................ 12

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ............................................................................................................. 19

*McDonald v. City of Chicago, Ill.,*
    561 U.S. 742 (2010) ............................................................................................................. 11

*McRorey v. Garland,*
    No. 7:23-CV-00047-O, 2023 WL 5200670 (N.D. Tex. Aug. 14, 2023) ................................... 10, 11

*Mueller Supply Co. v. JNL Steel Components, Inc.,*
    No. 6:21-CV-036-H, 2022 WL 1199212 (N.D. Tex. Mar. 8, 2022) ......................................... 17, 18

*Munn v. City of Ocean Springs,*
    763 F.3d 437 (5th Cir. 2014) ................................................................................................ 3, 8, 9

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022) ................................................................................................................. *passim*

*N.Y. State Rifle & Pistol Ass'n v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) ................................................................................................. 5

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................................................. 22

*Phelps v. Budge,*
    188 F. App'x 616 (9th Cir. 2006) .......................................................................................... 6

*Prime Healthcare Servs., Inc. v. Harris,*
    216 F. Supp. 3d 1096 (S.D. Cal. 2016) ................................................................................. 7

*Sessions v. Dimaya,*
    584 U.S. 148 (2018) ............................................................................................................. 7

*Teixeira v. Cnty. of Alameda,*
    873 F.3d 670 (9th Cir. 2017) ................................................................................................ 12

*Texas v. Biden,*
    10 F.4th 538 (5th Cir. 2021) ................................................................................................ 4, 19

*Tripoli Rocketry v. ATF*,
    437 F.3d 75 (D.C. Cir. 2006) ................................................................................ 7

*United States v. Campbell*,
    427 F.2d 892 (5th Cir. 1970) (per curiam) ............................................................ 6

*United States v. Clark*,
    582 F.3d 607 (5th Cir. 2009) ................................................................................ 8

*United States v. Clinical Leasing Serv., Inc.*,
    925 F.2d 120 (5th Cir. 1991) ................................................................................ 4

*United States v. Drasen*,
    845 F.2d 731 (7th Cir. 1988) ................................................................................ 6

*United States v. Felsen*,
    648 F.2d 681 (10th Cir. 1981) .............................................................................. 6

*United States v. Jubert*,
    __ F.4th __, 2025 WL 1577013 (5th Cir. June 4, 2025) ................................... 15

*United States v. Kelly*,
    276 F. App'x 261 (4th Cir. 2007) ......................................................................... 5

*United States v. Kent*,
    175 F.3d 870 (11th Cir. 1999) .............................................................................. 5

*United States v. Libertad*,
    681 F. Supp. 3d 102 (S.D.N.Y. 2023) ................................................................ 12

*United States v. Lim*,
    444 F.3d 910 (7th Cir. 2006) ................................................................................ 7

*United States v. M-K Specialties Model M-14 Machinegun*,
    424 F. Supp. 2d 862 (N.D. W. Va. 2006) ............................................................ 6

*United States v. Nat'l Dairy Prod. Corp.*,
    372 U.S. 29 (1963) ............................................................................................... 8

*United States v. Powell*,
    423 U.S. 87 (1975) ............................................................................................... 7

*United States v. Quiroz*,
    449 F.2d 583 (9th Cir. 1971) ................................................................................ 5

*United States v. Rahimi*,
    602 U.S. 680 (2024) ............................................................................... 10, 11, 14

*United States v. Wick*,
    No. CR 15-30-M-DLC, 2016 WL 10612608 (D. Mont. Mar. 11, 2016) ............. 6

*United States v. Williams,*
    553 U.S. 285 (2008) ................................................................................... 3

*VanDerStok v. Garland,*
    86 F.4th 179 (5th Cir. 2023) ..................................................................... 2

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests. Inc.,*
    455 U.S. 489 (1982) ............................................................................... 4, 6

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ................................................................................... 7

**U.S. Constitution**

U.S. Const. amend. II ..................................................................................... 10

**United States Code**

18 U.S.C. § 921 ................................................................................ 1, 5, 16 19

26 U.S.C. § 5845 ............................................................................................. 5

26 U.S.C. § 5861 ............................................................................................. 5

**Rules**

Fed. R. Civ. P. 65 .......................................................................................... 25

**Regulations**

27 C.F.R. § 478.11 ........................................................................................... 6

27 C.F.R. § 478.12 ....................................................................................... 5, 8

27 C.F.R. § 479.102 ......................................................................................... 3

87 Fed. Reg. 24,652 (Apr. 26, 2022) ...................................................... 8, 15

90 Fed. Reg. 9503 (Feb. 7, 2025) ................................................................. 2

**Other Authorities**

1 LAWS OF THE STATE OF MAINE (1830) ...................................................... 13

2 GENERAL LAWS OF MASSACHUSETTS FROM THE ADOPTION OF THE CONSTITUTION TO FEBRUARY 1822 (1823) .......................................................................................... 13, 14

3 LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED (1810) ........................................................ 13

11A Charles Alan Wright *et al.,*
    FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2021) ....................... 4

15 PUBLIC RECORDS OF THE COLONY OF CONNECTICUT (1890) ............... 14

Br. in Opp'n of Defense Distributed,
No. 23A82, 2023 WL 5112206 (U.S. Aug. 2, 2023) ................................................... 20

Br. in Opp'n of Defense Distributed,
No. 23A302, 2023 WL 6787247 (U.S. Oct. 11, 2023) ................................................. 20

Br. of Defense Distributed, *Bondi v. VanDerStok*,
No. 23-852, 2024 WL 4183989 (Sept. 12, 2024) ...................................................... 16

COLONIAL LAWS OF MASSACHUSETTS REPRINTED FROM THE EDITION OF 1672 (1890) ................. 14

CHARTER AND ORDINANCES OF THE CITY OF PROVIDENCE, WITH THE GENERAL ASSEMBLY
RELATING TO THE CITY (1835) ................................................................. 14

LAWS OF THE STATE OF NEW HAMPSHIRE; WITH THE CONSTITUTIONS OF THE UNITED STATES AND
OF THE STATE PREFIXED (Isaac Long Jr., 1830) ................................................ 14

Off. of the Att'y Gen., Second Amendment Task Force Memorandum (Apr. 8, 2025),
http://www.justice.gov/ag/media/1395956/dl?inline ........................................... 2, 3

Petitioner's Reply Br., *Bondi v. VanDerStok*,
No. 23-10718, 2024 WL 1098302 (Mar. 8, 2024) ............................................... 4, 16

ReasonTV, *Cody Wilson Thwarts Another Attempt to Stop Ghost Guns*, YouTube (Jan. 12, 2022),
https://www.youtube.com/watch?v=bZRugDpYBuc ................................................. 21

TMGN, *Biden's Ghost Gun Rule is Dead on Arrival Thanks to the 0% Receiver.*,
https://themachinegunnest.com/bidens-ghost-gun-rule-is-dead-on-arrival-thanks-to-the-0-
receiver/ ................................................................................... 21

## INTRODUCTION

Defense Distributed has failed to demonstrate that it is entitled to the extraordinary remedy of a preliminary injunction. Defense Distributed once again challenges the Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF") "Frame or Receiver" Rule, but its claim for relief is even weaker this time around. The Supreme Court recently upheld the Rule and Defense Distributed has simply recycled the same constitutional arguments raised during Supreme Court merits briefing. As Defendants have explained throughout this litigation, those arguments lack merit. Nor has Defense Distributed shown that it will suffer irreparable harm if it does not receive emergency injunctive relief. The harm it alleges is either self-inflicted or is fairly traceable not to the challenged rule but to a statute not challenged in this case. Finally, the balance of the equities strongly weighs in favor of Defendants, as shown most prominently by the fact that the Supreme Court has now *twice* ordered that the challenged rule should remain in effect while its merits are under review, a conclusion it could not have reached unless the balance of the equities favored Defendants. Defendants thus respectfully request that the Court deny Defense Distributed's motion for a preliminary injunction.

## BACKGROUND

This case involves a 2022 rule issued by ATF "designed to combat the proliferation of ghost guns." *Bondi v. VanDerStok*, 145 S. Ct. 857, 864 (2025). Various manufacturers and dealers of ghost guns challenged the Rule. They contended that because the Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.* ("GCA") [Gun Control Act] "cannot be fairly read to reach weapon parts kits or unfinished [firearm] frames or receivers," ATF's rule "purporting to extend the GCA's mandates to these products could not be enforced against anyone and had to be 'set aside' as impermissibly issued 'in excess of statutory . . . authority." *VanDerStok*, 145 S. Ct. at 864, 865 (citation omitted). In July 2023, this Court held that ATF had acted in excess of its statutory authority by promulgating the Rule. It

entered summary judgment in favor of these manufacturers and dealers on their statutory claim and vacated the Rule. Mem. Op. & Order, ECF No. 227.

In August 2023, the Supreme Court granted the government's application for a stay of this Court's judgment pending appeal. *See Garland v. VanDerStok*, 144 S. Ct. 44 (2023). The Supreme Court stayed this Court's vacatur in full and allowed the government to implement the Rule pending the disposition of its appeal to the Fifth Circuit and the disposition of any timely petition for a writ of certiorari. *See id.* This Court subsequently granted the motions of two plaintiffs (including Defense Distributed) for injunctive relief pending appeal, and enjoined ATF from implementing the Rule against these plaintiffs. Op. & Order, ECF No. 261. In October 2023, the Supreme Court vacated this injunction, allowing the Rule to be implemented (including against Defense Distributed). *See Garland v. Blackhawk Mfg. Grp., Inc.*, 144 S. Ct. 338 (2023).

The Fifth Circuit largely affirmed this Court's entry of summary judgment in favor of the manufacturers and dealers challenging the Rule. *VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023). The Supreme Court reversed, holding that "[t]he GCA embraces, and thus permits ATF to regulate, some weapon parts kits and unfinished frames or receivers, including" examples specifically addressed in the Supreme Court's decision. *VanDerStok*, 145 S. Ct. at 876.

In February 2025, President Trump issued an Executive Order titled "Protecting Second Amendment Rights." Exec. Order No. 14,206, 90 Fed. Reg. 9503 (Feb. 7, 2025). Among other things, the Order directs the Attorney General to "examine" various "actions of executive departments and agencies," including the Rule, to "assess any ongoing infringements of the Second Amendment rights of our citizens[.]" As part of implementing the President's Executive Order, in April 2025, the Attorney General created the Second Amendment Task Force, which is "charged with developing and executing strategies to use litigation and policy to advance, protect, and promote compliance with the

2

Second Amendment." *See* Off. of the Att'y Gen., Second Amendment Task Force Memorandum (Apr. 8, 2025), http://www.justice.gov/ag/media/1395956/dl?inline.

On remand, the parties nearly unanimously requested that the Court stay this case for sixty days while Attorney General's review continued. The sole party opposing this request is Defense Distributed. *See* Joint Status Report, ECF No. 290.

## ARGUMENT

I.    **Defense Distributed Is Not Likely to Succeed on the Merits.**

A.    **Defense Distributed Is Not Likely to Succeed on Its Fifth Amendment Claim.**

Defense Distributed has failed to show that it is likely to succeed on its claim that the Rule is unconstitutionally vague as applied to the specific items that are the subject of its motion. *See* PI Mot. at 10-13, ECF No. 293. Under the Fifth Amendment's Due Process Clause, a criminal or quasi-criminal law is unconstitutionally vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *accord Munn v. City of Ocean Springs*, 763 F.3d 437, 439 (5th Cir. 2014).

The requirements of equity prevent Defense Distributed from complaining of any purported ambiguity in the Rule as applied to its products when it has refused to have those products classified by ATF, which would have resolved any potential confusion. Defense Distributed's claim that it is "forc[ed] . . . to guess at compliance while facing criminal liability," Mot. at 13, ignores that the Rule provides for an administrative process by which regulated entities may obtain classifications as to whether their particular products fall within the Rule's scope. *See* 27 C.F.R. § 479.102(c) (ATF "may issue a determination (classification) to a person whether an item, including a kit, is a firearm as defined in this part upon receipt of a written request or form prescribed by" the agency). "[L]icensing . . . requirements," such as the Rule, "are afforded considerable deference in the vagueness analysis," in

part "because the regulated party may 'have the ability to clarify the meaning of the regulation[s] . . . by resort to an administrative process.'" *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122 (5th Cir. 1991) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests. Inc.*, 455 U.S. 489, 498 (1982)). The Rule provides Defense Distributed precisely such an opportunity by inviting requests for voluntary classifications as to whether a particular item is a "firearm" within the meaning of the GCA and its regulations. Indeed, ATF specifically notified Defense Distributed of the availability of this process and clarified that various items were not subject to the Rule. *See* Declaration of Jeremy S.B. Newman, Ex. 1 ("Newman Decl."), Appendix ("App.") 1-4. For a small number of remaining items, ATF offered to provide Defense Distributed with prompt classifications as to whether these few items were "firearms" within the Rule's ambit and requested a physical sample of the items for review. *Id.* But Defense Distributed refused to avail itself of the opportunity to resolve any uncertainty whether the Rule did or did not apply to these items. Equity does not act to remedy purported harm that is self-inflicted. *See Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) ("[A] party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted.") (quoting 11A Charles Alan Wright *et al.*, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2021)).

Even setting aside the fact that Defense Distributed's vagueness claim is predicated wholly on self-inflicted injury, it has not shown that it is likely to succeed on that claim. Defense Distributed misplaces its reliance on a single-Judge concurring opinion in the Fifth Circuit's now-reversed *VanDerStok* decision. *See* Mot. at 13. Had that opinion been persuasive to the Supreme Court, it could have upheld the Fifth Circuit's decision on the grounds articulated in that opinion, as Plaintiffs urged the Supreme Court to do. *See* Br. of Defense Distributed at 18-25, *Bondi v. VanDerStok*, No. 23-10718, 2024 WL 1098302, at *18-25 (Mar. 8, 2024). Although these vagueness arguments were clearly presented to the Supreme Court, it instead chose to reverse the Fifth Circuit.

Defense Distributed contends that the Rule is unconstitutionally vague for three reasons, none of which is persuasive. Mot. at 11-12. First, Plaintiffs incorrectly contend that the Rule is unconstitutionally vague in providing that a partially complete, disassembled, or nonfunctional frame or receiver is a firearm within the meaning of the GCA if it "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). But like countless other laws, this provision covering parts kits and frames and receivers that can readily be completed or made functional merely "call[s] for the application of a qualitative standard" to "real-world" facts. *Johnson v. United States*, 576 U.S. 591, 604 (2015).

"Readily" is a term and concept that Congress has used in a number of federal firearms laws, including the GCA itself.[1] Notably, Defense Distributed does not suggest that the GCA itself is unconstitutionally vague. To the contrary, courts have rejected vagueness challenges to the GCA's inclusion of products that "may readily be converted" into functional firearms. 18 U.S.C. § 921(a)(3)(A); *see, e.g.*, *United States v. Quiroz*, 449 F.2d 583, 585 (9th Cir. 1971); *United States v. 16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns*, 443 F.2d 463, 464 (2d Cir. 1971).[2] The

---

[1] *See, e.g.*, 18 U.S.C. § 921(a)(3)(A) (defining "firearm" to include "any weapon . . . which . . . may *readily be converted* to expel a projectile by the action of an explosive"); *see also* 26 U.S.C. § 5845(b) (defining "machinegun" as "any weapon which shoots, is designed to shoot, or can be *readily restored* to shoot, automatically…"); *id.* § 5845(c) (defining "rifle" as including any weapon within the prescribed definition "which may be *readily restored to fire* a fixed cartridge"); id. § 5845(d) (defining "shotgun" to include any weapon within the prescribed definition "which may be *readily restored to fire* a fixed shotgun shell"); *id.* § 5845(f) (defining "destructive device" to include "any combination of parts either designed or intended for use in converting any device into a destructive device . . . and from which a destructive device may be *readily assembled*"); *id.* § 5845(h) (defining "unserviceable firearm" to mean "a firearm which is incapable of discharging a shot by means of an explosive and incapable of being *readily restored* to a firing condition") (emphases added).

[2] *See also, e.g.*, *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 266 (2d Cir. 2015) (rejecting a void-for-vagueness challenge to the term "can be readily restored or converted" in New York and Connecticut statutes); *United States v. Kelly*, 276 F. App'x 261, 267 (4th Cir. 2007) (same, as to 26 U.S.C. § 5845(b), which includes the term "can be readily restored"); *United States v. Kent*, 175 F.3d 870, 874 (11th Cir. 1999) (same, as to 26 U.S.C. § 5861(d), as applied to an individual who possessed a short-barrel rifle that was disassembled at the time of his arrest but could be "readily restored to fire," *id.* §

Rule simply provides an uncontroversial definition of "readily" and lists the factors that courts have long used in applying that term in the firearms context—elaborations that provide *more* clarity about the Act's meaning, not less. Courts likewise have rejected vagueness challenges to the term "readily" in the context of criminal statutes other than the GCA and NFA. *See, e.g.*, *Phelps v. Budge*, 188 F. App'x 616, 619 (9th Cir. 2006) (rejecting vagueness challenge to the term "readily capable of causing substantial bodily harm or death," as used in a criminal statute); *United States v. Felsen*, 648 F.2d 681, 686-87 (10th Cir. 1981) (same, as to "readily attachable equipment items"); *Anderson v. Williams*, No. 2:10-CV-01916-KJD, 2011 WL 2580665, at *4 (D. Nev. June 27, 2011) (same, as to "readily identifiable vehicle").

Moreover, although the Fifth Circuit has not considered this precise question, it has rejected a void-for-vagueness challenge to the closely related statutory term "any combination of parts designed and intended for use in converting a weapon into a machine gun." *United States v. Campbell*, 427 F.2d 892, 893 (5th Cir. 1970) (per curiam). In determining whether a combination of parts was designed and intended for use in converting a weapon into a machine gun, a court would likely need to consider similar factors as the Rule prescribes for determining whether a non-functioning frame or receiver may be readily converted to function, such as the "time," "ease," "expertise," "equipment," "parts availability," "expense," "scope," and "feasibility" of the conversion. 27 C.F.R. § 478.11 (definition of "readily") (capitalization altered); *cf. Vill of Hoffman Ests.*, 455 U.S. at 500-01 (statutory term "designed . . . for use" calls for an inquiry into the product's "objective features").

---

5845(c)-(d)); *United States v. Drasen*, 845 F.2d 731, 737-38 (7th Cir. 1988) (same, as to the GCA's "statutory framework . . . as applied to parts kits"; *United States v. Wick*, No. CR 15-30-M-DLC, 2016 WL 10612608, at *3-4 (D. Mont. Mar. 11, 2016) (same, as to the term "can be readily restored" in the NFA); *United States v. M-K Specialties Model M-14 Machinegun*, 424 F. Supp. 2d 862, 872 (N.D. W. Va. 2006) (same).

Defense Distributed sidesteps the fact that the Rule has identified eight non-exhaustive factors relevant to the application of its "readily" standard. As common sense dictates and courts have confirmed, specifying factors relevant to application of a statutory or regulatory standard mitigates, rather than exacerbates, any vagueness concerns. *See, e.g.*, *Prime Healthcare Servs., Inc. v. Harris*, 216 F. Supp. 3d 1096, 1125 (S.D. Cal. 2016) (holding that a statute did not confer "boundless discretion" because it specified nine non-exhaustive factors to guide the ultimate "public interest" inquiry); *Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield*, 853 F. Supp. 2d 214, 235 (D. Conn. 2012) (holding that an ordinance was not void for vagueness in part because it set forth factors to consider in conducting the ultimate "appropriateness" inquiry, which, although "subjective in nature," were "sufficiently tied to objective . . . standards . . . to provide the required guidance . . . in enforcing the law"), *aff'd in relevant part, vacated in part, remanded sub nom. Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183 (2d Cir. 2014).[3]

The Due Process Clause does not require "perfect clarity and precise guidance." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989); *see also Sessions v. Dimaya*, 584 U.S. 148, 159 (2018) (reaffirming that "[m]any perfectly constitutional statutes use imprecise terms"). Accordingly, the Supreme Court

---

[3] Defense Distributed misplaces its reliance on *Tripoli Rocketry v. ATF*, 437 F.3d 75 (D.C. Cir. 2006), which did not involve a claim of constitutional vagueness but an APA arbitrary-and-capricious claim. In any event, the "fatal shortcoming" in *Tripoli Rocketry* was that the agency had "articulated no standard whatsoever" for its decision, *id.* at 81, 84, which is manifestly not the situation presented here. Nor, contrary to Defense Distributed, does *United States v. Lim*, 444 F.3d 910 (7th Cir. 2006), require that a law include "specific measurements" to avoid constitutional vagueness. Mot. at 11. *Lim* specifically noted that such precision is not required, citing *United States v. Powell*, 423 U.S. 87 (1975), which had upheld against a vagueness challenge a statute prohibiting the mailing of firearms "capable of being concealed on the person." *Lim*, 444 F.3d at 915-16 (citation omitted). *Powell* "acknowledged that Congress might have drafted the statute in more specific terms, as by delimiting the size of the firearms that could not be mailed," "[b]ut the fact that Congress could have employed clearer and more precise language equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted was unconstitutionally vague." *Lim*, 444 F.3d at 916 (citation omitted). So too here, the Rule did not require additional specificity, especially given the fact that "it is not unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take risk that he may cross the line." *Id.* (quoting *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952)).

and the Fifth Circuit have rejected vagueness challenges to criminal laws imposing standards as open-ended as: "near" a courthouse, *Cox v. Louisiana*, 379 U.S. 559, 568 (1965); "immoral purposes," *United States v. Clark*, 582 F.3d 607, 612 (5th Cir. 2009); "unreasonably low prices," *United States v. Nat'l Dairy Prod. Corp.*, 372 U.S. 29, 31-33 (1963); and "unreasonable noise," including noise "which, under the circumstances of time, place, and manner in which it is produced . . . annoys . . . a reasonable person of normal sensitivities," *Munn*, 763 F.3d at 438-39 (emphasis omitted). The Rule's "readily" standard is at least as precise with respect to the conduct that it proscribes as the standards upheld in *Cox*, *Clark*, *National Dairy Products Corp.*, and *Munn*.

Second, Defense Distributed contends that the Rule is impermissibly vague to the extent that its definition of "frame" and "receiver" excludes "a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." 27 C.F.R. § 478.12(c). But Defense Distributed does not contend that the classification of any of the six items that form the subject of its motion turns on whether these items are or are not an "unformed block of metal, liquid polymer, or other raw material" that has not yet reached a stage of manufacture whether it is identifiable as a frame or receiver. Absent such a contention, Defense Distributed has no standing to raise such a claim. This argument is thus irrelevant to Defense Distributed's as-applied vagueness claim.[4]

---

[4] In any event, this provision was included at the request of commenters in the firearms industry in order to provide the regulated community with greater clarity about parts that are not covered by the Rule, such as unfinished frame or receiver blanks. ATF explained that this exclusion makes clear that "[c]ompanies that sell or distribute only unfinished frame or receiver . . . blanks" of the sort typically purchased in bulk by commercial firearm manufacturers "are *not* required to be licensed or to mark those articles" with serial numbers. 87 Fed. Reg. 24,652, 24,700 (Apr. 26, 2022). Defense Distributed does not allege that it sells or distributes only such frame or receiver blanks typically purchased in bulk by commercial firearm manufacturers.

Third, Defense Distributed challenges as vague the Rule's provision that "[w]hen issuing a classification," ATF "may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit." *Id.* Contrary to Defense Distributed's claim, the plain language of this provision sufficiently describes "exactly what set of materials" are "relevant to this inquiry." Mot. at 12. When issuing a classification regarding an item or kit, ATF simply asks: When a seller sells this item or kit to a buyer, which materials are included? That is, does the item or kit as sold to the buyer include such items as jigs, molds, equipment, tools, instructions, guides, or marketing materials or not? The Rule thus provides "a person of ordinary intelligence [with] fair notice" of what ATF considers when making its classification. *Munn*, 763 F.3d at 439.

Defense Distributed's attempts to analogize the Rule to the residual clause of the Armed Career Criminal Act held unconstitutional in *Johnson v. United States*, 576 U.S. 591 (2015), are fundamentally misguided. The unique problem in *Johnson* was the assessment of whether a particular felony "involves conduct that presents a serious potential risk of physical injury to another"; that statutory provision "tie[d] the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." *Johnson*, 576 U.S. at 597. By contrast, analyzing whether an item may be readily converted to function as a firearm relies on real-world facts: *e.g.*, what tools are required, how much the conversion costs, how long it takes to complete the conversion. *Johnson* also invalidated this statutory provision after "[n]ine years' experience trying to derive meaning from the residual clause," "repeated failures to craft a principled and objective standard," and years of "pervasive disagreement" in courts of appeals about how to interpret the clause. *Id.* at 598-601. No such record of unworkability is presented here; in fact, courts have repeatedly recognized that the term "readily" as used in criminal statutes is not vague, as explained above. And *Johnson* cast no "doubt"

9

on "the constitutionality of laws that call for the application of a qualitative standard . . . to real-world conduct," as the Rule does, given that "the law is full of instances where a man's fate depends on his estimating rightly some matter of degree." *Id.* at 604 (citation and internal punctation omitted).

### B. Defense Distributed Is Not Likely to Succeed on Its Second Amendment Claim.

Defense Distributed has also failed to show that it is likely to succeed on its Second Amendment claim. Mot. at 14-18. The Second Amendment declares that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "'Like most rights,' however, "'the right secured by the Second Amendment is not unlimited.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022) (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). Where the government regulates the right to keep and bear arms, it bears the burden of showing that the challenged regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.* "Why and how the regulation burdens the right are central to this inquiry." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). That inquiry does not render constitutional only laws that mirror historical laws. *Bruen*, 597 U.S. at 30. Rather, courts will often have to "reason[] by analogy" to conduct the historical inquiry. *Id.* at 29. In so doing, the courts should consider "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition" by ascertaining "whether the new law is 'relevantly similar' to laws that the tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). The government is required only to "identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30 (emphasis in original).

*Heller* "made clear that 'nothing in [the Court's] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . or laws imposing conditions and qualifications on the commercial sale of arms.'" *McRorey v. Garland*, No. 7:23-CV-00047-O, 2023 WL 5200670, at *4 (N.D. Tex. Aug. 14, 2023) (quoting *Heller*, 554 U.S. at 626-27), *aff'd*, 99 F.4th 831 (5th Cir. 2024). "The Supreme Court emphasized that such regulations

10

are 'presumptively lawful.'" *Id.* (quoting *Heller*, 554 U.S. at 627 n.26); *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (similar); *McRorey*, 99 F.4th at 836 (observing that "*Bruen* did nothing to disturb" *Heller*'s description of "conditions and qualifications on the commercial sale of arms" as "presumptively lawful"); *Rahimi*, 602 U.S. at 699 (quoting *Heller*'s "presumptively lawful" language).

The provisions of the Rule challenged here only modestly impinge Second Amendment rights and are "consistent with the principles that underpin our regulatory tradition [of firearms]." *Rahimi*, 602 U.S. at 692. These provisions do not forbid the sale (or purchase) of any firearm, weapon parts kit, or other item. Nor do they impose any of the GCA's requirements on an individual making his or her own firearm. Instead, the Rule clarifies that those engaged in the manufacturing of certain items—like ready-to-assemble kits—are "firearms" and so must be sold in accordance with the GCA's licensing, recordkeeping, and background check requirements. Like the law upheld by the Fifth Circuit in *McRorey*, the background-check provision here ensures that sellers of weapon parts kits and firearm frames and receivers that are readily convertible to operable firearms "do not transfer" them to "individuals . . . bar[red] . . . from possessing a firearm." *McRorey*, 2023 WL 5200670, at *5; *see also McRorey*, 99 F.4th at 837 ("*Bruen* 'should not be interpreted to suggest the unconstitutionality of regimes, which often require applicants to undergo a background check' because such checks 'are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'") (quoting *Bruen*, 597 U.S. at 39 n.9) (internal punctuation omitted). And the Rule's licensing, recordkeeping, and serialization requirements for dealers and manufacturers "aim to assist law enforcement authorities in investigating serious crimes by permitting them to determine where, by whom, or when a firearm was manufactured and to whom it was sold or otherwise transferred." *VanDerStok*, 145 S. Ct. at 863 (citations and internal punctuation omitted). Any resulting burden on the purchasers of these firearms is minimal and no more than that imposed on purchasers of an already-assembled firearm.

11

The historical tradition of government regulation to ensure only law-abiding citizens acquire firearms dates back to pre-colonial English practice and extends through the colonial period and beyond the Founding. *United States v. Libertad*, 681 F. Supp. 3d 102, 114-15 (S.D.N.Y. 2023) (citing *Kanter v. Barr*, 919 F.3d 437, 457-58 (7th Cir. 2019) (Barrett, J., dissenting)). Various levels of government have long preserved the peace and welfare of the community by exercising sovereign power to regulate the commercial sale of products. *See* William J. Novak, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH CENTURY AMERICA 84 (1996), App. 6 ("[E]arly Americans understood the economy as simply another part of their well-regulated society, intertwined with public safety, morals, health, and welfare and subject to the same kinds of legal controls."). Firearms were no exception. "[C]olonial governments substantially controlled the firearms trade." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017); *see also id.* at 684 ("Neither of [Blackstone's or Tucker's] authoritative historic accounts states or implies that the English Bill of Rights encompassed an independent right to engage in firearms commerce."); *see generally Bruen*, 597 U.S. at 20 (noting significance of "American colonial views leading up to the founding").

The challenged licensing, recordkeeping, and serialization requirements are also consistent with historical regulation of firearms. At least two states in the early republic required gunbarrels to be proved and marked and prohibited the obliteration of the proof marks. In 1805, Massachusetts adopted a law for the appointment of "provers of fire arms" to "prove all musket barrels and pistol barrels" presented to them in exchange for a set fee. 3 LAWS OF THE COMMONWEALTH OF MASSACHUSETTS FROM NOVEMBER 28, 1780 TO FEBRUARY 28, 1807, at 259 (1807), App. 7. The law was adopted to prevent firearms from being "introduced into use which are unsafe, and thereby the lives of the citizens be exposed." *Id.* Under this law, the prover was required to "stamp" the barrel "within one and an half inches of the breech" with the prover's initials, the letters "P." and "M.," and the year—all in "letters and figures . . . so deeply impressed . . . as that the same cannot be erased or

disfigured." Id. at 260, App. 8. The act imposed a fine on any person who manufactured within the Commonwealth "any musket or pistol, without having the barrels proved and stamped as aforesaid." *Id.* It also imposed a fine on any person who "shall falsely forge or alter the stamp of any prover of firearms . . . impressed on any musket or pistol barrel." *Id.* at 261, App. 9.

Similarly, Maine in 1821 passed a law requiring the appointment of "suitable persons, to be provers of the barrels of all new, or unused firearms." 1 LAWS OF THE STATE OF MAINE 546 (1830), App. 10. Each prover was required (in exchange for compensation) to "prove and try the strength of the barrels of all firearms which shall be offered to him for that purpose, in such manner as to satisfy himself of the strength of the same," to "in a permanent manner, mark and number every barrel by him so proved," and to provide a certificate attesting to the proof. *Id.* The statute imposed a ten-dollar fine on any person who "shall sell or offer for sale within this State, any new, or unused musket, rifle or pistol barrel, without having the same first proved, marked and certified." *Id.* Additionally, it imposed a fine of "not more than one hundred dollars, nor less than twenty dollars," for any person who "shall falsely alter the stamp or mark or the certificate of any prover of firearms." *Id.*

Several states also had laws relating to the inspection and marking of gunpowder, which "was essential to the operation of firearms at that time." *Miller et al v. Bonta, et al.*, No. 3:19-cv-1537 (S.D. Cal. 2022) (Dkt. No. 137-3, at 22) (Declaration of Prof. Saul Cornell), App. 11; *cf. Bruen*, 597 U.S. at 58 (citing article co-authored by Cornell). In 1795, Pennsylvania enacted a law requiring gunpowder stored in the public magazine to be proved and marked and prohibiting importation, transfer, or sale of any gunpowder that was not appropriately marked. 3 LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED 240-44 (1810), App. 12-16. In 1809, Massachusetts required the inspection of all gunpowder manufactured in the commonwealth or stored in a public magazine, with the inspector marking each cask as either "Massachusetts Inspected Proof" or "Condemned" and adding his name and the year.

13

2 GENERAL LAWS OF MASSACHUSETTS FROM THE ADOPTION OF THE CONSTITUTION TO FEBRUARY 1822, at 199 (1823), App. 18. The law imposed a fine on any person who sold any condemned powder or "fraudulently alter[ed], or deface[d] any mark, or marks, placed by any inspector upon any cask or casks containing gunpowder." *Id.* New Hampshire adopted a very similar law in 1820. LAWS OF THE STATE OF NEW HAMPSHIRE; WITH THE CONSTITUTIONS OF THE UNITED STATES AND OF THE STATE PREFIXED 275-80 (Isaac Long Jr., 1830), App. 20-25.

Colonial and early state governments likewise prohibited the manufacture and transportation of gunpowder without a license. *See* COLONIAL LAWS OF MASSACHUSETTS REPRINTED FROM THE EDITION OF 1672, at 126 (1890) (1651 statute), App. 27 ("no person . . . shall transport any Gunpowder out of this Jurisdiction, without license first obtained from some two of the Magistrates"); 15 PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 191 (1890) (1775 statute), App. 29 (no "gunpowder made and manufactured . . . shall be exported out of the [Colony] without . . . license"); CHARTER AND ORDINANCES OF THE CITY OF PROVIDENCE, WITH THE GENERAL ASSEMBLY RELATING TO THE CITY 37 (1835) (1821 law) (prohibiting selling gunpowder within the town of Providence "without having a license therefor").[5]

The existence of these historical analogues demonstrates that the challenged provisions of the Rule are "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692 (citation omitted). The Rule's background-check, licensing, recordkeeping, and serialization requirements are "relevantly similar to laws that our tradition is understood to permit." *Id.* (citation omitted). The key question is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*,

---

[5] *Available at* https://firearmslaw.duke.edu/laws/the-charter-and-ordinances-of-the-city-of-providence-together-with-the-acts-of-the-general-assembly-relating-to-the-city-page-89-96-image-89-96-1854-available-at-the-making-of-modern-law-primary (last visited June 27, 2025).

597 U.S. at 29.  As explained above, the provisions challenged here impose at most a minimal "burden on the right of armed self-defense" because they merely require commercial sellers to abide by the same background-check, licensing, and recordkeeping requirements that every licensed firearm dealer complies with when selling firearms.  This minimal burden is no greater than those imposed by historical laws relating to the sale, marking, licensing, and inspection of firearms and gunpowder.

Defense Distributed has thus failed to show that it is likely to succeed on the merits of its Second Amendment claim.  Its arguments in support of that claim are also unpersuasive.  *See* Mot. at 14-18.  First, it is irrelevant whether or not there is a "historical tradition of regulating the self-manufacture of firearms."  *Id.* at 15.  Defense Distributed is not a natural person that can make items for its own use but is instead a "private business corporation," Def. Distributed Compl. ¶ 8, ECF No. 143, that sells commercial products.  It has not moved for injunctive relief prohibiting enforcement of the Rule with respect to the "self-manufacture of firearms for personal use" by any individual.  Mot. at 18.  Instead, it seeks an injunction preventing the enforcement of the Rule "against Defense Distributed vis-à-vis [certain] items" "*as sold by* Defense Distributed" on one of two named websites. *See id.* at 7, 8.  The Rule does not restrict in any way the "self-manufacture of firearms"—including weapon parts kits and unfinished frames and receivers readily convertible to firearms—by non-federal-firearms-licencees for personal use who are not prohibited by law from possessing them. Instead, it requires only that such items that are taken into inventory by licensed firearms dealers be serialized and recorded so that they may be traced by law enforcement if they are later involved in crime.  *See* 87 Fed. Reg. at 24,653, 24,742, 24,744.[6]  Second, Defense Distributed is mistaken in its

---

[6] To the extent that Defense Distributed's motion could be read as seeking to assert a constitutional claim on behalf of third parties, that claim is not likely to succeed because Defense Distributed has no standing to assert it.  *See United States v. Jubert*, __ F.4th __, 2025 WL 1577013, at *5 (5th Cir. June 4, 2025) ("Litigants rarely have Article III standing to challenge laws merely because they may conceivably be applied unconstitutionally to others.") (citation omitted).

assertion that the United States has no "historical tradition of regulating firearm parts." Mot. at 18. As shown above, colonial and early state governments passed laws imposing inspection, marking, and licensing requirements on specific firearms components: namely, gunbarrels and gunpowder.[7]

### C. Although the Supreme Court's *VanDerStok* Decision Did Not Adjudicate Constitutional Issues, the Decision Remains Instructive in Adjudicating Defense Distributed's Motion.

To the extent that Defense Distributed states that the Supreme Court's *VanDerStok* decision did not directly address constitutional challenges to the Rule, Defendants agree. *See* Mot. at 9-10. However, Defense Distributed errs in contending that the Supreme Court's decision "does not govern the preliminary injunction inquiry for any of the items [its] motion puts at issue." *Id.* at 9. As explained below, the Supreme Court's discussion of the purpose of the GCA and the dangers to law enforcement presented by ghost guns are highly relevant to the Court's balancing of the equities. Furthermore, Defense Distributed cannot evade the fact that the Supreme Court specifically held that the "partially complete frame that Polymer80 sells" is "a firearm 'frame'" that falls within the Rule's purview. *VanDerStok*, 145 S. Ct. at 873. As the Supreme Court pointedly remarked: "What else would you call it?" *Id.* The fact that the Supreme Court specifically held that the Rule is enforceable as to this particular frame is manifestly relevant to this Court's analysis.

Additionally, Defense Distributed expressly raised the same Second and Fifth Amendment arguments during the Supreme Court merits briefing in *VanDerStok*. *See* Br. of Defense Distributed at 18-25, *Bondi v. VanDerStok*, No. 23-852, 2024 WL 1098302, at *18-25 (Mar. 8, 2024); *see also* Petitioner's Reply Br. at 20-22, *Bondi v. VanDerStok*, No. 23-852, 2024 WL 4183989, at *20-22 (Sept.

---

[7] To be clear, ATF generally does not regulate individual firearm parts, with the exception of frames and receivers, and parts of machineguns and silencers. That remains true under the Rule. *See* *Vanderstok*, 145 S. Ct. at 870 (rejecting argument that "because Congress has spoken elsewhere to collections of firearm parts . . . we should infer [section 921(a)(3)(A)] does not address parts or kits containing any combinations of them" and recognizing "ATF itself acknowledges that subsection (A) does not allow it to regulate 'standalone triggers, barrels, stocks, or magazines'").

12, 2024). Yet the entire premise of Defense Distributed's motion is that the Supreme Court somehow ignored these arguments and overlooked these purported constitutional problems when it twice issued stays of this Court's orders, then granted certiorari, and issued a merits decision upholding the Rule against an APA challenge. Indeed, Defense Distributed's argument tacitly assumes that the Supreme Court upheld the Rule while failing to notice that it was so unconstitutional as to require the extraordinary remedy of a preliminary injunction. Such a dubious notion warrants no credence.

## II.    Defense Distributed Fails to Substantiate an Imminent Threat of Irreparable Injury.

Defense Distributed "bears 'the burden of establishing each element'" of the preliminary injunction standard, including irreparable harm. *Humana Ins. Co. v. Tenet Health Sys.*, No. 3:16-CV-2919-B, 2016 WL 6893629, at *11 (N.D. Tex. Nov. 21, 2016) (quoting *Janvey v. Alguire*, 647 F.3d 585, 591, 595 (5th Cir. 2011)). "[A]ny irreparable harm must be imminent for a preliminary injunction to issue." *Mueller Supply Co. v. JNL Steel Components, Inc.*, No. 6:21-CV-036-H, 2022 WL 1199212, at *15 (N.D. Tex. Mar. 8, 2022). "Speculative injury is not sufficient" for a preliminary injunction. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

Defense Distributed fails to meet its burden to substantiate that the Rule it challenges in this case is causing or will imminently cause irreparable injury. First, as to the so-called "G80 items," *see* Mot. at 8 (listing these items), any threat is speculative and hypothetical, because ATF has not determined whether such products are firearms under the Rule and has offered to classify them on an expedited basis if Defense Distributed sends samples of those products. After the Supreme Court's decision in *VanDerStok*, Defense Distributed's counsel contacted Defendants' counsel to inquire as to whether ATF considered various products sold by Defense Distributed to be firearms under the GCA and the Rule. Defendants worked earnestly to address Defense Distributed's concerns. Newman Decl. ¶ 2, App. 1. On June 3, 2025, less than a month after Defense Distributed initially reached out, Defendants' counsel sent Defense Distributed's counsel a letter addressing ATF's

position on various products sold by Defense Distributed.  *See id.* ex. 1.  That letter listed sixteen products sold by Defense Distributed and concluded:  "ATF has determined that these items do not fall within the scope of the rule.  Accordingly, neither ATF nor any of the other defendants in the above-listed case will enforce the rule against Defense Distributed with respect to any of the listed items during the pendency of the above-referenced case."  *Id.* at 2.  That letter further stated that as to the G80 items, "ATF has agreed that if Defense Distributed provides ATF with a sample of the following items sold by Defense Distributed (including all materials sold with the respective items), ATF will expedite its review of these items and provide an expedited informal classification whether the items fall within the scope of the rule."  *Id.*

Following that letter, Defense Distributed did not accept Defendants' invitation to send samples of the G80 items for expedited classification.  Instead, Defense Distributed's counsel asked for clarification regarding the letter.  In response, Defendants' counsel informed Defense Distributed that "ATF has not made a determination regarding whether or not they are firearms under the Rule, and ATF is not currently engaged in any enforcement against Defense Distributed as to those products."  Decl. of Cody Wilson at 4 (June 6, 2025), ECF No. 294-2.  Further, "ATF stands ready to classify those products on an expedited basis if and when Defense Distributed submits samples to ATF for classification," but "since Defense Distributed has, at least up to this point, elected not to submit samples for classification," ATF has not been able to "provide assurances as to its future treatment of those products."  *Id.*

Accordingly, any harm from enforcement of the Rule as to the G80 items is "[s]peculative," *Holland Am. Ins. Co.*, 777 F.2d at 997, and not "imminent," *Mueller Supply Co.*, 2022 WL 1199212, at *15.  And to the extent that Defense Distributed claims to be harmed by uncertainty over the regulatory treatment of the G80 items, any such harm stems from Defense Distributed's decision not

to submit samples for expedited classification. Such harm is "self-inflicted" and therefore "do[es] not count" as irreparable harm. *Texas*, 10 F.4th at 558.

Second, Defense Distributed cannot show that the Rule causes them any harm with respect to the Polymer80 80% Frame and two other partially complete frames that are materially indistinguishable from the Polymer80 80% Frame. *See* Mot. at 7 (listing and displaying images of these items). To the extent any such harm exists, it is caused not by the Rule challenged in this lawsuit but by the GCA, which defines "firearm" in a way so as to include these items. In *VanDerStok*, the Supreme Court held that the Polymer80 80% Frame is a "frame" under 18 U.S.C. § 921(a)(3)(B), and therefore is also a "firearm" under 18 U.S.C. § 921(a)(3). *See VanDerStok*, 145 S. Ct. at 872-74. The Supreme Court deemed it clear from examining side-by-side photographs of a complete frame and the Polymer80 80% frame that the latter product was "a firearm 'frame,' even though a little work is required to complete it," remarking: "Just look again at the second photo [of the Polymer80 80% Frame]. What else would you call it?" *Id.* at 873. That analysis applies equally to the M1911 80% Frame:45ACP and the M191180% Frame:9mm/10mm/.38 Super/.40 S&W, which are materially indistinguishable from the Polymer80 80% Frame. *See* Mot. at 7; *see also VanDerStok*, 145 S. Ct. at 874 (holding that "a product like Polymer80's qualifies as a 'frame'").

Any harm that Defense Distributed purportedly suffers based on the treatment of these products as firearms is not caused by the Rule, but rather is caused by Congress's enactment of the GCA and the Supreme Court's definitive construction of the GCA in *VanDerStok*. ATF is bound by the Supreme Court's ruling. It can disregard neither the statute nor the Supreme Court's construction of the statute. "[C]ourts decide legal questions by applying their own judgment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024). The GCA means what it means, and as to "a product like Polymer80's [80% Frame]," the Supreme Court has spoken: it "qualifies as a 'frame'" under the GCA.

19

*VanDerStok*, 145 S. Ct. at 874.  To the extent Defense Distributed claims it is harmed by that application of the GCA, that harm is caused by the statute itself, not ATF's Rule.

Defense Distributed's arguments that it is suffering irreparable harm are meritless.  Defense Distributed argues that it necessarily suffers irreparable harm based on the violation of its constitutional rights.  *See* Mot. at 18-19.  That argument fails because, as shown above, *see supra* at I, Defense Distributed's constitutional claims lack merit.  In any event, "[c]onstitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 203 (3d Cir. 2024) (Bibas, J.) (quoting *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989)).[8]

Defense Distributed next argues that the Rule is causing it irreparable economic harm.  Even though economic harm ordinarily does not qualify as irreparable harm, Defense Distributed argues that it will suffer economic harm "so great as to threat the existence of [its] business."  Mot. at 19 (quoting *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989)).  Notably, Defense Distributed raised these same arguments of irreparable economic harm in twice opposing emergency relief from the Supreme Court.  *See* Br. in Opp'n of Defense Distributed *et al.*, No. 23A82, 2023 WL 5112206, at *15-16 (U.S. Aug. 2, 2023) (arguing that "the Rule's enforcement inflicts such severe economic harm on Defense Distributed as to threaten its existence," and "Defense Distributed's economic harms are also irreparable because Defense Distributed cannot later recover its losses as monetary damages"); Br. in Opp'n of Defense Distributed, No. 23A302, 2023 WL 6787247, at *16-17 (U.S. Oct. 11, 2023) (similar).  Yet the Supreme Court twice rejected these

---

[8] Defense Distributed cites a Fifth Circuit case holding that the threatened constitutional harms for the particular plaintiffs in that case—violations of the liberty interest in avoiding unwanted medical treatment and the right to free exercise of religion—qualified as irreparable harm.  *See BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).  But the Fifth Circuit did not hold that any alleged violation of constitutional rights always constituted irreparable harm.

arguments and granted emergency relief to the government to allow the Rule to remain in force against Defense Distributed while the litigation advanced. *See Garland v. VanDerStok*, 144 S. Ct. 44 (2023); *Garland v. Blackhawk Mfg. Grp., Inc.*, 144 S. Ct. 338 (2023). This Court should follow the Supreme Court's lead.

Despite the Rule being in force since October 2023 as a result of the Supreme Court's rulings, Defense Distributed remains in business. That is unsurprising, as when the Rule was first promulgated, Defense Distributed enthusiastically embraced the Rule as a boon to its business because it focuses on products that are not covered by the Rule. As Defense Distributed's co-founder and leader explained to the media, the Rule would "drive out [Defense Distributed's] competitors" and "giv[e] us . . . a monopoly of the market," ReasonTV, *Cody Wilson Thwarts Another Attempt to Stop Ghost Guns*, YouTube (Jan. 12, 2022), https://www.youtube.com/watch?v=bZRugDpYBuc (2:31, 2:41), and "caused a surge in demand" for Defense Distributed's products, TMGN, *Biden's Ghost Gun Rule is Dead on Arrival Thanks to the 0% Receiver*, (Apr. 12, 2022), https://themachinegunnest.com/bidens-ghost-gun-rule-is-dead-on-arrival-thanks-to-the-0-receiver/. And ATF has now confirmed that many of Defense Distributed's products are not encompassed by the Rule. *See* Newman Decl., Ex. 1, at 1, App. 3. The Court should not credit Defense Distributed's unsupported assertion that the Rule threatens the existence of its business.

Defense Distributed also asserts that it will suffer irreparable harm in the form of unrecoverable compliance costs. *See* Mot. at 19. But Defense Distributed fails to substantiate these costs. Furthermore, as to the G80 items, Defense Distributed may submit these products for expedited classification, and if ATF concludes that the items are not firearms under the Rule, Defense Distributed need not incur any compliance costs. And as to the Polymer80 80% Frame and similar products, any costs Defense Distributed might incur from treating those products as firearms stems

not from the Rule but from Congress's enactment of a statute that defines firearms to include those products, as recently confirmed by the Supreme Court.

## III.    The Balance of the Equities Weighs in Favor of the Rule's Interim Enforcement.

The Supreme Court twice stayed the judgment of this Court and the Fifth Circuit invalidating the Rule, and held that the Rule should remain in effect pending its merits review.  It could not have entered those stays without determining that the government faced irreparable harm if the Rule could not be enforced, and that the balance of the equities favored the Rule's remaining in effect.  *See Nken v. Holder*, 556 U.S. 418, 426 (2009) (stay applicant must show, *inter alia*, that it "will be irreparably injured absent a stay," that a stay will not "substantially injure the other parties interested in the proceeding," and that "the public interest" favors a stay).  The Supreme Court's entry of a stay (twice) confirms that the balance of the equities strongly weighs in favor of the Rule's interim enforcement pending this Court's review of the parties' remaining merits arguments.

The government and the public will suffer irreparable injury if the Rule does not remain in effect.  As the Supreme Court explained, "[t]oday, companies are able to make and sell weapon parts kits that individuals can assemble into functional firearms in their own homes," and "[s]ales of these kits have grown exponentially."  *VanDerStok*, 145 S. Ct. at 863 (citation omitted).  However, "[s]ome manufacturers and dealers" (like Defense Distributed) "take the position that weapon parts kits do not qualify as 'firearms' subject to the GCA" and that "they are free to sell their products without obtaining a federal license, conducting background checks, maintaining sales records, or marking components with serial numbers."  *Id.*  As a result, "criminals . . . find [these kits] attractive" and "[p]olice departments around the Nation have confronted an explosion of crimes involving these ghost guns."  *Id.* (citation omitted).  "In 2017, law-enforcement agencies submitted about 1,600 ghost guns to the federal government for tracing" but "[b]y 2021, that number jumped to more than 19,000."

22

*Id.* at 863-64 (citation omitted).  "Efforts to trace the ownership of these weapons . . . have proven almost entirely futile."  *Id.* at 864 (citation omitted).

The Rule is "designed to combat the proliferation of ghost guns."  *Id.*  The Rule reaffirms that commercial sellers of weapon parts kits and firearm frames and receivers that are readily converted to be functional firearms must honor the GCA's background-check, licensing, recordkeeping, and serialization requirements.  "The background-check requirement seeks to keep guns out of the hands of criminals."  *Id.* at 863 (citation omitted).  "The licensing, recordkeeping, and serialization requirements, meanwhile, aim to assist law enforcement authorities in investigating serious crimes by permitting them to determine where, by whom, or when a firearm was manufactured and to whom it was sold or otherwise transferred."  *Id.* (citation omitted).  "Today, thousands of law-enforcement agencies nationwide depend on the Act's tracing system to link firearms involved in crimes to their owners."  *Id.* (citation omitted).

In short, the Rule's continued enforcement enables law enforcement to better trace firearms used in crimes and helps to ensure that those firearms do not end up in the hands of individuals prohibited from possessing firearms—such as felons—in the first place.  Just as the GCA supplemented "[e]xisting gun control measures" that "allowed criminals to acquire largely untraceable guns too easily" by, for example, allowing them to "evade state laws regulating in-person sales simply by purchasing guns through the mail," *id.* at 862,  the Rule similarly aims to prevent the circumvention of the GCA's mandates through the sale of weapon parts kits and firearm frames and receivers that may readily be converted into firearms.

By contrast to the irreparable harm that the government and the public will suffer if the Rule is prevented from being enforced, Defense Distributed will experience only minimal, if any, injury.  As noted above, the provisions of the Rule challenged by Defense Distributed do not prohibit it from selling any firearm, any weapons part kit, or any other item.  Instead, the Rule simply clarifies that

certain items—like ready-to-assemble kits—are "firearms" and so must be sold in accordance with the GCA's licensing, recordkeeping, and background check requirements.

These requirements are not especially onerous. Tens of thousands of federally licensed firearms manufacturers and dealers around the country manage to bear the costs associated with those requirements when producing and selling firearms. And of course, many more firearms owners similarly bear the minor costs associated with statutory compliance when they purchase firearms from federal firearms licensees. Such incidental costs to Defense Distributed do not outweigh the substantial harm to the government and the public if the Rule is prevented from being enforced, as the Supreme Court necessarily recognized in twice granting stays to allow the Rule to remain in effect.

Defense Distributed is not credible in claiming that absent emergency relief, it faces "potential business dissolution" or that "the company's survival" is "threaten[ed]." Mot. at 20. Notably, Defense Distributed previously represented that "[w]ithout injunctive relief, the new Final Rule will likely force Defense Distributed to . . . dissolve before any of the lawsuits challenging the new Final Rule yield a final judgment" and that "[t]he new Final Rule will destroy Defense Distributed, soon, unless the government is enjoined from enforcing the new Final Rule against it and its customers." Decl. of Cody Wilson ¶ 15 (Jan. 12, 2023), ECF No. 166-1. Yet despite the fact that the Rule has been in full effect since October 2023, Defense Distributed remains in business. Given the failure of Defense Distributed's past predictions, the Court should afford no weight to its present representations about the Rule's purported effect.

Nor is Defense Distributed persuasive in contending that entry of emergency injunctive relief is necessary to "[m]aintain the status quo." Mot. at 20. The status quo—endorsed by the Supreme Court—is that the Rule may be enforced. Moreover, the Supreme Court's decision belies Defense Distributed's contention that preventing the Rule from being enforced would "return[] the law's 'firearm' definition to what it had been for decades." *Id. VanDerStok* recognized that although the

Rule "seeks to regulate a greater variety of unfinished frames and receivers than the agency has in the past," nevertheless, "for decades, the agency has consistently interpreted [the GCA] to reach some unfinished frames and receivers, including ones no more finished than Polymer80's product." 145 S. Ct. at 873-74 (citation omitted); *see also id.* at 874 n.5 (the Rule "reflects the agency's consistent understanding that [the GCA] reaches some incomplete 'frames or receivers'"). And because Defense Distributed has not shown that it is likely to succeed on the merits of its constitutional claims, *see supra* at I, entering preliminary injunctive relief in its favor would disserve the public interest.

## IV.    If the Court Were to Issue a Preliminary Injunction, It Should Require a Bond.

Defendants have shown that Defense Distributed is not entitled to relief. However, if the Court were to enter a preliminary injunction, then it should order Defense Distributed to provide security. Under the Federal Rules of Civil Procedure, the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court were to issue a preliminary injunction here, the Court should require Defense Distributed to post an appropriate bond commensurate with the scope of any restraint. *See Ass'n of Professional Ball Players of Am. v. Madison*, No. 4:23-cv-01037-O, 2024 WL 102946, at *5 n.18 (N.D. Tex. Jan. 9, 2024) (court may order security in an "amount" it deems "appropriate").

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Defense Distributed's Motion for Preliminary Injunction.

DATED: June 27, 2025                                    Respectfully submitted,


                                                        BRETT A. SHUMATE
                                                        Assistant Attorney General, Civil Division

                                                        ALEXANDER K. HAAS
                                                        Director, Federal Programs Branch

ANDREW I. WARDEN
Assistant Director, Federal Programs Branch

*/s/ Daniel Riess*
DANIEL RIESS
JEREMY S.B. NEWMAN
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 353-3098
Email:  Daniel.Riess@usdoj.gov
*Attorneys for Defendants*


## CERTIFICATE OF SERVICE

On June 27, 2025, I electronically submitted the foregoing document with the clerk of court

for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the

court.  I hereby certify that I have served all parties electronically or by another manner authorized by

Federal Rule of Civil Procedure 5(b)(2).

*/s/ Daniel Riess*