UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED, | § | |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 4:22-cv-00691-O |
| PAMELA BONDI in her Official Capacity | § | |
| as Attorney General of the United States, *et* | § | |
| *al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**Defense Distributed's Reply in Support of
Defense Distributed's Motion for a Preliminary Injunction**

Table of Contents

Reply ................................................................................................................................... 3

I.     Defense Distributed will win on the merits. ............................................................... 4

       A.     The Rule violates the Due Process Clause. ................................................... 4

              1.     No one knows what the Rule covers. ................................................. 4

              2.     The classification process does not cure the violation. ...................... 5

              3.     There are no other procedural blocks. ................................................ 7

       B.     The Rule violates the Second Amendment. ................................................... 8

              1.     *Bruen* requires the step-two test of history and tradition. ................... 8

              2.     The Rule has no relevantly similar analogs. ...................................... 9

              3.     The American freedom to self-manufacture Arms is sacrosanct. ..... 11

       C.     The harms are ATF-inflicted, not self-inflicted. .......................................... 11

       D.     The statute's constitutionality is not at issue and need not be. ................... 12

II.    The other factors support an injunction. .................................................................. 12

Conclusion ......................................................................................................................... 12

Certificate of Service ........................................................................................................ 13

## Reply

Defense Distributed's Due Process Clause claim will succeed because no one can say *in advance* what this dangerously vague Rule covers—not the Supreme Court, not ATF, and most importantly, not Defense Distributed and the rest of the regulated public. *Bondi v. VanDerStok*, 145 S. Ct. 857 (2025), failed to conjure meaningful guidance. Falling back to "I know it when I see it," *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring), the Court classified only a Polymer80 kit and could not divine any cogent boundaries. Just as critically, ATF too cannot say *in advance* what the Rule covers. It cannot classify Defense Distributed's G80 products *without first receiving samples,* despite being given full specifications, open-source 3D models, and everything else a consumer would know. Due process requires clear boundaries for everyone *ex ante*. Yet the Rule yields only *post hoc* trials by an arbitrary ATF letter process. Judge Oldham's analysis of the Due Process Clause claim is correct, largely unanswered, and should be adopted.

Defense Distributed's Second Amendment claim will succeed because the Constitution has no "modest impingement" proviso. In a stunning reversal, ATF for the first time posits that the "provisions of the Rule challenged here *only modestly impinge Second Amendment rights.*" Doc. 297 at 18 (emphasis added) (hereinafter "ATF Br."). This critical concession occurs after ATF had maintained that the Rule implicated no Second Amendment rights, *e.g.*, Doc. 159 at 22, just long enough to ward off a constitutional-avoidance loss at the Supreme Court. Now that the tides have turned, ATF admits that the Rule "impinge[s] Second Amendment rights," ATF Br. at 18, while somehow still defending it. But of course, the fundamental rights that absolutely "shall not be infringed," U.S. Const. amend. II, also cannot be impinged—modestly or otherwise. This plus a landslide *Bruen* step-two analysis—American founders deemed the freedom to self-manufacture Arms with acquired parts sacrosanct—ensures the Second Amendment claim's success.

3

I.     **Defense Distributed will win on the merits.**

The Court should approach both constitutional claims on a clean slate because no court has adjudicated them. *Contra* ATF Br. at 22-23. The Supreme Court neared these issues only when refusing constitutional avoidance, which it accomplished with a one-paragraph holding resting solely on statutory conclusions. *Bondi v. VanDerStok*, 145 S. Ct. 857 (2025). It did not even once utter "Second Amendment" or "Due Process Clause," let alone render a holding about either.

A.     **The Rule violates the Due Process Clause.**

First, the Rule violates the vagueness doctrine because three provisions deny fair notice of what is punishable and invite arbitrary enforcement. DD Br. at 6, 10-13 (hereinafter DD Br.). The controlling rules from both *Johnson v. United States*, 576 U.S. 591 (2015), and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), were correctly applied by Judge Oldham's concurrence, which rightly rejects virtually every argument that ATF's latest brief has recycled.

1.     **No one knows what the Rule covers.**

The Rule's foremost vagueness danger stems from the "readily" provision, which defines "frame" and "receiver" to include a "partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." DD Br. at 11 (quoting 27 C.F.R. § 478.12(c)). Given that ATF's "readily" test has only "vacuous metrics" and not any "[o]bjectified, specific measurements," the "rule does not say, and no reasonable person can reliably infer, what point of evolution a piece of metal or plastic crosses the 'readily' barrier to become a 'frame or receiver.'" *Id.* As in *Johnson,* it ties criminality to the traits of an imagined "ordinary case" of self-manufacturing (time, equipment, effort, etc.) that is untied to real-world facts or statutory elements. *Id.* The "readily" construct no one really understands is too vague.

4

*United States v. Campbell*, 427 F.2d 892 (5th Cir. 1970) (cited by ATF Br. at 12), should not be followed, as even ATF concedes that it did not consider the question presented here. ATF Br. at 13. Nor should the Court follow ATF's old and out-of-circuit decisions, ATF Br. at 12-13 & n.2, because this "mishmash of GCA-NFA precedents" does not legitimize what the Rule does. *VanDerStok v. Garland*, 86 F.4th 179, 200-209 (5th Cir. 2023) (Oldham, J., concurring).

Next, ATF is wrong to deny (at 15) Defense Distributed's standing to assert the Rule's second source of vagueness—the definitional provision about "clearly identifiable" frame and receiver predecessors. The predecessor parts presented by the motion, DD Br. at 11-12, fall squarely within this provision's ambit—or at least arguably do—giving Defense Distributed a perfectly concrete and particularized stake in whether ATF can cover them with the Rule.

More complex legal tests aren't always clearer. Less is often more. *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534 (2022) (the demise of *Lemon*). So as to the Rule's third vagueness source, *see* DD Br. at 12, even if it successfully details *what* coverage factors ATF reviews (the kitchen sink, basically), no one can tell *how* the new factors work together. *Contra* ATF BR. at 16. By adding more *unpredictable* considerations to an already vague definition, the Due Process violation is exacerbated precisely as Judge Oldham explains. ATF has no answer to this.

**2.      The classification process does not cure the violation.**

ATF's voluntary classification process does not cure the Due Process violation. Primarily, this is because such a process can impact only the doctrine's demand for sufficient notice *to the citizenry*—not its separate demand for *bounding the regulating administrators*, which is enough on its own to show a constitutional violation and warrant relief. Defense Distributed made this point in the first brief by quoting Judge Oldham's opinion. DD Br. at 13. ATF has no answer.

5

Second, and alternatively, even if notice to the citizenry were all that the doctrine cared about, ATF's voluntary classification process does not cure the violation because it is optional on both sides. The Rule admits this: "There is no statutory requirement for a person to submit such requests and likewise no requirement for ATF to act upon any such requests." 87 Fed. Reg. 24652, 24710. The Director "may issue a determination"—not "shall." 27 CFR § 479.102(c).

Third (additionally and alternatively), the process is too hyperspecific. It pertains only to the submitted "item" when submitted and means nothing if there is a change of "configuration," "accessories," "attachments," or "marketing materials." *Id.* "Except for the classification of a specific component as the frame or receiver of a particular weapon, a determination made by the Director under this paragraph shall not be deemed by any person to be applicable to or authoritative with respect to any other sample, design, model, or configuration." *Id.*

Fourth (additionally and alternatively), ATF's voluntary classification process is incoherent. Instead of treating similar items consistently, it treats them contradictorily. *See* DD Br. at 13. "Why does ATF now posit that the Rule covers 80% pistol frames *but not 80% rifle lowers*?" *Id.* (Document 298 at 5 is ATF deeming 80% rifle lowers *not* covered). "No one knows, and this incoherence demonstrates the Rule's lack of clear standards, forcing Defense Distributed to guess at compliance while facing criminal liability." *Id.* ATF never answers this key point.

Fifth (additionally and alternatively), the nature of the enactment is wrong. While it is true that the Court's vagueness inquiry sometimes gives special leeway to enactments that come with classification processes, it does so only when the enactment addresses the economic interests of businesses. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (cited by ATF Br. at 11); *accord United States v. Clinical Leasing Services, Inc.*, 925 F.2d 120, 122 (5th Cir.

1991) (cited by ATF Br. at 11). The Rule gets no such leeway because it addresses fundamental liberties (not just economic interests) and all people (not just businesses). *Id.*

Sixth (still additionally and alternatively), ATF's voluntary classification process does not cure the Due Process violation because a classification process can never serve as a standalone solution. *See, e.g.*, *Clinical Leasing Services, Inc.*, 925 F.2d at 122 (cited by ATF Br. at 11). Even if the classification process is one small point in ATF's favor, two more impactful factors go heavily against it: the civil vs. criminal distinction and the threatened inhibition of constitutional rights. See *Vill. of Hoffman Estates*, 455 U.S. at 498.

For these reasons, the availability of ATF's voluntary classification process does not make Defense Distributed's injuries "self-inflicted." (For the same reasons as well, ATF is wrong to say (at 18) that this process's existence makes the injuries at issue insufficiently "imminent."). The process's indeterminacy does not attenuate or postpone the harm. The indeterminacy *is* the harm.

### 3. There are no other procedural blocks.

Defense Distributed will succeed in showing that the Rule violates the Due Process Clause *both* as-applied to Defense Distributed *and* facially. The Court therefore need not decide whether or how to apply the rubric of "facial" versus "as-applied" challenges.[1]

Procedurally, both are at issue. The operative pleading and motion present the claim without limitation, seeking both facial and as-applied success. *See* Doc. 143 at 25-27; Doc. 293-294. Substantively, both are meritorious. The arguments above show the violation as applied to Defense Distributed. Those same points drive the conclusion about facial invalidity.

---

[1] *Bondi v. VanDerStok*, 145 S. Ct. 857 (2025), opted to apply *Salerno*'s "facial" rubric because of how that particular statutory-contradiction claim had been briefed. *Id.* But the Court did not decide whether that rubric would apply otherwise (with different briefing or as to different claims). *Id.*

Pre-enforcement facial vagueness challenges are allowed to address the Due Process Clause's concern for a rule's "arbitrary and discriminatory enforcement," *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. D.C.*, 846 F.3d 391, 410 (D.C. Cir. 2017), and also when a rule chills constitutionally-protected conduct, *Dana's R.R. Supply v. Attorney Gen., Florida*, 807 F.3d 1235, 1241 (11th Cir. 2015). Defense Distributed's claim implicates both. ATF's schizophrenic classification of similar items (e.g., 80% pistol frames are covered, *but 80% rifle lowers* aren't) manifests the concern for arbitrary and discriminatory enforcement. As for chilling constitutionally-protected conduct, ATF has now conceded that the challenged Rule provisions "impinge Second Amendment rights." ATF Br. at 18. All of that warrants this facial challenge.

### B. The Rule violates the Second Amendment.

#### 1. *Bruen* requires the step-two test of history and tradition.

Recent briefs filed by the United States support the legality of Defense Distributed's Second Amendment claims. Specifically, the United States in recent briefs now agrees that the Second Amendment protects both the rights that it expressly covers *and* "those closely related acts necessary to their exercise"—*i.e.*, "'important corollar[ies]' of the core right to possess arms for self-defense and other lawful reasons." Brief for the United States as *Amicus Curiae*, *Barnett v. Raoul*, Nos. 24-3060, 24-3061, 24-3062, 24-3063 (7th Cir.) (June 13, 2025) (attached as Appendix A). Those newly-recognized corollary Second Amendment rights include at least the following:

- A right to "purchase" Arms
- A right to "keep [Arms] in repair" and "in a state of efficiency for use"
- A right to "purchase" and "possess" "ammunition suitable for such arms"
- A right to "provide ammunition suitable for such arms"
- A right to "maintain proficiency in firearm use."
- A right to "any firearm attachments (not just magazines) that are in common use by law-abiding citizens for lawful reasons," including "magazines," and "suppressors."

8

*Id.* A new Fifth Circuit brief accords. Gov'ts Supp. Resp. to Pet. for Reh'g En Banc, *United States v. Peterson*, No. 24-30043 (5th Cir.) (en banc) (May 23, 2025) (attached as Appendix B).

By adopting this paradigm, the United States has conceded that the Second Amendment upholds a right to self-manufacture Arms (and their "attachments") entailing the "possession," "purchase," and "provision" of gunsmithing parts and kits at the component level. Insofar as ATF's instant brief says otherwise, the Court should reject it in favor of the position espoused by both Defense Distributed, DD Br. at 14-18, and the more apt briefs quoted above.

Of course a rule that criminalizes part sales implicates both the right to sell the parts *and* the core Second Amendment right it helps compose. *See Hanson v. D.C.*, 120 F.4th 223, 232 (D.C. Cir. 2024) ("component level" regulations implicate the Second Amendment). *Hanson* is correct and the government's new Seventh Circuit brief expressly agrees (at 26) by quoting it. For ATF's instant brief (at 18) to take the opposition position is yet another incorrect and arbitrary reversal.

In this action, Defense Distributed can and does advance the complete panoply of Second Amendment rights concerning private Arms self-manufacturing. *Contra* ATF Br. at 22-23. To do so, Defense Distributed can assert both the constitutional interests of its customers, *see, e.g.*, *Gazzola v. Hochul*, 88 F.4th 186, 194 (2d Cir. 2023), and its own Second Amendment right to "provide" the corollaries that are "necessary to their exercise," *see supra* Part I.C.1.

### 2. The Rule has no relevantly similar analogs.

At *Bruen*'s step two, ATF offers no historical tradition of any regulations like the Rule. The founders never tried to stop people from *having* guns by regulating the *making* of guns with gun *part* proscriptions. On the contrary, from the colonial era through the 19th century, Americans enjoyed an unfettered right to self-manufacture arms with acquired parts. *See* DD Br. at 15-18.

9

Never has the American legal tradition conflated *personal* gun *making* with *public* gun *selling*. The distinction was born well before the founding and remains material today. DD Br. at 15-18. Because of this, ATF does not carry its burden by invoking a "tradition of government regulation to ensure only law-abiding citizens acquire firearms." ATF Br. at 19. Even if assumed to be accurate, that historical account pertains only to the latter realm of public gun selling laws. It does not help uphold the Rule's foray into the distinct realm of proscribing private self-manufacturing.

The cited laws about proving gun barrels, ATF Br. at 19, and gunpowder handling, ATF Br. at 20-21, are inapposite for three reasons. First, they lack a relevantly similar purpose (*Bruen*'s "why"). The Rule seeks to advance *criminal* law by controlling *who bears* Arms. ATF Br. at 11; *Bondi v. VanDerStok*, 145 S. Ct. 857, 879 (2025). Neither relic does anything like that. The laws about proving gun barrels sought to *protect* firearm *bearers* by minimizing *accidental hazards*, ATF Br. at 19, and the laws about gunpowder handling likewise sought to *protect* gunpowder *bearers* and their surroundings by minimizing *accidental hazards*, ATF Br. at 20-21. Old laws that try to protect gun users from accidents do not justify new laws trying to keep people from making guns.

Second, the cited relics lack a relevantly similar means (*Bruen*'s "how"). The laws about proving gun barrels worked by inspecting *fully finished firearms* to verify their safety *upon entry into commerce*, *see* ATF Br. at 19-20, and the gunpowder regulations likewise worked as to *finished gunpowder* with a focus on *public* storage and transport, *id.* at 20-21. Neither impeded the initial act of production like the Rule does. Neither operated against parts or ingredients that might or might not become an Arm or gunpowder at some future date. And neither operated without regard to whether the item would ever enter the public domain. All of these distinctions matter.

10

Finally, both of the laws about proving gun barrels were enacted *after* 1791; and so were many of the gunpowder laws. ATF Br. at 19-21. That tardiness depletes their value as evidence of what had already been liquidated into the Second Amendment. *See Bruen*, 597 U.S. at 35.

### 3. The American freedom to self-manufacture Arms is sacrosanct.

The Rule doesn't just lack the support of relevantly similar historical analogs. It defies a well-established tradition that affirmatively shows the opposite. *See* DD Br. at 15-18 (supplying Joseph G.S. Greenlee, *The American Tradition of Self Made Arms*, 54 St. Mary's L.J. 35 (2023)). From before 1791 until at least the late 1800s, the "traditional" method of domestic production was to self-manufacture Arms with factory-made parts that were *imported, unfinished, and unmarked*. *See* Raber & Associates, *Industrial History of the Springfield Armory,* at 292-294, 461-81 (1989) (prepared for U.S. Dep't of the Interior) (attached as Appendix C). This tradition exists because America couldn't make its own firearms any other way; interchangeable parts and modern machining are first named "armory practice" because modern machining evolved *from* the private, American system of working with unfinished gun parts. *See* David Hounshell, *From the American System to Mass Production*, 1800-1932. None of the traditional process's ingredient parts were themselves deemed guns and never did the founders let anyone criminalize their distribution.

### C. The harms are ATF-inflicted, not self-inflicted.

ATF calls the harms at issue "self-inflicted" by citing *Texas v. Biden*, 10 F.4th 538 (5th Cir. 2021) (cited by ATF Br. at 4). But just as the Court held in *Polymer80, Inc. v. Garland*, No. 4:23-CV-00029-O, 2023 WL 3605430, at *10 (N.D. Tex. Mar. 19, 2023), the facts in *Biden* are distinguishable and Defense Distributed "faces irreparable injury whatever course it takes—suffer economic injury or comply with a regulation it alleges the Government has no authority to enforce." *Id. Polymer* 80 should all be followed here.

11

D.  **The statute's constitutionality is not at issue and need not be.**

ATF gains nothing by saying that "Defense Distributed does not suggest that the GCA itself is unconstitutionally vague," ATF Br. at 5, and would gain nothing by saying that about the Second Amendment violation. Since Defense Distributed seeks only a judgment about ATF's enforcement of the Rule, *e.g.*, Doc. 143 at 27, all that Defense Distributed needs to establish—and all that the Court needs to confront—is the unconstitutionality of the Rule. If a holding about the Rule's unconstitutionality also has implications for the statute's validity, so be it—in the next case.

None of this contradicts *Bondi v. VanDerStok*, 145 S. Ct. 857 (2025). It held only that the GCA *lets* ATF enact this Rule—not that the GCA *requires* ATF to enact this Rule. So if the Court here holds that the instant Rule is unconstitutional, ATF will remain perfectly free to re-administer that statute by promulgating a new rule that is free of these infirmities. But again, the only question to answer here is about whether this Rule is unconstitutional now, and it is.

II.  **The other factors support an injunction.**

ATF says little about the other factors that isn't preempted by the motion's initial brief. *See* DD Br. at 18-22. For proof of irreparable harm, Doc. 294-2 is the June 2025 declaration that supplies (at p.3, ¶¶ 7-8) the key evidence of unrecoverable lost business income and unrecoverable compliance costs with all of the requisite specificity (and was cited before, DD Br. at 19-20).

ATF's final stance is severely contradictory. On the merits, it insists that G80 items *cannot* be classified without direct inspection; yet on equities, it *assumes their coverage* to say that an injunction would unravel the whole scheme. If the items' status is unclear, the Rule's coverage of it cannot be critical. This double standard reveals the arbitrary enforcement that must be stopped.

## Conclusion

The Court should grant the motion.

Respectfully submitted,

By /s/ *Chad Flores*
Chad Flores
  cf@chadfloreslaw.com
  Texas Bar No. 24059759
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
P: (713) 893-9440
F: (832) 645-2496

Counsel for Defense Distributed

**Certificate of Service**

A true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record on the day of its filing.

/s/ Chad Flores
Chad Flores