Nos. 24-3060, 24-3061, 24-3062, 24-3063

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT
—————————————

CALEB BARNETT, et al.,

Plaintiffs-Appellees,

v.

KWAME RAOUL, Attorney General of the State of Illinois, et al.,

Defendants-Appellants.

—————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
Case Nos. 3:23-cv-209, 3:23-cv-141, 3:23-cv-192, 3:23-cv-215
The Honorable Judge Stephen P. McGlynn

—————————————

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT
OF PLAINTIFFS-APPELLEES AND SUPPORTING AFFIRMANCE

—————————————

CHAD MIZELLE
  Acting Associate Attorney General

JASON MANION
BENJAMIN MEHR
  Attorneys

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Deputy Assistant Attorney General

  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

# TABLE OF CONTENTS

**PAGE**

INTEREST OF THE UNITED STATES ................................................1

INTRODUCTION........................................................................1

STATEMENT OF THE ISSUES...............................................3

ARGUMENT ...............................................................................4

    I.    The Act Violates The Second Amendment By
              Banning AR-15s And Other Firearms That Are
              In Common Use By Law-Abiding Citizens For Lawful
              Reasons.....................................................................4

          A.    Many of the banned firearms are "Arms"
                  under the Second Amendment......................................4

          B.    AR-15s and other firearms banned by the
                  Act are in common use by law-abiding citizens
                  for lawful reasons..........................................................9

          C.    As a complete ban on AR-15s and other firearms
                  that are in common use, the Act violates the Second
                  Amendment. ..................................................................13

    II.    Text, History, And Precedent Confirm That A
              Legislature May Not Ban A Class Of Weapons
              On The Ground That The Weapons Are "Militaristic."........14

          A.    The Second Amendment's text does not exclude
                  "militaristic" arms........................................................15

B.    The Second Amendment's history demonstrates that possessing at least certain "militaristic" weapons was a core part of the right to keep and bear arms.......................................................... 16

C.    Second Amendment-related precedent confirms that the government may not ban weapons on the ground that they are "militaristic." ........................... 18

III.    The Act Violates The Second Amendment By Banning The Possession Of Magazines And Other Firearm Attachments That Are In Common Use By Law-Abiding Citizens For Lawful Reasons. ............................... 22

CONCLUSION ....................................................................... 27

CERTIFICATE OF COMPLIANCE ..................................... 28

# TABLE OF AUTHORITIES

**CASES:**                                                                            **PAGE**

*Andrews v. State*, 50 Tenn. (3 Heisk.) 165 (1871)....................6, 8, 20, 24

*Aymette v. State*, 21 Tenn. 154 (1840)......................................................6

*Barnett v. Raoul*, 756 F. Supp. 3d 564 (S.D. Ill. 2024) ..................*passim*

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023).............*passim*

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc)...........*passim*

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam) ...............10

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................*passim*

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) (en banc).........22, 24, 25

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011).....................17, 23

*Friedman v. City of Highland Park*, 577 U.S. 1039 (2015) ........11, 13, 21

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ..................................12

*Garland v. Cargill*, 602 U.S. 406 (2024) ................................................11

*Hanson v. District of Columbia*,
    120 F.4th 223 (D.C. Cir. 2024) (per curiam)...............20, 24, 25, 28

*Harrel v. Raoul*, 144 S. Ct. 2491 (2024)...................................3, 6, 17, 21

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ..........................................11, 13, 25

*Hill v. Colorado*, 530 U.S. 703 (2000) .....................................................23

*Jackson v. City and County of San Francisco,*
  746 F.3d 953 (9th Cir. 2014) .......................................................23

*Luis v. United States*, 578 U.S. 5 (2016) ..................................................23

*Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue,*
  460 U.S. 575 (1983).........................................................................22

*New York State Rifle & Pistol Ass'n v. Bruen,*
  597 U.S. 1 (2022)..................................................................... *passim*

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)................7

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos,*
  No. 23-1141, 2025 WL 1583281 (U.S. June 5, 2025)...............5, 101

*Snope v. Brown*, No. 24-203,
  2025 WL 1550126 (U.S. June 2, 2025) ................................. *passim*

*Staples v. United States*, 511 U.S. 600 (1994) ....................................7, 10

*State v. Duke*, 42 Tex. 455 (1875).............................................................20

*State v. Kerner*, 107 S.E. 222 (N.C. 1921) ......................................6, 7, 20

*State v. Workman*, 14 S.E. 9 (W.V. 1891) ..........................................6, 20

*United States v. Miller*, 307 U.S. 174 (1939) ..........................9, 17, 19, 23

*United States v. Rahimi*, 602 U.S. 680 (2024) ..........................................9

**CONSTITUTION:** **PAGE**

U.S. Const. Amend. II ............................................................... 4

**REGULATION:**

Exec. Order No. 14,206, *Protecting Second Amendment Rights*,
    90 Fed. Reg. 9503 (Feb. 7, 2025) ...................................... 1

**RULE:**

Fed. R. App. P. 29(a)(2) ............................................................. 1

**MISCELLANEOUS:**

David B. Kopel & Joseph G.S. Greenlee,
    *The History of Bans on Types of Arms Before 1900*,
    50 J. Leg. 223 (2024) ..................................................... 18

Federal Bureau of Investigation, *Crime in the U.S.* (2019),
    https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-
    2019/tables/expanded-homicide-data-table-8.xls. ....................... 13

Memo. from the U.S. Att'y Gen.,
    *Second Amendment Enforcement Task Force* (Apr. 8, 2025),
    https://www.justice.gov/ag/media/1395956/dl?inline ..................... 1

The Federalist No. 44 (James Madison)
    (Charles R. Kesler ed., 2003) ............................................ 23

Thomas M. Cooley,
    *The General Principles of Constitutional Law in the*
    *United States of America* (3d ed. 1898) ................................ 20

William Baude & Robert Leider,
    *The General-Law Right to Bear Arms*,
    99 Notre Dame L. Rev. 1467 (2024) ................................. 19, 20

## INTEREST OF THE UNITED STATES

President Donald J. Trump has instructed his Administration to "protect the Second Amendment rights of all Americans."  Executive Order No. 14,206, *Protecting Second Amendment Rights*, 90 Fed. Reg. 9503 (Feb. 7, 2025).  Attorney General Pamela Bondi has likewise instructed the Department of Justice "to use its full might to protect the Second Amendment rights of law-abiding citizens."  Memo. from the U.S. Att'y Gen., *Second Amendment Enforcement Task Force* (Apr. 8, 2025).

This case poses important questions about the scope of the Second Amendment's protections.  The United States has strong interests in ensuring that these important questions are correctly resolved; that the Second Amendment is not treated as a second-class right; and that law-abiding Americans in this Circuit are not deprived of the full opportunity to enjoy the exercise of their Second Amendment rights.

The United States is permitted to file this amicus brief without the consent of the parties or leave from the Court.  Fed. R. App. P. 29(a)(2).

## INTRODUCTION

Three years ago, the Supreme Court issued a landmark decision meant to break a habit developed by some States of treating the Second

- - 1 - -

Amendment as "a second-class right, subject to an entirely different body of rules than the other" constitutional rights. *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 70 (2022) (citation omitted).

Regrettably, not every State got the message. Just a few months after *Bruen*, Illinois outlawed some of the most commonly used rifles and magazines in America via a so-called "assault weapons" ban. In doing so, Illinois violated the Supreme Court's clear directive that States cannot prohibit arms that are "in common use" by law-abiding citizens for lawful purposes. *District of Columbia v. Heller*, 554 U.S. 570, 624 (2008).

In an earlier appeal reviewing a preliminary injunction against the Protect Illinois Communities Act ("the Act"), this Court held that the Act was likely constitutional and reversed. *Bevis v. City of Naperville*, 85 F.4th 1175, 1203 (7th Cir. 2023). But this Court made it crystal clear that its opinion was "just a preliminary look at the subject." *Id.* at 1197. Now after final judgment, there are three very good reasons why this Court should reverse course and affirm the district court's injunction.

First, as explained below, key aspects of *Bevis*'s analysis are wrong, even judged against the Supreme Court's Second Amendment caselaw that existed at the time. Second, multiple Supreme Court Justices

(including *Bruen*'s author) have since made it clear that they disagree with *Bevis* and other recent lower-court opinions, and that the Court is likely to grant certiorari "in the next Term or two" to address the errors in those opinions. *See Snope v. Brown*, No. 24-203, 605 U.S. __, 2025 WL 1550126, at *1 (U.S. June 2, 2025) (statement of Kavanaugh, J.); *id.* at *2-5 (Thomas, J., dissenting from denial of certiorari); *Harrel v. Raoul*, 144 S. Ct. 2491, 2492-93 (2024) (statement of Thomas, J.).  Third, after this Court's decision in *Bevis*, the district court held a multi-day bench trial, heard significant evidence regarding the issues in this case, and made factual findings that show that the Act violates the Second Amendment as applied to semiautomatic firearms and attachments that are in common use by law-abiding citizens for lawful reasons.

For all these reasons, this Court should reverse course and affirm the district court's injunction.

## STATEMENT OF THE ISSUES

In this brief, the United States addresses only the following issues:

1.  Whether the Act violates the Second Amendment to the extent that it bans the possession of firearms that are in common use by law-abiding citizens for lawful reasons.

2.  Whether the Act violates the Second Amendment to the extent that it bans the possession of magazines and other firearm attachments that are in common use by law-abiding citizens for lawful reasons.

## ARGUMENT

I.   **The Act Violates The Second Amendment By Banning AR-15s And Other Firearms That Are In Common Use By Law-Abiding Citizens For Lawful Reasons.**

A.   **Many of the banned firearms are "Arms" under the Second Amendment.**

When analyzing a Second Amendment-based challenge to a firearms-related statute, courts must begin by determining whether the banned conduct (or, here, the banned firearm) falls within the scope of the Second Amendment, as originally understood. *Bruen*, 597 U.S. at 18-19. This inquiry begins with "the Second Amendment's text, as informed by history." *Id.* at 19.

The Second Amendment's text provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. Amend. II.

The Act bans the possession of various semiautomatic firearms, with the "paradigmatic example" being the AR-15 rifle. *Bevis*, 85 F.4th

- - 4 - -

at 1183.  In this case, the key question under the Second Amendment's text is whether the banned semiautomatic firearms are "Arms."[1]

Many of them—including AR-15s—are.[2]  The term "Arms," as used in the Second Amendment, describes the category of weapons that an individual would wear, bear, or carry for offensive or defensive action in case of conflict with other people.  *Heller*, 554 U.S. at 581.  Thus, the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms."  *Id.* at 582.  And it protects not "only those arms in existence in the 18th century," but also "those that were not in existence at the time of the founding.  *Ibid.*

---

[1]    The United States understands it to be undisputed in this appeal that the Act applies to "the people" whom the Second Amendment protects, and that it bans the "keep[ing] and bear[ing]" of various firearms and firearm attachments.

[2]    This brief focuses on AR-15s, the "paradigmatic example" of the type of firearm banned by the Act.  But to be clear, the Act is, in the United States' view, unconstitutional to the extent it bans the possession of any firearms (not just AR-15s) that are in common use by law-abiding citizens for lawful reasons.  For purposes of this amicus brief, however, the United States does not challenge the district court's findings that certain firearms banned by the Act, such as .50 caliber rifles and pistols, do not fall within that category.  *Barnett v. Raoul*, 756 F. Supp. 3d 564, 628 (S.D. Ill. 2024).  *But cf. Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, No. 23-1141, 605 U.S. __, 2025 WL 1583281, at *8 (U.S. June 5, 2025) (".50 caliber sniper rifles . . . are both widely legal and bought by many ordinary consumers").

Over a century of state precedent after the Framing confirms that rifles were understood to be part of this category of "Arms." *See State v. Kerner*, 107 S.E. 222, 225 (N.C. 1921) ("rifles"); *State v. Workman*, 14 S.E. 9, 11 (W.V. 1891) ("rifles"); *Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 179 (1871) ("the rifle of all descriptions," including "repeater" rifles); *Aymette v. State*, 21 Tenn. 154, 161 (1840) ("rifles").

Like other rifles have since the Founding, "AR-15s fall squarely within this category." *Snope*, 2025 WL 1550126, at *2 (Thomas, J., dissenting from denial of certiorari). They are worn, born, and carried for offensive or defensive action in case of conflict with others, thus satisfying *Heller*'s "expansive definition of 'Arms.'" *Bianchi v. Brown*, 111 F.4th 438, 518 (4th Cir. 2024) (en banc) (Richardson, J., dissenting). Indeed, it is hard to imagine how anyone fairly applying *Heller*'s definition of "Arms"—instead of redefining it—could conclude otherwise. *Cf. Harrel*, 144 S. Ct. at 2492-93 (statement of Thomas, J.); *Bevis*, 85 F.4th at 1206-07 (Brennan, J., dissenting).

The commonsense conclusion that an AR-15 is an "Arm" is amply supported by the factual findings in this case. After conducting a multi-day bench trial, the district court found that AR-15s and certain other

semiautomatic firearms banned by the Act are "weapon[s] that an individual carries for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person." *Barnett*, 756 F. Supp. 3d at 606, 634. This fact-laden determination certainly was not clearly erroneous, and this Court is not free to overturn it.

To be sure, the Second Amendment does not codify "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. For example, the right to keep and bear arms does not guarantee "an individual right to keep weapons capable of mass destruction," such as cannons. *Parker v. District of Columbia*, 478 F.3d 370, 394 (D.C. Cir. 2007); *Kerner*, 107 S.E. at 224 (the right to keep and bear arms "does not guarantee . . . that the people have the . . . right to use submarines and cannon of 100 miles range nor airplanes dropping deadly bombs"); *cf. Staples v. United States*, 511 U.S. 600, 611-12 (1994) (distinguishing between ordinary firearms and artillery and grenades).[3]

---

[3]    For this reason, at least one type of weapon banned by the Act—grenade launchers—may not qualify as an "Arm" because it is more like artillery or explosives.

But the AR-15 does not fall within this unprotected category. As explained below, the AR-15 is in common use by law-abiding citizens for lawful purposes, including for self-defense, target shooting, and public defense. Once an arm is in common use, its mere possession cannot "be infringed or forbidden by the Legislature." *Andrews*, 50 Tenn. at 179; *see also, e.g.*, *Snope*, 2025 WL 1550126, at \*1 (statement of Kavanaugh, J.); *Heller*, 554 U.S. at 628-29.

For protected "Arms," a legislature may only pass "such regulations and limitations" as do not "infringe the right secured and the necessary incidents to the exercise of such right." *Andrews*, 50 Tenn. at 179. Courts should generally determine the validity of restrictions on (or regulations regarding) the types of "Arms" that a citizen may possess at the *second* step of *Bruen*'s analysis, during which courts must consult our Nation's "historical tradition of firearm regulation" and determine whether a given restriction or regulation "is consistent with the principles that underpin [that] regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 691-92 (2024) (citation omitted).

**B.    AR-15s and other firearms banned by the Act are in common use by law-abiding citizens for lawful reasons.**

The Second Amendment does not allow the government to prohibit arms that are "in common use" among law-abiding citizens for lawful purposes. *Heller*, 554 U.S. at 624.  The Supreme Court adopted that test in *United States v. Miller*, 307 U.S. 174 (1939), where it explained that the Second Amendment secures the right to possess arms "of the kind in common use at the time."  *Id.* at 179; *see Heller*, 554 U.S. at 625 (reading *Miller* to hold that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes").  The Court applied that test in *Heller*, holding that the District of Columbia could not prohibit the possession of semiautomatic handguns, "the most popular weapon chosen by Americans for self-defense in the home."  *Id.* at 629.  Then the Court reaffirmed that test in *Bruen*, explaining that the Second Amendment protects the right to carry weapons that are "in common use," as distinguished from those that are "highly unusual in society at large."  597 U.S. at 47.

That test is "historically based."  *Snope*, 2025 WL 1550126, at *1 (statement of Kavanaugh, J.).  As *Heller* explained, the common-use test is "supported by the historical tradition of prohibiting the carrying of

- - 9 - -

'dangerous and unusual weapons.'" 554 U.S. at 627 (citation omitted). That "is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring in the judgment) (emphasis original). A weapon that is in common use, by definition, is not "unusual."

AR-15s fall squarely within the Supreme Court's "common use" test. *Cf. Snope*, 2025 WL 1550126, at *2 (Thomas, J., dissenting from denial of certiorari). "The AR-15 is the most popular rifle in the country," as the Supreme Court recognized in a unanimous opinion just days ago. *Smith & Wesson Brands*, 2025 WL 1583281, at *8; *accord, e.g.*, *Snope*, 2025 WL 1550126, at *2 (Thomas, J., dissenting from denial of certiorari); *Bianchi*, 111 F.4th at 518 (Richardson, J., dissenting); *Bevis*, 85 F.4th at 1214 (Brennan, J., dissenting). The AR-15 is "widely legal and bought by many ordinary consumers." *Smith & Wesson Brands*, 2025 WL 1583281, at *8; *see, e.g.*, *Snope*, 2025 WL 1550126, at *1 (statement of Kavanaugh, J.); *Garland v. Cargill*, 602 U.S. 406, 429-30 (2024) (Sotomayor, J., dissenting) ("commonly available"); *Staples*, 511 U.S. at 612 (AR-15s "traditionally have been widely accepted as lawful possessions"). There

is therefore no doubt that AR-15s are in common use.  *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("*Heller II*").

Not only are AR-15s "in common use," but the "overwhelming majority" of AR-15 owners use them "for lawful purposes, including self-defense and target shooting."  *Snope*, 2025 WL 1550126, at *2 (Thomas, J., dissenting from denial of certiorari) (citation omitted); *id.* at *1 (statement of Kavanaugh, J.); *Bianchi*, 111 F.4th at 518 (Richardson, J., dissenting); *Friedman v. City of Highland Park*, 577 U.S. 1039, 1042 (2015) (Thomas, J., dissenting from denial of certiorari).

The commonsense conclusion that the most popular civilian rifle in America is in common use by law-abiding citizens for lawful reasons is buttressed by the factual findings in this case.  After conducting a multi-day bench trial, the district court found that AR-15s and certain other firearms banned by the Act "are in common use" by law-abiding citizens for lawful purposes, including "self-defense."  *Barnett*, 756 F. Supp. 3d at 626-29, 633-35.  Among other specific factual findings, the court found that uses of AR-15s for unlawful purposes such as mass shootings—albeit reprehensible and tragic when they occur—"are clearly *outliers*" and are "*exception[s]*, not the rule."  *Id.* at 633; *accord Bianchi*, 111 F.4th at 529-

- - 11 - -

30 (Richardson, J., dissenting) ("mass public shootings accounted for fewer than 1% of all firearm-related homicides in the United States" between 1966 and 2023). These fact-laden determinations certainly were not clearly erroneous, and this Court is not free to overturn them.

AR-15s also are not "dangerous," at least as that term is used in Second Amendment caselaw. Of course, all firearms are "dangerous" in some sense. *Bevis*, 85 F.4th at 1201 n.12; *id.* at 1216 (Brennan, J., dissenting). But to be "dangerous" in the relevant sense, a firearm must be "especially dangerous," *see id.* at 1201, or "uniquely dangerous," *see Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015), *abrogated on other grounds by Bruen*, 597 U.S. 1.

AR-15s are not "especially" or "uniquely" dangerous as compared to other firearms (semiautomatic handguns) that are in common use. "AR-15s are semi-automatic, but so too are most handguns." *Snope*, 2025 WL 1550126, at *1 (statement of Kavanaugh, J.). "[C]riminals use both AR-15s and handguns . . . in unlawful ways that threaten public safety." *Ibid.* "But handguns can be more easily carried and concealed than rifles, and handguns—not rifles—are used in the vast majority of murders and other violent crimes that individuals commit with guns in America."

*Ibid.*; *accord Bianchi*, 111 F.4th at 524 (Richardson, J., dissenting); *Heller II*, 670 F.3d at 1286 (Kavanaugh, J., dissenting).[4]

In sum, "[t]here is no meaningful . . . distinction between semi-automatic handguns and semi-automatic rifles," and it would thus "strain logic and common sense to conclude that the Second Amendment protects semi-automatic handguns but does not protect semi-automatic rifles." *Heller II*, 670 F.3d at 1269, 1286 (Kavanaugh, J., dissenting). *See also Bevis*, 85 F.4th at 1215-16 (Brennan, J., dissenting).

### C.  As a complete ban on AR-15s and other firearms that are in common use, the Act violates the Second Amendment.

Applying the Supreme Court's Second Amendment caselaw to this question, AR-15s are "in common use" by law-abiding citizens for lawful reasons.  Under Supreme Court caselaw, "that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons." *Friedman*, 577 U.S. at 1042 (Thomas, J., dissenting from

---

[4]     According to the most recent FBI statistics, handguns account for 6,000-7,000 homicides per year, while rifles of all kinds account for only 200-400 homicides per year.  Fed. Bureau of Investigation, *Crime in the U.S.* (2019), https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-8.xls.

denial of certiorari); *see also, e.g.*, *Snope*, 2025 WL 1550126, at *1 (statement of Kavanaugh, J.).

Because the Act is a total ban on a category of firearms that are in common use by law-abiding citizens for lawful reasons, it is flatly unconstitutional. This Court should affirm the district court's injunction.

## II.   Text, History, And Precedent Confirm That A Legislature May Not Ban A Class Of Weapons On The Ground That The Weapons Are "Militaristic."

In *Bevis*, this Court held that "militaristic" firearms[5] are not even "Arms" under the Second Amendment, 85 F.4th at 1199, and other courts have reached similar conclusions, *Bianchi*, 111 F.4th at 441 ("military-style"). This position fails as a matter of text, history, and precedent.

---

[5]  It is worth mentioning that the AR-15 simply "*is not a military weapon*." *Bianchi*, 111 F.4th at 527 (Richardson, J., dissenting). It lacks "[t]he defining feature of a military rifle," "its 'selective-fire' capability, which allows the user to toggle between semiautomatic, burst, and fully automatic modes of fire." *Ibid.* Because of this lack, "the military has shunned the AR-15 for selective-fire rifles like the M-16[.]" *Id.* at 528. Indeed, "not one military in the world . . . uses purely semiautomatic rifles." *Ibid. See also Snope,* 2025 WL 1550126, at *1 (U.S. June 2, 2025) (statement of Kavanaugh, J.) ("Semi-automatic handguns and rifles are distinct from automatic firearms such as the M-16 automatic rifle used by the military."); *Bevis*, 85 F.4th at 1222 (Brennan, J., dissenting).

- - 14 - -

### A. The Second Amendment's text does not exclude "militaristic" arms.

The Second Amendment's prefatory clause—"A well regulated Militia, being necessary to the security of a free State"—certainly does not limit the scope of its operative clause, as the Supreme Court made clear in *Heller*. 554 U.S. at 577. But the Supreme Court was just as clear that the prefatory clause's text nevertheless "announces" one of the Second Amendment's "purpose[s]." *Ibid.* And "[l]ogic demands that there be a link between the stated purpose and the command." *Ibid.*[6]

Although the militia-related purpose announced in the Second Amendment's prefatory clause is not "the only reason Americans valued the ancient right" to keep and bear arms, the prefatory clause's text did capture "the purpose for which the right was codified," which was "to prevent elimination of the militia." *Id.* at 599. Not only that, but the Supreme Court in *Heller* confirmed that the militia-focused text of the Second Amendment's prefatory clause "fits perfectly" with the individual

---

[6]    *Bevis* went wrong, in part, by interpreting *Heller* as having "severed th[e] connection" between the two clauses. 85 F.4th at 1188. *Heller* did not. It instead recognized the fact that the Second Amendment *also* protects the right to keep and bear arms for individual self-defense, *in addition to* the right to keep and bear arms for collective self-defense.

right to keep and bear arms that is codified in the Second Amendment's operative clause. *Id.* at 598.

This Second Amendment's militia-related text, as interpreted by the Supreme Court, thus suggests that the government may not prohibit weapons simply because it considers them "militaristic." The contrary claim that "militaristic" weapons fall outside its scope wrongly requires reading the prefatory clause entirely out of the Second Amendment.

**B.    The Second Amendment's history demonstrates that possessing at least certain "militaristic" weapons was a core part of the right to keep and bear arms.**

The Second Amendment did not "lay down a novel principle" but rather codified a preexisting "right inherited from our English ancestors." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 599). "Grasping its scope thus depends on an understanding of its historical development." *Bianchi*, 111 F.4th at 484 (Richardson, J., dissenting).

History confirms what the Second Amendment's text suggests: Possessing weapons for the common defense was a core aspect of the preexisting right to keep and bear arms that the Founders codified in the Second Amendment. This Court's "'non-militaristic' limitation on the

Arms protected by the Second Amendment" is thus wholly "unmoored from . . . history." *Harrel*, 144 S. Ct. at 2492 (statement of Thomas, J.).

A few historical facts confirm that the government may not prohibit the possession of weapons on the ground that they are "militaristic." First, a shared feature of English and early American history is that England and the United States "had neither a standing professional army nor a regular police force." *Bianchi*, 111 F.4th at 484, 487 (Richardson, J., dissenting); *see Miller*, 307 U.S. at 179. Instead, the English and American people were the first line of defense from military invasion, insurrection or public unrest, and even government oppression. *See Bianchi*, 111 F.4th at 484-93, 521 (Richardson, J., dissenting).

Second, "[t]he people could only fulfill these [collective self-defense] duties if they owned arms and were skilled in their use." *Id.* at 485, 488 (Richardson, J., dissenting); *cf. Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011), *abrogated on other grounds by Bruen*, 597 U.S. 1.

Third, the requirement that the people be responsible for collective self-defense had implications for the types of arms that the people could— or indeed must—possess. After all, "a militia would be useless unless the citizens were enabled to exercise themselves in the use of warlike

weapons." *Heller*, 554 U.S. at 618 (citation omitted). For that reason, "English subjects were required for much of England's history to possess military weapons." *Bianchi*, 111 F.4th at 504 (Richardson, J., dissenting). And "[a]t the Founding, the people commonly kept certain arms for lawful purposes like self-defense and brought those same arms to perform militia service." *Id.* at 515, 523; *Heller*, 554 U.S. at 624-25; *see also* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Leg. 223, 241-54 (2024) (cataloguing arms mandates in colonial America).

These facts demonstrate that this Court's view that the Second Amendment does not protect "militaristic" weapons is at odds with our Nation's history of citizens possessing—and indeed, sometimes being required to possess—weapons that would be useful in various collective-self-defense contexts. Given this history, the purported "militaristic" character of a weapon does not by itself justify prohibiting it.

### C.  Second Amendment-related precedent confirms that the government may not ban weapons on the ground that they are "militaristic."

Two categories of Second Amendment-related precedent confirm that the Second Amendment contains no carveout for "militaristic"

weapons. First, early Second Amendment-related precedent from the nineteenth and early-twentieth centuries contains significant support for the view that possessing weapons for the common defense was a core aspect of the preexisting right to keep and bear arms that the Founders codified in the Second Amendment. Consistent with the extensive history discussed above, this early caselaw from federal and state courts uniformly viewed weapons that "ha[d] some reasonable relationship to the preservation or efficiency of a well regulated militia," that were "part of the ordinary military equipment," or the use of which "could contribute to the common defense" as being the core weapons (if not the only ones) protected by the Second Amendment and state analogues. *Miller*, 307 U.S. at 178; *see* William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev. 1467, 1480-82 (2024).

Indeed, "*[e]very* nineteenth-century court and legal treatise writer to consider the question understood that arms useful for militia service fell within the very core of the right." Baude & Leider, *supra*, at 1500-01. And "not even the most restrictive courts debated whether rifles and muskets designed for military use fell within the 'arms' protected by the

- - 19 - -

right to keep and bear arms." *Ibid.* "On this question," the law "was unanimously understood." *Id.* at 1501.[7]

Second, modern Second Amendment precedent confirms that, while weapons for the common defense are not the only weapons protected by the Second Amendment, they nonetheless remain protected if they meet the rest of *Heller*'s test, *i.e.*, if they are in common use by law-abiding citizens for lawful reasons. For example, in a recent decision (decided after *Bevis*), the D.C. Circuit grappled with this issue and rejected the idea "that Second Amendment protection does not extend to weapons that are 'most useful' in the military context." *Hanson v. District of Columbia*, 120 F.4th 223, 233 (D.C. Cir. 2024) (per curiam). And multiple

---

[7] For examples, see, *e.g.*, *Kerner*, 107 S.E. at 225 ("'arms,' an acquaintance with whose use was necessary for their protection against the usurpation of illegal power"); *Workman*, 14 S.E. at 11 ("the weapons of warfare to be used by the militia," "arms to be used in defending the state and civil liberty"); *Andrews*, 50 Tenn. at 179 ("the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defense of his own liberties, as well as of the State"); *State v. Duke*, 42 Tex. 455, 458 (1875) ("such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense, as well as such as are proper for the defense of the State"); *see also* Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 299 (3d ed. 1898) ("The arms intended by the Constitution are such as are suitable for the general defen[s]e of the community against invasion or oppression[.]").

members of the Supreme Court, including the authors of *Heller* and *Bruen*, have criticized this Court's repeated attempts to impose a "non-militaristic" limitation on the Second Amendment. *See Harrel*, 144 S. Ct. at 2492-93 (statement of Thomas, J.) (*Bevis* "contort[ed] what little guidance our precedents provide" to reach a "nonsensical" definition "unmoored from both text and history"); *Friedman*, 577 U.S. at 1041 (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari) (this Court's view that States may decide when citizens may possess "military-grade firearms" "ignores *Heller*'s fundamental premise); *see also Snope*, 2025 WL 1550126, at *1 (statement of Kavanaugh, J.) (semiautomatic rifles "are distinct from automatic firearms . . . used by the military").

* * *

Text, history, and precedent reject the view that "militaristic" weapons are not even "Arms" under the Second Amendment. This Court should make that clear now that this case has reached final judgment.

III. **The Act Violates The Second Amendment By Banning The Possession Of Magazines And Other Firearm Attachments That Are In Common Use By Law-Abiding Citizens For Lawful Reasons.**

The Act also violates the Second Amendment because it bans the possession of so-called "large-capacity magazines"[8] and other firearm attachments that are in common use by law-abiding citizens for lawful reasons.

"Constitutional rights . . . implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring in the judgment). In the neighboring First Amendment context, for example, a tax on ink and paper burdens the freedom of the press. *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 582 (1983). As Justice Scalia observed, "[t]here comes a point . . . at which the regulation of action intimately and unavoidably connected with traditional speech is a

---

[8]    The United States uses the phraseology of "large-capacity magazines" because that is the phraseology this Court used in *Bevis*. But many so-called "large-capacity magazines" are "standard issue for many firearms" and thus would more accurately be called "standard-capacity magazines." *Duncan v. Bonta*, 19 F.4th 1087, 1140 n.1 (9th Cir. 2021) (en banc) (Bumatay, J., dissenting).

regulation of speech itself." *Hill v. Colorado*, 530 U.S. 703, 745 (2000) (Scalia, J., dissenting). *Cf.* The Federalist No. 44, at 282 (Charles R. Kesler ed., 2003) (James Madison) ("No axiom is more clearly established in law, or in reason, than that wherever the end is required, the means are authorized[.]").

The same principle holds true in the Second Amendment context. As this Court has recognized in the past, Second Amendment protections extend to certain "important corollar[ies]" of the core right to possess arms for self-defense and other lawful reasons. *Ezell*, 651 F.3d at 708.

Several such corollaries receive Second Amendment protections. "The right to keep arms[] necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." *Andrews*, 50 Tenn. at 178. The right to keep and bear arms also involves the "right to maintain proficiency in firearm use." *Ezell*, 651 F.3d at 708. And it involves the right to possess ammunition. *See Miller*, 307 U.S. at 180; *see also Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("without bullets, the right to bear arms would be meaningless"). Although these activities may not literally involve the

"keep[ing]" of "Arms," each is a fundamental component of the right protected by the Second Amendment.

Applying that principle to the Act, the Second Amendment protects firearm attachments that are useful to the exercise of the right, including magazines, suppressors,[9] and other firearm attachments that are in common use by law-abiding citizens for lawful reasons.  As the D.C. Circuit has held, "[a] magazine is necessary to make meaningful an individual's right to . . . self-defense."  *Hanson*, 120 F.4th at 232; *see Bevis*, 85 F.4th at 1209 (Brennan, J., dissenting); *Duncan*, 19 F.4th at 1151 (Bumatay, J., dissenting) ("magazines are integral to the operation of firearms," and "many popular firearms would be practically inoperable without magazines").

---

[9]     This brief focuses on so-called "large-capacity magazines," the firearm attachment that is the focus of the appellee briefs.  But to be clear, the Act is, in the United States' view, unconstitutional to the extent it bans the possession of any firearm attachments (not just magazines) that are in common use by law-abiding citizens for lawful reasons.  This includes suppressors, as the United States recently argued elsewhere.  *See* Supp. En Banc Response, *United States v. Peterson*, No. 24-30043, Doc. 129-2, at 1-11 (5th Cir. May 23, 2025) ("a complete ban on suppressors would be unconstitutional").  For purposes of this amicus brief, the United States does not challenge the district court's findings that certain firearm attachments banned by the Act, such as grenade launchers, do not fall within that category.

So-called "large-capacity magazines" are extremely common in the United States. "Americans have in their hands and homes an estimated 100 million . . . magazines" that hold more than ten rounds of ammunition. *Hanson*, 120 F.4th at 269 (Walker, J., dissenting); *Duncan*, 19 F.4th at 1155 (Bumatay, J., dissenting); *Bevis*, 85 F.4th at 1214 (Brennan, J., dissenting). They are "a standard component on many of the nation's most popular firearms," and "are lawful in [most] states and under Federal law." *Duncan*, 19 F.4th at 1155 (Bumatay, J., dissenting); *Hanson*, 120 F.4th at 270 (Walker, J., dissenting). So-called "large-capacity magazines" are therefore in common use. *Heller II*, 670 F.3d at 1261. And they are frequently "used for lawful purposes, like home defense." *Duncan*, 19 F.4th at 1155 (Bumatay, J., dissenting); *Hanson*, 120 F.4th at 270 (Walker, J., dissenting).

These conclusions are borne out by the factual findings in this case. After conducting a multi-day bench trial, the district court found that "thirty-round large-capacity magazines" and "various attachments," including pistol grips, foregrips, flash suppressors, barrel shrouds, "and the like," are "in common use and have legitimate self-defense purposes. *Barnett*, 756 F. Supp. 3d at 628, 634-35. "For magazines, every round

- - 25 - -

matters in a self-defense scenario," during which "more rounds equals a higher chance of survival." *Id.* at 628. And "the attachments at issue make a weapon safer, easier to aim, and easier to fire, features that are well-suited for self-defense." *Ibid.*; *see id.* at 634. These fact-laden determinations certainly were not clearly erroneous, and this Court is not free to overturn them.

Because the Act bans the possession of magazines and other firearm attachments that are in common use by law-abiding citizens for lawful reasons, it violates the Second Amendment. "To hold otherwise," as the D.C. Circuit recently concluded, "would allow the government to sidestep the Second Amendment with a regulation prohibiting possession [of firearms and firearm attachments] at the component level, such as a firing pin." *Hanson*, 120 F.4th at 232 (cleaned up).

In sum, by banning the possession of magazines and other firearm attachments that are in common use by law-abiding citizens for lawful reasons, the Act violates the Second Amendment.

# CONCLUSION

For the foregoing reasons, this Court should affirm the district court's injunction.

Respectfully submitted,

CHAD MIZELLE                              HARMEET K. DHILLON
Acting Associate Attorney General          Assistant Attorney General

s/ *Jason Manion*                         JESUS A. OSETE
JASON MANION                              Deputy Assistant Attorney General
BENJAMIN MEHR
Attorneys                                 Department of Justice
                                          Civil Rights Division
                                          Appellate Section
                                          Ben Franklin Station
                                          P.O. Box 14403
                                          Washington, D.C.  20044-4403
                                          (202) 598-0243

Date:  June 13, 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) and Seventh Circuit Rule 29 because it contains 5,448 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) and Seventh Circuit Rule 32(b) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ *Jason Manion*
JASON MANION
Attorney

Date:  June 13, 2025