UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |  |
|---|---|---|
| DEFENSE DISTRIBUTED,<br>Plaintiff | § § § | |
| v. | § § | Civil Action No. 4:22-cv-00691-O |
| TODD WALLACE BLANCHE, in his<br>Official Capacity as Acting Attorney<br>General of the United States, *et al.*, | § § § § | |
| Defendants. | § § | |

**Defense Distributed and the Second Amendment Foundation's
Brief in Support of their Motion for Summary Judgment**

1

## Table of Contents

Table of Contents ................................................................................................... 2

Table of Authorities............................................................................................... 4

Summary of the Argument ..................................................................................... 7

Statement of the Case............................................................................................. 9

I.      Legal Background. ......................................................................................9

        A.      The old "firearm" definition..........................................................10

        B.      The new "firearm" definition. .......................................................11

        C.      The Rule remains in force................................................................13

II.     Procedural Posture. ..................................................................................14

        A.      Defense Distributed & SAF sought full summary judgment originally..................14

        B.      Post-remand schedule.......................................................................14

        C.      Standing remains established. .........................................................15

Argument ..............................................................................................................16

I.      Count Six: APA § 706(2)(B)—Due Process Clause. .......................................17

        A.      The Rule denies fair notice. ............................................................17

        B.      The Rule invites arbitrary enforcement. ..........................................18

        C.      Judge Oldham's roadmap controls. ............................................... 20

II.     Count Two: APA § 706(2)(A)—Failure to consider. ....................................... 20

        A.      *Bruen* supplied the controlling factors............................................. 20

        B.      ATF ignored the *Bruen* factors. ........................................................21

        C.      ATF used forbidden means-end scrutiny............................................ 22

III.    Count Three: APA § 706(2)(A), (C)—Delegation.........................................23

        A.      No Delegation In Fact...................................................................... 23

B.      Unconstitutional Delegation. ................................................................................ 25

IV.    Count Four: APA § 706(2)(A), (C)—Change of position. ................................................26

A.      The Final Rule Effects a Sweeping Reversal of Settled Agency Practice. .............27

B.      The Agencies Failed to Provide the Required Reasoned Explanation. ................ 28

C.      The Rule's New Standards Underscore the Arbitrary Reversal. ......................... 29

V.     Count Five: APA § 706(2)(B)—Right to Keep and Bear Arms. ......................................29

A.      The Second Amendment covers gunmaking. ...................................................... 29

B.      History forecloses the Rule. ................................................................................ 31

VI.    Scope of relief. ...................................................................................................................34

A.      Counts Two, Three, and Four lie outside *Bondi*'s framework. ...........................34

B.      Counts Five and Six succeed under the framework *Bondi* left in place. ................35

C.      Relief architecture. .............................................................................................35

Conclusion ....................................................................................................................................36

Certificate of Service ...................................................................................................................37

## Table of Authorities

**Cases**

*Andrews v. State*,
  50 Tenn. 165 (1871)...................................................................................................... 31

*Bondi v. VanDerStok*,
  604 U.S. 458 (2025) ............................................................................................... *passim*

*Data Marketing Partnership, LP v. United States Department of Labor*,
  45 F.4th 846 (5th Cir. 2022) ....................................................................................... 24, 35

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .................................................................................................... 23, 31

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ...............................................................................................28, 29, 30

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011)............................................................................................ 31

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012) ........................................................................................................30

*Illinois Ass'n of Firearms Retailers v. City of Chicago*,
  961 F. Supp. 2d 928 (N.D. Ill. 2014)...............................................................................32

*Jarkesy v. SEC*,
  34 F.4th 446 (5th Cir. 2022) ...........................................................................................26

*Johnson v. United States*,
  576 U.S. 591 (2015) ............................................................................... 8, 9, 18, 20, 36

*Luis v. United States*,
  578 U.S. 5 (2016) ........................................................................................................... 31

*Mock v. Garland*,
  75 F.4th 563 (5th Cir. 2023) ......................................................................................... 31

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024) .......................................................................................................36

*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*,
    463 U.S. 29 (1983) ...................................................................................... 22

*New York State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) ................................................................................ *passim*

*Sessions v. Dimaya*,
    584 U.S. 148 (2018) ...................................................................................... 20

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ......................................................................................36

*Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    437 F.3d 75 (D.C. Cir. 2006) .......................................................................19

*United States v. Evans*,
    333 U.S. 483 (1948) ...................................................................................... 20

*United States v. Lim*,
    444 F.3d 910 (7th Cir. 2006) .......................................................................19

*Utility Air Regulatory Group v. EPA*,
    573 U.S. 302 (2014) ...........................................................................24, 25, 29

*VanDerStok v. Garland*,
    86 F.4th 179 (5th Cir. 2023) ................................................................. *passim*

*Wages & White Lion Investments, L.L.C. v. FDA*,
    16 F.4th 1130 (5th Cir. 2021) ......................................................................29

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ...................................................................................... 24

**Statutes**

5 U.S.C. § 706 .................................................................................. *passim*

18 U.S.C. ch. 44 ..............................................................................................10

18 U.S.C. § 921 ................................................................................. *passim*

18 U.S.C. § 922 ................................................................................. *passim*

18 U.S.C. § 923 ......................................................................................................10, 24

18 U.S.C. § 924 ...................................................................................................... *passim*

18 U.S.C. § 926 ..............................................................................................................25

Federal Rule of Civil Procedure 56(a) ..............................................................................

**Administrative Authorities**

27 C.F.R. § 478.11 ............................................................................................... 8, 11, 28

27 C.F.R. § 478.12 ............................................................................................... *passim*

27 C.F.R. § 479.11 ...................................................................................................... 28

Definition of "Frame or Receiver" and Identification of Firearms,
        87 Fed. Reg. 24,652 (Apr. 26, 2022) ......................................................... *passim*

Internal Revenue Service, Department of the Treasury,
        33 Fed. Reg. 18,555 (Dec. 14, 1968) ................................................................. 11

**Secondary Authorities**

M.L. Brown, Firearms in Colonial America: The Impact on History and Technology 1492–1792
(1980) .....................................................................................................................33

John G.W. Dillin, The Kentucky Rifle (1975) ............................................................34

Joseph G.S. Greenlee, The American Tradition of Self-Made Arms,
54 St. Mary's L.J. 35 (2023) ............................................................................ *passim*

Letter from Secretary of State Thomas Jefferson to British Ambassador to the United States
George Hammond (May 15, 1793), in 7 The Writings of Thomas Jefferson 325 (Paul Leicester
Ford ed., 1904) ......................................................................................................33

Charles Winthrop Sawyer, Firearms in American History (1910) ...............................33

Francis Newton Thorpe, The Federal and State Constitutions, Colonial Charters, and Other
Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United
States of America (1909) ........................................................................................32

James B. Whisker, The Gunsmith's Trade (1992) .............................................. 33, 34

## Summary of the Argument

President Biden's so-called "ghost gun" regulation, *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022), violates the Due Process Clause because it fails to provide ordinary people fair notice of what conduct is criminal and invites arbitrary enforcement. The Constitution does not tolerate criminal prohibitions that turn on indeterminate standards. Yet that is exactly what the Rule does.

The Rule's core defect is its reliance on open-ended, subjective standards—most notably "readily" and "clearly identifiable." Those terms do not supply a workable boundary between lawful conduct and felony exposure. They require regulated parties to predict how ATF will weigh amorphous factors like time, ease, expertise, and tools. 27 C.F.R. § 478.11. They likewise require individuals to guess when a piece of material crosses an undefined line into a regulated "frame or receiver." *Id.* § 478.12(c). The Rule offers no objective thresholds, no safe harbors, and no administrable limits. That absence of standards denies fair notice as a matter of law.

The Rule also invites arbitrary enforcement. It authorizes ATF to consider an open-ended set of surrounding materials—templates, jigs, instructions, marketing materials—without specifying how those materials affect classification or where the line is drawn. *Id.* § 478.12(c). That structure delegates to individual officials the power to decide, case by case, what counts as a "firearm." The Due Process Clause forbids such criminal regimes. *See Johnson v. United States*, 576 U.S. 591 (2015). When liability turns on "a judicially imagined" or agency-imagined abstraction rather than clear elements, enforcement is unpredictable and arbitrary. *Id.* at 597.

The problem is compounded by the Rule's scope. The GCA imposes serious criminal penalties. 18 U.S.C. § 924. When vague standards define the reach of those penalties, the constitutional defect is at its apex. Individuals must be able to determine in advance whether their

conduct is lawful. Here, they cannot. As Judge Oldham rightly explained in the concurring opinion that should be followed here, the Rule replaces a clear rule with a multi-factor balancing test that "provides no guidance to anyone." *VanDerStok v. Garland*, 86 F.4th 179, 209 (5th Cir. 2023) (Oldham, J., concurring). That is the definition of unconstitutional vagueness.

The government's likely responses do not cure the defect. It is no answer to say that *some* applications are clear. The Supreme Court has rejected that theory. *Johnson*, 576 U.S. at 602. Nor can the government rely on post hoc assurances that ATF will provide guidance. The law itself must supply the standard. *Id.* at 597. And the Rule's reliance on discretionary classification determinations underscores the problem rather than solving it.

Because the Rule fails both prongs of the vagueness doctrine—fair notice and non-arbitrary enforcement—it cannot be enforced. That conclusion is sufficient to resolve the case.

The Court need not reach every claim to grant relief. Any one standing alone warrants the requested summary judgment. But because the Court has directed a full merits presentation, Defense Distributed and SAF press Counts Two through Six in full. Each is independently meritorious. Together, they confirm that the Rule is procedurally defective, unlawfully delegated, unexplained, and unconstitutional. And if the Court again resolves the case on a single ground, this briefing will preserve the remaining claims for the Fifth Circuit to reach if necessary.

The government's victory on Count One was not free. To secure it, the government had to persuade the Supreme Court that the Rule regulates objects that are not yet firearms — unfinished frames, unassembled parts, components in progress — on the sole ground that those objects participate in the process of firearm manufacture. That concession is what places the Second Amendment squarely in play, because the right to keep and bear arms necessarily protects

8

the conduct that produces them. And it is what exposes the Rule's fatal vagueness, because a regulation of the manufacturing process must identify the moment inert material crosses into regulated territory — a moment the Rule nowhere supplies. *Bondi* resolved whether the Rule fits the statute's text. It did so in terms that make every constitutional problem worse, not better. *Bondi* did not end this case. It sharpened it by giving a statutory win that confirms the Rule's constitutional defeat.

**Statement of the Case**

## I.      Legal Background.

Americans have always had the constitutional right to make personal firearms without presidential permission. The Second Amendment both stems from and protects this right, which has utmost support in the nation's history and tradition. "In fact, there were no restrictions on the manufacture of arms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries." Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 St. Mary's L.J. 35, 66 (2023). There is no historical tradition of regulating, let alone criminalizing, the self-manufacture of firearms.

Relatively recently, Congress used the Commerce Clause to enact a variety of criminal laws concerning commercial "firearm" transactions. *See* 18 U.S.C. ch. 44. Under this regime, it is a crime for many Americans to possess a commercial "firearm," 18 U.S.C. § 922(g), to transport a commercial "firearm," 18 U.S.C. §§ 923(a)(1)(A), 923(a)(3), to manufacture a commercial "firearm" at all, or to do so without a serial number, 18 U.S.C. §§ 923(a)(1)(A), 923(i). Should a person commit these or any of the other unlawful acts found in the twenty-six subsections of section 922, section 924 authorizes various penalties, including fines, imprisonment, or both.

9

"Firearm" is therefore one of criminal law's most impactful statutory keystones. In what is now 18 U.S.C. § 921, the Gun Control Act of 1968 supplied this keystone "firearm" definition:

> The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a). Congress never defined the constituent phrase "frame or receiver."

The Department of Justice's Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") has certain administrative authority over the GCA and issued rules redefining its keystone "firearm" term on several occasions. ATF issued a 1968 rule redefining "firearm" that prevailed until ATF's 2022 rule promulgated the redefinition at issue here.

### A.    The old "firearm" definition.

In 1968, ATF issued a rule redefining the GCA's "firearm" term by redefining the constituent phrase "frame or receiver." Internal Rev. Serv., Dep't of the Treasury, 33 Fed. Reg. 18,555 (Dec. 14, 1968) (formerly codified at 27 C.F.R. § 478.11 (2020)). It defined "frame or receiver" to mean the "part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." *Id.*

Under the 1968 Rule, ATF took the position that parts like so-called "receiver blanks" were not GCA "firearms." ATF's position was that "a hunk of metal became a federally regulated 'frame or receiver' only after it was 80% complete." *VanDerStok*, 86 F.4th at 198 (Oldham, J., concurring). According to this view, "items such as receiver blanks, 'castings' or 'machined bodies' in which the fire-control cavity area is completely solid and un-machined have not reached

the 'stage of manufacture' which would result in the classification of a firearm according to the GCA." R.2332 (emphasis added).

**B.      The new "firearm" definition.**

In 2022, ATF promulgated Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022). The Rule overhauls ATF's "firearm" definition with respect to the two contexts at issue here: (1) weapon part kits and (2) incomplete firearm frames and receivers.

27 C.F.R. 478.11 codifies ATF's new definitional position about weapon parts kits. According to this part of the Rule, the GCA term "firearm" now covers "a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. 478.11.

27 C.F.R. 478.12 codifies ATF's new position about incomplete frames and receivers. According to this part of the Rule, the GCA's "firearm" term does cover "a partially complete, disassembled, or nonfunctional frame or receiver" that is "designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver," but does not cover an "article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon." 27 C.F.R. 478.12(c).

The Rule's definitional changes carry huge legal consequences. They "place[] substantial limits on the well-known and previously unregulated right to 'the private ownership or use of firearms by law-abiding citizens for lawful purposes.'" *VanDerStok v. Garland*, 86 F.4th 179, 194 (5th Cir. 2023) (*quoting* the GCA, Pub. L. 90-618, Title I, § 101, 82 Stat. 1213, 1213 (Oct. 22, 1968)), *rev'd and remanded sub nom. Bondi v. VanDerStok*, 604 U.S. 458 (2025).

"Take, for example, an individual who buys a weapon parts kit containing several unfinished parts he later intends to build and adapt into a functional firearm for his personal use." *Id.* at 206-07 (Oldham, J., concurring). "Section 922 of the GCA, which uses the term 'firearm' to describe many of the 'unlawful acts' contained therein, may place additional burdens on this individual now that ATF has included aggregations of parts in the definition of 'firearm.'" *VanDerStok v. Garland*, 86 F.4th at 194. "Parts contained in the kit, which were previously unregulated, could now fall into the Final Rule's new definitions, such that the individual cannot sell, transport to another state, or, in some instances, possess the parts at all." *Id.* (footnotes omitted)." And key determinations, like which parts are regulated, what stage of manufacture they must be in, and how many together constitute an actual 'firearm,' are exceedingly unclear under the Final Rule, such that the individual must guess at what he is and is not allowed to do." *Id.*

The Rule's "firearm" definition is unprecedented. It criminalizes for the first time ever wide swaths of traditional gunmaking activities. "By expanding the types of items that are considered 'firearms,' ATF has cast a wider net than Congress intended: under the Final Rule, the GCA will catch individuals who manufacture or possess not just functional weapons, but even minute weapon parts that might later be manufactured into functional weapons." *Id.* "The Final Rule purports to criminalize such conduct and impose fines, imprisonment, and social stigma on persons who, until the Final Rule's promulgation, were law-abiding citizens." *Id.*

Judge Oldham's concurring opinion in this action's prior appeal sees the Rule's true danger. *Id.* at 197-98 (Oldham, J., concurring). "ATF's overarching goal in the Final Rule is to replace a clear, bright-line rule with a vague, indeterminate, multi-factor balancing test." *Id.*

12

"ATF's rationale: The new uncertainty will act like a Sword of Damocles hanging over the heads of American gun owners." *Id.* Hence this action.

### C.    The Rule remains in force.

The Rule challenged here is the same Rule that has been at issue throughout this litigation. It has not been rescinded, replaced, or superseded. It continues to govern Defense Distributed and SAF's members and continues to impose the same regulatory and criminal consequences described above.

The government has at times suggested that possible future agency action might affect the Rule. But the record shows no concrete change. In May 2025, DOJ counsel stated that the Attorney General's review process was "currently ongoing" and proposed delaying case deadlines. Ex. A at 1 (DOJ email of May 13, 2025). In March 2026, DOJ counsel stated that ATF was "planning to take additional action" with respect to the Rule but could not identify the nature or timing of that action. Ex. D at 1 (DOJ email of Mar. 27, 2026). On April 8, 2026, DOJ counsel stated that the government had "decided to maintain the current definition of firearm 'frame' and 'receiver' contained in that final rule." Ex. B at 1 (DOJ email of Apr. 8, 2026). Six days later, DOJ counsel directed the parties to disregard that statement because "the government has advised that it is considering changes to the frame/receiver rule." Ex. C at 1 (DOJ email of Apr. 14, 2026).

These shifting representations confirm only that no change has occurred. The Rule remains operative. It continues to bind regulated parties. And it continues to inflict the same injuries that give rise to this case. Speculation about possible future rulemaking does not alter that reality.

13

## II.     Procedural Posture.

### A.     Defense Distributed & SAF sought full summary judgment originally.

Defense Distributed and SAF have proceeded in the ordinary course at each stage of this litigation. After intervening, they filed their complaint on December 23, 2022, Doc. 143, and then moved for summary judgment on January 12, 2023, Doc. 165, supported by a brief addressing each of their claims, Doc. 166. They also replied in support of summary judgment on March 6, 2023. Doc. 193. The Court granted their motion for summary judgment, vacated the Rule, and denied the remaining claims as moot. Doc. 231. The ensuing appeal proceeded to the Fifth Circuit and then the Supreme Court, which remanded for further proceedings.

### B.     Post-remand schedule.

After remand, Defense Distributed sought interim relief while the unresolved constitutional and APA claims remained pending. The Court denied that relief, but also made clear that it intends to "resolve all remaining issues involved in this lawsuit." Doc. 314 at 1. It therefore ordered all parties to proceed by summary judgment on a complete schedule, with Plaintiffs' motion due April 24, 2026, Defendants' cross-motion and response due May 22, 2026, Plaintiffs' reply and response due June 19, 2026, and Defendants' reply due July 17, 2026. *Id.*

Defense Distributed and SAF now move under that schedule. This motion is not a new or piecemeal presentation. It is the next submission in the same case, after appellate remand, directed to claims that were pleaded, previously presented for summary judgment, and left unresolved only because the Court's earlier statutory ruling made further adjudication unnecessary.

### C.  Standing remains established.

Defense Distributed and SAF's standing is established on this record and has only strengthened as the case has progressed. From the outset, Defense Distributed showed that the Rule directly targets its core business—dealing in unfinished frames, receivers, and parts kits—and forces it to cease those activities under threat of criminal liability. Doc. 166-01 at 2–4. That compelled shutdown produced concrete and ongoing economic injury, including lost revenue, disrupted operations, vendor loss, and compliance costs. *Id.* at 4–5. Those injuries are neither abstract nor speculative. They arise from the Rule's reclassification of specific products Defense Distributed sold and would sell but for the Rule. *Id.* at 2–3. SAF independently established associational standing through members who would imminently acquire and use those same products but for the Rule's prohibitions and chilling effect. Doc. 166-02 at 2. That record satisfies Article III, and nothing in the intervening proceedings undermines it.

The post-remand evidence eliminates any suggestion that the injury is contingent or self-inflicted. The government has confirmed that it will enforce the Rule against Defense Distributed and its products during this litigation. *See* Doc. 294-1 at 2. That enforcement position maintains the same regulatory constraint that forced Defense Distributed to halt core lines of business and incur ongoing compliance costs. *See id.* at 3–4. The injuries therefore persist in real time and remain fully traceable to the Rule. Nor is this a case where the challenged conduct has ceased or become uncertain. The government's refusal to disclaim enforcement ensures a live controversy and continuing injury sufficient for Article III jurisdiction.

Additional unrebutted record evidence confirms that the Rule's effects extend to Defense Distributed's ability to function as a business. Financial institutions have declined to provide ordinary banking services because of the regulatory uncertainty created by the Rule's enforcement.

15

*See* Doc. 301-01 at 1. Insurance intermediaries report that insurers have declined to offer commercially viable coverage for the same reason. *See* Doc. 301-02 at 1. These are not isolated or idiosyncratic events. They reflect standard industry responses to unresolved criminal exposure and regulatory ambiguity. *See id.*; Doc. 301-01 at 1. The government's prior attempt to minimize these harms as limited or anecdotal misses the point. Article III requires injury, not exclusivity across all possible counterparties. The record shows concrete refusals tied to the Rule's enforcement posture, and that is sufficient. And critically, each of these injuries would be redressed by relief clarifying that the Rule cannot be enforced against Defense Distributed. Together with the original declarations, this evidence establishes standing as a matter of law and forecloses any renewed dispute on that issue.

## Argument

Defense Distributed and SAF's complaint seeks to have the new Final Rule held unlawful and set aside with six counts of claims asserting distinct legal theories. Doc. 143 at 20-27. Count One has been adjudicated. This Court granted summary judgment on that statutory claim, held that ATF exceeded its statutory authority, and vacated the Rule. Doc. 227; Doc. 231. The Fifth Circuit largely affirmed. *VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023). The Supreme Court then reversed on that statutory question, holding that the Rule is not facially inconsistent with the GCA. *Bondi v. VanDerStok*, 604 U.S. 458 (2025). What remains are Counts Two through Six. No court has ruled on those claims. *See* Doc. 231 at 2 n.1. Judge Oldham addressed the Due Process Clause issue in concurrence, *see VanDerStok*, 86 F.4th at 200–09 (Oldham, J., concurring), but neither the Fifth Circuit nor the Supreme Court adjudicated it. Defense Distributed and SAF now move for summary judgment on the unresolved claims, beginning with the Due Process Clause claim becuase it is strongest and supported by Judge Oldham's correct roadmap for decision.

16

Summary judgment is warranted where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). This Court has already applied that standard in this case, resolving the prior summary-judgment motions on the administrative record because the issues presented were legal, not factual. *See* Doc. 227 at 5–6. The same posture and mode of review controls here. The material facts are fixed by the administrative record and accompanying declarations, and the remaining questions—whether the Final Rule violates the APA and the Constitution—are purely legal. Summary judgment is therefore the proper and ordinary vehicle for resolution. Defense Distributed and SAF are entitled to judgment as a matter of law on all of their remaining claims.

## I.      Count Six: APA § 706(2)(B)—Due Process Clause.

Defense Distributed and SAF also move for summary judgment against Defendants on Count Six of Defense Distributed and SAF's complaint. *See* Doc. 143 at 25-27, ¶¶ 81-86. This claim has not yet been adjudicated, *see* Doc. 231 at 2 n.1, and should now be upheld as fully meritorious. The Fifth Amendment's Due Process Clause forbids deprivations of life, liberty, or property without due process of law. U.S. Const. amend. V. Its vagueness doctrine is violated by criminal laws that either deny defendants fair notice of what is punishable or invite arbitrary enforcement by lack of standards. *E.g.*, *Johnson v. United States*, 576 U.S. 591 (2015). Count Six shows that the Rule does this in three distinct ways, all of which independently warrant a final summary judgment in Defense Distributed and SAF's favor.

### A.      The Rule denies fair notice.

First, the Rule violates the Due Process Clause's vagueness prohibition by defining "frame" and "receiver" to include a "partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed,

assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). Those inherently amorphous terms—especially "readily," even as defined by 27 C.F.R. § 478.11—present an unconstitutional level of vagueness that denies citizens fair notice of what is punishable. The rule does not say, and no reasonable person can reliably infer, what point of evolution a piece of metal or plastic crosses the "readily" barrier to become a "frame or receiver." Vacuous metrics like this are invalid. *See Tripoli Rocketry v. ATF*, 437 F.3d 75, 81 (D.C. Cir. 2006). Objectified, specific measurements would be needed to cure this fault, *see United States v. Lim*, 444 F.3d 910, 916 (7th Cir. 2006), and the Rule has none.

**B.      The Rule invites arbitrary enforcement.**

Second, the Rule also violates the Due Process Clause's vagueness prohibition by defining "frame" and "receiver" to sometimes include "a forging, casting, printing, extrusion, unmachined body, or similar article," depending on whether or not it has "reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." 27 C.F.R. § 478.12(c). Here again, inherently amorphous terms—especially "clearly identifiable"—present an unconstitutional level of vagueness that denies citizens fair notice of what is punishable. Much like the vagueness problem regarding "readily," the Rule does not say, and no reasonable person can reliably infer, what point of evolution defines the "clearly identifiable" threshold.

Third, the Rule also violates the Due Process Clause's vagueness prohibition by providing that, "[w]hen issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit." 27 C.F.R. § 478.12(c). Those terms violate

the vagueness doctrine by inviting arbitrary enforcement. The Rule does not say, and no reasonable person can reliably infer, exactly what set of materials ATF thinks are relevant to this inquiry—let alone how the bureaucrats will construe them to make the critical determination.

Crimes cannot be defined by government imagination. So held *Johnson v. United States*, 576 U.S. 591 (2015), which deemed the law at issue unconstitutionally vague because it "ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." *Id.* The Rule here is just as bad, in that it ties the definition of all "firearm" based crimes to an administratively imagined notion of what a complete and operable "firearm" really is, based on little more than a bureaucrat's ipse dixit. "It is one thing to apply an imprecise . . . standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction." *Id.* The Rule's ATF-imagined abstraction of when a gun becomes a true gun is no better.

"Each of the uncertainties in the [Rule] may be tolerable in isolation, but 'their sum makes a task for us which at best could be only guesswork.'" *Id.* (*quoting United States v. Evans*, 333 U.S. 483, 495 (1948)). "Invoking so shapeless a provision to condemn someone to prison . . . does not comport with the Constitution's guarantee of due process." *Id.*

It is no answer for the government to say that *some* cases make for easy application of the Rule. The controlling holdings—both *Johnson* and *Sessions v. Dimaya*, 584 U.S. 148 (2018)— "squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson*, 576 U.S. at 602. Just as in *Johnson* and *Sessions*, the Rule produces "more unpredictability and arbitrariness than the Due Process Clause tolerates." *Dimaya*, 584 U.S. at 174-75.

19

### C.    Judge Oldham's roadmap controls.

Judge Oldham's concurring opinion from 2023 treats the Due Process Clause challenge to this Rule correctly and should be followed here. *VanDerStok v. Garland*, 86 F.4th 179, 209 (5th Cir. 2023) (Oldham, J., concurring), *rev'd and remanded sub nom. Bondi v. VanDerStok*, 604 U.S. 458 (2025). "As important as the Fifth Amendment's guarantee of fair notice to individuals is the Amendment's prohibition against "arbitrary enforcement" by government officials." *Id.* "It is thus of no use for ATF to say that it will tell ordinary people what they can do." *Id.* "The law exists to tell both the people and government officials what they can do." *Id.* "The nonexclusive eight-factor balancing test provides no guidance to anyone and hence is void for vagueness." *Id.*

Indeed, ATF's continued inability to cogently classify Defense Distributed's items proves the point. Why does ATF now posit that the Rule covers 80% pistol frames *but not 80% rifle lowers*? No one knows, and this incoherence demonstrates the Rule's lack of clear standards, forcing Defense Distributed to guess at compliance while facing criminal liability. Such arbitrary and unpredictable enforcement is exactly what the Due Process Clause forbids.

## II.    Count Two: APA § 706(2)(A)—Failure to consider.

Defense Distributed and SAF move for summary judgment against Defendants on Count Two of Defense Distributed and SAF's complaint. *See* Doc. 143 at 22-23, ¶¶ 67-69. This claim has not yet been adjudicated, *see* Doc. 231 at 2 n.1, and should now be upheld as fully meritorious.

### A.    *Bruen* supplied the controlling factors.

Count Two is the process-based claim about the Agencies having violated the Administrative Procedure Act by promulgating the Final Rule with insufficient considerations. *Id.* It is *not* the same as Defense Distributed and SAF's Count One, which asserts an *outcome*-based APA violation (the Final Rule's contradiction of its enabling statute) and is asserted by other

claimants. Nor is it the same as Defense Distributed and SAF's Count Five, which asserts an *outcome*-based APA and constitutional violation (the Final Rule's contradiction of the Second Amendment) and is asserted by other claimants as well. Defense Distributed and SAF's Count Two is process-focused instead of outcome-focused and, though it invokes Second Amendment precedent, the resulting violation is of the APA and not the Constitution. No other party asserts this claim. *See* Doc. 137 at 8 (Order granting Defense Distributed and SAF's motion to intervene) ("Putative Intervenors raise a unique claim implicating their rights under the Second Amendment that diverges from those brought by the current Plaintiffs.").

Defense Distributed and SAF's Count Two shows that the new Final Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," § 706(2)(A), because the Agencies when promulgating the Final Rule failed to consider legally relevant factors and data. Whenever an agency makes a rule, the agency's rulemaking process "must examine" "relevant factors" and "relevant data." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*, 463 U.S. 29, 43 (1983). For this rule, the Agencies had to consider the "relevant" Second Amendment inquiry upheld by *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). That is, the APA required the Agencies to consider whether this "regulation is consistent with this Nation's historical tradition of firearm regulation" and to do so *strictly*—i.e., without using the "means-end scrutiny" that *Bruen* deemed unconstitutional. *Id.* at 3-4, 19. No such inquiry occurred here.

**B.    ATF ignored the *Bruen* factors.**

When promulgating the new Final Rule, the Agencies doubly violated the APA by both (1) failing to consider the factors and data that *Bruen* deems constitutionally mandatory and (2) relying instead on factors and data that *Bruen* deems constitutionally improper. The administrative record is glaring in both respects. Most importantly, the record shows no *Bruen*-compliant considerations

because the Agencies did not even try to determine whether this "regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126-32. The Agencies never attempted to consider whether the new Final Rule "addresses a general societal problem that has persisted since the 18th century," and if so whether there was "a distinctly similar historical regulation addressing that problem." *Id.* These failures are established as a matter of law.

### C.       ATF used forbidden means-end scrutiny.

Instead of promulgating the Final Rule by considering the legally relevant factors and data, the administrative record shows that the Agencies compounded their APA violation by relying upon legally *irrelevant* matters. They infected their rulemaking process with the very presumptions of legality and means-ends scrutiny that *Bruen* deems illegal. *Compare* 87 Fed. Reg. 24,676-24,677 (relying on "compelling governmental interests" and "presumptively lawful regulatory measures"), *with Bruen*, 597 U.S. at 19 ("*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."). This too is established as a matter of law.

Given that the Agencies did not even attempt to consider the correct Second Amendment factors and data, it is no surprise to see that the resulting Final Rule violates the Constitution. But that important result-based violation is a different and distinct problem addressed by other claims. At issue here in Defense Distributed and SAF's Count Two is the Agencies' procedural failure to *consider* the historical factors and data that *Bruen* deems relevant—a process-based APA illegality that warrants setting the Final Rule aside regardless of how outcome-based claims turn out.

For these reasons, Defense Distributed and SAF's Count Two entitles them to a summary judgment holding that the Final Rule is "arbitrary, capricious, an abuse of discretion, or otherwise

22

not in accordance with law" and ordering that it be "set aside." 5 U.S.C. § 706(2); *see Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022).

### III.   Count Three: APA § 706(2)(A), (C)—Delegation.

Defense Distributed and SAF move for summary judgment against Defendants on Count Three of Defense Distributed and SAF's complaint. *See* Doc. 143 at 23-24, ¶¶ 70-73. This claim has not yet been adjudicated, *see* Doc. 231 at 2 n.1, and should now be upheld as fully meritorious.

#### A.   No Delegation In Fact.

By promulgating the new Final Rule, the Agencies committed a final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," § 706(2)(A), as well as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," § 706(2)(C), because the "major questions" doctrine shows that Congress did not in fact delegate to these Agencies the task of further defining the Gun Control Act's "firearm" term. *See West Virginia v. EPA*, 597 U.S. 697 (2022). Congress must "speak clearly if it wishes to assign to an agency decisions of 'vast economic and political significance.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324, (2014). The task of defining the Gun Control Act's "firearm" term is a decision of vast economic and political significance. Yet no statute clearly delegates it. The supposed delegation therefore did not occur in fact.

The major questions doctrine controls. Agencies require clear congressional authorization to decide issues of "vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (quotation omitted). Defining the scope of "firearm" under the GCA meets that standard. The term triggers criminal liability, licensing mandates, serialization requirements, and nationwide background-check obligations. *See* 18 U.S.C. §§ 922–923, 924. It is the statute's "bedrock." *VanDerStok v. Garland*, 86 F.4th 179, 184 (5th Cir. 2023).

The Final Rule rewrites that bedrock. It expands "firearm" to reach unfinished components and parts kits based on a multi-factor "readily" test untethered to statutory text. *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652, 24,739 (Apr. 26, 2022) (codified at 27 C.F.R. § 478.12(c)). That expansion sweeps in conduct Congress left unregulated—most notably the longstanding practice of private firearm manufacture. *VanDerStok*, 86 F.4th at 185.

Congress did not clearly authorize that move. The GCA defines "firearm" with precision. 18 U.S.C. § 921(a)(3). It does not mention parts kits or unfinished components as such. And for decades, ATF adhered to a narrower definition centered on completed frames or receivers. *See VanDerStok*, 86 F.4th at 184–85 (describing 1978 definition). The absence of clear statutory text forecloses any claimed delegation.

Fifth Circuit authority confirms the point. The court held that ATF's attempt to expand "firearm" to include weapon parts kits and nonfunctional components "exceeded its statutory authority." *Id.* at 181. That holding reflects the same principle: Congress did not authorize ATF to redefine the statute's core term.

The agencies' general authority to "carry out" the GCA does not change the analysis. 18 U.S.C. § 926(a). That provision permits implementation, not transformation. Agencies may fill gaps; they may not create them. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014) (rejecting agency effort to "rewrite clear statutory terms").

The Rule replaces Congress's definition with a policy-driven standard designed to capture new products Congress chose not to regulate. That is legislation, not interpretation. Because Congress did not clearly delegate that power, the Rule fails under § 706(2)(C).

24

## B.    Unconstitutional Delegation.

By promulgating the new Final Rule, the Agencies committed a final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," § 706(2)(A), as well as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," § 706(2)(C), because the nondelegation doctrine stopped Congress from delegating the task of further defining the Gun Control Act's "firearm" term to the Agencies. *See Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022) ("The two questions we must address, then, are (1) whether Congress has delegated power to the agency that would be legislative power but-for an intelligible principle to guide its use and, if it has, (2) whether it has provided an intelligible principle such that the agency exercises only executive power."). The power at issue—the power to define the Gun Control Act's keystone "firearm" term"— would be legislative power but-for an intelligible principle to guide its use. Yet Congress did not, in Gun Control Act's "firearm" definition or anywhere else, supply the Agencies with an "intelligible principle" to guide that definitional power's use. As such, Congress's supposed delegation to the Agencies' of a power to further define the Gun Control Act's "firearm" term is unconstitutional.

The governing test is settled. A delegation is invalid if it confers legislative power without a meaningful standard to guide the agency's discretion. *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022). The power claimed here is quintessentially legislative. Defining "firearm" determines the scope of criminal liability for a nationwide regulatory regime. It decides who must obtain federal licenses, conduct background checks, and face felony penalties. *See* 18 U.S.C. §§ 922–924. That is not gap-filling. It is lawmaking.

Congress supplied no intelligible principle to guide that power. The statute offers a fixed definition. It does not authorize ATF to expand that definition based on policy concerns,

25

technological change, or perceived enforcement gaps. Nor does it provide standards for deciding when an unfinished object becomes a regulated "firearm."

The Final Rule confirms the absence of constraint. Its "readily" standard relies on open-ended factors—time, ease, expertise, and tools—without objective thresholds. *See* 27 C.F.R. § 478.11 (defining "readily"). That framework leaves regulated parties and the agency itself without clear boundaries. It invites case-by-case policymaking, the hallmark of legislative discretion.

This lack of guidance is not incidental. It is the mechanism by which ATF expands its jurisdiction. The Rule's breadth depends on discretionary judgments about how much work is "enough" to convert a part into a firearm. That is precisely the sort of unguided authority the nondelegation doctrine forbids.

The constitutional problem is acute because the Rule attaches criminal consequences. The GCA imposes penalties—including imprisonment—for violations. *See* 18 U.S.C. § 924. When an agency defines the elements of criminal conduct without clear statutory limits, it exercises core legislative power.

Because the statute provides no intelligible principle for redefining "firearm," any such delegation is unconstitutional. The Rule therefore fails under § 706(2)(A) and (C).

IV.     **Count Four: APA § 706(2)(A), (C)—Change of position.**

Defense Distributed and SAF also move for summary judgment against Defendants on Count Four of Defense Distributed and SAF's complaint. *See* Doc. 143 at 24-25, ¶¶ 74-76. This claim shows that, by promulgating the new Final Rule, the Agencies committed a final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," § 706(2)(A), as well as "in excess of statutory jurisdiction, authority, or limitations, or short

26

of statutory right," § 706(2)(C), because the New Rule commits major changes without adequate explanation. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("Unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." In particular, even though the New Rule expressly repudiates the Agencies' prior position taken in multiple determinations, *see* 87 Fed. Reg. at 24,741 ("Prior determinations by the Director that a partially complete, disassembled, or nonfunctional frame or receiver, including a parts kit, was not, or did not include, a "firearm frame or receiver" under § 478.11, or "frame or receiver" under § 479.11, as those terms were defined prior to April 26, 2022, shall not continue to be valid or authoritative after that date.), no adequate explanation for that major change exists.

### A.     The Final Rule Effects a Sweeping Reversal of Settled Agency Practice.

The Final Rule does not refine prior policy. It repudiates it.

For decades, ATF interpreted "frame or receiver" to mean a single, completed component housing specified internal parts. *VanDerStok v. Garland*, 86 F.4th 179, 184–85 (5th Cir. 2023) (describing 1978 definition). That interpretation governed industry conduct and agency enforcement for over forty years. *Id.*

The Final Rule abandons that approach. It extends regulation to "partially complete, disassembled, or nonfunctional" components and to "weapon parts kits" based on a new "readily" standard. 27 C.F.R. §§ 478.11, 478.12(c); 87 Fed. Reg. 24,652, 24,739 (Apr. 26, 2022).

The agency acknowledged the break. It expressly invalidated prior classification determinations concluding that such items were not "firearms." 87 Fed. Reg. at 24,741. That is a wholesale reversal—not a clarification.

27

The consequences are equally sweeping. Conduct long understood to fall outside the GCA is now subject to licensing, serialization, and criminal penalties. *See* 18 U.S.C. §§ 922–924. The Rule thus "expand[s] regulatory power without congressional authorization." *Blackhawk Mfg. Grp. v. Garland*, No. 4:22-cv-00691-O, ECF No. 192 at 1 (N.D. Tex. Mar. 6, 2023).

### B.    The Agencies Failed to Provide the Required Reasoned Explanation.

An agency changing course must "display awareness that it is changing position" and provide a "reasoned explanation" for the new policy. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). Where prior policy created reliance interests, the agency must account for them. *Id.* The Final Rule fails that standard.

First, the agency offers no adequate explanation for discarding its longstanding definition. It points to changes in firearm technology and the rise of "ghost guns." 87 Fed. Reg. at 24,655–58. But policy concerns cannot justify rewriting statutory terms. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014). Nor do they explain why the prior interpretation—applied for decades—was wrong.

Second, the agency fails to grapple with its own contrary determinations. It does not reconcile prior classifications with the new rule. Instead, it declares them invalid going forward. 87 Fed. Reg. at 24,741. That is not reasoned decisionmaking. It is ipse dixit.

Precedent rejects such unexplained reversals. An agency must "acknowledge and explain" departures from prior policy; failure to do so is arbitrary and capricious. *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1138–39 (5th Cir. 2021). The Final Rule does neither.

Third, the agency fails to account for reliance interests. Industry participants—including Defense Distributed—structured their conduct around ATF's prior definitions and classifications. The Rule upends those settled expectations overnight, attaching new regulatory and criminal

28

consequences. Yet the agency offers no meaningful consideration of those reliance interests, as *Encino Motorcars* requires. 579 U.S. at 222.

### C.   The Rule's New Standards Underscore the Arbitrary Reversal.

The arbitrariness of the change is compounded by the indeterminacy of the new standards. The Rule replaces a concrete definition with an open-ended, multi-factor "readily" test. 27 C.F.R. § 478.11. That test depends on variables such as time, ease, expertise, and tools required for completion. *Id.* It supplies no objective thresholds.

That shift confirms the absence of reasoned explanation. The agency has not moved from one clear rule to another. It has abandoned clarity altogether in favor of discretionary enforcement.

Courts routinely reject such moves. An agency acts arbitrarily when it replaces a clear standard with a vague one without justification. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (requiring reasoned explanation for policy changes affecting regulated parties).

The Fifth Circuit has already recognized the underlying problem. ATF's new definitions expand regulatory reach beyond statutory limits and prior practice. *VanDerStok*, 86 F.4th at 181. That expansion is inseparable from the agency's unexplained reversal.

### V.   Count Five: APA § 706(2)(B)—Right to Keep and Bear Arms.

Defense Distributed and SAF also move for summary judgment against Defendants on Count Five of Defense Distributed and SAF's complaint. *See* Doc. 143 at 25, ¶¶ 77-80. This claim has not yet been adjudicated, *see* Doc. 231 at 2 n.1, and should now be upheld as fully meritorious.

### A.   The Second Amendment covers gunmaking.

At issue is the individual right to acquire and make Arms, which is part and parcel of the Second Amendment's right to keep and bear Arms. America's historical tradition of personal gunmaking is well-established and wholly free from any major federal regulation at all. Because

ATF's new "firearm" definition makes the GCA trample that right, its enforcement is unconstitutional.

Where "the Second Amendment's plain text covers an individual's conduct," the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Association, v. Bruen*, 597 U.S. 1 (2022). That test applies to the Rule's "firearm" definition and cannot be met.

As to the initial issue of constitutional text, the Second Amendment's operative words cover what the Rule proscribes. The Second Amendment's term "Arms" covers "all instruments that constitute bearable arms," including "those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. The Rule plainly regulates such "Arms" by changing the scope of the GCA's keystone "firearm" definition.

The activities proscribed by the Rule's new "firearm" definition are also covered by the Second Amendment phrase "keep and bear," which necessarily entails an individual right to make or acquire Arms. *See Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring in the judgment) ("Constitutional rights thus implicitly protect those closely related acts necessary to their exercise."). *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."); *Andrews v. State*, 50 Tenn. 165, 178 (1871) (the "right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair"); *see also Mock v. Garland*, 75 F.4th

30

563, 588 (5th Cir. 2023) (Willett, J., concurring) ("protected Second Amendment 'conduct' likely includes making common, safety-improving modifications to otherwise lawfully bearable arms); *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) ( "the right to keep and bear arms . . . must also include the right to *acquire* a firearm . . ." (emphasis in original)). Just as a law criminalizing printing presses would implicate the First Amendment, so too a law criminalizing personal gunsmithing parts and kits implicates the Second.

> ### B.   History forecloses the Rule.

Because the Rule's "firearm" definition implicates the Second Amendment's protections, Defendants have the burden of demonstrating the requisite historical tradition; it is not the Defendants' burden to disprove that historical tradition. *See Bruen*, 597 U.S. 1. Even so, authorities already make it clear that there is no historical tradition of regulating the self-manufacture of firearms that supports the Rule's expansion of the GCA.

Self-manufactured firearms in America have a long and, until just recently, unregulated history. *See* Joseph G.S. Greenlee, *The American Tradition of Self Made Arms*, 54 St. Mary's L.J. 35, 66 (2023). The unregulated self-manufacture of firearms was common in the American colonies, beginning with gunsmiths who made and repaired militia and hunting weapons and were "extremely important and highly valued in their communities." *Id.* at 9.

Colonists possessed both the express right to import whole firearms and the parts necessary to make their own firearms. *Id.* at 9-10 (citing Francis Newton Thorpe, *The Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America* 3787–88 (Francis Newton Thorpe ed., 1909)). While "[i]n the large gunsmith shops of the cities it is probable that many minds were given to the making of a gun . . . in the smaller shops which formed the great majority—mere cabins on the

outskirts of the wilderness—one man with or without an apprentice did every part of the work." Charles Winthrop Sawyer, *Firearms in American History* 145 (1910); *see also* James B. Whisker, *The Gunsmith's Trade* 5 (1992).

During the Revolutionary War, when the British attempted to prevent Americans from acquiring firearms and ammunition, Americans were forced to manufacture their own firearms and gunpowder to survive. *See* Greenlee, *supra*, at 12–15 (citing M.L. Brown, *Firearms in Colonial America: The Impact on History and Technology 1492-1792* 127 (1980)). Due to the circumstances of the war, "[n]early every able-bodied male between 16 and 60 . . . [had] to provide his own arms" and some men "built their arms themselves." *Id.* at 25. "When the colonies faced major arms shortages throughout the war, domestic arms manufacturing filled the void." *Id.* at 16. Indeed, the colonies themselves solicited firearm manufacturers, including those engaged in private manufacture and others outside of the firearms industry, to increase domestic production. *Id.* at 18–23.

Thomas Jefferson understood the right very well. Describing the landscape of firearms in early America in 1793, he wrote that "[o]ur citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." Letter from Secretary of State Thomas Jefferson to British Ambassador to the United States George Hammond, May 15, 1793, in 7 *The Writings of Thomas Jefferson* 325–26 (Paul Ford ed., 1904).

After the Revolutionary War, "gunsmithing was a universal need in early America" and "many early Americans who were professionals in other occupations engaged in gunsmithing as an additional occupation or hobby." Greenlee, *supra*, at 29. This tradition extended to pioneers,

mountain men, and explorers whose need to make and repair firearms was a survival necessity. *Id.* at 32.

ATF's supposedly modern notion of firearm "precursor parts" is not modern at all. Although some early riflemakers forged their firearm parts from scratch, "there were gunsmiths who did not forge out their barrel blanks, but purchased them in bulk from some factory like that of Eliphalet Remington." John G.W. Dillin, *The Kentucky Rifle* 96 (1975). These riflemakers then fitted their barrels "to hand-made stocks with American factory or English locks." *Id.*

This tradition of personal gunmaking—free from any major federal regulation whatsoever—continued into the nineteenth and twentieth centuries, when "[m]any of the most important innovations in firearms technology began not in a federal armory or major firearms manufactory, but in private homes and workshops." Greenlee, *supra*, at 35. Such innovations include "[t]he most popular rifle in America today . . . the AR-15, owned in the tens of millions . . . [whose] roots are in homebuilding." *Id.* at 39.

During all of these foundational time periods, anyone with the requisite skill had an essentially unfettered right to build their own firearms; "[o]ne need not have had a wealthy patron or sponsor, or work for king and nobility, to make guns." Greenlee, *supra*, at 41 (internal citation omitted); Whisker, *supra*, at 6 ("Even those apprentices who had never completed an apprenticeship might enter the trade. No guild, union or government agency attempted to regulate the gun making business….He need not take any examination. He need not present one of his guns to any examining board."); *id.* at 90 ("Gunsmiths considered it to be their right to make guns without regulation or interference.").

Deviations from this historical tradition are decidedly few and modern. No restrictions were placed on the self-manufacture of firearms for personal use (or their parts) in America during the seventeenth, eighteenth, or nineteenth centuries. *See* Greenlee, *supra*, at 40. Rather, "[a]ll such restrictions have been enacted within the last decade." *Id.* At the state level, it was not until 2016 that a small minority of states began to regulate the manufacture of arms for personal use. *Id.* at 42.

Hence, there is no American historical tradition of regulating firearm parts or the self-manufacture of firearms—let alone criminalizing them. Yet that is precisely what the Rule's "firearm" definition makes the GCA do. Because that violates the Second Amendment, *see N.Y. State Rifle & Pistol Ass'n, v. Bruen*, 597 U.S. 1 (2022), it cannot be enforced.

## VI.   Scope of relief.

### A.   Counts Two, Three, and Four lie outside *Bondi*'s framework.

*Bondi v. VanDerStok*, 604 U.S. 458 (2025), applied a *Salerno*-style test to a § 706(2)(C) statutory-text challenge only because the parties did not dispute that framework. *Id.* at 865–66. The Court signaled that test "would seem plainly … inapposite" to § 706(2)(A) arbitrary-and-capricious claims: a rule "so overbroad that it has only a single valid application … would seem plainly arbitrary or capricious under the APA." *Id.* at 866 n.2. Counts Two and Four are such claims. The defects — failure to consider constitutionally mandatory factors; unexplained reversal of a 40-year position — inhere in the rulemaking. So vacatur follows regardless of application. *See Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022). Count Three is structurally invalid across the board: if the Agencies lack authority under MQD or nondelegation, no application of the Rule is lawful, and *Bondi* addressed neither question.

**B.      Counts Five and Six succeed under the framework *Bondi* left in place.**

*Count Six. Johnson* forecloses a *Salerno* defense in criminal vagueness: it "squarely contradict[ed] the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 576 U.S. 591, 602 (2015). The Rule's indeterminate applications also vastly outnumber any narrow core of clear ones, so it lacks a "plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). And as applied to the M1911 80% Frames and G80 items — which cannot be finished by an "ordinary person, using ordinary tools" in minutes, *Bondi*, 604 U.S. at 480; Doc. 294 at 7–8, 10 n.1 — the Rule is unconstitutional for the independent reason that *Bondi* expressly reserved that question.

*Count Five. Bruen* requires the government to justify the regulation against the historical tradition before any *Salerno* inquiry — and at the level of the regulation, not its applications. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). The government cannot carry that burden for a Rule that criminalizes personal gunmaking, a tradition unregulated from the seventeenth century until the last decade. Greenlee, *The American Tradition of Self-Made Arms*, 54 St. Mary's L.J. 35, 40–42 (2023). The Rule also lacks a plainly legitimate sweep. *Moody*, 603 U.S. at 723. And as applied to the M1911 and G80 items, no tradition supports regulation this far from completion.

**C.      Relief architecture.**

Standing is established for each claim and each form of relief on the existing record. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); Doc. 166-01 at 2–5; Doc. 166-02 at 2; Doc. 294-1 at 2–4; Doc. 301-01; Doc. 301-02. Three remedies follow. Vacatur on Counts Two, Three, and Four — the rulemaking defects warrant it and *Bondi* does not foreclose it. An injunction against enforcement of the Rule as to Defense Distributed's M1911 80% Frames and G80 Build Kit, Unfinished Receiver, and Grip Module on Counts Five and Six. Doc. 294 at 7–8. A declaratory

judgment resolving the enforcement uncertainty that has produced ongoing injury independent of enforcement itself. Doc. 301-01; Doc. 301-02. This is the consolidated merits presentation the Court directed. Doc. 314. Judgment should issue.

## Conclusion

The motion should be granted.

Respectfully submitted,

By /s/ *Chad Flores*
Chad Flores
  chad@chadfloreslaw.com
  Texas Bar No. 24059759
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
P: (713) 893-9440
F: (832) 645-2496

Counsel for Defense Distributed and
the Second Amendment Foundation, Inc.

## Certificate of Service

A true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record on the day of its filing.

<u>/s/ Chad Flores</u>
Chad Flores