**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

DEFENSE DISTRIBUTED *et al.*,

    Plaintiffs,

  v.

TODD BLANCHE, in his official capacity as Acting Attorney General of the United States *et al.*,

    Defendants.

Case No. 4:22-cv-00691-O

**APPENDIX TO DEFENDANTS' COMBINED BRIEF IN OPPOSITION TO DEFENSE DISTRIBUTED AND SECOND AMENDMENT FOUNDATION'S MOTION FOR <u>SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANDREW I. WARDEN
Assistant Director, Federal Programs Branch

*/s/ Daniel Riess*
DANIEL RIESS
JEREMY S.B. NEWMAN
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 353-3098
Email: Daniel.Riess@usdoj.gov
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

On May 22, 2026, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Daniel Riess*

**TABLE OF CONTENTS**

Declaration of Jeremy S.B. Newman (June 26, 2025)..................................................................1

Open Letter to All Federal Firearms Licensees, *Impact of Final Rule 2021-05F on Partially Complete Polymer80, Lone Wolf, and Similar Semiautomatic Pistol Frames* (Dec. 27, 2022)............................................5

Open Letter to All Federal Firearms Licensees, *Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers* (Sept. 27, 2022)........................................................................15

William J. Novak, THE PEOPLE'S WELFARE, LAW AND REGULATION IN NINETEENTH CENTURY AMERICA 87 (1996) ....................................................................................22

3 LAWS OF THE COMMONWEALTH OF MASSACHUSETTS FROM NOVEMBER 28, 1780 TO FEBRUARY 28, 1807, at 259 (1807) ....................................................................24

1 LAWS OF THE STATE OF MAINE 546 (1830). ......................................................27

*Miller et al v. Bonta, et al.*, No. 3:19-cv-1537 (S.D. Cal. 2022) (Dkt. No. 137-3, at 22) (Declaration of Prof. Saul Cornell). ..................................................................28

3 LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED 240-44 (1810) ...............................29

2 GENERAL LAWS OF MASSACHUSETTS FROM THE ADOPTION OF THE CONSTITUTION TO FEBRUARY 1822, at 199 (1823) ........................................................................ 34

LAWS OF THE STATE OF NEW HAMPSHIRE; WITH THE CONSTITUTIONS OF THE UNITED STATES AND OF THE STATE PREFIXED 275-80 (Isaac Long Jr., 1830) ...................... 37

COLONIAL LAWS OF MASSACHUSETTS REPRINTED FROM THE EDITION OF 1672, at 125-26 (1890) (1651 statute) .......................................................................... 43

15 PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 190-92 (1890) (1775 statute) ................... 45

ATF Letter to Private Counsel #303304 (March 20, 2015).......................................... 48

ATF Classification Letter to Chris Coad, Ultra-Tech, Inc. (May 20, 2009)..........................53

ATF Classification Letter to Jason Davis, Davis & Associates (undated)............................55

Regulatory Impact Analysis (April 2022).........................................................61

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| JENNIFER VANDERSTOK *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> PAMELA BONDI, in her official capacity as Attorney General of the United States *et al.*, <br><br> Defendants. | Case No. 4:22-cv-00691-O |

### DECLARATION OF JEREMY S.B. NEWMAN

I, JEREMY S.B. NEWMAN, declare as follows:

1.    I am a Trial Attorney for the U.S. Department of Justice, Civil Division, Federal Programs Branch.  I am counsel to Defendants in the above-captioned action.  I make this declaration on the basis of personal knowledge.

2.    On May 5, 2025, counsel for Defense Distributed, Chad Flores, contacted my colleague Daniel Riess and I concerning the next steps in this action and the Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF) treatment of various products sold by Defense Distributed.  Over the next month, Mr. Riess and I corresponded with Mr. Flores regarding these issues.

3.    On June 3, 2025, I sent a letter to Mr. Flores via electronic mail, attached as Exhibit 1.

4.    Mr. Flores and I then engaged in additional correspondence, which Defense Distributed attached to a declaration it submitted in this case.  *See* ECF No. 294-2, at 4-7.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 4, 2025.

h___/h___

Jeremy S.B. Newman

App. 001

# EXHIBIT 1



**U.S. Department of Justice**

Civil Division

---

*Federal Programs Branch*                                   *Washington, D.C.  20005*

June 3, 2025

<u>VIA ELECTRONIC MAIL</u>
Mr. Chad Flores
Flores Law PLLC
9117 Franklin Street Suite 600
Houston, Texas 77002

      Re:    *VanDerStok et al. v. Bondi et al.*, No. 4:22-cv-00691-O (N.D. Tex.)

Dear Mr. Flores:

My clients in the above-listed case understand that you have requested the views of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) as to whether the following items as advertised for sale on the website of your client Defense Distributed fall within the scope of Final Rule, Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27 C.F.R pts. 447, 478, and 479) ("the rule"):

- AR-15 80% Lower Receiver – Forged and/or jigs sold therewith
- AK-47 80% Lower Receiver and/or jigs sold therewith
- AR-15 80% Lower Receiver and/or jigs sold therewith
- AR-308 80% Lower Receiver and/or jigs sold therewith

You have also asked whether the following items as advertised for sale on ghostgunner.net fall within the scope of the rule:

- CNC Machines
- Optic Cut
- 80% AR-15 Lower Receiver
- Starter Kits and Jig Sets
- "Zero percent"—with the exception of "GO Grip Module"
- "Materials"
- "Fixtures"
- "Accessories"
- "Tooling"
- "Spare parts"
- "Service and repairs"

You have also inquired whether the following item as advertised for sale on G80.com falls within the scope of the rule:

- G80 Jig Set

App. 003

2

In response to your request, ATF has determined that these items do not fall within the scope of the rule. Accordingly, neither ATF nor any of the other defendants in the above-listed case will enforce the rule against Defense Distributed with respect to any of the listed items during the pendency of the above-referenced case.

Furthermore, ATF has agreed that if Defense Distributed provides ATF with a sample of the following items sold by Defense Distributed (including all materials sold with the respective items), ATF will expedite its review of these items and provide an expedited informal classification whether the items fall within the scope of the rule:

- GO Grip Module (as sold on ghostgunner.net)
- G80 Build Bundle (as sold on G80.com)
- G80 Unfinished Receiver (as sold on G80.com)
- G80 Grip Module (as sold on G80.com)

Sincerely yours,

*/s/ Jeremy S.B. Newman*

Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005

2

App. 004

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco,
Firearms and Explosives
*Office of Enforcement Programs and Services*
Washington, DC 20226
*www.atf.gov*

December 27, 2022

## OPEN LETTER TO ALL FEDERAL FIREARMS LICENSEES

### Impact of Final Rule 2021-05F on Partially Complete Polymer80, Lone Wolf, and Similar Semiautomatic Pistol Frames

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is issuing this open letter to assist the firearms industry and the public in understanding whether a "partially complete, disassembled, or nonfunctional" frame of a Polymer80, Lone Wolf, or similar semiautomatic, striker-fired pistol (sometimes generally referred to as "Glock-type" pistols) has reached a stage of manufacture such that it "may readily be completed, assembled, restored, or otherwise converted" to a functional frame, and is therefore classified as a "frame" or "firearm" in accordance with the final rule titled *Definition of 'Frame or Receiver' and Identification of Firearms* (Final Rule 2021R-05F), which became effective August 24, 2022. In particular, the following addresses partially complete, disassembled, or nonfunctional semiautomatic striker-fired pistol frames or parts kits manufactured, sold, or distributed by Polymer80 (known as 'Poly80' or 'P80' frames or blanks), Lone Wolf (known as 'Freedom Wolf 80%' frames), and others, with the characteristics described below.

**Summary**

Applying the regulatory text of Final Rule 2021-05F, partially complete Polymer80, Lone Wolf, and similar striker-fired semiautomatic pistol frames, including, but not limited to, those sold within parts kits, have reached a stage of manufacture where they *"may readily be completed, assembled, restored, or otherwise converted"* to a functional frame. This definition of "readily" applies to each and every classification of a partially complete frame or receiver under this Rule, whether sold alone or as part of a kit. Therefore, *even without* any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials, these partially complete pistol frames are "**frames**" and also "**firearms**" as defined in the GCA and its implementing regulations, 18 U.S.C. § 921(a)(3)(B) and 27 CFR 478.12(a)(1), (c).

**Background**

The Gun Control Act (GCA) defines the term "**firearm**" as: *"…(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; **(B) the frame or receiver of any such weapon**; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique*

App. 005

*firearm."* (Emphasis added.)  18 U.S.C. § 921(a)(3).  The GCA implementing regulations define the terms "frame" and "receiver" by describing a single housing or structural component for one specific fire control component of a given weapon—for example, a single housing is specified for particular weapons such as a "handgun" and a "rifle."  27 CFR 478.12(a).

The regulation defines the term "**frame**" in 27 CFR 478.12(a)(1), as *"the part of a handgun, or variants thereof, that provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence, even if pins or other attachments are required to connect such component (i.e., sear or equivalent) to the housing or structure*."

Further, 27 CFR 478.12(c) explains when a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, is regulated as a "**frame**" or "**receiver**":

> *The terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, i.e., to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projectile weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be.  The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material).  When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.*

Section 478.11 defines "**readily**" as:

> *A process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state.  With respect to the classification of firearms, factors relevant in making this determination include the following:*
>
> *(a) Time, i.e., how long it takes to finish the process;*
> *(b) Ease, i.e., how difficult it is to do so;*
> *(c) Expertise, i.e., what knowledge and skills are required;*
> *(d) Equipment, i.e., what tools are required;*
> *(e) Parts availability, i.e., whether additional parts are required, and how easily they can be obtained;*
> *(f) Expense, i.e., how much it costs;*

App. 006

> *(h) Feasibility, i.e., whether the process would damage or destroy the subject of the process or cause it to malfunction.*

The above list of factors is a non-exhaustive list but represents factors that have been identified by federal courts as being relevant to a "**readily**" analysis with respect to firearms. For each and every assessment of whether any partially complete frame (in the case of a handgun) or receiver (in the case of a long gun) – whether assessed individually, or in conjunction with other items – is a "firearm" under the GCA, parties must consider the above definition, including all factors that are relevant to that assessment. This is true for all frames and receivers.

**Analysis**

There are many partially complete, disassembled, or nonfunctional semiautomatic pistol "frames" being marketed as so-called "partially complete" or "80%" frames.  The Federal firearms statutes and regulations, however, do not employ terms such as "80%," "80% finished," or "80% complete."  These are merely terms used by some to market these items; they are not based upon application of the term "**readily**" in the GCA or Final Rule 2021-05F.  As used in the GCA and the Final Rule, the term "readily" does not involve evaluation of a percentage of completion for an item that, when completed, will function as a frame or receiver.  Rather, the analysis examines how efficiently, quickly, and easily a clearly identifiable component part of a weapon can be completed, assembled, restored, or otherwise converted to house or provide a structure for the applicable fire control component.  Such analysis may include consideration of any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are, directly or indirectly, sold, distributed, possessed, or marketed with the component part or kit. As outlined in the above definition, the analysis must consider all factors that are relevant to the assessment.

On the above mentioned "partially complete" pistol frames and products manufactured by Polymer80, Lone Wolf, and similar "partially complete" frames used to assemble semiautomatic, striker-fired pistols, the critical areas of the "**frame**" are the front and rear fire control cavities. The front and rear cavities are critical because these areas provide housing for the sear.  *See* 27 CFR 478.12(a)(1), (a)(4)(iii).  As further explained and illustrated below, removing or indexing any material in these critical areas, or completing or indexing any of the pin holes necessary to install the sear, are therefore crucial steps in producing a functional frame.

App. 007



*Figure 1*

**In a pistol based on a Glock design, the trigger is housed in the front fire control cavity, and the sear, which is connected by the trigger bar, is located in the rear cavity.**



*Figure 2*

**For reference, in a pistol based on a Glock design, the trigger bar assembly contains the sear. The trigger bar assembly operates as a single unit.**



*Figure 3*

**The trigger bar assembly (side view and top view) is a single unit.  The frame cannot house or provide a structure for the sear without both the front and rear cavities.**

In addition, many front and rear cavities of pistol frames using this internal design incorporate slide rails that have pin holes designed to secure the trigger mechanism and sear in precise locations. Specifically, in the Polymer80 design, the front cavity also provides housing for a front slide rail module (known as the "Locking Block Rail System" or "LBRS"), and the rear cavity provides housing for a rear slide rail module (known as the "Rear Rail Module" or "RRM").  Under the Final Rule, these slide rail components are "attachments … required to connect" the sear to the frame.  *See* 27 CFR 478.12(a)(1).



*Figure 4*

App. 009

**The above picture, taken from Polymer80 instructional materials, shows that the trigger bar assembly is attached to the "Rear Rail Module," which is attached to the frame.**



*Figure 5*

**Top view of "Locking Block Rail System" and "Rear Rail Module" with trigger and trigger mechanism installed.**

The above mentioned "partially complete" pistol frame products marketed by Polymer80, Lone Wolf, and substantially similar "partially complete" frames used to assemble semiautomatic striker-fired pistols, are also manufactured from a polymer material and incorporate temporary rails or blocking tabs that are easily removable by a person with novice skill, using common tools, such as a Dremel-type rotary tool, within minutes—an amount of time and a set of circumstances that are far less than required to fall within the meaning of the term "readily" in the Final Rule. Once this material is removed, the partially complete frames are immediately capable of accepting both the slide rail attachments and fire control components, including the sear.

App. 010



*Figure 6*

### FIREARM - Poly80 with Temporary Rails



*Figure 7*

### FIREARM - Poly80 with Temporary Rails and Barrel Blocking Tab



*Figure 8*

### FIREARM - Poly80 with Temporary Rails and Barrel Blocking Tab

In addition, similar partially complete frame designs, such as those marketed by Lone Wolf, do not require removal of temporary rails but make it easy to attach the slide rails with connection points for the trigger mechanism and sear by incorporating fully formed front and rear fire control cavities into which the slide rails may be inserted. These slide rail attachments are

App. 011

commercially available online and may be glued-on within minutes—an amount of time and a set of circumstances that are far less than required to fall within the meaning of the term "readily" in the Final Rule—with no fitting and no specialized knowledge or expertise. The ease of obtaining and attaching such items is also pertinent as part of the analysis.



*Figure 9*

**FIREARM** - Lone Wolf "Freedom Wolf 80%" with Cavities for Slide Rail Attachments.



*Figure 10*



*Figure 11*

App. 012

**<u>FIREARM</u> - Fully Formed Front and Rear Cavities to Attach Slide Rail Inserts**



*Figure 12*

**Locking Block Cavity**



**Trigger Mechanism Cavity**

<u>Based on the above, partially complete Polymer80, Lone Wolf, and similar pistol frames with any kind of indexing or material removed from the front or rear fire control cavities for installation of the trigger mechanism and sear, or slide rail attachments to connect the trigger mechanism and sear to the frame, have reached a stage of manufacture where they *"may readily be completed, assembled, restored, or otherwise converted"* to a functional frame. As examined, they are classified as a "**frame**" and also a "**firearm**," as defined in the GCA, 18 U.S.C. § 921(a)(3)(B), and implementing regulations, 27 CFR 478.12(a)(1), (c). They are classified as firearms even if they are not sold, distributed, marketed, or possessed with any associated templates, jigs, molds, equipment, tools, instructions, or guides. While the analysis allows for the consideration of how a partially complete frame is, directly or indirectly, sold, distributed, marketed, or possessed with any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials, for these partially complete frames such analysis was not necessary because they are, by themselves, "frames" and "firearms" as defined in the GCA.</u>

This information is provided to assist the firearms industry and general public in understanding whether the above mentioned "partially complete" pistol frame products manufactured by Polymer80, Lone Wolf, and substantially similar "partially complete" frames

App. 013

used to assemble semiautomatic striker-fired pistols have reached the stage of manufacture where they are classified as a "**frame**" or "**firearm**." If persons remain unclear with respect to a specific model or configuration, they can voluntarily submit a request, under penalty of perjury, with a sample to ATF in accordance with 27 CFR 478.92(c) (GCA) or 479.102(c) (NFA). ATF cannot render a formal determination without a formal request and physically examining a submitted sample.

If you have any questions, please contact the Firearms & Ammunition Technology Division at fire_tech@atf.gov or (304) 616-4300.

KRISTEN DETINEO
Digitally signed by
KRISTEN DETINEO
Date: 2022.12.27
11:53:54 -06'00'

Assistant Director                          Assistant Director
Enforcement Programs and Services           Field Operations

App. 014



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Office of Enforcement Programs and Services*

September 27, 2022

Washington, DC 20226
www.atf.gov

## OPEN LETTER TO ALL FEDERAL FIREARMS LICENSEES

### Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is issuing this open letter to further assist the firearms industry and the public in understanding whether a "partially complete, disassembled, or nonfunctional" receiver of an AR-15/M-16 variant weapon has reached a stage of manufacture such that it "may readily be completed, assembled, restored, or otherwise converted" to a functional receiver, and is therefore classified as a "**frame or receiver**" or "**firearm**" in accordance with the final rule titled "Definition of 'Frame or Receiver' and Identification of Firearms (Final Rule 2021R-05F), which became effective August 24, 2022. In particular, the following addresses items that are clearly identifiable as an unfinished component part of a weapon—specifically, partially complete, disassembled, or nonfunctional AR-type receivers (also known as receiver 'billets' or 'blanks').

**Summary**

As stated in Final Rule 2021-05F and the regulatory text, a partially complete AR-type receiver with no indexing or machining of any kind performed in the area of the fire control cavity is not classified as a "**frame or receiver**" or "**firearm**" provided that it is not sold, distributed, or marketed with any associated templates, jigs, molds, equipment, tools, instructions, or guides, such as within a receiver parts kit. 27 CFR 478.12(c), Example 4. Consistent with Final Rule 2021R-05F and the regulatory text, ATF is providing the visual aids below to further illustrate the section of an "unfinished" item that, with further manufacture, machining, or processing, will constitute the "fire control cavity;" the second set of visual aids illustrates the stage of manufacture or machining at which that item becomes a receiver as defined in Final Rule 2021R-05F.

**Background**

The Gun Control Act (GCA) defines the term "**firearm**" as: *"…(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."* 18 U.S.C. § 921(a)(3). The GCA implementing regulations now define the terms "frame" and "receiver" by describing a single housing or structural component for one specific

App. 015

2

fire control component of a given weapon—for example, a single housing is specified for particular weapons such as a "handgun" and a "rifle."  27 CFR 478.12(a).  Moreover, 27 CFR 478.12(f)(1) also provides that the terms "frame" and "receiver" "shall include the specific part of a complete weapon … determined (classified) by the Director to be defined as a firearm frame or receiver prior to April 26, 2022."  As explicitly set out in the regulations, 27 CFR 478.12(f)(1)(i), for AR-15/M-16 variant firearms, "[t]he receiver is the lower part of the weapon that provides housing for the trigger mechanism and hammer (*i.e.*, lower receiver)."

A current regulation, 27 CFR 478.12(c), explains when a clearly identifiable component  of a weapon that is partially complete, disassembled, or nonfunctional is a "**frame**" or "**receiver**":

> *The terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, i.e., to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projectile weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be.  The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material).  When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.*

Sections 478.11 and 479.11 also define "**readily**" as:

> *A process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state.  With respect to the classification of firearms, factors relevant in making this determination include the following:*
>
> *(a) Time, i.e., how long it takes to finish the process;*
> *(b) Ease, i.e., how difficult it is to do so;*
> *(c) Expertise, i.e., what knowledge and skills are required;*
> *(d) Equipment, i.e., what tools are required;*
> *(e) Parts availability, i.e., whether additional parts are required, and how easily they can be obtained;*
> *(f) Expense, i.e., how much it costs;*
> *(g) Scope, i.e., the extent to which the subject of the process must be changed to finish it; and*
> *(h) Feasibility, i.e., whether the process would damage or destroy the subject of the process, or cause it to malfunction.*

The above list of factors is a non-exhaustive list, but represents factors that have been identified by Federal courts as being relevant to a "**readily**" analysis with respect to firearms.

App. 016

**Analysis**

There are many partially complete, disassembled, or nonfunctional AR-type "receivers" being marketed as so-called "80%" receivers.  However, Federal firearms statutes and supplemental regulations do not employ terms such as "80%," "80% finished," or "80% complete."  These are merely terms used by some to market these items; they are not based upon application of the term "**readily**" in the GCA or Final Rule 2021-05F. As used in the GCA and the Final Rule, the term "readily" does not involve evaluation of a percentage of completion for an item that, when completed, will function as a frame or receiver.   Rather, the analysis examines how efficiently, quickly, and easily a clearly identifiable component part of a weapon can be completed, assembled, restored, or otherwise converted to house or provide a structure for the applicable fire control component.

In an AR-15 variant weapon, the "fire control cavity" is the critical area of the receiver because this area "provides housing for the trigger mechanism and hammer."  27 CFR 478.12(f)(1)(i).  To be a "functional" receiver, an AR-type receiver must include a cavity sufficient to house the relevant internal parts, including a hole for a selector and 2 pin holes (trigger pin and hammer pin) in precise locations.  Removing or indexing any material in this critical area, or completing or indexing any of these holes, is therefore a crucial step in producing a functional receiver.

Thus, in order <u>not</u> to be considered "**readily**" completed to function, ATF has determined that a partially complete AR-type receiver must have no indexing or machining of any kind performed in the area of the trigger/hammer (fire control) cavity.  <u>A partially complete AR-type receiver with no indexing or machining of any kind performed in the area of the fire control cavity is not classified as a "**receiver**," or "**firearm**," if not sold, distributed, or marketed with any associated templates, jigs, molds, equipment, tools, instructions, or guides, such as within a receiver parts kit</u>.



**(if not sold, distributed, or marketed with any associated templates, jigs, molds, equipment, tools, instructions, or guides)**

4



**(if not sold, distributed, or marketed with any associated templates, jigs, molds, equipment, tools, instructions, or guides)**

Because the front of the takedown-pin lug clearance area merges with the back of the fire control cavity in a functional AR-type receiver, it was necessary for ATF to determine the point at which the takedown-pin lug clearance area stops, and the fire control cavity begins.  ATF has determined that drilling or milling a standard 0.800-inch takedown-pin area, measured from immediately forward of the front of the buffer retainer hole next to the fire control cavity, does not impact the ability of the fire control cavity to house the trigger mechanism and hammer.  Provided this length is not exceeded, the fire control cavity remains *"without critical interior areas having been indexed, machined, or formed"* as stated in 27 CFR 478.12(c), Example 4.

The following illustration demonstrates the fire control cavity of an AR-type receiver:



App. 018



**However**, the above analysis only applies to partially complete, disassembled, or nonfunctional frames or receivers without any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials.  Pursuant to Final Rule 2021R-05F, partially complete, disassembled, or nonfunctional frames or receivers that are sold, distributed, possessed with such items (or made available by the seller or distributor to the same person) may change the analysis, including those distributed as frame or receiver parts kits.  27 CFR 478.12(c).  For example, jigs, templates, or instructions can provide the same indexing as if it were placed directly on the unfinished frame or receiver.



**Firearm**



**Firearm**

App. 020

7

It is important that persons engaged in the business of manufacturing, importing, or dealing in these items do not take any steps to avoid licensing (18 U.S.C. §§ 922(a)(1), 923(a)), serialization (§ 923(i); 27 CFR 478.92(a)(2)), recordkeeping (§ 923(g)(1)(A); 27 CFR 478/125(i)), and other requirements and prohibitions of the law by selling or shipping the parts or parts kits in more than one box or shipment to the same person, or by conspiring with others to do so (18 U.S.C. §§ 2, 371).

Further, although unfinished frames or receivers that do not meet the definition of a "firearm" are not subject to regulation under GCA provisions, they are still considered "defense articles" on the U.S. Munitions Import List and, therefore, require an approved Application and Permit for Importation of Firearms, Ammunition and Implements of War (ATF Form 6) for importation into the United States under 27 CFR 447.41; 447.22, and are also subject to export controls.[1]

This information is provided to assist the firearms industry and general public in understanding whether a partially complete AR-type receiver has reached the stage of manufacture where it is classified as a "receiver" or "firearm."  If persons remain unclear with respect to a specific model or configuration, they can voluntarily submit a request, under penalty of perjury, with a sample to ATF in accordance with 27 CFR 478.92(c) (GCA) or 479.102(c) (NFA).  If you have any questions, please contact the Firearms & Ammunition Technology Division at fire_tech@atf.gov or (304) 616-4300.


Acting Assistant Director                         Acting Assistant Director
Enforcement Programs and Services                   Field Operations

---

[1] Exporters should consult with the U.S. Departments of Commerce and State to determine applicable requirements.

App. 021

CHAPTER THREE

# Public Economy:

# The Well-Ordered Market

So the markets are regulated.—Thomas M. Cooley

P ublic safety was a first-order concern of the well-regulated society to which all private rights and interests were subordinated. An examination of fire regulations thus goes far toward demystifying American private property. Property rights in the early nineteenth century were social, relative, and historical, not individual, absolute, and natural. A second aspect of American liberal mythology that stands in need of disenchantment concerns that mysterious and value-laden sociohistorical force known as "the market." Polity and economy have a very special relationship. But despite being at the center of American historical research for over a century, basic assumptions about the American state and the market have remained surprisingly static. First, state regulation and market economics are seen as diametrical opposites. Regulation is a contrived and public interference in a field of invisible economic relations otherwise natural and private.[1] Second, American economic regulation is understood as a relatively recent invention. As Thomas McCraw argued in 1975 (perhaps with the Massachusetts Board of Railroad Commissioners in mind), "regulation is barely a century old."[2]

This chapter takes aim at both of these assumptions. Through a historical reconstruction of nineteenth-century notions of *public* economy and the *well-ordered* market, it establishes the predominance in theory and practice of an approach to economic life in early America antithetical to the classical separation of market and state. The cases, statutes, and ordinances analyzed here

— 83 —

App. 022

Copyrighted material

suggest that early Americans understood the economy as simply another part of their well-regulated society, intertwined with public safety, morals, health, and welfare and subject to the same kinds of legal controls. Far from viewing the state and the economy as adversarial, public economy was part of a worldview slow to separate public and private, government and society. It understood commerce, trade, and economics, like health and morals, as fundamentally public in nature, created, shaped, and regulated by the polity via public law.

This chapter also demonstrates the deep roots of economic regulation in America. In contrast to historical depictions of the period from 1776 to 1860 as an era of Americanization, transformation, and modernization heralding the ascendancy of liberal constitutionalism and free-market economics, it documents the pervasiveness of a commitment to a regulated economy in a well-ordered society. Indeed, the deluge of restrictions on economic life passed by state and local authorities in this period suggests that "regulation" might supplant "the market" as a better metaphor for the age. Regulations were not quaint residues of a feudal regime doomed to obsolescence. Rather public economy and the well-regulated society functioned as central, compelling philosophies in early American public law—philosophies busily put into practice through a host of particular rules and prosecutions solicitous of public goods over individual interests.

The market did not burst on the American stage circa 1776 of its own natural self-volition. It was a human, historical, and political creation. Postrevolutionary America was indeed the site of an economic transformation. But it owed more to the visible laws of police than the natural laws of economics. This was a revolution that had more to do with the conspicuous invention of political economy than the invisible hand of the free market.

## Market Revolution or Legal-Political Economy?

The first hurdle blocking a reconstruction of the notion of public economy in nineteenth-century America is a twentieth-century perspective that separates public and private and understands economy as an autonomous and natural force in history. One of its most persistent historical themes is the notion of antebellum America as a site for the pivotal transition from colonial mercantilism to laissez-faire capitalism. The publication of Adam Smith's *Wealth of Nations* (1776), the story goes, "inaugurated an economic revolution by emphasizing laissez-faire and individualism in place of the mercantilist emphasis on government intervention and statism."[3] Building on accounts of the ascen-

App. 023

Copyrighted material

*than twice the amount of gold and silver actually in their vaults,"* be, and the same is hereby repealed; and hereafter the said Corporation shall not issue and have in circulation, at any one time, bills, notes, or obligations, to a greater amount than twice the capital stock actually paid in. <span style="float:right">Not to issue bills for more than twice the capital.</span>

SECT. 2. *And be it further enacted,* That instead of six, not less than five Directors of the aforesaid Corporation shall constitute a board for the transaction of business, of whom the President shall always be one, except in case of sickness or necessary absence, in which case the Directors present may choose a Chairman in his stead. <span style="float:right">Directors.</span>

[This Act passed <em>March</em> 8, 1805.]

---

An Act making a temporary Alteration in the Toll to be received by *The Proprietors of the Locks and Canals on Connecticut River.*    *79*

[This Act passed <em>March</em> 8, 1805.]

---

An Act to incorporate the north-westerly Part of the Town of *Otisfield,* and the easterly Part of the Town of *Bridgeton,* in the County of *Cumberland,* into a separate Town by the Name of *Harrison.*    *80*

[This Act passed <em>March</em> 8, 1805.]

---

An Act to provide for the Proof of Fire Arms manufactured within this Commonwealth.    *81*

WHEREAS no provision hath been made by law for the proof of fire arms manufactured in this Commonwealth, by which it is apprehended that many may be introduced into use which are unsafe, and thereby the lives of the citizens be exposed: To prevent which, <span style="float:right">Preamble.</span>

SECT. 1. *Be it enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same,* That the Governor, by and with the advice and consent of the Council, be, and he hereby is empowered to appoint, in any part of this Commonwealth where the manufacture of fire arms is carried on, suitable persons to be provers of fire arms, not exceeding two in any county, who shall be sworn to the faithful discharge of their trust, whose duty it shall be to prove all musket barrels and pistol barrels, which being sufficiently ground, bored and breeched, shall be offered to him to be proved; who shall prove the musket barrels twice in manner following, viz. first with a charge consisting of one eighteenth part of a pound of powder, one ounce of which, in a five and <span style="float:right">Provers of fire arms to be appointed.</span> <span style="float:right">How arms are to be proved.</span>

an

App. 024

260    PROOF OF FIRE ARMS.    *March* 8, An. 1805.

an half inch howitz, at an elevation of forty five degrees, will carry a twenty-four pound fhot eighty yards, with a ball fuited to the bore of the barrel ; the fecond proof to be with a charge confifting of one twenty-fecond part of the fame powder, with a ball fuited to the bore of the barrel ; and fhall prove the piftol barrels once with a charge confifting of one twenty-fecond part of a pound of powder, one ounce of which, in a five and half inch howitz at an elevation of forty-five degrees, will carry a twenty-four pound fhot feventy yards, with a ball fuited to the bore of the barrel ; which faid powder and ball it fhall be the duty of the prover to provide ; and if the faid mufket and piftol barrels fhall ftand the proof aforefaid, and fhall in no refpect fail, then it fhall be the duty of the faid prover to ftamp the fame on the upper fide, and within one and an half inches of the breech of faid barrels, with a

*How approved arms are to be marked.* ftamp confifting of the initial letters of the prover's name, and over thofe letters the letter P. alfo, in the line of the faid initial letters, and further up faid barrel the figures defignating the year of our Lord in which the proof is made, and over the faid figures the letter M. which faid letters and figures fhall be fo deeply impreffed on faid barrel, as that the fame cannot be erafed or disfigured, and fhall be in the form follow-

P    M

ing AB 1805. And when any barrels fhall burft or fhall in any manner fail in the proving as aforefaid, fo that in the opinion of the prover they are unfit for ufe, they fhall not be ftamped, but the faid prover fhall fuffer the owner to take them away ; and any prover fo proving mufket or piftol barrels as aforefaid, fhall be entitled to receive from the owner,

*Fees.* for each mufket barrel *thirty three cents*, and for each piftol barrel *twenty five cents*, whether the fame ftand proof and are ftamped or not.

SECT. 2. *And be it further enacted*, That if any perfon, after

*Penalty for not having arms proved.* the firft day of *June* next, fhall manufacture within this Commonwealth, any mufket or piftol, without having the barrels proved and ftamped as aforefaid, except fuch as are or may be manufactured in the armory of the *United States*, or in fulfilment of fome contract made and entered into, or that may hereafter be made and entered into, for the manufacturing of fire-arms for the *United States*, fhall forfeit and pay for every fuch mufket or piftol the fum of *ten dollars*, to be recovered in an action of debt, before any Court proper to try the fame, by any perfon who fhall fue for and recover the fame, to his own ufe.

SECT. 3. *And be it further enacted*, That if any perfon, after the faid firft day of *June* next, fhall fell and deliver, or fhall knowingly purchafe, any mufket or piftol, which fhall have been manufactured within this Commonwealth after the faid

**MESNE PROCESS.**     *March* 8, An. 1805.     261

said first day of *June* next, which shall not have the marks of proof above required, the person so selling and the person so purchasing shall each forfeit the sum of *ten dollars*, to be recovered by action of debt, before any Court proper to try the same, to the use of any person who shall sue for and recover the same.

*Penalty for selling or buying arms not proved.*

SECT. 4. *And be it further enacted,* That if any person shall falsely forge or alter the stamp of any prover of fire-arms, so appointed as aforesaid, impressed on any musket or pistol-barrel, pursuant to this Act, and be convicted thereof before the Supreme Judicial Court, he shall be punished by fine not exceeding *fifty dollars,* nor less than *twenty dollars,* according to the nature and aggravation of the offence.

*Penalty for forging stamp.*

[This Act passed *March* 8, 1805.]

---

An Act to incorporate a Number of the Inhabitants in the Town of *Limington,* in the County of *York,* into a separate Religious Society by the Name of *The First Baptist Society in Limington.*

§ 2

[This Act passed *March* 8, 1805.]

---

An Act directing the Mode of attaching on Mesne Process, and selling by Execution Shares of Debtors in incorporated Companies.

§ 3

SECT. 1. *B*E it enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same,* That the share or shares or interest of any person, in any turnpike, bridge, canal or other company, which heretofore has been or hereafter may be incorporated by the Legislature of this Commonwealth, with all the rights and privileges appertaining to such shares, may be attached on mesne process and taken on execution ; and when any such shares or interest shall be attached on mesne process, or taken on execution without such previous attachment, an attested copy or copies of such writ of attachment or execution, shall, by the officer holding the same, be left with the Clerk and Treasurer or Cashier of such company ; and so many of said shares or so much of said interest may be sold on said execution at public vendue, to the highest bidder, as shall be sufficient to satisfy the same, and the charges of the sale, after notice shall have been given of the time and place of sale in manner as hereinafter provided ; and in case the officer making the sale, or the purchaser or purchasers of any such shares or interest, do cause an attested copy or copies of such execution, and the officer's return thereon, to be left with such Clerk and Treasurer or Cashier, within fourteen days after the sale is completed, and

*Shares may be attached on mesne process, taken in execution, and sold.*

pay

App. 026

546                                FIREARMS.—PAPER.

## CHAPTER CLXII.

### An Act to provide for the proof of Firearms.

SEC. 1. BE *it enacted by the Senate and House of Repre-sentatives, in Legislature assembled,* That the Governor, by and

*Governor to appoint provers of gun barrels.* with the consent of the Council, be and he hereby is empow-ered to appoint suitable persons, to be provers of the barrels of all new, or unused firearms ; and it shall be the duty of each person so appointed, to prove and try the strength of the barrels of all firearms which shall be offered him for that purpose, in such manner as to satisfy himself of the strength

*Barrels to be marked and certificate given.* of the same; and shall in a permanent manner, mark and num-ber every barrel by him so proved, and make, and deliver to the person applying to have the same proved, a certificate for each barrel proved, and found good in the form following :

I certify that on this        day of        A. D. 18        I proved for        , a musket, pistol, or rifle barrel, (as the case may be,) and which is numbered and marked as in the margin, and that the same is good and strong.

A. B. Prover of firearms.

*Prover's fees.* SEC. 2. *Be it further enacted,* That each prover shall be entitled to receive from the person applying to have such barrel proved, twenty-five cents, in addition to the expense of the powder necessary for that purpose for each barrel so proved ; whether the same shall stand the proof and be marked or not.

*Penalty for sel-ling guns or pistols, not proved and marked.* SEC. 3. *Be it further enacted,* That if any person shall sell or offer for sale within this State, any new, or unused musket, rifle or pistol barrel, without having the same first proved, marked and certified according to the provisions of this Act, he shall forfeit for each barrel so sold, the sum of ten dollars, to be recovered by an action of debt before any

*How recover-ed.* Court proper to try the same ; to the use of any person who shall sue for and recover the same, or by indictment to the use of the State.

*Penalty for al-tering marks or certificates.* SEC. 4. *Be it further enacted,* That if any person shall falsely alter the stamp or mark or the certificate of any prov-er of firearms, appointed as aforesaid, and be convicted thereof before any Court proper to try the same, he shall forfeit and pay a fine of not more than one hundred dollars, nor less than twenty dollars, according to the nature and ag-gravation of the offence, for the use of the State.

[*Approved March* 10, 1821.]

App. 027

matters relating to guns or gun powder.[72]  Thus, Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb.[73] New York City even granted broad power to the government to search for gun powder and transfer powder to the public magazine for safe storage:

> [I]t shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city, and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever.[74]

37.   The power to regulate firearms and gunpowder was therefore at the very core of the police power and inheres in both states and local municipalities. The application of the police power to firearms and ammunition was singled out as the quintessential example of state police power by Chief Justice John Marshall in his 1827 discussion of laws regulating gun powder in *Brown v. Maryland*.[75]  This was so even though gunpowder was essential to the operation of firearms at that time and gun powder regulations necessarily affected the ability of gun owners to use firearms for self-defense, even inside the home.

---

[72] CORNELL, *supra* note 33.

[73] Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2.

[74] An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City, LAWS OF THE STATE OF NEW-YORK, COMPRISING THE CONSTITUTION, AND THE ACTS OF THE LEGISLATURE, SINCE THE REVOLUTION, FROM THE FIRST TO THE FIFTEENTH SESSION, INCLUSIVE 191-2 (Thomas Greenleaf, ed., 1792).

[75] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power").

Declaration of Saul Cornell (3:19-cv-01537-BEN-JLB)

App. 028

240

1795. the several reserved tracts of land adjoining the towns of *Erie, Franklin, Warren and Waterford,* and for other purposes therein mentioned." The governor is directed to appoint two persons, who, together with the commissioner of sales, are to appraise all the in-lots in squares, and the out lots in the second section of *Erie,* which appraisement shall be entered in a book for that purpose, they shall then advertise the lots for sale on a day certain; but no contract shall be confirmed until sixty days after opening the books; and the terms prescribed, in yearly instalments; the bonds to be sent to the Secretary of the Land-Office within six months; who shall issue patents to the purchasers, on payment according to the sales. The commissioner and persons appointed to be under oath or affirmation, and to receive a certain compensation.

The Beach of the lake, from the upper corner of the garrison tract, and for twenty perches back from the water's edge, down the lake to the out-lots, and from thence down the same, including all the land between the out-lots and the water's edge, to the tract of land No. 38, shall be and remain a public landing for the use of the inhabitants and others, until otherwise appropriated by law; and penalty for obstructing the said landing.

By an act passed 2d April, 1811. The occupancy and use of certain lands near *Presqu' Isle,* not less than two nor more than four acres, are ceded to the United States, for the purpose of erecting a light-house, commissioners appointed to survey and lay it off, and transmit the draft thereof to the Secretary of the treasury of the United States. —The jurisdiction, and right of soil excepted by the state.

An academy is incorporated in the borough of *Erie,* by act of 2d April, 1811. And five hundred acres of the reserved lands, adjoining the town and fifteen town lots, are granted to the said academy, for the use thereof, &c.

Two out-lots of the town of *Franklin,* ceded to the United States, by act of 1st Feb'y, 1796, (chap. 1858,) *post.*

---

## CHAPTER MDCCCXLVI.

*An* ACT *providing for the inspection of Gun-powder.*

[See vol. 2, pa. 401, and the note thereto.]

WHEREAS gun-powder imported from abroad, and manufactured within this state, hath frequently been found to vary much in its strength, and sometimes of inferior qualities, and its defects not discovered until brought into actual use: And whereas the modes heretofore used to prove the force thereof have been found uncertain and variable: And whereas Joseph Leacock, of the city of Philadelphia, hath invented an engine, called a pendulum powder proof, with a graduated arch and catch-pall, by which it is conceived that the force of gun-powder may be proved by experiment, and the article reduced to certain and uniform standards of strength, whereby the manufacture may be advanced towards ultimate perfection, and the purchaser and consumer protected against fraud and imposition:

SECT. I. *Be it enacted by the Senate and House of Representatives of the commonwealth of Pennsylvania, in General Assembly met, and it is hereby enacted by the authority of the same,* That

Gun-powder manufactured in this state, how to be packed in casks.

from and after the first day of October next, all gun-powder manufactured within this state, with intent, to sell the same within the city or county of Philadelphia, shall be put in good and tight kegs or casks of twenty-five, fifty, or one hundred pounds neat weight, each made of well seasoned timber, bound together with at least twelve hoops, and having a hole bored in each head, of the diameter of one fourth part of an inch, well stopped with corks and having the tare weight of each cask marked thereon, and that all such

App. 029

241

gun-powder, and all other gun-powder, wheresoever manufactured, imported into the port of Philadelphia, or brought into the city or county of Philadelphia for sale, shall be deposited, forthwith on such importation or bringing in by land or by water, in the public magazine in the said city, and delivered to the care of the keeper of the same, who shall give his receipt for the same, deliverable to the order of him or them who shall so deposit the same.

SECT. II. *And be it further enacted by the authority aforesaid,* That David Rittenhouse, Francis Gurney, and Thomas Proctor be, and they are hereby, appointed commissioners, to procure at least two pendulum powder proofs, upon the construction invented by the said Joseph Leacock, as nearly uniform in the length of the radius and weight of pendulum, and in length of caliber and weight of the pistol, as they can procure the same, and therewith make experiments of the respective strength or force of the several species of gun-powder imported from abroad, and manufactured within this state, sufficient in number to ascertain the quality and force of three different degrees of strength in explosion, and marking the number of degrees on the graduated arch of the said engine, to which equal quantities by weight of the said three species of gun-powder, rammed with equal force into the pistol, shall elevate the said pendulum; and the powder, which shall be barely capable of raising the said pendulum to the lowest rate of elevation, shall be the standard for the state of Pennsylvania for gun-powder of the first or lowest proof; and the powder, which shall be capable of raising the said pendulum to the highest rate of elevation, shall be the standard of gun-powder for the state of Pennsylvania of the third or highest proof; and the middle or second proof standard of gun-powder shall be ascertained by the number of degrees on the said graduated arch, to which the same quantity by weight in equal moieties of the first and third proof powder shall be capable of raising the said pendulum; and the said standard being so fixed and ascertained, the said commissioners shall make report thereof in writing, by indentures under their hands and seals, one part thereof, together with one of the said two pendulum powder proofs, and as accurate a draft and description thereof as can be made shall be returned to the Governor, to be filed and remain in the office of the Secretary of the commonwealth; one other part shall be returned to the Master of the Rolls, to be recorded in his office, and filed among the laws of the state; and the other part, together with the other pendulum powder proofs, shall be delivered to the first Inspector of gun-powder to be appointed in pursuance of this act, and by him, and his successors in office, to his and their successors, as often as another officer shall be appointed.

SECT. III. *And be it further enacted by the authority aforesaid,* That so often as the said pendulum powder proofs in the possession of the Inspector shall by natural wear, or by accident, be rendered unfit for use, or its accuracy doubted, the same shall be compared with the other remaining in the Secretary's office, and if found necessary, a new one constructed, and made conformably thereto in measure and weight, for the use of the Inspector at his own costs and charges.

1795.

All gunpowder manufactured, or imported, to be deposited in the magazine.

Commissioners appointed to procure pendulum powder proofs.

Standard proofs of gunpowder.

The commissioners to report, and return accurate drafts of the two pendulum powder proofs;

where the same shall be deposited.

How the pendulum in the keeping of the inspector may be repaired, or a new one made.

VOL. III.                    2 H

242

**1795.**

*A suitable building to be erected, for the use of the inspector.*

SECT. IV. *And be it further enacted by the authority aforesaid,* That the said Commissioners shall prepare and report a plan for the necessary buildings, and an estimate of the expense thereof, and the same being laid before and approved by the Governor, he shall cause to be erected and built, on the most proper part of the lot belonging to the public magazine aforesaid, a brick building, for the use of the Inspector, with two apartments, one for the purpose of keeping his engine apparatus and for making proofs, and the other for the purpose of keeping the samples of powder in safety, the expense of which building shall be paid and defrayed by warrants to be drawn by the Governor on the State Treasurer, which shall be allowed him on settlement of his accounts, out of the fund for the *Limitation of the expense.* support of government : *Provided,* That the whole amount of the expense thereof do not exceed the sum of five hundred dollars.

*An inspector of gun-powder to be appointed.*

SECT. V. *And be it further enacted by the authority aforesaid,* That it shall and may be lawful for the Governor of this commonwealth, and he is hereby required, as soon as conveniently may be after the passing of this act, and as often afterwards as the office shall become vacant by death, resignation or otherwise, to appoint one suitable and skilful person to be inspector of gun-powder in and for the city, port and county of Philadelphia, who before he enters *His qualification.* on the duties of his office, shall take and subscribe the oath or affirmation required by law for the support of the constitutions of the United States and of this state ; and moreover shall take and subscribe, before the Governor, an oath or affirmation, that he will well and faithfully perform all and singular the duties required by this act, according to the best of his knowledge, skill and ability, and without prejudice or partiality.

*Duties of the inspector.*

SECT. VI. *And be it further enacted by the authority aforesaid,* That it shall be the duty of the Inspector of gun-powder so to be appointed, for the time being, to attend at the said public magazine, *To inspect, examine and prove the gun-powder ;* and his office so to be built, as often as shall be necessary, to inspect and examine all gun-powder there to be deposited, to draw samples from each cask of powder which shall be so as aforesaid bored, and to open or otherwise get samples of casks of powder not bored as aforesaid, and removing such samples to his office, there to prove *to mark the standard quality ;* the same by the pendulum proof aforesaid, and note the standard quality of each cask, to provide himself with cedar plugs stamped on the outer end with the letters **S. P.** and the figures number one, number two, and number three, to designate the first, second and third proofs of standard gun-powder of the state of Pennsylvania, *to mark condemned gun-powder ;* and another stamped with the letters **S. P.** to designate condemned

c.

gun-powder, and therewith carefully to plug up the holes opened or made for the purpose with such marked plugs, as the proof quality of the powder in each cask respectively contained, and occasionally *to weigh the gun-powder occasionally ;* to weigh the said casks ; and if upon weighing the same suspicion should arise that the casks are false tared, or do not contain the quantity herein above mentioned for each cask, to empty the same, *and to supply any deficiency from other casks.* and weigh the cask and powder separately, to ascertain the deficiency, if any, in the neat weight, and to fill the same to its due weight out of any other cask belonging to the same person, marking the

App. 031

243

weight taken on the ullage casks, and keeping an exact account in **1795.** his books thereof, and of the names of the owners, and the persons bringing and depositing the same.

SECT. VII. *And be it further enacted by the authority aforesaid,* Rule for marking or condemning gun-powder. That every cask of gun-powder inspected as aforesaid shall be plugged up with a plug marked with the number next below the standard number of degrees to which the pendulum shall not be elevated in the proof, and that every cask of gun-powder inspected as aforesaid, which shall not elevate the pendulum to the standard of the first or lowest proof, shall be condemned, and one pint of clean water for every twenty-five pounds of powder therein contained shall be poured thereinto, and the hole plugged up with the plug marked S. P. before the same shall be delivered over to the

c.

owner to be refined and re-manufactured; and to prevent a failure in the inspection by the temporary indisposition of the Inspector, it shall and may be lawful for him to execute all the duties hereby The inspector, may appoint a deputy. required by a Deputy, to be appointed by him, and approved by the Governor, the Deputy first taking and subscribing the like oaths or affirmations hereby required from the principal.

SECT. VIII. *And be it further enacted by the authority aforesaid,* The inspector, &c. to be admitted into the magazine. That the keeper of the said magazine shall at all seasonable times in every juridical day in the year admit the said Inspector, and his Deputy and Assistants, into the said magazine, to do and perform the several duties hereby required of him and them, and shall not Powder not to be delivered, till inspected. deliver any powder from the said magazine until the same shall be inspected as aforesaid.

SECT. IX. *And be it further enacted by the authority aforesaid,* Penalty, if the inspector or his deputy are concerned in manufacturing or selling gun-powder. That no person appointed to the office of Inspector, or his Deputy, shall, during the time of holding or exercising the said office, be concerned directly or indirectly in manufacturing, buying or selling gunpowder in gross, or by retail, under penalty of forfeiting the sum of five hundred dollars for every such offence, to be recovered by any person who will sue for the same in any court having competent jurisdiction, one moiety for the use of this commonwealth, and the other to the use of him or them who shall sue for the same; and upon conviction thereof shall be removed from the said office, and wholly disqualified to take or hold any office of trust or profit under this commonwealth.

SECT. X. *And be it further enacted by the authority aforesaid,* Penalty on not depositing gun-powder in the magazine, or selling the same without inspection. That if any person, from and after the said first day of October next, importing or bringing into the port or city, or county of Philadelphia, any quantity of gun-powder exceeding twenty-five pounds, with intent to sell the same, shall neglect to deposit the same for inspection in the magazine aforesaid, or shall sell the same before it be inspected and marked as aforesaid, or shall sell any gun-powder that shall be condemned as aforesaid as and for merchantable gun-powder, every person so offending shall forfeit all such gun-powder as aforesaid.

SECT. XI. *And be it further enacted by the authority aforesaid,* Fees of the inspector. That the Inspector shall be entitled to demand and receive of and from the owner and possessor of all gun-powder deposited in the

App. 032

244

**1795.** said magazine, and by him or his Deputy examined, proved and plugged, as aforesaid, the following sums or rates, whether the same be approved or condemned, paid or secured, before the same shall be removed from the magazine, if the Inspector shall so require; for every cask of powder, manufactured in this state, or any of the United States, bored, and stopped with corks by the manufacturer, containing twenty-five pounds neat weight, seven cents; for every like cask containing fifty pounds, eight cents; for every like cask containing one hundred pounds, nine cents; and for every cask of foreign powder, or powder manufactured in the United States, not bored and stopped with corks as aforesaid, double the said price or rates; and for every cask which he shall find deficient one per cent. in weight and shall fill up, fifty cents.

*How disputes between the owner of gun-powder and the inspector shall be decided.*

Sect. xii. *And be it further enacted by the authority aforesaid,* That if any dispute should arise between the owner, possessor or consignee of any such powder and the Inspector, touching the proof or condemnation thereof, or of the goodness of the materials and manner in which the casks are made, upon application by the owner, possessor or consignee of such powder to one of the Magistrates of the city or county of Philadelphia, where the dispute shall arise, the said Magistrate shall issue his warrant to three indifferent judicious persons to be triers thereof, one of them to be named by the said owner, possessor or consignee, one by the said Inspector, and the third by the said Magistrate, directing the said triers to view and examine the said powder, and make report to him forthwith touching the condition thereof, and that if they shall find the said powder not merchantable, that they certify to him the cause thereof, and the said Magistrate shall thereupon give his judgment agreeably to the report of the said triers, or any two of them; and in case the said Magistrate shall on such report adjudge the powder not to be merchantable, he shall award the owner, possessor or consignee thereof, to pay all costs; but in case the said powder shall be found merchantable, the Inspector shall be adjudged to pay all costs, which may have accrued, and shall thereupon cause the powder to be marked as of the standard to be directed by the said triers. *(u)*

Passed 18th April, 1795.—Recorded in Law Book No. VI. page 26.

*(u)* By a supplement to this act, passed 29th March, 1802, in this volume, (chap. 2264.) The Inspector is authorized, directed and enjoined on request, &c. of any owner or occupier of any manufactory of gun-powder, within the county of Philadelphia, to repair to such manufactory, from time to time, to inspect and mark all gun-powder manufactured thereat, and to receive ten cents a mile, travelling expenses, therefor, besides his usual fees. And the owner may remove such gun-powder immediately from the manufactory to the place of exportation.

Penalty on the superintendant of the magazine, or his deputy, if concerned directly, or indirectly, in manufacturing or selling gun-powder.

The superintendant, in future, not to receive any fee or emolument for the delivery of any gun-powder; but shall only charge for the storage of gun-powder deposited in the magazine.

App. 033

4:22-cv-00691-O    Document 320    Filed 05/22/26    Page 37 of 117    PageID

with the advice of the Council, is hereby authorized to make. And the gaoler so appointed shall give such bonds and in the same manner, as is required of a sheriff, for the faithful performance of the duties of his office, and shall continue in office during the vacancy in the office of sheriff.

**Defaults of deputies, &c. after death, &c. of sheriff.**

Sect. 2. *Be it further enacted*, That the defaults or misfeasances in office, of any gaoler, or deputy-sheriff, after the death or resignation of any sheriff, by whom he was appointed, shall be adjudged a breach of the condition of the bond given by such sheriff: *Provided, however*, that this act shall not be

**Proviso.**

construed to make any surety, in any such bond, which has heretofore been given by such sheriff, liable to any suit which could not heretofore be legally prosecuted against him.

And, whereas doubts have arisen respecting the authority and duty of deputy-sheriffs to execute such precepts as may be in their hands at the time of the accruing of a vacancy in the office of sheriff in certain cases: Therefore,

**Deputy sheriffs to serve precepts in their hands at the time a vacancy happens in the office of sheriff.**

Sect. 3. *Be it further enacted*, That in every case of a vacancy in the office of sheriff in any county, by death, resignation, removal, or otherwise, every deputy sheriff, in office under such sheriff, having any writ or precept in his hands, at the time of such vacancy, shall have the same authority, and shall be under the same obligation to serve, execute, and return such writ or precept, as if such sheriff had continued in office. [*Feb. 24, 1809.*] Further add. acts—1811 ch. 102: 1813 ch. 189: 1822 ch. 20.

*Chap.* 47.

An Act to incorporate certain persons as Trustees, to improve and manage a Fund towards the support of Schools, in the north westerly parish in the town of Boxford. [*Feb. 27, 1809.*]

*Chap.* 48.

An Act to incorporate sundry persons into a Company, by the name of The Boylston Market Association. [*Feb. 27, 1809.*]

*Chap.* 49.
1807 ch. 93.

An Act confirming the laying out the road of the Housatonick Turnpike Corporation, at and near the line of the State of New-York. [*Feb. 27, 1809.*]

*Chap.* 50.

An Act to incorporate Benjamin Dearborn and others into a Society by the name and style of The Massachusetts Association for the encouragement of useful inventions. [*Feb. 27, 1809.*]

*Chap.* 51.

An Act to incorporate Rufus Pierce and others, for certain purposes. [*Feb. 27, 1809.*]

*Chap.* 52.

An Act providing for the appointment of Inspectors, and regulating the manufactory of Gun-Powder.

Sect. 1. *BE it enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same*, That his Excellency the Governor, by and with

**Governor to appoint inspectors of gunpowder.**

the advice of Council, be, and he is hereby authorized to appoint an inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this Commonwealth, and at such other places, as may by him be thought necessary; and his Excellency the Governor, by and with the advice of Council, is hereby further authorized and empowered to remove said inspectors, or any of them at pleasure, and may by new appointments from time to time fill any vacancy, or vacancies which may happen.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated on 2025-06-27 18:12 GMT  /  https://hdl.handle.net/2027/mdp.35112203975869
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

4:22-cv-00691-O    Document 320    Filed 05/22/26    Page 38 of 117    PageID

Sect. 2. *Be it further enacted*, That from and after the **Materials of which gunpowder shall be composed.** first day of July next, all gunpowder which shall be manufactured within this Commonwealth shall be composed of the following proportions, and quality of materials, that is, every one hundred parts of gunpowder, shall be composed of fourteen parts of fresh burnt coal, made from wood which forms the least ashes, and which has been carefully and well prepared, and made into coal, after being stripped of its bark, ten parts of pure sulphur, and seventy-six parts of purified nitre.

Sect. 3. *Be it further enacted*, That it shall be the duty of **Duty of inspectors.** each of said inspectors to inspect, examine and prove all gunpowder, which after the first day of July next, shall be deposited at any public powder magazine, or manufactured in this Commonwealth, before the same shall be removed from the manufactory, or received into such public powder magazine, and if upon such inspection and examination it shall appear to the inspector, that such gunpowder is well manufactured, and composed of pure materials, and of the proper proportions of materials, and such gunpowder shall be of the proof herein after mentioned, the inspector shall mark each cask, containing gunpowder by him inspected, exam- **Casks to be marked.** ined and proved as aforesaid, with the words Massachusetts Inspected Proof, and with his christian and surname, and shall also mark in figures upon each cask the quantity of powder contained therein, and the year in which the inspection is made.

Sect. 4. *Be it further enacted*, That no gunpowder within **Proof of powder.** this Commonwealth shall be considered to be of proof unless one ounce thereof, placed in the chamber of a four and an half inch howitzer, with the howitzer elevated so as to form an angle of forty-five degrees with the horizon, will, upon being fired, throw a twelve pound shot seventy-five yards at the least.

Sect. 5. *Be it further enacted*, That whenever any of said inspectors shall discover any gunpowder, deposited at any public powder magazine, or any other place within this Commonwealth, which is not well manufactured, or which is composed of impure materials, or of an improper proportion of materials, and which shall not be of the proof herein before mentioned, the inspector in such case shall mark each cask containing such **Casks of bad powder to be marked.** impure, ill manufactured or deficient gunpowder, with the word "Condemned" on both heads of the cask, and with the same word on the side thereof, with the christian and surname of the inspector on one head of the cask.

Sect. 6. *Be it further enacted*, That if any person shall know- **Penalty for selling condemned powder for good, and for altering marks on casks, &c.** ingly sell any condemned gunpowder, as and for good gunpowder, or shall fraudulently alter, or deface any mark, or marks, placed by any inspector upon any cask or casks containing gunpowder, or shall fraudulently put any gunpowder, which shall not have been inspected, or which has been condemned, into any cask or casks, which shall have been marked by any inspector, agreeably to the provisions contained in the

Digitized by Google          Original from
UNIVERSITY OF MICHIGAN

200                            1808. —— CHAP. 52——56.

third section of this Act, every such person so offending shall forfeit and pay not less than two hundred, nor more than five hundred dollars, for each and every offence, to be recovered in an action of debt in any court of competent jurisdiction, one half to the use of the Commonwealth, the other half to the use of him or them, who shall sue and prosecute for the same.

**Inspector to be sworn.**

SECT. 7. *Be it further enacted,* That each inspector who may be appointed by virtue of this Act, shall, before he acts as inspector, be sworn to the faithful and impartial discharge of the duties of his office, and each inspector shall be allowed one

**His fees.**

cent for each pound of gunpowder by him examined, inspected and proved, whether the same be by him approved or condemned, to be paid by the owner or owners of the gunpowder.

**Powder not to be sold or exported, before inspection.**

SECT. 8. *Be it further enacted,* That if any manufacturer of gun powder shall sell or dispose of, or shall cause or permit to be sold or disposed of, or shall export, or cause to be exported without the limits of this Commonwealth, any powder of his manufacture, before the same has been inspected and marked agreeably to the provisions of this Act, he shall forfeit and pay the sum of fifty cents for every pound of powder so sold, disposed of, or exported, to be recovered in the manner provided in the sixth section of this Act.

**Forfeiture for knowingly selling, &c. bad powder.**

SECT. 9. *Be it further enacted,* That if any person within this Commonwealth, after the first day of July next shall knowingly sell, expose, or offer for sale within this Commonwealth any gunpowder which is not well manufactured, or which is composed of impure materials, and which shall not be of the proof herein before required, shall forfeit and pay not less than five dollars, nor more than fifty dollars, for each and every offence, to be recovered in the manner provided in the sixth section of this Act. [*March* 1, 1809.] Add. acts —1809 ch. 118 : 1810 ch. 73.

---

**Chap. 53.**

An ACT authorizing the several Courts of Common Pleas in this Commonwealth, to allow accounts, and order payment, for services and expenses incident to said courts.

BE it enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same, That the several Courts of Common Pleas in this Commonwealth be, and they are hereby authorized and empowered to receive, examine, and allow the accounts, and order payment out of the treasury of their respective counties for services and expenses incident to said courts, any law to the contrary notwithstanding. [*March* 1, 1809.] Power transferred to the Circuit Courts—1811 ch. 33 : and thence to the Court of Common Pleas for the Commonwealth—1820 ch. 79.

---

**Chap. 54.**
**1803 ch. 146.**

An ACT in addition to an Act, entitled, " An Act establishing the Hartford and Dedham Turnpike Corporation." [*March* 1, 1809.] Further add. act—1812 ch. 91.

**Chap. 55.**

An ACT to incorporate a Religious Society in the Second Parish in Shapleigh. [*March* 1, 1809.]

**Chap. 56.**

An ACT to incorporate a number of the inhabitants of the Town of Parsonsfield, in the County of York, into a Religious Society, by the name of The First Baptist Society in Parsonsfield. [*March* 1, 1809.]

App. 036

Digitized by Google     Original from UNIVERSITY OF MICHIGAN

Generated on 2025-06-27 18:12 GMT  /  https://hdl.handle.net/2027/mdp.35112203975869
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

town or towns adopting the same, as fully to all intents and purposes, as to the town of Portsmouth.

*Approved June* 28, 1823.

---

# TITLE LXII.

## GUNPOWDER.

---

## CHAPTER I.

*AN ACT to prevent the keeping of large quantities of Gun-* Passed Feb.
*powder in private houses in Portsmouth, and for appointing* 18, 1794.
*a keeper of the Magazine belonging to said town.*

**W**HEREAS the keeping of large quantities of gun-powder in private houses in Portsmouth aforesaid, or in merchant ships, or vessels lying at the wharves in said town, would greatly endanger the lives and properties of the inhabitants thereof in case of fire; which danger might be prevented by obliging the owners of such powder, to deposit the same in the magazine provided by said town for that purpose;

Therefore,

SECT. 1. *Be it enacted by the senate and house of representatives, in general court convened,* That if any person or persons, shall keep in any dwelling-house, store or other building on land within the limits of said Portsmouth, except the magazine aforesaid, more than ten pounds of gun-powder at any one time, which ten pounds shall be Gun-powder kept in a tin cannister, properly secured for that purpose, not to be such person or persons shall forfeit the powder so kept, to kept in dwelling-houses, the firewards of said Portsmouth, to be laid out by them ling-houses, in purchasing such utensils as they may judge proper for &c. the extinguishing of fire; and the said firewards are hereby directed and empowered to seize, and cause the same to be condemned in any court of record proper to hear and try the same, to be disposed of for the purpose aforesaid. And the offender shall also forfeit and pay a fine for Fine. the use of the poor of said Portsmouth, equal to the value of the powder so kept in any store, dwelling house or building; which fine shall be sued for and recovered by the overseers of the poor of said Portsmouth for the use of said poor, in any court of law proper to try the same. Gun-powder

SECT. 2. *And be it further enacted, by the authority afore-* to be deposit-
*said,* That every master of any merchant ship or vessel, ed in maga-
bringing gunpowder into said Portsmouth, shall, within zine.
the space of forty-eight hours after his arrival, deposit in

Digitized by Google

**276**                     *Inspectors of Gunpowder.*

said magazine, all the gun-powder by him so brought as aforesaid ; and if he shall neglect so to do, he shall pay a fine of thirty pounds, for the use of the poor of said Portsmouth, to be recovered by said overseers in manner aforesaid.

Keeper of magazine to be chosen.

SECT. 3. *And be it further enacted,* That there shall be chosen annually, or oftener if necessity require, by the inhabitants of said Portsmouth, being legal voters, a keeper of said magazine, whose duty it shall be to receive into and deliver out of said magazine, all the powder so deposited, and to account therefor, who shall have a right to demand and receive for his time and trouble in attending on said business, at the rate of one shilling per hundred weight, for all quantities of powder above ten pounds, that he shall so receive into, and deliver out of said magazine ; and for all quantities under ten pounds, at the rate of a half penny per pound.

SECT. 4. *And be it further enacted,* That no person shall transport or carry through the compact part of the town of Portsmouth, more than ten pounds of gun-powder at any time without the same is in a close carriage, or is sufficiently covered, on penalty of forfeiting the sum of one dollar for each offence, to be recovered and applied in the same manner as is herein before directed.

SECT. 5. *And be it further enacted,* That the act to prevent the keeping large quantities of gun-powder in private houses in Portsmouth, passed the twenty-eighth day of February, one thousand seven hundred and eighty-six, be, and hereby is repealed.

                                 *Approved February* 18, 1794.

---

## CHAPTER II.

Passed June 21, 1820.

*AN ACT to provide for the appointment of inspectors and regulating the manufactory of gunpowder.*

SECT. 1. **B**E *it enacted by the senate and house of representatives, in general court convened,* That his excellency the governor by and with the advice of council, be, and he is hereby authorized to appoint an inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state, and at such other places as may by him be thought necessary ; and his excellency the governor by and with the advice of council is hereby further authorized and empowered to remove said inspectors or any of them at pleasure, and may by new appointments from time to time fill any vacancy or vacancies which may happen.

Inspectors of gunpowder to be appointed.

SECT. 2. *And be it further enacted*, That from and after the first day of July next, all gunpowder which shall be manufactured within this state, shall be composed of the following proportions and quality of materials, that is, every one hundred parts of gunpowder shall be composed of fourteen parts of fresh burnt coal, made from wood which forms the least ashes, and which has been carefully and well prepared and made into coal, after being stripped of its bark ; ten parts of pure sulphur, and seventy-six parts of purified nitre. *Proportion and quality of materials for the manufacture of gunpowder.*

SECT. 3. *And be it further enacted*, That it shall be the duty of each of said inspectors to inspect, examine and prove all gunpowder which after the first day of July next shall be deposited at any public powder magazine, or manufactory in this state, before the same shall be removed from the manufactory or received into such public powder magazine, and if upon inspection and examination it shall appear to the inspector that such gunpowder is well manufactured and composed of pure materials, and such gunpowder shall be of the proof hereinafter mentioned, the inspector shall mark each cask containing gunpowder by him inspected, examined, and proved as aforesaid, with the words " *New-Hampshire inspected proof*," and with his christian and surname, and shall also in figures mark upon each cask the quantity of powder contained therein, and the year in which the inspection is made. *Duty of inspectors.*

SECT. 4. *And be it further enacted*, That no gunpowder within this state shall be considered to be of proof unless one ounce thereof, placed in the chamber of a four and an half inch howitzer, with the howitzer elevated so as to form an angle of forty-five degrees with the horizon, will, upon being fired, throw a twelve pound shot seventy-five yards at the least. *Proof of quality of gunpowder.*

SECT. 5. *And be it further enacted*, That whenever any of said inspectors shall discover any gunpowder, deposited at any public powder magazine, or any other place within this state, which is not well manufactured, or which is composed of impure materials, or of any improper proportion of materials, and which shall not be of the proof herein before mentioned, the inspector, in such case, shall mark each cask containing such impure, ill-manufactured, or deficient gun-powder, with the word " *Condemned*," on both heads of the cask, and with the same words on the side thereof, with the christian and surname of the inspector on one head of the cask. *Inspectors to mark bad powder.*

SECT. 6. *And be it further enacted*, That if any person shall knowingly sell any condemned gunpowder, or shall fraudulently alter or deface any mark or marks, placed by any inspector upon any cask or casks containing gunpowder, or shall fraudulently put any gunpowder, which shall not have been inspected, or which has been condemned, *Penalty for selling condemned powder.*

into any cask or casks, which shall have been marked by any inspector agreeably to the provisions contained in the third section of this act, every such person, so offending, shall forfeit and pay not less than two hundred nor more than five hundred dollars, for each and every offence, to be recovered in an action of debt, in any court of competent jurisdiction, one half thereof to the use of the state, the other to the use of him or them who shall sue and prosecute for the same.

Inspector's fees and oath of office.

SECT. 7. *And be it further enacted,* That each inspector who may be appointed by virtue of this act, shall, before he acts as inspector, be sworn to the faithful and impartial discharge of the duties of his office, and each inspector shall be allowed one cent for each pound of gunpowder, by him examined, inspected and proved, whether the same be by him approved or condemned, to be paid by the owner or owners of the gunpowder.

Penalty for selling uninspected powder.

SECT. 8. *And be it further enacted,* That if any manufacturer of gunpowder shall sell or dispose of, or shall cause or permit to be sold or disposed of, or shall export or cause to be exported without the limits of this state, any powder of his manufacture, before the same has been inspected and marked agreeably to the provisions of this act, he shall forfeit and pay the sum of fifty cents for every pound of powder so sold, disposed of, or exported, to be recovered in the manner provided in the sixth section of this act.

Penalty for selling powder made of impure materials.

SECT. 9. *And be it further enacted,* That if any person within this state, after the first day of January next, shall knowingly sell, expose or offer for sale, within this state, any gunpowder which is not well manufactured, or which is composed of impure materials, and which shall not be of the proof herein before required, shall forfeit and pay not less than five dollars nor more than fifty dollars for each and every offence, to be recovered in the manner provided in the sixth section of this act.

*Approved June 21, 1820.*

---

# CHAPTER III.

Passed July 6, 1827.

*AN ACT to regulate the keeping and selling and transporting of gunpowder.*

SECT. 1. **B**E *it enacted by the senate and house of representatives, in general court convened,* That there shall not at

Penalty for keeping more than a quarter cask.

any time be kept in any warehouse, store, shop or other building in the compact part of any town or village in this state, a quantity of gunpowder, greater than one quarter cask or twenty-five pounds ; and any person or persons

so keeping a greater quantity, shall forfeit and pay for every day during which such greater quantity shall be kept as aforesaid, a sum not exceeding five dollars nor less than one dollar, to be sued for and recovered by the firewards or selectmen in an action of debt, in the name of the town, before any justice of the peace or court proper to try the same, with costs of suit ; and the whole of said forfeiture so recovered shall be for the use of the town, to be expended by the firewards or selectmen in purchasing materials necessary and proper to be used for the extinguishing of fires.

SECT. 2. *And be it further enacted*, That the firewards, or a major part of them, or the selectmen of any town, are hereby authorized and empowered to search any warehouse, store, shop, or other building in the compact part of any town, or village in this state, where they have cause to suspect that gunpowder, in a greater quantity than one quarter cask, or twenty-five pounds, may be kept or stored, and in case of finding any gun-powder, kept as aforesaid, in a quantity greater than one quarter cask, or twenty-five pounds, the said firewards or selectmen, are hereby authorized and empowered to seize the same, and the said gunpowder so kept, and stored, contrary to the provisions of this act, shall be forfeited to the town, and the firewards or selectmen, so finding and seizing the same, shall sell said gunpowder at auction, and the avails thereof, to be expended for the purposes aforesaid. *Firewards or selectmen may search for, seize and sell any greater quantity.*

SECT. 3. *And be it further enacted*, That every person keeping gunpowder to sell by retail, in any quantity less than one quarter cask, or twenty-five pounds, and who shall not at all times, keep the same in a tin cannister, or cannisters, or other incombustible vessel, or vessels, covered and secured from fire, or if said gunpowder be kept in a wooden cask, or casks, said cask, or casks, shall be enveloped in substantial and close leathern bags, or sacks, shall forfeit and pay for each and every day he, she, or they, shall so keep it, a sum not exceeding five dollars, nor less than one dollar, to be sued for, and recovered in the manner and for the purposes aforesaid. *Manner of keeping less than a quarter cask to sell by retail.*

SECT. 4. *And be it further enacted*, That gunpowder shall not be transported, or carried through the compact part of any town or village, in any cart, wagon, or other open carriage, in a quantity greater than four quarter casks, or one hundred pounds at any one time, nor unless the casks containing the gunpowder so transported, be enveloped in substantial leathern bags, or sacks, and any person or persons transporting gunpowder, as aforesaid, in a greater quantity, and without being enveloped, as aforesaid, except the same be conveyed in a closely covered carriage, shall forfeit and pay a sum, not more than fifty dollars, nor less than fifteen dollars, to be sued for and recovered *Transporting gunpowder through the compact part of any town.*

**280**                                     *Gunpowder.*

in the manner and for the purposes aforesaid.  And no cart, wagon, or other carriage, shall be permitted to stand in any shed, barn, or other building, or near any store, dwelling-house, or other building in the compact part of any town, or village, upon which there may be a greater quantity than one quarter cask, or twenty-five pounds of gunpowder, and in case any gunpowder shall be found upon any cart, wagon or other carriage, contrary to the provisions of this act, any fireward or selectman of the town where found, may seize the same and cause it to be sold as gunpowder, that may be found contrary to the provisions of this act.

*No carriage with more than one quarter cask to stand in such compact part.*

Sect. 5. *And be it further enacted*, That no person shall at any time transport or carry from town to town, or from place to place, any gunpowder for the purpose of peddling or selling it by retail in quantities less than twenty-five pounds, on penalty, that the owner, or owners, or person, or persons selling, or offering it for sale, shall forfeit and pay for every offence, a sum not more than five dollars, nor less than one dollar, to be sued for and recovered in the manner and for the purposes aforesaid.

*Carrying from town to town to retail.*

Sect. 6. *And be it further enacted*, That if any person or persons, shall sell, or offer for sale by retail, any gunpowder in any highway, or in any street, lane, or alley, or on any wharf, or parade, or common, such person or persons, so offending, shall forfeit and pay for each and every such offence a sum not more than five dollars, nor less than one dollar, to be sued for, and recovered, and for the purposes aforesaid.

*Penalty for retailing in any highway or on any parade, common, &c.*

Sect. 7. *And be it further enacted*, That if any person or persons shall within this state in the night time between sunsetting and sunrising sell or offer to sell by retail, or deal out any gunpowder, such person so offending shall forfeit and pay for each and every such offence a sum not more than five dollars nor less than one dollar, to be recovered and applied as aforesaid.

*Penalty for selling in night time.*

Sect. 8. *And be it further enacted*, That all prosecutions against [under] this act shall be commenced within three months after the offence shall have been committed and not afterwards.

*Limitation.*

Sect. 9. *And be it further enacted*, That an act passed July 2d, 1825, entitled " an act to regulate the keeping and selling and transporting gunpowder," be and the same is hereby repealed.  *Provided*, That nothing herein contained shall affect any rights acquired, or liabilities incurred under said act.                *Approved July 6, 1827.*

*Act 1825 repealed.*

Digitized by Google

and Chattel as fhall be found in any Corn-field or other inclofure.

And whofoever Impounds any Swine or Chattel, fhall give prefent notice to the Owner if he be known, or otherwife they fhall be cryed at the two next Lectures or Markets; And if Swine or Chattel efcape out of Pound, the Owner if known, fhall pay all damages according to Law.

And every perfon or perfons having notice given them, or otherwife left in writing at their Houfe or place of their ufual abode, of any of their Chattel Impounded or otherwayes Reftrained, fhall forthwith give fatisfaction to the party fo wronged, or otherwife Replevie their Chattel, and profecute the fame according to Law, upon peril of fuffering all the lofs and damage that fhall come to their Chattel by ftanding in the Pound or other lawful place of Reftraint. [*1645, 47, 57.*]

2. And if any perfon fhall refift or refcue any Chattel going to Pound, or fhall by any way or means convey them out of Pound or other Cuftody of the Law, whereby the party wronged may lofe his damages, and the Law be deluded, that in cafe of meer refcues, the party fo offending fhall forfeit to the Treafury *forty fhillings.*

And in cafe of Pound breach *five pounds,* and fhall alfo pay all damages to the party wronged, and if in the refcues any bodily harm be done to the perfon of any Man or other Creature, they may have remedy againft the Refcuers; And if either be done by any not of ability to anfwer the forfeiture and damages aforefaid, they fhall be openly Whipped by Warrant from any Magiftrate before whom the offender is convicted in the Town or Plantation where the offence was committed, not exceeding *twenty ftripes* for the meer Refcue or Pound breach; And for all damages to the party, they fhall fatisfie by fervice, as in cafe of Theft.

And if it appear there were any procurement of the Owner of the Chattel thereunto, and that they were Abetters therein, they fhall pay forfeiture and damages as if themfelves had done it. [*1647.*]

*Marginal notes: A.57.p.24. — Cattle impounded to be replevied or damage fatisfied — Refcues and Pound breach — Fine or — be whipped*

---

## P O W D E R.

VVHereas by favour of the Government in England, feveral quantities of Powder and other Amunition are yearly Imported into this Jurifdiction for our neceffary ufe and defence; To the end the favour we receive may not be Abufed, nor our felves Deprived of the juft and neceffary ufe thereof;

It is hereby Ordered and Enacted; That all Merchants or others, that fhall import into this Jurifdiction either Powder, Lead, Bullets Shot, or any Amunition whatfoever, fhall give particular notice of the quantity thereof to the *Publick Notary,* upon the pain and penalty of *forty pounds,* within one Month after the Landing of fuch Goods, who is hereby enjoyned to take particular notice of the fame, with the Mark and Number, and faithfully to enter the fame in a Book, and the Names of the Perfons to whom they are fold, or into whofe Cuftody or

*Marginal notes: A.52.p.3. — Powder imported to be Entred with the publick Notary*

F f power

power they are committed, that he may give account thereof upon Oath to the Governour, Deputy Governour or any of the Council from time to time; And the said Notary is hereby prohibited, upon the penalty of *one hundred pounds*, to grant Certificate to any Merchant or other of any such Goods but such as he shall have particular notice of, and entred as aforesaid.

*And to the end this Order may be duely observed, and that no person may plead ignorance thereof;*

It is hereby Ordered, That the Captain of the Castle shall upon the arrival of any Ship or Vessel in the Massachusets Bay, from any forraign parts, give notice of the contents of this Order, to the Master or Merchant of any such Vessels, and the Constables of all other Port-Towns in this Jurisdiction, are hereby required to do the same. [ *1651.* ]

*L. 1. p. 45.*

2. And it is further Ordered; That no person (except for the defence of themselves and their Vessels at Sea) shall transport any Gunpowder out of this Jurisdiction, without licence first obtained from some two of the Magistrates, upon penalty of forfeiting all such Powder as shall be transporting or transported, or the value thereof.

*And that there may be no defect for want of an Officer to take care herein;*

Searchers for powder exporting

This Court, the Court of Assistants, or any Shire Court, shall appoint meet persons, from time to time in all needful places, who have hereby power granted them, to search all Persons and Vessels that are or any way shall be suspicious to them to be breakers of this Order, and what they finde in any Vessel or Hands, without licence as aforesaid, to seize the same, and to keep the one half to their own use in recompence of their pains, and to deliver the other half forthwith to the Treasurer. [ *1645, 51.* ]

## *Prescriptions.*

IT is Ordered, Decreed, and by this Court Declared; That no Custome or Prescription shall ever prevail amongst us in any Moral case, (our meaning is) to maintain any thing that can be proved to be Morally sinful by the Word of God. [ *1641.* ]

## *Prisoners, Prison, House of Correction.*

Prisoners carried at their own charge

IT. is Ordered; That such Malefactors as are committed to any common Prison, shall be conveyed thither at their own charge if they be able, otherwise at the charge of the Country. [ *1646.* ]

Z. For

**PUBLIC RECORDS**          [December,

And it is *further provided*, That the provisions of this act
shall not extend to include or affect the 24th regiment of
militia in this Colony.

**[526] An Act for encouraging the Manufactures of Salt Petre and Gun
Powder.**

*Be it enacted by the Governor, Council and Representatives,
in General Court assembled, and by the authority of the same,*
That there shall be given and paid out of the Colony treasury
a premium or bounty of ten pounds for every hundred pounds
weight of good and merchantable salt petre or nitre that
shall be made and manufactured in this Colony between the
first day of June 1776 and the first day of January 1777,
and so in proportion for a greater or lesser quantity : Always
provided, That in case any proprietor of salt petre works
or manufacturer of salt petre shall, upon application and
request made to him by any person or persons, neglect or
refuse to communicate a full account of the materials out of
which and the process by which such salt petre or nitre is
made, such proprietor or manufacturer shall not be enti-
tuled to have or receive the aforesaid bounty or premium for
any salt petre or nitre he shall make ; anything herein con-
tained notwithstanding.

*Be it further enacted*, That a suitable number of inspectors
of salt petre or nitre be appointed by the General Assembly,
and that the claimants of the premium or bounty given by
this or any former act for the manufacture of salt petre or
nitre shall procure the salt petre or nitre by them made to
be inspected by one or more of said inspectors, and shall
also make oath before such inspector, which oath such in-
spector is hereby enabled to administer, that such salt petre
or nitre was made and manufactured in this Colony out of
materials collected therein by him or them, or for his or
their account, and that no other certificate hath been had or
given for the same ; and thereupon said inspector shall give
to the claimant or claimants a certificate of the quantity and
quality of such salt petre or nitre, and that proof hath been
made as aforesaid that the same was manufactured in this
Colony by such claimant or claimants ; which certificate

Digitized by Google

being laid before the Committee of the Pay-Table, they shall draw an order on the Colony Treasurer to pay such claimant or claimants the amount of the aforesaid bounty or premium on such nitre or salt petre out of the Colony treasury and charge the same to the Colony's account, who shall accept and pay such order accordingly.

*Be it also enacted*, That every town in this Colony, which hath and doth send Representatives to the General Assembly, in which salt petre or nitre works are not or shall not be erected and the manufacture of salt petre is not or shall not be carried on by some private person or persons, shall be and are hereby enjoined as soon as may be to erect one set of such works and carry on the manufacture of nitre or salt petre in the same; and that it shall be the duty of the selectmen of each town in this Colony, and they are hereby authorized and enjoined, at the expence and for the benefit of said town, to cause such works to be erected and said manufacture to be carried on in the same accordingly.

*Be it also enacted*, That no salt petre, nitre or gun-powder made and manufactured, or that shall be made and manufactured in this Colony, shall be exported out of the same by land or water without the licence of the General Assembly or his Honor the Governor and Committee of Safety, under the penalty of twenty pounds for every hundred weight of such salt petre, nitre or gun-powder, and proportionably for a greater or lesser quantity so without licence exported; to be recovered by bill, plaint or information, in any court of record in this Colony by law proper to take cognizance thereof.

And whereas it is necessary that two powder-mills be immediately erected in this Colony for manufacturing gunpowder,

*Be it further enacted by the authority aforesaid*, That a bounty or premium of thirty pounds shall be paid out of the Colony treasury to the person or persons who shall erect the first powder-mill in this Colony, and shall make and manufacture therein five hundred pounds weight of good and merchantable gun-powder; also that a bounty or premium

Digitized by Google

of thirty pounds shall be paid out of the Colony treasury to the person or persons who shall erect the second powder-mill in this Colony and make or manufacture therein five hundred pounds weight of good and merchantable gun-powder.

*Be it further enacted,* That the inspector or inspectors who shall inspect and give a certificate for any quantity of salt petre, as before directed, shall purchase and receive such salt petre for the Colony's use and benefit, and give his or their receipt therefor to the claimant or claimants, who shall be paid therefor out of the Colony treasury at such price as the General Assembly shall ascertain and affix.

And whereas it is expedient that powder-mills should be so situated as to accommodate the public in the best manner,

*Be it further enacted by the authority aforesaid,* That no powder-mill shall be erected in this Colony for the manufacture of gun-powder without the licence of the General Assembly, or in their recess of the Governor and Council, first had and obtained, under the penalty of thirty pounds for every such offence, to be recovered as the other foregoing penalties in this act are above directed to be recovered.

**An Act for restraining and punishing Persons who are inimical to the Liberties of this and the Rest of the United Colonies, and for directing Proceedings therein**

[527] *Be it enacted by the Governor, Council and Representatives, in General Court assembled, and by the authority of the same,* That if any person within this Colony shall directly or indirectly supply the ministerial army or navy with provisions, military or naval stores, or shall give any intelligence to the officers, soldiers or mariners belonging to said army or navy, or shall inlist or procure any others to inlist into the service of said army or navy, or shall take up arms against this or either of the United Colonies, or shall undertake to pilot any of the vessels belonging to said navy, or in any other ways shall aid or assist them, and be thereof duly convicted before the superior court, shall forfeit all his estate, which shall be accordingly seized by order of said court for the use of this Colony; and such person shall be further punished by imprisonment in any of the goals in this Colony



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

---

*Martinsburg, WV 25405*

www.atf.gov

**MAR 2 0 2015**

907010: WS
3311/ 303304

Mr. Mark Barnes
Mark Barnes & Associates
1350 I Street, N.W.
Suite 260
Washington D.C. 20005

Dear Mr. Barnes,

This letter is in response to your follow-up telephonic and electronic inquiries regarding correspondence and submitted sample to Firearms Technology Industry Services Branch (FTISB), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) by Alliant Techsytems Alliance (ATK). You are asking for additional clarification on behalf of ATK, as to when the frame or receiver of the submitted and evaluated **7.62 mm Automatic Chain Gun;** becomes a "machinegun". You have included a portion of our previous correspondence to ATK regarding the aforementioned evaluation with this request.

Basically, you wish to know, specifically; at what point the subject 7.62mm Automatic Chain Gun receiver; becomes a machinegun receiver. Prior to any dissemination of a formal response to your inquiry, a review of pertinent definitions is required.

The Gun Control Act of 1968 (GCA), as amended, defines **"firearm"** to include—

*"...any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive......[and] ... **the frame or receiver of any such weapon...."** (See 18 U.S.C. § 921(a)(3).)*

As specified in the GCA, 18 U.S.C. § 921(a)(23), *the term "**machinegun**" has "the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b))." (See below, page 2.)*

App. 048

Mr. Mark Barnes                                                      Page 2

The National Firearms Act of 1934 (NFA), 26 U.S.C. § 5845(a), defines "**firearm**" as:

"... *(1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (6) **a machinegun**; (7) any silencer (as defined in 18 U.S.C. § 921); and (8) a destructive device. The term 'firearm' shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the ...[Attorney General] ... finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon.*"

As you know, the NFA defines the term "**machinegun**" to mean—

"...*any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  **The term shall also include the frame or receiver of any such weapon**, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.*" *(See 26 U.S.C. § 5845(b).)*

As background to our findings, every licensed manufacturer has to meet all of the following Federal marking requirements that are specified in 27 CFR 478. 92:

...*each licensed manufacturer or licensed importer of any firearm manufactured or imported shall legibly identify each such firearm by engraving, casting, stamping (impressing), or otherwise conspicuously placing or causing to be engraved, cast, stamped (impressed) or placed on the frame or receiver thereof in a manner not susceptible of being readily obliterated, altered, or removed, an individual serial number not duplicating any serial number placed by the manufacturer or importer on any other firearm, and by engraving, casting, stamping (impressing), or otherwise conspicuously placing or causing to be engraved, cast, stamped (impressed), or placed on the frame or receiver, or barrel thereof in a manner of not susceptible of being readily obliterated, altered or removed, the model, if such designation has been made; the caliber or gauge; the name (or recognized abbreviation of same) of the manufacturer and also, when applicable, of the importer; in the case of a domestically made firearm, the city and State (or recognized abbreviation thereof) wherein the licensed manufacturer maintains its place of business; and in the case of an imported firearm, the name of the country in which manufactured and the city and State (or recognized abbreviation thereof) of the importer.*

App. 049

Mr. Mark Barnes                                                           Page 3

Furthermore, for firearms manufactured or imported on and after January 30, 2002, the engraving, casting, or stamping (impressing) of the serial number must be to a minimum depth of .003 inch and a minimum height of 1/16 inch. All other markings must be of a minimum depth of .003 inch.

As you are aware, a firearm frame or receiver is a "part" of a weapon. Pursuant to Federal law, it is a specific item that is itself a "firearm" under the GCA and a "machinegun" under the NFA. The GCA implementing regulations, 27 CFR 478.11, define frame or receiver as "that part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." Whereas before the GCA Federal law regulated "any part or parts of a firearm," Congress determined that this was impracticable and, in passing the GCA, determined that only the receiver would be regulated. This definition was necessary in order to identify that part of the firearm so that the public would be able to identify the regulated item.

The regulatory definition does not therefore require that a "precursor receiver" be capable of accepting installation of the fire-control components before it may be regulated. Because the regulatory definition speaks of the part (portion) that "provides housing," it is a standard used to determine which portion of the completed weapon is considered the "firearm frame or receiver." The regulatory definition is not a standard used to determine whether a particular item has reached a stage such that it is properly classified as a "frame or receiver." In this way, the regulatory definition answers the question "what" and not "when."

The critical inquiry, then, is the point at which an unregulated piece of metal or plastic becomes a regulated item under Federal law. ATF has long held that a piece of metal or plastic becomes a "part" when it reaches a critical "stage of manufacture." This is a point at which a substantial step has been taken, or a critical line crossed, so that the item in question may be so classified under the law. To fall under the purview of the GCA, NFA or AECA, an item needn't be capable of functioning to have reached a critical stage of manufacture. Indeed, Congress concluded that to make a specific item regulated by the GCA or NFA, an items need only be designed, re-designed, intended, readily convertible, readily restored, or combined with other parts.

ATF's position is best understood by considering alternatives. For example, in AR-type firearm receivers, ATF could have determined that the critical "stage of manufacture" was the creation of the magazine well. After all, an AR-type firearm cannot function as designed unless it can accommodate a magazine. However, this position would have permitted possessors to create a fire-control cavity, install the fire-control components, attach an upper assembly and fire a projectile without ever creating a "firearm receiver." This is clearly contrary to the statute.

Further, ATF might have determined that a piece of metal or plastic is not a "firearm receiver" until the cavity is capable of housing all of the fire-control components. However, this would have permitted the unregulated manufacture of receiver "blanks" in

App. 050

Mr. Mark Barnes                                                                Page 4

which all but one of the major processes are completed. For example, a manufacturer could avoid licensing and prohibited persons could lawfully possess "receiver blanks" with all but one fire-control component pin hole drilled. Further, this position would permit the manufacturer to index the remaining pinhole as long as the indexing would not create a hole so that the final component may be installed.

The point at which a firearm frame or receiver can be recognized as such is necessarily different from firearm to firearm due to the multitude of different model designs, methods of operation, features, material, and manufacturing methods. ATF has noted that such determination depends upon whether the item "can be brought to a stage of completeness that will allow it to accept the firearm components to which it is designed for [sic], using basic tools in a reasonable amount of time."

The statutory definition of "firearm" and common-sense law enforcement and public safety considerations support ATF's position. The GCA defines firearm, in relevant part, as a "weapon capable of expelling a projectile by the action of an explosive" and as a "frame or receiver of such weapon." In passing the GCA, Congress explicitly intended that the critical factor in determining whether an item is a "firearm" is that item's ability to expel a projectile by the action of an explosive. Therefore, ATF has long held that because the fire-control cavity is the area that is vital to the item's ability to expel a projectile, it is appropriate to focus on this area in making classifications.

Further, to require that an item be fully functional as a firearm receiver before it may be classified as such would allow manufacturers to substantially complete a receiver, leaving a purchaser to complete minor operations to make it fully functional. Such classification would allow manufacturers to avoid licensing, regulation, and serialization requirements, while permitting individuals to receive nearly functional weapons with no background checks. Such a classification would wholly undermine the Gun Control Act of 1968.

Finally, this analysis applies to frames and receivers of machineguns as well. There is no requirement that a machinegun receiver expel a projectile. That is, the receiver is only a "part" of the complete weapon and therefore, as only a receiver, it need not expel a projectile to be designated as such. ATF classifies machinegun receivers based upon the design feature that results in automatic fire.

For example, to be made in to a machinegun, an AR-type firearm requires a sear pin hole in the receiver and, often, a widening of the fire-control cavity in order to accommodate a sear. For this reason, ATF classifies any AR-type receiver with the sear pin hole as a machinegun. In comparison, the 7.62mm chain gun receiver incorporates design features found only on electro-driven machineguns.

App. 051

Mr. Mark Barnes                                                    Page 5

The subject firearm incorporates a "highly machined" firearm receiver, complex in design, which incorporates machinegun features and is further capable of accepting machinegun components such as a chain drive assembly, chain gun bolt assembly, motor and gear box assembly, which is initiated by an electrical discharge of energy as a part of the firing sequence.

A firearm receiver of this type is the frame or receiver of a weapon, which at no point in the manufacturing process is designed to be a semiautomatic weapon. Further, a chain gun "receiver housing", by design; is a machinegun receiver. Therefore, the subject receiver housing, at any stage in the depicted assembly process is identifiable as a "firearm" as defined in 18 U.S.C. § 921(a)(3) and moreover the frame or receiver of a weapon designed to shoot automatically more than one shot, without manual reloading, by a single function of the trigger; a "machinegun" as defined in 26 U.S.C. § 5845(b).

In conclusion, to reiterate; the "receiver housing" previously reviewed in *Detailed 7.62mm Receiver Determination Overview* submitted by ATK; illustrates a 7.62 mm Automatic Chain Gun receiver housing that is a "firearm" and a "machinegun" as defined in 18 U.S.C. § 921(a)(3) and 26 U.S.C. § 5845(b) respectively.

We thank you and trust that the foregoing has been responsive to your request for further clarification regarding this matter. If we can be of any further assistance, please contact us.

Sincerely yours,

*[signature: George Rogers]*

George Rogers
Acting Chief, Firearms Technology Industry Services Branch

App. 052



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

---

Martinsburg, West Virginia  25405

www.atf.gov

903050:MMK
3311/2009-565

MAY **2 0** 2009

Mr. Chris Coad
Ultra-Tech, Inc.
3003 Power Drive
Kansas City, Kansas  66106

Dear Mr. Coad:

This refers to your letter to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB), with an accompanying sample of a partially machined AR-15 type receiver-casting.  You have requested a classification of the sample.

The FTB evaluation of this casting found that the following machining operations had been completed:

- Casting to shape, from aluminum alloy, of an AR-15 type receiver.
- Milling of recesses for the bolt stop and magazine release.
- Milling of the forward and rear take-down pins.
- Milling of the magazine well.
- Threading for the attachment of the buffer tube assembly.
- Drill and tap for the pistol-grip screw.
- Hole for the take-down retaining pin and spring.

The following operations <u>were not</u> completed:

- Drilling of the fire-control (trigger-group) component pivot-pin holes.
- Milling of the cavity for the fire-control (trigger-group) components.

Additionally, we noted that there were no external markings on the receiver.

Our Branch has previously determined that if an AR-type receiver-blank possessed either pivot pin holes or indexing marks for the fire-control components (trigger group); or if any of the cavity for the trigger group had been milled, then the receiver-blank would have been finished to the point at which it could be recognized as a firearm frame or receiver.  Your submitted sample does not contain any of these critical features.

App. 053

-2-

Mr. Chris Coad

Based on our examination, FTB finds that this sample AR-15 type receiver-casting is not yet finished to the point at which it would be classified as a firearm. As such, it is not regulated by the Gun Control Act or National Firearms Act.

To facilitate the return of the submitted sample, please provide FTB with the appropriate FedEx or other common carrier account information within 60 days of receipt of this letter. If you intend to use UPS, you must make arrangements with them to pick up the item at our location. Alternatively, if you wish to abandon the sample to ATF, you may notify us in writing.

We trust the foregoing has been responsive to your request. If we can be of any further assistance, please contact us.

Sincerely yours,

John R. Spencer
Chief, Firearms Technology Branch

App. 054



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_Martinsburg, WV 25405_

www.atf.gov

903050:MRC
3311/301179

Mr. Jason Davis
Davis & Associates
27201 Puerta Real
Suite 300
Mission Viejo, CA 92691

Dear Mr. Davis,

This is in reference to your letter dated March 4, 2014, requesting reconsideration of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) determination that the EP80 prototype submitted by EP Arms, LLC. (EP Arms) is classified as a "firearm receiver" under the Gun Control Act of 1968 (GCA). The basis for your request is your belief that ATF's assumptions concerning the manufacturing process for the EP80 were integral to our determination that the prototype constitutes a firearm for purposes of the GCA. That is not correct. To the extent ATF made assumptions about the manufacturing process, it was because details about that process were not provided with the July 30, 2013, request for classification. In any event, for the reasons articulated below, the details provided in your March 4, 2014, letter do not change our ultimate conclusion that the EP80 is a firearm receiver under the GCA.

As you are aware, the GCA, 18 U.S.C. § 921(a)(3), defines the term **"firearm"** as follows: ..._(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm._ Further, GCA implementing regulations, 27 CFR § 478.11, define "firearm frame or receiver" as "that part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."

App. 055

Our examination of this EP80 prototype submitted by EP Arms confirmed that it had the following features and characteristics:

1. Magazine well.
2. Magazine catch.
3. Bolt catch.
4. Pistol grip.
5. Forming and tapping for receiver-extension/buffer tube.
6. Front pivot-pin hole.
7. Rear take-down hole.
8. Holes drilled for the detent take-down and pivot pin, retainer buffer, detent fire-control selector and pistol-grip screw.

Further examination by the Firearms Technology Branch (FTB) revealed that excess material extended past the exterior walls of the casting, indicating the approximate locations of the holes to be drilled for the selector, hammer, and trigger pins.

In our initial classification this office included analysis of two separate and distinct issues. First, we advised that the EP Arms submission was a firearm receiver because the fire control cavity was created during the manufacturing process and was later filled with polymer—the item referred to in your appeal as the "biscuit." *In addition,* we noted that filling the fire control cavity with plastic was not sufficient to destroy the firearm.

You have not appealed this determination as being incorrect, but are appealing the determination that the EP80 receiver is a firearm because the manufacturing process differs from what is described in our determination letter. In your request for reconsideration, you describe that during the manufacturing process, the area comprising the fire control cavity is formed around a nylon core that you refer to as a "biscuit" and that at no stage in the manufacturing is the EP80 "back filled."

We previously advised that "the filling of the cavity at a later point does not change our classification….ATF has long held that this is not sufficient to destroy the receiver and remove the item from classification as a 'frame or receiver.'" We included this analysis to address any contention that inserting the biscuit would remove the item from classification as a firearm receiver.

However, based upon your newly supplied description of the EP Arms manufacturing process, we agree that this aspect of our analysis is not applicable to the EP80, as the biscuit is not meant to destroy the firearm. In fact, we understand that your contention is that this process prevents the item from reaching a stage of manufacture in which it may be classified as a "firearm receiver" claiming that "[a]t no time is a fire-control cavity formed during the manufacturing process….In fact; at no time does a fire-control cavity exist in the manufacturing process." We disagree.

The EP Arms manufacturing process represents a change from the processes by which AR-type firearms have historically been produced. ATF has long held that items such as receiver blanks–"castings" or "machined bodies" in which the fire-control cavity area is

App. 056

completely solid and un-machined – have not yet reached a "stage of manufacture" to be classified as a "firearm receiver." These items are a *single piece of metal* that require a substantial amount of machining to the vital areas of the firearm. In your request for reconsideration, you noted several letters in which FTB determined that certain submissions were not firearm receivers. However, in each of those examples the fire-control cavity was the same material as the receiver itself and the material filling the fire-control cavity is integral to the item; therefore the fire-control "cavity" had not been created.

To illustrate, photo 1 is a receiver "blank." This is not classified as a "firearm receiver" because the fire-control cavity has not been machined in any way. It is a single piece of metal from which a firearm receiver may be produced through further machining.



Photo 1

To further illustrate this difference between the EP Arms manufacturing process and traditional metal "castings" or "machined bodies," consider the following. Photo 2 is an AR-type receiver with a fully machined fire-control cavity. The red box outlines the cavity. This is classified as a firearm receiver pursuant to the GCA.



Photo 2

App. 057

Photo 3 is an example of the EP Arms submission. The "biscuit" is the white portion—the exact size and dimensions of the functional fire-control cavity. Notice that the biscuit outlines the fire-control cavity as shown in photo 2.



**Photo 3**

Photo 4 is a side-view of the EP Arms design. The top sample is made of clear plastic and shows that the biscuit creates the internal dimensions of the fire-control cavity.



**Photo 4**

The photos illustrate that the EP Arms manufacturing process creates a fire-control cavity through the use of a "biscuit."

Accordingly, based upon your description of the EP Arms manufacturing process, the EP Arms submission is distinguishable from other "castings" or "blanks" that are not

App. 058

classified as firearms. Unlike "castings" or "blanks" which are formed as a single piece so that a fire-control cavity has not been made, EP Arms uses the biscuit specifically to create that fire-control cavity during the injection molding process. As described in your letter, it appears that the sole purpose of the "biscuit" is to differentiate the fire-control area from the rest of the receiver and thus facilitate the process of making the receiver into a functional firearm. ATF has long held that "indexing" of the fire-control area is sufficient to require classification as a firearm receiver. Based upon the EP Arms manufacturing process, it is clear that the "biscuit" serves to index the entire fire-control cavity. In fact, the biscuit is meant to differentiate the fire-control cavity from the rest of the firearm so that it may be easily identified and removed to create a functional firearm. See photo 5.



**Photo 5**

Therefore, the submitted sample is properly classified as a "firearm" as defined in 18 U.S.C. 921(a)(3) because the fire-control area is created during the manufacturing process through the use of the biscuit.

In addition to the formation of the fire-control cavity in the manufacturing process, your manufacturing process results in "excess material extending past the exterior walls of the casting, indicating the approximate locations of the holes to be drilled for the selector, hammer, and trigger pins." Based upon our previous understanding of the EP Arms manufacturing process, we did not analyze whether this excess material, on its own, would be sufficient to warrant classifying the EP80 as a firearm receiver. However, to remove any doubt about the correctness of our classification decision, we are including that analysis here.

The AR-15 platform is a two-part system generally comprised of a lower and an upper assembly. The lower assembly is classified as the receiver and a "firearm" because it provides the housing for the hammer and the firing mechanism, and contains mounting points for the upper assembly which accepts the barrel and houses the bolt or

Mr. Jason Davis                                                                 Page 6

breechblock. As stated above, an AR-15 receiver blank is not classified by ATF as a firearm. The point in the manufacturing process at which an AR-15 blank is classified as a firearm is when it has been indexed for or machined in the fire-control recess area. Such a receiver may also have had other machining performed, such as drilled pivot-pin and takedown-pin hole(s). However, based upon your explanation of the manufacturing process, this excess material indexing the location for the holes to be drilled is, by itself, sufficient to classify the sample as a firearm receiver. See photo 6, below.



Indexing for the selector, hammer, and trigger pins

**Photo 6**

If you require further information concerning our findings, we can be contacted at any time.

Sincerely yours,

Earl Griffith
Chief, Firearms Technology Branch

App. 060



# Definition of "Frame or Receiver" and Identification of Firearms

**27 CFR Parts 447, 478, and 479**

**Docket No. 2021R-05; AG Order No.**
**RIN 1140-AA54**
**Final Rule**

*Regulatory Impact Analysis and Final Regulatory FlexibilityAnalysis*

**April 2022**

Prepared by:
Office of Regulatory Affairs
Bureau of Alcohol, Tobacco, Firearms, and Explosives
Washington, D.C.

-1-

App. 061

# 4.  FFL and Non-FFL Manufacturers of Firearm Kits

This section addresses FFL and non-FFL manufacturers that produce partially complete, disassembled, or nonfunctional frames or receivers that are often sold within firearm parts kits. The final rule's definitions of "firearm" and "partially complete, disassembled, or nonfunctional frame or receiver" under the definition of "frame or receiver" capture both firearm parts kits that are designed to, or may readily be converted to, expel a projectile (*i.e.*, a weapon parts kit) and firearm parts kits with partially complete frames or receivers (*i.e.*, a frame or receiver parts kit). This analysis therefore uses the term "firearm parts kit" to refer to both weapon parts kit and frame or receiver parts kits because both the weapons and frames or receivers produced from the parts within these kits are subject to regulation as "firearms" under the rule and must be marked with a serial number.

## 4.1.  Need to Include Firearms Kits in the Definition of Firearm

Currently, ATF's definitions of "firearm frame or receiver" and "frame or receiver" are outdated and do not account for advances in firearms technology or terminology.  The reason for ensuring that firearm parts kits are included in the definition of "firearm" and "frame or receiver" is that is that these parts kits, or aggregations of weapon parts, some of which contain all of the components necessary to complete a functional weapon or frame or receiver within a short period of time, have been increasingly sold to individuals either directly from manufacturers of the kits or retailers, without background checks or recordkeeping.  When PMFs are made for personal use, they are not required by the GCA to have a serial number placed on the frame or receiver.  However, when PMFs are relinquished by their makers and enter commerce, the

absence of markings on PMFs makes it extremely difficult for law enforcement to determine where, by whom, or when they were manufactured and to whom they were sold or otherwise transferred if they are recovered and submitted for tracing.

4.2.  Comments Received on Manufacturers

ATF received various comments regarding the methodology used to determine affected populations and costs for non-FFL manufacturers of partially complete frames or receivers and firearms kits.  Several commenters treated manufacturers and retailers of these kits as one group and stated that the population estimated by ATF was too low.  ATF partially concurs that the population was underestimated.  After conducting further internet searches, ATF found more manufacturers and retailers of firearm kits with partially complete frames or receivers, but because the requirements for manufacturers and retailers are different, ATF accounts for them separately in different chapters of the RIA, which makes the numbers per chapter lower than the estimates submitted by some of the commenters.

Many commenters stated that ATF did not know how much of an effect on commerce the rule will have on manufacturers.  Some commenters stated that ATF did not account for the cost of non-FFL manufacturers to become licensed.  Some commenters stated that non-FFLs would be unable to become licensed either due to the costs associated with becoming licensed or because of zoning restrictions, and that ATF did not account for companies going out of business.  One commenter reiterated the opinion that non-FFL manufacturers are not likely to become licensed and that, because most of these companies are small, the final rule will force these companies to go out of business.  Commenters also asserted that ATF did not estimate the impact on revenue the rule will have on the public and that ATF's assumptions were

-28-

unsupported.  One commenter worried that the rule will have a significantly bigger impact than the cost stated in the NPRM.  Several commenters claimed that the rule will cause unemployment.

ATF concurs that the costs were underestimated in the analysis accompanying the proposed rule.  This RIA has revised the methodology and costs associated with the final rule to incorporate the costs and cost scenarios that the commenters suggested might arise.  In response to commenters who stated ATF's assumptions were lacking or unsupported, ATF reiterates that the agency does not maintain consolidated or aggregated records on companies' inventory regardless of whether the items in the inventory are regulated, nor can ATF interview all firearm part manufacturers to determine their intended future actions upon publication of the final rule. ATF can make estimates based on the best available information it can acquire through comments received, willing participants on informational surveys, and ATF subject matter experts, but it cannot determine with complete specificity the actual outcomes of the final rule.

## 4.3.  Population for Firearm Parts Kits

This chapter describes how the rule's definition of "frame or receiver" affects FFL and non-FFL manufacturers of firearm parts kits.

## 4.3.1.   Population of Manufacturers of Firearm Parts Kits

The final rule would affect certain FFL and non-FFL manufacturers that manufacture firearm parts kits with partially complete frames or receivers.  As stated previously, ATF does not maintain consolidated or aggregated records of companies' inventory regardless of whether the items the companies produce are regulated.  Therefore, ATF performed a search on the internet to estimate the number of manufacturers that would be affected by inclusion of firearm

App. 064

parts kit in the definitions of "firearm" and "frame or receiver." In the NPRM, ATF estimated that the rule may affect up to 35 non-FFL manufacturers. 86 FR at 27735. Commenters asserted that the population of non-FFL manufacturers was too low. ATF performed another search on the internet to determine the number of affected companies and found 84 companies that manufacture firearm parts kits with partially complete frames or receivers. The search also identified 45 retailers that sell such kits, but retailers are discussed in chapter 5 of this RIA, below.

ATF reviewed FFL licensing information to determine if the 84 manufacturers were FFLs or non-FFLs. Of the 84 manufacturers identified, ATF verified that 41 of them were FFLs and 43 were not FFLs. One of these FFLs was found to have become an FFL after the publication of the NPRM, while the other FFLs were licensed prior to the publication of the NPRM. For purposes of this analysis, ATF estimates that 43 non-FFL and 41 FFL manufacturers will be affected by the final rule.

4.3.2.   Population of Dealers and Individuals with Firearm Parts Kits

For populations and costs pertaining to firearm parts kits in the inventory of Type 01 and 02 FFLs, non-FFL retailers, and individuals, please refer to chapter 5.

4.4.   Costs to Manufacturers of Firearm Parts Kits

Currently, manufacturers of firearm parts kits produce and sell kits that require additional drilling of the frame or receiver in order to make them into a functional weapon or frame or

-30-

receiver.  A lower receiver parts kit can range in cost from $59.99 to $474.99.[4,5,6,7]  A handgun kit could range from $360 to $800.[8,9,10]  A rifle kit could range from $670 to $750.[11,12,13]  How the final rule will affect manufacturers of such kits depends on whether they are FFLs and on how they respond to these requirements.  Some non-FFL manufacturers may choose to apply to become an FFL.  Commenters suggested that some may opt to become FFLs despite a market strategy that attempts to avoid regulation by ATF.  One commenter provided some information on the price to serialize the "frame or receiver" within a firearm parts kit.  This commenter

---

[4] $350: *See* 80% Lowers, *LR-308 Lower Assembly | Lower Parts Kit | Butt Stock | Buffer Tube | FIRE/SAFE Billet 80% Lower*, *available at* https://www.80-lower.com/products/lr-308-lower-assembly-lower-parts-kit-fire-safe-billet-80-lower/ (visited Apr. 28, 2021).  The prices for items cited and listed throughout the RIA are the prices that were found at the time ATF conducted its analysis and therefore may differ from the prices listed at or after the time of publication.  ATF cannot account for inevitable fluctuations in market prices over time.

[5] $475: *See* 80% Lowers, *9mm AR-9 Lower Assembly | Lower Parts Kit | Tactical Brace | Buffer Tube | FIRE/SAFE Billet 80% Lower*, *available at* https://www.80-lower.com/products/ar-9-lower-assembly-lower-parts-kit-fire-safe-billet-80-lower/ (visited Apr. 28, 2021).

[6] $560–$70: JSDSupply, *80% Glock Compatible Lower Parts Kit – LPK*, *available at* https://jsdsupply.com/shop/80-glock-compatible-lower-parts-kit-lpk/ (visited Apr. 28, 2021).

[7] $470: *See* 80% Arms, *Easy-Jig® Gen 3 Starter Kit - AR15*, *available at* https://www.80percentarms.com/products/easy-jig-gen-3-starter-kit-ar15/ (visited Apr. 28, 2021).

[8] $800: *See* 80% Arms, *GST-9: 80% Pistol Build Kit*, *available at* https://www.80percentarms.com/products/gst-9-80-pistol-build-kit/ (visited Apr. 28, 2021).

[9] $636: *See* 80% Arms, *Complete 10.5" 5.56/300BLK AR-15 Pistol 80% Build Kit*, *available at* https://www.80percentarms.com/products/complete-10-5-5-56-300blk-ar-15-pistol-80-build-kit/ (visited Apr. 28, 2021).

[10] $360: *See* MDX Arms, *MDX Arms G23 LF23 .40SW with RMR Cut Build Kit - No Frame*, *available at* https://mdxarms.com/mdx-arms-g23-lf23-40sw-with-rmr-cut-build-kit-no-frame/ (visited Apr. 28, 2021).

[11] $670: *See* 80% Lowers, *.223 Wylde AR 15 Rifle Kit - 16" Parkerized Barrel, 1:7 Twist Rate with 12" M-Lok Handguard*, *available at* https://www.80-lower.com/products/223-wylde-ar-15-rifle-kit-16-parkerized-barrel-12-m-lok-handguard-w-80-lower-1-7-twist/ (visited Apr. 28, 2021).

12 $750: *See* 80% Lowers, *.223 Wylde AR 15 Rifle Kit - 16" Parkerized Barrel, 1:8 Twist Rate with 15" M-Lok Handguard*, *available at* https://www.80-lower.com/products/new-223-wylde-ar-15-rifle-kit-16-parkerized-barrel-15-m-lok-handguard-w-80-lower-1-8-twist/ (visited Apr. 28, 2021).

[13] $996: *See* 80% Arms, *Complete 18" AR .308 80% Build Kit*, *available at* https://www.80percentarms.com/products/complete-18-ar-308-80-build-kit/ (visited Apr. 28, 2021).

---

-31-

suggested that it would cost an estimated $10,000 to buy an appropriate laser engraver and associated equipment, plus labor costs to train an employee to use the laser engraver.

As previously stated, there are 41 FFL and 43 non-FFL manufacturers that will be affected by the rule. Because ATF does not know what future actions they may take, ATF envisions two scenarios in how the non-FFLs may respond to the final rule: become an FFL or end their business. Based on the comments received and the fact that only one manufacturer became an FFL after publication of the NPRM, ATF estimates it will be unlikely that a significant number of non-FFLs will opt to become FFLs. Hence, ATF estimates that 1 non-FFL will become a licensee, continue to sell firearm parts kits, and serialize the "frame or receiver," while the remaining 42 non-FFLs will end up dissolving their businesses. Based on the known revenue of non-FFL manufacturers of firearm parts kits, these non-FFL manufacturers are small businesses, and the loss in business transactions will be $583,500 for each non-FFL manufacturer that ends up dissolving its business. ATF notes that, because these firearm parts kits will now need to be serialized, this will reduce the overall supply and demand for such items.

In summary, ATF estimates three possible approaches which FFL and non-FFL manufacturers could take in order to comply with the final rule:

- Scenario 1: 1 Non-FFL manufacturer becomes an FFL and serializes the frames or receivers within the firearm parts kits it manufactures;

- Scenario 2: The 41 existing FFL manufacturers serialize their firearm parts kits; and

- Scenario 3: 42 Non-FFL manufacturers dissolve their business.

-32-

4.4.1.  Scenario 1: 1 Non-FFL Manufacturer Becomes Licensed as an FFL

Based on comments received, some commenters contend that there may be non-FFLs that opt to become licensed, and that ATF should cost it out.  Other comments suggested that it would be difficult or unlikely for non-FFLs to become licensed.  Although it might be unlikely that non-FFLs will opt to become licensed, for the purposes of this analysis, ATF assumes that 1 non-FFL manufacturer would become licensed, and the other remaining 42 non-FFL manufacturers will dissolve their businesses.

In order to become licensed, non-FFL manufacturers must complete an Application for Federal firearms license, ATF Form 7/7CR ("Form 7"), and include fingerprints, a passport photo, and postage to mail the package.  The application fee for a Type 07 FFL manufacturer is $150; the cost to get fingerprinted is $19; the cost to obtain a passport photo is approximately $16; and the cost for postage is approximately $1 for a large envelope.[14,15,16,17]

Because it takes time to complete the actions needed to complete a Form 7, ATF accounts for the hourly burden to perform activities such as filling out the form and obtaining fingerprints and passport photos.  ATF used the hourly burden as reported on Form 7 as the time needed to

---

[14] ATF, *Form 7/ 7 CR - Application for Federal Firearms License (ATF Form 5310.12/5310.16)*, *available at* , https://www.atf.gov/firearms/docs/form/form-7-7-cr-application-federal-firearms-license-atf-form-531012531016 ("Form 7").

[15] Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or legal Entity with Respect to Making or Transferring a Firearm, 81 FR 2658, 2715 (Jan 15, 2016) (stating the average cost to get fingerprints is $18.66).

[16] $16 = ($17 + 15) / 2.  Passport photo prices from CVS, *Passport Photos*, *available at* https://www.cvs.com/photo/passport-photos (last visited Mar. 24, 2022).

[17] *See* USPS, *Mailing & Shipping Prices*, *available at* https://www.usps.com/business/prices.htm (last visited Mar. 24, 2022).

-33-

complete a Form 7.[18]  The hourly burdens to obtain fingerprints and passport photos were obtained from comments received on a rule previously published by ATF.[19]

Because ATF does not know the salary or hourly wage rate of the person applying for the Form 7, ATF uses the wage rate for General and Operations Managers from the Bureau of Labor Statistics ("BLS") at the average hourly wage rate of approximately $60.[20]  In the NPRM, ATF used the 2019 wage rates as reported by BLS.  At the time of the publication of the NPRM, 2019 wage rates were the latest reported wages.  However, one commenter suggested that 2019 wage rates as reported in BLS are not recent enough to compensate for changes in wages in 2021.  This commenter suggested using BLS's Employee Cost Index to account for wage increases.  ATF concurs and updates the RIA to reflect the most recent BLS wage rate data (for 2020) and uses Employee Cost Index of 1.035 to account for wage increases in 2021.[21]  Finally, ATF adds a load rate[22] to the hourly wage to account for fringe benefits like health insurance to derive a loaded wage rate of $89.[23]

To simplify the total application cost discussed above, ATF presents Table 4.1, which

---

[18] Form 7 at 4.

[19] *See* Implementation of the Safe Explosives Act, Title XI, Subtitle C of Public Law 107-296, 68 FR 13768, 13777 (Mar. 20, 2003).

[20] BLS, *Occupational Employment and Wage* (May 2020), *available at* https://www.bls.gov/oes/2020/may/oes111021.htm (last visited Mar. 24, 2022).

[21] BLS, *Employment Cost Index—June 2021* (July 30, 2021), *available at* https://www.bls.gov/news.release/archives/eci_07302021.pdf (last visited Mar. 24, 2022).

[22] The load rate is based on the average total compensation $36.29 (CMU2010000000000D) for years 2020 and 2021 divided by the average wages and salaries $25.54 (CMU2020000000000D) for years 2020 and 2021.  *See* BLS, *Employer Cost for Employee Compensation*, *available at* https://data.bls.gov/cgi-bin/surveymost?cm (last visited Mar. 24, 2022).

[23] A loaded wage rate is the wage rate adjusted to include fringe benefits such as insurance.  Hourly wage rate of $60.45 * 1.035 Employee Cost Index * load rate of 1.4209 = $89.

-34-

App. 069

outlines the hourly burden, wage rate, and cost items required for a Form 7 application.

Table 4.1.  Cost for a Form 7 Application to Become a Type 07 FFL

| Cost Item | Hourly Burden | Hourly Wage Rate | Hourly Wage Adjusted with Employee Cost Index | Loaded Wage Rate | Wage Burden | Cost Item | |
|---|---|---|---|---|---|---|---|
| Form 7 | 1 | $60 | $63 | $89 | $89 | $150 | |
| Fingerprints | 1 | $60 | $63 | $89 | $89 | $19 | |
| Passport Photo | 0.5 | $60 | $63 | $89 | $44 | $16 | |
| Postage | | | | | | $1 | |
| Application Cost | | | | | $222 | $186 | **$408** |
| Form 8 Renewal Cost | 0.5 | $60 | $63 | $89 | $44 | $150 | **$194** |

Overall, the per company cost to apply to become a Type 07 FFL is $408 with a renewal fee of

$194 every 3 years.

4.4.1.1.  Non-FFL Manufacturers to Serialize Firearm Parts Kits

In addition to licensing, Federal law, 18 U.S.C. 923(i), requires licensed manufacturers to

mark firearms with an identifying serial number.  One commenter estimated that it would cost

-35-

App. 070

$10,000 for a laser engraver, air handler, and safety equipment.  ATF used this comment to base prices on the necessary equipment to serialize firearm parts kits with partially complete "frames or receivers."  Table 4.2 provides a range of costs to purchase a laser engraver.

Table 4.2.  Cost to Purchase a Laser Engraver

| | Laser Engraving Cost | Vendor | Website |
|---|---|---|---|
| | $16,997 | Boss Laser | https://www.bosslaser.com/laser-machines/hp-2440 |
| | $18,997 | Boss Laser | https://www.bosslaser.com/laser-machines/boss-hp-3655 |
| | $18,497 | Boss Laser | https://www.bosslaser.com/laser-machines/boss-hp-5598 |
| | $4,098 | Toolots | https://www.toolots.com/30w-handheld-fiber-laser-marking-machine.html |
| | $3,050 | Toolots | https://www.toolots.com/flmm-b01-30.html |
| Average Cost | **$12,328** | | |

Overall, ATF estimates that the average cost for a laser engraver is $12,328.  Based on the comment received about the cost of engraving, ATF also estimated the cost to purchase an air handler.  Table 4.3 shows the range of costs of air handlers.

Table 4.3.  Cost to Purchase an Air Handler

| Air Handler Cost | Vendor | Website |
|---|---|---|
| $1,193 | Grainger | https://www.grainger.com/product/44ZA50?ef_id=EAIaIQobChMIuceD4rqq9QIVu-y1Ch3q6gpzEAQYBiABEgIGlPD_BwE:G:s&s_kwcid=AL!2966!3!496359975784!!!g!437513351199!&gucid=N:N:PS:Paid:GGL:CSM-2295:4P7A1P:20501231&gclid=EAIaIQobChMIuceD4rqq9QIVu-y1Ch3q6gpzEAQYBiABEgIGlPD_BwE&gclsrc=aw.ds |
| $3,719 | AC | https://www.acwholesalers.com/Daikin-Light-Commercial- |

-36-

App. 071

|  | Wholesalers | DAT12043/p83645.html?gclid=EAIaIQobChMIuceD4rqq9QIVu-y1Ch3q6gpzEAQYBCABEgLNK_D_BwE |
| $1,696 | Comfort.com | https://www.ecomfort.com/LG-LVN241HV4/p102697.html?gclid=EAIaIQobChMIuceD4rqq9QIVu-y1Ch3q6gpzEAQYEiABEgL-KfD_BwE |
| **$2,203** | Average Cost | |

Overall, ATF estimates that the average cost for an air handler is $2,203.  The commenter suggested an FFL would need to also train an employee to do engraving of serial numbers.  ATF estimates that an FFL manufacturer may need a full-time engraver.  ATF uses the annual wage rate for 51-9194 Etchers and Engravers ($35,230) as reported by BLS.[24]  In addition to the base, annual wage rate, ATF used the Employee Cost Index of 1.035 and the load rate of 1.4209 as described in the paragraphs above to determine a loaded annual wage of $51,810.[25]  Although the commenter suggested including the cost of safety equipment, ATF believes that safety equipment is likely to be already included in normal manufacturing operations of non-FFL manufacturers.  Therefore, ATF did not individually assess the cost of safety items for this analysis.

4.4.1.2.  Non-FFL Manufacturers to Maintain Production and Disposition Records

In addition to acquiring marking equipment, non-FFL manufacturers that become licensees would need to maintain manufacturers' records in accordance with the regulations.  These records show the manufacture or production of firearms and their disposition (in this case, firearm parts kits with partially complete frames or receivers).  Based on the Paperwork

---

[24] BLS, *Occupational Employment and Wages: 51-9194 Etchers and Engravers* (May 2020), *available at* https://www.bls.gov/oes/2020/may/oes519194.htm (last visited Mar. 24, 2022).

[25] $35,230 * 1.035 Employee Cost Index * 1.4209 load rate = $51,810.

Reduction Act ("PRA") collection of information 1140-0067, it takes approximately one minute (0.01667 hours) to record this required information.[26]  In order to estimate the annual number of transactions, ATF reviewed publicly available information for revenue and compared it to the average retail price of a firearm parts kit with a partially complete frame or receiver.

Based on publicly available information from *Dun & Bradstreet*, ATF was able to obtain revenue data for certain relevant companies.[27]  Based on a review of affected non-FFL manufacturers, ATF was able to obtain the revenue of 24 out of 43 non-FFL manufacturers.  Of these non-FFL manufacturers, one was deemed not small under the Small Business Administration's ("SBA") size standards.[28]  ATF was unable to determine the size standards or revenue for 19 non-FFL manufacturers, as such information was not publicly available.  Of the 24 non-FFL manufacturers for which information was available, the average revenue was $2.6 million.  This $2.6 million average, however, was skewed by the revenue of one non-FFL manufacturer.  To account for this outlier and more accurately represent the revenue of the population of non-FFL manufacturers, ATF instead used the median revenue of $280,000.

ATF then reviewed retail costs of firearm parts kits with partially complete frames or receivers as a means of estimating the number of items produced annually.  For a list of prices used, please refer to the Appendix at the end of this analysis.  Using the average price of $116 for firearm kits with partially complete frames or receivers and the median revenue of $280,000,

---

[26] ATF, *Licensed Firearms Manufacturers Records of Production, Disposition, and Supporting Data*, *available at* https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202109-1140-005 (last visited Mar. 24, 2022).

[27] Dun & Bradstreet, *Data Cloud*, *available at* https://www.dnb.com/ (last visited Mar. 24, 2022).

[28] SBA, *Table of Size Standards* (Aug. 2019), *available at* https://www.sba.gov/document/support--table-size-standards (last visited Mar. 24, 2022).

App. 073

ATF estimates that the average number of those parts kits produced annually by non-FFL manufacturers is 2,408.[29]  Assuming that these firearm parts kits are manufactured and sold within the same year, ATF assumes two record entries (one for production and one for disposition) per kit, for an annual number of 4,816 record entries per non-FFL manufacturer.[30]

As stated above, ATF estimates that the time burden per record entry is one minute (0.01667 hours).[31]  In order to determine the cost associated with the time burden for the number of record entries calculated above, ATF estimates that recording the entries will be performed by an employee with a background in metal and plastic works.  For the purposes of this analysis, ATF uses three different wage categories from BLS.  ATF incorporated the Employee Cost Index to account for inflation and used a load rate to account additional costs such as benefits and insurance.[32]  Table 4.4 provides the hourly wage rates for the wage categories used for this scenario.

Table 4.4.  Wage Categories for Metal and Plastic Workers

| Hourly Wage | Hourly Wage Adjusted with Employee Cost Index | Loaded Wage Rate | BLS Occupation | Website |
|---|---|---|---|---|

---

[29] $280,000 annual revenue / $116 average retail price of a partially complete firearm kit = 2,408 items.

[30] 4,816 entries = 2,408 annual production * 2 entries.

[31] *See* footnote 26, *supra*.

[32] *See* BLS, *Series Report*, *available at* https://data.bls.gov/cgi-bin/srgate (last visited Mar. 24, 2022).  ATF used series CMU1010000000000D and series CMU1020000000000D.  Average total compensation: $36.29. Average cost per hour worked: $25.54.  Loaded wage rate: 1.4209 = $36.29 / $25.54.

App. 074

| | | | 51-4022 Forging Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls.gov/oes/2020/may/oes514022.htm |
|---|---|---|---|---|
| $21 | $22 | $31 | | |
| $19 | $20 | $28 | 51-4199 Metal Workers and Plastic Workers, All Other | https://www.bls.gov/oes/2020/may/oes514199.htm |
| $19 | $19 | $27 | 51-4031 Cutting, Punching, and Press Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls.gov/oes/2020/may/oes514031.htm |
| Average Wage | | **$29** | | |

Based on these calculations, ATF used a loaded hourly wage rate of $29 for recording entries in production and disposition records. In order to demonstrate the calculation of the hourly burden for PRA collection of information 1140-0067, ATF presents the per manufacturer hourly and wage burden in Table 4.5.

Table 4.5. Hourly and Wage Burden to Update and Maintain Production and Disposition Records

| Population Type | Hourly Burden | Loaded Wage Rate | Estimated Entries Annually | Per Manufacturer Cost |
|---|---|---|---|---|
| Non-FFL Manufacturer | 0.01667 | $29 | 4,816 | **$2,300** |

4.4.1.3. Summary Cost for Scenario 1: Non-FFL Manufacturer Becoming FFL

To simplify the presentation of the cost to become an FFL, Table 4.6 illustrates the first-year cost for a non-FFL manufacturer to become a Type 07 Manufacturer FFL.

Table 4.6. Per FFL and Total First-Year Cost to Become a Type 07 Manufacturer FFL

| Population Description | Population | One-time Cost | Annual Recurring Cost | Cost for Renewal | Per Company First Year Cost | Total First |
|---|---|---|---|---|---|---|

-40-

| | | | | Every Three Years | | Year Cost |
|---|---|---|---|---|---|---|
| Population to Become FFL | 1 | $14,939 | $54,111 | $194 | $69,049 | **$69,049** |

Although there may be other expenses beyond the cost described above, ATF is not required to consider these costs because they are too speculative to include in the cost estimates.

4.4.2.   Scenario 2: FFL Manufacturers to Serialize Firearm Parts Kits

Because the manufacturers considered in this section are currently licensed, they will not need to incur the same expenses as non-FFL manufacturers becoming FFLs.  Also, because they are already licensed, they will have an engraving machine and trained staff.  Based on public comments, however, manufacturers tend to have different machines to engrave serial numbers for different product lines, and their existing equipment accordingly may not be sufficient to engrave a serial number on firearm parts kits with partially complete frames or receivers.  Thus, FFLs may still need to acquire an appropriate laser engraving machine to comply with this rule and serialize firearm parts kits.  For the purposes of this analysis, ATF uses the average cost of a laser engraver and an air handler as stated in section 4.4.1 above as the one-time additional cost for FFL manufacturers to serialize firearm parts kits.  As stated above, the average price for a laser engraver is $12,328 and the average price of an air handler is $2,203, making the one-time cost per FFL manufacturer $14,530.

As stated above, FFL manufacturers will incur an additional record burden in updating and maintaining their records to reflect the production and disposition of firearm parts kits.  As discussed in section 4.4.1 above, the hourly burden is 1 minute (0.01667 hours) for each record

-41-

App. 076

entry.  The estimated loaded wage rate is $29.  The estimated annual number of entries is 4,816.[33]  The annual per FFL cost is $2,300.  Because there are an estimated 41 FFL manufacturers of firearm parts kits, the total first year cost for scenario 2 is $690,068.[34]

### 4.4.3.   Scenario 3: Non-FFL Manufacturers That Cease Business

For some non-FFLs, continuing operations may be cost prohibitive to comply with the new rule or due to different regulatory requirements, such as local zoning laws.  Other non-FFLs may choose to stay unregulated and therefore cease operations.

As stated above, ATF reviewed revenue data of all known non-FFL manufacturers of firearm parts kits using publicly available information from *Dun & Bradstreet*.  Based on the known revenue, the median revenue was $280,000.  As stated in section 4.4.1 above, the average revenue ($2.6 million) was not used because one non-FFL manufacturer was an outlier.  For purposes of this analysis, and as stated in above, ATF estimates that all non-FFL manufacturers except 1 (*i.e.*, 42 non-FFL manufacturers) will dissolve their businesses.  Based on the median revenue of non-FFL manufacturers, ATF estimates that the cost of the decision to cease operations will be $11.7 million annually.[35]

Commenters also stated that companies going out of business will cause unemployment.  ATF partially concurs.  Although employees will lose their jobs, it is not clear whether they will

---

[33] 4,816 total entries = 2,408 firearm parts kits with a partially complete "frame or receiver" produced annually * 2 entries per item.

[34] $690,068 industry cost = 41 companies * ($14,530 one-time cost + $2,300 recurring cost).  Both here and elsewhere, ATF used unrounded results from previous calculations when carrying out new calculations.  As a consequence, the results obtained from the new calculations do not always precisely match the results that would be obtained had the rounded figures been used.  Here, for example, ATF used the unrounded figures for the one-time and recurring costs to calculate the total industry cost.

[35] 42 non-FFL manufacturers * $280,000 median revenue = $11,760,000.

App. 077

be unable to find other employment. However, because ATF expects that not all employees will in fact be able to find alternative employees, ATF also estimates the number of job losses due to non-FFL manufacturers going out of business. Based on publicly available information on *Dun & Bradstreet*, ATF was able to determine the employee sizes of 24 non-FFL manufacturers. Based on these companies, the average number of employees was 20. However, as stated in the paragraphs above, one non-FFL manufacturer was not small and is considered an outlier. Therefore, ATF used the median number of employees to calculate total job loss. The median number of employees at these non-FFL manufacturers was six, and therefore, ATF estimates that the final rule will negatively affect an estimated total of 252 jobs.[36] Because ATF accounts for overall revenue lost, ATF does not account for loss of wages from these jobs due to double counting of costs from revenue.

4.4.4. Summary of Costs for Manufacturers of Firearm Parts Kits

To summarize the cost results discussed above, ATF presents Table 4.7, which shows the cost per manufacturer for the first year.

Table 4.7. Cost Per Manufacturer of Firearm Parts Kits

| Type of Cost Result | One-time Cost | Application Renewal Cost | Annual Recurring Cost | First Year Cost per Company |
|---|---|---|---|---|
| Scenario 1: Non-FFL Becomes FFL and Serializes | $14,939 | $194 | $54,111 | $69,049 |
| Scenario 3: Non-FFLs Dissolve Businesses | $0 | $0 | $280,000 | $280,000 |
| Scenario 2: FFLs Serialize | $14,530 | $0 | $2,300 | $16,830 |

*Note: Calculation of these numbers may not be exact due to rounding.

---

[36] 252 jobs = 6 jobs * 42 companies.

-43-

App. 078

For the purposes of this analysis, ATF estimates that one non-FFL manufacturer will become licensed as an FFL and serialize firearm parts kits, 41 FFL manufacturers will serialize firearm parts kits, and 42 non-FFL manufacturers will dissolve their businesses.  Table 4.8 illustrates the industry cost for manufacturers of firearm parts kits.

Table 4.8.  Industry Cost for Manufacturers of Firearm Parts Kits

| Total Manufacturing Cost | Population | One-time Cost | Application Renewal Cost | Annual Recurring Cost | Total First Year Cost |
|---|---|---|---|---|---|
| Scenario 1: Non-FFL Becomes an FFL and Serializes | 1 | $14,939 | $194 | $54,111 | $69,049 |
| Scenario 3: Non-FFLs Dissolve Businesses | 42 | $0 | $0 | $11,760,000 | $11,760,000 |
| Scenario 2: FFLs Serialize | 41 | $595,750 | $0 | $94,318 | $690,068 |
| Sum of Total First Year Cost | | | | | $12,519,118 |

*Note: The sum of these numbers may not be exact due to rounding.

To further understand the costs that FFL and non-FFL manufacturers could incur to comply with the final rule, Table 4.9 provides the 10-year undiscounted and discounted costs for this scenario.

Table 4.9.  10-Year Cost for FFL and Non-FFL Manufacturers of Firearm Parts Kits

| Year | Undiscounted | Discount Rate | |
|---|---|---|---|
| | | 3% | 7% |
| 2022 | $12,519,118 | $12,154,483 | $11,700,110 |
| 2023 | $11,908,429 | $11,224,836 | $10,401,283 |
| 2024 | $11,908,429 | $10,897,899 | $9,720,825 |

-44-

App. 079

| | | | |
|---|---|---|---|
| 2025 | $11,908,623 | $10,580,658 | $9,085,032 |
| 2026 | $11,908,429 | $10,272,315 | $8,490,545 |
| 2027 | $11,908,429 | $9,973,122 | $7,935,089 |
| 2028 | $11,908,623 | $9,682,800 | $7,416,092 |
| 2029 | $11,908,429 | $9,400,624 | $6,930,814 |
| 2030 | $11,908,429 | $9,126,819 | $6,477,396 |
| 2031 | $11,908,623 | $8,861,134 | $6,053,740 |
| Total | $119,695,560 | $102,174,690 | $84,210,926 |
| Annualized | | $11,977,991 | $11,989,741 |

*Note: Calculations using these estimates may not be exact due to rounding.

As shown in Table 4.9, the total 10-year cost is $119.7 million undiscounted, or $12.0 million annualized at 3 percent and $12.0 million annualized at 7 percent.

4.5.  Benefits of Regulating Firearm Parts Kits

Unlike firearms manufactured by FFLs, which must meet certain marking requirements, firearm parts kits with partially complete frames or receivers are not currently being serialized by their manufacturers, nor are the manufacturers requiring purchasers to undergo a NICS background check prior to purchase.  This is because these manufacturers do not consider such kits as falling within the current regulatory definition of "firearm," or otherwise subject to the current regulatory regime.  Because these manufacturers are not serializing the frames or receivers in these kits, and are not requiring background checks when selling them, the kits can be obtained with relative ease on the internet by persons who are prohibited from possessing firearms.  In other words, prohibited persons do not have to go in person to a local FFL to purchase this product.  Furthermore, certain manufacturers also offer the option to remove purchaser information in their sales records to prevent the government from tracing the purchasers of the sale.  This is another aspect of the current regulatory regime and existing industry practice that likely makes these firearm parts kits an attractive option to persons

-45-

App. 080

prohibited from possessing firearms.

In addition, a survey performed by *Small Arms Survey* suggested that purchases of firearms for illegal purposes are often made outside the traditional regulatory regime. Specifically, on firearms trafficking, the *Small Arms Survey* states that "[m]any of the traffickers studied did not apply for arms export licenses or attempt to exploit licensing exemptions; they simply bypassed the licensing system entirely."[37] Of the 159 cases that *Small Arms Survey* reviewed, over half of the cases involved selling firearm parts and accessories; an unknown number of these firearm kits were purchased, assembled into functional weapons, and then shipped illegally.[38]

Purchasing these firearm parts kits is easier than purchasing complete weapons not only because an individual can purchase them on the internet without undergoing a background check, but also because their sales do not trigger multiple sales reports that are reviewed by law enforcement for criminal activity. Because such transactions are not currently viewed as regulated, and because it is easy to assemble a complete weapon from these kits, they are an attractive option for those with intent to illegally use firearms.

As discussed in the NPRM, tracing is an integral tool for Federal, State, local, and international law enforcement agencies to utilize in their criminal investigations, and the proliferation of untraceable firearms severely undermines this process. 86 FR at 27723–24. ATF traces firearms found by law enforcement at a crime scene by first contacting the licensed

---

[37] Matt Schroeder, *The Mechanics of Small Arms Trafficking from the United States*, Small Arms Survey 1 (Mar. 2016), available at https://www.files.ethz.ch/isn/196408/SAS-IB17-Mechanics-of-trafficking.pdf (last visited Mar. 24, 2022).

[38] *Id.* at 4.

-46-

App. 081

manufacturer or importer marked on the frame or receiver.  That manufacturer or importer must maintain permanent records of their manufacture or importation.  Using the information obtained from those required records, ATF then contacts each licensed dealer and any other licensees that recorded their receipt and disposition to locate the first unlicensed purchaser and thus help find the perpetrator or otherwise solve the crime.[39]  However, because PMFs do not bear a serial number or other markings of a licensed manufacturer or importer, ATF has found it extremely difficult to complete such traces on behalf of law enforcement.  To demonstrate their increasing popularity in criminal activities, ATF filtered trace requests for suspected PMFs, which are typically assembled from firearm kits with partially complete frames or receivers.  Table 4.10 shows the approximate number of attempted traces of suspected PMFs from 2016 through 2021.

Table 4.10.  Number of Traces of Suspected PMFs from 2016 Through 2021

| Year | Published NPRM | Final Rule Update (as of 01/21/2022) | Difference Between NPRM and Final Rule[40] |
|---|---|---|---|
| 2016 | 1,750 | 1,758 | 8 |
| 2017 | 2,507 | 2,552 | 45 |
| 2018 | 3,776 | 3,960 | 184 |
| 2019 | 7,161 | 7,517 | 356 |
| 2020 | 8,712 | 10,109 | 1,397 |
| 2021 | 0 | 19,344 | 19,344 |
| **Total** | **23,906** | **45,240** | **21,334** |

---

[39] Licensees must respond to ATF trace requests within 24 hours.  18 U.S.C. 923(g)(7); *see also J&G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1045–46 (9th Cir. 2007) (describing the tracing process).

[40] The total number of suspected PMFs is greater than the 23,906 originally reported as of March 4, 2021, in the NPRM, 86 FR at 27772–23 because of (1) the addition of 2021 data; (2) updates to traces to add more specificity regarding the firearm; and (3) inclusion of all suspected PMFs recovered within this time frame regardless of when the trace was entered.

App. 082

| Homicides 2016 Through 2021 | 325 | 692 | 367 |
|---|---|---|---|

Based on suspected PMF traces from 2016 through 2021, there were approximately 692 homicides or attempted homicides carried out with a PMF.  There were also approximately 4,288 felons in possession of a suspected PMF.  To demonstrate the increasing popularity of these PMFs in criminal activities, Graph 4.1 illustrates this growth trend.

Graph 4.1.  Total Suspected PMFs by Year



Furthermore, if firearm parts kits or resulting PMFs are stolen, owners can report the theft to police and insurance companies and provide them with a full description of the firearm.  Because these kits (which are likely to become complete and assembled PMFs) will be serialized

-48-

App. 083

under the final rule, the firearm kits or PMFs would now be traceable in the event they were stolen, lost by licensees or individuals, or used in criminal activities.  Law enforcement would then be able to return any recovered stolen or lost firearm kits or PMFs to their rightful owners and use the trace to prosecute criminals who may have used those weapons.

-49-

App. 084

# 5.  Privately Made Firearms and FFL and non-FFL Dealers of Firearm Kits

A firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number placed by a licensed manufacturer at the time the firearm was produced is defined as a PMF in the final rule.  This definition does not include a firearm identified and registered in the NFRTR pursuant to chapter 53, title 26, United States Code, or any firearm manufactured or made before October 22, 1968 (unless remanufactured after that date).

Under the final rule, each FFL must mark PMFs within seven days of the firearm being received into inventory by the FFL or before disposition, whichever first occurs.  Licensees have from the date of the final rule's publication until 60 days after the date the final rule becomes effective to mark PMFs already in inventory.  FFLs that are manufacturers, importers, or dealers may mark PMFs for nonlicensees, and FFLs may directly supervise marking by another licensee or a nonlicensee that may mark a PMF in accordance with the regulations.

## 5.1.  Need for Markings on PMFs

Requiring the marking of PMFs that are taken into inventory allows FFLs to track and reconcile their inventories, respond to trace requests, process warranty claims, and report lost or stolen PMFs to police and insurance companies.  Furthermore, requiring markings on firearm kits with a partially complete frame or receiver is also necessary because these kits are likely to become PMFs.  Because these firearms will now be serialized, these PMFs will be traceable in the event that they are stolen from any licensee or are used in criminal activities.  Law

-50-

App. 085

enforcement will be able to return any recovered stolen or lost PMFs to their rightful owners, and they will be able to use the trace information to combat firearms trafficking and other criminal activity.

### 5.2.   Comments Received on FFL and non-FFL Dealers

Several commenters stated that the proposed rule would affect companies that retail only in firearm parts due to their concern that the proposed rule would have required multiple parts to become serialized.  In response to these concerns, ATF has changed the definition of "frame or receiver" to require only one part of a firearm to be serialized.  Because of this change, retailers of firearm parts other than the frame or receiver will be unaffected and can continue to sell unmarked, unregulated parts of a firearm.

One commenter asserted that the population of affected dealers of firearm kits with partially complete frames or receivers was underestimated in the NPRM, specifically stating that there were more than 75 dealers.  ATF partially concurs.  During the analysis described in the NPRM, ATF found 71 companies selling these firearm kits.  Although all 71 companies sell firearm kits with a partially complete frame or receiver, ATF separated the number of companies between manufacturers and dealers of kits.  However, ATF performed a second internet search of companies and found an additional 58 companies.  ATF then separated the total number of companies into four groups: (1) FFL manufacturers; (2) non-FFL manufacturers: (3) FFL dealers; and (4) non-FFL dealers.  By categorizing the companies this way, the population numbers appear to be lower than suggested by the commenter in each chapter of the RIA, but the overall number of companies affected is similar to the estimated total number suggested by the commenter.

-51-

Many commenters estimated a total number of PMFs already in circulation and estimated that the cost of marking those PMFs currently in circulation would be in the millions of dollars. Some commenters stated that the NPRM should have included an estimate of the number of PMFs and unfinished receivers that would be reclassified as firearms. ATF disagrees that it did not properly estimate the number of firearms affected. Neither the proposed nor final rule requires the serialization of all PMFs in circulation. The rule affects only firearm parts kits with a partially complete "frame or receiver" held by FFLs and PMFs that are transferred through an FFL; therefore, only the ones held by FFLs or that may go through FFLs, as the case may be, were accounted for. However, in this analysis, ATF provides an estimate of the total number of PMFs in circulation, along with potential costs to individuals who go through an FFL for services associated with their PMFs.

A couple of commenters stated that ATF did not provide evidence for its assumption that 10 percent of Type 01 and Type 02 FFLs currently deal in firearm parts kits with a partially complete frame or receiver, and that all dealers would have only two such items in inventory. The commenters noted that ATF cited only unknown subject matter experts ("SMEs"). In the NPRM, ATF relied on SMEs from its Firearms Industry Programs Branch ("FIPB") to provide an estimated population and number of firearm parts kits with a partially complete frame or receiver in inventory. However, many such kits are not currently viewed by their manufacturers as regulated, and because ATF does not have the inventory data that FFLs maintain, ATF is unable to obtain estimates at the level of accuracy requested by the commenters. To improve these estimates for the final rule, ATF relied on general observations from its field divisions to estimate population and inventory. This information was deemed to be the best available

-52-

App. 087

information for the analysis.

One commenter stated that ATF did not account for the lost revenue and increased expenses for gunsmiths, companies selling firearm parts kits, and individuals. ATF concurs that lost revenue was not accounted for in the proposed rule, and this RIA now incorporates the loss in revenue for companies and additional expenses for individuals.

Several commenters suggested that the populations, cost assumptions, and descriptions for in-house engraving were inaccurate. One commenter stated that engraving equipment is not common at FFLs. One commenter suggested that the only viable means of acquiring equipment for engraving is a laser engraver, associated equipment and safety supplies, and a specialized worker. Several suggested the labor and equipment needed to engrave existing inventory is significantly higher than the stamping method discussed in the NPRM. One commenter stated that ATF did not account for expenses associated with serializing PMFs made from polymer materials. The same commenter pointed out that the cost for non-FFL dealers were omitted from the analysis. One commenter stated that the assumption that individuals will not be charged for serialization is inaccurate.

Comments and anecdotal commentary from various offices and divisions throughout ATF suggest that most FFLs do not have gunsmiths on staff; therefore, it is unlikely that they will purchase engraving equipment if the staff and equipment are not already part of their normal operations. FFLs that deal in PMFs can either contract the serialization to another FFL or may be able to perform the serialization as part of their current gunsmithing services. Another possibility that ATF is including for this analysis is that FFLs can dispose of their PMF inventory.

-53-

App. 088

Many commenters stated that the cost of serializing a PMF can range between $35 and $405 based on whether the serialization includes only serializing or also includes related services such as cleaning, oiling, bluing, and polishing.  ATF infers from these comments that the high-end cost should be included because ATF should include the cost to return the PMF to its original state in the event the PMF is serialized due the PMF being taken into inventory by an FFL for repair or customization services that are performed on the PMF after implementation of the final rule.

ATF concurs that the description of in-house engraving methods outlined in the NPRM was inaccurate and therefore is no longer considering only FFLs that currently have gunsmiths on staff.  As for purchasing a laser engraver, associated equipment and safety supplies, and labor, ATF used this information to illustrate engraving expenses for manufacturers.  ATF disagrees that a dealer will need to purchase such labor and equipment because future firearm parts kits with a partially complete frame or receiver will be serialized by the manufacturer and not the dealer.  Dealers will not be required to provide additional serialization.  ATF concurs that it did not account for costs of serializing firearm parts kits with a partially complete frame or receiver made from polymer materials.  In order to account for those costs, ATF has now included the costs for disposing of such items if they cannot be serialized.  ATF also concurs that the cost for non-FFL dealers was omitted from the analysis, and ATF now incorporates such costs into this analysis.

Furthermore, ATF reiterates that PMFs for personal use are not required by this rule to be serialized (unless required by State or local law) and marking is limited to those that are taken into inventory, though the final rule exempts same day adjustment or repair and return to the

-54-

App. 089

person from whom it was received.  Because repairs are performed by gunsmiths, ATF assumes that only FFLs who are gunsmiths or hire gunsmiths will be performing repairs or customizations of PMFs, so ATF incorporated the annual costs for these FFLs in this analysis.  In the NPRM, ATF assumed that individuals with PMFs would choose not to undertake repairs or customization of their PMFs so as to avoid marking requirements; therefore, ATF did not anticipate costs to individuals.  This final analysis illustrates situations in which an individual might experience costs related to the final rule because of repairs and customization.  ATF estimated the cost of serialization to individuals in these situations only as potential costs to illustrate and respond to comments.  Based on gunsmithing experience from an SME from ATF's FATD, most individuals seeking repairs or customization typically do not seek bluing or other services at the same time they are seeking services such as engraving designs on firearms.  ATF concurs that the analysis in the NPRM regarding engraving was inaccurate.  ATF agrees that a more likely scenario is that there may be some FFLs that sell firearm parts kit with a partially complete frame or receiver that also offer gunsmithing services.  These FFLs will not need to purchase engraving equipment; rather, they can use their existing staff and equipment to serialize their existing inventory of firearm parts kits.  For FFLs that do not employ gunsmiths or do not have existing gunsmithing equipment, ATF estimates that these FFLs will contract out engraving services to another FFL or dispose of their inventory.

One commenter asserted that ATF's estimate of a one-time cost for contracting out gunsmithing services in order to mark inventory that would need to be serialized lacked any supporting evidence or data as to why this cost would not be on-going.  In the final analysis, ATF estimated a one-time contracting cost for gunsmithing services to account for FFLs that

have the affected firearm parts kits currently in inventory, but do not have gunsmithing capabilities. ATF made the assumption that most FFLs do not have gunsmiths on staff based on anecdotal commentary from various SMEs at ATF. This assumption was further substantiated by the comments received on the NPRM. Because it is unlikely that only FFLs with gunsmithing capabilities will carry firearm parts kits with a partially complete frame or receiver, ATF assumed that this portion of the population, *i.e.*, FFLs without gunsmithing capabilities, will therefore need to hire gunsmiths.

Because this subset of FFLs would not have gunsmithing capabilities, they logically would not provide repairs to PMFs currently in circulation. Furthermore, future firearm parts kits with a partially complete frame or receiver will already be serialized by the manufacturer. Given these circumstances, this subset of FFLs would not have ongoing serialization costs, nor would they incur expenses to buy serializing equipment; rather, they would incur a one-time expense in order to comply with the final rule.

One commenter stated that ATF did not account for the costs associated with entering PMFs into firearm acquisition and disposition records ("A&D records"). ATF concurs that A&D records were not accounted for in the PMF analysis. Currently, FFLs are required by regulation to enter all firearms, including PMFs, that they receive into their A&D records. Because this requirement already exists, ATF did not attribute additional costs for A&D recordkeeping. Again, ATF is not requiring all PMFs in circulation to be serialized; therefore, the only entries in A&D records are those already required by current regulations.

Some commenters suggested that, because of the proposed rule's definitions, it would cost more to purchase individual firearm parts because individuals would now have to go

-56-

App. 091

through FFLs to purchase their firearms kits and pay a transfer fee for each frame or receiver they purchase.  This concern is substantially mitigated because, based on the comments, the final rule changes the proposed definition of "frame or receiver" to identify only one part of a firearm that will need a serial number.

## 5.3.  Population of Markings on Firearms Kits and PMFs

FFLs that deal in PMFs are affected by the final rule in that they now have to mark their existing inventory of firearm parts kits with a partially complete frame or receiver as well as PMFs.  The affected FFLs are primarily anticipated to be Type 01 dealers, Type 02 dealers, and non-FFL sellers who will either need to become licensed or dissolve their businesses.  Individuals may also be affected and incur the additional cost of serializing their PMFs if they bring their PMF to an FFL for sale or repair and the FFL needs to take the PMF into inventory (or overnight in the case of a repaired firearm).

### 5.3.1.  Population of FFL and Non-FFL Manufacturers of Firearm Parts Kits with a Partially Complete "Frame or Receiver"

The final rule will affect certain FFL and non-FFL manufacturers that produce firearm parts kits with a partially complete frame or receiver.  However, the discussion regarding this population was addressed in chapter 4 above.

### 5.3.2.  Population of FFL and non-FFL Dealers

Due to the replacement definition of "frame or receiver," ATF anticipates that there will be a one-time cost associated with serializing PMFs or firearm parts kits with a partially complete frame or receiver that are currently in the inventory of dealers, as well as an annual cost to serialize individually owned PMFs that are taken into inventory.  The potentially affected FFL

-57-

dealers are Type 01 and Type 02 FFLs that may sell online or locally at a storefront, along with sellers that are nonlicensees (or non-FFL dealers).  Based on ATF's Federal Firearms Licensing Center databases, there are 53,816 Type 01 FFLs and 6,974 Type 02 FFLs.

However, the majority of these FFL dealers do not sell firearm kits with partially complete frames or receivers, and therefore the majority of FFL dealers will not be affected by this provision of the final rule.  In the NPRM, ATF relied on SMEs in FIPB to estimate the affected population and existing inventory.  This was the best available information.  Because ATF does not maintain consolidated or aggregated records on companies' inventory regardless of whether the items in the inventory are regulated, ATF does not have specific or direct information on how many FFL and non-FFL dealers will be affected or what aspect of their inventory might be affected.  ATF informally requested information from 10 FFL dealers, located throughout the country, in an effort to obtain relevant information.[41]  Of those 10 FFL dealers, 1 did not provide any information and 1 did not deal in firearm parts kits with a partially complete frame or receiver.  The remaining eight FFLs did not respond to the informal information request.  Given the lack of information from the industry, ATF sent out an internal survey to its field divisions asking for their best estimates of the percentage or number of FFL dealers that deal in firearm parts kits with a partially complete frame or receiver and their best estimates of the parts kits that dealers may have in their inventory.  Although Industry Operations Investigators ("IOIs") do not report such items as part of their inspections, ATF determined that their collective recollection represented the best available information regarding

---

[41] For the purposes of complying with the Paperwork Reduction Act, only 2 of the 10 FFL dealers were provided the actual list of questions.

the population and inventory because IOIs inspect a sample of FFLs every year.  Based on

informal observations from ATF IOIs and field divisions, ATF estimated that the final rule will

affect 124 Type 01 FFLs and 66 Type 02 FFLs, for a combined total of 190 FFL dealers.

Based on comments received regarding the affected population of non-FFL dealers, ATF

performed a second internet search of all sellers of firearm parts kits with a partially complete

frame or receiver.  As ATF discussed in chapter 4 of this analysis, there are 84 manufacturers

(both FFL and non-FFL) of these types of firearm kits.  For information and costs regarding

these 84 manufacturers of firearm parts kits with a partially complete frame or receiver, please

refer to chapter 4.  Of the remaining websites found regarding the retail sales of these firearm

parts kits, ATF found 21 FFL dealers with an online presence and 24 non-FFL dealers.  In total,

ATF found 214 FFL and non-FFL companies that sell firearm parts kits with a partially complete

frame or receiver.

  5.3.3.  Population of Type 03 FFL Collectors

The final rule will affect Type 03 FFL collectors who wish to add PMFs defined as curios

or relics into their collections of firearms.  This subset of PMFs will have to be serialized under

the final rule.  However, there is no requirement that Type 03 FFL collectors add their entire

collection of personal firearms into their required records.  They can keep and maintain a

personal collection similar to that of an unlicensed individual.  Because the final rule does

impose a requirement on Type 03 collectors to mark PMFs that are not curios or relics, PMFs are

unlikely to be curios or relics (*i.e.*, more than 50 years of age), and the rule does not require

retroactive serialization of all PMFs in their personal collections, Type 03 FFL collectors are not

likely to be affected by the rule as a licensee for many years.  For this reason, the relevant

population, costs, and requirements for Type 03 FFLs are included in the same group as unlicensed individuals listed below.

5.3.4. Population of Individuals

Individuals who own PMFs may be affected by this provision, but only when the PMF is transferred to an FFL and the FFL voluntarily accepts the PMF into its inventory. In the case of PMFs being adjusted or repaired by a dealer-gunsmith, the PMFs would need to be accepted overnight to be affected by this provision. Assuming that individuals would choose not to go through an FFL so as to avoid serializing their PMFs, no individuals will be affected by the rule. However, ATF attempts to estimate the total number of individuals that may own PMFs. As stated in chapter 4, ATF estimates there are 84 manufacturers of firearm parts kits with a partially complete frame or receiver. The median revenue of all manufacturers (both FFL and non-FFL) of firearm parts kits with a partially complete frame or receiver is $478,000. Because ATF does not know when these FFL and non-FFL manufacturers started manufacturing firearm parts kits with a partially complete frame or receiver, ATF used the years 2016 to 2020 as reported in PMF traces as a reference point. At an average retail price of $116 for firearm parts kits with a partially complete frame or receiver, ATF estimates the annual production of PMFs by all 84 manufacturers to be 345,258. Using a high estimate that all 84 manufacturers have been in the business from 2016 through 2021 (*i.e.*, for six years), ATF estimates that the total number of PMFs currently in circulation is less than 2.1 million. *See* Table 5.1 below. ATF reiterates that the final rule does not require the retroactive serialization of all PMFs in circulation, just those that are in an FFL's inventory.

Table 5.1 provides the outlines estimated number of PMFs currently in circulation.

-60-

App. 095

Table 5.1.  Number of PMFs in Circulation

| | |
|---|---:|
| All Kit Manufacturers | 84 |
| Years in Production | 6 |
| Median Revenue of All Manufacturers | $478,000 |
| Average Retail Price of Kits/Receivers | $116.30 |
| Annual Production | 345,245 |
| Total in Circulation | 2,071,470 |

Based on bump stock turn-ins after the final rule on "Bump-Stock-Type Devices" went into effect,[42] individuals turned in an average of two bump stocks.  One commenter suggested that individuals may own several PMF handguns and one PMF rifle.  For purposes of this analysis, ATF assumes three handguns and one rifle as the number of PMFs owned by individuals.  Using these data points, ATF estimates a range of individuals in Table 5.2.

Table 5.2.  Range of Individuals Who Currently Own PMFs

| Low | Midrange | High |
|---|---:|---:|
| 517,868 | 1,035,735 | 2,071,470 |

5.4.  Cost of Markings on Weapon Parts Kits and PMFs for FFL and non-FFL Dealers

As stated above, this chapter primarily deals with Type 01 and Type 02 FFLs dealers and non-dealers that will now need to mark their existing inventories of PMFs and firearm parts kits with a partially complete frame or receiver.  ATF assumes the cost associated with this marking

---

[42] Bump-Stock-Type Devices, 83 FR 66514 (Dec. 26, 2018).

App. 096

is primarily a one-time cost because manufacturers will be marking future firearm parts kits with a partially complete frame or receiver.  There may be annual costs for FFL dealers if they take PMFs into their inventory due to repairs or customization.

### 5.4.1.  Costs for Non-FFL Manufacturers

For non-FFL manufacturers that will be affected by this provision and their associated costs, please refer to chapter 4 above.

### 5.4.2.  Costs for FFL and non-FFL Dealers

Based on comments received regarding the NPRM, ATF revised some of the cost estimates of this chapter.  Depending on their staff, equipment, and FFL status, FFL dealers and non-FFL dealers have several ways to respond to the final rule.  ATF envisions five different scenarios resulting from the final rule that could cause costs for FFL and non-FFL dealers:

- Scenario 1: 42 FFL dealers with gunsmithing capabilities will engrave their own inventory;

- Scenario 2: 74 FFL dealers without gunsmithing capabilities will hire or outsource the engraving of their inventory to another FFL;

- Scenario 3: 74 FFL dealers and 12 non-FFL dealers will dispose of their inventory;

- Scenario 4: 12 non-FFL dealers will dissolve their businesses; and

- Scenario 5: 0 non-FFL dealers will become licensed as an FFL dealer.

For information regarding the numbers of affected populations, please read the different scenarios below.

-62-

App. 097

5.4.2.1.  Scenario 1: In-house Engraving

Based on informal observations from its field divisions, ATF estimates that FFL dealers maintain, on average, 10 firearm parts kits with a partially complete frame or receiver in inventory.  As discussed above, ATF also contacted 10 FFL dealers to inquire whether they would be interested in participating in an information request.  Of those 10, only 2 responded.  Of the two that responded, one did not provide any information and the other did not deal in firearm parts kits with a partially complete frame or receiver.  Because there is no way to obtain accurate numbers or information on these types of firearm kits, observations from field division inspections were deemed to be the best available source of information.

As discussed above in section 5.3.2, ATF estimates that there are 124 Type 01 and 66 Type 02 FFL dealers that deal in firearm parts kits with a partially complete frame or receiver.  Using the same methodology of averaging the estimated percentages from the different field divisions, ATF estimates that 28.7 percent of Type 01 FFLs and 9.66 percent of Type 02 FFLs have gunsmithing capabilities.  Using this information, ATF estimates that 36 Type 01 FFLs and 6 Type 02 FFLs (or 42 Type 01 and 02 FFLs combined) will use existing staff and equipment to perform in-house engraving.[43,44]

Because these FFL dealers already have gunsmithing capabilities, ATF assumes for purposes of this analysis that these FFL dealers will have in-house capabilities for engraving their existing inventory.  ATF used information reported by BLS to obtain an average wage rate

---

[43] 124 Affected Type 1 FFLs * 28.7 percent = 36 Type 1 FFLs with gunsmithing services.

[44] 66 affected Type 2 FFLs * 9.66 percent = 6 Type 2 FFLs with gunsmithing services.

-63-

for gunsmiths.  In the NPRM, ATF used the most recent wage rates by the publication of the

NPRM, which was 2019 data.  Comments suggested that wage rates changed drastically between

2019 and 2021, and that an inflation adjustment should be included.  Therefore, ATF updated the

wage rates to 2020, which is the latest information available at the time of analysis, and

multiplied the 2020 base wage rate by the Employee Cost Index of 1.035 to account for the

inflation of wages to 2021.[45]  In addition to the Employee Cost Index, ATF also used a load rate

of 1.4209 to account for additional costs like fringe benefits.[46]  Table 5.3 illustrates the wage

categories used for gunsmiths.

Table 5.3.  Wage Categories Used for Gunsmithing Activities

| Hourly Wage | Hourly Wage Adjusted with Employee Cost Index | Loaded Wage Rate | BLS Occupation | Website |
|---|---|---|---|---|
| $21 | $22 | $31 | 51-4022 Forging Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls.gov/oes/2020/may/oes514022.htm |
| $19 | $10 | $28 | 51-4199 Metal Workers and Plastic Workers, All Other | https://www.bls.gov/oes/2020/may/oes514199.htm |

---

[45] BLS, *Employment Cost Index—June 2021* (July 30, 2021), *available at* https://www.bls.gov/news.release/archives/eci_07302021.pdf (last visited Mar. 24, 2022).

[46] A loaded wage rate is hourly wage rate adjusted to include costs of fringe benefits such as insurance.  The load rate is based on theaverage total compensation of $36.29 (CMU2010000000000D) for the years 2020 and 2021 divided by the average wages and salaries of $25.54 (CMU2020000000000D) for the years 2020 and 2021.  BLS, *Employer Cost for Employee Compensation*, *available at* https://data.bls.gov/cgi-bin/surveymost?cm (last visited Mar. 24, 2022).

-64-

App. 099

| | | | 51-4031 Cutting, Punching, and Press Machine Setters, Operators, and Tenders, Metal | https://www.bls. gov/oes/2020/ma y/oes514031.ht |
|---|---|---|---|---|
| $19 | $19 | $27 | and Plastic | m |
| Average Loaded Wage | | **$29** | | |

ATF used the average loaded wage ($29) of the three job categories referenced in Table 5.3 for the loaded wage of a gunsmith.  Engraving firearm parts kits with a partially complete frame or receiver requires two collections of information ("COIs").  ATF utilized the hourly burden for making firearms from prior relevant PRA COI determinations.[47]  Based on the hourly burdens as reported in these COIs, the hourly burden to mark a firearm is 0.01667 hours and the hourly burden for entries into A&D records is 0.05 hours.  Table 5.4 outlines the per FFL dealer cost to engrave existing inventory of firearm parts kits with a partially complete frame or receiver.

Table 5.4.  Per FFL Dealer Cost to Engrave Existing Inventory of Firearm Parts Kits with a Partially Complete "Frame or Receiver"

| Activity Type | COI Number | Hourly Burden | Loaded Wage Rate | Existing Inventory | Entries per Kit | One-time Cost per FFL |
|---|---|---|---|---|---|---|
| Entries into A&D Records | COI: 1140-0032 | 0.05 | $29 | 10 | 2 | $29 |
| Mark Firearms | COI: 1140-0050 | 0.01667 | $29 | 10 | 1 | $5 |
| Total | | | | | | **$33** |

---

[47] ATF, *Identification Markings Placed on Firearms*, *available at* https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201807-1140-003 (last visited Mar. 24, 2022); and ATF, *Records of Acquisition and Disposition, Collection of Firearms*, *available at* https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202005-1140-002 (last visited Mar. 24, 2022).

-65-

App. 100

Because these FFL dealers retail in firearm parts kits with a partially complete frame or receiver, and because they have gunsmithing capabilities, for the purposes of this analysis, ATF assumes that there may be recurring costs to engrave individually owned PMFs currently in circulation when these PMFs enter an FFL's inventory.  An SME in FATD with prior gunsmithing experience estimated that a gunsmith would work on several hundred PMFs a year. For the purposes of this analysis, ATF used an overestimate of 500 repairs per year.  Due to the inherently busy nature of gunsmithing, the SME also specified that on-the-spot repairs are unlikely, and that most PMFs are held overnight and thus already included in A&D records as a PMF (though generally recorded without a serial number).  Therefore, ATF has attempted to estimate an annual recurring cost for PMFs that enter inventory due to repairs or customization that result in the PMF being held overnight.  However, based on the number of comments received regarding the serialization of PMFs, ATF estimates that seeking the services of FFLs for repairs or customization is less likely to occur, so the costs are overestimated.

Because PMFs are already entered into A&D records, ATF did not estimate an additional cost for A&D records; instead, ATF estimated only the cost for serializing PMFs.  The additional cost to individuals for serializing their PMF are accounted for under the costs to individuals below.  The hourly wage burden to mark a firearm is estimated to cost $0.48.[48]  Table 5.5 shows annually recurring costs per FFL dealer to serialize PMFs held overnight in inventory.

Table 5.5.  Annually Recurring Cost to Engrave PMFs Held Overnight in Inventory

---

[48] $0.48 cost to mark a PMF = $28.66 hourly wage * 0.01667 hours.

| Number of Repairs per Year | 500 |
|---|---|
| Cost to Mark per PMF | $0.48 |
| Annual Cost per FFL | $240 |

Table 5.6 provides a summary of the per FFL and industry costs outlined above.

Table 5.6.  Summary of Costs for FFL Dealers with Gunsmithing Capabilities

| Affected Population | Existing Inventory Cost | Annual Repair Costs | Per FFL First Year Cost | First Year Cost |
|---|---|---|---|---|
| 42 | $33 | $240 | $273 | $11,484 |

5.4.2.2.  Scenario 2: Contract out Gunsmithing Services

Of the remaining Type 01 and 02 FFL dealers, ATF assumes that a portion may contract out engraving services to a separate FFL or a licensed gunsmith.  Those FFL dealers that do not do so may instead opt to dispose of their inventory of firearm parts kits with a partially complete frame or receiver.  Because there is no way to determine which FFL dealers will chose to contract out engraving services or dispose of their inventory, ATF assumes 50 percent of the dealers will choose each option.  The 50 percent of dealers that choose to dispose of their inventory are discussed further in section 5.4.2.3, below.

ATF estimates that there are 44 Type 01 and 30 Type 02 FFL dealers that deal in firearm parts kits with a partially complete frame or receiver yet do not have gunsmithing capabilities and that would opt to obtain the services of a separate FFL to engrave these firearm parts kits in their inventory.  ATF estimates that the average price for serialization paid by these 74 dealers

would be $42.[49]

Although comments suggested a range of costs from $35 for serialization to $405 to include cleaning, oiling, bluing, and polishing services, ATF believes that $42 is an appropriate cost to use.  Based on information from an SME in FATD with gunsmithing experience, most individuals who engrave firearms do not request additional services such as cleaning or oiling when seeking engraving services.  Therefore, ATF did not account for the costs of these extra services.

ATF estimates the existing inventory of each FFL to be 10 firearm parts kit with a partially complete frame or receiver.  Based on the information above, ATF estimates that the per FFL cost for engraving inventory is $420, making the total cost for all FFLs for engraving inventory to be $31,080.[50]

### 5.4.2.3.  Scenario 3: Disposal Costs

As stated in the previous section, ATF assumed an even distribution between FFLs that would hire another party to engrave their inventory and FFLs that would dispose of their inventory.  Thus, much as ATF assumed 74 FFLs would choose to have their inventory engraved, ATF assumes that 74 FFLs would choose to dispose of their inventory.

In this portion of the analysis, ATF also considered the disposal costs for non-FFL

---

[49] For representative indications of the price of engraving services, see, e.g., Tar Heel State Firearms, *SBR / SBS Laser Engraving*, *available at* https://tarheelstatefirearms.com/store/index.php?route=product/product&product_id=232 (last visited Mar. 25, 2022); Atomic Engraving, *Serial Number Engraving*, *available at* https://www.atomicengraving.com/product-category/firearms-engraving/serial-number-engraving-ca-compliant/ (last visited Mar. 25, 2022).  As noted above, ATF cannot account for fluctuations in market prices over time, and the estimated price of engraving services used in this analysis—$42—may not precisely match the prices quoted by the cited websites or other providers of such services.

[50] $31,080 = 74 FFLs * (10 firearm parts kit with a partially complete frame or receiver * $42 to serialize each kit).

-68-

App. 103

dealers.  Some of these dealers may dissolve their business as a result of the rule, whereas some non-FFL dealers may choose only to dispose of their inventories of affected items.  Because ATF cannot determine which non-FFL dealers will choose which option, ATF assumed that 50 percent of non-FFL dealers would dissolve their business and 50 percent would choose only to dispose of their inventory.  Thus, ATF assumed that 12 non-FFL dealers would dispose of their inventory.  ATF assumed that the remaining 12 non-FFL dealers would dissolve their business, and these dealers are discussed more fully in section 5.4.2.4, below.

Both FFL and non-FFL dealers are also retail stores.  Hence, ATF assumes that a non-specialized retail employee will perform the work of disposing firearm parts kits with a partially complete frame or receiver.  For purposes of this analysis, ATF used the wage category of cashier to dispose of the existing inventory.  Table 5.7 provides the wage rate for a cashier.

Table 5.7.  Wage Rate for a Non-Specialized Employee

| Wage Rate | Wage Rate Adjusted with Employee Cost Index | Loaded Wage Rate After Adjustment for Cost Index | Title | Website |
|---|---|---|---|---|
| $12 | $13 | $18 | 41-2011 Cashier | https://www.bls.gov/oes/2020/may/oes412011.htm |

ATF anticipates that the same or similar methods that are used to destroy bump stock-type devices will be used to destroy a firearm parts kit with a partially complete frame or receiver.  Based on disposal information from ATF's rule regarding bump-stock type devices, ATF used the hourly burden as reported for small businesses as determined by the SBA.  Table 5.8 provides the cost and hourly burden to dispose of existing inventory.

-69-

App. 104

Table 5.8.  Hourly Burden and Cost to Dispose of Existing Inventory of Firearm Parts Kits with

a Partially Complete "Frame or Receiver"

| Hourly Burden | Loaded Wage Rate After Adjustment with Employee Cost Index | Per Dealer Cost | Source |
|---|---|---|---|
| 0.25 | $18 | $5 | Bump-Stock-Type Devices, 83 FR 66514, 66550 (Dec. 26, 2018). |

Because ATF does not know the inventory of non-FFL dealers, for the purposes of this analysis, ATF uses the same estimate of 10 firearm parts kits with a partially complete frame or receiver as was used above for FFL dealers.  ATF notes that this is likely to be an underestimate for non-FFL dealers because most firearm parts kits with a partially complete frame or receiver are available for purchase online.  However, for the purposes of this analysis, ATF assumes that non-FFL dealers that incur the costs described here sell other items and not only firearm parts kits with a partially complete frame or receiver; therefore, the loss of such parts kits due to disposal would only be a part of their total revenue.

In addition to the hourly burden of disposing existing inventory of firearm parts kits with a partially complete frame or receiver, these FFL and non-FFL dealers will incur a loss in inventory.  Table 5.9 lists the retail prices of firearm parts kits with a partially complete "frame or receiver" used for this analysis.  As noted earlier, the prices quoted by vendors such as the ones referenced here may fluctuate over time, but ATF believes the average price reported in Table 5.9 is a reasonable price to use for this RIA.

Table 5.9.  Retail Price of Firearm Parts Kits with a Partially Complete "Frame or Receiver"

| Cost | Vendor | Website |
|---|---|---|

-70-

App. 105

| | | |
|---:|---|---|
| $150 | Polymer 80 | https://www.polymer80.com/pistols/80percentpistolkits |
| $170 | Polymer 80 | https://www.polymer80.com/pistols/80percentpistolkits |
| $255 | 5D Tactical | https://www.5dtactical.com/80-build-kits-s/160.htm |
| $912 | 5D Tactical | https://www.5dtactical.com/80-build-kits-s/160.htm |
| $616 | 5D Tactical | https://www.5dtactical.com/80-build-kits-s/160.htm |
| $53 | Tennessee Arms | https://www.tnarmsco.com/categories/bundle-packs/80-bundles.html |
| $191 | Tennessee Arms | https://www.tnarmsco.com/categories/bundle-packs/80-bundles.html |
| $466 | Tennessee Arms | https://www.tnarmsco.com/categories/bundle-packs/80-bundles.html |
| $317 | Tennessee Arms | https://www.tnarmsco.com/categories/bundle-packs/80-bundles.html |
| $224 | Tennessee Arms | https://www.tnarmsco.com/categories/bundle-packs/80-bundles.html |
| $335 | | Average Price |

*Note: Calculations using these estimates may not be exact due to rounding.

At an average price of $335 per kit, the total loss in inventory per dealer is $3,354. Including the $5 hourly burden cost for disposal, the per FFL and non-FFL dealer cost to dispose of existing inventory of firearm parts kits with a partially complete frame or receiver is $3,359, making the industry cost for this scenario $288,835.[51]

5.4.2.4.  Scenario 4: Non-FFL Dealer Dissolves Business

Some non-FFL dealers only or primarily sell firearm parts kits with a partially complete frame or receiver.  Upon publication of the final rule, it is unlikely that these non-FFL dealers will be able to continue their business.  As described above, however, ATF assumed for the purposes of this analysis that half of the non-FFL dealers will simply dispose of their inventory

---

[51] $288,835 = 86 FFL and non-FFL dealers * ((10 firearm parts kits with a partially complete frame or receiver * $335) + $5 hourly disposal cost).

of affected items and remain in business; and only the remaining half of non-FFL dealers will dissolve their business.

Based on the information gathered on non-FFL dealers, the average revenue of a non-FFL dealer is $405,667.  The median revenue is $117,000.  Given the large discrepancy among the known revenues of non-FFL dealers, ATF used the median revenue rather than the average revenue.  Assuming 12 non-FFL dealers, with median revenues of $117,000, dissolve their business, ATF estimates this scenario will have an annual cost of $1.4 million.[52]

5.4.2.5.  Scenario 5: Non-FFL Dealer Becomes an FFL

Anecdotal evidence from the ATF field divisions indicates that most firearm parts kits with a partially complete frame or receiver are sold online and not through a local storefront.  It is unclear whether a non-FFL dealer that primarily sells on the internet will be able to completely change its operations to comply with the regulations that licensed dealers must abide by, including having a physical place of business where they maintain their inventory and records that are subject to ATF inspection.  However, to illustrate the potential cost for a non-FFL dealer to become licensed as a Type 01 or Type 02 FFL, ATF estimates the per company cost for a non-FFL dealer to become an FFL dealer.

In order to become licensed as a Type 01 or Type 02 FFL dealer, the non-FFL dealer will need to submit a Form 7 application.  Table 5.10 outlines the hourly burden and costs for the first-year application to become licensed as a Type 01 or Type 02 FFL.  In calculating these costs, ATF used the same sources as described earlier when discussing the costs associated with

---

[52] 12 non-FFL dealers * $117,000 median revenue = $1,404,000.

-72-

App. 107

Form 7.

Table 5.10.  Application Cost to be a Type 01 or 02 FFL

| Cost Item | Hourly Burden | Hourly Wage Rate | Hourly Wage Adjusted with Employee Cost Index | Loaded Hourly Wage Rate After Adjustment with Cost Index | Wage Burden | Cost Item | |
|---|---|---|---|---|---|---|---|
| Form 7 | 1 | $60 | $63 | $89 | $89 | $200 | |
| Fingerprints | 1 | $60 | $63 | $89 | $89 | $19 | |
| Passport Photo | 0.5 | $6 | $63 | $89 | $44 | $16 | |
| Postage | | | | | | $1 | |
| Application Cost | | | | | $222 | $236 | **$458** |
| Renewal Cost | 0.50 | $60 | $63 | $889 | $44 | $90 | **$134** |

In addition to the application for an FFL license, non-FFL dealers will also need to begin maintaining A&D records.  In order to determine the number of firearm parts kits with a partially complete frame or receiver that will now need to be entered in A&D records, ATF used the median revenue for non-FFL retailers divided by the average retail price for a firearm parts kit to derive an estimated number of 349 firearm parts kits with a partially complete frame or receiver

-73-

App. 108

per year.[53]  Multiplied by 2 entries for acquisitions and dispositions, the total number of entries is estimated to be 698.  Because retailers do not need specialized employees to record serial numbers, ATF used the same BLS category of cashier to enter A&D records at the loaded wage rate of $18.  For more information regarding this wage category, please refer to scenario 4 above.

Table 5.11.  Cost to Maintain A&D Records

| Population Type | Hourly Burden | Loaded Wage Rage | Estimated Entries Annually | Per Dealer Cost |
|---|---|---|---|---|
| Non-FFL Dealers | 0.0167 | $18 | 698 | $211 |

In addition to incurring costs associated with A&D records non-FFL dealers seeking to become FFL dealers will need to procure engraving services for their inventory from an FFL that provides engraving services.  Table 5.12 provides a summary of the one-time cost to engrave existing inventory.

Table 5.12.  One-time Cost for Non-FFL Dealers to Engrave Existing Inventory of Firearm Parts Kits with a Partially Complete "Frame or Receiver"

| | |
|---|---|
| Average Cost to Contract out Existing Inventory for Engraving | $42 |
| Number of Kits | 349 |
| Application Cost | $458 |
| Total First Time Cost | $15,116 |

---

[53] 349 firearm parts kit with a partially complete "frame or receiver" = $117,000 median revenue / $335 retail price of a parts kit.

-74-

App. 109

Table 5.13 provides a summary of the cost for a non-FFL dealer to become a licensed Type 01 or 02 FFL.

Table 5.13.  Summary of Costs for a Non-FFL Dealer to Become Licensed as an FFL Dealer

| Population Description | One-time Cost | Annual Recurring Cost | Every 3 Year FFL Renewal Cost | Per Company First Year Cost |
|---|---|---|---|---|
| Cost | $15,116 | $211 | $134 | $15,328 |

Based on a median annual revenue of $117,000, this scenario is likely to cost 13 percent of the revenue of a non-FFL dealer.

### 5.4.3.  Costs for Individuals to Mark PMFs

As stated previously in various sections, the final rule does not require serialization of all PMFs currently in circulation.  Although there may be State or local requirements for individuals to serialize their PMFs, the Federal requirements do not require serialization for PMFs owned by individuals unless they transfer their PMFs to an FFL.  In the NPRM, ATF did not estimate costs for an individual to do so because ATF assumed that individuals with PMFs would choose to avoid taking their PMF to an FFL to avoid the serialization requirement and hence would not incur any associated costs.  This assumption was reinforced by the many comments that ATF received regarding PMFs.

However, some commenters asserted that the rule disproportionately affects low-income households because it is more arduous and expensive for an individual to go through an FFL to purchase firearms than it is for an individual to purchase an unregulated firearm parts kit online and build a PMF.  ATF disagrees that the final rule disproportionately affects low-income households.  Regardless of the rule, ordering a firearm parts kit online and building a PMF may

-75-

App. 110

take more time and money overall than going to an FFL to purchase a complete firearm. Scenario 1 illustrates the cost for an individual to go to an FFL to purchase a complete firearm compared to the cost of building a PMF.   Additionally, because there is at least some possibility that individuals may choose to take an existing PMF to an FFL for repairs or customization, ATF estimates the cost for individuals to bring their PMFs to an FFL to be serialized.

5.4.3.1.  Result 1: Individuals Go to an FFL to Purchase a Firearm

Table 5.14 illustrates the cost to travel to an FFL to purchase a firearm.

Table 5.14.  Cost for Milage to an FFL

| Miles Traveled | 35.48 | ATF estimated during a previous rulemaking that this is the average distance traveled by an individual to turn in bump stock-type devices to ATF. |
|---|---|---|
| Per Diem for Miles Traveled | $.59 | General Services Administration, *Privately Owned Vehicle (POV) Mileage Reimbursement Rates* (Jan. 1, 2022), *available at* https://www.gsa.gov/travel/plan-book/transportation-airfare-pov-etc/privately-owned-vehicle-pov-mileage-reimbursement-rates last visited (Mar. 26, 2022). |
| Cost for Miles Traveled | $21 | |

*Note: Calculations using these estimates may not be exact due to rounding.

Based on the Department of Transportation's guidance on the costs for leisure time, ATF attempted to update the leisure wage based on the methodology outlined in the guidance.[54] The Department of Transportation uses the median household income as the base for income

---

[54] Dep't of Transportation, *Revised Departmental Guidance on Valuation of Travel Time in Economic Analysis* (Sept. 27, 2016), *available at* https://www.transportation.gov/office-policy/transportation-policy/revised-departmental-guidance-valuation-travel-time-economic last visited (Mar. 26, 2022).

from the Census. ATF used the latest median income of a household from the Current

Population Survey Annual Social and Economic Supplements, as published by the Census

Bureau in September 2021.[55] Table 5.15 provides the leisure wage.

Table 5.15. Leisure Wage Rate for Individuals

| Median Household Income (2021) | $67,521 |
|---|---|
| DOT Travel Time | 2080 |
| Value of Travel Time Savings | 50% |
| Leisure Wage | $16 |

ATF notes that the value calculated for the time and miles traveled are likely to be

overestimates because the data is based on the time and miles traveled for an individual to go to

an ATF field office rather than an FFL. There are more FFL locations than there are ATF

locations; therefore, FFL locations may be closer to the individual. Based on these

assumptions, Table 5.16 outlines the cost for an individual to go to an FFL (roundtrip) to

purchase an affected firearm kit.

Table 5.16. Individual Cost to Go to an FFL (Roundtrip)

| Total Cost for Driving Time | $25 |
|---|---|
| Cost for Miles Traveled | $21 |
| FFL Transfer Fee | $35 |
| Cost per Trip (per Individual) | $81 |

---

[55] Census Bureau, *Income and Poverty in the United States: 2020* (Sept. 14, 2021), *available at* https://www.census.gov/library/publications/2021/demo/p60-273.html (last visited Mar. 26, 2022).

The per individual cost to go to an FFL to purchase a firearm is $81.  In contrast, Table 5.17 illustrates an estimated time to build a PMF.

Table 5.17.  Estimated Time (in Hours) to Build a PMF

| Time to Build a PMF (low) | 4 |
|---|---|
| Time to Build a PMF (high) | 8 |
| Average Time | 6 |
| Leisure Wage | $16 |
| Cost to Build a PMF | $97 |

*Note: Calculations using these estimates may not be exact due to rounding some of the values used as inputs for subsequent calculations.

As illustrated, Table 5.17 shows that the cost to build a PMF is $97, which is more than the cost to go to an FFL to purchase firearm, as reported in Table 16 ($81).  Furthermore, various YouTube videos show that personally building a firearm is more expensive than buying a similar type of firearm through an FFL.[56, 57]

5.4.3.2.  Scenario 2: Serialization Cost

Based on the average cost of serialization as described above, ATF estimates that it will cost an additional $42 to serialize a PMF.

5.5.  Benefits of Marking PMFs

ATF anticipates a one-time surge in the markings of firearm parts kits with partially

---

[56] YouTube, *Polymer 80 What Does It Cost To Build* (June 16, 2021), *available at* https://www.youtube.com/watch?v=l4N1k6Hjqqk (last visited Mar. 26, 2022) (explaining at 2:24 that "[b]uilding the polymer 80 was about $50 or so more than buying a Glock 19," with a total price to build of $630.47).

[57] YouTube, *POLYMER 80 BUILD COST BREAKDOWN* (July 8, 2021), *available at* https://www.youtube.com/watch?v=a_prtH4NQ5g (last visited Mar. 26, 2022) (acknowledging at 4:00 that the price to personally build a Glock can be "pretty close to what a Glock costs" at retail, but also noting that costs for personally building a Glock can run higher than retail prices if a person is not knowledgeable about how to construct the weapon, with a cost of up to $1,000).

complete frames or receivers and PMFs, primarily from Type 01 and Type 02 FFL dealers. Regulating these items will help prevent felons and other prohibited persons from easily obtaining unmarked firearms without a background check and illegally making PMFs.  Bringing these kits and PMFs within the regulated market thereby helps prevent violent crime, allows ATF to locate and prosecute offenders and their straw purchasers, and makes it easier to trace firearms to criminals who commit crimes with the weapons they build from those kits.  As reported by commenters, the objective of ATF in issuing the rule is to increase public safety.

For more discussion on the benefits of serializing firearm kits and PMFs, please refer to chapter 4 on manufacturers of firearm parts kits with a partially complete frame or receiver.

# 6.  Gunsmithing

The final rule amends the definition of "gunsmith" under the term "engaged in the business" to make clear that businesses may be licensed as dealer-gunsmiths rather than as manufacturers if they, among other things, routinely repair or customize existing firearms not for sale or distribution, or mark PMFs, which by definition includes unmarked firearm parts kits with partially complete frames or receivers.  The final rule also makes clear that gunsmiths are not required to be licensed as manufacturers if they perform gunsmithing services only on existing firearms for their customers, or for another licensee's customers, because the work is not being performed to create firearms for sale or distribution.  The change to the definition also allows greater access to professional marking services so that individuals or gunsmiths can be licensed as dealer-gunsmiths solely to provide professional PMF marking services.  This provision includes all FFLs that perform gunsmithing activities; in particular, it may encompass

App. 114