**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

|  |  |
|---|---|
| DEFENSE DISTRIBUTED *et al.*,[1] <br><br> Plaintiffs, <br><br> v. <br><br> TODD BLANCHE, in his official capacity as Acting Attorney General of the United States *et al.*, <br><br> Defendants. | Case No. 4:22-cv-00691-O |

**DEFENDANTS' COMBINED BRIEF IN OPPOSITION TO DEFENSE DISTRIBUTED AND SECOND AMENDMENT FOUNDATION'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

---

[1] All plaintiffs except for Defense Distributed and Second Amendment Foundation have now voluntarily dismissed their claims. Stipulation of Dismissal, ECF No. 315.

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

BACKGROUND ..................................................................................................................2

    I.     Statutory Background ..............................................................................................2

    II.    Regulatory Background ...........................................................................................3

          A.     Definition of "Firearm" ............................................................................3

          B.     Definition of "Frame or Receiver" ..........................................................4

    III.   The Present Case .....................................................................................................5

ARGUMENT .......................................................................................................................6

    I.     Plaintiffs Have Largely Failed to Meet the Jurisdictional Requirement of Article III Standing ...................................................................................................................6

          A.     SAF Lacks Standing to Sue .......................................................................7

               1.     SAF Has Not Shown Associational Standing. ..............................7

               2.     SAF Has Not Shown Organizational Standing .............................8

           B.     DD Largely Fails to Establish Standing. ...................................................8

    II.    The Rule Is Lawful. ..............................................................................................13

          A.     Plaintiffs' Constitutional Claims Are Without Merit. ............................13

                1.     The Rule Is Not Void for Vagueness. ........................................13

                2.     The Rule Is Consistent With the Second Amendment .................21

                3.     The Rule Is Consistent With the Major Questions Doctrine and Principles of Non-Delegation. ...............................................27

                4.     Although the Supreme Court's *VanDerStok* Decision Did Not Adjudicate Constitutional Issues, the Decision Remains Instructive in Adjudicating Plaintiffs' Constitutional Claims ..............30

          B.     The Rule Is Consistent With the APA .....................................................30

                1.     Plaintiffs Have Failed to Show that the Rule's Second Amendment Analysis Caused Them Any Harm. ...............................31

                2.     The Rule Explains Any Change in Policy by ATF Regarding Partially-Complete Frames and Receivers and Weapon Parts Kits. ..............................................................................................32

    III.   Any Relief Should Be Narrowly Tailored. ...........................................................37

          A.     Section 706(2) Does Not Authorize the Universal Vacatur Urged by Plaintiffs ..................................................................................................37

          B.     In Any Event, Remand Without Vacatur Would Be the Appropriate Remedy for Any Procedural Violation. .....................................................39

C.    In the Alternative, Any Vacatur of the Rule Should Be Narrowly Tailored...........................................................................................................40

CONCLUSION.......................................................................................................................42

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*10 Ring Precision v. Jones*,
722 F.3d 711 (5th Cir. 2013) .................................................................................30

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935) .................................................................................29

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) .................................................................................40

*Amin v. Mayorkas*,
24 F.4th 383 (5th Cir. 2022) ................................................................................. 30, 31

*Ammex, Inc. v. United States*,
367 F.3d 530 (6th Cir. 2004) .................................................................................13

*Anderson v. Williams*,
No. 2:10-CV-01916-KJD, 2011 WL 2580665 (D. Nev. June 27, 2011) .................................17

*Arizona v. Biden*,
31 F.4th 469 (6th Cir. 2022) .................................................................................39

*Bondi v. VanDerStok*,
604 U.S. 458 (2025) .................................................................................*passim*

*Boyce Motor Lines v. United States*,
342 U.S. 337 (1952) .................................................................................18

*California v. Texas*,
593 U.S. 659 (2021) .................................................................................39

*Cent. & S. W. Servs., Inc. v. EPA*,
220 F.3d 683 (5th Cir. 2000) .................................................................................40

*Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield*,
853 F. Supp. 2d 214 (D. Conn. 2012) .................................................................................18

*Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*,
768 F.3d 183 (2d Cir. 2014) .................................................................................18

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .................................................................................6

*Cox v. Louisiana,*
 379 U.S. 559 (1965) ...................................................................................................19

*Crawford v. U.S. Dep't of Treasury,*
 868 F.3d 438 (6th Cir. 2017) .....................................................................................12

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor,*
 45 F.4th 846 (5th Cir. 2022) ......................................................................................37

*Deep S. Ctr. for Env't Just. v. EPA,*
 138 F.4th 310 (5th Cir. 2025) ......................................................................................7

*Dist. of Columbia v. Heller,*
 554 U.S. 570 (2008) ............................................................................................ 21, 22

*Entergy Miss., Inc. v. NLRB,*
 810 F.3d 287 (5th Cir. 2015) .....................................................................................32

*Erie R. Co. v. Tompkins,*
 304 U.S. 64 (1938) .....................................................................................................38

*FCC v. Consumers' Rsch.,*
 606 U.S. 656 (2025) ...................................................................................................29

*FCC v. Fox Television Stations,*
 556 U.S. 502 (2009) ...................................................................................................32

*FDA v. All. for Hippocratic Med.,*
 602 U.S. 367 (2024) ........................................................................................... 6, 8, 42

*FDA v. Wages & White Lion Invs., L.L.C.,*
 604 U.S. 542 (2025) ...................................................................................................31

*Fed. Power Comm'n v. Hope Natural Gas Co.,*
 320 U.S. 591 (1944) ...................................................................................................29

*Franciscan All., Inc. v. Azar,*
 414 F. Supp. 3d 928 (N.D. Tex. 2019) ......................................................................42

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
 561 U.S. 477 (2010) ...................................................................................................41

*Friends of St. Frances Xavier Cabrini Church v. FEMA,*
 658 F.3d 460 (5th Cir. 2011) ................................................................................. 6, 13

*Garland v. Blackhawk Mfg. Grp., Inc.,*
 144 S. Ct. 338 (2023) ...................................................................................................5

*Garland v. VanDerStok,*
 144 S. Ct. 44 (2023) ............................................................................................................5

*Gundy v. United States,*
 588 U.S. 128 (2019) ..........................................................................................................29

*Handley v. Chapman,*
 587 F.3d 273 (5th Cir. 2009) ....................................................................................... 32, 33

*Hardwick v. FAA,*
 170 F.4th 429 (5th Cir. 2026) ...........................................................................................30

*Hecht Co. v. Bowles,*
 321 U.S. 321 (1944) ..........................................................................................................39

*Home Bldg. & Loan Ass'n v. Blaisdell,*
 290 U.S. 398 (1934) ..........................................................................................................38

*Hunt v. Wash. State Apple Advert. Comm'n,*
 432 U.S. 333 (1977) ............................................................................................................7

*Johnson v. United States,*
 576 U.S. 591 (2015) ...............................................................................................16, 20, 21

*Kanter v. Barr,*
 919 F.3d 437 (7th Cir. 2019) .............................................................................................23

*La. Pub. Serv. Comm'n v. FERC,*
 761 F.3d 540 (5th Cir. 2014) .............................................................................................31

*Leander Indep. Sch. Dist. v. U.S. Dep't of Interior,*
 No. 1:22-CV-310-RP, 2022 WL 19300727 (W.D. Tex. Dec. 21, 2022) ............................................14

*Learning Res., Inc. v. Trump,*
 146 S. Ct. 629 (2026) ........................................................................................................28

*Lujan v. Defs. of Wildlife,*
 504 U.S. 555 (1992) ...............................................................................................6, 8, 12, 13

*Mallinckrodt Chem. Works v. Missouri ex rel. Jones,*
 238 U.S. 41 (1915) ............................................................................................................38

*Massachusetts v. Mellon,*
 262 U.S. 447 (1923) ..........................................................................................................38

*McCutchan v. Nicholson,*
 790 F. Supp. 3d 506 (N.D. Tex. 2025) ...............................................................................7

*McDonald v. City of Chicago, Ill.*,
  561 U.S. 742 (2010) ...............................................................................................................22

*McRorey v. Garland*,
  99 F.4th 831 (5th Cir. 2024)..............................................................................................12, 22, 23

*McRorey v. Garland*,
  No. 7:23-CV-00047-O, 2023 WL 5200670 (N.D. Tex. Aug. 14, 2023) ................................... 22, 23

*Morgan v. Huntington Ingalls, Inc.*,
  879 F.3d 602 (5th Cir. 2018) ...................................................................................................6

*Munn v. City of Ocean Springs*,
  763 F.3d 437 (5th Cir. 2014) .........................................................................................13, 19, 20

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018) ...............................................................................................................39

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ........................................................................................................... 6, 41

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) .............................................................................................................*passim*

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
  804 F.3d 242 (2d Cir. 2015) ...................................................................................................17

*Nat'l Ass'n of Fund Managers v. SEC*,
  151 F.4th 252 (5th Cir. 2025)..................................................................................................39

*Nat'l Broad. Co. v. United States*,
  319 U.S. 190 (1943).................................................................................................................29

*Nat'l Fam. Plan. & Reprod. Health Ass'n v. Gonzales*,
  468 F.3d 826 (D.C. Cir. 2006) ........................................................................................... 14, 15

*Nat'l Treasury Emps. Union v. Von Raab*,
  489 U.S. 656 (1989)...............................................................................................................40

*New York Cent. Sec. Corp. v. United States*,
  287 U.S. 12 (1932)...................................................................................................................29

*Nuziard v. Minority Bus. Dev. Agency*,
  721 F. Supp. 3d 431 (N.D. Tex. 2024) .....................................................................................37

*Panama Refining Co. v. Ryan*,
  293 U.S. 388 (1935)...............................................................................................................29

*Phelps v. Budge*,
  188 F. App'x 616 (9th Cir. 2006) ...............................................................................17

*Prime Healthcare Servs., Inc. v. Harris*,
  216 F. Supp. 3d 1096 (S.D. Cal. 2016) ......................................................................18

*Sessions v. Dimaya*,
  584 U.S. 148 (2018) ....................................................................................................19

*Shell Offshore Inc. v. Babbitt*,
  238 F.3d 622 (5th Cir. 2001) ......................................................................................32

*Shinseki v. Sanders*,
  556 U.S. 396 (2009) ....................................................................................................31

*Sierra Club v. U.S. Dep't of Interior*,
  990 F.3d 909 (5th Cir. 2021) ......................................................................................30

*SIH Partners LLLP v. Comm'r of Internal Revenue*,
  923 F.3d 296 (3d Cir. 2019) .......................................................................................32

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ......................................................................................................7

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ......................................................................................................6

*Sw. Elec. Power Co. v. EPA*,
  920 F.3d 999 (5th Cir. 2019) ......................................................................................41

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
  989 F.3d 368 (5th Cir. 2021) ......................................................................................40

*Texas Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*,
  110 F.4th 762 (5th Cir. 2024).....................................................................................37

*Texas v. Biden*,
  20 F.4th 928 (5th Cir. 2021).......................................................................................40

*Town of Chester v. Laroe Ests., Inc.*,
  581 U.S. 433 (2017) ......................................................................................................9

*Tripoli Rocketry v. ATF*,
  437 F.3d 75 (D.C. Cir. 2006) .....................................................................................18

*Turaani v. Wray*,
  988 F.3d 313 (6th Cir. 2021).......................................................................................12

*United States v. 16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns,*
    443 F.2d 463 (2d Cir. 1971) ...........................................................................................16

*United States v. Betancourt,*
    139 F.4th 480 (5th Cir. 2025), *cert. denied*, 223 L. Ed. 2d 561 (2026)........................... 21, 22

*United States v. Campbell,*
    427 F.2d 892 (5th Cir. 1970) ..........................................................................................17

*United States v. Clark,*
    582 F.3d 607 (5th Cir. 2009) ..........................................................................................19

*United States v. Clinical Leasing Serv., Inc.,*
    925 F.2d 120 (5th Cir. 1991) ..........................................................................................15

*United States v. Drasen,*
    845 F.2d 731 (7th Cir. 1988) ..........................................................................................17

*United States v. Felsen,*
    648 F.2d 681 (10th Cir. 1981) .........................................................................................17

*United States v. Guillen-Cruz,*
    853 F.3d 768 (5th Cir. 2017) ..........................................................................................29

*United States v. Kelly,*
    276 F. App'x 261 (4th Cir. 2007) ....................................................................................17

*United States v. Kent,*
    175 F.3d 870 (11th Cir. 1999) .........................................................................................17

*United States v. Libertad,*
    681 F. Supp. 3d 102 (S.D.N.Y. 2023).............................................................................23

*United States v. Lim,*
    444 F.3d 910 (7th Cir. 2006) ..........................................................................................18

*United States v. M-K Specialties Model M-14 Machinegun,*
    424 F. Supp. 2d 862 (N.D. W. Va. 2006)........................................................................17

*United States v. Nat'l Dairy Prod. Corp.,*
    372 U.S. 29 (1963) .........................................................................................................19

*United States v. Powell,*
    423 U.S. 87 (1975) .........................................................................................................18

*United States v. Quiroz,*
    449 F.2d 583 (9th Cir. 1971)...........................................................................................16

*United States v. Rahimi*,
    602 U.S. 680 (2024) ........................................................................................................21, 22, 26

*United States v. Texas*,
    173 F.4th 659 (5th Cir. 2026).......................................................................................................8

*United States v. Texas*,
    599 U.S. 670 (2023).....................................................................................................................37

*United States v. Wick*,
    No. CR 15-30-M-DLC, 2016 WL 10612608 (D. Mont. Mar. 11, 2016) ...........................17

*United States v. Williams*,
    553 U.S. 285 (2008).....................................................................................................................13

*VanDerStok v. Garland*,
    86 F.4th 179 (5th Cir. 2023).........................................................................................................5

*VanDerStok v. Garland*,
    633 F. Supp. 3d 847 (N.D. Tex. 2022)......................................................................................41

*VanDerStok v. Garland*,
    No. 23-10718, 2023 WL 4945360 (5th Cir. July 24, 2023)....................................................41

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 1186 (1982)...................................................................................................................18

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989).....................................................................................................................19

*Warth v. Seldin*,
    422 U.S. 490 (1975).......................................................................................................................7

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001).....................................................................................................................29

*Worldcall Interconnect, Inc. v. FCC*,
    907 F.3d 810 (5th Cir. 2018).......................................................................................................31

*Wulferic, LLC v. FDA*,
    793 F. Supp. 3d 830 (N.D. Tex. 2025)......................................................................................41

*Yakus v. United States*,
    321 U.S. 414 (1944).....................................................................................................................29

*Young Conservatives of Tex. Found. v. Smatresk*,
    73 F.4th 304 (5th Cir. 2023).......................................................................................................14

*Zimmerman v. City of Austin*,
   881 F.3d 378 (5th Cir. 2018) ................................................................................8

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. II ................................................................................21

## Statutes

5 U.S.C. § 703 ................................................................................ 38, 39

5 U.S.C. § 706 ................................................................................*passim*

18 U.S.C. § 921 ................................................................................*passim*

18 U.S.C. § 922 ................................................................................ 2, 37

18 U.S.C. § 923 ................................................................................2, 28, 37

18 U.S.C. § 926 ................................................................................3

18 U.S.C. §§ 921 *et seq.* ................................................................................2

26 U.S.C. § 5845 ................................................................................16, 17, 34

26 U.S.C. § 5861 ................................................................................17

Act of Aug. 24, 1937, ch. 754, § 3, 50 Stat. 51 ................................................................................38

## Regulations

27 C.F.R. § 478.11 ................................................................................*passim*

27 C.F.R. § 478.12 ................................................................................*passim*

27 C.F.R. § 478.42 ................................................................................37

27 C.F.R. § 478.124 ................................................................................37

27 C.F.R. § 478.125 ................................................................................37

27 C.F.R. § 479.102 ................................................................................14

86 Fed. Reg. 27,720 (May 21, 2021) ................................................................................35

87 Fed. Reg. 24,652 (Apr. 26, 2022) ................................................................................*passim*

**Other Authorities**

1 LAWS OF THE STATE OF MAINE (1830) ...............................................................................24

2 GENERAL LAWS OF MASSACHUSETTS FROM THE ADOPTION OF THE CONSTITUTION TO
    FEBRUARY 1822 (1823) ...........................................................................................................25

3 LAWS OF THE COMMONWEALTH OF MASSACHUSETTS FROM NOVEMBER 28, 1780
    TO FEBRUARY 28, 1807 (1807) ...............................................................................................24

3 LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, FROM THE FOURTEENTH DAY
    OF OCTOBER, ONE THOUSAND SEVEN HUNDRED (1810) ...................................................25

*Are "80%" or "unfinished" receivers illegal?*, ATF,
    https://www.atf.gov/resource-center/questions-and-answers?page=20 .......................................33

ATF Letter to Private Counsel #303304 (Mar. 20, 2015)) ..........................................................33

*Bondi v. VanDerStok*,
    No. 23-10718, 2024 WL 1098302 (Mar. 8, 2024) (Br. of DD)...................................... 15, 30

*Bondi v. VanDerStok*,
    No. 23-852, 2024 WL 4183989 (Sept. 12, 2024) (Petitioner's Reply Br. ) ...........................30

CHARTER AND ORDINANCES OF THE CITY OF PROVIDENCE, WITH THE GENERAL ASSEMBLY
    RELATING TO THE CITY, at 37 (1835) (1821 law), https://firearmslaw.duke.edu/laws/the-charter-
    and-ordinances-of-the-city-of-providence-together-with-the-acts-of-the-general-assembly-relating-
    to-the-city-page-89-96-image-89-96-1854-available-at-the-making-of-modern-law-primary ..........26

COLONIAL LAWS OF MASSACHUSETTS REPRINTED FROM THE EDITION OF 1672 (1890) ....................25

Ghostgunner.net, AR-00: 0% Receiver,
    https://ghostgunner.net/zero-percent/ (last accessed on May 20, 2026).......................................11

LAWS OF THE STATE OF NEW HAMPSHIRE; WITH THE CONSTITUTIONS OF THE UNITED STATES AND
    OF THE STATE PREFIXED (Isaac Long Jr., 1830) ...............................................................................25

ReasonTV, *Cody Wilson Thwarts Another Attempt to Stop Ghost Guns*,
(YouTube, Jan. 12, 2022), https://www.youtube.com/watch?v=bZRugDpYBuc..............................11

Regulatory Impact Analysis...............................................................................................................36

*Set Aside, Webster's New International Dictionary of the English Language* 2291 (2d ed. 1958) .....................37

TMGN, *Biden's Ghost Gun Rule is Dead on Arrival Thanks to the 0% Receiver*,
(Apr. 12, 2022), https://themachinegunnest.com/bidens-ghost-gun-rule-is-dead-on-arrival-thanks-
    to-the-0-receiver/ ................................................................................................................................11

William J. Novak, THE PEOPLE'S WELFARE: LAW AND REGULATION IN
  NINETEENTH CENTURY AMERICA  (1996) .................................................................................................... 23

**INTRODUCTION**

The Supreme Court has held that Congress gave the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") the authority to regulate certain weapon parts kits and partially-complete firearm frames and receivers that constitute statutory "firearms" within the meaning of the Gun Control Act. *Bondi v. VanDerStok*, 604 U.S. 458 (2025). ATF's rule requiring manufacturers and sellers of these items to abide by the same requirements as all licensed firearm manufacturers and dealers thus falls within the agency's regulatory authority. The plaintiffs challenging this rule therefore fail to prevail on their primary claim, and all but two have voluntarily dismissed from this action.

The remaining claims asserted by these two plaintiffs have no more merit than their rejected statutory-authority claim. Initially, these plaintiffs largely fail to establish standing. Plaintiff Second Amendment Foundation ("SAF") lacks associational standing because it has not identified any member with standing, nor has it shown any harm to the organization itself. Plaintiff Defense Distributed ("DD") largely fails to demonstrate any certainly-impending injury except with respect to four items it sells. That limited standing, in turn, limits any appropriate scope of relief.

In any event, Plaintiffs' constitutional and Administrative Procedure Act ("APA") claims have no merit. Plaintiffs lack standing to assert their void-for-vagueness claim because they have an easy means for avoiding any alleged uncertainty: seeking agency classification of products. That claim also fails on its merits because the rule uses terms that have survived previous vagueness challenges. Plaintiffs' Second Amendment claim fails because the rule is consistent with the nation's historical tradition of firearms regulation. Their remaining constitutional claims are merely repackaged versions of their beyond-statutory-authority claim that the Supreme Court has squarely rejected. And Plaintiffs' APA claims that the rule does not provide adequate explanation is similarly without merit. Defendants therefore respectfully request that this Court enter summary judgment in their favor.

**BACKGROUND**

I.    **Statutory Background**

Congress enacted the Gun Control Act of 1968, as amended, 18 U.S.C. §§ 921 *et seq.* ("GCA"), after finding that existing laws "allowed criminals to acquire largely untraceable guns too easily," for example, by "evad[ing] state laws regulating in-person sales simply by purchasing guns through the mail." *VanDerStok*, 604 U.S. at 462 (citation omitted). "As a result, many of those now engaged in importing, manufacturing, or dealing in firearms must obtain federal licenses, keep records of their sales, and conduct background checks before transferring firearms to private buyers." *Id.* (citing 18 U.S.C. §§ 922(t), 923(a), (g)(1)(A)). The GCA "also requires importers and manufacturers to mark their firearms with serial numbers." *Id.* (citing 18 U.S.C. § 923(i)).

"The background-check requirement seeks to keep 'guns out of the hands of criminals.'" *Id.* (citation omitted). "The licensing, recordkeeping, and serialization requirements, meanwhile, aim 'to assist law enforcement authorities in investigating serious crimes,' by permitting them 'to determine where, by whom, or when' a firearm was manufactured and to whom it was 'sold or otherwise transferred.'" *Id.* (citations omitted). "[T]housands of law-enforcement agencies . . . depend on the [GCA's] tracing system to link firearms involved in crimes to their owners." *Id.* (citation omitted).

"The GCA's mandates apply to 'firearms,'" which the law "defines . . . broadly." *Id.* (citations omitted); *see also id.* (referencing the GCA's "generous definition" of "firearm"). As relevant here, the term "firearm" includes "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive [or] (B) the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3).

"Recent years, however, have witnessed profound changes in how guns are made and sold." *VanDerStok*, 604 U.S. at 463. "Today, companies are able to make and sell weapon parts kits that individuals can assemble into functional firearms in their own homes." *Id.* "Sales of these kits have

grown exponentially," and "criminals . . . find them attractive" largely because "[s]ome manufacturers and dealers take the position that weapon parts kits do not qualify as 'firearms' subject to the GCA" and assert that "they are free to sell their products without obtaining a federal license, conducting background checks, maintaining sales records, or marking components with serial numbers." *Id.* at 463-64 (citations omitted).

The upshot is that privately manufactured firearms have been increasingly used in crimes in many jurisdictions. *See id.* at 464. Although in 2017, "law-enforcement agencies submitted about 1,600 [privately manufactured firearms] to the federal government for tracing," "[b]y 2021, that number jumped to more than 19,000," and the government reports that "[e]fforts to trace the ownership of these weapons . . . have proven almost entirely futile." *Id.* (citations omitted).

## II.    Regulatory Background

"In 2022, [ATF] adopted a new rule designed to combat the proliferation" of privately manufactured firearms. *Id.* (citing Final Rule, Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652)(Apr. 26, 2022) ("Rule"). "In doing so, the agency invoked authority Congress granted it to prescribe 'rules and regulations as are necessary to carry out' the GCA." *Id.* (citing 18 U.S.C. § 926(a)). "Two provisions in the [Rule] are of special relevance here." *Id.*

### A.    Definition of "Firearm"

"The first addresses weapon parts kits directly." *Id.* "Recall that [18 U.S.C.] § 921(a)(3) extends the GCA's mandates to 'firearms,' a term subsection (A) defines as 'any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive.'" *Id.* The Rule "interpret[s] this language to embrace weapon parts kits 'that are designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive.'" *Id.* (quoting 27 C.F.R. § 478.11, defining "firearm"). Under the Rule, "[t]hose who make or sell kits that satisfy this test . . . must comply with the GCA by securing federal

3

licenses, conducting background checks, keeping sales records, and marking their products with serial numbers." *Id.*; *see* 27 C.F.R. § 478.11 (definition of "firearm"). "To decide whether a kit 'may readily be converted' into a working gun, ATF . . . will consider several factors, including the time, ease, expertise, and equipment required to complete a weapon, as well as the availability of other necessary parts." *VanDerStok*, 604 U.S. at 464-65 (citing 27 C.F.R. § 478.11, defining "readily").

### B.        Definition of "Frame or Receiver"

"The second relevant aspect of the [Rule] concerns a key building block of almost any firearm: its frame or receiver." *Id.* at 465. "Under subsection (B) of [18 U.S.C.] § 921(a)(3), 'the frame or receiver of any such weapon' covered by subsection (A) is itself treated as a 'firearm,'" meaning that "a frame or receiver is, even when sold separately, subject to the [GCA's] requirements." *Id.* "Presumably, Congress singled out these components for special treatment because of the special role they play in constructing firearms." *Id.* "As the government put it in 1968, a frame or receiver is '[t]hat part . . . which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel.'" *Id.* (citation omitted).

The Rule clarifies this definition by providing that "a 'frame or receiver' subject to subsection (B) of § 921(a)(3), should be understood to encompass as well 'a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver.'" *Id.* (quoting 27 C.F.R. § 478.12(c), defining "frame or receiver"). "Still, ATF stressed, the Act and [the Rule] have their limits." *Id.* "They do not apply until an object has 'reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon.'" *Id.* (quoting 27 C.F.R. § 478.12(c), defining "frame or receiver"). "So, for example, 'a forging, casting, printing, extrusion, unmachined body, or similar article' does not count." *Id.* (quoting 27 C.F.R. § 478.12(c), defining "frame or receiver") (footnote omitted).

4

### III.    The Present Case

Various manufacturers and dealers of kits to make privately manufactured firearms challenged the Rule.  They argued that because the GCA "cannot be fairly read to reach weapon parts kits or unfinished [firearm] frames or receivers," the Rule "purporting to extend the GCA's mandates to these products could not be enforced against anyone and had to be 'set aside' as impermissibly issued 'in excess of statutory . . . authority." *Id.* at 466 (citation omitted).  In July 2023, this Court held that ATF had acted in excess of its statutory authority by promulgating the Rule.  It entered summary judgment in favor of these manufacturers and dealers on their statutory claim and vacated the Rule. Mem. Op. & Order, ECF No. 227.

In August 2023, the Supreme Court granted the government's application for a stay of this Court's judgment pending appeal.  *See Garland v. VanDerStok*, 144 S. Ct. 44 (2023) (mem.).  The Supreme Court stayed this Court's vacatur in full and allowed the government to implement the Rule pending the disposition of its appeal to the Fifth Circuit and the disposition of any timely petition for a writ of certiorari.  *See id.*  This Court subsequently granted the motions of two plaintiffs (including DD) for injunctive relief pending appeal, and enjoined ATF from implementing the Rule against these plaintiffs.  Op. & Order, ECF No. 261.  In October 2023, the Supreme Court vacated this injunction, allowing the Rule to be implemented (including against DD).  *See Garland v. Blackhawk Mfg. Grp., Inc.*, 144 S. Ct. 338 (2023) (mem.).

The Fifth Circuit largely affirmed this Court's entry of summary judgment in favor of the manufacturers and dealers challenging the Rule.  *VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023). The Supreme Court reversed, holding that "[t]he GCA embraces, and thus permits ATF to regulate, some weapon parts kits and unfinished frames or receivers, including" examples specifically addressed in the Supreme Court's decision.  *VanDerStok*, 604 U.S. at 484.

5

On remand, all plaintiffs except for DD and SAF have dismissed their claims without prejudice. Stipulation of Dismissal, ECF No. 315. The government has advised that it is considering changes to the challenged Rule.

## ARGUMENT

### I. Plaintiffs Have Largely Failed to Meet the Jurisdictional Requirement of Article III Standing.

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 397 (2024) (citation omitted). The "core component of standing is an essential and unchanging part of" this limitation. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). At the summary judgment stage, a plaintiff cannot rest on "mere allegations, but must set forth by affidavit or other evidence specific facts" to demonstrate standing. *Id.* at 561 (citations and quotation marks omitted). Moreover, plaintiffs "must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (citation and quotation marks omitted).

Standing requires: (1) an injury in fact, (2) a sufficient "causal connection between the injury and the conduct complained of" and (3) a likelihood that the injury will be redressed by a favorable decision. *Morgan v. Huntington Ingalls, Inc.*, 879 F.3d 602, 606 (5th Cir. 2018) (quoting *Lujan*, 504 U.S. at 560-61). The injury must be concrete and particularized, not merely "conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). A "'threatened injury must be *certainly impending* to constitute [an] injury in fact,' and . . . '[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted); *see also Friends of St. Frances Xavier Cabrini Church v. FEMA*, 658 F.3d 460, 466 (5th Cir. 2011) (a "plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official

6

conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical") (citation omitted).

Plaintiffs have largely failed to show that they have standing to sue. Plaintiff SAF has not demonstrated that it has either associational or organizational standing. Plaintiff DD has only established a certainly-impending injury with respect to four items as to which it alleges the enforcement of the Rule is causing it immediate, non-conjectural injury.

### A.   SAF Lacks Standing to Sue.

#### 1.   SAF Has Not Shown Associational Standing.

Plaintiff SAF purports to bring this action "on behalf of its members" as well as itself. DD & SAF's Complaint ¶ 13, ECF No. 143 ("Compl."). However, "[w]hen an organization seeks relief on behalf of its members, it must establish associational standing." *McCutchan v. Nicholson*, 790 F. Supp. 3d 506, 519 (N.D. Tex. 2025) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)), *aff'd*, No. 25-10890, 2026 WL 938222 (5th Cir. Apr. 7, 2026). "The associational standing doctrine permits a traditional membership organization 'to invoke the court's remedial powers on behalf of its members.'" *Id.* (citing *Warth v. Seldin*, 422 U.S. 490, 515 (1975)). "To establish associational standing, the organization must satisfy a three-prong test by showing that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023)).

Thus, to establish associational standing, an organization must, *inter alia*, "identify a specific member who would otherwise have standing to sue in his own right." *Deep S. Ctr. for Env't Just. v. EPA*, 138 F.4th 310, 320 (5th Cir. 2025). However, SAF has not identified any member with standing to sue, much less "set forth by affidavit or other evidence specific facts" demonstrating that an

identified member has standing. *Lujan*, 504 U.S. at 561 (citation omitted). Its failure to do so means that it cannot assert associational standing.[2]

### 2.      SAF Has Not Shown Organizational Standing.

Plaintiff SAF also purports to "bring[] this action on behalf of itself." Compl. ¶ 13. But SAF has not demonstrated that the organization itself has suffered any injury. The fact that SAF might be "ideologically opposed to" the Rule "does not demonstrate standing." *United States v. Texas*, 173 F.4th 659, 665 (5th Cir. 2026) (en banc); *see also All. for Hippocratic Med.*, 602 U.S. at 394 ("[A]n organization may not establish standing simply based on the intensity of the litigant's interest because of strong opposition to the government's conduct.") (citation omitted). Nor does "the fervor of its advocacy" give rise to standing. *Texas*, 173 F.4th at 665. And the Supreme Court has recently clarified that an organization may not "spend its way into standing" or "manufacture its own standing" by choosing to "divert its resources in response to a defendant's actions." *All. for Hippocratic Med.*, 602 U.S. at 394-95; *see also Texas*, 173 F.4th at 664 (rejecting organization's contentions that enforcement of challenged law would "frustrate their missions" and "require them to restructure their services" "causing them to divert resources" as insufficient to establish organizational standing). At best, SAF alleges "simply a setback to the organization's abstract social interests" that does not satisfy the requirements of organizational standing. *All. for Hippocratic Med.*, 602 U.S. at 394 (citation omitted).

### B.      DD Largely Fails to Establish Standing.

"Without concrete plans or any objective evidence to demonstrate a serious interest in violating [the Rule, a] plaintiff suffer[s] no threat of *imminent* injury." *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) (citation omitted). Applying this standard, Defendants acknowledge that

---

[2] Defendants respectfully acknowledge that this Court previously rejected Defendants' argument that SAF lacked associational standing because it was not a traditional membership organization. Mem. Op. & Order, ECF No. 227, at 21-22. Defendants do not renew that argument here.

DD has shown standing only with respect to four specifically identified items that it has established it has previously sold and has concrete plans to sell, and that the Rule *might* regulate.  *See* Decl. of Jeremy S.B. Newman, Ex. 1, Appendix ("App.") 1-4 (identifying these four items).[3]  Therefore, as explained below, *see infra* III.C, to the extent that the Court might determine that DD is entitled to any form of relief—which it should not—such relief should be limited to a ruling concerning only these four items.[4]  *See Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) ("plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought") (citation omitted).

No declarations submitted by DD establish otherwise.  The five-page declaration previously submitted by its co-founder, Cody Wilson, alleges that DD sells "unfinished receivers, unfinished frames, and frame and receiver parts kits that (1) are not Gun Control Act 'firearms' under the Gun Control Act itself, and (2) are not Gun Control Act 'firearms' under administrative actions taken prior to August 2022, but that (3) are defined for the first time ever as Gun Control Act 'firearms' by the new Final Rule."  Decl. of Cody Wilson ¶ 11, ECF No. 164-1 ("Wilson Decl."); *see also id.* ¶ 4 (DD sells products "marketed colloquially as '80 Percent Lowers'").  But the assertion that DD's products

---

[3] The items are (1) GO Grip Module (as sold by DD on ghostgunner.net); (2) G80 Build Bundle (as sold by DD on G80.com); (3) G80 Unfinished Receiver (as sold by DD on G80.com); G80 Grip Module (as sold by DD on G80.com).

[4] DD has previously argued that it also has sold and has concrete plans to sell three other items (namely, the Polymer80 80% Frame; M1911 80% Frame:45ACP; and M1911 80% Frame:9mm/10mm).  *See* DD Mot. for Prelim. Inj. at 7, ECF No. 294.  However, the Supreme Court in *VanDerStok* held that the Polymer80 80% Frame is a "frame" under 18 U.S.C. § 921(a)(3)(B), and therefore is also a "firearm" under 18 U.S.C. § 921(a)(3).  *See VanDerStok*, 604 U.S. at 477-81.  The Supreme Court deemed it clear from examining side-by-side photographs of a complete frame and the Polymer80 80% frame that the latter product was "a firearm 'frame,' even though a little work is required to complete it," remarking: "Just look again at the second photo [of the Polymer80 80% Frame].  What else would you call it?"  *Id.* at 479.  That analysis applies equally to the M1911 80% Frame:45ACP and the M191180% Frame:9mm/10mm/.38 Super/.40 S&W, which are materially indistinguishable from the Polymer80 80% Frame.  *See* Mot. at 7; *see also VanDerStok*, 604 U.S. at 481 (holding that "a product like Polymer80's qualifies as a 'frame'").

9

are "defined for the first time ever as Gun Control Act 'firearms' by the New Final Rule" is a legal conclusion that is unsupported by DD's factual averments.

DD's vague description of its products as "unfinished receivers, unfinished frames, and frame and receiver parts kits" that are "marketed colloquially as '80 Percent Lowers,'" *id.* ¶¶ 4, 11, does not provide sufficient information for Defendants or this Court to determine whether its products would be considered firearms under the Rule.  Under the Rule, partially-complete frames and receivers are considered firearms only if they are "designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver," 87 Fed. Reg. at 24,739 (27 C.F.R. § 478.12(c)), an inquiry that depends on the application of eight factors, *id.* at 24,735 (27 C.F.R. § 478.11).  The phrase "80 Percent" is a marketing term used by many firearms industry participants to describe a wide variety of partially complete frames and receivers, but it has no meaning in firearms law, and use of the term in no way signifies whether a product is classified as a firearm under the Rule.  *See id.* at 24,663 n.47.  DD points to an open letter issued by ATF concluding that certain partially complete frames marketed as 80 percent frames were firearms because they could readily be completed into functional frames.  *See* Wilson Decl. at 4.[5]  But ATF has also issued another open letter concluding that other products marketed as 80 percent receivers were not firearms under the Rule because they could not readily be completed into a functional state.  *See* App. 15-21.  These open letters underscore that a vague description of products as unfinished (or 80 percent) frames or receivers is insufficient to allow a determination of whether a particular product would qualify as a firearm under the Rule.[6]

---

[5] For context, Defendants attach the entire open letter at App. 5-14. The letter shows that ATF concluded that the products at issue were firearms after analyzing their specific features in detail and explaining how they could be quickly and easily completed into functional frames. *See* App. 7-13.

[6] DD has refused to provide ATF its products for classification, which would clarify whether the Rule regulates those products. *See infra* II.A.1.

The vagueness of the Wilson Declaration may be explained by the fact that it has repeatedly stated that the Rule would help its business.  DD markets the "0% receiver," which it claims can be used to create AR-15 receiver parts from raw blocks of aluminum using a computer numerical control (CNC) milling machine sold by DD called the Ghost Gunner 3. Ghostgunner.net, AR-00: 0% Receiver.[7]  In an interview conducted after the Rule was proposed but before the final Rule was announced, the interviewer noted that "Wilson said that Defense Distributed is the only DIY gun company pivoting in the face of this new regulation.  So the real impact of the law will be to drive out his competitors." ReasonTV, *Cody Wilson Thwarts Another Attempt to Stop Ghost Guns*, at 2:31 (YouTube, Jan. 12, 2022).[8]  Mr. Wilson then stated: "With this rule that Biden is pursuing, he's giving us, the nation's premier ghost gun company, I would say, a monopoly of the market." *Id.* at 2:41.

After the final Rule was announced, an industry publication reported that "[i]n response to the announcement of the Biden Admin's proposed rule change, DD decided to shift its focus to the creation of 0% receivers," and "[t]his rule change has caused a surge in demand for Defense Distributed's Ghost Gunner 3."  TMGN, *Biden's Ghost Gun Rule is Dead on Arrival Thanks to the 0% Receiver*, (Apr. 12, 2022).[9]  The publication quotes Mr. Wilson as saying: "Ghost Gunner anticipated this maneuver and is now shipping Zero Percent receivers." *Id.*[10]

Nor may DD manufacture standing via previously-filed declarations from a bank and an insurance agency.  *See* Decls. of Grant Williams, Marc Cisneros, ECF Nos. 301-1, 301-2.  Those declarations are evidence only of discretionary policy decisions made by third parties that are not

---

[7] *Available at* https://ghostgunner.net/zero-percent/
[8] *Available at* https://www.youtube.com/watch?v=bZRugDpYBuc
[9] *Available at* https://themachinegunnest.com/bidens-ghost-gun-rule-is-dead-on-arrival-thanks-to-the-0-receiver/
[10] Moreover, in 2025, DD reported $2,000,000 in annual revenue for the preceding three years, despite the Rule having been in effect since late 2023.  *See* Dun & Bradstreet, DD; D&B Duns Market Identifiers Plus (US) (Nov. 30, 2025), ECF No. 307-1.

traceable to any requirement of the Rule and cannot form the basis of any claim by DD.  The Rule does not apply to banks or insurance agencies, much less require them to take any specified action. Therefore, that (1) one bank made a discretionary policy decision not to provide banking services to DD, and (2) an unknown number of unidentified insurers have made discretionary decisions not to provide some unspecified type of insurance to unknown entities (not necessarily DD) are not "fairly traceable to the challenged action of [Defendants]" but "the result of the independent action of some third part[ies] not before the court." *Lujan*, 504 U.S. at 560 (citation omitted).  DD has not established traceability because "a third party's 'legitimate discretion' breaks the chain of constitutional causation." *McRorey v. Garland*, 99 F.4th 831, 839 (5th Cir. 2024) (quoting *Turaani v. Wray*, 988 F.3d 313, 317 (6th Cir. 2021)).

In *McRorey*, the plaintiffs alleged standing to challenge a statute expanding background checks for 18-to-20 year olds.  They claimed that even though under federal law, the maximum duration a licensed firearm seller needed to wait while a background check remained pending was 10 business days, "many waits extend much longer than 10 business days." *Id.*  The Fifth Circuit held that the plaintiffs lacked standing because they had not "pointed to any provision of the law that requires dealers to wait more than 10 business days," and that "dealers choose to do so is a result of their own policy." *Id.*  So too here, where DD has not pointed to any provision of the Rule requiring any action by bankers or insurers.  *See also Turaani*, 988 F.3d at 316-17 (plaintiff lacked standing to sue FBI despite the fact that after an FBI agent expressed concerns about plaintiff to a gun dealer, the dealer refused to sell plaintiff a firearm; "unless the [government's] actions had a 'determinative or coercive effect'" upon the third party, the claimant's quarrel is with the third party, not the [government]" (citations omitted)); *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 456-57 (6th Cir. 2017) (no standing despite allegations that because of certain regulations applied to plaintiffs as U.S. taxpayers having foreign accounts, foreign financial institutions had refused to do business with them; the institutions were not

required by the regulations to refuse the plaintiffs' business but had instead made a "voluntary choice" to do so); *Ammex, Inc. v. United States*, 367 F.3d 530, 534 (6th Cir. 2004) (operator of duty-free store lacked standing to sue government based on allegations that its suppliers had increased prices because of government-imposed excise tax where "[i]t was in the discretion" of those suppliers whether to charge the operator for the tax amount, so that "any alleged injury suffered by Plaintiff in the form of increased fuel costs was not occasioned by the Government").

Nor is it "likely, as opposed to merely speculative," that DD's alleged injury would be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560 (citation omitted). Neither the bank identified by DD nor the unknown, unidentified insurers are parties. Regardless of any decision by this Court, they remain completely free to accept or deny DD's business. And because DD remains free to obtain banking services or insurance coverage from any other banks or insurers it wishes, it has not shown that it is "*immediately* in danger of sustaining some *direct* injury as the result of" the Rule. *Friends of St. Frances Xavier Cabrini Church*, 658 F.3d at 466 (emphasis added) (citation omitted).

## II.     The Rule Is Lawful.

### A.     Plaintiffs' Constitutional Claims Are Without Merit.

#### 1.     The Rule Is Not Void for Vagueness.

Plaintiffs' claims that the Rule is unconstitutionally vague fail as a matter of law. Under the Fifth Amendment's Due Process Clause, a criminal or quasi-criminal law is unconstitutionally vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *accord Munn v. City of Ocean Springs*, 763 F.3d 437, 439 (5th Cir. 2014). The Rule easily satisfies this standard.

Initially, Plaintiffs lack standing to assert their vagueness claim. As explained above, *see supra* I.A, SAF lacks standing altogether. Moreover, DD lacks standing to complain of any purported

13

ambiguity in the Rule as applied to its products when it has refused to have those products classified by ATF, which would have resolved any potential confusion.

"[S]elf-inflicted harm doesn't satisfy the basic requirements for standing.  Such harm does not amount to an 'injury' cognizable under Article III."  *Young Conservatives of Texas Found. v. Smatresk*, 73 F.4th 304, 309 (5th Cir. 2023) (quoting *Nat'l Fam. Plan. & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006)).  In *National Family Planning & Reproductive Health Association*, an organizational plaintiff sought to enjoin enforcement of a federal statute preventing plaintiff and similar recipients of federal grant funds from discriminating against entities that refused to provide abortions.  468 F.3d at 827-28.  The organization alleged that the statute was impermissibly vague because its members did not know how to abide by the non-discrimination provision and were thus in jeopardy of losing federal funding.  *Id.* at 828.  The Court of Appeals concluded that the organization lacked standing because any alleged harm was "self-inflicted," given that the organization "ha[d] within its grasp an easy means for alleviating the alleged uncertainty," namely, "seek[ing] clarification from the agency" enforcing the statute.  *Id.* at 831.  And "[a]s the association ha[d] *chosen* to remain in the lurch, it [could not] demonstrate an injury sufficient to confer standing."  *Id.*; *accord Leander Indep. Sch. Dist. v. U.S. Dep't of Interior*, No. 1:22-CV-310-RP, 2022 WL 19300727, at *4 (W.D. Tex. Dec. 21, 2022).

As in *National Family Planning & Reproductive Health Association*, here, DD "has within its grasp an easy means for alleviating [its] alleged uncertainty" by "seek[ing] clarification from" ATF.  468 F.3d at 831.  The Rule provides for an administrative process by which regulated entities may obtain classifications as to whether the products they plan to sell fall within the Rule's scope.  *See* 27 C.F.R. § 479.102(c) (ATF "may issue a determination (classification) to a person whether an item, including a kit, is a firearm as defined in this part upon receipt of a written request or form prescribed by" the agency).  "[L]icensing . . . requirements," such as the Rule, "are afforded considerable deference in the vagueness analysis," in part "because the regulated party may 'have the ability to clarify the meaning

of the regulation[s] . . . by resort to an administrative process.'" *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122 (5th Cir. 1991) (citation omitted). The Rule provides DD precisely such an opportunity by inviting requests for voluntary classifications as to whether the four specifically-identified items that it wishes to sell are "firearms" within the meaning of the GCA and its regulations. Indeed, ATF expressly offered to provide DD with prompt classifications as to whether the four items were "firearms" within the Rule's ambit and requested a physical sample of the items for review. App. 1-4. But DD refused to avail itself of the opportunity to resolve any uncertainty whether the Rule did or did not apply to these items. Having "*chosen* to remain in the lurch" by deciding not to resolve any purported uncertainty, DD "cannot demonstrate an injury sufficient to confer standing." *Nat'l Family Planning*, 468 F.3d at 831.

Even setting aside the fact that Plaintiffs lack standing to assert their vagueness claim, that claim is meritless. Plaintiffs misplace their reliance on a single-Judge concurring opinion in the Fifth Circuit's now-reversed *VanDerStok* decision. *See* DD and SAF's Br. in Supp. of Mot. for Summ. J. at 20, ECF No. 317 ("Pls.' MSJ"). Had that opinion been persuasive to the Supreme Court, it could have upheld the Fifth Circuit's decision on the grounds articulated in that opinion, as DD urged the Supreme Court to do. *See* Br. of DD at 18-25, *Bondi v. VanDerStok*, No. 23-10718, 2024 WL 1098302, at *18-25 (Mar. 8, 2024). However, although these vagueness arguments were clearly presented to the Supreme Court, it instead chose to reverse the Fifth Circuit.

Plaintiffs contend that the Rule is unconstitutionally vague for three reasons, none of which is persuasive. Pls.' MSJ at 17-19. First, Plaintiffs incorrectly argue that the Rule is unconstitutionally vague in providing that a partially complete, disassembled, or nonfunctional frame or receiver is a firearm within the meaning of the GCA if it "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). But like countless other laws, this provision covering parts kits and frames and receivers that can readily be completed

15

or made functional merely "call[s] for the application of a qualitative standard" to "real-world" facts. *Johnson v. United States*, 576 U.S. 591, 604 (2015). The Supreme Court had no problem deciding that certain partially-complete frames and receivers were capable of being "readily" converted to function as frames and receivers. *See VanDerStok*, 604 U.S. at 480 ("Imagine a handgun that is otherwise ready to shoot, but contains Polymer80's incomplete frame. An ordinary person, using ordinary tools, can finish the frame in minutes. . . . [T]hat gun is a weapon capable of ready conversion into a working firearm under [18 U.S.C. § 921(a)(3)(A)].") (citation omitted); *cf. id.* at 472 ("[A] person without any specialized knowledge can convert a starter gun into a working firearm using everyday tools in less than an hour. And measured against that yardstick, [Polymer80's] 'Buy Build Shoot' kit can be 'readily converted' into a firearm too, for it requires no more time, effort, expertise, or specialized tools to complete.") (citation omitted).

"Readily" is a term and concept that Congress has used in a number of federal firearms laws, including the GCA itself.[11] Notably, Plaintiffs do not suggest that the GCA itself is unconstitutionally vague. To the contrary, courts have rejected vagueness challenges to the GCA's inclusion of products that "may readily be converted" into functional firearms. 18 U.S.C. § 921(a)(3)(A); *see, e.g.*, *United States v. Quiroz*, 449 F.2d 583, 585 (9th Cir. 1971); *United States v. 16,179 Molso Italian .22 Caliber Winlee*

---

[11] *See, e.g.*, 18 U.S.C. § 921(a)(3) (defining "firearm" to include "any weapon . . . which . . . may *readily be converted* to expel a projectile by the action of an explosive"); *see also* 26 U.S.C. § 5845(b) (defining "machinegun" as "any weapon which shoots, is designed to shoot, or can be *readily restored* to shoot, automatically…"); *id.* § 5845(c) (defining "rifle" as including any weapon within the prescribed definition "which may be *readily restored to fire* a fixed cartridge"); id. § 5845(d) (defining "shotgun" to include any weapon within the prescribed definition "which may be *readily restored to fire* a fixed shotgun shell"); *id.* § 5845(f) (defining "destructive device" to include "any combination of parts either designed or intended for use in converting any device into a destructive device . . . and from which a destructive device may be *readily assembled*"); *id.* § 5845(h) (defining "unserviceable firearm" to mean "a firearm which is incapable of discharging a shot by means of an explosive and incapable of being *readily restored* to a firing condition") (emphases added).

*Derringer Convertible Starter Guns*, 443 F.2d 463, 464 (2d Cir. 1971).[12]  The Rule simply provides an uncontroversial definition of "readily" and lists the factors that courts have long used in applying that term in the firearms context—elaborations that provide *more* clarity about the Act's meaning, not less. Courts likewise have rejected vagueness challenges to the term "readily" in the context of criminal statutes other than the GCA and NFA.  *See, e.g.*, *Phelps v. Budge*, 188 F. App'x 616, 619 (9th Cir. 2006) (rejecting vagueness challenge to the term "readily capable of causing substantial bodily harm or death," as used in a criminal statute); *United States v. Felsen*, 648 F.2d 681, 686-87 (10th Cir. 1981) (same, as to "readily attachable equipment items"); *Anderson v. Williams*, No. 2:10-CV-01916-KJD, 2011 WL 2580665, at *4 (D. Nev. June 27, 2011) (same, as to "readily identifiable vehicle").

Moreover, although the Fifth Circuit has not considered this precise question, it has rejected a void-for-vagueness challenge to the closely related statutory term "any combination of parts designed and intended for use in converting a weapon into a machine gun."  *United States v. Campbell*, 427 F.2d 892, 893 (5th Cir. 1970) (per curiam) (citation omitted).  In determining whether a combination of parts was designed and intended for use in converting a weapon into a machine gun, a court would likely need to consider similar factors as the Rule prescribes for determining whether a non-functioning frame or receiver may be readily converted to function, such as the "time," "ease," "expertise," "equipment," "parts availability," "expense," "scope," and "feasibility" of the conversion.

---

[12] *See also, e.g.*, *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 266 (2d Cir. 2015) (rejecting a void-for-vagueness challenge to the term "can be readily restored or converted" in New York and Connecticut statutes); *United States v. Kelly*, 276 F. App'x 261, 267 (4th Cir. 2007) (same, as to 26 U.S.C. § 5845(b), which includes the term "can be readily restored"); *United States v. Kent*, 175 F.3d 870, 874 (11th Cir. 1999) (same, as to 26 U.S.C. § 5861(d), as applied to an individual who possessed a short-barrel rifle that was disassembled at the time of his arrest but could be "readily restored to fire," 26 U.S.C. § 5845(c)-(d)); *United States v. Drasen*, 845 F.2d 731, 737-38 (7th Cir. 1988) (same, as to the GCA's "statutory framework . . . as applied to parts kits"; *United States v. Wick*, No. CR 15-30-M-DLC, 2016 WL 10612608, at *3-4 (D. Mont. Mar. 11, 2016) (same, as to the term "can be readily restored" in the NFA); *United States v. M-K Specialties Model M-14 Machinegun*, 424 F. Supp. 2d 862, 872 (N.D. W. Va. 2006) (same).

17

27 C.F.R. § 478.11 (definition of "readily") (capitalization altered); *cf. Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 500-01 (1982) (statutory term "designed . . . for use" calls for an inquiry into the product's "objective features").

Plaintiffs sidestep the fact that the Rule has identified eight non-exhaustive factors relevant to the application of its "readily" standard. As common sense dictates and courts have confirmed, specifying factors relevant to application of a statutory or regulatory standard mitigates, rather than exacerbates, any vagueness concerns. *See, e.g.*, *Prime Healthcare Servs., Inc. v. Harris*, 216 F. Supp. 3d 1096, 1125 (S.D. Cal. 2016) (holding that a statute did not confer "boundless discretion" because it specified nine non-exhaustive factors to guide the ultimate "public interest" inquiry); *Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield*, 853 F. Supp. 2d 214, 235 (D. Conn. 2012) (holding that an ordinance was not void for vagueness in part because it set forth factors to consider in conducting the ultimate "appropriateness" inquiry, which, although "subjective in nature," were "sufficiently tied to objective . . . standards . . . to provide the required guidance . . . in enforcing the law"), *aff'd in relevant part, vacated in part, remanded sub nom. Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183 (2d Cir. 2014).[13]

---

[13] Plaintiffs misplace their reliance on *Tripoli Rocketry v. ATF*, 437 F.3d 75 (D.C. Cir. 2006), which did not involve a claim of constitutional vagueness but an APA arbitrary-and-capricious claim. In any event, the "fatal shortcoming" in *Tripoli Rocketry* was that the agency had "articulated no standard whatsoever" for its decision, *id.* at 81, 84, which is manifestly not the situation presented here. Nor, contrary to Plaintiffs, does *United States v. Lim*, 444 F.3d 910 (7th Cir. 2006), require that a law include "specific measurements" to avoid constitutional vagueness. Pls.' MSJ at 18. *Lim* specifically noted that such precision is not required, citing *United States v. Powell*, 423 U.S. 87 (1975), which had upheld against a vagueness challenge a statute prohibiting the mailing of firearms "capable of being concealed on the person." *Lim*, 444 F.3d at 915-16 (citation omitted). *Powell* "acknowledged that Congress might have drafted the statute in more specific terms, as by delimiting the size of the firearms that could not be mailed," "[b]ut the fact that Congress could have employed clearer and more precise language equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted was unconstitutionally vague." *Id.* at 916 (citation omitted). So too here, the Rule did not require additional specificity, especially given the fact that "it is not unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take risk that he may cross the line." *Id.* (alteration omitted) (quoting *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952)).

The Due Process Clause does not require "perfect clarity and precise guidance." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989); *see also Sessions v. Dimaya*, 584 U.S. 148, 159 (2018) (reaffirming that "[m]any perfectly constitutional statutes use imprecise terms"). Accordingly, the Supreme Court and the Fifth Circuit have rejected vagueness challenges to criminal laws imposing standards as open-ended as: "near" a courthouse, *Cox v. Louisiana*, 379 U.S. 559, 568 (1965); "immoral purposes," *United States v. Clark*, 582 F.3d 607, 612 (5th Cir. 2009); "unreasonably low prices," *United States v. Nat'l Dairy Prod. Corp.*, 372 U.S. 29, 31-33 (1963); and "unreasonable noise," including noise "which, under the circumstances of time, place, and manner in which it is produced . . . annoys . . . a reasonable person of normal sensitivities," *Munn*, 763 F.3d at 438-39 (emphasis and citation omitted). The Rule's "readily" standard was understandable enough to be applied by the Supreme Court in *VanDerStok* and is at least as precise with respect to the conduct that it proscribes as the standards upheld in *Cox*, *Clark*, *National Dairy Products Corp.*, and *Munn*.

Second, Plaintiffs argue that the Rule is impermissibly vague to the extent that its definition of "frame" and "receiver" excludes "a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." 27 C.F.R. § 478.12(c). But DD does not contend that the classification of any of the four items that form the subject of its motion turns on whether these items are an "unformed block of metal, liquid polymer, or other raw material" that has not yet reached a stage of manufacture to make it identifiable as a frame or receiver. *Id.* Absent such a contention, it has no standing to raise such a claim (and as previously explained, SAF lacks standing to assert any of its claims). This argument is thus irrelevant to DD's as-applied vagueness claim.[14]

---

[14] In any event, this provision was included at the request of commenters in the firearms industry to provide the regulated community with greater clarity about parts that are not covered by the Rule,

Third, Plaintiffs challenge as vague the Rule's provision that "[w]hen issuing a classification," ATF "may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit." *Id.* Contrary to DD's claim, the plain language of this provision sufficiently describes "exactly what set of materials" are "relevant to this inquiry." Pls.' MSJ at 19. When issuing a classification regarding an item or kit, ATF simply asks: When a seller sells this item or kit to a buyer, which materials are included? That is, does the item or kit as sold to the buyer include such items as jigs, molds, equipment, tools, instructions, guides, or marketing materials or not? The Rule thus provides "a person of ordinary intelligence [with] fair notice" of what ATF considers when making its classification. *Munn*, 763 F.3d at 439.

Plaintiffs' attempts to analogize the Rule to the residual clause of the Armed Career Criminal Act held unconstitutional in *Johnson v. United States*, 576 U.S. 591 (2015), are fundamentally misguided. The unique problem in *Johnson* was the assessment of whether a particular felony "involves conduct that presents a serious potential risk of physical injury to another"; that statutory provision "tie[d] the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." *Id.* at 596-97 (citation omitted). By contrast, analyzing whether an item may be readily converted to function as a firearm relies on real-world facts: *e.g.*, what tools are required, how much the conversion costs, how long it takes to complete the conversion. *Johnson* also invalidated this statutory provision after "[n]ine years' experience trying to derive meaning from the residual clause,"

---

such as unfinished frame or receiver blanks. ATF explained that this exclusion makes clear that "[c]ompanies that sell or distribute only unfinished frame or receiver . . . blanks" of the sort typically purchased in bulk by commercial firearm manufacturers "are *not* required to be licensed or to mark those articles" with serial numbers. 87 Fed. Reg. at 24,700 (emphasis added). DD does not allege that it sells or distributes only such frame or receiver blanks typically purchased in bulk by commercial firearm manufacturers.

20

"repeated failures to craft a principled and objective standard," and years of "pervasive disagreement" in courts of appeals about how to interpret the clause. *Id.* at 598-601. No such record of unworkability is presented here; in fact, the Supreme Court had no problem applying the term "readily" as used in the Rule, as explained above. And *Johnson* cast no "doubt" on "the constitutionality of laws that call for the application of a qualitative standard . . . to real-world conduct," as the Rule does, given that "the law is full of instances where a man's fate depends on his estimating rightly some matter of degree." *Id.* at 604 (citation omitted).[15]

## 2.    The Rule Is Consistent With the Second Amendment.

Plaintiffs' Second Amendment claim is also meritless. Pls.' MSJ at 29-34. The Second Amendment declares that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "'Like most rights," however, "the right secured by the Second Amendment is not unlimited." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 21 (2022) (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with *the principles* that underpin our regulatory tradition." *United States v. Betancourt,* 139 F.4th 480, 484 (5th Cir. 2025) (quoting *United States v. Rahimi*, 602 U.S. 680, 692 (2024)) (emphasis in *Betancourt*), *cert. denied*, 223 L. Ed. 2d 561 (2026). That inquiry does not render constitutional only laws that mirror historical laws. *Bruen*, 597 U.S. at 30; *see also Rahimi*, 602 U.S. at 691-92 ("[T]he Second Amendment permits more than just those regulations identical to ones that

---

[15] Plaintiffs ask: "Why does ATF now posit that the Rule covers 80% pistol frames but not 80% rifle lowers?" Pls.' MSJ at 20. As ATF has explained, "[t]he Federal firearms statutes and regulations," including the Rule, "do not employ terms such as "80%," "80% finished," or "80% complete;" rather, "[t]hese are merely terms used by some to market these items." App. 7; *see also* App. 17 (same). However, to answer Plaintiffs' question directly, the reason is that these two products are quite different. A person may complete an unfinished pistol frame of the kind at issue here by merely drilling some holes and removing a blocking tab, a process that takes a few minutes. The completion of an AR-type rifle lower receiver, by contrast, requires carving substantial quantities of metal out of a casting, a process that is both time-consuming and requires expertise to be performed correctly.

could be found in 1791."). Rather, courts will often have to "reason[] by analogy" to conduct the historical inquiry. *Bruen*, 597 U.S. at 29. In so doing, the courts should ascertain "whether the new law is 'relevantly similar' to laws that the tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). "[T]he Government need not identify a Founding-era 'dead ringer' for, or a 'historical twin' of, a modern regulation." *Betancourt*, 139 F.4th at 484 (quoting *Rahimi*, 602 U.S. at 692). Rather, it suffices that the government "demonstrate the existence of a Founding-era legal tradition that was applied in a way 'relevantly similar' to the application today of" the Rule to Plaintiffs. *Id.* (quoting *Bruen*, 597 U.S. at 29).

*Heller* "made clear that 'nothing in [the Court's] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . or laws imposing conditions and qualifications on the commercial sale of arms.'" *McRorey v. Garland*, No. 7:23-CV-00047-O, 2023 WL 5200670, at *4 (N.D. Tex. Aug. 14, 2023) (quoting *Heller*, 554 U.S. at 626-27) (alteration in original), *aff'd*, 99 F.4th 831 (5th Cir. 2024). "The Supreme Court emphasized that such regulations are 'presumptively lawful.'" *Id.* (quoting *Heller*, 554 U.S. at 627 n.26); *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (similar); *McRorey*, 99 F.4th at 836 (observing that "*Bruen* did nothing to disturb" *Heller*'s description of "conditions and qualifications on the commercial sale of arms" as "presumptively lawful") (citation omitted); *Rahimi*, 602 U.S. at 699 (quoting *Heller*'s "presumptively lawful" language).

The provisions of the Rule challenged here regulate Second Amendment rights in a manner "consistent with the principles that underpin our regulatory tradition [of firearms]." *Rahimi*, 602 U.S. at 692 (citation omitted). These provisions do not forbid the sale (or purchase) of any firearm, weapon parts kit, or other item. Nor do they impose any of the GCA's requirements on an individual making his or her own firearm. Instead, the Rule clarifies that those engaged in the manufacturing of certain items—like ready-to-assemble kits—are "firearms" and so must be sold in accordance with the GCA's

22

licensing, recordkeeping, and background check requirements.  Like the law upheld by the Fifth Circuit

in *McRorey*, the background-check provision here ensures that sellers of weapon parts kits and firearm

frames and receivers that are readily convertible to operable firearms "do not transfer" them to

"individuals . . . bar[red] . . . from possessing a firearm."  *McRorey*, 2023 WL 5200670, at *5; *see also*

*McRorey*, 99 F.4th at 837 ("*Bruen* 'should not be interpreted to suggest the unconstitutionality of

regimes, which often require applicants to undergo a background check' because such checks 'are

designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible

citizens'") (quoting *Bruen*, 597 U.S. at 38 n.9).  And the Rule's licensing, recordkeeping, and

serialization requirements for dealers and manufacturers "aim to assist law enforcement authorities in

investigating serious crimes . . . by permitting them to determine where, by whom, or when a firearm

was manufactured and to whom it was sold or otherwise transferred."  *VanDerStok*, 604 U.S. at 462

(citations omitted).  Any resulting burden on the purchasers of these firearms is minimal and no more

than that imposed on purchasers of an already-assembled firearm.

The historical tradition of government regulation to ensure only law-abiding citizens acquire

firearms dates back to pre-colonial English practice and extends through the colonial period and

beyond the Founding.  *United States v. Libertad*, 681 F. Supp. 3d 102, 114-15 (S.D.N.Y. 2023) (citing

*Kanter v. Barr*, 919 F.3d 437, 457-58 (7th Cir. 2019) (Barrett, J., dissenting)).  Various levels of

government have long preserved the peace and welfare of the community by exercising sovereign

power to regulate the commercial sale of products.  *See* William J. Novak, THE PEOPLE'S WELFARE:

LAW AND REGULATION IN NINETEENTH CENTURY AMERICA 84 (1996), App. 23 ("[E]arly Americans

understood the economy as simply another part of their well-regulated society, intertwined with public

safety, morals, health, and welfare and subject to the same kinds of legal controls.").  Firearms were

no exception.  "[C]olonial governments substantially controlled the firearms trade."  *Teixeira v. Cnty.*

*of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017); *see also id.* at 684 ("Neither of [Blackstone's or Tucker's]

23

authoritative historic accounts states or implies that the English Bill of Rights encompassed an independent right to engage in firearms commerce."); *see generally Bruen*, 597 U.S. at 20 (noting significance of "American colonial views leading up to the founding").

The challenged licensing, recordkeeping, and serialization requirements are also consistent with historical regulation of firearms. At least two states in the early republic required gunbarrels to be proved and marked and prohibited the obliteration of the proof marks. In 1805, Massachusetts adopted a law for the appointment of "provers of fire arms" to "prove all musket barrels and pistol barrels" presented to them in exchange for a set fee. 3 LAWS OF THE COMMONWEALTH OF MASSACHUSETTS FROM NOVEMBER 28, 1780 TO FEBRUARY 28, 1807, at 259 (1807), App. 24. The law was adopted to prevent firearms from being "introduced into use which are unsafe, and thereby the lives of the citizens be exposed." *Id.* Under this law, the prover was required to "stamp" the barrel "within one and an half inches of the breech" with the prover's initials, the letters "P." and "M.," and the year—all in "letters and figures . . . so deeply impressed . . . as that the same cannot be erased or disfigured." *Id.* at 260, App. 25. The act imposed a fine on any person who manufactured within the Commonwealth "any musket or pistol, without having the barrels proved and stamped as aforesaid." *Id.* It also imposed a fine on any person who "shall falsely forge or alter the stamp of any prover of firearms . . . impressed on any musket or pistol barrel." *Id.* at 261, App. 26.

Similarly, Maine in 1821 passed a law requiring the appointment of "suitable persons, to be provers of the barrels of all new, or unused firearms." 1 LAWS OF THE STATE OF MAINE, at 546 (1830), App. 27. Each prover was required (in exchange for compensation) to "prove and try the strength of the barrels of all firearms which shall be offered [to] him for that purpose, in such manner as to satisfy himself of the strength of the same," to "in a permanent manner, mark and number every barrel by him so proved," and to provide a certificate attesting to the proof. *Id.* The statute imposed a ten-dollar fine on any person who "shall sell or offer for sale within this State, any new, or unused musket,

24

rifle or pistol barrel, without having the same first proved, marked and certified." *Id.* Additionally, it imposed a fine of "not more than one hundred dollars, nor less than twenty dollars," for any person who "shall falsely alter the stamp or mark or the certificate of any prover of firearms." *Id.*

Several states also had laws relating to the inspection and marking of gunpowder, which "was essential to the operation of firearms at that time." *Miller et al v. Bonta, et al.*, No. 3:19-cv-1537 (S.D. Cal. 2022) (Dkt. No. 137-3, at 22) (Decl. of Prof. Saul Cornell), App. 28; *cf. Bruen*, 597 U.S. at 58 (citing article co-authored by Cornell). In 1795, Pennsylvania enacted a law requiring gunpowder stored in the public magazine to be proved and marked and prohibiting importation, transfer, or sale of any gunpowder that was not appropriately marked. 3 LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED, at 240-44 (1810), App. 29-33. In 1809, Massachusetts required the inspection of all gunpowder manufactured in the commonwealth or stored in a public magazine, with the inspector marking each cask as either "Massachusetts Inspected Proof" or "Condemned" and adding his name and the year. 2 GENERAL LAWS OF MASSACHUSETTS FROM THE ADOPTION OF THE CONSTITUTION TO FEBRUARY 1822, at 199 (1823), App. 35. The law imposed a fine on any person who sold any condemned powder or "fraudulently alter[ed], or deface[d] any mark, or marks, placed by any inspector upon any cask or casks containing gunpowder." *Id.* New Hampshire adopted a very similar law in 1820. LAWS OF THE STATE OF NEW HAMPSHIRE; WITH THE CONSTITUTIONS OF THE UNITED STATES AND OF THE STATE PREFIXED, at 275-80 (Isaac Long Jr., 1830), App. 37-42.

Colonial and early state governments likewise prohibited the sale and transportation of gunpowder without a license. *See* COLONIAL LAWS OF MASSACHUSETTS REPRINTED FROM THE EDITION OF 1672, at 126 (1890) (1651 statute), App. 44 ("no person . . . shall transport any Gunpowder out of this Jurisdiction, without license first obtained from some two of the Magistrates"); 15 PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, at 191 (1890) (1775 statute), App. 46 (no "gun-

powder made and manufactured . . . shall be exported out of the [Colony] without . . . license"); An Act Regulating the Storage, Safe Keeping and Transportation of Gunpowder, §§ 1–19, PROVIDENCE, RHODE ISLAND, CHARTER AND ORDINANCES OF THE CITY (Knowles & Vose 1845) (law passed 1821) (prohibiting selling gunpowder within the town of Providence "without having a license therefor").[16]

The existence of these historical analogues demonstrates that the challenged provisions of the Rule are "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692 (citation omitted). The Rule's background-check, licensing, recordkeeping, and serialization requirements for manufacturers and sellers are "relevantly similar to laws that our tradition is understood to permit." *Id.* (citation omitted). The key question is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*, 597 U.S. at 29. As explained above, the provisions challenged here impose at most a minimal "burden on the right of armed self-defense" because they merely require commercial sellers to abide by the same background-check, licensing, and recordkeeping requirements that every licensed firearm dealer complies with when selling firearms. *Id.* This minimal burden is no greater than those imposed by historical laws relating to the sale, marking, licensing, and inspection of firearms and gunpowder.

Plaintiffs' Second Amendment claim is thus meritless. Its arguments in support of that claim are also unpersuasive. *See* Pls.' MSJ at 29-34. Plaintiff SAF does not allege—nor could it—that the Rule prevents its members from self-manufacturing firearms but that those members wish to "acquire from firms" products that the Rule regulates. *Id.* ¶ 7. Moreover, the Rule does not restrict in any way the "self-manufacture of firearms"—including weapon parts kits and unfinished frames and receivers

---

[16] *Available at* https://firearmslaw.duke.edu/laws/the-charter-and-ordinances-of-the-city-of-providence-together-with-the-acts-of-the-general-assembly-relating-to-the-city-page-89-96-image-89-96-1854-available-at-the-making-of-modern-law-primary (last visited May 14, 2026).

readily convertible to firearms—by non-federal-firearms-licensees for personal use who are not prohibited by law from possessing them.  Instead, it requires only that such items that are taken into inventory by licensed firearms dealers be serialized and recorded so that they may be traced by law enforcement if they are later involved in crime.  *See* 87 Fed. Reg. at 24,653, 24,742, 24,744.  Second, Plaintiffs are mistaken in their assertion that the United States has no "historical tradition of regulating firearm parts."  Pls.' MSJ at 34.  As shown above, colonial and early state governments passed laws imposing inspection, marking, and licensing requirements on specific firearms components: namely, gunbarrels and gunpowder.[17]

### 3.    The Rule Is Consistent With the Major Questions Doctrine and Principles of Non-Delegation.

The Supreme Court has rejected Plaintiffs' contention that in regulating weapon parts kits and partially-complete frames and receivers, the Rule exceeded ATF's statutory authority.  *See VanDerStok*, 604 U.S. at 468 (answering "the question whether [the Rule's] provisions addressing weapon parts kits are inconsistent on their face with the GCA" in the negative); *id.* at 477 ("[T]he GCA reaches, and permits ATF to regulate, at least some 'partially complete' frames or receivers.").  Despite the Supreme Court's holding that the Rule is consistent with the GCA, Plaintiffs nevertheless attempt to smuggle in their rejected exceeding-statutory-authority claims by reasserting them as claims under the major question doctrine and principles of non-delegation.  Pls.' MSJ at 23-26.  These claims are no more persuasive than when the Supreme Court rejected them the first time.

---

[17] To be clear, ATF generally does not regulate individual firearm parts, apart from frames and receivers, and parts of machineguns and silencers.  That remains true under the Rule.  *See VanDerStok*, 604 U.S. at 474 (rejecting argument that "because Congress has spoken elsewhere to collections of firearm parts . . . we should infer [section 921(a)(3)(A)] does not address parts or kits containing any combinations of them" and recognizing that "ATF itself acknowledges that subsection (A) does not allow it to regulate 'standalone triggers, barrels, stocks, or magazines'") (citation omitted).

Plaintiffs incorrectly allege that the Rule conflicts with the major questions doctrine because "Congress did not in fact delegate to [ATF] the task of further defining the Gun Control Act's 'firearm' term" to reach weapon parts kits or partially-complete frames and receivers. *Id.* at 23. To the contrary, as the Supreme Court recognized, in promulgating the Rule, "the agency invoked authority Congress granted it to prescribe 'rules and regulations as are necessary to carry out' the GCA." *VanDerStok*, 604 U.S. at 464 (citation omitted). And the Supreme Court specifically rejected the plaintiffs' "challenge to the agency's authority to regulate *any* weapon parts kits or unfinished frames or receivers," *id.* at 467, finding that ATF had the statutory authority to do so. *See id.* at 473 (rejecting the plaintiffs' argument "that [27 C.F.R.] § 478.11's provision addressing weapon parts kits is facially inconsistent with the [GCA]" "[b]ecause at least some weapon parts kits satisfy [Section 923(a)(3)(A) of the GCA]"); *id.* at 477 ("[T]he GCA reaches, and permits ATF to regulate, at least some 'partially complete' frames or receivers.") (citation omitted). This case thus does not present a situation where the major questions doctrine even applies because ATF has not taken action of major economic and political significance by relying on ambiguous statutory language to support an "extraordinary delegation[] of Congress's powers." *Learning Resources, Inc. v. Trump*, 607 U.S. 635, 639 (2026). Having litigated and lost their claim that Congress did not delegate to ATF the authority to regulate weapon parts kits or partially-complete frames and receivers, Plaintiffs cannot get a second bite at the apple by disguising this same claim as a major-questions-doctrine claim.[18]

Plaintiffs also err in their contention that Congress acted inconsistently with the non-delegation doctrine in defining the term "firearm" in the GCA. Pls.' MSJ at 25-26. The Supreme Court has reaffirmed—as it has, "time and again"—"that a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle'" to direct the exercise of its

---

[18] Bizarrely, Plaintiffs repeatedly cite the Fifth Circuit's *VanDerStok* opinion in support of their argument as if the Supreme Court had not reversed that opinion. *See* Pls.' MSJ at 23-24.

delegated authority. *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality opinion) (citation omitted). Indeed, "[o]nly twice in this country's history[,]" both times in 1935, has the Court "found a delegation excessive," and then only "because 'Congress had failed to articulate *any* policy or standard' to confine discretion." *Id.* at 146 (citation omitted); *see A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935). Meanwhile, the Court has rejected challenges to delegations as broad as the authority to set "fair and equitable" prices, *Yakus v. United States*, 321 U.S. 414, 427 (1944); to determine "just and reasonable" rates, *Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 600 (1944); to regulate broadcast licensing as "public interest, convenience, or necessity" require, *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225-26 (1943); to allow railroad acquisitions in the "public interest," *New York Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24 (1932); and to issue any air quality standards "requisite to protect the public health[,]" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (citation omitted).

The standards to satisfy an intelligible principle to guide an agency's exercise of authority are thus "not demanding." *Gundy*, 588 U.S. at 146. Congress need only delineate "both 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority.'" *FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025) (citation omitted). That standard is easily met here. Congress defined "firearm" in the GCA to mean (as relevant here) "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive [or] the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3)(A), (B). The fact that this definition has sufficiently delineated the general policy that ATF must pursue and the bounds of its delegated authority has been confirmed in the extensive jurisprudence applying the GCA's "firearm" definition since it was enacted more than half a century ago—including by the Supreme Court in *VanDerStok*. *See VanDerStok*, 604 U.S. at 467-81; *see also, e.g.*, *United States v. Guillen-Cruz*, 853 F.3d 768, 772 (5th Cir. 2017).

29

To the extent that Plaintiffs argue that the Rule impermissibly applies the GCA's definition of "firearm," Pls.' MSJ at 25-26, that is not a non-delegation claim but a claim that the Rule exceeds the GCA's statutory authority.  As explained above, the Supreme Court has squarely rejected that claim.

> **4.    Although the Supreme Court's *VanDerStok* Decision Did Not Adjudicate   Constitutional Issues, the Decision Remains Instructive in Adjudicating Plaintiffs' Constitutional Claims.**

To the extent that Plaintiffs imply that the Supreme Court's *VanDerStok* decision did not directly address constitutional challenges to the Rule, Defendants agree.  *See id.* at 16-17.  However, DD expressly raised the same Second and Fifth Amendment arguments during the Supreme Court merits briefing in *VanDerStok*.  *See* Br. of DD at 18-25, *Bondi v. VanDerStok*, No. 23-852, 2024 WL 1098302, at *18-25 (Mar. 8, 2024); *see also* Petitioner's Reply Br. at 20-22, *Bondi v. VanDerStok*, No. 23-852, 2024 WL 4183989, at *20-22 (Sept. 12, 2024).  Yet Plaintiffs' motion is premised on the notion that the Supreme Court somehow ignored these arguments and overlooked these purported constitutional problems when it twice issued stays of this Court's orders, then granted certiorari, and issued a merits decision upholding the Rule against an APA challenge.  Such a dubious notion warrants no credence.

**B.    The Rule Is Consistent With the APA.**

Plaintiffs' claims that the Rule is arbitrary and capricious under the APA fare no better.  *See* Pls.' MSJ at 20-23, 26-29.  The arbitrary and capricious standard is "narrow and highly deferential." *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021) (citation omitted).  The court's "task is merely to ask whether the agency considered the relevant facts and articulated a satisfactory explanation for its decision."  *Amin v. Mayorkas*, 24 F.4th 383, 393 (5th Cir. 2022).  "The court is not empowered to substitute its judgment for that of the agency," *Hardwick v. FAA*, 170 F.4th 429, 432 (5th Cir. 2026) (citation omitted), and must "uphold an agency's actions if its reasons and policy choices satisfy minimum standards of rationality," *10 Ring Precision v. Jones*, 722 F.3d 711, 723 (5th Cir.

2013) (citations omitted).  A reviewing court starts from "a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption by showing that the decision was erroneous."  *La. Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 558 (5th Cir. 2014) (citation omitted).  Plaintiffs have failed to overcome this presumption of validity because the Rule is rational.

> **1.      Plaintiffs Have Failed to Show that the Rule's Second Amendment Analysis Caused Them Any Harm.**

First, Plaintiffs err in contending that the Rule is arbitrary and capricious because, in their view, it did not follow the analysis set forth by *Bruen*.  Pls.' MSJ at 20-23.  That argument is unavailing.  As explained below, *see infra* II.A.2, ATF correctly concluded that the Rule is consistent with the Second Amendment.  Moreover, the APA requires courts to take account of the "rule of prejudicial error."  5 U.S.C. § 706(2)(F).  Under that rule, "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."  *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009); *see also Amin,* 24 F.4th at 394 (rejecting challenge to administrative action because the challenger had failed to show that it was prejudiced by the claimed error); *Worldcall Interconnect, Inc. v. FCC*, 907 F.3d 810, 818-19 (5th Cir. 2018) (same).  Thus, to the extent that Plaintiffs urge that the Rule is invalid because it cites and applies case law from federal courts employing a means-end scrutiny analysis that *Bruen* rejected, that argument has no merit.  Because ATF correctly explained that the Rule does not infringe Second Amendment rights, the inclusion of additional analysis reaching the same result under a different test cannot be prejudicial.  And given that the Second Amendment question is a legal one, its resolution does not implicate the sort of policy considerations and agency discretion that the agency must resolve in the first instance.  Because any alleged error thus "had no bearing on the procedure used or the substance of the decision reached, a remand would be pointless."  *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 590 (2025) (citations omitted).

In any event, *Bruen* was issued after the Rule's promulgation, and under APA review, "it is well established that reviewing courts generally should, in evaluating agency action, avoid considering

31

evidence that was not before the agency when it issued its final decision. Agency actions should generally be reviewed in light of the evidence before the agency at the time, and not with the benefit of hindsight." *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 630 n.8 (5th Cir. 2001) (internal citations omitted); *see also SIH Partners LLLP v. Comm'r of Internal Revenue*, 923 F.3d 296, 301 (3d Cir. 2019) (arbitrary and capricious review does not permit courts to apply "hindsight derived from matters occurring after the adoption" of the challenged agency action). The Rule thus adequately demonstrates why it does not infringe the Second Amendment.

### 2. The Rule Explains Any Change in Policy by ATF Regarding Partially-Complete Frames and Receivers and Weapon Parts Kits.

Second, to the extent that the Rule changed ATF's policy regarding partially-complete frames and receivers and weapon parts kits, the Rule adequately explains such change. *Contra* Pls.' MSJ at 26-29. "An agency's change in policy is not subjected to a heightened standard or more substantial review than the scrutiny applicable to policy drafted on a blank slate." *Handley v. Chapman*, 587 F.3d 273, 282 (5th Cir. 2009) (citing *FCC v. Fox Television Stations*, 556 U.S. 502, 514-16 (2009)). "Rather, a policy change must only meet three requirements: The new policy must be permissible under the statute; there must be good reasons for it; and the agency must believe that the new policy is better, which the conscious change of course adequately indicates." *Id.* (citation omitted); *accord Entergy Miss., Inc. v. NLRB*, 810 F.3d 287, 293 (5th Cir. 2015).

With respect to partially-complete frames and receivers, the Rule is consistent with ATF's longstanding fact-specific approach. There are no statutory definitions for the term "frame or receiver" in the GCA. Therefore, the crucial question is at what point a mere component or foundation of a component, such as a piece of metal or plastic, becomes a "frame or receiver" that is regulated as a firearm. For many years, ATF has determined that a component becomes a "frame or receiver" when it reaches a "critical stage of manufacture," which is the point at which it is "brought to a stage of completeness that will allow it to accept the firearm components [that] it is designed for,

32

using basic tools in a reasonable amount of time." *See, e.g.*, ATF Letter to Private Counsel #303304, at 3-4 (Mar. 20, 2015), App. 50-51.

Thus, ATF has always classified "some unfinished receivers [as] firearms because of the ease with which they can be made functional"—a standard which "is largely determined by which machining operations still needed to be performed." 87 Fed. Reg. at 24,668.[19] It likewise remains true that "a partially complete frame or receiver alone is not a frame or receiver if it still requires performance of certain machining operations." *Id.* Under the Rule, the issue is whether a partially-complete frame or receiver may "readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver[.]" *Id.* at 24,739. Accordingly, under the Rule, "[c]ompanies that sell or distribute only unfinished frame or receiver billets or blanks, and not any associated jigs, templates, or similar tools to the same customer are not required to be licensed or to mark those articles with identifying information." *Id.* at 24,700. The Rule clarifies that ATF will consider "any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available" with an unfinished frame or receiver to determine whether the component has reached the "critical stage of manufacture." *Id.* at 24,678. Plaintiffs do not demonstrate that this change was inadequately supported.[20]

---

[19] Indeed, in a prior filing, the former lead plaintiffs in this case cited an ATF webpage illustrating that a receiver with only a "partially machined fire-control cavity" was classified as a firearm under ATF's prior regulations, although it could not function as a receiver in its existing form. *See Are "80%" or "unfinished" receivers illegal?*, ATF, *available at* https://www.atf.gov/resource-center/questions-and-answers?page=20; Pls.' Br. in Supp. of Mot. for Prelim. Inj. at 30, ECF No. 16.

[20] Moreover, the change satisfies all three requirements for a regulatory change: it is consistent with the GCA, which vests ATF with the discretion to define the statutory term "frame or receiver," *see supra* Background; ATF acknowledged that it was changing position; and ATF explained the reason for the change. *See Handley*, 587 F.3d at 282. As for the reason for the change, ATF has long maintained that a partially complete frame or receiver is a "frame or receiver" for purposes of the GCA when it is sold "indexed," or marked with the locations for drilling or milling the holes or cavities necessary to initiate, complete, or continue the firing cycle. *See* 87 Fed. Reg. at 24,668; App. 53, 59. Prior to the Rule, however, ATF did not examine templates, jigs, or other items and materials made

As already explained above, Congress did not provide statutory definitions for the term "frame or receiver" in the GCA. However, ATF must draw the line somewhere, and the Rule thus defines "frame or receiver" to include a frame or receiver that is partially complete, disassembled, or nonfunctional—including a frame or receiver parts kit—that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a completed frame or receiver. *Id.* at 24,739 (27 C.F.R. § 478.12(c)); *see also id.* at 24,663, 24,727-28. ATF's definition utilizes the term "readily" not because it is required by statute to do so, but because it is a term and concept that Congress used, not only in 18 U.S.C. § 921(a)(3)(A), but elsewhere in federal firearm laws.[21] ATF also utilizes this term because it "has been repeatedly—and consistently—defined by case law." 87 Fed. Reg. at 24,678; *see also id.* at 24,678-79 & n.79 (citing authority). ATF's use of the term "readily" thus reflects the determinations that Congress has made throughout the federal firearm laws to define regulated weapons as including items that may be readily converted to regulated weapons, and ensures that the Rule coheres with this consistent legislative intent. In short, the Rule retains some aspects of ATF's existing policy with respect to partially complete frames and receivers, while making changes that the Rule acknowledges and reasonably explains.

---

available with a partially complete frame or receiver. *See* 87 Fed. Reg. at 24,668. Because the aggregation of a template or jig with a partially complete frame or receiver can arguably serve the same purpose as indexing, the Rule now requires consideration of such materials. *Id.*

[21] *See, e.g.*, 26 U.S.C. § 5845(b) (defining "machinegun" as "any weapon that shoots, is designed to shoot, or can be readily restored to shoot, automatically"); *id.* § 5845(c) (defining "rifle" as including any weapon within the prescribed definition "which may be readily restored to fire a fixed cartridge"); *id.* § 5845(d) (defining "shotgun" to include any weapon within the prescribed definition "which may be readily restored to fire a fixed shotgun shell"); *id.* § 5845(f) (defining "destructive device" to include "any combination of parts either designed or intended for use in converting any device into a destructive device . . . and from which a destructive device may be readily assembled"); *id.* § 5845(h) (defining "unserviceable firearm" to mean "a firearm which is incapable of discharging a shot by means of an explosive and incapable of being readily restored to a firing condition").

34

The Rule also does not reflect an unexplained change in ATF's regulation of weapon parts kits. As explained above, *see supra* n.17, ATF generally does not regulate individual firearm parts, apart from frames and receivers, and parts of machineguns and silencers. That remains true under the Rule. By contrast, ATF always has recognized that a weapon parts kit, standing alone, may fall within the GCA's statutory definition of a "firearm," where it "is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A); *see* 87 Fed. Reg. at 24,662 & n.44, 24,692; Proposed Rule, Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27,720, 27,726 & nn.39-40 (May 21, 2021) (citing case law confirming this interpretation). The Rule merely adds express language confirming and codifying this interpretation. *See* 87 Fed. Reg. at 24,662, 24,692. To the extent that ATF was required to explain this codification of existing policy, its explanation—which relied on both case law and the plain meaning of the statutory text—was more than adequate. *See id.* at 24,684.

Plaintiffs fail to substantiate their abbreviated arguments that the Rule did not adequately explain any change in course. Pls.' MSJ at 28-29. First, as the Supreme Court recognized, the Rule did not rewrite the GCA. *See VanDerStok*, 604 U.S. at 467 (explaining that "the plaintiffs' burden [was] to show that the Rule itself is inconsistent with the statute on its face"); *id.* at 468 ("disagree[ing]" with plaintiffs' arguments that "[27 C.F.R.] § 478.11's provisions addressing weapon parts kits are inconsistent on their face with the GCA"); *id.* at 477 (rejecting contention that "ATF's new regulation addressing unfinished frames and receivers, § 478.12(c), is facially inconsistent with the GCA").

Second, Plaintiffs incorrectly contend that ATF has not "reconcile[d] prior classifications" with the Rule. Pls.' MSJ at 28. In fact, the Rule expressly grandfathers its prior classifications of the frame or receiver of existing split frame or receiver firearm designs, including AR-15 and M-16 variants. 87 Fed. Reg. at 24,653; *see also id.* at 24,683, 24,693. "The only exception to 'grandfathering' will be for partially complete, disassembled, or nonfunctional frames or receivers . . . that ATF

35

[previously] did not classify as firearm 'frames or receivers[.]'" *Id.* at 24,653, 24,672.  And ATF explained the basis for this exception.  In the past, incomplete frames or receivers had been sent to ATF for classification without any of the other parts, jigs, templates, or materials that are sold or distributed with the item or kit.  *Id.* at 24,673.  Thus, the entire kit may not have been presented to the agency when it made its classification, *id.* at 24,709, even though these items and materials might arguably be relevant to making a proper firearm classification.  *Id.* at 24,725.  ATF explained that in addition to not grandfathering these particular classifications, individuals seeking classifications prospectively must submit any associated templates, jigs, molds, equipment, or tools that are included by the seller or distributor of the item or kit, to the purchaser or recipient of the item or kit, together with any instructions, guides, or marketing materials if they will be included by the seller or distributor with the item or kit.  *Id.* at 24,673.  ATF acted reasonably in making this distinction with respect to grandfathered classification decisions.

Third, Plaintiffs err in contending that ATF failed to account for any reliance interests of persons or entities already engaged in the production or sales of partially complete frames and receivers.  To the contrary, the agency's regulatory impact analysis directly accounted for the costs that such persons or entities might incur under the Rule.  *See* Regulatory Impact Analysis at 27-78, App. 61-114.  The agency reasonably concluded, however, that the benefits far outweighed the costs of maintaining a policy regarding partially complete frames and receivers that allowed for easy circumvention of the GCA's licensing and serialization requirements, which in turn has promoted illegal weapons trafficking.  Moreover, Plaintiffs exaggerate the cost and burden that the Rule imposes: ATF found only 214 companies nationwide that sell firearm parts kits with a partially complete frame or receiver.  *Id.* at 59, App. 94.  And the costs to such companies are limited to applying for a federal

firearms license, conducting background checks, and maintaining certain records.[22]  Further, ATF mitigated any burden where feasible by allowing persons to be licensed as dealer-gunsmiths, which will make professional marking services more available to other licensees and to unlicensed individuals, and will allow other licensed dealers to receive and transfer partially complete frames and receivers into inventory.  87 Fed. Reg. at 24,664, 24,689, 24,702-04.  ATF acted reasonably in making a distinction with respect to the classification decisions it chose to grandfather.

**III.    Any Relief Should Be Narrowly Tailored.**

**A.    Section 706(2) Does Not Authorize the Universal Vacatur Urged by Plaintiffs.**

As explained above, Plaintiffs are not entitled to relief.  In any event, the Court cannot universally vacate the Rule, as Plaintiffs urge, *see* Pls.' MSJ at 34-36, because Section 706(2) of the APA does not provide for such relief.  Defendants acknowledge that the Fifth Circuit has described vacatur of an unlawful agency action as the "default rule." *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859-860 (5th Cir. 2022); *see Texas Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.,* 110 F.4th 762, 780 (5th Cir. 2024) (stating that universal vacatur is "statutorily permissible, and required in this circuit").  However, Defendants respectfully submit that the APA as properly construed does not authorize universal vacatur.  *See United States v. Texas*, 599 U.S. 670, 693–99 (2023) (Gorsuch, J., concurring in the judgment) (explaining that the APA does not allow vacatur); *Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 498-501 (N.D. Tex. 2024) (explaining that the "APA does not explicitly authorize vacatur").

Starting with the text, the ordinary meaning of "set aside," 5 U.S.C. § 706(2), is to disregard, not to nullify. *See, e.g.*, *Webster's New International Dictionary of the English Language* 2291 (2d ed. 1958)

---

[22] The cost of a three-year license to be a dealer in firearms other than destructive devices is $200.  18 U.S.C. § 923(a)(3)(B); 27 C.F.R. § 478.42(c)(2).  The cost of renewal is $90 for three years. *Id.*  Licensed dealers must conduct background checks before transferring firearms to non-licensees, 18 U.S.C. § 922(t), and maintain records of firearms acquisition and disposition, 27 C.F.R. §§ 478.124, 478.125(e).

(defining "set aside" as: (a) "[t]o put to one side; discard; dismiss," and (b) "[t]o reject from consideration; overrule" (emphasis omitted)). This understanding is consistent with limits on judicial review. For example, when reviewing statutes for constitutionality, courts "have no power per se to review and annul acts of Congress on the ground that they are unconstitutional." *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923). Instead, judicial review "amounts to little more than the negative power to disregard an unconstitutional enactment." *Id.* Thus, when the APA was enacted, it was well understood that courts' "setting aside" unconstitutional statutes referred to disregarding such statutes in deciding the cases before them, not vacating the statutes. *See, e.g.*, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 87 (1938); Act of Aug. 24, 1937, ch. 754, § 3, 50 Stat. 51, 752-753; *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 432 (1934); *Mallinckrodt Chem. Works v. Missouri ex rel. Jones*, 238 U.S. 41, 54 (1915).

The APA's structure confirms in at least three respects that Section 706(2)'s instruction to "set aside" deficient agency action does not allow universal vacatur. First, whereas Section 706(2) supplies a rule of decision directing courts to disregard unlawful "agency action[s], findings, and conclusions," 5 U.S.C. § 706(2), Section 703 pertains to remedies. Absent a "special statutory review proceeding" authorizing a court to act directly upon an agency order, Section 703 limits plaintiffs to traditional remedies such as "declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." *Id.* § 703. It does not speak of vacatur.

Second, Section 706(2) requires a court to "hold unlawful and set aside" not only "agency action," but also "findings[] and conclusions." *Id.* § 706(2). It would make little sense for a court to vacate an agency's "findings" and "conclusions." But it is entirely sensible for a court to disregard unfounded agency findings and conclusions in resolving the case before it.

Third, because Section 706 provides the substantive standard for holding agency action "unlawful," *id.*, it must apply in all forms of action where Section 706 applies, including "actions for

38

declaratory judgments or [on] writs of prohibitory or mandatory injunction or habeas corpus," as well as "in civil or criminal proceedings for judicial enforcement," *id.* § 703. No one would suggest that a court hearing a habeas petition or an enforcement action could vacate a regulation. But Section 706(2) fits naturally in those contexts if it is understood as an instruction to disregard unlawful agency actions, conclusions, and findings.

Moreover, Congress enacted the APA against a background understanding that statutory remedies should be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Traditionally, remedies "operate with respect to specific parties," not "on legal rules in the abstract." *California v. Texas*, 593 U.S. 659, 672 (2021) (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 489 (2018)). By contrast, universal vacatur violates "the bedrock practice of case-by-case judgments with respect to the parties in each case." *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, C.J., concurring). There is no basis to conclude that Congress contemplated creating such extraordinary remedial power when it enacted the APA.

**B.      In Any Event, Remand Without Vacatur Would Be the Appropriate Remedy for Any Procedural Violation.**

In any event, even if vacatur were an available remedy, it would not be appropriate here in the event that Plaintiffs were to succeed on any procedural claims. "Remand without vacatur of the agency action is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Nat'l Ass'n of Priv. Fund Managers v. SEC*, 151 F.4th 252, 273 (5th Cir. 2025) (citations omitted). For all of Plaintiffs' APA claims, even if the Court were to find that ATF had not adequately substantiated the Rule, there would be at least a serious possibility that the agency could do so on remand. The defects that Plaintiffs purport to find in the Rule under the APA are precisely those amenable to correction on remand, through additional articulation of the agency's reasons for acting and/or an additional round of notice and comment. *See id.* (remanding without vacatur to allow agency to analyze economic impact of rules and respond to

further comments based on its analysis); *Texas Ass'n of Mfrs. v. U.S. Consumer Safety Comm'n*, 989 F.3d 368, 389-90 (5th Cir. 2021) (remanding without vacatur where the agency had not properly employed notice-and-comment procedures and had failed to consider relevant factors).

Courts in the Fifth Circuit may also consider vacatur's disruptive consequences in determining the appropriate remedy for an APA violation. *See, e.g.*, *Texas v. Biden*, 20 F.4th 928, 1000 (5th Cir. 2021), *rev'd and remanded on other grounds*, 597 U.S. 785 (2022); *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000); *cf. Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993). Here, the Supreme Court itself recognized the immense disruptive consequences of vacatur of the Rule. It explained that "[p]olice departments around the Nation have confronted an explosion of crimes involving . . . ghost guns," with the number of ghost guns submitted for tracing by law enforcement agencies for jumping from 1,600 in 2017 to over 19,000 in 2021—an increase of over 1100% in just four years. *VanDerStok*, 604 U.S. at 464 (citations omitted). Vacating the Rule—which was expressly upheld by the Supreme Court after staying multiple injunctions of the Rule preventing it from taking effect—would facilitate the further proliferation of untraceable weapons, which could not be reversed in the event that ATF cured any defects in the Rule on remand. *See Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 677 (1989) (noting that the government has a "compelling interest[]" in protecting "public safety").

### C.    In the Alternative, Any Vacatur of the Rule Should Be Narrowly Tailored.

Alternatively, any vacatur should be limited to the relevant provision or provisions of the Rule and to the parties to this action that have demonstrated standing with respect to any successful claim. With respect to severability, the Rule provides:

> in the event any provision of this rule, an amendment or revision made by this rule, or the application of such provision or amendment or revision to any person or circumstance is held to be invalid or unenforceable by its terms, the remainder of this rule, the amendments or revisions made by this rule, and the application of the provisions of such rule to any person or circumstance shall not be affected and shall be construed so as to give them the maximum effect permitted by law.

40

87 Fed. Reg. at 24,730. The Court should give effect to this clause and, to the extent it decides that vacatur of any provision of the Rule is warranted, tailor such relief narrowly such that the remainder of the Rule remains in effect. *See VanDerStok v. Garland*, No. 23-10718, 2023 WL 4945360, at *1 (5th Cir. July 24, 2023) (staying universal vacatur because "the agency has shown a strong likelihood of success on its assertion that the vacatur of the several non-challenged parts of the Rule was overbroad"); *see also Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019) (vacating only "unlawful . . . portions of [an agency] rule"); *cf. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) (noting that, "'when confronting a constitutional flaw in a statute,' . . . the 'normal rule' is 'that partial, rather than facial, invalidation is the required course'" (citations omitted)).

With respect to the scope of any vacatur, this Court has recognized that "longstanding principles of equity" confine courts to "redress[ing] particular injuries in particular cases or controversies." *VanDerStok v. Garland*, 633 F. Supp. 3d 847, 854 (N.D. Tex. 2022) (citation omitted). Moreover, universal relief "take[s] a toll on the federal court system" by "preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Id.* (citation omitted). These considerations are no less compelling in the context of vacatur on summary judgment than preliminary injunctive relief. *See also Wulferic, LLC v. FDA*, 793 F. Supp. 3d 830, 851-52 (N.D. Tex. 2025) (rejecting as unnecessary request to issue nationwide injunction).

Plaintiffs "must demonstrate standing . . . and for each form of relief that they seek." *Murthy*, 603 U.S. at 61 (citations omitted). Here, as explained above, SAF has failed to demonstrate standing to sue, *see supra* I.A, and at best, DD has shown standing only with respect to four specifically identified items that it has established it has previously sold and has concrete plans to sell, and that the Rule might regulate, *see supra* I.B. Moreover, the Supreme Court has explained that a plaintiff generally has no cognizable Article III interest in interfering with an agency's regulation of third parties. *See All. for*

41

*Hippocratic Med.*, 602 U.S. at 374 (explaining that, "[u]nder Article III of the Constitution, a plaintiff's desire to make a drug less available *for others* does not establish standing to sue"). Plaintiffs thus cannot show that relief extending beyond DD, and only concerning these four items, would be necessary to remedy any alleged injury.

Finally, in the event the Court were to grant summary judgment in favor of Plaintiffs on any of their claims, it should decline Plaintiffs' request for injunctive relief. *See* Pls.' MSJ at 35. As this Court has held, permanent injunctive relief is not appropriate under the APA where an injunction would have no "meaningful practical effect independent of its vacatur." *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 946 (N.D. Tex. 2019) (citation omitted); *see also id.* (noting that courts addressing unlawful administrative rules "ultimately 'invalidate—without qualification—[such] rules as a matter of course, leaving their predecessors in place until the agencies can take further action'") (citation omitted). Plaintiffs here do not argue that injunctive relief would have any effect independent of vacatur. Thus, any relief that the Court may grant should be limited, at most, to remand on any procedural violation or vacatur of any particular provision of the Rule that the Court holds unlawful and to the extent that Plaintiffs have shown standing for the relief they seek.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter summary judgment in their favor.

DATED: May 22, 2026                                          Respectfully submitted,


                                                             BRETT A. SHUMATE
                                                             Assistant Attorney General, Civil Division

                                                             ALEXANDER K. HAAS
                                                             Director, Federal Programs Branch

                                                             ANDREW I. WARDEN
                                                             Assistant Director, Federal Programs Branch

*/s/ Daniel Riess*
DANIEL RIESS
JEREMY S.B. NEWMAN
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 353-3098
Email: Daniel.Riess@usdoj.gov
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

On May 22, 2026, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Daniel Riess*

43