UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| DEFENSE DISTRIBUTED and THE SECOND AMENDMENT FOUNDATION, INC.,<br><br>    Plaintiffs<br><br>v.<br><br>TODD WALLACE BLANCHE, in his official capacity as Acting Attorney General of the United States, *et al.*,<br><br>    Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 4:22-cv-00691-O |

**Defense Distributed and the Second Amendment Foundation's
Reply Brief in Support of Their Motion for Summary Judgment and
Brief in Opposition to Defendants' Motion for Summary Judgment**

i

## Table of Contents

Table of Authorities..............................................................................................................iv

Summary of the Argument. ..................................................................................................1

Argument ...............................................................................................................................3

I.     Standing exists. ...........................................................................................................3

       A.     Defense Distributed has standing. .............................................................. 3

              1.     Standing exists for Defense Distributed's G80 products. ......................... 5

              2.     Standing exists for the Polymer80 and 1911 products. .............................. 6

              3.     The monopoly answer is wrong. ................................................................. 6

       B.     SAF has standing. ........................................................................................... 7

II.    Count Six: APA § 706(2)(B)—Due Process Clause. ........................................... 8

       A.     The Rule is still 3x unconstitutionally vague........................................... 9

              1.     The kit definition is unconstitutionally vague. ........................................ 9

              2.     The frame/receiver definition is unconstitutionally vague. .....................12

              3.     The consideration laundry list is unconstitutionally vague. ......................14

       B.     The classification process solves nothing for six separate reasons........................16

       C.     ATF's change promises are empty and counterproductive. ...............................18

III.   Count Two: APA § 706(2)(A)—Failure to consider. ..........................................19

       A.     The error was prejudicial. ...........................................................................19

       B.     The APA rejects "ends justify means." .......................................................21

       C.     The error is legal framing, not missing evidence.....................................21

IV.    Count Three: APA § 706(2)(A), (C)—Delegation..............................................22

       A.     No delegation in fact. ................................................................................... 22

       B.     Unconstitutional delegation........................................................................ 23

V.      Count Four: APA § 706(2)(A), (C)—Change of position. ............................... 24

    A.      The Rule is a major reversal. .................................................................... 24

    B.      ATF still has not explained the reversal. .................................................. 25

VI.     Count Five: APA § 706(2)(B)—Right to Keep and Bear Arms. ...................... 27

    A.      The government concedes Second Amendment coverage. ................................ 27

    B.      The government has not carried its burden. ........................................... 28

        1.      Generalized commercial regulation does not suffice. ............................. 29

        2.      Barrel-proofing and gunpowder laws fail the central "why" and "how" inquiries. ..................................................................................... 29

        3.      The real historical tradition favors DD and SAF. ..................................... 31

        4.      *Hemani* forecloses ATF's automatic-prohibition theory. ......................... 33

VII.    Full APA remedies are warranted. ................................................................... 35

VIII.   The statute's constitutionality is for another day. .......................................... 37

Conclusion .............................................................................................................. 37

Certificate of Service ............................................................................................. 38

## Table of Authorities

**Cases**

*Ashcroft v. Free Speech Coalition*,
    535 U.S. 234 (2002) ...................................................................................................34

*Bondi v. VanDerStok*,
    604 U.S. 458 (2025) ........................................................................................11, 13, 22

*City of Arlington, Tex. v. F.C.C.*,
    668 F.3d 229 (5th Cir. 2012) ....................................................................................20

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*,
    45 F.4th 846 (5th Cir. 2022) .....................................................................................35

*Dep't of Commerce v. New York*,
    588 U.S. 752 (2019). ....................................................................................................5

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211, 222 (2016) ...........................................................................................25

*FDA v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024)....................................................................................................36

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022) .....................................................................................23

*Johnson v. United States*,
    576 U.S. 591 (2015) ..........................................................................................1, 8, 10

*Kolender v. Lawson*,
    461 U.S. 352 (1983). ...................................................................................................15

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) .....................................................................................................5

*Motor Vehicle Manufacturers Ass'n of United States v. State Farm Mutual Automobile Insurance Co.*,
    463 U.S. 29 (1983) ..............................................................................................19, 21

*Nat'l Ass'n of Priv. Fund Managers v. SEC*,
    151 F.4th 252 (5th Cir. 2025) ...................................................................................35

*New York State Rifle & Pistol Ass'n v. Bruen*,
 597 U.S. 1 (2022) .................................................................................. 19, 28, 29, 32

*PDK Labs. Inc. v. U.S. D.E.A.*,
 362 F.3d 786 (D.C. Cir. 2004) ........................................................................... 19

*Sessions v. Dimaya*,
 584 U.S. 148 (2018) ...................................................................................... 1, 8, 9

*Shinseki v. Sanders*,
 556 U.S. 396, 406 (2009) ..................................................................................... 19

*Sierra Club v. U.S. Fish & Wildlife Serv.*,
 245 F.3d 434 (5th Cir. 2001) ............................................................................... 20

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
 600 U.S. 181 (2023) ...........................................................................................7, 8

*Susan B. Anthony List v. Driehaus*,
 573 U.S. 149 (2014).......................................................................................... 5, 10

*Texas Med. Ass'n v. HHS*,
 110 F.4th 762 (5th Cir. 2024)..............................................................................35

*TransUnion LLC v. Ramirez*,
 594 U.S. 413 (2021).............................................................................................3

*United States v. Campbell*,
 427 F.2d 892 (5th Cir. 1970) (per curiam) ....................................................11, 12

*United States v. Clinical Leasing Serv., Inc.*,
 925 F.2d 120 (5th Cir. 1991)..........................................................................17, 18

*United States v. Hemani*, No. 24-1234,
 2026 WL 1751710 (U.S. June 18, 2026) ........................................ 2, 26, 28, 29, 33

*United States v. Johnson*,
 632 F.3d 912 (5th Cir. 2011)............................................................................... 20

*United States v. Texas*,
 599 U.S. 670 (2023) ............................................................................................35
*United States v. Walters*,
 418 F.3d 461 (5th Cir. 2005) .............................................................................. 19

*U.S. Steel Corp. v. U.S. E.P.A.*,
   595 F.2d 207 (5th Cir. 1979) ............................................................................ 20

*Utility Air Regulatory Group v. EPA*, 22
   573 U.S. 302 (2014) ............................................................................................

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ...................................................................................17, 18

*VanDerStok v. Garland*,
   86 F.4th 179 (5th Cir. 2023) ........................................................................ 5, 16

*Wages & White Lion Investments, L.L.C. v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) ...............................................................................25

*West Virginia v. EPA*,
   597 U.S. 697 (2022) .......................................................................................... 22

*Worldcall Interconnect, Inc. v. FCC*,
   907 F.3d 810 (5th Cir. 2018) ............................................................................ 20

## Administrative Authorities

27 C.F.R. § 478.11 ............................................................................................9

27 C.F.R. § 478.12 ................................................................................ *passim*

Definition of "Frame or Receiver" and Identification of Firearms,
   87 Fed. Reg. 24,652 (Apr. 26, 2022) ................................................................ 17

Internal Revenue Service, Department of the Treasury,
   33 Fed. Reg. 18,555 (Dec. 14, 1968) ................................................................ 17

## Secondary Authorities

M.L. Brown, Firearms in Colonial America: The Impact on History and Technology 1492–1792
(1980) ........................................................................................................... 31

John G.W. Dillin, The Kentucky Rifle (1975) ............................................................32

Joseph G.S. Greenlee, The American Tradition of Self-Made Arms,
54 St. Mary's L.J. 35 (2023) ............................................................................ 31, 32

vi

Letter from Secretary of State Thomas Jefferson to British Ambassador to the United States George Hammond (May 15, 1793), in 7 The Writings of Thomas Jefferson 325 (Paul Leicester Ford ed., 1904) ................................................................................................................... 31

Charles Winthrop Sawyer, Firearms in American History (1910) ................................................. 31

Francis Newton Thorpe, The Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America (1909) ....................................................................................................... 31

James B. Whisker, The Gunsmith's Trade (1992) ......................................................................... 32

**Summary of the Argument.**

ATF's victory in *VanDerStok* sets up its failure here. To win the statutory case, ATF defended the Rule as reaching unfinished frames, receivers, and kits *because* they can become firearms through manufacture. That point was enough to win statutory authorization. But it creates the very constitutional problem now before this Court. If ATF regulates the means of making Arms, it must satisfy the Second Amendment. And if ATF imposes criminal consequences along a manufacturing continuum, it must draw a clear line for both the governed and the bureaucracy. The Rule does neither. The Rule's means of statutory survival spell its constitutional defeat.

The Rule is void for vagueness under *Johnson v. United States*, 576 U.S. 591 (2015), and *Sessions v. Dimaya*, 584 U.S. 148 (2018). Criminal exposure here turns on whether an unfinished item may "readily" become a frame or receiver, whether an unfinished article is "clearly identifiable," and how ATF weighs jigs, tools, instructions, marketing materials, and other associated materials. None draws an objective line. None tells citizens what is lawful. None tells ATF what is forbidden. A criminal rule must bind the bureaucracy that enforces it. This Rule leaves the boundary between lawful parts and federal firearms to after-the-fact agency judgment.

The classification process that ATF touts is no help. It is riddled with further defects. Due process requires reliable law *in advance*—not discretionary, impermanent permission after the regulated party asks. Yet ATF's classification process is voluntary, item-specific, nonprecedential, and dependent on the exact submitted configuration. It does not bind ATF for similar products, future products, changed materials, or later enforcement judgments. It gives the public no general notice and gives the agency no binding rule of decision. A rule that becomes knowable only after ATF conjures it—and even then without reasonable certainty—does not satisfy Due Process.

1

The Second Amendment claim is fully meritorious too. ATF has conceded the step-one question of whether the individual right to acquire and make Arms is part and parcel of the Second Amendment's right to keep and bear Arms, thereby triggering the step-two historical burden. At step two, ATF's scant showing does not come close. General commercial regulation is too abstract. Barrel-proofing laws were finished-product safety inspections, and gunpowder laws were explosive-storage rules. Those laws addressed accident prevention through safety testing, marking, storage, and transport limits. They did not impose federal licensing, serialization, recordkeeping, background checks, or criminal consequences on unfinished frames, receivers, kits, tools, and other key inputs. The real tradition points the other way: Private gunmaking in America was always common, lawful, and historically unregulated.

*United States v. Hemani*, No. 24-1234, 2026 WL 1751710, at \*4–5 (U.S. June 18, 2026), confirms that a modern firearms rule cannot burden covered conduct categorically because some people might misuse arms in some circumstances. *Id.* But that is how this Rule works. It does not ask who acquires the item, why, for what lawful purpose, or whether any individualized risk exists. It imposes firearm status automatically on the means of lawful self-manufacture. That is precisely the kind of categorical-risk logic that *Hemani* rejected as disallowed by the Second Amendment.

The remaining APA claims reinforce the same conclusion. ATF used the wrong constitutional frame during rulemaking, claimed major criminal regulatory power without clear congressional authorization, and replaced its settled frame-or-receiver line with a bespoke "readily" regime without a reasoned explanation. The same structural problem runs throughout: discretion to define the law, apply the law, and change the law without accounting for the consequences.

Full APA relief follows. Vacatur is the default remedy in this Circuit, and remand without vacatur is unavailable for defects this basic. No added agency explanation can make a vague criminal standard determinate or create a historical tradition that does not exist. The challenged provisions should be set invalidated and ATF's motion should be denied.

**Argument**

Defense Distributed and the Second Amendment Foundation file this combined reply brief in support of their motion for summary judgment, *see* Doc. 316 (motion); Doc. 317 (brief), and brief in opposition to ATF's motion for summary judgment, *see* Doc. 318 (motion); Docs. 319/321 (identical brief for both the response and cross motion). For the same reasons given below that DD and SAF's motion should be granted, ATF's motion should be denied.

**I.    Standing exists.**

Defense Distributed and SAF have standing, and ATF's brief proves it. Article III requires injury in fact, traceability, and redressability. *E.g., TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). ATF concedes that Defense Distributed faces a certainly impending injury from the Rule's enforcement against four identified G80 products. Doc. 319 at 14, 20, 22. That concession establishes standing for every claim here because each claim challenges Rule provisions that govern those products. ATF's remaining objections concern remedial scope, not Article III. Whether relief reaches four products, other products, or the Rule's operative provisions turns on the APA and the Rule's severability clause, not standing.

**A.    Defense Distributed has standing.**

Defense Distributed has standing because the Rule directly targets its core business. Defense Distributed deals in unfinished frames, receivers, parts kits, and related products. The Rule reclassifies those products as "firearms," forces Defense Distributed to stop or alter those

3

activities under threat of criminal liability, and produces ongoing economic and constitutional injury. *See* Doc. 166-01 at 2–5 (Declaration of Cody Wilson, Jan. 12, 2023). Those injuries are concrete, traceable to the Rule, and redressable by a judgment holding the Rule unlawful or unenforceable.

ATF's response largely concedes the point. ATF says Defense Distributed "largely fails to demonstrate any certainly-impending injury except with respect to four items it sells." Doc. 319 at 1. But that exception defeats ATF's standing argument. ATF later admits that Defense Distributed "has . . . established a certainly-impending injury with respect to four items as to which it alleges the enforcement of the Rule is causing it immediate, non-conjectural injury." *Id.* at 20. Article III does not require standing for every product in the catalog. One regulated product and one redressable injury are enough to reach the merits of every claim. Remedy scope issues are different.

The later record only strengthens standing. Defense Distributed supplied product-specific evidence, including the G80 website materials and product submissions identifying exactly what it sells and why the Rule blocks lawful commerce. *See* Doc. 294-1 at 2–4 (Declaration of Cody Wilson, June 6, 2025). It also supplied unrebutted banking and insurance evidence showing that the Rule's enforcement posture has driven ordinary commercial counterparties away. Southside Bank declined even basic deposit services because continued enforcement prevents it from ruling out regulatory or criminal exposure. Doc. 301-01 (Declaration of Grant Williams, Jan. 21, 2026). Insurance intermediaries likewise report that insurers will not offer commercially reasonable coverage because unresolved Rule enforcement makes risk impossible to price. Doc. 301-02 (Declaration of Marc Cisneros, Jan. 15, 2026). Those injuries are not speculative. They exist now. The fact that banks and insurers are third parties does not break traceability, because Article III

4

permits standing where third-party conduct is the predictable response to government action. *See Dep't of Commerce v. New York*, 588 U.S. 752, 767–68 (2019).

**1.      Standing exists for Defense Distributed's G80 products.**

Standing exists for the G80 products because ATF's own concession reaches them, and the record independently confirms injury. Defense Distributed identifies the G80 Build Kit, G80 Unfinished Receiver, and G80 Grip Module as products it sells or intends to sell through G80.com. *See* Doc. 293 at 2; Doc. 294 at 7–8; Doc. 294-1 at 2–4 (Declaration of Cody Wilson, June 6, 2025). ATF refuses to disclaim enforcement against those products absent a discretionary classification process. Doc. 294-1 at 2–4 (Declaration of Cody Wilson, June 6, 2025). That is enough for a pre-enforcement injury.

The classification-process argument does not defeat standing. Pre-enforcement standing exists where, as here, the plaintiff intends to engage in conduct arguably affected with a constitutional interest, the challenged law arguably proscribes that conduct, and the government has not disclaimed enforcement. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159–61 (2014); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007). Defense Distributed need not admit that its conduct violates the Rule, surrender samples, or await an agency letter before challenging a rule that already chills sales and threatens criminal consequences. The injury is the Rule's indeterminacy and enforcement threat, not Defense Distributed's refusal to ask ATF for individualized permission. It is "of no use for ATF to say that it will tell ordinary people what they can do" later. *VanDerStok v. Garland*, 86 F.4th 179, 209 (5th Cir. 2023) (Oldham, J., concurring), *rev'd and remanded sub nom. Bondi v. VanDerStok*, 604 U.S. 458 (2025).

Redressability is direct. A declaration or injunction preventing enforcement of the Rule against the G80 products would remove the legal barrier to selling them, reduce the enforcement uncertainty driving commercial counterparties away, and permit ordinary market activity to resume. That is Article III redress.

### 2.    Standing exists for the Polymer80 and 1911 products.

The Polymer80 80% Frame and the two 1911 frames are injured by the Rule for the same reasons as the G80 products. Defense Distributed sold them, intends to sell them, and faces the Rule's enforcement threat against them. Doc. 166-01 at 2-5; Doc. 294-1 at 2-4. ATF does not deny that threat. It argues that these products are statutory firearms after *VanDerStok* and that any remedy should be confined. Those are scope-of-relief arguments, addressed below with the remedy. They do not defeat the injury. And ATF cannot call these products too vaguely described to classify while insisting they are materially indistinguishable from a frame the Supreme Court already classified. Doc. 319 at 9-10 & n.4.

Relief against the Rule redresses the injury. The Rule, not the bare statutory definition, imposes the marking, recordkeeping, and licensing regime and the criminal-enforcement posture that injure Defense Distributed. A judgment barring enforcement of the Rule removes that regime even if the statutory definition reaches the frame. *VanDerStok* held only that the GCA permits the Rule to reach some products; it did not hold that the Constitution permits ATF to enforce the Rule against them, and it did not adjudicate Counts Two through Six. 604 U.S. at 473, 481.

### 3.    The monopoly answer is wrong.

ATF's monopoly theory confuses injury with profit. Article III asks whether the Rule injures Defense Distributed, not whether Defense Distributed stays profitable despite it. ATF concedes a certainly impending injury on four product lines. Doc. 319 at 14, 20, 22. That injury

exists whether Defense Distributed earns revenue elsewhere, adapts its catalog, or outlasts competitors. A regulated party does not forfeit standing by surviving the regulation.

ATF also mistakes the remnant for the original market. *See* Doc. 319 at 24. Before the Rule, Defense Distributed participated in a broader market for unfinished frames, receivers, parts kits, and related products. The Rule attached federal firearm status, compliance burdens, and criminal consequences to products previously sold as unregulated parts. That shrank the market itself. Defense Distributed's relative position in the smaller surviving market therefore proves injury rather than disproving it.

If the Rule destroys most of a market and leaves Defense Distributed standing in a much narrower remnant, the surviving remnant does not erase the lost market. A plaintiff does not lose standing because it weathered the wrongdoing better than others.

### B.    SAF has standing.

SAF has associational standing for a simple reason: Defense Distributed is a SAF member. *See* Doc. 166-02 at 1 (Declaration of Alan M. Gottlieb, Jan. 6, 2023). An association has standing when one member would have standing, the interests are germane to its purpose, and the claims and relief require no individual member participation. *E.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). ATF concedes Defense Distributed's injury. Doc. 319 at 14, 20, 22.

ATF's contrary argument ignores the membership it already litigated. ATF says SAF identified no member with standing. But the record identifies Defense Distributed, and this Court already held that SAF is a membership organization that may sue on its members' behalf. Doc. 227 at 21-22. ATF does not renew the contrary position. Doc. 319 at 8 n.2. SAF's associational standing therefore follows directly from Defense Distributed's conceded injury.

The fit requirements are satisfied. SAF's purpose is the right to keep and bear arms, including the lawful acquisition and making of arms and their components. Doc. 166-02 at 1. The requested relief is prospective and legal, so it requires no member-by-member proof. SAF is a proper plaintiff, and the Court need not reach organizational standing.

Standing therefore exists. Defense Distributed has direct standing. SAF has associational standing through Defense Distributed and through members. The Court may reach the merits.

## II.    Count Six: APA § 706(2)(B)—Due Process Clause.

Count Six establishes that the Rule is void for vagueness because it denies fair notice and invites arbitrary enforcement in a criminal regime. *Johnson v. United States*, 576 U.S. 591 (2015), and *Sessions v. Dimaya*, 584 U.S. 148 (2018), foreclose ATF's position that a vague rule survives whenever some applications are clear. Judge Oldham's concurrence in *VanDerStok* gives the Court the correct roadmap for holding this Rule unconstitutional. Doc. 317 at 17–20. The Fifth Amendment's bar on "arbitrary enforcement" matters as much as its guarantee of notice, he explained; it is no defense for ATF to promise it will tell people what they may do, because "[t]he law exists to tell both the people and government officials what they can do," and the Rule's "nonexclusive eight-factor balancing test provides no guidance to anyone and hence is void for vagueness." *VanDerStok v. Garland*, 86 F.4th 179, 209 (5th Cir. 2023) (Oldham, J., concurring), *rev'd and remanded sub nom. Bondi v. VanDerStok*, 604 U.S. 458 (2025). ATF is therefore wrong to argue that the Rule is saved by product classification, prior uses of "readily," or *VanDerStok*'s statutory holding. Doc. 319 at 13–21, 30.

### A.    The Rule is still 3x unconstitutionally vague.

#### 1.    The kit definition is unconstitutionally vague.

The Rule's first vagueness defect is the partially complete frame-or-receiver definition. That provision defines "frame" and "receiver" to include any "partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). The constitutional problem is narrow and concrete: no one can tell when unfinished material crosses the "readily" line into a federally regulated firearm component.

ATF answers that this provision merely applies a "qualitative standard" to "real-world" facts. Doc. 319 at 28–29. But the Rule does not identify the facts that matter in any administrable way. It says ATF may consider time, ease, expertise, equipment, parts availability, expense, scope, and feasibility. 27 C.F.R. § 478.11. It does not say how much time is too much, what level of expertise matters, what tools count, what expense matters, or how those factors trade off against each other. A list of unweighted variables is not a legal line.

*Johnson v. United States*, 576 U.S. 591 (2015), therefore controls rather than helps ATF. *Johnson* did not condemn vagueness only when a court imagines an "ordinary case" of a prior crime. It condemned criminal liability that turns on an abstraction no one can apply with legal certainty. *Id.* at 597. The Rule does the same thing. It makes criminal consequences depend on ATF's imagined conversion process—how an imagined builder, using imagined tools, with imagined skill, in imagined time, would complete an unfinished object. That is not a fixed legal standard. It is agency reconstruction after the fact.

9

ATF's appeal to the statutory word "readily" misses the claim. Doc. 319 at 29–30. DD and SAF do not argue that every use of "readily" is always vague. They argue that this Rule's use of "readily" is vague because it defines when inert or unfinished material becomes the regulated "frame or receiver" of a weapon. That line matters more than ordinary degree judgments because it marks the boundary between lawful commerce and felony exposure. *See* 18 U.S.C. §§ 922–924. The Rule supplies no objective threshold at that boundary.

ATF's standing answer turns the vagueness doctrine upside down. ATF says Defense Distributed has not proved that the Rule definitely covers the products it sells or intends to sell. Doc. 319 at 22–23. But pre-enforcement standing does not require a citizen to confess that its intended conduct is unlawful. *Susan B. Anthony List*, 573 U.S. at 163. The distinction is between conduct clearly proscribed and conduct only arguably proscribed. ATF's own account places Defense Distributed in the latter category: coverage turns on product-specific judgment, the eight 'readily' factors, associated materials, and discretionary classification. Doc. 319 at 22–23, 28–34. That uncertainty does not defeat standing or the vagueness claim. It is the problem due process exists to prevent. Nor can ATF save the Rule by pointing to easy applications. *Johnson* rejects the theory that a vague criminal provision survives merely because some conduct plainly falls within it. 576 U.S. at 602.

ATF is wrong to say the Supreme Court had "no problem" applying the Rule's "readily" standard. Doc. 319 at 29. *VanDerStok* did not supply a usable boundary. It resolved a facial statutory challenge by identifying one easy example on each side of the Rule's core coverage: Polymer80's "Buy Build Shoot" kit, which had "all of the necessary components" and could be assembled in 21 minutes, and Polymer80's unfinished frame, which could be completed by removing plastic tabs

10

and drilling a few holes. *Bondi v. VanDerStok*, 604 U.S. 458, 468, 478–79 (2025). The Court then stopped. For kits, the Court admitted that "some" may be too incomplete or cumbersome to qualify, recognized that the issue presents the "problem of the heap," and declined "to untangle exactly how far subsection (A) reaches." *Id.* at 473. For frames and receivers, the Court repeated the limit: "Some products may be so far from a finished frame or receiver that they cannot fairly be described using those terms," but "this case requires us to explore none of that." Id. at 481.

That is not easy administrability. It is a statutory holding built around Polymer80 and express refusal to identify the line. Justice Kavanaugh stated the point directly: "The line is not entirely clear." *Id.* at 486 (Kavanaugh, J., concurring). And Justice Alito correctly captured the holding's narrowness: "The Court has not held that any other kits or presently non-functional receivers are covered." *Id.* at 516 n.6 (Alito, J., dissenting). *VanDerStok* therefore confirms the vagueness problem. If the Supreme Court could decide only the obvious Polymer80 examples while reserving the boundary for "future cases," then ordinary citizens and enforcement officials have no present rule to apply at that boundary.

Nor does *VanDerStok* convert statutory permission into constitutional permission. It held only that the GCA permits ATF to regulate some kits and some unfinished frames or receivers. *Bondi v. VanDerStok*, 604 U.S. 458, 473, 481 (2025). It did not decide fair notice, arbitrary enforcement, the Second Amendment, or the Rule's application to Defense Distributed's G80, 1911, or Polymer80 products.

*United States v. Campbell*, 427 F.2d 892 (5th Cir. 1970) (per curiam), does no better. *Campbell* did not address this Rule, this definition, this eight-factor "readily" test, unfinished frames or receivers, or the constitutional boundary between unregulated material and a regulated

11

firearm component. It upheld a different statutory phrase in a different context. That does not validate ATF's new power to decide, case by case, when an unfinished object has become a firearm.

ATF's out-of-circuit "readily" cases fail for the same reason. Those cases involved operability or restoration questions about items already much closer to ordinary firearms or already situated within established firearms statutes. This case concerns the antecedent threshold: when a not-yet-complete object becomes a regulated frame or receiver at all. That is the question *VanDerStok* left open for harder applications. It is also the question the Rule fails to answer.

ATF's "perilously close" footnote only confirms the defect. Doc. 319 at 31 n.18. Constitutional protection does not fade at the boundary of a right. If Defense Distributed's conduct falls outside the Second Amendment, ATF must say so and prove it under the governing test. If the conduct remains protected, ATF must regulate it with constitutionally adequate standards. "Almost unprotected" is not a category.

The partially complete frame-or-receiver definition is therefore unconstitutionally vague. It replaces a legal boundary with a discretionary assessment. It gives ATF the power to decide after the fact whether unfinished material was "readily" convertible enough to count as a regulated frame or receiver. The Due Process Clause does not permit that structure in a criminal regime.

### 2.    The frame/receiver definition is unconstitutionally vague.

The Rule's second vagueness defect is the "clearly identifiable" fallback. The Rule says a "forging, casting, printing, extrusion, unmachined body, or similar article" is not a frame or receiver unless it has "reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon." 27 C.F.R. § 478.12(c). That limit does not solve the vagueness problem. It restates it.

"Clearly identifiable" gives no usable legal threshold. It does not say what physical features must exist, how complete they must be, what machining matters, or when a partially formed object becomes identifiable enough to trigger federal firearm status. The phrase asks the same forbidden question in different words: when has an unfinished object become close enough to a frame or receiver that criminal law treats it as one?

ATF answers by denying that this part of the Rule matters to the products at issue. It says Defense Distributed does not contend that classification of the four products turns on whether they are "an unformed block of metal, liquid polymer, or other raw material." Doc. 319 at 19. That response narrows the Rule by quotation. The operative text also reaches any "similar article" once ATF decides it has "reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon." 27 C.F.R. § 478.12(c). The G80 and 1911 products are unfinished articles whose incomplete portions matter to classification. The point is not that Defense Distributed sells raw material. The point is that the Rule gives no legal threshold for when an unfinished article becomes 'clearly identifiable' enough to carry federal firearm status.

*VanDerStok* does not cure this problem. *VanDerStok* held only that some partially complete frames may fall within the GCA, using Polymer80's near-complete frame as the example. *Bondi v. VanDerStok*, 604 U.S. 458, 478–81 (2025). The Court also recognized the boundary problem: "Some products may be so far from a finished frame or receiver that they cannot fairly be described using those terms," but the case did not require the Court to "explore" that line. *Id.* at 481. That reserved boundary is the boundary the Rule leaves undefined.

13

The "clearly identifiable" definition therefore fails for the same reason the "readily" definition fails. It gives ATF a conclusion, not a standard. A citizen cannot know in advance when an unfinished article has crossed the line. An enforcement official cannot apply the line without discretion. The Due Process Clause requires more before federal firearm status and criminal consequences attach.

### 3.   The consideration laundry list is unconstitutionally vague.

The Rule's third vagueness defect is the classification-considerations provision. When ATF classifies an item, the Director may consider "any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials" sold, distributed, possessed, or made available with the item. 27 C.F.R. § 478.12(c). That provision does not narrow the Rule. It expands ATF's discretion.

The defect is not that ATF considers context. The defect is that the Rule gives ATF no rule for using that context. It does not say which associated materials matter, how much they matter, when they become decisive, or how they interact with the item's physical characteristics. It lets ATF decide after the fact whether jigs, tools, instructions, videos, or marketing materials convert an unfinished article into a regulated frame or receiver.

ATF answers that the Supreme Court already rejected this objection. Doc. 319 at 30. It did not. VanDerStok expressly refused to decide "what weight, if any, ATF may lawfully give jigs, tools, and instructions when deciding whether a frame or receiver is present." *Bondi v. VanDerStok*, 604 U.S. 458, 484 (2025). The Court held only that subsection (B) reaches some incomplete frames or receivers. *Id.* It did not approve an unweighted list of extrinsic materials that lets ATF decide, case by case, when jigs, tools, instructions, guides, or marketing materials trigger federal firearm status.

14

The provision also invites arbitrary enforcement. ATF may treat a jig as decisive in one classification, irrelevant in another, and merely confirmatory in a third. A standard that leaves potentially decisive facts to ad hoc agency choice is not a standard at all. *See Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983).

ATF is wrong that "no such record of unworkability is presented here." Doc. 319 at 34. The G80 exchange is the record of unworkability. Defense Distributed identified the products, pointed ATF to the exact sales pages, supplied accurate images, and made available open-source .step reference models that capture each product's geometry, dimensions, assembly structure, and incomplete portions relevant to classification. Doc. 294 at 8; Doc. 294-1 at 2–4 (Declaration of Cody Wilson, June 6, 2025). Yet ATF still would not say whether the Rule covered the products without physical samples and a discretionary classification process. *Id.* If ATF cannot apply its Rule after receiving product identity, public descriptions, images, and CAD-grade reference models, then the Rule supplies no rule of decision. It supplies a discretionary inspection ritual.

ATF's footnote 15 confirms the same point. ATF tries to explain why the Rule covers 80% pistol frames but not 80% rifle lowers by saying a pistol frame may be completed by "merely drilling some holes" or removing a blocking tab, while an AR-type receiver requires "carving substantial quantities of metal" from a casting. Doc. 319 at 34 n.15. But that distinction is asserted, not supplied by the Rule. The Rule contains no metric for "some holes," "substantial quantities," material removal, time, tools, or expertise that separates a covered pistol frame from an uncovered rifle lower. ATF's explanation proves the problem it tries to solve: classification turns on an agency official's conclusory judgment that one unfinished item is close enough and another is not.

Nor can ATF cure the problem by saying this provision helps identify products designed for completion. Design evidence may sometimes matter. But due process requires a rule that tells citizens and officials when it matters and what legal consequence follows. This Rule instead supplies a menu of possible considerations and leaves the operative judgment to ATF.

The classification-considerations provision is therefore independently vague. It moves the legal boundary away from the item itself and into an undefined mix of accessories, instructions, and communications. That structure gives regulated parties no advance notice and gives ATF no binding constraint. The Due Process Clause does not permit federal criminal liability to turn on that kind of open-ended agency judgment.

### B.      The classification process solves nothing for six separate reasons.

ATF says Defense Distributed's uncertainty is self-inflicted because it can seek product classifications. Doc. 319 at 13–15. That answer *confirms* the due-process problem. A citizen facing criminal exposure need not submit property to the enforcing agency and await discretionary permission before knowing what the law allows. The Rule itself must give notice and bind enforcement judgment in advance. ATF's after-the-fact classification process saves nothing, for multiple reasons. Each confirms that the process is no substitute for law.

First, the process answers only notice. It reaches, at most, one half of the vagueness doctrine: fair notice to the public. It does nothing for the doctrine's separate command that the regulator itself be bound by ascertainable standards, which that defect alone establishes the violation. *VanDerStok*, 86 F.4th at 209 (Oldham, J., concurring). ATF has no answer to this point.

Second, the process is optional on both sides. It cannot cure even the notice defect because regulated parties need not submit requests and ATF need not answer them. The Rule says so: "There is no statutory requirement for a person to submit such requests and likewise no

16

requirement for ATF to act upon any such requests." 33 Fed. Reg. 18,652, 24,710. The Director "may" issue a determination—not "shall." 27 C.F.R. § 479.102(c).

Third, the process is item-specific to the point of uselessness. Any determination binds no one beyond the exact item submitted. It also evaporates upon any change in "configuration," "accessories," "attachments," or "marketing materials." *Id.* That is not advance notice of a legal standard; it is a one-off agency reaction to one frozen submission.

Fourth, the process is internally incoherent. ATF classifies like items unlike, treating 80% pistol frames as covered while treating 80% rifle lowers as uncovered. Doc. 298 at 5. That contradiction confirms the absence of governing standards rather than curing it.

ATF's treatment of jigs proves the same point. The Rule authorizes ATF, when classifying an item, to consider associated "templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials." 27 C.F.R. § 478.12(c). Yet ATF now appears to treat that authority as optional discretion it may invoke, ignore, or bracket depending on the desired classification. That does not cure vagueness. It confirms it. A rule that lets the agency consider jigs when they help coverage, but disregard them when they complicate coverage, supplies no standard at all.

Fifth, the Rule is the wrong kind of enactment to receive vagueness leeway. That leeway applies to enactments aimed at the economic interests of businesses. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982); *see also United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122 (5th Cir. 1991). This Rule reaches fundamental liberties, not just commercial interests, and all people, not just businesses.

17

Sixth, a classification process is never a standalone cure. *Clinical Leasing* treats administrative clarification as one factor, not a constitutional solvent. 925 F.2d at 122. Even crediting the process as one point for ATF, two weightier factors cut the other way: the Rule is criminal, not civil, and it threatens constitutional rights. *Hoffman Estates*, 455 U.S. at 498–99.

The process therefore neither makes these self-inflicted nor renders them insufficiently imminent. It does not defer the harm. The indeterminacy *is* the harm.

### C.    ATF's change promises are empty and counterproductive.

The government's shifting representations prove only that no court should wait on speculation. In May 2025, DOJ counsel said the Attorney General's review process was "currently ongoing." Doc. 317 at 13. In March 2026, DOJ counsel said ATF was "planning to take additional action" but could not identify what action or when it would occur. *Id.* On April 8, 2026, DOJ counsel said the government had "decided to maintain the current definition of firearm 'frame' and 'receiver' contained in that final rule." *Id.* Six days later, DOJ counsel told the parties to disregard that statement because "the government has advised that it is considering changes to the frame/receiver rule." *Id.* That sequence is not a concrete agency action. It is a moving target.

Empty promises of future rulemaking cannot defeat judgment. The only operative law before the Court is the Rule as it exists now. The government has had years to revise it, abandon it, clarify it, or replace it. It has done none of those things. A court adjudicates legal rights under law, not under a government lawyer's latest prediction that the agency might someday do something different.

The shifting representations also reinforce present injury. The Rule already fails because regulated parties cannot tell what it covers and ATF has no binding standard for deciding. The government then compounds that uncertainty by giving inconsistent signals about whether the

18

Rule will stay, change, or disappear. Defense Distributed cannot plan product lines, banking relationships, insurance coverage, compliance obligations, or litigation risk around speculation that ATF may revise the Rule at some unknown time in some unknown way. The Rule's present force is enough. Its unstable future only confirms why judgment is needed now.

### III.    Count Two: APA § 706(2)(A)—Failure to consider.

Count Two establishes that ATF acted arbitrarily and capriciously by promulgating the Rule without considering the Second Amendment inquiry *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), made controlling. *Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983), required ATF to examine the relevant factors and data. *Bruen* made history and tradition the relevant factors here, and ATF ignored them. Doc. 317 at 20–23.

### A.    The error was prejudicial.

ATF's leading argument on Count Two is harmless error. Doc. 319 at 31–32. That is a telling indicator that the underlying violation did indeed occur. It is wrong because (1) ATF did not carry its burden of negating harm, and (2) harm is evident.

ATF bears the burden to show harmlessness, and it did not carry it. That burden follows from two independent rules. First, the government must show harmlessness when its error concerns the Constitution or deprives citizens of liberty. *See Shinseki v. Sanders*, 556 U.S. 396, 406 (2009); *United States v. Walters*, 418 F.3d 461, 464 (5th Cir. 2005). Second, APA prejudice is presumed when a court cannot tell what weight the agency gave to material it should have considered. *PDK Labs. Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004).

Both rules apply here. ATF used the wrong constitutional frame and therefore considered the wrong materials in deciding whether to burden protected conduct. It offers no assertion, and certainly no proof, that it would have adopted the same Final Rule after a *Bruen*-compliant historical analysis. Denying harm is not showing harmlessness.

Harm is evident in any event. The harmless-error inquiry asks, among other things, whether the result likely would have changed, what body had authority to decide, how the error affects the fairness and integrity of proceedings, and whether the specific circumstances matter. *City of Arlington, Tex. v. F.C.C.*, 668 F.3d 229, 244 (5th Cir. 2012), *aff'd*, 569 U.S. 290 (2013). DD and SAF need not prove an actual Second Amendment violation to show harm. It is enough that ATF's error affected the rulemaking process or the substance of the decision.

The error also caused prejudice under the Fifth Circuit's APA standard. An APA defect warrants relief when it bears on either "the procedure used" or "the substance of the decision reached." *United States v. Johnson*, 632 F.3d 912, 930 (5th Cir. 2011); *see also U.S. Steel Corp. v. U.S. E.P.A.*, 595 F.2d 207, 215 (5th Cir. 1979). That standard is met when the error "directly informed" and "guided" the agency's conclusion. *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 444 (5th Cir. 2001). ATF's *Bruen* error did both. It defined the universe of historical materials ATF considered and directed ATF to use means-end scrutiny. That wrong frame necessarily infected a complex rulemaking about constitutional conduct.

*Worldcall Interconnect, Inc. v. FCC*, 907 F.3d 810 (5th Cir. 2018), is the flip side of the coin. There, the APA defect caused no harm because it "clearly had no bearing on the procedure used or the substance of the decision reached." 907 F.3d at 819. Here, ATF's *Bruen* error had both.

20

### B.     The APA rejects "ends justify means."

The process error *is the violation. See Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983).  ATF treats the claim as if the only question is whether the Rule could have been adopted after a proper *Bruen* analysis. That turns the APA upside down. Arbitrary-and-capricious review protects the decisionmaking process itself. A court does not excuse an agency's failure to consider controlling factors because the agency or its lawyers later insist the same outcome would have followed.

The point is especially important here. *Bruen* did not supply a technical evidentiary consideration. It replaced the governing constitutional framework. Once *Bruen* rejected interest balancing, ATF could not keep relying on the same policy calculus and call the omission harmless. The agency had to confront the right question before exercising regulatory power. It did not.

### C.     The error is legal framing, not missing evidence.

This is not a dispute about whether ATF collected the wrong evidence. *Contra* Doc. 319 at 31-32. It is a dispute about the legal test ATF used to evaluate the evidence. ATF looked at ghost-gun concerns, tracing, enforcement, and modern crime data through a means-end lens. *Bruen* required ATF to evaluate any burden on covered conduct against historical tradition instead.

The evidence may be fixed, but the legal test controls what the evidence means. A record sufficient under interest balancing may fail under history and tradition. That is what happened here. ATF had the administrative process, technical expertise, product classifications, industry comments, and historical submissions before it. But it evaluated them under the wrong constitutional frame.

21

Count Two therefore succeeds. ATF did not merely weigh evidence poorly. It used the wrong legal test, ignored the controlling Second Amendment factors, and adopted the Rule through a process the APA does not permit.

## IV.   Count Three: APA § 706(2)(A), (C)—Delegation.

Count Three establishes that ATF lacked a valid delegation to redefine the GCA's keystone term "firearm." Congress did not clearly authorize ATF to decide a question of vast political, economic, and criminal significance. And if the statute were read to confer that authority anyway, it would supply no intelligible principle for deciding when unfinished material becomes a federally regulated firearm. Doc. 317 at 23–26.

### A.   No delegation in fact.

Congress never *clearly* delegated this power to ATF. That defeats ATF's argument that *VanDerStok* and the GCA's general rulemaking authority resolve the major-questions and delegation claims. Doc. 319 at 27–30.

The GCA's general carry-out authority permits implementation, not major statutory revision. *West Virginia v. EPA*, 597 U.S. 697 (2022), and *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014), require clear congressional authorization before an agency claims major regulatory power from old statutory text. That requirement matters here because the Rule expands federal firearm status, triggers licensing and serialization duties, and attaches criminal consequences to products previously outside ATF's regime. Doc. 317 at 23–24.

*VanDerStok* does not resolve this claim. It held that the GCA permits the Rule to reach some weapon parts kits and some unfinished frames or receivers. *Bondi v. VanDerStok*, 604 U.S. 458 (2025). But statutory permission is not the same thing as *clear* congressional authorization. *VanDerStok* did not decide a delegation claim, did not apply the major-questions framework, and

22

did not cite *West Virginia* or *Utility Air*. That silence is dispositive of nothing except the claim *VanDerStok* actually decided.

The difference is not formal. It is the point. A statute may be broad enough to permit an agency construction in an ordinary statutory case but still not clear enough to delegate a major question. Clear-statement rules exist because important decisions must come from Congress, not from agency inference. Nothing in the GCA clearly authorizes ATF to convert unfinished components and parts kits into federally regulated firearms through a criminal regulatory regime. Count Three therefore remains unresolved and meritorious.

### B.      Unconstitutional delegation.

Any contrary reading would make the delegation unconstitutional. The only possible limiting principle is "readily." But "readily" does not tell ATF when unfinished material becomes a firearm. It does not specify time, tools, skill, cost, work, equipment, parts, or tolerances. It does not tell ATF how to weigh those variables. It does not mark a line between lawful parts and regulated firearms. Doc. 317 at 25–26.

That is not an intelligible principle. It is a discretion transfer. If Congress delegated ATF the power to decide criminal firearm status based on whether an unfinished item is "readily" completed, without objective thresholds or binding standards, then Congress delegated the power to define the law case by case. *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), forecloses that structure. Criminal liability cannot depend on ATF's after-the-fact judgment about how readily unfinished material might become something else.

The delegation problem therefore has two answers, both fatal to ATF. Either Congress did not clearly delegate this major power at all, or Congress delegated it without an intelligible principle. Either way, the Rule cannot survive Count Three, and ATF is wrong to treat this claim as a repackaged statutory-authority argument already resolved by *VanDerStok*. Doc. 319 at 27–30.

## V.    Count Four: APA § 706(2)(A), (C)—Change of position.

Count Four establishes that the Rule is arbitrary and capricious because ATF reversed settled practice without a reasoned explanation. The agency did not refine prior policy. It repudiated it, replacing a concrete frame-or-receiver definition with a bespoke "readily" regime that supplies discretion, not standards. Doc. 317 at 26–29.

### A.    The Rule is a major reversal.

The Rule effects a major reversal. For decades, ATF applied a concrete definition of "frame or receiver" centered on a completed component housing specified internal parts. Doc. 317 at 27–28. The Rule abandons that definition and extends federal firearm status to partially complete, disassembled, or nonfunctional components and weapon parts kits based on whether ATF thinks they may "readily" be completed, assembled, restored, or converted. 27 C.F.R. §§ 478.11, 478.12(c).

ATF acknowledged the break. It invalidated prior classifications that had concluded such items were not firearms. 87 Fed. Reg. 24,652, 24,741. Conduct long treated as outside the GCA is now subject to licensing, serialization, recordkeeping, background checks, and criminal penalties. That is not clarification. It is reversal.

24

**B.      ATF still has not explained the reversal.**

ATF's explanation at pages 45 through 47 is not reasoned decisionmaking. An agency changing course must acknowledge the change and give a reasoned explanation for it. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016); *Wages & White Lion Investments, L.L.C. v. FDA*, 16 F.4th 1130, 1138–39 (5th Cir. 2021). ATF says what it did: it changed the standard. It does not explain why the old standard was wrong, why the new standard is better, or why regulated parties should lose the benefit of decades of prior classifications and settled practice. *See* Doc. 319 at 45–47.

ATF's continuity defense cannot survive its own description of the Rule. ATF says the Rule merely carries forward its "critical stage of manufacture" approach and so clears the bar for a policy change. But the Rule does not turn, as the prior approach did, on the item's own machined state; it newly attaches firearm status to extrinsic materials—jigs, tools, instructions, and marketing—and to whether ATF predicts an item may "readily" be converted. Importing those criteria to criminalize what the prior line left lawful is a reversal, not a clarification.

And acknowledging a change is not the same as justifying it: ATF must still confront the "serious reliance interests" its prior classifications created *and explain why they must yield*. *Encino Motorcars*, 579 U.S. at 221–22. Tallying license fees and 214 affected companies in a regulatory impact analysis counts compliance costs; it does not grapple with the reliance of those who built lawful businesses on ATF's settled, concrete definition. That omission is the arbitrary-and-capricious error Count Four identifies.

ATF therefore fails Count Four. It identified only the new standard it adopted, not a reasoned basis for adopting it. The APA requires more.

25

### C.    Commerce Clause analysis independently confirms the limit.

Congress may reach the interstate buying and selling of goods, but it may not convert local manufacture and possession into federal crimes. Reading the statutes and this Rule to do the latter raises a serious enumerated-powers doubt, and the avoidance canon requires the narrower reading that withholds the power. That is the same clear-statement logic Count Three already supplies: a major and constitutionally fraught authority must come from Congress in clear terms, and the GCA's general carry-out language does not deliver it.

Justice Thomas's recent concurrence explains why the doubt is serious. He concluded that 18 U.S.C. § 922(g) "appears to exceed Congress's enumerated power to regulate interstate commerce" because it fixes liability on a thing's status—that it once crossed state lines—rather than on any interstate transaction. *Hemani*, 2026 WL 1751710, at *12 (Thomas, J., concurring). The commerce power reaches "the buying and selling of goods . . . trafficked across state lines," not "activities wholly separated from business, such as gun possession." *Id.* at *13. Mere possession is not economic activity and fits none of the commerce power's categories. *Id.* The contrary view would hand Congress "a general police power of the sort retained by the States." *Id.* at *12.

The Rule shares that defect. It does not stop at interstate sale. It attaches firearm status to the object itself—a partially complete frame, an unmachined casting, a parts kit—and imposes licensing, serialization, recordkeeping, and criminal liability on making and possessing those items for personal use, without regard to whether the item or the conduct ever enters interstate commerce. 27 C.F.R. §§ 478.11, 478.12(c). Criminal exposure turns on an item's predicted convertibility, not on any commercial transaction among the States. That is regulation of local

26

manufacture and possession—conduct at the core of the States' authority—relabeled as commerce regulation.

ATF's answer that it regulates a commercial market does not fit its own Rule. The Rule fixes firearm status by convertibility and reaches non-commercial self-manufacture, *see* Doc. 317 at 29–34, which is the precise police-power overreach Justice Thomas identified. For this additional reason, the GCA must be read narrowly, and so read it does not authorize this Rule.

## VI.    Count Five: APA § 706(2)(B)—Right to Keep and Bear Arms.

Count Five establishes that the Rule violates the Second Amendment. The right to keep and bear Arms necessarily protects the right to acquire Arms, make Arms, repair Arms, and obtain the components needed to do those things. Doc. 317 at 29–31. The government now leaves that threshold proposition uncontested. It then fails *Bruen's* historical-tradition test at every step.

### A.    The government concedes Second Amendment coverage.

The Second Amendment covers the conduct this Rule burdens. Gunmaking is protected because the right to keep and bear Arms includes the closely related acts needed to exercise that right. A right to possess Arms would be hollow if government could criminalize acquisition, repair, or personal manufacture. DD and SAF established that point in their opening brief. Doc. 317 at 29–31. And ATF now concedes the point by silence. Earlier in this case, ATF disputed whether the Rule implicated Second Amendment conduct at all. It now does not. *Compare* Doc. 317 at 29–31, *with* Doc. 319 at 21-27, 35–40. Having once resisted the threshold premise, ATF now lays down on it. The Court should treat the point as conceded and give the concession full effect.  For once that initial threshold is crossed, the Second Amendment claim succeeds with ease in the remaining analysis.

### B.    The government has not carried its burden.

Once the Second Amendment's text covers the conduct, the Rule is presumptively unconstitutional. *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022). The burden shifts to the government to justify its law with a historical tradition that is relevantly similar in both purpose and operation. *United States v. Hemani*, No. 24-1234, 2026 WL 1751710, at *4–5 (U.S. June 18, 2026). The "why" and "how" are central. *Id.* at *5. A modern law cannot survive because it resembles some historical law at a high level of abstraction. The analogue must fit with reasonable specificity.

The relevant categories matter. The Rule's "why" is *not* product safety or accident prevention. It is crime control: tracing privately made firearms, deterring unlawful acquisition, and preventing future misuse by imposing federal firearm status before an arm exists. And the Rule's "how" is not inspection of finished goods or safe storage of dangerous materials. It is an upstream federal firearms regime—licensing, serialization, recordkeeping, background checks, and criminal penalties—attached to unfinished frames, receivers, kits, tools, instructions, and associated materials. ATF therefore needed historical analogues with a similar crime-control purpose and a similar upstream licensing-and-tracing mechanism.

ATF offers no such tradition. It instead invokes generalized commercial regulation, barrel-proofing laws, and gunpowder laws. Doc. 319 at 36–40. None justifies this Rule. And the record affirmatively shows the opposite tradition: Americans have long made, acquired, repaired, assembled, and sold Arms and component parts without licensing, serialization, background checks, or criminal exposure. Doc. 317 at 31–34.

28

1. **Generalized commercial regulation does not suffice.**

ATF's commercial-regulation theory is too general to carry *Bruen*'s burden. ATF says governments have long regulated the commercial sale of products, including firearms. Doc. 319 at 36–37. But *Bruen* and *Hemani* require historical laws with reasonably specific similarity in purpose and operation, not a broad police-power tradition that can be stretched to cover any modern prohibition. *Bruen*, 597 U.S. at 29; *Hemani*, 2026 WL 1751710, at *5. Commercial-sale rules regulate transactions in finished or market-ready goods. This Rule regulates the upstream means of making Arms and does so to enable tracing, deterrence, and future law-enforcement control. That is a different why and a different how.

The overbreadth of ATF's analogue proves its weakness. If "commercial regulation" were enough, *Bruen* would collapse into rational-basis review for anything sold in a market. Firearms, ammunition, books, newspapers, printing presses, religious articles, and medical products all move through commerce. But of course constitutional rights do not lose their governing tests when protected things are bought and sold.

The relevant question is not whether government has ever regulated markets. The relevant question is whether history supports this kind of burden on this kind of protected conduct for this kind of reason. ATF identifies no such tradition.

2. **Barrel-proofing and gunpowder laws fail the central "why" and "how" inquiries.**

ATF's specific candidates fail too. Barrel-proofing laws and gunpowder laws belong to different constitutional categories. Their "why" was accident prevention: preventing defective barrels from exploding and preventing stored gunpowder from detonating. Their "how" was correspondingly limited: inspect or mark a finished barrel, collect a fee, or restrict the storage and

29

transport of a volatile explosive. This Rule's "why" is crime control through tracing and deterrence. Its "how" is an upstream federal firearms regime imposed on unfinished articles, kits, tools, instructions, and associated materials. Those categories do not match. Doc. 319 at 37–40.

Barrel-proofing laws addressed product safety, not crime control. Massachusetts and Maine required gun barrels to be tested and marked so defective barrels stayed off the market and citizens' lives were not exposed to accidental danger. *See* Doc. 319 at 37–38. A safety-inspection regime built to certify barrel strength cannot justify a law-enforcement regime built to track firearms, buyers, sellers, and makers.

Gunpowder laws fail for the same reason. They addressed the danger that a volatile explosive would detonate in storage or transit. *See* Doc. 319 at 38–40. Gunpowder is an explosive commodity, not a frame, receiver, parts kit, or Arm. Laws governing powder storage and transport say nothing about whether government may license the making of Arms, regulate component inputs, or transform unfinished material into a firearm.

The "how" mismatch is just as stark. The Rule uses the machinery of federal firearms control: licensing, serialization, recordkeeping, background checks, and criminal enforcement. A barrel-proofing law tested a finished, functional barrel, stamped it, and collected a fee. *See* Doc. 319 at 37–38. It did not regulate unfinished material, reach tools or instructions, require federal licensure, create a registry, impose background checks, or threaten felony punishment for selling component parts later used in lawful self-manufacture.

ATF's tradition is also too thin. A scattered pair of state barrel-proofing laws, including post-ratification examples, does not establish a national historical tradition. *See* Doc. 319 at 37–38. *Bruen* does not let the government define a constitutional right through sparse and late outliers.

30

The government needed historical evidence showing a settled tradition of comparable burdens. It produced isolated safety regulations that do not resemble the Rule in purpose or operation.

ATF's argument that the Rule leaves self-manufacture untouched only sharpens the mismatch. Doc. 319 at 35–36. The Rule criminalizes the commercial supply of the components self-manufacture requires. A right to make Arms means little if the government may outlaw selling the means to make them. The proof-mark and gunpowder laws never reached that far.

### 3.    The real historical tradition favors DD and SAF.

The Rule does not merely lack supporting analogues. It contradicts the actual historical tradition. Self-manufacture of firearms in America was common and, until recently, unregulated. Doc. 317 at 31–34; Joseph G.S. Greenlee, The American Tradition of Self-Made Arms, 54 St. Mary's L.J. 35, 66 (2023). Colonial gunsmiths made and repaired Arms in shops where "one man with or without an apprentice did every part of the work." Charles Winthrop Sawyer, Firearms in American History 145 (1910). Colonists also held an express right to import both whole firearms and parts used to build their own. Francis Newton Thorpe ed., The Federal and State Constitutions, Colonial Charters, and Other Organic Laws 3787–88 (1909).

The Revolution confirms the tradition. When Britain tried to cut off American arms, Americans built their own to survive. M.L. Brown, Firearms in Colonial America: The Impact on History and Technology 1492–1792 127 (1980). The colonies solicited private makers and non-industry makers to fill wartime shortages. Doc. 317 at 31–34. And Thomas Jefferson described the settled understanding in 1793: "Our citizens have always been free to make, vend, and export arms." Letter from Secretary of State Thomas Jefferson to George Hammond (May 15, 1793), in 7 The Writings of Thomas Jefferson 325–26 (Paul Ford ed., 1904).

31

ATF's "precursor parts" label does not describe a new phenomenon. Early riflemakers routinely "purchased [barrel blanks] in bulk from some factory," then fitted them to handmade stocks with factory or imported locks. John G.W. Dillin, The Kentucky Rifle 96 (1975). The traditional method of domestic production from before 1791 into the nineteenth century was to build Arms from factory-made parts that arrived imported, unfinished, and unmarked. Doc. 317 at 31–34. That practice later developed into interchangeable-parts armory production.

Those component parts were not treated as guns. Their distribution was not criminalized. The tradition was so settled that "[g]unsmiths considered it to be their right to make guns without regulation or interference." James B. Whisker, The Gunsmith's Trade 90 (1992). Restrictions reaching personal manufacture are recent, with the earliest state laws appearing only in 2016. Greenlee, *supra*, at 42.

The decisive point is what the founding generation did not do. Private gunmaking was common, lawful, and unregulated. Doc. 317 at 31–34. Had any tradition of licensing, registering, serializing, or criminalizing the making of Arms existed, it would appear everywhere because Americans made their own guns everywhere. Its absence is affirmative evidence against ATF. The problem ATF invokes—untraceable, homemade arms—is as old as the Republic, not a modern development that excuses the missing tradition. *Bruen*, 597 U.S. at 26–27.

The proof-mark laws confirm the point. When early governments regulated manufacture, they imposed a safety stamp on a finished barrel. Doc. 319 at 37–38. They did not impose a license, registry, serial-number requirement, background check, or criminal ban on unfinished parts. The founding tradition therefore points away from the Rule, not toward it.

#### 4.    *Hemani* forecloses ATF's automatic-prohibition theory.

*Hemani* makes the Rule's automatic operation fatal. The government there defended §
922(g)(3) as a categorical rule because drugs and guns can sometimes be a dangerous mix. The
Court held that "sometimes" is not enough. The statute failed as applied because it deprived a
person of Second Amendment rights without asking whether the drug use made him dangerous,
why he kept a gun, or how safely he did so. *Hemani*, 2026 WL 1751710, at *5. The Rule has the
same defect. It treats covered items as federally regulated firearms across the board because some
items may sometimes be used by some people for unlawful ends. That automatic structure fails
both "why" and "how." The "why" is a law-enforcement risk theory, not product safety,
explosive storage, or commercial quality control. The "how" is an automatic licensing-and-tracing
regime, not inspection, proof marking, fees, or storage limits. *Hemani* forecloses that move.

ATF's answer to SAF's members proves the same point. ATF says SAF does not allege
that the Rule "prevents" members from self-manufacturing firearms, only that they wish to
acquire regulated products from firms. Doc. 319 at 39. But the government cannot divide a
protected course of conduct into isolated steps, concede the endpoint, and then criminalize the
means. A right to self-manufacture is worthless if the government may forbid law-abiding citizens
from acquiring the unfinished frames, receivers, kits, jigs, tools, and instructions that make self-
manufacture possible. That is especially true under *Hemani*, because the Rule does not turn on any
member's dangerousness, unlawful purpose, unsafe plan, or intended misuse. It burdens
acquisition categorically because some people might later misuse the resulting arms. The Second
Amendment does not permit that end-run around protected conduct.

33

ATF's "inventory" answer fares no better. Doc. 319 at 39. A rule need not ban personal manufacture *at the workbench* to burden self-manufacture. It is enough that the Rule regulates the commercial supply chain that makes lawful self-manufacture possible. ATF's own description proves the burden: covered kits and unfinished frames or receivers must be serialized, recorded, and routed through the licensed-firearms regime once they enter dealer inventory. *Id.* That changes the legal status of the very items law-abiding citizens acquire to make Arms. It also imposes the tracing, recordkeeping, and compliance regime that the historical record lacks. Calling that a dealer-inventory rule does not make it constitutionally harmless. It is still an automatic regulatory burden on acquiring the means of protected self-manufacture.

The First Amendment analogy exposes the flaw. A law abridging "the freedom of speech, or of the press" could not be defended by saying it leaves citizens free to speak after the government licenses printing presses, serializes paper, records book sales, and regulates the commercial supply of ink because dangerous people *sometimes* use words for unlawful ends. *See, e.g.*, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002). The same principle applies here. The Second Amendment protects the right to keep and bear Arms, and that protection cannot be evaded by licensing, tracing, and criminalizing the ordinary means of acquiring and making them. Constitutional rights protect more than the final act. They protect the practical means needed to exercise the right.

All of this shows the importance of upholding the Second Amendment's application at step one. ATF had to concede coverage because the Rule burdens the means by which ordinary citizens acquire and make Arms. That concession makes the rest of the analysis a strict historical inquiry:

ATF must carry *Bruen*'s burden with real analogues, and policy arguments about tracing, crime, or administrative convenience no longer matter.

Count Five therefore succeeds. The Rule burdens conduct necessary to acquire and make Arms. Doc. 317 at 29–31. The government bears the historical burden. General commercial regulation is too broad. Barrel-proofing and gunpowder laws do not match in purpose or operation. Doc. 319 at 36–40. The real tradition affirmatively protects self-manufacture from acquired parts. Doc. 317 at 31–34. And *Hemani* forecloses automatic prohibitions justified only by modern risk predictions. The Second Amendment forecloses the Rule.

## VII.    Full APA remedies are warranted.

ATF's lead remedial argument is foreclosed. Section 706(2) authorizes vacatur, and the Fifth Circuit treats vacatur as the default remedy for unlawful agency action. *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859–60 (5th Cir. 2022); *Texas Med. Ass'n v. HHS*, 110 F.4th 762, 780 (5th Cir. 2024). ATF's contrary reading of "set aside" rests on a concurrence and out-of-circuit district authority. See *United States v. Texas*, 599 U.S. 670, 693–99 (2023) (Gorsuch, J., concurring in the judgment). This Court is bound by Fifth Circuit precedent. If the Rule is unlawful, the APA remedy is vacatur.

Remand without vacatur is unavailable. That remedy applies only where "there is at least a serious possibility that the agency will be able to substantiate its decision" on remand. *Nat'l Ass'n of Priv. Fund Managers v. SEC*, 151 F.4th 252, 273 (5th Cir. 2025). These defects are not substantiation problems. Counts Two, Three, and Four identify a rulemaking built on the wrong constitutional framework, an agency power Congress did not clearly delegate, and a major reversal left unexplained. Count Six identifies a void-for-vagueness criminal rule. Count Five identifies a

35

Second Amendment violation. No added explanation can make an indeterminate criminal standard determinate, supply missing congressional authorization, or create a historical tradition that does not exist.

ATF's disruption argument inverts the inquiry. The continued enforcement of an unlawful rule is the disruption the APA prevents. The government cannot preserve unlawful agency action because it prefers the policy consequences of keeping it in force. When a rule fails at its legal foundation, the court sets it aside.

Vacatur also runs to the unlawful Rule, not merely to four products. Section 706(2) directs courts to "set aside" unlawful agency action; it does not authorize a catalog-by-catalog remedy keyed to each plaintiff's inventory. Once standing exists—and ATF concedes Defense Distributed's standing for at least four products—the remedy turns on the unlawful agency action. The Polymer80, 1911, and G80 products illustrate the live controversy. They do not shrink the remedy.

ATF's reliance on *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), is misplaced. That case addresses who may sue over the regulation of third parties, not how far vacatur reaches after a plaintiff with standing proves unlawful agency action. Nor are the defects severable. The vagueness and Second Amendment defects inhere in the Rule's operative definitions of "frame or receiver" and "readily," which bind regulated parties across applications. The APA defects likewise infect the challenged provisions as provisions. A severability clause preserves valid remainders; it cannot save the unlawful provisions that caused the injury.

At minimum, relief must reach DD, SAF, their members, and the product and component categories that create this controversy. A product-only remedy would leave the same unlawful Rule in force and the same uncertainty intact.

## VIII.    The statute's constitutionality is for another day.

The statute's validity is not presented and need not be decided. Since DD and SAF seek only a judgment about ATF's enforcement of the Rule, ROA.2376 (Doc. 143 at 27), all that DD and SAF must establish—and all this Court must confront—is the Rule's unconstitutionality. If that holding has implications for the statute's validity, so be it—in the next case. The question now is whether ATF may enforce this Rule consistently with the Constitution. It may not.

### Conclusion

DD and SAF's motion should be granted.

Defendants' motion should be denied.

Respectfully submitted,

By /s/ *Chad Flores*
Chad Flores
  chad@chadfloreslaw.com
  Texas Bar No. 24059759
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
P: (713) 893-9440
F: (832) 645-2496

Counsel for Defense Distributed and
the Second Amendment Foundation, Inc.

## Certificate of Service

A true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record on the day of its filing.

/s/ Chad Flores
Chad Flores
