**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **DEFENSE DISTRIBUTED, *et al.*,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:22-cv-00691-O** |
| | § | |
| **TODD BLANCHE, in his official capacity as Attorney General of the United States, *et al.*,** | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

**OPINION & ORDER**

Before the Court are Plaintiffs Defense Distributed and the Second Amendment Foundation, Inc.'s Motion for Summary Judgment and Brief in Support (ECF Nos. 316–17); Defendants' Combined Response in Opposition and Motion for Summary Judgment and Brief in Support (ECF No. 318–19); Plaintiffs' Combined Reply and Response in Opposition (ECF No. 322); Defendants' Reply (ECF No. 328); and Plaintiffs' Surreply (ECF No. 329). Having considered the Parties' briefing and applicable law, the Court **GRANTS in part** Plaintiffs' Motion for Summary Judgment and **GRANTS in part** Defendants' Motion for Summary Judgment.

## I. INTRODUCTION

The action arises from a long running challenge to ATF's 2022 Final Rule entitled Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27 C.F.R. pts. 447, 478, 479) ("Final Rule"). The Final Rule departs from nearly 45 years of ATF precedent by interpreting the Gun Control Act of 1968's ("GCA") definition of "firearms" to include partially manufactured frames and receivers. The Parties and the Court are well versed in factual and procedural background but to orient the reader, the Court provides a brief overview and history.

## II. STATUTORY & REGULATORY BACKGROUND

In 1934, Congress enacted the National Firearms Act ("NFA") to authorize federal taxation and regulation of certain firearms such as machineguns, short-barreled shotguns, and short-barreled rifles. National Firearms Act of 1934, ch. 757, Pub. L. 73-474, 48 Stat. 1236, 1236. A few years later, Congress enacted the Federal Firearms Act ("FFA"), which more broadly defined "firearm" and thereby authorized federal regulation of "any weapon . . . designed to expel a projectile or projectiles by the action of an explosive . . . or [any part] of such weapon." Federal Firearms Act of 1938, ch. 850, Pub. L. No. 75-785, 52 Stat. 1250, 1250 (1938) (repealed 1968).

Thirty years later, Congress enacted the GCA, which superseded the FFA's regulation of firearms in interstate commerce. The GCA requires manufacturers and dealers of firearms to have a federal firearms license.[1] 18 U.S.C. §§ 921, *et seq*. Dealers must also conduct background checks before transferring firearms to someone without a license, and they must keep records of firearm transfers. *Id.* §§ 922(t), 923(g)(1)(A).

The GCA also redefines "firearm" more narrowly than the earlier regulations it superseded, defining the term as: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." *Id.* § 921(a)(3). But "[s]uch term does not include an antique firearm." *Id.* Notably, the GCA departs from the FFA's prior definition of "firearm" by restricting federal authority over "any part" of a firearm to only the "frame or receiver" of such firearm.

Congress delegated authority to the Attorney General to administer and enforce the GCA by authorizing him to "prescribe only such rules and regulations as are necessary to carry out the

[1] A manufacturer or dealer authorized to transfer firearms under the Gun Control Act is known as a Federal Firearms Licensee ("FFL").

provisions of this chapter." *Id.* § 926(a). The Attorney General, in turn, delegated that authority to the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). 28 C.F.R. § 0.130(a). Those who violate the federal firearms laws are subject to potential fines and imprisonment. 18 U.S.C. § 924(a).

In 1978, ATF promulgated a rule interpreting the phrase "frame or receiver," which the GCA does not define. The rule defined the "frame or receiver" of a firearm as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." Title and Definition Changes, 43 Fed. Reg. 13,531, 13,537 (Mar. 31, 1978). That definition remained in place until 2022.

In April 2022, ATF published the Final Rule changing, among other things, the 1978 definition of "frame or receiver." *See* 87 Fed. Reg. 24,652. ATF split the phrase into two parts, assigning the term "frame" to handguns and the term "receiver" to any firearm other than a handgun, such as rifles and shotguns. *See* 27 C.F.R. § 478.12(a)(1), (a)(2). ATF then defined the terms "frame" and "receiver" along the same lines as the 1978 rule, though with updated, more precise technical terminology.

But ATF did not stop there. Rather than merely updating the terminology, ATF decided to regulate *partial* frames and receivers. Under the new Final Rule, "[t]he terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." *Id.* § 478.12(c). But "[t]he terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished

component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." *Id.*

Further, the Final Rule permits the ATF Director to consider extrinsic factors when determining if an object is a frame or receiver. Specifically, "[w]hen issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with [or otherwise made available to the purchaser or recipient of] the item or kit." *Id.* The Final Rule also amends ATF's definition of "firearm" to include weapon parts kits that are "designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *Id.* § 478.11 (definition of "firearm").

## III. PROCEDURAL HISTORY

On August 11, 2022, the original plaintiffs, Jennifer VanDerStok; Michael G. Andren; Tactical Machining, LLC; and Firearms Policy Coalition, Inc., filed suit seeking relief from the final rule.[2] A number of groups subsequently moved and were granted permission to intervene. Among those were Defense Distributed and Second Amendment Foundation, Inc. ("SAF").[3] The Court previously granted summary judgment to the original plaintiffs and intervenors based on a statutory contradiction claim under the Administrative Procedure Act, 5 U.S.C. § 706, ("APA"). The Fifth Circuit largely affirmed, but the Supreme Court ultimately reversed. *See Bondi v. VanDerStok*, 604 U.S. 458 (2025). On remand, the original plaintiffs and intervenors dismissed their claims,[4] except for Defense Distributed and SAF (collectively "Plaintiffs"). The Court ordered Plaintiffs and Defendants (the Attorney General, Department of Justice, ATF, and the ATF

---

[2] *See* Original Pls.' Compl, ECF No. 1.
[3] *See* Pls.' Mot. Intervene, ECF No. 116; Order, Dec. 19, 2022, ECF No. 137; Pls.' Compl, ECF No. 143.
[4] *See* Stipulation Dismissal, ECF No. 315.

Director; collectively "Defendants") to move for summary judgment on all of Plaintiffs remaining claims. These include three claims under the APA for (1) failure to consider all of the relevant factors and data; (2) no delegation in fact; (3) unexplained change of position and two constitutional claims (4) violation of the Second Amendment and (5) a void for vagueness claim under the Fifth Amendment's Due Process Clause. Plaintiffs and Defendants both filed cross-motions for summary judgment and each side has responded and replied. The Motions are ripe for the Court's review.

## IV. LEGAL STANDARD

The APA "authorizes suit by '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61 (2004) (alteration in original) (quoting 5 U.S.C. § 702). Upon review of agency action, a district court is required to "hold unlawful and set aside agency action" that the court finds is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D).

Disputes arising under the APA are commonly resolved on summary judgment, where district courts sit as an appellate tribunal to decide legal questions on the basis of the administrative record. *See Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022). Summary judgment is proper where the Court finds that there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When parties file cross-motions for summary judgment, the Court reviews "each party's

motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Tex. v. United States*, 50 F.4th 498, 522 (5th Cir. 2022).

In APA cases challenging agency action, summary judgment "serves as the mechanism for deciding" whether the action "is supported by the administrative record and otherwise consistent with the APA standard of review." *Gadhave v. Thompson*, 2023 WL 6931334, at *1 (N.D. Tex. Oct. 19, 2023) (citation omitted). The agency resolves "factual issues to arrive at a decision that is supported by the administrative record, and the district court applies the APA standards of review to determine whether, as a matter of law, the evidence in the administrative record permitted the [agency to make the] decision it did." *Yogi Metals Grp. Inc. v. Garland*, 567 F. Supp. 3d 793, 797–98 (S.D. Tex. 2021), *aff'd*, 38 F.4th 455 (5th Cir. 2022) (internal citation and quotations omitted). Once a court determines the contested agency action falls short of the APA's substantive or procedural requirements, the reviewing court "shall" set aside the unlawful agency action. 5 U.S.C. § 706(2); *Data Mktg. P'ship, LP v. United States Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022).

## V. ANALYSIS

### A. Standing

Defendants first challenge whether Defense Distributed and SAF have standing to contest the Final Rule.[5] But as Plaintiffs point out, the Court has previously determined that both Plaintiffs have standing—at least twice.[6] The first time was in response to Defense Distributed and SAF's motion to intervene. There, the Court found that Defense Distributed "clearly demonstrated its standing to sue" and because "at least one of SAF's members—namely, Defense Distributed—has standing to sue in its own right" SAF "satisfied the standing requirement by establishing

[5] Defs.' Br. Supp. Mot. Summ. J. 6–13.
[6] Pls.' Br. Supp. Mot. Summ. J. 15, ECF No. 317; Pls.' Resp. 7, ECF No. 322.

associational standing."[7] The second time was in response to the parties' first round of summary judgment briefing. That time, the Court again found that SAF established associational standing and did not address Defense Distributed's standing because Defendants did not contest it.[8] While it does not appear that any substantial changes have occurred that would alter the Court's standing analysis, because "standing is a jurisdictional requirement and may be raised at any time" the Court briefly addresses Defendants' arguments. *Davis v. Tarrant Cnty., Tex.*, 565 F.3d 214, 220 (5th Cir. 2009).

1. Defense Distributed

Standing to sue is a doctrine rooted in Article III's case or controversy requirement and ensures that litigants are properly before a federal court seeking redress for a legal wrong. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), as revised (May 24, 2016). Establishing Article III standing requires a plaintiff to show that it has suffered (1) an injury-in-fact (2) that is fairly traceable to the defendants' conduct, and (3) is likely to be redressed by a favorable judicial decision. *Id.*

Defendants argue that Defense Distributed "largely fails to demonstrate any certainly-impending injury except with respect to four items it sells."[9] In doing so, Defendants concede that Defense Distributed "has shown standing [but] only with respect to four specifically identified items that it has established it has previously sold and has concrete plans to sell, and that the Rule

[7] Order 4–5, ECF No. 137.

[8] Order 21–22, ECF No. 227.

[9] Defs.' Br. Supp. Mot. Summ. J. 1, ECF No. 319. According to Defendants these items are "(1) GO Grip Module (as sold by DD on ghostgunner.net); (2) G80 Build Bundle (as sold by DD on G80.com); (3) G80 Unfinished Receiver (as sold by DD on G80.com); [(4)]G80 Grip Module (as sold by DD on G80.com)." *Id.* at n.3. Plaintiffs assert that three other items are affected by the private rule: (1) The Polymer80 80% Frame; (2) The M1911 80% Frame:45ACP; and (3) The M1911 80% Frame:9mm/10mm/.38 Super/.40 S&W. Defense Distributed classifies these items as items that Defense Distributed "used to sell but no longer does because of the Final Rule." *See* Mot. Prelim. Inj. 7, ECF No. 294; *see also* Pls. Reply 4–5, ECF No. 322.

might regulate."[10] Apparently realizing the significance of what they argued, in their Reply Defendants attempt to walk back this argument and assert that Defense Distributed lacks standing altogether.[11] But such an intentional statement made in summary judgment briefing is a judicial admission on which the Court can rely. *See Golden Spread Coop., Inc. v. Emerson Process Mgmt. Power & Water Sols., Inc.*, 360 F. Supp. 3d 494, 504 (N.D. Tex. 2019) (Fitzwater, J.), *aff'd sub nom. Golden Spread Elec. Coop., Inc. v. Emerson Process Mgmt. Power & Water Sols., Inc.*, 954 F.3d 804 (5th Cir. 2020); *see also Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476 (5th Cir. 2001) ("A judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them."). As such, because Defendants concede Defense Distributed has standing as to at least four products, the Court agrees.

Even without their concession, Defendants' argument that Defense Distributed has not met its burden of establishing an injury in fact still fails. This is because in a suit challenging the legality of government regulation, "[i]f a plaintiff is an object of [the] regulation 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Defense Distributed has asserted from the outset of this litigation that the Final Rule "directly targets its core business—dealing in unfinished frames, receivers, and parts kits—and forces it to cease those activities under threat of criminal liability."[12] This "compelled shutdown [has] produced concrete and ongoing economic injury" to Defense Distributed in the form of "lost revenue, disrupted operations, vendor loss, and compliance costs." Such injuries are "actual or imminent, not

[10] *Id.* at 9.
[11] Defs.' Reply 3 n.2, ECF No. 328.
[12] Pls.' Br. Supp. Mot. Summ. J. 15, ECF No. 317; *see also* Pls.' App. Supp. Br. Supp. Mot. Summ. J. (Declaration of Cody Wilson) 3, ECF No. 166-1.

conjectural or hypothetical" *Lujan*, 504 U.S. at 560. Plaintiffs have also substantiated injury by being having to remove products from market for fear of violating the Final Rule or prevented from bringing new products to market for the same reason. *See supra* note 9; *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (explaining that "threatened enforcement of a law creates an Article III injury.").

Nor is the injury self-imposed as Defendants claim.[13] Just because Defense Distributed could submit items to the ATF to determine if the items violate the Final Rule does not negate the harm the Final Rule is causing is not negated. "Standing is not defeated merely because the plaintiff has in some sense contributed to his own injury. . . . Standing is defeated only if it is concluded that the injury is *so completely due* to the plaintiff's own fault as to break the causal chain." *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 310 (5th Cir. 2023). A "plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (*quoting Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). It is well established that a credible threat of government action, on its own, provides a plaintiff with a sufficient basis for bringing suit. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007). Accordingly, Defense Distributed has standing.

2. <u>SAF</u>

Defendants contend that SAF has failed to demonstrate associational or organizational standing.[14] When an organization seeks relief on behalf of its members, as SAF does, it must establish associational standing. *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343

[13] Defs.' Br. Supp. Mot. Summ. J. 13–14, ECF No. 319.
[14] *Id.* at 7.

(1977). The associational standing doctrine permits a traditional membership organization "to invoke the court's [injunctive or declaratory] remedial powers on behalf of its members." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). To establish associational standing, the organization must satisfy a three-prong *Hunt* test by showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2157 (2023) (quoting *Hunt*, 432 U.S. at 343).

To start, the Court has already recognized that SAF satisfies the *Hunt* test.[15] But even setting that aside, SAF establishes associational standing. Defendants argue that SAF "lacks associational standing because the only member it identifies is [Defense Distributed], but Plaintiffs fail to show that [Defense Distributed] has suffered any injury alleged to have been suffered by SAF."[16] But the Court concluded above that Defense Distributed does have standing in its own right. Thus, the first prong is met. While it is unclear if Defendants challenge prongs two and three, SAF satisfies these as well. First, SAF asserts that its "purpose is the right to keep and bear arms, including the lawful acquisition and making of arms and their components."[17] Thus, the interests it seeks to protect are germane to its purpose. Next, Plaintiffs aver that their "requested relief is prospective and legal, so it requires no member-by-member proof."[18] Defendants do not appear to contest this assertion, so neither does the Court. As such, element three is met. And because SAF has associational standing, the Court need not reach organizational standing.

[15] Order 5, Dec. 19, 2022, ECF No. 137.
[16] Defs.' Reply 2, ECF No. 328.
[17] Pls.' Reply 8, ECF No. 322.
[18] *Id.*

**B. Void for Vagueness**

Plaintiffs argue that the Final Rule is void for vagueness in violation of the Fifth Amendment's Due Process Clause because it does not provide fair notice of what is punishable and invites arbitrary enforcement.[19] As a threshold matter, the Parties agree that the Supreme Court did not address any constitutional issues in *Bondi*.[20] Thus the Court proceeds with Plaintiffs' challenge.

The Fifth Amendment's Due Process Clause prohibits deprivations of life, liberty, or property without due process of law. U.S. Const. amend. V. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Merriott v. City of Bossier City*, 179 F.4th 393, 407 (5th Cir. 2026). A law is unconstitutionally vague if it (1) "fails to give ordinary people fair notice of the conduct it punishes" or (2) is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). In other words, "[a] regulation is void for vagueness when it is so unclear that people 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).

The Final Rule defines "frame" and "receiver" to "include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). When determining if an item qualifies as "readily" convertible the Final Rule lists eight factors to consider:

> (1) Time, i.e., how long it takes to finish the process; (2) Ease, i.e., how difficult it is to do so; (3) Expertise, i.e., what knowledge and skills are required; (4) Equipment, i.e., what tools are required; (5) Parts availability, i.e., whether additional parts are required, and how easily they can be obtained; (6) Expense, i.e.,

[19] Pls.' Br. Supp. Mot. Summ. J. 17, ECF No. 317.

[20] Defs.' Reply 12, ECF No. 328; Pls.' Br. Supp. Mot. Summ. J. 16, ECF No. 317.

> how much it costs; (7) Scope, i.e., the extent to which the subject of the process must be changed to finish it; and (8) Feasibility, i.e., whether the process would damage or destroy the subject of the process, or cause it to malfunction.

27 C.F.R. § 478.11. The Final Rule emphasizes that these are a "nonexclusive list of factors." 87 Fed. Reg. at 24699. The Final Rule further provides that a "frame" or "receiver" does not include a "forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon." 27 C.F.R. § 478.12 (c). "When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit." *Id.*

Plaintiffs argue that the Final Rule's use of amorphous terms—particularly "readily" and "clearly identifiable"—violates the Due Process Clause's vagueness prohibition because "[t]he rule does not say, and no reasonable person can reliably infer, what point of evolution a piece of metal or plastic crosses the 'readily' barrier to become a 'frame or receiver'" or is "clearly identifiable" as a component subject to federal firearm regulations.[21] Plaintiffs further argue that the Final Rule's reliance on "any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials" invites arbitrary enforcement because the Final "Rule does not say, and no reasonable person can reliably infer, exactly what set of materials ATF thinks are relevant to this inquiry."[22] Defendants respond that the rule is not vague but merely "applies a 'qualitative standard' to 'real-world' facts" permits.[23] But as Plaintiffs point out, "*Johnson* did not condemn vagueness only when a court imagines an 'ordinary case' of a prior crime. It condemned

[21] Pls. Br. Supp. Mot. Summ. J. 17–18, ECF No. 317.
[22] *Id.* at 19
[23] Defs.' Br. Supp. Mot. Summ. J. 16, ECF No. 319 (quoting *Johnson*, 576 U.S. at 603).

criminal liability that turns on an abstraction no one can apply with legal certainty."[24] *Johnson* deemed the law at issue unconstitutionally vague because it "tie[d] the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." 576 U.S. at 597.

Such abstract and vague language is precisely the Final Rule's problem. It predicates the determination of what readily means on a list of "nonexclusive" factors. The "readily" factors "fail[] to establish any generally applicable test" and instead "devolv[e] into guesswork and intuition." *Id.* at 600. The "indeterminacy of [such a] wide-ranging inquiry" fails to provide fair notice of what is prohibited. *Id.* at 597. The decision of when a hunk of metal or plastic "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver" is left to the subjective determination of the ATF and does not provide fair notice to the reader about when a component becomes subject to enforcement. 27 C.F.R. § 478.12(c). A "frame" or "receiver" can sometimes include "a forging, casting, printing, extrusion, unmachined body, or similar article," depending on whether the piece has "reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon." But who's to say when that stage is. The Final Rule does not provide any concrete examples other than an "unformed block of metal, liquid polymer, or other raw material." *Id.* So, at some unknown point between an "unformed block of metal" or "liquid polymer" and a fully completed firearm "a forging, casting, printing, extrusion, unmachined body, or similar article" becomes a "frame" or "receiver." *Id.* Such "a lack of concrete examples," "produces 'more unpredictability and arbitrariness than the Due Process Clause tolerates.'" *VanDerStok v. Garland*, 86 F.4th 179, 209 (5th Cir. 2023) (Oldham,

---

[24] Pls.' Reply 9, ECF No. 322.

J., concurring), *rev'd and remanded sub nom. Bondi v. VanDerStok*, 604 U.S. 458 (2025) (quoting *Sessions v. Dimaya*, 584 U.S. 148, 162 (2018)).

Defendants attempt to dismiss the vagueness problem by arguing that "'[r]eadily' is a term and concept that Congress has used in a number of federal firearms laws, including the GCA itself" and that other courts that have rejected vagueness challenges to the term "readily."[25] It is true that the GCA defines a "firearm" as "any weapon (including a starter gun) which . . . may readily be converted to expel a projectile by the action of an explosive." But an obvious difference jumps out. The firearm definition refers to an already formed weapon as opposed to the Final Rule which explains that a frame or receiver could be as innocuous as a "partially complete or disassembled billet or blank of a frame or receiver that is sold, distributed, or possessed with a compatible jig or template is a frame or receiver." 27 C.F.R. § 478.12 (c). It is hard to see how "readily" in the context of an already formed weapon and "readily" in the context of a block of metal or plastic and a jig or template are synonymous.

But regardless, the GCA is not being contested here, only the Final Rule is. Plaintiffs "do not argue that every use of 'readily' is always vague."[26] Rather Plaintiffs only contest the Final Rule's amorphous use of readily in the context of describing inert, unfinished materials becoming the regulated frame or receiver of a weapon. Judge Oldham's persuasive analysis explained that "the Final Rule is not the GCA. ATF may either have the text of the GCA, as upheld against due process challenges by various courts, or the more expansive Final Rule, which has never encountered such a challenge. But it may not mix and match legal texts with defenses." *VanDerStok*, 86 F.4th at 209 n.8 (Oldham, J., concurring).

[25] Defs.' Br. Supp. Mot. Summ. J. 16–17, ECF No. 319.
[26] Pls.' Reply 10, ECF No. 322.

The cases Defendants cite likewise do not support their "readily" argument. First, Defendants argue that *United States v. Campbell* rejected a void-for-vagueness challenge to the closely related statutory term "any combination of parts designed and intended for use in converting a weapon into a machine gun." 427 F.2d 892, 893 (5th Cir. 1970) (internal quotations omitted). But *Campbell* and several of the cases Defendants cite address the National Firearms Act—the act that regulates machineguns, among other things—and not the GCA. But the NFA was intended by Congress to be a more onerous law and has been interpreted by courts more expansively than the GCA.[27] *See VanDerStok*, 86 F.4th 179 at 202–08 (Oldham J., concurring). Second, two of the cases Defendants cite dealt with "readily" in relation to starter guns, which are specifically referred to as firearms in the GCA. *See United States v. 16,179 Molso Italian .22 Caliber Winler Derringer Convertible Starter Guns*, 443 F.2d 463 (2d Cir. 1971); *United States v. Quiroz*, 449 F.2d 583 (9th Cir. 1971). And as the Court has already emphasized, it is the text of the Final Rule, not the text of the GCA, which falls short of the Due Process Clause. Third, the cases that Defendants cite where vagueness challenges were rejected because the regulation at issue in those cases also used factors involved completely different subject matters and completely different factors.[28] Just because some regulations are found constitutional based in part on including factors does not mean that any regulation that mildly supplies some supporting factors is likewise constitutional.

Defendants additionally argue that none of Defense Distributed's products that form the basis of this lawsuit turn "on whether these items are an 'unformed block of metal, liquid polymer, or other raw material' that has not yet reached a stage of manufacture to make it identifiable as a

[27] *See* Defs.' Br. Supp. Mot. Summ. J. 17, ECF No. 319.
[28] *Id.* at 18–19.

frame or receiver" and therefore lack standing to challenge this aspect of the Final Rule.[29] But as Plaintiffs explain, "[t]he point is not that Defense Distributed sells raw material. The point is that the Rule gives no legal threshold for when an unfinished article becomes 'clearly identifiable' enough to carry federal firearm status."[30] "The law exists to tell both the people *and* government officials what they can do." *VanDerStok*, 86 F.4th 209 (Oldham, J., concurring) (emphasis in original). And because the Final Rule fails to provide appropriate guidance, it is void for vagueness.

**C. The Second Amendment**

Plaintiffs bring an as-applied Second Amendment challenge to the Final Rule pursuant to 5 U.S.C. § 702 (b). Plaintiffs argue the Final Rule unconstitutionally infringes on an individual's right to make or repair personal firearms by restricting access to the requisite components.[31] Defendants contend that the Final Rule is constitutional as written because it does not prohibit personal gunsmithing but merely requires certain items to "licensing, recordkeeping, and background check requirements."[32] The Court concludes Plaintiffs are correct.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. When evaluating Second Amendment claims, courts must first determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. If so, the "Constitution presumptively protects that conduct . . . [and] the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* "Only if a firearm regulation is consistent with this Nation's historical tradition

[29] *Id.* at 19 (quoting 27 C.F.R. § 478.12 (c)).
[30] Pls.' Reply 13, ECF No. 322.
[31] Pls. Br. Supp. Mot. Summ. J. 34, ECF No. 34; Pls. Reply 27, ECF No. 322.
[32] Defs.' Br. Supp. Mot. Summ. J. ECF No. 319.

may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.*

When determining whether a regulation is consistent with our Nation's historical tradition, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. While a modern regulation "need not be a 'dead ringer' or a 'historical twin'" for regulations at the founding, they must be "analogous enough to pass constitutional muster." *Id.* This involves asking both "'how' the analogue restricted the keeping or bearing of arms—that is, whether it imposed a restriction similar to that imposed by the challenged law . . . [and] 'why' the analogue restricted the keeping or bearing of arms—that is, whether its rationale was similar to that of the new law." *Wolford v. Lopez*, 146 S. Ct. 2032, 2044 (2026). "If laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons" are permissible. *Rahimi*, 602 U.S. at 692. However, the law may fail to pass constitutional muster if it regulates arms-bearing "to an extent beyond what was done at the founding." *Id.*

The Parties do not appear to dispute that the conduct at issue—individuals making or repairing firearms—is covered by the Second Amendment. Thus, such activity is presumptively constitutional, and any effort to restrict this right "is presumptively unconstitutional." *Wolford*, 146 S. Ct. 2032, 2044 (2026). The burden now shifts to Defendants to justify that the Final Rule does not "infringe the historical understanding of the codified right." *Id.*

As historical analogues, Defendants point to early colonial laws from Maine and Massachusetts requiring gun barrels to be proved or marked with a stamp to certify the barrel's

strength and safety.[33] They also cite to laws from several states requiring gunpowder to be inspected, stored, and transported properly.[34] But such laws are not historically analogous to the regulation at issue here. The colonial laws were enacted for product safety to protect the user of a firearm and for general public safety, while the Final Rule was enacted primarily "[b]ecause of the difficulty with tracing illegally sold or distributed [personally made firearms] . . . also commonly referred to as 'ghost guns.'" 87 Fed. Reg. at 24652. The stated purpose of the Final Rule is to "help ensure that firearms can be traced efficiently and effectively by law enforcement through the records of licensees, and help prevent the acquisition of easy-to-complete firearms by prohibited persons and terrorists." *Id.* It is evident the Final Rule's main aim is crime control through the tracking of the purchase of firearms.

Looking at the colonial laws and the Final Rule side-by-side, it is apparent that their intended aims were completely different. Barrel-proofing laws addressed product safety, not crime control. Massachusetts and Maine required gun barrels to be tested and marked so that defective barrels stayed off the market and citizens' lives were not exposed to accidental danger. Defendants agree as much: "The law was adopted to prevent firearms from being 'introduced into use which are unsafe, and thereby the lives of the citizens be exposed.'"[35] Gunpowder laws were enacted for similar reasons—to prevent impure gunpowder from being sold in commerce[36] and to address the

---

[33] *See* Defs.' Br. Supp. Mot. Summ. J. 24–25, ECF No. 319.
[34] *Id.*
[35] *Id.* at 24 (quoting 3 LAWS OF THE COMMONWEALTH OF MASSACHUSETTS FROM NOVEMBER 28, 1780 TO FEBRUARY 28, 1807, at 259 (1807)).
[36] *See* Defs.' App. Supp. Mot. Summ. J. App. 029, ECF No. 320, 3 LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED, at 240 (1810) ("Whereas gun-powder imported from abroad, and manufactured within this state, hath frequently been found to vary much in its strength, and sometimes of inferior qualities, and its defects not discovered until brought into actual use.").

danger that gunpowder might detonate in storage or transit.[37] But even still, gunpowder is an explosive commodity, not a frame, receiver, or parts kit. Laws governing gunpowder storage and transport have little in common with regulating firearm components or transforming unfinished material into a firearm.

Trying to harmonize the "why" and "how" of these regulations reveals that they are of different constitutional categories. The "why" of the colonial laws was user safety and accident prevention: preventing defective barrels from exploding on unwitting users and preventing stored gunpowder from detonating and harming the citizenry. The "how" was correspondingly limited: inspect or mark a finished barrel, collect a fee, or restrict the storage and transport of a volatile explosive. The Final Rule's "why" is crime control through tracing and deterrence. Its "how" is federal firearms regulation imposed on unfinished components, parts kits, tools, instructions, and associated materials. Those categories are not "relevantly similar." And as such the Court "can[not] infer that the restriction imposed by the modern law is likewise consistent with [the right codified by the Second Amendment]." *Wolford*, 146 S. Ct. at 2044.

The Final Rule does not merely lack supporting analogues. It contradicts the actual historical tradition of personal gunsmithing. Self-manufacture of firearms in America was common and indeed foundational to establishing our Nation. *See* Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35, 54 (2023). Americans throughout our history have continued to build their own arms and that "right [has] remained unregulated throughout [much of] American history." *Id.* at 66.

---

[37] *See* Defs.' App. Supp. Mot. Summ. J. App. 037, ECF No. 320, LAWS OF THE STATE OF NEW HAMPSHIRE; WITH THE CONSTITUTIONS OF THE UNITED STATES AND OF THE STATE PREFIXED 275 (Isaac Long Jr., 1830) ("Whereas the keeping of large quantities of gun-powder in private house in Portsmouth aforesaid, or in merchant ships, or vessels lying at the wharves in said town, would greatly endanger the lives and properties of the inhabitants thereof in case of fire; which danger might be prevented by obliging the owners of such powder, to deposit the same in the magazine provided by said town for that purpose.").

"[C]olonists in the first permanent English settlements had the express right to import arms and the items necessary to make them." *Id.* at 45. "Because American colonists relied so heavily on arms for food, sport, and survival, the ability and skill to manufacture arms was cherished." *Id.* at 46 (citing 1 CHARLES WINTHROP SAWYER, FIREARMS IN AMERICAN HISTORY 9 (1910)). As the Revolutionary War approached and tensions simmered with Britian, "the British attempted to prevent the Americans from acquiring firearms and ammunition." *Id.* at 48. Colonial Americans, in turn, needed to build their own arms to survive. *Id.* (citing M. L. BROWN, FIREARMS IN COLONIAL AMERICA 149 (1980)).

In 1775 and 1776, early colonies "encourage[d] such persons as are skilled in the manufacturing of firearms and bayonets, [to] diligently to apply themselves thereto, for supplying such of the inhabitants as may still be deficient." *Id.* at 55 (quoting *Report of the First Provincial Congress of Massachusetts (Dec. 8, 1774)*, *in* THE JOURNALS OF EACH PROVINCIAL CONGRESS OF MASSACHUSETTS IN 1774 AND 1775, AND OF THE COMMITTEE OF SAFETY 62, 109–10 (William Lincoln ed., 1838)). Due to the circumstances of the war, "[n]early every able-bodied male between sixteen and sixty was required to provide his own arms" requiring a number to build their arms themselves. *Id.* at 62. "After winning independence, Americans ensured that their new government could not impose the same tyranny that caused their separation from Great Britain. Britain's attempts to ban arms imports and prevent domestic production were fresh wounds when the Founders ratified the Second Amendment." *Id.* at 61.

After the Revolutionary War "gunsmithing was a universal need in early America, [and] many early Americans who were professionals in other occupations engaged in gunsmithing as an additional occupation or hobby." *Id.* at 66. "Regulations on self-built arms are not longstanding. In fact, there were no restrictions on the manufacture of arms for personal use in America during

the seventeenth, eighteenth, or nineteenth centuries." *Id.* at 78. Thus, the Court cannot conclude that the Final Rule's imposition of ambiguous and far-reaching regulations, which would restrict access to component parts thereby inhibiting home gunsmithing, comports with the Second Amendment.

**D. Change of Position**

Plaintiffs contend that when promulgating the Final Rule, ATF "committed a final agency action that was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' § 706(2)(A), as well as 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right,' § 706(2)(C)" by redefining what constitutes a "frame" or "receiver" without adequate explanation.[38] Defendants assert that the Final Rule is adequately explained and that its "treatment of partially complete frames and receivers and weapon parts kits reflects a consistently applied policy."[39]

"The change-in-position doctrine asks two questions. The first is whether an agency changed existing policy." *Food & Drug Admin. v. Wages & White Lion Investments, L.L.C.*, 604 U.S. 542, 569 (2025). Such a change can occur "when an agency acts inconsistently with an earlier position, performs a reversal of its former views as to the proper course, or disavows prior inconsistent agency action as no longer good law." *Id.* (internal citations and quotations omitted). Examples of position changes include rescinding a prior regulation, expanding the scope of an agency's enforcement activity, and abandoning a decades-old practice applied in enforcement actions. *Id.* (internal citations and quotations omitted). "Once a change in agency position is identified, the doctrine poses a second question: Did the agency 'display awareness that it *is*

[38] Pls.' Br. Supp. Mot. Summ. J. 26–27, ECF No. 317.
[39] Defs.' Reply 32, ECF No. 328; Defs.' Br. Supp. Mot. Summ. J. 32, ECF No. 319.

changing a position' and offer 'good reasons for the new policy'?" *Id.* (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

Here, Defendants concede that a change occurred.[40] So too does the Final Rule: "On May 21, 2021, the Department published in the Federal Register a Notice of Proposed Rulemaking . . . proposing changes to various regulations in 27 CFR parts 447, 478, and 479." 87 Fed. Reg. at 24654. Having determined that a change was made the Court proceeds to the next step.

At step two, the Court must determine whether the agency gave "adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). An agency is "free to change [its] existing policies as long as [it] provide[s] a reasoned explanation for the change." *Id.* But the "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* "That requirement is satisfied when the agency's explanation is clear enough that its 'path may reasonably be discerned.'" Id. (*Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286 (1974)).

In this case, the Final Rule meets these requirements. It explains that

> technological advances have also made it easier for companies to sell firearm parts kits, standalone frame or receiver parts, or partially complete frames or receivers to unlicensed persons, posing significant challenges to the regulation of frames and receivers and enabling prohibited individuals to easily make firearms at home, especially if aided by personally owned equipment or 3D printers.

87 Fed. Reg. at 24655. The Final Rule also goes on to discuss crime statistics related to personally made firearms and acknowledges its changing position by grandfathering in certain items that would otherwise fall within the Final Rule's new regulations. *See* 87 Fed. Reg. at 24672 ("to ensure

[40] *See* Defs.' Br. Supp. Mot. Summary J. 33, ECF No. 319 ("Plaintiffs do not demonstrate that this change was inadequately supported. . . . Moreover, the change satisfies all three requirements for a regulatory change . . . .").

that industry members and others can rely on ATF's prior classifications, most prior ATF classifications and variants thereof, including those for externally powered weapons, have been grandfathered into the definition of 'frame or receiver'"). ATF additionally undertook a "Regulatory Impact Analysis and Final Regulatory Flexibility Analysis"[41] to determine and account for the costs that "persons or entities already engaged in the production or sales of partially complete frames and receivers" might incur.[42] While the Final Rule suffers from other flaws, the Court cannot conclude that the Final Rule's change in position violates the APA.[43]

**E. Failure to Consider**

Plaintiffs assert that Defendants violated the Administrative Procedure Act by promulgating the Final Rule with insufficient considerations. Specifically, Plaintiffs assert that Defendants acted arbitrary and capriciously by "(1) failing to consider the factors and data that *Bruen* deems constitutionally mandatory and (2) relying instead on factors and data that *Bruen* deems constitutionally improper," *e.g.*, means-end scrutiny.[44] Defendants do not dispute that the Final Rule used means-end scrutiny. Rather they argue that (1) *Bruen* was issued after the Final Rule's promulgation and (2) that any error is harmless "[b]ecause ATF correctly explained that the [Final] Rule does not infringe Second Amendment rights, the inclusion of additional analysis reaching the same result under a different test cannot be prejudicial."[45]

---

[41] *See* Defs.' App. Supp. Mot. Summ. J. App. 61–114, ECF No. 320.
[42] Defs.' Br. Supp. Mot. Summ. J. 36, ECF No. 319.
[43] Plaintiffs additionally raise a Commerce Clause argument, but it is raised in their Response/Reply for the first time. See Pls.' Reply 26–27, ECF No. 322. But as Defendants note, "[a] claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005); *see also* Defs.' Reply 35–36, ECF No 328. As such, the Court does not reach this argument.
[44] Pls.' Br. Supp. Mot. Summ. J. 21, ECF No. 317.
[45] Defs.' Br. Supp. Mot. Summ. J. 31–32, ECF No. 319.

Under the failure to consider doctrine, an agency's "failure to consider 'relevant factors' will render 'an agency's decreed result' unlawful." *R.J. Reynolds Vapor Co. v. Food & Drug Admin.*, 65 F.4th 182, 189 (5th Cir. 2023) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). But "it is well established that reviewing courts generally should, in evaluating agency action, avoid considering evidence that was not before the agency when it issued its final decision." *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 630 n.8 (5th Cir. 2001); *see also SIH Partners LLLP v. Comm'r of Internal Revenue*, 923 F.3d 296, 302 (3d Cir. 2019) ("when reviewing an agency action under the APA, 5 U.S.C. § 706(2)(A), we must confine our review to the full administrative record that was before the agency at the time it took the action under review.") (internal quotations omitted) (citation modified).

Here, the Final Rule was promulgated on April 26, 2022, relying on means-end scrutiny to establish that the Final Rule was constitutional under the Second Amendment. *See* 87 Fed. Reg. 24,676 (relying on "compelling governmental interests" and "presumptively lawful regulatory measures"). The *Bruen* decision was issued a few weeks later on June 23, 2022. There, the Supreme Court "rejected the means-end-scrutiny approach and laid out the appropriate framework for assessing whether a firearm regulation is constitutional. That framework requires the Government to prove that the "regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Rahimi*, 602 U.S. at 749 (Thomas, J., dissenting) (quoting *Bruen*, 597 U.S. at 19). Had *Bruen* been the controlling law when the Final rule was promulgated, the Court would agree with Plaintiffs that the Final Rule was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" for failing to consider *Bruen*. 5 U.S.C. § 706(2)(a). Likewise, based on the Court's determination above that the Final Rule violates the Second Amendment such a deficiency would not be harmless error because of the prejudicial

"bearing on the procedure used" and "the substance of decision reached." *United States v. Johnson*, 632 F.3d 912, 930 (5th Cir. 2011); *see also Food & Drug Admin. v. Wages & White Lion Investments, L.L.C.*, 604 U.S. 542, 591, 145 (2025) ("the FDA has not identified any prior case in which we have held that the application of an erroneous understanding of the governing law was harmless."). But because *Bruen* was not yet the controlling law when the Final Rule was issued, the Court cannot find that Defendants failed to consider caselaw that was not yet considerable.

**F. Delegation**

Plaintiffs argue that ATF committed a final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," § 706(2)(A), and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," § 706(2)(C), "because the 'major questions' doctrine shows that Congress did not in fact delegate to these Agencies the task of further defining the Gun Control Act's 'firearm' term."[46] Defendants contend that *Bondi* established that Congress did in-fact delegate this authority to ATF and that Plaintiffs are trying to "get a second bite at the apple by disguising this same claim as a major-questions-doctrine claim."[47] While Plaintiffs' delegation claim here is different than the statutory contradiction claim that *Bondi* addressed, they are tangentially related. Enough so, that the Court agrees with Defendants that *Bondi* does indirectly affirm ATF has Congressional delegation to invoke the Final Rule.

"The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government." *Gundy v. United States*, 588 U.S. 128, 132 (2019). Some delegation is permitted, but Congress must supply an "intelligible principle to guide the delegee's use of discretion." *Id.* at 135. "Where a statute delegates authority to an agency, 'the role of the

[46] Pls.' Br. Supp. Mot. Summ. J. 23, ECF No. 317.
[47] Defs.' Br. Supp. Mot. Summ. J. 28, ECF No. 319.

reviewing court under the APA is' to 'fix the boundaries of the delegated authority and ensure the agency has engaged in reasoned decisionmaking within those boundaries.'" *Tex. Med. Ass'n v. United States Dep't of Health & Human Services*, 110 F.4th 762, 774 (5th Cir. 2024) (quoting *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 395 (2024) (citation modified). The Major Questions Doctrine requires that in "cases in which the 'history and the breadth of the authority that the agency has asserted,' and the 'economic and political significance' of that assertion" a court must question whether "Congress meant to confer such authority." *W. Virginia v. Envtl. Prot. Agency*, 597 U.S. 697, 721 (2022) (internal quotations omitted).

As the Court mentioned above, 18 U.S.C. § 921(a)(3) defines the term "firearm" to mean "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon . . . ." The parties agree that Congress has not defined what constitutes a "frame" or "receiver" and thus defining these terms has historically been left to ATF.[48] In *Bondi* the Supreme Court addressed a "'facial' pre-enforcement challenge to the [ATF's] authority to regulate *any* weapon parts kits or unfinished frames or receivers." *Bondi v. VanDerStok*, 604 U.S. at 467. The Supreme Court explained that when promulgating the Final Rule "[ATF] invoked authority Congress granted it to prescribe 'rules and regulations as are necessary to carry out' the GCA." *Id.* at 464 (quoting 18 U.S.C. § 926(a)). While the Court appreciates Plaintiffs' arguments, it seems clear that the Supreme Court thinks that Congress did in-fact delegate ATF's ability to define what a firearm is.

*Bondi* further determine that the "GCA reaches, and permits ATF to regulate, at least some 'partially complete' frames or receivers." *Id.* at 477 (quoting § 478.12(c)). The Supreme Court also concluded that "[b]ecause at least some weapon parts kits satisfy both of [§ 921(a)(3)(A)],

[48] See Pls.' Br. Supp. Mot. Summ. J. 10, ECF No. 317; Defs.' Reply 34, ECF No. 328.

§ 478.11 is not facially invalid." *Id.* at 473. While the Court agrees with Plaintiffs that the "task of defining the Gun Control Act's "firearm" term is a decision of vast economic and political significance,"[49] it appears from *Bondi* that the Supreme Court has determined that Congress "meant to confer such authority." *W. Virginia*, 597 U.S. at 721.

## VI. REMEDIES

Having found in favor of Plaintiffs on both their Second Amendment claim and their void for vagueness Due Process claim, the Court must finally consider the proper remedy. Plaintiffs seek (1) "[a] declaratory judgment resolving the enforcement uncertainty that has produced ongoing injury independent of enforcement itself" and (2) "[a]n injunction against enforcement of the [Final] Rule as to Defense Distributed's M1911 80% Frames and G80 Build Kit, Unfinished Receiver, and Grip Module."[50]

### A. Declaratory Relief

Plaintiffs are entitled to declaratory relief in this case. Under the Declaratory Judgment Act, a federal court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id.* The Declaratory Judgment Act is "an enabling Act, which confers . . . discretion on the courts rather than an absolute right upon the litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (citation omitted). And "[t]he existence of another adequate remedy [such as a vacatur or injunction] does not preclude a declaratory judgment that is otherwise appropriate." FED. R. CIV. P. 57. Thus, the Court **DECLARES** that 27 C.F.R. § 478.11 and 27 C.F.R. § 478.12(c) are unconstitutional under the Second Amendment and void for vagueness

[49] Pls. Br. Supp. Mot. Summ. J. 23, ECF No. 317.
[50] *Id.* at 36.

under the Due Process Clause of the Fifth Amendment and cannot be enforced against Defense Distributed, SAF, or any of SAF's current or future members.

**A. Permanent Injunctive Relief**

Plaintiffs are entitled to permanent injunctive relief. A permanent injunction is proper when a plaintiff (1) prevails on the merits, (2) there is no adequate remedy at law for the plaintiff's otherwise irreparable injury, (3) the balance of the harms favors the plaintiff, and (4) an injunction would serve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Plaintiffs satisfy each of these elements.

As explained earlier in this Order, Plaintiffs satisfy the first requirement because they succeed on the merits of their Second Amendment claims. Regarding the remaining injunction factors, Plaintiffs are suffering and will continue to suffer irreparable harm due to credible threats of enforcement, compliance costs, and the chilling of constitutional rights.[51] Likewise, the balance of the equities and the public interest factors are in Plaintiffs' favor. The Government has not identified any concrete injuries to counterbalance the real harms facing Plaintiffs. And there is no public interest in unlawful government action. *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021). Accordingly, having considered the arguments, evidence, and relevant law, the Court holds that the relevant factors weigh in favor of entering a permanent injunction.

Because Plaintiffs carry their burden as to each of the permanent injunction factors, the Court next addresses the scope of the injunction. When ordering equitable relief, the Court is obligated to state "specifically" and "in reasonable detail . . . the act or acts restrained or required" under the injunction. FED. R. CIV. P. 65(d)(1)(b)–(c). The scope of injunctive relief is "dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). An

[51] *See* Pls.' Br. Supp. Mot. Summ. J. 2–4, ECF No. 23.

injunction "should be crafted to provide 'complete relief to the plaintiffs.'" *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (quoting *Yamasaki*, 442 U.S. at 702). At the same time, the injunction "should be no more burdensome to the defendant than necessary to 'provide complete relief to the plaintiffs.'" *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). And it must be tailored to "redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018).

Therefore, the Court determines that an injunction focused on enforcement and implementation remains necessary to wholly redress Plaintiffs' injuries. Here, declaratory relief is not enough without the additional protection that flows from the clarity of permanent injunctive relief, specified below. Thus, the Court **ENJOINS** Defendants from enforcing 27 C.F.R. § 478.11 and 27 C.F.R. § 478.12(c) against Defense Distributed, SAF, or any of SAF's current or future members with respect to Defense Distributed's M1911 80% Frames and G80 Build Kit, Unfinished Receiver, and Grip Module.

## VII. CONCLUSION

Having found that the Final Rule is unconstitutional under the Second Amendment and void for vagueness under the Due Process Clause of the Fifth Amendment the Court **GRANTS** Plaintiffs' Motion for Summary Judgment (ECF No. 316) as to Counts Five and Six. And because the Court concludes that Plaintiffs have not prevailed on their APA claims, the Court **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 318) as to Plaintiffs' Counts Two, Three, and Four.

**SO ORDERED** on this **17th day** of **August, 2026**.

Reed O'Connor
CHIEF UNITED STATES DISTRICT JUDGE